# Exhibit 7

```
 1            UNITED STATES DISTRICT COURT
 2           NORTHERN DISTRICT OF CALIFORNIA
 3                   OAKLAND DIVISION
 4  DIGITAL REG OF TEXAS, LLC,    )
                                  )No. 12-CV-01971 CW (KAW)
 5           Plaintiff,           )
                                  )
 6       v.                       )
                                  )
 7  ADOBE SYSTEMS INCORPORATED,   )
    et al.,                       )
 8                                )
                                  )
 9           Defendants.          )
    _____)
10
11
12
13
14
15      VIDEOTAPED DEPOSITION OF EUGENE B. PHILLIPS, II
16                   Raleigh, North Carolina
                   Thursday, April 18th, 2013
17
18
19
20
21  Reported By:
22  Regina Toppins
23  Court Reporter
24  File No. 13-15701
25
                                                   Page 1
```

```
 1                      APPEARANCES
 2  ON BEHALF OF THE PLAINTIFF:
 3      ADAM G. PRICE, Esquire
        DINOVO, PRICE, ELLWANGER & HARDY, LLP
 4      7000 North MoPac Expressway, Suite 350
        Austin, Texas 78731
 5      (512) 539-2632 / aprice@dpelaw.com
 6  ON BEHALF OF THE DEFENDANT:
 7      EDWARD R. REINES, Esquire
        WEIL, GOTSHAL & MANGES, LLP
 8      201 Redwood Shores Parkway
        Redwood Shores, California 94065
 9      (650) 802-3000 / edward.reines@weil.com
10
11  ON BEHALF OF DEFENDANT VALVE CORPORATION:
12      REY BARCELO, Esquire (Via Telephone)
        BARCELO, HARRISON & WALKER, LLP
13      2901 West Coast Highway, Suite 200
        Newport Beach, California 92663
14      (949) 340-9736 / rey@bhiplaw.com
15  ON BEHALF OF DEFENDANT UBISOFT, INC.:
16      MARK C. LANG, Esquire (Via Telephone)
        ERISE IP, P.A.
17      6201 College Boulevard, Suite 300
        Overland Park, Kansas 66211
18      (913) 777-5600 / mark.lang@eriseIP.com
19
20       VIDEOTAPED DEPOSITION OF EUGENE B. PHILLIPS, II,
21  a witness called on behalf of Defendants, before Regina
22  Toppins, Notary Public, in and for the State of North
23  Carolina, at the offices of CaseWorks, Inc., 8601 Six
24  Forks Road, Raleigh, North Carolina 27615, on Thursday,
25  the 18th day of August, 2013, commencing at 9:00 a.m.
                                                   Page 2
```

```
 1                  INDEX OF EXAMINATIONS
 2                                                    PAGE
 3  BY MR. REINES . . . . . . . . . . . . . . . . . .  .5
 4  BY MR. BARCELO. . . . . . . . . . . . . . . . . . .186
 5
 6                    INDEX OF EXHIBITS
 7
 8  NUMBER     DESCRIPTION                           MARKED
 9  Exhibit  1  Provisional Application for Patent     49
    Exhibit  2  741 Patent                             53
10  Exhibit  3  File History for 741 Patent            56
    Exhibit  4  670 Patent                             63
11  Exhibit  5  541 Patent                             68
    Exhibit  6  DigitalContainers document             70
12  Exhibit  7  DigitalContainers document             91
    Exhibit  8  DigitalContainers document            118
13  Exhibit  9  DRM Technologies document             126
    Exhibit 10  DRM Envelope Design Notes             130
14  Exhibit 11  "The Rights Movement" article         140
    Exhibit 12  DigitalContainers documents           142
15  Exhibit 13  Purpose of the Business Plan          160
    Exhibit 14  Vendto document                       179
16
17
18
19
20
21
22
23
24
09:02  25
                                                   Page 3
```

```
09:03   1        VIDEOGRAPHER:  Good morning.  We're going on
09:03   2  the record.  The time on the video monitor is 9:01
09:03   3  a.m.  Today's date is April the 18th, 2013.  We are
09:03   4  located at the CaseWorks office, 8601 Six Forks Road
09:03   5  in Raleigh, North Carolina.
09:03   6        This marks the beginning of media Number 1
09:03   7  of the deposition of Eugene B. Phillips, II, in the
09:03   8  matter of Digital Reg of Texas, LLC, versus Adobe
09:03   9  Systems Incorporated, et al, in the US District Court,
09:03  10  Northern District of California, Oakland Division,
09:03  11  Case Number 12-CV-01971 CW (KAW).
09:03  12        My name is Brad Cartner.  I am a legal video
09:03  13  specialist here on behalf of Chase Litigation
09:03  14  Services.  The court reporter is Regina Toppins, also
09:03  15  on behalf of Chase Litigation Services.
09:03  16        Counsel, would you please identify
09:03  17  yourselves and state whom you represent.
09:03  18        MR. REINES:  Edward Reines from Weil,
09:03  19  Gotshal for EA, and Adobe.
09:04  20        MR. PRICE:  Adam Price from Dinovo Price for
09:04  21  Digital Reg, and Mr. Phillips individually.
09:04  22        MR. BARCELO:  This is Rey Barcelo on the
09:04  23  phone from Barcelo, Harrison & Walker for Defendant
09:04  24  Valve Corporation.
09:04  25        MR. LANG:  This is Mark Lang on the phone
                                                   Page 4
```

| | | |
|---|---|---|
| 09:04 | 1 | for Erise IP, representing Defendant Ubisoft, Inc. |
| 09:04 | 2 | P R O C E E D I N G S |
| 09:04 | 3 | EUGENE B. PHILLIPS, |
| 09:04 | 4 | having been duly sworn, testifies as follows: |
| 09:04 | 5 | EXAMINATION |
| 09:04 | 6 | VIDEOGRAPHER:  Please begin. |
| 09:04 | 7 | BY MR. REINES: |
| 09:04 | 8 | Q.  Please state your name and address for the |
| 09:04 | 9 | record. |
| 09:04 | 10 | A.  Eugene B. Phillips, II.  5745 Poolside Drive in |
| 09:04 | 11 | Raleigh, North Carolina 27612. |
| 09:04 | 12 | Q.  Are you employed? |
| 09:04 | 13 | A.  I'm a private contractor. |
| 09:04 | 14 | Q.  Who do you work for? |
| 09:04 | 15 | A.  I work for a number of companies, including |
| 09:05 | 16 | myself. |
| 09:05 | 17 | Q.  Okay.  Do you have an LLC or anything like that? |
| 09:05 | 18 | A.  No. |
| 09:05 | 19 | Q.  Do you have any association with Vendto? |
| 09:05 | 20 | A.  I am working in the Vendto project, yes. |
| 09:05 | 21 | Q.  So, you do that on a contract basis; is that |
| 09:05 | 22 | right? |
| 09:05 | 23 | A.  Um-hmm. |
| 09:05 | 24 | Q.  If that's a yes, you need to say. |
| 09:05 | 25 | A.  Yes.  Excuse me, yes. |

Page 5

| | | |
|---|---|---|
| 09:05 | 1 | Q.  Have you ever had your deposition taken before? |
| 09:05 | 2 | A.  Never. |
| 09:05 | 3 | Q.  Did you meet with counsel for Dig Reg in |
| 09:05 | 4 | preparing for today? |
| 09:05 | 5 | A.  Yes, briefly. |
| 09:05 | 6 | Q.  When did you meet? |
| 09:05 | 7 | A.  Yesterday. |
| 09:05 | 8 | Q.  How long was the meeting? |
| 09:05 | 9 | A.  An hour. |
| 09:05 | 10 | Q.  Did you -- when before that have you met with the |
| 09:05 | 11 | lawyers from Dig Reg in person? |
| 09:05 | 12 | A.  No. |
| 09:05 | 13 | Q.  How about by phone? |
| 09:05 | 14 | A.  I have met with the lawyers, yes, over the course |
| 09:05 | 15 | of this entire suit.  I've listened in on a few calls, |
| 09:05 | 16 | yeah. |
| 09:06 | 17 | Q.  And what was the purpose for your participation |
| 09:06 | 18 | in those calls? |
| 09:06 | 19 | A.  Just to be aware of the general circumstances. |
| 09:06 | 20 | Q.  Were you paid for your time? |
| 09:06 | 21 | A.  No. |
| 09:06 | 22 | Q.  Are you being paid for your time now? |
| 09:06 | 23 | A.  No. |
| 09:06 | 24 | Q.  Do you have continued interest of any kind |
| 09:06 | 25 | economically in any of the vendors, Farley Enterprises |

Page 6

| | | |
|---|---|---|
| 09:06 | 1 | of which you've worked over the years? |
| 09:06 | 2 | A.  I, you know, I own a little of the stock of DRM |
| 09:06 | 3 | Technologies, LLC, as far as I know anyway. |
| 09:06 | 4 | Q.  Right.  And you understand that DRM Technologies |
| 09:06 | 5 | has an interest in this lawsuit? |
| 09:06 | 6 | A.  Yes. |
| 09:06 | 7 | Q.  Okay.  Based on the fact that you've been |
| 09:07 | 8 | prepared by counsel for Dig Reg for your deposition |
| 09:07 | 9 | today, I'm going to assume you have a general |
| 09:07 | 10 | understanding of the process, but let me go over some -- |
| 09:07 | 11 | A.  Okay. |
| 09:07 | 12 | Q.  -- specifics.  During the course of the |
| 09:07 | 13 | deposition I'm going to ask some questions, and then |
| 09:07 | 14 | you're responsible for giving answers.  During the |
| 09:07 | 15 | course of the deposition there may be objections, but |
| 09:07 | 16 | those don't affect your obligation to respond fully and |
| 09:07 | 17 | accurately unless something is stated to the contrary. |
| 09:07 | 18 | A.  Okay. |
| 09:07 | 19 | Q.  Do you understand that? |
| 09:07 | 20 | A.  Yes, I do. |
| 09:07 | 21 | Q.  If during the course of the deposition you'd like |
| 09:07 | 22 | to take a walk to stretch your legs, to use the |
| 09:07 | 23 | lavatory, let me know, and then at an appropriate time |
| 09:07 | 24 | we'll take a break to do so.  Do you understand that? |
| 09:07 | 25 | A.  Yes, I do. |

Page 7

| | | |
|---|---|---|
| 09:07 | 1 | Q.  If during the course of the deposition you don't |
| 09:07 | 2 | understand any question I'm asking, or any aspect of a |
| 09:07 | 3 | question, let me know and as appropriate I'll address |
| 09:07 | 4 | your concern.  If you don't say anything, I'll assume |
| 09:07 | 5 | that you fully understand my question; is that fair? |
| 09:07 | 6 | A.  Yes. |
| 09:08 | 7 | Q.  The court reporter is taking down what's being |
| 09:08 | 8 | said, as you can tell.  In order for that process to |
| 09:08 | 9 | work, it's important for you to wait for me to complete |
| 09:08 | 10 | my question before you give your answer.  That can be a |
| 09:08 | 11 | very difficult thing to do. |
| 09:08 | 12 | A.  Okay. |
| 09:08 | 13 | Q.  It's not a normal everyday conversational thing. |
| 09:08 | 14 | I can see that you're, like most people, gonna take a |
| 09:08 | 15 | few reminders to just hold off on speaking, okay? |
| 09:08 | 16 | A.  Sure. |
| 09:08 | 17 | Q.  You understand that? |
| 09:08 | 18 | A.  Okay. |
| 09:08 | 19 | Q.  And also because the court reporter is taking |
| 09:08 | 20 | down what's being said, it's important that you give |
| 09:08 | 21 | answers in the form of words rather than nods and |
| 09:08 | 22 | gesticulations. |
| 09:08 | 23 | A.  Right. |
| 09:08 | 24 | Q.  Again, I'll keep you clear on that, but to the |
| 09:08 | 25 | extent that you do it, then I don't have to give |

Page 8

| | | |
|---|---|---|
| 09:08 | 1 | reminders. |
| 09:08 | 2 | A. Okay. |
| 09:08 | 3 | Q. Let's go through your educational history. You |
| 09:08 | 4 | went to North Carolina State; is that correct? |
| 09:09 | 5 | A. Correct. |
| 09:09 | 6 | Q. And you got an Electrical Engineering degree? |
| 09:09 | 7 | A. Correct. |
| 09:09 | 8 | Q. What year was that? |
| 09:09 | 9 | A. I got my degree from State in '83, way back. |
| 09:09 | 10 | Q. After that did you take courses of at UNC? |
| 09:09 | 11 | A. No, actually graduated from UNC first. I |
| 09:09 | 12 | graduated in '78 from UNC Chapel Hill. |
| 09:09 | 13 | Q. What was the degree? |
| 09:09 | 14 | A. Radio, Television and Motion Pictures. |
| 09:09 | 15 | Q. Was that a Bachelor's? |
| 09:09 | 16 | A. Yes, B. A. |
| 09:09 | 17 | Q. And then what was the degree that you got at N.C. |
| 09:09 | 18 | State? |
| 09:09 | 19 | A. A B.S. CE. |
| 09:09 | 20 | Q. How come you went back? So, you got a Bachelor's |
| 09:09 | 21 | and then you went back to get another Bachelor's? |
| 09:09 | 22 | A. Yeah, I went to State first for a couple of |
| 09:09 | 23 | years, got interested in television, transferred to UNC, |
| 09:09 | 24 | got my degree. Then, in the process of getting my SEC |
| 09:09 | 25 | ticket, I got interested in Engineering and went back to |

Page 9

| | | |
|---|---|---|
| 09:10 | 1 | school got my Engineering degree. |
| 09:10 | 2 | Q. When did you meet Mr. Venters? |
| 09:10 | 3 | A. I met Mr. Venters in 1973. |
| 09:10 | 4 | Q. What was the circumstances? |
| 09:10 | 5 | A. We both played on our high school football team. |
| 09:10 | 6 | Q. When did you first work with him professionally? |
| 09:10 | 7 | A. I worked with Chip in a small company called |
| 09:10 | 8 | Total Fax, a fax broadcasting company, I believe, in '96 |
| 09:10 | 9 | through '98, I think. Or, excuse me, probably '95 or |
| 09:10 | 10 | '96 through '97, I think is correct. |
| 09:10 | 11 | Q. How did it come about that you started working |
| 09:10 | 12 | with him? |
| 09:11 | 13 | A. Well, we were friends, and I had a large -- I had |
| 09:11 | 14 | a large format flat screen screen printing company of my |
| 09:11 | 15 | own, and I sold that and was looking for something to |
| 09:11 | 16 | do, and Chip had -- was starting his fax broadcasting |
| 09:11 | 17 | company and I went to work with him. |
| 09:11 | 18 | Q. What role did you have in Total Fax? |
| 09:11 | 19 | A. I was Operations Manager, you know. I, I ran the |
| 09:11 | 20 | day-to-day operations. |
| 09:11 | 21 | Q. Were you involved in terms of technically |
| 09:11 | 22 | developing the product? |
| 09:11 | 23 | A. I was a bit. We -- I worked -- we did have some |
| 09:11 | 24 | software work done for us in developing our fax |
| 09:11 | 25 | broadcasting package, and I was involved in that |

Page 10

| | | |
|---|---|---|
| 09:11 | 1 | somewhat, yes. |
| 09:11 | 2 | Q. And what did you do from your graduation from |
| 09:11 | 3 | North Carolina State in 1983 until 1995? |
| 09:12 | 4 | A. I went to work for Northern Telecom. That's what |
| 09:12 | 5 | it was called back then in the DMS 10 Installation |
| 09:12 | 6 | Engineering Department. And then at that for five |
| 09:12 | 7 | years. Then I went into business for myself, which is |
| 09:12 | 8 | always interesting, and I had that for five years. And |
| 09:12 | 9 | then I went to work with Chip. |
| 09:12 | 10 | Q. What was the nature of the business that you were |
| 09:12 | 11 | in for yourself? |
| 09:12 | 12 | A. It was a large format flat sheet screen printing |
| 09:12 | 13 | company, posters, signs. |
| 09:12 | 14 | Q. Nothing not using your EE degree? |
| 09:12 | 15 | A. No. |
| 09:12 | 16 | Q. Did you use your EE degree at Total Fax? |
| 09:12 | 17 | A. Did I use my EE? Certainly as a technology |
| 09:12 | 18 | company, and electro engineering is a technology field; |
| 09:13 | 19 | and so, I would say yes. |
| 09:13 | 20 | Q. Now, in terms of your association with Vendto, do |
| 09:13 | 21 | you have a contract with them? |
| 09:13 | 22 | A. No. |
| 09:13 | 23 | Q. So, is it just they ask -- what rate do you |
| 09:13 | 24 | charge them? |
| 09:13 | 25 | A. Well, it's not set. I'm actually just, you know, |

Page 11

| | | |
|---|---|---|
| 09:13 | 1 | working with them because I'm interested in the project. |
| 09:13 | 2 | And I hopefully it's, you know, some equity elbow |
| 09:13 | 3 | grease. |
| 09:13 | 4 | Q. How do you get compensated? |
| 09:13 | 5 | A. Well, we're looking for, you know, it's a |
| 09:13 | 6 | start-up. You're not compensated sometimes. |
| 09:13 | 7 | Q. Okay. So, for whatever work you've done at |
| 09:13 | 8 | Vendto, you haven't received any money? |
| 09:13 | 9 | A. No. |
| 09:13 | 10 | Q. Have you received stock? |
| 09:13 | 11 | A. Not in Vendto, no. You know, I -- Vendto is a -- |
| 09:13 | 12 | is related to DRM Technologies, LLC. And, you know, I |
| 09:14 | 13 | assume by default I will own a little bit of Vendto. |
| 09:14 | 14 | Q. How much time have you spent working on Vendto? |
| 09:14 | 15 | A. I've been working on the project now for, on and |
| 09:14 | 16 | off for since about June of this year -- excuse me, of |
| 09:14 | 17 | '12. Again, I have other projects I work on. |
| 09:14 | 18 | Q. How many hours I guess is more my question? |
| 09:14 | 19 | A. I would say that it's, you know, it's a |
| 09:14 | 20 | part-time. I couldn't estimate the hours, you know. |
| 09:14 | 21 | It's a part of my week. It's for a few hours, couple of |
| 09:14 | 22 | hours a day maybe. I would say probably 10 to 15 hours |
| 09:14 | 23 | a week, something like that. |
| 09:14 | 24 | Q. So, in the last week you've worked on the Vendto |
| 09:14 | 25 | project? |

Page 12

| 12:07 | 1 | A. It's a basic overview of the DCI system. |
| 12:07 | 2 | Q. Of, of the what's that? |
| 12:07 | 3 | A. DCI system. Just like it says. It's a |
| 12:07 | 4 | 10,000-foot shot. |
| 12:08 | 5 | Q. And does this encompass the securing technology? |
| 12:08 | 6 | A. I would have to say no. |
| 12:08 | 7 | Q. Turn to Page 018. |
| 12:08 | 8 | A. Yes, sir. |
| 12:08 | 9 | Q. What were you attempting to show here? |
| 12:08 | 10 | A. I believe I was trying to show our concept behind |
| 12:09 | 11 | the Air configuration of our, you know, potential Air |
| 12:09 | 12 | product cross platform product. |
| 12:09 | 13 | Q. I don't see any reference to Adobe in here; is |
| 12:09 | 14 | there some reason for that? |
| 12:09 | 15 | A. Well, for me, the DC java applet would have been, |
| 12:09 | 16 | would have been required to run the Air system for us. |
| 12:09 | 17 | That's why I say that. |
| 12:09 | 18 | Q. Which item? |
| 12:09 | 19 | A. The java applet. |
| 12:09 | 20 | Q. And you're saying this is a reference to an Adobe |
| 12:09 | 21 | platform? |
| 12:09 | 22 | A. I believe that when we said Next Generation |
| 12:09 | 23 | System, we were intending this to describe our Air |
| 12:09 | 24 | version of The Envelope, The Container. |
| 12:10 | 25 | Q. In your -- when you were working on the Adobe |

Page 97

| 12:10 | 1 | project, did you familiarize yourself with the Adobe |
| 12:10 | 2 | technology in the DRM space? |
| 12:10 | 3 | A. Only superficially, you know, so I could |
| 12:10 | 4 | understand Seth and talking about, you know, the |
| 12:10 | 5 | integrated run time, the W integrated run time. And |
| 12:10 | 6 | what would be required product-wise to get that to work, |
| 12:10 | 7 | for example, the java applet distribution server. |
| 12:10 | 8 | Q. Did anyone within DigitalContainer suggest that |
| 12:10 | 9 | Adobe was infringing any of the DigitalContainers family |
| 12:10 | 10 | of patents? |
| 12:10 | 11 | MR. PRICE: Objection. Let me caution the |
| 12:10 | 12 | witness not to reveal any privileged information. |
| 12:10 | 13 | A. I don't recall. |
| 12:10 | 14 | Q. Did you ever have a suspicion that Adobe was |
| 12:11 | 15 | infringing on any of the DigitalContainers patents? |
| 12:11 | 16 | MR. PRICE: Same caution. |
| 12:11 | 17 | A. You know, we thought that our portfolio described |
| 12:11 | 18 | a very basic system that pretty much any company was |
| 12:11 | 19 | going to violate if they decided to do these kinds of |
| 12:11 | 20 | operations really. You know, we were there early and we |
| 12:11 | 21 | felt there would be a lot of infringers, you know. |
| 12:11 | 22 | So, that was not my end of the company, but |
| 12:11 | 23 | that's, you know, this is a really basic process. You |
| 12:11 | 24 | got to kind of do some of it if you want to send people |
| 12:11 | 25 | stuff and have it be secure. So, I think in my mind, |

Page 98

| 12:12 | 1 | you know, when I, you know, there would be many |
| 12:12 | 2 | infringers. Is that not a terrible answer? |
| 12:12 | 3 | Q. No, it's -- |
| 12:12 | 4 | A. Really being honest. |
| 12:12 | 5 | Q. Trying to process the responsiveness. But with |
| 12:12 | 6 | respect to Adobe, you don't recall ever reaching any |
| 12:12 | 7 | conclusion that Adobe was infringing, and you don't |
| 12:12 | 8 | recall anyone ever saying that? |
| 12:12 | 9 | A. I don't recall anyone saying. I don't recall. I |
| 12:12 | 10 | don't remember. Personally, you know, like most of the |
| 12:12 | 11 | applications I use, some of which were Adobe, from my |
| 12:12 | 12 | understanding personally I thought they all probably |
| 12:12 | 13 | were -- had some infringement. |
| 12:12 | 14 | Q. When you say they all? |
| 12:12 | 15 | A. I mean, any application that, you know, takes |
| 12:12 | 16 | information and makes it so you can't put it on another |
| 12:12 | 17 | machine and make it work, that's us. |
| 12:13 | 18 | Q. Okay. And you're saying you had this belief. |
| 12:13 | 19 | Okay, I think I understand what you're saying, but you |
| 12:13 | 20 | had this belief when? |
| 12:13 | 21 | A. For me. |
| 12:13 | 22 | Q. 2003? |
| 12:13 | 23 | A. For me when I understood, you know, when I |
| 12:13 | 24 | finally kind of. |
| 12:13 | 25 | VIDEOGRAPHER: Microphone. |

Page 99

| 12:13 | 1 | A. For me, I think starting early on when I was |
| 12:13 | 2 | working at Deskgate, and finally kind of understood the |
| 12:13 | 3 | scope of those patents that were developed there. I |
| 12:13 | 4 | felt personally all along from early on that there were |
| 12:13 | 5 | most companies would be infringers. |
| 12:14 | 6 | Q. And by the time that you submitted your own |
| 12:14 | 7 | patent application in 2003, you had that belief? |
| 12:14 | 8 | MR. PRICE: Objection form. |
| 12:14 | 9 | A. Yes. I guess since my beliefs started before |
| 12:14 | 10 | that, I would say, yes. |
| 12:14 | 11 | Q. If you'd turn to Page 20, do you have that in |
| 12:14 | 12 | front of you? |
| 12:14 | 13 | A. Yes, sir. |
| 12:14 | 14 | Q. And that's the title Next Generation System |
| 12:14 | 15 | Encryption? Actually, let me go back one to 19. |
| 12:14 | 16 | A. Yes, sir. |
| 12:14 | 17 | Q. Let me go back even one more to 18 to where we |
| 12:14 | 18 | were. You have that reference to in the second set of |
| 12:14 | 19 | the second list, it refers to Microsoft Active |
| 12:14 | 20 | Directory; do you see that? |
| 12:14 | 21 | A. Um-hmm. |
| 12:14 | 22 | Q. You need to answer with a word. |
| 12:15 | 23 | A. Yes. |
| 12:15 | 24 | Q. What is that referring to? |
| 12:15 | 25 | A. Well, you know, that entire list is server |

Page 100

**Page 101**

```
12:15  1  security products.
12:15  2    Q.  Can you describe what?
12:15  3    A.  I don't know even know what a Microsoft Active
12:15  4  Directory is frankly.
12:15  5    Q.  Did you know at the time that you created this
12:15  6  chart?
12:15  7    A.  No.
12:15  8    Q.  You just included it?
12:15  9    A.  Well, I did the chart part.  Okay, that's my -- I
12:15 10  do the drawings like that.  This stuff I don't know
12:15 11  about.
12:16 12    Q.  Turning to the next page, can you describe what
12:16 13  this shows?
12:16 14    A.  Oh, 019?
12:16 15    Q.  Yes.
12:16 16    A.  Boy, that's a good question.  This was a -- this
12:16 17  was a drawing describing some of our plans.  And I know
12:16 18  that we, you know, the open mobile alliance with the old
12:16 19  make was big then.  And kind of think we wanted to
12:17 20  demonstrate that we could operate in that system, that's
12:17 21  all.
12:17 22    Q.  On the left side you see where it says -- never
12:17 23  mind that.
12:17 24        On 20, Page 20 entitled Next Generation System
12:17 25  Encryption, what are you showing here?
```

**Page 102**

```
12:17  1    A.  Now, that is my drawing.  That came out of work
12:17  2  on the secure patent.  So, this was our -- this starts
12:17  3  getting into, you know, these drawings were from a
12:17  4  number of different things.  As you can see, it's very
12:17  5  similar to the drawing in securing.
12:18  6    Q.  This schematic shows a system that is covered by
12:18  7  your 741 Patent, correct?
12:18  8    A.  I'm not sure that's true.  I would say that this
12:18  9  was an early evolution of the concept.  Well, it says
12:18 10  securing Covered By Securing Digital Content, so it
12:18 11  seems to me this developed a little more after that, but
12:18 12  it says right there black and white.
12:18 13    Q.  That's what it says, right?
12:18 14    A.  Yeah.
12:18 15    Q.  At least at the time that you prepared this chart
12:18 16  you believe that the design on Page 13020 was covered by
12:18 17  the 741 Patent?
12:18 18    A.  Yes.
12:19 19    Q.  Page 21, what does this show?
12:19 20    A.  Just pretty much the same thing.
12:19 21    Q.  What's the difference between the two?
12:19 22    A.  That's a good question.  It looks like they're
12:19 23  exactly the same thing to me.
12:19 24    Q.  If you turn to Page 13022, this is something you
12:19 25  prepared too on your securing digital content concept?
```

**Page 103**

```
12:19  1    A.  Yes.
12:19  2    Q.  And this describes how your invention works; is
12:19  3  that correct?
12:19  4    A.  I think this was taken from some description,
12:20  5  yes.
12:20  6    Q.  Okay.  And what was the purpose of including this
12:20  7  in this document?
12:20  8    A.  I don't know.  I didn't create this document.
12:20  9    Q.  And the next page, which is 23, that's also a
12:20 10  description of your invention; is that correct?
12:20 11    A.  Well, it's the same list.
12:20 12    Q.  Oh, it's a continued?  I see.
12:20 13    A.  Yeah, it's a continuation.
12:20 14    Q.  So, the answer's yes, then?
12:20 15    A.  Yes, sir.
12:20 16    Q.  Page 24?
12:20 17    A.  Yes, sir.
12:21 18    Q.  And is it your belief that the document was
12:21 19  prepared around 2005?
12:21 20    A.  I have no idea honestly.  I do not know.
12:21 21    Q.  We can tell that it's after 2004, right after
12:22 22  August 2004 based on Page 93?
12:22 23    A.  12093?
12:22 24    Q.  Yeah.
12:22 25    A.  It would certainly infer that, wouldn't it?
```

**Page 104**

```
12:22  1    Q.  If you turn to Page 07 through 09, if you would?
12:22  2    A.  Yes, sir.
12:22  3    Q.  Did you create this list?
12:23  4    A.  Yes.
12:23  5    Q.  And the regulating access to digital content,
12:23  6  that's a description to the 541 Patent?
12:23  7    A.  Yes.
12:23  8    Q.  And controlling access to electronic content
12:23  9  that's --
12:23 10    A.  No longer is in the world.  Controlling never off
12:23 11  the ground, so.
12:23 12    Q.  And the tracking electronic content, that's the
12:23 13  purple?
12:23 14    A.  Yes, sir.
12:23 15    Q.  And that's the 670 Patent?
12:23 16    A.  Yes, sir.
12:24 17    Q.  And turning to Page 25, if you would?
12:24 18    A.  Yes, sir, 25.
12:24 19    Q.  It shows this list of possible infringers.  Have
12:24 20  you seen -- did you create this list?
12:24 21    A.  I did not.
12:24 22    Q.  Okay.  Have you seen this list before?
12:24 23    A.  Probably, I don't know.  Probably.  I don't know.
12:24 24  I've seen many lists.
12:24 25    Q.  Do you know if any action was taken to address
```

| | | |
|---|---|---|
| 03:25 | 1 | A. Well, we were attempting to perform a similar |
| 03:25 | 2 | level security function without a commercial PKI system |
| 03:26 | 3 | entirely in our own structure with just very minimal |
| 03:26 | 4 | data transfer between the client and our server and our |
| 03:26 | 5 | proprietary back end. |
| 03:26 | 6 | Q. And do you know whether anyone else had |
| 03:26 | 7 | accomplished that at that time? |
| 03:26 | 8 | A. No, I don't. |
| 03:26 | 9 | Q. Do you know whether that was new? |
| 03:26 | 10 | A. I was under the impression it was new. |
| 03:26 | 11 | Q. Before you submitted your patent had you done any |
| 03:26 | 12 | review of the literature of the different types of |
| 03:26 | 13 | systems out there? |
| 03:26 | 14 | A. No. That was as far as I'm concerned the |
| 03:26 | 15 | technical side of -- that was really, you know, our |
| 03:26 | 16 | engineers purvey. And my side was trying to work out |
| 03:26 | 17 | the progression (SIC) logic. |
| 03:27 | 18 | Q. If you turn to Page 24? |
| 03:27 | 19 | A. Okay. |
| 03:27 | 20 | Q. And you see where it says at the last paragraph: |
| 03:27 | 21 | Importantly, DCS, that's the DigitalContainer Solution, |
| 03:27 | 22 | possesses a significant competitive advantage in the |
| 03:27 | 23 | marketplace against companies such as Adobe? |
| 03:27 | 24 | A. I do see that paragraph. |
| 03:27 | 25 | Q. And did you agree with that at the time? |

Page 153

| | | |
|---|---|---|
| 03:27 | 1 | A. Yes. |
| 03:27 | 2 | Q. And it says: All of these competitors use a |
| 03:27 | 3 | public key system to protect the digital content as |
| 03:27 | 4 | discussed earlier. |
| 03:28 | 5 | Do you see that? |
| 03:28 | 6 | A. Yes, sir. |
| 03:28 | 7 | Q. And that's referring to Adobe? |
| 03:28 | 8 | A. Yes, sir. |
| 03:28 | 9 | Q. And it's stating that the system used by Adobe is |
| 03:28 | 10 | different from the patented DigitalContainer system; |
| 03:28 | 11 | isn't that what that's saying in this paragraph? |
| 03:28 | 12 | A. As far as using a public key system in that |
| 03:28 | 13 | detail, yes. |
| 03:28 | 14 | Q. When you say that detail? |
| 03:28 | 15 | A. Well. |
| 03:28 | 16 | Q. This is -- let me just finish. |
| 03:28 | 17 | A. Excuse me. |
| 03:28 | 18 | Q. Let me just ask a question. DigitalContainers is |
| 03:28 | 19 | saying that its patented system has a significant |
| 03:28 | 20 | competitive advantage against the companies such as |
| 03:28 | 21 | Adobe, correct? |
| 03:28 | 22 | MR. PRICE: Objection to form. |
| 03:28 | 23 | A. That's what it says. |
| 03:28 | 24 | Q. And the reason is because the patented technology |
| 03:28 | 25 | in the DigitalContainer patents is different from the |

Page 154

| | | |
|---|---|---|
| 03:28 | 1 | systems used by Adobe, right? |
| 03:28 | 2 | MR. PRICE: Objection form. |
| 03:28 | 3 | A. This is in the scope of this PKI public private |
| 03:29 | 4 | key system, and that that aspect, it is different. |
| 03:29 | 5 | Q. So, you're saying at the time you knew that Adobe |
| 03:29 | 6 | had other systems that were the same as the |
| 03:29 | 7 | DigitalContainer systems. Does that seem a little |
| 03:29 | 8 | farfetched? |
| 03:29 | 9 | A. In my experience. |
| 03:29 | 10 | MR. PRICE: Let me object, form. |
| 03:29 | 11 | A. You know, the -- when you purchased an Adobe |
| 03:29 | 12 | product, which I use and quite fond of by the way, the |
| 03:29 | 13 | concept in which it is, you know, authorized and tied to |
| 03:29 | 14 | you and your device is I thought was all over us. |
| 03:29 | 15 | Q. Did you report that to management and tell them |
| 03:29 | 16 | that you thought their business plans were wrong? |
| 03:29 | 17 | A. Well, I never read this, for one thing, but we |
| 03:30 | 18 | did, you know, our key system was unique, so in that |
| 03:30 | 19 | aspect, it is different. The general process, though, |
| 03:30 | 20 | quite similar. |
| 03:30 | 21 | Q. I see. So, the difference between what Adobe |
| 03:30 | 22 | does and the DigitalContainer patents is the way the key |
| 03:30 | 23 | system works; is that correct? |
| 03:30 | 24 | MR. PRICE: Objection form. |
| 03:30 | 25 | A. The fact that there apparently was a third party |

Page 155

| | | |
|---|---|---|
| 03:30 | 1 | trusted key server, public key server. |
| 03:30 | 2 | Q. Do you know whether Adobe was using a third party |
| 03:30 | 3 | key server in 2002? |
| 03:30 | 4 | A. No. |
| 03:30 | 5 | Q. You have no idea at all in the world, do you? |
| 03:30 | 6 | A. No, um-hmm. |
| 03:30 | 7 | Q. Do you have any explanation why in the business |
| 03:30 | 8 | plan they didn't say, but Adobe has other business plans |
| 03:30 | 9 | that are actually infringing? |
| 03:31 | 10 | MR. PRICE: Objection form. |
| 03:31 | 11 | A. No, I don't. |
| 03:31 | 12 | Q. You'll agree generally in the 2002 business plan |
| 03:31 | 13 | DigitalContainers is distinguishing the difference |
| 03:31 | 14 | between the DRM systems it has patented versus the DRM |
| 03:31 | 15 | systems that Adobe is using? |
| 03:31 | 16 | MR. PRICE: Object to the form. |
| 03:31 | 17 | A. Could you repeat that, please? |
| 03:31 | 18 | MR. REINES: Could you read that back, |
| 03:31 | 19 | please. |
| 03:31 | 20 | (Whereupon, the requested portion was read |
| 03:31 | 21 | by the reporter.) |
| 03:31 | 22 | A. As it says in this paragraph, the last paragraph |
| 03:31 | 23 | in 23308, it specifically mentioned the public key |
| 03:31 | 24 | system. In that aspect we were different from everybody |
| 03:31 | 25 | on earth in my knowledge. In the basic concepts of |

Page 156

**Page 157**

```
03:32  1  regulating, they're all over us.  I'm sorry, I truly
03:32  2  believe that.
03:32  3     Q.  And you knew in 2002, right?
03:32  4     A.  I thought as far as I felt that the process was
03:32  5  an infringement?
03:32  6     Q.  Yes.
03:32  7     A.  Yeah.
03:32  8     Q.  Did you share that with management?
03:32  9     A.  I think --
03:32 10     Q.  You must have had discussions with Chip over
03:32 11  drinks or whatever?
03:32 12          MR. PRICE:  Objection to form.
03:32 13     A.  We thought all these companies were infringing
03:32 14  because, you know, we had a basic thing and somebody has
03:32 15  to do it.  Excuse me, that was my feeling.
03:32 16     Q.  You felt strong about it?  You're feeling pretty
03:32 17  strong about it now?
03:32 18     A.  Well, no, I'm just saying that, you know, there's
03:32 19  no -- I mean, we honestly felt like that we had a very
03:32 20  basic process that can only be done only a couple of
03:32 21  ways, and that there's anybody doing this process was
03:32 22  probably infringing on us.  I mean, that was my view as
03:32 23  a layman.  That's why we got you guys.
03:33 24     Q.  And you didn't hide that from your Mr. Venters,
03:33 25  did you?
```

**Page 158**

```
03:33  1     A.  Hide the fact that I thought these companies were
03:33  2  probably infringing?
03:33  3     Q.  Right.
03:33  4     A.  No, I didn't hide it, but I was kind of concerned
03:33  5  with other things, like survival.
03:33  6     Q.  Okay.  And in terms of when Digital Containers
03:33  7  and Digital Reg pursued patent infringement against
03:33  8  these companies, that's not something that you know
03:33  9  about.  That was something -- that was somebody else's
03:33 10  job?
03:33 11     A.  No, I don't know anything about that.
03:33 12     Q.  And did you ever ask them why they weren't
03:33 13  pursuing people for infringement if that's what you
03:33 14  believe was happening?
03:33 15     A.  No, I don't.  I mean, yeah, our concern at the
03:34 16  time was funding, you know.  So, I -- this was really,
03:34 17  you know, a lawsuit was not on my mind at the time
03:34 18  because I'm not in that area.
03:34 19     Q.  And in terms of your 741 Patent, did you believe
03:34 20  right from the start that that was being infringed by
03:34 21  everybody?  Everyone had to infringe that?
03:34 22     A.  741, oh, I don't know.  That's a good question.
03:34 23  I'm not sure.
03:34 24     Q.  Do you know whether Adobe infringes the 741
03:34 25  Patent?
```

**Page 159**

```
03:34  1          MR. PRICE:  Objection to form.
03:34  2     A.  I would think that it does.
03:34  3     Q.  And what system of theirs?
03:34  4     A.  I think that their general application locking
03:34  5  system like you bought, like I bought Creative Suite.
03:35  6  Wonderful program, by the way.  It is locked to your
03:35  7  machine when you buy it.  You can't copy that to anybody
03:35  8  else's machine.  So, that basic process at least part of
03:35  9  741 covers.  I do believe it's infringing.
03:35 10          MR. PRICE:  Objection form to the last
03:35 11     question, please.
03:35 12  BY MR. REINES:
03:35 13     Q.  Do you know what the encryption scheme is in
03:35 14  terms of how the keys are, where they're held, how
03:35 15  they're made?
03:35 16     A.  I assumed it was a PKI system.
03:35 17     Q.  Do you know?
03:35 18     A.  I don't know for sure.  I never did research.  I
03:35 19  never did research their software.
03:35 20     Q.  And do you know if they -- if Adobe uses a
03:35 21  container ID to create keys at any point in its process?
03:35 22     A.  No, I do not know.
03:35 23     Q.  You've no idea at all?
03:35 24     A.  No.
03:35 25     Q.  And how about EA?
```

**Page 160**

```
03:35  1     A.  I don't really know personally.
03:36  2     Q.  But you're still -- you're sure they're
03:36  3  infringing your 741 patent?
03:36  4          MR. PRICE:  Object to the form.
03:36  5     A.  Well, of the 741, I don't know.
03:36  6     Q.  You're familiar with the concept of decentralized
03:36  7  super DRM or centralized DRM?  Are those concepts
03:36  8  familiar to you?
03:36  9     A.  Hazy world of marketing, yes, I think they are.
03:36 10     Q.  Okay, well, why don't -- I'll show you a document
03:36 11  and we'll talk about it.
03:36 12          Marked as Exhibit 13 is a document entitled with
03:36 13  the heading Purpose of the Business Plan.  It's DIGREG
03:36 14  11264 verse 11307.  If you turn to 11285, please.  Okay,
03:37 15  do you see the reference to Decentralized SuperDRM
03:37 16  versus centralized DRM?
03:37 17     A.  Yes, sir.
03:37 18     Q.  Okay.  And what do you understand the difference
03:37 19  to be from a technology and business model perspective?
03:37 20     A.  Again, you know, to me this is referring to the
03:39 21  need to employ, you know, these third party PKI systems.
03:39 22     Q.  So, your understanding is that --
03:39 23     A.  And I, I'm sorry, go ahead.
03:39 24     Q.  No, you go.
03:39 25     A.  I know that we felt that our lightweight system
```

```
03:39  1  where many clients were passing very small amounts of
03:39  2  information, we felt like that's the advantage.
03:39  3      Q.  And with respect to the Microsoft Windows system,
03:39  4  was it your understanding that that was used as a
03:39  5  third-party PKI?
03:39  6      A.  Well, I was pretty -- I was under the impression
03:39  7  they did use a public key server, yeah.
03:39  8      Q.  That was a Microsoft server or some third party?
03:39  9          MR. PRICE:  Objection to form.
03:39 10      A.  I don't know the answer to that question.
03:40 11      Q.  So, are you aware of PKI systems where the public
03:40 12  key is maintained by the DRM service provider rather
03:40 13  than some third party?
03:40 14      A.  Not really, no.
03:40 15      Q.  And you don't know whether Microsoft,
03:40 16  RealNetworks, Apple, Macrovision, IBM, Softwrap, Clear
03:40 17  Key, Altnet or DMOD used that or not?
03:40 18      A.  I'm not aware specifically, no.
03:40 19      Q.  They could, they couldn't, you just don't know?
03:40 20      A.  I don't know.
03:40 21      Q.  Were you involved in attempting to sell the
03:41 22  DigitalContainer system to customers?
03:41 23      A.  No.
03:41 24      Q.  How did you decide which documents you were going
03:42 25  to produce in connection with the requests in this case?
                                                    Page 161

03:42  1      A.  I -- as I understood the subpoena, anything
03:42  2  related.  You know, I searched my machine for anything
03:42  3  related and I provided those.
03:42  4      Q.  When you say "anything related," related to what?
03:42  5      A.  Our company in general.  Almost four thousand
03:42  6  files I think, as I recall.
03:42  7      Q.  So, when you say our company in general, you're
03:42  8  referring to Dig Reg?
03:42  9      A.  DigitalContainers, Digital Reg, DRM Technologies,
03:42 10  LLC.
03:42 11      Q.  You consider those basically the same thing for
03:42 12  purposes of this?
03:42 13      A.  Well, for purposes of --
03:42 14          MR. PRICE:  Objection form.
03:43 15      A.  You know, I don't know.  I don't know about that.
03:43 16  I know that there's some legal differences.  I'm not
03:43 17  sure.
03:43 18      Q.  But in terms of the document, you don't divide
03:43 19  them out?
03:43 20          MR. PRICE:  Same objection.
03:43 21      A.  Yeah, I try to.  Everything remotely associated
03:43 22  with this case when I read the subpoena.  And I didn't
03:43 23  want to have somebody come get my machine and find out I
03:43 24  had done something illegal.  So, as far as I knew it,
03:43 25  anything related to the patents, the companies under any
                                                    Page 162

03:43  1  of the definitions I found and provided to our
03:43  2  attorneys.
03:43  3      Q.  When you say the companies in terms of the
03:43  4  documents, who are you referring to, which companies?
03:43  5      A.  DigitalContainers, Digital Reg, DRM Technologies,
03:43  6  LLC.  I thought that's what the subpoena was talking
03:43  7  about.
03:43  8      Q.  Did you differentiate between those three for who
03:43  9  had which documents?
03:43 10      A.  No.
03:43 11      Q.  Why not?
03:43 12      A.  Because they were all, you know, I kept my
03:43 13  documents in a kind of a one place, and I didn't even
03:43 14  think about that concept.
03:43 15      Q.  When did you first have representation in this
03:44 16  matter?  You said you were on some phone calls over the
03:44 17  time regarding this litigation?
03:44 18      A.  In -- when was I aware that we had
03:44 19  representation?
03:44 20      Q.  Yeah.
03:44 21          MR. PRICE:  Objection to form.
03:44 22      A.  Boy, that's a good question.  Ooh, boy.  I,
03:44 23  honestly, I have sat in on a few calls whenever they --
03:44 24  week, year, I don't know exactly.
03:44 25      Q.  When you say you've sat in on a few calls, what
                                                    Page 163

03:44  1  were they?
03:44  2      A.  Just listening to the comments by people.
03:44  3      Q.  Just to stay updated?
03:44  4      A.  Yeah, exactly.
03:44  5      Q.  You need to let me ask questions.
03:44  6          MR. PRICE:  And don't reveal the subject
03:44  7  matter of privileged discussions on the phone.  And
03:44  8  wait for the question.
03:45  9  BY MR. REINES:
03:45 10      Q.  Now I'm not even getting one word out.
03:45 11      A.  I'm sorry.
03:45 12      Q.  The purpose of your -- these phone calls that
03:45 13  you're referring to regarding by litigation was just for
03:45 14  you to stay apprised of what was going on in the
03:45 15  litigation?
03:45 16      A.  Yes, sir.
03:45 17      Q.  And you understand that the counsel's
03:45 18  representing you as part of your relationship with
03:45 19  Digital Reg; is that right?
03:45 20          MR. PRICE:  Object to the form.
03:45 21  BY MR. REINES:
03:45 22      Q.  Are you paying for Dinovo Price yourself?
03:45 23      A.  Not me.
03:45 24      Q.  Okay.  And you understand they're representing
03:45 25  you due to your affiliation with Digital Reg?
                                                    Page 164
```

```
04:51   1  knowledge.
04:51   2      Q.  When you were talking about successive recipients
04:51   3  in the content of the 070 Patent with the previous
04:52   4  attorney, Mr. Reines, do you recall that?
04:52   5      A.  Yes, sir.
04:52   6      Q.  And I think you said that successive recipient
04:52   7  could be a server; do you recall that?
04:52   8      A.  I do.
04:52   9      Q.  But that server would have to be a server that
04:52  10  receives a data from a previous recipient, wouldn't it?
04:52  11          MR. PRICE:  Objection form.
04:52  12      A.  Well, isn't that the definition of successive
04:52  13  recipient?
04:52  14      Q.  That's what I'm asking you.  Is that the
04:52  15  definition that you would be using?
04:52  16          MR. PRICE:  Objection form.
04:52  17      A.  Yes.
04:52  18          MR. BARCELO:  All right, we don't have any
04:52  19  further questions subject to the reservation of rights
04:52  20  that I stated earlier.
04:52  21          MR. PRICE:  Mark?
04:52  22          MR. LANG:  We're not going to have any
04:52  23  questions either.
04:52  24          MR. PRICE:  Okay, we're done.
04:52  25          VIDEOGRAPHER:  Okay, this concludes today's
```
Page 197

```
04:52   1  deposition of Eugene B. Phillips, II; April the 18th,
04:52   2  2013.  We're going off the record.  The time on the
04:53   3  video monitor is 4:51 p.m.  We're off the record.
        4          (DEPOSITION CONCLUDED AT 4:51 P.M.)
        5          (SIGNATURE RESERVED)
```
Page 198

```
 1  STATE OF NORTH CAROLINA
 2  COUNTY OF DURHAM
 3
 4              REPORTER'S CERTIFICATE
 5       I, Regina Toppins, Shorthand Reporter and Notary
 6  Public in and for the State of North Carolina, do hereby
 7  certify that there came before me on Thursday, the 18th
 8  day of April, 2013, the person hereinbefore named, who
 9  was by me duly sworn to testify to the truth and nothing
10  but the truth of his knowledge concerning the matters in
11  controversy in this cause; that the witness was
12  thereupon examined under oath, the examination reduced
13  to typewriting under my direction, and the deposition is
14  a true record of the testimony given by the witness.
15       I further certify that I am neither attorney or
16  counsel for, nor related to or employed by, any attorney
17  or counsel employed by the parties hereto or financially
18  interested in the action.
19       IN WITNESS WHEREOF, I have hereto set my hand,
20  this the 18th day of April, 2013.
21
22
23       _____
24       Regina Toppins, Notary Public
         Notary Number:  200626300019
25
```
Page 199