REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**Exhibit 10**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# TYLER DIVISION

| | |
|---|---|
| **DIGITAL REG OF TEXAS, LLC** § § | |
| **Plaintiff,** § § | |
| v. § | **C.A. No. 6:11-CV-305** |
| § | |
| **ADOBE SYSTEMS INCORPORATED, ET AL.,** § § § | |
| **Defendant.** § | |

## REBUTTAL EXPERT REPORT OF STEPHEN D. PROWSE

*[signature]*

**Stephen D. Prowse, Ph.D, CFA**

**December 18, 2013**
**Date**

Digital Reg of Texas, LLC v. Adobe Systems Incorporated, et al.
HIGHLY CONFIDENTIAL—OUTSIDE COUNSEL'S EYES ONLY

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................................3

  A. Assignment ....................................................................................................................3

  B. Summary of Opinions ...................................................................................................4

  C. Expert Qualifications ....................................................................................................5

  D. Information Considered ................................................................................................7

II. BACKGROUND .................................................................................................................7

  A. Legal Authority Regarding Damages for Patent Infringement .................................7

  B. The Patents-In-Suit ........................................................................................................8

  C. The Accused Products ...................................................................................................9

  D. The Parties ....................................................................................................................10

  E. Digital Rights Management Software Industry ........................................................13

III. THE PARR REPORT .......................................................................................................13

IV. REASONABLE ROYALTY ANALYSIS .......................................................................14

  A. Assumptions and Methodology ..................................................................................14

  B. The Hypothetical Negotiation ....................................................................................14

  C. The Georgia-Pacific Factors .......................................................................................15

V. EVALUATION OF THE PARR ROYALTY BASE .....................................................45

VI. OPINIONS AND CONCLUSIONS .................................................................................46

Case4:12-cv-01971-CW Document591-10 Filed07/30/14 Page4 of 11

Digital Reg of Texas, LLC v. Adobe Systems Incorporated, et al.
HIGHLY CONFIDENTIAL—OUTSIDE COUNSEL'S EYES ONLY

between Digital Reg and Adobe would have occurred in and around the first quarter of 2005, the date upon which Adobe started selling the LiveCycle Policy Server.[58]

30. The hypothetical negotiation is normally assumed to occur prior to the date that the alleged infringement began. As a result, I also assume the hypothetical negotiation would occur in 2005.

**C. The Georgia-Pacific Factors**

31. In general, during a negotiation where the parties possess similar negotiating skills, a hypothetical negotiation would tend to result in a negotiated amount somewhere on the continuum framed by the parties' expectations. The following analysis of the *Georgia-Pacific* factors informs the likely location of a negotiated amount on the continuum framed by the respective positions of Digital Reg and Adobe at the time of the hypothetical negotiation.

*GP Factor #1: The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.*

Evaluation of the Parr Analysis

32. Mr. Parr lists 10 settlement agreements between Digital Reg and various parties involving the patents-in-suit.[59] Mr. Parr admits that the "admissibility of these settlement agreements as a measure of a reasonable royalty may be in question."[60] Mr. Parr claims that "not all [of the settlement agreements] provide useful guidance for determination of a reasonable royalty rate" and that three agreements in particular are more relevant.[61] Specifically, Mr. Parr relies on settlement agreements with Intuit, Inc. ("Intuit"), Macrovision Corporation ("Macrovision"), and RPX Corporation, Inc. ("RPX").[62]

---

[58] Parr Report, pp. 7 – 8. *See also* 4/29/2013 Deposition of Julie Morgan, Exhibit 44.
[59] Parr Report, pp. 52 – 56.
[60] Parr Report, p. 52.
[61] Parr Report, p. 67.
[62] Parr Report, p. 67.

15

Digital Reg of Texas, LLC v. Adobe Systems Incorporated, et al.
HIGHLY CONFIDENTIAL—OUTSIDE COUNSEL'S EYES ONLY

33. On February 12, 2008 Digital Reg entered into a settlement agreement with Macrovision whereby Digital Reg granted Macrovision a worldwide, fully paid up, non-exclusive license to the '541 Patent without the right to sublicense.[63] In exchange, Macrovision agreed to pay Digital Reg a lump sum payment of ▮.[64]

34. Effective December 12, 2008, Digital Reg entered into a settlement agreement with RPX for the '541 Patent.[65] The agreement provided RPX a worldwide, non-exclusive license with the right to sublicense.[66] In exchange, RPX agreed to pay Digital Reg an "initial payment" of ▮ and a "second payment" of ▮ to be paid one year from the effective date.[67] In addition, RPX agreed to pay a "contingent payment" of ▮ if and when RPX earned gross revenues of ▮ in a single calendar year.[68]

35. On March 28, 2013 Digital Reg and Intuit entered into a settlement agreement for Digital Reg's entire patent portfolio.[69] Digital Reg granted Intuit a worldwide, non-exclusive, fully paid-up license under the Licensed Patents without the right to sublicense.[70] In exchange, Intuit agreed to pay Digital Reg a lump sum payment of ▮.[71]

36. The RPX agreement relied upon by Mr. Parr is not comparable to the hypothetical license. First, Adobe's business model is different than the business model employed by RPX. Adobe provides digital media and digital marketing software solutions. RPX does not make or sell any products. It is in the business of sublicensing technology to other companies and, as such, would likely be willing to pay

---

[63] DIGREG-69288 – 96.
[64] DIGREG-69288 – 96.
[65] DIGREG-10937 – 60.
[66] DIGREG-10937 – 60.
[67] DIGREG-10937 – 60. I note that on November 3, 2009, Digital Reg and RPX entered into an amended agreement whereby the "second payment" was amended to ▮. *See* DIGREG-10961 – 76.
[68] DIGREG-10937 – 60. I note that on October 13, 2011, Digital Reg and RPX entered into a second amended agreement whereby the "contingent payment" was amended to ▮. *See* DIGREG-072031 – 83.
[69] DIGREG-072200 – 208.
[70] DIGREG-072200 – 208.
[71] DIGREG-072200 – 208.

Case4:12-cv-01971-CW Document591-10 Filed07/30/14 Page6 of 11

Digital Reg of Texas, LLC v. Adobe Systems Incorporated, et al.
HIGHLY CONFIDENTIAL—OUTSIDE COUNSEL'S EYES ONLY

more for a license to the patented technology that it could then sublicense to a number of entities.[72] In fact, the settlement agreement between RPX and Digital Reg explicitly gives RPX the right to sublicense, a right that Adobe would not receive in the hypothetical negotiation.[73] I understand that RPX has sublicensed approximately ▇▇▇▇▇▇▇▇ as of February 2013 under its settlement agreement with Digital Reg.[74] Therefore, RPX's extent of use is much greater than Adobe's alleged use. As such, Mr. Parr fails to provide any analysis demonstrating that Adobe and RPX is comparable in any way.

37. Mr. Parr's reasons for selecting what he claims are relevant agreements appear speculative and inconsistent, if not opportunistic. For example, Mr. Parr claims that both Intuit and AVG "already had a license for some of Digital Reg's technology."[75] However, Mr. Parr chooses to only rely on the Intuit agreement.[76] In addition, while Mr. Parr considers the agreement with RPX to be comparable even though RPX does not make or sell any products, Mr. Parr claims that a number of the settlement agreements are not comparable even though they are with entities more similarly situated to Adobe. For example, he contends that a number of agreements are not comparable because of limited revenues associated with products alleged to infringe the patents-in-suit, but provides no evidence as to what those revenues are.[77]

38. Mr. Parr then attempts to create running royalty rates out of the lump sum payments associated with the Intuit, Macrovision and RPX licenses.[78] Mr. Parr's conversion of these lump sum settlement agreements into running royalty rates is unnecessary, speculative, and flawed. First, it is wholly unnecessary and stems from Mr. Parr's flawed analysis of the appropriate structure of the royalty agreed upon at the hypothetical negotiation. As discussed in detail later in my report, Mr. Parr ignores the testimony of Digital Reg's own witness and the fact that all 10 of the settlement

---

[72] 3/28/2013 Deposition of Michael Roberts Farley, pp. 158 – 159, 162; http://www.rpxcorp.com.
[73] DIGREG-10937 – 60.
[74] 3/28/2013 Deposition of Michael Roberts Farley, Exhibit 39.
[75] Parr Report, pp. 53 – 54.
[76] Parr Report, p. 67.
[77] Parr Report, pp. 53 – 56.
[78] Parr Report, pp. 53; 55 – 56.

17

Case4:12-cv-01971-CW Document591-10 Filed07/30/14 Page7 of 11

Digital Reg of Texas, LLC v. Adobe Systems Incorporated, et al.
HIGHLY CONFIDENTIAL—OUTSIDE COUNSEL'S EYES ONLY

45. According to the deposition testimony of Michael Farley, Manager of Digital Reg, DRM Technologies / DRM Management purchased from Wachovia the '541 Patent as well as two other patent applications (now the '670 Patent and the '515 Patent) as well as other pending patent applications and trademarks for ▇▇▇▇ in the form of ▇▇▇▇ in cash and a loan from Wachovia of ▇▇▇▇.[98] This transaction, between a willing buyer and seller, gives an indication of the value associated with the alleged patented technology. In addition, Adobe would only be licensing, not purchasing, the patents-in-suit from Digital Reg. Mr. Parr's flawed rate results in reasonable royalty damages that are significantly higher than the amount that Digital Reg paid to purchase a subset of the patents-in-suit, among other pending patent applications and trademarks, only 3 years before the hypothetical negotiation.

46. Thus, while there is no established royalty under this factor, the value of the transaction for ownership for some of the patents-in-suit is an indication of value. In addition, the settlement agreements are of limited relevance.

*GP Factor #2: The rates paid by the licensee for the use of other patents comparable to the patent in suit*

Evaluation of the Parr Analysis

47. Mr. Parr erroneously relies on Adobe's website as the basis for his analysis. Specifically, Mr. Parr asserts that based on its website, "Adobe suggests that $50,000 per year and a 5.5% royalty on revenue…on the DRM plug-ins constitutes a reasonable royalty."[99] Based on this information from Adobe's website, Mr. Parr concludes that "Adobe has entered into licenses related to DRM technology."[100] However, Mr. Parr states that "no agreements have been produced to permit any further analysis of Adobe's DRM licensing strategy or rates."[101]

---

[98] 3/27/2013 Deposition of Michael Roberts Farley, pp. 62 – 67, Exhibit 24; 3/28/2013 Deposition of Michael Roberts Farley, pp. 188 – 189.
[99] Parr Report, p. 57.
[100] Parr Report, p. 57.
[101] Parr Report, p. 57.

21

Case4:12-cv-01971-CW   Document591-10   Filed07/30/14   Page8 of 11

Digital Reg of Texas, LLC v. Adobe Systems Incorporated, et al.
HIGHLY CONFIDENTIAL—OUTSIDE COUNSEL'S EYES ONLY

48. Mr. Parr is not relying on an actual Adobe agreement, but instead, is simply relying on a portion of Adobe's website, which fails to discuss specific licensing terms or the consideration exchanged.[102] Further, Mr. Parr is considering an instance in which Adobe is the licensor, not the licensee. I am aware that Factor 2 relates to "the rates paid by the licensee for the use of other patents comparable to the patent in suit."[103] Therefore, Mr. Parr's analysis gives no indication of the consideration Adobe would pay to license DRM technology.

My Analysis

49. I am aware that, at the time of Mr. Parr's report, Adobe had produced four settlement agreements that Mr. Parr failed to address. On November 30, 2006, z4 Technologies Inc. ("z4") entered into a settlement agreement with Adobe for 14 patents and 9 published patent applications related to "software activation technology and/or distribution" as well as "any and all other patents and applications hereafter owned or directly or indirectly controlled by z4 related to software activation technology and/or distribution, having a Priority Date" on or before December 31, 2011.[104] ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉.[105]

50. On February 12, 2007, Adobe entered into a non-exclusive patent license and settlement agreement with ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

---

[102] Parr Report, p. 57.
[103] *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y.1970).
[104] ADOBE-DR0052427 – 433.
[105] ADOBE-DR0052427 – 433.
[106] ADOBE-DR0052434 – 465.
[107] For example, *see* U.S. Patent No. 6,789,198.
[108] U.S. Patent No. 6,789,198.

Case4:12-cv-01971-CW Document591-10 Filed07/30/14 Page9 of 11

Digital Reg of Texas, LLC v. Adobe Systems Incorporated, et al.
HIGHLY CONFIDENTIAL—OUTSIDE COUNSEL'S EYES ONLY

51. ███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

52. Effective October 5, 2011, Uniloc entered into a settlement and license agreement with Adobe for ███████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
████ [7]

53. I have reviewed these agreements and conclude that they offer no guidance as to the appropriate royalty in this matter outside of the structure of all agreements resulting in lump sum payments.[118] While I am aware that the technology

---

[109] ADOBE-DR0052434 – 465.
[110] ADOBE-DR0052434 – 465. ███████████████████████████
██████████████████████ See ADOBE-DR0052434 – 465.
ADOBE-DR0052738 – 746.
[112] U.S. Patent No. 5,103,476; U.S. Patent No. 5,222,134.
[113] ADOBE-DR0052738 – 746.
[114] ADOBE-DR0052419 – 426.
[115] U.S. Patent No. 5,490,216.
[116] ADOBE-DR0052419 – 426.
[117] ADOBE-DR0052419 – 426.
[118] To the extent settlement agreements are deemed not admissible, my analysis would not change. As set forth throughout this report, there are a number of considerations that support my opinions. The settlement agreements I have addressed further confirm those opinions.

Digital Reg of Texas, LLC v. Adobe Systems Incorporated, et al.
HIGHLY CONFIDENTIAL—OUTSIDE COUNSEL'S EYES ONLY

licensed in the agreements generally relates to DRM that does not mean that any particular Adobe settlement agreement is a relevant indicator of value for the patents-in-suit.[119] For example, the z4 settlement agreement was entered into in November 2006, or approximately six months after a judgment was entered against Microsoft for approximately $115 million to be paid to z4 for infringing a subset of the same patents.[120] In contrast, the settlement agreements involving Digital Reg provide a much lower indication of value associated with the patented technology. In addition, I note that the z4 settlement agreement covers a larger number of patents than the hypothetical license would.[121] Further, I understand that the z4 settlement agreement includes a license to all future patents.[122] As another example, I understand that at the time of settlement, Uniloc offered products for sale, unlike Digital Reg.

*GP Factor #3: The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold*

Evaluation of the Parr Analysis

54. Mr. Parr concedes that the parties would have likely agreed to a non-exclusive license in the United States.[123] I agree. Without exclusivity, the value to Adobe of any license agreement involving the patents-in-suit is lessened. The non-exclusive nature of the license tends to reduce the royalty as compared to an exclusive license. Additionally, Mr. Parr states that the hypothetical license would be limited to "the United States with no territorial or other restrictions."[124] I agree. Mr. Parr is seemingly aware that Digital Reg has not asserted any claims based on foreign patents. Given that the only rights Digital Reg would have conveyed in the hypothetical negotiation are rights in the patents-in-suit, there is no reason for Digital Reg to have

---

[119] Discussion with Professor Steve Wicker, Adobe's Technical Expert.
[120] ADOBE-DR0052427 – 433; "Microsoft Loses Patent Appeal, Must Pay $140 Million," PCWorld, 11/29/2007; "After winning patent suit, z4 sues Microsoft again," Network World, 11/30/2007. In comparison, Microsoft settled for ▮▮▮▮▮ with Digital Reg for the patents-in-suit.
[121] ADOBE-DR0052427 – 433.
[122] ADOBE-DR0052427 – 433.
[123] Parr Report, p. 57.
[124] Parr Report, p. 57.

Case4:12-cv-01971-CW Document591-10 Filed07/30/14 Page11 of 11

Digital Reg of Texas, LLC v. Adobe Systems Incorporated, et al.
HIGHLY CONFIDENTIAL—OUTSIDE COUNSEL'S EYES ONLY

requested, or Adobe to have agreed to pay, a royalty on foreign activity beyond the scope of the patents-in-suit. Finally, Mr. Parr fails to discuss that the hypothetical license would *not* grant Adobe the right to sublicense. This makes the RPX agreement not comparable with the hypothetical license between Digital Reg and Adobe.

My Analysis

55. The nature of the hypothetical license would be a non-exclusive U.S. only license with no right to sublicense. Each of these factors would lower the cost of the license relative to the alternatives (i.e., exclusive, worldwide, with right to sublicense).

*GP Factor #4: The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.*

Evaluation of the Parr Analysis

56. Mr. Parr asserts that "Digital Reg has licensed its patented inventions to others and does not keep the technology for its own exclusive use."[125] I agree.

My Analysis

57. Digital Reg has a history of attempting to monetize the patents-in-suit. For example, I am aware that patent licensing first became a goal of DRM Technologies in December 2004 after the company "signed up with Thinkfire," a "full service intellectual property advisory, brokerage and licensing services firm."[126] In addition, I am aware that Digital Reg was founded in order to "conduct litigation."[127] Further, I understand that Digital Reg has "a pro-licensing policy in terms of being interested in actively licensing the patents."[128]

---

[125] Parr Report, p. 57.
[126] 3/27/2013 Deposition of Michael Roberts Farley, p. 81; http://www.thinkfire.com.
[127] 3/27/2013 Deposition of Michael Roberts Farley, p. 88.
[128] 3/28/2013 Deposition of Michael Roberts Farley, p. 293.