1   EDWARD R. REINES (SBN 135960)
    edward.reines@weil.com
2   SONAL N. MEHTA (SBN 222086)
    sonal.mehta@weil.com
3   BYRON C. BEEBE (SBN 235179)
    byron.beebe@weil.com
4   WEIL, GOTSHAL & MANGES LLP
    201 Redwood Shores Parkway
5   Redwood Shores, CA 94065
    Telephone:  650-802-3000
6   Facsimile:  650-802-3100

7   Attorneys for Defendant
    ADOBE SYSTEMS INCORPORATED
8

9                  **UNITED STATES DISTRICT COURT**

10                **NORTHERN DISTRICT OF CALIFORNIA**

11                       **OAKLAND DIVISION**

12

| 13  DIGITAL REG OF TEXAS, LLC, | Civil Case No. 12-CV-01971 CW (KAW) |
|---|---|
| 14  Plaintiff, | **ADOBE SYSTEMS INC.'S *MOTIONS IN LIMINE* NOS. 1 - 9** |
| 15  vs. | **Honorable Claudia Wilken** |
| 16  ADOBE SYSTEMS INCORPORATED, et al., | |
| 17  Defendants. | **Judge: Hon. Claudia Wilken** |
| 18  | **Ctrm:  2, 4th floor** |
| 19  | **Date:   August 25, 2014** |
|     | **Time:  8:30 a.m.** |

20

21                       REDACTED

22

23

24

25

26

27

28

---

1

## <u>TABLE OF CONTENTS</u>

2

**Page**

3

MOTION IN LIMINE NO. 1 (EXCLUDE UNRELIABLE OPINIONS OF PLAINTIFF'S
DAMAGES EXPERT ROBERT PARR) ........................................................................... 1

4

Legal Standard.............................................................................................................. 1

5

Summary Of The Argument.......................................................................................... 1

6

Mr. Parr's Opinion As To Piracy Rates For Adobe Software Is Based On
Speculation And Conjecture, Not Reliable And Tangible Evidence ..................... 2

7

Mr. Parr's Opinion As To The Supposed Benefit Of The Patents-In-Suit Is Based
On Speculation And Not Sufficiently Reliable To Go Before The Jury.............. 4

8

9

Mr. Parr Improperly Bases His Opinion On A Profit Split Between Adobe And
Digital Reg ............................................................................................................ 6

10

Mr. Parr Improperly Cherry-Picks Evidence To Arrive At His Desired Royalty
Rate......................................................................................................................... 7

11

12

Mr. Parr Improperly Applies The Entire Market Value Rule To Arrive At A
Grossly Overinclusive Damages Base ................................................................. 11

13

MOTION IN LIMINE NO. 2 (EXCLUDE RPX LICENSE) ....................................... 13

14

MOTION IN LIMINE NO. 3 (EXCLUDE EVIDENCE RE: ADOBE'S AMT PRODUCT)........ 15

15

MOTION IN LIMINE NO. 4 (PRECLUDE REFERENCE TO ADOBE'S TOTAL
REVENUES, REVENUES NOT TIED TO ACCUSED FEATURES, MARKET
CAPITALIZATION, COMPANY VALUATION OR OVERALL FINANCIAL
SUCCESS) ................................................................................................................. 16

16

17

18

MOTION IN LIMINE NO. 5 (PRECLUDE ANY REFERENCE OR EVIDENCE
REGARDING WILLFULNESS)................................................................................ 17

19

MOTION IN LIMINE NO. 6 (PRECLUDE EVIDENCE OR ARGUMENT ON
INFRINGEMENT THEORIES NOT TIMELY DISCLOSED IN DISCOVERY)........................ 20

20

21

Digital Reg Failed To Timely Disclose A Joint Infringement Theory ............... 21

22

Digital Reg Failed To Timely Disclose Evidence Of Indirect Infringement .................... 21

23

Adobe Is Prejudiced By Digital Reg's Discovery Failures.................................. 22

24

MOTION IN LIMINE NO. 7 (PRECLUDE DIGITAL REG'S EXPERTS FROM
OFFERING OPINIONS NOT DISCLOSED IN EXPERT DISCOVERY).................................. 23

25

MOTION IN LIMINE NO. 8 (PRECLUDE ANY SUGGESTION OR ARGUMENT
RELATING TO ALLEGED DISCOVERY DEFICIENCIES)...................................... 24

26

27

MOTION IN LIMINE NO. 9 (PRECLUDE ALLEGATIONS OF COPYING)........................... 25

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple Inc. v. Samsung Elecs. Co., Ltd.*,
2013 WL 5958176 (N.D. Cal., Nov. 7, 2013) ........................................................... 13

*Apple, Inc. v. Samsung Elecs. Co.*,
2012 WL 3155574 (N.D. Cal. 2012) ........................................................................ 20

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*,
682 F.3d 1003 (Fed. Cir. 2012) .............................................................................. 18

*Black & Decker, Inc. v. Robert Bosch Tool Corp.*,
260 Fed. Appx. 284 (Fed. Cir. 2008) ...................................................................... 18

*Central Soya Co. v. Geo. A. Hormel & Co.*,
723 F.2d 1573 (Fed. Cir. 1983) ................................................................................ 1

*Daubert v. Merrell Dow Pharm.*,
509 U.S. 579 (1993) ................................................................................................... 1

*Dynetix Design Solutions, Inc. v. Synopsys, Inc.*,
2013 WL 4538210 (N.D. Cal. Aug. 23, 2013) .......................................................... 7

*Garretson v. Clark*,
111 U.S. 120 (1884) ................................................................................................... 1

*General Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ................................................................................................... 1

*Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*,
585 F. Supp. 2d 636 (D. Del. 2008) ........................................................................ 18

*In re Seagate*,
497 F.3d 1360 (Fed. Cir. 2007) ................................................................... 17, 18, 19

*Laserdynamics, Inc. v. Asus Computer Int.*,
694 F.3d 51 (Fed. Cir. 2012) .................................................................................. 12

*Lucent Technologies, Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009) .......................................................................... 1, 13

*Oracle Am., Inc. v. Google Inc.*,
798 F. Supp. 2d 1111 (N.D. Cal. 2011) .................................................................... 7

*Oracle Am., Inc. v. Google, Inc.*,
2012 WL 44485 (N.D. Cal., Jan. 9, 2012) .............................................................. 13

*Oracle USA, Inc. v. SAP AG*,
264 F.R.D. 541 (N.D. Cal. 2009) ............................................................................ 21

*Powell v. Home Depot U.S.A., Inc.*,
663 F.3d 1221 (Fed. Cir. 2011) .............................................................................. 18

*Uniloc USA, Inc. v. Microsoft Corp.*,
632 F.3d 1292 (Fed. Cir. 2011) .......................................................... 1, 7, 12, 17

*VNUS Medical Techs., Inc. v. Diomed Holdings, Inc.*,
2007 WL 3096589 (N.D. Cal. 2007) ....................................................................... 20

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
259 F.3d 1101 (9th Cir. 2001) ................................................................................ 23

**Statutes**

Fed. R. Civ. P. 26(e) ................................................................................................ 21

Fed. R. Civ. P. 26(e)(1) ........................................................................................... 21

Fed. R. Civ. P. 30(b)(6) ........................................................................................... 20

Fed. R. Civ. P. 37 .................................................................................................... 21

Fed. R. Civ. P. 37(c)(1) ........................................................................................... 21

Fed. R. Civ. P. 702 .................................................................................................... 1

**Other Authorities**

*Compensatory Damages Issues in Patent Infringement Cases*,
    Federal Judicial Center 32 (2011), *available at*
    http://www.fjc.gov/public/pdf.nsf/lookup/damagespatent.pdf/$file/damagespatent.pdf ........... 17

**MOTION IN LIMINE NO. 1 (EXCLUDE UNRELIABLE OPINIONS OF PLAINTIFF'S DAMAGES EXPERT ROBERT PARR)**

**Legal Standard**

A District Court bears the "responsibility of ensuring that all expert testimony must pertain to 'scientific, technical, or other specialized knowledge' under Federal Rules of Evidence ('FRE') 702, which in turn required the judge to determine that the testimony was based on a firm scientific or technical grounding." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011). The patentee, in turn, bears the burden of proving damages and tying the expert testimony on damages to the facts of the case. *Id.* at 1319-20. An expert's testimony must be excluded by the District Court if there is an "analytical gap" or lack of "fit" between the expert's conclusion and the facts of the case. *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993). An expert opinion on damages may not rely on unreasonable inferences or resort to "mere speculation or guess." *Central Soya Co. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1576 (Fed. Cir. 1983). The patentee "must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative." *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1337 (Fed. Cir. 2009) (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)).

**Summary Of The Argument**

Adobe seeks to exclude the testimony of Digital Reg's damages expert Russell Parr because Mr. Parr's opinion is not based on sufficient facts or data, intentionally ignores relevant facts, and utilizes unreliable methods, including because he:

1. speculates without reliable support or evidence that general software piracy rates and rates specific to other companies would somehow apply to Adobe's software to arrive a percentage of piracy savings supposedly enjoyed by Adobe;

2. assumes without basis that the supposed piracy-savings value of any digital rights management ("DRM") is attributable to the Patents-in-Suit;

3. assumes without basis, and contrary to precedent in this district, that the framework for a

1    hypothetical negotiation would include a fifty percent profit-split arrangement applied to the

2    speculative piracy savings;

3    4.    improperly cherry-picks evidence (including unreliable evidence with no nexus to the case)

4        to confirm his desired royalty rate; and

5    5.    applies his unreliable royalty rate to the entire market value of the accused products, contrary

6        to law, despite admitting that the invention does not drive demand of the accused products.

7    **Mr. Parr's Opinion As To Piracy Rates For Adobe Software Is Based On Speculation And
8    Conjecture, Not Reliable And Tangible Evidence**

9        Mr. Parr assumes without any evidence that Adobe's software piracy rates follow piracy

10   rates of software generally during the period predating the alleged use of the patented invention.

11   Specifically, he assumes that the alleged use of the patented inventions saved ███ of Adobe's

12   sales from piracy, based solely upon (1) studies of software piracy indicating 20% piracy rates of

13   software generally, and (2) testimony from Symantec that they have ████ piracy "hacks."

14   Beebe Decl., Ex. 1 [Parr Dep.] at 84:2-19 ("[Q.] Is it fair to say, then, that in attempting to

15   quantify what you believe to be the benefits to Adobe from the accused DRM technology, you

16   based your opinion on, one, applying general industry piracy rates for all software to Adobe and,

17   two, assuming that evidence as to the piracy rates that Symantec suffers would also apply to

18   Adobe? Is that fair? A. Yes, but let me say I'm looking at the overall piracy rate of the industry

19   and applying that to Adobe, and then I'm looking at the benefits that Symantec has enjoyed from

20   deploying DRM technology and applying that to Adobe. Q. Okay. And that's the complete basis

21   for your opinion as to the benefits that you believe Adobe gets from the patented inventions.

22   Correct? A. Yes.")[1]; Ex. 2 [Parr Report] ¶ 174.  Both assumptions fail to withstand scrutiny.

23        *First*, Mr. Parr has not considered—let alone established—sufficient nexus between these

24   general industry reports on software and the Adobe software at issue in this case to reasonably rely

25   on those reports as evidence of piracy rates for Adobe's software.

26   •    Mr. Parr relied on general piracy studies, even when they include no data relating to Adobe.

27

28   _____
[1]   Objections and internal citations omitted and emphasis added throughout, unless otherwise
noted.

1    Beebe Decl., Ex. 1 [Parr Dep.] at 29:6-12 ("[Q. W]ith respect to forming your opinions and

2    conclusions in this case, you did not do an analysis of piracy specific to software distributed

3    by Adobe. Right? A. No. I just looked at the -- all the studies which talked about piracy of

4    software in the United States, and Adobe wasn't singled out."); 28:12-13.

5    • Mr. Parr conducted no other analysis or investigation to determine Adobe's piracy rate.  *Id.*

6    at 29:13-16 ("Q. Okay. And you didn't do an independent investigation into what piracy

7    there is with respect to Adobe software. Right? A. Correct."); 74:8-13 ("[Q.] Have you done

8    any investigation or calculation or analysis of what piracy rates, if any, Adobe would have

9    for the specific software and applications that are identified here on Exhibit 3? A. No. I used

10   the industry information I had and applied that to Adobe.").

11   • Mr. Parr did not conduct any analysis of different piracy rates for different types of software.

12   *Id.* at 30:18-24 ("Q. And in forming your opinions and conclusions in the case, did you

13   evaluate or undertake to do any analysis by which to understand how piracy rates might

14   differ between types of software such as video games versus music versus Acrobat or

15   Photoshop on the other hand? A. I don't believe the studies considered that.").

16   • Mr. Parr did not conduct any independent investigation or analysis regarding industry studies

17   on piracy.  *Id.* at 32:5-11 ("[Q.] Aside from some reports that were produced in discovery,

18   did you undertake any independent investigation or analysis as to what industry studies there

19   have been on piracy? A. No. I looked at the two or three quoted in my report, and if I had

20   looked at others, I would have discussed them.").

21        ***Second***, Mr. Parr has not considered—let alone established—sufficient nexus between the

22   evidence of Symantec piracy rates he relied upon and Adobe piracy rates.

23   • Mr. Parr speculates that Adobe piracy rates decreased ██████ after alleged infringement

24   began, based solely on a statement from a Symantec employee about the rate of "hacks" of

25   Symantec software.  Beebe Decl., Ex. 2 [Parr Report] ¶ 174 ("James Kazanegras testified at

26   his deposition that Symantec had piracy 'hacks' of ██████ I have assumed that this

27   improvement over the 20% piracy rate can be attributed to the use of Digital Reg's invention.

28   Consequently, Symantec has enjoyed a benefit of ██████ savings. I have assumed that

Adobe has also enjoyed this same level of benefit from the Digital Reg invention."); Beebe Decl., Ex. 1 [Parr Dep.] at 84:2-14 ("[Q.] Is it fair to say, then, that in attempting to quantify what you believe to be the benefits to Adobe from the accused DRM technology, you based your opinion on, one, applying general industry piracy rates for all software to Adobe and, two, assuming that evidence as to the piracy rates that Symantec suffers would also apply to Adobe? Is that fair? A. Yes, but let me say I'm looking at the overall piracy rate of the industry and applying that to Adobe and then I'm looking at the benefits that Symantec has enjoyed from deploying DRM technology and applying that to Adobe.").

- Mr. Parr assumes Symantec's piracy rates apply to Adobe simply because they are both large software companies. *Id.* at 82:23-83:9 ("Q. So you assumed that whatever evidence Symantec had of piracy rights that Symantec faces would be applicable to Adobe because Adobe is also a company that sells enterprise and consumer software and is a big company? A. Well, yes, in general, that's correct. They sell a large diversified portfolio of products that are to consumers and enterprises, and if Symantec gets a certain benefit from their DRM technology, it's my assumption Adobe probably experiences the same amount, no more, no less."); 83:10-15.

- Yet, Mr. Parr admits that there are many differences between Adobe and Symantec products. *Id.* at 81:2-9 ("Q. Now, you understand that Symantec's products and Adobe's products are different. Right? A. Yes. Q. And they offer different functionalities to consumers. Right? A. Yes. Q. And they work different ways. Right? A. Oh, yes.").

**Mr. Parr's Opinion As To The Supposed Benefit Of The Patents-In-Suit Is Based On Speculation And Not Sufficiently Reliable To Go Before The Jury**

Mr. Parr merely assumes that the piracy-savings benefit he speculates is enjoyed by Adobe is attributable to the Patents-in-Suit. *See* Beebe Decl., Ex. 2 [Parr Report] ¶¶ 142, 153, 183.

- While he assumed that DRM provided some savings from piracy losses, Mr. Parr had no opinion or analysis as to whether DRM would actually result in a reduction of piracy. Beebe Decl., Ex. 1 [Parr Dep.] at 365:21-366:17 ("Q. And you haven't done any analysis to determine what percent of piracy, if there is any piracy, would actually be deterred by this DRM as opposed to the would-be pirates simply deciding not to use the software or finding

1   another alternative. You don't have a breakdown of that. Right? A. Right. I don't know – I'm

2   assuming there's benefit, but I don't know where those who are being turned away go. I just

3   know where there's some benefit and there's some savings, but where everybody goes after

4   they've hit the wall, I don't know… Q. Right. So in other words, you're assuming that a

5   would-be pirate or some percentage of would-be pirates would actually pay for the software,

6   but you don't know what percentage there is. Right? A. Yes, that's right.  Q. And you

7   haven't done that analysis. Right?  A. Correct.").

8   • Mr. Parr's opinion assumes without basis that any value from DRM is due to the patents.  *Id.*

9   at 105:5-105:13 ("Q. In other words, you don't have an analysis that would take even the

10   general industry information and the Symantec information and tie that specifically to the

11   patented inventions. Right? A. Well, no. I – I'm assuming that the DRM that Adobe is using

12   infringes and that if your DRM technology is infringing, there's benefit, and I've assumed

13   this is the benefit."); 75:2-10; 105:14-23; 106:2-11 ("[Q.]  Now, in terms of the other

14   technology that might be contributing to this piracy avoidance benefit that you've identified,

15   you haven't undertaken an analysis to parse out what percentage of that piracy avoidance

16   benefit is attributable to the patented inventions versus any other technology that contributes

17   to piracy avoidance. Correct? A. I don't see how to do that or why I would because, I guess,

18   it doesn't matter what you're using. If it infringes, you owe me 2.5 percent.").

19   • Mr. Parr just assumes the supposed DRM benefit is the same for all products.  *Id.* at 85:8-15

20   ("Q. So you did not do an independent analysis of each of the products listed here in Exhibit

21   3 to determine what benefit to Adobe there would be from the accused DRM technology. Is

22   that fair? A. That's correct. I assumed Adobe got the benefit, and these are the overall

23   products involved, and I assumed they all got benefits.").

24   • Mr. Parr did not even attempt to differentiate between the accused technologies.  *Id.* at 88:16-

25   20 ("Q. Okay. Now, you did not undertake an analysis that was separate for each of those

26   four accused DRM technologies to determine what the value to Adobe for each of those

27   technologies is or isn't. Right? A. Right."); 91:1-11.

28   • Mr. Parr performed no investigation of the accused software whatsoever.  *Id.* at 22:1-11 ("Q.

1    Is it also true that for those four categories of products that I just described, that would be

2    LiveCycle, Flash Platform, Digital Publishing, and the activation ALM, AMT products, that

3    you did not look into what features and functionalities are offered by those products? A. No.

4    I just know they're software products that Adobe sells and that they're accused of

5    infringement and that was all that was important to me. I didn't even care what they did.");

6    21:21-25 ("Q. And you haven't investigated what they do for purposes of forming your

7    opinions and conclusions in the case? A. No. I know their accused revenue, but I didn't look

8    into, say, playing with any of them.").

## Mr. Parr Improperly Bases His Opinion On A Profit Split Between Adobe And Digital Reg

10   - In purporting to translate supposed piracy savings enjoyed by Adobe into damages, Mr. Parr

11     undertakes a profit split analysis. Beebe Decl., Ex. 2 [Parr Report] ¶¶ 176-177 ("I believe that

12     a sharing of the saved profits would result in a 50% split of the saved profits. In my career I

13     have seen instances where inventions that result in a savings to the licensee are priced at a

14     50% sharing of the savings. Using a 50% split of the cost savings that Adobe would be

15     willing to pay indicates a damages royalty rate of ███████ of revenues.").[2]

16   - Importantly, Mr. Parr undertakes no analysis of the facts of the Digital Reg-Adobe

17     hypothetical negotiation to determine whether such a profit-split framework would be

18     appropriate for this particular hypothetical agreement. Indeed, other than a generic reference

19     to having "seen instances" of profit split in his career, he has offered no evidence or opinion

20     that either Adobe or Digital Reg would ever agree to such a framework. Beebe Decl., Ex. 1

21     [Parr Dep.] at 106:25-107:16 ("[Q.]  Now, you don't have any evidence of Adobe ever

22     entering into an agreement in which they agreed to a 50 percent profit split. Correct?  A. No.

23     I don't have any information like that for Adobe where they get a split 50/50, a profit

24

---

25   [2] Compounding the error of his improper profit-split framework, Mr. Parr improperly adopts
     Adobe's company-wide profits (from its SEC filings), and simply assumes, without any basis in

26   fact, that the same profits would apply to the specific accused instrumentalities. Beebe Decl., Ex. 1
     [Parr Dep.] at 103:23-104:7 ("Just so that there's no confusion down the road at trial, you do not

27   have a basis on which to say that the accused products have the same profit margin as the overall
     corporate profits that you've described here in Factor 11. Is that fair? A. I would admit they're not

28   -- that the products are not this exact profit margin. It might be a little more, it might be a little
     less. I don't know. All I had was what I had, and I had to do something.")

---

savings. I have experience with others, but not Adobe. Q. And I think it is also fair to say that you don't have any evidence of Digital Reg ever entering into an agreement in which they did a 50 percent profit split with the licensee. Correct? A. That's correct. I've only seen others do it, but you're correct. Q. And in the cases in which you've seen other people do a 50 percent profit split, have any of those cases been for DRM or activation technology? A. No.").

- Without any evidence that these parties, or any parties dealing with DRM technology, would employ a profit-split analysis, Mr. Parr's fifty percent profit-split must be rejected as a speculative and fundamentally unreliable methodology for approaching damages in this case. *See Oracle Am., Inc. v. Google Inc.*, 798 F. Supp. 2d 1111, 1119-20 (N.D. Cal. 2011) (excluding a fifty percent profit-split under the Nash Bargaining Solution, concluding "[i]t is no wonder that a patent plaintiff would love the Nash bargaining solution because it awards fully half of the surplus to the patent owner, which in most cases will amount to *half* of the infringer's profit, which will be many times the amount of real-world royalty rates," and that "[t]here is no anchor for this fifty percent assumption in the record of actual transactions" such that "[t]he Nash bargaining solution has never been approved by a judge to calculate reasonable royalties in litigation, at least in the face of objection" "despite the fact that for decades it has been lurking in the field of economics"); *see also Dynetix Design Solutions, Inc. v. Synopsys, Inc.*, 2013 WL 4538210 (N.D. Cal. Aug. 23, 2013) (excluding plaintiff's fifty percent profit split theory where the expert "failed to cite any evidence to support his conclusion that the 50% starting place would apply to component parts such as DLP in this particular industry," rendering his methodology "indistinguishable from 25% rule rejected in *Uniloc*, except that it may be even more arbitrary").

## Mr. Parr Improperly Cherry-Picks Evidence To Arrive At His Desired Royalty Rate

Perhaps recognizing the speciousness of his profit-sharing analysis, Mr. Parr also purports to undertake a traditional *Georgia-Pacific* analysis of a variety of other available evidence to arrive at a royalty rate. Beebe Decl., Ex. 2 [Parr Report] ¶ 178. In so doing, Mr. Parr applies a methodology that is unreliable and inconsistent in several dimensions—with the unsurprising result of yielding a royalty rate that is very close to the result of his profit sharing analysis.

Specifically, Mr. Parr relies on (1) two prior Digital Reg settlement agreements that include lump sum payments that he equates to ▮▮▮▮ effective royalty rates on past sales; and (2) a FAQ page on Adobe's website that offers to permit third party DRM software to plug in to Adobe software for a 5.5% royalty.  Beebe Decl., Ex. 1 [Parr Dep.] at 192:7-14; 199:21-200:3; 201:24-202:10.   On the flip side, Mr. Parr excludes (1) seven other Digital Reg agreements that grant rights to the Patents-in-Suit for ▮▮▮ and ▮ figure lump-sum amounts; and (2) Adobe's own license agreements for DRM technologies that include lump-sum amounts.  *Id.* at 203:16-22; 112:8-113:6.  This selective evaluation of evidence and resulting royalty rate should be excluded:

*First,* Mr. Parr improperly cherry-picked the Digital Reg settlement agreements he considered under *Georgia Pacific* Factor 1.

- Of the nine Digital Reg settlement agreements granting rights to one or more of the patents-in-suit or related patents that he considered, Mr. Parr only included two in his Factor 1 analysis.  *Id*. at 192:2-6 ("Now, within the context of the settlement agreements that you described in your Factor 1 analysis, you excluded eight agreements and included two in your analysis. Correct? A. Yes").[3]

- Intent on discounting any lump-sum damages analysis, Mr. Parr excluded the other seven Digital Reg agreements for lack of information concerning underlying revenue that would allow him to calculate an effective per-dollar royalty-rate.[4]  *Id*. at 163:7-18 (excluding AVG license because he did not have revenue numbers); 167:4-7 (excluding Valve agreement because he does not know its revenue); 172:5-18 (excluding LFP agreement because he does not know its revenue); 182:1-9 (excluding Playboy agreement because he believes there were not significant revenues); 175:11-20 (excluding Microsoft agreement because Mr. Parr did not know the revenue involved); *see also id.* at 152:20-153:4 (excluding Zynga because Digital Reg's principles said Zynga was at risk of bankruptcy and Digital Reg believes

---

[3] As described in the context of MIL 2 below, both sides' experts excluded Digital Reg's agreements with RPX in their Factor 1 analyses.  Accordingly, the tenth agreement—the RPX agreement—is not included in this discussion.

[4] Of course, even if Mr. Parr were correct that there is no underlying revenue information available from which to calculate an effective royalty rate, he cannot just disregard the agreements.  Rather, the evidence should be considered as evidence that the appropriate royalty would be a lump-sum.

1     royalties would be low); 170:23-171:12 (excluding Blockbuster agreement due to risk of

2     bankruptcy and statement from Digital Reg's principle that revenue was low).

3     • To reach his conclusion that revenue information that would allow an effective royalty rate

4       calculation is unavailable (and that the agreements should thus be excluded), Mr. Parr relied

5       only upon the untested assertions of Digital Reg's principle Michael Farley. *Id*. at 156:4-16

6       (relying on Mr. Farley's revenue numbers for Intuit); 163:13-18 (asking Mr. Farley for

7       revenue for AVG agreement and getting nothing); 152:20-153:4 (excluding Zynga because

8       Digital Reg's principles said Zynga was at risk of bankruptcy and Digital Reg believes

9       royalties would be low); 166:7-20 (relying only on Mr. Farley's characterization that

10      revenues were "disappointing" for Valve agreement); 170:1-8 (relying only on Mr. Farley's

11      characterization that revenues were "low" for Blockbuster agreement); 172:19-24 (same for

12      LFP); 180:19-181:10 (relying only on Mr. Farley's characterization that the patents could

13      only be asserted against Microsoft's music business and thus would be low); 182:5-9 (relying

14      entirely Mr. Farley's statements that Playboy's impacted revenues were not significant).

15     • Other than simply relying on Mr. Farley's self-serving statements, Mr. Parr conducted no

16       investigation to determine what revenues might be impacted. *Id*. at 156:20-25 (no

17       investigation or follow-up for Intuit revenue); 164:18-25 (same for AVG); 153:10-19 (not

18       even asking what Zynga's "low" revenue was); 166:18-167:3 (not even asking what Valve's

19       revenues were); 170:1-22 (no investigation into Blockbuster's revenues); 173:18-174:3

20       (same for LFP); 178:24-179:19 (same for Microsoft); 182:10-183:17 (same for Playboy).

21      ***And importantly***, even for the two agreements that Mr. Parr did consider in his Factor 1

22 analysis (the Intuit and Macrovision agreements), it turned out that Mr. Parr's effective royalty

23 rate calculation (the sole basis on which he drew the line between which agreements to include

24 and which to exclude) was wrong.

25     • Mr. Parr calculated his effective royalty rate based on past sales. *Id*. at 189:6-11 ("What

26       you're relying on is you read the [Macrovision] agreement to reflect an agreement between

27       the parties that the payment amount has an effective royalty rate for ███████ for past

28       revenues. Right? I'm reading from your report at Paragraph 136. A. Yes."); 155:7-25

1  (calculating effective rate for Intuit agreement based on past sales provided by Mr. Farley).

2  • But Mr. Parr acknowledges that both agreements also provide ***future*** rights to Digital Reg's

3  patents, with past and future rights awarded for a single lump-sum amount.   *Id.* at 192:7-14

4  ("Q. And of the two that you decided to include, one had an effective royalty rate of █████

5  █████ for past sales and then gave away future rates for free. Right? A. Yes. Q. And the

6  other one you calculated as having an effective royalty rate of ██████████ for past sales and

7  also gave away future rates for free. Right? A. Yes.").

8  • Ultimately, Mr. Parr was forced to concede that the effective royalty rate that he purported to

9  calculate would actually be diluted as Intuit and Macrovision continued to sell products but

10  that he had no idea by how much.   *Id.* at 341:12-25 ("Q. Now, I take it if you look at

11  Paragraph 334, the same -- or I assume the logic would apply to the Macrovision license as

12  well, that the ████████ royalty rate would decrease as revenues keep being generated by

13  Macrovision? A. Yes. If they keep going forward using the technology, further sales would

14  dilute the ████████. Q. And do you have any evidence that Macrovision ceased using the

15  patented technology after its entry into the license in February 2008?  A. Not that I can see in

16  my report, no. Q. So the effective royalty rate would be less than ██████████? A. If they

17  continue going forward, yes."); 340:16-341:11 (same for Intuit agreement).

18  ***Second,*** Mr. Parr ignored Adobe patent agreements covering related technologies.

19  *Compare* Beebe Decl., Ex. 2 [Parr Report] ¶ 138 ("However, no agreements have been produced

20  to permit any further analysis of Adobe's DRM licensing strategy or rates.") *with* Beebe Decl., Ex.

21  10 [Prowse Report] ¶¶ 49-53 (report of Adobe's expert analyzing four Adobe agreements relating

22  to DRM or software activation (all produced during fact discovery), each of which resulted in a

23  one-time fully paid-up, lump-sum payment).

24  ***Third***, after excluding seven Digital Reg patent agreements relating to the patents-in-suit

25  and four Adobe patent agreements relating to DRM and activation technologies, Mr. Parr instead

26  relied on a single page from Adobe's website to support a high running royalty rate. He did so

27  without establishing—or even investigating—any nexus to the patents or accused functionalities.

28  • Mr. Parr relied heavily on a one-page FAQ from Adobe's website relating to a DRM plug-in

---

1   license as evidence of a 5.5% royalty rate.  Beebe Decl., Ex. 2 [Parr Report] ¶¶ 137-138.

2   • Mr. Parr admitted that the DRM plug-in license did not convey any patent rights.  Beebe

3   Decl., Ex. 1 [Parr Dep.] at 109:21-25 ("Q. But that's not a patent license agreement. Right?

4   That's a technology agreement by which people can develop technology for use with Adobe

5   products. Correct? A. Right."); 114:13-16.

6   • Mr. Parr admitted he had no idea what technology or other information a plug-in license

7   covers or does not cover, let alone if it relates to the patented inventions at issue in this case.

8   *Id*. at 200:15-201:2 ("Q. So you actually have no idea what the plug-in covers or doesn't

9   cover? A. Right. I just know that for DRM technology, Adobe is trying to get 5.5 percent. Q.

10  Okay. And you have no idea what that DRM technology is. Right? How it's implemented --

11  A. No, no. Q. -- who it's implemented by? A. I don't know how it's implemented. Q. You

12  know nothing about it other than one page off of the Adobe website that talks about the

13  possibility of having a DRM plug-in agreement? A. Right.").

14  • Mr. Parr admits he did no investigation into the FAQ website or plug-in but still elected to

15  rely on the FAQ over agreements that relate to the patents-in-suit themselves.  *Id*. at 203:16-

16  22 ("Q. But in terms of what you did, you included the one or two-page plug-in discussion

17  from the web page that you didn't do any further investigation into and that you didn't know

18  what DRM technology was being covered and you excluded the eight agreements that relate

19  to the patents-in-suit. That's what you did? A. Yes, that's right."); 201:11-202:10.

20  • Mr. Parr further admits that he does not know how the exclusion of the 5.5% rate he arrived

21  at from this plug-in FAQ would impact his analysis.  *Id*. at 194:13-22 ("Q. If the judge

22  decides it's not comparable, do you agree that the royalty rate should go down from 2.5

23  percent? A. I'd have to think about it. I can't – I don't know.  Q. If the -- A. I don't like it

24  when judges tell me what's comparable and what's not. I'm in the business more than they

25  are. But if he says I can't use it, I don't know where I'm going to go.").

26  **Mr. Parr Improperly Applies The Entire Market Value Rule To Arrive At A Grossly**
    **Overinclusive Damages Base**

27

28  • After performing a faulty profit-splitting analysis and an unreliable *Georgia-Pacific* analysis,

1    Mr. Parr compounds his errors by applying the resulting 2.5% royalty rate he has come up

2    with to the entire revenue of all accused products.  In direct contradiction to Federal Circuit

3    law, Mr. Parr uses the entire market value of the accused products as his royalty base despite

4    admitting that the patented invention does not drive demand for the products.[5]

5    • Mr. Parr admits that he uses the entire revenue of accused Adobe products. *Id.* at 43:6-10

6    ("Q. [I]s it fair to say that in calculating damages, you applied the royalty rate that you

7    opined is appropriate to all sales revenue for the accused products? A. That's my goal, and

8    that's what I did, yes."); 67:17-25 ("[Q.] My question was: In forming your opinions and

9    conclusions, you didn't undertake any analysis to determine what proportion of all of the

10    features, functionality, value to customers, value to users, Acrobat Pro provides with regard

11    to the patents-in-suit, if any. Right? You didn't look at that question. Correct? A. Correct.

12    I'm assuming that the whole sale is infringement.").

13    • Mr. Parr admits that the invention does not drive demand.  *Id.* at 73:20-74:3; 76:4-10; 77:17-

14    23; 79:13-24 ("Q. From the consumers' perspective, you haven't done any analysis at all as

15    to the extent to which the patented inventions impact, if at all, consumers buying the accused

16    products listed on Exhibit 3. Right? A. I have not studied consumers', say, reaction to the

17    existence of DRM and how that would affect their buying decisions and the volume that they

18    would buy.").

19    • In an effort to superficially address the strict legal requirement that he apportion damages to

20    the accused functionality, Mr. Parr undertook an "apportionment" analysis that intentionally

21    has no effect. *Id.* at 215:11-16 ("Q. Okay. Then once you arrived at that amount, you

22    determined that if somebody were to tell you that you had to use the smallest salable unit,

23    you would decrease the base but increase the rate to get to the same number? A. Yes.");

24    214:15-23; 212:20-24; 213:10-18 ("[Q.] And the question that I have is: The way that you've

25    done that analysis, because you're adjusting the royalty base and then adjusting the royalty

26    rate in a proportionate way, under your math, any time you reduce the royalty base by a

27    _____

28    [5] Federal Circuit precedent requires that the entire market value not be used unless the invention drives demand for the entire product.  *Laserdynamics, Inc. v. Asus Computer Int.*, 694 F.3d 51, 67 (Fed. Cir. 2012); *Uniloc*, 632 F.3d at 1318.

1   particular amount to arrive at a smallest salable unit, you would have a corresponding

2   increase in the royalty rate to arrive at the same dollar amount. Right? A. That's what I did

3   here.").   This sort of "analysis" is in direct contravention of Federal Circuit precedent.

4   *Lucent*, 580 F.3d at 1338 ("Being precluded from using the computer as the royalty base, he

5   used the price of the software, but inflated the royalty rate accordingly. This cannot be an

6   acceptable way to conduct an analysis of what the parties would have agreed to in the

7   hypothetical licensing context.").

8   **MOTION IN LIMINE NO. 2 (EXCLUDE RPX LICENSE)**

9   Adobe moves *in limine* to exclude all evidence and argument regarding the RPX

10  agreements and negotiations thereof.[6]   Because both sides' damages experts agree that the RPX

11  agreements are not relevant to the hypothetical negotiation in this case, allowing evidence or

12  argument regarding the agreements serves no proper purpose and instead creates a danger of

13  undue prejudice, jury confusion, and waste of trial time.  *See Oracle Am., Inc. v. Google, Inc.*,

14  2012 WL 44485, *8 (N.D. Cal., Jan. 9, 2012) (excluding a settlement agreement for a large sum

15  where the settlement was "too dissimilar to be helpful in calculating damages"); *Apple Inc. v.*

16  *Samsung Elecs. Co., Ltd.*, 2013 WL 5958176, *4 (N.D. Cal., Nov. 7, 2013).

17  RPX is a patent aggregator—it licenses patents and then sublicenses those patents to its

18  members.  RPX does not make, use or sell products, let alone DRM technologies.  Beebe Decl.,

19  Ex. 1 [Parr Dep.] at 185:5-187:14 (admitting RPX's business is "buy[ing] technology usually

20  grouped together in portfolios and sublicens[ing] it to other companies" and RPX does not make

21  any products or DRM technologies).   In this case, RPX took a license to certain Digital Reg

22  patents and ███████████████████████████████████████████████████████████████

23  ███████████████.  Beebe Decl., Ex. 5 [Farley Dep.] 166:21-167:5; *see also* Ex. 11 [RPX Letter

24  to Michael Farley] at DIGREG-072098 – 072100 (███████████████████████).

25  Given these dissimilar circumstances, it is not surprising that ***both sides' experts*** agree that

26  ████████████████████ is not comparable or relevant to the hypothetical negotiation in this case.

27

28  ───────────────────────────
    [6] The RPX Agreements include the December 12, 2008 Agreement between Digital Reg and RPX, as well as November 3, 2009 and October 13, 2011 amendments thereto.

1   Digital Reg's damages expert, Russell Parr, admits that the RPX agreement is not useful in this

2   case.  Beebe Decl., Ex. 1 [Parr Dep.] at 188:12-19 ("Q. And it's fair to say you don't plan to tell

3   the jury that the RPX agreement is comparable to or relevant to the hypothetical negotiation

4   between the defendants in this case and Digital Reg.  Right? . . . A. I don't know if -- comparable?

5   I mean, it's a deal that involves DRM technology, and then ***I'll tell them that I don't think it's***

6   ***useful for this case***."); *see also id.* at 184:3-4 ("Q. Did you include or exclude RPX? A. I think it

7   would be safe to say I excluded it."); 187:15-20 ("Q. As a result of the fact that you don't know

8   how it's tied together, is ***it safe to say that you did not feel that it was appropriate to rely on the***

9   ***RPX license for the hypothetical negotiation analysis you did***? A. ***Yeah***. Otherwise, I'd be higher

10  than 2.5 percent.").  Adobe's damages expert also agrees that the RPX agreements should be

11  excluded.   Beebe Decl., Ex. 10 [Prowse Report] at 16; Ex. 12 [Prowse Dep.] at 31:4-33:13

12  (testifying *inter alia* "RPX has a completely different business model than Adobe, and its -- its use

13  of the patents it licenses is completely different from Adobe.").

14       Despite this agreement, Digital Reg has stated that it wishes to introduce the RPX

15  agreements at trial to (i) provide background on the licensing history of the patents-in-suit; and (ii)

16  to support its damages case by demonstrating that other companies have licensed the asserted

17  patents.  In the parties' meet and confer, Digital Reg has confirmed that it sees no other relevance

18  to the information besides these two generalized goals.  But the low probative value of permitting

19  this evidence for Digital Reg's professed purposes is far outweighed by the undue prejudice to

20  Adobe from introducing these agreements.  For one, if the RPX agreements were introduced at

21  trial, Adobe and its expert would have to spend significant trial time eliciting testimony and

22  introducing evidence regarding the unique circumstances surrounding RPX's business model and

23  the █████████ to the jury.  These are complex facts on a collateral issue that would only

24  create a significant risk of jury confusion.  Moreover, ████████████████████

25  ████████████████████████████████████████████████

26  ████████████████████████████████████████████████

27  █t.  *Compare* Beebe Decl., Ex. 2 [Parr Report] ¶ 135 (███████████████████████)

28  *with* Ex. 2 [Parr Report] ¶ 130 (████████████████).

---

1   All told, inclusion of agreements that together are an such outlier—both in terms of

2   circumstance and dollar amount—only risks prejudice to Adobe, particularly where the

3   agreements are admittedly divorced from the hypothetical negotiation at issue in this case.

4   Excluding the RPX agreements will save time and focus issues for trial.

5   **MOTION IN LIMINE NO. 3 (EXCLUDE EVIDENCE RE: ADOBE'S AMT PRODUCT)**

6   Adobe moves to exclude all evidence and argument related to Adobe's current AMT

7   software activation services under FRE 401 and 402 and based on this Court's ruling in Docket

8   Number 431.  Should the Court find it relevant, Adobe requests it be excluded under FRE 403.

9   The Court previously considered this question and determined that Adobe's AMT software

10  activation service is not accused.  Dkt. No. 431 at 7.  Thus, evidence concerning Adobe's AMT

11  software is not relevant.  Nonetheless, Digital Reg has, in direct contravention of this Court's

12  ruling, (1) asserted infringement of the patents-in-suit by AMT, and (2) included in its damage

13  calculations products which only utilize Adobe's AMT activation service.

14  During discovery, a dispute arose over whether Digital Reg was entitled to the source code

15  for Adobe's AMT activation service.  Adobe explained that Digital Reg was not entitled to the

16  source code because Digital Reg's infringement contentions are limited to a different Adobe

17  product – Adobe volume licensing services (Adobe's "ALM" product), which is a discontinued

18  product.  Nonetheless, Digital Reg contended that ALM is still in use as part of AMT.  Adobe

19  explained that AMT included references to ALM for compatibility reasons but that the

20  functionality of ALM had been completely replaced by new source code – the AMT source code.

21  This was confirmed in deposition by Adobe's employees Eric Wilde and Juan-Carlos Colosso.

22  Based on competent evidence, this Court determined that (1) Digital Reg's infringement

23  contentions are limited to the discontinued ALM product, and (2) "while Adobe still appears to be

24  using ALM, it is actually using a new system."  Dkt. No. 431 at 7.  The Court ruled that Adobe's

25  AMT activation service is not accused and not subject to further discovery.  Dkt. No. 431 at 7.

26  Notwithstanding this ruling, Digital Reg's expert submitted a report alleging infringement

27  of the patents-in-suit by Adobe's AMT activation service.  Dr. Devanbu opined, "Throughout this

28  report, I discuss as typical the protection of Acrobat with AMT 2.0."  *See* Dkt. No. 523-10

1  [Devanbu Rpt. App'x A-3] at 2.  Dr. Devanbu, repeating arguments already rejected by this Court,

2  then further opined "I understand that Adobe has attempted to articulate a relevant distinction

3  between components referred to as 'ALM' (or 'Adobe License Manager') and 'AMT' (or

4  'Application Management Technology'). However, Adobe's documentation makes clear that

5  'ALM is an AMT component.' Thus, all applications using the technology referred to as 'AMT'

6  are in fact using ALM, as AMT requires ALM." *Id.*

7       Dr. Devanbu's report alleging infringement of the patents-in-suit by AMT is in direct

8  contravention to this Court's order that (1) AMT is not an accused product and (2) Adobe's AMT

9  does not include ALM but is instead a new system.  Digital Reg should be excluded from

10 introducing evidence of Adobe's current AMT activation service, any argument that Adobe still

11 uses its prior ALM volume licensing code, or any damages calculations relying on either theory.

12      Furthermore, Dr. Devanbu's analysis is predicated on the AMT product operating in an

13 identical manner to that of Adobe's ALM product, which was discontinued over six years ago for

14 being a complete failure in the market place. Dkt. No. 371 [Joint Ltr Brief] at 9-10.  Dr. Devanbu

15 has not seen the source code for AMT much less compared the AMT source code with the ALM

16 source code.  Dr. Devanbu only reaches his conclusions by blatantly ignoring this Court's ruling

17 and the evidence on which this Court's ruling is based.

18      Should the Court conclude that evidence of Adobe's current AMT activation services

19 makes some fact more or less probable in this action, Adobe requests the Court exercise its

20 discretion to exclude such evidence under FRE 403.  The introduction of evidence regarding non-

21 accused product functionality and sales which shares use of a name (ALM), but no other relevant

22 features, with accused functionality, will only serve to confuse the jury as to the functionality of

23 the accused products and the proper damages calculations. Any probative value will be

24 substantially outweighed by the risk of misleading or confusing the jury.

25 **MOTION IN LIMINE NO. 4 (PRECLUDE REFERENCE TO ADOBE'S TOTAL REVENUES, REVENUES NOT TIED TO ACCUSED FEATURES, MARKET**
26 **CAPITALIZATION, COMPANY VALUATION OR OVERALL FINANCIAL SUCCESS)**

27      Adobe requests that the Court preclude from introducing evidence and argument regarding

28 Adobe's total revenues, revenues not tied specifically to the accused features that are subject to

infringement allegations, market capitalization, company valuation, or overall financial success. Such evidence is not only irrelevant to the calculation of damages but also unfairly prejudicial to Adobe.  FRE 401-403; *see Compensatory Damages Issues in Patent Infringement Cases*, Federal Judicial Center 32 (2011), *available at* http://www.fjc.gov/public/pdf.nsf/lookup/damagespatent.pdf/$file/damagespatent.pdf  ("Some of the most common in limine motions related to patent damages are directed to testimony and argument concerning the accused infringer's net worth, total revenue, or revenues from the sales of anything but the actual royalty base.  Such information is normally inadmissible as unfairly prejudicial and should not be presented to the jury, whether in voir dire, opening statement, witness testimony, or closing argument."); *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318-1320 (Fed. Cir. 2011) (introduction of Microsoft's revenue "cannot help but skew the damages horizon for the jury").  Introduction of such evidence at trial may lead to jury confusion and error, including by misleading the jury to believe that it should base a damages award on Adobe's overall profitability, when Digital Reg has not purported to—and cannot possibly—link financial data or success not tied to the accused activities to any issue in the case.

## MOTION IN LIMINE NO. 5 (PRECLUDE ANY REFERENCE OR EVIDENCE REGARDING WILLFULNESS)

Adobe moves to preclude Digital Reg from presenting evidence or argument on willful infringement for either one of two independent reasons:  (1) there is not sufficient evidence under the objective prong of *Seagate* for willfulness to go before the jury; and (2) during discovery Digital Reg failed to disclose a viable willfulness theory under the subjective prong of *Seagate*.

In *Seagate Tech.*, the Federal Circuit announced a two-part test for willful infringement:

> [T]o establish willful infringement, a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent.... The state of mind of the accused infringer is not relevant to this objective inquiry.

*See In re Seagate*, 497 F.3d 1360, 1371 (Fed. Cir. 2007).  The patent owner then must show that this objectively high risk was "either known or so obvious that it should have been known" to the alleged infringer—a subjective analysis involving the accused infringer's state of mind.  *Id.*  The

objective prong is "a separate legal test from *Seagate*'s subjective component" and the subjective prong "must be addressed only after the objective requirement is satisfied." *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 682 F.3d 1003, 1005-1007 (Fed. Cir. 2012).

With respect to the objective prong, "[s]hould the court determine that the infringer's reliance on a defense was not objectively reckless, it cannot send the question of willfulness to the jury, since proving the objective prong is a predicate to consideration of the subjective prong." *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1236 (Fed. Cir. 2011); *see also Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 585 F. Supp. 2d 636, 642 (D. Del. 2008) ("[U]nder *Seagate*'s objective standard, 'both legitimate defenses to infringement claims and credible invalidity arguments demonstrate the lack of an objectively high likelihood that a party took actions constituting infringement of a valid patent.'") (quoting *Black & Decker, Inc. v. Robert Bosch Tool Corp.*, 260 Fed. Appx. 284, 291 (Fed. Cir. 2008)). "[T]he objective determination of recklessness, even though predicated on underlying mixed questions of law and fact, is best decided by the judge as a question of law subject to *de novo* review." *Bard*, 682 F.3d at 1006–07. In light of Adobe's non-infringement and invalidity positions, including those in Adobe's summary judgment motions and supporting expert submissions (Dkt. No. 556), Adobe has presented a host of defenses, any one of which forecloses a finding of objective recklessness.

Even if Digital Reg could somehow overcome Adobe's showing on the objective prong, Digital Reg should be precluded from presenting any evidence or argument regarding willful infringement because it failed to disclose during discovery any viable theory under the subjective prong of *Seagate*, let alone adequate supporting evidence. During discovery, Adobe's very first interrogatory requested that Digital Reg describe in detail all facts and circumstances supporting or otherwise relating to Digital Reg's contention that Adobe willfully infringed the patents-in-suit. Beebe Decl., Ex. 13 [Digital Reg Resps. to Adobe's First Set of Individual Interrogs., DTX522] at 3. The entirety of Digital Reg's response (save objections) was:

> Adobe acquired knowledge of at least some of the Patents-in-Suit at least through the prosecution of its own patents before the United States Patent and Trademark Office.

1   Specifically, U.S. Patent Nos. 8,166,384 and 8,001,143, assigned to Adobe Systems
2   Incorporated, refer to Digital Reg's prior U.S. Patent No. 6,389,541; U.S. Patent No.
3   7,707,642, assigned to Adobe Systems Incorporated, refers to Digital Reg's prior U.S. Patent
    No. 6,751,670; and U.S. Patent No. 7,996,672, assigned to Adobe Systems Incorporated,
    refers to Digital Reg's prior U.S. Patent No. 7,421,741.

4

5

6

7

8

9   *Id.*

10      This disclosure is inadequate to present a viable theory under the subjective prong of

11  *Seagate* because Digital Reg does not even purport to offer a theory—let alone adequate evidence

12  to support a contention—that Adobe had the requisite state of mind.  First, Digital Reg has not

13  disclosed any theory under which Adobe's citation to the patents-in-suit as potential prior art to

14  Adobe patents (which Digital Reg does not even contend have any connection to the case, let

15  alone the infringement allegations) constitutes evidence of Adobe's state of mind as to the

16  likelihood of infringement under the subjective prong of *Seagate*.  Second, Digital Reg has not

17  disclosed any theory under which Adobe's business meetings with Digital Reg in 2004 and 2005,

18  which are far removed from product development for the accused products, would render the risk

19  of infringement so obvious that it should have been known.  *Id.*  In fact, during a Rule 30(b)(6)

20  deposition about these interactions between Adobe and Digital Reg, Digital Reg's corporate

21  representative Mr. Chip Venters

22

23                                                     Beebe Decl., Ex. 6 [Venters Dep.] at 307:6-313:25.  When asked

24  whether Digital Reg ever "

25

26                                                                                                          *Id.*

27  Mr. Venters' business partner and Digital Reg's manager (responsible for the legal and financial

28  aspects of the company) Mr. Michael Farley likewise testified that Digital Reg

1

2

3      Because Digital Reg has disclosed no contention or supporting evidence regarding

4  Adobe's state-of-mind,[7] the Court should also preclude it from introducing any evidence or

5  argument as to willful infringement.  Unsupported insinuations of willful infringement will not

6  only be unfairly prejudicial against Adobe but also confusing to the jury.

7  **MOTION IN LIMINE NO. 6 (PRECLUDE EVIDENCE OR ARGUMENT ON**
   **INFRINGEMENT THEORIES NOT TIMELY DISCLOSED IN DISCOVERY)**

8

9      Adobe moves to exclude evidence that was not properly disclosed in discovery under

10  Federal Rules of Civil Procedure (Fed. R. Civ. P.) 26(e) and 37(c)(1).  In particular, Adobe moves

11  to exclude any evidence or argument alleging Adobe directly infringes under a joint infringement

12  theory and any evidence or argument supporting the claim that Adobe possesses a specific intent

13  to cause the harm of patent infringement.  Both of these infringement theories were subject to

14  direct and specific interrogatory requests.  Digital Reg failed to identify any evidence in support of

15  those claims during both fact and expert discovery and failed to supplement its discovery

16  responses to disclose supporting evidence at any time.   The law is clear that such tactics are not

17  permitted and that the consequence for hiding evidence in discovery is exclusion from trial.

18      Digital Reg's failure to provide a substantive response to interrogatories seeking the

19  identification of evidence supporting Digital Reg's infringement theories warrants exclusion of

20  evidence identified after the close of discovery.  *See VNUS Medical Techs., Inc. v. Diomed*

21  *Holdings, Inc.*, 2007 WL 3096589 (N.D. Cal. 2007).  "The parties are expected to supplement

22  and/or correct their disclosures promptly when required under that Rule, without the need for a

23  request from opposing counsel or an order from the Court."  *Apple, Inc. v. Samsung Elecs. Co.*,

24  2012 WL 3155574 at *4 (N.D. Cal. 2012).  "Rule 37 *mandates* that a party's failure to comply

25

26  ---
   [7] Having failed to disclose its contentions and supporting evidence during discovery, Digital Reg
27  should not be permitted to introduce new theories or evidence at this late date.  Digital Reg's
   failure to disclose adequate willfulness contentions is neither substantially justified nor harmless,
28  as Digital Reg had ample opportunities to disclose its evidence of Adobe's purported willful
   infringement, and Adobe has relied upon Digital Reg's contentions in preparing its defense.

1  with the . . . supplemental disclosure obligations under Federal Rule of Civil Procedure 26(e)(1)

2  results in that party being precluded from 'use [of] that information … to supply evidence on a

3  motion, at a hearing or at trial, unless the failure was substantially justified or is harmless.'"

4  *Oracle USA, Inc. v. SAP AG*, 264 F.R.D. 541, 544 (N.D. Cal. 2009).

5  **Digital Reg Failed To Timely Disclose A Joint Infringement Theory**

6       During discovery, Adobe's Interrogatory No. 6 requested:  "For each Asserted Claim,

7  identify each actor that performs each step of the claimed method, and where the step is performed

8  by a third party, ***provide a complete description of all evidence that Adobe has an agency***

9  ***relationship with and/or exercises direction and control over such third party***, including, but not

10  limited to, evidence of instructions, directions, written communications, contracts and/or

11  agreements and identify, by Bates number, all documents on which you rely or refer for your

12  response."  Beebe Decl., Ex. 15 [Digital Reg Resps. to Adobe's 3rd Set of Interrogs., DTX525] at

13  4-5.  Digital Reg responded only that "it will provide its response in connection with its expert

14  report, pursuant to the Scheduling Order governing this case."  *Id.* at 5.  It provided no substantive

15  response during fact discovery.

16       Despite this improper delay tactic, Digital Reg's infringement report contained no

17  discussion of, nor citation to evidence supporting, the claim that Adobe directs or controls any

18  third-party conduct.  And at deposition, Digital Reg's expert made clear that he had no opinion on

19  joint infringement.  Beebe Decl., Ex. 14 [Devanbu Dep.] at 101:18-20; Dkt. No. 523-19 [Devanbu

20  Dep.] at 678:13-21 ("Q. And I think you testified that ***you offered no opinions with respect to***

21  ***joint infringement*** in the context of Symantec; do you recall that?  A. Yes.  Q. ***Is that also true***

22  ***for Adobe?*** A. ***Yes, I have no opinion on that.***")

23  **Digital Reg Failed To Timely Disclose Evidence Of Indirect Infringement**

24       Adobe propounded two interrogatories specifically requesting information relating to any

25  indirect infringement theory Digital Reg intended to pursue.  In particular, Interrogatory No. 7

26  requested Digital Reg "describe in detail the acts of Adobe that you contend contribute to or are

27  inducing the direct infringement," while Interrogatory No. 8 requested Digital Reg describe in

28  detail "when Adobe first had notice of the patents" and "each document concerning Adobe's

1   alleged inducement or contribution."  Beebe Decl., Ex. 15 [Digital Reg Responses to Adobe's 3rd

2   Set of Interrogatories, DTX525] at 5-6.  Digital Reg's response to both interrogatories repeated the

3   claim that Digital Reg "will provide its response in connection with its expert report."  *Id* at 6-7.

4        In its expert report, Digital Reg disclosed no facts supporting an indirect infringement

5   claim.  Digital Reg failed to identify a single fact demonstrating that Adobe acted with knowledge

6   of the asserted patents, and Digital Reg's expert admitted in deposition he did not know when

7   Adobe learned of the patents.  Dkt. No. 523-19 [Devanbu Dep.] at 505:9-11 ("Q. In fact, you don't

8   know when Adobe first had notice of any of the Patent's-in-Suit; right?  A. That's correct.").

9   Likewise, Digital Reg's report contained no discussion of the scienter element of indirect

10  infringement, and Digital Reg's expert admitted he had no knowledge of Adobe's belief regarding

11  infringement.  *Id.* at 506:5-12 (Q. And you have no evidence or no knowledge as to whether or not

12  Adobe believed that it was infringing any of the Patents-in-Suit; correct?  A. I don't know what

13  Adobe believed.  Q. And that is still true today; right? . . . A. I don't know what they believe.");

14  509:18-510:3.  Indeed, Digital Reg's expert went so far as to admit he had formed no opinion on

15  direct or indirect infringement.  *Id.* at 664:1-3 ("Q. Okay.  So you – you didn't form an opinion as

16  to what was required for direct infringement?  A. Or indirect infringement; no.").

17       Likewise, with respect to contributory infringement, Digital Reg's expert reports are

18  completely silent regarding any claim that Adobe contributes to infringement, and fail to discuss

19  relevant elements of such a claim – including whether the products have substantial non-infringing

20  uses.  *See* Dkt. No. 523-5 [Devanbu Rpt. App'x. A-1] at 1 (failing to allege contributory

21  infringement).  Moreover, Digital Reg's opposition to Adobe's motion for summary judgment on

22  indirect infringement was limited to inducement.  Dkt. Nos. 541 at 20; 560 at 9 ("Defendants are

23  liable indirectly for the actions of their customers if they have induced them to perform some of

24  the method steps.").  Digital Reg has not developed a theory of contributory infringement in this

25  case.  Any evidence and argument on that point is thus irrelevant, unduly prejudicial, and likely to

26  confuse the jury regarding the evidence necessary to properly determine indirect infringement.

27  **Adobe Is Prejudiced By Digital Reg's Discovery Failures**

28       Adobe moved for summary judgment on both of these issues based on Digital Reg's

1  failure to come forward with any supporting evidence during discovery.  In response, Digital Reg

2  identified only a software user license and the existence of manuals generally.  Adobe promptly

3  objected to this tactic.  Dkt. No. 564-4 [Defendants' Reply Brief] at 1-3, 6.

4      Although it is Digital Reg's burden to demonstrate that its failure was substantially

5  justified or harmless, *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir.

6  2001), there is no doubt that Adobe is prejudiced by Digital Reg's failure to abide by its discovery

7  obligations.  Without ***any*** disclosure of Digital Reg's joint or indirect infringement theories,

8  Adobe did not have the opportunity to develop its defense, whether to test the evidence Digital

9  Reg intended to present at trial or to develop its own evidence in response.  Permitting Digital Reg

10 to proceed on an undisclosed theory, using undisclosed evidence, is exactly the prejudicial trial by

11 ambush the discovery rules are intended to prevent.  Digital Reg's failure also caused Adobe to

12 use the few pages it was allowed for summary judgment (given the number of defendants and

13 asserted patents, and the need to address claim construction) on these issues.

14 **MOTION IN LIMINE NO. 7 (PRECLUDE DIGITAL REG'S EXPERTS FROM**
**OFFERING OPINIONS NOT DISCLOSED IN EXPERT DISCOVERY)**

15

16      Pursuant to FRCP 26 and 37, Adobe moves to preclude new opinions from Digital Reg's

17 experts that could have been raised in expert discovery but were not.  Specifically, Digital Reg's

18 experts cannot now:

19 • Apply claim constructions that were proposed by Adobe and known to Digital Reg's experts,

20   but which Digital Reg's experts ***elected*** not to apply in preparing their reports.[8]

21   o With respect to the '541 patent, Adobe requests that the Court preclude Digital Reg's

22     experts from offering any opinions regarding the claim construction requirement that the

23     term "token" to be construed as "a file indicating whether the transaction has been

24     approved."  Dkt. No. 574 at 6.  This requirement was proposed by Adobe and known to

25     Digital Reg's experts prior to the deadline for disclosure of their expert reports.  Yet, as

26 

27 [8] Digital Reg's experts' failure to address available claim constructions was not an accident or
   omission.  Both experts acknowledged their obligation to provide the complete basis for their

28 opinions in their reports and confirmed that they had done so.  Beebe Decl., Ex. 14 [Devanbu
   Dep.] at 289: 13-17; Dkt. No. 520-16 [Keller Dep.] at 14:18-15:13, 57:19-59:7.

Adobe demonstrated during the summary judgment phase, Digital Reg's infringement expert omitted any infringement analysis applying this requirement and, instead, expressly limited his opinion to disagreeing with the requirement.  Dkt. No. 556 at 13.

o With respect to the '670 patent, Digital Reg's experts offered no testimony that the patent includes granting access prior to a server response—a construction proposed by Adobe (and known to Digital Reg's experts) and adopted by the Court.  Dkt. No. 556 at 19.

• Offer opinions as to Adobe's state of mind.

o Digital Reg's infringement expert Dr. Devanbu admitted he had no opinion on Adobe's scienter.  Dkt. No. 523-19 [Devanbu Dep.] at 506:5-12 (Q. And you have no evidence or no knowledge as to whether or not Adobe believed that it was infringing any of the Patents-in-Suit; correct?  A. I don't know what Adobe believed. Q. And that is still true today; right? A. I don't know what they believe.").

• Offer opinions as to the availability or absence of noninfringing alternatives.

o Dr. Devanbu admitted he had not done an analysis on this subject. *Id*. at 658:25-659:18 ("Q. Now, you're also not offering any opinion that the current products and systems and the way they're done now is the only way that Adobe could achieve access control or DRM; right?  A. Do I believe that Adobe has other design options besides options for designing DRM?  That decision as to what DRM method to use is a complicated decision which concerns user interface design, convenience of use, economics, business and technology.  So I don't know what -- the constraints under which Adobe operates and what made them choose to design their DRM mechanisms in this manner, so I don't really know what their choices are. Q. So you -- you can't say that there are no other choices; right? A. I can't say if there are or there are not. *I have no opinion on that*.").

Adobe requests that the Court limit Digital Reg's experts to presenting the opinions disclosed in their reports throughout trial.

## MOTION IN LIMINE NO. 8 (PRECLUDE ANY SUGGESTION OR ARGUMENT RELATING TO ALLEGED DISCOVERY DEFICIENCIES)

Pursuant to FRE 402 and 403, Adobe moves to preclude Digital Reg from making any

arguments, statements, or suggestions (or attempting to elicit any testimony) that Adobe withheld or failed to produce evidence or failed to comply with its discovery obligations. Such comments are irrelevant to the merits of the case, and would be highly prejudicial to Adobe, confusing for the jury, and would waste trial time. Adobe fully complied with its discovery obligations. If Digital Reg felt Adobe did not comply, it should have sought relief through a motion to compel. Where Digital Reg did, the motion was resolved and any deficiency determined by the Court was addressed by Adobe. Digital Reg should not be permitted to insinuate otherwise before the jury.

## MOTION IN LIMINE NO. 9 (PRECLUDE ALLEGATIONS OF COPYING)

Adobe moves to exclude any evidence or argument that Adobe copied, in whole or in part, the asserted patents or any product allegedly embodying any invention disclosed in the asserted patents. During discovery, Adobe requested Digital Reg identify any evidence supporting a claim that Adobe copied the invention of the asserted patents. Digital Reg identified no evidence. Beebe Decl., Ex. 16 [Plaintiff's Second Amended Resps. and Objs. to Defendants' First Set of Common Interrogs, DTX519] at 8-10. Later, when questioned on this topic Digital Reg's 30(b)(6) witness on this topic, Chip Venters, admitted any claim of copying was made only by Digital Reg's lawyers and that he had no actual knowledge or evidence to suggest copying. Beebe Decl., Ex. 17 [Venters Dep.] at 514:14-22 ("Q. The last bullet says, 'Defendants' copying of the invention.' Do you see that? A. Correct. Q. In your corporate representative capacity of Digital Reg of Texas, are you aware of any copying of your invention by any of the Defendants in this lawsuit? A. That is for counsel to decide. I leave that to counsel."); 515:19-21 ("Q. Do you have any personal knowledge regarding any copying? A. No."). Likewise, Digital Reg's invalidity expert Dr. Keller (who opined on secondary considerations of obviousness) admitted to having no knowledge of any alleged copying. Dkt. No. 520-16 [Keller Dep.] at 218:10-16 ("Q. Okay. So other than allegation of infringement that you were advised of by counsel for Digital Reg, you don't have any other basis to suggest that defendants were copying the patents; correct? A. I don't have knowledge of the defendants' particular actions in this case."). Because Digital Reg has admitted it has no evidence of copying by Adobe, it would be unduly prejudicial to Adobe and confusing to the jury to allow Digital Reg to insinuate that any copying occurred.

1

2  Dated:  July 30, 2014                    Respectfully submitted,

3

4                                             _/s/_____Edward R. Reines_____
                                            Edward R. Reines
5                                           WEIL, GOTSHAL & MANGES LLP
                                            201 Redwood Shores Parkway
6                                           Redwood Shores, CA  94065
                                            Telephone:  (650) 802-3000
7                                           Facsimile:  (650) 802-3100

8                                           *Attorneys for Defendant*
                                            *Adobe Systems Incorporated*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28