1    W. PAUL SCHUCK (Cal. Bar No. 203717)
     *pschuck@bzbm.com*
2    BARTKO, ZANKEL, BUNZEL & MILLER
     One Embarcadero Center, Suite 800
3    San Francisco, California 94111
     Telephone: (415) 956-1900
4    Facsimile: (415) 956-1152

5    ANDREW G. DINOVO (admitted *pro hac vice*)
     *adinovo@dpelaw.com*
6    ADAM G. PRICE (admitted *pro hac vice*)
     *aprice@dpelaw.com*
7    DINOVO PRICE ELLWANGER & HARDY LLP
     7000 N. MoPac Expressway, Suite 350
8    Austin, Texas 78731
     Telephone: (512) 539-2626
9    Facsimile: (512) 539-2627

10   Attorneys for Plaintiff
     DIGITALREG OF TEXAS, LLC

11

12                  **UNITED STATES DISTRICT COURT**

13                  **NORTHERN DISTRICT OF CALIFORNIA**

14                        **OAKLAND DIVISION**

15

16   DIGITAL REG OF TEXAS, LLC,            Civil Case No. 12-CV-01971 CW (KAW)

17                   Plaintiff,            **DIGITAL REG OF TEXAS, LLC'S**
                                           **OPPOSITION TO ADOBE SYSTEMS**
18           vs.                           **INC.'S MOTIONS *IN LIMINE* NOS. 1 - 9**

19   ADOBE SYSTEMS INCORPORATED, et al.,   Judge: The Honorable Claudia Wilken
                                           Date: August 13, 2014
20                   Defendants.           Time: 2:00 p.m.
                                           Ctrm: 2, 4th floor
21

22

23

24

25
                           **REDACTED VERSION**
26

27

28

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION....................................................................................................... 1

A. The Court Should Deny Adobe's MIL No. 1 Because Mr. Parr's Opinios Are Relevant and Admissible ........................................................................................... 1

B. The Court Should Deny Adobe's MIL No. 2 Because the RPX License Relevant to an Appropriate Reasonable Royalty................................................................. 11

C. The Court Should DenyAdobe's MIL No. 3 Because AMT and ALM are Accused Products in this Case ...................................................................................... 13

D. The Court Should Deny Adobe's MIL No. 4 Because Adobe's Revenues Are Relevant to an Appropriate Reasonable Royalty............................................................ 15

E. The Court Should Deny Adobe's MIL No. 5 Because a Reasonable Fact-Finder Could Find Willful Infringement .......................................................................... 16

F. The Court Should Deny Adobe's MIL No. 6 Because Digital Reg Timely Disclosed its Infringement Theories ......................................................................................... 19

G. The Court Should Deny Adobe's MIL No. 7 Because Adobe Seeks to Preclude Digital Reg's Expert from Testifying About Opinions Set Forth in his Report ................... 20

H. The Court Should Deny Adobe's MIL No. 8 Because Adobe's Discovery Deficiencies Will Assist the Jury in Evaluating the Expert's Opinions ..................................... 22

I. The Court Should Deny Adobe's MIL No. 9 Because Evidence of Adobe's Copyng is Relevant to Indirect Infringement, Willfulness, Enhanced Damages and Nonobviousness ................................................................................................. 23

CONCLUSION ..................................................................................................... 235

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Apple, Inc. v. Samsung Elecs. Co.*,
    2013 WL 5958176 (N.D. Cal. Nov. 7, 2013)........................................................11

*Aspex Eyewear, Inc. v. Clariti Eyewear, Inc.*...........................................................17

*Bard Peripheral Vascular v. W.L. Gore & Assoc.*,
    682 F.3d 1003 (Fed. Cir. 2012)..........................................................................16, 17

*Cargill, Inc. v. Canbra Foods, Ltd.*,
    476 F.3d 1359 (Fed. Cir. 2007)................................................................................21

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*,
    2012 WL 5417552 (W.D. Pa., Nov. 2, 2012) ..........................................................16

*City of Pomona v. SQM N. Am. Corp.*,
    750 F.3d 1036 (9th Cir. 2014)...................................................................................2

*Cook Inc. v. Endologix, Inc.*,
    2012 WL 3779198 (S.D. Ind. Aug. 30, 2012)..........................................................16

*Crocs, Inc. v. Internat'l Trade Comm'n*,
    598 F.3d 1294 (Fed. Cir. 2010)................................................................................24

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) ...............................................................................3, 7, 10

*Depuy Spine, Inc. v. Medtonic Sofamor Danek, Inc.*,
    567 F.d3d 1314, 1336 (Fed. Cir. 1996)..............................................................23, 24

*DSU Medical Corp. v. JMS Co., Ltd.*,
    471 F.3d 1293 (Fed. Cir. 2006)................................................................................24

*Dynetix Design Solutions, Inc. v. Synopsys, Inc.*,
    2013 WL 4538210 (N.D. Cal. Aug. 23, 2013)....................................................3, 4, 5

*Fujitsu Ltd. v. Netgear Inc.*,
    620 F.3d 1321 (Fed. Cir. 2010)................................................................................21

*Golden Blount, Inc. v. Robert H. Peterson Co.*,
    438 F.3d 1354 (Fed. Cir. 2006)................................................................................17

*Graham v. John Deere Co.*,
    383 U.S. 1 (1966) ....................................................................................................24

*HTC Corp. v. Tech. Props. Ltd.*,
    2013 WL 5525043 (N.D. Cal. Sept. 17, 2013)............................................................18

*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010)............................................................................1, 3

*Jurgens v. CBK, Ltd.*,
    80 F.3d 1566 (Fed. Cir. 1996)................................................................................24

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
    694 F.3d 51 (Fed. Cir. 2012)...................................................................................3

*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009)......................................................................5, 8, 10

*Minemyer v. B-Roc Representatives, Inc.*,
    No. 07 C 1763, 2011 WL 1113146 (N.D. Ill. 2011) ...............................................24

*Mondis Tech. Ltd. v. LG Elec., Inc.*,
    2011 WL 2417367 (E.D. Tex June 14, 2011) ..............................................7, 8, 9

*Monsanto Co. v. E.I. DuPont De Nemours & Co.*,
    2012 WL 2979080 (E.D. Mo. July 20, 2012) .........................................................17, 18

*Monsanto Co. v. McFrling*,
    488 F.3d 973 (Fed. Cir. 2007)................................................................................11

*Oracle Am., Inc. v. Google Inc.*,
    847 F.Supp.2d 1178 (N.D. Cal. 2012) ....................................................................11

*Phillips v. Netblue, Inc.*,
    2007 WL 528722 (N.D. Cal. Feb. 13, 2007).............................................................1

*Read Corp. v. Portec, Inc.*,
    970 F.2d 816 (Fed. Cir. 1992).................................................................................24

*Sanofi-Aventis Deutschland GMBH v. Glenmark Pharm. Inc., USA* ..................................4

*In re Seagate Technology LLC*,
    497 F.3d 1360 (Fed. Cir. 2007)(en banc) .........................................16, 18, 24

*Specialty Composites v. Cabot Corp.*,
    845 F.2d 981 (Fed. Cir. 1988).................................................................................23

*Spectralytics, Inc. v. Cordis Corp.*,
    649 F.3d 1336 (Fed. Cir. 2011)...............................................................................24

*Stratoflex, Inc. v. Aeroquip Corp.*,
    713 F.2d 1530 (Fed. Cir 1983)................................................................................24

*Uniloc USA, Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011) ............................................................................. 1

*United States v. 14.38 Acres of Land, More or Less Situated in Leflore County*,
   80 F.3d 1074 (5th Cir. 1996) ............................................................................... 13

*United States v. Hankey*,
   203 F.3d 1160 (9th Cir. 2000) ............................................................................... 1

*United States. v. Pedregon*,
   520 Fed. App'x 605 (9th Cir. 2013) ....................................................................... 1

**Statutes**

35 U.S.C. 271(a), (b) and (c) ................................................................................... 19

**Other Authorities**

Fed. Rules. Evid.

   Rule 403 .................................................................................................................. 1

   Rule 702 ............................................................................................................. 1, 3

   Rule 703 .................................................................................................................. 6

Relevant evidence may only be excluded if its probative value is so substantially outweighed by its prejudicial effects that the mere mention of it before the jury prior to any admissibility ruling would so greatly impact the jury that no jury instruction or admonition from the bench could cure the impact. FED. R. EVID. 403. The decision whether to admit evidence over a Rule 403 objection lies squarely with the trial judge. *United States. v. Pedregon,* 520 Fed. App'x 605, 607 (9th Cir. 2013). "[R]elevant evidence is inherently prejudicial" and thus "the application of Rule 403 must be cautious and sparing." *United States v. Hankey,* 203 F.3d 1160, 1172 (9th Cir. 2000) (quotations omitted). Rule 403 requires "that the probative value of the evidence be compared to the articulated reasons for exclusion and permits exclusion only if one or more of those reasons '*substantially outweigh*' the probative value." *Id.* at 1172 (emphasis added); *see also Phillips v. Netblue, Inc.,* 2007 WL 528722 at *4 (N.D. Cal. Feb. 13, 2007) (to exclude relevant evidence (1) it must have an "unfairly prejudicial non-probative aspect" and (2) this "unfairly prejudicial, non-probative aspect [must] substantially outweigh the offered evidence's probative aspect.") (internal citations omitted).

## A.   The Court Should Deny Adobe's MIL No. 1 Because Mr. Parr's Opinions Are Relevant and Admissible

Patent damages must be based on sound economic principles and reliable data. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1312-15 (Fed. Cir. 2011). To be admissible, evidence considered in a reasonable royalty analysis must be tied to the facts of the case and the patented invention. *Id.* at 1315. But, as the Federal Circuit has repeatedly recognized, "any reasonable royalty analysis necessarily involves an element of approximation and uncertainty." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 857-858 (Fed. Cir. 2010). "The test 'is not correctness of the expert's conclusions but the soundness of his methodology,' and when an expert meets the threshold established by Rule 702, the expert may testify and the fact finder decides how

much weight to give that testimony." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014)(internal citations omitted).

In his expert report, Mr. Parr analyzed the *Georgia-Pacific* factors ("*G-P* factors") and conducted a profitability analysis related to Adobe's accused products. Ex. A at 51-70. Mr. Parr utilized these quantitative data points together with his qualitative/subjective analysis of the other *G-P* factors to reach a 2.5% royalty rate. *Id.* at 68. Mr. Parr also conducted an apportionment analysis regarding the revenue percentage a third party traditionally receives for providing electronic content distribution services. *Id.* at 69-70. His analysis and opinions will assist the jury and should be admitted.

       1.    *Mr. Parr's Profitability Analysis Is Reliable and Admissible*

███████████████████████████████████████████████████████████

██████ Ex. D, Colosso Depo. at 29-31 and Ex. B, Morgan Depo. at 72-73. Mr. Parr concluded that without Digital Reg's technology, Adobe would have sold fewer accused products because a higher percentage of the accused products would have been pirated instead of purchased. Accordingly, in his profitability analysis, Mr. Parr determined an estimated amount of Adobe profit that results from reduced piracy rates based on the use of Digital Reg's patented technology. He then apportioned only this portion of Adobe's profit (not total profits from the accused products) between Adobe and Digital Reg████████████████████████████████████ *Id.* at 61-66.

Because Adobe failed to produce records regarding piracy rates specific to its products or the efficacy of its DRM strategy (*see Ex.* B at 76-80, 85), Mr. Parr conducted his profitability analysis as follows: First, he used BSA industry reports to estimate Adobe's savings attributable to Digital Reg's patented technology.[1] Ex. A at 65. The BSA industry reports showed a piracy

[1] ████████████████████████████████████████████████████ Ex. B, Morgan Dep. at 73-74, 82.

rate of 20% in the United States.  Second, Mr. Parr used testimony from a Symantec 30(b)(6)

deponent, who testified that Symantec, a company who licensed Digital Reg's patented inventions,

██████████████████████████████████ [2] Ex. A at 65 and Ex. C, Kazanegras Dep.

at 66.  Using this data, Mr. Parr determined that Digital Reg's technology reduced piracy rates of

Adobe's accused products by approximately ██████ over the industry average.  Ex. A at 65.

*See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 78-79 (Fed. Cir. 2012)

(permitting a damages expert to use price information of a similar product where the accused

infringer did not track prices of the accused product). [3]

Although Mr. Parr's opinions involve "an element of approximation and uncertainty," *i4i*,

598 F.3d at 857-858, his opinions are based on "sufficient facts or data," are "the product of

reliable principles and methods," and are the result of a "reliabl[e] appli[cation] of the principles

and methods to the facts of th[is] case."  FED. R. EVID. 702.  "The existence of other facts,

however, does not mean that the facts used failed to meet the minimum standards of relevance or

reliability…Under Rule 702, the question is whether the expert relied on facts sufficiently related

to the disputed issue." *i4i*, 598 F.3d at 855-856.  "[I]t is not the district court's role under *Daubert*

to evaluate the correctness of facts underlying an expert's testimony…Questions about what facts

are most relevant or reliable to calculating a reasonable royalty are for the jury." *Id.* at 856.

In support of its objection to Mr. Parr's 50/50 apportionment of the profit resulting from

reduced piracy, Adobe cites a non-analogous case–*Dynetix Design Solutions, Inc. v. Synopsys,*

*Inc.*, 2013 WL 4538210 at * 1 (N.D. Cal. Aug. 23, 2013)).   In *Dynetix*, the expert began his

royalty rate analysis at half of the gross profit margin on the accused products and then

---

[2] Mr. Parr concluded that the other features and functionalities within Adobe's products and Symantec's products and the differences between them were unimportant to his analysis because Digital Reg's patents protect all of these features and functionalities and would presumably have the same efficacy rate for both of them. *See* Ex. A at 82-83.

[3] Adobe also challenges Mr. Parr's use of the company-wide product profit margins rather than the accused product profit margins.  This is addressed in detail *infra* in response to Adobe's Motion *in Limine* No. 4.

manipulated it upwards or downwards based on the *G-P* factors. *Id.* at *1. The expert ultimately arrived at an unreasonable 14.25% royalty rate, which he then applied to his determined royalty base (all of the accused product revenue wherein the accused products had many features). *See id.* at * 1-2. The court rejected this analysis because the expert failed to tailor the royalty rate to the facts of the case, including the particular technology, industry, or party. *See id.* at 4.

Here, by contrast, Mr. Parr applied a profit analysis specifically tailored to Digital Reg's patented technology and the facts of this case. He ascertained the amount of profit Adobe received through the use of Digital Reg's patents, *i.e.*, the profit Adobe received due to the additional accused products it was able to sell because Adobe incorporated the Digital Reg patented technology into its accused products.[4] Unlike in *Dynetix*, Mr. Parr did not split Adobe's profit margin on the accused products and apply it to all accused products. If he had done this ██ ████████████████████████████████████████████████████████████████████ ███████████████████ Ex. A at 65. Moreover, unlike in *Dynetix*, Mr. Parr apportioned his analysis to focus only on the benefit Adobe received using the patented technology.

Splitting the profits related to Adobe's additional sales, as Mr. Parr did here, is not unreasonable because neither Digital Reg nor Adobe would be incentivized to enter into a license agreement if either party took all or the majority of the profit savings. Ex. A at 65. ████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████[5]

██████████[4]██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

[5]Interestingly, the *Sanofi-Aventis Deutschland GMBH v. Glenmark Pharm. Inc., USA* case discussed in the *Dynetix* case lends further support to the appropriateness of a 50/50 profit split

2.   *Mr. Parr Correctly Analyzed Relevant License Agreements*

Contrary to Adobe's allegations, Mr. Parr did not "cherry pick" the agreements he considered in setting a royalty rate.  Mr. Parr considered and discussed all of the Digital Reg settlement agreements in his expert report.  Ex. A at 53-56. Many were not useful in setting a royalty rate due to considerations specific to those particular agreements.  Without support, Adobe further accuses Mr. Parr of purposely excluding agreements to arrive at a royalty rate similar to his profit sharing analysis royalty rate.  As detailed in Mr. Parr's report, however, the profit sharing analysis was conducted independently of the analysis of Digital Reg's settlement agreements and Adobe's key DRM agreement and neither had any bearing on the other.  Ex. A at 53-56, 61-66.

Adobe ignores well established case law that even parties agreeing to a lump-sum royalty agreement often "consider the expected or estimated usage…of a given invention…because the more frequently most inventions are used, the more valuable they generally are and therefore the larger the lump-sum payment." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1327 (Fed. Cir. 2009).  Mr. Parr necessarily analyzed the number of products that infringed and the impacted revenue for the licensees in the previous Digital Reg settlement agreements.  ██████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████[6]

analysis.  In that case, the court accepted a 50/50 profit split because the damages expert had considered the facts of the case, specifically the relationship between the parties and their relative bargaining power, the relationship between the patent and the accused products, the standard profit margins in the industry and the presumed validity of the patent.  2011 WL 383861 at *3.  Mr. Parr's apportionment here should likewise be accepted given the *G-P* factor analysis he undertook and his experience in the industry.  Ex. A at 65.  Mr. Parr specifically considered the relationship between the parties and their relative bargaining power, the relationship between the patent and the accused products, Adobe's profit margins, and the presumed validity of the patent.  *Id.* at 28, 52-53, 58, 61-66, 68.

[6] ████████████████████████████████████████████████████████████

████████████████████████████████████████████████  Ex. E, Sitescape/DRM Agreement at 7 and Ex. F, Farley Depo. at 92.

It is axiomatic that a settlement agreement will usually result in a lump sum payment because the settling defendant/licensee has deprived the licensor of the opportunity to collect running royalties for past infringement. Digital Reg was forced to sue defendants and collect all of the royalties that should have been paid on a running basis in a single lump sum. ███████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████. Ex. G, Prowse Dep. at 36-37. Consequently, it is improper for Adobe to conclude that a hypothetical negotiation would have yielded a lump sum agreement simply because the existing *settlement* agreements all involve the payment of a lump sum.

Despite Adobe's criticisms, there is nothing improper with Mr. Parr's reliance on Mr. Farley's statements regarding Digital Reg's reasons for entering into previous settlement agreements. "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." FED. R. EVID. 703. Because Mr. Parr did not have access to any other information regarding the circumstances and considerations related to these earlier settlement agreements, he utilized the information at his disposal in a reasonable manner to determine which settlement agreements were most valuable in a reasonable royalty analysis.

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████ Adobe offers no evidence that these licensed parties were, in fact, using the infringing technology going forward and, more importantly, fails to account for the counterbalancing effect of the assumption of validity and infringement associated with the hypothetical negotiation. Mr. Parr repeatedly stated that all of the settlement agreements were entered into with infringement and validity in doubt. Ex. A at 52-56; see also Ex. H, Parr Dep. at 162 ("I believe that that makes whatever the settlement is lower than the amount we should use in the hypothetical negotiation because we know for certain that there's validity and

1   infringement."). A validity, infringement, and enforceability premium is widely accepted.

> The licenses at issue all appear to be executed before litigation (or at least before there was an adjudication regarding validity and infringement). At that time, the parties executed the license in the 'real world' with uncertainty regarding the validity of the patents and infringement of the licensed products. In the hypothetical negotiation, however, the patent is assumed to be valid and the accused products are assumed to infringe. Therefore, as compared to the 'real world' in which the licenses to the patents-in-suit were negotiated, the patentee in the 'hypothetical-world' is in a better bargaining position. How much better is debatable, but that decision is for the fact-finder. Accordingly, it is rational and economically sensible, due to this fact alone, that the patentee in the 'hypothetical-world' may receive a more favorable royalty than in the 'real world.'

> The Federal Circuit has endorsed this principle. *See, e.g., ResQNet.com*, 594 F.3d at 872 ("[A] reasonable royalty may permissibly reflect the fact that an infringer had to be ordered by a court to pay damages, rather than agreeing to a reasonable royalty." (internal quotes omitted); *TMW Mfg.*, 789 F.2d at 900"

*Mondis Tech. Ltd. v. LG Elec., Inc.*, 2011 WL 2417367 at *4 (E.D. Tex June 14, 2011).

Adobe also argued that Mr. Parr should not have relied on the Adobe DRM key agreement because it did not convey patent rights. However, this agreement showed that Adobe expected to be compensated on a running royalty basis for 5.5% of the entire value of the DRM plug-in (payments due to the licensee from any third party for the use or distribution of the licensee plug-in and goods and services that rely upon Reader and the licensee plug-in to view, print and/or otherwise access PDF files containing any DRM Features;...). Ex. A at 57.[7]  Mr. Parr's royalty rate is lower than this 5.5% rate to account for the different technology.

In the aggregate, Mr. Parr analyzed all of the comparable and relevant Digital Reg settlement agreements and Adobe license agreements and determined they support his royalty rate and structure. Mr. Parr's methodology and reasoning are sound, and any objections to Mr. Parr's analysis of the agreements merely go to the weight a jury should assign to his opinions and not the admissibility of them. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993).

---

[7]Adobe further criticized Mr. Parr for not considering four Adobe agreements that Adobe's own expert claimed offered no guidance as to the appropriate royalty rate. Ex. I, Prowse Report at 23.

3.     *Adobe Misstates Entire Market Value Rule and Smallest Saleable Unit Case Law*

Even if the patented feature is not the reason for customer demand, the value of the whole product may be used if, for example, the value of the patented feature could not be separated out from the value of the whole product. However, the rate resulting from the hypothetical negotiation would be a lower rate because it is being applied to the value of the whole product and the patented feature is not the reason for the customer's purchase of the whole product. *See Mondis*, 2011 WL 2417367 at *2-3; *see also* N.D. Cal. Model Patent Jury Instructions, B.5.7 (June 17, 2014).

Adobe failed to provide sales data for any smaller saleable unit, presumably because no such sales data exists.  The patented invention is part of the accused product and protects the entire accused product from being pirated, among other things.  It has no value apart from the underlying content it protects and cannot be separated out from the value of the product as a whole.[8]

> Although our law states certain mandatory conditions for applying the entire market value rule, courts must nevertheless be cognizant of a fundamental relationship between the entire market value rule and the calculation of a running royalty damages award.  Simply put, the base used in a running royalty calculation can always be the value of the entire commercial embodiment, as long as the magnitude of the rate is within an acceptable range (as determined by the evidence).

*Lucent*, 580 F.3d at 1338-1339.  The Federal Circuit, in *Lucent*, determined that using the entire value of the software can be appropriate as a royalty base even for an infrequently used feature, such as the date-picker functionality in Outlook, provided the evidence suggests that the royalty rate selected is within an acceptable range based on the evidence.  The evidence supports using the entire value of the electronic content being delivered and protected as the royalty base.

Digital Reg's alternative smallest saleable unit analysis, while unnecessary because Digital Reg is entitled to use the entire value of the protected software as a royalty base, is not contrary to the holding in *Lucent* and addresses the problem with an absolute application of the entire market

---

[8] Adobe's damages expert could not articulate a smaller saleable unit that was the equivalent of Digital Reg's patented technology. Ex. I at 42.

value rule discussed in *Mondis*.  In *Mondis*, the expert's opinion was based on comparable licenses which were calculated on the entire value of the licensed products even though the patented feature products did not create the customer demand for the product.  2011 WL 2417367 at *2-3.  The court determined the entire market value of the accused product was justified.

> If this rule were absolute, then it would put Plaintiff in a tough position because on one hand, the patented feature does not provide the basis for the customer demand, but on the other hand, the most reliable licenses are based on the entire value of the licensed products. If Plaintiff cannot use the entire market value of the accused products, then Plaintiff would have to apportion the accused product and would have two choices regarding the use of the 13 comparable licenses of the patents-in-suit.  First, Plaintiff's expert could speculate as to how the licensed parties would have apportioned the patented feature in those licensed products, and then Plaintiff cold derive a new royalty rate based on the apportioned part.  This choice is undesirable, however, because this would be largely speculative and the previously comparable licenses would suddenly become non-comparable.  Alternatively, Plaintiff could choose not to rely on the 13 licenses of the patents-in-suit and instead base its damages model on some other evidence.  This is also undesirable because the licenses of the patents-in-suit, at least under Federal Circuit jurisprudence, are potentially the most reliable evidence in this case in computing a reasonable royalty.

*Id.* (internal citations omitted).  Mr. Parr also based his damages opinion on comparable settlement agreements and other data points that utilize the entire value of the accused products as the royalty base.   Because he was able to select an alternative smallest saleable unit (distribution functionality) for which the industry norm is also calculated as a percentage of the entire value of the products (30% of the value of the distributed product), he was able to normalize the agreements involving royalty rates calculated as a percentage of the entire value of the accused product/software without having to speculate about the rate that would have been agreed to between the parties.[9]

     Mr. Parr's smallest saleable unit alternative approach is also distinguishable from the

1    objectionable approach taken in *Lucent*. Lucent's expert first applied his royalty rate to the entire

2    market value of the infringing computers *and* software, and opined that Lucent was entitled to a

3    1% royalty based on the entire price of the computer and software. *See Lucent*, 580 F.3d at 1338.

4
     The court precluded the expert from using the entire value of the computer and software as a
5
     royalty base because only the software contained the infringing feature. *See id*. at 1338. Because
6
7    he was forced to reduce the royalty base, the expert simply increased the royalty rate from 1% to

8    8%, without justification, to arrive at the same number he would have arrived at using a 1%

9    royalty rate for the computer *and* the software. *See id*. The court found that the 8% rate was

10   untethered from the technology and the evidence. *See id*.

11
         In contrast, here, Mr. Parr provided a quantitative justification for his 30% apportionment
12
     of the entire value of the product to account for the distribution platform component. In support,
13
14   he cited several distribution platform agreements to show that 30% was an industry standard. Ex.

15   A. at 69-79. Mr. Parr then adjusted the royalty rate he applied to the apportioned amount because

16   the quantitative license agreements analyzed a royalty rate based on the *entire* value of the

17   product. *Id*. He could not simply apply that same rate to the apportioned amount because it would

18
     bear no relationship to the licensing agreements he was using as comparable (*i.e.*, it would become
19
     "untethered" to the license agreements related to the technology). ████████████████████

20   ███████████████████████████████████████████████████████████████████████████████████

21
22   ███████████████████████████████████████████████████████████████████████████████████

23   ███████████████████████████████████████████████████████████████████

24       Despite Adobe's disagreement with Mr. Parr's opinions, they are relevant and admissible.

25   Adobe's remedy is cross-examination and rebuttal evidence, not exclusion. *See Daubert*, 509 U.S.

26   at 596. Adobe's MIL No. 1 should be denied.

27

28

---

**B.      The Court Should Deny Adobe's MIL No. 2 Because the RPX License Is Relevant to an Appropriate Reasonable Royalty**

Adobe seeks to exclude an agreement between Digital Reg and RPX because it is allegedly not comparable to a license that would result from a hypothetical negotiation between Digital Reg and Adobe.  But Federal Circuit precedent supports the conclusion reached by Mr. Parr that the RPX Agreement provides relevant information for the hypothetical negotiation and to counter Adobe's expert's arguments regarding the overall value of Digital Reg's patents.  The RPX Agreement involved *the same patent owner* (*i.e.*, Digital Reg), related to one of the *identical patents* asserted in this litigation (*i.e.*, the '541 Patent) and conveyed patent rights only.  As such, it is probative evidence of the appropriate royalty rate in this case.  *See, e.g. Monsanto Co. v. McFrling*, 488 F.3d 973, 978-79 (Fed. Cir. 2007).[10]

As set forth in Mr. Parr's report, ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[10] The cases cited by Adobe are inapposite.  The cited portions of *Oracle Am., Inc. v. Google Inc.*, 847 F.Supp.2d 1178, 1186-88 (N.D. Cal. 2012) involve an expert referring to noncomparable licenses and settlements involving non-parties to the underlying litigation.  The *Oracle* expert provided only a cursory discussion of the licenses and referred to the technology only as involving intellectual property associated with mobile devices and services.  *See id.*  Moreover, the expert conflated two settlement agreements from two separate litigations and used the allegations from the earlier litigation to describe the importance of the settlement amount from the later litigation.  *See id.*  This problem was compounded because the settlement amount from the later litigation also resolved antitrust claims between the parties.  *See id.*  In *Apple, Inc. v. Samsung Elecs. Co.*, 2013 WL 5958176, at 4-5 (N.D. Cal. Nov. 7, 2013), the excluded HTC/Apple agreement did not quantify the benefit Apple received because it included a broad cross-license through which Apple received not only royalty payments but a fully paid-up license to practice certain HTC patents.  The agreement also involved a global settlement of 50 worldwide patent infringement cases and covered 32 Apple patents (only two of which were involved in the present litigation).  The Court had also previously ruled that no new evidence, such as this HTC/Apple agreement, could be admitted into evidence in the retrial.  Theses facts bear no resemblance to the facts of this case.

---

1 ████████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████

3      Adobe erroneously argues that Mr. Parr did not consider the RPX Agreement useful or

4 beneficial for purposes of his damages analysis.  To the contrary, in his report, Mr. Parr conducted

5 a reasonable royalty analysis based on the *G-P* factors, several of which required Mr. Parr to

6 analyze the RPX Agreement.   For example, for *G-P* factor No. 1, Mr. Parr reviewed

7 settlement/license agreements related to Digital Reg's patent portfolio.  Because some of these

8 licensees already had a license to the '541 patent via their membership with RPX, these parties

9 were not required to pay a license fee for the '541 patent.  ████████████████████████

10 █████████████████████████████████   The negotiated settlements with these

11 parties contemplated an already existing license to the '541 patent through their membership in

12 RPX.  Ex. J, RPX letter to Digital Reg.  License fees paid by these parties are in addition to

13 whatever value Digital Reg received via the RPX Agreement.  Considering these agreements in

14 isolation from the RPX Agreement would leave the jury with a mistaken impression regarding the

15 amounts Digital Reg received for these licenses.  Further, for *G-P* factor No. 15, the RPX

16 Agreement was so important that Mr. Parr included it in his summary of the most important data

17 points related to his damages analysis and his conclusion to his expert report.  Ex. A at 67-70.

18 Adobe's own damages expert, Mr. Prowse, conceded that the RPX Agreement is relied upon by

19 Mr. Parr for his *G-P* analysis.  Ex. I at 15.

20      Adobe's citations to Mr. Parr's deposition are misleading.   The testimony about the

21 usefulness of the RPX Agreement related to whether the RPX Agreement can be used to establish

22 a *quantitative* royalty rate.[11]  It does not relate to its usefulness for his damages analysis generally.

23

24

25

26

27 ─────────────────────
   [11] ████████████████████████████████████████████████████

28 ████████████████████████████████████████████████████████

1   Adobe's arguments regarding the RPX license go to its weight, not admissibility.  *United*

2   *States v. 14.38 Acres of Land, More or Less Situated in Leflore County,* 80 F.3d 1074, 1077 (5th

3   Cir. 1996).  Adobe's MIL No. 2 should be denied.

4   **C.      The Court Should Deny Adobe's MIL No. 3 Because AMT and ALM Are Accused**

5   **Products in this Case**

6       To support its claim that Application Management Technology ("AMT") is not at issue in

7   the case, Adobe refers to a discovery order from Magistrate Westmore.  *See* Mot. at 15 (citing Dkt.

8   431 at 7).  But, significantly, there is no reference to AMT on the cited page, and nowhere in the

9   Order is AMT excluded from the case.  Further, despite Digital Reg having been denied additional

10  source code and financial information, Digital Reg marshaled sufficient evidence regarding AMT

11  to meet its burden at trial.   More fundamentally, Digital Reg has globally accused Adobe

12  Licensing Manager ("ALM"), whether or not it was made part of AMT.

13

14  ███████████████████████████████████████████

15  ████████████████████.  Digital Reg's first interrogatory asked Adobe to identify "every

16  **Accused Product** you have made, sold, offered for sale, used or imported into the United States."

17  █████████████████████████████████████

18



19

20

21

22

23

24

25

26

27

28

Ex. K, Adobe's Interrogatory Response at 5-6. ████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████ For Adobe to

claim that AMT is not an Accused Product after having identifying it as an Accused Product

cannot be reconciled. Adobe's admission that AMT was an Accused Product is dispositive.[13]

█████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████

█████████████████████████████████████

█████████████████████████████████████

Ex. L, Devanbu Report at A3, p. 2 (emphasis added). █████████████

█████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████

Ex. L at A3, p. 16; *id.* at A3, p. 6. ████████████████████

████████████████████████████

Finally, Adobe's publicly available information reveals ongoing use of ALM as an AMT

component in each of the last several years. This information is summarized in the table below:

[12] In apparently every case in which the AMT trademark is used and in which activation occurs, those products include Adobe License Manager within them.
[13] At the very least, Adobe's MIL is too broad. Digital Reg should be able to proceed against Adobe for the products that relate to both ALM and AMT, including ALM 2.1/AMT 1.0, ALM 2.5/AMT 1.5 and ALM 3.0/AMT 20.

| Log Date | ALM | AMT | Product(s) |
|---|---|---|---|
| February 23, 2009 | Adobe License Manager v. 2.1 (build 2.1082) | library version 6.0.0.75,6.0 | Creative Suite 3 (Dreamweaver) |
| May 17, 2010 | Adobe License Manager v. 2.1 (build 2.1076) | library version 1.0.0.1076,46.277176 | Creative Suite 3 (Flash Builder) |
| January 16, 2011 | Adobe License Manager v. 3.2 (build 64.0) | library version 3.0.0.64,3.0 | Creative Suite 5 (Photoshop) |
| September 27, 2011 | Adobe License Manager v. 3.5 (build 2.0) | library version 3.5.0.34,3.5 | Creative Suite 5 (Photoshop) |
| June 12, 2012 | Adobe License Manager v. 3.5 (build 2.0) | library version 3.5.0.34,3.5 | Creative Suite 6 (Acrobat Pro) |
| January 16, 2013 | Adobe License Manager v. 3.2 (build 64.0) | library version 3.0.0.64,3.0 | Creative Suite 5 (Photoshop) |
| February 20, 2013 | Adobe License Manager v. 3.5 (build 2.0) | library version 6.0.0.75,6.0 | Creative Suite 6 (Adobe Premier Pro) |

*Logs Reflecting Ongoing Use of Adobe License Manager (ALM)/Adobe AMT*

Ex. M. These distinct sources of information: Adobe's discovery responses, Adobe's source code, and information available publicly, including from Adobe's website, all compel the conclusion that ALM is an AMT component used by Adobe to this day. Adobe's naked assertion that it discontinued use of ALM in 2007 is contradicted by its admissions and the evidence. Adobe's MIL No. 3 should be denied.

**D.     The Court Should Deny Adobe's MIL No. 4 Because Adobe's Revenues Are Relevant to an Appropriate Reasonably Royalty**

Adobe failed to produce documents containing expenses on only accused products in the United States. As a result, Digital Reg was forced to determine the operating profit for Adobe's accused products using revenue and cost numbers set forth in Adobe's 10-Ks. Mr. Parr calculated gross profit margins using Adobe's 10-Ks for all Adobe products as a percentage of all product revenue, and calculated Adobe's total operating expenses as a percentage of Adobe's total revenues to determine an operating profit margin for all products. The operating profit margin for all products was then applied to the accused product revenue to determine the operating profit for Adobe's accused products only. *Id.* at 61-66. Accordingly, Adobe's total revenues and revenues not tied to accused features are relevant and admissible.

Adobe's document production is incomplete with respect to the accused products that use Activation/AMT/ALM. Consequently, Digital Reg may introduce Adobe's publicly-filed 10-Ks to show revenue associated with Creative Suite products that use Activation/AMT/ALM functionality, and the percentage of those Creative Suite products attibutable to sales in the U.S.[14]

Digital Reg does not intend to refer to Adobe's market capitalization, company valuation, or overall financial success. However, Digital Reg's trial exhibits PX74-82 (Adobe's 10Ks), which contain relevant and admissible evidence regarding Adobe's total revenues and revenues not tied to accused features, should not be excluded merely because those exhibits may also contain information related to other issues. Adobe's MIL No. 4, therefore, should be denied.

**E.    The Court Should Deny Adobe's MIL No. 5 Because a Reasonable Fact-Finder Could Find Willful Infringement**

Adobe's MIL on willful infringement is an end-run at an untimely summary judgment. Adobe failed to move on this issue before, and should not be permitted to do so now.

In considering the objective prong of *Seagate*, the court determines "based on the record ultimately made in the infringement proceedings, whether a reasonable litigant could realistically expect those defenses to succeed." *Bard Peripheral Vascular v. W.L. Gore & Assoc.*, 682 F.3d 1003, 1008 (Fed. Cir. 2012)(discussing *In re Seagate Technology LLC*, 497 F.3d 1360, 1368-71 (Fed. Cir. 2007)(en banc). "[T]he judge may, when the defense is a question of fact or a mixed question of law and fact, allow the jury to determine the underlying facts relevant to the defense in the first instance, for example, the questions of anticipation or obviousness." *Bard*, 682 F.3d at 1008. As such, *Bard* contemplates a decision on the objective prong *after* the jury has deliberated on other aspects of willfulness. *See Cook Inc. v. Endologix, Inc.*, 2012 WL 3779198, at *1-2 (S.D. Ind. Aug. 30, 2012); *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 2012 WL 5417552, *1 (W.D. Pa., Nov. 2, 2012).

---

[14] If Adobe supplements its production to include expense information of the accused products in the United States, and sales revenue information for Creative Suite products sold in the United States, Digital Reg will not need to use Adobe's 10-Ks.

■ Additionally, each of those seven notifications occurred *prior to* Digital Reg filing its lawsuit. In response to being told repeatedly about Digital Reg's patents, Adobe did nothing to ensure that it was not infringing Digital Reg's patents. Each of the accused Adobe products was released and/or modified ***after*** Adobe's awareness, consideration, and analysis of Digital Reg's Patents. *See* Ex. K at 4-6.

Adobe contends that because it put forward a defense to the lawsuit beginning in 2011, objective recklessness cannot exist. However, Adobe's approach has been flatly rejected by multiple courts; simply defending a patent lawsuit is insufficient under the law to foreclose a willfulness finding. In *Bard Peripheral Vascular, Inc. v. W.L. Gore & Associates, Inc.*, for example, the court found that allowing a defense to go to the jury was not "not dispositive or necessarily persuasive regarding its determination of whether Defendant's defenses were objectively reasonable." 2013 WL 5670909 at *4 (D. Ariz. Oct. 17, 2013); *see also Monsanto Co. v. E.I. DuPont De Nemours & Co.*, 2012 WL 2979080, *2 (E.D. Mo. July 20, 2012) (finding that summary judgment rulings do not automatically prove that an objectively reasonable defense has been raised). Moreover, a court may dismiss an assertion of a good-faith belief in non-infringement where the defendant "made little-to-no effort to assess whether it infringed or whether the patent was invalid after receiving notice of the patent." *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1369 (Fed. Cir. 2006). Adobe's purported "host of defenses" have never been evaluated or tested on their merits, and Adobe has presented no evidence of their strength. In the absence of an evaluation of the strength of Adobe's defenses, the objectively high likelihood that Adobe's actions constituted infringement of a valid patent cannot be ignored.

Further, Adobe's defenses were developed at the earliest in 2011, seven years after it was first made aware of Digital Reg's patents. In *Aspex Eyewear, Inc. v. Clariti Eyewear, Inc.*, the

Federal Circuit held that "the ***timing as well as the content*** of an opinion of counsel may be relevant to the issue of willful infringement, for timely consultation with counsel may be evidence that an infringer did not engage in objectively reckless behavior." *Aspex*, 605 F.3d 1305, 1313 (Fed. Cir. 2010) (emphasis added). Here, the inverse is true. Adobe puts forward no argument for its utter failure to account for the "objectively high likelihood that its actions constituted infringement of a valid patent" prior to 2011. Prior to 2011, there is no evidence of an opinion of counsel regarding validity, no evidence of an opinion of counsel regarding infringement, and no evidence of an internal investigation by Adobe of its products to determine if they infringed. By remaining willfully blind, Adobe cannot now be heard to say that its conduct could not be willful. *See Seagate*, 497 F.3d at 1371.

For the subjective prong, Digital Reg must show that the "objectively-defined risk ... was either *known* or so obvious that it *should have been known* to the accused infringer." *Seagate*, 497 F.3d at 1371. At trial, Digital Reg will advance the theory of willful infringement that it has pursued throughout this litigation: Adobe continued to infringe despite its knowledge of the patents-in-suit. ███████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████ The '541 and/or '670 patents were cited by the USPTO as prior art to Adobe's patent applications. Ex. Q, Ex. R. Adobe presented no attorney opinion upon which it relied, and provided no evidence of any pre-suit investigation into whether it infringed. Thus, the objectively-defined risk was *known* or *should have been known* to Adobe. *See HTC Corp. v. Tech. Props. Ltd.,* 2013 WL 5525043, at *8 (N.D. Cal. Sept. 17, 2013) ("The record supports a finding that HTC knew about the patents and TPL's claims of infringement before it began the activities that allegedly infringe and as explained above, here there remains an important issue regarding the role of the external crystal in HTC's products in generating a signal."); *see also Monsanto*, 2012 WL 2979080 at *2.

**F.     The Court Should Deny Adobe's MIL No. 6 Because Digital Reg Timely Disclosed its Infringement Theories**

Adobe focused much of its oral presentation at the summary judgment hearing on its contention that Digital Reg disclosed its infringement theories too late.  Digital Reg directed the Court's to the contentions themselves, which called out indirect infringement in each of the separate documents and provided detailed references, including the operation of source code on the various network components.  Adobe's MIL is a recasting of its previously rejected arguments.

**1.     *Digital Reg Timely Disclosed Direct Infringement by Multiple Actors***

In terms of whether Digital Reg pleaded "joint infringement," joint infringement is simply an informal label used to describe direct infringement where one party is responsible for the acts of another whom it directs and controls.  Digital Reg has provided Adobe with everything it might need to understand the infringement bases on which Digital Reg planned to proceed—namely, 35 U.S.C. 271(a), (b) and (c), when this case was first filed.  Ex. U.

**2.     *Digital Reg Timely Disclosed Indirect Infringement***

Digital Reg first provided contentions on October 28, 2011.  In the opening paragraphs, those contentions provided as follows:

> Plaintiff further accuses Adobe of indirectly infringing the '541 Patent through providing, authorizing and instructing regarding the Accused System and Method to others, including its customers. Installing or activating the Accused System and Method and the operation thereof directly infringe the asserted claims. Adobe intends to cause infringement by its customers and users. Adobe instructs users to use the Accused System and Method in an infringing manner. Adobe further instructs users to configure and operate the Accused System and Method in an infringing manner. Adobe also provides support services for the Accused System and Method, including providing instructions, guides, online materials and technical support.

Ex. S at 1. Adobe never once moved to strike or for clarification.  Because Digital Reg timely disclosed its theories of infringement, which include direct infringement for performing all the steps of certain asserted claims and indirect infringement for inducing and contributing to the infringement of its customers and end users of its products, Adobe's MIL No. 6 should be denied..

**G.     The Court Should Deny Adobe's MIL No. 7 Because Adobe Seeks to Preclude Digital Reg's Expert from Testifying About Opinions Set Forth in his Report**

Adobe improperly casts this motion as precluding Digital Reg's experts from offering opinions not disclosed in their expert reports.  In actuality, Adobe seeks to preclude Digital Reg's expert from testifying about the very opinions set forth in his reports.

Adobe's attempt to preclude certain claim construction testimony is wholly unfounded. Digital Reg's expert, Dr. Devanbu, applied the Court's claim construction relative to the nature of the "token" and the requirement that it indicate whether or not access should be granted.  Dr. Devanbu expressed concern that Adobe's proposed construction incorporated the term "transaction," and might intend to require a commercial transaction associated with the token. Adobe later retreated from this position:  "Digital Reg argues that Adobe's construction is limited to a financial transaction. Not so. A transaction is simply an interaction between parties."  Dkt. 556-4 at 12.  Adobe omits from its MIL this explanation from Dr. Devanbu: "This construction is incorrect, however, because one skilled in the art would understand the token to indicate rights or permissions, not the state or result of any business transaction."  Both parties and the Court agree that no ***business transaction*** is necessarily tied to the token.  This is a nonissue.

In his report, Dr. Devanbu details his infringement analysis for each accused product, and where he finds each token and its function.  For example, for Flash, Dr. Devanbu opined as follows:



---

1   Ex. L at A1, pp. 19-20 (citing Jones Dep. 24:4–20).  As further explained by Dr. Devanbu, the

2   ████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████

9   ███████████████████████████████████████████

10      With respect to the '670 patent, Adobe contends that "Digital Reg's experts offered no

11  testimony that the patent includes granting access prior to a server response."  Mot. at 24.  Yet as

12  this Court observed during claim construction, claims 45 and 52 differ from claim 32 in that they

13  do not include the limitation relating to granting access at a certain time.  *See* Dkt. 574 at 39-40.

14  Digital Reg is not asserting that Adobe infringes claim 32.  Adobe's MIL is misplaced.

15

16      Likewise, Adobe's attempt to preclude scienter testimony is unfounded.   While Dr.

17  Devanbu does not claim to have omniscient knowledge, he testified repeatedly about

18  circumstantial evidence of specific intent regarding what Adobe specifically instructs, documents,

19  encourages, and requires of users of its software.  Parties seldom reveal their state of mind, so

20  circumstantial and indirect evidence are the most common evidence supporting a finding of intent.

21  *See Fujitsu Ltd. v. Netgear Inc.,* 620 F.3d 1321, 1332 (Fed. Cir. 2010) (reversing summary

22  judgment of no inducement based on circumstantial evidence of intent); *see also Cargill, Inc. v.

23  Canbra Foods, Ltd.,* 476 F.3d 1359, 1364 (Fed. Cir. 2007) ("[B]ecause direct evidence of

24  deceptive intent is rarely available, such intent can be inferred from indirect and circumstantial

25  evidence.").  Each of Dr. Devanbu's claim charts provide as follows:

26

27      Plaintiff further accuses Adobe of **indirectly infringing** the '541 Patent through
        providing, authorizing and instructing regarding the Accused System and Method
28      to others, including its customers. Installing or activating the Accused System and

Method and the operation thereof directly infringe the asserted claims. **Adobe intends to cause infringement** by its customers and users. Adobe **instructs users** to use the Accused System and Method in an infringing manner. Adobe **further instructs users** to configure and operate the Accused System and Method in an infringing manner. Adobe also **provides support** services for the Accused System and Method, including providing **instructions**, guides, online materials and technical support.

Ex. L at A1, p.1 (emphasis added). Dr. Devanbu's charts are replete with further development of the evidence relating to this intent, instruction, support, and requirement. For example:



Finally, Adobe's attempt to preclude non-infringing alternatives testimony is unfounded. In his report, Dr. Devanbu spent two pages discussing alternatives to the claimed inventions and why they are inferior. *See* Ex. L at 17-19. After technically analyzing these alternatives, he opined: "I understand that no reasonable non-infringing alternative is available." *Id.* at 19.

These opinions should be conveyed to the jury. Adobe's MIL No. 7 should be denied.

**H.     The Court Should Deny Adobe's Mil No. 8 Because Adobe's Discovery Deficiencies Will Assist the Jury in Evaluating the Experts' Opinions**

Digital Reg has encountered significant difficulty obtaining the discovery it needs to present its case at trial. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆ Ex. B at 13-16, 23-26. Digital Reg has filed a numerous motions to compel, which have been granted in substantial part. Digital Reg expects Adobe to attack the sufficiency and

completeness of Digital Reg's evidence, including for example Digital Reg's reliance on Adobe's

public filings with the SEC and public documentation rather than Adobe's internal records, which

were never produced in great part. Adobe produced approximately 1/3 more documents about a

single prior art affirmative defense on the final day of fact discovery than in response to all of

Digital Reg's requests over the preceding years, for all seven patents and for all Adobe products

ever in suit. Digital Reg should be allowed to explain to the jury the reasons that it has been

limited in the amount of information it has available so that the jury draws no negative inferences.

**I.     The Court Should Deny Adobe's MIL No. 9 Because Evidence of Adobe's Copying Is Relevant to Indirect Infringement, Willfulness, Enhanced Damages, and Nonobviousness**

Adobe seeks an order precluding Digital Reg from arguing or presenting evidence at trial

that Adobe copied Digital Reg's Patents. Specifically, Adobe contends that copying is irrelevant

because "Digital Reg has admitted it has no evidence of copying by Adobe." Adobe is mistaken.

Digital Reg will present evidence at trial including at least the following: Digital Reg's

expert has concluded that the products at issue in this case infringe the Asserted Claims of the

Patents-in-Suit. Ex. O at 307:6-312:12; Ex. P. Digital Reg's

Patents were cited by the USPTO in initially rejecting Adobe's patent applications. Ex. Q; Ex. R.

Each of the accused Adobe products was released and/or modified *after* Adobe's awareness,

consideration, and analysis of Digital Reg's Patents. *See* Ex. K at 4-6. With these facts, a jury can

surmise that Adobe learned the claimed method from Digital Reg before Adobe developed the

products used to practice the inventions claimed in the Patents-in-suit. That is copying. *See*

*Depuy*, 567 F.3d at 1328-29 (Fed. Cir. 1996) (finding copying where the alleged infringer decided

to incorporate a feature "in the manner disclosed in the []patent," and therefore "copied the

patent's . . . limitation."); *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 991 (Fed. Cir.

1988) (finding evidence of copying where alleged infringer "closely copied *the invention* in the [ ]

patent") (emphasis added).

Evidence of Adobe's awareness, consideration, analysis, and/or emulation of Digital Reg's

1   patented inventions is relevant to providing indirect infringement, willful infringement, and

2   enhanced damages and to rebutting Adobe's defense of invalidity on the ground of obviousness,

3   all of which will be decided (at least in part) by the jury.  **First**, evidence of copying is directly

4   relevant to establishing Adobe's knowledge that by selling infringing products to its customers

5   and instructing and assisting them in using the patented methods, it was inducing infringement.

6   *See DSU Medical Corp. v. JMS Co., Ltd.*, 471 F.3d 1293 (Fed. Cir. 2006).  **Second**, copying is

7   indisputably relevant to *Seagate*'s second, subjective prong for willful infringement.  *See, e.g.,*

8   *Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.d3d 1314, 1336 (Fed. Cir. 1996)

9   (holding that evidence of copying is relevant to *Seagate*'s second prong, "as it may show what the

10  accused infringer knew or should have known about the likelihood of its infringement"); *Jurgens*

11  *v. CBK, Ltd.*, 80 F.3d 1566, 1571 (Fed. Cir. 1996) (bad faith, or willful, infringement occurs where

12  "an infringer merely copies a patented invention"); *see also Minemyer v. B-Roc Representatives,*

13  *Inc.*, No. 07 C 1763, 2011 WL 1113146, at *3 (N.D. Ill. 2011) (denying motion *in limine* to

14  preclude evidence of copying because it is relevant to the question of willful infringement and

15  therefore cannot be excluded categorically).  **Third**, copying is relevant to enhanced damages

16  under the *Read* factors.  *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826-27 (Fed. Cir. 1992)

17  ("whether the infringer deliberately copied the ideas or design of another"); *see also Spectralytics,*

18  *Inc. v. Cordis Corp.*, 649 F.3d 1336, 1349 (Fed. Cir. 2011) ("*Seagate* did not change the

19  application of the *Read* factors with respect to enhancement of damages when willful infringement

20  under § 285 is found").  **Finally**, evidence of copying is highly relevant to the issue of

21  nonobviousness of the Patents-in-Suit over the invalidity challenges raised by Adobe.  *See*

22  *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966) (holding that copying is relevant as a

23  secondary consideration of nonobviousness); *see also Crocs, Inc. v. Internat'l Trade Comm'n*, 598

24  F.3d 1294, 1311 (Fed. Cir. 2010) ("Still another objective measure . . . copying may indeed be

25  another form of flattering praise for inventive features."); *Stratoflex, Inc. v. Aeroquip Corp.*, 713

26  F.2d 1530, 1539 (Fed. Cir 1983) ("[it] is error to exclude that [copying] evidence from

27  consideration.").  Accordingly, all such evidence, including evidence of Adobe's copying, is

28  appropriate for the jury to consider and will not unfairly prejudice Adobe or confuse the jury.

Adobe does not dispute the relevance of Digital Reg's "copying" evidence. Instead, Adobe contends that Digital Reg is precluded from offering evidence of copying because it experts did not offer opinions on copying and based on Digital Reg's discovery responses.[15]  *See* Mot. at 25.  Adobe is again mistaken.

First, evidence of copying need not come in through expert testimony.  It is perfectly appropriate for Digital Reg to introduce evidence of copying, including for purposes of establishing validity, through documents and testimony of percipient witnesses.  Second, Digital Reg's discovery responses cannot justify exclusion of copying evidence here.  Specifically, the fact that Digital Reg's 30(b)(6) witness testified that he "lacked any personal knowledge regarding any copying" by Adobe is wholly unremarkable.  Mr. Venters is not and has never been affiliated with Adobe and thus, unsurprisingly, did not directly participate, observe, or know of Adobe's actions.  Additionally, pursuant to the Protective Order in this case, Mr. Venters is not privy to, *inter alia*, the operation of the accused Adobe products.  Further, Adobe had knowledge (as well as notice) of all of the copying evidence Digital Reg intends to present at trial.  *See* Ex. N at 3; Ex. T, Adobe's Suppl. Resp. & Objs. to Digital Reg's Common Interrogs. No. 9 at 9-10.

In short, there is nothing in the law or in this record that prevents Digital Reg from adducing evidence of copying and Adobe's Motion *in Limine* No. 9 should be denied.

## CONCLUSION

Where appropriate, Plaintiff has agreed to Defendants requests.  However, Defendants' motion should be denied where under the rubric of Rule 403's policy of favoring admissibility, Defendants have failed to prove that both the offered evidence has an unfairly prejudicial non-probative aspect, and that this unfairly non-probative aspect substantially outweighs the evidence's probative aspect.

---

[15] The discovery responses about which Adobe complains in its Motion relate only to secondary indicia of nonobviousness.  *See* Mot. at 25 & Ex. 16 at 8-10 (Digital Reg's response to Interrogatory No. 5, asking Digital Reg to "identify each [sic] any secondary indicia supporting the consideration that you alleged supports any non-obviousness of the invention(s) claimed"); *see* Mot. at 25 & Ex. 17 (testimony by Digital Reg's 30(b)(6) representative on the topic 34, which provides "Any objective evidence of nonobviousness to be relied upon by Digital Reg).

1    DATED:  August 6, 2014                    DINOVO PRICE ELLWANGER & HARDY LLP

2

3                                             By:    _/s/ Andrew G. DiNovo_____
                                                         Andrew G. DiNovo
4

5                                             Attorneys for Plaintiff
                                              DIGITAL OF TEXAS, LLC
6

7                                    **ATTESTATION OF E-FILER**

8            Pursuant to Local Rule 5-1(i), the undersigned ECF user whose login and password are

9    being used in filing this document, hereby attests that the signatory has concurred in the filing of

10   this document.

11

12   Dated:  August 6, 2014                          _/s/ W. Paul Schuck_____
                                                     W. Paul Schuck
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   832416.1