```
 1                                        volume 1

 2                                    Pages 1 - 152

 3                  UNITED STATES DISTRICT COURT

 4                 NORTHERN DISTRICT OF CALIFORNIA

 5   DIGITAL REG OF TEXAS, LLC   )
                                 )
 6           Plaintiff,          )   NO. C-12-1971 CW
                                 )
 7    VS.                        )   MONDAY, AUGUST 25, 2014
                                 )
 8   ADOBE SYSTEMS, INC., ET AL.,)   OAKLAND, CALIFORNIA
                                 )
 9           DefendantS.         )   JURY TRIAL
     _____)

10

11           Before The Honorable CLAUDIA WILKEN, Judge

12

13           REPORTER'S TRANSCRIPT OF PROCEEDINGS

     APPEARANCES:
14
     For Plaintiff:          DINOVO, PRICE, ELLWANGER & HARDY LLP
15                           7000 NORTH MOPAC EXPRESSWAY, SUITE 350
                             AUSTIN, TEXAS 78731
16                      BY:  ANDREW G. DINOVO, ESQUIRE
                             ADAM G. PRICE, ESQUIRE
17                           GREGORY DONAHUE, ESQUIRE
                             JAY D. ELLWANGER, ESQUIRE
18                           NICOLE E. GLAUSER, ESQUIRE

19   ALSO PRESENT:           MICHAEL FARLEY, COMPANY REPRESENTATIVE

20                        (APPEARANCES CONTINUED)

21
     Reported By:            Diane E. Skillman, CSR 4909, RPR, FCRR
22                           Official Court Reporter

23        TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

24

25
```

1

2    **FOR DEFENDANT**              WEILL, GOTSHAL & MANGES, LLP
     **ADOBE SYSTEMS:**             201 REDWOOD SHORES PARKWAY
3                                   REDWOOD SHORES, CALIFORNIA 94065
                              BY:   EDWARD R. REINES, ESQUIRE
4                                   SONAL N. MEHTA, ESQUIRE
                                    BYRON BEEBE, ESQUIRE
5                                   ANANT PRADHAN, ESQUIRE

6

7    **ALSO PRESENT:**              PAUL BETLEM, COMPANY REPRESENTATIVE
                                    KAREN ROBINSON, IN-HOUSE COUNSEL
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         I N D E X

2        PLAINTIFF'S OPENING STATEMENT BY MR. ELLWANGER     100

3        DEFENDANT'S OPENING STATEMENT BY MS. MEHTA         119

| | |
|---|---|
| 1 | MONDAY, AUGUST 25, 2014                              8:32 A.M. |
| 2 | P R O C E E D I N G S |
| 3 | THE CLERK:  CALLING DIGITAL REG OF TEXAS, LLC VERSUS |
| 4 | ADOBE SYSTEMS INCORPORATED, ET AL. |
| 5 | PLEASE STEP FORWARD AND STATE YOUR APPEARANCES. |
| 6 | MR. DINOVO:  GOOD MORNING, YOUR HONOR.  THIS IS DREW |
| 7 | DINOVO FOR DIGITAL REG. |
| 8 | I HAVE WITH ME -- |
| 9 | MR. REINES:  YOUR HONOR, EDWARD REINES FROM WEIL, |
| 10 | GOTSHAL ON BEHALF OF ADOBE. |
| 11 | THE COURT:  OKAY.  SO YOU HAD SOME AGREED-UPON |
| 12 | CHANGES TO THE PRELIMINARY JURY INSTRUCTIONS, I AM TOLD? |
| 13 | MR. REINES:  YES, YOUR HONOR.  THEY ARE DOCUMENTED IN |
| 14 | OUR SUBMISSION FRIDAY, WHICH IS SIX -- DOCUMENT 644.  AND -- |
| 15 | THE COURT:  OH, OKAY. |
| 16 | MR. REINES:  -- WHAT IT AMOUNTS TO IS WE HAVE |
| 17 | NARROWED THE CASE BY REMOVING OUR LICENSE DEFENSE IN RESPONSE |
| 18 | TO THINGS THAT HAVE HAPPENED BETWEEN THE PARTIES.  SO THERE |
| 19 | ARE JUST THREE LOCATIONS WHERE THAT NEEDS TO BE MODIFIED. |
| 20 | IT'S PRETTY MINOR. |
| 21 | THE COURT:  OKAY. |
| 22 | MR. REINES:  AND THEN, THE SECOND THING THE PARTIES |
| 23 | HAVE AGREED UPON IS IN THE CLAIM CONSTRUCTIONS WE WOULD LIKE |
| 24 | TO ADD IN THE AGREED CONSTRUCTIONS, SO NOT JUST THE CONTESTED |
| 25 | CONSTRUCTIONS THAT THE COURT ENTERED, BUT IN ADDITION THE |

1   AGREED CONSTRUCTION.

2       THERE IS NOTHING DISPUTED, IT IS JUST THOSE TWO ITEMS.

3           **THE COURT:**  DO I HAVE THAT SOMEWHERE?

4           **MR. REINES:**  IT'S DOCUMENTED IN EXHIBIT 644.

5           **THE COURT:**  THE DEFINITIONS?

6           **MR. REINES:**  YEAH.  IT'S ONE DEFINITION.

7           **THE COURT:**  OH, IT'S JUST ONE?

8           **MR. REINES:**  YES.

9           **THE COURT:**  OH.

10          **MR. REINES:**  AND I CAN HAND IT UP, IF YOU LIKE.

11          **THE COURT:**  NO.  WHAT I REALLY NEED IS TO BE ABLE TO

12  CUT AND PASTE IT, SO IF I KNOW WHERE IT'S AT I CAN DO THAT.

13          **MR. DINOVO:**  IT WAS SUBMITTED IN CONNECTION WITH THE

14  JOINT CLAIM CONSTRUCTION STATEMENT, WHICH I THINK WAS FOUR

15  THREE,  BUT WE CAN FIND THE DOCUMENT NUMBER.

16          **MR. REINES:**  YES.  IT IS DOCKET NUMBER 275, AT 3.

17          **THE COURT:**  I AM SORRY?

18          **MR. REINES:**  DOCKET NUMBER 275, AT PAGE 3.

19          **THE COURT:**  OH, AT PAGE 3.  OKAY.

20          **MR. REINES:**  WE APPRECIATE THAT.

21          **MR. DINOVO:**  AND FOR CLARITY, YOUR HONOR, THERE WAS

22  TWO AGREED CONSTRUCTIONS.  ONE RELATES TO THE '741, WHICH, AS

23  YOU KNOW, IS NO LONGER IN SUIT, SO IT IS JUST THE '541.

24          **THE COURT:**  SO OTHERWISE, THE PRELIMINARY

25  INSTRUCTIONS ARE OKAY?

```
1              MR. REINES:  THAT'S CORRECT.

2              MR. DINOVO:  YES, YOUR HONOR.

3              THE COURT:  AND I HAVEN'T HAD A CHANCE TO READ YOUR

4    NEW EXPERT REPORT OR THE PAPERS ABOUT IT, BUT I WILL TAKE A

5    LOOK AT THOSE.

6              MR. REINES:  IT'S FULLY BRIEFED, AND WE FILED THEM,

7    AND WE ARE SEEKING PERMISSION TO FILE THAT.  SO THOSE ARE THE

8    PENDING ITEMS.

9              THE COURT:  OKAY.  IS THERE SOMETHING ELSE?

10             MR. REINES:  THERE IS A THIRD ISSUE.  MS. MEHTA CAN

11   HANDLE IT ON THE JURY BOOK.

12             THE COURT:  OH, OKAY.

13             MS. MEHTA:  YES, YOUR HONOR.  THANK YOU.  SO WITH

14   RESPECT TO THE JURY BOOK, THE PARTIES ARE AGREED THAT A LIST

15   OF THE CLAIM CONSTRUCTIONS, JUST A SUMMARY TABLE AND THE TWO

16   PATENTS-IN-SUIT SHOULD BE IN THERE.

17        DEFENDANTS' PROPOSAL IS THAT WE ALSO ADD COPIES OF JUST

18   THE TWO KEY PRIOR ART PATENTS THAT WE WILL BE PRESENTING SO

19   THAT THE JURY HAS THOSE PATENTS HANDY SO THEY CAN USE THOSE

20   FIVE THINGS BASICALLY FOR PRESENTATION OF THE EVIDENCE.

21        AND I THINK THAT PLAINTIFF HAS AN OBJECTION TO INCLUDING

22   THE TWO PIECES OF PRIOR ART.

23             THE COURT:  YEAH.  NO, I DON'T THINK WE NEED THAT.

24   AND WE ALSO DON'T NEED THE CLAIM CONSTRUCTION BECAUSE THEY ARE

25   GOING TO GET A COPY OF THE PRELIMINARY JURY INSTRUCTIONS AND
```

1    THIS LITTLE GLOSSARY THAT I HAVE, AND THE CLAIM CONSTRUCTIONS

2    THEY WILL HAVE THERE.

3            **MS. MEHTA:**  WE CAN PULL THAT OUT, YOUR HONOR.

4            **THE COURT:**  OH, IF IT'S ALREADY IN, IT DOESN'T

5    MATTER.  DID YOU PUT IN THE AGREED-UPON ONE THAT YOU WANTED?

6            **MS. MEHTA:**  WE DID.

7            **THE COURT:**  SO THAT'S FINE.  IF IT'S ALREADY THERE

8    YOU DON'T NEED TO TAKE IT OUT.

9            **MS. GLAUSER:**  ONE OTHER ITEM THAT DIGITAL REG WANTED

10   TO PROPOSE INCLUDING IN THE JUROR BOOKS WAS A WITNESS

11   ESSENTIALLY PHOTO BOOK TO THE EXTENT THAT THE JURORS -- IT

12   WOULD BE HELPFUL TO HAVE A PICTURE OF THE WITNESSES WHILE THEY

13   ARE TESTIFYING WHILE THEY --

14           **THE COURT:**  THAT CAN BE HELPFUL IF YOU CAN AGREE ON

15   UNFLATTERING OR FLATTERING PHOTOS OF EACH WITNESS.

16           **MS. GLAUSER:**  WE HAVE PREPARED OURS AND SHARED IT

17   WITH ADOBE AND SUGGESTED THAT THEY DO THE SAME. I'M NOT SURE

18   THAT THEY ARE PREPARED TO DO SO OR NOT THIS MORNING.

19           **MS. MEHTA:**  WE CAN DO THAT, YOUR HONOR.

20           **THE COURT:**  OKAY.  YES.  IT DOES SOMETIMES HELP THE

21   JURY.

22           **MS. MEHTA:**  THE ONLY ISSUE IS WE MAY NEED TO ADJUST

23   THAT AS THE TRIAL GOES ON BECAUSE ADDITIONAL WITNESSES MAY BE

24   CALLED, BUT WE CAN DEAL WITH THAT.

25           **THE COURT:**  EITHER THAT OR PUT THEM IN WHEN THEY ARE

```
1    CALLED.

2              MS. MEHTA:  WE CAN DO THAT, YOUR HONOR.

3              THE COURT:  YOU COULD, I GUESS, HAND THEM OUT AND

4    THEY CAN PUT THEM IN THEIRSELVES.

5              MS. GLAUSER:  OUR WILL-CALL LIST IS SET SO WE ARE

6    HAPPY TO PUT OUR ENTIRE GROUP IN.  TO THE EXTENT ADOBE HASN'T

7    YET DETERMINED WHICH WILL-CALL WITNESSES THEY WILL HAVE, THEN

8    THEY MAY NEED TO UPDATE --

9              THE COURT:  HOWEVER, YOU WANT TO HANDLE IT.

10             MS. MEHTA:  WE WILL FIGURE THAT OUT, YOUR HONOR.

11             MS. GLAUSER:  AND, YOUR HONOR, JUST SO IT IS CLEAR

12   WHERE WE ARE TODAY THE PARTIES HAD AGREED ON THE 18TH TO

13   EXCHANGE AN UPDATED WITNESS LIST.  WE HAVE DONE THAT.

14       ADOBE HASN'T YET TOLD US ANY FACT WITNESS THAT THEY WILL

15   CALL, WHICH IS PREJUDICIAL TO SOME EXTENT TO OUR ABILITY TO

16   DETERMINE WHAT DEPOSITION DESIGNATIONS THAT WE NEED.

17             MS. MEHTA:  YOUR HONOR, THAT IS ACTUALLY NOT TRUE.

18   SO A COUPLE OF OUR FACT WITNESSES OR ONE OF OUR FACT WITNESSES

19   IS BEING CALLED IN THEIR CASE LIVE AND ANOTHER ONE IS BEING

20   CALLED BY VIDEO IN THEIR CASE.

21       AND THEN WE HAVE, I THINK IT'S TWO, OR MAYBE THREE FACT

22   WITNESSES THAT ARE MAY-CALL.  AND THE REASON IS WE DON'T KNOW

23   WHAT THEIR CASE WILL LOOK LIKE SO WE DON'T KNOW AND CAN'T

24   COMMIT THAT WE ARE GOING TO BRING THEM LIVE.

25       THEY ALSO HAVE TRIAL SUBPOENAS OUT TO ALL OF OUR
```

1    WITNESSES, SO IF THEY NEED TO CALL SOMEONE LIVE IN THEIR CASE

2    THEY CAN LET US KNOW.  BUT. UNFORTUNATELY, WE CAN'T COMMIT TO

3    THOSE THREE OR FOUR FACT WITNESSES BECAUSE WE JUST DON'T KNOW

4    YET.

5            **THE COURT:**  WELL, YOU ARE GOING TO HAVE TO -- YOU

6    DON'T HAVE TO COMMIT IN THE SENSE OF A WEDDING CEREMONY, BUT

7    YOU NEED TO GIVE YOUR BEST SHOT.

8            **MS. MEHTA:**  WE HAVE DONE THAT.  WE HAVE GIVEN THEM A

9    GOOD FAITH IDENTIFICATION OF WHO WE THINK WE ARE GOING TO

10   CALL.  AND WE HAVE ALSO GIVEN THEM AN AGREEMENT THAT TWO DAYS

11   BEFORE WE CALL SOMEONE WE WILL LET THEM KNOW.

12           **THE COURT:**  OKAY.  ALL RIGHT.  I GUESS WE WILL JUST

13   HAVE TO GO WITH THAT.

14           **MS. GLAUSER:**  OKAY.

15           **THE COURT:**  WHAT ABOUT DEPOS?  I HAVEN'T RECEIVED ANY

16   DEPOS YET.

17           **MS. GLAUSER:**  YOUR HONOR, WE FILED DEPOSITION

18   DESIGNATIONS FOR JOSEPH JONES.  THERE WAS ONLY ONE PASSAGE TO

19   WHICH ADOBE HAD AN OBJECTION.  AND SO WE FILED JUST THAT ONE

20   EXCERPT.  IN THE MARGIN IT HAD ADOBE'S OBJECTION AND OUR

21   RESPONSE.  WE DIDN'T FILE THE REST OF THE DESIGNATIONS THAT WE

22   PLAN ON OFFERING, BECAUSE DURING THE PARTIES' MEET AND CONFER

23   THERE WERE NO OBJECTIONS.  BOTH SIDES AGREED IT WAS PROPER TO

24   PRESENT.

25           **THE COURT:**  OKAY.  SO YOU FILED THAT OBJECTION IN

```
 1   ECF?

 2              MS. GLAUSER:  WE DID.

 3              THE COURT:  AND I WILL BE ABLE TO MAKE SENSE OF IT

 4   WITHOUT READING THE CONTEXT?

 5              MS. GLAUSER:  I BELIEVE THAT YOU WILL, YOUR HONOR.

 6   AND WE ARE HAPPY TO GET YOU A PAPER COPY OF IT, IF YOU NEED.

 7   IF YOU LET US KNOW WE WILL BE HAPPY TO DO THAT.

 8              THE COURT:  JUST THE ONE, AND I DON'T NEED TO READ

 9   BEFORE OR AFTER IT --

10              MS. GLAUSER:  I DON'T BELIEVE YOU WILL.

11              THE COURT:  OKAY.  SO THE JURORS ARE HERE,

12   PRESUMABLY.  AND THEY ARE -- I HAD GIVEN THEM ANOTHER ONE-PAGE

13   QUESTIONNAIRE OR TWO-PAGE QUESTIONNAIRE.  BUT I THINK I MAY

14   HAVE SENT YOU A COPY OF IT.

15              MS. MEHTA:  I DON'T BELIEVE WE HAVE RECEIVED IT.

16              MS. GLAUSER:  I DON'T BELIEVE WE RECEIVED IT.

17              THE COURT:  CAN YOU GIVE THEM A BLANK COPY OF THE

18   QUESTIONNAIRE?

19        SO IT WILL PROBABLY TAKE THEM ANOTHER HALF HOUR OR SO TO

20   FINISH THOSE, AND THEN WE WILL GET STARTED WITH VOIR DIRE.

21              MS. MEHTA:  THANK YOU, YOUR HONOR.

22              (RECESS AT 8:40 A.M.; RESUMED AT 9:25 A.M.)

23              THE CLERK:  YOU MAY BE SEATED.  THANK YOU.

24        ALL THE PROSPECTIVE JURORS PLEASE STAND, AND RAISE YOUR

25   RIGHT HAND.
```

```
 1                    (PROSPECTIVE JURORS SWORN.)

 2          THE CLERK:  WE ARE CALLING C-12-1971, DIGITAL REG OF

 3   TEXAS, LLC VERSUS ADOBE INCORPORATED, ET AL.

 4      PLEASE STEP FORWARD AND STATE YOUR APPEARANCES FOR THE

 5   RECORD, PLEASE.

 6          THE COURT:  YES.  JUST A SECOND.

 7      LADIES AND GENTLEMEN, YOU HAVE BEEN CALLED AS POTENTIAL

 8   JURORS IN A FEDERAL CIVIL TRIAL.  YOU'VE HEARD A LITTLE BIT

 9   ABOUT IT FROM THE QUESTIONNAIRES YOU FILLED OUT.  THE CLERK

10   HAS JUST ANNOUNCED THE NAME OF THE CASE, AND NEXT I WILL HAVE

11   THE ATTORNEYS STATE THEIR APPEARANCES TO YOU, WHICH MEANS THEY

12   WILL STATE THEIR NAMES, INTRODUCE THEMSELVES TO YOU AND WHO

13   THEY REPRESENT AND WHO ANY PARTIES ARE WHO ARE IN THE

14   COURTROOM.

15      YOU HAVE BEEN ASKED WHETHER YOU KNOW ANY OF THE ATTORNEYS

16   OR WITNESSES ON THAT LIST THAT YOU LOOKED AT THIS MORNING.

17   AND THESE WILL BE SOME OF THE SAME PEOPLE, SO YOU CAN LOOK AT

18   THEM AND SEE IF YOU MIGHT KNOW ANY OF THEM.

19      SO IF COUNSEL WOULD STATE YOUR APPEARANCES, PLEASE, AND

20   THOSE OF THE PEOPLE HERE WITH YOU, STARTING WITH THE

21   PLAINTIFF.

22          MR. DINOVO:  THANK YOU, YOUR HONOR.

23      GOOD MORNING.  MY NAME IS DREW DINOVO.  I'M REPRESENTING

24   DIGITAL REG, THE PATENTEE IN THIS CASE.

25      OUR TRIAL TEAM INCLUDES MS. NIKKI GLAUSER, PAUL SCHUCK,
```

```
1    SHANNON MASON, JAY ELLWANGER, ADAM PRICE AND GREG DONAHUE.

2        AND WITH US IN THE COURTROOM ARE OUR CLIENT

3    REPRESENTATIVES, MR. MIKE FARLEY AND MR. CHIP VENTERS.

4        THANK YOU.

5            MR. REINES:  GOOD MORNING, EVERYONE.  MY NAME IS ED

6    REINES, AND I REPRESENT ADOBE.  AND FIRST I WOULD LIKE TO

7    INTRODUCE YOU TO SOME PEOPLE FROM ADOBE.  THIS IS PAUL BETLEM,

8    WHO IS THE SENIOR DIRECTOR AT ADOBE, AND KAREN ROBINSON, WHO

9    IS ONE OF THE IN-HOUSE ATTORNEYS AT ADOBE.

10       AND THEN, MY TEAM, LEGAL TEAM FOR ADOBE IS SONAL MEHTA,

11   BYRON BEEBE, ANANT PRADHAN.  AND THEN, OUR SUPPORT IS IRENA

12   KHAIT AND MATT BONINI.

13       THANK YOU.

14           THE COURT:  SO IS THERE ANYONE HERE WHO DIDN'T

15   REALIZE THEY MIGHT HAVE KNOWN SOME OF THESE PEOPLE WHEN YOU

16   SAW THEIR NAME ON THE LIST?  IF THAT IS THE CASE, RAISE YOUR

17   HAND.

18                   (NO RESPONSE.)

19           THE COURT:  NO.  OKAY.

20       SO AS I MENTIONED, THIS IS A FEDERAL CIVIL CASE.  IT IS A

21   PATENT CASE.  IT'S SCHEDULED TO RUN IN TERMS OF EVIDENCE

22   PRESENTATION FOR ABOUT TEN DAYS.  WE WILL BE IN SESSION THIS

23   WEEK, MONDAY THROUGH FRIDAY.

24       OUR DAILY SCHEDULE, EXCEPT FOR TODAY, WHICH WE WILL SORT

25   OF HAVE TO PLAY BY EAR, BUT IN GENERAL THE SCHEDULE DURING
```

```
1    TRIAL WILL BE 8:30 IN THE MORNING UNTIL 1:30 IN THE AFTERNOON.

2        WE WILL TAKE TWO SHORT BREAKS IN-BETWEEN, BUT NOT A

3    LENGTHY LUNCH BREAK.  WE FOUND THAT ENABLES THE JURORS TO GO

4    HOME ABOUT 1:30 AND BE ABLE TO PICK UP KIDS FROM SCHOOL OR

5    PERHAPS GO TO WORK IN THE AFTERNOON OR TEND TO THEIR BUSINESS.

6        SO IT DOES MEAN IT IS A SOMEWHAT LONG MORNING, SO YOU CAN

7    BRING IN YOUR ENERGY BARS, WHATEVER, HAVE A SNACK DURING THE

8    SHORT BREAK.  BUT NOT BREAKING FOR A WHOLE LUNCH HOUR TENDS TO

9    MAKE THINGS A LITTLE BIT MORE EFFICIENT, WE FOUND, FOR THE

10   JURORS.

11       WE WILL BE IN SESSION MONDAY THROUGH FRIDAY.  MONDAY OF

12   NEXT WEEK IS A HOLIDAY, LABOR DAY, ON THE FIRST OF SEPTEMBER,

13   SO WE WILL NOT BE IN SESSION THEN.  BUT WE WILL BE IN SESSION

14   THE REMAINING FOUR DAYS OF THAT WEEK.  AND WHAT WE ANTICIPATE

15   IS FINISHING THE EVIDENCE IN THE CASE BY THAT TIME, BY FRIDAY,

16   SEPTEMBER 5TH.  AND THEN, WE ANTICIPATE HAVING CLOSING

17   ARGUMENTS AND JURY INSTRUCTIONS ON MONDAY, SEPTEMBER 8TH.  AND

18   AFTER THAT THE JURY WILL DELIBERATE.

19       AND IT IS UP TO THE JURY HOW LONG IT TAKES THEM TO REACH A

20   VERDICT, SO IT COULD BE THE NEXT DAY, OR IT COULD BE A COUPLE

21   OF DAYS.  BUT IT SHOULDN'T BE BEYOND THAT WEEK OF THE 8TH OF

22   SEPTEMBER.

23       SO THAT'S THE SCHEDULE THAT WE WILL USE.

24       WE HAVE ASKED YOU FOR TWO SEPARATE QUESTIONNAIRES.  ONE

25   WAS THE ONE THAT WAS MAILED OUT TO YOU BEFORE YOU CAME IN, AND
```

1    WE HAVE THOSE.  AND THEN THE ONE YOU FILLED OUT THIS MORNING

2    THAT HAD A LITTLE BIT MORE TO DO WITH THIS CASE.  AND BOTH OF

3    THOSE YOU FILLED OUT UNDER PENALTY OF PERJURY.  WE ASK YOU

4    THESE QUESTIONS NOT TO INVADE YOUR PRIVACY OR MAKE YOU

5    UNCOMFORTABLE, BUT TO ENABLE US TO FIND A JURY THAT CAN BE

6    FAIR AND IMPARTIAL IN THIS PARTICULAR CASE.

7        SO IF WHEN I SPEAK WITH YOU INDIVIDUALLY ABOUT THESE

8    QUESTIONNAIRES, IF IT OCCURS TO YOU THAT YOU'VE FORGOTTEN

9    SOMETHING OR PERHAPS MISSTATED SOMETHING INADVERTENTLY, PLEASE

10   BRING IT TO MY ATTENTION SO WE KNOW IT IS MORE IMPORTANT WE

11   HEAR ABOUT IT THAN NOT.

12       IF BY CHANCE THERE SHOULD BE SOMETHING YOU FEEL PRIVATE

13   ABOUT AND YOU DIDN'T WANT TO PUT IN THE QUESTIONNAIRE OR DON'T

14   WANT TO TALK ABOUT IT IN FRONT OF OTHERS, MAKE SURE YOU TELL

15   ME, AND WE WILL MAKE ARRANGEMENTS FOR THAT.

16       THE PARTIES IN THE CASE ARE A COMPANY CALLED DIGITAL REG

17   AND A COMPANY CALLED ADOBE.  YOU PROBABLY, A LOT OF YOU, HAVE

18   HEARD OF ADOBE AND SOME OF THE SOFTWARE AND MIGHT HAVE USED

19   IT.  THAT DOESN'T MATTER.  THE ONLY THING THAT WOULD MATTER

20   WOULD BE IF YOU HAD WORKED FOR ADOBE, OR DIGITAL REG, FOR THAT

21   MATTER, BUT THAT IS LESS LIKELY.  IF YOU WORKED FOR ADOBE, IF

22   YOU HAD SUCH AN EXTREME EXPERIENCE WITH SOME ADOBE SOFTWARE

23   THAT IT WOULD AFFECT YOUR ABILITY TO BE FAIR, EITHER YOU LOVED

24   IT SO MUCH OR HATED IT SO MUCH, OR WHATEVER, YOU CAN BRING

25   THAT TO MY ATTENTION.

1          BUT JUST BECAUSE YOU HAVE HEARD OF ADOBE OR MIGHT HAVE

2     USED PHOTO SHOP OR ONE OF THEIR PRODUCTS, THAT WOULD NOT BE

3     ANYTHING THAT WE NEED TO CONCERN OURSELVES WITH.

4          SO I WILL BE ASKING EACH OF YOU A FEW QUESTIONS, AND THEN

5     THE ATTORNEYS WILL HAVE A CHANCE TO ASK A FEW QUESTIONS, IF

6     THEY WOULD LIKE TO, AND WE WILL DETERMINE WHO SHOULD BE

7     EXCUSED AND WHO SHOULD BE SEATED ON THE JURY.

8          SO WE WILL START WITH THE PERSON I HOPE WILL BE

9     MR. MC KENZIE.  GOOD.

10         WE DID A SLIGHTLY DIFFERENT SYSTEM THIS TIME WITH MAILING

11    THE QUESTIONNAIRES OUT AND THEN ALSO HAVING MORE WHEN YOU GOT

12    HERE.  SO WE ARE HAVING A LITTLE BIT OF PAPERWORK CONTROL

13    PROBLEM, WHICH I APOLOGIZE FOR.  BUT THAT'S GOOD TO KNOW THAT

14    WE GOT MR. MC KENZIE HERE FIRST.

15              **THE CLERK:**  DID YOU FLIP THE BUTTON ON THE MIC?

16              **THE COURT:**  WE WILL BE PASSING THE MIC ALONG.  IF YOU

17    HOLD IT PRETTY CLOSE TO YOUR MOUTH, ALTHOUGH NOT TOO CLOSE, SO

18    WE CAN HEAR YOU.  WHEN YOU HEAR YOUR VOICE COMING OUT OF THE

19    SYSTEM, THEN YOU WILL KNOW THAT YOU'RE CLOSE ENOUGH TO IT.

20         SO, YOU ARE RETIRED AS AN ENGINEER.  CAN YOU DESCRIBE

21    GENERALLY WHAT SORT OF WORK YOU DID?

22              **PROSPECTIVE JUROR:**  I DESIGNED AND BUILT EQUIPMENT

23    FOR THE UNIVERSITY OF CALIFORNIA PHYSICS DEPARTMENT FOR THE

24    INSTRUCTIONAL AREAS, LECTURES, ET CETERA.

25              **THE COURT:**  WHAT KIND OF EQUIPMENT?  COMPUTERS?

```
1    WAVETABLES?

2            PROSPECTIVE JUROR:  PRETTY MUCH A JACK OF ALL TRADES

3    FOR SCIENCE.

4            THE COURT:  OKAY, INCLUDING COMPUTERS?

5            PROSPECTIVE JUROR:  MINIMALLY.  I HAVE BEEN OUT FOR

6    TEN YEARS, BUT WE HAD SOME COMPUTERS.

7            THE COURT:  OKAY.  AND YOU SERVED ON A JURY IN STATE

8    COURT AT SOME UNCLEAR TIME IN THE PAST.

9            PROSPECTIVE JUROR:  YES.

10           THE COURT:  WERE THEY BOTH CRIMINAL CASES?

11           PROSPECTIVE JUROR:  WE.

12           THE COURT:  AND DID THE JURIES REACH VERDICTS IN BOTH

13   CASES?

14           PROSPECTIVE JUROR:  YES.

15           THE COURT:  ANYTHING ABOUT THOSE EXPERIENCES THAT

16   WOULD MAKE IT HARD FOR YOU TO BE FAIR IN THIS CASE?

17           PROSPECTIVE JUROR:  NO.

18           THE COURT:  OKAY.

19      OKAY.  IF YOU WOULD PASS THE MICROPHONE TO THE PERSON I

20   HOPE WILL BE MS. HOFFMANN?

21           PROSPECTIVE JUROR:  YES.

22           THE COURT:  OKAY.  AND YOU ARE CURRENTLY AN

23   INSTRUCTIONAL ASSISTANT IN SAN LORENZO?

24           PROSPECTIVE JUROR:  NO, I'M RETIRED.

25           THE COURT:  OH, YOU ARE RETIRED.  OKAY.  SORRY.
```

```
 1            BUT THAT WAS -- WHAT WAS YOUR MOST RECENT OCCUPATION?

 2                 PROSPECTIVE JUROR:  I WAS A TEACHER.

 3            THE COURT:  ENGLISH?

 4            PROSPECTIVE JUROR:  FOURTH GRADE.

 5            THE COURT:  OKAY.  AND BOTH OF YOUR CHILDREN ARE

 6   TEACHERS?

 7            PROSPECTIVE JUROR:  CORRECT.

 8            THE COURT:  DO THEY LIVE AT HOME, EITHER OF THEM?

 9            PROSPECTIVE JUROR:  NO.

10            THE COURT:  WHAT DO THEY TEACH?

11            PROSPECTIVE JUROR:  ONE IS AT A CONTINUATION SCHOOL,

12   TEACHES MANY SUBJECTS.  AND THE OTHER IS A HIGH SCHOOL ENGLISH

13   TEACHER.

14            THE COURT:  OKAY.  AND YOUR SPOUSE IS RETIRED FROM

15   WHAT?

16            PROSPECTIVE JUROR:  CORRECT.  HE'S A TEACHER.

17            THE COURT:  RETIRED TEACHER?

18            PROSPECTIVE JUROR:  CORRECT.

19            THE COURT:  SO THE WHOLE FAMILY?

20            PROSPECTIVE JUROR:  CORRECT.

21            THE COURT:  WHAT DID YOUR HUSBAND TEACH?

22            PROSPECTIVE JUROR:  HIGH SCHOOL SOCIAL STUDIES,

23   MAINLY.

24            THE COURT:  OKAY.

25       AND YOU SERVED AS A JUROR IN A CIVIL CASE IN ALAMEDA
```

```
1    COUNTY?

2              PROSPECTIVE JUROR:  CORRECT.

3              THE COURT:  DO YOU REMEMBER ANYTHING ABOUT THE CASE,

4    WHAT IT WAS ABOUT, GENERALLY?

5              PROSPECTIVE JUROR:  OH, YES.

6              THE COURT:  OKAY.  JUST BRIEFLY, WHAT WAS IT ABOUT?

7              PROSPECTIVE JUROR:  IT WAS A LAWSUIT, AND I DIDN'T

8    REALIZE ON THE QUESTIONNAIRE THE QUESTION ABOUT LAWSUITS.  I

9    THOUGHT IT WAS PERSONALLY FOR ME OR MY FAMILY.

10             THE COURT:  RIGHT.  IT IS.

11             PROSPECTIVE JUROR:  BUT THIS WAS A LAWSUIT.

12             THE COURT:  OKAY.  WAS IT CAR ACCIDENT?

13             PROSPECTIVE JUROR:  NO.

14             THE COURT:  OR WHAT WAS IT ABOUT?

15             PROSPECTIVE JUROR:  AN EMPLOYEE SUING AN EMPLOYER FOR

16   DISCRIMINATION, AMONG OTHER THINGS.  THERE WERE MANY -- IT WAS

17   A VERY BROAD LAWSUIT.

18             THE COURT:  OKAY.  DID THE JURY REACH A VERDICT IN

19   THE CASE?

20             PROSPECTIVE JUROR:  YES.

21             THE COURT:  ALL RIGHT.  IF YOU WOULD PASS THE

22   MICROPHONE, PLEASE, TO MR. ODELL.

23             PROSPECTIVE JUROR:  I DO HAVE ONE QUESTION FOR YOU.

24   SORRY.

25             THE COURT:  SURE.
```

1          **PROSPECTIVE JUROR:**  I FEEL LIKE A LILY TOMLIN

2     CHARACTER.  CAN MY SEAT BE LOWERED?

3               **THE COURT:**  CAN YOUR SEAT BE LOWERED?

4          **PROSPECTIVE JUROR:**  YES.

5               **THE COURT:**  OH, I AM SURE IT CAN, BUT I'VE NEVER SAT

6     IN ONE.

7          **PROSPECTIVE JUROR:**  MY FEET ARE DANGING A BIT.  THERE

8     IS A NICE BAR HERE BUT --

9          **THE CLERK:**  IF THERE IS AN ADJUSTMENT, IT IS UNDER

10    THE SEAT.  BUT I DON'T THINK THEY HAVE AN ADJUSTMENT.

11             **THE COURT:**  WE CAN GET YOU A FOOT STOOL.  I ACTUALLY

12    THINK I HAVE ONE UNDER HERE.

13        IF YOU REACH UNDER A LOT OF TIMES THEY HAVE A LITTLE FLAT

14    PADDLE KIND OF THING.

15             **THE CLERK:**  THEY DON'T HAVE --

16        (SIMULTANEOUS COLLOQUY.)

17             **THE COURT:**  WE WILL SEE IF --

18             **THE CLERK:**  I CAN FIND A BOX.

19             **THE COURT:**  WELL, IF YOU ARE SEATED, WE WILL FIND

20    SOMETHING FOR YOU TO MAKE SURE YOU ARE COMFORTABLE.  SORRY.

21    THAT'S THE FIRST PERSON I'VE HAD WITH THAT ISSUE.

22        SO MR. ODELL -- OH, AND, BY THE WAY, ATTACHED TO THE

23    QUESTIONNAIRES, AS I'VE MENTIONED, YOU HAD A LONG LIST OF

24    POTENTIAL WITNESSES.  DON'T BE WORRIED.  THEY WON'T ALL BE

25    CALLED.  BUT IT IS A LIST OF ALL THE PEOPLE WHO MIGHT BE

```
1    CALLED, AS WELL AS ATTORNEYS, AND SO ON.

2        IF I FORGET AND DIDN'T NOTICE YOU CHECKED OFF SOMEONE WHEN

3    I TALK TO YOU, IF YOU CAN RAISE IT.  NEITHER OF YOU CHECKED

4    ANY PEOPLE.  IF I FORGET, PLEASE REMIND ME THAT YOU CHECKED

5    ONE OF THOSE OFF.

6        SO, MR. ODELL, YOU DO COMMERCIAL REAL ESTATE APPRAISING?

7            PROSPECTIVE JUROR:  CORRECT.

8            THE COURT:  AND YOUR WIFE WORKS FOR BEST LABEL

9    COMPANY.  IS THAT A COMPANY THAT MAKES LABELS?

10           PROSPECTIVE JUROR:  YES, THEY DO.  FOOD AND ALL KINDS

11   OF THINGS.  YES.

12           THE COURT:  AND YOU TESTIFIED IN A CASE --

13           PROSPECTIVE JUROR:  YES, I HAVE BEEN CALLED AS AN

14   EXPERT WITNESS IN BANKRUPTCY PROCEEDINGS INVOLVING COMMERCIAL

15   REAL ESTATE ON TWO DIFFERENT OCCASIONS.

16           THE COURT:  OKAY.  SO THAT WAS IN BANKRUPTCY COURT?

17           PROSPECTIVE JUROR:  YES.

18           THE COURT:  WHICH MEANS THERE WAS NO JURY, PROBABLY.

19           PROSPECTIVE JUROR:  NO JURY, YES.

20           THE COURT:  OKAY.  HOW DID IT HAPPEN YOU HAD BEEN

21   CALLED?  WERE YOU INVOLVED IN A TRANSACTION OR --

22           PROSPECTIVE JUROR:  I WAS CALLED BY THE DEFENDANT IN

23   ONE CASE -- IN BOTH CASES BECAUSE THEY WANTED TO ESTABLISH

24   VALUES; THAT THEY WERE IN A DISPUTE AS TO WHAT THE VALUES WERE

25   IN THE BANKRUPTCY PROCEEDING.  SO I WAS CALLED TO ACTUALLY
```

1   APPRAISE THE PROPERTY, AND THEN TESTIFY AS AN EXPERT WITNESS.

2            **THE COURT:**  HOW DID THAT COME ABOUT?  DID YOU --

3            **PROSPECTIVE JUROR:**  I KNEW THE CLIENTS.

4            **THE COURT:**  OKAY.

5            **PROSPECTIVE JUROR:**  THEY KNEW MY SERVICES, SO THEY

6   RETAINED MY SERVICES FOR THAT PARTICULAR PURPOSE.

7            **THE COURT:**  SOMETIMES PEOPLE ARE SORT OF PROFESSIONAL

8   EXPERT WITNESSES AND DO A LOT OF IT, SO PEOPLE KNOW THEM.  BUT

9   JUST TO DO IT TWICE, I WAS CURIOUS HOW THEY HAPPENED --

10           **PROSPECTIVE JUROR:**  BECAUSE I HAD DONE COMMERCIAL

11   REAL ESTATE WORK FOR THEM.

12           **THE COURT:**  OKAY.  AND YOU NOTE THAT YOU USE ADOBE

13   SOFTWARE.  PRESUMABLY, THAT WOULDN'T HAVE ANY AFFECT ON YOUR

14   ABILITY --

15           **PROSPECTIVE JUROR:**  I USE IT FOR WORK FOR CREATING

16   PDF FILES AND VARIOUS OTHER THINGS, BUT THAT IS JUST

17   WORK-RELATED.

18           **THE COURT:**  OKAY.  IF YOU WOULD HAND THE MICROPHONE

19   TO MR. PATTERSON.

20      SO YOU HAD A LONG-TIME EMPLOYMENT WITH THE DEPARTMENT OF

21   DEVELOPMENTAL SERVICES, AND THEN SWITCHED OVER TO THE PARKS

22   AND REC, SO TO SPEAK.

23           **PROSPECTIVE JUROR:**  CORRECT.

24           **THE COURT:**  BOTH OF ARE STATE AGENCIES, I GUESS.

25           **PROSPECTIVE JUROR:**  CORRECT.

```
1            THE COURT:  SO IT WAS A TRANSFER WITHIN THE STATE
2    SYSTEM?
3            PROSPECTIVE JUROR:  CORRECT.
4            THE COURT:  COULD YOU JUST TELL ME GENERALLY WHAT IT
5    IS YOU DO NOW?
6            PROSPECTIVE JUROR:  I'M A MANAGEMENT SERVICES
7    TECHNICIAN.  I USE THE COMPUTER QUITE A BIT AND MANY DIFFERENT
8    SOFTWARE PROGRAMS FOR THE MAINTENANCE DEPARTMENT.
9            THE COURT:  OKAY.  AND YOUR SON OR DAUGHTER WHO IS
10   THE COMPUTER TECH, IS HE --
11           PROSPECTIVE JUROR:  SON.
12           THE COURT:  SON.
13           PROSPECTIVE JUROR:  YES.
14           THE COURT:  IS HE FREELANCE OR WORK FOR A COMPANY.
15           PROSPECTIVE JUROR:  WORKS FOR A COMPANY AND HE
16   FREELANCES.
17           THE COURT:  FREELANCES.  OKAY.
18      OKAY.  IF YOU WOULD PASS THE MICROPHONE, PLEASE, TO
19   MS. POUSCHINE?
20           PROSPECTIVE JUROR:  POUSCHINE.
21           THE COURT:  AND FOR WHOM DOES YOUR HUSBAND WORK?
22           PROSPECTIVE JUROR:  WORKDAY.
23           THE COURT:  OH, THAT'S THE NAME OF THE COMPANY?
24           PROSPECTIVE JUROR:  THAT'S THE NAME OF THE COMPANY.
25           THE COURT:  WHAT DO THEY DO?
```

```
1              PROSPECTIVE JUROR:  THEY DO ENTERPRISE SOFTWARE,

2    SOFTWARE AS A SERVICE IN THE CLOUD.

3              THE COURT:  OKAY.  AND YOU SERVED AS A JUROR IN A

4    CIVIL CASE IN ALAMEDA COUNTY, I GUESS?

5              PROSPECTIVE JUROR:  YES.

6              THE COURT:  DO YOU REMEMBER WHAT KIND OF A CASE IT

7    WAS, WHAT IT WAS ABOUT, GENERALLY.

8              PROSPECTIVE JUROR:  IT WAS A BANK AND A FIRE TRUCK

9    COMPANY, THAT IT WAS A MINORITY-OWNED FIRE TRUCK COMPANY.  AND

10   THE LOAN WENT INTO DEFAULT, AND THEY WANTED TO RECOUP THEIR

11   MONEY.

12             THE COURT:  OKAY.  AND DO YOU HAVE ANOTHER -- NUMBER

13   OF CONNECTIONS WITH LAW AND COMPUTERS.

14             PROSPECTIVE JUROR:  YEAH.

15             THE COURT:  WHICH IS ALL FINE.  IS THERE ANYTHING

16   ABOUT ANY OF IT THAT WOULD MAKE IT HARD FOR YOU TO BE FAIR IN

17   THIS CASE?

18             PROSPECTIVE JUROR:  OH, I DON'T THINK SO.

19             THE COURT:  OKAY.

20      OKAY.  IF YOU WOULD PASS THE MICROPHONE, PLEASE, TO MS --

21   DO YOU GO BY SANTIS?

22             PROSPECTIVE JUROR:  SANTISROMERO.

23             THE COURT:  YOU USE BOTH NAMES?

24             PROSPECTIVE JUROR:  YES.

25             THE COURT:  OKAY.  AND YOU -- FOR WHOM DO YOU WORK AS
```

```
 1    A SOCIAL WORKER?

 2              PROSPECTIVE JUROR:  SAN MATEO COUNTY.

 3         THE COURT:  YOU WORK FOR THE COUNTY?

 4              PROSPECTIVE JUROR:  UH-HUH.

 5         THE COURT:  OKAY.  AND SOMEONE WAS INVOLVED IN A

 6    LAWSUIT REGARDING LABOR LAWS.  WAS THAT YOURSELF OR SOMEONE

 7    CLOSE TO YOU?

 8              PROSPECTIVE JUROR:  IT WAS MYSELF.

 9         THE COURT:  OKAY.  AND WHAT -- JUST BRIEFLY, WHAT WAS

10    IT ABOUT?

11              PROSPECTIVE JUROR:  I WAS WORKING FOR A HOTEL, AND

12    THEY DID NOT PAY FOR -- THEY DID NOT WANT TO GIVE ME MY LUNCH

13    BREAKS, SO I PURSUED A LAWSUIT.

14         THE COURT:  BY YOURSELF OR WAS IT A CLASS ACTION OF

15    SOME SORT?

16              PROSPECTIVE JUROR:  MYSELF.

17         THE COURT:  OKAY.  AND YOU MENTION A FINANCIAL

18    HARDSHIP.  COULD YOU DESCRIBE THAT?

19              PROSPECTIVE JUROR:  MY HUSBAND HAS BEEN UNEMPLOYED

20    FOR TWO MONTHS, AND HE STARTED WORK ON MONDAY.  WE DIDN'T --

21    MY EMPLOYEE HANDBOOK, I WOULD BE ABLE TO SERVE FOR TEN DAYS

22    PAID.  BUT ANYTHING ADDITIONAL FROM THAT, UNFORTUNATELY, I

23    WOULD NOT BE ABLE TO FINANCIALLY SUPPORT, SINCE I AM THE SOLE

24    PROVIDER AT THIS TIME.

25         THE COURT:  OKAY.  WELL, AS I SAY, WE ARE HOPING THE
```

```
1    CASE WILL TAKE ABOUT TEN DAYS, NOT TOO MUCH LONGER THAN THAT.

2    SO THAT SHOULD WORK OUT OKAY.

3            PROSPECTIVE JUROR:  YES.

4            THE COURT:  ALL RIGHT.  IF YOU WOULD PASS THE

5    MICROPHONE TO MR. GROSS, PLEASE.

6        SO YOU ARE STILL WORKING.

7            PROSPECTIVE JUROR:  THAT'S NOT TRUE.  I'M RETIRED.

8            THE COURT:  OKAY, SORRY.  I GUESS WE DIDN'T -- THIS

9    IS ALSO A NEW FORM OF QUESTIONNAIRES.  IT IS NOT THE ONE I'M

10   USED TO.  AND I'M HAVING TROUBLE SEEING WHERE IT SAYS

11   DIFFERENT THINGS.  IT SAYS YOUR SPOUSE IS ALSO RETIRED?

12           PROSPECTIVE JUROR:  THAT'S TRUE.

13           THE COURT:  WHAT DID YOUR SPOUSE DO?

14           PROSPECTIVE JUROR:  SHE WAS A REGULATORY MANAGER IN

15   TELECOMMUNICATIONS.

16           THE COURT:  OKAY.

17           PROSPECTIVE JUROR:  FOR PAC BELL AND WHOEVER THEY

18   HAVE BEEN FOR 35 YEARS.

19           THE COURT:  OKAY.  AND YOU SERVED ON A GRAND JURY,

20   NOT ON A TRIAL JURY.

21           PROSPECTIVE JUROR:  THAT'S RIGHT.  CRIMINAL GRAND

22   JURY.

23           THE COURT:  OKAY.  AND YOUR WIFE HAD A PERSONAL

24   INJURY LAWSUIT?

25           PROSPECTIVE JUROR:  THAT'S RIGHT.
```

1           **THE COURT:**  COULD YOU TELL ME ABOUT IT JUST BRIEFLY?

2     WHAT HAPPENED, OR WHAT IT WAS ABOUT.

3           **PROSPECTIVE JUROR:**  SHE GOT T-BONED BY A SEMI ON THE

4     FREEWAY, AND WE HAD TO -- WE HAD TO TAKE -- ACTUALLY, WE

5     SETTLED ON THAT.  SO IT WAS JUST PERSONAL INJURY.

6           **THE COURT:**  OKAY.  YOU WERE REPRESENTED BY YOUR

7     INSURANCE COMPANY?

8           **PROSPECTIVE JUROR:**  THEIR ATTORNEY, YEAH.  YEAH.

9           **THE COURT:**  SO YOU'VE EXPRESSED A FEW ISSUES WITH

10    ADOBE SOFTWARE.  PRESUMABLY, THAT WOULDN'T AFFECT YOUR ABILITY

11    TO BE FAIR TO IT AS A COMPANY WITH RESPECT TO ANOTHER COMPANY.

12          **PROSPECTIVE JUROR:**  PROBABLY NOT.

13          **THE COURT:**  YOU WOULD DO YOUR BEST TO MAKE SURE THAT

14    IT DIDN'T?

15          **PROSPECTIVE JUROR:**  I WOULD DO MY BEST.

16          **THE COURT:**  OKAY.  IF YOU WOULD PASS THE MIC DIRECTLY

17    BEHIND YOU.

18       AND THEN, MA'AM, IF YOU WOULD PASS IT ALL THE WAY DOWN TO

19    WHO I HOPE WILL BE MS. LIN.

20       AND COULD YOU DESCRIBE, GENERALLY, WHAT YOU ACTUALLY DO AT

21    YOUR JOB?

22          **PROSPECTIVE JUROR:**  I WORK AT AT&T.  I AM PROJECT

23    MANAGER AND MANAGE, I GUESS, BASICALLY ETHERNET TO THE CELL

24    SITES.

25          **THE COURT:**  MANAGE ETHERNET WHAT?

```
1          PROSPECTIVE JUROR:  ETHERNET TO THE CELL SITES.

2          THE COURT:  I'M NOT GETTING IT.

3       OH, ETHERNET TO THE CELL SITES.

4          PROSPECTIVE JUROR:  YES.

5          THE COURT:  OKAY.  AND YOU HAVE A ROOMMATE OR PARENTS

6    OR A SIGNIFICANT OTHER WHO WORKS FOR THE CITY AND COUNTY?

7          PROSPECTIVE JUROR:  I LIVE WITH MY BROTHER.

8          THE COURT:  OKAY.  AND YOU HAVE SERVED ON JURIES IN

9    STATE COURT THREE TIMES.  WERE THEY CIVIL OR CRIMINAL OR A

10   LITTLE OF BOTH?

11         PROSPECTIVE JUROR:  I ACTUALLY DID NOT SERVE ON THE

12   JURY.

13         THE COURT:  YOU WERE CALLED IN, BUT DID NOT ACTUALLY

14   SERVE.

15         PROSPECTIVE JUROR:  RIGHT.

16         THE COURT:  OKAY.

17      OKAY.  IF YOU WOULD PASS THE MICROPHONE, PLEASE, TO

18   MR. RICHARDSON.

19      COULD YOU DESCRIBE FOR ME WHAT YOU DO, GENERALLY, ON THE

20   JOB?

21         PROSPECTIVE JUROR:  YES.  I AM A PROJECT MANAGER FOR

22   A WATER-BASED CONSULTING FIRM, CIVIL ENGINEER.  I MANAGE WATER

23   AND WASTEWATER PROJECTS.

24         THE COURT:  HAS YOUR WIFE EVER WORKED OUTSIDE THE

25   HOME?
```

```
 1              PROSPECTIVE JUROR:  YES, SHE HAS TAUGHT IN PUBLIC

 2    SCHOOLS.

 3              THE COURT:  OKAY.  IF YOU WOULD PASS THE MICROPHONE

 4    TO MS. LEE.

 5        AND YOU ARE LIVING WITH SOMEONE WHO WORKS IN A RESTAURANT

 6    AND SOMEONE WHO WORKS WITH LOANS.  IS THAT YOUR PARENTS?

 7              PROSPECTIVE JUROR:  YES.

 8              THE COURT:  OKAY.  AND YOU SERVED ON A JURY ONCE IN,

 9    I GUESS THAT WOULD BE, SAN MATEO COUNTY?

10              PROSPECTIVE JUROR:  MARTINEZ.

11              THE COURT:  OH, IN MARTINEZ.  YOU WERE LIVING -- YOU

12    ARE IN DALY CITY NOW.

13              PROSPECTIVE JUROR:  UH-HUH.

14              THE COURT:  BUT YOU PREVIOUSLY LIVED IN MARTINEZ?

15              PROSPECTIVE JUROR:  SAN PABLO.

16              THE COURT:  OKAY.  SO THAT WAS CONTRA COSTA COUNTY,

17    THEN?

18              PROSPECTIVE JUROR:  YES.

19              THE COURT:  AND YOU SERVED ON A JURY IN A CRIMINAL

20    CASE, AND THE JURY REACHED A VERDICT IN THE CASE?

21              PROSPECTIVE JUROR:  YES.

22              THE COURT:  OKAY.

23        OKAY.  IF YOU WOULD PASS THE MICROPHONE TO MR. CHAN.

24        SO YOU WORK FOR SSL, WHICH DOES WHAT?

25              PROSPECTIVE JUROR:  MANUFACTURER OF SATELLITES.
```

```
 1              THE COURT:  I AM SORRY?

 2              PROSPECTIVE JUROR:  MANUFACTURE OF SATELLITES.

 3              THE COURT:  SATELLITES?

 4              PROSPECTIVE JUROR:  YES.

 5              THE COURT:  CAN YOU DESCRIBE, GENERALLY, WHAT YOU DO

 6      FOR THEM?

 7              PROSPECTIVE JUROR:  I AM A TEST ENGINEER, AND I

 8      DEVELOP TEST SYSTEMS FOR THE SATELLITES.

 9              THE COURT REPORTER:  I AM SORRY, WHAT?

10              PROSPECTIVE JUROR:  I AM A TEST ENGINEER FOR SSL, AND

11      I DEVELOP TEST SYSTEMS FOR THE SATELLITES.

12              THE COURT:  ARE YOU LIVING WITH YOUR PARENTS OR WITH

13      OTHER ROOMMATES?

14              PROSPECTIVE JUROR:  I LIVE WITH MY PARENTS.

15              THE COURT:  OKAY.  IF YOU WOULD PASS THE MICROPHONE

16      TO MS. LU.

17          AND THE NAME OF YOUR COMPANY IS?

18              PROSPECTIVE JUROR:  BYER CALIFORNIA.

19              THE COURT:  OH, THAT IS THE NAME OF THE COMPANY.

20      OKAY.  AND WHAT DO THEY DO?

21          BYER CALIFORNIA, B-Y-E-R.

22          WHAT DO THEY DO?

23          COULD YOU HOLD THE MIC UP CLOSE AND LISTEN FOR YOUR VOICE

24      COMING OUT OF THE CEILING?

25              PROSPECTIVE JUROR:  IT'S A GARMENT, GARMENT COMPANY.
```

1          **THE COURT:**  A GARMENT COMPANY.

2          **PROSPECTIVE JUROR:**  YES.

3          **THE COURT:**  YOU DO QUALITY CONTROL FOR THEM?

4          **PROSPECTIVE JUROR:**  YES.

5          **THE COURT:**  AND DOES YOUR SPOUSE WORK OUTSIDE THE

6     HOME?

7          **PROSPECTIVE JUROR:**  NO.

8          **THE COURT:**  HAS HE EVER WORKED?  YOU ARE MARRIED?

9          **PROSPECTIVE JUROR:**  YES.

10         **THE COURT:**  YES.  AND YOUR HUSBAND DOESN'T WORK?

11         **PROSPECTIVE JUROR:**  NO.  HE'S WORKING.

12         **THE COURT:**  HE DOES WORK?

13         **PROSPECTIVE JUROR:**  YEAH.

14         **THE COURT:**  WHAT DOES HE DO?

15         **PROSPECTIVE JUROR:**  HE IS A BAKER.

16         **THE COURT:**  HE IS A BAKER.

17         **PROSPECTIVE JUROR:**  YEAH.

18         **THE COURT:**  DO YOU HAVE ANY CHILDREN?

19         **PROSPECTIVE JUROR:**  YES.

20         **THE COURT:**  HOW MANY?

21         **PROSPECTIVE JUROR:**  THREE.

22         **THE COURT:**  HOW OLD ARE THEY?

23         **PROSPECTIVE JUROR:**  THE OLDEST IS 24.  THE YOUNGEST

24    ONE'S 18.

25         **THE COURT:**  OKAY.  AND ARE ANY OF THEM WORKING?

1        PROSPECTIVE JUROR:  NO, JUST IN THE COLLEGE.

2        THE COURT:  I AM SORRY?

3        PROSPECTIVE JUROR:  THEY ARE IN THE COLLEGE.

4        THE COURT:  THEY ARE IN COLLEGE.  THE 24-YEAR-OLD IS

5    IN COLLEGE?

6        PROSPECTIVE JUROR:  YES, THE LAST YEAR OF COLLEGE.

7        THE COURT:  OKAY.  AND YOU WERE BORN IN CHINA?

8        PROSPECTIVE JUROR:  YES.

9        THE COURT:  YOU'VE LIVED HERE FOR NINE YEARS?

10       PROSPECTIVE JUROR:  NO, ABOUT 25 YEARS.

11       THE COURT:  OH, I SEE, 15 YEARS IN DALY CITY.

12       PROSPECTIVE JUROR:  YES.

13       THE COURT:  BEFORE THAT, NINE YEARS IN SAN FRANCISCO?

14       PROSPECTIVE JUROR:  YES.

15       THE COURT:  SO YOU CAME TO THE U.S. --

16       PROSPECTIVE JUROR:  ABOUT 25 YEARS.

17       THE COURT:  25 YEARS AGO?

18       PROSPECTIVE JUROR:  UH-HUH.

19       THE COURT:  OKAY.  AND ON THE JOB DO YOU SPEAK

20   ENGLISH --

21       PROSPECTIVE JUROR:  NO.

22       THE COURT:  -- OR CHINESE.

23       PROSPECTIVE JUROR:  VERY SELDOM.  JUST A LITTLE.

24       THE COURT:  EVERYONE AT YOUR JOB SPEAKS MANDARIN?

25       PROSPECTIVE JUROR:  CHINESE AND SPANISH AND SOMETHING

```
1    AND ENGLISH.
2                  THE COURT:  OKAY.  DO YOU SPEAK SPANISH?
3                  PROSPECTIVE JUROR:  NO.
4                  THE COURT:  WE HAD YOU CHECK BOXES WHETHER YOU HAD
5    ANY WORK WITH LAW OR PATENTS OR SOFTWARE AND ALSO WITH SELLING
6    MEDIA CONTENT LIKE ONLINE BOOKS OR ONLINE MUSIC.  HAVE YOU HAD
7    ANY TRAINING OR WORK IN THAT?
8                  PROSPECTIVE JUROR:  NO.
9                  THE COURT:  WHAT ABOUT IN COMPUTER SCIENCE?  HAVE YOU
10   WORKED IN COMPUTER SCIENCE AT ALL OR TRAINED IN COMPUTER
11   SCIENCE AT ALL?
12                 PROSPECTIVE JUROR:  I DON'T REMEMBER I CHECKED THAT
13   BOX.
14                 THE COURT:  NO, IT SAID "YES" OR "NO" AND YOU DIDN'T
15   CHECK EITHER BOX.
16                 PROSPECTIVE JUROR:  NO.
17                 THE COURT:  SO YOU WANTED TO CHECK "NO"?
18                 PROSPECTIVE JUROR:  NO-
19                 THE COURT:  YES?
20                 PROSPECTIVE JUROR:  NO.
21                 THE COURT:  YOU HAVE NOT HAD ANY WORK OR TRAINING IN
22   COMPUTER SCIENCE; IS THAT CORRECT?
23                 PROSPECTIVE JUROR:  NO.  NO, I DON'T TRAINING IN ANY
24   OF THAT.
25                 THE COURT:  OKAY.
```

```
 1          OKAY.  IF YOU WOULD PASS THE MICROPHONE TO MS. CHING.

 2       SO YOU LIVE BY YOURSELF?

 3              PROSPECTIVE JUROR:  NO.  I LIVE WITH MY FAMILY.

 4          THE COURT:  OKAY.  AND ARE ANY OF THEM WORKING?

 5              PROSPECTIVE JUROR:  MY SISTER, SHE'S -- SHE'S THE

 6    TEACHER.

 7          THE COURT:  SHE'S A TEACHER.

 8              PROSPECTIVE JUROR:  YEAH.  AND ANOTHER ONE IS A

 9    NURSE.  AND MY BROTHER IS WORKING IN THE LAB.

10          THE COURT:  YOUR BROTHER WORKS IN A LAB?

11       PROSPECTIVE JUROR:  YEAH.

12          THE COURT:  AND THE OTHER ONE, DID YOU SAY, WAS A

13    NURSE?

14              PROSPECTIVE JUROR:  YEAH.

15          THE COURT:  A NURSE, OKAY.

16              PROSPECTIVE JUROR:  AND MY FATHER AND MOTHER IS

17    RETIRED.

18          THE COURT:  WHAT DID THEY DO?  DID THEY USED TO WORK?

19          PROSPECTIVE JUROR:  YOU SAY MY FATHER AND MOTHER?

20          THE COURT:  DID THEY WORK BEFORE?

21          PROSPECTIVE JUROR:  YEAH.

22          THE COURT:  BEFORE THEY RETIRED THEY WORKED?

23          PROSPECTIVE JUROR:  YEAH.

24          THE COURT:  WHAT DID THEY DO?

25              PROSPECTIVE JUROR:  MY FATHER IS WORKING AT THE
```

```
1    RESTAURANT.
2              THE COURT:  AT THE WHAT?
3              PROSPECTIVE JUROR:  RESTAURANT.  RESTAURANT.  HE WAS
4    COOK.
5              THE COURT:  AT THE WHAT?
6              PROSPECTIVE JUROR:  RESTAURANT.
7              THE COURT:  OH, RESTAURANT.
8              PROSPECTIVE JUROR:  YEAH.
9              THE COURT:  AND WHAT DID YOUR MOTHER DO?
10             PROSPECTIVE JUROR:  HOTEL.
11             THE COURT:  SHE WORKED AT A HOTEL?
12             PROSPECTIVE JUROR:  HOUSEKEEPING.
13             THE COURT:  HOUSEKEEPING?
14             PROSPECTIVE JUROR:  UH-HUH.
15             THE COURT:  AND YOU WERE BORN IN CHINA.  HOW LONG
16   HAVE YOU BEEN LIVING IN THE UNITED STATES?
17             PROSPECTIVE JUROR:  ABOUT 14.
18             THE COURT:  14 YEARS?  AND ALL YOUR EDUCATION WAS IN
19   CHINA?
20             PROSPECTIVE JUROR:  I STARTED ENGLISH AT THE CONTRA
21   COSTA COLLEGE.
22             THE COURT:  OKAY.  AND YOU WORK AS A REAL ESTATE
23   AGENT?
24             PROSPECTIVE JUROR:  YEAH, JUST TWO YEARS.
25             THE COURT:  AND DO YOU USE ENGLISH AT YOUR JOB?
```

```
1              PROSPECTIVE JUROR:  YEAH.

2         THE COURT:  OKAY.

3              PROSPECTIVE JUROR:  BUT MOST TIME IT'S CHINESE.

4         THE COURT:  PEOPLE AT YOUR JOB SPEAK CHINESE, ALSO?

5              PROSPECTIVE JUROR:  YEAH.

6         THE COURT:  OKAY.  IF YOU WOULD PASS THE MICROPHONE,

7    PLEASE, TO MS. CONNOR.

8       WHAT AGENCY DO YOU WORK FOR AT CONTRA COSTA?

9              PROSPECTIVE JUROR:  EMPLOYMENT AND HUMAN SERVICES.

10         THE COURT:  AND ARE YOU MARRIED, SEPARATED, DIVORCED,

11   WIDOWED, SINGLE?

12             PROSPECTIVE JUROR:  MARRIED.

13         THE COURT:  AND DOES YOUR HUSBAND WORK OUTSIDE THE

14   HOME?

15             PROSPECTIVE JUROR:  RETIRED.

16         THE COURT:  WHAT DID HE DO?

17             PROSPECTIVE JUROR:  FLOOR COVERING INSTALLATION.

18         THE COURT:  FLOOR COVERING.  OKAY.  DO YOU HAVE ANY

19   CHILDREN?

20             PROSPECTIVE JUROR:  THEY ARE ADULTS.

21         THE COURT:  DO ANY OF THEM -- ARE ANY OF THEM

22   EMPLOYED?

23             PROSPECTIVE JUROR:  YES.

24         THE COURT:  WHAT DO THEY DO?

25             PROSPECTIVE JUROR:  MY SON IS A TRUCK DRIVER, AND MY
```

1    DAUGHTER WORKS FOR THE FIRE DEPARTMENT.

2          **THE COURT:**  AND THEY DON'T LIVE AT HOME?

3          **PROSPECTIVE JUROR:**  NO, THEY DO NOT.

4          **THE COURT:**  OKAY.  AND YOU HAVE NOT BEEN IN THE

5    MILITARY SERVICE OR DONE ANY LAW ENFORCEMENT WORK?

6          **PROSPECTIVE JUROR:**  NO.

7          **THE COURT:**  OKAY.  IF YOU WOULD PASS THE MICROPHONE

8    TO THE GENTLEMAN RIGHT THERE WHO I HOPE WILL BE ARE

9    MR. COLLARO.

10          **PROSPECTIVE JUROR:**  YES.

11          **THE COURT:**  HOW DO YOU PRONOUNCE IT?

12          **PROSPECTIVE JUROR:**  COLLARO.

13          **THE COURT:**  COLLARO.

14      SO THE COMPANY YOU WORK FOR IS A PRIVATE COMPANY.  IT IS

15    NOT A GOVERNMENTAL AGENCY OF ANY KIND?

16          **PROSPECTIVE JUROR:**  YES.

17          **THE COURT:**  "YES," IT IS PRIVATE.

18          **PROSPECTIVE JUROR:**  YEAH, PRIVATE.

19          **THE COURT:**  OKAY.  AND YOU LIVE BY YOURSELF?

20          **PROSPECTIVE JUROR:**  WITH MY PARENTS, CURRENTLY.

21          **THE COURT:**  AND ARE THEY WORKING?

22          **PROSPECTIVE JUROR:**  YES.  BOTH OF THEM.

23          **THE COURT:**  WHAT DO THEY DO?

24          **PROSPECTIVE JUROR:**  MY DAD IS VICE PRESIDENT OF A

25    CONSTRUCTION BUSINESS, AND MY MOM'S MY BOSS.

```
1              THE COURT:  OKAY.  SO SHE RUNS CALIFORNIA DIESEL AND

2     POWER?

3              PROSPECTIVE JUROR:  YES.

4              THE COURT:  AND YOU CHECKED "YES," AND THEN CROSSED

5     IT OUT.  I GUESS MAYBE YOU WERE CALLED TO SERVE, BUT NEVER

6     ACTUALLY SERVED.

7              PROSPECTIVE JUROR:  YES, I WAS CALLED TO SERVE.

8              THE COURT:  BUT YOU NEVER ACTUALLY SERVED ON THE

9     JURY?

10             PROSPECTIVE JUROR:  NO.

11             THE COURT:  AND WHAT DO YOU USE THE INTERNET FOR?

12             PROSPECTIVE JUROR:  SURFING, YOU KNOW, PICK SOMETHING

13    AND GOOGLE IT.

14             THE COURT:  RECREATIONAL AT HOME.

15             PROSPECTIVE JUROR:  YEAH.

16             THE COURT:  YOU DON'T USE IT ON YOUR JOB?

17             PROSPECTIVE JUROR:  NO.

18             THE COURT:  OKAY.  IF YOU WOULD PASS THE MICROPHONE,

19    PLEASE, TO MR. ROSINSKI, IS IT?

20             PROSPECTIVE JUROR:  YES.

21             THE COURT:  AND WHAT COMPANY DO YOU WORK FOR?

22             PROSPECTIVE JUROR:  SAN FRANCISCO CHRONICLE.

23             THE COURT:  AND WHAT COMPANY OR WHAT TYPE OF

24    COMPANY -- OH, I SEE.  YOUR WIFE WORKS -- YOUR SPOUSE WORKS

25    FOR PR MAGIC.  THAT IS THE NAME OF THE COMPANY?
```

```
1              PROSPECTIVE JUROR:  THAT'S RIGHT.

2              THE COURT:  AND YOU MUST USE THE INTERNET BOTH FOR

3    WORK AND AT HOME?

4              PROSPECTIVE JUROR:  THAT'S CORRECT.

5              THE COURT:  SO YOUR WORK IS FULLY ON COMMISSION

6    WITHOUT A SALARY?

7              PROSPECTIVE JUROR:  THERE IS A SALARY, SO IT IS NOT

8    EXCLUSIVELY COMMISSIONS.

9              THE COURT:  OKAY.  SO YOU MENTIONED THAT YOUR WORK

10   WOULD MAKE IT DIFFICULT FOR YOU TO SERVE.  GIVEN THAT

11   RELATIVELY SHORT TRIAL AND THE MORNING HOURS, DO YOU THINK YOU

12   WOULD BE ABLE TO KEEP UP ADEQUATELY WITHOUT -- IF YOU WERE

13   SELECTED?

14             PROSPECTIVE JUROR:  I MEAN, IT'S A CHALLENGE FOR ME.

15   WE ARE RELAUNCHING OUR WEBSITE FOR THE FIRST -- LET'S SEE --

16   FIRST TIME IN TEN OR 12 YEARS, DOING A WHOLE REDESIGN.  THAT

17   RELAUNCHING HAPPENS AROUND THE 12TH OF SEPTEMBER OF THIS

18   MONTH, OR NEXT MONTH.  RIGHT NOW IS OUR SALES WINDOW.  WE WILL

19   MAKE OR BREAK OUR YEAR RIGHT NOW.

20             THE COURT:  SALES WINDOW FOR?

21             PROSPECTIVE JUROR:  CLOSING DEALS AGAINST THIS

22   RELAUNCH.  BIG SALES INITIATIVE THROUGHOUT THE WHOLE COMPANY.

23             THE COURT:  AND THIS IS THE SAN FRANCISCO CHRONICLE?

24             PROSPECTIVE JUROR:  THAT'S RIGHT.  AND OUR WEBSITE

25   SFGATE.COM.
```

1        **THE COURT:**  OKAY.  WE GENERALLY DON'T TAKE INTO

2   ACCOUNT THE PROBLEMS A PARTICULAR BUSINESS MIGHT HAVE,

3   ESPECIALLY IF IT IS A LARGE BUSINESS.

4        **PROSPECTIVE JUROR:**  IT WOULD BE MORE ABOUT ME AND MY

5   SALES TEAM AS OPPOSED TO THE COMPANY'S POTENTIAL HARDSHIP.  IT

6   WOULD BE ME AND MY SALES.  MY SELLERS WOULD MAKE OUR YEAR

7   RIGHT NOW WITH THE SALES THAT WE CLOSE OVER THE NEXT TWO TO

8   THREE WEEKS.

9        **THE COURT:**  OKAY.  WELL, YOUR SALES TEAM WOULD STILL

10  BE THERE.

11       **PROSPECTIVE JUROR:**  WITHOUT ME.

12       **THE COURT:**  YEAH.

13       **PROSPECTIVE JUROR:**  THAT'S RIGHT.

14       **THE COURT:**  OKAY.  HOW MANY PEOPLE ARE ON YOUR SALES

15  TEAM?

16       **PROSPECTIVE JUROR:**  SIX.

17       **THE COURT:**  OKAY.  IF YOU WOULD PASS THE MICROPHONE

18  TO MR. SIU.

19       **PROSPECTIVE JUROR:**  YES.

20       **THE COURT:**  SO YOUR WORK IS ANALYZING FINANCIAL

21  REPORTS?  OR WHAT SORT OF REPORTS DO YOU ANALYZE?

22       **PROSPECTIVE JUROR:**  YES.  SO I WORK FOR THE FEDERAL

23  RESERVE BANK OF SAN FRANCISCO.  SO I AM A REPORTS ANALYST FOR

24  BANKS.

25       **THE COURT:**  SO I WAS JUST TRYING TO GET SOME IDEA

1    WHAT THAT ACTUALLY MEANT.  YOU ANALYZE PEOPLE'S FINANCIAL

2    REPORTS OR --

3              **PROSPECTIVE JUROR:**  BANKS DEPOSITS AND RESERVABLE

4    LIABILITIES DATA.

5              **THE COURT:**  I SEE.  AND DO YOU LIVE BY YOURSELF?

6              **PROSPECTIVE JUROR:**  YES, I DO.

7              **THE COURT:**  AND YOU SERVED ON A JURY ONCE IN STATE

8    COURT IN ALAMEDA COUNTY?

9              **PROSPECTIVE JUROR:**  IN THE FREMONT COURT, CORRECT.

10             **THE COURT:**  WAS IT A CRIMINAL CASE OR A CIVIL CASE?

11             **PROSPECTIVE JUROR:**  IT WAS A CRIMINAL CASE.

12             **THE COURT:**  DID THE JURY REACH A VERDICT?

13             **PROSPECTIVE JUROR:**  YES.

14             **THE COURT:**  OKAY.  IF YOU WOULD PASS THE MICROPHONE

15   PLEASE TO MR. BANG?

16             **PROSPECTIVE JUROR:**  THAT'S CORRECT.

17             **THE COURT:**  WHAT DOES YOUR COMPANY DO?

18             **PROSPECTIVE JUROR:**  ELECTRONIC DESIGN AUTOMATION.

19             **THE COURT:**  AND WHAT DO YOU DO?  I KNOW YOU ARE AN

20   OPERATIONS DIRECTOR, BUT WHAT DOES THAT MEAN YOU DO ON A SORT

21   OF DAY-TO-DAY BASIS?

22             **PROSPECTIVE JUROR:**  I MAKE SURE THAT THE SERVICE IS

23   ALL BASICALLY EFFICIENT AND RUNNING EVERY DAY.

24             **THE COURT:**  OKAY.  AND YOU SERVED ON A JURY ONCE IN

25   STATE COURT IN SAN MATEO COUNTY?

```
 1                PROSPECTIVE JUROR:  THAT'S CORRECT.

 2                THE COURT:  IN A CIVIL CASE.  WHAT KIND OF A CASE WAS

 3    IT?

 4                PROSPECTIVE JUROR:  ANIMAL ABUSE.

 5                THE COURT:  BUT IT WAS CIVIL?  IT WAS A PRIVATE

 6    PERSON SUING ANOTHER PRIVATE PERSON?  OR WAS THE PERSON BEING

 7    PROSECUTED FOR ABUSING AN ANIMAL.

 8                PROSPECTIVE JUROR:  I THINK IT'S PROSECUTED FOR

 9    ABUSING AN ANIMAL.

10                THE COURT:  OKAY.  SO THAT WAS PROBABLY A CRIMINAL

11    CASE.

12                PROSPECTIVE JUROR:  I GUESS, YEAH.

13                THE COURT:  AND THE JURY WAS NOT ABLE TO REACH A

14    VERDICT?  THEY WEREN'T ABLE TO AGREE?

15                PROSPECTIVE JUROR:  THAT'S CORRECT.

16                THE COURT:  OKAY.  YOU HAVE A SIBLING WHO WAS A

17    PROSECUTOR AND WHO IS NOW AN ATTORNEY.  IS THIS IN THIS AREA

18    OR SOMEWHERE ELSE?

19                PROSPECTIVE JUROR:  IN TEXAS.

20                THE COURT:  IN TEXAS, OKAY.

21       AND WHAT HAS BEEN YOUR CONNECTION WITH PATENTS?

22                PROSPECTIVE JUROR:  I'VE DONE A FEW -- I GUESS FROM

23    MY STANDPOINT OF WHAT I DO AT MY JOB IS I DO A LOT OF WORK

24    WITH CONTRACTS AND VERIFYING TERMS AND GOING THROUGH REDLINING

25    QUITE A BIT.
```

```
1              THE COURT:  ARE YOU THE INVENTOR ON ANY PATENTS

2    YOURSELF?

3              PROSPECTIVE JUROR:  NO.

4              THE COURT:  HAVE YOU EVER BEEN INVOLVED IN ANY PATENT

5    LAWSUITS?

6              PROSPECTIVE JUROR:  NO.

7              THE COURT:  YOU SAY YOU HAVE A GOOD FRIEND WHO WORKS

8    AT ADOBE.  WHEREABOUTS?

9              PROSPECTIVE JUROR:  THAT'S CORRECT.  HERE IN THE BAY

10   AREA.

11             THE COURT:  HERE IN THE BAY AREA?  WHAT DOES HE OR

12   SHE DO?

13             PROSPECTIVE JUROR:  SOFTWARE ENGINEER.

14             THE COURT:  IN WHAT FACILITY?

15             PROSPECTIVE JUROR:  I AM NOT SURE.

16             THE COURT:  COULD YOU GIVE US THE NAME SO WE CAN MAKE

17   SURE THAT IT ISN'T SOMEONE WHO IS INVOLVED IN ANY WAY?

18             PROSPECTIVE JUROR:  SURE.  DAN BEATTY.

19             THE COURT:  COULD YOU SPELL THAT FOR ME?

20             PROSPECTIVE JUROR:  DAN B-E-A-T-T-Y.

21             THE COURT:  B-E-A-T-T-Y?  IS THERE ANYTHING ABOUT

22   THAT RELATIONSHIP THAT WOULD MAKE IT HARD FOR YOU TO BE FAIR

23   IN THIS CASE?

24             PROSPECTIVE JUROR:  I DON'T THINK SO UNLESS HIS NAME

25   SOMEHOW CAME UP AND THERE WAS SOME TERMINOLOGY THROWN AROUND
```

```
1    ABOUT HIM.
2           THE COURT:  OKAY.  I DON'T THINK THAT IS LIKELY.
3       AND YOU WOULD BE ABLE TO REFRAIN FROM DISCUSSING THE CASE
4    WITH HIM WHILE YOU WERE A JUROR, I PRESUME?
5           PROSPECTIVE JUROR:  THAT'S CORRECT.
6           THE COURT:  ALL RIGHT.  IF YOU WOULD PASS THE
7    MICROPHONE TO MR. AGUILAR?
8       SO YOU STUDIED LAW?
9           PROSPECTIVE JUROR:  YES.
10          THE COURT:  DID YOU FINISH LAW SCHOOL?
11          PROSPECTIVE JUROR:  I AM SORRY?
12          THE COURT:  DID YOU FINISH LAW SCHOOL?
13          PROSPECTIVE JUROR:  YES, I DID.
14          THE COURT:  AND DID YOU TAKE PASS THE BAR ANYWHERE?
15          PROSPECTIVE JUROR:  I AM AN INACTIVE MEMBER OF THE
16   STATE BAR.
17          THE COURT:  CALIFORNIA?
18          PROSPECTIVE JUROR:  YES.
19          THE COURT:  DID YOU PRACTICE AT ONE TIME?
20          PROSPECTIVE JUROR:  NEVER DID.
21          THE COURT:  OKAY.  AND COULD YOU DESCRIBE GENERALLY,
22   WHAT YOU DO ON YOUR JOB ON A DAY-TO-DAY BASIS?
23          PROSPECTIVE JUROR:  I'M PART OWNER OF A SMALL FAMILY
24   COMPANY.  WE DO METAL FINISHING.  IT'S -- MY DUTIES ARE KIND
25   OF RUN FROM THE FRONT OFFICE TO BACK TO THE PRODUCTION AREA.
```

```
1    AND WE ARE -- IT WAS MY FATHER'S BUSINESS, AND WE HAVE BEEN IN

2    THE SAME LOCATION FOR -- SINCE 1955.  AND THINGS HAVE SLOWED

3    DOWN ENOUGH IN THE INDUSTRY THAT WE'RE CURRENTLY TRYING TO

4    SELL THE BUSINESS.  WE HAVE BEEN DISCUSSING IT, BUT WE FINALLY

5    STARTED GOING THROUGH WITH IT.  AND THIS WAS THE PART I WROTE

6    DOWN ON THE QUESTIONNAIRE THIS MORNING, THAT WE HAD JUST BEGUN

7    THE PROCESS, AND WE RECEIVED OUR FIRST OFFER.

8        IT'S A COMPLEX KIND OF CLOSING BECAUSE OF THE KIND OF

9    CHEMICALS AND MATERIALS WE'VE USED OVER THE YEARS.  BUT IT'S

10   BASICALLY ONE OF MY BROTHERS AND MYSELF THAT ARE RUNNING THE

11   SALE, AND REPRESENTING US.

12       SO MY RESPONSE TO THAT WAS I'M QUESTIONING WHAT KIND OF

13   CONCENTRATION I COULD DEVOTE TO THE CASE WHEN THIS WAS A LARGE

14   PART OF WHAT WE HAVE BEEN DOING FOR THE LAST THREE OR FOUR

15   WEEKS AND, YOU KNOW, FORESEE DOING IN THE NEXT WEEKS TO COME

16   WHEN WE GO THROUGH THE PROCESS.

17            THE COURT:  OKAY.  WE WILL TRY TO TAKE THAT INTO

18   ACCOUNT.  HOPEFULLY, NOW THAT YOU HAVE HEARD THE TRIAL WILL BE

19   IN SESSION FROM 8:30 TO 1:30, THAT WILL GIVE YOU ENOUGH TIME

20   IN THE AFTERNOONS TO CONTINUE DEALING WITH YOUR --

21            PROSPECTIVE JUROR:  I AM NOT SAYING I CAN'T DO IT.

22            THE COURT:  OKAY.

23            PROSPECTIVE JUROR:  I JUST WANTED TO HAVE IT OUT

24   THERE.

25            THE COURT:  IF YOU WERE SELECTED YOU WOULD DO YOUR
```

```
1    BEST TO CONCENTRATE, I PRESUME?

2              PROSPECTIVE JUROR:  YES.

3         THE COURT:  OKAY.  IF YOU WOULD PASS THE MICROPHONE

4    TO MR. CURETON?

5              PROSPECTIVE JUROR:  YES.

6         THE COURT:  I AM SORRY.  I GOT DISTRACTED HERE WITH

7    MR. AGUILAR.  I HAD A COUPLE OF OTHER QUESTIONS.

8       YOU'VE LISTED THE OCCUPATION OF ADULTS LIVING IN YOUR

9    HOUSEHOLD.  ONE IS A REGISTERED NURSE.  I'M GUESSING THAT IS

10   YOUR WIFE?

11             PROSPECTIVE JUROR:  MY WIFE IS A REGISTERED NURSE.

12        THE COURT:  THEN, YOU HAVE A CLERK.  IS THAT YOUR

13   ADULT CHILD?

14             PROSPECTIVE JUROR:  OH, MY SON, HE GOES TO CANADA

15   COLLEGE IN SAN MATEO, AND HE WORKS AT LUCKY SUPERMARKET.

16        THE COURT:  OKAY.  OH, I SEE.  THEN, YOUR OTHER CHILD

17   IS IN THE AIR FORCE.

18             PROSPECTIVE JUROR:  YES.  SHE'S DUE TO RETIRE IN

19   ABOUT A YEAR --

20        THE COURT:  OKAY.

21             PROSPECTIVE JUROR:  -- YEAR-AND-A-HALF.

22        THE COURT:  AND WHAT DOES SHE DO FOR THE AIR FORCE?

23             PROSPECTIVE JUROR:  SHE'S A -- SHE'S A STAFF

24   SERGEANT, WHATEVER THE HIGHEST NONCOM POSITION IS IN THE AIR

25   FORCE.  SHE WORKS AT BEALE AIR FORCE BASE, AND SHE'S NOT
```

```
1    ALLOWED TO TALK ABOUT WHAT SHE DOES.

2            THE COURT:  OKAY.  SO YOU DON'T KNOW?

3            PROSPECTIVE JUROR:  I AM NOT GOING TO SAY.

4    (LAUGHTER).

5            THE COURT:  RIGHT.  OKAY.  YOU ARE NOT ALLOWED TO

6    TALK ABOUT IT, EITHER.

7            PROSPECTIVE JUROR:  RIGHT.

8            THE COURT:  AND YOU HAVE SERVED ON A JURY IN STATE

9    COURT IN, I'M GUESSING, SAN MATEO COUNTY?

10           PROSPECTIVE JUROR:  RIGHT.  ABOUT THREE YEARS AGO.

11           THE COURT:  IT WAS A CIVIL CASE, AND THE JURY REACHED

12   A VERDICT.  WHAT WAS IT ABOUT, GENERALLY?

13           PROSPECTIVE JUROR:  IT WAS A GENTLEMAN SUING FOR

14   DAMAGES FOR AN AUTO ACCIDENT, MEDICAL DAMAGES.

15           THE COURT:  OKAY.  SO BACK TO MR. CURETON.

16      YOU WERE CALLED IN TO SERVE ON A JURY, BUT YOU WEREN'T

17   SELECTED, SO YOU DIDN'T ACTUALLY SERVE?

18           PROSPECTIVE JUROR:  CORRECT.

19           THE COURT:  OKAY.  AND YOU SAY YOU OWN STOCK IN

20   ADOBE?

21           PROSPECTIVE JUROR:  YES.

22           THE COURT:  IS IT AN AMOUNT OF STOCK THAT WOULD

23   GREATLY AFFECT YOUR FINANCIAL SITUATION?

24           PROSPECTIVE JUROR:  OH, ME, PERSONALLY?

25           THE COURT:  YES.
```

```
1              PROSPECTIVE JUROR:  ARGUABLY, I SUPPOSE.

2              THE COURT:  AS A PERCENTAGE OF YOUR NET WORTH, LET'S

3    SAY?

4              PROSPECTIVE JUROR:  20 PERCENT?  I DON'T KNOW.  IS

5    THAT WHAT YOU ARE ASKING?

6              THE COURT:  YEAH.

7              PROSPECTIVE JUROR:  YEAH, I SUPPOSE IT'S SIGNIFICANT.

8              THE COURT:  OKAY.  YOU WOULD PASS THE MICROPHONE TO

9    MR. ALBERT?

10             PROSPECTIVE JUROR:  YES.

11             THE COURT:  IS IT STILL ON?  YOU HAVE TO HOLD IT

12   PRETTY CLOSE.

13             PROSPECTIVE JUROR:  YES, I AM MR. ALBERT.

14             THE COURT:  OKAY.  SO YOU WORK -- OH, YOU'RE RETIRED?

15             PROSPECTIVE JUROR:  THAT'S CORRECT.

16             THE COURT:  FROM A COMPANY THAT DID WHAT?

17             PROSPECTIVE JUROR:  A SEED COMPANY, AN AG BIOTECH

18   COMPANY.

19             THE COURT:  AND PRIOR TO THAT YOU WORKED FOR THE

20   DEPARTMENT OF -- THE U.S. DEPARTMENT OF AGRICULTURE?

21             PROSPECTIVE JUROR:  THAT'S CORRECT.

22             THE COURT:  AND YOUR SPOUSE IS STILL WORKING?

23             PROSPECTIVE JUROR:  YES, SHE IS.

24             THE COURT:  AND WHAT IS HER FIELD?

25             PROSPECTIVE JUROR:  SHE'S A MOLECULAR PATHOLOGIST,
```

1    MOLECULAR GENETICIST.

2              **THE COURT:**  SO YOU WERE NAMED AS THE INVENTOR ON SOME

3    PATENTS?

4              **PROSPECTIVE JUROR:**  THAT'S CORRECT.

5              **THE COURT:**  AND THAT IS THROUGH YOUR WORK AT PIONEER

6    HYBRID?

7              **PROSPECTIVE JUROR:**  THERE, AND ALSO WITH THE AG

8    RESEARCH SERVICE, THE USD AG RESEARCH SERVICE.

9              **THE COURT:**  OH, OKAY.  SO IN BOTH CASES THE EMPLOYER

10   WAS THE ACTUALLY OWNER OF THE PATENT.

11             **PROSPECTIVE JUROR:**  THAT'S CORRECT.

12             **THE COURT:**  AND WAS THERE EVER ANY LAWSUITS OR

13   DISPUTES ABOUT ANY OF THE PATENTS YOU WERE NAMED ON?

14             **PROSPECTIVE JUROR:**  NOT TO MY KNOWLEDGE.

15             **THE COURT:**  YOU NEVER HAD TO GO TESTIFY ABOUT THEM OR

16   ANYTHING LIKE THAT?

17             **PROSPECTIVE JUROR:**  CORRECT.

18             **THE COURT:**  OKAY.

19        OKAY.  IF YOU WOULD PASS THE MICROPHONE TO MR. THORPE.

20        SO DR HORTON IS A CONSTRUCTION COMPANY?

21             **PROSPECTIVE JUROR:**  YES.  HOME BUILDER.

22             **THE COURT:**  OKAY.  AND HAVE YOU BEEN MARRIED IN THE

23   PAST?

24             **PROSPECTIVE JUROR:**  HAVE I BEEN IN --

25             **THE COURT:**  NO, HAVE YOU BEEN MARRIED IN THE PAST?

```
1          PROSPECTIVE JUROR:  NO, SINGLE.

2          THE COURT:  OKAY.

3      YOU LIVE BY YOURSELF?

4          PROSPECTIVE JUROR:  YES.

5          THE COURT:  AND YOU HAVE A LAWSUIT PENDING IN

6  FLORIDA.  CAN YOU --

7          PROSPECTIVE JUROR:  CORRECT.

8          THE COURT:  -- TELL ME A LITTLE BIT ABOUT THAT?

9          PROSPECTIVE JUROR:  I HAVE A RENTAL PROPERTY IN

10 JACKSONVILLE, AND I HAVE A TENANT THAT HAD JUST MOVED IN.  AND

11 THEIR 11-YEAR-OLD SON SHOT AND KILLED THE BABYSITTER IN MY

12 HOUSE, AND THEY ARE SUING ME.

13         THE COURT:  OH, MY GOSH.  OKAY.

14     AND YOU HAVE AN INSURANCE?

15         PROSPECTIVE JUROR:  YES, ST. JOHN'S INSURANCE COMPANY

16 IS DEFENDING ME IN THE SUIT.

17         THE COURT:  OKAY.  ALL RIGHT.  IF YOU WOULD PASS THE

18 MICROPHONE DIRECTLY BEHIND YOU.  AND IN THE BACK ROW, SEND IT

19 ALL THE WAY DOWN TO THE PERSON BY THE WALL, WHOM I AM HOPING

20 WILL BE MR. BRUCE.

21     SO YOU HAVE TWO ADULT CHILDREN?

22         PROSPECTIVE JUROR:  YES.

23         THE COURT:  ONE WORKS IN SALES.

24         PROSPECTIVE JUROR:  YES.

25         THE COURT:  FOR WHAT KIND OF A COMPANY?
```

```
1              PROSPECTIVE JUROR:  IT IS A PAYROLL COMPANY.

2              THE COURT:  IS THE OTHER ONE WORKING?

3              PROSPECTIVE JUROR:  NOT YET.

4              THE COURT:  BUT YOU ARE HOPEFUL?

5              PROSPECTIVE JUROR:  YES.

6              THE COURT:  AND I AM SORRY ABOUT YOUR WIFE.  DID SHE

7    WORK OUTSIDE THE HOME BEFORE SHE PASSED AWAY?

8              PROSPECTIVE JUROR:  YES, SHE DID.

9              THE COURT:  WHAT DID SHE DO?

10             PROSPECTIVE JUROR:  SHE TRAVELED AROUND THE WORLD

11   TEACHING PEOPLE HOW TO MAKE MONEY SELLING BALLOONS.

12             THE COURT:  SMALL BALLOONS OR BIG BALLOONS?

13             PROSPECTIVE JUROR:  PARTY BALLOONS.

14             THE COURT:  OKAY.  AND YOU SERVED AS A JUROR IN STATE

15   COURT IN NAPA COUNTY?  OR NO, SONOMA IS THE COUNTY.

16             PROSPECTIVE JUROR:  SONOMA COUNTY.

17             THE COURT:  THAT WAS A CRIMINAL CASE?

18             PROSPECTIVE JUROR:  YES, MA'AM.

19             THE COURT:  AND THE JURY REACHED A VERDICT IN THE

20   CASE?

21             PROSPECTIVE JUROR:  YES.

22             THE COURT:  SO YOU MENTIONED SOME PROBLEMS THAT THE

23   OWNER OF YOUR COMPANY HAD.

24             PROSPECTIVE JUROR:  YES, MA'AM.

25             THE COURT:  YOU HAVE THAT SAME PROBLEM.
```

```
 1              PROSPECTIVE JUROR:  NO, NOT ME.

 2          THE COURT:  OH, OKAY.  JUST THE OWNER?

 3          PROSPECTIVE JUROR:  CORRECT.

 4          THE COURT:  OH, OKAY.  SO IT SAYS -- OH, OKAY.  SO

 5   THE OWNER WENT TO PRISON.

 6          PROSPECTIVE JUROR:  YES, MA'AM.

 7          THE COURT:  WHAT THIS SAYS IS:

 8              "HE WAS CONVICTED AND WENT TO PRISON, THE OWNER.  AND

 9              I WENT, TOO."

10      SO I THOUGHT THAT MEANT YOU WENT ALONG WITH HIM.

11          PROSPECTIVE JUROR:  I DIDN'T DO VERY WELL IN ENGLISH.

12          THE COURT:  SO IS THAT WHAT IS CONTINUED DOWN AT THE

13   BOTTOM, YOU WENT TO HIGH SCHOOL WITH HIM?

14          PROSPECTIVE JUROR:  YES.  AND WE ARE STILL FRIENDS.

15      I STILL WORK FOR HIM.

16          THE COURT:  SORRY, ABOUT THAT.  SO HE'S OUT NOW?

17          PROSPECTIVE JUROR:  YES, MA'AM.

18          THE COURT:  OKAY.  AND THE COMPANY KEPT GOING DURING

19   THAT WHOLE TIME?

20          PROSPECTIVE JUROR:  YES.

21          THE COURT:  OKAY.  SORRY ABOUT THAT.  I MISREAD IT.

22   IT WAS CONTINUED TO THE BOTTOM, BUT I INTERPRETED THAT AS

23   GOING WITH A DIFFERENT QUESTION.  OKAY.  GLAD I CLEARED THAT

24   UP.

25      OKAY.  SO MR. NEAVES, IS IT?
```

```
1              PROSPECTIVE JUROR:  YES.

2              THE COURT:  AND WHAT DID YOU DO FOR CHARLES SCHWAB

3    WHEN YOU WERE WORKING THERE?

4              PROSPECTIVE JUROR:  I RETIRED AS A SENIOR VICE

5    PRESIDENT IN THE INTERNATIONAL -- RUNNING THE INTERNATIONAL

6    COMPUTER CENTERS.

7              THE COURT:  OH, OKAY.  SO IT WAS COMPUTER RELATED AS

8    OPPOSED TO INVESTMENT RELATED?

9              PROSPECTIVE JUROR:  YES.  I SPENT MY WHOLE LIFE IN

10   THE IT INDUSTRY.

11             THE COURT:  OKAY.

12        DID YOUR SPOUSE WORK OUTSIDE THE HOME?

13             PROSPECTIVE JUROR:  A VERY LONG TIME AGO AS AN

14   ACCOUNTANT.

15             THE COURT:  AND YOUR SON OR DAUGHTER WHO'S A GRANT

16   WRITER; IS THAT FREELANCE OR DOES HE OR SHE WORK FOR --

17             PROSPECTIVE JUROR:  WORKS FOR EDGEWOOD IN SAN

18   FRANCISCO.

19             THE COURT:  FOR WHAT?

20             PROSPECTIVE JUROR:  EDGEWOOD CHILDREN'S HOME.

21             THE COURT:  OH, OKAY.

22        AND YOU SERVED ON JURIES THREE DIFFERENT TIMES IN SAN

23   FRANCISCO COUNTY?

24             PROSPECTIVE JUROR:  I HAVE BEEN CALLED.  I SERVED ON

25   ONE JURY.
```

```
1              THE COURT:  I SEE.  AND THE ONE YOU ACTUALLY SERVED

2    ON, WAS THAT A CIVIL CASE OR A CRIMINAL CASE?

3              PROSPECTIVE JUROR:  IT WAS A CIVIL CASE, AND WE DID

4    REACH A VERDICT.

5              THE COURT:  WHAT WAS IT ABOUT GENERALLY?

6              PROSPECTIVE JUROR:  IT WAS BACK ALIMONY.

7              THE COURT:  OKAY.

8         OKAY.  IF YOU WOULD PASS THE MICROPHONE TO -- DO YOU GO BY

9    ZIEBARTH BASEMAN OR JUST BASEMAN?

10             PROSPECTIVE JUROR:  JUST BASEMAN.

11             THE COURT:  OKAY.

12        WHAT DOES YOUR COMPANY DO?

13             PROSPECTIVE JUROR:  IT'S A HOUSE CLEANING BUSINESS.

14             THE COURT:  I SEE.  AND YOUR PRIOR WORK WITH ALOHA

15   HOUSE?  IS THAT A --

16             PROSPECTIVE JUROR:  VACATION RENTAL IN HAWAII.

17             THE COURT:  I SEE.  OKAY.

18        AND IS IT YOUR HUSBAND WHO'S A POLICE OFFICER?

19             PROSPECTIVE JUROR:  YES.

20             THE COURT:  WHO IS THE RETIRED SECRETARY?

21             PROSPECTIVE JUROR:  MY MOTHER-IN-LAW.

22             THE COURT:  OKAY.  IF YOU WOULD PASS THE MICROPHONE

23   PLEASE TO MS. DOUGHERTY?

24             PROSPECTIVE JUROR:  YES, MA'AM.

25             THE COURT:  SO YOUR HUSBAND IS WORKING AT SAFEWAY AS
```

```
 1    A RETAIL CLERK?

 2            PROSPECTIVE JUROR:  YES, MA'AM.

 3            THE COURT:  AND YOU'RE WORKING THERE AS WELL?

 4            PROSPECTIVE JUROR:  NO.

 5            THE COURT:  YOU ARE AT CVS NOW?

 6            PROSPECTIVE JUROR:  YES, MA'AM.

 7            THE COURT:  AND YOU'RE ALSO ATTENDING SCHOOL?

 8            PROSPECTIVE JUROR:  I WAS GOING TO, BUT I DIDN'T PASS

 9    THE TEST.

10            THE COURT:  I SEE.  OKAY.

11       OKAY.  AND YOU WERE BORN IN INDONESIA.  HOW LONG HAVE YOU

12    LIVED IN THIS COUNTRY?

13            PROSPECTIVE JUROR:  I HAVE LIVING IN THIS COUNTRY FOR

14    25 YEARS.

15            THE COURT:  OKAY.  AND WHEN YOU WERE GOING TO SCHOOL,

16    YOU WENT TO SCHOOL IN -- FOR ENGLISH AS A SECOND LANGUAGE BUT

17    ALSO YOU TOOK CLASSES IN ENGLISH?

18            PROSPECTIVE JUROR:  YES, MA'AM.

19            THE COURT:  OKAY.  IF I WOULD PASS THE MICROPHONE

20    PLEASE TO -- I'M, I CAN'T SEE YOU.  IS IT MS. LANE OR CANE

21    (SIC)?

22            PROSPECTIVE JUROR:  MS. LAM.

23            THE COURT:  I SEE THAT.

24       WHAT DOES YOUR COMPANY DO?

25            PROSPECTIVE JUROR:  MY COMPANY IS A COMPUTER SOFTWARE
```

```
1    COMPANY.  AND I AM THE DESIGNER OF THE SOFTWARE APPS AND ALL

2    THE GRAPHICS DESIGN.

3            THE COURT:  WHAT KIND OF SOFTWARE IS IT?  WHAT DOES

4    IT DO?

5            PROSPECTIVE JUROR:  THEY HAVE THE SOFTWARE FOR

6    RESTAURANTS FOR RETAIL AND THEN THE ENTERPRISE FINANCIAL

7    REPORTING SOFTWARE.

8            THE COURT:  OKAY.  SO YOU PUT DOWN MARKETING

9    ASSOCIATE, BUT YOU ALSO WRITE THE SOFTWARE?

10           PROSPECTIVE JUROR:  MARKETING IS JUST A TITLE, BUT I

11   DO THE DESIGNING OF THE SOFTWARE AND APPS.

12           THE COURT:  I SEE.  AND WHAT DOES YOUR -- WHAT DOES

13   YOUR HUSBAND DO?

14           PROSPECTIVE JUROR:  HE'S A DATA CLEANING ANALYST AT

15   HIS COMPANY, AND HIS COMPANY IS DEVELOP FINANCE DATABASE

16   SOFTWARE TO THE FUND HOLDER.

17           THE COURT:  OKAY.  MR. PAGE?

18           PROSPECTIVE JUROR:  YES.

19           THE COURT:  ARE YOU STILL WORKING?

20           PROSPECTIVE JUROR:  NO, I'M RETIRED.

21           THE COURT:  OKAY.

22           PROSPECTIVE JUROR:  I WORKED FOR 30 YEARS FOR GENERAL

23   CABLE.  THEY MADE AERIAL LIFTS FOR THE TELEPHONE COMPANY.

24           THE COURT:  OKAY.

25           PROSPECTIVE JUROR:  AND MY WIFE OF 50 YEARS JUST
```

PASSED AWAY; SHE WORKED IN ELECTRONICS.

        **THE COURT:**  OKAY.  AND NO CHILDREN?

        **PROSPECTIVE JUROR:**  YES.  I GOT TWO BOYS AND A GIRL
AND A GRANDSON.

        **THE COURT:**  ARE ANY OF THE KIDS WORKING?

        **PROSPECTIVE JUROR:**  MY DAUGHTER, SHE WORKS IN SAN
JOSE.  AND MY OTHER SON, I DON'T KNOW TOO MUCH ABOUT HIM.  HE
DON'T CONTACT ME NONE.  AND MY OLDEST SON, HE LIVES WITH ME.
HE RECYCLES.

        **THE COURT:**  OKAY.  AND THE DAUGHTER WHO WORKS IN SAN
JOSE, WHAT KIND OF WORK DOES SHE DO?

        **PROSPECTIVE JUROR:**  SOME KIND OF GOVERNMENT JOB.  I
DON'T KNOW.  SHE DOESN'T TALK ABOUT IT.

        **THE COURT:**  OKAY.

   WHAT SORT OF WORK DID YOUR WIFE DO -- HAD SHE RETIRED?

        **PROSPECTIVE JUROR:**  YES.  SHE WAS RETIRED.  SHE
WORKED IN ELECTRONICS.

        **THE COURT:**  FOR WHAT COMPANY?

        **PROSPECTIVE JUROR:**  MOUNTAIN VIEW.

        **THE COURT:**  IN ASSEMBLY?

        **PROSPECTIVE JUROR:**  YES.

        **THE COURT:**  OKAY.  IF YOU WOULD PASS THE MICROPHONE
TO MS. WHITE, PLEASE.

   SO YOU ARE STILL WORKING?

        **PROSPECTIVE JUROR:**  I AM RETIRED.

```
 1              THE COURT:  WHAT ABOUT YOUR HUSBAND?

 2              PROSPECTIVE JUROR:  HE'S RETIRED.  HE'S DOING SOME

 3    PROJECT WORK RIGHT NOW, BUT HE'S RETIRED.

 4              THE COURT:  OKAY.  SO YOU'VE BEEN CALLED IN TO JURY

 5    SERVICE BUT NEVER ACTUALLY SAT ON A JURY?

 6              PROSPECTIVE JUROR:  THAT'S RIGHT.

 7              THE COURT:  OKAY.  IF YOU WOULD PASS THE MICROPHONE

 8    TO MS. CHAMBERS, PLEASE.

 9       COULD YOU DESCRIBE GENERALLY WHAT YOUR COMPANY DOES?

10              PROSPECTIVE JUROR:  I'M A MANAGEMENT CONSULTANT.  I

11    WORK IN FINANCIAL SERVICES, FINANCIAL TECHNOLOGY, BUSINESS

12    PROBLEMS, HAVE BEEN MOST RECENTLY WORKING AT WELLS FARGO IN

13    THEIR ONLINE AREA AND SPECIFICALLY IN THE ONLINE FRAUD AREA.

14              THE COURT:  OKAY.  AND WHAT SORT OF THING DOES YOUR

15    HUSBAND DO AT THE LAB?

16              PROSPECTIVE JUROR:  THAT'S PROBABLY MY SON.

17              THE COURT:  OH, OKAY.

18              PROSPECTIVE JUROR:  HE WAS JUST ON AN INTERNSHIP.

19    HE'S IN SCHOOL.

20              THE COURT:  OH, I SEE.  IS YOUR HUSBAND WORKING

21    OUTSIDE THE HOME?

22              THE WITNESS:  NO.  HE'S RETIRED.

23              THE COURT:  WHAT DID HE DO?

24              PROSPECTIVE JUROR:  HE WAS A POLICE OFFICER.

25              THE COURT:  OKAY.  AND YOU'VE SAT ON JURIES IN STATE
```

```
1    AND FEDERAL COURT?

2              PROSPECTIVE JUROR:  NO, JUST STATE.  THREE JURIES.

3         THE COURT:  THAT WOULD HAVE BEEN IN CONTRA COSTA

4    COUNTY?

5              PROSPECTIVE JUROR:  TWO IN CONTRA COSTA, ONE IN

6    ALAMEDA.

7         THE COURT:  OKAY.  YOU USED TO LIVE IN ALAMEDA?

8         PROSPECTIVE JUROR:  UH-HUH.  IN OAKLAND.

9         THE COURT:  AND SOME WERE CIVIL, SOME WERE CRIMINAL?

10        PROSPECTIVE JUROR:  CORRECT.

11        THE COURT:  ALL OF THEM REACHED VERDICTS?

12        PROSPECTIVE JUROR:  YES.

13        THE COURT:  THE CIVIL CASE, WHAT WAS THAT ABOUT?

14             PROSPECTIVE JUROR:  THAT WAS SOMEBODY WAS SUING, I

15   THINK IT WAS PG&E, BECAUSE THEY TRIPPED ON ONE OF THOSE METAL

16   KIND OF GRATES ON THE SIDEWALK, AND HAD TERRIBLE DAMAGE, AND

17   THAT SORT OF THING.

18        THE COURT:  OKAY.

19             PROSPECTIVE JUROR:  THE MOST RECENT WAS ABOUT 15

20   MONTHS AGO.

21        THE COURT:  OKAY.  AND YOU WERE A WITNESS IN A CHILD

22   CUSTODY CASE THAT --

23             PROSPECTIVE JUROR:  CORRECT.  MY OWN CHILD CUSTODY

24   CASE.

25        THE COURT:  OKAY.  AND THAT WAS WITH A FORMER SPOUSE?
```

1          **PROSPECTIVE JUROR:**  NO, NO.  THAT WAS WHEN I WAS THE

2     CHILD.  WHEN I WAS 11 OR SOMETHING, I WAS TESTIFYING.

3          **THE COURT:**  OH, FOR GOODNESS SAKE.  OKAY.

4     YOUR HUSBAND HAD A LAWSUIT PROBLEM MORE RECENTLY?

5          **PROSPECTIVE JUROR:**  WELL, 25 YEARS AGO.  HE WAS A

6     POLICE OFFICER.  HE WAS -- HE SHOT AND KILLED SOMEONE IN THE

7     LINE OF DUTY SO THERE WAS A CIVIL SUIT.

8          **THE COURT:**  OKAY.  AND WERE YOU MARRIED AT THE TIME?

9          **PROSPECTIVE JUROR:**  YES.

10          **THE COURT:**  WAS THE CASE SETTLED?

11          **PROSPECTIVE JUROR:**  YES.  HE WAS ACQUITTED.

12     UNANIMOUSLY ACQUITTED.

13          **THE COURT:**  SO IT WENT TO TRIAL?

14          **PROSPECTIVE JUROR:**  OH, YEAH.  UH-HUH.

15          **THE COURT:**  IT WENT TO TRIAL?

16          **PROSPECTIVE JUROR:**  YES.

17          **THE COURT:**  OH, OKAY.

18     YOU HAVE A BROTHER WHO IS A PATENT ATTORNEY IN SAN

19     FRANCISCO.

20          **PROSPECTIVE JUROR:**  UH-HUH.

21          **THE COURT:**  WHICH FIRM DOES HE WORK FOR?

22          **PROSPECTIVE JUROR:**  I CAN'T REMEMBER.  HE JUST

23     SWITCHED.  SIDEMAN SOMETHING.  IT'S MORE -- IT'S NOT A PATENT

24     LAW FIRM EXCLUSIVELY.

25          **THE COURT:**  BANCROFT SIDEMAN.

```
1              PROSPECTIVE JUROR:  HE FOCUSES ON PHARMA.

2              THE COURT:  WOULD YOU MIND TELLING ME HIS NAME JUST

3    SO WE CAN MAKE SURE --

4              PROSPECTIVE JUROR:  GUY CHAMBERS.

5              THE COURT:  OKAY.  AND IT'S EITHER SIDEMAN

6    BANCROFT --

7              PROSPECTIVE JUROR:  YES, IT'S SIDEMAN BANCROFT.

8              THE COURT:  THEY DO PATENT WORK?

9              PROSPECTIVE JUROR:  THEY NOW DO.

10             THE COURT:  YOU SAY YOUR HUSBAND AND BROTHER ARE

11   ATTORNEYS?

12             PROSPECTIVE JUROR:  WELL, MY HUSBAND HAS A LAW

13   DEGREE.  HE PRACTICED FOR A TIME BEFORE HE DECIDED TO BECOME A

14   POLICE OFFICER.

15             THE COURT:  I SEE.  OKAY.

16             PROSPECTIVE JUROR:  OKAY.

17             THE COURT:  IF YOU WOULD PASS THE MICROPHONE PLEASE

18   TO MS. ALEXANDER.

19             PROSPECTIVE JUROR:  MISSES.

20             THE COURT:  I'M SORRY?

21             PROSPECTIVE JUROR:  MISSES.

22             THE COURT:  I JUST CALL EVERYBODY MS.  IT'S EASIER TO

23   KEEP TRACK.

24       SO ARE YOU CURRENTLY ASSIGNED AS A SUBSTITUTE TEACHER OR

25   DO YOU GO ON A DAY-BY-DAY BASIS OR DO YOU HAVE --
```

1           **PROSPECTIVE JUROR:**  I PUT ON THE COMPUTER I WOULD NOT

2    BE AVAILABLE --

3           **THE COURT:**  YOU GENERALLY DO IT ON A DAY-TO-DAY

4    BASIS?

5           **PROSPECTIVE JUROR:**  UH-HUH.  I HAVE DONE LONG TERMS,

6    BUT I'M NOT DOING ONE RIGHT NOW.

7           **THE COURT:**  SRUSD?

8           **PROSPECTIVE JUROR:**  SAN RAMON UNIFIED SCHOOL

9    DISTRICT.

10          **THE COURT:**  AND THE COMPANY THAT YOUR HUSBAND WORKS

11   FOR, WHAT DO THEY DO?

12          **PROSPECTIVE JUROR:**  CLOUD BILLING.

13          **THE COURT:**  YOU SERVED ON A CRIMINAL CASE IN CONTRA

14   COSTA COUNTY IN RICHMOND AND THE JURY REACHED A VERDICT IN THE

15   CASE?

16          **PROSPECTIVE JUROR:**  THEY DID.  IT WAS A DUI.  YES.

17          **THE COURT:**  YOU KNOW SOMEONE NAMED MIKE FARLEY WHO

18   LIVES IN NORTH CAROLINA --

19          **PROSPECTIVE JUROR:**  THAT'S NOT HIM.

20          **THE COURT:**  OKAY.

21      WE JUST HAVE A FEW MORE.  I THINK WE WILL FINISH UP AND

22   THEN TAKE A BREAK.

23      IF YOU WOULD PASS THE MICROPHONE BACK TO THE BACK ROW AND

24   THE PERSON AT THE FAR END IS MS. REAL (SIC)?

25          **PROSPECTIVE JUROR:**  RICH.

```
 1              THE COURT:  RICH.  SORRY.

 2        SO COULD YOU DESCRIBE GENERALLY WHAT YOU DO AT PITTSBURG

 3   SCHOOL DISTRICT?

 4              PROSPECTIVE JUROR:  IT'S IN THE HR DEPARTMENT.  I

 5   MANAGE AND PROCESS EMPLOYEE BENEFITS.

 6              THE COURT:  YOU DID THAT SAME KIND OF WORK IN THE

 7   PRIVATE SECTOR PRIOR TO THAT?

 8              PROSPECTIVE JUROR:  YES.

 9              THE COURT:  YOUR HUSBAND WORKS --

10              PROSPECTIVE JUROR:  SCHOOL DISTRICT.

11              THE COURT:  -- FOR THE SCHOOL DISTRICT AS WELL?

12              PROSPECTIVE JUROR:  YES.

13              THE COURT:  AND THE CHILDREN ARE BOTH IN COLLEGE OR

14   ONE IN HIGH SCHOOL AND ONE IN COLLEGE?

15              PROSPECTIVE JUROR:  THEY ARE NOW BOTH IN COLLEGE.

16              THE COURT:  OKAY.  OKAY.  IF YOU WOULD PASS THE

17   MICROPHONE TO MR. CONNER.

18        FOR WHICH COMPANY DO YOU WORK?

19              PROSPECTIVE JUROR:  RIGHT NOW I WORK FOR ROUND TABLE

20   PIZZA.  I GOT HIRED ON AT A HOSPITAL.  I JUST HAVEN'T GONE

21   THROUGH THE HR PROCESS YET.

22              THE COURT:  OKAY.  AND YOUR WIFE WORKS AS A STORE

23   MANAGER?

24              PROSPECTIVE JUROR:  YES.  SMART AND FINAL.

25              THE COURT:  OKAY.
```

```
 1        OKAY.  AND IF YOU COULD PASS THE MICROPHONE TO MR. PIKAL
 2   IS IT -- MS. PIKAL?
 3             PROSPECTIVE JUROR:  YES.
 4             THE COURT:  SORRY.  I SHOULD LOOK BEFORE I TALKED.
 5   AND YOU WORK FOR A PRIVATE AGENCY NOT FOR A GOVERNMENTAL
 6   AGENCY AS A SOCIAL WORKER?
 7             PROSPECTIVE JUROR:  RIGHT.  IT'S A NONPROFIT.
 8             THE COURT:  OKAY.  AND YOUR PRIOR JOB, WHAT KIND OF
 9   AGENCY WAS THAT?  OH, A PRESCHOOL YES?
10             PROSPECTIVE JUROR:  YES.
11             THE COURT:  OKAY.  AND YOUR SPOUSE IS AN ATTORNEY AT
12   CHEVRON IN-HOUSE.
13             PROSPECTIVE JUROR:  HE WORKS FOR CHEVRON.  HE'S NOT
14   IN THE LEGAL DEPARTMENT, BUT HE IS AN ATTORNEY.
15             THE COURT:  I SEE.  AND YOU CHECKED TWO BOXES "YES"
16   IN TERMS OF TRAINING AND EXPERIENCE, AND SO ON.  THEN THE
17   OTHERS YOU DIDN'T CHECK -- IS THAT BECAUSE THEY WERE ALL A
18   "NO"?
19             PROSPECTIVE JUROR:  NO.
20             THE COURT:  AND YOU HAVE A FRIEND WHO WORKS FOR
21   ADOBE?  WHEREABOUTS?
22             PROSPECTIVE JUROR:  I THINK OVER IN MOUNTAIN VIEW,
23   PALO ALTO.
24             THE COURT:  MOUNTAIN VIEW.  WOULD YOU MIND GIVING THE
25   NAME TO MAKE SURE THAT THAT NAME --
```

1          **PROSPECTIVE JUROR:**  SURE.  GAVIN PEACOCK.

2          **THE COURT:**  DO YOU KNOW WHAT HE DOES?

3          **PROSPECTIVE JUROR:**  HE'S DEVELOPER, SCIENTIST.  I

4    DON'T KNOW WHAT HIS ACTUAL TITLE IS.

5          **THE COURT:**  WOULD THAT RELATIONSHIP MAKE IT HARD FOR

6    YOU TO BE FAIR IN THIS CASE FOR ANY REASON?

7          **PROSPECTIVE JUROR:**  I DON'T THINK SO.  HE LIKES HIS

8    JOB.

9          **THE COURT:**  OKAY.  YOU WOULD BE ABLE TO REFRAIN FROM

10   SPEAKING WITH HIM ABOUT THE CASE UNTIL AFTER IT WAS OVER?

11         **PROSPECTIVE JUROR:**  YES.

12         **THE COURT:**  OKAY.  ALL RIGHT.

13     WHY DON'T WE TAKE A SHORT BREAK IN JUST A MOMENT.  YOU CAN

14   JUST LEAVE THAT MIC RIGHT IN THE BENCH THERE, AND THE CLERK

15   WILL COME AND GET IT IN A MINUTE.

16     WE WILL TAKE A -- SAY A 15-MINUTE BREAK UNTIL 11:10.  IF

17   YOU COULD LOOK WHERE YOU ARE SITTING AND MAKE SURE YOU SIT IN

18   THE SAME PLACE WHEN YOU COME BACK SO THAT WE'LL KNOW WHO YOU

19   ARE.

20     DURING THIS BREAK AND ANY FUTURE BREAKS, DON'T DISCUSS THE

21   CASE AMONGST YOURSELVES OR WITH ANYONE ELSE.  IF YOU NEED TO

22   CALL HOME OR CALL YOUR JOB, YOU CAN TELL THEM GENERALLY WHAT

23   IT'S ABOUT, BUT DON'T DISCUSS THE CASE.  IF YOU SHOULD HAPPEN

24   TO RUN INTO ANY OF THE ATTORNEYS OR OTHER PEOPLE INVOLVED IN

25   THE CASE, DON'T SPEAK TO THEM OR ACKNOWLEDGE THEM IN ANY WAY

```
1    AND THEY WON'T BE SPEAKING TO YOU.

2        SO WE WILL SEE YOU BACK HERE AT 11:10, AND THE ATTORNEYS

3    MAY HAVE SOME QUESTIONS FOR YOU.

4        I WOULD LIKE TO SEE THE ATTORNEYS FOR A MOMENT, PLEASE.

5        (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE PROSPECTIVE

6    JURORS.)

7            THE COURT:  MA'AM, IF YOU HAVE A PROBLEM, GO BACK TO

8    YOUR SEAT AND WE WILL ASK YOU ABOUT IT.

9            THE CLERK:  SHE WANTS SOMETHING UNDER HER FEET.

10           THE COURT:  OKAY.

11       SO I GUESS ALL POTENTIAL JURORS HAVE LEFT THE COURTROOM AT

12   THIS POINT?

13           THE CLERK:  I WILL LOCK THE DOOR AS WELL.

14           THE COURT:  SO, YOU CAN HAVE A SEAT IF YOU WOULD

15   LIKE.

16       I THINK I SAID I WOULD END UP WITH NINE JURORS.  YOU EACH

17   HAVE THREE CHALLENGES.  SO I NEED 15 QUALIFIED PEOPLE.  I

18   THINK I HAVE THEM.

19       THERE IS A FEW HARDSHIP PEOPLE, OR NOT EXACTLY HARDSHIP,

20   BUT IT SEEMS TO ME THAT MS. LU, MABEL H. LU DOES NOT SPEAK

21   ENGLISH WELL ENOUGH TO SERVE IN MY ESTIMATION, SO YOU CAN TELL

22   ME IF YOU DISAGREE.  AND LIKEWISE, THE PERSON RIGHT NEXT TO

23   HER, MS. CHING, YUK MAN CHING.  I THINK -- SHE ACTUALLY SAYS

24   SHE DOESN'T SPEAK ENGLISH VERY WELL.  AND I HAD THE IMPRESSION

25   THAT THAT WAS TRUE.
```

1      WE HAVE THIS PERSON WHO WORKS FOR SFGATE, WHICH I'M NOT

2   TOO TERRIBLY SYMPATHETIC WITH, BUT I GUESS IF WE HAVE PLENTY

3   OF PEOPLE, I CAN EXCUSE HIM FOR A HARDSHIP.

4      AND I THINK THAT MR. AGUILAR CAN MANAGE.  HE WAS CONCERNED

5   ABOUT SELLING HIS BUSINESS, BUT I THINK HE CAN DEAL WITH THAT

6   IN THE AFTERNOON, SO I'M NOT INCLINED TO EXCUSE HIM FOR A

7   HARDSHIP.

8      THIS PERSON WHO OWNS STOCK IN ADOBE, I GUESS IT WOULD BE

9   DISQUALIFYING IF HE WAS A JUDGE, SO I SUPPOSE -- I DIDN'T WANT

10  TO GET INTO WHETHER THIS CASE WOULD HAVE AN EFFECT ON ADOBE'S

11  STOCK OR NOT.  AND I SORT OF THOUGHT HE PROBABLY DIDN'T HAVE

12  THAT MUCH ADOBE STOCK, BUT APPARENTLY HE DOES, SO I SUPPOSE I

13  SHOULD EXCUSE HIM AS WELL, UNLESS ANYBODY HAS ANY THOUGHTS ON

14  THAT POINT.

15     DOES ANYONE ELSE -- DO ANY OF YOU HAVE ANY CAUSE

16  CHALLENGES AT THIS POINT?

17                        (NO RESPONSE.)

18          **THE COURT:**  I GUESS NOT.

19          **MR. REINES:**  NO, YOUR HONOR.

20          **MR. DINOVO:**  NO.

21          **THE COURT:**  SO WHEN WE COME BACK, I GIVE YOU -- WHAT

22  DID I SAY I WOULD GIVE YOU TEN MINUTES A SIDE OR SOMETHING?

23          **MR. DINOVO:**  I THINK YOU SAID 15.  WHATEVER YOUR

24  PREFERENCE IS.

25          **THE COURT:**  DO YOU HAVE QUESTIONS YOU WILL BE WANTING

```
1    TO ASK?

2              MR. DINOVO:  I CAN PUT IT INTO EITHER WINDOW.

3              THE COURT:  OKAY.  DO YOU HAVE QUESTIONS YOU WILL BE

4    WANTING TO ASK?

5              MR. REINES:  I MAY HAVE JUST A FEW.

6              THE COURT:  SO WHAT WE WILL DO WHEN WE COME BACK

7    IS -- WELL, I GUESS MAYBE WE WILL JUST DO YOUR VOIR DIRE AND

8    THEN EXCUSE THEM AGAIN AND DO YOUR CHALLENGES WHILE THEY ARE

9    OUT, AND THEN BRING THEM BACK AND THEN EXCUSE THE ONES WHO ARE

10   GOING TO BE EXCUSED.  IT'S TWO BREAKS IN A SHORT TIME FOR

11   THEM, BUT WE MIGHT AS WELL LET THEM LEAVE, I GUESS, WHILE YOU

12   ARE DOING YOUR CHALLENGES.

13      OKAY.  WE WILL SEE YOU BACK IN TEN MINUTES OR SO.

14             MR. DINOVO:  YOUR HONOR, CAN I ASK, DO YOU HAVE A

15   PREFERENCE IN TERMS OF LENGTH OF OPENING STATEMENTS, HOW LONG

16   THEY MIGHT BE?

17             THE COURT:  WELL, YOU ARE ON THE CLOCK FOR

18   EVERYTHING.  I DON'T FIND JURORS CAN SIT STILL FOR MUCH LONGER

19   THAN AN HOUR.

20      HOW LONG DID YOU HAVE IN MIND?

21             MR. DINOVO:  THAT'S PERFECTLY FINE FOR US.

22             THE COURT:  HOW LONG DID YOU HAVE IN MIND?

23             MR. REINES:  LESS THAN AN HOUR.

24             THE COURT:  OKAY.  AND THE DEMONSTRATIVES, YOU KNOW,

25   I AM INCLINED TO SAY GO AHEAD.  IT'S NOT LIKE ANYBODY IS GOING
```

```
1    TO REMEMBER THEM IN ANY DETAIL IN THE FUTURE.

2        I INSTRUCT THEM THAT THE OPENING STATEMENT ISN'T EVIDENCE.

3    I DON'T KNOW WHEN YOU TURNED THEM OVER AND WHEN YOU DIDN'T

4    TURN THEM OVER.  I GUESS MAYBE WE CAN TALK ABOUT IT AT THE

5    TIME NEXT BREAK, BUT PAGING THROUGH THESE, IT STRIKES ME THAT

6    NO ONE IS GOING TO REMEMBER WHAT'S ON THEM ANYWAY, SO I'M NOT

7    TOO CONCERNED.

8        MS. MEHTA:  I THINK FROM OUR PERSPECTIVE, THE BIG

9    THING IS THEY HAVE ONE DEMONSTRATIVE WHICH IS A TIME LINE

10   WHICH IS GOING TO BE THE FOCUS OF THEIR PRESENTATION.  AND

11   THEY HAVE A MEETING ON THERE THAT THEY ARE CONTENDING

12   HAPPENED, AND THERE IS NO WITNESS THAT IS GOING TO BE AT THIS

13   TRIAL THAT IS GOING TO BE TALKING ABOUT THAT.  IT IS BLATANTLY

14   HEARSAY.

15       THE COURT:  WELL, IF IT DOESN'T COME IN, THEN YOU

16   WILL BE ABLE TO POINT OUT IN CLOSING ARGUMENTS THAT THEY

17   PROMISED THIS TESTIMONY AND THEY DIDN'T GIVE IT.  SO YOU

18   CERTAINLY WOULDN'T WANT TO PROMISE THEM SOMETHING THAT YOU

19   WEREN'T GOING TO BE ABLE TO DELIVER ON.

20       MR. ELLWANGER:  THAT WAS GOING TO BE MY ARGUMENT,

21   YOUR HONOR.

22       THE COURT:  WHAT'S THAT?

23       MR. ELLWANGER:  WELL, AS TO WHY IT SHOULD COME IN.

24   IF WE DON'T GET IT IN, IT MAKES FOR GREAT CLOSING.  AND WE

25   BELIEVE WE WILL GET IT IN AND WE CAN LAY OUT FOR YOUR HONOR
```

1   WHY WE'LL GET IT IN, BUT WE THINK THE LARGER POINT IS THAT IT

2   IS A DEMONSTRATIVE, AND IF WE DON'T PROVE IT UP IN OUR CASE,

3   IT WILL COME BACK TO BITE US.

4        **THE COURT:**  ON THE TESTIMONY IN THE DEPO, I COULDN'T

5   REALLY TELL WHAT IT WAS ABOUT.  BUT, AGAIN, I DON'T THINK IT'S

6   LIKELY TO HAVE ANY DISCERNIBLE EFFECT ON ANYBODY, SO I WILL

7   JUST ALLOW IT TO BE INCLUDED.

8        **MR. ELLWANGER:**  YES, YOUR HONOR.

9        **THE COURT:**  OKAY.

10     (RECESS TAKEN AT 10:59 A.M.; RESUMED AT 11:10 A.M.)

11       **THE CLERK:**  REMAIN SEATED.

12       **THE COURT:**  AT THIS TIME WE WILL SEE IF THE

13  PLAINTIFF'S ATTORNEY HAS ANY QUESTIONS HE WOULD LIKE TO ASK OF

14  YOU.

15       **MR. DINOVO:**  THANK YOU, YOUR HONOR.

16     LADIES AND GENTLEMEN, I FIRST WOULD LIKE TO START BY

17  THANKING YOU FOR YOUR PARTICIPATION TODAY.  I KNOW SOME OF YOU

18  HAVE EXPRESSED YOU WOULD RATHER BE SOMEWHERE ELSE.  AND I KNOW

19  ALL OF US HAVE OTHER THINGS THAT WE MIGHT BE DOING.  BUT WE

20  HAVE A UNIQUE SYSTEM OF JUSTICE HERE IN THE UNITED STATES.  I

21  THINK WE ARE THE ONLY COUNTRY WHO ACTUALLY HAS A CIVIL JURY

22  SYSTEM.

23     SO, OBVIOUSLY, A KEY COMPONENT OF THAT IS THE JURY.  AND I

24  THANK YOU ON BEHALF OF MY CLIENT AND OUR TRIAL TEAM.

25     JUST A FEW FOLLOW-UP QUESTIONS.

1        MR. MC KENZIE, I UNDERSTAND YOU WORKED FOR SOME PERIOD OF

2   TIME AT BERKELEY IN THE TECH DEPARTMENT.

3            **PROSPECTIVE JUROR:**  THAT'S CORRECT.  UC BERKELEY

4   PHYSICS.

5            **MR. DINOVO:**  IN THE PHYSICS DEPARTMENT.  DID YOU EVER

6   DO ANY CODING OR PROGRAMMING?

7            **PROSPECTIVE JUROR:**  NO.

8            **MR. DINOVO:**  SO YOU DON'T CONSIDER YOURSELF A

9   COMPUTER SCIENCE PERSON?

10           **PROSPECTIVE JUROR:**  NOPE.

11           **MR. DINOVO:**  OKAY.  MS. HOFFMANN, DID YOU GET YOUR

12   FOOTSTOOL?

13           **PROSPECTIVE JUROR:**  YES.  THANK YOU.  THANK YOU.

14   THANK YOU.

15           **MR. DINOVO:**  GOOD.  IF YOU CAN PLEASE PASS THE MIC TO

16   MR. ODELL.

17       MR. ODELL, I UNDERSTAND YOU WERE AN EXPERT WITNESS IN A

18   BANKRUPTCY PROCEEDING.

19           **PROSPECTIVE JUROR:**  YES.

20           **MR. DINOVO:**  I THINK YOU SAID YOU WERE WORKING WITH

21   THE DEFENDANT IN THAT MATTER.

22           **PROSPECTIVE JUROR:**  YES, I WAS.

23           **MR. DINOVO:**  WAS THE DEFENDANT THE DEBTOR OR

24   CREDITOR?

25           **PROSPECTIVE JUROR:**  THE DEBTOR -- WELL, IN THIS CASE

```
1    THEY WERE THE ONES THAT WERE FILING THE BANKRUPTCY, YES.

2           MR. DINOVO:  OKAY.  AND WHAT WAS THE RESOLUTION OF

3    THAT MATTER?

4           PROSPECTIVE JUROR:  THE RESOLUTION OF THE MATTER

5    WAS -- IT WASN'T EVEN BASED ON THE EXPERT TESTIMONY.  IT WAS

6    BASED ON ANOTHER MATTER TOTALLY UNRELATED TO MY TESTIMONY.

7           MR. DINOVO:  I SEE THAT YOU'RE A USER OF ADOBE

8    SOFTWARE?

9           PROSPECTIVE JUROR:  YES.

10          MR. DINOVO:  WHICH SOFTWARE ARE YOU USING?

11          PROSPECTIVE JUROR:  IT'S BASICALLY GOOD FOR

12   CONVERTING INTO PDF FILES.  THAT IS MOSTLY WHAT I USE IT FOR.

13   OCCASIONALLY FOR THE PHOTO PROGRAM, BECAUSE I USE PHOTOS IN MY

14   NARRATIVE APPRAISAL REPORTS.

15          MR. DINOVO:  HAVE YOU EVER ENCOUNTERED SECURE PDF'S?

16          PROSPECTIVE JUROR:  SECURE PDF'S?  YES.

17          MR. DINOVO:  THANK YOU.  PLEASE PASS IT ALONG TO

18   MR. PATTERSON.

19      MR. PATTERSON, I UNDERSTAND YOUR SON, ALEX, DEVELOPS

20   SOFTWARE?

21          PROSPECTIVE JUROR:  CORRECT.

22          MR. DINOVO:  WHAT SORT OF SOFTWARE HAS HE DEVELOPED?

23          PROSPECTIVE JUROR:  HE'S DEVELOPED GAMING STUFF AND

24   AN APP FOR THE ANDROID PHONE WHAT WAS NOT AVAILABLE.  IT WAS

25   AVAILABLE ONLY FOR THE IPHONE.
```

1          **MR. DINOVO:**  DO YOU KNOW IF HE OR HIS COMPANY EVER

2     SOUGHT PATENT PROTECTION?

3          **PROSPECTIVE JUROR:**  NO, I DO NOT.

4          **MR. DINOVO:**  THANK YOU.  IF YOU CAN PASS THE

5     MICROPHONE TO MS. POUSCHINE.

6          **PROSPECTIVE JUROR:**  POUSCHINE.

7          **MR. DINOVO:**  I UNDERSTAND YOUR HUSBAND HAS SOFTWARE

8     PATENTS?

9          **PROSPECTIVE JUROR:**  YES.  I AM NOT SURE HOW MANY.

10    MORE THAN ONE, BUT LESS THAN HALF A DOZEN.

11         **MR. DINOVO:**  IS HE PROUD OF THAT ACCOMPLISHMENT?

12         **PROSPECTIVE JUROR:**  NO, NOT REALLY.  IT IS PART OF

13    HIS JOB.

14         **MR. DINOVO:**  DO YOU KNOW WHAT THE FIELD WAS IN WHICH

15    HE --

16         **PROSPECTIVE JUROR:**  AT LEAST ONE WAS IN SEQUEL, AND

17    THE OTHER IS JAVA AND SQL.

18         **MR. DINOVO:**  OKAY.  SO IN THE FIELD OF COMPUTER

19    PROGRAMMING?

20         **PROSPECTIVE JUROR:**  OH, YEAH.

21         **MR. DINOVO:**  WHERE WAS HE WORKING AT THE TIME?

22         **PROSPECTIVE JUROR:**  WELL, THE ONE PATENT THAT I'M

23    SURE OF IS FOR WORKDAY, HIS CURRENT COMPANY.  AND AT LEAST ONE

24    OF THE OTHERS WAS FOR A COMPANY CALLED -- WAS ORIGINALLY

25    CALLED WHITELIGHT, AND THEN THEY WERE ACQUIRED BY A COMPANY

```
1    CALLED SYMPHONY.

2              THE COURT REPORTER:  I AM SORRY, WHITELIGHT?

3              PROSPECTIVE JUROR:  WHITELIGHT, ONE WORD.

4              MR. DINOVO:  THANK YOU.  IF YOU CAN PLEASE PASS THE

5    MIC A COUPLE DOWN TO MR. GROSS.

6         MR. GROSS, I UNDERSTAND YOU HAVE HAD SOME NEGATIVE

7    EXPERIENCES WITH ADOBE SOFTWARE?

8              PROSPECTIVE JUROR:  WELL, I TEND TO USE OPEN SOURCE

9    SOFTWARE, AND WHEN I'M FORCED TO USE COMMERCIAL STUFF I HAVE

10   USED ADOBE, ADOBE THINGS.  AND I RECOGNIZE THAT WHEN UPGRADES

11   COME, STUFF COMES ALONG WITH IT THAT I DON'T HAVE THE ABILITY

12   TO, YOU KNOW, REJECT BEFOREHAND.  I HAVE TO GO CHASE IT DOWN

13   AND GET RID OF IT.  MINOR ANNOYANCE.

14             MR. DINOVO:  I SEE.

15             PROSPECTIVE JUROR:  BUT ANNOYING.

16             MR. DINOVO:  SO YOU SOUND PRETTY TECH SAVVY IF YOU

17   ARE USING OPEN SOURCE.

18             PROSPECTIVE JUROR:  WELL, I AM AN USER.  I'M NOT A

19   DEVELOPER.

20             MR. DINOVO:  I SEE.  DO YOU HAVE A SPECIFIC ISSUE

21   WITH WHAT ADOBE EMBEDS IN ITS PROGRAMS?

22             PROSPECTIVE JUROR:  YES.  THEY SOMETIMES PUSH SEARCH

23   ENGINES AND TOOLBARS, THINGS LIKE THAT.

24             MR. DINOVO:  THANK YOU.  IF YOU CAN PLEASE PASS THE

25   MIC UP TO MR. RICHARDSON.
```

1          MR. RICHARDSON, HELLO.

2               PROSPECTIVE JUROR:  HELLO.

3               MR. DINOVO:  FOR WHICH FIRM DOES YOUR SISTER'S

4     HUSBAND WORK?

5               PROSPECTIVE JUROR:  HE WORKED FOR APPLE.

6               MR. DINOVO:  FOR APPLE, OKAY.  AND HE WAS A COMPUTER

7     ENGINEER.  DO YOU KNOW IF HE WAS A PATENT HOLDER.

8               PROSPECTIVE JUROR:  I DON'T BELIEVE HE WAS.  HE WAS

9     IN THE HARDWARE SIDE OF APPLE.

10              MR. DINOVO:  I SEE.  THANK YOU.

11         AND YOU ALSO MENTIONED USING ACROBAT TO CREATE PDF FILES?

12              PROSPECTIVE JUROR:  YES.

13              MR. DINOVO:  HAVE YOU ENCOUNTERED SECURE PDF'S?

14              PROSPECTIVE JUROR:  I DON'T BELIEVE SO.

15              MR. DINOVO:  IF YOU CAN PLEASE PASS THE MICROPHONE TO

16    MR. CHAN.

17         MR. CHAN, I BELIEVE YOU SAID YOU WORK IN THE FIELD OF

18    SATELLITES.

19              PROSPECTIVE JUROR:  YEAH.

20              MR. DINOVO:  FOR WHAT SORT OF SATELLITES?

21              PROSPECTIVE JUROR:  WE DO LIKE COMMUNICATION

22    SATELLITES THAT GO INTO SPACE.

23              MR. DINOVO:  FOR A --

24              PROSPECTIVE JUROR:  TV, CABLE TV OR TELECOMMUNICATION

25    SATELLITES.

1          **MR. DINOVO:**  SO YOU PROVIDE THESE SATELLITES TO THE

2     CABLE PROVIDERS?

3               **PROSPECTIVE JUROR:**  YEAH.

4               **MR. DINOVO:**  AND IS THERE ENCRYPTION IN THAT

5     COMMUNICATION, DO YOU KNOW?

6               **PROSPECTIVE JUROR:**  I AM NOT FAMILIAR WITH THAT

7     PORTION.

8               **MR. DINOVO:**  YOU MENTIONED ADOBE BEING A PUBLISHER OF

9     MULTIMEDIA SOFTWARE.  WHAT SOFTWARE ARE YOU AWARE OF?

10              **PROSPECTIVE JUROR:**  JUST LIKE FLASHPLAYER AND ACROBAT

11    READER.

12              **MR. DINOVO:**  AND HOW DO YOU ENCOUNTER FLASHPLAYER?

13              **PROSPECTIVE JUROR:**  THEY USE IT ON YOUTUBE, SO --

14              **MR. DINOVO:**  THANK YOU.  IF YOU COULD PLEASE PASS THE

15    MIC ALL THE WAY DOWN TO MR. COLLARO, I THINK AT THE BEGINNING

16    THERE.

17        HELLO, MR. COLLARO .

18              **PROSPECTIVE JUROR:**  HELLO.

19              **MR. DINOVO:**  I UNDERSTAND THAT YOU'RE FAMILIAR WITH

20    ADOBE SYSTEMS BEING A VIDEO DIGITAL PROGRAM ON ALMOST ALL

21    COMPUTERS.  ARE YOU REFERRING TO FLASHPLAYER?

22              **PROSPECTIVE JUROR:**  YES, I AM CONSTANTLY UPDATING IT.

23              **MR. DINOVO:**   HOW IS THAT?

24              **PROSPECTIVE JUROR:**  IT'S ON MY COMPUTER.  EVERY TIME

25    I LOG ONTO MY COMPUTER IT UPDATES SOMETHING.

```
 1            MR. DINOVO:  OKAY.  SO IN WHAT CIRCUMSTANCES DO YOU

 2   ENCOUNTER FLASH?

 3            PROSPECTIVE JUROR:  ON YOUTUBE, USUALLY.

 4            MR. DINOVO:  AND, FINALLY, MY LAST QUESTION IS FOR

 5   MR. ROSINSKI.

 6      MR. ROSINSKI, I UNDERSTAND THAT YOU ARE INVOLVED IN THE

 7   CREATION AND SELLING OF MEDIA CONTENT.

 8            PROSPECTIVE JUROR:  YEP.

 9            MR. DINOVO:  SO, I PRESUME THAT THAT CONTENT IS

10   IMPORTANT AND VALUABLE TO YOUR COMPANY?

11            PROSPECTIVE JUROR:  YES.

12            MR. DINOVO:  OKAY.  THANK YOU.

13      NO FURTHER QUESTIONS, YOUR HONOR.

14            MR. REINES:  GOOD AFTERNOON -- GOOD MORNING.  WE ARE

15   NOT IN THE AFTERNOON YET.  GOOD MORNING, EVERYBODY.  THANK YOU

16   FOR COMING DOWN.

17      I HAVE A FEW QUESTIONS ON BEHALF OF ADOBE.  IF WE CAN MOVE

18   THE MICROPHONE TO MS. HOFFMANN, JUROR NUMBER TWO.

19      THANK YOU VERY MUCH.  APPRECIATE IT.

20      YOU MENTIONED EARLIER THAT YOU HAD SAT ON A JURY WHERE

21   THERE WAS A VERDICT.  AND I WAS CURIOUS:  WHAT WAS THE OUTCOME

22   OF THE VERDICT IN THAT CASE?

23            PROSPECTIVE JUROR:  AS I SAID, IT WAS VERY

24   COMPLICATED, SEVERAL ISSUES.  NO AWARD WAS GIVEN TO THE

25   PLAINTIFF EXCEPT A VERY MINOR AWARD.  BUT THE PLAINTIFF DID
```

```
 1    NOT GET WHAT THEY WERE SEEKING.

 2              MR. REINES:  OKAY.

 3              PROSPECTIVE JUROR:  EXCEPT FOR A VERY MINOR AMOUNT.

 4              MR. REINES:  THANK YOU VERY MUCH.

 5         WOULD YOU HAND THE MICROPHONE TO MR. GROSS, NUMBER SEVEN?

 6         MR. GROSS, WHEN THE COURT WAS FOLLOWING UP ON YOUR

 7    COMMENTS REGARDING COMMERCIAL SOFTWARE, THE QUESTION WAS ASKED

 8    WHETHER YOU WERE COMFORTABLE THAT YOU COULD BE FAIR IN

 9    CONSIDERING THE EVIDENCE AND SO FORTH.  AND YOUR ANSWER WAS:

10    "PROBABLY."

11         YOU ARE A USER OF OPEN SOURCE, AND I THINK EVERYBODY IS

12    INTERESTED IN A FAIR TRIAL THAT REALLY FOCUSES ON THE EVIDENCE

13    AND THE ISSUES AND THE COURT'S INSTRUCTIONS.

14         IS THERE ANY REASONABLE CHANCE THAT YOU WOULD FIND

15    YOURSELF IN A POSITION WHERE YOU FELT LIKE YOU WERE GOING TO

16    BE BIASED A LITTLE BIT ONE WAY OR THE OTHER?

17              PROSPECTIVE JUROR:  I THINK I CAN HOLD MY BIASES IN

18    CHECK.

19              MR. REINES:  WE APPRECIATE THAT.  THANK YOU.

20         AND THEN, MR. COLLARO, NUMBER 15, PLEASE.  THANK YOU.

21         YOU MENTIONED YOU HAD ISSUES WITH ADOBE UPDATES IN THE

22    SENSE THAT WHEN YOU TURNED ON YOUR COMPUTER THEY WOULD COME

23    IN.  WOULD THAT AFFECT AT ALL YOUR ABILITY TO BE FAIR AND

24    IMPARTIAL IN THIS CASE?

25              PROSPECTIVE JUROR:  NO, NOT AT ALL.
```

1           **MR. REINES:**  THANK YOU VERY MUCH.

2       THAT IS ALL WE HAVE, YOUR HONOR.  THANK YOU.

3           **THE COURT:**  OKAY.  I HATE TO SEND YOU OUT AGAIN, BUT

4    WE NEED TO SPEAK A LITTLE BIT OUTSIDE YOUR PRESENCE.  SO COULD

5    YOU SIT QUIETLY WHILE WE DO THAT, OR I COULD EXCUSE YOU AND

6    LET YOU TAKE ANOTHER QUICK BREAK AND COME BACK IN ABOUT 15

7    MINUTES.

8       WHY DON'T WE DO THAT?  IT'S 11:25.  I THINK WE CAN BE

9    FINISHED IN TEN MINUTES, IF YOU WOULDN'T MIND COMING BACK AT

10   11:35.

11      DOES EITHER SIDE HAVE ANYTHING TO ADD TO WHAT WE MENTIONED

12   EARLIER?

13          **MR. DINOVO:**  NO, YOUR HONOR.

14          **MR. REINES:**  I THINK THERE IS ONE ISSUE I WOULD LIKE

15   TO TAKE UP.

16          **THE CLERK:**  WHO HAS THE MIC?

17          **THE COURT:**  YOU CAN LEAVE IT ON THE BENCH THERE.

18   THANKS.

19      (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE PROSPECTIVE

20   JURORS.)

21          **THE COURT:**  YES, SIR.

22          **MR. REINES:**  YOUR HONOR, OUR CONCERN SURROUNDS JUROR

23   NUMBER SEVEN, MR. GROSS.  YOU ARE PROBABLY NOT SURPRISED AT

24   THAT.  YOU KNOW, BASED ON EXPERIENCE THE OPEN SOURCE MOVEMENT

25   VERSUS COMMERCIAL SOFTWARE IS A BIG FRACTURE AMONG PEOPLE WHO

1   ARE TECH SAVVY.  AND GIVEN THE DEPTH THAT WE HAVE IN THE

2   REMAINING VENIRE, WE ARE NOT GOING TO HAVE A PROBLEM GETTING A

3   JURY, OBVIOUSLY.  I THINK THAT IS AN APPROPRIATE CAUSE.  HIS

4   ORIGINAL ANSWER WAS "PROBABLY."

5       THE MORE I LEARN THAT HE WAS KIND OF ONE OF THESE OPEN

6   SOURCE ENTHUSIASTS, THE MORE CONCERN I HAD.  I JUST DON'T

7   THINK IT'S APPROPRIATE.  WE STRUCK THE PERSON WHO HAS STOCK

8   HOLDING IN ADOBE.  IT SEEMS TO ME THAT WOULD BE EVENHANDED.

9       **MR. DINOVO:**  YOUR HONOR, I THINK THE LINE OF

10  QUESTIONING WAS:

11      "WILL YOU BE IMPARTIAL?"  AND THE ANSWER WAS:  "YES."

12      THERE ARE PEOPLE WHO HAVE GOOD FRIENDS AT ADOBE.  THEY

13  WERE ASKED THE SAME QUESTION:  COULD THEY BE IMPARTIAL AND SET

14  THAT SORT OF PERSONAL RELATIONSHIP ASIDE, WHICH IS PROBABLY

15  STRONGER THAN WHAT HE CALLED "A MINOR ANNOYANCE" AT HAVING TO

16  DEAL WITH SOME OF THESE SOFTWARE TWEAKS.

17      THAT IS WHY PEREMPTORY CHALLENGES EXIST.  IF HE SAYS HE

18  CAN BE IMPARTIAL AND THEY DON'T THINK SO, THEY CAN STRIKE HIM.

19      **MR. REINES:**  YOUR HONOR, I THINK THE IDEOLOGICAL --

20      **THE COURT:**  I AM GOING TO LET HIM GO.  HE SEEMS TO BE

21  SORT OF AN ICONOCLAST, IF NOTHING ELSE.

22      SO THE FIRST CHALLENGE IS WITH THE PLAINTIFF.

23      DO YOU HAVE ANY PEREMPTORY CHALLENGES?

24      **MR. DINOVO:**  DO WE HAVE ANY CHALLENGES?  NO.

25      FOR CAUSE?

1        **THE COURT:**  PEREMPTORY.

2        **MR. DINOVO:**  YES.

3        **THE COURT:**  YOU ARE ALLOWED A TOTAL OF THREE.  I'M

4   JUST GOING TO GO BACK AND FORTH, STARTING WITH YOU.  I WANT TO

5   DO IT FAIRLY QUICKLY.  I WAS HOPING TO GET BOTH OPENING

6   STATEMENTS IN TODAY.

7        **MR. DINOVO:**  ALL RIGHT.  FIVE, YOUR HONOR.

8        **THE COURT:**  FIVE?

9        **MR. DINOVO:**  JUROR NUMBER FIVE.

10       **THE COURT:**  WHAT'S THE NAME?

11       **THE CLERK:**  HEATHER ANNE POUSCHINE.

12       **THE COURT:**  AND DO YOU HAVE ONE?

13       **MR. REINES:**  YES, YOUR HONOR.  NUMBER SIX,

14   SANTISROMERO.

15       **MR. DINOVO:**  NEXT ONE, YOUR HONOR, IS MS. LIN, NUMBER

16   EIGHT.

17       **MR. REINES:**  NUMBER 14, YOUR HONOR, MS. HELEN CONNOR.

18       **THE COURT:**  THIS WOULD BE YOUR LAST CHALLENGE.

19       **MR. DINOVO:**  NUMBER 11, YOUR HONOR, MR. CHAN.

20       **MR. REINES:**  NUMBER 15, YOUR HONOR, JARED COLLARO.

21       **THE COURT:**  OKAY.  SO THAT LEAVES US -- I'M GOING TO

22   READ OFF WHO I THINK IS ON THE JURY THEN.  AND YOU CAN TELL ME

23   IF I'VE GOT ANYTHING WRONG.

24       NUMBER ONE WOULD BE MR. MC KENZIE.

25       TWO WOULD BE MS. HOFFMANN.

```
1        THREE WOULD BE MR. ODELL.

2        FOUR, MR. PATTERSON.

3        FIVE, MR. RICHARDSON.

4        SIX, MS. LEE, VIVIEN LEE.

5        SEVEN, MR. SIU.

6        EIGHT, MR. BANG.

7        AND, NINE, MR. ALBERT.

8        HAVE I GOT THAT RIGHT?

9            MR. REINES:  DID YOU STRIKE AGUILAR?  WAS THAT --

10           THE COURT:  YES, I AM SORRY.  AGAIN, BECAUSE WE HAVE

11   ENOUGH, I THOUGHT I'D LET HIM GO.  SORRY IF THAT MESSED UP

12   YOUR CALCULATIONS.

13           MR. REINES:  THAT'S OKAY, YOUR HONOR.

14           THE COURT:  DID I GET IT RIGHT OTHER THAN THAT?

15           MR. DINOVO:  I AM SORRY --

16           MR. REINES:  YES, YOUR HONOR.

17           THE COURT:  OKAY.  SO WHAT I WOULD LIKE TO DO.  IT'S

18   11:30.  I THINK WE CAN JUST MAKE IT.  IF WE BRING THEM BACK

19   NOW, IT WILL TAKE ME 15 MINUTES TO READ THESE INSTRUCTIONS.

20      BUT THAT WOULD STILL GIVE US -- WE WOULD HAVE TO RUN A

21   LITTLE BIT LATE IF YOU BOTH TOOK A FULL HOUR, BUT I THINK WE

22   CAN GET BOTH CLOSING ARGUMENTS IN BY 1:30.

23           MR. REINES:  WE ARE NOT TAKING A FULL HOUR.  I DON'T

24   KNOW IF YOU ARE.

25           MR. DINOVO:  NO.
```

1          **MR. REINES:**  WE WON'T BE TAKING A FULL HOUR.

2          **THE COURT:**  SO WE CAN GET BOTH OPENING STATEMENTS IN

3     THEN.

4          **MR. REINES:**  I THINK SO.

5          **THE COURT:**  NIKKI, WHY DON'T YOU TELL THEM THEY ARE

6     WELCOME TO COME BACK IN NOW.

7        (PROCEEDINGS HELD IN THE PRESENCE OF THE PROSPECTIVE

8     JURORS.)

9          **THE COURT:**  YOU MAY BE SEATED.  I THINK THE WHOLE

10    TIME HASN'T PASSED YET.  NOT EVERYONE IS BACK.  IS EVERYONE

11    BACK?  ANYONE MISSING FROM YOUR RIGHT OR TO YOUR LEFT?

12       (NO RESPONSE.)

13         **THE COURT:**  WE HAVE SELECTED THE NINE PEOPLE THAT WE

14    WILL ASK TO SERVE AS JURORS IN THE CASE.  SO I'M GOING TO CALL

15    OFF YOUR NAMES.  IF I CALL YOUR NAME, WILL YOU PLEASE STAND?

16    AND ONCE THE NINE OF YOU ARE STANDING, THE CLERK WILL

17    ADMINISTER THE OATH TO YOU.  AND YOU WILL SIMPLY SAY "I WILL."

18       AND THEN, AFTER THAT, I WILL HAVE A FEW WORDS OF

19    INSTRUCTION FOR THOSE OF YOU WHO WEREN'T SELECTED.  AND THEN I

20    WILL BE EXCUSING THE ONES WHO WEREN'T SELECTED.

21       AND THE ONES WHO WERE SELECTED, I WILL GIVE YOU

22    INSTRUCTIONS, AND THEN WE WILL HEAR OPENING STATEMENTS FROM

23    EACH SIDE.

24       SO THE PEOPLE WHO HAVE BEEN SELECTED TO SERVE, IF YOU

25    WOULD PLEASE STAND.  THOSE ARE MR. MC KENZIE.  AND

1    MS. HOFFMANN, WE WILL MAKE SURE WE GET SOMETHING COMFORTABLE

2    FOR YOU.  SORRY ABOUT THAT.

3        MR. ODELL.  MR. PATTERSON.  MR. RICHARDSON.  MS. LEE.

4    MR. SIU.  MR. BANG, AND MR. ALBERT.

5            **THE CLERK:**  IF YOU CAN PLEASE EACH RAISE YOUR RIGHT

6    HAND.

7        (JURORS SWORN.)

8            **THE CLERK:**  PLEASE SAY "I DO. "

9        (JURORS RESPONDED:  "I DO.")

10           **THE COURT:**  IF YOU WILL JUST HAVE A SEAT FOR A

11   MINUTE.

12       WE HAVE ONE WOMAN, I GUESS.  NOT AN ALL MALE JURY.  I ONCE

13   HAD AN ALL MALE JURY, AND I KEPT SAYING "GENTLEMEN" INSTEAD OF

14   "LADIES AND GENTLEMEN."

15       SO THOSE OF YOU WHO WERE NOT SELECTED FOR THIS TRIAL, I

16   HOPE YOU WILL GET ANOTHER CHANCE, ESPECIALLY IF YOU HAVEN'T

17   EVER HAD A CHANCE TO SERVE AS A JUROR.  I HOPE YOU GET A

18   CHANCE TO SERVE.  I THINK YOU WILL FIND IT A VERY INTERESTING

19   AND REWARDING EXPERIENCE, AND A VALUABLE RIGHT AS A CITIZEN TO

20   GET A CHANCE TO PARTICIPATE IN THE JUSTICE SYSTEM.

21       SO I THANK YOU FOR COMING IN, FOR TAKING YOUR TIME UP

22   TODAY AND FOR OFFERING YOURSELF AS WILLING TO SERVE.  AND I

23   HOPE THAT YOU WILL GET ANOTHER CHANCE TO SERVE.

24       I DON'T BELIEVE THAT YOU WILL BE ASKED TO COME IN AGAIN,

25   BUT BEFORE YOU LEAVE IF YOU COULD GO CHECK BACK IN THE JURY

```
1    ASSEMBLY ROOM.

2              THE CLERK:  THEY ARE FREE TO LEAVE.

3              THE COURT:  YOU CAN JUST LEAVE, THEN.  AND, AGAIN,

4    THANK YOU FOR YOUR SERVICE.  AND HOPEFULLY WE WILL SEE YOU AT

5    SOME POINT IN THE FUTURE.

6         THOSE WHO HAVE BEEN SELECTED, REMAIN IN YOUR SEAT AND WE

7    WILL BE RESEATING YOU IN JUST A MOMENT.

8                   (PAUSE IN THE PROCEEDINGS.)

9              THE COURT:  OKAY.  SO I THINK THE BEST WAY IS GO TO

10   BE TO FILL UP THE WHOLE FIRST ROW.

11        SO SIR, IN THE BACK ROW IF YOU WOULD TAKE THE FIFTH SEAT

12   THERE.  AND, MA'AM, IF YOU WOULD TAKE THE SIXTH SEAT.

13        AND THEN, MR. SIU, YOU CAN TAKE THE SEVENTH SEAT IN THE

14   FRONT ROW.

15        AND THEN, MR. BANG, IF YOU CAN GO IN THE BACK ROW AND COME

16   ALL THE WAY DOWN.

17        THERE WE GO.  AND SHE SAID SHE DID GET YOU A FOOTSTOOL.

18   IS THAT COMFORTABLE?

19              PROSPECTIVE JUROR:  VERY COMFORTABLE.  THANK YOU.

20              THE COURT:  OKAY.  GOOD.  AND THE MONITORS PROBABLY

21   HAVE NOTHING ON THEM NOW, BUT THEY DO MOVE UP, DOWN, SIDEWAYS,

22   TWIST.  SO THE TWO OF YOU IN THE BACK WE ARE HOPING YOU WILL

23   BE ABLE TO SEE WELL ENOUGH BY LOOKING OVER THE SHOULDER OF

24   THOSE IN THE FRONT, AND ASKING FOR HELP IF YOU NEED IT.

25        YOU CAN ALSO, IF IT IS EASIER TO SEE A MONITOR, MOVE DOWN
```

1    TO ANY ONE OF THE OTHER CHAIRS.  AND WE WILL PROBABLY ALSO PUT

2    STUFF ON ONE OR BOTH OF THESE -- ONE OR BOTH OF THESE LARGER

3    MONITORS, IF THAT IS EASIER FOR YOU TO SEE.

4        YOU CAN GO AHEAD AND GIVE THEM THE JURY INSTRUCTIONS.

5        NEVER MIND.

6        SO BEFORE WE GET STARTED WITH THE OPENING STATEMENTS, I'M

7    GOING TO GIVE YOU SOME PRELIMINARY JURY INSTRUCTIONS.  I WILL

8    GIVE YOU A COPY OF THESE INSTRUCTIONS THAT YOU WILL BE ABLE TO

9    USE THROUGHOUT THE TRIAL, SO YOU DON'T NEED TO WORRY ABOUT

10   TAKING NOTES WHILE I'M SPEAKING.

11       THESE ARE PRELIMINARY INSTRUCTIONS, AND THEY WILL HELP YOU

12   UNDERSTAND THE PRINCIPLES THAT APPLY TO CIVIL TRIALS AND HELP

13   YOU UNDERSTAND THE EVIDENCE AS YOU LISTEN TO IT.

14       YOU SHOULD NOT TAKE THE INSTRUCTIONS HOME WITH YOU IN THE

15   EVENINGS.  YOU WILL BE CONVENING IN A JURY ROOM WE WILL SHOW

16   YOU SHORTLY, AND YOU CAN LEAVE YOUR COPY OF THE INSTRUCTIONS

17   AND ANY NOTES YOU MIGHT TAKE IN THE JURY ROOM OVER THE

18   EVENINGS.

19       AT THE END OF THE TRIAL I WILL BE GIVING YOU A FINAL SET

20   OF THE INSTRUCTIONS, WHICH WILL PROBABLY BE SOMEWHAT LONGER

21   THAN THIS SET.  AND IF THERE ARE ANY DIFFERENCES BETWEEN THE

22   FINAL SET AND THIS SET, YOU WILL BE USING THE FINAL SET.  AND

23   WE WILL BE COLLECTING THIS SET AND DESTROYING THEM, JUST IN

24   CASE THERE ARE ANY DIFFERENCES.

25       YOU SHOULD NOT INFER FROM THESE INSTRUCTIONS OR FROM

1    ANYTHING I MIGHT SAY OR DO AS ANY INDICATION THAT I HAVE AN

2    OPINION ABOUT THE EVIDENCE OR WHAT YOUR VERDICT SHOULD BE.

3         IT WILL BE YOUR DUTY TO FIND THE FACTS FROM ALL THE

4    EVIDENCE IN THE CASE, AND TO THOSE FACTS YOU WILL APPLY THE

5    LAW AS I WILL GIVE IT TO YOU.

6         YOU MUST FOLLOW THE LAW AS I GIVE IT TO YOU WHETHER YOU

7    AGREE WITH IT OR NOT.  AND YOU MUST NOT BE INFLUENCED BY ANY

8    PERSONAL LIKES OR DISLIKES, OPINIONS, PREJUDICES OR SYMPATHY.

9    THAT MEANS YOU MUST DECIDE THE CASE SOLELY ON THE EVIDENCE YOU

10   WILL BE RECEIVING.  AND THAT WAS THE OATH THAT YOU JUST TOOK.

11        IN FOLLOWING MY INSTRUCTIONS, YOU MUST FOLLOW ALL OF THEM

12   AND NOT SINGLE OUT SOME AND IGNORE OTHERS.  THEY ARE ALL

13   IMPORTANT.

14        THE EVIDENCE THAT YOU ARE TO CONSIDER IN DECIDING WHAT THE

15   FACTS ARE CONSISTS OF THE SWORN TESTIMONY OF ANY WITNESS, THE

16   EXHIBITS THAT WILL BE RECEIVED INTO EVIDENCE, AND ANY FACTS AS

17   TO WHICH THE PARTIES MAY AGREE.

18        IN REACHING YOUR VERDICT, YOU MAY CONSIDER ONLY THE

19   TESTIMONY AND EXHIBITS RECEIVED INTO EVIDENCE AND THE FACTS AS

20   TO WHICH THE PARTIES MAY AGREE.  AND CERTAIN THINGS ARE NOT

21   EVIDENCE, AND YOU MAY NOT CONSIDER THEM IN DECIDING WHAT THE

22   FACTS ARE.  I WILL LIST THEM FOR YOU.

23        ARGUMENTS AND STATEMENTS BY THE LAWYERS ARE NOT EVIDENCE.

24   THE LAWYERS ARE NOT WITNESSES.  WHAT THEY WILL SAY IN THEIR

25   OPENING STATEMENTS, IN THEIR CLOSING ARGUMENTS AND AT OTHER

1    TIMES IS INTENDED TO HELP YOU INTERPRET THE EVIDENCE, BUT IT

2    IS NOT EVIDENCE.

3        IF THE FACTS AS YOU REMEMBER THEM DIFFER FROM THE WAY THE

4    LAWYERS STATE THEM, YOUR MEMORY OF THEM CONTROLS.

5        QUESTIONS AND OBJECTIONS BY LAWYERS ARE NOT EVIDENCE.

6    ATTORNEYS HAVE A DUTY TO THEIR CLIENTS TO OBJECT WHEN THEY

7    BELIEVE A QUESTION IS IMPROPER UNDER THE RULES OF EVIDENCE.

8    YOU SHOULD NOT BE INFLUENCED BY THE OBJECTION OR BY THE

9    COURT'S RULING ON IT.

10        ANY TESTIMONY THAT IS EXCLUDED OR STRICKEN OR THAT I

11    INSTRUCT YOU TO DISREGARD IS NOT EVIDENCE AND MUST BE NOT

12    CONSIDERED.  IN ADDITION, SOMETIMES TESTIMONY AND EXHIBITS MAY

13    BE RECEIVED ONLY FOR A LIMITED PURPOSE.  IF I GIVE YOU A

14    LIMITING INSTRUCTION YOU MUST FOLLOW IT.

15        ANYTHING YOU MAY HAVE SEEN OR HEARD WHEN COURT WAS NOT IN

16    SESSION IS NOT EVIDENCE.  YOU ARE TO DECIDE THE CASE SOLELY ON

17    THE EVIDENCE RECEIVED AT THE TRIAL.

18        EVIDENCE MAY BE DIRECT OR CIRCUMSTANTIAL.  DIRECT EVIDENCE

19    IS DIRECT PROOF OF A FACT, SUCH AS TESTIMONY BY A WITNESS,

20    ABOUT WHAT THAT WITNESS PERSONALLY SAW OR HEARD OR DID.

21        CIRCUMSTANTIAL EVIDENCE IS PROOF OF ONE OR MORE FACTS FROM

22    WHICH YOU COULD FIND ANOTHER FACT.  YOU SHOULD CONSIDER BOTH

23    KINDS OF EVIDENCE.  THE LAW MAKES NO DISTINCTION BETWEEN THE

24    WEIGHT TO BE GIVEN TO EITHER DIRECT OR CIRCUMSTANTIAL

25    EVIDENCE.  IT IS FOR YOU TO DECIDE HOW MUCH WEIGHT TO GIVE TO

1    ANY EVIDENCE.  BEFORE YOU DECIDE THAT A FACT HAS BEEN PROVED

2    BY CIRCUMSTANTIAL EVIDENCE, YOU MUST CONSIDER ALL THE EVIDENCE

3    IN THE LIGHT OF REASON, EXPERIENCE AND COMMON SENSE.

4        AS I MENTIONED, THERE ARE RULES OF EVIDENCE THAT CONTROL

5    WHAT CAN BE RECEIVED INTO EVIDENCE.  WHEN A LAWYER ASKS A

6    QUESTION OR OFFERS AN EXHIBIT INTO EVIDENCE, AND THE LAWYER ON

7    THE OTHER SIDE THINKS IT IS NOT PERMITTED BY THE RULES OF

8    EVIDENCE, THAT LAWYER MAY OBJECT.

9        IF I OVERRULE THE OBJECTION, THE QUESTION MAY BE ANSWERED

10   OR THE EXHIBIT RECEIVED.

11       IF I SUSTAIN THE OBJECTION, THE QUESTION CANNOT BE

12   ANSWERED OR THE EXHIBIT CANNOT BE RECEIVED.  WHENEVER I

13   SUSTAIN AN OBJECTION TO A QUESTION, YOU MUST IGNORE THE

14   QUESTION AND MUST NOT GUESS WHAT THE ANSWER MIGHT HAVE BEEN.

15       SOMETIMES I MAY ORDER THAT EVIDENCE BE STRICKEN FROM THE

16   RECORD AND THAT YOU DISREGARD OR IGNORE THE EVIDENCE.  THAT

17   MEANS THAT WHEN YOU ARE DECIDING THE CASE, YOU MUST NOT

18   CONSIDER THE EVIDENCE THAT I TOLD YOU TO DISREGARD.

19       IN DECIDING THE FACTS IN THIS CASE, YOU MAY HAVE TO DECIDE

20   WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO BELIEVE.

21   YOU MAY BELIEVE EVERYTHING A WITNESS SAYS OR PART OF IT OR

22   NONE OF IT.  PROOF OF A FACT OR THE WEIGHT OF THE EVIDENCE AS

23   TO A FACT DOES NOT NECESSARILY DEPEND ON THE NUMBER OF

24   WITNESSES WHO TESTIFY ABOUT IT.

25       IN CONSIDERING THE TESTIMONY OF ANY WITNESS, YOU MAY TAKE

INTO ACCOUNT THE OPPORTUNITY AND ABILITY OF THE WITNESS TO SEE

OR HEAR OR KNOW THE THINGS TESTIFIED TO; THE WITNESS' MEMORY;

THE WITNESS' MANNER WHILE TESTIFYING; THE WITNESS' INTEREST IN

THE OUTCOME OF THE CASE AND ANY BIAS OR PREJUDICE; WHETHER

OTHER EVIDENCE CONTRADICTED THE WITNESS' TESTIMONY; WHETHER

THE WITNESS GAVE DIFFERENT TESTIMONY ON A PRIOR OCCASION; THE

REASONABLENESS OF THE WITNESS' TESTIMONY IN THE LIGHT OF ALL

THE EVIDENCE; AND ANY OTHER FACTORS THAT BEAR ON

BELIEVABILITY.

   THE EVIDENCE THAT A WITNESS LIED UNDER OATH OR GAVE

DIFFERENT TESTIMONY ON A PRIOR OCCASION MAY BE CONSIDERED

ALONG WITH ALL THE OTHER EVIDENCE IN DECIDING WHETHER OR NOT

TO BELIEVE THE WITNESS AND HOW MUCH WEIGHT TO GIVE TO THE

TESTIMONY OF THE WITNESS, AND FOR NO OTHER PURPOSE.

   SOME WITNESSES CALLED "EXPERT WITNESSES" BECAUSE OF

EDUCATION OR EXPERIENCE ARE PERMITTED TO STATE THEIR OPINIONS

AND THE REASONS FOR THOSE OPINIONS.

   OPINION TESTIMONY SHOULD BE JUDGED JUST LIKE ANY OTHER

TESTIMONY.  YOU MAY ACCEPT IT OR REJECT IT AND GIVE IT AS MUCH

WEIGHT AS YOU THINK IT DESERVES, CONSIDERING THE WITNESS'

EDUCATION AND EXPERIENCE, THE REASONS GIVEN FOR THE OPINION,

AND ALL THE OTHER EVIDENCE IN THE CASE.

   I WILL NOW SAY A FEW WORDS ABOUT YOUR CONDUCT AS JURORS:

FIRST, KEEP AN OPEN MIND THROUGHOUT THE TRIAL AND DO NOT

DECIDE WHAT THE VERDICT SHOULD BE UNTIL YOU AND YOUR FELLOW

1    JURORS HAVE COMPLETED YOUR DELIBERATIONS AT THE END OF THE

2    CASE.

3        SECOND, BECAUSE YOU MUST DECIDE THIS CASE BASED ONLY ON

4    THE EVIDENCE RECEIVED IN THE CASE, AND ON MY INSTRUCTIONS AS

5    TO THE LAW THAT APPLIES, YOU MUST NOT BE EXPOSED TO ANY OTHER

6    INFORMATION ABOUT THE CASE OR TO THE ISSUES IT INVOLVES DURING

7    THE COURSE OF YOUR JURY DUTY.

8        THUS, UNTIL THE END OF THE CASE OR UNTIL I TELL YOU

9    OTHERWISE, DO NOT COMMUNICATE WITH ANYONE IN ANY WAY AND DO

10   NOT LET ANYONE ELSE COMMUNICATE WITH YOU IN ANY WAY ABOUT THE

11   MERITS OF THE CASE OR ANYTHING TO DO WITH IT.  THIS INCLUDES

12   DISCUSSING THE CASE IN PERSON, IN WRITING, BY PHONE OR

13   ELECTRONIC MEANS BY EMAIL, TEXT MESSAGING, OR IN ANY INTERNET

14   CHAT ROOM, BLOG, WEBSITE OR ANY OTHER FEATURE.  YOU MAY NOT

15   COMMUNICATE ABOUT THE TRIAL WITH YOUR FAMILY MEMBERS OR YOUR

16   EMPLOYER, ALTHOUGH YOU MAY NOTIFY YOUR FAMILY AND YOUR

17   EMPLOYER THAT YOU'VE BEEN SEATED AS A JUROR IN THE CASE.

18       YOU MAY NOT COMMUNICATE WITH THE PEOPLE INVOLVED IN THE

19   TRIAL.  IF YOU ARE ASKED OR APPROACHED IN ANY WAY ABOUT YOUR

20   JURY SERVICE OR ANYTHING ABOUT THIS CASE, YOU MUST RESPOND

21   THAT YOU'VE BEEN ORDERED NOT TO DISCUSS THE MATTER AND TO

22   REPORT THE CONTACT TO THE COURT.

23       YOU MAY COMMUNICATE WITH YOUR FELLOW JURORS PROVIDED THAT

24   ALL THE JURORS ARE PRESENT FOR THE DISCUSSION AND THE

25   DISCUSSION OCCURS IN THE JURY ROOM WITH THE DOOR CLOSED.

```
1        BECAUSE YOU WILL RECEIVE ALL THE EVIDENCE AND LEGAL

2    INSTRUCTION YOU MAY PROPERLY CONSIDER TO RETURN A VERDICT, DO

3    NOT READ, WATCH OR LISTEN TO ANY NEWS OR MEDIA ACCOUNTS OR

4    COMMENTARY ABOUT THE CASE OR ANYTHING TO DO WITH IT.  DO NOT

5    DO ANY RESEARCH, SUCH AS CONSULTING DICTIONARIES, SEARCHING

6    THE INTERNET, OR USING ANY OTHER REFERENCE MATERIALS.

7        AND DO NOT MAKE ANY INVESTIGATION OR IN ANY OTHER WAY TRY

8    TO LEARN ANYTHING ABOUT THE CASE ON YOUR OWN.  THE LAW

9    REQUIRES THESE RESTRICTIONS TO ENSURE THE PARTIES HAVE A FAIR

10   TRIAL ON THE SAME EVIDENCE THAT EACH PARTY HAS HAD AN

11   OPPORTUNITY TO ADDRESS.

12       A JUROR WHO VIOLATES THESE RESTRICTIONS JEOPARDIZES THE

13   FAIRNESS OF THESE PROCEEDINGS AND A MISTRIAL COULD RESULT THAT

14   WOULD REQUIRE THE ENTIRE TRIAL PROCESS TO START OVER.

15       IF ANY JUROR IS EXPOSED TO ANY OUTSIDE INFORMATION, PLEASE

16   NOTIFY THE COURT IMMEDIATELY.

17       DURING DELIBERATIONS YOU WILL HAVE TO MAKE YOUR DECISION

18   BASED ON WHAT YOU RECALL OF THE EVIDENCE.  YOU WILL NOT HAVE A

19   TRANSCRIPT OF THE TRIAL.  I URGE YOU TO PAY CLOSE ATTENTION TO

20   THE TESTIMONY AS IT IS GIVEN.  IF AT ANY TIME YOU CANNOT SEE

21   OR HEAR THE TESTIMONY, EVIDENCE, QUESTION OR ARGUMENTS, LET ME

22   KNOW SO I CAN CORRECT THE PROBLEM.

23       IF YOU WISH YOU MAY TAKE NOTES, AND WHEN THE EVIDENCE

24   BEGINS TOMORROW WE WILL GIVE PADS AND PENCILS IN CASE YOU DO

25   WISH TO TAKE NOTES.  IF YOU DO TAKE NOTES, PLEASE KEEP THEM TO
```

1    YOURSELF UNTIL YOU AND YOUR FELLOW JURORS GO INTO THE JURY

2    ROOM TO DECIDE THE CASE.

3        WHEN YOU LEAVE IN THE AFTERNOON YOUR NOTES SHOULD BE LEFT

4    IN THE JURY ROOM.  DO NOT LET THE NOTE-TAKING DISTRACT YOU.

5    NO ONE WILL READ YOUR NOTES, AND THEY WILL BE DESTROYED AT THE

6    CONCLUSION OF THE CASE.

7        WHETHER OR NOT YOU TAKE NOTES YOU SHOULD RELY ON YOUR OWN

8    MEMORY OF THE EVIDENCE.  NOTES ARE ONLY TO ASSIST YOUR MEMORY.

9    YOU SHOULD NOT BE OVERLY INFLUENCED BY YOUR NOTES OR THOSE OF

10   YOUR FELLOW JURORS.

11       YOU WILL BE ALLOWED TO PROPOSE WRITTEN QUESTIONS TO

12   WITNESSES.  YOU MAY PROPOSE QUESTIONS IN ORDER TO CLARIFY THE

13   TESTIMONY, BUT YOU ARE NOT TO EXPRESS ANY OPINION ABOUT THE

14   TESTIMONY OR ARGUE WITH ANY WITNESS.

15       IF YOU PROPOSE ANY QUESTIONS, REMEMBER THAT YOUR ROLE IS

16   THAT OF A NEUTRAL FACT FINDER, NOT AN ADVOCATE.  IF YOU HAVE A

17   QUESTION YOU WOULD LIKE TO SUBMIT TO A PARTICULAR WITNESS,

18   WRITE IT DOWN AND HAND IT TO THE COURTROOM DEPUTY, MS. RILEY.

19   YOU CAN DO THAT WHEN YOU ARE ON YOUR WAY IN OR OUT FROM THE

20   BREAK.  I WILL REVIEW THE QUESTION WITH THE ATTORNEYS TO

21   DETERMINE WHETHER IT IS LEGALLY PROPER.

22       THERE ARE SOME PROPOSED QUESTIONS THAT I WILL NOT PERMIT

23   OR WILL NOT ASK IN THE WORDING SUBMITTED BY THE JUROR.  THIS

24   MIGHT HAPPEN EITHER DUE TO THE RULES OF EVIDENCE OR OTHER

25   LEGAL REASONS OR BECAUSE THE QUESTION IS EXPECTED TO BE

1    ANSWERED LATER IN THE CASE.

2        IF I DO NOT ASK A PROPOSED QUESTION OR IF I REPHRASE IT,

3    DO NOT SPECULATE AS TO THE REASONS.  DO NOT GIVE UNDUE WEIGHT

4    TO THE QUESTION, ANY QUESTIONS THAT YOU OR OTHER JURORS

5    PROPOSE.

6        YOU SHOULD EVALUATE THE ANSWERS TO THOSE QUESTIONS IN THE

7    SAME MANNER YOU EVALUATE ALL THE OTHER EVIDENCE.  BY GIVING

8    YOU THE OPPORTUNITY TO PROPOSE QUESTIONS, I'M NOT REQUESTING

9    OR SUGGESTING THAT YOU DO SO.  IT WILL OFTEN BE THE CASE THAT

10   A LAWYER HAS NOT ASKED A QUESTION BECAUSE IT IS LEGALLY

11   OBJECTIONABLE OR BECAUSE A LATER WITNESS MAY BE ADDRESSING

12   THAT SUBJECT.

13       THIS CASE INVOLVES A DISPUTE RELATING TO SEVERAL UNITED

14   STATES PATENTS.  ARE WE READY TO SHOW THE VIDEO?

15           **MR. REINES:**  YES, YOUR HONOR.

16           **THE COURT:**  SO BEFORE I SUMMARIZE THE POSITION OF THE

17   PARTIES AND THE LEGAL ISSUES INVOLVED IN THE DISPUTE, WE WILL

18   SHOW YOU A SHORT VIDEO WHICH WILL DESCRIBE WHAT A PATENT IS

19   AND HOW ONE IS OBTAINED.

20       THERE WILL BE -- ON THE COPY OF THE INSTRUCTIONS THAT I'M

21   PLANNING TO GIVE YOU, THERE IS A GLOSSARY WHICH CONTAINS SOME

22   OF THESE WORDS SO IF YOU DON'T RECOGNIZE THEM OR FORGET THEM

23   LATER, YOU CAN LOOK THEM UP ON THE GLOSSARY.

24       SO YOU CAN GO AHEAD AND RUN THE VIDEO THEN.

25       (VIDEO PLAYED.)

1          **THE CLERK:**  THE BIG GALLERY, YOU CAN TURN THOSE.

2          **MS. GLAUSER:**  THE VOLUME IS --

3          **THE COURT:**  WHY DON'T YOU STOP IT?  WE COULD TRY A

4     MIC.  I DON'T KNOW.  HOW IT IS FEEDING INTO THE SYSTEM?  IT

5     SHOULD BE FEEDING INTO THE SYSTEM.

6          **THE CLERK:**  IT IS BASED ON THE VOLUME OF THEIR

7     LAPTOP.  WE CAN'T CONTROL THE VOLUME OF THEIR LAPTOP.

8          **THE COURT:**  WE CAN WAIT AND SHOW IT TOMORROW.  I

9     MEAN, YOU CAN TRY PUTTING A MICROPHONE SOMEWHERE, BUT I DON'T

10    KNOW WHERE.

11         THAT IS JUST A GENERAL INTRODUCTION.  THAT WILL BE FINE.

12    WE WILL SHOW IT TOMORROW ONCE WE WORK OUT THE KINKS IN IT.  IT

13    TALKS ABOUT THE U.S. PATENT AND TRADEMARK OFFICE AGENCY OF THE

14    UNITED STATES GOVERNMENT THAT ISSUES PATENTS AND HOW PEOPLE

15    APPLY FOR THEM AND THEY ARE EXAMINED AND ISSUED, AND WHAT THE

16    RESULT OF THAT IS.

17         BUT WHAT WE HAVE HERE IS TWO PATENTS.  AND YOU WILL BE

18    GIVEN A BINDER TOMORROW WHICH WILL HAVE A COPY OF EACH OF THE

19    TWO PATENTS IN THEM.  THE TWO PATENTS ARE CALLED THE 6,389,541

20    PATENT AND THE 6,751,670 PATENT.  BUT FOR SHORT WE CALL THOSE

21    THE '541 PATENT AND '670 PATENT.  IT'S THE LAST THREE DIGITS

22    OF THE PATENT NUMBER IS WHAT PEOPLE USUALLY CALL THEM.

23         I WILL POINT OUT A COUPLE OF FEATURES OF THE PATENT.  THEY

24    LOOK LIKE THIS (INDICATING).  AND YOU WILL SEE THEM.  THEY

25    HAVE THE PATENT NUMBER UP HERE AT THE TOP, THE TITLE OF THE

1    PATENT, AND THEN THEY HAVE WHAT'S CALLED "AN ABSTRACT," WHICH

2    IS A LITTLE PARAGRAPH THAT TELLS A LITTLE BIT ABOUT IT.

3        AND THEN, AFTER THAT, THEY HAVE A BUNCH OF DRAWINGS.  I

4    DON'T RECOMMEND YOU READ THIS COLD.  THE ATTORNEYS AND THE

5    WITNESSES WILL BE EXPLAINING IT TO YOU AND POINTING OUT THE

6    PARTS OF IT THAT ARE RELEVANT TO YOUR DECISION.  BUT WE JUST

7    THOUGHT YOU WOULD WANT TO SEE THE WHOLE THING AS A MATTER OF

8    INTEREST.  IT HAS A BUNCH OF DIFFERENT DRAWINGS ABOUT

9    DIFFERENT ASPECTS OF IT.

10       AND THEN, IT GOES INTO THE TEXT, WHICH IN THIS CASE STARTS

11   AT COLUMN ONE.  AND IT THEN TALKS ABOUT THE BACKGROUND OF THE

12   INVENTION, A SUMMARY OF THE INVENTION, AND A DETAILED

13   DESCRIPTION OF THE DRAWINGS AND A DESCRIPTION OF WHAT THEY

14   CALL "AN EMBODIMENT OF THE INVENTION," OR ONE WAY THAT ONE

15   COULD PRACTICE THE INVENTION.

16       THEN, AFTER THAT, AT COLUMN 12 IN THIS ONE, THERE IS A

17   LITTLE PHRASE THAT SAYS:  "WHAT IS CLAIMED IS."

18       AND THEN, IT HAS NUMBERED PARAGRAPHS THAT SAY THE EXACT

19   THINGS THAT ARE CLAIMED IN THE PATENT.  THAT IS WHAT REALLY

20   COUNTS.  THE FIRST PART IS SORT OF A DESCRIPTION.  THE CLAIMS

21   DESCRIBES WHAT IS CLAIMED IN THE PATENT.  THERE IS QUITE A FEW

22   OF THEM, BUT ONLY A COUPLE -- FOUR OR FIVE OF THEM ARE AT

23   ISSUE IN THIS CASE.  AGAIN, IT WILL BE EXPLAINED TO YOU WHICH

24   ONES ARE ACTUALLY AT ISSUE HERE.

25       THERE ARE TWO KINDS OF CLAIMS, INDEPENDENT CLAIMS AND

1    DEPENDENT CLAIMS.  AN INDEPENDENT CLAIM STANDS ALONE.  A

2    DEPENDENT CLAIM DEPENDS UPON IT.  SO A DEPENDENT CLAIM WILL

3    SAY THE CLAIM OF CLAIM 1 PLUS X, OR THE CLAIM OF CLAIM 1 PLUS

4    X AND Y.

5        SO A DEPENDENT CLAIM DEPENDS ON THE INDEPENDENT CLAIM.  IF

6    AN INDEPENDENT CLAIM IS NOT INFRINGED, THEN THE DEPENDENT

7    CLAIM ISN'T EITHER, BECAUSE IT INCLUDES EVERYTHING THAT WAS IN

8    THE INDEPENDENT CLAIM.

9        SO HERE, CLAIM 1 OF THE '541 PATENT AND CLAIMS 32 AND 45

10   OF THE '670 PATENT ARE THE INDEPENDENT CLAIMS.

11       AND THEY EACH CONTAIN A NUMBER OF REQUIREMENTS THAT MUST

12   BE SHOWN IN ORDER TO SHOW INFRINGEMENT.  AND THEN CLAIMS TWO,

13   FOUR AND 13 OF THE '541 PATENT AND CLAIM 52 OF THE '670 PATENT

14   ARE DEPENDENT CLAIMS.

15       THE ACCUSED PRODUCTS ARE THE ADOBE FLASH PLATFORM, A

16   PRODUCT CALLED LIVECYCLE OR IS IT LIVECYCLE?

17           **MR. DINOVO:**  LIVECYCLE.

18           **THE COURT:**  LIVECYCLE.  AND PROGRAM CALLED "SOFTWARE

19   ACTIVATION SERVICES, WHICH IS THE DEFENDANT COMPANY INFRINGED

20   ITS PATENTS AND INDUCED AND CONTRIBUTED TO INFRINGEMENT BY

21   USERS OF THOSE PRODUCTS.

22       DIGITAL REG ALSO CONTENDS THAT ADOBE'S INFRINGEMENT OF THE

23   '541 AND '670 PATENTS WAS WILLFUL.  ADOBE DENIES THAT IT HAS

24   INFRINGED ANY OF THE ASSERTED CLAIMS OF THE '541 OR THE '670

25   PATENT.  AND ADOBE ALSO ARGUES THAT THE ASSERTED CLAIMS, ALONG

1    WITH CLAIM 32 OF THE '670 PATENT, ARE INVALID.

2        YOUR JOB WILL BE TO DECIDE WHETHER THE ASSERTED CLAIMS OF

3    THE '541 AND '670 PATENTS ARE VALID AND WHETHER THEY HAVE BEEN

4    INFRINGED BY ADOBE'S ACCUSED PRODUCTS.

5        IF YOU DECIDE THAT ANY CLAIM OF THE ASSERTED PATENTS IS

6    NOT INVALID AND HAS BEEN INFRINGED, THEN YOU WILL NEED TO

7    DECIDE THE MONEY DAMAGES TO BE AWARDED TO DIGITAL REG TO

8    COMPENSATE IT FOR THE INFRINGEMENT.

9        YOU WILL ALSO NEED TO DECIDE WHETHER THE INFRINGEMENT WAS

10   WILLFUL.  IF YOU DECIDE THAT ANY INFRINGEMENT WAS WILLFUL THAT

11   DECISION WILL NOT AFFECT ANY DAMAGES AWARD THAT YOU MAY GIVE.

12   I WILL TAKE ANY WILLFULNESS INTO ACCOUNT LATER.

13       AS I MENTIONED EARLIER, THE PATENT CLAIMS ARE NUMBERED

14   SENTENCES AT THE END OF THE PATENT THAT DESCRIBE THE

15   BOUNDARIES OF THE PATENT'S PROTECTION.  IT IS MY JOB AS JUDGE

16   TO EXPLAIN TO YOU THE MEANING OF ANY LANGUAGE IN THE CLAIMS

17   THAT NEEDS INTERPRETATION.

18       I HAVE ALREADY DETERMINED THE MEANING OF CERTAIN TERMS IN

19   THE CLAIMS OF THE '541 AND '670 PATENTS.  YOU WILL BE PROVIDED

20   ATTACHED TO YOUR COPY OF THE INSTRUCTIONS A DOCUMENT THAT

21   REFLECTS THOSE MEANINGS.  YOU ARE TO APPLY MY DEFINITIONS OF

22   THESE TERMS THROUGHOUT THE CASE.

23       HOWEVER, MY INTERPRETATION OF THE LANGUAGE OF THE CLAIMS

24   SHOULD NOT BE TAKEN AS AN INDICATION THAT I HAVE A VIEW

25   REGARDING ISSUES SUCH AS INFRINGEMENT OR INVALIDITY.  THOSE

1    ISSUES WILL BE YOURS TO DECIDE AT THE END OF THE TRIAL.  I

2    WILL PROVIDE YOU WITH MORE DETAILED INSTRUCTIONS ON THE

3    MEANING OF THE CLAIMS BEFORE YOU RETIRE TO DELIBERATE ON YOUR

4    VERDICT.

5        IN A MOMENT, THE TRIAL WILL BEGIN.  FIRST, EACH SIDE MAY

6    MAKE AN OPENING STATEMENT.

7        AN OPENING STATEMENT IS NOT EVIDENCE.  IT IS SIMPLY AN

8    OUTLINE TO HELP YOU UNDERSTAND WHAT THAT PARTY EXPECTS THE

9    EVIDENCE WILL SHOW.  THEN TOMORROW THE PRESENTATION OF

10   EVIDENCE WILL BEGIN.  WITNESSES WILL TAKE THE WITNESS STAND

11   AND DOCUMENTS WILL BE OFFERED AND ADMITTED INTO EVIDENCE.

12       THERE MAY BE DIFFERENT STANDARDS OF PROOF THAT YOU WILL

13   APPLY TO THE EVIDENCE, DEPENDING ON THE ISSUE YOU ARE

14   DECIDING.  ON SOME ISSUES, YOU MUST DECIDE WHETHER SOMETHING

15   IS MORE LIKELY TRUE THAN NOT.

16       ON OTHER ISSUES, YOU WILL USE A HIGHER STANDARD AND DECIDE

17   WHETHER IT IS HIGHLY PROBABLE THAT SOMETHING IS TRUE.  DIGITAL

18   REG WILL PRESENT ITS EVIDENCE ON ITS CONTENTION THAT SOME OF

19   THE CLAIMS OF THE '541 AND '670 PATENTS HAVE BEEN AND CONTINUE

20   TO BE INFRINGED BY ADOBE, AND THAT THE INFRINGEMENT HAS BEEN

21   AND CONTINUES TO BE WILLFUL.

22       THE WITNESSES WILL BE QUESTIONED BY DIGITAL REG'S COUNSEL

23   IN WHAT IS CALLED "DIRECT EXAMINATION."

24       AFTER THE DIRECT EXAMINATION OF A WITNESS IS COMPLETED,

25   THE OPPOSING SIDE HAS AN OPPORTUNITY TO CROSS-EXAMINE THE

1    WITNESS.  TO PROVE INFRINGEMENT OF ANY CLAIM, DIGITAL REG MUST

2    PERSUADE YOU THAT IT IS MORE LIKELY THAN NOT THAT ADOBE HAS

3    INFRINGED EVERY ELEMENT OF THAT CLAIM.  TO PERSUADE YOU THAT

4    ANY INFRINGEMENT WAS WILLFUL, DIGITAL REG MUST PROVE THAT IT

5    IS HIGHLY PROBABLE THAT THE INFRINGEMENT WAS WILLFUL.

6         AFTER DIGITAL REG HAS PRESENTED ITS WITNESSES, ADOBE WILL

7    CALL ITS WITNESSES WHO WILL ALSO BE EXAMINED AND

8    CROSS-EXAMINED.  ADOBE WILL PRESENT ITS EVIDENCE RESPONDING TO

9    DIGITAL REG'S INFRINGEMENT AND WILLFULNESS CONTENTIONS.  IN

10   ADDITION, ADOBE WILL PRESENT EVIDENCE SUPPORTING ITS OWN

11   INVALIDITY DEFENSES.

12        TO PROVE INVALIDITY OF ANY CLAIM ADOBE MUST PERSUADE YOU

13   THAT IT IS HIGHLY PROBABLE THAT THE CLAIM IS INVALID.  DIGITAL

14   REG WILL THEN HAVE THE OPTION TO PUT ON REBUTTAL EVIDENCE

15   RESPONDING TO ADOBE'S EVIDENCE OF NONINFRINGEMENT, LACK OF

16   WILLFULNESS AND INVALIDITY.

17        AFTER EACH WITNESS THE ATTORNEYS WILL -- I DON'T KNOW IF

18   YOU WANTED TO DO THIS.  THIS IS IN HERE, BUT WE DIDN'T REALLY

19   TALK ABOUT IT.

20        BECAUSE THE EVIDENCE IS INTRODUCED PIECEMEAL, YOU NEED TO

21   KEEP AN OPEN MIND AS THE EVIDENCE COMES IN AND WAIT FOR ALL

22   THE EVIDENCE BEFORE YOU MAKE ANY DECISIONS.  IN OTHER WORDS,

23   YOU SHOULD KEEP AN OPEN MIND THROUGHOUT THE TRIAL.  AFTER THE

24   EVIDENCE HAS BEEN PRESENTED I WILL GIVEN YOU FINAL

25   INSTRUCTIONS ON THE LAW THAT APPLIES TO THE CASE, AND THE

1    ATTORNEYS WILL MAKE CLOSING ARGUMENTS.

2        AS I MENTIONED, CLOSING ARGUMENTS ARE NOT EVIDENCE.  AFTER

3    THE INSTRUCTIONS AND CLOSING ARGUMENTS YOU WILL THEN DECIDE

4    THE CASE.

5        SO, AT THIS POINT, WE CAN PROCEED WITH THE PLAINTIFF'S

6    OPENING STATEMENT.

7            **MR. DINOVO:**  YES, YOUR HONOR.

8            **THE COURT:**  YOU ARE WELCOME TO TURN THE PODIUM IF YOU

9    WOULD LIKE, AND MOVE IT OVER, BUT I THINK YOU WILL PROBABLY

10   NEED TO SPEAK INTO THE MICROPHONE.

11               (PAUSE IN THE PROCEEDINGS.)

12           **THE COURT:**  THE PLAINTIFF'S ARGUMENT WILL BE LESS

13   THAN AN HOUR.  IF YOU ARE GETTING HUNGRY WHAT WE MIGHT DO IS

14   TAKE A SHORT BREAK BEFORE WE HEAR THE DEFENDANT'S CLOSING

15   ARGUMENT, WHICH WILL ALSO BE LESS THAN AN HOUR, THEN BREAK FOR

16   THE DAY.  SO WE WILL PROBABLY BE RUNNING A LITTLE BIT LATER

17   THAN 1:30.

18       SO IF YOU DO NEED SOMETHING TO EAT, THERE'S VENDING

19   MACHINES IN THE JURY ASSEMBLY ROOM, AND WE WILL TAKE A QUICK

20   BREAK SO YOU CAN DO THAT IF YOU NEED TO.

21       GO AHEAD.

22                    **OPENING STATEMENT**

23           **MR. ELLWANGER:**  MAY IT PLEASE THE COURT, ADOBE

24   PROTECTS ITS OWN PROPERTY WITH STOLEN PROPERTY.  THIS IS A

25   CASE ABOUT DIGITAL RIGHTS MANAGEMENT, OR "DRM" FOR SHORT.

1    NOW, THIS IS TECHNOLOGY THAT ALLOWS US TO PROTECT OUR

2    ELECTRONIC FILES WHENEVER WE SEND THEM AROUND THE INTERNET.

3    AND SOME COMPANIES USE THIS TECHNOLOGY.  SOME COMPANIES

4    INCORPORATE THIS TECHNOLOGY INTO THEIR OWN PRODUCTS TO MAKE

5    MONEY WITH IT.

6         AND ONE OF THE COMPANIES THAT DOES THAT IS THE DEFENDANT

7    IN THIS CASE, ADOBE.  YOU SEE OVER 20 YEARS AGO, A MAN BY THE

8    NAME OF PATRICK PATTERSON STARTED THINKING ABOUT HOW THE

9    INTERNET COULD REALLY BE A TOOL FOR ALLOWING PEOPLE TO SEND

10   ALL SORTS OF FILES AROUND THE INTERNET, LIKE MUSIC AND BOOKS

11   AND VIDEOS.

12        AND AT THAT TIME, MOST PEOPLE DIDN'T EVEN KNOW WHAT THE

13   INTERNET WAS.  THERE WERE NO BROWSERS.  THERE WERE NO WEBSITES

14   THAT YOU COULD VISIT FROM YOUR COMPUTER.  BUT MR. PATTERSON

15   WONDERED HOW HE COULD FIGURE OUT A LOGICAL WAY THAT HE COULD

16   SECURELY SEND COPYRIGHTED MATERIALS THROUGH THE INTERNET SO

17   THAT YOU COULD LOCK INTO A COMPUTER'S ADDRESS AND ALLOW

18   SOMEONE TO MAKE IT TO SHARE A FILE, BUT NOT COPY IT.

19        THEY WANTED TO MAKE SURE THAT AN AUTHOR OR AN ARTIST'S

20   COPYRIGHTED MATERIALS COULD BE SHARED, BUT NOT STOLEN.

21        SO AFTER YEARS OF WORK, AFTER SUCCESSES AND AFTER

22   FAILURES, ON MAY 14TH, 2002, THE UNITED STATES PATENT AND

23   TRADEMARK OFFICE GRANTED THE '541 PATENT, ENTITLED "REGULATING

24   ACCESS TO DIGITAL CONTENT."

25        THE INVENTOR?  PATRICK PATTERSON.

1        TWO YEARS LATER ON JUNE 15TH, 2004, THE UNITED STATES

2    PATENT OFFICE GRANTED THE '670 PATENT, ENTITLED "TRACKING

3    ELECTRONIC COMPONENT."

4        AND THE INVENTOR?  ONCE AGAIN, PATRICK PATTERSON.

5        THIS CASE CENTERS AROUND THOSE TWO PATENTS THAT ARE NOW

6    OWNED BY A COMPANY CALLED "DIGITAL REG."  THEY ARE THE

7    PLAINTIFF IN THIS CASE, AND THEY ARE MY CLIENT.

8        AS YOU LEARNED DURING JURY SELECTION MY NAME IS JAY

9    ELLWANGER.  AND I'M ONE OF THE LAWYERS WHO REPRESENTS DIGITAL

10   REG IN THIS CASE.  AND THE OTHER LAWYERS THAT WE ANTICIPATE

11   YOU WILL HEAR FROM FROM OUR TEAM ARE DREW DINOVO, NIKKI

12   GLAUSER AND ADAM PRICE.

13       AND IN THE COURTROOM TODAY ARE TWO REPRESENTATIVES OF

14   DIGITAL REG, MR. MIKE FARLEY AND MR. CHIP VENTERS.  AND THEY

15   ARE BOTH GOING TO SIT ON THAT WITNESS STAND, AND THEY ARE

16   GOING TO TELL YOU THEIR STORY.

17       BUT FIRST, AFTER WE FINISH THESE OPENING STATEMENTS,

18   TOMORROW MORNING YOU ARE GOING TO HEAR FROM THE INVENTOR

19   HIMSELF, PATRICK PATTERSON.

20       WE EXPECT THAT MR. PATTERSON WILL TELL YOU THAT BETWEEN

21   JUNE 1993 UNTIL JANUARY 1996, DURING THAT TIME PERIOD HE SPOKE

22   WITH FRIENDS AND COLLEAGUES AND EMPLOYEES WITHIN THE COMPUTER

23   SOFTWARE INDUSTRY AND BEGAN TO WORK ON A SYSTEM DESIGN FOR

24   PROTECTING THOSE COPYRIGHTED MATERIALS.

25       WE EXPECT THE EVIDENCE TO SHOW THAT BY JANUARY OF 1996,

```
1     MR. PATTERSON HAD A COMPLETE WORKING SET OF DESIGN DOCUMENTS,

2     FROM CONCEPTUAL DESIGN TO A DETAILED WORK FLOW THAT WAS

3     SUFFICIENT FOR A COMPUTER PROGRAMMER TO DEVELOP A PRODUCT.

4         AND WITH THAT WORK COMPLETE, HE THEN DECIDED TO

5     INCORPORATE A COMPANY CALL "PC DESKGATE."

6         HE HIRED HIS FIRST THREE EMPLOYEES.  HE CONTRACTED WITH A

7     NETWORKING SERVICE COMPANY.  AND FOR THE NEXT 15 MONTHS, PC

8     DESKGATE WORKED TIRELESSLY ON A PRODUCT ARE CALLED THE

9     "UNIVERSAL ENVELOPE."

10        THIS PRODUCT WAS ESSENTIALLY A TOOL FOR ELECTRONICALLY

11    MAILING A BOOK OR SONG OR A VIDEO, USING A PASSWORD TO PROTECT

12    THE CONTENT THAT WAS INSIDE THE ENVELOPE.

13        BUT ONCE THE CONTENT WAS REMOVED FROM THE ENVELOPE, IT WAS

14    NO LONGER PROTECTED FROM UNAUTHORIZED COPYING.  YOU SEE,

15    MR. PATTERSON WANTED TO USE THIS PRODUCT TO DEMONSTRATE WHY IT

16    WAS SO IMPORTANT THAT YOU PROTECT THE CONTENT INSIDE THE

17    ENVELOPE, AS WELL.

18        SO IN MARCH OF 1997, MR. PATTERSON HAD A BUNCH OF MEETINGS

19    TO TRY TO RAISE MONEY TO FUND THIS IDEA.  BUT EVERYONE TOLD

20    HIM IN ORDER FOR THEM TO INVEST HE NEEDED TO GO AHEAD AND

21    DEVELOP THAT SYSTEM FOR MAINTAINING THE PROTECTION OF THE

22    COPYRIGHTED CONTENT INSIDE THE ENVELOPE.

23        SO, MR. PATTERSON DID.  AND AFTER THAT, THE PULITZER

24    PRIZE-WINNING PUBLISHER OF A MAJOR NEWSPAPER WAS SO EXCITED

25    ABOUT MR. PATTERSON'S IDEA THAT HE WROTE A CHECK FOR $150,000
```

1    ON THE SPOT TO CONTINUE DEVELOPMENT OF THIS PRODUCT.  AND FOUR

2    MONTHS LATER HE CONTRIBUTED ANOTHER $75,000.

3        NOW, IN AUGUST OF THAT YEAR, MR. PATTERSON MET WITH MIKE

4    FARLEY.  AND MIKE FARLEY ALSO LIKED THIS IDEA SO MUCH SO THAT

5    HE SAID HE WOULD RAISE $50,000 A MONTH TO CONTINUE FINANCING

6    THIS YOUNG COMPANY.  IN FACT, MR. FARLEY EVEN JOINED PC

7    DESKGATE TO CONTINUE RAISING MONEY FOR THE COMPANY.

8        AFTER THAT, CHIP VENTERS JOINED THE COMPANY, AS WELL.  AND

9    WITH THIS NEW FUNDING AND THIS NEW LEADERSHIP PC DESKGATE WAS

10   ABLE TO HIRE EVEN MORE PROGRAMMERS IN ORDER TO WRITE COMPUTER

11   CODE FOLLOWING MR. PATTERSON'S SPECIFIC DESIGNS.

12       AND IN ADDITION, THESE FUNDS WERE USED TO PAY FOR THE

13   FILING OF PATENTS.  WE EXPECT THAT MR. PATTERSON WILL TELL YOU

14   ABOUT THE LONG HOURS HE SPENT AT THE LAW OFFICES OF FISH &

15   RICHARDSON, WORKING AROUND THE CLOCK WITH PATENT LAWYERS TO

16   WRITE THE CLAIMS OF HIS PATENTS, PROVING THAT EACH STEP ALONG

17   THE WAY THAT HIS IDEAS AND HIS INVENTION WORKED.

18       THAT FIRST PATENT WAS FILED IN MAY OF 1998, AND IT BECAME

19   THE '541 PATENT.  SO AFTER THEY FILED THESE PATENTS THEY

20   IMMEDIATELY STARTED TO PUT THE INVENTION TO WORK.  AND THEY

21   LAUNCHED AN E COMMERCE SITE CALLED "STORE RACK."  AND THEY PUT

22   UP EBOOKS AND NEW YORK DAILY NEWSPAPER, AND EVEN A HUNDRED

23   SONGS FROM INDIE BANDS ALL AROUND THE COUNTRY.

24       IN FACT, THEY EVEN PUT UP A SONG BY A REALLY YOUNG ARTIST.

25   THE ALBUM HADN'T BEEN RELEASED YET, BUT THE ARTIST HAD

1    ACTUALLY FOUND THIS WEBSITE AND WAS REALLY EXCITED ABOUT ALL

2    THINGS INTERNET.

3        AND HE CONTACTED US AND SAID:

4        "I REALLY WANT TO LAUNCH MY NEW ALBUM ON YOUR

5        WEBSITE."

6        AND THAT SINGER WAS JULIAN LENNON, JOHN LENNON'S SON.

7    AND.

8        AND AFTER HE LAUNCHED HIS NEW ALBUM ON OUR WEBSITE, THINGS

9    REALLY TOOK OFF FROM THERE.  WE HAD A QUARTER MILLION HITS AND

10   DOWNLOADS THE FIRST MONTH; 500,000 PASSAROUNDS THAT VERY FIRST

11   MONTH.

12       AND THEN, MR. PATTERSON GOT A CALL FROM A FAMOUS COLUMNIST

13   NAMED JOHN DVORAK OF PC WEEK MAGAZINE.  AND HE INVITED THEM TO

14   COME TO INTERNET WORLD '98 EXPO IN JULY OF THAT YEAR IN NEW

15   YORK, IN ORDER TO PRESENT TO THE EXPOSITION ABOUT THEIR NEW

16   COMPANY.  AND WOULDN'T YOU KNOW IT?  AT ONE OF THE LARGEST

17   TECHNOLOGY EXPOS IN THE COUNTRY IN 1998, PC DESKGATE WON THE

18   AWARD FOR BEST NEW INTERNET COMPANY.

19       BUT, PRETTY SOON THEREAFTER, THE FIRST DOT COM BUBBLE

20   BURST.  PEOPLE AROUND HERE FELT IT.  PEOPLE AROUND THE WHOLE

21   COUNTRY FELT IT.  AND PC DESKGATE FELT IT, AS WELL.  THEY WERE

22   MERGED INTO ANOTHER COMPANY.  AND PATRICK PATTERSON LEFT.

23   THAT COMPANY THEN WENT BANKRUPT, AND THE PATENTS AND THE

24   ASSETS GOT PASSED FROM BANK TO BANK.

25       BUT DURING THE NEXT SEVERAL YEARS, MR. FARLEY STARTED TO

1    PUT AN INVESTMENT GROUP TOGETHER TO TRY TO BUY BACK THE

2    TECHNOLOGY AND THE PATENTS.  AND IT TOOK SEVERAL YEARS AND

3    SEVERAL FAILED ATTEMPTS, BUT MR. FARLEY AND MR. VENTERS GOT

4    THE PATENTS BACK.

5        YOU SEE, THEY BELIEVED IN THE POWER OF PATRICK PATTERSON'S

6    INVENTIONS.  THEY IMMEDIATELY STARTED TO RAISE VENTURE CAPITAL

7    FUNDS AND INVESTMENT DOLLARS SO THEY COULD TRY TO PROMOTE

8    THESE IDEAS.

9        IN FACT, THEY EVEN HAD A MEETING WITH A GROUP CALLED

10   "ADOBE VENTURES" IN JUNE OF 2004.  AND DURING THAT MEETING WE

11   BELIEVE THE TESTIMONY WILL SHOW THAT MR. VENTERS PRESENTED A

12   PAPER CALLED "THE ADOBE VALUE PROPOSITION."  AND THAT HE

13   OUTLINED ALL OF THE WAYS ADOBE COULD IMPROVE THEIR PRODUCTS IF

14   THEY WOULD ONLY INCORPORATE OUR TECHNOLOGY.

15       IN FACT, HE WENT SO FAR AS TO TELL THEM EXACTLY WHAT

16   ASPECTS OF THE TECHNOLOGY THAT WE OWN THAT THEY SHOULD USE.

17   UNFORTUNATELY, NOTHING EVER CAME OF THIS MEETING, EXCEPT FOR

18   ONE THING.  AFTER THAT, ADOBE STARTED TO TRY TO GET ITS OWN

19   DRM PATENTS.

20       NOW, WE TRIED TO SEE THE VIDEO EARLIER TODAY, AND YOU WILL

21   SEE IT TOMORROW MORNING, TO GIVE YOU MORE INFORMATION ABOUT

22   HOW THE PATENT PROCESS WORKS.  BUT, AS A VERY BRIEF

23   INTRODUCTION, YOU MIGHT IMAGINE THAT A PATENT OFFICE CAN

24   EITHER ACCEPT OR REJECT YOUR APPLICATION.  AND IF THEY DO

25   REJECT YOUR APPLICATION, ONE OF THE REASONS IS BECAUSE IT

1    COULD BE THAT SOMETHING HAD ALREADY BEEN PATENTED BEFORE.

2        NOW, YOU HAVE THE RIGHT TO APPEAL IT, ALL RIGHT?  YOU CAN

3    SAY:

4        "NO.  NO.  NO.  NO.  MY PATENT MAKES AN IMPROVEMENT

5        ON SOMETHING THAT WAS INVENTED EARLIER."

6        NOW, THAT DOESN'T NECESSARILY MEAN YOU DON'T INFRINGE THAT

7    EARLIER PATENT.  IT JUST MEANS YOU ARE ADDING TO AN EARLIER

8    INVENTION.

9        THINK ABOUT A PENCIL.  SOMEONE A LONG TIME AGO DECIDED

10   THAT IT WAS A REALLY GOOD IDEA TO ADD AN ERASER TO THE TIP OF

11   A PENCIL.  IT DOESN'T MEAN THE PERSON THAT INVENTED THAT

12   DIDN'T OWE ROYALTIES TO THE PERSON THAT INVENTED THE WHOLE

13   PENCIL.  IT JUST MEANS THEY HAD A REALLY GREAT IMPROVEMENT TO

14   SOMETHING THAT ALREADY EXISTED.

15       AND WE BELIEVE THAT THE EVIDENCE WILL SHOW THAT IN THIS

16   CASE ADOBE ADDED THE ERASER TO PATRICK PATTERSON'S PENCIL.

17       NOW, WE HAVE BEEN TALKING ALREADY ABOUT A LOT OF DIFFERENT

18   DATES AND LOT OF DIFFERENT PATENTS AND APPLICATIONS AND

19   MEETINGS.  AND IT IS VERY IMPORTANT THAT DURING THIS TRIAL WE

20   KEEP THOSE DATES AND TIMES STRAIGHT, BECAUSE AS THE JUDGE JUST

21   INSTRUCTED YOU, ONE OF THE THINGS WE ARE GOING TO PROVE IS

22   ADOBE WILLFULLY INFRINGED THESE PATENTS, AND THAT THEY KNEW

23   WHAT THEY WERE DOING.  AND THE TIMING OF WHAT THEY KNEW AND

24   WHEN THEY KNEW IT IS VERY IMPORTANT.

25       SO I'M GOING TO GO THROUGH SOME OF THE DATES AGAIN AND

1    TALK ABOUT SOME NEW ONES VERY BRIEFLY THROUGH A TIME LINE OF

2    DIGITAL REG AND ADOBE'S INTERACTIONS.

3        ON THE TOP HALF OF THE TIME LINE, YOU WILL SEE THAT

4    DIGITAL REG FILED ITS OWN PATENT, THE '541, IN MAY OF 1998.

5    AND A FEW MONTHS LATER IN NOVEMBER 1998 THEY FILED A SECOND

6    APPLICATION THAT WOULD ULTIMATELY BECOME THE '670 PATENT.

7        ALMOST FOUR YEARS TO THE DAY AFTER IT WAS FILED, THE

8    UNITED STATES PATENT AND TRADEMARK OFFICE GRANTED THE

9    APPLICATION THAT BECAME THE '541 PATENT.  AND AFTER THAT

10   PATENT WAS GRANTED, THE UNITED STATES PATENT AND TRADEMARK

11   OFFICE IN APRIL 2014 REJECTED AN ADOBE APPLICATION BASED ON

12   THE TEACHINGS OF THE '541 PATENT.  SOMEBODY HAD GOTTEN THERE

13   FIRST.

14       AFTER THAT, THE PATENT OFFICE GRANTED DIGITAL REG'S SECOND

15   PATENT, THE '670.  AND WITH THESE TWO PATENTS IN HAND, THE

16   EVIDENCE WILL SHOW THAT IS WHEN CHIP VENTERS SAT DOWN AND

17   WROTE OUT A PROPOSITION.  SENT IT TO ADOBE VENTURES, AND HAD A

18   MEETING WITH THEM.  AND HE LAID OUT IN THIS VALUE PROPOSITION

19   EVERYTHING THAT HE THOUGHT ADOBE NEEDED TO KNOW IN SPECIFIC,

20   TALKING ABOUT HOW TO BE ABLE TO GIVE USERS OF ADOBE PRODUCTS A

21   WAY TO SECURELY TRACK, AUTHENTICATE AND MONETIZE DOCUMENTS,

22   GRAPHICS AND OTHER MEDIA.  BASICALLY, MEMBERS OF THE JURY, HE

23   SPELLED IT OUT.

24       AFTER THAT, ADOBE STARTED CITING OUR OWN PATENTS IN THEIR

25   APPEAL OF THAT REJECTION.  AND THEY WROTE A LONG DOCUMENT THAT

1    WE ARE GOING TO TALK ABOUT IN TRIAL SAYING HOW:

2        "NO.  NO.  NO.  THIS '541 PATENT SHOULDN'T NEGATE

3        WHAT WE HAVE DONE."

4        BUT IN WRITING THAT APPEAL THEY SURE ENDED UP LEARNING A

5    LOT ABOUT OUR PATENT.

6        SO, WE ALSO DECIDED IN FOUR YEARS LATER TO TRY IT AGAIN

7    AND HAVE ANOTHER MEETING WITH ADOBE.  AND WE BELIEVE THE

8    EVIDENCE WILL SHOW AT THAT MEETING ADOBE WALKED OUT.

9        IN AUGUST OF 2008, ONCE AGAIN, THE PATENT OFFICE GAVE

10   NOTICE OF THE '670 PATENT TO ADOBE AND TOLD THEM:

11       "DIGITAL REG HAS ANOTHER PATENT THAT YOU NEED TO LOOK

12       AT."

13       AND, AGAIN, AFTER BEING PUT ON NOTICE, ADOBE STARTS

14   REFERENCING OUR PATENTS IN THEIR COMMUNICATIONS WITH THE

15   PATENT OFFICE.

16       SO WE TRIED A THIRD TIME TO ENGAGE ADOBE.  AND IN APRIL OF

17   2010, WE ACTUALLY GAVE THEM A PROPOSITION TO BUY THE PATENTS

18   BECAUSE THEY HAD ALREADY BEEN USING THEM IN THEIR TECHNOLOGY.

19   BUT ADOBE DECLINED TO DO SO, AND A YEAR LATER WE BROUGHT THIS

20   LAWSUIT.

21       AND WOULDN'T YOU KNOW IT?  A MONTH AFTER THAT, THEY CITED

22   OUR PATENTS AGAIN.

23       NOW, AS PLAINTIFF, AS THE JUDGE TOLD YOU WE BEAR THE

24   BURDEN OF PROOF.  WE HAVE TO PROVE TO YOU THAT IT IS MORE

25   LIKELY TRUE THAN NOT TRUE THAT ADOBE INFRINGED EACH OF THE

1    CLAIMS THAT WE HAVE ASSERTED FROM THE '541 AND '670 PATENTS.

2        BUT, IN ADDITION TO PROVING THAT ADOBE INFRINGES OUR

3    PATENTS, WE'RE GOING TO PROVE THAT ADOBE WILLFULLY INFRINGED

4    THESE PATENTS.  IN OTHER WORDS, THEY DID IT ON PURPOSE.  AND

5    IN ORDER TO DO THAT, WE ARE GOING TO BRING THREE WITNESSES TO

6    TALK ABOUT THE FACTS OF THE CASE TO YOU.

7        AS I SAID, WE WILL BRING PATRICK PATTERSON, WE WILL BRING

8    MR. FARLEY, AND WE WILL BRING MR. VENTERS.  AND AFTER YOU'VE

9    HEARD FROM THOSE THREE GENTLEMEN, WE ARE GOING TO BRING AN

10   EXPERT WITNESS TO THE STAND TO REALLY GET UNDER THE HOOD OF

11   WHAT THIS TECHNOLOGY DOES AND HOW IT DOES IT.

12       HIS NAME IS DR. PREM DEVANBU.  AND HE HAS BEEN A

13   DISTINGUISHED AND DECORATED PROFESSOR OF COMPUTER SCIENCE OVER

14   AT UC DAVIS FOR THE LAST 16 YEARS.

15       AND DR. DEVANBU IS GOING TO WALK THROUGH EACH OF THE

16   ASSERTED CLAIMS OF THESE PATENTS AND MATCH UP ELEMENT BY

17   ELEMENT BY ELEMENT OF THE CLAIMS WITH EACH OF THE ADOBE

18   PRODUCTS THAT WE HAVE ASSERTED IN THIS CASE.

19       HE WILL EVEN EXPLAIN THAT EVEN IF ADOBE HAD NEVER HEARD OF

20   THE '541 AND '670 PATENTS, BECAUSE OF THE WAY THEIR PRODUCTS

21   WORK THEY INFRINGE OUR PATENTS.  BUT HE WILL ALSO DISCUSS HOW

22   ADOBE SPECIFICALLY INSTRUCTS ITS CUSTOMERS TO OPERATE THE

23   PRODUCTS IN A WAY THAT INFRINGE OUR PATENTS.  AND,

24   IMPORTANTLY, HE WILL EVEN SHOW YOU THE INDIVIDUAL LINES OF

25   ADOBE'S COMPUTER CODE THAT HE EXAMINED HIMSELF THAT SHOW HOW

1    THESE PRODUCTS INFRINGE.

2       NOW, AFTER THAT YOU WILL HEAR FROM ADOBE'S EXPERT,

3    DR. WICKER.  AND IT PROBABLY WON'T SURPRISE YOU THAT WE EXPECT

4    THAT ADOBE'S EXPERT WILL TELL YOU THAT ADOBE DOESN'T USE THE

5    TECHNOLOGY AT ISSUE, THEY DON'T INFRINGE THE PATENT, AND SO

6    ON.  BUT INSTEAD OF ONLY LISTENING TO WHAT DR. WICKER SAYS,

7    LISTEN VERY CAREFULLY TO WHAT HE DOESN'T SAY.  BECAUSE WE

8    EXPECT THAT THE EVIDENCE WILL SHOW THAT DR. WICKER DIDN'T

9    EXAMINE A SINGLE LINE OF ADOBE'S COMPUTER CODE TO DETERMINE

10   WHETHER OR NOT IT INFRINGED.  NOT ONE LINE.

11      HE ONLY LOOKED AT WHAT WE GAVE HIM.  CONSIDER THAT WHEN

12   YOU CONSIDER HIS TESTIMONY.

13      NEXT WE PLAN TO CALL ONE OF ADOBE'S OWN EMPLOYEES, A MAN

14   BY THE NAME OF JONATHAN HERBACH.  HE WILL PROVIDE CORPORATE

15   TESTIMONY ON BEHALF OF ADOBE.

16      NOW, HE MAY WORK FOR ADOBE, BUT WE EXPECT THAT HE WILL BE

17   FORCED TO TESTIFY AND CONFIRM THAT ADOBE KNEW ABOUT OUR

18   PATENTS BECAUSE THE UNITED STATES PATENT OFFICE TOLD HIM ABOUT

19   THEM WHEN HE WAS FILING HIS OWN APPLICATIONS.

20      LISTEN AS HE TELLS YOU HOW ADOBE INTENTIONALLY DESIGNS ITS

21   LIVECYCLE PRODUCTS TO PROTECT DOCUMENTS AND DATA WITH FULL

22   KNOWLEDGE OF DIGITAL REG'S PATENTS.

23      FINALLY, WE INTEND TO CALL MR. RUSSELL PARR.  MR. PARR IS

24   AN EXPERT WHO HAS PRACTICED IN THE FIELD OF INTELLECTUAL

25   PROPERTY VALUATION AND IS A ROYALTY CONSULTANT FOR OVER 25

1    YEARS.  HE HAS ANALYZED ROYALTY RATES.  HE'S VALUED PATENTS.

2    HE'S PROVIDED OPINIONS IN THE PAST FOR THE LIKES OF AT&T AND

3    HEWLETT-PACKARD AND IBM, EVEN DR. SUESS.

4        HE LITERALLY WROTE THE BOOK ON THE SUBJECT.  IT IS CALLED

5    ROYALTY RATES FOR TECHNOLOGY, WHICH IS IN ITS FIFTH EDITION.

6    AND HE HAS WRITTEN MULTIPLE OTHER BOOKS ON INTELLECTUAL

7    PROPERTY VALUATION WHICH HAVE BEEN TRANSLATED INTO HALF A

8    DOZEN LANGUAGES.

9        AND IN THIS CASE HE IS GOING TO EXPLAIN TO YOU THE BASIS

10   FOR WHAT DIGITAL REG SHOULD BE PAID BY ADOBE FOR ADOBE'S

11   INFRINGEMENT OF THE '541 AND '670 PATENTS.  AND HE WILL WALK

12   YOU THROUGH WHAT ARE CALLED "THE GEORGIA-PACIFIC FACTORS."

13   IT'S NAMED AFTER A FAMOUS CASE.  AND THAT WILL ESTABLISH WHAT

14   EACH OF YOU WILL NEED TO CONSIDER WHEN YOU CONSIDER WHETHER OR

15   NOT TO AWARD DAMAGES.

16       AFTER MR. PARR TESTIFIES, WE EXPECT THAT ADOBE WILL CALL

17   THEIR OWN DAMAGES EXPERT.  AND WE EXPECT THAT HE WILL SAY THAT

18   ADOBE DOESN'T OWE A PENNY, AND IF THEY DO OWE ANYTHING IT IS

19   NOT VERY MANY PENNIES.  EVEN THOUGH WE EXPECT THE EVIDENCE

20   WILL SHOW ADOBE MADE BILLIONS OF DOLLARS FROM THE PRODUCTS WE

21   HAVE ACCUSED IN THIS LAWSUIT.

22       AND AS HE GIVES YOU HIS OPINION, LISTEN AS HE TELLS YOU

23   THAT IN FORMING THAT OPINION HE CONSIDERED ALL THESE DIFFERENT

24   LICENSE AGREEMENTS THAT WERE SMALLER THAT DIGITAL REG HAS

25   ENTERED INTO WITH COMPANIES OVER THE YEARS, WHETHER OR NOT

1    THOSE COMPANIES WERE IN THE SAME POSITION AS ADOBE.

2        BUT LISTEN AS HE TELLS YOU HE COMPLETELY IGNORED A VERY

3    LARGE LICENSE AGREEMENT WITH A COMPANY CALLED "RPX." HE

4    AVERAGED ALL OF THE OTHER LICENSE AGREEMENTS DIGITAL REG HAS

5    WITH COMPANIES LIKE SONY, MICROSOFT, INTUIT, AVG, SYMANTEC,

6    EA, MACROVISION, ZYNGA. ALL OF THOSE COMPANIES TOOK A LICENSE

7    WITH DIGITAL REG. BUT THE BIG ONE WITH RPX? HE JUST DIDN'T

8    AVERAGE THAT IN.

9        NOW, I KNOW THAT SOMETIMES WHEN YOU'RE DOING MATH AND YOU

10   ARE COMPUTING AN AVERAGE YOU WILL DROP THE HIGH AND THE LOW

11   NUMBER, THEN DO THE MATH. BUT ADOBE'S EXPERT JUST DROPPED THE

12   HIGH NUMBER. CONSIDER THAT WHEN YOU CONSIDER HIS TESTIMONY.

13       AFTER THAT, OUR CASE WILL CLOSE AND IT WILL BE ADOBE'S

14   TURN TO PRESENT THEIR DEFENSE. AND WE ANTICIPATE THAT THEY

15   WILL TELL YOU THAT EVEN IF THEY DO INFRINGE THE '541 AND '670

16   PATENTS, IT DOESN'T MATTER BECAUSE THOSE PATENTS SIMPLY ARE

17   NOT INVALID. THEY DON'T COUNT. THE UNITED STATES PATENT AND

18   TRADEMARK OFFICE GOT IT WRONG. AGAIN, THEY SHOULDN'T HAVE TO

19   PAY A PENNY.

20       AND AS THEY DO THIS, CONSIDER THE EVIDENCE THAT YOU HAVE

21   ALREADY HEARD ABOUT HOW EARLY THESE PATENTS WERE FILED.

22       YOUR HONOR, MAY I APPROACH THE EXHIBIT?

23           **THE COURT:** YES. IF YOU CAN KEEP YOUR VOICE UP.

24       **MR. SHIU:** I WILL, YOUR HONOR.

25       HOW EARLY DIGITAL REG'S PATENTS WERE FILED. ABOUT HOW

1   ADOBE WAS PUT ON NOTICE OF DIGITAL REG'S PATENTS BY THE UNITED

2   STATES PATENT OFFICE THEMSELVES.

3       HOW ADOBE THEN THEMSELVES STARTED NAMING OUR PATENTS IN

4   THEIR FILINGS -- IN THEIR PATENTS IN THEIR FILINGS WITH THE

5   PATENT OFFICE.  HOW WE TRIED TO MEET WITH THEM AGAIN AND AGAIN

6   AND AGAIN.  CONSIDER HOW THIS EVIDENCE FITS TOGETHER WHEN YOU

7   CONSIDER WHAT ADOBE KNEW AND WHEN THEY KNEW IT.

8       ASK YOURSELF:  WHO GOT IT RIGHT?  THE UNITED STATES PATENT

9   AND TRADEMARK OFFICE OR ADOBE'S HIRED EXPERTS?  THE EVIDENCE

10  WILL SHOW THAT PATRICK PATTERSON INVENTED THE '541 AND '670

11  PATENTS, AND NO ONE BEAT HIM TO IT.

12      WHEN I WAS A KID I USED TO LOVE GOING TO A'S GAMES OR WHAT

13  USED TO BE CALLED THE "OAKLAND ALAMEDA COUNTY COLISEUM" BEFORE

14  OVERSTOCK TOOK IT OVER.  AND THIS WAS BACK IN THE DAY OF MARK

15  MCGWIRE AND JOSE CANSECO, WALT WEISS, DENNIS ECKERSLEY, DAVE

16  STEWART.  TONY LA RUSSA WAS THE MANAGER.

17      AND EVERY TIME MY DAD WOULD TAKE ME TO A GAME I'D ALWAYS

18  BRING MY BASEBALL MITT WITH ME.  AND HE WOULD ASK ME:

19      "WHY DO YOU ALWAYS LUG THAT THING ALONG?  IT'S A ONE IN A

20  MILLION CHANCE TO CATCH A BASEBALL."

21      AND AS A KID, I THOUGHT IT FELT LIKE A ONE IN A MILLION

22  CHANCE, TOO.  LIKE CATCHING A BASEBALL WAS THIS RARE AND

23  WONDERFUL THING.  BUT LIKE EVERY OTHER KID IN THE COLISEUM WHO

24  CARRIED HIS GLOVE TO A GAME, I WAS A DREAMER.

25      AND IN 2002, THE SAME YEAR THAT THE UNITED STATES PATENT

1    OFFICE GRANTED THE '541 PATENT, MAJOR LEAGUE BASEBALL USED

2    MORE GAME BALLS THAN THE UNITED STATES PATENT OFFICE ISSUED

3    PATENTS.  A PATENT IS ALSO A RARE AND WONDERFUL THING.

4        IT'S WOVEN INTO THE FRAMEWORK OF OUR SOCIETY.

5        "THE CONGRESS SHALL HAVE THE POWER TO PROMOTE THE PROGRESS

6    OF SCIENCE AND USEFUL ARTS BY SECURING FOR LIMITED TIMES TO

7    AUTHORS AND INVENTORS THE EXCLUSIVE RIGHTS TO THEIR RESPECTIVE

8    WRITINGS AND DISCOVERIES."

9        THAT'S FROM ARTICLE ONE, SECTION EIGHT OF THE UNITED

10   STATES CONSTITUTION.

11       AND YOU KNOW WHO GRANTED THE VERY FIRST UNITED STATES

12   PATENT BACK IN 1790?  THOMAS JEFFERSON.

13       PATENTS ARE INTELLECTUAL PROPERTY, BUT THEY ARE PROPERTY

14   NONETHELESS.  THEY CAN BE BOUGHT, SOLD, ASSIGNED, USED, NOT

15   USED, JUST LIKE ANY OTHER KIND OF PROPERTY, LIKE A HOUSE OR A

16   CAR OR A PIECE OF LAND.

17       AND WHEN SOMEONE USES YOUR PATENTS YOU HAVE A RIGHT TO

18   CHARGE THEM A ROYALTY FOR DOING THAT.  AND IN THE SAME WAY

19   THAT A LANDLORD CAN CHARGE YOU RENT FOR LIVING IN HIS

20   APARTMENT OR HERTZ CAN CHARGE YOU FOR RENTING ONE OF THEIR

21   CARS, A PATENT OWNER HAS THE RIGHT TO CHARGE A ROYALTY FOR

22   USING HIS INVENTION.

23       BUT YOU ARE THE SYSTEM THAT ENFORCES THAT RIGHT.  YOU ARE

24   THE ONES WHO CAN PROTECT PATRICK PATTERSON'S INVENTION, AND

25   TELL COMPANIES LIKE ADOBE THAT WHEN THEY USE SOMEONE ELSE'S

1    TECHNOLOGY, THEY HAVE TO PAY FOR IT.

2        NOW, AT THE END OF THE TRIAL AT THE CLOSE OF ALL THE

3    EVIDENCE I'M GOING TO HAVE A CHANCE TO COME UP AGAIN BEFORE

4    YOU AND TALK TO YOU ABOUT THE EVIDENCE THAT YOU'VE SEEN AND

5    THE TESTIMONY THAT YOU'VE HEARD.  AND WHEN I DO, THREE THINGS

6    WILL BE TRUE.

7        FIRST, ADOBE INFRINGES THE '541 AND '670 PATENTS, AND THEY

8    DID IT WILLFULLY.

9        SECOND, PATRICK PATTERSON INVENTED THE '541 AND THE '670

10   PATENTS, JUST LIKE THE UNITED STATES PATENT OFFICE SAYS HE

11   DID.

12       AND THIRD, ADOBE OWES DIGITAL REG ROYALTIES FOR USING

13   THOSE PATENTS, BECAUSE ADOBE CAN'T PROTECT ITS OWN PROPERTY

14   WITH STOLEN PROPERTY.

15           **THE COURT:**  WE CAN TAKE A QUICK BREAK, JUST IN CASE

16   ANYONE IS GETTING HUNGRY.  WE WILL ONLY BE GOING LESS THAN AN

17   HOUR, BUT IT IS 12:30.  LET'S TAKE A TEN-MINUTE BREAK IN CASE

18   YOU WANT TO RUN OUT REAL QUICK OR GO BACK TO THE VENDING

19   MACHINES AND GET YOURSELF SOMETHING.

20       IT'S 12:30.  WE WILL COME BACK AT 12:40.

21       OH, JURORS, I AM SORRY.  YOU HAVE A SPECIAL ROOM RIGHT

22   THROUGH HERE.  AND MS. RILEY WILL TAKE YOU THROUGH THERE AND

23   SHOW YOU HOW TO GET IN AND OUT OF IT AND WHERE YOU CAN KEEP

24   YOUR NOTES AND THAT SORT OF THING.

25       DON'T GIVE THEM THE INSTRUCTIONS YET.  I FOUND A COUPLE OF

```
1    TYPOS.

2            THE CLERK:  NO PROBLEM.

3            THE COURT:  SHE WILL SHOW YOU THE DOOR.  WHEN YOU

4    COME BACK YOU CAN COME IN THROUGH A DOOR IN THE HALLWAY AND

5    WAIT IN THIS ROOM UNTIL WE ARE READY FOR YOU.

6        AND SHE MAY HAVE PAPER AND PENCIL FOR YOU AS WELL.

7        (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

8            THE COURT:  SO I FOUND A COUPLE MORE.  UNFORTUNATELY,

9    I MADE ALL THE COPIES, BUT I FOUND A COUPLE MORE PLACES WHERE

10   THE WORD "LICENSING" WAS USED, SO I DIDN'T READ THAT, BUT I AM

11   GOING TO HAVE TO REDO THE THING.

12       AND THEN, IT SUDDENLY OCCURRED TO ME THAT WE HADN'T REALLY

13   TALKED ABOUT THESE INTERIM CLOSING STATEMENTS THAT PEOPLE

14   SOMETIMES GIVE.  AND I DIDN'T KNOW IF THAT WAS OUR IDEA OR

15   YOURS.  AND IF YOU WANT THEM.  IT IS ON PAGE 12, LINES 14

16   THROUGH 18.

17           MR. REINES:  WE DISCUSSED THAT AT THE PRETRIAL

18   CONFERENCE, THE IDEA WE WERE GOING FORWARD.  I DON'T KNOW IF

19   WE FORMALIZED IT MORE RECENTLY, BUT THAT WAS THE ORIGINAL

20   PLAN.

21           MS. GLAUSER:  MAYBE IT DRAGS THE TRIAL ON LONGER.  IF

22   YOU WANT IT WE CAN LEAVE IT IN THERE.  WE ARE HAPPY TO

23   SUBTRACT IT OUT AND JUST HAVE THE QUESTIONING GO TO THE JURORS

24   WITHOUT ATTORNEY ARGUMENT AFTER THE QUESTION.

25           THE COURT:  OKAY.  WHY DON'T YOU TALK ABOUT IT
```

```
1    AMONGST YOURSELVES?  IT WILL USE UP YOUR TIME.  AND IF ONE

2    PERSON DOES IT, THE OTHER WILL FEEL COMPELLED TO DO SO, AS

3    WELL.

4        I DON'T HAVE IN FRONT OF ME THE INSTRUCTION THAT WE WERE

5    SHOWING THE VIDEO IN LIEU OF.  I DON'T KNOW IF IT IS ANYTHING

6    YOU NEED OR THAT YOU NEEDED OR THAT YOU NEED FOR YOUR OPENING.

7         MR. REINES:  NO, I THINK WE ARE FINE, YOUR HONOR.  WE

8    WILL PLAY THE VIDEO TOMORROW.  WE DIDN'T HAVE THE OPPORTUNITY

9    TO TEST EVERYTHING WE WOULD HAVE LIKED BEFORE.

10        THE COURT:  YOU WILL BE ABLE TO DO THAT THIS

11   AFTERNOON.  I HAVE A 2:00 O'CLOCK CALENDAR, BUT HOPEFULLY YOU

12   CAN GET IN BEFORE THAT OR AFTER THAT AND FIGURE OUT HOW TO

13   MAKE IT LOUDER.

14        MR. REINES:  THANK YOU.

15        MS. GLAUSER:  YOUR HONOR, HOW WOULD YOU LIKE TO

16   HANDLE OBJECTIONS TO EXHIBITS THAT WILL BE FOR THE THREE

17   WITNESSES OR AT LEAST TWO WITNESSES THAT WILL APPEAR TOMORROW?

18        THE COURT:  WELL, I GUESS YOU'LL HAVE TO OBJECT WHEN

19   THEY'RE OFFERED IF I HAVEN'T RULED ON THEM ALREADY, OR YOU

20   COULD TELL ME AT THE END OF THE DAY IF WE HAVE TIME WHAT THEY

21   ARE SO I CAN LOOK AT THEM IN ADVANCE.

22        MS. GLAUSER:  OKAY.  THANK YOU VERY MUCH.

23        MR. REINES:  YOUR HONOR, IN TERMS OF THE GENERAL

24   PROTOCOL, IF WE HAVE ISSUES WE WILL TRY TO MINIMIZE THEM.  I

25   THINK WE DID A REASONABLY GOOD JOB TODAY.
```

1      WE ALERT YOU AT 8:15 AND THEN WE HAVE FIFTEEN MINUTES.  WE

2    HAVE TO BE CONCISE, BUT WE CAN DO IT THEN.

3          **THE COURT:**  YES.

4          **MR. REINES:**  OKAY.  THANK YOU.

5          **THE COURT:**  IF YOU KNOW THE DAY BEFORE, THAT'S EVEN

6    BETTER.

7          **MR. REINES:**  EVEN BETTER.  OKAY.

8          **MS. GLAUSER:**  HOW WOULD YOUR HONOR LIKE TO HANDLE

9    OFFERS OF PROOF?  AT THE END OF THE DAY, AT THE BEGINNING OF

10   THE DAY OR AS THEY SQUEEZE IN?

11         **THE COURT:**  EITHER AT THE BEGINNING OR THE END.

12         **MS. GLAUSER:**  OKAY.  VERY WELL.

13         **THE COURT:**  OKAY.

14         (RECESS TAKEN AT 12:29; RESUMED AT 12:39 A.M.)

15         (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

16         **THE CLERK:**  REMAIN SEATED.  COME TO ORDER.  THIS

17   COURT IS BACK IN SESSION.

18         **THE COURT:**  YOU MAY PROCEED.

19         **MS. MEHTA:**  THANK YOU, YOUR HONOR.

20                      **<u>OPENING STATEMENT</u>**

21         **MS. MEHTA:**  GOOD AFTERNOON.

22      WE HEARD MR. ELLWANGER'S SIDE OF THE STORY ON BEHALF OF

23   DIGITAL REG.  NOW IT'S OUR TURN TO TELL YOU THE VIEW OF THE

24   FACTS AND THE SIDE OF THE STORY FROM ADOBE'S PERSPECTIVE.

25      BEFORE I DO THAT, I WANT TO DO TWO THINGS.  THE FIRST

1    THING IS TO THANK YOU FOR YOUR TIME AND YOUR SERVICE.  IT HAS

2    BEEN A LONG MORNING AND YOU HAVE A FEW DAYS AHEAD OF YOU OF

3    HEARING TESTIMONY AND SORTING THROUGH THE FACTS, AND WE KNOW

4    IT TAKES TIME AWAY FROM YOUR LIVES, BUT WE APPRECIATE IT

5    BECAUSE IT'S IMPORTANT.

6        THE SECOND THING I WANT TO DO IS JUST RE-INTRODUCE YOU TO

7    SOME OF THE FOLKS YOU MET BRIEFLY THIS MORNING AND WE ARE

8    GOING TO HEAR FROM.

9        FIRST, ME, I'M SONAL MEHTA.  I WILL BE REPRESENTING ADOBE

10   IN THE CASE AND YOU WILL BE SEEING ME FROM TIME TO TIME

11   THROUGHOUT THE TRIAL.  THEN THERE WILL BE MR. REINES.  YOU'RE

12   GOING TO SEE HIM.  MR. BEEBE, MR. PRADHAN.

13       AND THEN FROM ADOBE ITSELF IS MS. ROBINSON, WHO'S IN THE

14   LITIGATION DEPARTMENT OF ADOBE.  HER RESPONSIBILITY IS TO

15   MANAGE THIS CASE.  AND MR. BETLEM.  HE'S NOT A LAWYER.  HE'S A

16   SENIOR DIRECTOR AND A TECHNICAL PERSON.  HE'S A TECHNOLOGIST

17   AT ADOBE.  AND IT'S HIS JOB TO MANAGE THE PRODUCTS AND THE

18   ENGINEERING AND THE TECHNOLOGY OF ADOBE.  WE WILL BE TALKING

19   ABOUT HIM A BIT MORE IN A FEW MINUTES.

20       YOU HEARD FROM MR. ELLWANGER.  A TIME LINE, HE SHOWED YOU

21   THE PATENTS, HE TOLD YOU ABOUT MR. PATTERSON.  AS YOU HEAR THE

22   EVIDENCE IN THIS CASE, WHEN YOU THINK ABOUT ALL THOSE FACTS

23   AND TO PUT THEM IN CONTEXT, THAT'S YOUR JOB.  IT'S YOUR JOB TO

24   CONSIDER THE EVIDENCE AND TO PUT THEM IN CONTEXT.

25       AND WHEN YOU ARE DOING THAT, I WOULD ASK YOU TO THINK

1    ABOUT THE DIFFERENT TYPES OF PATENT CASES THAT THERE MIGHT BE.

2    SOMETIMES THERE'S PATENT CASES WHERE SOMEBODY COMES UP WITH

3    SOMETHING REALLY INNOVATIVE.  THEY START A COMPANY.  THEY PUT

4    PRODUCTS OUT THERE.  AND THEN SOMEONE COMES ONTO THE MARKET

5    AND STARTS COMPETING WITH THEM.  AND THERE'S A REAL QUESTION

6    AS TO WHETHER THAT COMPETITOR HAS ACTUALLY TAKEN THE INVENTION

7    OF THAT COMPANY.

8        THERE'S ALSO OTHER KINDS OF PATENT CASES.  THERE ARE

9    PATENT CASES WHERE SOMEONE GETS A PATENT, AND THEN THEY TRY TO

10   COMMERCIALIZE IT, THEY TRY TO PUT OUT A PRODUCT, BUT IT TURNS

11   OUT THERE'S NO MARKET FOR IT, THEY CAN'T GET ANYBODY TO

12   ACTUALLY BUY THE PRODUCT, AND THEN THEY ARE LEFT WITH A PATENT

13   AND THEY ARE TRYING TO FIGURE OUT WHAT TO DO TO ACTUALLY MAKE

14   MONEY.  AND WHAT THEY DECIDE TO DO IS TO SUE OTHER PEOPLE FOR

15   INFRINGEMENT SO THAT THEY CAN MAKE SOME MONEY ON THEIR PATENT.

16       AND AT THE END OF THIS CASE, AFTER YOU'VE HEARD ALL THE

17   EVIDENCE AND ALL THE TESTIMONY, I'D ASK YOU TO THINK ABOUT

18   WHICH ONE OF THOSE CASES IS THIS.  WHERE DOES THIS CASE FIT IN

19   THE SPECTRUM OF PATENT LITIGATION.

20       NOW, AS YOU DO THAT, YOU'RE GOING TO HEAR FROM A NUMBER OF

21   WITNESSES ON BEHALF OF BOTH PARTIES.  MR. ELLWANGER INTRODUCED

22   THE PRINCIPALS OF DIGITAL REG.  HE DIDN'T REALLY TALK ABOUT

23   THE COMPANY DIGITAL REG, SO I'M GOING TO START BY TALKING

24   ABOUT THE COMPANY.

25       DIGITAL REG WAS ACTUALLY FORMED IN 2007.  AND THAT'S THE

1    COMPANY THAT OWNS THE PATENTS IN THE CASE.  WHAT HE DIDN'T

2    MENTION IS THAT DIGITAL REG DOESN'T MAKE OR SELL ANY PRODUCTS.

3        THE EVIDENCE WILL SHOW THAT THEY HAVE NO BUSINESS ASIDE

4    FROM THE PATENTS AND SUING PEOPLE ON THE PATENTS.  AND THE

5    EVIDENCE WILL SHOW THEY DO NOT COMPETE WITH ADOBE IN THE

6    MARKETPLACE.

7        NOW, WHO ARE MR. FARLEY AND MR. VENTERS?  WE WILL HEAR

8    FROM THEM DIRECTLY.  I THINK WHAT YOU ARE GOING TO HEAR IS,

9    MR. FARLEY WAS A FUNDRAISER FOR DIGITAL REG.  HE'S NOT A

10   TECHNOLOGIST, HE'S NOT A TECHNICAL GUY.  HE'S NOT THE OWNER OR

11   THE INVENTOR OF THE PATENTS.  AND HE REALLY DOESN'T KNOW A LOT

12   ABOUT EVEN THE LICENSING OF THE LITIGATION OF THE PATENTS AT

13   THE END OF THE DAY.  HE'S THE MONEY GUY ESSENTIALLY.

14       AND THEN WE'RE GOING TO HEAR FROM MR. VENTERS.  AND

15   MR. VENTERS, HE'S THE MARKETING GUY.  NOT A TECHNOLOGIST, NOT

16   AN INVENTOR, DOESN'T KNOW ANYTHING ABOUT LICENSING OR

17   LITIGATION.  BUT THE ONE THING THAT YOU HEARD REPEATEDLY FROM

18   MR. ELLWANGER IS THAT YOU ARE GOING TO HEAR THROUGHOUT THE

19   TRIAL FROM MR. VENTERS ABOUT ALL OF THESE CONTACTS THAT

20   SUPPOSEDLY HAPPENED BETWEEN ADOBE AND DIGITAL REG.

21       I WANT YOU TO LISTEN CAREFULLY TO MR. VENTERS' TESTIMONY

22   AND REALLY THINK CRITICALLY ABOUT WHAT HE'S SAYING AND ABOUT

23   WHETHER THE EVIDENCE ACTUALLY BACKS UP WHAT HE'S SAYING.  AND

24   THEN AT THE END OF THE DAY YOU CAN JUDGE THE CREDIBILITY OF

25   MR. FARLEY AND MR. VENTERS.

OPENING STATEMENT – MEHTA

1        AND IN PARTICULAR, I WANT YOU TO THINK ABOUT THE TESTIMONY

2    THAT YOU HEAR FROM MR. VENTERS THAT THIS WHOLE TIME LINE THAT

3    THEY SHOWED YOU, ALL THESE CONTACTS THEY SAID THEY HAD WITH

4    ADOBE.  HE NOW SAYS, GOING BACK ALL THE WAY TO 2002, THAT

5    DIGITAL REG KNEW THAT ADOBE WAS INFRINGING, BUT THEY NEVER

6    SAID ANYTHING TO ADOBE.  NEVER SAID TO ADOBE, WE THINK YOU'RE

7    INFRINGING, WE THINK YOU NEED TO TAKE A LICENSE TO THESE

8    PATENTS BECAUSE YOU ARE INFRINGING.  THEY NEVER FOLLOWED UP

9    WITH A LAWSUIT.

10        IN FACT, IF YOU LOOK AT THE TIME LINE, THEY SAID THEY KNEW

11    IN 2002 TO 2004 THAT WE WERE INFRINGING, BUT THEY SAID

12    NOTHING.  DIDN'T GIVE US NOTICE OF INFRINGEMENT.  THEY DIDN'T

13    FILE A LAWSUIT.

14        THEY SAID THAT THEY CAME TO MEET WITH ADOBE IN 2004.  NOW,

15    BE CAREFUL, AGAIN, HERE WITH THE EVIDENCE AND LISTEN CLOSELY.

16    BECAUSE WHAT THE EVIDENCE WILL SHOW IS THAT MEETING IN 2004?

17    IT WASN'T WITH ADOBE ENGINEERS, IT WASN'T WITH TECHNICAL

18    PEOPLE, IT WAS WITH A SPECIFIC SUBSIDIARY OF ADOBE THAT WAS

19    INTENDED TO PROVIDE VENTURE CAPITAL FUNDING TO SMALL START-UP

20    COMPANIES.  THAT WAS WHO MR. VENTERS SAID HE MET WITH.

21        EVEN MR. VENTERS WILL ADMIT THAT AT THAT MEETING, THEY

22    DIDN'T GIVE ADOBE ANY NOTICE THAT THEY CLAIMED THAT ADOBE

23    INFRINGED, AND THEY DIDN'T FILE A LAWSUIT.

24        AGAIN, THEY SAY THEY MET WITH ADOBE LATER ON IN 2007,

25    2008, AND THEY ADMIT AND YOU WILL SEE TESTIMONY THAT ADOBE --

1    THAT THEY KNEW THAT ADOBE WAS INFRINGING.  THAT'S WHAT THEY

2    ARE SAYING NOW; THEY KNEW IN 2007, 2008, AGAIN, THAT THEY

3    THOUGHT ADOBE WAS INFRINGING.  AND, AGAIN, THERE WAS NO

4    LAWSUIT AND THERE WAS NO NOTICE OF INFRINGEMENT.

5        THEN, IN 2007, THEY SUED A BUNCH OF COMPANIES.  THEY SUED

6    MICROSOFT, AND THEY SUED SONY, AND THEY SUED APPLE, SUED A

7    BUNCH OF COMPANIES AND SAID, WE HAVE THIS IS PATENT, I'M THE

8    FUNDRAISER, I'M THE MARKETING GUY, WE ARE GOING TO START THIS

9    COMPANY, AND WE ARE GOING TO SUE PEOPLE ON THIS PATENT.

10       GUESS WHAT?  DIDN'T SUE ADOBE.

11       NOW, YOU MAY BE ASKING YOURSELVES, AND YOU HEARD

12   MR. ELLWANGER TALK ABOUT THIS A BIT.  MICROSOFT TOOK A

13   SETTLEMENT.  SONY TOOK A SETTLEMENT.  ALL THESE COMPANIES WERE

14   WILLING TO PAY THESE PEOPLE FOR THIS PATENT.

15       WHY WON'T ADOBE JUST PAY?  WHY ARE WE HERE?  WHY ARE WE

16   GOING THROUGH THIS WHOLE PROCESS?  WHY ARE WE TAKING YOU AWAY

17   FROM YOUR LIVES?  THERE'S A SIMPLE REASON FOR THAT.  ADOBE

18   DOESN'T INFRINGE.

19       AND WHILE MICROSOFT AND SONY AND OTHER PEOPLE MIGHT BE

20   WILLING TO PAY SMALL AMOUNTS TO AVOID HAVING TO GO THROUGH THE

21   TROUBLE OF ALL OF THIS, TO PAY FOR THE LAWYERS, AND ALL OF THE

22   WORK THAT HAS TO GO INTO DEFENDING THEMSELVES, ADOBE HAS SAID,

23   ENOUGH.

24       THE EVIDENCE WILL SHOW THAT ADOBE USED TO PAY THOSE KINDS

25   OF SETTLEMENTS WHEN PEOPLE WOULD HAVE PATENTS AND WOULD TRY TO

1    MAKE MONEY FROM THEM, AND WOULD COME KNOCKING ON THE DOOR AND

2    SAY, HEY, WE HAVE A PATENT.  WE WANT YOU TO PAY US TO MAKE US

3    GO AWAY.  ADOBE USED TO SETTLE THOSE CASES.

4       BUT HERE'S THE PROBLEM.  SOMEONE COMES KNOCKS ON YOUR

5    DOOR, ASKS YOU TO PAY THEM A LITTLE BIT TO MAKE YOU GO AWAY,

6    AND YOU PAY THEM, THEN SOMEONE ELSE COMES KNOCKS ON YOUR DOOR

7    AND THEN SOMEONE ELSE COMES AND KNOCKS ON YOUR DOOR.

8       SO ADOBE HAS SAID, THAT'S IT.  THAT'S ENOUGH.  WHEN WE

9    DON'T INFRINGE, WHEN WE HAVEN'T DONE ANYTHING WRONG, WHEN THE

10   PATENT'S NOT VALID, WE ARE NOT JUST GOING TO WRITE YOU A CHECK

11   TO MAKE IT GO AWAY.  EVEN IF IT MEANS THAT WE HAVE TO PAY TO

12   LITIGATE A CASE, AND EVEN IF IT MEANS THAT WE HAVE TO TAKE

13   SENIOR DIRECTORS OF ADOBE AWAY FROM THEIR JOB TO COME AND

14   PARTICIPATE IN A TRIAL, ADOBE HAS MADE THE DECISION THAT IT'S

15   GOING TO AVAIL ITSELF OF THE JUSTICE SYSTEM TO LET YOU DECIDE

16   WHETHER WE SHOULD HAVE TO PAY PEOPLE TO MAKE THEM GO AWAY WHEN

17   WE DON'T INFRINGE AND WHERE THEY HAVEN'T REALLY INVENTED

18   ANYTHING.

19      SO AT THE END OF ALL THE EVIDENCE, I WILL ASK YOU TO

20   REALLY THINK ABOUT WHETHER THE EVIDENCE HAS SHOWN THAT ADOBE

21   HAS, IN FACT, INFRINGED AND WHETHER, IN FACT, MR. PATTERSON

22   INVENTED ANYTHING.  AND I THINK WHAT YOU WILL SEE IS THAT THE

23   ANSWER TO THOSE TWO QUESTIONS IS ADOBE HASN'T DONE ANYTHING

24   WRONG AND ADOBE SHOULDN'T HAVE TO PAY WHEN IT DOESN'T

25   INFRINGE.

```
1         NOW, I WANT TO TALK A LITTLE BIT ABOUT THE ADOBE FOLKS

2    THAT YOU ARE GOING TO HEAR.  THE ADOBE FOLKS THAT YOU ARE

3    GOING TO HEAR FROM INCLUDE MR. BETLEM.  AND WHAT THESE

4    WITNESSES ARE GOING TO TALK TO YOU ABOUT IS THEY'RE GOING TO

5    TALK TO YOU ABOUT ADOBE AND ITS HISTORY OF INNOVATION AND

6    ENGINEERING.

7         ADOBE HAS OVER 12,000 EMPLOYEES.  HUNDREDS AND HUNDREDS OF

8    THOSE PEOPLE ARE ENGINEERS.  ADOBE HAS THOUSANDS OF GAME

9    BALLS.  IF A PATENT IS A GAME BALL, WE HAVE THOUSANDS OF THEM,

10   AND WE VALUE THEM AND WE RESPECT THEM BECAUSE THEY REPRESENT

11   THE HARD WORK AND THE INNOVATION OF THE THOUSANDS OF ENGINEERS

12   THAT WORK AT ADOBE.  AND THAT HARD WORK AND THAT INNOVATION

13   HAS LED TO THE TYPES OF PRODUCTS THAT ALL OF YOU HAVE, OR MANY

14   OF YOU HAVE DEALT WITH ON A DAY-TO-DAY BASIS, INCLUDING

15   ACROBAT AND FLASH AND PHOTOSHOP.

16        NOW, ONE THING YOU DIDN'T HEAR FROM MR. ELLWANGER WAS

17   WHAT'S THE TECHNOLOGY THAT IS ACTUALLY AT ISSUE IN THIS CASE.

18   IT'S NOT FLASH OR PHOTOSHOP OR ACROBAT IN THE WAY THAT YOU USE

19   IT OR I USE IT ON MY COMPUTER.  IT'S ABOUT THE DRM OR

20   ACTIVATION TECHNOLOGY THAT JUST GOES AROUND SOME OF THOSE

21   PRODUCTS.  IT'S ABOUT A PRODUCT CALLED LIVECYCLE.  AND IN

22   PARTICULAR, THE LIVECYCLE MANAGEMENT SERVER, NOT EVEN THE

23   WHOLE LIVECYCLE PRODUCT.

24        WHEN YOU HEARD FROM THE JUDGE ABOUT FLASH, IT'S NOT ABOUT

25   THE FLASH PLAYER THAT YOU SEE ON YOUR COMPUTER SCREEN.  IT'S
```

1    ABOUT A FLASH ACCESS SERVER.  AND IT'S ABOUT SOMETHING CALLED

2    SOFTWARE ACTIVATION OR PRODUCT THAT WE'RE GOING TO TALK ABOUT

3    AT THE TRIAL IS ALM.

4        IT'S PROBABLY SOMETHING NONE OF YOU HAVE EVER HEARD OF.  I

5    HAD NEVER HEARD OF IT BEFORE THE CASE.  IT'S NOT ABOUT

6    PHOTOSHOP AND ABOUT EDITING PHOTOS, IT'S NOT ABOUT ACROBAT AND

7    CREATING OR MANIPULATING PDF'S.  AND IT'S NOT ABOUT FLASH AND

8    PLAYING VIDEOS OR MOVIE CLIPS.  IT'S ABOUT UNDERLYING BACK-END

9    TECHNOLOGY.

10       NOW, WHAT MR. BETLEM IS GOING TO BE ABLE TO TELL YOU ABOUT

11   IS WHAT ADOBE HAS DONE TO DEVELOP SOME OF THESE PRODUCTS.

12   HE'S A SENIOR DIRECTOR OF THE COMPANY.  HE ACTUALLY STARTED A

13   COMPANY CALLED MACROMEDIA IN 2000.  AND MACROMEDIA IS THE

14   COMPANY THAT DEVELOPED FLASH, WHICH ADOBE LATER ACQUIRED.

15       AND AS HE HAS BEEN AT ADOBE, MR. BETLEM HAS HAD A PRETTY

16   IMPORTANT AND PRETTY UNIQUE ROLE AS A SENIOR MEMBER OF AN

17   ENGINEERING COUNCIL, WHICH IS A COUNCIL OF JUST 20 OR SO

18   PEOPLE AT THE COMPANY WHO ARE FOCUSED ON AND ARE RESPONSIBLE

19   FOR SETTING THE STRATEGIC VIEW OF THE TECHNOLOGY, SETTING THE

20   PLANS OF HOW THE TECHNOLOGY IS GOING TO DEVELOP, AND

21   SUPPORTING THE INNOVATION AND THE ENGINEERING TEAMS.

22       HE'S GOING TO COME TALK TO YOU ABOUT HOW ADOBE DEVELOPS

23   ITS PRODUCTS.  AND HE'S GOING TO TELL YOU ABOUT ADOBE'S

24   PATENTS AND ABOUT ADOBE'S COMMITMENT TO INNOVATION AND ITS

25   RESPECT FOR INTELLECTUAL PROPERTY.

```
 1          YOU'RE ALSO GOING TO HEAR FROM JONATHAN HERBACH.  JONATHAN
 2     HERBACH WAS OR IS AN ENGINEER WHO HAS BEEN AT ADOBE SINCE
 3     2001.  HE ACTUALLY STARTED AT ADOBE RIGHT OUT OF COLLEGE AND
 4     HE WAS PART OF A SPECIAL RESEARCH TEAM AT THE COMPANY.  AND
 5     THE COMPANY PAID FOR HIM TO GO TO STANFORD AND GET HIS MASTERS
 6     WHILE HE WAS WORKING AT ADOBE.  AND HE IS THE PERSON THAT YOU
 7     ARE GOING TO HEAR FROM TALKING ABOUT THE LIVECYCLE PRODUCT.
 8     THAT'S ONE OF THE THREE PRODUCTS.
 9          WHAT'S PARTICULARLY INTERESTING ABOUT MR. HERBACH AND THE
10     THING I WANT YOU TO LISTEN TO ABOUT MR. HERBACH IS WHEN DID
11     ADOBE START DEVELOPING THE LIVECYCLE PRODUCT, ONE OF THE
12     PRODUCTS THAT'S BEING ACCUSED NOW?
13          MR. ELLWANGER TOLD YOU THAT DIGITAL REG CAME TO ADOBE IN
14     2004, AND THAT'S WHEN ADOBE SUDDENLY KNEW ABOUT THESE PATENTS
15     AND STARTED DOING WHATEVER IT WAS DOING THAT THEY THINK MAKES
16     ADOBE'S INFRINGEMENT WILLFUL.  WHAT MR. HERBACH IS GOING TO
17     TELL YOU IS THEY HAD ALREADY DEVELOPED THE LIVECYCLE PRODUCT
18     STARTING IN 2002, AND IT WAS RELEASED IN 2003.
19          SO BEFORE MR. VENTERS EVER CAME KNOCKING ON ADOBE
20     VENTURES' DOOR LOOKING FOR MONEY, ADOBE HAD ALREADY DEVELOPED
21     AND PUT OUT THE VERY PRODUCT THAT'S NOW BEING ACCUSED OF
22     INFRINGEMENT.
23          SO, AGAIN, MR. ELLWANGER SAID, WELL, HE WANTS YOU TO
24     LISTEN TO WHAT PEOPLE KNEW AND WHEN THEY KNEW IT.  SO DO WE.
25     WE WANT YOU TO LISTEN TO WHAT PEOPLE KNEW AND WHEN THEY KNEW
```

1    IT.  AND WHAT MR. HERBACH IS GOING TO TELL YOU IS ADOBE WAS

2    ALREADY DOING THE DRM THAT THEY'RE BEING ACCUSED OF NOW BACK

3    BEFORE MR. VENTERS EVEN CAME KNOCKING ON THE DOOR.

4        NOW YOU'RE ALSO GOING TO HEAR FROM MR. JOSEPH JONES.

5    MR. JONES ACTUALLY RECENTLY MOVED OUT OF STATE, SO HE'S NOT

6    GOING TO BE HERE IN PERSON, WHICH WE APOLOGIZE FOR, BUT YOU

7    WILL BE ABLE TO SEE HIS TESTIMONY BY VIDEO.  AND HE'S GOING TO

8    TALK TO YOU A LITTLE BIT ABOUT THE FLASH PLATFORM, HOW IT WAS

9    DEVELOPED, HOW IT WORKS.

10       THOSE ARE QUESTIONS THAT YOU DIDN'T HEAR ANYTHING FROM

11   MR. ELLWANGER ON.  MR. ELLWANGER DIDN'T TALK ABOUT HOW THE

12   ADOBE PRODUCTS WORK AT ALL.  WELL, MR. JONES IS GOING TO TELL

13   YOU HOW THEY WORK JUST AS MR. HERBACH AND MR. BETLEM WILL.

14       AND THEN WHEN YOU TAKE THAT EVIDENCE AND YOU CONSIDER IT

15   AGAINST THE PATENT CLAIMS, THAT'S WHERE WE'D ASK YOU TO REALLY

16   THINK HARD ABOUT WHETHER THE EVIDENCE LINES UP WITH THE STORY

17   THAT THEY ARE TELLING YOU.

18       NOW, YOU HEARD REFERENCE TO SOME OF THESE EXPERTS THAT ARE

19   GOING TO BE TESTIFYING.  ONE OF THE THINGS THAT BOTH SIDES

20   HAVE DONE IS THEY HAVE ASKED SOMEBODY WITH SOME EXPERTISE IN

21   COMPUTER SCIENCE TO COME AND REALLY ANALYZE THE EVIDENCE, THE

22   TECHNOLOGY, AND REALLY TRY TO HELP PACKAGE THAT UP SO THAT IT

23   CAN BE PRESENTED TO ALL OF YOU IN A WAY THAT'S EFFICIENT.

24       SO WE'VE ASKED DR. WICKER, PROFESSOR WICKER TO DO THAT, TO

25   REALLY LOOK AT THE ADOBE PRODUCTS AND LOOK AT THE PRIOR ART,

OPENING STATEMENT – MEHTA

1    AND FIGURE OUT WHETHER THE ADOBE PRODUCTS WORKS THE SAME WAY

2    AS WHAT DIGITAL REG'S PATENTS CLAIM, AND ALSO THINK ABOUT

3    WHETHER DIGITAL REG AND MR. PATTERSON REALLY WERE FIRST AS

4    DIGITAL REG ASKED.

5        DR. WICKER, AND YOU ARE GOING TO HEAR A LOT FROM

6    DR. WICKER, DR. WICKER IS A PROFESSOR AT CORNELL.  HE'S ON THE

7    AIR FORCE SCIENTIFIC ADVISORY BOARD.  HE'S A PRINCIPAL

8    INVESTIGATOR FOR A FOUNDATION FOR THE NATIONAL SCIENCE

9    FOUNDATION.  HE'S INCREDIBLY EXPERIENCED IN THIS FIELD.

10        AND WHAT HE DOES -- DID WAS HE STUDIED ALL THE DOCUMENTS

11    AND ALL THE MATERIALS.  HE TALKED TO PEOPLE AT ADOBE.  HE

12    LOOKED AT EVERYTHING THAT DIGITAL REG'S EXPERT LOOKED AT, AND

13    HE DID AN ANALYSIS, AND HE CAME TO THE CONCLUSION.  AND I WILL

14    EXPLAIN WHY HE CAME TO THAT CONCLUSION IN JUST A BIT, BUT HE

15    CAME TO THE CONCLUSION THAT ADOBE DOESN'T INFRINGE THESE

16    PATENTS.  AND ACTUALLY, IT TURNS OUT, THAT THERE WAS SOMEBODY

17    ELSE THAT WAS WORKING IN THE FIELD OF DIGITAL REG'S MANAGEMENT

18    THAT HAPPENED TO HAVE COME UP WITH THE SAME SOLUTION WELL

19    BEFORE MR. PATTERSON.

20        THAT PERSON IS JONATHAN SCHULL.  YOU ARE GOING TO HEAR

21    FROM DR. SCHULL.  DR. SCHULL ACTUALLY IS A BIOTECHNOLOGIST.

22    AND IN THE EARLY '90S, HE WAS WORKING ON SOMETHING IN HIS LAB

23    AND THOUGHT, HEY, WOULDN'T IT BE INTERESTING IF I COULD COME

24    UP WITH A WAY TO TAKE ELECTRONIC CONTENT AND PUT A SPECIFIC

25    PROTECTION MECHANISM AROUND IT SO I CAN DISTRIBUTE IT TO

1    PEOPLE.

2         THIS WAS YEARS BEFORE MR. PATTERSON CLAIMS TO HAVE COME UP

3    WITH THIS IDEA.  AND MR. SCHULL OR DR. SCHULL IS GOING TO TELL

4    YOU ABOUT HOW HE CAME UP WITH THIS IDEA, HOW HE GOT HIS

5    PATENTS ON HIS IDEA, AND HOW HE DEVELOPED A PRODUCT ON HIS

6    IDEA, AND HOW HE DID THAT BEFORE MR. PATTERSON THOUGHT OF THE

7    INVENTIONS THAT HE'S CLAIMING, GOT HIS PATENT, OR DIGITAL REG

8    AND MR. FARLEY AND MR. VENTERS DECIDED THEY WANTED TO TRY TO

9    MAKE MONEY FROM THOSE PATENTS.

10        AND YOU WILL BE TASKED WITH THINKING ABOUT DR. SCHULL'S

11   TESTIMONY AND THE TIME LINE, AND FIGURING OUT WHEN PEOPLE KNEW

12   IT OR WHAT THEY KNEW AND WHEN THEY KNEW IT.  WHEN DID

13   DR. SCHULL COME UP WITH THIS INVENTION AND WHEN DID HE KNOW

14   IT?

15        NOW, AFTER YOU HEAR ALL OF THAT EVIDENCE AND ALL THAT

16   TESTIMONY, THERE ARE REALLY TWO BASIC ISSUES THAT ARE GOING TO

17   BE PUT TO YOU.  THE FIRST ONE IS, DO ADOBE'S PRODUCTS WORK

18   IDENTICALLY TO WHAT'S CLAIMED IN THE PATENTS?  AND THE SECOND

19   ONE IS, DID DR. SCHULL COME UP WITH IT FIRST, SUCH THAT HIS

20   WORK INVALIDATES THE PATENTS?

21        I'M GOING TO TALK TO YOU ABOUT THE FIRST QUESTION FIRST

22   AND THEN WE'LL GO TO THE SECOND QUESTION.

23        ON THE FIRST QUESTION, THIS IS THE CLAIM OF THE '541

24   PATENT THAT WE ARE GOING TO BE FOCUSED ON.  YOU ARE GOING TO

25   SEE THIS A LOT.  IT'S CLAIM 1.  I'M SORRY.  YOU ARE GOING TO

1    SEE IT SO MUCH YOU ARE GOING TO BE SICK OF IT.  BUT IT'S

2    IMPORTANT BECAUSE PATENT CASES AREN'T ABOUT WHETHER SOMEBODY

3    SAYS THEY THOUGHT OF SOMETHING IN AN ABSTRACT WAY OR WHETHER

4    THE PATENT IS THE GAME DAY BASEBALL, OR ANY OF THAT.  THEY ARE

5    ABOUT THE CLAIMS.  AND THE JUDGE IS GOING TO INSTRUCT YOU THAT

6    THE CLAIMS DEFINE WHAT IT IS THAT DIGITAL REG OWNS.

7        MR. ELLWANGER DID NOT SHOW YOU THE CLAIMS OF THE PATENT AT

8    ALL.  HE CAME UP HERE AND HE TALKED TO YOU OVER AND OVER AND

9    OVER AGAIN ABOUT THE TIME LINE AND GOING TO A'S GAMES WHEN HE

10   WAS A KID, AND ALL OF THAT.  BUT THE PATENT CLAIM, THE THING

11   THAT THEY HAVE TO PROVE THAT ADOBE INFRINGED, HE DIDN'T EVEN

12   MENTION IT.

13       WELL, I'M GOING TO ASK YOU TO THINK ABOUT IT.  AND WE ARE

14   GOING TO REMIND YOU OF IT A LOT OVER THE COMING DAYS BECAUSE

15   IT IS THE TOUCHSTONE FOR THE WORK THAT YOU'RE GOING TO BE

16   DOING.

17       AND WHAT WE THINK THAT YOU'RE GOING TO FIND WHEN THE

18   EVIDENCE IS IN IS THAT THE EVIDENCE SHOWS THAT THIS CLAIM AND

19   THE OTHER CLAIMS THAT THEY SAY ADOBE INFRINGES, WE ARE NOT THE

20   SAME AS THOSE CLAIMS.  IN FACT, ADOBE'S PRODUCTS ARE

21   FUNDAMENTALLY DIFFERENT IN KEY WAYS.  WE ARE NOT IDENTICAL TO

22   THE CLAIMS.  AND THAT'S THE QUESTION THAT YOU HAVE TO ASK

23   YOURSELVES WHEN YOU HEAR THE EVIDENCE COME IN.

24       SO LET'S TALK A LITTLE BIT ABOUT WHY -- I'M GOING TO GO

25   THROUGH THIS QUICKLY BECAUSE YOU ARE GOING TO HEAR A LOT ABOUT

1    THIS FROM PEOPLE WITH A BIT MORE EXPERTISE IN COMPUTER SCIENCE

2    THAN ME, SO WHAT I'M GOING TO DO IS TRY TO GIVE YOU A

3    HIGH-LEVEL OVERVIEW.

4        THERE ARE REALLY TWO THINGS THAT MAKE THE ADOBE SYSTEM

5    DIFFERENT FROM WHAT'S BEING CLAIMED IN MR. PATTERSON'S '541

6    PATENT.  THOSE TWO THINGS ARE THE REQUIREMENTS THAT YOU HAVE A

7    "YES", A "NO" TOKEN AND, SECONDLY, THAT THE TOKEN, IF YOU GET

8    A "YES", LEADS THE COMPUTER TO GENERATING A PERMISSION.

9        NOW, WHAT DOES ALL THAT MEAN?  TOKEN, PERMISSION, ALL OF

10   THAT.  SO WHAT WE HAVE DONE IS -- WHAT WE HAVE ACTUALLY DONE

11   IS TRY TO CREATE SOME GRAPHICS FOR HOW THIS ALL WORKS.  SO I

12   AM GOING TO TRY TO USE THE GRAPHICS TO MAKE IT A LITTLE BIT

13   EASIER TO FOLLOW, ESPECIALLY TODAY ON DAY ONE.

14       SO THE CLAIM REQUIRES A TOKEN.  AND WHAT THE PATENT SAYS,

15   AND YOU'RE GOING TO SEE EVIDENCE OF THIS, IS THE TOKEN HAS A

16   "YES", "NO" IDENTIFIER IN THE FIRST BIT, AND THEN IT'S GOING

17   TO HAVE 127 DUMMY BITS OR GARBAGE BITS.  THAT'S WHAT THE

18   PATENT IS CLAIMING AS THE TOKEN.

19       WHAT ADOBE HAS IS NOT A "YES" OR "NO" INDICATOR WITH 127

20   DUMMY BITS.  WHAT ADOBE SENDS IS A COMPLEX FILE WITH THOUSANDS

21   AND THOUSANDS OF BITS OF DATA THAT INCLUDE ENCRYPTED POLICIES,

22   AND LICENSES, AND DOCUMENT KEYS, AND OTHER INFORMATION THAT

23   ALLOWS THE ADOBE SYSTEMS TO WORK.

24       AND SO WHAT YOU ARE GOING TO FIND IS THAT THE EVIDENCE

25   WILL SHOW THAT THE THING THAT THEY SAY IS SOMEHOW A "YES",

1    "NO" IDENTIFIER IS, IN FACT, NOT "YES" OR "NO" AND IS VERY,

2    VERY COMPLICATED INFORMATION.

3        YOU ARE PROBABLY ASKING YOURSELVES WHY DOES THIS MATTER?

4    IT'S A SUCH A MINOR DIFFERENCE.  WELL, IT MATTERS A LOT.  IT

5    MATTERS BECAUSE THEY CLAIMED A SPECIFIC THING, AND THAT'S WHAT

6    THE PATENT OFFICE TOLD THEM THEY COULD HAVE, AND THEY CAN'T

7    NOW KNOCK ON SOMEONE'S DOOR AND ASK FOR MONEY IF THAT PERSON

8    IS DOING SOMETHING DIFFERENT.  THAT'S NOT THE WAY PATENTS

9    WORK.

10       SO THERE'S GOING TO BE A LOT OF TECHNICAL DETAIL AND

11   THERE'S GOING TO BE A LOT OF TESTIMONY ABOUT SOURCE CODE AND

12   DOCUMENTS AND KEYS, AND ALL OF THAT.  BUT IT'S IMPORTANT

13   BECAUSE THOSE DETAILS ARE WHAT MATTER.

14       WE ARE ASKING YOU TO LOOK UNDER THE COVERS AND LOOK AT

15   THOSE DETAILS AND THINK ABOUT WHETHER THOSE DETAILS REALLY

16   ESTABLISH THAT THE ADOBE PRODUCTS WORK IDENTICALLY TO THE

17   PATENT CLAIMS.

18       NOW, I TOLD YOU THERE'S A SECOND REASON ADOBE PRODUCTS

19   DON'T MEET THE LIMITATIONS OF THE CLAIM.  THE SECOND ONE IS

20   THAT IN THE PATENT YOU HAVE THIS CONCEPT OF A PERMISSION.

21   BASICALLY A PERMISSION IS THE THING THAT'S GOING TO LET A USER

22   ACCESS THAT CONTENT, IT'S THE CONTENT THAT'S IN THE ENVELOPE

23   THAT MR. ELLWANGER WAS TALKING ABOUT.

24       HERE'S THE THING.  IN THE PATENT AND IN THE SYSTEM THAT

25   DIGITAL REG SAYS MR. PATTERSON INVENTED, THIS PERMISSION IS

1    SUPPOSED TO BE CREATED AT THE USER'S COMPUTER.  THAT'S A

2    REALLY IMPORTANT REQUIREMENT OF THE PATENT.  IN FACT, IF YOU

3    LOOK AT THE PATENT, IT SAYS SPECIFICALLY IN THE CLAIM, THE

4    THING THAT DEFINES THEIR INVENTION AND WHAT THEY CAN ASK FOR

5    DAMAGES FOR, AND THE THING THAT WOULD BE REQUIRED FOR ADOBE TO

6    INFRINGE, IT SAYS THAT THIS PERMISSION IS GENERATED AT THE

7    CLIENT.  THAT'S THE USER'S COMPUTER IN THEIR HOME OR THEIR

8    OFFICE.

9        AND WHAT THE PARTIES AGREED WAS THAT THIS REQUIRES THAT

10   THE PERMISSION BE GENERATED LOCALLY, AGAIN, AT THE USER'S

11   COMPUTER IN THEIR HOME OR THEIR OFFICE.

12       AND THIS ISN'T JUST SOME MINOR DIFFERENCE.  AGAIN, THIS IS

13   AN IMPORTANT TECHNICAL DIFFERENCE.

14       AND THE REASON IS BECAUSE, AND THE EVIDENCE WILL SHOW

15   THIS, WHEN MR. PATTERSON WAS TRYING TO GET HIS PATENT ISSUED,

16   THE PATENT OFFICE ACTUALLY SAID, HOLD ON A SECOND.  THERE'S

17   OTHER PEOPLE THAT ARE ALREADY DOING WHAT YOU ARE DOING, YOU

18   CAN'T HAVE THE PATENT.

19       AND IN ORDER TO GET THE PATENT ALLOWED, IN ORDER TO HAVE

20   THAT PATENT THAT MR. ELLWANGER WAVED IN FRONT OF YOU,

21   MR. PATTERSON HAD TO SAY WE ARE DIFFERENT THAN EVERYONE BEFORE

22   US BECAUSE WE CREATE THIS PERMISSION AT THE CLIENT.  AND WHAT

23   ALL THOSE OTHER PEOPLE DO IS THEY CREATE IT AT A CENTRAL

24   COMPUTER OR SERVER.

25       SO THIS REQUIREMENT, WHICH YOU ARE GOING TO HEAR A LOT

1    ABOUT, IT WAS THE REQUIREMENT THAT ALLOWED MR. PATTERSON TO

2    GET THE PATENT TO BEGIN WITH.  AND ADOBE DOESN'T MEET IT.

3        NOW, WHAT YOU ARE GOING TO HEAR FROM THE WITNESSES IN THIS

4    CASE ARE EXAMPLES OF HOW THE PATENT WORKS AND EXAMPLES OF HOW

5    ADOBE'S PRODUCTS WORKS, AND HOW THOSE EXAMPLES MAP TO THE

6    REQUIREMENTS OF THE CLAIMS THAT I JUST SHOWED YOU.

7        WHAT I'M GOING TO DO IS I'M ACTUALLY GOING TO RUN THROUGH

8    AND SHOW YOU REALLY QUICKLY HOW THE PATENTED SYSTEM WORKS AND

9    THEN HOW ADOBE'S SYSTEM WORKS, AND HOW THEY ARE DIFFERENT.

10   AND THEN AS THE EVIDENCE COMES IN, I WANT YOU TO BE THINKING

11   ABOUT THAT FRAMEWORK AND THINKING ABOUT WHETHER OR NOT THE

12   ADOBE SYSTEM IS ACTUALLY IDENTICAL TO THE SYSTEM, OR WHETHER

13   IT TURNS OUT THAT ADOBE IS DIFFERENT FROM THE PATENT IN

14   EXACTLY THE WAY THEY SAID COULDN'T BE DIFFERENT OTHERWISE THEY

15   WOULDN'T HAVE GOTTEN THE PATENT AT ALL.

16       HERE IS HOW THE ADOBE SYSTEM WORKS.  THIS IS A CLIENT

17   COMPUTER.  THIS WAS BACK IN 1996, 1997, 1998, SO IT'S A LITTLE

18   OLDER COMPUTER, AND YOU WANT TO ACCESS SOME SOFTWARE.  THE

19   SOFTWARE IS LOCKED.  YOU CAN'T ACCESS IT.

20       SO WHAT MR. PATTERSON'S PATENT SAYS IS, I AM GOING TO

21   PAY -- I'M GOING TO ASK THE PERSON TO PAY FOR ACCESS TO THE

22   SOFTWARE.  AND WHEN YOU PAY FOR ACCESS TO THE SOFTWARE, WHAT'S

23   GOING TO HAPPEN IS YOUR PAYMENT IS GOING TO GO OVER THE

24   INTERNET.  AND AS THAT PAYMENT GOES OVER TO THE INTERNET, IT'S

25   GOING TO ARRIVE AT THE SERVER.  AND WHAT THE SERVER IS GOING

1   TO DO IS IT'S GOING TO SAY, OKAY, WE HAVE GOTTEN MONEY NOW, WE

2   HAVE GOTTEN YOUR PAYMENT, WE ARE GOING TO GIVE YOU

3   AUTHORIZATION TO USE THIS SOFTWARE.  WE ARE GOING TO GIVE YOU

4   A "YES" IN THAT "YES", "NO" TOKEN.  SO YOU GET A "YES".  AND

5   THE "YES" GOES FROM THE SERVER TO THE CLIENT COMPUTER TO YOUR

6   COMPUTER AT YOUR HOME OR YOUR OFFICE, AND IT LOCKS IT THERE.

7   AND IT SAYS, OKAY, I HAVE A "YES", NOW I HAVE PERMISSION TO

8   ACTUALLY USE THE SOFTWARE.

9        AND THE WAY IT KNOWS THAT YOU HAVE PERMISSION IS, WHEN YOU

10   GET THAT TOKEN, THE LOCAL COMPUTER AT YOUR HOME OR YOUR OFFICE

11   GOES THROUGH THE WORK TO ACTUALLY GENERATE A PERMISSION.  IT'S

12   CREATING THAT PERMISSION LOCALLY AT YOUR HOME OR YOUR OFFICE

13   COMPUTER.  AND IT'S THAT PERMISSION THAT ACTUALLY LETS YOU GET

14   ACCESS TO THE SOFTWARE.

15        AND THAT'S THE THING THEY TOLD THE PATENT OFFICE MADE THEM

16   DIFFERENT.  AND THAT'S THE THING THE PATENT OFFICE FOUND WAS

17   DIFFERENT SUCH THAT THEY COULD GET THE PATENT.

18        WHEN YOU LOOK AT THE ADOBE SYSTEMS, THEY WORK VERY

19   DIFFERENTLY.  THE WAY THE ADOBE SYSTEMS WORK IS YOU WANT TO

20   ACCESS SOFTWARE.  YOU ARE GOING TO COLLECT SOME INFORMATION.

21   IT'S GOING TO SEND THAT INFORMATION TO THE SERVERS BACK AT

22   ADOBE.  AND WHEN IT GETS THERE, THAT WORK OF FIGURING OUT

23   WHETHER YOU HAVE PERMISSION?  THAT HAPPENS AT THE SERVER JUST

24   THE WAY IT HAPPENED IN THE PRIOR ART AND THE WAY THAT THEY

25   SAID IT DIDN'T HAPPEN IN THE PATTERSON PATENT.

OPENING STATEMENT – MEHTA

1        IT HAPPENS AT THE SERVER.  WHAT THE SERVER DOES, IT TAKES

2    THIS INFORMATION, IT GIVES YOU A KEY, AND THEN THAT KEY GOES

3    BACK TO YOUR COMPUTER AT YOUR HOME OR YOUR OFFICE, AND THAT

4    KEY JUST GETS STORED AT YOUR COMPUTER.  AND WHEN IT GETS

5    STORED, YOU HAVE ACCESS TO THE SOFTWARE.

6        SO WHEN ALL THE EVIDENCE IS IN, I'M GOING TO ASK YOU TO

7    CONSIDER THE TESTIMONY OF DR. WICKER ABOUT HOW THE PRODUCTS

8    WORK.  AND WE ARE GOING TO ASK YOU TO CONSIDER THE TESTIMONY

9    OF DIGITAL REG'S EXPERT ON HOW THE PRODUCTS WORK.

10       AND WHAT YOU'RE GOING TO FIND IS THAT EVEN DIGITAL REG'S

11   EXPERT AGREES THAT THIS IS A DIFFERENCE BETWEEN THE PATENTS

12   AND THE PRODUCTS.  HE -- THEY SAID HE STUDIED THOUSANDS OF

13   LINES OF SOURCE CODE AND DOCUMENTS, AND ALL OF THAT, AND AT

14   THE END OF THE DAY, AFTER DOING ALL OF THAT WORK TO STUDY

15   ADOBE'S PRODUCTS, WHAT DIGITAL REG'S EXPERT FOUND WAS THAT THE

16   KEY THAT HAS TO BE GENERATED AT THE CLIENT COMPUTER TO MEET

17   THE PATENT CLAIMS IS NOT GENERATED THERE.  THAT LIMITATION IS

18   NOT MET.

19       AND WHEN ALL THE EVIDENCE IS IN, WE WILL ASK YOU TO FIND

20   THAT THAT DIFFERENCE MEANS THAT ADOBE'S PRODUCTS ARE NOT

21   IDENTICAL TO THE PATENT CLAIMS, AND THAT ADOBE DOESN'T

22   INFRINGE.

23       WHILE IT MIGHT BE CONVENIENT FOR ADOBE TO WRITE THEM A

24   CHECK, LIKE MICROSOFT OR SONY OR SOME OF THESE OTHER PEOPLE

25   DID, JUST SO THEY DIDN'T HAVE TO GO THROUGH THE TROUBLE OF THE

1    TRIAL, THE MONEY THAT'S ASSOCIATED WITH LITIGATION,

2    DISTRACTING PEOPLE LIKE MR. BETLEM FROM THEIR JOBS, THAT ADOBE

3    SHOULDN'T HAVE TO PAY WHEN IT DOESN'T INFRINGE.

4        NOW, THE '670 PATENT, I'M NOT GOING TO GO THROUGH IT IN

5    DETAIL.  THERE'S A NUMBER OF LIMITATIONS FOR THIS PATENT.  AND

6    WHAT WE'D ASK YOU TO DO IS, AGAIN, LISTEN CAREFULLY TO THE

7    EVIDENCE ON THE '670 PATENT.  LISTEN TO DR. WICKER.  LISTEN TO

8    ADOBE'S ENGINEERS.  LISTEN EVEN TO DR. DEVANBU, AND CONSIDER

9    WHETHER OR NOT THEY HAVE PROVEN THAT THE ADOBE PRODUCTS ARE

10   IDENTICAL.

11       WE THINK THE EVIDENCE WILL SHOW, JUST AS WITH THE '541,

12   THAT THEY ARE NOT IDENTICAL.  THERE ARE IMPORTANT DIFFERENCES,

13   AND THOSE IMPORTANT DIFFERENCES MEAN THAT ADOBE DOESN'T

14   INFRINGE.

15       NOW, I MENTIONED EARLIER THAT WE WERE GOING TO TALK OR

16   HEAR FROM AND TALK TO DR. SCHULL.  WELL, WITH DR. SCHULL --

17   AND I'M GOING TO SKIP THROUGH SOME OF THESE SLIDES HERE IN THE

18   INTEREST OF TIME GETTING YOU GUYS OUT OF HERE BY LUNCH, WHAT

19   DR. SCHULL IS GOING TO TELL YOU ABOUT IS A SYSTEM THAT HE HAS

20   WHICH WAS CALLED THE SOFTLOCK SYSTEM.

21       MR. BONINI, IF YOU CAN SKIP TO THAT SLIDE FOR THE SOFTLOCK

22   SYSTEM.  THAT WOULD BE HELPFUL.

23       WHAT THE SOFTLOCK SYSTEM WAS WAS THE SYSTEM THAT

24   MR. SCHULL CAME UP WITH FOR TAKING CONTENT, TAKING ELECTRONIC

25   CONTENT LIKE BOOKS, OR WHATEVER, AND DISTRIBUTING IT

1    ELECTRONICALLY TO PEOPLE.

2        AND AS I MENTIONED, MR. SCHULL CAME UP WITH THAT YEARS

3    BEFORE, YEARS BEFORE MR. PATTERSON CAME UP WITH IT, AND

4    MR. SCHULL GOT A PATENT ON IT.  AND WHAT THAT PATENT SHOWS IS

5    THAT JUST AS THERE ARE DIFFERENCES BETWEEN THE

6    PATENTS-IN-SUITS AND ADOBE'S PRODUCTS, IT ACTUALLY TURNS OUT

7    THAT MR. SCHULL'S PATENT AND THE PATENTS-IN-SUIT ARE VERY,

8    VERY SIMILAR AND REALTY IDENTICAL.

9        THAT'S THE THING ABOUT THIS CASE THAT WE WANT YOU TO

10   CONSIDER WHEN YOU GO BACK AND YOU HEAR ALL THE EVIDENCE IS, IS

11   IT POSSIBLE THAT THEY CAN COME TO ADOBE AND ASK ADOBE TO PAY

12   FOR ALL THESE PRODUCTS THAT ADOBE'S BEEN SELLING FOR YEARS,

13   WHEN THEY SAT SILENTLY BY AND DIDN'T DO ANYTHING, WHEN, IN

14   FACT, SOMEBODY ELSE HAD ACTUALLY DONE IT EVEN BEFORE THEY SAID

15   THEY DID IT.

16       YOU ARE GOING TO HEAR FROM MR. SCHULL.  AND I WANT YOU TO

17   ASK YOURSELF THAT QUESTION.  DID MR. PATTERSON REALLY COME UP

18   WITH THIS OR IS IT, IN FACT, THE CASE THAT MR. SCHULL CAME UP

19   WITH IT MUCH BEFORE, AND MR. SCHULL HAS THE PATENT ON THIS AND

20   NOT MR. PATTERSON.  AND SHOULD ADOBE HAVE TO PAY MR. PATTERSON

21   WHEN HE DIDN'T REALLY COME UP WITH THIS AT ALL.

22       NOW, YOU HEARD FROM MR. ELLWANGER THAT THEY HAVE THEIR

23   PATENTS AND THE SCHULL PATENT ISN'T REALLY INVALIDATING.  AND

24   HE KEPT REFERENCING THE FACT THAT THE PATENT OFFICE GRANTED

25   MR. PATTERSON THE PATENT.  THE PATENT OFFICE SAID THAT

1    MR. PATTERSON HAD AN INVENTION.

2        WELL, GUESS WHAT?  WHEN MR. SCHULL GOT HIS PATENT,

3    MR. PATTERSON GOT HIS PATENT YEARS LATER, IT ACTUALLY TURNED

4    OUT THAT MR. PATTERSON'S '541 PATENT ISSUED FROM THE PATENT

5    OFFICE WITHOUT THE PATENT OFFICE EVER KNOWING ABOUT

6    MR. SCHULL'S TECHNOLOGY, NEVER KNOWING ABOUT SOFTLOCK, NEVER

7    KNOWING ABOUT MR. SCHULL'S PATENT.

8        SAME FOR THE '670 PATENT.  IN FACT, YOU ARE THE FIRST

9    PEOPLE TO CONSIDER WHETHER OR NOT MR. PATTERSON REALLY HAS AN

10   INVENTION OVER THE 67 -- OVER THE SCHULL TECHNOLOGY, OVER THE

11   SOFTLOCK.  YOU ARE THE FIRST PEOPLE EVER TO CONSIDER THAT

12   QUESTION.

13       AND YOU WILL HEAR THE TESTIMONY AND YOU WILL HEAR THE

14   EVIDENCE, AND WE'LL ASK YOU TO THINK SERIOUSLY ABOUT IT AND

15   THINK SERIOUSLY ABOUT WHETHER ADOBE SHOULD HAVE TO PAY WHEN

16   MR. SCHULL CAME UP WITH IT FIRST.

17       NOW, THERE'S ONE MORE PIECE OF THE STORY THAT

18   MR. ELLWANGER SPENT A LOT OF TIME TALKING ABOUT THAT I WANT TO

19   TALK ABOUT.  AND THAT'S THIS WHOLE BUSINESS OF THE ADOBE

20   PATENTS THAT CITE THE DIGITAL REG PATENTS.  THAT WAS SORT OF

21   THE MOST FOCUSED OF HIS OPENING AND HIS TIME LINE AND ALL OF

22   THAT.

23       HE SPENT A LOT OF TIME TELLING YOU THAT THEY CLAIM THEY

24   CAME TO ADOBE VENTURES AND MET WITH ADOBE VENTURES IN 2004,

25   AND THEN AFTER THAT ADOBE SOMEHOW STARTED GETTING PATENTS ON

1    DRM.

2        WELL, WHAT THE EVIDENCE IS ACTUALLY GOING TO SHOW IS THAT

3    ADOBE WAS STARTING TO DEVELOP THE TECHNOLOGY THAT'S AT ISSUE

4    IN THIS CASE WELL BEFORE THAT MEETING.  SO, ADOBE'S LIVECYCLE

5    PRODUCT STARTED DEVELOPMENT IN 2002 AND WAS RELEASED IN 2004

6    AND 2005.

7        AND MR. HERBACH, WHO YOU ARE GOING TO HEAR FROM, HE'S

8    GOING TO COME AND TESTIFY LATER THIS WEEK, HE HAS PATENTS ON

9    LIVECYCLE THAT GO BACK TO BEFORE THAT MEETING WITH DIGITAL

10   REG.

11       IN FACT, YOU HEARD MR. ELLWANGER SAY, LOOK, ADOBE GOT ALL

12   THESE PATENTS.  THEY STARTED GETTING PATENTS AFTER DIGITAL

13   REG'S MEETING WITH ADOBE VENTURES, AND HE TOLD YOU THAT IT WAS

14   ONLY AFTER THAT MEETING THAT ADOBE STARTED FILING FOR THESE

15   PATENTS.

16       HE SHOWED YOU A LITTLE APPLICATION ON THE BOTTOM.  HE

17   SAID, LOOK, THIS APPLICATION WAS AFTER THE MEETING.  WELL,

18   ACTUALLY, THE APPLICATION?  IT WAS FILED IN 2000, FOUR YEARS

19   BEFORE THEY CLAIM TO HAVE EVER COME TO ADOBE VENTURES TO ASK

20   FOR FUNDING.  ADOBE WAS ALREADY FILING THE PATENTS THAT THEY

21   ARE POINTING TO NOW AS EVIDENCE OF WILLFULNESS.

22       AND WHAT YOU ARE GOING TO FIND IS THAT IN THOSE PATENTS,

23   THE PATENT OFFICE ACTUALLY CONSIDERED THE PATTERSON PATENT AND

24   IT GRANTED ADOBE THE PATENT OVER THE PATTERSON PATENT.  THAT

25   MEANS THE PATENT OFFICE SAID, OKAY, YOU FILE THIS PATENT.  WE

1    ARE LOOKING AT THE PATTERSON PATENT AS PRIOR ART, AND WE THINK

2    YOU'RE DIFFERENT, AND SO WE ARE GOING TO GIVE YOU YOUR PATENT

3    EVEN THOUGH MR. PATTERSON'S PATENT IS OUT THERE.

4        AND ADOBE PATENTS WERE ALLOWED OVER THE DIGITAL REG

5    PATENTS.  NOT ONCE, NOT TWICE, BUT MULTIPLE TIMES.

6        HERE'S ANOTHER PATENT FROM ADOBE THAT ISSUED OVER THE

7    DIGITAL REG PATENTS.  AND ANOTHER PATENT THAT THE EVIDENCE

8    WILL SHOW MR. HERBACH AS THE INVENTOR THAT ISSUED OVER THE

9    DIGITAL REG PATENTS AND OVER THE DIGITAL REG PATENTS.

10       AND SO AT THE END OF THE DAY, THE TIME LINE AND THE STORY

11   THAT THEY CAME TO ADOBE AND THEY TOLD ADOBE ABOUT THE PATENTS

12   AND THEN SOMEHOW ADOBE STARTED GOING OUT AND GETTING PATENTS

13   IN THIS TECHNOLOGY AFTER THAT, TAKE A CLOSER LOOK AND REALLY

14   CONSIDER THE EVIDENCE AND REALLY CONSIDER WHETHER THAT

15   EVIDENCE ALL HANGS TOGETHER.

16       BECAUSE I THINK WHAT YOU ARE GOING TO FIND IS THAT ADOBE

17   HAS THOUSANDS OF PATENTS.  IT'S A LEADER IN INNOVATION AND IT

18   HAS BEEN DOING THIS FOR A REALLY, REALLY LONG TIME.  AND

19   DIGITAL REG WAS A COMPANY THAT TRIED TO MAKE SOMETHING OUT OF

20   A PATENT IN A SPACE WHERE THERE'S ALREADY LOTS OF PEOPLE DOING

21   IT, INCLUDING DR. SCHULL, INCLUDING LOTS OF OTHER PEOPLE IN

22   THE PRIOR ART, AND INCLUDING ADOBE, AND THEY COULDN'T MAKE A

23   PRODUCT, AND THEY COULDN'T GET A SUCCESSFUL COMPANY, AND SO

24   WHAT THEY DID IS THEY SAID WE ARE GOING TO TAKE THESE PATENTS

25   AND WE ARE GOING TO SEE IF WE CAN GET PEOPLE TO PAY US MONEY

```
1    FOR THESE PATENTS.

2         AND WE ARE ASKING YOU TO CONSIDER ALL THE EVIDENCE AND THE

3    WITNESS TESTIMONY AND THE DOCUMENTS, AND LOOK AT IT WITH A

4    CRITICAL EYE, AND DECIDE WHETHER ADOBE SHOULD HAVE TO PAY JUST

5    BECAUSE SOMEONE CAME KNOCKING ON THE DOOR EVEN WHEN ITS

6    PRODUCTS ARE NOT THE SAME AND EVEN WHEN MR. PATTERSON DIDN'T

7    INVENT IT AT ALL.

8         IT'S AN IMPORTANT ROLE, AND WE APPRECIATE YOUR TIME.  AND

9    AT THE END OF THE CASE, ADOBE WILL COME BACK TO YOU AND

10   SUMMARIZE ALL THE EVIDENCE, AND WE ARE GOING TO ASK YOU TO

11   FIND THAT ADOBE DOES NOT INFRINGE AND THAT WE OWE ZERO

12   DAMAGES, AND WE ARE GOING TO ASK YOU TO FIND FOR ADOBE.

13        THANK YOU FOR YOUR ATTENTION.  THANK YOU FOR YOUR

14   ATTENTION GOING FORWARD THROUGH THE REST OF THE CASE.  AND

15   WITH THAT, WE LEAVE IT IN YOUR HANDS TO CONSIDER ALL THE

16   EVIDENCE.

17            THE COURT:  ALL RIGHT.  WE WILL BREAK FOR THE DAY IN

18   A MINUTE OR TWO.  MS. RILEY WILL GO BACK WITH YOU TO THE JURY

19   ROOM AND GIVE YOU SOME PADS AND PENCILS YOU CAN TAKE NOTES

20   WITH TOMORROW IF YOU WOULD LIKE TO.

21        WE WILL START UP AGAIN TOMORROW AT 8:30.  WE WILL SHOW

22   THAT VIDEO THAT WE WERE TRYING TO SHOW, AND THEN WE'LL CALL

23   THE FIRST WITNESS.

24        REMEMBER THIS EVENING AS WELL AS EVERY DAY OF THE TRIAL,

25   NOT TO DISCUSS THE CASE WITH ANYONE ELSE AND NOT TO EVEN
```

1    DISCUSS IT AMONGST YOURSELVES UNLESS YOU ARE ALL TOGETHER

2    SITTING IN THE JURY ROOM AND ALL TALKING ABOUT IT.

3        I TOLD YOU THE SCHEDULE.  THAT IS AN AGGRESSIVE SCHEDULE

4    AND WE WILL BE KEEPING TIME ON THE ATTORNEYS AND MAKING SURE

5    THAT THEY MOVE ALONG QUICKLY, BUT IT DOES MEAN THAT WE DO NEED

6    TO BE IN SESSION EVERY DAY FROM 8:30 TO 1:30.  WE CAN'T START

7    WITHOUT ALL OF YOU.  SO IF SOMEBODY IS LATE, EVERYONE HAS TO

8    SIT AND WAIT FOR THAT PERSON.

9        I KNOW SOME OF YOU ARE COMING FROM SOME DISTANCE, RELYING

10   ON TRAFFIC AND PUBLIC TRANSPORTATION.  PLEASE PLAN YOUR TRIP

11   SO THAT YOU'VE GOT A LITTLE LEAD TIME IN CASE THERE IS BAD

12   TRAFFIC OR THERE IS A PROBLEM ON PUBLIC TRANSPORTATION SO THAT

13   PEOPLE AREN'T SITTING, WAITING FOR YOU AND THE SCHEDULE ISN'T

14   BEING STRETCHED OUT.

15       THE OTHER THING THAT I WOULD LIKE TO LET YOU KNOW IS ONCE

16   YOU DO START DELIBERATING, WHICH WILL PROBABLY BE ON MONDAY,

17   THE 8TH OF SEPTEMBER, THAT OFTENTIMES JURIES DO LIKE TO STAY

18   FOR LONGER WHEN THEY ARE SITTING DELIBERATING AND THEY'RE IN

19   THE MIDDLE OF THINGS, AND SOMETIMES THEY WISH TO STAY LONGER

20   THAN 1:30.  SO WHEN YOU ARE PLANNING YOUR LONG RANGE PLANS FOR

21   THE WEEK OF THE 8TH, IF YOU WOULD CONSIDER WHETHER YOU WOULD

22   BE ABLE TO STAY LATER THAN 1:30, SAY TWO, OR THREE, OR FOUR IF

23   YOU ARE DELIBERATING ON THOSE DAYS.

24       AGAIN, YOU CAN LEAVE THROUGH THE ROOM HERE.  MS. RILEY

25   WILL GIVE YOU YOUR JUROR BADGES TO WEAR WHEN YOU LEAVE AND

1    WHEN YOU COME BACK IN SO PEOPLE KNOW YOU'RE A JUROR AND WON'T

2    TALK TO YOU ABOUT THE CASE IN FRONT OF YOU, AND WE WILL SEE

3    YOU TOMORROW AT 8:30.

4            **THE COURT:**  I WOULD LIKE TO SEE THE ATTORNEYS FOR A

5    MOMENT, PLEASE.

6            **THE CLERK:**  GO AHEAD.

7        (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

8            **THE COURT:**  I AM GOING TO GO AHEAD AND TAKE OUT THE

9    PARAGRAPH ABOUT THE BRIEF OPPORTUNITIES DURING THE COURSE OF

10   THE TRIAL JUST BECAUSE I DIDN'T READ IT SO I DON'T WANT TO PUT

11   IT IN THERE.  BUT IF YOU DO DECIDE YOU WANT TO DO IT, AND YOU

12   BOTH AGREE, I WILL INSTRUCT THE FIRST TIME SOMEONE DECIDES TO

13   DO IT WHAT THAT IS ALL ABOUT.

14       I'M TRYING TO FIGURE OUT WHY CLAIM 32 OF THE '670 IS IN

15   HERE SINCE IT'S NOT ALLEGED TO BE INFRINGED.

16           **MR. REINES:**  WE HAVE AN INVALIDITY COUNTERCLAIM.  IT

17   WAS JUST DROPPED, AND I THINK WE'VE MAINTAINED IT.  IF THE

18   COURT WOULD LIKE US TO CONSIDER DROPPING THAT, BUT I MEAN, I

19   THINK IT'S NOT GOING TO ADD MUCH TO THE TRIAL AND IT WAS

20   ASSERTED AGAINST US, AND THERE'S CERTAINLY SUBJECT MATTER

21   JURISDICTION SO IT'S NOT A JURISDICTIONAL PROBLEM WITH IT.

22           **THE COURT:**  WELL, IT'S UP TO YOU, I GUESS, UNLESS

23   THERE'S SOME LEGAL REASON WHY YOU CAN'T PURSUE IT.  AS LONG AS

24   I HAVE TO PRINT OUT ALL THESE INSTRUCTIONS AGAIN, I WAS GOING

25   TO TAKE THAT OUT IF YOU ARE NOT REALLY PURSUING IT.

1              **MR. DINOVO:**  WE OBVIOUSLY THINK IT WOULD BE EASIER

2      FOR THE JURY TO NOT TALK ABOUT ANOTHER INDEPENDENT CLAIM OF

3      THE '670.

4              **MR. REINES:**  I THINK WE WOULD LIKE TO PURSUE IT, YOUR

5      HONOR.

6              **THE COURT:**  YOU WOULD LIKE TO?

7              **MR. REINES:**  PURSUE IT.

8              **THE COURT:**  YOU CAN GIVE THEM A COVENANT NOT TO SUE,

9      I GUESS, ON THAT CLAIM.

10             **MR. DINOVO:**  I'M ACTUALLY NOT SURE HOW THAT WORKS.  I

11     THINK IT'S A PATENT BY PATENT BASIS.  I WOULD HAVE TO LOOK

12     INTO THAT.

13             **THE COURT:**  OKAY.  NOW SOMEBODY ON EACH OF YOUR TEAMS

14     IS KEEPING TIME, I PRESUME?

15             **MR. REINES:**  YES.

16             **THE COURT:**  AND YOU'LL DOUBLE-CHECK WITH EACH OTHER

17     EACH DAY TO MAKE SURE YOU ARE ON THE SAME PAGE AS FAR AS

18     TIMING BECAUSE I'M NOT KEEPING TIME.

19             **MS. GLAUSER:**  WE ARE HAPPY TO DO THAT, YOUR HONOR.

20             **THE COURT:**  THEN I WANT TO MAKE SURE I HAVE ALL OF

21     THE PARR REPORTS AND ALSO YOUR DAMAGES EXPERT.  ARE THOSE ON

22     FILE SOMEWHERE?  ARE THEY IN THE EXHIBITS?  AM I GOING TO BE

23     ABLE TO FIND THOSE?  DID YOU FILE THE NEW ONE?

24             **MS. GLAUSER:**  YES, YOUR HONOR, WE DID.  WE FILED THE

25     REPORT.  I BELIEVE WE PULLED THE DOCKET NUMBER.  I'LL GET IT

```
1    FOR YOU IN A MOMENT.  SHANNON HAS IT.

2       WE FILED THE REPORT AND THERE'S -- WE DID FILE HIS REPORT.

3    ADOBE HAS FILED A RENEWED MOTION.  THERE'S A RESPONSE AND I

4    BELIEVE THEY FILED A REPLY.

5            THE COURT:  I ALSO WANTED TO READ YOUR EXPERT.

6            MR. REINES:  RIGHT.  WE HAVE NOT FILED OUR EXPERT'S

7    REPORT.  WE WILL DO SO THIS AFTERNOON.

8            THE COURT:  WOULD YOU DO THAT?

9            MR. REINES:  AS SOON AS WE CAN WE WILL FILE THAT.

10           THE COURT:  I WILL HAVE TO READ THOSE PAPERS.  I

11   DIDN'T REALIZE THEY HAD COME IN AND I HADN'T READ THEM.

12      YOU BETTER HAVE A BACKUP PLAN FOR DEPOSING HIM.

13           MR. REINES:  YEAH.  WE DO HAVE A BACKUP PLAN.

14           THE COURT:  HAVE A DEPOSITION SCHEDULE --

15           MR. DINOVO:  WE HAVE IT SCHEDULED TOMORROW EVENING.

16           MR. REINES:  AT 6:00 O'CLOCK.

17           THE COURT:  WE WILL SEE YOU TOMORROW MORNING.

18           MR. ELLWANGER:  YOUR HONOR, ONE VERY QUICK THING.

19           THE COURT:  DID YOU WANT TO TELL ME WHAT YOUR

20   EXHIBITS ARE THAT YOU OBJECT TO TOMORROW?

21           MR. ELLWANGER:  WE WOULD LIKE TO SPECIFICALLY WITH

22   MR. PATTERSON BECAUSE HE'S THE FIRST WITNESS TO BE CALLED,

23   YOUR HONOR, ADOBE HAS SOME OBJECTIONS TO THE DEMONSTRATIVE

24   EXHIBIT THAT WE INTEND TO USE.  AND IF I COULD PASS UP A COPY

25   TO THE COURT.
```

```
1            THE COURT:  YOU CAN'T BECAUSE MY CLERK ISN'T HERE

2    RIGHT AT THE MOMENT.  YOU CAN LEAVE IT ON THAT TABLE AND I

3    WILL HAVE HER GET IT.

4            MR. ELLWANGER:  YES, YOUR HONOR.  JUST A VERY QUICK

5    SYNOPSIS OF THE DISAGREEMENT.

6        YESTERDAY DURING THE MEET-AND-CONFER PROCESS, ADOBE

7    WITHDREW ITS OBJECTIONS TO ALL OF THE EXHIBITS THAT WE ARE

8    USING IN THIS DEMONSTRATIVE, BUT NOW THEY SAY THEY DON'T WANT

9    US TO BE ABLE TO SHOW THOSE EXHIBITS TO THE JURY.

10       ALL WE DO IS, AS YOU WILL SEE, CULL OUT WHEREVER IN THE

11   PATENTS AND THE PROSECUTION HISTORY MR. PATTERSON'S PATENT OR

12   MR. PATTERSON'S NAME IS MENTIONED.  WE THINK THAT SINCE THEY

13   DON'T OBJECT TO THE UNDERLYING DOCUMENTS, WE SHOULD BE ABLE TO

14   SHOW THEM.

15           THE COURT:  THESE ARE UNDERLYING DOCUMENTS OR

16   DEMONSTRATIVES?  I THOUGHT YOU SAID THEY WERE DEMONSTRATIVES.

17           MR. ELLWANGER:  WE HAD A MEET AND CONFER ABOUT THE

18   UNDERLYING DOCUMENTS.  THEY WITHDREW THEIR OBJECTIONS TO THESE

19   UNDERLYING DOCUMENTS.  WE THEN LATER SAID WE ARE GOING TO USE

20   THIS DEMONSTRATIVE INCORPORATING THOSE UNDERLYING DOCUMENTS

21   AND THEY OBJECTED TO THE DEMONSTRATIVES.

22           THE COURT:  DO I HAVE A COPY OF THE DEMONSTRATIVE?

23       THAT'S THAT.  SO WHAT'S THE PROBLEM WITH THEM?

24           MR. REINES:  THE ISSUE IS THAT MR. PATTERSON IS THE

25   INVENTOR ON THE DIG REG PATENTS.  HE WOULD LIKE -- THEY WOULD
```

1    LIKE TO USE HIM TO WALK THROUGH ADOBE'S PATENT FILINGS TO SHOW

2    THE FACT THAT IT WAS CITED AS PRIOR ART BASICALLY.

3            **THE COURT:**  THROUGH ADOBE'S.

4            **MR. REINES:**  THEY WANTED TO USE HIM TO GO TO ADOBE'S

5    PATENTS WHICH HE HAD NEVER SEEN BEFORE THIS TRIAL OR WHATEVER,

6    AND GO THROUGH AND WALK THROUGH OUR PATENT FILINGS.  THEY PUT

7    IN FOUR PATENTS AND SOME FILE HISTORIES.

8        AND WE SAID, YOU KNOW, THOSE ARE OUR PATENTS AND OUR FILE

9    HISTORIES WE ARE NOT GOING TO OBJECT TO THEM.  AND IT'S TRUE

10   THAT WE CITED PRIOR ART IN THEM SO WE ARE NOT OBJECTING.  WE

11   ARE NOT OBJECTING ON RELEVANCE OR SOMETHING LIKE THAT.

12       WHAT OUR OBJECTION IS THEY'VE GOT 20 SLIDES, AND THEY WANT

13   TO BE WALK THROUGH THE FILE HISTORIES, THAT'S WHERE WE DREW

14   THE LINE, TO HAVE A FACT WITNESS GO THROUGH ANOTHER ENTITIES'

15   FILE HISTORIES TO TALK ABOUT THE BACK AND FORTH, AND IT IS HIS

16   NAME, IT'S HIS NAME, AND IT'S HIS NAME.  EITHER IT'S A WASTE

17   OF TIME BECAUSE BY THE TIME THEY GO THROUGH FOUR PATENTS

18   ALREADY TO SAY THAT'S MY NAME, THAT'S MY NAME, THAT'S MY NAME,

19   OR IF HE DOES ANYTHING MORE, IT'S COMPLETELY OBJECTIONABLE.

20   IT'S IMPROPER EXPERT TESTIMONY.  WHAT DOES HE KNOW ABOUT OUR

21   FILE HISTORY?  IS HE GOING TO START ANALYZING THEM?  WE

22   HAVEN'T GOTTEN A REPORT.  IT'S TOTALLY IMPROPER.

23           **MR. ELLWANGER:**  MAY I RESPOND, YOUR HONOR?

24           **THE COURT:**  YES.

25           **MR. ELLWANGER:**  DURING THE MEET-AND-CONFER PROCESS,

```
1    WE SPECIFICALLY REPRESENTED THAT HE WOULD NOT BE PROFFERING

2    EXPERT TESTIMONY ABOUT IT, AND HE WOULD SIMPLY BE IDENTIFYING

3    WHERE HIS PATENT IS REFERRED TO IN THEIR FILINGS.

4        AND GIVEN ALL THE BACK AND FORTH EVEN DURING THE OPENING

5    STATEMENT ABOUT WHAT ADOBE KNEW AND WHEN THEY KNEW IT FOR

6    WILLFULNESS, IT IS VERY IMPORTANT THE JURY HEARS WHERE THOSE

7    CAME OUT.

8        AND BECAUSE THE INVENTOR HAS REVIEWED THESE DOCUMENTS, WE

9    HAVE LIMITED THE FILE HISTORIES SO THAT THEY ARE NOT 500 PAGES

10   LONG, THEY ARE TWO OR THREE PAGES LONG, THE EXHIBITS WE ARE

11   GOING TO OFFER, AND THEY JUST FOCUS AROUND WHERE IN THE FILE

12   HISTORY THEY MENTION HIS NAME.

13       THE COURT:  NO, I DON'T THINK HE HAS ANY PARTICULAR

14   INFORMATION TO OFFER OTHER THAN THAT'S HIS NAME, WHICH IS

15   OBVIOUS.  SO THAT -- SEEMS LIKE WOULD BE ARGUMENTATIVE FOR HIM

16   TO DO IT.

17       THEY WILL BE IN EVIDENCE.  YOU CAN ARGUE THEM.

18       MR. ELLWANGER:  TO BE CLEAR, YOUR HONOR, WE MAY OFFER

19   THEM THROUGH THIS WITNESS BECAUSE THERE'S NO OBJECTION, BUT WE

20   ARE NOT ALLOWED --

21       THE COURT:  NOT THROUGH THIS WITNESS.  THIS WITNESS

22   ISN'T THE RIGHT PERSON TO OFFER ADOBE'S PATENTS.

23       YOU OFFER THEM THROUGH ADOBE'S -- THROUGH SOME ADOBE

24   WITNESS, I PRESUME, OR JUST ENTER THEM THROUGH STIPULATION OR

25   SOMETHING.  THIS WITNESS HAS NO PARTICULAR CONNECTION TO THEM.
```

1        **MR. ELLWANGER:**  YES, YOUR HONOR.

2        **THE COURT:**  OKAY.

3

4              (PROCEEDINGS ADJOURNED AT 1:31 P.M.)

5

6

7                   <u>**CERTIFICATE OF REPORTER**</u>

8        I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE

9   UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY

10  CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

11  RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

12

13              _Diane E. Skillman_

14          DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

15              MONDAY, AUGUST 25, 2014

16

17

18

19

20

21

22

23

24

25