```
                                volume 2

                            Pages 153 - 361

                    UNITED STATES DISTRICT COURT

                   NORTHERN DISTRICT OF CALIFORNIA

DIGITAL REG OF TEXAS, LLC   )
                            )
            Plaintiff,      )    NO. C-12-1971 CW
                            )
  VS.                       )    TUESDAY, AUGUST 26, 2014
                            )
ADOBE SYSTEMS, INC., ET AL.,)    OAKLAND, CALIFORNIA
                            )
            Defendants.     )    JURY TRIAL
_____)
```

```
            Before The Honorable CLAUDIA WILKEN, Judge
```

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

```
For Plaintiff:          DINOVO, PRICE, ELLWANGER & HARDY LLP
                        7000 NORTH MOPAC EXPRESSWAY, SUITE 350
                        AUSTIN, TEXAS 78731
                 BY:  ANDREW G. DINOVO, ESQUIRE
                      ADAM G. PRICE, ESQUIRE
                      GREGORY DONAHUE, ESQUIRE
                      JAY D. ELLWANGER, ESQUIRE
                      NICOLE E. GLAUSER, ESQUIRE



                        BARTKO ZANKEL BUNZEL MILLER
                        ONE EMBARCADERO CENTER, SUITE 800
                        SAN FRANCISCO, CALIFORNIA 942111
                 BY:  W. PAUL SCHUCK, ESQUIRE


ALSO PRESENT:           MICHAEL FARLEY, COMPANY REPRESENTATIVE

                    (APPEARANCES CONTINUED)

Reported By:            Diane E. Skillman, CSR 4909, RPR, FCRR
                        Official Court Reporter
         TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION
```

1

2

3

4   **FOR DEFENDANT**          WEILL, GOTSHAL & MANGES, LLP
    **ADOBE SYSTEMS:**         201 REDWOOD SHORES PARKWAY
5                              REDWOOD SHORES, CALIFORNIA 94065
                         BY:  EDWARD R. REINES, ESQUIRE
6                              SONAL N. MEHTA, ESQUIRE
                               BYRON BEEBE, ESQUIRE
7                              ANANT PRADHAN, ESQUIRE

8

9   **ALSO PRESENT:**          PAUL BETLEM, COMPANY REPRESENTATIVE
                               KAREN ROBINSON, IN-HOUSE COUNSEL
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**I N D E X**

| PLAINTIFF'S WITNESSES: | PAGE | VOL. |
|---|---|---|
| **PATTERSON, PATRICK** | | |
| DIRECT EXAMINATION BY MR. ELLWANGER | 164 | 2 |
| CROSS-EXAMINATION BY MR. REINES | 200 | 2 |
| REDIRECT EXAMINATION BY MR. ELLWANGER | 271 | 2 |
| RECROSS-EXAMINATION BY MR. REINES | 277 | 2 |
| | | |
| **FARLEY, MICHAEL** | | |
| DIRECT EXAMINATION BY MS. GLAUSER | 281 | 2 |
| CROSS-EXAMINATION BY MR. REINES | 334 | 2 |

1                        **I N D E X**

2    **PLAINTIFF'S EXHIBITS:**                    **EVD.**      **VOL.**

3        1                                  191         2

4        3                                  192         2

5        31 & 32                            305         2

6        34, 35, 36                         316         2

7        120                                260         2

8        121A                               176         2

9        121B                               180         2

10       184                                360         2

11

12   **DEFENDANT'S EXHIBITS:**

13       482                                203         2

14       483                                202         2

15       503 (PG. 72)                       232         2

16       503 (PG. 75)                       237         2

17       503 (PG. 76)                       237         2

18       503 (PG. 198)                      240         2

19       503 (PG. 201)                      241         2

20       503 (PG. 202)                      242         2

21       503 (PG. 203)                      243         2

22       503 (PG. 208)                      243         2

23       503 (PG. 217)                      244         2

24       503 (PG. 230)                      244         2

25

```
1    TUESDAY, AUGUST 26, 2014                          8:26 A.M.

2                    P R O C E E D I N G S

3        (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

4            THE CLERK:  REMAIN SEATED.  COME TO ORDER.  COURT IS

5    IN SESSION.

6            THE COURT:  SO YOU ARE READY TO SHOW THE VIDEO?

7            MR. REINES:  YEAH, WE WILL BE READY, YOUR HONOR.

8            THE COURT:  WHO IS THE FIRST WITNESS?

9            MS. GLAUSER:  THE FIRST WITNESS TODAY IS GOING TO BE

10   PATRICK PATTERSON.

11           THE COURT:  DO YOU HAVE A PROBLEM WITH HIS TESTIMONY?

12           MR. REINES:  WE HAVE ONE --

13           THE COURT:  EXHIBITS OR SOMETHING?

14           MR. REINES:  THE ONE ISSUE WE HAVE IS ACTUALLY

15   RATHER, HOPEFULLY, A MINOR ONE, WHICH IS MOTION IN LIMINE

16   ORDER NUMBER 13.

17           THE COURT:  YES.

18           MR. REINES:  THERE IS AMBIGUITY IN HERE.  I THINK

19   IT'S JUST --

20           THE COURT:  WHOSE 13?

21           MR. REINES:  THIS IS DIGITAL REG'S.  AND THIS IS

22   PAGE 29, AT LINE 7.

23           THE COURT:  OKAY.

24           MR. REINES:  THE ISSUE IS THAT THE COURT STATED THE

25   '541 PATENT LAWSUIT IS NOT RELEVANT, BUT THE PATENT LITIGATION
```

1  LAWSUITS UNDERLYING THE SETTLEMENT AGREEMENTS PROVIDE A

2  RELEVANT CONTEXT TO THE SETTLEMENT AMOUNTS.

3       **THE COURT:**  WELL, THE ''541 AS AGAINST THE OTHER

4  DEFENDANTS.  OBVIOUSLY, THE '541 AS AGAINST THIS DEFENDANT IS

5  RELEVANT.

6       **MR. REINES:**  RIGHT.

7       **THE COURT:**  THEY ALREADY MENTIONED THE OTHERS.  BUT

8  AS TO THE SETTLEMENTS, IF THOSE ARE PART OF THE REASONABLE

9  ROYALTY ANALYSIS --

10       **MR. REINES:**  YOUR HONOR, THE ISSUE IS THAT THEY ARE

11  THE SAME LAWSUITS.  IN OTHER WORDS, THE '541 PATENT LAWSUIT IS

12  THE --

13       **THE COURT:**  I KNOW.

14       **MR. REINES:**  OKAY.  SO THERE'S PRIOR DEPOSITIONS THAT

15  WE ARE GOING TO BE USING FROM THAT CASE.  MR. FARLEY IS GOING

16  TO BE PRESENTING MULTIPLE SETTLEMENTS FROM THAT CASE.  SO WE

17  ARE GOING TO BE REFERRING TO THAT CASE. I JUST DON'T WANT TO

18  RUN AFOUL OF THE '541 PATENT LAWSUIT.  IT'S NOT RELEVANT.  I

19  AM GOING TO REFER TO IT.

20       **THE COURT:**  IT IS NOT RELEVANT.  HOWEVER, THE PATENT

21  LITIGATION LAWSUITS UNDERLYING THE SETTLEMENT AGREEMENTS, YES,

22  IT IS THE '541 IF YOU DON'T --

23       **MR. REINES:**  JUST BEING CAREFUL, YOUR HONOR.

24       **THE COURT:**  ALL RIGHT.  OKAY.

25       **MS. GLAUSER:**  AND, YOUR HONOR, THERE IS AN

```
1    OUTSTANDING OBJECTION TO AN EXHIBIT WE ARE GOING TO USE DURING

2    MR. PATTERSON'S TESTIMONY.  WE ARE HAPPY TO TAKE IT UP DURING

3    MR. PATTERSON'S TESTIMONY WHEN WE CAN LAY THE PROPER

4    FOUNDATION.  AND IF ADOBE --

5            THE COURT:  WHAT IS IT AN OBJECTION TO?  IS IT ONE OF

6    THESE DEMONSTRATIVE SCREENS?

7            MR. ELLWANGER:  NO, YOUR HONOR.  IT IS A DIFFERENT

8    EXHIBIT, 121A AND B.  BUT WE PLAN TO --

9            THE COURT:  SHOULD I FIND IT ON MY COMPUTER?

10           MR. ELLWANGER:  I CAN GIVE YOU A COPY, YOUR HONOR.

11   THE OBJECTION IS AUTHENTICITY, THOUGH, AND WE INTEND TO LAY

12   THAT FOUNDATION WITH MR. PATTERSON DURING HIS DIRECT.

13           THE COURT:  AND YOU THINK IT IS A FAKE DOCUMENT?

14           MR. REINES:  NO.  HE DIDN'T RECOGNIZE THE WITNESS

15   THAT THEY ARE GOING TO ATTEMPT TO PRESENT IT THROUGH.  DIDN'T

16   RECOGNIZE IT.  DIDN'T KNOW WHERE IT CAME FROM.

17      THERE ARE NOTES THAT ARE ATTACHED.  THERE IS AN NDA, AND

18   THEN THERE ARE THESE NOTES THAT ARE IN SEQUENCE IN THE BATES

19   RANGE.  AND HE DIDN'T RECOGNIZE THEM.

20           THE COURT:  SO IT IS NOT AUTHENTICITY.  YOU DON'T

21   THINK IT IS A FORGED OR FAKE DOCUMENT.  YOU JUST DON'T THINK

22   THERE IS NO FOUNDATION TO QUESTION IT WITH THIS WITNESS, WHICH

23   IS TRUE IF THIS WITNESS DIDN'T WRITE IT, HASN'T SEEN IT,

24   DOESN'T KNOW WHAT IT IS.

25           MR. REINES:  AND THIS IS THEIR PROOF OF INVENTION, SO
```

```
1    IT IS EXTRA IMPORTANT.

2           MR. ELLWANGER:  YOUR HONOR, WHAT WAS TESTIFIED TO

3    DURING THE DEPOSITION A YEAR-AND-A-HALF AGO WHEN NO TIME WAS

4    GIVEN TO REVIEW THE DOCUMENTS, THERE IS GOING TO BE SOME

5    TESTIMONY THAT MR. PATTERSON WAS NOT ABLE TO GET.  WE WEREN'T

6    THE ONES ASKING THE QUESTIONS.  THEY WILL LAY THAT FOUNDATION.

7    NOW, IT IS A FINE CROSS POINT AS TO WHAT WAS SAID AT

8    DEPOSITION.

9           THE COURT:  NOW HE IS GOING TO SAY HE DOES RECOGNIZE

10   IT, AND HE DID SEE IT, OR SOMETHING LIKE THAT?  AND THEY ARE

11   GOING TO IMPEACH HIM WITH HIS DEPOSITION. IS THAT WHAT WE ARE

12   GOING TO --

13          MR. ELLWANGER:  NO, YOUR HONOR.

14          THE COURT:  WHAT IS HE GOING TO SAY?

15          MR. ELLWANGER:  WE ANTICIPATE THE WITNESS WILL SAY

16   THEY ARE HIS WRITINGS, BUT THAT HE DID NOT RECALL THEM BEING

17   ATTACHED TO THE NDA.

18      THE WAY THE QUESTION'S WERE PHRASED IN THE DEPOSITION WAS:

19   IS THIS A UNIFIED DOCUMENT?  AND THE LINE HE'S GOING TO DRAW

20   IS HE DIDN'T RECOGNIZE IT AT THE TIME AS A UNIFIED DOCUMENT.

21   BUT HE DOES, UPON REVIEWING THEM, RECOGNIZE THEM AS HIS OWN

22   WORK.

23          THE COURT:  OKAY.  WELL, I JUST YOU WILL JUST IMPEACH

24   HIM WITH HIS DEPO, THEN.

25          MR. REINES:  WOULD VOIR DIRE BE APPROPRIATE, BECAUSE
```

```
1    HE SAID HE NEVER READ THE DOCUMENT, DOESN'T KNOW WHO WROTE IT?

2         THE COURT:  NO.  CROSS-EXAMINATION WOULD BE

3    APPROPRIATE.

4      ALL RIGHT.  WE WILL BRING IN THE JURY.  YOU CAN -- OH, WE

5    WILL DO THE VIDEO FIRST.

6      GO AHEAD.  BRING IN THE JURY.  I AM JUST TALKING TO THEM.

7      YOU ARE READY TO GO WITH THE VIDEO, THEN?

8         THE CLERK:  YES.  I NEED TO PUT IT ON "PUBLISH."

9         THE COURT:  AND IS YOUR WITNESS IN THE COURTROOM?

10         MR. ELLWANGER:  HE IS NOT, YOUR HONOR.  WOULD YOU

11    LIKE US TO BRING HIM IN?

12         THE COURT:  YES.

13         MR. ELLWANGER:  AND THERE WAS AN ADDITIONAL ISSUE WE

14    WANTED TO RAISE, BECAUSE IT WILL BE GERMANE TO THE NEXT

15    WITNESS.

16         THE COURT:  WELL, IT IS A LITTLE TOO LATE NOW.  BUT

17    GET YOUR WITNESS HERE SO WE CAN CALL HIM RIGHT UP.

18         MR. REINES:  YOUR HONOR, WE WOULD LIKE TO INVOKE THE

19    RULE ON WITNESSES.

20         THE COURT:  WITNESSES ARE EXCLUDED EXCEPT FOR THE

21    PARTY REPRESENTATIVE, EXPERTS AND THE WITNESS WHO IS

22    TESTIFYING.  BUT HE CAN BE HERE DURING THE VIDEO.

23         (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

24         THE COURT:  WHAT WAS THE EXHIBIT NUMBER YOU WERE JUST

25    TALKING ABOUT?
```

1      PLEASE BE SEATED.

2           **MR. REINES:**  121A AND B.

3           **THE COURT:**  GOOD MORNING, LADIES AND GENTLEMEN.

4    THANK YOU FOR BEING PROMPT.

5      NOW, WE ARE GOING TO SHOW THE VIDEO THAT WE TRIED TO SHOW

6    YESTERDAY.  WE HOPE YOU CAN HEAR IT THIS TIME.  LET US KNOW.

7    AND THEN, WE WILL CALL THE WITNESS.

8      GO AHEAD.

9                        (VIDEO PLAYED.)

10          **THE COURT:**  ALL RIGHT.  YOU MAY CALL YOUR FIRST

11   WITNESS.

12          **MR. ELLWANGER:**  YOUR HONOR, AT THIS POINT DIGITAL REG

13   CALLS PATRICK PATTERSON.

14          **THE CLERK:**  MR. PATTERSON, IF YOU CAN COME UP TO THE

15   WITNESS STAND, PLEASE, AND RAISE YOUR RIGHT HAND FOR ME.

16          **MR. REINES:**  YOUR HONOR, THE RULE WAS INVOKED, AND

17   THERE ARE MULTIPLE WITNESSES FROM --

18          **THE COURT:**  ALL WITNESSES EXCEPT EXPERTS.

19          **MR. REINES:**  RIGHT.

20          **THE COURT:**  YOU DON'T WANT TO EXCLUDE EXPERTS.

21          **MR. REINES:**  THAT IS CORRECT.  IT IS THE FACT

22   WITNESS.

23          **THE COURT:**  SO YOU NEED TO LOOK AROUND THE COURTROOM

24   AND SEE IF ANY WITNESSES ARE PRESENT, AND IF THEY ARE, ASK

25   THEM TO LEAVE.

1        RAISE YOUR RIGHT HAND, PLEASE, SIR.

2        (**PATRICK PATTERSON**, CALLED AS A WITNESS FOR THE PLAINTIFF,

3     HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

4            **THE WITNESS:**  I DO.

5            **THE CLERK:**  YOU MAY BE SEATED.  ONCE SEATED, I'M

6     GOING TO ASK THAT YOU STATE AND SPELL YOUR FIRST AND LAST NAME

7     FOR THE RECORD, PLEASE.

8            **THE WITNESS:**  MY FIRST NAME IS PATRICK,

9     P-A-T-R-I-C-K.  LAST NAME IS PATTERSON, P-A-T-T-E-R-S-O-N.

10           **THE CLERK:**  THANK YOU.

11           **MR. ELLWANGER:**  YOUR HONOR?

12           **THE COURT:**  IS THERE SOME DISPUTE WHO IS A TESTIFYING

13    WITNESS?

14           **MR. ELLWANGER:**  WELL, YOUR HONOR ALSO EXCLUDED

15    CORPORATE REPRESENTATIVES, AND BOTH GENTLEMEN IN THE COURTROOM

16    ARE REPRESENTATIVES OF DIGITAL REG HERE IN THAT CAPACITY.

17           **MR. REINES:**  MY UNDERSTANDING, YOUR HONOR, IS ONE

18    CORPORATE REPRESENTATIVE.

19           **THE COURT:**  ONE.

20           **MR. ELLWANGER:**  WELL, OUR UNDERSTANDING IS THAT THERE

21    ARE MULTIPLE CORPORATE REPRESENTATIVES FOR ADOBE.

22           **THE COURT:**  ONE.

23           **MR. REINES:**  YOUR HONOR, WE HAVE ONE CORPORATE

24    REPRESENTATIVE.  IN-HOUSE COUNSEL, WHO IS NOT A WITNESS IN THE

25    CASE.

1        **THE COURT:**  GO AHEAD.

2    WE ARE GOING TO NEED HIS DEPO, I THINK.  THE ORIGINAL?

3        **MR. ELLWANGER:**  THESE ARE THE EXHIBITS, YOUR HONOR.

4    WE DID NOT INCLUDE THE DEPOSITION.

5        **THE COURT:**  OKAY.  I HAVE A FEELING WE ARE GOING TO

6    NEED IT, SO YOU BETTER DIG IT OUT.

7        **THE CLERK:**  ARE YOU GIVING THE WITNESS PAPER

8    EXHIBITS?  IS THAT WHAT YOU ARE TRYING TO HAND UP?  BECAUSE

9    OTHER THAN THAT WE DON'T NEED ANYTHING HANDED UP TO THE COURT

10   UNLESS IT IS SOMETHING SHE'S REQUESTING.

11       **MR. ELLWANGER:**  MAY I APPROACH, YOUR HONOR?

12       **THE COURT:**  YES.

13           (BINDER HANDED TO WITNESS.)

14       **THE WITNESS:**  THANK YOU.

15                  **DIRECT EXAMINATION**

16   BY MR. ELLWANGER

17   **Q.**  GOOD MORNING, MR. PATTERSON.

18   **A.**  GOOD MORNING TO YOU.

19   **Q.**  COULD YOU PLEASE INTRODUCE YOURSELF TO THE JURY?

20   **A.**  YES.  GOOD MORNING TO YOU, AS WELL.  MY NAME IS PATRICK

21   PATTERSON.  I'M 67 YEARS OLD.  I'M RETIRED.  I LIVE WITH MY

22   WIFE, DEBBIE, IN MEXICO.  WE LIVE IN CENTRAL MEXICO UP IN THE

23   HIGHLANDS, IN A LITTLE TOWN CALLED SAN MIGUEL DE ALLENDE.

24   **Q.**  MR. PATTERSON, IF YOU COULD, PLEASE, TELL THE JURY WHY YOU

25   ARE HERE TODAY TO TESTIFY.

1   **A.**  WELL, I'M HERE TODAY BECAUSE I'M A WITNESS FOR A COMPANY

2   THAT IS CALLED DIGITAL REG.  I'M ALSO THE INVENTOR OF TWO

3   PATENTS, AND THOSE PATENTS ARE WHAT IS AT ISSUE HERE.  DIGITAL

4   REG, THEY OWN THE PATENTS, BUT I AM THE INVENTOR OF THEM, AND

5   THAT'S WHY I WAS CALLED HERE TO TESTIFY.

6   **Q.**  OKAY.  WE WILL TALK ABOUT THOSE PATENTS IN JUST A MOMENT,

7   MR. PATTERSON.  BUT, FIRST, I WOULD LIKE THE JURY TO GET A

8   CHANCE TO KNOW YOU A LITTLE BIT BETTER.

9   **A.**  ALL RIGHT.

10  **Q.**  COULD YOU TELL THE JURY WHERE YOU WENT TO SCHOOL?

11  **A.**  I WENT TO COLLEGE AT THE UNIVERSITY OF NORTH CAROLINA AT

12  CHAPEL HILL.

13  **Q.**  AND DID YOU GRADUATE FROM UNC?

14  **A.**  YES, I WAS GRADUATED IN 1968.  AND, IN FACT, I WAS

15  ADMITTED TO THE UNIVERSITY OF NORTH CAROLINA LAW SCHOOL, BUT I

16  ALSO RECEIVED MY DRAFT NOTICE IN JUNE OF 1968 FOR THE U.S.

17  ARMY.

18  **Q.**  AND DID YOU SERVE IN THE U.S. ARMY?

19  **A.**  YES, I DID.  I WAS LIEUTENANT IN THE FIELD ARTILLERY.  AND

20  I SERVED 13 MONTHS.  I WENT TO THE DEMILITARIZED ZONE IN SOUTH

21  KOREA, AND THEN I RETURNED TO THE UNITED STATES TO FORT BRAGG.

22  AND, IN FACT, THAT'S WHERE I TOOK MY FIRST COBALT PROGRAMMING

23  CLASSES.  AND I BECAME A CREDENTIALED COBALT PROGRAMMER.  IN

24  FACT, I TAUGHT COBALT PROGRAMMING MY LAST FEW MONTHS AT FORT

25  BRAGG TO DISABLED SOLDIERS.

PATTERSON – DIRECT / ELLWANGER

1  **Q.** ANY OTHER PROGRAMMING WORK WHILE YOU WERE IN THE MILITARY?

2  **A.** NOT REALLY. ALL STARTED RIGHT AFTER THAT.

3  **Q.** TELL THE JURY WHAT OTHER PROGRAMMING EXPERIENCE YOU GAINED

4  AFTER YOU LEFT THE ARMY.

5  **A.** WELL, IT WAS MORE THAN JUST PROGRAMMING. I BECAME A

6  SYSTEMS ANALYST AND COMPUTER SOFTWARE DESIGNER. I DID LEARN

7  TO WRITE COMPUTER CODE IN BASIC. THAT WAS MY LANGUAGE OF

8  CHOICE. IT WAS CALLED "BASIC INTERPRETER" OR "BASIC

9  COMPILER."

10  MY APPLICATION CODING EXPERIENCE FOR WRITING APPLICATIONS

11  THAT WOULD INTERFACE WITH A CUSTOMER WAS IN A HIGH-LEVEL

12  LANGUAGE CALLED "DATABUS." AND, OF COURSE, I HAD -- THOSE

13  DAYS I HAD A PRETTY GOOD WORKING KNOWLEDGE OF A LANGUAGE

14  CALLED C OR C PLUS PLUS, BUT I CERTAINLY WAS NOT A PROGRAMMER

15  OF THAT LANGUAGE.

16  **Q.** AND AFTER THE MILITARY, AFTER YOUR MILITARY SERVICE ENDED,

17  DID YOU GO BACK TO SCHOOL?

18  **A.** YES. AS A MATTER OF FACT, AFTER I GOT OUT OF THE

19  MILITARY, I USED THE GI BILL, AND I HAD A SCHOLARSHIP AND I

20  ATTENDED THE UNIVERSITY OF SOUTH CAROLINA. THAT IS WHERE I

21  EARNED MY MASTERS IN BUSINESS ADMINISTRATION, MY MBA.

22  **Q.** YOU MENTIONED THESE OTHER PROGRAMMING LANGUAGES THAT YOU

23  LEARNED. DID YOU TAKE ANY FORMAL CLASSES?

24  **A.** WELL, YOU KNOW, I WAS SELF-TAUGHT, REALLY. I WAS LIKE A

25  LOT OF GUYS BACK THEN WHO WENT ON TO INVENT SOME PRETTY COOL

1    TECHNOLOGY.  I MEAN, WE JUST WENT OUT AND HAD A NEW IDEA, AND

2    WE INVENTED THINGS.  WE JUST -- WE JUST -- I WOULD JUST CALL

3    IT OJT, SELF-LEARNING.  BUT, YEAH, I ALSO HAD FORMAL COURSES

4    IN COMPUTER DESIGN AND PROGRAMMING.

5    **Q.**  WHERE DID YOU TAKE THOSE COURSES?

6    **A.**  GOSH, I HAD CLASSES IN LOWELL, MASSACHUSETTS, SAN ANTONIO,

7    TEXAS.  OF COURSE, WASHINGTON, D.C. I CAME OUT HERE.  I HAD

8    TIME OUT HERE IN HAWTHORNE, CALIFORNIA, I WAS IN CARLSBAD,

9    CALIFORNIA.  I TOOK SYSTEM DESIGN CLASSES IN CHICAGO.

10   **Q.**  THANK YOU, MR. PATTERSON.

11       NOW, AFTER YOU GRADUATED FROM THE UNIVERSITY OF SOUTH

12   CAROLINA WITH YOUR MBA, WHERE DID YOU GO TO WORK?

13   **A.**  I WENT TO WORK FOR A REGIONAL BANK IN THE STATE OF SOUTH

14   CAROLINA.

15   **Q.**  WHAT WAS IT CALLED?

16   **A.**  FIRST CITIZENS.

17   **Q.**  WHAT DID YOU DO FOR FIRST CITIZENS BANK?

18   **A.**  I WAS HIRED TO DIRECT THE CONVERSION OF THEIR DEMAND

19   DEPOSIT ACCOUNTING OF THE CHECKING ACCOUNT SYSTEM.  BUT

20   EVERYTHING BACK THEN WAS ALL -- YOU DID IT ALL BY HAND.  YOU

21   HAD SLIPS OF PAPER.  THERE WERE NO COMPUTERS.  AND I WAS HIRED

22   TO CONVERT IT OVER TO A TOTALLY COMPUTERIZED SYSTEM.

23   **Q.**  WERE YOU ABLE TO DO THAT?

24   **A.**  OH, SURE.

25   **Q.**  AFTER YOU FINISHED YOUR WORK AT THE BANK, WHERE DID YOU GO

1    NEXT?

2    **A.**  WELL, I ACTUALLY WENT TO WORK FOR ONE OF THE BANK'S

3    CLIENTS CALLED THE SOUTHERN GAS COMPANY.

4    **Q.**  WHAT DID YOU DO FOR SOUTHERN GAS?

5    **A.**  I DESIGNED AND IMPLEMENTED A LIQUID FUELS INVENTORY

6    MANAGEMENT AND CONTROL SYSTEM FOR THEM.

7    **Q.**  WAS THAT A COMPUTERIZED SYSTEM?

8    **A.**  IT WAS TOTALLY COMPUTERIZED, YES.

9    **Q.**  DID YOU HAVE ANY OTHER JOBS RELATED TO TECHNOLOGY?

10   **A.**  WELL, I GUESS.  WELL, I WORKED FOR WANG LABORATORIES.

11   THEY WERE ALL ABOUT TECHNOLOGY.  AND I WORKED FOR AMERICAN

12   MANAGEMENT SYSTEMS, AND WE DESIGNED SOME OF THE LARGEST --

13   LARGEST COMPUTER SYSTEMS IN THE PUBLIC SECTOR.

14   **Q.**  AND WAS IT YOUR ROLE AT THOSE COMPANIES TO DESIGN SYSTEMS?

15   **A.**  DESIGN, INSTALL, YEAH.  QUALITY CONTROL.

16   **Q.**  YOU MENTIONED WANG LABORATORIES AND AMERICAN MANAGEMENT

17   SYSTEMS.  WHAT YEAR ARE WE UP TO AT THIS POINT?

18   **A.**  OH, GOSH, I -- THAT WOULD BE ABOUT 1983 OR '84.

19   **Q.**  OKAY.  AND AFTER YOU LEFT THOSE COMPANIES WHERE DID YOU

20   WORK NEXT?

21   **A.**  OH, I WENT TO WORK FOR A COMPANY CALLED EXCALIBER

22   TECHNOLOGIES.

23   **Q.**  WHAT WAS YOUR JOB AT EXCALIBER?

24   **A.**  WELL, I BECAME THE EXECUTIVE VICE PRESIDENT OF EXCALIBER

25   TECHNOLOGIES.

1    **Q.**  WHAT WERE YOUR SPECIFIC DUTIES THERE?

2    **A.**  WELL, I WAS RESPONSIBLE FOR THE COMPUTER APPLICATIONS THAT

3    WE BUILT FOR OUR CUSTOMERS.  WE USED OUR OWN PROPRIETARY

4    PATTERN RECOGNITION.  AND OUR CUSTOMERS WOULD USE THESE

5    APPLICATIONS THAT WE BUILT FOR DESIGN SUPPORT ANALYSIS

6    REASONS.  AND MY RESPONSIBILITY WAS TO MAKE SURE THAT OUR

7    PROGRAMS NOT ONLY WERE RELIABLE BUT THAT THEY HAD TO COMPLY

8    WITH THE SPECIFICATIONS THAT WE HAD GIVEN TO OUR CUSTOMERS.

9    **Q.**  AND DID YOU OVERSEE THE DESIGN OF THOSE SPECIFICATIONS?

10   **A.**  RIGHT FROM THE TOP.  THE ACTUAL CONCEPTUAL DESIGN OF WHAT

11   THE SYSTEM WAS GOING TO DO DOWN THROUGH THE ACTUAL DETAILED

12   DATA FLOWS WE HAD.  AND EVEN INCLUDING WRITING THE ACTUAL

13   CODING SCRIPTS, YOU KNOW, THE LITTLE BIT OF GUIDANCE WE WOULD

14   GIVE TO A PROGRAMMER WHAT THEY WERE SUPPOSED TO DO.

15   **Q.**  MR. PATTERSON, I WOULD LIKE TO TURN YOUR ATTENTION TO THE

16   '541 AND THE '670 PATENT, AND TALK TO THE JURY FOR A LITTLE

17   BIT ABOUT HOW YOU CONCEIVED OF THOSE IDEAS THAT WOULD

18   EVENTUALLY BECOME THOSE PATENTS.  OKAY?

19       HOW DID YOU COME UP WITH THOSE IDEAS, MR. PATTERSON?

20   **A.**  FOR THE '541 AND THE '670?

21   **Q.**  CORRECT.

22   **A.**  WELL, WHAT SPARKED MY INTEREST IN THIS WHOLE THING WAS --

23   AND THIS WAS BACK IN 1993.  IT WAS THE FIRST PART OF THE YEAR.

24   I HAD A GOOD FRIEND OF MINE WHO LIVED IN BOSTON.  I WAS LIVING

25   IN THE WASHINGTON AREA.  AND WE WERE -- AT THE TIME WE WERE

PATTERSON – DIRECT / ELLWANGER

1  FAXING.  I GUESS EVERYBODY KNOWS WHAT A FAX IS.  BUT WE WERE

2  HAVING THIS CONTEST ABOUT NAMING:  "CAN YOU NAME THIS SONG?

3  DO YOU KNOW WHO THE ARTIST WAS" KIND OF A THING.  I WAS

4  TALKING TO HIM ON THE PHONE.

5       AND IT CAME UP, HE SAID, WELL, WHAT WAS MY FAVORITE SONG.

6  THIS WAS '93.  AND I TOLD HIM "LADY IN RED" BY CHRIS DE BURGH.

7  AND MY FRIEND SAID, "LADY IN RED"?  I HAVE NEVER EVEN HEARD OF

8  THAT SONG. CAN YOU SEND IT TO ME?

9       AND I DON'T KNOW.  IT JUST STRUCK ME RIGHT THERE ON THE

10  SPOT.  YOU KNOW, WHY WOULD IT HAVE TO BE SO DIFFICULT FOR ME

11  TO SEND HIM A SONG?  I WOULD SAY THAT'S WHAT REALLY SPARKED MY

12  INTEREST.

13  Q.  AND WHAT WERE THE REASONS THAT WERE SO DIFFICULT AT THE

14  TIME FOR YOU TO BE ABLE TO SEND A SONG TO HIM?

15  A.  WELL, THINK ABOUT HOW I WAS GOING TO DO IT.  YOU KNOW,

16  FIRST OFF, NO ONE WAS REALLY PUTTING MUSIC AND MAKING IT

17  AVAILABLE TO YOU.  IN FACT, THEY WERE TERRIFIED OF DOING THIS

18  BACK THEN.

19       I MEAN, IT JUST WASN'T LIKE IT IS TODAY.  YOU WEREN'T

20  GOING TO GET, YOU KNOW, ANY MUSICIAN WHO WANTED TO MAKE THEIR

21  MUSIC FREELY AVAILABLE SO PEOPLE COULD JUST HAND IT AROUND.

22  Q.  SO HOW DID THE PEOPLE -- WHAT DID PEOPLE START CALLING THE

23  TECHNOLOGY THAT PREVENTED YOU FROM JUST HANDING IT AROUND?

24  A.  WELL, THAT EVENTUALLY BECAME SOMETHING CALLED DRM, OR

25  DIGITAL RIGHTS MANAGEMENT.  IT WAS THE CONTROL SOFTWARE, IF

1    YOU WILL, THAT COULD PROTECT IT.

2    **Q.**  SO ONCE YOU SAW THIS PROBLEM, HOW DID YOU START TO ATTACK

3    IT?

4    **A.**  WELL, AGAIN, THIS IS 1993.  FIRST THING I WANTED TO DO IS

5    I WANTED TO BASICALLY UNDERSTAND WHAT -- YOU KNOW, WHAT WERE

6    THE CIRCUMSTANCES?  WHAT COULD I FIND OUT?  SO I REALLY

7    STARTED JUST THINKING ABOUT IF THE INTERNET WERE GOING TO BE A

8    USEFUL TOOL ONE DAY FOR PEOPLE TO USE TO SHARE INFORMATION,

9    AND THINGS OF THAT SORT, WHAT WAS IT GOING TO TAKE, REALLY, TO

10   BE ABLE TO WHAT I WOULD CALL ENSURE THAT A PIECE OF MUSIC OR A

11   BOOK OR MAGAZINE OR PERIODICAL COULD ACTUALLY BE SAFE.

12   **Q.**  AND WHY WAS IT IMPORTANT FOR THAT MATERIAL TO BE SAFE?

13   **A.**  WELL, LIKE I SAID EARLIER, I MEAN, THIS IS COPYRIGHTED

14   MATERIAL.  RIGHT?  SOMEBODY OWNED IT.  IF IT WAS MUSIC, IT WAS

15   AN ARTIST OWNED IT.  IF IT WAS A BOOK, AN AUTHOR HAD WRITTEN

16   IT.

17       IF IT WERE GOING TO BE ON A COMPUTER IN AN ELECTRONIC

18   FORM, THEY WANTED TO MAKE SURE THAT ONLY THE PERSON WHO, YOU

19   KNOW, EITHER BOUGHT IT OR WAS AUTHORIZED TO HAVE IT COULD HAVE

20   IT.  NOT JUST GIVE IT AWAY TO SOMEBODY ELSE AND HAVE THEM MAKE

21   COPIES OF IT.

22   **Q.**  WHAT DID YOU DO NEXT?

23   **A.**  WELL, I DECIDED I WOULD -- I WOULD FIGURE IT OUT.  I MEAN,

24   I WAS STRUCK BY THE LOGIC OF THE SITUATION, BECAUSE IN

25   THOSE -- AT THAT TIME WHAT WE DID HAVE WAS EVERYBODY HAD A

1    COMPUTER THAT ONE WAY OR ANOTHER, IF YOU LOOKED INSIDE OF IT,

2    YOU COULD FIGURE IT OUT.  IT WAS KIND OF UNIQUE, LIKE A VIN

3    NUMBER OF A CAR. TODAY EVERY CAR HAS A UNIQUE VIN NUMBER.  AND

4    EVEN IN '93 -- BACK IN '93 I COULD GET INTO A COMPUTER AND

5    LOOK AT THE CPU OR THE MOTHERBOARD, THE MAIN BOARD.  WE COULD

6    GET NUMBERS, RIGHT?  AND I JUST WANTED TO MAKE SURE THAT WE

7    COULD COME UP WITH A METHOD OF KIND OF USING THAT KIND OF

8    INFORMATION TO ASSOCIATE COPYRIGHTED MATERIAL, MAYBE WITH A

9    PARTICULAR COMPUTER.

10   **Q.**  AND DID YOU START WRITING DOWN YOUR IDEAS?

11   **A.**  I SPENT ALL OF '93, ALL OF '94 INTERVIEWING PEOPLE, GOING

12   TO MY FORMER EMPLOYEES OUT HERE IN CALIFORNIA FROM EXCALIBER,

13   TALKING TO PEOPLE IN BASICALLY THE COMPUTER SOFTWARE,

14   COLLECTING UP INFORMATION, BUILDING A DATABASE.

15       AND I BEGAN MY SOFTWARE DESIGN FOR EXACTLY WHAT I WANTED

16   TO DO FROM THE CONCEPT RIGHT DOWN TO WHAT THE -- WHAT THE

17   ACTUAL FLOW CHARTS HAD TO BE.  THAT IS WHAT I WAS WORKING ON

18   ALL THROUGH '93, '94 AND MOST OF '95.

19   **Q.**  WHEN DO YOU THINK YOU HAD YOUR INVENTION?

20   **A.**  WELL, I CAN REMEMBER SPECIFICALLY, BECAUSE ONCE I HAD ALL

21   OF MY SYSTEM DESIGN, MY FLOW CHARTS, MY CODING SCRIPTS FOR THE

22   PIECES OF MY INVENTION THAT I NEEDED, HAD THEM ALL IN MY

23   CODING BOOKS AND ARRANGED, I DECIDED I WAS GOING TO START MY

24   OWN COMPANY.  AND THAT WAS RIGHT AT THE START OF 1996.

25   **Q.**  WHAT WAS THE NAME OF YOUR COMPANY?

1    **A.**  I NAMED MY COMPANY PC DESKGATE.  I INCORPORATED IT, I

2    THINK IN MARCH OF -- MIGHT HAVE EVEN BEEN FEBRUARY OF 1996.

3    **Q.**  DID YOU HIRE ANY EMPLOYEES?

4    **A.**  WELL, THAT WAS THE FIRST THING I DID.  I HIRED THREE

5    EMPLOYEES, AND I CONTRACTED WITH A NETWORKING COMPUTER

6    SERVICES FIRM SO I COULD HAVE, YOU KNOW, MY OWN NETWORK

7    SERVICES AND ROUTERS AND THINGS OF THAT SORT.  OF COURSE, WE

8    BOUGHT SOME COMPUTERS.

9    **Q.**  WHAT WAS THE FIRST GOAL OF PC DESKGATE?

10   **A.**  WELL, ALL RIGHT, AS MUCH AS I WANTED TO, I WANTED TO GET

11   STARTED ON TRANSLATING MY INVENTIONS THAT I HAD DOCUMENTED

12   INTO APPLICATION CODE.

13       BUT I HAD TO HAVE MONEY.  I MEAN, I HAD TO GO OUT AND

14   RAISE MONEY.  AND SO THE FIRST THING I WANTED WAS SOMETHING

15   THAT I COULD DEMONSTRATE MY CONCEPTS IN.  HERE I NEEDED

16   SOMETHING.  SO I WANTED TO BUILD THIS THING CALLED A UNIVERSAL

17   ENVELOPE.  THAT WAS WHAT I WOULD SAY WAS MY FIRST GOAL.

18   **Q.**  WHAT WAS THE UNIVERSAL ENVELOPE?

19   **A.**  WELL, TODAY YOU WON'T THINK MUCH OF IT.  BUT AT THE TIME I

20   JUST TOOK THE WINDOWS -- WINDOWS 95 HAD COME OUT, WHICH WAS A

21   VERY GOOD THING.  AND I WAS ABLE TO TAKE THE WINDOWS FILE

22   SYSTEM.  AND I JUST HAD AN IMAGE, A PICTURE THAT LOOKED LIKE

23   AN ENVELOPE.  AND SO WHEN YOU OPENED IT, YOU WERE JUST OPENING

24   THE WINDOWS FILE SYSTEM, BUT YOU COULD TAKE ANOTHER FILE AND

25   COPY IT AND PUT IT IN THE ENVELOPE.  AND YOU COULD CLOSE UP

1    THE ENVELOPE.

2         AND I HAD IT MADE SO YOU COULD PUT A PASSWORD ON IT.  YOU

3    COULD THEN SEND THAT ON AN EMAIL AS AN ATTACHMENT.  AND IF YOU

4    GAVE THE PERSON YOU WERE SENDING IT TO THE PASSWORD, OF COURSE

5    THEY CAN OPEN IT UP.  NOTHING UNUSUAL ABOUT THAT, RIGHT?

6         BUT WHAT I WANTED WAS TO DEMONSTRATE WHILE ALL THAT WAS

7    GREAT, BUT WHEN YOU TOOK THE FILES OUT OF THE ENVELOPE THEY

8    WEREN'T SAFE ANYMORE.  YOU COULD TAKE THOSE FILES AND SEND

9    THEM TO ANYBODY YOU WANTED TO, RIGHT?

10        THAT WAS EXACTLY WHAT MY INVENTION I DESIGNED WAS INTENDED

11   TO DO:  KEEP THOSE FILES SAFE.

12   **Q.**  WHAT DID YOU DO NEXT?

13   **A.**  ONCE I HAD THAT, AND I STARTED SETTING UP MEETINGS WITH

14   ANGEL INVESTORS, FRIENDS, MY OWN FAMILY.  I WENT TO VENTURE

15   CAPITALISTS.  AND I USED THIS PRODUCT TO DEMONSTRATE EXACTLY

16   WHAT I WAS ASKING THEM THE MONEY FOR.

17   **Q.**  BEFORE YOU HAD MEETINGS WITH SOME OF THESE FOLKS, WOULD

18   YOU MAKE THEM SIGN AGREEMENTS TO KEEP IT PRIVATE?

19   **A.**  OH, YES.  IN FACT, WHEN I INCORPORATED MY COMPANY IT WAS

20   WITH A PRETTY -- WHAT I THOUGHT -- BIG NAME LAW FIRM, REED,

21   SMITH, SHAW & MCCLAY.  THEY WERE PROVIDING ALL OF THE

22   CORPORATE GOVERNANCE FOR ME, SO I WAS OUTFITTED WITH

23   CONFIDENTIALITY STATEMENTS AND NONDISCLOSURE AGREEMENTS.  AND

24   YOU HAD TO SIGN THESE ITEMS.

25   **Q.**  THERE IS A BINDER THAT I HANDED UP TO YOU EARLIER, AND

1    INSIDE THAT BINDER THERE IS A DOCUMENT THAT IS MARKED WITH A

2    TAB 121A.  CAN YOU TAKE A LOOK AT THAT, MR. PATTERSON?

3              **THE CLERK:**  IS 121A THE EXHIBIT NUMBER?

4              **MR. ELLWANGER:**  YES, IT IS.

5              **THE COURT:**  YOU NEED TO NOT USE "TAB," AND SAY

6    EXHIBIT MAKE IT CLEAR TO ME AND THE REPORTER IT IS AN EXHIBIT.

7              **MR. ELLWANGER:**  YES, YOUR HONOR –– YES, MA'AM.

8    **BY MR. ELLWANGER**

9    **Q.**  LOOK AT 121A.

10   **A.**  ALL RIGHT.  I AM LOOKING AT –– THERE IS A COVER SHEET.  DO

11   YOU WANT ME TO TURN THE COVER SHEET?

12   **Q.**  YES, YOU CAN LOOK AT THE NEXT TWO PAGES OF THE DOCUMENT.

13   **A.**  I SEE.

14   **Q.**  AFTER YOU HAVE HAD A MOMENT TO REVIEW THAT DOCUMENT,

15   MR. PATTERSON, CAN YOU LOOK UP?

16   **A.**  LET ME LOOK AT IT.  I THINK I KNOW WHAT YOU HAVE GIVEN ME

17   HERE.

18       SURE.  OKAY.  I KNOW WHAT THIS IS.

19   **Q.**  AND WITHOUT GOING INTO THE DETAILS OF THE DOCUMENT, CAN

20   YOU JUST IDENTIFY WHAT PLAINTIFF'S EXHIBIT 121A IS?

21   **A.**  THIS IS ONE OF THE CONFIDENTIALITY AGREEMENTS.  IT IS

22   ACTUALLY CALLED A "NONDISCLOSURE AGREEMENT" HERE.  AND THIS

23   WAS SIGNED BY A FELLOW NAMED PAT DANE, FOR DANE INTERLOGIC WAS

24   THE COMPANY, AS I RECALL.

25   **Q.**  DID YOU ALSO SIGN THAT DOCUMENT?

PATTERSON – DIRECT / ELLWANGER

1    **A.**  YEAH, I SIGNED IT.  I SIGNED IT, UH-HUH.

2    **Q.**  IS THIS A FAIR AND ACCURATE COPY OF THE DOCUMENT YOU

3    SIGNED?

4    **A.**  THIS APPEARS TO BE, YEAH, AN EXACT COPY OF THE DOCUMENT.

5            **MR. ELLWANGER:**  YOUR HONOR, PLAINTIFFS OFFER EXHIBIT

6    121A.

7            **MR. REINES:**  NO OBJECTION, YOUR HONOR.

8            **THE COURT:**  RECEIVED.

9        (PLAINTIFF'S EXHIBIT 121A RECEIVED IN EVIDENCE)

10   **BY MR. ELLWANGER**

11   **Q.**  NEXT, I WANT YOU TO LOOK AT THE TAB FOR PLAINTIFF'S 121B.

12   **A.**  121B, OKAY.  AGAIN, THERE IS A COVER SHEET.

13   **Q.**  GO AHEAD AND LOOK THROUGH THE PAGES OF THE DOCUMENT, AND

14   LOOK UP WHEN YOU ARE DONE.

15   **A.**  (WITNESS REVIEWING EXHIBIT.)

16       DO YOU WANT ME TO READ ALL THIS?

17   **Q.**  JUST SUFFICIENT FOR YOU TO BE ABLE TO IDENTIFY THE

18   DOCUMENT, MR. PATTERSON.  WE WILL ASK IN MORE DETAIL ABOUT IT

19   AFTER YOU HAVE.

20   **A.**  ALL RIGHT.  I'VE LOOKED AT IT.

21   **Q.**  CAN YOU IDENTIFY THAT DOCUMENT?

22   **A.**  YES.  I CAN IDENTIFY THIS DOCUMENT.

23   **Q.**  WHAT IS IT?

24   **A.**  WELL, THIS APPEARS TO BE RIGHT OUT OF MY WORK PAPERS, MY

25   SYSTEM DESIGN PAPERS.  THESE ARE PIECES OF CODINGS SCRIPTS AND

PATTERSON – DIRECT / ELLWANGER

1    INSTRUCTIONS OUT OF MY INVENTION THAT I SPENT MOST OF 1994,

2    '95 CREATING.

3    **Q.**   ARE THESE PAGES INITIALED?

4    **A.**   YES, EVERY ONE IS INITIALED.

5    **Q.**   CAN YOU TELL BY WHOM?

6    **A.**   WELL, I -- LET ME SEE.  IT LOOKS -- I WOULD SAY IT'S "PD."

7    THAT WOULD BE PAT DANE.

8             **MR. REINES:**  OBJECTION, YOUR HONOR, SPECULATION.

9             **MR. ELLWANGER:**  YOUR HONOR, THE WITNESS --

10            **THE COURT:**  HE'S TRYING TO LAY A FOUNDATION.

11   **BY MR. ELLWANGER**

12   **Q.**   MR. PATTERSON, COULD YOU LOOK BACK AT 121A, ON THE LAST

13   PAGE OF THE DOCUMENT?

14   **A.**   AH.

15   **Q.**   DO YOU SEE AT THE BOTTOM OF PAGE 121A A SIGNATURE BY

16   MR. PAT DANE?

17   **A.**   YES.

18   **Q.**   NOW, I WANT YOU TO LOOK AT THE PLAINTIFF'S EXHIBIT 121B,

19   THE ONE YOU WERE JUST LOOKING AT.  DO YOU SEE THAT SAME

20   SIGNATURE?

21   **A.**   YES.

22   **Q.**   WHICH PAGES DO YOU SEE IT ON?

23   **A.**   ON PAGE 1, 2, 3, 4 AND 5.

24   **Q.**   DO YOU ALSO SEE A DATE NEXT TO THAT --

25   **A.**   AND 6.

PATTERSON – DIRECT / ELLWANGER

1  **Q.**  DO YOU SEE A DATE NEXT TO THAT SIGNATURE?

2  **A.**  YES.  THE DATE IS 12/3/1996.

3  **Q.**  AND LOOKING BACK TO EXHIBIT 121A --

4  **A.**  YES.

5  **Q.**  -- DO YOU SEE A DATE THAT MR. DANE SIGNED THAT DOCUMENT?

6  **A.**  12/3/1996.

7  **Q.**  IS 121B A FAIR AND ACCURATE COPY OF THOSE PAPERS YOU JUST

8  DESCRIBED?

9  **A.**  121B?  YES, IT IS A FAIR AND ACCURATE COPY.

10  **MR. ELLWANGER:**  YOUR HONOR, PLAINTIFFS OFFER

11  PLAINTIFF'S EXHIBIT 121B.

12  **MR. REINES:**  OBJECTION, YOUR HONOR.

13  **THE COURT:**  WHAT ARE THEY A COPY OF?

14  **MR. ELLWANGER:**  HIS WORK PAPERS, YOUR HONOR, FROM HIS

15  DESIGN OF THE --

16  **THE COURT:**  INITIALED BY SOMEONE ELSE.

17  **MR. ELLWANGER:**  AS PART OF THE NDA AGREEMENT THAT HAS

18  BEEN ADMITTED AS EXHIBIT 121A, YOUR HONOR.

19  **MR. REINES:**  OBJECTION.  NO FOUNDATION FOR THAT.

20  **MR. ELLWANGER:**  YOUR HONOR, THE WITNESS HAS TESTIFIED

21  THAT HE RECOGNIZES THESE PAGES, AND THAT HE RECOGNIZES THEM AS

22  BEING A PART OF THE AGREEMENT THAT WAS JUST ENTERED, AND THAT

23  THEY ARE A FAIR AND ACCURATE COPY OF THEM.

24  **THE COURT:**  COULD YOU ASK HIM THAT AGAIN?  I HEARD

25  HIM IDENTIFYING SOMEBODY ELSE'S INITIALS, WHICH SOMETIMES

```
 1    PEOPLE WILL LAY A FOUNDATION BY SAYING:
 2        "ARE YOU FAMILIAR WITH THIS PERSON'S SIGNATURE?  HOW MANY
 3    TIMES HAVE YOU SEEN IT?  IS THIS IT?"
 4        IF HE IS JUST LOOKING AT IT AND SAYING:
 5        "WELL, IT LOOKS SIMILAR," WELL, WE CAN ALL SAY WHETHER IT
 6    LOOKS SIMILAR OR NOT.  NONE OF US IS A HANDWRITING EXPERT.
 7            MR. ELLWANGER:  ABSOLUTELY.
 8            THE COURT:  BUT IF YOU COULD GO BACK.  MAYBE I MISSED
 9    IT.  GO BACK OVER AGAIN THE PART WHERE HE SAYS ALL THE
10    TYPEWRITTEN STUFF IS HIS WORK.
11            MR. ELLWANGER:  YES.  HAPPY TO.
12            THE COURT:  REGARDLESS OF WHO INITIALED IT.
13            MR. ELLWANGER:  YES, YOUR HONOR.
14            THE COURT:  IS THAT WHAT YOU ARE TRYING TO SAY?
15            MR. ELLWANGER:  IT IS.  AND WE ARE HAPPY TO GO
16    THROUGH THAT AGAIN.
17    BY MR. ELLWANGER
18    Q.  MR. PATTERSON, IF YOU CAN LOOK AT 121B.
19    A.  121B?
20    Q.  YES.  LOOK THROUGH THE SIX PAGES OF THAT DOCUMENT.  AND
21    TAKE YOUR TIME, SIR.
22    A.  YES.
23    Q.  AND TELL ME WHEN YOU HAVE HAD A CHANCE TO REVIEW 121B.
24            THE CLERK:  THIS SHOULD ALSO BE ON YOUR SCREEN.
25    A.  (WITNESS REVIEWING EXHIBIT.)
```

PATTERSON – DIRECT / ELLWANGER

1          OKAY.  WHAT DO YOU WANT TO KNOW ABOUT IT?

2    **Q.**  DO YOU RECOGNIZE THAT DOCUMENT?

3    **A.**  I RECOGNIZE THIS DOCUMENT.

4    **Q.**  WHAT IS IT?

5    **A.**  THIS DOCUMENT IS STRAIGHT OUT OF MY COMPUTER SOFTWARE

6    DESIGN PAPERS THAT INCLUDES MY CODING SCRIPTS THAT I USE FOR

7    MY 3 INVENTIONS.  YOU CAN READ HOW IT OPERATES ON EACH OF

8    THESE PAGES.

9    **Q.**  IS THAT A FAIR AND ACCURATE COPY OF THOSE PAPERS YOU JUST

10   DESCRIBED?

11   **A.**  THIS IS A FAIR AND ACCURATE COPY OF MY WORK, YES.  THOSE

12   PAPERS.

13            **MR. ELLWANGER:**  YOUR HONOR, PLAINTIFFS OFFER

14   PLAINTIFF'S 121B.

15            **THE COURT:**  YOU WROTE THESE PAPERS?  YOU WROTE THIS

16   DOCUMENT?

17            **THE WITNESS:**  I WROTE EVERYTHING ON THESE PAPERS,

18   YES, I DID.

19            **THE COURT:**  OKAY.  ALL RIGHT?  IT WILL BE RECEIVED.

20        (PLAINTIFF'S EXHIBIT 121B RECEIVED IN EVIDENCE)

21            **MR. ELLWANGER:**  NOW, IF WE COULD PLEASE PUT 121B ON

22   THE SCREEN.

23                    (PUBLISHED TO JURY.)

24   **BY MR. ELLWANGER**

25   **Q.**  MR. PATTERSON, THERE IS A SCREEN IN FRONT OF YOU THAT

1   SHOULD SHOW 121B.  AND ON THAT VERY FIRST PAGE, THE VERY TOP

2   OF THE AGREEMENT --

3          **MR. ELLWANGER:**  MS. MASON, IF YOU CAN BLOW UP THE

4   FIRST PARAGRAPH.

5   **BY MR. ELLWANGER**

6   **Q.**  DO YOU SEE THIS IS RELATED TO 121A, THAT NONDISCLOSURE

7   AGREEMENT YOU JUST DISCUSSED?

8   **A.**  YES, I CAN READ THAT RIGHT HERE.  UH-HUH.

9   **Q.**  AND HOW DO YOU -- WHAT DOES IT SAY?

10  **A.**  WELL, IT SAYS THAT THE SEVEN PAGES OF THIS DOCUMENT, THE

11  ONES THAT HAVE ALL THESE INITIALS ON IT, ARE NOT ONLY

12  CONFIDENTIAL, BUT THAT THEY ARE COVERED BY THE NONDISCLOSURE

13  AGREEMENT THAT I HAVE SIGNED, AND HE HAS SIGNED.  AND THE

14  INITIALS CONFIRM THAT HE IS RECOGNIZING THE CONFIDENTIAL

15  NATURE THAT'S ALSO DESCRIBED IN THE NONDISCLOSURE AGREEMENT.

16  **Q.**  LET'S BACK UP FOR A SECOND.  WHY ARE YOU MEETING WITH THIS

17  MR. DANE IN THE FIRST PLACE?

18  **A.**  WELL, MR. DANE, I HAD MET WITH HIM, I THINK, ON TWO

19  PREVIOUS OCCASIONS BEFORE THIS -- MAYBE THREE -- BEFORE THIS

20  CAME UP.  BUT MR. DANE WAS THE CREATOR OF ONE OF THE VERY

21  FIRST CONSUMER-ORIENTED INTERNET COMPANIES.  I MEAN, CONSUMER,

22  BECAUSE IT WAS CALLED "PC PITSTOP."  YOU CAN IMAGINE WHAT IT

23  WAS.

24      HE WAS LOCATED OUT HERE IN SILICON VALLEY SOMEWHERE.  AND

25  MR. DANE HAD BEEN INTRODUCED TO ME.  AND SOMEBODY HAD TOLD HIM

1   WHAT I WAS WORKING ON.  AND HE BELIEVED HE COULD ASSIST ME IN

2   FINDING INVESTMENT CAPITAL.  THAT IS WHAT THESE DOCUMENTS

3   RELATED TO.

4   **Q.**  WHY WAS IT IMPORTANT FOR PC DESKGATE TO HAVE A

5   NONDISCLOSURE AGREEMENT BEFORE YOU HANDED OVER THESE

6   DOCUMENTS?

7   **A.**  THIS IS MY INVENTION.  IT WAS, AS FAR AS I WAS CONCERNED,

8   IT WAS NOT ONLY CONFIDENTIAL.  IT WAS SECRET.  I DIDN'T WANT

9   SOMEBODY TO GET THEIR HANDS ON IT AND TRY TO GET A STEP AHEAD

10  OF ME BY, YOU KNOW, DOING THE SAME THING I WAS DOING.

11  **Q.**  NOW, IF YOU COULD PLEASE, MR. PATTERSON, LOOK TO PAGE 2 OF

12  PLAINTIFF'S EXHIBIT 121B.

13         **MR. ELLWANGER:**  AND MS. MASON, IF YOU CAN PULL THAT

14  UP.

15  **BY MR. ELLWANGER**

16  **Q.**  DO YOU SEE THE PARAGRAPH THERE ENTITLED "SUMMARY DETAIL OF

17  PROTECTING CONTENT"?

18  **A.**  YES, I SEE THAT.

19  **Q.**  HOW DO YOU KNOW THAT THIS IS A SUMMARY OF YOUR INVENTION,

20  MR. PATTERSON?

21  **A.**  WELL, WHEN I WAS LOOKING AT IT THE SECOND TIME, THIS WAS

22  THE PARAGRAPH I WAS DOING A QUICK REVIEW ON, BECAUSE THIS IS

23  ACTUALLY A SYNOPSIS OF EXACTLY WHAT I WAS DOING.

24  **Q.**  TELL THE JURY WHAT THAT IS.

25  **A.**  WELL, THIS SUMMARY DETAIL, IF YOU TAKE A LOOK AT IT, THIS

1    IS THE WHOLE IDEA ABOUT HOW WHAT I WAS GOING TO COME UP AS AN

2    INVENTION WAS WHAT I CALL A TRANSPARENT, SEAMLESS WAY FOR

3    PEOPLE TO HANDLE INFORMATION BACK AND FORTH.  TRANSPARENT,

4    SEAMLESS.  YOU WEREN'T GOING TO HAVE TO KEEP TRACK OF

5    PASSWORDS ANYMORE.  YOU WEREN'T GOING TO HAVE TO DO THIS.  IT

6    WAS ALL GOING TO HAPPEN BEHIND THE SCENES.

7        THIS LITTLE SYNOPSIS IS EXACTLY WHAT I WROTE BACK 18 YEARS

8    AGO, 19 YEARS AGO DESCRIBING THAT.

9            **MR. ELLWANGER:**  AND IF WE CAN PULL UP PAGE 3 OF

10   EXHIBIT 121B.

11   **BY MR. ELLWANGER:**

12   **Q.**  AT A HIGH LEVEL, MR. PATTERSON, WHAT ARE THESE FLOW CHARTS

13   AND DIAGRAMS THAT ARE DESCRIBED?

14   **A.**  WELL, I WILL TELL YOU THAT THIS PARTICULAR PART OF MY

15   INVENTION THAT WAS IN MY SOFTWARE DESIGN DOCUMENTS, I CHOSE TO

16   PUT THIS IN HERE BECAUSE THIS IS ACTUALLY THE METHOD IN WHICH

17   I WAS GOING TO ALLOW AN AUTHORIZED USER TO TAKE THE SAME FILE,

18   BOOK OR MOVIE, OR WHATEVER IT MIGHT BE, GO TO A DIFFERENT

19   COMPUTER, AND WE WOULD KNOW IT WAS THE AUTHORIZED USER.  SO

20   THEY COULD USE THE SAME THING ON A SECOND COMPUTER.

21   **Q.**  OKAY.  AND AS YOU WERE TESTIFYING TO EARLIER, THERE ARE

22   INITIALS AND DATES AT THE BOTTOM OF EACH PAGE?

23   **A.**  YES.

24   **Q.**  WHAT DATE IS THAT ON EACH PAGE OF THIS?

25   **A.**  WELL, THE DATE ON THIS ONE, ON THESE PAGES, IS DECEMBER

1    THE 3RD.

2    **Q.**  OF WHICH YEAR?

3    **A.**  1996.

4    **Q.**  AND WHY WOULD YOU HAVE HAD MR. DANE INITIAL AND DATE EVERY

5    PAGE OF THESE WORK DRAWINGS?

6    **A.**  I WANTED TO MAKE SURE THAT WE HAD AN UNDERSTANDING SO

7    LATER WE WOULDN'T HAVE A MISUNDERSTANDING ABOUT HOW MUCH

8    RESPONSIBILITY HE WOULD HAVE FOR ENSURING THAT THIS

9    INFORMATION STAYED UNDER HIS CONTROL AND NOT BE DISSEMINATED

10   TO ANYBODY.

11   **Q.**  NOW, WHEN YOU GAVE A DEPOSITION IN THIS CASE,

12   MR. PATTERSON, DID YOU RECALL SEEING 121B AT THAT TIME?

13   **A.**  121B?

14   **Q.**  YES.

15   **A.**  NO.  THE ONE WITH ALL THESE PAGES?  NO.  WELL, I SAW IT IN

16   THE DEPOSITION.

17   **Q.**  RIGHT.

18   **A.**  IS THAT -- BUT I DIDN'T RECALL WHEN THEY SHOWED IT TO ME

19   IN THE DEPOSITION.  I DIDN'T EVEN RECALL THIS AT ALL.

20   **Q.**  DID YOU RECALL THE NONDISCLOSURE AGREEMENT?

21   **A.**  YEAH, SURE.

22   **Q.**  BUT DID YOU RECALL THEM BEING SEEN TOGETHER AS ONE

23   DOCUMENT?

24   **A.**  OH, WELL, YEAH.  TO ME THEY WERE ONE DOCUMENT.

25   **Q.**  I'M ASKING ABOUT AT THE TIME OF THE DEPOSITION.

PATTERSON – DIRECT / ELLWANGER

1    **A.**  AT THE TIME OF THE DEPOSITION, NO.

2    **Q.**  SO WHY DO YOU RECOGNIZE THEM NOW WHEN YOU DIDN'T A

3    YEAR-AND-A-HALF AGO?

4    **A.**  WELL, NOW I DON'T JUST RECOGNIZE THEM NOW.  A

5    YEAR-AND-A-HALF AGO I WAS IN A DEPOSITION, AND ONE OF THE

6    ATTORNEYS -- THERE WERE ABOUT SIX ATTORNEYS IN THIS

7    DEPOSITION.  I WAS THERE ALL DAY.  THEY WERE ALL SHOWING ME

8    DIFFERENT DOCUMENTS AND PAGES.  I DIDN'T REMEMBER MOST OF THE

9    THINGS THEY SHOWED ME.  THEY WERE SHOWING ME PATENTS, AND MY

10   OWN PATENT, AND ASKING ME QUESTIONS.

11       WHEN THEY GOT TO THIS ONE, AND THEY, YOU KNOW, SHOWED IT

12   TO ME, I RECOGNIZED THE DISCLOSURE AGREEMENT, BUT I DIDN'T

13   EVEN HAVE A CLUE.  I WAS JUST BLANK ABOUT HAVING SEEN THIS.

14   BUT WHEN THEY ALL LEFT -- IN OTHER WORDS, WHEN THE DEPOSITION

15   WAS OVER, THEY JUST ALL LEFT.

16       THEY PACKED UP EVERYTHING UP.  I WAS LEFT IN THE

17   CONFERENCE ROOM AT THIS BIG TABLE WITH NOTHING.  I DIDN'T HAVE

18   THIS OR ANY OF THE OTHER EXHIBITS, AND I WANTED TO KNOW WHAT I

19   HAD BEEN -- BECAUSE I KNEW I WAS -- I WAS TESTIFYING.  I

20   WANTED TO KNOW WHAT I HAD BEEN LOOKING AT.

21       AND SO I ASKED ONE OF YOUR -- I DON'T SEE HER, BUT YOU HAD

22   SOMEBODY.  I WAS IN YOUR OFFICES, RIGHT?  AND I ASKED THEM TO

23   GO AND GET ME ALL OF THE EXHIBITS THAT I JUST SPENT ABOUT NINE

24   HOURS WITH.  AND I WENT THROUGH AND FOUND THIS.

25       AND THAT IS WHEN I SAW THE DATE AND REALIZED THIS WAS

1    THREE WEEKS BEFORE CHRISTMAS.  AND I REMEMBERED IN 1996 WHERE

2    IT HAPPENED.  AND PAT DANE LIVED IN SILICON VALLEY AND HAD

3    TOLD ME, YEAH, HE WAS GOING TO GET THIS INVESTORS MEETING SET

4    UP, BUT WE HAD TO DO IT OVER THE CHRISTMAS HOLIDAYS.  THAT WAS

5    IT.  AND HE HAD TO HAVE THE NDA, THE NONDISCLOSURE AGREEMENT.

6    HE HAD TO HAVE IT EARLY ON SO HE COULD MAKE SURE WHATEVER IT

7    WAS THAT HE COULD GET IT AGREED TO.

8    **Q.**  MR. PATTERSON, BASED ON NDA'S LIKE THE ONE WE JUST HAVE

9    BEEN TALKING ABOUT IN YOUR DESIGN DOCUMENTS, DID ANYONE INVEST

10   IN YOUR COMPANY?

11   **A.**  YES, THEY DID.

12   **Q.**  WHO INVESTED IN PC DESKGATE?

13   **A.**  THE FIRST ANGEL INVESTOR I WENT TO SEE WAS A PULITZER

14   PRIZE-WINNING PUBLISHER NAMED FRANK DANIELS, III.  AND

15   MR. DANIELS WAS ALREADY INTO THE INTERNET.  HE WAS ALREADY --

16   HE WAS RUNNING TOTAL SPORTS AND HE HAD CAUSE.

17       AND HE SAT THERE AND SAW MY DEMO, AND I SHOWED HIM THAT I

18   ALREADY HAD EVERYTHING FIGURED OUT.  MY INVENTIONS WERE DONE.

19   I JUST NEEDED TO PUT THEM OUT IN APPLICATION CODE.

20       HE STOOD UP, AND SAID:  "I HAVE GOT MY CHECKBOOK.  HERE IS

21   $150,000."  HE GAVE ME THAT ON THE SPOT.  AND THREE MONTHS

22   LATER HE GAVE ME ANOTHER CHECK FOR 75,000.

23   **Q.**  DID ANYONE ELSE INVEST?

24   **A.**  WELL, SURE.  IN FACT, RIGHT AFTER THAT, MR. FARLEY, THE

25   DIGITAL REG COMPANY, HE BROUGHT HIS GROUP IN.  THEY CAME AND

PATTERSON – DIRECT / ELLWANGER

1  TOOK A LOOK AT WHAT I WAS DOING, AND THEY WANTED TO KNOW WHAT

2  I NEEDED.  I TOLD HIM "MONEY."  I ONLY NEEDED MONEY.  I

3  ALREADY HAD IT FIGURED OUT.  AND HE DID NOT EVEN WALK OUT OF

4  THE ROOM.

5       HE SAID:  "I WILL PUT IN $50,000 A MONTH STARTING RIGHT

6  NOW," AND WASN'T BUT A FEW MONTHS LATER HE SAID:  "WORK

7  FASTER.  HERE'S $75,000 A MONTH."

8  **Q.**  DID YOU EVER DISCUSS YOUR VISION WITH ANY OF THESE

9  INVESTORS?

10  **A.**  WELL, I KNOW I DID WITH MR. FARLEY.  I THINK THAT'S WHY HE

11  JUMPED AT THE CHANCE TO GET IN ON IT, YEAH.

12  **Q.**  WHAT WAS THAT VISION?

13  **A.**  WELL, MY VISION WAS A FUTURE WHERE PEOPLE WERE GOING TO

14  KNOW ABOUT THE INTERNET, AND THEY WERE GOING TO TAKE ADVANTAGE

15  OF IT.  THEY WERE GOING TO WANT TO ACTUALLY BE ABLE TO GET A

16  BOOK FROM BARNES AND NOBLE.  AT LEAST I DIDN'T KNOW THEN IT

17  WOULD BE LIKE AMAZON.  OKAY?  I THOUGHT THERE WOULD BE LOTS OF

18  PUBLISHERS OUT THERE.  THERE WOULD BE CAPITAL RECORDS,

19  COLUMBIA.

20       I DIDN'T KNOW WE WOULD GET THEM CONSOLIDATED, WHICH MAKES

21  IT VERY EASY.  IN MY VISION I KNEW THERE WOULD BE ALL THESE

22  PEOPLE WHO WOULD HAVE COPYRIGHTED MATERIAL.  AND YOU WOULD BE

23  ABLE TO GO THERE AND BUY IT, AND YOU COULD DOWNLOAD IT AND YOU

24  COULD HAVE IT, ONLY IF IT WASN'T A ROYAL PAIN IN THE BUTT TO

25  DO.

1    IF YOU WERE GOING TO HAVE TO SIGN UP WITH A TRUSTED AGENT

2  AND GET A CERTIFICATE OR HAVE TO REMEMBER PASSWORDS, IT WASN'T

3  GOING TO WORK.

4    THAT'S WHAT REALLY CAUGHT FARLEY'S ATTENTION BECAUSE HE

5  WASN'T AN EXPERT COMPUTER USER, AND HE WAS ALREADY BACK IN

6  THOSE DAYS HAVING ENOUGH TROUBLE, YOU KNOW, FIGURING OUT -- HE

7  UNDERSTOOD EXACTLY WHAT I MEANT.  THAT WAS MY VISION.  AND HE

8  MADE HIS DECISION.

9  **Q.**  DID THAT EXIST BEFORE YOU INVENTED IT?

10  **A.**  WELL, I INVENTED THIS, REALLY, BY THE END OF 1995.  OKAY?

11  I MEAN -- AND WHAT I JUST DESCRIBED TO YOU THERE WAS NOWHERE

12  IN THE MARKET COULD YOU GO AND FIND THAT KIND OF A SEAMLESS

13  SYSTEM, FRICTIONLESS SYSTEM, YOU KNOW, PASSWORD-FREE KIND OF A

14  THING.

15  **Q.**  SO WHAT DID YOU USE THIS FUNDING FOR?

16  **A.**  WELL, I STEPPED UP OUR SCHEDULE BY HIRING SOME MORE

17  CONTRACT PROGRAMMERS.  I BROUGHT IN OUR FIRST HIGH-SPEED T-1

18  LINE.  I NEEDED BANDWIDTH.  I WAS GOING TO REALLY DO THIS

19  THING.  YOU KNOW, THESE BOOKS.  AND THEN, WE EVEN TRIED SOME

20  VIDEO MOVIES THAT WERE HUGE.  I NEEDED THAT.  AND IT WAS

21  EXPENSIVE.  I MEAN, TO GET ONE OF THE LINES BACK THEN, IT COST

22  PRETTY BIG BUCKS.

23    WE BOUGHT SERVERS SO WE COULD HOOK EVERYTHING UP.  OF

24  COURSE, YOU KNOW, THE OTHER THING.

25  **Q.**  WHAT WAS THAT?

1    **A.**  THAT IS WHY MR. FARLEY RAISED HIS INVESTMENT, BECAUSE I

2    SAID:  "LET'S GET A PATENT."  SO I ENGAGED THE PATENT LAW FIRM

3    CALLED "FISH & RICHARDSON."  AND SAID:  "CAN WE GET THIS THING

4    PATENTED?"  THEY SAID:  "ABSOLUTELY."

5        THAT'S HOW WE REALLY STARTED BURNING THROUGH THE MONEY.

6    **Q.**  OKAY.

7    **A.**  BECAUSE YOU GUYS ARE REALLY EXPENSIVE.

8    **Q.**  TELL THE JURY, WHAT WAS IT LIKE TO FILE A PATENT

9    APPLICATION?

10   **A.**  YOU KNOW, THE FILING WAS PRETTY EASY.  BACK THEN, IT WAS

11   ON PAPER.  AND I THINK ROB GREENBERG TOOK IT DOWN TO THE

12   PATENT OFFICE.  YOU MEAN, WHAT IT TOOK TO GET THERE.

13   **Q.**  RIGHT.

14   **A.**  OH, I WOULD RATHER HAVE STAYED UP ALL NIGHT JUST DOING

15   SYSTEM DESIGN.  IT WAS KIND OF ROUND THE CLOCK, BECAUSE ONCE

16   THEY GOT STARTED THEY WANTED TO GET IT DONE, TOO.  IT WAS VERY

17   TEDIOUS, PAINFUL.  I HAD TO HAVE THEM DECONSTRUCT ALL MY

18   LANGUAGE, TURN IT INTO THIS LEGALESE PATENT CLAIM STUFF.

19       AND, REMEMBER, I HAD A FULL-TIME JOB.  I WAS RUNNING A

20   COMPANY.  I WAS TRYING TO FIGURE OUT SO MANY THINGS.  BUT I

21   WAS THE ONLY ONE WHO COULD WORK WITH THESE ATTORNEYS.  I

22   LITERALLY HAD A COT IN THE OFFICE SO I COULD TO SLEEP.

23   **Q.**  DID THE FISH & RICHARDSON LAWYERS TEST YOUR PRODUCT AS

24   THEY WERE WRITING THE CLAIMS?

25   **A.**  THEY WOULD MAKE THESE CHECK SHEETS, RIGHT?  THEN, THEY

1   WOULD TEST THE SOFTWARE AND MAKE SURE THAT IT OPERATED IN

2   ACCORDANCE WITH THE CHECK SHEETS.  AND THAT WAY THEY COULD BE

3   SURE THAT WHAT WE WERE PUTTING ON THE PATENT APPLICATION IS

4   ACTUALLY HOW THE INVENTION WORKED.

5   **Q.**  AND DID ALL OF THAT HARD WORK PAY OFF FOR YOU?

6   **A.**  PAID OFF?  WELL, FIRST OFF, WE WERE ABLE TO FILE A PATENT.

7   THAT HAPPENED MAY, I THINK, OF 1998.  AND, ULTIMATELY, OF

8   COURSE, I GOT MY PATENT.  I MEAN, IT WAS ACTUALLY ISSUED IN, I

9   THINK, 2002.  THOUGH I HEARD IN THAT VIDEO YOU CAN DO IT IN 18

10  MONTHS.

11  **Q.**  MR. PATTERSON, IN THAT BINDER IN FRONT OF YOU, THERE'S A

12  DOCUMENT MARKED PLAINTIFF'S EXHIBIT 1.  CAN YOU TAKE A LOOK AT

13  THAT, MR. PATTERSON?

14          **THE COURT:**  IT SHOULD BE ON YOUR SCREEN.

15  **BY MR. ELLWANGER**

16  **Q.**  LOOKING AT THE SECOND PAGE OF THAT DOCUMENT, MR. --

17  **A.**  THAT IS WHAT I AM LOOKING FOR.

18          **THE COURT:**  IT'S ON YOUR SCREEN.

19          **THE WITNESS:**  THIS IS -- THIS IS THE '541 PATENT THAT

20  I MENTIONED WHEN I FIRST CAME UP HERE.

21  **BY MR. ELLWANGER**

22  **Q.**  IS THAT A FAIR AND ACCURATE COPY OF THE '541 PATENT,

23  MR. PATTERSON?

24  **A.**  I WOULD SAY SO.

25          **THE COURT:**  WERE YOU GOING TO GIVE THEM BINDERS WITH

1    COPIES OF THE TWO PATENTS?  I THOUGHT I HEARD SOME TALK ABOUT

2    BINDERS.

3          **MS. GLAUSER:**  YES, YOUR HONOR.  THAT IS THE

4    INTENTION.

5          **MR. ELLWANGER:**  MAY WE DO THAT NOW, YOUR HONOR?

6          **THE COURT:**  YOU CAN DO IT WHILE THEY ARE TALKING, AND

7    IT DOESN'T TAKE A LOT OF TIME.

8    **BY MR. ELLWANGER**

9    **Q.**  MR. PATTERSON, IS THAT A FAIR AND ACCURATE COPY OF THE

10   '541 PATENT?

11   **A.**  YES, IT IS A FAIR AND ACCURATE COPY OF THE'541 PATENT.

12         **MR. ELLWANGER:**  YOUR HONOR, PLAINTIFFS OFFER

13   PLAINTIFF'S 1.

14         **THE COURT:**  YES.

15         (PLAINTIFF'S EXHIBIT 1 RECEIVED IN EVIDENCE)

16   **BY MR. ELLWANGER**

17   **Q.**  LOOKING TO WHAT IS PLAINTIFF'S EXHIBIT 3 IN THAT BINDER,

18   CAN YOU TAKE A LOOK AT THAT, MR. PATTERSON?

19   **A.**  ALL RIGHT, YES.  I'M LOOKING AT IT.

20   **Q.**  DO YOU RECOGNIZE EXHIBIT 3?

21   **A.**  I DO RECOGNIZE EXHIBIT 3.

22   **Q.**  WHAT IS IT?

23   **A.**  ALL RIGHT.  THIS IS THE SECOND PATENT I MENTIONED THIS

24   MORNING WHEN I CAME UP HERE.  THIS IS THE '670.  I DON'T KNOW.

25   EVERYBODY JUST USES THE LAST THREE DIGITS OF THE PATENTS.  I

```
 1    DIDN'T KNOW THAT UNTIL AFTER IT GOT ISSUED.

 2    Q.  IS THAT A FAIR AND ACCURATE COPY, SIR?

 3    A.  YES.

 4            MR. ELLWANGER:  PLAINTIFFS OFFER PLAINTIFF'S 3.

 5            THE COURT:  RECEIVED.

 6            (PLAINTIFF'S EXHIBIT 3 RECEIVED IN EVIDENCE)

 7    BY MR. ELLWANGER

 8    Q.  MR. PATTERSON, ARE THOSE THE TWO PATENTS AT ISSUE IN THIS

 9    CASE?

10    A.  THESE ARE THE TWO PATENTS AT ISSUE, YES.

11    Q.  WE HAVE HEARD A LOT ABOUT THE '541 PATENT, BUT WHAT IS THE

12    '670 PATENT ABOUT?

13    A.  WELL, THE '670 PATENT IS A PATENT COVERING TRACKING

14    DOCUMENTS, TRACKING ELECTRONIC FILES.

15    Q.  DURING THIS PROSECUTION TIME PERIOD WHEN YOU STILL WORKED

16    AT PC DESKGATE, DID YOU ASSIGN THOSE PATENTS TO YOUR COMPANY,

17    PC DESKGATE?

18    A.  YES.

19    Q.  NOW, YOU MENTIONED THIS TRACKING COMPONENT.  WHY WAS

20    TRACKING IMPORTANT TO YOUR INVENTION?

21    A.  WELL, YOU RECALL I MENTIONED THAT I SPENT MOST OF '93 AND

22    ALMOST ALL OF '94 I WAS TRYING TO GATHER INFORMATION.  I WENT

23    AND VISITED A LOT OF PEOPLE.  ONE OF THE THINGS I FOUND OUT

24    WAS THAT -- AND THIS IS NO EXAGGERATION -- I HAD LIST OF OVER

25    500 FREE NEWSLETTERS, FREE HONORS MAGAZINES, PUBLICATIONS AND
```

1    PERIODICALS THAT WERE FREE.  THESE WERE ALL HARD COPY, NOW.

2    BUT YOU COULD SUBSCRIBE TO THEM.  YOU COULD HAVE THEM SENT TO

3    YOU IN THE MAIL.  OR YOU COULD JUST GO PICK THEM UP.  THEY

4    WOULD HAVE THEM IN ALL SORTS OF LOCATIONS.  BUT THE PUBLISHERS

5    OF THESE NEWSLETTERS AND SUCH THINGS MADE MONEY ON ADVERTISING

6    THAT WAS INSIDE.

7        AND THE ADVERTISING, THEY ONLY PAID BASED ON THE

8    READERSHIP.  WHAT I FIGURED OUT VERY EARLY ON WAS ALL THESE

9    NEWSLETTERS AND PEOPLE WERE GOING TO WANT TO DO WHAT I HAD

10   ALREADY FIGURED OUT:  MAKE THEIR STUFF AVAILABLE ON THE

11   INTERNET.

12       THE ADVERTISERS WERE ONLY GOING TO PAY THEM IF THEY KNEW

13   WHAT THE READERSHIP WAS.  IF THE PUBLISHERS COULD ONLY CHARGE

14   FOR THE ONES YOU DOWNLOADED, THEY WOULD BE REALLY

15   UNDERSELLING, BECAUSE THEY WOULD NEED TO KNOW IF SOMEBODY

16   DOWNLOADED A NEWSLETTER, THEIR COMPUTER, AND TOOK IT AS AN

17   ATTACHMENT AND STUCK IT ON THEIR EMAIL, FOR EXAMPLE, AND SENT

18   IT OUT TO EVERYBODY IN THEIR FAMILY.

19       THEY NEEDED TO KNOW, BE ABLE TO HAVE A WAY TO REPORT THE

20   TOTAL READERSHIP.  TO DO THAT YOU NEEDED TO BE ABLE TO TRACK

21   WHERE THINGS WERE.  THAT'S THE TRACKING DOCUMENT.

22   **Q.**  SO AFTER YOU GOT THESE PATENTS ON FILE WITH THE PTO, WHAT

23   STEPS DID PC DESKGATE TAKE TO USE THE TECHNOLOGY?

24   **A.**  OH, OKAY.  WE FILED THE '541 IN MAY OF 1998.  NOW, THAT

25   SAME MONTH WE WANTED TO MAKE AN ANNOUNCEMENT TO THE INTERNET

1    WORLD THAT WE WERE HERE, AND WHAT WE HAD.  WE PUT UP OUR

2    FIRST -- IT WAS CALLED A STORE RACK OR MEDIA STORE.  IT WAS A

3    BIG WEBSITE.

4        NOW, ON THIS WEBSITE WE HAD OUR FIRST ELECTRONIC BOOKS

5    THAT YOU COULD DOWNLOAD.  WE HAD A HUNDRED INDIE BANDS.  NOW,

6    THOSE WERE INDEPENDENT BANDS, AND A LOT OF GRUNGE MUSIC FROM

7    SEATTLE, PLACES LIKE THAT.  A HUNDRED BANDS HAD COME TO OUR

8    SITE, PACKAGED THEIR MUSIC AND PUT IT UP ON THE WEBSITE.

9        WE EVEN HAD -- WE HAD THE NEW YORK POST, THE DAILY

10   NEWSPAPER, WE HAD IT THERE.  GOSH, WE HAD ALL KINDS OF MEDIA

11   UP ON THIS WEBSITE, YOU KNOW, SO PEOPLE COME AND GET IT AND

12   ACTUALLY SEE THIS THING AT WORK.

13   **Q.**  AFTER YOU LAUNCHED THIS WEBSITE AND AFTER YOU STARTED

14   GETTING THE INDIE BANDS AND THE NEWSPAPER AND BOOKS ONLINE,

15   WHAT WAS THE BIG EVENT THAT REALLY LAUNCHED IT?

16   **A.**  WELL, YEAH.  WHAT MADE US FAMOUS, WHAT GOT SUCCESSFUL WAS

17   WHEN WE HAD ALL THIS ARRANGED UP THERE IN MAY, I TOOK THE

18   CALL.  IT WAS AN AGENT FROM THIS YOUNG ARTIST, THIS SINGER,

19   THIS MUSICIAN.  HE WAS COMING OUT WITH A NEW CD ALBUM.

20       IN FACT, IT WAS COMING OUT -- IT WAS SUPPOSED TO COME OUT

21   IN MAY, THE VERY TIME WE WERE DOING THIS.  HE WAS REALLY INTO

22   THE INTERNET.  HE HAD SEEN WHAT WE WERE DOING ON THIS WEBSITE.

23   HE SAW WHAT IT WAS GOING TO DO TO THE MUSIC INDUSTRY.  HE

24   WANTED TO BE IN ON IT RIGHT ON THE SPOT.

25       SO THIS YOUNG ARTIST HAD HIS AGENT CALL TO SEE IF THEY

1    COULD PARTICIPATE.  AND THE GUY'S NAME IS JULIAN LENNON.  THIS

2    IS JOHN LENNON'S SON.  AND JULIAN WAS RELEASING THIS NEW CD

3    ALBUM.  NOT AN INDIVIDUAL CUT, IT WAS GOING TO BE THE WHOLE

4    ALBUM.  AND HE WANTED TO TAKE ONE OF HIS SONGS OFF OF THE

5    ALBUM, FEATURE IT UP ON THE WEBSITE.

6         I SAID:  "WHAT SONG?"  HE SAID:  "DAY AFTER DAY."

7         NAME OF HIS ALBUM IS CALLED "PHOTOGRAPH SMILES."  WE PUT

8    HIM UP ON THE WEBSITE, PUT THE SONG UP THERE.  AND THE FIRST

9    MONTH, THE VERY FIRST MONTH WE HAD OVER 250,000 DOWNLOADS OF

10   HIS ONE SONG.

11        AND WE ALSO HAD INCORPORATED AND PUT UP MY TRACKING

12   INVENTION, THE ONE I JUST TALKED TO YOU ABOUT.  WE DIDN'T FILE

13   A PATENT UNTIL, I THINK, NOVEMBER ON IT.  BUT WE WENT AHEAD

14   AND PUT THE TRACKING IN.  THEY DOWNLOADED 250,000 OF THAT SONG

15   "DAY AFTER DAY," AND THEN THEY PASSED IT AROUND OVER 500,000

16   OTHER PEOPLE.  AND WE TRACKED IT, AND COULD SHOW EXACTLY WHAT

17   HAPPENED TO IT.

18   Q.  NOW, AFTER THIS QUARTER MILLION DOWNLOADS AND HALF A

19   MILLION PASSAROUNDS, WERE YOU NOTICED?

20   A.  NO.  I ALWAYS WANTED TO BE FAMOUS.  AND FOR ABOUT A DAY --

21   I MEAN, REALLY.  WHAT HAPPENED WAS I GOT A TELEPHONE CALL FROM

22   A MAN NAMED JOHN DVORAK.  THIS MAN WROTE A COLUMN.  I THINK HE

23   WAS EVEN ONE OF THE EDITORS OF A MAGAZINE BACK THEN, PC WEEK.

24   AND HE INVITED ME TO COME TO THE INTERNET WORLD '98 EXPO IN

25   NEW YORK AND BE ONE OF THE PRESENTERS UP THERE AS A PRODUCT

```
 1   COMPANY FOR THE INTERNET.

 2       SO WE WERE INVITED.  AND I SAID:  "SURE."  IT WAS IN JULY

 3   OF 1998.  SO THAT'S WHAT I DID.  I WENT UP THERE.

 4   Q.  WHAT HAPPENED AT THE EXPO?

 5   A.  I WON.  WE WERE THE HEADLINE.  WE WERE THE BEST NEW

 6   INTERNET COMPANY OF 1998.

 7   Q.  SO WHY WAS -- WHY WAS THIS CONFERENCE AND WINNING THIS

 8   AWARD IMPORTANT TO PC DESKGATE?

 9   A.  WE WERE READY TO GROW AND GROW REALLY FAST.  AND

10   MR. FARLEY WANTED ME TO DO EVERYTHING I COULD TO FIND A GOOD

11   PARTNER OR TO FIND A BIG INVESTOR TO PUT IT IN THERE.

12   Q.  WHAT DID YOU DO?

13   A.  I STARTED TAKING PHONE CALLS.  FOR THE FIRST TIME I WASN'T

14   CALLING AND TRYING TO HAVE MEETINGS TO SEE THEM.  THEY WERE

15   COMING IN TO SEE ME.  THAT WAS IN THE TIME WHEN THE PRESIDENT

16   OF MARKETING COMPANY IN ATLANTA CAME UP AND VISITED ME.  AND

17   HE CAME UP WITH A PROPOSAL ABOUT US DOING A MERGER WITH HIM.

18   Q.  WHAT WAS THE NAME OF THAT COMPANY?

19   A.  M2 DIRECT.

20   Q.  DID THAT MERGER HAPPEN?

21   A.  IT DID.  WE DID MERGE WITH M2 DIRECT.

22   Q.  DID THE NEW COMPANY CONTINUE TO PUSH YOUR TECHNOLOGY?

23   A.  THEY WERE VERY BIG ON IT.  THEY PUSHED IT A LOT.  AND IT

24   FITTED RIGHT INTO THEIR MARKETING PROGRAM BECAUSE THEY HAD ONE

25   BUSINESS DIVISION THAT WAS CALLED BUSINESS TELESERVICES.  AND
```

PATTERSON – DIRECT / ELLWANGER

1   THIS GROUP CONSISTED OF A LOT OF YOUNG HIGH-TECH INTERNET

2   SOFTWARE GURUS WHO KNEW HOW TO DOWNLOAD ALL THE DIFFERENT

3   SOFTWARE PROGRAMS THAT YOU COULD BUY.

4       THEY KNEW HOW TO DOWNLOAD THEM AND RUN THEM, THINGS OF

5   THAT SORT.  AND WHAT THEY DID, THIS COMPANY WAS CALLED "UST

6   SOLUTIONS" BEFORE THEY EVER BECAME A PART OF M2 DIRECT.  AND

7   N2 DIRECT WOULD CONTRACT THESE PEOPLE WITH OTHER COMPANIES.

8   **Q.**  NOW, WAS M2 DIRECT ULTIMATELY SUCCESSFUL?

9   **A.**  WELL, ACTUALLY, M2 DIRECT WAS NOT ULTIMATELY SUCCESSFUL.

10  **Q.**  WHAT HAPPENED?

11  **A.**  WE PUT TOGETHER AN INITIAL PUBLIC OFFERING.  WE WERE GOING

12  TO HAVE THIS IPO, AND WE NEEDED A LOT OF MONEY.  OF COURSE THE

13  COMPANY WAS SPENDING A LOT OF MONEY.  IT WAS SUPPOSED TO GO

14  PUBLIC, I THINK, IN SEPTEMBER OF 1999.  THINGS CHANGED ON THE

15  INTERNET SCENE REALLY, REALLY FAST.  AND ABOUT 2000, THE

16  INTERNET BUBBLE WAS COLLAPSING EVERYWHERE.

17      M2 DIRECT WAS UNABLE TO GO PUBLIC, UNABLE TO RAISE THE

18  MONEY IT NEEDED.  AND I WAS NOT EVEN WITH THE COMPANY WHEN

19  THIS HAPPENED.  I HAD ALREADY LEFT THE COMPANY.  BUT THEY RAN

20  OUT OF MONEY, AND THEY WENT INTO BANKRUPTCY AND LOST ALL THEIR

21  ASSETS.

22  **Q.**  DID THAT INCLUDE THE PATENTS?

23  **A.**  IT INCLUDED THE PATENTS.

24  **Q.**  MR. PATTERSON, DID YOU EVEN HAVE A CHANCE TO REVIEW YOUR

25  PATENTS WHEN THEY WERE ISSUED?

PATTERSON – DIRECT / ELLWANGER

1   **A.**  WELL, WHEN THEY WERE ISSUED?

2   **Q.**  RIGHT.

3   **A.**  EX-EMPLOYEE OF MINE SENT ME AN EMAIL AROUND CHRISTMASTIME

4   IN 2002.  AND IN THE EMAIL ONE OF THE THINGS HE TOLD ME WAS HE

5   HAD SEEN THAT MY PATENT HAD BEEN ISSUED BY THE PATENT AND

6   TRADE OFFICE.

7   **Q.**  AND DID YOU READ IT?

8   **A.**  I WAS AT A CLIENT, NATIONAL INSTITUTES OF HEALTH, AND I

9   WENT TO A COMPUTER.  AND I WENT TO THE PTO DATABASE.  AND

10  AFTER AWHILE I WAS ACTUALLY ABLE TO FIND -- FIND THE PATENT,

11  THE '541 PATENT, AND I BROUGHT IT UP ON THE SCREEN.

12  **Q.**  AND WHAT WAS GOING THROUGH YOUR HEAD WHEN YOU READ THAT

13  YOUR PATENT HAD FINALLY ISSUED?

14  **A.**  WELL, I WAS PRETTY PROUD TO SEE MY NAME ON THAT PATENT.

15  **Q.**  DID YOU KEEP IN TOUCH WITH MIKE FARLEY AFTER YOU LEFT M2

16  DIRECT?

17  **A.**  I DIDN'T SEE MIKE FARLEY FOR ABOUT SEVEN YEARS, I THINK.

18  SIX OR SEVEN YEARS.

19  **Q.**  WHEN DID YOU TWO START TALKING AGAIN?

20  **A.**  I THINK IT MUST HAVE BEEN 2005.

21  **Q.**  WHAT HAPPENED IN 2005?

22  **A.**  MR. FARLEY WAS IN WASHINGTON, D.C., WHICH IS WHERE I WAS

23  LIVING.  HE CALLED ME OUT OF THE BLUE.  I WAS GLAD TO HEAR

24  FROM HIM.  HE ASKED IF I WOULD MEET HIM FOR LUNCH THE NEXT

25  DAY, AND I TOLD HIM I WOULD LOVE TO.

PATTERSON – DIRECT / ELLWANGER

1    **Q.**  DID YOU DEVELOP A WORKING RELATIONSHIP WITH HIM SOON AFTER

2    THAT?

3    **A.**  WELL, NOT AT THE MEETING.  BUT, YEAH, AFTER THAT, HE HAD

4    CONTACTED ME, AND WE DID DEVELOP A WORKING RELATIONSHIP.

5    **Q.**  WHAT WAS THAT?

6    **A.**  WELL, IT WAS WONDERFULLY UPLIFTING NEWS TO ME.  MIKE

7    FARLEY TOLD ME THAT HE AND AN EX-EMPLOYEE OF MINE -- I DON'T

8    KNOW IF HE'S HERE, BUT HIS NAME IS CHIP VENTERS -- THAT THEY

9    HAD BOUGHT MY PATENTS, AND THAT THEY OWNED THEM.

10        AND HE TOLD ME THAT HE WANTED TO GET MY ASSISTANCE; THAT

11   IF THEY WERE GOING TO HAVE TO GET INVOLVED IN ANY KIND OF

12   LITIGATION, THEY WANTED TO KNOW IF I WOULD BE WILLING TO BE A

13   WITNESS; WOULD I PROVIDE, YOU KNOW, INFORMATION, ANSWER

14   QUESTIONS.  AND I TOLD HIM:  "YEAH."  I MEAN, I WOULD DO

15   ANYTHING TO BE A PART OF THAT.

16   **Q.**  DID THEY AGREE TO PAY YOU FOR YOUR TIME?

17   **A.**  ABSOLUTELY.

18   **Q.**  WHAT WAS THAT AGREEMENT?

19   **A.**  THEY AGREED TO PAY ME 4 PERCENT OF THE NET PROCEEDS OUT OF

20   ANY OF THE ROYALTIES THAT THEY SIGNED WITH THE COMPANIES THAT

21   THEY HAVE SIGNED OR ANY LICENSE FEES; ANY PROCEEDS THAT CAME

22   FROM MY PATENTS.

23   **Q.**  AND DO YOU THINK YOU SHOULD BE COMPENSATED FOR YOUR

24   PATENTS?

25   **A.**  WELL, YES, I CERTAINLY DO THINK SO.

PATTERSON – CROSS / REINES

| 1 | **Q.**  DO YOU KNOW HOW MUCH ADOBE HAS PAID FOR THE USE OF YOUR |
| 2 | PATENTS? |
| 3 | **A.**  NOTHING. |
| 4 | **Q.**  DO YOU KNOW WHETHER OTHER COMPANIES HAVE PAID TO LICENSE |
| 5 | YOUR PATENTS? |
| 6 | **A.**  OH, YES, I DO KNOW OTHER COMPANIES HAVE PAID. |
| 7 | **Q.**  MR. PATTERSON, ARE YOU PROUD OF WHAT YOU INVENTED? |
| 8 | **A.**  I'M VERY PROUD OF IT, YES, I AM. |
| 9 | **Q.**  WHY IS THAT? |
| 10 | **A.**  WELL, I REALLY DO THINK MY INVENTIONS CHANGED THE OVERALL |
| 11 | LANDSCAPE FOR WHAT I WOULD CALL THE CREATIVE MINDS OF THE |
| 12 | WORLD.  ARTISTS AND MUSICIANS AND AUTHORS, ANYBODY WHO CAN |
| 13 | CREATE THINGS AND WHO DESERVE THE OPPORTUNITY TO MAKE SURE |
| 14 | THAT THEY GET COMPENSATED FOR IT. |
| 15 | AND MY INVENTIONS ENABLE THEM TO FIND A WHOLE NEW |
| 16 | DISTRIBUTION MECHANISM IN THE WORLD, AND YET KNOW THAT THEIR |
| 17 | COPYRIGHT WAS SAFE AND PROTECTED. |
| 18 | **MR. ELLWANGER:**  THANK YOU, MR. PATTERSON. |
| 19 | WE PASS THE WITNESS. |
| 20 | **THE COURT:**  GO AHEAD. |
| 21 | **MR. REINES:**  THANK YOU, YOUR HONOR. |
| 22 | **CROSS-EXAMINATION** |
| 23 | **BY MR. REINES** |
| 24 | **Q.**  MR. PATTERSON, ARE YOU EMPLOYED BY DIGITAL REG? |
| 25 | **A.**  NO, I AM NOT.  NO, I'M NOT. |

PATTERSON – CROSS / REINES

1  **Q.**  YOU ARE A CONSULTANT.  THAT IS WHAT YOU TESTIFIED TO

2  EARLIER?

3  **A.**  YES.

4  **Q.**  AND THE CONSULTING AGREEMENT THAT YOU'RE WORKING UNDER NOW

5  FROM DIGITAL REG, THAT IS SOMETHING THAT YOU SIGNED DURING

6  THIS LITIGATION IN 2011; IS THAT CORRECT?

7  **A.**  I'M NOT SURE OF THAT DATE.

8         **MR. REINES:**  WHY DON'T WE CALL UP EXHIBIT 483,

9  PLEASE?

10                        (DISPLAYED ON SCREEN.)

11  **BY MR. REINES**

12  **Q.**  DO YOU RECOGNIZE EXHIBIT 483?

13  **A.**  YES.

14  **Q.**  CAN YOU DESCRIBE WHAT IT IS?

15     WELL, LET ME ASK YOU:  IS THIS THE AGREEMENT YOU ENTERED

16  INTO IN DECEMBER OF 2011 WITH DIGITAL REG?

17  **A.**  IS THIS THE AGREEMENT -- I CAN'T SEE THE SECOND PAGE.  IS

18  THIS --

19         **MR. REINES:**  GO TO THE SECOND PAGE, PLEASE.

20         **THE WITNESS:**  CAN YOU GO TO WHERE IT TELLS ME?  I

21  HAVE ONE WITH THE LAW FIRM, RIGHT, I THINK.  AND I HAD ONE

22  WITH DIGITAL REG.

23  **BY MR. REINES**

24  **Q.**  WHY DON'T WE GO BACK TO --

25  **A.**  IS THIS THE DIGITAL REG?

PATTERSON – CROSS / REINES

1    **Q.**  YES.

2    **A.**  OKAY.  THAT'S IT.

3         **MR. REINES:**  WE WOULD MOVE THIS EXHIBIT INTO

4    EVIDENCE, YOUR HONOR.

5         **MR. ELLWANGER:**  NO OBJECTION.

6         **THE COURT:**  RECEIVED.

7         (DEFENDANT'S EXHIBIT 483 RECEIVED IN EVIDENCE)

8              (PUBLISHED TO JURY.)

9    **BY MR. REINES**

10   **Q.**  AND UNDER YOUR AGREEMENT WITH DIGITAL REG FROM 2011, YOU

11   ARE NOT RECEIVING AN HOURLY RATE.  YOU ARE NOT RECEIVING

12   CONSULTING FOR YOUR TIME BY HOURLY RATE, RIGHT?

13   **A.**  NOT FOR ME.  IT IS A ONE-SHOT DEAL.  I ONLY GET PAID IF

14   THEY GET PAID.

15   **Q.**  RIGHT.  SO YOU HAVE A SHARE OF THE BUSINESS OF DIGITAL REG

16   IN TERMS OF THE VERDICT IN THIS CASE, CORRECT?

17   **A.**  FOR ANY ROYALTIES AND LICENSES, SURE.

18   **Q.**  AND IN AGREEMENT -- IN EXCHANGE FOR THAT YOU AGREED TO

19   HELP WITH THE PATENT PORTFOLIO AND TO SUPPORT THE INTELLECTUAL

20   PROPERTY ENFORCEMENT EFFORT; IS THAT CORRECT?

21   **A.**  TO SOME DEGREE.

22   **Q.**  DID YOU LIMIT HOW MUCH YOU WOULD HELP?

23   **A.**  WELL, I DID HAVE A LIMIT OF HOW MUCH I WOULD HELP.

24   **Q.**  IS IT IN THE AGREEMENT?

25   **A.**  PROBABLY NOT.

1   **Q.**  WITH RESPECT TO THE SECOND AGREEMENT THAT YOU HAD –– YOU

2   MENTIONED THAT YOU HAD TWO, RIGHT?

3   **A.**  YES.

4   **Q.**  OKAY.

5       **MR. REINES:**  THE SECOND AGREEMENT, WHY DON'T WE CALL

6   THAT UP, WHICH IS EXHIBIT 482?

7                   (DISPLAYED ON SCREEN.)

8   **BY MR. REINES**

9   **Q.**  WOULD YOU REVIEW THIS?  AND CAN YOU CONFIRM THAT THIS IS

10  THE AGREEMENT THAT YOU HAD WITH THE LITIGATION TEAM AT DINOVO?

11  **A.**  THIS APPEARS TO BE THAT AGREEMENT.

12  **Q.**  OKAY.

13  **A.**  A COPY OF IT.

14      **MR. REINES:**  BASED ON THAT, YOUR HONOR, WE WOULD MOVE

15  THIS INTO EXHIBIT, EXHIBIT 482.

16      **MR. ELLWANGER:**  NO OBJECTION.

17      **THE COURT:**  RECEIVED.

18      (DEFENDANT'S EXHIBIT 482 RECEIVED IN EVIDENCE)

19      **MR. REINES:**  WHY DON'T WE PULL UP THE FIRST PARAGRAPH

20  OF THIS, SO YOU CAN SEE WHAT YOUR WORK WAS FOR THEM STARTING

21  IN 2011.

22                  (PUBLISHED TO JURY.)

23  **BY MR. REINES**

24  **Q.**  AND YOU AGREED FOR THE LITIGATION EFFORT TO PERFORM

25  RESEARCH AND ANALYSIS WORK; ISN'T THAT CORRECT?

1    **A.**  YES, I DID.

2    **Q.**  YOU AGREED TO REVIEW DOCUMENTS?

3    **A.**  I AM SORRY?

4    **Q.**  YOU AGREED TO REVIEW DOCUMENTS?

5    **A.**  YES.

6    **Q.**  AND YOU AGREED TO CONSULT ORALLY?

7    **A.**  YES.

8    **Q.**  AND PREPARE MEMOS FOR THE LEGAL TEAM, LITIGATION TEAM?

9    **A.**  YES.

10   **Q.**  AND BEYOND THAT, YOU AGREE TO PARTICIPATE IN MEETINGS OR

11   HEARINGS?

12   **A.**  YES.

13   **Q.**  AND THEN, DEPOSITION AND TRIAL TESTIMONY, CORRECT?

14   **A.**  YES.  THAT'S RIGHT.

15   **Q.**  AND YOU KNEW THE DEPOSITION WAS GOING TO COME.  YOU HAD

16   DEPOSITIONS IN THE PAST.  YOU KNEW THAT WAS GOING TO COME,

17   RIGHT?

18   **A.**  WHEN I SIGNED THIS, I DON'T KNOW.

19   **Q.**  WHEN YOU SIGNED THE AGREEMENT TO COMMIT TO ATTENDING A

20   DEPOSITION, YOU KNEW YOU WOULD BE WORKING ON A DEPOSITION IF

21   IT CAME UP, CORRECT?

22   **A.**  OH, IF IT CAME UP, YES.  I DIDN'T KNOW THEY WERE COMING

23   UP.

24   **Q.**  OKAY.  AS IT HAPPENED, THIS WASN'T THE FIRST TIME THAT YOU

25   HAD BEEN RETAINED IN A SIMILAR WAY.  IN A PRIOR LITIGATION,

1    FOR YOUR '541 PATENT, YOU WERE ALSO RETAINED AND THE TERMS

2    WERE BASICALLY THE SAME.  YOU RECEIVED 4 PERCENT OF THE

3    OUTCOME, CORRECT?

4    **A.**  YES, THAT'S RIGHT.

5    **Q.**  AND THAT WAS A COMPENSATION FEE AGREEMENT, RIGHT?  THAT IS

6    WHAT YOU CALLED IT?

7    **A.**  YEAH, THAT WOULD BE –– SURE, THAT MAKES SENSE.

8    **Q.**  YOU INQUIRED OF MR. FARLEY WHETHER YOU COULD DO SOME

9    ACTUAL CONSULTING WORK IN CONNECTION CASE, UNLIKE TECHNOLOGY

10   WORK, RIGHT?

11   **A.**  WELL, HE WOULD CONTACT ME.

12   **Q.**  RIGHT.  BUT DO YOU REMEMBER HIM TELLING YOU THERE WAS AN

13   ISSUE THAT YOU COULDN'T DO ACTUAL TECHNICAL CONSULTING WORK

14   WITH DIGITAL REG?  IS THAT FAMILIAR TO YOU?

15   **A.**  NOT REALLY.

16   **Q.**  OKAY.  ALL RIGHT.

17       LET'S TALK ABOUT THE WORK THAT YOU ACTUALLY DID UNDER

18   THESE AGREEMENTS, AND SPECIFICALLY THE WORK THAT YOU DID WITH

19   THE DINOVO FIRM WITH THEIR AGREEMENT WITH YOU.

20       YOU SPENT HOURS PREPARING FOR YOUR DEPOSITION, DIDN'T YOU?

21   **A.**  I THINK I WAS IN HIS OFFICE FOR TWO–AND–A–HALF HOURS THE

22   DAY BEFORE THE DEPOSITION.

23   **Q.**  TWO–AND–A–HALF HOURS ONLY?

24   **A.**  YES.

25   **Q.**  OKAY.  ALL RIGHT.  LET'S TALK ABOUT THAT TIME THAT YOU

PATTERSON – CROSS / REINES

1    SPENT WITH THEM.

2        WHEN YOU PREPARED, YOU KNEW WE WOULD BE ASKING ABOUT THE

3    PATENTS IN THE DEPOSITION, CORRECT?

4    **A.**  WHEN I SPENT THE TWO-AND-A-HALF HOURS WITH THE LAW FIRM,

5    THEY INFORMED ME THAT I WOULD PROBABLY BE ASKED QUESTIONS

6    ABOUT MY PATENTS, YES.  BUT I DIDN'T KNOW THAT BEFORE I GOT TO

7    THE LAW FIRM.

8    **Q.**  OKAY.  YOU'VE BEEN INVOLVED IN A PRIOR LITIGATION

9    INVOLVING YOUR '541 PATENT IN 2008 OR NINE, CORRECT?

10   **A.**  YES.

11   **Q.**  YOU HAD YOUR DEPOSITION TAKEN FOR TWO DAYS, CORRECT?

12   **A.**  RIGHT.

13   **Q.**  SO YOU HAD ALREADY BEEN THROUGH THE DRILL?

14   **A.**  YES.

15   **Q.**  AND YOU KNEW THE DEPOSITION, SINCE IT WAS ABOUT THE '541

16   PATENT, THEY WERE GOING TO ASK YOU ABOUT THE '541 PATENT,

17   RIGHT?

18   **A.**  YES.

19   **Q.**  OKAY.  NOW, YOUR DEPOSITION WAS GOING TO HAPPEN IN ANOTHER

20   CASE INVOLVING THE '541 PATENT?

21   **A.**  RIGHT.

22   **Q.**  AND YOU KNEW WE WERE GOING TO ASK YOU ABOUT THE '541

23   PATENT, DIDN'T YOU?

24   **A.**  NO, I DIDN'T.

25   **Q.**  OKAY.  NOW, IN TERMS OF THE AMOUNT OF TIME, DO YOU RECALL

PATTERSON – CROSS / REINES

| | |
|---|---|
| 1 | YOU TESTIFIED TWO-AND-A-HALF HOURS?  ARE YOU PRETTY SURE ABOUT |
| 2 | THAT? |
| 3 | **A.**  I THINK THAT WAS ABOUT RIGHT. |
| 4 | **Q.**  ALL RIGHT.  WOULD YOU TURN TO YOUR DEPOSITION -- LET ME |
| 5 | ASK YOU, YOU WERE DEPOSED IN THIS CASE IN APRIL OF 2013? |
| 6 | **A.**  YES.  UH-HUH. |
| 7 | **THE COURT:**  MAY I HAVE THE ORIGINAL? |
| 8 | **MR. REINES:**  YES. |
| 9 | (PAUSE IN THE PROCEEDINGS.) |
| 10 | (DEPOSITION HANDED TO COURT.) |
| 11 | **BY MR. REINES** |
| 12 | **Q.**  YOU WERE DEPOSED IN APRIL OF 2013, CORRECT? |
| 13 | **A.**  YES, THAT'S RIGHT. |
| 14 | **Q.**  AND THERE WAS A COURT REPORTER THERE TAKING DOWN WHAT WAS |
| 15 | BEING SAID? |
| 16 | **A.**  YES. |
| 17 | **Q.**  YOU WERE UNDER OATH, CORRECT? |
| 18 | **A.**  YES. |
| 19 | **Q.**  AND I WOULD LIKE TO DIRECT YOU SPECIFICALLY TO PAGE 311, |
| 20 | IF YOU WOULD, OF THE APRIL 25TH TRANSCRIPT.  EXCUSE ME. |
| 21 | APRIL 26TH.  I MISSPOKE. |
| 22 | **A.**  WHAT PAGE? |
| 23 | **Q.**  310. |
| 24 | **THE COURT:**  IT'S THE LITTLE PAGES. |
| 25 | **MR. REINES:**  YES. |

1        **THE COURT:**  IN THE LITTLE CONDENSED VERSION, THERE'S

2    FOUR PAGES ON A PAGE.  SO IT IS NOT THE BIG PAGE ON THE BOTTOM

3    RIGHT.  IT IS ONE OF THE LITTLE PAGES.

4    **BY MR. REINES**

5    **Q.**  IT'S THE UPPER LEFT QUARTER.

6    **A.**  I SEE IT.

7    **Q.**  IF YOU LOOK AT LINES 12 THROUGH 17.

8    **A.**  YES, I SEE THEM.

9    **Q.**  AND DO YOU SEE WHERE IT SAYS "QUESTION:  HOW MUCH TIME DID

10   YOU SPEND PREPARING FOR YOUR DEPOSITION TODAY?"

11   **A.**  YES.

12   **Q.**  AND YOUR ANSWER WAS:  "TODAY?"  WITH A QUESTION MARK?

13   **A.**  YEAH.

14   **Q.**  AND I SAID:  "WELL, TODAY AND YESTERDAY."

15       AND DO YOU SEE YOUR ANSWER WAS:  "OH, I SPENT MAYBE FIVE

16   OR SIX HOURS WITH THE DINOVO ATTORNEYS ON TUESDAY"?

17   **A.**  YES.  UH-HUH.

18   **Q.**  DOES THAT REFRESH YOUR RECOLLECTION YOU SPENT FIVE OR SIX

19   HOURS AND NOT TWO-AND-A-HALF PREPARING?

20   **A.**  NOT REALLY.  I WAS IN THE OFFICE FOR FIVE OR SIX HOURS,

21   BUT, IN FACT, DINOVO WAS ON ANOTHER CASE.  AND I GUESS, I

22   DON'T KNOW, MAYBE HE FIGURED I COULD WAIT.  AND I DID.

23   **Q.**  YOU WANTED TO BE AS PREPARED AS YOU COULD BE TO ANSWER THE

24   QUESTIONS, RIGHT, WHEN YOU PREPARED?

25   **A.**  I THOUGHT I COULD GET PREPARED IF THEY GAVE ME A COUPLE OF

1    HOURS.

2    **Q.**  BUT YOU WANTED TO BE AS PREPARED AS YOU COULD BE, RIGHT?

3    THAT WAS YOUR GOAL?

4    **A.**  I DIDN'T HAVE THAT AS A GOAL.

5    **Q.**  OKAY.  WOULD YOU --

6         **MR. REINES:**  WHY DON'T WE PLAY FOR DEPOSITION

7    LINES -- 311, LINES 12 THROUGH 16 ON THE VIDEO, PLEASE.

8         (VIDEO PLAYED AS FOLLOWS:)

9              "ANSWER:  WELL, I WANTED TO BE AS PREPARED AS I COULD

10             BE."

11   **BY MR. REINES**

12   **Q.**  DOES THAT REFRESH YOUR RECOLLECTION THAT YOU WANTED TO BE

13   AS PREPARED AS YOU COULD BE?

14   **A.**  WITH TWO-AND-A-HALF HOURS OF HELP, SURE.

15   **Q.**  NOW, YOU ACTUALLY DID YOUR BEST TO PREPARE FOR THE

16   DEPOSITION, DIDN'T YOU?

17   **A.**  WITH THE TWO-AND-A-HALF HOURS.

18   **Q.**  OKAY.  BUT YOU DIDN'T TELL ME IT WAS TWO-AND-A-HALF HOURS.

19   YOU SAID --

20   **A.**  YOU DIDN'T ASK ME, DID YOU?  YOU JUST ASKED ME HOW LONG I

21   WAS THERE.

22   **Q.**  ALL RIGHT.  NOW, AT THE DEPOSITION YOU CONFIRMED YOU WERE

23   PREPARED TO GIVE CANDID AND COMPLETE TESTIMONY, DIDN'T YOU?

24   **A.**  THAT'S TRUE.

25   **Q.**  OKAY.  NOW, IN THE DEPOSITION WHEN I ASKED YOU ABOUT --

PATTERSON – CROSS / REINES

```
 1    SO -- SO BEFORE THE DEPOSITION YOU HAD BEEN -- THE CONSULTANT

 2    AGREEMENT WITH THE DINOVO LAW FIRM HAD BEEN FROM 2011 TO 2013,

 3    CORRECT?

 4    A.  YES, THAT'S RIGHT.

 5    Q.  AND ONE OF THE THINGS YOU COMMITTED TO DO FOR YOUR FOUR

 6    PERCENT WAS TO PREPARE FOR DEPOSITION, CORRECT?

 7    A.  THAT'S RIGHT.

 8    Q.  AND YOU KNEW THE '541 PATENT WAS GOING TO BE THE SUBJECT

 9    OF THE DEPOSITION, DIDN'T YOU?

10    A.  YES.

11    Q.  AND AT YOUR DEPOSITION I ASKED YOU IF YOU COULD DESCRIBE

12    HOW ANY OF YOUR PATENTS WERE INNOVATIVE AT ALL, DIDN'T I?

13    A.  I DID KIND OF RECALL THAT, YEAH.

14    Q.  YOU SAID YOU COULDN'T DESCRIBE AT ALL HOW ANY OF YOUR

15    PATENTS WERE INNOVATIVE, COULD YOU?

16    A.  THAT'S RIGHT.  I COULDN'T.

17    Q.  WITH RESPECT TO THE '541 PATENT, SPECIFICALLY, I

18    SPECIFICALLY ASKED YOU -- YOU HAD THE PATENT.  I SAID TO YOU:

19    "CAN YOU DESCRIBE AT ALL HOW THE '541 PATENT WAS INNOVATIVE?"

20    AND YOU SAID YOU COULDN'T DO THAT, CORRECT?

21    A.  I COULDN'T DO THAT AT THAT TIME, THAT'S RIGHT.

22    Q.  AND THE REASON YOU GAVE FOR WHY YOU COULDN'T GIVE ANY

23    TESTIMONY AT ALL ABOUT WHY ANY OF YOUR PATENTS WERE INNOVATIVE

24    WHEN YOU KNEW WE WERE GOING TO ASK YOU ABOUT IT WAS BECAUSE

25    YOU WERE TOO FAR AWAY FROM IT AND YOUR WORK PAPERS WERE
```

1    MISSING, CORRECT?

2    **A.**  THAT'S CORRECT.

3    **Q.**  AND THEN, AS I UNDERSTOOD IT, WHEN YOU WORKED WITH THE

4    FISH & RICHARDSON ATTORNEYS WITH THE COT IN THEIR OFFICE --

5    **A.**  YES.

6    **Q.**  -- THE REAL FOCUS WAS CRAFTING THE CLAIMS, WASN'T IT?

7    **A.**  THAT WAS THEIR FOCUS.  THAT WAS THEIR FOCUS.  I DIDN'T

8    KNOW HOW TO DO THE CLAIMS.  THEY -- YOU KNOW, I WORKED WITH

9    THEM, AND THEY WOULD CONSTRUCT THE CLAIM LANGUAGE, YES.

10   **Q.**  THEY NEEDED YOU THERE ON A COT IN ORDER TO BE ABLE TO GET

11   THE CLAIMS RIGHT; IS THAT CORRECT?

12   **A.**  YEAH.

13   **Q.**  OKAY.  AND WHEN I ASKED YOU ABOUT CLAIM 1 OF THE '541

14   PATENT, WHICH IS WHAT ADOBE'S BEING ACCUSED OF INFRINGEMENT

15   FOR, AND I ASKED YOU IF YOU EVEN GENERALLY UNDERSTOOD THAT

16   CLAIM.

17            **MR. REINES:**  WHY DON'T WE PUT THE CLAIM UP?  THAT IS

18   EXHIBIT 1, CLAIM 1, PLEASE.  WHY DON'T WE LOOK AT IT?

19                      (PUBLISHED TO JURY.)

20       WELL, I MEAN.  THAT'S ALL RIGHT.  LET ME MOVE FORWARD WITH

21   THE QUESTION.  HE HAS IT UP THERE.  OKAY.  THANK YOU.

22       CAN YOU BLOW THAT UP A LITTLE, MR. BONINI?  THANK YOU.

23            **THE WITNESS:**  IT IS BIG ENOUGH HERE.  I CAN SEE IT

24   HERE.

25            **MR. REINES:**  EXCELLENT.  I WANTED TO MAKE SURE THE

1   JURY AND EVERYONE CAN SEE IT.  THANK YOU.

2   **BY MR. REINES**

3   **Q.**  WHEN I ASKED YOU IN YOUR DEPOSITION ABOUT CLAIM 1 OF THE

4   '541 PATENT, WHICH IS THE SUBJECT OF THE LITIGATION, YOU SAID

5   YOU DIDN'T EVEN GENERALLY UNDERSTAND THAT CLAIM, CORRECT?

6   **A.**  YES.  THAT'S RIGHT.

7   **Q.**  AND THEN, JUST SO IT WASN'T A MATTER OF LEGALESE, WE

8   LOOKED AT FIGURE 5.

9          **MR. REINES:**  CAN YOU PULL FIGURE 5 UP?

10                (PUBLISHED TO JURY.)

11   **BY MR. REINES**

12   **Q.**  DO YOU GENERALLY RECOGNIZE FIGURE 5 AS SOMETHING

13   ASSOCIATED WITH YOU?

14   **A.**  I DON'T.  I MEAN, I DON'T RECOGNIZE IT.

15   **Q.**  OKAY.  THIS IS FIGURE 5 OF YOUR '541 PATENT, CORRECT?

16   **A.**  DO YOU WANT ME TO LOOK AT MY PATENT AND SEE IF THAT IS

17   WHAT IS ON FIGURE 5?

18   **Q.**  NO.  I'M REPRESENTING TO YOU THAT IS FIGURE 5 OF YOUR

19   PATENT.

20   **A.**  OKAY.  I AGREE.

21   **Q.**  DOES IT LOOK FAMILIAR AT ALL?

22   **A.**  NO.

23   **Q.**  DO YOU HAVE -- DO YOU RECALL IN YOUR DEPOSITION I ASKED

24   YOU IF YOU HAD ANY IDEA WHAT YEAR YOU CAME UP WITH THE BASIC

25   CONCEPT OF FIGURE 5 THAT'S IN YOUR PATENT?  SUPPOSED TO SHOW

PATTERSON – CROSS / REINES

1    YOUR INVENTION.  AND YOU SAID YOU HAD NO IDEA WHAT YEAR.  DO

2    YOU REMEMBER THAT?

3    **A.**  NO, I DON'T REMEMBER THAT.

4    **Q.**  OKAY.  WHY DON'T WE SEE IF WE CAN REFRESH YOUR

5    RECOLLECTION?  LET ME ASK YOU THIS:  SO DO YOU HAVE ANY IDEA

6    WHEN YOU -- WHAT YEAR YOU CAME UP WITH THE INVENTIONS --

7    **A.**  IF THIS IS, IN FACT, A FLOW CHART OUT OF PATENT '541, THEN

8    THIS FLOW CHART WOULD HAVE BEEN CREATED BY ME SOMETIME BETWEEN

9    JULY, 1993 AND JANUARY, 1996.

10   **Q.**  OKAY.  IT'S IMPORTANT, BECAUSE THE COURT REPORTER IS

11   WORKING VERY HARD, TO MAKE SURE SHE GETS AN ACCURATE RECORD

12   THAT YOU WAIT FOR ME TO COMPLETE MY QUESTION.

13   **A.**  I AM SORRY.

14   **Q.**  THANK YOU.  I KNOW YOU ARE DOING YOUR BEST, AND THIS IS AN

15   UNUSUAL SETTING, BUT I APPRECIATE IT FOR ORDERLINESS HERE.

16       ALL RIGHT.  WELL, I WOULD LIKE YOU TO TURN TO PAGE 321 OF

17   YOUR DEPOSITION.

18   **A.**  I GOT IT.

19       **MR. REINES:**  AND WHY DON'T WE PLAY THAT TESTIMONY

20   FROM LINE 11 TO 17.

21       **THE CLERK:**  HOLD ON.  GO AHEAD.

22       (VIDEO PLAYED AS FOLLOWS:)

23       "QUESTION:  AND WITH RESPECT TO THE FIGURES IN THE

24       PATENT -- LET'S SAY FIGURE 5.  DO YOU HAVE ANY IDEA

25       WHEN YOU CAME UP WITH THIS PARTICULAR CONCEPT THAT'S

1              DEPICTED IN THIS FIGURE?

2              "ANSWER:  I DON'T RECALL.

3              "QUESTION:  DO YOU KNOW -- DO YOU HAVE ANY IDEA WHAT

4              YEAR OR ANYTHING?

5              "ANSWER:  NO."

6      **BY MR. REINES**

7      **Q.**  NOW, DOES THAT REFRESH YOUR RECOLLECTION THAT I THEN MOVED

8      TO FIGURE 7 OF THE '541 PATENT, AND I ASKED YOU:

9              "DO YOU HAVE ANY IDEA AT ALL WHEN YOU CAME UP WITH

10             THAT FIGURE DEPICTING YOUR '541 INVENTION?"

11     **A.**  DO YOU WANT ME TO FIND FIGURE 7 SOMEWHERE?

12     **Q.**  WE CAN PUT IT UP ON THE SCREEN FOR YOUR CONVENIENCE.

13                        (PUBLISHED TO JURY.)

14        THERE IT IS.

15             **THE COURT:**  I AM SORRY.  WHAT IS THE QUESTION?  YOU

16     ARE ASKING WHETHER HE REMEMBERS WHETHER YOU ASKED HIM ABOUT

17     THAT?

18             **MR. REINES:**  I WILL REFRAME THE QUESTION, YOUR HONOR.

19     FIRST I WANT HIM TO DIGEST THE FIGURE.

20     **BY MR. REINES**

21     **Q.**  HAVE YOU DIGESTED THE FIGURE?

22     **A.**  I THOROUGHLY DIGESTED IT.

23     **Q.**  OKAY.  DO YOU HAVE ANY IDEA WHEN YOU CAME UP WITH THE

24     CONCEPT OF THE PROCESS DESCRIBED IN FIGURE 7?

25     **A.**  THIS FIGURE IS IN MY '541 PATENT, AS I UNDERSTAND IT.  AND

PATTERSON – CROSS / REINES

1   I SEE THE NUMBER UP ON THE TOP, "'541." SO THIS FIGURE YOU

2   WILL FIND CAME RIGHT FROM MY COMPUTER SOFTWARE DESIGN DOWN AT

3   MY DETAIL FLOW BEFORE YOU WILL FIND THE CODING SLIPS THAT WAS

4   ALL PRODUCED BY ME BETWEEN 1993 AND THE LAST DAY OF 1995.

5   **Q.** IN DEPOSITION, WHEN I ASKED YOU THE SAME QUESTION, DO YOU

6   RECALL THAT YOU SAID YOU HAD NO IDEA WHAT YEAR?

7   **A.** I WON'T -- I DON'T RECALL, BUT I DON'T RECALL, YOU KNOW,

8   KNOWING HARDLY ANYTHING THAT YOU SHOWED ME BACK IN APRIL OF

9   2013.

10  **Q.** LAST YEAR?

11  **A.** LAST YEAR.

12  **Q.** OKAY. LET ME ASK YOU, THEN, WHAT YOU DO REMEMBER.

13      LET ME ASK YOU THIS:  WHEN I ASKED YOU IN DEPOSITION

14  WHETHER YOU HAD ANY MEMORY AT ALL OF THE CONCEPT OF EXECUTING

15  AN INSTALLATION PROCESS THAT GENERATES AT THE CLIENT A

16  PERMISSION LOCK UNIQUELY TO A CLIENT DIRECT FROM CLAIM 1, YOU

17  HAD NO MEMORY WHEN YOU CAME UP WITH THAT IDEA, CORRECT?

18      SITTING HERE NOW DO YOU HAVE ANY MEMORY?

19  **A.** THAT'S RIGHT. EVEN NOW I CAN'T SPECIFICALLY REMEMBER THAT

20  MOMENT.

21  **Q.** AND WITH RESPECT TO THE TECHNOLOGY THAT IS ACTUALLY IN

22  YOUR PATENTS -- FORGET WHOEVER YOU SHOWED OR WHATEVER YOUR

23  DISCUSSION WAS IN 1998 AT THE EXPO -- IN TERMS OF THE

24  TECHNOLOGY IN YOUR PATENTS, YOU DON'T RECALL ANY INDUSTRY

25  PRAISE FOR THAT TECHNOLOGY, DO YOU?

1    **A.**  I REALLY DON'T KNOW WHAT YOUR QUESTION WAS.  I DON'T

2    UNDERSTAND THAT.

3    **Q.**  WITH RESPECT TO THE TECHNOLOGY THAT IS DESCRIBED IN YOUR

4    PATENTS?

5    **A.**  YES.

6    **Q.**  YOU DON'T RECALL ANY INDUSTRY PRAISE OF THAT TECHNOLOGY,

7    SPECIFICALLY, AS COMPARED TO WHATEVER IT WAS THAT YOU SHOWED

8    AT THE EXPO IN 1998.

9    **A.**  I DON'T KNOW ANYTHING AT ALL ABOUT THAT.

10   **Q.**  NOW, THERE WAS ONE THING IN YOUR –– IN 2009 THAT YOU

11   REMEMBERED ABOUT THE '541 PATENT, BECAUSE YOU WERE QUESTIONED

12   CLOSELY ABOUT IT THERE, TOO.  AND WHAT YOU REMEMBERED IN 2009

13   WHEN YOU WERE DEPOSED WAS THAT THE '541 APPLICATION, IN TERMS

14   OF THE NOVELTY OF THAT, WAS THAT IT WAS CLIENT CENTRIC IN THE

15   WAY THAT THE DRM COPY CONTROL OCCURRED.

16       DO YOU RECALL THAT?  I MEAN, IS THAT TRUE?  LET ME ASK YOU

17   THAT.

18   **A.**  WELL, I USED THAT TERM "CLIENT CENTRIC" PRETTY FREELY,

19   YEAH.

20   **Q.**  OKAY.  AND YOU WERE ASKED:

21           "WHAT DO YOU MEAN IT IS A CLIENT–CENTRIC SOLUTION,

22           THIS '541 PATENT?"

23       BECAUSE THAT WAS KIND OF WHAT YOU SAID WAS WHAT MADE IT

24   NOVEL.

25       AND YOUR ANSWER WAS THAT THE PROCESS THAT PREVENTED

1    COPYING WAS INITIATED BY A RELATIONSHIP BETWEEN A PC AND A

2    SERVER, BUT THE ACTUAL CONTROLLING PROCESS THAT PROTECTED THE

3    CONTENT WAS PERFORMED AT THE CLIENT.

4        MY QUESTION TO YOU IS:  WHEN YOU SAY THAT YOUR '541

5    PATENT, IN TERMS OF WHAT YOU BELIEVED THE NOVELTY WAS, IS THAT

6    THIS CLIENT -- THIS CLIENT-CENTRIC SOLUTION, CORRECT?  LET ME

7    JUST ASK YOU THAT.

8    **A.**  CLIENT CENTRIC.  YES.

9    **Q.**  AND BY "CLIENT CENTRIC," YOU MEAN THAT THE ACTUAL

10   CONTROLLING PROCESS THAT PROTECTED THE CONTENT IS PERFORMED AT

11   THE CLIENT, CORRECT?  THAT IS WHAT "CLIENT CENTRIC" MEANS?

12   **A.**  I DON'T KNOW IF THAT IS WHAT IT MEANS TO YOU.

13       "CLIENT CENTRIC" MEANS TO ME THAT THE PROTECTION ITSELF IS

14   NOT GOING TO OCCUR WITHOUT A CLIENT BEING INVOLVED.  THAT IS

15   WHAT IT MEANS TO ME.

16       THIS WAS NOT A SERVER-ONLY SOLUTION.  YOU HAVE TO HAVE A

17   CLIENT WITH IT.

18   **Q.**  ALL RIGHT.

19           **MR. REINES:**  I MOVE TO STRIKE THAT AS NONRESPONSIVE,

20   YOUR HONOR.  I ASKED HIM WHETHER IT WAS THAT THE ACTUAL

21   CONTROLLING PROCESS WAS AT THE CLIENT.  THAT WAS "YES" OR

22   "NO."

23           **THE COURT:**  I WON'T STRIKE IT.  YOU CAN ASK IT AGAIN,

24   IF YOU LIKE.

25           **MR. REINES:**  THANK YOU.

PATTERSON – CROSS / REINES

1   **BY MR. REINES**

2   **Q.**  I WOULD LIKE TO DIRECT YOU TO YOUR DEPOSITION FROM 2009.

3   THIS IS ON MARCH 24TH, 2009.  AND YOU RECALL YOUR DEPOSITION

4   WAS TAKEN AT THAT TIME?

5   **A.**  2009, YES.

6   **Q.**  AND --

7   **A.**  THERE WAS A DEPOSITION.

8   **Q.**  AND THERE WAS A COURT REPORTER?

9   **A.**  YES.

10  **Q.**  YOU SWORE YOU WOULD TELL THE TRUTH?

11  **A.**  YES.

12  **Q.**  YOU WERE EXPECTING 4 PERCENT OF THE PROCEEDS OF THE

13  LITIGATION?

14  **A.**  THAT'S RIGHT.

15  **Q.**  AND YOU PREPARED FOR THAT DEPOSITION, TOO?

16  **A.**  UH-HUH.  I DON'T HOW MUCH PREPARATION I DID.

17  **Q.**  OKAY.  LET'S LOOK AT PAGE 54.  THIS DEPOSITION TRANSCRIPT

18  IS A LITTLE TRICKY.  WHAT I WOULD DO IS GO LOOK AT THE BOTTOM.

19  IT SAYS PAGE 46, BELIEVE IT OR NOT.

20  **A.**  54?

21  **Q.**  THE PAGE OF THE TRANSCRIPT WE ARE GOING TO LOOK AT, BUT

22  THE PAGE OF WHAT IS IN YOUR BINDER, IT WILL BE EASIER IF YOU

23  JUST LOOK AT PAGE 46 AT THE BOTTOM.  AND I APOLOGIZE.  THIS IS

24  THE WAY IT WAS GIVEN TO US FROM YOUR COUNSEL.

25  **A.**  NO.  THIS IS JUST OPERATOR PROBLEM.  IT IS NOT YOUR FAULT.

PATTERSON – CROSS / REINES

1  **Q.**  UNDERSTOOD.

2  **A.**  SO WE ARE -- I'M ON PAGE NUMBER IN THIS BINDER, AND IT

3  SAYS 46 AND --

4  **Q.**  ARE YOU ON THE MARCH 24TH, 2009 DEPOSITION TRANSCRIPT?

5  **A.**  YES, I AM.

6  **Q.**  GREAT.  ARE YOU AT PAGE 46 AT THE BOTTOM?

7  **A.**  YES.

8  **Q.**  GREAT.  AND THEN, IF YOU LOOK AT THE MIDDLE OF THE PAGE

9  YOU SEE WHERE IT SAYS "54"?

10  **A.**  YES.

11  **Q.**  THAT'S THE TRANSCRIPT NUMBER PAGE IS RIGHT THERE, THAT 54.

12  IF YOU LOOK AT LINES 2 THROUGH 11, THE QUESTION WAS POSED TO

13  YOU:

14      "WHAT DO YOU MEAN BY A CLIENT-CENTRIC SOLUTION?"

15  **A.**  YES.

16  **Q.**  YOUR ANSWER WAS:

17      "WHAT I MEAN IS THAT THE PROCESS OF ENSURING THAT

18      ELECTRIC CONTENT, COPYRIGHTED INFORMATION COULD NOT

19      BE ACCESSED IN AN UNAUTHORIZED MANNER.  THE PROCESS

20      THAT PREVENTED THAT WAS INITIATED BY A RELATIONSHIP

21      BETWEEN A PC AND A SERVER DEVICE, BUT THE ACTUAL

22      CONTROLLING PROCESS THAT PROTECTED THE CONTENT WAS

23      PERFORMED AT THE CLIENT."

24  **A.**  RIGHT.

25  **Q.**  DO YOU SEE THAT TESTIMONY?

1    **A.**  YEAH.

2    **Q.**  ALL RIGHT.  I WOULD LIKE TO ASK YOU ABOUT THE '670 PATENT

3    NOW.  WITH RESPECT TO THE '670 PATENT --

4           **THE COURT:**  WHY DON'T WE TAKE A BREAK?

5           **MR. REINES:**  SURE.  THANK YOU.

6           **THE COURT:**  IT'S 10:05.  WE WILL BREAK UNTIL 10:20.

7       IF YOU CAN BE BACK ON THE STAND AT 10:20, PLEASE.

8           (RECESS TAKEN AT 10:05; RESUMED AT 10:15 A.M.)

9       (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

10          **THE CLERK:**  ARE ALL THE PLAYERS HERE FOR THE

11   OBJECTION?

12          **MR. REINES:**  YES.

13          **THE CLERK:**  REMAIN SEATED.  COME TO ORDER.  COURT IS

14   BACK IN SESSION.

15          **THE COURT:**  GO AHEAD.  YES.

16          **MS. GLAUSER:**  THANK YOU FOR THE TIME, YOUR HONOR.

17      DURING MR. FARLEY'S DIRECT EXAMINATION TODAY, DIGITAL REG

18   WOULD LIKE TO USE A DEMONSTRATIVE THAT IS A LIST OF THE PATENT

19   AGREEMENTS THAT DIGITAL REG HAS ENTERED INTO.

20      ADOBE HAS INFORMED US THEY DON'T HAVE AN OBJECTION TO THE

21   OVERALL DEMONSTRATIVE.  THEY HAVE OBJECTION TO THREE SPECIFIC

22   LINES.  THOSE THREE SPECIFIC LINES ARE A LICENSE BETWEEN DRM

23   AND SITESCAPE.  THE LICENSE BETWEEN DIGITAL REG AND SYMANTEC

24   AND THE LICENSE BETWEEN DIGITAL REG AND EA.

25      AND AS WE UNDERSTAND IT, THEIR OBJECTION TO THE EA AND

1    SYMANTEC LICENSE IS BASED ON YOUR HONOR'S MIL RULING THAT

2    MR. PARR IS NOT ALLOWED TO RELY ON THOSE LICENSES IN HIS

3    DAMAGES CALCULATION.

4        BUT AS THE COURT IS WELL AWARE, LICENSES ARE ALSO EVIDENCE

5    OF INDUSTRY ACQUIESCENCE.  MR. FARLEY IS GOING TO BE

6    TESTIFYING ABOUT THE INDUSTRY'S ACCEPTANCE OF THE TECHNOLOGY

7    AND THAT'S AN IMPORTANT CONSIDERATION FOR A SECONDARY

8    CONSIDERATION OF NONOBVIOUSNESS.  SO WE WILL SEEK TO HAVE THE

9    SITESCAPE, EA, AND SYMANTEC AGREEMENT ENTERED THROUGH MR.

10   FARLEY.

11           **MR. REINES:**  WOULD THE COURT LIKE TO SEE THE

12   DOCUMENT?

13           **THE COURT:**  OKAY.

14               (DOCUMENT HANDED TO THE COURT.)

15           **MR. REINES:**  YOUR HONOR, I HAVE TWO BASIC PROBLEMS.

16   THE FIRST IS EXHIBIT 46, SITESCAPE.  IT IS DESCRIBED AS A

17   LICENSE GRANT THERE.  IT'S UNQUESTIONABLY AN OPTION THAT WAS

18   NEVER EXERCISED.  IN OTHER WORDS, THE PARTY THAT WAS

19   POTENTIALLY GOING TO PAY 7 PERCENT, NEVER AGREED TO PAY THE

20   7 PERCENT.

21       AND WHAT EXACERBATES THAT IS NO DAMAGES EXPERT HAS SAID

22   THAT THAT 7 PERCENT HAS ANY RELEVANCE TO THE DAMAGES AT ALL.

23   SO THERE IS NO FOUNDATION FOR THEM.  AND MR. FARLEY'S

24   DISCLAIMED ANY EXPERTISE IN WHAT THE RIGHT ROYALTY IS.  IT'S

25   JUST DECEPTIVE.  IT'S NOT A LICENSE GRANT.

1          AND THEN THE SECOND PROBLEM IS THAT EA AND SYMANTEC --

2     THEY ARE SAYING IT'S LICENSING HISTORY.  ONE IS, WE HAVE 10,

3     15 LICENSES.  WE DON'T NEED THE SETTLEMENT FROM LAST MONTH OF

4     SYMANTEC IN ORDER TO BE ABLE TO PROVE THAT.  SO IT'S OF

5     MARGINAL RELEVANCE.

6          AND THE COURT'S ALREADY HELD THAT THERE'S NO EXPERT THAT

7     CAN SAY THAT THESE NUMBERS HAVE ANY RELEVANCE.  YOU KNOW,

8     LARGE PORTFOLIO LICENSES AND ALL THE OTHER PROBLEMS WITH IT.

9     SO IT SEEMS TO ME --

10         **THE COURT:**  I DON'T KNOW WHAT THESE TWO ARE.  ARE

11    THESE PART OF THE RPX?

12         **MR. REINES:**  NO.  THESE, EA AND SYMANTEC ARE TWO

13    LICENSES THAT -- THAT -- THEY'RE REALLY SETTLEMENTS IN THIS

14    CASE.  SETTLEMENTS IN THIS CASE THAT HAVE BEEN VERY RECENT

15    THAT MR. PARR TRIED TO SUPPLEMENT LATE AND THE COURT STRUCK

16    HIS ABILITY TO RELY ON THEM JUST BECAUSE THEY WERE SO LATE.

17    ONE WAS A SETTLEMENT AT THE END OF LAST YEAR AND THE OTHER ONE

18    WAS IN JULY, AND SO THE COURT HAS ALREADY SAID THAT THESE TWO

19    CAN'T BE RELIED ON BY THE DAMAGES EXPERTS BECAUSE THEY WEREN'T

20    TIMELY INTRODUCED AS DAMAGES SUPPORT.

21         **MS. GLAUSER:**  AND WE ARE NOT RELYING ON THEM FOR THAT

22    PURPOSE, YOUR HONOR.

23         **THE COURT:**  SHE'S SAYS THAT'S NOT WHAT HE'S -- HE'S

24    NOT THE DAMAGES EXPERT.  HE'S JUST GOING TO SAY WHAT HAPPENED

25    IN THE INDUSTRY.

```
 1          MR. REINES:  RIGHT.  AND IT SEEMS TO ME THAT PUTTING

 2   THE NUMBERS, WHICH IS EXACTLY -- WE ALL KNOW THAT'S HOW THIS

 3   IS GOING TO BE USED, THE 685 AND 450 THERE, IF IT'S NOT FOR

 4   ROYALTY, THERE'S NO REASON FOR IT.  AND THEY HAVE A VERSION OF

 5   THIS CHART, SO IT'S NOT LIKE THEY ARE PREJUDICED, THAT

 6   EXCLUDES 46, 104 AND 105 THAT THEY TALKED ABOUT.  IF THEY

 7   WANT --

 8          MS. GLAUSER:  YOUR HONOR, WE PREPARED IT IN AN

 9   ATTEMPT TO CONFER WITH THE OTHER SIDE FOR TODAY'S ARGUMENT,

10   BUT EACH OF THESE AGREEMENTS IS DEMONSTRATIVE OF SECONDARY

11   INDICIA OF NONOBVIOUSNESS.  AND UNLESS ADOBE --

12          THE COURT:  I WILL ALLOW THEM FOR THIS PURPOSE, BUT

13   NOT FOR THE DAMAGE CALCULATION.

14          MS. GLAUSER:  WE HAVE ONE OTHER ISSUE FOR

15   MR. FARLEY'S TESTIMONY TODAY, YOUR HONOR.  YOU HAD PREVIOUSLY

16   RULED THAT THE AMOUNTS OF THE RPX AGREEMENT COULDN'T COME IN,

17   AND WE BELIEVE THAT ADOBE HAS NOW OPENED THE DOOR.

18       I HAVE A COPY OF THE --

19          THE COURT:  YOU OPENED THE DOOR.  I WAS SURPRISED

20   THERE WASN'T AN OBJECTION.

21          MS. GLAUSER:  WE UNDERSTOOD YOUR HONOR'S RULING TO BE

22   THAT WE WERE ALLOWED TO DISCUSS THE FACT THAT RPX WAS THE

23   LARGEST AS A WAY TO IMPEACH MR. PROWSE'S DAMAGES TESTIMONY OF

24   ADOBE'S DAMAGES EXPERT'S TESTIMONY BECAUSE HE EXCLUDED THE

25   LARGEST LICENSE AND YET KEPT IN ALL OF THE OTHERS.
```

PATTERSON – CROSS / REINES

1      BUT DURING OPENING STATEMENT, ADOBE'S ATTORNEYS ARGUED

2  THAT DIGITAL REG HAD SUED MICROSOFT, SONY AND APPLE, AND THAT

3  THOSE COMPANIES WERE WILLING TO PAY DIGITAL REG FOR USE OF THE

4  PATENT AND THAT THEY MIGHT BE WILLING TO PAY SMALL AMOUNTS.

5      IT PREJUDICES US TO HAVE OUR SIDE ARGUING THAT THE AMOUNT

6  IS LARGE WHILE ADOBE IS ARGUING THAT THE AMOUNT IS SMALL, AND

7  INSTEAD THE JURY SHOULD BE ALLOWED TO DECIDE IF, IN FACT,

8  APPLE, WHO TOOK THE LICENSE THROUGH RPX, PAID A LARGE OR SMALL

9  AMOUNT HERE.

10          **MS. MEHTA:**  YOUR HONOR, IF I MAY JUST --

11          **THE COURT:**  THE AMOUNT IS NOT -- THE LARGE AMOUNT --

12  THE LARGE AMOUNT OF THE RPX LICENSE IS NOT COMING IN.

13      NOW, YOU'RE SAYING THAT SOME OTHER THINGS WERE MENTIONED

14  IN OPENING THAT SHOULDN'T HAVE BEEN?

15          **MS. GLAUSER:**  NO.  WE ARE, IN FACT, ARGUING THAT IN

16  ORDER TO RESPOND TO ARGUMENTS THAT WERE MADE IN OPENING, THE

17  AMOUNT OF THE RPX LICENSE DOES, IN FACT, NEED TO COME IN AND

18  WE ARE SEEKING A NEW RULING FROM YOUR HONOR ON THE MOTION IN

19  LIMINE.

20          **THE COURT:**  NO.  I THOUGHT YOU, IN THE OPENING,

21  VIOLATED THE MOTION IN LIMINE, AS I SAY, AND I WAS QUITE

22  SURPRISED THERE WASN'T AN OBJECTION.  BUT THAT DOESN'T MAKE

23  THINGS BETTER FOR YOU.

24          **MS. GLAUSER:**  WE WOULD THEN LIKE TO SEEK A

25  CLARIFICATION ON IT.  ARE WE ALLOWED TO REFER TO IT AS A LARGE

```
1    AGREEMENT?

2           THE COURT:  AS A LARGE NUMBER?

3           MS. GLAUSER:  YES.

4           THE COURT:  I SUPPOSE.

5           MS. MEHTA:  I THINK WHAT WE DISCUSSED AT THE MOTION

6    IN LIMINE HEARING WAS THAT THEY COULD REFER TO IT AS LARGER

7    THAN THE OTHERS SO THAT THEIR EXPERT WOULDN'T BE CRITICIZED

8    FOR SAYING IT IS LARGE OR SMALL, BUT LARGE ITSELF IS

9    MISLEADING.

10           THE COURT:  IT'S THE LARGEST, LARGER THAN THE OTHERS.

11           MS. MEHTA:  RIGHT.

12           MS. GLAUSER:  YES, YOUR HONOR.

13           MS. MEHTA:  THANK YOU, YOUR HONOR.

14           THE COURT:  CAN YOU BRING IN THE JURY?

15           THE CLERK:  SURE.

16        (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

17           THE COURT:  PLEASE BE SEATED.  YOU MAY PROCEED.

18           MR. REINES:  THANK YOU, YOUR HONOR.

19    BY MR. REINES:

20    Q.  ON DIRECT EXAMINATION, YOU ADDRESSED THE '670 PATENT,

21    CORRECT?

22    A.  YES.

23    Q.  AND WHAT YOU DESCRIBED ABOUT THE '670 PATENT WAS, YOU

24    TALKED ABOUT THE TRACKING FEATURE, CORRECT?

25    A.  YES.
```

PATTERSON – CROSS / REINES

1    **Q.**  AND YOU WENT ON AT SOME LENGTH ABOUT THE IMPORTANCE OF THE

2    TRACKING TO THE INVENTION OF THE '670 PATENT, DIDN'T YOU?

3    **A.**  YES.

4    **Q.**  OKAY.

5        NOW, WHEN I HAD THE CHANCE TO PREPARE FOR THIS TRIAL AND

6    DEPOSE YOU LAST YEAR, YOU SAID, TESTIFIED UNDER OATH, THAT YOU

7    COULD NOT DESCRIBE AT ALL HOW THE INVENTIONS CLAIMED IN THE

8    '670 PATENT ARE INNOVATIVE.

9        DO YOU RECALL THAT?

10   **A.**  NO, I DON'T RECALL THAT.

11   **Q.**  IS IT, IN FACT, TRUE THAT YOU CANNOT DESCRIBE AT ALL HOW

12   THE INVENTION IS CLAIMED IN THE '670 PATENT ARE INNOVATIVE

13   COMPARED TO THE PRIOR ART?

14   **A.**  THAT IS TRUE, I CANNOT REALLY DESCRIBE HOW THE HOWS AND

15   WAYS OF IT RIGHT NOW.

16            **MR. REINES:**  LET'S PULL UP CLAIM 45 OF THE '670

17   PATENT, PLEASE, MR. BONINI, WHICH IS EXHIBIT 3.

18                    (PUBLISHED TO JURY.)

19   BY MR. REINES:

20   **Q.**  DO YOU UNDERSTAND CLAIM 45 IS THE CLAIM THAT'S BEING

21   ASSERTED AGAINST ADOBE?

22   **A.**  YES, I WAS TOLD THAT.

23   **Q.**  OKAY.  AND DID YOU UNDERSTAND THAT WHEN I CAME TO QUESTION

24   YOU ABOUT THE ALLEGATIONS OF INFRINGEMENT AGAINST ADOBE, THAT

25   YOU TESTIFIED THAT YOU HAD NO IDEA AT ALL WHAT CLAIM 45 MEANS.

PATTERSON – CROSS / REINES

1   **A.**   DID I ACTUALLY SAY "NO IDEA"?

2   **Q.**   YES.   WELL, YOU AGREED TO THAT, IN ANY EVENT.

3       WELL DO YOU HAVE ANY IDEA?

4   **A.**   ACTUALLY, I DON'T THINK I HAVE ANY IDEA RIGHT NOW AND I'M

5   READING IT.

6   **Q.**   OKAY.

7       NOW, AGAIN, WITH RESPECT TO THE '670 PATENT, YOU DON'T

8   RECALL ANYONE GIVING INDUSTRY PRAISE SPECIFICALLY TO THE

9   TECHNOLOGY DESCRIBED IN ANY OF YOUR PATENTS, INCLUDING THE

10   '670 PATENT, RIGHT?

11   **A.**   I DON'T RECALL ANYBODY.

12   **Q.**   LET'S TALK ABOUT YOUR PATENT PROSECUTION NOW.   LET'S

13   SWITCH GEARS A LITTLE BIT.

14       YOUR FIRST MEETING WITH PATENT ATTORNEYS WAS IN THE FALL

15   OF 1997; IS THAT CORRECT?

16   **A.**   IN THE FALL -- YES, 1997.

17   **Q.**   NOW, YOUR TESTIMONY ON DIRECT WAS THAT YOU HAD THE IDEA TO

18   PATENT YOUR DESKGATE WORK, AND YOU TOLD MR. FARLEY ABOUT IT AT

19   YOUR MEETING, AND THAT'S WHY HE GOT EXCITED AND WANTED TO

20   INVEST ALL THE MONEY, RIGHT?

21       DO YOU REMEMBER THAT ON DIRECT?

22   **A.**   ABOUT THE PATENTING?

23   **Q.**   YEAH.

24   **A.**   I THINK WE HAVE TWO THINGS CONFUSED.

25   **Q.**   OKAY.   WHEN YOU WERE WORKING WITH MR. FARLEY IN YOUR

PATTERSON – CROSS / REINES

1   INITIAL MEETING?

2   **A.**   UH-HUH.

3   **Q.**   AND HE GOT EXCITED, ONE OF THE THINGS YOU SAID IS, I THINK

4   WE'VE GOT PATENTABLE STUFF, WE SHOULD GO PATENT IT.

5       IS THAT CORRECT OR NOT CORRECT?

6   **A.**   THAT'S NOT CORRECT.

7   **Q.**   OKAY.  THE IDEA FOR PATENTING WAS MR. FARLEY'S OR YOURS?

8   **A.**   WELL, I -- MR. FARLEY WANTED ME TO START A PATENTING

9   PROCESS WHEN I WASN'T READY TO DEVOTE ALL OF MY TIME TO START

10  A PATENTING PROCESS.

11  **Q.**   DID YOU RESPOND TO HIM YOU DIDN'T THINK YOU HAD ANYTHING

12  PATENTABLE?

13  **A.**   WELL, I DIDN'T THINK IT COULD BE PATENTABLE WITHOUT ME.

14  **Q.**   IN TERMS OF MR. FARLEY WHEN HE SUGGESTED THAT YOU PATENT

15  YOUR WORK AT DESKGATE, DID YOU SAY YOU DIDN'T THINK YOU HAD

16  ANYTHING PATENTABLE?

17  **A.**   THERE WAS NOTHING PATENTABLE IF I WASN'T GOING TO BE

18  INVOLVED IN IT.  NO ONE ELSE HAD ACCESS TO MY RECORDS, MY

19  DOCUMENTS, MY SOFTWARE DESIGN.  NOTHING.

20  **Q.**   LET'S TALK ABOUT YOUR WORK WITH THE ACTUAL PATENT

21  ATTORNEYS.

22      YOUR FIRST MEETING WITH THE PATENT ATTORNEYS WAS FALL OF

23  1997?  DOES THAT SOUND ABOUT RIGHT TO YOU?

24  **A.**   I THINK SO.

25  **Q.**   OKAY.  SO GOING BACK TO THAT.

1      YOU HAD -- AND YOU HAD INVOLVEMENT WITH YOUR PATENTS --

2   LET ME ASK YOU THIS:  YOU TOOK THE PATENTING PROCESS PRETTY

3   SERIOUSLY, DIDN'T YOU?

4   **A.**  I DID, YES.

5   **Q.**  AND YOU WERE INVOLVED WITH IT FROM FALL 1997, WHEN YOU

6   FIRST STARTED LIKE YOU JUST DESCRIBED, UNTIL DECEMBER 1999

7   WHEN YOU WERE ASKED TO LEAVE M2; IS THAT CORRECT?

8   **A.**  THAT'S CORRECT.

9   **Q.**  OKAY.

10      DURING THAT WHOLE TIME PERIOD YOU TOOK IT SERIOUSLY AND

11  DID WHAT YOU COULD TO SUPPORT YOUR PATENTS, RIGHT?

12  **A.**  YES.

13  **Q.**  NOW, IN TERMS OF THE MEETING WITH YOUR LAWYERS, YOU HAD

14  ABOUT 50, FIVE ZERO MEETINGS WITH YOUR LAWYERS TO PREPARE YOUR

15  PATENTS, THE '541, '760, AND THE REST OF THEM; IS THAT

16  CORRECT?

17  **A.**  I HAD 55?

18  **Q.**  NO, I'M SORRY IF I MISSPOKE.

19      50, FIVE ZERO.

20  **A.**  I HAD 50 MEETINGS WITH MY PATENT ATTORNEYS?

21  **Q.**  RIGHT.

22  **A.**  THAT'S WHERE THE MONEY WENT.  OKAY.  I DIDN'T KNOW THAT.

23  I KNEW IT WAS A LOT OF THEM.  YEAH.

24  **Q.**  OKAY.

25          **MR. REINES:**  WELL, LET ME DIRECT YOU TO YOUR

1    DEPOSITION OF APRIL 25TH, PAGE 214, PLEASE, AND SEE IF WE CAN

2    PULL THAT UP IN VIDEO.  AND THAT'S AT LINE 17 THROUGH 24.

3              **MR. ELLWANGER:**  APRIL 25, WHICH YEAR?

4              **MR. REINES:**  THIS IS IN 2013.

5         AND TO BE CLEAR PAGE 214, LINE 17 TO 24:

6         (VIDEO PLAYED AS FOLLOWS TO BEST OF THE REPORTER'S

7    ABILITY:)

8              "QUESTION:  HOW MANY MEETINGS DID YOU HAVE WITH THE

9              ATTORNEYS AT FISH & RICHARDSON, TOTAL?

10             "ANSWER:  50.

11             "QUESTION:  50?

12             "ANSWER:  SEEMS LIKE I LIVED THERE.

13             "QUESTION:  OKAY.  SO YOU MET WITH THEM OFTEN?

14             "ANSWER:  YES."

15   **BY MR. REINES:**

16   **Q.**  SO YOU DO RECALL INTRODUCING THE NUMBER 50 INTO THE

17   DISCUSSION --

18   **A.**  NOT UNTIL YOU JUST SHOWED IT TO ME.

19   **Q.**  BUT NOW YOU REMEMBER IT, RIGHT?

20   **A.**  OH, YEAH.

21             **THE COURT:**  I THINK YOU NEED TO TURN UP THE VOLUME.

22             **MR. BONINI:**  THAT'S IT.

23             **THE COURT:**  THAT'S IT?

24   **BY MR. REINES:**

25   **Q.**  AND YOU FILED THE APPLICATION FOR THE '541 PATENT ON

1    MAY 15TH, 1998?  DOES THAT SOUND ABOUT RIGHT?

2    **A.**  YEAH, THAT SOUNDS RIGHT.

3    **Q.**  AND YOU KNOW THAT KIND OF INFORMATION BECAUSE YOU HAVE

4    BEEN PREPARING FOR TRIAL WITH ATTORNEYS?

5    **A.**  NO, BUT I LOOKED AT IT WHEN YOU SHOWED IT ON THE SCREEN

6    HERE.

7    **Q.**  LET'S PULL IT UP TO CONFIRM THAT.

8              **MR. REINES:**  IT'S EXHIBIT 503.

9         IS IT ON YOUR SCREEN?

10             **THE WITNESS:**  NO.

11                      (DISPLAYED ON SCREEN.)

12             **MR. REINES:**  THERE WE GO.  THANK YOU.

13        WHY DON'T WE GO TO PAGE 6.

14   **BY MR. REINES:**

15   **Q.**  DO YOU RECOGNIZE THIS AS YOUR APPLICATION JUST BASED ON

16   THE FRONT THERE?  "REGULATING ACCESS TO DIGITAL CONTENT,

17   PATRICK E. PATTERSON"?

18   **A.**  I -- I DON'T REMEMBER EVER SEEING THIS DOCUMENT, BUT IF

19   THAT'S WHAT IT IS, THAT'S WHAT IT IS.

20   **Q.**  YOU DIDN'T SEE YOUR APPLICATION FOR YOUR PATENT?

21   **A.**  THIS IS WHEN, 1998, MAY THE 15TH?  SO WE WERE TALKING --

22   OKAY, 16 YEARS AGO.  IF THAT'S WHAT WE USED TO FILE IT, OKAY.

23   **Q.**  ALL RIGHT.

24             **MR. REINES:**  BASED ON THE TESTIMONY AND EVEN JUDICIAL

25   NOTICE, WE WOULD MOVE FOR -- INTO EVIDENCE EXHIBIT 503, WHICH

```
1    IS THE FILE HISTORY.

2              THE COURT:  WELL, I DON'T WANT THE WHOLE THING.  YOU

3    CAN PUT IN THE PARTS THAT ARE ACTUALLY REFERRED TO.

4              MR. REINES:  OKAY.  CAN WE REFER TO THEM AND THEN

5    WORK WITH --

6              THE COURT:  YES.

7              MR. REINES:  -- WORK WITH THE COURT?  OKAY.  THANK

8    YOU.

9              MR. ELLWANGER:  WE HAVE NO OBJECTION TO THAT PROCESS,

10   YOUR HONOR.

11             MR. REINES:  THANK YOU VERY MUCH.

12      WHY DON'T WE TURN TO 503, PAGE 72, PLEASE.

13      (DEFENDANT'S EXHIBIT 503 (PG. 72) RECEIVED IN EVIDENCE)

14                  (PUBLISHED TO JURY.)

15   BY MR. REINES:

16   Q.  IF WE CAN JUST LOOK AT THAT BLOWN UP A BIT.

17      DO YOU RECOGNIZE YOUR SIGNATURE ON THIS OATH OF

18   INVENTORSHIP?

19   A.  YES, I DO.

20   Q.  WHEN YOU SWORE THAT IT WAS YOUR INVENTION IN THAT

21   APPLICATION, YOU COMMITTED TO A FEW THINGS.

22      LET'S FIRST LOOK AT THE COMMITMENT TO SUBMIT INFORMATION

23   MATERIAL TO PATENTABILITY.

24             MR. REINES:  CAN YOU PULL UP THAT PARAGRAPH,

25   MR. BONINI?
```

1    IT STARTS "I ACKNOWLEDGE THE DUTY."  IT'S IN THE MIDDLE.

2    THANK YOU.

3  **BY MR. REINES:**

4  **Q.**  DO YOU SEE WHERE IT SAYS:  "I ACKNOWLEDGE THE DUTY TO

5  DISCLOSE ALL INFORMATION I KNOW TO BE MATERIAL TO

6  PATENTABILITY"?

7  **A.**  YES, I SEE THAT.

8  **Q.**  YOU UNDERSTAND PART OF THAT IS THIS IDEA THAT YOU HAVE TO

9  SUBMIT PRIOR ART THAT YOU KNOW OF?

10  **A.**  OH.  YOU KNOW, WHERE I WENT BACK AND FOUND PEOPLE THAT HAD

11  PATENTS AND THINGS THAT MIGHT BE RELATED TO THIS; IS THAT WHAT

12  YOU MEAN?

13  **Q.**  YES.

14  **A.**  YEAH.

15  **Q.**  OKAY.  AND IF WE CAN GO UP ONE MORE PARAGRAPH, PLEASE.

16    AND DO YOU SEE WHERE YOU STATE:  "I HEREBY STATE THAT I

17  HAVE REVIEWED AND UNDERSTAND THE CONTENTS OF THE

18  ABOVE-IDENTIFIED SPECIFICATION, INCLUDING THE CLAIMS"?

19  **A.**  YES, I SEE THAT.

20  **Q.**  OKAY.  AND WHEN YOU SWORE UNDER OATH THAT YOU UNDERSTOOD

21  THE CLAIMS THAT YOU WERE SUBMITTING TO THE PATENT OFFICE, THAT

22  WAS TRUE AT THE TIME, CORRECT?

23  **A.**  THAT WAS TRUE AT THE TIME.

24  **Q.**  OKAY.  AND ONE OF THE TASKS THAT YOU RECEIVED FROM YOUR

25  PATENT ATTORNEYS WAS TO BE SURE YOU UNDERSTOOD THE PRIOR ART

```
1    BEFORE YOU SUBMITTED THE APPLICATION, CORRECT?

2    A.  MY TASK WAS TO ASSIST THEM IN FINDING WHAT YOU WERE

3    CALLING PRIOR ART.  I WASN'T REQUIRED TO UNDERSTAND IT.  I

4    MEAN, THEY COULD UNDERSTAND IT.

5    Q.  NOW, YOU RECALL THE TERM "PRIOR ART" THAT'S THE TERM WE

6    HEARD --

7    A.  I LEARNED THIS MORNING THAT'S WHAT YOU CALL IT, YEAH.

8    Q.  YOU KNEW THAT BEFOREHAND, RIGHT, FROM YOUR WORK ON PATENT

9    APPLICATIONS THAT IT WAS CALLED PRIOR ART?

10   A.  I HAD COMPLETELY FORGOTTEN.  I THINK YOU CALLED IT PRIOR

11   ART, BUT....

12   Q.  I WOULD LIKE TO DIRECT YOU TO PAGE 324 OF YOUR DEPOSITION

13   AT LINE 23 THROUGH PAGE 325, LINE 2.

14       THIS IS IN THE APRIL 26TH.

15   A.  324?

16   Q.  YEP.  WHY DON'T WE PLAY THAT ON THE VIDEO.

17       (VIDEO PLAYED AS FOLLOWS:)

18           "QUESTION:  YOU STATED ONE OF THE THINGS WHEN YOU

19           WERE PREPARING YOUR PATENT APPLICATIONS WAS TO BE

20           SURE THAT YOU HAD AN UNDERSTANDING OF THE PRIOR ART;

21           THAT'S ONE OF THE TASKS YOU HAD FROM YOUR PATENT

22           ATTORNEY?

23           "ANSWER:  YES."

24   BY MR. REINES:

25   Q.  AND IN REVIEWING THE PRIOR ART TO MAKE SURE YOU HAD A GOOD
```

PATTERSON – CROSS / REINES

1    UNDERSTANDING OF IT, YOU DID YOUR BEST TO DO THAT, DIDN'T YOU,

2    AT THE TIME?

3    **A.**   I DIDN'T UNDERSTAND THOSE CLAIMS AND THOSE PATENTS THAT

4    YOU ARE CALLING AS PRIOR ART.

5    **Q.**   OKAY.

6    **A.**   BUT MY ATTORNEYS DID.

7    **Q.**   BUT THE QUESTION WAS, WHEN YOU WERE SEARCHING FOR PRIOR

8    ART, YOU ACKNOWLEDGE YOU SEARCHED FOR PRIOR ART, CORRECT?

9    **A.**   YES, MANY HOURS WORTH.

10   **Q.**   WHEN YOU DID THAT, YOU DID YOUR BEST TO LOOK FOR PRIOR

11   ART?

12   **A.**   YES, I DID.

13   **Q.**   THAT WAS FOR MANY YOURS.

14       NOW, WHEN YOU SAY YOU DIDN'T UNDERSTAND THE PRIOR ART, THE

15   PRIOR ART IS TECHNICAL ARTICLES AND PATENTS, RIGHT?

16   **A.**   THAT'S RIGHT.

17   **Q.**   AND YOU UNDERSTAND THEM BECAUSE YOU WERE WORKING IN THE

18   FIELD?

19   **A.**   I COULD UNDERSTAND MOST OF THE TECHNICAL ARTICLES, BUT ALL

20   THOSE PATENTS, I WOULD BRING UP –– I BROUGHT IN SO MANY

21   PATENTS BUT THOSE ATTORNEYS HAD TO LOOK AT THOSE CLAIMS AND

22   TELL ME, YOU KNOW, IF THEY WERE RELEVANT OR NOT.

23   **Q.**   THAT WAS THIS COLLABORATIVE PROCESS WITH THE ATTORNEYS

24   WHERE YOU STAYED IN THE COT AND MET WITH THEM ON 50 DIFFERENT

25   OCCASIONS?

PATTERSON – CROSS / REINES

1    **A.**   THAT'S RIGHT.  THAT WAS GOING ON AT THE SAME TIME WE WERE

2    WRITING THE PATENT; WE WERE LOOKING FOR THESE PRIOR ART

3    THINGS.

4    **Q.**   YOU COLLECTED PRIOR ART PATENTS THAT YOU THOUGHT MIGHT BE

5    RELEVANT, CORRECT?

6    **A.**   THAT'S RIGHT.

7    **Q.**   ALL RIGHT.

8        AND THE OTHER THING YOU DID WAS IF YOU FOUND AN URL WITH

9    SOMETHING INTERESTING, A WEB ADDRESS, YOU WOULD SEND THAT TO

10   THE ATTORNEYS SO THEY COULD LOOK AT THAT, TOO; THAT'S ANOTHER

11   THING YOU DID?

12   **A.**   I DON'T REMEMBER.  BUT IF I DONE IT, I WOULD HAVE, YEAH.

13   **Q.**   FAIR ENOUGH.  ONE WAY OR THE OTHER YOU GOT THE PRIOR ART

14   TO THE PATENT ATTORNEYS?

15   **A.**   THAT'S RIGHT.

16   **Q.**   AND THE GOAL OF THIS WAS TO SUBMIT AN INFORMATION

17   DISCLOSURE STATEMENT, A FORM THAT GOES TO THE PATENT OFFICE,

18   BUT TO SUBMIT THE PRIOR ART BUT ONLY THAT WHICH WAS RELEVANT

19   TO THE PATENT OFFICE, RIGHT?

20   **A.**   THAT'S HOW THE PATENT ATTORNEYS EXPLAINED IT TO ME, YEAH.

21   **Q.**   YOU DIDN'T WANT TO JUST LOAD UP THE PATENT OFFICE WITH A

22   BEVY OF PRIOR ART, YOU WANTED TO BE SELECTIVE AND ONLY PUT IN

23   THE STUFF THAT WAS TRULY MATERIAL TO PATENTABILITY; IS THAT

24   RIGHT?

25   **A.**   THAT WAS WHAT I THOUGHT WAS GOING ON, YES.

1    **Q.**  LET'S LOOK AT THAT.  IT'S PAGE 75 OF EXHIBIT 503.

2          (DEFENDANT'S EXHIBIT 503 (PG. 75) RECEIVED IN EVIDENCE)

3                        (PUBLISHED TO JURY.)

4          DO YOU SEE WHERE IT SAYS INFORMATION DISCLOSURE STATEMENT?

5    **A.**  YES.

6    **Q.**  ALL RIGHT.

7              **MR. REINES:**  LET'S GO TO PAGE 76 OF THAT, PLEASE.

8          (DEFENDANT'S EXHIBIT 503 (PG. 76) RECEIVED IN EVIDENCE)

9    **BY MR. REINES:**

10   **Q.**  AND DO YOU SEE THERE'S A GRID THERE OF THE PATENTS THAT

11   WERE SUBMITTED IN YOUR PATENT APPLICATION.

12             **MR. REINES:**  AND LET'S HIGHLIGHT FOR EVERYBODY'S EASY

13   REFERENCE THE WOLFE '220 PATENT, IF WE CAN.

14         THERE WE GO.

15   **BY MR. REINES:**

16   **Q.**  DO YOU SEE THAT WOLFE '220?

17   **A.**  I SEE IT.

18   **Q.**  OKAY.

19         SO, AFTER THIS CULLING PROCESS WHEN YOU WORK

20   COLLABORATIVELY WITH YOUR PATENT ATTORNEYS, ONE OF THE PRIOR

21   ART REFERENCES THAT MADE THE GRADE AS BEING SUFFICIENTLY CLOSE

22   TO YOUR CLAIMS WAS THE WOLFE PATENT, CORRECT?

23   **A.**  THAT'S WHAT I WOULD CONCLUDE BY LOOKING AT THIS.

24   **Q.**  YES.  OKAY.

25         WHY DON'T WE LOOK AT EXHIBIT 679, WHICH IS THE WOLFE '220

1    PATENT.

2                      (DISPLAYED ON SCREEN.)

3       MR. PATTERSON, YOU WERE HERE FOR OPENINGS AND YOU REMEMBER

4    MS. MEHTA, MY COLLEAGUE?

5    **A.**  I WAS NOT PERMITTED TO BE HERE FOR OPENINGS.  I DON'T KNOW

6    WHAT YOU DISCUSSED.

7    **Q.**  I'M SORRY.  I MADE AN ASSUMPTION.

8    **A.**  THAT'S ALL RIGHT.  DIDN'T WANT YOU TO GET OFF ON A TANGENT

9    AND THEN ME SAY, OH....

10   **Q.**  I AM SORRY.

11      DO YOU SEE THIS AS THE -- DO YOU SEE THIS WOLFE PATENT

12   NAMED "METHOD OF CONTROLLING THE COPYING OF SOFTWARE"?

13   **A.**  YES.

14           **MR. REINES:**  YOUR HONOR, WE WOULD MOVE INTO EVIDENCE

15   THE '679 PATENT (SIC).

16           **MR. ELLWANGER:**  NO OBJECTION.

17           **THE COURT:**  I WILL TAKE IT UNDER SUBMISSION.  I DON'T

18   WANT TO LOAD UP THE JURY WITH DOZENS OF PATENTS.

19           **MR. REINES:**  THIS IS -- THIS IS THE ONLY ONE I'M

20   INTRODUCING THAT'S A PRIOR ART PATENT.

21           **THE COURT:**  EVER?

22           **MR. REINES:**  NOT EVER.  WITH OUR EXPERTS WE ARE

23   OBVIOUSLY DOING IT, BUT JUST IN THE CONTEXT --

24           **THE COURT:**  I'LL TAKE IT UNDER SUBMISSION AND SEE HOW

25   MANY COME UP AND WHICH ARE THE MOST RELEVANT.

1           **MR. ELLWANGER:**  I BELIEVE IN THE RECORD YOU CALLED IT

2    THE 679 PATENT.  IT IS ACTUALLY THE '220 PATENT.

3           **MR. REINES:**  THANK YOU VERY MUCH.  I APPRECIATE THAT.

4    LET ME CLEAR THE RECORD TO THE EXTENT I MUDDLED IT.

5       EXHIBIT 679 IS THE '220 PATENT OF WOLFE.  AND THAT IS --

6    WE HAVE OFFERED IT INTO EVIDENCE AND IT'S BEING TAKEN UNDER

7    SUBMISSION AT THIS POINT IN TIME.

8           **THE COURT:**  YOU CAN SHOW.  YOU CAN USE IT AS YOU

9    WOULD A DEMONSTRATIVE, BUT I DON'T KNOW THAT I WILL SEND ALL

10   OF THESE PRIOR ART PATENTS BACK TO THE JURY.

11          **MR. REINES:**  FAIR ENOUGH.

12      I APPRECIATE THAT, YOUR HONOR.

13      SO LET'S PUBLISH IT.

14             (PUBLISHED TO JURY.)

15   **BY MR. REINES:**

16   **Q.**  THE NAME OF THIS IS "METHOD OF CONTROLLING THE COPYING OF

17   SOFTWARE".

18      DO YOU SEE THAT?

19   **A.**  YES.  UH-HUH.

20   **Q.**  AND THE DATE, AND YOU KNOW ENOUGH TO KNOW THE DATE IS 1986

21   FOR THIS, DO YOU SEE THAT?

22   **A.**  YES.

23   **Q.**  SO COPY CONTROL FOR SOFTWARE, WHEN YOU FILED YOUR PATENT

24   APPLICATION, YOU KNEW YOU DIDN'T COME UP WITH THE IDEA OF

25   COPYING SOFTWARE, CONTROLLING THE COPYING OF SOFTWARE,

1    CORRECT?

2    **A.**  YOU MEAN UNLESS YOU WERE DOING IT BETWEEN A CLIENT AND A

3    SERVER AND THE INTERNET?

4       I MEAN, THIS IS 1986.  SO I SUPPOSE YOU ARE TALKING ABOUT

5    USING DISKETTES, THREE AND A HALF AND THE BIG 8-INCH ONES.

6    **Q.**  YOU DON'T REALLY KNOW WHAT'S IN THIS, CORRECT?

7    **A.**  I DON'T KNOW WHAT'S IN THIS.

8    **Q.**  LET'S LOOK AT HOW THIS PLAYED OUT IN THE PATENT OFFICE.

9       WHY DON'T WE GO TO PAGE 198 OF EXHIBIT 503, THE BACK AND

10   FORTH YOU HAD WITH THE PATENT OFFICE.

11        **THE CLERK:**  LET ME HAVE THE PAGE NUMBER ONE MORE

12   TIME.  I'M SORRY.

13        **MR. REINES:**  PAGE 198.  THANK YOU.

14      (DEFENDANT'S EXHIBIT 503 (PG. 198) RECEIVED IN EVIDENCE)

15            (PUBLISHED TO JURY.)

16   **BY MR. REINES:**

17   **Q.**  OKAY.  NOW, WE CAN PULL THAT UP AND WE SEE FOR PAGE -- FOR

18   PAGE 198, THIS IS THE RESPONSE TO YOUR PATENT APPLICATION,

19   CORRECT, THAT YOUR ATTORNEYS RECEIVED?

20   **A.**  I DON'T REMEMBER THIS.

21      IS THIS A RESPONSE TO OUR PATENT ATTORNEYS?

22   **Q.**  YES, IT IS.

23   **A.**  OKAY.

24   **Q.**  WHY DON'T WE PULL THAT UP AND SHOW YOU THAT THE CLAIMS

25   HAVE ALL BEEN REJECTED.

PATTERSON – CROSS / REINES

1           **MR. REINES:**  MR. BONINI, CAN WE HIGHLIGHT THAT?

2      **BY MR. REINES:**

3      **Q.**  DO YOU SEE THAT IN THIS APPLICATION ALL THE CLAIMS HAVE

4      BEEN REJECTED?

5      **A.**  YES.

6      **Q.**  OKAY.

7           AND DO YOU HAVE A GENERAL MEMORY THAT WHEN YOU SUBMITTED

8      YOUR PATENT APPLICATION, THE OFFICE ACTION THAT HAPPENED

9      BEFORE YOU LEFT THE COMPANY WAS A REJECTION OF ALL YOUR

10     CLAIMS?

11     **A.**  I DON'T HAVE ANY RECOLLECTION OF THIS.

12     **Q.**  OKAY.  LET'S LOOK AT PAGE 201.

13          **THE CLERK:**  OF EXHIBIT 503?

14          **MR. REINES:**  OF EXHIBIT 503, YES.  THANK YOU.

15          (DEFENDANT'S EXHIBIT 503 (PG. 201) RECEIVED IN EVIDENCE)

16     **BY MR. REINES:**

17     **Q.**  DO YOU SEE WHERE THE CLAIMS ARE REJECTED IN PARAGRAPH 10

18     BASED ON THE JOHNSON PATENT?

19                        (PUBLISHED TO JURY.)

20          **MR. REINES:**  CAN WE HIGHLIGHT THE JOHNSON PATENT

21     PLEASE, AND THE REJECTION?

22          **THE WITNESS:**  YES, I SEE THAT.

23     **BY MR. REINES:**

24     **Q.**  OKAY.

25          NOW, IN JOHNSON, WHAT THE PATENT OFFICE SAID IS:

1           "JOHNSON DISCLOSES REGULATING ACCESS TO DIGITAL

2       CONTENT AT A CLIENT INITIATED BY A HUMAN AND/OR

3       COMPUTER PROGRAM COMPRISING REQUESTING PERMISSION

4       FROM AN EXTERNAL SOURCE, A LICENSE SERVER, FOR A

5       RESOURCE TO ACCESS A DIGITAL CONTENT, RECEIVING FROM

6       THE EXTERNAL SOURCE A TOKEN THAT IS TRANSPARENT TO

7       THE RESOURCE AND SELECTIVELY GRANTING THE RESOURCE

8       ACCESS TO THE DIGITAL CONTENT BASED ON THE RECEIVED

9       TOKEN."

10      DO YOU SEE THAT?

11  **A.**  YES.

12  **Q.**  LITTLE BIT OF A MOUTHFUL, BUT I WANT TO MAKE SURE THAT WE

13  HAD THAT.

14      SO, YOU UNDERSTAND THAT HERE, THE PATENT OFFICE IS SAYING

15  JOHNSON DISCLOSES THAT INFORMATION AND THAT THAT'S --

16  ANTICIPATES, IN OTHER WORDS, YOUR PATENT ISN'T ANY DIFFERENT

17  THAN THE CLAIMS AT THAT TIME, CORRECT?

18  **A.**  YES, I SUPPOSE THAT'S WHAT THEY --

19  **Q.**  LET'S GO TO THE NEXT PAGE.  AND LET'S GO TO PARAGRAPH 11.

20      DO YOU SEE WHERE YOUR CLAIMS WERE REJECTED BY THE HALTER

21  PATENT?

22          **THE CLERK:**  THIS IS PAGE 202?

23          **MR. REINES:**  THIS IS PAGE 202.

24      (DEFENDANT'S EXHIBIT 503 (PG. 202) RECEIVED IN EVIDENCE)

25          **THE WITNESS:**  YES, I SEE IT.

1      **MR. REINES:**  I WILL BE MORE CAREFUL.

2    **BY MR. REINES:**

3    **Q.**  WITH RESPECT TO THE HALTER PATENT, DO YOU SEE THAT THAT

4    ANTICIPATED CLAIM 1?

5    **A.**  YES, I SEE THAT.

6    **Q.**  OKAY.  AND IT DISCLOSED A PERMISSION AND A TOKEN, AT LEAST

7    ACCORDING TO THE PATENT OFFICE?

8    **A.**  YES, I SEE IT.

9    **Q.**  IF WE CAN TURN TO PAGE 203 OF EXHIBIT 503, AND

10   SPECIFICALLY LOOK AT PARAGRAPH 13.

11       (DEFENDANT'S EXHIBIT 503 (PG. 203) RECEIVED IN EVIDENCE)

12       DO YOU SEE THOSE CLAIMS ALL ANTICIPATED BY DOLPHIN?

13   **A.**  YES, I SEE IT.

14       **MR. REINES:**  MR. BONINI, WOULD YOU JUST HIGHLIGHT THE

15   SENTENCE ABOVE THAT BECAUSE THAT'S KIND OF THE SUMMARY OF IT.

16       YES.  THAT'S PERFECT.

17   **BY MR. REINES:**

18   **Q.**  AND, AGAIN, THERE'S A DISCLOSURE OF A PERMISSION AND A

19   TOKEN AND THOSE THINGS THAT YOU CLAIM IN YOUR PATENT, CORRECT?

20   **A.**  RIGHT.  RIGHT.

21   **Q.**  AND NOW LET'S GO TO EXHIBIT 503, PAGE 206.  ACTUALLY, WE

22   CAN SKIP THAT ONE.

23       WHY DON'T WE GO TO PAGE 208, AND WE WILL GET TO WOLFE.

24       (DEFENDANT'S EXHIBIT 503 (PG. 208) RECEIVED IN EVIDENCE)

25       **MR. REINES:**  IF WE CAN FIRST HIGHLIGHT THE FIRST

1    SENTENCE RIGHT AFTER 16.

2                    (PUBLISHED TO JURY.)

3    **BY MR. REINES:**

4    **Q.**  SO AT THE TIME YOU LEFT DESKGATE, YOUR PATENT CLAIMS WERE

5    REJECTED BASED ON WOLFE.

6         CAN YOU SEE THAT?  JUST WHAT YOU SEE THERE.

7    **A.**  YES.

8    **Q.**  OKAY.  AND IF WE LOOK AT THE PARAGRAPH "DESCRIPTION",

9    THERE'S A STATEMENT THAT WOLFE DISCLOSES A METHOD OF

10   CONTROLLING THE COPYING OF A SOFTWARE ON A CLIENT.

11   **A.**  YES.

12   **Q.**  OKAY.  NOW LET'S LOOK AT THE RESPONSE IN THE FACE OF THESE

13   REJECTIONS.  SPECIFICALLY LET'S LOOK AT PAGE 217.

14        ACTUALLY, LET'S GO TO 230.  LET'S GO TO 230 AND LOOK AT

15   THIS RESPONSE.

16             **MR. REINES:**  THIS IS PAGE 230 OF EXHIBIT 503 FOR THE

17   RECORD.

18        (DEFENDANT'S EXHIBIT 503 (PG. 230) RECEIVED IN EVIDENCE)

19                    (PUBLISHED TO JURY.)

20        MR. BONINI, I APOLOGIZE.  I THINK IT'S VALUABLE TO LOOK AT

21   THE AMENDMENT.  LET'S LOOK BACK AT THE AMENDMENT.

22        LET'S TURN TO EXHIBIT 503, AT PAGE 217.  LET'S PULL UP THE

23   AMENDED CLAIM.  THE AMENDED CLAIM.

24        (DEFENDANT'S EXHIBIT 503 (PG. 217) RECEIVED IN EVIDENCE)

25                    (PUBLISHED TO JURY.)

1    **BY MR. REINES:**

2    **Q.**  THIS WILL LOOK SOMEWHAT FAMILIAR BECAUSE THIS IS CLOSE OR

3    EXACT, THE RECORD WILL SHOW WHATEVER IT IS, BUT THIS IS

4    LOOKING LIKE YOUR CLAIM AT ISSUE THAT'S ASSERTED HERE.

5         AND DO YOU SEE THE LANGUAGE "EXECUTING AN INSTALLATION

6    PROCESS THAT GENERATES AT THE CLIENT A PERMISSION THAT IS

7    LOCKED UNIQUELY TO THE CLIENT."

8         DO YOU SEE THAT?

9    **A.**  YEAH, I DO SEE THAT.

10   **Q.**  OKAY.

11   **A.**  WHEN WAS THIS MAILED IN?

12   **Q.**  THIS WAS MAILED IN IN MAY OF 2000.

13   **A.**  ALL THESE THINGS YOU'RE SHOWING ME, I WASN'T EVEN WORKING

14   THERE?

15   **Q.**  NO, NOT -- WHEN YOU SAY "ALL THESE THINGS"?

16   **A.**  THE OTHER ONE YOU SHOWED ME YOU SAID IT WAS NOVEMBER THE

17   29TH.  I WAS GONE NOVEMBER THE 13TH.  I NEVER LOOKED BACK.

18        SO, I'M JUST -- FOR YOUR INFORMATION, I DON'T KNOW WHERE

19   YOU ARE GOING WITH IT, BUT I WASN'T THERE.

20   **Q.**  EARLIER YOU TESTIFIED THAT YOU TESTIFIED IN DECEMBER OF

21   1999 --

22   **A.**  THIS IS NOVEMBER 13TH, I THINK, WAS THE DATE.

23   **Q.**  WELL, THE RECORD -- WE WILL HAVE THE RECORD ON THAT.

24        IF YOU WOULD TURN TO THE DESCRIPTION -- RETURN TO THE

25   DESCRIPTION OF HOW YOU DISTINGUISHED WOLFE.  YOUR LAWYERS, I

PATTERSON – CROSS / REINES

1    UNDERSTAND THAT YOUR LAWYERS SUBMITTED THIS.

2    **A.**  I AM SORRY?

3    **Q.**  I UNDERSTAND YOUR LAWYERS SUBMITTED THIS, NOT YOU.

4    **A.**  THANK YOU.

5    **Q.**  AND WE WILL BE DONE WITH THIS DOCUMENT SOON.  SO I JUST

6    WANT TO SHOW YOU THIS LAST POINT.

7        AT THE BOTTOM OF THIS PAGE -- AND LET'S BLOW THAT UP AS

8    BEST WE CAN BECAUSE THIS IS AN IMPORTANT ONE.

9        YOU WERE DESCRIBING, AT LEAST YOUR ATTORNEYS ON YOUR

10   BEHALF, WERE DESCRIBING HOW YOU WERE DIFFERENT FROM WOLFE

11   BECAUSE IT WAS OBVIOUSLY VERY CROWDED AREA OF PRIOR ART.  AND

12   IT SAYS:

13           "AMENDED CLAIM 1 MAKES CLEAR THAT IT IS AT THE CLIENT

14            THAT THE INSTALLATION PROCESS GENERATES THE

15            PERMISSION KEY THAT IS UNIQUELY LOCKED TO THE CLIENT.

16            IN WOLFE, IT IS THE CENTRAL COMPUTER THAT GENERATES A

17            MACHINE-DEPENDENT PERMISSION CODE."

18       DO YOU SEE THAT?

19   **A.**  YES, UH-HUH.

20   **Q.**  YOU UNDERSTAND ENOUGH TO UNDERSTAND THAT THE DISTINCTION

21   THAT'S BEING DRAWN IS BETWEEN THE CLIENT AND THE SERVER,

22   CORRECT?

23   **A.**  I'M NOT REALLY CLEAR ON WHAT THE DISTINCTION IS HERE.

24   **Q.**  OKAY.  ALL RIGHT.  WHY DON'T WE TALK ABOUT WHAT YOU WERE

25   DOING.

PATTERSON – CROSS / REINES

1       YOU TALKED A LITTLE BIT ABOUT THE 1993 AND 1996 TIME

2   PERIOD AND HOW BUSY YOU WERE WITH YOUR DESKGATE PROJECT.  THE

3   WAY YOU MADE MONEY DURING THAT TIME PERIOD WAS YOU WERE

4   RUNNING YOUR OWN FAMILY'S HEDGE FUND, CORRECT?

5   **A.**  THAT'S RIGHT.

6   **Q.**  SO YOU DID SOME TECHNICAL WORK, BUT YOU WERE ALSO RUNNING

7   THE HEDGE FUND, CORRECT?

8   **A.**  WELL, IT WASN'T MUCH RUNNING, BUT, YES.  I WAS RESPONSIBLE

9   FOR IT.

10  **Q.**  OKAY.  LET'S TALK ABOUT DANE.

11  **A.**  TALK ABOUT WHAT?

12  **Q.**  DANE, PAT DANE.  D-A-N-E.

13  **A.**  YES.

14  **Q.**  LET'S PULL UP EXHIBIT 121A AND B.

15      YOU UNDERSTAND WE TOOK THE NDA AND WE MADE CLEAR THAT IT

16  WAS ONE DOCUMENT WHICH IS A, AND THOSE TYPEWRITTEN NOTES WERE

17  B.

18  **A.**  THANK YOU.  I DID UNDERSTAND THAT TODAY.

19  **Q.**  BECAUSE IT'S -- THIS TRIAL MECHANICS ISN'T EVERYDAY FOR

20  PEOPLE, SO I APPRECIATE THAT.

21      SO IN THIS NDA, YOU HAD THIS NDA IN YOUR FILES AFTER

22  RECEIVING IT FROM ATTORNEYS IN 2008 AND 2009?

23  **A.**  YES.

24  **Q.**  OKAY.  THAT WAS THE KIND OF THING YOU DID WITH THE

25  ATTORNEYS UNDER YOUR DIFFERENT CONSULTING AGREEMENTS?  I GUESS

1    WE HAVE THREE DIFFERENT CONSULTING AGREEMENTS.

2    **A.**  I JUST -- LIKE I SAID, I WANTED TO GET WHATEVER THE

3    EXHIBITS WERE THAT PEOPLE WERE USING BECAUSE YOU GUYS ALWAYS

4    TAKE THEM AWAY.

5        SO THEY CAME UP WITH WHATEVER WAS BEING USED, SO I COULD

6    HAVE COPIES OF THEM.

7    **Q.**  HAS THE DINOVO TEAM EVER REFUSED TO GIVE YOU THE DOCUMENTS

8    THAT -- IF YOU WANTED A DOCUMENT?

9    **A.**  DINOVO, NO.

10   **Q.**  SO IF YOU WANTED --

11   **A.**  YOU AND THE OTHER ATTORNEYS WERE IN THE OFFICE, YOU SHOWED

12   ME LOTS OF DOCUMENTS.  I THINK THIS WAS ONE OF THEM.  BUT WHEN

13   YOU LEFT, YOU TOOK THEM WITH YOU.  I DIDN'T HAVE THEM.

14   **Q.**  DO YOU UNDERSTAND THAT IN THE DEPOSITION PROCESS, THE

15   COURT REPORTER TAKES THE EXHIBITS THAT HAVE BEEN MADE AND THEN

16   KEEPS THEM FOR SAFEKEEPING?

17   **A.**  YEAH.  I FOUND THAT OUT AFTER EVERYBODY WAS GONE.

18   **Q.**  OKAY.  BUT AT ANY TIME IF YOU WANTED TO GET YOUR WORK

19   PAPERS, OR ANY DOCUMENT ASSOCIATED WITH WHAT YOU THOUGHT WAS

20   YOUR INVENTION OR DESKGATE, YOU COULD HAVE GOTTEN THEM FROM

21   YOUR -- I GUESS THE PERSON WHO YOU WERE CONSULTING WITH,

22   RIGHT, THE DINOVO LAW FIRM?

23   **A.**  I'M VERY CONFUSED.

24   **Q.**  IF YOU -- IF, DURING THESE LAST FOUR, FIVE YEARS WHEN YOU

25   WERE A WITNESS, YOUR DEPOSITION WAS TAKEN SEVERAL TYPES, TRIAL

1    TESTIMONY, IF YOU EVER WANTED A DOCUMENT ABOUT YOUR WORK --

2    **A.** YES. I FOLLOW YOU.

3    **Q.** -- YOU COULD HAVE JUST GOTTEN IT FROM THE DINOVO LAW FIRM

4    AS COMPARED TO ADOBE'S LAWYERS, RIGHT?

5    **A.** TRUE. YEAH.

6    **Q.** AND YOU UNDERSTAND THAT THE DINOVO LAW FIRM IS NOW PUTTING

7    A LOT OF EMPHASIS ON EXHIBIT 121A AND B AS BEING SOMETHING

8    THAT IT SOMEHOW DOCUMENTS YOUR INVENTION, CORRECT?

9    **A.** THEY ARE PUTTING A LOT OF EMPHASIS ON THIS (INDICATING)?

10   **Q.** LET ME ASK YOU ABOUT IT NOW.

11       YOU DON'T RECALL EVER HAVING THE DANE NDA OR THE NOTES --

12   LET ME STAY WITH THE NDA.

13       YOU DON'T RECALL EVER HAVING THE NDA -- I APOLOGIZE TO

14   YOU. LET ME START AGAIN.

15       YOU DIDN'T REMEMBER WHO CAME UP WITH THE NDA AGREEMENT,

16   RIGHT? YOU DON'T REMEMBER THAT?

17   **A.** NO, I DON'T.

18   **Q.** AND YOU MENTIONED WHAT PAT DANE'S ROLE WAS, HE WAS GOING

19   TO INTRODUCE YOU TO BELL ATLANTIC, IS THAT RIGHT, IN 1996?

20   **A.** WELL, THAT IS -- THAT WAS WHAT I THOUGHT WE WERE AGREEING

21   TO. BUT HE MIGHT HAVE BEEN INTERESTED IN INVESTING IN THE

22   COMPANY. I MEAN, YOU KNOW, IF BELL WAS GOING TO DO IT, HE

23   MIGHT WANT DO IT, TOO. I DON'T KNOW.

24   **Q.** BUT WHEN WE WERE ASKING YOU ABOUT THE DOCUMENTS IN YOUR

25   DEPOSITION, DO YOU REMEMBER THAT YOU SAID THAT HE SIMPLY WAS

1    GOING TO INTRODUCE YOU TO BELL ATLANTIC?

2    **A.**  YES, THAT'S --

3    **Q.**  YOU WERE INTRODUCED TO MR. DANE BY CHIP VENTERS?

4    **A.**  YES.

5    **Q.**  OKAY.  AND THAT WAS IN 1996 BEFORE THE NDA?

6    **A.**  YES.

7    **Q.**  NOW LET'S TALK ABOUT THE NOTES, WHICH ARE EXHIBIT 121.

8        NOW, THE FIRST THING IS, THE NOTES AT THE TOP SAY "SEVEN

9    PAGES", RIGHT?

10   **A.**  YEAH.

11                      (PUBLISHED TO JURY.)

12   **Q.**  THERE'S ACTUALLY ONLY SIX PAGES IN THE DOCUMENT, ISN'T

13   THAT TRUE?

14       WE WILL GO TO THE LAST PAGE AND SEE IT IS PAGE 6 ON IT?

15   **A.**  ISN'T THIS INCLUDING THE COVER PAGE, THE NDA?

16   **Q.**  THE NDA IS TWO PAGES, RIGHT?

17   **A.**  I DON'T REMEMBER.  IN THE NDA, YOU ONLY SHOWED ME ONE

18   PAGE, DIDN'T YOU?

19   **Q.**  LET'S GET INTO THE DOCUMENT MORE.

20       YOU NEVER READ THIS DOCUMENT BEFORE YOUR DEPOSITION IN

21   APRIL 2013; ISN'T THAT RIGHT?

22   **A.**  WELL, I CERTAINLY READ IT BACK IN 1995.

23   **Q.**  WOULD YOU PLAY THE DEPOSITION OF MR. PATTERSON FROM

24   APRIL 25TH, 2013 AT LINES (SIC) 204, 3 THROUGH 5?

25           **THE COURT:**  WHAT PAGE?

PATTERSON – CROSS / REINES

```
1          (VIDEO PLAYED AS FOLLOWS:)

2              "QUESTION HAVE YOU EVER READ THIS DOCUMENT BEFORE?

3              MR. REINES:  204.

4              "ANSWER:  NO."

5    BY MR. REINES:

6    Q.   AND YOU WERE –– DO YOU KNOW WHO WROTE THE DOCUMENT?

7         YOU TESTIFIED ON DIRECT THAT YOU WROTE THE DOCUMENT.  DO

8    YOU RECALL THAT?

9    A.   THAT'S EXACTLY RIGHT.  I WROTE THE DOCUMENT IN 1995.

10   Q.   BUT YOU ACTUALLY DON'T KNOW WHO WROTE THE DOCUMENT; ISN'T

11   THAT RIGHT?

12   A.   I KNOW WHO WROTE THE DOCUMENT.  THAT WAS MY DOCUMENT.

13   IT'S RIGHT OUT OF MY SOFTWARE NOTES.  MY SOFTWARE DESIGN.

14   Q.   LET'S PLAY PAGE 204, LINE 1 THROUGH 2.

15          (VIDEO PLAYED AS FOLLOWS:

16              "QUESTION:  DO YOU KNOW WHO WROTE THIS?

17          "ANSWER:  NO.

18   BY MR. REINES:

19   Q.   DO YOU HAVE ANY IDEA WHEN THE NOTES WERE CREATED?

20   A.   YES, I DO.

21   Q.   LET'S PLAY PAGE 205, LINE 18 THROUGH 20.

22          (VIDEO PLAYED AS FOLLOWS:)

23              "QUESTION:  SITTING HERE TODAY, CAN YOU IDENTIFY WHEN

24              THIS DOCUMENT WAS CREATED?

25              "ANSWER:  NO."
```

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930**

**BY MR. REINES:**

Q.   DO YOU REMEMBER WHEN YOU FOUND THE NDA IN YOUR FILE IN

2008, 2009, I GUESS THAT CAME UP AS PART OF THE LITIGATION

PROCESS YOU FOUND THE NDA, YOU DIDN'T REMEMBER NOTES BEING

ATTACHED TO IT, DID YOU?

A.   NO, I DIDN'T.

Q.   SO THESE -- THIS NOTE -- THESE NOTES WHICH ARE 121B?

A.   THOSE PAGES?

Q.   YEAH.  THEY WEREN'T ATTACHED -- ATTACHED TO THE NDA WHEN

YOU GOT IT?

A.   I DON'T -- I DON'T SEE ANY STAPLE MARKS ON THIS THING, SO

I'M NOT SURE HOW THIS WAS ALL CONNECTED.

Q.   NOW, YOU DON'T RECALL ASKING ANYONE -- YOU DON'T RECALL

PROVIDING TECHNICAL INFORMATION TO PAT DANE, DO YOU?

A.   TECHNICAL INFORMATION?

Q.   YES.

A.   THIS IS VERY TECHNICAL INFORMATION HERE IN MY NOTES.

Q.   LET'S PLAY PAGE 205, LINE 4 THROUGH 6.

     (VIDEO PLAYED AS FOLLOWS:)

         "QUESTION:  AND DO YOU RECALL YOURSELF EVER PROVIDING

         TECHNICAL INFORMATION TO PAT DANE?

         "ANSWER:  NO, I DON'T RECALL."

**BY MR. REINES:**

Q.   DO YOU RECALL DIRECTING ANYONE ELSE TO PROVIDE TECHNICAL

INFORMATION TO PAT DANE OTHER THAN YOURSELF?

1  **A.**  I DON'T THINK ANYONE IN MY COMPANY WOULD HAVE DONE THAT.

2  I DON'T REMEMBER EVER DIRECTING SOMEBODY TO DO THAT.

3  **Q.**  NOW, AFTER WE WENT THROUGH THIS LINE OF QUESTIONING IN

4  YOUR DEPOSITION WHERE YOU SAID -- YOU'RE NOT GOING TO DENY

5  THAT AT YOUR DEPOSITION YOU HAD THESE NOTES ATTACHED, IT WAS

6  ONE EXHIBIT AT THAT POINT THE WAY IT WAS PRODUCED, TO THE NDA,

7  YOU ARE NOT GOING TO DENY THAT AT THAT TIME YOU SAID THAT YOU

8  NEVER READ THE DOCUMENT.  YOU LOOKED AT IT, YOU COULDN'T

9  IDENTIFY WHEN THEY WERE CREATED, RIGHT?

10      YOU ARE NOT DENYING THAT?  I THINK YOU SAID THAT ON

11  DIRECT.  ARE YOU DENYING SITTING HERE NOW THAT IN YOUR

12  DEPOSITION WHEN YOU WERE SHOWN THE NOTES OF 121B, THAT YOU

13  SAID, I HAVE NEVER READ THIS DOCUMENT BEFORE?  WE JUST --

14  **A.**  FOR?

15  **Q.**  THE DEPOSITION.

16  **A.**  EXCEPT WHEN I WROTE IT, OF COURSE, BACK IN '95.  IS THAT

17  WHAT YOU MEAN, OR NOT?

18  **Q.**  LET ME STEP BACK AGAIN.

19      IN YOUR DEPOSITION, YOU TESTIFIED THAT YOU DID NOT KNOW

20  WHO WROTE THOSE NOTES.  DO YOU WANT TO WATCH THE VIDEO AGAIN?

21  **A.**  NO.  THAT'S FINE.  THAT WAS IN THE DEPOSITION.  I DID NOT

22  KNOW.

23  **Q.**  THAT'S ALL I WAS TRYING TO ESTABLISH.

24  **A.**  THANK YOU.

25  **Q.**  VERY GOOD.

1         WHEN YOU TESTIFIED THAT YOU DIDN'T KNOW WHO WROTE THE

2    NOTES AND TESTIFIED YOU DIDN'T READ THEM BEFORE, THE QUESTION

3    WAS POSED TO YOU THAT IF CALLED AT TRIAL, YOUR TESTIMONY WOULD

4    BE THE SAME REGARDING THIS DOCUMENT.

5         DO YOU RECALL THAT?

6    **A.**  NO, BUT OKAY.

7    **Q.**  DIDN'T YOU, IN FACT, TESTIFY IN YOUR DEPOSITION THAT YOUR

8    TESTIMONY THAT YOU DIDN'T REMEMBER THE DOCUMENT, YOU DIDN'T

9    KNOW WHO WROTE IT, WOULD BE THE SAME AT YOUR TRIAL AS IT WAS

10   IN YOUR DEPOSITION.  DIDN'T YOU TESTIFY TO THAT?

11   **A.**  YES.

12   **Q.**  OKAY.  SO, LET'S TALK ABOUT COMMERCIALIZATION.

13        AT DESKGATE YOU WERE THE MOST SENIOR BUSINESS EXECUTIVE,

14   CORRECT?

15   **A.**  AT DESKGATE, YES.

16   **Q.**  YOU DESCRIBED YOURSELF AS, WHEN WE ASKED YOU, YOU

17   DESCRIBED YOURSELF AS CEO, CHAIRMAN OF THE BOARD --

18   **A.**  I WAS ALL THE "C" OFFICERS AND THE JANITOR, YEAH.

19   **Q.**  -- STRATEGIC PLANNING OFFICER, CHIEF OF HUMAN RESOURCES,

20   AND SO ON, RIGHT?

21   **A.**  THAT'S RIGHT.

22   **Q.**  AND IF THERE WERE BUSINESS DECISIONS MADE ABOUT PRODUCT

23   INTRODUCTION OR PRICING, OR ANYTHING LIKE THAT, YOU WOULD HAVE

24   BEEN THE PERSON, CORRECT?

25   **A.**  I DIDN'T MAKE ALL THE DECISIONS, BUT OTHER PEOPLE HAD, YOU

1    KNOW, RESPONSIBILITY TO DO THINGS INDEPENDENTLY OF ME.

2    **Q.**  BUT IF A PRODUCT WAS INTRODUCED OR PRICED OR OFFERED TO

3    THE PUBLIC OR PUBLICIZED IN THE MEDIA, YOU WOULD HAVE KNOWN

4    ABOUT THAT, CORRECT, AT DESKGATE?

5    **A.**  I'M NOT SURE IF I WOULD HAVE.  I MEAN, I GUESS AFTER THE

6    FACT IF SOMEBODY DID SOMETHING I WOULD.

7    **Q.**  ALL RIGHT.

8        LET'S LOOK AT THE VIA EXPRESS PRODUCT IN THE CONTEXT OF

9    THE PATENTS.

10            **MR. REINES:**  IF WE CAN CALL UP EXHIBIT 1, PLEASE.

11   AND THAT'S SPECIFICALLY THE '541 PATENT.

12       AND IF WE CAN GO TO FIGURE 6, PLEASE AND BLOW THAT UP.

13                    (PUBLISHED TO JURY.)

14   **BY MR. REINES:**

15   **Q.**  DO YOU SEE AT THE TOP IN THE -- AT THAT BAR IN THE TOP, IT

16   SAYS, "VIA EXPRESS UNIVERSAL ENVELOPE"?

17   **A.**  YES, I DO.

18   **Q.**  AND YOU REFERRED TO UNIVERSAL ENVELOPE BEFORE?

19   **A.**  EXACTLY.

20   **Q.**  ALL RIGHT.  AND IF YOU TURN TO --

21   **A.**  I DIDN'T REFER TO A VIA EXPRESS UNIVERSAL ENVELOPE.

22   **Q.**  IN YOUR PATENT YOU DID.

23   **A.**  IN THE -- WELL, THIS PICTURE -- THIS IS OUT OF MY PATENT,

24   RIGHT?

25   **Q.**  YES.

1    **A.**  I'M JUST SAYING THAT IN MY TESTIMONY THIS MORNING, I

2    TALKED ABOUT A UNIVERSAL ENVELOPE --

3                    (SIMULTANEOUS COLLOQUY.)

4    **Q.**  LET'S, MR. PATTERSON, THAT WAS MY ERROR.  IF WE CAN MAKE

5    SURE WE ARE SPEAKING ONE AT A TIME.  IT'S VERY HARD --

6    **A.**  I'M SORRY.

7    **Q.**  -- FOR THE COURT REPORTER.

8         IN YOUR PATENT WHEN YOU WERE WORKING WITH ALL THESE

9    MEETINGS WITH THE ATTORNEYS, YOU WORKED ON THE FIGURES, RIGHT?

10   **A.**  I THINK ROB GREENBERG DID ALL THE, YOU KNOW, FLOW CHARTS

11   AND FIGURES.

12   **Q.**  SO YOU WEREN'T INVOLVED WITH THE FIGURES AND THE FLOW

13   CHARTS OF YOUR PATENT, THAT CAME FROM ROB GREENBERG, YOUR

14   ATTORNEY?

15   **A.**  AT SOME TIME OR ANOTHER I WOULD HAVE LOOKED AT THEM, BUT I

16   DON'T REMEMBER HOW THAT HAPPENED.

17   **Q.**  BUT, BASICALLY, RESPONSIBILITY FOR DEVELOPING AND DRAWING

18   OUT THE FIGURES, THAT WAS DONE BY THE PATENT LAWYERS?

19   **A.**  AS I RECALL THAT, YOU KNOW, THEY DECIDED WHAT THE FIGURES

20   OR FLOW CHARTS HAD TO BE, WHAT WE HAD TO SHOW.  YEAH.

21   **Q.**  BEFORE YOU SUBMITTED IT TO THE PATENT OFFICE BECAUSE YOU

22   SIGNED AN OATH, YOU LOOKED AT THE LAWYER'S FIGURES AND CHARTS

23   AND EVERYTHING, AND YOU CONFIRMED THAT YOU MAY NOT HAVE

24   UNDERSTOOD THEM, BUT YOU CONFIRMED THAT THEY WERE OKAY?

25   **A.**  OH SURE, YEAH.

PATTERSON – CROSS / REINES

1    **Q.**  LET'S TURN TO FIGURE 8, PLEASE.

2                        (PUBLISHED TO JURY.)

3        NOW IN FIGURE 8 AT THE TOP, DO YOU SEE, AGAIN, "VIA

4    EXPRESS UNIVERSAL ENVELOPE"?

5    **A.**  I DO, UH-HUH.

6            **MR. REINES:**  LET'S GO TO FIGURE 9, IF YOU WOULD,

7    MR. BONINI.

8                        (PUBLISHED TO JURY.)

9    **BY MR. REINES:**

10   **Q.**  HERE IT SAYS "VIA EXPRESS UNIVERSAL ENVELOPE" AT THE TOP

11   AGAIN, RIGHT?

12   **A.**  UH-HUH.

13   **Q.**  LET'S TURN TO THE '670 PATENT, WHICH IS TRIAL EXHIBIT 3 IN

14   EVIDENCE.

15           **MR. REINES:**  AND I WOULD LIKE YOU TO TURN TO

16   FIGURE 6A, MR. BONINI.

17                        (PUBLISHED TO JURY.)

18   **BY MR. REINES:**

19   **Q.**  AND, AGAIN, IT HAS THAT "VIA EXPRESS" AT THE TOP.  DO YOU

20   SEE THAT?

21   **A.**  WELL, ARE YOU ASKING ME IF IT'S LIKE WHAT WAS ON THE OTHER

22   ONE?  THE OTHER ONE SAID VIA EXPRESS -- THIS ONE SAYS

23   "UNTITLED VIA EXPRESS".

24   **Q.**  RIGHT.  AND THEN IN THE LOWER RIGHT-HAND CORNER IT SAYS,

25   "WELCOME TO VIA EXPRESS" IN YOUR PATENT, DOESN'T IT?

1   **A.**  YES, ON THIS PHOTO.

2   **Q.**  AND SIMILAR FIGURES OF 6A, B, C, D, G AND J, LET'S LOOK AT

3   FIGURE G, 6G.

4                    (PUBLISHED TO JURY.)

5       AND I BRING THIS UP.  I REMEMBER YOU COMMENTED, I BELIEVE,

6   THAT YOU REMEMBER THE BEARS.  I DON'T KNOW, MAYBE THAT WAS

7   MEMORABLE FOR YOU WHEN YOU WERE REVIEWING MR. GREENBERG'S

8   WORK.

9       IT SAYS THERE, "VIA EXPRESS UNIVERSAL ENVELOPE".  DO YOU

10  SEE THAT?

11  **A.**  YES, UH-HUH.

12  **Q.**  WHY DON'T WE GO TO J, AND THEN WE WILL BE DONE WITH THIS.

13  6J.

14                    (PUBLISHED TO JURY.)

15      THIS, AGAIN, FEATURES YOUR VIA PRODUCT.  DO YOU SEE WHERE

16  IT SAYS "VIA EXPRESS UNIVERSAL ENVELOPE"?

17  **A.**  YES, I SEE IT.

18  **Q.**  AND THEN YOU ACTUALLY HAD THE WEBSITE VIA EXPRESS.COM, DO

19  YOU SEE THAT?

20  **A.**  YES, I DO.

21  **Q.**  ALL RIGHT.

22      NOW, I WOULD LIKE TO CALL UP AN ARTICLE FROM AUGUST OF

23  1997 IN PC WEEK, WHICH IS PLAINTIFF'S EXHIBIT 120 --

24  **A.**  UH-HUH.

25  **Q.**  -- FOR IDENTIFICATION.

1                    (DISPLAYED ON SCREEN)

2          IF YOU CAN JUST LOOK AT THIS.  I THINK THE PLACE TO LOOK

3     IS AT PAGE 3.  SO IT'S EXHIBIT 120, PAGE 3.

4          AND THAT'S AN ARTICLE ABOUT DESKGATE THAT WAS IN PC WEEK?

5     **A.**   YES.

6     **Q.**   THAT WAS A PRETTY BIG DEAL, WASN'T IT?

7     **A.**   WHAT IS THE DATE OF THIS?

8     **Q.**   I BELIEVE THE DATE IS AUGUST OF 1997, AUGUST 25TH.

9     **A.**   WHAT YEAR?

10    **Q.**   1997.

11    **A.**   AUGUST?

12    **Q.**   YES.

13         IN ANY EVENT --

14    **A.**   THIS TELEPHONE NUMBER IS AREA CODE 703.

15         THAT'S A VIRGINIA TELEPHONE NUMBER.

16    **Q.**   LET'S GO TO THE FIRST PAGE OF THE EXHIBIT.

17    **A.**   WAIT.  WAIT.  THIS -- I WASN'T -- MY OFFICES WERE IN

18    WASHINGTON, D.C.

19    **Q.**   DO YOU SEE WHERE IT SAYS, "PC WEEK" IT SAYS "AUGUST 25TH,

20    1997"?

21    **A.**   YES, I DO.

22    **Q.**   OKAY.  IF WE GO TO THE THIRD PAGE, YOU SEE WHERE IT SAYS

23    "DESKGATE'S VIA EXPRESS"?

24    **A.**   YES.

25    **Q.**   OKAY.

1    **MR. REINES:**  AND WE WOULD, BASED ON THAT, MOVE THIS

2    INTO EVIDENCE.

3           **MR. ELLWANGER:**  NO OBJECTION.

4           **THE COURT:**  RECEIVED.

5       (PLAINTIFF'S EXHIBIT 120 RECEIVED IN EVIDENCE)

6    **BY MR. REINES:**

7    **Q.**  ALL RIGHT.  I WOULD LIKE TO ASK YOU ABOUT THIS <u>PC WEEK</u>

8    ARTICLE ABOUT YOUR VIA EXPRESS ENVELOPE PRODUCT.

9       YOU HAVE NO MEMORY AT ALL OF THE VIA NAME, RIGHT?

10   **A.**  OF THE VIA EXPRESS NAME, UNTIL I THINK YOU OR ONE OF THE

11   OTHER ATTORNEYS LAST YEAR, I JUST DIDN'T REMEMBER EVER

12   BRANDING ANYTHING WE HAD LIKE THIS.

13   **Q.**  AND AT THE TIME OF YOUR DEPOSITION, APRIL 2013, YOU HAVE

14   BEEN THROUGH A WHOLE TRIAL -- WHOLE LITIGATION ABOUT THE '541

15   PATENT WITH YOUR DEPOSITION IN 2009?

16   **A.**  RIGHT.

17   **Q.**  AND YOU REVIEWED YOUR '541 PATENT IN CONNECTION WITH THAT

18   DEPOSITION?

19   **A.**  RIGHT.

20   **Q.**  YOU PREPARED FOR YOUR DEPOSITION BY REVIEWING THE '541

21   PATENT IN THIS CASE, CORRECT?

22   **A.**  FOR TODAY?

23   **Q.**  NO, FOR YOUR DEPOSITION IN THIS CASE IN APRIL OF 2013.

24      REMEMBER?

25   **A.**  YES.

 1   **Q.**  THE HOURS WITH THE DINOVOS?

 2   **A.**  I KNOW.  I'M STARTING TO HAVE A SENIOR MOMENT HERE.

 3   **Q.**  WE ALL HAVE ISSUES WE ARE TRYING TO REMEMBER THE BEST WE

 4   CAN, BUT I'M GOING TO ASK YOU TO DO YOUR BEST BECAUSE YOU ARE

 5   UNDER OATH.

 6        DO YOU UNDERSTAND THAT?

 7   **A.**  I UNDERSTAND.

 8   **Q.**  YOU UNDERSTOOD YOU WERE UNDER OATH IN YOUR DEPOSITION,

 9   CORRECT?

10   **A.**  I UNDERSTOOD THEN.

11   **Q.**  YOU DID YOUR ABSOLUTE BEST TO ANSWER TRUTHFULLY THEN?

12   **A.**  THAT'S EXACTLY RIGHT.

13   **Q.**  IN YOUR DEPOSITION YOU COMMITTED TO BEING CANDID AND

14   COMPLETE, DIDN'T YOU?

15   **A.**  YES.

16   **Q.**  ALL RIGHT.  JUST TO BE --

17   **A.**  IT'S RIGHT HERE.  MCCLEAN, VIRGINIA.

18   **Q.**  THERE'S A PROCESS FOR THIS.

19   **A.**  I'M SORRY.

20   **Q.**  WE HAVE TO GO ONE AT A TIME.  I APOLOGIZE.

21   **A.**  I SHOULDN'T READ THESE THINGS YOU GIVE ME, BUT I CAN'T

22   HELP IT.

23   **Q.**  YOU -- WHEN WE DISCLOSED THIS, YOU KNOW, DAYS AGO TO YOUR

24   COUNSEL WHO KNEW THAT IT WAS A TRIAL -- ACTUALLY DISCLOSED IT

25   MONTHS AGO, AND THE PROCESS IS THEY ASK YOU QUESTIONS AFTER I

1    GO.  SO, I'LL ASK QUESTIONS AND THEN --

2    **A.**  I'M SORRY.

3    **Q.**  -- IF THERE'S ANYTHING THEY WANT TO BRING OUT.

4    **A.**  YOU ARE DOING A GOOD JOB.  IT'S MY FAULT.

5    **Q.**  I JUST WANT TO BE CLEAR ABOUT THE PROCESS BECAUSE IT'S

6    FOREIGN.

7        REGARDING VIA, YOU HAVE NO MEMORY AT ALL ABOUT THE VIA

8    NAME, RIGHT?

9    **A.**  I DON'T REMEMBER -- MAYBE CHIP VENTERS.  THIS MUST BE ONE

10   OF HIS PRODUCTS.  I DON'T -- THIS IS THE SAME ENVELOPE, YOU

11   KNOW, THAT I USED TO DEMONSTRATE THINGS FOR INVESTORS.  SO HE

12   GOT A STORY.  I DON'T KNOW HOW HE DID IT.

13           **MR. REINES:**  LET'S LOOK AT THE PRICING FOR THIS,

14   MR. BONINI.  IN THERE THERE'S A STATEMENT OF THE PRICING.

15           **THE WITNESS:**  I SEE.

16   **BY MR. REINES:**

17   **Q.**  DO YOU SEE THAT?

18   **A.**  YES.

19   **Q.**  WHAT WAS YOUR PRICING?

20   **A.**  WHAT IS IT HERE?

21   **Q.**  YES.

22   **A.**  SAYS $49 FOR DESKTOP VERSION.  2500 FOR SERVER VERSION,

23   WHICH INCLUDES -- I CAN'T QUITE READ THAT, 50 SEAT LICENSES.

24   **Q.**  OKAY.

25       AND IN ORDER FOR THE PRICING OF SEAT LICENSES AND ALL THAT

1    TO BE ARRIVED AT BEFORE IT WOULD BE IN AN ARTICLE IN PC WEEK

2    MAGAZINE, AS THE CHIEF EXECUTIVE OFFICER, THE CHIEF PRODUCT

3    OFFICER, ALL THOSE THINGS, YOU WOULD HAVE AT LEAST BEEN

4    CONSULTED ON THIS, RIGHT?

5    **A.**  I HAVE NO MEMORY OF US TAKING MY ENVELOPE AND PUTTING A

6    PRICE ON IT.

7    **Q.**  NOW --

8    **A.**  WHO WOULD HAVE BOUGHT IT?  I DON'T --

9    **Q.**  WHEN I WAS ASKING YOU ABOUT THIS DOCUMENT AND YOUR VIA

10   PRODUCT, YOU TESTIFIED, DIDN'T YOU, THAT THE PATENTED

11   CAPABILITIES DID NOT EXIST IN AUGUST OF 1997?

12   **A.**  NO, THEY ALL EXISTED, BUT THEY HAD NOT BEEN PUT INTO

13   APPLICATION SOFTWARE.

14   **Q.**  ALL RIGHT.

15        **MR. REINES:**  WELL, WHY DON'T WE PLAY YOUR DEPOSITION

16   AT 375:14 THROUGH 376:7.  AND THIS IS FROM YOUR APRIL 26TH,

17   2013 DEPOSITION.

18        (VIDEO PLAYED AS FOLLOWS:)

19             "QUESTION:  WHY DIDN'T YOU INCLUDE ALL THESE

20             ADDITIONAL FEATURES THAT YOU JUST DESCRIBED -- THE

21             REGULATING, DELIVERING, TRACKING THAT'S DESCRIBED IN

22             YOUR PATENT APPLICATIONS IN THIS VIA EXPRESS PRODUCT

23             THAT'S BEING SOLD AND PROMOTED IN AUGUST 1997?  IF

24             YOU DIDN'T, HOW COME YOU DIDN'T INCLUDE IT THAT WAY?

25             "ANSWER:  YOU ARE SAYING WHY DIDN'T -- WHY WEREN'T

1          ALL THOSE CAPABILITIES INCLUDED IN THIS?

2          "QUESTION:  YES.

3          "ANSWER:  THEY DIDN'T EVEN EXIST.  THIS SAYS 1997.

4          YEAH, AUGUST 1997.  AND THE TELEPHONE NUMBER THAT'S

5          IN THIS THING, THIS'S A 703 AREA CODE.  THAT'S --

6          "QUESTION:  WHAT DOES THAT ALL THAT MEAN TO YOU?

7          "ANSWER:  THAT MEANS THAT -- MY INVENTION HAD NOT

8          BEEN REDUCED TO COMPUTER SOFTWARE CODE IN

9          AUGUST 1997.

10         "QUESTION:  ARE YOU REFERRING TO REGULATING, TRACKING

11         OR DELIVERING, OR ALL THREE?

12         "ANSWER:  YEAH, ALL THREE."

13    **BY MR. REINES:**

14    **Q.**  ALL RIGHT.  NOW LET ME ASK YOU ABOUT THE DESKGATE

15    PRODUCTS, ALL OF THEM.  AND I'M INCLUDING ALL OF THE ONES THAT

16    YOU HAD, WHETHER THOSE PRODUCTS USE THE INVENTIONS IN THE

17    PATENTS-IN-SUIT, ANY OF THE PATENTS.

18         THAT'S NOT SOMETHING YOU KNOW YOURSELF, RIGHT?  THAT'S

19    SOMETHING YOU LEAVE TO THE ATTORNEYS?

20    **A.**  COULD YOU REPEAT THAT, PLEASE?

21    **Q.**  YES.

22         REGARDING ALL OF THE PRODUCTS AND SERVICES THAT YOU HAD AT

23    DESKGATE OVER THE YEARS, WHETHER ANY OF THEM USED THE

24    INVENTIONS THAT ARE CLAIMED IN THE '541 PATENT OR THE '761

25    (SIC) PATENT, THAT'S NOT SOMETHING THAT YOU'RE CAPABLE OF

1    TESTIFYING ABOUT --

2    **A.**  OF COURSE I CAN TESTIFY.  MAY 15TH, 1998, WHEN WE FILED

3    THAT PATENT FOR '541, WAS WHEN FISH & RICHARDSON SAID WE WERE

4    AUTHORIZED TO PUT OUR INVENTION UP, YOU KNOW, WORKING SO

5    PEOPLE COULD SEE IT.  THAT'S WHEN WE OPENED UP THE DOOR TO OUR

6    STORE FOR OUR, YOU KNOW, ALL OF OUR INDY BANDS AND OUR BOOKS,

7    AND THINGS OF THAT SORT.

8    **Q.**  WHETHER THAT HAPPENED, THAT ALL CAME FROM YOUR PATENT

9    ATTORNEYS, CORRECT?

10   **A.**  WHAT ALL CAME FROM MY PATENT ATTORNEYS?

11   **Q.**  WHETHER THE PRODUCT THAT YOU HAD WAS USING THE CLAIMED

12   INVENTIONS OF THE PATENTS-IN-SUIT.

13   **A.**  THE PATENT ATTORNEYS APPROVED MY DECISION THAT WE OPEN UP

14   THE WEB STORE TO THE WORLD SO THEY COULD SEE MY INVENTIONS

15   AFTER WE FILED THE '541 PATENT.

16       THEY DID LET ME GO AHEAD AND PUT TRACKING ON PRIOR TO

17   FILING THE NOVEMBER TRACKING PATENT.

18   **Q.**  IS IT TRUE OR NOT TRUE THAT ALL THE INFORMATION YOU HAD AS

19   TO WHETHER OR NOT THE PRODUCT AT DESKGATE USED THE INVENTIONS

20   OF THE PATENT-IN-SUIT CAME FROM ATTORNEYS NOT FROM YOURSELF.

21   ALL OF IT CAME FROM THE ATTORNEYS.  IS THAT TRUE OR NOT TRUE?

22   **A.**  I STILL DON'T UNDERSTAND WHAT YOU ARE ASKING ME.

23   **Q.**  YOU DID NOT -- IN YOUR DEPOSITION, YOU DIDN'T UNDERSTAND

24   WHAT WAS INVENTIVE ABOUT THE PATENT, YOU DIDN'T UNDERSTAND THE

25   CLAIMS EVEN GENERALLY, CORRECT?

PATTERSON – CROSS / REINES

1   **A.**  THAT'S CORRECT.

2   **Q.**  WHEN I ASKED YOU ABOUT WHETHER ANY OF YOUR PRODUCTS USED

3   ANY OF THE INVENTIONS IN YOUR PATENTS, YOU SAID YOU DIDN'T

4   KNOW, YOU GOT THE INFORMATION FROM THE ATTORNEYS.

5       ISN'T THAT TRUE?  DOESN'T THAT SOUND RIGHT?

6   **A.**  YOU MEAN AFTER MAY 1998?

7       I KNOW IN MAY 1998, ALL MY INVENTIONS WERE IN, WHEN YOU

8   DOWNLOADED MUSIC OR BOOK, YOU HAD MY INVENTIONS.

9           **MR. REINES:**  I WOULD LIKE TO PLAY PAGE 330, LINE 24

10  THROUGH PAGE 331, LINE 3.

11      (VIDEO PLAYED AS FOLLOWS:)

12          "QUESTION:  THE INFORMATION THAT YOU HAVE, ALL OF IT,

13          AS TO WHETHER OR NOT THE PRODUCT THAT YOU HAD AT

14          DESKGATE USED THE INVENTIONS IN THE PATENTS-IN-SUIT,

15          THAT ALL CAME FROM AN ATTORNEY.; IS THAT CORRECT?

16          "ANSWER:  YES."

17  **BY MR. REINES:**

18  **Q.**  AND WHEN I ASKED ABOUT WHAT THAT INFORMATION WAS SO I

19  COULD PROBE WHETHER YOUR PRODUCTS -- LET ME ASK YOU.  LET ME

20  STEP BACK.

21      THE PRODUCTS, WHATEVER THIS YOU ARE DESCRIBING, YOU DON'T

22  HAVE ANY OF THAT INFORMATION ANYMORE, RIGHT?  YOU DON'T HAVE

23  AN EXAMPLE OF IT?

24  **A.**  NO.

25  **Q.**  NO YOU DON'T?

1    **A.**  NO, I DON'T.

2    **Q.**  RIGHT.  THAT'S ALL MISSING.

3    **A.**  OKAY.

4    **Q.**  WHEN I ASKED ABOUT WHAT THE INFORMATION WAS THAT SHOWED

5    YOU EVER USED YOUR INVENTIONS IN YOUR PRODUCTS AT DESKGATE,

6    YOUR ATTORNEYS INSTRUCTED YOU NOT TO ANSWER ON THE GROUNDS OF

7    ATTORNEY-CLIENT PRIVILEGE.  DO YOU RECALL THAT?

8    **A.**  NO, I DON'T RECALL THAT.  BUT IF THEY DID, THEY DID.  I

9    HOPE I DIDN'T ANSWER.

10        **MR. REINES:**  LET'S PLAY LINE -- PAGE 331 OF YOUR

11   DEPOSITION, LINES 4 THROUGH 21, WHICH WAS IMMEDIATELY AFTER

12   THE SEGMENT WE JUST SHOWED.  IT'S THE NEXT THING THAT HAPPENED

13   IN THE DEPOSITION.

14        OKAY.  WE DON'T HAVE VIDEO OF THAT.  THANK YOU VERY MUCH.

15        LET ME READ IT INTO THE RECORD.

16            "MR. REINES:"  MYSELF.  "OKAY.  I WANT TO BE

17            APPROPRIATE WITH YOU.  YOU KNOW, I'M GOING TO ASK

18            HIM, I MEAN, WILL YOU ALLOW HIM TO ANSWER WHAT THE

19            SUBSTANCES OF THOSE DISCUSSIONS ARE?" REFERRING TO

20            YOUR DISCUSSIONS WITH THE ATTORNEY.

21            YOUR ATTORNEY:  "NO, NOT THE SUBSTANCE."

22            "MR. REINES:  OKAY.  SO DO I NEED TO ASK IT OR CAN I

23            JUST RELY ON THE FACT THAT YOU'RE OBJECTING?"

24            AND THE ANSWER FROM THE ATTORNEY:  "YOU CAN RELY ON

25            THE FACT THAT I'M OBJECTING."

1           I SAID:  "OKAY."

2           ANOTHER ATTORNEY SAID:  "OBJECTING AND INSTRUCTING

3           HIM NOT TO ANSWER."

4           MR. DONAHUE SAID:  "INSTRUCTING HIM NOT TO ANSWER

5           WITH RESPECT TO CONVERSATIONS THAT WERE HAD WITH

6           COUNSEL RELATED TO THAT."

7   **BY MR. REINES:**

8   **Q.**  DO YOU SEE THAT?

9   **A.**  YES.  DID I FOLLOW THE INSTRUCTION?

10  **Q.**  YOU FOLLOWED THE INSTRUCTION.

11  **A.**  THANK YOU.

12  **Q.**  ALL RIGHT.

13       REGARDING THE M2, THE WAY YOUR COMPANY DESKGATE ENDED,

14  YOUR COMPANY ESSENTIALLY ENDED YOU WERE ASKED TO LEAVE M2 IN,

15  I THINK YOU SAID NOVEMBER, I THOUGHT I HEARD DECEMBER.

16  **A.**  YES.

17  **Q.**  AND YOU WERE THE LARGEST SHAREHOLDER OF M2 AT THE TIME?

18  **A.**  I WAS.

19  **Q.**  AND THEN WHEN YOU WERE THE LARGEST SHAREHOLDER IT WENT

20  BANKRUPT, DIDN'T IT?

21  **A.**  THEY DID.  THEY WENT BANKRUPT.

22  **Q.**  YOU RECALL EARLIER ON DIRECT YOU EXPLAINED WHY YOU THOUGHT

23  IT MIGHT HAVE GONE BANKRUPT, M2?

24  **A.**  WHILE THEY MIGHT --

25  **Q.**  ON YOUR DIRECT EXAMINATION, YOU --

PATTERSON – CROSS / REINES

1    **A.**   I DON'T REMEMBER WHAT I SAID.   IF YOU'LL --

2    **Q.**   DO YOU RECALL GENERALLY ON YOUR DIRECT EXAMINATION

3    TESTIFYING WHY YOU THOUGHT M2 WENT BANKRUPT WITH THE DESKGATE

4    PRODUCT, AND YOU WERE THE LARGEST SHAREHOLDER?   DO YOU

5    REMEMBER --

6    **A.**   I DON'T REMEMBER WHAT I SAID.

7    **Q.**   SOMETHING ABOUT A BUBBLE?

8    **A.**   OH, TODAY.   I THOUGHT YOU WERE TALKING ABOUT DURING THE

9    DEPOSITION IN 20 -- YES, TODAY I REMEMBER.

10   **Q.**   OKAY.   I SAID "DIRECT", MAYBE, AGAIN, THAT'S TRIAL TALK.

11   I WILL TRY TO MINIMIZE THAT.

12       IN DEPOSITION WHEN I ASKED YOU ABOUT THE M2 BANKRUPTCY,

13   YOU SAID YOU DIDN'T KNOW HOW THE BANKRUPTCY HAPPENED.   DO YOU

14   REMEMBER THAT?

15   **A.**   YES.

16   **Q.**   OKAY.

17       NOW, IN TERMS OF WHY, INSTEAD OF KEEPING DESKGATE AS A

18   SEPARATE COMPANY WHERE YOU WERE CEO AND ALL THOSE OTHER

19   THINGS, THE REASON YOU WANTED TO MERGE WITH M2 IN 1999, YOU

20   WANTED TO PIGGYBACK ON M2 TO GO IPO BEFORE THE BUBBLE BURST,

21   CORRECT?

22   **A.**   THAT'S TRUE.

23   **Q.**   ALL RIGHT.   WE'RE WRAPPING UP.   A COUPLE OF IMPORTANT

24   QUESTIONS.

25       REGARDING INFRINGEMENT, YOU UNDERSTAND THIS IS AN

1  INFRINGEMENT TRIAL, RIGHT?

2  **A.**  YES, I DO.

3  **Q.**  YOU HAVE BEEN COMING BACK AND FORTH TO COURT WITH THE

4  DINOVO TEAM?

5  **A.**  NO.

6  YOU MEAN TO THIS COURT?  NO, I HAVEN'T.

7  **Q.**  OKAY.  YOU --

8  **A.**  I SAW THE VIDEO, TOO, AND I KNOW WE ARE HERE ABOUT YOUR

9  CLIENT HAS BEEN INFRINGING ON MY TWO PATENTS.

10  **Q.**  THAT'S WHAT YOU ARE SAYING?

11  **A.**  THAT'S WHAT I WAS TOLD BY MY ATTORNEYS.

12  **Q.**  OKAY.

13  YOU DON'T HAVE ANY IDEA AT ALL AS TO WHETHER ADOBE'S

14  INFRINGING; ISN'T THAT TRUE?

15  **A.**  I CERTAINLY HAVE AN IDEA NOW.

16  **Q.**  AT YOUR DEPOSITION WHEN I ASKED YOU, AND I WAS PREPARING

17  FOR TRIAL AND YOU KNEW I WAS, YOU TOLD ME YOU DIDN'T HAVE ANY

18  IDEA WHETHER ADOBE WAS INFRINGING.

19  **A.**  WHEN YOU AND I WERE TOGETHER 15 MONTHS AGO, I HAD NO IDEA

20  IF YOU OR ANY OF THOSE OTHER COMPANIES WERE INFRINGING.

21  **Q.**  AND YOU HAVE ONLY LEARNED THAT BETWEEN AFTER YOUR

22  DEPOSITION AND DURING TRIAL PREP WITH THE DINOVO TEAM?

23  **A.**  THAT'S RIGHT.

24  **Q.**  AND YOU HAVE SPENT TIME WITH THE DINOVO TEAM GOING OVER

25  YOUR DIRECT EXAMS; ISN'T THAT CORRECT?

1    **A.** IS THIS THIS MORNING?

2    **Q.** YEAH.

3    **A.** I DID, YES.

4    **Q.** AND LET'S TALK ABOUT THE VALUE OF THE PATENTS.  YOU DON'T

5    HAVE ANY IDEA WHAT THE PATENTS ARE WORTH, RIGHT?

6    **A.** I THINK I HAVE AN IDEA.  YES.

7    **Q.** DO YOU HAVE AN IDEA OF WHAT THE PATENTS ARE WORTH?

8    **A.** YES.

9    **Q.** ALL RIGHT.

10          **MR. REINES:** LET'S PLAY THE DEPOSITION VIDEO FROM

11   APRIL OF 2013 AT PAGE 310, LINES 5 THROUGH 7.

12       NO?  READ?  WE DON'T HAVE VIDEO I SUPPOSE.

13          **THE WITNESS:** I CAN READ IT.

14          **MR. REINES:** THANK YOU FOR CALLING THAT UP.

15       AND THE QUESTION I ASKED YOU AT LINE 5 WAS:

16       "AND YOU HAVE NO IDEA WHAT THE PATENTS ARE WORTH; IS THAT

17   CORRECT?"

18       AND YOUR ANSWER WAS:  "NO, I REALLY -- I DON'T."

19       NO FURTHER QUESTIONS, YOUR HONOR.

20          **MR. ELLWANGER:** REDIRECT EXAMINATION, YOUR HONOR?

21                  **<u>REDIRECT EXAMINATION</u>**

22   BY MR. ELLWANGER:

23   **Q.** MR. PATTERSON, I HAVE ABOUT FIVE MINUTES OF FOLLOW-UP

24   QUESTIONS I NEED TO ASK YOU ABOUT THAT CROSS-EXAMINATION.

25   OKAY?

1    **A.**  ALL RIGHT.

2    **Q.**  NOW ADOBE'S LAWYER JUST ENDED BY ASKING WHETHER OR NOT YOU

3    KNEW THAT ADOBE INFRINGED YOUR PATENTS, RIGHT?

4    **A.**  YES.  THAT'S RIGHT.

5    **Q.**  MR. PATTERSON, ARE YOU ALLOWED TO SEE ADOBE'S CONFIDENTIAL

6    SOURCE CODE?

7    **A.**  NO.

8    **Q.**  MR. PATTERSON, YOU WERE ALSO ASKED WHETHER OR NOT YOU KNEW

9    WHAT YOUR PATENTS WERE WORTH, RIGHT?

10   **A.**  YES.

11   **Q.**  MR. PATTERSON, ARE YOU ALLOWED TO SEE ADOBE'S CONFIDENTIAL

12   FINANCIAL INFORMATION?

13   **A.**  NO.

14   **Q.**  MR. PATTERSON, YOU WERE ALSO ASKED ABOUT CLAIM LANGUAGE

15   WITHIN YOUR PATENTS.

16          **MR. ELLWANGER:**  AND, MS. MASON, IF YOU CAN PULL UP

17   PLAINTIFF'S EXHIBIT 3.

18                  (PUBLISHED TO JURY.)

19   **BY MR. ELLWANGER:**

20   **Q.**  SPECIFICALLY, YOU WERE SHOWN CLAIM 45 OF THE '670 PATENT.

21      DO YOU REMEMBER SEEING THAT?

22   **A.**  YES, I DO.  YOU SHOWED IT TO ME EARLIER TODAY.

23   **Q.**  NOW I KNOW YOU WEREN'T IN THE COURTROOM FOR OPENING

24   STATEMENT, MR. PATTERSON, BUT WERE YOU IN THE COURTROOM WHEN

25   THE VIDEO WAS PLAYED TO THE JURY THIS MORNING?

1    **A.**  YES, THEY LET ME COME IN AND SEE THE VIDEO.

2    **Q.**  DID YOU SEE THE PART OF THE VIDEO WHERE THEY TALKED ABOUT

3    HOW ATTORNEYS OFTEN ARE THE ONES OR USUALLY THE ONES THAT

4    WRITE THE CLAIMS IN THESE PATENT APPLICATIONS?

5    **A.**  YES.

6    **Q.**  AND WAS THAT THE CASE IN YOUR PATENT APPLICATION?

7    **A.**  YES.  ABSOLUTELY.

8    **Q.**  MR. PATTERSON, DID YOU WRITE CLAIM 45 OR DID THE LAWYERS

9    FROM FISH & RICHARDSON WRITE CLAIM 45?

10   **A.**  THE LAWYER FROM FISH & RICHARDSON WROTE THIS CLAIM.

11   **Q.**  THAT WAS OVER 16 YEARS AGO?

12   **A.**  THAT WAS 16 -- YOU'RE RIGHT, 16 YEARS AGO.

13   **Q.**  OKAY.

14       YOU WERE ALSO ASKED ABOUT DOCUMENTS WITHIN THE FILE

15   HISTORY OF THIS PATENT APPLICATION THAT SHOWED YOUR PATENT HAD

16   BEEN REJECTED OVER EARLIER PATENTS, RIGHT?

17   **A.**  YES.

18   **Q.**  AND THERE WAS A LOT OF BACK AND FORTH IN THAT FILE

19   HISTORY, WASN'T THERE?

20   **A.**  YES, THERE WAS.

21   **Q.**  HOW LONG DID IT TAKE FOR THAT PATENT TO BE GRANTED FROM

22   WHEN YOU FILED IT TO WHEN IT WAS FINALLY GRANTED IN 2002?

23   **A.**  WELL, WE FILED IT IN MAY OF 1998.  AND I THINK IT -- I

24   DIDN'T SEE IT UNTIL CHRISTMAS OF 2002.  I THINK IT CAME OUT IN

25   MAY OF 2002.  I THINK -- SO THAT'S FOUR YEARS, RIGHT?

```
 1    Q.   UH-HUH.

 2         AND DID THE PATENT OFFICE ULTIMATELY GRANT THE '541

 3    PATENT?

 4    A.   YES, THEY DID.

 5    Q.   DID THE PATENT OFFICE ULTIMATELY GRANT THE '670 PATENT?

 6    A.   YES, THEY DID.

 7    Q.   YOU WERE ALSO ASKED SOME QUESTIONS ABOUT THIS PC WEEK

 8    ARTICLE, EXHIBIT 120.

 9         MR. ELLWANGER:  MS. MASON, IF YOU CAN PULL UP THAT

10    DOCUMENT RIGHT THERE.

11                   (PUBLISHED TO JURY.)

12    BY MR. ELLWANGER:

13    Q.   MR. PATTERSON, DO YOU REMEMBER WHEN YOU AND I WERE TALKING

14    TO THE JURY ABOUT YOUR INVENTION STORY?

15    A.   YES.

16    Q.   DO YOU REMEMBER TALKING ABOUT DEVELOPING THIS DIGITAL

17    ENVELOPE?

18    A.   THAT'S RIGHT, I DO.

19    Q.   WHEN YOU FIRST DEVELOPED THE DIGITAL ENVELOPE, DID IT

20    SECURE THE INFORMATION THAT WENT INSIDE THE ENVELOPE?

21    A.   WELL, YOU MEAN WHILE IT WAS IN THE ENVELOPE?

22    Q.   CORRECT.

23    A.   YES.

24    Q.   BUT DID IT ONCE IT WAS TAKEN OUT OF THE ENVELOPE?

25    A.   NO.  THAT WAS THE WHOLE POINT OF WHY WE DID IT.
```

1    **Q.**  NOW WHAT'S THE HIGHLIGHTED PORTION OF THIS ARTICLE TALK

2    ABOUT?

3    **A.**  IT TALKS ABOUT PROTECTING A MAIL ATTACHMENT WITH

4    PASSWORDS.

5    **Q.**  DOES IT TALK ABOUT ANY PART OF YOUR INVENTION THAT

6    PROTECTED THE ATTACHMENT AFTER IT WAS OUT OF THE ENVELOPE?

7    **A.**  NO.

8    **Q.**  AND WHAT'S THE DATE OF THIS ARTICLE?

9    **A.**  THAT'S WHAT I WAS LOOKING AT.  HE SAID IT WAS IN AUGUST OF

10   '97, I THINK.  I COULDN'T MAKE IT OUT.

11   **Q.**  SO WAS IT BEFORE YOU FILED YOUR PATENT APPLICATION?

12   **A.**  WELL, YES, IT WAS ALMOST A YEAR BEFORE.

13   **Q.**  AND BEFORE YOU FINALIZED THE PRODUCT THAT WAS THE

14   INVENTION OF WHAT PROTECTED THE CONTENTS INSIDE THE ENVELOPE?

15   **A.**  WELL, YES, THAT'S RIGHT.

16   **Q.**  SO IS THIS ARTICLE CONSISTENT WITH YOUR TESTIMONY FROM

17   EARLIER THIS MORNING?

18   **A.**  YES.

19   **Q.**  MR. PATTERSON, YOU WERE ALSO ASKED A NUMBER OF QUESTIONS

20   ABOUT THIS DANE NDA AND YOUR RECOLLECTION OF IT.

21          **MR. ELLWANGER:**  IF YOU COULD, PLEASE, PULL UP

22   EXHIBIT 121A, MS. MASON, AND ALSO 121B, MS. MASON.

23                    (PUBLISHED TO JURY.)

24   **BY MR. ELLWANGER:**

25   **Q.**  NOW, DO YOU SEE A DATE IN THIS EXHIBIT, MR. PATTERSON?

1    **A.**  YES, I DO.  IT'S DECEMBER THE 3RD, 1996.

2    **Q.**  I BELIEVE THE JURY HEARD SEVERAL TIMES THAT YOU WERE

3    DEPOSED IN 2013, RIGHT?

4    **A.**  THAT'S RIGHT.

5         IN FACT, HERE IT SAYS APRIL OF 2013.

6    **Q.**  HOW MANY YEARS PASSED BETWEEN WHEN THIS DOCUMENT WAS

7    SIGNED BY MR. DANE AND WHEN YOU WERE ASKED QUESTIONS ABOUT IT?

8    **A.**  I WAS A HISTORY MAJOR.  SIX FROM -- 17 YEARS.

9    **Q.**  OKAY.  BUT LOOKING AT IT NOW, DO YOU SEE WHERE MR. DANE

10   HAS HIS SIGNATURE THAT APPEARS ON BOTH THE NDA AND YOUR NOTES?

11   **A.**  YES, I DO.

12   **Q.**  AND DO YOU AGREE THAT THAT'S THE SAME DATE WRITTEN IN THE

13   SAME HANDWRITING ON BOTH THE NDA AND THE NOTES?

14          **MR. REINES:**  YOUR HONOR, OBJECTION.

15          **THE COURT:**  SUSTAINED.

16   **BY MR. ELLWANGER:**

17   **Q.**  MR. PATTERSON, YOU WERE ASKED WHETHER OR NOT YOU WOULD

18   GIVE THE SAME TESTIMONY IN YOUR DEPOSITION THAT YOU WOULD GIVE

19   AT TRIAL.

20        DO YOU RECALL BEING ASKED THAT A FEW MINUTES AGO?

21   **A.**  YES, I DO.

22   **Q.**  IN YOUR OPINION, IS YOUR TESTIMONY CONSISTENT THAT YOU

23   DIDN'T REMEMBER THAT ATTACHMENT AT THE TIME BUT NOW YOU DO?

24   **A.**  YES.

25          **MR. ELLWANGER:**  PASS THE WITNESS, YOUR HONOR.

1          **MR. REINES:**  JUST A FEW QUESTIONS, YOUR HONOR.

2                          **RECROSS-EXAMINATION**

3     BY MR. REINES:

4     Q.  STAYING WITH THE NOTES THAT ARE EXHIBIT 121B, WHEN YOU

5     WERE ASKED, YOU WERE ASKED ABOUT THE DOCUMENT.  IT WAS ABOUT

6     TEN QUESTIONS ABOUT IT, INCLUDING WHETHER YOU EVER READ IT,

7     WHETHER YOU RECOGNIZED IT, DO YOU KNOW WHO WROTE IT, DO YOU

8     KNOW WHEN THEY WERE CREATED, ALL THAT SERIES OF QUESTIONS; YOU

9     RECALL THAT?

10    A.  YES, I DO.

11    Q.  AND THEN AT THE END OF THAT, AFTER YOU ABSOLUTELY HAD BEEN

12    CLEAR UNDER OATH THAT YOU DIDN'T KNOW ANYTHING ABOUT IT, YOU

13    DIDN'T RECOGNIZE WRITING IT EVEN THOUGH YOU NOW SAY IT'S ALL

14    YOUR INVENTIONS --

15    A.  I DID KNOW SOMETHING ABOUT IT.

16    Q.  AFTER THAT TESTIMONY, WHEN WE ASKED YOU, ARE YOU GOING TO

17    GIVE THE SAME TESTIMONY ABOUT THAT DOCUMENT NOW AS AT TRIAL,

18    DID YOU UNDERSTAND THAT TO MEAN THAT YOU WERE GOING TO GIVE

19    THE SAME TESTIMONY THAT YOU DIDN'T RECOGNIZE THE DOCUMENT, YOU

20    DIDN'T KNOW WHO WROTE IT, THAT YOU DIDN'T KNOW -- THAT YOU

21    NEVER READ IT, YOU DIDN'T KNOW ABOUT IT, YOU DIDN'T KNOW WHO

22    WROTE IT, IS THAT WHAT YOU WERE VALIDATING UNDER OATH FOR US?

23    A.  THAT IS ABSOLUTELY THE CASE IN APRIL OF LAST YEAR.  I

24    DIDN'T REMEMBER ANY OF THAT.

25    Q.  ALL RIGHT.

1            AND THEN IF YOU TURN TO EXHIBIT 1, THE '541 PATENT.

2            WE WILL PUT IT UP.  I WOULD LIKE TO PUT UP THE FRONT PAGE.

3                      (PUBLISHED TO JURY.)

4            AND I WANT TO SHOW YOU -- AGAIN, JUDGE FOGEL DID AN ABLE

5      JOB ON THE VIDEO THAT WE SAW LISTING THE REFERENCES THAT WERE

6      CITED IN THE PROCESS.

7            AND WE WILL SEE THE WOLFE REFERENCE -- LET'S MAGNIFY THAT

8      FOR EVERYBODY -- AND THE JOHNSON REFERENCE, AND THE HALTER

9      REFERENCE.

10           AND YOU UNDERSTAND WHEN THESE PATENTS ARE ON THE FRONT

11     PAGE, THAT THIS MEANS THIS IS PRIOR ART THAT EITHER THE

12     INVENTOR HAD SUBMITTED OR THE PATENT OFFICE HAD FOUND THAT WAS

13     CONSIDERED IN THE PROSECUTION, RIGHT?  YOU UNDERSTAND THAT?

14     **A.**  YES, I DO.

15     **Q.**  THERE ARE OTHERS HERE, BUT I WANTED TO ASK YOU ABOUT

16     THOSE.

17           WHEN YOU FOUND REFERENCES AND GAVE THEM TO YOUR PATENT

18     ATTORNEY AND THEY WERE PATENTS, BECAUSE YOU MENTIONED THERE

19     WAS A LOT OF PATENTS, DID YOU COMPARE THOSE PATENTS WITH YOUR

20     PRODUCTS TO MAKE SURE YOU WEREN'T INFRINGING WHEN YOU FOUND

21     THEM?

22     **A.**  WHEN WE FOUND THESE PARTICULAR ITEMS, AS I RECALL,

23     SOMETIME BEFORE WE ACTUALLY -- BECAUSE I DON'T KNOW WHEN WE

24     FOUND THESE, BUT BETWEEN '97, NOVEMBER, AND MAY OF 1998,

25     SOMEBODY, ME OR THE ATTORNEYS FOUND THESE ITEMS, AND THOUGHT

1    THEY WERE RELATED BASED ON WHAT -- HOW FAR WE WERE IN

2    DEVELOPING OUR SOFTWARE AND BEFORE WE FILED THE PATENT, THE

3    ATTORNEYS WOULD GO IN AND COMPARE WHATEVER THESE THINGS ARE TO

4    HOW THEY WERE ACTUALLY WRITING THE CLAIMS, I THINK, OF '541.

5    **Q.**   WHEN THE PATENTS WERE REJECTED BASED ON PARTICULAR CLAIMS,

6    DO YOU KNOW WHETHER THERE WAS A COMPARISON -- IN OTHER WORDS,

7    THE PATENT OFFICE IS SAYING WOLFE RENDERS IT UNPATENTABLE OR

8    JOHNSON'S IDENTICAL, DID THAT CAUSE YOU TO GO LOOK?  DO YOU

9    KNOW IF THE COMPANY WENT AND LOOKED?

10   **A.**   I DON'T KNOW WHAT HAPPENED.  NO, I DON'T REMEMBER.

11   **Q.**   DID YOU EVER LOOK AT ANY PATENT TO DETERMINE WHETHER YOU

12   WOULD BE INFRINGING WITH THE PRODUCTS OR SERVICES YOU WERE

13   ATTEMPTING TO COMMERCIALIZE AT PC DESKGATE?

14   **A.**   IN FACT, WHEN WE STARTED THIS PROCESS, NOT UNDERSTANDING

15   WHY WE WERE DOING IT, THE ATTORNEYS FROM FISH & RICHARDSON

16   EXPLAINED TO ME THAT THE REASON WE WERE DOING THIS WAS BECAUSE

17   THEY RELATED AND IF, IN FACT, THEY, THE ATTORNEYS, THOUGHT

18   THEY WERE INFRINGING OR SOMEBODY ELSE DID, THAT WE HAD SOME

19   OBLIGATION AT THAT MOMENT TO FIND OR SEEK A REMEDY FOR IT.

20   THAT'S HOW I UNDERSTOOD IT.

21   **Q.**   THAT WAS THE ATTORNEY'S WORK, THE OUTSIDE LAW FIRM, NOT

22   YOUR WORK, CORRECT?

23   **A.**   THAT'S RIGHT.

24   **Q.**   AND YOU RELIED ON FISH & RICHARDSON TO PERFORM THAT WORK;

25   THAT'S NOT SOMETHING THAT YOU, AS A --

1    **A.**  EXACTLY.

2    **Q.**  OKAY.

3           **MR. REINES:**  THANK YOU.  NO FURTHER QUESTIONS.

4           **MR. ELLWANGER:**  NOTHING FURTHER.

5           **THE COURT:**  YOU'RE EXCUSED.  YOU MAY STEP DOWN.  YOU

6    MAY CALL YOUR NEXT WITNESS.

7           **MS. GLAUSER:**  YOUR HONOR, AT THIS TIME DIGITAL REG

8    CALLS MIKE FARLEY.

9           **THE CLERK:**  ARE THE BINDERS UP HERE GOING TO PERTAIN

10   TO THIS WITNESS AS WELL?

11          **MS. GLAUSER:**  NO.  YOUR HONOR, WE HAVE A SEPARATE --

12          **THE CLERK:**  PLEASE RAISE YOUR RIGHT HAND.

13        **(MICHAEL FARLEY,** CALLED AS A WITNESS FOR THE PLAINTIFF,

14   HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

15          **THE WITNESS:**  I DO.

16          **THE CLERK:**  PLEASE BE SEATED.  ONCE SEATED, I'M GOING

17   TO ASK IF YOU CAN PLEASE STATE AND SPELL YOUR FIRST AND LAST

18   NAME FOR THE RECORD PLEASE.  GO AHEAD, HAVE A SEAT.

19      STATE AND SPELL YOUR FIRST AND LAST NAME FOR ME.

20          **THE WITNESS:**  THEY'RE CLEARING OFF THE DESK HERE.

21      MY NAME IS MICHAEL FARLEY.  M-I-C-H-A-E-L.  THE LAST NAME

22   IS F-A-R-L-E-Y.

23          **THE CLERK:**  THANK YOU.

24          **THE WITNESS:**  UH-HUH.

25          **MS. GLAUSER:**  MAY IT PLEASE THE COURT.

1                          **DIRECT EXAMINATION**

2      **BY MS. GLAUSER:**

3      **Q.**  THE JURY JUST HEARD YOUR NAME, MR. FARLEY, BUT I WOULD

4      LIKE FOR THEM TO KNOW WHAT YOUR RELATIONSHIP IS TO THE

5      PLAINTIFF DIGITAL REG.

6          COULD YOU TELL US?

7      **A.**  I AM PRESIDENT, VICE PRESIDENT.  I'VE GOT A NUMBER OF

8      DIFFERENT TITLES LIKE ALL SMALL BUSINESSMEN DO.  I DON'T KNOW

9      REALLY WHAT THEY ARE.

10         MY PARTNER CHIP VENTERS AND I ARE THE TWO PEOPLE THAT ARE

11     THE PRESIDENT, VICE PRESIDENT, CHAIRMAN OF THE BOARD, ALL

12     THOSE SORTS OF THINGS.

13     **Q.**  WAS IT YOUR DECISION TO BRING THE LAWSUIT TODAY AGAINST

14     ADOBE?

15     **A.**  YES, IT WAS.

16     **Q.**  WHY DID DIGITAL REG DECIDE TO SUE ADOBE?

17     **A.**  WELL, WE BELIEVE THAT THEY ARE, WITHOUT OUR PERMISSION,

18     ILLEGALLY USING TWO PATENTS WHICH WE OWN.

19     **Q.**  I WOULD LIKE THE JURY TO HEAR A LITTLE BIT ABOUT YOU

20     FIRST.

21     **A.**  SURE.

22     **Q.**  ARE YOU MARRIED?

23     **A.**  I AM.  IN FACT, I HATE TO ADMIT THIS, BUT WE JUST

24     CELEBRATED OUR 48TH WEDDING ANNIVERSARY LAST WEDNESDAY.

25         AND WE HAVE THREE CHILDREN, THREE GIRLS.  AND THEY ARE ALL

FARLEY – DIRECT / GLAUSER

1    MARRIED.  AND WE HAVE SIX GRANDCHILDREN.  AND I HATE TO ADMIT,

2    THIS, BUT ONE OF THEM IS ACTUALLY GOING TO VOTE THIS YEAR.

3    SHE'S 18.  I'M GETTING TO BE OLD.

4    **Q.**  WHERE DO YOU AND YOUR WIFE LIVE, MR. FARLEY?

5    **A.**  WE LIVE IN TUCSON, ARIZONA.

6    **Q.**  DO YOUR CHILDREN LIVE THERE AS WELL?

7    **A.**  NO.  ONE LIVES IN PHOENIX WITH HER HUSBAND.  ONE LIVES IN

8    WASHINGTON, D.C. WITH HER HUSBAND.  AND THE OTHER JUST MOVED

9    TO DENVER A YEAR AGO.  SHE HAS TWO CHILDREN AS WELL.  THEY ALL

10   HAVE TWO CHILDREN.

11   **Q.**  ARE YOU ORIGINALLY FROM ARIZONA?

12   **A.**  NO, ACTUALLY FROM LOS ANGELES, CALIFORNIA.

13   **Q.**  WHAT BROUGHT YOU TO TUCSON?

14   **A.**  THE UNIVERSITY OF ARIZONA.

15   **Q.**  IS THAT WHERE YOU ATTENDED COLLEGE?

16   **A.**  I DID.

17   **Q.**  WHEN DID YOU GRADUATE?

18   **A.**  I GRADUATED IN 1967.  I ACTUALLY STAYED FIVE YEARS BECAUSE

19   I GOT BACK INTO THE ROTC PROGRAM AND BECAME AN OFFICER IN THE

20   ARMY SIGNAL CORPS.

21   **Q.**  AND SO IS THE ARMY SIGNAL CORPS WHAT YOU DID AFTER

22   GRADUATING FROM COLLEGE?

23   **A.**  OH, YEAH.  THAT WAS THE HEIGHT OF THE VIETNAM WAR

24   SITUATION, AND I WAS EXTREMELY LUCKY.  I GOT SENT TO GERMANY.

25   **Q.**  WHAT YEAR WAS THAT?

FARLEY – DIRECT / GLAUSER

1    **A.**  IT WAS -- LET'S SEE.  I HAD TO BE AT FORT BENNING,

2    GEORGIA, I THINK IT WAS AUGUST OF 1967.

3    **Q.**  HOW LONG WERE YOU IN GERMANY?

4    **A.**  SPENT THE FIRST SIX MONTHS IN THE STATES AND THEN WENT TO

5    GERMANY IN JANUARY OF 1968, AND SPENT UNTIL THE MIDDLE OF '69.

6    **Q.**  AND THEN DID YOU MOVE BACK TO THE STATES?

7    **A.**  WENT BACK TO TUCSON WHERE I WENT BACK INTO THE LIFE

8    INSURANCE BUSINESS AND WAS AN AGENT FOR NORTHWESTERN MUTUAL

9    LIFE INSURANCE COMPANY.

10   **Q.**  DID YOU HAVE ANY OTHER WORK IN TUCSON AT THAT TIME?

11   **A.**  WELL, DURING THAT PERIOD OF TIME, WHICH WAS ABOUT 12 YEARS

12   OR SO, WE STAYED IN TUCSON, I ALSO DID -- WAS INVOLVED IN A

13   NUMBER OF REAL ESTATE SYNDICATIONS AND GOT -- PARTNERED UP

14   WITH A GUY IN THE REAL ESTATE BUSINESS.  AND I RAISED THE

15   MONEY, AND HE FOUND THE PROPERTIES AND DID THE MANAGING OF

16   THEN, AND IT WORKED OUT OKAY FOR A WHILE.

17   **Q.**  YOU MENTIONED BEFORE THAT YOU WERE A BUSINESSMAN.  WHAT

18   ARE THE REAL ESTATE SYNDICATIONS, WERE THOSE YOUR OWN

19   BUSINESSES?

20   **A.**  THEY WERE JUST -- WE WOULD GO OUT AND BUY A PIECE OF

21   PROPERTY AND FIND FOLKS THAT WOULD BE WILLING TO PUT UP THE

22   FUNDS AND MAKE AN ANNUAL PAYMENT ON THE MORTGAGE ON THE

23   PROPERTY.  AND THEN OUR HOPE WAS TO RESELL THEM AT A LATER

24   DATE AT A PROFIT AND SHARE THE PROFITS, YOU KNOW, WITH THE

25   PEOPLE THAT INVESTED WITH US, THE LIMITED PARTNERS.

1    **Q.**  WHAT DID YOU DO NEXT?

2    **A.**  IN -- LET'S SEE.  IT WAS JANUARY OF 1991, I WAS A VERY

3    LUCKY GUY.  I GOT TO GO WORK AT THE WHITE HOUSE FOR VICE

4    PRESIDENT GEORGE HERBERT WALKER BUSH.

5    **Q.**  WHAT DID YOU DO?

6    **A.**  I WAS IN CHARGE OF ALL OF HIS INTERNATIONAL TRAVEL AND

7    DOMESTIC TRAVEL, AND TOOK CARE OF THE STAFF, MANAGED THE

8    PLANES, THE MOTORCADES, AND ALL THAT STUFF.  I WAS A GLORIFIED

9    BAGGAGE GUY.

10   **Q.**  WERE YOU RESPONSIBLE FOR THE TRAFFIC JAMS DURING HIS

11   VISITS --

12   **A.**  ABSOLUTELY.  I WAS RESPONSIBLE FOR ALL OF THAT STUFF.

13   **Q.**  AFTER THAT WHAT DID YOU DO, MR. FARLEY?

14   **A.**  WENT BACK TO TUCSON AND STARTED BACK UP IN THE INSURANCE

15   BUSINESS AGAIN.  AND THEN A FRIEND OF MINE CALLED ME AND --

16   FROM DC, TOLD ME ABOUT A PROGRAM THAT HUD HAD FOR FINANCING

17   CONGREGATE CARE FACILITIES FOR SENIOR CITIZENS.  AND I GOT

18   VERY INTERESTED IN THAT.

19       I FOUND A PROFESSOR AT THE UNIVERSITY OF ARIZONA WHO WAS A

20   GERONTOLOGIST, AND HE HAD GREAT CONNECTIONS IN THAT INDUSTRY.

21   AND WE PARTNERED UP AND STARTED TO GO OUT TO BUILD THOSE.

22   **Q.**  HOW LONG DID YOU WORK IN THAT INDUSTRY?

23   **A.**  WE DID THAT FOR ABOUT THREE YEARS.  WE WERE JUST ABOUT

24   GETTING READY TO BUILD A PROPERTY.  WE FOUND A PIECE IN

25   ACTUALLY SUN CITY, ARIZONA.  GOOD PLACE, LOTS OF PROSPECTIVE

1    CUSTOMERS.  AND WE ENDED UP GOING TO NEW YORK, FINDING A GUY

2    THAT WAS RAISING MONEY FOR US, BUT CONGRESS CHANGED THE TAX

3    LAWS AND THE DEPRECIATION BENEFITS, SO THE INVESTORS JUST WENT

4    AWAY SO WE CLOSED THAT DOWN AND I STARTED LOOKING FOR

5    SOMETHING NEW.

6    **Q.**  WHAT DID YOU DO NEXT?

7    **A.**  I FOUND A FRIEND WHO WAS INVOLVED IN RESELLING LONG

8    DISTANCE PHONE COMPANY.  IT WAS A COMPANY CALLED CELLUTEL.

9    THEY ALSO HAD MADE APPLICATION FOR SOME CELLULAR PHONE

10   LICENSES.

11       AND I JOINED HIM.  AND ONE DAY THE SECRETARY WALKS IN AND

12   SAYS, HEY, THERE'S AN ATTORNEY ON THE PHONE FROM DC SAYS HE'S

13   GOT TO TALK TO YOU.  SO HE TOOK THE CALL.  WE JUST WON THE

14   LICENSE IN CHARLESTON, WEST VIRGINIA.

15   **Q.**  WHEN YOU'RE REFERRING TO THAT TELECOMMUNICATIONS OR

16   CELLULAR LICENSING BUSINESS, WAS THAT YOUR OWN BUSINESS OR

17   SOMEONE ELSE'S?

18   **A.**  NO.  IT WAS -- WE WERE PART OWNERS IN THE COMPANY THAT HAD

19   WON THE LICENSE.  THERE WERE OTHER INVESTORS IN IT.  AND WE

20   CONTINUED TO MANAGE THAT FOR THE NEXT, I THINK IT WAS THREE TO

21   FOUR YEARS.  I DON'T REMEMBER EXACTLY HOW MANY YEARS.  IT WAS

22   UNTIL 1988.

23       ANYWAY, WE BOUGHT THE LICENSE OFF OF AN INDIVIDUAL WHO HAD

24   IT IN MCGOWAN, TEXAS.  WE TRADED OUR LICENSE IN CHARLESTON FOR

25   ONE IN BROWNSVILLE, TEXAS AND WE BUILT A CELLULAR PHONE SYSTEM

FARLEY – DIRECT / GLAUSER

1    ALONG THE TEXAS/MEXICAN BORDER, ALL THE WAY FROM BROWNSVILLE

2    TO MCGOWAN, TEXAS, AND THEN WE SOLD IT.

3    **Q.**  MR. FARLEY, HOW MANY BUSINESSES HAVE YOU FOUNDED OVER THE

4    COURSE OF YOUR CAREER?

5    **A.**  FOUNDED OR BEEN INVOLVED IN?  TWELVE MAYBE, 13.  I DON'T

6    KNOW.  I HAVE LOST COUNT.  IT'S BEEN 48 YEARS.

7    **Q.**  HAVE THEY ALL BEEN SUCCESSFUL?

8    **A.**  NO.  AND THEY USUALLY AREN'T.  YOU WIN SOME AND YOU LOSE

9    SOME.  THAT'S WHAT IT IS IN THE SMALL BUSINESS.  YOU KNOW, A

10   SMALL BUSINESSMAN HAS A LOT OF PROBLEMS.  AND HE'S THE HEAD

11   GUY FOR EVERYTHING.  AND THEY DON'T ALWAYS WORK OUT.  WE HAVE

12   HAD FAILURES.

13   **Q.**  WE WERE TALKING A LITTLE ABOUT THE TELECOMMUNICATIONS

14   CELLULAR LICENSING BUSINESS.  DID YOU CONSIDER THAT ONE TO BE

15   A SUCCESS?

16   **A.**  OH, YEAH.  WE SOLD THAT AT A NICE PROFIT TO A GENTLEMAN

17   OUT OF PHILADELPHIA.

18   **Q.**  WHAT DID YOU DO NEXT?

19   **A.**  THE GUYS WHO BUILT THE SYSTEM, THE CELL SYSTEM FOR US IN

20   TEXAS, THEY HAD JUST GOTTEN HOLD OF A REGIONAL PAGING LICENSE

21   THAT COVERED THE AREA FROM BOSTON DOWN TO NEWPORT NEWS,

22   VIRGINIA.  AND THEY ASKED ME TO JOIN THEM, WHICH I DID.  AND I

23   WAS THE MANAGING PARTNER FOR THE VIRGINIA SYSTEM.

24         AND WE BUILT OUT AN ENTIRE REGIONAL PAGING COMPANY WHICH

25   HAD NEVER BEEN DONE BEFORE IN THE COUNTRY.  WE WERE ONE OF THE

 1  FIRST COMPANIES, I THINK, TO SELL PAGERS IN PLACES LIKE

 2  COSTCO.

 3      SO WE HAVE DONE A LOT OF INNOVATION IN THAT ONE.  AND WE

 4  SOLD THAT TO A PUBLIC COMPANY IN 1994.

 5  **Q.**  MR. FARLEY, HELP YOURSELF TO ADDITIONAL WATER IF YOU NEED

 6  IT.

 7  **A.**  THANKS.

 8  **Q.**  AFTER YOU SOLD THAT BUSINESS, WHAT DID YOU DO NEXT?

 9  **A.**  GOT INVOLVED IN THE GOLF MAINTENANCE BUSINESS FOR A WHILE.

10  AND THAT'S ONE THAT DIDN'T WORK OUT.

11      AND THEN I STILL HAD SOME FUNDS FROM THE PAGING COMPANY,

12  WHICH WAS NICE, SO I STARTED LOOKING AROUND FOR SOMETHING

13  ELSE.  AND I CALLED A FRIEND IN WASHINGTON, D.C. AND SAID I

14  WAS COMING BACK THERE AND DID HE HAVE ANYTHING.  HE SAID,

15  YEAH, I MET A GUY YOU OUGHT TO MEET.  I WENT BACK AND THAT'S

16  WHEN I MET PAT PATTERSON.

17  **Q.**  I WOULD LIKE THE JURY TO HEAR A LITTLE BIT ABOUT HOW YOU

18  MET MR. PATTERSON.

19      WHEN DID THAT FIRST MEETING OCCUR?

20  **A.**  THAT WAS IN AUGUST OF 1997.  AND I REMEMBER IT WAS HOT.

21      I WENT BACK AND MET MY FRIEND MIKE.  HE INTRODUCED ME TO

22  PAT PATTERSON.  PAT GAVE US A PRESENTATION OF WHAT HE HAD.

23      AND WHAT HE SHOWED WAS THAT ENVELOPE THAT THEY JUST HAD UP

24  HERE A MINUTE AGO, THE UNIVERSAL ENVELOPE.  AND HE SHOWED

25  PUTTING SOME DOCUMENTS IN IT, CLOSING IT UP, PUTTING A

FARLEY – DIRECT / GLAUSER

1    PASSWORD ON IT, AND THEN HE SAID YOU CAN TAKE THIS ENVELOPE

2    AND ATTACH IT TO EMAIL AND MAIL IT AROUND, AND THE GUY AT THE

3    OTHER END, HE GETS IT, HAS TO HAVE THE PASSWORD TO GET AT THE

4    DOCUMENTS.

5        MAN, I THOUGHT THAT WAS THE GREATEST THING I'D EVER SEEN.

6    I THOUGHT THIS IS A REPLACEMENT FOR FED-EX.  FED-EX WAS DOING

7    MOSTLY DOCUMENTS BACK THEN.  THEY DIDN'T DO A LOT OF RETAIL

8    PACKAGES AND STUFF.  SO I WAS THINKING, JESUS, THIS INTERNET

9    IS REALLY GREAT.  I'VE GOT TO GET INVOLVED IN IT.

10       SO I ASKED PAT IF I COULD COME TO HIS OFFICE.  HE SAID,

11   YEAH.  WE SET A MEETING UP FOR THE NEXT DAY.  AND I WENT OUT

12   AND WE SPENT A WHILE, MADE A DEAL, SHOOK HANDS AND I STARTED

13   RAISING MONEY FOR HIM.

14   Q.  SO WHAT KIND OF DEAL ARE YOU REFERRING TO?

15   A.  WELL, I DON'T REMEMBER THE DETAILS OF IT, BUT I DO KNOW

16   THAT I WAS GOING TO BRING -- GO OUT AND RAISE MONEY AND BE

17   SELLING STOCK IN HIS COMPANY EFFECTIVELY, WHAT IT AMOUNTED TO.

18   AND WE AGREED ON SOME AMOUNT OF STOCK FOR EVERY DOLLAR THAT WE

19   DID.

20       I PUT SOME OF MY OWN MONEY IN.  I DON'T REMEMBER, 25 OR

21   $50,000 TO START OFF.  AND I THINK WENT HOME.  IN THE FIRST

22   MONTH I SENT HIM $50,000, WHICH PART WAS MINE AND I THINK I

23   HAD ANOTHER INVESTOR IN THAT AS WELL.

24   Q.  IF YOU DON'T REMEMBER THE AMOUNT, WHY ARE YOU POSITIVE

25   THAT YOU INVESTED IN DESKGATE?

1    **A.**  BECAUSE I ALWAYS MADE IT A PRACTICE THAT I WOULD NOT ASK

2    OTHER PEOPLE TO INVEST IN SOMETHING I HADN'T PUT MY OWN MONEY

3    INTO.

4    **Q.**  DID YOU IMMEDIATELY START SEEKING INVESTORS FOR DESKGATE?

5    **A.**  OH, YEAH.  I HAD THAT LITTLE ENVELOPE ON MY COMPUTER AND I

6    WOULD SHOW PEOPLE THAT.  I TOLD THEM WE WERE GOING TO REPLACE

7    FED-EX.  THIS WAS GOING TO BE THE INTERNET VERSION OF GETTING

8    RID OF ALL THE TRAVEL AGENTS.  THERE USED TO BE HUNDREDS AND

9    THOUSANDS OF THOSE GUYS AROUND.  NOW YOU CAN'T FIND ONE IF YOU

10   WANTED.  WE WERE GOING TO DO THE SAME TO FED-EX.  THAT WAS THE

11   PLAN IN MY MIND.  THAT WAS WHAT I THOUGH WAS THE GREAT THING

12   ABOUT IT.  I RAISED MONEY AT THE RATE OF ABOUT 50,000 A MONTH

13   FOR FOUR OR FIVE MONTHS.

14   **Q.**  AT THE TIME, DID YOU UNDERSTAND THAT MR. PATTERSON HAD

15   IDEAS BEYOND THAT DIGITAL ENVELOPE?

16   **A.**  NO.  ACTUALLY ABOUT THE SECOND MONTH THAT I WAS INVOLVED,

17   IN OCTOBER, ONE OF THE GUYS THAT I WAS TALKING TO ABOUT

18   INVESTING SAID, HEY, DO YOU GUYS HAVE ANY PATENTS?  I DON'T

19   KNOW.  I WILL GO LOOK.  FIND OUT.

20       I CALLED PAT.  AND HE DIDN'T -- HE HADN'T PATENTED

21   ANYTHING.  I SAID, WHY DON'T YOU CALL SOMEBODY AND LET'S JUST

22   SEE IF THIS IS PATENTABLE.  AND HE AGREED THAT HE WOULD DO

23   THAT.

24       SO, I WAS GOING BACK ABOUT ONCE A MONTH TO DC TO SEE PAT

25   AND THE PEOPLE AT THE COMPANY, FIND OUT WHAT THE NEW THINGS

FARLEY – DIRECT / GLAUSER

```
 1    WERE.  AND I THINK IT WAS NOVEMBER, ABOUT 30 DAYS LATER AFTER
 2    I CALLED HIM, I WALKED IN THE OFFICE AND PAT SAID, HEY,
 3    THERE'S TWO GUYS COMING OVER FROM FISH & RICHARDSON.  HE SAID
 4    IT WAS THEIR FIRST MEETING WITH THEM.  I ASKED IF I COULD SIT
 5    IT.  HE SAID, SURE.
 6        SO SAT IN ON THE MEETING.  AT THE END, THEY SAID,
 7    ABSOLUTELY, YOU HAVE SOMETHING THAT'S PATENTABLE.
 8        AND SO THEY AGREED TO WORK WITH PAT ON IT.  AND I NEVER --
 9    I WASN'T INVOLVED IN THAT FROM THAT POINT FORWARD.  I DIDN'T
10    HAVE ANYTHING TO DO WITH IT FROM THERE.
11        MR. REINES:  YOUR HONOR, OBJECTION.  WE MOVE TO
12    STRIKE THE TESTIMONY ABOUT WHAT HIS LAWYERS TOLD HIM.  THEY
13    CONSISTENTLY BLOCKED ATTORNEY-CLIENT COMMUNICATIONS.  HE'S
14    GIVEN PATENTABILITY -- TESTIMONY THAT THERE WAS PATENTABILITY
15    CONVEYED.  WE MOVE TO STRIKE THAT --
16        MS. GLAUSER:  MAY I RESPOND, YOUR HONOR?
17        THE COURT:  YES.
18        MS. GLAUSER:  WE DIDN'T ALLOW MR. FARLEY TO GO INTO
19    THE ADVICE THAT HIS COUNSEL GAVE HIM UNDER CONFIDENTIAL TERMS,
20    BUT THE FACT THAT COUNSEL FOUND IT TO BE PATENTABLE IS OBVIOUS
21    BY THE FACT THAT THEY PURSUED THE FILING OF THE APPLICATION
22    AND THE --
23        THE COURT:  YOU CAN ARGUE THAT, BUT WE WILL STRIKE
24    THE TESTIMONY.
25
```

1    **BY MS. GLAUSER:**

2    **Q.** MR. FARLEY, DO YOU HAVE ANY IDEA HOW THE FUNDS THAT YOU

3    RAISED WERE USED BY DESKGATE?

4    **A.** YEAH. THEY WERE RAISED TO PAY FOR THOSE PATENT ATTORNEYS

5    AND THEY WERE USED TO CONTINUE THE DEVELOPMENT OF PAT'S

6    SOFTWARE.

7    **Q.** JUST TO MAKE SURE WE DIDN'T GET CUT OFF, DID YOU HAVE ANY

8    OTHER INVOLVEMENT IN THE PATENT APPLICATION PROCESS OR THE

9    PROSECUTION OF THE PATENTS?

10   **A.** NO, OTHER THAN I WAS STILL OUT SELLING THIS AS THE WAY TO

11   WIPE OUT FEDERAL EXPRESS, AND –– BUT AFTER THE PATENT, THE

12   FIRST PATENT GOT FILED, I WENT BACK AND SAT DOWN AND HAD LUNCH

13   WITH PAT. AND I SAID, SO –– HE SAID, HEY, WE GOT THE PATENT

14   FILED, OR ONE OF THEM. I SAID, GREAT. SO WHAT IS IT ALL

15   ABOUT?

16       AND HE WENT AND EXPLAINED TO ME IN TECHNICAL TERMS, BUT

17   WHAT I TOOK AWAY FROM IT WAS THAT HE WAS GOING TO NOW BE ABLE

18   TO, THOSE DOCUMENTS THAT I WAS TALKING ABOUT THAT WENT IN THE

19   FED-EX ENVELOPE, THEY COME OUT, ANYBODY COULD PUT THEM IN THE

20   COPY MACHINE. WELL, HE WAS NOW WORKING ON A WAY TO PREVENT

21   ANYBODY FROM PUTTING THAT DOCUMENT IN THE COPY MACHINE OR THE

22   MUSIC AND COPYING OR ANYTHING. HE SAID THAT'S REALLY WHAT THE

23   ESSENCE OF THE PATENT THAT THEY HAD JUST FILED WAS ALL ABOUT.

24       I DIDN'T REALLY UNDERSTAND THAT PART OF IT UNTIL MAY. AND

25   I GOT EVEN MORE EXCITED ABOUT WHAT I HAD FALLEN INTO. THAT'S

1    WHEN I STARTED RAISING $75,000 A MONTH BECAUSE MY ENTHUSIASM

2    LEVEL WENT WAY UP AND SO DID THE PEOPLE I WAS TALKING TO.

3    **Q.**  AT THE TIME, DID YOU BELIEVE DESKGATE WOULD BE A

4    SUCCESSFUL BUSINESS?

5    **A.**  OH, YEAH, BECAUSE THE INTERNET WAS JUST BOILING ALONG.  I

6    MEAN, ONE OF THE COMPANIES THAT WAS A COMPETITOR OF OURS AT

7    THE TIME, DID AN IPO SOMEPLACE IN THERE, AND IT WAS

8    INTERNET -- INTERTRUST, I THINK IT WAS, THE NAME OF THE

9    COMPANY, AND GOSH THEY WENT PUBLIC AT A NUMBER I COULDN'T EVEN

10   BELIEVE, AND THEN THE PRICE JUST WENT NUTS.  IT WENT STRAIGHT

11   UP AND THEY WERE WORTH, I THINK AT THE HEIGHT, 1.3,

12   $1.5 BILLION.  I DON'T REMEMBER THE EXACT AMOUNT.  THEY WERE

13   WORTH A LOT OF MONEY.  IT WAS IN BILLIONS.  I'M THINKING THEY

14   DON'T EVEN HAVE A PRODUCT AND WE'VE GOT STUFF.  WE SHOULD BE

15   DOING THE SAME THING.

16   **Q.**  THE JURY HAS HEARD THAT DESKGATE ULTIMATELY MERGED WITH M2

17   DIRECT IN EARLY 1999?

18   **A.**  YES, THEY DID.

19   **Q.**  WERE YOU IN FAVOR OF THAT MERGER?

20   **A.**  NO, I WASN'T.

21   **Q.**  WHY NOT?

22   **A.**  I REALLY BELIEVED THAT WE WOULD DO BETTER AS AN

23   INDEPENDENT COMPANY, AS OUR COMPETITOR INTERTRUST HAD DONE.

24   AND PEOPLE IN WALL STREET WERE TAKING ANYBODY PUBLIC IN THOSE

25   DAYS.  I MEAN IT WAS RIDICULOUS TO BE HONEST WITH YOU IN

FARLEY – DIRECT / GLAUSER

1    HINDSIGHT.  THAT'S WHAT CAUSES BUBBLES, I GUESS.

2        AND WE WERE IN IT.  I WAS THINKING, GOSH, LET'S GET UP

3    THERE TO WALL STREET, FIND SOMEBODY TO TAKE US PUBLIC.  THE

4    GUYS FROM ATLANTA CAME ALONG AND SAID THEY WERE DOING AN IPO

5    FOR THEIR MARKETING COMPANY.  IF THEY PUT THIS TECHNOLOGY THAT

6    PAT HAD IN HIS COMPANY IN IT, IT WOULD, YOU KNOW, PUT THE

7    SIZZLE ON THEIR STEAK AND THEY CAN GO PUBLIC.

8        AND PAT WAS ENTHRALLED WITH IT.  AND I WASN'T IN CONTROL,

9    SO HE WENT AHEAD AND DID IT.  AND I OPPOSED IT.

10   **Q.**  DID THAT AFFECT YOUR RELATIONSHIP WITH MR. PATTERSON?

11   **A.**  WELL, I DIDN'T -- I WASN'T INVITED TO JOIN THE NEW

12   COMPANY, AND THEY DIDN'T NEED MONEY.  THEY WERE BORROWING IT

13   LIKE CRAZY.  THEY HAD PLENTY OF BANKS AND STUFF TO HELP THEM

14   WITH FINANCING.  AND THAT WAS FINE.

15       BUT WE HAD STOCK IN THE COMPANY.  MY FRIENDS THAT I SOLD

16   THE STOCK TO, YOU KNOW, WERE PART OF HIM, TOO, SO I DIDN'T

17   WALK AWAY LIKE A MAD CHILD.  IT WAS SMART FOR ME TO STAY

18   INVOLVED AND TRY TO WORK WITH THEM AS BEST I COULD.

19       I ENDED UP ACTUALLY GETTING SOME LICENSES FOR THE

20   TECHNOLOGY BECAUSE THEY DECIDED THEY WANTED TO LICENSE PAT'S

21   STUFF.  SO I GOT A LICENSE FROM, I DON'T REMEMBER EXACTLY WHAT

22   THE PARTICULAR VERTICAL WAS THAT WE WERE GETTING THE LICENSE

23   FOR, BUT, YOU KNOW, LIKE E-CATALOGS OR SOMETHING WAS ONE OF

24   THE VERTICALS I REMEMBER.  THERE WERE THREE OR FOUR OTHERS AND

25   WE HAD SOME OTHER COMPANIES AND WE GOT THEM.

FARLEY – DIRECT / GLAUSER

1        IT WAS A GOOD THING FROM THE STANDPOINT OF DOING THE IPO

2   TO HAVE SOME LICENSES OUT THERE.  WE PAID HARD DOLLARS FOR

3   THAT.  I PAID $25,000 IN ONE COMPANY FOR THE LICENSE AND THE

4   OTHER THREE COMPANIES THAT GOT LICENSES I THINK PAID THE SAME.

5   **Q.**  MR. FARLEY, WHY WERE YOU INTERESTED THROUGH YOUR OWN

6   BUSINESS IN TAKING A LICENSE TO THE DESKGATE PATENTED

7   TECHNOLOGY?

8   **A.**  I STILL THOUGHT THAT THIS WAS A GREAT TECHNOLOGY AND THAT

9   IT WAS GOING TO BE REVOLUTIONARY IN THE INDUSTRY; THAT THE

10  RECORD INDUSTRY AT THE TIME WAS JUST IN SHAMBLES.  YOU KNOW,

11  THEY WERE LOSING REVENUE LIKE CRAZY BECAUSE PEOPLE WERE

12  DIGITALIZING THEIR MUSIC AND JUST PASSING IT AROUND TO THEIR

13  FRIENDS.  THEY WERE BESIDE THEMSELVES.

14       THEN SOMETHING CALLED NAPSTER CAME ALONG.  AND NAPSTER WAS

15  A NEW WAY TO LET PEOPLE SHARE MUSIC ALL OVER THE WORLD.  AND

16  THE RECORD INDUSTRY WAS BESIDE THEMSELVES, AND THEY SUED THEM,

17  I THINK, AND FINALLY GOT THEM OUT OF BUSINESS.

18       BUT WE HAD –– PAT'S TECHNOLOGY WOULD HAVE PROTECTED ALL OF

19  THAT.  BUT, ANYWAY, THAT'S WHAT I THOUGHT.  I THOUGHT THE

20  INTERNET WAS GROWING AND THAT'S WHY I WANTED THOSE LICENSES

21  BECAUSE I STILL BELIEVED IN THE TECHNOLOGY.

22  **Q.**  MR. PATTERSON ALSO TESTIFIED THAT THE M2 DIRECT ULTIMATELY

23  DECLARED BANKRUPTCY?

24  **A.**  YES, THEY DID.

25  **Q.**  WERE YOU INVOLVED IN THE BANKRUPTCY?

FARLEY – DIRECT / GLAUSER

1    **A.**  I WAS.

2    **Q.**  HOW?

3    **A.**  WELL, WE HAD THOSE LICENSES AND WE WANTED TO PRESERVE

4    THEM.  AND IT WAS -- WE WENT AND SAW AN ATTORNEY.  IT WAS OUR

5    UNDERSTANDING THAT LICENSES WOULD BE PRESERVED FOR THE LICENSE

6    HOLDERS TO A BANKRUPTCY.

7        SO THERE WAS ANOTHER FELLOW, ED MANUKIAN, WHO HAD ALSO --

8    HIS COMPANY HAD A LICENSE, AND WE GOT TOGETHER AND HIRED HIS

9    LAW FIRM MCGUIRE WOODS, AND THEY REPRESENTED US AND WE TRIED

10   TO GET OUR LICENSES PRESERVED THROUGH THE BANKRUPTCY.

11   **Q.**  DID THAT ULTIMATELY HAPPEN?

12   **A.**  NO.  I DON'T KNOW WHY, BUT FOR SOME REASON IT WAS RULED

13   THAT WE COULDN'T DO THAT.  AND SO I TOOK ANOTHER TACT AND

14   DECIDED I WOULD SEE IF I COULD BUY THE TECHNOLOGY OUT OF THE

15   BANKRUPTCY.

16   **Q.**  HOW DID YOU DO THAT?

17   **A.**  I WENT AND TALKED TO PEOPLE IN THE CREDITORS' COMMITTEE.

18   THE POOR CREDITORS WERE OWED -- THIS WAS NOT THE SENIOR

19   CREDITORS.  THERE WERE TWO OF THOSE.  THIS WAS THE REST OF THE

20   POOR FOLKS THAT HAD LENT MONEY TO THIS COMPANY OR DONE

21   BUSINESS WITH THEM.

22       AND THEY OWED THEM $13 MILLION.  SO I MADE A DEAL WITH

23   THEM THAT WE WOULD FORM A NEW COMPANY.  THEY'D -- WE'D GIVE

24   THEM $3 MILLION NOTE AND FIVE PERCENT OF THE COMPANY FOR THE

25   BALANCE OF THEIR -- FOR THEIR OTHER $10 MILLION.

```
 1        SO THEY WERE AGREEABLE TO THAT.  WE WENT TO THE TRUSTEE OF
 2   THE BANKRUPTCY, SAID WE WOULD LIKE TO PUT AN OFFER IN.  WE PUT
 3   THE BUSINESS PLAN TOGETHER UNDER THE NAME OF DIGITAL FUEL, I
 4   THINK IT WAS, AND WE TRIED TO BUY, BUT WE WERE NOT SUCCESSFUL.
 5   Q.  LET'S BACK UP A SECOND.
 6        YOU MENTIONED THIS BUSINESS DIGITAL FUEL.  DID IT HAVE A
 7   BUSINESS PLAN?
 8   A.  OH, YEAH.  WE HAD TO SUBMIT A BUSINESS PLAN TO THE TRUSTEE
 9   OF THE BANKRUPTCY.  AND IT HAD A LOT OF DIFFERENT THINGS THAT
10   WE WERE GOING TO DO, AND THE PLANS.  AND WE HAD FOUND A GUY IN
11   THE MARKETING INDUSTRY THAT HAD BEEN A FORMER CEO WHO WAS
12   GOING TO BE THE CEO.  I HAD AN INVESTMENT BANKER GUY WHO WAS
13   GOING TO PUT UP THE MONEY.  I THINK IT WAS AROUND FOUR, FOUR
14   AND A HALF MILLION DOLLARS.  I DON'T REMEMBER THE NUMBER.
15        THAT WAS ONLY 14 YEARS AGO OR SOMETHING.  MY MEMORY IS
16   SLIPPING ON THE DETAILS OF IT.
17        BUT --
18   Q.  DO YOU RECALL WHAT IT IS YOU INTENDED TO DO WITH DIGITAL
19   FUEL?
20   A.  YEAH.  I MEAN, I WAS IN LOVE WITH THIS TECHNOLOGY.  I
21   STILL THOUGHT IT WAS GREAT.  WE WANTED TO CONTINUE ON WITH
22   WHAT PAT HAD BEEN DOING AND WHAT M2 DIRECT HAD BEEN DOING.  M2
23   DIRECT HAD BEEN PRETTY SUCCESSFUL FROM WHAT I UNDERSTOOD WITH
24   USING PAT'S TECHNOLOGY AND A WHOLE BUNCH OF DIFFERENT
25   INTERESTING WAYS IN MARKETING INDUSTRY.
```

1    **Q.**  YOU SAID YOU ULTIMATELY WEREN'T SUCCESSFUL?

2    **A.**  RIGHT.

3    **Q.**  DID THE BANKRUPTCY COURT NOT ACCEPT YOUR BID?

4    **A.**  NO.  I'M SORRY, I THOUGHT I SAID THAT.  THEY DID NOT

5    ACCEPT OUR BID.  AND THE COMPETING COMPANY WHO WAS WORKING

6    WITH FIRST UNION BANK WHO WAS THE NUMBER ONE SECURED CREDITOR,

7    THE SENIOR SECURE CREDITOR ENDED UP -- THOSE -- THAT BANK AND

8    THIS GUY WERE WORKING TOGETHER, AND THE TRUSTEE GAVE THEM THE

9    ASSETS OF THE BANKRUPTCY, WHICH, BY THE WAY, THE ONLY THING

10   THAT WAS LEFT WERE THE TWO PATENTS AND THE TECHNOLOGY, I

11   GUESS, OF DESKGATE.

12   **Q.**  SO WAS THAT THE END THEN OF YOUR INVOLVEMENT WITH DESKGATE

13   IP?

14   **A.**  I THOUGHT IT WAS, BUT SOMETIME IN 2001, MARCH OR APRIL, I

15   THINK, THE BANK CALLED MY ATTORNEY AND SAID THEY HAD A FALLING

16   OUT WITH WHOEVER THEY WERE WORKING WITH AND WERE WE STILL

17   INTERESTED.

18       AND THE ATTORNEY CALLED ME.  I JUMPED AT IT.  I SAID, YOU

19   BET WE'RE INTERESTED.  WE PUT ANOTHER BUSINESS PLAN TOGETHER.

20   I WENT BACK TO ED MANUKIAN, AND HE WAS STILL INTERESTED.

21       I THINK WE CALLED THAT ONE UNISAFE WAS THE NAME OF THAT

22   COMPANY.  WE MADE ANOTHER EFFORT TO BUY IT.  AND WE WERE DOING

23   QUITE WELL.  WE WERE SUPPOSED TO CLOSE THE DEAL ON

24   SEPTEMBER 30TH OF 2001.  BUT A LITTLE EVENT HAPPENED ON 9/11

25   AND THE ENTIRE FINANCIAL MARKETS AND, YOU KNOW, THE WHOLE

```
1    COUNTRY HAD A -- WAS IN KIND OF A DISARRAY FINANCIALLY AFTER
2    9/11, AND WE JUST STOPPED COMPLETELY.  WE TOLD THE BANK WE
3    COULDN'T CLOSE.  THE FOLKS WE HAD LINED UP AS INVESTORS DIDN'T
4    WANT TO INVEST.  IT WAS A VERY DIFFICULT TIME FOR SMALL
5    COMPANIES.  ANYBODY, REALLY, TO RAISE MONEY AFTER THAT.  IT
6    WAS -- IT WENT ON FOR A COUPLE OF YEARS.
7         THE COURT:  LET'S TAKE OUR BREAK.  IT'S 5 TO 12.  WE
8    WILL BREAK UNTIL 12:10.  YOU CAN GO AHEAD TO THE JURY ROOM.
9       YOU MAY STEP DOWN.  BE BACK ON THE STAND AT 12:10.
10      I DO HAVE A QUESTION FOR THE LAWYERS THOUGH.
11      (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)
12         THE COURT:  I HAVE AN OBLIGATION ON THURSDAY FROM
13   NINE UNTIL ABOUT 10:30.  SO I WANTED TO ASK YOU FIRST, BUT WE
14   CAN EITHER TRY TO MAKE UP THOSE HOURS SOME OTHER TIME OR I CAN
15   SEE IF THE JURY CAN STAY UNTIL 3:30 THAT DAY AND GO FROM
16   10:30 TO 3:30 INSTEAD OF 8:30 TO 1:30.  IF THAT WILL WORK FOR
17   YOU, I'LL ASK THE JURY.  IF THAT WOULDN'T WORK FOR YOU, WE
18   WILL GO 10:30 TO 1:30 THAT DAY.
19         MR. REINES:  WE ARE FLEXIBLE.  THAT SOUNDS LIKE A
20   GOOD IDEA ONLY IF IT WORKS FOR THE JURY.
21         MR. ELLWANGER:  WHATEVER WORKS FOR THE JURY.  ONE
22   IDEA WE WERE JUST DISCUSSING WAS MAYBE WE CAN RESERVE THAT
23   EXTRA 90 MINUTES TO WEEK TWO IF WE NEED IT.  THAT WAY WE DON'T
24   HAVE TO KEEP THE JURY LATE THIS WEEK IF IT TURNS OUT WE'RE
25   TRENDING FASTER THAN WE THINK.
```

 1           **MR. REINES:**  IF THE COURT WANTS TO KEEP IT MOVING --

 2           **MR. ELLWANGER:**  JUST AN IDEA.

 3           **THE COURT:**  I WILL ASK THEM IF THEY CAN STAY, WE'LL

 4    STAY.  IF THEY HAVE A PROBLEM, THEN WE WON'T.

 5           **MR. REINES:**  THANK YOU.

 6           **THE COURT:**  OKAY.

 7         (RECESS TAKEN AT 11:58 A.M.; RESUMED AT 12:10 P.M.)

 8          (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

 9           **THE CLERK:**  REMAIN SEATED COME TO ORDER.  COURT IS

10    BACK IN SESSION.

11           **THE COURT:**  GO AHEAD.

12    **BY MS. GLAUSER:**

13    **Q.**  MR. FARLEY, BEFORE THE BREAK WE WERE DISCUSSING YOUR

14    SECOND ATTEMPT TO PURCHASE DESKGATE'S INTELLECTUAL PROPERTY?

15    **A.**  YES.

16    **Q.**  YOU WERE REFERRING TO A BANK.  WHO WAS THAT BANK?

17    **A.**  I CAN'T REMEMBER WHETHER IT WAS FIRST UNION OR WHETHER IT

18    WAS WACHOVIA.  THE REASON I CAN'T REMEMBER IS IT'S SOMEPLACE

19    IN THERE, WACHOVIA BANK BOUGHT OR MERGED WITH FIRST UNION AND

20    FIRST UNION, WHICH IT WON IN THE BANKRUPTCY COURT, BECAME THE

21    WACHOVIA BANK.

22    **Q.**  THIS WAS THROUGH WHICH COMPANY AT THIS TIME?

23    **A.**  THE SECOND ATTEMPT THAT WE MADE DIGITAL FUEL WAS THE ONE

24    IN BANKRUPTCY.  AFTER BANKRUPTCY IT WAS UNISAFE, AND THAT WAS

25    TERMINATED BY 9/11.

FARLEY – DIRECT / GLAUSER

1  **Q.**  WERE TERMS OF THE DEAL BETWEEN UNISAFE AND FIRST UNION OR

2  WACHOVIA ACTUALLY REACHED?

3  **A.**  YES.  YEAH, WE HAD AN AGREEMENT.

4  **Q.**  DO YOU RECALL WHAT THAT AGREEMENT WAS?

5  **A.**  THE NUMBERS WERE, I THINK IT WAS $4 MILLION THAT WE AGREED

6  TO PAY THE BANK.  WE WERE GOING TO GIVE THEM A MILLION IN

7  CASH.  AND WE HAD A 3 MILLION-DOLLAR NOTE.

8     AT THE END OF ONE YEAR, AT THE CONCLUSION OF ONE YEAR FROM

9  THE PURCHASE DATE, WE COULD COME BACK TO THEM AND GIVE THEM

10  ANOTHER MILLION DOLLARS AND THEN THEY WOULD BE WILLING TO TAKE

11  THE REMAINING $2 MILLION AND INVEST IT IN THE COMPANY AS

12  EQUITY.  AND I BELIEVE THAT THEY WOULD GET 6 PERCENT OF THE

13  COMPANY, WHICH MADE IT A 33 MILLION-DOLLAR VALUATION OF THE

14  ENTIRE COMPANY FOR THAT DEAL.  BUT THAT WAS PART OF THE

15  NEGOTIATIONS IN THE BEGINNING.  SO THAT WAS -- I'M PRETTY SURE

16  THAT WAS THE DEAL.

17  **Q.**  YOU MENTIONED THAT THAT DEAL DIDN'T ACTUALLY CLOSE BECAUSE

18  OF THE --

19  **A.**  9/11 HAPPENED AND, YOU KNOW.  WHAT A BAD DAY THAT WAS.

20  **Q.**  AND SO THEN, AGAIN, WAS THAT THE END OF YOUR INVOLVEMENT

21  WITH DESKGATE'S INTELLECTUAL PROPERTY?

22  **A.**  YOU KNOW, THE SECOND TIME I WAS SUPREMELY DEPRESSED.  I

23  THOUGHT, GOSH, MAYBE I SHOULDN'T HAVE THIS STUFF.  BUT ABOUT

24  MARCH OF 2002, THE GUY AT THE BANK WHO WAS NOW WITH WACHOVIA

25  CALLED US UP AGAIN AND SAID, HEY, YOU GUYS STILL WANT THIS

1    STUFF?  HE WAS TALKING ABOUT ALL OF THE DESKGATE TECHNOLOGY

2    STUFF.

3        AND WE -- THE LAWYER CALLED ME AGAIN AND SAID HE'S STILL

4    INTERESTED.  I SAID, YEAH, BUT, YOU KNOW, THEY OBVIOUSLY DON'T

5    HAVE ANYBODY TO BUY IT.  THE BANKS ARE HAVING TROUBLE AGAIN.

6    LET'S GO IN AND MAKE A LOW OFFER.  WE MIGHT AS WELL.  I MEAN,

7    THEY HAD A RESPONSIBILITY TO GET RID OF NONPERFORMING ASSETS

8    AND TO ME IT WAS A PERFORMING ASSET.

9        SO I FIGURED, YOU KNOW, LET'S GO GIVE IT A TRY AND SO WE

10   DID.

11   **Q.**  WHEN DID THAT OCCUR?

12   **A.**  IT WAS MARCH OR APRIL BECAUSE WE ENDED UP CLOSING THE

13   TRANSACTION WITH THEM IN JUNE OF 2002.  SO IT HAD TO BE

14   SOMEPLACE IN MARCH OR APRIL.

15   **Q.**  AND SO AFTER THEY CALLED TO OFFER THE OPPORTUNITY TO AGAIN

16   PURCHASE DESKGATE'S INTELLECTUAL PROPERTY --

17   **A.**  UH-HUH.

18   **Q.**  -- WHAT DID YOU DO NEXT?

19   **A.**  WE MADE THEM AN OFFER.  WE OFFERED THEM $500,000.  AND IT

20   WAS GOING TO BE $25,000 DOWN AND THEY WOULD HAVE TO CARRY A

21   NOTE FOR 475,000 AT NO INTEREST FOR THE FIRST THREE YEARS AND

22   THEN INTEREST ONLY FOR THE LAST TWO YEARS AND HAVE A BALLOON

23   IN FIVE YEARS.

24   **Q.**  AND WHAT ENTITY WERE YOU GOING TO USE TO PURCHASE THE

25   PROPERTY AT THAT TIME?

1    **A.**  WE WERE GOING TO FORM A NEW ENTITY CALLED -- WHICH WE DID

2    FORM, AND IT WAS CALLED DESKGATE TECHNOLOGIES -- I'M SORRY.

3    IT WAS -- IT WAS CALLED -- I'M GETTING ALL THESE COMPANIES

4    CONFUSED.  DRM TECHNOLOGIES, LLC.

5    **Q.**  WHEN YOU FORMED DRM TECHNOLOGIES, DID YOU INVITE ANYONE

6    ELSE TO JOIN YOU?

7    **A.**  OH, YEAH.  WE FORMED -- WE USED AN LLC AND WE HAD ANOTHER

8    LLC THAT WAS INVOLVED CALLED DRM MANAGEMENT, LLC.  AND OUR

9    WHOLE PURPOSE IN SETTING UP THOSE STRUCTURES WAS SO THAT WHAT

10   HAPPENED TO US BEFORE WHERE WE WOULD END UP LOSING CONTROL OF

11   THIS TECHNOLOGY WOULDN'T HAPPEN TO US AGAIN.

12        AND THERE'S -- MY LAWYER SHOWED ME SOME WAYS WE COULD DO

13   THAT, AND THAT'S HOW COME WITH SET UP THAT STRUCTURE.

14   **Q.**  YOU MENTIONED EARLIER THAT MR. VENTERS IS ONE OF THE

15   CO-MANAGERS OF DRM TECHNOLOGIES?

16   **A.**  YES, HE IS.

17   **Q.**  DID YOU INVITE HIM TO JOIN YOU IN THIS PURSUIT AT THAT

18   TIME OR --

19   **A.**  OH, YEAH.

20   **Q.**  -- OR DID THAT HAPPEN LATER?

21   **A.**  NO, NO, NO.  I INVITED HIM RIGHT AWAY.  HE WAS WITH ME ALL

22   ALONG IN ALL OF THOSE EVENTS THAT WE WERE TRYING TO BUY IT.

23   CHIP WAS IN THE BACKGROUND HELPING ME WITH A LOT OF MATERIAL

24   FOR THE BUSINESS PLANS AND THE PLANNING AND ALL THAT STUFF.

25        I HAD BECOME VERY GOOD FRIENDS WITH CHIP WHEN WE WERE AT

1   DESKGATE, AND IT REMAINED THAT WAY FOR A LONG TIME.  WE HAVE

2   BEEN PARTNERS LONGER THAN HALF THE PEOPLE IN THE COUNTRY BEEN

3   MARRIED.

4   **Q.**  YOU MENTIONED THAT YOU CONSIDERED THE DESKGATE PROPERTY TO

5   BE A PERFORMING ASSET FOR YOU --

6   **A.**  OH, ABSOLUTELY.

7   **Q.**  -- WHAT DID DRM TECHNOLOGIES INTEND TO DO --

8   **A.**  EXACTLY THE SAME THINGS --

9   **Q.**  -- WITH THE TECHNOLOGIES?

10  **A.**  EXACTLY THE SAME THING THAT M2 DIRECT WAS GOING TO DO

11  DIGITAL, WHAT DIGITAL FUEL WAS GOING TO DO, WHAT UNISAFE WAS

12  GOING TO DO.  WE WERE GOING TO TAKE THAT TECHNOLOGY AND TRY TO

13  BUILD IT OUT AND TAKE IT TO THE MARKETPLACE, AND DO WHAT WE

14  COULD TO MAKE THE TECHNOLOGY A SUCCESS.

15  **Q.**  DID WACHOVIA ACTUALLY -- OR FIRST UNION ACTUALLY ASSIGN

16  DESKGATE'S INTELLECTUAL PROPERTY OVER TO DRM TECHNOLOGIES?

17  **A.**  YES.  THEY DID.  WE DID THE DEAL WITH THEM.  WE SIGNED AN

18  AGREEMENT WITH THEM.  AND THEY ASSIGNED ALL OF THE PATENTS,

19  WHICH AT THAT TIME IT WAS ONLY ONE PATENT THAT HAD BEEN ISSUED

20  WHICH WAS THE '541, IF I REMEMBER CORRECTLY.

21  **Q.**  DID THE PURCHASE AGREEMENT AND ASSIGNMENT THEN ALSO

22  INCLUDE THE APPLICATION THAT ULTIMATELY ISSUED AS THE '670

23  PATENT?

24  **A.**  YES.  WE BOUGHT NOT ONLY THE ISSUED PATENT, BUT ALL THE

25  APPLICATIONS AND ALL OF THE TRADEMARKS AND ALL OF THE --

| | |
|---|---|
| 1 | WHATEVER THE NAMES AND ALL THE STUFF THAT WAS -- AND WE ALSO |
| 2 | GOT WHAT THE BANK HAD IN THE WAY OF THE SOURCE CODE TO THE |
| 3 | SOFTWARE. |
| 4 | **Q.** YOU HAVE A BINDER IN FRONT OF YOU, MR. FARLEY? |
| 5 | **A.** YES. UH-HUH. |
| 6 | **Q.** I WOULD LIKE TO DIRECT YOUR ATTENTION TO PLAINTIFF'S |
| 7 | EXHIBIT 31 AND 32. |
| 8 | **A.** OKAY. |
| 9 | **Q.** STARTING FIRST WITH EXHIBIT 31. CAN YOU IDENTIFY WHAT |
| 10 | THIS IS? |
| 11 | **A.** YEAH. 31 IS THE TERMS OF THE AGREEMENT WITH THE BANK FOR |
| 12 | THE PURCHASE OF THE DESKGATE TECHNOLOGIES AND PATENT -- PATENT |
| 13 | APPLICATIONS, AND SO ON. |
| 14 | **Q.** IS IT A TRUE AND ACCURATE COPY OF THAT PURCHASE AGREEMENT? |
| 15 | **A.** I WAS GOING TO CHECK IT. CHIP SIGNED IT, AND MY SIGNATURE |
| 16 | IS HERE SOMEPLACE. |
| 17 | YEAH. EVERYBODY -- THIS IS SIGNED BY EVERYBODY. SO I |
| 18 | BELIEVE THIS IS THE CORRECT COPY. |
| 19 | **Q.** CAN I REFER YOU NEXT, PLEASE, TO PLAINTIFF'S EXHIBIT 32? |
| 20 | **A.** OKAY. |
| 21 | **Q.** WOULD YOU IDENTIFY THAT? |
| 22 | **A.** THIS WAS THE ASSIGNMENT OF THE PATENTS, WHICH, I BELIEVE, |
| 23 | IS THE DOCUMENT THAT WE ENDED UP SENDING TO THE PATENT OFFICE |
| 24 | AND TRADEMARKS. |
| 25 | YEAH. IT'S LISTED THE PATENTS HERE. IT'S GOT THE |

1    CANADIAN APPLICATION FOR THE '541.  IT'S GOT THE EUROPEAN

2    APPLICATION FOR THE '541.

3        I DON'T KNOW WHAT WIPO IS, BUT I THINK IT'S THE WORLD

4    APPLICATION FOR -- SOMETHING LIKE THAT.

5        THEN WE'VE GOT TRACKING ELECTRONIC CONTENT DELIVERING

6    ELECTRONIC CONTENT AND THEN PATENTS IN OTHER PARTS OF THE

7    WORLD FOR BOTH OF THOSE, I BELIEVE.

8    **Q.**  AND YOU ARE IDENTIFYING THERE THE INTELLECTUAL PROPERTY

9    THAT YOU UNDERSTOOD YOU WERE RECEIVING?

10   **A.**  ABSOLUTELY.

11   **Q.**  IS THAT A TRUE AND ACCURATE COPY OF THE ASSIGNMENT OF THAT

12   PROPERTY FROM WACHOVIA TO DRM TECHNOLOGIES?

13   **A.**  YES.  IT IS SIGNED BY THE GUY AT THE BANK, SO I BELIEVE IT

14   IS.

15           **MS. GLAUSER:**  YOUR HONOR, AT THIS TIME WE OFFER

16   PLAINTIFF'S EXHIBIT 31 AND 32 INTO EVIDENCE.

17           **MR. REINES:**  NO OBJECTION.

18           **THE COURT:**  RECEIVED.

19       (PLAINTIFF'S EXHIBITS 31 AND 32 RECEIVED IN EVIDENCE)

20   **BY MS. GLAUSER:**

21   **Q.**  MR. FARLEY, YOU TOLD US THAT PART OF THE TERMS OF THE DEAL

22   WERE THAT YOU WERE TO MAKE A CASH PAYMENT OF $25,000; IS THAT

23   RIGHT?

24   **A.**  YES, MA'AM.

25   **Q.**  DID YOU ACTUALLY MAKE THAT PAYMENT?

1   **A.**  WE DID.

2   **Q.**  AND DID DRM TECHNOLOGIES PAY OFF THE OTHER PORTION OF THE

3   PURCHASE PRICE THAT WAS MEANT TO BE A $475,000 LOAN?

4   **A.**  IN A ROUNDABOUT WAY WE DID.

5   **Q.**  WHAT DO YOU MEAN?

6   **A.**  ABOUT, I FORGET EXACTLY WHEN, MAYBE A YEAR OR SO LATER,

7   TWO YEARS LATER, I BECAME FRIENDS WITH THE GUY WHO WORKED AT

8   THIS BANK AND DEALT WITH ALL THE WAY THROUGH.  AND I CALLED

9   HIM AND ASKED HIM ABOUT THE NOTE AND WHETHER HE THOUGHT WE

10  MIGHT BE ABLE TO BUY IT FROM THE BANK.  HE SAID, YEAH, YOU

11  REALLY COULD.

12      HE GAVE ME SOME SUGGESTIONS ON HOW TO GO ABOUT DOING THAT.

13  AND ACTUALLY CHIP'S FATHER, CARL VENTERS, THE II, WENT TO THE

14  BANK AND MADE AN OFFER TO PURCHASE THE $475,000 NOTE WHICH HAD

15  NO INTEREST FOR THREE YEARS AND 5 PERCENT INTEREST ONLY FOR

16  THE NEXT TWO YEARS, AND HE OFFERED HIM 95,000 IN CASH, I

17  THINK.  AND THEY TOOK IT.

18      AND SO HE THEN WAS GIVEN ALL OF THE SECURITY INTEREST IN

19  THE PATENTS BECAUSE THE BANK HAD KEPT A SECURITY INTEREST

20  BECAUSE WHEN THEY SOLD IT TO US BECAUSE WE HADN'T PAID THEM IN

21  FULL, SO ALL OF THE SECURITY INTEREST WAS TRANSFERRED TO

22  MR. VENTERS SENIOR.

23      AND THEN HE -- WE MADE A DEAL WITH HIM TO GIVE HIM 200,000

24  WORTH OF EQUITY IN DRM TECHNOLOGIES FOR GIVING US THE NOTE AND

25  ALL OF THE SECURITY INTEREST BACK.

1      SO WHEN THAT (SIC) TRANSACTIONS WERE COMPLETED, DRM

2   TECHNOLOGIES NOW OWNED ALL OF THE STUFF THAT WE HAD ORIGINALLY

3   BOUGHT FROM THE BANK ABSOLUTELY FREE AND CLEAR AND MR. VENTERS

4   HAD A BIG EQUITY STAKE IN OUR COMPANY.  IT WAS A GREAT DEAL

5   FOR EVERYONE.

6   **Q.**  MR. FARLEY, DO YOU THINK THAT CASH PAYMENTS THAT YOU MADE

7   IN ACQUIRING DESKGATE'S INTELLECTUAL PROPERTY REFLECT THE

8   VALUE OF THAT INTELLECTUAL PROPERTY?

9          **MR. REINES:**  OBJECTION, YOUR HONOR, IMPROPER EXPERT

10   OPINION.

11          **MS. GLAUSER:**  YOUR HONOR, WE ARE NOT SOLICITING AN

12   EXPERT OPINION FROM MR. FARLEY.  WE ARE SIMPLY ASKING HIM,

13   WITHIN HIS BUSINESS, IF HE VALUED THE PATENTS ABOVE THE AMOUNT

14   THAT HE PAID TO THE BANK IN PURCHASING THEM.

15          **THE COURT:**  SUSTAINED.

16   **BY MS. GLAUSER:**

17   **Q.**  WE SPOKE BEFORE ABOUT THE FACT THAT YOU CONSIDERED THEM TO

18   BE PERFORMING ASSETS FOR DRM TECHNOLOGIES.  I WANT TO TALK

19   WITH YOU A LITTLE BIT ABOUT THE BUSINESS PLAN FOR DRM

20   TECHNOLOGIES.

21   **A.**  OKAY.

22   **Q.**  DID YOU FORM IT TO ENTER INTO LITIGATION?

23   **A.**  OH, ABSOLUTELY NOT.

24   **Q.**  WHAT WAS THE PLAN THEN?

25   **A.**  WELL, WE WANTED TO TAKE THE SOFTWARE THAT WE HAD AND BRING

1    IT BACK TO LIFE, SO TO SPEAK, BECAUSE IT HAD BEEN DORMANT FOR

2    A COUPLE OF YEARS SITTING IN THE BANK VAULT.  AND SO WE HIRED

3    A COUPLE OF GUYS THAT HAD BEEN INVOLVED WITH US BEFORE.

4        AND WE WENT OUT AND FOUND A COMPANY IN SAN DIEGO CALLED

5    GLOBAL MOVIES DIRECT WHO WAS RENTING MOVIES MADE IN INDIA.

6    THEY CALL IT BOLLYWOOD OVER THERE AS OPPOSED TO HOLLYWOOD, BUT

7    IT'S A BIG INDUSTRY IN INDIA, AND THERE ARE A LOT OF INDIANS

8    LIVING IN THIS COUNTRY.

9        HE WAS MAILING OUT MOVIES JUST THE WAY NETFLIX USED TO

10   MAIL THEM OUT.  HE WANTED TO DIGITALIZE HIS BUSINESS.  HE HAD

11   HEARD ABOUT US THROUGH A MUTUAL FRIEND, AND HE HAD A LOT OF

12   TECHNOLOGY PEOPLE, SO WE MADE A DEAL WITH HIM.  WE WERE GOING

13   TO PAY HIM SOME MONEY, I THINK IT WAS $15,000 TO HELP US

14   RECONSTITUTE THIS IN MIND OF WORKING TOWARDS DELIVERING VIDEOS

15   OVER THE INTERNET TO HIS CUSTOMERS.

16       THE PROBLEM WITH IT WAS THAT WE WERE TOO EARLY.  WE WERE

17   WAY, WAY ABOVE THE TIME LINE WHEN THE INTERNET COULD HANDLE

18   VIDEOS.  IT'S JUST NOW IN THE LAST FOUR, FIVE YEARS, THREE OR

19   FOUR YEARS IT HAS REALLY COME AROUND.  WE WERE TOO FAR AHEAD

20   ON THE CUTTING EDGE ON THAT PARTICULAR DEAL.

21       BUT WE GOT THE SOFTWARE BACK UP AND RUNNING UP THERE.  A

22   LITTLE LATER ON, ABOUT A YEAR LATER, I HIRED ANOTHER GUY WHO

23   WORKED FOR PAT PATTERSON AT DESKGATE, AND HE WORKED WITH US

24   FOR ABOUT SEVEN YEARS WORKING ON TRYING TO DEVELOP A CROSS

25   PLATFORM SOFTWARE PROGRAM THAT INCORPORATED PAT'S STUFF.  THAT

1    WAS THE SORT OF THE THING YOU HAD TO DO AT THAT TIME, AND IT

2    WAS REALLY DIFFICULT.  IN FACT, TO MY KNOWLEDGE, I DON'T THINK

3    ANYBODY ELSE WAS REALLY ABLE TO DO THAT AT THAT TIME.  BUT

4    THAT'S WHAT WE WERE WORKING ON.

5            **MR. REINES:**  YOUR HONOR, OBJECTION.  I JUST -- WE CAN

6    RETURN -- THAT'S NOT EXACTLY QUESTION AND ANSWER.  ITS SO

7    LONG, IT'S DIFFICULT TO NAVIGATE.

8            **THE COURT:**  WHY DON'T YOU ASK QUESTIONS MORE

9    FREQUENTLY.

10   **BY MS. GLAUSER:**

11   **Q.**  I DON'T WANT TO SPEAK OVER YOU, MR. FARLEY, WE WILL GO

12   BACK AND FORTH.  IT WILL BE JUST FINE.

13   **A.**  OKAY.

14   **Q.**  IS IT FAIR TO SAY THAT DRM TECHNOLOGIES WAS ATTEMPTING TO

15   DEVELOP A PRODUCT?

16   **A.**  YES, IT WAS.

17   **Q.**  AND BESIDES TRYING TO DEVELOP A PRODUCT, WHAT ELSE WAS DRM

18   TECHNOLOGIES DOING AT THAT TIME?

19   **A.**  WE WERE ALSO TRYING TO LICENSE THE PRODUCT AND/OR ENTER

20   INTO JOINT VENTURES WITH COMPANIES THAT COULD USE THE

21   TECHNOLOGY THAT WE HAD.

22   **Q.**  WITH REGARD TO THE FIRST OBJECTIVE OF DEVELOPING A

23   PRODUCT, DO YOU HAVE A SENSE OF HOW MUCH MONEY DRM

24   TECHNOLOGIES INVESTED IN THE DEVELOPMENT?

25   **A.**  YES.

1   **Q.**   WHAT IS IT?

2   **A.**   FROM 2002, WHEN WE BOUGHT IT, TO THE END OF 2007, I THINK

3   IT WAS LIKE $1.3 MILLION THAT WE PUT INTO THAT SORT OF

4   ACTIVITY.

5   **Q.**   YOU MENTIONED THAT YOU WERE ALSO TRYING TO MEET WITH OTHER

6   COMPANIES TO FORM JOINT VENTURES OR TO LICENSE YOUR

7   TECHNOLOGY?

8   **A.**   YES.

9   **Q.**   WERE YOUR INITIAL ATTEMPTS TO DO SO SUCCESSFUL?

10  **A.**   NO, THEY WEREN'T.  WE'D GO AND MAKE PRESENTATIONS TO

11  COMPANIES, AND THEY WOULD LISTEN POLITELY AND –– BUT THEN AT

12  THE END OF THE MEETING, WE WOULD NEVER HEAR FROM THEM AGAIN OR

13  THEY WOULD CALL BACK AND SAY, NO, WE ARE NOT GOING TO DO

14  ANYTHING WITH YOU.

15  **Q.**   SO AT THAT TIME DID YOU GIVE UP ON YOUR LICENSING

16  ATTEMPTS?

17  **A.**   NO.  I WAS KIND OF GETTING READY TO GIVE UP ON IT, BUT WE

18  DIDN'T.  IF YOU ARE GOING TO BE IN SMALL BUSINESS, YOU CAN'T

19  BE A QUITTER.

20      I THINK IT WAS AT THE END OF 2004 WE SAW AN ARTICLE IN

21  FORTUNE MAGAZINE THAT WAS ABOUT A COMPANY CALLED THINKFIRE.

22  IT WAS FOUNDED BY TWO GUYS.  ONE WAS DAN MCCURTY (PHONETIC)

23  WAS THE PRESIDENT AND THE OTHER GUY WAS NATHAN MARIBOLD, WHO

24  HAD BEEN THE CHIEF TECHNOLOGY OFFICER AT MICROSOFT.  AND THAT

25  KIND OF CAUGHT MY ATTENTION.

1      AND, ANYWAY, IT SAID IN THE ARTICLE THAT THEY HAD FORMED

2   THEIR COMPANY, AND THEIR BUSINESS PURPOSE WAS TO HELP SMALL

3   COMPANIES WITH PATENT PORTFOLIOS TO GO OUT AND LICENSE THEIR

4   PRODUCTS.

5      AND WE WEREN'T HAVING ANY SUCCESS AT DOING IT.  I'M

6   THINKING, HEY, HERE'S TWO GUYS WHO HAVE BEEN DOING THIS FOR A

7   LONG TIME.  ONE OF THEM IS A BIG SHOT, YOU KNOW, CHIEF

8   TECHNOLOGY OFFICER AT MICROSOFT, HE KNOWS EVERYBODY I'M SURE.

9   SO I PICKED UP THE PHONE AND CALLED DAN MCCURTY AND TOLD HIM

10  WHO HE WERE.  SURE ENOUGH, AFTER A COUPLE OF CALLS, HE FLEW

11  OUT TO TUCSON.  AND WE HIRED HIM IN DECEMBER OF 2004 TO GO TO

12  WORK FOR US.

13     AND WE WERE GOING TO GO TRY TO USE THEIR EXPERTISE IN

14  UNDERSTANDING AND CONTEXT INTO GETTING MORE LICENSES FOR --

15  FROM COMPANIES FOR OUR PRODUCT.

16  **Q.**  DID YOU HIRE THINKFIRE TO FIND TARGETS THAT YOU COULD SUE

17  IN COURT?

18  **A.**  NO.  THAT WASN'T -- NEVER PART OF THEIR ORIGINAL BUSINESS

19  PLAN, NOR WERE WE THINKING ABOUT IT AT THE TIME.

20     THEIR METHODOLOGY WAS THAT THEY HAD -- THEY WOULD DO WHAT

21  THEY CALLED CLAIM CHARTS.  I HAD NEVER SEEN ONE UNTIL THEY

22  CAME TO VISIT US THE FIRST TIME.  AND THEY WOULD SHOW HOW THE

23  PRODUCT, THE TECHNOLOGY THAT WE OWNED WOULD BE CHARTED AGAINST

24  WHAT OTHER COMPANIES WERE DOING WITH THEIR PRODUCTS.

25     AND THEY SAID IF YOU TAKE THIS, AND ALONG WITH, YOU KNOW,

1    SOME OF THE PEOPLE WE KNOW, WE CAN SHOW PEOPLE WHY THIS IS

2    ADVANTAGEOUS FOR THEM TO TAKE A LICENSE.  I SAID GREAT.

3         BUT THEY WANTED -- THE PAYMENT DEAL THAT WE HAD WITH THEM

4    WAS THAT THEY WERE ON A CONTINGENCY ARRANGEMENT FOR GETTING US

5    LICENSES.  SO IT WAS A GREAT DEAL FOR US.  WE GOT THIS GREAT

6    COMPANY WITH GOOD PEOPLE.  WE DIDN'T PAY THEM A DIME UNLESS

7    THEY WERE SUCCESSFUL.  I LOVE THOSE KINDS OF DEALS.

8    **Q.**  EVEN THOUGH YOUR EARLY MEETINGS HADN'T BEEN SUCCESSFUL IN

9    ATTEMPTING TO REACH THESE JOINT VENTURES, WERE THESE NEW

10   MEETINGS SUCCESSFUL?

11   **A.**  UNFORTUNATELY THEY WEREN'T.  IT TURNED OUT AFTER TWO AND A

12   HALF YEARS, THEY WEREN'T SUCCESSFUL REALLY WITH ANY OF THEIR

13   CUSTOMERS, WE DON'T THINK.

14        I HAVE TALKED TO SOME OF THEM SINCE.  AND JUST -- IT

15   WASN'T A BUSINESS PLAN TO WORK.  THE BIG COMPANIES YOU WANT TO

16   DO BUSINESS, DIDN'T WANT TO DO BUSINESS WITH YOU.  THEIR WHOLE

17   PLAN WAS TO RUN RIGHT OVER YOU, I GUESS.  THAT'S WHAT IT

18   SEEMED TO US.

19            **MR. REINES:**  OBJECTION --

20                 (SIMULTANEOUS COLLOQUY.)

21            **THE COURT:**  HE'S TRYING TO MAKE AN OBJECTION.  IF YOU

22   WOULD STOP AND LET HIM SAY WHAT IT IS.

23            **MS. GLAUSER:**  OF COURSE, YOUR HONOR.

24            **MR. REINES:**  OBJECTION, MOVE TO STRIKE THE TESTIMONY

25   AS HEARSAY.  HE'S SAYING WHAT HE HEARD LATER FROM THINKFIRE

1    ABOUT WHAT PEOPLE HAD SAID TO THINKFIRE, AS I UNDERSTAND IT.

2              **MS. GLAUSER:**  WE ARE NOT OFFERING IT FOR THE TRUTH OF

3    THE MATTER ASSERTED.  WE ARE OFFERING IT TO SHOW WHAT HE

4    UNDERSTOOD AND ACTIONS HE TOOK BASED ON THAT UNDERSTANDING.

5              **THE COURT:**  WE WILL JUST STRIKE IT.

6    **BY MS. GLAUSER:**

7    **Q.**  MR. FARLEY, I CAN SEE THE COURT REPORTER LEANING IN A

8    LITTLE BIT.  WOULD YOU MIND MOVING THE MICROPHONE A LITTLE

9    CLOSER TO YOUR MOUTH OR MAYBE PULLING YOUR CHAIR IN JUST A

10   BIT.

11   **A.**  IS THAT BETTER?

12   **Q.**  IT WILL MAKE HER JOB EASIER.

13        DID THINKFIRE ULTIMATELY PROVIDE YOU WITH ANY ADVICE THEN

14   ON WHAT YOU SHOULD DO BASED ON THE FACT THAT THESE MEETINGS

15   JUST WEREN'T GOING ANYWHERE?

16   **A.**  YES, THEY DID.

17   **Q.**  WHAT WAS THAT ADVICE?

18   **A.**  WELL, WE, ABOUT THE MIDDLE OF 2007, CAME TO A MUTUAL

19   AGREEMENT THAT THE LICENSING DEAL WASN'T WORKING.  THEY HAD --

20   SO THEY PUT TOGETHER A PACKAGE OF WHAT THEY CALL CLAIM CHARTS

21   WHICH IS WHERE THEY MAP OUR PATENTED TECHNOLOGY AGAINST WHAT

22   OTHER COMPANIES ARE DOING, AND THEN THEY TOOK THAT OUT TO A

23   NUMBER OF DIFFERENT LAW FIRMS AND HELPED US FIND A LAW FIRM TO

24   PROCEED WITH LITIGATION BECAUSE THAT WAS THE ONLY WAY WE WERE

25   EVER GOING TO GET ANYBODY TO PAY US FOR THE TECHNOLOGY WHICH

1    THEY WERE USING, IN MY VIEW, ILLEGALLY.

2    **Q.**  WHAT HAPPENED NEXT?

3    **A.**  THEY FOUND A LAW FIRM FOR US.  AND WE TOOK OUR –– ONE OF

4    OUR PATENTS, THE '541 AND THE CANADIAN APPLICATION AND

5    EUROPEAN –– WE TRANSFERRED THEM, I BELIEVE, TO A COMPANY

6    CALLED DIGITAL REG, WHICH IS A WHOLLY-OWNED SUBSIDARY OF DRM

7    TECHNOLOGIES.

8         SO, IT'S –– IT IS A SEPARATE COMPANY AND IT'S FORMED IN

9    TEXAS, BUT IT IS OWNED BY OUR COMPANY, WHICH MEANS ALL OF THE

10   INVESTORS WERE GETTING –– WOULDN'T BE TAKEN OUT OF IT.  IN

11   OTHER WORDS, WE WEREN'T TRYING TO MOVE IT AWAY FROM THE

12   INVESTORS.  EVERYBODY WAS GOING TO GET THE SAME FULL SHARE,

13   BUT WE DID IT AS A SEPARATE COMPANY.  THEY THOUGHT THAT WAS

14   THE BEST WAY TO GO.

15   **Q.**  SO ALL THE PEOPLE THAT ARE INVOLVED IN DRM TECHNOLOGIES

16   ALSO INVOLVED IN DIGITAL REG?

17   **A.**  EFFECTIVELY, YES.

18   **Q.**  YOU MENTIONED THAT THE '541 AND SOME OTHER PATENTS GOT

19   ASSIGNED FROM DRM TECHNOLOGIES TO DIGITAL REG.  DID ––

20   **A.**  JUST THE '541 AND THE CANADIAN '541 AND THE EUROPEAN '541

21   APPLICATION, I BELIEVE, IS WHAT WE DID.

22   **Q.**  AT SOME POINT IN TIME DID THE '670 PATENT ALSO GET

23   ASSIGNED FROM DRM TECHNOLOGIES TO DIGITAL REG?

24   **A.**  YES, BUT THAT WASN'T UNTIL –– I THINK IT WAS 2011, MAYBE

25   '10.  IT WAS LATER.  IT WAS AFTER THAT FIRST LAWSUIT GOT

1  RESOLVED.

2  **Q.** MR. FARLEY, CAN I REFER YOU IN YOUR NOTEBOOK THERE TO

3  PLAINTIFF'S EXHIBIT 34?

4  **A.** OKAY.

5  **Q.** 35 AND 36?

6  **A.** OKAY.

7  **Q.** IF YOU CAN LOOK AT THOSE THREE DOCUMENTS TOGETHER.  LET ME

8  KNOW WHEN YOU HAVE HAD A CHANCE TO VIEW THEM, AND THEN I HAVE

9  A FEW QUESTIONS FOR YOU.

10  **A.** OKAY.

11     34 IS THE ASSIGNMENT OF THE PATENTS FROM DRM TECHNOLOGIES

12  TO DIGITAL REG IN SEPTEMBER OF '07.

13     AND THEN THE NEXT ONE IS THE ASSIGNMENT OF ALL OF THE REST

14  OF THE PATENTS THAT WE HAD AT THAT POINT, WHICH AMOUNTED TO 12

15  MORE PATENTS.  AND THAT WAS DONE IN MARCH OF 2011.

16     AND THEN THE THIRD ONE --

17  **Q.** THE THIRD ONE YOU ARE REFERRING TO EXHIBIT 36?

18  **A.** YEAH, I'M SORRY.  36.

19     WELL, ACTUALLY, THAT'S THE SAME DOCUMENT, BUT IT IS DATED

20  NOW JUNE 2011.

21  **Q.** SO IS IT FAIR TO SAY THAT YOU RECOGNIZE PLAINTIFF'S

22  EXHIBIT 34, 35 AND 36 AS THE ASSIGNMENTS THAT YOU PREVIOUSLY

23  TESTIFIED ABOUT?

24  **A.** YES, THAT'S CORRECT.

25  **Q.** AND ARE THEY TRUE AND ACCURATE COPIES OF THE ASSIGNMENTS

```
1    OF THE PATENTS FROM DRM TECHNOLOGIES TO DIGITAL REG?

2    A.  YES, THEY ARE.  THEY ARE ALL SIGNED AND NOTARIZED.

3          MS. GLAUSER:  YOUR HONOR, AT THIS TIME WE OFFER

4    PLAINTIFF'S EXHIBITS 34, 35 AND 36 INTO EVIDENCE.

5          MR. REINES:  NO OBJECTION, YOUR HONOR.

6          THE COURT:  RECEIVED.

7      (PLAINTIFF'S EXHIBITS 34, 35 AND 36 RECEIVED IN EVIDENCE)

8    BY MS. GLAUSER:

9    Q.  WE DISCUSSED THE FACT THAT OTHER PEOPLE WHO ARE INVOLVED

10   IN DRM TECHNOLOGIES ARE THE SAME PEOPLE INVOLVED IN DIGITAL

11   REG, RIGHT?

12   A.  CORRECT, YES.

13   Q.  IS MR. PATTERSON INVOLVED WITH DIGITAL REG?

14   A.  YES.

15   Q.  IN WHAT WAY?

16   A.  WE HAVE AN AGREEMENT WITH MR. PATTERSON WHEREBY HE

17   RECEIVES A PERCENTAGE OF THE PROCEEDS WHICH ARE RECEIVED BY

18   DIGITAL REG OF TEXAS FROM ANY LITIGATION OR LICENSING AFTER

19   THE EXPENSES OF THE LITIGATION ARE TAKEN OUT.

20   Q.  WHOSE IDEA WAS IT TO GIVE MR. PATTERSON THAT PERCENTAGE?

21   A.  WELL, I THINK IT WAS PROBABLY A COMBINATION OF MYSELF AND

22   THE ATTORNEYS THAT WERE REPRESENTING US IN THAT CASE.

23       I HAD ALWAYS THOUGHT THAT PAT HAD GOTTEN A PRETTY RAW DEAL

24   AT THE M2 DIRECT THING.  HE HAD BEEN KIND OF THROWN OUT OF

25   THAT COMPANY.  AND HE WAS UPSET ABOUT IT AND LEFT, AND KIND OF
```

1    JUST WALKED AWAY FROM EVERYTHING.  AND I ALWAYS FELT BAD ABOUT

2    IT.

3        I THOUGHT THAT HE, AS THE INVENTOR, SHOULD HAVE SOME

4    INTEREST IN THE THING.  I WAS VERY HAPPY TO HEAR THE LAWYER

5    SAY, IT WOULD BE GOOD IF WE COULD HAVE THE INVENTOR, AND I

6    THOUGHT, GREAT, WHAT A WONDERFUL OPPORTUNITY TO DO WHAT'S

7    RIGHT FOR PAT AND WOULD BE GOOD IN TERMS OF THE LITIGATION

8    THAT WAS GOING TO BE MOVED FORWARD.

9        SO I CALLED PAT WHEN I WAS IN DC.  THE ATTORNEY, MR. OLIVO

10   CAME DOWN.  WE HAD A MEETING, AND WE ENTERED INTO A TENTATIVE

11   AGREEMENT.  AND MR. LEGAL (SIC) SPENT THE NEXT COUPLE OF WEEKS

12   WRITING IT UP AND SENT IT TO ME AND WE SIGNED IT.  HAPPY TO DO

13   IT.

14   **Q.**  AT SOME POINT IN TIME DID DIGITAL REG FOLLOW THINKFIRE'S

15   ADVICE THAT MEETING OUTSIDE THE CONTEXT OF LITIGATION WOULDN'T

16   BE PRODUCTIVE?

17   **A.**  THAT WAS A PRETTY EASY DECISION TO MAKE BECAUSE IT HADN'T

18   BEEN.

19   **Q.**  SO WHAT HAPPENED?

20   **A.**  WELL, WE FILED LITIGATION AGAINST NINE COMPANIES, I THINK

21   IT WAS, IN SEPTEMBER 2007, I BELIEVE IT WAS, WAS WHEN WE FILED

22   OUR FIRST LITIGATION.

23   **Q.**  HOW WAS THAT LITIGATION INVOLVED?

24   **A.**  EVERY COMPANY IN THE LITIGATION NOW HAS A LICENSE FOR THE

25   PATENTS.  I'M SORRY, FOR THE '541 PATENT BECAUSE THAT WAS THE

```
1    ONLY ONE INVOLVED IN THAT LITIGATION.

2    Q.   ARE YOU FAMILIAR WITH THOSE LICENSE AGREEMENTS?

3    A.   YES.

4    Q.   I WOULD LIKE TO REFER YOU TO A GROUP OF EXHIBITS WITHIN

5    YOUR BINDER.

6    A.   OKAY.

7    Q.   I DON'T NECESSARILY AT THIS MOMENT NEED YOU TO WALK US

8    THROUGH WHAT EACH ONE IS.

9    A.   OKAY.

10   Q.   AS A GROUP, I WOULD LIKE TO ASK YOU A QUESTION.

11   A.   SURE.

12   Q.   IN YOUR BINDER, IF YOU CAN REFER TO -- IT'S QUITE A

13   LENGTHY NUMBER -- LONG LIST.  PLAINTIFF'S EXHIBIT 24B.

14   A.   YEP, I SEE THAT.

15   Q.   43A, 44A, 45A.

16   A.   OKAY. THAT'S HERE.

17   Q.   THE LIST KEEPS GOING.

18   A.   OKAY.

19   Q.   46.

20   A.   GOT THAT.

21   Q.   96?

22   A.   YEP.

23   Q.   THROUGH 105.  SO THAT ENTIRE RANGE.

24   A.   96, 97, 98, 100, 101, 102, 103, 104, AND 105.  LOOKS LIKE

25   THEY ARE ALL HERE.
```

1    **Q.**  YOU MADE IT.

2    **A.**  I DON'T SEE 99.  IS THERE SUPPOSED TO BE A 99 HERE?

3    **Q.**  THERE IS SUPPOSED TO BE A 99, BUT I CAN GET YOU A COPY IF

4    IT'S NOT THERE.  WE CAN TALK ABOUT THE OTHERS WITHOUT THAT FOR

5    THE MOMENT.

6    **A.**  OKAY.  THERE JUST DOESN'T SEEM TO BE -- 99 IS MISSING FROM

7    THIS BOOK.

8    **Q.**  I WILL GET IT FOR YOU.

9    **A.**  OKAY.

10   **Q.**  WITH REGARD TO THE OTHERS, WHAT DO YOU RECOGNIZE THESE

11   DOCUMENTS TO BE?

12   **A.**  YOU WANT ME TO TAKE A SECOND TO LOOK AT THEM?  IS THAT

13   WHAT YOU'RE SAYING?

14   **Q.**  COLLECTIVELY AS A GROUP, WHAT ARE THEY?

15   **A.**  JUST THUMBING THROUGH THEM QUICKLY, THEY LOOK LIKE ALL OF

16   THE LICENSE AGREEMENTS THAT WE HAVE ENTERED INTO WITH THE

17   VARIOUS COMPANIES THAT WERE -- HAVE BEEN IN THE FIRST

18   LITIGATION AND SOME IN THE SECOND LITIGATION.

19   **Q.**  ARE THEY ALL EXECUTED COPIES OF LICENSE AGREEMENTS?

20   **A.**  I HAVEN'T LOOKED SPECIFICALLY AT THAT, BUT I KNOW THAT

21   THERE WAS ONE LICENSE WHICH WE COULDN'T FIND AN EXECUTED COPY

22   OF FOR SOME REASON.  I DON'T KNOW WHY.  WE HAVE A COPY OF IT,

23   BUT IT ISN'T FULLY EXECUTED.

24       THAT WAS WITH MACROVISION, I BELIEVE IT WAS.

25   **Q.**  EVEN IF THE LICENSE AGREEMENT -- THE COPY THAT YOU HAVE

1    WASN'T EXECUTED, DO YOU BELIEVE THAT A LICENSE AGREEMENT WAS

2    ACTUALLY EXECUTED BETWEEN DRM TECHNOLOGIES AND MACROVISION?

3    **A.**   OH, YEAH.  I REMEMBER THAT ONE DISTINCTLY.

4    **Q.**   DID THE PARTIES PERFORM THEIR RESPECTIVE OBLIGATIONS?

5    **A.**   YES.  THEY SENT US THE MONEY AND WE GAVE THEM A LICENSE.

6    SO I FIGURED IF THEY SENT THE MONEY, THAT MEANS THEY WANTED TO

7    DO IT.

8            **MS. GLAUSER:**  YOUR HONOR, PERMISSION TO APPROACH?

9            **THE COURT:**  YES.

10   **BY MS. GLAUSER:**

11   **Q.**   MR. FARLEY, I'M HANDING YOU THE MISSING EXHIBIT 99.

12        CAN YOU BRIEFLY IDENTIFY THIS FOR US?

13   **A.**   YES.  THIS IS ALSO A LICENSE AGREEMENT.

14   **Q.**   A TRUE AND ACCURATE COPY OF WHICH LICENSE AGREEMENT?

15   **A.**   THIS IS -- ARE YOU SURE WE HAVE THE RIGHT ONE?  THIS SAYS

16   "ADOBE SYSTEMS".  I DON'T THINK WE HAVE A LICENSE WITH ADOBE

17   SYSTEMS YET.

18        AM I READING IT WRONG?

19   **Q.**   IF YOU CAN LOOK AT THE FIRST PARAGRAPH OF THAT EXHIBIT.

20   **A.**   I SEE WHY IT SAYS "ADOBE SYSTEMS".  THAT'S IDENTIFYING THE

21   CASE.  I APOLOGIZE.  I LOOKED AT THE SECOND PARAGRAPH.

22        SO THE DEFENDANT HERE IN THIS ONE WAS ZYNGA.  I'M SORRY.

23   **Q.**   NO WORRIES.

24   **A.**   SORRY TO GIVE YOU A HEART ATTACK.

25   **Q.**   IT WOULD HAVE BEEN MY MISTAKE.  IT WOULDN'T BE THE FIRST

1    TIME.

2         IS THAT A FAIR AND ACCURATE COPY OF THE AGREEMENT BETWEEN

3    DRM TECHNOLOGIES AND ZYNGA -- OR DIGITAL REG AND ZYNGA?

4    **A.**  I BELIEVE IT IS.

5              **MS. GLAUSER:**  I HAVE TO REPEAT THIS LONG LIST THEN

6    FOR YOU.  I AM SORRY.  AT THIS TIME WE OFFER PLAINTIFF'S

7    EXHIBITS 24B, 43A, 44A, 45A, 46, 96, 97, 98, 99, 100, 101,

8    102, 103, 104 AND 105.

9              **THE COURT:**  I DON'T PARTICULARLY WANT A LOT OF STUFF.

10             **MS. GLAUSER:**  YOUR HONOR, THE PARTIES HAVE AGREED --

11                  (SIMULTANEOUS COLLOQUY.)

12             **MS. GLAUSER:**  THE PARTIES HAVE AGREED ON A

13   DEMONSTRATIVE THAT WILL SUMMARIZE IT WHICH WE WILL BRING UP

14   NEXT.  BUT BEFORE I PUBLISH THE DEMONSTRATIVE TO THE JURY I

15   WANTED TO OFFER THE UNDERLYING EXHIBITS INTO EVIDENCE.

16             **THE COURT:**  WE WON'T ACTUALLY RECEIVE THEM INTO

17   EVIDENCE.  WE WILL JUST CONSIDER THEM THE UNDERLYING DOCUMENTS

18   AND WE WILL RECEIVE THE DEMONSTRATIVE FOR PURPOSES OF SENDING

19   THEM TO THE JURY AND FOR PURPOSES OF MAKING THEM PART OF THE

20   TRIAL RECORD.

21        WE DON'T NEED ALL THOSE WORDS, RIGHT?

22             **MS. GLAUSER:**  I BELIEVE THAT THE UNDERLYING LICENSES

23   MAY HAVE SOME INDEPENDENT SIGNIFICANCE LATER WITH REGARD TO --

24             **THE COURT:**  I WILL TAKE IT UNDER SUBMISSION.

25             **MS. GLAUSER:**  THANK YOU VERY MUCH, YOUR HONOR.

1          **MR. REINES:**  YOUR HONOR, WE HAVE AN ADDITIONAL

2     OBJECTION THAT WAS ADDRESSED EARLIER TO 104 AND 105 AND 46,

3     BUT WE CAN DEAL WITH THAT.

4          **THE COURT:**  YOUR OBJECTION IS NOTED TO THOSE.

5     **BY MS. GLAUSER:**

6     **Q.**  MR. FARLEY, DO YOU THINK THAT IT WOULD BE HELPFUL, AS THE

7     COURT HAS SUGGESTED, TO BRING UP A DEMONSTRATIVE THAT

8     SUMMARIZES THIS VOLUMINOUS PACKAGE OF INFORMATION THAT ARE THE

9     LICENSES?

10    **A.**  I'M WITH THE JUDGE ON THIS ONE.  LET'S DO IT EASY.

11          **MS. GLAUSER:**  MS. MASON, CAN YOU BRING UP THAT FARLEY

12    DEMONSTRATIVE FOR US?

13          (DEMONSTRATIVE PUBLISHED ON SCREEN.)

14    **BY MS. GLAUSER:**

15    **Q.**  I THINK IT'S PROBABLY BEST IF WE JUST WALK THROUGH THESE

16    CHRONOLOGICALLY.

17          IF YOU CAN START WITH PLAINTIFF'S –– WHAT'S IDENTIFIED AS

18    PLAINTIFF'S EXHIBIT 46.  WHAT IS THAT?

19    **A.**  THAT WAS AN OPTION FOR –– I'M SORRY.  THAT'S AN OPTION TO

20    TAKE OUT –– TO GET A LICENSE FROM US THAT WAS GIVEN TO

21    SITESCAPE IN SEPTEMBER 2006.

22    **Q.**  WHAT DID THEY PAY FOR THE OPTION?

23    **A.**  THEY PAID US A $10,000 CASH PAYMENT TO HAVE THE OPTION.

24    **Q.**  WHAT WAS THE OPTION FOR?

25          WHAT DID THEY HAVE THE OPTION TO DO?

1   **A.**  TO GET A LICENSE FOR ALL OF OUR PATENTS.

2   **Q.**  DID THEY EVER EXERCISE THAT OPTION?

3   **A.**  NO, THEY DIDN'T.

4   **Q.**  IF THEY HAD EXERCISED THE OPTION PURSUANT TO THE

5   AGREEMENT, WHAT WOULD THEY HAVE OWED DRM TECHNOLOGIES?

6   **A.**  WE WOULD HAVE GOTTEN A ROYALTY FROM THEM ON PRODUCT THAT

7   THEY SOLD AT THE RATE OF 7 PERCENT.

8       SO THE PRICE OF THEIR PRODUCT TIMES 7 PERCENT WOULD BE

9   WHAT WE WOULD HAVE GOTTEN.

10  **Q.**  IN YOUR EXPERIENCE IN NEGOTIATING THE PATENT LICENSES ON

11  BEHALF OF DRM TECHNOLOGIES AND DIGITAL REG, DO YOU HAVE AN

12  UNDERSTANDING OF THE DIFFERENCE BETWEEN A RUNNING ROYALTY AND

13  A LUMP SUM?

14  **A.**  YEAH.  THE ROYALTY RATE THAT WE WOULD HAVE HAD WITH

15  SITESCAPE WOULD HAVE BEEN A CONTINUOUS PAYMENT.  SORT OF LIKE

16  RENT ON A BUILDING.  YOU GET A MONTHLY CHECK FOR YOUR -- THE

17  SPACE THAT YOU WOULD RENT IT OUT TO SOMEBODY.  WHEREAS WITH A

18  LUMP SUM PAYMENT, IT'S KIND OF LIKE THEY PREPAY THE RENT FOR A

19  LONG, LONG TIME ON THE -- AS LONG AS THEY WANTED TO BE IN IT.

20  THAT'S PRETTY MUCH WHAT IT AMOUNTS TO.

21  **Q.**  DOES DIGITAL REG HAVE A PREFERENCE FOR A RUNNING ROYALTY

22  OR LUMP SUM?

23  **A.**  FROM A BUSINESS PERSPECTIVE I WOULD THINK A RUNNING

24  ROYALTY RATE WOULD BE BETTER, BUT NORMALLY YOU DON'T GET A

25  RUNNING ROYALTY, AT LEAST FROM WHAT I'VE EXPERIENCED TO DATE.

FARLEY – DIRECT / GLAUSER

1    **Q.**  SO DO ALL OF THE LICENSE AGREEMENTS THAT ARE LISTED HERE

2    ON THIS DEMONSTRATIVE INCLUDE A RUNNING ROYALTY?

3    **A.**  NO.  NONE OF THEM DO.  EXCEPT THAT SITESCAPE ONE.

4    **Q.**  NONE OTHER THAN THE SITESCAPE?

5    **A.**  YES.

6    **Q.**  DO YOU HAVE ANY EXPLANATION FOR THAT?

7    **A.**  ALL OF THESE OTHERS WERE THE RESULT OF SETTLEMENTS IN

8    LITIGATION.

9    **Q.**  DO YOU KNOW WHETHER -- IF ADOBE HAD COME TO YOU OR DURING

10   YOUR MEETINGS WITH ADOBE, THEY HAD BEEN WILLING TO ENTER INTO

11   A LICENSE WOULD DIGITAL REG HAVE ATTEMPTED TO NEGOTIATE A

12   RUNNING ROYALTY?

13   **A.**  I SURE WOULD HAVE TRIED, BUT I DOUBT WE WOULD HAVE GOTTEN

14   IT.  BUT WE WOULD HAVE TRIED.  IT WOULD HAVE BEEN BEST FROM

15   OUR PERSPECTIVE.

16   **Q.**  CAN WE GO TO PLAINTIFF'S EXHIBIT 98.  WHAT IS THIS ONE?

17   **A.**  98, THAT'S THE VERY FIRST LICENSE THAT WE DID OUT OF

18   LITIGATION WITH MACROVISION, WHICH IS THE ONE THAT WE DON'T

19   HAVE THE SIGNED COPIES FOR.

20   **Q.**  HOW MUCH DID MACROVISION PAY FOR THE LICENSE?

21   **A.**  THEY PAID $98,000 (SIC).  AND IT WAS BASED ON AN 1 PERCENT

22   ROYALTY RATE ON THE NUMBER OF UNITS THAT THEY HAD SOLD UP TO

23   THAT POINT.

24   **Q.**  SO THAT 1 PERCENT ROYALTY RATE WAS SOMETHING THE PARTIES

25   ACTUALLY REACHED AN AGREEMENT ON AND PUT INTO THE LICENSE

1    AGREEMENT?

2    **A.**  YES.

3            **THE COURT:**  HE SAID 98.  THIS SAYS 89. I DON'T --

4            **THE WITNESS:**  I MISSPOKE.  YOU'RE RIGHT, NINE EIGHT

5    (SIC).

6            **THE COURT:**  THIS SAYS EIGHT NINE.

7    **BY MS. GLAUSER:**

8    **Q.**  WE CAN PULL IT UP SEPARATELY.  DO YOU HAVE AN INDEPENDENT

9    KNOWLEDGE OF WHETHER OR NOT THE AGREEMENT WITH MACROVISION WAS

10   FOR 89,000 OR 98,000?

11   **A.**  I MISSPOKE.  SHE'S ABSOLUTELY CORRECT.  I APOLOGIZE,

12   JUDGE.

13   **Q.**  CAN WE MOVE THEN TO OUR GROUP OF PLAINTIFF'S EXHIBITS 43A,

14   44A AND 45A.  WHAT ARE THESE?

15   **A.**  THESE ARE AGREEMENTS THAT WE ENTERED INTO WITH A COMPANY

16   CALLED RPX.

17   **Q.**  WHAT IS RPX?

18   **A.**  RPX IS A COMPANY THAT WAS FORMED SOMETIME AROUND THE SAME

19   TIME THAT WE FILED OUR FIRST LITIGATION OR SHORTLY THEREAFTER.

20       AND THEY -- THEIR BUSINESS MODEL WAS THAT THEY WOULD GO

21   OUT AND BUY PATENTS OR SECURE LICENSES FOR PATENTS THAT THEY

22   WOULD THEN HAVE THE RIGHT TO SUBLICENSE TO MEMBERS OF THEIR

23   ORGANIZATION.  AND FOR A MEMBER, YOU HAD TO PAY A CERTAIN

24   AMOUNT OF MONEY TO THEM EVERY YEAR BASED ON HOW BIG YOU WERE.

25       SO, I THINK IT WAS -- I DON'T EVEN KNOW WHAT THEIR RATES

1   WERE, BUT IT WAS SCALED BASED ON THE SIZE OF YOUR COMPANY.

2   AND THEY BASICALLY BOUGHT TECHNOLOGY PATENTS --

3   **Q.**  MR. FARLEY, DO YOU KNOW HOW MANY MEMBERS RPX HAD AT THE

4   TIME THEY ENTERED INTO THE 2008 AGREEMENT WITH DIGITAL REG?

5           **MR. REINES:**  OBJECTION, YOUR HONOR, SPECULATION.

6           **THE COURT:**  YOU HAVE TO LAY A FOUNDATION.

7   **BY MS. GLAUSER:**

8   **Q.**  MR. FARLEY, DO YOU -- LET'S START WITH A "YES" OR "NO".

9       DO YOU HAVE ANY KNOWLEDGE OF HOW MANY MEMBERS RPX HAD AT

10  THE TIME YOU ENTERED INTO THIS LICENSE AGREEMENT WITH... RPX?

11          **THE COURT:**  THAT'S JUST A "YES" OR "NO".

12          **THE WITNESS:**  NO, I DON'T.  I'M SORRY.  NO.

13  **BY MS. GLAUSER:**

14  **Q.**  WAS THERE ANYTHING IN THE AGREEMENT THAT REFLECTED WHO WAS

15  TO RECEIVE A LICENSE TO THE '541 --

16  **A.**  YES.

17  **Q.**  -- PATENT?

18  **A.**  YES.

19  **Q.**  PURSUANT TO THE RPX AGREEMENT, WHAT ENTITY RECEIVED A

20  LICENSE TO THE '541 PATENT?

21  **A.**  APPLE COMPUTER.

22  **Q.**  AT THAT TIME THAT YOU ENTERED INTO THE AGREEMENT, DID

23  ANYBODY ELSE RECEIVE A LICENSE TO THE TECHNOLOGY?

24  **A.**  RPX, UNDER THAT AGREEMENT, HAD THE RIGHT TO LICENSE THE

25  PATENT TO OTHER MEMBERS FOR ONLY A ONE-YEAR PERIOD.

1  **Q.**  WITHOUT REVEALING THE ACTUAL AMOUNT, WHERE, AMONG THE

2  OTHER LICENSE AGREEMENTS, DOES THE AMOUNT THAT RPX PAID

3  COMPARE TO THE AMOUNT THAT THE OTHER LICENSEES PAID?

4  **A.**  MUCH, MUCH HIGHER.

5  **Q.**  WHAT IS --

6  **MR. REINES:**  OBJECTION, YOUR HONOR.

7  **THE COURT:**  THAT'S STRICKEN.  IT'S HIGHER.  THAT'S

8  THE HIGHEST OF THE AMOUNTS AND THAT'S ALL THAT YOU NEED TO

9  KNOW.

10  **BY MS. GLAUSER:**

11  **Q.**  WHAT IS PX97, MR. FARLEY?

12  **A.**  THAT'S A LICENSE AGREEMENT FROM LFP INTERNET GROUP FOR

13  67,500.

14  **Q.**  DO YOU HAVE ANY KNOWLEDGE ABOUT WHY YOU AGREED TO THAT

15  AMOUNT?

16  **A.**  IN MEDIATION SETTLEMENTS WITH THAT COMPANY, WE DISCOVERED

17  THAT THEY HAD REMOVED DIGITAL RIGHTS MANAGEMENT FROM THEIR

18  PRODUCTS SOMETIME AFTER WE FILED THE SUIT.

19  AND WE TOOK THAT AMOUNT BECAUSE THAT REALLY COVERED THE

20  AMOUNT THAT WAS -- HAD BEEN -- COVERED THE INFRINGEMENT OF OUR

21  PATENT.

22  **Q.**  WHAT ABOUT PX96?

23  **A.**  THAT WAS BLOCKBUSTER.  WE TOOK THAT AMOUNT BECAUSE THEY

24  WERE -- THE WORD WAS OUT ON THE STREET THAT THEY WERE ABOUT TO

25  FILE BANKRUPTCY.  SO WE JUST DECIDED IT WOULD BE BETTER TO

1    TAKE WHAT WE COULD GET BEFORE IT WENT INTO BANKRUPTCY BECAUSE

2    WE WOULD HAVE GOTTEN NOTHING IF IT DID HAPPEN.  IT DID HAPPEN.

3    THEY DID GO TO BANKRUPTCY.

4    Q.  WHAT ABOUT PLAINTIFF'S EXHIBIT 103?  WHAT WAS THAT?

5    A.  THAT'S WAS THE SAME THING AS THE ONE BEFORE WHERE THE

6    COMPANY PLAYBOY HAD TAKEN THE DIGITAL RIGHTS MANAGEMENT OFF OF

7    THEIR MATERIAL, AND SO WE SETTLED FOR THAT AMOUNT BECAUSE IT

8    COVERED WHAT HAD BEEN INFRINGED AT THE TIME WHERE THEY USED

9    THE DIGITAL RIGHTS MANAGEMENT ON THEIR PRODUCTS.

10   Q.  MR. FARLEY, CAN I ASK YOU, DID DIGITAL REG EVER SEEK TO

11   JOINT --

12          THE REPORTER:  I'M SORRY, PLEASE REPEAT.

13   BY MS. GLAUSER:

14   Q.  I WAS CURIOUS WHETHER DRM TECHNOLOGIES OR DIGITAL REG EVER

15   SOUGHT TO JOINT VENTURE WITH A PORNOGRAPHY BUSINESS THE SAME

16   WAY THAT IT SOUGHT TO JOINT VENTURE WITH ADOBE?

17          MR. REINES:  OBJECT, YOUR HONOR.  THERE'S NO

18   FOUNDATION IN THE RECORD THAT THEY SOUGHT TO PARTNER WITH

19   ADOBE.

20          THE COURT:  THAT'S TRUE.  THAT HASN'T REALLY COME UP

21   YET.  MAYBE YOU CAN REPHRASE IT.

22          MS. GLAUSER:  I WOULD BE HAPPY TO DO SO.

23   BY MS. GLAUSER:

24   Q.  ARE YOU AWARE OF WHETHER OR NOT DIGITAL REG EVER SOUGHT TO

25   JOINT VENTURE WITH A BUSINESS IN THE PORNOGRAPHY INDUSTRY?

FARLEY – DIRECT / GLAUSER

1    **A.**  WHEN WE FIRST BOUGHT THIS TECHNOLOGY BACK IN 2002, WE WERE

2    LOOKING AT THE VARIOUS INDUSTRIES THAT WERE MAKING GOOD MONEY

3    ON THE INTERNET SELLING PRODUCT.  AND NEEDLESS TO SAY, THE

4    PORNOGRAPHY INDUSTRY WAS DOING QUITE WELL.  IN FACT, THEY

5    WERE --

6           **THE COURT:**  WOULD YOU JUST ANSWER THE QUESTION?

7           **THE WITNESS:**  THEY WERE DOING $3 BILLION --

8           **THE COURT:**  THE QUESTION WAS WHETHER YOU EVER SOUGHT

9    TO JOINT VENTURE WITH A PORNOGRAPHY COMPANY.  THAT'S "YES" OR

10   "NO".

11          **THE WITNESS:**  THE ANSWER IS NO.

12          **THE COURT:**  OKAY.  THANKS.

13          **THE WITNESS:**  YOU'RE WELCOME.

14   **BY MS. GLAUSER:**

15   **Q.**  YOU DID LICENSE PLAYBOY AND LFP, HOWEVER, DID YOU?

16   **A.**  WE DID.

17   **Q.**  WHY IS THAT?

18   **A.**  BECAUSE THEY WERE ILLEGALLY USING THE PATENTED TECHNOLOGY

19   THAT WE HAD AND WE DIDN'T THINK THERE WAS ANY REASON NOT TO

20   HAVE THEM PAY FOR WHAT THEY WERE USING ILLEGALLY.  THEY SHOULD

21   BE NO DIFFERENT THAN ANYBODY ELSE.

22   **Q.**  WE CAN PROBABLY SKIP TO PLAINTIFF'S EXHIBIT 99.

23   **A.**  OKAY.

24   **Q.**  THIS REFERENCES THE AGREEMENT BETWEEN DIGITAL REG AND

25   ZYNGA.

1       DO YOU HAVE ANY INFORMATION AS TO WHY DIGITAL REG ENTERED

2  INTO THIS LICENSE AGREEMENT FOR THAT AMOUNT?

3  **A.**  I THINK THAT AMOUNT WAS SIMILAR TO THE SITUATION WITH

4  BLOCKBUSTER.  WE WERE CONCERNED ABOUT THEIR FINANCIAL

5  VIABILITY.  AND THEY DIDN'T HAVE THAT MANY PRODUCTS THAT THEY

6  WERE USING OUR TECHNOLOGY SO WE SETTLED AT THAT AMOUNT.

7  **Q.**  AND WITH REGARDS TO PLAINTIFF'S EXHIBIT 100, WHICH IS THE

8  AGREEMENT BETWEEN DIGITAL REG AND INTUIT --

9  **A.**  YES.

10  **Q.**  -- DO YOU HAVE ANY UNDERSTANDING WHY THAT AGREEMENT WAS

11  REACHED?

12  **A.**  I BELIEVE THAT THAT WAS BASED ON THE NUMBER OF UNITS THAT

13  THEY HAD SOLD AND THAT WE HAD A KIND OF A ROYALTY RATE BUILT

14  INTO THAT.

15  **Q.**  DO YOU HAVE ANY KNOWLEDGE ABOUT WHAT THE ASSOCIATED --

16  **A.**  I'M SORRY?

17  **Q.**  DO YOU HAVE ANY INFORMATION ABOUT WHAT THE ASSOCIATED

18  REVENUE OR UNDERLYING SALES WERE?

19  **A.**  I DON'T REMEMBER OFF THE TOP OF MY HEAD.

20  **Q.**  OKAY.

21  **A.**  I CAN DO THE CALCULATIONS THERE.  IT'S QUICKLY $14 MILLION

22  WOULD BE WHAT IT WAS TO GET A 2 PERCENT, BUT I'M NOT A HUNDRED

23  PERCENT POSITIVE OF THAT.

24  **Q.**  IS IT YOUR UNDERSTANDING THAT THE 2 PERCENT RATE WAS THE

25  EQUIVALENT OF THE AMOUNT SET FORTH IN THAT AGREEMENT?

1    **A.**  YES.

2             **MR. REINES:**  OBJECTION, YOUR HONOR.  WHAT'S THE

3    FOUNDATION FOR INTUIT SALES?  IN ORDER TO DO THAT, THAT'S THE

4    MISSING VARIABLE.

5             **MS. GLAUSER:**  HE'S TESTIFIED --

6                      (SIMULTANEOUS COLLOQUY.)

7             **THE COURT:**  YES?

8             **THE REPORTER:**  I'M SORRY, I DIDN'T HEAR.

9             **THE COURT:**  HE GOT 350,000.  WHETHER THAT'S 2 PERCENT

10   OF THEIR SALES OR NOT, WE DON'T KNOW.  AND YOU WOULD HAVE TO

11   LAY A FOUNDATION TO ESTABLISH IT OR WE CAN STRIKE THE

12   2 PERCENT AND GO WITH THE 350,000.

13   **BY MS. GLAUSER:**

14   **Q.**  MR. FARLEY, DO YOU HAVE ANY KNOWLEDGE ABOUT WHAT PERCENT

15   OF THE SALES UNDERLIE THE AGREEMENT THAT YOU REACHED WITH

16   INTUIT?

17             **THE COURT:**  THAT'S A "YES" OR "NO".

18             **THE WITNESS:**  NO.

19   **BY MS. GLAUSER:**

20   **Q.**  DO YOU HAVE ANY UNDERSTANDING OF WHY YOU ENTERED INTO THE

21   AGREEMENT WITH VALVE, WHICH IS PLAINTIFF'S EXHIBIT 102?

22   **A.**  I'M SORRY?  WHAT WAS IT?  WOULD YOU ASK ME AGAIN?

23   **Q.**  NO WORRIES.

24       PLAINTIFF'S EXHIBIT 102, IT'S THE AGREEMENT BETWEEN

25   DIGITAL REG AND VALVE.

FARLEY – DIRECT / GLAUSER

1    **A.**   UH-HUH.

2    **Q.**   I'M CURIOUS WHETHER OR NOT YOU HAVE ANY UNDERLYING

3    UNDERSTANDING OF WHY DIGITAL REG ENTERED INTO THAT AGREEMENT

4    FOR THAT AMOUNT?

5    **A.**   VALVE IS THE GAME COMPANY.  I DON'T THINK WE -- THEY WERE

6    USING OUR TECHNOLOGY ON ALL OF THEIR GAMES IS THE REASON THAT

7    IT IS -- THAT'S THE REASON IT'S A LOWER AMOUNT.

8    **Q.**   AND WITH REGARD TO PLAINTIFF'S EXHIBIT 101, WHICH IS THE

9    AGREEMENT BETWEEN DIGITAL REG AND AVG, DO YOU HAVE ANY

10   UNDERSTANDING AS TO WHY DIGITAL REG ENTERED INTO THIS

11   AGREEMENT FOR THE AMOUNT LISTED?

12   **A.**   IT WAS A NEGOTIATED AGREEMENT IN MEDIATION, AND THAT'S --

13   I'M SORRY.  THAT'S ALL I REMEMBER ABOUT THAT ONE, IS IT WAS A

14   MUTUALLY AGREED UPON IN A MEDIATION SESSION.

15   **Q.**   ALL RIGHT.  THANKS FOR YOUR PATIENCE.

16        **MS. GLAUSER:**  MS. MASON, WE'RE DONE WITH THAT

17   DEMONSTRATIVE.

18   **BY MS. GLAUSER:**

19   **Q.**   IT WAS A LOT OF INFORMATION TO TRUDGE THROUGH.  I REALLY

20   HAVE ONE MORE QUESTION FOR YOU, MR. FARLEY.

21   **A.**   OKAY.

22   **Q.**   IN THIS LITIGATION, WHAT DOES DIGITAL REG HOPE TO GET FROM

23   ADOBE?

24        **MR. REINES:**  OBJECTION, YOUR HONOR.  THAT QUESTION IS

25   COMPLETELY VAGUE.  AND IF IT IS ASKING FOR A DAMAGES

1    CALCULATION, THERE'S NO FOUNDATION THAT HE'S IN ANY POSITION

2    TO GIVE ONE.

3         **MS. GLAUSER:**  I DIDN'T ASK HIM HOW MUCH IT WAS WORTH.

4    I ASKED WHAT DIGITAL REG'S HOPE WAS IN THIS LAWSUIT.

5       HE HAS BROUGHT IT.  I THINK THE JURY SHOULD HAVE AN

6    OPPORTUNITY TO HEAR WHY IT IS THAT DIGITAL REG HAS BROUGHT

7    THIS LAWSUIT AND ASKED --

8         **THE COURT:**  YOU ARE ASKING FOR A DOLLAR FIGURE?  HOW

9    MUCH MONEY HE HOPES TO GET?

10        **MS. GLAUSER:**  I'M NOT.

11        **THE COURT:**  MAYBE YOU BETTER REPHRASE YOUR QUESTION

12   THEN.

13      I DON'T KNOW WHAT ELSE -- I JUST DON'T KNOW WHAT YOU ARE

14   TRYING TO GET AT HERE.  I'M CONCERNED THAT IT MIGHT NOT BE

15   ADMISSIBLE.  SO --

16        **MS. GLAUSER:**  I CAN DEFINITELY TRY TO REPHRASE THE

17   QUESTION.

18   **BY MS. GLAUSER:**

19   **Q.**  MR. FARLEY, WHY HAVE YOU SUED ADOBE TODAY?

20   **A.**  BECAUSE WE BELIEVE THAT THEY ARE INFRINGING ON OUR PATENTS

21   AND WE WOULD LIKE TO GET SOME JUST PAYMENT FOR THE USE OF OUR

22   PROPERTY.

23        **MS. GLAUSER:**  PASS THE WITNESS.

24

25

| | |
|---|---|
| 1 | **CROSS–EXAMINATION** |
| 2 | **BY MR. REINES:** |
| 3 | **Q.**  GOOD AFTERNOON. |
| 4 | **A.**  HOW ARE YOU DOING? |
| 5 | **Q.**  GOOD.  THANK YOU. |
| 6 |     I THINK YOU'VE BEEN IDENTIFIED AS THE CORPORATE |
| 7 | REPRESENTATIVE FOR DIGITAL REG FOR THIS TRIAL; IS THAT |
| 8 | CORRECT? |
| 9 | **A.**  I THINK SO. |
| 10 | **Q.**  AND YOUR TITLE IS MANAGER OF DIGITAL REG; IS THAT CORRECT? |
| 11 | **A.**  ONE OF THEM. |
| 12 | **Q.**  WHAT IS YOUR OWNERSHIP INTEREST IN DIGITAL REG? |
| 13 | **A.**  IT'S ABOUT 22 PERCENT, MAYBE. |
| 14 | **Q.**  AND IN GENERAL, YOU MANAGE THE LITIGATION EFFORT, CORRECT? |
| 15 | GENERALLY. |
| 16 | **A.**  GENERALLY THAT'S MY RESPONSIBILITY. |
| 17 | **Q.**  OKAY. |
| 18 |     LET'S TALK ABOUT THIS MEETING WITH MR. DINOVO AND |
| 19 | MR. PATTERSON THAT YOU REFERRED TO ON DIRECT. |
| 20 |     DO YOU RECALL ON DIRECT YOU RAISED THAT MEETING WHERE YOU |
| 21 | CAME UP –– |
| 22 | **A.**  NO, I NEVER SAID ANYTHING ABOUT A MEETING WITH MR. DINOVO. |
| 23 | **Q.**  OKAY.  MAYBE I MISUNDERSTOOD THEN. |
| 24 | **A.**  YEAH. |
| 25 | **Q.**  SO, THE MEETING THAT YOU HAD –– |

FARLEY – CROSS / REINES

1    **A.**  I TALKED ABOUT --

2              **THE COURT:**  HE SAID A NAME, AND THE COURT REPORTER

3    PICKED IT UP AS DINOVO.  I DIDN'T THINK IT WAS DINOVO EITHER,

4    BUT I COULDN'T HEAR WHAT IT WAS.  THEN LATER HE SAID

5    MR. LEGAL, WHICH WAS --

6              **THE WITNESS:**  OLIVO, O-L-I-V-O.  JACK OLIVO.

7              **MR. REINES:**  OKAY.  WELL, THAT CLEARS A LOT UP.

8              **THE WITNESS:**  ITALIANS ARE HARD NAMES TO REMEMBER.

9    JACK'S A GOOD GUY.

10   **BY MR. REINES:**

11   **Q.**  MR. OLIVO --

12   **A.**  YES.

13   **Q.**  -- HE WAS YOUR LITIGATION ATTORNEY FOR THE LAWSUIT?

14   **A.**  THE FIRST ONE WE DID, YES, SIR.

15   **Q.**  MR. DINOVO IS YOUR ATTORNEY FOR THIS SUIT, AND MR. OLIVO

16   WAS YOUR ATTORNEY FOR THE LAST SUIT?

17   **A.**  WE GOT IT.  WE ARE ON TRACK NOW.

18   **Q.**  I'M TRYING TO GET FULLY ON TRACK.

19   **A.**  ME, TOO.

20   **Q.**  THE MEETING WAS MR. OLIVO, YOUR PRIOR LITIGATION

21   ATTORNEY --

22   **A.**  YES, SIR.

23   **Q.**  -- AND MR. PATTERSON, IS THAT CORRECT, AND YOU?  WERE ALL

24   THREE OF YOU PRESENT?

25   **A.**  YES, SIR.

1   **Q.**  AND THE IDEA WAS YOU WANTED TO GET MR. PATTERSON WORKING

2   WITH THE LITIGATION EFFORT AS A CONSULTANT?

3   **A.**  THAT WAS ONE OF THE THINGS I SAID, YES.

4   **Q.**  AND WAS IT -- WHEN YOU RETAINED MR. PATTERSON AND GAVE HIM

5   A PIECE OF THE ACTION TO BE PART OF THE LITIGATION EFFORT, DID

6   YOU WANT HIM TO BE PREPARED FOR HIS PARTICIPATION IN THE

7   DEPOSITIONS AND TRIALS AND SO FORTH; WAS THAT IMPORTANT TO

8   YOU?

9   **A.**  YES.

10  **Q.**  AND DID YOU DO ANYTHING TO INTERFERE WITH THE ABILITY OF

11  YOUR TRIAL LAWYERS TO PROVIDE HIM WITH THE PATENTS OR THE FILE

12  HISTORY OR DOCUMENTS LIKE THE DANE NOTES?  DID YOU DO ANYTHING

13  TO INTERFERE WITH HIS ABILITY TO GET THOSE AT ANY POINT IN

14  TIME?

15  **A.**  I PRETTY MUCH STEPPED BACK FROM THE RELATIONSHIP BETWEEN

16  BOTH SETS OF ATTORNEYS AND MR. PATTERSON ONCE I HAD MADE AN

17  INTRODUCTION OF MR. PATTERSON TO HIM.  AND IT WAS THE

18  ATTORNEY'S JOBS TO ORGANIZE WHATEVER IT WAS THEY WANTED TO GET

19  DONE AND DO.  AND I STEPPED BACK FROM THAT.

20  **Q.**  AS THE MANAGER OF THE PATENT LITIGATION EFFORT --

21  **A.**  YES.

22  **Q.**  -- YOUR UNDERSTANDING WAS THEY WERE ALL COOPERATING,

23  MR. PATTERSON WAS GETTING WHATEVER INFORMATION HE NEEDED, AND

24  THERE WAS NO PROBLEMS THERE?

25  **A.**  ACTUALLY I DIDN'T REALLY KEEP UP WITH IT ONE WAY OR THE

FARLEY – CROSS / REINES

1    OTHER.  I JUST STAYED OUT OF IT, PRETTY MUCH.

2       I ASSUMED THAT EVERYTHING WAS OKAY, IF THAT'S WHAT YOU

3    WANTED TO KNOW.

4    **Q.**  OKAY.  AND THE ONLY BUSINESS OF DIGITAL REG IS PATENT

5    LITIGATION, CORRECT?

6    **A.**  THE ONLY BUSINESS OF DIGITAL REG?

7    **Q.**  YEAH.

8    **A.**  WELL, AS A HUNDRED PERCENT OWNED SUBSIDIARY OF DRM

9    TECHNOLOGIES, YES.  IT WAS SET UP FOR THE PURPOSE OF

10   LITIGATION.  THAT IS CORRECT.

11   **Q.**  AND YOU NEVER INTENDED TO OFFER ANY PRODUCTS, CORRECT?

12   **A.**  THROUGH DIGITAL REG?  NO.

13   **Q.**  AND THE HEADQUARTERS FOR DIGITAL REG, WHEN YOU ORIGINALLY

14   SET IT UP, WAS IN MARSHALL, TEXAS IN A LAW OFFICE; IS THAT

15   CORRECT?

16   **A.**  THAT'S CORRECT.

17   **Q.**  AND AT LEAST UP TO LAST MARCH WHEN I TOOK YOUR DEPOSITION,

18   THAT'S WHERE IT WAS; THAT'S WHERE YOUR HEADQUARTERS WERE?

19   **A.**  IT MIGHT HAVE BEEN.  WE MOVED THEM TO MR. DINOVO'S OFFICE

20   IN AUSTIN, I BELIEVE.  BUT I'M NOT A HUNDRED PERCENT SURE OF

21   WHETHER WE DID THAT BEFORE OR AFTER THE DEPOSITION WITH YOU.

22   **Q.**  OKAY.

23   **A.**  IT'S THE OFFICERS ARE IN TEXAS.  THEY ARE EITHER IN

24   MARSHALL OR AUSTIN.

25   **Q.**  YOU ARE NOT AWARE OF ANYONE EVER BEING AT THOSE

FARLEY – CROSS / REINES

```
1   HEADQUARTERS IN TERMS OF DIGITAL REG?

2   A.  NO.

3   Q.  LET'S START AT THE BEGINNING OF YOUR INVOLVEMENT WITH

4   DESKGATE.

5       YOUR FIRST MEETING WITH DESKGATE WAS IN AUGUST OF 1997;

6   ISN'T THAT CORRECT?

7   A.  NO.

8   Q.  THE MEETING IN WHICH YOU INVESTED WITH THEM, WAS THAT

9   AUGUST OF 1997; DO I HAVE THAT WRONG?

10  A.  I APOLOGIZE.  YES.  MY FIRST -- I WAS THINKING WHEN I

11  STARTED INVESTING.  YES.  I MET PAT PATTERSON IN AUGUST OF

12  1997.  I APOLOGIZE.  I'M GETTING CONFUSED.  I'M GETTING OLD.

13  YOU KNOW?  LONG TIME AGO, 17 YEARS.

14                  (SIMULTANEOUS COLLOQUY.)

15  Q.  I APOLOGIZE.  LET'S BE SURE WE ARE STAYING ONE AT TIME.  I

16  WILL DO MY ABSOLUTE BEST.

17  A.  I WILL, TOO.

18  Q.  THANK YOU.

19      AFTER YOU INVESTED MONEY IN PAT PATTERSON'S DESKGATE

20  ENTITY, YOU HAD A DISCUSSION WITH HIM ABOUT PATENTING,

21  CORRECT?

22  A.  YES.

23  Q.  AND WHEN YOU RAISED THE SUBJECT WITH HIM, YOU HAD HEARD

24  FROM SOMEONE ELSE, YOU KNOW, DO YOU HAVE PATENTS BEFORE THEY

25  WANTED TO INVEST AS YOU WERE TRYING TO FUNDRAISE, AND SOMEONE
```

1    ASKED YOU ABOUT PATENTS, AND YOU WENT TO PAT TO INQUIRE ABOUT

2    THE PATENTING STATUS; ISN'T THAT CORRECT?

3    **A.**  YES.

4    **Q.**  WHEN YOU RAISED THAT TOPIC WITH PAT, HE SAID HE DIDN'T

5    THINK WHAT HE HAD WAS PATENTABLE, DIDN'T HE?

6    **A.**  I DON'T REMEMBER HIM SAYING THAT.

7    **Q.**  I WOULD LIKE TO ASK YOU ABOUT THE DEPOSITIONS LAST MARCH.

8    **A.**  I SAID IT DIDN'T I?

9    **Q.**  I BET YOU DID.

10       SO YOU WERE DEPOSED IN MARCH OF LAST YEAR, 2013, AND YOU

11   WERE UNDER OATH WHEN YOU WERE DEPOSED; IS THAT CORRECT?

12   **A.**  RIGHT.

13   **Q.**  YOU DID YOUR BEST TO TELL THE TRUTH AT THAT TIME; ISN'T

14   THAT TRUE?

15   **A.**  YEAH.

16            **MR. REINES:**  I WOULD LIKE TO READ THE TESTIMONY FROM

17   HIS MARCH 28TH, DEPOSITION AT PAGE 150, LINE 11 THROUGH 151,

18   LINE 22.

19   **A.**  AM I SUPPOSED TO BE LOOKING AT THIS?

20   **Q.**  I'M GOING TO READ IT.  IT'S GOING TO BE A LITTLE LONG.  IF

21   YOU WANT TO FOLLOW ALONG, YOU CERTAINLY --

22   **A.**  I TRUST YOU.

23   **Q.**  BUT IT'S GOING TO BE A LITTLE LONG.  I APOLOGIZE FOR THAT,

24   BUT I THINK IT MAKES THE POINT.

25       AT PAGE 150, THE QUESTION WAS AT LINE 11:

1          "CAN YOU CORROBORATE THAT PAT PATTERSON HAD CONCEIVED

2          THE INVENTION DESCRIBED IN THE '541 PATENT AS EARLY

3          AS JUNE OF 1996?"

4       THAT WAS THE QUESTION POSED.

5          YOUR RESPONSE WAS:  "I WASN'T AROUND, NOR DID I KNOW

6          PAT IN JUNE OF 1996.  I DIDN'T MEET HIM UNTIL AUGUST

7          OF 1997."

8          **THE WITNESS:**  OKAY.

9          **MR. REINES:**  (READING)

10         "SO FROM ANY PERSONAL KNOWLEDGE THAT I HAVE OF

11         WHETHER HE WAS THAT WAS THE DATE THAT HE CONCEIVED OF

12         THE IDEA.  I CAN'T GIVE YOU ANY PERSONAL KNOWLEDGE OF

13         THAT, THE FACT THAT I TALKED TO HIM OR VISITED WITH

14         HIM ABOUT IT OR ANYTHING ABOUT IT ALONG THE LINE."

15      AND THEN THE QUESTION WAS:

16         "SO IN WHAT CAPACITY ARE YOU A CORROBORATING

17         WITNESS?"

18      AND YOUR ANSWER WAS:

19         "WELL, I THINK THEY PUT MY NAME DOWN," REFERRING TO

20         YOUR ATTORNEYS, "BECAUSE WHEN I STARTED IN SEPTEMBER

21         OF 1997 TO RAISE FUNDS FOR THE COMPANY, ONE OF THE

22         INDIVIDUALS I TALKED TO, AND I CAN'T REMEMBER HIS

23         NAME, I'M SORRY, I'VE TALKED TO A LOT OF PEOPLE" --

24         **THE WITNESS:**  UH-HUH.

25         **MR. REINES:**  (READING)

1              "–– THE GUY SAID, DO YOU HAVE PATENTS?  AND I KNEW

2              NOTHING ABOUT PATENTS.  NEVER BEEN INVOLVED WITH THEM

3              IN ALL MY PRIOR ACTIVITY.  I TAKE THAT BACK.  THERE

4              WAS A PATENT IN THE GOLF BUSINESS THING.  I

5              APOLOGIZE.  BUT I DIDN'T KNOW VERY MUCH ABOUT IT."

6         SORRY I NEED TO READ THE WHOLE THING.

7              **THE WITNESS:**  THAT'S FINE.  I JUST THOUGHT ABOUT

8    THAT.

9              **MR. REINES:**  CONTINUING AT LINE 9:

10             "SO I WENT BACK TO WASHINGTON, D.C. AS ONE OF MY

11             MONTHLY VISITS.  I AM THINKING IT WAS OCTOBER OR

12             NOVEMBER.  I CALLED PAT.  I DON'T REMEMBER HOW.  I

13             SAID, HEY, I'VE GOT A GUY WHO HAS COME UP WITH THIS

14             IDEA AND HE SAID THAT YOU SHOULD, YOU KNOW, DO WE

15             HAVE PATENTS?  ARE YOU APPLYING FOR THEM?  AND THAT

16             WOULD HELP MAKE AN INVESTMENT DECISION.  AND PAT

17             SAYS, I DON'T THINK THIS STUFF IS PATENTABLE.  AND I

18             SAID, DO YOU KNOW ANYTHING ABOUT PATENTS?  AND HE

19             SAID NO.  I SAID NEITHER DO I."

20        AND THEN IT GOES ON.  I THINK I CAN SPARE EVERYONE BEYOND

21   THAT UNLESS THERE'S A COMPLAINT.

22   **BY MR. REINES:**

23   **Q.**  ALL RIGHT.  IN 1997, WHEN YOU STARTED WORKING AS A

24   FUNDRAISER, YOU ALSO WERE INVOLVED IN SOME SALES ACTIVITY,

25   CORRECT, FOR DESKGATE?

FARLEY – CROSS / REINES

1    **A.**   NOT MUCH.  I MEAN, I WOULD -- I WAS ENTHUSIASTIC ABOUT IT.

2    WHEN I KNEW PEOPLE IN TUCSON THAT I WAS -- I WOULD TELL THEM

3    ABOUT WHAT WE HAD AND SAID WE OUGHT TO USE THIS.  IF THEY WERE

4    KIND OF GOING, OH, THAT'S INTERESTING STUFF, I WOULD GET

5    SOMEBODY FROM THE COMPANY TO TALK TO THEM ON THE PHONE.

6        I WASN'T OUT -- I WASN'T TECHNICAL ENOUGH TO SELL THE

7    PRODUCT, BUT I COULD SELL THE CONCEPT AND THE IDEA OF IT.

8    **Q.**   BUT IN TERMS OF SELLING WHATEVER PRODUCTS DESKGATE HAD,

9    YOU WEREN'T TECHNICAL ENOUGH TO DO THAT, RIGHT?

10   **A.**   NO, BUT I WAS CAPABLE OF TELLING PEOPLE WHAT THEY HAD AND

11   INTRODUCING THEM TO THE RIGHT GUY TO GIVE THEM THE DETAILED

12   INFORMATION ON IT.

13   **Q.**   WHILE YOU WEREN'T DEDICATED TO SALES, YOU DID GET INVOLVED

14   A LITTLE BIT IN THE SALES ACTIVITY; IS THAT FAIR?

15   **A.**   LISTEN, I'M AN OLD SALESMAN.  I'LL SELL ALL THE TIME.

16   **Q.**   OKAY.

17       WITH RESPECT TO VIA EXPRESS, YOU SAW THE TESTIMONY BEFORE

18   ABOUT VIA EXPRESS AND AS REFERENCED IN THE PATENTS?

19   **A.**   YEAH.

20   **Q.**   TO YOUR KNOWLEDGE, VIA EXPRESS HAD THREE TO FIVE CUSTOMERS

21   FOR GROSS SALES OF $600?  DOES THAT SOUND FAMILIAR AS

22   APPROXIMATE NUMBERS?

23   **A.**   WOULD YOU JUST SAY THAT NUMBER AGAIN ONE MORE TIME,

24   PLEASE?

25   **Q.**   ABOUT THREE TO FIVE PEOPLE AND THE GROSS AMOUNT WOULD BE

1    $600?

2    **A.**  OH, YEAH.  I THINK THAT WAS RIGHT.

3    **Q.**  OKAY.

4    **A.**  I THINK THAT'S CORRECT BECAUSE I HAD SET UP A CREDIT CARD

5    COMPANY IN TUCSON.  WE PUT A TELEPHONE LINE IN BETWEEN AND

6    THEY HAD ALWAYS GIVEN ME A REPORT.  THAT WAS KIND OF THE TOTAL

7    AMOUNT THAT WE HAD SOLD BEFORE THE MERGER TOOK PLACE, AND THAT

8    LINE WAS TAKEN OUT.

9    **Q.**  I KNOW YOU INTENDED TO BE HELPFUL BY THAT, BUT WE'LL

10   MOVE ––

11   **A.**  I'M SORRY.

12   **Q.**  IF THE ANSWER IS "YES" ––

13   **A.**  I DID GIVE YOU THAT INFORMATION BEFORE.

14   **Q.**  OKAY.  AGAIN, TRY TO STAY IN ORDER BECAUSE THE COURT

15   REPORTER HAS HAD A LONG DAY ALREADY.

16       NOW IN TERMS OF VERIFYING THAT THE '541 PATENT WAS USED

17   FOR ANY PRODUCT AT ANY POINT, NO ONE AT DIGITAL REG OR DIGITAL

18   REG CAN VERIFY THAT BECAUSE YOU'RE NOT TECHNICAL AND CHIP WAS

19   MARKETING; ISN'T THAT TRUE?

20   **A.**  PUT THAT WAY IT'S TRUE, YES.

21   **Q.**  AND IN TERMS OF VIA EXPRESS, WHICH WE SAW IN BOTH THE '670

22   AND '541 PATENTS, BASED ON YOUR BUSINESS EXPERIENCE AND SO

23   FORTH LOOKING AT IT, YOU DIDN'T CONSIDER THAT A SUCCESSFUL

24   PRODUCT, CORRECT?  THAT WAS NOT SUCCESSFUL?

25   **A.**  WHAT WAS NOT SUCCESSFUL?

1    **Q.**  VIA EXPRESS.

2    **A.**  NO, I THOUGHT IT WAS SUCCESSFUL.  IT WAS EARLY.

3         **MR. REINES:**  I WOULD LIKE TO READ YOUR DEPOSITION,

4    MARCH 27TH, 2013 AT LINES (SIC) 36 -- 13 THROUGH 21.  (AT

5    LINES 36 -- 13 THROUGH 21.

6         **THE COURT:**  WHAT PAGE?

7         **MR. REINES:**  36.  THIS IS AT LINE 13.  IT BEGINS WITH

8    A QUESTION:

9         "WOULD YOU CONSIDER VIA EXPRESS TO BE A SUCCESSFUL

10        PRODUCT?"

11    YOUR ANSWER WAS:

12        "THE ONE THAT WAS PASSWORD PROTECTED?"

13    AND THE QUESTION WAS:

14        "YES."

15    AND THE ANSWER WAS:

16        "NO, I DON'T THINK YOU COULD CALL IT SUCCESSFUL."

17    **A.**  THAT'S DIFFERENT THAN WHAT YOU JUST ASKED ME.

18    **Q.**  LET ME ASK YOU ABOUT THE MERGER WITH M2 AFTER DESKGATE.

19        WITH RESPECT TO THE MERGER WITH M2, YOU HAD THIS ISSUE

20    WITH PAT PATTERSON ABOUT WHETHER IT SHOULD BE DONE OR NOT.

21        WHAT YOU UNDERSTOOD FROM MR. PATTERSON AS TO WHY HE

22    COMMITTED THE COMPANY TO MERGE WITH M2 IS HE WANTED TO DO AN

23    IPO AND HE WOULD BECOME WEALTHY.

24        THAT WAS YOUR TAKE ON THE SITUATION, WASN'T IT?

25    **A.**  IN A GENERAL WAY, YES.

FARLEY – CROSS / REINES

1   Q.   NOW, REGARDING THE PRODUCT, YOU'VE BEEN ATTEMPTING TO

2   COMMERCIALIZE THE TECHNOLOGY ALMOST CONTINUOUSLY THAT'S IN THE

3   PATENTS THAT ARE BEING ASSERTED, RIGHT?

4   A.   I HAVE.

5   Q.   IN YOUR MARCH 2013 DEPOSITION, SO AT LEAST TO THAT TIME,

6   YOUR TESTIMONY WAS YOU CAN'T SAY THAT YOU SUCCESSFULLY

7   COMMERCIALIZED THE TECHNOLOGY YET, RIGHT, AS OF THAT DATE?

8   A.   NO, THAT WOULD BE CORRECT.  IT HAS BEEN A TOUGH ONE.

9   Q.   ALL RIGHT.  LET'S TALK ABOUT THE PATENT PURCHASE.

10  A.   OKAY.

11  Q.   YOU PURCHASED THE PATENT IN THE WAKE OF BANKRUPTCY FROM

12  WACHOVIA BANK?  I THINK I HAVE THE RIGHT PRONUNCIATION.

13  A.   THEY ENDED UP AS THE OWNER.

14  Q.   AND THE PURCHASE PRICE WAS BASICALLY 500,000.  YOU'RE

15  FLUENT IN THE SPECIFICS OF THE FINANCING AND OTHER THINGS, BUT

16  BASICALLY THE ORIGINAL PRICE WAS 500,000?

17  A.   THAT'S CORRECT.

18  Q.   AND HOW MANY PATENTS DO YOU HAVE NOW IN THE DIGITAL REG

19  PORTFOLIO?

20  A.   COUNTING CONTINUATION?

21  Q.   THE WHOLE KITTEN CABOODLE.

22  A.   I THINK IT'S IN THE NEIGHBORHOOD OF 27.

23  Q.   ALL THOSE PATENT RIGHTS WERE PURCHASED FOR $500,000 IN

24  2002; ISN'T THAT CORRECT?

25  A.   NO.

FARLEY – CROSS / REINES

1    Q.  WHAT PART WASN'T PURCHASED?

2    A.  WE PUT IN SOME NEW ADDITIONAL PATENTS SINCE WE BOUGHT IT.

3    THERE'S A COUPLE OF THEM.

4         IF I GOT A LIST OUT, I CAN TELL YOU WHICH ONES THEY WERE.

5    BUT WE'VE ADDED SOME ADDITIONAL PATENTS OTHER THAN THE ONES

6    THAT WERE THERE.

7         THERE WERE FOUR BASIC PATENTS WHICH WE BOUGHT FROM

8    WACHOVIA BANK.  ONE OF THEM WAS ISSUED AND THE OTHER THREE

9    WERE NOT.  THE ONE OF THE THREE NEVER DID GET ISSUED, BUT THE

10   OTHER TWO DID.  AND WE FILED CONTINUATIONS ON THOSE.

11        WE'VE ALSO FILED SEVERAL OF OUR OWN PATENTS, AND WE FILED

12   CONTINUATIONS ON THOSE AND WE FILED FOREIGN PATENTS ON SOME OF

13   THEM.  SO THE 27 NUMBER HAS NOTHING TO DO WITH WHAT WE PAID

14   FOR THE TECHNOLOGY.  OKAY?

15   Q.  I UNDERSTAND.

16   A.  I WANT TO BE CLEAR SO WE ARE ALL ON THE SAME PAGE.

17   Q.  I THINK YOU WERE CLEAR THERE.

18   A.  THANK YOU.

19   Q.  IN TERMS OF THIS SECOND WAIVE OF LITIGATION --

20   A.  UH-HUH.

21   Q.  -- THERE WAS SEVEN PATENTS IN THE LAWSUIT, CORRECT?

22   A.  I BELIEVE THAT'S RIGHT.

23   Q.  AND SIX OF THEM ARE PATENTS THAT YOU GOT FROM THE PATENT

24   RIGHTS YOU PURCHASED FOR $500,000; IS THAT TRUE?

25   A.  I DON'T KNOW THE ANSWER TO THAT TO BE A HUNDRED PERCENT

1    POSITIVE.  IF YOU SAY IT'S CORRECT, IT PROBABLY IS.

2    **Q.**  IN TERMS OF THE TECHNOLOGY YOU RECEIVED BECAUSE YOU WANTED

3    TO MAKE A GO OF IT -- LET ME STEP BACK.

4        IN 2002 AFTER YOU BOUGHT THE ASSETS FOR THIS $500,000?

5    **A.**  UH-HUH.

6    **Q.**  YOU RECEIVED NOT ONLY ALL THE PATENTS WE JUST DISCUSSED,

7    YOU ALSO RECEIVED OTHER TECHNOLOGY IN THE SENSE OF -- YOU

8    RECEIVED TRADEMARKS; ISN'T THAT CORRECT?

9    **A.**  OH, YES.

10   **Q.**  AND YOU WANTED TO MAKE A GO OF IT WITH MR. PATTERSON'S

11   TECHNOLOGY AGAIN.  I THINK THAT WAS THE TESTIMONY ON DIRECT?

12   **A.**  THAT'S CORRECT.

13   **Q.**  OKAY.  AND WHAT YOU DISCOVERED WAS THAT THAT WAS REALLY

14   OLD TECHNOLOGY NOT WASN'T COMMERCIALLY VIABLE WHEN YOU TRIED

15   TO USE -- WHEN YOU TRIED TO COME UP WITH NATURAL PRODUCT,

16   DIGITAL CONTAINERS?

17   **A.**  YEAH.  IT REALLY NEEDED TO BE UPGRADED TO A CROSS PLATFORM

18   KIND OF TECHNOLOGY.  AND IT WASN'T THAT AT THE TIME WE BOUGHT

19   IT.

20   **Q.**  LET'S TALK ABOUT THINKFIRE.

21   **A.**  OKAY.

22   **Q.**  IN 2004, WHEN YOU ENTERED INTO THE THINKFIRE ARRANGEMENT,

23   THAT WAS IN -- YOU STARTED THAT PROCESS IN WHAT, WAS IT

24   JUNE 2004, AROUND THERE?

25   **A.**  NO, NO, NO.  WE STARTED IN -- OH, GOSH, IT HAPPENED REALLY

1    QUICK.  I THINK THAT ARTICLE WAS IN OCTOBER.  AND I CALLED HIM

2    AND HE WAS COMING OUT TO TUCSON IN TWO OR THREE OR FOUR WEEKS.

3    MIGHT HAVE BEEN -- THANKSGIVING WAS IN THERE -- I HONESTLY

4    DON'T REMEMBER.  I KNOW THAT WE FINALLY SIGNED THE AGREEMENT

5    AT THE END OF DECEMBER.

6    **Q.**  IN TERMS OF THE THINKFIRE AGREEMENT, WHAT YOU THOUGHT YOU

7    WERE GETTING FROM THEM WAS HELP WITH LICENSING, AND IF THE

8    LICENSING DIDN'T WORK, THEN THEY PUT TOGETHER A PACKAGE THAT

9    HELPED WITH LITIGATION; IS THAT CORRECT?

10   **A.**  THAT IS NOT WHAT I SAID.

11   **Q.**  I WOULD LIKE TO DIRECT YOU TO YOUR DEPOSITION, WHICH IS

12   DATED MARCH 27TH, 2013.

13        **MR. REINES:**  AT LINE 18 THROUGH 112, LINE 1, BUT

14   THERE'S ONLY ONE WORD ON 112 LINE 1 SO WE ONLY NEED TO

15   HIGHLIGHT -- I THINK THAT'S THE WRONG TRANSCRIPT.  DO YOU HAVE

16   THE RIGHT ONE?

17        THE QUESTION WAS:

18            "WHAT SERVICE WAS THINKFIRE TO PROVIDE DRM

19            TECHNOLOGIES?

20        THE ANSWER WAS:

21            "LICENSING, AND IF THAT DIDN'T WORK, THEN THEY

22            WOULD -- THEY WOULD HELP US PUT AN PACKAGE -- A

23            PACKAGE TOGETHER IN TERMS OF WHAT THE VALUE WAS TO

24            OUR PATENTS AND WHAT COMPANIES MAY OR MAY NOT BE

25            INFRINGING UPON THOSE, AND THEN THEY WOULD TAKE THOSE

1              PACKAGES TO LAW FIRMS SPECIALIZED IN LITIGATION AND

2              ON A CONTINGENCY ARRANGEMENT."

3     **BY MR. REINES:**

4     **Q.**  IS THAT --

5     **A.**  I DID SAY THAT, BUT IF I MIGHT -- I GUESS YOU DON'T WANT

6     TO GET TO THE DETAILS.  THAT'S FINE.

7     **Q.**  IT'S NOT THAT I --

8     **A.**  IT'S OKAY.  I SAID ANOTHER THING THIS MORNING.

9     **Q.**  THE PROCESS IS THAT YOUR ATTORNEYS GO NEXT --

10    **A.**  I UNDERSTAND.  I'M SORRY.

11    **Q.**  AND THE SPECIALTY OF THINKFIRE WAS DETERMINING WHETHER

12    COMPANIES WERE INFRINGING, RIGHT?  THE CLAIM CHARTS?

13    **A.**  NOT ORIGINALLY.  I KNOW I PROBABLY SAID THAT IT WAS IN

14    THERE, BUT THEY DID DO CLAIM CHARTS RIGHT OFF THE BAT, YES.

15    THEY DID SHOW US CLAIM CHARTS RIGHT IN THE VERY BEGINNING.

16    **Q.**  IS IT YOUR UNDERSTANDING IS THE PURPOSE OF CLAIM CHARTS IS

17    TO SHOW WHAT'S INFRINGING.  YOU COMPARE THE REQUIREMENTS OF

18    THE CLAIM AND THEN YOU DEMONSTRATE HOW THEY ARE MET, RIGHT?

19    **A.**  TODAY THAT IS MY UNDERSTANDING.

20    **Q.**  OKAY.  BUT DID YOU GENERALLY UNDERSTAND THAT WHEN YOU

21    HIRED THINKFIRE THAT THEIR SPECIALTY WAS DETERMINING WHETHER

22    THE COMPANIES WERE INFRINGING SO THAT YOU KNEW WHO THE RIGHT

23    TARGETS WOULD BE?

24    **A.**  THEY KNEW MORE ABOUT PATENTS AND LICENSING AND HOW TO GO

25    ABOUT STRUCTURING IT THAN I DID.

FARLEY – CROSS / REINES

1          WHAT I SAID THIS MORNING ABOUT WHAT THEIR BUSINESS MODEL

2     WAS INITIALLY WAS TO BE IN THE LICENSING BUSINESS WAS CORRECT.

3     THEY DID DO CLAIM CHARTS.  AND EVENTUALLY THEY DID HELP US IN

4     IDENTIFYING PEOPLE OR COMPANIES THAT WERE INFRINGING ON THE

5     PATENTS.

6          WHEN WE DID THOSE DEPOSITIONS WITH YOU, I'M SURE I LUMPED

7     ALL OF THAT FIVE-YEAR PERIOD ALTOGETHER, AND I TRIED TO

8     CLARIFY THAT THIS MORNING IN MY TESTIMONY.  SO, PLEASE, READ

9     WHATEVER YOU WANT TO.

10    **Q.**  YOU UNDERSTAND THAT THINKFIRE'S SPECIALTY IS IN

11    DETERMINING WHETHER THERE'S INFRINGEMENT, RIGHT?

12    **A.**  NOW, YES.

13    **Q.**  OKAY.

14    **A.**  I DON'T EVEN THINK THEY ARE IN EXISTENCE ANYMORE.  I AM

15    NOT SURE.  I DON'T KNOW.

16    **Q.**  YOUR UNDERSTANDING NOW IS WHEN YOU HIRED THINKFIRE THEIR

17    SPECIALTY AT THAT TIME WAS DETERMINING INFRINGEMENT, CORRECT?

18    **A.**  NO, THAT WAS NOT MY UNDERSTANDING AT THE TIME I HIRED

19    THEM.  THEY BECAME THAT.  AT THE TIME I HIRED THEM, THEY WERE

20    IN THE LICENSING BUSINESS.  THEY ENDED UP IN THE LITIGATION

21    IDENTIFICATION BUSINESS, SO TO SPEAK, LATER ON BECAUSE THE

22    LICENSING BUSINESS ASPECT OF IT HAD NOT WORKED OUT.

23         THAT'S WHAT I SAID THIS MORNING.  I KNOW I PROBABLY LUMPED

24    IT ALTOGETHER IN MY DEPOSITIONS AND SAID, OH, THEY DID IT ALL,

25    BUT IN REALITY THEY DIDN'T DO IT ALL IN THE BEGINNING.  OKAY?

1    **Q.**  MY QUESTION IS A LITTLE DIFFERENT.

2    **A.**  I'M SORRY.

3    **Q.**  MY QUESTION ISN'T WHAT THINKFIRE WAS DOING FOR YOU.

4         MY QUESTION WAS, DO YOU UNDERSTAND NOW THAT ONE OF THE

5    THINGS THAT THINKFIRE WAS CAPABLE OF DOING IN 2004 WAS

6    DETERMINING INFRINGEMENT?  THAT WAS A SPECIALTY OF THEIRS?

7    **A.**  WERE THEY CAPABLE OF DOING IT IN 2004?

8    **Q.**  YES.

9    **A.**  YES, THEY HAD PEOPLE WITH THAT KIND OF EXPERIENCE.  THEY

10   WERE CAPABLE OF THAT.

11   **Q.**  ALL RIGHT.

12        AND YOU UNDERSTOOD THE WAY THEY WOULD DO LICENSING IS THEY

13   WOULD COME UP WITH CLAIM CHARTS AND THEN THEY'D GO TO

14   POTENTIAL LICENSING TARGET AND THEY WOULD SHOW THEM THE CLAIM

15   CHART AND THEY'D SAY WE THINK YOU ARE INFRINGING, AND

16   HOPEFULLY THAT WOULD AVOID LITIGATION; IS THAT CORRECT?

17   **A.**  THAT IS CERTAINLY ONE OF THE WAYS THEY DID IT.

18   **Q.**  YOU UNDERSTAND THAT CREATION OF CLAIM CHARTS IS AN

19   INFRINGEMENT ANALYSIS, AT LEAST NOW YOU UNDERSTAND?

20   **A.**  I DIDN'T.  I DO NOW.

21   **Q.**  THINKFIRE WAS INCENTIVIZED TO IDENTIFY AS MANY TARGETS FOR

22   YOU AS POSSIBLE BECAUSE OF THIS CONTINGENCY RELATIONSHIP,

23   RIGHT?

24   **A.**  OH, YEAH.  YEAH.

25   **Q.**  AND IN TERMS OF WHETHER OR NOT A PARTICULAR TARGET WAS

1    INFRINGING OR NOT, THAT'S SOMETHING THAT YOU DEFERRED TO

2    THINKFIRE BECAUSE YOU WEREN'T CAPABLE OR AT LEAST AS CAPABLE

3    AS THEM OF POLICING THAT; IS THAT RIGHT?

4    **A.**  I MEAN, BELIEVE ME, ALL THE STUFF YOU GUYS ARE INVOLVED IN

5    IN THE PATENTS, BACK THEN IT WAS A REAL DAUNTING AND UNKNOWN

6    THING TO ME.

7    **Q.**  YOU KNOW I'M BACK TO THE -- YOU, IN FACT, SAW THE

8    POSSIBILITY OF LITIGATION BY 2004 WHEN YOU ENTERED INTO THE

9    THINKFIRE AGREEMENT, RIGHT?

10   **A.**  NO, THAT'S NOT RIGHT.

11   **Q.**  YOUR DEPOSITION WAS ALSO TAKEN IN THE ORIGINAL '541 PATENT

12   CASE, CORRECT?

13   **A.**  YEP.

14   **Q.**  AND YOU ATTEMPTED TO BE AS HONEST IN THAT DEPOSITION AS

15   YOU DID BECAUSE YOU WERE UNDER OATH AS YOU DID IN THE

16   SUBSEQUENT DEPOSITIONS?

17   **A.**  YES.

18   **Q.**  I WOULD LIKE TO DIRECT YOU TO THE MARCH 19TH, 2009

19   DEPOSITION.

20        **MR. REINES:**  IT'S PAGE 140, LINES 11 TO 24.  AND THE

21   QUESTION WAS:

22        "WHEN YOU ENTERED INTO THE AGREEMENT WITH THINKFIRE,

23        DID YOU SEE THE POSSIBILITY OF LITIGATION TO ENFORCE

24        ANY OF THE DESKGATE PATENTS?"

25   THERE WAS A COLLOQUY WITH COUNSEL.  AND YOUR ANSWER AT 24

1    WAS:

2             "THE ANSWER TO YOUR QUESTION IS YES."

3    **BY MR. REINES:**

4    **Q.**  ALL RIGHT.  LET'S TALK ABOUT THE LITIGATION THAT YOU

5    STARTED IN 2007.

6        IN 2007 THERE WERE TEN TARGET COMPANIES IDENTIFIED FOR

7    THAT LITIGATION; IS THAT RIGHT?

8    **A.**  I DON'T REMEMBER WHETHER THERE WAS NINE OR TEN.

9    **Q.**  OKAY.  SO NINE OR TEN.  BUT ADOBE WASN'T AMONG THEM; IS

10   THAT RIGHT?

11   **A.**  THAT'S CORRECT.

12   **Q.**  AND YOU KNEW OF ADOBE AS OF 2007?

13   **A.**  YES.

14   **Q.**  OKAY.

15       NOW, IN TERMS OF WHO WAS SUED, PARTICULAR COMPANIES THAT

16   WERE SUED, THAT WAS SOMETHING THAT YOU LEFT TO THE LAWYERS;

17   ISN'T THAT RIGHT?

18   **A.**  THAT'S CORRECT.

19   **Q.**  SO IN TERMS OF ADOBE NOT BEING SUED, THAT WAS YOUR

20   LAWYER'S DECISION; ISN'T THAT RIGHT?

21   **A.**  THAT'S CORRECT.

22   **Q.**  AND WE HEARD MR. PATTERSON TESTIFY EARLIER TODAY THAT

23   PATENT LAWYERS THAT HE WORKED WITH WERE VERY EXPENSIVE.

24       DO YOU REMEMBER THAT TESTIMONY?

25   **A.**  YOU DON'T THINK YOU'RE CHEAP, DO YOU?

FARLEY – CROSS / REINES

1    **Q.**  I TRY NOT TO BE CHEAP --

2                    (SIMULTANEOUS COLLOQUY.)

3    **Q.**  I TRY TO BE WORTH MY VALUE.

4    **A.**  YEAH.

5    **Q.**  BUT IN TERMS OF PATENT LITIGATION, BECAUSE OF ITS

6    COMPLEXITY AND TIME CONSUMPTION, AND ALL THOSE THINGS, YOU

7    UNDERSTAND THAT THAT WAS -- THAT'S A MULTIMILLION DOLLAR

8    PROPOSITION TO TAKE A CASE ALL THE WAY?

9    **A.**  TO TAKE IT ALL THE WAY TO TRIAL?

10   **Q.**  YES.

11   **A.**  OH, I HAVE BECOME AWARE OF THAT, YES.

12   **Q.**  AND, IN FACT, YOU KNEW THAT THAT HIGH COST OF PATENT

13   LITIGATION WHEN YOU BROUGHT YOUR SUIT AND STARTED SETTLING THE

14   CASES, SO IN YOUR SETTLEMENT NEGOTIATIONS, YOU UNDERSTOOD THE

15   COST THAT WAS GOING TO BE IMPOSED ON THE DEFENDANT?

16   **A.**  YOU MEAN COST ON BOTH SIDES?

17   **Q.**  YOU -- I DON'T WANT TO PERSONALLY ADDRESS WHAT YOUR

18   ARRANGEMENT IS WITH YOUR ATTORNEY, BECAUSE I DON'T THINK I'M

19   SUPPOSED TO, BUT IN TERMS OF THE DEFENDANTS, THEY ARE PAYING

20   HOURLY RATES FOR LAWYERS IN GENERAL.  THAT WAS YOUR

21   ASSUMPTION, CORRECT?  THERE IS NO CONTINGENCY IF YOU'RE ON

22   DEFENSE, RIGHT?

23              **MS. GLAUSER:**  OBJECTION, CALLS FOR SPECULATION.

24              **THE WITNESS:**  I DON'T KNOW HOW YOU GUYS OPERATE.

25              **THE COURT:**  I AM SORRY, WE HAVE AN OBJECTION WHICH

1    WAS SPECULATION?

2         **MS. GLAUSER:**  HE IS ASKING MR. FARLEY ABOUT THE

3    ARRANGEMENTS BETWEEN DEFENDANTS AND THEIR COUNSEL.

4         **THE COURT:**  MAYBE YOU WANT TO REPHRASE IT.

5    **BY MR. REINES:**

6    **Q.**  WHEN YOU NEGOTIATED THE SETTLEMENTS AND YOU TESTIFIED

7    ABOUT HOW CERTAIN NUMBERS WERE REACHED, ONE OF THE

8    CONSIDERATIONS THAT YOU UNDERSTOOD THAT THE PARTIES WOULD BOTH

9    MAKE WAS THE COST OF THE LITIGATION, CORRECT?

10   **A.**  THAT'S CORRECT.

11        **MS. GLAUSER:**  OBJECTION, STILL CALLS FOR SPECULATION,

12   YOUR HONOR.  HE CAN TESTIFY ABOUT WHAT DIGITAL REG CONSIDERED,

13   BUT HE HASN'T LAID THE FOUNDATION TO SHOW WHAT THE DEFENDANTS

14   WOULD HAVE BEEN CONSIDERING OR WHY HE WOULD HAVE KNOWN IT.

15        **THE COURT:**  OVERRULED.

16   **BY MR. REINES:**

17   **Q.**  AND IN TERMS OF THE RIGHT ROYALTY RATE FOR THESE

18   AGREEMENTS THAT WE HAVE SEEN OVER TIME, YOU WERE THE FINAL

19   APPROVAL FOR THE ROYALTIES; ISN'T THAT CORRECT?

20   **A.**  I SIGNED THE AGREEMENTS, BUT I USUALLY CHECKED WITH MY

21   PARTNER, CHIP.  THAT'S WHY WE MANAGED TO STAY TOGETHER FOR 15

22   YEARS.

23   **Q.**  BUT IN TERMS OF THE NUMBERS, YOU JUST DEFERRED -- YOU

24   REALLY DEFERRED TO THE LAWYERS; ISN'T THAT RIGHT?

25   **A.**  THAT'S TRUE.

FARLEY – CROSS / REINES

1    **Q.**  AND IN GENERAL, YOU DID NOT KNOW HOW THE ROYALTY NUMBERS

2    WERE REACHED, CORRECT?

3    **A.**  I'D SAY THAT'S A FAIR ASSUMPTION.

4    **Q.**  AND IN TERMS OF WHEN YOU ARE NEGOTIATING ALL THESE

5    SETTLEMENTS THAT WE SAW, YOU DON'T HAVE AN UNDERSTANDING OF

6    WHAT PRODUCTS ARE ACCUSED OF INFRINGEMENT, RIGHT?

7    **A.**  IN MOST CASES, NO.

8    **Q.**  SO YOU ARE NEGOTIATING WITH SOMEONE TO RESOLVE A

9    LITIGATION WHERE YOU KNOW IT'S GOING TO COST THEM POTENTIALLY

10   MILLION OF DOLLARS AND YOU ARE SEEKING 50,000, $70,000, AND

11   YOU DON'T KNOW WHAT PRODUCT IT IS THAT HAS BEEN ACCUSED OF

12   INFRINGEMENT, CORRECT?

13   **A.**  IT DEPENDS WHAT COMPANY IT IS WE ARE DEALING WITH.  SOME

14   OF THE SMALLER COMPANIES THEY ONLY HAD ONE OR TWO PRODUCTS.  A

15   COMPANY LIKE ADOBE, THEY HAVE A WHOLE BUNCH OF PRODUCTS.

16       I'M NOT SURE I UNDERSTAND WHAT THE QUESTION IS.  I

17   DON'T....

18   **Q.**  IN GENERAL, WHEN YOU WERE NEGOTIATING THESE SETTLEMENTS,

19   YOU DIDN'T HAVE AN UNDERSTANDING OF WHAT PRODUCTS WERE

20   ACCUSED; ISN'T THAT CORRECT?

21   **A.**  I WOULD HAVE DISCUSSIONS WITH THE ATTORNEYS ABOUT THE

22   SETTLEMENTS.  AND WE WOULD REVIEW WHAT THE ISSUES WERE AND

23   WHAT THEIR RECOMMENDATIONS WERE, AND WHETHER WE HAD MORE THAN

24   ONE PRODUCT IN LINE.

25       BUT DID I UNDERSTAND -- ARE YOU ASKING ME DID I UNDERSTAND

FARLEY – CROSS / REINES

```
1    THE DETAILS OF THE PRODUCTS THAT WERE IN LITIGATION?  HOW THEY

2    WORKED AND THAT SORT OF THING?

3    Q.  LET ME ASK A DIFFERENT QUESTION.

4    A.  OKAY.

5    Q.  WHEN YOU AUTHORIZED LITIGATION AGAINST NINE, TEN

6    COMPANIES, WHATEVER THE NUMBER WAS, ADOBE, DID YOU HAVE AN

7    UNDERSTANDING OF WHAT PRODUCTS WERE ACCUSED OF INFRINGEMENT?

8    A.  YES.  I HAD A GENERAL UNDERSTANDING.  BUT DID I UNDERSTAND

9    THE DETAILS OF THOSE PRODUCTS?  NO.

10       I'M SORRY, I MUST HAVE MISUNDERSTOOD YOUR QUESTION.

11   Q.  I WOULD LIKE TO DIRECT YOU TO YOUR MARCH 28TH, 2013

12   DEPOSITION AT PAGE 216, LINE 2 THROUGH LINE 9.

13       AND LINE 2:

14           "NOW, WHEN YOU AUTHORIZED LITIGATION ON BEHALF OF

15           DIGITAL REG AND MANAGEMENT, DO YOU HAVE AN

16           UNDERSTANDING OF WHAT PRODUCTS ARE ACCUSED BY THE

17           DEFENDANTS?"

18       YOUR ANSWER WAS:

19           "VERY -- I'D ACTUALLY SAY NO, I DON'T."

20   A.  OKAY.

21           MS. GLAUSER:  OBJECTION, YOUR HONOR.  THAT WAS

22   IMPROPER IMPEACHMENT.  THE QUESTION THERE WAS ACCUSED BY THE

23   DEFENDANTS.

24           THE COURT:  I CAN'T FIND IT.  WHAT PAGE IS IT ON?

25           MR. REINES:  216, LINES 2 THROUGH 9.
```

1          **MS. GLAUSER:**  THE QUESTION IS --

2          **THE COURT:**  MARCH 27TH?

3          **MR. REINES:**  YES -- NO, MARCH 28TH.  I APOLOGIZE.

4                    (PAUSE IN THE PROCEEDINGS.)

5          **MR. REINES:**  I WILL WITHDRAW IT, YOUR HONOR.  I CAN

6    MOVE ON.

7          **THE COURT:**  IT'S FINE.

8          **MR. REINES:**  THANKS.

9          **THE COURT:**  WHY DON'T WE BREAK FOR THE DAY.

10         **MR. REINES:**  THANK YOU.

11         **THE COURT:**  SO, LADIES AND GENTLEMEN, I AM SORRY TO

12   DO THIS SO QUICKLY, BUT ON THURSDAY, WE HAVE A CONFLICT

13   THURSDAY MORNING AND WE WON'T BE ABLE TO START UNTIL 10:30 ON

14   THURSDAY.

15         WHAT I WOULD LIKE TO DO, IF YOU COULD, WOULD BE TO STILL

16   GET OUR FIVE HOURS IN BY GOING 10:30 TO 3:30, BUT I RECOGNIZE

17   I TOLD YOU 10:30 (SIC) TO 1:30, SO IF YOU'VE RELIED ON THAT

18   AND MADE PLANS THAT YOU CAN'T CHANGE FOR THURSDAY, MAYBE YOU

19   CAN TRY TO SEE IF YOU CAN DO IT TONIGHT AND GIVE ME A NOTE

20   TOMORROW IF THAT -- ANY OF YOU IF THAT WON'T WORK FOR YOU.

21         BUT IF IT WOULD, I WOULD LIKE TO STAY ON TRACK AND GO FORM

22   10:30 TO 3:30 WITH TWO BREAKS ON THURSDAY.  IF YOU CAN GIVE ME

23   A NOTE TOMORROW IF THAT'S A PROBLEM FOR YOU.

24         OTHERWISE, WE WILL SEE YOU TOMORROW MORNING AT 8:30.  ALL

25   OF THE SAME ADMONITIONS APPLY.  SO WE WILL SEE YOU THEN.

```
1          YOU ARE EXCUSED FOR THE DAY.  YOU MAY STEP DOWN.  I WILL

2     NEED YOU ON THE STAND AT 8:30.

3          AND I HAVE A QUESTION FOR THE LAWYERS.

4          (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

5               THE COURT:  I'M WORKING ON A VERDICT FORM AND I'M

6     FINDING IN THE JURY INSTRUCTIONS, PROPOSED JURY INSTRUCTIONS

7     REFERENCES TO AN ENABLEMENT AND STATUTORY BARS.  ARE THEY OUT?

8               MR. REINES:  OUT.  WELL, ENABLEMENT'S OUT.  STATUTORY

9     BAR MAY NEED TO BE IN TO QUALIFY THINGS AS PRIOR ART BECAUSE

10    THERE'S ANTICIPATION, SO STATUTORY BAR PROBABLY NEEDS TO STAY

11    IN.

12              THE COURT:  ON THE VERDICT FORM?

13              MR. REINES:  WE WILL LOOK ON THE VERDICT.

14              THE COURT:  DON'T LOOK AT YOUR VERDICT FORM.  I'M

15    DOING A DIFFERENT VERDICT FORM.

16         THE QUESTION IS, DO I NEED TO ASK QUESTIONS ABOUT

17    STATUTORY BARS ON THE JURY FORM?  IT'S GOING TO BE BROKEN DOWN

18    BY EACH PRODUCT AND EACH CLAIM IN TABLES.  AND SO IF YOU DO

19    HAVE A STATUTORY BAR CLAIM, I WOULD NEED TO KNOW WHICH CLAIMS

20    YOU HAVE A STATUTORY BAR CLAIM ABOUT AND WHICH PRODUCT.

21              MR. REINES:  RIGHT.  I WOULD SAY NOT BEYOND

22    ANTICIPATION.  IN OTHER WORDS, NOT INDEPENDENT OF

23    ANTICIPATION.

24              THE COURT:  WE HAVE ANTICIPATION.

25              MR. REINES:  I THINK THAT ENCOMPASSES THE STATUTORY
```

```
 1    BAR.

 2            THE COURT:  SO WE DON'T NEED THE STATUTORY BAR.

 3    OKAY.

 4            MS. GLAUSER:  WE HAVE TWO VERY QUICK HOUSEKEEPING

 5    MATTERS.  THE FIRST IS THE DEMONSTRATIVE THAT LISTS ALL OF THE

 6    LICENSES.  IF THE COURT WOULD PREFER, WE ARE HAPPY TO OFFER

 7    THE LIST DEMONSTRATIVE AS AN EXHIBIT.

 8            THE COURT:  YES.  I WOULD RATHER HAVE THAT THEN ALL

 9    OF THOSE LICENSES.

10            MS. GLAUSER:  MAY WE TAKE CARE OF THAT ON THE RECORD

11    TOMORROW?

12            THE COURT:  SURE.  WE ARE ON THE RECORD NOW, BUT --

13            MS. GLAUSER:  WE ARE HAPPY TO OFFER IT THEN NOW IF

14    YOUR HONOR PREFERS.

15        SO AS A RESULT, WE WOULD LIKE TO OFFER THE DEMONSTRATIVE

16    USED DURING MR. FARLEY'S TESTIMONY THAT SUMMARIZES EACH OF THE

17    LICENSE AGREEMENTS REFLECTED ON THE DEMONSTRATIVE INTO

18    EVIDENCE.

19            THE COURT:  WE WILL HAVE TO CALL IT DEFENDANT'S (SIC)

20    NEXT IN ORDER.

21            THE CLERK:  184.

22                      (SIMULTANEOUS COLLOQUY)

23          (PLAINTIFF'S EXHIBIT 184 RECEIVED IN EVIDENCE)

24            MR. REINES:  THERE'S INACCURACIES IN HERE.

25            THE COURT:  YOU CAN POINT THOSE OUT.
```

1          **MS. GLAUSER:**  YOUR HONOR, WE HAVE ONE OTHER ISSUE.

2    WE HAD ASKED HOW YOU WANTED TO HANDLE OFFERS OF PROOF.

3    MR. FARLEY IS HERE TODAY.  WE ARE HAPPY TO DO THE OFFER OF

4    PROOF REGARDING THE RPX LICENSE WITH HIM NOW OR WE CAN HANDLE

5    IT TOMORROW MORNING ASSUMING THAT, I DON'T BELIEVE, MR. REINES

6    HAS FINISHED HIS QUESTIONING.

7          **THE COURT:**  WHAT, YOU WANT TO MAKE AN OFFER OF PROOF

8    OF SOMETHING I'VE EXCLUDED THAT YOU WANT ON THE RECORD?

9          **MS. GLAUSER:**  YES, YOUR HONOR.

10         **THE COURT:**  JUST WRITE IT DOWN.  FILE SOMETHING.

11         **MS. GLAUSER:**  WILL DO.

12         **THE COURT:**  OKAY.

13             (PROCEEDINGS ADJOURNED AT 1:35 P.M.)

14

15                    <u>**CERTIFICATE OF REPORTER**</u>

16          I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE

17    UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY

18    CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

19    RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

20

21             *Diane E. Skillman*

22          DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

23             WEDNESDAY, AUGUST 27, 2014

24

25