volume 3

Pages 362 – 580

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DIGITAL REG OF TEXAS, LLC    )
                             )
          Plaintiff,         )    NO. C-12-1971 CW
                             )
  VS.                        )    WEDNESDAY, AUGUST 27, 2014
                             )
ADOBE SYSTEMS, INC., ET AL.,)     OAKLAND, CALIFORNIA
                             )
          Defendants.        )    JURY TRIAL
_____)


Before The Honorable CLAUDIA WILKEN, Judge

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**For Plaintiff:**          DINOVO, PRICE, ELLWANGER & HARDY LLP
                            7000 NORTH MOPAC EXPRESSWAY, SUITE 350
                            AUSTIN, TEXAS 78731
                     BY:    ANDREW G. DINOVO, ESQUIRE
                            ADAM G. PRICE, ESQUIRE
                            GREGORY DONAHUE, ESQUIRE
                            JAY D. ELLWANGER, ESQUIRE
                            NICOLE E. GLAUSER, ESQUIRE



                            BARTKO ZANKEL BUNZEL MILLER
                            ONE EMBARCADERO CENTER, SUITE 800
                            SAN FRANCISCO, CALIFORNIA 942111
                     BY:    W. PAUL SCHUCK, ESQUIRE


**ALSO PRESENT:**          MICHAEL FARLEY, COMPANY REPRESENTATIVE

                     (APPEARANCES CONTINUED)

**Reported By:**           Diane E. Skillman, CSR 4909, RPR, FCRR
                           Official Court Reporter
          TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

1

2

3

4    **FOR DEFENDANT**          WEILL, GOTSHAL & MANGES, LLP
     **ADOBE SYSTEMS:**         201 REDWOOD SHORES PARKWAY
5                               REDWOOD SHORES, CALIFORNIA 94065
                          BY:  EDWARD R. REINES, ESQUIRE
6                               SONAL N. MEHTA, ESQUIRE
                                BYRON BEEBE, ESQUIRE
7                               ANANT PRADHAN, ESQUIRE

8

9    **ALSO PRESENT:**          PAUL BETLEM, COMPANY REPRESENTATIVE
                                KAREN ROBINSON, IN-HOUSE COUNSEL
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      I N D E X

 2   PLAINTIFF'S WITNESSES:                    PAGE    VOL.

 3   FARLEY, MICHAEL

 4   CROSS-EXAMINATION BY MR. REINES (RESUMED)  372     3

 5   VENTERS, CARL

 6   DIRECT EXAMINATION BY MS. GLAUSER          415     3

 7   CROSS-EXAMINATION BY MS. MEHTA             449     3

 8   REDIRECT EXAMINATION BY MS.GLAUSER         469     3

 9   RECROSS-EXAMINATION BY MS. MEHTA           471     3

10   EXAMINATION BY THE COURT                   566     3

11   EXAMINATION BY MR. REINES                  571     3

12   JONES, JOSEPH – BY DEPOSITION              472     3

13   DEVANBU, PREMKUMAR

14   DIRECT EXAMINATION BY MR. DINOVO           473     3

15   PLAINTIFF'S EXHIBITS:        ID.      EVD.    VOL.

16       16                                497      3

17       21C                               533      3

18       52                                535      3

19       55                                537      3

20       56                                538      3

21       125C                              431      3

22   DEFENDANT'S EXHIBITS:

23       457                               462      3

24       694                 393                    3

25
```

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930**

```
1    WEDNESDAY, AUGUST 27, 2014                        8:25 A.M.

2                      P R O C E E D I N G S

3        (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

4            THE CLERK:  REMAIN SEATED.  COME TO ORDER.  COURT IS

5    IN SESSION.

6            THE COURT:  GOOD MORNING.

7            MS. GLAUSER:  GOOD MORNING, YOUR HONOR.

8            THE COURT:  I AM GOING TO LET PARR TESTIFY.  I'M

9    WORKING ON AN ORDER.  I THOUGHT HE WAS COMING IN IN THE

10   DEFENSE CASE, BACK TO BACK, WITH THE DEFENSE EXPERT, SO I

11   DIDN'T REALIZE YOU WERE PUTTING HIM ON SO QUICKLY.

12       BUT I WILL ALLOW HIM, AND I WILL HAVE AN ORDER THAT WILL

13   CIRCUMSCRIBE HIS TESTIMONY, WHICH I WILL GET OUT TODAY.

14       AND WHAT ELSE DID YOU HAVE?  DEPO OF BETLEM.

15           MS. GLAUSER:  YES, YOUR HONOR.  WE HAVE A PENDING

16   MOTION TO TAKE A DEPOSITION OF A WITNESS THAT DID NOT APPEAR

17   ON ADOBE'S INITIAL DISCLOSURES.

18           THE COURT:  I'M NOT INCLINED TO GRANT THAT.  I

19   HAVEN'T TOTALLY FINISHED IT YET, BUT I WILL TAKE A FURTHER

20   LOOK, BUT I'M NOT INCLINED TO GRANT IT.

21       AND WHAT ELSE?

22           MS. GLAUSER:  LAST OUTSTANDING ISSUE IS AN OBJECTION

23   TO AN EXHIBIT THAT WE WOULD LIKE TO USE WITH MR. VENTERS.  WHO

24   WILL TESTIFY AFTER MR. FARLEY.

25           THE COURT:  IS THIS AN EXHIBIT I ALREADY HAVE AND
```

1    KNOW ABOUT?

2         **MS. GLAUSER:**  I'M NOT SURE IT IS, BUT WE ARE HAPPY TO

3    PASS ANOTHER ONE UP.

4         SO THIS IS A DOCUMENT MR. VENTERS PREPARED IN PREPARATION

5    FOR THE 2004 MEETING.  AND WE ANTICIPATE HIS TESTIMONY WILL BE

6    THAT DURING THE 2004 MEETING HE WALKED THROUGH THIS

7    PRESENTATION WITH ADOBE.

8         THE COPY THAT WE HAVE OF THE 2004 VERSION HAS A COMMENT,

9    AN INTERNAL COMMENT ON PAGE 125C.004.  BUT MR. VENTERS WILL BE

10   ABLE TO CONFIRM THAT THIS IS THE COPY THAT HE SENT TO ADOBE

11   AND WALKED THROUGH WITH ADOBE DURING THE 2004 MEETING.

12        **MS. MEHTA:**  AND, YOUR HONOR, OUR OBJECTION IS UNDER

13   THE BEST EVIDENCE RULE.  SO THIS DOCUMENT IS BEING RELIED UPON

14   AS EVIDENCE OF NOTICE OF THE PATENTS TO ADOBE.  SO IT HAS

15   HEIGHTENED SIGNIFICANCE IN THE CASE.  AND DIGITAL REG CONCEDES

16   THAT THEY DON'T ACTUALLY HAVE THE DOCUMENT THAT WAS ALLEGEDLY

17   SENT TO ADOBE.  THEY ARE SAYING THIS OTHER VERSION OF THE

18   DOCUMENT IS CLOSE TO WHAT WAS SENT TO ADOBE.

19        THE PROBLEM IS THAT THERE IS ACTUALLY AT LEAST FOUR

20   VERSIONS OF THE DOCUMENT THAT HAVE BEEN PRODUCED BY DIGITAL

21   REG.  THE ONE THAT THEY SAY IS THE ONE THAT WAS SENT HAS

22   COMMENTS IN IT, AND IT WASN'T ACTUALLY SENT.

23        THERE'S OTHER VERSIONS THAT HAVE DIFFERENT COMMENTS,

24   DIFFERENT LANGUAGE.  THERE'S VERSIONS THAT ARE DATED 2004, BUT

25   HAVE INTERNAL REFERENCES TO 2007, SO THEY ARE MISDATED.  SO

1   WHAT WE HAVE IS A SITUATION WHERE THERE ARE FOUR DIFFERENT

2   VERSIONS OF A DOCUMENT WITH INCORRECT OR UNRELIABLE DATES AND

3   A WITNESS WHO IS GOING TO SAY:

4       "WELL, I SENT A DOCUMENT THAT'S X," AND THAT IS EXACTLY

5   WHAT THE BEST EVIDENCE RULE'S INTENDED TO PROHIBIT IS SOMEONE

6   TAKING A DOCUMENT OF HEIGHTENED SIGNIFICANCE AND SUBSTITUTING

7   ORAL TESTIMONY OR A DRAFT OR A DIFFERENT DOCUMENT AND

8   SUGGESTING THAT THAT WAS ACTUALLY THE DOCUMENT THAT WAS

9   TRANSMITTED.

10          MS. GLAUSER:  MAY I RESPOND?

11          THE COURT:  IF THERE ARE FOUR VERSIONS HOW WOULD HE

12  KNOW EXACTLY FOR SURE WHICH ONE IT WAS?

13          MS. GLAUSER:  HE KNOWS THE 2004 VERSION BECAUSE THIS

14  IS THE MAIN DOCUMENT.  THE REASON THERE ARE OTHER VERSIONS IS

15  THAT HE UPDATED THE DOCUMENT IN PREPARATION FOR THE 2008

16  MEETING.

17      SO WHEN ADOBE'S COUNSEL IS REFERRING TO SUBSEQUENT

18  VERSIONS THAT HAVE EDITS, WE PRODUCED ALL VERSIONS OF THE

19  ADOBE VALUE PROPOSITION.  IT WAS DRAFTED FOR THE 2004 MEETING,

20  AND THIS IS THE VERSION THAT CHIP USED WHEN HE WAS ON THE

21  PHONE WITH ADOBE TO WALK THROUGH THE PATENTS AND PROVIDE

22  NOTICE TO ADOBE.  AFTER 20 --

23          THE COURT:  HOW DOES HE KNOW?  ARE THERE COMPUTER

24  DATES ON THE HARD DRIVE OR SOMETHING?

25          MS. MEHTA:  NO, YOUR HONOR.

1          **THE COURT:**  HOW CAN HE MEMORIZE AN EIGHT-PAGE

2     DOCUMENT AND SAY I KNOW IT WAS THIS ONE WITH THIS COMMENT AND

3     NOT ANOTHER ONE WITH A DIFFERENT COMMENT?

4          **MS. GLAUSER:**  THE SUBSEQUENT COMMENTS UPDATE FOR

5     INFORMATION THAT DIDN'T HAPPEN UNTIL AFTER 2004.  ON HERE ON

6     THE BOTTOM IS A COPYRIGHT DATE OF 2004.  SO THIS IS THE

7     DOCUMENT HE PRESENTED IN 2004.

8          AFTER THAT MEETING IN PREPARATION FOR THE 2008 MEETING, HE

9     USED THE 2004 DOCUMENT TO UPDATE IT, MAKE EDITS AND ADD IN

10    PATENTS AND INFORMATION THAT HAD HAPPENED AFTER 2004 IN

11    PREPARATION FOR THE 2008 MEETING.

12         WE ARE NOT INTENDING TO OFFER ANY OF THOSE DRAFTS.

13         **THE COURT:**  RIGHT.

14         **MS. GLAUSER:**  THE ONLY ONE WE ARE INTENDING TO OFFER

15    IS THE ONE MR. VENTERS WILL TESTIFY IS THE ONE HE PRESENTED TO

16    ADOBE.  AND TO THE EXTENT THERE IS ANY ISSUE, THEY ARE WELCOME

17    TO TAKE IT UP ON CROSS-EXAMINATION AND IT WOULD GO TO THE

18    WEIGHT, NOT THE ADMISSIBILITY.

19         **MS. MEHTA:**  YOUR HONOR, THIS IS ALL HEARSAY, AND IT'S

20    UNDULY --

21         **THE COURT:**  YOU DON'T HAVE ANY VERSION OF IT, I

22    GUESS.

23         **MS. MEHTA:**  NO, WE DON'T HAVE ANY VERSION OF IT.

24    THERE'S NO EVIDENCE --

25         **THE COURT:**  IS THERE ANYTHING ABOUT ANY OF THE LATER

1   VERSIONS THAT WOULD LEAD YOU TO BELIEVE THAT ONE OF THE LATER

2   VERSION IS REALLY THE FIRST VERSION?

3          MS. MEHTA:   THERE ARE SO MANY INCONSISTENCIES IN

4   TERMS OF THE DATES, IN TERMS OF THE REDLINES AND THE INTERNAL

5   COMMENTS, NOBODY HAS ANY IDEA WHAT THE VERSION IS.

6          THE COURT:   ONE CAN TELL -- I MEAN, IF THERE IS A

7   LATER DATE THEN YOU KNOW THAT IS A LATER DOCUMENT.  SO WE CAN

8   RULE THAT ONE OUT.  IS THERE ANY WAY --

9          (SIMULTANEOUS COLLOQUY.)

10          THE COURT:   -- THIS ONE COULD BE RULED OUT?  IS THERE

11   ANYTHING THAT COULD BE LATER --

12          MS. MEHTA:   YES.

13          THE COURT:   -- ABOUT THIS ONE THAN ANY OF THE OTHERS?

14   OR, SECONDARILY, CAN WE TAKE OUT ANY OF THE DIFFERENCES?  ARE

15   ANY OF THESE DIFFERENCES THE POINT YOU ARE TRYING TO MAKE?

16   CAN WE TAKE OUT THE DIFFERENCES AND --

17          MS. GLAUSER:   YOUR HONOR, I DON'T THINK THERE IS ANY

18   DISAGREEMENT ABOUT THE INFORMATION THAT IS IN HERE.  AND, IN

19   FACT, THE --

20          THE COURT:   DO WE HAVE A GENERIC VERSION THAT DOESN'T

21   HAVE ANY INCONSISTENCIES AT ALL?

22          MS. MEHTA:   YOUR HONOR, THERE IS A SIGNIFICANT

23   DISAGREEMENT.  SO, NUMBER ONE, WHEN HE WAS DEPOSED ON THE

24   DOCUMENT HE ACTUALLY SAID A DIFFERENT VERSION OF THE DOCUMENT,

25   WHICH IS NOT ONE AT 125C, BUT 125B WAS THE ONE HE PRESENTED TO

1    ADOBE.

2        SO NOW THEY ARE SAYING THAT EVEN THOUGH IN DEPOSITION HE

3    SAID 125B WAS WHAT HE PRESENTED TO ADOBE, HE IS NOW GOING TO

4    SAY 125C WAS PRESENTED TO ADOBE.

5             **THE COURT REPORTER:**  EXCUSE ME, COUNSEL.

6        (SIMULTANEOUS COLLOQUY.)

7             **THE COURT:**  IS THERE A MEANINGFUL DIFFERENCE BETWEEN

8    THEM?

9          **MS. MEHTA:**  YES, YOUR HONOR, BECAUSE THEY HAVE

10   DIFFERENT TEXT.  AND THEY ARE SAYING THAT THEY ON A PHONE

11   CALL, I GUESS, PRESENTED THE DOCUMENT; THAT THE TEXT OF THE

12   DOCUMENTS IS DIFFERENT.  THERE ARE SUBSTANTIVE DIFFERENCES IN

13   WHAT THE SENTENCES ARE.

14           **THE COURT:**  ONE IS SAYING: "YOU KNOW ABOUT THIS

15   PATENT," AND THE OTHERS SAY "WE KNOW YOU DON'T KNOW ABOUT THIS

16   PATENT"?

17       I MEAN, IS THERE A MEANINGFUL DIFFERENCE?  PREJUDICIAL

18   DIFFERENCE?  SOMETHING THAT YOU COULDN'T RESOLVE BY STRIKING

19   ALL THE DIFFERENT PARTS.

20          **MS. MEHTA:**  YES, YOUR HONOR.  THERE ARE A COUPLE OF

21   DIFFERENCES.  ONE IS BECAUSE THEY ARE SAYING APPARENTLY NOW

22   THAT THIS WAS DONE OVER THE PHONE.  THERE IS A PREJUDICIAL

23   DIFFERENCE --

24           **THE COURT:**  THE MEETING WAS ON THE PHONE AND THE

25   DOCUMENT --

1            MS. MEHTA:  RIGHT.  THAT IS WHAT I JUST HEARD.

2            MS. GLAUSER:  YOUR HONOR, THE WAY THE MEETING

3    OCCURRED IS THAT THIS DOCUMENT WAS SENT TO ADOBE.  THIS WAS

4    THE IMPETUS FOR THE MEETING WITH ADOBE.  THEY THEN HAD A

5    TELEPHONE MEETING WHERE DIGITAL REG WALKED THROUGH WITH ADOBE

6    THIS DOCUMENT.

7         AND WHEN YOU ARE ASKING IF THERE IS ANY PREJUDICIAL

8    DIFFERENCE, THERE ISN'T.  ALL OF THE TRACK COMMENTS BETWEEN

9    EVERY SINGLE VERSION OF THIS DOCUMENT DO NOT RELATE TO THE

10   '541 AND '670 PATENT.

11           THE COURT:  WHY DON'T YOU TAKE ALL OF THE VERSIONS

12   AND SCRUB ANYTHING OUT OF THEM THAT IS DIFFERENT BETWEEN THE

13   FOUR AND HAVE A GENERIC VERSION THAT HAS NOTHING EXCEPT THINGS

14   THAT ARE COMMON TO ALL FOUR VERSIONS?

15           MS. MEHTA:  AND, YOUR HONOR, WE WOULD ASK TO REVIEW

16   THAT BECAUSE WE NEED TO BE ABLE TO SEE THE TRACK CHANGES AND

17   WHAT DIFFERENCES THEY ARE MAKING TO THE DOCUMENT BEFORE WE CAN

18   CROSS-EXAMINE THE WITNESS ON THAT.

19           THE COURT:  YOU CAN DO THE SAME THING.  SCRUB IT.

20   TAKE -- ANYPLACE WHERE TWO THINGS ARE DIFFERENT, TAKE OUT

21   BOTH. IF THERE IS TWO DIFFERENT COMMENTS, TAKE OUT BOTH.

22        WE NEED TO GO.

23        WOULD YOU BRING IN THE JURY?

24        WHAT?

25           MR. REINES:  THE DOCUMENT THAT THEY ARE SAYING WAS

1    GIVEN TO ADOBE HAS TRACK CHANGES, COMMENTS, WHICH MEANS

2    OBVIOUSLY IT WASN'T GIVEN TO ADOBE.  IT SAYS: "CHANGE THIS

3    BECAUSE WE WANT ADOBE" --

4            **THE COURT:**  WE WILL TAKE ALL THAT OUT.

5            **MR. REINES:**  THAT IS HOW WE ARE GOING TO IMPEACH HIM

6    AND SAY --

7            **THE COURT:**  WELL, YOU CAN HAVE IT IN, IF YOU WANT IT.

8            **MR. REINES:**  THANK YOU.

9            **THE CLERK:**  READY?

10           **THE COURT:**  WHO IS ON THE STAND?

11       GOOD MORNING.

12           **THE CLERK:**  MR. FARLEY.

13       (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

14           **THE COURT:**  PLEASE HAVE A SEAT.

15       GOOD MORNING, LADIES AND GENTLEMEN.  THANK YOU FOR BEING

16   HERE TIMELY, AND WE WILL CONTINUE WITH THE CROSS-EXAMINATION

17   OF MR. FARLEY.

18       (MR. FARLEY RESUMED THE STAND, AND FURTHER TESTIFIED AS

19   FOLLOWS:)

20                    **CROSS-EXAMINATION RESUMED**

21   **BY MR. REINES:**

22   **Q.**  GOOD MORNING, MR. FARLEY.

23   **A.**  GOOD MORNING, MR. REINES.

24   **Q.**  I WOULD LIKE TO START BACK AND RESUME WITH THE

25   OCTOBER 1997 COMPLAINT FILING, YOUR FIRST SET OF PATENT

```
 1    LITIGATION ON BEHALF OF DIGITAL REG.

 2    A.  2007?

 3    Q.  YES.  OCTOBER 5TH.

 4    A.  THANK YOU.

 5         MR. REINES:  PLEASE CALL UP EXHIBIT 692, PLEASE.

 6         (DISPLAYED ON SCREEN.)

 7    BY MR. REINES

 8    Q.  CAN YOU CONFIRM THAT EXHIBIT 692 IS THE COMPLAINT THAT YOU

 9    AUTHORIZED TO BE FILED IN 1997?

10    A.  I BELIEVE IT IS.

11    Q.  OKAY.

12         MR. REINES:  WITH THAT, YOUR HONOR, WE WOULD MOVE IT

13    INTO EVIDENCE.  IT'S A SIGNIFICANT DOCUMENT.

14         MS. GLAUSER:  I THINK THE DOCUMENT IS CUMULATIVE TO

15    WHAT HE --

16         THE COURT:  I AM SORRY?

17         MS. GLAUSER:  I THINK THE DOCUMENT IS CUMULATIVE OF

18    ANYTHING THAT MR. FARLEY CAN TESTIFY TO.  I'M NOT SURE WE NEED

19    TO ENTER --

20         THE COURT:  YES.  I'M NOT, EITHER.  YOU CAN ASK HIM

21    ABOUT IT.

22         MR. REINES:  OKAY.

23         THE COURT:  IF WE NEED -- YOU CAN SHOW IT.  YOU CAN

24    SHOW IT, BUT I DON'T KNOW WE NEED TO PUT IT INTO EVIDENCE.

25         MR. REINES:  AS LONG AS WE CAN SHOW IT.
```

1    WOULD YOU PULL UP THE DEFENDANT'S LIST FOR EVERYONE TO

2    SEE?

3                    (DISPLAYED ON SCREEN.)

4    **BY MR. REINES:**

5    **Q.**  SO THIS IS THE LIST OF DEFENDANTS THAT YOU SUED; IS THAT

6    CORRECT?

7    **A.**  YES, SIR.

8    **Q.**  OKAY.  AND WE HAD A DISCUSSION YESTERDAY ABOUT WHETHER IT

9    WAS NINE OR TEN DEFENDANTS.  DO YOU RECALL THAT?

10   **A.**  YES, SIR.

11   **Q.**  I'M SEEING NOW IT'S GOT HUSTLER.COM?  THAT WAS THE LEAD

12   DEFENDANT THAT YOU SUED; IS THAT CORRECT?

13   **A.**  YES, SIR.

14   **Q.**  AND THEN --

15   **A.**  THAT IS WHAT IT SAYS.

16   **Q.**  AND THEN, LFP IS THE SECOND DEFENDANT.  CORRECT?

17   **A.**  YES, SIR.

18   **Q.**  YOUR BELIEF IS THAT THOSE TWO ENTITIES ARE RELATED; IS

19   THAT RIGHT?

20   **A.**  I DIDN'T HAVE A BELIEF ONE WAY OR THE OTHER, BUT I BELIEVE

21   SITTING HERE TODAY THAT THAT IS CORRECT, THAT THEY ARE ONE AND

22   THE SAME.

23   **Q.**  SO WHEN YOU AUTHORIZED THE FILING OF THE SUIT, YOU HAD NO

24   IDEA WHETHER HUSTLER.COM --

25   **A.**  NO, I DID NOT SAY THAT.  I JUST SAID THAT THE TWO OF THEM,

1    I BELIEVE, ARE THE SAME.  THAT'S WHAT I SAID.

2    **Q.**  OKAY.

3    **A.**  WHEN YOU ASKED ME THE QUESTION.  I DIDN'T PREPARE THE

4    DOCUMENT, SO I DIDN'T THINK IN TERMS OF THAT AT THE TIME.  IT

5    WASN'T A CONCERN OF MINE.  I DIDN'T MAKE A BIG ISSUE OF IT,

6    OKAY?

7    **Q.**  ALL RIGHT.  IN TERMS OF THE SUIT, AMONG THE COMPANIES THAT

8    YOU SUED WERE SOME TECHNOLOGY COMPANIES, CORRECT, BIG SOFTWARE

9    COMPANIES?

10   **A.**  YES, SIR.

11   **Q.**  AND THAT WOULD INCLUDE AT LEAST MICROSOFT APPLE, SONY,

12   MACROVISION, CORRECT?

13   **A.**  YES, SIR.

14   **Q.**  AND HOW DID YOU GET INFORMATION SUFFICIENT TO SUE THOSE

15   COMPANIES IN 2007 BASED ON YOUR PATENTS, IN TERMS OF THE

16   INTERNAL WORKINGS OF THE PRODUCTS?

17   **A.**  I PERSONALLY HAD NOTHING TO DO IN TERMS OF GATHERING THE

18   INFORMATION THAT WAS USED TO DETERMINE THAT THESE COMPANIES

19   SHOULD BE IN THE LAWSUIT.

20   **Q.**  BUT YOUR TEAM HAD SUFFICIENT INFORMATION FROM THE SOURCES

21   THEY HAD TO GET THAT INFORMATION BEFORE THE SUIT BEFORE YOU

22   GOT THE DISCOVERY THAT MATERIALS AND EVERYTHING ELSE, RIGHT?

23   **A.**  I ASSUME THAT THEY DID.

24   **Q.**  SO YOUR BELIEF IN 1997 WAS THAT WITH THINKFIRE WORKING FOR

25   YOU AND YOUR ATTORNEYS AT THE TIME, THAT YOU ALSO HAD THE

FARLEY – CROSS / REINES

```
1    OUTSIDE LITIGATION COUNSEL, THAT THEY -- YOU WERE COMFORTABLE
2    THEY WERE ABLE TO GET INFORMATION FROM THE PUBLIC DOMAIN
3    SUFFICIENT TO SUE THESE COMPANIES, CORRECT?
4    A.  HOWEVER THEY GET IT.  I'VE ALWAYS BEEN AMAZED HOW THEY GET
5    IT.  BUT, YES, THEY HAVE THEIR WAYS OF FIGURING THAT STUFF
6    OUT.  WHETHER IT IS PUBLIC DOMAIN OR SOMETHING ELSE, I DON'T
7    KNOW THE ANSWER.
8    Q.  YOU'RE NOT AWARE ANYBODY GOT ANY IMPROPER TECHNICAL
9    INFORMATION THAT WAS CONFIDENTIAL FROM ANY OF THESE COMPANIES
10   BEFORE THE FILING OF THE SUIT, THAT YOU ARE AWARE OF?
11   A.  I ASSUME THAT THEY DIDN'T.
12   Q.  OKAY.  AND, JUST ONCE AGAIN TO CONFIRM, AT THE TIME THAT
13   YOU AUTHORIZED THIS SUIT, YOU WERE AWARE ADOBE WAS A LARGE
14   SOFTWARE COMPANY?
15   A.  THERE'S A LOT OF LARGE SOFTWARE COMPANIES THAT AREN'T
16   INCLUDED HERE.
17   Q.  RIGHT.  IF YOU CAN BE RESPONSIVE TO MY QUESTION.  MY
18   QUESTION.  MY QUESTION WAS:  YOU ARE AWARE AT THIS POINT IN
19   TIME THAT ADOBE IS A LARGE SOFTWARE COMPANY?
20   A.  I'M BEING RESPONSIVE TO YOUR QUESTION, SIR. ADOBE AND MANY
21   OTHERS ARE LARGE SOFTWARE COMPANIES THAT ARE NOT LISTED HERE,
22   AND WE ARE AWARE OF ALL OF THEM.
23   Q.  IT WILL BE QUICKER IF YOU ARE RESPONSIVE.
24       LET'S ADDRESS THE MICROSOFT FIRST.  WE WENT THROUGH THE
25   SERIES OF LICENSES AND WE WANT TO SEE HOW THIS RESOLVED.
```

1     **MR. REINES:**  IF WE COULD PULL UP THE MICROSOFT

2     SETTLEMENT, WHICH IS EXHIBIT 24B.

3                         (DISPLAYED ON SCREEN.)

4     **BY MR. REINES**

5     **Q.**  DO YOU HAVE THAT UP THERE?

6              **MR. REINES:**  FOR THE LICENSE AGREEMENTS, I PLAN ON

7     GOING THROUGH THEM, NOT IN AN EXHAUSTIVE WAY BUT IN WAYS I

8     THINK WILL BE HELPFUL TO RESOLUTION OF THE MATTERS.  I

9     UNDERSTAND THE COURT DOESN'T WANT ALL OF THEM IN EVIDENCE.

10             **THE COURT:**  YOU CAN USE THEM.  WE WILL NOT PUT THEM

11    ALL IN EVIDENCE.  YOU CAN PUT THEM OUT.

12             **MR. REINES:**  PUBLISH THEM.

13             **THE COURT:**  YES.

14             **MR. REINES:**  WHY DON'T WE PUBLISH 24B, PLEASE?

15       (DISPLAYED ON SCREEN.)

16             **MR. REINES:**  THANK YOU.

17    **BY MR. REINES:**

18    **Q.**  THIS IS AN AGREEMENT WITH MICROSOFT.  CORRECT?

19    **A.**  YES.

20    **Q.**  AND YOU SIGNED IT; IS THAT RIGHT?

21    **A.**  YES.

22    **Q.**  NOW, IN TERMS OF WHAT WAS ANALYZED, WINDOWS MEDIA PLAYER

23    WAS ONE OF THE PRODUCTS THAT WAS ANALYZED BEFORE YOU BROUGHT

24    SUIT AND THAT YOU KNEW WAS AT ISSUE IN THIS SETTLEMENT?  DO

25    YOU REMEMBER THAT?

1   **A.**  NO, I DON'T REMEMBER IT.  I THOUGHT IT WAS SOME SORT OF

2   MUSIC COMPANY THAT MICROSOFT HAS, WHAT WE ENDED UP HAVING IN

3   THE SUIT.  THAT EVENTUALLY CLOSED DOWN.  THAT'S MY MEMORY, BUT

4   IT WAS A LONG TIME AGO.

5   **Q.**  IN TERMS OF WHAT THINKFIRE ANALYZED, IT WAS THINKFIRE THAT

6   GAVE YOU COMFORT THAT YOU HAD ENOUGH INFORMATION TO SUE

7   MICROSOFT; IS THAT CORRECT?

8   **A.**  NO.  MR. OLIVO, WHO WAS OUR ATTORNEY, WAS THE ONE THAT DID

9   THE FINAL ANALYSIS.  AND HE WAS -- I BELIEVE ISN'T THERE SOME

10  RULE 11 FOR ATTORNEYS THAT THEY HAVE A RESPONSIBILITY TO BE

11  ABLE TO PROVE THAT THEY ARE DOING THE RIGHT THING IN ORDER TO

12  SUE SOMEBODY?

13  **Q.**  YOU'RE GETTING INTO --

14  **A.**  IT WAS REALLY ON MR. OLIVO'S HEAD TO BE CORRECT, NOT

15  THINKFIRE.

16  **Q.**  BUT IN TERMS OF THE PACKET YOU HAD WITH LITIGATION, WITH

17  THE CLAIM CHARTS, AND SO FORTH, THAT CAME FROM THINKFIRE?

18  **A.**  SOME OF IT DID, YES, I BELIEVE.

19      **MR. REINES:**  WHY DON'T WE PULL UP THE THINKFIRE

20  AGREEMENT, WHICH IS EXHIBIT 458.

21      AND IT IS IN EVIDENCE.

22      (PUBLISHED TO JURY.)

23      **MR. REINES:**  IF WE CAN GO TO PAGE 17, PLEASE.

24      **THE CLERK:**  I DON'T SHOW 458 IN EVIDENCE.

25      **MR. REINES:**  OH, I AM SORRY.  I AM SORRY.  OKAY.  LET

 1    ME JUST CONFIRM, THEN.  I APOLOGIZE.

 2         WOULD YOU LOOK AT THE 458?  LET'S GO TO THE FIRST PAGE.

 3         (DISPLAYED ON SCREEN.)

 4    **BY MR. REINES:**

 5    **Q.**  YOU RECOGNIZE EXHIBIT 458 AS THE AGREEMENT BETWEEN DIGITAL

 6    REG AND THINKFIRE REGARDING INVESTIGATING INFRINGEMENT?

 7    **A.**  CAN I SEE THE SECOND PAGE, TOO?

 8    **Q.**  SURE.

 9         YOU SIGNED IT.  DO YOU WANT TO GO TO YOUR SIGNATURE?

10    **A.**  NO, I WANTED TO BE SURE WHAT THE FIRST PARAGRAPH 1.1 WAS.

11    SO, YES, THIS IS THE AGREEMENT THAT SAYS THEY ARE GOING TO

12    WORK FOR US FOR LICENSING AND SELLING OUR PATENTS ONLY.

13         **MR. REINES:**  OKAY.  YOUR HONOR, WE WOULD MOVE 458

14    INTO EVIDENCE.  THIS IS THE THINKFIRE AGREEMENT.

15         **MS. GLAUSER:**  NO OBJECTION, YOUR HONOR.

16         **THE COURT:**  RECEIVED.

17         (PUBLISHED TO JURY.)

18         **MR. REINES:**  I JUMPED THE GUN, AND I APOLOGIZE TO

19    EVERYBODY FOR THAT.

20         IF WE CAN GO BACK TO 458 AT 17, PLEASE.  OKAY.

21    **BY MR. REINES**

22    **Q.**  AND THIS IS THE WORK THAT YOU WANTED TO HAVE THINKFIRE DO,

23    CORRECT, RELATIVE TO MICROSOFT?

24    **A.**  YES.  THAT'S CORRECT.  THIS IS WHAT THEY WERE WORKING FOR

25    A LICENSING AGREEMENT.

FARLEY – CROSS / REINES

1  **Q.**  RIGHT.  SO THE WAY YOU HAD THE AGREEMENT WAS YOU HAD A

2  GENERAL MASTER AGREEMENT, AND THEN YOU HAD SPECIFIC AGREEMENTS

3  FOR PARTICULAR TARGETS WHERE THEY WOULD KIND OF DO A FOCUSING

4  THING, AND IT WAS CALLED A "STATEMENT OF WORK"?

5  **A.**  YES, THAT'S CORRECT.

6  **Q.**  OKAY.  AND THIS IS THE STATEMENT OF WORK FOR MICROSOFT?

7  **A.**  YES, FOR THE LICENSING EFFORTS.

8  **Q.**  OKAY.  GREAT.

9  **A.**  THAT'S CORRECT.

10  **Q.**  AND IN TERMS OF WHAT YOU -- PRODUCTS YOU WERE FOCUSING ON

11  FOR MICROSOFT, IT IS THE MICROSOFT WINDOWS MEDIA PLATFORM AND

12  OPERATING SYSTEM.  DO YOU SEE THAT?

13  **A.**  YES, I DO.

14  **Q.**  AND FOR THE '541 PATENT?

15  **A.**  YES.

16  **Q.**  AND THAT IS CONSISTENT WITH YOUR MEMORY?

17  **A.**  I HAVE -- I'M NOT ARGUING WITH YOU ABOUT IT.  NO, THAT'S

18  IT.  THAT IS WHAT WE WERE TRYING TO GET A LICENSE FOR.

19  **Q.**  EXCELLENT.

20       **MR. REINES:**  LET'S GO TO THE NEXT PAGE 18, THE NEXT

21  PAGE, PLEASE.  AND IF YOU CAN PULL THAT UP, PLEASE.

22       (PUBLISHED TO JURY.)

23       **MR. REINES:**  THANK YOU.

24  **BY MR. REINES**

25  **Q.**  IS THAT YOUR SIGNATURE THERE?

1  **A.**  YES, SIR.

2  **Q.**  AND IN TERMS OF THE ESTIMATE FROM THINKFIRE AS TO WHAT

3  ROYALTIES THEY THOUGHT THEY COULD OBTAIN FROM MICROSOFT, IT

4  SAID A MINIMUM OF 10 MILLION TO THE WINDOWS MEDIA PLATFORM AND

5  GREATER THAN 50 MILLION FOR THE WINDOWS OPERATING SYSTEM.  DO

6  YOU SEE THAT?

7  **A.**  YES, I DO.

8  **Q.**  AND SINCE THEY WERE THE EXPERTS YOU TOOK THEM AT THEIR

9  WORD AS TO WHAT YOUR EXPECTATIONS WERE AT THE TIME?

10  **A.**  WE WERE NOVICES IN THE FIELD AT THAT TIME.

11  **Q.**  AND YOU TOOK THEIR WORD FOR IT AT THE TIME?

12  **A.**  YES.

13  **Q.**  AND THE ULTIMATE SETTLEMENT THAT YOU ENTERED INTO WITH

14  MICROSOFT FOR THE OPERATING SYSTEM AND THE MEDIA PLATFORM WAS

15  FOR -- I THINK WE SHOW ON THE CHART -- ABOUT $487,000; IS THAT

16  CORRECT?

17  **A.**  WAIT A MINUTE.  WOULD YOU SAY THAT AGAIN?

18  **Q.**  THE SETTLEMENT WITH MICROSOFT --

19  **A.**  YES.

20  **Q.**  -- THAT RESULTED FROM THE LITIGATION WAS $487,000?

21  **A.**  YES, BUT IT HAD NOTHING TO DO WITH THESE THINGS THAT YOU

22  HAVE ON THE SCREEN HIGHLIGHTED HERE.  THAT ISN'T WHAT WE SUED

23  THEM ON.  WE SUED THEM ON A MUSIC SYSTEM.

24  **Q.**  RIGHT.  LET'S LOOK AT THE LICENSE.

25       **MR. REINES:**  CAN YOU TURN TO EXHIBIT 24B PAGE 2 AT

1    SECTION 1.6?

2        AND CAN YOU HIGHLIGHT THE FIRST SENTENCE?

3    **BY MR. REINES:**

4    **Q.**  IN TERMS OF WHAT THE MICROSOFT PRODUCTS WERE THAT WERE

5    LICENSED, THAT'S NOT -- THAT INCLUDES BUT NOT LIMITED AS TO

6    SOFTWARE PRODUCTS, EQUIPMENT SYSTEMS AND SERVICES, PAST,

7    PRESENT AND FUTURE.  DO YOU SEE THAT?

8    **A.**  YES, I DO.

9    **Q.**  THAT IS CONSISTENT WITH YOUR UNDERSTANDING AS TO WHAT WAS

10   LICENSED?

11   **A.**  YES, IT IS BUT --

12   **Q.**  THAT'S --

13   **A.**  -- JUST SO WE ARE CLEAR, I THINK OUR CONFUSION IS THAT WE

14   SUED THEM ON ONE THING AND WE LICENSED THEM FOR EVERYTHING.

15       SO I THINK THAT IS WHERE I'M HAVING A DISAGREEMENT WITH

16   YOU.  WHAT YOU HAVE SAID IS CORRECT.

17   **Q.**  YOU ARE SAYING MICROSOFT GENERALLY DOESN'T USE DRM.  YOU

18   ARE SAYING IT IS SOME MUSIC SERVICE?

19   **A.**  NO.  NO, I DIDN'T.  DON'T PUT WORDS IN MY MOUTH, PLEASE.

20   I DID NOT SAY THAT.

21   **Q.**  IF YOU CAN JUST ANSWER MY QUESTIONS.  I AM GOING TO BE

22   ASKING LEADING QUESTIONS --

23   **A.**  I KNOW YOU DO.

24   **Q.**  BECAUSE I'M ENTITLED TO.  BUT I THINK THE STATEMENT THAT

25   I'M PUTTING WORDS IN YOUR MOUTH IS NOT APPROPRIATE.  YOU ARE

 1    PERFECTLY CAPABLE OF SAYING "YES" OR "NO" TO MY QUESTIONS.

 2        NOW, IN TERMS OF THE FACTS OR CIRCUMSTANCE TO EXPLAIN THE

 3    PRICE BELOW $500,000 FOR ALL THE MICROSOFT PRODUCTS PAST,

 4    PRESENT AND FUTURE, YOU CAN'T EXPLAIN ANY OF THE FACTS OR

 5    CIRCUMSTANCES FOR THAT; ISN'T THAT CORRECT?

 6    **A.**  THAT WOULD BE CORRECT.  I DIDN'T NEGOTIATE THIS AGREEMENT.

 7    **Q.**  AND YOU HAVE NO BASIS TO SAY WHY THE AMOUNT WAS ONE WAY OR

 8    THE OTHER, WHAT IT WAS BECAUSE THAT WAS THE ATTORNEYS AND THAT

 9    WAS ALL ATTORNEY-CLIENT PRIVILEGE?

10    **A.**  THAT'S CORRECT.

11    **Q.**  AND, IN FACT, THIS LICENSE AGREEMENT --

12        **MR. REINES:**  WHY DON'T WE GO TO THE LICENSE PATENTS

13    SECTION, WHICH IS SECTION 1.5, PLEASE?  IT IS THE

14    IMMEDIATE-ABOVE SECTION.

15    **BY MR. REINES**

16    **Q.**  THIS STATES THE PATENTS THAT ARE LICENSED, RIGHT?

17    **A.**  YES.  THE '541 IS WHAT THEY RECEIVED A LICENSE TO.

18    **Q.**  AND THEY ALSO RECEIVED RELATED PATENTS, CORRECT?

19    **A.**  WE HAD A CANADIAN APPLICATION AND A EUROPEAN APPLICATION

20    FOR THIS PATENT.  AND THAT'S WHAT THE OTHERS WERE INTENDED TO

21    BE.

22    **Q.**  YOU ARE GIVING THIS TESTIMONY NOW, BUT ISN'T IT TRUE THAT

23    WHEN YOU SIGNED THIS AGREEMENT --

24        **MR. REINES:**  AND WHY DON'T WE PULL UP THE SIGNATURE?

25

1    **BY MR. REINES**

2    **Q.**  WELL, YOU ACKNOWLEDGED YOU SIGNED IT.

3       WHEN YOU SIGNED THE AGREEMENT YOU HADN'T READ THE

4    AGREEMENT, CORRECT?

5    **A.**  THAT'S CORRECT.  I HAD NOT READ IT.

6    **Q.**  SO YOU JUST SIGNED THIS MICROSOFT AGREEMENT WITHOUT

7    READING IT AT ALL, RIGHT?

8    **A.**  NO, I HAD A DISCUSSION WITH MY ATTORNEY --

9    **Q.**  NO, MY QUESTION WAS:  "DID YOU READ IT"?

10   **A.**  NO, I DIDN'T READ IT.  I HAD A DISCUSSION WITH MY

11   ATTORNEY.  I AM SORRY.  I MEAN --

12           **MR. REINES:**  YOUR HONOR, I DID ASK --

13           **THE COURT:**  YOU REALLY NEED TO ANSWER THE QUESTION.

14   IF HE ASKS YOU IF YOU READ IT, JUST SAY YOU DIDN'T READ IT.

15   IF YOUR ATTORNEY FEELS MORE NEEDS -- OR THE ATTORNEY WHO

16   CALLED YOU FEELS MORE NEEDS TO COME OUT, SHE WILL BE SURE TO

17   ASK YOU.

18           **THE WITNESS:**  I APOLOGIZE.  MY FIRST TIME DOING THIS.

19           **THE COURT:**  SURE.  NO PROBLEM.

20   **BY MR. REINES:**

21   **Q.**  ALL RIGHT.  I WOULD LIKE TO MOVE ON FROM MICROSOFT AND GO

22   TO MACROVISION, ANOTHER ONE OF THE COMPANIES THAT WAS IN THIS

23   ORIGINAL CASE.

24           **MR. REINES:**  AND WHY DON'T WE PULL UP EXHIBIT 184,

25   WHICH WILL BE FAMILIAR BECAUSE IT WAS USED IN YOUR DIRECT

1    EXAMINATION.

2        (PUBLISHED TO JURY.)

3    **BY MR. REINES**

4    **Q.**  AND FOR MACROVISION, WHAT YOU PUT ON YOUR CHART WAS

5    1 PERCENT AND $89,000.  CORRECT?

6    **A.**  YES.

7    **Q.**  ALL RIGHT.  LET'S TALK ABOUT THAT.

8            **MR. REINES:**  ACTUALLY, LET'S PUT UP YOUR TRIAL

9    TESTIMONY SO WE KNOW EXACTLY WHAT YOU SAID ABOUT IT.  THIS IS

10   TRIAL TESTIMONY AT 324, LINE 20 THROUGH 325, LINE 2.  AND THE

11   QUESTION THAT WAS ASKED TO YOU BY YOUR COUNSEL IS:

12       "HOW MUCH DID MACROVISION PAY FOR THE LICENSE?"

13       YOUR ANSWER IS:

14       "THEY PAID 98,000," WITH A SIC "AND IT WAS BASED ON A

15   1 PERCENT ROYALTY RATE ON THE NUMBER OF UNITS THAT THEY HAD

16   SOLD UP TO THAT POINT."

17       DO YOU SEE THAT?

18   **A.**  YES, I DO.

19   **Q.**  OKAY.

20   **A.**  I THINK I MISSPOKE ON THAT NUMBER, TOO.

21   **Q.**  YES.  I'M NOT FAULTING YOU FOR THAT.

22   **A.**  OKAY.

23   **Q.**  SO IN TERMS OF THE 1 PERCENT YOU SAID THE $89,000

24   SETTLEMENT PRICE WAS BASED ON AN 1 PERCENT ROYALTY RATE,

25   RIGHT?  THAT IS WHAT YOU TOLD THE JURY?

1   **A.**  YES, THAT'S CORRECT.

2   **Q.**  OKAY.  IN FACT, YOU WERE NOT EVEN AWARE OF ANYTHING TO DO

3   WITH 1 PERCENT WHEN YOU APPROVED THIS LICENSE AGREEMENT.  IT

4   WAS JUST THE BOTTOM LINE WAS $89,000.  THAT IS WHAT YOU CARED.

5   YOU GOT $89,000 IN THE DOOR, RIGHT?

6   **A.**  I THINK THAT WOULD BE FAIR.

7   **Q.**  AND, IN FACT, WHEN I ASKED YOU ABOUT THIS 1 PERCENT FIGURE

8   THAT WAS INSERTED BY YOUR ATTORNEYS, YOUR LITIGATION

9   ATTORNEYS, INTO THE AGREEMENT --

10       **MR. REINES:**  WHY DON'T WE PULL THAT UP?

11       **MS. GLAUSER:**  OBJECTION, YOUR HONOR.  THIS IS

12   IMPROPER IMPEACHMENT.  HE HASN'T ASKED WHETHER OR NOT HE

13   DISAGREES WITH THE TESTIMONY THAT HE GAVE YESTERDAY, IF THERE

14   IS ANY CONTRADICTION.  THERE IS NO NEED TO BE PULLING UP THE

15   TRANSCRIPT FROM YESTERDAY.  IF HE HAS A QUESTION OF

16   MR. FARLEY --

17       **THE COURT:**  OKAY, WHY DON'T YOU SET UP WHAT YOU

18   ARE --

19       **MR. REINES:**  I AM PULLING UP AN EXHIBIT.  I'M NOT

20   SURE WHAT THAT WAS.

21     IF YOU CAN PULL UP EXHIBIT 98, AT PAGE 5, SECTION 6.7.

22     (DISPLAYED ON SCREEN.)

23       **MR. REINES:**  AND WE CAN PUBLISH THAT.

24     (PUBLISHED TO JURY.)

25       **MR. REINES:**  OKAY.

FARLEY – CROSS / REINES

1    **BY MR. REINES:**

2    **Q.**  SO, THIS IS THE PROVISION, PROVISION 6.7, THAT YOU RELIED

3    ON WHEN YOU REPRESENTED THROUGH THAT CHART THAT THERE WAS

4    1 PERCENT ASSOCIATED WITH INTUIT; IS THAT CORRECT?

5    **A.**  2 PERCENT WITH INTUIT.  IT'S 1 PERCENT WITH THIS.

6    **Q.**  EXCUSE ME.  RIGHT.  MACROVISION 1 PERCENT.

7    **A.**  YES.  OKAY.  I'M SORRY.

8    **Q.**  WITH THAT RESPECT TO THAT 1 PERCENT, AS YOU SAID WHEN YOU

9    SIGNED THIS AGREEMENT YOU DIDN'T READ IT, CORRECT?

10   **A.**  NO, I DIDN'T.

11   **Q.**  WHEN YOU SIGNED IT YOU HAD NO IDEA ABOUT THIS 1 PERCENT.

12   WHAT YOU KNEW ABOUT WAS THE $89,000 YOU WERE GOING TO GET?

13   **A.**  NO.

14   **Q.**  IN FACT, WHEN I ASKED YOU ABOUT THE 6.7, WASN'T IT TRUE

15   WITH THE 6.7 -- 6.7 PROVISION WHERE YOU AGREED TO AN EFFECTIVE

16   ROYALTY RATE OF 1 PERCENT, THAT YOUR VIEW OF THAT IS THAT WAS

17   JUST LAWYER STUFF?

18   **A.**  THAT'S TRUE.

19          **MR. REINES:**  AND IF WE GO TO SECTION 9.2, WHICH IS AT

20   PAGE 6, WHICH IS THE NEXT PAGE OF THE EXHIBIT.

21       (PUBLISHED TO JURY.)

22   **BY MR. REINES:**

23   **Q.**  THIS IS WHERE YOU TALK ABOUT THE CONFIDENTIALITY OF THE

24   DOCUMENT.

25       DO YOU SEE WHERE THERE IS A PROVISION SPECIFICALLY THAT

1    YOUR EXPERTS –– I ASSUME MEANING YOURS DAMAGES EXPERT –– WOULD

2    BE ABLE TO –– "EXPERTS EYES ONLY."  DO YOU SEE THAT?

3    **A.**  YEAH.

4    **Q.**  AND SO YOUR UNDERSTANDING OF THIS PROVISION IS THAT YOUR

5    EXPERT WOULD BE ABLE TO GET ACCESS TO THAT 1 PERCENT RATE TO

6    USE IT FOR PURPOSES OF LITIGATION?

7    **A.**  I ASSUME THAT IS WHAT IT SAYS.  WHAT YOU HAVE TAKEN HERE

8    LOOKS LIKE THAT IS WHAT IT SAYS.  BUT, AGAIN, I'M NOT A

9    LAWYER.

10   **Q.**  AND NOW IN TERMS OF WHY MACROVISION WOULD PAY $89,000 FOR

11   YOUR PATENTS.  LET'S TALK ABOUT THAT FOR A SECOND.

12       YOU UNDERSTOOD MACROVISION WAS GOING INTO A MERGER SHORTLY

13   AFTER YOU FILED SUIT.  CORRECT?

14   **A.**  THAT'S WHAT MY ATTORNEY TOLD ME THE EVENING THAT HE CALLED

15   ME ABOUT IT.

16   **Q.**  YOU UNDERSTOOD WHEN YOU WERE NEGOTIATING WITH THEM,

17   BECAUSE YOU ARE AN EXPERIENCED BUSINESSMAN, THAT WHEN YOU ARE

18   GOING INTO A MERGER HAVING PENDING LITIGATION AGAINST YOU IS

19   NOT THE BEST THING.  CORRECT?

20   **A.**  I GUESS.  I HAVE NEVER BEEN INVOLVED EXCEPT IN ONE MERGER,

21   SO I WOULD ASSUME THAT WOULD BE THE CASE.

22   **Q.**  AND IN ADDITION FOR MACROVISION, NOT ONLY DID IT HAVE A

23   MERGER COMING UP WHERE IT WANTED TO CLEAR THE BOOKS, BUT YOU

24   KNEW AT THE TIME THEY WERE FACING HUNDREDS OF THOUSANDS, IF

25   NOT MILLIONS OF DOLLARS IN LEGAL BILLS IF THEY CONTINUED

FARLEY – CROSS / REINES

```
 1    LITIGATING THE CASE.  RIGHT?
 2           MS. GLAUSER:  OBJECTION, YOUR HONOR.  CALLS FOR
 3    SPECULATION.  HE HASN'T LAID THE FOUNDATION FOR HOW MR. FARLEY
 4    WOULD HAVE THAT KNOWLEDGE.
 5           THE COURT:  I THOUGHT WE DID.  WASN'T IT THIS WITNESS
 6    WITH WHOM WE DISCUSSED THE COST OF LITIGATION?
 7           MR. REINES:  YES.
 8    BY MR. REINES:
 9    Q.  YOU KNEW THAT PATENT -- WELL, YOU KNOW THAT PATENT
10    LITIGATION COSTS A LOT OF MONEY, RIGHT?
11    A.  YES.
12    Q.  OKAY.
13    A.  IT DOES.
14    Q.  ALL RIGHT.
15        WHY DON'T WE GO TO -- OH, AND IN TERMS OF WHY YOU
16    AGREED -- DIGITAL REG AGREED TO THE $89,000, YOU CAN'T SAY
17    ANYTHING ABOUT WHY YOU DID THAT, RIGHT?
18    A.  NO, SIR, BECAUSE MY ATTORNEY AND I HAD DISCUSSIONS ABOUT
19    IT BEFORE I SIGNED THE AGREEMENT.
20    Q.  SO THAT IS ALL ATTORNEY-CLIENT PRIVILEGE, SO YOU CAN'T SAY
21    ANYTHING?
22    A.  I THINK IT IS.
23    Q.  LET'S MOVE TO BLOCKBUSTER, WHICH IS PX96.
24        FOR BLOCKBUSTER, THE SETTLEMENT AMOUNT THAT WAS AGREED TO
25    WAS $42.5 THOUSAND, CORRECT?
```

1    **A.**  I WILL TAKE YOUR WORD FOR IT, YES.

2    **Q.**  I MEAN, IF YOU WANT, I WAS TRYING TO --

3    **A.**  IS IT ON THIS DOCUMENT HERE SOMEPLACE?  WAS BLOCKBUSTER

4    42,500?  YES, I THINK THAT'S THE NUMBER.

5         **MR. REINES:**  LET'S PULL UP EXHIBIT 184, AND JUST BE

6    SURE.

7         (PUBLISHED TO JURY.)

8         **MR. REINES:**  ALTHOUGH THERE ARE SOME ERRORS ON YOUR

9    CHART, THIS ISN'T ONE OF THEM.

10        **MS. GLAUSER:**  OBJECTION, YOUR HONOR.  MOVE TO STRIKE.

11        **THE COURT:**  YES.

12        **THE WITNESS:**  YES, YOU'RE CORRECT.

13        **MR. REINES:**  WHY DON'T WE PUT 184, AND PUBLISH IT,

14    PLEASE?

15        (PUBLISHED TO JURY.)

16        **MR. REINES:**  THANK YOU.

17   **BY MR. REINES:**

18   **Q.**  DO YOU SEE NEXT TO BLOCKBUSTER 42,500?

19   **A.**  I AM SORRY.  YES.

20   **Q.**  SO WE HAVE THAT THERE.

21   **A.**  I APOLOGIZE.

22   **Q.**  NOW, AGAIN, WITH THIS LICENSE AGREEMENT, YOU DIDN'T READ

23   THE LICENSE AGREEMENT BEFORE YOU SIGNED IT?

24   **A.**  THAT'S CORRECT.

25   **Q.**  AND ONE THING YOU DO REMEMBER IS THAT THE 42,000 YOU KNEW

1   WAS WELL BELOW THE LITIGATION COST THAT WOULD BE FACED BY

2   BLOCK BUSIER IF IT CONTINUED IN THE LITIGATION?

3   **A.**  I THINK THAT WOULD BE CORRECT.

4   **Q.**  THAT'S SOMETHING THAT YOU KNEW WHEN YOU NEGOTIATED WITH

5   THEM, AND YOU NEGOTIATED THEM TO $42,000.  YOU KNEW THAT THEY

6   WOULD BE FACING, POTENTIALLY, HUNDREDS OF THOUSANDS, IF NOT

7   MILLIONS OF DOLLARS IN LEGAL FEES, CORRECT?

8   **A.**  NO, I THINK I SAID YESTERDAY WE KNEW THEY WERE GOING TO GO

9   INTO BANKRUPTCY AND WE THOUGHT IT WOULD BE BEST TO GET WHAT WE

10  COULD BEFORE THEY FILED FOR BANKRUPTCY.

11      ISN'T THAT WHAT I SAID YESTERDAY?  SOMETHING ALONG THAT

12  LINE.

13  **Q.**  ISN'T THAT SOMETHING YOU DISCUSSED WITH YOUR ATTORNEY?

14  **A.**  NO.  ACTUALLY, MY PARTNER AND I HAD SEEN THINGS IN THE

15  PRESS ABOUT THAT.

16  **Q.**  BUT IN TERMS OF WHAT BLOCKBUSTER WAS FACING, BLOCK BLUSTER

17  WAS FACING POTENTIALLY MILLIONS OF DOLLARS OF PATENT

18  LITIGATION COSTS.  OR IT COULD PAY YOU $42,000.  IS THAT

19  RIGHT?

20  **A.**  YES.  THAT --

21  **Q.**  OKAY.  NOW, LET'S TALK ABOUT LFP.

22      **MR. REINES:**  AND WHY DON'T WE KEEP THIS WHILE WE TALK

23  ABOUT LFP.

24  **BY MR. REINES**

25  **Q.**  YOU CALL IT "LFP INTERNET GROUP" AT 67,500.  JUST SO THAT

FARLEY – CROSS / REINES

1   PEOPLE KNOW WHAT BUSINESS THAT IS, THAT'S THE HUSTLER

2   BUSINESS; IS THAT CORRECT?

3   **A.**  I BELIEVE THAT'S CORRECT.

4   **Q.**  OKAY.  AND IN TERMS OF THE HUSTLER SETTLEMENT AND THE

5   67,500, YOU DON'T KNOW HOW THAT NUMBER WAS REACHED?  RIGHT?

6   **A.**  I DID NOT PARTICIPATE IN THE NEGOTIATIONS.  THAT'S

7   CORRECT.

8   **Q.**  AND, AGAIN, THIS IS ANOTHER LICENSE AGREEMENT THAT YOU

9   SIGNED WITHOUT READING, CORRECT?

10  **A.**  THIS PARTICULAR ONE, YES.

11  **Q.**  ALL RIGHT.  WHY DON'T WE GO TO PLAYBOY, WHICH IS 80,000.

12  NOW, YOU NEGOTIATED WITH PLAYBOY, CORRECT?

13  **A.**  MY ATTORNEY NEGOTIATED WITH THEM.

14  **Q.**  SO YOU DON'T KNOW HOW THE $80,000 NUMBER WAS REACHED FOR

15  PLAYBOY?

16  **A.**  THAT'S CORRECT.

17  **Q.**  BUT YOU DID HAVE A BELIEF THAT THE ADULT ENTERTAINMENT

18  INDUSTRY WAS A BIG DOLLAR INDUSTRY IN TERMS OF DRM, CORRECT?

19  **A.**  WE THOUGHT SO, YES.

20  **Q.**  ALL RIGHT.  LET'S TALK ABOUT ZYNGA, WHICH IS $50,000.  YOU

21  SETTLED WITH ZYNGA FOR $50,000.  YOU WERE CONCERNED -- WHEN

22  YOU TESTIFIED YESTERDAY -- YOU WERE CONCERNED ABOUT THE

23  FINANCIAL VIABILITY OF ZYNGA.  THAT IS WHAT YOUR TESTIMONY WAS

24  AS TO WHY YOU AGREED TO A $50,000 SETTLEMENT?

25  **A.**  I BELIEVE THAT IS WHAT I SAID, YES.

1    **Q.**  I WOULD LIKE TO DIRECT YOU AND HAVE MARKED AS THE NEXT

2    EXHIBIT FOR IDENTIFICATION --

3              **MR. REINES:**  DO WE HAVE THE NUMBER FOR THAT?

4              **THE COURT:**  DEFENDANT'S NEXT IN ORDER?

5              **THE CLERK:**  YOUR NEXT IN ORDER BASED ON YOUR EXHIBIT

6    LIST IS 694.

7              **MR. REINES:**  ALL RIGHT.  694 FOR IDENTIFICATION, YOUR

8    HONOR.  MAY I APPROACH?

9              **THE COURT:**  YES.

10             **MR. REINES:**  THANK YOU.

11        (DEFENDANT'S EXHIBIT 694 WAS MARKED FOR IDENTIFICATION.)

12                  (EXHIBIT HANDED TO WITNESS.)

13             **THE WITNESS:**  THANKS.

14             **MR. REINES:**  IF YOU WOULD, MR. BONINI, PUT UP THE

15   SECOND PAGE OF THIS DOCUMENT.

16   **BY MR. REINES**

17   **Q.**  DO YOU RECOGNIZE THIS AS A ZYNGA FORM 10K?

18   **A.**  THAT IS WHAT IT SAYS, YES.

19   **Q.**  AND THAT'S THE KIND OF DOCUMENT YOU WOULD LOOK AT TO

20   DETERMINE THE FINANCIAL VIABILITY OF A COMPANY AT THE TIME

21   FRAME IF YOU WERE IN NEGOTIATIONS?

22   **A.**  NO.

23   **Q.**  THAT IS NOT THE TYPE OF DOCUMENT YOU WOULD LOOK AT?

24   **A.**  I WOULDN'T, NO.

25   **Q.**  WHY DON'T YOU TURN TO PAGE 68, PLEASE.

FARLEY – CROSS / REINES

1        IF YOU WOULD LOOK AT ZYNGA'S 10K, THIS IS FOR THE PERIOD

2    ENDING THE END OF 2012.  IT WAS FILED IN FEBRUARY OF 2013.

3        AND IF YOU WOULD JUST LOOK AT THE --

4    **A.**  PAGE 68?

5    **Q.**  YES, PLEASE.

6    **A.**  THE BALANCE SHEET; IS THAT CORRECT?  THE CONSOLIDATED

7    BALANCE SHEET?

8    **Q.**  THE CONSOLIDATED BALANCE SHEET.  YEP.  AND IF YOU WOULD

9    LOOK AT THE CURRENT ASSETS, DO YOU SEE IT IS GOING TO BE

10   1.5 BILLION?

11       **MS. GLAUSER:**  OBJECTION, YOUR HONOR.  NO FOUNDATION

12   HAS BEEN LAID THAT THIS WITNESS HAS ANY KNOWLEDGE OF NUMBERS

13   IN ZYNGA'S 10K, THAT HE EVEN LOOKED AT IT.

14       **THE COURT:**  THAT WOULD SEEM TO BE THE CASE.

15       **MR. REINES:**  HE'S TESTIFYING THAT HE HAD A BELIEF

16   REGARDING THE FINANCIAL VIABILITY OF THE COMPANY.

17       **THE COURT:**  HE SAID HE DIDN'T SEE THIS DOCUMENT.  SO,

18   IT WOULDN'T BE POSSIBLE TO GET IT IN THROUGH HIM.

19       ALSO, I DON'T KNOW IF YOU ALL CAN HEAR HIM, BUT YOU

20   DRIFTED AWAY FROM THE MICROPHONE.

21       **THE WITNESS:**  SORRY.

22       **THE COURT:**  AND IT IS NOT PICKING UP YOUR VOICE.

23       **THE WITNESS:**  IS THAT BETTER?  I AM SORRY.

24       **THE COURT:**  IT IS HARD TO LOOK AT DOCUMENTS AND KEEP

25   THE MICROPHONE IN THE SAME PLACE, BUT YOU NEED TO.

FARLEY – CROSS / REINES

1          **THE WITNESS:**  I WILL WORK ON IT.  I AM SORRY.

2          GO AHEAD, ED.

3    **BY MR. REINES:**

4    **Q.**  WHEN YOU WERE NEGOTIATING THIS BUSINESS DEAL WITH ZYNGA,

5    WHAT DID YOU LOOK AT TO DETERMINE THE FINANCIAL VIABILITY OF

6    ZYNGA?

7    **A.**  I BELIEVE MY PARTNER FOUND A COUPLE OF ARTICLES IN THE

8    PRESS SOMEPLACE.  AND HE WAS CONCERNED ABOUT THE VIABILITY OF

9    THE COMPANY AT THE TIME THAT WE WERE NEGOTIATING WITH THEM.

10   **Q.**  AND YOU DIDN'T LOOK AT THE 10K ONLINE TO DETERMINE THAT

11   THEY HAD HUNDREDS OF MILLIONS OF DOLLARS OF CASH ON HAND?

12   **A.**  NO, I DIDN'T.

13   **Q.**  OKAY.  AND IF ZYNGA WASN'T -- DIDN'T HAVE THIS FINANCIAL

14   VIABILITY THINGS FROM THESE COUPLE OF ARTICLES THAT YOUR

15   PARTNER HAD, WHAT'S THE PRICE THAT YOU THINK WOULD HAVE BEEN

16   APPROPRIATE FOR THEM?

17   **A.**  I DON'T REMEMBER WHAT WE WERE EVEN TALKING ABOUT WITH THEM

18   AT THE TIME.

19   **Q.**  WOULD IT HAVE BEEN MORE THAN A HUNDRED THOUSAND DOLLARS?

20   **A.**  I WOULD ASSUME IT MIGHT HAVE BEEN.

21   **Q.**  AND YOU ARE SAYING THAT THIS DIFFERENCE IN TENS OF

22   THOUSANDS OF DOLLARS IS BASED ON YOUR CONCERNS ABOUT THE

23   VIABILITY OF ZYNGA?

24   **A.**  YES, THAT'S CORRECT.

25   **Q.**  ALL RIGHT.  I WOULD LIKE TO DIRECT YOU BACK TO

```
 1    EXHIBIT 184.

 2    A.  ARE WE DONE WITH THIS ONE, SIR?

 3    Q.  YES.

 4    A.  OKAY.

 5    Q.  WHY DON'T WE TURN TO -- NOW I'M GOING TO HIT THE ONES THAT

 6    ARE GREATER THAN THE PLAYBOY $80,000.  AND WE WILL GO THROUGH

 7    THOSE.

 8        NOW, WITH RESPECT TO INTUIT, YOU PUT A 2 PERCENT NUMBER

 9    THERE?

10    A.  YES.

11    Q.  AND, IN FACT, YOU'RE NOT AWARE OF ANY PRECEDENT FOR A

12    2 PERCENT ROYALTY FOR YOUR PATENTS-IN-SUIT; ISN'T THAT RIGHT?

13    A.  THAT WAS -- COULD YOU REPEAT THAT?  THAT WAS PRETTY

14    DEFINITE.

15    Q.  YES.  AS OF YOUR DEPOSITION IN MARCH OF 2013, YOU WEREN'T

16    AWARE OF ANY PRECEDENT FOR A 2 PERCENT ROYALTY FOR YOUR

17    PATENTS.

18    A.  WELL, IF THAT IS WHAT I SAID IN MARCH, I'M GOING TO AGREE

19    WITH YOU, SAID IT.

20    Q.  AND YOU BELIEVE IT TO BE TRUE?

21    A.  I'VE DONE SOME ADDITIONAL STUDYING SINCE THEN.  BUT --

22    Q.  THAT IS WHY I ASKED YOU ABOUT YOUR DEPOSITION, BECAUSE I

23    WANTED WHAT I HAD ACCESS TO.

24    A.  RIGHT.  I UNDERSTAND THAT.

25    Q.  AND BASED ON -- DO YOU RECALL THAT AS OF MARCH OF LAST
```

1    YEAR, YOU WEREN'T AWARE OF ANYTHING THAT WOULD SUPPORT A

2    2 PERCENT ROYALTY, AND YOU ARE NOT AWARE OF ANY PRECEDENT FOR

3    A 2 PERCENT ROYALTY FOR YOUR PATENTS?

4    **A.**  AS OF MARCH, THAT'S CORRECT.

5    **Q.**  AND YOU KNEW YOU WERE APPEARING AS THE CORPORATE

6    REPRESENTATIVE ON BEHALF OF DIGITAL REG REGARDING LICENSING

7    AND ROYALTIES, AND YOU WERE TO BE PREPARED FOR THAT?

8    **A.**  I LEARNED THAT THE DAY BEFORE I WAS TO GO TO THAT

9    DEPOSITION, THAT'S CORRECT.  I JUST LEARNED IT THE DAY BEFORE,

10   JUST SO WE ARE CLEAR.

11   **Q.**  SO YOUR ATTORNEYS DIDN'T TELL YOU ANYTHING BEFORE THE DAY

12   BEFORE?

13   **A.**  I DON'T REMEMBER THEM DOING THAT.

14   **Q.**  AND YOU WERE SUPPOSED TO BE RESPONSIBLE FOR GATHERING THE

15   INFORMATION TO BE THE CORPORATE REPRESENTATIVE ON THE

16   IMPORTANT SUBJECT OF ROYALTIES?

17   **A.**  I REVIEWED A NUMBER OF DOCUMENTS THE DAY BEFORE THE

18   DEPOSITION SO THAT WE WOULD BE PREPARED FOR THAT.  BUT, THERE

19   WAS AN AWFUL LOT OF DOCUMENTS, AND I WAS NOT ABLE TO READ THEM

20   ALL WORD-FOR-WORD.

21   **Q.**  ALL RIGHT.

22          **MR. REINES:**  WITH RESPECT TO THE INTUIT LICENSE,

23   LET'S PULL THAT UP.  THAT'S EXHIBIT 100.

24       (DISPLAYED ON SCREEN.)

25       LET'S PULL UP SECTION FOUR SO WE CAN LOOK AT WHAT PATENTS

1    WERE LICENSED.

2              **THE CLERK:**  IF IT IS SOMETHING THAT IS NOT IN

3    EVIDENCE THAT THE JUDGE HAS SAID CAN BE PUBLISHED YOU NEED TO

4    TELL ME, BECAUSE I DON'T KNOW WHAT YOUR REPORTS ARE, WHICH

5    ONES CAN BE SHOWN, SO YOU HAVE TO TELL ME.

6              **MR. REINES:**  UNDERSTOOD.  I JUST DIDN'T HAVE A

7    MONITOR HERE.  I THOUGHT IT WASN'T PULLED UP.

8              **THE CLERK:**  I SEE EVERYBODY GIVING ME EYES.

9              **MR. REINES:**  NOBODY SHOULD BE GIVING YOU EYES.

10             **THE COURT:**  THERE IS A MONITOR THERE.

11             **MR. REINES:**  IT IS TILTED AWAY FROM ME SO THE JURY

12   CAN'T SEE IT.  IT WAS MY BAD.  I WAS LOOKING AT THIS.  I WILL

13   TRY TO BE BETTER AT IT.

14             **THE CLERK:**  IS IT ONE THAT CAN BE PUBLISHED NOW?

15             **MR. REINES:**  YES, IT IS.

16             **THE CLERK:**  OKAY.

17             **MR. REINES:**  IT WAS ON ME.

18        (PUBLISHED TO JURY.)

19   **BY MR. REINES:**

20   **Q.**  IN TERMS OF THE INTUIT LICENSE THERE ARE SEVEN PATENTS

21   THAT YOU LICENSED TO INTUIT, CORRECT?

22   **A.**  YES, I SEE THAT.

23   **Q.**  IN THIS CASE THERE ARE TWO PATENTS LICENSED -- NOT

24   LICENSED -- BUT TWO PATENTS ASSERTED, ACCUSED OF INFRINGEMENT.

25   BUT IN THE INTUIT CASE WHAT YOU LICENSED WAS ACTUALLY SEVEN

1    PATENTS, RIGHT?

2    **A.**  YES, THEY WANTED TO HAVE A LICENSE ON OUR ENTIRE PATENT

3    PORTFOLIO, AND WE AGREED TO DO THAT.  WE DID THAT, I THINK,

4    WITH EVERYBODY.

5    **Q.**  BUT THE LAWYERS HANDLED THAT AGREEMENT, RIGHT?

6    **A.**  YES, THEY DID.

7    **Q.**  ALL RIGHT.  I WOULD LIKE TO GO TO THE NEXT EXHIBIT WHICH

8    IS EXHIBIT 101.

9           **MR. REINES:**  AND THIS IS APPROPRIATE FOR PUBLICATION

10   TO THE JURY.

11          **THE CLERK:**  THANK YOU.

12          **MR. REINES:**  YOU'RE WELCOME.

13      (PUBLISHED TO JURY.)

14          **MR. REINES:**  IF YOU COULD TURN TO PAGE 11 OF THE

15   EXHIBIT, MR. BONINI.

16      I APPRECIATE ALL YOUR GOOD WORK, TOO.

17          **THE WITNESS:**  WHICH LICENSE IS THIS?

18   **BY MR. REINES:**

19   **Q.**  THIS ONE IS AVG.

20   **A.**  OKAY.

21   **Q.**  OKAY.  FOR THE AVG, THIS IS THE LICENSE PATENT LIST.  DO

22   YOU UNDERSTAND THAT?

23   **A.**  YES.

24   **Q.**  OKAY.

25          **MR. REINES:**  AND SO WHY DON'T WE HIGHLIGHT THE NUMBER

FARLEY – CROSS / REINES

1    OF PATENTS?

2    **BY MR. REINES**

3    **Q.**  I THINK IN THIS CASE WITH RESPECT TO AVG, 14 PATENTS WERE

4    LICENSED; IS THAT CORRECT?

5    **A.**  YES.  I DIDN'T COUNT THEM.  THE NUMBER IS 1 THROUGH 14.

6    **Q.**  YOU ALSO LICENSED THEM ON OTHER PATENT APPLICATIONS?

7    **A.**  YES.  WE GAVE THEM THE WHOLE PATENT PORTFOLIO, I BELIEVE.

8    **Q.**  AND REMEMBER YOU TALKED ABOUT NOT ONLY DID YOU HAVE THE

9    PATENTS THAT YOU BOUGHT OUT OF BANKRUPTCY, BUT YOU ALSO HAD

10   ADDITIONAL PATENTS YOU HAD AT DIGITAL REG, RIGHT?

11   **A.**  YES, WE FILED SOME OF OUR OWN, AND WE FILED A NUMBER OF

12   CONTINUATIONS, WHICH ARE -- I DON'T KNOW -- BROTHERS OR

13   SISTERS OF THE ORIGINAL.  WHATEVER YOU CALL THEM.

14   **Q.**  AND SO IN TERMS OF THE LICENSE PRICE FOR AVG IN THE

15   SETTLEMENT IT WOULDN'T BE JUST FOR TWO PATENTS.  IT WOULD BE

16   FOR 14 OF THESE PATENT APPLICATIONS, AND THEN I THINK THERE IS

17   A LONG LIST OF FOREIGN APPLICATIONS; IS THAT CORRECT, IN TERMS

18   OF WHAT WAS LICENSED?

19   **A.**  YEAH.  I THINK WE GAVE EVERYBODY THAT WE GAVE A LICENSE TO

20   THE ENTIRE PATENT PORTFOLIO THAT WE HAD.  I BELIEVE THAT'S

21   WHAT WE DID.

22   **Q.**  ARE YOU SURE?

23   **A.**  NOT A HUNDRED PERCENT, BUT I'M 99 PERCENT SURE.

24   **Q.**  YOU DIDN'T READ THAT LICENSES --

25   **A.**  NO, I DIDN'T.  BUT, AGAIN, I HAD CONVERSATIONS WITH MY

```
1    ATTORNEY ABOUT ALL OF THESE, AND I'M PRETTY SURE THAT WE

2    LICENSED EVERYTHING.  SO I JUST TRYING TO HELP YOU HERE WITH

3    UNDERSTANDING WHY WE GAVE THEM THIS MUCH.

4    Q.  WITH RESPECT TO VALVE, WHICH IS EXHIBIT 102 --

5            THE CLERK:  CAN THIS BE PUBLISHED?

6            MR. REINES:  THIS ALSO CAN BE PUBLISHED TO THE JURY.

7        (PUBLISHED TO JURY.)

8    BY MR. REINES:

9    Q.  NOW, IN VALVE LET'S LOOK AT THE LICENSED PATENTS, WHICH IS

10   102.8, PAGE 8.  AND THE NUMBER OF PATENTS THERE IS 14.  DO YOU

11   SEE THAT?

12   A.  YES.

13   Q.  AND THESE ARE THE LICENSED PATENTS, CORRECT?

14   A.  YES.

15   Q.  AND NOW I WOULD LIKE TO GO UP TO THE "WHEREAS" CLAUSE AND

16   ASK YOU ABOUT THE CONTENT DELIVERY AD THAT YOU LICENSED.

17           MR. REINES:  SO IF WE CAN PULL THAT UP.  THIS IS ON

18   THE "WHEREAS" ON PAGE 1, AND APPROPRIATE FOR PUBLICATION.

19       (PUBLISHED TO JURY.)

20   BY MR. REINES

21   Q.  AND DO YOU SEE WHERE IT SAYS "CONTENT DELIVERY ADS"?

22   A.  YES.

23   Q.  ACTUALLY, IT'S BELOW THE "WHEREAS."

24   A.  I ASSUMED YOU GUYS WERE DOING IT CORRECTLY.

25   Q.  THAT TIME I DIDN'T DO THE RIGHT THING.  OKAY.  DO.
```

FARLEY – CROSS / REINES

1      YOU HAVE --

2   **A.**   YES.  I SEE WHERE IT SAYS "CONTENT DELIVERY ADS."

3   **Q.**   THAT WAS ANOTHER SET OF PATENTED TECHNOLOGY THAT YOU HAD,

4   CORRECT?

5   **A.**   CONTENT DELIVERY ADS IS ANOTHER WHOLLY-OWNED SUBSIDIARY OF

6   DRM TECHNOLOGIES, YES.

7   **Q.**   AND WHY DON'T YOU VERY BRIEFLY DESCRIBE WHAT THIS

8   ADDITIONAL PATENT PORTFOLIO THAT VALVE IS GETTING FROM EVEN

9   ANOTHER COMPANY?

10  **A.**   IT ISN'T A PORTFOLIO.  I BELIEVE IT IS ONE APPLICATION FOR

11  SOME E COMMERCE ACTIVITIES.

12  **Q.**   AND YOU CREATED A WHOLE SUBSIDIARY FOR THAT BUSINESS?

13  **A.**   YES, WE DID.

14  **Q.**   OKAY.  AND WHEN YOU NEGOTIATED WITH VALVE, THEY WANTED --

15  FOR THEIR MONEY THEY WANTED NOT ONLY YOUR ENTIRE PATENT

16  PORTFOLIO FROM DIGITAL REG, WHICH WAS THOSE 14 PATENTS AND

17  APPLICATIONS AND FOREIGNS, BUT THEY ALSO WANTED THIS OTHER SET

18  OF PATENT RIGHTS FROM THIS OTHER SUBSIDIARY?  DO YOU REMEMBER

19  THAT?

20  **A.**   WHAT I REMEMBER IS THAT THEY DIDN'T WANT US TO COME BACK

21  AND EVER SUE THEM AGAIN.  THIS WAS THE WAY TO GUARANTEE THEM

22  THAT WE WOULDN'T DO THAT.

23  **Q.**   SO --

24  **A.**   BECAUSE WE OWNED THAT A HUNDRED PERCENT AT THE TIME.  THEY

25  JUST WANTED TO BE SURE THAT WE WOULD NOT COME BACK, WHICH I

1   THOUGHT WAS FAIRLY REASONABLE FROM THEIR PERSPECTIVE, AS WELL

2   AS OURS.  WE ARE NOT INTERESTED IN GOING BACK AND PICKING ON

3   THEM ON ANOTHER PATENT.

4   **Q.**  AND AS TO WHETHER VALVE WAS INFRINGING ANY OF YOUR

5   PATENTS, DO YOU HAVE ANY IDEA?

6   **A.**  I BELIEVE THAT THEY WERE, OR WE WOULDN'T HAVE FILED

7   AGAINST THEM.

8   **Q.**  AND IN TERMS OF WHICH PATENTS AND WHAT PRODUCTS, YOU HAVE

9   NO IDEA?

10  **A.**  I DON'T REMEMBER OFF THE TOP OF MY HEAD, NO.

11  **Q.**  ALL RIGHT.  LET'S TALK ABOUT SYMANTEC, WHICH IS

12  EXHIBIT 105, AND APPROPRIATE FOR PUBLICATION TO THE JURY.

13         **THE COURT:**  ANOTHER WAY TO SAY IT WOULD JUST BE

14  "EXHIBIT 105 IN EVIDENCE," THEN SHE WILL KNOW.

15         **THE CLERK:**  NO, THESE ARE THE REPORTS THAT YOU SAID

16  WEREN'T GOING TO COME INTO EVIDENCE AND --

17         **THE COURT:**  I AM SORRY.  MY MISTAKE.

18         **MR. REINES:**  I WAS TRYING TO --

19         **THE CLERK:**  YEAH.

20      (PUBLISHED TO JURY.)

21  **BY MR. REINES:**

22  **Q.**  FOR SYMANTEC LET'S LOOK AT HOW MANY PATENTS YOU LICENSED

23  THEM.  THAT IS EXHIBIT 105.  AND THAT'S AT PAGE 10.

24      AND THEY GOT 16 PATENTS AND SOME PATENT APPLICATIONS,

25  CORRECT?

FARLEY – CROSS / REINES

1    **A.**  YES.

2    **Q.**  AND WITH RESPECT TO ADOBE, YOU HAVEN'T ASSERTED THE OTHER

3    PATENTS ON THIS LIST AGAINST ADOBE YET?

4    **A.**  I'M NOT A HUNDRED PERCENT SURE.

5    **Q.**  YOU KNOW THERE'S ONLY TWO PATENTS AT SUIT HERE.  THERE IS

6    16 THERE?

7    **A.**  I DON'T KNOW WHETHER SOME OF THOSE ARE CONTINUATIONS OF

8    THE ONES -- I AM NOT -- I DON'T UNDERSTAND PATENT LAW THAT

9    WELL, BUT WE DO HAVE CONTINUATIONS ON THE '670.  AND DOES THAT

10   MEAN THAT THEY ARE INCLUDED IN THE SUIT OR NOT?  I DON'T

11   UNDERSTAND.  I'M NOT SURE ABOUT IT.

12   **Q.**  DO YOU KNOW WHETHER THERE IS NEW PATENT INFRINGEMENT

13   CLAIMS THAT YOU HAVE AGAINST ADOBE THAT YOU COULD BRING?

14   **A.**  I DON'T KNOW ONE WAY OR THE OTHER.

15   **Q.**  LET'S TALK ABOUT SIDE SCAPE.  AND LET'S GO UP TO

16   EXHIBIT 184 FOR THAT.

17        ACTUALLY, WITH SYMANTEC THE DATE OF THE SYMANTEC

18   SETTLEMENT THAT JUST HAPPENED LIKE A COUPLE MONTHS AGO, RIGHT?

19   **A.**  YEAH.  I THINK SO.

20   **Q.**  SO, SYMANTEC FOR THE AMOUNT THAT THEY PAID NOT ONLY GOT

21   THIS LICENSE, BUT THEY DIDN'T HAVE TO PAY FOR THIS WHOLE TRIAL

22   PRESENTATION; IS THAT CORRECT?

23   **A.**  THEY WERE SMART.  THEY GOT IT.

24   **Q.**  AND THE COST OF A TRIAL, DO YOU HAVE ANY SENSE WHAT THAT

25   IS?

 1    **A.**  WHICH TRIAL?

 2    **Q.**  THIS ONE.

 3    **A.**  I DON'T HAVE ANY IDEA.  I KNOW IT'S A LOT.

 4    **Q.**  WITH RESPECT TO EXHIBIT 184, PLEASE.

 5        (PUBLISHED TO JURY.)

 6            **MR. REINES:**  LET'S PULL THAT UP.

 7    **BY MR. REINES**

 8    **Q.**  WITH RESPECT TO SITESCAPE, WHICH IS YOUR FIRST ONE, IT

 9    SAYS "LICENSE GRANT SITESCAPE."  DO YOU SEE THAT?  THEN IT

10    SAYS THE RATE OF THAT LICENSE GRANT IS 7 PERCENT?

11    **A.**  OH, OKAY.  I SEE YOU ARE LOOKING AT THE HEADINGS.

12    **Q.**  IT IS THE FIRST LINE.

13    **A.**  I SEE YOUR HEADINGS.  YES, I SEE 7 PERCENT.

14    **Q.**  RIGHT.  FOR EXHIBIT 46 IT SAYS "SITESCAPE."

15    **A.**  RIGHT.

16    **Q.**  THEN, IMMEDIATELY ABOVE THAT SAYS "LICENSE GRANT."

17    **A.**  I GOT YOU.

18    **Q.**  YESTERDAY YOU TESTIFIED SITESCAPE WASN'T A LICENSE GRANT.

19    IT WAS ACTUALLY AN OPTION?

20    **A.**  THAT'S CORRECT.

21    **Q.**  IF IT SAYS "LICENSE GRANT IN SITESCAPE" THAT IS A MISTAKE,

22    RIGHT?  THAT IS AN ERROR.  THAT IS NOT ACCURATE, RIGHT?

23    **A.**  WE ALL MAKE ERRORS.  YOU MADE ONE A MINUTE AGO.  WE MADE

24    ONE HERE, I GUESS.  YES, I WOULD AGREE THAT IS AN ERROR, BUT

25    IT IS JUST A LIST.

| | |
|---|---|
| 1 | **Q.** AND WITH RESPECT TO SITESCAPE OPTION, SITESCAPE HAD AN |
| 2 | OPTION TO TAKE A LICENSE FOR 7 PERCENT, RIGHT, IF THEY WANTED? |
| 3 | **A.** I'M PRETTY SURE THAT IS WHAT I SAID YESTERDAY, WASN'T IT? |
| 4 | **Q.** AND JUST CONFIRMING THEY SAID:  "WE WOULD RATHER NOT HAVE |
| 5 | YOUR PATENTS AND NOT PAY 7 PERCENT," AND THEY DIDN'T TAKE IT, |
| 6 | RIGHT? |
| 7 | **A.** THAT IS NOT WHAT THEY SAID. |
| 8 | **Q.** THEY DECLINED THE 7 PERCENT OPTION, RIGHT? |
| 9 | **A.** THEY GOT BOUGHT.  THAT'S WHY THEY DECLINED.  THE NEW |
| 10 | PEOPLE DECLINED. |
| 11 | **MR. REINES:** OBJECTION. MOVE TO STRIKE AS LACKING |
| 12 | FOUNDATION. |
| 13 | **THE WITNESS:** OKAY. |
| 14 | **THE COURT:** YES. |
| 15 | BY MR. REINES: |
| 16 | **Q.** THE FACT IS THAT SITESCAPE DIDN'T SAY:  "YES, WE WANT TO |
| 17 | PAY 7 PERCENT" AT ANY POINT IN TIME AND TAKE THE LICENSE, |
| 18 | RIGHT? |
| 19 | **A.** YES.  YOU ARE ABSOLUTELY CORRECT. |
| 20 | **Q.** ALL RIGHT.  LET'S TALK ABOUT ADOBE NOW. |
| 21 | YOU STARTED YOUR TESTIMONY YESTERDAY SAYING YOU BROUGHT |
| 22 | THIS SUIT BECAUSE YOU BELIEVE THAT ADOBE -- I'M NOT SURE OF |
| 23 | THE EXACT VERBIAGE -- STOLE YOUR PATENTS, OR WHATEVER IT WAS. |
| 24 | AND YOU FILED SUIT ON THAT MORE RECENTLY.  WHEN DID YOU -- DO |
| 25 | YOU RECALL THAT TESTIMONY, GENERALLY? |

FARLEY – CROSS / REINES

1    **A.**   GENERALLY.

2    **Q.**   OKAY.  WHEN DID YOU FIRST BELIEVE ADOBE WAS INFRINGING?

3    **A.**   WHEN DID I FIRST BELIEVE IT?

4    **Q.**   YOU WERE THE PERSON RESPONSIBLE FOR MANAGING THE

5    LITIGATION EFFORT, AND YOU WERE, I THINK YOU SAID PRESIDENT,

6    VICE PRESIDENT.  IT WAS YOUR OPERATION.

7    **A.**   THE PROBLEM IS, WE DIDN'T THINK IN THOSE TERMS IN THE

8    EARLY YEARS.  WE ONLY STARTED THINKING IN THOSE TERMS ABOUT

9    TWO-AND-A-HALF YEARS AFTER WE ENTERED INTO OUR AGREEMENT WITH

10   THINKFIRE.

11       WE WEREN'T IN -- WE DIDN'T HAVE THE PLAN OF LITIGATING

12   ANYTHING.  AND SO WE DIDN'T THINK IN TERMS OF INFRINGEMENT.

13   SO TO ANSWER YOUR QUESTION, WHEN DID IT FIRST COME TO MY

14   ATTENTION THAT THEY MIGHT BE?

15       IT WAS PROBABLY 2009 OR TEN WHEN WE WERE LOOKING AT LISTS

16   OF COMPANIES THAT MIGHT BE.

17   **Q.**   AND YOU AND MR. VENTERS, YOU GUYS WERE PARTNERS THROUGH

18   THAT TIME PERIOD, TALKING PRETTY REGULARLY?

19   **A.**   YES.

20   **Q.**   AND SO, IF HE THOUGHT THERE WAS A COMPANY THAT WAS

21   INFRINGING, I MEAN YOU GUYS GENERALLY COMPARED NOTES ON THOSE

22   KINDS OF TOPICS?

23   **A.**   NOT REALLY, BECAUSE WE DIDN'T THINK IN THOSE TERMS.

24   **Q.**   IN 2007, YOU AUTHORIZED A LAWSUIT AGAINST TEN DIFFERENT

25   COMPANIES.

1    **A.**  I JUST SAID IN THE EARLY YEARS WE DIDN'T THINK IN THOSE

2    TERMS.  AROUND 2007 WE DID START THINKING IN THOSE TERMS.

3    MAYBE I DIDN'T MAKE MYSELF CLEAR.

4    **Q.**  IN TERMS OF WHEN YOU -- YOU KNEW YOU WERE GOING TO BRING

5    LITIGATION, AND YOU WERE DECIDING WHO TO BRING LITIGATION

6    AGAINST IN THE YEAR 2007; ISN'T THAT TRUE?

7    **A.**  THAT WOULD BE CORRECT.

8    **Q.**  SO YOU WERE THINKING IN THOSE TERMS FOR 2007, AT A

9    MINIMUM, RIGHT?

10   **A.**  YES.

11   **Q.**  AT THAT TIME PERIOD DID YOU BELIEVE ADOBE WAS -- THERE WAS

12   A REASONABLE LIKELIHOOD THAT ADOBE WAS INFRINGING?  YOU, BEING

13   DIGITAL REG.

14   **A.**  I DID NOT THINK IN TERMS OF THAT.  THERE WERE PEOPLE THAT

15   WERE STUDYING THAT FOR US.  WE DIDN'T REALLY UNDERSTAND HOW

16   YOU FIGURED ALL OF THAT OUT.  IT'S A VERY COMPLICATED FIELD,

17   AND MR. VENTERS AND I ARE NOT EXPERTS IN IT.

18        BUT, THINKFIRE STARTED TO INFORM US.  AND AFTER

19   TWO-AND-A-HALF YEARS OF WORKING WITH THEM THAT PEOPLE DID

20   INFRINGE; THAT THERE WERE ISSUES ABOUT IT.  AND, YOU KNOW, WE

21   KNEW THERE WERE PATENT LAWSUITS GOING ON, BUT, YOU KNOW, WE

22   WEREN'T THINKING ABOUT DOING ANYTHING IN THAT AREA.

23   **Q.**  IN 2007, DID YOU BELIEVE IT WAS REASONABLY LIKELY THAT

24   ADOBE WAS INFRINGING WHEN YOU HAD ALL THIS INFORMATION FROM

25   THINKFIRE AND YOU WERE WORKING ON YOUR LITIGATION PLAN?

1    **A.**  WE WEREN'T THINKING IN TERMS OF ADOBE.  WE WERE THINKING

2    IN TERMS OF THE ONES THAT WERE ACTUALLY ENDED UP IN THE

3    LAWSUIT AT THAT TIME.  I MEAN, I AM TRYING TO BE AS HONEST AS

4    I CAN WITH YOU HERE, SIR, ANSWERING YOUR QUESTIONS.

5    **Q.**  SO YOU AND MR. VENTERS, YOU PUT SOME THOUGHT, SINCE IT WAS

6    YOUR PRIMARY BUSINESS, INTO WHAT YOUR LITIGATION PLAN WAS

7    GOING TO BE IN 2007; ISN'T THAT RIGHT?

8    **A.**  FIRST OF ALL, IT WASN'T OUR PRIMARY BUSINESS.  OUR PRIMARY

9    BUSINESS WAS TRYING TO GET LICENSE AGREEMENTS WITH COMPANIES.

10   BUT IN THAT TIME PERIOD WE DID START THINKING IN TERMS OF

11   LITIGATION.  THAT WOULD BE CORRECT.

12   **Q.**  AND AS A BUSINESSMAN YOU PUT A LITIGATION PLAN TOGETHER,

13   CORRECT?

14   **A.**  THE LAWYERS PUT A LITIGATION PLAN TOGETHER.

15   **Q.**  AND AS TO WHETHER ADOBE WAS PART OF THAT LITIGATION --

16   WHETHER ADOBE -- THERE WAS A REASONABLE LIKELIHOOD THAT ADOBE

17   WAS INFRINGING AT THAT TIME, YOU JUST WEREN'T THINKING ABOUT

18   THAT AT THAT TIME; IS THAT RIGHT?

19   **A.**  I CAN'T TELL YOU IF THEY LOOKED AT ADOBE OR DIDN'T LOOK AT

20   ADOBE.

21   **Q.**  AND --

22   **A.**  I WAS GOING TO SAY, I DON'T THINK WE STARTED THINKING IN

23   THOSE TERMS UNTIL -- ACTUALLY, WE ENTERED INTO THAT LICENSE

24   WITH RPX WHEN WE ENDED UP WITH A LIST OF COMPANIES THAT WOULD

25   BE ALLOWED TO BECOME MEMBERS OF RPX, AND THE ONES THAT WOULD

1    BE EXCLUDED FOR HAVING OUR PATENT AS PART OF THEIR LICENSE

2    AGREEMENT.  THAT IS ABOUT THE FIRST TIME WE STARTED MAKING A

3    LIST UP.  I HOPE THAT HELPED YOU.

4    **Q.**  SO PRIOR TO YOUR LAWSUIT WHERE YOU SUED TEN DIFFERENT

5    COMPANIES YOU HADN'T PUT A LIST TOGETHER OF WHO IT WAS YOU

6    WANTED TO SUE FOR INFRINGEMENT; IS THAT RIGHT?

7    **A.**  NO, THE FIRST LIST I REMEMBER WE PUT TOGETHER WAS FOR THAT

8    RPX LICENSE AGREEMENT.

9    **Q.**  AND WHEN WAS THAT?

10   **A.**  WHAT WAS THE DATE OF THAT LICENSE AGREEMENT?  IT WOULD

11   HAVE BEEN SEVERAL MONTHS BEFORE.  THAT LICENSE AGREEMENT, I

12   CAN TELL YOU, WAS IN DECEMBER OF 2008.  SO IT WAS IN THAT TIME

13   PERIOD.  NOVEMBER, DECEMBER, THAT THAT ISSUE CAME UP ABOUT WHO

14   WOULD WE EXCLUDE, WHO WOULDN'T WE EXCLUDE, WHO COULD BE

15   THEIRS, WHO COULD BE OURS, THAT SORT OF THING.

16   **Q.**  THE FIRST TIME THAT YOU HAD THE SUSPICION ABOUT ADOBE'S

17   INFRINGEMENT AT DIGITAL REG WAS IN NOVEMBER, DECEMBER OF 2008;

18   IS THAT CORRECT?

19   **A.**  ADOBE WAS ON OUR LIST THAT COULD NOT BECOME A MEMBER OF

20   RPX AND GET A LICENSE THROUGH RPX TO THE '541.  YES.  THEY

21   WERE ON OUR LIST AT THAT TIME.

22   **Q.**  RIGHT.  AND THAT IS HOW YOU KNOW THAT WAS THE FIRST TIME

23   THAT YOU HAD A BELIEF THAT ADOBE MIGHT BE INFRINGING, CORRECT?

24   THAT'S HOW YOU REMEMBER THAT DATE.

25   **A.**  I REMEMBER THE DATE BECAUSE OF THE RPX DEAL MORE THAN I DO

FARLEY – CROSS / REINES

1  THE LIST.  BUT I KNOW THAT THEY WERE ON THE LIST, BUT I WAS

2  NOT THINKING IN THOSE TERMS BACK AT THAT TIME FRAME.

3  **Q.**  RIGHT.

4  **A.**  WE JUST MADE A LIST UP OF PEOPLE WE THOUGHT WERE PROBABLY

5  INFRINGING.  I DON'T KNOW HOW FAR BACK THEY WOULD GO, BUT -- I

6  MEAN, IT WASN'T OUR BUSINESS.  WE WEREN'T THINKING ABOUT IT.

7  **Q.**  I JUST WANT IF YOU CAN DIRECTLY ANSWER MY QUESTION.  I

8  BELIEVE BASED ON YOUR TESTIMONY -- BUT I WANT TO JUST BE

9  SURE -- THAT IN TERMS OF WHEN YOU FIRST HAD A SUSPICION THAT

10  ADOBE MIGHT BE INFRINGING, THAT THAT WAS AT THE END OF 2008 AS

11  PART OF THIS ENGAGEMENT WITH RPX, TO YOUR KNOWLEDGE, AS HEAD

12  OF RPX.

13  **A.**  I DON'T THINK THAT IS CORRECT.

14  **Q.**  WHEN WAS IT?

15  **A.**  I DON'T THINK I CAN ACTUALLY PIN DOWN A DATE FOR YOU AS TO

16  WHEN WE ACTUALLY -- BECAUSE WE DIDN'T THINK IN THOSE TERMS.

17  IT IS HARD FOR ME TO REMEMBER WHEN THAT MIGHT HAVE BEEN.

18  BECAUSE I WASN'T THINKING IN TERMS OF LITIGATION.

19  YOU KNOW, WE WERE LOOKING TO MEET WITH PEOPLE, HOPEFULLY

20  LICENSE OUR PATENTS, AND WE WEREN'T THINKING IN THOSE TERMS.

21  SO I CAN'T GIVE YOU A DATE.

22  **Q.**  WHEN YOU INITIATED LITIGATION AT THE END OF 2007, AT THAT

23  POINT, HAD DIGITAL REG, YOU AND MR. VENTERS AS THE LEADERSHIP,

24  HAD ANY SUSPICION THAT ADOBE WAS INFRINGING AT THAT POINT IN

25  TIME?  YOU WERE THINKING OF LITIGATION AT THAT TIME.

FARLEY – CROSS / REINES

1   **A.**  WE HAD A SUSPICION THAT THEY HAD BEEN OR WOULD -- THAT

2   THEY PROBABLY HAD BEEN.  THAT IS WHY WE PUT THEM ON THEIR

3   LIST.  AS TO WHEN, SPECIFIC TIME, I CAN'T GIVE YOU AN HONEST

4   ANSWER ON THAT.  I CANNOT PIN DOWN A DATE FOR YOU.

5       JUST AS LONG AS WE ARE CLEAR ON THAT, WE MIGHT AS WELL BE

6   CLEAR ON IT.

7   **Q.**  UNDERSTOOD.  MY QUESTION IS JUST:  CAN YOU SAY WHETHER IT

8   WAS BEFORE OR AFTER --

9   **A.**  I JUST SAID I CAN'T PIN THE DATE DOWN.

10  **Q.**  JUST LET ME COMPLETE MY QUESTION.  THAT'S ALL I AM ASKING,

11  OKAY?

12  **A.**  UM-HUM.

13  **Q.**  WAS IT BEFORE OR AFTER YOU BEGAN THE HUSTLER LITIGATION AT

14  THE END OF 2007?  IF YOU CAN'T ANSWER, THAT'S FINE.  IF YOU

15  KNOW IT WAS BEFORE, KNOW IT WAS AFTER, PLEASE STATE THAT.

16  **A.**  I CAN'T ANSWER YOUR QUESTION.

17  **Q.**  DO YOU HAVE ANY IDEA WHEN DIGITAL REG FIRST SUSPECTED THAT

18  ADOBE WAS INFRINGING?  ANY IDEA AT ALL?

19  **A.**  SAME ANSWER:  I CAN'T ANSWER YOUR QUESTION.  I DON'T KNOW

20  FOR SURE.

21  **Q.**  MY QUESTION WASN'T FOR SURE.  MY QUESTION WAS:  "DO YOU

22  HAVE ANY IDEA"?

23  **A.**  NO.

24  **Q.**  IN TERMS OF WHAT ADOBE WAS ACCUSED OF INFRINGING, OR IS

25  ACCUSED OF INFRINGING IN THIS CASE, AT LEAST AS OF THE TIME OF

FARLEY – CROSS / REINES

```
1    YOUR DEPOSITION YOU COULDN'T STATE ANYTHING ABOUT WHAT THAT
2    WAS, CORRECT?
3    A.  I DON'T REMEMBER THE DETAILS OF WHAT THE CLAIM CHARTS AND
4    ALL OF THAT STUFF WAS THAT THE ATTORNEYS PUT TOGETHER.  NO, I
5    DON'T.
6    Q.  ALL RIGHT.  NOW, I WOULD LIKE TO GO BACK TO SOME TESTIMONY
7    ON DIRECT.  WE ARE WRAPPING UP.
8    A.  OKAY.
9    Q.  ON DIRECT YOU WERE ASKED ABOUT YOUR INVOLVEMENT WITH THE
10   PORN INDUSTRY.  DO YOU RECALL THAT?
11   A.  YES.
12   Q.  OKAY.  AND YOU AT ONE POINT WANTED TO USE THE TECHNOLOGY
13   OF THE DESKGATE PATENTS TO PROTECT THE PORN INDUSTRY; ISN'T
14   THAT CORRECT?
15   A.  I -- IT WAS A -- IT WAS A LOT OF MONEY IN THAT INDUSTRY,
16   AS I SAID YESTERDAY, I THINK.  AND WE CERTAINLY THOUGHT ABOUT
17   IT.  BUT, I DON'T BELIEVE WE EVER MOVED FORWARD ON IT OTHER
18   THAN TO FILE SOME SUITS AGAINST A COUPLE OF COMPANIES.
19   Q.  AND THE REASON THAT YOU WANTED TO TRY TO USE THE
20   TECHNOLOGY OF WHAT WAS DIGITAL CONTAINERS, WHICH IS THE PARENT
21   OF --
22   A.  YEAH.
23   Q.  -- OF DIGITAL REG, THE REASON THAT YOU WANTED TO USE THE
24   PATENTS FOR THE PORN INDUSTRY WAS BECAUSE OF GREED; WASN'T IT?
25   A.  I DID SAY THAT IN MY -- THAT THAT WAS THE REASON WE WERE
```

1   EVEN LOOKING AT IT.  YOU KNOW?  EVERYBODY HAS GOT THAT

2   EMOTION, I THINK.

3              **MR. REINES:**  NO FURTHER QUESTIONS.

4              **MS. GLAUSER:**  WE HAVE NO FURTHER QUESTIONS, YOUR

5   HONOR.  MAY THIS WITNESS BE EXCUSED?

6              **THE COURT:**  YES.

7        YOU MAY BE EXCUSED.  YOU MAY STEP DOWN.

8        YOU MAY CALL YOUR NEXT WITNESS.

9              **THE WITNESS:**  THANK YOU, YOUR HONOR.

10             **THE CLERK:**  COME FORWARD TO THE WITNESS –– COME

11  FORWARD TO THE WITNESS STAND FOR ME, AND RAISE YOUR RIGHT

12  HAND.

13       PLEASE RAISE YOUR RIGHT HAND.

14       (**CARL VERNON VENTERS,** CALLED AS A WITNESS FOR THE

15  PLAINTIFF, HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

16             **THE WITNESS:**  I DO.

17             **THE CLERK:**  YOU MAY BE SEATED.  ONCE SEATED, I'M

18  GOING TO ASK THAT YOU PLEASE STATE AND SPELL YOUR FIRST AND

19  LAST NAME FOR THE RECORD, PLEASE.

20             **THE WITNESS:**  CARL VERNON VENTERS.

21             **THE CLERK:**  SPELL YOUR NAME, PLEASE?

22             **THE WITNESS:**  CARL, C-A-R-L.  VERNON, V, AS IN

23  VICTOR, E-R-N-O-N. VENTERS, V-E-N-T-E-R-S.

24             **THE CLERK:**  THANK YOU.

25

1                      **DIRECT EXAMINATION**

2  **BY MS. GLAUSER:**

3  **Q.**  GOOD MORNING, MR. VENTERS.

4  **A.**  GOOD MORNING.

5  **Q.**  COULD YOU PLEASE EXPLAIN TO THE JURY HOW YOU ARE INVOLVED

6  WITH THE PLAINTIFF, DIGITAL REG?

7  **A.**  YES.  I'M ONE OF THE PRINCIPALS OF THE COMPANY.

8  **Q.**  WHY ARE YOU HERE TO TESTIFY THIS MORNING?

9  **A.**  I'M HERE TO TALK ABOUT TWO MEETINGS WE HAD WITH ADOBE.

10  **Q.**  BEFORE WE GET INTO THOSE MEETINGS, I WOULD LIKE THE JURY

11  TO HEAR A LITTLE ABOUT WHO YOU ARE.

12  **A.**  MARIN COUNTY, CALIFORNIA.

13  **Q.**  ARE YOU MARRIED?

14  **A.**  YES, TO SHELLY, FOR NINE YEARS.

15  **Q.**  DO YOU AND SHELLY HAVE ANY CHILDREN?

16  **A.**  YES.  I HAVE A SON, WHO IS 24, LIVES IN SAN DIEGO, BROOKS.

17  AND MAGGY IS MY DAUGHTER, 22, IN NORTH CAROLINA.

18  **Q.**  DID YOU GO TO COLLEGE?

19  **A.**  YES, I DID.

20  **Q.**  WHERE DID YOU GO.

21  **A.**  UNIVERSITY OF NORTH CAROLINA, CHAPEL HILL.

22  **Q.**  WHAT WAS YOUR MAJOR?

23  **A.**  RADIO, TELEVISION AND MOTION PICTURES IS WHAT WE CALLED IT

24  IN THOSE DAYS, BUT NOW THEY CALL IT "BROADCAST JOURNALISM."

25  **Q.**  WHEN DID YOU GRADUATE, MR. VENTERS?

1    **A.**  1980.

2    **Q.**  WHAT DID YOU DO AFTER GOING TO SCHOOL?

3    **A.**  WELL, MY FAMILY HAD ALWAYS BEEN IN POLITICS FOR 35 YEARS.

4    SO I WENT TO CAPITAL HILL, WORKED FOR A CONGRESSMAN FOR A BIT,

5    TO SEE IF IT WAS FOR ME, BUT IT WASN'T?

6    **Q.**  I'M A FAST TALKER, SO I SHOULD BE THE LAST PERSON TO GIVE

7    YOU ADVICE.  BUT I KNOW IT IS VERY HARD FOR THE COURT REPORTER

8    TO TAKE IT UP.

9    **A.**  OKAY.

10   **Q.**  SO IF YOU WILL SPEAK A LITTLE SLOWER FOR US IT WILL HELP

11   EVERYBODY IN THE COURTROOM.

12   **A.**  OKAY.

13   **Q.**  HOW LONG WERE YOU IN CAPITAL HILL?

14   **A.**  ABOUT SIX MONTHS.

15   **Q.**  WHAT DID YOU DO NEXT?

16   **A.**  WELL, I WAS –– MY PASSION WAS SKI RACING IN THOSE DAYS,

17   AND I WAS OFFERED TO RUN THIS LITTLE SKI RESORT IN NORTH

18   CAROLINA FOR THE WINTER, SO I WENT UP AND DID THAT FOR THAT

19   WINTER.

20   **Q.**  WHAT DID YOU DO AFTER THAT WINTER SKI SEASON?

21   **A.**  I LEFT FOR VAIL, COLORADO, TO CONTINUE TO SEEK MY PASSION.

22   **Q.**  WHY DID YOU DO WHILE YOU WERE IN VAIL?

23   **A.**  FIRST THING I DID WAS I GOT A JOB WITH A RADIO STATION OUT

24   THERE, THE TOWN RADIO STATION.  AND I WAS IN SALES AND

25   COMMERCIAL PRODUCTION.

1  **Q.**  WHAT COMPANY WAS THAT?

2  **A.**  THAT WAS THE RADIO STATION.  I FORGET THE –– KQAS?  I

3  FORGET WHAT IT WAS.  ONE OF THOSE CALL LETTERS, RIGHT.

4  **Q.**  WHAT DID YOU DO NEXT?

5  **A.**  UM, I STARTED A COUPLE OF COMPANIES THERE.

6  **Q.**  HOW MANY COMPANIES DID YOU START IN VAIL?

7  **A.**  THREE COMPANIES.

8  **Q.**  WHAT WAS THE FIRST ONE?

9  **A.**  THE FIRST ONE WAS CALLED "VIDEO IMAGE PRODUCTIONS."  IT

10  WAS A VIDEO PRODUCTION COMPANY THAT TOOK ADVANTAGE OF

11  SOMETHING THAT WAS BRAND NEW IN THOSE DAYS, WHICH WAS PORTABLE

12  VIDEO EQUIPMENT.

13     AND WE WOULD GO OUT –– WE SHOT OUTDOOR FILMS, MOSTLY

14  SKIING AND CLIMBING.  AND WE WOULD, YOU KNOW, TAKE THIS

15  EQUIPMENT THAT WAS PORTABLE, AND WE WOULD SHOOT THESE KIND OF

16  GOPRO-TYPE VIDEOS.  BUT THE EQUIPMENT WEIGHED 65 POUNDS, NOT

17  8 OUNCES.  SO A LITTLE DIFFERENT.

18     AND THE FACT THAT I WAS A SKI RACER AND I COULD SKI

19  BACKWARDS WAS A SKILL THAT REALLY HELPED IN THAT BUSINESS.

20  **Q.**  HOW LONG DID YOU HAVE THAT BUSINESS?

21  **A.**  I HAD THAT BUSINESS UNTIL '86.

22  **Q.**  YOU MENTIONED THAT YOU HAD A DIFFERENT BUSINESS AT THE

23  SAME TIME WHILE YOU WERE IN VAIL.  WHAT WAS THE OTHER?

24  **A.**  YES.  THERE WERE A LOT OF CONVENTIONS AND MEETINGS IN

25  VAIL, SO WE STARTED AN AUDIO VISUAL EQUIPMENT RENTAL

VENTERS – DIRECT / GLAUSER

1    BUSINESS.  AND THEN, WE STARTED A MAGAZINE CALLED "ROCKY

2    MOUNTAIN REAL ESTATE," WHICH I EDITED.

3    **Q.**  WHEN DID YOU LEAVE VAIL?

4    **A.**  1986.

5    **Q.**  WHERE DID YOU GO?

6    **A.**  I HAD KIND OF A CAREER-ENDING SKI INJURY, SO AT THE SAME

7    TIME I WAS INVITED TO COME TO RALEIGH, NORTH CAROLINA AND

8    PRODUCE SOME DOCUMENTARIES FOR TIME-WARNER CABLE CALLED "THE

9    STATE OF THE ARTS IN RALEIGH," SO I WENT BACK AND DID THAT.

10   **Q.**  WHAT DID DO YOU AFTER DOING THAT DOCUMENTARY?

11   **A.**  WELL, I JOINED MY STEPMOTHER'S AD AGENCY THAT SHE HAD

12   STARTED AS PRESIDENT AND CREATIVE DIRECTOR.

13   **Q.**  THAT WAS IN RALEIGH?

14   **A.**  YES.

15   **Q.**  DID YOU HAVE ANY OTHER JOBS IN RALEIGH AT THAT TIME?

16   **A.**  WELL, I STARTED ANOTHER VERSION OF THE COMPANY WE HAD IN

17   VAIL, WHICH WAS AUDIO VISUAL VAIL.  WE CALLED IT AUDIO VISUAL

18   SERVICES IN RALEIGH.  AND THAT BUSINESS GREW AND WAS ALL OVER

19   NORTH CAROLINA BY THE TIME WE WERE DONE WITH IT.

20   **Q.**  IS THAT BUSINESS STILL IN OPERATION TODAY?

21   **A.**  IT WAS SOLD TO ANOTHER COMPANY, YES.  IT STILL IS, THOUGH.

22   **Q.**  WHAT DID YOU DO -- WHY DID YOU SELL THE VAIL BUSINESSES?

23   **A.**  OH, WE ARE BACK TO VAIL?  OH, BECAUSE AGAIN I HAD A SEASON

24   CAREER INJURY -- A CAREER-ENDING INJURY.  AND I WENT BACK TO

25   NORTH CAROLINA TO DO THE DOCUMENTARIES.  AND WHILE I WAS BACK

THERE, IT WAS LIKE:  "WOW.  I HAVE SOME OPPORTUNITIES HERE,"

SO --

**Q.**  I APPRECIATE YOU LISTENING SO CLOSELY.  I MISSPOKE.  WHY

DID YOU SELL THE BUSINESS IN RALEIGH?

**A.**  OH, WELL, FIRST OF ALL, THERE WAS ONE OTHER BUSINESS IN

RALEIGH I DIDN'T GET TO TELL YOU ABOUT.

**Q.**  WHAT WAS IT?

**A.**  IT WAS AERIAL BROADCASTING.  IT WAS A TRAFFIC-REPORTING

SERVICE, WHICH WAS KIND OF UNIQUE FOR THE DAY.  WE HAD LITTLE

AIRPLANES FLYING AROUND THE TRIANGLE, AND THEY WOULD RADIO

TRAFFIC REPORTS DOWN TO A TRANSCRIBER.  AND THE TRANSCRIBER

WOULD THEN CONVERT IT TO FAX AND SEND IT TO THE RADIO

STATIONS, WHICH SOUNDS ANTIQUATED NOW, BUT WE THOUGHT THAT WAS

PRETTY COOL STUFF IN THE DAY.

**Q.**  DID YOU EVENTUALLY SELL THAT BUSINESS?

**A.**  YES.

**Q.**  WHY DID YOU GET RID OF THE TWO RALEIGH BUSINESSES?

**A.**  I REMEMBER IT LIKE IT WAS YESTERDAY.  I WAS IN THE STUDIO.

WE WERE CUTTING A SHOW.  IT WAS AN INTERNATIONAL ETIQUETTE

EXPERT WITH A SHOW WE WERE DOING FOR HER.  AND WE WERE

TALKING, AS USUAL, ABOUT THE DISTRIBUTION DEAL:  WAS IS DONE?

HOW IS IT GOING TO BE DISTRIBUTED?

AND SOMEBODY WALKED IN THE STUDIO AND SAID -- TOLD US

SOMETHING -- THIS THING ABOUT THIS THING CALLED "THE

INFORMATION HIGHWAY," WHICH IS WHAT THEY CALLED IT, WHICH

1  ENDED UP BEING THE INTERNET.  AND SAID THAT THE INFORMATION

2  HIGHWAY WOULD ALLOW YOU TO DISTRIBUTE VIDEO, MUSIC, BOOKS,

3  ANYTHING ELECTRONIC, WITHOUT A MIDDLEMAN.

4      I WAS LIKE "REALLY?  GOSH."

5      SO AT THAT MOMENT I SAID:  "THAT IS WHAT I WANT TO BE

6  INVOLVED IN."

7  Q.  ABOUT WHAT YEAR ARE WE TALKING ABOUT?

8  A.  THAT WAS IN '92.

9  Q.  WHEN YOU DECIDED THAT IS WHAT YOU WANTED TO BE INVOLVED

10  IN, WHAT DID YOU DO NEXT?

11  A.  WELL, I STARTED THIS COMPANY CALLED TOTAL FAX AND GOT RID

12  OF THE -- SOLD THE OTHER COMPANIES.

13  Q.  WHAT IS TOTAL FAX?

14  A.  TOTAL FAX WAS ONE OF THE FIRST FAX BROADCASTING COMPANIES.

15  IT WAS A -- WE HAD -- THE BEST WAY TO DESCRIBE TO YOU HOW IT

16  WORKED, WE HAD TRADE ASSOCIATIONS AS CLIENTS IN WASHINGTON,

17  D.C. IN FACT, I HAD MOVED THERE.  AND THEY WOULD HAVE MEMBERS

18  ALL OVER THE COUNTRY, AND SOMETIMES ALL OVER THE WORLD.

19      AND BEFORE FAX CAME ALONG THEY WOULD HAVE TO MAIL

20  COMMUNICATIONS, WHICH WAS SLOW AND EXPENSIVE.  WHEN FAX CAME

21  ALONG, WE COULD GET IT TO THEM INSTANTLY, AND IT WAS CHEAPER.

22  SO IT WAS A PRETTY BIG INNOVATION FOR THE TIME.

23  Q.  WHAT HAPPENED TO THAT BUSINESS?

24  A.  IT WAS ACTUALLY SOLD TO A COMPANY CALLED "PREMIERE

25  COMMUNICATIONS" THAT WANTED TO STAY IN FAX.  AND WE WANTED TO

VENTERS – DIRECT / GLAUSER

1    KIND OF MOVE ON TO MORE OF AN INTERNET COMPANY.  WE TOOK SOME

2    OF THAT COMPANY, AND WE GOT AN INVESTMENT FROM CAPITAL

3    BROADCASTING AND WE STARTED SOMETHING CALLED "TOTAL ACCESS

4    COMMUNICATIONS."

5    **Q.**  WHAT SERVICES DID TOTAL ACCESS COMMUNICATIONS OFFER?

6    **A.**  IT WAS MORE INTERNET-CENTRIC.  IT WAS EMAIL SERVICES.  BUT

7    IN THOSE DAYS YOU COULDN'T GET INTERNET JUST ANYWHERE.  AND

8    WE HAD U.S. AIR.  CRYSTAL CITY WAS OUR CLIENT.  WE STARTED OFF

9    GIVING THEM INTERNET SERVICES.

10   **Q.**  IS THAT BUSINESS STILL OPERATIONAL?

11   **A.**  NO, U.S. AIR WENT TO SOME OTHER BIG COMPANY EVENTUALLY,

12   AND CAPITAL BROADCASTING GOT OUT OF THE BUSINESS, AND SO DID

13   WE.

14   **Q.**  WHAT DID YOU DO NEXT?

15   **A.**  WELL, NEXT, I WAS INTRODUCED TO PAT PATTERSON.

16   **Q.**  HOW WERE YOU INTRODUCED TO MR. PATTERSON?

17   **A.**  FAMILY FRIEND, DAVE ROGERS, WHO I USED TO SKI WITH, HE

18   KNEW ABOUT MY BUSINESSES AND THE ELECTRONIC COMMUNICATION

19   BUSINESS I WAS IN.  AND HE KNEW I WAS ALWAYS TALKING ABOUT

20   SECURITY AND HOW THAT WAS A PROBLEM.  HE ALSO KNEW PAT

21   PATTERSON THROUGH BUSINESS.  AND PAT HAD BEEN TALKING ABOUT

22   THESE NEW TECHNOLOGIES THAT HE WAS DEVELOPING THAT PROMISED TO

23   BE ABLE TO SECURE ANY KIND OF COMMUNICATION.

24       AND HE SAID:  "GOSH, YOU GUYS SHOULD GET TOGETHER."

25   **Q.**  YOU MENTIONED THAT YOU HAD BEEN TALKING ABOUT PROBLEMS

VENTERS – DIRECT / GLAUSER

1    WITH SECURITY FOR DIGITAL CONTENT.  WHY DID THAT COME UP IN

2    YOUR BUSINESS?

3    **A.**  WELL, YOU KNOW, FAX, BELIEVE IT OR NOT, WAS -- SOME PEOPLE

4    CONSIDER IT SECURE.  BUT SOMETIMES IT WAS FALLING ON THE FLOOR

5    IN SOMEBODY'S OFFICE AND THE WRONG PERSON WOULD PICK IT UP, SO

6    THAT WAS INHERENTLY INSECURE.

7         THEN, WHEN WE SWITCHED TO EMAIL AND SOME OF THE NEWER

8    STUFF, OBVIOUSLY WE WERE SENDING DOCUMENTS AND STUFF OUT IN

9    THE OPEN.  WE KNEW IT WAS A SERIOUS PROBLEM AND WE KNEW THAT

10   THERE WERE SOME TYPES OF CUSTOMERS THAT WOULD NOT USE THE

11   INTERNET SERVICES BECAUSE OF THE LACK OF SECURITY.

12   **Q.**  BEFORE MEETING WITH MR. PATTERSON, WERE YOU PERSONALLY

13   AWARE OF ANY WAY TO SECURELY SEND DIGITAL CONTENT BY EMAIL?

14   **A.**  I WAS NOT AWARE OF ANY.

15   **Q.**  WHEN DID THAT FIRST MEETING WITH MR. PATTERSON OCCUR?

16   **A.**  IN 1996.

17   **Q.**  OKAY.  WHAT HAPPENED AS A RESULT OF THAT MEETING?

18   **A.**  WELL, WE GOT TO BE REALLY GOOD FRIENDS.  I STILL HAD OTHER

19   ACTIVITIES, BUT WE WOULD JUST HANG OUT, AND WE WOULD TALK.

20   AND OVER TIME I GOT TO HEAR HIS VISION OF HOW SOME OF THESE

21   TECHNOLOGIES THAT HE WAS BUILDING COULD IMPACT THESE THINGS

22   THAT I KNEW NEEDED TO BE FIXED IN TERMS OF SECURITY.

23        AND THEN, HE GOT TO KNOW ME AND MY MARKETING BACKGROUND

24   AND ALL THAT, AND WE SORT OF STARTED SEEING HOW WE COULD

25   POSSIBLY WORK TOGETHER.

1  **Q.** DURING THAT TIME DID HE EXPLAIN TO YOU WHAT HIS VISION

2  WAS?

3  **A.** OH YEAH. HE TALKED ABOUT IT IN DETAIL. HE ENVISIONED A

4  WORLD WHERE, AGAIN, ALL THESE DOCUMENTS COULD -- DOCUMENTS AND

5  MUSIC AND VIDEO AND ALL THAT WOULD MOVE ABOUT FREELY ON THE

6  INTERNET, AND IT WOULD HAVE SECURITY. AND IMPORTANT SECURITY

7  FEATURES LIKE AUTHENTICATION. IT WOULD HAVE TRACKING,

8  CONDITIONAL ACCESS. THESE WERE ALL THINGS THAT I KNEW THAT

9  YOU HAD TO HAVE. AND HE KNEW IT, TOO, AND HE FIGURED OUT HOW

10 TO DO IT.

11 **Q.** WHEN DID YOU ACTUALLY JOIN DESKGATE?

12 **A.** FORMALLY IN 1997.

13 **Q.** WHY DID YOU DECIDE TO FORMALLY JOIN?

14 **A.** I THOUGHT IT WAS A GREAT THING TO BE DOING. I THOUGHT

15 MR. PATTERSON WAS A PIONEER, AND I THOUGHT THE TECHNOLOGY WAS

16 PIONEERING. AND I THOUGHT IT WAS GOING TO BE NOT JUST MAYBE A

17 FUN BUSINESS OR A PROFITABLE BUSINESS, BUT JUST A REALLY

18 IMPORTANT BUSINESS TO BE INVOLVED IN.

19 **Q.** WHEN YOU JOINED DESKGATE, DID THEY HAVE A PRODUCT AT THAT

20 TIME?

21 **A.** YES, THEY DID.

22 **Q.** WHAT PRODUCT WAS THAT?

23 **A.** IT WAS CALLED "THE UNIVERSAL ENVELOPE." IT WAS A SIMPLE

24 PRODUCT THAT TOOK A FILE, ENCRYPTED IT. YOU COULD PUT A

25 PASSWORD ON IT, AND THEN YOU COULD ATTACH IT TO AN EMAIL AND

1    SEND IT TO ANYBODY.

2    **Q.**  ARE YOU AWARE OF WHETHER OR NOT AT THAT TIME MR. PATTERSON

3    AND DESKGATE WERE WORKING TO DEVELOP A SECOND GENERATION OR A

4    DIFFERENT PRODUCT?

5    **A.**  YES.  THERE WAS A -- THERE WAS DEVELOPERS AND CONTRACTORS

6    THAT WERE COMING IN AND OUT.  I KNOW DESIGN DOCUMENTS THAT HE

7    HAD HE WAS WORKING FROM.  YEAH, IT WAS VERY BUSY WORKING ON

8    THAT NEXT ITERATION.

9    **Q.**  WHAT WAS THAT NEXT ITERATION GOING TO BE?

10   **A.**  THE NEXT ITERATION WAS REALLY -- WELL, IT WAS SOMETHING WE

11   ENDED UP CALLING "VIA PUBLISHER," BUT YOU CAN CALL IT WHATEVER

12   YOU WANT.

13       IT WAS A SYSTEM THAT ALLOWED YOU TO TAKE THE FILE AND

14   CREATE AN ALMOST TRANSPARENT ENVIRONMENT WHERE THE USER DIDN'T

15   HAVE TO REMEMBER A PASSWORD AND DIDN'T HAVE TO DO ALL THESE

16   THINGS. AND THEY WOULD DO A LOT OF STUFF AUTOMATICALLY, THE

17   THINGS THAT HAD TO BE DONE TO MAKE THIS MORE A FRICTIONLESS

18   ENVIRONMENT FOR DIGITAL MEDIA.

19       SO IT HAD A LOT OF COMPONENTS TO IT, BUT THAT IS REALLY

20   WHAT IT WAS.  IT WAS THE EASY-TO-USE PIECE THAT YOU WOULD HAVE

21   TO HAVE FOR THIS TO BE A SUCCESSFUL-TYPE ENDEAVOR, THIS

22   DIGITAL DISTRIBUTION.

23   **Q.**  WHAT WERE YOUR RESPONSIBILITIES AT DESKGATE?

24   **A.**  I WAS DIRECTOR OF MARKETING.  SO IT WAS MY JOB TO LET THE

25   WORLD KNOW WHAT WE HAD.

1    **Q.**   AND HOW DID YOU GO ABOUT DOING THAT?

2    **A.**   WELL, WE WROTE WHITE PAPERS.  I MANAGED THE WEBSITES.  WE

3    DID PUBLIC RELATIONS, PR.  WE DID CONFERENCES.  I SET UP

4    MEETINGS, ATTENDED MEETINGS.  ANYTHING THAT YOU NEEDED TO DO

5    TO FURTHER THE MESSAGE WAS SORT OF MY RESPONSIBILITY.

6    **Q.**   WERE YOU RESPONSIBLE FOR ANY KIND OF BRANDING WITH REGARD

7    TO THE PRODUCTS?

8    **A.**   YES.  IN FACT, WHEN I GOT THERE WE REBRANDED EVERYTHING.

9    **Q.**   BY "REBRANDED" WHAT DOES THAT MEAN?

10   **A.**   WELL, SOMETIMES WHAT YOU CALL A PRODUCT WHEN YOU START AND

11   WHAT IS A BETTER NAME FOR IT ARE TWO DIFFERENT THINGS.  WHEN I

12   GOT THERE THE NAME FOR THE PRODUCT, UNIVERSAL ENVELOPE, IT

13   DIDN'T REALLY SAY MUCH.  VIA WAS A NAME WE CAME UP WITH

14   BECAUSE IT IMPLIED A WAY TO GET THINGS DONE.  SO IT BECAME

15   SORT OF THE MAIN NAME BRAND.  AND THEN, WE DID LINE EXTENSIONS

16   OF THE BRAND AFTER THAT.

17   **Q.**   THE JURY HEARD DESKGATE ULTIMATELY MERGED WITH M2 DIRECT.

18   DID YOU CONTINUE TO HAVE INVOLVEMENT WITH DESKGATE OR M2

19   DIRECT AFTER THE MERGER?

20   **A.**   NO, I DID NOT.

21   **Q.**   HOW WAS IT YOU BECAME TO BE INVOLVED WITH DRM

22   TECHNOLOGIES?

23   **A.**   WELL, MR. FARLEY AND I BECAME FRIENDS DURING THOSE DAYS,

24   BECAUSE HE WAS AN INVESTOR IN DESKGATE.  AND WE JUST STAYED IN

25   TOUCH DURING THIS WHOLE PERIOD WHERE THE TRANSITION WAS GOING

1    ON.  HE WOULD ASK MY ADVICE.  AND HE KNEW I WAS VERY, VERY

2    INTERESTED IN IT.

3         AND WHEN HE INFORMED ME THAT HE THOUGHT OF A WAY WE COULD

4    GET THE TECHNOLOGY AND THE IP BACK, HE ASKED ME IF I WANTED TO

5    JOIN HIM.  AND I SAID:  "SURE.  I WOULD LOVE TO."

6    **Q.**  IN WHAT CAPACITY DID YOU JOIN?

7    **A.**  PRETTY MUCH AS IN DESKGATE.  MORE THE MARKETING PERSON.

8    IT WAS MY JOB TO LET THE WORLD KNOW WHAT WE HAD AGAIN.

9    **Q.**  WERE YOU RESPONSIBLE FOR ANY OF DRM TECHNOLOGIES ATTEMPTS

10   TO JOINT VENTURE WITH OTHER COMPANIES OR GIVE LICENSES TO

11   OTHER COMPANIES?

12   **A.**  YES.  THAT WAS MY PRIMARY RESPONSIBILITY.

13   **Q.**  AND IN DOING SO, CAN YOU JUST FILL UP OUT A LITTLE MORE ON

14   HOW IT IS YOU WENT ABOUT ATTEMPTING TO SEEK JOINT VENTURES?

15   **A.**  WELL, I WOULD RESEARCH AND IDENTIFY COMPANIES THAT I

16   THOUGHT COULD BENEFIT FROM USING THE IP AND THE TECHNOLOGY.

17        I WOULD WRITE WHITE PAPERS AND PROPOSALS.  I ACTUALLY

18   SPOKE AT CONFERENCES, DRM CONFERENCES ALL OVER THE WORLD.

19        I WOULD ASSIST IN SETTING UP MEETINGS AND PREPARING THE

20   MATERIALS FOR THOSE MEETINGS.  AND SOME OF THE MEETINGS I

21   WOULD ATTEND IN PERSON.

22   **Q.**  DID DIGITAL REG MEET WITH ADOBE PRIOR TO FILING THIS

23   LAWSUIT?

24   **A.**  YES.

25   **Q.**  HOW MANY TIMES?

VENTERS – DIRECT / GLAUSER

1    **A.**   TWICE.

2    **Q.**   LET'S TALK ABOUT THE FIRST MEETING BETWEEN DIGITAL REG AND

3    ADOBE.  WHEN DID THAT OCCUR?

4    **A.**   2004.

5    **Q.**   CAN YOU EXPLAIN TO US HOW DID THAT 2004 MEETING COME

6    ABOUT?

7    **A.**   WELL, I HAD IDENTIFIED ADOBE AS A COMPANY WE OUGHT TO TALK

8    TO.  WE DID RESEARCH AND FOUND OUT THEY HAD THIS DIVISION OF

9    THEIR COMPANY CALLED "ADOBE VENTURES."  IT WAS THEIR JOB AT

10   ADOBE VENTURES TO LOOK AT PROPOSALS AND THEN DECIDE WHETHER

11   SOMETHING MIGHT OR MIGHT NOT QUALIFY.

12        AND THEN, WHEN THEY DID, THEY INVITED US.  I SENT THEM

13   THAT DOCUMENT.  AND AFTER REVIEW THEY SAID: "LET'S HAVE A

14   MEETING AND TALK ABOUT IT."

15   **Q.**   SO DID YOU ACTUALLY SEND A PROPOSAL TO THE ADOBE

16   VENTURES --

17   **A.**   ADOBE VENTURES.  IF YOU LOOK ON THEIR WEBSITE IT SAID:

18   "PLEASE SEND US YOUR PROPOSALS AND REQUEST FOR MEETINGS."

19   **Q.**   DID THE PROPOSAL THAT YOU SENT HAVE A PARTICULAR TITLE TO

20   THAT PAPER?

21   **A.**   IT WAS CALLED "THE ADOBE VALUE PROPOSITION, 2004."

22   **Q.**   WHO DRAFTED THAT PARTICULAR PAPER?

23   **A.**   I DID.

24   **Q.**   AND WHY IS IT THAT YOU SUBMITTED THE ADOBE VALUE

25   PROPOSITION?

VENTERS – DIRECT / GLAUSER

1    **A.** WELL, I WANTED TO LET ADOBE KNOW THAT THE IP, THE PATENTS

2    AND TECHNOLOGY WE HAD COULD DO WHAT WE THOUGHT WONDERFUL

3    THINGS FOR THEIR PRODUCTS.  THAT IT WOULD GIVE THEIR PRODUCTS

4    A LEVEL OF SECURITY THAT CORPORATIONS WANTED.  AND, AGAIN, IT

5    WOULD BE BENEFICIAL FOR THEM TO HAVE IT AND FOR US TO BE

6    PARTNERED WITH THEM.

7    **Q.** WHO ATTENDED THE MEETING IN 2004?

8    **A.** MYSELF AND TWO PEOPLE FROM ADOBE VENTURES.

9    **Q.** WHEN DIGITAL REG MET WITH ADOBE IN 2004, DID YOU BELIEVE

10   THAT ADOBE WAS INFRINGING DRM TECHNOLOGIES' PATENTS?

11   **A.** I DIDN'T KNOW WHETHER THEY WERE OR THEY WEREN'T. I THOUGHT

12   THEY WERE DOING A LOT OF THINGS THAT LOOKED LIKE WHAT WE WERE

13   DOING, BUT THAT WASN'T MY -- WHAT I WAS LOOKING TO DO.

14   **Q.** IN 2004, DID YOU ACCUSE ADOBE OF INFRINGING THE PRODUCTS?

15   **A.** ABSOLUTELY NOT.

16   **Q.** MR. VENTERS, WERE YOU IN THE COURTROOM WHEN ADOBE'S

17   COUNSEL GAVE THEIR OPENING STATEMENT?

18   **A.** YES, I WAS.

19   **Q.** DID YOU HEAR ADOBE'S COUNSEL FAULT DIGITAL REG FOR NOT

20   ACCUSING ADOBE OF INFRINGEMENT AT THE 2004 MEETING?

21   **A.** I DID HEAR THAT.

22   **Q.** WHY DIDN'T YOU DO THAT?

23   **A.** WELL, WE WERE JUST TRYING TO WORK WITH ADOBE.  WE WERE --

24   WE WERE LOVERS, NOT FIGHTERS.  WE REALLY FELT THERE WOULD BE

25   GENUINE INTEREST FROM THEM IN PARTNERING WITH US BECAUSE WE

1   THOUGHT THAT THEY WERE A PERFECT MATCH FOR OUR IP.

2   **Q.**  WHERE DID THE 2004 MEETING WITH ADOBE OCCUR?

3   **A.**  HAPPENED ON THE PHONE.

4   **Q.**  AND WHAT HAPPENED DURING THE TELEPHONE MEETING?

5   **A.**  VERY CORDIAL MEETING.  WE WENT DOWN.  WE REVIEWED THE

6   WHOLE PAPER.  THEY ASKED A LOT OF QUESTIONS.  AT THE END

7   EVERYBODY THANKED EACH OTHER.  THEY SAID: "WE WILL GET BACK

8   TO YOU," AND THAT ENDED THE MEETING.

9   **Q.**  ARE YOU ABLE TO IDENTIFY WHICH PAPER IT IS THAT YOU

10  DISCUSSED WITH ADOBE DURING THE 2004 TELEPHONE MEETING?

11  **A.**  YES.  IT WAS THE ADOBE VALUE PROPOSITION, 2004.

12  **Q.**  ARE YOU AWARE OF WHETHER OR NOT THERE ARE MULTIPLE

13  VERSIONS OF THE ADOBE VALUE PROPOSITION PAPER?

14  **A.**  WE HAVE SOME INTERNAL VERSIONS.  YES, SO THERE WERE

15  INTERNAL VERSIONS.  AND THERE WAS DRAFTS LATER.  I USED IT TO

16  DRAFT OTHER STUFF.  THERE WAS ONE COPY WE SENT TO ADOBE

17  VENTURES.

18  **Q.**  MR. VENTERS, I'M SORRY THAT I DON'T RECALL, BUT DO YOU

19  HAVE A BINDER IN FRONT OF YOU WITH EXHIBITS?

20  **A.**  NO.

21          **MS. GLAUSER:**  PERMISSION TO APPROACH, YOUR HONOR?

22          **THE COURT:**  YES.

23              (BINDER HANDED TO WITNESS.)

24  **BY MS. GLAUSER:**

25  **Q.**  DO YOU HAVE SOME KLEENEX UP THERE, MR. VENTERS?

1        **THE CLERK:**  DID YOU SPILL SOMETHING?

2        **THE COURT:**  YES.  HE NEEDS A PAPER TOWEL.

3        **THE WITNESS:**  YEAH.  I'VE GOT IT IN FRONT OF ME.

4             (PAUSE IN THE PROCEEDINGS.)

5        **THE WITNESS:**  OKAY.  I'VE GOT IT IN FRONT OF ME NOW.

6    SORRY ABOUT THAT.  THAT'S GOOD.  THANK YOU.

7    **BY MS. GLAUSER:**

8    **Q.**  OKAY.  GREAT.  IF I CAN REFER YOU TO THE DOCUMENT LABELED

9    125C?

10   **A.**  OKAY.

11   **Q.**  CAN YOU IDENTIFY FOR THE JURY WHAT THIS IS?

12   **A.**  125C, ADOBE VALUE PROPOSITION.  YES, THIS IS THE PAPER WE

13   SENT TO ADOBE VENTURES FOR THAT MEETING.

14   **Q.**  IF YOU WILL TURN TO THE PAGE THAT IS MARKED "125C.004."

15   **A.**  YES.

16   **Q.**  DO YOU SEE THERE THAT THERE IS A COMMENT BOX?

17   **A.**  YES.  THIS IS AN INTERNAL VERSION.  AND THIS IS A COMMENT

18   THAT I MADE TO MYSELF, WHICH I ALWAYS DID.

19   **Q.**  DOES THAT MEAN THAT ADOBE WOULD HAVE RECEIVED THE INTERNAL

20   VERSION?

21   **A.**  NO, THEY WOULD NOT HAVE RECEIVED THIS.  THEY WOULD HAVE

22   RECEIVED THE VERSION WITHOUT THE COMMENT BOX.

23   **Q.**  ARE YOU ABLE TO EXPLAIN WHETHER THERE WOULD HAVE BEEN ANY

24   DIFFERENCES BETWEEN THIS DOCUMENT THAT YOU HAVE BEFORE YOU,

25   125C, AND THE VERSION THAT ADOBE RECEIVED AND YOU PRESENTED

1    DURING THE TELEPHONE MEETING OTHER THAN THIS INTERNAL COMMENT?

2    **A.**  NOT THAT I KNOW OF, NO.  I THINK THIS IS WHAT WE SENT

3    THEM.

4            **MS. GLAUSER:**  YOUR HONOR, AT THIS TIME WE WOULD OFFER

5    125C INTO EVIDENCE.

6            **THE COURT:**  SUBJECT TO YOUR EARLIER COMMENTS, IT WILL

7    BE RECEIVED.

8            **MS. MEHTA:**  WE OBJECT ON HEARSAY AND 403 GROUNDS, FOR

9    THE RECORD.

10           **THE COURT:**  WELL, IT IS NOT RECEIVED FOR THE MATTERS

11   ASSERTED THEREIN.

12       (PLAINTIFF'S EXHIBIT 125C WAS RECEIVED IN EVIDENCE.)

13           **MS. GLAUSER:**  YOUR HONOR, WE WOULD ACTUALLY LIKE

14   TO -- MY APOLOGIES.

15                       (PUBLISHED TO JURY.)

16           **MS. GLAUSER:**  IF WE CAN BRING UP 125C, THE FIRST

17   PAGE. AND IF WE CAN BLOW UP THE TITLE IN THE FIRST PARAGRAPH,

18   HIGHLIGHTING THE FIRST SENTENCE.  THAT WOULD BE WONDERFUL.

19   **BY MS. GLAUSER:**

20   **Q.**  MR. VENTERS, DO YOU SEE HERE WHERE IT SAYS:  "DIGITAL

21   CONTAINERS PATENTED SUPER DRM AND E COMMERCE TECHNOLOGIES CAN

22   BE WOVEN INTO A VARIETY OF ADOBE PRODUCTS TO CREATE A ROBUST

23   SET OF SECURE, HIGHLY MOBILE SOLUTIONS FOR ITS CURRENT AND

24   FUTURE CUSTOMERS"?

25   **A.**  YES, I SEE THAT.

VENTERS – DIRECT / GLAUSER

1  **Q.**  WHAT WERE YOU REFERRING TO THERE BY USING "PATENTED SUPER

2  DRM"?

3  **A.**  SUPER DRM WAS A BRANDING NAME FOR OUR ACTUAL PACKAGE OF IP

4  IN PATENTS.  THAT WAS THE PATENTS '541 AND '670.  AND PLUS THE

5  TECHNOLOGIES THAT WENT WITH IT.  THERE WERE SOME APPLICATIONS

6  IN THIS, AS WELL.

7  **Q.**  DURING THE MEETING DID YOU IDENTIFY SPECIFIC ADOBE

8  PRODUCTS THAT YOU THOUGHT COULD BENEFIT FROM YOUR PATENTED

9  TECHNOLOGY?

10  **A.**  YES, I DID.  I THINK IF YOU GO FURTHER DOWN THIS PAGE YOU

11  WILL SEE WHERE THAT HAPPENED.

12  **Q.**  CAN YOU POINT OUT WHERE?

13  **A.**  I THINK IT IS THE FOURTH PARAGRAPH.  IT STARTS WITH:

14  "THE PURPOSE OF THIS PAPER IS TO OUTLINE HOW THE SYSTEMS

15  WOULD WORK AND BE EASILY INTEGRATED WITH EXISTING ADOBE

16  PRODUCTS."

17  AND THEN, WE –– AS YOU GO FURTHER DOWN, YOU WILL SEE

18  SOME –– I WOULD SAY:

19  "IT WOULD BE THE WAY PEOPLE WOULD CREATE, PACKAGE,

20  MARKET, PROTECT AND MONETIZE INTELLECTUAL PROPERTY.  OUR GOAL

21  IS TO CREATE A DRM CONTENT DISTRIBUTION PRODUCT THAT COMBINES

22  ADOBE ACROBAT, COPY AND PRINT CONTROL FEATURES WITH DCI'S

23  PATENTED AUTHENTICATION E COMMERCE AND TRACKING FEATURES."

24  WE SAID THAT WE FELT THAT A PRODUCT LIKE THAT WOULD BE A

25  VERY COMPETITIVE ADVANTAGE IN THE MARKETPLACE.

VENTERS – DIRECT / GLAUSER

1   **Q.**  DID YOU IDENTIFY OTHER THAN ADOBE ACROBAT COPY, OTHER

2   PRODUCTS AT ADOBE THAT YOU THOUGHT COULD BENEFIT FROM DRM

3   TECHNOLOGIES' PATENTS?

4   **A.**  WELL, IF YOU SEE AT THE BOTTOM OF THAT PAGE, YOU WILL SEE

5   "THE INTELLIGENT DOCUMENT PLATFORM ACROBAT."

6          **THE COURT:**   "THE INTELLIGENT DOCUMENT PLATFORM

7   ACROBAT."

8      YOU NEED TO SPEAK MORE SLOWLY, ESPECIALLY WHEN YOU READ.

9          **THE WITNESS:**  I AM SORRY.  I AM A REALLY FAST READER.

10  I AM SORRY.

11     YES.  SO AT THE BOTTOM "INTELLIGENT DOCUMENT PLATFORM

12  ACROBAT."  THERE IS A LIST DOWN THERE AT THE BOTTOM.

13  **BY MS. GLAUSER**

14  **Q.**  DOES THE ADOBE VALUE PROPOSITION PAPER, EXHIBIT 125C,

15  SPECIFICALLY REFER TO THE '541 AND '670 PATENTS?

16  **A.**  YES, IT DOES.

17  **Q.**  CAN YOU POINT OUT FOR US THE FIRST PLACE THAT THOSE

18  PATENTS ARE SPECIFICALLY REFERENCED?

19  **A.**  I THINK IF YOU GO OVER TO 125C.004, WHICH IS PAGE 4 OF THE

20  DOCUMENT, YOU WILL SEE A HEADING CALLED:  "SUPPORTING PATENTS

21  AND INTELLECTUAL PROPERTY."

22     AND RIGHT UNDER THAT YOU WILL SEE WE SAY:

23     "DIGITAL CONTAINERS HAVE BEEN GRANTED TWO PATENTS BY THE

24  U.S. PATENT OFFICE."

25          **THE COURT:**  NO.  NO.  NO.  HUH-UH.

1    **THE WITNESS:**  SORRY.

2    **BY MS. GLAUSER:**

3    **Q.**  I DO SEE THERE A PARAGRAPH --

4    **THE COURT:**  NONE OF THAT WAS TAKEN DOWN.  IF YOU WANT

5    IT, YOU HAVE TO ASK IT AGAIN.

6    **MS. GLAUSER:**  I WILL BREAK IT DOWN, YOUR HONOR.

7    THANK YOU VERY MUCH.

8    **BY MS. GLAUSER**

9    **Q.**  ON THE PARAGRAPH UNDERNEATH THAT HEADING I DO SEE WHERE IT

10   SAYS DIGITAL CONTAINERS HAS BEEN GRANTED TWO PATENTS BY THE

11   U.S. PATENT OFFICE.  THEN, IT HAS IN QUOTATIONS: "REGULATING

12   ACCESS TO DIGITAL CONTENT."

13       AND IT HAS IN QUOTATIONS: "TRACKING ELECTRONIC CONTENT."

14       TO WHAT DO THOSE TWO QUOTED ITEMS REFER?

15   **A.**  THE REGULATING ACCESS TO DIGITAL CONTENT REFERS TO U.S.

16   PATENT NUMBER 6389541.  AND THE TRACKING ELECTRONIC CONTENT

17   PIECE REFERS TO AS PATENT NUMBER 6751670.

18   **Q.**  WHEN YOU SAY "REFER" --

19   **A.**  THEY ARE THE SAME THING.  THAT'S THE NAME.  YEAH.  YEAH.

20   SORRY ABOUT THAT.

21   **Q.**  THAT'S OKAY.  WE NEED TO LET EACH OTHER FINISH, OTHERWISE

22   THE COURT REPORTER CANNOT DO HER JOB.

23       ARE THE PATENTS SPECIFICALLY IDENTIFIED ANYWHERE ELSE IN

24   THE ADOBE VALUE PROPOSITION DOCUMENT?

25   **A.**  YES.  AS YOU GO FURTHER INTO THE DOCUMENT, YOU WILL GET TO

1   125C.006 WHERE WE HAVE A LITTLE DIAGRAM CALLED "CENTRAL

2   CONCEPTS OF THE DC PATENTS."

3   **Q.**  I'M LOOKING AT THAT DIAGRAM.  I DON'T SEE A SPECIFIC

4   REFERENCE TO THE '541 OR '670.  HOW IS IT REFERENCED IN THIS

5   DIAGRAM?

6   **A.**  IF YOU GO TO THE NEXT PAGE, TOO, YOU WILL SEE A LEGEND FOR

7   THAT DIAGRAM.  AND IT WAS IN COLOR WHEN WE GAVE IT TO THEM.  I

8   DON'T KNOW IF YOU HAVE A COLOR VERSION OF IT.

9           **MS. GLAUSER:**  LET'S START WITH THIS.

10       MS. MASON, WOULD YOU DO A SPLIT SCREEN DIAGRAM IN BLACK

11   AND WHITE ON ONE HALF AND THE LEGEND ON THE OTHER?

12       IF YOU CAN BLOW UP THE FIRST AND THIRD PARAGRAPHS, IF THAT

13   IS POSSIBLE.

14       IF YOU WOULDN'T MIND, DO THE THIRD PARAGRAPH INSTEAD OF

15   THE MIDDLE.

16       PERFECT.  THANK YOU VERY MUCH.

17   **BY MS. GLAUSER:**

18   **Q.**  THE INFORMATION THAT APPEARS ON 125C.007 THAT IS

19   IDENTIFIED AS THE LEGEND, IS THAT REFERRING BACK TO THE

20   PICTURE DIAGRAM?

21   **A.**  YES.  YES, IT IS.

22   **Q.**  OKAY.  SO THEN WHERE ON THE LEGEND DOES IT INDICATE THE

23   '541 PATENT?

24   **A.**  WELL, AGAIN, IT IS NOT IN COLOR, BUT YOU CAN SEE THAT IT

25   SAYS IT'S IN RED.  "REGULATING ACCESS DIGITAL CONTENT '541 IS

VENTERS - DIRECT / GLAUSER

1    ITEMS IN RED."

2        AND I WISH YOU COULD SEE IT IN COLOR, BUT YOU WOULD SEE

3    ONE, TWO, THREE.  YOU WOULD SEE COLOR BALLS POINTING AROUND IN

4    A FLOW.

5        AND THEN, IN PURPLE, WHICH YOU CAN'T SEE, WAS THE '670

6    PATENT, TRACKING ELECTRONIC CONTENT.  IF YOU COULD SEE IT, YOU

7    COULD SEE HOW IT FLOWS AROUND, TOO, BUT IT IS HARD WITHOUT THE

8    COLOR.

9    Q.  NOW, THE DIAGRAM THAT WE ARE LOOKING AT IS BLACK AND

10   WHITE.  BUT WOULD ADOBE HAVE RECEIVED A COLOR VERSION --

11   A.  YES, THEY DID.

12   Q.  -- OF THE DIAGRAM?

13   A.  YES, THEY DID.

14   Q.  WHEN YOU HAD THE MEETING WITH ADOBE ON THE TELEPHONE, DID

15   YOU WALK THROUGH EACH OF THESE PLACES WHERE YOU'VE IDENTIFIED

16   FOR THE JURY THE '541, OR THE '670 ARE SPECIFICALLY SET OUT?

17   A.  YES, WE DID.

18   Q.  DID YOU DESCRIBE FOR ADOBE THE SUBJECT MATTER OF THE '541

19   PATENT IN ADDITION TO SPECIFICALLY IDENTIFYING IT?

20   A.  WELL, YEAH.  I MEAN, IT WAS REALLY -- IT WAS ALWAYS TO

21   SORT OF, AGAIN, TALK ABOUT AUTHENTICATION, CONDITIONAL ACCESS.

22   IT WAS -- YOU KNOW, IT WAS ALWAYS IN THE CONTEXT OF WHAT IT

23   COULD DO TO PROTECT AND SECURE CONTENT.  IS THAT YOUR

24   QUESTION?

25   Q.  IT IS HALF OF MY QUESTION.

1   **A.**  OKAY.

2   **Q.**  DID YOU ACTUALLY SHARE THAT INFORMATION WITH ADOBE?

3   **A.**  OH, YES.

4   **Q.**  DOES THE ADOBE VALUE PROPOSITION DESCRIBE THE SUBJECT

5   MATTER --

6   **A.**  YES.  IT SAYS RIGHT HERE.  WE JUST PRETTY MUCH WENT DOWN

7   THIS PAPER.

8   **Q.**  I KNOW THIS IS A DIFFERENT TYPE OF CONVERSATION,

9   MR. VENTERS.  IT WOULD BE EASIER FOR THE WHOLE COURT.  YOU

10  HAVE TO LET ME FINISH THE QUESTION, AND THEN YOU CAN ANSWER.

11  THE COURT REPORTER CAN'T TAKE IT DOWN.

12      IT IS ALSO VERY HARD FOR THE COURT OR THE JURY TO HEAR

13  IT.

14  **A.**  OKAY.

15  **Q.**  SO WHERE IN THE ADOBE PROPOSITION IS THE '541 PATENT

16  DESCRIBED TO ADOBE?

17  **A.**  WELL, I THINK WE MAKE A HIGH-LEVEL DESCRIPTION BACK ON

18  PAGE 4, WHICH IS 125.004.  AND WE ALSO -- ARE YOU TALKING

19  ABOUT THE '541, SPECIFICALLY?

20  **Q.**  THAT WAS MY FIRST QUESTION.

21  **A.**  SO '541 IS ON THAT PAGE.  AND THEN, WE GO INTO SOME DETAIL

22  AGAIN WITH THIS DIAGRAM AND WITH THE LEGEND.

23  **Q.**  AND WHAT ABOUT THE '670, IS THAT DESCRIBED?

24  **A.**  YEAH.  WHEN YOU GO BACK OVER TO PAGE 5, WHICH IS 125.005,

25  WE DESCRIBE IT AGAIN FROM A HIGH LEVEL.  AND THEN, BACK AGAIN

1  ON PAGE 6 AND 7, WITH THE DIAGRAM AND THE LEGEND.  WE DO OUR

2  BEST TO DESCRIBE IT.

3  **Q.**  HOW DID THE MEETING WITH ADOBE CONCLUDE?

4  **A.**  VERY CORDIALLY.  EVERYBODY THANKED EACH OTHER.  THEY SAID

5  THEY WOULD GET BACK, AND SO IT CONCLUDED WITH THAT.

6  **Q.**  DID ADOBE GET BACK TO YOU?

7  **A.**  THEY DID.

8  **Q.**  WHAT DID THEY SAY TO YOU?

9  **A.**  THEY SAID THEY WEREN'T INTERESTED.

10  **Q.**  DO YOU REGRET HAVING THE 2004 MEETING WITH ADOBE?

11  **A.**  WELL, I KIND OF DO NOW, YEAH.  I DO.

12  **Q.**  WHY?

13  **A.**  WELL, WE DID SORT OF LAY EVERYTHING OUT IN DETAIL.  WE

14  SHOWED THEM HOW THEY COULD USE OUR PRODUCTS TO IMPROVE THEIR

15  OWN PRODUCTS.  AND AFTER THAT MEETING, IT SEEMED LIKE

16  EVERYTHING WE TOLD THEM TO DO WAS WHAT WE WANTED TO DO WAS

17  WHAT THEY WERE DOING.

18  **Q.**  AFTER THE 2004 MEETING, WHAT HAPPENED NEXT BETWEEN DIGITAL

19  REG AND ADOBE?

20  **A.**  WELL, WE DID EVENTUALLY CONTACT THEM FOR ANOTHER MEETING.

21  **Q.**  WHEN WAS THAT?

22  **A.**  THAT WAS IN 2008.

23  **Q.**  WHAT WAS THE PURPOSE OF THE 2008 MEETING?

24  **A.**  IT WAS ANOTHER MEETING TO BASICALLY LET THEM KNOW WHAT WE

25  HAD AND TO TELL THEM ABOUT A PARTNERSHIP OPPORTUNITY.

VENTERS – DIRECT / GLAUSER

1    **Q.**  WERE YOU INVOLVED IN THE 2008 MEETING?

2    **A.**  YES, I WAS.

3    **Q.**  WHAT WAS YOUR INVOLVEMENT?

4    **A.**  PREPARING FOR THE MEETING, PREPARING SOME DOCUMENTS AND

5    THAT SORT OF THING.

6    **Q.**  WHAT TYPE OF DOCUMENTS DID YOU PREPARE FOR THE 2008

7    MEETING WITH ADOBE?

8    **A.**  WELL, I PREPARED A VERY SIMILAR DOCUMENT TO THIS.  IN

9    FACT, I JUST TOOK THIS DOCUMENT, EVOLVED IT.  I ADDED THE

10   MACROMEDIA PRODUCTS. I ADDED SOME NEW PATENTS THAT WE HAD BEEN

11   GRANTED.  BUT IT WAS ESSENTIALLY AN UPDATED VERSION OF THIS

12   ONE.

13   **Q.**  AND WHEN YOU ARE REFERRING TO "THIS ONE" --

14   **A.**  2004, YES.

15   **Q.**  THE ADOBE VALUE PROPOSITION THAT IS MARKED AS PLAINTIFF'S

16   EXHIBIT --

17   **A.**  YES.

18   **Q.**  -- 125C?

19   **A.**  125C.

20   **Q.**  BASED ON HOW THE 2004 MEETING ULTIMATELY ENDED, WHY DID

21   YOU THINK A 2008 MEETING WITH ADOBE MIGHT BE BENEFICIAL?

22   **A.**  WELL, AT THE TIME WE HAD THIS REALLY UNIQUE DEVELOPMENT

23   DEAL WITH MPAA, THE MOTION PICTURE ASSOCIATION OF AMERICA.

24   AND THEY WERE WANTING TO EXPERIMENT WITH DIGITAL DISTRIBUTION,

25   WHICH WAS A BIG STEP FORWARD.  AND WE THOUGHT THAT IT WOULD BE

1   SOMETHING THAT WOULD INTEREST ADOBE.  AND WE WANTED TO HAVE

2   ANOTHER -- A BIGGER PARTNER INVOLVED WITH US.  SO WE FELT IT

3   WAS WORTH GOING BACK TO THEM AND SEE IF THEY WERE INTERESTED

4   IN GETTING IN WITH US ON SOMETHING.

5   **Q.**  AT THAT MEETING DID YOU ACCUSE ADOBE OF INFRINGING YOUR

6   PATENT?

7           **MS. MEHTA:**  OBJECTION, YOUR HONOR.  CALLS FOR

8   HEARSAY.  THERE IS NO FOUNDATION HE WAS AT THE MEETING. HE

9   TESTIFIED AT DEPOSITION --

10          **THE COURT:**  THAT WOULD SEEM TO BE THE CASE.

11          **MS. MEHTA:**  MOVE TO STRIKE ALL REFERENCES TO THE

12  MEETING.  THERE IS NO VERIFICATION THAT IT EVER HAPPENED.

13     HE --

14          **MS. GLAUSER:**  YOUR HONOR, HE HAS TESTIFIED THAT HE

15  WAS INVOLVED IN THE MEETING.  I CAN LAY A BETTER FOUNDATION TO

16  ESTABLISH THAT.

17          **THE COURT:**  IF HE WASN'T AT IT, THEN HE CAN'T TESTIFY

18  THAT IT HAPPENED OR ANYTHING THAT HAPPENED AT IT.

19          **MS. GLAUSER:**  I WILL ATTEMPT TO LAY THE FOUNDATION TO

20  SHOW HOW HE HAS THAT KNOWLEDGE.

21  **BY MS. GLAUSER**

22  **Q.**  ARE YOU AWARE OF WHETHER OR NOT THE 2008 MEETING WITH

23  ADOBE ACTUALLY OCCURRED?

24  **A.**  YES.

25          **THE COURT:**  THAT IS A "YES" OR "NO."

VENTERS – DIRECT / GLAUSER

```
1         THE WITNESS:  YES.
2    BY MS. GLAUSER
3    Q.  HOW DO YOU KNOW?
4         MS. MEHTA:  OBJECTION, YOUR HONOR.
5         THE COURT:  THAT IS JUST THE SOURCE OF THE
6    INFORMATION, NOT THE INFORMATION ITSELF.  DID SOMEONE TELL YOU
7    THAT IT HAPPENED?  DID YOU OBSERVE IT FROM AN AIRPLANE OR FROM
8    A WINDOW OR --
9         THE WITNESS:  SOMEBODY TOLD ME THAT IT HAPPENED.
10         THE COURT:  OKAY.  SO THAT'S STRICKEN.  THAT'S
11    HEARSAY.
12         MS. GLAUSER:  YOUR HONOR, WE BELIEVE GIVEN A LITTLE
13    BIT OF LEEWAY TO ESTABLISH -- TO LAY THE FOUNDATION WE CAN
14    ESTABLISH ONE OF THE EXCEPTIONS TO HEARSAY.
15         MS. MEHTA:  OBJECTION, YOUR HONOR.
16         THE COURT:  WHAT WOULD THAT BE?
17         MS. GLAUSER:  WE BELIEVE THAT MR. VENTERS IS GOING TO
18    TESTIFY THAT THE PERSON WHO ATTENDED THE MEETING IMMEDIATELY
19    CALLED HIM AND TOLD HIM ABOUT IT.
20         THE COURT:  NO.
21         MS. GLAUSER:  IN ADDITION TO THE FACT IT IS NOT BEING
22    OFFERED FOR THE TRUTH OF THE MATTER ASSERTED OF WHAT WAS SAID
23    AT THE MEETING.
24         MS. MEHTA:  YOUR HONOR?
25         MS. GLAUSER:  ADOBE'S STATEMENTS WOULDN'T BE HEARSAY,
```

VENTERS – DIRECT / GLAUSER

1    AND IT WOULD SHOW THE NOTICE.

2            **THE COURT:**  NONE OF THAT IS GOING TO WORK.

3            **MS. MEHTA:**  WE MOVE TO STRIKE AND REQUEST A CURATIVE

4    INSTRUCTION ESPECIALLY IN LIGHT OF COUNSEL ATTEMPTING TO

5    TESTIFY.

6            **THE COURT:**  YES.  WE HAVE A RULE CALLED "THE HEARSAY

7    RULE" WHICH SAYS YOU CAN'T TESTIFY TO WHAT SOMEONE ELSE TOLD

8    YOU AND HAVE THAT BE OFFERED FOR THE TRUTH OF WHAT THE PERSON

9    TOLD YOU.

10        SO IF THIS GENTLEMAN WASN'T AT THE MEETING HE CAN'T

11    TESTIFY WHAT WAS SAID AT THE MEETING OR EVEN THAT THE MEETING

12    TOOK PLACE.  SO THAT IS WHAT WE WERE TALKING ABOUT, AND YOU

13    SHOULDN'T CONSIDER THE MEETING OR ANYTHING SAID, ADDED FROM

14    THIS WITNESS.

15        SORRY.  I CAN'T ANSWER VERBAL QUESTIONS.  IF YOU WANT TO

16    WRITE SOMETHING DOWN AND SEND IT OUT, YOU CAN DO THAT.

17        GO AHEAD.

18            **MS. GLAUSER:**  THANK YOU, YOUR HONOR.

19    **BY MS. GLAUSER:**

20    **Q.**  SUBSEQUENT TO THE PREPARATIONS THAT YOU DID OF UPDATING

21    THE ADOBE VALUE PROPOSITION, HAVE YOU BEEN INVOLVED IN ANY

22    OTHER MEETINGS BETWEEN DIGITAL REG AND ADOBE THAT OCCURRED

23    BEFORE FILING THIS SUIT?

24    **A.**  NO.

25    **Q.**  WHY DIDN'T DIGITAL REG REACH OUT TO ADOBE AGAIN BEFORE

FILING SUIT?

**A.**  WELL, WE HAD HAD TWO MEETINGS WITH THEM.  WE HAD GONE

THROUGH THEIR --

        **MS. MEHTA:**  OBJECTION.

        **THE WITNESS:**  -- VENTURE CAPITAL FIRM.

        **MS. MEHTA:**  OBJECTION, YOUR HONOR.  HE JUST TESTIFIED

AGAIN ABOUT THE MEETING YOU JUST STRUCK FROM THE RECORD.

        **THE COURT:**  RIGHT.  WE DON'T KNOW.  THERE IS NO

EVIDENCE OF A SECOND MEETING, BUT -- FRANKLY, I DON'T KNOW

THAT HIS MOTIVATION IS REALLY RELEVANT.

      **MS. GLAUSER:**  YOUR HONOR, PART OF WHAT THE OTHER SIDE

HAS PUT AT ISSUE IN THIS CASE IS WHETHER OR NOT DIGITAL REG

HAS ACCUSED IN A MEETING WITH ADOBE, ACCUSED THEM OF

INFRINGEMENT.  WE ARE ATTEMPTING TO ANSWER THE QUESTION OF:

WHY NOT?

        **MS. MEHTA:**  YOUR HONOR, THEY PUT THAT AT ISSUE, NOT

US.

        **THE COURT:**  RIGHT.  BUT IT DOESN'T MATTER WHY NOT.

THE ONLY QUESTION IS THEIR STATE OF MIND, NOT DIGITAL REG'S

STATE OF MIND.

        **MS. GLAUSER:**  YOUR HONOR, MAY WE HAVE A SIDEBAR ON

THIS?

        **THE COURT:**  NOT NOW.  YOU CAN GO ON TO ANY OTHER

QUESTIONS YOU HAVE FOR THIS WITNESS.

1  **BY MS. GLAUSER:**

2  **Q.**  YOU TESTIFIED EARLIER THAT YOU THOUGHT ADOBE MAY HAVE BEEN

3  USING YOUR TECHNOLOGY IN THE 2004 TIME FRAME.  ARE YOU AWARE

4  OF WHAT PRODUCTS IN THE 2004 TIME FRAME YOU THOUGHT MIGHT

5  INCORPORATE YOUR TECHNOLOGY?

6  **A.**  I THINK IT'S IN THE DOCUMENT, THE ADOBE PROPOSITION 2004

7  DOCUMENT.  I BELIEVE THAT I OUTLINED IT IN THAT DOCUMENT.

8  **Q.**  ARE YOU AWARE OF WHETHER OR NOT THOSE ARE THE SAME

9  PRODUCTS THAT ARE AT ISSUE IN THIS LAWSUIT?

10  **A.**  I THINK --

11        **MS. MEHTA:**  OBJECTION, YOUR HONOR.  SHE HASN'T LAID A

12  FOUNDATION FOR THAT.

13        **MS. GLAUSER:**  I AM, IN FACT, ASKING HIS AWARENESS.

14        **MS. MEHTA:**  WHETHER HE KNOWS WHAT THE PRODUCTS ARE

15  THAT ARE IN THIS LAWSUIT?

16        **THE COURT:**  OKAY.  I GUESS YOU CAN LAY A FOUNDATION

17  FOR THAT.

18     I AM SORRY.  WHAT WAS THE QUESTION NOW?

19        **MS. GLAUSER:**  I ASKED WHETHER HE WAS AWARE OF WHETHER

20  THE PRODUCTS HE IDENTIFIED IN 2004 ARE THE SAME PRODUCTS THAT

21  ARE AT ISSUE IN THIS LAWSUIT.

22        **THE COURT:**  YOU MEAN, IN THE PAPER?

23        **MS. GLAUSER:**  YES, MA'AM.

24        **THE COURT:**  WELL, IF THERE'S NUMBERS IN THEM, THEN WE

25  CAN LOOK AT THAT FOR OURSELVES.  AND IF THERE AREN'T NUMBERS,

```
 1    THEN I GUESS THE JURY CAN TRY TO FIGURE IT OUT AS BEST THEY

 2    CAN.  IT WOULD BE HIS SPECULATION.

 3            MS. GLAUSER:  I'M REFERRING TO THE ACTUAL PRODUCT,

 4    NOT THE VOLUME OF THE PRODUCT.  SO WHETHER THE PRODUCT --

 5            THE COURT:  IF THE -- I HAVEN'T READ THE WHOLE PAPER.

 6    IF IT HAS PATENT NUMBERS IN IT, WE CAN AGREE THOSE ARE THE

 7    SAME NUMBERS.  IF IT DOESN'T HAVE NUMBERS IN IT, THEN ADOBE

 8    HAS NO WAY OF KNOWING WHAT THE PATENT NUMBERS ARE.  AND IT

 9    DOESN'T REALLY MATTER WHETHER IN HIS MIND HE THOUGHT IT WAS

10    THE SAME PATENTS.

11            MS. GLAUSER:  LET ME TRY THE QUESTION AGAIN AND SEE

12    IF I CAN CLEAR THE CONFUSION UP.

13    BY MS. GLAUSER

14    Q.  MR. VENTERS, ARE YOU AWARE OF WHAT PRODUCTS ARE AT ISSUE

15    IN THIS LAWSUIT?

16    A.  YES.

17            THE COURT:  YOU MEAN, WHAT PATENTS?  WHICH --

18            MS. GLAUSER:  WHICH OF ADOBE'S PRODUCTS.

19            THE COURT:  I SEE.

20    BY MS. GLAUSER:

21    Q.  WHAT IS YOUR UNDERSTANDING OF WHAT PRODUCTS ARE AT ISSUE?

22    A.  I THINK IT'S THE ADOBE LIVECYCLE AND ACROBAT LIVECYCLE.  I

23    THINK THERE IS A LICENSE MANAGER AND SOME FLASH-TYPE

24    TECHNOLOGY.  YES.

25    Q.  IN 2004, WHEN YOU MET WITH ADOBE, WERE YOU DISCUSSING WITH
```

1    THEM -- WAS IT YOUR UNDERSTANDING THAT FLASH, ADOBE'S FLASH

2    PRODUCT USED DRM TECHNOLOGIES' PATENTS?

3    **A.**   THEY DIDN'T OWN FLASH IN THOSE DAYS.

4    **Q.**   IN 2004, WHEN YOU MET WITH ADOBE, WAS IT YOUR

5    UNDERSTANDING THAT THEIR LIVECYCLE PRODUCTS USED DRM

6    TECHNOLOGIES' PATENTS?

7    **A.**   I DON'T THINK THEY CALLED IT THAT.  AND I DON'T THINK THEY

8    WERE REALLY DOING THAT QUITE THE WAY THEY ARE DOING IT NOW.

9         **MS. GLAUSER:**  YOUR HONOR, AT THIS TIME WE PASS THE

10   WITNESS SUBJECT TO ABILITY TO HAVE A SIDEBAR TO TALK ABOUT THE

11   TOPICS ABOUT WHICH WE WOULD LIKE TO DISCUSS.

12        **THE COURT:**  OKAY.  WE WILL TAKE OUR BREAK.  IT'S

13   FIVE AFTER TEN.  WE WILL BREAK UNTIL 10:20.  AND YOU MAY STEP

14   DOWN, SIR.

15     YOU ALL MAY RETIRE TO THE JURY ROOM.  I WILL SPEAK WITH

16   THE LAWYERS, PLEASE.

17     (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

18        **THE COURT:**  IF YOU WAVE YOUR ARMS THE LIGHT WILL COME

19   ON.

20        **THE CLERK:**  OR JUST STEP IN.

21        **THE COURT:**  YOU MAY STEP DOWN.

22        **THE WITNESS:**  IS THERE A ROOM I NEED TO GO INTO?

23        **THE COURT:**  NO, UNLESS YOU WOULD LIKE TO USE --

24             (LAUGHTER)

25        **THE CLERK:**  THE WITNESS ROOM.

1          **THE COURT:**  TO THE LEFT.  YES, THERE IS A WITNESS

2     ROOM OUT TO YOUR LEFT IF YOU WOULD LIKE A PLACE TO SIT.

3          WHAT IS IT YOU ARE TRYING TO BRING OUT NOW?

4          **MS. GLAUSER:**  YOUR HONOR, THE REASON THAT WE

5     REQUESTED A SIDEBAR IS BECAUSE IN OPEN COURT ADOBE ADMITTED

6     THAT THE 2008 MEETING DID OCCUR.  THERE HAS BEEN NO CONTENTION

7     THAT IT HASN'T.  THERE HASN'T BEEN ANY EVIDENCE THAT IT

8     HASN'T.

9          IN ADDITION TO THAT, THE FACT THAT THE MEETING OCCURRED IS

10    DEMONSTRATED OR REFLECTED IN MR. PATTERSON'S COMMENTS BACK TO

11    MR. VENTERS AFTER THE MEETING.

12         AND WHILE THAT MIGHT BE HEARSAY, IF IT WERE OFFERED FOR

13    THE TRUTH OF THE MATTER ASSERTED, IT'S ALSO OFFERED TO SHOW

14    WHY MR. VENTERS DIDN'T PURSUE FURTHER MEETINGS WITH ADOBE.

15    BECAUSE THE EVIDENCE WILL SHOW THAT AT THAT MEETING ADOBE

16    SAID:  "WE ARE NOT TALKING ANYMORE.  YOU ARE LITIGIOUS."

17         ADOBE'S STATEMENTS ARE NOT HEARSAY.  THEY ARE ADMISSIBLE

18    UNDER 801(D)(2).

19         **THE COURT:**  THEY COULD BE TESTIFIED TO BY SOMEONE WHO

20    HEARD THEM.

21         **MS. GLAUSER:**  THERE MAY BE TWO LAYERS OF HEARSAY,

22    YOUR HONOR.

23         **THE COURT:**  RIGHT.

24         **MS. GLAUSER:**  THE FIRST WOULD BE ADOBE'S STATEMENTS,

25    WHICH ARE NOT HEARSAY.  THEY ARE ADMISSIONS OF A PARTY

1    OPPONENT.

2              **THE COURT:**  IF ONE WHO HEARD THEM TESTIFIES THEY WERE

3    SAID. IF THIS GENTLEMAN DIDN'T HEAR THEM, HE CAN'T TESTIFY

4    THAT THEY WERE SAID.

5              **MS. GLAUSER:**  THE SECOND LAYER OF HEARSAY, YOUR

6    HONOR, IS AS YOU ARE DISCUSSING, MR. PATTERSON'S RELAYING OF

7    ADOBE'S COMMENTS TO CHIP.  AND IF ALLOWED TO TESTIFY,

8    MR. VENTERS WOULD EXPLAIN THAT MR. PATTERSON IMMEDIATELY

9    CALLED CHIP AFTER THE MEETING AND TOLD HIM –– CALLED

10   MR. VENTERS AFTER THE MEETING AND TOLD HIM WHAT ADOBE SAID.

11      THAT'S ADMISSIBLE UNDER 801(3).  IT'S CONTEMPORANEOUS ––

12             **THE COURT:**  PRESENT SENSE IMPRESSION.

13      NO.  IT IS CLASSIC HEARSAY.  BUT YOU HAD PATTERSON.  WHY

14   NOT JUST ASK PATTERSON?

15             **MS. GLAUSER:**  IT IS A BIT CONFUSING.  BUT IT'S A

16   DIFFERENT PATTERSON.  IT IS TOM PATTERSON, WHO IS NOT ANY

17   LONGER INVOLVED WITH THE COMPANY.

18             **THE COURT:**  NO.  IT IS HEARSAY.  I MEAN, IF ADOBE WAS

19   THERE, YOU CAN CALL THE ADOBE WITNESS, I GUESS.  BUT SO FAR

20   THERE HASN'T BEEN ANYONE WHO CAN TESTIFY TO WHAT WAS SAID AT

21   THAT MEETING.

22      (RECESS TAKEN AT 10:09 A.M.; RESUMED AT 10:25 A.M.)

23      (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

24             **THE CLERK:**  EVERYONE CAN HAVE A SEAT.

25      REMAIN SEATED.  COME TO ORDER.  THIS COURT IS BACK IN

1    SESSION.

2         **THE COURT:**  SO I HAVE A NOTE INDICATING THAT THE JURY

3    IS HAVING TROUBLE HEARING THE JUDGE AND THE LAWYER.  YOU CAN

4    HEAR THE LAWYER.  YOU ARE NOT SUPPOSED TO BE HEARING THE

5    OBJECTIONS, ANYWAY.  IT IS JUST AS WELL YOU CAN'T HEAR THEM

6    ALL.  SO WE WILL SOMETIMES THEY SAY THINGS -- I WORRY ABOUT

7    IT.  I WILL TRY TO SPEAK INTO THE MIC.

8         AND YOU CAN SPEAK LOUDER IF YOU WOULD LIKE THEM TO HEAR

9    YOUR OBJECTIONS, BUT THE OBJECTIONS AREN'T EVIDENCE.  ALL YOU

10   NEED TO KNOW IS WHAT THE WITNESS ENDS UP SAYING AFTER THE

11   OBJECTION.  SO DON'T WORRY ABOUT IT TOO MUCH IF YOU DON'T HEAR

12   THAT PART.  OKAY.

13        **MS. MEHTA:**  THANK YOU, YOUR HONOR.

14                      **CROSS-EXAMINATION**

15   BY MS. MEHTA:

16   **Q.**  GOOD MORNING, MR. VENTERS.

17   **A.**  GOOD MORNING.

18   **Q.**  WHILE YOU WERE AT DRM TECHNOLOGIES AND DIGITAL REG, HOW

19   INVOLVED WERE YOU IN THE PATENT PROSECUTION PROCESS?

20   **A.**  NOT AT ALL.

21   **Q.**  SO --

22        **THE COURT:**  YOU NEED TO SPEAK INTO YOUR MIC.

23        **THE WITNESS:**  OKAY.  OKAY.  NOT AT ALL.

24   BY MS. MEHTA:

25   **Q.**  SO WHEN IT WAS TIME FOR PATENTS TO ISSUE THAT WERE IN THE

| 1 | DIGITAL REG OR DIGITAL CONTAINERS' PORTFOLIO, HOW DID YOU COME |
| 2 | TO LEARN THAT A PATENT HAD ISSUED? |
| 3 | **A.**   USUALLY WE WOULD GET AN EMAIL FROM OUR ATTORNEY IN |
| 4 | WASHINGTON TELLING US THAT THERE HAD BEEN A GRANT. |
| 5 | **Q.**   ABOUT HOW LONG AFTER A PATENT ISSUED WOULD YOU FIND THAT |
| 6 | OUT FROM THE ATTORNEYS? |
| 7 | **A.**   I ASSUME RIGHT AWAY. |
| 8 | **Q.**   WITHIN DAYS, WEEKS? |
| 9 | **A.**   I WOULD ASSUME IN DAYS. |
| 10 | **Q.**   OKAY.  NOW, ARE YOU AWARE OF WHEN THE '670 PATENT ISSUED? |
| 11 | **A.**   I DON'T.  I CAN'T RECALL THAT EXACT DATE RIGHT NOW. |
| 12 | **Q.**   DOES JUNE 15TH, 2004 SOUND FAMILIAR? |
| 13 | **A.**   SOUNDS FAMILIAR, BUT I DON'T HAVE IT IN FRONT OF ME. |
| 14 |        **MS. MEHTA:**  MR. BONINI, WHY DON'T WE PULL UP PX30, |
| 15 | '670.  WE WILL JUST CONFIRM THAT FOR YOU. YOU HAVE TO PUT IT |
| 16 | UP SO IT CAN BE PUBLISHED TO THE JURY. |
| 17 |        **THE CLERK:**  I AM SORRY, PX30? |
| 18 |        **MS. MEHTA:**  I MISSPOKE.  PX3. |
| 19 |        **THE CLERK:**  OKAY. |
| 20 |            (PUBLISHED TO JURY.) |
| 21 | **BY MS. MEHTA:** |
| 22 | **Q.**   YOU RECOGNIZE THAT AS THE '670 PATENT, CORRECT? |
| 23 | **A.**   CORRECT. |
| 24 | **Q.**   YOU SEE THE ISSUE DATE THERE, JUNE 15TH, 2004? |
| 25 | **A.**   CORRECT. |

1    **Q.**  SO, EARLIER YOU TESTIFIED THAT YOU MET WITH ADOBE VENTURES

2    IN JUNE OF 2004.  DO YOU RECALL THAT?

3    **A.**  I'M NOT SURE IF IT WAS JUNE.  I THOUGHT I SAID "SUMMER,

4    2004."

5    **Q.**  YOU ARE NOT SURE WHEN YOU MET WITH THEM AT ALL?

6    **A.**  I KNOW I MET WITH THEM IN SUMMER, 2004.

7    **Q.**  DO YOU KNOW HOW LONG AFTER THE '670 PATENT ISSUED THAT YOU

8    MET WITH THEM?

9    **A.**  I DON'T.

10   **Q.**  NOW, LET'S TALK ABOUT THE MEETING THAT YOU SAID HAPPENED

11   AND THE DOCUMENT THAT YOU SAID THAT YOU SENT TO THEM.  FIRST,

12   WITH RESPECT TO THE DOCUMENT THAT YOU SAID YOU SENT TO THEM,

13   THE DOCUMENT THAT YOU TESTIFIED ABOUT IN YOUR DIRECT

14   EXAMINATION, THAT'S PX125C.  THAT IS NOT ACTUALLY THE DOCUMENT

15   THAT YOU SAY YOU SENT TO ADOBE, CORRECT?

16   **A.**  CORRECT.

17   **Q.**  AND YOU ACTUALLY DON'T HAVE THE DOCUMENT THAT YOU SAY YOU

18   SENT TO ADOBE?  RIGHT?

19   **A.**  I DO, IT IS JUST NOT IN THE RECORD.

20            **MS. MEHTA:**  MOVE TO STRIKE, YOUR HONOR.

21            **THE WITNESS:**  I HAVE –– I HAVE THE DOCUMENT.  YOU

22   JUST HAVEN'T HAD THE ONE THAT WAS INTERNAL.

23            **MS. MEHTA:**  MOVE TO STRIKE, YOUR HONOR.  THAT IS

24   INCONSISTENT WITH HIS TESTIMONY ON DIRECT AND IT'S

25   NONRESPONSIVE.

1    **BY MS. MEHTA:**

2    **Q.**   ON DIRECT EXAMINATION, YOU SAID THAT THE VERSION 125C IS

3    ACTUALLY NOT THE DOCUMENT THAT WAS SENT TO ADOBE, RIGHT?

4    **A.**   THAT DOCUMENT, RIGHT, WAS NOT.

5    **Q.**   AND, IN FACT, IN THE LITIGATION YOU KNEW YOU HAD AN

6    OBLIGATION TO PRODUCE TO ADOBE THE DOCUMENTS THAT YOU WERE

7    GOING TO TRY TO USE IN THIS CASE, RIGHT?

8    **A.**   THAT'S RIGHT.

9    **Q.**   AND YOU ATTEMPTED TO MEET THAT OBLIGATION DILIGENTLY,

10   RIGHT?

11   **A.**   I DID.

12   **Q.**   AND YOU KNEW THAT THIS DOCUMENT WAS GOING TO BE IMPORTANT

13   TO THE CASE, RIGHT?

14   **A.**   I DID.

15   **Q.**   IN FACT, YOU KNEW YOU WERE GOING TO STAND HERE AND TESTIFY

16   TO THE JURY THAT IN 2004, YOU SENT A DOCUMENT TO ADOBE ABOUT

17   THE PATENTS-IN-SUIT, RIGHT?

18   **A.**   YES, I DID.

19   **Q.**   AND YOU SEARCHED YOUR RECORDS AND ALL YOUR FILES TO LOOK

20   FOR THAT DOCUMENT, DIDN'T YOU?

21   **A.**   YES.

22   **Q.**   AND YOU PRODUCED MULTIPLE VERSIONS OF SOMETHING CALLED

23   "THE ADOBE VALUE PROPOSITION," RIGHT?

24   **A.**   YES.

25   **Q.**   BUT NONE OF THE VERSIONS YOU PRODUCED ARE THE ONE THAT YOU

1  SAY YOU ACTUALLY SENT TO ADOBE, RIGHT?

2  **A.**  THAT'S TRUE.

3  **Q.**  NOW, WITH RESPECT TO THE SENDING OF THE DOCUMENT TO ADOBE,

4  AFTER GOING THROUGH ALL YOUR FILES, DILIGENTLY LOOKING FOR THE

5  DOCUMENT, KNOWING THAT IT WAS GOING TO BE IMPORTANT AND YOU

6  WERE GOING TO TELL THE JURY ABOUT THE DOCUMENT, YOU DIDN'T

7  FIND OR YOU DIDN'T IDENTIFY AND PRODUCE TO YOUR LAWYERS ANY

8  EMAILS THAT SHOW THAT YOU SENT IT, RIGHT?

9  **A.**  I DID NOT.

10  **Q.**  AND YOU DIDN'T IDENTIFY OR SEND TO YOUR LAWYERS ANY FAXES

11  THAT SHOW THAT YOU SENT IT, RIGHT?

12  **A.**  I DID NOT.

13  **Q.**  YOU DON'T HAVE A PHOTOCOPY OF A MAILING, RIGHT.

14  **A.**  CORRECT.

15  **Q.**  YOU DON'T HAVE A CERTIFIED MAIL RECEIPT, CORRECT?

16  **A.**  CORRECT.

17  **Q.**  YOU DON'T HAVE A REGISTERED MAIL RECEIPT OR A FED-EX?

18  **A.**  CORRECT.

19  **Q.**  OTHER THAN YOUR TESTIMONY TODAY THAT YOU SENT SOME VERSION

20  OF THE DOCUMENT THAT YOU HAVE NOT SHOWN TO THE JURY, TO ADOBE

21  IN 2004, YOU HAVEN'T PROVIDED ANY EVIDENCE OF WHAT WAS SENT TO

22  ADOBE OR IF ANYTHING WAS SENT AT ALL, CORRECT?

23  **A.**  CORRECT.

24  **Q.**  NOW, LET'S PULL UP 125C, AND IN PARTICULAR PAGE 004.

25                    (PUBLISHED TO JURY.)

1          **MS. MEHTA:**  MR. BONINI, IF YOU CAN HIGHLIGHT THAT

2    COMMENT BUBBLE ON THE RIGHT-HAND SIDE.

3    **BY MS. MEHTA:**

4    **Q.**  SO, MR. VENTERS, THIS IS 125C.  THIS IS THE DOCUMENT THAT

5    YOU SAY IS A DRAFT THAT WAS SOMETHING LIKE THE THING THAT YOU

6    SAY YOU SENT TO ADOBE, RIGHT?

7          **MS. GLAUSER:**  OBJECTION, YOUR HONOR.

8    MISCHARACTERIZES THE TESTIMONY.

9          **THE COURT:**  SUSTAINED.

10         **THE WITNESS:**  I'M JUST SAYING --

11         **THE COURT:**  THERE IS NO QUESTION PENDING.  I

12   SUSTAINED THE OBJECTION.  THAT MEANS YOU DON'T ANSWER IT.

13   **BY MS. MEHTA:**

14   **Q.**  THIS IS THE DRAFT YOU RELIED UPON IN YOUR DIRECT

15   EXAMINATION, RIGHT?

16   **A.**  YES.

17   **Q.**  THIS DRAFT ACTUALLY HAS A COMMENT THAT IS AN INTERNAL

18   DIGITAL CONTAINERS' COMMENT, RIGHT?

19   **A.**  YES.

20   **Q.**  WHAT THAT COMMENT SAYS IS THERE NEEDS TO BE A STRATEGY

21   BEHIND THE PROPOSAL THAT YOU ARE MAKING TO ADOBE FOR RIGHTS

22   ACQUISITION AND DIGITIZATION, CORRECT?

23   **A.**  CORRECT.

24   **Q.**  YOU SAID THE FORMER IS THE HARD PART, RIGHT?

25   **A.**  CORRECT.

VENTERS – CROSS / MEHTA

1    **Q.**  THIS IS ACTUALLY AN INTERNAL COMMENT HIGHLIGHTING ONE OF

2    THE CHALLENGES ASSOCIATED WITH THE TECHNOLOGY AND THE STRATEGY

3    THAT YOU WERE WORKING ON, CORRECT?

4    **A.**  I'M NOT SURE EXACTLY WHAT I WAS REFERRING TO.  IT HAS BEEN

5    SO LONG.  I ASSUME THAT IT WAS.

6    **Q.**  SO YOU'RE SAYING THAT YOU'RE SURE THAT YOU SENT A VERSION

7    OF THIS DOCUMENT TO ADOBE TEN YEARS AGO, BUT YOU CAN'T TELL

8    WHAT THE COMMENT IS THAT'S IN THE DOCUMENT?

9    **A.**  OBVIOUSLY, I MADE THE COMMENT.  I'M NOT SURE EXACTLY AT

10   THIS MOMENT WHAT I WAS REFERRING TO, BUT IT WAS IN THAT

11   VERSION OF THE DOCUMENT.

12   **Q.**  IT'S FAIR TO SAY THAT YOU WOULDN'T HAVE SENT AN INTERNAL

13   STRATEGIC COMMENT HIGHLIGHTING ONE OF THE CHALLENGES TO YOUR

14   STRATEGY TO ADOBE, RIGHT?

15   **A.**  NO.

16   **Q.**  THAT'S AN AFFIRMATIVE TO MY QUESTION?

17   **A.**  YES.  I WOULD NOT HAVE SENT THAT DOCUMENT WITH THAT

18   COMMENT ON IT.

19          **MS. GLAUSER:**  OKAY.  NOW, LET'S GO TO PAGE 125C.008.

20                (PUBLISHED TO JURY.)

21          **MS. GLAUSER:**  AND, ACTUALLY, I AM SORRY.  LET ME

22   CHANGE THAT TO .007.  START THERE.

23   **BY MS. GLAUSER**

24   **Q.**  NOW, ONE OF THE THINGS THAT YOU WERE -- YOU HAVE THIS

25   DOCUMENT IN YOUR BINDER, IF YOU NEED TO SEE IT.

1      **MR. REINES:** MR. BONINI, IF YOU COULD PLEASE

2   HIGHLIGHT OR EXPAND –– I AM SORRY. I'M ON THE WRONG PAGE

3   AGAIN.

4      PAGE 006. IT IS THE SECOND FULL PARAGRAPH. IT STARTS

5   WITH "DCI ALSO".

6   **BY MS. MEHTA:**

7   **Q.** ALL RIGHT. MR. VENTERS, DO YOU SEE THAT?

8   **A.** YES.

9   **Q.** OKAY. NOW, IN THIS DOCUMENT THAT YOU SAY YOU SENT TO

10  ADOBE, YOU MENTION HERE THAT DCI –– THAT'S DIGITAL CONTAINERS,

11  RIGHT?

12  **A.** EXACTLY.

13  **Q.** THAT IS SUPPOSED TO BE A REFERENCE TO YOUR TECHNOLOGY?

14  **A.** CORRECT.

15  **Q.** SO YOUR TECHNOLOGY ALSO STANDS IN CONTRAST TO SERVER–BASED

16  SECURITY SYSTEMS WHERE ALL THE COMPUTING IS CONDUCTED

17  CENTRALLY. DO YOU SEE THAT?

18  **A.** CORRECT.

19  **Q.** THAT WAS AN IMPORTANT COMPONENT OF YOUR TECHNOLOGY IN THE

20  VALUE PROPOSITION TO ADOBE THAT YOU WANTED TO HIGHLIGHT?

21  **A.** YES.

22  **Q.** THE NEXT SENTENCE SAYS: "DCI'S ENCRYPTION AND DECRYPTION

23  METHODOLOGY PERFORMS KEY TASKS USING THE CAPABILITIES OF THE

24  USER'S MACHINE."

25      DO YOU SEE THAT?

VENTERS – CROSS / MEHTA

1    **A.**  YES.

2    **Q.**  THAT WAS ALSO AN IMPORTANT COMPONENT OF YOUR TECHNOLOGY

3    YOU WANTED TO HIGHLIGHT, CORRECT?

4    **A.**  YES.

5    **Q.**  NOW, THIS DOCUMENT DOESN'T INCLUDE ANY SUGGESTION OF

6    INFRINGEMENT BY ADOBE, RIGHT?

7    **A.**  NO IT DOESN'T.

8    **Q.**  YOU DIDN'T CONSIDER THIS TO BE ANY SUGGESTION THAT ADOBE

9    WAS INFRINGING WHEN YOU SENT IT, RIGHT?

10   **A.**  NO, I DIDN'T.

11   **Q.**  NOW, YOU SAID THAT AFTER SENDING OR AFTER YOU SENT SOME

12   VERSION OF THIS DOCUMENT TO ADOBE, THAT YOU HAD A PHONE CALL

13   WITH ADOBE VENTURES; IS THAT RIGHT?

14   **A.**  CORRECT.

15   **Q.**  YOU UNDERSTAND ADOBE VENTURES IS ACTUALLY A SEPARATE

16   ENTITY THAT IS RESPONSIBLE FOR VENTURE CAPITAL FUNDING, RIGHT?

17   **A.**  WE DIDN'T UNDERSTAND THAT TO BE THE CASE AT THE TIME.

18   **Q.**  YOU KNEW THEY WERE RESPONSIBLE FOR PROVIDING VENTURE

19   CAPITAL FUNDING TO SMALL BUSINESSES.

20   **A.**  YEAH, BUT THEY CLEARLY STATED THEY DID OTHER THINGS, AS

21   WELL.

22   **Q.**  THEY WERE THE INVESTMENT ARM?

23   **A.**  WELL, THEY -- THEY CLEARLY STATED THAT THEY WERE LOOKING

24   FOR PARTNERS FOR COMPANIES WITH FRESH IDEAS THAT COULD

25   COMPLEMENT ADOBE'S PRODUCTS.

1   **Q.**  YOU GAVE A DEPOSITION IN THIS CASE, RIGHT?

2   **A.**  RIGHT.

3   **Q.**  AND YOU TESTIFIED ON BEHALF OF YOURSELF, RIGHT?

4   **A.**  SURE.

5   **Q.**  YOU WERE ALSO TESTIFYING AS A CORPORATE REPRESENTATIVE FOR

6   DIGITAL REG, CORRECT?

7   **A.**  RIGHT.

8   **Q.**  AND YOU KNEW YOU WERE UNDER OATH, CORRECT?

9   **A.**  CORRECT.

10  **Q.**  AND YOU DID YOUR BEST TO TESTIFY HONESTLY AND TRUTHFULLY?

11  **A.**  CORRECT.

12  **Q.**  YOU PREPARED FOR THAT DEPOSITION, CORRECT?

13  **A.**  CORRECT.

14  **Q.**  YOU REVIEWED DOCUMENTS?

15  **A.**  CORRECT.

16  **Q.**  YOU MET WITH THE LAWYERS FOR DIGITAL REG FOR A NUMBER OF

17  HOURS?

18  **A.**  CORRECT.

19  **Q.**  AND YOU KNEW YOUR TESTIMONY IN THE CASE WAS GOING TO BE

20  IMPORTANT TO DIGITAL REG'S CLAIMS AGAINST ADOBE, CORRECT?

21  **A.**  RIGHT.

22  **Q.**  YOU DID YOUR BEST TO BE TRUTHFUL AND ACCURATE?

23  **A.**  YES.

24  **Q.**  AND COMPLETE?

25  **A.**  CORRECT.

```
 1   Q.   IF YOU COULD TURN TO PAGE 308 OF YOUR DEPOSITION DATED --

 2   A.   A DEPOSITION?

 3   Q.   THERE'S A BINDER FOR THAT.  I AM SORRY.  MARCH 26TH, 2013,

 4   PAGE 308, LINE 7.

 5   A.   MARCH 20 -- WHAT IS THE DATE, MARCH 17TH?

 6   Q.   NO.  MARCH 26TH, PAGE 308, LINE 7.

 7   A.   ARE YOU TALKING ABOUT THE FRAME PAGES OR THE ONES AT THE

 8   VERY BOTTOM?

 9   Q.   VERY GOOD QUESTION.  SO IT IS ACTUALLY GOING TO BE THE

10   FRAMED PAGES.

11   A.   FRAMED PAGES.

12   Q.   AND WHY DON'T YOU TURN TO -- WE WILL SPEED THIS UP.  TURN

13   TO 308.

14   A.   OKAY.

15   Q.   LINE 7.  IT'S ON THE TOP RIGHT-HAND CORNER.

16           THE COURT:  ARE YOU WORKING WITH HIS DEPOSITION?

17           MS. MEHTA:  YES.

18           THE COURT:  DO I HAVE A COPY?

19           MS. MEHTA:  YES, YOU DO, YOUR HONOR.

20           THE WITNESS:  IT IS WAY IN THE BACK, RIGHT?

21           MS. MEHTA:  OH, I APOLOGIZE.  I THOUGHT I GAVE IT TO

22   YOU.

23               (BINDER HANDED TO COURT.)

24           MS. MEHTA:  IT IS APPROXIMATELY 75 PAGES --

25           THE WITNESS:  I MUST BE LOOKING --
```

```
 1          MS. MEHTA:  MAY I APPROACH, YOUR HONOR?

 2          THE COURT:  YES.

 3          THE WITNESS:  IF YOU GO TO 308, I'M ALL THE WAY IN

 4   THE BACK.

 5                  (COUNSEL ASSISTS WITNESS.)

 6      I WAS JUST LOOKING AT THE WRONG THING THERE.  OKAY.

 7   BY MS. MEHTA:

 8   Q.  ALL RIGHT.  ARE YOU WITH ME?

 9   A.  WITH YOU.

10   Q.  GREAT.  SO DURING THAT DEPOSITION ONE OF MY COLLEAGUES

11   ASKED YOU:

12          "AND YOUR UNDERSTANDING WAS ADOBE VENTURES WAS THE

13           INVESTMENT ARM OF ADOBE THAT WOULD FUND SMALLER

14           COMPANIES AND THAT KIND OF THING; IS THAT CORRECT?"

15   A.  CORRECT.

16   Q.  "ANSWER" --

17      HOLD ON.

18   A.  OKAY.

19   Q.  (READING)

20          "ANSWER:  THAT IS EXACTLY WHAT THEY HAD ON THEIR WEB

21           PAGE, AND THAT IS WHY WE WENT TO THEM."

22      THAT WAS YOUR TESTIMONY?

23   A.  CORRECT.

24   Q.  NOW, AT THE SAME TIME YOU WERE ALSO GOING TO OTHER

25   TECHNOLOGY COMPANIES WITH INVESTMENT ARMS, CORRECT?
```

1    **A.**   CORRECT.

2    **Q.**   YOU WERE LOOKING FOR FUNDING FOR THEM, AS WELL?   FROM

3    THEM, AS WELL?

4    **A.**   FUNDING AND PARTNERSHIPS.

5    **Q.**   OTHER COMPANIES LIKE INTEL, AS AN EXAMPLE?

6    **A.**   YES.

7    **Q.**   NOW, WHEN YOU WERE MEETING WITH ADOBE YOU NEVER MET WITH

8    ANYONE ON THE DRM TEAM FROM ADOBE, CORRECT?

9    **A.**   CORRECT.

10   **Q.**   NOW, YOUR ATTORNEYS HAVEN'T IDENTIFIED ANY ADOBE WITNESSES

11   THAT CAN TESTIFY ABOUT THIS MEETING THAT YOU SAY YOU HAD WITH

12   THEM ON THE PHONE IN 2004, RIGHT?

13   **A.**   CORRECT.

14   **Q.**   YOU KNEW THAT THAT MEETING WAS GOING TO BE A CRITICAL PART

15   OF THE CASE THAT DIGITAL REG WAS BRINGING AGAINST ADOBE, AND

16   YOU AND YOUR ATTORNEYS COULDN'T IDENTIFY ANYONE FROM ADOBE TO

17   TESTIFY, RIGHT?

18   **A.**   NO ONE ASKED ME TO IDENTIFY WHO I MET WITH.

19   **Q.**   SO YOUR ATTORNEYS NEVER ASKED?

20   **A.**   THEY NEVER ASKED.

21   **Q.**   NOW, THIS ADOBE VALUE PROPOSITION DOCUMENT, DATED --

22   EXHIBIT 125C, THAT WAS A DOCUMENT OR A FORM OF DOCUMENT THAT

23   YOU ALSO SENT TO OTHER COMPANIES, CORRECT?

24   **A.**   CORRECT.

25          **MS. MEHTA:**   MR. BONINI, LET'S PULL UP DX 457.

 1                    (DISPLAYED ON SCREEN.)

 2   **BY MS. MEHTA:**

 3   **Q.**  MR. VENTERS, DO YOU SEE DX 457.

 4   **A.**  YES, I DO.

 5   **Q.**  DO YOU RECOGNIZE THAT DOCUMENT?

 6   **A.**  YES, I DO.

 7   **Q.**  WHAT IS THAT DOCUMENT?

 8   **A.**  IT IS A DOCUMENT I PRODUCED.  IT'S CALLED "THE DIGITAL

 9   CONTAINER DOLBY PROPOSITION."

10          **MS. MEHTA:**  AT THIS TIME WE WOULD MOVE DX 457 INTO

11   EVIDENCE.

12          **MS. GLAUSER:**  NO OBJECTION, YOUR HONOR.

13          **THE COURT:**  RECEIVED.

14      (DEFENDANT'S EXHIBIT 457 RECEIVED IN EVIDENCE)

15          **MS. MEHTA:**  MS. RILEY, IF WE CAN PUBLISH THAT.

16          **THE CLERK:**  YOU DON'T NEED TO TELL ME.

17                    (PUBLISHED TO JURY.)

18   **BY MS. MEHTA:**

19   **Q.**  MR. VENTERS, THIS IS A VALUE PROPOSITION DOCUMENT THAT YOU

20   SENT TO DOLBY, RIGHT?

21   **A.**  CORRECT.

22          **MS. MEHTA:**  AND MR. BONINI, JUST HIGHLIGHT THE TOP SO

23   THE JURY AND MR. VENTERS CAN SEE IT MORE CLEARLY.

24   **BY MS. MEHTA**

25   **Q.**  AND, AGAIN, THE PURPOSE OF THIS DOCUMENT WAS TO TELL THEM

1    ABOUT YOUR PATENTS AND YOUR TECHNOLOGY, RIGHT?

2    **A.**   CORRECT.

3    **Q.**   SEE IF YOU CAN GET THEM INTERESTED IN THE COMPANY?

4    **A.**   CORRECT.

5         **MS. MEHTA:**   NOW, IF YOU COULD TURN, MR. BONINI, TO

6    PAGE 009 OF DX 457.  AND IF YOU CAN HIGHLIGHT THE BULLETS AT

7    THE BOTTOM.

8    **BY MS. MEHTA**

9    **Q.**   MR. VENTERS, THE BULLETS ON THE BOTTOM OF .009 OF

10   EXHIBIT 457 ARE YOUR REASONS TO DOLBY FOR WHY THEY SHOULD TAKE

11   A LICENSE OR PARTNER WITH DIGITAL CONTAINERS, RIGHT?

12   **A.**   CORRECT.

13   **Q.**   AND, IN FACT, IT SAYS:  "THE REASONS TO LICENSE THE

14   PATENTED DRM TECHNOLOGIES," RIGHT?

15   **A.**   CORRECT.

16   **Q.**   YOU INCLUDED WITHIN THOSE PATENTED DRM TECHNOLOGIES THE

17   '541 AND '670 PATENTS, RIGHT?

18   **A.**   CORRECT.

19   **Q.**   NOW, LET'S LOOK AT THE LAST BULLET.  WHEN YOU WERE

20   ENCOURAGING DOLBY TO TAKE A LICENSE TO THE '541 AND '670

21   PATENTS, ONE OF THE REASONS YOU TOLD THEM THEY SHOULD TAKE A

22   LICENSE IS TO AVOID POTENTIAL PATENT VIOLATIONS AND

23   LITIGATION, CORRECT?

24   **A.**   CORRECT.

25   **Q.**   NOW, IF YOU RECALL 125C, YOU NEVER INCLUDED ANYTHING IN

1    THE ADOBE DOCUMENT THAT YOU SAID YOU SENT TO SUGGEST TO ADOBE

2    THAT THEY SHOULD TAKE A LICENSE TO AVOID PATENT VIOLATIONS OR

3    LITIGATION, RIGHT?

4    **A.**  CORRECT.

5    **Q.**  IN FACT, PRIOR TO FILING THE LAWSUIT AGAINST ADOBE IN

6    2011, YOU ARE NOT AWARE OF ANYONE ASSOCIATED WITH DIGITAL REG

7    EVER INFORMING ADOBE THAT IT WAS INFRINGING THE

8    PATENTS-IN-SUIT, CORRECT?

9    **A.**  CORRECT.

10   **Q.**  DURING YOUR DIRECT EXAMINATION YOU TALKED A BIT ABOUT THE

11   VIA PUBLISHER PRODUCT.  DO YOU RECALL THAT?

12   **A.**  I DO.

13   **Q.**  YOU DON'T HAVE ANY KNOWLEDGE OF ANYONE EVER CONDUCTING AN

14   ANALYSIS TO SEE WHETHER THE VIA PUBLISHER PRODUCT ACTUALLY IS

15   MAPPING TO THE CLAIMS OF THE '541 PATENT, RIGHT?

16   **A.**  IT WAS MY UNDERSTANDING WHEN MR. PATTERSON SAT DOWN WITH

17   THE PATENT LAWYERS WHEN THEY ACTUALLY WROTE THE PATENT, THAT

18   HE SAT BESIDE THEM WITH THE TECHNOLOGY RUNNING.

19   **Q.**  BUT YOU DON'T KNOW -- THAT'S THE PATENT LAWYERS AT FISH &

20   RICHARDSON?

21   **A.**  FISH & RICHARDSON, YES.

22   **Q.**  YOU ARE NOT TESTIFYING THAT THE PATENT LAWYERS AT FISH &

23   RICHARDSON DID AN ANALYSIS TO SEE WHETHER THE VIA PUBLISHER

24   PRODUCT ACTUALLY MAPPED THE CLAIMS, RIGHT?

25   **A.**  I DON'T KNOW THAT, YEAH.

1    **Q.**  YOU CAN'T SAY WHETHER THIS VIA PUBLISHER TECHNOLOGY THAT

2    YOU WERE TESTIFYING ON ABOUT IN DIRECT EXAMINATION ACTUALLY

3    RELATES TO THE CLAIMS OF THE '541 PATENT, RIGHT?

4    **A.**  I'M NOT A PATENT ATTORNEY, SO I COULDN'T REALLY SAY, YES.

5    **Q.**  I'M GOING TO GO BACK IN TIME A LITTLE BIT AND TALK ABOUT

6    DESKGATE AND SOME OF THE PRODUCTS AND WORK THAT YOU WERE DOING

7    AT DESKGATE.

8       WITH RESPECT TO DESKGATE, FROM THE TIME THAT YOU JOINED

9    THE COMPANY YOU WERE WORKING HARD TO TRY TO COMMERCIALIZE THIS

10   TECHNOLOGY, RIGHT?

11   **A.**  CORRECT.

12   **Q.**  AND AS THE MARKETING PERSON, YOU WERE VERY INVOLVED IN

13   THAT, RIGHT?

14   **A.**  VERY INVOLVED.

15   **Q.**  IT IS FAIR TO SAY THAT BY LATE 1998 THERE WERE NO PAYING

16   CUSTOMERS FOR ANY PRODUCTS THAT PC DESKGATE WAS MAKING, RIGHT?

17   **A.**  I DON'T KNOW IF THAT IS FAIR TO SAY.

18   **Q.**  LET'S LOOK AT YOUR DEPOSITION.  SAME DAY.

19   **A.**  SAME DAY AS THE LAST ONE?

20   **Q.**  YES, MARCH 26TH.

21   **A.**  OKAY.

22   **Q.**  THIS IS GOING TO BE ON PAGE 107, IN THE LITTLE FRAME

23   BRACKETS.

24   **A.**  OKAY.

25   **Q.**  AT LINE 5.

1    **A.**  OKAY.

2    **Q.**  I WILL START LINE 6, BECAUSE THAT IS COLLOQUY.

3         MY QUESTION --

4    **A.**  107?

5    **Q.**  ARE YOU IN -- I THINK YOU CHANGED BOOKS.  DID YOU CHANGE

6    BOOKS?

7    **A.**  I'M ON THE BOOK YOU GAVE ME.

8    **Q.**  HOLD ON ONE SECOND.

9         **MS. MEHTA:**  I'M GOING TO APPROACH THE WITNESS IF THAT

10   IS OKAY, YOUR HONOR.

11        **THE WITNESS:**  OKAY.

12        **THE COURT:**  YES, ALTHOUGH IF YOU ARE JUST READING

13   IT --

14        **THE WITNESS:**  THIS IS -- IF I AM ON THIS PANEL IT

15   STARTS WITH "WONDERFUL PERIOD OF TIME."

16   **BY MS. MEHTA:**

17   **Q.**  YOU ARE THERE EXACTLY.

18   **A.**  YEAH. YEAH. YEAH.

19   **Q.**  OKAY.  NOW, ON PAGE 107, THE QUESTION WAS:

20        "IN THE LATE 1998 TIME FRAME, WERE THERE ACTUALLY ANY

21        CUSTOMERS, FOLKS WHO HAD PAID PC DESKGATE FOR THE

22        SERVICE?

23        "NO."

24   DO YOU SEE THAT?

25   **A.**  YES, I DO SEE THAT.

1    **Q.**  WAS THAT YOUR TESTIMONY?

2    **A.**  THAT WAS MY TESTIMONY AT THE TIME.

3    **Q.**  FROM THE LAUNCH OF YOUR PRODUCT AT PC DESKGATE UNTIL

4    MID-2000 YOU DON'T EVEN KNOW WHETHER THERE WERE EVEN A

5    THOUSAND DOLLARS IN REVENUE FOR THE PRODUCT, RIGHT?

6    **A.**  I WASN'T SURE OF THE AMOUNT.

7    **Q.**  SO YOU CAN'T EVEN SAY WHETHER THERE WAS A THOUSAND

8    DOLLARS.  YOU JUST DON'T KNOW?

9    **A.**  I DON'T KNOW THE EXACT AMOUNT.

10   **Q.**  NOW, AFTER YOU ACQUIRED THE PATENTS FOLLOWING THE

11   BANKRUPTCY, YOU CONTINUED TO TRY TO COMMERCIALIZE THE PATENTS,

12   RIGHT?

13   **A.**  CORRECT.

14   **Q.**  AND YOU CONTINUED TO TRY TO MONETIZE THE PATENTS, RIGHT?

15   **A.**  CORRECT.

16   **Q.**  AND ONE OF THE THINGS THAT YOU TRIED TO DO WAS SELL A

17   PRODUCT AND GET CUSTOMERS, RIGHT?

18   **A.**  CORRECT.

19   **Q.**  AND YOU WEREN'T SUCCESSFUL IN GETTING ANY CUSTOMERS,

20   CORRECT?

21   **A.**  THAT'S CORRECT.

22   **Q.**  AND YOU TRIED TO LICENSE THE PATENT, RIGHT?

23   **A.**  CORRECT.

24   **Q.**  AND YOU COULDN'T GET COMPANIES TO TAKE A LICENSE TO THE

25   PATENT, EITHER, RIGHT?

1  **A.**  THAT'S CORRECT.

2  **Q.**  YOU TALKED TO GOOGLE, RIGHT?

3  **A.**  WE DID TALK TO GOOGLE, YES.

4  **Q.**  THEY PASSED?

5  **A.**  THEY PASSED, YES.

6  **Q.**  YOU TALKED TO YAHOO?

7  **A.**  WE DID, THAT'S RIGHT.

8  **Q.**  AND THEY PASSED?

9  **A.**  THEY PASSED.

10  **Q.**  YOU TALKED TO TIVO?

11  **A.**  WE DID.

12  **Q.**  AND THEY PASSED?

13  **A.**  THEY PASSED.

14  **Q.**  NOW, YOU MENTIONED ON DIRECT EXAMINATION THAT YOU REGRET

15  TALKING TO ADOBE IN 2004, RIGHT?

16  **A.**  CORRECT.

17  **Q.**  AND YOU CERTAINLY SUGGESTED THAT YOU FELT THAT ADOBE TOOK

18  THIS INFORMATION THAT WAS IN THE DOCUMENT THAT YOU SENT TO

19  THEM THAT YOU DON'T HAVE, OR THAT WE DON'T HAVE, AND THAT

20  SOMEHOW ADOBE WAS TRYING TO COPY THAT AND USE IT IN THEIR

21  PRODUCTS, RIGHT?

22  **A.**  I DON'T THINK I WAS QUITE THAT DIRECT IN WHAT I SAID.  I

23  SAID IT SEEMED LIKE THEY WERE DOING A LOT OF THINGS LIKE WE

24  TALKED ABOUT IN THE PAPER.

25  **Q.**  IN FACT, YOU DON'T HAVE ANY PERSONAL KNOWLEDGE THAT ANYONE

1    AT ADOBE EVER COPIED ANYTHING IN THE PATENTS OR IN YOUR VALUE

2    PROPOSITION DOCUMENT, RIGHT?

3    **A.**  CORRECT.

4    **Q.**  AND, IN FACT, YOU DON'T KNOW IF ANYBODY THAT WORKED ON ANY

5    OF THE PRODUCTS THAT ARE BEING ACCUSED EVEN KNEW ABOUT THE

6    ADOBE VENTURES MEETING, RIGHT?

7    **A.**  CORRECT.

8    **Q.**  AND YOU DON'T KNOW IF ANYONE THAT WORKED ON ANY OF THE

9    PRODUCTS KNEW ABOUT THE DOCUMENT, RIGHT?

10   **A.**  CORRECT.

11   **Q.**  AND YOU DON'T KNOW IF ANYONE THAT WORKED ON THE PRODUCTS

12   KNEW ABOUT THE PATENTS, RIGHT?

13   **A.**  NO, I WOULDN'T OF HAD DIRECT -- I WOULDN'T HAVE KNOWN

14   THAT.

15   **Q.**  SO YOU ARE NOT IN A POSITION TO ACTUALLY SAY THAT ADOBE

16   COPIED ANYTHING FROM DIGITAL REG, CORRECT?

17   **A.**  CORRECT.

18          **MS. MEHTA:**  I PASS THE WITNESS, YOUR HONOR.

19                    **REDIRECT EXAMINATION**

20   **BY MS. GLAUSER:**

21   **Q.**  I JUST HAVE A FEW QUESTIONS FOR YOU, MR. VENTERS.

22       ADOBE'S LAWYERS WERE ASKING YOU WHETHER ADOBE VENTURES IS

23   THE INVESTMENT ARM OF ADOBE.  DO YOU RECALL THAT?

24   **A.**  YES.

25   **Q.**  WHY DID YOU GO TO THE INVESTMENT ARM OF ADOBE IN 2004?

1   **A.**  WELL, THEY WERE THE EASIEST PEOPLE TO TALK TO, NUMBER ONE,

2   TO START A PROCESS.  NUMBER TWO, WE WERE LOOKING FOR

3   PARTNERSHIP.  YES, WE WERE LOOKING FOR MONEY.  EVERYBODY WAS

4   LOOKING FOR MONEY.  I MEAN, VENTURE CAPITAL, THAT'S MONEY,

5   RIGHT?  IT WAS IMPLICIT IN THE FACT WE WERE GOING TO SEE A

6   VENTURE CAPITAL FIRM, THAT, YES, INVESTMENT COULD HAPPEN.

7   **Q.**  IN THAT PROCESS, WHAT WAS IT YOU WERE SEEKING MONEY TO DO?

8   **A.**  WE WERE SEEKING MONEY TO CONTINUE OUR DEVELOPMENT AND TO

9   CONTINUE TO DEVELOP THE PRODUCTS AND TAKE IT TO MARKET.

10  **Q.**  HAS IT BEEN YOUR PRACTICE THAT IN ATTEMPTING TO SEEK

11  INVESTMENTS FROM OTHER COMPANIES YOU HAVE TO DESCRIBE WHAT IT

12  IS THAT YOU INTEND TO DO WITH THE MONEY?

13  **A.**  ABSOLUTELY.

14  **Q.**  DID THAT HAPPEN AT THE 2004 MEETING WITH ADOBE?

15  **A.**  NO.  THERE WAS NO DISCUSSION ABOUT MONEY OR INVESTMENT AT

16  ALL.

17  **Q.**  WHAT WAS THE DISCUSSION?

18  **A.**  THE DISCUSSION WAS WHAT YOU SAW IN THAT DOCUMENT.  IT WAS

19  JUST TO INFORM THEM THAT WE EXISTED, THAT WE HAD THIS -- THESE

20  PATENTS AND TECHNOLOGY.  AND WE WERE REALLY JUST KIND OF

21  LETTING THEM TELL US WHAT THEY THOUGHT SHOULD BE THE NEXT

22  STEP.

23          **MS. GLAUSER:**  NO FURTHER QUESTIONS, YOUR HONOR.

24          **MS. MEHTA:**  JUST ONE QUESTION, YOUR HONOR.

25          **THE WITNESS:**  OKAY.

1                       **RECROSS-EXAMINATION**

2      **BY MS. MEHTA:**

3      **Q.**  WHEN YOU SAY YOU MET WITH ADOBE IN ADOBE VENTURES IN 2004,

4      YOUR GOAL IN MEETING WITH THEM WAS TO RECEIVE FUNDING,

5      CORRECT?

6      **A.**  IT WAS ONE OF THE GOALS TO POTENTIALLY RECEIVE FUNDING.

7      **Q.**  OKAY.  I'M GOING TO READ FROM YOUR DEPOSITION AT --

8      ACTUALLY, I THINK I ALREADY READ FROM THAT PORTION --

9      **A.**  YOU DID.

10            **MS. MEHTA:**  ALL RIGHT.  THANK YOU.  NOTHING FURTHER.

11            **MS. GLAUSER:**  MAY THIS WITNESS BE EXCUSED?

12            **THE COURT:**  IF YOU HAVE NOTHING FURTHER, YES.

13            **MS. GLAUSER:**  WE HAVE NOTHING FURTHER.

14            **THE COURT:**  ALL RIGHT.  YOU ARE EXCUSED.  YOU MAY

15      STEP DOWN.

16         YOU MAY CALL YOUR NEXT WITNESS.

17            **THE CLERK:**  I AM GOING TO REMOVE ANY BINDERS THAT

18      DON'T PERTAIN TO THE NEXT WITNESS.

19            **MR. DINOVO:**  AT THIS TIME, YOUR HONOR, WE ARE CALLING

20      MR. JONES BY DEPOSITION -- BY VIDEOTAPE.

21            **THE COURT:**  OKAY.

22         SO, LADIES AND GENTLEMEN, YOU'VE HEARD REFERENCES TO

23      DEPOSITIONS IN THE EARLIER TESTIMONY.  A DEPOSITION IS THE

24      SWORN TESTIMONY OF A WITNESS TAKEN BEFORE THE TRIAL.  THE

25      WITNESS IS PLACED UNDER OATH, AND TO TELL THE TRUTH AND THE

1    LAWYERS FOR EACH PARTY MAY ASK QUESTIONS.  AND THE QUESTIONS

2    AND ANSWERS ARE RECORDED.  SOMETIMES IN ADDITION TO USING A

3    DEPOSITION WITH A WITNESS, IF A WITNESS IS UNAVAILABLE WE

4    ALLOW THAT WITNESS TO TESTIFY BY DEPOSITION.

5        SO THEY WILL BE SHOWING YOU AN EXCERPT OF A VIDEO

6    DEPOSITION OF A WITNESS WHO WILL NOT BE HERE IN PERSON TO

7    TESTIFY.  SO YOU SHOULD CONSIDER THIS DEPOSITION TESTIMONY

8    PRESENTED TO YOU IN COURT IN LIEU OF LIVE TESTIMONY INSOFAR AS

9    POSSIBLE IN THE SAME WAY AS IF THE WITNESS HAD BEEN PRESENT TO

10   TESTIFY.

11            **MR. DINOVO:**  YOUR HONOR, WOULD IT BE FAIR TO INSTRUCT

12   THE JURY THIS WAS ADOBE'S CORPORATE REPRESENTATIVE THAT WAS

13   BEING DEPOSED?

14            **THE COURT:**  IF IT WAS.

15            **MR. DINOVO:**  IT WAS.

16            **THE COURT:**  THIS WAS APPARENTLY ADOBE'S CORPORATE

17   REPRESENTATIVE WHO YOU WILL BE HEARING TESTIFY.

18            **MS. MEHTA:**  IT WAS ONLY WITH RESPECT TO A PARTICULAR

19   PRODUCT WHICH IS THE PRODUCT FAMILY THAT HE WORKED ON.

20            **THE COURT:**  WHICH IS WHAT?

21            **MS. MEHTA:**  THE FLASH PLATFORM, FLASH ACCESS

22   PLATFORM.

23            **THE COURT:**  ALL RIGHT.

24                (DEPOSITION PLAYED OF MR. JONES.)

25            **THE COURT:**  IS THAT IT?

1          **MR. DINOVO:**  YES, YOUR HONOR.

2          **THE COURT:**  YOU MAY CALL YOUR NEXT WITNESS.

3          **MR. DINOVO:**  AT THIS TIME WE CALL DR. PREM DEVANBU.

4          **THE COURT:**  IS HE IN THE COURTROOM?

5          **THE CLERK:**  PLEASE COME UP TO THE WITNESS STAND AND

6    RAISE YOUR RIGHT HAND FOR ME, PLEASE.

7          **THE COURT:**  CAN I HAVE A WRITTEN TRANSCRIPT OF THAT

8    DEPO PLAY WE JUST DID?

9          **MR. DINOVO:**  YES.

10         **THE COURT:**  NOT RIGHT THIS SECOND, BUT EVENTUALLY?

11         **MR. DINOVO:**  YES.

12       (**PREMKUMAR DEVANBU**, CALLED AS A WITNESS FOR THE PLAINTIFF,

13    HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

14         **THE WITNESS:**  YES, I DO.

15         **THE CLERK:**  YOU MAY BE SEATED.  ONCE SEATED, I'M

16    GOING TO ASK THAT YOU PLEASE STATE AND SPELL YOUR FIRST AND

17    LAST NAME FOR THE RECORD, PLEASE.

18         **THE WITNESS:**  MY NAME IS PREMKUMAR THOMAS DEVANBU.

19    P-R-E-M-K-U-M-A-R.  MIDDLE NAME IS THOMAS, T-H-O-M-A-S.

20    LAST NAME IS DEVANBU, D-E-V-A-N-B-U.

21         **THE CLERK:**  THANK YOU.

22                        <u>**DIRECT EXAMINATION**</u>

23    BY MR. DINOVO:

24    Q.  HELLO, DR. DEVANBU.  I KNOW YOU HAVE BEEN IN THE COURTROOM

25    A BIT THIS MORNING.  I KNOW THE COURT REPORTER, SINCE WE ARE

DEVANBU – DIRECT / DINOVO

```
 1    GOING TO BE COVERING SOME TECHNICAL SUBJECT MATTER, WOULD
 2    APPRECIATE MY AND YOU TALKING SLOWLY AND NOT TALKING OVER ONE
 3    ANOTHER.  ALL RIGHT?
 4    A.  YES.
 5    Q.  COULD YOU PLEASE INTRODUCE YOURSELF TO THE JURY?
 6    A.  YES.  MY NAME IS PREMKUMAR THOMAS DEVANBU.
 7    Q.  ON WHAT SUBJECT WILL YOU BE TESTIFYING TODAY, SIR?
 8    A.  ON THE INFRINGEMENT SCENARIOS FOR THE PATENT '670 AND
 9    '541.
10    Q.  WHAT ARE YOUR EDUCATIONAL QUALIFICATIONS THAT WOULD
11    SUPPORT YOU TESTIFYING ABOUT INFRINGEMENT BY ADOBE OF THE '541
12    AND '670 PATENTS?
13    A.  I HAVE A BACHELOR'S IN ELECTRICAL ENGINEERING FROM THE
14    INDIAN INSTITUTE OF TECHNOLOGY IN INDIA, AND A MASTERS AND A
15    PH.D. IN COMPUTER SCIENCE FROM RUTGERS UNIVERSITY.
16    Q.  WHEN DID YOU ACHIEVE YOUR PH.D. AT RUTGERS?
17    A.  1994.
18    Q.  DO YOU HAVE ANY TEACHING EXPERIENCE IN THE AREA OF
19    COMPUTER SCIENCE, DR. DEVANBU?
20    A.  YES, I HAVE BEEN TEACHING AT UNIVERSITY OF CALIFORNIA
21    DAVIS SINCE 1998.
22    Q.  THANK YOU.  AND ARE YOU A FULL PROFESSOR THERE?
23    A.  YES, I AM A FULL PROFESSOR.
24    Q.  WHAT MATTERS DO YOU TEACH?
25    A.  I TEACH SOFTWARE ENGINEERING AND BASIC COMPUTER
```

DEVANBU – DIRECT / DINOVO

1    PROGRAMMING.

2    **Q.** WHAT LANGUAGES DO YOU TEACH IN CONNECTION WITH YOUR BASIC

3    COMPUTER PROGRAMMING CLASS?

4    **A.** WE TEACH C. AT UC DAVIS WE TEACH C, C PLUS PLUS AND JAVA.

5    **Q.** AND THAT'S YOUR GRADUATE LEVEL CLASS, AS WELL?

6    **A.** YES. THAT'S RIGHT.

7    **Q.** DO YOU KNOW WHAT LANGUAGES ADOBE HAS PROGRAMMED THE

8    PRODUCTS THAT YOU ANALYZED, WHAT LANGUAGE IT USED?

9    **A.** THEY WERE MOSTLY C, C PLUS PLUS AND JAVA.

10   **Q.** THESE ARE THE SAME LANGUAGES THAT YOU TEACH AND HAVE BEEN

11   TEACHING AT UC DAVIS FOR 16 YEARS?

12   **A.** THAT'S CORRECT.

13   **Q.** DO YOU HAVE ANY PRACTICAL WORK EXPERIENCE IN THE FIELD OF

14   COMPUTER SCIENCE?

15   **A.** YES. AFTER MY MASTERS FROM RUTGERS IN 1979, I WORKED AT

16   PERKIN-ELMER, BELL LABORATORIES, AT&T LABORATORIES FOR ABOUT

17   18 YEARS.

18   **Q.** DO YOU KNOW DID YOU ENCOUNTER ANYONE RELATING TO THE C OR

19   C PLUS PLUS LANGUAGES DURING YOUR WORK THERE?

20   **A.** YES, I MET THE INVENTORS OF BOTH C AND C PLUS PLUS, AND I

21   KNOW THEM.

22   **Q.** DO YOU HOLD ANY POSITIONS WITH PROFESSIONAL SOCIETIES IN

23   THE AREA OF COMPUTER SCIENCE?

24   **A.** YES. I AM A MEMBER OF THE ASSOCIATION FOR COMPUTING

25   MACHINERY.

1    **Q.**  ALL RIGHT.  AND HAVE YOU SERVED ON ANY JOURNAL EDITORIAL

2    BOARDS?

3    **A.**  YES.  I HAVE BEEN ON THE EDITORIAL BOARD FOR THE IEEE

4    TRANSACTIONS ON SOFTWARE ENGINEERING AND THE ACM TRANSACTIONS

5    ON SOFTWARE AND METHODOLOGY, THE TWO BEST JOURNALS IN THE

6    FIELD.

7    **Q.**  WHERE ELSE DO PEOPLE IN YOUR FIELD PUBLISH?

8    **A.**  THEY TEND TO PUBLISH IN CONFERENCES, ESPECIALLY IN SHORTER

9    TERM WORK THAT NEEDS TO BE DISSEMINATED AS SOON AS POSSIBLE.

10   **Q.**  HAVE YOU HAD PERSONAL INVOLVEMENT IN CONFERENCES?

11   **A.**  YES.  I HAVE BEEN ON THE PROGRAM COMMITTEES FOR THE

12   INTERNATIONAL CONFERENCE ON SOFTWARE ENGINEERING AND THE ACM

13   SIGSOFT FOUNDATIONS OF SOFTWARE ENGINEERING.

14       THESE ARE THE TWO BEST CONFERENCES IN THE FIELD WHERE THE

15   BEST PEOPLE SEND THEIR BEST WORK.

16   **Q.**  HAVE YOU WRITTEN ANY TECHNICAL PAPERS?

17   **A.**  YES, I HAVE.

18   **Q.**  APPROXIMATELY HOW MANY?

19   **A.**  OVER 130.

20   **Q.**  IS THAT NUMBER OF SIGNIFICANCE TO YOU?

21   **A.**  IT'S A LOT.

22   **Q.**  ALL RIGHT.

23       WHAT IS THE BASIC AREA OF YOUR RESEARCH AT UC DAVIS?

24   **A.**  I STUDY SOFTWARE ENGINEERING, HOW PEOPLE BUILD LARGE

25   SOFTWARE SYSTEMS.

DEVANBU – DIRECT / DINOVO

1    **Q.**  WHAT IS A LARGE SOFTWARE SYSTEM?

2    **A.**  ANYTHING UPWARDS OF A FEW HUNDRED THOUSAND LINES OF CODE.

3    **Q.**  COULD YOU GIVE THE JURY A SENSE OF THE COMPLEXITY OF A

4    LARGE SOFTWARE SYSTEM IN SOME WAY?

5    **A.**  WELL, IT'S FOR SYSTEMS OF SIMILAR SIZE AND HUMAN EFFORT,

6    SOFTWARE SYSTEMS THAT ARE ABOUT THE MOST COMPLEX CONSTRUCTIONS

7    OF MANKIND.

8    **Q.**  MORE COMPLEX THAN BRIDGES OR BUILDINGS?

9    **A.**  YES.

10   **Q.**  ARE THE PRODUCTS THAT WE'RE ANALYZING HERE, THE ADOBE

11   ACCUSED PRODUCTS, ARE THEY LARGE-SCALE SOFTWARE SYSTEMS OF

12   THAT NATURE?

13   **A.**  YES.

14   **Q.**  SO YOU CONSIDER THAT RELEVANT?  YOUR RESEARCH IS RELEVANT

15   TO YOUR ANALYSIS IN THIS CASE?

16   **A.**  THAT'S RIGHT.

17   **Q.**  DR. DEVANBU, HAVE YOU EVER TESTIFIED AT A TRIAL BEFORE?

18   **A.**  NEVER.

19   **Q.**  AND YOUR --

20   **A.**  YES.  SORRY.  I MISSPOKE.  I WAS IN A TRAFFIC CASE.

21   **Q.**  ALL RIGHT.  NEVER IN A PATENT TRIAL?

22   **A.**  NO.

23   **Q.**  OKAY.  IF YOU CAN JUST LET ME FINISH MY ANSWER (SIC).

24   AND YOU GAVE A DEPOSITION IN THIS CASE, DIDN'T YOU?

25   **A.**  YES, I DID.

1   **Q.**  WAS THAT YOUR FIRST DEPOSITION?

2   **A.**  YES.

3   **Q.**  SO, YOU'RE NOT WHAT SOMEONE MIGHT CALL "A CAREER

4   TESTIFYING WITNESS"; IS THAT FAIR?

5   **A.**  NO.

6   **Q.**  WHAT IS YOUR CAREER?

7   **A.**  I'M A PROFESSOR.

8   **Q.**  ALL RIGHT.  APPROXIMATELY HOW MUCH OF YOUR TIME DO YOU

9   THINK OVER THE LAST 20 YEARS YOU'VE DEDICATED TO CONSULTING IN

10  PATENT LITIGATION?

11  **A.**  LESS THAN 1 PERCENT.

12  **Q.**  ARE YOU CHARGING DIGITAL REG FOR YOUR TIME SPENT IN

13  CONNECTION WITH REVIEWING SOURCE CODE IN THIS MATTER?

14  **A.**  YES.

15  **Q.**  WHAT IS YOUR RATE THERE?

16  **A.**  $350 FOR THE FIRST HUNDRED HOURS OR SO, THEN 250 AFTER

17  THAT.

18  **Q.**  HAVE YOU GOTTEN INTO THAT 250 RANGE?

19  **A.**  YES.

20  **Q.**  SO YOU'VE SPENT OVER A HUNDRED HOURS REVIEWING SOURCE CODE

21  IN CONNECTION WITH THIS CASE?

22  **A.**  NOT JUST ADOBE, BUT OTHER DEFENDANTS, AS WELL.

23  **Q.**  IS YOUR COMPENSATION BASED IN ANY WAY ON THE NATURE OF

24  YOUR TESTIMONY OR THE OUTCOME OF THIS CASE, SIR?

25  **A.**  NO.

1           **MR. DINOVO:**  AT THIS TIME, YOUR HONOR, WE WOULD

2     SUBMIT DR. DEVANBU AS AN EXPERT IN THE FIELD OF COMPUTER

3     SCIENCE AND LARGE-SCALE SYSTEMS.

4           **MS. MEHTA:**  NO OBJECTION, YOUR HONOR.

5           **THE COURT:**  ALL RIGHT.

6           **MR. DINOVO:**  THANK YOU.

7     **BY MR. DINOVO:**

8     **Q.**  DR. DEVANBU, LET ME REFER YOU TO PLAINTIFF'S EXHIBIT 1,

9     THE '541 PATENT.

10          **MR. DINOVO:**  MAY I APPROACH, YOUR HONOR?

11          **THE COURT:**  YES.

12              (BINDERS HANDED TO WITNESS.)

13                (PUBLISHED TO JURY).

14    **BY MR. DINOVO**

15    **Q.**  ALL RIGHT. DR. DEVANBU, YOU ARE FAMILIAR WITH THE '541

16    PATENT, ARE YOU NOT?

17    **A.**  YES.

18    **Q.**  WHAT IS IT GENERALLY ABOUT?

19    **A.**  IT'S ABOUT DIGITAL RIGHTS MANAGEMENT.

20    **Q.**  AND, MORE SPECIFICALLY, COULD YOU HELP THE JURY UNDERSTAND

21    TO WHAT THE CLAIMS OF THE '541 PATENT ARE DIRECTED?

22    **A.**  THE CLAIMS ARE DIRECTED TO THE NEED TO REQUEST PERMISSION

23    FROM AN EXTERNAL SOURCE BEFORE ACCESSING SOME PROTECTED

24    CONTENT.

25    **Q.**  ALL RIGHT.  WOULD IT BE HELPFUL FOR YOU TO EXPLAIN TO THE

```
 1    JURY THE NATURE OF THIS TECHNOLOGY IF WE PUT ON A

 2    DEMONSTRATIVE?

 3    A.  YES.

 4            MR. DINOVO:  WE WOULD LIKE TO PUT ON DEMONSTRATIVE

 5    EXHIBIT 1.

 6                    (PUBLISHED TO JURY).

 7    BY MR. DINOVO

 8    Q.  ALL RIGHT, SIR.  WHEN YOU PUT TOGETHER THIS DEMONSTRATIVE,

 9    WHAT WAS THIS INTENDED TO DEPICT?

10    A.  I WAS TRYING TO EXPLAIN HOW DIGITAL RIGHTS MANAGEMENT

11    WORKS, IN GENERAL.

12    Q.  SO WHAT IS SHOWN HERE?

13    A.  SO THE IDEA HERE IS THAT A BUSINESS MIGHT CREATE

14    ELECTRONIC CONTENT THAT IS DIFFICULT AND EXPENSIVE TO CREATE.

15    AND THEY WOULD LIKE TO PROTECT IT.  SO IN THIS CASE WE ARE

16    SHOWING EXAMPLES SUCH AS DOCUMENTS, MEDIA, INCLUDING VIDEO,

17    AUDIO AND GAMES AND SOFTWARE.

18    Q.  ALL RIGHT.  IS THIS NEXT SLIDE INTENDED TO SHOW A DANGER

19    ASSOCIATED WITH THE DISTRIBUTION OF DIGITAL CONTENT?

20    A.  YES.  THIS ILLUSTRATES THE NEED FOR DIGITAL RIGHTS

21    MANAGEMENT BECAUSE SINCE IT IS ELECTRONIC IT CAN BE COPIED

22    OVER THE NETWORK OR USING A USB STICK OR ANY NUMBER OF

23    MEANS.

24    Q.  SO WHAT IS THE GENERAL IDEA, THEN, OF DIGITAL RIGHTS

25    MANAGEMENT?
```

DEVANBU – DIRECT / DINOVO

1   **A.**  THE GENERAL IDEA HERE IS THAT THE OWNERS OF THE CONTENT

2   WOULD LIKE TO BENEFIT FROM THE WORK THEY PUT INTO IT.  SO THEY

3   WOULD LIKE TO HAVE AUTHORIZATION BEFORE PEOPLE GETTING TO USE

4   IT -- ARE GETTING TO USE IT.

5   **Q.**  WHAT DO YOU MEAN, SIR, BY "AUTHORIZATION"?

6   **A.**  I MEAN THAT SOME PROCESS IS EXECUTED THAT DETERMINES

7   WHETHER PEOPLE HAVE THE RIGHT TO ACCESS IT.

8   **Q.**  WE WILL RETURN TO THAT POINT IN A MOMENT.  WE HEARD A

9   LITTLE BIT ABOUT BUSINESS RULES FROM MR. JONES A MINUTE AGO.

10  DOES THAT RELATE TO THE AUTHORIZATION PROCESS?

11  **A.**  YES.

12  **Q.**  DO YOU VIEW THE NATURE OF THE BUSINESS RULES TO BE

13  MATERIAL TO YOUR ANALYSIS?

14  **A.**  NOT TO THIS PARTICULAR PATENT, NO.

15  **Q.**  ALL RIGHT.  SO, WHAT IS DEPICTED HERE ON THE NEXT SLIDE,

16  SLIDE FIVE?

17  **A.**  THIS BASICALLY SHOWS THAT A VENDOR WHO CREATES VALUABLE

18  DOCUMENTS OR GOVERNMENT AGENCY OR PRIVATE COMPANY THAT WANTS

19  TO PROTECT VALUABLE DOCUMENTS THAT MIGHT USE DIGITAL RIGHTS

20  MANAGEMENT TO ACHIEVE THAT GOAL.

21  **Q.**  AND THIS FOLLOWING SLIDE, DOES IT SHOW AT A HIGH LEVEL HOW

22  DRM MIGHT BE APPLIED?

23  **A.**  THAT'S RIGHT. SO, IN GENERAL, YOU MIGHT ADD SOME

24  PROTECTION TO ELECTRONIC CONTENT.  SO -- AND THAT FORCES A

25  CHECK BEFORE FOR AUTHORIZATION BEFORE THE FILE IS ACCESSED.

DEVANBU – DIRECT / DINOVO

1    **Q.**  HOW ABOUT THIS NEXT SLIDE?

2    **A.**  SO WHAT THIS SHOWS IS SOMETHING VERY IMPORTANT, WHICH IS

3    THAT IN THE PRESENCE OF DIGITAL RIGHTS MANAGEMENT TECHNOLOGY,

4    THERE IS A LOT OF FLEXIBILITY GAINED IN HOW PROTECTED CONTENT

5    IS DISTRIBUTED.  SO THAT ONE IS ABLE TO SELL IT, RESELL IT,

6    DISTRIBUTE IT FREELY WITH THE CONFIDENCE THAT THE CONTENT IS

7    NOT ACCESSED WITHOUT PROPER AUTHORIZATION.

8    **Q.**  ALL RIGHT, SIR.  AND WHAT IS SHOWN HERE ON THE SEQUENCE

9    OF  --

10   **A.**  THIS SHOWS A VARIETY OF WAYS IN WHICH DIGITAL RIGHTS

11   MANAGEMENT MIGHT BE IMPLEMENTED.  IF SOMEONE REQUESTS ACCESS

12   TO A CONTENT A VARIETY OF WAYS TO ACCESS MIGHT BE CHECKED.  SO

13   YOU MIGHT CHECK THAT THE PERMISSION CAME WITH THE DOCUMENT.

14       YOU MIGHT CHECK IF YOU HAVE TO ASK AN EXTERNAL SERVER --

15   YOU SAW THAT ANIMATION THERE BRIEFLY -- TO SEE IF PERMISSION

16   CAN BE OBTAINED FROM THE EXTERNAL SERVER.  OR YOU MIGHT CHECK

17   IF THE PERMISSION WILL BE ACCESSED.

18       AND IF ONE OF THOSE THINGS HOLDS, THEN IN ORDER TO ACCESS

19   THE CONTENT, AND IF NONE OF THOSE APPLY THEN YOU MAY NOT BE

20   ABLE TO ACCESS THE CONTENT.

21   **Q.**  ALL RIGHT.  THANK YOU, SIR.  LET'S RUN THROUGH AT A HIGH

22   LEVEL THE CONCEPTS IN THE '670 PATENT, WHICH IS PLAINTIFF'S

23   EXHIBIT 3.

24       DID YOU TAKE A LOOK AT THAT PATENT IN CONNECTION WITH

25   FORMING YOUR OPINIONS TODAY?

1    **A.**   I DID.

2    **Q.**   OKAY.  WHAT IS INTENDED TO BE SHOWN HERE?

3    **A.**   SO, THIS IS A SETTING WHERE CREATORS OF CONTENT WANT TO

4    KNOW WHETHER CONTENT IS BEING ACCESSES.  FOR EXAMPLE, IF A

5    DOCUMENT IS A VALUABLE DOCUMENT TO A COMPANY OR GOVERNMENT

6    ACCESS THEY MIGHT WANT TO KNOW WHEN SOMEBODY IS TRYING TO

7    ACCESS THAT CONTEXT.

8    **Q.**   IS THAT THE BASIC NOTION OF "TRACKING" IN THE TITLE OF THE

9    PATENT?

10   **A.**   THAT'S RIGHT.

11   **Q.**   SO, THIS SLIDE REFERS TO THE HIDING ACCESS?

12   **A.**   THAT'S RIGHT.  SO IF A MISCREANT WERE TO TRY, FOR EXAMPLE,

13   ACCESS -- WERE TRYING TO ACCESS THE DOCUMENT, AND THEY WEREN'T

14   SUPPOSED TO.  THEY WERE TRYING TO HIDE THE FACT THAT THEY WERE

15   ATTEMPTING TO LOOK INTO THE DOCUMENT, THEY WOULDN'T BE ALLOWED

16   TO ACCESS IT.

17   **Q.**   WHAT ARE THE CORE CONTENTS OF THIS '670 PATENT?

18   **A.**   WE ARE TRYING TO SHOW HERE THAT IF A LEGITIMATE USER WHO

19   TRIES TO ACCESS THE CONTENT, AND UNDER THE '670 PATENT WHEN

20   THEY TRY TO ACCESS THE CONTENT THE NOTIFICATION WOULD BE SENT

21   TO THE SERVER.  AND IF A BAD PERSON WERE TRYING TO ACCESS THIS

22   CONTENT AND VERIFICATION WAS STOPPED, THEN THE BAD PERSON

23   WOULDN'T BE ALLOWED TO ACCESS THE CONTENT.  THAT IS WHAT WE

24   ARE TRYING TO ELICIT HERE.

25   **Q.**   OKAY.  THANK YOU.  AND THIS NEXT SLIDE, SLIDE 14, WHAT IS

1  SHOWN HERE, DR. DEVANBU?

2  **A.**   THE IDEA HERE IS ESSENTIALLY THAT THE CONTENT, ONCE IT IS

3  PROTECTED, COULD BE FREELY SENT TO RECIPIENTS.  AND FROM THAT

4  RECIPIENT TO SUCCESSIVE RECIPIENTS.  AND THE CREATOR OF THE

5  CONTENT COULD ALWAYS HAVE THE CONFIDENCE THAT WHOEVER RECEIVED

6  IT, WHEN THEY WERE TRYING TO OPEN IT, SOMEBODY WOULD BE

7  NOTIFIED THEY WERE TRYING TO ACCESS IT.  SO THIS WAY THEY CAN

8  TRACK THE ACCESS, ATTEMPTS TO ACCESS THIS CONTENT.

9  **Q.**   ALL RIGHT.  LET'S TAKE A QUICK LOOK AT CLAIM 45 OF THE

10  '670 PATENT.  COULD YOU AT JUST A VERY HIGH LEVEL SUMMARIZE

11  HOW THIS OPERATES?

12  **A.**   SO ESSENTIALLY THERE ARE FOUR ELEMENTS TO THE CLAIM 45,

13  WHICH SAYS YOU CREATE SOME CONTENT, AND THEN YOU MAKE SURE

14  THAT THE CONTENT CANNOT BE ACCESSED UNTIL NOTIFICATION

15  INFORMATION, COLLECTIVE EXECUTION INSTRUCTIONS HAS BEEN

16  TRANSMITTED.

17      THEN YOU CAN SEND THIS FILE WHICH HAS THIS PROTECTION TO

18  AT LEAST ONE ADDRESS.  SO SOMEBODY HAS TO ACTUALLY GET IT.

19  AND THEN, WHEN SOMEBODY TRIES TO ACCESS IT, YOU GET

20  NOTIFICATION WHEN A SUCCESSIVE RECIPIENT OTHER THAT THE

21  IMMEDIATE RECIPIENT TRIES TO ACCESS IT.

22          **MR. DINOVO:**  YOUR HONOR, MAY I APPROACH THE WITNESS?

23  I JUST HAVE A LASER POINTER.

24          **THE COURT:**  YES.

25          **MR. DINOVO:**  THANK YOU.

1    **THE WITNESS:**  MAY I GET SOME MORE WATER, PLEASE?

2    **THE CLERK:**  THERE IS NO WATER IN THERE?

3    **THE WITNESS:**  I AM SORRY.  THERE IS A LITTLE BIT.

4    **THE COURT:**  THE OTHER GUY SPILLED IT ALL.

5    (PAUSE IN THE PROCEEDINGS.)

6    **THE CLERK:**  NO PROBLEM.

7    (PAUSE IN THE PROCEEDINGS.)

8    **MR. DINOVO:**  AND, YOUR HONOR, WE ARE JUST PUTTING UP

9    SIMPLY THE CLAIM LANGUAGE OF THE '670 AND '541 PATENTS.

10    **THE COURT:**  YOU MIGHT HAVE A PROBLEM BECAUSE YOU ARE

11    BLOCKING THE OTHER ATTORNEYS WITH THOSE.  GENERALLY, WE FIND

12    THE ONLY WAY YOU CAN DO THAT SORT OF THING IS PUT IT OVER ON

13    THE SIDE.

14    **MR. DINOVO:**  ALL RIGHT.

15    **THE COURT:**  AT THAT POINT YOU MAY BE BLOCKING THE

16    MONITOR, BUT MAYBE NO ONE IS USING THAT ONE.  THEN YOU WILL

17    HAVE TO MOVE IT WHEN THE JURY COMES AND GOES BECAUSE --

18    **MR. DINOVO:**  WE WILL CERTAINLY DO THAT.  WE THOUGHT

19    IT MIGHT BE USEFUL AS WE ARE WALKING THROUGH TO HAVE THE

20    CLAIMS TO REFER TO SINCE THERE IS ONLY A HANDFUL OF THEM.

21    **THE WITNESS:**  I HAVE A LASER, BUT I CAN'T FIGURE OUT

22    HOW TO WORK THIS THING.

23    **MR. DINOVO:**  MAY I APPROACH, YOUR HONOR?

24    **THE WITNESS:**  I GOT IT.

25    (PAUSE IN THE PROCEEDINGS.)

1     **BY MR. DINOVO:**

2     **Q.**  ALL RIGHT, SIR.  SO WE HAVE THE CLAIMS, THE ASSERTED

3     CLAIMS OF THE '670 PATENT OVER HERE.  UNFORTUNATELY, THEY ARE

4     A LITTLE BIT OBLIQUE TO YOU.

5     **A.**  OKAY.  THAT'S FINE.

6     **Q.**  AT LEAST THE JURY CAN SEE THEM.

7         THEN WE HAVE THE CLAIMS OF THE '541 PATENT OVER ACROSS THE

8     ROOM HERE.

9     **A.**  OKAY.

10    **Q.**  SO IF DURING THE COURSE OF YOUR TESTIMONY THIS AFTERNOON

11    IF YOU WOULD LIKE TO MAKE REFERENCE TO THEM, AT LEAST YOU KNOW

12    THEY ARE WITHIN THE SIGHT OF THE JURY.

13    **A.**  THANK YOU.

14    **Q.**  LET'S TURN TO CLAIM 52 OF THE '670 PATENT.

15        FIRST OF ALL, SIR, DO YOU HAVE AN UNDERSTANDING AS TO WHAT

16    A DEPENDENT CLAIM IS?

17    **A.**  YES, I DO.

18    **Q.**  WHAT IS IT?

19    **A.**  DEPENDENT CLAIM IS ONE THAT ELABORATES ON SOME ASPECT OF

20    THE INDEPENDENT CLAIM.  IN THIS CASE 45 IS THE INDEPENDENT

21    CLAIM AND 52 IS THE DEPENDENT CLAIM.

22    **Q.**  IF YOU CAN KEEP IT AT AN EVEN PACE, THANK YOU.

23        SO CLAIM 52, WHAT DOES IT ADD TO CLAIM 45?

24    **A.**  SO CLAIM 52 SAYS, ALL THE STEPS OF THE CLAIM 45 WHERE WHEN

25    THE FIRST STEP WHEN YOU CREATE THE FILE YOU ACTUALLY ENCRYPT

1    THE CONTENT.

2    **Q.**  ALL RIGHT.  THANK YOU.

3        AT A HIGH LEVEL CAN YOU EXPLAIN WHAT ENCRYPTION IS?

4    **A.**  WHAT WE SEE HERE IS AN EXAMPLE OF SOME ENCRYPTED TEXT.  IT

5    LOOKS LIKE GIBBERISH.  THERE IS NO WAY TO KNOW WHAT IT MEANS.

6    IT CANNOT BE DECRYPTED WITHOUT A KEY, AND THE KEY IS SHOWN

7    NEXT.

8        IN THIS CASE THE KEY IS A VERY SIMPLE SUBSTITUTION

9    SOFTWARE KEY.  IT JUST MEANS THE LETTER A IS REPLACED BY THE

10   LETTER P, AND SO ON.  FROM THE PLAIN TEST TO THE CIPHERTEXT.

11       SO IF YOU WANT TO GO THE OTHER WAY YOU JUST REPLACE THE P

12   BY THE A --

13           **THE COURT:**  I THINK YOU ARE SPEAKING TOO FAST FOR THE

14   REPORTER.

15           **THE WITNESS:**  I AM SORRY.  NEVER DONE THIS BEFORE.

16       SO, YES.  THE P GETS REPLACED BY THE A, IN ORDER TO DO

17   DECRYPTION, SO --

18           **THE COURT:**  YOU ALSO NEED TO KEEP -- KEEP SPEAKING

19   DIRECTLY INTO THE MICROPHONE.  IF YOU DON'T HEAR YOUR VOICE

20   COMING OUT OF THE CEILING IT MEANS YOU ARE NOT SPEAKING INTO

21   THE MICROPHONE.

22           **THE WITNESS:**  I APOLOGIZE.

23       SO, YOU WILL REPLACE THE LETTERS IN THE BOTTOM BY THE

24   CORRESPONDING LETTERS ON THE TOP.  AND THAT IS THE KEY.  AND

25   IF YOU HAVE KNOWLEDGE OF THAT KEY, THEN YOU CAN TAKE THE

1    GIBBERISH-LOOKING TEXT FROM THE TOP, AND YOU CAN DECRYPT IT

2    AND OBTAIN THE -- WHAT IS CALLED "THE PLAIN TEXT" IN THE

3    BOTTOM.

4        THE KEY ALLOWS YOU TO DECRYPT THE GIBBERSH.

5    **Q.**  THANK YOU.  AND I THINK YOU SAID THIS IS A VERY SIMPLE

6    TYPE OF ENCRYPTION?

7    **A.**  YES, IT IS VERY EASILY BROKEN.

8    **Q.**  YOU HEARD DOCTOR -- EXCUSE ME -- MR. JONES TESTIFYING BY

9    VIDEO ABOUT A NUMBER OF ENCRYPTION TYPES IMPLEMENTED IN THE

10   FLASH PROGRAM.

11   **A.**  THAT'S RIGHT.

12   **Q.**  WOULD THOSE BE MORE COMPLEX OR SIMPLER THAN THIS?

13   **A.**  MUCH MORE COMPLEX.

14   **Q.**  LET'S TALK A LITTLE BIT ABOUT THE CLAIMS OF THE '541

15   PATENT, SIR.

16       SO, WHAT IS SHOWN ON THIS SLIDE?

17   **A.**  SO THE '541 PATENT USES A PARTICULAR REGULATION WHERE YOU

18   FIRST CHECK AND SEE WHETHER THERE IS A PERMISSION THAT IS

19   PRE-EXISTING, WHETHER IT CAME WITH THE DOCUMENT OR SOMEHOW IS

20   PRE-EXISTING.  AND IF IT DOESN'T PRE-EXIST WE ASK AN EXTERNAL

21   SERVER FOR PERMISSION.  AND THAT SERVER CHECKS THE BUSINESS

22   RULES AND RETURNS A TOKEN.  AND IF NO AUTHORIZATION TOKEN IS

23   RECEIVED, THEN ACCESS WOULD BE DENIED.

24   **Q.**  ALL RIGHT.  AND YOU MAY HAVE ALREADY BASICALLY GONE

25   THROUGH THIS, BUT IS THAT THE HIGH-LEVEL VIEW OF YOUR

```
1    INTERPRETATION OF CLAIM 1?

2    A.  YES.  THAT'S RIGHT.

3    Q.  HOW ABOUT CLAIM 2 -- EXCUSE ME.  WHAT DOES CLAIM 2 ADD TO

4    CLAIM 1?

5    A.  CLAIM 2 SAYS THAT CERTAIN ELEMENTS OF CLAIM 1 ARE

6    PERFORMED AT THE CLIENT.

7    Q.  WHICH ELEMENTS ARE THOSE, SIR?

8    A.  THAT WOULD BE THE REQUESTING THE PERMISSION, RECEIVING THE

9    TOKEN AND SELECTIVELY GRANTING RESOURCE ACCESS.

10   Q.  WHAT IS THIS SLIDE?

11   A.  THIS SLIDE SHOWS IN THE ANIMATION THAT EVERYTHING

12   HAPPENS -- ALL THOSE STEPS HAPPEN AT THE CLIENT RIGHT HERE.

13   Q.  IS CLAIM 4 ALSO ASSERTED IN THIS CASE?

14   A.  YES.  CLAIM 4 SAYS THAT THE PERMISSION COMPRISES A UNIQUE

15   CODED KEY CORRESPONDING TO THE CONTENT.

16   Q.  HOW -- WHAT IS A UNIQUE CODED KEY?

17   A.  A KEY THAT IS SPECIFIC TO THE CONTENT.

18   Q.  ALL RIGHT.  AND HOW IS THAT SHOWN HERE?

19   A.  SO, WHAT IS SHOWN HERE IS THAT THE TOKEN THAT IS RECEIVED

20   INCLUDES INFORMATION THAT CAN BE USED TO PRODUCE THE UNIQUE

21   CODED KEY.

22   Q.  ALL RIGHT.  DO YOU KNOW IF CLAIM 13 IS ALSO AN ASSERTED

23   CLAIM IN THIS CASE?

24   A.  YES, IT IS.

25   Q.  WHAT DOES CLAIM 13 ADD TO CLAIM 1?
```

1    **A.**  WHAT CLAIM 13 SAYS IS THAT AS A RESULT OF A REQUEST TO THE

2    SERVER THERE ARE SOME BUSINESS RULES OR SOME COMPUTATIONS THAT

3    OCCUR AT THE SERVER TO DETERMINE IF THE TOKEN SHOULD BE

4    GRANTED.

5    **Q.**  ALL RIGHT.  AND WE TOUCHED ON THIS BEFORE, BUT ARE THE

6    SPECIFIC BUSINESS RULES THAT MIGHT BE USED FOR THE

7    AUTHORIZATION PROCESS RELEVANT TO THIS CLAIM?

8    **A.**  THE CLAIM IS VERY GENERAL, AND IT DOESN'T SAY ANYTHING

9    SPECIFIC ABOUT THE AUTHORIZATION PROCEDURE ITSELF.

10   **Q.**  COULD YOU GIVE US A REAL WORLD EXAMPLE OF A TYPE OF

11   AUTHORIZATION PROCEDURE?  FOR EXAMPLE, ARE YOU FAMILIAR WITH

12   ROLE-BASED ACCESS?

13   **A.**  YES.  SO YOU MIGHT DETERMINE WHETHER THE PERSON REQUESTING

14   THE ACCESS IS AT A CERTAIN LEVEL IN THE ORGANIZATION OR PLAYS

15   A CERTAIN ROLE BEFORE THEY ARE ALLOWED TO ACCESS THE CONTENT.

16   **Q.**  THANK YOU.

17        SO WHAT IS DEPICTED HERE?

18   **A.**  SO, WHAT IS DEPICTED HERE IS THAT THE REQUEST THAT COMES

19   FROM THE CLIENT RIGHT HERE, TRIGGERS -- I AM SORRY.  THAT

20   SHOULD SAY "PERMISSION." IT RECEIVES A REQUEST, AND THEN THEY

21   EXECUTE AN AUTHORIZATION PROCESS.  AND AS A RESULT OF THE

22   AUTHORIZATION PROCESS -- THEY RECEIVE THE PERMISSION REQUEST,

23   AND THEN THEY EXECUTE AN AUTHORIZATION PROCESS.  AND THEN,

24   AFTER THAT, THEY RETURN THE RESULT AS A RESULT OF THE

25   AUTHORIZATION PROCESS.

1    **Q.**  SO FROM WHAT SYSTEM TO WHAT SYSTEM IS THE –– IS THE

2    PERMISSION REQUEST SENT?

3    **A.**  THE PERMISSION REQUEST ARISES FROM THE CLIENT.

4    **Q.**  AND IT IS RECEIVED AT THE SERVER?

5    **A.**  YES, THAT'S CORRECT.

6    **Q.**  AND THE REQUEST IS PROCESSED WHERE?

7    **A.**  THE REQUEST IS PROCESSED AT THE SERVER.

8    **Q.**  ALL RIGHT.  AND IT'S THEN THAT RESULT IS RETURNED TO WHICH

9    SYSTEM?

10   **A.**  IT IS RETURNED BACK TO THE CLIENT.

11        **THE COURT:**  WE ARE ABOUT DUE FOR A BREAK.  IS THIS A

12   GOOD TIME, OR IS THIS A GOOD STOPPING POINT.

13        **MR. DINOVO:**  THIS IS PERFECT.  THANK YOU.

14        **THE COURT:**  IT IS FIVE TO 12.  WE'LL RETURN AT

15   12:10.

16        AND I GUESS –– I HAVEN'T RECEIVED A NOTE FROM ANY OF YOU

17   ABOUT HAVING A PROBLEM STAYING UNTIL 3:30 TOMORROW.  EVERYONE

18   IS OKAY WITH THAT?  WE WON'T START UNTIL 10:30 TOMORROW IN

19   CASE I FORGET TO REMIND YOU OF THAT.

20        YOU MAY STEP DOWN, SIR.

21        (RECESS TAKEN AT 11:55 A.M.; RESUMED AT 12:10 P.M.)

22        (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

23        **THE CLERK:**  WE ARE WAITING ON ONE.

24        **THE COURT:**  YOU CAN GO AHEAD AND BE SEATED.

25        YOU MAY PROCEED.

1      **MR. DINOVO:**  THANK YOU, YOUR HONOR.

2   **BY MR. DINOVO:**

3   **Q.**  DR. DEVANBU, DO YOU KNOW IF THE TERM "TOKEN" HAS BEEN

4   CONSTRUED BY THIS COURT?

5   **A.**  YES, IT HAS.

6   **Q.**  WHAT IS THE CONSTRUCTION THAT THIS COURT ISSUED FOR THE

7   TERM "TOKEN"?

8   **A.**  THE TERM "TOKEN", WHICH IS REFERRED TO -- I'M HAVING

9   TROUBLE POINTING THERE.

10  **Q.**  I DON'T HAVE THE PATENT CLAIM UP ON THE SCREEN, BUT WE ARE

11  GOING TO SET IT UP HERE FOR THE JURY.

12  **A.**  OKAY.

13      SO THE TERM "TOKEN", ACCORDING TO THE COURT'S

14  CONSTRUCTION, REFERS TO A FILE THAT INDICATES WHETHER THE

15  TRANSACTION HAS BEEN APPROVED AND ACCESS SHOULD BE GRANTED.

16  **Q.**  ALL RIGHT.

17      I WOULD LIKE YOU TO TAKE A LOOK AT WHAT ADOBE'S COUNSEL

18  TOLD THIS JURY THAT WE HAD TO PROVE TO PREVAIL IN THIS CASE ON

19  OUR INFRINGEMENT CLAIM.  ALL RIGHT?

20  **A.**  YES.

21      **MR. DINOVO:**  MS. MASON, CAN YOU PLEASE PUT UP SLIDE

22  AD 1022?

23                  (PUBLISHED TO JURY.)

24      THANK YOU.

25

1    **BY MR. DINOVO:**

2    **Q.**  SIR, DO YOU SEE ON THE TOP OF THIS SLIDE WHICH WAS TAKEN

3    FROM ADOBE COUNSEL'S PRESENTATION, IT SAYS:

4        "'541 PATENT REQUIREMENTS FOR INFRINGEMENT, YES/NO TOKEN."

5        THERE IS DEPICTED HERE WHAT LOOKS TO BE -- WHAT IS SHOWN

6    HERE?

7    **A.**  ON THE LEFT IT SHOWS 128 BIT SEQUENCE.  ON THE RIGHT IT

8    SHOWS ADOBE AND A BOX WITH TWO LITTLE BOXES INSIDE IT AND A

9    DOCUMENT KEY.

10   **Q.**  ALL RIGHT.

11       AND YOU TESTIFIED THAT THE COURT'S CONSTRUCTION FOR TOKEN

12   IS A FILE INDICATING WHETHER THE TRANSACTION HAS BEEN APPROVED

13   AND ACCESS SHOULD BE GRANTED.

14       IS THERE ANYTHING AT ALL IN THE COURT'S CONSTRUCTION ABOUT

15   128 BITS?

16   **A.**  NO.

17   **Q.**  IS THERE ANYTHING AT ALL IN THE COURT'S CONSTRUCTION ABOUT

18   127 BITS OF DUMMY INFO?

19   **A.**  NO, IT DOES NOT.

20   **Q.**  IS THERE ANYTHING AT ALL IN THE COURT'S CONSTRUCTION THAT

21   USES THE WORDS "YES/NO"?

22   **A.**  NO.

23       **MS. MEHTA:**  OBJECTION, YOUR HONOR.  THIS IS EXACTLY

24   THE ISSUE THAT WE RAISED IN MOTION IN LIMINE NUMBER 20

25   REGARDING THE CLAIM CONSTRUCTION RULING AND WITNESSES NOT

1    TESTIFYING ON ISSUES THAT ARE INCONSISTENT WITH THE COURT'S

2    REASONING ON CLAIM CONSTRUCTION.  AND HE JUST OFFERED

3    TESTIMONY THAT'S FLATLY CONTRADICTED BY THE COURT'S RULING.

4              **THE COURT:**  WELL, I DON'T -- WE WILL HAVE TO TAKE

5    THAT UP ANOTHER TIME.

6         BUT WHAT'S IN THE CLAIM CONSTRUCTION ITSELF IS NOT THE

7    FULL PATENT.  THERE ARE MANY, MANY WORDS IN THAT PATENT THAT

8    AREN'T CONSTRUED BY THE COURT AT ALL BECAUSE THEY WEREN'T

9    DISPUTED.  SO THE FACT THAT SOMETHING ISN'T IN THE CLAIM

10   CONSTRUCTION ITSELF DOESN'T MEAN IT ISN'T IN -- SOMEWHERE ELSE

11   IN THE PATENT.

12        WE'LL JUST HAVE TO TAKE THAT UP ANOTHER TIME.

13             **MS. MEHTA:**  YES, YOUR HONOR, WE WILL RAISE IT AFTER.

14        THANK YOU.

15   **BY MR. DINOVO:**

16   **Q.**  OKAY, SIR.  BUT AT LEAST AS FAR AS THE TERM "TOKEN" THAT

17   HAS BEEN CONSTRUED BY THE COURT, DID YOU APPLY OR IS YOUR

18   ANALYSIS CONSISTENT WITH THE COURT'S CLAIM CONSTRUCTION FOR

19   TOKEN?

20   **A.**  YES, IT IS.

21   **Q.**  OKAY.  NOW LET'S TURN, SIR, TO YOUR ANALYSIS OF

22   INFRINGEMENT ITSELF.

23   **A.**  OKAY.

24   **Q.**  ARE YOU AWARE THAT MY CLIENT HAS ACCUSED ADOBE ACTIVATION

25   TECHNOLOGY OF INFRINGEMENT?

DEVANBU – DIRECT / DINOVO

```
1    A.   YES.

2    Q.   DID YOU ANALYZE THAT ACTIVATION TECHNOLOGY?

3    A.   YES, I DID.

4    Q.   COULD YOU INTRODUCE THE JURY TO THE BASIC PREMISE OR

5    CONCEPT OF ADOBE'S ACTIVATION TECHNOLOGY?

6    A.   IT IS -- INTENDED TO PREVENT PEOPLE WHO DON'T HAVE

7    LEGITIMATE COPIES OF ADOBE SOFTWARE FROM USING THEM.

8    Q.   OKAY.  ADOBE SOFTWARE SUCH AS ACROBAT?

9    A.   THAT'S CORRECT.

10   Q.   WHAT IS ADOBE LICENSE MANAGER?

11   A.   ADOBE LICENSE MANAGER IS A TECHNOLOGY THAT APPLIES DIGITAL

12   RIGHTS MANAGEMENT TO ADOBE SOFTWARE.

13   Q.   HOW DOES IT WORK AT A HIGH LEVEL?

14   A.   AT A HIGH LEVEL, BASICALLY IT WORKS BY CHECKING TO SEE IF

15   SOME PRE-EXISTING LICENSE EXISTS ON THE MACHINE WHERE

16   SOMEBODY'S TRYING TO USE THE SOFTWARE.  AND IF IT DOESN'T

17   EXIST, IT REQUESTS PERMISSION FROM A SERVER.  AND THEN IF THAT

18   PERMISSION IS OBTAINED, THEN IT ALLOWS THE USER TO ACCESS THE

19   SOFTWARE.

20   Q.   WHAT DID YOU DO, DR. DEVANBU, TO ASCERTAIN WHETHER OR NOT

21   ADOBE INFRINGED?

22   A.   I LOOKED AT THE DOCUMENTS MADE AVAILABLE BY ADOBE AND THE

23   SOURCE CODE.

24   Q.   ALL RIGHT.

25        SO, IF YOU COULD PLEASE LOOK IN YOUR BINDER TO PLAINTIFF'S
```

1    EXHIBIT 16.

2    **A.**  I'M SORRY, I DON'T HAVE THE BINDER HERE.  I HAVE THE

3    SOURCE CODE BINDER.

4          **MR. DINOVO:**  MAY I APPROACH, YOUR HONOR?

5          **THE COURT:**  YES.

6                (BINDER HANDED TO WITNESS.)

7          **THE WITNESS:**  THANK YOU.

8       I'M SORRY, THIS IS ALSO THE SOURCE CODE BINDER.

9          **MR. DINOVO:**  ALL RIGHT.

10               (EXHIBIT BINDER HANDED TO WITNESS.)

11   **BY MR. DINOVO:**

12   **Q.**  ARE WE THERE NOW?

13   **A.**  YES.

14   **Q.**  OKAY.

15      SO HAVE YOU SEEN EXHIBIT 16 BEFORE?

16   **A.**  YES, I HAVE.

17   **Q.**  WHAT IS IT?

18   **A.**  IT'S A DOCUMENT DESCRIBING THE FUNCTIONALITY OF ADOBE

19   LICENSE MANAGER.

20   **Q.**  WHAT IS THE DOCUMENT'S TITLE?

21   **A.**  "ADOBE LICENSE MANAGER".

22   **Q.**  DOES IT APPEAR TO BE A TRUE AND CORRECT COPY?

23   **A.**  YES, IT DOES.

24          **MR. DINOVO:**  WE OFFER INTO EVIDENCE PLAINTIFF'S

25   EXHIBIT 16.

1    **MS. MEHTA:**  NO OBJECTION.

2    **THE COURT:**  RECEIVED.

3    (PLAINTIFF'S EXHIBIT 16 RECEIVED IN EVIDENCE)

4                    (PUBLISHED TO JURY.)

5    **BY MR. DINOVO:**

6    **Q.**  YOU MENTIONED THAT YOU HAVE THE SOURCE CODE BINDER, SIR?

7    **A.**  YES.

8    **Q.**  DID YOU REVIEW SOURCE CODE IN CONNECTION WITH YOUR

9    ANALYSIS OF THE ADOBE ACTIVATION TECHNOLOGY?

10   **A.**  YES, I DID.

11   **Q.**  WHAT IS SOURCE CODE?

12   **A.**  SOURCE CODE IS A HUMAN READABLE FORM OF WHAT A COMPUTER

13   PROGRAM DOES.

14   **Q.**  WHY —— LET ME START OVER.

15        WAS IT IMPORTANT FOR YOU, IN THE PERFORMANCE OF YOUR

16   ANALYSIS, TO REVIEW THE SOURCE CODE?

17   **A.**  SOURCE CODE IS WHAT IS USED BY PROGRAMMERS TO WRITE THE

18   SOFTWARE TO UNDERSTAND IT AND TO MAINTAIN IT.  AND IT GETS

19   DIRECTLY AND AUTOMATICALLY CONVERTED INTO WHAT ACTUALLY RUNS

20   ON YOUR MACHINE.

21        SO, THE SOURCE CODE IS THE MOST ACCURATE REPRESENTATION OF

22   WHAT ACTUALLY HAPPENS WHEN A SYSTEM RUNS.

23   **Q.**  COULD YOU REFER, IN THE SOURCE CODE EXHIBIT, TO ——

24   **A.**  SOURCE CODE?

25   **Q.**  —— PLAINTIFF'S EXHIBIT 175C, AND TAKE A LOOK AT THAT.

 1    **A.**  YES, I HAVE IT.

 2    **Q.**  ALL RIGHT.

 3       COULD YOU LOOK IT OVER AND SEE IF THAT APPEARS TO BE THE

 4    COLLECTION OF SOURCE CODE AND RELATED DOCUMENTS THAT ADOBE HAS

 5    PRODUCED RELATING TO ACTIVATION TECHNOLOGY?

 6    **A.**  YES, IT DOES.

 7          **MR. DINOVO:**  YOUR HONOR, WE WOULD OFFER EXHIBIT 175C

 8    INTO EVIDENCE.  AND MY UNDERSTANDING IS ADOBE HAS ASKED THAT

 9    WE WAIT UNTIL THE END OF ALL OF THE EVIDENCE IS IN AND THEN

10    PRESENT A SINGLE SEALED VERSION OF THIS.

11          **THE COURT:**  YOU WANT TO SUBMIT SOURCE CODE TO THE

12    JURY?

13          **MR. DINOVO:**  WELL, IT'S ACTUALLY A COLLECTION OF

14    DOCUMENTS THAT THEY'VE -- SOME OF WHICH ARE SOURCE CODE AND

15    OTHERS OF WHICH THEY HAVE IDENTIFIED AS SOURCE CODE PROTECTION

16    DOCUMENTS.

17          **THE COURT:**  I DOUBT IT, BUT I WILL TAKE THAT UNDER

18    SUBMISSION.

19          **MR. DINOVO:**  ALL RIGHT.  THANK YOU, YOUR HONOR.

20       MS. MASON, CAN YOU PLEASE PUT ON PRESENTATION 2?

21          **THE COURT:**  YOU CAN USE IT IF YOU WANT TO PUT SOURCE

22    CODE UP ON THE SCREEN OR SOMETHING, BUT I DON'T THINK WE WILL

23    BE SUBMITTING LARGE AMOUNTS OF SOURCE CODE TO THE JURY AS

24    EVIDENCE.

25          **MR. DINOVO:**  ALL RIGHT, YOUR HONOR.  BUT IT'S OKAY IF

1    WE REFER TO IT IN THE PRESENTATIONS?

2              **THE COURT:**  YES.

3              **MR. DINOVO:**  THANK YOU.

4                   (PUBLISHED TO JURY.)

5    **BY MR. DINOVO:**

6    **Q.**  ALL RIGHT.  IS THIS A DEMONSTRATIVE THAT YOU PREPARED

7    RELATING TO YOUR ANALYSIS OF WHETHER OR NOT ADOBE'S ACTIVATION

8    TECHNOLOGY INFRINGES THE '541 PATENT?

9    **A.**  THAT'S CORRECT.

10   **Q.**  SO IF YOU WOULD DESCRIBE AGAIN HOW ADOBE'S ACTIVATION

11   TECHNOLOGY WORKS AT A HIGH LEVEL?

12   **A.**  SO THE IDEA WOULD BE THAT SOMEBODY IS TRYING TO USE THE

13   SOFTWARE, BUT THE SOFTWARE IS SURROUNDED BY THIS KIND OF

14   PROTECTION MECHANISM.  WHEN THEY TRY TO ACCESS THE SOFTWARE,

15   THE PROTECTION MECHANISM SENDS REQUESTS FOR ACCESS TO THE

16   SERVER AND THE SERVER RETURNS A LICENSE TOKEN.  AND BASED ON

17   THE TOKEN, THE -- THE USER'S GIVEN ACCESS TO THE SOFTWARE.

18   **Q.**  AT THAT POINT THEY CAN USE THE SOFTWARE?

19   **A.**  YES.  THAT'S CORRECT.

20   **Q.**  WHAT IS YOUR UNDERSTANDING AS TO WHY THIS MIGHT BE OF

21   INTEREST TO ADOBE?

22   **A.**  SO, I TRIED TO SUMMARIZE ON THIS SLIDE THAT ADOBE, LIKE

23   MANY SOFTWARE COMPANIES, CREATE SOFTWARE THAT'S EXPENSIVE TO

24   CREATE AND PEOPLE MAY WISH TO PIRATE IT AND USE IT WITHOUT

25   PAYING FOR IT.  SO ADOBE HAS A DIVISION TO REGULATE USE OF THE

1   SOFTWARE SO PEOPLE DON'T USE IT WITHOUT PROPER AUTHORIZATION.

2       SO, ADOBE SOFTWARE IS PACKAGED WITH INSTRUCTIONS IN THE

3   LICENSE MANAGER CODE THAT REQUESTS PERMISSION FROM A SERVER TO

4   RUN THE SOFTWARE UPON ATTEMPT TO USE IT.  AND IF A TOKEN

5   GRANTING PERMISSION IS NOT RECEIVED, THEN THE ADOBE SOFTWARE

6   WILL NOT RUN.

7           **MS. MEHTA:**  OBJECTION, YOUR HONOR, THAT -- AND MOVE

8   TO STRIKE.  THE WITNESS HAS NO FOUNDATION TO TALK ABOUT

9   ADOBE'S MOTIVATIONS OR LACK OF MOTIVATIONS.

10          **MR. DINOVO:**  I THINK IT'S PRETTY CLEAR, YOUR HONOR,

11  THEY PUT DRM PROTECTIONS IN TO AVOID PIRACY.

12          **THE COURT:**  OH, BUT THAT WAS AWAYS BACK.

13          **MS. MEHTA:**  NO, HE JUST -- HE HAD A LONG ANSWER, BUT

14  HIS LONG ANSWER INCLUDED HIS ASSUMPTIONS AS TO MOTIVATIONS ON

15  ADOBE'S PART FOR WHICH HE HAS NO FOUNDATION.

16          **THE COURT:**  OKAY.  WELL, IF HE SAID THAT, THAT IS NOT

17  SOMETHING HE WOULD KNOW.

18  **BY MR. DINOVO:**

19  **Q.**  SIR, LET'S RUN THROUGH, IF WE COULD, THE STEPS OF THE '541

20  PATENT CLAIM 1.

21  **A.**  OKAY.

22      SO THE STEPS ARE TO FIRST SEE IF THE CLIENT HAS A

23  PRE-EXISTING PERMISSION TO ACCESS THE SOFTWARE.  IF THEY DO,

24  THEN THERE'S NO NEED TO CHECK AGAIN.

25      IF THE CLIENT DOES NOT, THEN WE REQUEST PERMISSION FROM

1    THE EXTERNAL SOURCE, IN THIS CASE IT'S THE LICENSE MANAGER.

2    AND THEN FROM THE EXTERNAL SOURCE, HE RECEIVE PERMISSION TO

3    USE THE SOFTWARE -- RECEIVE A TOKEN.  AND BASED ON THE TOKEN,

4    WE GRANT ACCESS TO ACCESS THE SOFTWARE.

5    **Q.**  ALL RIGHT.  AND THERE HAS TO BE A GENERATION PROCESS, DOES

6    THERE NOT?

7    **A.**  THAT'S RIGHT.

8        THE TOKEN IS VALUABLE, IN SOME SENSE, IT'S VALUABLE

9    INFORMATION.  SO IT HAS TO BE SOMEHOW DECODED AND PROCESSED TO

10   EXTRACT THE PERMISSION FROM THE TOKEN BECAUSE OTHERWISE

11   SOMEBODY ELSE MAY STEAL THAT.

12   **Q.**  DID YOU USE THE CLAIM LANGUAGE ITSELF AS YOUR BASIS FOR

13   ANALYZING INFRINGEMENT?

14   **A.**  YES.  I USED THE CLAIM LANGUAGE AND THE CONSTRUCTIONS

15   PROVIDED BY THE COURT.

16   **Q.**  ALL RIGHT.

17       AND GIVEN -- ARMED WITH THOSE TWO TOOLS, THE CLAIM

18   LANGUAGE AND THE CONSTRUCTIONS PROVIDED BY THE COURT, LET'S GO

19   BACK TO OUR EARLIER LINE OF QUESTIONING.

20       DO YOU SEE ANYTHING IN THERE ABOUT 128 BITS OR DUMMY BITS

21   OR ANYTHING OF THAT NATURE?

22   **A.**  NO, I DID NOT.

23   **Q.**  ALL RIGHT.

24       LET'S TALK ABOUT THE FIRST STEP IN THE CONTEXT OF ADOBE

25   ACTIVATION AND LICENSING TECHNOLOGY.  ALL RIGHT, SIR?

1    **A.**  YES.

2    **Q.**  WHAT DOES SLIDE 8 SHOW?

3    **A.**  SLIDE 8 SHOWS AN EXCERPT FROM AN ADOBE DOCUMENT ABOUT THE

4    LICENSE MANAGER.  AND IT SHOWS HOW THE DOCUMENT DESCRIBES THAT

5    THE FIRST ELEMENT OF THE CLAIM IS USED IN ADOBE TECHNOLOGY.

6    **Q.**  OKAY.  SO HOW FREQUENTLY WHEN ALM –– AN ALM ENABLED

7    APPLICATION RUNS IS THERE A CHECK FOR AN E-LICENSE?

8    **A.**  EVERY TIME IT RUNS.  IT FIRST CHECKS AND SEES IF THE

9    LICENSE EXISTS ON THE USER'S MACHINE.

10   **Q.**  WHAT HAPPENS IF NO LOCAL E-LICENSE IS FOUND?

11   **A.**  THEN THEY GO TO STEP TWO, BUT IF IT DOESN'T EXIST, IT

12   REQUESTS PERMISSION FROM AN EXTERNAL SOURCE.

13   **Q.**  ALL RIGHT.

14       DO YOU SEE THE DESIGNATION AT THE BOTTOM OF THE PAGE

15   "PX16"?

16   **A.**  YES.

17   **Q.**  DOES THAT CORRESPOND TO THE PLAINTIFF'S EXHIBIT 16 THAT WE

18   HAVE ENTERED INTO EVIDENCE?

19   **A.**  THAT'S RIGHT.

20   **Q.**  THANK YOU.

21       I DON'T WANT TO HAVE EVERYONE IN THE JURY'S EYES GLAZE

22   OVER HERE, DR. DEVANBU, BUT I THOUGHT IT WOULD BE USEFUL FOR

23   YOU TO EXPLAIN, AT LEAST TO THE HIGH LEVEL, THE TYPES OF

24   ROUTINES AND CALLS THAT ACTUALLY ACCOMPLISH THIS FUNCTIONALITY

25   BASED ON YOUR SOURCE CODE REVIEW.

1      ALL RIGHT?

2   **A.**  YES.

3   **Q.**  COULD YOU PLEASE RUN THROUGH WHAT IS DEPICTED BY THESE

4   BOXES?

5   **A.**  YES.  IN GENERAL, TO DIVIDE UP THE WORK OF BUILDING A

6   LARGE SOFTWARE SYSTEM, IT'S DIVIDED UP INTO MODULES.  AND THE

7   MODULES GET ASSIGNED TO INDIVIDUALS OR TEAMS.

8      SO WHEN YOU ARE TRACING THROUGH CODE TO TRY AND UNDERSTAND

9   WHAT'S HAPPENING, ONE NEEDS TO LOOK AT THE MODULES AND HOW THE

10  MODULES ESSENTIALLY CONNECT TO OR EXCHANGE INFORMATION WITH

11  EACH OTHER IN ORDER TO ACCOMPLISH THE OVERALL GOAL.

12     SO ESSENTIALLY WHAT I'M SHOWING HERE IS WHAT I FOUND WHEN

13  I LOOKED AT THE ADOBE SOURCE CODE, A SET OF -- A WHOLE SET OF

14  MODULES IN DIFFERENT SOURCE FILES.  THE SOURCE FILES ARE

15  DEPICTED BY THINGS LIKE WINMAIN.CPP.  AND THE MODULE NAMES ARE

16  SHOWN IN OPEN AND CLOSE PARENTHESES.

17     FOR EXAMPLE, YOU SEE NAMES LIKE WINMAIN OPEN CLOSE ON THE

18  TOP LEFT.  THAT'S WHERE EVERYTHING STARTS.

19     THEN THERE'S A WHOLE CHAIN OF CALLS THAT ARE -- THAT I

20  TRACED THROUGH.  AND FINALLY WE STOPPED AT A MODULAR CALLED

21  ALM LICENSE CHECK WHICH IS GOING TO BE CRITICAL IN EXECUTING?

22  MULTIPLE STEPS.  SO WE'LL GET TO THAT NEXT.

23  **Q.**  SO BEFORE WE DO GO THERE, I SEE SOME NOTATIONS ON THESE

24  RECTANGLES, IF YOU WILL, AND THERE IS A DESIGNATION OF A-SC.

25     DO YOU KNOW WHAT THAT REFERS TO?

DEVANBU – DIRECT / DINOVO

1   **A.**   THAT REFERS TO WHAT LAWYERS CALL BATES NUMBERS, WHICH,

2   ESSENTIALLY, IS A REFERENCE NUMBER THAT IS PLACED ON EVERY

3   DOCUMENT TO IDENTIFY IT LATER.

4   **Q.**   DO YOU KNOW IF THAT REFERS TO THE ADOBE SOURCE CODE THAT

5   YOU LOOKED AT AS EXHIBIT 175?

6   **A.**   YES.  I JUST ABBREVIATED IT TO A–SC TO FIT IN THOSE BOXES.

7   IT STANDS FOR ADOBE SOURCE CODE.

8   **Q.**   AND THAT'S THE SOURCE CODE THAT YOU REFER TO AS ADOBE

9   EXHIBIT 175C?

10   **A.**   CORRECT.

11   **Q.**   THERE'S ALSO LINE NUMBERS HERE.  WHAT ARE THE LINE NUMBERS

12   INDICATE?

13   **A.**   THE LINE NUMBERS ARE LINE NUMBERS WITHIN THE FILE.

14        SO, JUST FOR EASE OF REFERENCE THERE'S FILE LINE NUMBERS.

15   SO THE BATES NUMBERS REFERS THE WHOLE PAGE AND THE LINE

16   NUMBERS REFERS TO LINE NUMBERS THAT ARE SHOWN IN THE LEFT–HAND

17   COLUMN.

18   **Q.**   SO YOU'VE IDENTIFIED SPECIFIC FILES OR FUNCTIONS AND THE

19   LINE NUMBERS THAT CALL THE OTHER ONES FOR PERFORMANCE OF THIS

20   STEP?

21   **A.**   THAT'S CORRECT.

22   **Q.**   ALL RIGHT.

23        LET'S TURN TO THE NEXT SLIDE.  WHAT'S SHOWN HERE?

24                    (PUBLISHED TO JURY.)

25   **A.**   OKAY.  SO THIS MODULAR FUNCTION CALLED "ALM LICENSE CHECK"

1    PLAYS A CRITICAL ROLE IN THE INFRINGEMENT SCENARIO.

2        SO THIS ROUTINE -- I HAVE HIGHLIGHTED IT TO SHOW IT IS

3    IMPORTANT.  YOU WILL SEE IT IN TWO SUCCESSIVE SLIDES.

4        THIS IS THE ONE THAT FIRST THROUGH A LONG SERIES OF CALLS,

5    YOU KNOW, CHECKS TO SEE WHETHER PRE-EXISTING PERMISSION EXISTS

6    ON THE MACHINE.

7        IF WE JUST KEEP GOING FORWARD, WE WILL FINALLY GET TO THE

8    LAST FUNCTION IN THE LOWER RIGHT.  IT'S THIS FUNCTION CALLED

9    ALM -- ON THE LOWER RIGHT THAT'S HIGHLIGHTED -- "ALM PRODUCT

10   LICENSE PRI SCAN" THAT ACTUALLY CHECKS IN THE LOCAL STORAGE TO

11   SEE IF THERE IS A PRE-EXISTING PERMISSION.  PEOPLE GIVE THESE

12   FUNCTIONS LONG NAMES SO THEY'RE EASY TO UNDERSTAND.  IT'S FOR

13   HUMAN CONSUMPTION.

14   **Q.**  I SEE.  ALL RIGHT.

15       AND WHAT DOES SLIDE 11 SHOW?

16                   (PUBLISHED TO JURY.)

17   **A.**  SLIDE 11 BASICALLY IS A RECAP SHOWING THAT THE CODE THAT

18   WE JUST SHOWED CORRESPONDS TO THE DOCUMENTATION THAT WAS

19   PROVIDED BY THE ADOBE LICENSE MANAGER.  SO IT'S ESSENTIALLY A

20   REPEAT OF -- IT JUST SHOWS THAT THE TWO CORRESPOND, THE

21   DOCUMENT AND THE SOURCE CODE.

22   **Q.**  OKAY.  IS THIS ANOTHER DEPICTION OF THE PROCESS OF THE

23   SECOND ELEMENT?

24   **A.**  YES.  IT'S QUITE A COMPLICATED CHART.  BUT BASICALLY IT

25   STARTS WITH THE SAME ROUTINE SHOWN IN THE UPPER LEFT.  AND YOU

1   WILL SEE SOME ANIMATIONS THAT SHOW HOW THE CONTROL FLOWS.  TO

2   GET IT ON THE SCREEN, THERE'S SORT OF A COMPLICATED LAYOUT.

3        BUT, FINALLY, I'D JUST LIKE TO POINT YOU TO THE TWO

4   METHODS IN THE LOWER RIGHT, STEP ONE AND STEP TWO, ON THE

5   LOWER RIGHT OF THE CHART.  MAYBE I CAN POINT AT IT.  SO, THIS

6   ONE IS STEP ONE.  THIS ONE IS STEP TWO (INDICATING).

7        THEY'RE BOTH CALLED FROM THIS ROUTINE OVER HERE.  I AM

8   SORRY, THEY'RE CALLED FROM THIS ROUTINE OVER HERE

9   (INDICATING).

10        THIS IS THE STEP THAT COLLECTS DATA RELATIVE TO THE

11   LICENSE REQUEST; SUGGEST A SERIAL NUMBER OF THE MACHINE, AND

12   SO ON.  THEN THAT DATA GETS SENT IN THIS METHOD HERE, ALM HTTP

13   SEND.

14        NOW YOU MAY NOT ALL RECOGNIZE HTTP.  IT'S THE STANDARD WEB

15   PROTOCOL BECAUSE ALL THE WEB URL'S START WITH THE HTTP.  SO

16   THIS IS A STANDARD PROTOCOL TO SEND THE REQUEST TO THE LICENSE

17   SERVER.

18        AND THIS CALL IS ANOTHER ROUTINE CALL, ALM HTTP SEND

19   INTERNAL, WHICH IS ESSENTIALLY ACTUALLY SENDS THE REQUEST.

20   **Q.**  WHAT IS HTTP AN ACRONYM FOR?

21   **A.**  HYPERTEXT TRANSFER PROTOCOL.

22   **Q.**  AND YOU SAID THAT'S A STANDARD WEB REQUEST.  THAT IS THE

23   SORT OF -- IS THAT THE SORT OF COMMUNICATION THAT OCCURS ON

24   THE INTERNET ALL THE TIME?

25   **A.**  YES.  WHEN YOU TYPE IN A WEB URL, HTTP REFERS TO THIS

1     PARTICULAR PROTOCOL.

2     **Q.**   THANK YOU.

3          LET'S TURN TO THE NEXT ELEMENT OF THE '541 PATENT,

4     ELEMENT 2.

5          SORRY, ELEMENT 3.

6     **A.**   WE JUST WENT THROUGH ELEMENT 2.

7     **Q.**   WE DID, INDEED.

8          SO, RECEIVING FROM THE EXTERNAL SOURCE A TOKEN.  DID YOU

9     REVIEW THE SOURCE CODE AND THE ADOBE DOCUMENTATION TO

10    ASCERTAIN WHETHER THIS ELEMENT WAS PRESENT?

11    **A.**   YES.

12         SO YOU WILL SEE IN THE SOURCE CODE THAT -- THAT THIS IS

13    THE PLACE WE WERE THE LAST TIME.  I'M JUST SHOWING IT FOR

14    CONTEXT.

15         BECAUSE THE REQUEST THAT WAS SENT FROM ALM TRUSTSTORAGE

16    THROUGH THESE, ESSENTIALLY COMES BACK.  JUST LIKE WHEN YOU

17    TYPE IN A URL IN THE BROWSER, IT EVENTUALLY COMES BACK AND

18    DISPLAYS THE WEB CONTENT.

19         IN THE SAME WAY THIS REQUEST ESSENTIALLY COMES BACK AND

20    RETURNS A VALUE TO THIS MODULE.  AND THEN THAT DATA, YOU KNOW,

21    WHEN IT COMES BACK -- KEEP GOING -- GETS SENT TO THIS METHOD.

22    AND YOU CAN RECOGNIZE FROM THE NAME, WHICH IS ALM RPC

23    DISASSEMBLE ACTIVATION RESPONSE, THAT REFERS TO TAKING THE

24    RESPONSE FROM THE HTTP REQUEST AND DISASSEMBLING IT,

25    CALCULATING WITH IT TO SEE WHAT TO DO WITH THE RESPONSE.

1    SO THAT IS WHAT THIS BIT DOES.

2  **Q.**  IS THAT OPERATING AT THE CLIENT SIDE?

3  **A.**  IT'S OPERATING AT THE CLIENT'S SIDE.

4  **Q.**  LET'S TURN TO THE FINAL ELEMENT OF CLAIM 1.

5    BASED ON THE RECEIVED TOKEN, EXECUTING AN INSTALLATION

6  PROCESS.

7    DID YOU ANALYZE THAT ELEMENT AS WELL?

8  **A.**  YES, I DID.  AND --

9  **Q.**  WAS IT PRESENT?

10 **A.**  YES.

11 **Q.**  ALL RIGHT.

12   WHAT IS SHOWN ON THIS SLIDE?

13               (PUBLISHED TO JURY.)

14 **A.**  IT'S THE SAME SLIDE TO SHOW YOU HOW THE REQUEST IS SENT.

15 AND WE ARE GOING TO COME BACK AND SEE IN A SUBSEQUENT SLIDE

16 HOW THE RESPONSE IS PROCESSED.

17   SO, THIS RESPONSE BACKS ALL THE WAY UP TO THIS METHOD.

18   WE CAN KEEP GOING.

19   SO -- AND THEN THIS RESPONSE, BASED ON THE RECEIVED

20 REQUEST, IT CALLS THIS ROUTINE CALLED ALM TRUSTSTORAGE

21 ACTIVATE LICENSE.

22   THE TRUST STORAGE IS THE LOCAL TRUSTED STORAGE WHICH LOCKS

23 IN THE PERMISSION TO USE THE SOFTWARE.  SO THAT ROUTINE CALLS

24 THIS OTHER ROUTINE CALLED ALM UPDATE FULFILLMENT INFORMATION.

25 AND THEN THAT, ESSENTIALLY THROUGH A VARIETY OF ROUTINES, WE

DEVANBU – DIRECT / DINOVO

1   CAN KEEP GOING.  UPDATE SOMETHING CALLED THE PRODUCT

2   CONFIGURATION DATABASE, WHICH IS THE STORAGE THAT LOCKS IN THE

3   PERMISSION THAT WAS RECEIVED.

4   **Q.**  ALL RIGHT, SIR.

5       SO JUST SO I'M CLEAR, WHAT IS THE TOKEN -- WHAT SATISFIES

6   THE TOKEN IN THIS CONTEXT?

7   **A.**  IT'S A LICENSE THAT'S RECEIVED FROM THE ALM LICENSE

8   SERVER.

9   **Q.**  ALL RIGHT.  AND WHAT SATISFIES THE PERMISSION?

10  **A.**  THE PERMISSION IS A SPECIALIZED PIECE OF CRYPTOGRAPHIC

11  DATA, THAT IS SECRETLY ENCODED DATA, THAT'S PRESENT INSIDE THE

12  LICENSE TOKEN.  AND THAT CRYPTOGRAPHIC DATA HAS TO BE CHECKED

13  AND DECODED AT THE CLIENT BEFORE IT IS ACCEPTED AS A

14  PERMISSION.

15  **Q.**  THANK YOU.

16      DURING THE COURSE OF THE OPENING, ADOBE HAS MADE AN ISSUE

17  OF WHETHER SOMETHING MAY BE GENERATED AT THE CLIENT OR AT THE

18  SERVER.  IN YOUR ASSESSMENT, IS THE PERMISSION HERE GENERATED

19  AT THE CLIENT?

20  **A.**  THE PERMISSION IS GENERATED AT THE CLIENT.

21  **Q.**  IS IT CONSISTENT, IN YOUR VIEW, WITH THE LANGUAGE OF

22  CLAIM 1 THAT INFORMATION WOULD BE OBTAINED FROM THE SERVER IN

23  ORDER TO GENERATE THE PERMISSION?

24  **A.**  YES, IT IS.

25  **Q.**  IN FACT, DR. DEVANBU, ISN'T IT REQUIRED THAT

1    INFORMATION -- AND THE COURT'S CONSTRUCTION I THINK WAS A FILE

2    INDICATING WHETHER THE TRANSACTION HAD BEEN APPROVED AND

3    ACCESS SHOULD BE GRANTED -- ISN'T IT REQUIRED BY THE CLAIM

4    THAT THAT INFORMATION BE OBTAINED FROM AN EXTERNAL SOURCE?

5    **A.**  YES.

6              **MS. MEHTA:**  OBJECTION, YOUR HONOR, LEADING.

7              **THE COURT:**  SUSTAINED.

8              **MR. DINOVO:**  I WILL REPHRASE THE QUESTION.

9    **BY MR. DINOVO:**

10   **Q.**  WHAT DO YOU UNDERSTAND AN EXTERNAL SOURCE TO BE IN THE

11   CONTEXT OF CLAIM 1 AND WHAT IS ITS ROLE?

12   **A.**  IT'S THE ALM LICENSE SERVER IS THE EXTERNAL SOURCE.

13   **Q.**  OKAY.  THAT'S IN THE CONTEXT OF ACTIVATION SPECIFICALLY?

14   **A.**  YES.

15   **Q.**  MORE GENERALLY, YOUR READING OF CLAIM 1, WHAT IS THE ROLE

16   OF THE EXTERNAL SOURCE?

17   **A.**  THE EXTERNAL SOURCE PROVIDES A LICENSE TOKEN WHICH

18   CONTAINS INFORMATION THAT ALLOWS THE CLIENT TO DECIDE WHETHER

19   TO GRANT ACCESS OR NOT.

20   **Q.**  THANK YOU.

21        ALL RIGHT.  LET'S TALK ABOUT -- BEFORE WE MOVE TO CLAIM 2,

22   IS IT YOUR OPINION, DR. DEVANBU, THAT ADOBE ACTIVATION

23   TECHNOLOGY MEETS EACH AND EVERY ELEMENT OF CLAIM 1 LITERALLY?

24   **A.**  YES, IT DOES.

25   **Q.**  WHO IS PERFORMING EACH AND EVERY STEP OF THE CLAIM METHOD?

1   **A.**  IT WOULD BE USERS WHO ARE RUNNING ADOBE SOFTWARE ON THEIR

2   MACHINES.

3   **Q.**  DOES ADOBE PROVIDE INSTRUCTIONS TO ITS USERS OR OTHERWISE

4   REQUIRE ITS USERS TO PERFORM THOSE STEPS?

5   **A.**  IF THEY RUN ADOBE SOFTWARE, THESE THINGS WILL HAPPEN.

6   **Q.**  AND WHAT HAPPENS IF THEY SOMEHOW DISABLE OR CIRCUMVENT THE

7   ACTIVATION PROCESS?

8   **A.**  YOU WOULD REQUIRE A LOT OF SKILL TO DEFEAT IT.  IT WOULD

9   BE VERY DIFFICULT.

10  **Q.**  BUT IF -- MY QUESTION WAS A LITTLE DIFFERENT, WHICH IS:

11  IF THEY SOMEHOW STOP THIS COMMUNICATION TO THE SERVER, WHAT

12  HAPPENS?

13  **A.**  ANY SUCH NAIVE EFFORT WOULD BE RESISTED AND THE SOFTWARE

14  WOULD NOT RUN.

15  **Q.**  LET'S TURN TO CLAIM 2 OF THE PATENT.  AND I THINK YOU'VE

16  TESTIFIED THAT THIS REQUIRES CERTAIN THINGS TO OCCUR AT THE

17  CLIENT.

18  **A.**  YES.

19  **Q.**  IS IT YOUR OPINION THAT CLAIM 2 IS ALSO INFRINGED BY ADOBE

20  ACTIVATION SOFTWARE?

21  **A.**  YES, SIR.

22  **Q.**  WHY IS THAT YOUR OPINION?

23  **A.**  BECAUSE THE STEPS LISTED IN THE CLAIM OCCUR AT THE CLIENT.

24  **Q.**  ALL RIGHT.  LET'S TURN TO CLAIM 4, DR. DEVANBU.

25  **A.**  OKAY.

1   **Q.**  WHAT, JUST TO SUMMARIZE AGAIN, WHAT DOES CLAIM 4 REQUIRE

2   IN ADDITION TO CLAIM 1?

3   **A.**  CLAIM 4 REQUIRES THAT THE PERMISSION HAS A UNIQUE CODED

4   KEY WHICH CORRESPONDS TO THE DIGITAL CONTENT.

5   **Q.**  DOES THE PERMISSION OF THE ACTIVATION TECHNOLOGY THAT

6   ADOBE PROVIDES HAVE A UNIQUE CODED KEY?

7   **A.**  IT DOES.

8   **Q.**  WHAT IS SHOWN ON THIS SLIDE?

9                       (PUBLISHED TO JURY.)

10  **A.**  SO, BASICALLY WHAT IS SHOWN HERE IS THAT WHEN ONE OF THOSE

11  METHODS THAT WE TALKED ABOUT RECEIVES A RESPONSE FROM THE

12  SERVER, IT PULLS OUT A PARTICULAR FIELD CALLED FLEX ACTIVATION

13  RESPONSE.  THIS FIELD IS UNIQUELY CODED AND MUST BE DECODED AT

14  THE CLIENT'S SIDE BY A PROPRIETARY FLEX LM SOFTWARE, AND IT'S

15  CHECKED TO MAKE SURE IT'S VALID.

16          **MS. MEHTA:**  OBJECTION, YOUR HONOR, IF WE CAN HAVE THE

17  SLIDE TAKEN DOWN TO ADDRESS ONE ISSUE WITH YOUR HONOR?

18                       (SLIDE REMOVED.)

19          **MS. MEHTA:**  YOUR HONOR, THERE'S A REFERENCE AT THE

20  BOTTOM, THE LAST LINE OF THE SLIDE WHICH VIOLATES ONE OF THE

21  COURT'S MOTION IN LIMINE RULINGS.  THIS IS ALSO A EXCERPT FROM

22  THE EXPERT REPORT WHICH SHOULDN'T BE PUBLISHED TO THE JURY.

23          **MR. DINOVO:**  WHAT MOTION IN LIMINE ARE YOU REFERRING

24  TO?

25          **MS. MEHTA:**  LOOK AT THE LAST LINE.  THAT'S AN

1    IMPROPER CHARACTERIZATION OF DISCOVERY.

2              **THE COURT:**  THE LAST LINE OF THE BLUE BOX?

3              **MS. MEHTA:**  LAST LINE OF THE BLUE BOX, YES, YOUR

4    HONOR.

5              **MR. DINOVO:**  WE CAN STRIKE THAT IF THAT'S

6    PROBLEMATIC.

7              **THE COURT:**  OKAY.

8    **BY MR. DINOVO:**

9    **Q.**  SO, PUTTING ASIDE THE TEXT, LET'S JUST NOT LEAVE THE SLIDE

10   UP.

11       WHAT -- WHAT ABOUT THE SOURCE CODE WAS INDICATIVE TO YOU,

12   DR. DEVANBU, ABOUT THE -- THE PRESENCE OF A UNIQUE CODED KEY?

13   **A.**  SO, WITH REFERENCE TO CLAIM 4, THE RESPONSE THAT IS

14   RECEIVED FROM THE SERVER IS PROCESSED AT THE CLIENT TO EXTRACT

15   A PARTICULAR KEY WHICH IS USED BY SPECIAL SOFTWARE AT THE

16   CLIENT SIDE TO DECODE IT -- TO BE DECODED AND CHECKED.  IF IT

17   IS DECODED AND IT CHECKS OUT, THEN THE CLIENT SIDE IS ALLOWED

18   TO ACCESS IT.

19       THIS IS IMPORTANT BECAUSE IF ANYBODY COULD MAKE UP THE

20   DATA THAT'S SENT BACK TO THE CLIENT, THEN ANYBODY COULD USE

21   IT.  SO THE DATA THAT'S SENT BACK HAS TO BE CHECKED AND

22   DECODED.

23       SO SOME KIND OF STRONG CRYPTOGRAPHIC PARAMETERS ARE

24   REQUIRED WITHIN THE DATA TO BE CHECKED.

25   **Q.**  THANK YOU, DR. DEVANBU.

1         **MR. DINOVO:**  MS. MASON, CAN YOU TURN TO SLIDE 23?

2      WE WOULD LIKE TO REPUBLISH THIS TO THE JURY --

3         **THE CLERK:**  I WASN'T AT MY DESK.

4         **MR. DINOVO:**  I'M SORRY.

5                    (PUBLISHED TO JURY.)

6   **BY MR. DINOVO:**

7   **Q.**  DR. DEVANBU, DID YOU ALSO ANALYZE WHETHER OR NOT CLAIM 13

8   OF THE '541 PATENT WAS INFRINGED BY ADOBE ACTIVATION

9   TECHNOLOGY?

10  **A.**  I DID.

11  **Q.**  WHAT YOUR CONCLUSION?

12  **A.**  IT WAS INFRINGING.

13  **Q.**  WHAT IS IT THAT CLAIM 13 REQUIRES?

14  **A.**  CLAIM 13, IT REQUIRES THAT WHEN YOU REQUEST A PERMISSION

15  FROM AN EXTERNAL SOURCE, THAT EXTERNAL SOURCE EXECUTES SOME

16  KIND OF AUTHORIZATION PROCEDURE BEFORE DETERMINING WHETHER TO

17  SEND BACK THE TOKEN OR NOT.

18  **Q.**  ALL RIGHT.

19      AND WHAT IS SHOWN ON THIS SLIDE?

20  **A.**  SO WHAT WE ARE SHOWING HERE IS, WHEN A REQUEST IS MADE TO

21  RUN SOME SOFTWARE, THEN THE CREDENTIALS ARE SENT TO THE

22  SERVER.  AND THEN THE NEXT SLIDE.

23      BEFORE THE TOKEN IS SENT BACK -- WE CAN KEEP GOING -- SO

24  THIS IS THE ORIGINAL SLIDE.  WE CAN KEEP GOING TO THE NEXT

25  SLIDE.

1        OKAY.  SO WHEN THE REQUEST IS RECEIVED AT THE SERVER, IT

2   INITIATES A PROCESS WHEN THE HTTP REQUEST IS RECEIVED TO CHECK

3   AND SEE IF THE LICENSE SHOULD INDEED BE GRANTED TO THE

4   REQUESTING CLIENT BASED ON AUTHORIZATION PROCESS.

5   **Q.**  ALL RIGHT.  AND FROM WHICH DEVICE IS THE REQUEST SENT?

6   **A.**  FROM THE CLIENT.

7   **Q.**  ALL RIGHT.  SO IS IT ALSO TRUE AND -- THAT ALL OF THE

8   STEPS OF CLAIM 13 ARE PERFORMED AT THE CLIENT?

9   **A.**  THAT'S CORRECT.

10  **Q.**  IF YOU COULD REFER AGAIN, SIR, TO PLAINTIFF'S EXHIBIT 16

11  IN YOUR BINDER.

12  **A.**  YES.

13  **Q.**  LET'S TURN TO THE FIRST PAGE.

14  **A.**  YES.

15        **MR. DINOVO:**  I WOULD LIKE, MS. MASON, PLAINTIFF'S

16  EXHIBIT 16, PAGE 1.

17      (PUBLISHED TO JURY.)

18      COULD YOU BLOW UP THE FIRST COUPLE OF PARAGRAPHS?

19  **BY MR. DINOVO:**

20  **Q.**  ALL RIGHT, SIR, I AM HAVING TROUBLE SEEING THE SCREEN.

21      DOES IT INDICATE ON THAT DOCUMENT THAT ADOBE LICENSE

22  MANAGER IS EMBEDDED?

23  **A.**  YES.  ADOBE LICENSE MANAGER, THE SECOND PARAGRAPH, IS AN

24  EMBEDDED E-LICENSE MANAGEMENT SYSTEM THAT ENABLES AUTOMATED

25  LICENSE MANAGEMENT.

1    **Q.**  WHAT DOES IT MEAN TO BE EMBEDDED?

2    **A.**  THAT MEANS THAT IT IS A PART OF OTHER APPLICATIONS.

3    **Q.**  SO WHATEVER USER ACQUIRES THAT APPLICATION IS GOING TO GET

4    THIS AS A PART OF IT?

5    **A.**  THAT'S RIGHT.

6    **Q.**  ALL RIGHT.

7         **MR. DINOVO:**  MS. MASON, CAN YOU PLEASE TURN TO 16,

8    PAGE 7?

9                         (PUBLISHED TO JURY.)

10   **BY MR. DINOVO:**

11   **Q.**  IF YOU COULD PLEASE REFER TO THAT, DR. DEVANBU.

12        DO YOU SEE A SECTION THAT SAYS "HOW ALM WORKS" AT THE

13   BOTTOM OF THE PAGE, THE LAST PARAGRAPH?

14   **A.**  YES.

15   **Q.**  AND JUST TO RECAP, I THINK SOME OF THIS WAS IN YOUR

16   PRESENTATION, BUT THIS IS -- WHAT DOES THIS PARAGRAPH INDICATE

17   IN TERMS OF THE FREQUENCY WITH WHICH ALM OPERATES?

18   **A.**  SO EACH TIME AN ALM ENABLED APPLICATION RUNS, IT CHECKS

19   FOR AN E-LICENSE ON THE USER'S MACHINE.  SO THAT HAPPENS EVERY

20   TIME IT RUNS.

21   **Q.**  AND WHAT HAPPENS, IF YOU LOOK TOWARDS THE MIDDLE, THE

22   SENTENCE STARTING "ONCE", WHAT HAPPENS IF AN E-LICENSE IS

23   RECEIVED?

24   **A.**  ONCE AN E-LICENSE IS DOWNLOADED, NO FURTHER COMMUNICATION

25   WITH THE SERVER IS REQUIRED.

1    **Q.**  WHY NOT?

2    **A.**  BECAUSE BEFORE RUNNING IT, FIRST CHECKS TO SEE IF IT IS

3    AVAILABLE LOCALLY.  AND IF IT IS, IT DOESN'T MAKE THE REMOTE

4    REQUEST.

5    **Q.**  IS THAT CONSISTENT WITH THE REQUIREMENT IN CLAIM 1?

6    **A.**  YES, IT IS.

7    **Q.**  THANK YOU.

8            **MR. DINOVO:**  MS. MASON, PLEASE PUT UP ADOBE PAGE 17

9    FROM ITS OPENING?

10            **THE CLERK:**  I'M SORRY WHAT?

11            **MR. DINOVO:**  THIS IS A DEMONSTRATIVE.

12            **THE CLERK:**  OH.

13                (PUBLISHED TO JURY.)

14    **BY MR. DINOVO:**

15    **Q.**  ALL RIGHT, SIR.

16      DURING ADOBE'S OPENING, THEY IDENTIFIED TWO KEY ISSUES IN

17    THE CASE WHICH LEFT THE IMPRESSION THAT THESE WERE THE ISSUES

18    THAT THE CASE TURNED ON, AT LEAST TO SOME.

19      ONE WAS THE RECEIVING -- THE RECEIPT OF A YES NO TOKEN

20    FROM A SERVER, AND THE OTHER IS, IF YES, GENERATE AT THE

21    CLIENT A PERMISSION LOCKED TO THE CLIENT.

22      LET'S TAKE THEM IN TURN.

23      FIRST OF ALL, YOU'VE READ TO THE JURY AND YOU'VE APPLIED

24    IN YOUR OWN WORK THE COURT'S CONSTRUCTION OF TOKEN, RIGHT?

25    **A.**  CORRECT.

1    **Q.**  DOES THAT CONSTRUCTION INCLUDE THE TERM "YES NO"?

2    **A.**  NO.

3          **MS. MEHTA:**  OBJECTION, YOUR HONOR.  THIS IS THE SAME

4    ISSUE IN TERMS OF A VIOLATION OF THE COURT'S RULING ON THE

5    MOTION IN LIMINE AND ELICITING TESTIMONY THAT'S DIRECTLY

6    CONTRARY TO THE COURT'S CLAIM CONSTRUCTION RULING.

7          **THE COURT:**  OKAY.  YOU'VE BEEN OVER THIS "YES NO"

8    THING BEFORE, AND WE'LL TAKE THAT UP LATER.

9        IF YOU CAN GIVE ME A PAGE AND LINE CITE, THOUGH.

10          **MS. MEHTA:**  I WILL HAVE THAT READY FOR YOU.

11       DO YOU WANT IT NOW?  YES.

12                  (PAUSE IN THE PROCEEDINGS.)

13          **MS. MEHTA:**  YOUR HONOR, THAT WOULD BE IN THE CLAIM

14   CONSTRUCTION ORDER AT PAGE 6, LINES 21 TO 23.  AND YOUR

15   HONOR'S ADMONITION TO THE COUNSEL FOR DIGITAL REG IN THE

16   MOTION IN LIMINE ORDER --

17          **THE COURT:**  THAT'S FINE.  I KNOW WHERE THAT IS.

18          **MS. MEHTA:**  AT 32.

19          **MR. DINOVO:**  MAY I RESPOND, YOUR HONOR, BRIEFLY?

20          **THE COURT:**  NOT NOW.

21   **BY MR. DINOVO:**

22   **Q.**  ALL RIGHT, SIR.  YOU APPLIED WHAT THE COURT SAID A TOKEN

23   MEANS, RIGHT, NOT WHAT ADOBE SAID?

24   **A.**  CORRECT.

25   **Q.**  AND APPLYING WHAT THE COURT SAID A TOKEN MEANS IN THIS

1    CASE FOR PURPOSES OF YOUR INFRINGEMENT ANALYSIS, WAS THAT

2    PRESENT?

3    **A.**  YES.

4    **Q.**  HOW ABOUT THE GENERATION OF THE -- AT THE CLIENT A

5    PERMISSION LOCK TO THE CLIENT.

6    **A.**  THAT WAS PRESENT.

7    **Q.**  ALL RIGHT.  THIS TERM "GENERATE".  WHAT DOES THAT MEAN TO

8    YOU?

9    **A.**  I BELIEVE THE COURT HAS SAID THAT GENERATION MEANS THAT

10   THERE'S SOME INFORMATION RECEIVED FROM THE SERVER.  AND THAT

11   INFORMATION IS PROCESSED AT THE CLIENT TO GENERATE A

12   PERMISSION.

13   **Q.**  ALL RIGHT.  AND APPLYING THAT UNDERSTANDING OF THE TERM

14   "GENERATION", IT'S PRESENT IN ADOBE ACTIVATION TECHNOLOGY?

15   **A.**  IT IS.

16   **Q.**  THANK YOU.

17        LET'S TURN TO THE '670 PATENT VERSUS THE SAME TECHNOLOGY,

18   ALL RIGHT?

19             **MR. DINOVO:**  IF WE CAN PLEASE CHANGE.

20        THANK YOU.

21                  (PUBLISHED TO JURY.)

22   **BY MR. DINOVO:**

23   **Q.**  SIR, THIS IS EXHIBIT 3 IN YOUR BOOK.

24   **A.**  YES.

25   **Q.**  CAN YOU READ FROM WHERE YOU ARE SITTING THE PREAMBLE OF

1    THE '670 PATENT?

2    **A.**   IT'S NOT ON THIS PAGE.

3    **Q.**   ALL RIGHT.

4    **A.**   I'M SORRY.

5    **Q.**   IF YOU REFER TO YOUR NOTEBOOK, YOU WILL SEE EXHIBIT 3.

6    **A.**   I'M SORRY.

7                     (PAUSE IN THE PROCEEDINGS.)

8    **A.**   A METHOD OF TRACKING ELECTRONIC CONTENT.

9    **Q.**   ALL RIGHT.  THANK YOU.

10       SO WHAT DOES THAT MEAN TO YOU -- OR WHAT WOULD THAT MEAN

11   TO A PERSON OF ORDINARY SKILL IN THE ART?

12   **A.**   IT MEANS A WAY TO TRACK WHEN SOMEBODY IS ACCESSING

13   PROTECTED CONTENT.

14   **Q.**   THANK YOU.

15           **MR. DINOVO:**  SO, IF WE CAN PUT UP PRESENTATION 3?

16                    (PUBLISHED TO JURY.)

17   **BY MR. DINOVO:**

18   **Q.**   ALL RIGHT.  SO IS THIS A PRESENTATION THAT YOU PUT

19   TOGETHER, DR. DEVANBU, ABOUT --

20   **A.**   YES.

21   **Q.**   -- YOUR ANALYSIS OF THE '670 RELATIVE TO ACTIVATION?

22   **A.**   RIGHT.  YES.

23   **Q.**   WHAT'S SHOWN ON SLIDE 3?

24   **A.**   WHAT'S BEING SHOWN HERE IS THAT THIS TECHNOLOGY ALLOWS

25   SOMEBODY TO FREELY DISTRIBUTE SOME ELECTRONIC CONTENT OVER THE

1    INTERNET, THROUGH DISK, OR USB STICKS, OR WHATEVER.

2        AND WHENEVER IT'S RECEIVED AND SOMEBODY TRIES TO ACCESS

3    IT, IT'S POSSIBLE TO SEND AND COLLECT TRACKING INFORMATION.

4    **Q.**  ALL RIGHT.  HAVE YOU -- ARE YOU AWARE OF WHETHER OR NOT

5    THE COURT HAS CONSTRUED THE TERM "SUCCESSIVE RECIPIENT" IN

6    THIS CASE?

7    **A.**  YES.

8    **Q.**  WHAT IS THAT CONSTRUCTION?

9    **A.**  SUCCESSIVE RECIPIENT IS SOMEBODY WHO RECEIVES THE CONTENT

10   FROM ANOTHER USER.

11   **Q.**  OKAY.  LET'S TURN TO SLIDE 4 THAT'S SHOWN HERE.

12                        (PUBLISHED TO JURY.)

13   WHAT'S SHOWN ON SLIDE 4, SIR?

14   **A.**  WHAT THIS SHOWS IS ESSENTIALLY WHEN SOMEBODY TRIES TO

15   ACCESS UNPROTECTED CONTENT, THERE'S SOME COMMUNICATION WITH

16   THE SERVER THAT SENDS SOME INFORMATION UP TO THE SERVER.  AND

17   WITHOUT THAT INFORMATION BEING RECEIVED, THE SOFTWARE WILL NOT

18   RUN.

19   **Q.**  ALL RIGHT.  LET'S TURN TO THE ACTUAL CLAIM LANGUAGE OF THE

20   '670 PATENT ON SLIDE 7.  AND IT'S ALSO ON THE POSTER BOARD.

21       WHAT -- COULD YOU WALK US THROUGH THE STEPS OF CLAIM 45 OF

22   THE '670 PATENT?

23   **A.**  SO, THE ELEMENTS -- THE FIRST ELEMENT OF THE CLAIM IS THAT

24   YOU CREATE A FILE THAT HAS ELECTRONIC CONTENT IN IT.  AND THE

25   METHOD CAUSES ACCESS TO THE CONTENT TO BE DENIED UNTIL

DEVANBU – DIRECT / DINOVO

```
 1   NOTIFICATION INFORMATION COLLECTED BY EXECUTION INSTRUCTIONS
 2   HAS BEEN SUCCESSFULLY TRANSMITTED.
 3   Q.  WHAT IS NOTIFICATION INFORMATION?
 4   A.  COULD BE ANY INFORMATION.  SOMETHING THAT HAS TO DO WITH
 5   WHO IS USING IT.  COULD BE ANYTHING ASSOCIATED WITH THAT.
 6   Q.  WHAT IS IT USED FOR?
 7   A.  IT COULD BE USED FOR A VARIETY OF PURPOSES.  IT COULD BE
 8   USED TO TRACK WHO IS USING THE DOCUMENT.  IT COULD BE USED TO
 9   REGULATE ACCESS TO THE DOCUMENT.  IN FACT, IT COULD BE USED
10   FOR A VARIETY OF THINGS.
11   Q.  THEN TRANSMITTING THE FILE TO AT LEAST ONE ADDRESS, WHAT
12   IS GOING ON THERE?
13   A.  SO, THIS ALLOWS YOU TO DISTRIBUTE THE DOCUMENT TO ANYONE
14   WHO MAY WANT TO HAVE IT, BUT WHEN THEY TRY TO ACCESS IT, IT
15   WILL BE TRACKED.
16   Q.  AND THEN FINALLY, RECEIVING NOTIFICATION INFORMATION FROM
17   A SUCCESSIVE RECIPIENT.
18       WHO'S DOING THE RECEIVING HERE?
19   A.  SO, THE NOTIFICATION IS RECEIVED BY SOME SORT OF SERVER.
20   Q.  SO IS THIS THE SAME AS CLAIM -- AS THE '541 PATENT WHERE
21   EVERYTHING IS HAPPENING AT THE CLIENT?
22   A.  THIS IS DIFFERENT.  HERE THE NOTIFICATION IS COLLECTED BY
23   A SERVER.
24   Q.  LET'S TURN TO SLIDE 8.
25                   (PUBLISHED TO JURY.)
```

1       WHAT IS SHOWN HERE, SIR?

2   **A.**  SO THIS IS AN EXCERPT FROM A DOCUMENT PROVIDED IN PX175.

3       ESSENTIALLY, THIS SAYS THAT IN ORDER TO VALIDATE A

4   LICENSE, YOU HAVE TO SEND A SERIAL NUMBER TO A TRUSTED

5   AUTHORITY AND TOLD THAT SERIAL NUMBER IS VALID FOR THE

6   PARTICULAR MACHINE IT CAME FROM.  SO THIS WOULD BE THE

7   NOTIFICATION INFORMATION BEING SENT.

8   **Q.**  COULD YOU PLEASE TURN TO YOUR SOURCE CODE BOOK?

9   **A.**  YES.

10  **Q.**  SC-2329.

11  **A.**  SORRY.

12      OKAY.

13  **Q.**  ALL RIGHT, SIR.  WHAT IS THAT DOCUMENT?

14  **A.**  IT'S THE AMT INTEGRATION GUIDE.

15  **Q.**  I REALIZE IT HAS AN ADOBE SOURCE CODE BATES LABEL, BUT IS

16  IT SOURCE CODE?

17  **A.**  NO.

18  **Q.**  IS THAT A DOCUMENT THAT YOU REVIEWED IN CONNECTION WITH

19  YOUR ANALYSIS TODAY?

20      IS THAT DOCUMENT EXCERPTED ON SLIDE 8 BEFORE THE JURY

21  HERE?

22  **A.**  YES, IT IS.

23  **Q.**  ALL RIGHT.

24          **MR. DINOVO:**  WE WOULD OFFER THIS EXHIBIT.  IT'S PART

25  OF THE GROUP OF PLAINTIFF'S EXHIBIT 175C AND IT BEARS THE

1    BATES NUMBER JUST READ INTO THE RECORD INTO EVIDENCE.

2            **THE COURT:**  WELL, IF IT'S PART OF THAT LARGE

3    DOCUMENT, I TOOK THAT UNDER SUBMISSION.  SO YOU MAY USE IT AND

4    SHOW IT, BUT WE WILL DECIDE LATER HOW MUCH OF IT ACTUALLY

5    NEEDS TO GO TO THE JURY.

6            **MR. DINOVO:**  FAIR ENOUGH, YOUR HONOR.

7        I'M JUST POINTING OUT THIS IS A TEXTURAL DOCUMENT.  SO IF

8    YOUR HONOR CHOOSES NOT TO PUBLISH -- SEND SOURCE CODE TO THE

9    JURY, THAT THIS DOCUMENT MIGHT BE TREATED DIFFERENTLY.

10           **THE COURT:**  PERHAPS SO.

11           **MR. DINOVO:**  OKAY.  THANK YOU.

12   **BY MR. DINOVO:**

13   **Q.**  SO WHAT ABOUT SLIDE 8 IS SALIENT OR MEANINGFUL TO YOU IN

14   CONNECTION WITH THIS?

15   **A.**  SO ESSENTIALLY THIS DESCRIBES THE SENDING OF NOTIFICATION

16   INFORMATION PRIOR TO GRANTING ACCESS.

17   **Q.**  WHAT IS INDICATED BY YOUR HIGHLIGHTING BOTH ELEMENTS 1 AND

18   3 HERE?

19   **A.**  SO TO SHOW THE INFRINGEMENT OF ALL THE ELEMENTS OF THE

20   CLAIM, WE ARE GOING TO FOCUS ON PIECES OF IT AT A TIME.  THE

21   FIRST WE ARE GOING TO SO IS PIECE 1 AND 3.

22   **Q.**  OKAY.  WHAT'S SHOWN HERE?

23   **A.**  SO THIS BASICALLY SHOWS THAT ADOBE HAS CREATED FILES THAT

24   INCLUDE ELECTRONIC CONTENT, VARIOUS APPLICATIONS, AND THEY ARE

25   TRANSMITTED ALONG THE WEB BY PLACING THEM ON WEB PAGES SO YOU

1    CAN DOWNLOAD THEM.  THAT SATISFIES THE FIRST AND THIRD

2    ELEMENTS OF THE CLAIM.

3    **Q.**  I SEE.  OKAY.

4        LET'S TALK ABOUT THE SECOND ELEMENT.  THIS LOOKS LIKE A

5    PASSAGE WE HAVE SEEN BEFORE.  HOW DOES THIS BEAR ON THE SECOND

6    ELEMENT?

7    **A.**  SO ESSENTIALLY THIS CAUSES ACCESS TO THE ELECTRONIC

8    CONTENT TO BE DENIED UNTIL NOTIFICATION INFORMATION COLLECTED

9    BY EXECUTABLE INSTRUCTIONS HAS BEEN TRANSMITTED TO THE LICENSE

10   SERVER.

11   **Q.**  IF YOU CAN JUST SLOW DOWN A LITTLE BIT, DR. DEVANBU.

12   THANK YOU.

13   **A.**  I APOLOGIZE.

14   **Q.**  ALL RIGHT.

15       DID YOU REVIEW SOURCE CODE IN CONNECTION WITH YOUR

16   ANALYSIS OF WHETHER THE ADOBE ACTIVATION TECHNOLOGY INFRINGES

17   THE '670 PATENT?

18   **A.**  I DID.

19   **Q.**  DOES THIS DEMONSTRATE OR ASSIST IN DISCUSSING THAT?

20   **A.**  YES.  IT'S THE SAME SERIES OF METHOD CALLS WE ARE GOING TO

21   SEE AS BEFORE -- WE HAVE SEEN BEFORE.

22       AND ESSENTIALLY WE CAN KEEP GOING AHEAD.  AND EVENTUALLY

23   THIS IS GOING TO BOTTOM OUT AT -- YOU CAN KEEP GOING -- IN AN

24   ATTEMPT TO TRANSMIT DATA ON THE WEB AT THIS ALM HTTP SEND, THE

25   METHOD THAT YOU SEE IN THE LOWER RIGHT, WHICH, AGAIN, IS A WEB

1    REQUEST THAT GETS SENT OUT.

2        SO, UNLESS A REQUEST IS SUCCESSFULLY SENT, WHICH WE WILL

3    SEE NEXT, THE ACCESS IS NOT GRANTED.

4    **Q.**  ALL RIGHT.  LET'S TALK ABOUT THE FINAL ELEMENT OF

5    CLAIM 45.

6        WHAT IS SHOWN HERE WITH RESPECT TO THAT?

7    **A.**  SO IN THE PREVIOUS SLIDE, ESSENTIALLY WHAT YOU SAW IS THE

8    ABILITY TO DISTRIBUTE THE SOFTWARE FREELY.  THIS IS IMPORTANT

9    BECAUSE ONE OF THE CONCERNS FOR PIRACY IS THAT I GIVE THE

10   SOFTWARE TO MY FRIENDS, YOU KNOW, SO THAT THEY DON'T HAVE TO

11   PAY FOR IT.  SO THAT WOULD BE ME AS A RECIPIENT GIVING THE

12   SOFTWARE TO A SUCCESSIVE RECIPIENT.

13       ONE OF THE ELEMENTS OF THE PATENT IS THE SUCCESSIVE

14   RECIPIENT, IF THEY WERE TO TRY TO ACCESS IT, NOTIFICATION

15   INFORMATION WOULD BE SENT WHEN THEY ATTEMPTED TO ACCESS IT,

16   AND WILL BE COLLECTED.

17   **Q.**  ALL RIGHT.

18       DOES CLAIM 45 SPEAK SPECIFICALLY TO DENIAL OF ACCESS OR

19   GRANTING ACCESS, OR BOTH?

20   **A.**  IT RELATES TO DENIAL OF ACCESS.

21   **Q.**  ALL RIGHT.  SO THERE'S NO MENTION IN CLAIM 45 OF

22   SPECIFICALLY GRANTING ACCESS?

23   **A.**  NO.

24   **Q.**  SO WHAT IS THE TIMING THAT IS REQUIRED IN YOUR ASSESSMENT

25   BY CLAIM 45 WITH RESPECT TO THE DENIAL OF ACCESS?

1  **A.**  MY INTERPRETATION OF THE CLAIM IS THAT ACCESS IS DENIED

2  UNTIL NOTIFICATION INFORMATION IS SENT.

3  **Q.**  ALL RIGHT.  IN YOUR ASSESSMENT, IS THAT ELEMENT MET BY

4  ADOBE ACTIVATION SOFTWARE?

5  **A.**  YES.

6  **Q.**  AND WHO IS -- IS ONE ENTITY OR MULTIPLE ENTITIES

7  PERFORMING EACH AND EVERY STEP OF CLAIM 45 OF THE '670?

8  **A.**  IT'S BEING DONE AT THE SERVER.

9  **Q.**  SO A SINGLE ENTITY?

10  **A.**  THAT'S RIGHT.

11  **Q.**  SO WHAT IS SHOWN ON THIS SLIDE?

12                    (PUBLISHED TO JURY.)

13  **A.**  SO, ESSENTIALLY WHAT IS BEING SHOWN HERE IS -- SO I

14  MISSPOKE THE LAST TIME.  I SAID "SERVER".  WHAT I MEAN TO SAY

15  IS SOFTWARE BEING OPERATED BY A SINGLE ENTITY.

16  **Q.**  ALL RIGHT.

17  **A.**  THIS SLIDE NOW?

18  **Q.**  YES.  WHAT'S SHOWN ON THIS SLIDE, SIR?

19  **A.**  OKAY.  SO BASICALLY, THE IMPORTANT POINT HERE IS THAT THE

20  LAST ELEMENT OF THE CLAIM BASICALLY SAYS THAT NOTIFICATION IS

21  COLLECTED FROM SUCCESSIVE RECIPIENTS.

22       SO REGARDLESS IF IT'S IMMEDIATE OR A SUCCESSIVE RECIPIENT,

23  THE LICENSE ACTIVATION WORKS EXACTLY THE SAME WAY.

24  **Q.**  SO EVEN IF ONE PERSON WERE TO TAKE THE SOFTWARE AND

25  TRANSMIT THAT SOFTWARE TO ANOTHER PERSON, THE SAME PROCESS

1    WOULD OCCUR?

2    **A.**  THAT'S RIGHT.

3    **Q.**  ALL RIGHT, SIR.  LET'S MOVE ON TO A DIFFERENT TECHNOLOGY.

4        WHAT IS LIVECYCLE?

5    **A.**  LIVECYCLE IS A BUSINESS PROCESS AUTOMATION ENVIRONMENT.

6    **Q.**  CAN YOU USE MORE LAYMAN'S TERMS?  WHY WOULD SOMEONE USE

7    LIVECYCLE IN THE REAL WORLD?

8    **A.**  MOST COMPANIES HAVE COMPLICATED PROCESSES FOR PROCESSING

9    INTERNAL BUSINESS THINGS LIKE PURCHASE ORDERS OR TRAVEL

10   EXPENSING, OR THINGS ALONG THESE LINES.

11   **Q.**  FORMS?

12   **A.**  FORMS OF VARIOUS TYPES.  SO THAT'S WHAT LIVECYCLE COMES

13   IN.

14   **Q.**  WHAT ABOUT LIVECYCLE RIGHTS MANAGEMENT?

15   **A.**  LIVECYCLE RIGHTS MANAGEMENT IS A TECHNOLOGY TO CONTROL

16   ACCESS OR APPLY DRM TO A SPECIFIC DOCUMENT THAT MAY BE

17   VALUABLE.

18   **Q.**  IS LIVECYCLE RIGHTS MANAGEMENT, DOES IT WORK WITH ACROBAT

19   PRO, FOR EXAMPLE?

20   **A.**  YES, IT DOES.

21   **Q.**  HOW DOES IT CAN WORK WITH ACROBAT PRO?

22   **A.**  WHEN SOMEBODY WERE TO TRY TO OPEN A DOCUMENT THAT IS

23   PROTECTED BY LIVECYCLE RIGHTS MANAGEMENT, THEIR ACCESS TO THAT

24   DOCUMENT WOULD BE CONTROLLED THROUGH CERTAIN TYPES OF

25   POLICIES.

1   **Q.** DID YOU REVIEW ANY ACROBAT CODE -- SOURCE CODE IN

2   CONNECTION WITH PERFORMING YOUR ANALYSIS ABOUT LIVECYCLE?

3   **A.** I DID.

4   **Q.** WHAT SORT OF CODE DID YOU REVIEW TO PERFORM THAT ANALYSIS?

5   **A.** I REVIEWED CODE THAT WAS PROVIDED TO ME CONCERNING

6   ACROBAT, IMPLEMENTATION OF ACROBAT.

7   **Q.** DO YOU KNOW WHETHER OR NOT THAT CODE IS EMBEDDED IN

8   ACROBAT?

9   **A.** YES, IT IS.

10  **Q.** WHY IS IT EMBEDDED?

11  **A.** SO THAT IF SOMEBODY WERE TO USE ACROBAT PRO IN A SETTING

12  WHERE THEY WANTED TO CONTROL ACCESS TO DOCUMENTS, THEN THAT

13  FEATURE WOULD BE BUILT INTO ACROBAT.

14  **Q.** SITTING HERE TODAY, CAN YOU ESTIMATE HOW MANY ROUTINES OR

15  MODULES WITHIN ACROBAT PRO PERFORM LIVECYCLE FUNCTIONALITY?

16       **MS. MEHTA:** OBJECTION, YOUR HONOR. THIS IS ALL

17  OUTSIDE THE SCOPE OF HIS REPORT. HE DIDN'T OFFER ANY OPINIONS

18  RELATING TO ANY CODE ASSOCIATED WITH ACROBAT READER -- ACROBAT

19  PRO. IN FACT, HE DIDN'T EVEN HAVE THE CODE FOR ACROBAT PRO.

20       **MR. DINOVO:** YOUR HONOR, EVERY ONE OF HIS CITATIONS,

21  IF I'M NOT MISTAKEN, OR WE CAN ASK DR. DEVANBU, BUT ALMOST ALL

22  OF HIS CITATIONS RELATING TO LIVECYCLE RELATE TO THE ACROBAT

23  PRODUCT.

24       **THE COURT:** OKAY. YOU JUST NEED TO TELL ME PAGE AND

25  LINE WHERE THIS TESTIMONY IS DISCUSSED IN HIS EXPERT REPORT.

 1    AND I DON'T GUESS I HAVE A COPY OF HIS EXPERT REPORT.

 2        I GUESS I CAN PULL IT UP.  IS IT ON YOUR FLASH DRIVES?

 3            MR. DINOVO:  IT WILL BE IN THE TRIAL EXHIBITS.  IT

 4    WILL BE 19, BUT I'M NOT SURE OF THE ALPHANUMERIC DESIGNATION.

 5            THE COURT:  IF YOU LIKE GO ON TO SOME OTHER AREA AND

 6    COME BACK TO THIS AFTER YOU'VE LOCATED IT.

 7            MR. DINOVO:  VERY WELL, YOUR HONOR.

 8            THE COURT:  CAN YOU TELL ME WHERE THE EXHIBIT IS?

 9            MR. DINOVO:  IT'S –– THERE'S A SERIES OF EXHIBITS

10    THAT ARE IN PLAINTIFF'S EXHIBIT 19A THROUGH F THAT CORRESPOND

11    TO HIS EXPERT REPORT.

12            MS. MEHTA:  YOUR HONOR, I HAVE A COPY OF HIS EXPERT

13    REPORT I CAN HAND UP TO YOU.

14            THE COURT:  IS IT AN EXTRA?

15            MS. MEHTA:  YES.

16            THE COURT:  OKAY.

17                (BINDER HANDED TO COURT.)

18            MR. DINOVO:  IT WOULD BE 19E, YOUR HONOR.

19            THE COURT:  OKAY.

20            MR. DINOVO:  AND MAYBE WE SHOULD TAKE THIS UP, BUT MY

21    UNDERSTANDING IS THAT CODE SPECIFICALLY REFERS TO THE ACROBAT

22    FAMILY IN THE ACTUAL CODE ITSELF.

23            THE COURT:  IT'S NOT SO MUCH THE CODE, COUNSEL IS

24    SAYING THAT HE DIDN'T TESTIFY TO THIS INFORMATION IN HIS

25    EXPERT REPORT.  SO THAT'S WHAT I WILL BE LOOKING FOR, NOT

1    WHETHER HE HAD THE CODE, BUT WHETHER HE DISCUSSED THIS

2    PARTICULAR POINT IN HIS REPORT.

3              **MR. DINOVO:**  OKAY.  WE ARE HAPPY TO ADDRESS THAT.

4         **THE COURT:**  IF YOU HAVE A PAGE AND LINE NOW, YOU CAN

5    GIVE IT TO ME.  IF NOT, YOU CAN FIND IT LATER.

6              **MR. DINOVO:**  IT'S 19E, THE PREAMBLE CALLS OUT ACROBAT

7    PRO.  HIS SOURCE CODE CITATIONS REPEATEDLY REFER TO ACROBAT

8    CODE.  HE DEFINES ACROBAT PRO AND LIVECYCLE RIGHTS MANAGEMENT

9    AND LIVECYCLE AS THE ACCUSED PRODUCTS.

10      SO, I CAN GIVE AN EXHAUSTIVE LIST, YOUR HONOR, BECAUSE I

11   DON'T THINK WE'LL FINISH DR. DEVANBU TODAY.

12             **THE COURT:**  OKAY.

13            **MS. MEHTA:**  JUST ONE CLARIFICATION.

14      I THINK THE PROBLEM IS I THINK MR. DINOVO IS CONFLATING

15   MULTIPLE VERSIONS OF ACROBAT AND MULTIPLE DIFFERENT ACROBAT

16   PRODUCTS.

17      SO ACROBAT PRO WAS NOT THE PRODUCT MR. DEVANBU CONSIDERED

18   AND RELIED UPON IN HIS REPORT.  IT WAS ACROBAT READER.  THAT'S

19   THE PRODUCT FOR WHICH HE HAD THE SOURCE CODE AND HE CITED THE

20   SOURCE CODE.

21      SO IF THE QUESTIONS ARE ABOUT ACROBAT PRO OR ACROBAT

22   GENERICALLY, THEN THAT'S WHERE IT IS OUTSIDE THE SCOPE.

23            **THE COURT:**  SO IF YOU WANT TO ASK ABOUT ACROBAT

24   READER INSTEAD, YOU CAN DO THAT.

25

1    **BY MR. DINOVO:**

2    **Q.**  SO LET'S TALK ABOUT ACROBAT READER.

3        DOES ACROBAT READER HAVE SPECIFIC INSTRUCTIONS EMBEDDED IN

4    IT PERTAINING TO LIVECYCLE?

5    **A.**  YES, IT DOES.

6    **Q.**  HOW MANY ROUTINES OR MODULES WERE IN THIS CODE THAT YOU

7    ANALYZED RELATING TO ACROBAT READER?

8    **A.**  IT IS DIFFICULT TO SAY.  PROBABLY IN THE RANGE OF A

9    HUNDRED.

10   **Q.**  ALL RIGHT.

11       COULD YOU REFER TO THE BINDER THAT YOU HAVE IN FRONT OF

12   YOU AND TAKE A LOOK AT EXHIBIT 21C?

13   **A.**  YES.  I'M THERE.

14   **Q.**  THANK YOU.

15       IS THIS A DOCUMENT THAT YOU'VE SEEN BEFORE?

16   **A.**  YES, I HAVE.

17   **Q.**  WHAT IS THE TITLE OF THE DOCUMENT?

18   **A.**  "A PRIMER ON ELECTRONIC DOCUMENT SECURITY".

19   **Q.**  DOES IT LOOK TO BE A TRUE AND CORRECT COPY OF THAT

20   DOCUMENT?

21   **A.**  YES, IT DOES.

22   **Q.**  IS THIS A DOCUMENT THAT YOU CITED IN YOUR EXPERT REPORT?

23   **A.**  I BELIEVE IT IS, YES.

24   **Q.**  ALL RIGHT.  COULD YOU TURN TO 21C.007?

25   **A.**  YES.

1    **Q.**  ALL RIGHT.  AND –– WELL, BEFORE YOU DO THAT, I'M SORRY.

2         **MR. DINOVO:**  I WOULD LIKE TO OFFER THIS INTO

3    EVIDENCE, YOUR HONOR.

4         **MS. MEHTA:**  NO OBJECTION.

5         **THE COURT:**  RECEIVED.

6         (PLAINTIFF'S EXHIBIT 21C RECEIVED IN EVIDENCE)

7              (PUBLISHED TO JURY.)

8    **BY MR. DINOVO:**

9    **Q.**  ALL RIGHT.

10        SIR, SO IF YOU WOULD LOOK AT PAGE 21.00C (SIC), IT LOOKS

11   LIKE THERE'S SOMETHING LEFT OFF THE LEFT MARGIN.

12        WHAT DOES THIS INDICATE TO YOU?

13   **A.**  SO ACROBAT –– "ADOBE ACROBAT TRACKS ALL PREVIOUS SIGNED

14   VERSIONS WITHIN THE DOCUMENT FOR EASY VERIFICATION OF CHANGES

15   MADE DURING THE DOCUMENT'S LIFECYCLE."

16   **Q.**  ALL RIGHT.  LET'S TURN TO PAGE 9 OF THIS DOCUMENT FROM

17   YOUR REPORT.  AND THERE'S A TABLE IN THE MIDDLE OF THIS

18   DOCUMENT.

19        I DON'T KNOW IF YOU CAN SEE THAT?

20   **A.**  YES, I CAN.

21   **Q.**  WHAT DOES THIS TABLE SUMMARIZE TO YOU?

22   **A.**  IT SUMMARIZES FOR THE VARIOUS PRODUCTS FROM ADOBE WHAT

23   SECURITY FEATURES ARE SUPPORTED.

24   **Q.**  ALL RIGHT.  AND IS THERE SOME DISCUSSION OF ADOBE

25   LIVECYCLE RIGHTS MANAGEMENT?

1    **A.**  YES, THERE IS.

2    **Q.**  THAT'S IN THE RIGHT COLUMN THERE?

3    **A.**  THAT'S RIGHT.

4    **Q.**  AND IN THE LEFT COLUMN THERE'S -- WHAT IS THE TITLE OF THE

5    LEFT COLUMN?

6    **A.**  "ADOBE ACROBAT FAMILY".

7    **Q.**  IS THERE A REFERENCE IN THE THIRD ROW TO ADOBE LIVECYCLE?

8    **A.**  IN THE THIRD ROW OF THE FIRST COLUMN?

9    **Q.**  YES, SIR.

10   **A.**  YES.  YES.  ADOBE LIVECYCLE POLICY SERVER SOFTWARE.

11   **Q.**  OKAY.  AND WHAT IS THE FUNCTION OF THAT SOFTWARE?

12   **A.**  SO, ESSENTIALLY WHAT THEY ARE SAYING HERE IS WHEN YOU ARE

13   PROTECTING DOCUMENTS WITH ADOBE ACROBAT FAMILY, IT IS POSSIBLE

14   TO USE ENCRYPTION SIGNATURES TO VERIFY THE AUTHENTICITY OF THE

15   DOCUMENT OR YOU COULD CONTROL ACCESS TO THE DOCUMENT USING THE

16   LIVECYCLE PRODUCTS -- LIVECYCLE RIGHTS MANAGEMENT PRODUCTS.

17   **Q.**  THANK YOU, SIR.

18       COULD YOU REFER TO PLAINTIFF'S EXHIBIT 52?

19   **A.**  I'M THERE.

20   **Q.**  ALL RIGHT.  IS THIS A DOCUMENT YOU'VE SEEN BEFORE?

21   **A.**  YES.

22   **Q.**  AND RELIED ON IN YOUR REPORT?

23   **A.**  YES.

24   **Q.**  WHAT IS THE TITLE OF THE DOCUMENT?

25   **A.**  "ABOUT LIVECYCLE RIGHTS MANAGEMENT ES2".

1   **Q.**  DO YOU SEE A URL AT THE BOTTOM OF THE PAGE?

2   **A.**  YES.

3   **Q.**  DOES THAT INDICATE ANYTHING TO YOU?

4   **A.**  IT'S WHERE THIS DOCUMENT CAME FROM.

5   **Q.**  WHERE DID IT COME FROM?

6   **A.**  FROM ADOBE'S WEBSITE.

7   **Q.**  ALL RIGHT, SIR.

8        AND DOES THIS APPEAR TO BE A TRUE AND CORRECT COPY OF THIS

9   DOCUMENT?

10  **A.**  IT DOES.

11           **MR. DINOVO:**  WE OFFER PLAINTIFF'S EXHIBIT 52 INTO

12  EVIDENCE.

13           **MS. MEHTA:**  NO OBJECTION.

14           **THE COURT:**  RECEIVED.

15       (PLAINTIFF'S EXHIBIT 52 RECEIVED IN EVIDENCE)

16           **MR. DINOVO:**  IF YOU COULD, MS. MASON, PLEASE CAPTURE

17  THE FIRST PARAGRAPH IN THE BULLET POINTS.

18  **BY MR. DINOVO:**

19  **Q.**  WHAT IS ADOBE LIVECYCLE RIGHTS MANAGEMENT?

20  **A.**  SO IT'S RIGHTS MANAGEMENT SYSTEM FOR ORGANIZATIONS TO

21  CONTROL WHO HAS ACCESS TO SENSITIVE DOCUMENTS AND ALSO TO

22  TRACK THE USE OF THESE SENSITIVE DOCUMENTS.

23  **Q.**  OKAY.  AND IT SAYS SOMETHING HERE ABOUT AUTHORIZED USERS.

24       WHAT DOES THAT MEAN?

25  **A.**  SO, WE TALKED EARLIER ABOUT BUSINESS PROCESSES WHERE

DEVANBU – DIRECT / DINOVO

1    ORGANIZATIONS WANT TO PROCESS THEIR ACTIVITIES USING

2    DOCUMENTS.

3        AND THE RIGHTS MANAGEMENT PIECE ESSENTIALLY ENSURES THAT

4    ONLY THE PEOPLE WHO ARE AUTHORIZED TO SEE CERTAIN DOCUMENTS

5    ARE ALLOWED TO SEE THEM.

6    **Q.**  DOES THIS EXHIBIT, EXHIBIT 52, AND THIS PARTICULAR PASSAGE

7    INDICATE ANYTHING ABOUT SUPPORT FOR ACROBAT PRODUCTS?

8    **A.**  YES.  SO, PDF FILES ARE SUPPORTED AND A VARIETY OF OTHER

9    DOCUMENT FORMATS ARE SUPPORTED.

10   **Q.**  DR. DEVANBU, IF YOU CAN PLEASE NOW TURN TO PLAINTIFF'S

11   EXHIBIT 55.

12       ARE YOU THERE, SIR?

13   **A.**  YES, I AM.

14   **Q.**  IS THIS A DOCUMENT THAT YOU'VE SEEN BEFORE?

15   **A.**  YES.

16   **Q.**  AND WHAT IS THE TITLE OF THE DOCUMENT?

17   **A.**  "LIVECYCLE ENTERPRISE SUITE SERVICES", ES SERVICES.

18   **Q.**  ES IS AN ACRONYM FOR ENTERPRISE SUITE?

19   **A.**  YES.

20   **Q.**  DOES THIS, IN THE TABLE OF CONTENTS, DOES IT ADDRESS

21   RIGHTS MANAGEMENT SERVICE AS ONE OF THOSE SERVICES?

22   **A.**  YES.  THIS IS ITEM NUMBER 24 IS THE RIGHTS MANAGEMENT

23   SERVICE.

24   **Q.**  DOES THIS APPEAR TO BE A TRUE AND CORRECT COPY OF THIS

25   DOCUMENT?

1  **A.**  I BELIEVE SO, YES.

2  　　　**MR. DINOVO:**  WE WILL OFFER PLAINTIFF'S EXHIBIT 55

3  INTO EVIDENCE.

4  　　　**MS. MEHTA:**  NO OBJECTION.

5  　　　**THE COURT:**  RECEIVED.

6  　　　(PLAINTIFF'S EXHIBIT 55 RECEIVED IN EVIDENCE)

7  **BY MR. DINOVO:**

8  **Q.**  THEN, FINALLY, ON THIS PRODUCT, DR. DEVANBU, WE'LL TURN TO

9  PLAINTIFF'S EXHIBIT 56.

10  **A.**  YES, I'M THERE.

11  **Q.**  ALL RIGHT, SIR.  AND WHAT IS THE TITLE OF THAT DOCUMENT?

12  **A.**  "LIVECYCLE ES OVERVIEW".

13  **Q.**  THAT'S ENTERPRISE SUITE?

14  **A.**  YES.

15  **Q.**  OR ENTERPRISE SERVICES YOU SAID?

16  **A.**  ENTERPRISE SERVICES.

17  **Q.**  THANK YOU.

18  　　IS THIS A DOCUMENT THAT YOU RELIED ON IN YOUR REPORT?

19  **A.**  YES.

20  **Q.**  DOES IT APPEAR TO BE A TRUE AND CORRECT COPY?

21  **A.**  YES.

22  　　　**MR. DINOVO:**  WE OFFER PLAINTIFF'S EXHIBIT 56 INTO

23  EVIDENCE.

24  　　　**THE COURT:**  ANY OBJECTION?

25  　　　**MS. MEHTA:**  I'M SORRY.  NO OBJECTION.

1          **THE COURT:**  RECEIVED.

2       (PLAINTIFF'S EXHIBIT 56 RECEIVED IN EVIDENCE)

3          **MR. DINOVO:**  AND I AM MISREPRESENTING MYSELF.  I SAID

4     THAT WAS THE LAST ONE, BUT WE'RE JUST GOING TO DO ONE MORE.

5     **BY MR. DINOVO:**

6     **Q.**  IF YOU COULD TURN TO THE SOURCE CODE BINDER.  AND IF YOU

7     CAN LOOK AT THE TAB 175B AND --

8     **A.**  YES, I'M THERE.

9     **Q.**  IF YOU CAN FLIP THROUGH THAT COLLECTION OF DOCUMENTS WITH

10    SOURCE CODE DESIGNATIONS.

11    **A.**  YES.  THERE'S A LOT HERE.

12    **Q.**  THERE IS, INDEED.

13       I UNDERSTAND THE TIME IS SHORT, BUT DOES IT LOOK LIKE THE

14    SOURCE CODE DOCUMENTS THAT YOU REVIEWED IN CONNECTION WITH

15    YOUR ANALYSIS OF THE LIVECYCLE PRODUCTS?

16    **A.**  YES, IT DOES.

17    **Q.**  ALL RIGHT.

18       AND I UNDERSTAND THE COURT WILL PROVIDE FURTHER GUIDANCE,

19    BUT SUBJECT TO THAT GUIDANCE, WE WILL OFFER THE GROUP OF

20    DOCUMENTS ENTITLED PLAINTIFF'S EXHIBIT 175B INTO EVIDENCE.

21          **THE COURT:**  I WILL TAKE THAT UNDER SUBMISSION.

22          **MR. DINOVO:**  THANK YOU, YOUR HONOR.

23       MS. MASON, CAN WE PLEASE GET THE PRESENTATION NUMBER FOUR?

24    **BY MR. DINOVO:**

25    **Q.**  SIR, IN THE COURSE OF PERFORMING YOUR WORK, FOR PREPARING

1    YOUR REPORT, AND FOR APPEARING HERE TODAY TO PROVIDE YOUR

2    OPINIONS, DID YOU ANALYZE WHETHER OR NOT THE LIVECYCLE RIGHTS

3    MANAGEMENT AND LIVECYCLE PRODUCTS INFRINGE THE '541 PATENT?

4    **A.**  I DID.

5    **Q.**  COULD YOU TELL THE JURY A LITTLE BIT ABOUT HOW LIVECYCLE

6    WORKS?

7    **A.**  SO, LIVECYCLE RIGHTS MANAGEMENT IS INTENDED FOR USE IN

8    SETTINGS LIKE PERHAPS THE CIA OR SOME COMPANY THAT HAS VERY

9    VALUABLE DOCUMENTS THAT THEY DON'T WANT UNAUTHORIZED PEOPLE TO

10   SEE.

11        SO, THERE'S A LOT OF IMPORTANT DOCUMENTS THAT ARE OF

12   CONCERN.  WE CAN STEP THROUGH.  SO WE WANT TO ENSURE THE WRONG

13   PEOPLE DON'T READ IT.

14        SO DOCUMENTS ARE SUBJECT TO A CERTAIN KIND OF DIGITAL

15   RIGHTS MANAGEMENT PROTECTION.  AND WHEN SOMEBODY TRIES TO USE

16   IT, THIS ACCESS MANAGEMENT IS CHECKED.  AND IF AVAILABILITY --

17   IF PERMISSION TO ACCESS IT IS NOT LOCALLY AVAILABLE, THEN A

18   REQUEST IS SENT TO A REMOTE SERVER WHICH WOULD BE THE NEXT

19   STEP IN THE SLIDE.

20   **Q.**  ALL RIGHT.

21   **A.**  AND IF RIGHTS ARE RECEIVED, THEN THEY ARE ALLOWED TO

22   ACCESS IT.

23        ONE THING THAT CAN BE DONE IS THAT THE DOCUMENT CAN THEN

24   BE FREELY DISTRIBUTED THROUGH THE WEB OR THROUGH EMAIL WITH

25   THE CONFIDENCE THAT IF THEY TRIED TO READ IT, THEN THE ACROBAT

1    FAMILY OF PRODUCTS WOULD CHECK AND SEE IF THE ACCESS WAS

2    ALLOWABLE AND THEN GRANT THE ACCESS.

3    **Q.**  ALL RIGHT, SIR --

4    **A.**  THIS ALSO WORKS WITH OTHER FORMATS BESIDES ACROBAT.

5    **Q.**  OKAY.  THANK YOU.

6         LET'S TURN TO SLIDE 6.  WHAT'S SHOWN HERE, SIR?

7                        (PUBLISHED TO JURY.)

8    **A.**  SO BASICALLY WHEN SOMEBODY TRIES TO ACCESS THE DOCUMENT,

9    IT FIRST CHECKS TO SEE WHETHER THE PERMISSION IS AVAILABLE

10   LOCALLY IN A CACHE STORE.  AND IF THAT PERMISSION IS NOT

11   AVAILABLE, THEN A REQUEST IS MADE TO AN EXTERNAL SERVER.

12   **Q.**  ALL RIGHT.  AND WHAT DOES THE SERVER RETURN?

13   **A.**  THE SERVER RETURNS SOMETHING CALLED A VOUCHER AND THE

14   PERMISSION IS EXTRACTED FROM THE VOUCHER.  AND THE USER IS

15   GRANTED ACCESS TO THE DOCUMENT IF PERMISSIBLE.

16   **Q.**  ALL RIGHT.  LET'S FLIP THROUGH SOME OF THESE ISSUES THAT I

17   THINK WE'VE DISCUSSED BEFORE AND GET TO SORT OF MEAT OF YOUR

18   ANALYSIS.

19        JUST TO GIVE A PREVIEW, DID YOU LOOK AT CLAIM 1 OF THE

20   '541 PATENT, AND WHAT WAS YOUR CONCLUSION?

21   **A.**  IT INFRINGES.

22   **Q.**  LET'S TAKE THE ELEMENTS IN TURN.  WHAT'S SHOWN HERE?

23   **A.**  SO IT IS BASICALLY SHOWING HOW THE ELEMENTS OF THE CLAIM

24   ARE SATISFIED.

25        SO, STEP ONE SHOWS THE FIRST ELEMENT OF THE CLAIM, THAT IS

DEVANBU – DIRECT / DINOVO

1    SOMEBODY CREATES DOCUMENTS.  SO THIS PICTURE IS DRAWN FROM ONE

2    OF THE DOCUMENTS THAT YOU JUST INTRODUCED INTO EVIDENCE.

3    **Q.**  PLAINTIFF'S EXHIBIT 21C.

4    **A.**  RIGHT.

5        SO FIRST YOU CREATE SOME DOCUMENTS.  AND THIS STEP IS

6    INDICATED IN THE FIGURE PROVIDED BY ADOBE.

7        THEN YOU ADD PROTECTION TO DOCUMENTS, AND THEN THEY CAN BE

8    VIEWED.

9    **Q.**  THANK YOU.

10       ALL RIGHT.  WHAT'S DEPICTED ON SLIDE 11, SIR?

11   **A.**  SO ESSENTIALLY IT SHOWS HOW YOU CAN CREATE AND DISTRIBUTE

12   DOCUMENTS.  AND THEN WHEN SOMEBODY TRIES TO OPEN IT, THAT

13   WOULD BE NEXT STEP.

14       THERE'S AN ATTEMPT -- THERE'S AN AUTHORIZATION -- WHEN

15   THERE'S AN ATTEMPT TO ACCESS, WE AUTHORIZE THE ACCESS AND THEN

16   PERMIT IT IF IT'S AUTHORIZED.

17   **Q.**  AND THIS IS FROM ANOTHER OF THE EXHIBITS WE ENTERED,

18   EXHIBIT 52?

19   **A.**  THAT'S RIGHT.

20   **Q.**  ALL RIGHT.  LET'S TURN TO THE CLAIM LANGUAGE.

21       WHAT ABOUT THIS EXCERPT FROM EXHIBIT 56 ASSISTS YOU IN

22   YOUR ANALYSIS ABOUT INFRINGEMENT?

23   **A.**  SO, ESSENTIALLY, YOU KNOW, THIS IS THE PREAMBLE AND THE

24   FIRST ELEMENT OF THE CLAIM WHERE WE SEE THE CLIENT HOLDS A

25   PRE-EXISTING PERMISSION FOR THE RESOURCE TO ACCESS TO DIGITAL

1    CONTENT.

2        IN THIS CASE, THE DIGITAL CONTENT, IF YOU WANT TO SUBJECT

3    IT TO RIGHTS MANAGEMENT PROTECTION, IT IS AN ENCRYPTED

4    DOCUMENT.  AND AS WE SAW BEFORE, DOCUMENTS THAT ARE ENCRYPTED

5    CANNOT BE ACCESSED WITHOUT THE KEY.  AND THE KEY CONSTITUTES

6    THE PERMISSION.

7        SO, THIS KEY HAS TO BE OBTAINED FROM THE EXTERNAL SOURCE.

8    **Q.**  SO WHAT -- WHERE IS THE KEY LOCATED IN THIS PROCESS?

9    **A.**  THE KEY IS STORED INSIDE A VOUCHER.

10   **Q.**  WHAT DOES SLIDE 13 SHOW?  IT APPEARS TO BE AN EXCERPT FROM

11   MR. HERBACH.  WHY DID YOU FIND THIS SIGNIFICANT TO YOUR

12   ANALYSIS?

13   **A.**  MR. HERBACH WAS PRESENTED BY ADOBE AS AN EXPERT ON

14   LIVECYCLE RIGHTS MANAGEMENT, AND THIS IS WHAT HE DESCRIBED.

15       SO, ESSENTIALLY THE RELEVANT PART IS THE SECOND QUESTION

16   ANSWER WHICH SAYS THAT THE USER CANNOT ACCESS THE DOCUMENT

17   WITHOUT THE VOUCHER.

18   **Q.**  BEFORE WE LEAVE THAT SLIDE, THERE'S A REFERENCE TO ONLINE

19   USE.  IS THERE A DISTINCTION BETWEEN ONLINE AND OFF LINE USE

20   IN THE LIVECYCLE CONTEXT?

21   **A.**  YES.  THERE ARE TWO WAYS IN WHICH DOCUMENTS COULD BE

22   ACCESSED.  SO, IN SOME CASES YOU MIGHT WANT TO GIVE PEOPLE THE

23   RIGHT ACCESS TO THE DOCUMENT EVEN IF THEY ARE NOT IN ACCESS OF

24   THE INTERNET.  SO THEY MIGHT BE TRAVELING ON THE PLANE.  AND

25   THEY MIGHT STILL WISH TO READ THE DOCUMENT.

1       IN THAT CASE, THEY COULD BE GRANTED OFF LINE ACCESS

2   PRIVILEGES.  SO THAT'S DONE THROUGH AN OFF-LINE VOUCHER.

3   OTHERWISE, THEY ARE EXPECTED TO BE ABLE TO CONNECT AND GET

4   ACCESS ON THE ONLINE ROUTINE.

5   **Q.**  ALL RIGHT.

6   **A.**  SO THIS IS JUST THE FIRST STEP OF THE CLAIM.  WE ARE GOING

7   TO EXPLAIN HOW THAT HAPPENS.

8       SO THE ACROBAT FAMILY OF APPLICATIONS CONTAINS EXECUTABLE

9   INSTRUCTIONS.  AND WHEN INSTRUCTIONS ARE GIVEN TO OPEN THE

10  FILE, IT FIRST COLLECTS AND TRANSMITS NOTIFICATION

11  INFORMATION.  THIS IS USUALLY IN THE FORM OF SOME PRINCIPLE,

12  SOMETHING ABOUT THE PARTICULAR PERSON.  THE PRINCIPLE REFERS

13  TO THE PERSON WHO IS TRYING ON ACCESS THE DOCUMENT.

14      SOME INFORMATION ABOUT THEM IS NOTIFIED.  AND IF THEY ARE

15  ALLOWED TO ACCESS IT, THEN THEY ARE ALLOWED TO OPEN THE FILE.

16  **Q.**  ALL RIGHT.  DR. DEVANBU, JUST REMIND YOU TO PLEASE KEEP

17  YOUR PACE DOWN.  I WILL REMIND MYSELF AS WELL.

18      OKAY.  WHAT ABOUT SLIDE 16?

19                  (PUBLISHED TO JURY.)

20  **A.**  SO WHAT THIS SHOWS IS THERE'S A CHECK FOR A CACHE LOCAL

21  VOUCHER.  SO IF THE LOCAL VOUCHER IS AVAILABLE IN THE CACHE,

22  THERE'S A CALL TO CHECK FOR THAT.  AND IF THAT VOUCHER IS

23  AVAILABLE, THEN THAT VOUCHER IS PROCESSED TO EXTRACT THE KEY

24  AND DECRYPT THE DOCUMENT.  IF THAT LOCAL VOUCHER IS NOT

25  AVAILABLE, THEN IT REQUESTS REMOTELY FOR A VOUCHER.

1  **Q.**  OKAY.  IT LOOKS LIKE WE ARE GETTING BACK TO SOME SOURCE

2  CODE CITATIONS HERE.

3  **A.**  THAT'S RIGHT.

4  **Q.**  CAN YOU WALK US THROUGH THOSE AT A HIGH LEVEL?

5  **A.**  YES.

6  SO THE LIVECYCLE RIGHTS MANAGEMENT HAS A PIECE WHICH HAS

7  TO BE INITIALIZED.  THAT'S THE FIRST CALL IN THE SEQUENCE.

8  SO THAT'S THE INITSESSION METHOD THAT GETS CALLED.  THAT

9  METHOD CALLS ANOTHER METHOD CALLED REQUEST ACCESS.  AND IT

10  REQUESTS ACCESS IN ONE SCENARIO IT REQUESTS ONLINE ACCESS AND

11  THAT IS DONE THROUGH A METHOD CALLED REQUEST ACCESS ONLINE.

12  THE REQUEST ACCESS ONLINE METHOD FIRST CALLS THE GET

13  CACHED VOUCHER METHOD TO SEE IF THERE'S A CACHED LOCAL

14  VOUCHER.  IF THAT LOCAL VOUCHER IS NOT AVAILABLE, THEN IT GOES

15  OFF AND REQUESTS A VOUCHER FROM THE SERVER.

16  **Q.**  OKAY.  LET'S TURN TO THE NEXT ELEMENT, WHICH IS THE

17  REQUESTING FROM THE EXTERNAL SOURCE.

18  **A.**  YES.

19  SO, THIS IS THE TWO STEPS.  I'M SHOWING ON THE RIGHT HERE.

20  SO IF YOU HAVE A LOCAL VOUCHER AND THEN YOU PROCEED.  THAT'S

21  THE FIRST OF -- THE FIRST FLOW CHART THERE, RIGHT THERE

22  (INDICATING).

23  AND IF THE LOCAL VOUCHER IS NOT AVAILABLE, THEN YOU GO OFF

24  AND ASK THE SERVER.  THEN YOU RECEIVE THE VOUCHER AND GENERATE

25  PERMISSION BASED ON THE VOUCHER.

1     SO THIS IS ELEMENT 2 AND ELEMENT 3 OF THE CLAIM.  SO WE

2     ARE GOING TO LOOK AT ELEMENT 2 NEXT.

3     **Q.**  ALL RIGHT.  WE ARE LOOKING AT ELEMENT 2 NOW?

4     **A.**  THAT'S RIGHT.

5     SO, IF THE CACHED VOUCHER IS NOT AVAILABLE, SO THAT'S THE

6     FIRST STEP, IT CHECKS TO SEE IF THE CACHED VOUCHER IS

7     AVAILABLE, IF IT IS NOT AVAILABLE, IT PROCEEDS TO THE NEXT

8     STEP, WHICH IS REQUESTING A VOUCHER FROM THE SERVER.

9     AND WE CAN KEEP GOING.

10    **Q.**  IS THIS, JUST SO WE ARE CLEAR, IS THIS WITH RESPECT TO

11    ONLINE OR OFF-LINE MODE?

12    **A.**  THIS IS ONLINE.

13    SO IT CALLS THE GET VOUCHER TO PROCESS -- TO REQUEST A

14    VOUCHER.  AND THROUGH A LONG SERIES OF CALLS, THIS EVENTUALLY

15    GETS TO -- THIS METHOD HERE CALLED SOAP CALL GET CONSUME

16    LICENSE.

17    SO THE "SOAP" REFERS TO SIMPLE OBJECT ACCESS PROTOCOL,

18    WHICH IS ANOTHER KIND OF STANDARD LIKE HTTP THAT ALLOWS YOU TO

19    REQUEST INFORMATION, MAKE CHANGES, OR UPDATE INFORMATION VIA

20    THE WEB.

21    SO THIS SOAP CALL IMPL GET CONSUME LICENSE, IT'S A VERY

22    NAME.  IT'S ACTUALLY A METHOD THAT'S AUTOMATICALLY GENERATED

23    TO EXECUTE THE CALL USING THE SOAP PROTOCOL AND GET THE

24    RESPONSE.

25    IN OTHER WORDS, IT'S NOT PROGRAMMED BY HUMAN, IT'S

1    GENERATED.

2    **Q.**  I SEE.  OKAY.

3         SO ARE WE TURNING TO ELEMENT 3 NOW?

4    **A.**  YES.

5    **Q.**  DOES THIS ASSIST IN YOUR EXPLANATION OF ELEMENT 3'S

6    PRESENCE?

7    **A.**  YES.  SO ESSENTIALLY THIS IS THE PART WHERE THE NEXT STEP

8    OF THE -- NEXT ELEMENT OF THE CLAIM, THE RECEIVING THE DATA.

9         SO, IF SUCCESSFUL, GET VOUCHER GETS BACK TO REQUEST ACCESS

10   ONLINE, AND THEN THERE'S A VOUCHER THAT'S RECEIVED.

11        AND THE VOUCHER IS A DATA STRUCTURE WITH A LOT OF DATA IN

12   IT.  AND THAT DATA GETS PROCESSED BY POST PROCESS VOUCHER

13   WHICH IS THE NEXT METHOD THAT GETS CALLED.

14        SO THIS IS RECEIVING THE VOUCHER FROM EXTERNAL TOKEN AND

15   THEN PROCESSING THE VOUCHER.

16   **Q.**  ALL RIGHT.  THAT TAKES US TO THE LAST STEP, CORRECT?

17   **A.**  RIGHT.  THAT IS -- YES.

18        SO TO EXPLAIN THIS ELEMENT, WE CITE THE DEPOSITION OF

19   HERBACH.  SO -- SO THE VOUCHER CONTAINS PERMISSIONS AND ALSO

20   CONTAINS SOME OTHER INFORMATION INDICATING THE CLIENT

21   APPLICATION, WHETHER OR NOT ACCESS SHOULD BE GRANTED.

22        SO, THE CLIENT PROCESSED THE VOUCHER AND THEN DECIDES

23   WHETHER TO EXTRACT THE KEY AND GRANT ACCESSION.

24   **Q.**  ALL RIGHT.

25        LET'S LOOK AT THE NEXT SLIDE.  THIS IS FROM PLAINTIFF'S

1    EXHIBIT 55.

2                    (PUBLISHED TO JURY.)

3        WHAT DOES THIS SHOW TO YOU?

4    **A.**  SO THIS IS SHOWING HOW THIS HAPPENS, HOW THE KEY IS

5    EXTRACTED AND STORED.

6        SO IN THE CASE FOR -- IN THE CASE OF OFF-LINE USE, THE KEY

7    THAT IS RECEIVED -- AND THE VOUCHER IS ACTUALLY ENCRYPTED WITH

8    THE KEY OF THE CUSTOMER.  SO THE PERSON, THE CLIENT REQUESTING

9    THE SOFTWARE.

10       SO, IN ORDER TO EXTRACT THE KEY, THE CLIENT WILL DECODE

11   THE KEY THAT IS SENT USING THEIR USE PRINCIPLE KEY, AND THEN

12   USE THE DECODED KEY AS THE PERMISSION TO ACCESS THE CONTENT.

13   **Q.**  WHEN YOU SAY "DECODE" WHAT DO YOU MEAN THERE?

14   **A.**  SO WHEN A VOUCHER IS TRANSMITTED, WHETHER IT'S ONLINE OR

15   OFF-LINE ACCESS, YOU DON'T WANT PRYING EYES TO SEE THE

16   VOUCHER, PULL UP THE INFORMATION AND ACCESS THE DOCUMENT

17   WITHOUT AUTHORIZATION.  RIGHT?

18   **Q.**  OKAY.

19   **A.**  SO IF I COULD SEE A VOUCHER GOING BY ON WIFI, FOR EXAMPLE,

20   I COULD GRAB THAT VOUCHER AND USE IT TO ACCESS SOME SECRET

21   DOCUMENT AT THE CIA, FOR EXAMPLE.

22       SO IN ORDER TO DISALLOW THAT, THE VOUCHERS THAT ARE SENT

23   ARE ALWAYS PROTECTED IN SOME WAY.  THEY'RE PROTECTED IN

24   DIFFERENT WAYS IN THE OFF LINE AND ONLINE CASE.

25       IN ORDER TO PROCESS THAT PROTECTION AND EXTRACT IT IN A

1    USABLE FORM, THE CLIENT WILL BE PROCESSING THE VOUCHER.

2    **Q.**   OKAY.  AND IN THIS PARTICULAR OFF-LINE EXAMPLE, HOW DOES

3    THAT PROCESSING OCCUR?

4    **A.**   IN THE OFF-LINE CASE, THE VOUCHER CONTAINS A KEY THAT IS

5    ENCRYPTED WITH THE KEY OF THE PERSON WHO IS RECEIVING IT,

6    WHO'S ALLOWED ACCESS TO IT.  SO IF YOU DON'T HAVE THAT KEY,

7    YOU CAN'T EXTRACT THE DOCUMENT'S ENCRYPTION KEY.

8    **Q.**   ALL RIGHT.

9        SO IF THAT VOUCHER WERE INTERCEPTED, AS YOU SAY, FOR

10   EXAMPLE, ON WIFI BY SOMEONE WHO IS NOT THE INTENDED RECIPIENT,

11   COULD THEY MAKE USE OF THAT VOUCHER?

12   **A.**   WITHOUT ACCESS TO THAT PRINCIPLE KEY, IT'S JUST GIBBERISH.

13            **THE COURT:**  LET'S BREAK FOR THE DAY.  IT'S 1:30.  WE

14   WILL START UP AGAIN TOMORROW AT 10:30 AND WE'LL GO TO 3:30.

15       DURING THE EVENING LEAVE YOUR NOTES AND YOUR INSTRUCTIONS

16   IN THE JURY ROOM.  WEAR YOUR BADGES WHEN YOU LEAVE AND WHEN

17   YOU COME BACK.  REMEMBER NOT TO DISCUSS THE CASE OUTSIDE THE

18   JURY ROOM, AMONGST YOURSELVES OR WITH ANYONE ELSE, AND WE WILL

19   SEE YOU TOMORROW.

20       ONE OF YOU HAS A POTENTIAL APPOINTMENT NEXT WEEK.  JUST

21   KEEP US INFORMED ABOUT THAT AND WE WILL DEAL WITH IT ONE WAY

22   OR ANOTHER.

23       YOU MAY STEP DOWN, SIR.  WE'LL NEED YOU BACK AT 10:30.

24       I WOULD LIKE TO SEE THE ATTORNEYS FOR A MOMENT.

25       (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

1        **THE COURT:** SO COUNSEL'S POINT WAS THAT YOU WERE

2   ASKING THIS WITNESS SEEMINGLY WHETHER THERE WAS ANYTHING IN

3   THE CLAIM CONSTRUCTION THAT CALLED FOR A "YES" OR "NO" FROM

4   THE TOKEN, AND COUNSEL POINTS TO PAGE 6 OF THE CLAIM

5   CONSTRUCTION ORDER WHICH DOES SAY THAT THE -- UNLIKE THE

6   PLAINTIFF'S PROPOSAL, THAT THE TOKEN DOES CONTAIN A "YES NO"

7   INDICATION.

8        SO, ALTHOUGH THAT ISN'T SAID SPECIFICALLY IN THE

9   CONSTRUCTION, IT WAS CLEARLY WHAT THE CONSTRUCTION MEANT.  SO,

10  IT'S NOT APPROPRIATE FOR YOU TO HAVE THE WITNESS SAY THAT'S

11  NOT THERE BECAUSE IT IS THERE.  AND IF I HAVE TO, I WILL

12  INSTRUCT THE JURY THAT IT'S THERE.

13       **MR. DINOVO:** OKAY.  WHAT ABOUT THE 127 BITS AND

14  THIS --

15       **THE COURT:** THAT'S IN THERE, TOO, I THINK.

16       **MR. DINOVO:** NO.  NO.  THE 127 BITS IS DEFINITELY NOT

17  IN ANY SORT OF -- IT'S NOT EVEN IN THE BALLPARK BECAUSE --

18       **THE COURT:** I DON'T REMEMBER AN OBJECTION TO THAT.

19  IS THERE AN OBJECTION?

20       **MS. MEHTA:** YOUR HONOR, WE WOULD HAVE TWO REQUESTS.

21       ONE IS THAT WE WOULD SEEK A CURATIVE INSTRUCTION BECAUSE

22  HE PUT UP OUR SLIDE FROM THE OPENING, WHICH IS CONSISTENT WITH

23  THE COURT'S RULING, AND THEN IMPLIED THAT WE WERE MISLEADING

24  THE JURY AND THAT, IN FACT, THE COURT'S CLAIM CONSTRUCTION

25  DOESN'T REQUIRE THE "YES NO", WHICH IT CLEARLY DOES.

1      AND THAT ENTIRE LINE OF QUESTIONING -- THE QUESTION WAS:

2          "IS THERE ANYTHING AT ALL IN THE COURT'S CLAIM

3          CONSTRUCTION THAT REQUIRES A "YES NO"?

4      THE TESTIMONY FROM THE WITNESS WAS "NO", WHICH IS

5  OBVIOUSLY INCONSISTENT WITH THE COURT'S RULING, AND THAT'S IN

6  CLEAR VIOLATION OF THE COURT'S MOTION IN LIMINE RULING.

7      AND WE DISCUSSED THIS EXACT SCENARIO DURING THE MOTION IN

8  LIMINE HEARING, AND YOU WARNED COUNSEL THAT THEY COULDN'T DO

9  THIS.  SO WE WOULD REQUEST A CURATIVE INSTRUCTION.

10     THE OTHER THING WE WOULD REQUEST --

11         **THE COURT:**  NOW OR WITH THE FINAL INSTRUCTIONS?

12         **MS. MEHTA:**  I WOULD SAY NOW AND IN THE FINAL BECAUSE

13  HE WENT BACK TO IT OVER AND OVER AND OVER AGAIN AND IT'S

14  MISLEADING TO THE JURY AND IT'S PREJUDICIAL TO US.  AND IT

15  NEEDS TO BE IN THE FINAL BECAUSE IT'S PART OF THE CLAIM

16  CONSTRUCTION.

17     THE OTHER THING I WOULD REQUEST IS THE ABILITY TO IMPEACH

18  THE WITNESS WITH JUST THAT PORTION OF THE COURT'S CLAIM

19  CONSTRUCTION ORDER RELATING TO THE CONSTRUCTION OF TOKENS.

20  NOT THE REST OF THE ORDER, BUT JUST THAT TWO PAGES OR TWO

21  PARAGRAPHS.

22         **MR. DINOVO:**  YOUR HONOR, MAY I RESPOND?

23         **THE COURT:**  YES.

24         **MR. DINOVO:**  SO, AS YOUR HONOR WELL KNOWS, AS A

25  MATTER OF BASIC CLAIM CONSTRUCTION, TO TAKE AN EXAMPLE FROM A

1    PATENT SPECIFICATION, THERE'S A THOUSAND FEDERAL CIRCUIT CASES

2    THAT SAY IT'S INAPPROPRIATE, AND THESE LAWYERS WELL KNOW THIS,

3    IT'S INAPPROPRIATE TO TAKE AN EXAMPLE AND SAY THAT'S WHAT THE

4    CLAIM REQUIRES.

5         **THE COURT:**  RIGHT, BUT THAT'S NOT WHAT WE ARE TALKING

6    ABOUT.

7         WHAT WE ARE TALKING ABOUT IS THE CLAIM CONSTRUCTION ORDER

8    THAT SAYS THE COURT'S CONSTRUCTION MAKES CLEAR THAT A TOKEN

9    DOES NOT INDICATE SIMPLY THAT ACCESS SHOULD BE GRANTED BUT

10   ALSO CONTAINS A "YES NO" INDICATION.

11        **MR. DINOVO:**  OKAY.  SO --

12        **THE COURT:**  MAYBE THAT WAS WRONG, BUT THAT'S WHAT WE

13   ARE GOING WITH.

14        **MR. DINOVO:**  SO THAT PARTICULAR COMPONENT OF THE

15   COURT'S CLAIM CONSTRUCTION, MAYBE IT'S APPROPRIATE FOR US TO

16   CLARIFY.

17        BUT I THINK IT'S VITAL FOR THE COURT TO UNDERSTAND THAT

18   WHEN THEY REPRESENT IN THEIR OPENING THAT WE HAVE TO SHOW,

19   WHICH THEY DID, THAT ADOBE'S LICENSE IS IDENTICAL, I THINK WAS

20   HER LANGUAGE, TO 127 DUMMY BIT EXAMPLE IN THE SPECIFICATION --

21        **THE COURT:**  YOU'RE CHANGING THE SUBJECT.

22        **MS. MEHTA:**  EXACTLY.

23        **THE COURT:**  WE WILL TALK ABOUT DUMMY BITS IN A MINUTE

24   IF THERE IS AN ISSUE ABOUT DUMMY BITS THAT I DON'T REMEMBER.

25        WHAT WE ARE TALKING ABOUT NOW IS THE "YES NO" TOKEN.  AND

1    THAT WAS CLEAR IN THE CLAIM CONSTRUCTION.  AND, COUNSEL, YOU

2    CAN WRITE A MODERATELY WORDED -- DON'T WRITE ANYTHING

3    OUTRAGEOUS OR I WON'T USE IT, BUT A MODERATELY WORDED

4    INSTRUCTION THAT CLARIFIES THAT I CAN GIVE TOMORROW, AND ALSO

5    THE SAME ONE OR SEPARATE ONE THAT I CAN INSERT SOMEWHERE INTO

6    THE INSTRUCTIONS, OR MAYBE I JUST HAVE TO MODIFY THE CLAIM

7    CONSTRUCTION ITSELF TO SAY THAT IT DOES REQUIRE A "YES NO"

8    INDICATION.

9           **MS. MEHTA:**  YES, YOUR HONOR.  OUR SUGGESTION WOULD

10    BE, AND WE ARE HAPPY TO WRITE UP SOMETHING MODERATELY WORDED

11    FOR YOU TO INCLUDE IN THE FINAL, BUT GIVEN THAT THE JURY HAS

12    THE CLAIM CONSTRUCTION SHEET IN THEIR BINDERS, IT MAY MAKE

13    SENSE TO AMEND THE CLAIM CONSTRUCTION IN THAT SHEET SO THAT

14    THEY HAVE THAT WITH THE REST OF THE CLAIM CONSTRUCTIONS.

15           **THE COURT:**  YOU CAN WRITE A PROPOSED AMENDMENT.

16           **MS. MEHTA:**  WE WILL DO SO.

17           **THE COURT:**  SHOW ALL THOSE THINGS TO COUNSEL.  I'M

18    SURE THEY WON'T AGREE IN GENERAL THAT THEY'D LIKE IT DONE, BUT

19    AT LEAST IF THEY HAVE ANY SUGGESTIONS ABOUT HOW IT SHOULD BE

20    DONE, YOU CAN TAKE THOSE INTO ACCOUNT BEFORE YOU SUBMIT IT.

21           **MS. MEHTA:**  WE WILL DO SO YOUR HONOR.

22           **THE COURT:**  IF YOU CAN TRY TO SUBMIT IT BY FIVE SO I

23    CAN LOOK AT IT.

24           **MS. MEHTA:**  WE WILL DO THAT.

25           **MR. DINOVO:**  YOUR HONOR, CAN I ASK FOR A CURATIVE

```
 1    INSTRUCTION TO THE EXTENT THAT THEY IMPLIED, WHICH RIGHT ON

 2    THEIR OPENING PATENT REQUIREMENTS, AND THEY SHOW DIGITAL REG'S

 3    127 BIT EXAMPLE WITH A DUMMY BIT.  THIS IS CLEARLY NOT

 4    ENCOMPASSED --

 5         THE COURT:  YOU ARE GOING BACK TO OBJECT TO SOMETHING

 6    IN THE OPENING STATEMENT; IS THAT WHAT WE ARE DOING NOW?

 7         MR. DINOVO:  WELL, WHAT --

 8         THE COURT:  I'M TRYING TO FOLLOW THE THREAD.

 9         MR. DINOVO:  I UNDERSTAND.

10         THE COURT:  WE ARE DONE TALKING ABOUT "YES NO" AND

11    NOW YOU WOULD LIKE TO TALK ABOUT SOMETHING ELSE, WHICH IS

12    WHAT?

13         MR. DINOVO:  WELL, IT'S THE SAME -- I UNDERSTAND

14    THERE'S TWO DIFFERENT COMPONENTS HERE.  ONE IS THE "YES NO",

15    THE OTHER IS THIS GRAPHICAL DESCRIPTION WITH THE HEADING

16    "REQUIREMENTS FOR INFRINGEMENT".  AND IT SHOWS AN EXAMPLE FROM

17    THE SPECIFICATION AND IMPLIES, I THINK ACTUALLY IT STATES

18    EXPLICITLY THAT WE HAVE TO SHOW BECAUSE THEY --

19         THE COURT:  WHAT YOU ARE TALKING ABOUT HERE IS A

20    DEMONSTRATIVE THEY USED IN THEIR OPENING STATEMENT?

21         MR. DINOVO:  YES, YOUR HONOR.

22         THE COURT:  WHY ARE YOU BRINGING THAT UP NOW?

23         MR. DINOVO:  BECAUSE WE WANT TO MAKE CLEAR THAT WHAT

24    THEY REPRESENTED TO THIS JURY IS A REQUIREMENT TO SHOW

25    INFRINGEMENT IS NOT, IN FACT, A REQUIREMENT.
```

1          **MS. MEHTA:**  ACTUALLY, YOUR HONOR, WHAT THE OPENING

2     STATEMENT SAID, AND IT'S ACTUALLY ON THE SLIDE -- THE OTHER

3     SLIDE THAT HE'S NOT -- HASN'T PULLED UP FOR YOU YET BUT SHOWED

4     THE WITNESS --

5          **THE COURT:**  I HAVE THE SLIDES RIGHT HERE.  WHICH ONE

6     ARE WE TALKING ABOUT?

7          **MR. DINOVO:**  SLIDE AD 1022.

8          **MS. MEHTA:**  ACTUALLY, IF YOU GO AHEAD OF THAT, THERE

9     IS A TITLE SLIDE THAT SAYS THE TWO REQUIREMENTS.  IT SIMPLY

10    SAYS THE TOKEN IS YES NO.  AND EVEN ON THE SLIDE THAT

11    MR. DINOVO POINTED YOU TO, THE HEADING SAYS KEY REQUIREMENTS

12    FOR INFRINGEMENT YES NO TOKEN.

13        AND WE NEVER ARGUED TO THE JURY THAT A 128 BIT TOKEN WAS

14    REQUIRED OR THAT A DUMMY BIT WAS REQUIRED, OR ANY OF THAT.  WE

15    SAID THE COURT'S CONSTRUCTION OR THE CLAIMS REQUIRE YES NO AND

16    THEN WE SHOWED HOW THE PATENT REFLECTS WHAT THE TOKEN IS

17    THAT'S DEPICTED IN THE PATENT, WHICH IS, OF COURSE,

18    APPROPRIATE, AND WHAT THE TOKEN IS IN THE ACCUSED PRODUCTS,

19    WHICH IS ALSO APPROPRIATE.

20        SO THERE'S NOTHING THAT WE HAVE DONE THAT SUGGEST DUMMY

21    BITS ARE REQUIRED OR THAT GARBAGE BITS ARE REQUIRED OR

22    ANYTHING LIKE THAT.  IT'S SIMPLY ILLUSTRATIVE.  AND NOTABLY

23    THERE WAS NO OBJECTION DURING OPENING.

24        **MR. DINOVO:**  WELL, WE DIDN'T WANT TO INTERRUPT THEIR

25    OPENING, YOUR HONOR, BUT IT SOUNDS LIKE THEY AGREE THAT THIS

```
1   IS NOT REQUIRED.  AND IF THERE'S GOING TO BE A CURATIVE

2   INSTRUCTION, WE WOULD ASK THAT THERE BE AN INSTRUCTION THAT

3   THE DUMMY INFORMATION REPRESENTED IN THIS DIAGRAM IS NOT

4   REQUIRED.

5        MS. MEHTA:  THERE WAS NO TESTIMONY TO SUGGEST THAT

6   THERE WAS AND THERE WAS NOTHING IN THE OPENING TO SUGGEST THAT

7   THERE WAS.

8        THE COURT:  IS THIS A DRAWING FROM THE SPECIFICATION?

9        MS. MEHTA:  IT'S JUST AN ILLUSTRATIVE THAT WE CREATED

10  FOR OPENING.  IT'S NOT EVIDENCE.  IT'S NOT IN EVIDENCE.

11     AND UNLIKE MR. DINOVO WHO ELICITED TESTIMONY FROM AN

12  EXPERT DIRECTLY CONTRARY TO THE COURT'S CLAIM CONSTRUCTION, WE

13  DIDN'T EVEN SUGGEST THAT 128 BITS WERE REQUIRED.  ALL WE SAID

14  IS THAT A YES NO IS REQUIRED.

15       MR. DINOVO:  ALL I SEE IS THE HEADING, "REQUIREMENTS

16  FOR INFRINGEMENT --

17       MS. MEHTA:  YES NO TOKEN.  HE'S MISREPRESENTING THE

18  TITLE OF THE SLIDE.

19       MR. DINOVO:  IF THERE IS NO CONCERN --

20       THE COURT:  WHAT IS IT THAT YOU WANT NOW?  I'M NOT

21  GOING TO GIVE A CURATIVE INSTRUCTION TO A GRAPHIC THAT WAS

22  SHOWN IN THE OPENING STATEMENT.  IT'S WAY TOO LATE FOR THAT.

23     IF YOU ARE TRYING TO ANTICIPATE AN OBJECTION THAT THEY

24  MIGHT MAKE TO TESTIMONY YOUR EXPERT MIGHT HAVE TO MAKE CLEAR

25  THAT 127 BIT IS NOT -- DUMMY INFO IS NOT REQUIRED ON THE
```

1    TOKEN, IF YOU ELICIT THAT FROM YOUR EXPERT, I GUESS YOU WON'T

2    OBJECT.

3            **MS. MEHTA:**  THEY DID ELICIT THAT FROM THE EXPERT AND

4    WE DID NOT OBJECT.

5            **THE COURT:**  OH, OKAY.

6            **MR. DINOVO:**  PRESUMABLY WHEN I ELICIT IT FROM THEIR

7    OWN EXPERT, HE WON'T -- HE WON'T DICKER WITH ME EITHER.

8        I THINK THE POINT IS, IF WE ARE GOING TO CHANGE CLAIM

9    CONSTRUCTION HERE IN THE MIDDLE OF THE TRIAL TO -- AND MODIFY

10   THE CONSTRUCTION TO THE JURY, WHICH I GUESS WOULD BE DIFFERENT

11   THAN THE PRELIMINARY INSTRUCTIONS, THEN WE SHOULD MAKE CLEAR

12   THAT THIS PARTICULAR EMBODIMENT IS NOT REQUIRED.  BECAUSE WE

13   CERTAINLY THINK A FAIR VIEWING OF THIS SLIDE IS THEY ARE

14   REPRESENTING THIS TO BE A REQUIREMENT.  AND I RECALL MS. MEHTA

15   SAYING THE WORD "IDENTICAL" ABOUT 20 TIMES DURING HER OPENING,

16   SAYING THIS HAS TO BE IDENTICAL TO THAT.

17           **MS. MEHTA:**  NO, YOUR HONOR.  WHAT I SAID WAS THAT THE

18   ACCUSED PRODUCTS HAVE TO BE IDENTICAL TO THE CLAIMS AND THEN I

19   SAID THAT THE CLAIMS REQUIRE YES NO.

20       EVEN THE SLIDE THAT MR. DINOVO KEEPS POINTING YOU TO, THE

21   TITLE HE'S TRUNCATING, HE'S NOT READING THE FULL TITLE

22   INTENTIONALLY, OBVIOUSLY, AND WHAT HE'S TRYING TO DO IS OPEN

23   THE DOOR TO CREATING CONFUSION FOR THE JURY.

24       WHAT WE ARE ASKING TO DO IS FOR A CURATIVE INSTRUCTION

25   BECAUSE HE VIOLATED THE COURT'S MOTION IN LIMINE RULING AND

```
1    ELICITED TESTIMONY DIRECTLY CONTRARY TO THE COURT'S CLAIM

2    CONSTRUCTION.

3              MR. DINOVO:  ALL WE DID IS ASK --

4              THE COURT:  WE ARE DONE WITH THAT.  NOW WE ARE

5    TALKING ABOUT THIS 127 BITS, WHICH I'M STILL REALLY NOT

6    FOLLOWING.  THE OBJECTION YOU HAVE IS WHERE IT SAYS "'541

7    PATENT REQUIREMENTS FOR INFRINGEMENT YES NO TOKEN"?

8              MR. DINOVO:  YES, YOUR HONOR.

9              THE COURT:  SO THAT'S ACCURATE.

10             MR. DINOVO:  THE HEADING ALONE, BUT OF COURSE --

11             THE COURT:  SO UNDER THERE, THERE'S A DRAWING OF

12   DIGITAL REG'S WHAT, OF A PREFERRED EMBODIMENT OR SOMETHING?

13             MR. DINOVO:  IT'S AN EMBODIMENT.

14             MS. MEHTA:  IT'S JUST ILLUSTRATIVE OF WHAT THE TOKEN

15   THAT'S DEPICTED IN THE SPECIFICATION LOOKS LIKE AND WHAT SOME

16   OF THE TOKENS LOOK LIKE --

17             MR. DINOVO:  THESE WERE NOT USED --

18             THE COURT:  YOU'RE INTERRUPTING.

19             MR. DINOVO:  YES, MA'AM.

20             MS. MEHTA:  IT IS NOT IN EVIDENCE.  I DIDN'T ARGUE

21   THAT 128 BITS WERE REQUIRED.  I DIDN'T ARGUE DUMMY BITS WERE

22   REQUIRED.  WE SIMPLY EXPLAINED THE EVIDENCE WOULD SHOW THAT

23   THE COURT'S CONSTRUCTION REQUIRED A YES NO AND THAT WE DON'T

24   HAVE IT.  AND THEN WE SHOWED FOR THE JURY SO THEY COULD HAVE

25   AN UNDERSTANDING OF THE PATENT AND THE PRODUCTS, HOW THE
```

1    PATENT WORKS, WHICH IS EXACTLY WHAT THEY HAVE BEEN DOING ALL

2    DAY.

3          **THE COURT:**  I GUESS YOUR ISSUE IS THAT THE HEADING

4    SAYS "REQUIREMENTS YES NO TOKEN" BUT THE DRAWING HAS DUMMY

5    INFO, AND YOU THINK THAT THAT MIGHT LEAD SOMEONE TO BELIEVE

6    THE DUMMY INFO WAS ALSO REQUIRED.

7          **MR. DINOVO:**  THAT WAS MY TAKEAWAY FROM THE ARGUMENT

8    THAT THERE WAS --

9          **THE COURT:**  IF YOU DO A GRAPHIC FOR YOUR CLOSING

10   ARGUMENT, DON'T HAVE A PICTURE UNDER THE WORD "REQUIRE" THAT

11   INCLUDES SOMETHING THAT ISN'T REQUIRED.

12          **MS. MEHTA:**  THAT'S FINE, YOUR HONOR.

13          **MR. DINOVO:**  THANK YOU, YOUR HONOR.

14          **THE COURT:**  OTHER THAN THAT, I DON'T SEE A PROBLEM.

15          **MR. DINOVO:**  VERY WELL, YOUR HONOR.  THANK YOU.

16          **MR. REINES:**  YOUR HONOR, WE HAVE TWO OTHER ISSUES.  I

17   APOLOGIZE.  I WILL TRY TO BE AS BRIEF AS POSSIBLE.

18          **THE COURT:**  OKAY.

19          **MR. REINES:**  ONE, YOUR HONOR, IS CONCERNING -- WE'RE

20   BACK TO THE VENTERS' TESTIMONY AND THE 2004 MEETING.

21      WE HAVE SERIOUS CONCERN ABOUT THE DISCOVERY PERFORMANCE

22   AND THE IMPLICATION OF THE VENTERS' TESTIMONY.  HE TESTIFIED

23   THAT HE HAD THE ACTUAL DOCUMENT THAT WAS SENT TO ADOBE.

24   THAT'S WHAT HE TESTIFIED TO.

25          **THE COURT:**  HE TESTIFIED WHEN?

1        **MR. REINES:**  UP ON THE STAND TODAY.

2        **THE COURT:**  WELL, THERE WAS NO HARD COPY.  IT WAS

3  SUBMITTED ONLINE.

4        **MR. REINES:**  NO.  HE SAYS HE HAS A COPY OF IT.  HE

5  SAID IT JUST WASN'T PRODUCED IN THE CASE.  HE SAYS HE

6  POSSESSES IT.

7        **THE COURT:**  OH, OH, THAT'S TRUE.  OKAY.  YOU SHOULD

8  GET THAT FROM HIM.  ASK HIM WHAT IT WAS HE WAS REFERRING TO

9  AND GET IT AND GIVE IT TO THEM.

10        **MS. GLAUSER:**  I HAVE ASKED, YOUR HONOR.  AND THE

11  ANSWER IS THAT IT'S THE EXACT DOCUMENT THAT WE ENTERED TODAY

12  WITH THE TRACK CHANGES OFF SO THAT IT DOESN'T HAVE THAT ONE

13  COMMENT BUBBLE.

14        **MR. REINES:**  YOUR HONOR --

15        **MS. GLAUSER:**  SO RATHER THAN BURDEN THE EVIDENCE WITH

16  THE ADDITIONAL ONE WHERE HE'S ALREADY SAID THAT THE COMMENT

17  BUBBLE WASN'T GIVEN -- YOU WERE ABLE TO CROSS HIM ON THE

18  COMMENT BUBBLE.  IF WE WANT TO BRING HIM BACK IN TO HAVE THE

19  OTHER, THAT'S FINE.

20  I'M HAPPY TO GIVE IT TO YOU.  I JUST DON'T KNOW THAT IT

21  NEEDS TO BE ADDED INTO EVIDENCE IF IT'S THE EXACT SAME

22  DOCUMENT WITHOUT THE COMMENT BUBBLE.

23        **THE COURT:**  I THINK IT'S MORE A QUESTION OF SEEING IT

24  AND UNDERSTANDING THE DISCOVERY WAS COMPLETE, IF IT WAS.

25  SO, I THINK -- YEAH.  HE SHOULD BRING IN OR GIVE YOU TO

```
1    GIVE THEM THE DOCUMENT THAT HE WAS REFERRING TO IN HIS

2    TESTIMONY.

3            MS. GLAUSER:  ABSOLUTELY, YOUR HONOR.

4            MR. REINES:  YOUR HONOR, WE LEVELED A BEST EVIDENCE

5    OBJECTION TO THE COURT AND TO THEM.  WE HAD MEET AND CONFERS

6    SAYING THIS IS OBVIOUSLY NOT THE DOCUMENT BECAUSE IT'S GOT

7    TRACK CHANGES.  THIS ISN'T SOMETHING ANY PROFESSIONAL

8    ORGANIZATION WOULD GIVE TO ANOTHER PROFESSIONAL ORGANIZATION.

9        THIS IS THEIR KEY ARGUMENT ON WILLFULNESS.  AND THEY ARE

10   SAYING THEY WITHHELD FROM US THE ACTUAL DOCUMENT --

11           THE COURT:  I MEAN, EVERYONE KNOWS IN WORD YOU JUST

12   SAY DON'T ACCEPT CHANGES OR SOMETHING, AND IT CREATES IT

13   WITHOUT THE COMMENTS.  SO THEY COULD DO THAT.  I DON'T KNOW

14   WHY YOU DIDN'T DO IT.

15           MR. REINES:  THEY GAVE US --

16           THE COURT:  EXCUSE ME.

17       WHY DIDN'T YOU GIVE THEM ONE -- WHY DID YOU GIVE THEM THE

18   ONE THAT HAD THE COMMENT BUBBLE IN IT?

19           MS. GLAUSER:  I THINK THAT IT WAS AN ISSUE OF HOW IT

20   GOT PRODUCED.  SO IT GOT PULLED FROM THEIR FILES AND THEN

21   PRODUCED IN THAT WAY VERSUS THE TERM TRACK CHANGES OFF AND NOW

22   SEND OUT.

23       THERE WASN'T ANY EMAIL DISCOVERY IN THIS CASE SO WE DON'T

24   HAVE THE EMAIL THAT WENT TO -- AT LEAST I DON'T BELIEVE THERE

25   WAS.  THERE WASN'T ANY EMAIL DISCOVERY WHERE IT WOULD HAVE THE
```

1    ATTACHMENT THAT WENT TO ADOBE.  WHAT IT HAS IS THE FILES THAT

2    ARE IN DIGITAL REG'S COMPUTER.  WHEN IT GOT PULLED, IT GOT

3    PULLED WITH THE TRACK CHANGES, AS I UNDERSTAND IT.

4         **MR. REINES:**  YOUR HONOR, THEY WITHHELD THE KEY

5    DOCUMENT THAT WE SAID WAS THE BEST EVIDENCE VIOLATION.

6         **THE COURT:**  THEY PRINTED IT OUT IN A WAY WHERE IT

7    SHOWED THE COMMENT INSTEAD OF MANIPULATING IT TO SAY

8    "REVIEW" -- TO SAY, WHAT DO YOU TELL IT --

9         **MS. GLAUSER:**  REMOVE --

10        **THE COURT:**  -- ACCEPT ALL CHANGES, OR SOMETHING LIKE

11   THAT.

12        **MR. REINES:**  I DON'T THINK IT'S THAT SIMPLE IN THE

13   SENSE THAT IT'S THE MOST IMPORTANT DOCUMENT.  AND WE ASKED

14   UNDER BEST EVIDENCE YOU WOULD THINK THEY WOULD HAVE GIVEN US

15   THE ACTUAL DOCUMENT THEY ARE TRYING TO PROVE THAT THEY GAVE

16   US.

17      IN OTHER WORDS, IF THEY KNEW THEY GAVE US A DIFFERENT

18   VERSION OF THE DOCUMENT, WHEN WE SAID WE DON'T BELIEVE THAT'S

19   THE DOCUMENT YOU'RE GIVING, YOU SHOULD GIVE IT TO US.  WE HAVE

20   SPECIFIC DOCUMENT REQUESTS.

21        **THE COURT:**  WHY DIDN'T YOU CLEAR THIS UP BEFORE?

22   DIDN'T YOU KNOW IT WAS JUST A COMMENT AND YOU COULD EASILY

23   PRINT OUT A DOCUMENT THAT DIDN'T HAVE THE COMMENT?

24        **MS. GLAUSER:**  IT SEEMS THEN IT WOULD HAVE BEEN

25   MANIPULATING THE DOCUMENT THE WAY THAT IT WAS STORED ON

```
1    DIGITAL REG'S SYSTEMS.

2           THE COURT:  YOU COULD TELL EACH OTHER WHAT WORD DOES

3    AND HOW YOU GET COMMENTS OUT AND GIVE THEM ONE WITHOUT THE

4    COMMENT.  WERE YOU NOT TALKING TO EACH OTHER ABOUT THESE

5    MATTERS?

6           MR. REINES:  WE DID NOT.

7           THE COURT:  ANYWAY, WHAT I WOULD LIKE YOU TO DO IS

8    GET IS VENTERS AROUND HERE ANYMORE?  DID HE GO HOME?

9           MS. GLAUSER:  I BELIEVE THAT HE IS.

10          MR. REINES:  THE LAST THING IN THE WORLD --

11          THE COURT:  IS HE IN THE BUILDING IS WHAT I'M ASKING.

12          MR. FARLEY:  YES, MA'AM.  HE'S RIGHT OUTSIDE.

13          THE COURT:  I REALLY DON'T WANT TO DO THIS, BUT I

14   SUPPOSE WE CAN PUT HIM ON THE STAND AND QUESTION HIM ABOUT --

15          MR. REINES:  NO.

16          THE COURT:  -- IF THERE IS ANOTHER DOCUMENT ON HIS

17   COMPUTER AND MAKE SURE WE PRINT IT OUT.

18          MR. REINES:  NO.  THE LAST THING IN THE WORLD IS WE

19   WOULD WANT THEM TO BE ABLE TO PUT INTO EVIDENCE A NEW DOCUMENT

20   THAT WAS NOT PRODUCED DURING DISCOVERY.

21          THE COURT:  I AM CONCERNED ABOUT THE INTEGRITY OF THE

22   DISCOVERY PROCESS.

23          MR. REINES:  YES.

24          THE COURT:  NO, I'M NOT GOING TO PUT HIM ON IN FRONT

25   OF THE JURY AGAIN OR PUT A DIFFERENT DOCUMENT IN FRONT OF THE
```

1    JURY.  I WOULD LIKE TO MAKE SURE THERE ISN'T -- THAT HE WASN'T

2    REFERRING TO SOME OTHER DOCUMENT THAT WASN'T TURNED OVER.

3        SO WE COULD HAVE HIM ON THE STAND TO ASK HIM UNDER OATH

4    WHAT HE WAS TALKING ABOUT OR WE CAN HAVE HIM DO A DECLARATION.

5            **MR. REINES:**  I'M HAPPY TO QUESTION HIM NOW.  BUT

6    THERE'S A RELATED -- IF THE COURT DOESN'T WHAT TO DO THAT, WE

7    WON'T DO IT.  IT'S A SERIOUS ISSUE BECAUSE IT'S THE DOCUMENT

8    THAT THEY'RE SAYING PUTS US ON NOTICE.

9            **THE COURT:**  ALL RIGHT.  CALL HIM IN.

10           **MS. GLAUSER:**  WOULD YOU LIKE A COPY OF THE DOCUMENT

11   THAT HE'S REFERRING TO FIRST?

12           **MR. REINES:**  YOUR HONOR, THERE'S A SECOND ISSUE,

13   WHICH IS IMPORTANT.  I'M SORRY.  IT'S RELATING TO THE SAME --

14           **THE COURT:**  WOULD YOU GO GET HIM?

15           **MR. REINES:**  -- ISSUE WHICH IS THAT HE TESTIFIED THAT

16   HE WAS NEVER ASKED WHO THE ADOBE PERSONNEL WERE THAT HE HAD

17   THIS SUPPOSED PHONE CALL WITH.

18       WE HAVE MULTIPLE REQUESTS WHERE WE ASKED HIM FOR THAT

19   INFORMATION AND THEY FAILED.  THEY DIDN'T EVEN DO THE BASIC

20   QUESTION OF HIM OF WHO'S THE ADOBE PERSON SO WE COULD ASK.  WE

21   ASKED EVERYBODY AT ADOBE.  NO ONE EVER HEARD OF THEM, NO

22   RECORDS.  WE WERE FORCED TO PROVE A NEGATIVE AND THEN HE

23   REVEALS IN FRONT OF THE JURY THAT IT WAS NEVER ASKED AS THOUGH

24   WE WERE SOMEHOW AT FAULT --

25           **THE COURT:**  MR. VENTERS IS BACK IN THE ROOM NOW.  I

1    DON'T KNOW IF YOU WANT TO ALERT HIM TO THE ISSUES.

2        WE HAVE TO TAKE A BREAK.  THE COURT REPORTER HAS BEEN

3    GOING TOO LONG WITHOUT A BREAK.

4        I SUPPOSE WE CAN COME BACK IN A HALF AN HOUR AND PUT

5    MR. VENTER ON THE STAND.

6            **MR. REINES:**  CAN YOU INSTRUCT THE WITNESS NOT TO

7    SPEAK TO COUNSEL ABOUT THIS TOPIC?

8            **THE COURT:**  YES.  YOU NEED NOT TO TALK TO THE

9    ATTORNEYS IN THE MEANTIME AND BE BACK HERE AT 2:15.

10           **MS. GLAUSER:**  I DON'T KNOW IF IT'S POSSIBLE, IF IT IS

11   POSSIBLE IF MR. VENTERS --

12           **THE COURT:**  YOU CAN STEP OUT NOW.  JUST BE BACK AT

13   2:15 IF YOU WOULD PLEASE.

14           **MS. GLAUSER:**  I DON'T KNOW IF IT'S POSSIBLE BECAUSE I

15   DON'T KNOW IF MR. VENTERS USES A DESKTOP COMPUTER, IF HE USES

16   A LAPTOP.  IF HE HAS A LAPTOP AND IT HAS A COPY OF THE

17   DOCUMENT TO WHICH HE IS REFERRING, WOULD THE COURT LIKE A COPY

18   OF IT BEFORE WE BEGIN HIS QUESTIONING?

19           **THE COURT:**  SURE.

20           **MR. REINES:**  YOUR HONOR --

21           **MS. GLAUSER:**  I DON'T KNOW IF WE CAN GET IT.  THEN

22   THE QUESTION IS, HOW DO I ASK MR. VENTERS THAT?

23           **MR. REINES:**  YOUR HONOR, WE WOULD PREFER TO JUST DO

24   THE QUESTIONING WITHOUT ANY INTERACTION WITH COUNSEL.

25           **THE COURT:**  OKAY.

```
1        IF HE HAS THE DOCUMENT, IT'S A DOCUMENT THAT CONTAINS

2   TRACK CHANGES AND THE WAY TO PRINT IT WOULD BE TO SAY "DON'T

3   PRINT THE TRACK CHANGES" AND HE WOULD PRINT IT OUT.  WE ALL

4   KNOW WHAT THAT WOULD LIKE.  IT WOULD LOOK JUST LIKE THIS WITH

5   BIGGER MARGINS AND NO LITTLE COMMENT BUBBLE.  I THINK.  IT'S

6   THAT RIGHT?

7        SO I DON'T THINK THERE'S A GREAT DEAL OF POINT IN PRINTING

8   IT OUT THAT WAY.

9            MR. REINES:  RIGHT.

10            THE COURT:  OKAY.

11        (RECESS TAKEN AT 1:47 P.M.; RESUME AT 2:50 P.M.)

12            (CASE CALLED AND APPEARANCES GIVEN.)

13            THE COURT:  OKAY.  AND WHERE'S MR. VENTER?

14            MS. GLAUSER:  WE CAN BRING HIM IN IN JUST A MOMENT.

15        THE ONE ISSUE WE WANTED TO RAISE BEFORE WE BEGIN THE

16   QUESTIONING IS JUST TO RESERVE PRIVILEGE.

17        PART OF THIS IS GOING TO INVOLVE DISCUSSIONS WITH COUNSEL

18   ON THIS PARTICULAR EXHIBIT VERSION.  AND I UNDERSTAND THAT

19   MR. VENTERS NEEDS TO BE ABLE TO ANSWER THE QUESTIONS THAT

20   MR. REINES IS ASKING, BUT WE ARE JUST RESERVING GENERAL

21   PRIVILEGE AND NOTING BUT NOT WAIVING PRIVILEGE RELATING TO

22   MR. VENTERS' TRIAL PREPARATION OR ANY OTHER TOPIC.

23            THE COURT:  ALL RIGHT.  WOULD YOU STEP UP TO THE

24   STAND, PLEASE?  YOU HAVE PREVIOUSLY BEEN SWORN IN THIS

25   PROCEEDING AND ARE STILL UNDER OATH.
```

1          **THE WITNESS:**  YES, MA'AM.

2          **THE COURT:**  I JUST HAD A COUPLE OF QUESTIONS FIRST,

3     IF YOU DON'T MIND.

4       YOU WERE TESTIFYING ABOUT A DOCUMENT THAT YOU SAID YOU

5     GAVE TO ADOBE BACK AROUND THE TIME OF THE 2004 MEETING.

6          **THE WITNESS:**  YES, MA'AM.

7          **THE COURT:**  WE HAD SUCH A DOCUMENT HERE, AND YOU MADE

8     SOME COMMENT -- I DIDN'T GET A CHANCE TO LOOK IT UP -- BUT

9     SOMETHING LIKE, I HAVE THE DOCUMENT THAT I GAVE; THIS ISN'T

10    IT.

11         **THE WITNESS:**  RIGHT.

12         **THE COURT:**  WHAT WERE YOU REFERRING TO --

13         **THE WITNESS:**  SHOULD I USE THE MICROPHONE?

14         **THE COURT:**  YOU CAN, YES.

15         **THE WITNESS:**  IT IS A DOCUMENT WITH TRACKING ON AND

16    TACKING OFF IS THE SAME DOCUMENT.

17         **THE COURT:**  WHAT DOCUMENT WERE YOU REFERRING TO --

18         **THE WITNESS:**  THE DOCUMENT THAT I SENT TO ADOBE IS

19    THE ONE --

20         **THE COURT:**  EXCUSE ME.

21         **THE WITNESS:**  EXCUSE ME.

22         **THE COURT:**  LET ME FINISH THE QUESTION.

23      WHAT DOCUMENT WERE YOU REFERRING TO WHEN YOU SAID ON THE

24    STAND EARLIER THAT YOU HAVE THE DOCUMENT AND THIS ISN'T IT?

25         **THE WITNESS:**  I GUESS I WAS REFERRING TO THE FACT

1    THAT I HAVE A DOCUMENT THAT HAS THE TRACKING TURNED OFF.

2            **THE COURT:**  WHERE DO YOU HAVE THAT DOCUMENT?

3            **THE WITNESS:**  IT'S ONE IN THE SAME, BASICALLY.  IN

4    OTHER WORDS, YOU –– THAT –– THAT HAPPENED BACK IN THE DAY A

5    LOT.  IN 2004 –– CAN I PROVIDE THIS EXPLANATION?

6            **THE COURT:**  SURE.

7            **THE WITNESS:**  IN 2004, IT WAS BEFORE –– IT WAS COMMON

8    THAT YOU WOULD PUT THESE KINDS OF PROPOSALS IN PDF –– THANK

9    YOU, DEBBIE.

10       AND SO YOU WOULD SEND OUT WORD DOCS, WHICH WAS THE COMMON

11   OPERATING SYSTEM AT THE TIME.  AND THEY HAD THE TRACKING

12   FUNCTION ON THERE.  RIGHT?

13       AND I CAN TELL YOU, BECAUSE IT HAPPENED TO ME MORE THAN

14   ONCE, I WOULD SEND OUT A DOCUMENT WITH THE TRACKING ON.  I

15   DIDN'T KNOW.  IN FACT, FOR ALL I KNOW, ADOBE VENTURES GOT THIS

16   DOCUMENT WITH THE TRACKING ON.  BUT I CAN TELL YOU IN THE

17   CONVERSATION WITH THEM THEY DIDN'T SAY, OH, BY THE WAY, THE

18   TRACKING IS ON.

19       SO, I REALLY DON'T KNOW WHETHER THEY GOT THAT DOCUMENT,

20   THAT VERSION WITH IT TURNED ON OR OFF, BUT I CAN TELL YOU

21   THAT'S THE DOCUMENT.

22            **THE COURT:**  AND THEN YOU SAID SOMETHING ELSE WHEN YOU

23   WERE TESTIFYING ABOUT THE TWO PEOPLE THAT YOU SPOKE WITH ON

24   THE PHONE IN 2004 WHEN YOU TALKED TO ADOBE.

25       WHO WERE THOSE TWO PEOPLE?

1          THE WITNESS:  I'VE GOT THEIR NAME ON MY COMPUTER, BUT

2     I DIDN'T KNOW I WAS GOING TO NEED TO KNOW IT TODAY.  IT'S ON

3     MY COMPUTER.

4          THE COURT:  DO YOU KNOW EITHER OF THE NAMES?

5          THE WITNESS:  OH, BOY.  NOT OFF THE TIP OF MY TONGUE.

6     BUT IF I KNEW I WOULD NEED TO KNOW FOR THE RECORD -- WHERE I

7     GOT CONFUSED IS IN THE DEPOSITION, ADOBE DID NOT ASK ME WHO

8     THE PEOPLE WERE.

9          AND SO I WAS GETTING CONFUSED WITH WHETHER THEY WERE

10    TALKING ABOUT THE DEPOSITION, OR NOW, OR WHETHER -- THE ANSWER

11    IS, BECAUSE THEY NEVER ASKED ME, TO MY RECOLLECTION, DID THEY

12    ASK ME WHO THE PEOPLE WERE IN THE DEPOSITION.  I DIDN'T COME

13    TO THIS COURT READY TO TELL YOU WHO THEY ARE, BUT I KNOW WHO

14    THEY ARE.

15         THE COURT:  WHO NEVER ASKED YOU?

16         THE WITNESS:  I DON'T THINK ADOBE DURING DEPOSITION

17    ASKED ME IF I KNEW WHO THEY WERE.

18         THE COURT:  SO YOU HAVE THEIR NAMES ON YOUR COMPUTER?

19         THE WITNESS:  YES, I DO.  I CAN BRING THEM TO COURT

20    TOMORROW.

21         THE COURT:  IS IT A DESKTOP OR A LAPTOP?

22         THE WITNESS:  IT'S A LAPTOP.

23         THE COURT:  WHERE IS IT?

24         THE WITNESS:  IT'S BACK AT MY HOUSE.

25         THE COURT:  IS -- IT'S IN A FILE ON THE COMPUTER, A

1    DOCUMENT --

2           **THE WITNESS:**  I CAN TELL YOU WHAT IT IS.

3        IT IS THE -- IT'S ON A BOOKMARK.  AND I CAN TELL YOU --

4    SHOW YOU THE DATE ON THE BOOKMARK.  IT'S THE BOOKMARK OF THEIR

5    WEBSITE THAT HAD THE PEOPLE'S NAMES AND HOW TO GET THEM THE

6    INFORMATION.  I'VE GOT THE ACTUAL BOOKMARK.

7           **THE COURT:**  IS IT IN THE CLOUD SOMEWHERE?

8           **THE WITNESS:**  WELL, IT'S ON MY COMPUTER AS A

9    BOOKMARK.  WHEN YOU GO TO IT, YOU SEE IT.  IT'S IN THE CLOUD.

10          **THE COURT:**  IF YOU WENT TO IT ON ONE OF THESE

11   COMPUTERS AND SIGNED IN?

12          **THE WITNESS:**  I WOULD HAVE TO GO BACK TO THE WAY-BACK

13   MACHINE AND I WOULD HAVE TO DO ALL THAT SEARCHING AND ALL, BUT

14   SURE, I COULD DO THAT.  I GO TO 2004, GO RIGHT TO ADOBE

15   VENTURES.  THERE WAS A WOMAN AND A MAN IN THE MEETING, AND

16   THEY ARE RIGHT THERE ON THE WEBSITE.

17          **THE COURT:**  WHAT YOU SAID IN COURT EARLIER WHEN YOU

18   WERE TESTIFYING ABOUT THIS IS YOU WERE ASKED DID YOU TELL YOUR

19   ATTORNEYS THE NAMES.  AND YOU WERE ASKED WHY NOT.  AND YOU

20   SAID YOUR ATTORNEYS HADN'T ASKED YOU.

21          **THE WITNESS:**  YOU KNOW, MAYBE I SAID THAT TOO

22   STRONGLY.  IT WAS MY RECOLLECTION THAT IN 2004 -- WHEN THEY

23   ASKED ME DURING DEPOSITION --

24          **THE COURT:**  THEY WHO?

25          **THE WITNESS:**  ADOBE, DURING DEPOSITION, WHEN WE WERE

1    TALKING ABOUT THIS, NO ONE ASKED ME IF I KNEW WHO IT WAS.  SO

2    I DIDN'T GIVE THAT ANSWER.

3        NOW, IN THAT ANSWER I JUST GAVE ABOUT MY ATTORNEYS, I

4    DON'T REALLY -- I PROBABLY MADE THAT TOO STRONGLY.  I DON'T

5    RECALL THEM LATELY ASKING ME WHO THE PEOPLE WERE EITHER.  I

6    JUST DON'T RECALL.

7            **MR. REINES:**  ALL RIGHT.  THANK YOU.  WHY DON'T WE

8    START WITH THE WITNESS TOPIC FIRST.  AND WHY DON'T WE GIVE THE

9    DEPOSITION BECAUSE I THINK THE COURT WILL SEE A DIFFERENT

10   STORY.

11              (DEPOSITION HANDED TO COURT.)

12           **MR. REINES:**  I WILL JUST READ IT FOR THE RECORD.

13       THIS IS FROM YOUR DEPOSITION DATED MARCH 26TH, 2013.  AND

14   JUST TO CLARIFY, THE WITNESS WAS DESIGNATED, YOUR HONOR, JUST

15   SO WE HAVE THE FULL RECORD HERE, THE TOPIC ON WHICH HE WAS

16   IDENTIFIED WAS ALL FACTS AND CIRCUMSTANCES RELATING TO

17   PRE-SUIT COMMUNICATION BETWEEN DIGITAL CONTAINERS, DIGITAL

18   REG, OR INDIVIDUALS OR ENTITIES ACTING ON DIGITAL CONTAINER'S

19   OR DIGITAL REG'S BEHALF ON THE ONE HAND AND ADOBE ON THE OTHER

20   HAND, INCLUDING BUT NOT LIMITED TO COMMUNICATIONS OR MEETINGS

21   WITH ADOBE RELATING TO PROSPECTIVE BUSINESS RELATIONSHIP

22   BETWEEN THE COMPANIES IN 2004."

23       BECAUSE WE KNEW THAT THERE WAS A 2004 MEETING.  SO WE

24   SPECIFICALLY SENT A 30(B)(6) NOTICE TARGETED ON THAT.

25

| | |
|---|---|
| 1 | **__EXAMINATION__** |
| 2 | **BY MR. REINES:** |
| 3 | **Q.**  AND YOU RECALL BEING DESIGNATED ON THAT TOPIC, RIGHT? |
| 4 | **A.**  I THINK SO, YES. |
| 5 | **Q.**  AND YOU KNEW YOU HAD TO BE EDUCATED ABOUT THAT MEETING |
| 6 | BECAUSE THAT MEETING WAS A THEORY OF WILLFULNESS THAT YOU HAD, |
| 7 | RIGHT? |
| 8 | **A.**  I ASSUME.  I WOULD HAVE TO LOOK AT IT.  I GUESS SO, YEAH. |
| 9 | **Q.**  OKAY.  AND IF YOU –– LET ME HAND UP –– |
| 10 | **A.**  OKAY. |
| 11 | **MR. REINES:**  MAY I APPROACH? |
| 12 | **THE WITNESS:**  OKAY. |
| 13 | **BY MR. REINES:** |
| 14 | **Q.**  YOUR TESTIMONY HERE IS THAT NOBODY ASKED YOU IN THE |
| 15 | DEPOSITION WHO WAS PRESENT FOR ADOBE, CORRECT? |
| 16 | **A.**  THAT IS MY RECOLLECTION, YEAH. |
| 17 | **Q.**  PAGE 307, LINE 6 THROUGH 7. |
| 18 | SO THE QUESTION IS, 307, 6 THROUGH 7. |
| 19 | "SO YOU APPROACHED ADOBE IN 2004 ABOUT POTENTIAL |
| 20 | BUSINESS; IS THAT CORRECT? |
| 21 | 'ANSWER:  YES, WE DID." |
| 22 | THE QUESTION WAS: |
| 23 | "DO YOU REMEMBER WHO WAS THERE FOR ADOBE?" |
| 24 | SO, IN FACT, YOU WERE ASKED DIRECTLY WHO WAS THERE FOR |
| 25 | ADOBE, WEREN'T YOU? |

1  **A.**  LET ME GET TO IT.

2  **Q.**  SURE.

3        **THE COURT:**  WHAT PAGE?

4        **MR. REINES:**  307 AT LINE 9.

5        **THE COURT:**  OKAY.

6        **THE WITNESS:**  YOU'RE RIGHT.  I SAID I DON'T RECALL

7  THE NAMES OF THE GENTLEMEN, BUT I THINK IT WAS A WOMAN AND TWO

8  GENTLEMEN.

9     AND I SAID, BUT WE DON'T HAVE THEM IN FRONT OF ME TODAY.

10        **MR. REINES:**  RIGHT.

11     YOUR HONOR, CAN I FOLLOW UP ON THE ANSWERS FROM BEFORE?

12        **THE COURT:**  YES.

13  **BY MR. REINES:**

14  **Q.**  WHEN YOU SAID TESTIFIED JUST TO THE COURT'S QUESTIONS

15  ABOUT YOU HAVE THEM ON YOUR COMPUTER THE NAMES OF THE ADOBE

16  PERSONNEL, DO YOU HAVE A PDF OF THE WEBSITE FROM ADOBE FROM

17  TEN YEARS AGO, 2004 --

18  **A.**  I JUST GOT A BOOKMARK THAT'S BEEN ON MY COMPUTER FOR A

19  WHILE THAT GOES BACK TO ADOBE VENTURES AT THE TIME THAT I WENT

20  AND SAW --

21  **Q.**  SO IT GOES TO THE WAY-BACK MACHINE?

22  **A.**  IT GOES TO THE WAY-BACK MACHINE, RIGHT.

23  **Q.**  SO WHEN YOU SAY IT'S ON YOUR COMPUTER --

24  **A.**  IT'S A BOOKMARK WITH AN HTML CONNECTION BACK TO THE

25  WEBSITE.  SUMMER OF 2004, ADOBE VENTURES, AND IT HAS THE NAMES

1    OF THE PEOPLE.

2    **Q.**  AND DO YOU ACTUALLY REMEMBER THAT THOSE WERE THE PEOPLE OR

3    DID YOU JUST GO AND TRY TO DETERMINE WHO WERE THE PEOPLE AT

4    THE TIME?

5    **A.**  AS PER THIS, I SAID THAT I KNEW IT WAS A WOMAN AND TWO

6    GENTLEMEN.  AND WHEN I WENT THERE, I SAW, YES, THERE WAS A

7    WOMAN AND THERE WAS ACTUALLY FOUR GENTLEMEN.

8    **Q.**  BUT WHEN YOU WENT TO THE WEBSITE, THAT WAS AFTER-THE-FACT

9    RESEARCH AS COMPARED TO SOMETHING YOU DID AT THE TIME,

10   CORRECT, BECAUSE YOU WERE ON THE WAY-BACK MACHINE?

11   **A.**  WELL, YEAH, IT WAS THE WAY-BACK MACHINE, BUT IT WAS THE

12   SAME WEBSITE THAN WHEN I DID ALL THIS, YOU CAN SEE WHERE IT IS

13   SOLICITING DOCUMENTS, THAT WAS THE PEOPLE THAT WERE THERE.

14   THAT'S WHO I TALKED TO.

15   **Q.**  LET ME ASK A VERY SIMPLE QUESTION.

16   **A.**  OKAY.

17   **Q.**  WHY DID YOU GO ON THE WAY-BACK MACHINE TO DISCOVER WHO

18   WERE THE PEOPLE AT ADOBE IN 2004?

19   **A.**  WELL, WE HAD LONG LOST THOSE RECORDS.  I MEAN, THERE'S A

20   LOT OF THINGS.  2004 IS A LONG TIME AGO.  THE WAY-BACK MACHINE

21   IS A GREAT RESOURCE TO GIVE YOU A RECOLLECTION.

22       I MEAN, IT'S LIKE I DIDN'T HAVE IT IN MY CONTACT LIST OR

23   WHATEVER.  THE WAY-BACK MACHINE DID REFRESH MY MEMORY.

24   **Q.**  YOU DID THAT IN PREPARATION FOR THE DEPOSITION?

25   **A.**  I CAN'T REMEMBER THE TIMING ON THAT.

1   **Q.**  WHAT WAS YOUR PURPOSE IN INVESTIGATING WHO WAS AT ADOBE IN

2   2004 AT ADOBE VENTURES?

3   **A.**  I DO KNOW I WAS TRYING TO CONFIRM MY OWN RECOLLECTION WAS

4   THAT THERE WAS A WOMAN AND TWO MEN THERE.  SO I JUST WENT TO

5   THE WAY-BACK MACHINE, LIKE A LOT OF PEOPLE DO, TO CONFIRM THE

6   RECOLLECTION.

7   **Q.**  IN CONNECTION WITH LITIGATION?

8   **A.**  I GUESS SOMEWHAT, MAYBE.  I WENT TO THE WAY-BACK MACHINE

9   TO SAY TO MYSELF WHO WAS AT THAT MEETING BECAUSE I HAD LOST

10  TRACK IN MY MIND.  I SEE A LOT OF PEOPLE IN BUSINESS.  I JUST

11  COULDN'T REMEMBER THEIR NAMES.

12  **Q.**  AND THAT WAS DURING THE TIME OF THIS CASE; IS THAT

13  CORRECT?

14  **A.**  IT WAS -- I THINK IT WAS AFTER I SAID THAT IT WAS TWO

15  WOMEN AND A MAN IN THIS.  BECAUSE IT CAME UP AND I JUST LIKE,

16  GOSH, LET ME SEE IF I CAN CONFIRM MY RECOLLECTION.

17      BUT IN THIS TESTIMONY RIGHT HERE, I SAID I KNOW IT WAS A

18  WOMAN AND TWO MEN.

19  **Q.**  AND YOUR ATTORNEYS NEVER ASKED YOU AT ANY POINT IN TIME,

20  CORRECT?

21  **A.**  I DON'T THINK THERE WAS REALLY A PRECISION QUESTION OR

22  ANSWER BY ME.  IT JUST -- NO.

23  **Q.**  NOW, WITH RESPECT TO THE DOCUMENT -- UNLESS THE COURT HAS

24  MORE QUESTIONS ON THE WITNESSES -- ON THE DOCUMENTS, IN TERMS

25  OF THE DOCUMENTS THAT YOU HAVE THAT YOU PRODUCED, AND YOU HAVE

1  DIFFERENT DOCUMENTS THAT ARE ADOBE VALUE PROPOSITION, RIGHT,

2  IN YOUR POSSESSION?

3  **A.**  YEAH.

4  **Q.**  THEY ARE IN WHAT FORMAT?

5  **A.**  MICROSOFT WORD.  THE 2004 VERSION OF WORD.

6  **Q.**  SO YOU HAVE THE WORD DOCUMENTS FROM 2004; IS THAT CORRECT?

7  **A.**  YES.

8  **Q.**  OKAY.  AND IS IT ONE FILE OR ARE THERE MULTIPLE FILES

9  BECAUSE THIS WAS FROM 2004 TO 2007, RIGHT?

10  **A.**  THERE'S MULTIPLE FILES.  AND THEY ALL HAVE METADATA ON

11  SHOWING EXACTLY WHEN THEY WERE PRODUCED.

12  **Q.**  AND WITH RESPECT TO EXHIBIT 125C, WHICH IS THE VERSION

13  WITH THE BOX THERE, YOU HAVE A VERSION OF THAT WITH METADATA

14  SHOWING WHEN THAT DOCUMENT WAS CREATED?

15  **A.**  I'M PRETTY CERTAIN I DO, YES.

16  **Q.**  WITH RESPECT TO THE DOCUMENT THAT DOESN'T -- THAT'S THE

17  FINAL DOCUMENT THAT YOU BELIEVE IS THE DOCUMENT YOU ACTUALLY

18  GAVE ADOBE, THAT DIFFERENT DOCUMENT, DO YOU HAVE THAT

19  DOCUMENT, TOO, WITH METADATA?

20  **A.**  I'M PRETTY SURE.  I MEAN, THE DOCUMENT I SENT TO ADOBE WAS

21  THAT DOCUMENT WITH THE TRACKING TURNED OFF.

22      HOWEVER, AS I SAID A MINUTE AGO, IN THOSE DAYS SOMETIMES

23  YOU DIDN'T REALLY, REALLY KNOW.  I MEAN, IT WAS -- ONE REASON

24  WHY PDF -- AGAIN, THANK YOU, DEBBIE, CAME ALONG AS SORT OF

25  MORE OF A DE FACTO WAY TO DO THESE THINGS, BECAUSE PEOPLE ARE

1    CONSTANTLY MAKING THAT MISTAKE.

2         NOW, I WILL ADD ONE MORE THING.  WHEN I OPENED UP ALL

3    THIS, AND LIKE A LOT OF OTHER PEOPLE, I HAD SWITCHED TO

4    MACINTOSH.  I OPENED UP, WHEN THERE WAS A REQUEST FOR THESE

5    DOCUMENTS FOR THIS TRIAL, I HAD SWITCHED TO MACINTOSH.  AND I

6    WAS OPENING THESE THINGS AND LOOKING AT THEM.  AND I DON'T

7    KNOW IF YOU'VE GOT EXPERIENCE WITH THAT COMPUTER, BUT IF YOU

8    OPEN A WORD DOC IN MAC PAGES, SOMETIMES IT DOESN'T SHOW YOU

9    WHETHER OR NOT TRACKING IS ON.

10        SO IT'S VERY POSSIBLE I SENT THIS INTO THE RECORD AND

11   DIDN'T EVEN KNOW TRACKING WAS ON OR OFF THE WAY PAGES

12   INTERPRETED IT.

13   Q.  AND THOSE DOCUMENTS ARE ON WHAT COMPUTER, YOUR LAPTOP HERE

14   OR --

15   A.  THEY'RE ON A MACINTOSH COMPUTER BACK WHERE I'M STAYING.

16   Q.  WHY DID YOU BRING ALL THESE FILES FOR THIS EXHIBIT TO

17   TRIAL?

18   A.  WHY DID I BRING ALL THESE FILES FOR THIS EXHIBIT?  I DON'T

19   UNDERSTAND WHAT YOU ARE SAYING.

20   Q.  IN 2004 YOU HAD A DIFFERENT COMPUTER THAN YOUR MAC?

21   A.  I DID, YES.

22   Q.  OKAY.  AND YOUR MODERN MAC TEN YEARS LATER, YOU'RE SAYING

23   HAS THE WORD FILES --

24   A.  WHEN YOU TRANSFER YOUR FILES OVER, WE DID OUR BEST, YOU

25   KNOW, TO KEEP OLD STUFF.

1     SO, IN –– ON AN APPLE COMPUTER, YOU'VE GOT –– YOU CAN PUT

2     YOUR OLD WORD FILES, WHICH A LOT OF PEOPLE DON'T REALLY KNOW,

3     HOWEVER, WHEN YOU OPEN THEM UP, PAGES IS NOT FULLY COMPATIBLE

4     WITH WORD.

5         SO WHEN YOU ARE LOOKING AT REALLY OLD WORD DOCS AND PAGES,

6     YOU LOSE INFORMATION, YOU LOSE FORMATTING.  IT'S VERY, VERY

7     COMMON.  SO, YOU KNOW, I'M JUST SAYING IT'S POSSIBLE THAT I

8     SENT THIS TO THE COURT OR THIS TO BE IN THE RECORD, AND I

9     DIDN'T EVEN KNOW TRACKING WAS ON.  THAT'S VERY POSSIBLE.

10        AND IT'S POSSIBLE I SENT IT TO ADOBE WITH THE TRACKING ON

11    AND THEY JUST DIDN'T SAY ANYTHING.

12    **Q.**  DID YOU COLLECT THE DOCUMENTS YOURSELF OR DID YOU TURN

13    OVER YOUR COMPUTER FOR OTHERS TO COPY?

14    **A.**  I COLLECTED IT MYSELF PER INSTRUCTIONS.

15    **Q.**  IT WAS COPIED OFF THIS MAC ––

16    **A.**  I THINK IT WAS OFF THIS MAC.

17    **Q.**  OKAY. AND HOW LONG HAVE YOU HAD THIS MAC?

18    **A.**  I THINK I GOT THIS LATEST ONE ABOUT THREE YEARS AGO, FOUR

19    YEARS AGO.

20    **Q.**  OKAY.  AND IN TERMS OF HOW YOU GOT THE DOCUMENTS

21    PHYSICALLY TO THE DINOVO LAW FIRM, WAS THAT EMAIL?

22    **A.**  I CAN'T REMEMBER WHETHER WE SENT IT ON DISKS OR NOT.  I

23    CAN'T REMEMBER HOW WE GOT IT THERE.

24    **Q.**  ARE YOU COMFORTABLE WITH US DOING A FORENSIC ANALYSIS OF

25    THOSE DOCUMENTS SO WE CAN LOOK AT WHEN THEY WERE CREATED AND

```
1    IF THEY'VE BEEN CHANGED?

2              THE WITNESS:  SURE.

3         MR. REINES:  THAT'S ALL I HAVE, YOUR HONOR.

4         THE COURT:  IS THERE ANYTHING YOU WANTED TO ADD?

5         MS. GLAUSER:  YOUR HONOR I DON'T HAVE ANY QUESTIONS

6    FOR MR. VENTERS.

7         THE COURT:  OKAY.

8         MS. GLAUSER:  HOWEVER, WE WOULD OBJECT TO A REQUEST

9    FOR FORENSIC --

10        THE COURT:  YOU DON'T HAVE ANY QUESTIONS.  YOU DON'T

11   HAVE ANYMORE QUESTIONS.  WE CAN AT LEAST GET HIM GET OFF THE

12   STAND BEFORE YOU START ARGUING.

13        THE WITNESS:  THANK YOU, MA'AM.

14        THE COURT:  YOU CAN TURN OVER THE -- MAYBE YOU SHOULD

15   STAY FOR THIS.  I WOULD LIKE --

16        MS. GLAUSER:  MR. VENTERS.

17        THE COURT:  I WOULD LIKE TO GET THE ACTUAL FILE OFF

18   YOUR COMPUTER ONTO A FLASH DRIVE OR AN EMAIL OR WHAT, WITH ALL

19   THE METADATA, ALL THE CHANGES, EVERYTHING ON IT JUST AS

20   THEY -- THEIR FULLEST VERSION.

21        THE WITNESS:  OKAY.

22        THE COURT:  ON YOUR COMPUTER.  AND GIVE ONE TO EACH

23   SIDE.

24      I DON'T SEE ANY PROBLEM WITH LOOKING AT THEM -- I MEAN,

25   WHEN YOU SAY "FORENSIC EXAM", ALL YOU'RE GOING TO DO IS LOOK
```

```
1   AT IT IN WORD AND SEE WHAT METADATA IS IN THERE AND SEE WHAT

2   DATE IT WAS CREATED AND SEE WHETHER THERE'S TRACKING ON OR

3   OFF, AND WHAT HAPPENS WHEN YOU TURN IT ON OR OFF.  AND IF

4   ANYTHING ARISES THAT'S WORTHY OF NOTE, THEN YOU CAN ALL TELL

5   ME WHAT THAT IS.

6           MS. GLAUSER:  YES, YOUR HONOR.

7           MR. REINES:  THE OTHER THING WOULD BE A PRINTOUT OF

8   THE, SINCE YOU HAVE IT ON YOUR COMPUTER, OF THE WAY-BACK PAGE

9   WITH THE ADOBE --

10          THE COURT:  OH, YEAH.

11          THE WITNESS:  I WILL BE GLAD TO DO THAT.

12          THE COURT:  PRINTOUT OF THE WAY-BACK PAGE OR YOU CAN

13  EMAIL THE LINK.

14          THE WITNESS:  THAT'S AN EASIER WAY TO DO IT.

15          THE COURT:  OKAY.

16          MR. REINES:  YOUR HONOR, ONE CONCERN I HAVE IS THAT

17  THE METADATA CHANGES APPARENTLY IF IT GETS COPIED OFF THE

18  MACHINE.  IS THAT RIGHT?

19          THE COURT:  IT HAS BEEN COPIED OFF MANY TIMES, SO IF

20  CHANGES ITS CHANGED.

21          THE WITNESS:  CAN I VOLUNTEER SOME INFORMATION?

22      THE NICE THING ABOUT THE MACINTOSH OPERATING SYSTEM IS THE

23  CREATION DATE ON DOCUMENTS, EVEN IF IT GOES BACK TO THE WORD

24  PERIOD, CREATION DATE IS MAINTAINED THROUGHOUT.

25      IN FACT, THESE THINGS -- OPEN UP A DOCUMENT, IT WOULD ADD
```

1    A NEW DATE, CLOSE IT.  AND A FRIEND OF MINE WHO IS A MAC

2    EXPERT SAID, NO, NO, NO, YOU WILL ALWAYS BE ABLE TO SEE THE

3    CREATION DATE IN THIS ONE FILE.

4        SO UNLESS I KNOW ANOTHER WAY TO ALTER IT, THERE IS A

5    CREATION DATE THAT IS MAINTAINED BY THE MACINTOSH SYSTEM.

6            **THE COURT:**  LOOK AT WHAT'S THERE.  IF IT LEADS TO

7    SOME FURTHER INQUIRY, WE CAN TAKE IT UP AT ANOTHER --

8            **MR. REINES:**  YOUR HONOR, ONE MINOR POINT JUST ON

9    THE -- I KNOW I AM TRYING YOUR PATIENCE AT THIS TIME, BUT ON

10   THE PARR ORDER ON THE MOTION TO EXCLUDE.

11           **THE COURT:**  RIGHT.

12           **MR. REINES:**  I JUST WANT TO ASK WITH RESPECT TO THE

13   LEGAL SUFFICIENCY OF THAT, BECAUSE OF THE WAY THE COURT'S

14   ORDER IS WRITTEN, ADOBE'S PRESERVED ITS ABILITY TO OBJECT TO

15   THE LEGAL SUFFICIENCY OF WHAT'S PRESENTED AT TRIAL AND AFTER

16   TRIAL; IS THAT CORRECT?

17           **THE COURT:**  YES.

18           **MR. REINES:**  THANK YOU.

19           **THE COURT:**  OKAY.

20               (PROCEEDINGS ADJOURNED AT 2:47 P.M.)

21

22

23

24

25

1

2                    **CERTIFICATE OF REPORTER**

3              I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE

4      UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY

5      CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

6      RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

7

8      _Diane E. Skillman_____

9                    DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

10                      THURSDAY, AUGUST 28, 2014

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jones depo video transcript

Group:  Multi-clips
ID:          Jones

Group:  Jones, Joseph (Vol. 01) - 03/22/2013     JJ001
Page Range:      4:18-4:19
Duration:        00:00:07.4

    4:18                  JOSEPH R. JONES,
    4:19 having been first duly sworn, testified as follows:


Group:  Jones, Joseph (Vol. 01) - 03/22/2013     JJ002
Page Range:      10:22-11:1
Duration:        00:00:13.1

    10:22      Q.  Okay.  So I've handed you what's been
    10:23 marked as Exhibit 7.  It's a document entitled
    10:24 "Adobe Flash Access, Version 3.0, Overview."  It's
    10:25 dated August 2011.  Do you see that?
    11: Page 11
    11: 1      A.  I do.


Group:  Jones, Joseph (Vol. 01) - 03/22/2013     JJ003
Page Range:      12:1-12:13
Duration:        00:00:40.7

    12: 1      Q.  Okay.  So let's turn to the page that ends
    12: 2 in 282, according to those numbers.  Just beginning
    12: 3 right at the top, the first sentence under the
    12: 4 heading "An overview of Adobe Flash Access SDK"
    12: 5 says, "Adobe Flash Access SDK is a digital rights
    12: 6 management platform that makes it possible to
    12: 7 protect and securely deliver video and audio content
    12: 8 for playback on consumer devices such as personal
    12: 9 computers."  Do you agree with that statement?
    12:10      A.  I agree that's what it says, yes.
    12:11      Q.  Do you agree that Adobe Flash Access SDK is
    12:12 in fact a digital rights management platform?
    12:13      A.  Yes.


Group:  Jones, Joseph (Vol. 01) - 03/22/2013     JJ004
Page Range:      12:15-12:16
Duration:        00:00:03.0

    12:15          THE WITNESS:  It is a digital rights
    12:16 management platform.


Group:  Jones, Joseph (Vol. 01) - 03/22/2013     JJ005
Page Range:      12:18-13:2
Duration:        00:00:34.3

    12:18      Q.  So what is your understanding of what the
    12:19 term "digital rights management platform" means?
    12:20      A.  DRM would be a subset of content protection
    12:21 technologies that have the ability -- excuse me --
    12:22 the ability to specify specific usage rights under
    12:23 which content can be decrypted and subsequently
    12:24 played.
    12:25      Q.  So is that -- going back to the sentence,
                              Page 1

Jones depo video transcript
13: Page 13
13: 1 is that how it makes it possible to protect and
13: 2 securely deliver video and audio content?

Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ006
Page Range:       13:4-13:19
Duration:         00:00:49.9

    13: 4          THE WITNESS:  I'm not sure I understand the
    13: 5 question.
    13: 6 BY MR. COUTU:
    13: 7      Q.  Being able to assign usage rules and
    13: 8 decrypt and encrypt based on those, is that how it
    13: 9 in fact makes it possible to protect content?
    13:10      A.   So by encrypting the content and
    13:11 restricting the scenarios in which the content can
    13:12 be decrypted and subsequently played, you can
    13:13 enforce business models, such as subscription or
    13:14 rental or those types of things, so yes.  And also
    13:15 it can be used to ensure that only a trusted player
    13:16 is used, which allows people to enforce that ads are
    13:17 seen in ad-supported content.  So by doing those
    13:18 enforcement techniques, it enables business models
    13:19 that would not otherwise be possible.

Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ007
Page Range:       14:4-14:10
Duration:         00:00:19.1

    14: 4      Q.  Okay.  Moving on to the next sentence,
    14: 5 then, "Flash Access is a flexible platform that
    14: 6 enables content owners to protect their content and
    14: 7 maintain control over distribution," is that true?
    14: 8      A.   Yes.  That is true.
    14: 9      Q.  And how does it enable content owners to
    14:10 protect their content?

Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ008
Page Range:       14:12-14:23
Duration:         00:00:29.6

    14:12          THE WITNESS:  It's a technology that
    14:13 encrypts content so that you can specify usage
    14:14 rights.
    14:15 BY MR. COUTU:
    14:16      Q.  Okay.  And how does it maintain control
    14:17 over distribution?
    14:18      A.   Because content services or their
    14:19 designates can have license servers which issue
    14:20 license -- licenses to end users, and by controlling
    14:21 the business rules under which those content
    14:22 licenses are issued, you therefore control
    14:23 distribution of the content.

Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ009
Page Range:       14:24-14:25
Duration:         00:00:08.3

    14:24          Q.  So how might the content be distributed

```
                    Jones depo video transcript
        14:25 that is transmitted to one or more end users?


Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ009A
Page Range:      15:3-15:8
Duration:        00:00:13.9

        15: 3            THE WITNESS:  Are you looking for a
        15: 4 specific transport technology or are you looking for
        15: 5 a specific protocol?
        15: 6 BY MR. COUTU:
        15: 7        Q.  More a use case.  If I want to acquire this
        15: 8 protected content, how might I do that?


Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ009B
Page Range:      15:10-15:17
Duration:        00:00:20.9

        15:10            THE WITNESS:  A common use case would be
        15:11 streaming the content in a browser.
        15:12 BY MR. COUTU:
        15:13        Q.  Are there any others?
        15:14        A.  There are others, but they are far less
        15:15 common.  For example, you could distribute an AIR
        15:16 application which allows the consumer to download
        15:17 content that is protected.


Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ010
Page Range:      15:23-16:15
Duration:        00:00:51.3

        15:23        Q.  And there's a sentence there that says,
        15:24 "Flash Access lets content owners and distributors
        15:25 control how and where their content can be
        16: Page 16
        16: 1 distributed and experienced, providing end-to-end
        16: 2 protection throughout the content life cycle."
        16: 3            Do you agree with that statement?
        16: 4        A.  I agree with that statement, yes.
        16: 5        Q.  What does "end-to-end protection" mean?
        16: 6        A.  "End-to-end protection" refers to
        16: 7 persistent protection of the content.  Unlike a
        16: 8 technology like RTMPE, which is purely a link
        16: 9 protocol, Adobe Access and Flash Access, the content
        16:10 is protected at all points during distribution.  So
        16:11 it's -- on the servers it is protected, it is
        16:12 protected in transit, and it is protected on the
        16:13 device that is rendering the content.
        16:14        Q.  And how is that accomplished?
        16:15        A.  Through encryption.


Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ011
Page Range:      16:17-17:5
Duration:        00:00:29.8

        16:17            THE WITNESS:  Through encryption.
        16:18 BY MR. COUTU:
        16:19        Q.  Okay.  So the protection in this case,
        16:20 then, follows -- remains with the content throughout
        16:21 the life cycle?
```

```
                    Jones depo video transcript
16:22        A.  The content is protected and encrypted at
16:23 all stages of distribution and playback.
16:24        Q.  Okay.  How is the content encrypted;
16:25 according to what algorithm?
17:  Page 17
17:  1        A.  AES-128, sometimes counter mode, sometimes
17:  2 CBC.
17:  3        Q.  And are those symmetric or asymmetric
17:  4 algorithms?
17:  5        A.  AES is a symmetric algorithm.


Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ012
Page Range:       18:2-18:11
Duration:         00:00:20.3

18:  2        Q.  Okay.  So if I acquire a protected file as
18:  3 a download, am I able to send that to anyone else to
18:  4 circumvent this protection?
18:  5        A.  If you download the encrypted file, only
18:  6 you would be able to play that file.
18:  7        Q.  So what would happen if I did send it to --
18:  8 so I download it and send it to you --
18:  9        A.  The --
18:10        Q.  -- and you try to play it?
18:11        A.  I -- sorry.


Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ013
Page Range:       18:13-19:1
Duration:         00:00:36.9

18:13        THE WITNESS:  If a piece of protected
18:14 content is downloaded and then sent to another user
18:15 on another device, that other user would simply see
18:16 a -- blob of pseudorandom data that they would not
18:17 be able to do anything with unless they were able to
18:18 first acquire a license.
18:19 BY MR. COUTU:
18:20        Q.  And how might they acquire a license?
18:21        A.  That depends on the -- the business rules
18:22 established by the distributor.
18:23        Q.  What are some examples?
18:24        A.  An example would be a movie service, where
18:25 you're downloading to own, since we're talking about
19:  Page 19
19:  1 downloaded content.


Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ014
Page Range:       19:3-19:10
Duration:         00:00:20.9

19:  3        THE WITNESS:  To own.
19:  4        So that -- that's a very common use case,
19:  5 although it is not very popular for Adobe Flash
19:  6 Access.  That's more popular for some other DRMs.
19:  7        In a download-to-own scenario, typically
19:  8 what would happen is you would go to acquire a
19:  9 license and they would make you log in,
19:10 demonstrating that you actually do own that asset.
```

```
                   Jones depo video transcript
Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ015
Page Range:        19:12-19:13
Duration:          00:00:03.1

    19:12    Q.  Okay.  So when you say "log in," what would
    19:13 that entail?


Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ015A
Page Range:        19:15-19:16
Duration:          00:00:03.0

    19:15          THE WITNESS:  It depends on the -- the
    19:16 content service.


Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ015B
Page Range:        19:18-19:21
Duration:          00:00:06.9

    19:18    Q.  Okay.
    19:19    A.  Everybody has different mechanisms.
    19:20    Q.  What are -- what is one such mechanism?
    19:21    A.  I don't really know.


Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ015C
Page Range:        19:23-19:25
Duration:          00:00:06.6

    19:23          THE WITNESS:  I don't really know the
    19:24 technologies that our customers are using for that,
    19:25 because it is outside the context of Flash Access.


Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ016
Page Range:        22:4-25:19
Duration:          00:04:51.6

    22: 4    Q.  What is Flash Media Server?
    22: 5    A.  Flash Media Server is a -- a server --
    22: 6 piece of server software that is used to distribute
    22: 7 content.
    22: 8    Q.  Okay.  And who might the customers of Flash
    22: 9 Media Server be?  Do you have any examples?
    22:10    A.  The most common example would be content
    22:11 delivery networks, such as Akamai or Brightcove or
    22:12 those types of companies.
    22:13    Q.  Okay.  Turning now to the next page -- this
    22:14 is page 283 -- the -- continuing the bullet points
    22:15 there at the top, it says, with the heading being
    22:16 "Flash Access gives:  Developers the ability to
    22:17 automate Flash Access capabilities, including
    22:18 authorization and authentication, into a content
    22:19 distributor's existing environment."  Do you
    22:20 understand what "authorization" means there?
    22:21    A.  Authorization is a concept in computer
    22:22 science that is similar but not the same as
    22:23 authentication.  So authentication is, are you who
    22:24 you say you are; and then, once authenticated, you
    22:25 can use authorization to determine whether or not
    23: Page 23
    23: 1 you have permission to access the asset that you're
```

Jones depo video transcript

23: 2 requesting access to.
23: 3      Q.   Got it.  Okay.  So long that -- those same
23: 4 veins, there are just some terms here, and we'll go
23: 5 through those, just to make sure we're speaking the
23: 6 same language as we go forward.  So under the
23: 7 heading "Terminology and core concepts," also on
23: 8 page 283, starting with "Consumer," it says, "The
23: 9 consumer is the end user who downloads or streams
23:10 content."  Is that your understanding?
23:11      A.   That's a common meaning for that term, yes.
23:12      Q.   Is it the meaning that we can assume is
23:13 used throughout this document from Adobe?
23:14      A.   I can't guarantee that usage is consistent
23:15 throughout a document, but generally we would use
23:16 the term "consumer" or "user" to refer to the
23:17 individual who's actually playing back the content.
23:18      Q.   Got it.  Okay.  Next one, being "Content,"
23:19 says, "Content consists of digital audio or video
23:20 files encoded in the FLV or F4V format."  Do you
23:21 agree with that?
23:22      A.   That is the way we're using that term, yes.
23:23      Q.   What's a -- what is the FLV format?
23:24      A.   FLV and F4V are both basically MPEG-4
23:25 container directives.
24: Page 24
24: 1      Q.   Are they Adobe proprietary formats?
24: 2      A.   The extensions to the MPEG-4 container are
24: 3 Adobe proprietary.
24: 4      Q.   Okay.  Next line says, "The Content
24: 5 Encryption Key," in parentheses, "CEK, is a
24: 6 cryptographic key used to encrypt the content."  You
24: 7 see that?
24: 8      A.   I do.
24: 9      Q.   So what algorithm does the CEK employ?
24:10      A.   The CEK is a AES-128 key.
24:11      Q.   So every piece of protected content, then,
24:12 is encrypted according to AES-128?
24:13      A.   Yes.  And in some scenarios it is counter
24:14 mode, and in some scenarios it is cipher block
24:15 chaining, or CBC.
24:16      Q.   The -- CM and CBC just being different
24:17 modes of AES?
24:18      A.   Different modes would be an accurate way to
24:19 describe it, yes.  And it would be -- the -- the
24:20 canonical abbreviation of counter mode would be CTR.
24:21      Q.   Okay.  Next one says, "Content owners.
24:22 Content owners are the business entities who own the
24:23 copyright to the content.  These can be large motion
24:24 picture studios, or smaller, independent producers
24:25 of movies or other audiovisual content."  Is that
25: Page 25
25: 1 accurate?
25: 2      A.   The groups listed there, motion picture
25: 3 studios and independent producers of movies, are
25: 4 content owners.  There are other types of content
25: 5 owners.
25: 6      Q.   All right.  So are these Flash Access
25: 7 customers, or no, these types of entity?
25: 8      A.   Occasionally they are.  They are not our
25: 9 most common customer.
25:10      Q.   What is the most common customer?
25:11      A.   Content services and/or service providers.
25:12      Q.   Okay.  The next one says, "Content

```
                    Jones depo video transcript
    25:13 packagers are organizations who package content for
    25:14 use with Flash Access."  What's an example of a
    25:15 content packager?
    25:16     A.  I cannot think of an example of a company
    25:17 that is solely a content packager.
    25:18     Q.  So what type of company is a content
    25:19 packager and something else?
```

Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ017
Page Range:      25:21-25:24
Duration:        00:00:10.9

```
    25:21          THE WITNESS:  An example -- there are
    25:22 service providers that provide DRM services
    25:23 including but not limited to content packaging, such
    25:24 as Brightcove or Ooyala.
```

Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ018
Page Range:      26:4-26:18
Duration:        00:00:42.2

```
    26: 4     Q.  So what other services are they providing,
    26: 5 then?
    26: 6     A.  I don't know the full menu of services that
    26: 7 they provide, but it would certainly include
    26: 8 typically license serving.  And sometimes they would
    26: 9 coordinate the relationship with content delivery
    26:10 networks.
    26:11     Q.  What is license serving, then?
    26:12     A.  License serving would be administering the
    26:13 server that issues content licenses.
    26:14     Q.  And is that using Adobe Flash Access, that
    26:15 server?
    26:16     A.  It could be using Adobe Flash Access or it
    26:17 could be using another content protection
    26:18 technology.
```

Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ019
Page Range:      27:5-28:2
Duration:        00:01:16.7

```
    27: 5     Q.  Okay.  Next one says "DRM metadata,"
    27: 6 defined as "Information that the client, meaning
    27: 7 Adobe Flash Player or Adobe AIR runtime, sends to
    27: 8 identify the requested content."
    27: 9          So it says "information" that is sent.
    27:10 What type of information is that?
    27:11     A.  That is variable, depending on a number of
    27:12 different configuration options, but it would
    27:13 include the -- an encrypted version of the content
    27:14 encryption key, and it would include information
    27:15 that is necessary in order to acquire a license,
    27:16 such as a license server URL.
    27:17     Q.  Okay.  So you said an encrypted version of
    27:18 the CEK.
    27:19     A.  Uh-huh.
    27:20     Q.  Encrypted according to what algorithm?
    27:21     A.  It would be encrypted with RSA, with a
    27:22 1024-bit key.
    27:23     Q.  And is RSA asymmetric or symmetric?
```
Page 7

```
                     Jones depo video transcript
27:24      A.   Asymmetric.
27:25      Q.   So who would the key pair belong to in this
28: Page 28
28: 1 case where the CEK is encrypted according to an RSA
28: 2 key pair?
```

```
Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ019A
Page Range:       28:4-28:6
Duration:         00:00:02.2
```

```
28: 4          THE WITNESS:   That really depends.
28: 5 BY MR. COUTU:
28: 6      Q.   What does it depend on?
```

```
Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ020
Page Range:       28:6-28:11
Duration:         00:00:16.4
```

```
28: 6      Q.   What does it depend on?
28: 7      A.   It depends on who packaged the content, and
28: 8 it depends on who is hosting the license server,
28: 9 which may or may not be the same entity.
28:10      Q.   Okay.  What are the options depending on
28:11 who packaged the content?
```

```
Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ021
Page Range:       28:14-29:1
Duration:         00:00:32.7
```

```
28:14          THE WITNESS:   So remember we mentioned that
28:15 a content service may include the service of being a
28:16 content packager.  That is one example.  Another
28:17 example might be that a content owner may actually
28:18 hand content in a prepackaged and pre-encrypted form
28:19 to the content service.
28:20 BY MR. COUTU:
28:21      Q.   Okay.  So once the CEK is --
28:22      A.   Or the content service may do it
28:23 themselves.
28:24      Q.   Sorry.  Okay.  So once the CEK is
28:25 encrypted, is it ever encrypted according to a
29: Page 29
29: 1 different key?
```

```
Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ022
Page Range:       29:4-29:7
Duration:         00:00:07.1
```

```
29: 4          THE WITNESS:   What do you mean by "ever"?
29: 5 BY MR. COUTU:
29: 6      Q.   At any point in the end-to-end content life
29: 7 cycle that we looked at earlier.
```

```
Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ023
Page Range:       29:13-29:15
Duration:         00:00:05.8
```

```
29:13          So you said we have an encrypted version of
```

                         Jones depo video transcript
     29:14 the CEK, correct?
     29:15     A.  In the DRM metadata, correct.


Group:  Jones, Joseph (Vol. 01) - 03/22/2013     JJ024
Page Range:       29:17-30:17
Duration:         00:01:04.4

     29:17           THE WITNESS:  DRM metadata.
     29:18 BY MR. COUTU:
     29:19     Q.  And it's encrypted according to a certain
     29:20 key pair, right?
     29:21     A.  Yes.  It is encrypted for -- with the
     29:22 license server's public key.
     29:23     Q.  Okay.
     29:24     A.  So that it can be decrypted with the
     29:25 license server's private key.
     30: Page 30
     30: 1     Q.  Is it ever encrypted, in the context of the
     30: 2 Flash Access end-to-end protection, according to a
     30: 3 different key?  Does that key ever change?
     30: 4     A.  The content encryption key?  Is the content
     30: 5 encryption key --
     30: 6     Q.  Correct.
     30: 7     A.  -- re-encrypted?
     30: 8           Yes, when a license is generated by the
     30: 9 license server, the license server will decrypt the
     30:10 content key, using the license server's private key,
     30:11 and then re-encrypt it using either the machine key
     30:12 of the device that is making the license request or
     30:13 the domain key that is part of the license server
     30:14 request.
     30:15     Q.  Okay.  And then is that DRM metadata
     30:16 written back into the content file after that
     30:17 happens?


Group:  Jones, Joseph (Vol. 01) - 03/22/2013     JJ025
Page Range:       30:19-31:6
Duration:         00:00:30.4

     30:19           THE WITNESS:  Is the DRM metadata itself
     30:20 written into the content file?
     30:21 BY MR. COUTU:
     30:22     Q.  Correct.
     30:23     A.  It depends on the scenario.
     30:24     Q.  Does that ever happen?
     30:25     A.  Does that ever happen?
     31: Page 31
     31: 1           It is never written into the content
     31: 2 itself.  It is occasionally -- there are cases where
     31: 3 it is written to the container; so that you remember
     31: 4 we talked about F4F being an MPEG-4 container.  It
     31: 5 is written in certain scenarios to the MPEG-4
     31: 6 container.


Group:  Jones, Joseph (Vol. 01) - 03/22/2013     JJ026
Page Range:       31:7-31:8
Duration:         00:00:03.7

     31: 7     Q.  How is that container generally structured,
     31: 8 then?  How would it know where to write it?
                         Page 9

Jones depo video transcript

Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ026A
Page Range:       31:10-31:17
Duration:         00:00:15.1

    31:10           THE WITNESS:  There is a standard, the
    31:11 MPEG-4 standard.
    31:12 BY MR. COUTU:
    31:13      Q.  Okay.  Do we know what the section of the
    31:14 container into which it might be written is called
    31:15 according to that standard?
    31:16      A.  It would be written to the MPEG-4
    31:17 container's header.


Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ027
Page Range:       31:18-33:2
Duration:         00:02:09.4

    31:18      Q.  Okay.  Moving on to the next page, labeled
    31:19 284, this gets more into licenses.  It says, "A
    31:20 license is a data structure that contains" -- I'm
    31:21 sorry, on the very top of the page.
    31:22           "A license is a data structure that
    31:23 contains an encrypted key used to decrypt content
    31:24 associated with a policy."
    31:25           Is the encrypted key here the CEK that we
    32: Page 32
    32: 1 just looked at?
    32: 2      A.  Yes.
    32: 3      Q.  Next sentence says, "The license is
    32: 4 generated by Flash Access when the consumer requests
    32: 5 content and is bound to the consumer's computer."
    32: 6 Is that also the process you just described?
    32: 7      A.  That's a slight oversimplification and is,
    32: 8 as -- as is often the case with oversimplifications,
    32: 9 not entirely technically accurate.  The license is
    32:10 not necessarily generated when the consumer requests
    32:11 the content.  It may be pregenerated.  It may be
    32:12 issued in advance for something called predelivery.
    32:13 Or it could be -- could have been issued at some
    32:14 point in the past because you previously played back
    32:15 that content.  But this is one scenario in -- in
    32:16 which a license could be issued, which is that
    32:17 consumer -- and it wouldn't be when the consumer
    32:18 requests content, but, rather, when they attempt to
    32:19 play back that content.
    32:20      Q.  I see.
    32:21      A.  So it would never actually be issued when
    32:22 the consumer requests the content.  That's -- that's
    32:23 a poor choice of words on the part of the person who
    32:24 wrote this document.
    32:25      Q.  Okay.  The phrase there "and is bound to
    33: Page 33
    33: 1 the consumer's computer," what do you understand
    33: 2 that to mean?


Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ028
Page Range:       33:14-33:18
Duration:         00:00:15.6

Page 10

```
                    Jones depo video transcript
33:14          Just to wrap up licenses, and the last
33:15 sentence says, "In order to view content, the
33:16 consumer must obtain a license."
33:17          So if a consumer does not obtain a license,
33:18 is there any way that he might view that content?
```

Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ028A
Page Range:      33:20-33:23
Duration:        00:00:12.9

```
33:20          THE WITNESS:  It depends on what you mean
33:21 by "obtain a license."  If you mean request a
33:22 license, then the answer is yes.  If you mean must a
33:23 license be present, the answer is no.
```

Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ029
Page Range:      33:25-34:6
Duration:        00:00:16.9

```
33:25     Q.  So you can request a license, not receive
34: Page 34
34: 1 one, and be able to view the content?
34: 2     A.  No.
34: 3     Q.  You cannot do that?
34: 4     A.  If you do not have a license -- if no
34: 5 license is present, you will be unable to view the
34: 6 content.
```

Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ030
Page Range:      34:7-35:18
Duration:        00:01:43.5

```
34: 7     Q.  Okay.  So you can request a license and be
34: 8 denied that license?
34: 9     A.  Yes.
34:10     Q.  Why might you be denied the license?
34:11     A.  That would be up to the business rules
34:12 established by the content distributor.
34:13     Q.  What's an example of one?
34:14     A.  You don't have -- you don't have
34:15 authorization, because you logged in and your login
34:16 failed.  That would be an example.  Or you're not a
34:17 registered user.
34:18     Q.  Okay.  Next section --
34:19     A.  Or actually, I can think of a hundred other
34:20 scenarios.  For example, they may only be licensed
34:21 to issue licenses to specific types of devices.  So
34:22 they may say, "Oh, your device is not allowed," or
34:23 they may deny because you aren't able to enforce
34:24 output protection.  There are any number of reasons
34:25 why you might be denied a license.
35: Page 35
35: 1     Q.  Okay.  Next section, "License acquisition,"
35: 2 says, "License acquisition is the process of
35: 3 acquiring a license allowing the consumer to decrypt
35: 4 and view protected content according to a set of
35: 5 usage rules."  I think you just described kind of
35: 6 what the usage rules situation means, correct?
35: 7     A.  I don't think that I described the totality
35: 8 of usage rules.
```

Jones depo video transcript
35: 9     Q.   Okay.   Those were examples of some usage
35:10 rule?
35:11     A.   Those were examples of usage rules.
35:12     Q.   Okay.   So there, when it says "the process
35:13 of acquiring" the "license," can you describe that
35:14 process?
35:15     A.   It would be an HTTP request, which includes
35:16 identifying information, specifically the DRM
35:17 metadata, as part of the request.
35:18     Q.   Is there anything else in that request?


Group:   Jones, Joseph (Vol. 01) - 03/22/2013      JJ031
Page Range:      35:20-36:6
Duration:        00:00:29.6

35:20          THE WITNESS:  I -- I don't know for sure
35:21 that there is nothing else included in that request,
35:22 but the important component of a -- of the license
35:23 request would be the DRM metadata and the
35:24 certificate machine key or -- I'm sorry, the machine
35:25 certificate or the domain certificate for which you
36:  Page 36
36:  1 are requesting a license.   There may be other pieces
36:  2 of data, but they are not critical to the process of
36:  3 issuing a license.
36:  4 BY MR. COUTU:
36:  5     Q.   Okay.   What is in the DRM metadata?   What
36:  6 type of data is in there?


Group:   Jones, Joseph (Vol. 01) - 03/22/2013      JJ032
Page Range:      36:8-37:13
Duration:        00:01:22.5

36:  8          THE WITNESS:   So we talked about that
36:  9 earlier.   The DRM metadata includes information that
36:10 is necessary to -- to identify the content.   It
36:11 includes an encrypted version of the content
36:12 encryption key.   It includes a transport
36:13 certificate.   And it includes a license server URL.
36:14 BY MR. COUTU:
36:15     Q.   Okay.   And I think you just went through
36:16 the next sentence, so we can -- we can skip over
36:17 that one.
36:18          Actually, so the license acquisition
36:19 process, to be clear, happens regardless how the
36:20 user might have acquired the content that he seeks
36:21 to use?
36:22     A.   Not necessarily.
36:23     Q.   When would it not occur?
36:24     A.   If the user already has a license or if a
36:25 license is included in the content, in what are
37:  Page 37
37:  1 called embedded license scenarios --
37:  2     Q.   Okay.   So if you --
37:  3     A.   -- it wouldn't have to do a license
37:  4 request.
37:  5     Q.   Sorry.
37:  6          So if the user already has a license, then
37:  7 there's a license resident on his device?
37:  8     A.   If there's -- that is one scenario, where a
37:  9 license is already cached on that device.
                        Page 12

Jones depo video transcript
37:10     Q.  Okay.  So would the client, then, first
37:11 check to see that there's a license there before
37:12 attempting to go through this license acquisition
37:13 process?

Group:  Jones, Joseph (Vol. 01) - 03/22/2013     JJ033
Page Range:      37:15-38:4
Duration:        00:00:31.4

37:15           THE WITNESS:  It depends on the scenario.
37:16 There are -- it's worth noting that this is a
37:17 software development kit --
37:18 BY MR. COUTU:
37:19     Q.  Uh-huh.
37:20     A.  -- and not a product.  This isn't -- this
37:21 isn't a boxed product that you just install.  It's a
37:22 software development kit.  So you're -- as a
37:23 licensee of Flash Access, you are not installing a
37:24 piece of software.  You are writing software that
37:25 calls our APIs.  How you call those APIs is so
38: Page 38
38: 1 variable that it's not really possible to answer
38: 2 that question.
38: 3     Q.  Is it possible to create a client that
38: 4 would do that?

Group:  Jones, Joseph (Vol. 01) - 03/22/2013     JJ034
Page Range:      38:7-38:12
Duration:        00:00:11.7

38: 7           THE WITNESS:  You'd have to restate the
38: 8 question to include what "that" means.
38: 9 BY MR. COUTU:
38:10     Q.  To first check for a local cached -- you
38:11 called it a cached license, before making a license
38:12 acquisition request.

Group:  Jones, Joseph (Vol. 01) - 03/22/2013     JJ035
Page Range:      38:14-39:1
Duration:        00:00:44.0

38:14           THE WITNESS:  It is possible to develop a
38:15 client that would first check for the existence of a
38:16 cached license prior to doing a license request.
38:17 BY MR. COUTU:
38:18     Q.  Okay.  So let's move down under "License
38:19 Server."  It looks like the second sentence there
38:20 says, "If the user is authorized to access the
38:21 content, the License Server issues a license
38:22 allowing the runtime...to decrypt and play back
38:23 content based on the policy and rights associated
38:24 with the consumer's account."
38:25           How does the license allow the runtime
39: Page 39
39: 1 client to decrypt the content?

Group:  Jones, Joseph (Vol. 01) - 03/22/2013     JJ036
Page Range:      39:3-39:18
Duration:        00:00:42.8
Page 13

Jones depo video transcript

39: 3        THE WITNESS:  The license -- the content
39: 4 license includes the content encryption key, which
39: 5 is necessary to decrypt the content.
39: 6 BY MR. COUTU:
39: 7        Q.  Okay.  And the final sentence under that
39: 8 section says, "You must create and deploy a License
39: 9 Server using the Flash Access SDK."  Does that imply
39:10 there's no other way to create a license server that
39:11 would provide for license acquisition?
39:12        A.  Absent a circumvention, it would be
39:13 difficult to impossible to create a license service
39:14 that does not use the Adobe Access or Flash Access
39:15 license server SDK.
39:16        Q.  Okay.  So Adobe's instructing its customers
39:17 here to use its own SDK to create this license
39:18 server?

Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ037
Page Range:      39:21-40: 5
Duration:        00:00:23.8

39:21        THE WITNESS:  Adobe is indicating that that
39:22 is the only known way to issue a license.
39:23 BY MR. COUTU:
39:24        Q.  Okay.  Just going back to what we were
39:25 talking about earlier, with it being an SDK and that
40: Page 40
40: 1 it's possible to write different kind of clients, do
40: 2 you know of any customers that have written a client
40: 3 that behaves as we discussed, where it would check
40: 4 for a local cached license before --
40: 5        A.  That's a fairly common implementation.

Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ038
Page Range:      40: 9-41:14
Duration:        00:00:51.1

40: 9        THE WITNESS:  It's a common implementation.
40:10 Yes, I am aware of customers that have implemented
40:11 that as -- as a mechanism.
40:12 BY MR. COUTU:
40:13        Q.  Which ones are you aware of?  What
40:14 customers?
40:15        A.  So I know -- most customers, I don't know
40:16 implementation details.  However, in the course
40:17 of -- of working with customers, sometimes you do
40:18 discover implementation details, because you're
40:19 providing service.  So I do know that VUDU checks
40:20 for the existence of a license prior to issue --
40:21 prior to doing a request.
40:22        Q.  Okay.
40:23        A.  V-U-D-U.
40:24        Q.  V-U-D-U.
40:25        Are you aware of any others, any other
41: Page 41
41: 1 customers, that do that?
41: 2        A.  Off the top of my head, I can't think of
41: 3 anybody that I know that -- enough about their
41: 4 implementation to -- to specify.
41: 5        Q.  Okay.  Do you know anyone else at Adobe who

Jones depo video transcript
41: 6 would know that kind of information?
41: 7      A.   Support representatives could have greater
41: 8 knowledge of what's -- what is implemented, but, no,
41: 9 I cannot say definitively whether or not somebody
41:10 would -- would have information about a customer's
41:11 implementation.
41:12      Q.   Okay.
41:13      A.   It's not our practice to store information
41:14 about our -- our customers' implementations.


Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ039
Page Range:      41:5-41:17
Duration:        00:00:29.7

41: 5      Q.   Okay.  Do you know anyone else at Adobe who
41: 6 would know that kind of information?
41: 7      A.   Support representatives could have greater
41: 8 knowledge of what's -- what is implemented, but, no,
41: 9 I cannot say definitively whether or not somebody
41:10 would -- would have information about a customer's
41:11 implementation.
41:12      Q.   Okay.
41:13      A.   It's not our practice to store information
41:14 about our -- our customers' implementations.
41:15      Q.   Okay.  Do you provide consulting services
41:16 or anything like that?  Is that how you know how
41:17 VUDU does it?


Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ039A
Page Range:      41:20-42:3
Duration:        00:00:19.2

41:20           THE WITNESS:   Could you restate the
41:21 question?
41:22 BY MR. COUTU:
41:23      Q.   Does Adobe provide consulting services to
41:24 customers to help them implement a client using the
41:25 Flash Access SDK?
42: Page 42
42: 1      A.   There is -- we do not generally provide
42: 2 professional services, including consulting
42: 3 services.


Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ043
Page Range:      47:20-48:3
Duration:        00:00:25.8

47:20      Q.   Okay.  Let's go to number -- point number
47:21 2, on page 285.  And this just runs through the
47:22 steps.  And we'll just review each of those steps.
47:23 It says, "Create policies specifying the usage rules
47:24 under which consumers can view the content.  A
47:25 policy is the container for the rules and
48: Page 48
48: 1 restrictions that determine how, when, and where
48: 2 protected content can be viewed by customers."
48: 3           Is that accurate?


Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ044

Jones depo video transcript
Page Range:     48:5-50:14
Duration:       00:02:50.1

48: 5          THE WITNESS:  That is an accurate statement
48: 6 in that it is the default set of rules and
48: 7 restrictions that are used on a piece of content.
48: 8 It is worth noting that those -- those rules and
48: 9 restrictions can be overridden at the time of
48: 10 license issuance.
48: 11 BY MR. COUTU:
48: 12      Q.   Why might the -- why might they be
48: 13 overridden?
48: 14      A.   Business rules are -- are unique for
48: 15 different companies.  I can think of a number of
48: 16 examples.  I'll give you two just off the top of my
48: 17 head.  One is a scenario where you rent a piece of
48: 18 content and that rental license will have certain
48: 19 policy, but then later on you decide:  You know
48: 20 what? I really like that movie.  I'm going to go
48: 21 ahead and purchase it.  So you acquire a new
48: 22 license, that gives you new -- new rights, including
48: 23 the ability to view that content past the rental
48: 24 expiration.
48: 25          Another scenario is -- and we actually
49: Page 49
49: 1 provide this as recommended guidance to customers --
49: 2 to have the default policy that is packaged with
49: 3 content be as restrictive as possible and then
49: 4 loosen those restrictions at the time of license
49: 5 issuance.
49: 6      Q.   I see.  Okay.
49: 7          Step number 3 says, "Package the content
49: 8 and specify what policies to apply."  Excuse me.
49: 9 "What policies to apply."
49: 10          So packaging here means encrypting the
49: 11 content, correct?
49: 12      A.   Yes.  It means encrypting and preparing
49: 13 protected content.
49: 14      Q.   Okay.  The next paragraph says, "Flash
49: 15 Access SDK encrypts the content using a Content
49: 16 Encryption Key," in parentheses, "CEK, and binds one
49: 17 or more policies to the content."  What does it mean
49: 18 to bind the policy to the content?
49: 19      A.   It includes that policy or those policies
49: 20 into the DRM metadata.
49: 21      Q.   Okay.  The next sentence says, "The result
49: 22 is a protected content file that can only be played
49: 23 by a consumer who has obtained a license from the
49: 24 corresponding License Server."  And I think we
49: 25 covered that.  So in order to play the content, you
50: Page 50
50: 1 must communicate with a license server, correct?
50: 2      A.   It is accurate that in order to play the
50: 3 content, you must have a license.
50: 4      Q.   And you obtain a license from the license
50: 5 server?
50: 6      A.   Sometimes, but not always.
50: 7      Q.   How else do you obtain the license?
50: 8      A.   It may already be in your cache, or it may
50: 9 be distributed at the time that you acquired the
50: 10 content, in what are called -- I apologize.  The
50: 11 word's escaping me.  But you can include the license
50: 12 with the content.

                    Jones depo video transcript
     50:13     Q.   Okay.  So you might have previously
     50:14 obtained the license, then?


Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ045
Page Range:      50:17-50:19
Duration:        00:00:04.5

     50:17          THE WITNESS:  You may have previously
     50:18 obtained.  But it could also be delivered with the
     50:19 content.


Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ046
Page Range:      50:21-51:7
Duration:        00:00:32.8

     50:21     Q.  I see.  Okay.
     50:22          So the next paragraph there says, "During
     50:23 packaging, the content is encrypted using the CEK.
     50:24 The CEK is encrypted using the License Server public
     50:25 key and included in the DRM metadata along with the
     51: Page 51
     51: 1 policies.  The DRM metadata is signed using the
     51: 2 Packager private key, and the metadata is included
     51: 3 in the protected content."  And it's included in the
     51: 4 MPEG container, like we discussed before?
     51: 5     A.  That is one scenario.  And obviously that
     51: 6 is referring to the scenario that is depicted here.
     51: 7 That is not always true.


Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ047
Page Range:      56:23-57:11
Duration:        00:00:29.2

     56:23     Q.  Okay.  Next paragraph says, "If allowed by
     56:24 the license, the client stores the license to enable
     56:25 offline access to the license."  So is this the
     57: Page 57
     57: 1 license caching that we were discussing earlier?
     57: 2     A.  It is.
     57: 3     Q.  So this sentence reads like that always
     57: 4 happens, it always stores a license.  Is that true?
     57: 5     A.  I don't think it reads that way.  It
     57: 6 says --
     57: 7     Q.  I'm sorry.
     57: 8     A.  -- "if."
     57: 9     Q.  You're right.
     57:10          Sorry.  "If allowed by the license."  How
     57:11 might the license allow that?


Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ047A
Page Range:      57:15-57:22
Duration:        00:00:15.9

     57:15          THE WITNESS:  The license -- one of the
     57:16 properties of a license is duration of cached
     57:17 licenses, how long you are able to cache this
     57:18 license, how long this specific license may be
     57:19 cached.  That value can be set to 0.
     57:20 BY MR. COUTU:
                         Page 17

```
                     Jones depo video transcript
57:21      Q.  Is that common?
57:22      A.  It is.


Group:  Jones, Joseph (Vol. 01) - 03/22/2013     JJ048
Page Range:      57:25-59:4
Duration:        00:01:16.9

57:25      Q.  Next sentence says, "License caching allows
58:  Page 58
58:  1 the consumer to view protected content without
58:  2 reacquiring a license every time they want to view
58:  3 content."  Is that an accurate statement?
58:  4      A.  Could -- could you repeat it?  I'm sorry.
58:  5 I lost my place in the document.
58:  6      Q.  Sure.  Sorry.  We're on the paragraph that
58:  7 beings with "If allowed."
58:  8      A.  Okay.  "If allowed by the license" --
58:  9      Q.  Third paragraph, second --
58: 10      A.  -- "the client stores the license to enable
58: 11 offline access to the license.  License caching
58: 12 allows the consumer to view protected content
58: 13 without reacquiring a license every time they" wish
58: 14 "to view" the "content."
58: 15          That is accurate.  If the license is
58: 16 cached, you don't have to reacquire it.
58: 17      Q.  So -- okay.  So the license has been stored
58: 18 locally.  The client checks.  If it finds a license
58: 19 there, it uses that.  Otherwise it goes to the
58: 20 license --
58: 21      A.  What do you mean by the client?
58: 22      Q.  The -- so either the AIR runtime or the
58: 23 Flash Player.
58: 24      A.  So a specific component of the AIR runtime
58: 25 or the Flash Player, in this case AdobeCP, which is
59:  Page 59
59:  1 the module that actually performs that function,
59:  2 would check, if instructed, to -- to see if there's
59:  3 a license in the cache.  If such a license exists
59:  4 and is valid, then it would not need to reacquire.


Group:  Jones, Joseph (Vol. 01) - 03/22/2013     JJ049
Page Range:      60:10-61:4
Duration:        00:01:03.2

60: 10          And so just to wrap up here, point 5 says,
60: 11 "Once the Flash Player or Adobe AIR runtime client
60: 12 has a license, the client extracts the CEK from the
60: 13 license, and the consumer can view the content they
60: 14 are authorized to access."  Where it says "has a
60: 15 license," that may be a cached license or it may be
60: 16 one that it's acquired if necessary, correct?
60: 17      A.  It may be a license that it just acquired,
60: 18 it may be a license that is cached, or it may be a
60: 19 license that is embedded.
60: 20      Q.  Okay.  Down below the placeholder for the
60: 21 missing diagram, it says, "The previous example
60: 22 shows just one possible workflow.  Alternatively,
60: 23 you might use a workflow with a proactive download
60: 24 of content where the license acquisition happens
60: 25 much later.  Another option is to implement a
61:  Page 61
```

Jones depo video transcript
61: 1 preorder workflow where the license acquisition
61: 2 occurs before the content is accessed."  Are those
61: 3 the scenarios that you had been discussing earlier
61: 4 as alternatives?


Group:  Jones, Joseph (Vol. 01) - 03/22/2013     JJ049A
Page Range:     61:6-61:8
Duration:       00:00:08.3

61: 6           THE WITNESS:  It refers to scenarios that
61: 7 include predelivery of license.  It does not mention
61: 8 the embedded license scenario.


Group:  Jones, Joseph (Vol. 01) - 03/22/2013     JJ050
Page Range:     72:7-72:24
Duration:       00:00:42.6

72: 7       Q.   Okay.  And the next sentence, at the
72: 8 beginning of the next paragraph, says, "When
72: 9 implementing a License Server, you must obtain the
72:10 necessary digital certificates from Adobe."  Do you
72:11 agree with that?
72:12       A.   Yes.
72:13       Q.   What are the necessary digital
72:14 certificates?
72:15       A.   For a license server?
72:16       Q.   Well, the sentence says "when implementing
72:17 a License Server," so yes.
72:18       A.   A license server, you would have to have a
72:19 license certificate, which you would acquire from
72:20 Adobe.
72:21       Q.   Okay.  So does every license server
72:22 implementation require interaction with Adobe, then?
72:23       A.   Yes.
72:24       Q.   Okay.  Why is that?


Group:  Jones, Joseph (Vol. 01) - 03/22/2013     JJ051
Page Range:     73:1-73:6
Duration:       00:00:13.5

73: 1           THE WITNESS:  The product will not function
73: 2 without a valid certificate.
73: 3 BY MR. COUTU:
73: 4       Q.   Does Adobe keep a record of all the
73: 5 certificates it has issued?
73: 6       A.   Yes.


Group:  Jones, Joseph (Vol. 01) - 03/22/2013     JJ054
Page Range:     86:8-86:19
Duration:       00:00:42.1

86: 8       Q.   Okay.  So returning to the sentence that --
86: 9 below that, that begins with "in addition," at the
86:10 end of it, it says "optionally track license usage."
86:11 But how might license usage be tracked?
86:12       A.   For example, a log file where -- which is
86:13 appended to each time an operation is completed.
86:14       Q.   Okay.  So the server is notified when an
86:15 operation is requested, then?
Page 19

```
                    Jones depo video transcript
86:16       A.  Yes.  The server is notified when an
86:17 operation is requested.
86:18       Q.  Okay.  And what data is in that request,
86:19 that might be logged?
```

```
Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ055
Page Range:       86:22-87:4
Duration:         00:00:18.6
```

```
86:22          THE WITNESS:  What -- so what type of
86:23 request are you talking about?  Are you --
86:24 BY MR. COUTU:
86:25       Q.  Let's talk about license acquisition.
87: Page 87
87: 1       A.  Okay.  In a license acquisition request, it
87: 2 would include the DRM metadata, and it would include
87: 3 either the domain certificate or the machine
87: 4 certificate.
```

```
Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ056
Page Range:       87:5-87:6
Duration:         00:00:04.9
```

```
87: 5       Q.  And that would be logged?
87: 6       A.  That's up to the implementer.
```

```
Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ057
Page Range:       88:14-88:24
Duration:         00:00:37.8
```

```
88:14          Let's look at page 222 of the same
88:15 document.  Beginning right at the top, it says,
88:16 "Authentication and License requests contain
88:17 information about the machine token issued to the
88:18 client during individualization."  Is that a true
88:19 statement?
88:20       A.  I've never seen the word "token" used in
88:21 this context.  If you replace it with "machine
88:22 certificate," the statement is accurate.
88:23       Q.  What do you understand the word "token" to
88:24 mean?
```

```
Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ058
Page Range:       89:1-89:9
Duration:         00:00:19.0
```

```
89: 1          THE WITNESS:  It's not a term that we use
89: 2 in DRM.
89: 3 BY MR. COUTU:
89: 4       Q.  So you would call that a certificate, you
89: 5 said?
89: 6       A.  Yes.  It's a digital certificate, which has
89: 7 a very specific definition.
89: 8       Q.  Okay.  So why do authentication and license
89: 9 requests contain that machine information?
```

```
Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ059
Page Range:       89:11-89:17
```

```
                    Jones depo video transcript
Duration:        00:00:24.3

    89:11          THE WITNESS:  The content encryption key
    89:12 will be encrypted with the key pair associated with
    89:13 that machine certificate.  So in order to consume
    89:14 content, you must have the corresponding private key
    89:15 associated with that machine certificate, and you
    89:16 must have the certificate itself in order to submit
    89:17 a license request.


Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ060
Page Range:       89:19-89:24
Duration:         00:00:16.6

    89:19    Q.  Okay.  So the next two sentences are "The
    89:20 machine token contains a MachineId, an identifier
    89:21 assigned during individualization.  Use this
    89:22 identifier to count the number of machines from
    89:23 which a user has requested a license."  Do you agree
    89:24 with those two sentences?


Group:  Jones, Joseph (Vol. 01) - 03/22/2013      JJ060A
Page Range:       90:2-90:25
Duration:         00:01:12.2

    90: 2          THE WITNESS:  A MachineId is transmitted as
    90: 3 part of a -- an individualization request and as
    90: 4 part of a license request.
    90: 5 BY MR. COUTU:
    90: 6    Q.  Okay.  So the last sentence, "Use this
    90: 7 identifier to count the number of machines from
    90: 8 which a user has requested a license," why would one
    90: 9 want to do that?
    90:10    A.  A common use case would be the -- an
    90:11 implementation of a device domain.
    90:12    Q.  What's a device domain?
    90:13    A.  A device domain is a collection of devices
    90:14 that are asserted to be controlled by a user.
    90:15    Q.  Okay.  Is that like I have this laptop and
    90:16 an iPad, and that's a device domain for me?
    90:17    A.  That would be -- sort of.  You would join
    90:18 those devices to a domain.  You would say, "This
    90:19 tablet is mine, so I'm joining it to the domain.
    90:20 This laptop is mine, so I'm joining it to the
    90:21 domain."  And the service provider might say you may
    90:22 only have three or five or eight devices joined to a
    90:23 domain at a -- at a time, and then content licenses
    90:24 can be issued to the domain, so that you can move
    90:25 them freely among the devices that you control.


Total Length - 00:39:43
```