volume 4

Pages 581 – 790

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DIGITAL REG OF TEXAS, LLC    )
                             )
            Plaintiff,       )    NO. C-12-1971 CW
                             )
  VS.                        )    THURSDAY, AUGUST 28, 2014
                             )
ADOBE SYSTEMS, INC., ET AL.,)    OAKLAND, CALIFORNIA
                             )
            Defendants.      )    JURY TRIAL
_____ )

Before The Honorable CLAUDIA WILKEN, Judge

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**For Plaintiff:**          DINOVO, PRICE, ELLWANGER & HARDY LLP
                            7000 NORTH MOPAC EXPRESSWAY, SUITE 350
                            AUSTIN, TEXAS 78731
                      BY:   ANDREW G. DINOVO, ESQUIRE
                            ADAM G. PRICE, ESQUIRE
                            GREGORY DONAHUE, ESQUIRE
                            JAY D. ELLWANGER, ESQUIRE
                            NICOLE E. GLAUSER, ESQUIRE


                            BARTKO ZANKEL BUNZEL MILLER
                            ONE EMBARCADERO CENTER, SUITE 800
                            SAN FRANCISCO, CALIFORNIA 942111
                      BY:   W. PAUL SCHUCK, ESQUIRE


**ALSO PRESENT:**           MICHAEL FARLEY, COMPANY REPRESENTATIVE

                      (APPEARANCES CONTINUED)

**Reported By:**            Diane E. Skillman, CSR 4909, RPR, FCRR
                            Official Court Reporter
              TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

1

2

3

4    **FOR DEFENDANT**              WEILL, GOTSHAL & MANGES, LLP
     **ADOBE SYSTEMS:**             201 REDWOOD SHORES PARKWAY
5                                   REDWOOD SHORES, CALIFORNIA 94065
                              BY:   EDWARD R. REINES, ESQUIRE
6                                   SONAL N. MEHTA, ESQUIRE
                                    BYRON BEEBE, ESQUIRE
7                                   ANANT PRADHAN, ESQUIRE

8

9    **ALSO PRESENT:**             PAUL BETLEM, COMPANY REPRESENTATIVE
                                    KAREN ROBINSON, IN-HOUSE COUNSEL
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          I N D E X

 2    PLAINTIFF'S WITNESS:                        PAGE   VOL.

 3    DEVANBU, PREMKUMAR

 4    DIRECT EXAMINATION BY MR. DINOVO (RESUMED)  585    4

 5    CROSS-EXAMINATION BY MS. MEHTA              632    4

 6    REDIRECT EXAMINATION BY MR. DINOVO          686    4

 7    RECROSS-EXAMINATION BY MS. MEHTA            694    4

 8

 9    DEFENDANT'S WITNESS:

10    WICKER, STEPHEN

11    DIRECT EXAMINATION BY MS. MEHTA             701    4

12    CROSS-EXAMINATION BY MR. DINOVO             753    4

13

14

15

16    PLAINTIFF'S EXHIBITS:          EVD.     VOL.

17        4 (PG. 232)                740       4

18       65                          616       4

19       67                          617       4

20    DEFENDANT'S EXHIBITS:

21       360                         735       4

22       505 (PGS. 1432 & 1449)      738       4

23

24

25
```

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930**

| 1 | <u>THURSDAY, AUGUST 28, 2014</u>                          10:40 A.M. |

1    THURSDAY, AUGUST 28, 2014                          10:40 A.M.

2                        P R O C E E D I N G S

3          THE CLERK:  REMAIN SEATED.  COME TO ORDER.  COURT IS

4    IN SESSION.

5          THE COURT:  GOOD MORNING.

6          MR. DINOVO:  GOOD MORNING.

7          THE CLERK:  READY FOR YOU.

8        (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

9          THE COURT:  PLEASE BE SEATED.

10       GOOD MORNING, LADIES AND GENTLEMEN.  SORRY FOR THE LATE

11   START.  WE WILL END AT 3:30 ANYWAY.  WE HAVE THE WITNESS ON

12   THE STAND UNDER DIRECT EXAMINATION.

13         MR. DINOVO:  THANK YOU, YOUR HONOR.

14     MS. MASON, IF YOU CAN PLEASE PUT ON PRESENTATION SLIDE 14?

15                    (PUBLISHED TO JURY.)

16         MS. MEHTA:  YOUR HONOR, JUST ONE ISSUE BEFORE WE GET

17   INTO TESTIMONY.  WE SUBMITTED A PROPOSAL YESTERDAY REGARDING

18   THE ISSUE THAT WAS DISCUSSED WITH THE COURT AT THE END OF THE

19   TESTIMONY ABOUT THE YES/NO INDICATOR.

20         THE COURT:  I HAVE NOT LOOKED AT IT.

21         MS. MEHTA:  OKAY.

22         THE COURT:  GO AHEAD.

23         MR. DINOVO:  YOUR HONOR, THE JUROR SEEMS TO HAVE A

24   QUESTION.  SHOULD I --

25         THE COURT:  OH.

```
 1                    (QUESTION HANDED TO COURT.)

 2              THE COURT:  GO AHEAD.

 3              MR. DINOVO:  THANK YOU.

 4                  DIRECT EXAMINATION RESUMED

 5   BY MR. DINOVO:

 6   Q.  ALL RIGHT, SIR.  LET'S TRY TO GET OURSELVES BACK IN THAT

 7   PLACE.  IT HAS BEEN A FULL NIGHT NOW.  SO WE WERE --

 8              THE COURT:  THE JURY CAN'T HEAR THE TESTIMONY, SO YOU

 9   ARE GOING TO NEED TO KEEP YOUR VOICE RIGHT NEXT TO THE

10   MICROPHONE AND LISTEN FOR IT.  AND DON'T TURN YOUR HEAD AWAY

11   FROM IT.

12       OKAY.  GO AHEAD.

13   BY MR. DINOVO:

14   Q.  ALL RIGHT, DR. DEVANBU.  SO WE WERE TALKING, WERE WE NOT,

15   ABOUT THE '541 PATENT AND THE LIVECYCLE PRODUCT?

16   A.  THAT'S RIGHT.

17   Q.  OKAY.  AND ON YOUR MONITOR YOU CAN SEE THE STEP THAT WE

18   WERE TALKING ABOUT, WHICH WAS A METHOD FOR REGULATING ACCESS

19   TO DIGITAL CONTENT?

20   A.  THAT'S CORRECT.

21   Q.  AND, SPECIFICALLY, THIS FIRST STEP.

22   A.  RIGHT.

23   Q.  DID YOU EVALUATE THE LIVECYCLE PRODUCT TO ASCERTAIN

24   WHETHER OR NOT IT SATISFIES THIS FIRST STEP?

25   A.  YES, I DID.
```

DEVANBU – DIRECT / DINOVO

1    **Q.**  WHY DON'T YOU TELL US AT A HIGH LEVEL WHAT THIS SLIDE 15

2    REPRESENTS?

3    **A.**  SO, WHEN A DOCUMENT IS OPENED THAT'S UNDER THE CONTROL OF

4    LIVECYCLE, THERE ARE EXECUTABLE INSTRUCTIONS THAT FIRST

5    COLLECT, AND THEN TRANSMIT NOTIFICATION INFORMATION.  AND IF

6    THE TRANSMISSION IS SUCCESSFUL, THEN THE ACCESS IS GRANTED TO

7    OPEN THE FILE.  AND IF THE TRANSMISSION IS NOT SUCCESSFUL,

8    THEN WE DO NOT GRANT ACCESS.

9    **Q.**  THANK YOU.

10       SO WHAT DOES THIS NEXT SLIDE SHOW, DR. DEVANBU?

11   **A.**  SO WHEN A PRODUCT IN THE ACROBAT FAMILY ATTEMPTS TO OPEN A

12   PROTECTED FILE, A FILE THAT'S PROTECTED IN THE LIVECYCLE

13   RIGHTS MANAGEMENT, IT FIRST INITIALIZES A SECURITY SESSION

14   WITHIN THE SECURITY SESSION.

15       IT CHECKS TO SEE IF IT HAS GOT A LOCALLY CACHED VOUCHER. A

16   CACHE IS JUST A TEMPORARY LOCAL STORAGE.  SO IT CHECKS IN THE

17   LOCAL STORAGE TO SEE IF IT HAS GOT A VOUCHER.  AND IF THE

18   VOUCHER IS AVAILABLE, IT USES THE VOUCHER TO GRANT PERMISSION.

19   AND IF NOT, IT GOES AND ASKS THE SERVER.

20   **Q.**  ALL RIGHT, SIR.  THIS CACHE, IS THAT RELEVANT TO THE USE

21   OF LIVECYCLE ONLINE OR OFFLINE?

22   **A.**  IT IS USED IN BOTH CASES.

23   **Q.**  SO WHAT IS SHOWN ON THIS SLIDE, SIR?

24   **A.**  SO, WHAT IS SHOWN HERE IS THE CODE CITATIONS THAT ARE

25   RELEVANT TO THIS PROCEDURE.  SO FUNCTIONING BEGINS WITHIN THIS

1    EDC.  EDC, I BELIEVE, WAS THE OLD NAME FOR THIS PRODUCT.  AND

2    SO MANY OF THE FUNCTIONS AND THE METHODS ARE IN FILES THAT MAY

3    BEGIN WITH EDC.

4        SO FIRST A SESSION, INITIALIZED SESSION METHOD THAT IS

5    SHOWN HERE IS -- THAT I'M POINTING TO IS THE TOP BOX.  IT

6    SHOWS WHERE THE -- IT SHOWS WHERE EVERYTHING STARTS.  THE

7    SECURITY SESSION GETS INITIALIZED.  AND WITHIN THAT SESSION

8    THERE IS A METHOD CALLED "REQUESTACCESS."  AND THIS

9    REQUESTACCESS METHOD, UNDER SOME CONDITIONS, CALLS IT A

10   REQUESTACCESS ONLINE METHOD.

11       AND THE REQUEST ONLINE METHOD -- WE CAN PROCEED -- YES.

12   IT CALLS THIS GETCACHEDVOUCHER METHOD, WHICH CAN STORE THE

13   CACHE WITHIN THE SAME SESSION.  AND IF THE CACHE IS AVAILABLE

14   IT PROCEEDS TO THE NEXT STEP, WHICH IS TO REQUEST A VOUCHER

15   FROM THE SERVER.

16   Q.  YOU ARE SAYING IF THE VOUCHER IS PRESENT IN CACHE IT

17   REQUESTS IT FROM THE SERVER?

18   A.   IF THE VOUCHER IS PRESENT IN THE CACHE, IT DOES NOT

19   REQUEST IT.  I AM SORRY. IF THE VOUCHER IS PRESENT IN THE

20   CACHE, IT DOES NOT REQUEST IT FROM THE SERVER.

21   Q.  SO WHEN DOES IT REQUEST IT FROM THE SERVER?

22   A.  IF THE VOUCHER IS NOT PRESENT IN THE CACHE.

23   Q.  I SEE.  THANK YOU.

24       ALL RIGHT.  LET'S TURN TO THE SECOND ELEMENT OF CLAIM 1 OF

25   THE '541 PATENT.  IT SAYS:

1      "IF NOT REQUESTING PERMISSION FROM AN EXTERNAL SOURCE FOR

2   THE RESOURCE TO ACCESS THE DIGITAL CONTENT."

3      IN YOUR ANALYSIS, WHAT IS THE EXTERNAL SOURCE?

4   **A.**  THE EXTERNAL SOURCE HERE WOULD BE THE LIVECYCLE RIGHTS

5   MANAGEMENT SERVER.

6   **Q.**  AND DOES THIS CONTEMPLATE REQUESTING A PERMISSION FROM

7   THAT SOURCE?

8   **A.**  THAT'S RIGHT.

9   **Q.**  SO WHAT IS SHOWN HERE IN THIS FLOW CHART, SIR?

10  **A.**  SO I'M POINTING AT THE SERVER HERE.  ESSENTIALLY WHAT WE

11  TALKED ABOUT SO FAR IS THAT THE THREE STEPS THAT I'M POINTING

12  TO.  OH, I THINK I SHOULDN'T BE USING THIS BECAUSE IT IS

13  REFLECTING OFF THE SCREEN AND GOING IN THE DIRECTION OF THE

14  JURY.

15  **Q.**  ALL RIGHT.  WELL, LET'S NOT USE IT, THEN.  WHY DON'T YOU

16  NOT USE IT.

17  **A.**  SO THE TOP RIGHT-HAND BOXES WITH THE FLOW CHART ARE THE

18  ONES WE ALREADY TALKED ABOUT.  AND SO THAT WAS THE STEPS ONE

19  AND TWO WHERE WE CHECKED THE LOCAL CACHE AND ASK THE EXTERNAL

20  SOURCE.  IF THAT IS NOT AVAILABLE, THEN WE REQUEST THE

21  EXTERNAL SOURCE.  THAT'S THE RED BOX WITH THE LOCK ON IT.

22  **Q.**  ALL RIGHT.

23  **A.**  IF THAT DOESN'T WORK, WE REQUEST A SOURCE.  AND THEN, FROM

24  THAT SOURCE WE GET A VOUCHER, WHICH SATISFIES A TOKEN

25  LIMITATION IN THIS CASE.  AND THEN, BASED ON THE TOKEN WE

1    GENERATE A PERMISSION.

2    **Q.**  SO LET'S TALK ABOUT THIS TOKEN A BIT AND THE DISCUSSION WE

3    HAD YESTERDAY ABOUT THE REQUIREMENTS FOR A TOKEN.

4        ASSUMING IT HAS TO BE A TOKEN THAT INDICATES ACCESS SHOULD

5    BE GRANTED OR INDICATES THAT, NO, ACCESS SHOULD NOT BE

6    GRANTED, IS THAT PRESENT IN THE VOUCHER?

7            **MS. MEHTA:**  OBJECTION, YOUR HONOR.  THIS IS GOING

8    BACK INTO THE TERRITORY OF ATTEMPTING TO REWRITE OR

9    RECHARACTERIZE THE CLAIM CONSTRUCTION.

10           **THE COURT:**  WELL, THAT -- THAT AREA ISN'T OFF LIMITS.

11   IT'S JUST --

12           **MS. MEHTA:**  THAT QUESTION WAS A CHARACTERIZATION.

13           **THE COURT:**  BUT IT WAS A CORRECT ONE.

14       DID YOU HAVE ANY PROBLEM WITH WHAT WE TALKED ABOUT AND THE

15   OUTCOME OF YESTERDAY'S DISCUSSION?

16           **MR. DINOVO:**  NO, YOUR HONOR.  WE SUBMITTED

17   ALTERNATIVE PROPOSALS.  I'M FINE WITH -- OBVIOUSLY, WE WOULD

18   PREFER OURS, BUT WE UNDERSTOOD THE COURT'S GUIDANCE AND THAT

19   IS WHY I'M TRYING TO MAKE HIS TESTIMONY RELEVANT OR ADDRESS

20   THE REVISED INSTRUCTION.

21           **MS. MEHTA:**  AND THE PROBLEM WITH THAT, YOUR HONOR, IS

22   THAT THIS IS NOW THEY ARE TRYING TO ATTEMPT TO ADDRESS THAT

23   ISSUE.  THEY ARE GOING OUTSIDE THE SCOPE OF HIS REPORT,

24   BECAUSE THERE IS NO DISCUSSION OF THAT IN HIS REPORT

25   WHATSOEVER, WHICH IS WHY THEY TRIED TO DO WHAT THEY DID

1    YESTERDAY.

2        SO WE WOULD ASK THAT YOUR HONOR READ THE CURATIVE

3    INSTRUCTION NOW.

4            **THE COURT:**  OKAY.  SO, I WANT –– DIDN'T GET A CHANCE

5    TO DO THIS EARLIER, BUT I WANTED TO CLARIFY THAT YESTERDAY THE

6    DIGITAL REG'S EXPERT, DR. DEVANBU, TESTIFIED THAT THE COURT'S

7    INTERPRETATION OF THE TERM "TOKEN" DID NOT EXPLICITLY REQUIRE

8    THAT IT INCLUDE –– THAT IT CONTAIN A YES/NO INDICATOR.

9        AND I WANTED TO EXPLAIN THAT I AND INTERPRETED THE TERM

10   "TOKEN," AS YOU WILL SEE IN YOUR PAPERS, TO MEAN A FILE

11   INDICATING WHETHER THE TRANSACTION HAS BEEN APPROVED AND

12   ACCESS SHOULD BE GRANTED.

13       THIS MAKES CLEAR THAT A TOKEN DOES NOT SIMPLY INDICATE

14   THAT ACCESS SHOULD BE GRANTED, BUT ALSO INCLUDES –– ALSO

15   CONTAINS A YES/NO INDICATOR EXHIBITING EITHER APPROVAL OR

16   REJECTION OF THE TRANSACTION.

17       YOU SHOULD DISREGARD ANY TESTIMONY THAT MY INTERPRETER OF

18   THE TERM "TOKEN" DOES NOT REQUIRE A YES/NO INDICATOR.  SO AND

19   THEN IN TERMS OF THE INDICATION THAT THIS SUBJECT ISN'T

20   DISCUSSED IN THE EXPERT'S REPORT –– I KNOW I HAD IT YESTERDAY.

21   IF YOU CAN GIVE ME PAGE AND LINE WHERE IT IS, THEN I'LL TAKE A

22   LOOK.

23            **MR. DINOVO:**  OF COURSE, YOUR HONOR.  SO, WHAT WE

24   PREPARED YESTERDAY WERE CITES TO THE ADOBE ACROBAT FAMILY OF

25   PRODUCTS.  AND SO WE HAD THOSE CITATIONS READY TO FILE.

```
 1            THE COURT:  THE QUESTION IS DISCUSSION OF THE YES/NO

 2    INDICATOR.

 3            MR. DINOVO:  YES, YOUR HONOR.  AND THIS WAS

 4    ACTUALLY --

 5            THE COURT:  ALL I NEED IS A PAGE AND LINE WHERE IT IS

 6    IN THE REPORT, AND IF IT ISN'T THEN YOU NEED TO GO ON TO

 7    SOMETHING ELSE.

 8            MR. DINOVO:  OKAY.  THIS WAS SOMETHING THAT WAS

 9    BRIEFED BEFORE THE TRIAL, SO WE WILL PROVIDE THAT FULL BRIEF.

10            MS. MEHTA:  YOUR HONOR, IT WAS NOT IN HIS REPORT.

11            THE COURT:  WHAT I AM LOOKING FOR IS PAGE AND LINE OF

12    THE REPORT, AND IF THAT IS NOT HANDY, WHY DON'T YOU GO ON TO

13    SOME OTHER SUBJECT, AND WE WILL TAKE IT UP LATER?

14            MR. DINOVO:  OF COURSE, YOUR HONOR.

15    BY MR. DINOVO:

16    Q.  SO, DR. DEVANBU, IN YOUR REPORT, DID YOU ANALYZE WHETHER

17    OR NOT THE TOKEN WAS USED TO GENERATE A PERMISSION AT THE

18    CLIENT?

19    A.  I DID.

20    Q.  ALL RIGHT.  AND THAT PERMISSION -- WHAT IS THE PURPOSE OF

21    THAT PERMISSION?

22    A.  THE PERMISSION IS INFORMATION THAT ENABLES THE CLIENT TO

23    ACCESS THE SOURCE CODE.

24    Q.  ALL RIGHT.  IN YOUR REPORT, WHAT DO YOU IDENTIFY AS THE

25    "TOKEN"?
```

DEVANBU – DIRECT / DINOVO

1    **A.**  SO -- SO THE TOKEN -- IF I CAN EXPLAIN THIS -- THE TOKEN

2    IS ESSENTIALLY A COLLECTION OF INFORMATION THAT IS SENT FROM

3    THE SERVER TO THE CLIENT.  A BUNCH OF BITS, RIGHT?  AND AT THE

4    CLIENT A PERMISSION IS ANOTHER BUNCH OF BITS THAT ENABLES

5    ACCESS, RIGHT?  FOR EXAMPLE, A KEY.  OKAY?

6         SO THE INFORMATION THAT IS SENT CANNOT SIMPLY INCLUDE

7    THE -- DIRECTLY INCLUDE THE BITS THAT ARE USED TO GENERATE THE

8    PERMISSION OF THE CLIENT.  BECAUSE IF IT DID, THEN SOMEBODY

9    WOULD SPY ON IT AND STEAL IT.

10        SO THERE HAS TO BE SOME -- SOMEBODY WOULD SPY ON THE BITS

11   THAT ARE SENT ALONG THE WIRE, FOR EXAMPLE, OR WIFI, AND SIMPLY

12   STEAL THOSE BITS, RIGHT?

13        SO THE INFORMATION THAT IS SENT FROM THE CLIENT -- FROM

14   THE SERVER TO THE CLIENT, HAS TO BE CHECKED AT THE CLIENT TO

15   MAKE SURE THAT IT'S FROM A REAL SOURCE.  AND THE INFORMATION

16   THAT ENABLES ACCESS, THAT IS THE PERMISSION, HAS TO BE

17   EXTRACTED FROM IT.

18   **Q.**  ALL RIGHT, SIR.

19   **A.**  AND THAT'S TRUE IN THIS CASE.

20   **Q.**  THAT WAS MY NEXT QUESTION.  SO IN THE CONTEXT OF THE

21   LIVECYCLE ANALYSIS RELATIVE TO THE '541 PATENT, WHAT TOKEN DID

22   YOU IDENTIFY?

23   **A.**  THE VOUCHER.

24   **Q.**  ALL RIGHT.  AND WHAT IS THE VOUCHER IN REAL WORLD TERMS?

25   **A.**  SO THE VOUCHER INCLUDES INDICATIONS SUCH AS WHETHER THE

1    DOCUMENT HAS BEEN REVOKED.  SO, FOR EXAMPLE, IT MIGHT BE THE

2    CASE THAT THE DOCUMENT IS NO LONGER VALID, BECAUSE DIFFERENT

3    DECISIONS ARE BEING MADE WITHIN THE ORGANIZATION.  SO THE

4    VOUCHER MIGHT INDICATE:

5        "DON'T USE THIS DOCUMENT ANYMORE, BECAUSE IT HAS EXPIRED."

6    **Q.**  ALL RIGHT.

7            **MS. MEHTA:**  OBJECTION, YOUR HONOR.  MOVE TO STRIKE.

8    THAT TESTIMONY IS OUTSIDE THE SCOPE OF HIS REPORT.  HE DID NOT

9    TESTIFY WHETHER OR NOT THE VOUCHER HAS A TRANSACTION THAT'S

10   APPROVED OR NOT APPROVED, OR YES/NO.  IN FACT, HE SAID HE

11   DIDN'T THINK THAT WAS A LIMITATION, AND HE DIDN'T APPLY IT.

12           **MR. DINOVO:**  YOUR HONOR, CAN I ADDRESS THAT?  SO, THE

13   TRANSACTION --

14           **THE COURT:**  GIVE ME THE PAGE AND LINE OF HIS REPORT

15   AT WHICH HE DISCUSSES THIS.

16           **MR. DINOVO:**  YES, OF COURSE.

17           **MS. MEHTA:**  I WOULD DIRECT YOU TO -- IF IT IS

18   HELPFUL, I CAN DIRECT YOU TO A2 OF HIS REPORT AT PAGE 15 WHERE

19   HE SAYS:

20       "I UNDERSTAND THAT ADOBE IS PROPOSED THE TOKEN BE

21   CONSTRUED AS A FILE INDICATING WHETHER THE TRANSACTION HAS

22   BEEN APPROVED.  THIS CORRECTION IS INCORRECT," SO ON AND ON SO

23   FORTH.  HE DOES NOT ADDRESS THAT THAT LIMITATION IS MET.  ALL

24   HE DOES IS CONTEST THAT IT IS A LIMITATION, WHICH IS

25   INCONSISTENT WITH THE COURT'S RULING.

1        **MR. DINOVO:**  YOUR HONOR, IF I CAN ADDRESS THAT, I

2  THINK THIS IS A NONISSUE.  THIS, AGAIN, WAS SUBJECT TO THE

3  PRETRIAL BRIEFING.

4       WHAT DR. DEVANBU SAID IN HIS REPORT IS HE DIDN'T THINK A

5  TRANSACTION SHOULD BE A COMMERCIAL TRANSACTION.  ACTUALLY,

6  ADOBE IN ITS FOLLOWING BRIEF SAID THEY AGREED IT NEED NOT BE A

7  COMMERCIAL TRANSACTION.

8       AND THEN, THE COURT, IN ITS CLAIM CONSTRUCTION ORDER,

9  SAID:

10      "SINCE IT DOESN'T HAVE TO BE A COMMERCIAL TRANSACTION,

11  I'LL ACCEPT THE WORD 'TRANSACTION.'"

12      SO TRANSACTION --

13        **THE COURT:**  THAT IS NOT THE ISSUE.  WHY DON'T YOU GO

14  ON TO SOMETHING ELSE, AND WE CAN DISCUSS THIS AT ANOTHER TIME.

15        **MR. DINOVO:**  OF COURSE.

16        **THE COURT:**  YOU HAVE OTHER AREAS BESIDES THIS AREA

17  THAT YOU CAN DISCUSS?

18        **MR. DINOVO:**  OF COURSE.

19  **BY MR. DINOVO:**

20  **Q.**  ALL RIGHT, SIR.  SO ONCE THE VOUCHER IS RECEIVED, WHAT

21  IS -- WHAT OCCURS AT THE CLIENT?

22  **A.**  SO ONCE A VOUCHER IS RECEIVED, THEN BASED ON THE VOUCHER

23  SOME INFORMATION IS EXTRACTED FROM THE VOUCHER AND DECODED TO

24  PRODUCE THE PERMISSION TO ACCESS THE RESOURCE.

25  **Q.**  ALL RIGHT.  AND IN YOUR REPORT, WHAT IS THE PERMISSION

DEVANBU – DIRECT / DINOVO

```
1   THAT YOU IDENTIFY?

2   A.  SO -- SO THE PERMISSION THAT WE IDENTIFY IS A KEY THAT IS

3   USED TO DECRYPT THE DOCUMENT.

4   Q.  SO WHAT IS SHOWN HERE ON SLIDE 21?

5   A.  SO, ESSENTIALLY, WHAT WE ARE SHOWING HERE IS THAT THE CALL

6   TO -- CONTINUING FROM BEFORE, WE CALL GETCACHEDVOUCHER TO SEE

7   IF IT IS THERE AND IF IT'S LOCALLY STORED.  IF IT IS NOT, WE

8   CALL GETVOUCHER TO REQUEST THE VOUCHER REMOTELY.

9       AND THE GETVOUCHER USES THE SOAP PROTOCOL, WHICH WE TALKED

10  ABOUT BRIEFLY YESTERDAY TO ACCESS THE DATA FROM THE REMOTE

11  SERVER.

12  Q.  ALL RIGHT.  THANK YOU.

13      WHAT IS SHOWN HERE ON SLIDE 22, SIR?

14  A.  SO IF WE CAN HIT THE ADVANCE ONCE MORE.  ONCE MORE.  OKAY.

15      SO THIS IS -- BASICALLY SHOWS THE SECOND STEP.  REQUESTING

16  THE VOUCHER FROM AN EXTERNAL SOURCE.

17  Q.  ALL RIGHT?  AND THESE ARE THE SOURCE CODE CITATIONS TO

18  THAT PROCESS?

19  A.  THAT'S RIGHT.

20  Q.  CAN YOU WALK US THROUGH SLIDE 23?

21  A.  SO, YES.  I THINK WE CAN ADVANCE IT.  WE HAVE ALREADY

22  TALKED ABOUT THIS.  OKAY.

23  Q.  ALL RIGHT.  LET'S TALK ABOUT -- WE TALKED TO AN EXTENT

24  ABOUT THE TOKEN.  WHY DON'T WE MOVE ON TO THE FOLLOWING

25  ELEMENT?
```

DEVANBU – DIRECT / DINOVO

```
 1    A.  THAT'S RIGHT.  THE THIRD ELEMENT WAS RECEIVING THE TOKEN.

 2    AND THEN, AFTER THAT, BASED ON THE RECEIVING TOKEN, EXECUTING

 3    AN INSTALLATION PROCESS.

 4    Q.  ALL RIGHT.  AND WHAT IS MATERIAL TO YOU ABOUT THIS

 5    TESTIMONY THAT IS SHOWN HERE?  I AM SORRY.  I THINK I PASSED

 6    THE SLIDE.  SORRY.

 7    A.  SO, BASICALLY THE LIMITATION IS THAT BASED ON THE RECEIVED

 8    TOKEN EXECUTING PROCESS THAT GENERATES AT THE CLIENT A

 9    PERMISSION.  SO BASED ON THE RECEIVED TOKEN EXECUTING AN

10    INSTALLATION PROCESS THAT GENERATES AT THE CLIENT A

11    PERMISSION.

12        SO THE DOCUMENT KEY IS WITHIN THE VOUCHER.  AND DEPENDING

13    WHETHER IT IS ONLINE OR OFFLINE, THE VOUCHER ARRIVES IN AN

14    ENCRYPTED FORM IN DIFFERENT SETTINGS IN SLIGHTLY DIFFERENT

15    WAYS.

16        SO THAT INFORMATION IS EXTRACTED FROM THE VOUCHER.  THE

17    KEY INFORMATION IS EXTRACTED FROM THE VOUCHER, AND THAT'S WHAT

18    SATISFIES THIS STEP.

19    Q.  THANK YOU.  ALL RIGHT.  WHAT IS SHOWN HERE ON THIS ADOBE

20    DOCUMENT, PLAINTIFF'S EXHIBIT 55?

21    A.  OKAY.  SO THIS DOCUMENT DESCRIBES WHAT HAPPENS IN THE CASE

22    THAT THE DOCUMENT IS ENABLED FOR VIEWING OFFLINE.  IN OTHER

23    WORDS, MAYBE IT IS A CRITICAL DOCUMENT, BUT YOU WOULD STILL

24    LIKE THE ENGINEERS TO TAKE THE DOCUMENT WITH THEM ON A PLANE,

25    FOR EXAMPLE.
```

1         BUT EVEN ON THE PLANE WE WOULD LIKE THEM TO VIEW THE

2    DOCUMENT WHEN THEY HAVE NO INTERNET ACCESS.  WE WOULD LIKE

3    THEM TO VIEW THE DOCUMENT WITH UNDER CONTROL OF SOME POLICIES.

4         THIS IS CALLED AN "OFFLINE MODE."  IN OFFLINE MODE, THE

5    OFFLINE VOUCHER HAS WITHIN IT A KEY THAT IS ENCRYPTED WITH

6    SOMETHING CALLED "A PRINCIPAL KEY."

7         THE PRINCIPAL KEY IS THE KEY ASSOCIATED WITH THE USER.

8    **Q.**  ALL RIGHT.  AND WE HAVE ANOTHER EXCERPT FROM ADOBE'S

9    CORPORATE REPRESENTATIVE, MR. HERBACH.  WHAT IS THE RELEVANCE

10   OF THIS?

11   **A.**  SO THIS BASICALLY SHOWS THAT THE TOKEN THAT IS RECEIVED

12   HAS AN ENCRYPTED KEY, AND THAT KEY IS DECODED AND EXTRACTED

13   FROM THE -- FROM THE VOUCHER, AND THEN IS USED TO PRODUCE THE

14   ACCESS.

15   **Q.**  OKAY, SIR.  UNDERSTANDING THAT THESE ARE COMPLEX

16   FUNCTIONS, WHY DON'T YOU WALK US THROUGH AT A HIGH LEVEL WHAT

17   IS SHOWN HERE?

18   **A.**  SO THE LAST STEP BASICALLY SAYS -- THIS IS STEP 4C AT THE

19   BOTTOM BOX THERE.  AND THAT BASICALLY SHOWS THAT THE TOKEN MAY

20   BE FOUND BY A LATER EXECUTION OF THE ACCESS CHECKING PROCESS.

21        AND THIS IS IF THEY WERE IN THE SAME SECURITY SESSION AND

22   THEY TRIED TO OPEN THE DOCUMENT AGAIN, THEN THE VOUCHER WOULD

23   BE CACHED, AND THEY WOULDN'T HAVE TO MAKE AN EXTERNAL REQUEST.

24   **Q.**  IS IT THE TOKEN OR THE PERMISSION THAT IS CHECKED?

25   **A.**  SAY AGAIN?  YES.  IF THEY WERE TRYING TO ACCESS THE

1    DOCUMENT AGAIN, THEY COULD FIND THE VOUCHER IN THE STORED

2    CACHE.

3    **Q.**   WHAT IS THE PERMISSION THAT YOU ARE SPECIFICALLY

4    IDENTIFYING IN CONNECTION WITH THE LIVECYCLE PRODUCT?

5    **A.**   IT'S THE KEY WITHIN THE VOUCHER.

6    **Q.**   OKAY.

7         AND YOU MAY HAVE COVERED THIS ALREADY, BUT CAN YOU REMIND

8    US WHAT YOU MEAN BY A "KEY"?

9    **A.**   SO THE DOCUMENTS ARE ENCRYPTED.  AND AS I MENTIONED

10   BEFORE, ENCRYPTED DOCUMENTS LOOK LIKE GIBBERISH.  THE ONLY WAY

11   YOU CAN DECODE THEM IS WITH SOME INFORMATION THAT WOULD ENABLE

12   YOU TO DECODE IT.  AND THAT INFORMATION IS A SECRET KEY THAT

13   ALLOWS YOU TO DECODE THE INFORMATION THAT IS ENCRYPTED.

14   **Q.**   THANK YOU.  ALL RIGHT.  SO I THINK SLIDE 32 CONTINUES ON

15   FROM 31.

16   **A.**   YES.  SO THIS BASICALLY TALKS ABOUT HOW THE VOUCHER COULD

17   BE LOCALLY STORED.  SO, THERE IS TWO SETTINGS.  IN THE ONLINE

18   SETTING THE VOUCHER IS STORED IN THE SECURITY SESSION IN THE

19   CACHE.

20        IN THE OFFLINE SETTING IT IS ALSO STORED IN THE CACHE, BUT

21   IT CAN ALSO BE TOWARD IN THE DATABASE.

22   **Q.**   I SEE.  AND SO THE LAST TWO FUNCTIONS THERE, ONE REFERS TO

23   OFFLINE AND ONE REFERS TO ONLINE USE?

24   **A.**   THAT'S RIGHT.

25   **Q.**   OKAY, SIR.  GIVEN THAT ANALYSIS, DO YOU HAVE AN OPINION AS

```
 1    TO WHETHER OR NOT ADOBE LIVECYCLE PRODUCTS INFRINGE CLAIM 1 OF

 2    THE '541 PATENT?

 3    A.  YES.  I FOUND ALL FOUR LIMITATIONS INFRINGED.

 4    Q.  THANK YOU.

 5        AND WHICH PARTY OR GROUP OF PEOPLE IS PERFORMING THESE

 6    STEPS?

 7    A.  SO ANY COMMERCIAL OUTFIT THAT USES LIVECYCLE RIGHTS

 8    MANAGEMENT PRODUCT WOULD INFRINGE.

 9    Q.  LET'S TURN TO CLAIM 2.  CLAIM 2, I THINK -- WHY DON'T YOU

10    REMIND THE JURY WHAT THE SIGNIFICANCE IS OF CLAIM 2?

11    A.  CLAIM TWO BASICALLY SAYS THAT THE NAMED STEPS REQUESTING

12    THE PERMISSION, RECEIVING THE TOKEN AND SELECTIVELY GRANTING

13    THE RESOURCE ACCESS ARE PERFORMED BY THE CLIENT.

14    Q.  THANK YOU.  AND IN THE PERFORMANCE OF YOUR ANALYSIS, DID

15    YOU ASCERTAIN IN YOUR OPINION WHETHER OR NOT CLAIM 2 IS

16    INFRINGED BY THE ADOBE LIVECYCLE PRODUCTS?

17    A.  YES, IT IS.

18    Q.  OKAY.  START AT CLAIM 3, SIR.

19    A.  OKAY.

20    Q.  HERE THE PERMISSION COMPRISES A UNIQUE CODED KEY.  I

21    BELIEVE YOUR TESTIMONY WAS THAT THERE WAS A KEY OF SOME KIND

22    THAT WAS THE PERMISSION?

23    A.  THAT'S RIGHT.

24    Q.  CAN YOU PROVIDE ANY FURTHER DETAIL ABOUT THE KEY THAT IS

25    USED IN LIVECYCLE?
```

DEVANBU – DIRECT / DINOVO

1   **A.**  THE KEY IS AN ENCRYPTION KEY THAT IS BASED ON SYMMETRIC

2   ENCRYPTION.

3   **Q.**  THANK YOU.  AND SO YOU BELIEVE THAT TO BE PRESENT, AS

4   WELL --

5   **A.**  THAT'S RIGHT.

6   **Q.**  -- BASED ON YOUR VIEW OF THE SOURCE CODE?

7   **A.**  RIGHT.

8   **Q.**  LET'S LOOK AT -- SORRY -- THIS TESTIMONY.  WHAT IS THE

9   SIGNIFICANCE OF THIS TESTIMONY FROM ADOBE'S --

10  **A.**  THIS IS JUST MORE CORROBORATING EVIDENCE FROM DEPOSITION

11  THAT WHERE ONE OF THE ADOBE REPRESENTATIVES IS ASKED:

12      "WHAT IS THE VOUCHER USED FOR?"

13      AND HE SAYS:

14      "THERE'S A DOCUMENT KEY WITHIN THE VOUCHER."  THAT IS THE

15  SECOND ANSWER.  I AM SORRY, THE FIRST ANSWER.

16      "THAT IS USED TO SYMMETRICALLY DECRYPT THE DOCUMENT."

17      AND HE SAYS FURTHERMORE:

18      "THE PERMISSIONS IN THE VOUCHER ARE USED TO INSTRUCT THE

19  CLIENT APPLICATION, FOR EXAMPLE, WHETHER TO ALLOW PRINTING OR

20  NOT."

21  **Q.**  SO IN YOUR ASSESSMENT IS ADOBE'S CORPORATE

22  REPRESENTATIVE'S TESTIMONY THAT THE KEY WITHIN THE VOUCHER IS

23  A SYMMETRIC ENCRYPTION KEY, IS THAT CONSISTENT WITH YOUR

24  TESTIMONY?

25  **A.**  THAT'S RIGHT.

1           **MS. MEHTA:**  OBJECTION, YOUR HONOR.  LEADING.

2           **MR. DINOVO:**  I WILL REPHRASE, YOUR HONOR.

3     **BY MR. DINOVO:**

4     **Q.**  UPON REVIEWING ADOBE'S CORPORATE REPRESENTATIVE'S

5     TESTIMONY, DO YOU BELIEVE IT TO BE CONSISTENT OR INCONSISTENT

6     WITH YOUR VIEW OF A PERMISSION?

7     **A.**  IT IS CONSISTENT.

8     **Q.**  ALL RIGHT, SIR.  FINALLY, WITH RESPECT TO THIS PATENT AND

9     THIS FAMILY OF PRODUCTS, LET'S TURN TO CLAIM 13.  WHAT DOES

10    CLAIM 13 ADD TO CLAIM 1?

11    **A.**  SO, WHAT THIS MEANS IS THAT WHEN THE CLIENT REQUESTS AN

12    AUTHORIZATION, THAT EVENT SHOULD TRIGGER AN AUTHORIZATION

13    PROCEDURE WHICH DECIDES WHETHER OR NOT TO GRANT THE TOKEN.

14    **Q.**  OKAY.  AND IT SAYS THAT THIS OCCURS IN AN EXTERNAL SOURCE.

15    DOES THAT MEAN THAT IN YOUR ASSESSMENT THAT CLAIM 13 REQUIRES

16    SOME PARTY OTHER THAN THE CLIENT TO TAKE ACTION?

17    **A.**  SO, IT JUST SIMPLY SEEMS TO MODIFY REQUESTING PERMISSION

18    IN A WAY THAT SAYS WHEN YOU REQUEST A PERMISSION FROM THE

19    CLIENT -- IN OTHER WORDS, WHEN THE CLIENT PERFORMS THAT

20    ACTION -- SOMETHING ELSE HAPPENS SOMEWHERE ELSE.

21    **Q.**  THANK YOU.

22          ALL RIGHT.  SO, WE ARE NEARING THE END OF THIS

23    PRESENTATION.  WHY DON'T YOU TELL US WHAT THIS SLIDE DEPICTS?

24    **A.**  SO, BASICALLY, THIS SAYS, YOU KNOW -- THIS JUST SORT OF

25    SUMMARIZES HOW LIVECYCLE RIGHTS MANAGEMENT DEALS WITH THE '541

1    PATENT THAT WE TALKED ABOUT EARLIER.  SO, YOU KNOW, BASICALLY,

2    YOU KNOW, WE CHECK -- IN CLAIM 1, WE CHECK IN THE LOCAL

3    PERMISSION STORE.  YOU KNOW, IF PERMISSION IS NOT AVAILABLE

4    LOCALLY, WE REQUEST IT FROM THE EXTERNAL SERVER.  WE RECEIVE

5    THE TOKEN.  AND BASED ON THE TOKEN WE GRANT THE PERMISSION.

6    **Q.**  THANK YOU.  FINALLY, THERE'S A DEPICTION HERE OF WHAT?

7    **A.**  THIS BASICALLY IS JUST SHOWING THE LAST CLAIM, CLAIM

8    NUMBER 13, THAT REQUESTS FROM THE CLIENT, TRIGGERS SOME ACTION

9    AT THE SERVER.

10   **Q.**  AND WHAT IS THAT ACTION?

11   **A.**  SO ON THE SERVER SIDE THERE IS AN AUTHORIZATION PROCESS

12   WHICH DEPENDS UPON THE WAY THE SERVER IS SET UP THAT DECIDES

13   WHETHER OR NOT TO GRANT THE TOKEN.

14   **Q.**  ALL RIGHT.  AND DO YOU HAVE SOURCE CODE CITATIONS FOR THAT

15   ACTIVITY?

16   **A.**  YES.  THIS IS JUST SHOWING THAT ON THE CLIENT SIDE THERE

17   IS A REQUEST MADE TO THE SERVER THAT TRIGGERS AN

18   AUTHORIZATION.

19   **Q.**  AND WHERE IS THE REQUEST SHOWN OR --

20   **A.**  THE REQUEST IS SHOWN IN THE BOTTOM BOX ON THE RIGHT-HAND

21   SIDE ABOVE THE CLAIM 13.  THIS VERY LONG METHOD:

22       "SOAP_CALL_IMPL_GETCONSUMELICENSE." IT SENDS A MESSAGE TO

23   THE SERVER.

24   **Q.**  ALL RIGHT.  YOU USED THE TERM "SOAP."  WHAT IS THAT?

25   **A.**  SIMPLE OBJECT ACCESS PROTOCOL.  PROTOCOL FOR REQUESTING

1   ACTIONS ON THE WEB.

2   **Q.**   THANK YOU.  AND THE FINAL SLIDE OF THIS PRESENTATION,

3   SLIDE 41, WHAT IS SHOWN HERE, SIR?

4   **A.**   CAN WE ADVANCE A BIT?

5   **Q.**   YES.

6   **A.**   SO WHAT I'M SHOWING HERE IS ACTUALLY SOME CODE ON THE

7   SERVER SIDE.  YOU WILL NOTICE THAT IN THE TOP BOX IT IS:

8        "EDCSOAP.CPP."  THAT IS A C PLUS PLUS PROGRAM FILE.  THAT

9   IS ON THE CLIENT SIDE, AND IT CALLS THE SERVER.

10       NOW, YOU KNOW, THIS IS –– TRANSFERS ESSENTIALLY THE

11   REQUEST PROCESSING TO THE SERVER SIDE.  AND WHAT WE ARE

12   SHOWING ON THE BOTTOM THREE BOXES ON THE LEFT–HAND SIDE IS

13   JAVA CODE WHERE THE PROCESSING HAPPENS ON THE SERVER SIDE.

14       AND THESE ARE BASICALLY THE "BUSINESSHANDLER.JAVA" AND SO

15   ON, ARE THE BUSINESS RULES THAT GET APPLIED ON THE SERVER

16   SIDE.

17   **Q.**   ALL RIGHT.

18   **A.**   AND THEN, FINALLY, I'M SORRY.  I SHOULD ADD THAT THE

19   VOUCHER GETS CREATED AT THE BOTTOM, AT THE BOTTOM CODE, AND IT

20   GETS SENT BACK.

21   **Q.**   ALL RIGHT.  THANK YOU.

22       SO YOUR OPINION RELATIVE TO CLAIM 13 OF THE '541 AND THE

23   LIVECYCLE PRODUCTS IS WHAT?

24   **A.**   CLAIM 13 IS SATISFIED.

25   **Q.**   COULD YOU REFER, SIR, TO PLAINTIFF'S EXHIBIT 52 IN YOUR

DEVANBU – DIRECT / DINOVO

```
 1   BINDER?
 2   A.  I AM SORRY.  I FORGOT TO BRING MY READING GLASSES.  DO YOU
 3   MIND IF I GET THEM?
 4        MR. DINOVO:  YOUR HONOR, DO YOU MIND IF HE RUNS AND
 5   GET HIS GLASSES?
 6        THE COURT:  NO, I DON'T MIND.
 7        THE WITNESS:  MAY I?
 8        THE COURT:  YES, YOU MAY.
 9            (PAUSE IN THE PROCEEDINGS.)
10        MR. DINOVO:  MS. MASON, IF YOU CAN HIGHLIGHT THE
11   BOTTOM OF THE FIRST PAGE WITH A TITLE.
12            (PUBLISHED TO JURY.)
13   BY MR. DINOVO
14   Q.  I THINK I NEED GLASSES, TOO, DR. DEVANBU.  I'M HAVING
15   TROUBLE SEEING IT.  DO YOU SEE THE TITLE HERE INDICATED IN
16   PLAINTIFF'S EXHIBIT 52?
17   A.  YES.
18   Q.  WHAT IS IT?
19   A.  DOCUMENT ACCESS CONTROL AND AUDITING.
20   Q.  AND IS IT YOUR OPINION THAT LIVECYCLE WRITES MANAGEMENT
21   PROVIDES ACCESS CONTROL?
22   A.  YES, IT DOES.
23   Q.  DO YOU HAVE AN UNDERSTAND ABOUT -- CAN YOU TURN TO THE
24   SECOND SENTENCE THERE?  DO YOU SEE THAT THERE IS A REFERENCE
25   TO MONITORING AND TRACKING?
```

1    **A.**   YES.   YOU CAN MONITOR THE DOCUMENT, MAKE CHANGES TO THE

2    POLICY, PREVENT USERS FROM CONTINUING TO ACCESS THE DOCUMENT.

3         AND THEN, THE NEXT PARAGRAPH IT SAYS:

4         "YOU CAN MONITOR POLICY-PROTECTED DOCUMENTS AND EVENTS."

5    **Q.**   WHAT IS MEANT BY "TRACKING EVENTS" THERE?

6    **A.**   TRACKING EVENTS BASICALLY APPLIES TO DOCUMENTS THAT YOU

7    CONSIDER SO VALUABLE THAT YOU WOULD LIKE TO KNOW WHEN AND WHO

8    IS ACCESSING IT.

9    **Q.**   ALL RIGHT.   THANK YOU.

10        SO LET'S TURN TO PRESENTATION FIVE, WHICH IS THE SAME SET

11   OF PRODUCTS, BUT THE '670.   AND I'M HOPEFUL THAT WE CAN BE A

12   LITTLE QUICKER SINCE WE HAVE HAD A DISCUSSION ABOUT LIVECYCLE.

13             (DEMONSTRATIVE DISPLAYED ON EASEL).

14   **BY MR. DINOVO:**

15   **Q.**   ALL RIGHT.   DR. DEVANBU, I'M NOT SURE YOU CAN SEE THE

16   BOARD.   IT IS A LITTLE -- IT IS AT A STRANGE ANGLE.   BUT CAN

17   YOU READ THE PREAMBLE ALOUD?

18   **A.**   "A METHOD OF TRACKING ACCESS TO ELECTRONIC CONTENT, THE

19   METHOD COMPRISING."

20   **Q.**   THANK YOU, SIR.   SO, DO YOU UNDERSTAND LIVECYCLE RIGHTS

21   MANAGEMENT PRODUCTS TO BE ADAPTED TO TRACK ACCESS TO

22   ELECTRONIC CONTENT?

23   **A.**   THAT'S CORRECT.

24   **Q.**   WHAT IS THE ELECTRONIC CONTENT IN THE CONTEXT OF

25   LIVECYCLE?

DEVANBU – DIRECT / DINOVO

1    **A.**  IT'S MOSTLY DOCUMENTS, BUT A VARIETY OF DIFFERENT KINDS OF

2    DOCUMENTS ARE SUPPORTED.

3    **Q.**  THANK YOU.  OKAY, SIR.  IF WE CAN WALK THROUGH WHAT THIS

4    ANIMATION SHOWS.

5    **A.**  SO WE SAW THIS BEFORE.  IT'S BASICALLY SOMEBODY WHO

6    CREATED AN IMPORTANT DOCUMENT, AND THEY WANT TO MAKE SURE THAT

7    THE WRONG PEOPLE DON'T READ IT.

8         SO SOME POLICY PROTECTION IS ADDED TO THE DOCUMENT FILE,

9    AND IT'S CHECKED WHEN IT'S OPENED.  AND WE SAW THIS BEFORE, AS

10   WELL.

11        SO ONCE PROTECTION IS ADDED TO THE DOCUMENT IT COULD BE

12   FREELY DISTRIBUTED.  AND THE DOCUMENT CREATOR COULD HAVE THE

13   CONFIDENCE THAT ACCESS TO IT IS ALWAYS TRACKED.  SO --

14   **Q.**  YES.  PLEASE CONTINUE.  SO ON THIS NEXT LINE.

15   **A.**  SO IF SOMEBODY WERE TO TRY TO OPEN IT, THEN THERE WOULD BE

16   AN ATTEMPT TO TRANSMIT SOME CREDENTIAL INFORMATION ABOUT THE

17   USER AND THE DOCUMENT TO THE SERVER.  AND IF THAT TRANSMISSION

18   IS SUCCESSFULLY CONCLUDED, THEN -- WE CAN KEEP GOING, I THINK,

19   WITH THE ANIMATION -- THEN IF ACCESS WOULD BE GRANTED.  BUT IF

20   NOT, THEN THE OPEN ACCESS ATTEMPT WOULD FAIL IF ANY PART OF

21   THE SERVER COMMUNICATION FAILS.

22   **Q.**  OKAY.  AND I THINK WE HAVE TALKED ABOUT SOME OF THESE

23   REASONS FOR DOING IT.  LET'S MOVE ON TO THE ACTUAL CLAIM

24   LANGUAGE.  SO LOOKING AT THE PREAMBLE THAT RELATES TO TRACKING

25   ACCESS, WHAT ABOUT THIS ADOBE DOCUMENT INDICATES THAT

1   FUNCTIONALITY TO YOU?

2   **A.**  SO THIS IS ESSENTIALLY AN EXPLANATION OF HOW THE ADOBE

3   LIVECYCLE PRODUCT WORKS.  WE CAN PROBABLY STEP THROUGH THE

4   ANIMATION HERE.

5       SO IT SHOWS HOW SOMEBODY CAN CREATE THE DOCUMENTS, AND

6   THEN THEY COULD -- SECOND STEP -- ADD POLICY PROTECTIONS TO

7   THE DOCUMENT, AS WE SAW BEFORE.  AND THEN, WHEN SOMEBODY TRIED

8   TO VIEW THE DOCUMENT, ONCE IT HAS BEEN DISTRIBUTED, THE --

9   WHEN THEY TRY TO VIEW IT WE WOULD AUTHORIZE AND PERMIT ACCESS

10  TO THE DOCUMENT.

11  **Q.**  THIS IS ANOTHER DIAGRAM FROM ADOBE'S DOCUMENTATION.  WHAT

12  DOES THIS SHOW?

13  **A.**  IT SHOWS HOW THIS WORKS WITH A SORT OF NICE ANIMATION AND

14  PICTURE.  SO, YOU KNOW, BASICALLY THE FOUR STEPS THAT WE JUST

15  TALKED ABOUT EARLIER.

16      THE FIRST TWO STEPS BEING YOU CREATE A DOCUMENT AND YOU

17  APPLY POLICIES TO THE DOCUMENT.

18  **Q.**  OKAY.  AND THE THIRD STEP?

19  **A.**  THERE IS SOMEBODY TRYING TO VIEW THE DOCUMENT, AND WHEN

20  THE DOCUMENT IS VIEWED YOU CAN TRACK THE USAGE OF THE

21  DOCUMENTS.

22  **Q.**  IS THIS -- DO THESE STEPS CORRESPOND TO THE STEPS IN THE

23  DIAGRAM ON THE PRECEDING PAGE?

24  **A.**  YES, THIS IS -- THIS IS FROM AN ADOBE DOCUMENT.

25  **Q.**  IF YOU COULD LOOK AT NUMBER FOUR, I DON'T KNOW IF YOU CAN

DEVANBU – DIRECT / DINOVO

1    READ THAT.

2    **A.**   THE DOCUMENT OWNER POLICY SET COORDINATOR OR ADMINISTRATOR

3    CAN TRACK DOCUMENTS AND MODIFY ACCESS TO THEM BY USING THE WEB

4    PAGES.  DEVELOPERS CAN ALSO TRACK DOCUMENTS --

5    **Q.**   THAT'S --

6    **A.**   SORRY.

7    **Q.**   THAT'S SUFFICIENT.  I JUST WANTED TO STOP YOU THERE,

8    DR. DEVANBU.

9        SO, BASED ON THAT, DO YOU HAVE AN UNDERSTANDING AS TO WHAT

10   ADOBE MEANS BY "TRACKING"?

11   **A.**   YES.  IT'S TRACKING THE DOCUMENT THAT'S BEING VIEWED, WHEN

12   IT IS BEING VIEWED, AND WHO IS BEING VIEWED, DEPENDING ON THE

13   POLICY.

14   **Q.**   ALL RIGHT.  LET'S TURN TO THE CLAIM LANGUAGE OF THE '670

15   PATENT, CLAIM 45.  AND WE'LL ADDRESS FOR EFFICIENCY SAKE BOTH

16   THE FIRST AND THIRD ELEMENT, ALL RIGHT?

17   **A.**   RIGHT.

18   **Q.**   WHAT IS SHOWN ON THIS SLIDE?

19   **A.**   RIGHT.  SO IT'S BASICALLY SHOWING IN THIS PICTURE FROM ONE

20   OF ADOBE'S DOCUMENTATION HOW WE CREATE THE FILE AND THEN HOW

21   WE TRANSMIT IT.

22       AND I THINK THERE IS SOME ANIMATION HERE.  THAT SHOWS THAT

23   YOU CAN TRANSMIT FILES ON THE WEB, EMAIL, ANY WAY YOU LIKE.

24           **MR. DINOVO:**   OKAY.  AND, FOR THE RECORD, THAT IS

25   PLAINTIFF'S EXHIBIT 52.

| | |
|---|---|
| 1 | **THE WITNESS:**  RIGHT. |
| 2 | **BY MR. DINOVO:** |
| 3 | **Q.**  HOW ABOUT THIS NEXT SLIDE? |
| 4 | **A.**  IT'S SHOWING THE SAME THING.  THE DOCUMENT CAN BE CREATED, |
| 5 | AND THEN YOU CAN APPLY A SECURITY POLICY AND DISTRIBUTE THE |
| 6 | DOCUMENT USING WEB PAGES, FOR EXAMPLE.  AND ALSO THEY MENTION |
| 7 | YOU CAN DISTRIBUTE IT BY EMAIL THROUGH A NETWORK FOLDER OR ON |
| 8 | A WEBSITE. |
| 9 | **Q.**  WHICH ELEMENT IS THE DISTRIBUTION RELATED TO? |
| 10 | **A.**  THAT'S RELATED TO TRANSMITTING THE FILE TO AT LEAST ONE |
| 11 | ADDRESS. |
| 12 | **Q.**  ALL RIGHT, SIR.  LET'S TURN TO CLAIM 45 OF THE '670, THE |
| 13 | SECOND ELEMENT. |
| 14 | **A.**  OKAY. |
| 15 | **Q.**  SO WHAT DO WE HAVE HERE ON SLIDE 17? |
| 16 | **A.**  THE SECOND ELEMENT REQUIRES THAT ACCESS TO THE ELECTRONIC |
| 17 | CONTENT IS DENIED.  SO THE DOCUMENT IN THIS CASE IS ENCRYPTED, |
| 18 | SO ACCESS TO THIS DOCUMENT REQUIRES A KEY.  IF YOU DON'T HAVE |
| 19 | A KEY, THEN ESSENTIALLY ACCESS IS DENIED. |
| 20 | SO THIS PARAGRAPH ESSENTIALLY STATES THAT THE SYMMETRIC |
| 21 | CRYPTOGRAPHIC SYSTEM IS USED FOR ENCRYPTION AND DECRYPTION. |
| 22 | THAT IS WHAT THAT MEANS. |
| 23 | AND SO SINCE WE ENCRYPT THE POLICIES AND THE DOCUMENTS WE |
| 24 | CAN'T DECRYPT IT, SO WE DON'T HAVE ACCESS TO IT.  IF YOU JUST |
| 25 | GOT A DOCUMENT BY EMAIL, IF YOU JUST GOT THIS DOCUMENT BY |

1   EMAIL YOU CAN'T VIEW IT.  YOU CAN'T HAVE ACCESS TO IT WITHOUT

2   THE KEY.

3   **Q.**  WHERE IS THE KEY LOCATED?

4   **A.**  THE KEY IS IN A VOUCHER.

5   **Q.**  ALL RIGHT.  WHAT WAS SIGNIFICANT TO YOU, DR. DEVANBU,

6   ABOUT THIS TESTIMONY FROM ADOBE'S CORPORATE REPRESENTATIVE?

7   **A.**  THAT IS THE KEY THAT YOU NEED TO VIEW THE DOCUMENT IS IN A

8   VOUCHER.  AND IN ORDER TO GET THAT DOCUMENT'S PERMISSION, THE

9   PERMISSION TO VIEW IT, YOU NEED TO GET THE VOUCHER.

10  **Q.**  ALL RIGHT.  LET'S TURN TO THE SECOND COMPONENT OF THE

11  SECOND STEP, 2B.

12  **A.**  RIGHT.  SO, 2A AND 2B ARE ESSENTIALLY SAYING THAT UNLESS

13  NOTIFICATION INFORMATION IS COLLECTED AND SENT, UNTIL IT IS

14  SENT, ACCESS IS DENIED.

15  **Q.**  AND --

16  **A.**  I AM SORRY.

17  **Q.**  IS THAT THE CASE WITH THE LIVECYCLE PRODUCTS?

18  **A.**  YES, IT IS.

19  **Q.**  IS THAT DEPICTED HERE IN YOUR FLOW CHART?

20  **A.**  THAT'S RIGHT.  SO THE NOTIFICATION INFORMATION IS WITHIN,

21  FOR EXAMPLE, THE ACROBAT PRODUCT FAMILY.  IT WILL COLLECT AND

22  TRANSMIT THE INFORMATION.  AND THEN, IF IT IS SUCCESSFULLY

23  RECEIVED -- IF IT IS SUCCESSFULLY TRANSMITTED, THEN ACCESS IS

24  GIVEN.  IF THE NOTIFICATION INFORMATION COULD NOT BE -- COULD

25  NOT BE TRANSMITTED, THEN WE DON'T GRANT ACCESS.

1  **Q.**  WHAT DO YOU MEAN BY "NOTIFICATION INFORMATION"?

2  **A.**  HERE IT DEPENDS ON THE POLICY.  BUT USUALLY THERE IS AT

3  LEAST A DOCUMENT I.D. AND THE USER I.D. IN SOME CASES WOULD BE

4  TRANSMITTED.

5  **Q.**  OKAY.  LET'S LOOK UNDER THE HOOD A LITTLE BIT.  WHAT IS

6  SHOWN HERE?

7  **A.**  SO WE'RE LOOKING AT THE SOURCE CODE HERE.  WE HAVE SEEN

8  THIS BEFORE, SO IT REALLY IS THE SAME SOURCE CODE.  AND WHAT

9  WE ARE SHOWING HERE IS THAT IF THE SOAP CALL FAILS, THAT IS

10  THE TRANSMISSION FAILED, THEN THERE'S A METHOD CALL THAT

11  PROCESSES THE FAILURE AND DIAGNOSES THE FAILURE.

12      AND IF THE TRANSMISSION FAILED, THE INITIALIZATION FAILS.

13  AND THEN, ACCESS TO THE DOCUMENT IS NOT GRANTED.

14  **Q.**  ALL RIGHT, DR. DEVANBU.  LET'S TURN TO THE FINAL ELEMENT

15  HERE.

16  **A.**  OKAY.

17  **Q.**  WHAT DO YOU UNDERSTAND TO BE A SUCCESSIVE RECIPIENT?

18  **A.**  A SUCCESSIVE RECIPIENT HERE IS SOMEBODY WHO GETS THE

19  DOCUMENT FROM A PREVIOUS USER.

20      SO, YOU KNOW, THIS IS A TRACE FROM A DEPOSITION.  SHOULD I

21  GO AHEAD?

22  **Q.**  I AM SORRY.  WHAT IS MR. HERBACH, ADOBE'S CORPORATE

23  REPRESENTATIVE -- WHAT DOES HIS TESTIMONY INDICATE TO YOU?

24  **A.**  SO, BASICALLY, IN THIS -- IN THIS DISCUSSION, MR. HERBACH

25  WAS ASKED, YOU KNOW, FOR EXAMPLE, IF SOMEONE PASSES THE

1  DOCUMENT TO ANOTHER PERSON.  SO THAT'S THE FIRST QUESTION ON

2  THE TOP.

3      IT SAYS THE SECOND SENTENCE:

4      "IF THE DOCUMENT IS PASSED FROM POSITION TO POSITION FIVE,

5  WOULD THE PERSON IN POSITION FIVE BE AUTHORIZED TO ACCESS THE

6  DOCUMENT?"

7      THEN, THERE IS SOME CONFUSION ABOUT THE QUESTION.  AND

8  THEN, FINALLY, HE SAYS:

9      "WHENEVER ANYBODY OPENS THE DOCUMENT, ESSENTIALLY

10  REGARDLESS OF HOW THEY GOT IT, THE APPLICATION LIKE READER 11

11  WILL ATTEMPT TO COMMUNICATE WITH THE LIVECYCLE RIGHTS

12  MANAGEMENT SERVER."

13  **Q.**  OKAY.  SO GIVEN THAT ANALYSIS OF THE DOCUMENTATION AND

14  SOURCE CODE, WHAT IS YOUR OPINION RELATIVE TO CLAIM 45 OF THE

15  '670 PATENT AND WHETHER OR NOT IT IS INFRINGED BY THE

16  LIVECYCLE PRODUCTS?

17  **A.**  IT IS INFRINGED BY THE LIVECYCLE PRODUCTS.

18  **Q.**  AND WHO IS PARTY OR ACTOR THAT IS PERFORMING THE STEPS OF

19  CLAIM 45?

20  **A.**  IN THIS CASE IT WOULD BE ANYBODY OPERATING THE LIVECYCLE

21  RIGHTS MANAGEMENT SOFTWARE.

22  **Q.**  THANK YOU.  LET'S TURN TO CLAIM 52.  AND THIS WILL

23  CONCLUDE THIS PRESENTATION.

24      WHAT DOES CLAIM 52 ADD?

25  **A.**  SO IT'S BASICALLY AT THE BOTTOM OF THE WHITE BOARD.  AND

1    ON THE SLIDE IT BASICALLY SAYS THAT JUST LIKE 45, THE

2    VARIATION BEING THAT CREATING THE FILE INCLUDES ENCRYPTING THE

3    ELECTRONIC CONTENT.

4    **Q.**  ALL RIGHT.  DOES, IN FACT, LIVECYCLE ENCRYPT THE CONTENT?

5    **A.**  YES.  THIS IS A DOCUMENT FROM -- EXTRACT OF A DOCUMENT

6    FROM ADOBE THAT -- I BELIEVE IT'S EXHIBIT 56 -- THAT DESCRIBES

7    THE ENCRYPTION PROCESS.

8    **Q.**  ALL RIGHT.  AND JUST -- COULD YOU JUST AT A HIGH LEVEL

9    DESCRIBE THE TYPE OF ENCRYPTION THAT IS USED IN LIVECYCLE?

10   **A.**  AS IT SAYS HERE, IT SAYS:

11       "SYMMETRIC CRYPTOGRAPHIC KEY SYSTEM."

12   **Q.**  AND WHAT IS "SYMMETRIC ENCRYPTION," SIR?

13   **A.**  SO WHEN YOU ENCRYPT A DOCUMENT SOMETIMES YOU USE THE SAME

14   KEY FOR ENCRYPTION AND DECRYPTION.  IN THAT SETTING IT IS

15   CALLED A "SYMMETRIC KEY ENCRYPTION."

16   **Q.**  ALL RIGHT.  AND FINAL SLIDE ON THIS PRESENTATION, AGAIN

17   FROM MR. HERBACH, WHAT ENCRYPTION SCHEME DOES HE IDENTIFY?

18   **A.**  SO HE IDENTIFIES THE AES STANDARD TO ENCRYPT THE

19   DOCUMENTS.

20   **Q.**  GIVEN YOUR ANALYSIS OF THE SOURCE CODE AND ADOBE

21   DOCUMENTATION AND THE STATEMENTS OF ADOBE'S CORPORATE

22   REPRESENTATIVES, WHAT IS YOUR CONCLUSION RELATIVE TO CLAIM 52

23   OF THE '670 PATENT AND WHETHER OR NOT IT IS INFRINGED BY ADOBE

24   LIVECYCLE?

25   **A.**  IT IS INFRINGED.

1    **Q.**  THANK YOU.

2         ALL RIGHT, DR. DEVANBU.  WE ARE JUST GOING TO COVER NOW

3    THE LAST PRODUCT THAT DIGITAL REG HAS ACCUSED OF INFRINGEMENT,

4    THE FLASH ACCESS, ALL RIGHT?  WHAT IS ADOBE FLASH?

5    **A.**  FLASH IS A PLATFORM FOR DELIVERING VIDEO CONTENT.

6    **Q.**  ALL RIGHT.  CAN YOU GIVE ME AN EXAMPLE OF WHERE SOMEONE

7    MIGHT ENCOUNTER FLASH ON A DAY-TO-DAY BASIS?

8    **A.**  IF YOU USE VOODOO YOU WOULD CERTAINLY BE USING FLASH.

9    **Q.**  WHAT IS VOODOO?

10   **A.**  VOODOO IS A VIDEO PLAYER.  YOU CAN FIND IT ON MANY

11   PLATFORMS WHERE YOU CAN PLAY VIDEO CONTENT:  MOVIES,

12   TELEVISION SHOWS.

13   **Q.**  SO YOU CAN WATCH MOVIES THROUGH VOODOO?

14   **A.**  YES.

15   **Q.**  ALL RIGHT.  HOW ABOUT FLASH ACCESS?  HOW DOES THAT DIFFER

16   FROM FLASH?

17   **A.**  FLASH ACCESS IS THE DIGITAL RIGHTS MANAGEMENT FEATURE OF

18   FLASH.  SO, IF -- YOU KNOW, IF YOU MAKE MOVIES OF CATS IN YOUR

19   HOUSE, YOU MAY NOT CARE ABOUT PROTECTING THEM.

20        BUT IF YOU MAKE SOMETHING VERY VALUABLE OR SOMETHING YOU

21   WISH TO RESTRICT ACCESS TO, YOU KNOW, THEN YOU MAY USE FLASH

22   ACCESS TO PROTECT THE CONTENT.

23   **Q.**  I SEE.

24        SO DO THESE COMPONENTS OF FLASH WORK COOPERATIVELY?

25   **A.**  YES.

1   **Q.**  DO YOU KNOW HOW ONE WOULD WATCH A FLASH VIDEO?  WHAT WOULD

2   THEY NEED AT HIS OR HER MACHINE OR DEVICE?

3   **A.**  SO THERE'S A VARIETY OF WAYS IT COULD BE USED.  BUT,

4   ESSENTIALLY, YOU WOULD HAVE TO HAVE AN APPLICATION THAT

5   ENABLES THE FLASH LIBRARIES, INCLUDING THE FLASH ACCESS

6   LIBRARIES.  SO IF YOUR APPLICATION THAT VIEWS VIDEOS IS

7   INTENDED TO ALSO VIEW PROTECTED CONTENT, THEN YOU WOULD HAVE

8   AN APPLICATION THAT INCORPORATED FLASH ACCESS AND FLASH.

9   **Q.**  SIR, CAN YOU PLEASE TURN TO PLAINTIFF'S EXHIBIT 65 IN YOUR

10  BINDER?

11  **A.**  OKAY.

12  **Q.**  ARE YOU THERE, SIR?

13  **A.**  YES.

14  **Q.**  CAN YOU PLEASE READ THE TITLE ALOUD?

15                  (DISPLAYED TO JURY.)

16  **A.**  THE TITLE IS:  "PROTECTING CONTENT ADOBE FLASH ACCESS.

17  **Q.**  IS THIS A DOCUMENT YOU REVIEWED IN CONNECTION WITH FORMING

18  YOUR OPINIONS?

19  **A.**  YES.

20  **Q.**  DOES IT APPEAR TO BE A TRUE AND CORRECT COPY OF THAT

21  DOCUMENT?

22  **A.**  YES.

23          **MR. DINOVO:**  PLAINTIFF OFFERS PLAINTIFF'S EXHIBIT 65

24  INTO EVIDENCE.

25          **MS. MEHTA:**  NO OBJECTION.

1          **THE COURT:**  RECEIVED.

2          (PLAINTIFF'S EXHIBIT 65 WAS RECEIVED IN EVIDENCE.)

3     **BY MR. DINOVO:**

4     **Q.**  NOW, SIR, I WOULD LIKE YOU TO TURN TO PLAINTIFF'S EXHIBIT

5     67.

6     **A.**  I'M THERE.

7     **Q.**  ALL RIGHT.  AND YOU MIGHT JUST CHECK FOR THE RECORD IT

8     APPEARS TO BE THE SAME AS PLAINTIFF'S EXHIBIT 66.  I THINK IT

9     IS JUST A CLEANER COPY.

10    **A.**  YES.  IT'S THE SAME DOCUMENT WITH THE SAME DATE.

11    **Q.**  OKAY.

12          **THE COURT:**  WE CAN'T HAVE BOTH.

13          **MR. DINOVO:**  NO.

14          **THE COURT:**  SO WE WILL STRIKE 66 AND USE 67?

15          **MR. DINOVO:**  YES, YOUR HONOR.  I JUST WANTED TO MAKE

16    CLEAR THAT IT WAS THE SAME DOCUMENT HE REFERENCED IN HIS

17    REPORT.

18    **BY MR. DINOVO**

19    **Q.**  SO, FOR THE RECORD, EXHIBIT 66 BEARS THE BATES RANGE

20    ADOBE-DR280, RIGHT?

21    **A.**  66?

22    **Q.**  YES, SIR.

23    **A.**  YES.  IT STARTS AT 280.

24    **Q.**  THANK YOU.  ALL RIGHT.  SO LET'S TALK ABOUT 67, SINCE IT

25    IS A MORE LEGIBLE COPY.

1        WHAT IS THE TITLE OF THAT DOCUMENT?

2   **A.**  IT'S "ADOBE FLASH ACCESS OVERVIEW."

3   **Q.**  IS THERE A VERSION ASSOCIATED WITH IT?

4   **A.**  VERSION 3.0 DATED AUGUST 2011.

5   **Q.**  THANK YOU, SIR.  IS THIS DOCUMENT -- OBVIOUSLY, THE BATES

6   NUMBERS AREN'T ON IT, BUT IS THIS DOCUMENT ONE THAT YOU RELIED

7   UPON IN FORMING YOUR OPINIONS?

8   **A.**  YES, I DID.

9   **Q.**  DOES IT APPEAR TO BE A TRUE AND CORRECT COPY OF THAT

10  DOCUMENT?

11  **A.**  YES.

12        **MR. DINOVO:**  PLAINTIFF OFFERS PLAINTIFF'S EXHIBIT 67

13  INTO EVIDENCE.

14        **MS. MEHTA:**  NO OBJECTION.

15        **THE COURT:**  RECEIVED.

16        **MR. DINOVO:**  THANK YOU.

17      (PLAINTIFF'S EXHIBIT 67 WAS RECEIVED IN EVIDENCE.)

18  **BY MR. DINOVO:**

19  **Q.**  FINALLY, LAST HOUSEKEEPING MATTER ON EXHIBITS.  COULD YOU

20  TURN TO YOUR SOURCE CODE BINDER AND REFER TO TAB 175A?

21  **A.**  I'M THERE.

22  **Q.**  COULD YOU JUST TAKE A LOOK AT IT AND SEE IF IT APPEARS TO

23  BE THE SOURCE CODE OR COLLECTION OF SOURCE CODE THAT YOU

24  RELIED ON IN FORMING YOUR OPINION WITH RESPECT TO FLASH?

25  **A.**  YEAH.  THERE ARE SEVERAL HUNDRED PAGES, BUT IT SEEMS OKAY.

1    **Q.**  OKAY.

2          **MR. DINOVO:**  AND THE COURT, I UNDERSTAND, IS TAKING

3    THIS UNDER ADVISEMENT.  SUBJECT TO THAT WE OFFER PLAINTIFF'S

4    EXHIBIT 175A INTO EVIDENCE.

5          **THE COURT:**  WE WILL CONSIDER THAT UNDER SUBMISSION.

6          **MR. DINOVO:**  THANK YOU, YOUR HONOR.

7    **BY MR. DINOVO:**

8    **Q.**  OKAY.

9          **MR. DINOVO:**  SO THE LAST PRESENTATION WOULD BE,

10   MS. MASON, PLEASE, PRESENTATION SIX.

11             (PUBLISHED TO JURY.)

12   **BY MR. DINOVO**

13   **Q.**  ALL RIGHT.  WE HAVE GONE THROUGH THESE CLAIMS A NUMBER OF

14   TIMES, SO WE WILL SEE IF WE CAN EXPEDITE THINGS HERE.  BUT I

15   THINK THE JURY MIGHT FIND IT HELPFUL FOR YOU TO EXPLAIN THE

16   NOTION OF FLASH A LITTLE BIT BETTER.

17   **A.**  YES.  SO FLASH IS INTENDED TO PROVIDE DIGITAL RIGHTS

18   MANAGEMENT ON VIDEO CONTENT.  SO WE ARE JUST SHOWING HERE THAT

19   IF SOMEBODY MADE A LOT OF VALUABLE VIDEO CONTENT THEY MIGHT BE

20   CONCERNED THAT SOMEBODY ELSE MIGHT COPY AND USE IT WITHOUT

21   PAYING FOR IT.

22       SO THEY HAVE A GOAL TO PREVENT ILLEGITIMATE USE OF THESE

23   VIDEOS.  SO FOR THAT THEY CAN USE FLASH ACCESS.

24   **Q.**  OKAY, SIR.

25       AND WALK THROUGH THESE SLIDES, BUT THE BASIC PREMISE IS

1    THIS PROVIDER OF VIDEO CONTENT MAY WANT TO PROTECT IT WITH

2    DRM?

3    **A.**   RIGHT.  THE REGIME IS THE SAME.  YOU PROTECT IT, AND THEN

4    LICENSING AND ACTIVATION HAPPENS BEFORE YOU CAN VIEW IT.

5    **Q.**   OKAY.  SO, WHAT IS SHOWN HERE ON SLIDE FIVE?

6    **A.**   SO WHAT IS SHOWN HERE IS BASICALLY THE USER IS TRYING TO

7    VIEW THE VIDEO CONTENT.  AND WHEN THEY TRY TO VIEW IT, THEY

8    SEND SOME CREDENTIALS TO THE -- TO THE PLAYER -- TO THE

9    SERVER, AND THE SERVER RESPONDS WITH A LICENSE.  AND THAT

10   LICENSE IS CHECKED, AND AT THE CLIENT SIDE, AND VALIDATED.

11   AND IF IT IS VALID, THEN ACCESS IS GRANTED, AND THEY CAN VIEW

12   THE VIDEO CONTENT.

13   **Q.**   OKAY.  AND IF THE TOKEN IS NOT RECEIVED?

14   **A.**   IF THE TOKEN IS NOT RECEIVED, THEN THERE IS NO ACCESS

15   GRANTED.

16       THIS JUST SUMMARIZES THE FUNCTIONING.

17   **Q.**   THANK YOU.  LET'S TURN TO THE PREAMBLE OF CLAIM 1, AND THE

18   FIRST ELEMENT.

19   **A.**   YES.  IT SAYS:

20       "METHOD OF REGULATING ACCESS TO DIGITAL CONTENT."

21   **Q.**   ALL RIGHT.  AND SO THERE'S AN EXCERPT FROM THE JONES

22   DEPOSITION WHICH THE JURY HEARD FROM YESTERDAY.  BUT WHAT IS

23   SIGNIFICANT HERE IN THIS TESTIMONY?

24   **A.**   SO, BASICALLY, THIS IS CONFIRMING THE PREAMBLE TO THE

25   PATENT, A METHOD FOR REGULATING ACCESS TO DIGITAL CONTENT.

1    AND MR. JONES' ANSWER, ESPECIALLY THE SECOND ANSWER, SAYS

2    BASICALLY THAT, YOU KNOW, IT'S -- FLASH IS A DIGITAL RIGHTS

3    MANAGEMENT PLATFORM.  AND DIGITAL RIGHTS MANAGEMENT PLATFORM

4    IS THE ABILITY TO SPECIFY USAGE RIGHTS UNDER WHICH CONTENT

5    COULD BE DECRYPTED AND PLAYED, THUS REGULATING ACCESS.

6    **Q.**  OKAY.  AND THIS IS PROBABLY A BIT DIFFICULT TO READ, BUT

7    IF WE LOOK AT THE FIRST ELEMENT OF THE '541 PATENT RELATIVE TO

8    FLASH, WHAT ABOUT MR. JONES' TESTIMONY IS RELEVANT TO THE

9    CHECKING PROCEDURE?

10   **A.**  SO IT IS PROBABLY HELPFUL TO JUST FOCUS ON THE LAST BIT.

11   SO MR. JONES IS REFERRING TO:

12       "A SPECIFIC COMPONENT," IF I CAN READ IT, "OF THE AIR

13   RUNTIME OR THE FLASH PLAYER, IN THIS CASE ADOBECP," WHICH

14   STANDS FOR ADOBE CONTENT PROTECTION.

15       AND THIS MODULE, HE SAYS:

16       "WOULD CHECK, IF INSTRUCTED TO -- TO CHECK IF THERE IS A

17   LICENSE IN THE CACHE.  IF SUCH A LICENSE EXISTS AND IT'S

18   VALID, THEN IT WOULD NOT NEED TO REACQUIRE A LICENSE."

19   **Q.**  I AM SORRY. MAYBE IF YOU CAN SLOW DOWN A LITTLE BIT AND

20   WALK THROUGH THAT ONE MORE TIME, BECAUSE I THINK THAT IS

21   IMPORTANT.

22   **A.**  SURE.  MR. JONES IS REFERRING TO THE AIR RUNTIME, A-I-R

23   RUNTIME, IN THE LAST SENTENCE ON THE EXCERPT FROM HIS

24   DEPOSITION.

25       AND HE SAYS:

1        "A SPECIFIC COMPONENT OF AIR RUNTIME OR THE FLASH PLAYER,

2    IN THIS CASE ADOBECP," WHICH IS THE ADOBE CONTENT PROTECTION,

3    "WHICH IS THE MODULE," HE SAYS, "THAT ACTUALLY PERFORMS THAT

4    FUNCTION, WOULD CHECK, IF INSTRUCTED TO -- TO SEE IF THERE'S A

5    LICENSE IN THE CACHE.  IF SUCH A LICENSE EXISTS AND IT IS

6    VALID, THEN IT WOULD NOT NEED TO REACQUIRE."

7        THAT IS WHAT HE SAYS.

8    **Q.**  WHAT DO YOU UNDERSTAND BY MR. JONES' TESTIMONY WITH

9    RESPECT TO "REACQUIRE"?

10   **A.**  SO BASICALLY HE IS SAYING THAT IF THE PRE-EXISTING LICENSE

11   IS NOT VALID, THE PRE-EXISTING PERMISSION IS NOT VALID, THEY

12   WOULD HAVE TO REACQUIRE IT.

13   **Q.**  OKAY.  SO WE MAY BE JUMPING AHEAD A LITTLE BIT, BUT SO

14   THIS FIRST ELEMENT, THEN, IS CHECKING TO SEE IF THERE IS A

15   PRE-EXISTING PERMISSION, YOU UNDERSTAND MR. JONES' TESTIMONY

16   TO CORROBORATE THAT?

17   **A.**  THAT'S CORRECT.

18   **Q.**  LET'S LOOK AT THE SOURCE CODE CITATIONS YOU'VE COLLECTED.

19   AND AT A VERY HIGH LEVEL, CAN YOU WALK US THROUGH WHAT IS

20   GOING ON HERE?

21   **A.**  YES.  SO THE ADOBE CONTENT PROTECTION IS A COLLECTION OF

22   SUBROUTINES OR A LIBRARY, AS WE CALL IT.  IT'S KIND OF

23   BORROWING BOOKS FROM A LIBRARY.  YOU BORROW CODE FROM A CODE

24   LIBRARY.  SO THIS IS A CODE LIBRARY PROVIDED BY ADOBE.

25       AND THE FIRST METHOD ON THE TOP LEFT IS A METHOD IN THIS

1    ADOBECP LIBRARY.  ADOBECP LIBRARY.  SO THIS IS CALLED WHEN YOU

2    WANT TO GET A LICENSE.  AND SO THERE'S A LONG SERIES OF CALLS.

3    AN IMPORTANT ONE IS -- IS THE METHOD IN THE LOWER LEFT, WHICH

4    IS:

5        "GETLOCALLICENSEFORPLAY," WHICH IS -- THAT'S RIGHT --

6    WHICH CHECKS TO SEE IF THE LICENSE IS PRESENT LOCALLY.

7    **Q.**  ALL RIGHT.  THANK YOU.

8        AND I BELIEVE YOU SAID MR. JONES HAD MENTIONED ADOBECP.

9    IS THAT THE SAME ADOBECP THAT IS SHOWN HERE IN YOUR SOURCE

10   CODE CITATIONS?

11   **A.**  THAT'S RIGHT.

12   **Q.**  OKAY.  LET'S TURN TO THE SECOND ELEMENT OF THE '541.

13   REQUESTING PERMISSION FROM AN EXTERNAL SOURCE.

14   **A.**  OKAY.

15   **Q.**  WHAT ABOUT PLAINTIFF'S EXHIBIT 67 SHOWS THAT ELEMENT?

16   **A.**  SO THE FIRST PARAGRAPH, IF I CAN READ THAT, IT SAYS:

17       "DURING LICENSE ACQUISITION" -- SO THIS IS THE CASE WHEN

18   YOU DON'T HAVE THE LOCALLY-STORED LICENSE -- "THE CLIENT SENDS

19   INFORMATION IDENTIFYING THE REQUESTED CONTENT, (THE DRM

20   METADATA) AND THE MACHINE CERTIFICATE (IDENTIFYING THE

21   CONSUMER'S COMPUTER) TO THE RETAILER'S LICENSE SERVER.  THE

22   LICENSE SERVER (SIC) IS SENT TO THE SERVER, IS ENCRYPTED USING

23   THE TRANSPORT PUBLIC KEY, WHICH IS ALSO INCLUDED IN THE DRM

24   METADATA."

25       SO THIS CONSTITUTES THE REQUEST FOR THE PERMISSION FROM

1    THE EXTERNAL SOURCE.

2    **Q.**   AND THAT EXTERNAL SOURCE IS WHAT?

3    **A.**   THE LICENSE SERVER.  OKAY.

4    **Q.**   OKAY.  DID ADOBE'S CORPORATE REPRESENTATIVE CORROBORATE

5    THAT UNDERSTANDING?

6    **A.**   RIGHT.  THIS IS ANOTHER EXCERPT FROM MR. JONES' INTERVIEW.

7    AND HE'S ASKED:

8        "WHEN IT SAYS HERE THE PROCESS OF ACQUIRING, QUOTE, 'THE

9    LICENSE,' CAN YOU DESCRIBE THAT PROCESS?"

10       AND HE SAYS:

11       "THAT WOULD BE AN HTTP REQUEST, WHICH INCLUDES IDENTIFYING

12   INFORMATION, SPECIFICALLY DRM METADATA AS PART OF THAT

13   REQUEST."

14   **Q.**   THANK YOU.  AND DID YOU REVIEW SOURCE CODE TO ENSURE THAT

15   YOUR OPINION WAS WELL-GROUNDED?

16   **A.**   YES, I DID.  IT IS ALSO ANOTHER COMPLICATED SERIES OF

17   EVENTS.  IN THIS CASE, THE METHOD IN THE ADOBE CONTENT

18   PROTECTION LIBRARY, CP LIBRARY, CALLED "LICENSE DOWNLOAD."

19       THIS IS THE METHOD YOU WOULD USE TO DOWNLOAD THE LICENSE.

20   SO THERE IS A LONG SERIES OF EVENTS WE CAN STEP RIGHT THROUGH

21   IT.

22       I AM SORRY.  THAT WAS THE LAST ONE THERE.

23   **Q.**   OKAY.

24   **A.**   SO THERE IS A METHOD IN THE CENTER THERE CALLED "ACQUIRE

25   LICENSE," WHICH SENDS A REQUEST TO A URL.  A URL IS UNIFORM

1    RESEARCH LOCATER, WHICH IS WEB ADDRESS.

2        SO, ESSENTIALLY, IT IS A HTTP, OR WEB REQUEST TO GET THE

3    LICENSE.

4    **Q.**  OKAY.  LET'S TURN TO ELEMENT THREE OF CLAIM 1.

5    **A.**  YES:  "RECEIVING FROM THE EXTERNAL SOURCE A TOKEN."

6    **Q.**  OKAY.  WHAT TOKEN DID YOU IDENTIFY IN YOUR REPORT,

7    DR. DEVANBU?

8    **A.**  SO THIS IS A LICENSE.  AND THIS IS A DOCUMENT FROM ADOBE

9    THAT SAYS:

10       "A LICENSE IS A DATA STRUCTURE THAT INCLUDES AN ENCRYPTED

11   KEY USED TO DECRYPT CONTENT ASSOCIATED WITH A POLICY (SIC)."

12   **Q.**  OKAY.  AND DID YOU REVIEW SOURCE CODE IN ADDITION TO --

13   **A.**  YES, I DID.

14   **Q.**  SORRY.  IF YOU CAN JUST LET ME FINISH MY QUESTION, SIR.

15       DID YOU REVIEW SOURCE CODE IN CONNECTION WITH ANALYZING

16   THIS THIRD ELEMENT?

17   **A.**  RIGHT.  SO THIS METHOD ACQUIRE LICENSE SENDS A REQUEST TO

18   AN EXTERNAL SOURCE WHICH, WHEN COMPLETED, RETURNS A LICENSE

19   TOKEN.

20   **Q.**  ALL RIGHT.  AND THAT CITATION, AGAIN, IS -- AN ASC

21   CITATION, WHAT DOES THAT INDICATE?

22   **A.**  ADOBE SOURCE CODE.

23   **Q.**  LET'S TURN TO THE FINAL ELEMENT.  DID YOU FIND ANY

24   TESTIMONY FROM ADOBE'S CORPORATE REPRESENTATIVE, MR. JONES,

25   RELEVANT TO YOUR ANALYSIS?

1    **A.**  THAT'S RIGHT.  SO, BASICALLY, THE PERMISSION THAT IS

2    RECEIVED IS -- PERMISSION THAT IS PRODUCED AS A RESULT OF THE

3    INSTALLATION PROCESS IS LOCKED UNIQUELY TO THE CLIENT.  AND

4    MR. JONES SAYS THAT -- HE IS ASKED THE QUESTION:

5       "CAN A CONSUMER MOVE A LICENSE FROM ONE MACHINE TO ANOTHER

6    AND STILL BE ABLE TO DECRYPT THE CONTENT?"

7       AND HE SAYS:

8       "THEY COULD MOVE THE LICENSE.  THEY COULD MOVE THE CONTENT

9    CONTAINER, BUT THEY WON'T WORK ON ANOTHER DEVICE."

10      SO IT IS LOCKED ON THE DEVICE.

11   **Q.**  OKAY.  WHAT IS THE FORM OF PERMISSION THAT YOU IDENTIFIED?

12   **A.**  SO, THE TOKEN THAT IS RECEIVED IS A LICENSE.  AND ONCE THE

13   LICENSE IS RECEIVED, THE CODE INDICATES THAT IT'S FIRST

14   VALIDATED.  AND THIS IS A COMPLEX PROCESS.  DEPENDS ON THE

15   BUSINESS SETTING IT'S USED IN.

16      AND ONCE THE LICENSE IS VALIDATED, THEN THEY CAN EXTRACT

17   THE KEY FROM IT.  THE KEY IS STORED INSIDE THE LICENSE IN AN

18   ENCRYPTED FORM.  AND THE KEY HAS TO BE DECRYPTED.  AND ONCE

19   THE KEY IS DECRYPTED, THEN THE CONTENT CAN BE DECRYPTED.

20   **Q.**  SO IN YOUR OPINION IS THE PERMISSION IN THE FLASH SYSTEM

21   GENERATED FROM THE TOKEN?

22   **A.**  YES, IT IS THE KEY.

23   **Q.**  WHERE DOES THAT GENERATION OCCUR?

24   **A.**  IT OCCURS IN THAT ROUTINE -- IN THE ROUTINE THAT I

25   MENTIONED, ACQUIRED LICENSE.  IT CALLS SOME OTHER ROUTINES TO

1    CHECK THE LICENSE, MAKE SURE IT'S OKAY, AND THEN DECRYPT THE

2    KEY.

3    **Q.**  AT THE SERVER SIDE OR THE CLIENT SIDE?

4    **A.**  THE CLIENT SIDE.

5    **Q.**  OKAY.  THIS APPEARS TO BE AN OVERALL SUMMARY OF THE

6    PROCESS?

7    **A.**  THAT'S RIGHT.  THE LICENSE CONTAINS THE CONTENT ENCRYPTION

8    KEY.  AND THIS KEY IS THE ONE THAT IS USED TO ENCRYPT THE

9    VIDEO CONTENT.  AND THE CONTENT ENCRYPTION KEY IS ITSELF

10   ENCRYPTED WITH ANOTHER KEY BEFORE BEING PLACED IN THE LICENSE.

11   **Q.**  WHAT DOES SLIDE 24 SHOW?

12   **A.**  SO, BASICALLY IT SHOWS WHAT HAPPENS TO THE LICENSE ONCE IT

13   IS RECEIVED.

14   **Q.**  AND THESE ARE A NUMBER OF SOURCE CODE CALLS RELATING TO

15   THAT?

16   **A.**  THAT'S RIGHT.

17   **Q.**  LET'S TURN TO -- AND I THINK THIS IS MORE SOURCE CODE

18   CALLS THAT YOU HAD IDENTIFIED?

19   **A.**  WE ARE SHOWING ALL OF THE RELEVANT PARTS TO THE DIFFERENT

20   STEPS OF THE FOURTH ELEMENT OF THE CLAIM.

21   **Q.**  I SEE.  AND SO THOSE THAT ARE IDENTIFIED IN RED ARE

22   PERFORMED BY THE FUNCTIONS IN RED?

23   **A.**  THAT'S RIGHT.

24   **Q.**  SO DO I GATHER THAT THE PURPLE CLAUSE IS PERFORMED BY THE

25   SAME BOX AS THE TOP?

DEVANBU - DIRECT / DINOVO

1  **A.**  THAT'S RIGHT.  ONCE THE KEY IS EXTRACTED, WE GO BACK TO

2  THE SAME METHOD THAT GOT THE LICENSE.  AND THEN, THE

3  PERMISSION GETS STORED LOCALLY.

4  **Q.**  ALL RIGHT, SIR.  WAS THERE SOMETHING PARTICULARLY HELPFUL

5  ABOUT THIS EXCERPT FROM ADOBE'S CORPORATE REPRESENTATIVE,

6  MR. JONES?  I AM SORRY.  I'M FLIPPING AND CLICKING AT THE SAME

7  TIME.  ALL RIGHT.

8  **A.**  YES.  SO, IT BASICALLY TALKS ABOUT HOW THE DRM -- SORRY --

9  THE RECEIVED LICENSE CONTAINS AN ENCRYPTED VERSION OF THE

10  CONTENT ENCRYPTION KEY.

11  **Q.**  OKAY.  AND JUST HELP ME UNDERSTAND WHAT'S PASSED AS THE

12  TOKEN.  IF THAT WERE USED, COULD SOMEONE TAKE THAT TOKEN AND

13  GENERATE A PERMISSION FROM IT?

14  **A.**  IF THE TOKEN WERE INTERCEPTED EN ROUTE BY SOMEBODY ELSE,

15  THEY WOULDN'T BE ABLE TO DO ANYTHING WITH IT, BECAUSE THE

16  IMPORTANT KEY THAT'S IN THE TOKEN IS ENCRYPTED WITH THE

17  MACHINE'S KEY.  SO UNLESS YOU HAD THE MACHINE'S KEY, NOBODY

18  ELSE COULD REALLY ACCESS IT.  ONLY THE RECEIVING MACHINE COULD

19  ACCESS IT.

20  **Q.**  THANK YOU.  WHAT WAS SIGNIFICANT ABOUT THIS EXCERPT FROM

21  MR. JONES' DEPOSITION?

22  **A.**  SO BASICALLY HE'S TALKING ABOUT THE LICENSE BEING STORED

23  ON THE MACHINE.  LICENSE CACHING.  AND HE SAYS:

24      "LICENSE CACHING" -- SECOND SENTENCE -- "ALLOWS THE

25  CONSUMER TO VIEW PROTECTED CONTENT WITHOUT REACQUIRING THE

1   LICENSE EVERY TIME THEY WISH TO VIEW THE CONTENT."

2   **Q.**  OKAY.  AND ARE THERE MORE SOURCE CODE CITATIONS THAT YOU

3   HAVE HERE RELATIVE TO YOUR ANALYSIS?

4   **A.**  YES.  SO, THIS BASICALLY IS TALKING ABOUT HOW THE CONTENT

5   ENCRYPTION KEY IS DECRYPTED.  IT IS A LONG SERIES OF CALLS.

6   AND THE LAST STEP IS UNFORTUNATELY IN THE LOWER LEFT, WHERE IT

7   SAYS:

8       "UNWRAP THE KEY USING MACHINE CREDENTIALS."

9       SO THERE IS A METHOD THAT ACTUALLY HAS A FAIRLY CLEAR

10  NAME.  I UNWRAP THE KEY USING MACHINE CREDS.  SO IT DECRYPTS

11  THE CONTENT ENCRYPTION KEY USING THE MACHINE, SPECIFICALLY.

12  **Q.**  ALL RIGHT, SIR.  SO BASED ON YOUR VIEW OF THE SOURCE CODE

13  AND ADOBE'S CORPORATE REPRESENTATIVE'S DEPOSITION AND ADOBE'S

14  DOCUMENTS, HAVE YOU FORMED AN OPINION ABOUT WHETHER OR NOT

15  FLASH AND FLASH ACCESS INFRINGE CLAIM 1 OF THE '541 PATENT?

16  **A.**  YES, IT DOES.

17  **Q.**  LET'S MOVE ON TO CLAIM 2.  AND CLAIM 2, AS WE'VE

18  DISCUSSED, TALK ABOUT THE STEPS OCCURRING AT A CLIENT.  IS IT

19  YOUR OPINION THAT THE STEPS REQUIRED IN CLAIM 2 ARE PERFORMED

20  AT THE CLIENT?

21  **A.**  THAT'S RIGHT.

22  **Q.**  AND SO IS CLAIM 2, IN YOUR OPINION, INFRINGED BY THE FLASH

23  ACCESS FLASH --

24  **A.**  PLAYER.

25  **Q.**  -- COMBINATION?

1    **A.**  YES.

2    **Q.**  WHAT IS SHOWN HERE ON SLIDE 29?

3    **A.**  IT JUST SHOWS THAT ALL THE SIGNIFICANT EVENTS IN CLAIM 1

4    ARE -- THE THREE STEPS SHOWN IN CLAIM 1 ARE OCCURRING IN

5    CLAIM 2 -- I AM SORRY -- ARE OCCURRING AT THE CLIENT.

6    **Q.**  SO THAT'S THE PURPLE --

7    **A.**  YES.

8    **Q.**  -- CIRCLE?

9        ALL RIGHT.  LET'S TURN TO CLAIM 4.  THIS REQUIRES THAT THE

10   PERMISSION IS A UNIQUELY CODED KEY.  DID YOU FIND THAT TO BE

11   PRESENT?

12   **A.**  YES.  THE KEY IS THE KEY THAT IS USED TO DECRYPT THE

13   CONTENT:  THE CONTENT ENCRYPTION KEY.

14   **Q.**  DOES ADOBE CALL IT A "KEY"?

15   **A.**  YES.

16   **Q.**  AND CAN YOU GIVE ME A LITTLE MORE DETAIL ABOUT THE KEY?

17   **A.**  RIGHT.  SO THIS IS TESTIMONY FROM MR. JONES, AND HE SAYS

18   THE CONTENT -- NEXT LINE -- HE'S REFERRED TO AN ADOBE

19   DOCUMENT, AND HE'S ASKED:

20       "WHAT ALGORITHM IS USED BY THIS KEY?"

21       AND HE SAYS:

22       "IT IS AN AES128 KEY."

23   **Q.**  ALL RIGHT.  AND ANYTHING ABOUT THIS, IN PARTICULAR, THIS

24   NEXT PASSAGE, THAT IS RELEVANT?

25   **A.**  I THINK IT'S BASICALLY THE SAME INFORMATION, SO WE CAN

 1    SKIP IT.

 2    **Q.**  ALL RIGHT.  SO IS IT YOUR OPINION THAT CLAIM FOUR IS

 3    INFRINGED BY FLASH ACCESS AND FLASH?

 4    **A.**  YES.

 5    **Q.**  LET'S TURN TO CLAIM 13.

 6        WHAT DOES CLAIM 13 ADD?  CAN YOU REMIND US?

 7    **A.**  YES.  BASICALLY IT SAYS THAT WHEN THE CLIENT GENERATES A

 8    REQUEST, IT MUST AT A SERVER GENERATE SOME KIND OF

 9    AUTHORIZATION PROCEDURE, WHICH RESULTS IN THE TOKEN BEING

10    GRANTED OR NOT.

11    **Q.**  ALL RIGHT. AND DID YOU FIND THAT TO BE PRESENT IN THE

12    FLASH AND FLASH ACCESS?

13    **A.**  YES.  SO IF YOU LOOK AT THE SECOND PARAGRAPH OF THIS

14    QUOTATION FROM ADOBE DOCUMENT -- ADOBE DOCUMENT -- IT SAYS:

15        "THE LICENSE SERVER WHICH MAY BE INTEGRATED INTO THE

16    RETAILER'S BILLING AND AUTHENTICATION INFRASTRUCTURE CAN

17    PERFORM A BUSINESS RULES CHECK TO VERIFY THAT THE USER IS

18    AUTHORIZED TO VIEW THE REQUESTED CONTENT."

19        SO THAT BUSINESS RULES CHECK SATISFIES THE AUTHORIZATION

20    PROCEDURE ELEMENT OF THE CLAIM.

21    **Q.**  LET'S TURN TO THIS SLIDE.  WHAT DOES THIS SHOW?

22    **A.**  THIS JUST SHOWS WHAT CLAIM 13 REQUIRES, WHICH IS AT THE

23    REQUEST FROM THE CLIENT RESULTS IN SOME COMPUTATION AT THE

24    SERVER.  AND THAT IS WHAT HAPPENS.

25    **Q.**  A COMPUTATION OF WHAT KIND, SIR?

1    **A.**  AUTHORIZATION PROCEDURE.

2    **Q.**  AND THE FINAL SLIDE OF THIS PRESENTATION, WHAT IS SHOWN

3    HERE?

4    **A.**  THIS BASICALLY, I BELIEVE, SHOWS THE REQUEST FROM THE

5    CLIENT THAT GOES OUT TO A SERVER, THEREBY GETTING AN

6    AUTHORIZATION PROCEDURE.  SO IT IS THAT METHOD, THE CENTRAL

7    METHOD ACQUIRE LICENSE THAT SENDS A REQUEST TO A PARTICULAR

8    WEBSITE, AND THAT WEBSITE EXECUTES AN AUTHORIZATION PROCEDURE.

9    **Q.**  ALL RIGHT, DR. DEVANBU.  GIVEN YOUR ANALYSIS OF THE SOURCE

10   CODE, THE DOCUMENTS AND THE ADOBE TESTIMONY, WHAT IS YOUR

11   OPINION RELATIVE TO CLAIM 13 AND WHETHER IT IS INFRINGED BY

12   FLASH?

13   **A.**  IT IS INFRINGED.

14   **Q.**  NOW, DR. DEVANBU, IN YOUR REPORT DID YOU CONSIDER SOME

15   POSSIBLE ALTERNATIVES TO THE APPROACH THAT WAS OUTLINED OR

16   INVENTED BY MR. PATTERSON?

17   **A.**  YES.

18   **Q.**  AND WAS ONE SUCH APPROACH PHYSICAL PROTECTION?

19   **A.**  THAT'S RIGHT.

20   **Q.**  IN YOUR OPINION, ARE THERE DISADVANTAGES TO IMPLEMENTING

21   PHYSICAL PROTECTION RELATIVE TO THE INVENTIONS DISCLOSED IN

22   THE '541 AND '670 PATENTS?

23   **A.**  RIGHT.  SO PHYSICAL PROTECTION BASICALLY MEANS THAT YOU

24   HAVE SOME KIND OF -- LIKE, FOR EXAMPLE, USB DONGLE THAT PLUGS

25   INTO THE BACK OF YOUR COMPUTER.  AND YOU CAN'T USE THE

1    SOFTWARE WITHOUT HAVING THE PHYSICAL DONGLE PRESENT.

2        SO IF SOMEBODY COPIES THE SOFTWARE, AND THEY DON'T HAVE

3    THE PHYSICAL DONGLE, THEY CAN'T USE THE SOFTWARE.  SO,

4    OBVIOUSLY, THAT'S VERY INCONVENIENT AND WOULD BE VERY ANNOYING

5    TO USE.  THAT IS ONE ALTERNATIVE.

6    **Q.**  ALL RIGHT.  WHAT ABOUT THE ALTERNATIVE OF PASSING A

7    PASSWORD IN THE OPEN WITHOUT ENCRYPTION?  IS THAT A SUITABLE

8    ALTERNATIVE?

9    **A.**  SO AS I EXPLAINED IF THE -- IF INFORMATION THAT COMES FROM

10   THE SERVER IS SENT IN THE CLEAR, WHATEVER THE INFORMATION IS,

11   ANYBODY COULD INTERCEPT IT AND USE IT FOR WHATEVER PURPOSE.

12   SO, YOU KNOW, SO SENDING PASSWORDS IN THE CLEAR WOULD BE VERY

13   INSECURE.

14   **Q.**  ALL RIGHT.  THANK YOU, DR. DEVANBU.

15       **MR. DINOVO:**  I HAVE -- I WILL PASS THE WITNESS.

16                   **CROSS-EXAMINATION**

17   **BY MS. MEHTA:**

18   **Q.**  GOOD MORNING, DR. DEVANBU.

19   **A.**  GOOD MORNING.

20   **Q.**  IT IS STILL MORNING, YES.

21       ALL RIGHT.  I'M GOING TO START BY TALKING ABOUT SOME

22   BACKGROUND OF SOME OF THE ISSUES THAT YOU'VE BEEN DISCUSSING

23   ON YOUR DIRECT EXAMINATION.  AND TO DO THAT, I AM GOING TO USE

24   SOME OF THE SLIDES THAT YOU PUT TOGETHER AND PRESENTED WITH

25   MR. DINOVO.

1          NOW, WHEN YOU WERE PUTTING TOGETHER YOUR PRESENTATION FOR

2    YOUR DIRECT EXAMINATION, YOU REVIEWED THE SLIDES CAREFULLY,

3    RIGHT?

4    **A.**  YES.

5    **Q.**  AND YOU WANTED TO BE AS ACCURATE AS YOU COULD?

6    **A.**  YES.

7    **Q.**  AND SO THE SLIDES THAT YOU PRESENTED ARE AN ACCURATE

8    REPRESENTATION OF YOUR OPINIONS IN THE CASE, CORRECT?

9    **A.**  YES.

10   **Q.**  OKAY.  GOOD.

11          **MS. MEHTA:**  MR. BONINI, IF YOU COULD PUT UP DI028,

12   WHICH IS ONE OF THE SLIDES THAT DR. DEVANBU PRESENTED

13   YESTERDAY.

14                    (PUBLISHED TO JURY.)

15          YOU SEE THIS, DR. DEVANBU?

16   **A.**  YES.

17   **Q.**  OKAY.  AND THE REFERENCE IN THE MIDDLE IS A TYPO.  IT

18   SHOULD BE MR. PATTERSON AND NOT MR. PETERSON.

19   **A.**  I AM SORRY.  SOUNDS RIGHT.

20   **Q.**  NO PROBLEM.  BUT WHAT I WANT TO TALK ABOUT, IN PARTICULAR,

21   IS THIS SLIDE WAS INTENDED TO CONVEY YOUR SUGGESTION THAT

22   MR. PATTERSON'S PATENTS ARE ALL ABOUT DRM, RIGHT?

23   **A.**  RIGHT.

24   **Q.**  OKAY.  NOW, YOU'RE NOT ACTUALLY OFFERING ANY TESTIMONY

25   ABOUT WHAT MR. PATTERSON OR DIGITAL REG INVENTED, RIGHT?  OR

DEVANBU – CROSS / MEHTA

```
 1    MAY HAVE INVENTED?
 2    A.  I AM OFFERING TESTIMONY ABOUT WHETHER THE PATENTS INFRINGE
 3    THE APPLICATIONS.
 4    Q.  RIGHT.  SO YOU ARE NOT OFFERING ANY TESTIMONY TO THE JURY
 5    ABOUT WHAT MR. PATTERSON OR DIGITAL REG MAY HAVE INVENTED,
 6    RIGHT?
 7    A.  CORRECT.
 8    Q.  AND YOU'RE NOT ABLE TO DESCRIBE WHAT YOU BELIEVE THE
 9    ADVANTAGES OF THE PATENTS ARE IF THERE ARE ANY ADVANTAGES,
10    RIGHT?  THAT IS NOT SOMETHING YOU CONSIDERED.
11    A.  YOU MEAN, WHAT THE -- HOW THE PATENTS ARE SUPERIOR TO
12    OTHER APPROACHES TO DIGITAL RIGHTS MANAGEMENT?
13    Q.  RIGHT.  YOU DON'T HAVE ANY OPINION WITH RESPECT TO WHETHER
14    OR NOT THERE ARE ANY ADVANTAGES TO MR. PATTERSON'S PATENTS
15    OVER THE PRIOR ART OR WHAT OTHER PEOPLE WERE DOING IN THE
16    INDUSTRY, CORRECT?
17    A.  I'M NOT OPINING ON VALIDITY OF THE PATENTS.
18    Q.  SO YOU ARE NOT OPINING ON ANY ADVANTAGES, IF THERE ARE
19    ANY, RIGHT?
20    A.  NO.  I'M OPINING ON INFRINGEMENT.
21    Q.  YOU DO AGREE THAT DIGITAL REG WAS NOT THE FIRST COMPANY TO
22    THINK OF OR IMPLEMENT DRM, RIGHT?
23    A.  THERE WERE DIGITAL RIGHTS MANAGEMENT REGIMES, IDEAS
24    FLOATING AROUND.  YOU KNOW, I HAVE TO THINK.  I HAVEN'T
25    CONSIDERED THAT.  THAT IS SOMETHING THAT I HAVEN'T REALLY
```

DEVANBU – CROSS / MEHTA

1    THOUGHT ABOUT.  I WASN'T ASKED TO DO THAT, SO I DON'T

2    REALLY -- I HAVE TO GO BACK AND LOOK AT THE LITERATURE.  I

3    COULDN'T TELL YOU RIGHT NOW.

4    **Q.**  I'M GOING POINT YOU TO YOUR DEPOSITION TESTIMONY.  THIS IS

5    IN APRIL -- I AM SORRY -- JANUARY THIS PAST YEAR,

6    JANUARY 20TH.

7    **A.**  IS IT IN HERE?

8    **Q.**  YES.  IT IS IN ONE OF YOUR BINDERS, ON PAGE 114 AT LINE

9    ONE.  THE QUESTION WAS:

10       "SO YOU WOULD AGREE THAT DIGITAL REG WAS NOT THE FIRST

11   COMPANY TO IMPLEMENT DIGITAL RIGHTS MANAGEMENT?

12       "ANSWER:  YES.  YES, I DO."

13       THAT WAS YOUR TESTIMONY, RIGHT?

14   **A.**  PAGE 114?

15   **Q.**  114 AT LINE ONE.

16       "QUESTION:  SO YOU'D AGREE THAT DIGITAL REG WAS NOT THE

17   FIRST COMPANY TO IMPLEMENT DIGITAL RIGHTS MANAGEMENT?

18       "ANSWER:  YES.  YES, I DO."

19       DO YOU SEE THAT?

20   **A.**  YES.

21   **Q.**  THAT WAS YOUR TESTIMONY, RIGHT?

22   **A.**  YES.

23   **Q.**  AND WHEN YOU TESTIFIED IN THE DEPOSITION --

24           **THE COURT:**  DO I HAVE HIS DEPOSITION?

25           **MS. MEHTA:**  SORRY, YOUR HONOR.  WE WILL GET THAT

```
 1    RIGHT TO YOU.
 2    BY MS. MEHTA:
 3    Q.  WHEN YOU TESTIFIED IN THE DEPOSITION YOU KNEW THAT YOU
 4    WERE UNDER OATH, RIGHT?
 5    A.  YES.
 6    Q.  YOU KNEW IT WAS VERY IMPORTANT TO BE TRUTHFUL AND
 7    ACCURATE, RIGHT?
 8    A.  YES.
 9    Q.  AND YOU KNEW IT WAS IMPORTANT TO PROVIDE FULL AND COMPLETE
10    OPINIONS, RIGHT?
11    A.  YES.
12    Q.  YOU DID ALL OF THOSE THINGS, RIGHT?  AND YOU ACTUALLY HAD
13    PREPARED EXTENSIVELY FOR YOUR DEPOSITION, RIGHT?
14    A.  CORRECT.
15    Q.  YOU SPENT LOTS AND LOTS OF HOURS REVIEWING MATERIALS?
16    A.  I DID.
17    Q.  AND YOU REALLY HAD A LOT OF MEETINGS WITH COUNSEL FOR
18    DIGITAL REG TO PREPARE, RIGHT?
19    A.  YES.
20    Q.  AND YOU REVIEWED THE SOURCE CODE, AND THE DOCUMENTS,
21    RIGHT?
22    A.  RIGHT.
23    Q.  AND SO ALL OF THAT INFORMATION AND ALL OF THAT WAS WHAT
24    YOU WERE TESTIFYING ABOUT IN YOUR DEPOSITION.
25    A.  THAT'S RIGHT.
```

1    **Q.** OKAY. NOW, YOU'VE PUBLISHED AN ACADEMIC PAPER ON DRM,

2    CORRECT?

3    **A.** THAT'S RIGHT.

4    **Q.** THAT WAS IN THE YEAR 2000?

5    **A.** THAT'S CORRECT.

6    **Q.** AND IN THAT PAPER YOU DESCRIBED A VARIETY OF DRM OR

7    DIGITAL RIGHTS MANAGEMENT TECHNOLOGIES, RIGHT?

8    **A.** I DID.

9    **Q.** AND YOU SEARCHED FOR COPY PROTECTION OR DRM PATENTS AS

10   PART OF YOUR ANALYSIS ON THAT PAPER, CORRECT?

11   **A.** IN SOME CASES, YES.

12   **Q.** AND YOU NEVER CAME ACROSS DIGITAL REG'S PATENTS AS PART OF

13   YOUR WORK IN DRM, RIGHT?

14   **A.** AT THAT POINT, NO.

15   **Q.** IN FACT, THE FIRST TIME YOU BECAME AWARE OF DIGITAL REG

16   WAS WHEN YOU GOT APPROACHED BY COUNSEL FOR DINOVO AT THE

17   DINOVO FIRM TO WORK ON THIS CASE, RIGHT?

18   **A.** RIGHT.

19   **Q.** YOU NEVER HEARD OF MR. PATTERSON BEFORE?

20   **A.** NO.

21   **Q.** NOW, YOU TESTIFIED JUST BEFORE THE CONCLUSION OF YOUR

22   DIRECT EXAMINATION THAT YOU'RE AWARE THAT THERE ARE

23   ALTERNATIVE DRM MECHANISMS, RIGHT?

24   **A.** RIGHT.

25   **Q.** AND ONE OF THE MECHANISMS YOU MENTIONED WAS PHYSICAL

DEVANBU – CROSS / MEHTA

1   PROTECTION?

2   **A.**   RIGHT.

3   **Q.**   AND YOU ALSO MENTIONED SENDING A PASSWORD IN THE CLEAR.

4   **A.**   ON THE WAY BACK, YES.

5   **Q.**   YES.  NOW, YOU KNOW THERE IS ALSO OTHER ALTERNATIVES

6   BEYOND SIMPLY PHYSICAL PROTECTION AND PASSWORDS IN THE CLEAR,

7   RIGHT?

8   **A.**   YES.

9   **Q.**   ONE OPTION WOULD BE STREAMING CONTENT?

10  **A.**   YES.

11  **Q.**   AND YOU KNOW THE FLASH PLAYER STREAMS CONTENT, RIGHT?

12  **A.**   RIGHT.

13  **Q.**   SO YOU WOULD AGREE WHEN THE FLASH PLAYER STREAMS CONTENT

14  THAT IS AN ALTERNATIVE TO THE PATENTS, RIGHT?

15  **A.**   SO ACCORDING TO THE DESCRIPTIONS OF THE WAY STREAMING

16  WORKS, WHEN YOU RECEIVE A STREAM AND IT IS PROTECTED YOU GO

17  THROUGH THE SAME PROCESS.  YOU FIRST REQUEST A LICENSE, CHECK

18  FOR THE LICENSE, REQUEST A LICENSE.  AND YOU GO THROUGH IT, SO

19  I WOULDN'T CONSIDER IT AN ALTERNATIVE.

20  **Q.**   THAT WASN'T  --

21  **A.**   THAT DOESN'T  --

22  **Q.**   THAT WASN'T QUITE MY QUESTION.  LET ME TRY TO REPHRASE IT

23  TO GET BACK TO THE HEART OF THE QUESTION.  SO YOU AGREE THAT

24  STREAMING IS AN ALTERNATIVE TO MR. PATTERSON'S TECHNOLOGY IN

25  TERMS OF DRM, RIGHT?

1    **A.**  I DON'T AGREE, BECAUSE IN STREAMING YOU WOULD STILL HAVE

2    TO, FIRST, YOU KNOW, DOWNLOAD THE CONTENT.  IT IS DESCRIBED IN

3    YOUR DOCUMENT.  I JUST READ IT RECENTLY.  THAT YOU CAN -- YOU

4    CAN -- YOU'D HAVE TO FIRST ACQUIRE THE LICENSE, AND THEN GO

5    THROUGH THE SAME PROCESS.

6    **Q.**  NOW, YOU WERE CAREFUL IN PREPARING YOUR EXPERT REPORT IN

7    THIS MATTER?

8    **A.**  YES, I WAS.  YEAH.

9    **Q.**  AND YOU WERE TRUTHFUL AND ACCURATE IN THAT?

10   **A.**  YES.

11   **Q.**  IN YOUR EXPERT REPORT YOU EXPLAIN THAT ONE WAY TO ACHIEVE

12   AN ALTERNATIVE TO THE PATENTS WAS FOR VIDEO AND AUDIO CONTENT

13   TO MAKE IT AVAILABLE VIA STREAMING SO THAT CONTENT IS

14   AVAILABLE IN CHUNK-SPANNING LIMITED TIME PERIODS, RIGHT?

15   THAT'S AT PAGE 20 OF YOUR REPORT.

16   **A.**  WHICH -- WHICH REFERENCE IS IT?  I AM SORRY.  I WANT TO

17   MAKE SURE I'M CLEAR ABOUT THE QUESTION AND ANSWER.

18   **Q.**  IT IS GOING TO BE IN THE BINDER WITH YOUR EXPERT REPORT.

19   DO YOU SEE THAT?

20   **A.**  I'M NOT SURE WHICH ONE IT IS.  OKAY.  IS IT --

21          **MS. MEHTA:**  YOUR HONOR, MAY I APPROACH?

22          **THE COURT:**  YES.

23               (COUNSEL ASSISTS WITNESS.)

24   **BY MS. MEHTA:**

25   **Q.**  SO THIS IS ACTUALLY IN THE MAIN BODY OF THE REPORT AND NOT

1    IN THE CHARTS.

2    **A.**   OKAY.

3    **Q.**   I'M TALKING ABOUT PAGE 20.  AND AT PAGE 20, YOU EXPLAINED

4    IN YOUR REPORT THAT ONE OF THE ALTERNATIVES TO THE PATENTED

5    TECHNOLOGIES IS FOR VIDEO AND AUDIO CONTENT TO BE STREAMED.

6    RIGHT?

7    **A.**   OH, OKAY.  RIGHT.  SO -- SO IF -- IF THE VIDEO AND AUDIO

8    CONTENT IS -- THAT IS BEING STREAMED IS NOT NEEDING A

9    PROTECTION, LIKE, FOR EXAMPLE, IN YOUTUBE, THAT STREAM, AND

10   IT'S, YOU KNOW, CATS AND STUFF, AND NOBODY CARES ABOUT IT.

11   BUT IF YOU ARE STREAMING A VALUABLE MOVIE, THEN YOU WOULD WANT

12   TO PROTECT IT.

13   **Q.**   YOU WILL AGREE, THOUGH, THAT THERE ARE -- IN THE CASES

14   WHERE SOMEONE IS STREAMING WITHOUT THAT SORT OF PROTECTION ON

15   IT, THAT THAT WOULD BE AN ALTERNATIVE TO THE PATENTS.  THAT IS

16   WHAT YOU SAID IN YOUR REPORT.

17   **A.**   IF YOU DON'T CARE ABOUT THE CONTENT, IF IT IS CAT VIDEOS,

18   YOU CAN STREAM IT.  THERE IS NO DIGITAL RIGHTS MANAGEMENT

19   THERE.

20   **Q.**   NOW, YOU TALKED A BIT ABOUT THE PATENTS AND DRM.  IN YOUR

21   ANALYSIS, YOU DID NOT PROVIDE ANY OPINION THAT THE PATENTS

22   PROVIDE THE MOST PRACTICAL WAY OF IMPLEMENTING DRM, CORRECT?

23   **A.**   SO IN MY REPORT I BASICALLY SAID IT'S A GOOD COMPROMISE,

24   YOU KNOW.  ALL SECURITY FEATURES YOU HAVE TO COMPROMISE

25   BETWEEN CONVENIENCE AND SECURITY.  THE MOST SECURE THING IS TO

DEVANBU – CROSS / MEHTA

1    NOT GIVE ANYTHING AWAY.  BUT YOU HAVE TO MAKE THAT TRADE-OFF.

2    AND THIS IS A REASONABLE COMPROMISE.

3    **Q.**  IT IS ONE REASONABLE COMPROMISE, BUT THERE IS LOTS, RIGHT?

4    **A.**  IT DEPENDS ON THE PARTICULAR BUSINESS CONDITIONS UNDER

5    WHICH YOU ARE OPERATING.  AND, YOU KNOW, EVERYBODY HAS TO

6    DECIDE HOW THEY WANT TO USE THEIR TECHNOLOGIES TO ACHIEVE THE

7    COMPROMISE THEY WANT TO ACHIEVE.

8    **Q.**  RIGHT.  AND YOU ARE NOT SAYING THAT THESE PATENTS PROVIDE

9    THE MOST PRACTICAL WAY OF DOING THAT?

10   **A.**  THERE IS NO WAY TO SAY WHAT THE MOST PRACTICAL WAY IS.

11   ENGINEERING IS ALWAYS A TRADE-OFF.  IN SOME SETTINGS SOMETHING

12   MAY BE BEST.  IN OTHER SETTINGS SOMETHING ELSE MAY BE THE

13   BEST.  SO --

14   **Q.**  NOW, WITH RESPECT TO DRM, YOU PRESENTED IN DIRECT SOME

15   SLIDES RELATING TO PIRACY.  DO YOU REMEMBER THAT?

16   **A.**  I AM SORRY.  I RATHER LOOK AT THE SLIDES, IF I MAY?

17   **Q.**  YOU REMEMBER THE IMAGE OF THE BAD PIRATE?

18   **A.**  GOT YOU, YES.

19   **Q.**  JUST SO WE CAN MAKE SURE THE COURT REPORTER ISN'T GOING TO

20   HAVE PROBLEMS TRANSCRIBING, IF YOU DON'T MIND, PAUSE AND LET

21   ME FINISH MY QUESTION, AND I WILL TRY AND DO THE SAME.

22       WHEN YOU WERE TALKING ABOUT PIRACY WITH RESPECT TO THE

23   PATENTS, IT WAS NOT YOUR VIEW THAT THE PATENTS ARE A SOLUTION

24   TO PIRACY OR COPY PROTECTION, RIGHT?

25   **A.**  SO I THINK I SAID IN MY REPORT THAT A DETERMINED ADVERSARY

DEVANBU – CROSS / MEHTA

1   CAN BREAK VIRTUALLY ANYTHING.  BUT I THINK MOST PEOPLE WHO USE

2   COPY-PROTECTED CONTENT ARE NOT THAT DETERMINED OR NOT THAT

3   CAPABLE.  SO --

4   **Q.**  SO -- I AM SORRY.

5   **A.**  ONE OF MY GRAD STUDENTS COULD POSSIBLY BREAK EVERYTHING.

6   BUT, YOU KNOW, YOUR TYPICAL USER IS NOT A COMPUTER SCIENCE

7   STUDENT.  YOU KNOW, FOR THEM PROTECTION IS QUITE EFFECTIVE.

8   **Q.**  YOU ARE NOT SAYING THAT THE DIGITAL REG PATENTS SOLVED THE

9   PROBLEM OF PIRACY, RIGHT?  THAT IS NOT YOUR TESTIMONY?

10  **A.**  NO.

11  **Q.**  NOW, YOU ALSO DIDN'T DO ANY ANALYSIS TO QUANTIFY HOW

12  EFFECTIVE OR INEFFECTIVE THE DIGITAL REG PATENTS MIGHT BE IN

13  AVOIDING PIRACY, CORRECT?

14  **A.**  I AM SORRY.  I MISSED THAT QUESTION.  CAN YOU PLEASE

15  REPEAT IT?

16  **Q.**  SURE.  YOU DIDN'T DO ANY ANALYSIS OF HOW EFFECTIVE OR

17  INEFFECTIVE THE DIGITAL REG PATENTS MIGHT BE AT AVOIDING

18  PIRACY, RIGHT?

19  **A.**  NO, I DID NOT.

20  **Q.**  NOW, I WANT TO DO A LITTLE BIT OF DISCUSSION AND EXPLORE A

21  LITTLE BIT YOUR -- THE BACKDROP THAT YOU HAD WHEN YOU WERE

22  FORMING YOUR INFRINGEMENT CONCLUSIONS.

23       SO, YOU SAID ON DIRECT EXAMINATION THAT YOU CONDUCTED AN

24  ANALYSIS AND DETERMINED THAT ADOBE'S THREE PRODUCTS THAT ARE

25  AT ISSUE IN THE CASE INFRINGE THE CLAIMS, RIGHT?

1    **A.**   RIGHT.

2    **Q.**   NOW, WHEN YOU STARTED WORKING ON THE CASE, THE PLAINTIFF'S

3    LAWYERS AT THE DINOVO FIRM, THEY HAD ALREADY PICKED THE CLAIMS

4    THAT THEY THOUGHT WERE INFRINGED BY ADOBE, RIGHT?

5    **A.**   CORRECT.

6    **Q.**   AND YOU DIDN'T ASK THE COUNSEL AT DINOVO WHY THEY PICKED

7    THOSE CLAIMS, RIGHT?

8    **A.**   I DID NOT.

9    **Q.**   AND WHEN YOU FIRST ACCEPTED THE ASSIGNMENT, YOU KNEW YOU

10   WERE GOING TO BE ASKED TO PROVIDE AN OPINION THAT THE ADOBE

11   PRODUCTS INFRINGE THOSE CLAIMS, CORRECT?

12   **A.**   I GUESS THAT IS WHAT THEY WERE HOPING FOR.  YES.

13   **Q.**   AND IN MAKING THE DECISION TO ACCEPT THAT ASSIGNMENT, YOU

14   DIDN'T ACTUALLY ANALYZE THE MERITS OF ANY OF THE CLAIMS

15   AGAINST ADOBE, RIGHT?

16   **A.**   SO, I DID KNOW THE CLAIMS, AND I DID KNOW THE PRODUCTS.  I

17   WENT AND LOOKED THEM UP ON THE WEB.  AND IT SEEMED REASONABLE.

18   **Q.**   SO YOUR TESTIMONY IS THAT BEFORE YOU TOOK YOUR ASSIGNMENT

19   IN THIS CASE THAT YOU INVESTIGATED THE ADOBE PRODUCTS?

20   **A.**   I DON'T KNOW WHICH ONES I LOOKED AT.  I LOOKED AT SOME OF

21   THEM.

22   **Q.**   ALL RIGHT.  DR. DEVANBU, I'M GOING TO READ FROM YOUR

23   DEPOSITION AT PAGE 487, AT LINE 11, WHERE I ASKED YOU:

24       "SO ASIDE FROM YOUR WORK IN THIS CASE, IT IS SAFE TO SAY

25   THAT YOU DID NOT HAVE ANY PRIOR KNOWLEDGE AS TO HOW THE ADOBE

1  FLASH PLATFORM, ADOBE LIVECYCLE, ADOBE DIGITAL PUBLISHING

2  TOOLS AND ADOBE SOFTWARE DELIVERY AND LICENSING AND ACTIVATION

3  FUNCTION" --

4  **A.**  WHICH LINE NUMBER ARE YOU LOOKING AT?

5  **Q.**  LINE 11 ON PAGE 487.

6      AGAIN:  "ASIDE FROM YOUR WORK IN THIS CASE, IT IS SAFE TO

7  SAY THAT YOU DID NOT HAVE ANY PRIOR KNOWLEDGE AS TO HOW THE

8  ADOBE FLASH PLATFORM, ADOBE LIVECYCLE, ADOBE DIGITAL

9  PUBLISHING TOOLS AND ADOBE SOFTWARE DELIVERY, LICENSING AND

10  ACTIVATION FUNCTION?

11      "ANSWER:  YES."

12          **MR. DINOVO:**  YOUR HONOR, IF I MIGHT OBJECT.  THE

13  QUESTION IS IMPROPER IMPEACHMENT INSOFAR AS IT IS ASIDE FROM

14  HIS WORK IN THIS CASE.

15          **MS. MEHTA:**  YOUR HONOR, THE --

16          **THE COURT:**  IT IS NOT THE SAME QUESTION THAT YOU

17  ASKED, SO IF YOU WANT TO ASK HIM THIS ONE, YOU CAN.

18          **MS. MEHTA:**  SURE.

19  **BY MS. MEHTA**

20  **Q.**  SO I THINK THE QUESTION I ASKED YOU, DR. DEVANBU -- AND

21  LET'S BE CLEAR ABOUT THIS --

22          **THE COURT:**  IF YOU WANT TO READ BACK A PRIOR

23  QUESTION, YOU CAN.  IF YOU WANT TO ASK HIM THIS QUESTION, YOU

24  CAN.

25          **MS. MEHTA:**  THAT'S WHAT I'M GOING TO DO, YOUR HONOR.

1    THANK YOU.

2    **BY MS. MEHTA:**

3    **Q.**   SO ASIDE FROM YOUR WORK IN THIS CASE, MEANING BEFORE YOU

4    TOOK THE ASSIGNMENT --

5    **A.**   RIGHT.

6    **Q.**   -- YOU DIDN'T KNOW ANYTHING ABOUT THE ACCUSED PRODUCTS,

7    RIGHT?

8    **A.**   BEFORE I TOOK ON THIS ASSIGNMENT -- WELL, YOU KNOW, I

9    GUESS I'D SEEN FLASH AND ACROBAT BUT --

10   **Q.**   THAT WAS IT?

11   **A.**   RIGHT.  I DON'T KNOW IF YOU ARE ASKING ME:  DID I DO ANY

12   UNPAID WORK FOR THEM?  YES, I DID.  SO WHEN THEY ASKED ME:

13       "DO YOU WANT TO WORK ON THIS," I WENT AND LOOKED THEM UP

14   ON THE WEB. YOU KNOW, WHAT ARE THEY TALKING ABOUT?

15       SO, YOU KNOW, BEFORE I STARTED CHARGING THEM FOR MY TIME I

16   DID TAKE A LOOK AND SEE ON THE WEB IF I COULD -- YOU KNOW, IF

17   THIS MADE SENSE.  IF THERE WAS SOME DRM GOING ON IN THESE

18   PRODUCTS.  YES, I DID.

19   **Q.**   ASIDE FROM JUST TAKING A LOOK ON THE WEB, AT ADOBE'S WEB

20   PAGE, YOU DIDN'T HAVE ANY INFORMATION ABOUT HOW THE ACTUAL DRM

21   WORKED, RIGHT?

22   **A.**   NO.

23   **Q.**   YOU DIDN'T LOOK AT THE SOURCE CODE, RIGHT?

24   **A.**   NOT REALLY, NO.

25   **Q.**   YOU DIDN'T LOOK AT ANY OF THE DOCUMENTS THAT YOU WERE

DEVANBU – CROSS / MEHTA

1    CITING IN YOUR DIRECT EXAMINATION, RIGHT?

2    **A.**  SO I DON'T RECALL EXACTLY WHAT ONLINE THINGS I LOOKED AT.

3    ANYTHING THAT IS -- PRETTY MUCH EVERYTHING THAT IS CITED CAN

4    BE FOUND ON THE WEB EVEN NOW.  SO I MAY HAVE LOOKED AT SOME OF

5    THOSE.  I DON'T REMEMBER WHAT I LOOKED AT.  BUT I LOOKED AT IT

6    BEFORE I STARTED GETTING PAID, IF THAT IS WHAT YOU MEAN.

7    **Q.**  IF YOU CAN SLOW DOWN?

8    **A.**  OKAY.

9    **Q.**  I KNOW YOU WANT TO ANSWER THE QUESTION AND GET OFF THE

10   STAND.  I TOTALLY UNDERSTAND.  BUT THE COURT REPORTER IS GOING

11   TO NEED TO HAVE YOU SLOW DOWN JUST A LITTLE BIT.

12   **A.**  SORRY.

13   **Q.**  NOW, WHEN YOU WERE COMING TO YOUR CONCLUSIONS ON

14   INFRINGEMENT, YOU DIDN'T CONSIDER THE PRIOR ART, RIGHT?

15   **A.**  DID I CONSIDER THE PRIOR ART?  I THINK I -- I THINK I SAID

16   I DIDN'T REALLY DO ANY -- SORRY -- VALIDITY ANALYSIS.  SO I

17   DON'T KNOW ABOUT THAT.

18   **Q.**  WHEN YOU FORMED YOUR OPINIONS ON INFRINGEMENT YOU WEREN'T

19   THINKING ABOUT THE PRIOR ART?

20   **A.**  RIGHT.

21   **Q.**  NOW, YOU TALKED A BIT ABOUT SOURCE CODE DURING YOUR DIRECT

22   EXAMINATION.

23   **A.**  YES.

24   **Q.**  AND YOU ALSO CITED A NUMBER OF INTERNAL ADOBE DOCUMENTS

25   AND ALSO PUBLIC ADOBE DOCUMENTS, RIGHT?

DEVANBU – CROSS / MEHTA

1    **A.**   YES.

2    **Q.**   AND YOU CITED DEPOSITION TESTIMONY FROM A NUMBER OF ADOBE

3    ENGINEERS.

4    **A.**   YES.

5    **Q.**   AND IN FORMING YOUR OPINIONS, YOU REVIEWED A NUMBER OF

6    DEPOSITION TRANSCRIPTS FROM ADOBE ENGINEERS, RIGHT?

7    **A.**   YES.

8    **Q.**   AND I THINK MR. DINOVO ASKED YOU ON DIRECT YOUR TESTIMONY

9    WAS BASED ON THE SOURCE CODE AND THE DOCUMENTS AND THE

10   DEPOSITIONS, RIGHT?

11   **A.**   CORRECT.

12   **Q.**   AND WHEN YOU DID ALL OF YOUR ANALYSIS AND YOUR REVIEW, THE

13   SOURCE CODE AND THE DOCUMENTS AND THE TESTIMONY WERE

14   CONSISTENT IN TERMS OF DESCRIBING HOW THE ADOBE PRODUCTS

15   WORKED, RIGHT?

16           **MR. DINOVO:**  OBJECTION, COMPOUND.

17           **MS. MEHTA:**  IT IS NOT COMPOUND, YOUR HONOR.  I JUST

18   WANTED TO ASK --

19           **MR. DINOVO:**  SHE IS ASKING EVERY STATEMENT MADE IN A

20   DEPOSITION IS CONSISTENT WITH EVERY DOCUMENT HE REVIEWED?

21           **THE COURT:**  I GUESS SHE IS.

22           **MS. MEHTA:**  YEAH.

23           **THE WITNESS:**  I HAVE NO WAY OF KNOWING.  I MEAN,

24   THERE IS A LOT OF STUFF.  I WOULD HAVE TO LOOK AT EVERY SINGLE

25   THING TO SEE IF IT IS CONSISTENT.

1    **BY MS. MEHTA:**

2    **Q.**   LET ME ASK YOU THIS QUESTION:   WHEN YOU WENT THROUGH ALL

3    OF THE SOURCE CODE DOCUMENTS AND TESTIMONY THAT YOU RELIED

4    UPON TO CONCLUDE INFRINGEMENT, YOU DIDN'T FIND ANY INTERNAL

5    INCONSISTENCIES, RIGHT?

6    **A.**   I WASN'T REALLY SEARCHING FOR INCONSISTENCIES.   I WAS

7    TRYING TO UNDERSTAND WHAT WAS GOING ON.

8    **Q.**   SURE.

9    **A.**   YOU KNOW, IT'S DIFFICULT.

10   **Q.**   AS YOU WERE TRYING TO UNDERSTAND WHAT WAS GOING ON YOU

11   REVIEWED THE SOURCE CODE AND THE DOCUMENTS AND THE TESTIMONY,

12   AND YOU FOUND THAT THE TESTIMONY AND THE DOCUMENTS

13   CORROBORATED YOUR REVIEW OF THE SOURCE CODE, RIGHT?   THAT WAS

14   THE WORD YOU USED WITH MR. DINOVO?

15   **A.**   SO I DON'T MEAN TO SOUND LIKE A WHIMP, BUT THERE ARE

16   THOUSANDS OF PAGES.   AND I CAN'T REALLY ANSWER THAT QUESTION

17   IN GENERAL.   I PREFER TO ANSWER IT SPECIFICALLY ABOUT SPECIFIC

18   THINGS THAT YOU WANT TO ASK MY ABOUT.

19   **Q.**   FAIR ENOUGH.   HOW ABOUT WE JUST LIMIT IT TO THE DOCUMENTS

20   AND THE TESTIMONY THAT WERE CITED IN YOUR DIRECT EXAMINATION.

21   OKAY?

22   **A.**   OKAY.

23   **Q.**   SO OVER THE COURSE OF THE LAST FEW DAYS YOU PRESENTED A

24   NUMBER OF PIECES OF SOURCE CODE, A NUMBER OF ADOBE DOCUMENTS

25   AND A NUMBER OF EXCERPTS OF DEPOSITION TESTIMONY FROM ADOBE

1    ENGINEERS, RIGHT?

2    **A.**  RIGHT.

3    **Q.**  AND ALL OF THAT EVIDENCE WAS CONSISTENT IN TERMS OF

4    DESCRIBING HOW THE ADOBE PRODUCTS WORK AS IT'S RELEVANT TO

5    YOUR OPINIONS IN THIS CASE, RIGHT?

6    **A.**  CORRECT.  YEAH.

7              **THE COURT:**  YOU ALSO KEEP REFERRING TO "DIRECT BY

8    MR. DINOVO."  BUT WAS THE DIRECT BY MR. DINOVO?

9              **MS. MEHTA:**  YES, YOUR HONOR.

10   **BY MS. MEHTA:**

11   **Q.**  NOW, WITH RESPECT TO ALTERNATIVES TO THE PATENT CLAIMS,

12   YOU DON'T KNOW WHAT DRM OR ACCESS CONTROL SOLUTIONS ADOBE

13   OFFERED PRIOR TO THE SPECIFIC ACCUSED PRODUCTS IN THIS CASE,

14   RIGHT?

15   **A.**  I DON'T KNOW.

16   **Q.**  AND YOU'RE NOT OFFERING ANY OPINION THAT THE ONLY WAY

17   ADOBE COULD DO DRM IS THROUGH THE SPECIFIC WAYS THAT ARE DONE

18   IN THE ACCUSED PRODUCTS NOW, RIGHT?

19   **A.**  SO, I HAVEN'T FORMED AN OPINION ON THE CHOICES AVAILABLE

20   TO ADOBE.

21   **Q.**  NOW, YOU UNDERSTAND THAT DIGITAL REG IS ACCUSING ADOBE OF

22   DIRECT INFRINGEMENT, CORRECT?

23   **A.**  SAY AGAIN?

24   **Q.**  YOU UNDERSTAND THAT DIGITAL REG IS ACCUSING ADOBE OF

25   DIRECT INFRINGEMENT.  RIGHT?

DEVANBU – CROSS / MEHTA

1    **A.**  I THOUGHT IT WAS INDUCED INDIRECT INFRINGEMENT.  INDUCED

2    INDIRECT INFRINGEMENT.

3    **Q.**  OKAY.  SO YOUR OPINION IS THERE IS NO DIRECT INFRINGEMENT

4    BY ADOBE?

5    **A.**  NO.

6    **Q.**  NOW, WITH RESPECT TO SOME OF THE OPINIONS THAT YOU

7    PRESENTED, YOU REFERENCED A NUMBER OF TIMES WHO YOU WERE

8    THINKING HYPOTHETICALLY MIGHT BE USING THE ADOBE PRODUCTS,

9    RIGHT?

10   **A.**  RIGHT.

11   **Q.**  AND WHEN YOU CONCLUDED INFRINGEMENT, YOU DIDN'T ACTUALLY

12   IDENTIFY ANY ADOBE INDIVIDUAL OR ADOBE, AS AN ENTITY, AS

13   ACTUALLY PRACTICING ANY OF THE CLAIM STEPS, RIGHT?

14   **A.**  WHICH CLAIM AND WHICH PRODUCT ARE WE REFERRING TO?

15   **Q.**  WHY DON'T WE START WITH CLAIM 1 OF THE '541 PATENT?

16   **A.**  OKAY.

17   **Q.**  YOU DON'T HAVE ANYONE AT ADOBE YOU THINK HAS PRACTICED ALL

18   OF THE CLAIMS OF CLAIM 1, RIGHT?

19   **A.**  SO FOR WHICH PRODUCT?  FOR ACTIVATION, LIVECYCLE?

20   **Q.**  WELL, WHY DON'T WE START WITH ACTIVATION?

21   **A.**  OKAY.

22   **Q.**  FOR ACTIVATION YOU ARE NOT CONTENDING THAT ANYONE AT ADOBE

23   HAS PRACTICED ALL THE STEPS, RIGHT?

24   **A.**  NO.

25   **Q.**  IN FACT, YOUR INFRINGEMENT THEORY FOR ACTIVATION REQUIRES

1    THAT THE STEPS BE PRACTICED BY A SERVER THAT'S POSTED BY ONE

2    ENTITY, AND -- I AM SORRY.  I JUST GOT PASSED A NOTE.  THE

3    TRANSCRIPT MAY BE UNCLEAR ON SOMETHING I ASKED YOU BECAUSE OF

4    THE WAY I PHRASED THE QUESTION.  SO I APOLOGIZE.  I'M GOING TO

5    ASK IT AGAIN JUST TO MAKE SURE WE ARE CLEAR.

6    **A.**  OKAY.

7    **Q.**  SO I ASKED YOU:  IT'S YOUR OPINION THAT THERE IS NO DIRECT

8    INFRINGEMENT BY ADOBE.  AND I JUST WANT TO MAKE SURE YOUR

9    ANSWER TO THAT IS THE AFFIRMATIVE, IN THAT THERE IS NO DIRECT

10   INFRINGEMENT BY ADOBE; IS THAT CORRECT?

11   **A.**  SO, I WANT TO MAKE SURE I UNDERSTAND THE LEGAL TERMINOLOGY

12   HERE CORRECTLY.  SO, IN CASE, FOR EXAMPLE, THAT THE LICENSE

13   MANAGEMENT SERVER IS OPERATED BY ADOBE, IN THE CASE OF THE

14   '670 THERE COULD BE DIRECT INFRINGEMENT.

15   **Q.**  OKAY.  LET'S FOCUS IN ON THE '541.

16   **A.**  OKAY.

17   **Q.**  YOU ARE NOT CONTENDING THAT ADOBE DIRECTLY INFRINGES THE

18   '541, CLAIM 1, CORRECT?

19   **A.**  IT'S PERFORMED AT THE CLIENT AND WHOEVER IS RUNNING ADOBE

20   SOFTWARE.

21   **Q.**  AND WITH RESPECT TO THE OTHER PRODUCTS FOR CLAIM 1 OF THE

22   '541, AGAIN YOU ARE NOT CONTENDING THAT THERE IS DIRECT

23   INFRINGEMENT BY ADOBE, RIGHT?

24   **A.**  FOR THE CASE OF LIVECYCLE, WHOEVER IS USING ACROBAT PRO,

25   WITH LIVECYCLE RIGHTS MANAGEMENT ENABLED, WOULD BE INFRINGING

DEVANBU – CROSS / MEHTA

```
 1    IT.
 2    Q.  THAT IS NOT ADOBE, THOUGH?
 3    A.  YES, IT IS CUSTOMERS OF ADOBE.
 4    Q.  AND WITH RESPECT TO FLASH, AGAIN, YOU ARE NOT CONTENDING
 5    THAT ADOBE DIRECTLY INFRINGES CLAIM 1, RIGHT?
 6    A.  SO IN THE CASE OF '541 AND THE FLASH PRODUCT IT WOULD BE
 7    THE ADOBE CONTENT PROTECTION LIBRARY THAT IS INFRINGING.  AND
 8    THAT WOULD BE BUILT INTO APPLICATIONS THAT ARE USED BY CLIENTS
 9    TO VIEW VIDEO CONTENT.
10    Q.  SO YOU ARE NOT CONTENDING THAT ADOBE INFRINGES CLAIM 1 OF
11    THE '541 PATENT DIRECTLY ON THE FLASH PLATFORM, RIGHT?
12    A.  CORRECT.
13    Q.  NOW, YOU MENTIONED EARLIER WITH RESPECT TO CLAIM 1 OF THE
14    '541 PATENT THAT YOUR INFRINGEMENT THEORY REQUIRES A USER AT
15    THE CLIENT, OR CLIENT AT THE USER, I SHOULD SAY, AND A SERVER,
16    RIGHT?
17    A.  THIS IS FOR THE FLASH OR --
18    Q.  I'M ACTUALLY ADDRESSING ALL OF THE PRODUCTS, BUT I CAN
19    BREAK IT DOWN, IF THAT IS HELPFUL.
20    A.  THAT WOULD BE HELPFUL.
21    Q.  WHY DON'T WE START WITH ALM?
22    A.  OKAY.
23    Q.  ALM, YOUR INFRINGEMENT THEORY FOR CLAIM 1 OF THE '541
24    PATENT REQUIRES THAT THERE BE A USER AND A SERVER, CORRECT?
25    A.  RIGHT.
```

1    **Q.**  AND THOSE WOULD BE TWO DIFFERENT ACTORS, ONE PROVIDING THE

2    USER AND ONE PROVIDING THE SERVER, RIGHT?

3    **A.**  RIGHT.  BUT ALL THE STEPS ARE PERFORMED AT THE CLIENT FOR

4    '541.

5    **Q.**  AND WITH RESPECT TO LIVECYCLE, AGAIN, YOU NEED A CLIENT

6    AND YOU NEED A SERVER, RIGHT?

7    **A.**  RIGHT.  THE STEPS OF THE CLAIM ARE PERFORMED AT THE

8    CLIENT.

9    **Q.**  SO YOUR VIEW IS THAT THE CLIENT ITSELF IS DIRECTLY

10   INFRINGING, AND THAT ADOBE IS NOT DIRECTLY INFRINGING BECAUSE

11   ALL OF THE STEPS ARE PERFORMED AT THE CLIENT?

12   **A.**  THE CLIENT OPERATING THE ADOBE SOFTWARE IS INFRINGING.

13   **Q.**  NOW, WHEN YOU WERE PREPARING YOUR OPINIONS IN THE CASE,

14   YOU WEREN'T FAMILIAR WITH THE CONCEPT OF JOINT INFRINGEMENT,

15   CORRECT?

16   **A.**  I DON'T RECALL.

17   **Q.**  SO YOU ARE NOT OFFERING ANY OPINION OF JOINT INFRINGEMENT

18   BY ADOBE, RIGHT?

19   **A.**  IN THIS CASE THE TWO PATENTS THAT ARE BEING ASSERTED ARE

20   NOT JOINT INFRINGEMENT.

21   **Q.**  AND YOU DID NOT OFFER ANY OPINIONS ON MULTIPLE PARTIES

22   WORKING TOGETHER TO INFRINGE, CORRECT?

23   **A.**  I DON'T -- SO TALKING ABOUT THE PATENTS-IN-SUIT AND THE

24   CLAIMS-IN-SUIT, RIGHT NOW THERE IS NO JOINT INFRINGEMENT.

25   **Q.**  NOW, I ALSO WANT TO TALK A LITTLE BIT ABOUT WHAT THE

DEVANBU – CROSS / MEHTA

1   FEATURES AND FUNCTIONALITIES ARE THAT YOU'VE OPINED ON AS

2   BEING PART OF THE INFRINGEMENT THEORY.  YOU'LL AGREE WITH ME

3   THAT UNDER YOUR INFRINGEMENT THEORY, YOU'RE NOT CLAIMING THAT

4   THESE PATENTS COVER ALL OF THE FUNCTIONALITIES IN ACROBAT FOR

5   EXAMPLE, RIGHT?

6   **A.**  I'M NOT SURE I UNDERSTAND THE QUESTION.

7   **Q.**  SURE.  YOU'RE NOT SUGGESTING THAT MR. PATTERSON'S PATENTS

8   COVER ALL OF THE FEATURES AND FUNCTIONALITIES IN ACROBAT, ARE

9   YOU?

10  **A.**  RIGHT.  IT JUST COVERS THE DIGITAL RIGHTS MANAGEMENT PART.

11  **Q.**  AND EVEN UNDER YOUR THEORY IT IS ONLY THE ALM OR

12  ACTIVATION LIBRARIES THAT ARE IN THE PRODUCT THAT WOULD EVEN

13  BE ACCUSED, RIGHT?

14  **A.**  CORRECT.

15  **Q.**  AND THAT IS TRUE FOR ALL OF THE PRODUCTS THAT MIGHT BE

16  DELIVERED USING ADOBE'S ACTIVATION TECHNOLOGY, RIGHT?

17  **A.**  AGAIN, IT WOULD BE BETTER IF YOU CAN TAKE IT BIT BY BIT.

18  IN THE CASE OF LIVECYCLE RIGHTS MANAGEMENT --

19  **Q.**  MAYBE I CAN BE MORE CLEAR. I'M NOT TALKING ABOUT LIVECYCLE

20  RIGHT NOW.

21  **A.**  OKAY.

22  **Q.**  I'M JUST TALKING ABOUT ADOBE ACTIVATION, OR ALM.

23  **A.**  YES.

24  **Q.**  AND FOR ALM, FOR ANY CONTENT THAT'S DISTRIBUTED, YOUR

25  INFRINGEMENT THEORY IS LIMITED TO THE ALM OR ACTIVATION

DEVANBU – CROSS / MEHTA

1    LIBRARIES AND NOT THE REST OF THE CONTENT, RIGHT?

2    **A.**   YES, THE LICENSE ACTIVATION TECHNOLOGY.

3    **Q.**   AND SAME FOR LIVECYCLE, RIGHT?  FOR LIVECYCLE YOU'RE

4    ACCUSING ONLY THE ACTIVATION OR ACCESS CONTROL, NOT THE

5    CONTENT ITSELF, CORRECT?

6    **A.**   THE RIGHTS MANAGEMENT PART, YES.

7    **Q.**   AND FOR FLASH, AGAIN, YOU'RE ONLY ACCUSING THE ACCESS

8    CONTROL, NOT FLASH PLAYER OR THE CONTENT ITSELF, CORRECT?

9    **A.**   CORRECT.

10   **Q.**   NOW, YOU UNDERSTAND -- JUST TO GO BACK TO LIVECYCLE, YOU

11   UNDERSTAND FOR LIVECYCLE THAT LIVECYCLE CAN PROTECT A VARIETY

12   OF DIFFERENT DOCUMENT TYPES, RIGHT?

13   **A.**   YES.

14   **Q.**   IT CAN PROTECT PDF'S, RIGHT?

15   **A.**   YES.

16   **Q.**   AND WORD DOCUMENTS?

17   **A.**   YES.

18   **Q.**   NOW, YOU'RE NOT CONTENDING THAT MICROSOFT WORD INFRINGES

19   THE CLAIMS OF THE '541 PATENT, ARE YOU?

20   **A.**   SO, IT'S THE CLIENT SIDE SOFTWARE THAT CONFORMS TO ADOBE'S

21   INSTRUCTIONS HOW THE LIVECYCLE MANAGEMENT PROTOCOL WORKS.

22   THAT WHOLE THING WOULD HAVE TO BE BUILT INTO MICROSOFT WORD OR

23   ONE OF THOSE PRODUCTS.

24   **Q.**   BUT MICROSOFT WORD ITSELF ISN'T PART OF YOUR INFRINGEMENT

25   ALLEGATIONS?

1    **A.**   IN THIS PARTICULAR CASE, I HAVEN'T ANALYZED ANY MICROSOFT

2    CODE.

3    **Q.**   NOW, AGAIN, JUST TO TALK ABOUT YOUR OPINIONS WITH RESPECT

4    TO DRM, GENERALLY, BEFORE WE GET INTO THE DETAILS OF THE

5    CLAIMS, IN THE CONTEXT OF A PRODUCT THAT'S PROTECT BY DRM,

6    YOUR UNDERSTANDING IS THAT A CUSTOMER IS PURCHASING THE

7    PRODUCT FOR THE CONTENT, NOT FOR THE DRM OR ACCESS CONTROL,

8    RIGHT?

9    **A.**   UM, RIGHT.  SO, IF I BUY A MOVIE, I AM BUYING THE MOVIE TO

10   WATCH THE MOVIE, IF THAT IS WHAT YOU MEAN.

11   **Q.**   ONE CLARIFICATION TO YOUR TESTIMONY FROM TESTIMONY.  ON

12   DIRECT EXAMINATION, MR. DINOVO ASKED YOU ABOUT YOUR HOURLY

13   RATE FOR THE CASE, RIGHT?

14   **A.**   RIGHT.

15   **Q.**   AND I THINK YOU TESTIFIED THAT YOU WERE COMPENSATED AT

16   $350, AND THEN THERE IS A DISCOUNT DOWN TO $200 FOR SOURCE

17   CODE REVIEW?

18   **A.**   250.

19   **Q.**   TO 250.  NOW, THE REST OF YOUR WORK ON THE CASE, BESIDES

20   SOURCE CODE REVIEW --

21   **A.**   YES.

22   **Q.**   -- YOU WERE COMPENSATED AT A DIFFERENT RATE FOR THAT,

23   CORRECT?

24   **A.**   THAT'S RIGHT.

25   **Q.**   AND THAT WAS $400 FOR ALL OF YOUR CONSULTING WORK PER

DEVANBU – CROSS / MEHTA

1    HOUR?

2    **A.**  IT WAS 350 FOR CONSULTING AND 500 FOR TESTIFYING.

3    **Q.**  IF YOU CAN TURN TO YOUR EXPERT REPORT AT PAGE 5 --

4    ACTUALLY, WHY DON'T I DO THIS?  WHY DON'T I JUST ASK QUESTION

5    THIS WAY.  SAVE YOU TIME.

6    **A.**  OKAY.

7    **Q.**  WITH RESPECT TO YOUR TESTIMONY --

8    **A.**  YES.

9    **Q.**  -- YOU'RE ACTUALLY BEING PAID $500 FOR THAT?

10   **A.**  YES.

11   **Q.**  I WOULD LIKE TO TURN TO THE '541 PATENT NOW.

12   **A.**  OKAY.

13          **MS. MEHTA:**  HERE IT IS.

14          **THE COURT:**  WHY DON'T WE TAKE A BREAK, THEN.  IT'S

15   12:20.  WE WILL BREAK UNTIL 12:35.  REMIND ME TO SPEAK WITH

16   THE ATTORNEYS.

17      YOU MAY STEP DOWN.  PLEASE BE BACK IN 15 MINUTES.

18      (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

19          **THE COURT:**  SO YOU WERE HAVING AN ISSUE AS TO WHETHER

20   THE YES/NO INFRINGEMENT WAS IN HIS REPORT, AND THEN YOU

21   CONCLUDED.  SO WERE YOU ABLE TO GET IN EVERYTHING YOU WANTED

22   TO WITHOUT RESOLVING THAT ISSUE?

23          **MR. DINOVO:**  I THINK SO, YOUR HONOR.

24          **THE COURT:**  OKAY.  AS LONG AS THERE IS NOT SOMETHING

25   ELSE YOU WANT, THEN I THINK WE HAVE RESOLVED IT.

1        **MR. DINOVO:**  YEAH.

2        **THE COURT:**  OKAY.

3        **MR. DINOVO:**  YOUR HONOR, CAN I –– IN CASE IT COMES

4    UP –– I AM SORRY TO BE CASUAL ABOUT THIS.  CAN WE –– I CAN

5    CONTINUE, IF I NEED TO, TO ASK ABOUT THE TOKEN ON REDIRECT. I

6    DON'T WANT TO HAVE ANOTHER SITUATION WITH THE JURY.

7        SO I AM JUST GOING TO ASK HIM WHETHER HIS ANALYSIS WHETHER

8    OR NOT THE TOKEN APPROVED THE TRANSACTION, WHICH YOUR HONOR

9    HAS RULED TWICE ON THIS ISSUE, ACTUALLY, ON SUMMARY JUDGMENT

10   AND THEN RECONSIDERATION THAT HE HAD.  SO WE THOUGHT THIS

11   ISSUE WAS ––

12       **THE COURT:**  SHOW ME THE PAGE AND LINE WHERE HE TALKS

13   ABOUT THAT.

14       **MR. DINOVO:**  ALL RIGHT.

15       **THE COURT:**  IT IS NOT THE QUESTION OF THE COMMERCIAL

16   VERSUS THE TRANSACTION.  IT IS THE QUESTION OF YES OR NO,

17   WHETHER OR NOT.  COUNSEL SAYS THAT IS NOT IN HIS REPORT.  IF

18   YOU THINK IT IS, GIVE ME A PAGE AND LINE, AND I WILL LOOK AT

19   IT.  THE PAGE AND LINE YOU GAVE ME BEFORE OR SHE GAVE ME

20   BEFORE IT WASN'T IN.

21       **MR. DINOVO:**  THANK YOU, YOUR HONOR.

22       (RECESS FROM 12:22 P.M.; RESUMED AT 12:48 P.M.)

23       (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

24       **THE CLERK:**  REMAIN SEATED.  COME TO ORDER.  COURT IS

25   BACK IN SESSION.

1    **THE COURT:**  GO AHEAD.

2    **BY MS. MEHTA:**

3    **Q.**  DR. DEVANBU, DURING THE BREAK DID YOU TALK TO COUNSEL FOR

4    DINOVO?

5    **A.**  YES, I DID.

6    **Q.**  DID YOU KNOW THAT IT WAS INAPPROPRIATE TO CONSULT WITH

7    YOUR COUNSEL DURING A BREAK?

8    **A.**  I DID NOT.

9    **THE COURT:**  ACTUALLY, WE HAVE NOT MADE ANY SUCH RULE,

10   AND IT IS NOT UNIVERSAL.  IF YOU WANT A RULE LIKE THAT, WE CAN

11   MAKE IT.  YOU HAVEN'T MADE IT YET THAT I KNOW OF.

12   **MS. MEHTA:**  WE WOULD.  I AM SORRY, YOUR HONOR.  I

13   THOUGHT WE HAD.  I APOLOGIZE, BUT WE WOULD LIKE THAT REQUEST.

14   **MR. DINOVO:**  NO OBJECTION, YOUR HONOR.

15   **THE COURT:**  OKAY.

16   **BY MS. MEHTA:**

17   **Q.**  NOW, ONE THING I WANTED TO CLEAR UP FROM BEFORE, AND THEN

18   I WILL GET TO THE '541.

19   **A.**  OKAY.

20   **Q.**  IS WE WERE TALKING ABOUT THE ANALYSIS YOU DID OR THE

21   REVIEW YOU DID OF ADOBE'S WEBSITE BEFORE YOU TOOK THE

22   ENGAGEMENT WITH DINOVO.  DO YOU RECALL THAT?

23   **A.**  THAT'S RIGHT, YES.

24   **Q.**  YOU SAID YOU LOOKED AT SOME PUBLICLY-AVAILABLE PRODUCTS

25   ABOUT THE THREE PRODUCTS AT ISSUE.

1    **A.**  I DON'T KNOW WHICH ONES I LOOKED AT, BUT I LOOKED AT SOME.

2    **Q.**  NOW, THE REVIEW THAT YOU DID ON THE WEBSITE, THAT WAS

3    ENOUGH INFORMATION FOR YOU TO BE COMFORTABLE THAT YOU COULD

4    REASONABLY SUPPORT AN ALLEGATION THAT ADOBE INFRINGED?

5    **A.**  NO.

6    **Q.**  SO WHEN YOU TOOK THE ASSIGNMENT YOU DIDN'T HAVE ENOUGH

7    INFORMATION TO BE REASONABLE THAT ADOBE INFRINGED?

8    **A.**  I WOULD HAVE LIKED TO LOOK AT THE SOURCE CODE AND SPEND

9    MORE TIME.  I WASN'T WILLING TO SPEND ALL THE TIME WITHOUT

10   GETTING PAID FOR IT.

11   **Q.**  SO YOU ACCEPTED THE ASSIGNMENT, AND YOU DIDN'T KNOW AT

12   THAT POINT IN TIME WHETHER YOU WERE GOING TO BE ABLE TO

13   SUPPORT THE ASSIGNMENT YOU WERE BEING GIVEN?

14   **A.**  IT IS FEASIBLE, BUT I DIDN'T KNOW FOR SURE.

15   **Q.**  NOW, WITH RESPECT TO THE '541, I WANT TO START BY TALKING

16   ABOUT THE FLASH PLATFORM?

17   **A.**  OKAY.

18   **Q.**  AND, IN PARTICULAR, THE CONCEPT OF PREDELIVERY.

19   **A.**  OKAY.

20   **Q.**  YOU ARE FAMILIAR WITH THAT, RIGHT?

21   **A.**  YEAH.

22   **Q.**  YOU REVIEWED THE TESTIMONY OF MR. JONES, RIGHT?

23   **A.**  YES.

24   **Q.**  YOU CITED THAT IN YOUR DIRECT EXAMINATION?

25   **A.**  RIGHT.

1    Q.  AND WE WATCHED THE VIDEO YESTERDAY. YOU WERE HERE FOR

2    THAT, RIGHT?

3    A.  YES.

4    Q.  NOW, YOU KNOW THAT MR. JONES TESTIFIED THAT THE FLASH

5    PLATFORM IS USED IN SITUATIONS IN WHICH A LICENSE IS

6    PREDELIVERED BEFORE THE USER ACTUALLY REQUESTS THE CONTENT,

7    RIGHT?

8    A.  YES.  HE ALSO SAID THAT --

9    Q.  IF YOU CAN JUST FOCUS IN ON MY QUESTIONS, OKAY?

10       YOU DIDN'T REVIEW ANY SOURCE CODE RELATING TO PREDELIVERY

11   OF A LICENSE IN FLASH, RIGHT?

12   A.  I DID NOT.

13   Q.  AND YOU DON'T DISPUTE MR. JONES' TESTIMONY THAT THE FLASH

14   PLATFORM CAN BE USED IN SITUATIONS OF PREDELIVERY, RIGHT?

15   A.  SURE.

16   Q.  YOU ALSO DON'T HAVE ANY BASIS TO OPINE AS TO HOW MANY

17   USERS USED PREDELIVERY VERSUS NOT PREDELIVERY, RIGHT?

18   A.  WHAT I CAN SAY IS THAT MR. JONES STATED IN HIS TESTIMONY

19   THAT ADOBE ENCOURAGES PEOPLE TO PROVIDE A LIMITED LICENSE ON

20   PREDELIVERY.  AND THEN, WHEN THEY WANT MORE ACCESS, TO REQUEST

21   THEM TO UPGRADE.

22   Q.  BUT YOU HAVE NO IDEA HOW MUCH IS DONE BY PREDELIVERY AND

23   HOW MUCH IS UPGRADE, RIGHT?  YOU DON'T KNOW THAT.

24   A.  IT SEEMS LIKE A RESTRICTED LICENSE ON PREDELIVERY,

25   ACCORDING TO MR. JONES' TESTIMONY, AND THEY ARE ENCOURAGED TO

1   UPGRADE TO A BETTER LICENSE.

2   **Q.**  YOU DON'T KNOW WHAT THE BREAKDOWN OF THAT IS.  THAT IS

3   WHAT I AM TRYING TO GET AT.

4   **A.**  I DON'T KNOW.

5         **MS. MEHTA:**  NOW, IF WE CAN PUT UP DI158, MR. BONINI.

6               (PUBLISHED FOR JURY.)

7   **BY MS. MEHTA**

8   **Q.**  THIS IS ONE OF YOUR SLIDES FROM YOUR DIRECT EXAMINATION,

9   RIGHT?

10  **A.**  OKAY.

11  **Q.**  AND IN YOUR DIRECT EXAMINATION, THIS WAS INTENDED TO

12  ADDRESS THE REQUIREMENT THAT A PERMISSION BE RECEIVED FROM AN

13  EXTERNAL SOURCE, RIGHT?

14  **A.**  THAT'S RIGHT.

15  **Q.**  AND YOUR UNDERSTANDING IS THAT THE COURT'S CONSTRUCTION

16  REQUIRES A PERMISSION IS UNIQUELY LOCKED TO THE CLIENT, RIGHT?

17  **A.**  THAT'S CORRECT.

18  **Q.**  AND SO PRESUMABLY YOU ARE INTENDING TO CONVEY HERE THAT

19  FLASH HAS A PERMISSION OR A KEY THAT IS UNIQUELY LOCKED TO THE

20  CLIENT, RIGHT?

21  **A.**  THAT'S RIGHT.

22  **Q.**  AND IT'S TRUE THAT THAT KEY THAT YOU ARE POINTING TO IS

23  ACTUALLY LOCKED TO THE CLIENT AT A SERVER, RIGHT?

24  **A.**  SO THERE'S TWO STEPS OF LOCKING.  SO FIRST IS LIKE THE KEY

25  IS DECRYPTED AT THE CLIENT.  AFTER BEING, YOU KNOW, ENCRYPTED

1    AT THE SERVER, IT IS DECRYPTED AT THE CLIENT.  AND THEN,

2    IT'S –– THEN THE CLIENT CAN VIEW THE SOFTWARE, CORRECT.

3    **Q.**  SO FAIR ENOUGH.  BUT MY QUESTION WAS:  THE LOCKING TO THE

4    CLIENT –– AND YOU CAN LOOK AT THIS DOCUMENT IF YOU NEED TO ––

5    BUT THE LOCKING AT THE CLIENT ACTUALLY IS DONE AT THE SERVER,

6    RIGHT?

7    **A.**  YES.

8    **Q.**  AND YOU UNDERSTAND THAT IN THE FLASH PLATFORM OR THE FLASH

9    ACCESS PLATFORM A KEY CAN ACTUALLY BE LOCKED TO A DOMAIN,

10   RIGHT?

11   **A.**  THAT'S CORRECT.  THAT IS ANOTHER POSSIBILITY.

12   **Q.**  AND DOMAINS WOULD BE MULTIPLE DIFFERENT USERS OR DEVICES?

13   **A.**  THAT'S ONE USE OF FLASH ACCESS, CORRECT.

14   **Q.**  THERE IS ALSO A USE OF FLASH ACCESS WHERE THE KEY IS

15   ACTUALLY NOT LOCKED TO A DEVICE AT ALL, RIGHT?

16   **A.**  YOU'RE TALKING ABOUT A LICENSE THAT IS JUST COMPLETELY

17   OPEN.

18   **Q.**  YES.

19   **A.**  I SUPPOSE IT CAN BE USED THAT WAY.

20   **Q.**  SO JUST SO WE ARE CLEAR, WITH RESPECT TO FLASH ACCESS,

21   THERE ARE INSTANCES IN WHICH A KEY, THE THING THAT YOU POINT

22   TO AS THE PERMISSION, IS NOT UNIQUELY LOCKED TO THE CLIENT

23   BECAUSE IT IS LOCKED TO MULTIPLE CLIENTS OR DEVICES, RIGHT?

24   **A.**  THAT'S RIGHT, YES.

25   **Q.**  AND THERE ARE INSTANCES WHERE IT IS NOT UNIQUELY LOCKED TO

1  THE CLIENT BECAUSE IT'S NOT LOCKED AT ALL, RIGHT?

2  **A.**  CORRECT.  YES.

3  **Q.**  NOW, WITH RESPECT TO ALM, THE LOCKING OF THE E-LICENSE TO

4  A CLIENT THAT YOU POINTED TO --

5  **A.**  SO CAN I BE CLEAR ABOUT SOMETHING HERE?

6  **Q.**  MR. DEVANBU -- I AM SORRY -- DR. DEVANBU?

7  **A.**  I WANT --

8       **THE COURT:**  SORRY.  I'M AFRAID THAT ISN'T POSSIBLE.

9  WE NEED TO MOVE ON TO ANOTHER QUESTION.

10      **THE WITNESS:**  OKAY.

11      **MS. MEHTA:**  THANK YOU.

12      **THE COURT:**  IF THE ATTORNEY WHO CALLED YOU FEELS

13 SOMETHING NEEDS TO BE EXPLAINED WE WILL BE SURE TO ASK YOU

14 ABOUT THAT.

15      **THE WITNESS:**  OKAY.

16 **BY MS. MEHTA:**

17 **Q.**  NOW, I JUST WANT TO TURN TO THIS CONCEPT UNIQUELY LOCKING

18 FOR THE ALM FOR A MOMENT.

19 **A.**  YES.  OKAY.

20 **Q.**  THE LICENSE THAT IS RECEIVED FROM THE SERVER, THE LOCKING

21 THAT YOU'RE POINTING TO THAT IS DONE AT THE SERVER, RIGHT?

22 **A.**  SO, IN THE CASE OF ALM, THERE'S THE FLEX LM PACKAGE WHICH

23 ACTUALLY DOES THE ENCODING AND DECODING OF THE INFORMATION

24 THAT'S IN THE LICENSE.  AND I --

25 **Q.**  SO --

1    **A.**  SORRY.  GO AHEAD.

2    **Q.**  I WANT TO FOCUS IN ON THE E-LICENSE YOU POINTED TO.

3          **MS. MEHTA:**  MR. BONINI, IF YOU COULD PULL UP DI14 --

4    I AM SORRY -- DI44.

5    **BY MS. MEHTA**

6    **Q.**  IN DI44, YOU ARE -- THIS IS WHAT YOU -- THIS IS WHAT YOU

7    ARE POINTING TO, RIGHT?

8    **A.**  RIGHT.

9    **Q.**  AND YOU ACTUALLY WERE POINTING TO THE E-LICENSE THAT COMES

10   OVER FROM THE SERVER AS THE THING THAT COMES FROM THE SERVER

11   TO THE CLIENT, RIGHT?

12   **A.**  RIGHT.

13   **Q.**  THAT IS ACTUALLY LOCKED TO THE CLIENT WHEN IT LEAVES THE

14   SERVER, RIGHT?

15   **A.**  IT DEPENDS UPON HOW FLEX ACTION RESPONDS WORKS.  I WASN'T

16   PROVIDED THE SOURCE CODE FOR FLEX.  SO THE FLEX MAY BE, IN

17   FACT, USING A SYMMETRIC PROCESS WHERE THE KEY THAT'S USED AT

18   THE CLIENT AND THE SERVER ARE DIFFERENT.

19        SO IN ANY LICENSING MECHANISM THERE MAY BE LOCKING KIND OF

20   GOING ON AT THE CLIENT AND UNLOCKING GOING ON AT THE SERVER.

21   AND IT DEPENDS UPON WHICH KIND OF ENCRYPTION SCHEME IS USED.

22   **Q.**  RIGHT.  SO FOR ADOBE ACTIVATION LICENSING, ALM, YOU

23   ACTUALLY DON'T KNOW WHERE THE UNIQUE LOCKING TO THE CLIENT

24   HAPPENS AT ALL, RIGHT?

25   **A.**  I DON'T KNOW WHAT KIND OF ENCRYPTION IS BEING USED THERE.

1    **Q.**  AND YOU SAID THAT THIS FLEX ACTION RESPONSE CODE WASN'T

2    AVAILABLE TO YOU.  YOU KNOW THAT THAT'S CODE ACTUALLY PROVIDED

3    BY A COMPANY CALLED "MACROVISION," RIGHT?

4    **A.**  CORRECT.

5    **Q.**  THAT IS PROPRIETARY MACROVISION TECHNOLOGY?

6    **A.**  CORRECT.

7    **Q.**  NOW, WITH RESPECT TO LIVECYCLE, SAME QUESTION:  THE THING

8    THAT YOU POINT TO AS THE TOKEN OR THE KEY THAT COMES OVER FROM

9    THE SERVER, THAT IS ACTUALLY LOCKED TO THE CLIENT AT THE

10   SERVER, RIGHT, BEFORE IT LEAVES THE SERVER, CORRECT?

11   **A.**  RIGHT.  BUT THE PERMISSION --

12   **Q.**  IF YOU CAN JUST FOCUS IN ON MY QUESTION.

13   **A.**  OKAY.

14   **Q.**  THANK YOU.

15       NOW, I'M GOING TO HONE IN SOME MORE ON THE CONCEPT OF

16   TOKEN AND PERMISSION WITH RESPECT TO FLASH.

17   **A.**  OKAY.

18   **Q.**  AND WITH RESPECT TO FLASH, YOU POINTED TO THE CEK, OR

19   CONTENT ENCRYPTION KEY, WITHIN THE DRM METADATA AS THE

20   PERMISSION, RIGHT?

21   **A.**  CORRECT.  YES.

22   **Q.**  AND AS YOU APPLIED YOUR INFRINGEMENT ANALYSIS TO THE FLASH

23   PLATFORM, THE KEY THAT'S IN THE DRM METADATA IS ACTUALLY

24   GENERATED AT THE SERVER, AND THEN PASSED TO THE CLIENT,

25   CORRECT?

1   **A.**  RIGHT.  IT IS GENERATED AT THE SERVER AND PASSED TO THE

2   CLIENT IN ENCRYPTED FORM, AND IT IS REGENERATED AT THE CLIENT.

3   **Q.**  RIGHT.  BUT THE KEY, THE CEK THAT YOU ARE POINTING TO AS

4   THE PERMISSION, IT EXISTS AND WAS CREATED OR GENERATED AT THE

5   SERVER?

6   **A.**  YES.  IT IS REGENERATED AT THE CLIENT.

7   **Q.**  WELL, IT IS NOT REGENERATED.  IT IS DECRYPTED AND STORED.

8   **A.**  WELL, THE THING IS THE LOCKING --

9   **Q.**  DR. DEVANBU?

10  **A.**  I'M TRYING TO ANSWER IT.

11  **Q.**  HOLD ON JUST ONE SECOND.

12  **A.**  OKAY.

13  **Q.**  OKAY?  I WANT TO BE VERY CLEAR ABOUT WHAT THE QUESTION IS.

14  MAYBE I WILL ASK IT THIS WAY:  YOU AGREE THAT THE KEY, THE

15  CEK, EXISTS AT THE SERVER BEFORE IT LEAVES THE SERVER.

16  **A.**  YES.

17  **Q.**  LIVECYCLE.

18  **A.**  OKAY.

19  **Q.**  WITH RESPECT TO LIVECYCLE -- AND, AGAIN, HONING IN ON

20  THESE CONCEPTS OF PERMISSIONS -- YOUR UNDERSTANDING OF THE

21  CLAIM IS THAT IT REQUIRES THAT THE CLIENT CHECK LOCALLY TO SEE

22  IF A PRE-EXISTING PERMISSION EXISTS, RIGHT?

23  **A.**  RIGHT.

24  **Q.**  AND IF THERE IS NO PERMISSION, THEN AS REQUIRED BY CLAIM 1

25  OF THE '541, YOU WOULD HAVE TO REQUEST THE PERMISSION FROM THE

1    SERVER, CORRECT?

2    **A.**   CORRECT.

3    **Q.**   AND YOUR OPINION IS THAT THE SERVER WOULDN'T BE CONTACTED

4    IF THE PERMISSION IS ALREADY AVAILABLE TO THE CLIENT, RIGHT?

5    **A.**   YES.  IF IT'S AVAILABLE IN A CACHE IT DOESN'T HAVE ASK THE

6    SERVER.

7    **Q.**   I WANT YOU TO ASSUME SOMETHING FOR ME, A HYPOTHETICAL, IF

8    YOU WILL.

9         IF YOU ASSUME THAT IN THE LIVECYCLE SYSTEM THE APPLICATION

10   ALWAYS ATTEMPTS TO COMMUNICATE WITH THE SERVER, EVEN IF IT

11   ALREADY HAS A PERMISSION, THEN YOU WOULD AGREE THAT THAT

12   LIMITATION IS NOT MET, RIGHT?

13            **MR. DINOVO:**  I'LL OBJECT THAT THAT IS AN INCOMPLETE

14   HYPOTHETICAL, YOUR HONOR.  SHE IS NOT SAYING WHEN THE SYSTEM

15   ATTEMPTS TO ACCESS THE SERVER.

16            **THE COURT:**  OVERRULED.

17            **THE WITNESS:**  SO, IF THE SYSTEM WERE TO CONTACT THE

18   SERVER BEFORE IT CHECKED THE CACHE, WHICH IT DOES, THEN YOU'RE

19   CORRECT.

20   **BY MS. MEHTA:**

21   **Q.**   AND IF IT -- ACTUALLY, LET ME MOVE ON.

22        NOW, THERE'S ALSO IN THE PATENT THE REQUIREMENT OF SENDING

23   AND RECEIVING INFORMATION, RIGHT?

24   **A.**   RIGHT.

25   **Q.**   AND SO I ASSUME YOU'LL AGREE WITH ME THAT WHERE A DEVICE

DEVANBU – CROSS / MEHTA

1    IS OFFLINE, IT CAN'T SEND OR RECEIVE, CORRECT?

2    **A.**  CORRECT.

3    **Q.**  OKAY.  LET'S TALK A LITTLE BIT ABOUT THE GENERATION OF

4    WHAT YOU SAY IS THE PERMISSION IN THE LIVECYCLE SYSTEM.

5    **A.**  OKAY.

6    **Q.**  SO, IN YOUR APPLICATION OF CLAIM 1 OF THE '541 PATENT TO

7    LIVECYCLE, THE INFORMATION THAT YOU POINT TO AS THE PERMISSION

8    THAT'S ACTUALLY CREATED OR GENERATED AT THE SERVER, AND THEN

9    PASSED TO THE CLIENT, CORRECT?

10   **A.**  IT IS REGENERATED TO THE CLIENT, BECAUSE IF YOU SEND THE

11   KEY OR THE PERMISSION IN THE CLEAR, WITHOUT ENCRYPTING IT IN

12   SOME FORM, THEN IT CAN BE STOLEN.

13   **Q.**  SO, DO YOU DENY THAT THE THING THAT YOU POINT TO AS THE

14   PERMISSION IS ACTUALLY GENERATED AT THE CLIENT?

15   **A.**  THE KEY THAT IS GENERATED AT THE CLIENT?  I AM SORRY.  CAN

16   YOU ASK ME WHAT I'M DENYING AGAIN?

17   **Q.**  YES.  LET ME ASK YOU THE QUESTION AGAIN AND WE WILL SEE

18   WHAT YOUR ANSWER IS.

19       SO WITH RESPECT TO LIVECYCLE, YOU ARE POINTING TO THE

20   VOUCHER AS THE THING THAT GOES FROM THE SERVER TO THE CLIENT,

21   RIGHT?

22   **A.**  YES.

23   **Q.**  THAT'S THE PERMISSION, RIGHT?

24   **A.**  THAT'S THE TOKEN, AND THE PERMISSION IS GENERATED FROM THE

25   TOKEN.

DEVANBU – CROSS / MEHTA

1   Q.  THE PERMISSION IS ACTUALLY SOMETHING THAT'S WITHIN THE

2   VOUCHER?

3   A.  YES, IN ENCRYPTED FORM.

4   Q.  AND THE ENCRYPTED THING THAT'S WITHIN THE VOUCHER, THAT'S

5   ACTUALLY -- THAT EXISTS AT THE SERVER BEFORE THE VOUCHER IS

6   SENT, CORRECT?

7   A.  RIGHT, AND IT IS REGENERATED TO THE CLIENT.

8   Q.  NOW, WHEN YOU SAY SOMETHING IS REGENERATED TO THE

9   CLIENT -- I'M FOCUSING IN AGAIN ON LIVECYCLE -- YOU ARE

10  ACTUALLY JUST TALKING ABOUT DECRYPTING IT, RIGHT?

11  A.  CORRECT.

12  Q.  SO THE ACTUALLY INFORMATION THAT'S THE KEY THAT YOU'RE

13  POINTING TO WITHIN THAT VOUCHER, THAT INFORMATION EXISTED AT

14  THE SERVER.  IT WAS SIMPLY ENCRYPTED.

15  A.  YES.

16  Q.  SO, THE ENCRYPTED KEY THAT YOU POINT TO AS THE PERMISSION

17  EXISTED AT THE SERVER.

18  A.  RIGHT.

19  Q.  BEFORE THE VOUCHER WAS TRANSMITTED TO THE CLIENT.

20  A.  RIGHT.

21  Q.  SAME QUESTIONS.  I'M GOING TO FOCUS ON THE ALM PRODUCTS

22  NOW.

23      SO IN THE ALM PRODUCTS, THE THING THAT YOU POINT TO AS THE

24  PERMISSION IS THE E-LICENSE, RIGHT?

25  A.  RIGHT.

1    **Q.**  AND THE E-LICENSE, THAT IS GENERATED AT THE SERVER?

2    **A.**  CORRECT.

3    **Q.**  AND IT'S THEN PASSED TO THE CLIENT?

4    **A.**  CORRECT.

5    **Q.**  ALL RIGHT.  LET'S TURN TO THE '670 PATENT.

6    **A.**  OKAY.

7    **Q.**  IN THE '670 PATENT, LET'S FOCUS ON CLAIM 45.

8    **A.**  OKAY.

9    **Q.**  CLAIM 45 REQUIRES UNDER YOUR INFRINGEMENT THEORY MULTIPLE

10   DIFFERENT ACTORS TO PERFORM THE STEPS OF THE CLAIM, CORRECT?

11   **A.**  CAN I HAVE A LOOK AT THE CLAIM TO MAKE SURE I AM NOT

12   MISSING ANYTHING HERE?

13   **Q.**  SURE.  DO YOU HAVE IT IN FRONT OF YOU?

14   **A.**  WHICH VOLUME?  THERE'S THREE VOLUMES HERE.

15         **MS. MEHTA:**  HOW ABOUT IF I DO THIS?

16      MR. BONINI, CAN YOU PLEASE PUT UP PX3?  AND LET'S PUT

17   CLAIM 45 ON THE SCREEN.

18   **BY MS. MEHTA**

19   **Q.**  DO YOU HAVE THAT?

20   **A.**  I'VE GOT IT.

21   **Q.**  UNDER YOUR INFRINGEMENT THEORY, DR. DEVANBU, CLAIM 45

22   REQUIRES MULTIPLE DIFFERENT ACTORS TO PERFORM THE STEPS OF THE

23   CLAIM, CORRECT?

24   **A.**  WHAT DO YOU MEAN BY "ACTORS"?

25   **Q.**  DIFFERENT ENTITIES OR PEOPLE.

1    **A.**  SAME COMPANY.  IT WOULD HAVE TO BE THE SAME COMPANY,

2    BECAUSE IT WOULD HAVE TO BE IN ONE TRUST DOMAIN.

3    **Q.**  I'M GOING TO READ FROM YOUR DEPOSITION, AT PAGE 672, AT

4    LINE 9 THROUGH 12.

5        THE QUESTION WAS:

6        "WITH RESPECT TO CLAIM 45, THERE ARE MULTIPLE DIFFERENT

7    ACTORS THAT PERFORM THE STEPS OF CLAIM 45 UNDER YOUR

8    INFRINGEMENT THEORY, CORRECT?"

9        AND THE ANSWER WAS:

10        "YES."

11        THAT WAS YOUR TESTIMONY, RIGHT?

12    **A.**  I AM SORRY.  WHICH LINE NUMBER WAS IT AGAIN?

13            **THE COURT:**  IT DOESN'T MATTER.  IT CLEARLY WAS HIS

14    TESTIMONY, SO WE DON'T NEED HIM TO SAY IT WAS.

15    **BY MS. MEHTA:**

16    **Q.**  WITH RESPECT TO THE '670 PATENT --

17    **A.**  OKAY.

18    **Q.**  -- I'M GOING TO TALK A LITTLE BIT ABOUT FIRST THE

19    INSTALLER FILE.

20    **A.**  OKAY.

21    **Q.**  YOU UNDERSTAND THAT WITH RESPECT TO THE ALM PRODUCTS, OR

22    ACTIVATION PRODUCTS, YOUR INFRINGEMENT THEORY IS BASED ON AN

23    INSTALLER FILE THAT CAN BE DOWNLOADED FROM ADOBE'S WEBSITE,

24    RIGHT?

25    **A.**  NO.  IT CAN BE MY GIVING THE SOFTWARE TO SOMEBODY ELSE ON

1    A USB STICK.

2    Q.  LET'S LOOK AT DI64.

3        SO THIS IS YOUR SLIDE FOR ADOBE ACTIVATION FOR CLAIM 45,

4    RIGHT?

5    A.  SURE.

6    Q.  WHAT YOU ARE POINTING OUT HERE IS THE ADOBE DOWNLOADS PAGE

7    ON THE WEBSITE?

8    A.  YES.

9    Q.  AND YOU'RE SAYING THAT THE FILES ARE CREATED BY ADOBE?

10   A.  YES.

11   Q.  AND THEN, THEY ARE TRANSMITTED BY ADOBE VIA THE WEB,

12   RIGHT?

13   A.  RIGHT.

14   Q.  SO YOUR INFRINGEMENT THEORY THAT YOU PRESENTED ON DIRECT

15   EXAMINATION FOR ALM FOR CLAIM 45 WAS THE DOWNLOADING OF FILES

16   FROM ADOBE ON THE INTERNET, RIGHT?

17   A.  WE DISCUSSED OTHER POSSIBILITIES, AS WELL.  IN THE SLIDES

18   WE TALKED ABOUT DISTRIBUTING IT THROUGH EMAIL.

19   Q.  SURE.  BUT I WANT TO FOCUS ON THIS INFRINGEMENT THEORY.

20   AND THE RECORD WILL REFLECT WHETHER YOU DID THAT OR NOT.  BUT

21   WITH RESPECT TO THIS INFRINGEMENT THEORY --

22   A.  OKAY.

23   Q.  -- THE THING THAT YOU'RE SUGGESTING, THE FILE THAT YOU'RE

24   SUGGESTING IS CREATED --

25   A.  UH-HUH.

DEVANBU – CROSS / MEHTA

1  **Q.**  -- AND DOWNLOADED --

2  **A.**  UH-HUH.

3  **Q.**  -- THAT FILE IS AN INSTALLER FILE, RIGHT?

4  **A.**  YES.

5  **Q.**  AND YOU AGREE THAT THE INSTALLER FILE DOESN'T ACTUALLY

6  HAVE ANY DRM ON IT AT ALL, RIGHT?

7  **A.**  NO.

8  **Q.**  IS THAT CORRECT OR --

9  **A.**  CORRECT.

10  **Q.**  AND YOU'LL ALSO AGREE THAT THERE ARE SITUATIONS IN WHICH

11  THE INSTALLER FILE THAT YOU POINTED TO THAT'S DOWNLOADED HAS

12  APPLICATION INSTRUCTIONS, BUT NOT THE SOFTWARE OR ELECTRONIC

13  CONTENT, CORRECT?

14  **A.**  INSTALLER FILES' CONTENT ARE NOT KNOWN.  IT COULD BE

15  ANYTHING.

16  **Q.**  SO YOU DON'T KNOW -- OR, ACTUALLY, LET ME PHRASE IT A

17  LITTLE BIT DIFFERENTLY.

18  YOUR TESTIMONY -- ACTUALLY, I WILL DO IT EVEN MORE

19  CLEARLY.

20  YOU ARE NOT TESTIFYING THAT THE INSTALLER FILE THAT'S

21  BEING DOWNLOADED FROM THE WEBSITE HAS THE ELECTRONIC CONTENT

22  OF THE SOFTWARE, RIGHT?

23  **A.**  SO, THE INSTALLER FILE MAY RESULT IN ADDITIONAL FILES

24  BEING TRANSMITTED.  SO WHEN YOU RUN THE INSTALLER YOU MAY GET

25  ADDITIONAL FILES THAT ARE TRANSMITTED.

DEVANBU – CROSS / MEHTA

1    **Q.**  SO THE --

2                        (SIMULTANEOUS COLLOQUY.)

3    **A.**  SO, ACTUALLY, LET ME FINISH MY ANSWER.  WHEN EVERYTHING IS

4    INSTALLED AND YOU TRY TO RUN IT, YOU WILL GO THROUGH THE DRM

5    REGIME.

6    **Q.**  OKAY.  BUT I DON'T WANT TO FOCUS ON WHAT HAPPENS ONCE THE

7    SOFTWARE GETS TO THE CLIENT, OKAY?  PUT THAT OUT OF YOUR MIND

8    FOR A MOMENT.

9        WHAT I WANT TO HONE IN ON IS WHAT YOU WERE DESCRIBING IN

10   YOUR DIRECT EXAMINATION DURING THE SLIDE, WHICH IS THE PROCESS

11   OF CREATING AND DOWNLOADING THE FILE.  ARE YOU WITH ME?

12   **A.**  YES.

13   **Q.**  IN THE PROCESS OF CREATING AND DOWNLOADING THE FILE FOR

14   THE ALM PRODUCTS, YOU WILL AGREE THAT THERE IS NO DRM FOR THE

15   INSTALLER FILE, RIGHT?

16   **A.**  RIGHT.

17   **Q.**  AND YOU WILL AGREE THAT THE INSTALLER FILE DOES NOT

18   NECESSARILY HAVE IN IT THE ELECTRONIC CONTENT.  RIGHT?

19   **A.**  YES.  WE DON'T KNOW WHAT'S IN THERE.  RIGHT.

20   **Q.**  AND WHEN YOU REACHED YOUR CONCLUSION OF INFRINGEMENT, YOU

21   ACTUALLY DIDN'T IDENTITY ANY SITUATION IN WHICH SOMEBODY

22   DOWNLOADS AN INSTALLER FILE THAT HAS BOTH THE CONTENT AND THE

23   EXECUTABLE INSTRUCTIONS IN IT --

24   **A.**  CORRECT.

25   **Q.**  -- RIGHT?

1    **A.**  CORRECT.

2    **Q.**  NOW, YOU MENTIONED EARLIER THAT YOU, ON DIRECT

3    EXAMINATION, TALKED ABOUT A SITUATION IN WHICH SOFTWARE MIGHT

4    BE PASSED FROM ONE USER TO ANOTHER ON A THUMB DRIVE, FOR

5    EXAMPLE?

6    **A.**  CORRECT.

7    **Q.**  NOW, YOU HAVEN'T OFFERED ANY OPINION AS TO WHETHER IN THAT

8    HYPOTHETICAL THE THING THAT'S BEING PASSED IS THE INSTALLER

9    FILES OR THE ACTUAL UNDERLYING SOFTWARE CONTENT, RIGHT?  YOU

10   JUST DON'T KNOW THAT?

11   **A.**  I DON'T KNOW WHAT PEOPLE MIGHT DO.  BUT IF THEY WERE TO

12   DISTRIBUTE THE COPY, THE EXECUTABLE FROM THEIR LAPTOP TO A USB

13   DISK, OR SOMETHING LIKE THAT, AND GIVE IT TO THEIR FRIEND,

14   THEN THE DRM WOULD PROTECT THE SOFTWARE.

15   **Q.**  BUT YOU DON'T KNOW THAT THAT HAPPENS.

16   **A.**  I THINK PEOPLE DO TRY TO PIRATE SOFTWARE.

17   **Q.**  THAT IS NOT MY QUESTION.  YOU HAVE NOT IDENTIFIED ANY

18   INSTANCE IN WHICH ANYONE HAS TAKEN ALL OF THE DIFFERENT FILES

19   THAT CAN BE INSTALLED ON THE COMPUTER AFTER THE INSTALLATION

20   PROCESS, GATHERED THEM UP, PUT THEM ON A THUMB DRIVE AND THEN

21   TAKEN THEM TO SOMEONE ELSE, RIGHT?  YOU DON'T HAVE AN INSTANCE

22   OF THAT THAT YOU CAN POINT TO.

23   **A.**  SO THE PREMISE OF YOUR QUESTION IS THAT THE FILES ARE

24   SCATTERED ALL OVER THE PLACE, THEY ARE NOT.  THEY ARE IN A

25   SINGLE FOLDER.  IN MANY OPERATING SYSTEMS YOU CAN JUST COPY

1    THAT FOLDER IN.

2    Q.  ALL RIGHT.  FAIR ENOUGH.  YOU HAVE NOT OFFERED ON DIRECT

3    EXAMINATION OR IN YOUR REPORT OR ANYWHERE IN THIS CASE ANY

4    OPINION THAT ANYBODY OR ANY INSTANCE IN WHICH ANYBODY HAS EVER

5    TAKEN A FOLDER FROM THEIR LAPTOP WITH ALL THE FILES THAT ARE

6    REQUIRED FOR THE ELECTRONIC CONTENT AND PASSED THAT TO SOMEONE

7    ELSE, RIGHT? YOU HAVE NOT OFFERED THAT OPINION?

8    A.  I HAVE -- I CAN'T SAY THAT I COULD LIKE TO ACCUSE ANYBODY

9    OF SOFTWARE PIRACY.

10   Q.  LET'S TALK ABOUT THE ALM PRODUCT WITH RESPECT TO THE

11   SUCCESSIVE RECIPIENT LIMITATION.

12   A.  OKAY.

13   Q.  NOW, IN THE CASE WHERE YOU ARE RECEIVING THE INSTALLER

14   FILE --

15          MS. MEHTA:  STRIKE THAT.  LET ME MOVE ON TO SOMETHING

16   ELSE.

17   BY MS. MEHTA

18   Q.  I WANT TO TURN TO THE UNTIL LIMITATION.

19   A.  OKAY.

20   Q.  YOU'RE FAMILIAR WITH THAT LIMITATION?

21   A.  YES.

22   Q.  AND YOUR UNDERSTANDING IS THAT THE CLAIM REQUIRES THAT THE

23   ACCESS TO THE ELECTRONIC CONTENT BE DENIED UNTIL THE

24   INFORMATION IS SUCCESSFULLY TRANSMITTED, CORRECT?

25   A.  CORRECT.

1    **Q.**   NOW, IN THE LIVECYCLE SYSTEM --

2    **A.**   RIGHT.

3    **Q.**   -- ENCRYPTED DOCUMENTS CANNOT BE OPENED UNTIL THE CLIENT

4    RECEIVES A VOUCHER FROM THE SERVER, CORRECT?

5    **A.**   CORRECT.

6    **Q.**   SO, IF SOMEBODY IS A USER, AND THEY WANT TO OPEN A

7    DOCUMENT THAT'S ON THE LIVECYCLE SYSTEM, THEY WOULD CONTINUE

8    TO BE DENIED ACCESS EVEN AFTER THE TRANSMISSION INFORMATION IS

9    SENT UNLESS AND UNTIL THEY GET A VALID VOUCHER BACK.

10   **A.**   YES.  FROM THE TIME BETWEEN THE TRANSMISSION OF THE

11   REQUEST AND THE RECEPTION OF THE ACCESS, ACCESS WOULD STILL BE

12   DENIED.

13   **Q.**   OKAY.

14   **A.**   BUT IT IS DENIED UNTIL IT IS TRANSMITTED.

15   **Q.**   SO, IN OTHER WORDS, WHETHER OR NOT THE USER IS GOING TO

16   HAVE ACCESS TO THE CONTENT IS NOT DEPENDENT ON THE

17   TRANSMISSION OF THE INFORMATION, IT'S DEPENDENT ON RECEIVING A

18   VALID VOUCHER BACK, RIGHT?

19   **A.**   IF THE TRANSMISSION FAILS, FOR WHATEVER REASON, AND THE

20   USER TRIES TO BLOCK THE TRANSMISSION, ACCESS WOULD BE DENIED.

21   **Q.**   SO THAT IS ONE EXAMPLE WHERE ACCESS MIGHT BE DENIED?

22   **A.**   RIGHT.

23   **Q.**   BUT ANOTHER EXAMPLE WHERE ACCESS MIGHT BE DENIED IS A

24   SUCCESSFUL TRANSMISSION, BUT A VOUCHER THAT COMES BACK THAT IS

25   NOT VALID.

```
1    A.   BOTH SCENARIOS ARE POSSIBLE, YES.

2    Q.   SO MERELY SENDING A REQUEST FOR A VOUCHER IS NOT ENOUGH.

3    A.   ENOUGH FOR WHAT?

4    Q.   TO RECEIVE ACCESS TO THE CONTENT.

5    A.   IT'S ENOUGH TO BE -- NOT SENDING IS ENOUGH TO BE DENIED.

6    Q.   WELL, I WANT TO PUT IT A LITTLE BIT DIFFERENTLY.  I WANT

7    TO UNDERSTAND WHAT IT IS THAT TRIGGERS THE ACCESS TO THE

8    CONTENT.

9    A.   OKAY.

10   Q.   THE ACCESS TO THE CONTENT IN THE LIVECYCLE SYSTEM IS

11   TRIGGERED BY THE RECEIPT OF INFORMATION BACK FROM THE SERVER,

12   NOT JUST THE SENDING OF THE REQUEST, CORRECT?

13   A.   RIGHT.

14   Q.   THE SAME IS TRUE FOR ALM, CORRECT?  FOR ALM YOU NEED TO

15   SEND OUT THE NOTIFICATION INFORMATION AND RECEIVE A VALID

16   E-LICENSE BACK IN ORDER TO ACCESS CONTENT.

17   A.   FOR ACCESS, YES.

18   Q.   AND ACCESS WILL CONTINUE TO BE DENIED UNTIL YOU RECEIVE

19   BACK FROM THE SERVER A VALID E-LICENSE, CORRECT?

20   A.   RIGHT.

21   Q.   WE ARE TALKING ABOUT ALM RIGHT NOW, SO I WANT TO TALK

22   ABOUT ANOTHER ASPECT OF ALM THAT IS RELEVANT TO THE '670

23   PATENT.  AND THAT IS A FEATURE CALLED "TRY AND BUY."  ARE YOU

24   FAMILIAR WITH THAT?

25   A.   YES.
```

1    **Q.**  AND YOU UNDERSTAND THAT ADOBE PRODUCTS USE OR INCLUDE A

2    TRY AND BUY FEATURE, RIGHT?

3    **A.**  CORRECT.

4    **Q.**  AND TRY AND BUY IS A 30-DAY PERIOD WHERE A USER CAN ACCESS

5    ADOBE SOFTWARE WITHOUT PAYING, RIGHT?

6    **A.**  RIGHT.

7    **Q.**  NOW, YOU -- IN FORMING YOUR OPINIONS IN THE CASE, YOU

8    DIDN'T QUANTIFY HOW MANY USERS ACTUALLY ACTIVATE ADOBE

9    SOFTWARE AFTER THE 30-DAY TRY AND BUY PERIOD IS DONE, RIGHT?

10   **A.**  I THINK ANYONE WHO PAYS ADOBE WILL ACTIVATE IT.

11   **Q.**  YOU DON'T KNOW HOW MANY USERS DO THAT.

12   **A.**  HOW MANY USERS GIVE ADOBE MONEY FOR THEIR SOFTWARE?

13   **Q.**  RIGHT.

14   **A.**  I DON'T KNOW.

15   **Q.**  AND DURING THE TRY AND BUY PERIOD YOU GET 30 DAYS OF

16   UNRESTRICTED ACCESS TO THE SOFTWARE BEFORE YOU ARE DENIED THAT

17   ACCESS, RIGHT?

18   **A.**  I HAVEN'T -- DON'T KNOW WHAT THE RULES ARE FOR DIFFERENT

19   PRODUCTS.  I DON'T KNOW ABOUT WHAT FEATURES ARE ALLOWED UNTIL

20   THE -- 30-DAY PERIOD EXPIRES.

21   **Q.**  IS IT FAIR TO SAY YOU CAN'T IDENTIFY ANY FEATURES IN ADOBE

22   SOFTWARE THAT ARE UNAVAILABLE DURING THAT 30-DAY PERIOD?

23   **A.**  I DON'T KNOW.

24   **Q.**  SO YOU CANNOT OFFER AN OPINION, THEN -- LET ME REPHRASE IT

25   DIFFERENTLY.  YOU ARE NOT OFFERING AN OPINION, THEN, THAT IN

1    THE ALM CONTEXT WITHIN THE FIRST 30 DAYS ACCESS IS DENIED,

2    RIGHT?  YOU JUST DON'T KNOW.

3    **A.**  NO.

4    **Q.**  IS THAT CORRECT?

5    **A.**  CORRECT.

6    **Q.**  NOW, IN THAT FIRST 30 DAYS DURING THE TRY AND BUY, IT'S

7    TRUE THAT THE APPLICATION THAT YOU'RE DOWNLOADING FROM THE

8    ADOBE WEBSITE WILL BE USABLE EVEN WITHOUT TRANSMITTING WHAT

9    YOU CALL "NOTIFICATION INFORMATION" TO THE SERVER AND

10   RECEIVING A RESPONSE BACK, RIGHT?

11   **A.**  CORRECT.

12   **Q.**  BEAR WITH ME FOR JUST ONE SECOND.

13                    (PAUSE IN THE PROCEEDINGS.)

14   **BY MS. MEHTA:**

15   **Q.**  DR. DEVANBU, I WOULD LIKE TO TURN TO OR TURN BACK TO THE

16   LIVECYCLE PRODUCT FOR A FEW MINUTES.

17   **A.**  OKAY.

18   **Q.**  AND, IN PARTICULAR, I WOULD LIKE TO TALK ABOUT THE

19   LIVECYCLE PRODUCTS WITH RESPECT TO THE '670 PRODUCT.

20       ACTUALLY, YOU KNOW WHAT?  LET ME FOCUS ON '541.  I

21   APOLOGIZE.  LIVECYCLE FOR THE '541.

22       FOR THE '541 PATENT YOU ADDRESSED BOTH THE ONLINE AND THE

23   OFFLINE VERSIONS OF LIVECYCLE, CORRECT?

24   **A.**  CORRECT.

25   **Q.**  AND I'M GOING TO PULL UP YOUR SLIDES HERE BECAUSE I WANT

```
 1    TO UNDERSTAND WHAT YOUR ANALYSIS WAS.

 2         SO WITH RESPECT TO --

 3              MS. MEHTA:  LET'S PULL UP, IF YOU WOULD, MR. BONINI,

 4    DI91.

 5    BY MS. MEHTA

 6    Q.  THIS IS ONE OF YOUR SLIDES ON THE LIVECYCLE, RIGHT?

 7    A.  THAT'S CORRECT.

 8    Q.  AND THIS IS IN THE SECTION THAT RELATES TO AN ACCESS

 9    CHECKING PROCEDURE, CORRECT?

10    A.  CORRECT.

11    Q.  AND WHAT YOU'RE POINTING TO HERE IS SOURCE CODE FOR ONLINE

12    ACCESS.

13    A.  CORRECT.

14    Q.  RIGHT?

15              MS. MEHTA:  AND THEN, I WOULD LIKE TO FAST FORWARD A

16    LITTLE BIT, MR. BONINI, TO DI103 WHERE YOU TALK ABOUT STEP

17    FOUR.

18    BY MS. MEHTA

19    Q.  DO YOU SEE THAT?

20    A.  YES.

21    Q.  AND THERE YOU HAVE EXCERPTED A DOCUMENT, RIGHT?

22    A.  CORRECT.

23    Q.  THAT IS THE DOCUMENT THAT YOU'RE RELYING ON TO SATISFY THE

24    LIMITATION THAT YOU HAVE HERE ON SLIDE DI103, THAT IS THE

25    BASED ON THE RECEIVED TOKEN, EXECUTING AN INSTALLATION PROCESS
```

1    THAT IS UNIQUELY LOCKED TO THE CLIENT.

2    **A.**  CORRECT.

3    **Q.**  THAT DOCUMENT THAT YOU'RE RELYING ON FOR THAT ELEMENT,

4    THAT ACTUALLY RELATES TO OFFLINE ACCESS.

5    **A.**  CORRECT.

6    **Q.**  NOW, YOU UNDERSTAND THAT WHEN A DOCUMENT IS OFFLINE, OR

7    WHEN A SYSTEM IS OFFLINE FOR LIVECYCLE, YOU CAN CONTINUE TO --

8    ACTUALLY, LET ME PHRASE IT A LITTLE BIT DIFFERENTLY.  TAKE A

9    STEP BACK.

10       A USER OF THE LIVECYCLE SYSTEM THAT IS OFFLINE CAN HAVE

11   ACCESS TO ELECTRONIC CONTENT.

12   **A.**  CORRECT.

13   **Q.**  AND WHEN THEY ARE OFFLINE AND ACCESSING ELECTRONIC

14   CONTENT, THAT WOULD BE DONE EVEN WHEN THE NOTIFICATION

15   INFORMATION IS NOT SENT, RIGHT?

16   **A.**  ACCESS WILL NOT BE GRANTED IF THE LEASE HAS EXPIRED.

17   **Q.**  THAT WASN'T MY QUESTION, DR. DEVANBU.  I WANT YOU TO FOCUS

18   IN ON MY QUESTION.

19       YOU'VE OFFERED AN OPINION OF INFRINGEMENT FOR LIVECYCLE

20   WHERE THE SYSTEM IS OFFLINE.

21   **A.**  CORRECT.

22   **Q.**  WHERE THE SYSTEM IS OFFLINE, YOU TESTIFIED EARLIER THAT

23   NOTIFICATION INFORMATION CAN'T BE TRANSMITTED, RIGHT?

24   **A.**  IF IT'S OFFLINE, YES.

25   **Q.**  AND YOU'LL AGREE WITH ME THAT A USER OF THE SYSTEM OFFLINE

1  CAN STILL ACCESS THE ELECTRONIC CONTENT.

2  **A.** THAT IS WHAT I WAS TRYING TO ANSWER. THEY CAN'T ACCESS IT

3  IF THE LEASE IS EXPIRED.

4  **Q.** YOU UNDERSTAND THAT THE WHOLE POINT -- I THINK YOU TALKED

5  ABOUT THIS ON DIRECT -- THE WHOLE POINT OF LIVECYCLE OFFLINE

6  ACCESS IS THAT PEOPLE CAN ACTUALLY USE DOCUMENTS WHEN THEY ARE

7  OFFLINE, RIGHT?

8  **A.** YES, THEY CAN. YES.

9  **Q.** AND IN ORDER TO DO THAT, THEY WOULD HAVE PERMISSIONS TO A

10 DOCUMENT THAT MIGHT BE STORED LOCALLY, RIGHT?

11 **A.** CORRECT.

12 **Q.** AND THAT MEANS THAT WHEN THAT USER IS SEEKING TO LOOK AT

13 THAT CONTENT, OR ACCESS THAT CONTENT, THEY WILL BE PERMITTED

14 TO ACCESS THE CONTENT EVEN WHEN THEY ARE NOT SENDING OUT

15 TRANSMISSION OR NOTIFICATION INFORMATION, CORRECT?

16 **A.** I'M JUST TRYING TO BE PRECISE. THEY CAN ACCESS IF THE

17 LEASE IS STILL VALID. IF THE LEASE IS INVALID -- IF THE LEASE

18 IS STILL VALID ON THE DOCUMENT. IF THE PERMISSION IS EXPIRED

19 THEY WILL NOT BE ABLE TO ACCESS IT.

20 **Q.** MAYBE I CAN REPHRASE THE QUESTION THIS WAY TO ADDRESS

21 THAT.

22     IN THE CASE OF SOMEBODY THAT IS OFFLINE WITH LIVECYCLE

23 ACCESSING CONTENT -- WELL, ACTUALLY, LET ME TAKE A STEP BACK

24 EVEN FURTHER AND MAKE THIS MORE PRECISE.

25     YOU'LL AGREE THAT LIVECYCLE IS INTENDED TO, IN YOUR VIEW,

1    ALLOW FOR OFFLINE ACCESS?

2    **A.**  YES.

3    **Q.**  AND SO IF IT'S INTENDED TO ALLOW FOR OFFLINE ACCESS, THEN

4    THERE ARE CIRCUMSTANCES IN WHICH THE INTENDED CIRCUMSTANCES,

5    IN FACT, IN WHICH A PERSON WILL HAVE A LEASE THAT'S VALID SO

6    THAT THEY CAN ACCESS CONTENT OFFLINE?

7    **A.**  CORRECT.

8    **Q.**  AND IN THOSE CIRCUMSTANCES, ACCESS TO THE CONTENT WILL NOT

9    BE DENIED BASED ON SENDING OR RECEIVING ANYTHING, RIGHT?

10   **A.**  CORRECT.

11   **Q.**  IN FACT, IN THAT -- IN THOSE CIRCUMSTANCES, THE INTENDED

12   OFFLINE USE CASE, ACCESS TO THE CONTENT IS FREELY AVAILABLE

13   REGARDLESS OF WHETHER YOU ARE SENDING OR TRANSMITTING

14   ANYTHING, RIGHT?

15   **A.**  I DON'T KNOW WHAT YOU MEAN BY "INTENDED."

16   **Q.**  LET ME REPHRASE THE QUESTION.  THAT IS A FAIR POINT.  I'M

17   JUST TRYING TO FOCUS IN ON THAT SCENARIO THAT WE TALKED ABOUT

18   FOR THE OFFLINE SITUATION.

19   **A.**  CORRECT.

20   **Q.**  A USER HAS ACCESS WHETHER OR NOT THEY ARE TRANSMITTING

21   ANYTHING, AS LONG AS THEY HAVE A VALID LEASE.

22   **A.**  CORRECT.

23   **Q.**  NOW, I WANT TO TOUCH ON A FEW ADDITIONAL AREAS.  ONE OF

24   THEM IS THE -- YOU HAD SOME DISCUSSION EARLIER ABOUT ADOBE

25   USERS USING THINGS AND WHETHER OR NOT ADOBE INTENDS FOR USERS

1    TO USE CERTAIN THINGS?

2    **A.**  YES.

3    **Q.**  YOU DID THAT ON DIRECT EXAMINATION?

4    **A.**  YES.

5    **Q.**  NOW, YOU DON'T ACTUALLY HAVE ANY KNOWLEDGE OR DON'T HAVE

6    ANY INFORMATION AS TO WHAT ADOBE'S INTENTION IS WITH RESPECT

7    TO ITS USERS, RIGHT?

8    **A.**  SO, ALL I CAN TELL IS FROM THE DOCUMENTS AND FROM THE

9    SOURCE CODE WHAT ACTIONS THE SOFTWARE WOULD PERFORM.  YOU

10   KNOW, AS FAR AS, YOU KNOW, INTENTIONS FOR A LARGE COMPANY IT

11   IS DIFFICULT TO KNOW.

12              **MS. MEHTA:**  I PASS THE WITNESS.

13                    **REDIRECT EXAMINATION**

14   **BY MR. DINOVO**

15   **Q.**  ALL RIGHT, DR. DEVANBU.  JUST A FEW MORE POINTS ON

16   REDIRECT.

17        FIRST OF ALL, SIR, DO YOU KNOW -- THERE WAS SOME

18   DISCUSSION ABOUT YOUR OPINIONS ABOUT PRIOR ART.  DO YOU KNOW

19   WHETHER OR NOT THE PARTIES HAVE ENGAGED AN EXPERT TO ANALYZE

20   THE VALIDITY OF THE PATENTS AND THE PRIOR ART WHO WILL BE

21   TESTIFYING LATER IN THE TRIAL?

22   **A.**  I BELIEVE SO, YES.

23   **Q.**  WAS THAT AN AREA OF RESPONSIBILITY OR SUBJECT MATTER OF

24   YOUR REPORT?

25   **A.**  NO.

1    **Q.**  WHAT WAS THE SUBJECT MATTER OF YOUR REPORT?

2    **A.**  INFRINGEMENT.

3    **Q.**  ALL RIGHT.  THERE WAS ALSO SOME DISCUSSION ABOUT PRIOR TO

4    YOUR BEING ENGAGED WHAT YOU HAD DONE.  DID YOU HAVE ACCESS TO

5    ALL THE SOURCE CODE THAT YOU ULTIMATELY REVIEWED BEFORE YOU

6    WERE ENGAGED?

7    **A.**  NO.

8    **Q.**  WHY NOT?

9    **A.**  IT'S PROPRIETARY CONFIDENTIAL INFORMATION.

10   **Q.**  DR. DEVANBU, I KNOW YOU'RE NOT A LAWYER, RIGHT?

11   **A.**  I'M NOT.

12   **Q.**  OKAY.  DO YOU HAVE AN UNDERSTANDING AS TO THE DIFFERENCE

13   BETWEEN DIRECT AND INDIRECT INFRINGEMENT?

14   **A.**  YES.

15   **Q.**  WHAT IS YOUR UNDERSTANDING OF DIRECT INFRINGEMENT?

16   **A.**  IS WHEN ONE PARTY PERFORMS ALL THE LIMITATIONS OF THE

17   CLAIM.

18   **Q.**  ALL RIGHT.  AND JUST TO CLEAR UP YOUR TESTIMONY ON CROSS,

19   IS IT YOUR OPINION THAT ADOBE DIRECTLY INFRINGES FOR ANY

20   PATENT RELATIVE TO ANY PRODUCT?

21   **A.**  SO, IF THE LICENSE MANAGER IS OPERATED BY ADOBE, WHICH IT

22   CAN BE, THEN IT WOULD INFRINGE THE '670 PATENT.

23   **Q.**  ALL RIGHT.  SO, IT'S YOUR TESTIMONY, THEN, AND YOUR

24   OPINION THAT THERE IS DIRECT INFRINGEMENT IN THAT SITUATION?

25   **A.**  CORRECT.

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930**

1  **Q.**  AND IN THE OTHER SCENARIOS ARE YOU RELYING ON INDIRECT

2  INFRINGEMENT?

3  **A.**  YES.

4  **Q.**  YOU TESTIFIED ON CROSS THAT THERE WERE CERTAIN PROPRIETARY

5  ASPECTS OF THE INSTALLATION PROCESS IN ACTIVATION, RIGHT?

6  **A.**  RIGHT.

7  **Q.**  WHAT CAN YOU TELL THE JURY ABOUT THAT INSTALLATION

8  PROCESS?  WHAT GOES ON BASED ON YOUR REVIEW OF THE SOURCE

9  CODE?

10  **A.**  SO, IN ANY SITUATION LIKE THIS, WHEN SOME SECRET OR

11  IMPORTANT INFORMATION IS SENT AND TRANSMITTED, THEN THAT

12  SECRET INFORMATION HAS TO BE PROCESSED SOMEHOW AT THE CLIENT

13  TO DECODE THAT INFORMATION.

14  IF YOU SEND THIS KIND OF INFORMATION IN THE CLEAR THEN IT

15  CAN'T BE READ.  SO THERE IS SOME PROCESSING THAT GOES ON AT

16  THE CLIENT TO DECODE IT.

17  SO IN THE CASE OF THE FLASH, THE FLASH SOFTWARE, THE KEY

18  THAT'S GENERATED AT THE SERVER IS ENCRYPTED WITH THE PUBLIC

19  KEY OF THE CLIENT.  SO THE ENCRYPTED KEY THAT IS PRODUCED IS

20  TRANSMITTED TO THE CLIENT.  AND THEN IT'S DECRYPTED USING THE

21  PRIVATE KEY OF THE CLIENT.

22  SO, IN FACT, THE KEY DATA THAT IS PRESENT AT THE SERVER

23  IS DIFFERENT THAN THE KEY DATA THAT IS PRODUCED AT THE CLIENT

24  BECAUSE IT IS ENCRYPTED USING THE PUBLIC KEY.

25  **Q.**  SO YOU WERE TALKING ABOUT FLASH THERE?

1    **A.**   THAT'S RIGHT.

2    **Q.**   IN THE CONTEXT OF LIVECYCLE, HOW DOES THIS INSTALLATION

3    PROCESS INSTALL THE PERMISSION?

4    **A.**   IN THE CASE OF THE --

5    **Q.**   AND I AM JUST HAVING MY COLLEAGUE PUT UP THE CLAIM

6    LANGUAGE OF THE '541.

7    **A.**   OKAY.  SO IN THE CASE OF LIVECYCLE, WHEN THE KEY INSIDE

8    THE VOUCHER IS RECEIVED, IT IS STORED IN A CACHE AT THE

9    CLIENT.

10       NOW, IN THE CLIENT -- THE LOCKING PROCEDURE AT THE CLIENT

11   OCCURS BECAUSE THE KEY IS STORED -- THE KEY AND THE VOUCHER

12   ARE STORED IN A CACHE.  NOW, THAT CACHE IS LOCKED TO SOMETHING

13   CALLED "A SECURITY SESSION" AT THE CLIENT.

14       YOU KNOW, SO, IN GENERAL, THERE ARE TWO KINDS OF SECURITY.

15   THERE IS CRYPTOGRAPHIC SECURITY AND SYSTEM SECURITY.  THE

16   SESSION, THE SECURE SESSION THAT'S AT THE CLIENT IS KIND OF

17   SYSTEMS SECURITY.  SO THE CACHE THAT IS STORED INSIDE THE

18   VOUCHER ON THE CLIENT IS SECURED BY HAVING A SECURED

19   SESSION -- IS LOCKED BY HAVING A SECURE SESSION.

20   **Q.**   ALL RIGHT.  OKAY.  AND I THINK YOUR TESTIMONY WAS IN A

21   COUPLE OF INSTANCES THAT THERE WAS SOMETHING GENERATED AT THE

22   SERVER, AND THAT WAS SOMETHING ELSE REGENERATED AT THE CLIENT?

23   **A.**   CORRECT.

24   **Q.**   COULD YOU EXPLAIN WHAT YOU MEANT BY THAT?

25   **A.**   OKAY.  SO MAYBE WE CAN TAKE IT STEP BY STEP.  SO IN THE

1     CASE OF THE -- CASE OF THE FLASH TECHNOLOGY, THE CONTENT

2     ENCRYPTION KEY IS ENCRYPTED.  IT IS A SYMMETRIC ENCRYPTION.

3     THERE'S TWO DIFFERENT KEYS.

4       SO THE CONTENT ENCRYPTION KEY IS ENCRYPTED WITH THE PUBLIC

5     KEY OF THE MACHINE AT THE SERVER.  AND THEN, IT'S TRANSMITTED

6     IN ENCRYPTED FORM TO THE CLIENT.  AND THE CLIENT REGENERATES

7     THE KEY BY USING THE PRIVATE KEY OF THE CLIENT TO REGENERATE

8     THE KEY.

9     **Q.**  OKAY.  SO BEFORE WE MOVE AWAY FROM THAT EXAMPLE, IS WHAT

10    IS TRANSMITTED THE SAME AS THE KEY, OR IS IT DIFFERENT?

11    **A.**  IT'S AN ENCRYPTED FORM OF THE KEY IN ALL CASES.  IT HAS TO

12    BE.

13    **Q.**  SO IS IT ACCURATE TO SAY THAT IF IT WERE INTERCEPTED IT

14    WOULD BE -- WOULD IT BE USEFUL OR NOT USEABLE?

15    **A.**  IT WOULD BE USELESS.

16    **Q.**  IN WHAT CONTEXT WOULD IT BE USEFUL FOR THE RECIPIENT?

17       **MS. MEHTA:**  OBJECTION, YOUR HONOR.  THIS IS OUTSIDE

18    THE SCOPE OF THE EXAMINATION.

19       **THE COURT:**  OVERRULED.

20       **THE WITNESS:**  SORRY?

21    **BY MR. DINOVO**

22    **Q.**  IN WHAT CONTEXT WOULD IT BE USEFUL?

23    **A.**  THE STEALING THE DATA THAT'S BEING TRANSMITTED OR --

24    **Q.**  WELL, LET ME ASK THE QUESTION A DIFFERENT WAY.  THE ONLY

25    WAY THE CLIENT CAN MAKE USE OF THE KEY IS IF IT ALREADY HAS

1    THE KEY THAT IT NEEDS TO DECRYPT, RIGHT?

2    **A.**  RIGHT.

3    **Q.**  OKAY.  WITH RESPECT TO THE '541 PATENT, WHAT IS YOUR

4    UNDERSTANDING ABOUT WHETHER OR NOT THE MEANING OF THE CLAIM

5    AND THE COURT'S CONSTRUCTION ALLOWS THE RECEIPT OF INFORMATION

6    FROM A SERVER?

7    **A.**  FROM THE SERVER, THE COURT SAYS THAT IT CAN RECEIVE A

8    TOKEN.

9    **Q.**  OKAY.  AND IS IT YOUR UNDERSTANDING AS A PERSON OF

10   ORDINARY SKILL IN THE ART IN VIEW OF THE COURT'S

11   CONSTRUCTIONS, THAT THE CLIENT CAN USE THE TOKEN TO GENERATE

12   THE PERMISSION?

13   **A.**  THAT'S RIGHT.  THE CLIENT CAN USE THE INFORMATION IN THE

14   TOKEN TO DECIDE WHETHER OR NOT TO GRANT ACCESS AND GENERATE A

15   PERMISSION.

16   **Q.**  ISN'T THAT, IN FACT, REQUIRED BY THE CLAIM LANGUAGE THAT

17   IT USES THAT TOKEN TO GENERATE THE PERMISSION?

18   **A.**  THAT'S RIGHT.

19   **Q.**  IN THE COURSE OF YOUR CROSS YOU WERE ASKED ABOUT

20   LIVECYCLE, AND WHETHER THERE WERE MULTIPLE ACTORS.  AND YOU

21   ASKED WHAT WAS MEANT BY "ACTOR" AND MENTIONED THE SAME

22   COMPANY.  CAN YOU EXPLAIN WHAT YOU WERE INTENDING TO SAY

23   THERE?

24   **A.**  SO, WHEN YOU OPERATE A LIVECYCLE SYSTEM, IT'S USUALLY

25   WITHIN THE CONTEXT OF ONE ORGANIZATION, ALTHOUGH IT DOESN'T

1    HAVE TO BE.  USUALLY IN THE CONTEXT OF ONE ORGANIZATION WHICH

2    HAS DOCUMENTS IT WANTS TO PROTECT.

3        AND SO THE SERVER AND THE CLIENT ALL OPERATE WITHIN THE --

4    WITHIN THE FIREWALL OF ONE COMPANY.  SO THEY CAN PROTECT THE

5    RIGHTS, PROTECT DOCUMENT ACCESS RIGHTS.

6    **Q.**  ALL RIGHT.  SO ALTHOUGH THERE MAY BE DIFFERENT PEOPLE IN

7    THE COMPANY, USERS, IT ADMINISTRATORS AND WHATNOT, IT'S YOUR

8    VIEW THAT THERE WOULD BE A SINGLE ACTOR IN THAT CONTEXT OR A

9    SINGLE PARTY?

10   **A.**  A SINGLE PARTY OPERATING --

11           **MS. MEHTA:**  OBJECTION.

12           **THE COURT:**  EXCUSE ME.

13           **MS. MEHTA:**  SORRY.  OBJECTION, YOUR HONOR.  THAT

14   LACKS FOUNDATION.  CALLS FOR SPECULATION.  HE HAS NO IDEA WHAT

15   ENTITIES DO WITH LIVECYCLE.  AND IT IS LEADING.

16           **THE COURT:**  REPHRASE IT AS A HYPOTHETICAL, I SUPPOSE.

17   **BY MR. DINOVO**

18   **Q.**  ALL RIGHT, SIR.  YOU'VE TESTIFIED THAT YOU THINK IT WOULD

19   BE TYPICAL -- DIDN'T YOU TESTIFY THAT YOU THINK IT WOULD BE

20   TYPICAL FOR AN ORGANIZATION TO RUN A LIVECYCLE SERVER?

21   **A.**  YES. THERE ARE SEVERAL EXAMPLES --

22           **THE COURT:**  I SAID YOU CAN REPHRASE IT AS A

23   HYPOTHETICAL.

24           **MR. DINOVO:**  ALL RIGHT.

25           **THE COURT:**  IF YOU WOULD LIKE TO DO THAT, GO AHEAD.

1    IF NOT, GO ON TO SOMETHING ELSE.

2           **MR. DINOVO:**  FAIR ENOUGH.

3    **BY MR. DINOVO**

4    **Q.**  DR. DEVANBU, HYPOTHETICALLY SPEAKING, WHY WOULD A COMPANY

5    WANT TO RUN A DIGITAL RIGHTS MANAGEMENT SERVICE WITHIN ITS

6    FIREWALL?

7    **A.**  YOU'RE TALKING ABOUT LIVECYCLE RIGHTS MANAGEMENT.

8    **Q.**  SURE.

9    **A.**  SO THERE ARE SEVERAL EXAMPLES IN THESE DOCUMENTS, WHICH

10   ARE REAL CASE STUDIES OF COMPANIES THAT USE LIVECYCLE RIGHTS

11   MANAGEMENT.

12   **Q.**  OKAY.  BUT I'M JUST SAYING HYPOTHETICALLY WHY WOULD A

13   COMPANY WANT TO DO THIS INTERNALLY?

14   **A.**  CASE STUDIES TALK ABOUT THINGS LIKE A COMPANY THAT HAS

15   DESIGN DOCUMENTS, AND THEY HAVE MULTIPLE LOCATIONS AROUND THE

16   WORLD, AND THEY WANT TO PROTECT ACCESS TO THE DESIGN DOCUMENTS

17   AND CONFINE THEM TO SOME COUNTRIES, FOR EXAMPLE.

18   **Q.**  OKAY.  LET'S TURN TO THIS NOTION OF, I THINK, TRY AND BUY.

19   DO YOU RECALL THAT DISCUSSION?

20   **A.**  YES.

21   **Q.**  IS TRY AND BUY PART OF YOUR INFRINGEMENT ANALYSIS?

22   **A.**  NO.

23   **Q.**  SO, YOUR INFRINGEMENT ANALYSIS IS TALKING ABOUT THINGS

24   THAT ARE NOT WITHIN THE TRIAL PERIOD; IS THAT RIGHT?

25   **A.**  RIGHT.

DEVANBU – RECROSS / MEHTA

```
 1            MR. DINOVO:  PASS THE WITNESS.

 2                     RECROSS-EXAMINATION

 3    BY MS. MEHTA:

 4    Q.  YOU'RE ALMOST DONE JUST A FEW MORE QUESTIONS.

 5    A.  OKAY.

 6    Q.  IN FORMING YOUR OPINIONS IN THIS CASE, DR. DEVANBU, YOU

 7    DIDN'T CONSIDER THE QUESTION OF WHETHER OR NOT THERE ARE

 8    SUBSTANTIAL NONINFRINGING USES FOR THE ADOBE PRODUCTS, RIGHT?

 9    A.  SO I THINK YOU'RE ASKING ABOUT DIFFERENT KINDS OF

10    INFRINGEMENT.  BUT -- SO MAYBE WE CAN TAKE IT STEP-BY-STEP AND

11    WE CAN --

12    Q.  SURE.  WHAT I'M ASKING -- MAYBE I WILL EVEN REPHRASE IT A

13    LITTLE BIT DIFFERENTLY.

14        WHEN YOU FORMED YOUR OPINIONS IN THE CASE, AND YOU DID

15    YOUR ANALYSIS, YOU DIDN'T EVEN KNOW WHAT SUBSTANTIAL

16    NONINFRINGING USES WERE, CORRECT?

17        HOLD ON FOR A SECOND.  I AM JUST GOING TO REPEAT THAT FOR

18    THE COURT REPORTER.

19        WHEN YOU DID YOUR ANALYSIS IN THIS CASE, YOU DIDN'T EVEN

20    KNOW WHAT SUBSTANTIAL NONINFRINGING USES WERE, CORRECT?

21    A.  AT WHICH POINT IN MY WORK?

22    Q.  UP TO THE POINT YOU SUBMITTED YOUR REPORT.

23    A.  I READ UP ON IT AT SOME POINT.  I DON'T REMEMBER WHEN.

24    Q.  LET'S GO TO YOUR DEPOSITION.  AS OF THE TIME OF YOUR

25    DEPOSITION YOU DIDN'T KNOW WHAT SUBSTANTIAL NONINFRINGING USES
```

1   WERE, RIGHT?

2   **A.**  I DON'T RECALL.  SORRY.

3   **Q.**  SO YOU ARE NOT OFFERING AN OPINION AS TO SUBSTANTIAL

4   NONINFRINGING USES?

5   **A.**  SO -- OKAY.  SO IF YOU CONSIDER LIVECYCLE RIGHTS

6   MANAGEMENT, FOR EXAMPLE --

7   **Q.**  HOLD ON.  I WANT TO BE VERY SPECIFIC.  IN YOUR REPORT IN

8   THIS CASE YOU DIDN'T OFFER ANY OPINION WITH RESPECT TO

9   SUBSTANTIAL NONINFRINGING USES, RIGHT?

10  **A.**  I DON'T BELIEVE I DID.

11  **Q.**  NOW, YOU WERE TALKING A LITTLE BIT ABOUT THIS PROPRIETARY

12  FLEXNET TECHNOLOGY, RIGHT?

13  **A.**  CORRECT.

14  **Q.**  AND MR. DINOVO ASKED YOU ABOUT WHETHER OR NOT THERE WOULD

15  HAVE TO BE SOME SORT OF PROCESSING IN THAT CIRCUMSTANCE?

16  **A.**  CORRECT.

17  **Q.**  YOU DON'T ACTUALLY KNOW WHAT THE FLEXNET TECHNOLOGY DOES,

18  RIGHT?

19  **A.**  IT WOULD HAVE TO BE SOMETHING CRYPTOGRAPHIC, OTHERWISE IT

20  WOULD BE INSECURE.

21  **Q.**  BUT YOU DON'T HAVE ACCESS TO THE INFORMATION, THE

22  MACROVISION INFORMATION TO ACTUALLY KNOW WHAT IS DONE; IS THAT

23  RIGHT?

24  **A.**  WE DIDN'T CITE ANYTHING ABOUT THAT, NO.

25  **Q.**  YOU ALSO MENTIONED THAT IN THE CONTEXT OF LIVECYCLE --

1    **A.**  YES.

2    **Q.**  -- YOUR OPINION IS BASED ON CACHING OF A LICENSE?

3    **A.**  CORRECT.

4         **MS. MEHTA:**  MR. BONINI, IF YOU CAN PULL UP PX55 AT

5    PAGE 56.

6       AND THERE IS A FIGURE THERE IN THE MIDDLE.  IF YOU CAN

7    BLOW THAT UP, PLEASE.

8    **BY MS. MEHTA**

9    **Q.**  AND, DR. DEVANBU, THIS IS A FIGURE OF EXHIBIT 55 IN WHICH

10   IT DEPICTS A LIVECYCLE USE CASE, RIGHT?

11   **A.**  OKAY.  YES.

12   **Q.**  AND WHAT IT ACTUALLY SHOWS DOWN THERE ON NUMBER THREE IS

13   THAT IN THE LIVECYCLE SYSTEM, ONCE YOU RECEIVE THE KEY FROM

14   THE SERVER, THE CLIENT OR THE USER DISCARDS THE KEY, RIGHT?

15   **A.**  I'M NOT FAMILIAR WITH THE CONTEXT OF THIS DOCUMENT.

16   **Q.**  THIS WAS A DOCUMENT THAT YOU CITED ON DIRECT EXAMINATION

17   WITH MR. DINOVO.

18   **A.**  I DON'T REMEMBER THIS PRECISE LOCATION.  I JUST DON'T WANT

19   TO TAKE THIS OUT OF CONTEXT HERE.

20   **Q.**  FAIR ENOUGH.  IS IT FAIR TO SAY THAT YOU ARE NOT DISPUTING

21   OR DISAGREEING WITH THE NOTION THAT LIVECYCLE DISCARDS THE KEY

22   ONCE IT IS RECEIVED FROM THE SERVER?

23   **A.**  I THINK THE SETTING HERE IS THE PERSON WHO CREATES THE

24   DOCUMENT.  SO THIS IS NOT TALKING ABOUT ACCESS.  THIS IS

25   TALKING ABOUT CREATION, I BELIEVE.

1   **Q.**   IT IS ACTUALLY TALKING ABOUT THERE'S THREE DIFFERENT

2   STEPS, RIGHT?  STEP ONE, STEP TWO AND STEP THREE?

3   **A.**   THAT'S RIGHT.

4   **Q.**   WHAT I'M FOCUSED IN ON IS STEP THREE.

5   **A.**   OKAY.

6   **Q.**   YOU SEE WHAT STEP THREE IS IS WHERE THE CLIENT

7   APPLICATION --

8           **MS. MEHTA:**   MR. BONINI, WHY DON'T YOU GO DOWN TO THE

9   BOTTOM OF THE PAGE WHERE IT DESCRIBES THE STEPS.  THIS MIGHT

10  BE HELPFUL.

11  **BY MS. MEHTA**

12  **Q.**   DO YOU HAVE THAT, DR. DEVANBU?

13  **A.**   OKAY.

14  **Q.**   AND IT'S -- THIS IS THE STEPS DESCRIPTION.  DO YOU SEE

15  THAT?

16  **A.**   YES.

17  **Q.**   FOR STEP THREE IT SAYS:

18      "THE CLIENT APPLICATION USES THE KEY TO ENCRYPT THE

19  DOCUMENT, DISCARDS THE DOCUMENT KEY, AND EMBEDS THE LICENSE

20  AND POLICY."

21      DO YOU SEE THAT?

22  **A.**   YES.

23  **Q.**   AND YOU UNDERSTAND THAT THAT'S WHEN THE CLIENT IS

24  ATTEMPTING TO ACCESS THE CONTENT?

25  **A.**   NO, IT'S NOT.  IT IS WHEN THE CLIENT IS ENCRYPTING THE

1    DOCUMENTS.  SEE IT SAYS "ENCRYPT" NOT "DECRYPT."

2    **Q.**  OKAY.  LET'S GO TO THE NEXT PAGE, MR. BONINI.  PAGE 57.

3    THIS MIGHT CLEAR IT UP.

4    **BY MS. MEHTA**

5    **Q.**  IF YOU LOOK AT THE TOP PART OF THAT PAGE, IT SAYS:

6    "DOCUMENT ACCESS FOR ONLINE USE."

7        DO YOU SEE THAT?

8    **A.**  YES.

9    **Q.**  NOW, THIS IS TALKING ABOUT DECRYPTING, RIGHT?

10   **A.**  OKAY.

11   **Q.**  ALL RIGHT.  NOW, IF YOU GO DOWN TO THAT SAME CHART,

12   MR. BONINI, WHERE IT DESCRIBES THE STEPS.

13   **A.**  RIGHT.

14   **Q.**  THIS DOCUMENT SAYS THAT IN STEP THREE YOU'RE AT THE

15   CLIENT, RIGHT?

16   **A.**  RIGHT.

17   **Q.**  AND YOU'RE DECRYPTING THE INFORMATION THAT'S RECEIVED FROM

18   THE SERVER, RIGHT?

19   **A.**  RIGHT.

20   **Q.**  AND IF YOU GO BACK UP TO THE FIGURE, WHEN YOU ARE

21   DECRYPTING THE INFORMATION THAT IS RECEIVED FROM THE SERVER,

22   YOU ACTUALLY DISCARD THE DOCUMENT KEY, RIGHT?

23   **A.**  CORRECT.

24   **Q.**  NOW, THERE IS SOME DISCUSSION ON YOUR EXAMINATION WITH

25   MR. DINOVO ABOUT ENCRYPTING AND DECRYPTING THE THING THAT YOU

1   POINT TO AS THE PERMISSION OR THE KEY THAT COMES OVER FROM THE

2   SERVER.  YOU RECALL THAT?

3   **A.**  CORRECT.

4   **Q.**  AND I THINK YOU SAID THAT IN THE CONTEXT OF THE ACCUSED

5   PRODUCTS THE KEY IS GENERATED AT THE SERVER, ENCRYPTED,

6   TRANSMITTED AND THEN DECRYPTED?

7   **A.**  CORRECT.

8   **Q.**  NOW, I WANT YOU TO PUT ASIDE FROM THE MOMENT THE PROCESS

9   OF ENCRYPTION AND DECRYPTION, OKAY?  SET THAT ASIDE.

10  **A.**  CORRECT.

11  **Q.**  BEFORE THE KEY IS ENCRYPTED AT THE SERVER IT IS GENERATED

12  AND EXISTS AT THE SERVER.  RIGHT?

13  **A.**  CORRECT.

14  **Q.**  NOW, LET'S GO OVER TO THE OTHER SIDE TO THE CLIENT.  AFTER

15  DECRYPTION, THE KEY THAT'S AT THE CLIENT IS THE SAME KEY THAT

16  EXISTED AT THE SERVER BEFORE ENCRYPTION, CORRECT?

17  **A.**  CORRECT.

18          **MS. MEHTA:**  NO FURTHER QUESTIONS, YOUR HONOR.

19          **MR. DINOVO:**  NOTHING FURTHER, YOUR HONOR.

20          **THE COURT:**  ALL RIGHT.  YOU ARE EXCUSED.  YOU MAY

21  STEP DOWN.

22      YOU MAY CALL YOUR NEXT WITNESS.

23          **MS. MEHTA:**  YOUR HONOR, AT THIS POINT DEFENDANTS CALL

24  DR. WICKER OUR --

25          **THE COURT:**  THIS IS THE ARRANGEMENT YOU ALL HAVE

1   AGREED TO?

2           **MS. MEHTA:**  YES, YOUR HONOR.  WE THOUGHT IT WOULD BE

3   HELPFUL FOR THE JURY TO DO IT BACK TO BACK.

4           **THE COURT:**  OKAY.  SO WHAT WE ARE GOING TO DO NOW,

5   RATHER THAN WAIT UNTIL THE DEFENDANT'S CASE AND HEAR FROM

6   THEIR WITNESS, THEIR EXPERT WITNESS ON THE SAME SUBJECT, WE

7   THOUGHT IT MIGHT BE EASIER FOR YOU IF YOU HEARD OUT OF ORDER

8   THE DEFENDANT'S EXPERT RIGHT NOW.

9        SO THIS WILL BE THE DEFENDANT'S EXPERT CALLED OUT OF ORDER

10  TO TALK ABOUT THE THINGS THAT THE PLAINTIFF'S EXPERT JUST

11  TALKED ABOUT.

12       SO IF YOU WILL STAND AND RAISE YOUR RIGHT HAND, PLEASE.

13       (STEPHEN WICKER, CALLED AS A WITNESS FOR THE DEFENDANT,

14  HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

15          **THE WITNESS:**  I DO.

16          **THE CLERK:**  PLEASE STATE YOUR NAME AND SPELL YOUR

17  FIRST AND LAST NAME FOR THE RECORD, PLEASE.

18          **THE WITNESS:**  STEPHEN WICKER, S-T-E-P-H-E-N,

19  W-I-C-K-E-R.

20          **THE CLERK:**  THANK YOU.

21          **MS. MEHTA:**  YOUR HONOR, BEFORE WE PROCEED WITH

22  MR. WICKER'S TESTIMONY, WOULD IT BE POSSIBLE FOR HIM TO

23  APPROACH THE SCREEN AT TIMES DURING HIS EXAMINATION?

24          **THE COURT:**  AS LONG AS HE CAN KEEP HIS VOICE UP AND

25  EVERYONE CAN SEE AND HEAR HIM.

```
 1              MS. MEHTA:  SURE.  BUT WOULD IT BE POSSIBLE FOR HIM

 2   TO USE A LAPEL MIC?

 3              THE CLERK:  I CAN SWITCH IT.

 4              THE COURT:  SURE.

 5              MS. MEHTA:  THANK YOU, YOUR HONOR.

 6                   (PAUSE IN THE PROCEEDINGS.)

 7                     DIRECT EXAMINATION

 8   BY MS. MEHTA:

 9   Q.  ALL RIGHT.

10       DR. WICKER, ARE YOU SET?

11   A.  YES, I AM.

12   Q.  THANK YOU.

13       DR. WICKER, COULD YOU INTRODUCE YOURSELF TO THE JURY,

14   PLEASE?

15   A.  SURE.  MY NAME IS STEVE WICKER.

16              THE CLERK:  GIVE ME ONE SECOND TO SWITCH, OKAY?

17              MS. MEHTA:  MR. BONINI, IF YOU CAN PULL UP MR. --

18   DR. WICKER'S DEMONSTRATIVES, PLEASE, FOR THE '541 PATENT.

19                   (PUBLISHED TO JURY.)

20              THE WITNESS:  MY NAME IS STEVE WICKER.  I'M A

21   PROFESSOR OF ELECTRICAL AND COMPUTER ENGINEERING AT CORNELL

22   UNIVERSITY.

23   BY MS. MEHTA:

24   Q.  DR. WICKER, COULD YOU TELL US A LITTLE BIT ABOUT YOUR

25   BACKGROUND AND EXPERIENCE?
```

1   **A.**  YES.

2       I STARTED MY WORK LIFE AS AN ENGINEER AT HUGHES AIRCRAFT

3   IN EL SEGUNDO, CALIFORNIA.  I WORKED ON COMMUNICATION PAYLOADS

4   FOR SATELLITES.  I GOT MY PH.D. IN ELECTRICAL ENGINEERING AT

5   U.S.C. AND THEN SPENT NINE YEARS AS A PROFESSOR OF ELECTRICAL

6   ENGINEERING AT GEORGIA TECH.

7       AND AT THAT POINT CORNELL LET ME KNOW THEY WERE BUILDING A

8   WIRELESS AREA.  THEY WERE STARTING TO GET INTO WIRELESS

9   RESEARCH.  CELLULAR WAS STARTING TO LOOK ATTRACTIVE, SO I WENT

10  TO CORNELL IN 1996, AND I HAVE BEEN THERE EVER SINCE.

11  **Q.**  DR. WICKER, COULD YOU DESCRIBE SOME OF YOUR RESEARCH AT A

12  HIGH LEVEL?

13  **A.**  CERTAINLY.

14      OVER THE YEARS MY RESEARCH HAS BEEN IN BOTH WIRE AND

15  WIRELESS COMMUNICATION SYSTEMS.

16      MORE RECENTLY, I'VE FOCUSED ON SECURITY AND PRIVACY AND

17  DIGITAL RIGHTS MANAGEMENT.  I AM PARTICULARLY INTERESTED IN

18  CREATING TOOL KITS FOR PRIVACY AND SECURITY THAT INCLUDE

19  CRYPTOGRAPHIC TECHNIQUES.

20  **Q.**  DR. WICKER, DO YOU HAVE ANY PUBLICATIONS?

21  **A.**  YES, I DO.

22  **Q.**  HOW MANY?

23  **A.**  I ACTUALLY HAVEN'T COUNTED, BUT APPROXIMATELY 250.

24  **Q.**  AND DO YOU HAVE ANY BOOKS THAT YOU HAVE AUTHORED?

25  **A.**  YES.

1    **Q.**  HOW MANY?

2    **A.**  SIX.

3    **Q.**  AND PRIOR TO YOUR WORK IN THIS CASE, YOU'VE DONE WORK IN

4    DIGITAL RIGHTS MANAGEMENT TECHNOLOGY?

5    **A.**  THAT'S CORRECT.

6         **MS. MEHTA:**  YOUR HONOR, AT THIS TIME WE WOULD PROFFER

7    DR. WICKER AS AN EXPERT IN THE AREAS OF THE '541 AND '670

8    PATENTS.

9         **MR. DINOVO:**  NO OBJECTION, YOUR HONOR.

10        **THE COURT:**  ALL RIGHT.

11        **MS. MEHTA:**  YOUR HONOR, MAY I ALSO REQUEST

12   DR. WICKER'S DEMONSTRATIVE EXHIBITS BE PUBLISHED TO THE JURY?

13        **THE CLERK:**  THEY WILL BE ONCE I SEE YOU'RE USING

14   THEM.

15        **MS. MEHTA:**  THANK YOU.  I'M GOING TO GO TO THE NEXT

16   SLIDE.  THANK YOU.

17   **BY MS. MEHTA:**

18   **Q.**  DR. WICKER, WHAT WAS YOUR ASSIGNMENT IN THIS CASE?

19   **A.**  I WAS ASKED TO -- TO STUDY THE PATENTS AND THE ACCUSED

20   PRODUCTS, AND TO TAKE A LOOK AT DR. DEVANBU'S INFRINGEMENT

21   REPORT, AND DETERMINE WHETHER OR NOT IN MY OPINION HE HAD

22   SHOWN THAT INFRINGEMENT HAD INDEED TAKEN PLACE.

23   **Q.**  AND WHAT ANALYSIS DID YOU UNDERTAKE TO REACH YOUR

24   CONCLUSIONS?

25   **A.**  IN MY ANALYSIS, I STARTED WITH THE PATENTS THEMSELVES.  I

1    READ THE WRITTEN DESCRIPTION -- WRITTEN DESCRIPTIONS, THE BODY

2    OF THE PATENTS, AND I READ THE CLAIMS THAT HAD BEEN ASSERTED.

3        I THEN LOOKED TO THE FILE HISTORIES, THE BACK AND FORTH

4    BETWEEN THE INVENTOR AND THE PATENT OFFICE.

5        I ALSO LOOKED AT THE COURT'S CLAIM CONSTRUCTION.

6        AND THAT COMBINATION OF THINGS TOLD ME WHAT A PERSON OF

7    SKILL IN THE ART WOULD HAVE THOUGHT THE CLAIMS ACTUALLY MEANT.

8        I THEN LOOKED AT DEPOSITION TRANSCRIPTS, INTERROGATORY

9    RESPONSES TO DETERMINE HOW THE ACCUSED PRODUCTS WORKED.

10        I ALSO LOOKED AT DR. DEVANBU'S REPORT AND LOOKED AT HOW HE

11    HAD ANALYZED THINGS.  THERE'S ALSO A REPORT BY DR. KELLER ON

12    VALIDITY, AND THAT'S A SEPARATE SUBJECT.

13        I LOOKED AT SOME SOURCE CODE, SPECIFICALLY THAT THAT HAD

14    BEEN REFERENCED IN DR. DEVANBU'S REPORT.  I LOOKED AT A LARGE

15    NUMBER OF ADOBE TECHNICAL DOCUMENTS.  THERE WAS QUITE A BIT

16    FOCUSING ON THE THREE ACCUSED PRODUCTS.

17        AND THEN FINALLY I WAS ABLE TO TALK TO ADOBE ENGINEERS.  I

18    WAS ABLE TO TALK TO THE FOLKS WHO WROTE THE CODE AND DEVELOP

19    THESE PRODUCTS AND ASK THEM SPECIFIC QUESTIONS.

20    **Q.**  DR. WICKER, ARE YOU BEING COMPENSATED FOR YOUR WORK IN

21    THIS CASE?

22    **A.**  YES.

23    **Q.**  WHAT'S YOUR HOURLY RATE?

24    **A.**  $600.

25    **Q.**  NOW, I WANT TO FOCUS IN ON THE ANALYSIS THAT YOU CONDUCTED

1    AND THE CONCLUSIONS THAT YOU REACHED WITH RESPECT TO THE '541

2    PATENT FIRST.

3        ON THE '541 PATENT, DID YOU AGREE OR DISAGREE WITH

4    DR. DEVANBU'S CONCLUSION AS TO INFRINGEMENT BY THE ADOBE

5    ACCUSED PROPERTIES?

6    **A.**  I DISAGREED WITH DR. DEVANBU.

7    **Q.**  COULD YOU EXPLAIN -- WELL, WHY DON'T WE START WITH AN

8    EXPLANATION OF THE PATENT, AND THEN YOU CAN GET INTO WHY.

9        SO IF YOU COULD PERHAPS GIVE US AN OVERVIEW OF THE '541

10   PATENT.

11                      (PUBLISHED TO JURY.)

12   **A.**  THE '541 PATENT PROVIDES A TECHNIQUE FOR REGULATING ACCESS

13   TO DIGITAL CONTENT.  THAT'S WHAT IT SAYS IN THE TITLE OF THE

14   PATENT.

15       AND YOU GO TO THE ABSTRACT, IT PROVIDES MORE DETAIL.  IT

16   SAYS:  "THE CONTENT IS INACCESSIBLE TO A USER UNTIL A PAYMENT

17   OR USE AUTHORIZATION OCCURS."

18       AND BEYOND THAT, THE PATENT CALLS FOR A VERY SPECIFIC WAY

19   OF DOING THIS, A PARTICULAR TECHNIQUE OR SET OF TECHNIQUES IN

20   DRM.

21   **Q.**  NOW, IF YOU COULD, WHY DON'T WE FOCUS IN ON THE CLAIMS.

22       I AM GOING TO POINT YOU TO CLAIM 1 OF THE '541.  AND IF

23   YOU COULD WALK US THROUGH YOUR UNDERSTANDING OF THE CLAIM

24   AND -- AND HOW IT FITS INTO THE PICTURE OF THIS CASE.

25   **A.**  OKAY.  THIS IS CLAIM 1 FOR THE '541, THE ENTIRE CLAIM.

1    AND I'VE GOT -- IN FACT, THIS MIGHT BE A GOOD POINT, IF I

2    MAY, TO POINT TO A FEW THINGS ON THE SCREEN.

3         MS. MEHTA:  YOUR HONOR, WOULD THAT BE OKAY?

4         THE COURT:  YES.

5         MS. MEHTA:  THANK YOU, DR. WICKER.

6              (PUBLISHED TO JURY.)

7         THE WITNESS:  I'LL TRY NOT TO TRIP OVER THE WIRES.

8    SO THIS IS CLAIM 1 OF THE '541 PATENT.  WHAT I'VE DONE IS

9    NUMBERED THE INDIVIDUAL PARAGRAPHS OR ELEMENTS, AS THEY ARE

10   CALLED, FOR THE PARTICULAR CLAIM.

11   IF WE FOCUS ON CLAIM 1 ON THE NEXT SLIDE -- EXCUSE ME,

12   LIMITATION ONE, WHAT IT CALLS FOR IS A COMPUTER IMPLEMENTED

13   METHOD OF REGULATING ACCESS TO DIGITAL CONTENT.

14   THEN IT SAYS IT'S GOING TO BE A METHOD.  AND THAT METHOD

15   WILL HAVE A NUMBER OF STEPS.  SO WE KNOW RIGHT UP FRONT IT

16   INVOLVES REGULATING ACCESS TO DIGITAL CONTENT.  AND THE

17   SPECIFICATION SHOWS SOME PICTURES, AND I'VE GOT SOME OF THAT

18   DIGITAL CONTENT THERE.

19   NEXT PLEASE.

20              (PUBLISHED TO JURY.)

21   SO THE NEXT STEP IS AT A CLIENT.  AND THEN IT GOES ON.  I

22   WANT TO EMPHASIZE -- I'VE HIGHLIGHTED THIS IN RED.  WHAT IT'S

23   SAYING IS, WE'VE GOT A STEP HERE, AND IT'S GOING TO BE DONE AT

24   THE CLIENT, WHICH, OF COURSE, IS THE TERMINAL, YOUR LAPTOP,

25   WHATEVER IT IS YOU'RE USING TO ACCESS A SERVER.

1        SO GOING ON, "AT A CLIENT, EXECUTING AN ACCESS CHECKING

2    PROCESS TO DETERMINE WHETHER THE CLIENT HOLDS A PRE-EXISTING

3    PERMISSION FOR A RESOURCE TO ACCESS THE DIGITAL CONTENT".

4        SO IT'S GOING TO LOOK LOCALLY AT THE CLIENT TO DETERMINE

5    WHETHER OR NOT IT ALREADY HAS ACCESS TO LOOK AT THIS

6    PARTICULAR CONTENT.  DO WE HAVE AN EXISTING PERMISSION?  OKAY.

7                    (PUBLISHED TO JURY.)

8        THE NEXT STEP BEGINS WITH, "IF NOT".  SO NOW WE HAVE TWO

9    STEPS.  YOU SAY, WE CHECK SOMETHING AND THEN IF NOT, WE ARE

10   GOING TO DO SOMETHING ELSE.  SO IT'S STANDARD COMPUTER SCIENCE

11   SORT OF THING -- STEP IN MANY PROGRAM LANGUAGES.

12       OKAY.  SO WE CHECKED IF NOT, WE ARE GOING TO REQUEST

13   PERMISSION FROM AN EXTERNAL SOURCE FOR THE RESOURCE TO ACCESS

14   THE DIGITAL CONTENT.

15       SO WE DIDN'T HAVE THE LOCAL PERMISSION, SO WHAT WE ARE

16   GOING TO DO IS SEND -- THAT WENT PRETTY QUICKLY -- ANYWAY, THE

17   MONEY WENT FROM THE COMPUTER ACROSS THE INTERNET OR THE

18   NETWORK, WHATEVER IT MAY BE, TO A SERVER.  OKAY?  SO IF

19   REQUESTED PERMISSION IN THIS CASE BY SENDING MONEY.

20                    (PUBLISHED TO JURY.)

21       THE NEXT STEP, STEP 4, RECEIVING FROM THE EXTERNAL SOURCE

22   A TOKEN.

23       SO THE SERVER GOT THE MONEY.  AND SO HERE WE SEE THE TOKEN

24   COMING ACROSS.  AGAIN, IT INDICATES APPROVAL OR REJECTION.  IN

25   THIS CASE, IT'S APPROVAL.  WE GOT A YES IN OUR TOKEN WHICH

1    SAYS THAT -- CONTINUING ON --

2                    (PUBLISHED TO JURY.)

3        -- STEP 5 -- OH, I'M SORRY.  LET ME SAY A LITTLE BIT MORE

4    ABOUT THE TOKEN.

5        THE COURT HAS A CLAIM CONSTRUCTION, AND THIS IS ONE OF THE

6    TERMS IN THE CLAIM THAT THE COURT TOLD ME AND OTHERS MEANT.

7        OKAY.  SO IN THIS CASE, THE TOKEN IS A FILE INDICATING

8    WHETHER THE TRANSACTION HAS BEEN APPROVED AND ACCESS SHOULD BE

9    GRANTED.

10       AND THIS IS THE WAY THE PATENT DESCRIBES IT.  IT SAYS, "A

11   TOKEN, FOR EXAMPLE, IS A FIRST BIT THAT SIGNIFIES ACCEPTANCE

12   OR REJECTION".  SO IT'S BINARY, YES NO.

13           **MR. DINOVO:**  JUST A MOMENT.

14       YOUR HONOR, COULD WE ASK QUESTIONS HERE AS OPPOSED TO A

15   PURE NARRATIVE?

16           **MS. MEHTA:**  I WAS JUST GOING TO ASK HIM ABOUT THE

17   NEXT LIMITATION.

18           **MR. DINOVO:**  THANK YOU.

19   **BY MS. MEHTA:**

20   **Q.**  NOW, IF WE CAN TURN TO THE NEXT LIMITATION, WHICH IS THE

21   BASED ON LIMITATION.

22   **A.**  OKAY.

23       THIS IS NOW THE FIFTH LIMITATION FROM THE CLAIM.  AND IT

24   SAYS, BASED ON THAT RECEIVED TOKEN, IN THIS CASE IT WAS A YES

25   THAT CAME FROM THE SERVER, EXECUTING AN INSTALLATION PROCESS

1    THAT GENERATES AT THE CLIENT A PERMISSION THAT IS LOCKED

2    UNIQUELY TO THE CLIENT.

3        SO TWO PIECES HERE.  IT'S BEING DONE AT THE CLIENT AND,

4    FOR EXAMPLE, IT'S GOING TO USE A MACHINE I.D. TO LOCK THAT

5    PERMISSION TO THE CLIENT.  OKAY?

6        SO WHAT WE JUST SAW WAS THE GEARS TURNING AND THE TOKEN

7    CAUSED THIS PROCESS TO GENERATE A KEY THAT WE CAN NOW USE TO

8    ACCESS THE DOCUMENT.

9        AND THE FINAL PIECE TO THIS LAST STEP IS, THAT MAY BE

10   FOUND BY A LATER EXECUTION OF THE ACCESS CHECKING PROCESS.

11   SO, WE GOT PERMISSION, WE GENERATED THE PERMISSION LOCALLY

12   AFTER WE GOT THE TOKEN, AND NOW THAT PERMISSION IS STORED SO

13   THAT THE NEXT TIME AROUND WHEN SOMEONE TRIES TO ACCESS THIS

14   MATERIAL, WE'LL HAVE PERMISSION.  SO IT'S LIKE THAT ORIGINAL

15   STEP WE SAW AT THE BEGINNING OF THE CLAIM.

16       THE NEXT TIME WE LOOK, WE'LL HAVE PERMISSION AND WE WON'T

17   DO THESE OTHER THINGS.

18   **Q.**  DR. WICKER, COULD YOU DESCRIBE WHETHER OR NOT THE "AT THE

19   CLIENT" REQUIREMENT THAT YOU'VE IDENTIFIED HAS ANY PARTICULAR

20   SIGNIFICANCE IN THE CONTEXT OF THE '541 PATENT IN YOUR VIEW?

21   **A.**  YES.

22       THIS "AT THE CLIENT" LANGUAGE WAS EMPHASIZED IN A NUMBER

23   OF DIFFERENT PLACES.  IN FACT, IT'S WHAT DIGITAL REG USED TO

24   DISTINGUISH WHAT THEY WERE CLAIMING IS THEIR INVENTION FROM

25   SOME DRM THAT WAS IN THE PRIOR ART.  I THINK THIS HAS BEEN

1   ALREADY MENTIONED ONCE EARLIER THIS WEEK.

2        THERE WAS A PATENT TO WOLFE THAT ALSO HAD SOME DRM, AND IT

3   WAS PRIOR ART.  AND WHAT THE PATENTEE, THE APPLICANT, SAID WAS

4   THAT WE DON'T DO IT LIKE WOLFE.  AMENDED CLAIM 1 MAKES CLEAR

5   THAT IT IS AT THE CLIENT THAT THE INSTALLATION PROCESS

6   GENERATES THE PERMISSION KEY.

7        IN WOLFE, IT IS AT THE CENTRAL COMPUTER.  IT IS THE

8   CENTRAL COMPUTER, EXCUSE ME, THAT GENERATES THE MACHINE

9   DEPENDENT PERMISSION CODE.  SO WOLFE DID IT AT THE SERVER.

10  WHAT WE ARE DOING -- WHAT DIGITAL REG SAID THEY WERE DOING WAS

11  DOING IT AT THE CLIENT.  THAT'S WHY THAT LANGUAGE WAS

12  IMPORTANT TO ME.

13  **Q.**  NOW, IF YOU WILL, COULD YOU ALSO DESCRIBE WHETHER THERE'S

14  BEEN ANY OTHER EXPERT ANALYSIS IN THE CASE THAT RELATES TO

15  THIS "AT THE CLIENT" REQUIREMENT?

16  **A.**  YES.

17       DR. KELLER, AGAIN, IS THE VALIDITY EXPERT THAT DIGITAL REG

18  HIRED.  AND WHEN HE WAS ASKED THE QUESTION:  WHATEVER IT IS

19  THAT ONE WOULD POINT TO BE THAT PERMISSION HAS TO HAVE BEEN

20  CREATED AT THE CLIENT.

21       CORRECT, IT HAS TO BE GENERATED AT THE CLIENT.

22       SO HE AGREED WITH ME THAT THAT WAS IMPORTANT AS WELL.

23  **Q.**  IS THERE A REASON WHY IT WOULD BE IMPORTANT TO GENERATE

24  THE PERMISSION LOCALLY AT THE CLIENT AS OPPOSED TO PASSING IT

25  FROM THE SERVER?

1    **A.**  YES.  ARGUABLY IT'S IMPORTANT BECAUSE -- WELL, BASICALLY

2    HERE'S WHAT DR. KELLER SAID WITH REGARD TO HIJACKING.

3        AND THAT'S BEEN MENTIONED A TIME OR TWO EARLIER TODAY,

4    THIS IDEA THAT BY GENERATING AT THE CLIENT WE PREVENT

5    HIJACKING.

6        AND WHAT DID DR. KELLER SAID WAS, PASSING THE PASSWORD

7    RATHER THAN A TOKEN USED TO GENERATE A PERMISSION, EXPOSES THE

8    PASSWORD TO HIJACKING AND POTENTIAL MISUSE.

9        SO IT'S THIS BASIC IDEA THAT, YOU KNOW, IF WE GENERATE IT

10   LOCALLY AND NEVER SEND IT OUT, NO ONE CAN INTERCEPT IT.

11   **Q.**  DR. WICKER, WE KIND OF WENT THROUGH THE STEPS OF THE CLAIM

12   THERE.  IF YOU COULD, COULD WE DESCRIBE -- QUICKLY RUN THROUGH

13   THE ANIMATION THAT YOU PREPARED AND TAKE US THROUGH THE STEP,

14   ALL OF THE CLAIMS AND HOW THEY FIT TOGETHER?  HOW ALL THE

15   STEPS OF THE CLAIM FIT TOGETHER?

16                    (PUBLISHED TO JURY.)

17   **A.**  OKAY.

18       SO THIS IS THE ANIMATION.  AGAIN, WE HAVE GOT A CLIENT

19   COMPUTER AND WE'RE GOING TO ATTEMPT TO ACCESS THAT CONTENT.

20   WE LOOK TO SEE IF WE HAVE PERMISSION LOCALLY.

21       WE DON'T, SO HAVING FAILED, WE THEN SEND, IN THIS CASE

22   SOME MONEY, SEND A REQUEST TO THE SERVER.  THE SERVER WILL

23   RECEIVE OUR MONEY AND THEN SEND THE TOKEN IN RETURN.  IN THIS

24   CASE THE TOKEN SAYS YES.

25       THE TOKEN THEN TELLS THE COMPUTER THAT IT CAN GENERATE

1    LOCALLY THE PERMISSION.  AND WE'LL SEE SOME GEARS COME UP THAT

2    SHOW THIS GENERATION PROCESS.  AND THAT GENERATION IS TIED TO

3    THE MACHINE, SO WE USE THE MACHINE I.D. TO GENERATE THE KEY

4    AND THE KEY CAN NOW BE USED TO ACCESS THE CONTENT.

5        AND, FINALLY, NOW THAT IT'S OPEN, WE ARE GOING TO STORE

6    THE KEY SO NEXT TIME WE'LL KNOW -- WE WILL BE ABLE TO ACCESS

7    THE CONTENT WITHOUT GOING THROUGH THOSE STEPS.

8    **Q.**  NOW, DR. WICKER, DID YOU ANALYZE THE ADOBE ACCUSED

9    PRODUCTS WITH RESPECT TO THE INFRINGEMENT ALLEGATION ON

10   CLAIM 1 OF THE '541 PATENT?

11   **A.**  YES, I DID.

12   **Q.**  I'M GOING TO HAVE YOU STEP THROUGH THE PRODUCTS.  AND

13   LET'S START WITH THE SOFTWARE ACTIVATION OR ALM PRODUCT.

14   **A.**  OKAY.

15       SO, AGAIN, THIS IS THE ALM PRODUCT, ALSO REFERRED TO AS

16   SOFTWARE ACTIVATION.  A FEW QUICK FACTS THAT I DISCOVERED.

17       IT WAS RELEASED IN NOVEMBER 2006 BUT DISCONTINUED JUST TWO

18   AND A HALF MONTHS LATER.  SO THIS PRODUCT WAS NOT AROUND FOR A

19   LONG TIME.  IT WAS DISCONTINUED BECAUSE OF INEFFECTIVENESS AND

20   CUSTOMER COMPLAINTS.

21       WHAT THEY WERE TRYING TO DO WAS CONTROL THE NUMBER OF

22   LICENSES THAT A GIVEN GROUP COULD USE.  LIKE A COMPANY WOULD

23   GET A WHOLE BUNCH OF LICENSES.  IT DIDN'T WORK VERY WELL.

24   PEOPLE WOULD BE DENIED ACCESS WHEN THEY SHOULD HAVE BEEN GIVEN

25   ACCESS.

1    **Q.**  NOW, DR. WICKER, WAS THE DRM COMPONENT FOR ALM HOMEGROWN

2    AT ADOBE OR WAS THAT SOMEONE ELSE'S TECHNOLOGY?

3    **A.**  NO, IT WAS SOMEONE ELSE'S.  IN FACT, I THINK THERE WAS

4    JUST A REFERENCE TO THIS IN THE LAST HOUR.

5        THIS DRM COMPONENT WAS LICENSED FROM A COMPANY CALLED

6    MACROVISION.  SO ADOBE WENT TO A THIRD PARTY TO GET THIS AND

7    LICENSE IT.  SO WE CAN SEE ALM IS BASED ON MACROVISION'S

8    FLEXNET ELECTRONIC LICENSING TECHNOLOGY.

9    **Q.**  DR. WICKER, I'M GOING TO ASK YOU NOW TO DESCRIBE FOR US

10   HOW THE ACCUSED ALM DRM COMPONENT WORKS IN THE VOLUME

11   LICENSING CONTEXT.

12                    (PUBLISHED TO JURY.)

13   **A.**  OKAY.  LET'S START WITH A COMPUTER.  IN FACT, WE HAVE AN

14   ADOBE PRODUCT HERE ON THE SCREEN.

15       SO LET'S GO AHEAD AND GET STARTED.

16       WHEN WE TRY AND ACCESS THE SOFTWARE, THE DRM ON THIS

17   MACHINE IS GOING TO COLLECT THE MACHINE I.D. AND A SERIAL I.D.

18   THESE ARE THE TWO PIECES THAT IT'S GOING TO SEND TO THE

19   SERVER.

20       SO IF WE CAN CLICK AGAIN.

21       THIS INFORMATION, MACHINE I.D. AND SERIAL I.D. IS SENT OUT

22   OVER THE NETWORK TO THE SERVER.

23       NOW THE SERVER IS GOING TO USE THIS INFORMATION TO

24   GENERATE THE PERMISSION, TO GENERATE, AMONG OTHER THINGS, A

25   KEY.  SO WE WILL SEE THAT MACHINE I.D. AND THE SERVER --

1    SERIAL I.D., EXCUSE ME, BEING PROCESSED TO CREATE, AMONG OTHER

2    THINGS, A KEY.  OKAY?  THAT'S THE KEY THAT WILL ALLOW US TO

3    ACCESS THE SOFTWARE.

4    **Q.**  THEN WHAT HAPPENS WITH THAT KEY?

5    **A.**  THAT KEY IS GOING TO BE ENCRYPTED AND IT'S GOING TO BE

6    SENT BACK ACROSS THE NETWORK.  AT THE CLIENT COMPUTER, THE KEY

7    WILL THEN BE USED TO ACCESS THE SOFTWARE.

8    **Q.**  AND IF YOU CAN DESCRIBE HOW THAT WORKS.

9    **A.**  OKAY.

10       SO THIS KEY IS NOW LOCKED TO THIS MACHINE.  SO THE SYSTEM

11   WILL CHECK TO MAKE SURE THAT THIS IS THE MACHINE FOR WHICH

12   THIS KEY WAS DESIGNED.  AND IF IT WAS, INDEED, THE RIGHT

13   MACHINE, IS THIS KEY VALID FOR THIS COMPUTER.  IF SO, ACCESS

14   IS GRANTED, AND YOU CAN USE THE SOFTWARE.

15   **Q.**  NOW, DR. WICKER, IN YOUR ANALYSIS, DID YOU CONSIDER

16   WHETHER OR NOT ALM HAS DIFFERENT CONFIGURATIONS?

17   **A.**  IT ACTUALLY HAS A LARGE NUMBER OF CONFIGURATIONS.  AND,

18   AGAIN, THIS IS SOMETHING THAT'S BEEN ALLUDED TO EARLIER TODAY.

19       THERE'S A LOT OF THEM.  I'M GOING TO EMPHASIZE TWO OR

20   THREE.

21       FIRST OFF, THERE ARE CONFIGURATIONS THAT NEED ACCESS TO

22   THE INTERNET.  THESE TWO AND THAT ONE, BUT THERE ARE SOME THAT

23   DON'T.  SO YOU CAN HOST THIS IN-HOUSE IN WHICH CASE YOU DON'T

24   NEED ACCESS TO THE INTERNET.

25       INCLUDE OR EXCLUDE, THE MACHINE NAME TRACKING.  SO IN SOME

1  CASES WE DO BIND THE KEY TO THE MACHINE AND IN SOME CASES WE

2  DON'T.  IT'S AN OPTION.

3      AND THEN FINALLY WE CAN USE E-LICENSE FILTERS TO CONTROL

4  WHICH USERS MAY DOWNLOAD.  DO THAT LOCALLY, IT'S A LOCAL FORM

5  OF CONTROL.

6  **Q.**  DR. WICKER, DID YOU AGREE OR DISAGREE WITH DR. DEVANBU'S

7  CONCLUSION THAT ALM INFRINGES CLAIM 1 OF THE '541 PATENT?

8  **A.**  I DISAGREE.

9  **Q.**  WHY DON'T YOU FOCUS IN ON WHAT ASPECTS OF THE CLAIM -- ON

10  WHICH ASPECTS OF THE CLAIM YOU HAVE A DISAGREEMENT WITH

11  DR. DEVANBU.

12  **A.**  OKAY.  LET'S START WITH -- REMEMBER, AGAIN, THERE ARE A

13  NUMBER OF STEPS.  I'M USING THE SAME NUMBERS, OF COURSE.

14      I WOULD LIKE TO FOCUS, BECAUSE OF THE ORDER IN WHICH

15  THINGS HAPPEN, ON THIS FOURTH STEP, RECEIVING FROM THE

16  EXTERNAL SOURCE A TOKEN.

17      IF WE CAN GO TO THE NEXT SLIDE.

18                  (PUBLISHED TO JURY.)

19      REMEMBER THAT THE ACCUSED PRODUCT TAKES A MACHINE I.D. AND

20  A SERIAL I.D. TO GENERATE A KEY.  AND THIS IS DONE AT THE

21  SERVER.  I SHOULD HAVE HIGHLIGHTED THAT.  ANYWAY, IT'S DONE AT

22  THE SERVER.

23      NOW THIS IS WHAT'S ACCUSED OF BEING A TOKEN, BUT IT'S NOT.

24  IT CAN'T BE A TOKEN.  BECAUSE WHAT IT IS IS A FULLY DEVELOPED

25  MACHINE LOCKED LICENSE.  IT'S NOT SOMETHING THAT APPROVES OR

1  REJECTS, IT'S THE LICENSE ITSELF.  NOW --

2  **Q.**  DR. WICKER, WERE YOU IN THE COURTROOM YESTERDAY FOR

3  DR. DEVANBU'S TESTIMONY?

4  **A.**  YES, I WAS.

5  **Q.**  AND DID YOU HEAR HIS TESTIMONY REGARDING THE TOKEN AND THE

6  YES NO LIMITATION?

7  **A.**  YES, I DID.

8  **Q.**  AND WHAT WAS -- WHAT DID YOU THINK IN TERMS OF WHETHER YOU

9  AND DR. DEVANBU AGREE OR DISAGREE ON THAT?  DO YOU AGREE OR

10  DISAGREE WITH HIM?

11  **A.**  WELL, I AGREE WITH HIM TO THE EXTENT HE SAYING WE HAVE A

12  FULLY DEVELOPED MACHINE LOCKED LICENSE AND NOT AN INDICATION

13  OF YES OR NO.

14  **Q.**  FROM HIS TESTIMONY YESTERDAY, DID YOU UNDERSTAND THAT HE

15  IS OR IS NOT AGREEING THAT YOU HAVE A TOKEN WITHIN THE CONTEXT

16  OF THE CLAIM CONSTRUCTION -- LET ME REPHRASE THAT TO BE A

17  LITTLE BIT MORE CLEAR.

18      FROM THE TESTIMONY YESTERDAY, IS THERE AN AGREEMENT OR

19  DISAGREEMENT BETWEEN YOU AND DR. DEVANBU AS TO WHETHER OR NOT

20  WHAT'S SENT FROM THE SERVER TO THE CLIENT HAS A YES NO?

21  **A.**  SO WE AGREE THAT WHAT'S SENT IS A FULLY DEVELOPED MACHINE

22  LOCKED LICENSE.  WE DISAGREE ABOUT WHETHER IT'S A TOKEN.  I

23  DON'T THINK IT CAN BE A TOKEN BECAUSE WE'VE ALREADY GOT THE

24  LICENSE.  THERE IS NO APPROVAL OR REJECTION AND A LATER

25  CREATION OF THE PERMISSION.  THIS IS THE PERMISSION.

1   **Q.**  DID YOU HEAR DR. DEVANBU PROVIDE ANY TESTIMONY AS TO

2   WHETHER OR NOT THERE WAS A YES NO IN THE LICENSE THAT'S SENT

3   FROM THE SERVER TO THE CLIENT?

4   **A.**  NO.

5   **Q.**  NOW LET'S TALK ABOUT THE NEXT LIMITATION.  AND IF YOU

6   COULD PROVIDE YOUR OPINION AS TO WHETHER OR NOT THERE IS --

7   THIS LAST LIMITATION IS PRACTICED BY THE ALM PRODUCTS.

8   **A.**  OKAY.  THERE'S A LOT IN THIS LIMITATION, SO I TRIED TO

9   HIGHLIGHT WHAT I WAS GOING TO FOCUS ON.

10      WE ARE EXECUTING AN INSTALLATION PROCESS AT THE CLIENT

11  THAT GENERATES A PERMISSION.  SO THAT'S WHAT I FOCUSED ON IN

12  THIS NEXT PIECE.

13      SO, GOING BACK TO WHAT I SHOWED BEFORE, WE'VE GOT A SERIAL

14  I.D. AND A MACHINE I.D. AT THE SERVER THAT ARE USED TO

15  GENERATE THAT COMPLETE PERMISSION, THAT COMPLETE VOUCHER.  AND

16  THAT'S WHAT WE SEE HERE.  IT RESULTS IN, AMONG OTHER THINGS,

17  THE KEY.

18      AND SO THAT'S THE KEY THAT WE'RE GOING TO BE USING TO

19  ACCESS THE SOFTWARE.  AND IT'S BEING GENERATED NOT AT THE

20  CLIENT, BUT AT THE SERVER.

21  **Q.**  DR. WICKER, DID YOU FIND ANY DOCUMENTARY EVIDENCE TO

22  SUPPORT YOUR ANALYSIS OF WHERE THE KEY IS GENERATED IN THE ALM

23  PRODUCTS?

24  **A.**  YES.

25      SO ON THE NEXT SLIDE, I WOULD LIKE TO POINT TO AN ALM

1    WHITE PAPER.  I THINK IT'S PLAINTIFF'S EXHIBIT 16, IF I'M

2    READING THAT CORRECTLY.

3                    (PUBLISHED TO JURY.)

4        THIS SAYS WHAT ACTUALLY I JUST SAID.  IT SAYS:  "THE ADOBE

5    LICENSE SERVER OR THE ALM BACK-END SERVICE SENDS THE REQUESTER

6    AN E-LICENSE."

7        THE E-LICENSE, THE PERMISSION, COMES FROM THE SERVER.

8    **Q.**  AND YOU HEARD DR. DEVANBU'S TESTIMONY EARLIER TODAY ON

9    THIS ISSUE, RIGHT?

10   **A.**  YES, I DID.

11   **Q.**  AND ARE YOU IN AGREEMENT ON THAT POINT?

12   **A.**  WITH REGARD TO WHERE THE LICENSE COMES FROM, YES.

13       THE PERMISSION THAT IS INFORMATION THAT IS PASSED FROM THE

14   SERVER, YES.  HE AGREED WITH THAT.  AND, AGAIN, THE PERMISSION

15   COMES FROM THE SERVER.  YES, I DO AGREE WITH THAT.

16   **Q.**  NOW, WE TALKED A LITTLE BIT ABOUT THE CONCEPT OF

17   GENERATING THIS PERMISSION LOCALLY AT THE CLIENT AND THE

18   SERVER.  IS THAT AN IMPORTANT COMPONENT OF THE '541 CLAIM 1 IN

19   YOUR OPINION?

20   **A.**  YES.

21   **Q.**  AND WHY IS THAT?

22   **A.**  WELL, IT'S OBVIOUSLY -- IT'S BEEN DISCUSSED QUITE A BIT SO

23   FAR IN COURT.

24       I WOULD LIKE TO POINT OUT THAT, FOR EXAMPLE, DR. KELLER

25   POINTS OUT IN HIS EXPERT REPORT THAT BY GENERATING AT THE

1    CLIENT INSTEAD OF THE SERVER, WE CAN AVOID HIJACKING AND

2    MISUSE.

3        AND I THINK THAT'S SOMETHING THAT WAS MENTIONED EARLIER

4    TODAY.  IF WE DO IT AT THE CLIENT, IT CAN'T BE INTERCEPTED.

5    **Q.**  NOW, ADOBE'S PRODUCTS, AS YOU JUST TESTIFIED, GENERATE THE

6    KEY AT THE SERVER AND THEN PASS IT OVER THE INTERNET.  WHY

7    AREN'T ADOBE'S PRODUCTS SUBJECT TO THE SAME HIJACKING CONCERN?

8    **A.**  WELL, ADOBE CAME UP WITH A DIFFERENT SOLUTION.  RATHER

9    THAN SENDING JUST A TOKEN, WHOSE INTERCEPTION WOULD BE

10   MEANINGLESS, ADOBE SENDS THE FULL LICENSE, THE FULL PERMISSION

11   BUT ENCRYPTS IT.

12       SO NOW IF THAT LICENSE IS HIJACKED, EVERYTHING'S THERE BUT

13   IT'S USELESS BECAUSE IT IS LOCKED.  IT HAS BEEN ENCRYPTED AND

14   THE PEOPLE WHO HIJACKED IT DON'T HAVE THE KEY, THEREFORE, THEY

15   CAN'T GET AT IT.

16   **Q.**  NOW, ONE THING I JUST WANT TO CLARIFY BECAUSE OF THIS

17   ENCRYPTION PROCESS.

18       THE KEY GENERATED AT THE SERVER PRIOR TO ENCRYPTION, IS IT

19   THE SAME OR DIFFERENT FROM THE KEY THAT IS STORED AT THE

20   CLIENT AFTER DECRYPTION?

21   **A.**  OKAY.  THERE HAS BEEN A LOT OF KEYS DISCUSSED.  THERE'S

22   ACTUALLY A HIERARCHY OF KEYS DOING DIFFERENT THINGS.

23       THE KEY I'M TALKING ABOUT HERE, THE KEY THAT WILL GIVE US

24   ACCESS TO THIS ADOBE PRODUCT IS THE EXACT SAME KEY THAT'S

25   GENERATED OVER HERE AT THE SERVER.  WE ENCRYPT IT, WE DO OTHER

1    THINGS WITH IT, BUT THE KEY THAT'S GENERATED HERE IS THE EXACT

2    SAME KEY THAT'S USED TO OPEN UP THIS SOFTWARE AND ALLOW YOU TO

3    USE IT.

4    Q.  IS IT -- LET ME ASK THE QUESTION THIS WAY.

5         IS THE PROCESS OF AN ENCRYPTING AND DECRYPTING DATA, DOES

6    THAT CHANGE OR REGENERATE THE DATA IN ANY WAY?

7    A.  NO.  NO.  THAT'S JUST SIMPLE PROCESSING.

8         BASICALLY WHAT'S HAPPENING IS, WE HAVE A KEY HERE AND WE

9    WANT TO PROTECT IT.  SO AS PART OF THE COMMUNICATION PROCESS

10   WE'RE GOING TO ENCRYPT IT.  WHEN IT GETS OVER ON THE OTHER END

11   OF THE NETWORK, WE DECRYPT IT.

12        THERE'S ALL KINDS OF PROCESSING THAT HAPPENS WHEN WE

13   COMMUNICATE OVER THE INTERNET.  YOU KNOW, THERE'S TCPIP

14   PROTOCOLS AND WHATNOT, BUT WHAT STARTS HERE AS THE KEY, IS THE

15   SAME KEY THAT ENDS UP HERE.  THE KEY THAT'S GENERATED AT THE

16   SERVER IS THE KEY THAT UNLOCKS THE SOFTWARE.

17   Q.  THANK YOU, DR. WICKER.

18        IF YOU COULD MAYBE JUST SUMMARIZE YOUR OPINIONS WITH

19   RESPECT TO CLAIM 1 FOR ALM.

20   A.  OKAY.  SO WHAT I HAVE SHOWN IS THERE IS NO TOKEN THAT'S

21   CALLED FOR IN THE CLAIM AND THERE'S NO GENERATION OF THE

22   PERMISSION AT THE CLIENT.

23        SO WE X OUT THESE LAST TWO LIMITATIONS.  AND I'VE BEEN

24   INSTRUCTED THAT YOU HAVE TO ACTUALLY SATISFY EVERYTHING TO

25   INFRINGE.  SO IT'S A METHOD CLAIM.  YOU HAVE TO PRACTICE ALL

1    THE STEPS IN ORDER TO INFRINGE THE CLAIM.

2        WELL, ADOBE'S ALM PRODUCTS DON'T PRACTICE 4 AND 5, AT

3    LEAST.

4    **Q.**  DID YOU ALSO CONSIDER THE DEPENDENT CLAIMS OF THE '541

5    PATENT THAT ARE ASSERTED IN THE CASE?

6    **A.**  YES.

7    **Q.**  WHAT WAS YOUR CONCLUSION WITH RESPECT TO THOSE CLAIMS?

8    **A.**  THESE DEPENDENT CLAIMS 2, 4 AND 13 INCLUDE CLAIM 1.  THEY

9    HAVE SOME LANGUAGE THAT SAYS "A METHOD INCLUDING CLAIM 1", ET

10   CETERA.

11       WELL, THAT MEANS YOU HAVE TO SATISFY CLAIM 1 AS WELL AS

12   WHATEVER ADDITIONAL STEPS ARE ADDED BY 2, 4 AND 13.  SO IF YOU

13   DON'T SATISFY CLAIM 1 YOU CAN'T SATISFY 2, 4 AND 13.  THAT'S

14   REALLY MY BASIS FOR SAYING ALM CAN'T INFRINGE 2, 4 AND 13.

15   **Q.**  THANK YOU, DR. WICKER.

16       LET'S TURN TO THE FLASH ACCESS PRODUCT FOR CLAIM 1 OF THE

17   '541 PATENT.

18   **A.**  OKAY.

19   **Q.**  SO IF YOU CAN GIVE US JUST QUICK BACKGROUND ON FLASH AND

20   THEN WE'LL MOVE TO THE CLAIM LIMITATIONS.

21   **A.**  OKAY.  WELL, FLASH, LITTLE MORE FAMILIAR -- IT'S STILL

22   AROUND.  DEVELOPMENT STARTED IN 2006 AND EARLY 2007, AND THE

23   FIRST FLASH PRODUCTS -- FIRST FLASH ACCESS WAS RELEASED IN

24   MARCH 2008.

25   **Q.**  AND IF YOU COULD DESCRIBE HOW THE FLASH ACCESS DRM SCHEME

1    WORKS.

2                    (PUBLISHED TO JURY.)

3    **A.**  OKAY.  THIS IS A LITTLE DIFFERENT, WHAT'S BEING PROTECTED.

4         WE'VE GOT VIDEO IN THIS CASE, FOOTBALL GAME.  COULD ALSO

5    HAVE AUDIO.  THERE'S A NUMBER OF DIFFERENT THINGS FLASH CAN BE

6    USED FOR.  BUT TYPICALLY A MORE -- NOT JUST A DOCUMENT.

7         SO HERE WE HAVE FLASH ACCESS.

8         NOW, WHEN YOU ATTEMPT TO ACCESS THE VIDEO, IN THIS

9    PARTICULAR CASE, A MACHINE I.D. AND A SERIAL I.D. ARE ONCE

10   AGAIN SENT TO THE SERVER.  THIS WILL BE A LITTLE FAMILIAR.

11        THE MACHINE I.D. AND SERIAL I.D. ARE USED TO GENERATE A

12   KEY.  THE KEY AND SOME OTHER MATERIAL ARE ENCRYPTED, SENT

13   ACROSS THE WEB.  THE CLIENT COMPUTER THEN RETRIEVES THE KEY

14   AND YOU CAN WATCH THE FOOTBALL GAME.

15   **Q.**  DR. WICKER, AS YOU WERE CONSIDERING THE FLASH PRODUCT, DID

16   YOU CONSIDER DIFFERENT CONFIGURATIONS?

17   **A.**  YES.  AS WITH ALM, THERE ARE MANY DIFFERENT

18   CONFIGURATIONS.

19        WITH REGARD TO FLASH, FOR EXAMPLE, YOU CAN LOCK THE KEY TO

20   THE DOMAIN NAME -- I THINK THAT WAS DISCUSSED EARLIER -- AND

21   NOT THE MACHINE.

22        SO, FOR EXAMPLE, WE'VE GOT DOMAIN SUPPORT THAT'S

23   REFERENCED IN THIS DOCUMENT, THE FLASH ACCESS OVERVIEW.

24   ANOTHER OPTION IS TO SIMPLY TURN OFF THE LICENSING.  OKAY.  NO

25   LICENSE, YOU CAN JUST USE IT.

1      ANOTHER ISSUE, AND I THINK THIS HAS BEEN DISCUSSED AS

2   WELL, THE LICENSE CAN BE PRE-DELIVERED.  YOU CAN ACTUALLY GET

3   THE LICENSE BEFORE YOU GET THE CONTENT.

4      SO ALL OF THESE ARE DIFFERENT WAYS OF USING FLASH, AMONG

5   OTHERS.

6   **Q.**  AS YOU UNDERSTAND DR. DEVANBU'S ANALYSIS, AND AS YOU

7   RESPONDED TO IT, WOULD THESE SCENARIOS FALL WITHIN HIS

8   INFRINGEMENT THEORY?

9   **A.**  NO.  NO.  IN FACT, FROM WHAT HE JUST SAID, THEY WOULD NOT.

10  I THINK HE SAID THAT HIMSELF.

11  **Q.**  NOW, DID YOU FORM AN AGREEMENT OR A DISAGREEMENT WITH

12  DR. DEVANBU WITH RESPECT TO WHETHER OR NOT THE FLASH ACCESS

13  PLATFORM INFRINGES CLAIM 1 OF THE '541 PATENT?

14  **A.**  I DID NOT AGREE WITH REGARD TO INFRINGEMENT FOR ANY OF

15  THESE CONFIGURATIONS.

16  **Q.**  OKAY.  LET'S LOOK AT THE CLAIM, AND MAYBE YOU CAN EXPLAIN

17  WHY YOU DISAGREE WITH DR. DEVANBU ON INFRINGEMENT.

18  **A.**  OKAY.

19     SO, IN THIS CASE, FOR FLASH, IT'S A LOT LIKE ALM.  THERE'S

20  A QUESTION OF ARE WE RECEIVING A TOKEN OR ARE WE ACTUALLY

21  GETTING THE FULL PERMISSION.

22     SO WHAT I FOUND WAS -- WE CAN GO TO THE NEXT SLIDE.

23              (PUBLISHED TO JURY.)

24     THE FLASH PLATFORM DOESN'T GIVE A YES OR NO.  WHAT IT DOES

25  IS IT PASSES A VOUCHER THAT INCLUDES A MACHINE LOCKED KEY.  SO

1    THAT'S OUR KEY.  THAT'S WHAT WE ARE GOING TO USE TO WATCH THE

2    GAME, OR WHATEVER.  IT'S NOT A YES OR NO INDICATION.

3    **Q.**  DR. WICKER, YOU WATCHED THE ENTIRE EXAMINATION OF

4    DR. DEVANBU, RIGHT?

5    **A.**  I DID.

6    **Q.**  DID YOU HEAR HIM OFFER ANY OPINION OR POINT TO ANYTHING AS

7    BEING A YES NO INDICATION IN WHAT HE POINTED TO AS THE TOKEN?

8    **A.**  NO.

9    **Q.**  NOW, YOU SAID YOU DISAGREE WITH HIM ON THE CONCLUSION OF

10   INFRINGEMENT.

11       DO YOU AGREE OR DISAGREE THAT THE FLASH PLATFORM DOESN'T

12   SEND A YES NO INDICATION TO THE CLIENT?

13   **A.**  I DON'T BELIEVE IT SENDS A YES NO.  IT SENDS A COMPLETE

14   VOUCHER WITH A MACHINE LOCKED KEY.  THAT'S NOT A TOKEN.

15   **Q.**  NOW IF WE CAN TURN TO THE NEXT LIMITATION.

16       IS THE LIMITATION 5, THE BASED ON THE RECEIVED TOKEN

17   GENERATING A CLIENT AT THE CLIENT A PERMISSION LIMITATION, IS

18   THAT MET IN THE FLASH ACCESS PLATFORM PRODUCT IN YOUR VIEW?

19   **A.**  NO.  NO.

20       AGAIN, IT'S THE SAME ISSUE.  WE ARE EXECUTING -- THE CLAIM

21   CALLS FOR EXECUTING AN INSTALLATION PROCESS THAT GENERATES AT

22   THE CLIENT A PERMISSION.

23       AND AS I JUST SHOWED YOU, THE PERMISSION, THE LOCKED KEY,

24   IS GENERATED AT THE SERVER.  WE TAKE A MACHINE I.D. AND A

25   SERIAL I.D., AND CRUNCH IT ALONG WITH SOME OTHER THINGS, AND

1  WE GET OUR KEY.

2      THE KEY IS ENCRYPTED AND THEN SENT TO OUR -- OUR LAPTOP OR

3  WHATEVER THE CASE MAY BE, WHATEVER WE ARE TRYING TO WATCH THE

4  GAME ON.

5      SO, THE PERMISSION, IF YOU WILL, THE KEY IS GENERATED AT

6  THE SERVER, NOT AT THE CLIENT.

7  **Q.**  NOW, DR. WICKER, WERE THERE ANY ADOBE DOCUMENTS OR SUPPORT

8  THAT YOU LOOKED AT IN CONFIRMING THE DESCRIPTION THAT YOU JUST

9  PROVIDED?

10  **A.**  YES.

11      FOR EXAMPLE, THIS IS THE ADOBE FLASH ACCESS 2.0 PROTECTING

12  CONTENT.  IT NOTES THAT THE LICENSE SERVER ISSUES, TO ISSUE A

13  LICENSE TO THE USER.  SO THAT'S WHERE THE LICENSE COMES FROM,

14  THE SERVER.

15      HERE'S FLASH ACCESS 3.0.  THE LICENSE SERVER ISSUES A

16  LICENSE CONTAINING THE CONTENT ENCRYPTION KEY TO DECRYPT THE

17  CONTENT.  THAT'S THE KEY WE NEED TO WATCH THE GAME.

18  **Q.**  NOW, IF WE COULD, WHY DON'T WE SUM UP YOUR OPINION WITH

19  RESPECT TO '541 CLAIM 1 FOR FLASH ACCESS.

20  **A.**  OKAY.

21      AS WITH THE PREVIOUS CASE, AS WITH ALM, FLASH ACCESS CAN'T

22  INFRINGE BECAUSE THERE'S NO TOKEN.  WE ARE NOT GETTING THE YES

23  NO INDICATION, APPROVAL OR REJECTION.  WHAT WE ARE GETTING IS

24  A COMPLETE DIGITAL KEY AND SOME OTHER INFORMATION.

25      AND THIS -- THIS PERMISSION, THIS KEY IS GENERATED NOT AT

1    THE CLIENT, BUT AT THE SERVER.  SO THESE LAST TWO STEPS AREN'T

2    PERFORMED BY FLASH ACCESS.

3    **Q.**   WHAT ABOUT THE DEPENDENT CLAIMS?

4    **A.**   AGAIN, IF YOU DON'T INFRINGE THE FIRST CLAIM, YOU CAN'T --

5    LET ME REPHRASE THAT.

6        IF YOU DON'T INFRINGE THE INDEPENDENT CLAIM, YOU CAN'T

7    INFRINGE THE CLAIMS THAT DEPEND ON IT.  SO, IF YOU DON'T

8    INFRINGE CLAIM 1, YOU CAN'T INFRINGE 2, 4 AND 13.

9    **Q.**   OKAY.  LAST PRODUCT FOR THIS CLAIM, THE LIVECYCLE RIGHTS

10   MANAGEMENT SERVER.  DID YOU FORM AN OPINION AS TO WHETHER OR

11   NOT THE LIVECYCLE RIGHTS MANAGEMENT SERVER INFRINGES CLAIM 1

12   OF THE '541 PATENT?

13   **A.**   YES, I DID.

14   **Q.**   WHAT WAS YOUR OPINION?

15   **A.**   IT DOESN'T INFRINGE EITHER.

16   **Q.**   COULD YOU EXPLAIN A LITTLE BIT OF BACKGROUND ABOUT THE

17   PRODUCT AND YOUR BASIS FOR THAT CONCLUSION?

18   **A.**   OKAY.

19       THIS DEVELOPMENT STARTED IN 2002, AND IT WAS RELEASED IN

20   2004.  IT'S BASICALLY A TECHNOLOGY FOR LOCALLY CONTROLLING

21   ACCESS -- OR WITHIN A NETWORK, EXCUSE ME, FOR CONTROLLING

22   ACCESS TO DOCUMENTS.

23   **Q.**   IF YOU COULD USE YOUR ANIMATION TO EXPLAIN HOW THAT WORKS.

24   **A.**   SURE.

25                    (PUBLISHED TO JURY.)

1        SO ONCE AGAIN WE'VE GOT A CLIENT COMPUTER.  WE ARE TRYING

2   TO ACCESS A DOCUMENT.  NOW, NOTE WE ARE SENDING TWO DIFFERENT

3   THINGS HERE.  THAT WAS A USER I.D. THAT WENT BY VERY QUICKLY

4   AND A PASSWORD.  THAT IS THEN USED TO PROCESS THE KEY THAT

5   WILL BE USED TO ACCESS THE DOCUMENT.  THAT'S AN IMPORTANT

6   DIFFERENCE I'LL GET BACK TO.

7        THAT KEY IS THEN SENT BACK OVER THE WEB OR THE LAN,

8   WHATEVER THE CASE MAY BE.  AND SO THIS PARTICULAR USER, IF

9   THEY ARE GRANTED ASSESS, WILL BE ABLE TO ACCESS THE DOCUMENT.

10  **Q.**  AND, AGAIN, AS YOU DID WITH THE OTHER PRODUCTS, DID YOU

11  CONSIDER WHETHER OR NOT THERE ARE DIFFERENT CONFIGURATIONS OF

12  LIVECYCLE?

13  **A.**  THERE ARE A LOT OF CONFIGURATIONS.  IN FACT, THIS COMES

14  WITH AN SDK, A SOFTWARE DEVELOPMENT KIT, THAT ALLOWS YOU TO

15  FINE TUNE BASICALLY PROVIDES YOU WITH AN APPLICATION INTERFACE

16  SO THAT YOU CAN FINE TUNE EXACTLY WHAT YOU WANT THIS

17  PROTECTION SYSTEM TO DO.

18       SO, LOTS OF DIFFERENT VARIATIONS.

19       AND, IN PARTICULAR, I WANT TO EMPHASIZE, ONE, YOU CAN USE

20  THIS AS AN ONLINE OR AN OFFLINE SYSTEM.  SO ONLINE, AS WE'LL

21  SEE, YOU'LL HAVE TO -- YOU IMMEDIATELY GO OUT AND GET

22  PERMISSION.  BUT IF IT'S OFFLINE, YOU CAN ACTUALLY EMBED THE

23  PERMISSION IN THE DOCUMENT ITSELF SO YOU NEVER HAVE TO GO

24  ANYWHERE.

25  **Q.**  LET'S TURN TO THE CLAIM.  AND MAYBE YOU CAN WALK US

1    THROUGH THE BASIS FOR THAT CONCLUSION THAT YOU FORM THAT

2    LIVECYCLE DOESN'T INFRINGE.

3    **A.**  OKAY.  WELL, THIS TIME I'M GOING TO START WITH 2 AND 3.

4    THIS IS MY -- THE "IF NOT" STATEMENT.

5                        (PUBLISHED TO JURY.)

6        SO, JUST TO REMIND YOU REAL QUICKLY, AT A CLIENT EXECUTING

7    AN ACCESS CHECKING PROCESS TO SEE WHETHER WE CAN GET ACCESS.

8    IF NOT, REQUESTING PERMISSION FROM AN EXTERNAL SOURCE.

9        OKAY.  SO IF WE CAN CONTINUE ON.

10                       (PUBLISHED TO JURY.)

11       NOTE THAT "IF NOT" AGAIN.  BUT CONTINUING ON, I WANT TO

12   NOTE THAT RATHER THAN CHECK THE FIRST STEP, LIVECYCLE ALWAYS

13   REACHES OUT TO THE SERVER AND THE CONFIGURATION THAT HAS BEEN

14   ACCUSED OF INFRINGEMENT.  IT DOES NOT FIRST LOOK FOR A

15   PERMISSION.  OKAY?

16       I TALKED TO MR. HERBACH -- I THINK WE WILL HEAR FROM HIM

17   NEXT -- HE'S THE ENGINEER WHO DESIGNED AND BASICALLY RUNS THE

18   OPERATION THAT DEVELOPS LIVECYCLE.  AND ALONG WITH THE

19   DOCUMENTS, HE EXPLAINED THAT LIVECYCLE ALWAYS REACHES OUT.

20   THERE IS NO CHECKING FOR A PERMISSION IN THE ONLINE VERSION.

21   **Q.**  I'M GOING TO GO BACK AND ASK YOU NOW IF YOU CAN JUST WALK

22   US THROUGH THE LIVECYCLE OPERATION THERE.

23   **A.**  OKAY.

24       SO, ONCE AGAIN, WE'VE GOT THE COMPUTER.  NOW, WHEN WE TRY

25   AND ACCESS THE DOCUMENT IN THE ONLINE VERSION, WE MAY HAVE --

1    YOU ARE ALREADY OVER THERE.  OKAY.

2       SO WE ARE GOING TO SEND THE USER I.D. AND THE PASSWORD

3    OVER HERE (INDICATING).  I DON'T KNOW IF YOU SAW IT GO ACROSS,

4    BUT IT WENT ACROSS.  AND THE USER I.D. AND PASSWORD ARE GOING

5    TO BE USED TO GENERATE THAT PERMISSION.  SO WE ALWAYS REACH

6    OUT.  WE ALWAYS SEND THE USER I.D. AND PASSWORD.

7    **Q.**  NOW, WERE THERE DOCUMENTS THAT YOU LOOKED AT TO CONFIRM

8    THE OPERATION?

9    **A.**  YES.  THERE WERE A LOT OF DOCUMENTS, ACTUALLY, BUT I WILL

10   POINT TO THE LIVECYCLE -- IT'S ACTUALLY LIVECYCLE ES SERVICES.

11      SO WHAT THIS DESCRIBED WAS THE DOCUMENT IDENTIFIER IS SENT

12   TO THE RIGHTS MANAGEMENT SERVICE -- SERVER.  THAT IDENTIFIER

13   IS ONE OF THE THINGS I POINTED OUT.

14      AND ANOTHER THING I WANT TO NOTE, THE DOCUMENT IS

15   DECRYPTED WHEN THAT KEY COMES BACK ACROSS THE WEB OR THE LAN

16   AND THE DOCUMENT KEY IS DISCARDED.  SO IT'S NOT SAVED.  SO

17   THERE'S NO REASON TO LOOK FOR THAT KEY LATER ON BECAUSE YOU

18   THREW IT AWAY.

19   **Q.**  SO, YOU'VE ADDRESSED THE FIRST -- OR THE SECOND AND THE

20   THIRD LIMITATION.

21   **A.**  RIGHT.

22   **Q.**  WERE THERE ANY OTHER LIMITATIONS THAT YOU FOUND TO BE

23   MISSING?

24   **A.**  WELL, THAT WAS ACTUALLY ENOUGH, BUT I WENT AHEAD AND

25   LOOKED AT THE LAST TWO STEPS.

1    AND, ONCE AGAIN, WE SEE THE SAME -- THE SAME ISSUES.  THE

2    QUESTION OF A TOKEN, IS THERE A TOKEN PRESENT.

3    WELL, AS I SHOWED YOU, THERE IS NO TOKEN PRESENT.

4    INSTEAD, WHAT WE ARE GETTING FROM THE SERVER IS A VOUCHER THAT

5    INCLUDES A KEY.  IT'S NOT AN APPROVAL OR A REJECTION, IT'S NOT

6    A YES OR A NO INDICATION, IT'S THE KEY.  OKAY?  IT'S WHAT YOU

7    NEED TO ACCESS THE DOCUMENT.  AND THIS IS SOMETHING

8    MR. HERBACH CONFIRMED.

9  **Q.**  SO WOULD THAT FOURTH LIMITATION OF CLAIM 1 OF THE '541 BE

10   MET BY LIVECYCLE?

11 **A.**  NO.

12 **Q.**  AND WHY DON'T WE TURN TO THE LAST LIMITATION.

13   WAS THE LAST LIMITATION MET IN YOUR ANALYSIS?

14 **A.**  AGAIN, IT'S THE SAME THEME.

15   THE REQUIREMENT IS THAT WE GENERATE AT THE CLIENT A

16   PERMISSION.  HAS TO BE DONE AT THE CLIENT THIS GENERATION OF

17   THE PERMISSION.  BUT AS I'VE SHOWN YOU, IT'S GENERATED AT THE

18   SERVER.  THE KEY COMES FROM THE SERVER.  THE USER I.D. AND

19   PASSWORD ARE PROCESSED TO GENERATE THE KEY HERE AT THE SERVER

20   AND THEN THAT KEY IS SENT TO THE CLIENT.

21 **Q.**  WERE THERE ANY DOCUMENTS THAT YOU LOOKED AT TO -- OR

22   ANALYZED AS PART OF YOUR ANALYSIS OF LIVECYCLE?

23 **A.**  YES.

24   THIS, AGAIN, IS THE -- I THINK IT'S LIVECYCLE ES SERVICES.

25   IT SAYS, "RIGHTS MANAGEMENT ES CREATES A DOCUMENT LICENSE.

1    KEYS ARE SENT BACK TO THE CLIENT."

2        SO THIS IS ONE EXAMPLE OF A DOCUMENT, MR. HERBACH WILL

3    TALK ABOUT THIS AS WELL, I GUESS, BUT BASICALLY WHAT IT IS

4    SAYING IS THE RIGHTS MANAGEMENT CREATES THE LICENSE AND THEN

5    THE KEY IS SENT TO THE CLIENT.  IT'S NOT GENERATED AT THE

6    CLIENT.

7    **Q.**  AND DID YOU REVIEW THE LIVECYCLE POLICY SERVER SDK

8    DOCUMENT AS WELL?

9    **A.**  YES.  THIS TALKS ABOUT EXTRACTING THE POLICY DETAILS FROM

10   THE DOCUMENT.  THAT'S ONE OF THE OTHER THINGS THAT COMES WITH

11   THE LICENSE.  THERE ARE CERTAIN RULES OF USE, AND THOSE SORTS

12   OF THINGS.

13   **Q.**  IF YOU CAN SUM UP WHETHER OR NOT THAT LAST LIMITATION IS

14   MET IN YOUR VIEW.

15   **A.**  OKAY.

16       IN MY OPINION, AND I THINK TO SOME EXTENT DR. DEVANBU

17   AGREES, THAT LAST ISN'T SATISFIED EITHER BECAUSE THE KEY IS

18   ACTUALLY GENERATED AT THE SERVER, NOT AT THE CLIENT.  SO

19   THAT'S WHY I X'D OUT THAT PART OF THE FIFTH STEP.

20   **Q.**  I WANT TO FOCUS YOU IN ON ANOTHER ASPECT OF THE FIFTH

21   STEP, WHICH IS THIS "LOCKED UNIQUELY TO THE CLIENT ASPECT".

22       IS THIS SOMETHING -- WHY DON'T WE TALK ABOUT THAT FIRST

23   BEFORE WE TALK ABOUT IT IN THE CONTEXT OF LIVECYCLE.

24       IN THE CONTEXT OF THE CLAIM, WHAT IS THE SIGNIFICANCE OR

25   LACK OF SIGNIFICANCE OF LOCKED UNIQUELY TO THE CLIENT IN YOUR

1    VIEW?

2    **A.**   OKAY.  SO IT'S PART OF THE CLAIM LANGUAGE.  IT'S SAYING

3    THAT THIS PERMISSION THAT'S GENERATED AT THE CLIENT IS LOCKED

4    UNIQUELY TO THE CLIENT, SO IT CAN ONLY BE USED BY THAT CLIENT.

5    THE CLIENT CAN THEN PASS IT ON TO SOMEBODY ELSE.

6         AND IT'S ALSO IMPORTANT BECAUSE IT'S ONE OF THE THINGS

7    THAT'S EMPHASIZED IN THE PATENT.  FOR EXAMPLE, THIS IS '541

8    PATENT, COLUMN 9, LINES 4 THROUGH 9.  WE LOCK THE PERMISSION

9    TO A PARTICULAR MACHINE.  LOCK THE INSTALLATION TO A

10   PARTICULAR MACHINE.  IT'S STATED RIGHT THERE IN THE PATENT.

11   **Q.**   IS THAT -- I AM SORRY?

12   **A.**   IT'S IMPORTANT IN MY ANALYSIS BECAUSE ADOBE'S DOCUMENTS

13   ARE LOCKED TO THE USERS AND LIVECYCLE, NOT TO A PARTICULAR

14   MACHINE.

15        THAT WAY THE USER CAN BE ON HIS OR HER LAPTOP, CAN BE ON A

16   WORK COMPUTER, WHEREVER, AND STILL ACCESS THE DOCUMENT BECAUSE

17   IT'S NOT LOCKED TO THE MACHINE.

18        USERS MUST LOG IN BEFORE PERFORMING THE FOLLOWING TASKS.

19   OPENING POLICY-PROTECTED DOCUMENTS.  AGAIN, IT'S THE LIVECYCLE

20   SERVICES DOCUMENT.

21   **Q.**   OKAY.

22        NOW, IF YOU COULD, LET'S SUMMARIZE YOUR OPINION AS TO

23   WHETHER OR NOT '541 CLAIM 1 IS MET BY THE LIVECYCLE PRODUCT.

24   **A.**   OKAY.

25        IN THIS INSTANCE, NONE OF THE STEPS OF THE METHOD 2, 3, 4

1    AND 5 -- AFTER WE HAVE THE METHOD COMPRISING, WE HAVE ALL

2    THESE STEPS -- NONE OF THEM ARE PERFORMED BY LIVECYCLE.

3        YOU KNOW, I CAN WALK THROUGH IT AGAIN, BUT BASICALLY THEY

4    ARE NOT THERE.

5    **Q.**  WHAT ABOUT THE DEPENDENT CLAIMS?

6    **A.**  OKAY.  THAT'S AGAIN THE SAME ARGUMENT.  JUST SHOWED YOU

7    CLAIM 1 ISN'T PRACTICE.  IF CLAIM 1 IS NOT PRACTICED, THE

8    DEPENDENT CLAIMS CAN'T BE PRACTICED EITHER.  SO 2, 4 AND 13

9    CAN'T BE INFRINGED.

10   **Q.**  NOW, DR. WICKER --

11           **THE COURT:**  IT'S TIME TO TAKE OUR BREAK.  IS THIS A

12   GOOD TIME?

13           **MS. MEHTA:**  CERTAINLY, YOUR HONOR.

14           **THE COURT:**  ALL RIGHT.  IT'S 2:15.  WE WILL BREAK

15   UNTIL 2:30 AND THEN WE WILL GO UNTIL 3:30.

16       (RECESS TAKEN AT 2:15 P.M.; RESUMED AT 2:30 P.M.)

17       (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

18           **THE CLERK:**  YOU CAN BE SEATED.

19       REMAIN SEATED.  COME TO ORDER.  THIS COURT IS BACK IN

20   SESSION.

21   **BY MS. MEHTA:**

22   **Q.**  ALL RIGHT, DR. WICKER.

23       I WANT TO TAKE CARE OF JUST ONE QUICK HOUSEKEEPING MATTER

24   WITH YOU.  AND THAT IS, IF YOU CAN TURN IN YOUR BINDER TO

25   EXHIBIT PX65, WHICH IS A DOCUMENT YOU REFERENCED IN YOUR '541

1    SLIDES?

2    **A.**   OKAY.

3    **Q.**   DO YOU RECOGNIZE THAT DOCUMENT?

4    **A.**   YES.   THIS IS THE ADOBE FLASH ACCESS VERSION 2.0 THAT I

5    REFERRED TO.

6    **Q.**   AND THAT'S SOMETHING THAT YOU CONSIDERED IN YOUR ANALYSIS?

7    **A.**   YES.

8    **Q.**   DOES THE EXHIBIT COPY LOOK LIKE THE COPY OF THE DOCUMENT

9    THAT YOU REVIEWED IN YOUR ANALYSIS?

10   **A.**   YES, IT DOES.

11            **MS. MEHTA:**   YOUR HONOR, WE MOVE PX65 INTO THE RECORD?

12            **MR. DINOVO:**   NO OBJECTION, YOUR HONOR.

13            **THE COURT:**   RECEIVED.

14            **THE CLERK:**   PLAINTIFF'S EXHIBIT 65?

15            **MS. MEHTA:**   YES.

16            **THE CLERK:**   IT WAS PREVIOUSLY ADMITTED EARLIER THIS

17   MORNING.

18            **MS. MEHTA:**   I APOLOGIZE.   I MISSED THAT THIS MORNING.

19   **BY MS. MEHTA:**

20   **Q.**   THEN ONE LAST ONE IS DX360.   DEFENDANT'S EXHIBIT 360.

21   **A.**   OKAY.

22   **Q.**   DO YOU RECOGNIZE THAT DOCUMENT, DR. WICKER?

23   **A.**   YES.   THIS IS PART OF THE LIVECYCLE POLICY SERVER CLIENT

24   SDK SPECIFICALLY DEVELOPING CLIENT APPLICATIONS.

25   **Q.**   AND IS THAT SOMETHING YOU CONSIDERED IN YOUR ANALYSIS?

1    **A.**  YES, IT IS.

2    **Q.**  IS THE DOCUMENT THAT YOU HAVE IN FRONT OF YOU MARKED

3    DEFENDANT'S EXHIBIT 360 THE SAME DOCUMENT YOU LOOKED AT?

4    **A.**  YES.  THIS IS THE DEVELOPING CLIENT APPLICATIONS DOCUMENT.

5         **MS. MEHTA:**  YOUR HONOR, AT THIS TIME, WE MOVE

6    DEFENDANT'S EXHIBIT 360 INTO THE RECORD.

7         **MR. DINOVO:**  NO OBJECTION.

8         **THE COURT:**  RECEIVED.

9         (DEFENDANT'S EXHIBIT 360 RECEIVED IN EVIDENCE)

10   **BY MS. MEHTA:**

11   **Q.**  DR. WICKER, LET'S CHANGE FOCUS TO THE '670 PATENT.

12   **A.**  OKAY.

13        **MS. MEHTA:**  MR. BONINI, IF WE CAN PLEASE PULL UP

14   DR. WICKER'S ILLUSTRATIVES FOR THE '670?

15                  (PUBLISHED TO JURY.)

16       THERE WE GO.

17   **BY MS. MEHTA:**

18   **Q.**  DR. WICKER, IF YOU CAN BRIEFLY GIVE US AN OVERVIEW OF THE

19   PATENT?

20   **A.**  OKAY.

21       THE '670 IS A LITTLE DIFFERENT FROM WHAT WE WERE TALKING

22   ABOUT BEFORE.  HERE, WE ARE GOING TO BE LOOKING AT TRACKING

23   THE ELECTRONIC CONTENT.  THE POINT IS MORE WHO'S USING THE

24   DOCUMENT AND MAKING SURE WE, FOR EXAMPLE, COUNT THE NUMBER OF

25   USES AS OPPOSED TO SIMPLY CONTROLLING ACCESS.

1   **Q.**  LET'S FOCUS IN ON CLAIM 45.

2   **A.**  OKAY.

3   **Q.**  AND I GUESS BEFORE I DO THAT, I WANT TO ASK YOU, YOU'VE

4   CONSIDERED DR. DEVANBU'S INFRINGEMENT OPINIONS WITH RESPECT TO

5   CLAIM 45?

6   **A.**  THAT'S CORRECT.

7   **Q.**  AND DO YOU AGREE OR DISAGREE?

8   **A.**  I DO NOT AGREE.

9   **Q.**  OKAY.  NOW, LET'S -- MAYBE YOU CAN WALK US THROUGH THE

10  STEPS OF CLAIM 45 AND GIVE US AN OVERVIEW OF HOW THE CLAIMED

11  METHOD WORKS.

12  **A.**  OKAY.  MAY I GO BACK TO THE SCREEN?

13  **Q.**  YES, PLEASE.

14                  (PUBLISHED TO JURY.)

15  **A.**  THIS IS CLAIM 45 OF THE '670.

16      AGAIN, IT'S A METHOD.  IT'S GOT A SERIES OF STEPS THAT

17  I'VE NUMBERED.  THE ACTUAL STEPS ARE 2, 3 AND 4, AND ONE IS

18  THE PREAMBLE.

19  **Q.**  WHY DON'T WE START WITH STEP 1, OR THE PREAMBLE.

20  **A.**  OKAY.

21      SO STEP 1 CALLS FOR A METHOD OF TRACKING ACCESS OF

22  ELECTRONIC CONTENT.  WE WANT TO KNOW WHO USES IT.

23      IT'S A METHOD COMPRISING -- GO TO THE SECOND STEP --

24  CREATING A FILE THAT INCLUDES ELECTRONIC CONTENT.

25      SO THIS REPRESENTS THE FILE.  AND IT'S GOT SOME KIND OF

1   ELECTRONIC CONTENT, ANY VARIETY OF THINGS.  AND CONTINUING ON

2   WITH THIS STEP, AND CAUSES ACCESS TO THE CONTENT TO BE DENIED.

3   SO YOU'RE BLOCKED FROM USING IT.

4       AND THEN THE THIRD PIECE TELLS US HOW LONG YOU'RE BLOCKED.

5   YOU'RE BLOCKED UNTIL NOTIFICATION INFORMATION, THAT'S THE

6   LITTLE DOTS WE SEE GOING ACROSS -- UNTIL NOTIFICATION

7   INFORMATION COLLECTED BY EXECUTABLE INSTRUCTIONS HAS BEEN

8   SUCCESSFULLY TRANSMITTED.  SO WE CREATE A FILE, BUT WE BLOCK

9   ACCESS TO IT UNTIL NOTIFICATION INFORMATION HAS BEEN

10  SUCCESSFULLY TRANSMITTED.

11  **Q.**  DR. WICKER, WHAT'S THE SIGNIFICANCE OF THAT FINAL

12  LIMITATION OR FINAL HIGHLIGHTED PORTION OF THAT LIMITATION?

13  **A.**  WELL, THIS PATENT IS ABOUT TRACKING.  SO WHAT WE ARE

14  SAYING IS, UNTIL THAT TRACKING HAS BEEN ENABLED THROUGH

15  SUCCESSFUL TRANSMISSION, WE'RE GOING TO BLOCK ACCESS.  SO

16  ACCESS IS BLOCKED UNTIL SUCCESSFUL TRANSMISSION.

17  **Q.**  WAS THERE ANY EVIDENCE YOU RELIED UPON TO CONFIRM THAT

18  UNDERSTANDING?

19  **A.**  YES.

20      FOR EXAMPLE, THERE WAS DISCUSSION OF A RELATED PATENT --

21  THIS IS PART OF THE FILE HISTORY -- FOR THE RELATED PATENT

22  THAT INCORPORATED THE PATENT WE'RE LOOKING AT, AND THE PATENT

23  OFFICE TALKED ABOUT ITS UNDERSTANDING OF WHAT THE LANGUAGE

24  THAT WAS IN THIS RELATED PATENT MEANT.

25      IT SAID, "APPLICANTS ARGUE THE INVENTION AS CLAIMED GRANTS

1    ACCESS IMMEDIATELY UPON TRANSMISSION OF THE NOTIFICATION,

2    WITHOUT WAITING FOR A RESPONSE FROM THE SERVER".

3        SO THIS TELLS ME THAT IT'S THE TRANSMISSION THAT I SHOULD

4    FOCUS ON IN DETERMINING WHEN ACCESS WILL BE GRANTED.

5            **MS. MEHTA:**  YOUR HONOR, AT THIS TIME WE WOULD MOVE

6    DEFENDANT'S 505, PAGES 1449 AND 1432 INTO THE RECORD.

7            **MR. DINOVO:**  NO OBJECTION.

8            **THE COURT:**  RECEIVED.

9        (DEFENDANT'S EXHIBITS 505 (PGS 1432 & 1449) RECEIVED IN

10    EVIDENCE)

11            **THE CLERK:**  I'M SORRY.  CAN I HAVE THE NUMBERS AGAIN?

12            **MS. MEHTA:**  EXHIBIT 505, 1449, 1432.

13            **THE CLERK:**  THANK YOU.

14    **BY MS. MEHTA:**

15    **Q.**  NOW, DR. WICKER, IF YOU COULD MAYBE GIVE US AN OVERVIEW OF

16    HOW ALL OF THE STEPS FIT TOGETHER?

17    **A.**  OKAY.

18        SO I'LL START WITH TRANSMITTING THE FILE TO AT LEAST ONE

19    ADDRESS.

20        SO WE HAVE ALREADY SEEN THE EARLIER REQUIREMENT.  NOW WE

21    ARE GOING TO TRANSMIT THE FILE FROM THE ENVELOPE CREATOR TO A

22    RECIPIENT.  AND THEN MAYBE ON TO A SUCCESSIVE RECIPIENT.  THAT

23    SUCCESSIVE LANGUAGE IS IMPORTANT.  AND THEN ON TO ANOTHER --

24    WE CAN DO THIS OVER AND OVER.  BUT I'VE GOT TWO SUCCESSIVE

25    RECIPIENTS AND ONE RECIPIENT.

1    **Q.**  AND THEN WHAT ABOUT THE NEXT STEP?

2    **A.**  THE NEXT STEP BRINGS IN THAT SUCCESSIVE PART.

3        RECEIVING NOTIFICATION INFORMATION FROM A SUCCESSIVE

4    RECIPIENT.

5        SO WE'VE GOT OUR ENVELOPE CREATOR.  WE SEND THE FILE TO

6    THE RECIPIENT.  WE CAN TOGGLE THAT.  NOW, THE RECIPIENT IS

7    GOING TO BE BLOCKED FROM USING THAT UNTIL THE SUCCESSFUL

8    TRANSMISSION.  SO NO ACCESS.  BUT HERE WE SEE THE

9    TRANSMISSION, SUCCESSFUL TRANSMISSION, THE USER GETS ACCESS.

10       NOW LET'S SUPPOSE THIS RECIPIENT SENDS IT ON TO A

11   SUCCESSIVE RECIPIENT.  IT'S WHEN THE SUCCESSIVE RECIPIENT

12   ATTEMPTS TO ACCESS, TRANSMISSION SUCCESSFUL ACCESS IS GRANTED.

13   THAT'S WHAT SATISFIES THIS CLAIM LANGUAGE, RECEIVING FROM THE

14   SUCCESSIVE RECIPIENT.

15       WE WILL DO IT AGAIN.  HERE'S ANOTHER SUCCESSIVE RECIPIENT.

16   THEY ATTEMPT TO ACCESS, SUCCESSFUL TRANSMISSION ACCESS IS

17   GRANTED, AND WHEN IT'S RECEIVED, THEY RECEIVE THE INFORMATION

18   FROM A SUCCESSIVE RECIPIENT.

19   **Q.**  AND WHAT WAS THE MEANING OF SUCCESSIVE RECIPIENT THAT YOU

20   APPLIED IN YOUR ANALYSIS?

21   **A.**  THE COURT PROVIDED THE CONSTRUCTION FOR ME.  THE COURT

22   SAYS, SUCCESSIVE RECIPIENT MEANS USER THAT RECEIVES ELECTRONIC

23   CONTENT FROM A PREVIOUS RECIPIENT.  SO THAT TOLD ME WHAT IT

24   MEANT.

25   **Q.**  WAS THERE ANY OTHER SUPPORT THAT YOU LOOKED AT TO EVALUATE

1    WHAT THAT MEANS IN THE CONTEXT OF THE COURT'S CLAIM

2    CONSTRUCTION?

3    **A.**   THE COURT'S CLAIM CONSTRUCTION WAS REFLECTED IN THE PATENT

4    AND IN, FOR EXAMPLE, THE FILE HISTORY, THE BACK AND FORTH

5    BETWEEN THE INVENTOR AND THE PATENT OFFICE.

6         HERE WE SEE THE PATENTEE CONFIRMING WHAT THIS MEANS.  THE

7    ENVELOPE MAY BE RETRANSMITTED BY AN INITIAL RECIPIENT TO

8    SUCCESSIVE RECIPIENTS.  AND THEN IT GOES ON FROM THERE.  SO

9    IT'S TELLING ME SUCCESSIVE MEANS AFTER THAT FIRST RECIPIENT,

10   WHICH MAKES SENSE.

11        **MS. MEHTA:**  YOUR HONOR, AT THIS TIME WE WOULD MOVE

12   PAGE 232 OF PX4, WHICH IS THE FILE HISTORY, INTO EVIDENCE.

13        **MR. DINOVO:**  NO OBJECTION.

14        **THE COURT:**  RECEIVED.

15        (PLAINTIFF'S EXHIBIT 4 (PG 232) RECEIVED IN EVIDENCE)

16   **BY MS. MEHTA:**

17   **Q.**   NOW, DR. WICKER, LET'S --

18        **THE COURT:**  AGAIN, WHAT I WANT TO DO IS PUT A JOINT

19   EXHIBIT WITH THE RELEVANT PAGES OF THE FILE HISTORY INTO ONE

20   EXHIBIT.

21        **MS. MEHTA:**  YES, YOUR HONOR.  WE WILL WORK TOGETHER

22   TO DO THAT.  THANK YOU.

23   **BY MS. MEHTA:**

24   **Q.**   IF WE COULD TRANSITION INTO THE ACCUSED PRODUCTS AND HOW

25   THEY WORK.

1        AGAIN, WE WILL START WITH THE LIVECYCLE RIGHTS MANAGEMENT

2   PRODUCT.

3   **A.**   OKAY.

4   **Q.**   SO WHY DON'T WE DO THAT?

5   **A.**   OKAY.  LIVECYCLE DOESN'T SATISFY FOR A COUPLE OF REASONS.

6        FIRST THING I WOULD LIKE TO FOCUS ON IS THIS CAUSES ACCESS

7   TO BE DENIED UNTIL NOTIFICATION INFORMATION HAS BEEN

8   SUCCESSFULLY TRANSMITTED.

9        IF WE CAN GO TO THE NEXT SLIDE.

10                     (PUBLISHED TO JURY.)

11       WE SEE THAT LIVECYCLE DOES NOT GRANT ACCESS UPON

12   TRANSMISSION -- SUCCESSFUL TRANSMISSION.  IT'S NOT THE WAY

13   IT'S DONE.  LIVECYCLE REQUIRES A KEY FROM THE SERVER.

14       SO IT'S NOT THE SUCCESSFUL TRANSMISSION THAT DETERMINES.

15   IT'S GETTING THAT KEY.

16       SO IF WE CONTINUE ON, WE SEE THAT NUMBER ONE, SOMEONE

17   TRIES TO OPEN A DOCUMENT -- THESE ARE THE VARIOUS APPLICATIONS

18   WE COULD BE LOOKING AT, ACROBAT PROFESSIONAL, ADOBE READER.

19   IF SOMEONE TRIES TO OPEN A DOCUMENT, THE SYSTEM PROVIDES THE

20   USER NAME AND PASSWORD, IT'S SENT OVER TO THE LIVECYCLE RIGHTS

21   MANAGEMENT SERVER, IT AUTHENTICATES THE USER, CHECKS THE

22   POLICY FOR AUTHORIZATION -- AND REMEMBER THIS IS THE USER, NOT

23   THE MACHINE -- CHECKS THE POLICY FOR AUTHORIZATION, AND THEN

24   CREATES A VOUCHER THAT CONTAINS THE KEY AND SENDS IT BACK.

25       SO IT'S NOT THE TRANSMISSION THAT CAUSES THE SUCCESSFUL

1  ACCESS, IT'S THAT VOUCHER WITH THE DOCUMENT KEY AND

2  PERMISSIONS.

3  **Q.** WERE THERE ANY OTHER DOCUMENTS THAT YOU LOOKED AT TO

4  CONFIRM THAT UNDERSTANDING?

5  **A.** WELL, THERE WERE SEVERAL. FOR EXAMPLE, THIS IS THE

6  LIVECYCLE OVERVIEW. AND IT TALKS ABOUT -- THIS IS ACTUALLY

7  FROM THE SDK -- OVERALL SDK HAS A LOT OF DOCUMENTS. THIS IS

8  ONE.

9      THE LIVECYCLE ES PROVIDES DEVELOPMENT TOOLS THAT ALLOW A

10  WIDE VARIETY OF USERS, ET CETERA, TO DEVELOP THIS. AND ONE OF

11  THE THINGS THAT IT TALKS ABOUT IN THIS SDK IS THAT WE CAN USE

12  THE SYSTEM ONLINE OR OFFLINE.

13      SO THERE'S A LOT OF DIFFERENT USES. DOCUMENT PROTECTION

14  FOR OFFLINE USE, WE CAN ACTUALLY EMBED THE KEY IN IT. SO IT

15  HAS NOTHING TO DO WITH TRANSMITTING SUCCESSFULLY.

16  **Q.** NOW THIS IS AN IMPORTANT POINT SO I WANT TO MAKE SURE WE

17  ARE CLEAR ON YOUR OPINION ON THIS.

18      REGARDING THIS SUCCESSFUL TRANSMISSION LIMITATION, MAYBE

19  YOU CAN JUST EXPLAIN AGAIN WHY YOU FORM THE CONCLUSION THAT

20  THAT'S NOT MET BY THE LIVECYCLE PRODUCT.

21  **A.** OKAY. SO, AGAIN, THE DETERMINATIVE POINT IS NOT

22  SUCCESSFUL TRANSMISSION, IT'S GETTING A KEY. LIVECYCLE

23  REQUIRES A KEY BEFORE GRANTING ACCESS.

24      NOW, IT DOESN'T GRANT ACCESS UPON SUCCESSFUL TRANSMISSION

25  BECAUSE FIRST OFF, ACCESS MAY BE DENIED. YOU MAY SUCCESSFULLY

1    TRANSMIT AND THEN BE TURNED DOWN.

2        IN ANOTHER SITUATION, WE MAY GET ACCESS WITHOUT ANY

3    TRANSMISSION.  THAT'S THE OFFLINE VERSION THAT'S BEEN

4    DISCUSSED IN COURT.

5    **Q.**  NOW, IF YOU COULD, WAS THERE ANY OTHER -- ACTUALLY, I

6    THINK WE'VE COVERED THIS ALREADY.  I'M GOING TO MOVE PASSED

7    THIS WHEN WE LOOKED AT THIS BEFORE.

8        SO WITH RESPECT TO THE CLAIM, YOU'VE TALKED ABOUT THE

9    SECOND LIMITATION.  WHY DON'T WE TURN TO THE DEPENDENT CLAIMS.

10   **A.**  OKAY.

11       SO THE LIMITATION WASN'T MET.  THERE WAS NO INFRINGEMENT

12   OF CLAIM 45, AND IN THIS CASE, THE DEPENDENT CLAIM IS CLAIM 52

13   WHICH INCLUDES 45.  IF YOU DON'T INFRINGE 45, YOU CAN'T

14   INFRINGE 52.

15   **Q.**  OKAY.  THANK YOU.

16       WHY DON'T WE TURN TO THE ALM PRODUCT.

17   **A.**  OKAY.

18   **Q.**  AND IF YOU COULD, IF YOU CAN DESCRIBE HOW ALM FOR VOLUME

19   LICENSING WORKS IN THE CONTEXT OF DR. DEVANBU'S INFRINGEMENT

20   ALLEGATIONS AND ALL OF THE MATERIALS YOU CONSIDERED.

21   **A.**  WHAT WAS DISCUSSED THEN WAS THIS VOLUME LICENSING

22   SITUATION IN WHICH A LICENSE IS PROVIDED TO A COMPANY -- SO

23   WE'LL MOVE THE LICENSE OVER -- AND IT'S IN THE FORM OF AN

24   INSTALLATION FILE.  THAT WAS DISCUSSED IN SOME DETAIL DURING

25   THE EARLY AFTERNOON.

1        THAT INSTALLATION FILE IS PROVIDED TO DIFFERENT USERS.  SO

2   IT'S PUT ON A SERVER, FOR EXAMPLE.  INDIVIDUAL USERS WILL

3   DOWNLOAD OR UPGRADE THEIR PARTICULAR PRODUCTS.

4        AND NOW LET'S SUPPOSE A PARTICULAR USER WANTS TO ACCESS

5   THE PRODUCT.  INSTALLS THE PRODUCT FIRST.  THERE'S NO DRM ON

6   THE INSTALLATION, SO WE GET THE FILES.

7        NOW, WHEN WE ACTUALLY TRY TO ACCESS THE APPLICATION, TRY

8   AND USE THE EXECUTABLE FILE, THAT'S WHEN WE HAVE TO GO GET THE

9   KEY.  SO REMEMBER, THIS IS LIVECYCLE.  WHEN YOU TRY AND USE

10  IT, YOU'VE GOT TO GO GET A KEY IMMEDIATELY.  THERE'S NO --

11  **Q.**  DOCTOR, I AM SORRY TO INTERRUPT YOU.

12       YOU JUST SAID TO LIVECYCLE.  DID YOU MEAN TO SAY ALM?

13  **A.**  I MEANT TO SAY ALM.  I'M SORRY.

14  **Q.**  NO PROBLEM.

15  **A.**  MY MISTAKE.  LET'S STICK WITH ALM.

16       SO WITH ALM, WHEN WE ATTEMPT TO ACCESS, THE MACHINE I.D.

17  AND THE SERIAL I.D. ARE SENT TO THE SERVER.  THE SERVER USES

18  THEM TO CREATE A KEY, A COMPLETE PERMISSION, WHICH IS THEN

19  SENT BACK TO THE USER.  AND THE USER CAN THEN ACCESS.

20  **Q.**  NOW, IS THAT FIRST USER A SUCCESSIVE RECIPIENT?

21  **A.**  NO.  NO.  BECAUSE THIS USER DOWNLOADED IT, HAD THE

22  ORIGINAL -- ORIGIN INSTALL FILE, INSTALLED IT, AND NOW THEY

23  ARE TRYING TO ACCESS.  AND THEY HAD TO GO THROUGH THIS

24  PROCESS.

25  **Q.**  NOW WHAT HAPPENS WHEN A DIFFERENT USER WANTS TO ACCESS

1   CONTENT THEY DOWNLOADED FROM THE SERVER?

2   **A.** SAME THING HAPPENS. MACHINE I.D., SERIAL I.D. SENT, GOES

3   BACK WITH A KEY, GETS ACCESS, AND THE SAME WITH THIS

4   INDIVIDUAL HERE. MACHINE I.D., SERIAL I.D., USED TO GENERATE

5   THE KEY AT THE SERVER, IT THEN GOES BACK.

6   **Q.** THANK YOU, DR. WICKER.

7       NOW, WE TALKED A LITTLE BIT ABOUT THE OTHER

8   CONFIGURATIONS -- DIFFERENT CONFIGURATIONS OF ALM WITH RESPECT

9   TO THE '541.

10      DID YOU ALSO CONSIDER THOSE WITH RESPECT TO THE '670?

11  **A.** YES.

12      AS WITH THE OTHER PRODUCTS, THERE ARE A NUMBER OF

13  DIFFERENT CONFIGURATIONS. FOR EXAMPLE, NEED ACCESS TO THE

14  INTERNET. SOMETIMES WE DO, SOMETIMES WE DON'T.

15      INCLUDE OR EXCLUDE THE MACHINE NAME TRACKING. SOMETIMES

16  YES, SOMETIMES NO. AND, AGAIN, THE E-LICENSE FILTER.

17      SO THERE ARE A LOT OF DIFFERENT CONFIGURATIONS FOR ALM.

18  **Q.** LET'S GO BACK TO THE CLAIM. IF YOU CAN EXPLAIN WHETHER OR

19  NOT YOU BELIEVE THE SECOND LIMITATION THAT YOU'VE HIGHLIGHTED

20  HERE IS MET BY THE ALM PRODUCTS.

21  **A.** OKAY.

22      AGAIN, WITH ALM, YOU DON'T ACCESS UNTIL YOU GET THE KEY.

23  AND WHAT THE CLAIM -- IF WE CAN GO BACK FOR A MOMENT.

24  **Q.** I'M SORRY.

25                    (PUBLISHED TO JURY.)

1    **A.**  WHAT THE CLAIM REQUIRES IS ACCESS IS DENIED UNTIL

2    NOTIFICATION INFORMATION IS SUCCESSFULLY SENT.

3        WELL, AS WE HAVE SEEN, THAT'S NOT ENOUGH.  IT DOESN'T WORK

4    LIKE THAT.  ADOBE REQUIRES A LICENSE BEFORE GETTING ACCESS.

5    BUT THERE'S A CAVEAT HERE.  YOU CAN USE IT FREELY FOR 30 DAYS

6    USING TRY AND BUY BEFORE YOU GET THE KEY.  SO, BOTH OF THESE

7    SHOW -- THERE ARE TWO DIFFERENT WAYS THAT SHOW THAT THAT CLAIM

8    LIMITATION IS NOT MET.

9    **Q.**  I'M GOING TO STOP YOU FOR A SECOND AND ASK YOU ABOUT THIS

10   TRY AND BUY PERIOD.

11       IF A PERSON DOWNLOADS THE SOFTWARE, AND THEN DURING THE

12   30-DAY TRY AND BUY PERIOD ACTIVATES IT, WILL THEY EVER HAVE

13   BEEN DENIED ACCESS TO THE SOFTWARE?

14   **A.**  NO.  IF YOU ACCESS IT ON THE 29TH DAY, YOU WILL HAVE

15   SEEMLESS USE.  YOU ARE NEVER DENIED.

16   **Q.**  THEN YOU HAVE ANOTHER BULLET HERE.  CAN YOU EXPLAIN THE

17   SIGNIFICANCE OF THAT?

18   **A.**  ADOBE DOES NOT GRANT ACCESS UPON SUCCESSFUL TRANSMISSION.

19   THE SUCCESSFUL TRANSMISSION DOESN'T DETERMINE ANYTHING.

20   ACCESS CAN BE DENIED EVEN IF THE TRANSMISSION WAS SUCCESSFUL

21   IF FOR SOME REASON, YOU KNOW, YOU ARE NOT ON THE LIST FOR

22   ACCESSING THE DOCUMENT OR USING THE APPLICATION.

23   **Q.**  WERE THERE ANY DOCUMENTS OR OTHER SUPPORT THAT YOU USED TO

24   CONFIRM THAT UNDERSTANDING?

25   **A.**  YEAH.  THIS IS THE SAME ALM WHITE PAPER WE LOOKED AT ABOUT

1    30, 40 MINUTES AGO.  IT TALKS ABOUT USE FOR A 30-DAY GRACE

2    PERIOD.  THAT'S THE TRY AND BUY.

3        ALSO TALKS ABOUT THE USER HAVING TO DOWNLOAD AN E-LICENSE

4    FOR UNINTERRUPTED USE OF THE PRODUCT.  SO THAT'S THOSE TWO

5    ISSUES THAT I HAVE WITH THE INFRINGEMENT ANALYSIS.  ONE, YOU

6    CAN USE IT BEFORE THERE'S ANY TRANSMISSION AND, TWO,

7    TRANSMISSION IS NOT ENOUGH IN THE LONG RUN BECAUSE YOU HAVE TO

8    HAVE THE LICENSE.

9    **Q.**  NOW, WAS THAT THE END OF YOUR ANALYSIS WITH RESPECT TO

10   CLAIM 45 AND THE ALM PRODUCT?

11   **A.**  NO.  WE CONTINUE ON.

12       I WOULD LIKE TO NOTE THERE'S ADDITIONAL MATERIAL, NAMELY,

13   REQUIREMENT FOR CREATING A FILE AND TRANSMITTING THE FILE.

14   **Q.**  AND IF YOU COULD EXPLAIN WHETHER YOU BELIEVE THAT THOSE

15   LIMITATIONS ARE MET.

16   **A.**  AGAIN, TALKING ABOUT CREATION AND TRANSMISSION.  THERE HAS

17   TO BE A FILE THAT INCLUDES ELECTRONIC CONTENT.  AND THEN,

18   AGAIN, CAUSES ACCESS TO BE DENIED, ET CETERA.  I WOULD LIKE TO

19   FOCUS ON THIS ELECTRONIC CONTENT.

20       WHAT HAS BEEN ACCUSED AND WHAT WAS DISCUSSED EARLIER TODAY

21   IN COURT WAS THE INSTALLER.  THE INSTALLER GOES TO THE

22   COMPANY, PUT ON A SERVER, PEOPLE DOWNLOAD IT, AND IT'S --

23   THERE IS NO DRM ON THE INSTALLER.  THERE IS NO DENIAL OF

24   ACCESS TO THE INSTALLER.  YOU CAN INSTALL.  IT'S ONLY LATER

25   WHEN WHAT'S ACTUALLY BEEN INSTALLED IS ACCESSED THAT YOU

1  ENCOUNTER POTENTIALLY DRM.  BUT THE INSTALLER ITSELF IS NOT

2  PROTECTED.

3  **Q.**  NOW, IN THAT EXAMPLE THAT YOU JUST DESCRIBED, OR IN

4  DESCRIBING THE PRODUCT, WHO IS IT THAT'S CREATING THE FILE?

5  **A.**  WHO IS IT THAT'S CREATING THE FILE?

6       WELL, ADOBE DIDN'T CREATE THE FILE.  THE FILE HAS NOT BEEN

7  CREATED BY THE INSTALLER, IF THAT'S WHAT YOU ARE ASKING.  THAT

8  WAS DISCUSSED EARLIER.  THERE REALLY IS NO EVIDENCE IN COURT

9  AS TO HOW THAT INSTALLER ACTUALLY WORKS.  THE INSTALLER IS NOT

10  JUST A COLLECTION OF FILES.

11  **Q.**  NOW, IN TERMS OF THE SECOND PART OF THAT LIMITATION THAT

12  YOU WERE TALKING ABOUT, MAYBE YOU CAN ADDRESS THAT.

13  **A.**  OKAY.  I SORT OF -- I TOUCHED ON THIS A BIT.

14       THE SECOND PART OF THE LIMITATION IS CAUSES ACCESS TO THE

15  ELECTRONIC CONTENT TO BE DENIED UNTIL NOTIFICATION INFORMATION

16  IS SENT.

17       INSTALLER FILE DOESN'T DO THAT.  IF YOU'VE INSTALLED

18  SOFTWARE, YOU KNOW IT WILL HAPPILY LET YOU INSTALL IT.  IN

19  MOST CASES, IT'S -- IT'S LATER ON THAT POTENTIALLY YOU MAY

20  HAVE ISSUES.  BUT THE INSTALLER FILE CERTAINLY DOESN'T DO

21  THIS.  IT DOESN'T HAVE ANY DRM.

22  **Q.**  LET'S TURN TO THE NEXT LIMITATION THEN.  IF YOU COULD

23  DESCRIBE YOUR ANALYSIS WITH RESPECT TO THE SUCCESSIVE

24  RECIPIENT LIMITATION.

25  **A.**  WHAT'S CALLED FOR HERE IS RECEIVING NOTIFICATION

1    INFORMATION FROM A SUCCESSIVE RECIPIENT OTHER THAN THE ONE --

2    THE IMMEDIATE SENDER OF THE ELECTRONIC CONTENT.

3        IT'S JUST NOT THE FIRST USER TO GET IT, IT'S THE

4    SUCCESSIVE RECIPIENT.  WHEN YOU GET THE NOTIFICATION

5    INFORMATION FROM THAT SUCCESSIVE RECIPIENT, YOU SATISFY THE

6    STEP.

7    **Q.**  MAYBE YOU CAN SHOW US ON THIS GRAPHIC WHETHER YOU FOUND

8    THERE TO BE A SUCCESSIVE RECIPIENT IN THE ALM CONTEXT.

9                        (PUBLISHED TO JURY.)

10   **A.**  OKAY.

11       SO HERE WE HAVE THE INSTALLER FILE, POTENTIALLY ON A

12   SERVER.  IT'S BEING DOWNLOADED BY DIFFERENT USERS.  EACH OF

13   THESE USERS IS AN ORIGINAL RECIPIENT.  THEY DIDN'T USE IT --

14   SORRY.  THEY DIDN'T RECEIVE IT FROM ANOTHER USER.  THEY JUST

15   DOWNLOADED IT, OBTAINED IT FROM THE COMPANY, AND THAT'S IT.

16       AS WAS DISCUSSED AGAIN EARLIER, THERE'S NO EVIDENCE THAT

17   PEOPLE ARE PASSING IT AROUND.

18   **Q.**  IF YOU COULD JUST SUMMARIZE YOUR OPINION WITH RESPECT TO

19   CLAIM 45.

20   **A.**  OKAY.  SO, WE'VE LOOKED AT ALL OF THESE STEPS AND 2, 3 AND

21   4, AS I'VE SHOWN, ARE NOT PRACTICED BY THE INSTALLER.

22   **Q.**  YOU UNDERSTAND THAT THE DEPENDENT CLAIM, CLAIM 52 IS ALSO

23   ASSERTED, RIGHT?

24   **A.**  THAT'S CORRECT.

25   **Q.**  DID YOU REACH A CONCLUSION AS TO INFRINGEMENT BY THE

1    DEPENDENT CLAIM?

2    **A.**  YES, I DID.

3    **Q.**  WHAT WAS THAT CONCLUSION?

4    **A.**  AGAIN, SINCE THE INDEPENDENT CLAIM IS NOT SATISFIED, THE

5    DEPENDENT CLAIM CAN'T BE.  YOU HAVE TO HAVE THE INDEPENDENT

6    CLAIM PLUS WHATEVER THE DEPENDENT CLAIM CALLS FOR.

7    **Q.**  THANK YOU, DR. WICKER.

8         NOW I WANT TO TURN YOUR ATTENTION TO ONE LAST TOPIC THAT

9    RELATES TO OR CUTS ACROSS BOTH OF THE PATENTS, THE '541 AND

10   THE '670, AND THAT'S THE TOPIC OF DESIGN-AROUND OPTIONS.

11        IF YOU CAN BRIEFLY DESCRIBE –– WELL, LET ME START BY

12   ASKING, DID YOU FORM ANY OPINIONS WITH RESPECT TO

13   DESIGN-AROUND OPTIONS?

14   **A.**  YES, I DID.

15   **Q.**  AND IF YOU CAN BRIEFLY DESCRIBE FIRST WHAT DESIGN-AROUND

16   OPTIONS ARE, AND THEN WE WILL TALK ABOUT YOUR ANALYSIS.

17   **A.**  OKAY.

18        THIS FACTORS INTO THE DAMAGES, THE ECONOMIC SIDE OF THE

19   CASE, BUT BASICALLY THE ISSUE IS, ASSUMING THAT THERE IS

20   INFRINGEMENT, AND THAT'S SOMETHING I OBVIOUSLY DON'T AGREE

21   WITH, BUT ASSUMING THERE IS, HOW HARD WOULD IT HAVE BEEN TO

22   DESIGN AROUND.  YOU KNOW, IF IT'S AN EASY FIX, THAT'S AN

23   IMPORTANT THING TO CONSIDER.

24        SO THAT WAS SOMETHING I CONSIDERED.  I ASKED MYSELF, YOU

25   KNOW, WHAT KIND OF DESIGN-AROUND OPTIONS WOULD THERE HAVE BEEN

1    ASSUMING THAT THESE, YOU KNOW, PRODUCTS ACTUALLY DO INFRINGE.

2        AND THE DATE WAS IMPORTANT.  I UNDERSTAND IT TO BE THE

3    DATE THAT INFRINGEMENT ALLEGEDLY BEGAN.  SO IT'S AN ASSUMPTION

4    I WAS REQUIRED TO MAKE.

5        I SAID, HOW COULD I DESIGN AROUND?  WELL, THERE'S A LOT OF

6    WAYS --

7    **Q.**  SORRY, I JUST WANT TO CLARIFY.

8        WITH RESPECT TO THE DATE, THAT'S THE -- THAT WAS THE DATE

9    YOU WERE ASKED TO ASSUME FOR THIS ANALYSIS, RIGHT?

10   **A.**  THAT'S CORRECT.

11       SO IN 2005, WHAT COULD WE HAVE DONE?  WHAT COULD ADOBE

12   HAVE DONE?  WELL, THEY COULD HAVE REARRANGED SECTIONS OF CODE

13   SO THAT THINGS OPERATED A LITTLE DIFFERENTLY, SO THEY DIDN'T

14   OPERATE IN THE ACCUSED MANNER.

15       FOR EXAMPLE, DON'T ALLOW KEYS TO BE SAVED IN MEMORY.  YOU

16   CAN'T GO LOOK IN MEMORY FOR A PREVIOUSLY SAVED PERMISSION IF

17   YOU DON'T ALLOW KEYS TO BE SAVED.  THAT'S A RELATIVELY SIMPLE

18   THING TO DO.

19       UTILIZE LOCAL ACTIVATION PROCESSES.  ADOBE ALREADY HAS

20   TECHNIQUES FOR EMBEDDING KEYS THAT DON'T REQUIRE ACCESSING A

21   SERVER.  THAT'S SOMETHING ELSE ADOBE COULD HAVE DONE AS

22   OPPOSED TO USING THE ACCUSED TECHNIQUES.

23       AND HAVING THOUGHT OF THESE, I WAS ABLE TO TALK TO ADOBE

24   ENGINEERS AND ACTUALLY ASK THEM HOW HARD WOULD IT HAVE BEEN TO

25   MAKE THESE CHANGES.  AND THEY CONFIRMED THAT IN SOME CASES,

1    THEY WOULD HAVE BEEN REALLY EASY.  IN OTHER CASES, THEY WOULD

2    HAVE TAKEN A SMALL AMOUNT OF TIME.  BUT OVERALL IMPLEMENTING

3    THESE OPTIONS WOULD HAVE BEEN TRIVIAL.

4        THESE ARE SOMETHING THAT, FOR EXAMPLE, THE GENTLEMAN THAT

5    WE'LL TALK TO NEXT, MR. HERBACH TALKED TO ME ABOUT, AND OTHERS

6    AS WELL.  AND THE CUSTOMERS WOULD NOT HAVE BEEN AFFECTED.

7    THERE MAY BE SMALL VARIATIONS AND TIME DELAYS, BUT SO SMALL AS

8    TO NOT BE NOTICEABLE.

9        SO, YOU KNOW, BASICALLY THERE WERE DESIGN-AROUND OPTIONS

10   AVAILABLE THAT WOULD HAVE BEEN RELATIVELY PAINLESS.

11   **Q.**  JUST TO BE CLEAR, THESE DESIGN-AROUND OPTIONS THAT YOU

12   CONSIDERED ARE WITH RESPECT TO DR. DEVANBU'S OPINION THAT WHAT

13   WE ARE DOING -- OR WHAT ADOBE IS DOING NOW INFRINGES, RIGHT?

14   **A.**  EXACTLY.  I TOOK A LOOK AT THE SPECIFIC THINGS THAT

15   DR. DEVANBU SAID INFRINGED, AND I SAID, ALL RIGHT, I WILL

16   ASSUME HE'S RIGHT, IS THERE A WAY TO DESIGN AROUND IT?

17       AND THAT'S WHAT I TALKED ABOUT IN MY EXPERT REPORT IN MORE

18   DETAIL.

19   **Q.**  BUT DO YOU OR DO YOU NOT AGREE THAT HE'S RIGHT ON WHETHER

20   OR NOT THE WAY ADOBE DOES IT IS ACTUALLY INFRINGING?

21   **A.**  IT'S NOT INFRINGING FOR THE REASONS WE HAVE BEEN TALKING

22   ABOUT.

23           **MS. MEHTA:**  THANK YOU, DR. WICKER.  YOUR HONOR, I

24   PASS THE WITNESS.

25           **THE WITNESS:**  THANK YOU.

1          **MR. DINOVO:**  MAY I APPROACH, YOUR HONOR?

2          **THE COURT:**  YES.

3               (BINDER HANDED TO WITNESS.)

4                    **CROSS-EXAMINATION**

5     BY MR. DINOVO:

6     **Q.**  GOOD AFTERNOON, DR. WICKER.

7     **A.**  GOOD AFTERNOON.

8     **Q.**  SO WE HAVE MET BEFORE, HAVEN'T WE?

9     **A.**  YES.

10    **Q.**  YOU'VE TESTIFIED QUITE A NUMBER OF TIMES?

11    **A.**  YES.

12    **Q.**  APPROXIMATELY HOW MANY?

13    **A.**  A COUPLE DOZEN.

14    **Q.**  WAS IT OVER 30 WHEN WE LAST SPOKE?

15    **A.**  ROUGHLY 30, I THINK.

16    **Q.**  AND I THINK YOU INDICATED YOUR RATE WAS $600 AN HOUR?

17    **A.**  YES.

18    **Q.**  ALL RIGHT.

19         LET ME JUST ASK YOU, BECAUSE IT SEEMS TO BE A FUNDAMENTAL

20    ISSUE IN THIS CASE, CAN DATA BE GENERATED TWICE?

21    **A.**  CERTAINLY DATA CAN BE RECREATED IN DIFFERENT PLACES.  IN

22    OTHER WORDS, I CAN GENERATE SOMETHING IN ONE PLACE AND THEN

23    FOLLOW THE SAME ALGORITHM TO GENERATE IT IN ANOTHER PLACE.

24    **Q.**  OKAY.  THAT'S HELPFUL.

25         AND CAN DATA BE GENERATED IN TWO LOCATIONS?  CAN IT BE

1  GENERATED AT SAY ONE SERVER AND GENERATED AT ANOTHER SERVER?

2  **A.**  CERTAINLY.  IF -- DEPENDS ON WHAT YOU MEAN BY "DATA".

3  LET'S SUPPOSE WE HAVE A SEQUENCE OF NUMBERS.  THERE ARE

4  NUMBER GENERATORS THAT ARE DETERMINISTIC.  AND IF I OPERATE

5  THEM IN TWO DIFFERENT PLACES, THEY WILL GIVE ME THE SAME

6  NUMBERS GIVEN THE SAME STARTING CONDITIONS.

7  **Q.**  OKAY.

8  NOW I JUST WANT TO MAKE SURE I UNDERSTAND THE SCOPE OF

9  YOUR TESTIMONY ABOUT INFRINGEMENT.  IF I MISS ANYTHING, PLEASE

10  LET ME KNOW.

11  IS IT ACCURATE TO SAY THAT FOR THE '541 VERSUS

12  ACTIVATION -- I'M SORRY.  THE '541 PATENT RELATIVE TO ADOBE'S

13  ACTIVATION TECHNOLOGY, YOU HAVE NO OPINION THAT ANY OF THE

14  DEPENDENT CLAIMS ARE NOT INFRINGED INDEPENDENTLY OF YOUR

15  ANALYSIS OF THE INDEPENDENT CLAIM?

16  **A.**  OKAY.  SO WHAT I SAID WAS -- WELL, I FOCUSED ON THE FACT

17  THAT CLAIM 1 WAS REQUIRED, AS I UNDERSTAND IT, AND SINCE

18  CLAIM 1 WASN'T INFRINGED, THAT WAS THE CONCLUSION WITH REGARD

19  TO THE DEPENDENT CLAIMS.  SO I DIDN'T GO BEYOND THAT.

20  **Q.**  OKAY.

21  **A.**  IF CLAIM 1 WASN'T THERE, THE OTHERS CAN'T BE THERE.

22  **Q.**  OKAY.  I UNDERSTAND THAT THAT'S YOUR OPINION.  I GUESS I

23  WAS ASKING IF THERE'S ANYTHING ELSE, ASSUMING THE JURY FINDS

24  THAT THERE'S INFRINGEMENT OF CLAIM 1, IS THERE ANYTHING ELSE

25  YOU HAVE TO SAY ABOUT INFRINGEMENT OF THE REMAINING CLAIMS?

1    **A.**  WELL, I HAVEN'T TALKED ABOUT IT.  I DIDN'T TESTIFY ABOUT

2    IT.

3    **Q.**  OKAY.  AND THEN LET'S CONTINUE THIS PROCESS FOR THE '670

4    VERSUS ACTIVATION.

5        THERE, THERE'S ONE DEPENDENT CLAIM 52, RIGHT?

6    **A.**  YES, SIR.

7    **Q.**  IF THE JURY WERE TO FIND THAT CLAIM 45 WERE MET AND

8    INFRINGED, YOU HAVE NO OPINION THAT YOU'RE PREPARED TO PROVIDE

9    THAT CLAIM 52 FOR SEPARATE AND INDEPENDENT REASONS IS NOT

10   INFRINGED?

11   **A.**  WELL, I CERTAINLY DIDN'T TALK ABOUT IT.  I WOULD BE HAPPY

12   TO ANSWER FURTHER QUESTIONS IF YOU WISH.

13   **Q.**  OKAY.  YOU DON'T HAVE ANY OF THAT IN YOUR REPORT AND YOU

14   DIDN'T SAY ANYTHING ON DIRECT ABOUT THAT?

15   **A.**  I CERTAINLY DIDN'T SAY ANYTHING ON DIRECT.  I WOULD HAVE

16   TO CHECK MY REPORT.

17   **Q.**  OKAY.  AND LET'S CONTINUE THE SEQUENCE BECAUSE I THINK

18   IT'S USEFUL.

19       SO THE '541 RELATIVE TO LIVECYCLE.  I UNDERSTAND IT'S YOUR

20   OPINION THAT THERE'S NO INDEPENDENT CLAIM INFRINGEMENT, BUT

21   YOU HAVE NOTHING TO SAY TODAY ABOUT THE DEPENDENT CLAIMS?

22   **A.**  BEYOND THE FACT THAT THE INDEPENDENT IS NOT INFRINGED,

23   THAT'S CORRECT.

24   **Q.**  OKAY.  AND THEN THE SAME IS TRUE FOR '670 VERSUS LIVECYCLE

25   AND '541 VERSUS FLASH, RIGHT?

1    **A.**  THAT'S CORRECT.

2    **Q.**  LET'S TALK ABOUT YOUR UNDERSTANDING OF THE MEANING OF

3    TOKEN.

4       WHAT SPECIFIC DATA STRUCTURE, IF ANY, IS REQUIRED BY THE

5    COURT'S CONSTRUCTION OF TOKEN AS YOU UNDERSTAND IT?

6    **A.**  THE COURT HAS A CLEAR CLAIM CONSTRUCTION THAT SAYS, I'M

7    PARAPHRASING, THERE IS ACCEPTANCE OR REJECTION THAT IS PASSED

8    BACK AND TO THE CLIENT.

9       THERE ARE EXAMPLES -- THERE IS AN EXAMPLE, EXCUSE ME, IN

10   THE WRITTEN DESCRIPTION, BUT I DON'T BELIEVE THERE'S A

11   REQUIRED DATA STRUCTURE.

12   **Q.**  OKAY.  SO, IF I UNDERSTAND YOUR TESTIMONY OR YOUR

13   UNDERSTANDING AS A PERSON OF ORDINARY SKILL IN THE ART, THERE

14   IS NO REQUIREMENT FOR DUMMY BITS OR PARTICULAR LENGTH OF THE

15   TOKEN?

16   **A.**  OKAY.  SO WHAT YOU ARE REFERRING TO IS THE EXAMPLE THAT'S

17   GIVEN.  I THINK IT WAS 127 DUMMY BITS PLUS ONE ACCEPTANCE OR

18   NONACCEPTANCE -- REJECTION.  IT DOESN'T HAVE TO BE EXACTLY

19   THAT, NO.

20   **Q.**  IT DOESN'T HAVE TO BE CLOSE TO THAT, DOES IT?

21   **A.**  IT HAS TO CONVEY THE SAME INFORMATION.  IN OTHER WORDS,

22   HAVE TO BE ACCEPTANCE OR REJECTION EXPLICITLY IN THE TOKEN.

23   **Q.**  OKAY.  BUT NO SPECIFIC DATA STRUCTURE IS REQUIRED,

24   CORRECT?

25   **A.**  NO.  NO SPECIFIC LENGTH OR ANYTHING LIKE THAT.

1    **Q.**  OKAY.

2         NOW, I -- I UNDERSTAND YOUR TESTIMONY TO BE THAT WHETHER

3    OR NOT ACCESS IS GRANTED AT THE CLIENT, UNDER CLAIM '541

4    (SIC), IS DEPENDENT ON THE PERMISSION, RIGHT?

5    **A.**  THAT'S CORRECT.

6    **Q.**  AND YOU AGREE WITH ME, DON'T YOU, SIR, THAT IN EACH OF THE

7    ADOBE PRODUCTS, AND IF YOU PREFER WE CAN TAKE THEM ONE AT A

8    TIME, THAT WHAT IS AT THE CLIENT DEFINES THE SCOPE OF RIGHTS

9    THAT THE USER CAN EXERCISE.

10        **MS. MEHTA:**  OBJECTION, COMPOUND.

11   **BY MR. DINOVO:**

12   **Q.**  ALL RIGHT.  YOUR ATTORNEY HAS MADE AN OBJECTION, SO LET'S

13   TAKE THEM ITEM BY ITEM.  ALL RIGHT, SIR?

14        OKAY.  IN THE LIVECYCLE CONTEXT, DO YOU HAVE AN

15   UNDERSTANDING AS TO WHAT DR. DEVANBU POINTS TO AS THE

16   PERMISSION THAT'S STORED AT THE CLIENT?

17   **A.**  YES.

18   **Q.**  WHAT IS THAT?

19   **A.**  IT'S MY UNDERSTANDING THAT DR. DEVANBU IS SAYING THAT THE

20   KEY THAT COMES FROM THE SERVER AND IS THEN DECRYPTED

21   CONSTITUTES A REGENERATION OF -- OR CREATION OF A PERMISSION.

22   **Q.**  OKAY.  AND THAT PERMISSION THAT IS REGENERATED AT THE

23   CLIENT DEFINES THE SCOPE OF RIGHTS OF THAT USER, RIGHT?

24   **A.**  WELL, I SHOULD NOTE I DON'T CONSIDER THAT REGENERATION.  I

25   CONSIDER IT SIMPLE DECRYPTION.  BUT WHAT IS DECRYPTED DOES,

1    INDEED, THE DEFINE THE SCOPE OF THE RIGHTS.

2    **Q.**  SO FOR EXAMPLE, IT WOULD GIVE A YES OR NO INDICATION AS TO

3    WHETHER THAT USER COULD PRINT, RIGHT?

4    **A.**  THAT WOULD BE AN EXAMPLE OF THE RIGHTS.  THAT WOULD BE

5    EITHER ALLOWED OR DISALLOWED.  THAT'S CORRECT.

6    **Q.**  IT WOULD GIVE A YES OR NO INDICATION AS TO WHETHER THAT

7    USER COULD EVEN OPEN THE DOCUMENT?

8    **A.**  WELL, THE KEY ALONE WOULD ALLOW OPENING OF THE DOCUMENT.

9    **Q.**  OKAY.

10   AND THERE'S A WHOLE BASKET OF RIGHTS DEFINED IN THE

11   LIVECYCLE SET OF RIGHTS THAT THIS INFORMATION WILL DEFINE A

12   SET OF RIGHTS AS TO WHETHER THAT USER CAN YES OR NO PERFORM

13   EACH THOSE FUNCTIONS, RIGHT?

14   **A.**  THAT'S CORRECT.  THERE IS A POLICY, A SET OF POLICIES AND

15   RULES THAT DEFINE WHAT THAT PARTICULAR USER CAN DO WITH THAT

16   DOCUMENT.

17   **Q.**  OKAY.  NOW LET'S TURN TO FLASH.

18   DO YOU HAVE AN UNDERSTANDING AS TO WHAT DR. DEVANBU

19   DESCRIBED AS THE PERMISSION IN ADOBE FLASH ACCESS IN FLASH?

20   **A.**  IT'S MY UNDERSTANDING THAT DR. DEVANBU -- ACTUALLY I HEARD

21   HIM TESTIFY THAT THE KEY THAT WAS CREATED AT THE SERVER AND

22   THEN SENT TO THE CLIENT WAS THE PERMISSION.

23   **Q.**  OKAY.  BUT IT'S NOT JUST SENT TO THE CLIENT, RIGHT?

24   THERE'S CHANGES MADE TO IT, RIGHT?

25   **A.**  CERTAINLY.

1          AS I MENTIONED, IT'S-- CHANGES MAY NOT BE THE RIGHT WORD.

2   BUT I -- IT'S ENCRYPTED, IT'S PREPARED FOR TRANSMISSION.

3   THERE'S PROBABLY ENCAPSULATION AND IP DATA GRAMS.  THERE'S A

4   LOT OF THINGS THAT HAPPEN WHEN YOU TRANSFER SOMETHING OVER THE

5   INTERNET.

6   **Q.**  DO YOU AGREE WITH DR. DEVANBU'S TESTIMONY THAT ONCE DATA

7   IS ENCRYPTED, THE WHOLE POINT IS THAT TO AN INTERCEPTER, IT

8   WOULD BE ESSENTIALLY USELESS?

9   **A.**  THAT IS THE POINT OF THE ENCRYPTION.  YOU BASICALLY WANT

10  TO MAKE SURE THAT ANYONE WHO IS LISTENING IN, WHO'S SNIFFING,

11  WHATEVER THE CASE MAY BE, WILL BE GETTING NOTHING USEFUL.

12  **Q.**  OKAY.

13         AND THEN THERE'S A PROCESS AT THE CLIENT UPON RECEIPT THAT

14  WOULD THEN DECRYPT THAT AND EXTRACT THE RELEVANT INFORMATION

15  TO DEFINE A SET OF ACCESS AND USE RIGHTS FOR THAT CLIENT,

16  CORRECT?

17  **A.**  IT IS CORRECT IT WILL BE DECRYPTED -- DEMODULATED,

18  DECRYPTED, THERE'S A NUMBER OF THINGS, AND THEN VARIOUS PIECES

19  WILL BE EXTRACTED AND SENT TO DIFFERENT PROCESSES, FOR

20  EXAMPLE, TO DETERMINE RIGHTS.

21  **Q.**  OKAY.  AND THAT INFORMATION WOULD BE, IF YOU WILL, A YES

22  OR A NO AS TO WHETHER THAT USER AS ACCESS RIGHTS TO THAT

23  PARTICULAR PIECE OF CONTENT?

24  **A.**  THE KEY ITSELF WILL PROVIDE ACCESS IN THE EXAMPLES I'VE

25  SEEN.  THERE MAY BE OTHER ISSUES, FOR EXAMPLE, WHETHER YOU CAN

1    HIGHLIGHT OR WHETHER YOU CAN PRINT, FOR EXAMPLE, WITH PDF'S.

2    BUT ACTUALLY BEING ABLE TO SEE IT COMES WITH THE KEY.

3    **Q.**   I WAS INTENDING TO TALK ABOUT FLASH.

4    **A.**   FLASH, I AM SORRY.

5    **Q.**   SO IN THE CONTEXT OF FLASH, YOU AGREE WITH ME THAT WHAT IS

6    ULTIMATELY DECRYPTED WILL DEFINE THE SET OF RIGHTS THAT THE

7    USER MAY HAVE TO THE CONTENT?

8    **A.**   YES.  I DO AGREE THAT THERE IS A LOT OF DATA THAT DEFINES

9    RIGHTS WITH REGARD TO WHAT CAN BE DONE WITH THAT.

10   **Q.**   OKAY.

11   **A.**   PARTICULAR --

12   **Q.**   FOR EXAMPLE, DID YOU READ MR. JONES' TESTIMONY RELATING TO

13   THE VUDU SERVICE?

14   **A.**   YES.

15   **Q.**   ARE YOU FAMILIAR WITH THAT SERVICE?

16   **A.**   YES.  HE DISCUSSED IT IN THE EXCERPTS THAT YOU SHOWED IN

17   COURT.

18   **Q.**   I HAPPEN TO USE THAT SERVICE.  I DON'T KNOW IF YOU DO.  DO

19   YOU KNOW THAT YOU CAN RENT CONTENT?

20   **A.**   YES.

21   **Q.**   OKAY.  SO YOU CAN BASICALLY RENT A MOVIE FOR A PERIOD OF

22   TIME?

23   **A.**   YES.

24   **Q.**   AND IS THE RIGHT -- IS THE PERMISSION THAT'S CONVEYED

25   UNDER DR. DEVANBU'S ANALYSIS IN ENCRYPTED FORM, IS THAT WHAT

1    DEFINES THE LENGTH OF TIME THAT A USER MAY ACCESS?

2    **A.**  I ACTUALLY DON'T KNOW HOW THE TIME LIMITATIONS OF VUDU ARE

3    EMBEDDED.  IT COULD BE WITHIN THE RULES.  THERE COULD BE

4    SEPARATE DATA STRUCTURES.

5    **Q.**  OKAY.  DO YOU KNOW WHETHER OR NOT THE USER HAS THE RIGHT

6    TO ACCESS ITSELF IS -- WHAT IS -- AMONG WHAT IS CONVEYED

7    BETWEEN THE FLASH ACCESS SERVER AND THE CLIENT?

8    **A.**  AGAIN, I DON'T KNOW WHETHER IT'S A SEPARATE LICENSING

9    PIECE OR WHETHER IT'S PART OF THE ORIGINAL KEY AND POLICY THAT

10   LIMITS THE USER'S ACCESS TIME.

11   **Q.**  OKAY.  BUT YOU DO AGREE THAT WHAT'S TRANSMITTED BETWEEN

12   THE SERVER AND THE CLIENT, AND WHAT DR. DEVANBU'S IDENTIFYING

13   AS THE TOKEN, WILL GIVE A YES OR NO INDICATION AS TO WHETHER

14   THAT USER CAN ACCESS THE PREMIUM CONTENT IN THE VUDU PROCESS?

15   **A.**  I MUST ADMIT I DIDN'T HEAR DR. DEVANBU TALKING ABOUT THIS

16   SPECIFIC QUESTION, BUT WITH REGARD TO HOW MUCH TIME, FOR

17   EXAMPLE, YOU CAN SPEND WATCHING THE VIDEO, THAT WILL BE

18   SOMEHOW SENT TO THE CLIENT AND WILL BE SOMEHOW LOCKED IT IN IN

19   A SECURE WAY.

20   **Q.**  AND THEN SO THERE IS AN INSTALLATION PROCESS AT THE

21   CLIENT, IS THERE NOT, THAT WILL STORE THAT INFORMATION?

22   **A.**  YES.

23   **Q.**  OKAY.  AND YOU UNDERSTAND THERE TO BE AN INSTALLATION

24   REQUIREMENT IN THE '541 CLAIM, RIGHT?

25   **A.**  YES, I DO.

1   **Q.**  OKAY.

2       I'M NOT SURE WE TALKED ABOUT ACTIVATION IN THIS SERIES OF

3   QUESTIONS.  SO, DO YOU HAVE AN UNDERSTANDING AS TO WHAT

4   DR. DEVANBU IDENTIFIES AS THE TOKEN THAT IS TRANSMITTED

5   BETWEEN THE SERVER AND THE CLIENT?

6   **A.**  YES.  IT'S MY RECOLLECTION THAT, ONCE AGAIN, HE'S POINTING

7   TO A FILE, AN ENCRYPTED FILE THAT INCLUDES A KEY.

8   **Q.**  OKAY.  AND IS THAT FILE DECRYPTED UPON RECEIPT BY THE

9   CLIENT?

10  **A.**  YES, IT IS.

11  **Q.**  OKAY.  AND DOES THE ENCRYPTED FILE DEFINE WHETHER OR NOT

12  THAT PARTICULAR USER OR MACHINE HAS A YES OR NO RIGHT TO

13  ACCESS THAT PROTECTED CONTENT?

14  **A.**  THE KEY THAT IS PROVIDED IS WHAT'S USED TO ACCESS.  SO THE

15  PRESENCE OF THE KEY PROVIDES THE ACCESS.  IT'S NOT AN

16  ACCEPTANCE OR REJECTION, IT'S SIMPLY THE KEY.

17  **Q.**  WHAT IF THE KEY IS IMPROPER OR EMPTY?  WILL THE USER BE

18  PROVIDED ACCESS OR NOT?

19  **A.**  WELL, IF THE KEY HAS BEEN CORRUPTED, NO.  THERE'S LOTS OF

20  WAYS THAT THE PROCESS CAN FAIL.  BUT LET'S JUST SUPPOSE, YOU

21  KNOW, THAT A BIT'S BEEN FLOAT (PHONETIC) THEN, NO, IT'S NOT

22  GOING TO WORK.

23  **Q.**  WHAT'S NOT --

24  **A.**  BY ACCIDENT, THERE'S LOTS OF REASONS THAT COULD HAPPEN.

25  **Q.**  OR IT COULD BE THAT THE PERSON IS NOT AUTHORIZED AND THAT

1    WAS THE INTENDED RESPONSE FROM THE SERVER, RIGHT?

2    **A.**  WELL, THEY WOULDN'T SEND A KEY IF THE PERSON HAD BEEN

3    DENIED FOR WHATEVER REASON.

4    **Q.**  OKAY.  WHAT WOULD THEY SEND?

5    **A.**  EITHER A MESSAGE OR NOTHING.

6    **Q.**  ALL RIGHT.  SO IN THAT CONTEXT, THE PRESENCE OF THE KEY IS

7    AN INDICATION OF YES, ACCESS IS GRANTED, CORRECT?

8    **A.**  IT WOULD BE IMPLICIT, BUT IT WOULD NOT BE AN EXPLICIT

9    ACCEPTANCE OR REJECTION.

10   **Q.**  DR. WICKER, YOU READ CODE, RIGHT?

11   **A.**  YES.

12   **Q.**  OKAY.  HOW LONG, DO YOU KNOW, THAT THE ADOBE CODE WAS MADE

13   AVAILABLE FOR INSPECTION AND REVIEW BY TECHNICAL EXPERTS IN

14   THIS CASE?

15   **A.**  I AM SORRY, I DON'T RECALL.

16   **Q.**  AND YOU NEVER ACTUALLY MADE IT OVER TO THE REVIEW

17   FACILITY, DID YOU?

18   **A.**  NO, I DID NOT GO TO THE REVIEW FACILITY.

19   **Q.**  SO I TAKE IT YOU SPENT ZERO HOURS REVIEWING SOURCE CODE AT

20   THAT FACILITY?

21   **A.**  AT THAT FACILITY, THAT'S CORRECT.

22   **Q.**  AND IN TERMS OF THE ANALYSIS SET FORTH IN YOUR REPORT, I

23   SAW IN YOUR SLIDE, YOU SAID YOU REVIEWED SOURCE CODE, BUT YOU

24   DIDN'T CITE ANY SOURCE CODE IN YOUR REPORT, DID YOU?

25   **A.**  I BELIEVE I POINTED TO SOME OF DR. DEVANBU'S ANALYSIS OF

1  SOURCE CODE.  GENERALLY SPEAKING, I AGREED WITH WHAT HE

2  DESCRIBED THAT SOURCE CODE IS DOING.

3  **Q.**  OKAY.  SO YOU DON'T QUIBBLE WITH DR. DEVANBU IN ANY

4  PARTICULAR ABOUT THE OPERATION OF THE SOURCE CODE?

5  **A.**  NO, THAT'S NOT QUITE WHAT I SAID.

6  WHAT I SAID WAS THAT, YOU KNOW, WHEN HE DESCRIBED A PIECE

7  OF CODE, I AGREED WITH WHAT HE WAS SAYING, AFTER CONFIRMING

8  IT, OF COURSE, WITH ENGINEERS AND MY OWN INITIAL REACTION TO

9  WHAT HE WAS LOOKING AT.

10  THERE ARE SOME THINGS THAT I THINK HE MISSED, AND THAT'S

11  WHAT WE DISCUSSED TODAY.

12  **Q.**  OKAY.

13  I MEAN, I UNDERSTAND THAT YOUR ANALYSIS DIFFERS FROM HIS,

14  BUT JUST FOCUSING ON THE SOURCE CODE, YOU CAN'T IDENTIFY ANY

15  ERRORS DR. DEVANBU MADE IN THE ANALYSIS EVEN AFTER CONFERRING

16  WITH ADOBE PERSONNEL?

17  **A.**  THAT'S RIGHT.  WHEN I LOOKED AT THE SPECIFIC CODE THAT HE

18  LOOKED AT, IT APPEARED TO ME THAT HE WAS DESCRIBING IT

19  CORRECTLY.

20  **Q.**  THANK YOU.

21  SO JUST SO WE'RE CLEAR, LET'S TAKE THE PRODUCTS ONE AT A

22  TIME.

23  WITH THE ADOBE ACTIVATION TECHNOLOGY, YOU UNDERSTAND THAT

24  TO RELATE TO THE ALM 2.0 AMT PRODUCT, RIGHT?

25  **A.**  THE VOLUME DISTRIBUTION ALM, YES, THAT'S CORRECT.

1   **Q.**  ALL RIGHT.  THANK YOU.  AND YOU DIDN'T REVIEW THAT CODE?

2   **A.**  ONLY THE PORTIONS THAT WERE POINTED TO BY DR. DEVANBU.

3   **Q.**  THE SAME QUESTION FOR FLASH AND FOR LIVECYCLE; YOU LOOKED

4   AT WHAT DR. DEVANBU SAID AND YOU AGREED WITH IT, OR YOU AGREED

5   WITH HIS INTERPRETATION OF THE CODE BUT YOU DIDN'T LOOK AT

6   ANYTHING ELSE?

7   **A.**  BEFORE WE GO ON, I ASSUME YOU ARE ASKING ME WITH REGARD TO

8   UP UNTIL THE TIME I WROTE MY REPORT AND SUBMITTED IT.  I HAVE

9   HAD AN OPPORTUNITY TO LOOK AT CODE SINCE THEN.

10  **Q.**  OKAY.

11  **A.**  ARE YOU ASKING UP UNTIL THE SPECIFIC POINT IN TIME.

12  **Q.**  YEAH, I THINK WE SHOULD LIMIT YOUR TESTIMONY TO WHAT YOU

13  SAID IN YOUR REPORT AND DEPOSITION.

14  **A.**  OKAY.

15  **Q.**  NOW, YOU DID HAVE AN OPPORTUNITY, DID YOU NOT, SIR, TO

16  REVIEW THE TESTIMONY OF MR. JONES?

17  **A.**  YES, I DID.

18  **Q.**  DO YOU RECALL WHAT THE SUBJECT MATTER OF HIS TESTIMONY

19  WAS?

20  **A.**  YES.  IN FACT, SOME OF IT WAS PLAYED HERE IN COURT.

21  **Q.**  OKAY.  IT WAS FLASH, RIGHT?

22  **A.**  EXACTLY.

23  **Q.**  FLASH ACCESS?

24  **A.**  FLASH ACCESS.

25  **Q.**  SO YOU AGREE WITH MR. JONES, OR DO YOU DISPUTE THAT THE

1   FLASH ACCESS DEFAULT RULES USE A POLICY WHICH IS A CONTAINER

2   FOR THE RULES AND RESTRICTIONS THAT DETERMINE HOW, WHEN AND

3   WHERE PROTECTED CONTENT CAN BE USED BY CONSUMERS?

4   **A.**  YES.  THAT'S MY UNDERSTANDING AS WELL.  I HAVE NO REASON

5   TO DISPUTE HIM ON THAT.

6   **Q.**  SO THAT SOUNDS TO ME MORE ROBUST THAN YES OR NO, RIGHT?

7   IT'S DEFINING A WHOLE SET OF CONDITIONS; HOW, WHEN, AND WHERE.

8   **A.**  IT IS TRUE THERE ARE A LOT OF RULES THAT ARE POTENTIALLY

9   INVOKED.

10  **Q.**  AND AMONG THEM ARE YES OR NO.

11  **A.**  WELL, AGAIN, THE PRESENCE OF THE ENCRYPTED KEY GIVES

12  ACCESS.  SO THERE'S NO, YOU KNOW, YES, YOU HAVE ACCESS, NO,

13  YOU DON'T.  THAT IS THE KEY.  THE KEY GIVES YOU THE ACCESS.

14  SO IT IS IMPLICITLY A YES.

15  **Q.**  WELL --

16  **A.**  THE RULES INVOLVE HOW YOU CAN DEAL WITH THE PROTECTED

17  CONTENT.

18  **Q.**  I'M SORRY, I DIDN'T MEAN TO INTERRUPT.

19      SO IN ADDITION TO THE KEY IS THE DEFINITION OF A HOST OF

20  PERMISSIONS THAT WE JUST OUTLINED IN DR. JONES' ADOBE'S

21  CORPORATE REPRESENTATIVE IDENTIFIED, RIGHT?

22  **A.**  THAT'S CORRECT.

23  **Q.**  DO YOU AGREE WITH ME THAT FLASH ACCESS IS DESIGNED TO HAVE

24  TWO STEPS?

25      I WILL JUST HELP YOU OUT, OR TRY TO.  CONTENT PREPARATION

1   AND CONTENT ACQUISITION, DOES THAT RING A BELL?

2   **A.**   YES.  YES.

3   **Q.**   NOW FOR THE ACQUISITION OF PROTECTED CONTENT, A REQUEST

4   CAN BE MADE TO A LICENSING SERVER FOR A LICENSE TO THE

5   PROTECTED CONTENT, RIGHT?

6   **A.**   THAT'S CORRECT.

7   **Q.**   AND THAT REQUEST WOULD USE INFORMATION SUCH AS A MACHINE

8   I.D.?

9   **A.**   POTENTIALLY, NOT NECESSARILY.

10  **Q.**   OKAY.

11  **A.**   DEPENDS ON HOW IT'S BEEN -- I'M SORRY.  IT DEPENDS ON HOW

12  IT WAS CONFIGURED.  IT COULD USE THE MACHINE I.D.

13  **Q.**   AND IN RESPONSE, THE LICENSING SERVER GENERATES A LICENSE

14  CONTAINING A CONTENT ENCRYPTION KEY FOR THAT PROTECTED

15  CONTENT.

16  **A.**   YES.  THE SERVER GENERATES THE ENCRYPTION KEY.  THAT'S

17  CORRECT.

18  **Q.**   THE LICENSE SERVER ENCRYPTS THE CONTENT ENCRYPTION KEY?

19  **A.**   THAT'S CORRECT.

20  **Q.**   SO THAT IF IT IS INTERCEPTED, IT WON'T BE USED BY SOMEONE

21  OTHER THAN THE INTENDED RECIPIENT?

22  **A.**   THAT SPEAKS TO THE INTENT.  THERE MAY BE OTHER REASONS FOR

23  ENCRYPTING.  BUT CERTAINLY ONE OF THE BENEFITS OF ENCRYPTING

24  BEFORE TRANSMISSION IS TO PREVENT AN UNAUTHORIZED USER FROM

25  ACCESSING THE MATERIAL.

1   **Q.**  YOU AGREE THAT IT'S NECESSARY TO DECRYPT THE CONTENT

2   ENCRYPTION KEY BEFORE THE USER CAN ACCESS THE PROTECTED

3   CONTENT?

4   **A.**  THAT'S CORRECT.

5   **Q.**  AND THE CEK OR CONTENT ENCRYPTION KEY WOULD THEN BE STORED

6   LOCALLY AT THE CLIENT?

7   **A.**  THAT ALSO DEPENDS ON THE RULES.  BUT IT COULD BE STORED.

8   IT MIGHT NOT BE STORED.  BUT IT WOULD BE USED TO ACCESS THE

9   CONTENT.

10  **Q.**  OKAY.  BUT YOU AGREE WITH ME IT CAN BE STORED CONSISTENT

11  WITH THE ADOBE FLASH ACCESS PLATFORM?

12  **A.**  THAT'S RIGHT.  THAT IS ONE OF THE POSSIBLE CONFIGURATIONS.

13  **Q.**  DO YOU AGREE -- I AM SORRY, SIR?

14  **A.**  I WAS AGREEING WITH YOU.

15  **Q.**  DO YOU AGREE THAT THE FLASH ACCESS SDK IS GENERALLY USED

16  FOR BUILDING UP A LICENSING SERVER?

17  **A.**  I MISSED THE WORDS IN THE MIDDLE THERE.  IT'S BEING USED

18  TO?

19  **Q.**  BUILD UP A LICENSING SERVER.

20  **A.**  YES, EXACTLY.  THAT'S WHAT IT'S FOR.

21  **Q.**  AND THAT SERVER IS THE FLASH LICENSE SERVER?

22  **A.**  ONCE IT IS SUBSTANTIATED, YES.

23  **Q.**  AND THE LICENSE IS GENERATED OR CAN BE GENERATED WHEN A

24  USER REQUESTS CONTENT?

25  **A.**  THAT'S CORRECT.

1   **Q.**  AND DO YOU AGREE, SIR, THAT IN THE FLASH ARCHITECTURE AN

2   ATTEMPT TO ACCESS CONTENT BY A CUSTOMER MAY RESULT IN A

3   TRANSMISSION TO THE LICENSING SERVER?

4   **A.**  YES, THAT'S CERTAINLY TRUE.

5   **Q.**  AND THAT LICENSE CAN BE BOUND TO A SPECIFIC MACHINE.

6   **A.**  IT CAN BE.  NOT NECESSARILY, BUT IT CAN BE.

7   **Q.**  AND THAT MACHINE CAN BE ONE ASSOCIATED A FLASH PLAYER OR

8   AIR ONE TIME?

9   **A.**  YES.

10  **Q.**  DOES ADOBE RECOMMEND TO CUSTOMERS THAT THEY SHOULD SET THE

11  DEFAULT POLICY THAT ITS PACKAGE WITH CONTENT TO BE AS

12  RESTRICTIVE AS POSSIBLE AND THEN LOOSEN THOSE RESTRICTIONS AT

13  THE TIME OF LICENSE ISSUANCE?

14          **MS. MEHTA:**  OBJECTION, OUTSIDE THE SCOPE.

15          **THE COURT:**  IN WHICH PRODUCT IS THIS?

16          **MR. DINOVO:**  I'M REFERRING TO THE FLASH ACCESS

17  SITUATION.  AND SPECIFICALLY THIS WAS --

18          **THE COURT:**  OVERRULED.

19          **MR. DINOVO:**  I'M SORRY?

20          **THE COURT:**  OVERRULED.

21          **MR. DINOVO:**  THANK YOU.

22          **THE WITNESS:**  AS I RECALL, THAT QUESTION WAS ASKED OF

23  MR. JONES.  AND I BELIEVE HE AGREED, BUT I WOULD HAVE TO CHECK

24  HIS TRANSCRIPT TO BE SURE.

25

**BY MR. DINOVO:**

**Q.** AND IF MR. JONES -- I'LL REPRESENT TO YOU I WAS READING

MR. JONES TESTIMONY.

SO YOU DON'T HAVE ANY REASON TO DIFFER?

**A.** NO, I DON'T HAVE ANY REASON TO DIFFER.

**Q.** YOU DON'T HAVE ANY REASON TO DIFFER WITH MR. JONES, DO

YOU, THAT VUDU IS ONE OF THE ADOBE CUSTOMERS THAT IMPLEMENTS

FLASH ACCESS IN A WAY SUCH AS TO CACHE LICENSES AT THE USER'S

MACHINES?

**A.** I BELIEVE THAT'S WHAT HE SAID.  I DO RECALL HEARING THAT.

**Q.** OKAY.  DO YOU RECALL HIM SAYING THAT IN THE VUDU

IMPLEMENTATION, HE KNOWS THAT THERE IS AN ACCESS TO THE CACHE

TO MAKE SURE THAT -- OR TO CHECK WHETHER OR NOT THE LICENSE'S

PRESENT BEFORE COMMUNICATING TO THE SERVER?

**A.** I DON'T RECALL HIM SAYING THAT.  BUT IF HE DID, I HAVE NO

REASON TO DISPUTE IT.

**Q.** WOULD YOU LIKE TO SEE HIS TESTIMONY, SIR?

**A.** THAT WOULD BE HELPFUL.

**Q.** ALL RIGHT.

IF YOU COULD REFER TO JONES, IT'S IN YOUR BINDER IN YOUR

HAND.

JONES DEPOSITION, PAGE 58, LINES 8 THROUGH 16.

**MR. DINOVO:**  DOES YOUR HONOR NEED A COPY?

**THE WITNESS:**  I AM SORRY, WHAT WERE THE LINES AGAIN?

I'M ON 58.

1    **BY MR. DINOVO:**

2    **Q.**  8 THROUGH 16.

3    **A.**  YES, I AGREE WITH YOUR CHARACTERIZATION.

4    **Q.**  THANK YOU.

5        LET'S LOOK AT A DOCUMENT THAT YOU REFERENCED WITH

6    MS. MEHTA ON DIRECT.  DEFENDANT'S EXHIBIT 360.

7        DO YOU STILL HAVE YOUR BINDER FROM HER DIRECT?

8    **A.**  YES, I DO.

9                        (PUBLISHED TO JURY.)

10       OKAY I'M THERE.

11           **MR. DINOVO:**  I BELIEVE DEFENDANT'S EXHIBIT 360 WAS

12   PREVIOUSLY ADMITTED?

13           **THE CLERK:**  IT WAS.

14           **MR. DINOVO:**  THANK YOU.

15       ALL RIGHT.  MS. MASON, IF YOU CAN PLEASE TURN TO 360, 13.

16       AND IF YOU CAN PLEASE BLOW UP THE FIRST MAIN HEADING

17   THERE.

18       YES, THANK YOU.

19   **BY MR. DINOVO:**

20   **Q.**  NOW, DO YOU SEE HERE, SIR, IN CONNECTION WITH THE

21   LIVECYCLE RIGHTS MANAGEMENT A WHOLE HOST OF PERMISSIONS

22   ASSOCIATED WITH LIVECYCLE?

23   **A.**  THAT'S RIGHT.  SPECIFICALLY WHAT'S BEING DESCRIBED HERE

24   ARE ALL OF THE THINGS THAT ARE –– THE DIFFERENT TYPES OF

25   PERMISSIONS THAT ARE ASSOCIATED WITH THE EDC VOUCHER THAT'S

1    REFERENCED IN THE FIRST LINE.

2    **Q.**  LET'S ACTUALLY READ IT OUT LOUD IF YOU DON'T MIND.

3        "WHEN A USER REQUESTS ACCESS TO A DOCUMENT, AN EDC VOUCHER

4    OBJECT IS RETURNED", RIGHT?

5    **A.**  YES.

6    **Q.**  YOU UNDERSTAND THAT TO BE THAT WHICH DR. DEVANBU

7    IDENTIFIES AS THE TOKEN?

8    **A.**  THAT'S CORRECT.

9    **Q.**  AND THEN IT SAYS, "THIS OBJECT CAN BE USED TO OBTAIN THE

10   SET OF PERMISSIONS."

11       SO, HOW WAS IT USED TO OBTAIN THE SET OF PERMISSIONS?  DO

12   YOU HAVE AN UNDERSTANDING OF THAT?

13   **A.**  THE PERMISSIONS ARE EXTRACTED FROM THE OBJECT.

14   **Q.**  WELL, THE OBJECT IS FIRST DECRYPTED, RIGHT?

15   **A.**  YES.

16   **Q.**  OKAY.  IT'S DECRYPTED AND THEN THAT SET OF PERMISSIONS IS

17   USED TO GENERATE -- OR THAT DECRYPTED OBJECT, THE EDC VOUCHER

18   IS THEN USED TO GENERATE THE SET OF PERMISSIONS, CORRECT?

19   **A.**  THAT'S CORRECT.

20   **Q.**  AND THOSE ARE AT THE CLIENT?

21   **A.**  THEY ORIGINATE AT THE SERVER, BUT THEN THEY ARE SENT TO

22   THE CLIENT.

23   **Q.**  THEY ARE SENT TO THE CLIENT IN ENCRYPTED FORM.  THEY ARE

24   DECRYPTED.  AND ACCORDING TO ADOBE'S OWN DOCUMENTATION, THEY

25   ARE USED TO OBTAIN THE SET OF PERMISSIONS, RIGHT?

1    **A.**   THAT'S CORRECT.

2    **Q.**   SO THE SET OF PERMISSIONS IS NOT THE EDC VOUCHER?

3    **A.**   EDC VOUCHER CONTAINS THE PERMISSIONS.  AND THE PERMISSIONS

4    ORIGINATE AT THE SERVER.  THEY ARE EXTRACTED OR OBTAINED FROM

5    THE OBJECT THAT IS DECRYPTED AT THE CLIENT.

6    **Q.**   OKAY.

7        DO YOU AGREE WITH ME, SIR, THAT THE TOKEN IS USED IN THE

8    CONTEXT OF THE '541 PATENT AS AN INPUT TO GENERATE THE

9    PERMISSION?

10   **A.**   WOULD YOU MIND IF I GET UP?  I CAN'T SEE.

11   **Q.**   I DON'T MIND AT ALL.

12   **A.**   OKAY.

13   **Q.**   I'M SORRY, I DIDN'T APPRECIATE THAT ANGLE.

14       IF YOU WOULD LIKE --

15   **A.**   I AM SORRY.

16   **Q.**   IF YOU WOULD LIKE, WE CAN MOVE IT CLOSER TO YOU.

17           **THE COURT:**  OR GET A COPY OF THE PATENT AND YOU CAN

18   LOOK AT IT ON THE PIECE OF PAPER.

19           **MR. DINOVO:**  THAT IS A BETTER IDEA.

20       IF YOU CAN HAVE A SEAT.

21       IF WE CAN CALL UP PLAINTIFF'S EXHIBIT 1.  I DON'T KNOW

22   WHAT PAGE CLAIM 1 WOULD BE ON.

23               (PAUSE IN THE PROCEEDINGS.)

24           **THE COURT:**  MAYBE THAT WAS MORE TROUBLE THAN IT WAS

25   WORTH.  I WAS THINKING A PIECE OF PAPER.

1        **MR. DINOVO:**  MAY I APPROACH, YOUR HONOR?

2        **THE COURT:**  YEAH.

3                    (EXHIBIT HANDED TO WITNESS.)

4        **THE WITNESS:**  WOULD YOU MIND REPEATING THE QUESTION?

5    **BY MR. DINOVO:**

6    **Q.**  I DON'T KNOW THAT THERE WAS ONE PENDING.  I WAS JUST

7    WAITING FOR YOU TO GET YOUR BEARINGS.

8    **A.**  I'M THERE.

9    **Q.**  OKAY.  I HAVE HANDED YOU A PAPER COPY OF PLAINTIFF'S

10   EXHIBIT 1, WHICH IS THE '541 PATENT.  IS THAT WHAT YOU HAVE IN

11   YOUR HAND THERE?

12   **A.**  YES.

13   **Q.**  AND I WAS FOCUSING ON THE FINAL ELEMENT OF CLAIM 1.

14       BASED ON THE RECEIVED TOKEN, EXECUTING AN INSTALLATION

15   PROCESS THAT GENERATES AT THE CLIENT A PERMISSION.

16       ALL RIGHT?  AND MY QUESTION WAS, DON'T YOU AGREE WITH ME

17   THAT THE TOKEN IS USED AS AN INPUT CHIP TO GENERATE A

18   PERMISSION?

19   **A.**  NO.  I THINK THAT THAT WOULD BE MISLEADING.  BECAUSE IF

20   YOU READ THROUGH THE PATENT, WHAT IT SAYS IS THE TOKEN IS

21   SIMPLY A YES NO.  IT'S BINARY, IN FACT, AS THE SINGLE EXAMPLE

22   THAT'S PROVIDED IT SHOWS.  SO IT'S SIMPLY INDICATING WHETHER

23   OR NOT YOU CAN GO THROUGH THIS PROCESS.

24       "BASED ON THE RECEIVED TOKEN" MEANS BASED ON WHETHER WE

25   CAN DO THIS OR NOT, NOT THAT THE TOKEN IS AN INPUT TO THE

1    PROCESS.

2    **Q.**  SO IN FORMING YOUR OPINION, DID YOU APPLY A CONSTRUCTION

3    OF TOKEN THAT LIMITED IT TO A ONE BIT YES OR NO?

4    **A.**  NO.  I LIMITED IT TO THE COURT'S CLAIM CONSTRUCTION, WHICH

5    SAID ACCEPTANCE OR REJECTION, BASICALLY, YES OR NO.

6    **Q.**  IS IT YOUR TESTIMONY OR OPINION THAT IF ADDITIONAL

7    INFORMATION IS PROVIDED, THAT SOMEHOW THERE IS NO

8    INFRINGEMENT?

9    **A.**  NO.  MY TESTIMONY WOULD BE THAT THAT LANGUAGE HAS TO BE

10   SATISFIED.  IF THERE'S OTHER MATERIAL, IT DEPENDS ON WHAT IT

11   IS.  IT DEPENDS ON WHETHER THE PRESENCE OF THAT MATERIAL

12   CONTRADICTS, FOR EXAMPLE, WHETHER THIS IS BEING DONE AT THE

13   CLIENT OR BEING DONE AT THE SERVER.

14       AND I THINK IN THE PRESENT INSTANCE, WE'RE SEEING A CASE

15   IN WHICH IT'S BEING DONE AT THE SERVER, BUT WE ARE SIMPLY

16   ENCRYPTING AND PASSING IT ON SO THE CLIENT CAN THEN PROCESS

17   AND EXTRACT IT.

18   **Q.**  SIR, DON'T YOU AGREE WITH ME THAT THE EXPLICIT LANGUAGE OF

19   THE CLAIM REFERS TO RECEIVING FROM AN EXTERNAL SOURCE A TOKEN,

20   RIGHT?  SO YOU ARE BRINGING A TOKEN TO THE CLIENT?

21   **A.**  THAT'S CORRECT.

22   **Q.**  BASED ON THAT TOKEN, THE GENERATION OF A PERMISSION.

23   **A.**  I DO AGREE THAT IT'S -- I AM SORRY.

24   **Q.**  I THINK I INTERRUPTED YOU.

25   **A.**  I WAS ABOUT TO SAY I DO AGREE IT SAYS THAT.

1   **Q.**  OKAY.

2       SO, WHY IS IT YOUR OPINION THEN THAT THE TOKEN IS NOT USED

3   AS AN INPUT TO THE PROCESS FOR THE GENERATION OF A PERMISSION?

4   **A.**  WELL, FIRST OFF, THE LANGUAGE, RECEIVING FROM THE EXTERNAL

5   SOURCE A TOKEN, AND BASED ON THE RECEIVED TOKEN, NOT USING THE

6   RECEIVED TOKEN, BUT BASED ON THE RECEIVED TOKEN.

7       THEN I READ THE PATENT, AND IT TELLS ME IN THE ONE EXAMPLE

8   IT HAPPENS TO BE A YES OR NO.  I LOOK AT THE COURT'S CLAIM

9   CONSTRUCTION, WHICH COVERS OTHER EXAMPLES, OF COURSE, BUT IT

10  ALSO SAYS ACCEPTANCE OR REJECTION.

11      SO, TO ME, BASED ON MEANS IF ALLOWED TO EXECUTE AN

12  INSTALLATION PROCESS.

13  **Q.**  DID YOU SEE DR. DEVANBU'S SIMPLE EXAMPLE, I THINK IT WAS

14  SOMETHING LIKE THE DEFEND THE EAST CASTLE WALL?

15  **A.**  YES, FROM THE VERY BEGINNING.

16  **Q.**  DON'T YOU AGREE WITH ME THAT THAT MESSAGE, DEFEND THE EAST

17  CASTLE WALL, IS BASED ON THE ENCRYPTED MESSAGE?

18  **A.**  YES.  HE SHOWED AN EXAMPLE OF, I THINK IT WAS A SIMPLE

19  SUBSTITUTION CIPHER IN WHICH WHAT APPEARED TO BE NONSENSE

20  BECAME DEFEND THE EAST CASTLE WALL, OR SOMETHING LIKE THAT.

21  **Q.**  THANK YOU.

22      CONTINUING THE ANALYSIS OF LIVECYCLE, SIR.

23          **MR. DINOVO:**  OH, BEFORE WE TURN AWAY THIS EXHIBIT,

24  COULD YOU, MS. MASON, PLEASE PULL UP 360.012 AND THE EVENT

25  LOGGING.

1              (PUBLISHED TO JURY.)

2    **BY MR. DINOVO:**

3    **Q.**  DO YOU HAVE AN UNDERSTANDING, SIR, BASED ON YOUR ANALYSIS

4    IN THIS CASE WHAT THE EVENT LOGGING FEATURES ARE OF ADOBE

5    LIVECYCLE?

6    **A.**  YES.

7    **Q.**  WHAT IS IT?

8    **A.**  BASICALLY IT'S A MEANS FOR KEEPING TRACK OF VARIOUS

9    PROCESSES AS THEY ARE EXECUTED AND RECORDING THAT THEY HAVE

10   BEEN EXECUTED.

11   **Q.**  INCLUDING ACCESS TO PROTECTED DOCUMENTS?

12   **A.**  FOR EXAMPLE, YES.

13   **Q.**  DO YOU AGREE WITH ME, SIR, THAT WHEN A USER WANTS TO

14   UTILIZE A PROTECTED DOCUMENT, THEY FIRST HAVE TO LOG INTO THE

15   ADOBE DIGITAL RIGHTS MANAGEMENT SERVICE?

16   **A.**  AND WE ARE SPECIFICALLY TALKING ABOUT LIVECYCLE?

17   **Q.**  YES, SIR.

18   **A.**  YES.

19   **Q.**  AND LET'S TAKE THE SITUATION OF A PROTECTED PDF.  ALL

20   RIGHT?

21   **A.**  OKAY.

22   **Q.**  DO YOU AGREE WITH ME THAT IF A USER -- A FIRST LIVECYCLE

23   USER WHO HAD NO RIGHTS TO VIEW CONTENT SENT IT TO A SECOND

24   USER WHO HAD NO RIGHTS, THE SECOND USER WOULDN'T BE ABLE TO

25   ACCESS IT EITHER, RIGHT?

1    **A.**  IF THE SECOND USER DID NOT HAVE ACCESS RIGHTS, THEY

2    WOULDN'T BE ABLE TO SEE IT.

3    **Q.**  OKAY.  AND IN THAT CONTEXT, WOULD THAT MEET THE

4    REQUIREMENT OF SUCCESSIVE RECIPIENT?

5    **A.**  I THINK IN YOUR HYPOTHETICAL, DIDN'T YOU START BY SAYING

6    THE FIRST USER?

7        CAN WE SEE THE CLAIM LANGUAGE?  I THINK IT REQUIRES A BIT

8    MORE THAN WHAT YOU'RE DESCRIBING.

9    **Q.**  WOULD YOU RATHER HAVE THE COURT'S CLAIM CONSTRUCTION?

10   **A.**  I WOULD LIKE TO START WITH THE CLAIM.

11   **Q.**  ALL RIGHT.

12        **MR. DINOVO:**  IF WE CAN BRING UP PLAINTIFF'S

13   EXHIBIT 3.

14        **THE WITNESS:**  THIS IS THE CONTEXT IN WHICH YOU ARE

15   ASKING THE QUESTION.

16   **BY MR. DINOVO:**

17   **Q.**  YES, SIR, THAT'S CORRECT.

18        I THINK WE ARE TRYING TO GET IT UP ON THE SCREEN FOR YOU.

19   YOU HAVE ONE IN FRONT OF YOU, OF COURSE.

20                    (PUBLISHED TO JURY.)

21        OKAY.  LET ME JUST BACK UP AND SEE IF YOU AGREE OR

22   DISAGREE WITH DR. DEVANBU'S COMMENT THAT HE THINKS IT'S A

23   REASONABLE USE CASE THAT A CORPORATION, FOR EXAMPLE, WOULD USE

24   LIVECYCLE INTERNALLY WITHIN ITS FIREWALL.

25   **A.**  IT'S CERTAINLY POSSIBLE.

1   **Q.**   OKAY.  SO LET'S USE THAT EXAMPLE.

2       COMPANY X.  EMPLOYEE 1 PUTS A PROTECTED PDF ON A FLASH

3   DRIVE AND HANDS IT TO EMPLOYEE 2.

4   **A.**   OKAY.

5   **Q.**   LET'S ASSUME THIS IS AN INTERNAL DOCUMENT, NEITHER OF

6   WHICH EMPLOYEE HAS THE RIGHTS UNDER THE POLICY TO VIEW.

7       IS THE SECOND PERSON WHO GETS IT A SUCCESSIVE RECIPIENT

8   WITHIN THE MEANING OF THE COURT'S CLAIM CONSTRUCTION?

9   **A.**   OKAY.  SO THIS IS A HYPOTHETICAL, AS I UNDERSTAND IT,

10  BECAUSE THERE IS NO EVIDENCE THAT THIS SORT OF THINGS HAPPENS.

11      BUT CERTAINLY THE SECOND PERSON TO RECEIVE IT –– THE FIRST

12  PERSON RECEIVED IT, THEN THE SECOND PERSON RECEIVED IT.  THE

13  SECOND PERSON WOULD BE A SUCCESSIVE RECIPIENT.

14  **Q.**   OKAY.

15      AND YOU AGREE THAT IF THE FIRST LIVECYCLE USER HAS NO

16  RIGHTS TO VIEW CONTENT AND PASSES IT TO A SECOND USER WITH THE

17  SAME RIGHTS, THEN THE SECOND USER WOULD HAVE NO TECHNICAL

18  CAPABILITY TO VIEW THE CONTENT.

19  **A.**   SO IF THE SECOND USER DID NOT HAVE RIGHTS OF ACCESS, THEY

20  WOULD NOT BE ABLE TO VIEW IT.

21  **Q.**   ALL RIGHT.

22      DO YOU AGREE WITH ME THAT IF A RECIPIENT OF A LIVECYCLE

23  DOCUMENT IS DENIED ACCESS AND PASSES IT TO A SUCCESSIVE

24  RECIPIENT, THAT PERSON WOULD ALSO BE DENIED ACCESS?

25  **A.**   NOT NECESSARILY.

1    **Q.**  IT DEPENDS ON WHETHER THAT PERSON, THE SECOND PERSON HAS

2    RIGHTS?

3    **A.**  THAT'S CORRECT.

4           **THE COURT:**  WHY DON'T WE BREAK FOR THE DAY.  IT'S

5    3:30.

6        SO TOMORROW IS FRIDAY.  WE'LL GO BACK ON OUR 8:30 TO

7    1:30 SCHEDULE.  SO WE'LL START AT 8:30 TOMORROW.

8        REMEMBER NOT TO DISCUSS THE CASE AMONGST YOURSELVES OR

9    WITH ANYONE ELSE OVER THE BREAK.  LEAVE YOUR NOTES IN THE JURY

10   ROOM, AND WE'LL SEE YOU TOMORROW MORNING AT 8:30.  THANKS FOR

11   ACCOMMODATING OUR SCHEDULE TODAY.

12       YOU MAY STEP DOWN, SIR, AND WE WILL NEED YOU BACK AT

13   8:30 UNLESS THEY HAVE SOME OTHER AGREEMENT.

14       I WOULD LIKE TO SEE THE ATTORNEYS FOR JUST A MINUTE.

15       (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

16          **THE COURT:**  I HAD GIVEN YOU A PROPOSED VERDICT FORM

17   AND I GOT A RESPONSE FROM THE PLAINTIFF.  SO I DON'T KNOW IF

18   YOU HAD ANY COMMENT ON THAT OR IF YOU WANT TO FILE SOMETHING.

19          **MR. REINES:**  WE CAN FILE SOMETHING TONIGHT, IF THAT'S

20   ALL RIGHT.

21          **THE COURT:**  OKAY.  I GUESS WE CAN WAIT AND SEE, BUT

22   IT SEEMS AS THOUGH WE NEED TO TAKE OUT THE DIRECT INFRINGEMENT

23   BOXES ON THE '541.

24          **MR. REINES:**  THAT'S RIGHT.

25          **MR. DINOVO:**  YES, YOUR HONOR.

1          **THE COURT:**  OKAY.

2              **MR. REINES:**  YOUR HONOR, ONE IMPORTANT ISSUE.

3      WE HAD THE OPPORTUNITY DURING THE COURT DAY TODAY TO LOOK

4    AT WHAT WAS PRODUCED TO US THIS TIME REGARDING THE ADOBE VALUE

5    PROPOSITIONS DOCUMENT, WHICH HAS BEEN MARKED AS EXHIBIT 125A,

6    B, C AND D.

7          **THE COURT:**  YES.

8              **MR. REINES:**  AND VERY DISTURBINGLY WE HAVE FOUND THAT

9    THERE'S TWO OTHER VERSIONS FROM THE TIME PERIOD.  AND ONE OF

10   THEM DOES NOT HAVE THE '670 PATENT ON IT.  SO THERE'S MULTIPLE

11   VERSIONS THAT WEREN'T PRODUCED.

12       AND IT'S VERY DISTURBING TO US BECAUSE COUNSEL REPRESENTED

13   TO YOU YESTERDAY THAT THEY CHECKED, AND THAT IT WAS ONE

14   DOCUMENT, AND THERE WAS EITHER A BUBBLE OR NOT A BUBBLE, AND

15   THAT IT WAS ALL THE SAME DOCUMENT AND ALL WAS WELL AND ALL WAS

16   MUCH ADO ABOUT NOTHING.

17       AND THEY PUT THE WITNESS UP, AND WE DIDN'T HAVE THE

18   OPPORTUNITY TO IMPEACH HIM WITH THE SAME DOCUMENT, WITH THE

19   SAME COMMENT BUBBLE WITHOUT THE '670 PATENT.

20       THAT'S EXTRA IMPORTANT.  NOT ONLY BECAUSE THAT'S THEIR

21   ONLY WILLFULNESS THEORY ON THE '670 PATENT, BUT THAT'S

22   IMPORTANT BECAUSE THAT WOULD MEAN THERE'S MULTIPLE, MULTIPLE

23   VERSIONS.  IT WOULD BE INCONSISTENT WITH MULTIPLE STORIES

24   WE'VE HEARD AT DIFFERENT POINTS IN TIME.  AND WE DIDN'T HAVE

25   THE OPPORTUNITY TO IMPEACH HIM BY SAYING WASN'T THERE A

1    VERSION THAT DIDN'T HAVE THE '670 PATENT ON IT THAT WAS FROM

2    THAT SAME TIME PERIOD.  WASN'T THERE THIS OTHER VERSION --

3         **THE COURT:**  THEY SAID THERE WERE FOUR VERSIONS.  ONE

4    WAS THE '04 VERSION AND THEN THERE WERE THREE SUBSEQUENT

5    VERSIONS.  SO IF YOU ARE REFERRING TO ONE OF THE THREE

6    SUBSEQUENT VERSIONS, THAT WOULDN'T BE INCONSISTENT WITH WHAT

7    WAS REPRESENTED.

8         **MR. REINES:**  THAT'S TRUE.

9         **THE COURT:**  IF THERE'S ANOTHER ORIGINAL '04 VERSION

10   THAT DIDN'T HAVE THE '670, I SUPPOSE THAT WOULD BE SOMETHING

11   ELSE AGAIN.

12        **MR. REINES:**  THAT'S WHAT THE SITUATION IS.

13    SO THERE'S TWO -- SO THERE'S NOW SEVEN VERSIONS TO OUR

14   KNOWLEDGE.  WE ARE DEALING WITH IT AS WE GET IT.  IT'S

15   SHIFTING SANDS FOR US AS MUCH AS IT IS FOR YOU.

16    YES, THERE'S TWO, THE METADATA SHOWS THAT THERE'S THREE.

17   NONE OF THEM ARE IN JUNE.  THE TESTIMONY WAS JUNE.  SO --

18   DURING TRIAL.  SO THE JURY HEARD A JUNE DATE.  THAT ISN'T

19   TRUE.

20    AND THERE'S NOW THREE VERSIONS FROM THAT SAME TIME PERIOD,

21   ONE WHICH DOESN'T HAVE THE PATENT AS THEY ARE ARGUING

22   WILLFULNESS ON.  AND COUNSEL REPRESENTED TO YOU THAT IT WAS

23   ALL ONE DOCUMENT.  MAYBE I'M MISSING SOMETHING ON THIS.

24        **THE COURT:**  OKAY.  DO YOU HAVE A REQUEST?

25        **MR. REINES:**  YES.  WE WOULD REQUEST TO TAKE THE

1    DEPOSITION OF MR. VENTERS ON ALL THESE NEW VERSIONS.  AND WE'D

2    ALSO -- ADOBE WOULD LIKE TO TAKE THE DEPOSITION OF MS. GLAUSER

3    ON WHAT HER BASIS WAS FOR STATING THAT THERE WAS ONE DOCUMENT

4    AND THAT THIS -- THAT ALL IT WAS WAS A MATTER OF TURNING ON

5    AND OFF THE BUBBLE.

6            **THE COURT:**  NO, WE ARE NOT GOING TO DO THAT.

7        DOES VENTER LIVE AROUND HERE?

8            **MR. REINES:**  HE LIVES IN MARIN.

9            **MS. GLAUSER:**  AND YOUR HONOR --

10           **THE COURT:**  HE MENTIONED SOMETHING ABOUT WHERE HE WAS

11   STAYING.

12           **MR. REINES:**  SAN LEANDRO.

13           **MS. GLAUSER:**  HE RENTED A HOUSE.

14           **MR. REINES:**  SAN LEANDRO.

15           **THE COURT:**  OKAY.

16           **MR. REINES:**  IT'S VERY DISTURBING, YOUR HONOR.  I

17   THINK IT'S A BIG DEAL.

18           **THE COURT:**  YOU WANT TO DEPOSE HIM?

19           **MR. REINES:**  THERE'S NOW ADDITIONAL VERSIONS OF THIS

20   DOCUMENT.  YES.  WE WOULD HAVE IMPEACHED HIM IN FRONT OF THE

21   JURY ON AN ISSUE THAT THEY'VE MADE THEIR PRIMARY ARGUMENT.

22           **THE COURT:**  THERE ARE SIMPLER SOLUTIONS THAN DEPOSING

23   HIM.  WE COULD STRIKE THE DOCUMENT.

24           **MR. REINES:**  THAT -- IF THE COURT -- WE PREFER THAT,

25   BUT WE ARE JUST TRYING TO GET TO THE BOTTOM OF IT.  WE WOULD

```
 1    BE VERY COMFORTABLE STRIKING THE DOCUMENT FROM THE RECORD.

 2              MS. GLAUSER:  YOUR HONOR, MAY I RESPOND ON THIS --

 3              THE COURT:  -- USE THE ONE THAT DIDN'T HAVE THE '670,

 4    AND THEN YOU WOULD ARGUE THAT IF THEY DISCLOSED ANYTHING, IT

 5    WAS ONLY THE '541 AND NOT THE '670.  IT JUST SEEMS THERE'S

 6    SIMPLER SOLUTIONS FOR THE TRIAL.

 7        MAYBE IF YOU WANT SANCTIONS OR SOMETHING LIKE THAT, YOU

 8    HAVE TO DEPOSE HIM, BUT IN TERMS OF MAKING IT THROUGH THE

 9    TRIAL --

10              MR. REINES:  FAIR ENOUGH.

11              MS. GLAUSER:  YOUR HONOR --

12              MR. REINES:  WE CAN --

13                   (SIMULTANEOUS COLLOQUY.)

14              MR. REINES:  LET ME STATE WHAT WE ARE SEEKING.

15        BASED ON WHAT WE KNOW NOW, WHAT WE WOULD SEEK, WHICH I

16    THINK MAKES A LOT OF SENSE, IS THE STRIKING OF EXHIBIT 125C

17    AND RELATED TESTIMONY.  AND THE REASON IS VERY SPECIFIC.

18    UNDER 403 AND THE BEST EVIDENCE RULE, WE SAID ALL ALONG WE'RE

19    BEING GIVEN A VERSION OF WHAT HE SAYS HE SENT TO THE -- TO US

20    OF WHICH WE HAVE NO RECORD.  AND WE NEVER GOT A GOOD

21    EXPLANATION OF WHY WE DIDN'T HAVE THE ORIGINAL, WHICH IS WHAT

22    THE BEST EVIDENCE RULE REQUIRES --

23              THE COURT:  IT WAS SUBMITTED ONLINE.  THERE IS NO

24    HARD COPY ORIGINAL.

25              MR. REINES:  WELL, I MEAN YOU HAVE AN EMAIL WITH AN
```

1    ATTACHMENT.

2         **THE COURT:**  IT WASN'T EMAILED.  IT WAS TYPED INTO THE

3    WEB PAGE AS I UNDERSTAND IT.

4         **MR. REINES:**  NO.  THERE WAS AN EMAIL ADDRESS ON THE

5    WEBSITE.

6         **MS. GLAUSER:**  MAY I RESPOND ON THAT, YOUR HONOR?

7    THERE WAS NO E-DISCOVERY IN THIS.  THEY NEVER SOUGHT TO TAKE

8    E-DISCOVERY.  THE PARTIES AGREED THAT THEY WERE GOING TO LIMIT

9    THE COSTS OF DISCOVERY HERE AND ONLY PRODUCE THE DOCUMENTS

10   THAT WERE IN THEIR POSSESSION, AND NOT DO ANY EMAIL SEARCHES.

11   SO THAT HASN'T BEEN DONE HERE.

12        THERE IS NO DEBATE FROM WHAT MR. REINES IS SAYING ABOUT

13   THE FACT THAT DOCUMENT 125C, THE ONE THAT MR. VENTERS

14   TESTIFIED HE CREATED IN 2004 WAS CREATED IN JULY OF 2004, AND

15   USED DURING HIS TELEPHONE CONVERSATION WITH ADOBE.

16        THAT'S THE DOCUMENT THAT THEY DOWNLOADED FROM THE

17   MACINTOSH AND THAT HAS BEEN PROVIDED.  IT'S THE DOCUMENT THAT

18   HAS THE COMMENT BUBBLE, AND THE METADATA ON IT SHOWS THAT IT'S

19   JULY 2004.

20        **THE COURT:**  WHAT HE'S SAYING IS THERE'S A VERSION OF

21   IT THAT DOESN'T ADDRESS THE '670 AND THAT THE VERSION THAT WE

22   WERE DEALING WITH DID ADDRESS THE '670.

23        SO WHY WOULD THERE BE A VERSION, IF THERE IS, AS HE SAID,

24   WHY WOULD THERE BE A 2004 VERSION THAT DIDN'T ADDRESS THE '670

25   PATENT?

1          **MS. GLAUSER:**  THE '670 PATENT DIDN'T ISSUE UNTIL JUNE

2     OF 2004.  SO TO THE EXACT THAT A DRAFT WAS MADE BEFORE THAT --

3          **MR. REINES:**  THAT'S OUR ARGUMENT, YOUR HONOR.

4          **THE COURT:**  SO THEN YOU'RE SAYING THE DOCUMENT YOU

5     GAVE DIDN'T ADDRESS THE '670, THAT NONE OF THE 2004 DOCUMENTS

6     ADDRESSED THE '670?

7          **MS. GLAUSER:**  NO.  THE 125C, THE DOCUMENT THAT WE

8     OFFERED INTO EVIDENCE AND THAT WAS ADMITTED HAS THE METADATA

9     OF 2004 ON IT.

10         **THE COURT:**  DOES IT ADDRESS THE '670 PATENT?

11         **MS. GLAUSER:**  AND THAT DOCUMENT DOES ADDRESS THE '670

12    PATENT.

13         **THE COURT:**  SO WHY IS THERE ANOTHER DOCUMENT, AS HE

14    REPRESENTS, ALSO FROM '04 THAT DOES NOT ADDRESS THE '670

15    PATENT?

16         **MS. GLAUSER:**  I BELIEVE BECAUSE THE METADATA ON THAT

17    ONE SHOWS THAT IT IS FROM JUNE 2004 BEFORE THE ISSUANCE OF THE

18    '670 PATENT.

19         **MR. REINES:**  YOUR HONOR, THAT WOULD BE CRITICAL

20    CROSS-EXAMINATION OF THE WITNESS WHEN HE TESTIFIED THAT THE

21    MEETING TOOK PLACE IN JUNE THAT HE HAD A JUNE VERSION THAT

22    DOESN'T HAVE THE '670 PATENT.  WE ARE NOT CONCEDING --

23         **THE COURT:**  I'M SORRY.  SO THE VERSION -- THE VERSION

24    THAT HE SAYS HE SUBMITTED AND THAT WE ALL LOOKED AT WAS FROM

25    JULY?

1          **MS. GLAUSER:**  OF 2004, YES.

2          **THE COURT:**  AND WHEN DID HE HAVE THIS CONVERSATION

3     WITH ADOBE?

4          **MS. GLAUSER:**  HE TESTIFIED THAT IT WAS IN THE SUMMER.

5     IN FACT, MR. REINES ASKED HIM WHEN WAS THE '670 ISSUED?  AND

6     HE TESTIFIED IT WAS IN JUNE OF 2004.

7          **THE COURT:**  WHEN WAS THE CONVERSATION WITH ADOBE?

8          **MS. GLAUSER:**  IN THE SUMMER.  HE SAID HE CAN'T

9     REMEMBER THE MONTH --

10          **THE COURT:**  JUNE OR JULY.  THAT DOES SEEMS NOW TO BE

11     RATHER CRITICAL.

12          **MS. GLAUSER:**  HE SAID IT WAS SHORTLY AFTER THE

13     ISSUANCE OF THE '670 BECAUSE HE RECALLS DISCUSSING THE '670

14     AND KNOWS THAT THAT WAS THE DOCUMENT THAT HE PRESENTED.

15          **MR. REINES:**  YOUR HONOR, THAT'S DECEPTIVE.  HE

16     TESTIFIED THAT IT WAS IN JUNE IN FRONT OF THE JURY.

17          **MS. GLAUSER:**  HE DIDN'T.  YOU ASKED HIM ON

18     CROSS-EXAMINATION.  HE SAID THAT'S NOT WHAT I SAID.  I SAID IT

19     WAS THE SUMMER.

20          **MR. REINES:**  OKAY.  WE WILL -- IF I CAN -- I WILL

21     DEMONSTRATE TO YOU THAT HE SAID JUNE.  THAT'S FIRST OF ALL.

22          AND IN TERMS OF OUR POSITION, I NEED TO CLEAR THE RECORD

23     BECAUSE THIS IS VERY IMPORTANT TO US FOR OBVIOUS REASONS,

24     WHICH SHOULD BE MANIFEST.

25          I DO NOT AGREE THAT THE METADATA IS VALID BECAUSE WE HAVE

1    BEEN GETTING HANDED THESE DAISY CHAINS OF DOCUMENTS.  I

2    BASICALLY DON'T AGREE THAT ANYTHING IS VALID ABOUT HOW THIS

3    DOCUMENT HAS BEEN PRODUCED TO US.

4        WITH RESPECT -- THERE'S THREE DOCUMENTS THAT THEIR

5    METADATA SHOWS IS FROM 2004, AND IT'S INCREDIBLY PREJUDICIAL

6    TO US THAT WE WEREN'T ABLE TO IMPEACH HIM WITH THEIR MULTIPLE

7    VERSIONS, INCLUDING ONE IN JUNE, WHICH WAS HIS ORIGINAL

8    TESTIMONY.  I WOULD IGNORE THAT -- COUNTER ARGUMENT TO THAT.

9    AND THAT, IN FACT, HE DIDN'T TESTIFY -- KNOW ABOUT THE '670

10   PATENT.

11       THE FACT IS, WHAT DO I BELIEVE?  I BELIEVE HE WAS MAKING

12   THAT ALL UP AND THAT HE SAID, I READ THE WHOLE DOCUMENT.  HE

13   DOESN'T HAVE AN ACTUAL KNOWLEDGE OF WHAT HE SAID.  HE WAS

14   USING THE DOCUMENT TO REFRESH HIM.  AND THEY SELECTIVELY

15   PRODUCED THE DOCUMENT THAT SAID WHAT THEY WANT.

16       THE FACT THERE IS NO E-DISCOVERY IS NO JUSTIFICATION FOR

17   NOT PRODUCING OTHER VERSIONS THAT DON'T HAVE THE PATENT.

18   THAT'S JUST NOT EXCULPATORY IN ANY WAY.

19           **THE COURT:**  I'M HEARING YOU SAY THAT YOU WOULD HAVE

20   IMPEACHED HIM.  SO THE WAY TO DEAL WITH THAT WOULD BE TO BRING

21   HIM BACK AND GO AHEAD AND IMPEACH HIM.

22       THE WAY TO DEAL WITH THE FACT THERE WAS NO E-DISCOVERY

23   WOULD BE TO GET THAT EMAIL.

24           **MS. GLAUSER:**  I DON'T KNOW IF IT'S POSSIBLE.  WE CAN

25   LOOK INTO IT.

1          **THE COURT:**  TRY AND SEE WHAT ACTUALLY WAS ATTACHED TO

2     THAT EMAIL IF IT EXISTS ANYWHERE.

3          **MS. GLAUSER:**  I CAN FIND OUT.  I DON'T KNOW WHETHER

4     THE 2004 EMAIL STILL EXISTS.  IF THEY DO, IT WOULD BE GREAT

5     FOR US.

6          **THE COURT:**  SO THEN THE FINAL QUESTION WOULD BE IS

7     THE DEPOSITION OF HIM IN THE MIDDLE OF THE TRIAL A USEFUL

8     EXERCISE OR SHOULD WE CALL HIM BACK AND PUT HIM ON THE STAND

9     AND YOU CAN ASK HIM WHATEVER YOU WANT.

10          **MR. REINES:**  YOUR HONOR, I RETURN TO THE --

11          **THE COURT:**  IF YOU WANT TO DO A DEPOSITION --

12          **MR. REINES:**  I RETURN TO THE PROPORTIONAL RELIEF THAT

13     I REQUESTED, WHICH IS TO STRIKE THE DOCUMENT.  TO HAVE THEM

14     NOW BRING NEW VERSIONS IN AND BACKFILL AND SAY WELL, WE HAVE

15     DOCUMENTS, WE HAVE METADATA IS INCREDIBLY PREJUDICIAL WHEN THE

16     WHOLE CASE --

17          **THE COURT:**  WHY DON'T YOU SUBMIT ALL THE VERSIONS OF

18     THE DOCUMENTS WITH SOME KIND OF EXPLANATION OF WHICH IS WHICH

19     SO I CAN LOOK AT THEM.

20          **MR. REINES:**  FAIR ENOUGH.

21          **THE COURT:**  GIVE ME THE PAGE AND LINE OF WHEN HE

22     TESTIFIED ABOUT THEM, WHAT IT WAS THAT HE SAID.  IF YOU WANT A

23     DEPOSITION OF HIM AND YOU WANT TO DO THAT TOMORROW OR OVER THE

24     WEEKEND, THAT'S FINE.  OR WE CAN HAVE HIM COME BACK TOMORROW

25     OR TUESDAY AND GET ON THE STAND AGAIN.

1         **MR. REINES:**  WE WILL TAKE HIS DEPOSITION, IF THAT'S

2    ALL RIGHT WITH THE COURT, AND WE'LL ALSO SUBMIT TO THE COURT

3    ALL THE DIFFERENT VERSIONS AND ALL OUR REASONINGS AS TO WHY WE

4    ARE PREJUDICED.

5         **THE COURT:**  YOU NEED TO FIND -- SEE IF THAT EMAIL IS

6    ANYWHERE.

7         **MS. GLAUSER:**  I WILL ATTEMPT TO DO SO.

8       YOUR HONOR, ONE MOMENT.  THE TWO PRINTOUTS THAT YOU HAVE,

9    THE '670 IS IN BOTH.

10        **THE COURT:**  I DON'T WANT TO DO THIS ON RAW DATA.

11       **MR. REINES:**  THANK YOU.

12        **THE COURT:**  SUBMIT WHAT YOU CAN COME UP WITH AND I'LL

13   TAKE A LOOK AT IT.

14           (PROCEEDINGS ADJOURNED IN 3:42 P.M.)

15                    **CERTIFICATE OF REPORTER**

16        I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE

17   UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY

18   CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

19   RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

20

21            *Diane E. Skillman*

22            DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

23               FRIDAY, AUGUST 29, 2014

24

25