VOLUME 5

PAGES 791 - 1004

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DIGITAL REG OF TEXAS, LLC   )
                            )
          PLAINTIFF,        )   NO. C-12-1971 CW
                            )
 VS.                        )   FRIDAY, AUGUST 29, 2014
                            )
ADOBE SYSTEMS, INC., ET AL.,)   OAKLAND, CALIFORNIA
                            )
          DEFENDANTS.       )   JURY TRIAL
_____)


BEFORE THE HONORABLE CLAUDIA WILKEN, JUDGE

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**FOR PLAINTIFF:**        DINOVO, PRICE, ELLWANGER & HARDY LLP
                          7000 NORTH MOPAC EXPRESSWAY, SUITE 350
                          AUSTIN, TEXAS 78731
                 BY:  ANDREW G. DINOVO, ESQUIRE
                      ADAM G. PRICE, ESQUIRE
                      GREGORY DONAHUE, ESQUIRE
                      JAY D. ELLWANGER, ESQUIRE
                      NICOLE E. GLAUSER, ESQUIRE


                          BARTKO ZANKEL BUNZEL MILLER
                          ONE EMBARCADERO CENTER, SUITE 800
                          SAN FRANCISCO, CALIFORNIA 942111
                 BY:  W. PAUL SCHUCK, ESQUIRE


**ALSO PRESENT:**         MICHAEL FARLEY, COMPANY REPRESENTATIVE

                      (APPEARANCES CONTINUED)

**REPORTED BY:**          DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
                          OFFICIAL COURT REPORTER
          TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

```
1

2

3

4    FOR DEFENDANT              WEILL, GOTSHAL & MANGES, LLP
     ADOBE SYSTEMS:             201 REDWOOD SHORES PARKWAY
5                               REDWOOD SHORES, CALIFORNIA 94065
                          BY:  EDWARD R. REINES, ESQUIRE
6                               SONAL N. MEHTA, ESQUIRE
                                BYRON BEEBE, ESQUIRE
7                               ANANT PRADHAN, ESQUIRE

8

9    ALSO PRESENT:              PAUL BETLEM, COMPANY REPRESENTATIVE
                                KAREN ROBINSON, IN-HOUSE COUNSEL
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      I N D E X

 2   DEFENDANT'S WITNESS:                    PAGE   VOL.

 3   WICKER, STEPHEN

 4   CROSS-EXAMINATION BY MR. DINOVO (RESUMED)   802    5

 5   REDIRECT EXAMINATION BY MS. MEHTA          828    5

 6   RECROSS-EXAMINATION BY MR. DINOVO          836

 7   PLAINTIFF'S WITNESSES:

 8   HERBACH, JONATHAN (ADVERSE)

 9   DIRECT EXAMINATION BY MR. ELLWANGER        840    5

10   CROSS-EXAMINATION BY MR. REINES            867    5

11   REDIRECT EXAMINATION MR. ELLWANGER         909    5

12   RECROSS-EXAMINATION BY MR. REINES          922    5

13   PARR, RUSSELL

14   DIRECT EXAMINATION BY MR. PRICE            924    5

15   CROSS-EXAMINATION BY MR. REINES            973    5

16   PLAINTIFF'S EXHIBITS:        EVD.    VOL.

17        95                      948      5

18       154                      865      5

19       178                      912      5

20       181                      967      5

21       182                      857      5

22

23   DEFENDANT'S EXHIBITS:

24       497                      895      5

25
```

1    FRIDAY, AUGUST 29, 2014                        8:23 A.M.

2                    P R O C E E D I N G S

3           THE CLERK:  REMAIN SEATED.

4        (PROCEEDINGS OUTSIDE THE PRESENCE OF THE JURY.)

5           MR. REINES:  GOOD MORNING, YOUR HONOR.

6           THE COURT:  GOOD MORNING.

7           MS. GLAUSER:  GOOD MORNING.

8           THE COURT:  SO YOU SAW THIS NOTE FROM THE JURY.

9           MR. REINES:  YES, YOUR HONOR.

10          THE COURT:  I'M A LITTLE CONCERNED ABOUT ITS TONE:

11       "DOES THE COURT CARE THAT THIS JUROR WAS UNABLE TO HEAR"

12    IS A LITTLE PASSIVE-AGGRESSIVE.

13          MR. REINES:  I DON'T KNOW.

14          THE COURT:  HE DID RAISE HIS HAND, AND I DIDN'T WANT

15    TO TAKE HIS QUESTION VERBALLY.  HE GAVE THE NOTE YESTERDAY.

16    THIS IS THE SAME GUY, NUMBER ONE, THAT SAID "I CAN'T HEAR."

17       BUT I THOUGHT THAT MEANT HE COULDN'T HEAR.  BUT I GUESS IT

18    MEANT HE HAD MORE PROBLEMS THAN THAT.  SO I THOUGHT THAT WHAT

19    I WOULD SAY IS THAT, OF COURSE, THE COURT IS CONCERNED THAT

20    ALL THE JURORS CAN HEAR.  HOWEVER, I CAN'T TAKE VERBAL

21    COLLOQUY WITH YOU DURING THE TRIAL.  BUT IF YOU CAN'T HEAR OR

22    YOU CAN'T UNDERSTAND, I THOUGHT I COULD TELL THEM TO RAISE

23    THEIR HAND AND PUT THEIR HAND BESIDE THEIR EAR, AND WE WOULD

24    ALL TRY TO WATCH FOR THAT, AND REMIND WHICHEVER WITNESS IT WAS

25    TO SPEAK UP.

1              **MR. REINES:**  THAT MAKES SENSE, YOUR HONOR.

2              **THE COURT:**  I CAN'T THINK OF ANYTHING ELSE TO DO.  I

3     DON'T KNOW IF DR. DEVANBU WILL BE BACK ON THE STAND.  I DID

4     NOTICE THAT HE HAS A BIT OF A WAY OF TAILING OFF AT THE END OF

5     SENTENCES.  IT WASN'T A QUESTION OF LOUDNESS OR SPEAKING INTO

6     THE MIC, BUT A KIND OF TAILING OFF OF THE SENTENCES.

7          SO IF HE IS GOING TO BE BACK ON THE STAND, YOU MIGHT WORK

8     WITH HIM ON MAKING SURE HE KEEPS HIS VOICE UP AT THE END OF

9     PHRASES AND SENTENCES, AS WELL.

10         I CAN ALSO TELL THEM WHILE THERE IS NO TRANSCRIPT, THEY

11    CAN ASK FOR READBACK.  IF THERE ARE PARTS THAT THEY FEEL THEY

12    MISSED, THEY SHOULD MAKE A NOTE OF THAT.  AND IF IT IS NEEDED

13    DURING DELIBERATIONS, THEY CAN ASK FOR READBACK.

14         I HOPE I REMEMBER TO SAY ALL THOSE THINGS.

15             **MR. REINES:**  THAT IS ONE WE MIGHT REGRET.

16             **THE COURT:**  TRUE.  BUT, I MEAN, HE SAYING HE HAS

17    MISSED A LOT OF TESTIMONY.  I CAN'T IGNORE THAT.

18             **MR. DINOVO:**  JUST THINKING OUT LOUD, YOUR HONOR, ONE

19    APPROACH MIGHT BE FOR BOTH PARTIES' DEMONSTRATIVES TO BE

20    PUBLISHED TO THE JURY IN THE JURY ROOM.

21             **THE COURT:**  WELL, YOU CAN TALK ABOUT THAT WITH EACH

22    OTHER.

23             **MR. REINES:**  RIGHT.

24         WHY DON'T WE MEET AND CONFER ON THAT?

25             **THE COURT:**  AND YOU MIGHT NEED TO CLEAN THEM UP A

1   BIT.

2        SO WHAT DID I SAY?  WE WOULD HAVE A SYMBOL.  I DO CARE.

3   WE HAVE A SYMBOL FOR HEARING.  I DO CARE.  WE CAN'T DISCUSS.

4   SYMBOL FOR NOT HEARING.  AND READBACK.

5        IS THERE SOMETHING ELSE I WAS GOING TO SAY?

6             **MR. REINES:**  YOUR HONOR, TURNING TO THE ADOBE VALUE

7   PROPOSITION DOCUMENT, THE -- ONE OF THE NEW VERSIONS THAT WAS

8   UNPRODUCED DURING DISCOVERY, WHICH WE RECEIVED YESTERDAY WHEN

9   WE RECEIVED TWO VERSIONS HAD METADATA WHICH RAISED EVEN MORE

10  CONCERNS.

11       FIRST, THE NAME OF THE DOCUMENT, YOUR HONOR, IS SUN VALUE

12  PROPOSITION, AS IN SUN MICROSYSTEMS VALUE PROPOSITION.  SO

13  THAT IS OF CONCERN.  AND THEN, THE PARTY THAT LAST SAVED IT,

14  ACCORDING TO THE METADATA, WAS NOT MR. VENTERS.  IT WAS A

15  FELLOW -- AT LEAST IN ONE OF THE CASES -- CALLED "BARRY

16  PHILLIPS."

17       SO THAT FURTHER UNDERMINES HIS FOUNDATION TO TALK ABOUT

18  WHAT'S IN THE DOCUMENT.

19       THE SECOND THING, YOUR HONOR, IS, JUST TO CLARIFY MY

20  STATEMENTS, AND FRANKLY CLARIFY THINGS THAT HAVE BEEN SAID BY

21  THE OTHER SIDE, YOU KNOW, WITH THE BENEFIT OF LOOKING MORE

22  THAN BETWEEN QUESTIONS YESTERDAY, THE ONE THAT WE SAID DOESN'T

23  MENTION THE '670 PATENT, DOESN'T MENTION THE '670 PATENT.

24       WHAT IT DOES DO IS IT REFERS TO A TRACKING OF ELECTRONIC

25  CONTENT.  THAT'S THE -- IT SAYS "TRACKING ELECTRONIC CONTENT",

```
1    IN QUOTE, "PATENT BY THE U.S. PATENT OFFICE."

2        I THINK IT PROBABLY HADN'T ISSUED AT THIS DATE BECAUSE THE

3    MEETING SUPPOSEDLY -- AT LEAST ORIGINALLY -- HAPPENED IN JUNE,

4    AND MAYBE IT HAPPENED BEFORE IT ISSUED OR NOT.  THERE IS JUST

5    SO MANY QUESTIONS ABOUT WHICH VERSION OF THE DOCUMENT WAS

6    GIVEN.

7        AND, ESSENTIALLY, THE TESTIMONY IS, REALLY, TWO THINGS.

8    THE TESTIMONY --

9            THE COURT:  WELL, WHAT ARE WE GOING TO DO ABOUT THIS?

10   I THOUGHT WE DECIDED YESTERDAY WHAT WE WERE GOING TO DO.

11           MR. REINES:  RIGHT.  WE HAVE FOUR REQUESTS.  WE HAD

12   ASKED FOR A DEPOSITION.  THE OTHER SIDE WOULD NOT CONSENT TO

13   THAT.

14           THE COURT:  NOW, WE'RE -- WE SAID THAT YESTERDAY,

15   RIGHT?  WE ARE GOING TO HAVE A DEPOSITION.

16           MS. GLAUSER:  YOUR HONOR, WE UNDERSTOOD YESTERDAY

17   THAT YOU WANTED US TO SUBMIT EACH OF THE VERSIONS WITH AN

18   EXPLANATION OF WHAT IT WAS, AND WE WOULD TAKE UP WHETHER THE

19   DEPOSITION WAS ACTUALLY IS NECESSARY.

20           THE COURT:  LET US SCHEDULE A DEPOSITION.

21           MR. REINES:  THE SECOND THING, YOUR HONOR, IS WHAT WE

22   WOULD LIKE TO SEE IS THE FILE STRUCTURE OF MR. VENTERS, AT

23   LEAST AS IT RELATES TO THE ADOBE VALUE PROPOSITION DOCUMENTS

24   SO THAT WE SEE WHAT THEY ARE.

25       I MEAN, WE JUST GOT TWO MORE I DON'T KNOW IF IT WAS
```

```
1    LIMITED TO THAT '04 TIME FRAME OF THE SUMMER, BUT --

2              THE COURT:  I DON'T KNOW WHAT YOU MEAN BY "FILE

3    STRUCTURE," BUT WHY DON'T YOU TELL THEM WHAT IT IS THAT YOU

4    WANT --

5              MR. REINES:  WE DID.

6              THE COURT:  -- AND YOU GIVE IT TO THEM.  OKAY.

7              MR. REINES:  WE WOULD GO ONE FURTHER, AND THAT IS THE

8    MAC COMPUTER THAT NOW HAS THESE DOCUMENTS, WHICH ARE A MESS,

9    WE WOULD ASK FOR FORENSICS.  OUR FORENSICS PEOPLE TELL US WITH

10   THAT DOCUMENT, WITH THAT ABILITY, WE WILL BE ABLE TO DETERMINE

11   MORE ABOUT THE BEGINNING OF THIS DOCUMENT, WHICH IS CALLED

12   "SUN VALUE PROPOSITION DOCUMENT," AND BEEN RENAMED "ADOBE

13   VALUE PROPOSITION DOCUMENT."

14      OH, BY THE WAY, BOTH OF THE NEW ONES.

15              THE COURT:  SO THEY WERE JUST CUT AND PASTED FOR

16   VARIOUS CLIENTS, BUT --

17              MR. REINES:  THAT WOULD HAVE BEEN --

18              THE COURT:  HAVE HIM BRING THE COMPUTER WITH HIM.

19              MS. GLAUSER:  YOUR HONOR, MAY I RESPOND?  HE HAS THE

20   COMPUTER WITH HIM, AND WE ARE HAPPY TO PRESENT IT TO THE COURT

21   FOR IN CAMERA REVIEW.  BUT THERE'S NO --

22              THE COURT:  HIS COMPUTER?  WHAT WOULD I KNOW ABOUT

23   IT? I CAN'T TURN A MAC ON.

24              MS. GLAUSER:  THERE IS NO BASIS TO TURN OVER

25   MR. VENTERS' PERSONAL COMPUTER FOR ADOBE TO DO WHATEVER IT
```

```
1    WANTS AND IMAGE FORENSICALLY.  IF THEY WANT TO TAKE THE

2    DEPOSITION AND ASK MR. VENTERS ABOUT THESE DOCUMENTS, THEN WE

3    WILL COME REPLY WITH THE ORDER DO SO.

4             THE COURT:  ALL I'M SAYING IS HAVE HIM BRING THE

5    LAPTOP -- IT IS A LAPTOP, RIGHT?

6             MS. GLAUSER:  IT IS.

7             MR. REINES:  YES.

8             THE COURT:  HAVE HIM BRING IT TO THE DEPOSITION.  WE

9    ARE NOT GOING TO TAKE IT APART AT THE DEPOSITION.  BUT IF

10   SOMETHING COMES UP, AND HE CAN PULL IT UP AND SAY, SEE, HERE

11   IS MY DIRECTORY.  AND HERE IS MY PATH.  AND HERE'S THE

12   DIFFERENT DOCUMENTS.**********

13      AND THEY CAN LOOK AT IT ON THE SCREEN, TAKE SOME

14   SCREENSHOTS OF IT, OR WHATEVER, THAT MIGHT BE HELPFUL.

15      AND IF WE NEED MORE THAN THAT BECAUSE SUSPICIONS AREN'T

16   ALLAYED BY THE WHOLE PROCESS, THEN WE WILL CONSIDER A FORENSIC

17   ANALYSIS OR IMAGING OF IT, IN PARTICULAR THE HARDWARE, OR

18   WHATEVER.

19             MS. GLAUSER:  WE WOULD REQUEST, YOUR HONOR, THAT ANY

20   DEPOSITION BE LIMITED.  AND SO WE WOULD SEEK YOUR GUIDANCE ON

21   THE APPROPRIATE TIME FOR IT.  WE WOULD SUGGEST --

22             THE COURT:  FOUR HOURS.

23             MR. REINES:  THAT'S FINE, YOUR HONOR.

24             MS. GLAUSER:  WE WOULDN'T SAY THAT FOUR HOURS WOULD

25   BE NECESSARY.
```

1          **THE COURT:**  I WOULD HOPE YOU WOULDN'T USE MORE THAN

2     YOU NEEDED, BUT I DON'T WANT A BIG FIGHT ABOUT NOW, IT IS TWO.

3     NOW, IT IS TWO HOURS AND 15.

4        SO NOT MORE THAN FOUR.

5          **MR. REINES:**  YOUR HONOR, THE FINAL THING IS THAT

6     DIGITAL REG SUBMITTED A BRIEF ON THIS ISSUE THIS MORNING THAT

7     I DON'T THINK THE COURT OBVIOUSLY HAS HAD AN OPPORTUNITY TO

8     LOOK AT IT.  WE WOULD LIKE TO OPPORTUNITY TO RESPOND.  WE CAN

9     DO THAT OVER THE WEEKEND.

10         **THE COURT:**  OKAY.

11         **MR. REINES:**  THANK YOU, YOUR HONOR.

12         **MS. GLAUSER:**  AND IS IT CLEAR, YOUR HONOR, THE

13    DEPOSITION IS TO BE LIMITED IN SCOPE TO THE ADOBE VALUE

14    PROPOSITION DOCUMENT?

15         **THE COURT:**  WELL, AND THE MEETING AND DISCOVERY

16    EFFORTS THAT WERE MADE TO PRODUCE IT.

17         **MR. REINES:**  AND THIS WITNESS ISSUE ABOUT THE WAYBACK

18    MACHINE, AND ALL THAT, YOUR HONOR?

19         **THE COURT:**  THAT IS WHAT I AM TALKING ABOUT, THE

20    MEETING:  THE PARTICIPANTS, THE DATE, THE MATERIALS, BEFORE,

21    DURING AND AFTER.

22         **MR. REINES:**  THANK YOU.

23         **MS. GLAUSER:**  THANK YOU, YOUR HONOR.

24         **THE COURT:**  OKAY.  WE CAN HAVE THE WITNESS BACK ON

25    THE STAND, AND WE WILL BRING IN THE JURY.  AND WE ARE ON

1    DIRECT, STILL, ARE WE?

2              **MS. MEHTA:**  NO, YOUR HONOR.  WE ARE ON

3    CROSS-EXAMINATION.

4              **THE COURT:**  OKAY.

5         (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

6              **THE COURT:**  PLEASE BE SEATED.

7         GOOD MORNING, LADIES AND GENTLEMEN.  AND THANK YOU FOR

8    BEING TIMELY, AS USUAL.  I JUST WANT TO SET UP A PROTOCOL

9    HERE.  I'M VERY CONCERNED THAT ALL OF YOU ARE ABLE TO HEAR AND

10   UNDERSTAND ALL OF THE WITNESS TESTIMONY AND EXHIBITS AS IT

11   COMES IN.

12        I CAN'T DISCUSS THE CASE OR ENTER INTO A COLLOQUY WITH YOU

13   FROM THE JURY BOX, BUT I THOUGHT WHAT I COULD DO IS SET UP A

14   PROTOCOL WHEREBY IF YOU CAN'T HEAR SOMETHING OR CAN'T

15   UNDERSTAND IT OR CAN'T SEE IT, THAT YOU WOULD RAISE YOUR HAND

16   AND GO LIKE THIS (INDICATING).

17        SO YOU RAISE YOUR HAND, BUT YOU ALSO DO THIS (INDICATING)

18   SO I KNOW YOU ARE NOT ASKING TO COMMENT ON SOMETHING, BUT

19   TELLING ME YOU CAN'T HEAR OR, LIKE THIS, (INDICATING) IF YOU

20   CAN'T SEE.

21        I CAN'T LOOK AT YOU ALL THE TIME BECAUSE I AM TRYING TO

22   FOLLOW ALONG, TOO.  BUT I WILL KEEP A CLOSER EYE ON YOU.  THE

23   ATTORNEYS WILL, TOO.  IF THEY SEE SOMEBODY WITH THEIR EAR UP

24   WE WILL TRY TO BE MORE CONSCIOUS OF THAT AND TRY AND DEAL WITH

25   THE ISSUE.

```
1        IF THERE IS SOMETHING YOU MISSED, I DID MENTION TO YOU
2   THAT THERE WILL NOT BE A TRANSCRIPT FOR YOU, BUT THERE IS A
3   POSSIBILITY OF READBACK.  SO WHEN YOU ARE DELIBERATING IF IT
4   TURNS OUT SOMEBODY MISSED SOMETHING, YOU CAN ASK TO HAVE
5   CERTAIN PORTIONS OF A CERTAIN WITNESS' TESTIMONY ABOUT A
6   CERTAIN SUBJECT READ BACK TO YOU.
7        SO DON'T BE CONCERNED THAT THERE IS NO REMEDY IF YOU DID
8   MISS SOMETHING THAT YOU FEEL TURNS OUT TO BE IMPORTANT.  SO WE
9   WILL TRY TO DO BETTER.
10       AND WE'LL PROCEED THEN WITH THE CROSS-EXAMINATION.
11           MR. DINOVO:  THANK YOU, YOUR HONOR.
12       (STEPHEN WICKER RESUMED THE STAND, AND CROSS-EXAMINATION
13  RESUMED AS FOLLOWS:)
14                   CROSS-EXAMINATION RESUMED
15  BY MR. DINOVO
16  Q.  GOOD MORNING, DR. WICKER.
17  A.  GOOD MORNING.
18  Q.  ALL RIGHT.  SO LET'S CONTINUE WHERE WE LEFT OFF.  DID YOU
19  READ THE DEPOSITION TRANSCRIPT OF MR. HERBACH, ADOBE'S
20  CORPORATE REPRESENTATIVE?
21  A.  YES, I DID.
22  Q.  ALL RIGHT.  AND DO YOU AGREE WITH MR. HERBACH, SIR, THAT
23  THE MOST ACCURATE REFLECTION OF THE ACCUSED TECHNOLOGY IS THE
24  SOURCE CODE?
25  A.  YES.
```

1   **Q.**  AND YOU DIDN'T REVIEW THE SOURCE CODE OTHER THAN WHAT

2   DR. DEVANBU PUT IN HIS REPORT, RIGHT?

3   **A.**  THAT'S CORRECT.

4   **Q.**  AND YOU AGREED WITH DR. DEVANBU'S ANALYSIS OF THAT SOURCE

5   CODE?

6   **A.**  YES.  THE CODE HE LOOKED AT AND CHARACTERIZED, I HAD NO

7   PROBLEM WITH THAT.

8   **Q.**  DO YOU FURTHER AGREE WITH ADOBE THAT THE SOURCE CODE

9   DESCRIBES EXACTLY HOW THE PRODUCT WORKS AND WHAT THE COMPUTER

10  IS INTENDED TO DO?

11  **A.**  YES, THAT'S CORRECT.

12  **Q.**  DO YOU AGREE WITH ME, DR. WICKER, THAT WHEN AN ACROBAT

13  CLIENT WANTS TO OPEN A PROTECTED PDF, THE CLIENT NEEDS TO KNOW

14  WHAT TYPE OF AUTHENTICATION ARE AVAILABLE TO KNOW WHAT TYPE OF

15  INFORMATION IS NEEDED?

16  **A.**  YES.  THERE WILL BE A SET OF RULES THAT HAVE TO BE

17  FOLLOWED TO DETERMINE WHETHER OR NOT THAT DOCUMENT CAN BE

18  OPENED.

19  **Q.**  ALL RIGHT.  AND SO YOU AGREE WITH ME, THEN, THAT

20  AUTHENTICATION OCCURS IN THE LIVECYCLE PRODUCT?

21  **A.**  YES, IT DOES.

22  **Q.**  DO YOU AGREE THAT WHEN AN ACROBAT CLIENT TRIES TO OPEN A

23  DOCUMENT IT SENDS THE DOCUMENT I.D. TO THE SERVER?

24  **A.**  IN LIVECYCLE, YES, IT DOES.

25  **Q.**  DO YOU AGREE, DR. WICKER, THAT WHEN AN ACROBAT CLIENT

1    OPENS THE DOCUMENT, THE OPERATING SYSTEM MAY COMMUNICATE AN IP

2    ADDRESS TO THE SERVER?

3    **A.**   THAT IS AN OPTION.  IT IS A POSSIBILITY.

4    **Q.**   DO YOU ALSO AGREE, SIR, THAT LIVECYCLE CAN TRACK THE USE

5    AND ACCESS OF DOCUMENTS?

6    **A.**   AGAIN, THAT IS AMONG THE MANY CONFIGURATIONS THAT CAN BE

7    ESTABLISHED, YES.

8    **Q.**   THAT IS ONE SUCH CONFIGURATION?

9    **A.**   YES, THAT IS POSSIBLE.

10   **Q.**   IT IS TAUGHT BY ADOBE IN ITS INSTRUCTIONS?

11   **A.**   YES, IN THE LIVECYCLE MANUALS.

12   **Q.**   DO YOU AGREE THAT IN ALL CONFIGURATIONS OF VERSION EIGHT

13   OF LIVECYCLE RIGHTS MANAGEMENT, THE LIVECYCLE RIGHTS

14   MANAGEMENT SERVER WILL CREATE A VOUCHER AND RETURN THAT

15   VOUCHER TO THE CLIENT?

16   **A.**   YOU ARE ASSUMING THE ONLINE MODE.  IN THE ONLINE MODE,

17   YES.

18   **Q.**   YOU DON'T BELIEVE IT'S TRUE IN ALL CONFIGURATIONS?

19   **A.**   I WOULD NEED TO GO OVER THE LIST OF CONFIGURATIONS TO MAKE

20   SURE.  IT IS CERTAINLY TRUE IN MANY OF THE CONFIGURATIONS.

21   **Q.**   MORE GENERALLY, DR. WICKER, DO YOU AGREE WITH ME THAT

22   ADOBE INSTRUCTS ITS CUSTOMERS IN THE USE AND OPERATION OF THE

23   ACCUSED PRODUCTS?

24   **A.**   YES, THAT'S THE CASE.

25   **Q.**   NOW, WITH RESPECT TO THE LICENSING FEATURES OF ADOBE

1  SOFTWARE, ADOBE INTENDS TO MAINTAIN SOME LEVEL OF CONTROL OVER

2  THE USER'S USE AND OPERATION OF THE SOFTWARE, RIGHT?

3          **MS. MEHTA:**  OBJECTION, YOUR HONOR.  LACKS FOUNDATION

4  AND CALLS FOR SPECULATION.  IT IS ABOUT THE INTENTION OF

5  ADOBE.

6          **THE COURT:**  REPHRASE.

7  **BY MR. DINOVO**

8  **Q.**  WELL, DOES -- IN YOUR OPINION, DOES ADOBE ACTUALLY EXERT

9  SOME LEVEL OF CONTROL OVER THE USER'S USE AND OPERATION OF THE

10  SOFTWARE?

11          **MS. MEHTA:**  OBJECTION, YOUR HONOR.  THIS IS ALSO

12  OUTSIDE THE SCOPE OF HIS DIRECT EXAMINATION.  HE DIDN'T TALK

13  AT ALL ABOUT EXERTING CONTROL OVER ANYTHING.

14          **THE COURT:**  OVERRULED.

15          **THE WITNESS:**  I'M GENERALLY AWARE THAT ADOBE DOES USE

16  DRM TECHNOLOGY IN PROTECTING ITS PRODUCTS.

17  **BY MR. DINOVO**

18  **Q.**  THE QUESTION, SIR, WAS WHETHER ADOBE INTENDS TO

19  MAINTAIN --

20          **MR. DINOVO:**  OR LET ME REPHRASE THAT.

21  **BY MR. DINOVO**

22  **Q.**  WHETHER ADOBE ACTUALLY EXERTS CONTROL OVER THE USER'S USE

23  AND OPERATION OF THE SOFTWARE?

24  **A.**  THE EXTENT TO WHICH ADOBE EXERTS CONTROL OVER THE USE OF

25  THE SOFTWARE IS NOT SOMETHING I'VE LOOKED INTO IT.

1          **MR. DINOVO:**  MS. MASON, COULD YOU PLEASE PLAY BACK

2     C132?

3          **THE COURT:**  WELL, IF YOU ARE READING A DEPOSITION, I

4     NEED TO GET THE PAGE AND LINE.

5          **MR. DINOVO:**  YES, YOUR HONOR.  THIS IS FROM

6     DR. WICKER'S DEPOSITION ON SEPTEMBER 23RD, PAGE 120, LINES 2

7     THROUGH 5.

8          **THE COURT:**  SOMEBODY GAVE ME A BINDER.

9              (DEPOSITION VIDEO BEGAN PLAYING.)

10         **THE COURT:**  I AM SORRY.  COULD YOU STOP, PLEASE?

11      SOMEBODY GAVE ME A BINDER, BUT IT ONLY HAS 123 AND 124.

12    WHOEVER TOOK HIS DEPOSITION NEEDS TO HAVE THE ORIGINAL AND

13    GIVE IT TO ME SO I CAN LOOK AT IT.

14         **MR. DINOVO:**  I THINK THAT'S SIMPLY AN ERROR ON THE

15    LABEL.  IT IS ACTUALLY 9-23 AND 9-24.

16         **THE COURT:**  OH.

17         **MS. MEHTA:**  AND, YOUR HONOR, I OBJECT TO THE VIDEO

18    CLIP THAT THEY HAVE PLAYED.  THEY ARE PLAYING AN ANSWER

19    WITHOUT ACTUALLY PLAYING THE QUESTION.  THEY NEED TO HAVE THE

20    COMPLETE QUESTION AND ANSWER.

21         **THE COURT:**  OKAY.  WELL, I AM STILL SEARCHING FOR THE

22    PAGE AND LINE.

23         **MR. DINOVO:**  OKAY.  WE CAN READ IT ALOUD IF THAT

24    WOULD ALLAY COUNSEL'S CONCERNS.

25         **THE COURT:**  WELL, THAT WOULDN'T HELP, EITHER, BECAUSE

1    I STILL DON'T KNOW THE PAGE AND LINE.

2            **MR. DINOVO:**  I AM SORRY.  IT'S 9-23, WHICH IS

3    NOTWITHSTANDING THE TAB, BUT THE DEPOSITION YOU HAVE, THE

4    FIRST DEPOSITION YOU HAVE OF DR. WICKER.

5            **THE COURT:**  OKAY.

6            **MR. DINOVO:**  AND THE ANSWER IS ON 120, 2 THROUGH 5.

7    BUT TO ADDRESS COUNSEL'S CONCERN WE WILL READ THE PRECEDING

8    QUESTION, AS WELL.

9            **THE COURT:**  OKAY.

10               (PAUSE IN THE PROCEEDINGS.)

11           **MR. DINOVO:**  (READING)

12           "QUESTION:  IN THE CONTEXT OF OUR DISCUSSION WITH

13           LICENSING, ADOBE KNOWS THAT THE LICENSING PROTECTION

14           ASSOCIATED WITH AMT" --

15           **MS. MEHTA:**  OBJECTION, YOUR HONOR.  THIS IS ABOUT THE

16   PRODUCT THAT WAS EXCLUDED FROM THE CASE.  AND THIS IS A

17   VIOLATION OF MIL RULING ON THE MIL NUMBER THREE.  AMT IS NOT A

18   PRODUCT IN THE CASE.

19           **MR. DINOVO:**  YOUR HONOR, IF I CAN ADDRESS THAT.  AMT,

20   THE CODE THAT THEY GAVE US, ALM2.0 --

21           **THE COURT:**  WE ARE REALLY GETTING INTO THE WEEDS

22   HERE.  LET'S GO INTO SOMETHING ELSE, AND I'LL CHECK BACK WHAT

23   THE QUESTION WAS AND WHETHER THIS IS REALLY IMPEACHING OF IT,

24   AND YOU CAN TAKE IT UP AT THE BREAK.

25           **MR. DINOVO:**  ALL RIGHT.  VERY WELL, YOUR HONOR.

1  **BY MR. DINOVO**

2  **Q.**  NOW, YOU DID TESTIFY, DIDN'T YOU, DR. WICKER, THAT ADOBE

3  DOES EXERT SOME DEGREE OF CONTROL?

4  **A.**  YES.  WHAT I SAID EARLIER WAS I DON'T KNOW THE EXTENT OF

5  THAT CONTROL.

6  **Q.**  WELL, YOU KNOW ONE WAY THAT IT EXERTS CONTROL IS TO LIMIT

7  THE USE AND MODIFICATION OF ITS EXECUTABLES.

8  **A.**  THAT'S CORRECT.

9  **Q.**  FOR EXAMPLE, YOU'VE TESTIFIED THAT ADOBE DOESN'T

10  DISTRIBUTE ITS SOURCE CODE BECAUSE THAT WOULD BE EASIER FOR

11  SOMEONE TO MODIFY AND ADAPT TO A DIFFERENT PURPOSE.

12  **A.**  THAT IS GENERALLY TRUE, YES.

13  **Q.**  WELL, ADOBE DOESN'T GENERALLY DISTRIBUTE ITS SOURCE CODE,

14  DOES IT?

15       **MS. MEHTA:**  OBJECTION.  FOUNDATION, SPECULATION AND

16  IT IS ALL OUTSIDE THE SCOPE.

17       **THE COURT:**  WELL, YOU CAN REPHRASE IT, I GUESS.

18       **MR. DINOVO:**  HE'S TESTIFIED ABOUT THIS IN DEPOSITION,

19  YOUR HONOR.  THESE ARE QUESTIONS DIRECTLY OUT OF HIS

20  DEPOSITION WHERE HE RESPONDED AFFIRMATIVELY.

21       **THE COURT:**  WELL, SOMETIMES –– IF YOU ARE SAYING THE

22  OBJECTION WAS WAIVED BECAUSE IT WASN'T RAISED AT THE

23  DEPOSITION?  IS THAT WHAT YOU ARE SAYING?

24       **MR. DINOVO:**  THERE WAS NO OBJECTION RAISED TO THE

25  QUESTION.

1        **THE COURT:**  OKAY.

2        **MS. MEHTA:**  I AM SORRY, YOUR HONOR.  IF I CAN HAVE

3  THE PAGE AND LINE.

4        **THE COURT:**  SOME OBJECTIONS ARE WAIVED AND SOME

5  AREN'T.  I DON'T KNOW.  JUST BECAUSE IT WAS ASKED AT THE

6  DEPOSITION DOESN'T MAKE IT AUTOMATICALLY ADMISSIBLE AT TRIAL,

7  I DON'T THINK, UNLESS IT IS SOME SORT OF MANDATORY OBJECTION

8  THAT IS WAIVED IF IT'S NOT MADE, AND I --

9              (SIMULTANEOUS COLLOQUY.)

10        **MR. DINOVO:**  LET ME --

11        **THE COURT:**  BUT, YOU COULD REPHRASE IT TO ASK WHETHER

12  HE HAS EVER TRIED TO GET ADOBE SOURCE CODE.  I MEAN, IT'S A

13  RATHER BROAD QUESTION --

14        **MR. DINOVO:**  OKAY.

15        **THE COURT:**  -- FOR HIM TO KNOW THE ANSWER TO --

16        **MR. DINOVO:**  FAIR ENOUGH.

17        **THE COURT:**  -- FROM HIS PERSONAL KNOWLEDGE.

18        **MR. DINOVO:**  ALLOW ME TO REPHRASE, DR. WICKER.

19  **BY MR. DINOVO:**

20  **Q.**  HOW MANY HOURS HAVE YOU SPENT ON THIS CASE, INCLUDING THE

21  LAST WEEK?

22  **A.**  IT WOULD JUST BE A ROUGH GUESS, BUT I WOULD SAY ON THE

23  ORDER OF 200, 250.

24  **Q.**  AND OVER THE COURSE OF THAT TIME, YOU'VE TALKED TO A

25  NUMBER OF ADOBE PERSONNEL, RIGHT?

1   **A.**  YES, I HAVE.

2   **Q.**  AND YOU'VE DONE SOME INVESTIGATION INTO THE OPERATION OF

3   ADOBE'S PRODUCTS?

4   **A.**  THAT'S CORRECT.

5   **Q.**  HAVE YOU EVER ENCOUNTERED DURING THAT TIME ANY INSTANCE

6   WHERE ADOBE DISTRIBUTES SOURCE CODE TO ITS CUSTOMERS?

7   **A.**  THE ONLY INSTANCE I KNOW OF IN WHICH SOURCE CODE WAS

8   OBTAINED WAS UNDER A PROTECTIVE ORDER.

9   **Q.**  AND IN CONNECTION WITH THE LAWYERS AND THE EXPERTS IN THIS

10  CASE?

11  **A.**  EXACTLY.

12  **Q.**  AND NONE OF THE ADOBE WITNESSES EVER TOLD YOU THAT SOURCE

13  CODE IS DISTRIBUTED?

14  **A.**  NO ONE HAS EVER SAID THAT TO ME.

15  **Q.**  AND, IN GENERAL, IN YOUR EXPERIENCE IN THE INDUSTRY,

16  COMPANIES ARE MORE PROTECTIVE ABOUT THEIR SOURCE CODE THAN

17  THEY WOULD BE ABOUT OBJECT CODE, BECAUSE THAT SORT OF THING,

18  SOURCE CODE IS EASIER TO MANIPULATE AND CHANGE.

19  **A.**  AND TO LEARN FROM, AS WELL, YES.

20  **Q.**  DR. WICKER, DO YOU AGREE WITH ME THAT THE '541 PATENT --

21      **MR. DINOVO:**  AND, MS. MASON, CAN YOU PULL UP

22  PLAINTIFF'S EXHIBIT 1, CLAIM 1.

23                  (PUBLISHED TO JURY.)

24  **BY MR. DINOVO**

25  **Q.**  IS IT ON YOUR MONITOR, DR. WICKER?  YOU CAN SEE IT THERE.

1    **A.**  YES.  I'VE GOT IT.

2    **Q.**  WE TOUCHED ON THIS A BIT YESTERDAY.  I JUST WANT TO HAVE A

3    FULL UNDERSTANDING OF YOUR OPINION.

4        DO YOU AGREE WITH ME THAT CLAIM 1 ALLOWS FOR THE INPUT OF

5    THE PERMISSION GENERATED LOCALLY TO BE RECEIVED FROM AN

6    EXTERNAL SOURCE?

7    **A.**  I WOULD AGREE THAT IN LOOKING AT THE LAST ELEMENT BASED

8    ON -- WHAT IT STATES HERE IS THAT THE PERMISSION IS GENERATED

9    AT THE CLIENT.  BASED ON THAT AND THE FILE HISTORY, I WOULD

10   DISAGREE.

11           **MR. DINOVO:**  YOUR HONOR, I WOULD LIKE TO USE YOUR

12   CLAIM CONSTRUCTION ORDER FOR THE LIMITED PURPOSE OF POINTING

13   OUT TO DR. WICKER THAT THIS LANGUAGE --

14           **THE COURT:**  YOU'RE MAKING A SPEAKING OBJECTION HERE,

15   IT SEEMS, OR ABOUT TO TELL ME WHAT IT IS YOU WANT TO SAY --

16           **MR. DINOVO:**  ALL RIGHT.

17           **THE COURT:**  -- BEFORE I GIVE YOU PERMISSION TO SAY

18   IT.  SO --

19           **MR. DINOVO:**  MAY WE APPROACH?

20           **THE COURT:**  NO, I DON'T DO SIDEBARS.  IF YOU WANT TO

21   POINT TO A PAGE AND LINE OF THE ORDER THAT YOU THINK YOU WANT

22   TO TALK ABOUT.

23           **MS. MEHTA:**  AND, YOUR HONOR, I WOULD OBJECT TO THAT

24   BECAUSE THEY WERE THE ONES THAT MOVED IN LIMINE TO PRECLUDE

25   DISCUSSION OF A CLAIM CONSTRUCTION ORDER, AND WE ABIDED BY THE

1    COURT'S EXAMINATION AND DIDN'T USE IT ON CROSS-EXAMINATION OF

2    DR. DEVANBU.

3              **MR. DINOVO:**  QUITE THE --

4              **THE COURT:**  THEY CAN ASK, AND I WILL LOOK, AND YOU

5    CAN LOOK, TOO.

6              **MR. DINOVO:**  FAIR ENOUGH, YOUR HONOR.

7              **THE COURT:**  WHAT PAGE AND LINE DID YOU HAVE IN MIND?

8              **MR. DINOVO:**  YES, YOUR HONOR.  IT'S PAGE 34, THE

9    FINAL SENTENCE.  WELL, THE FINAL FULL SENTENCE ON THE PAGE.

10   AND --

11                   (PAUSE IN THE PROCEEDINGS.)

12             **THE COURT:**  THIS WAS A CONSTRUCTION THAT WAS AGREED

13   TO.

14             **MS. MEHTA:**  YES, YOUR HONOR, BUT THEY ARE QUOTING

15   FROM THE ANALYSIS ON SUMMARY JUDGMENT, AND THEY MOVED IN

16   LIMINE TO PRECLUDE THAT FROM COMING IN.

17             **THE COURT:**  THIS WAS A CONSTRUCTION THAT WAS AGREED

18   TO.

19             **MR. DINOVO:**  YES, YOUR HONOR.  AND THIS WAS

20   PRECISELY --

21             **THE COURT:**  IT'S NOT -- IT ISN'T SOMETHING THE COURT

22   HAD TO RESOLVE IN ORDER TO DO THE CLAIM CONSTRUCTION BECAUSE

23   YOU AGREED TO IT.  SO THAT WOULDN'T BE WITHIN THE REALM OF THE

24   EXCEPTION TO THE MOTION IN LIMINE ORDER.  SO THE OBJECTION IS

25   SUSTAINED.

1          MR. DINOVO:  ALL RIGHT.

2          THE COURT:  OR THE PERMISSION TO USE IT IS DENIED.

3     BY MR. DINOVO

4     Q.  DR. WICKER, YOU REVIEWED CERTAIN PATENTS FOR

5     COMPARABILITY, DIDN'T YOU?

6          MS. MEHTA:  OBJECTION, YOUR HONOR.  AGAIN, THIS IS

7     OUTSIDE THE SCOPE.  THERE WAS NO DISCUSSION OF COMPARABLE

8     PATENTS AT ALL DURING DIRECT EXAMINATION.  WE ARE NOW GETTING

9     INTO A TOTALLY COLLATERAL MATTER THAT IS NOT PART OF DR.

10    WICKER'S --

11         THE COURT:  I DON'T KNOW.  YOU TALKED ABOUT THE WOLFE

12    PATENT AND MAYBE ONE OTHER.

13         MS. MEHTA:  I THINK HE IS REFERRING TO OTHER

14    PATENTS --

15         THE COURT:  IF YOU ARE TALKING ABOUT A PATENT THAT

16    WASN'T DISCUSSED, THEN THE OBJECTION IS SUSTAINED.

17         MR. DINOVO:  ALL RIGHT, YOUR HONOR.  I WILL MOVE ON.

18    BY MR. DINOVO

19    Q.  LET'S TALK ABOUT YOUR SLIDE DECK, SIR.

20         MR. DINOVO:  MS. MASON, CAN YOU PLEASE BRING UP SLIDE

21    17 FROM THE '541 PRESENTATION OF DR. WICKER?

22                    (PUBLISHED TO JURY.)

23    Q.  ALL RIGHT, SIR.  AND HERE YOU WERE REFERRING TO THE WOLFE

24    REFERENCE?

25    A.  YES.

1    **Q.**   YOU NEVER SET FORTH IN EITHER THIS REPORT OR ANY

2    INVALIDITY REPORT ANY ANALYSIS OF THE ELEMENTS OF THE '541

3    PATENT BEING MET BY WOLFE, HAVE YOU?

4    **A.**   NO --

5              **MS. MEHTA:**   OBJECTION, YOUR HONOR.   NOW WE ARE

6    GETTING INTO INVALIDITY TESTIMONY.   THE WITNESS HASN'T

7    PRESENTED ON HIS OPINIONS ON INVALIDITY YET.   THAT IS A WHOLE

8    DIFFERENT ISSUE FOR NEXT WEEK.

9              **THE COURT:**   OVERRULED.

10             **MR. DINOVO:**   THANK YOU, YOUR HONOR.

11   **BY MR. DINOVO**

12   **Q.**   SO IN THE BOTTOM BULLET POINT YOU MAKE THE STATEMENT THAT

13   DIGITAL REG WOULD NOT HAVE OTHERWISE GOTTEN THE PATENT, RIGHT?

14   **A.**   YES, THAT'S CORRECT.

15   **Q.**   SO MY QUESTION TO YOU, SIR, WAS DID, IN YOUR INFRINGEMENT

16   REPORT, OR ANY OTHER DOCUMENT THAT YOU'VE SUBMITTED IN THIS

17   CASE, DID YOU EVER DO A LINE-BY-LINE, ELEMENT-BY-ELEMENT

18   COMPARISON OF DIGITAL REG'S PATENTS AND WOLFE'S PATENT?

19   **A.**   NO.   MY POINT WAS MORE THAT THIS ARGUMENT WAS TO GET

20   AROUND WOLFE, AND, THEREFORE, GIVEN WHAT THE PATENT OFFICE HAD

21   SAID BEFORE, HAD THIS ARGUMENT NOT BEEN MADE, WOLFE WOULD HAVE

22   REMAINED A PROBLEM FOR THE PATENTEE.

23   **Q.**   YOU ARE NOT PREPARED TODAY TO DO AN ANALYSIS OF WOLFE AND

24   HOLD IT UP AGAINST THE PATENT CLAIM, RIGHT?

25   **A.**   I COULD.   IT WOULD TAKE SOME TIME.   I HAVEN'T DONE IT

1    BEFORE.

2    **Q.**   ALL RIGHT.  AND DO YOU KNOW, FOR EXAMPLE, IF DURING THE

3    SAME PATENT PROSECUTION THE PATENT OFFICE SAID THAT WOLFE DOES

4    NOT DISCLOSE EXECUTING AN INSTALLATION PROCESS AT THE CLIENT

5    BASED ON THE TOKEN RECEIVED?

6    **A.**   I AM SORRY. CAN YOU REPEAT THE QUESTION?

7    **Q.**   OF COURSE.  DO YOU KNOW WHETHER THE PATENT OFFICE NOTED

8    DURING PROSECUTION THAT WOLFE DOES NOT DISCLOSE EXECUTING AN

9    INSTALLATION PROCESS AT THE CLIENT BASED ON THE TOKEN

10   RECEIVED?

11   **A.**   I BELIEVE THAT'S CORRECT, BECAUSE THE EMPHASIS HERE IS ON

12   WOLFE DOING THE GENERATION AT THE SERVER AS OPPOSED TO AT THE

13   CLIENT.

14           **MR. DINOVO:**  ALL RIGHT.  SLIDE 44 OF THE SAME

15   PRESENTATION, PLEASE, MS. MASON.

16                   (PUBLISHED TO JURY.)

17           **MR. DINOVO:**  COULD YOU BLOW UP THE CENTER BOX,

18   PLEASE?

19   **BY MR. DINOVO**

20   **Q.**   SO THE FIRST PASSAGE THAT YOU'VE HIGHLIGHTED SAYS:

21      "ADOBE LICENSE SERVER OR THE ALM BACK-END SERVICE SENDS

22   THE REQUESTER AN E-LICENSE."

23      RIGHT?

24   **A.**   THAT'S CORRECT.

25   **Q.**   AND YOU UNDERSTAND THAT DR. DEVANBU SAYS THAT THE

1    E-LICENSED IN AN ENCRYPTED FORMAT IS THE TOKEN, RIGHT?

2    **A.**  THAT'S MY UNDERSTANDING, YES.

3    **Q.**  IS THERE A REASON YOU DECLINED TO HIGHLIGHT AS SIGNED

4    TEXT?

5    **A.**  NO.  IT'S A LONG PIECE OF TEXT, AND SO I WANTED TO

6    EMPHASIZE THE FACT THAT THE E-LICENSE CAME FROM THE SERVER AS

7    OPPOSED TO BEING CREATED AT THE CLIENT.

8    **Q.**  DO YOU DEGREE THAT THE E-LICENSE IS ENCRYPTED IN THE FORM

9    THAT IT'S TRANSMITTED?

10   **A.**  YES, ABSOLUTELY.

11   **Q.**  AND THAT ENCRYPTION HAS TO BE TAKEN OFF OR DECRYPTED AT

12   THE CLIENT IN ORDER TO BE USEFUL TO THE CLIENT?

13   **A.**  THAT'S CORRECT.

14   **Q.**  AND AT THAT POINT THE E-LICENSE IS STORED AT THE CLIENT?

15   **A.**  YES.

16   **Q.**  ALL RIGHT.  LET'S GO TO YOUR '670 PRESENTATION.

17          **MR. DINOVO:**  SLIDE EIGHT, PLEASE.

18                    (PUBLISHED TO JURY.)

19   **BY MR. DINOVO**

20   **Q.**  ALL RIGHT.  THERE IS A LOT OF TEXT ON THIS SLIDE.  I'M

21   HAVING TROUBLE SEEING IT.  YOU REFERRED TO SOMETHING IN THE

22   PROSECUTION HISTORY ABOUT SELECTIVELY GRANTING ACCESS, RIGHT?

23   **A.**  THIS IS FROM THE PROSECUTION HISTORY OF A RELATED PATENT,

24   NOT THE PATENT-IN-SUIT.  BUT, YES, THAT'S CORRECT.

25   **Q.**  CLAIM 45 DOESN'T SPEAK TO SELECTIVELY GRANTING ACCESS,

1    DOES IT?

2    **A.**  IT'S MY UNDERSTANDING THAT THIS "SELECTIVELY GRANTING"

3    LANGUAGE WAS CHANGED.  THAT WAS AN ERROR.  IT WAS CHANGED TO

4    "SELECTIVELY DENIED," LATER IN THE PROSECUTION OF THIS PATENT.

5    **Q.**  WELL, CLAIM 32 OF THE '670 PATENT DOES REQUIRE GRANTING

6    ACCESS, RIGHT?

7    **A.**  IT CALLS FOR DENYING ACCESS UNTIL SUCCESSFUL TRANSMISSION,

8    IF THAT IS WHAT YOU ARE REFERRING TO.

9    **Q.**  WE MAY HAVE BEEN TALKING PAST ONE ANOTHER.  I WAS

10   SWITCHING TO CLAIM 32 AND MAKING A COMPARISON.  IF IT WOULD BE

11   HELPFUL TO HAVE EXHIBIT 3 IN FRONT OF YOU, SIR, JUST CONFIRM

12   FOR ME THAT CLAIM 32 DOES REQUIRE GRANTING ACCESS.  CLAIM 45

13   DOES NOT.

14         **MS. MEHTA:**  OBJECTION, YOUR HONOR.  CLAIM 32 IS NOT

15   ONE OF THE CLAIMS THAT IS ASSERTED FOR PURPOSES OF

16   INFRINGEMENT.  SO WE ARE NOW GETTING INTO A WHOLE OTHER CLAIM

17   IN THE PATENT THAT IS NOT ONE OF THE ONES THAT IS BEING

18   ASSERTED FOR INFRINGEMENT.

19         **MR. DINOVO:**  I'M SIMPLY TRYING TO JUXTAPOSE THE

20   DIFFERENCES IN THE CLAIMS, BECAUSE DR. WICKER IS REFERRING TO

21   A GRANTING ACCESS REQUIREMENT, WHICH IS NOT PRESENT IN

22   CLAIM 45.

23         **THE COURT:**  WELL, COUNSEL IS CORRECT THAT CLAIM 32

24   ISN'T SUBJECT OF THIS EXAMINATION.

25

1    **BY MR. DINOVO**

2    **Q.**  ALL RIGHT, SIR.  DO YOU UNDERSTAND THAT OTHER CLAIMS IN

3    THE PATENT ACTUALLY REFER TO GRANTING ACCESS?

4           **MS. MEHTA:**  YOUR HONOR, THIS IS THE SAME ISSUE.  HE

5    JUST TAKES THE NUMBER OUT, AND HE'S STILL GOING INTO A WHOLE

6    DIFFERENT AREA.

7           **MR. DINOVO:**  YOUR HONOR, I'M JUST TRYING TO ESTABLISH

8    THAT THERE ARE DIFFERENCES IN THE CLAIMS, AND -- LET ME

9    APPROACH THE QUESTION A DIFFERENT WAY.

10   **BY MR. DINOVO**

11   **Q.**  IS THE WORD -- DOES THE WORD "ACCESS" APPEAR ANYWHERE IN

12   CLAIM 45?  AND --

13   **A.**  THE WORD "ACCESS" IN CLAIM 45?  YES.

14   **Q.**  WHERE DOES IT APPEAR?

15   **A.**  READING FROM CREATING A FILE -- IN FACT, I CAN POINT TO

16   IT.  LOOK AT THE SECOND LIMITATION:

17      "CREATING A FILE THAT INCLUDES ELECTRONIC CONTENT AND

18   CAUSES ACCESS."

19   **Q.**  "CAUSES ACCESS TO BE DENIED."

20      DOES IT IS REFER TO THE TIME THAT ACCESS IS GRANTED?

21   **A.**  THE WAY THE LANGUAGE IS CONSTRUCTED WE HAVE:

22      "CREATING A FILE THAT INCLUDES ELECTRONIC CONTENT AND

23   CAUSES ACCESS TO THE ELECTRONIC CONTENT TO BE DENIED UNTIL

24   NOTIFICATION INFORMATION," ET CETERA.

25      SO THAT "UNTIL," I BELIEVE, TO A PERSON OF SKILL WOULD

1    MEAN THE DENIAL OF ACCESS IS MAINTAINED UNTIL.  IN OTHER

2    WORDS, THE DENIAL IS REMOVED AFTER THE SUCCESSFUL

3    TRANSMISSION.

4    Q.  OKAY.  BUT, THE DISTINCTION THAT I'M DRAWING IS THERE IS

5    NO -- THE PASSAGE THAT YOU CITED FROM THE PROSECUTION HISTORY

6    TALKED ABOUT GRANTING ACCESS AT A PARTICULAR TIME, RIGHT?

7    A.  WELL, AGAIN, IT IS MY UNDERSTANDING THAT THAT WAS AN

8    ERROR, AND IT WAS CHANGED TO "DENY" LATER IN THE PROSECUTION

9    OF THAT PARTICULAR PATENT.

10   Q.  THE PASSAGE SAID "GRANTING ACCESS" THAT YOU PROPOSED TO

11   THE JURY TO CONSIDER.

12   A.  WHAT I PUT ON THE SCREEN DID CONTAIN THE ERROR THAT SAYS

13   "GRANTS" AS OPPOSED TO "DENY."

14   Q.  WHY IS IT YOUR BELIEF THAT THAT'S AN ERROR?  IS IT YOUR

15   VIEW THAT LANGUAGE ISN'T USED IN THE OTHER CLAIMS IN THE SAME

16   PATENT, IN THE '670 PATENT?

17            MS. MEHTA:  YOUR HONOR, WE ARE BACK TO THE SAME ISSUE

18   AGAIN.

19            THE COURT:  THERE'S TWO QUESTIONS.  YOU CAN ASK THE

20   FIRST ONE.

21   BY MR. DINOVO

22   Q.  WHY DO YOU BELIEVE IT'S AN ERROR?

23   A.  THE PROSECUTION HISTORY FOR THAT OTHER PATENT, THE RELATED

24   PATENT, DOES INDICATE FOR THAT PARTICULAR CLAIM IT WAS CHANGED

25   TO "DENY."

1    **Q.** HAVE YOU IN THE COURSE OF REVIEWING YOUR OPINION REVIEWED

2    THE ENTIRETY OF THE '670 PATENT AT ISSUE?

3    **A.** YES.

4    **Q.** DO YOU KNOW IF OTHER CLAIMS OF THE '670 PATENT REFER TO

5    GRANTING ACCESS?

6    **A.** YES.

7         **MR. DINOVO:** MS. MASON, SLIDE 15 FROM THE '670

8    PRESENTATION, PLEASE.

9              (PUBLISHED TO JURY.)

10   **BY MR. DINOVO**

11   **Q.** ALL RIGHT, SIR. ON THE LEFT COLUMN THERE THAT LOOKS TO BE

12   WHAT? THAT'S THE ACROBAT FAMILY OF PRODUCTS?

13   **A.** AT LEAST SOME OF THEM, YEAH.

14   **Q.** ALL RIGHT. AND THAT WOULD INCLUDE WHICH PRODUCTS?

15   **A.** WHAT IS SHOWN IS ADOBE ACROBAT PROFESSIONAL, ADOBE ACROBAT

16   STANDARD AND THE ADOBE READER.

17   **Q.** ALL RIGHT. AND THE RIGHT GRAPHIC IS WHAT?

18   **A.** "ADOBE LIVECYCLE ES RIGHTS MANAGEMENT."

19   **Q.** SO, IN YOUR EXAMPLE, THE ACROBAT FAMILY, INCLUDING ACROBAT

20   PROFESSIONAL COMMUNICATES USING THE LIVECYCLE RIGHTS

21   MANAGEMENT TECHNOLOGY?

22        **MS. MEHTA:** OBJECTION, YOUR HONOR. NOW WE ARE

23   GETTING INTO A PRODUCT THAT IS NOT ACTUALLY ACCUSED. AND WE

24   ARE JUST USING AN ILLUSTRATION FROM A DOCUMENT TO SUGGEST THAT

25   SOMETHING IS ACCUSED NOT IS NOT ACCUSED.

1      **MR. DINOVO:**  YOUR HONOR, I AM ASKING HIM WHAT HE

2    INTENDED TO DEPICT ON HIS OWN DEMONSTRATIVE.

3           **THE COURT:**  IS THIS ONE THAT WAS SHOWN TO THE JURY

4    DURING HIS DIRECT?

5           **MR. DINOVO:**  YES.

6           **THE COURT:**  OKAY.

7           **THE WITNESS:**  WHAT I INTENDED TO DEPICT HERE IS THAT

8    LIVECYCLE DOES NOT GRANT ACCESS UPON TRANSMISSION.  THAT'S NOT

9    ENOUGH.  THAT IS NOT WHAT DETERMINES WHETHER ACCESS IS

10   GRANTED.  WHAT IS DETERMINED -- WHAT YOU WOULD HAVE TO GO

11   THROUGH -- I THINK CLICK THE MOUSE OR WHATEVER A COUPLE OF

12   TIMES.  WHAT YOU WILL SEE IS ACCESS IS NOT GRANTED UNTIL THE

13   VOUCHER IS SENT FROM THE RIGHTS MANAGEMENT SERVER TO THE

14   CLIENT.

15   **BY MR. DINOVO**

16   **Q.**  ALL RIGHT?

17   **A.**  SO IT IS NOT THE SUCCESSFUL TRANSMISSION.  IT IS THE

18   RETURN.  IT IS THE PROVISION OF THE LICENSE OR VOUCHER.

19   **Q.**  I WAS DIRECTING YOUR ATTENTION, DR. WICKER, TO THE

20   PRODUCTS THAT YOU'VE IDENTIFIED.  AND SO LET'S FOCUS IN ON

21   ACROBAT PROFESSIONAL.  ACROBAT PROFESSIONAL HAS THIS

22   CAPABILITY TO COMMUNICATE WITH LIVECYCLE RIGHTS MANAGEMENT

23   SERVERS, RIGHT?

24   **A.**  YES.

25   **Q.**  ALL RIGHT.  AND YOU UNDERSTAND THAT ACROBAT PROFESSIONAL

1    HAS LIVECYCLE RIGHTS MANAGEMENT CODE EMBEDDED WITHIN THE

2    PRODUCT?

3    **A.**  SOME VERSIONS, YES.

4    **Q.**  ALL RIGHT.  WHICH VERSIONS?

5    **A.**  MY POINT IN SAYING THAT WAS THAT I DON'T KNOW WHICH

6    VERSIONS DO OR DON'T.  I KNOW THAT SOME DO.

7    **Q.**  ALL RIGHT.  AND THE REASON THAT ACROBAT PROFESSIONAL HAS

8    THAT CAPABILITY IS WHAT?

9    **A.**  IT'S DIGITAL RIGHTS MANAGEMENT.  IT IS A WAY OF

10   CONFIGURING THE USE THIS PARTICULAR APPLICATION WITHIN A

11   CORPORATE ENVIRONMENT SO THAT A CERTAIN NUMBER OF LICENSES CAN

12   BE GRANTED.  CONTROL CAN BE PLACED ON WHO USES IT WHEN AND HOW

13   OFTEN.

14   **Q.**  OKAY.  THANK YOU.  LET'S TURN TO SLIDE 43.

15       SO, HERE YOU WERE TALKING ABOUT INSTALLER DISTRIBUTION.

16   AND IF I UNDERSTAND CORRECTLY THAT'S WHERE SOMEONE DOWNLOADS A

17   PROGRAM THAT ACTUALLY DOWNLOADS OTHER FILES TO INSTALL AN

18   EXECUTABLE FILE?

19   **A.**  THAT'S RIGHT.  WHENEVER WE BUY -- TYPICALLY, THESE DAYS

20   WHEN WE BUY SOFTWARE, AN INSTALLER IS WHAT IS PROVIDED.  AND

21   IT IS THAT INSTALLER THAT CONTROLS THE PLACEMENT OF THE

22   APPLICATION ON THE CLIENT MACHINE.

23   **Q.**  OKAY.  DO YOU CONSIDER THAT USE OR MISUSE OF SOFTWARE?

24   **A.**  THE USE OF AN INSTALLER?

25   **Q.**  YES.

1    **A.**  I THINK IT'S PART OF THE NATURAL PROCESS OF ACQUIRING AN

2    APPLICATION.

3    **Q.**  ALL RIGHT.  AND DON'T YOU UNDERSTAND DR. DEVANBU'S

4    TESTIMONY TO BE DIRECTED TO THE MISUSE OF SOFTWARE, THE

5    INAPPROPRIATE COPYING OF SOFTWARE?  I THINK HE MENTIONED A

6    FLASH DRIVE OR EMAIL WHERE YOU ARE SENDING A FOLDER OR A GROUP

7    OF FILES TO YOUR FRIEND OR PUTTING IT ON ANOTHER COMPUTER.

8    **A.**  IT IS MY UNDERSTANDING THAT DR. DEVANBU'S TESTIMONY WAS

9    THAT IT WAS THE INSTALLER THAT WAS UNDER WHICH HE WAS READING

10   THE CLAIM LANGUAGE.  BEYOND THAT, I'M NOT SURE I UNDERSTAND

11   THE QUESTION.

12   **Q.**  SO, THE PERSON HAS TO GET THE FILE FROM SOMEWHERE, RIGHT?

13   SO THIS -- LET'S ASSUME THIS PERSON INTENDS TO PIRATE.  HE

14   WOULD GET THE FILE FROM AN INSTALLER, CONCEIVABLY, RIGHT?

15   THAT'S --

16   **A.**  IS THE FILE THE INSTALLER?  IN OTHER WORDS, ARE YOU SAYING

17   THAT A PERSON WHO WISHED TO PIRATE THE APPLICATION WOULD

18   ACQUIRE THE INSTALLER?

19   **Q.**  I'M SAYING IN THE FIRST INSTANCE THERE HAS TO BE SOMEONE

20   DOWNLOADING A PROGRAM.  LET'S ASSUME THAT IS AN INSTALLER.

21   **A.**  OKAY.

22   **Q.**  IN THE SITUATION WHERE SOMEONE IS ACTUALLY PIRATING, IN

23   OTHER WORDS, WHAT IS INTENDED TO BE PREVENTED BY DRM, THE

24   INSTALLER IS NOT AT ISSUE.  RIGHT?

25   **A.**  WELL, THAT'S RIGHT.  BECAUSE THERE IS NO DRM APPLIED TO

1    THE INSTALLER.  THAT WAS ACTUALLY THE POINT I WAS MAKING.

2    **Q.**  OKAY.  BUT THE SITUATION OF SOMEONE PASSING A FOLDER WITH

3    EXECUTABLE FILES ON A FLASH DRIVE, OR BY EMAIL, THAT'S NOT

4    WHAT IT IS ADDRESSED HERE.

5    **A.**  NO, NO.  THAT IS ACTUALLY MY POINT.  THE INSTALLER IS --

6    THERE'S NO PROBLEM IN MOVING THAT AROUND BECAUSE THERE IS NO

7    DRM.

8    **Q.**  ALL RIGHT.  LET'S TURN TO SLIDE 46.

9                        (PUBLISHED TO JURY.)

10       AND YOU TALKED ABOUT A FEW DESIGN-AROUND OPTIONS.  I

11   WANTED TO TOUCH ON THOSE.  ALL RIGHT?

12   **A.**  YES.

13   **Q.**  SO, ONE OF THEM IS:  "DO NOT ALLOW KEYS TO BE SAVED IN

14   MEMORY."

15       SO THAT IS THIS NOTION OF CACHE WE HAVE BEEN TALKING

16   ABOUT, RIGHT?

17   **A.**  THAT'S RIGHT.

18   **Q.**  AND IF YOU COULDN'T DO THAT, YOU WOULDN'T HAVE OFFLINE

19   ACCESS, RIGHT?

20   **A.**  THIS WAS MORE IN THE CONTEXT OF THE ONLINE VERSION.  IF

21   YOU OPEN UP A FILE AND ACQUIRE THE KEY ONLINE IN THE WAYS

22   WE'VE DESCRIBED AND DISCUSSED IN THE LAST DAY OR TWO, IT'S

23   THAT KEY THAT WOULD NOT BE SAVED.

24       OFFLINE, I DON'T UNDERSTAND TO BE AT ISSUE.  THERE IS NO

25   ACCESS, THERE IS NO SERVER, THEREFORE -- AND THE KEY COULD BE

1    EMBEDDED IN THE DOCUMENT IN THAT SITUATION.

2    **Q.**   OKAY.  BUT THE SITUATION, FOR EXAMPLE, OF LIVECYCLE, THERE

3    IS A PERMISSION THAT IS STORED IN MEMORY FOR OFFLINE USE,

4    RIGHT?

5    **A.**   THE KEY IS ACTUALLY STORED IN THE DOCUMENT FOR ONLINE USE

6    IF IT IS CONFIGURED THAT WAY.  THAT IS A SPECIAL CONFIGURATION

7    THAT HAS TO BE DONE BY THE USER.

8    **Q.**   MY QUESTION WAS OFFLINE USE.

9    **A.**   YES.

10   **Q.**   AND SO THAT WOULD BE STORED SO THAT YOU CAN ACCESS IT

11   OFFLINE.

12   **A.**   THAT'S CORRECT.

13   **Q.**   SO THAT WOULDN'T WORK VERY WELL.

14       WHAT ABOUT LOCAL ACTIVATION PROCESS?  HOW WOULD THAT WORK?

15   IS THAT LIKE ENTERING A CD KEY LIKE I USED TO DO WHEN I HAD A

16   COMPUTER PROGRAM ON A CD?

17   **A.**   EXACTLY.  THAT WOULD BE ONE EXAMPLE OF LOCAL ACTIVATION.

18   THE POINT BEING THAT THERE IS NO REACHING OUT TO THE SERVER.

19   **Q.**   SO THAT IS NOT SEAMLESS TO THE USER, IS IT?

20   **A.**   IT'S SOMETHING THE USER WOULD BE ACQUAINTED WITH.  I DON'T

21   THINK IT WOULD BE BURDENSOME.

22   **Q.**   WELL, ADOBE DOESN'T DO IT, RIGHT?

23   **A.**   ADOBE HAS DONE IT IN THE PAST.  AND THE ENGINEERS I TALKED

24   TO DIDN'T SEEM TO THINK IT WOULD BE A PROBLEM.

25   **Q.**   ISN'T ONE OF THE OBJECTIVES OF ADOBE'S LICENSE MANAGEMENT

WICKER – CROSS / DINOVO

1    TECHNOLOGY, FOR EXAMPLE, AND THE OTHER PRODUCTS WE ARE TALKING

2    ABOUT TO MAKE THIS WHOLE DRM PROCESS AS UNOBTRUSIVE AS

3    POSSIBLE?

4         **MS. MEHTA:**  OBJECTION, YOUR HONOR.  NOW, HE IS JUST

5    TESTIFYING.

6         **THE COURT:**  OVERRULED.

7         **MS. MEHTA:**  AND HE IS TESTIFYING ABOUT THE OBJECTIVES

8    OF SOMEBODY RELATING TO DRM.

9         **THE COURT:**  OVERRULED.

10        **THE WITNESS:**  GENERALLY SPEAKING, DRM, TO THE EXTENT

11   THAT IT IS SEAMLESS OR TRANSPARENT, THAT'S GOOD.  CUSTOMERS

12   WON'T BE -- WON'T HAVE TO DO COMPLICATED TASKS.

13   **BY MR. DINOVO**

14   **Q.**  SIR, WHAT WAS YOUR TESTIMONY ABOUT THE NUMBER THAT IT

15   WOULD COST FOR ADOBE TO DESIGN AROUND USING WHAT YOU CALL

16   "TRIVIAL OPTIONS"?

17   **A.**  I ACTUALLY DON'T RECALL THE NUMBER.  YOU WANT ME TO CHECK

18   MY REPORT?  OR YOU CAN REFRESH MY MEMORY.

19   **Q.**  ACTUALLY, I AM NOT SURE.  I THINK IT WAS ON THE ORDER OF

20   $125,000.  BUT I'M NOT SURE, EITHER.

21   **A.**  I THINK THAT IS RIGHT.  IT WAS IN THE LOW HUNDREDS OF

22   THOUSANDS.

23   **Q.**  OKAY.  AND JUST MY BACK-OF-THE-ENVELOPE MATH, BASED ON

24   YOUR RATE -- AND I'M NOT PREPARED TO DENY YOU THE RIGHT TO BE

25   PAID, OF COURSE -- BUT YOUR RATE AT $600 AN HOUR AND 250

1    HOURS, THAT IS $150,000, RIGHT?

2    **A.**  YES.

3    **Q.**  SO, IF ADOBE COULD HAVE TRIVIALLY DESIGNED AROUND WITHOUT

4    BEING OBTRUSIVE OR HAVING AN INFERIOR PRODUCT FOR THEIR

5    CUSTOMERS, WHY WOULD THEY PAY YOU MORE THAN THE DESIGN-AROUND

6    COST AND HAVE ALL THESE PEOPLE IN THE COURTROOM, AS OPPOSED TO

7    SIMPLY MAKING THIS TRIVIAL CHANGE?

8    **A.**  BECAUSE ADOBE CLEARLY THINKS THEY DON'T INFRINGE THESE

9    CLAIMS.

10   **Q.**  THAT MAY BE TRUE, AND THEY MAY NOT WANT TO PAY --

11           **THE COURT:**  THIS COMMENTARY ISN'T APPROPRIATE.  IF

12   YOU HAVE ANOTHER QUESTION, GO AHEAD ASK IT.

13   **BY MR. DINOVO**

14   **Q.**  ALL RIGHT, SIR. THEY WOULDN'T HAVE HAD TO PAY A ROYALTY,

15   WOULD THEY, TO DESIGN AROUND?  THEY COULD HAVE CEASED ANY

16   ALLEGATION OF INFRINGEMENT.  I THINK YOU SAID THIS IS BASED ON

17   DR. DEVANBU'S CLAIM CONSTRUCTION, RIGHT, THAT THIS STILL

18   WORKED?

19           **THE COURT:**  YOU ASKED TWO QUESTIONS THERE.

20   **BY MR. DINOVO**

21   **Q.**  DIDN'T YOU SAY, SIR, THAT THIS WAS BASED -- THESE ARE

22   DESIGN AROUNDS EVEN FOR DR. DEVANBU'S ANALYSIS?

23   **A.**  YES.  THIS DESIGN AROUND DISCUSSION REQUIRES THAT I ASSUME

24   INFRINGEMENT.  AND, OF COURSE, I DON'T AGREE WITH THAT.  BUT

25   I'M REQUIRED BY THE COURT TO ASSUME INFRINGEMENT BEFORE

1    TALKING ABOUT DESIGN-AROUND OPTIONS.

2    **Q.**  OKAY.  AND APPLYING DR. DEVANBU'S ANALYSIS, THIS COULD

3    HAVE BEEN DONE FOR LESS THAN THE COST IT WOULD HAVE BEEN FOR

4    ADOBE TO PAY YOU.

5    **A.**  IN SOME CASES THAT'S TRUE.

6         **MR. DINOVO:**  THANK YOU.

7       PASS THE WITNESS.

8                    **REDIRECT EXAMINATION**

9    **BY MS. MEHTA:**

10   **Q.**  DR. WICKER, JUST A FEW FOLLOW-UP QUESTIONS.  THERE WAS

11   SOME DISCUSSION TODAY ABOUT AVAILABILITY OF SOURCE CODE AND

12   THE LIKE.  DID YOU REVIEW ANY DOCUMENTS RELATING TO SOFTWARE

13   DEVELOPMENT KITS AS PART OF YOUR ANALYSIS?

14   **A.**  YES, I DID.

15   **Q.**  AND WAS THERE ANY INFORMATION ABOUT ADOBE SOURCE CODE THAT

16   WAS DISTRIBUTED AS PART OF THE SOFTWARE DEVELOPMENT KIT

17   INFORMATION THAT YOU REVIEWED?

18   **A.**  YES.  THAT'S THE POINT OF AN SDC:  TO DESCRIBE THE

19   SOFTWARE THAT'S AVAILABLE; TO DESCRIBE THE APPLICATION

20   PROGRAMMING INTERFACE; AND TO BASICALLY HELP USERS TO

21   CONFIGURE THE SOFTWARE TO MEET THEIR NEEDS.

22        **MS. MEHTA:**  MR. BONINI, I DON'T KNOW IF IT IS

23   POSSIBLE TO PUT UP DR. WICKER'S SLIDE PRESENTATION, THE '541

24   PRESENTATION -- I AM SORRY -- '670 PRESENTATION AT SLIDE

25   EIGHT, WHICH WAS THE ONE MR. DINOVO WAS JUST TALKING ABOUT.

1      AND IF WE CAN HAVE THAT PUBLISHED TO THE JURY, MS. RILEY.

2   THANK YOU.

3   **BY MS. MEHTA:**

4   **Q.**  DR. WICKER, THERE WERE SOME QUESTIONS ABOUT THIS GRANT AND

5   DENY AND ALL OF THAT.  IF I CAN DIRECT YOU TO THE TOP BOX ON

6   SLIDE EIGHT.  AND IF YOU COULD READ THAT LIMITATION IN ITS

7   ENTIRETY.  AND LET ME KNOW WHEN YOU'VE DONE THAT, AND THEN I

8   WILL ASK YOU THE FOLLOW-UP QUESTION.

9   **A.**  OKAY.  READ IT OUT LOUD?

10  **Q.**  NO, YOU CAN JUST READ IT TO YOURSELF.

11  **A.**  OKAY.

12      OKAY.

13  **Q.**  OKAY.  NOW, WITH RESPECT TO THE FINAL CLAUSE OF THAT

14  LIMITATION, CAN YOU EXPLAIN HOW THAT RELATES IN YOUR OPINION

15  OR IF IT RELATES, IN YOUR OPINION, TO CLAIM 45 OF THE '670

16  PATENT?

17  **A.**  OKAY.  SO THE FINAL CLAUSE WOULD BE "UNTIL THE

18  NOTIFICATION INFORMATION IS TRANSMITTED."  AND THAT IS THE

19  IDENTICAL CLAUSE FROM THE CLAIM-IN-SUIT.

20  **Q.**  I WANT TO GO BACK TO A COUPLE OF THE ISSUES THAT WERE

21  DISCUSSED YESTERDAY.  THERE WAS A DISCUSSION WITH MR. DINOVO

22  ABOUT THE CONCEPT OF CREATING THE SAME DATA IN TWO PLACES.  DO

23  YOU RECALL THAT?

24  **A.**  YES, I DO.

25  **Q.**  IS THAT HOW THE ACCUSED PRODUCTS WORK?

1   **A.**  NO.

2   **Q.**  HOW DO THE ACCUSED PRODUCTS WORK?

3   **A.**  THE ACCUSED PRODUCTS WORK BY GENERATING A LICENSE OR

4   VOUCHER OF SOME KIND AT THE SERVER, ENCRYPTING IT AND SENDING

5   IT TO THE CLIENT.  THE CLIENT DECRYPTS IT AND USES WHAT WAS

6   GENERATED AT THE SERVER.

7   **Q.**  NOW, THERE WAS ALSO DISCUSSION YESTERDAY ABOUT PACKAGING

8   UP DATA BEFORE IT'S TRANSMITTED OVER THE INTERNET.  DO YOU

9   RECALL THAT?

10  **A.**  YES.

11  **Q.**  DOES PACKAGING DATA SO IT CAN BE TRANSMITTED OVER THE

12  INTERNET CHANGE THE DATA?

13  **A.**  NO.  NO, WHAT HAPPENS WHEN YOU USE THE INTERNET, THESE

14  VARIOUS PROTOCOLS AND TCP IP HAVE PAYLOADS.  IT IS LIKE

15  PUTTING SOMETHING IN A TRUCK, AND THEN DRIVING IT WITH THE

16  TRUCK ACROSS THE NETWORK, AND THEN YOU UNLOAD IT.  IT DOESN'T

17  CHANGE THE CONTENTS.  THE PAYLOAD IS THE PAYLOAD.

18      AND WE ARE SIMPLY PACKAGING IT, WRAPPING THINGS AROUND

19  IT -- "ENCAPSULATING" IS THE TERM -- TO GET IT ACROSS THE

20  NETWORK.

21  **Q.**  WOULD THAT TRUE BOTH WITH AND WITHOUT ENCRYPTION, OR DOES

22  THAT DIFFER WHEN YOU ARE ENCRYPTING?

23  **A.**  ENCRYPTION IS JUST ANOTHER WAY OF WRAPPING SOMETHING

24  AROUND THE CONTENT.

25  **Q.**  AND DOES ENCRYPTION AND DECRYPTION CHANGE THE CONTENT

1  ITSELF?

2  **A.**  WHAT IT DOES IS IT MASKS IT, BUT THE CONTENT IS STILL

3  THERE FOR THE PERSON, UNCHANGED, FOR THE PERSON WHO HAS THE

4  DECRYPTION KEY.

5       **MS. MEHTA:**  MR. BONINI, IF WE CAN PUT UP THE TAB IN

6  THE JURY BOOK THAT HAS THE CLAIM CONSTRUCTIONS, TAB ONE.

7     AND, IF WE COULD, LET'S HIGHLIGHT THE FIRST CLAIM

8  CONSTRUCTION LIMITATION THERE.

9                 (PUBLISHED TO JURY.)

10  **BY MS. MEHTA**

11  **Q.**  DR. WICKER, COULD YOU CONFIRM WHETHER OR NOT THIS IS A

12  CLAIM CONSTRUCTION YOU ARE FAMILIAR WITH?

13  **A.**  YES, THAT IS.

14  **Q.**  IS THIS A CONSTRUCTION THAT YOU APPLIED?

15  **A.**  YES, IT IS.

16  **Q.**  WOULD RECEIVING A KEY FROM A REMOTE SERVER AND STORING IT

17  LOCALLY MEET THIS REQUIREMENT?

18  **A.**  NO.

19  **Q.**  WHY NOT?

20  **A.**  BECAUSE YOU'RE NOT CREATING A PERMISSION LOCALLY.  YOU'VE

21  RECEIVED IT FROM SOMEWHERE ELSE.  YOU'VE RECEIVED IT FROM THE

22  SERVER.

23  **Q.**  NOW, THERE WAS SOME DISCUSSION ABOUT THE TOKEN REQUIREMENT

24  YESTERDAY.  DO YOU RECALL THAT?

25  **A.**  YES.

1    **Q.**  AND YOU RECALL THE TESTIMONY THAT THE TOKEN REQUIRES A

2    YES/NO INDICATION?

3    **A.**  YES.

4    **Q.**  NOW, IF YOU COULD LOOK AT --

5          **MS. MEHTA:**  MR. BONINI, MAYBE -- I APOLOGIZE FOR

6    THIS, BUT I THINK WE ARE GOING TO HAVE TO SWITCH TO THE

7    PATENT, THE '541 PATENT, WHICH IS EXHIBIT 1 AT CLAIM 1.

8    **BY MS. MEHTA**

9    **Q.**  DO YOU HAVE THE CLAIM IN FRONT OF YOU, DR. WICKER?

10   **A.**  YES.

11   **Q.**  LOOK AT THE FINAL LIMITATION OF THE CLAIM.

12   **A.**  OKAY.

13   **Q.**  AND YOU RECALL THERE WAS SOME TESTIMONY YESTERDAY ABOUT

14   EXECUTING THAT INSTALLATION PROCESS BASED ON THE RECEIVED

15   TOKEN?

16   **A.**  YES.

17   **Q.**  NOW, THERE WAS ALSO SOME TESTIMONY ABOUT WHETHER THE

18   PRESENCE OF A KEY IS AN INDICATION OF "YES."  DO YOU RECALL

19   THAT?

20   **A.**  YES, I DO.

21   **Q.**  WOULD THE PRESENCE OF A KEY, WHICH IS THE ACCUSED

22   PERMISSION, ABOUT ENOUGH TO SATISFY THE COURT'S CLAIM

23   CONSTRUCTION FOR TOKEN, IN YOUR VIEW?

24   **A.**  NO.

25   **Q.**  WHY NOT?

1    **A.**  THE PRESENCE OF A KEY IS SIMPLY THAT.  IT IS THE

2    PERMISSION.  SO, WE'VE GOTTEN THE PERMISSION ALREADY FROM THE

3    SERVER.  THERE IS NO YES/NO WHICH THEN WOULD LEAD TO A LOCAL

4    GENERATION OF A KEY.  SO IT WOULDN'T SATISFY.

5    **Q.**  THANK YOU, DR. WICKER.

6        CLAIM 1 IN THE FIRST LIMITATION DISCUSSES AT A CLIENT

7    EXECUTING AN ACCESS CHECKING PROCESS.  DO YOU SEE THAT?

8    **A.**  YES.

9    **Q.**  IF YOU COULD JUST READ THAT LIMITATION TO YOURSELF.

10   **A.**  OKAY.

11   **Q.**  NOW, IT TALKS ABOUT WHETHER OR NOT THERE'S A PRE-EXISTING

12   PERMISSION, RIGHT?

13   **A.**  THAT'S RIGHT.

14   **Q.**  WHAT IS THAT PRE-EXISTING PERMISSION FOR?  WHAT IS IT

15   TRYING TO ACCOMPLISH?

16   **A.**  THE POINT IS HERE WE'RE LOOKING TO SEE IF THE CLIENT HAS

17   ALREADY GENERATED THE KEY.  IF IT'S ALREADY PRESENT, AND

18   THEREFORE THERE IS NO NEED FOR THE SUBSEQUENT STEPS.

19   **Q.**  IF THERE WERE A PRE-EXISTING PERMISSION PRESENT IN THE

20   CONTEXT OF THE CLAIM IN THE PATENT, WHAT WOULD THE USER GET?

21   **A.**  IF THERE WAS A PRE-EXISTING PERMISSION, THE USER WOULD GET

22   ACCESS.

23   **Q.**  ACCESS TO WHAT?

24   **A.**  THE DOCUMENT OR WHATEVER IT MAY BE.

25   **Q.**  YOU RECALL YESTERDAY THERE WAS SOME TESTIMONY REGARDING

1    THE LIVECYCLE PRODUCT?

2    **A.**  YES.

3    **Q.**  AND THERE WAS TESTIMONY REGARDING POLICIES OR BASKETS OF

4    RIGHTS THAT LET YOU DO THINGS LIKE PRINTING AND THINGS LIKE

5    THAT?

6    **A.**  YES.

7    **Q.**  NOW, YOU ALSO UNDERSTAND THAT IN THE CONTEXT OF LIVECYCLE

8    DR. DEVANBU POINTS TO THE CONTENT ENCRYPTION KEY WITHIN THE

9    VOUCHER AS THE PERMISSION, RIGHT?

10   **A.**  THAT'S CORRECT.

11   **Q.**  IS THE CONTENT -- I WILL START OVER.  IS THE CONTENT

12   ENCRYPTION KEY IN VOUCHER THE THING THAT GRANTS ACCESS TO THE

13   CONTENT?

14   **A.**  YES.

15   **Q.**  NOW, ALL THE OTHER RIGHTS AND POLICIES THAT YOU WERE

16   TALKING ABOUT, ARE THOSE THE THINGS THAT GRANT RIGHTS OR -- I

17   AM SORRY.  LET ME PHRASE THAT A LITTLE BIT BETTER.

18       THE OTHER BASKET OF RIGHTS OR POLICIES FOR PRINTING AND

19   ALL OF THAT, ARE THOSE THE THINGS THAT ALLOW YOU TO ACCESS THE

20   CONTENT?

21   **A.**  NO.  I THINK THE BEST WAY TO LOOK AT THEM IS TO SAY THIS

22   DEFINES WHAT ACCESS IS, BUT ACCESS IS GRANTED BY THE KEY.  ALL

23   THE OTHER DETAILS DEFINE THE LIMITS OF THE ACCESS.

24   **Q.**  I'M GOING TO TURN YOUR ATTENTION NOW TO THE FLASH

25   PLATFORM.  AND WITH RESPECT TO THE FLASH PLATFORM, YOU

1    UNDERSTAND THAT DR. DEVANBU POINTS TO A KEY WITHIN THE DRM

2    METADATA AS THE PERMISSION, RIGHT?

3    A.   THAT'S CORRECT.

4    Q.   AND WHERE IS THAT KEY GENERATED?

5    A.   AT THE SERVER.

6    Q.   DOES THE KEY EVER SEND YES/NO INDICATION?

7    A.   I AM SORRY.  DOES THE KEY?

8    Q.   WELL, ACTUALLY, LET ME PHRASE IT A LITTLE BIT DIFFERENTLY.

9        IN THE CONTEXT OF FLASH, DOES WHATEVER IS SENT FROM THE

10   SERVER TO THE CLIENT EVER INCLUDE A YES/NO INDICATION?

11   A.   NO.  WHAT'S PROVIDED IS THE KEY.

12   Q.   AND THERE WAS A DISCUSSION YESTERDAY ABOUT FLASH STREAMING

13   AND POLICIES THAT MIGHT ENABLE SOMEONE TO WATCH CONTENT FOR A

14   PARTICULAR AMOUNT OF TIME.  DO YOU RECALL THAT?

15   A.   YES, I DO.

16   Q.   DO YOU UNDERSTAND DR. DEVANBU'S INFRINGEMENT THEORY TO BE

17   POINTING TO THE STORING OF THOSE POLICIES AS THE PERMISSION?

18   A.   NO.  HE'S POINTING TO THE KEY.  AND THE POLICIES, AGAIN,

19   DEFINE WHAT ACCESS IS.  BUT HE IS SAYING THE KEY, AND I AGREE

20   THE KEY PROVIDES ACCESS.

21   Q.   AND, FINALLY -- AND I APOLOGIZE FOR GOING OUT OF ORDER A

22   LITTLE BIT, BUT I'M GOING TO SWITCH TOPICS A BIT, AND BACK TO

23   LIVECYCLE IN THE CONTEXT OF THE '670.

24       YOU RECALL THAT THERE WAS SOME DISCUSSION YESTERDAY ABOUT

25   EVENT LOGGING FOR LIVECYCLE?

1    **A.**  YES.

2    **Q.**  IS THE EVENT LOGGING PROCESS THAT WAS DISCUSSED THE

3    ACCUSED PROCESS THAT DR. DEVANBU TESTIFIED ABOUT?

4    **A.**  NO.

5    **Q.**  HOW IS THAT DIFFERENT?

6    **A.**  EVENT LOGGING IS SIMPLY KEEPING TRACK OF WHAT'S GOING ON

7    IN THE SYSTEM.  DR. DEVANBU IS POINTING TO ACTUAL OPERATIONS

8    WITHIN THE SYSTEM NOT KEEPING TRACK OF WHAT'S HAPPENED.

9         **MS. MEHTA:**  THANK YOU.

10        OKAY.  THAT'S ALL I HAVE.  THANK YOU.

11                    <u>RECROSS–EXAMINATION</u>

12   **BY MR. DINOVO**

13   **Q.**  JUST A COUPLE MORE QUESTIONS, DR. WICKER, AND I THINK WE

14   WILL BE DONE.

15        I JUST WANTED TO BE CLEAR.  YOUR COUNSEL ASKED YOU A

16   QUESTION ABOUT WHETHER ENCRYPTION CHANGES THINGS, CHANGES

17   DATA.

18   **A.**  YES.

19   **Q.**  ISN'T THE WHOLE POINT OF ENCRYPTION TO MAKE IT SO THAT THE

20   PERSON, IF A PERSON WERE TO INTERCEPT WHATEVER HAD BEEN

21   ENCRYPTED THAT THEY COULDN'T DO ANYTHING WITH IT?

22   **A.**  ENCRYPTION OBSCURES DATA.  IT KEEPS UNAUTHORIZED PEOPLE

23   FROM BEING ABLE TO READ OR USE THE DATA.  BUT THE DATA IS

24   STILL THERE.

25        IN OTHER WORDS, IF SOMEONE HAS THE KEY, THEY CAN ACCESS

1    THE DATA.  THE DATA DOESN'T GO AWAY.

2    **Q.**  SO IT IS INTENDED TO BE REVERSIBLE?

3    **A.**  EXACTLY.  IT IS A TRANSFORMATION.

4    **Q.**  ALL RIGHT.  AND THEN, THAT REVERSE TRANSFORMATION IS WHAT

5    OCCURS AT THE CLIENT IN THESE CONTEXTS WE ARE TALKING ABOUT.

6    **A.**  THAT'S RIGHT. DECRYPTION DOES OCCUR AT THE CLIENT.

7           **MR. DINOVO:**  MS. MASON, IF I CAN PLEASE GET 360,

8    PLAINTIFF'S EXHIBIT 360 -- OR, ACTUALLY, I AM SORRY --

9    DEFENDANT'S EXHIBIT 360, PAGE 13.

10                    (PUBLISHED TO JURY.)

11          **MR. DINOVO:**  AND JUST THE FIRST PARAGRAPH.

12   **BY MR. DINOVO**

13   **Q.**  I JUST WANT TO WALK THROUGH THIS LANGUAGE WITH YOU,

14   DR. WICKER, JUST TO BE CLEAR.

15   **A.**  OKAY.

16   **Q.**  SO THE EDC VOUCHER IS WHAT DR. DEVANBU IDENTIFIED AS THE

17   TOKEN, RIGHT?

18   **A.**  YES.

19   **Q.**  AND THIS ADOBE DOCUMENT SAYS THAT THAT OBJECT CAN BE USED

20   TO OBTAIN A SET OF PERMISSIONS?

21   **A.**  THAT'S CORRECT.

22   **Q.**  AND IT DOESN'T SAY THAT THE TOKEN -- OR EXCUSE ME -- THE

23   VOUCHER IS THE SET OF PERMISSIONS.  IT SAYS IT CAN BE USED TO

24   OBTAIN THAT SET, RIGHT?

25   **A.**  RIGHT.  I WOULD SAY IT IS MORE ACCURATE TO SAY THE VOUCHER

1   CONTAINS THE PERMISSIONS, AMONG OTHER THINGS, BECAUSE IT ALSO

2   INCLUDES A KEY.

3   **Q.** WELL, IT CONTAINS THE PERMISSIONS IN AN ENCRYPTED FORMAT

4   THAT AN INTERCEPTOR COULD NOT MAKE USE OF?

5   **A.** THAT'S RIGHT.

6   **Q.** THE TRANSFORMATION USES THAT VOUCHER AS AN INPUT.  THE

7   TRANSFORMATION OCCURS AT THE CLIENT, AND THEN THE CLIENT HAS

8   THE PERMISSIONS?

9   **A.** NOT EXACTLY.  THE CIPHERTEXT GOES THROUGH A DECRYPTION

10  PROCESS TO GIVE US PLAIN TEXT.  AND THE PLAIN TEXT THAT WE

11  START WITH IS, IN THIS CASE, THE VOUCHER, WHICH INCLUDES THESE

12  PERMISSIONS.  SO ALL OF THIS IS PRESENT, BOTH IN THE PLAIN

13  TEXT AND THE CIPHERTEXT, IF THE SYSTEM IS WORKING PROPERLY.

14  **Q.** SO YOU DON'T BELIEVE THIS TO BE ACCURATE THAT THE VOUCHER

15  CAN BE USED TO OBTAIN THE SET OF PERMISSIONS?  IS THAT

16  INACCURATE?

17  **A.** NO, THE VOUCHER CONTAINS THE PERMISSIONS, AMONG OTHER

18  THINGS.  SO IF WE HAVE THE VOUCHER WE CAN OBTAIN THE

19  PERMISSION.

20  **Q.** AND BY DECRYPTION AT THE CLIENT AT THIS TRANSFORMATION

21  PROCESS.

22  **A.** WELL, IF IT IS PREVIOUSLY ENCRYPTED, BECAUSE OF THE

23  TRANSMISSION, THEN WHEN WE DECRYPT IT, AT THAT POINT WE WILL

24  BE ABLE TO EXTRACT THE PERMISSIONS.

25  **Q.** THANK YOU.

1    **A.**   OKAY.

2              **THE COURT:**  ANYTHING ELSE?

3              **MS. MEHTA:**  NO, YOUR HONOR.

4              **THE COURT:**  YOU'RE EXCUSED.  YOU MAY STEP DOWN. THANK

5    YOU.

6              **THE WITNESS:**  THANK YOU, YOUR HONOR.

7              **THE COURT:**  I DON'T KNOW WHO IS CALLING THE NEXT

8    WITNESS.

9              **MR. ELLWANGER:**  YOUR HONOR, PLAINTIFF CALLS JONATHAN

10   HERBACH, ADVERSE.

11             **THE COURT:**  OKAY.

12             **THE CLERK:**  ARE YOU THE WITNESS?  GOING TO COME UP

13   FOR ME, PLEASE?

14      ARE YOU GOING TO BE POINTING TO THE SCREEN AND USING THE

15   LAPEL MIC OR ARE YOU OKAY WITH THE REGULAR MIC?

16      RAISE YOUR RIGHT HAND FOR ME, AND I WILL SWITCH THE MICS.

17      STAND AND RAISE YOUR RIGHT HAND FOR ME.

18      (**JONATHAN HERBACH,** CALLED AS A WITNESS FOR THE PLAINTIFF,

19   HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

20             **THE WITNESS:**  YES.

21             **THE CLERK:**  OKAY.  I WILL HAVE YOU HAVE A SEAT.  ONCE

22   SEATED, I'M GOING TO ASK THAT YOU STATE AND SPELL YOUR FIRST

23   AND LAST NAME FOR THE RECORD, PLEASE.

24             **THE WITNESS:**  MY NAME IS JONATHAN HERBACH.

25   J-O-N-A-T-H-A-N, HERBACH, H-E-R -- B, AS IN BOY -- A-C-H.

1            **THE CLERK:**  THANK YOU.

2            **THE WITNESS:**  SURE.

3                        **DIRECT EXAMINATION**

4    BY MR. ELLWANGER

5    **Q.**  GOOD MORNING, MR. HERBACH.

6    **A.**  GOOD MORNING.

7    **Q.**  WE HAVEN'T MET.  MY NAME IS JAY ELLWANGER.  I'M ONE OF THE

8    ATTORNEYS REPRESENTING DIGITAL REG IN THIS CASE.  I HAVE A FEW

9    QUESTIONS THAT I WOULD LIKE TO ASK YOU THIS MORNING.

10   **A.**  OKAY.

11   **Q.**  MR. HERBACH, WHO DO YOU WORK FOR?

12   **A.**  I WORK FOR ADOBE SYSTEMS.

13   **Q.**  HOW LONG HAVE YOU WORKED FOR ADOBE SYSTEMS?

14   **A.**  I'VE WORKED FULL TIME SINCE THE SUMMER OF 2001.

15   **Q.**  SO OVER 13 YEARS?

16   **A.**  (NODS HEAD.)

17       YES.  I'M SORRY.

18           **THE COURT:**  JUST SAY "YES" ALOUD.  AND ALSO IF YOU

19   WOULD MAKE SURE THE MICROPHONE IS BETWEEN YOU AND THE WAY YOUR

20   FACE IS POINTING SO YOUR VOICE IS GOING INTO IT.

21           **THE WITNESS:**  OF COURSE.  YES.

22   BY MR. ELLWANGER

23   **Q.**  MR. HERBACH, YOU UNDERSTAND ADOBE IS THE DEFENDANT IN THIS

24   LAWSUIT?

25   **A.**  I DO, YES.

1      **MR. ELLWANGER:**  YOUR HONOR, AT THIS TIME WE ASK THE

2   COURT TO RECOGNIZE MR. HERBACH AS AN ADVERSE WITNESS AND ALLOW

3   QUESTIONING TO PROCEED ACCORDINGLY.

4      **THE COURT:**  YES.

5   **BY MR. ELLWANGER**

6   **Q.**  MR. HERBACH, YOU'RE A SENIOR PRODUCT MANAGER FOR THE ADOBE

7   ACROBAT PRODUCT, RIGHT?

8   **A.**  YES.

9   **Q.**  AND YOU'VE GIVEN PRIOR TESTIMONY IN THIS CASE AS A

10  CORPORATE REPRESENTATIVE OF ADOBE ABOUT THE DESIGN,

11  DEVELOPMENT, FUNCTION AND OPERATION OF THE FUNCTIONALITIES

12  IDENTIFIED IN DIGITAL REG'S INFRINGEMENT CLAIM CHARTS?

13  **A.**  YES.

14  **Q.**  AGAIN, THOSE INFRINGEMENT CLAIM CHARTS ARE SPECIFICALLY

15  THE ONES DEALING WITH LIVECYCLE DIGITAL RIGHTS MANAGEMENT.

16  **A.**  YES.

17  **Q.**  AND YOU WORKED ON THE ADOBE LIVECYCLE PRODUCT FOR MANY

18  YEARS.

19  **A.**  IN DIFFERENT CAPACITIES, YES.

20  **Q.**  IN FACT, YOU WORKED ON THE RIGHTS MANAGEMENT PIECES OF

21  LIVECYCLE, SPECIFICALLY?

22  **A.**  I DID.

23  **Q.**  AND AT TIMES, RIGHTS MANAGEMENT WAS THE MAIN FOCUS OF YOUR

24  WORK.

25  **A.**  AT TIMES IT WAS.

1    **Q.**  AND, IN FACT, YOU WERE THE PRODUCT MANAGER OF LIVECYCLE

2    RIGHTS MANAGEMENT FROM 2007 TO 2011 --

3    **A.**  YES.

4    **Q.**  -- IS THAT RIGHT?

5        AND, MR. HERBACH, YOU HAVE PATENTS YOURSELF?

6    **A.**  YES.

7    **Q.**  YOU PARTICIPATED IN THE PATENT APPLICATION PROCESS.

8    **A.**  I HAVE.

9    **Q.**  AND THOSE PATENTS HAVE BEEN ASSIGNED TO YOUR EMPLOYER,

10   ADOBE?

11   **A.**  YES.

12          **MR. ELLWANGER:**  NOW, YOUR HONOR, IF I MAY, WE HAVE

13   FIVE PATENTS AND FIVE PORTIONS OF PROSECUTION HISTORY.  WOULD

14   YOUR HONOR PREFER I ENTER THOSE INTO EVIDENCE OR SIMPLY USE

15   THE DEMONSTRATIVE TO WALK THROUGH THEM?  THEY ARE ADOBE

16   PATENTS.

17          **THE COURT:**  THE LATTER.

18          **MR. ELLWANGER:**  OKAY.  MS. MASON, IF YOU CAN PLEASE

19   PUT UP THE SLIDES, BEGINNING WITH PLAINTIFF'S 6.

20                  (PUBLISHED TO JURY.)

21   **BY MR. ELLWANGER**

22   **Q.**  MR. HERBACH, I WANT TO WALK THROUGH AS SERIES OF PATENTS

23   AND FILE HISTORIES FOR YOUR EMPLOYER ADOBE.  YOU HAVE THEM IN

24   A BINDER IN FRONT OF YOU, OR YOU ARE WELCOME TO LOOK AT THE

25   SCREEN.

1          **MR. REINES:** YOUR HONOR, THIS IS A REDUX OF WHAT WE

2     HAD PREVIOUSLY. TO THE EXTENT IT IS HIS PATENTS WE HAVE

3     ABSOLUTELY NO OBJECTION TO HIM TESTIFYING ABOUT THOSE.

4        TO THE EXTENT IT IS JUST ADOBE PATENTS, THEY HAVE SO MANY

5     PATENTS AND SO MANY ENGINEERS, IT JUST DOESN'T SEEM RIGHT TO

6     HAVE HIM TESTIFYING ABOUT THINGS THAT ARE NOT HIS PATENT.

7     THAT IS WHAT IS UP ON THE SCREEN NOW.

8          **MR. ELLWANGER:** MAY I RESPOND, YOUR HONOR.

9          **THE COURT:** YOU CAN ASK. IF YOU AREN'T FAMILIAR WITH

10    THEM ENOUGH TO TESTIFY ABOUT THEM, THEN JUST SAY SO.

11         **THE WITNESS:** OKAY.

12    BY MR. ELLWANGER

13    Q.  NOW, MR. HERBACH, DO YOU RECOGNIZE HERE THAT THIS IS A

14    PATENT WITH THE LAST THREE DIGITS ENDING IN '384?

15    A.  YES.

16    Q.  AND DO YOU ALSO SEE, SIR, THAT THE ASSIGNEE OF THIS PATENT

17    IS ADOBE SYSTEMS INCORPORATED?

18    A.  YES, IT IS.

19    Q.  OKAY. AND DO YOU ALSO SEE, SIR, THAT ONE OF THE PATENTS

20    LISTED ON THIS ADOBE PATENT IS THE PATTERSON PATENT?

21         **MR. REINES:** YOUR HONOR, I DON'T -- IT IS NOT A BIG

22    DEAL, BUT THIS IS THE SAME ISSUE THAT WE HAD BEFORE. HE

23    HASN'T LAID ANY FOUNDATION HE KNOWS ANYTHING ABOUT THIS

24    PATENT. WHAT HE IS GOING TO BE DOING IS SAYING:

25        "DO YOU SEE PATTERSON? DO YOU SEE PATTERSON?"

1        **MR. ELLWANGER:**  MAY I RESPOND, YOUR HONOR?  WITH

2   MR. PATTERSON YOU ASKED THAT WE PRESENT THIS THROUGH AN ADOBE

3   WITNESS.  THIS IS THE CORPORATE REPRESENTATIVE OF ADOBE WHO

4   GAVE TESTIMONY ABOUT LIVECYCLE RIGHTS MANAGEMENT ON BEHALF OF

5   THE COMPANY.

6        THESE PATENTS HAVE TO DO WITH LIVECYCLE RIGHTS MANAGEMENT.

7   HE WAS PREVIOUSLY DESIGNATED AS THEIR REPRESENTATIVE.  AND SO

8   WE ARE SIMPLY FOLLOWING THE INSTRUCTION.

9        **THE COURT:**  YES.  IF THE ONLY POINT IS TO SAY THERE

10  ARE A LOT OF PATENTS THAT CONTAIN THE NAME "PATTERSON," WE CAN

11  GET A STIPULATION AND SAY HOW MANY PAGES THERE ARE AND HOW

12  MANY TIMES THE NAME IS MENTIONED AND SO ON.  WE DON'T NEED TO

13  DO THAT THROUGH TESTIMONY OF A WITNESS LOOKING AT A PIECE OF

14  PAPER THAT WE CAN LOOK AT AND SAY:

15      "OH, I SEE IT THERE.  IT SAYS 'PATTERSON.'"

16       **MR. REINES:**  YOUR HONOR, WE ARE HAPPY TO COOPERATE.

17       **THE COURT:**  IF THERE IS SOMETHING ELSE FROM THIS

18  WITNESS WHY DON'T UP MOVE ON TO THAT?

19       **MR. ELLWANGER:**  MAY I HAVE THE COURT'S PERMISSION TO

20  SPECIFICALLY TALK ABOUT MR. HERBACH'S PATENTS, AND THEN WE

21  WILL TALK ABOUT THE STIPULATION ON THE OTHERS?

22       **THE COURT:**  IF YOU ARE TALKING ABOUT SOMETHING BEYOND

23  THE FACT THAT IT SAYS "PATTERSON" IN IT.

24       **MR. ELLWANGER:**  OKAY.  I THINK WE CAN WORK WITH

25  OPPOSING COUNSEL WITH THAT STIPULATION, IF THAT WOULD BE WHAT

```
1    THE COURT WANTS.

2              THE COURT:  THAT WOULD BE A MORE EFFICIENT WAY OF

3    POINTING IT OUT RATHER THAN HAVE A WITNESS GO THROUGH IT AND

4    SAY:

5         "YES, I SEE IT.  I SEE IT."

6              MR. ELLWANGER:  WE WILL WORK ON THAT THIS WEEKEND.

7              THE COURT:  OKAY.

8    BY MR. ELLWANGER

9    Q.  MR. HERBACH, YOUR EXAMINATION JUST GOT A LOT SHORTER.

10         I DO WANT TO ASK YOU, THOUGH, MR. PATTERSON -- EXCUSE

11   ME -- MR. HERBACH, ABOUT EXHIBIT 52, WHICH IS IN EVIDENCE.

12             MR. ELLWANGER:  MS. MASON, CAN YOU PULL UP 52?

13             THE WITNESS:  IS 52 IN MY BINDER, AS WELL?

14   BY MR. ELLWANGER

15   Q.  IT IS.  I BELIEVE IT IS IN THE BLACK BINDER.

16   A.  I DON'T BELIEVE I HAVE A BLACK BINDER HERE.

17             MR. ELLWANGER:  MAY I APPROACH, YOUR HONOR?

18             THE COURT:  YES.

19                 (BINDER HANDED TO WITNESS.)

20   BY MR. ELLWANGER

21   Q.  LOOKING IN THAT BINDER, MR. HERBACH, YOU WILL SEE A TAB

22   MARKED "PLAINTIFF'S 52."  IF YOU CAN TAKE A LOOK AT THAT

23   DOCUMENT, SIR.

24   A.  OKAY.

25   Q.  YOU'VE SEEN EXHIBIT 52, HAVE YOU NOT?
```

1    **A.**  YES, I HAVE.

2    **Q.**  IT'S THE ONLINE HELP PAGE FOR A PORTION OF THE RIGHTS

3    MANAGEMENT PRODUCT?

4    **A.**  YES.  IT'S THE ONLINE HELP.

5    **Q.**  OKAY.  AND THAT DOCUMENT SHOWS THE CURRENT SUPPORTED FILE

6    FORMATS FOR LIVECYCLE RIGHTS MANAGEMENT, CORRECT?

7    **A.**  YES, FOR THIS PARTICULAR VERSION OF THE PRODUCT.  THIS WAS

8    THE LIST OF SUPPORTIVE FILE TYPES.

9    **Q.**  AND THOSE SUPPORTIVE FILE TYPES INCLUDE PDF FILES?

10   **A.**  YES.

11   **Q.**  INCLUDE ADOBE FLASH FILES?

12   **A.**  YES.

13   **Q.**  AT LEAST AS FAR BACK AS 2007 WHEN YOU WERE THE PRODUCT

14   MANAGER?

15   **A.**  CORRECT.

16   **Q.**  AND AT LEAST AS OF THE DATE OF YOUR DEPOSITION IN MARCH OF

17   LAST YEAR, THEY ARE STILL SUPPORTED BY LIVECYCLE RIGHTS

18   MANAGEMENT?

19   **A.**  MANY OF THESE FILE FORMATS ARE SUPPORTED.  I CAN'T SPEAK

20   TO WHETHER PTC CONTINUES TO SUPPORT THEIR PRODUCT PRO ENGINEER

21   WILDFIRE 4.

22   **Q.**  SPECIFICALLY, PDF FILES AND FLASH FILES ARE STILL

23   SUPPORTED?

24   **A.**  ADOBE PDF FILES ARE SUPPORTED.  I CAN'T SPEAK TO WHETHER

25   ADOBE FLASH FILES ARE STILL SUPPORTED.

1    **Q.**  LET'S TALK ABOUT ADOBE READER 11 FOR A MOMENT,

2    MR. HERBACH.  WHEN SOMEONE OPENS A PDF ON THEIR DESKTOP USING

3    READER 11, IT RECOGNIZES THAT THE DOCUMENT IS PROTECTED WITH

4    THE RIGHTS MANAGEMENT SERVER, CORRECT?

5    **A.**  YES.

6    **Q.**  AND IT WILL CONTACT THAT SERVER TO LEARN MORE ABOUT HOW

7    THAT SERVER IS CONFIGURED?

8    **A.**  YES.  WHEN A USER TRIES TO OPEN A DOCUMENT IT IS GOING TO

9    REALIZE THAT IT'S A LIVECYCLE RIGHTS MANAGEMENT DOCUMENT AND

10   BEGIN THE COMMUNICATION PROCESS WITH THAT SERVER TO DETERMINE

11   THE BEST WAY TO COMMUNICATE WITH THAT SERVER.

12   **Q.**  OKAY.  AND NEXT THE SERVER WILL SEND OUT INFORMATION TO

13   THE CLIENT BASED UPON HOW THE CUSTOMER HAS CONFIGURED THE

14   SERVER?

15   **A.**  THE CLIENT IS GOING -- THE SERVER IS GOING TO COMMUNICATE

16   TO THE CLIENT HOW THE CLIENT SHOULD COMMUNICATE WITH THE

17   SERVER.  AND AS A PART OF THAT IT'S GOING TO BE WHAT TYPE OF

18   USER NAME AND PASSWORD IS ACCEPTABLE TO THE SERVER.

19       AND THEN THAT INFORMATION WILL BE USED AT THE CLIENT TO

20   PRESENT TO THE -- TO THE CUSTOMER A PROMPT TO ENTER THEIR USER

21   NAME AND PASSWORD PRIOR TO THE DOCUMENT PROCEEDING TO OPEN

22   FURTHER.

23   **Q.**  OKAY.  THE SYSTEM CAN ALSO BE CONFIGURED TO SEND

24   INFORMATION ABOUT THE USER; IS THAT RIGHT, MR. HERBACH?

25   **A.**  CAN YOU REPEAT THAT?  I AM SORRY.

1    **Q.**  YES.  THE SYSTEM CAN BE CONFIGURED TO SEND INFORMATION

2    ABOUT THE USER.

3    **A.**  WELL, THE CLIENT —— THE SYSTEM CAN BE CONFIGURED TO HAVE

4    THE CLIENT INSTEAD OF ASKING THE END USER FOR USER NAME AND

5    PASSWORD, CAN ACTUALLY USE A DIFFERENT TYPE OF A COMMUNICATION

6    MECHANISM, SOMETHING WE CALL "KERBEROS," WHICH ALLOWS FOR

7    WHAT —— K-E-R-B-E-R-O-S.

8        IT'S A TECHNICAL MECHANISM, BUT THE NOTION IS THAT IF A

9    USER HAS LOGGED INTO THEIR MACHINE ALREADY, THEN IT WOULD BE

10   IN SOME CIRCUMSTANCES FOR SOME CUSTOMERS INCONVENIENT TO ASK

11   THE USER AGAIN AND AGAIN TO RE-ENTER THEIR USER NAME AND

12   PASSWORD.  AND BECAUSE WE KNOW WHO THE USER IS BECAUSE OF THIS

13   KERBEROS MECHANISM, WE CAN ALLOW THE SYSTEM TO DETERMINE WHO

14   THE USER IS AUTOMATICALLY.

15   **Q.**  MR. HERBACH, I APPRECIATE YOU HAVE A LOT TO SAY ABOUT

16   LIVECYCLE RIGHTS MANAGEMENT, BUT IF YOU CAN JUST LISTEN TO THE

17   QUESTIONS I'M ASKING, AND ANSWER THEM, THEN ADOBE'S LAWYER CAN

18   ASK YOU FOLLOW-UP QUESTIONS, OKAY?

19   **A.**  OKAY.

20   **Q.**  THE SYSTEM CAN BE CONFIGURED TO SEND INFORMATION ABOUT THE

21   USER, CORRECT?

22   **A.**  I WANT TO ANSWER THAT QUESTION BUT I'M NOT REALLY SURE

23   WHAT THAT MIGHT MEAN.  IT SEEMS FAIRLY GENERIC.

24   **Q.**  THERE IS A COPY OF YOUR DEPOSITION IN THE BINDER THAT HAS

25   BEEN PLACED IN FRONT OF YOU.  AND IF YOU CAN, PLEASE, SIR,

1  TURN TO PAGE 40 OF THE TRANSCRIPT, WHICH IS ACTUALLY PAGE 10

2  OF THE DEPOSITION IN THE BLACK BINDER.

3     TELL ME WHEN YOU'VE GOTTEN THERE, SIR.

4  **A.**  SURE, ONE MOMENT.

5        **MR. REINES:**  WHAT IS THE PAGE AND LINE?

6        **THE COURT:**  WHAT HE IS JUST ASKING YOU IS TO BE A

7  LITTLE MORE SPECIFIC.  AND THAT WAS A VERY GENERIC QUESTION.

8  IF YOU CAN BE MORE SPECIFIC, HE MIGHT BE ABLE TO ANSWER IT.

9     IF HE ANSWERED A GENERIC QUESTION AT THE DEPOSITION, WE

10  HAVE TO GO BACK AND LOOK AT THE CONTEXT.

11        **MR. ELLWANGER:**  OKAY.

12  **BY MR. ELLWANGER**

13  **Q.**  DOES A SERVER PASS ANY INFORMATION THAT SAYS:

14     "THIS IS WHO I AM"?  IS THERE ANY INFORMATION PASS LIKE

15  THAT IN ANY CALL?

16        **THE COURT:**  WHAT PRODUCT ARE WE TALKING ABOUT?

17        **MR. ELLWANGER:**  ADOBE READER 11.

18        **THE COURT:**  I AM SORRY?

19        **MR. ELLWANGER:**  ACROBAT READER 11.

20        **THE WITNESS:**  CAN YOU REPEAT THAT ONCE MORE?

21  **BY MR. ELLWANGER**

22  **Q.**  SURE.

23  **A.**  THANK YOU.

24  **Q.**  CAN THE SYSTEM BE CONFIGURED TO SEND INFORMATION ABOUT THE

25  USER, SUCH AS:  "THIS IS WHO I AM"?

1    **A.**   YES.  AND THAT KERBEROS EXAMPLE, I THINK, IS AN EXAMPLE OF

2    THE CLIENT SENDING "THIS IS WHO I AM" ON BEHALF OF THE USER.

3    **Q.**   LET ME ASK YOU SOME QUESTIONS ABOUT LIVECYCLE,

4    MR. HERBACH.  ADOBE'S LIVECYCLE RIGHTS MANAGEMENT SOLUTION HAS

5    BEEN IN THE MARKET SINCE THE BEGINNING OF 2005?

6    **A.**   YES.

7    **Q.**   AND THE LIVECYCLE PRODUCT CAN TRACK DOCUMENTS BY

8    CONFIGURING IT TO KEEP INFORMATION ABOUT WHICH DOCUMENTS ARE

9    OPEN.

10   **A.**   YES.

11   **Q.**   AND IN LIVECYCLE RIGHTS MANAGEMENT TO PREVENT INFORMATION

12   FROM SPREADING BEYOND YOUR REACH, YOU CAN ALSO MONITOR AND

13   CONTROL HOW RECIPIENTS USE YOUR DOCUMENTS AFTER YOU DISTRIBUTE

14   THEM.

15   **A.**   AS A PART OF THE PRODUCT WE HAVE WHAT WE CALL "AUDIT

16   CAPABILITIES," WHICH ALLOW AN AUTHOR TO DETERMINE WHEN AND

17   WHERE DOCUMENTS ARE OPENED.

18            **MR. ELLWANGER:**  MS. MASON, IF YOU CAN PULL UP EXHIBIT

19   52, WHICH HAS BEEN ADMITTED?

20        SPECIFICALLY, 52.001.

21                      (PUBLISHED ON SCREEN.)

22   **BY MR. ELLWANGER**

23   **Q.**   DO YOU SEE AT THE BOTTOM OF THIS DOCUMENT, MR. HERBACH,

24   THE VERY LAST PARAGRAPH, THAT IN LIVECYCLE RIGHTS MANAGEMENT

25   YOU CAN MONITOR POLICY PROTECTED DOCUMENTS AND TRACK EVENTS,

HERBACH – DIRECT / ELLWANGER

1    SUCH AS WHEN AN UNAUTHORIZED OR AUTHORIZED USER ATTEMPTS TO

2    OPEN THE DOCUMENT.  DO YOU SEE THAT LANGUAGE?

3    **A.**  I SEE THE HIGHLIGHTED LANGUAGE, YES.

4    **Q.**  AND THAT IS ONE OF THE CAPABILITIES OF LIVECYCLE RIGHTS

5    MANAGEMENT ES2?

6    **A.**  YES, IT IS POSSIBLE TO CONFIGURE THE SYSTEM THAT WAY.

7    **Q.**  IN FACT, ADOBE SAYS YOU CAN.

8    **A.**  YES, BECAUSE IT IS POSSIBLE.

9    **Q.**  NOW, ADOBE USES LIVECYCLE RIGHTS MANAGEMENT AS A COMPANY,

10   DOESN'T IT?

11   **A.**  YES.

12   **Q.**  ACROBAT PRO?

13   **A.**  ADOBE USES ACROBAT PRO AND ADOBE READER.

14   **Q.**  AND ADOBE FLASH?

15   **A.**  AT TIMES WE HAVE USED ADOBE FLASH.

16   **Q.**  IN FACT, ADOBE EVEN OFFERS A PLAN WHERE ITS EMPLOYEES CAN

17   BUY ITS OWN PRODUCTS AT A DISCOUNT?

18   **A.**  YES.

19   **Q.**  YOU KNOW OF CUSTOMERS THAT TRACK DOCUMENTS USING

20   LIVECYCLE, RIGHT?

21   **A.**  WELL, AS I MENTIONED, THE TRACKING CAPABILITIES

22   HIGHLIGHTED HERE ARE POSSIBLE WITH THE PRODUCT.  IT IS

23   DEPENDING UPON HOW YOU CONFIGURE THE PRODUCT WHETHER YOU

24   CHOOSE AS A CUSTOMER TO CHOOSE TO TRACK INDIVIDUAL DOCUMENTS.

25   **Q.**  MR. HERBACH, I'M GOING TO ASK YOU THAT QUESTION ONE MORE

1    TIME.  YOU KNOW OF CUSTOMERS THAT TRACK DOCUMENTS USING

2    LIVECYCLE, CORRECT?

3    **A.**  IT IS POSSIBLE WITH THE PRODUCT.  I DON'T HAVE SPECIFIC

4    KNOWLEDGE ABOUT HOW INDIVIDUAL CUSTOMERS CHOOSE TO CONFIGURE

5    THE SOLUTION.  THERE ARE MANY DIFFERENT ASPECTS OF THE

6    SOLUTION THEY COULD CHOOSE TO ENABLE OR NOT, DEPENDING ON

7    THEIR BUSINESS NEEDS.

8            **MR. ELLWANGER:**  OBJECTION, NONRESPONSIVE.

9            **THE COURT:**  I DON'T THINK SO.  I THINK HE IS SAYING

10   HE DOESN'T KNOW FOR SURE WHAT THEY DO.  I GUESS YOU CAN

11   EXPLORE THAT FURTHER.  ASK IF HE HAS GONE TO A CUSTOMER'S

12   FACILITY AND SEEN IT, IF IT'S THAT IMPORTANT.

13           **MR. ELLWANGER:**  ABSOLUTELY.  ABSOLUTELY.

14   **BY MR. ELLWANGER**

15   **Q.**  WELL, LET'S TALK ABOUT THAT, MR. HERBACH.  YOU PREVIOUSLY

16   TESTIFIED THAT YOU KNOW OF ONLY ONE OR TWO CUSTOMERS WHO HAVE

17   BEEN PUBLIC REFERENCES WHO DO NOT USE TRACKING; IS THAT

18   CORRECT?

19   **A.**  YES.  I WOULD LIKE TO SEE THE CONTEXT OF THAT, IF THAT'S

20   POSSIBLE.

21   **Q.**  I CAN DRAW YOUR ATTENTION TO PAGE 48, LINES 2 THROUGH 12

22   OF YOUR DEPOSITION.  IT'S LISTED AS PAGE 12 OF THE DOCUMENT

23   YOU HAVE IN FRONT OF YOU.  IT SHOULD BE THE LAST TAB,

24   MR. HERBACH.

25   **A.**  SO I'M AT THE LAST TAB AND I'M LOOKING AT --

1    **Q.**  YOUR DEPOSITION TRANSCRIPT, SIR?

2    **A.**  YES.

3    **Q.**  YOU SEE HOW THERE IS FOUR PAGES ON EACH PAGE?

4    **A.**  YES.

5    **Q.**  THEY HAVE NUMBERS?

6    **A.**  YES.

7    **Q.**  GO TO PAGE 48, LINES 2 THROUGH 12.  AND PLEASE REVIEW THAT

8    TESTIMONY, AND TELL ME WHEN YOU HAVE READ IT.

9    **A.**  SURE.

10   **Q.**  IS YOUR MEMORY REFRESHED?

11   **A.**  YES.  THANK YOU.

12   **Q.**  MR. HERBACH, AGAIN, YOU'VE PREVIOUSLY TESTIFIED THAT YOU

13   KNOW OF ONLY ONE OR TWO CUSTOMERS WHO HAVE BEEN PUBLIC

14   REFERENCES WHO DO NOT USE TRACKING.

15   **A.**  YES.  I REFERRED TO TWO CUSTOMERS.  ONE OR TWO CUSTOMERS

16   THAT ARE PUBLIC REFERENCES WHO I BELIEVE DON'T USE TRACKING.

17   **Q.**  OKAY.  AND YOU ARE FAMILIAR WITH RIGHTS MANAGEMENT ES?

18   **A.**  YES.

19   **Q.**  AND THAT'S THE LOGIN PORTION OF A POLICY-PROTECTED

20   DOCUMENT?  OR LOGIN PORTION OF OPENING A POLICY-PROTECTED

21   DOCUMENT?

22   **A.**  CAN YOU REPEAT THAT?

23   **Q.**  SURE.  DOES RIGHTS MANAGEMENT ES DEAL WITH THE LOGIN

24   PORTION OF OPENING POLICY-PROTECTED DOCUMENTS?

25   **A.**  RIGHTS MANAGEMENT ES IS THE PRODUCT NAME THAT DESCRIBES

1    THE SOLUTION THAT ALLOWS YOU TO PROTECT DOCUMENTS.

2    **Q.**  OKAY.  AND YOU THINK THAT YOU COULD COME UP WITH TEN

3    CUSTOMERS THAT USE THAT LOGIN PORTION OF OPENING

4    POLICY-PROTECTED DOCUMENTS?

5    **A.**  WELL, AGAIN, I DON'T HAVE SPECIFIC KNOWLEDGE ABOUT WHAT

6    CUSTOMERS DO WHEN THEY DEPLOY THE SOLUTION.  THEY CAN USE

7    THAT.  THEY CAN ALSO USE THE AUDIT CAPABILITIES IN THE

8    PRODUCT.  BUT THEY ARE NOT OBLIGATED TO USE EITHER OF THOSE

9    FEATURES IN THE SOLUTION.

10   **Q.**  I UNDERSTAND THAT IS YOUR TESTIMONY NOW, BUT YOU'VE

11   PREVIOUSLY TESTIFIED YOU KNOW OF TEN CUSTOMERS, PERSONALLY,

12   WHO USE THIS POLICY-PROTECTED DOCUMENT FEATURE.

13   **A.**  OKAY.

14   **Q.**  IS THAT TRUE?

15   **A.**  WHAT YOU DREW ME TO WAS MENTIONING ONE OR TWO.  CAN YOU

16   GIVE ME SOME CONTEXT?

17   **Q.**  PLEASE TURN TO PAGE 61, LINE 11 OF YOUR DEPOSITION,

18   MR. HERBACH.

19   **A.**  OF COURSE.

20   **Q.**  AND IF YOU COULD, PLEASE, SIR, READ FROM LINE 11 OF

21   PAGE 61 TO LINE 9 OF PAGE 62, AND TELL ME WHEN YOU'VE HAD A

22   CHANCE TO REVIEW THAT TESTIMONY.

23                    (PAUSE IN THE PROCEEDINGS.)

24   **A.**  YEAH.

25   **Q.**  HAVE YOU HAD A CHANCE TO REVIEW THAT TESTIMONY?

1    **A.**  I THINK SO.

2    **Q.**  IS YOUR MEMORY REFRESHED?

3    **A.**  IT IS.  THANK YOU.

4    **Q.**  DO YOU THINK YOU COULD NAME TEN CUSTOMERS THAT USE THE

5    LOGIN PORTION OF OPENING POLICY-PROTECTED DOCUMENTS?

6    **A.**  I PROBABLY COULD.  YEAH.

7    **Q.**  OKAY.  NOW, YOU KNOW THAT NO SPECIAL SOFTWARE DEPLOYMENT

8    FOR READER IS REQUIRED BECAUSE HUNDREDS OF BILLIONS OF COPIES

9    HAVE ALREADY BEEN DOWNLOADED, RIGHT?

10   **A.**  RIGHT.  READER USERS CAN OPEN DOCUMENTS WITH NO

11   CONFIGURATION BECAUSE THE DOCUMENTS THEMSELVES CONTAIN THE

12   KNOWLEDGE ABOUT WHERE THE SERVER IS.  AND BASED ON ONCE THEY

13   KNOW THE SERVER, THEY CAN COMMUNICATE WITH THE SERVER TO OPEN

14   THE DOCUMENTS.

15   **Q.**  BECAUSE THEY HAVE BUILT-IN RIGHTS MANAGEMENT, RIGHT?

16   **A.**  THEY HAVE THE VIEWING CAPABILITIES BUILT IN, YES.

17   **Q.**  YOU KNOW THAT AT LEAST THE FILE FORMATS ACROBAT SEVEN OR

18   LATER AND READER SEVEN OR LATER ARE RELATED -- THEIR SUPPORT

19   IS RELATED TO THE LIVECYCLE SUITE, CORRECT?

20   **A.**  YES.  THEY ARE RELATED TO THE LIVECYCLE RIGHTS MANAGEMENT

21   SOLUTION.

22   **Q.**  AND SINCE VERSION SEVEN OF READER AND ACROBAT CAME OUT,

23   THEY HAVE INCLUDED RIGHTS MANAGEMENT CAPABILITIES.

24   **A.**  SINCE VERSION SEVEN OF -- SINCE READER VERSION SEVEN CAME

25   OUT, IT INCLUDED READING CAPABILITIES WITHIN IT FOR RIGHTS

1    MANAGEMENT.

2         THE ACROBAT SOLUTION ALSO CONTAINED READING CAPABILITIES

3    BUILT-IN AS PART OF THE SOLUTION.

4    **Q.**   WHICH INCLUDED RIGHTS MANAGEMENT?

5    **A.**   OPENING EXISTING RIGHTS MANAGEMENT DOCUMENTS THAT WERE

6    PROTECTED WITH EXISTING SERVERS THAT A CUSTOMER PURCHASED.

7    **Q.**   OKAY.  AND ADOBE SPECIFICALLY INSTRUCTS ITS USERS HOW TO

8    ACCESS LIVECYCLE RIGHTS MANAGEMENT FUNCTIONALITY FROM ACROBAT

9    PRO, RIGHT?

10   **A.**   CAN YOU REPEAT THAT ONCE MORE?

11   **Q.**   SURE.  ADOBE SPECIFICALLY INSTRUCTS ITS USERS HOW TO

12   ACCESS LIVECYCLE RIGHTS MANAGEMENT FUNCTIONALITY FROM ACROBAT

13   PRO.

14   **A.**   AS A PART OF ACROBAT PRO YOU MUST FIRST CONFIGURE ACROBAT

15   TO TALK TO A SPECIFIC LIVECYCLE RIGHTS MANAGEMENT SERVER.  BY

16   DEFAULT, IT IS NOT ON.  AND SO TO MAKE IT POSSIBLE WE INCLUDE

17   IN THE HELP AND WITHIN THE PRODUCT ITSELF INSTRUCTIONS ON:  IF

18   YOU KNOW THE NAME OF A SERVER AND IF YOU HAVE AN ACCOUNT THERE

19   WHERE TO TYPE THAT INFORMATION IN TO CONFIGURE IT.

20   **Q.**   OKAY.  MR. HERBACH, IN YOUR BINDER YOU HAVE A TAB MARKED

21   "182."  COULD YOU TAKE A LOOK AT 182 FOR A MOMENT?

22   **A.**   YEAH.

23   **Q.**   DO YOU RECOGNIZE EXHIBIT 182 AS COMING FROM ADOBE'S OWN

24   HELP PAGE ON THE WEB?

25   **A.**   YES.

1   **Q.**  IT'S ENTITLED "SECURING DOCUMENTS WITH ADOBE LIVECYCLE

2   RIGHTS MANAGEMENT ES"?

3   **A.**  YES.

4         **MR. ELLWANGER:**  YOUR HONOR, AT THIS POINT PLAINTIFFS

5   OFFER EXHIBIT 182.

6         **THE COURT:**  ANY OBJECTION TO 182?

7         **MR. REINES:**  NO.

8         **THE COURT:**  RECEIVED.

9      (PLAINTIFF'S EXHIBIT 182 WAS RECEIVED IN EVIDENCE.)

10  **BY MR. ELLWANGER**

11  **Q.**  SO, MR. HERBACH, YOU SEE HERE IN THE VERY FIRST PARAGRAPH

12  OF THIS DOCUMENT THAT ADOBE --

13        **MR. ELLWANGER:**  THE LAST SENTENCE, MS. MASON, IF YOU

14  CAN HIGHLIGHT THAT LAST SENTENCE.

15  **BY MR. ELLWANGER**

16  **Q.**  YOU SEE HERE THAT ADOBE SAYS THAT USERS CONNECT TO ADOBE

17  LIVECYCLE RIGHTS MANAGEMENT ES TO WORK WITH POLICIES, CORRECT?

18  **A.**  YES.

19        **MR. ELLWANGER:**  AND, MS. MASON, IF YOU CAN ACTUALLY

20  HIGHLIGHT THE SENTENCE BEFORE THAT.

21  **BY MR. ELLWANGER**

22  **Q.**  ADOBE INSTRUCTS USERS OF ACROBAT TEN PRO THAT POLICIES

23  PROVIDED BY ADOBE LIVECYCLE RIGHTS MANAGEMENT ES ARE STORED ON

24  THE SERVER AND CAN BE REFRESHED FROM THE SERVER.  DO YOU SEE

25  THAT?

1   **A.**  I DO SEE THAT.

2   **Q.**  AND YOU AGREE THAT THAT'S TRUE?

3   **A.**  YES.

4   **Q.**  OKAY.  AND, IN FACT, YOU WOULD AGREE, SIR, THAT HERE ON

5   THIS PAGE ADOBE'S SPECIFICALLY INSTRUCTING THEIR CUSTOMERS HOW

6   TO USE LIVECYCLE RIGHTS MANAGEMENT WITH ACROBAT PRO.

7   **A.**  THIS DOCUMENT, THE ENTIRE DOCUMENT HERE, AS YOU SAY, AND I

8   AGREE IT IS THE HELP WHICH EXPLAINS HOW IT IS POSSIBLE TO

9   CONNECT AND CONFIGURE THE SYSTEM.

10  **Q.**  AND BY CONNECTING AND CONFIGURING THE SYSTEM ADOBE IS

11  SPECIFICALLY INSTRUCTING PEOPLE TO GO TO THIS HELP PAGE HOW TO

12  SECURE DOCUMENTS WITH THE ADOBE LIVECYCLE RIGHTS MANAGEMENT

13  FOR ACROBAT PRO?

14  **A.**  I DON'T KNOW IF I SHOULD PARSE YOUR WORDS CAREFULLY, BUT

15  "INSTRUCTING" FEELS LIKE AN ASK TO CUSTOMERS, AND HELP IS A

16  SET OF INFORMATION WE PROVIDE TO CUSTOMERS THAT THEY CAN USE

17  WHEN THEY NEED HELP.

18  **Q.**  OKAY.  THIS IS ADOBE'S WEBSITE, RIGHT?

19  **A.**  ABSOLUTELY.

20  **Q.**  WRITTEN BY ADOBE EMPLOYEES?

21  **A.**  YES.

22  **Q.**  AND A HELP FILE IS FOR THE BENEFIT OF CONSUMERS?

23  **A.**  YES.

24  **Q.**  AND IF A CONSUMER HAS A QUESTION ABOUT HOW TO CONFIGURE

25  ADOBE LIVECYCLE -- OR HOW TO CONFIGURE ADOBE ACROBAT PRO USING

1   ADOBE LIVECYCLE RIGHTS MANAGER, THEY GO TO THIS WEB PAGE?

2   **A.**  THEY CAN, YES.

3   **Q.**  IF THEY GO TO THIS WEB PAGE, ADOBE GIVES THEM INSTRUCTIONS

4   ON HOW TO DO THAT?

5   **A.**  YES.

6   **Q.**  ADOBE INTENDS FOR CUSTOMERS TO RELY ON THIS INFORMATION,

7   RIGHT?

8   **A.**  ADOBE INTENDS FOR THIS INFORMATION TO BE ACCURATE, YES.

9   **Q.**  OR ELSE THEY WOULDN'T PUT IT ON THEIR OWN WEBSITE, RIGHT,

10  MR. HERBACH?

11  **A.**  WE PROVIDE HELP DOCUMENTATION FOR MANY OF OUR FEATURES TO

12  MAKE SURE THAT CUSTOMERS CAN UNDERSTAND HOW TO USE THE PRODUCT

13  WITHOUT CALLING US FOR HELP.

14  **Q.**  ABSOLUTELY.  AND SO YOU WOULDN'T PUT INCORRECT INFORMATION

15  ON YOUR HELP PAGE.

16  **A.**  LIKE ALL SOFTWARE, THERE MAY OCCASIONALLY BE TYPOGRAPHICAL

17  OR OTHER ERRORS, POTENTIALLY.  BUT THE INTENT IS TO MAKE IT

18  CLEAR AND CORRECT TO THE CUSTOMERS.

19  **Q.**  TO INSTRUCT THEM HOW TO DO SOMETHING ABOUT WHICH THEY HAVE

20  A QUESTION.

21  **A.**  TO HELP THEM UNDERSTAND HOW TO ACCOMPLISH WHAT THEY WANT

22  TO DO, YES.

23  **Q.**  YES?

24  **A.**  TO HELP THEM.  WE PROVIDE HELP TO HELP OUR USERS, YES.

25  **Q.**  BUT NOT INSTRUCTION?

1    **A.**  I GUESS I THINK OF "INSTRUCTION" IN THE CONTEXT OF A CLASS

2    OR A COURSE OR A PROFESSOR AT A COLLEGE, NOT A HELP GUIDE IN

3    SOFTWARE.

4    **Q.**  DOES ADOBE PROVIDE ANY CLASSES TO ITS CUSTOMERS ON HOW TO

5    USE ADOBE LIVECYCLE RIGHTS MANAGEMENT?

6    **A.**  I DON'T KNOW.

7    **Q.**  YOU ARE THE CORPORATE REPRESENTATIVE FOR ADOBE ON THE

8    LIVECYCLE RIGHTS MANAGEMENT, RIGHT?

9    **A.**  I AM.

10   **Q.**  IN FACT, YOU ARE THE HEAD OF THAT PRODUCT.

11   **A.**  YES.

12   **Q.**  MR. HERBACH, YOU KNOW THAT IN ADOBE ACROBAT STANDARD AND

13   ADOBE ACROBAT PRO THE CLIENT APPLICATION USES THE DOCUMENT KEY

14   TO ENCRYPT THE DOCUMENT, DISCARDS THE DOCUMENT KEY, AND EMBEDS

15   THE DOCUMENT LICENSE AND POLICY.  YOU DEGREE WITH THAT, RIGHT?

16   **A.**  I GOT A LITTLE LOST IN THE MIDDLE.  I AM SORRY.  CAN YOU

17   REPEAT THAT ONCE MORE?

18   **Q.**  SURE.

19        **MR. ELLWANGER:**  IN FACT, CAN WE PULL UP EXHIBIT 55

20   THAT IS IN EVIDENCE?

21   **BY MR. ELLWANGER**

22   **Q.**  IT'S IN YOUR BINDER MR. HERBACH.  SPECIFICALLY, I'M GOING

23   TO DIRECT YOUR ATTENTION TO PAGE 56 OF EXHIBIT 55.

24        **MR. ELLWANGER:**  AND, MS. MASON, IF YOU CAN PUT

25   PAGE 56 ON THE SCREEN.

1      ACTUALLY, LET'S BLOW UP THE LAST PARAGRAPH, MS. MASON.

2   PARAGRAPH THREE AT THE VERY BOTTOM.

3   **BY MR. ELLWANGER**

4   **Q.**  JUST TO RESET THINGS, MR. HERBACH, YOU UNDERSTAND YOU ARE

5   LOOKING AT ADOBE LIVECYCLE ES VERSION 8.0?

6   **A.**  OKAY.

7   **Q.**  RIGHT? IT'S A GUIDE FOR THAT PRODUCT?

8   **A.**  YES.

9   **Q.**  OKAY.  AND YOU WOULD AGREE WITH ME, SIR, THAT IN THE GUIDE

10  THAT ADOBE PUBLISHES THEY STATE THE CLIENT APPLICATION USES

11  THE DOCUMENT KEY TO ENCRYPT THE DOCUMENT, DISCARDS THE

12  DOCUMENT KEY AND EMBEDS THE DOCUMENT LICENSE AND POLICY.

13  CORRECT?

14  **A.**  WHEN THE DOCUMENT IS PROTECTED FOR OFFLINE USE, ALL OF

15  THAT INFORMATION CAN BE INCLUDED WITHIN THE DOCUMENT.  AND THE

16  DOCUMENT KEY IS, INDEED, DISCARDED.

17  **Q.**  SO THE ANSWER TO MY QUESTION IS:  "YES, THE DOCUMENT SAYS

18  THAT"?

19  **A.**  THE DOCUMENT SAYS WHAT YOU'VE HIGHLIGHTED.

20  **Q.**  OKAY.  ON THE NEXT PAGE, PAGE 57, TOWARDS THE BOTTOM, DO

21  YOU SEE WHERE THERE'S THE NUMBERED PARAGRAPH 2, BEGINNING WITH

22  THE RIGHTS MANAGEMENT SERVICE?

23  **A.**  YES.

24  **Q.**  AND YOU WOULD AGREE WITH ME, MR. HERBACH, THAT THE RIGHTS

25  MANAGEMENT SERVICE AUTHENTICATES THE USER, CHECKS THE POLICY

1    FOR AUTHORIZATION AND CREATES A VOUCHER, CORRECT?

2    **A.**  YES.

3    **Q.**  AND THAT THE VOUCHER CONTAINING THE DOCUMENT'S KEY AND

4    PERMISSIONS IS SENT BACK TO THE CLIENT APPLICATION.

5    **A.**  YES, WHEN THE USER IS ENTITLED TO OPEN THE DOCUMENT.

6    **Q.**  OKAY.  NOW, WERE IN THE COURTROOM WHEN DR. DEVANBU

7    TESTIFIED ABOUT THE RIGHTS MANAGEMENT TECHNOLOGY?

8    **A.**  NO.

9    **Q.**  OKAY.  BUT YOU WOULD AGREE, THOUGH, THAT IT CAN BE

10   CONFIGURED IN ADOBE FOR OFFLINE USE?

11   **A.**  THE PRODUCT CAN BE CONFIGURED FOR OFFLINE USE.  THIS

12   PARTICULAR PAGE IS TALKING ABOUT ONLINE USE.

13   **Q.**  ACTUALLY, LET'S TAKE THAT DOWN.  JUST GENERALLY, SIR, IT

14   CAN BE CONFIGURED FOR OFFLINE USE?

15   **A.**  YES.  THE PRODUCT ALLOWS DOCUMENTS TO BE TAKEN OFFLINE IF

16   THERE IS NOT A NETWORK CONNECTION AVAILABLE FOR A USER TO

17   COMMUNICATE WITH THE SERVER.

18   **Q.**  LIKE IN AN AIRPLANE?

19   **A.**  YES.

20   **Q.**  IF A DOCUMENT IS PROTECTED WITH RIGHTS MANAGEMENT

21   TECHNOLOGY AND IT IS ENABLED FOR OFFLINE USE, IT CONTAINS AN

22   OFFLINE KEY, DOESN'T IT?

23   **A.**  YES.

24   **Q.**  MR. HERBACH, IF YOU COULD, IN YOUR BINDER THERE IS A

25   DOCUMENT MARKED "PLAINTIFF'S 154."

1       CAN YOU TAKE A LOOK AT THAT, SIR?

2                    (PAUSE IN THE PROCEEDINGS.)

3                      (DISPLAYED ON SCREEN.)

4   **A.**  OKAY.  I HAVE IT.

5   **Q.**  DO YOU SEE IT?

6   **A.**  I DO.

7   **Q.**  MR. HERBACH, YOU RECOGNIZE THIS AS THE ADOBE LIVECYCLE

8   POLICY SERVER EXTENSION SOFTWARE LICENSE AGREEMENT, CORRECT?

9           **MR. REINES:**  OBJECTION, LACK OF FOUNDATION, YOUR

10  HONOR.

11          **THE COURT:**  OVERRULED.  HE WILL LAY THE FOUNDATION,

12  IF HE CAN.

13  **BY MR. ELLWANGER**

14  **Q.**  MR. HERBACH, AGAIN, YOU WERE THE PRODUCT --

15          **THE COURT:**  YOU ASKED HIM THE QUESTION.  LET HIM

16  ANSWER IT.

17          **THE WITNESS:**  YES.  THIS DOCUMENT IS DESCRIBED AS A

18  SOFTWARE LICENSE AGREEMENT FOR THE LIVECYCLE POLICY SERVER

19  EXTENSION SOFTWARE.

20  **BY MR. ELLWANGER**

21  **Q.**  AND THAT IS THE DIVISION YOU ARE THE PRODUCT MANAGER FOR?

22  **A.**  IT'S ONE OF THE COMPONENTS IN THE LIVECYCLE SOLUTION THAT

23  I WAS THE PRODUCT MANAGER FOR.

24          **MR. ELLWANGER:**  YOUR HONOR, PLAINTIFFS OFFER 154.

25          **THE COURT:**  I WASN'T TOTALLY CLEAR.  ARE YOU JUST

1    READING WHAT IT SAYS, OR CAN YOU IDENTIFY THIS AS BEING, IN

2    TRUTH, WHAT IT SAYS IT IS?

3            **THE WITNESS:**  I TRUST THIS IS, IN FACT, THE

4    AGREEMENT.  I HAVEN'T CAREFULLY REVIEWED THE LICENSE

5    AGREEMENTS RECENTLY.

6            **MR. ELLWANGER:**  PERHAPS I CAN DRAW SOME MORE

7    FOUNDATION FOR HIM.

8            **THE COURT:**  OKAY.

9    **BY MR. ELLWANGER**

10   **Q.**  PLEASE LOOK AT THE FINAL PAGE OF EXHIBIT 154.

11   **A.**  YES.

12   **Q.**  DO YOU SEE THAT FILE EXTENSION THERE, SIR?

13   "LIVECYCLE_POLICYSERVER_EXT"?

14   **A.**  YES.

15   **Q.**  IN YOUR EXPERIENCE, SIR, IS THAT A COMMON FILE EXTENSION

16   FOR DOCUMENTS OF THIS TYPE WITHIN ADOBE?

17   **A.**  YES.

18   **Q.**  DO YOU HAVE ANY REASON TO DISAGREE THAT THIS IS A TRUE AND

19   CORRECT COPY OF THE SOFTWARE LICENSE AGREEMENT FOR ADOBE

20   LIVECYCLE POLICY SERVER?

21   **A.**  I TRUST THIS IS THE DOCUMENT.  I WILL NOTE THAT IN THE

22   FINAL LINE IT SUGGESTS THAT THIS DOCUMENT WAS CREATED IN

23   OCTOBER 2006.

24   **Q.**  OKAY.

25   **A.**  I WAS NOT THE PRODUCT MANAGER AT THAT TIME. I WAS AN

1    ENGINEER, AND SO I DON'T THINK I WOULD HAVE REVIEWED THIS

2    SPECIFIC DOCUMENT AT THAT POINT.

3    **Q.**  DO YOU RECOGNIZE, THOUGH, SIR, AT THE BOTTOM OF EACH PAGE

4    ON THE RIGHT CORNER THERE IS A DENOTATION MARKED "ADOBE.DR"?

5    **A.**  YES.

6    **Q.**  AND THEN, I WILL REPRESENT TO YOU THAT THIS IS A DOCUMENT

7    PRODUCED TO US BY ADOBE.

8    **A.**  ABSOLUTELY.

9            **MR. ELLWANGER:**  YOUR HONOR, PLAINTIFF'S OFFER 154.

10           **MR. REINES:**  YOUR HONOR, I DON'T KNOW HE HAS LAID THE

11   FOUNDATION.

12           **THE COURT:**  IT WILL BE RECEIVED.

13       (PLAINTIFF'S EXHIBIT 154 WAS RECEIVED IN EVIDENCE.)

14   **BY MR. ELLWANGER**

15   **Q.**  MR. HERBACH, I WANT TO DRAW YOUR ATTENTION TO THE FIRST

16   PARAGRAPH OF EXHIBIT 154.  AND DO YOU SEE THERE IN THE CENTER

17   OF THAT AGREEMENT BY CLICKING TO ACKNOWLEDGE YOUR AGREEMENT?

18           **MR. ELLWANGER:**  AND, MS. MASON, IF YOU COULD

19   HIGHLIGHT THAT SENTENCE.

20   **BY MR. ELLWANGER**

21   **Q.**  DO YOU SEE WHERE WE ARE AT, MR. HERBACH?

22   **A.**  I DO.

23   **Q.**  AND YOU WOULD AGREE WITH ME THIS IS WHAT IS COMMONLY

24   CALLED A "CLICK-THROUGH AGREEMENT"?

25           **MR. REINES:**  YOUR HONOR, IT CAME FROM OUR FILES.  IF

1    IT'S IN EVIDENCE, THAT'S OKAY.  BUT ASKING HIM ABOUT THE

2    SPECIFIC CLICK-THROUGH FILES, HE IS NOT A LICENSING GUY.  HE

3    WAS AN ENGINEER --

4         **MR. ELLWANGER:**  YOUR HONOR, HE WAS THE PROPERTY

5    MANAGER FOR THIS DIVISION.

6         **THE COURT:**  SURE.  BUT HE ISN'T THE LAWYER WHO WRITES

7    THE LICENSE DOCUMENTS.  I DON'T KNOW WHERE YOU ARE TRYING TO

8    GO WITH THIS.

9         **MR. ELLWANGER:**  I WILL --

10        **THE COURT:**  YES.  I THINK WE CAN ALL AGREE THAT IS

11   PROBABLY WHAT THIS IS.  BUT WE ARE NOT GOING TO GO VERY FAR

12   INTO LEGAL ANALYSIS OR LICENSING TERMS ANALYSIS FROM SOMEONE

13   WHO IS IN CHARGE OF THE TECHNOLOGY.

14        **MR. ELLWANGER:**  YES, YOUR HONOR.

15   **BY MR. ELLWANGER**

16   **Q.**  I WANT TO DRAW YOUR ATTENTION TO THE FINAL PARAGRAPH ON

17   THAT FIRST PAGE, PARAGRAPH 4.2.

18        **MR. ELLWANGER:**  AND IF YOU CAN BLOW THAT UP,

19   MS. MASON.

20   **BY MR. ELLWANGER**

21   **Q.**  NOW, YOU WOULD AGREE WITH ME, SIR, AS A TECHNOLOGIST THAT

22   IT IS IMPORTANT FOR YOUR CUSTOMERS TO NOT MODIFY ADOBE

23   LIVECYCLE'S SOLUTION.

24   **A.**  THE CORE SOFTWARE ITSELF IS NOT INTENDED TO BE MODIFIED.

25   AND I BELIEVE THAT IS WHAT THIS LEGAL AGREEMENT IS INTENDED TO

1    PROTECT.

2    **Q.**  IN FACT, THAT LEGAL AGREEMENT SAYS THAT A CUSTOMER MAY NOT

3    MODIFY ADOBE LIVECYCLE POLICY SERVER; IS THAT CORRECT?  THAT

4    IS WHAT IT SAYS?

5    **A.**  THAT'S WHAT THE WORDS SAY:

6        "YOU MAY NOT MODIFY, ADAPT OR TRANSLATE THE SOFTWARE."

7            **MR. ELLWANGER:**  AND IF YOU COULD, THE PARAGRAPH ABOVE

8    THAT, MS. MASON, PARAGRAPH THREE.

9    **BY MR. ELLWANGER**

10   **Q.**  THAT DEALS WITH INTELLECTUAL PROPERTY RIGHTS, CORRECT,

11   MR. HERBACH?

12           **MR. REINES:**  YOUR HONOR, I MEAN, WE ARE GETTING FAR

13   AFIELD HERE.

14           **THE COURT:**  WE ARE.

15           **MR. ELLWANGER:**  LAST QUESTION, YOUR HONOR.

16           **THE COURT:**  ALL RIGHT.

17   **BY MR. ELLWANGER**

18   **Q.**  MR. HERBACH, INTELLECTUAL PROPERTY RIGHTS ARE IMPORTANT TO

19   ADOBE SOFTWARE, ARE THEY NOT?

20   **A.**  YES.

21           **MR. ELLWANGER:**  PASS THE WITNESS.

22                    **CROSS-EXAMINATION**

23   **BY MR. REINES**

24   **Q.**  MR. HERBACH, YOU TESTIFIED ON DIRECT EXAM THAT YOU STARTED

25   WITH ADOBE I THINK IT WAS 11 YEARS AGO AS A FULL-TIME

1    EMPLOYEE.  CAN YOU DESCRIBE WHEN YOU FIRST STARTED WORKING FOR

2    ADOBE, PLEASE?

3    **A.**  SURE.  WHEN I WAS IN HIGH SCHOOL A FRIEND OF MINE

4    INTRODUCED ME TO AN ENGINEER AT ADOBE.  AND AFTER MY -- AS I

5    WAS WRAPPING UP MY FRESHMAN YEAR IN COLLEGE I WAS LOOKING FOR

6    AN INTERNSHIP AND SPOKE TO HIM, AND SECURED AN INTERNSHIP FOR

7    MY FRESHMAN AND SUCCESSIVELY MY SOPHOMORE SUMMER IN COLLEGE.

8    **Q.**  AND WHEN DID YOU START AT ADOBE FULL TIME?  IS THAT

9    IMMEDIATELY AFTER COLLEGE?

10   **A.**  YEAH, IMMEDIATELY -- ABOUT A MONTH OR SO AFTER I GRADUATED

11   WITH A COMPUTER SCIENCE DEGREE, I STARTED FULL TIME IN THE

12   SAME GROUP.  IT WAS CALLED "THE ADVANCED TECHNOLOGY GROUP."

13       IT WAS THE RESEARCH LAB WITHIN ADOBE.  THE MAJORITY OF THE

14   EMPLOYEES WERE PH.D.'S.  IN SOME WAYS IT WAS ACTUALLY LIKE

15   XEROX PARC.  IN FACT, THE MAJORITY OF THE PH.D.'S WERE ALUMNI

16   FROM XEROX PARC.

17       AND THE FOCUS OF THE GROUP AND MY WORK WAS TO RESEARCH AND

18   BUILD TECHNOLOGIES THAT WOULD BE CRITICAL FOR THE FUTURE OF

19   ADOBE.

20            **THE COURT:**  YOU ARE SAYING "XEROX PARC"?

21            **THE WITNESS:**  XEROX PARC, P-A-R-C.

22            **MR. REINES:**  DID YOUR HONOR HAVE A QUESTION ABOUT

23   THAT?

24            **THE COURT:**  I DON'T KNOW WHAT IT IS, BUT MAYBE IT

25   DOESN'T MATTER.

1    **MR. REINES:**  WHY DON'T WE STEP BACK AT LEAST TO

2    ANSWER THAT QUESTION.

3    **BY MR. REINES**

4    **Q.**  CAN YOU DESCRIBE WHAT XEROX PARC IS AND, THEREFORE, WHAT

5    THE MODEL WAS FOR THE ADOBE RESEARCH GROUP THAT YOU STARTED IN

6    WHEN YOU LEFT COLLEGE?

7    **A.**  SO THE MODEL WAS SIMILAR TO BUILD TECHNOLOGIES THAT WOULD

8    BE POTENTIALLY INTERESTING AND CRITICAL TO ADOBE'S FUTURE.

9    XEROX, BEFORE I WAS BORN, STARTED A LAB IN –– NEAR PALO ALTO

10   CALLED THE PALO ALTO RESEARCH CENTER, P-A-R-C.

11       IN THIS LAB MANY NOW COMMONPLACE TECHNOLOGIES LIKE THE

12   MOUSE, THE MOUSE THAT YOU USE ON THE COMPUTER, THE GRAPHICAL

13   USER INTERFACE THAT WE ARE USED TO IN USING WINDOWS OR MAC,

14   OS.  AND, IN FACT, THE LASER PRINTER TECHNOLOGIES ALSO CAME

15   FROM WITHIN ALL THAT WORK.  I BELIEVE ETHERNET, THE NETWORKING

16   TECHNOLOGY THAT IS USED BETWEEN COMPUTERS AND THE INTERNET WAS

17   DEVELOPED THERE.

18       NOW, SOME OF THESE TECHNOLOGIES WERE CERTAINLY RELATED TO

19   WHAT XEROX WAS DOING AT THE TIME.  SOME OF THE TECHNOLOGIES

20   WERE SPECULATIVE.  AND THAT SAME MODEL APPLIED TO WHAT WE WERE

21   TRYING TO BUILD WITHIN THE ADVANCED TECHNOLOGY GROUP, ATG,

22   WITHIN ADOBE.

23   **Q.**  JUST TO MIND MY P'S AND Q'S, WHY DON'T YOU DESCRIBE WHERE

24   YOU WENT TO COLLEGE AND WHAT DEGREE YOU GOT, FOR THE RECORD?

25   **A.**  SURE.  I HAVE A BACHELOR'S IN COMPUTER SCIENCE FROM

1    PRINCETON.

2    **Q.**  ALL RIGHT.  WHEN YOU STARTED AT THE ADVANCED TECHNOLOGY

3    GROUP THAT WAS IN WHAT YEAR?

4    **A.**  IT WAS IN THE SUMMER OF 2001.

5    **Q.**  AND JUST IN TERMS OF FILLING OUT YOUR EDUCATIONAL

6    BACKGROUND, AT SOME POINT IN TIME DID YOU GET AN ADDITIONAL

7    DEGREE?

8    **A.**  I DID.  AS I SAID, THE MAJORITY OF MY PEERS WERE PH.D.'S,

9    AND MY MANAGERS ENCOURAGED ME TO CONTINUE MY EDUCATION.  IN

10   FACT, ADOBE PAID FOR ME PART-TIME TO GO TO STANFORD TO GET A

11   MASTER'S IN COMPUTER SCIENCE WHILE I WAS WORKING FULL TIME

12   WITHIN THE RESEARCH LAB.

13   **Q.**  YOU RECEIVED THAT MASTER'S?

14   **A.**  I DID, YES.

15   **Q.**  LET'S GET RIGHT TO THE LIVECYCLE PRODUCT, WHICH HAS BEEN

16   ACCUSED OF INFRINGEMENT HERE.  WHAT WAS YOUR INVOLVEMENT WITH

17   LIVECYCLE AT THE EARLIEST POINT?

18   **A.**  AT ITS EARLIEST POINT, ONE OF THE TECHNOLOGIES THAT I AND

19   A FEW COLLEAGUES WERE RESEARCHING WERE HOW TO -- HOW TO SHARE

20   PROTECTED DOCUMENTS.  AND WE BEGAN TO BUILD A PROTOTYPE IN

21   2002, WHICH WAS FOCUSED ON HOW -- HOW LARGE ORGANIZATIONS,

22   COMPANIES, GOVERNMENTS COULD CONTROL DOCUMENTS AND INFORMATION

23   BY POLICY.  MAKING SURE THAT THE RIGHT PEOPLE COULD

24   CONCEPTUALLY OPEN THE RIGHT DOCUMENTS AT THE RIGHT POINT IN

25   TIME.

HERBACH – CROSS / REINES

1    AND IT'S THAT TECHNOLOGY THAT WE BUILT OUT AS A PROTOTYPE

2  THAT BECAME THE BASIS FOR WHAT WAS LATER PRODUCTIZED AND KNOWN

3  AS "LIVECYCLE RIGHTS MANAGEMENT," AND/OR "LIVECYCLE POLICY

4  SERVER" AT SOME DIFFERENT POINTS IN TIME.

5  **Q.**  WHO WERE THE TWO COLLEAGUES?  OR I DON'T KNOW IF IT WAS

6  TWO, THREE.  WHATEVER THE NUMBER.

7  **A.**  THE PRIMARY COLLEAGUES AT THAT POINT WERE BILL SHAPIRO AND

8  JIM DONAHUE.

9  **Q.**  AT SOME POINT DID YOU -- CAN YOU DESCRIBE HOW THAT SHIFTED

10  FROM BEING AN R AND D PROJECT IN A THINK TANK TO AN ACTUAL

11  PRODUCTIZATION?

12  **A.**  YEAH.  SO BETWEEN 2002 AND 2003, WE WENT THROUGH SEVERAL

13  DESIGNS OF HOW THE PRODUCT WOULD WORK AND BUILT OUT BY LATE

14  SUMMER, 2003, A COMPLETE WORKING PROTOTYPE THAT ALLOWED

15  DOCUMENTS TO BE PROTECTED BY POLICIES AND SHARED AMONGST --

16  AMONGST INDIVIDUALS.

17    AND BILL AND JIM AND I SPENT TIME WITH OUR MANAGERS AND

18  WITH THE MANAGEMENT OF ADOBE AND CONVINCED THEM THAT THIS WAS

19  A BUSINESS OPPORTUNITY WORTH INVESTING IN.

20    AND SO IN THE FALL OF 2003, WE MOVED OUT OF THE RESEARCH

21  LAB, OUT OF ATG, INTO A PRODUCT GROUP, AND STARTED TO HIRE A

22  TEAM TO TAKE THE WORKING PROTOTYPE AND ACTUALLY TURN IT INTO

23  SOMETHING THAT WE COULD SELL AS A PRODUCT.

24  **Q.**  AND WHEN YOU MOVED INTO THE COMMERCIALIZATION, WHAT WAS

25  THE NAME OF THE PRODUCT?

1   **A.**   WELL, AT THAT POINT IN TIME WE REALLY DIDN'T HAVE A NAME.

2   THERE IS A CODE NAME FOR THE PROJECT.   BUT ONLY LATER ONCE

3   THE -- ONCE WE HIRED MORE PEOPLE AND STARTED TO GET THE

4   MARKETING TEAM INVOLVED, DID IT, IN EARLY TO MID 2004, BECOME

5   KNOWN OFFICIALLY AS "LIVECYCLE POLICY SERVER."

6   **Q.**   DURING YOUR INVOLVEMENT WITH LIVECYCLE, DID YOU OBTAIN

7   PATENTS ON THAT PRODUCT?

8   **A.**   MANY.   SO WE FILED OUR FIRST SET OF PATENTS ON HALLOWEEN

9   IN 2003, JUST AS WE WERE TRANSITIONING OVER TO THE

10   COMMERCIALIZATION TEAM.

11       AND SINCE THEN, HAVE OVER TEN PATENTS THAT HAVE ISSUED AND

12   PROBABLY ANOTHER FIVE TO TEN THAT ARE STILL PENDING

13   APPLICATION.

14   **Q.**   ARE PATENTS IMPORTANT TO YOU?

15   **A.**   THEY ARE NICE, BUT ULTIMATELY THEY ARE A BYPRODUCT AND

16   REFLECTION OF THE WORK THAT WE ARE DOING IN TERMS OF

17   DEVELOPING INNOVATIVE TECHNOLOGIES THAT WE CAN BRING TO MARKET

18   TO HELP OUR CUSTOMERS.

19   **Q.**   RIGHT NOW THE JURY HAS BEEN SITTING HERE WITH A TIME LINE

20   PREPARED BY DIGITAL REG'S LITIGATION TEAM WHICH HAS REFERENCE

21   TO SOME OF YOUR APPLICATIONS.   SO, WE'RE GOING TO MOVE INTO

22   THE PATENT PROCESS HERE A BIT FOR THAT REASON.

23           **MR. ELLWANGER:**   YOUR HONOR, JUST FOR POINT OF

24   CLARIFICATION, IS THIS GOING TO BE ANY DIFFERENT THAN WHAT WE

25   ATTEMPTED TO DO ON DIRECT?   AND, IF SO, PERHAPS IT CAN BE PART

1    OF THE STIPULATION.

2            **THE COURT:**  I DON'T KNOW.

3            **MR. ELLWANGER:**  WELL, WE ARE JUST GETTING INTO THE

4    SAME PATENTS THAT I ATTEMPTED TO TALK TO MR. HERBACH ABOUT ON

5    DIRECT EXAMINATION AND THE FILE HISTORIES AND TIME LINES.  SO

6    I WAS UNDER THE IMPRESSION WE WERE GOING TO CREATE A

7    STIPULATION BETWEEN THE PARTIES ON THIS TESTIMONY.

8            **THE COURT:**  WELL, I THOUGHT WHAT YOU WERE DOING WAS

9    POINTING OUT THAT THE NAME "PATTERSON" WAS IN A LOT OF THESE

10   PATENTS.  AND I THOUGHT THAT THAT WAS AN INEFFICIENT WAY OF

11   POINTING THAT OUT.

12       IF THERE WAS SOMETHING MORE THAT YOU WERE PLANNING TO DO

13   WITH THAT AND HE DOES IT, THEN YOU CAN DO IT, TOO.

14           **MR. ELLWANGER:**  FAIR ENOUGH.

15   BY MR. REINES

16   Q.  I AM GOING TO BE ASKING ABOUT YOUR PATENTS, NOT OTHER

17   PEOPLE'S, OKAY?

18       NOW, THERE HAS BEEN ALLEGATIONS THAT YOU -- "YOU" BEING

19   ADOBE -- STOLE SOMETHING FROM DIGITAL REG.  AND YOUR

20   APPLICATIONS ARE UP THERE, SO, AGAIN, THAT IS WHY I'M GOING TO

21   GET INTO THE PATENT APPLICATION PROCESS OF YOURS.

22       DID YOU FILE YOUR OWN PATENT APPLICATIONS?

23   A.  NO.  WE TOOK THE IDEAS THAT WE FELT WERE PATENTABLE AND

24   TALKED TO OUR ATTORNEYS.  AND ONCE THEY AGREED THAT THEY WERE

25   POTENTIALLY INNOVATIVE WE WORKED WITH OUTSIDE COUNSEL TO DRAFT

1    THE LONG APPLICATIONS.  AND WE SPENT TIME TO MAKE SURE THAT

2    THE ENGLISH DESCRIPTION OF THE TECHNOLOGY WAS, IN FACT,

3    ACCURATE.  BUT THEN, THEY TOOK CARE OF THE FILING.

4    Q.  AFTER THE APPLICATION WAS FILED, DID YOU STAY INVOLVED

5    WITH THE PATENTS?

6    A.  NO.  THE ATTORNEYS AT THAT POINT HANDLED THE APPLICATION

7    FOR THE MANY YEARS IT TOOK FOR THEM TO ISSUE.

8    Q.  AND TO THE EXTENT THERE'S ACTIVITIES, REJECTIONS AND THOSE

9    KIND OF THINGS, IN THE PATENT OFFICE, IS THAT SOMETHING YOU

10   GET INVOLVED IN IN ANY SUBSTANTIVE WAY?

11   A.  NO.

12   Q.  I WOULD LIKE TO DIRECT YOU TO EXHIBIT 12, PLEASE.  THIS IS

13   IN -- I THINK THE -- EITHER -- I THINK BOTH BINDERS HAVE THIS

14   ONE BECAUSE OF THE SIGNIFICANCE.

15   A.  OKAY.

16   Q.  AND WOULD YOU JUST CONFIRM, IF YOU HAVE IT IN FRONT OF

17   YOU, THAT THIS EXHIBIT 12 IS ONE OF YOUR PATENTS THAT HAS

18   ISSUED?

19   A.  YEAH.

20   Q.  THANK YOU.

21        MR. REINES:  MAY WE -- OH, SORRY.

22     WE WOULD LIKE TO MOVE THIS PATENT INTO EVIDENCE AS AN

23   IMPORTANT PIECE IN THE PICTURE.

24        THE COURT:  I WILL TAKE THAT UNDER SUBMISSION.  YOU

25   CAN SHOW IT.  AND WHILE YOU ARE AT IT, YOU MIGHT AS WELL POINT

1    OUT THE REFERENCES TO PATTERSON ON IT.  IT WILL BE QUICKER.

2              **MR. REINES:**  I'M HAPPY TO DO THAT.

3        FIRST OF ALL, CAN WE HIGHLIGHT FOR EVERYBODY THE FILING

4    DATE?  AND EXPAND IT SO IT IS MORE LEGIBLE TO THE EYES?

5        I WAS USING "HIGHLIGHT" IN A GENERIC WAY THAT WAS

6    IMPRECISE.

7    **BY MR. REINES**

8    **Q.**  DO YOU SEE THERE THE ORIGINAL APPLICATION DATE FOR YOUR

9    '102 PATENT?

10   **A.**  THIS WAS -- THIS PARTICULAR PATENT WAS FILED IN 2010, BUT

11   I THINK IT SAYS ABOUT AN INCH BELOW THAT THIS WAS BASED UPON

12   DIVISION OF AN APPLICATION THAT WAS ORIGINALLY FILED IN AUGUST

13   OF 2004.

14   **Q.**  OKAY.  AND YOU RECALL, GENERALLY, THAT YOU FILED PATENT

15   APPLICATIONS IN AUGUST, 2004?

16   **A.**  YES.

17   **Q.**  AND WERE THOSE THE FIRST WAVE OF PATENTS THAT YOU FILED ON

18   LIVECYCLE?

19   **A.**  NO, I THINK THE FIRST WAIVE OF PATENTS ON LIVECYCLE WAS

20   FILED ON HALLOWEEN IN 2003.

21   **Q.**  LET'S LOOK AT THE REFERENCE TO "PATTERSON" ON THE FACE OF

22   THAT APPLICATION.  I SHOULD SAY "PATENT."

23             **MR. REINES:**  CAN WE PULL THAT UP, PLEASE?

24       IT'S ACTUALLY -- I SHOULD SAY THAT IT'S ON THE SECOND.

25   THERE IS A LOT OF REFERENCES.  THERE IS ONE.

1    **BY MR. REINES**

2    **Q.**   OKAY.  DO YOU SEE THAT THERE IS A REFERENCE TO

3    "PATTERSON"?

4    **A.**   I DO.  IT IS HIGHLIGHTED.  THERE IS A REFERENCE TO A

5    PATENT ENDING IN '670 BY PATTERSON.

6    **Q.**   WHY DON'T WE GO TO THE SECOND PAGE SO WE HAVE A SENSE OF

7    HOW MANY PATENTS WERE INVOLVED IN THIS?  AND DO YOU HAVE A

8    GENERAL SENSE OF HOW MANY PATENTS ARE ON THIS APPLICATION?

9    **A.**   YEAH --

10   **Q.**   APPLICATIONS OR --

11   **A.**   I DON'T HAVE THE FULL APPLICATION IN FRONT OF ME.  MAYBE A

12   HUNDRED LINES HERE?

13   **Q.**   AND DID YOU HAVE ANY UNDERSTANDING THAT THERE WAS ANY

14   OBLIGATION ON YOU AS AN ENGINEER AT ADOBE TO LOOK AT EVERY ONE

15   OF THESE PATENT APPLICATIONS OR PATENTS THAT HAVE BEEN CITED?

16   **A.**   NO.

17   **Q.**   DID YOU HAVE ANY UNDERSTANDING THAT THERE IS ANY

18   SUGGESTION THAT EVERY ONE OF THESE PATENTS WAS A POTENTIAL

19   INFRINGEMENT RISK FOR ANY ADOBE PRODUCTS WITH WHICH YOU WERE

20   WORKING THAT MAY BE RELATED TO THIS PATENT?

21   **A.**   NO.

22   **Q.**   HAVE YOU EVER HEARD -- LET ME ASK IT THIS WAY:  IN THE

23   COURSE OF YOUR DUTIES AT ADOBE, ARE YOU AWARE OF ANYBODY AT

24   ADOBE TREATING EVERY SINGLE CITATION OF PRIOR ART AS BEING

25   SOMETHING THAT IS A SUGGESTION OF INFRINGEMENT?

1    **A.**  NO.

2    **Q.**  AND TO THE EXTENT THERE IS ANY KIND OF ISSUE WITH ANY OF

3    THESE PATENTS OR PATENTS APPLICATIONS THAT WERE CITED AS PRIOR

4    ART, WHO WOULD BE RESPONSIBLE FOR SORTING THAT OUT?

5    **A.**  THE OUTSIDE COUNSEL OR THE PATENT ATTORNEYS THAT ARE

6    EMPLOYED BY ADOBE.

7    **Q.**  AND NOW THE -- IT'S MANIFEST, BUT THE '102 PATENT, DID

8    THAT ISSUE OVER THE PATTERSON PATENT THAT WAS CITED HERE?

9    **A.**  YES, IT DID.

10   **Q.**  ALL RIGHT.  LET'S LOOK AT EXHIBIT 10, PLEASE.

11         **THE COURT:**  WHY DON'T WE TAKE OUR BREAK?  IT IS

12   10:10.  WE WILL BREAK UNTIL 10:25.

13       (RECESS TAKEN AT 10:10 A.M.; RESUMED AT 10:25 A.M.)

14       (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

15         **THE CLERK:**  YOU MAY GO AHEAD AND BE SEATED.

16     REMAIN SEATED.  COME TO ORDER.  COURT IS BACK IN SESSION.

17         **THE COURT:**  GO AHEAD.

18   **BY MR. REINES**

19   **Q.**  I WOULD LIKE TO DIRECT YOUR ATTENTION TO EXHIBIT 10 FOR

20   IDENTIFICATION.

21   **A.**  OKAY.

22                    (DISPLAYED FOR JURY).

23   **Q.**  CAN YOU DESCRIBE WHAT THIS IS?

24   **A.**  YES.  THIS IS A PATENT ENDING IN '642.  IT IS ONE OF MY

25   PATENTS.  AND I BELIEVE IT IS THE ONE REFERRED TO EARLIER THAT

1    WAS FILED IN AUGUST OF 2004.

2    **Q.**  SO THE TECHNOLOGY DESCRIBED IN THIS APPLICATION, YOU'RE

3    SAYING THAT'S FROM WHAT DATE?

4    **A.**  THIS IS THE LIVECYCLE TECHNOLOGY THAT WAS FILED ON

5    AUGUST 31, 2004.

6    **Q.**  AND WE SEE THIS IS THE '323 APPLICATION.  WHY DON'T WE

7    MOVE IT INTO EVIDENCE, YOUR HONOR.

8        YOUR HONOR, WE WOULD LIKE TO MOVE EXHIBIT 10 INTO

9    EVIDENCE, PLEASE.

10            **MR. ELLWANGER:**  NO OBJECTION.

11            **THE COURT:**  RECEIVED.

12            **THE CLERK:**  IS THIS --

13            **THE COURT:**  THIS IS A PATENT?

14            **MR. REINES:**  THIS IS A PATENT THAT'S THE BASIS FOR

15    THE ALLEGED THEFT.

16            **THE COURT:**  OKAY.  I'M NOT SURE WE WILL NEED THE

17    WHOLE PATENT, BUT WE WILL ADMIT SOMETHING.

18            **MR. REINES:**  OKAY.

19            **THE CLERK:**  SO ARE YOU TAKING IT UNDER SUBMISSION --

20            **THE COURT:**  YES.

21            **THE CLERK:**  -- LIKE YOU DID THE OTHERS?

22            **THE COURT:**  YES.

23            **MR. REINES:**  IF WE CAN PULL IT UP AND SHOW THE JURY

24    EVERYTHING, INCLUDING THE CITATION TO PATTERSON, PLEASE.

25                    (PUBLISHED TO JURY.)

1          SO WE SEE THAT THIS WAS A REFERENCE CITED TO PATTERSON.

2     AND CAN WE, JUST FOR FULSOMENESS, GO TO PAGE 2, MR. BONINI, SO

3     WE CAN SEE AGAIN THE NUMBER OF PATENT -- PATENTS AND PATENT

4     APPLICATIONS CITED HERE?

5     **BY MR. REINES**

6     **Q.**  WHAT ARE THE TOTAL NUMBER OF REFERENCES THAT WERE CITED IN

7     THE COURSE OF THIS PROSECUTION?

8     **A.**  PERHAPS 50 OR SO.

9     **Q.**  NOW, TURNING BACK TO THE TIME LINE, DIGITAL REG FEATURES A

10    REJECTION IN 2008 ON THIS APPLICATION, AS WHEN PAT PATTERSON

11    WAS CITED FIRST?  AND LET ME ASK YOU, PRIOR TO AUGUST 2008,

12    HAD YOU EVER HEARD OF PATTERSON OR THE PATENT THAT'S BEING

13    CITED ON THE COVER OF THIS SHEET?

14    **A.**  NO, I HAD NOT.

15    **Q.**  AND WE ALSO SEE LATER ON -- I BELIEVE IT'S IN THE 2010

16    TIME PERIOD -- YOUR OTHER PATENT WHICH WE JUST LOOKED AT,

17    EXHIBIT 12, ALSO HAS A CITATION.

18         DO YOU RECALL BEING INFORMED THAT THERE WAS A PATTERSON

19    AMONG THE 50 OR A HUNDRED REFERENCES THAT WERE BEING CITED IN

20    THE COURSE OF YOUR PROSECUTION WHEN YOU OBTAINED THE PATENT?

21    **A.**  NO.

22    **Q.**  OKAY.  NOW, WHY DON'T WE LOOK AT THE FIGURES?  AND WHAT I

23    WOULD LIKE TO DO -- YOU CAN, OF COURSE, LOOK THROUGH YOUR

24    PERSONAL COPY.  BUT WHY DON'T WE LEAF THROUGH THE FIGURES JUST

25    TO FAMILIARIZE YOURSELF AND REFRESH ON THE CONTENT OF THIS?

1          **MR. REINES:**  AND JUST SCROLL THROUGH THEM,

2    MR. BONINI, IF YOU WOULD, KINDLY, FROM FIGURE ONE ALL THE WAY

3    THROUGH TO 26.

4          WE CAN STOP THERE, FOR EXAMPLE.

5    **BY MR. REINES**

6    **Q.**  AND CAN YOU DESCRIBE WHAT THAT FIGURE IS, FOR THE RECORD,

7    IN TERMS -- THAT IS FIGURE 8; IS THAT CORRECT?

8    **A.**  SO FIGURE 8 IS A PICTURE DESCRIBING HOW LIVECYCLE

9    MANAGEMENT WORKS, ONE OF THE PATENTS WE HAVE APPLIED FOR AND

10   RECEIVED.

11   **Q.**  AND IN TERMS OF YOUR DESIGN FOR THE LIVECYCLE POLICY

12   SERVER, THAT WASN'T YOURS ALONE, RIGHT?  THERE WAS OTHERS

13   INVOLVED IN THAT, CORRECT?

14   **A.**  YES.

15   **Q.**  AND YOUR CO-INVENTORS, MR. DONAHUE AND MR. SHAPIRO, THOSE

16   ARE THE TWO INDIVIDUALS THAT CONCEIVED THESE IDEAS WITH YOU

17   BACK IN THE TECHNOLOGY GROUP AT THE THINK TANK; IS THAT

18   CORRECT?

19   **A.**  YES.  MR. DONAHUE AND MR. SHAPIRO WERE MY COLLEAGUES BACK

20   AT ATG, THE ADVANCED TECHNOLOGY GROUP.  THEY WERE MY

21   COLLEAGUES WHO HELPED DEVISE THE TECHNOLOGY PROTOTYPE THAT HAS

22   SINCE BECOME LIVECYCLE POLICY SERVER.

23   **Q.**  OKAY.  AND I KNOW YOU ARE DOING YOUR BEST, AS WE ARE ALL

24   TRYING TO DO, BUT IF WE CAN JUST BRING THE PACE DOWN FOR THE

25   COURT REPORTER WHO HAS REALLY BEEN WORKING HARD.

1    **A.**  ABSOLUTELY.

2    **Q.**  OKAY.  IN TERMS OF THE DESIGN FOR YOUR LIVECYCLE POLICY

3    SERVER, THE DRM COMPONENT OF IT, FROM THESE PATENTS AND THE

4    OTHER WORK YOU DID, DID YOU GET ANY OF THOSE IDEAS FROM ANYONE

5    OUTSIDE OF ADOBE?

6    **A.**  NO.

7    **Q.**  DID YOU GET THOSE IDEAS FROM ANYONE OTHER THAN THE THREE

8    IN YOUR WORKING GROUP AND MAYBE ADDITIONAL EMPLOYEES THAT

9    MIGHT HAVE SUPPORTED YOU?

10   **A.**  NO.  IT WAS OURS.

11   **Q.**  DID YOU EVER TALK TO ANYONE AT ADOBE VENTURES TO TRY TO

12   OBTAIN INFORMATION ABOUT WHAT OTHERS MIGHT HAVE BEEN DOING SO

13   YOU COULD USE THOSE?

14   **A.**  NO.

15   **Q.**  ARE YOU AWARE OF ANYONE AT ADOBE EVER ATTEMPTING TO GATHER

16   INFORMATION FROM SOURCES SUCH AS ADOBE VENTURES TO TRY AND

17   INCORPORATE IDEAS INTO THEIR PRODUCTS OR DESIGNS?

18   **A.**  NO.

19   **Q.**  AND YOU WERE FAMILIAR WITH ADOBE VENTURES, THOUGH, IN THIS

20   2004 TIME PERIOD WHEN YOU FILED ALL THESE PATENTS ON YOUR

21   LIVECYCLE?

22   **A.**  IN THE COURSE OF NORMAL EMPLOYEE AND BUSINESS, YES.

23   **Q.**  AND CAN YOU EXPLAIN -- YOU MENTIONED THAT YOU HAD A BIG

24   WAVE OF PATENT APPLICATIONS THAT WERE SUBMITTED ON HALLOWEEN

25   OF 2003.  AND THEN, THE FOLLOW ON APPLICATIONS THAT WERE

HERBACH – CROSS / REINES

1   CITED.  WHY WAS THERE A 2003 SET OF PATENTS, AND THEN A 2004

2   SET OF PATENTS THAT WERE FILED?

3   **A.**  THE 2003 SET OF PATENTS WERE THE CORE TECHNOLOGY

4   REFLECTING WHAT WE HAD INITIALLY BUILT WITHIN THE PROTOTYPE.

5   AND THAT, THAT CORE TECHNOLOGY WHICH HANDLES THE BASIC

6   MECHANISMS FOR ONLINE ACCESS, OFFLINE ACCESS AND OTHER KEY

7   ASPECTS OF THE PRODUCT HAVE REMAINED CONSISTENT IN HOW THE

8   PRODUCT WORKS UP THROUGH TODAY.

9       AS WE STARTED TO PRODUCTIZE, THIS, THOUGH, WE ADDED SOME

10  ADDITIONAL FEATURES AND CONCEPTS AND THINGS THAT WERE NOT

11  THERE WITHIN THE PROTOTYPE.  AND SO THERE WERE SUCCESSIVE

12  WAVES OF PATENT APPLICATIONS FOR THE THINGS THAT WE AMENDED.

13  **Q.**  AND LET'S TALK ABOUT ADOBE VENTURES A LITTLE BIT.  BECAUSE

14  OF THE ALLEGATIONS MADE IN THIS CASE I NEED TO COVER THIS.

15      IN 2004, WHAT WAS YOUR UNDERSTANDING BASED ON THE WORK

16  THAT YOU DID OF ADOBE VENTURES?

17  **A.**  IT WAS A SEPARATE ORGANIZATION WITH THE ADOBE BRAND THAT

18  WORKED WITH ADOBE'S MONEY TO INVEST IN TECHNOLOGY AND STARTUPS

19  THAT HAD THE POTENTIAL TO MAKE MONEY FOR ADOBE.

20  **Q.**  AND YOU'RE NOT AWARE OF ANY POINT OF ANY ENGINEERS THAT

21  GOT PRODUCT IDEAS FROM ADOBE VENTURES?  DO YOU KNOW ONE WAY OR

22  ANOTHER ON THAT POINT?

23  **A.**  I'M NOT AWARE OF ANY, AND I'M NOT SURE WHY ONE WOULD EVEN

24  CONSIDER THAT.

25  **Q.**  WHY DO YOU SAY THAT?

1   **A.**  I AND MY COLLEAGUES ARE PRETTY CONFIDENT IN TERMS OF OUR

2   ABILITY TO BUILD AND INNOVATE ON OUR OWN.

3   **Q.**  AND IN TERMS OF ADOBE VENTURES, ARE YOU AWARE IN TERMS OF

4   WHETHER, YOU KNOW, THAT'S BEEN A SUCCESSFUL ENTERPRISE?

5           **MR. ELLWANGER:**  OBJECTION.  BEYOND THE SCOPE.  THIS

6   WITNESS HAS ALREADY TESTIFIED TO HIS LIMITED KNOWLEDGE OF

7   ADOBE VENTURES.

8           **MR. REINES:**  YOUR HONOR, IF IT IS BEYOND THE SCOPE,

9   HE IS ALSO ON OUR WITNESS LIST.  IF IT IS LACK OF FOUNDATION I

10  THINK I LAID THE FOUNDATION ALREADY.

11          **THE COURT:**  WELL, MAYBE --

12          **MR. REINES:**  DO YOU WANT ME TO LAY MORE FOUNDATION?

13          **THE COURT:**  FOUNDATION ABOUT HOW WELL --

14          **MR. ELLWANGER:**  I ACTUALLY MEANT LACK OF FOUNDATION.

15          **MR. REINES:**  I WILL ADDRESS THE FOUNDATION.

16          **THE COURT:**  OKAY.

17          **MR. REINES:**  I WILL WITHDRAW THE QUESTION, AND

18  ADDRESS THE FOUNDATION.

19          **THE COURT:**  OKAY.

20  **BY MR. REINES**

21  **Q.**  OVER THE YEARS HAVE YOU HAD BUSINESS REASONS TO BE

22  GENERALLY FAMILIAR WITH ADOBE VENTURES?

23  **A.**  YES, IT'S -- YES.  LIKE MANY OTHER ASPECTS OF THE COMPANY

24  I NEED TO BE FAMILIAR OF HOW WE DO BUSINESS.

25  **Q.**  AND WITH RESPECT TO ADOBE VENTURES, ARE YOU AWARE OF,

HERBACH – CROSS / REINES

1    BASED ON THAT EXPERIENCE, OF SOME OF THE SUCCESSES THEY HAVE

2    HAD?

3    **A.** YES. I KNOW THEY INVESTED IN SHUTTERFLY, THE PHOTO

4    SHARING SITE, AS WELL AS NETSCAPE, WHO BUILT THE BROWSER.

5    **Q.** NOW, YOU SAID BEFORE THAT YOU DIDN'T THINK IT MADE ANY

6    SENSE FOR ADOBE ENGINEERS TO GET IDEAS FROM ADOBE VENTURES.

7    CAN YOU EXPAND ON THAT A LITTLE BIT?

8    **A.** YEAH. I THINK AS INDIVIDUAL ENGINEERS WE HAVE THE ABILITY

9    TO CREATE IDEAS ON OUR OWN. AND, CULTURALLY, WE'RE ENCOURAGED

10   TO CREATE OUR OWN IDEAS. SO I DON'T –– I DON'T WHY

11   INDIVIDUALS WOULD HAVE INTEREST IN TALKING TO ADOBE VENTURES

12   FOR THAT PURPOSE. AND I DON'T KNOW WHY ADOBE VENTURES WOULD

13   EVER WANT TO DO THAT, EITHER.

14   **Q.** WHY DO YOU SAY THAT?

15   **A.** WELL, THEY –– AS A SEPARATE COMPANY, THEY HAD THE

16   BUSINESS OBJECTIVE OF INVESTING IN COMPANIES. AND ENSURING

17   THAT THEY HAD THE ABILITY TO DO THAT SUCCESSFULLY ALSO RELIES

18   ON TRUST.

19   **Q.** ALL RIGHT. LET'S TALK SPECIFICALLY ABOUT DIGITAL REG

20   WHICH HAS MADE THESE ALLEGATIONS ABOUT YOUR DEVELOPMENT AND

21   THE RELATIONSHIP TO THEIR PATENT APPLICATION ADOBE VENTURES.

22   HAVE YOU EVER HEARD OF DIGITAL REG OF TEXAS?

23   **A.** NOT BEFORE THIS.

24   **Q.** ONE OF YOUR SPECIALTIES IS DRM; IS THAT CORRECT?

25   **A.** YES.

1    **Q.** AND HAVE YOU EVER HEARD OF DIGITAL CONTAINERS, ONE OF THE

2    FAMILY OF COMPANIES OF MR. FARLEY?

3    **A.** NO.

4    **Q.** HAVE YOU EVER HEARD OF PATRICK PATTERSON AT ALL OTHER THAN

5    SEEING HIM ON THESE COUPLE OF DOCUMENTS?

6    **A.** NO.

7    **Q.** HAVE YOU EVER HEARD OF THE '541 PATENT OUTSIDE OF HAVING

8    TO TAKE TIME OUT OF YOUR DAY, FOR WHICH WE ARE APPRECIATIVE?

9    **A.** NO.

10   **Q.** HAVE YOU EVER HEARD OF THE '670 PATENT WHICH WE HAVE ALL

11   BEEN HEARING ABOUT THIS WEEK?

12   **A.** NOT BEFORE THIS.

13   **Q.** HAVE YOU EVER READ EITHER OF THOSE DIGITAL REG PATENTS?

14   **A.** NO.

15   **Q.** AND BEFORE I MOVE OUT OF THIS CHAPTER, AND WE MOVE ON, LET

16   ME ASK YOU, I MEAN, WHAT -- WHAT IS YOUR RESPONSE TO THE

17   SUGGESTION THAT YOU AND COLLEAGUES AT ADOBE TOOK INFORMATION

18   THROUGH ADOBE VENTURES AND USED IT FOR YOUR LIVECYCLE PRODUCT?

19   **A.** I'M TOTALLY SURPRISED AND SPEECHLESS.

20   **Q.** I WOULD LIKE TO ASK YOU ABOUT THE ACTUAL PRODUCT.  AND

21   PROBABLY A TOPIC THAT'S MORE COMFORTABLE FOR YOU AND MORE

22   FRIENDLY.

23       WITH RESPECT TO LIVECYCLE, CAN YOU DESCRIBE WHAT LIVECYCLE

24   WITH RIGHTS MANAGEMENT IS IN TERMS OF A PLUG-IN?

25   **A.** SURE.  SO, THE LIVECYCLE SUITE OF PRODUCTS AND THE RIGHTS

HERBACH - CROSS / REINES

1    MANAGEMENT CAPABILITY WITHIN THAT HAS A PLUG-IN THAT'S A PART

2    OF ACROBAT AND A PART OF READER THAT, FOR EXAMPLE, ALLOWS

3    USERS TO OPEN DOCUMENTS IN THE EXISTING COPY OF THE FREE

4    READER.  AND THE SOFTWARE WILL THEN KNOW WHAT TO DO EVEN

5    THOUGH THE EXISTING BASE SOFTWARE THAT HANDLES RENDERING AND

6    IMAGES WITH A READER DOESN'T REALLY KNOW ANYTHING AT ALL

7    WITHOUT THIS PLUG-IN OF WHAT RIGHTS MANAGEMENT IS.

8    **Q.**  IS THERE A PLUG-IN FOR ADOBE LIVECYCLE WITH RIGHTS

9    MANAGEMENT IN THE ACROBAT PRO PRODUCT?

10   **A.**  YES.

11   **Q.**  IS THAT PLUG-IN ENABLED WHEN SOMEONE PURCHASES ACROBAT

12   PROFESSIONAL?

13   **A.**  NO.  IT'S -- IT'S DORMANT UNTIL A USER CONFIGURES IT IN

14   SOME FORM WITH AN EXISTING SERVER AND WITH AN ACCOUNT ON THAT

15   SERVER.

16   **Q.**  ARE THERE OTHER ASPECTS OF ACROBAT PRO THAT ARE DORMANT OR

17   NONFUNCTIONING WHEN PURCHASED ABSENT STEPS SUCH AS A

18   REGISTRATION OR A PAYMENT OR SOME OTHER PROCESS?

19   **A.**  YEAH, THERE ARE SEVERAL.  WOULD YOU LIKE AN EXAMPLE?

20   **Q.**  IF YOU HAVE ONE.

21   **A.**  YES.  SO, IN MY CURRENT BUSINESS BUILDING SOLUTIONS FOR

22   CONSUMERS WITH READER AND ACROBAT, ONE OF THE SERVICES THAT I

23   BUILD IS CALLED "SEND NOW."  IT'S A WAY FOR USERS TO SHARE

24   DOCUMENTS WITH OTHERS.

25       AND IT'S A SUBSCRIPTION SERVICE THAT A USER HAS TO HAVE

1   AND HAS TO TURN ON IN READER AND IN ACROBAT PRO.

2   **Q.**  NOW, CAN YOU DESCRIBE THE PROCESS IF SOMEONE BUYS ACROBAT

3   PROFESSIONAL AND THEY ARE ONE OF THE PEOPLE THAT HAS THE

4   DESIRE TO USE IT WITH LIVECYCLE, WHAT THEY HAVE TO DO IN ORDER

5   TO GET FROM HAVING THAT SOFTWARE TO ACTUALLY HAVING ANY CHANCE

6   AT ALL OF USING IT?

7   **A.**  FIRST THEY HAVE TO HAVE THE SERVER SOMEWHERE.  SO THEIR

8   ORGANIZATION HAS TO BE RUNNING A COPY OF LIVECYCLE RIGHTS

9   MANAGEMENT.  AND THEY HAVE TO HAVE AN ACCOUNT USER NAME AND A

10  PASSWORD ON THAT SERVER.

11      ONCE THEY HAVE THAT INFORMATION, THEY NEED TO GO INTO

12  ACROBAT AND CONFIGURE IT TO POINT THE CLIENT AT THAT SERVER

13  RUNNING OUT THERE SOMEWHERE AND TO LET THAT SERVER KNOW WHO

14  THEY ARE, SUCH THAT THE SERVER IS WILLING TO COMMUNICATE WITH

15  THEM AND ALLOW THEM TO PROTECT NEW DOCUMENTS WITH THE SYSTEM.

16  **Q.**  ALL RIGHT.  NOW, HOW MANY COPIES OF LIVECYCLE WITH RIGHTS

17  MANAGEMENT HAS ADOBE SOLD OVER, I GUESS, SINCE 2004?

18  **A.**  A FEW HUNDRED.

19  **Q.**  WHY ARE THERE SO FEW COPIES OF THIS SOFTWARE OVER A DECADE

20  PLUS SOLD BY ADOBE, WHICH IS OBVIOUSLY A VERY SUCCESSFUL

21  COMPANY?

22  **A.**  THE DOCUMENT PROTECTION FEATURES WITHIN LIVECYCLE RIGHTS

23  MANAGEMENT ARE ADVANCED TECHNOLOGY FOR SECURITY AND VERY FEW

24  ORGANIZATIONS HAVE THAT NEED FOR SUCH ADVANCED TECHNOLOGY FOR

25  PROTECTING DOCUMENTS.

1   **Q.**   CAN YOU GIVE AN EXAMPLE OF THE TYPE OF INSTITUTION WHICH

2   MIGHT BE INTERESTED IN THIS SPECIALIZED TECHNOLOGY?

3   **A.**   THE U.S. MILITARY, FOR EXAMPLE.

4   **Q.**   NOW, YOU TESTIFIED BEFORE THAT LIVECYCLE WITH RIGHTS

5   MANAGEMENT, THAT'S -- IS THAT ALL OF LIVECYCLE, OR ARE THERE

6   OTHER ASPECTS TO IT?

7   **A.**   THERE ARE MANY OTHER ASPECTS BEYOND RIGHTS MANAGEMENT.

8   THERE ARE 12 TO 14 OR SO DIFFERENT -- DIFFERENT MODULES THAT

9   ALL WORK WITH DOCUMENTS IN SOME FORM.

10        BUT RIGHTS MANAGEMENT IS THE ONE THAT IS FOCUSED ON

11   DOCUMENT PROTECTION ITSELF.

12   **Q.**   SO OF THE 12 OR 14 DIFFERENT MODULES, ONE OF THOSE IS

13   LIVECYCLE WITH RIGHTS MANAGEMENT; IS THAT CORRECT?

14   **A.**   YES.

15   **Q.**   OKAY.  NOW, CONTRASTING TO THAT SMALL DATABASE WITH

16   LIVECYCLE, LET ME ASK YOU ABOUT ADOBE ACROBAT PRO NOW.

17   **A.**   OKAY.

18   **Q.**   HOW MANY COPIES ARE THERE?  AND YOU CAN JUST GIVE A

19   GENERALIZED ESTIMATE OF ACROBAT PROFESSIONAL.

20   **A.**   TENS OF MILLIONS.

21   **Q.**   AND BASED ON YOUR EXPERIENCE, HOW MANY PEOPLE USING

22   ACROBAT PRO AT ADOBE WITH THEIR DOCUMENTS, YOU KNOW, LIKE ALL

23   OF US MIGHT USE IT WHEN WE RECEIVE A PDF OR WORKING WITH

24   ACROBAT PROFESSIONAL IN THAT CONTEXT, HOW MANY OF THEM WOULD

25   EVER TOUCH LIVECYCLE WITH RIGHTS MANAGEMENT, THE DRM?

HERBACH - CROSS / REINES

1    **A.**   THE NUMBER OF -- CAN YOU REPEAT THAT?

2    **Q.**   SURE.  WHAT ARE THE NUMBER OF USERS OF ADOBE PROFESSIONAL

3    THAT WOULD BE INTERACTING AT ALL WITH LIVECYCLE WITH RIGHTS

4    MANAGEMENT?

5    **A.**   THE NUMBER OF USERS WHO HAVE ADOBE ACROBAT PROFESSIONAL

6    WHO ARE INTERACTING IN SOME FORM WITH ADOBE LIVECYCLE RIGHTS

7    MANAGEMENT IS VERY SMALL.

8    **Q.**   AND WHY DO YOU SAY THAT?

9    **A.**   WELL, FOR A COUPLE OF REASONS.  THE NUMBER OF LIVECYCLE

10   RIGHTS MANAGEMENT CUSTOMERS IS SMALL IN THE FEW HUNDREDS.  THE

11   NUMBER OF EXISTING LIVECYCLE RIGHTS MANAGEMENT CUSTOMERS WHO

12   USE IT WITH ADOBE ACROBAT PROFESSIONAL ITSELF IS VERY SMALL.

13   SO THAT IS A VERY SMALL NUMBER OF A SMALL NUMBER.

14       BUT IF YOU THEN TAKE THAT VERY SMALL NUMBER OF A SMALL

15   NUMBER AND COMPARE THAT TO THE TENS OF MILLIONS OF COPIES OF

16   ADOBE ACROBAT PROFESSIONAL THAT WE HAVE SOLD, IT'S -- IT'S

17   SUPER TINY.

18   **Q.**   AND IN ORDER TO USE THE DIGITAL RIGHT MANAGEMENT METHODS

19   OF LIVECYCLE WITH RIGHTS MANAGEMENT, WOULD YOU -- AND LET'S

20   SAY YOU WERE AN ADOBE ACROBAT PROFESSIONAL USER.  IN ORDER TO

21   USE THE LIVECYCLE RIGHTS MANAGEMENT DRM SOLUTION AS A METHOD,

22   YOU WOULD HAVE TO BE ONE OF THAT SUPER TINY GROUP?

23   **A.**   RIGHT.  YOU WOULD HAVE TO BE IN THAT SUPER TINY GROUP AND

24   THEN GONE THROUGH THE STEPS TO CONFIGURE A PRODUCT TO TURN IT

25   ON.  GONE THROUGH THE STEPS TO CONFIGURE YOUR ACROBAT CLIENT

HERBACH – CROSS / REINES

1    TO TURN ON THE FEATURE TO TALK TO THE LIVECYCLE SERVER.

2    **Q.**   AND WHY WOULD YOUR AVERAGE ADOBE PROFESSIONAL USER NOT BE

3    ABLE TO USE THE DRM FOR LIVECYCLE?  THAT MIGHT BE, YOU KNOW,

4    THIS DORMANT CODE THAT MIGHT BE IN THE PRODUCT.  WHY IS THAT?

5    WHAT WOULD PREVENT THEM FROM DOING IT?

6    **A.**   THE -- TO BE BLUNT, AS STRAIGHTFORWARD AS THE HELP GUIDE

7    MIGHT BE TO DESCRIBE HOW TO TURN THE FEATURE ON, IT'S

8    SOMETHING YOU HAVE TO BE REALLY CAREFUL WHAT YOU TYPE IN.  AND

9    IF YOU TYPE IN THE WRONG THING, IT JUST WON'T WORK VERY WELL.

10   IT WON'T WORK, AND THE ERROR MESSAGE YOU GET WILL PROBABLY NOT

11   BE VERY HELPFUL IN HELPING YOU UNDERSTAND WHAT TO DO.

12   **Q.**   AND IN ORDER FOR AN AVERAGE ACROBAT PROFESSIONAL USER TO

13   USE THE LIVECYCLE WITH RIGHTS MANAGEMENT, WOULD THEY NEED TO

14   BE AWARE OF A LIVECYCLE SERVER AND HAVE ACCESS TO IT?

15   **A.**   ABSOLUTELY.

16   **Q.**   WHY IS THAT?

17   **A.**   WELL, BECAUSE, THE CLIENT HAS -- THE CLIENT DOESN'T --

18   CLIENT LIKE ACROBAT AND READER IN THE CONTEXT OF -- I AM

19   SORRY.

20       ACROBAT, THE SOFTWARE THAT YOU CAN USE TO PROTECT NEW

21   DOCUMENTS, DOESN'T HAVE WHAT I MIGHT TECHNICALLY CALL "OTHER

22   DISCOVERY."

23       IT HAS NO IDEA WHERE TO LOOK TO FIND A SERVER THAT MIGHT

24   BE NEARBY.  SO YOU HAVE TO MANUALLY GO AHEAD AND CONFIGURE IT

25   AND THEN ENTER YOUR ACCOUNT IN SOME FORM.

HERBACH – CROSS / REINES

1   **Q.**  DO YOU UNDERSTAND THAT DIGITAL REG IS ACCUSING OF

2   INFRINGEMENT EVERY COPY OF ACROBAT PROFESSIONAL DURING THE

3   RELEVANT TIME PERIOD, REGARDLESS OF WHETHER IT IS EVER USED

4   WITH LIVECYCLE OR HAS THE ABILITY TO BE USED WITH IT?

5   **A.**  YEAH.

6   **Q.**  LET'S TALK ABOUT THE PRODUCT OPERATION, WHICH IS PROBABLY

7   EVEN MORE COMFORTABLE FOR YOU.

8   **A.**  OKAY.

9   **Q.**  HOW MANY YEARS DID YOU WORK ON LIVECYCLE IN TERMS OF

10  EITHER DEVELOPING THE PRODUCT OR SUPPORTING IT?

11  **A.**  I STARTED IN 2002, 2003, IN THAT PROTOTYPE STAGE, AND

12  PRODUCTIZED IT AT THAT POINT AND WAS THE PRODUCT MANAGER LATER

13  THROUGH 2011.  SO, ABOUT NINE YEARS OR SO.

14  **Q.**  CAN YOU GIVE AN EXAMPLE OF A TYPICAL LIVECYCLE USER AND

15  MAYBE A LITTLE BIT MORE ABOUT HOW THEY WOULD USE IT?

16  **A.**  A LIVECYCLE USER, IN GENERAL, MIGHT BE AN INSURANCE

17  COMPANY.  AND SO THEY MIGHT BE INTERESTED IN AUTOMATING

18  PROCESSES AROUND INSURANCE APPLICATIONS AND ISSUING OF

19  INSURANCE POLICIES.

20      SO, FOR EXAMPLE, AN AGENT OUT IN THE FIELD WORKING WITH A

21  POTENTIAL CUSTOMER MIGHT COLLECT INFORMATION ON THEIR NAME,

22  THE MODEL OF THE CAR THAT THEY HAVE, OTHER INFORMATION THAT

23  WOULD GO INTO AN INSURANCE APPLICATION FOR A CAR.

24      ONCE THAT INFORMATION WAS COLLECTED, IT WOULD BE BROUGHT

25  BACK TO THE SERVER.  AND THE DOCUMENT WOULD BE PROCESSED, AND

1    IT MIGHT THEN HAVE TO BE SENT TO MULTIPLE PEOPLE TO VIEW.

2        FOR EXAMPLE, THE UNDERWRITING DEPARTMENT MIGHT HAVE TO

3    REVIEW THAT CONTENT AND FIGURE OUT IF THIS IS AN APPROPRIATE

4    CUSTOMER FOR THE INSURANCE COMPANY.

5        AND ONCE THEY ACTUALLY APPROVE THE DOCUMENT -- WELL,

6    APPROVE THE CUSTOMER FOR A NEW INSURANCE POLICY, THEN

7    LIVECYCLE COULD TAKE ALL OF THAT DATA ABOUT THE USER'S NAME,

8    THE NAME OF THE CAR, ALL THAT SORT OF STUFF, PACKAGE IT UP AND

9    AUTOMATICALLY CREATE A DOCUMENT.

10       AND THEN, SEND THAT, THAT DOCUMENT -- IN THIS CONTEXT IT

11   WOULD BE THE INSURANCE POLICY -- BACK OUT TO THE CUSTOMER.

12   Q.  ARE YOU FAMILIAR WITH THE SOURCE CODE OF THE LIVECYCLE

13   WITH RIGHTS MANAGEMENT?  I DON'T MEAN TO INSULT YOU, BUT IT IS

14   PART OF THE COURT PROCESS.

15   A.  OF COURSE.  YEAH, I WROTE MUCH OF IT IN PROTOTYPE FORM,

16   AND PRODUCT FORM IN 2003 AND BEYOND.

17   Q.  NOW, DID YOU TAKE TIME OUT OF YOUR WORK TO TALK TO

18   DR. WICKER SO THAT -- TO DISCUSS THE WORKINGS OF LIVECYCLE AS

19   IT RELATED TO THIS CASE?

20   A.  I DID.

21   Q.  CAN YOU DISCUSS -- WELL, LET ME ASK YOU THIS:  I WOULD

22   LIKE YOU TO DESCRIBE HOW LIVECYCLE WITH RIGHTS MANAGEMENT

23   WORKS.  THERE IS TWO CASES THAT THE PARTIES HAVE BEEN TALKING

24   ABOUT ONLINE, AND OFFLINE.  AND MAYBE FIRST YOU CAN GIVE US A

25   CONCISE TUTORIAL ON WHAT THE DIFFERENCE IS BETWEEN ONLINE AND

1    OFFLINE, JUST AT A GENERAL LEVEL.

2    **A.**   SURE.  SO FOR ONLINE ACCESS THE CONCEPT HERE IS WE WANT TO

3    PROTECT DOCUMENTS WITH A POLICY THAT WOULD BE CENTRALLY

4    CONTROLLED.

5        AND SO IF A DOCUMENT IS PROTECTED WITH ONLINE ACCESS, THE

6    CONCEPT IS THAT WHENEVER A USER OPENS THE DOCUMENT, NO MATTER

7    WHERE THEY ARE, THE CLIENT THAT THEY ARE USING, THAT SOFTWARE

8    WILL PHONE HOME TO THE SERVER TO TELL THE SERVER WHO THIS IS,

9    WHAT IS THE IDENTIFIER FOR THE DOCUMENT THAT THEY ARE ACTUALLY

10   TRYING TO OPEN.

11       AND THE SERVER AT THAT POINT WOULD DETERMINE, OH, YES.

12   THIS IS JONATHAN TRYING TO OPEN UP THIS PARTICULAR DOCUMENT.

13   AND HE IS ENTITLED TO OPEN IT.  AND SO THE SERVER WILL SEND

14   DOWN THE KEY TO DECRYPT THE -- TO ALLOW THE CLIENT TO DECRYPT

15   THE DOCUMENT FOR THAT USER.

16   **Q.**   OKAY.  AND SO THAT'S THE OFFLINE OR ONLINE?

17   **A.**   YEAH.  SO THAT IS THE ONLINE ACCESS WHEN YOU'RE ON THE

18   NETWORK AND YOU ARE ABLE TO COMMUNICATE IN REAL TIME WITH THE

19   SERVER, AND THEREFORE GET RIGHT AS OF RIGHT NOW, WHETHER I'M

20   AN EMPLOYEE AND ENTITLED, OR WHATEVER CIRCUMSTANCES MIGHT

21   DICTATE, WHETHER I'M ENTITLED TO OPEN THAT DOCUMENT RIGHT NOW

22   LIVE.

23   **Q.**   WHEN I WORK WITH DOCUMENTS SOMETIMES I THINK I'M ONLINE

24   AND I'M OFFLINE.  SO THAT I'M CONFUSED HERE NOW IS CONSISTENT

25   WITH THAT PRACTICE.

1    CAN YOU DESCRIBE NOW WHEN YOU ARE OFFLINE, SO YOU ARE NOT

2    ON THE INTERNET, HOW LIVECYCLE RIGHTS MANAGEMENT WORKS IN THAT

3    CONTEXT?

4    **A.**   SURE.   AND JUST BY WAY OF EXAMPLE, WHEN WE DESIGNED THIS

5    PRODUCT BACK IN THE PROTOTYPE FORM WE KNEW THERE WOULD BE

6    CIRCUMSTANCES WHERE IMPORTANT BUSINESS DOCUMENTS WOULD NEED TO

7    BE READ WHEN YOU DIDN'T HAVE A NETWORK CONNECTION.

8        IF YOU WERE TRAVELING ON AN AIRPLANE AND YOU HAD TO READ A

9    VERY SENSITIVE DOCUMENT THAT WAS CONTROLLED BY POLICY, WE

10   REALIZED WE HAD TO CREATE A MECHANISM THAT WE CALLED "OFFLINE

11   PROCESS," WHEREBY IF YOU ARE NOT ABLE, DUE TO CIRCUMSTANCES,

12   TO COMMUNICATE WITH THE SERVER, AND AFTER TRYING TO

13   COMMUNICATE WITH THE SERVER AND DETERMINING THAT YOU CAN'T,

14   THEN IT CAN ENTER WHAT WE CALL THE "OFFLINE MODE", WHERE THERE

15   IS ENOUGH KEY AND STUFF EMBEDDED WITHIN THE DOCUMENT THAT THE

16   SOFTWARE CAN MAKE A DETERMINATION THAT, OKAY, I CAN'T CONTACT

17   THE SERVER, BUT I HAVE ENOUGH STUFF HERE TO SAY, YEAH, I CAN

18   LET JONATHAN OPEN THIS DOCUMENT RIGHT NOW BECAUSE HE'S

19   ENTITLED.

20   **Q.**   THANK YOU.

21       I WOULD LIKE TO NOW CALL UP SOME -- SPECIFICALLY, THE

22   LIVECYCLE ES SERVICES PRODUCT DOCUMENTATION, WHICH IS MARKED

23   AS EXHIBIT 497.

24                   (DISPLAYED TO JURY.)

25

1    **Q.**  AND YOU CAN LOOK AT THAT IN THE BINDER.  AND ON PAGE -- DO

2    YOU RECOGNIZE THIS AS PRODUCT DOCUMENTATION WHICH GENERALLY

3    DESCRIBES THE LIVECYCLE RIGHTS MANAGEMENT PRODUCT?

4    **A.**  YES.

5          **MR. REINES:**  YOUR HONOR, WE WOULD MOVE THIS INTO

6    EVIDENCE, PLEASE.

7          **MR. ELLWANGER:**  NO OBJECTION.

8          **MR. REINES:**  "NO OBJECTION," HE'S SAYING.

9          **THE COURT:**  RECEIVED.

10          **MR. REINES:**  SORRY.  TRYING TO BE HELPFUL.

11       (DEFENDANT'S EXHIBIT 497 WAS RECEIVED IN EVIDENCE)

12          **MR. REINES:**  ALL RIGHT.  WOULD YOU TURN TO PAGE 3,

13    MR. BONINI?

14       OKAY.  ACTUALLY, YOU KNOW WHAT?  LET'S JUST GO TO -- CUT

15    IT QUICK AND GO TO PAGE 57.

16    **BY MR. REINES**

17    **Q.**  AND DO YOU SEE THE FIGURE HERE ON PAGE 57?  IT IS ON YOUR

18    SCREEN, OR YOU CAN PULL UP THE HARD COPY, IF THAT IS A

19    PREFERENCE?

20    **A.**  YES, I DO.

21    **Q.**  CAN YOU JUST DESCRIBE HOW THIS FIGURE REFLECTS THE

22    WORKINGS OF THE PRODUCT?

23    **A.**  YES.  SO THIS IS A PICTURE TRYING TO SHOW IN THREE BROAD

24    STEPS WHAT HAPPENS WHEN A USER ATTEMPTS TO OPEN A DOCUMENT ON

25    THEIR MACHINE, AND THAT THEY -- AND WHEN THEY ARE ONLINE HOW

HERBACH – CROSS / REINES

1   THE COMMUNICATION OCCURS BETWEEN THE CLIENT AND THE SERVER IN

2   REAL TIME TO DETERMINE WHETHER THAT USER SHOULD BE ENTITLED TO

3   OPEN THE DOCUMENT, AND THEN HOW THE PROCESS WORKS TO OPEN THE

4   DOCUMENT ITSELF.

5   **Q.**   AND THIS IS THIS PROCESS OF COLLECTING CREDENTIALS THAT

6   YOU ALREADY DESCRIBED EARLIER?

7   **A.**   YES.   THIS MIGHT PROVIDE MORE DETAIL, BUT EXACTLY.

8   **Q.**   WHEN DOES THIS HAPPEN?

9   **A.**   THIS PROCESS HAPPENS EVERY TIME A USER OPENS A DOCUMENT

10  BECAUSE THE CLIENT DOESN'T NECESSARILY KNOW.   I MEAN, NEITHER

11  THE SOFTWARE NOR THE HUMAN ACTUALLY KNOW WHETHER THEY ARE

12  ONLINE.   OBVIOUSLY, A PERSON MIGHT KNOW IF THEY ARE ON AN

13  AIRPLANE THEY DON'T HAVE A CONNECTION.   BUT IN THAT CONTEXT,

14  THE SOFTWARE DOESN'T REALLY KNOW THAT THEY ARE OFFLINE.   AND

15  EVEN IF YOU ARE AT THE OFFICE AND PLUGGED IN AND YOU THINK YOU

16  MIGHT BE ONLINE, FROM YOUR PERSPECTIVE AS A CLIENT MAYBE THE

17  SERVER CRASHED AND AT THAT POINT IN TIME IT'S UNAVAILABLE.   SO

18  THIS CHECK IS ALWAYS DONE.

19  **Q.**   NOW, ONE OF THE SIGNIFICANT QUESTIONS THAT'S BEEN RAISED

20  IN THIS CASE IS WHETHER THERE IS A CHECK LOCALLY TO DETERMINE

21  IF THERE IS ANY EXISTING PERMISSION FOR THE DOCUMENT.   JUST SO

22  THAT WE'RE CLEAR ABOUT HOW THE PRODUCT WORKS, CAN YOU ANSWER

23  THAT QUESTION FOR US?   WHICH IS, IS THERE A CHECK LOCALLY TO

24  DETERMINE IF THERE IS AN EXISTING PERMISSION FOR THE DOCUMENT?

25  **A.**   THERE IS NOT.   THE CLIENT WON'T ALWAYS TALK TO THE SERVER

HERBACH - CROSS / REINES

1    TO TRY TO GET THE LATEST POLICY DEFINITION AND DETERMINE IN

2    REAL TIME IF THE USER IS ENTITLED TO LOOK AT THE DOCUMENT NOW.

3    **Q.**  WHY IS THAT THE DESIGN THAT YOU AND YOUR TEAM CAME UP WITH

4    ORIGINALLY?

5    **A.**  WE FELT THAT BUSINESSES PAYING FOR THE PRIVILEGE OF

6    CONTROLLING DOCUMENTS BY POLICY MAY HAVE EVERCHANGING BUSINESS

7    RULES, AND THEY WOULD PREFER TO HAVE THE LATEST POLICY

8    CONTROLS ALWAYS REFLECTED WHEN PEOPLE ARE OPENING DOCUMENTS.

9    **Q.**  NOW, ONCE THE SERVER HAS A DOCUMENT I.D. AND THE USER'S

10   CREDENTIALS, WHAT DOES IT DO WITH THAT INFORMATION?

11   **A.**  YES.  I THINK THAT KIND OF GETS TO IN THIS DIAGRAM HERE

12   WHAT'S GOING ON AT STEP TWO.  SO AFTER THE SERVER HAS RECEIVED

13   THE DOCUMENT I.D., AND THE USER'S CREDENTIALS, THE FIRST THING

14   IT IS GOING TO DO IS VERIFY THAT THE USER'S CREDENTIALS, THE

15   USER NAME AND PASSWORD IN THIS CASE, IN FACT ARE THE CORRECT

16   CREDENTIALS FOR THAT USER.  AND ONCE WE, AS IT SAYS HERE,

17   AUTHENTICATE WHO THE USER IS, THEN WE ARE GOING TO LOOK AT

18   WHAT -- LOOK AT THE POLICY ASSOCIATED WITH THIS PARTICULAR

19   DOCUMENT I.D.

20        AND DETERMINE IF RIGHT NOW THIS USER SHOULD BE ALLOWED TO

21   OPEN THE DOCUMENT.  AND IF THEY ARE ALLOWED TO OPEN THE

22   DOCUMENT, WHAT MIGHT THEY BE ENTITLED TO DO?

23        SO IN THIS CONTEXT IT SAYS IT IS CHECKING THE POLICY FOR

24   AUTHORIZATION.  AND ONCE IT HAS DONE THAT AND HAS DETERMINED

25   THAT, YES, IN FACT THIS USER CAN OPEN THE DOCUMENT, AND, YES,

1    IN FACT HE SHOULD BE ALLOWED TO PRINT, BUT NOT MAKE

2    MODIFICATIONS TO THE DOCUMENT, IT TAKES THAT INFORMATION AND

3    PUTS IT INTO WHAT WE CALL A VOUCHER.  AND THAT VOUCHER, IS

4    THEN SENT BACK DOWN TO THE CLIENT.  THAT'S SORT OF SHOWN IN

5    THIS ORANGISH LINE GOING TO THE LEFT.

6    **Q.**  OKAY.

7    **A.**  WHICH INCLUDES THE KEY, WHICH IS WHAT IS USED BY THE

8    CLIENT TO DECRYPT THE DOCUMENT, AS WELL AS THE THINGS THAT WE

9    CALL IN THE SYSTEM AS PERMISSIONS.  PERMISSIONS IN THIS

10   CONTEXT WOULD BE –– AND YOU CAN PRINT.  YOU CAN MAKE

11   MODIFICATIONS.  YOU CAN COPY.  POTENTIALLY, OTHER THINGS AS

12   WELL.

13   **Q.**  DOES THE VOUCHER INCLUDING A YES/NO INDICATION?

14   **A.**  THE –– IT DOES NOT.  THE VOUCHER CONTAINS THE DOCUMENT KEY

15   AND THE THINGS THAT WE CALL PERMISSIONS.

16   **Q.**  DOES THE –– AND IN TERMS OF THE PERMISSIONS IN THE VOUCHER

17   THAT YOU ARE REFERRING TO, WHERE ARE THOSE GENERATED?

18   **A.**  SO, THE PERMISSIONS ARE DERIVED FROM THE CENTRAL POLICY AT

19   THE SERVER.  AND THAT IS DONE COMPLETELY SEPARATELY FROM THE

20   DOCUMENT KEY.

21   **Q.**  AND IN TERMS OF THESE ACTIVITIES AT THE SERVER OF THE

22   PERMISSIONS, DO THOSE PERMISSIONS GRANT ACCESS TO THE

23   DOCUMENT?

24   **A.**  NO.  THE PERMISSIONS IN THE VOUCHER ARE FURTHER

25   INSTRUCTIONS TO THE CLIENT.  ONCE THE KEY IS USED TO OPEN UP

1    THE DOCUMENT, PERMISSIONS LIKE CAN YOU PRINT?  CAN YOU MAKE

2    MODIFICATIONS?  CAN YOU COPY, ARE USED TO INSTRUCT IN THIS

3    CONTEXT ACROBAT OR READER TO ALLOW OR DISALLOW THE MENU ITEMS.

4    SO THE PRINT MENU OR THE PRINT BUTTON MIGHT BE GRAYED OUT IF

5    THE PERMISSION SAYS YOU SHALL NOT PRINT.

6        BUT ALL THAT HAPPENS AFTER THE KEY HAS BEEN USED TO OPEN

7    UP THE DOCUMENT FOR THE USER.

8    Q.  NOW, THIS KEY THAT YOU TALKED ABOUT THAT WAS GENERATED AT

9    THE SERVER AND IS BEING COMMUNICATED OVER THE INTERNET, OR

10   OTHER NETWORK TO THE CLIENT, IS THAT BASED ON THESE

11   PERMISSIONS, SUCH AS YOU CAN PRINT?  YOU CAN DO WHATEVER, YOU

12   CAN MAKE VERSIONS, WHATEVER?

13   A.  WELL, IT'S REALLY BASED UPON WHAT IS INSIDE THE POLICY.

14   AND THE POLICY WILL DEFINE WHICH USERS CAN OPEN, WHICH USERS

15   CAN PRINT.

16       BUT, THAT INFORMATION IS DISTILLED DOWN, AND IT'S

17   ENCAPSULATED IN THESE PERMISSIONS THAT ARE SENT ALONGSIDE THE

18   KEY IN THE VOUCHER.

19       DOES THAT ANSWER YOUR QUESTION?

20   Q.  YES, IT DOES.

21       IS THE KEY EXTRACTED AT THE CLIENT BASED ON THE

22   PERMISSIONS IN THE VOUCHER?

23   A.  NO.  WHEN IT RECEIVES A VOUCHER IT KNOWS TO EXTRACT THE

24   KEY TO OPEN THE DOCUMENT.  THE PERMISSIONS KICK IN AFTER THE

25   DOCUMENT HAS BEEN OPENED AFTER IT HAS BEEN DECRYPTED WITH THAT

1    KEY.

2    **Q.**   LET'S TALK ABOUT THAT THIRD STEP IN YOUR FIGURE.  ONCE

3    THE -- WHEN THE VOUCHER IS RECEIVED AT THE CLIENT, WHAT

4    HAPPENS?

5    **A.**   YEAH.  I THINK I JUST ALLUDED TO THAT.  SO HERE AT STEP

6    THREE, AFTER THE VOUCHER HAS BEEN RECEIVED, IT'S GOING TO

7    DECRYPT THE DOCUMENT WITH THAT KEY.  AND THAT'S THE ONLY THING

8    THAT IS AVAILABLE TO DECRYPT THE DOCUMENT.

9        WITHOUT THAT PHYSICALLY, IT'S AN ENCRYPTED DOCUMENT THAT

10   THE CLIENT HAS NO IDEA WHAT TO DO WITH.

11   **Q.**   WHEN THE DOCUMENT IS CLOSED WHAT HAPPENS TO THE KEY?

12   **A.**   WHEN THE DOCUMENT IS CLOSED, THE KEY IS DISCARDED.  THE

13   CLIENT HAS NO NEED FOR IT.

14       IT GOES BACK TO OUR PHILOSOPHY WE PREFER ONLINE ACCESS.

15   WE PREFER GOING BACK TO THE SERVER TO GET IN REAL TIME WHAT

16   THIS USER CAN DO.  AND THE WAY WE CAN CONTROL THAT IS BECAUSE

17   WE DON'T HAVE THE DOCUMENT KEY ITSELF FLOATING OUT THERE IN

18   THE WORLD.  IT IS REALLY JUST CENTRALLY AT THE SERVER.

19   **Q.**   JUST TO BE CLEAR, AFTER THE DOCUMENT'S CLOSED IS THE KEY

20   THAT WAS USED TO OPEN THAT DOCUMENT STORED LOCALLY?

21   **A.**   NO, IT IS NOT.

22   **Q.**   IS THE DOCUMENT EVER LOCKED TO A PARTICULAR MACHINE?

23   **A.**   IT'S NOT.  THE SYSTEM DOESN'T HAVE ANY NOTION OF MACHINES.

24   IT'S WHAT I WOULD CALL "IDENTITY BASED."  IT GOES TO THE --

25   THE GOAL OF OPENING DOCUMENTS BASED UPON WHO YOU ARE, THE

1   CREDENTIALS THAT USING THE PASSWORD THAT YOU HAVE PROVIDED IN

2   STEP ONE HERE.

3   **Q.**  IF I HAD A RIGHTS MANAGEMENT DOCUMENT ON MY LOCAL LAPTOP,

4   AND I MOVE THAT DOCUMENT TO MY IPAD, WOULD I BE ABLE TO USE

5   THAT DOCUMENT?

6   **A.**  YES.  WE ACTUALLY CONSIDER THAT A FEATURE.  IT IS

7   IDENTITY-BASED, AND, THEREFORE, DOESN'T REALLY MATTER WHERE

8   YOU ARE.  AS LONG AS IT'S YOU AND YOU'RE ENTITLED IN REAL TIME

9   BY THE SERVER IN THIS CONTEXT TO OPEN THE DOCUMENT, THEN YOU

10  SHOULD BE ABLE TO DO THAT.

11  **Q.**  THERE HAS BEEN SOME CONFUSION CREATED ABOUT THIS

12  ONLINE/OFFLINE.  IF YOU ARE OFFLINE, CAN YOU ACCESS A DOCUMENT

13  THAT ONLY HAS ONLINE ACCESS?

14  **A.**  IF A DOCUMENT ONLY PROVIDES ONLINE ACCESS, THEN THERE IS

15  NO -- IT IS NOT POSSIBLE TO OPEN IT OFFLINE.  THE MECHANISMS

16  THAT WE WOULD EMBED IN THE DOCUMENT TO ALLOW FOR OFFLINE JUST

17  AREN'T PRESENT.  AND, THEREFORE, IT WOULDN'T WORK.

18  **Q.**  IF WE CAN TURN TO PAGE 59, PLEASE.  AND THIS REFERS TO THE

19  OFFLINE ACCESS FEATURE.  LOOK AT THE FIRST FULL PARAGRAPH

20  UNDER THE FIGURE.  DO YOU SEE THAT?

21                    (PUBLISHED TO JURY.)

22  **Q.**  AND DO YOU SEE WHERE IT SAYS:

23     "TO OPEN DOCUMENT OFFLINE, USER MUST HAVE RECENTLY LOGGED

24  INTO RIGHTS MANAGEMENT ES AND MUST HAVE CLOSE THE NETWORK

25  CONNECTION"?

1    WHY DOES THE NETWORK -- I ASKED YOU IF YOU CAN SEE THAT.

2    **A.**  I CAN.

3    **Q.**  WHY DOES THE NETWORK CONNECTION NEED TO BE CLOSED?

4    **A.**  IT NEEDS TO BE CLOSED BECAUSE THE CLIENT IS ALWAYS GOING

5    TO FIRST CONTACT THE SERVER.  AND ONLY UPON THAT FAILING WILL

6    IT ACTUALLY GO AND LOOK AT THE OFFLINE ACCESS STUFF THAT IS

7    EMBEDDED WITHIN THE DOCUMENT.

8        AGAIN, IT PREFERS ONLINE ACCESS, AND SO YOU HAVE TO

9    EXPLICITLY CLOSE THE CONNECTION IN SOME FORM TO FORCE IT INTO

10   USING OFFLINE.

11   **Q.**  WILL THE CLIENT COMPUTER ALWAYS CHECK THE SERVER FIRST IN

12   THAT SITUATION?

13   **A.**  YES.

14   **Q.**  WHY DO THAT WHEN THE DOCUMENT MAY HAVE AN EMBEDDED KEY?

15   **A.**  THE INFORMATION THAT WAS EMBEDDED MAY BE DATED.  AND IN

16   SOME FORM THERE'S THE POSSIBILITY THAT THE POLICY HAS CHANGED

17   ON THE SERVER.  AND THE DESIGN OF THE SYSTEM MATCHES THE --

18   OUR PREFERENCE TO GIVE THE BEST POSSIBLE GUARANTEE TO THE --

19   TO THE -- THE PURCHASER OF THE SOLUTION THAT THE LATEST POLICY

20   WILL BE USED.

21   **Q.**  AND IN THE OFFLINE MODE IS THE DOCUMENT EVER LOCKED TO A

22   CLIENT?

23   **A.**  IN THE OFFLINE MODE IT IS NEVER LOCKED TO MACHINES, IF

24   THAT IS WHAT YOU MEAN BY "CLIENTS."  IT'S ATTACHED TO THE

25   USER'S IDENTITY.

1    **Q.**  NOW, WE'VE ADDRESSED THE YES/NO PERMISSION WHERE THE KEY

2    HAS BEEN GENERATED, AND THE LOCKING, AND HOW THAT HAPPENS.  I

3    WOULD LIKE TO MOVE TO THE OPERATION RELEVANT TO –– AT LEAST WE

4    KNOW ABOUT –– THE '670 PATENT HERE.

5        IS ACCESS DENIED TO THE DOCUMENT UNTIL THERE IS A

6    SUCCESSFUL TRANSMISSION OF INFORMATION TO A SERVER IN

7    LIVECYCLE WITH RIGHTS MANAGEMENT?

8    **A.**  NO.  TRANSMISSION IS NOT RELEVANT.

9    **Q.**  CAN YOU EXPLAIN WHY YOU SAY TRANSMISSION IS NOT RELEVANT?

10   **A.**  SURE.  SO IF I AM OPENING A DOCUMENT ONLINE I SUBMIT MY

11   REQUEST TO THE SERVER WITH THE DOCUMENT I.D. AND MY

12   CREDENTIALS.  AND THE FACT THAT I SUBMITTED THAT REQUEST IS

13   REALLY JUST THE FIRST OF THOSE THREE STEPS TO ACTUALLY GETTING

14   THE VOUCHER BACK AND USING THE VOUCHER.  UNTIL I GET THE

15   VOUCHER WHICH CONTAINS THE ONE AND ONLY KEY TO OPEN THE

16   DOCUMENT ONLINE, I CAN'T DO ANYTHING WITH IT.

17   **Q.**  WELL, LET'S TEST THAT.

18   **A.**  OKAY.

19   **Q.**  IS THERE ANY INSTANCE WHERE INFORMATION IS TRANSMITTED

20   SUCCESSFULLY TO THE SERVER, BUT ACCESS IS, NEVERTHELESS,

21   DENIED?

22   **A.**  SURE.  IF I TRY TO OPEN A DOCUMENT THAT I'M NOT ENTITLED

23   TO OPEN, I'M STILL GOING TO GO THROUGH THE BASIC STEPS OF

24   DOUBLE-CLICKING ON THE DOCUMENT.  AS A USER, THE CLIENT WILL

25   THEN COLLECT MY CREDENTIALS, TAKE THE DOCUMENT I.D., SEND IT

1    TO THE SERVER.  AND THE SERVER MAY THEN SAY THAT I AM NOT

2    ENTITLED TO OPEN THIS DOCUMENT AND WILL NOT SEND THE KEY.

3    **Q.**  LET'S TAKE ANOTHER TEST.  WILL A USER EVER BE GRANTED

4    ACCESS TO THE DOCUMENT WITHOUT ANY TRANSMISSION AT ALL?

5    **A.**  YES.  SO, IF A USER -- WELL, LET ME REPHRASE THAT.  IF

6    I'M OFFLINE, AND I TRY TO OPEN THE DOCUMENT AND I HAPPEN NOT

7    TO BE CONNECTED TO THE NETWORK -- I'M ON AN AIRPLANE -- MY

8    CLIENT WILL TRY TO REACH OUT TO THE SERVER.  THAT WILL FAIL,

9    AND THAT TRANSMISSION WILL FAIL.  BUT THEN, IF I'M ENTITLED TO

10   OPEN IT OFFLINE WHEN I'M ON THE AIRPLANE, THE STUFF WILL KICK

11   IN FOR OFFLINE ACCESS, AND I WILL BE ABLE TO OPEN THE DOCUMENT

12   EVEN THOUGH THERE WAS NO SUCCESSFUL TRANSMISSION TO THE

13   SERVER.

14   **Q.**  NOW, IN TERMS OF THE DESCRIPTION OF THE OPERATION OF THE

15   PRODUCTS THAT YOU'VE JUST GIVE RELEVANT TO THE TWO PATENTS IN

16   THIS CASE, IS THAT HOW YOUR PRODUCT WORKED SINCE YOUR ORIGINAL

17   TIME IN 2003 WHEN YOU SUBMITTED YOUR PATENT APPLICATIONS?

18   **A.**  ABSOLUTELY.

19   **Q.**  AND THAT WASN'T -- THOSE WEREN'T IDEAS THAT YOU TOOK FROM

20   ANYBODY ELSE?

21   **A.**  CORRECT.

22   **Q.**  I THINK ONE MORE DOCUMENT.

23        **MR. REINES:**  IF WE CAN CALL UP EXHIBIT 360, PLEASE.

24   **BY MR. REINES**

25   **Q.**  CAN YOU DESCRIBE WHAT THIS DOCUMENT IS FOR IDENTIFICATION?

1    **A.**   SURE.  THIS DOCUMENT IS ENTITLED: "DEVELOPING CLIENT

2    APPLICATIONS."  IT'S A KIT USED TO ADD ADDITIONAL TYPES OF

3    FILE FORMATS BEYOND PDF AND, FOR EXAMPLE, TO THE LIVECYCLE

4    PRODUCT.

5    **Q.**   AND DOES THIS DOCUMENT DESCRIBE THE FUNCTIONALITY THAT

6    YOU'VE BEEN PRESENTING TO THE JURY HERE TODAY AS TO HOW YOUR

7    PRODUCTS WORK?

8    **A.**   YES.  IT FOLLOWS THE BASIC FUNCTIONALITY WITHIN THE

9    SOLUTION.

10           **MR. REINES:**  AND IF WE CAN GO TO THE COPYRIGHT DATE

11   OF THIS ON PAGE 2, PLEASE, SO WE CAN DATE THE DOCUMENT.

12   **BY MR. REINES**

13   **Q.**   WHAT IS THE DATE THAT YOU SEE THERE?

14   **A.**   2005.

15   **Q.**   NOW, THE ALLEGED ADOBE VENTURES MEETING WHERE DIGITAL REG

16   PROVIDED INFORMATION HAPPENED IN -- YOU KNOW, ACCORDING TO THE

17   CONTENTIONS OF DIGITAL REG -- IN THE SUMMER OF 2004.  IS IT

18   POSSIBLE, JUST IN TERMS OF THE TIME LINE, FOR YOU TO HAVE

19   TAKEN IDEAS FROM THAT MEETING AND INCORPORATED THAT INTO THE

20   OPERATION OF THE PRODUCT AS DESCRIBED IN THIS DOCUMENTATION OR

21   YOUR PATENTS?

22   **A.**   NO.

23   **Q.**   YOU EARLIER REFERENCED PLUG-INS, AND YOU MENTIONED THAT

24   LIVECYCLE HAD A PLUG-IN FEATURE, CORRECT?  AND AS PART OF YOUR

25   LIVECYCLE WORK, ARE YOU AWARE OF OTHER DRM PLUG-INS THAT WILL

1    WORK WITH PRODUCTS SUCH AS ACROBAT PRO?

2    **A.**  YES, I'M AWARE THAT WE HAD -- HAVE A PROGRAM IN PLACE THAT

3    WILL ALLOW OTHER PARTIES TO BUILD DRM PLUG-INS AND INCORPORATE

4    THOSE THIRD-PARTY DRM PLUG-INS INTO OUR FREE ADOBE READER.

5    **Q.**  AND IN TERMS OF THE ACTUAL DRM TECHNOLOGY IN THIS PROGRAM

6    THAT YOU'RE DESCRIBING, IS THAT TECHNOLOGY THAT IS PROVIDED BY

7    THE THIRD PARTIES' DRM SOLUTION, OR IS THAT AN ADOBE SOLUTION?

8    **A.**  YES.  AND PERHAPS THE NAME MAY BE A LITTLE BIT CONFUSING.

9    THIS IS INTENDED AS A MECHANISM BY WHICH WE, ADOBE, CAN ALLOW

10   OTHER PEOPLE TO USE ALL OF THE STUFF WITHIN READER TO OPEN

11   DOCUMENTS AND RENDER DOCUMENTS AND SHOW PICTURES AND TEXT AND

12   ALL OF THAT SORT OF STUFF.

13       BUT TO TAKE THAT AND MARRY THAT WITH SOMEONE ELSE'S NOTION

14   OF DRM, AND SO SOMEONE ELSE'S DRM PLUG-IN, THEIR TECHNOLOGY IS

15   THEN INCORPORATED INTO THE BIGGER ADOBE READER.

16   **Q.**  THE REASON I'M ASKING YOU THIS IS DIGITAL REG'S DAMAGES

17   EXPERT IS RELYING ON THIS PLUG-IN TO SUPPORT ITS DAMAGES

18   THEORY.  AND I WANT TO ASK YOU:  IS ADOBE PAYING FOR DIGITAL

19   DRM TECHNOLOGY IN THIS SITUATION WHERE THE THIRD PARTY IS

20   PROVIDING -- IS ESSENTIALLY LICENSING ALL OF THE RIGHTS TO

21   WORK WITH ADOBE ACROBAT PROFESSIONAL?

22   **A.**  RIGHT.  IT'S ACTUALLY THE OTHER WAY AROUND.  WHAT WE ARE

23   DOING IS GIVING OTHER PEOPLE, OTHER COMPANIES THE OPPORTUNITY

24   TO TAKE ADVANTAGE OF ALL THE CAPABILITIES WITHIN READER FOR

25   THEIR DRM TECHNOLOGY.  AND SO FOR THAT WE CHARGE A FEE FOR

1    THAT PRIVILEGE.

2    **Q.** HAS ANYONE EVER TAKEN UP ADOBE ON THIS OFFER TO OPEN UP,

3    TO HAVE ALL THIS ACCESS TO READER AND TO USE THEIR OWN

4    THIRD-PARTY DRM?

5    **A.** NOT AT LEAST SINCE 2007.

6    **Q.** DOES ADOBE WANT PEOPLE TO TAKE THEIR OWN READER WITH THEIR

7    OWN DRM SOLUTION AND INSTEAD SUBSTITUTE THIS THIRD-PARTY DRM

8    THROUGH THIS PROGRAM? IS THIS SOMETHING THAT YOU WANT TO DO?

9    **A.** WELL, IT'S NOT SOMETHING THAT WE EXPLICITLY WANT TO

10   ENCOURAGE. WE HAVE OUR OWN DRM SOLUTION AND LIVECYCLE RIGHTS

11   MANAGEMENT. BUT WE DON'T WANT TO PRECLUDE ANYBODY ELSE IF

12   THEY HAVE DRM TECHNOLOGY THAT THEY WANT TO USE WITH OUR

13   WIDESPREAD FREE ADOBE READER.

14   **Q.** AND AS SOMEONE WHO HAS WORKED WITH DRM ALL THESE YEARS,

15   WHAT IS THE EXPLANATION FOR WHY IN SO MANY YEARS NOBODY HAS

16   EVER ENTERED INTO THIS ARRANGEMENT WITH ADOBE WHERE THEY GET

17   ASSESS TO THE ENTIRE READER, AND THEN USE THEIR OWN DRM

18   MODULE?

19   **A.** PERSONALLY, I THINK IT'S A LITTLE BIT EXPENSIVE. BUT A

20   NUMBER OF COMPANIES HAVE STARTED, BUT HAVE NOT REALLY BEEN

21   HAPPY WITH THE FINANCIAL TERMS, AND THEY FOUND OTHER

22   OPPORTUNITIES INSTEAD.

23   **Q.** WHAT IS THE LIVECYCLE PDF GENERATOR?

24   **A.** PDF GENERATOR IS ONE OF THE OTHER DOZEN OR 14 OR SO

25   COMPONENTS WITHIN THE LIVECYCLE SUITE.

1    **Q.** DURING YOUR CONVERSATIONS WITH DR. WICKER, DID YOU DISCUSS

2    CHANGES TO LIVECYCLE RIGHTS MANAGEMENT WITH REGARD TO THE

3    LIVECYCLE PDF GENERATOR AS ONE OF THESE DESIGN-AROUND OPTIONS?

4    **A.** YEAH.  AND IN THAT CONTEXT, IN PARTICULAR, PDF GENERATOR

5    IS A LIVECYCLE MECHANISM BY WHICH YOU CAN TAKE NONPDF FILES,

6    FOR EXAMPLE, MICROSOFT OFFICE DOCUMENTS, AND IN THE LIVECYCLE

7    SERVER CONVERT THEM TO PDF'S.  AND, THEREFORE, THAT CAN BE

8    USED IN CONJUNCTION WITH THE LIVECYCLE RIGHTS MANAGEMENT

9    COMPONENT TO CONVERT AND PROTECT DOCUMENTS ALL CENTRALLY.

10   **Q.** DID YOU DISCUSS WITH DR. WICKER WHETHER THAT WOULD BE HARD

11   OR EASY OR MODERATE IN TERMS OF WHAT WOULD NEED TO BE DONE IN

12   ORDER TO MAKE THAT KIND OF CHANGE?

13   **A.** YES.  IT WAS VERY EASY.

14   **Q.** AND DID YOU DISCUSS WITH DR. WICKER IF THIS DESIGN AROUND

15   WAS USED, WHAT THE IMPACT WOULD HAVE ON THE CUSTOMER

16   EXPERIENCE?

17   **A.** FOR RECIPIENTS THERE WOULD BE NO IMPACT WHATSOEVER.  WHEN

18   THEY OPEN A DOCUMENT THEY WOULD HAVE NO IDEA HOW AND WHEN AND

19   WHERE THE PDF WAS ITSELF GENERATED.

20       FOR AUTHORS, THE IMPACT WOULD BE THEY WOULD HAVE TO SEND

21   THE DOCUMENT TO THE SERVER.

22   **Q.** AND IN TERMS OF THE COST OF THIS DESIGN AROUND, WHAT IS

23   THE AVERAGE SALARY OF AN ADOBE EMPLOYEE?

24   **A.** THE FULLY LOADED COST WITH BENEFITS AND EVERYTHING IS LIKE

25   160 TO 225 A YEAR, THOUSAND.

1    **MR. REINES:**  ALL RIGHT.  WELL, THANK YOU SO MUCH.

2    **THE WITNESS:**  SURE.

3    **MR. REINES:**  THAT'S WHAT I HAVE.

4    PASS THE WITNESS, YOUR HONOR.

5    **MR. ELLWANGER:**  REDIRECT, YOUR HONOR?

6    **THE COURT:**  YES.

7                    **REDIRECT EXAMINATION**

8    BY MR. ELLWANGER

9    Q.  MR. HERBACH, THERE IS JUST A FEW STEPS WITHIN THE

10   LIVECYCLE MANAGEMENT PROCESS THAT I WANT TO MAKE SURE WE

11   CONFIRM.

12   A.  SURE.

13   Q.  OKAY.  HAVING TO DO WITH VOUCHERS.

14   A.  OKAY.

15   Q.  PERMISSIONS ARE SENT IN THE VOUCHER, RIGHT?

16   A.  WE SEND PERMISSIONS IN THE VOUCHER, YES.

17   Q.  AND THE VOUCHER IS ENCRYPTED.

18   A.  WELL, IT DEPENDS UPON THE PRODUCT.  FROM ABOUT 2002 TO

19   2010 THE VOUCHER WAS NOT ENCRYPTED.

20   Q.  BUT TODAY IT IS.

21   A.  WE'VE SINCE ADDED ENCRYPTION, YES.

22   Q.  AND THE CLIENT DECRYPTS, CORRECT?

23   A.  WHEN THE CLIENT IS ENCOUNTERING ONE OF THESE VOUCHERS

24   CREATED WITH A SERVER SINCE 2010, IT WILL DECRYPT, YEAH.

25   Q.  AND WHEN THEY DECRYPT THEY OBTAIN THE PERMISSIONS?

HERBACH — REDIRECT / ELLWANGER

1    **A.**  WHEN THEY DECRYPT THE VOUCHER THEY GET THE EXISTING

2    VOUCHER WHICH HAS THE DOCUMENT KEY, AS WELL AS PERMISSIONS.

3    **Q.**  SO YES?

4    **A.**  SURE.

5    **Q.**  YOU TESTIFIED JUST A MOMENT AGO WITH ADOBE'S COUNSEL THAT

6    THE NUMBER OF USERS WHO WOULD INTERACT WITH LIVECYCLE RIGHTS

7    MANAGEMENT IS VERY SMALL.  DO YOU REMEMBER THAT?

8    **A.**  YES, THE NUMBER OF ACROBAT PRO USERS WHO INTERACT WITH THE

9    LIVECYCLE SERVER IS VERY SMALL.

10   **Q.**  OKAY.  BUT LIVECYCLE RIGHTS MANAGEMENT IS EMBEDDED IN

11   EVERY COPY OF ADOBE ACROBAT PRO.

12   **A.**  YES.  THERE IS A LIVECYCLE PLUG-IN EMBEDDED WITHIN COPIES

13   OF ACROBAT PRO, YES.

14   **Q.**  AND I MIGHT NOT HAVE GOTTEN THE NUMBER RIGHT.  DID YOU SAY

15   HUNDREDS OF MILLIONS OF COPIES OF THIS HAVE BEEN SOLD?

16   **A.**  I THINK THAT TENS OF MILLIONS OF ACROBAT PRO HAVE BEEN

17   SOLD.

18   **Q.**  TENS OF MILLIONS.  BUT THAT YOU COULD IDENTIFY MAYBE A

19   HUNDRED CUSTOMERS, YOU SAID, THAT WOULD USE LIVECYCLE RIGHTS

20   MANAGEMENT?

21   **A.**  I THINK I SAID A FEW HUNDRED COPIES OF THE SERVER SOLUTION

22   HAD BEEN SOLD.

23          **MR. ELLWANGER:**  YOUR HONOR, MAY I APPROACH THE

24   WITNESS?

25          **THE COURT:**  YES.

1       (DOCUMENT HANDED TO WITNESS.)

2  **BY MR. ELLWANGER**

3  **Q.**  I AM HANDING YOU A COPY OF WHAT'S BEEN MARKED PLAINTIFF'S

4  EXHIBIT 178.  IT WASN'T IN YOUR BINDER, WHICH IS WHY I WANTED

5  TO PROVIDE YOU THAT COPY.

6  **A.**  SURE.

7  **Q.**  COULD YOU TAKE A LOOK AT PLAINTIFF'S 178 AND TELL ME WHEN

8  YOU'VE HAD A CHANCE TO LOOK THAT DOCUMENT OVER?

9  **A.**  OKAY.

10       (PAUSE IN THE PROCEEDINGS.)

11  **A.**  OKAY.  I THINK I'VE SEEN ENOUGH.

12  **Q.**  MR. HERBACH, THAT IS THE DOCUMENT PUBLISHED BY ADOBE,

13  RIGHT?

14  **A.**  THAT'S WHAT IT LOOKS LIKE, YES.

15  **Q.**  ENTITLED:  "ACROBAT FOR LIFE SCIENCES"?

16  **A.**  YES, PRESUMABLY FROM 2010.

17  **Q.**  AND THE REASON YOU SAY "PRESUMABLY FROM 2010," IS BECAUSE

18  AT THE VERY BOTTOM OF THE PAGE THERE IS A HTTP WEB ADDRESS

19  THAT SAYS: "BLOGS.ADOBE.COM," RIGHT?

20  **A.**  YES.

21  **Q.**  AND THAT HAS A 2010 DATE IN THE FILE EXTENSION.

22  **A.**  YES.

23       **MR. ELLWANGER:**  YOUR HONOR, AT THIS TIME PLAINTIFFS

24  OFFER EXHIBIT 178.

25       **MR. REINES:**  NO OBJECTION.

1      **THE COURT:**  RECEIVED.

2           (PLAINTIFF'S EXHIBIT 178 RECEIVED IN EVIDENCE)

3      **MR. ELLWANGER:**  IF WE COULD PLACE EXHIBIT 178 ON THE

4      SCREEN, MS. MASON?

5           **THE CLERK:**  I WILL.  I WILL.  I WILL.

6      **MR. ELLWANGER:**  I APOLOGIZE.

7                (PUBLISHED TO JURY.)

8      **BY MR. ELLWANGER**

9      **Q.**  NOW, AT THE VERY TOP OF THE DOCUMENT, MR. HERBACH, IT SAYS

10     "ACROBAT FOR LIFE SCIENCES."

11          **MR. ELLWANGER:**  THE VERY TOP THERE, MS. MASON, UP BY

12     THE LOGO.

13     **BY MR. ELLWANGER**

14     **Q.**  MR. HERBACH, YOU SEE THAT THIS DOCUMENT SAYS THAT:

15          "ACROBAT FOR LIFE SCIENCES IS A RESOURCE THAT COVERS

16          THE USE OF ACROBAT FOR THOSE INVOLVED IN THE

17          PHARMACEUTICAL, BIOPHARMA AND MEDICAL DEVICE

18          MARKETS."

19     RIGHT?

20     **A.**  YES.

21     **Q.**  THAT IS A BIG MARKET, ISN'T IT?

22     **A.**  I WOULD IMAGINE IT IS, YES.

23     **Q.**  OKAY.  AND IN THE VERY NEXT PART OF THE DOCUMENT,

24     MR. HERBACH, WHERE IT IS ENTITLED, "REMOVING SECURITY FROM

25     PDF'S INDIVIDUALLY AND IN A BATCH," YOU WOULD AGREE WITH ME

1    THAT THIS ADOBE DOCUMENT SAYS IN THE VERY FIRST LINE, "ACROBAT

2    FILES MAY BE SECURED USING PASSWORDS, DIGITAL CERTIFICATES OR

3    USING RIGHTS MANAGEMENT PROVIDED BY ADOBE'S LIVECYCLE RIGHTS

4    MANAGEMENT SERVER," CORRECT?

5    **A.**  THAT IS WHAT IT SAYS, YES.

6    **Q.**  SO YOU WOULD AGREE WITH ME THAT THIS DOCUMENT PUBLISHED

7    FOR FOLKS IN THE PHARMACEUTICAL BIOPHARMA AND MEDICAL DEVICE

8    MARKETS IS INSTRUCTING ITS USERS THAT, HEY, IF YOU WANT TO

9    SECURE ADOBE PDF'S, YOU CAN USE DIGITAL REG'S -- EXCUSE ME --

10   RIGHTS MANAGEMENT PROVIDED BY ADOBE'S LIVECYCLE RIGHTS

11   MANAGEMENT SERVER.

12   **A.**  "INSTRUCT" FEELS LIKE A VERY STRONG WORD COMPARED TO WHERE

13   IT SAYS "THEY MAY."

14   **Q.**  OKAY.  WELL, LET'S LOOK AT THE SECOND PAGE OF THIS

15   DOCUMENT.

16   **A.**  OKAY.

17          **MR. ELLWANGER:**  AND IF YOU COULD PULL UP THAT,

18   MS. MASON.  I WOULD LIKE TO TURN TO PAGE 178.002, MS. MASON.

19                    (PUBLISHED TO JURY.)

20       THANK YOU.  AND IF YOU COULD BLOW UP THE TOP HALF OF THE

21   PAGE THERE.

22   **BY MR. ELLWANGER**

23   **Q.**  NOW, MR. HERBACH, YOU WOULD AGREE WITH ME THAT THIS IS A

24   SCREEN SHOT OF ADOBE ACROBAT PRO EXTENDED.  SEE AT THE TOP

25   THERE?

1    **A.**  YES.

2    **Q.**  AND, AGAIN, THIS IS A SCREEN SHOT THAT'S PLACED IN THIS

3    ADOBE DOCUMENT, RIGHT?

4    **A.**  YES.

5    **Q.**  OKAY.  NOW, AT THE VERY TOP OF THAT PICTURE THERE, YOU SEE

6    WHAT'S COMMONLY CALLED A "TOOLBAR," DON'T YOU?

7    **A.**  I DO.

8    **Q.**  AND A TOOLBAR CONTAINS FEATURES, READING LEFT TO RIGHT,

9    LIKE "FILE, EDIT, VIEW, DOCUMENT," RIGHT?

10   **A.**  (WITNESS NODS HEAD.)

11   **Q.**  AND THERE IS ANOTHER TOOLBAR BELOW THAT THAT SAYS "CREATE,

12   COMBINE, COLLABORATE, SECURE," RIGHT?

13   **A.**  YES.

14   **Q.**  AND UNDERNEATH THE SECURE TOOLBAR YOU SEE ONE OF THE TABS

15   IS "ADOBE LIVECYCLE RIGHTS MANAGEMENT," CORRECT?

16   **A.**  SHORTLY BELOW D, YES.

17   **Q.**  THAT ADOBE LIVECYCLE RIGHTS MANAGEMENT IS INCLUDED ON THE

18   TOOLBAR OF ADOBE ACROBAT PRO, RIGHT?

19   **A.**  A MENU ITEM THAT ALLOWS YOU TO CONFIGURE THE CLIENT, YES.

20   **Q.**  I AM SORRY.  DID YOU SAY IT WAS ON THE TOOLBAR?

21   **A.**  I SEE THE WORDS THAT SAY, "ADOBE LIVECYCLE RIGHTS

22   MANAGEMENT" IN A MENU DROPDOWN UNDER A BUTTON THAT SAYS

23   "SECURE."

24   **Q.**  AND YOU WOULD AGREE WITH ME THAT ONLY THE MOST COMMONLY

25   USED TOOLS APPEAR ON THE TOOLBAR IN ADOBE ACROBAT PRO.

1    **A.**  NO, I WOULDN'T, ACTUALLY.

2           **MR. ELLWANGER:**  YOUR HONOR, MAY I APPROACH?

3           **THE COURT:**  YES.

4                  (DOCUMENT HANDED TO WITNESS.)

5    **BY MR. ELLWANGER**

6    **Q.**  MR. HERBACH, I HAVE HANDED YOU A COPY OF WHAT HAS BEEN

7    MARKED AS PLAINTIFF'S 179.  I APOLOGIZE YOU DON'T HAVE A COPY

8    IN YOUR BINDER, BUT THAT IS A COPY OF THE EXHIBIT THERE.

9    **A.**  OKAY.

10   **Q.**  IF YOU COULD, PLEASE, SIR, TAKE A MOMENT AND TAKE A LOOK

11   AT EXHIBIT 179 AND TELL ME WHEN YOU'VE HAD A CHANCE TO REVIEW

12   THAT DOCUMENT.

13   **A.**  ALL RIGHT.

14          **THE COURT:**  WELL, LET'S GO TO THE PART THAT YOU'RE

15   INTERESTED IN.  I DON'T WANT TO WAIT WHILE HE LOOKS AT FIVE

16   PAGES --

17          **MR. ELLWANGER:**  VERY WELL, YOUR HONOR.

18          **THE COURT:**  -- OF SOMETHING HE HAS SEEN BEFORE.

19          **MR. ELLWANGER:**  YES, YOUR HONOR.

20          **THE WITNESS:**  THANK YOU.

21   **BY MR. ELLWANGER**

22   **Q.**  MR. HERBACH --

23          **THE COURT:**  IF YOU NEED TO LATER TO LOOK AT THE

24   CONTEXT, BUT I DON'T WANT TO SIT HERE AND HAVE YOU LOOK AT IT

25   ALL NOT KNOWING WHAT IT IS YOU ARE LOOKING FOR.

1      **THE WITNESS:**  THANK YOU.

2    **BY MR. ELLWANGER**

3    **Q.**  MR. HERBACH, YOU SEE THIS IS A DOCUMENT ENTITLED, "WHAT'S

4    NEW IN ADOBE ACROBAT X PRO"?

5    **A.**  YES.

6    **Q.**  AND YOU SEE AT THE BOTTOM, ONCE AGAIN, THAT FAMILIAR WEB

7    ADDRESS HTTPHELP.ADOBE.COM?

8    **A.**  YES.

9    **Q.**  THAT WOULD MAKE YOU BELIEVE THAT THIS IS A DOCUMENT

10   PUBLISHED BY ADOBE.

11   **A.**  YES.

12         **MR. ELLWANGER:**  YOUR HONOR, AT THIS TIME PLAINTIFFS

13   OFFER 179.

14         **THE COURT:**  WELL, I'M NOT SURE WE WILL NEED THE WHOLE

15   THING.  YOU CAN SHOW IT TO HIM, CERTAINLY.

16         **MR. ELLWANGER:**  MAY I PLACE IT ON THE SCREEN, YOUR

17   HONOR?

18         **THE COURT:**  YES.

19              (PUBLISHED TO JURY.)

20         **MR. ELLWANGER:**  IF YOU COULD, MS. MASON, BLOW UP

21   "WHAT'S NEW, PAREN, ACROBAT X STREAMLINED USER INTERFACE."

22      NO, NO.  BELOW THAT.

23      THANK YOU.

24   **BY MR. ELLWANGER**

25   **Q.**  MR. HERBACH, YOU SEE THAT THIS IS A DOCUMENT THAT STATES:

1    "WHAT'S NEW IN ACROBAT X"?

2    **A.**  YES, I DO.

3    **Q.**  AND THAT INCLUDES A STREAMLINED USER INTERFACE?

4    **A.**  I SEE THAT, YES.

5    **Q.**  AND THEN, ADOBE SAYS THAT THIS STREAMLINED, SIMPLIFIED

6    USER INTERFACE DISPLAYS THE MOST COMMONLY USED TOOLS, RIGHT?

7    **A.**  YES.

8          **MR. ELLWANGER:**  NOW, MS. MASON, IF YOU CAN PULL UP

9    PAGE 3 OF EXHIBIT 179.

10         AND IF YOU COULD BLOW UP THE SECTION THAT SAYS, "ADD TOOLS

11   TO TOOL PANE."

12   **BY MR. ELLWANGER**

13   **Q.**  THAT SECOND SENTENCE THERE, MR. HERBACH, YOU WOULD AGREE

14   WITH ME THAT ADOBE SAYS, "BY DEFAULT, ONLY THE MOST COMMONLY

15   USED TOOLS APPEAR."

16        DO YOU SEE THAT?

17   **A.**  I SEE IT SAYS THAT, YES.

18         **MR. ELLWANGER:**  AND FLIPPING BACK TO THE SECOND PAGE

19   OF THIS EXHIBIT, 179.002, MS. MASON.  IF YOU COULD EXPAND THAT

20   VERY TOP MENU BAR SECTION?

21        PERFECT.

22   **BY MR. ELLWANGER**

23   **Q.**  AND YOU SEE THAT THIS ADOBE ACROBAT X MENU BAR ON THAT

24   LEFT SIDE HAS ONE OF THE TASK MENU ITEMS SHOWN AS SECURE,

25   RIGHT?  WITH THE LITTLE LOCK MECHANISM BY IT?

 1    **A.**  YES.

 2    **Q.**  AND THAT THERE IS A DROPDOWN MENU BOX UNDER THAT TOOLBAR

 3    THAT SAYS "PROTECTION," RIGHT?

 4    **A.**  UM, I BELIEVE THAT IS ACTUALLY SHOWING SOMETHING ELSE.

 5    SO, CAN YOU REPEAT THE QUESTION?

 6    **Q.**  DOES IT SAY THE WORD "PROTECTION" IN THE DROPDOWN TOOLBAR?

 7          **THE COURT:**  WELL, YOU ARE IMPLYING THAT THAT IS A

 8    DROPDOWN FROM THE FIRST COLUMN, BUT IT IS NOT.  IT IS A

 9    COMPARISON OF IX AND X.  SO I THINK THAT IS WHAT IS CAUSING

10    THE PROBLEM.

11          **MR. ELLWANGER:**  OKAY.

12          **THE COURT:**  MAYBE YOU CAN REPHRASE YOUR QUESTION.

13          **MR. REINES:**  OBJECTION, YOUR HONOR.  I'M GOING TO

14    OBJECT TO THIS LINE OF QUESTIONING.  THIS WITNESS, THERE'S NO

15    DEMONSTRATION HE IS AN EXPERT ON THE TOOLBARS.  WE ARE

16    WANDERING THROUGH THIS.

17          **THE COURT:**  WELL, WE ARE TRYING TO POINT OUT CERTAIN

18    THINGS, SO I WILL GIVE HIM SOME LEEWAY TO POINT THOSE THINGS

19    OUT.

20          **MR. REINES:**  OKAY.

21          **THE COURT:**  MAYBE YOU NEED TO REPHRASE YOUR LAST

22    QUESTION.

23          **MR. ELLWANGER:**  YES, YOUR HONOR.

24    BY MR. ELLWANGER

25    **Q.**  YOU WOULD AGREE WITH ME THAT ON THIS DOCUMENT DESCRIBING

1    WHAT'S NEW IN ACROBAT X, THIS DOCUMENT TALKS ABOUT THE ACROBAT

2    X MENU BAR, RIGHT?

3    **A.**  YES.

4    **Q.**  AND ON THE ACROBAT X MENU BAR IS A LINK THAT YOU CAN CLICK

5    FOR PROTECTION, RIGHT?

6    **A.**  YES.

7    **Q.**  OKAY.  AND THAT BY DEFAULT, ONLY THE MOST COMMONLY USED

8    TOOLS APPEAR IN THE TOOLBAR.

9    **A.**  THAT'S WHAT IT SAYS, YES.

10   **Q.**  YOU HAD A FEW QUESTIONS ABOUT ADOBE VENTURES.  YOU RECALL

11   THAT?

12   **A.**  I DO.

13   **Q.**  AND YOU SAID THAT IT WOULD BE UNCOMMON FOR AN ENGINEER TO

14   SPEAK WITH AN ADOBE VENTURES PERSONNEL MEMBER TO TALK ABOUT

15   COMPANIES THAT THEY WERE INVESTING IN, RIGHT?

16   **A.**  I DON'T THINK I USED THE WORD "UNCOMMON." I SAID -- I

17   SAID -- I THINK I SAID SOMETHING MORE DEFINITIVE.

18        MY RECOLLECTION -- MY RECOLLECTION FROM AN HOUR AGO WAS

19   THAT I SAID I HAVE NOT, AND I DON'T THINK OTHERS WOULD EITHER.

20   **Q.**  I WILL GO WITH YOUR RECOLLECTION.

21   **A.**  OKAY.

22   **Q.**  BUT DO YOU ALSO RECALL THAT ADOBE ACQUIRED A COMPANY

23   CALLED "MACROMEDIA"?

24   **A.**  YEAH.

25   **Q.**  AND WITH THAT OTHER COMPANY THAT THEY ACQUIRED, THEY

1    DEVELOPED A PRODUCT CALLED "FLASH"?

2    **A.**  MACROMEDIA DEVELOPED FLASH.

3    **Q.**  AND ADOBE ACQUIRED IT?

4    **A.**  YES.

5    **Q.**  AND ADOBE SELLS IT?

6    **A.**  SURE.

7    **Q.**  AND NOW THE WORLD KNOWS IT AS "ADOBE FLASH"?

8    **A.**  YES.

9    **Q.**  YOU ALSO TESTIFIED TO THE JURY ABOUT YOUR INVOLVEMENT IN

10   THE PATENT PROCESS THROUGH YOUR OWN PATENTS, RIGHT?

11   **A.**  YES.

12   **Q.**  I BELIEVE YOUR TESTIMONY WAS THAT ONCE YOU FILED THE

13   APPLICATION THAT YOU WERE SORT OF THE HANDS-OFF FROM THERE,

14   RIGHT?

15   **A.**  IN TERMS OF THE ATTORNEYS WORKING WITH THE PATENT OFFICE,

16   YES.

17   **Q.**  YES.  AND LET'S TALK ABOUT THOSE ATTORNEYS.  YOU MENTIONED

18   THAT YOU WORKED WITH OUTSIDE COUNSEL, RIGHT?

19   **A.**  YES.

20   **Q.**  BUT YOU ALSO MENTIONED THAT YOU WOULD WORK WITH WHAT YOU

21   SAID WERE IN-HOUSE PATENT LAWYERS, CORRECT?

22   **A.**  YES.  BEFORE ADOBE CHOSE TO INVEST IN PAYING OUTSIDE

23   COUNSEL, AN INTERNAL ATTORNEY WOULD REVIEW THE CONCEPTS TO

24   MAKE SURE THEY WERE WORTHY OF APPLYING FOR PATENTS.

25   **Q.**  AND WHEN YOU SAY THIS "INTERNAL ATTORNEY," THAT IS AN

1    ATTORNEY WHO IS AN EMPLOYEE OF ADOBE, RIGHT?

2    **A.**   YES.

3    **Q.**   JUST LIKE YOU?

4    **A.**   YES.

5    **Q.**   MR. HERBACH, HAVE YOU EVER TESTIFIED ON BEHALF OF ADOBE

6    BEFORE?

7    **A.**   THIS IS THE FIRST TIME I'VE TESTIFIED.  I'VE GIVEN A

8    DEPOSITION BEFORE.

9    **Q.**   HOW MANY TIMES HAVE YOU BEEN DEPOSED ON BEHALF OF ADOBE?

10   **A.**   I THINK JUST ONCE.

11   **Q.**   BUT YOU ARE OBVIOUSLY AN EMPLOYEE OF ADOBE, CORRECT?

12   **A.**   YES.

13   **Q.**   YOU OWN STOCK IN ADOBE?

14   **A.**   I DO.

15   **Q.**   ADOBE PAYS YOU BONUSES?

16   **A.**   YES.

17   **Q.**   THOSE BONUSES ARE BASED ON YOUR PERFORMANCE?

18   **A.**   BONUSES ARE BASED UPON THE MIX OF MY PERFORMANCE AND

19   COMPANY PERFORMANCE.

20   **Q.**   AND AFTER YOU STEP OFF THAT STAND, MR. HERBACH, YOU ARE

21   GOING TO GO BACK TO WORK FOR ADOBE?

22   **A.**   I MAY TAKE THE REST OF THE DAY OFF, BUT (LAUGHTER) -- BUT

23   AFTER A LONG WEEKEND, YES.

24          **MR. ELLWANGER:**  THANK YOU.

25          **THE WITNESS:**  SURE.

1        **MR. ELLWANGER:**  PASS THE WITNESS.

2        **MR. REINES:**  JUST A FEW QUESTIONS.  THANK YOU.

3                   **RECROSS-EXAMINATION**

4   **BY MR. REINES**

5   **Q.**  LET'S GO BACK, GENERALLY, TO THE DROPDOWN BARS.  AND LET

6   ME ASK YOU, WHEN YOU GO THROUGH THE DIFFERENT DROPDOWN BARS TO

7   GET TO LIVECYCLE, IF IT'S GRAYED OUT, DO YOU KNOW WHAT THAT

8   MEANS BASED ON YOUR EXPERIENCE?  DO YOU HAVE ENOUGH KNOWLEDGE

9   ABOUT HOW THINGS WORK TO UNDERSTAND WHAT IT MEANS WHEN IT IS

10  GRAYED OUT?

11  **A.**  I THINK SO.

12  **Q.**  CAN YOU DESCRIBE THAT FOR EVERYBODY?

13  **A.**  SURE.  IF SOMETHING IS GRAYED OUT, IT MEANS THAT THE

14  JARGON WE MIGHT USE IS "IT'S DISABLED."  IT IS NOT SOMETHING

15  THAT THE USER CAN CLICK ON OR DO SOMETHING WITH FOR ONE OF

16  POTENTIALLY MANY REASONS.

17  **Q.**  DID THE SHOWING OF THE DOCUMENT TO YOU ABOUT THIS ACROBAT

18  FOR LIFE SCIENCES CHANGE IN ANY WAY YOUR TESTIMONY FROM BEFORE

19  THAT THE AMOUNT OF ADOBE ACROBAT PROFESSIONAL USERS THAT WOULD

20  EVER TOUCH LIVECYCLE WAS SUPER TINY?  DOES IT EFFECT THAT AT

21  ALL?

22  **A.**  NOT AT ALL.  THE SCREEN SHOT IN THE LIFE SCIENCES DOCUMENT

23  WAS A SLIGHTLY DIFFERENT VERSION OF A PRODUCT FROM WHAT WAS

24  TALKED ABOUT IN THE SUBSEQUENT DOCUMENT.  AND IN THAT SCREEN

25  SHOT WHERE IT HAPPENED TO SAY "ADOBE LIVECYCLE RIGHTS

1    MANAGEMENT" -- I'M LOOKING AT HALFWAY DOWN THE SCREEN -- THERE

2    IS A LITTLE TRIANGLE -- I WOULD CALL IT A "CARET" -- WHICH IF

3    YOU HOOVER YOUR MOUSE OVER IT POPS UP ANOTHER DIALOGUE.  OH,

4    THAT IS NOT RIGHT.  IT POPS UP -- IN THAT VERSION OF POPUP I

5    WOULD CALL "SUBMENU" WHERE THERE WOULD BE SEVERAL OPTIONS

6    WHICH ARE GRAYED OUT AND DISABLED BY DEFAULT, AS I DISCUSSED

7    EARLIER.

8    Q.   NOW, THERE IS A SUGGESTION -- AT LEAST I TOOK IT AS A

9    SUGGESTION -- REGARDING THE INTERNAL PATENT ATTORNEY THAT

10   MIGHT CLEAR YOUR INVENTION TO MAKE SURE IT WAS PATENTABLE

11   BEFORE IT GOES OUT TO THE LAW FIRM TO HANDLE YOUR PROSECUTION

12   PROCESS.

13        DID YOU EVER GET ANY OF YOUR IDEAS FOR LIVECYCLE WITH

14   RIGHTS MANAGEMENT FROM THE PATENT ATTORNEYS THAT YOU WORKED

15   WITH?

16   A.   NO.

17             MR. REINES:  NO FURTHER QUESTIONS, YOUR HONOR.

18             MR. ELLWANGER:  NOTHING FURTHER, YOUR HONOR.

19             THE COURT:  ALL RIGHT.  YOU ARE EXCUSED.  YOU MAY

20   STEP DOWN.

21             THE WITNESS:  THANK YOU.

22             THE COURT:  YOU MAY CALL YOUR NEXT WITNESS.

23             MR. PRICE:  WE CALL RUSSELL PARR, YOUR HONOR.

24             THE CLERK:  ANY BINDERS THAT DON'T PERTAIN TO THIS

25   WITNESS, IF YOU CAN PICK THEM UP.

1    YOU WANT TO RAISE YOUR RIGHT HAND WHILE THEY'RE WORKING

2    OUT THE BINDER ISSUE?

3    (**RUSSELL PARR**, CALLED AS A WITNESS FOR THE PLAINTIFF,

4    HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

5         **THE WITNESS:**  I DO.

6         **THE CLERK:**  THANK YOU.

7    IF YOU CAN PLEASE STATE AND SPELL YOUR FIRST AND LAST NAME

8    FOR THE RECORD, PLEASE.

9         **THE WITNESS:**  RUSSELL PARR, P-A-R-R.  RUSSELL IS

10   SPELLED R-U-S-S-E-L-L.

11        **THE CLERK:**  THANK YOU.

12        **THE COURT:**  YOU MAY HAVE A SEAT.

13                    <u>**DIRECT EXAMINATION**</u>

14   **BY MR. PRICE:**

15   **Q.**  GOOD MORNING, MR. PARR.

16   WOULD YOU PLEASE INTRODUCE YOURSELF TO THE JURY?

17   **A.**  MY NAME IS RUSSELL L. PARR.

18   **Q.**  HOW OLD OF A MAN ARE YOU, SIR?

19   **A.**  FIFTY-NINE.

20   **Q.**  WHAT WERE YOU ASKED TO DO FOR THIS CASE?

21   **A.**  I WAS ASKED TO PROVIDE AN OPINION ABOUT THE DAMAGES

22   ECONOMICALLY THAT ADOBE --

23        **THE COURT:**  YOU ARE GOING TO NEED TO SPEAK RIGHT INTO

24   THE MICROPHONE THERE.

25        **THE WITNESS:**  I WAS ASKED TO PROVIDE AN OPINION ABOUT

1  THE DAMAGES THAT ADOBE SHOULD PAY TO DIGITAL REG FOR PATENT

2  INFRINGEMENT.

3  **BY MR. PRICE:**

4  **Q.**  ARE YOU BEING COMPENSATED FOR YOUR WORK ON THIS CASE?

5  **A.**  YES.

6  **Q.**  AT WHAT RATE?

7  **A.**  575 AN HOUR.

8  **Q.**  IS YOUR COMPENSATION TIED TO THE OUTCOME OF THE CASE?

9  **A.**  NO.

10  **Q.**  LET'S TALK A LITTLE BIT ABOUT YOUR BACKGROUND.

11     HOW LONG HAVE YOU BEEN INVOLVED IN INTELLECTUAL PROPERTY

12  VALUATION?

13  **A.**  OVER 25 YEARS.

14  **Q.**  WHAT TYPES OF ENTITIES OR CLIENTS HAVE YOU BEEN HIRED BY?

15  **A.**  UNIVERSITIES, CORPORATIONS, INDIVIDUALS.

16  **Q.**  ANY PEOPLE YOU CAN NAME BY NAME, SIR?

17  **A.**  WELL, INCORPORATIONS I'VE WORKED FOR -- DONE WORK FOR

18  AT&T, IBM, EDWARD LIFESCIENCES, INGERSOLL, MOTTS.

19  UNIVERSITIES, I'VE DONE WORK FOR THEM; RUTGERS UNIVERSITY,

20  PRINCETON, CARNEGIE MELLON UNIVERSITY.

21     AND THEN I'VE ALSO DONE WORK FOR INDIVIDUALS.  I DID WORK

22  FOR THE ESTATE OF DR. SEUSS.

23  **Q.**  INTERESTING.  COULD YOU TELL US ABOUT YOUR WORK WITH

24  DR. SEUSS?

25  **A.**  AS PART OF ESTATE TAXES, YOU HAVE TO VALUE ALL ASSETS THAT

1    ARE PART OF THE ESTATE, AND HIS COPYRIGHTS WERE PART OF THE

2    ESTATE.

3        SO, I HAD TO COME UP WITH A VALUE FOR ALL THE BOOKS.  BUT

4    IN ADDITION, THE COPYRIGHTS HAD VALUE FOR APPLICATION TO TOYS,

5    CLOTHING, BEDDING, PLUSH TOYS, THEME PARKS, THEATER

6    PRODUCTIONS, MOVIES, AND NONE OF THOSE HAD BEEN DONE BEFORE

7    BECAUSE HE DIDN'T CARE FOR LICENSING.

8        SO WE HAD TO, FROM THE GROUND UP, CREATE MODELS AND

9    ANALYSIS AND FORECASTS TO DETERMINE WHAT ROYALTIES THE ESTATE

10   WAS GOING TO GET FOR THE REMAINING LIFE OF THE COPYRIGHTS ON A

11   ROYALTY BASE THAT WAS PROJECTED FROM THE GROUND UP.

12   **Q.**  WHAT IS YOUR EDUCATIONAL BACKGROUND?

13   **A.**  I HAVE A BACHELORS DEGREE IN ELECTRICAL ENGINEERING AND A

14   MASTERS -- MBA IN FINANCE.

15   **Q.**  HAVE YOU BEEN AWARDED ANY PROFESSIONAL DESIGNATIONS?

16   **A.**  YES.  I'M A CHARTERED FINANCIAL ANALYST AND AN ACCREDITED

17   SENIOR APPRAISER, AND I'M A CERTIFIED LICENSING PROFESSIONAL.

18   **Q.**  HAVE YOU PUBLISHED ANY BOOKS RELATED TO ROYALTY RATES FOR

19   INTELLECTUAL PROPERTY LICENSES?

20   **A.**  FOR ROYALTY RATES I PUBLISHED THREE BOOKS MYSELF.  AND

21   THEY ARE TITLED "ROYALTY RATES FOR TECHNOLOGY", "ROYALTY RATES

22   FOR PHARMACEUTICALS AND BIOTECHNOLOGY" AND "ROYALTY RATES FOR

23   TRADEMARKS AND COPYRIGHTS".

24   **Q.**  ANY OTHER BOOKS YOU'VE AUTHORED OR CO-AUTHORED, SIR?

25   **A.**  YES.  THERE'S A NUMBER THAT HAVE BEEN PUBLISHED BY JOHN

1    WILEY & SONS.  THEIR TITLES ARE "INTELLECTUAL PROPERTY

2    INFRINGEMENT DAMAGES", "VALUATION OF INTELLECTUAL PROPERTY AND

3    INTANGIBLE ASSETS".  ANOTHER TITLE IS "ROYALTY RATES FOR

4    INTELLECTUAL PROPERTY".  ANOTHER TITLE IS "INVESTING IN

5    INTELLECTUAL PROPERTY".  ANOTHER TITLE IS "INTELLECTUAL

6    PROPERTY EXPLOITATION AND JOINT VENTURE PROFIT STRATEGIES".

7    **Q.**  HAVE YOU EVER TESTIFIED AT TRIAL OR DEPOSITION BEFORE?

8    **A.**  YES.

9    **Q.**  HOW MANY TIMES?

10   **A.**  WELL, AT TRIAL, I'VE TESTIFIED 20 TIMES.  IF YOU INCLUDE

11   DEPOSITIONS AND TESTIMONY AT TRIAL IT WOULD BE OVER -- WELL

12   OVER 50 TIMES.

13          **MR. PRICE:**  YOUR HONOR, DIGITAL REG WOULD LIKE TO

14   OFFER MR. PARR AS A DAMAGES EXPERT IN THIS CASE.

15          **MR. REINES:**  NO OBJECTION, YOUR HONOR.

16          **THE COURT:**  ALL RIGHT.

17   **BY MR. PRICE:**

18   **Q.**  LET'S JUST START WITH -- WE HAVE HEARD A LOT OF TECHNICAL

19   INFORMATION.  WHAT, IF ANY, TECHNICAL INFORMATION DID YOU NEED

20   TO KNOW FOR YOUR FINANCIAL ANALYSIS?

21          **MR. REINES:**  YOUR HONOR, I GUESS I SHOULD -- JUST TO

22   PRESERVE THE RECORD, SUBJECT TO ALL OF THE DISCUSSIONS WE HAVE

23   HAD OUTSIDE THE PRESENCE OF THE JURY.

24          **THE COURT:**  RIGHT.

25          **THE WITNESS:**  THE INFORMATION I NEED IS TO UNDERSTAND

1    WHAT THE END RESULT OF THE INVENTION IS; WHAT DOES IT DO.

2        AS FAR AS THE CODE AND THE TECHNICAL ASPECTS OF IT, THAT

3    IS NOT PART OF MY EXPERTISE SO I RELY ON OTHERS, DR. DEVANBU

4    FOR ONE, TO PROVIDE INFORMATION TO ME ABOUT WHAT'S INFRINGING

5    AND WHEN IT STARTED INFRINGING.

6    **BY MS. GLAUSER:**

7    **Q.**  DO YOU HAVE AN UNDERSTANDING OF THE TERM "DIGITAL RIGHTS

8    MANAGEMENT"?

9    **A.**  YES, I DO.

10   **Q.**  WHAT IS YOUR UNDERSTANDING OF THAT?

11   **A.**  I UNDERSTAND IT HAS TO DO WITH THE CONTROL, REGULATION AND

12   PROTECTION OF CONTENT.

13   **Q.**  DO YOU UNDERSTAND -- DO YOU HAVE AN UNDERSTANDING OF WHAT

14   PIRACY MEANS?

15   **A.**  YES.

16   **Q.**  TELL --

17   **A.**  PIRACY HAS TO DO WITH THE DISTRIBUTION OF UNAUTHORIZED

18   COPIES OF CONTENT OR SOFTWARE PROGRAMS THAT ARE MAKING ITS WAY

19   OUT IN THE WORLD, BUT FOR WHICH PRODUCERS THAT HAVE WRITTEN

20   THE PROGRAMS AND SELL THEM, LIKE ADOBE, DON'T GET PAID.

21   **Q.**  HAVE YOU DONE ANY RESEARCH REGARDING THE FINANCIAL IMPACT

22   OF PIRACY IN THE UNITED STATES?

23   **A.**  YES.

24   **Q.**  PLEASE GIVE US SOME BACKGROUND ON THAT RESEARCH.

25   **A.**  WELL, THERE ARE INDEPENDENT ENTITIES THAT DO RESEARCH IN

1    VERY FOCUSED AREAS.  ONE IS NAMED -- I REFER TO IT AS BSA.  I

2    THINK IT'S THE BUSINESS SOFTWARE ALLIANCE.  ANOTHER COMPANY IS

3    CALLED INTERNATIONAL DATA CORPORATION.

4        THEY FOCUS, LIKE I SAID, ON VERY, VERY KEY AND NICHE

5    ASPECTS AND DO IT FOR CONTRACT OR FOR ORGANIZATIONS, AND

6    PRODUCE REPORTS ABOUT THIS KIND OF SUBJECT.

7    **Q.**  AND YOU HAVE A BINDER IN FRONT OF YOU THERE.

8    **A.**  YES.

9    **Q.**  IF YOU'LL LOOK AT EXHIBIT 89 AND 108.

10       AND TELL THE JURY IF THESE ARE DOCUMENTS YOU RELIED ON IN

11   FORMING YOUR OPINION.

12                    (PAUSE IN THE PROCEEDINGS.)

13   **A.**  I HAVE 108.  I'M HAVING TROUBLE FINDING 89.

14   **Q.**  89 IS HIDDEN IN THERE.  IT'S A SMALLER TAB.

15   **A.**  OKAY, 89.  YES.  THIS IS -- THE BOTTOM SAYS IT'S A BSA

16   REPORT.

17   **Q.**  OKAY.  IS THIS THE TYPE OF INFORMATION YOU GENERALLY RELY

18   ON IN CONDUCTING YOUR ANALYSIS?

19   **A.**  YES.

20   **Q.**  YOU RELIED ON IT IN THIS CASE?

21   **A.**  YES.

22   **Q.**  DO YOU CONSIDER THIS TO BE RELIABLE INFORMATION?

23   **A.**  YES.

24          **MR. PRICE:**  YOUR HONOR, WE'D OFFER THIS TO PUBLISH TO

25   THE JURY IF THAT'S YOUR PREFERENCE, OR WE CAN OFFER IT INTO

```
1    EVIDENCE.

2              MR. REINES:  NO OBJECTION TO PUBLISHING THIS.

3              THE COURT:  ALL RIGHT.

4              MR. PRICE:  MS. MASON TURN TO EXHIBIT 89, 5.

5                   (PUBLISHED TO JURY.)

6    BY MR. PRICE:

7    Q.  DO YOU SEE TABLE 1 THERE, SIR?

8    A.  YES, I DO.

9              MR. PRICE:  IF WE CAN GET THE TOP OF THE TABLE.

10   BY MR. PRICE:

11   Q.  WHAT DID YOU LOOK AT, IF ANYTHING, WITH RESPECT TO

12   TABLE 1?

13   A.  THIS SHOWS PIRACY RATES FOR DIFFERENT COUNTRIES.

14      AND ON THE RIGHT COLUMN, YOU WILL SEE THAT THE PIRACY RATE

15   FOR THE UNITED STATES BETWEEN 2003 AND 2006 WAS 22 TO

16   21 PERCENT.

17             MR. PRICE:  I CAN'T READ THAT FROM HERE.  CAN YOU GET

18   IN ON THE UNITED STATES IN THE UPPER RIGHT?

19   BY MR. PRICE:

20   Q.  IS THAT WHAT YOU ARE REFERRING TO, SIR?

21   A.  YES.

22   Q.  OKAY.

23             MR. PRICE:  IF WE CAN GO TO EXHIBIT 89, PAGE 8.  IT'S

24   ACTUALLY PAGE 7 OF THE DOCUMENT BUT IT'S 008 OF THE EXHIBIT.

25                   (PUBLISHED TO JURY.)
```

1        IF WE CAN GET THE TOP PART OF IT.

2    **BY MR. PRICE:**

3    **Q.**   DID YOU RELY ON TABLE 2, SIR?   CONSIDER IT IN ANY WAY?

4    **A.**   YES, TABLE 2.

5    **Q.**   WHAT WAS YOUR TAKEAWAY FROM THAT?

6    **A.**   IT SHOWS THAT IN THE UNITED STATES IN 2006, THE LOSSES TO

7    PIRACY WERE $7.3 BILLION.

8    **Q.**   OKAY.   AND ANY -- ANY ANALYSIS WITH RESPECT TO THAT

9    NUMBER, SIR?

10   **A.**   I DIDN'T DO ANY ANALYSIS.   I JUST -- IT JUST INDICATES

11   PIRACY IS AN ENORMOUS PROBLEM.   AND THIS IS JUST FOR ONE YEAR.

12   **Q.**   LET'S TURN TO EXHIBIT 108.

13                    (DISPLAYED ON SCREEN.)

14       DID YOU RELY ON 108 IN FORMING YOUR OPINION?

15   **A.**   YES.   IT'S ANOTHER STUDY BY BSA.   AND IT LOOKS LIKE IDC

16   WAS INVOLVED WITH THIS, TOO.   I THINK IT'S A SIMILAR STUDY,

17   IT'S JUST FOR 2009, SO IT WOULD BE AN UPDATE.

18           **MR. PRICE:**   WE WOULD OFFER THIS FOR PUBLICATION TO

19   THE JURY, YOUR HONOR.

20           **MR. REINES:**   AT THIS POINT I'M CONCERNED ABOUT THE

21   TIME WE ARE SPENDING ON THIS SUBJECT GIVEN THE RULINGS AND THE

22   HISTORY.

23       I THINK PIRACY IS NOT PART OF ANY OF THE CORE OF HIS

24   OPINIONS.   THIS IS BACKGROUND.   WE HAVE SEEN ONE REPORT.   HOW

25   MANY OF THESE REPORTS ARE WE GOING TO GO THROUGH?   IT'S NOT

PARR – DIRECT / PRICE

```
 1   WHAT HIS OPINION IS ABOUT.
 2              THE COURT:  YOU MAY USE IT WITH THE JURY AND WE WILL
 3   TAKE UNDER SUBMISSION WHETHER IT'S ADMITTED INTO EVIDENCE.
 4              MR. PRICE:  IF YOU TURN TO PAGE 9, TABLE 1, AND GO TO
 5   THE UNITED STATES AT THE TOP.
 6                        (PUBLISHED TO JURY.)
 7   BY MR. PRICE:
 8   Q.  WHAT DID YOU OBSERVE THERE, SIR, IF ANYTHING, WITH RESPECT
 9   TO YOUR ANALYSIS?
10   A.  BY 2009, THE PIRACY RATE IN THE UNITED STATES WAS STILL
11   20 PERCENT.
12   Q.  OKAY.  LET'S MOVE ON.
13      TALK A LITTLE BIT ABOUT YOUR OPINION.  PLEASE GIVE THE
14   JURY AN OVERVIEW OF THE METHODOLOGY YOU USED IN FORMING YOUR
15   OPINION.
16   A.  ALL RIGHT.
17      THERE'S A CONSTRUCT THAT WAS CREATED OR ESTABLISHED, I
18   THINK IN 1967, WHERE YOU LOOK AT A HYPOTHETICAL NEGOTIATION.
19   AND WHAT YOU ARE DOING IS CREATING A SITUATION HYPOTHETICALLY
20   WHERE IF THE TWO PARTIES WERE TO HAVE NEGOTIATED FOR A LICENSE
21   AT THE TIME OF THE INFRINGEMENT, AT THE MOMENT BEFORE IT
22   BEGAN, WHAT WOULD THEY HAVE COME UP WITH INSTEAD OF
23   INFRINGEMENT.
24      AND THE GUIDANCE FOR THAT NEGOTIATION IS PROVIDED BY
25   WHAT'S CALLED THE GEORGIA-PACIFIC FACTORS.  THERE ARE 15
```

1    FACTORS THAT BASICALLY REPRESENT QUESTIONS.

2        BASED ON THE ANSWERS TO THOSE QUESTIONS, YOU NOW HAVE

3    INFORMATION THAT THE TWO PARTIES IN THE HYPOTHETICAL

4    NEGOTIATION WOULD USE TO COME UP WITH THE AMOUNT THAT THEY

5    WOULD HAVE AGREED TO BACK IN 2005 BEFORE INFRINGEMENT.  IT'S

6    LIKE TAKING THE PLACE OF INFRINGEMENT.

7    **Q.**  CAN YOU SEE THIS BOARD OVER HERE THAT WE HAVE PUT UP?

8    **A.**  YES.

9    **Q.**  ARE YOU ABLE TO READ THE FACTORS THAT ARE UP THERE?

10   **A.**  NOT WELL.

11   **Q.**  NOT WELL.

12        **MR. PRICE:**  CAN WE GET THAT A LITTLE CLOSER TO HIM SO

13   HE CAN SEE IT OR TILT IT?

14        **THE COURT:**  OR YOU COULD LET THE JURY SEE THAT AND

15   GIVE HIM A HARD COPY.

16        **MR. PRICE:**  DO WE HAVE A HARD COPY?

17        **THE WITNESS:**  THAT'S BETTER.

18        **MR. PRICE:**  OKAY.

19        **THE WITNESS:**  A LITTLE.

20   **BY MR. PRICE:**

21   **Q.**  OKAY.  LET'S -- WELL, FIRST OFF, WHAT WAS THE HYPOTHETICAL

22   DATE FOR THIS CASE?

23   **A.**  2005.

24   **Q.**  HOW DID YOU DETERMINE THAT?

25   **A.**  THAT CAME FROM OTHERS.  LIKE DR. DEVANBU DID AN ANALYSIS

1    OF THE TECHNOLOGY AND THE ACCUSED PRODUCTS, AND HE DETERMINED

2    FROM HIS TECHNICAL ANALYSIS WHEN INFRINGEMENT BEGAN.

3    **Q.**  ARE YOU FAMILIAR WITH THE TERM "LUMP SUM"?

4    **A.**  YES.

5    **Q.**  WHAT IS IT IN CONTEXT OF ONE OF THESE ANALYSES?

6    **A.**  WELL, THERE ARE BASICALLY TWO TYPES OF LICENSE AGREEMENTS

7    OR COMPENSATION FOR LICENSE AGREEMENTS.  ONE IS A RUNNING

8    ROYALTY AND ONE IS A LUMP SUM.

9        IN A RUNNING ROYALTY, YOU PAY AS YOU GO.  EACH YEAR YOU

10   SEE HOW MANY -- YOU AGREE TO WHAT SALES WOULD BE THAT WOULD BE

11   USING THE PATENTED TECHNOLOGY THAT'S BEING LICENSED, AND YOU

12   AGREE ON A ROYALTY RATE.  AND THEN AT THE END OF THE YEAR OR

13   QUARTERLY OR SEMIANNUALLY, YOU PAY.  THE LICENSEE PAYS THE

14   LICENSOR.  THAT'S A RUNNING ROYALTY AGREEMENT.

15       THE ALTERNATIVE IS TO SIT DOWN TOGETHER, FORECAST ALL

16   SALES THAT COULD POSSIBLY HAPPEN INTO THE FUTURE, AND THEN

17   FIGURE OUT WHAT KIND OF LUMP SUM WOULD BE EQUIVALENT TO PAYING

18   AS YOU GO.

19       SO, IF YOU ARE DOING A SIGNIFICANT DEAL, YOU STILL HAVE TO

20   CONSIDER THE ROYALTY BASE, WHICH IS SALES, IT WOULD BE BASED

21   ON THE TECHNOLOGY, AND YOU STILL HAVE TO FIGURE OUT WHAT KIND

22   OF ROYALTY RATE IN A SENSE YOU ARE GIVING UP FOR THE LUMP SUM.

23       SO REALLY ONE IS PAYING EVERYTHING UP FRONT AND THE OTHER

24   IS PAYING AS YOU GO.

25   **Q.**  AND FOR THIS CASE, WHICH LUMP SUM AND RUNNING ROYALTY DID

1   YOU CHOOSE?

2   **A.**  I USED THE RUNNING ROYALTY TO CALCULATE TO APPLY TO THE

3   KNOWN REVENUES TO COME UP WITH A LUMP SUM TO CURE THE

4   DAMAGES -- I MEAN TO CURE THE INFRINGEMENT.

5   **Q.**  OKAY.  YOU SAID YOU CAME UP WITH A ROYALTY -- A RUNNING

6   ROYALTY INITIALLY?

7   **A.**  OH, YES.

8   **Q.**  WHY DID YOU CHOOSE A RUNNING ROYALTY INITIALLY?

9   **A.**  WELL, YOU HAVE -- ONCE YOU HAVE THE ACCUSED PRODUCTS,

10  REVENUE BASE, YOU HAVE TO FIGURE OUT HOW MUCH OF THAT SHOULD

11  BE PAID TO THE LICENSOR.  AND IN ORDER TO FIGURE OUT WHAT

12  PORTION OF THE TOTAL ROYALTY BASE, YOU NEED A ROYALTY RATE.

13      SO THE FIRST THING I HAD TO DO WAS FIGURE OUT WHAT'S A

14  FAIR ROYALTY RATE.

15  **Q.**  OKAY.  AND WERE THERE ANY UNDERLYING FACTS THAT SUPPORTED

16  YOUR VIEW THAT A RUNNING ROYALTY WAS APPROPRIATE?

17  **A.**  THE PARTIES THEMSELVES.  I KNOW THAT DIGITAL REG AT LEAST

18  WOULD HAVE PREFERRED TO DO A RUNNING ROYALTY.

19      ONE OF THE REASONS COMPANIES DO PREFER THAT IS BECAUSE YOU

20  PAY AS YOU GO.  AND INSTEAD OF TRYING TO GUESS OR ESTIMATE

21  WHAT ALL FUTURE USE WILL BE, YOU ELIMINATE THE RISK OF

22  OVERPAYING OR UNDERPAYING BECAUSE OF A FALSE OR A FAULTY

23  FORECAST.  SO, THE PARTIES CAN ELIMINATE THE RISK OF THAT BY

24  PAYING AS YOU GO.  SO I KNOW THAT DIGITAL REG WANTED TO DO A

25  RUNNING ROYALTY RATE IF THEY COULD.

1      I ALSO KNOW THAT ADOBE IS -- UNDERSTANDS THE SAME THING

2    ABOUT RUNNING ROYALTIES BECAUSE THAT'S HOW THEY PRICE THEIR

3    DRM TECHNOLOGY ASSOCIATED WITH ADOBE READER.  THEY HAVE A

4    TECHNOLOGY THAT THEY LICENSE, AND THEY'RE NOT PRICING IT AS A

5    LUMP SUM.  THEY PRICE IT AS A RUNNING ROYALTY.

6    **Q.**  OKAY.  LET'S WORK OUR WAY THROUGH THE FACTORS STARTING

7    WITH FACTOR 1.

8      CAN YOU EXPLAIN TO THE JURY WHAT THAT IS IN YOUR ANALYSIS?

9    **A.**  THE FIRST FACTOR SAYS LET'S LOOK AT WHAT THE PLAINTIFF HAS

10   RECEIVED FOR THE LICENSING OF THEIR TECHNOLOGY.

11     AND I FOUND THAT THERE WERE TEN SETTLEMENT AGREEMENTS

12   ASSOCIATED WITH THEIR PATENTS FOR WHICH MONEY WAS PROVIDED.

13   **Q.**  DID YOU CONSIDER ALL OF THOSE AGREEMENTS, SIR?

14   **A.**  I LOOKED AT THEM ALL, YES.  TWO OF THEM, IN PARTICULAR,

15   THOUGH ALLOWED FOR THE DEVELOPMENT OF RUNNING ROYALTY.  THE

16   OTHERS DIDN'T PROVIDE INFORMATION NEEDED TO DEVELOP A RUNNING

17   ROYALTY.  THEY WERE JUST PROVIDED TO ME AS HERE'S THE LUMP SUM

18   AMOUNT THAT WAS PAID AND WE HAVE NO INFORMATION ABOUT THE

19   REVENUES THAT WERE ACCUSED.

20     TWO OF THE CASE -- TWO OF THE LICENSES, THOUGH, DID

21   PROVIDE AN INDICATION OF RELATING THE AMOUNT OF DAMAGES TO THE

22   AMOUNT OF USAGE.  SO, THOSE TWO HELPED TO FORMULATE A RUNNING

23   ROYALTY.  THE OTHERS, UNFORTUNATELY, COULDN'T.

24   **Q.**  DID YOU USE THE OTHERS IN YOUR ANALYSIS?

25   **A.**  I COULDN'T BECAUSE I WASN'T ABLE TO CONVERT -- WASN'T ABLE

1    TO COMPARE THE AMOUNT OF THE SETTLEMENT TO THE USAGE, AND

2    THERE WAS NO WAY TO RELATE THE AMOUNTS THAT WERE PAID TO THE

3    USAGE IN THIS CASE.

4    **Q.**  AND WHICH TWO AGREEMENTS DID YOU FIND USEFUL FOR YOUR

5    ANALYSIS?

6    **A.**  THERE WAS A SETTLEMENT WITH A COMPANY CALLED MACROVISION.

7    AND INSIDE THE -- IN THE LICENSE, THE PARTIES AGREED THAT THE

8    AMOUNT BEING PAID REPRESENTED 1 PERCENT OF THE ACCUSED

9    REVENUE.

10       THE OTHER AGREEMENT THAT I COULD CONVERT TO A ROYALTY RATE

11   WAS WITH INTUIT WHERE THE AMOUNT PAID COULD BE RELATED TO THE

12   TOTAL REVENUE OF ACCUSED USE, AND THAT CONVERSION INDICATED A

13   ROYALTY OF 2.5 PERCENT.

14   **Q.**  OKAY.

15       **MR. PRICE:**  YOUR HONOR, I BELIEVE THESE HAVE ALREADY

16   BEEN PUBLISHED TO THE JURY.  WE WOULD OFFER THEM INTO

17   EVIDENCE, THESE TWO IN PARTICULAR BEING RELIED ON.

18       **THE COURT:**  WE WILL RECEIVE THE PARTS THAT WE NEED.

19       **MR. PRICE:**  OKAY.

20   **BY MR. PRICE:**

21   **Q.**  LET'S START -- IF YOU WILL LOOK AT EXHIBIT 98 OF YOUR

22   BOOK.

23       LET'S TURN TO SECTION 6.7, WHICH IS ON PAGE 5.

24   **A.**  YES, I SEE IT.

25       **MR. PRICE:**  CAN THAT BE PUBLISHED ON THE SCREEN SO

1    THE JURY CAN SEE IT?

2            **THE CLERK:**  WHAT EXHIBIT NUMBER IS THIS?

3            **MR. PRICE:**  98.

4            **THE CLERK:**  I DON'T SHOW THAT 98 HAS BEEN RECEIVED IN

5    EVIDENCE.

6            **MR. DINOVO:**  I THINK IT HAS BEEN PREVIOUSLY

7    PUBLISHED.

8            **MR. REINES:**  THIS IS THE LICENSE AGREEMENTS WHERE

9    BOTH PARTIES AGREE THAT THEY CAN BE PUBLISHED, ALTHOUGH NOT

10   YET INTO EVIDENCE.

11           **THE COURT:**  ALL RIGHT.  SO YOU MAY PUBLISH THEM.  AND

12   THEY ARE UNDER SUBMISSION AS TO WHICH PARTS WILL BE ADMITTED.

13           **MR. PRICE:**  OKAY.

14                   (PUBLISHED TO JURY.)

15   **BY MR. PRICE:**

16   **Q.**  LOOK AT 6.7.  HERE IT IS.

17       TELL THE JURY WHAT YOU ARE SEEING HERE.

18   **A.**  THIS IS A PORTION OF THE LICENSE AGREEMENT.  AND IN

19   PARAGRAPH 6.7 THE PARTIES ARE AGREEING THAT THE ROYALTY AMOUNT

20   THAT HAS BEEN PAID TO CURE PAST INFRINGEMENT REPRESENTED

21   1 PERCENT OF THE ACCUSED REVENUES THAT INFRINGED DIGITAL REG'S

22   PATENTS.

23   **Q.**  OKAY.  IS THIS PAST REVENUES ONLY OR DOES IT ACCOUNT FOR

24   FUTURES AS WELL?

25   **A.**  I THINK THIS DEAL LETS THEM HAVE RIGHTS INTO THE FUTURE.

1    **Q.**  AND DOES THAT AFFECT YOUR ANALYSIS OF THIS AGREEMENT IN

2    ANY WAY?

3    **A.**  WELL, I UNDERSTAND THAT -- I DON'T KNOW WHAT THE FUTURE

4    HOLDS, WHETHER THEY ARE GOING TO CONTINUE USING IT.  IF THEY

5    DO, THAT WOULD DILUTE THIS ONE PERCENT BECAUSE YOU'RE ONLY

6    GETTING -- I DON'T KNOW WHAT FUTURE USE MACROVISION IS

7    PLANNING.  IF THEY CONTINUE TO USE -- SUPPOSE THEY DOUBLE WHAT

8    THEY -- WHAT THIS 1 PERCENT HAS PAID FOR, THEN THE EFFECTIVE

9    RATE WOULD GO DOWN TO HALF A PERCENT.

10   **Q.**  OKAY.

11   **A.**  IF THEY DON'T DO ANYTHING FUTURE EVER AGAIN WITH IT, THEN

12   THE EFFECTIVE RATE IS 1 PERCENT.

13   **Q.**  DO YOU UNDERSTAND THIS TO BE THE RESULT OF A SETTLEMENT OF

14   CONTESTED LITIGATION?

15   **A.**  YES.  THAT'S RIGHT.

16   **Q.**  CAN YOU JUXTAPOSE THAT TO THE HYPOTHETICAL NEGOTIATION

17   SCENARIO?  WHAT IS DIFFERENT ABOUT THAT?

18   **A.**  THERE'S A KEY DIFFERENCE.  IN THESE -- IN ALL SETTLEMENT

19   AGREEMENTS, THERE'S NO CERTAINTY THAT THE PATENTS ARE VALID

20   AND INFRINGED.

21        AND IN THE HYPOTHETICAL NEGOTIATION THAT WE'RE HERE, I'M

22   PROVIDING AN OPINION BASED ON CERTAINTY.  YOU DON'T EVEN

23   BOTHER WITH MY OPINION UNTIL YOU COME TO THE DETERMINATION

24   THAT YOU BELIEVE THE PATENTS ARE VALID AND YOU BELIEVE WHAT

25   ADOBE HAS DONE IS INFRINGED.  SO I AM COMING UP WITH A ROYALTY

1    RATE THAT KNOWS THOSE FOR CERTAIN.

2        WHEN YOU ARE NEGOTIATING A SETTLEMENT AGREEMENT, YOU DON'T

3    KNOW THOSE THINGS FOR CERTAIN.  AND BECAUSE OF THE

4    UNCERTAINTY, THE ROYALTY RATE PAYMENT IS GOING TO BE LESS.

5    **Q.**  OKAY.

6        ANY MORE ANALYSIS OF THE MACROVISION AGREEMENT OR CAN WE

7    MOVE ON TO THE INTUIT AGREEMENT?

8    **A.**  NO, WE CAN GO ON.

9    **Q.**  OKAY.

10            **MR. PRICE:**  TURN TO EXHIBIT 100.  AND IN PARTICULAR

11    SECTION 9.1, WHICH IS ON PAGE 4.

12            **THE WITNESS:**  YES, I HAVE 9.1.

13            **MR. PRICE:**  CAN THAT BE PUBLISHED TO THE JURY?

14            **THE COURT:**  YES.

15                    (PUBLISHED TO JURY.)

16            **MR. REINES:**  YES.

17        NO OBJECTION.

18    **BY MR. PRICE:**

19    **Q.**  SO WOULD YOU TELL US WHAT YOU ARE SEEING HERE?

20    **A.**  YES.  THIS IS -- FOR THIS SETTLEMENT AGREEMENT WITH

21    INTUIT, THE AMOUNT THAT WAS PAID TO DIGITAL REG WAS $350,000.

22    **Q.**  OKAY.

23        I'M NOT SEEING A RATE IN THERE, THOUGH.  CAN YOU TELL US

24    HOW YOU WERE ABLE TO CALCULATE THAT RATE BASED ON THIS NUMBER?

25    **A.**  YES.  FOR ALL OF THE AGREEMENTS I TALKED TO THE PERSON AT

1   DIGITAL REG WHO NEGOTIATED THESE DEALS.  AND HE TOLD ME THAT

2   IN THIS CASE, HE WAS AWARE THAT $14 MILLION WORTH OF REVENUE

3   WAS BEING ACCUSED.

4        SO NOW I KNOW THAT THE $350,000 WAS THE SETTLEMENT AMOUNT

5   BASED ON $14 MILLION OF ACCUSED REVENUE.  THAT TRANSLATES INTO

6   A 2.5 PERCENT ROYALTY.

7             MR. REINES:  YOUR HONOR, WE WOULD MOVE TO STRIKE THAT

8   TESTIMONY AND RELIANCE ON THIS LICENSE.

9        AS EVERYONE HERE WILL RECALL, WHEN MR. FARLEY ATTEMPTED TO

10  STATE THAT HE HAD KNOWLEDGE ON THAT SUBJECT, IT WAS DEEMED

11  INADMISSIBLE AND LACKING FOUNDATION.

12       UNDER RULE 703, THIS IS NOT EVEN SUPPOSED TO BE PUBLISHED

13  TO THE JURY DUE TO THE PREJUDICIAL NATURE OF IT.

14            THE COURT:  WELL, HE CAN LAY A FOUNDATION THAT THIS

15  WAS THE SORT OF INFORMATION THAT EXPERTS TYPICALLY RELY UPON,

16  AND THEN IT'S ADMISSIBLE.

17            MR. REINES:  WELL, NO.  UNDER RULE 703, YOUR HONOR,

18  IT'S A BALANCING TEST BETWEEN PREJUDICIAL AND PROBATIVE VALUE.

19            THE COURT:  WELL, WE'VE GONE -- THIS HAS BEEN

20  LITIGATED TO SOME EXTENT.  AND THIS IS WHAT WE DECIDED WOULD

21  BE ALLOWED, AS I REMEMBER IT.

22            MR. REINES:  THIS IS --

23            THE COURT:  I WILL ALLOW IT SUBJECT TO A MOTION TO

24  STRIKE.

25            MR. REINES:  THIS IS COMPLETELY INDEPENDENT OF THAT.

1    THIS IS BASED ON THE FACT THAT WHEN HE ATTEMPTED -- WHEN

2    MR. FARLEY ATTEMPTED TO LAY THE FOUNDATION THAT HE KNEW THE

3    REVENUE NUMBER IN OPEN SESSION, THAT THAT WAS STRICKEN, THAT'S

4    THE ONLY BASIS FOR THIS OPINION.  AND UNDER RULE 703 --

5            **THE COURT:**  I DON'T KNOW IF IT IS OR IT ISN'T.  WE'D

6    HAVE TO ASK HIM TO FIND OUT.  HE SAID HE TALKED TO SOMEBODY.

7    I DON'T KNOW WHO HE TALKED TO, WHETHER IT WAS FARLEY OR

8    SOMEBODY ELSE.

9        YOU CAN LAY A FOUNDATION AS TO WHO TOLD HIM THIS AND

10   WHETHER IT WAS THIS SORT OF THING -- THAT INFORMATION WAS THE

11   SORT OF THING THAT AN EXPERT WOULD NORMALLY RELY UPON.

12   **BY MR. PRICE:**

13   **Q.**  WHO TOLD YOU THIS, SIR?

14   **A.**  IT WAS MIKE FARLEY.

15   **Q.**  DID YOU RECORD THIS CONVERSATION IN ANY WAY?  NOT RECORD

16   LIKE WITH A TAPE RECORDER --

17   **A.**  OKAY.

18   **Q.**  -- BUT DID YOU SOMEHOW TAKE NOTE OF IT?

19   **A.**  YES.  I REMEMBER WE WERE TALKING ABOUT TEN LICENSE

20   AGREEMENTS THAT WERE SETTLEMENTS.  AND FOR -- I WAS ASKING HIM

21   ABOUT EACH ONE BECAUSE HE NEGOTIATED THEM.

22       IN MANY CASES, HE SAID, DISCOVERY HAD SHOWN THERE WAS VERY

23   LITTLE USE, AND HE NEGOTIATED A LOW SETTLEMENT TO END THE CASE

24   SINCE THERE WAS NO SIGNIFICANT USE.

25       WHEN WE CAME TO THIS ONE -- BECAUSE I WENT THROUGH THEM

1    ONE BY ONE ON THE PHONE, I ASKED HIM, DO YOU KNOW OR HAVE AN

2    IDEA WHAT THE ACCUSED REVENUE WAS.  AND HE TOLD ME 14 MILLION.

3    I WOULD HAVE NO OTHER WAY TO FIND THIS OUT.

4         **MR. REINES:**  YOUR HONOR, I JUST RENEW THE OBJECTION

5    UNDER 703 AND WOULD BE HAPPY --

6         **THE COURT:**  DO YOU HAVE A PAGE AND LINE OF THE

7    TESTIMONY?

8         **MR. REINES:**  YES, I'M SURE I DO.

9         **MR. PRICE:**  CAN I MAKE A COMMENT, YOUR HONOR, OR

10   RESPOND?

11        **THE COURT:**  YES.

12        **MR. PRICE:**  WHAT MR. FARLEY REMEMBERED TWO DAYS AGO

13   VERSUS WHAT HE MIGHT HAVE REMEMBERED A YEAR AGO ARE TWO

14   DIFFERENT THINGS.  AND MR. PARR WAS ON THE OTHER SIDE OF THAT

15   TELEPHONE CONVERSATION, SO HE CAN TESTIFY AS TO WHAT HE HEARD.

16        **THE COURT:**  OKAY.

17        **MR. REINES:**  YOUR HONOR, IT'S PAGE 331, AND THE COURT

18   SAID --

19        **THE COURT:**  THAT'S ALL RIGHT.  I'LL READ IT.

20        **MR. REINES:**  SORRY.

21             (PAUSE IN THE PROCEEDINGS.)

22        **THE COURT:**  WE WILL JUST HAVE TO MOVE ON.  I'LL HAVE

23   TO READ OVER THIS.  I DON'T REMEMBER IT.

24      GO AHEAD.

25        **MR. PRICE:**  OKAY.  AND --

```
1              THE COURT:  WE WILL STRIKE IT IF WE HAVE TO.

2              MR. PRICE:  MAY I PROCEED ON THIS LINE, YOUR HONOR?

3              THE COURT:  I GUESS SO.  I DON'T KNOW WHAT MORE THERE

4    IS TO SAY.

5    BY MR. PRICE:

6    Q.  WERE YOU ABLE TO CALCULATE A RATE BASED ON THOSE TWO

7    PIECES OF INFORMATION?

8    A.  YES.  YOU HAVE THE SETTLEMENT AMOUNT OF $350,000, AND YOU

9    ASSOCIATE THAT WITH THE ACCUSED REVENUE, WHICH MIKE FARLEY

10   TOLD ME WAS 14 MILLION, AND THAT INDICATES ROYALTY OF

11   2.5 PERCENT.

12   Q.  OKAY.  LET'S MOVE ON TO EXHIBIT 100, PAGE 6.  AND THIS IS

13   PART B.

14                   (PUBLISHED TO JURY.)

15      DO YOU SEE PART B THERE?  IT RELATES TO RPX?

16   A.  YES.

17   Q.  WITHOUT REVEALING ANYTHING ABOUT THE ACTUAL AMOUNTS, TELL

18   ME THE IMPACT OF THAT STATEMENT IN THE AGREEMENT WITH RESPECT

19   TO YOUR ANALYSIS OF THE AGREEMENT.

20   A.  WELL, THIS INDICATES THAT INTUIT ALREADY HAD SOME RIGHTS

21   AND PAID SOMETHING FOR SOME RIGHTS ASSOCIATED WITH DRM.  SO

22   THE AMOUNT PAID TO DIGITAL RIGHTS WAS AN INCREMENTAL AMOUNT.

23   IT'S NOT THE TOTAL AMOUNT THAT INTUIT PAID TO GET DIGITAL

24   RIGHTS MANAGEMENT FREEDOM TO OPERATE.  THEY PAID RPX

25   SOMETHING, AND IN ADDITION PAID 2.5 PERCENT TO INTUIT.
```

1       SO, IF YOU WANT THE -- I DON'T KNOW WHAT PORTION OF --

2    THEY PAID TO RPX, BUT THEY DID PAY SOMETHING.  AND THOSE

3    TOTALED TOGETHER WOULD BE EQUIVALENT TO WHAT WE WOULD USE

4    HERE.

5       BUT ALL I HAD IS THE 2.5 PERCENT COMPONENT.

6    **Q.** OKAY.

7       NOW WHY DIDN'T YOU JUST AVERAGE ALL THE SETTLEMENTS

8    TOGETHER AND COME UP WITH A NUMBER?

9    **A.** ALL RIGHT.

10      BECAUSE BY TALKING TO MIKE FARLEY, MANY OF THE SUPPLEMENTS

11   WERE FOUND TO BE, AFTER LITIGATION WAS INITIATED, YOU DO

12   DISCOVERY.  AND DISCOVERY WAS STARTING TO INDICATE THAT THE

13   AMOUNT OF USE THAT THESE OTHER ENTITIES MADE WAS BECOMING TO

14   BE SMALL.  AND I DON'T KNOW WHAT THOSE AMOUNTS WERE, SO I

15   COULDN'T CONVERT THEM INTO A ROYALTY RATE.

16      BUT IF YOU ARE SUGGESTING YOU SHOULD JUST TAKE THESE SMALL

17   AMOUNTS, WITH NO REGARD TO THE HUGE AMOUNT OF USE THAT ADOBE

18   HAS MADE, IT'S -- IT'S RIDICULOUS.  IT'S LIKE TRYING TO FIGURE

19   OUT THE AVERAGE AGE OF A 6-FOOT HEALTHY MALE IN THE UNITED

20   STATES AND AVERAGING, FINDING OUT -- TRYING TO FIGURE OUT HIS

21   WEIGHT BY AVERAGING THE WEIGHT OF A FEW FOUR YEAR OLDS.  THEY

22   ARE NOT THE SAME MAGNITUDE.

23   **Q.** OKAY.

24      DO YOU HAVE ANY MORE ANALYSIS WITH RESPECT TO FACTOR 1, OR

25   SHOULD WE MOVE ON TO FACTOR 2?

PARR – DIRECT / PRICE

1   **A.**  NO, WE CAN MOVE ON.

2   **Q.**  OKAY.  LET'S GO TO FACTOR 2.

3       JUST BRIEFLY DESCRIBE TO THE JURY WHAT IT IS AND YOUR

4   ANALYSIS OF IS.

5   **A.**  IT SAYS THE NEXT PIECE OF INFORMATION THAT WOULD BE GOOD

6   FOR THE PARTIES TO KNOW IN THE NEGOTIATION IS WHAT HAS ADOBE

7   PAID FOR SIMILAR TECHNOLOGY.

8       SO THERE THE LICENSEE, AND WE NOW KNOW IT -- OR GOTTEN AN

9   IDEA OF WHAT DIGITAL REG'S RECEIVED FOR THEIR TYPE OF

10  TECHNOLOGY, NOW YOU TAKE A LOOK AT IS THERE EVIDENCE OF WHAT

11  ADOBE PAID.

12  **Q.**  IF YOU'D TURN TO EXHIBIT 95.

13      IDENTIFY THAT DOCUMENT, PLEASE, SIR, WHEN YOU GET THERE.

14  **A.**  YES.

15      THIS IS -- INSTEAD OF WHAT ADOBE PAID, THIS IS WHAT ADOBE

16  CHARGES FOR DIGITAL RIGHTS MANAGEMENT TECHNOLOGY PLUG-INS TO

17  THEIR ADOBE READER.

18  **Q.**  I AM SORRY.

19  **A.**  IT INDICATES THAT IF YOU WANT TO HAVE THE RIGHTS TO PLUG

20  IN DRM TECHNOLOGY INTO THEIR PRODUCT, YOU HAVE TO PAY THEM

21  $50,000 A YEAR PLUS 5.5 PERCENT.

22  **Q.**  OKAY.

23  **A.**  AS THE ROYALTY.

24  **Q.**  WOULD YOU LOOK IN THE BOTTOM RIGHT-HAND CORNER OF

25  EXHIBIT 95, PLEASE?

1    **A.**  YEAH.

2    **Q.**  AND WHAT DO YOU SEE THERE AT THE BOTTOM LEFT-HAND CORNER?

3    IS IT A URL?

4    **A.**  YES, I SEE A URL.  UH-HUH.

5    **Q.**  AND WHO DOES IT RELATE TO?

6    **A.**  ADOBE.

7    **Q.**  OKAY.

8    **A.**  THIS IS FROM THEIR WEBSITE.  IT'S JUST THEIR WAY OF SAYING

9    WE ARE GOING TO CHARGE --

10   **Q.**  DID YOU RELY ON THIS DOCUMENT AS PART OF YOUR ANALYSIS?

11   **A.**  YES.

12   **Q.**  DO YOU CONSIDER IT TO BE INFORMATION AN EXPERT WOULD RELY

13   ON IN FORMING THEIR ANALYSIS?

14   **A.**  YES.  IT DIRECTLY RELATES TO DIGITAL RIGHTS TECHNOLOGY.

15   IT SHOWS THAT ADOBE EXPECTS TO BE PAID FOR THEIRS WHEN YOU'RE

16   LICENSING IT OUT -- WHEN THEY'RE LICENSING IT OUT.  SO IT'S

17   NOT UNREASONABLE FOR THEM TO PAY A ROYALTY TO DIGITAL REG TO

18   LICENSE IN.

19         **MR. PRICE:**  YOUR HONOR, WE WOULD LIKE TO OFFER

20   EXHIBIT 95 INTO EVIDENCE.

21         **MR. REINES:**  THIS IS THE SAME STATUS AS THE OTHER

22   LICENSES.

23         **MR. PRICE:**  THIS ONE IS A LITTLE DIFFERENT.  THIS IS

24   THE FIRST TIME WE'VE SEEN THIS ONE, AND IT RELATES --

25         **THE COURT:**  HOW LONG IS IT?

1        **MR. PRICE:**  ONE PAGE.

2        **THE COURT:**  IT WILL BE RECEIVED.

3        (PLAINTIFF'S EXHIBIT 95 RECEIVED IN EVIDENCE)

4                (PUBLISHED TO JURY.)

5    **BY MR. PRICE:**

6    **Q.**  IF WE COULD GO TO THE TOP PORTION.

7        YOU SEE THE TITLE THERE?

8    **A.**  YES.

9    **Q.**  YOU SEE THIS DOCUMENT RELATES TO DRM PLUG-INS?

10   **A.**  YES.

11   **Q.**  OKAY.  LET'S GO DOWN TO WHAT YOU WERE REFERENCING.

12       THE QUESTION THAT STARTS WITH ONE OF THE TERMS OF THE DRM

13   AGREEMENT?

14   **A.**  THAT'S RIGHT.  SO --

15       **MR. PRICE:**  CAN YOU MAKE THAT A LITTLE MORE LEGIBLE?

16   IT'S HARD TO READ.

17       **THE WITNESS:**  IN FREQUENTLY ASKED QUESTIONS -- IF YOU

18   ARE ON THE WEBSITE, THERE IS OFTEN FREQUENTLY ASKED QUESTIONS

19   AND THE ANSWERS ARE PROVIDED IN ADVANCE.

20       SO I GUESS THEY ARE ASKED OFTEN WHAT IS THIS GOING TO COST

21   IF I WANT TO DEVELOP A PLUG-IN.  THIS IS THE ANSWER:  YOU WILL

22   BE CHARGED $50,000 PER YEAR TO DEVELOP AND SELL YOUR PLUG-IN

23   AND YOU WILL WANT 5.5 PERCENT OF THE REVENUE YOU GET FOR

24   SELLING THAT PLUG-IN.

25   **Q.**  LOOKING AT THE PARAGRAPH BELOW THAT WHERE NET REVENUE IS

1    DEFINED, CAN YOU TELL THE JURY YOUR ANALYSIS BASED ON -- IN

2    LIGHT OF THAT PORTION?

3    **A.**  THE BEST WAY TO DO IT IS TO JUST SAY NET REVENUES IS

4    DEFINED BY ADOBE TO MEAN:  "ALL PAYMENT DUE TO THE LICENSEE

5    FROM ANY THIRD PARTY FOR, ONE, THE USE OR DISTRIBUTION OF THE

6    LICENSEE PLUG-IN, TWO, GOODS AND SERVICES THAT RELY UPON THE

7    READER AND THE LICENSE PLUG-IN TO VIEW, PRINT AND/OR OTHERWISE

8    ASSESS PDF FILES CONTAINING ANY DRM FEATURES".

9        SO IT'S BASICALLY SAYING, IF YOU SELL A PRODUCT THAT PLUGS

10   INTO ADOBE, WE GET 5.5 PERCENT OF THE BENEFITS FROM SELLING

11   THAT.

12   **Q.**  AND LET'S GO DOWN TO THE BOTTOM OF IT.  THERE'S SOME

13   BULLET POINTS DOWN THERE.

14       I WOULD LIKE TO FOCUS IN ON THOSE.

15           **MR. PRICE:**  AND CAN WE DO A BETTER JOB OF GETTING IN

16   ON THAT?  AGAIN, IT'S DIFFICULT TO READ.

17   **BY MR. PRICE:**

18   **Q.**  WOULD YOU LOOK AT THE FIRST AND SECOND BULLET POINTS, SIR,

19   AND TELL US IF THAT IMPACTED YOUR VIEW OF WHETHER OR NOT THIS

20   WAS A RELIABLE SOURCE?

21   **A.**  WELL, THIS IS -- THIS IS THE LAST FREQUENTLY ASKED

22   QUESTION.  THE ANSWER -- THE QUESTION IS:  IF I DON'T WANT TO

23   PAY THE FEE, WHAT ARE MY OPTIONS?

24       IT'S A REASONABLE QUESTION.  I WANT TO HAVE A PLUG-IN,

25   DEVELOP ONE, BUT IF I DON'T WANT TO PAY THE 5.5 PERCENT, WHAT

1    CAN I DO?  ONE OF THE OPTIONS IS TO BUY ADOBE'S LIVECYCLE ES

2    RIGHTS MANAGEMENT.

3         SO AS FAR AS I'M CONCERNED, ADOBE IS ESTABLISHING AN

4    EQUIVALENCY HERE.  THEY'RE SAYING WE'LL TAKE 5.5 PERCENT OF

5    WHATEVER YOU DEVELOP, OR, HEY, INSTEAD, YOU DON'T HAVE TO PAY

6    US 5.5 PERCENT, YOU CAN BUY LIVECYCLE AND PLUG IT IN.

7    **Q.**  NOW, YOU MENTIONED EARLIER THAT YOU HAD SEEN SOME EVIDENCE

8    RELATING T ADOBE, OR AT LEAST WHAT YOU THOUGHT WAS ADOBE'S

9    PREFERENCE FOR A RUNNING ROYALTY.  IS THIS THAT DOCUMENT YOU

10   ARE REFERRING TO?

11   **A.**  WELL, IT SHOWS THEY UNDERSTAND RUNNING ROYALTIES.  AND IF

12   THEY EXPECT TO BE PAID A RUNNING ROYALTY FOR THEIR TECHNOLOGY,

13   SO I DON'T SEE THAT I'M WRONG IN REQUIRING AN ANALYSIS THAT

14   SAYS THEY SHOULD PAY A RUNNING ROYALTY WHEN THEY ARE USING

15   SOMEONE ELSE'S DRM TECHNOLOGY.

16   **Q.**  OKAY.  IS THAT IT FOR FACTOR 2, OR IS THERE ANY MORE YOU

17   LOOKED AT?

18   **A.**  YES, WE ARE DONE.

19            **THE COURT:**  LET'S TAKE OUR BREAK.  IT'S 12:10.  WE

20   WILL BREAK UNTIL 12:25.  YOU MAY STEP DOWN.  IF YOU WOULD BE

21   BACK ON THE STAND AT 12:25.

22        AND I WOULD LIKE TO SEE THE ATTORNEYS FOR A MOMENT.

23        (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

24        IF I CAN GET MR. FARLEY TO STEP OUT OF THE ROOM FOR A

25   MOMENT, PLEASE.

1        I THINK HE ACTUALLY WAS OUT OF THE ROOM WHEN THIS CAME UP,

2   WHICH WAS FORTUITOUS.

3        YOU NEED TO KEEP IN MIND THAT IF YOU ALLOW YOUR WITNESSES

4   TO COME BACK IN, THAT MEANS THAT YOU ARE NOT GOING TO RECALL

5   THEM.

6        MR. FARLEY DID SAY IN THE PORTION THAT WAS POINTED OUT

7   THAT HE DID NOT KNOW WHETHER INTUIT PAID 14 MILLION OR NOT.

8   SO, THAT DOESN'T MEAN THAT HE DIDN'T PREVIOUSLY TELL THE

9   EXPERT THAT HE DID, BUT YOU CAN CERTAINLY IMPEACH THE EXPERT

10  WITH THE NOTION THAT IF THAT 14 MILLION FIGURE HAD NO BASIS,

11  THEN THE 2 PERCENT FIGURE WOULD LIKEWISE HAVE NO BASIS.

12        **MR. REINES:**  MY UNDERSTANDING OF THE LAW IS -- WAS

13  AMENDED TO AVOID THE SITUATION WHERE TESTIMONY'S NOT GOOD

14  ENOUGH TO COME IN DIRECTLY, BUT CAN COME IN INDIRECTLY.

15        SO THERE'S TWO THINGS.  ONE IS, THERE'S A 403 BALANCING

16  THAT'S REQUIRED WITH THE BURDEN ON THE OTHER SIDE, THAT

17  SHOWING THAT THE -- THE PROBATIVE VALUE IS GREATER THAN THE

18  PREJUDICIAL VALUE, WHICH IS CLEARLY NOT SO WHERE THERE'S NO

19  WAY HE KNEW ABOUT THE REVENUES IS PROVEN ON THE RECORD.

20        AND THE SECOND THING IS, IN -- AND I HAVE A COPY IF THE

21  COURT WOULD LIKE, UNITED STATES VERSUS .59 ACRES OF LAND, NOT

22  MUCH, I SUPPOSE, THE NINTH CIRCUIT HELD THAT IF IT IS ALLOWED

23  IN, THAT A -- AN INSTRUCTION IS NECESSARY TO MAKE CLEAR THAT

24  IT'S NOT EVIDENCE EVEN THOUGH THIS GUY'S REPEATING WHAT

25  SOMEONE COULDN'T SAY UNDER OATH ON THE STAND.

1        **THE COURT:**  WELL, I SUPPOSE I CAN DO THAT OR STRIKE

2    THE PERCENTAGE AND USE THE 350,000, WHICH IS WHAT I THINK WE

3    TALKED ABOUT DOING.

4        **MR. REINES:**  I THINK YOU DID THAT.  YOU DID THAT AT

5    331.  IT SAYS IT.

6        **MR. PRICE:**  YOUR HONOR --

7        **THE COURT:**  FROM HIS TESTIMONY, YES.  BUT HE DID TELL

8    THE WITNESS THAT APPARENTLY, AND THE WITNESS RELIED ON IT I

9    IMAGINE --

10            (SIMULTANEOUS COLLOQUY.)

11        **MR. PRICE:**  I'M SORRY.  THAT WAS MY FAULT.

12        **THE COURT:**  WHAT IS IT NOW?

13        **MR. PRICE:**  HE RECORDED IT IN HIS REPORT, SO THERE'S

14    LIKE A --

15        **THE COURT:**  I DON'T DOUBT THAT FARLEY TOLD HIM THAT.

16    BUT THE POINT IS THAT WE NOW KNOW THAT FARLEY HAD NO BASIS FOR

17    KNOWING THAT.  SO NOW WE HAVE TO FIGURE OUT WHAT DO WE DO WITH

18    THE FACT THAT THIS EXPERT RELIED IN GOOD FAITH ON INFORMATION

19    THAT TURNS OUT APPARENTLY NOT TO BE BASED -- WITH A BASIS.  SO

20    THAT'S THE PROBLEM WE ARE FACING RIGHT NOW.

21        BUT IF WE ARE DONE WITH THAT, I GUESS WE CAN MOVE ON TO

22    OTHER THINGS, AND YOU CAN EITHER WRITE ME AN INSTRUCTION THAT

23    YOU THINK WILL SOLVE IT -- WELL, THAT WILL EITHER EXPLAIN THAT

24    THERE WAS NO BASIS FOR THAT NUMBER OR SIMPLY STRIKE THE

25    PERCENTAGE AND USE THE DOLLAR FIGURE.

1    WHICH REMINDS ME OF SOMETHING I KEPT -- MEANT TO BRING UP

2    PREVIOUSLY.  I'M GETTING WORRIED ABOUT THIS 184, I THINK IT

3    IS, EXHIBIT.  I ALLOWED IN THE FACT THAT ALL THESE LICENSES

4    WERE TAKEN BECAUSE IT WAS A GEORGIA-PACIFIC FACTOR AND THE

5    LICENSES WERE TAKEN.  BUT IT ALSO HAS THE AMOUNTS IN IT,

6    INCLUDING AMOUNTS THAT HAVE BEEN EXCLUDED AND AMOUNTS THAT

7    AREN'T USED BY THE EXPERT.

8    SO I'M NOW THINKING WE BETTER HAVE A VERSION OF THIS TO GO

9    IN WHICH DOESN'T HAVE ANY RATES OR AMOUNTS ON IT AT ALL.  AND

10   THE DRM ONE SHOULD SAY SOMETHING LIKE "OPTION TO LICENSE",

11   BECAUSE THAT WASN'T EVEN A LICENSE AT ALL.  S IF YOU COULD

12   MAKE A NEW VERSION AND SUBSTITUTE IT FOR 184.

13           **MR. REINES:**  YOUR HONOR --

14           **THE COURT:**  OF YOU CAN MAKE TWO PROPOSED

15   INSTRUCTIONS.  AND IF YOU HAVE ANYTHING ELSE YOU WANT TO TELL

16   ME YOU CAN, BUT WE WON'T DISCUSS IT ANYMORE AT THIS POINT WITH

17   THIS WITNESS.

18           **MR. PRICE:**  VERY QUICKLY, YOUR HONOR.  MR. FARLEY

19   SAID HE COULDN'T REMEMBER IT OFF THE TOP OF HIS HEAD.  HE KNEW

20   IT WAS RELATED TO UNITS THAT HAD TOLD AND THAT THEY HAD SOME

21   KIND OF ROYALTY RATE BUILT INTO THAT.

22   SO HE DIDN'T HAVE PERFECT RECOLLECTION OF THE NUMBER, BUT

23   HE'S CLEARLY SAYING HE REMEMBERS THIS ONE BEING UNIQUE.  AND

24   THAT IS ON PAGE 330, LINE 12 THROUGH 20.

25           **MR. REINES:**  YOUR HONOR, HE DIDN'T HAVE FOUNDATION,

1    THE COURT FOUND THAT, AND THEN THEY ABANDONED EVEN ATTEMPTING

2    TO ESTABLISH IT.  THAT'S AT 331.

3        IS THERE A RECONSIDERATION MOTION ON THE EVIDENCE?  AND

4    THEN --

5            **THE COURT:**  WELL, I DIDN'T FIND ANYTHING.  I HAD HIM

6    ASK WHETHER HE KNEW AND HE SAID HE DIDN'T, SO HE DIDN'T.

7            **MR. REINES:**  THEN IT WAS ABANDONED --

8            **THE COURT:**  THAT DOESN'T MEAN HE DIDN'T SAY SO ON

9    SOME PREVIOUS OCCASION.  THAT'S WHY I WANTED FARLEY TO LEAVE.

10   I SUPPOSE MAYBE HE COULD SAY HE KNEW IT BACK THEN BUT HE

11   DIDN'T KNOW IT NOW.  I DON'T KNOW WHAT HE MIGHT SAY, BUT HE

12   HAS NOT BEEN EXCLUDED, SO I DON'T EVEN KNOW IF HE CAN BE

13   RECALLED NOW THAT HE HAS BEEN SITTING IN.

14           **MR. PRICE:**  HE'S THE CORPORATE REPRESENTATIVE, YOUR

15   HONOR, SO I THINK THE RULE WOULDN'T APPLY TO HIM.

16           **MR. REINES:**  YOUR HONOR, IT WOULD JUST BE INCREDIBLY

17   PREJUDICIAL GIVEN HE WAS GIVEN A FULL OPPORTUNITY TO TESTIFY

18   AT THAT POINT IN THE CASE, AND HE FAILED TO ESTABLISH

19   FOUNDATIONS.  TOP OF THE HEAD; THIS IS HIS CENTRAL BUSINESS

20   DUTIES KNOWING THESE FACTS.

21           **THE COURT:**  OKAY.  WELL --

22           **MR. REINES:**  JUST TWO ISSUES, YOUR HONOR, BECAUSE

23   IT'S COMING UP FOR CROSS AFTERWARDS RELATED TO THIS CLOSELY.

24       ONE IS, I WOULD LIKE TO USE THAT CHART, EVEN THOUGH I FIND

25   IT OBJECTIONABLE AND WE PRESERVED OUR OBJECTIONS, JUST AS THE

1    COURT DESCRIBED THEM, BUT TO IMPEACH MR. PARR AND MR. FARLEY

2    AND DIG REG.

3        AND, TWO, IS THAT I WOULD LIKE -- I NEED TO CROSS-EXAMINE

4    PARR ON THIS 2.5 PERCENT THEORY BECAUSE, WHEN I DO MY

5    CROSS-EXAMINATION -- UNLESS IT'S STRICKEN.  SO I'M GOING TO

6    HAVE TO GO OVER THAT TERRITORY IN SOME SENSE.  I DON'T WANT

7    THAT TO BE PERCEIVED AS OPENING SOME KIND OF DOOR --

8            **THE COURT:**  I GUESS YOU WOULD SAY THAT IF THE

9    NUMBER -- IF THE PERCENTAGE IS BASED ON THE NUMBER AND THE

10   NUMBER PROVES TO BE FALSE, THE PERCENTAGE IS MEANINGLESS.

11           **MR. REINES:**  YES.

12           **THE COURT:**  YOU CAN DO THAT.

13           **MR. REINES:**  OKAY.  THANK YOU.

14           **THE COURT:**  OKAY.

15           **MR. PRICE:**  THANK YOU, YOUR HONOR.

16       (RECESS TAKEN AT 12:17; RESUMED AT 12:30 P.M.)

17       (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

18           **THE COURT:**  IF WE CAN HAVE THE WITNESS BACK ON THE

19   STAND?

20       PLEASE BE SEATED.

21       YOU MAY PROCEED.

22   **BY MR. PRICE:**

23   **Q.**  MR. PARR, LET'S GO ON TO FACTOR NUMBER 3.  AND WHILE THE

24   BOARD IS BEING PUT UP, I'LL JUST TELL YOU WHAT IT IS.

25       THE NATURE AND SCOPE OF THE LICENSE AS EXCLUSIVE OR

1    NONEXCLUSIVE OR AS RESTRICTED OR NONRESTRICTED IN TERMS OF

2    TERRITORY OR WITH RESPECT TO WHO --

3            **THE REPORTER:**  EXCUSE ME.

4            **MR. PRICE:**  NOW THAT I HAVE MY BOARD, I'M NOT EVEN

5    GOING TO REPEAT IT.

6    **BY MR. PRICE:**

7    **Q.**   CAN YOU GIVE US A TRUNCATED VERSION OF WHAT FACTOR 3 IS

8    AND HOW IT IMPACTED YOUR ANALYSIS, IF ANY, SIR?

9    **A.**   THIS -- IT DEFINES WHAT WE ARE LICENSING.

10       THE LICENSE WOULD COVER THE UNITED STATES, NO TERRITORIAL

11   RESTRICTIONS WITHIN THE UNITED STATES, AND IT WOULD BE A

12   NONEXCLUSIVE LICENSE.

13       NOW, IF IT'S NONEXCLUSIVE, THE ROYALTY RATE WOULD BE A

14   LITTLE LOWER THAN EXCLUSIVE.  IF YOU'RE GOING TO LICENSE

15   EXCLUSIVELY, YOU'VE GOT TO GET ALL YOUR MONEY OUT OF THE ONE

16   PERSON USING IT.  IF YOU ARE LICENSING NONEXCLUSIVELY, THEN

17   YOU ARE GOING TO CHARGE A LITTLE LESS BECAUSE THE LICENSOR --

18   LICENSEE, SAY ADOBE KNOWS THAT OTHER PEOPLE ARE GOING TO GET

19   TO USE IT AND MAYBE TO COMPETE WITH THEM ON IT.

20       BUT THAT'S THE WHOLE GIST OF THAT FACTOR.

21   **Q.**   OKAY.  IS THAT -- DOES YOUR ANALYSIS RESULT IN AN UPWARD

22   OR DOWNWARD REVISION OF THE NUMBER IN ANY WAY?

23   **A.**   KIND OF NEUTRAL, BUT LIKE I SAID, IF WE WERE GOING TO BE

24   EXCLUSIVE, WE SHOULD GO HIGHER.

25   **Q.**   OKAY.  IS THAT IT FOR 3?

1    **A.**  YES.

2    **Q.**  LET'S GO TO 4.

3    **A.**  4.

4         NOW, IF YOU LOOK AT THE ESTABLISHED POLICY OF THE

5    LICENSOR, AND THE ESTABLISHED POLICY OF DIGITAL REG IS THAT

6    THEY WANT A LICENSE.  THEY ARE NOT GOING TO KEEP THIS FOR

7    THEIR OWN MONOPOLISTIC USE.

8         AND THAT WOULD NOT SAY -- THE FACT THAT THEY AREN'T GOING

9    TO BE USING IT THEMSELVES, THEY MIGHT BE WILLING TO TAKE A

10   LOWER ROYALTY RATE TO GET A LOT OF PEOPLE TO LICENSE IT.

11        BUT IF IT HAD BEEN THE CASE, WE'RE IN THE HYPOTHETICAL

12   NEGOTIATION THEY WERE ADAMANT THAT THEY DIDN'T WANT TO EVER

13   LICENSE TO ANYBODY AND THEY HAD TO BECAUSE OF THE HYPOTHETICAL

14   SCENARIO, THEN THAT WOULD PRESSURE THE RATE UP.

15        BUT HERE WE DON'T HAVE THAT CONCERN.

16   **Q.**  SO THE UPSHOT OF 4, SIR?

17   **A.**  WELL, THERE IS NO REASON TO DRIVE IT UP.  AND I DON'T SEE

18   ANY REASON THAT YOU WOULD LOWER IT WHERE JUST BECAUSE THEY ARE

19   NOT TRYING TO USE IT THEMSELVES YOU WOULDN'T GIVE IT AWAY.  IT

20   DOESN'T HAVE A TREMENDOUS SWAYING EFFECT.

21   **Q.**  OKAY.  LET'S LOOK AT 5.

22   **A.**  THIS FACTOR SAYS YOU SHOULD CONSIDER THE COMMERCIAL

23   RELATIONSHIP BETWEEN THE TWO.

24        IN THIS CASE THEY ARE NOT COMPETITORS.  IF THEY WERE,

25   DIRECT, FIERCE FIGHTING COMPETITORS, THEN THERE WOULD BE GREAT

1    RELUCTANCE TO SHARE TECHNOLOGY BETWEEN COMPETITORS.  AND THAT

2    WOULD BE HIGH PRESSURE FOR THE ROYALTY RATE.

3        BUT HERE WE HAVE WHAT YOU WOULD CALL MORE OF AN INVENTOR

4    WITH NO COMMERCIALIZATION INTENTION AND A PROMOTER WITH ADOBE

5    BEING INTERESTED IN DEVELOPING COMMERCIALIZATION BENEFITS FROM

6    IT.

7        SO, WHEN WE LOOK AT THIS FACTOR, WE ARE CATEGORIZING THE

8    PARTIES.  ONE IS AN INVENTOR, THE OTHER IS A PROMOTER.  AND

9    THE ONLY REASON IT WOULD HAVE AN IMPACT TO PRESS THE ROYALTY

10   HIGHER IS IF THEY WERE FIERCE COMPETITORS.  BECAUSE THE LAST

11   THING YOU WANT TO DO IS LICENSE A TECHNOLOGY THAT'S IMPORTANT

12   TO YOU TO BE USED BY A COMPETITOR AGAINST YOU.

13       WE DON'T HAVE THAT PROBLEM HERE.

14   Q.  AND DID THIS RESULT IN AN UPWARD OR DOWNWARD REVISION, IF

15   ANY?

16   A.  I DON'T SEE ANY REASON TO GO DOWN, BUT I CERTAINLY THIS --

17   DEFINITELY NOT -- DEFINITELY NO REASON TO GO UP.

18   Q.  OKAY.  SO IT'S NEUTRAL, IS THAT FAIR TO SAY?

19   A.  YES.

20   Q.  LET'S LOOK AT 6.

21       AND HE'S GOING TO CHANGE THE BOARD OUT FOR US.

22       TELL US THE FACTOR 6 WHAT IT IS AND IF IT IMPACTED YOUR

23   ANALYSIS?

24   A.  THIS SAYS TAKE A LOOK AT CONVOY SALES, OR YOU MIGHT THINK

25   OF THEM AS ACCESSORIES.

1      IF -- IF I'M LICENSING A PATENT TO MAKE A PRODUCT, AND I

2   SELL THAT PRODUCT, BUT IN ADDITION, SAY 50 PERCENT OF THE

3   TIMES, THEY ALSO YIELDS SALE OF OTHER PRODUCTS, THEN I MIGHT

4   BE REASONABLE -- IT MIGHT BE REASONABLE FOR ME TO ASK FOR A

5   HIGHER ROYALTY ON THE PRODUCT BECAUSE I KNOW YOU ARE GOING TO

6   MAKE A WHOLE LOT OF MONEY ON ACCESSORIES.

7      IN THIS CASE, THERE IS EVIDENCE THAT WHEN SOFTWARE

8   COMPANIES SELL SOFTWARE, THEY OFTEN GET ADDITIONAL WORK, WHICH

9   IS SUPPORT AND SERVICES.  THEY MIGHT CHARGE FOR LOADING THE

10  SOFTWARE, AND FOR SPECIALIZING IT OR CUSTOMIZING IT, OR FOR

11  MAINTAINING AND RUNNING IT.  NOW, THAT EXISTS IN THE INDUSTRY,

12  AND ADOBE DOES, I THINK, ENJOY THAT.  BUT I DON'T HAVE

13  EVIDENCE TO DIRECTLY TIE THAT POSSIBILITY TO THE SPECIFIC

14  PRODUCTS HERE.

15     IT MAY HAVE HAPPENED, I DON'T KNOW IF IT'S HAPPENED.  SO I

16  HAVEN'T GIVEN THAT ANY WEIGHT.  BUT I JUST WANTED TO STATE IN

17  ADDRESSING THAT FACTOR I'M AWARE THAT THERE COULD BE CONVOYED

18  SALES, BUT I HAVEN'T GIVEN IT ANY WEIGHT.

19  **Q.**  OKAY.  IS THAT IT FOR 6?

20  **A.**  YOU WANT TO LOOK AT THE DURATION.

21     IF WE'RE ARGUING OR LICENSING, DOING A NEGOTIATION FOR

22  PATENTS THAT HAVE A VERY SHORT PERIOD OF TIME, THE ARGUMENT

23  WOULD BE THEY ARE NOT VERY VALUABLE BECAUSE YOU CAN JUST WAIT

24  THREE MONTHS, SIX MONTHS UNTIL THEY EXPIRE AND THEN START

25  PRACTICING THE INVENTION WITHOUT HAVING TO PAY ANYBODY.

1       IN THIS INSTANCE, AT THE HYPOTHETICAL NEGOTIATION OF 2005,

2   THE PATENTS WEREN'T GOING TO EXPIRE UNTIL 2018.  SO IF YOU

3   WANT TO USE DIGITAL RIGHTS MANAGEMENT TECHNOLOGY, YOU CAN'T

4   WAIT.  YOU HAVE TO PAY.

5       SO THIS DOESN'T NECESSARILY MAKE YOU WANT TO PAY -- THIS

6   DOESN'T MEAN YOU HAVE TO PAY A HIGHER RATE OR A LOWER RATE, IT

7   JUST MEANS A RATE CAN'T BE ESCAPED.  SOME AMOUNT HAS TO BE

8   PAID BECAUSE THERE'S NO WAY TO WAIT IT OUT.

9   **Q.**  LET'S LOOK AT FACTOR 9.

10  **A.**  COMMERCIAL SUCCESS IS BASED ON THE SIGNIFICANT AMOUNT OF

11  THE ACCUSED REVENUE THAT'S ASSOCIATED WITH THE USE OF THE

12  PATENTED INVENTION --

13  **Q.**  I'M SORRY, I MISSPOKE.  WE ARE ON FACTOR 8.  SO, YES,

14  PLEASE, CONTINUE ON FACTOR 8.

15  **A.**  THE ESTABLISHED PROFITABILITY OF THE PRODUCT MADE UNDER

16  THE PATENT, ITS COMMERCIAL SUCCESS, POPULARITY.

17      AND WHAT I'M SAYING, WE CAN MEASURE COMMERCIAL SUCCESS BY

18  THE ENORMOUS AMOUNT OF REVENUE THAT IS BEING ACCUSED OF

19  INFRINGEMENT.

20      NOW, AS TO PROFITABILITY, ADOBE DIDN'T PROVIDE ANY

21  SPECIFIC PROFIT INFORMATION FOR THE SPECIFIC PRODUCTS.

22  **Q.**  AND FACTOR 9, SIR?

23  **A.**  THE UTILITY AND ADVANTAGE OVER OLD MODES.

24      ALL RIGHT.  THIS IS -- IF WE ARE NEGOTIATING FOR THIS

25  TECHNOLOGY, WE ARE GOING TO ALSO CONSIDER WELL, HOW IS THIS

1    BETTER THAN MY OTHER ALTERNATIVES?

2         AND FOR THIS I TALKED TO DR. DEVANBU.  AND HE EXPLAINED

3    SOME OF THE OLD MODES AND ALTERNATIVES AND WHY HE CONSIDERED

4    THEM TO BE INFERIOR AT THIS POINT.

5         THE FIRST ONE HE EXPLAINED WAS THE DELIVERY OF THE

6    SOFTWARE PRODUCTS ON THE CD-ROMS, WHICH WAS VERY COMMON FIVE,

7    TEN YEARS AGO.  THE TECHNOLOGY -- THERE WAS A TECHNOLOGY

8    EMBEDDED IN THE CD-ROMS SO THAT IF I BOUGHT IT AND LOADED IT

9    ONTO MY COMPUTER, I COULDN'T THEN JUST MAKE COPIES OF IT AND

10   SELL THEM TO OTHER PEOPLE.  SO THE TECHNOLOGY THERE WAS

11   PHYSICAL.

12        HE SAID THERE'S ANOTHER METHOD WHERE YOU COULD GET DIGITAL

13   RIGHTS MANAGEMENT BY REQUIRING PEOPLE TO BUY A HARDWARE

14   PLUG-IN.  SO IF YOU WANT -- BUY A PRODUCT, YOU HAVE TO HAVE

15   SOME SORT OF PIECE OF HARDWARE THAT ATTACHED TO YOUR COMPUTER

16   THAT ALLOWED YOU TO GET AUTHORIZATION TO USE THE PROGRAM.  AND

17   HE SAID THAT WAS KIND OF RIDICULOUS.  CONSUMERS ARE GOING TO

18   LIKELY BE HESITANT TO BUY A PLUG-IN FROM EVERY COMPANY THAT

19   THEY WANT TO BUY SOFTWARE.

20        THEN THE THIRD OPTION WOULD BE TO USE THE CLOUD, MEANING

21   THAT YOU WOULD HAVE TO CONSTANTLY HAVE A CONNECTION, A WI-FI

22   CONNECTION TO USE THE SOFTWARE SO THAT THE CLOUD COULD

23   CONSTANTLY AUTHORIZE YOUR USE OF A PROGRAM.  HE SAID THAT'S --

24   THAT'S PRETTY BURDENSOME AND A LOT OF CONSUMERS AREN'T GOING

25   TO LIKE THE FACT THAT THEY CAN'T USE ADOBE ACROBAT OR OTHER

1    PROGRAMS, OR ANY KIND OF PROGRAM UNLESS THEY HAVE A WI-FI

2    CONNECTION.

3        SO HE SAID THAT AS FAR AS HE WAS CONCERNED, THE DIGITAL

4    RIGHTS MANAGEMENT INVENTION IS THE MOST ELEGANT SOLUTION

5    BETWEEN DOING NOTHING AND DOING THESE, SAY, DRACONIAN MEASURES

6    THAT ARE GOING TO ANNOY CONSUMERS.  AND HE ALSO TOLD ME HE

7    WASN'T AWARE OF ANY WAY TO DESIGN AROUND THE DRM TECHNOLOGY.

8    **Q.**  IS THAT IT FOR FACTOR 9?

9    **A.**  YES.

10   **Q.**  AND DO YOU WANT TO MOVE ON TO FACTOR 10?

11          **MR. REINES:**  YOUR HONOR, COULD WE HAVE SOME KIND OF

12   QUESTION SO WE DON'T GET LONG NARRATIVES?  "MOVE ON TO FACTOR

13   10" IS NOT REALLY A QUESTION.

14          **THE COURT:**  ALL RIGHT.

15   **BY MR. PRICE:**

16   **Q.**  DESCRIBE FOR THE JURY WHAT FACTOR 10 IS.

17   **A.**  IT SAYS YOU SHOULD CONSIDER THE NATURE OF THE PATENTED

18   INVENTION.  SAYS THE CHARACTER OF THE COMMERCIAL EMBODIMENT OF

19   IT IS OWNED AND PRODUCED BY THE LICENSOR AND THE BENEFITS TO

20   THE USERS.

21   **Q.**  OKAY.  GIVE US YOUR ANALYSIS OF THAT FACTOR.

22   **A.**  WELL, THE BENEFITS TO THE LICENSOR, WHICH WOULD BE DIGITAL

23   REG'S BENEFIT IS THAT IT HAS BEEN LICENSING IT TO QUITE A FEW

24   PEOPLE.

25        THE BENEFITS TO THE USERS IS THAT -- THOSE OF ADOBE,

1    INCORPORATED INTO THEIR PRODUCTS AND THEN PROTECT THEMSELVES

2    FROM HAVING UNAUTHORIZED PIRATED COPIES SAY FLOODING THE

3    MARKETPLACE.

4         AND THAT'S WHAT I CONSIDERED FOR THAT FACTOR.

5    **Q.**  DID THAT AFFECT YOUR ULTIMATE CONCLUSION AS TO THE RATE?

6    **A.**  IT DIDN'T CHANGE THE RATE, IT'S JUST SAYING IT'S EMBEDDED

7    IN THE PRODUCT AND IT'S JUST ANOTHER THING THAT YOU SHOULD

8    UNDERSTAND ABOUT THE TECHNOLOGY.

9    **Q.**  OKAY.  DO YOU HAVE ANYTHING MORE ABOUT FACTOR 10 OR SHOULD

10   WE MOVE ON?

11   **A.**  11 IS NEXT.

12   **Q.**  LET'S GO TO 11.

13   **A.**  ALL RIGHT.

14        THIS FACTOR SAYS THAT YOU SHOULD EXTENT TO WHICH THE

15   INFRINGER HAS MADE USE OF THE INVENTION.

16        AND FROM DR. DEVANBU AND HIS ANALYSIS OF THE TECHNOLOGY,

17   AND INFRINGEMENT, 2. -- $2 BILLION 66 MILLION OF ACCUSED

18   PRODUCT HAVE BEEN ASSOCIATED WITH THE USE OF THE INVENTION.

19        SO, THE -- FOR ME, WE ARE NOT TALKING ABOUT SMALL

20   INSIGNIFICANT USE.

21   **Q.**  OKAY.  ON TO FACTOR 12.  I WILL WAIT FOR HIM TO PUT IT UP.

22   **A.**  FACTOR 12 --

23   **Q.**  LET ME ASK YOU A QUESTION.

24        FACTORS 12 AND 13, DID YOU FIND THEM AT ALL SIGNIFICANT

25   WITH RESPECT TO YOUR ANALYSIS FOR THIS CASE?

1    **A.**  WELL, THEY ARE BOTH TALKING ABOUT WHAT WOULD BE

2    COMPARABLE -- WHAT INDUSTRY STANDARD IS THERE.  IS THERE JUST

3    A RULE OF THUMB THAT'S USED IN THIS PARTICULAR INDUSTRY FOR

4    THIS KIND OF TECHNOLOGY SO THAT WE DON'T EVEN HAVE TO BOTHER

5    WITH ALL OF THIS ANALYSIS.

6       AND THE FACTORS ARE SAYING IF THERE'S A RULE OF THUMB, YOU

7    SHOULD CONSIDER IT.  WELL, THERE IS REALLY NOT A RULE OF

8    THUMB.  IN FACT, THERE IS NOT A RULE OF THUMB IN ANY INDUSTRY.

9    **Q.**  OKAY.  SO 12 AND 13 WERE OF NO EFFECT?

10   **A.**  THAT'S CORRECT.

11   **Q.**  LET'S GO TO 14.

12   **A.**  14 IS --

13   **Q.**  LET ME GET A QUESTION OUT.

14      WHAT IS 14?

15   **A.**  IT'S THAT YOU SHOULD CONSULT EXPERTS --

16   **Q.**  DID YOU DO --

17   **A.**  -- IN THESE AREAS.

18      YES, I DID.  I CONSIDERED DR. DEVANBU AS A VERY IMPORTANT

19   EXPERT FOR ME TO UNDERSTAND THE BEGINNING OF THE INFRINGEMENT

20   DATE, AND HIS ANALYSIS INDICATED WHICH PRODUCTS INFRINGED, AND

21   HIS ANALYSIS INDICATED WHEN IT STARTED.

22   **Q.**  OKAY.  AND FACTOR NUMBER 15, WOULD YOU -- IT'S A FAIRLY

23   LONG ONE.  WOULD YOU GIVE US A SHORT VERSION OF THAT?

24   **A.**  AS FAR AS I'M CONCERNED, IT BOILS DOWN TO THE HYPOTHETICAL

25   NEGOTIATION.  WHAT WOULD THE PARTIES DO WITH ALL THE

1   INFORMATION WE'VE JUST COLLECTED FROM THE PRIOR 14 SO THAT

2   THEY COULD VOLUNTARILY REACH A DECISION AS TO WHAT A FAIR

3   AMOUNT IS TO PAY -- TO CURE -- IN PLACE OF WHAT HAS HAPPENED

4   BY HAVING INFRINGEMENT.

5   Q.  OKAY.  AND WHAT IS YOUR ANALYSIS UNDER FACTOR 15?

6   A.  WELL, I FIRST CONCLUDED A ROYALTY RATE REASONABLY -- I

7   FIGURED A REASONABLE ROYALTY RATE IS TWO AND A HALF PERCENT.

8   Q.  WHAT DID YOU LOOK AT TO COMPUTE THAT RATE?

9   A.  WELL, CONSIDERED ALL THE FACTORS, AND THEN WE HAD THREE

10  LICENSE SITUATIONS.  1 PERCENT FOR MACROVISION, TWO AND A HALF

11  PERCENT FROM INTUIT, AND FIVE AND A HALF PERCENT OF WHAT ADOBE

12  REQUIRES IF YOU WANT TO USE THEIR TECHNOLOGY.

13      SO, TO BE CONSERVATIVE, I WENT IN THE MIDDLE.  THAT'S HOW

14  I FIGURED TWO AND A HALF PERCENT WAS REASONABLE.

15  Q.  OKAY.  SO WE'VE DONE THE ROYALTY RATE.  WHAT DO WE DO NEXT

16  IN TERMS OF YOUR ANALYSIS?

17  A.  YOU HAVE TO APPLY IT TO THE ROYALTY BASE WHICH REPRESENTS

18  THE REVENUE DERIVED -- ASSOCIATED WITH THE INFRINGEMENT.

19  Q.  IF YOU WILL LOOK IN YOUR BINDER AT EXHIBIT 181.  IT'S THE

20  LAST TAB THERE.

21      TELL US IF YOU'VE RELIED ON THAT DOCUMENT TO PERFORM YOUR

22  ANALYSIS.

23      I GUESS THE FIRST QUESTION SHOULD BE, CAN YOU IDENTIFY

24  THAT DOCUMENT FOR US?

25  A.  THAT'S IN A DOCUMENT THAT'S PROVIDED BY ADOBE SHOWING

1    THEIR SALES DURING THE INFRINGEMENT PERIOD OF THE ACCUSED

2    PRODUCTS.

3    **Q.**  DID YOU -- I AM SORRY, GO AHEAD.

4    **A.**  I DIDN'T USE THIS IN MY REPORT AT THIS LENGTH.  THIS IS

5    QUARTERLY, AND I CONDENSED IT INTO AN ANNUAL AMOUNT.

6    **Q.**  SO YOU HAVE A CONDENSED VERSION THAT WE CAN LOOK AT?

7    **A.**  IT'S IN MY REPORT.

8    **Q.**  AND DID YOU RELY ON THIS IN CONDUCTING YOUR ANALYSIS?

9    **A.**  YES.

10   **Q.**  AND IS IT INFORMATION THAT EXPERTS IN YOUR FIELD WOULD

11   RELY UPON?

12   **A.**  YES.

13           **MR. PRICE:**  YOUR HONOR, WE ASK THAT EXHIBIT 181 BE

14   RECEIVED INTO EVIDENCE?

15           **MR. REINES:**  YOUR HONOR, PER ALL THE DISCUSSIONS, WE

16   DON'T BELIEVE THERE'S ANY BASIS FOR THE NUMBERS THAT ARE GOING

17   TO BE PRESENTED INTO EVIDENCE.

18           **THE COURT:**  I'LL ALLOW IT AND YOU CAN CROSS-EXAMINE,

19   ALTHOUGH I'M NOT SEEING IT.

20           **MR. PRICE:**  IS IT NOT UP?

21           **THE COURT:**  IT'S NOT SUPPOSED TO BE UP TO THE JURY,

22   BUT IT CAN BE UP TO THE COURT TO TAKE A LOOK AT.

23                   (DISPLAYED ON SCREEN.)

24           **MR. REINES:**  JUST TO EMPHASIZE 403 -- RULE 403 AND

25   ALL THE LAW THAT WE HAVE CITED ABOUT THIS KIND OF NUMBER.

1    **THE COURT:**  I'LL ALLOW IT SUBJECT TO

2    CROSS-EXAMINATION.

3    **THE CLERK:**  SO ADMITTED, YOUR HONOR?

4    **THE COURT:**  IS THIS AN EVIDENCE OR DEMONSTRATIVE?

5    **MR. PRICE:**  IT'S AN EVIDENCE.  WE ARE GOING TO GO TO

6    THE DEMONSTRATIVE BECAUSE THAT'S A LITTLE DIFFICULT TO READ.

7    **THE COURT:**  OKAY.

8    (PLAINTIFF'S EXHIBIT 181 RECEIVED IN EVIDENCE)

9    **BY MR. PRICE:**

10   **Q.**  SO LET'S PUT UP THE DEMONSTRATIVE.  IT'S POWER POINT SLIDE

11   2.

12   (PUBLISHED TO JURY.)

13   AND THIS IS A THE TRUNCATED VERSION THAT YOU PREPARED?

14   **A.**  THAT'S RIGHT.  THESE ARE THE REVENUES PROVIDED BY ADOBE IN

15   RESPONSE TO WHAT WAS ACCUSED, THE ACCUSED PRODUCTS.  AND, YOU

16   KNOW, YOU CAN SEE IN THE EARLY YEARS THERE'S -- THERE WERE

17   ZERO SALES AND LATER YEARS THERE WERE LOTS OF SALES.

18   AND THE TOTAL AMOUNT OF THE REVENUE FOR ACCUSED PRODUCTS

19   IS $2 BILLION 66 MILLION.

20   **Q.**  COULD YOU SAY THAT AGAIN?  I THINK YOU SAID 2,066,000,000.

21   I DIDN'T QUITE CATCH IT.

22   **A.**  THE TOTAL AMOUNT IS $2,066,000,000.

23   **Q.**  AND THAT'S THE TOTAL THERE IN THE LOWER RIGHT-HAND CORNER?

24   **A.**  YES, THAT'S RIGHT.

25   **Q.**  OKAY.  SO AFTER YOU LOOKED AT THIS, WHAT DID YOU DO NEXT?

PARR – DIRECT / PRICE

1    **A.**   THE NEXT IDEA IS TO APPORTION THE TOTAL REVENUES TO AN

2    AMOUNT THAT YOU MIGHT CALL THE SMALLEST SALABLE UNIT OR, IN

3    THIS CASE, WHERE DOES THE DIGITAL RIGHTS MANAGEMENT TECHNOLOGY

4    GET IMPLEMENTED, AT WHERE IS IT INVOKED?

5         SO I DID RESEARCH, AND I FOUND THAT WHEN THESE -- WHEN

6    SOFTWARE PRODUCTS ARE DISTRIBUTED, THE DISTRIBUTOR GETS

7    30 PERCENT OF THE PRICE FOR DISTRIBUTION AND DELIVERY.

8         AND DISTRIBUTION AND DELIVERY IS WHERE CONTROL AND

9    REGULATION AND MANAGEMENT OF TECHNOLOGY OCCURS.  IT'S WHERE

10   THE DRM INVENTIONS WOULD BE DEPLOYED IN THE DELIVERY AND

11   DISTRIBUTION PORTION.

12        SO IT TOOK 30 PERCENT OF THIS 2 BILLION-DOLLAR NUMBER AND

13   CAME UP WITH THE UNIVERSE OF DISTRIBUTION AND DELIVERY, AND

14   THEN APPLIED THE 2.5 PERCENT ROYALTY TO THE 30 PERCENT NUMBER.

15   **Q.**   OKAY.  LET'S EXPLAIN HOW WE GOT THAT 30 PERCENT NUMBER,

16   OKAY?

17   **A.**   YES.

18   **Q.**   IN YOUR BINDER YOU HAVE EXHIBITS 109, 110 AND 111.

19        AND IF YOU WOULD LOOK AT THOSE IN AGGREGATE, WE WILL DO

20   THIS IN ONE BIG SWATH.

21   **A.**   ALL RIGHT.

22   **Q.**   AND ARE THESE THE DOCUMENTS YOU RELIED ON TO COME UP WITH

23   THIS 30 PERCENT NUMBER?

24   **A.**   YES.

25   **Q.**   ARE THEY DOCUMENTS THAT ARE RELIED UPON BY EXPERTS IN YOUR

1    FIELD?

2    **A.**  I RELIED ON THEM AND I'M AN EXPERT IN MY FIELD.  YEAH.

3        THE INFORMATION HERE SHOWS THAT 30 PERCENT IS STANDARD

4    INDUSTRY PRACTICE FOR DISTRIBUTION AND DELIVERY OF SOFTWARE.

5            **MR. PRICE:**  YOUR HONOR, WE ASK THEY BE OFFERED IN

6    EVIDENCE, EXHIBITS 109, 110 AND 111.

7            **MR. REINES:**  RENEWING OBJECTIONS AND REEMPHASIZING.

8            **THE COURT:**  WELL, THIS IS DIFFERENT SUBJECT MATTER.

9    AND I THINK THAT IT PROBABLY IS NOT ADMISSIBLE UNDER 703.

10       HE CAN USE IT, BUT I BELIEVE THE RULE SAYS HE CAN USE

11   OTHERWISE INADMISSIBLE INFORMATION, BUT IT ISN'T ADMITTED.

12           **MR. REINES:**  THAT'S CORRECT.

13           **MR. PRICE:**  OKAY.  SO WE CAN MAYBE PUBLISH IT TO THE

14   JURY, YOUR HONOR?

15           **THE COURT:**  NO.  HE CAN TALK ABOUT IT.

16   **BY MR. PRICE:**

17   **Q.**  WHY DON'T WE TALK ABOUT EXHIBIT 109.

18   **A.**  OKAY.

19   **Q.**  AND IF YOU WILL TURN TO THE SECOND PAGE OF THAT.

20       FIRST OFF, WHAT IS THIS DOCUMENT?

21   **A.**  THIS ONE SAYS "SEGA CLAIMING 941,000 FROM THQ OVER COMPANY

22   OF HEROES 2 PREORDERS".

23   **Q.**  OKAY.  AND IF YOU WILL TURN TO THE SECOND PAGE, DO YOU SEE

24   THE 30 PERCENT NUMBER SUPPORTED ANYWHERE IN THERE?

25   **A.**  THE LAST PARAGRAPH SAYS:  "THE CUT SEGA CLAIMS IT IS OWED

1    IS 70 PERCENT OF THE TOTAL, MEANING VALVE-STEAM TOOK

2    30 PERCENT."

3        VALVE STEAM IS A VALUE DISTRIBUTION COMPANY.  THEY HAVE

4    TAKEN THEIR 30 PERCENT FOR PERFORMING THAT FUNCTION.  THIS IS

5    AN EXAMPLE OF A DISTRIBUTOR AND DEALER, AND THIS ESTABLISHES

6    THAT THEY GOT 30 PERCENT.

7    **Q.**  LET'S MOVE ON TO THE NEXT EXHIBIT, 110.

8        AND THE FIRST PAGE THERE, PARAGRAPH STARTING WITH

9    "VIRTUALLY".

10       IF YOU LOOK IN THERE AND SEE IF YOU SEE ANY SUPPORT FOR

11   YOUR NUMBER THERE?

12   **A.**  THAT PARAGRAPH SAYS:  "VIRTUALLY ALL THE BEST KNOWN APP

13   STORES HAVE FALLEN IN LINE DIRECTLY WITH THE 30/70 REVENUE

14   SPLIT."

15       AND, AGAIN, 30 PERCENT IF YOU'RE A STORE SELLING SOFTWARE

16   YOU GET 30 PERCENT AND THE PRODUCER GETS 70 PERCENT.

17       WHAT I MEAN BY "PRODUCER", THE OWNER OF THE GAME OR THE

18   SOFTWARE, OR WHATEVER IT IS.

19   **Q.**  OKAY.  DO YOU SEE THAT -- ANYTHING LIKE THAT MENTIONED

20   ANYWHERE ELSE?  IF YOU CAN LOOK AT THE LAST SENTENCE OF THAT

21   PAGE.

22   **A.**  YEAH.

23       "THE LIMITATIONS CAUSED BY USING THIS LANGUAGE AND THE

24   DISCONTENT DEVELOPERS ARE EXPRESSING OVER 70/30 PERCENT CUT."

25       I MEAN, THE DEVELOPERS AREN'T HAPPY, BUT IT DOESN'T MATTER

1    IF THEY ARE HAPPY OR NOT.  THIS IS WHAT EVERYBODY IS CHARGING.

2    THIS IS WHAT THE STANDARD IS.

3    **Q.**  OKAY.  LET'S MOVE ON TO EXHIBIT 111, IN THE FIRST

4    PARAGRAPH.

5        LET US KNOW IF YOU SEE ANY SUPPORT FOR YOUR 30 PERCENT

6    NUMBER THERE.

7    **A.**  THE LAST SENTENCE SAYS:  THOSE WRITTEN TO TAKE ADVANTAGE

8    OF MICROSOFT 8'S METRO INTERFACE WILL REQUIRE GIVING MICROSOFT

9    THE INDUSTRY STANDARD 30 PERCENT CUT OF SALES.

10   **Q.**  OKAY.  AND WHY DO YOU SUGGEST THAT THIS IS THE CORRECT

11   INDUSTRY STANDARD TO BE APPLIED?

12   **A.**  BECAUSE THIS HAS TO DO, SAY WITH DELIVERY AND

13   DISTRIBUTION.  THIS IS WHERE DIGITAL REG INVENTION WOULD BE

14   INVOKED AND BE POWERFUL.

15       SO I'M TAKING 30 PERCENT OF THE TOTAL REVENUES AS THIS

16   SMALLER SALABLE UNIT AND APPLYING MY ROYALTY RATE TO THE

17   30 PERCENT NUMBER.

18           **MR. REINES:**  YOUR HONOR, WE WOULD OBJECT TO THAT AND

19   MOVE TO STRIKE AS NOT EVEN BEING THE MINIMAL LEGAL STANDARDS

20   UNDER 702 TO BE IN AN OPEN COURT.

21       I AM VERY -- WE HAD THAT ISSUE BEFORE, BUT WE'RE CERTAINLY

22   MAKING CLEAR ON THE RECORD WE DON'T THINK 30 PERCENT IS A

23   LEGITIMATE PORTION ANALYSIS HERE.

24           **THE COURT:**  YES, YOU'VE MADE THAT OBJECTION, AND I'VE

25   OVERRULED IT.

1    **BY MR. PRICE:**

2    **Q.**   OKAY.  LET'S GO BACK TO THE POWER POINT, SLIDE 2.

3                      (PUBLISHED TO JURY.)

4        MR. PARR, WOULD YOU TELL US IF YOU -- IF YOUR ROYALTY

5    ANALYSIS INCLUDES ANY PRODUCTS THAT ARE NOT LISTED HERE.

6        DID YOU -- IS THIS FOR EVERYTHING OR IS IT JUST FOR THESE

7    PRODUCTS?

8    **A.**   NO.  THE AMOUNT OF DAMAGES I'M COMING UP WITH IS FOR THE

9    INFRINGEMENT ASSOCIATED WITH THESE PRODUCTS AND THIS REVENUE,

10   AND NOTHING ELSE.

11   **Q.**   OKAY.  SO LET'S GO TO THE NEXT SLIDE.  WALK US THROUGH

12   THIS.

13       WHAT ARE WE SEEING HERE ON THE TOP LINE?

14                      (PUBLISHED TO JURY.)

15   **A.**   THERE IT IS.  OKAY.  THE TOP LINE IS THE TOTAL ACCUSED

16   REVENUE FROM THE SOFTWARE IS, LIKE I SAID, 2,066,000,000.

17       THEN I'M TRYING TO CAPTURE LOWEST SALABLE UNIT, AN

18   ALLOCATION OF THE PORTION OF REVENUES THAT MIGHT BE MORE

19   DIRECTLY ASSOCIATED WITH THE IMPLEMENTATION OF THE INFRINGED

20   TECHNOLOGY.  AND THAT'S THE 30 PERCENT WE JUST TALKED ABOUT.

21       SO NOW WE HAVE $619,860,000.  AND THAT'S WHERE I APPLIED

22   MY 2.5 PERCENT ROYALTY RATE TO COME UP WITH DAMAGES THAT ADOBE

23   SHOULD PAY TO DIGITAL REG OF $15,496,500.

24   **Q.**   OKAY.  SO THAT -- THAT -- THE 30 PERCENT IS THE TOP LINE,

25   RIGHT?  THAT'S WHERE YOU CUT THE ROYALTY BASE DOWN?

1    **A.**   THAT'S RIGHT.

2    **Q.**   AND THEN THE BOTTOM LINE IS THE APPLICATION OF WHAT WE

3    CAME OUT OF THE GEORGIA-PACIFIC FACTORS WITH?

4    **A.**   YES.

5    **Q.**   AND YOU MULTIPLY THE REDUCED TOTAL BY THE GEORGIA-PACIFIC

6    OUTCOME?

7    **A.**   THE ROYALTY RATE.

8    **Q.**   ROYALTY RATE, AND THEN TELL US AGAIN THE TOTAL?

9    **A.**   15.5 MILLION.

10   **Q.**   AND THAT IS WHAT YOUR OPINION IS OF DIGITAL REG'S DAMAGES

11   IN THIS CASE?

12   **A.**   YES.

13        **MR. PRICE:**   OKAY.  I WILL PASS THE WITNESS.

14                    **CROSS-EXAMINATION**

15   **BY MR. REINES:**

16   **Q.**   MR. PARR, ARE YOU READY?

17   **A.**   YES.

18   **Q.**   THANK YOU.

19        I WOULD LIKE TO JUST DISCUSS SOME OF THE LITIGATION

20   MECHANICS OF AN EXPERT.

21        HOW MANY HOURS DID YOU WORK ON YOUR FIRST REPORT?

22   **A.**   I DON'T RECALL.  A HUNDRED, MAYBE 150.

23   **Q.**   AND THE WAY IT WORKED IS YOU WORKED AN AMOUNT OF TIME AND

24   YOU PUT A FIRST REPORT TOGETHER; IS THAT CORRECT?

25   **A.**   RIGHT.

1    **Q.**   AND THEN WE HAD A DEPOSITION OF YOU AFTER THAT; IS THAT

2    RIGHT?

3    **A.**   I DON'T REMEMBER -- FOR THIS CASE, I DON'T REMEMBER

4    EXACTLY -- YES, THAT'S TRADITIONALLY WHAT YOU DO.  I WROTE A

5    REPORT AND THEN I GAVE A DEPOSITION.  YES.

6    **Q.**   YOU DON'T REMEMBER IN THIS CASE ISSUING A REPORT AND THEN

7    HAVING YOUR DEPOSITION TAKEN?

8    **A.**   YES.  THERE'S BEEN TWO, I THINK.  SO, I DO REMEMBER TAKING

9    A DEPOSITION, YES.

10   **Q.**   OKAY.

11       AND FOR YOUR DEPOSITION IN THIS CASE, YOU KNEW THAT YOU

12   NEEDED TO BE PREPARED ON YOUR REPORT, CORRECT?

13   **A.**   SURE.  YES.

14   **Q.**   AND YOU DID YOUR BEST TO DO THAT, DIDN'T YOU?

15   **A.**   YES.

16   **Q.**   AND YOU SPENT THE TIME THAT YOU NEEDED TO INVEST TO MAKE

17   SURE THAT YOU WOULD BE FULLY PREPARED FOR YOUR DEPOSITION,

18   RIGHT?

19   **A.**   YES.

20   **Q.**   AND THEN YOU'VE ACTUALLY, IN THIS CASE, PREPARED FOUR

21   REPORTS, RIGHT?

22   **A.**   YES.  TOTAL OF FOUR.

23   **Q.**   OKAY.

24       AND IN CONNECTION WITH YOUR CURRENT OPERATIVE REPORT, YOU

25   HAD A -- YOU SPENT ABOUT HOW MANY HOURS ON THAT?  IT WAS ABOUT

PARR - CROSS / REINES

```
1    TWO WEEKS AGO.

2    A.   WHICH ONE?

3    Q.   THE FOURTH ONE THAT YOU CALLED THIRD SUPPLEMENTAL.

4    A.   THAT WAS ADJUSTMENTS TO THE REPORT TO ELIMINATE SOME

5    FACTORS, SO IT DIDN'T TAKE A LOT.   THERE WAS NO NEW

6    INFORMATION ADDED.

7    Q.   OKAY.   BUT IN ANY EVENT, YOU SPENT HOW MUCH TIME ON THAT

8    REPORT?

9    A.   I DON'T KNOW, TEN HOURS.

10   Q.   AND THEN I TOOK YOUR DEPOSITION LAST TUESDAY NIGHT; IS

11   THAT CORRECT?

12   A.   YES.

13   Q.   OKAY.   AND WITH RESPECT TO THAT DEPOSITION, YOU TOOK THAT

14   DEPOSITION SERIOUSLY, RIGHT?

15   A.   ALWAYS.

16   Q.   YOU SPENT ALL THE TIME THAT YOU THOUGHT YOU NEEDED TO BE

17   FAMILIAR WITH YOUR REPORT AND SUBJECT MATTER, CORRECT, IN

18   ORDER TO BE PREPARED?

19   A.   YES.   UH-HUH.

20   Q.   NOW, WHEN YOU PREPARED -- WELL, LET ME SAY, IN THIS CASE,

21   ONE OF THE THINGS YOU LOOKED AT AS A CORE BODY OF INFORMATION

22   WAS TEN LITIGATION SETTLEMENTS, DO YOU RECALL THAT?

23   A.   YES.

24   Q.   AND THAT WAS THE INFORMATION THAT WAS IN YOUR FIRST

25   REPORT?
```

1    **A.**  YES.

2    **Q.**  AT THE TIME OF YOUR FIRST REPORT, WERE YOU AWARE THAT

3    THERE WAS PRIOR LITIGATION INVOLVING ONE OF THE PATENTS THAT'S

4    IN SUIT IN THIS CASE?

5    **A.**  WELL, YES.  THEY WOULD HAVE BEEN THE SUBJECT OF SOME OF

6    THE SETTLEMENT LICENSE AGREEMENTS THAT I HAD.

7    **Q.**  WHEN YOU SAY SOME OF THOSE, DO YOU KNOW HOW MANY OF THEM?

8    **A.**  I DIDN'T TRACK THEM ALL.  THERE'S TEN SETTLEMENT

9    AGREEMENTS.  I DON'T KNOW HOW MANY OF THEM WERE INVOLVED AS A

10   RESULT OF LITIGATION.

11   **Q.**  YOU DON'T KNOW THAT ALL TEN LITIGATION SETTLEMENTS WERE

12   FROM LITIGATION?

13   **A.**  THEY WOULD BY DEFINITION BE.

14   **Q.**  AND WITH RESPECT TO YOUR KNOWLEDGE, CERTAINLY AT

15   DEPOSITION, DID YOU KNOW WHEN YOUR DEPOSITION WAS TAKEN THAT

16   THE PATENTS-IN-SUIT HAD THAT PRIOR LITIGATION?  WERE YOU AWARE

17   OF THAT FACT?

18   **A.**  IT WAS IN MY FIRST REPORT, SO I WOULD KNOW THAT THEY HAD

19   SETTLEMENTS OF PRIOR LITIGATION.

20   **Q.**  ALL RIGHT.

21        **MR. REINES:**  I WOULD LIKE TO APPROACH.  YOUR HONOR,

22   HERE IS THE ORIGINAL FOR YOU.

23             (BINDER HANDED TO COURT.)

24        **MR. REINES:**  MAY I APPROACH?

25        **THE COURT:**  YES.

1          MR. REINES:  THANK YOU.  HERE IS YOUR DEPOSITION

2     TRANSCRIPTS.

3                    (BINDER HANDED TO WITNESS.)

4     BY MR. REINES:

5     Q.  I WOULD LIKE TO DIRECT YOU TO PAGE 205, LINE 5 THROUGH 8.

6         AND WHY DON'T WE PLAY THAT.  IT'S 205, FROM YOUR FIRST

7     DEPOSITION, LINES 5 THROUGH 8.

8                    (VIDEO PLAYED AS FOLLOWS:)

9              "NOW, YOU UNDERSTOOD THERE WAS A PRIOR LITIGATION

10             INVOLVING AT LEAST ONE OF THE PATENTS-IN-SUIT.

11             RIGHT?

12             "ANSWER:  NO, I DON'T REMEMBER."

13    BY MR. REINES:

14    Q.  LET'S TALK ABOUT THE SETTLEMENT AGREEMENTS A LITTLE BIT.

15        REGARDING SETTLEMENT AGREEMENTS, YOU AGREE THAT SETTLEMENT

16    AGREEMENTS NEVER INDICATE VALIDITY OR INFRINGEMENT, CORRECT?

17    A.  I DON'T KNOW IF IT'S NEVER, BUT I'VE NEVER SEEN ONE.  AS

18    FAR AS I'VE NEVER SEEN ONE WHERE THE PARTIES STIPULATE THAT

19    THEIR PATENTS ARE VALID AND THE PATENTS INFRINGE.

20        AS FAR AS I'M CONCERNED, ALL OF THE SETTLEMENTS I'VE SEEN

21    LEAVE THAT QUESTION OPEN BECAUSE THERE WAS NO COURT DECISION

22    TO PROVE THAT THEY WERE VALID AND PROVE THEY WERE INFRINGED.

23    Q.  RIGHT.  BUT IF YOU LISTEN TO MY QUESTION, BECAUSE WORDS

24    MATTER AS YOU KNOW FROM HAVING DONE THIS 70 TIMES, YOUR

25    TESTIMONY IS THAT SETTLEMENT AGREEMENTS NEVER INDICATE

1    VALIDITY.  RIGHT?  THEY JUST DON'T INDICATE THAT TO YOU; ISN'T

2    THAT TRUE?

3    **A.**  CORRECT.

4    **Q.**  AND DO YOU UNDERSTAND THAT ONE OF THE ARGUMENTS BEING MADE

5    BY DIGITAL REG IS THAT THE FACT OF THESE SETTLEMENT AGREEMENTS

6    PROVE THE VALIDITY -- SUPPORT THE VALIDITY OF THEIR PATENT?

7        DID YOU KNOW THAT?

8    **A.**  NO, I DIDN'T KNOW THAT.

9    **Q.**  NOW, OF THE TEN LITIGATION SETTLEMENTS, YOU EXCLUDED EIGHT

10   AGREEMENTS AND INCLUDED TWO IN YOUR ANALYSIS IN TERMS OF WHAT

11   YOU WERE RELYING ON; ISN'T THAT CORRECT?

12   **A.**  YES.

13   **Q.**  AND, IN FACT, YOU HAVE THREE DATA POINTS FOR YOUR ROYALTY

14   RATE.  THE ADOBE PLUG-IN, IN TERMS OF THE RATE ITSELF, THE

15   MACROVISION AND INTUIT LICENSE AGREEMENTS.

16       THOSE ARE THE KIND NUMERICALLY WHAT YOU RELIED ON; ISN'T

17   THAT RIGHT?

18   **A.**  CORRECT.

19   **Q.**  OKAY.

20       LET ME ASK YOU ABOUT THE ADOBE PLUG-IN LICENSE THAT WE SAW

21   ON THE SCREEN AND THAT MR. HERBACH TESTIFIED AND YOU TESTIFIED

22   ABOUT TODAY.

23       IF YOU COULDN'T RELY ON THAT 5.5 PERCENT, YOU JUST

24   WOULDN'T KNOW WHERE TO GO WITH YOUR ANALYSIS; ISN'T THAT TRUE?

25   **A.**  I WOULD DEFINITELY FIGURE IT OUT, BUT RIGHT NOW I WOULD

1   HAVE TO CONSIDER IT.  I CAN'T SAY I DON'T KNOW WHERE TO GO, I

2   JUST --

3   **Q.**  ALL RIGHT --

4   **A.**  I WOULD HAVE TO READJUST.

5   **Q.**  I WOULD LIKE TO PLAY YOUR DEPOSITION AT LINE -- PAGE 194,

6   LINE 13 THROUGH PAGE 195, LINE 5.

7                    (VIDEO PLAYED AS FOLLOWS:)

8             "QUESTION:  IF THE JUDGE DECIDES IT'S NOT COMPARABLE,

9             DO YOU AGREE THAT THE ROYALTY RATE SHOULD GO DOWN

10            FROM 2.5 PERCENT?

11            "ANSWER:  I'D HAVE TO THINK ABOUT IT.  I CAN'T -- I

12            DON'T KNOW.

13            "QUESTION:  IF THE --

14            "ANSWER:  I DON'T LIKE IT WHEN JUDGES TELL ME WHAT'S

15            COMPARABLE AND WHAT'S NOT.  I'M IN THE BUSINESS MORE

16            THAN THEY ARE.  BUT IF HE SAYS I CAN'T USE IT, I

17            DON'T KNOW WHERE I'M GOING TO GO.

18            "QUESTION:  OKAY.  AND IF THE JURY DECIDES THAT THE

19            5.5 PERCENT PLUG-IN IS NOT COMPARABLE BECAUSE IT'S

20            NOT A PATENT LICENSE AND IT'S NOT FOR DRM TECHNOLOGY

21            THAT YOU CAN TIE TO THE PATENTS-IN-SUIT AND THEY

22            DECIDE IT'S NOT COMPARABLE, DO YOU AGREE THAT THE

23            NUMBER SHOULD GO DOWN FROM 2.5 PERCENT?

24            "ANSWER:  I DON'T KNOW WHAT TO DO WITH INJURIES.

25            THEY'RE ON THEIR OWN.  THEY CAN DECIDE WHATEVER THEY

1        WANT."

2  BY MR. REINES:

3  Q.  YOU AGREE THAT THROUGH THE ADOBE PLUG-IN -- LET ME STEP

4  BACK.

5        REGARDING THE AGREEMENT, THE 5.5 PERCENT THAT YOU RELY ON

6  THAT WAS JUST ADDRESSED IN THAT TESTIMONY WE ADDRESSED WITH

7  THE JUDGE AND THE JURY, THAT 5.5 PERCENT, THAT'S NOT A LICENSE

8  FOR DRM, RIGHT?

9  A.  WELL, IT TALKS ABOUT DRM EXACTLY IN IT.  IF YOU WANT TO

10  PUT DRM IN THEIR PRODUCT, YOU HAVE TO PAY 5.5 PERCENT.  SO I

11  EQUATE THAT TO DRM.

12  Q.  THE LICENSEE HAS THE DRM TECHNOLOGY, RIGHT?

13        THE LICENSEE HAS --

14  A.  THE PERSON THAT'S GOING TO BE REQUIRED TO PAY THE

15  5.5 PERCENT HAS TO DEVELOP THEIR OWN DRM.  AND IF YOU WANT TO

16  INCORPORATE DRM INTO ADOBE'S PRODUCT, YOU HAVE TO PAY THEM

17  FIVE AND A HALF PERCENT.

18  Q.  I THINK IT'S A SIMPLE QUESTION.

19        THE PERSON THAT'S THE LICENSEE THAT WOULD BE PAYING THE

20  5.5 PERCENT, THEY'RE NOT GETTING ANY DRM TECHNOLOGY.  THEY ARE

21  THE ONES THAT ARE COMING UP WITH THE DRM TECHNOLOGY; ISN'T

22  THAT TRUE?

23  A.  RIGHT.  THEY'RE JUST GETTING RIGHTS TO PUT IT INTO THE

24  PROPERTY.

25  Q.  WE WILL TALK IN A MINUTE ABOUT WHAT THEY ARE GETTING.

PARR – CROSS / REINES

1       BUT WHAT I WANT TO BE CLEAR IS WHAT THEY'RE NOT GETTING.

2   THEY'RE NOT GETTING DRM TECHNOLOGY FOR THEIR 5.5 PERCENT; THEY

3   HAVE IT.

4   **A.**  OR THEY HAVE TO DEVELOP IT, THAT'S CORRECT.

5   **Q.**  OKAY.

6       NOW, WHAT THEY ARE GETTING FOR THEIR 5.5 PERCENT IS THEY

7   ARE GETTING ACCESS TO ALL OF THE TECHNOLOGY OF THE ADOBE

8   READER THAT THEY CAN PUT THEIR DRM ON, ESSENTIALLY BEING

9   COMPETITIVE WITH THE ADOBE DRM, AND THEN THEY CAN TRY AND DO

10  WHAT THEY WANT WITH THAT PRODUCT, RIGHT?

11  **A.**  WHAT THEY ARE GETTING, IN A SENSE, IS A KEY TO THE DOOR.

12  SO THEY CAN CREATE THE TECHNOLOGY THAT WILL BE COMPATIBLE WITH

13  THE TECHNOLOGY OF THE PRODUCT, OF ADOBE'S ACROBAT.

14      SO THEY ARE NOT REALLY GETTING THE TECHNOLOGY AS MUCH AS

15  THEY'RE JUST GETTING HERE'S A MAP OR THE KEY TO THE DOOR SO

16  THAT YOU CAN BUILD YOUR PRODUCT AND IT WILL WORK WITH ADOBE.

17  **Q.**  RIGHT.  AND WHEN THEY GET THE KEY TO THE DOOR TO OPEN THE

18  DOOR --

19  **A.**  UH-HUH.

20  **Q.**  -- WHETHER IT IS TO A SAFE OR ANYTHING ELSE, WHAT'S ON THE

21  OTHER SIDE IS ALL THE TECHNOLOGY AND ALL THE PATENTS OF

22  ADOBE'S THAT ADOBE'S ALLOWED TO CONTROL, THEY'RE GETTING ALL

23  THAT BENEFIT, RIGHT?

24  **A.**  THEY'RE NOT GETTING ANY RIGHTS TO USE IT TO MAKE PRODUCTS.

25  THEY ARE JUST GETTING RIGHTS TO MAKE SURE THEIR PRODUCTS WORKS

1   WITH IT.

2        YOU'RE IMPLYING THAT THEY WILL BE GETTING ALL OF ADOBE

3   TECHNOLOGY, SAY FOR ACROBAT, AND THEN BE FREE TO GO USE IT ANY

4   WAY THEY WANT, AND THAT'S WRONG.

5   **Q.**  SO YOU DON'T UNDERSTAND THAT IF THEY USE THAT PLUG-IN OF

6   THEIR DRM WITH ADOBE'S PRODUCTS WITHOUT PERMISSION, THAT THAT

7   WOULD BE INFRINGEMENT?

8        YOU'VE DONE A LOT OF EXPERTING IN THIS AREA, RIGHT?  YOU

9   UNDERSTAND THAT, DON'T YOU?

10  **A.**  I DON'T UNDERSTAND YOUR QUESTION.

11  **Q.**  DO YOU UNDERSTAND THAT IF SOMEONE TAKES THEIR OWN DRM

12  TECHNOLOGY, AND WITHOUT LICENSE USES IT AND MATCHES IT TO ALL

13  OF ADOBE'S TECHNOLOGY AND ENCOURAGES PEOPLE TO USE IT THAT

14  WAY, THAT CAN BE PATENT INFRINGEMENT?

15       DO YOU UNDERSTAND THAT?

16  **A.**  I DON'T KNOW THAT -- YES, BECAUSE THEY WOULD --

17  HYPOTHETICALLY, TO MAKE A PLUG-IN, THAT WORKS WITH ADOBE

18  PRODUCT, WITHOUT HAVING RIGHTS TO SAY POKE AROUND INSIDE THE

19  ADOBE PRODUCT, THAT WOULD BE -- WELL, I DON'T KNOW WHAT IT

20  WOULD BE.  I'M NOT A PATENT EXPERT.

21       IT'S JUST THAT ADOBE IS SAYING THAT IF YOU WANT THE KEY TO

22  THE DOOR SO THAT YOU CAN MAKE YOUR PRODUCT COMPATIBLE WITH OUR

23  PRODUCT, WE WANT 5.5 PERCENT.

24       BUT REMEMBER, WHEN YOU GET THE KEY TO THE DOOR, THAT

25  DOESN'T MEAN YOU GET OWNERSHIP TO DO ANYTHING YOU WANT ONCE

```
1    YOU GET INSIDE THE REST OF THE HOUSE.  YOU CAN'T GO IN AND USE

2    THAT TO MAKE YOUR OWN ADOBE PRODUCT.  YOU ARE ONLY GETTING

3    LIMITED RIGHTS.  THIS IS JUST WHAT IT LOOKS LIKE INSIDE THE

4    HOUSE, YOU BUILD YOUR PLUG-IN IT WILL FIT.

5    Q.  AND IN TERMS OF THIS 5.5 PERCENT, HAS ANYBODY EVER ENTERED

6    INTO AN AGREEMENT WHERE THEY HAVE BEEN WILLING TO PAY THE

7    5.5 PERCENT TO GET ACCESS TO THE ADOBE TECHNOLOGY FOR THEIR

8    PLUG-IN?

9    A.  WELL, AS I SAID IN MY REPORT, I DON'T KNOW.  I HAVE NEVER

10   SEEN ANY LICENSES.

11   Q.  AND, IN FACT, ISN'T TRUE -- YOU'VE TESTIFIED A LITTLE BIT

12   HOW YOU THINK IT WORKS, BUT YOU HAVE NO IDEA HOW THE DRM

13   PLUG-INS ARE IMPLEMENTED?

14   A.  NO, THAT'S A TECHNICAL ISSUE.  I WOULD RELY ON DR. DEVANBU

15   FOR THAT.

16   Q.  AND YOU DON'T KNOW ANYTHING ABOUT IT OTHER THAN THE

17   ONE-PAGE DOCUMENT THAT WAS UP HERE, CORRECT?

18   A.  THAT'S THE ONLY INFORMATION ADOBE PROVIDED ON IT, THAT'S

19   CORRECT.

20   Q.  AND IN TERMS OF THE RELATIONSHIP BETWEEN THE PLUG-INS OF

21   THESE THIRD PARTIES AND THE ACCUSED DRM TECHNOLOGY, YOU HAVE

22   NO IDEA WHETHER THERE'S COMPARABILITY OR ANYTHING LIKE THAT?

23   A.  FROM A TECHNICAL POINT OF VIEW?

24   Q.  YES.

25   A.  RIGHT.
```

1    THE CODE THAT MAKES THEM HAPPEN AND THE TECHNOLOGY

2    INVOLVED, I DON'T KNOW HOW YOU WOULD COMPARE THE PATENTS AT

3    ISSUE HERE WITH SAY A PLUG-IN THAT HASN'T EVEN BEEN INVENTED

4    YET.

5    **Q.**  BECAUSE YOU ARE NOT A PATENT EXPERT AND BECAUSE YOU ARE

6    NOT A TECHNICAL EXPERT, NOTWITHSTANDING YOUR TESTIMONY ABOUT

7    WHAT YOU THINK MIGHT HAPPEN, YOU DON'T HAVE ANY IDEA WHAT THE

8    BENEFITS WOULD BE TO THE THIRD PARTY FOR ENTERING INTO THIS

9    AGREEMENT, RIGHT?

10   **A.**  WELL, I DON'T KNOW HOW MANY THEY COULD SELL.

11   **Q.**  BUT YOU DON'T HAVE ANY IDEA TO A THIRD PARTY, IF THERE

12   EVER WAS ONE THAT WANTED TO PAY 5.5 PERCENT, WHAT BENEFITS

13   THEY WOULD GET FOR THEIR 5.5 PERCENT; WHAT ACCESS THEY WOULD

14   GET, WHAT RIGHTS THEY WOULD GET, YOU HAVE NO IDEA AT ALL.

15   **A.**  I JUST TOLD YOU WHAT I UNDERSTAND.  THEY GET THE RIGHTS TO

16   HAVE COMPATIBILITY WITH SOFTWARE, BUT THEY DON'T GET THE

17   SOFTWARE.

18   **Q.**  I WOULD LIKE TO PLAY YOUR DEPOSITION, PAGE 201, LINE 6

19   THROUGH 10.

20            (VIDEO PLAYED AS FOLLOWS:)

21        "QUESTION:  AND YOU DON'T KNOW WHAT THOSE BENEFITS

22        ARE FOR THE PEOPLE THAT ARE -- THE THIRD PARTIES THAT

23        ARE ENTERING INTO THE AGREEMENT WITH ADOBE, RIGHT?

24        YOU DON'T KNOW WHAT BENEFITS THEY'RE GETTING?

25        "ANSWER:  NO.  I JUST KNOW ADOBE WANTS 5.5 PERCENT."

1      DID YOU ASK DIGITAL REG ABOUT ANY OF THE INFORMATION ABOUT

2   THE BENEFITS OR THE USAGE OR WHETHER THEY'VE BEEN ABLE TO FIND

3   OUT FROM MR. HERBACH WHETHER ANYONE EVER ENTERED INTO THIS

4   LICENSE AGREEMENT?

5   **A.**  NO, I HAVE -- I DON'T KNOW -- I STILL DON'T KNOW WHAT THE

6   BENEFITS ARE OF PEOPLE THAT HAVE MADE A PLUG-IN AND SOLD IT.

7   THAT'S WHAT I'M REFERRING TO HERE ARE BENEFITS.

8      YOU HAVE TO PAY 5.5 PERCENT.  BUT I DON'T HAVE ANY

9   EVIDENCE THAT SHOWS PEOPLE HAVE DONE THIS AND MADE A BILLION

10  DOLLARS ON WHICH THEY PAY 5.5 PERCENT.

11     SO I DON'T KNOW WHAT BENEFITS PEOPLE WHO HAVE DONE THIS

12  HAVE RECEIVED BY DOING IT.  I JUST KNOW THAT TO DO IT, YOU

13  HAVE TO PAY 5.5 PERCENT.

14          **MR. REINES:**  YOUR HONOR, I MOVE TO STRIKE THAT

15  TESTIMONY.  THE QUESTION WAS WHETHER HE ASKED DIG REG'S

16  ATTORNEYS FOR THE INFORMATION THAT HE DIDN'T HAVE.

17          **THE COURT:**  ALL RIGHT.

18  **BY MR. REINES:**

19  **Q.**  LET'S TALK ABOUT YOUR FIRST REPORT.

20     IN YOUR FIRST REPORT, THE ROYALTY RATE THAT YOU CONCLUDED

21  WAS REACHED WAS 2.5 PERCENT; ISN'T THAT CORRECT?

22  **A.**  YES.

23  **Q.**  AND THE THEORY THAT YOU USED FOR THAT RELATED TO PIRACY

24  SAVINGS, CORRECT?

25  **A.**  THAT WAS ONLY ONE PORTION.  THE THEORY I USED WAS THE

1    ENTIRE GEORGIA-PACIFIC FACTORS AND THE LICENSE AGREEMENTS THAT

2    ARE JUST DISCUSSED HERE IN THE REPORT, AND ALSO A CALCULATION

3    I DID OF SAVINGS.

4    Q.  AND THE PIRACY SAVINGS OPINION THAT YOU HAD, FROM WHICH

5    HELPED YOU GET TO THIS 2.5 PERCENT ROYALTY RATE, YOU CONCLUDED

6    THAT THE NUMBER CAME OUT TO 2 PERCENT UNDER THAT, WHATEVER

7    THAT FORMULA WAS THAT YOU USED, CORRECT?

8    A.  I THINK I REMEMBER THAT FOR ME THAT INDICATED A

9    2-POINT PERCENT ROYALTY WHICH SUPPORTED ALL THE OTHER

10   INFORMATION I HAD ALREADY TO SUPPORT 2.5.

11   Q.  AND THEN WHAT YOU DID WAS YOU TOOK THAT 2 PERCENT NUMBER

12   AND YOU CHANGED IT TO 2.5 PERCENT BECAUSE THAT'S THE

13   CALCULATION YOU HAD FOR DIFFERENT PARTIES, DIFFERENT PEOPLE

14   THAT YOU WERE ALLEGED -- THAT DIG REG WAS ALLEGING

15   INFRINGEMENT FOR SO THAT THEY WOULD BE CONSISTENT.

16   A.  I DIDN'T CHANGE IT.  WHAT I HAVE IS 1 PERCENT FOR

17   MACROVISION.  THEN I HAD TWO AND A HALF PERCENT FROM INTUIT.

18   FIVE AND A HALF PERCENT FROM ADOBE WHEN THEY'RE LICENSING THE

19   RIGHTS TO MAKE DRM.  AND THEN I HAD THIS CALCULATION, WHICH

20   WAS 2 PERCENT.

21       AND IF YOU SPREAD THEM OUT AND LOOK AT THEM, I DECIDED

22   YOU'VE GOT A LOW, YOU'VE GOT A HIGH, I WENT WITH TWO AND A

23   HALF PERCENT AS IN BETWEEN.

24   Q.  AND AT LEAST ONE REASON WHY YOU WENT FROM THAT 2 PERCENT

25   TO 2.5 PERCENT WAS BECAUSE YOU THOUGHT DIGITAL REG WOULD WANT

1    TO BE CONSISTENT LICENSING CAMPAIGN WHERE THEY WOULD CHARGE

2    PEOPLE THE SAME AMOUNT, AND THERE ARE OTHERS THAT HAD

3    DIFFERENT RATES, BUT SOME THAT HAD 2.5 PERCENT, AT LEAST

4    ACCORDING TO WHAT YOUR DAMAGES THEORIES WERE IN LITIGATION,

5    CORRECT?

6    **A.**  I DON'T KNOW IF I SAID THAT OR NOT.  IT DOESN'T SEEM

7    UNREASONABLE.  BUT I'M NOT LIKE TRYING TO DISTORT DATA.  I'M

8    LOOKING FOR DATA TO SUPPORT 2.5 PERCENT.

9         I DIDN'T GO OUT LOOKING TO GET 2.5 PERCENT.  I DID ALL

10   THIS WITH A COMPLETELY BLANK OPINION.  AND I JUST KEPT COMING

11   UP WITH INFORMATION THAT'S SUPPORTED TWO AND A HALF PERCENT.

12   **Q.**  WILL YOU AGREE THAT YOU WENT FROM 2 PERCENT, WHICH WAS

13   YOUR SO-CALLED PROFIT SHARING ANALYSIS, TO 2.5 PERCENT BASED

14   AT LEAST IN PART ON THE FACT THAT FOR OTHER ENTITIES YOU'D

15   COME UP WITH 2.5 PERCENT AND YOU WANTED TO BE CONSISTENT AT

16   2.5 PERCENT ALL THE TIME?

17   **A.**  NO.  I DIDN'T LOOK AT THE PROFIT SPLIT OF 2 PERCENT AND

18   THEN DECIDE IT SHOULD GO UP TO 2.5.  NEVER DID I DO THAT.

19             **MR. REINES:**  YOUR HONOR, MAY I --

20             **THE WITNESS:**  IN FACT, THE PROFIT SPLIT ANALYSIS I

21   DID WAS KIND OF AN AFTERTHOUGHT.  I ALREADY HAD 1 TO 5.5.  AND

22   LATER IN THAT REPORT, I DID A PROFIT SPLIT ANALYSIS TO SEE

23   WHAT WOULD COME UP.  AND ALL OF A SUDDEN IT WAS UH, 2 PERCENT,

24   THAT SUPPORTS ME.

25             **MR. REINES:**  YOUR HONOR, I'D ASK FOR THAT TO BE

```
1    STRICKEN.  THAT IS NOT RESPONSIVE TESTIMONY.

2              THE COURT:  ALL RIGHT.

3              MR. REINES:  MAY I APPROACH?

4              THE COURT:  YES.

5                   (BINDER HANDED TO WITNESS.)

6    BY MR. REINES:

7    Q.  I WOULD LIKE YOU TO TURN TO YOUR FIRST REPORT AT

8    PARAGRAPH 184, PLEASE.

9    A.  GOT IT.

10                   (PUBLISHED TO JURY.)

11   Q.  LET'S -- JUST THE TWO SENTENCES FROM THE THIRD LINE TO THE

12   SEVENTH LINE?

13             THE COURT:  I'M NOT SURE HIS REPORT --

14                   (DOCUMENT REMOVED FROM SCREEN.)

15             MR. REINES:  LET'S NOT SHOW IT TO THE JURY.

16             THE COURT:  IT'S DOWN.

17   BY MR. REINES:

18   Q.  DO YOU SEE THE SENTENCE THAT SAYS:

19             "BASED ON AN ADOBE PROFIT ANALYSIS, I ALSO DETERMINED

20             THAT A TWO-POINT -- A 2 PERCENT ROYALTY RATE WOULD BE

21             REASONABLE BASED ON A SPLIT OF THE PROFITS

22             ATTRIBUTABLE TO DIGITAL REG'S INVENTION.  BECAUSE

23             DIGITAL REG WOULD LIKELY WANT TO ENTER INTO A

24             CONSISTENT LICENSING CAMPAIGN, IT WOULD LIKELY ALSO

25             CONSIDER HOW A 50 PERCENT SPLIT OF PROFITS WOULD WORK
```

1          WITH OTHER DEFENDANTS SUCH AS EA, UBISOFT, AND

2          SYMANTEC.  BY COMBINING THESE IMPORTANT DATA POINTS,

3          I BELIEVE A 2.5 PERCENT ROYALTY RATE IS A

4          CONSERVATIVE FIGURE."

5     DO YOU SEE THAT?

6     **A.**  YES.

7     **Q.**  AND SO THE FACT OF A CONSISTENT LICENSING CAMPAIGN WAS A

8     CONTRIBUTOR TO YOUR 2.5 PERCENT ROYALTY, RIGHT?  THAT'S A

9     "YES" OR "NO" QUESTION.

10         SIMPLE QUESTION.  WAS THE FACT THAT YOU WANTED TO HAVE A

11    CONSISTENT ROYALTY RATE FOR DIGITAL REG AT 2.5 PERCENT ONE OF

12    THE REASONS WHY YOU CAME TO 2.5 PERCENT IN YOUR FIRST REPORT?

13    **A.**  RIGHT.  I ESTABLISHED 2.5 PERCENT AND FELT THAT IT SHOULD

14    BE UNIVERSAL.  THAT'S RIGHT.  BUT IT WASN'T LIKE THE OTHER WAY

15    AROUND.

16    **Q.**  NOW, IN THAT FIRST REPORT, YOU INCLUDED AN ALTERNATIVE

17    WHERE WHAT YOU SAID WAS, SINCE YOU HAD THIS HUGE BASE UNDER

18    DIGITAL REG'S THEORY OF $2 BILLION IN REVENUE, THAT YOU WERE

19    GOING TO APPORTION IT SO YOU WOULDN'T BE TRYING TO GET ALL THE

20    MONEY FOR ALL OF THAT, BUT YOU WOULD JUST TRY TO GET A

21    30 PERCENT ROYALTY BASE; ISN'T THAT CORRECT?

22    **A.**  YES.

23    **Q.**  AND THEN YOU SAID, THE WAY YOU WERE GOING TO WORK IT WAS

24    LIKE A SEESAW, RIGHT?  THAT IF YOU LOWERED THE BASE BY 30 --

25    TO 30 PERCENT FROM A HUNDRED PERCENT, YOU WERE AUTOMATICALLY

1    GOING TO INCREASE THE ROYALTY RATE SO THAT THE AMOUNT ALWAYS

2    REMAIN THE SAME.

3         AND YOU DID A CALCULATION, WHICH WAS -- SEEMED HARDER THAN

4    I REMEMBER.  IT WAS LIKE -- I THINK YOU CAME TO LIKE 8.33 AS

5    THE NEW EFFECTIVE ROYALTY RATE.  SO YOU AGREED, OH, WELL, WE

6    SHOULD APPORTION, AT LEAST UNDER THIS ALTERNATIVE THEORY, BUT

7    IT GOES UP 8.33 PERCENT.

8         IS THAT GENERALLY FAMILIAR?

9    **A.**  THAT'S WHAT I DID, YES.

10   **Q.**  AND YOU SAID, WELL, THAT 8.33 PERCENT, THAT'S EFFECTIVELY

11   A 2.5 PERCENT RATE ON THE OVERALL BASE, RIGHT?

12   **A.**  RIGHT.  THE 2.5 PERCENT IS FROM LICENSES, BUT IT'S FROM

13   THE LICENSE WE HAVE BEEN TALKING ABOUT, THE SETTLEMENTS.

14   **Q.**  I'M NOT ASKING YOU FOR ALL THE INTERWORKINGS OF HOW YOU

15   GOT TO 2.5 PERCENT.  I JUST WANTED TO GET INTO THE SEESAW

16   POINT.

17   **A.**  OKAY.  THE SEE --

18   **Q.**  THERE'S NO QUESTION PENDING.

19        SO YOU HAD YOUR MAIN OPINION, AND WE TALKED ABOUT, AND

20   THAT CAME TO A 2.5 PERCENT ROYALTY.  AND THEN YOU HAD YOUR

21   ALTERNATIVE THEORY, THIS APPORTIONMENT THEORY, AND THAT CAME

22   TO AN EFFECTIVE 2.5 PERCENT ROYALTY RATE; ISN'T THAT TRUE?

23   **A.**  PLEASE SAY THAT AGAIN.  I DIDN'T FOLLOW YOU.

24   **Q.**  SURE.

25        YOUR MAIN OPINION IN YOUR FIRST REPORT CAME TO A

1    2.5 PERCENT ROYALTY RATE, CORRECT?

2    **A.**   THAT WAS MY ULTIMATE OPINION, YES.

3    **Q.**   AND THAT -- A VERY SUBSTANTIAL PART OF THAT WAS THIS

4    PIRACY SAVINGS AMOUNT THAT WE TALKED ABOUT?

5    **A.**   I CAN'T SAY THAT.  I CAN'T SAY THAT'S A SUBSTANTIAL PART.

6         I LOOKED AT THE SETTLEMENT AGREEMENTS.  THEY LED ME TO 2.5

7    PERCENT.  AND HERE'S HOW I USUALLY DO THINGS.

8    **Q.**   OKAY.

9    **A.**   WHAT I DO THEN IS, IS THERE SOME OTHER THING I CAN DO

10   TO -- A DIFFERENT APPROACH THAT MIGHT GIVE SUPPORT FOR IT, OR

11   NOT.  SO I DID THIS PROFIT SAVINGS ANALYSIS, AND IT CAME UP

12   WITH 2 PERCENT.

13        AND SO I THOUGHT, YEAH, LOOK, HERE'S ANOTHER DIFFERENT

14   APPROACH OTHER THAN JUST LOOKING AT THE SETTLEMENT AGREEMENTS,

15   AND IT COMES UP WITH A NUMBER THAT'S GENERALLY SUPPORTIVE.

16   THAT'S ALL I DID IT FOR.

17   **Q.**   NOW, IN TERMS OF THE PROFITS SAVINGS APPROACH THAT YOU

18   USED, THE APPROACH YOU USED WHERE YOU CALCULATED AGAINST ALL

19   REVENUE AND DIDN'T USE A 30 PERCENT DIVIDER BECAUSE YOU USED

20   THE SEESAW METHOD, AND YOUR ATTEMPT TO APPORTION WITH THAT

21   30 PERCENT, THAT WAS ALL STRUCK BY THE COURT AS INAPPROPRIATE,

22   CORRECT?

23             **MR. PRICE:**  OBJECTION, YOUR HONOR.  THAT'S --

24             **THE COURT:**  YEAH, THAT --

25             **MR. PRICE:**  THERE'S A MOTION IN LIMINE --

1          **THE COURT:**  THAT'S STRICKEN.

2          **MR. REINES:**  OKAY.

3     **BY MR. REINES:**

4     **Q.**  IN ANY EVENT, THOSE OPINIONS ARE NOT OPINIONS THAT YOU ARE

5     TENDERING NOW, CORRECT?

6     **A.**  WELL --

7     **Q.**  I'M NOT SAYING THE ULTIMATE ANSWER, BUT THE METHODOLOGIES.

8     **A.**  THE PROFIT SPLIT IS OUT.

9     **Q.**  OKAY.  AND THE SEESAW IS OUT, TOO?

10    **A.**  YES.

11    **Q.**  AND IN TERMS OF ATTEMPTING TO USE THE 2 BILLION AS A

12    ROYALTY BASE, THAT'S OUT, TOO, CORRECT?

13    **A.**  CORRECT.

14    **Q.**  NOW, LET'S TALK ABOUT YOUR SECOND SUPPLEMENTAL REPORT.

15         IN YOUR SECOND SUPPLEMENTAL REPORT, YOU CONSIDERED TWO NEW

16    LICENSES, CORRECT?  TWO DIFFERENT LICENSES, LET ME CALL THEM

17    THAT.

18    **A.**  THE SECOND ONE ACTUALLY WAS JUST THE EXACT SAME REPORT AS

19    THE FIRST, BUT ADOBE HAD PROVIDED NEW INFORMATION ABOUT

20    ACCUSED REVENUE.

21         SO I THINK THE SECOND REPORT WAS JUST TO SHOW THE

22    2.5 PERCENT TIMES THIS NEW AMOUNT OF ACCUSED REVENUE THAT

23    ADOBE WAS SAYING, LOOK, HERE'S SOME MORE REVENUE THAT'S NOW

24    ACCUSED.

25    **Q.**  AND I -- IF I CONTRIBUTED TO CONFUSION, I APOLOGIZE.  WE

1    ARE ALL WORKING WITH A LOT OF PAPER.

2        THERE'S FOUR REPORTS, BUT THE NUMBERING SCHEME THAT YOU

3    USED WAS A FIRST REPORT, AND THEN WHAT YOU JUST CALLED A

4    SUPPLEMENTAL REPORT, WHICH IS THE ONE YOU JUST DESCRIBED, AND

5    THEN A FIRST -- SECOND SUPPLEMENTAL REPORT, AND A THIRD

6    SUPPLEMENTAL REPORT.

7        SO WHEN I REFERRED TO THE SECOND SUPPLEMENTAL REPORT, I

8    MEAN THE DOCUMENT THAT YOU LABELED AS THE SECOND SUPPLEMENTAL

9    REPORT, WHICH IS ACTUALLY THE FIRST SUPPLEMENTAL REPORT, WHICH

10   WAS ON AUGUST 18TH.  SO YOU DID IT ABOUT TWO WEEKS AGO.

11   **A.**  OKAY.

12   **Q.**  DO YOU KNOW THAT REPORT?  BECAUSE I THINK IT'S IN YOUR

13   BINDER.

14   **A.**  I'M SURE IT IS.

15   **Q.**  BECAUSE OF THE CONFUSION, I WANT TO MAKE SURE YOU HAVE THE

16   OPPORTUNITY TO REFRESH SO WE ARE ALL WORKING ON THE SAME

17   DOCUMENT.  THAT'S ONLY FAIR.

18        **THE COURT:**  AND IN THE FUTURE, LET'S CALL THEM BY

19   DATE RATHER THAN CALL THEM BY FIRST, SECOND, AND THIRD.

20        **MR. REINES:**  OKAY.  THAT WILL BE A GOOD WAY TO AVOID

21   THIS PROBLEM.

22   **BY MR. REINES:**

23   **Q.**  DO YOU HAVE AT AUGUST 18TH, 2014 REPORT?

24   **A.**  YES, I DO.

25   **Q.**  OKAY.

PARR – CROSS / REINES

1    **A.**  GOT IT.

2    **Q.**  AND WITH THAT AUGUST 18TH, 2014 REPORT, YOU CONSIDERED TWO

3    LICENSES THAT WERE NEW INFORMATION FOR YOU.  LET'S CALL IT

4    THAT.

5    **A.**  YES, THAT'S RIGHT.

6    **Q.**  OKAY.  AND ONE OF THEM WAS A 1 PERCENT LICENSE, ACCORDING

7    TO YOUR ANALYSIS, CORRECT?

8    **A.**  YES, THAT'S RIGHT.

9    **Q.**  AND THEN YOUR STATEMENT, YOUR ANALYSIS WAS A ROYALTY RATE

10   OF APPROXIMATELY 1 PERCENT OF ACCUSED REVENUE GENERALLY

11   SUPPORTS MY 2.5 PERCENT ROYALTY RATE CONCLUSION.

12   **A.**  YES.

13   **Q.**  OKAY.  LET'S LOOK AT THE SECOND LICENSE.

14       THE SECOND LICENSE WAS .33 PERCENT, CORRECT?

15   **A.**  YES.

16   **Q.**  AND YOUR CONCLUSION WAS THAT THAT SUPPORTS YOUR

17   2.5 PERCENT ROYALTY RATE.  THAT DIDN'T CHANGE YOUR 2.5 PERCENT

18   ROYALTY RATE AT ALL, RIGHT?

19   **A.**  BECAUSE I STILL HAD THE OTHER ONES.  I NOW HAD 1 PERCENT

20   FROM MACROVISION, TWO AND A HALF PERCENT FROM INTUIT,

21   5.5 PERCENT FOR THE ADOBE DRM LICENSING STRATEGY.  NOW, IN

22   ADDITION TO THOSE, I HAVE 1 PERCENT FROM --

23   **Q.**  YOU DON'T NEED TO MENTION THE NAMES.  JUST KEEP IT TO THE

24   NUMBERS.

25   **A.**  I'M SORRY.

1       1 PERCENT FROM ONE OF THE SETTLEMENTS AND 3 PERCENT --

2    .3 PERCENT FROM THE OTHER SETTLEMENTS.  SO I GOT MORE BUT

3    THEY'RE STILL SURROUNDING TWO AND A HALF PERCENT.  I DIDN'T

4    SEE ANY REASON TO CHANGE MY TWO AND A HALF PERCENT.

5    **Q.**  YOU UNDERSTAND THROUGH NO FAULT OF ADOBE'S THAT YOU HAD TO

6    WITHDRAW THAT REPORT; YOU'RE NOT RELYING ON THOSE LICENSES,

7    CORRECT?

8            **MR. PRICE:**  OBJECTION, YOUR HONOR.  WE ARE UP AGAINST

9    THIS MOTION IN LIMINE AGAIN.

10           **THE COURT:**  YEAH.

11           **MR. REINES:**  I HAVE TO MAKE -- YOUR HONOR, YOU GAVE

12   US THE OPPORTUNITY TO POINT OUT THAT IT'S 2.5 PERCENT NO

13   MATTER WHAT REPORT.  I HAVE TO MAKE THE POINT THAT IT WASN'T

14   RELIED ON.  I DON'T KNOW HOW ELSE TO DO THAT.

15           **THE COURT:**  THAT'S FINE, BUT THE REASON THAT IT

16   WASN'T DOESN'T NEED TO BE MENTIONED.

17           **MR. REINES:**  I --

18                   (SIMULTANEOUS COLLOQUY.)

19           **THE COURT:**  -- DOES ANY FAULT NEED TO BE SAID OR NOT

20   SAID.

21           **MR. REINES:**  I JUST SAID WE WEREN'T AT FAULT.  THAT'S

22   ALL I SAID.

23           **THE COURT:**  THAT'S STRICKEN.

24           **MR. REINES:**  OKAY.

25

1    **BY MR. REINES:**

2    **Q.**  ALL RIGHT.

3        AND, AGAIN, JUST TO BE CLEAR, IN THAT AUGUST 18TH REPORT,

4    YOU STILL CAME UP WITH THE 2.5 PERCENT, CORRECT?

5    **A.**  RIGHT.  I HAD 2.5 PERCENT.  NOW I'VE GOT TWO NEW PIECES OF

6    DATA.  AND WHEN ADDED TO THE COLLECTION OF THE DATA THAT I

7    HAD, I SAW NO REASON TO CHANGE.

8        THERE'S NOTHING STUNNINGLY DIFFERENT THAT WOULD SAY, WOW,

9    THAT SHOULD BE SO MUCH HIGHER BECAUSE OF THESE.

10   **Q.**  AND IN THE CURRENT REPORT, YOU ARE STILL AT 2.5 PERCENT,

11   RIGHT, EVEN THOUGH YOU DID A MODIFIED ANALYSIS?

12   **A.**  BECAUSE I STILL HAVE THE CORE DEALS THAT PROVIDED A

13   2.5 PERCENT CONCLUSION.

14       IN OTHER WORDS, WE'VE HAD DATA COME AND DATA GO, BUT NONE

15   OF THE DATA THAT'S COME AND GONE HAS BEEN SURPRISINGLY OUTSIDE

16   OF MY RANGE.

17            **MR. REINES:**  YOUR HONOR, THIS IS A LOGICAL POINT.  I

18   CAN GO ON, THERE'S NO PROBLEM WITH THAT, IT'S JUST I'M

19   SWITCHING GEARS.

20            **THE COURT:**  WE CAN.  I USUALLY GO TO UNTIL 1:30.  BUT

21   IF YOU WOULD LIKE TO BREAK NOW --

22            **MR. REINES:**  IF THAT'S ALL RIGHT.

23            **MR. PRICE:**  YOUR HONOR, IF THERE'S ANY CHANCE WE CAN

24   FINISH.  MR. PARR DOES LIVE ON THE EAST COAST.

25            **THE COURT:**  OH, I DON'T --

1          **MR. REINES:**  NO.  THIS IS A SMALL FRACTION OF THE

2     OUTLINE.

3          **MR. PRICE:**  OKAY.

4          **THE COURT:**  OKAY.  SO WE'LL BREAK FOR THE WEEKEND

5     THEN, LADIES AND GENTLEMEN.

6          SOMEONE HAS ASKED FOR AN UPDATE OR A REPETITION OF THE --

7     OR PROJECTION.  WHAT I HAD SAID BEFORE, AND I THINK IS STILL

8     THE CASE, IS THAT WE WILL HAVE THE EVIDENCE COMPLETED BY NO

9     LATER THAN THE END OF THE DAY ON FRIDAY THE 5TH.  AND WE

10    ANTICIPATE THEN HAVING -- YOU MAY STEP DOWN IF YOU WOULD

11    LIKE -- INSTRUCTIONS AND CLOSING ARGUMENTS AND THE BEGINNING

12    OF DELIBERATIONS ON MONDAY, THE 8TH OF SEPTEMBER.

13         AND THE DELIBERATIONS CAN TAKE AS LONG AS THEY TAKE.  IT

14    COULD BE THAT DAY, IT COULD BE THE REST OF THAT WEEK.

15         THERE'S SOME CHANCE WE GET DONE EARLIER WITH THE EVIDENCE,

16    IN WHICH CASE WE COULD HAVE INSTRUCTIONS AND ARGUMENT EARLIER

17    THAN THE 8TH, PERHAPS ON THE 5TH, BUT I HAVE NO INDICATION ONE

18    WAY OR THE OTHER ABOUT THAT.

19         WE ARE MORE OR LESS ON TRACK WITH WHAT WE HAVE BEEN

20    PLANNING.  SOMETIMES THINGS HAPPEN, BUT SO FAR THEY HAVEN'T.

21         SO, YOU REMEMBER THAT MONDAY IS A HOLIDAY.  SO WE WILL BE

22    BACK IN SESSION ON TUESDAY.  WE WILL START UP AT 8:30.  SO,

23    AGAIN, I WILL ASK YOU TO MAKE SURE THAT YOU ARE HERE ON TIME

24    SO WE CAN KEEP TO THE SCHEDULE.

25         REMEMBER NOT TO DISCUSS THE CASE OR DO ANY RESEARCH ABOUT

1    THE CASE ON YOUR OWN OVER THE LONG WEEKEND.  LEAVE YOUR NOTES

2    AND YOUR JURY INSTRUCTIONS IN THE JURY ROOM.  TAKE YOUR BADGES

3    WITH YOU AND BRING THEM BACK ON TUESDAY WHEN YOU COME, AND

4    HAVE A GOOD WEEKEND.

5         (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

6         **THE COURT:**  SO I DID SAY YOU COULD IMPEACH WITH HIS

7    PRIOR REPORTS.  I SORT OF HAD IN MIND POINTING OUT THE

8    DIFFERENCES, AND SO ON.  WE HADN'T REALLY DISCUSSED WHETHER IT

9    WOULD BE EXPLAINED AS TO WHY THOSE REPORTS WEREN'T EXTANT

10   ANYMORE, AND I DON'T HAVE ANY PARTICULAR IDEAS ABOUT WHAT TO

11   DO ABOUT THAT.

12        **MR. PRICE:**  YOUR HONOR, WE HAVE A SPECIFIC MOTION IN

13   LIMINE NUMBER 20 THAT ADDRESSES THIS VERY ISSUE.  NO RELIEF

14   WAS SOUGHT FROM THAT MOTION IN LIMINE.  YOUR ORDER WAS CLEAR

15   THAT IT COULD BE USED FOR IMPEACHMENT AND FOR CREDIBILITY, BUT

16   I DON'T THINK CREDIBILITY WAS BASICALLY SAYING THAT THE COURT

17   STRUCK YOUR REPORT, AND NOW WE'VE GOT THIS COMMENT FROM MR. --

18        **THE COURT:**  WHAT WOULD BE YOUR IDEA AS TO HOW IT

19   WOULD BE EXPLAINED THAT THERE WERE THREE PRIOR REPORTS --

20        **MR. PRICE:**  JUST THAT YOU ISSUED ANOTHER REPORT AND

21   IT DID THIS, AND YOU DID ANOTHER REPORT THAT DID THIS.  BUT

22   NOT LIKE THIS, HEY, THE JUDGE SAID THAT THIS REPORT IS NO

23   GOOD.

24        THAT'S -- THAT'S -- INCREDIBLY PREJUDICIAL, AND THEN IT

25   HAPPENED AGAIN.

1          **MR. REINES:**  YOUR HONOR, ALL I SAID IS THAT WE

2     WEREN'T AT FAULT.

3          **THE COURT:**  NO.  EARLIER THAN THAT --

4          **MR. REINES:**  OH.  THAT IS TRUE.  THAT IS TRUE.  THE

5     POINT I WAS TRYING TO MAKE IS THAT IT WAS NOT OUR

6     RESPONSIBILITY THAT THIS HAPPENED.

7          **THE COURT:**  IT WAS YOUR FAULT IN THE SENSE YOU MOVED

8     TO STRIKE THEIR EXPERT TESTIMONY.

9          **MR. REINES:**  WELL, I MEAN THAT'S BECAUSE -- I MEAN

10     THAT'S BECAUSE IT WAS LEGALLY INADEQUATE, WHICH PUT US IN THIS

11     SITUATION IN THE FIRST PLACE.  AND WE DID SEEK PERMISSION, AND

12     A FAIR READING OF THAT ORDER WAS THAT THAT WAS APPROPRIATE TO

13     SAY HE HAD THESE PRIOR OPINIONS, THEY WERE INSUFFICIENT, AND

14     THEY WERE THE SAME NUMBER NO MATTER WHAT IT IS.  THAT'S HOW I

15     TOOK IT.

16          **MR. PRICE:**  YOUR HONOR, WE WERE CONCERNED ABOUT THIS

17     YESTERDAY.  WAS IT THE 19TH --

18          **MS. GLAUSER:**  IT WASN'T YESTERDAY.  IT WAS THE

19     19TH --

20          **MR. PRICE:**  THE 19TH WE HAD A MEET AND CONFER AND

21     SAID, LOOK, WE ARE NOT GOING TO TALK ABOUT WHAT THE JUDGE

22     ORDERED IN TERMS OF THE JUDGE ORDERED THE REPORT STRUCK.

23     MR. REINES AGREED THAT HE WOULDN'T BE DOING THAT.

24          SO WE -- OTHERWISE WE WOULD HAVE COME TO YOU FOR

25     ADDITIONAL CLARIFICATION, BUT WE HAD NO IDEA THAT HE WAS GOING

```
 1    TO SAY THE JUDGE STRUCK YOUR ORDER IN FRONT OF THE JURY.

 2              MR. REINES:  I MADE NO SUCH COMMITMENT.  I MEAN, THEY

 3    ARE SAYING FIVE DAYS AGO I SAID WHAT I WAS DOING TO DO ON

 4    CROSS?  I'M NOT SURE THE ORDER ISSUED.  THAT'S THE FIRST

 5    THING.

 6         THE SECOND THING, YOUR HONOR, IS WE WOULD ASK, WITH

 7    RESPECT TO PARR, THAT THEY BE INSTRUCTED NOT TO CONSULT WITH

 8    HIM OVER THE -- WHILE HE'S PENDING ON THE STAND.

 9              MR. PRICE:  WE'RE NOT READY TO MOVE ON -- WE HAVEN'T

10    MOVED ON FROM THE OLD ISSUE, SO I THINK WE NEED TO ADDRESS

11    WHAT WE NEED TO DO ABOUT WHAT JUST HAPPENED.

12              THE COURT:  LET'S HAVE NO MORE REFERENCES TO THE FACT

13    THAT THE COURT STRUCK THE REPORTS OR WHOSE FAULT IT WAS THAT

14    THEY WERE STRICKEN.  YOU MAY REFER TO THE FACT THAT THERE WERE

15    A NUMBER OF DIFFERENT REPORTS AND NOT BRING OUT ANYTHING ABOUT

16    WHY THERE WERE, AND --

17              MR. REINES:  I WILL MOVE ON TOTALLY.

18              THE COURT:  -- YOU WON'T BE ABLE TO EXPLAIN WHY THEY

19    WERE EITHER.  LEAVE IT AS A MYSTERY.

20              MR. PRICE:  CAN WE HAVE A CURATIVE INSTRUCTION,

21    THOUGH, YOUR HONOR, THAT SAYS THE JUDGE -- THE COURT HAS NOT

22    PASSED ON MR. PARR'S METHODOLOGY, OR SOMETHING OF THAT

23    NATURE --

24              THE COURT:  A CURATIVE INSTRUCTION WON'T BE FALSE.

25    YOU CAN DRAFT A PROPOSED INSTRUCTION THAT SAYS IT'S NOT THEIR
```

1    PROVINCE, OR SOMETHING LIKE THAT.  BUT, NO, I AM NOT GOING TO

2    SAY I DIDN'T DO IT --

3                    (SIMULTANEOUS COLLOQUY.)

4          **MR. PRICE:**  -- I UNDERSTAND.  I'M NOT GOING TO GO

5    CRAZY WITH IT, YOUR HONOR.

6          ANOTHER COMMENT, YOUR HONOR, AND I THINK THIS WOULD BE

7    HELPFUL, I THINK THAT THIS LINE FROM YOUR ORDER, BECAUSE IT

8    HAS BEEN ABUSED TWICE ABOUT IMPEACHING HIS CREDIBILITY AND

9    METHODOLOGY WITH THE OLD REPORTS, I THINK THAT SHOULD BE TAKEN

10   AWAY BECAUSE IT HAS NOW BEEN --

11         **THE COURT:**  NO.  I AM VERY TROUBLED BY HIS TESTIMONY,

12   AND HE MAY CROSS-EXAMINE ON IT.

13         BUT IF YOU CAN DRAFT AN INSTRUCTION THAT SAYS, I DON'T

14   KNOW WHAT IT WOULD SAY, FRANKLY, BUT I WILL BE HAPPY TO

15   CONSIDER WHATEVER YOU WOULD LIKE.  I WOULDN'T -- HAD I BEEN

16   ASKED, I WOULD NOT HAVE ALLOWED IT TO BE SAID THAT THE COURT

17   HAD STRICKEN IT, BUT I WASN'T ASK AND I DIDN'T SAY THAT, AND I

18   DON'T KNOW WHAT YOU MIGHT HAVE SAID PRIVATELY TO ONE ANOTHER,

19   BUT IT WASN'T CONFIRMED BY ME AS FAR AS I'M AWARE.

20         SO, YOU MAY DRAFT SOMETHING.

21         **MR. PRICE:**  WE WILL.  THANK YOU, YOUR HONOR.

22         **THE COURT:**  SHOW IT TO THEM FIRST.

23         OKAY.  ANYTHING ELSE?

24         **MR. DINOVO:**  I'M CURIOUS TO HEAR WHAT ADOBE THINKS

25   ABOUT THE TIME FRAME.

1          **MR. REINES:**  I THINK -- WE CAN CONSULTED A LITTLE

2     BIT.

3        I THINK WEDNESDAY, THURSDAY END OF EVIDENCE.  IT'S ONE OF

4     THOSE THINGS WHERE IT'S SORT OF CUSPY.  ANYTHING CAN CHANGE

5     FROM EITHER SIDE, BUT WE ARE THINKING, YOU KNOW, IT FLOPS INTO

6     THURSDAY, OR IT ENDS, IF WE ARE ALL LUCKY, I GUESS, END OF

7     WEDNESDAY.  THAT'S THE BEST --

8          **THE COURT:**  THAT SEEMS OPTIMISTIC TO ME, BUT THAT

9     WOULD BE FINE.  THE JURY WOULD BE HAPPY AS WELL.

10         **MR. REINES:**  AS I TOLD OPPOSING COUNSEL, WE ARE GOING

11    TO BE LOOKING TO MAYBE DROP AT LEAST ONE WITNESS AND MAYBE

12    SKINNY DOWN ANOTHER.  YOU KNOW, IT GETS TO THE END OF THE

13    CASE....

14        AND THEN JUST -- I KEEP GETTING NOTES -- THAT WE WANT A

15    STATEMENT OF NO CONSULTATION WITH MR. PARR.

16        IT'S NOT CLEAR TO US IF THAT'S A STANDING RULE IN THIS

17    CASE OR A PER WITNESS RULE.

18         **THE COURT:**  I GENERALLY DON'T MAKE THAT RULE, BUT IF

19    THAT'S WHAT YOU WOULD LIKE --

20         **MR. REINES:**  YES.

21         **MR. PRICE:**  WE HAVE NO INTEREST IN THAT RULE, YOUR

22    HONOR.

23         **THE COURT:**  I'M SORRY?

24         **MR. PRICE:**  IF IT'S NOT A STANDING RULE, I DON'T KNOW

25    WHY WE WOULD APPLY IT ANY DIFFERENTLY HERE.

1          **THE COURT:**  IF PEOPLE WANT IT, THEY CAN HAVE IT.

2      DO YOU WANT TO CONSULT WITH HIM OVER THE --

3          **MR. PRICE:**  I DON'T KNOW.  IT'S A THREE-DAY WEEKEND.

4  THERE'S A LOT OF TIME THERE.

5          **MR. REINES:**  YOUR HONOR, IT APPLIED TO US WHEN WE HAD

6  WITNESSES MULTIPLE TIMES.  THE COURT SAID THAT WASN'T THE

7  THING, AND WE SAID CAN WE INVOKE -- THE RULE WAS INVOKED.

8          **THE COURT:**  WHAT RULE?

9          **MR. REINES:**  WE UNDERSTOOD THAT THE COURT SAID IT

10  WASN'T THE STANDARD -- MS.  MEHTA --

11         **MS. MEHTA:**  YES, YOUR HONOR.

12      DURING THE EXAMINATION OF DR. DEVANBU, THIS ISSUE CAME UP.

13  AND YOUR HONOR SAID WE HAVEN'T HAD A DECISION AS TO WHETHER

14  THAT RULE IS GOING TO BE INVOKED OR NOT.  YOU ASKED WHETHER I

15  WANTED IT TO BE, AND I SAID IT WOULD.

16      AND THEN FROM THAT POINT FORWARD, ADOBE ABIDED BY THE

17  RULES.  FOR EXAMPLE, OUR TECHNICAL EXPERT, DR. WICKER, WAS ON

18  CROSS-EXAMINATION YESTERDAY AFTERNOON THAT CONTINUED TO THIS

19  MORNING.  WE DID NOT CONSULT WITH HIM AT ALL OVER THE COURSE

20  OF THE EVENING.

21      SO WE THINK NOW THAT THE RULE HAS BEEN INVOKED, AND WE'VE

22  ABIDED BY IT, AND THEY HAVEN'T OBJECTED TO ITS INDICATION THAT

23  THEY NEED TO ABIDE BY IT AS WELL.

24         **MR. PRICE:**  WE ARE OKAY WITH IT.

25         **THE COURT:**  I WASN'T -- I DIDN'T REMEMBER WHETHER --

1    I WAS CONCERNED WHETHER IT WAS APPLIED TO EXPERTS OR

2    PERCIPIENTS.  AND I DIDN'T REMEMBER WHETHER IT WAS A

3    PERCIPIENT IT HAD COME UP WITH BEFORE, IN WHICH CASE ONE MIGHT

4    ARGUE THAT AN EXPERT IS DIFFERENT, BUT IF IT WAS AN EXPERT

5    THAT IT CAME UP WITH BEFORE, THEN IT WOULD APPLY TO FUTURE

6    EXPERTS AS WELL.

7         **MR. DINOVO:**  ONE FINAL POINT ON THAT, YOUR HONOR.

8    MR. PARR DOES LIVE ON THE EAST COAST, SO OBVIOUSLY WE HAVE TO

9    COORDINATE WITH HIM TO SOME DEGREE HIS FLIGHT BACK.

10        **THE COURT:**  YOU CAN TALK TO HIM ABOUT LOGISTICS, YES.

11        **MR. PRICE:**  JUST NOT HIS TESTIMONY.

12        **THE COURT:**  CORRECT.  YES.

13        **MR. REINES:**  HAVE A GOOD LONG WEEKEND, THE WHOLE

14   STAFF.

15        **THE COURT:**  OKAY.

16            (PROCEEDINGS CONCLUDED AT 1:33 P.M.)

17            **CERTIFICATE OF REPORTER**

18        I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE

19   UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY

20   CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

21   RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

22

23            _Diane E. Skillman_

24        DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

25            SATURDAY, AUGUST 30, 2014

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930**