VOLUME 6

PAGES 1005 – 1217

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DIGITAL REG OF TEXAS, LLC   )
                            )
          PLAINTIFF,        )   NO. C-12-1971 CW
                            )
 VS.                        )   TUESDAY, SEPTEMBER 2, 2014
                            )
ADOBE SYSTEMS, INC., ET AL.,)   OAKLAND, CALIFORNIA
                            )
          DEFENDANTS.       )   JURY TRIAL
_____)


BEFORE THE HONORABLE CLAUDIA WILKEN, JUDGE

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**FOR PLAINTIFF:**          DINOVO, PRICE, ELLWANGER & HARDY LLP
                            7000 NORTH MOPAC EXPRESSWAY, SUITE 350
                            AUSTIN, TEXAS 78731
                    BY:  ANDREW G. DINOVO, ESQUIRE
                         ADAM G. PRICE, ESQUIRE
                         GREGORY DONAHUE, ESQUIRE
                         JAY D. ELLWANGER, ESQUIRE
                         NICOLE E. GLAUSER, ESQUIRE


                            BARTKO ZANKEL BUNZEL MILLER
                            ONE EMBARCADERO CENTER, SUITE 800
                            SAN FRANCISCO, CALIFORNIA 942111
                    BY:  W. PAUL SCHUCK, ESQUIRE


**ALSO PRESENT:**           MICHAEL FARLEY, COMPANY REPRESENTATIVE

                        (APPEARANCES CONTINUED)

**REPORTED BY:**            DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
                            OFFICIAL COURT REPORTER
            TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

```
 1

 2

 3

 4    FOR DEFENDANT           WEILL, GOTSHAL & MANGES, LLP
      ADOBE SYSTEMS:          201 REDWOOD SHORES PARKWAY
 5                            REDWOOD SHORES, CALIFORNIA 94065
                        BY:   EDWARD R. REINES, ESQUIRE
 6                            SONAL N. MEHTA, ESQUIRE
                              BYRON BEEBE, ESQUIRE
 7                            ANANT PRADHAN, ESQUIRE

 8

 9    ALSO PRESENT:           PAUL BETLEM, COMPANY REPRESENTATIVE
                              KAREN ROBINSON, IN-HOUSE COUNSEL
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                          I N D E X

2    PLAINTIFF'S WITNESS:                       PAGE      VOL.

3    PARR, RUSSELL

4    CROSS-EXAMINATION BY MR. REINES (RESUMED)  1008       6

5    REDIRECT EXAMINATION BY MR. PRICE          1074       6

6    RECROSS-EXAMINATION BY MR REINES           1087       6

7

8    PROWSE, STEPHEN

9    DIRECT EXAMINATION BY MR. REINES           1096       6

10   CROSS-EXAMINATION BY MR. PRICE             1129       6

11   REDIRECT EXAMINATION BY MR. REINES         1154       6

12   RECROSS-EXAMINATION BY MR. REINES          1157       6

13   BETLEM, PAUL

14   DIRECT EXAMINATION BY MR. REINES           1159       6

15   CROSS-EXAMINATION BY MR. DINOVO            1170       6

16   SCHULL, JON

17   DIRECT EXAMINATION BY MR. REINES           1183       6

18

19

20   DEFENDANT'S EXHIBIT 695 IN EVIDENCE ON PAGE 1070

21

22

23

24

25
```

```
 1    TUESDAY, SEPTEMBER 2, 2014                        8:30 A.M.

 2           (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

 3             THE COURT:  PLEASE BE SEATED.

 4         GOOD MORNING, LADIES AND GENTLEMEN.

 5         WE WILL CONTINUE WITH CROSS-EXAMINATION OF THE PLAINTIFF'S

 6    EXPERT ON DAMAGES.

 7             MR. REINES:  THANK YOU, YOUR HONOR.

 8           (RUSSELL PARR RESUMED THE STAND, HAVING BEEN PREVIOUSLY

 9    DULY SWORN, AND TESTIFIED FURTHER AS FOLLOWS:)

10                      CROSS-EXAMINATION RESUMED

11    BY MR. REINES:

12    Q.  GOOD MORNING, MR. PARR.

13    A.  GOOD MORNING.

14    Q.  I HOPE YOU AND EVERYBODY FOUND SOME TIME TO REST A LITTLE

15    BIT THIS WEEKEND.

16    A.  YES.

17    Q.  ALL RIGHT.  I WOULD LIKE TO SHOW YOU A DEMONSTRATIVE THAT

18    WAS USED IN YOUR DIRECT EXAMINATION TO REFRESH US ON THE KEY

19    DATA POINTS THAT YOU WERE RELYING ON.  AND WE SEE THERE THAT

20    YOU HAVE THE DIFFERENT PERCENTAGES FOR THE THREE AGREEMENTS:

21    MACROVISION, INTUIT AND THE PLUG-IN AGREEMENT.  DO YOU SEE

22    THAT?

23    A.  YES.

24    Q.  OKAY.  NOW, ONE QUESTION YOU HAD TO FACE WHEN YOU WERE

25    FORMULATING YOUR DAMAGES OPINION WAS WHETHER THE PARTIES,
```

1  HYPOTHETICALLY, IF THEY NEGOTIATED IN 2005, WOULD HAVE AGREED

2  TO A LUMP SUM PAYMENT FOR FUTURE AND BACK DAMAGES ALL IN ONE,

3  PAY ONE PRICE, OR A RUNNING ROYALTY WHERE YOU PAY FOR EACH

4  PRODUCT UNIT.  IS THAT CORRECT?

5  **A.**  YES.

6  **Q.**  AND YOUR CONCLUSION BASED ON THE WORK THAT YOU DID IN THIS

7  CASE WAS THAT THE PARTIES WOULD AGREE TO A RUNNING ROYALTY,

8  NOT A LUMP SUM.  CORRECT?

9  **A.**  RIGHT.  THAT'S HOW YOU WOULD CALCULATE THE DAMAGES, YES.

10  **Q.**  AND IN DECIDING WHICH SETTLEMENT AGREEMENTS YOU RELIED ON

11  TO HELP FORMULATE A RUNNING ROYALTY, YOU USED ONLY THE

12  SETTLEMENT LICENSE WHERE YOU COULD CALCULATE AN EFFECTIVE

13  RUNNING ROYALTY; ISN'T THAT CORRECT?

14  **A.**  THAT'S RIGHT.  WHERE THE INFORMATION WAS AVAILABLE, THAT'S

15  RIGHT.

16  **Q.**  SO IF IT WAS A LUMP SUM PAYMENT AND YOU DIDN'T THINK THAT

17  YOU COULD BACK OUT A ROYALTY RATE, YOU DIDN'T USE THAT TO HELP

18  FORMULATE A RUNNING ROYALTY FOR YOUR 2.5 PERCENT OPINION,

19  RIGHT?

20  **A.**  WELL, THEY WERE ALL LUMP SUMS, BUT FOR MANY OF THEM I

21  DIDN'T HAVE THE ASSOCIATED REVENUE TO CONVERT THE LUMP SUM

22  SETTLEMENT AMOUNT INTO A ROYALTY.

23  **Q.**  AND SO YOU ONLY RELIED, ACTUALLY, ON TWO WHERE YOU THOUGHT

24  YOU COULD COME UP WITH SOME KIND OF ROYALTY RATE, RIGHT?  THAT

25  IS THE MACROVISION AND THE INTUIT?

1   **A.**  THOSE ARE THE ONLY TWO FOR WHICH REVENUE INFORMATION WAS

2   AVAILABLE.

3   **Q.**  THANK YOU.

4       NOW, IN DETERMINING WHAT THE PARTIES WOULD HAVE AGREED TO,

5   WHETHER IT WOULD HAVE BEEN LUMP SUM OR REASONABLE ROYALTY, ONE

6   OF THE THINGS THAT IS STANDARD TO CONSIDER IS THE PREFERENCES

7   OF THE PARTIES AS TO WHAT TYPE OF LICENSING ARRANGEMENT THEY

8   WANT, RIGHT?

9   **A.**  YES.  THAT SHOULD GET SOME WEIGHT, YES.

10  **Q.**  WHEN YOU FORMED YOUR OPINION IN THIS CASE, YOU DIDN'T

11  ANALYZE WHETHER DIGITAL REG OR ADOBE HAD A PREFERENCE FOR

12  RUNNING ROYALTY OR LUMP SUM.  YOU JUST DIDN'T DO THAT WORK.

13  **A.**  WELL, NO, I DISAGREE.  I KNEW FROM MIKE FARLEY THAT HE

14  WOULD PREFER A RUNNING ROYALTY.  AND I DON'T KNOW THAT THERE

15  WAS A WITNESS FROM ADOBE THAT SAID THEY WOULD NOT PREFER A

16  RUNNING ROYALTY, BUT I THINK THEIR PLUG-IN INDICATES THEY

17  ASSOCIATE RUNNING ROYALTIES WITH DRM.  SO I CAN'T AGREE WITH

18  YOU THAT I DIDN'T DO ANY ANALYSIS.

19  **Q.**  I WOULD LIKE TO PLAY YOUR DEPOSITION FROM JANUARY 23RD,

20  2014, AT PAGE 58, LINE 19, THROUGH 59, LINE 1.

21      (VIDEO PLAYED AS FOLLOWS:

22          "QUESTION:  RIGHT NOW I'M ASKING SPECIFICALLY WITH

23          RESPECT TO DIGITAL REG AND ADOBE --

24          "ANSWER:  UH-HUH.

25          "QUESTION -- YOU DON'T HAVE ANY EVIDENCE AND HAVEN'T

1          DONE ANY ANALYSIS AS TO WHETHER OR NOT THEY WOULD

2          HAVE A PREFERENCE FOR A REASONABLE ROYALTY OR A

3          RUNNING ROYALTY VERSUS A LUMP SUM.

4          "ANSWER:  RIGHT I DON'T KNOW WHAT THEIR PREFERENCE

5          IS."

6     **BY MR. REINES:**

7     **Q.**  NOW, MR. FARLEY TESTIFIED HERE IN COURT THAT IN HIS

8     EXPERIENCE WITH LICENSING AGREEMENTS, HE NORMALLY DOESN'T GET

9     A RUNNING ROYALTY, AT LEAST BASED ON WHAT HE KNOWS FROM HIS

10    LIFETIME OF NEGOTIATING LICENSES.  DID YOU HEAR THAT

11    TESTIMONY?

12    **A.**  I DON'T BELIEVE I WAS HERE FOR THAT.  BUT I UNDERSTOOD

13    THAT THAT'S ABOUT RIGHT.  HIS EXPERIENCE HAS BEEN LUMP SUMS,

14    BUT HE WOULD PREFER A RUNNING ROYALTY.

15    **Q.**  AND MR. FARLEY ALSO ACKNOWLEDGED AT TRIAL THAT IF HE HAD

16    NEGOTIATED A LICENSE WITH ADOBE IN 2005 IN THIS HYPOTHETICAL

17    NEGOTIATION SETTING HE DOUBTED HE WOULD HAVE GOTTEN A RUNNING

18    ROYALTY.  YOU WEREN'T HERE FOR THAT, EITHER?

19    **A.**  NO.

20          **MR. REINES:**  AND LET'S CALL UP DEMONSTRATIVE 184,

21    WHICH HAS BEEN USED BY DIGITAL REG.  AND, AGAIN, THIS HAS SOME

22    DISCREPANCIES, BUT LET ME FOCUS ON THE RATE AMOUNT THAT'S

23    LISTED.

24          (PUBLISHED TO JURY.)

25

1  **BY MR. REINES**

2  **Q.**  DO YOU KNOW MR. FARLEY TESTIFIED THAT NONE OF THE ACTUAL

3  LICENSE AGREEMENTS WAS FOR A RUNNING ROYALTY?

4  **A.**  NO, I DON'T KNOW THAT HE TESTIFIED TO THAT.  BUT BY

5  READING THEM I KNOW THAT ONLY ONE MENTIONED A ROYALTY.  THAT

6  WAS THE MACROVISION.

7  **Q.**  AND REGARDING -- ALL RIGHT.  WELL, LET'S TALK ABOUT

8  MR. FARLEY AND HOW YOU RECEIVED INFORMATION FROM MR. FARLEY

9  ABOUT THE LITIGATION SETTLEMENTS WHICH ARE A GOOD PART OF THE

10  BASIS FOR YOUR OPINION AND THE OPINION OF THE ADOBE EXPERT.

11  AND WE HAVE HEARD A LOT ABOUT THEM LAST WEEK.

12      YOU SPOKE TO MR. FARLEY FOR ABOUT AN HOUR TO AN

13  HOUR-AND-A-HALF BEFORE YOU WROTE YOUR REPORT; IS THAT CORRECT?

14  **A.**  THAT SOUNDS ABOUT RIGHT, YES.

15  **Q.**  AND WHAT YOU DID WITH MR. FARLEY IS YOU WENT DOWN THE LIST

16  AND TALKED ABOUT EACH OF THE SETTLEMENTS?

17  **A.**  YES.  I HAD EACH ONE OF IN FRONT OF ME.

18  **Q.**  NOW, DO YOU KNOW THAT MR. FARLEY CAME TO COURT HERE AND

19  TESTIFIED THAT, IN GENERAL, HE DID NOT KNOW HOW THE ROYALTY

20  NUMBERS WERE REACHED IN THESE SETTLEMENT AGREEMENTS?

21  **A.**  NO.

22  **Q.**  AND DO YOU KNOW THAT MR. FARLEY, IN GENERAL, DEFERRED TO

23  THE ATTORNEYS AS TO -- TO NEGOTIATE THE AGREEMENTS AND COME UP

24  WITH THE NUMBERS?  DID YOU KNOW THAT BASED ON YOUR WORK IN

25  THIS CASE?

1   **A.**  NO.  NOT BASED ON MY CONVERSATIONS WITH HIM, NO.

2   **Q.**  NOW, MR. FARLEY TESTIFIED HERE THAT PATENT LITIGATION IS

3   VERY EXPENSIVE, A MULTIMILLION DOLLAR PROPOSITION THAT WOULD

4   BE FACING THE PARTIES IN THESE NEGOTIATIONS.  YOU AGREE WITH

5   THAT, DON'T YOU, THAT IS IT'S YOU'RE IN FOR SEVEN FIGURES AND

6   MULTIMILLION IF IT'S A TRIAL.

7   **A.**  OH, BOTH SIDES.  ABSOLUTELY, YES.

8   **Q.**  LET'S DIVE INTO THE LICENSE AGREEMENTS.

9        **MR. REINES:**  CAN WE PUT UP THE PARR DEMONSTRATIVE.

10                    (PUBLISHED TO JURY.)

11  **BY MR. REINES**

12  **Q.**  ALL RIGHT.  I WOULD LIKE TO TALK ABOUT THE MACROVISION

13  AGREEMENT, WHICH IS EXHIBIT 98.  THAT WAS A LICENSE FOR THE

14  '541 PATENT, CORRECT?

15  **A.**  I BELIEVE THAT WAS ALL THAT WAS COVERED.  I WOULD HAVE TO

16  HAVE IT TO BE CERTAIN.

17  **Q.**  SO YOU DON'T KNOW WHAT PATENTS WERE INCLUDED IN THE

18  MACROVISION?

19  **A.**  WELL, I KNOW AT LEAST THE '541.  I DON'T KNOW IF IT

20  INCLUDED OTHERS.

21  **Q.**  DOES IT MATTER TO YOUR ANALYSIS WHAT PATENTS WERE

22  INCLUDED?

23  **A.**  ONE OF THE PATENTS IN ISSUE SHOULD BE, YES.

24  **Q.**  AS LONG AS THERE IS ONE PATENT AT ISSUE INVOLVED YOU DON'T

25  REALLY CARE HOW MANY PATENTS ARE INVOLVED IN THE AGREEMENT?

1   **A.**  NO, AS LONG AS THEY GET THE FREEDOM TO OPERATE BASED ON

2   WHATEVER THEY HAVE LICENSED.

3   **Q.**  AND THE MACROVISION AGREEMENT GRANTED MACROVISION THE

4   RIGHT TO USE FOR THE PAST, BUT ALSO FOR THE FUTURE, CORRECT?

5   **A.**  THAT'S RIGHT.

6   **Q.**  AND WHEN THEY HAD THIS PROVISION ABOUT THE 1 PERCENT,

7   BECAUSE MACROVISION WAS $89,000, AND IT SAID -- YOU KNOW, THE

8   PARTIES WERE SAYING THIS WAS 1 PERCENT, RIGHT?  THAT IS

9   BASICALLY HOW IT WENT?

10  **A.**  YES.

11  **Q.**  THE 1 PERCENT WAS TO CURE FOR THE PAST INFRINGEMENT,

12  CORRECT?

13  **A.**  YES.

14  **Q.**  SO IF THERE WAS ADDITIONAL UNITS SOLD BY MACROVISION AFTER

15  THE DATE OF AGREEMENT, EACH ONE OF THOSE WOULD DILUTE THE

16  1 PERCENT, SO THAT NUMBER WOULD GO DOWN, DOWN, DOWN, DOWN,

17  DOWN, RIGHT?

18  **A.**  DEPENDING ON THE FUTURE USE, YES.

19  **Q.**  HOW MANY MORE YEARS DID THE MACROVISION LICENSE EXTEND?

20  AND SO YOU COULD EVALUATE IF IT WAS 1 PERCENT FOR PAST, WE

21  NEED TO KNOW WHAT THE FUTURE IS SO THAT WE CAN FIGURE OUT OUR

22  DIVISION EQUATION FOR THE PROPER ROYALTY RATE.

23  **A.**  IT WOULD GO FOR TEN MORE YEARS.  BECAUSE I THINK THE

24  PATENT -- THE PATENTS EXPIRE IN 2018.  THIS WAS NEGOTIATED

25  2008.

PARR – CROSS / REINES

1  **Q.**  SO IT WOULD HAVE BEEN –– SO THE 1 PERCENT COVERED THREE

2  YEARS, BUT THE LICENSE ACTUALLY –– OR THREE OR FOUR, I GUESS.

3  BUT THE LICENSE WAS ACTUALLY GOING TO EXTEND FOR 13 TO 14,

4  DEPENDING ON HOW YOU DID THE MATH, RIGHT?

5  **A.**  THAT'S CORRECT.

6  **Q.**  AND WHEN YOU SAY "1 PERCENT," YOU DIDN'T INCLUDE –– JUST

7  "YES" OR "NO" ON THIS –– YOU DIDN'T INCLUDE ANY CONSIDERATION

8  FOR THESE TEN YEARS OF ROYALTY–FREE USE THAT WAS GOING TO TAKE

9  PLACE?

10  **A.**  CORRECT.

11  **Q.**  NOW, THERE ARE NUMBERS IN THE MACROVISION AGREEMENT

12  RELATING TO THIS 1 PERCENT NUMBER.  IN THE AGREEMENT IT'S 6.7.

13  DID YOU DO THE MATH TO SEE IF THAT ACTUALLY COMES OUT TO

14  1 PERCENT?

15  **A.**  NO.

16  **Q.**  DO YOU KNOW –– DO YOU KNOW THAT IT DOESN'T COME OUT TO

17  1 PERCENT?

18  **A.**  NO, I DIDN'T.  I JUST READ THEY AGREED 1 PERCENT, AND I

19  DON'T KNOW WHAT MATH YOU ARE REFERRING TO.

20  **Q.**  WELL, THEY STATED HOW MANY UNITS WERE SOLD, RIGHT?

21  **A.**  YES.

22  **Q.**  AND DO YOU KNOW WHETHER THEY STATED THE PRICE PER UNIT?

23     YOU DON'T KNOW?

24  **A.**  I'M LOOKING AT NOW THERE IS A REFERENCE TO 19.99 PER UNIT.

25  **Q.**  BUT YOU DIDN'T KNOW THAT UNTIL YOU JUST READ IT?

1    **A.**  I DIDN'T REMEMBER.  THE FIRST TIME I READ THIS WAS A YEAR

2    AGO.

3    **Q.**  AND YOU DIDN'T DO THE MATH, THOUGH?

4    **A.**  THAT'S CORRECT.

5    **Q.**  THE NUMBER OF UNITS TIMES THE PRICE, AND THEN DIVIDING

6    WITH THE ACTUAL $89,000.  YOU DIDN'T DO THAT?

7    **A.**  NO, I JUST TOOK THIS AGREEMENT AT FACE VALUE.

8    **Q.**  NOW, MR. FARLEY WAS YOUR SOURCE ON THE MACROVISION

9    AGREEMENT AND HOW THAT 1 PERCENT WAS ARRIVED AT, CORRECT?

10   **A.**  WELL, NO.  FOR THE MACROVISION THE 1 PERCENT IS AGREED TO

11   RIGHT HERE AS YOU CAN SEE IN THE AGREEMENT.

12   **Q.**  WHEN YOU INTERVIEWED MR. FARLEY AND YOU WENT AGREEMENT BY

13   AGREEMENT -- AND, OBVIOUSLY, MACROVISION IS ONE OF THE TWO

14   THAT YOU ACTUALLY RELIED ON --

15   **A.**  YES.  RIGHT.

16   **Q.**  -- YOU ASKED HIM, DIDN'T YOU, ABOUT THE 1 PERCENT AND HOW

17   THAT CAME ABOUT AND WHAT IT MEANT?

18   **A.**  NO.  THAT ONE ALREADY HAD IT.  IT INDICATED 1 PERCENT.  I

19   MIGHT HAVE ASKED HIM:  "DID YOU AGREE TO THIS?"  AND THAT'S

20   WHAT IS IN THE AGREEMENT.  THERE WAS NO CALCULATION THAT

21   NEEDED TO BE DONE, SO WE DIDN'T TALK ABOUT THIS ONE, AS FAR AS

22   I CAN RECALL, AT LENGTH.

23   **Q.**  DID MR. FARLEY TELL YOU HE WASN'T EVEN AWARE OF THE

24   1 PERCENT WHEN HE APPROVED THE LICENSE AGREEMENT?

25   **A.**  NO, HE DIDN'T TALK ABOUT THAT.

1   **Q.**  AND DID MR. FARLEY TELL YOU THAT HE CONSIDERED THIS

2   1 PERCENT JUST TO BE LAWYER STUFF, AND WHAT HE CARED ABOUT WAS

3   THE $89,000 THAT HE WAS GOING TO GET?

4   **A.**  NO, I NEVER HEARD HIM SAY THAT.

5   **Q.**  ALL RIGHT.  LET'S TALK ABOUT THE INTUIT AGREEMENT.

6        **MR. REINES:**  MR. BONINI, WHY DON'T WE PUT UP THE

7   OTHER CHART SHOWING THE DIFFERENT AGREEMENTS?

8        **THE CLERK:**  ALSO A DEMONSTRATIVE?

9        **MR. REINES:**  YES, IT IS A DEMONSTRATIVE.  THANK YOU.

10    NO, LET'S PUT UP THE OTHER CHART.  THANKS.  THE OTHER

11  OTHER CHART.  OKAY.  HERE WE GO.

12       (PUBLISHED TO JURY.)

13  **BY MR. REINES:**

14  **Q.**  ALL RIGHT.  WE TALKED ABOUT MACROVISION, WHICH WAS

15  $89,000.  WE TRIED TO CLEAN UP THE CHARTS SO IT HAD THE

16  PERTINENT INFORMATION AND NOT OTHER INFORMATION.

17    LET'S TALK ABOUT INNUIT.  THE OTHER AGREEMENT YOU RELIED

18  ON WAS INTUIT, CORRECT?

19  **A.**  YES.  YES.

20  **Q.**  THAT WAS A LUMP SUM OF 350,000?

21  **A.**  YES.

22  **Q.**  AND THIS WAS ONE WHERE YOU THOUGHT YOU COULD COME UP WITH

23  A ROYALTY RATE SO THEREFORE THIS MIGHT BE USEFUL TO YOUR

24  ANALYSIS, RIGHT?

25  **A.**  YES.

1    **Q.**  IN TERMS OF WHERE YOU RECEIVED THE REVENUE NUMBER, AT

2    LEAST AS OF LAST WEEK WHEN I TOOK YOUR DEPOSITION, YOU

3    COULDN'T REMEMBER WHERE YOU GOT THE REVENUE NUMBER SUCH THAT

4    YOU WERE ABLE TO COME UP AND TURN THE LUMP SUM INTO A RATE,

5    RIGHT?

6    **A.**  NO, THAT IS NOT TRUE.  I GOT THE REVENUE NUMBER FROM MY

7    DISCUSSION WITH MIKE FARLEY.

8    **Q.**  WHY DON'T WE PLAY YOUR DEPOSITION FROM AUGUST 26TH, 2014,

9    AT PAGE 32, LINES 7 THROUGH 13.

10        EXCUSE ME.  EIGHT THROUGH 15.  PAGE 30, 8 THROUGH 15.

11        (VIDEO PLAYED AS FOLLOWS:)

12            "QUESTION:  NOW, DO YOU RECALL WHETHER MR. FARLEY

13            KNEW ANYTHING ABOUT THE REVENUE ASSOCIATED WITH

14            INTUIT IN YOUR CONVERSATION?

15            "ANSWER:  I DON'T RECALL WHERE THE 14 MILLION CAME

16            FROM, BUT IF IT DOESN'T COME FROM THE DOCUMENT THAT'S

17            CITED, THEN I WOULD ASSUME IT CAME FROM DISCUSSING IT

18            WITH HIM, BECAUSE I HAD NO OTHER WAY OF DETERMINING

19            14 MILLION."

20    **BY MR. REINES:**

21    **Q.**  SO, IN TERMS OF THE REVENUE NUMBER AS OF LAST WEEK, YOUR

22    ASSUMPTION WAS YOU GOT IT FROM MIKE FARLEY, CORRECT?

23    **A.**  IT IS THE ONLY PLACE I COULD HAVE GOTTEN IT FROM BECAUSE

24    IT IS NOT IN THE AGREEMENT.

25    **Q.**  BUT YOU DON'T ACTUALLY REMEMBER HIM PROVIDING YOU THAT

1    INFORMATION; ISN'T THAT FAIR?

2    **A.** WELL, THE TELEPHONE CALL I HAD WITH HIM WAS A YEAR AGO. I

3    DON'T REMEMBER ANYTHING OTHER THAN ASSOCIATING $14 MILLION

4    WITH THAT AGREEMENT AFTER TALKING WITH HIM.

5    **Q.** NOW, YOU'RE AWARE THAT -- IN THE TRIAL THAT WAS HAPPENING

6    HERE, YOU WEREN'T HERE WHEN MR. FARLEY TESTIFIED?

7    **A.** NO, I WAS NOT.

8    **Q.** YOU ARE AWARE THAT HE TESTIFIED THAT HE HAD NO KNOWLEDGE

9    ABOUT WHAT PERCENT OF SALES UNDERLIED THE AGREEMENT; THAT HE

10   JUST -- HE WASN'T IN A POSITION TO KNOW ABOUT THE REVENUE.

11   **A.** I HAVE BEEN TOLD THAT HE HAD SAID HE FORGOT.

12   **Q.** AND YOU UNDERSTAND THERE'S NO EVIDENCE IN THE RECORD AS TO

13   WHAT THE REVENUE IS FOR INTUIT. RIGHT?

14   **A.** I DON'T KNOW. I JUST KNOW WHERE I GOT IT. AND I DON'T

15   KNOW WHAT OTHER EVIDENCE THERE IS.

16   **Q.** AND SINCE YOU DON'T REMEMBER YOUR CONVERSATION WITH

17   MR. FARLEY, YOU DON'T REMEMBER WHERE HE TOLD YOU HE GOT THE

18   NUMBER OF WHAT INTUIT'S INTERNAL SALES FIGURES WERE?

19   **A.** NO. HE TOLD ME THE 14 MILLION, AND I DON'T REMEMBER HIM

20   TELLING ME WHAT HIS SOURCE OF THAT WAS.

21   **Q.** AND DID YOU ASK?

22   **A.** I MIGHT HAVE.

23   **Q.** YOU JUST DON'T REMEMBER?

24   **A.** I DON'T REMEMBER.

25   **Q.** AND IN TERMS OF THE LICENSE FOR INTUIT, HOW LONG WAS THAT

1    LICENSE EXTENDING FOR?

2    **A.**  IT WOULD BE THE SAME.  IT WOULD BE UNTIL THE PATENTS

3    EXPIRE.  SO IT WOULD GO FOR ABOUT THE SAME PERIOD OF TIME AS

4    THE MACROVISION.

5    **Q.**  IT WOULD ACTUALLY BE DIFFERENT BECAUSE THERE WERE MORE

6    PATENTS FOR INTUIT, RIGHT?

7    **A.**  YES.

8    **Q.**  AND HOW MANY PATENTS WAS INTUIT GETTING FOR THIS $350,000?

9    **A.**  I DON'T REMEMBER, EXACTLY.  I'M MORE INTERESTED IN AS LONG

10   AS THEY GET RELIEF, FREEDOM TO OPERATE.  SO IF IT IS ONE THAT

11   THEY NEED, OR A HUNDRED, IT'S FOR FREEDOM TO OPERATE.

12   **Q.**  SO YOUR TESTIMONY IS THAT A PATENT LICENSE AGREEMENT THAT

13   IS FOR ONE PATENT IS THE SAME VALUE AS A PATENT LICENSE

14   AGREEMENT -- I THINK YOUR TERMS ARE NOW A HUNDRED PATENTS.

15   YOU COULD GET A HUNDRED PATENTS OR ONE PATENT, AND THE PRICE

16   WOULD BE THE SAME, ACCORDING TO WHAT YOU'RE SAYING NOW?

17   **A.**  ABSOLUTELY.  THAT'S CORRECT.

18   **Q.**  AND SO YOU DIDN'T EVEN BOTHER TO FIGURE OUT HOW MANY

19   PATENTS THERE WERE FOR INTUIT, RIGHT?

20   **A.**  NO, I'M JUST -- WHENEVER YOU TAKE A LICENSE WHAT YOU ARE

21   REALLY LOOKING FOR IS FREEDOM TO OPERATE.

22   **Q.**  I'M JUST ASKING YOU -- REMEMBER, WE STAY WITH MY

23   QUESTIONS.  AND IF YOUR COUNSEL THINKS IT'S WORTHY, I AM SURE

24   THEY WILL DO IT IN THEIR TURN.

25        JUST TO BE CLEAR, WHAT MY QUESTION WAS:  YOU DIDN'T EVEN

1    BOTHER TO EVALUATE HOW MANY PATENTS WERE BEING LICENSED IN THE

2    INTUIT AGREEMENT BECAUSE IT JUST DOESN'T MATTER TO YOU?

3    **A.**   RIGHT.  IT'S NOT IMPORTANT TO ME.

4    **Q.**   LET'S LOOK AT THE AGREEMENTS THAT YOU EXCLUDED, THE EIGHT

5    AGREEMENTS THAT YOU EXCLUDED FROM YOUR ANALYSIS.  LET'S START

6    WITH WHAT IS SOMETIMES CALLED "LFP."  YOU UNDERSTAND LFP IS

7    HUSTLER?

8    **A.**   YES.

9    **Q.**   AND PART OF YOUR OPINION AS TO WHY YOU REJECTED THE

10   $67,000 HUSTLER LICENSE AS BEING RELEVANT AT ALL TO YOUR

11   ANALYSIS WAS MR. FARLEY TOLD YOU A BIT ABOUT THE HUSTLER

12   BUSINESS AND THAT FROM WHAT HIS ANALYSIS OF WHAT HUSTLER WAS

13   THAT THEIR USE WAS LIMITED?

14   **A.**   RIGHT.  I UNDERSTOOD THAT THE REASONING THEY SETTLED IS

15   BECAUSE THROUGH EARLY DISCOVERY THEY WERE LEARNING THAT THERE

16   WAS VERY LIMITED USE.  AND THAT IT WOULD -- YOU KNOW, LIKE WE

17   SAID BEFORE, IT IS $2 MILLION OR MANY MILLIONS OF DOLLARS TO

18   DO A CASE.

19        SO WHEN HE LEARNED EARLY ON THERE WASN'T A LOT OF USAGE BY

20   LF (SIC), EVEN THOUGH HE DIDN'T KNOW THE RIGHT AMOUNT, EXACT

21   AMOUNT, HE THOUGHT IT WAS TIME TO SETTLE THAT.

22   **Q.**   WHEN YOU SAY "HE" AND "HIM" AND ALL THAT, THAT IS

23   MR. FARLEY?

24   **A.**   MR. FARLEY, YES.

25   **Q.**   DO YOU KNOW MR. FARLEY TESTIFIED HERE THAT HE DIDN'T KNOW

```
 1    HOW THE $89,000 NUMBER WAS REACHED?

 2    A.  NO --

 3    Q.  67,500.  EXCUSE ME.  I AM SORRY TO INTERRUPT YOU.

 4    A.  OKAY.

 5    Q.  I AM SORRY TO EVERYBODY, BUT I MISSTATED THAT.  THE

 6    $67,500 FOR HUSTLER.

 7    A.  NO.  HE AND I DIDN'T TALK ABOUT HOW THE VALUE OF 67.5 WAS

 8    REACHED.  WE TALKED ABOUT THE FACT THAT THERE WAS

 9    LIMITED-TO-NO REVENUE, ACCUSED REVENUE BASE.

10    Q.  CAN I ASK YOU A QUESTION ABOUT THAT?  SO, ACCORDING TO

11    YOUR ANALYSIS, HUSTLER HAD A LIMITED-TO-NO ROYALTY BASE,

12    RIGHT?

13    A.  BASED ON MY DISCUSSIONS WITH MR. FARLEY.

14    Q.  YOU WILL AGREE THEY WERE GOING TO BE GETTING ABOUT TEN

15    YEARS OF FREE USE ALL THAT THEY WANTED OF THE PATENTS,

16    CORRECT, FOR THE FUTURE, FOR THE LUMP SUM?

17    A.  THAT'S RIGHT.

18    Q.  THEY COULD HAVE DONE ANYTHING IN THE FUTURE AND USED IT,

19    RIGHT?

20    A.  YES.

21    Q.  OKAY.  BUT WHAT I WANT TO ASK YOU IS:  DID YOU ASK

22    MR. FARLEY WHY, IF HUSTLER HAD VERY LITTLE USAGE, HE WOULD SUE

23    HUSTLER FOR PATENT INFRINGEMENT, BUT NOT SUE BIG SOFTWARE

24    COMPANIES LIKE ADOBE AND SYMANTEC, AND ALL THE OTHERS THAT

25    WERE SUBSEQUENTLY SUED?
```

1   **A.**  WELL, THEY WERE SUED, SUBSEQUENTLY.

2   **Q.**  DO YOU --

3   **A.**  I DON'T UNDERSTAND YOUR QUESTION.

4   **Q.**  DID YOU ASK MR. FARLEY WHY IN THE 2007 LITIGATION HE SUED

5   HUSTLER, WHICH I GUESS YOU'RE SAYING NOW THAT HE TOLD YOU

6   DIDN'T HAVE MUCH REVENUE, INSTEAD OF SUING ALL THESE COMPANIES

7   THAT ARE LARGE COMPANIES, LARGE SOFTWARE COMPANIES?  DID YOU

8   DISCUSS THAT WITH HIM?

9   **A.**  NO, I DIDN'T DISCUSS THE ORDER OF -- THE ONLY REASON I WAS

10  TALKING TO HIM IS BECAUSE HE WAS SUING THE VERY LARGE

11  COMPANIES THAT YOU'RE TALKING ABOUT.  AND I DON'T KNOW WHY HE

12  WENT IN THE ORDER THAT HE WENT IN, I GUESS.  WAS YOUR QUESTION

13  WHY DID THEY SUE THESE PEOPLE FIRST, AS OPPOSED TO ADOBE

14  SECOND?

15  **Q.**  THAT IS ONE QUESTION.  I THINK YOU'VE ATTEMPTED TO ANSWER

16  IT.  LET ME ASK YOU THE OTHER QUESTION, WHICH IS:  DID YOU ASK

17  HIM WHY THEY SUED HUSTLER AT ALL IF HUSTLER WAS MAKING VERY

18  LITTLE USE?  AND I THINK YOU KNOW MR. FARLEY HAD SOME

19  FAMILIARITY WITH THE ADULT ENTERTAINMENT INDUSTRY.  DO YOU

20  KNOW WHY THEY WOULD SUE HUSTLER?

21  **A.**  THE ONLY REASON --

22          **MR. PRICE:**  OBJECTION.  MOVE TO STRIKE THE

23  COMMENTARY.

24          **THE COURT:**  YES.

25          **THE WITNESS:**  THE ONLY REASON THE PLAINTIFF EVER SUES

1    SOMEONE IS BECAUSE THEY SUSPECT THERE IS SIGNIFICANT ACCUSED

2    REVENUE -- SIGNIFICANT INFRINGEMENT.  AND YOU DON'T FIND OUT

3    THAT IT IS NOT THERE UNTIL YOU START THE SUIT.

4    **BY MR. REINES:**

5    **Q.**  LET'S LOOK AT THE NEXT LICENSE, WHICH IS TO PLAYBOY.  THE

6    PLAYBOY LICENSE WAS $80,000.  IS THAT CORRECT?

7    **A.**  THAT'S WHAT IT SAYS HERE, YES.

8    **Q.**  IS THAT CONSISTENT WITH YOUR BELIEF?

9    **A.**  IT APPEARS CORRECT.

10   **Q.**  AND WHEN YOU SPOKE TO MR. FARLEY, WHAT DID HE TELL YOU AS

11   TO WHY PLAYBOY'S LUMP SUM PAYMENT FOR USE OF THE PATENT

12   BACKWARDS AND FORWARDS WAS $80,000?

13   **A.**  HE TOLD ME THE SAME THING WITH HUSTLER.  THERE WAS VERY

14   LIMITED USE, AND IT WAS DISCONTINUED.  SO THAT THE, SAY,

15   ACCUSED REVENUE, THE AMOUNT OF DAMAGES THAT ULTIMATELY COULD

16   COME ABOUT WERE MINUSCULE, BECAUSE NOT ONLY DID THEY USE IT

17   VERY LIMITEDLY, THEY CEASED TO USE IT.

18   **Q.**  DID YOU ASK HIM FOR ANY SUPPORT FOR THE STATEMENTS THAT

19   THESE COMPANIES THEY HAD GONE TO THE TROUBLE OF SUING WERE

20   ACTUALLY, ACCORDING TO WHAT HE WAS TELLING YOU, NOT USING IT

21   AT ALL?

22   **A.**  I TOOK HIS WORD FOR IT.

23   **Q.**  NOW, THE BLOCKBUSTER LICENSE FOR THE '541 PATENT AND

24   RELATED PATENTS, THAT WAS 42,500?  IS THAT CONSISTENT WITH

25   YOUR MEMORY?

1    **A.**  YES.

2    **Q.**  AND IN TERMS OF WHAT THE ACCUSED REVENUE WAS FOR

3    BLOCKBUSTER, YOU DIDN'T KNOW WHAT THAT WAS?

4    **A.**  I DIDN'T.  THAT'S WHY I ASKED MR. FARLEY.  AND HE

5    INDICATED TO ME, AGAIN, IT WAS VERY LIMITED USE.  THERE WAS

6    VERY LOW ACCUSED REVENUE.  AND HE WAS ALSO MOTIVATED TO SETTLE

7    AS QUICKLY AS POSSIBLE BECAUSE HE WAS AFRAID THAT BLOCKBUSTER

8    WAS GOING TO GO BANKRUPT.

9    **Q.**  MY QUESTION WAS FOCUSED ON THE REVENUE NUMBERS, NOT OTHER

10   THINGS.  WITH RESPECT TO THE REVENUE NUMBERS, YOU ASKED

11   MR. FARLEY, CORRECT?

12   **A.**  THAT'S CORRECT.  I ASKED.

13   **Q.**  AND YOU ARE PRETTY CONFIDENT ABOUT THAT.  YOU TESTIFIED TO

14   THAT A COUPLE OF TIMES?

15   **A.**  I AM CONFIDENT THAT I ASKED HIM ABOUT IT, YES.

16   **Q.**  ALL RIGHT.  I WOULD LIKE TO FOCUS NOW ON THE MICROSOFT

17   AGREEMENT.  MICROSOFT, THE LICENSE AMOUNT FOR THE SETTLEMENT

18   WAS $487,500?

19   **A.**  YES.

20   **Q.**  FOR THE '541 AND RELATED PATENTS?

21   **A.**  YES.

22   **Q.**  YOU EXCLUDED CONSIDERATION OF THIS LICENSE, CORRECT, ALL

23   TOGETHER?

24   **A.**  I HAD TO.

25   **Q.**  AND YOU HAD TO BECAUSE YOU HAD THIS RESTRICTION ON

PARR – CROSS / REINES

1  YOURSELF THAT UNLESS YOU KNEW THE SPECIFIC REVENUES, AT LEAST

2  ACCORDING TO MR. FARLEY, YOU COULDN'T FIGURE OUT WHAT A

3  RUNNING ROYALTY WAS, AND THEN IT WAS EXCLUDED, RIGHT?  THAT

4  WAS YOUR METHODOLOGY?

5  **A.**  RIGHT.  I HAD TO BE ABLE TO RELATE IT TO REVENUES SO I

6  COULD RELATE THE DAMAGES IN THIS CASE TO THE REVENUES.

7  **Q.**  YOU KNOW THAT MR. FARLEY HIRED AN ORGANIZATION CALLED

8  "THINKFIRE" FOR ANALYZING THE MICROSOFT INFRINGEMENT AND ITS

9  SCOPE?

10  **A.**  NO.

11  **Q.**  YOU'VE HEARD OF THINKFIRE?

12  **A.**  I'VE HEARD OF IT, YES.

13  **Q.**  WHAT IS YOUR UNDERSTANDING OF WHAT THINKFIRE IS BASED ON

14  WORKING ON, WHAT IS IT, 70 PATENT CASES WHERE YOU'VE

15  TESTIFIED?

16  **A.**  I DON'T KNOW.  I'VE HEARD THE NAME "THINKFIRE."  I KNOW

17  THEY HAVE -- THEY DO SOME SERVICE IN INTELLECTUAL PROPERTY,

18  BUT I KNOW OF NOTHING ELSE ABOUT THAT ENTITY.

19  **Q.**  NOW, DID YOU KNOW THAT THINKFIRE -- MR. FARLEY TALKED

20  ABOUT THIS -- WAS STARTED BY THE FORMER CHIEF TECHNOLOGY

21  OFFICER OF MICROSOFT?

22  **A.**  I DON'T KNOW ANYTHING ABOUT THINKFIRE.

23  **Q.**  THEN, I TRUST YOU DON'T KNOW THAT THINKFIRE INFORMED

24  MR. FARLEY THAT THE IMPACTED PRODUCTS AT MICROSOFT BASED ON

25  THE LAWSUIT WAS INCLUDED WINDOWS?

1  **A.**  NO, I DON'T KNOW WHAT THINKFIRE TOLD MR. FARLEY.

2  **Q.**  SO YOU DIDN'T EVEN KNOW THAT THINKFIRE DID THE ANALYSIS OF

3  MICROSOFT'S INFRINGEMENT BEFORE THE LAWSUIT TO EVALUATE WHAT

4  THE BASE WAS?

5  **A.**  CORRECT.

6        **MR. PRICE:**  OBJECTION, YOUR HONOR.  THESE QUESTIONS

7  ALL LACK FOUNDATION.

8        **THE COURT:**  OVERRULED.

9  **BY MR. REINES:**

10  **Q.**  NOW, IN TERMS OF THE REVENUE THAT WAS BEING ACCUSED FROM

11  MICROSOFT, HOLDING ASIDE THE THINKFIRE CHAPTER, WHICH YOU

12  DIDN'T KNOW ABOUT AT ALL, YOU DIDN'T KNOW WHAT THE REVENUES

13  WERE THAT WERE BEING ACCUSED, RIGHT?

14  **A.**  NO.  AND I ASKED MIKE FARLEY, AND HE WASN'T ABLE TO TELL

15  ME.

16  **Q.**  AND, ONCE AGAIN, YOU'RE VERY CONFIDENT THAT YOU ASKED MIKE

17  FARLEY BECAUSE YOU WERE BEING PRETTY SYSTEMATIC ABOUT THAT?

18  **A.**  YES.

19  **Q.**  AND DID YOU ASK HIM WHAT THE SPECIFIC AMOUNT WAS?

20  **A.**  AMOUNT OF WHAT?

21  **Q.**  REVENUES THAT MICROSOFT HAD THAT WERE ACCUSED OF

22  INFRINGEMENT.

23  **A.**  I ASKED HIM, AND HE SAID THAT INFORMATION WASN'T AVAILABLE

24  TO HIM, BUT WAS INDICATED THAT THROUGH DISCOVERY THIS AMOUNT

25  WAS NOT SIGNIFICANT, SO IT WASN'T WORTH PURSUING TRIAL.  IT

1  WAS WORTH SETTLING.

2  **Q.**  SO FOR LFP, HUSTLER, PLAYBOY, BLOCKBUSTER AND MICROSOFT,

3  MR. FARLEY TOLD YOU AFTER THEY BROUGHT THE SUIT THEY DECIDED

4  THAT THERE WASN'T ENOUGH REVENUE THERE TO MAKE THEM

5  INTERESTING; IS THAT CORRECT?

6  **A.**  THERE WAS NOT ENOUGH REVENUE TO MAKE PURSUING THE EXPENSE

7  OF TRIAL, CORRECT.

8  **Q.**  BUT YOU NEVER ASKED MR. FARLEY, SPECIFICALLY, WHAT THE

9  DOLLAR AMOUNT WAS OF REVENUES OF MICROSOFT SO YOU COULD

10  PERFORM FOR YOURSELF AND SEE WHETHER HIS CHARACTERIZATION OF

11  THESE THINGS AS RELATIVELY SMALL WAS, IN FACT, CORRECT.

12  RIGHT?

13  **A.**  THAT WAS THE WHOLE REASON FOR THE TELEPHONE CALL TO TRY TO

14  FIND SOME INFORMATION ABOUT THE REVENUES TO ASSOCIATE WITH

15  THIS DAMAGE AMOUNT.

16  **Q.**  I WOULD LIKE TO PLAY YOUR DEPOSITION AT PAGE 178, LINE 24

17  THROUGH 179, LINE 7.

18      THIS IS YOUR JANUARY 23 DEPOSITION FROM THIS YEAR.

19      (VIDEO PLAYED AS FOLLOWS:)

20          "QUESTION:  YOU DON'T KNOW WHAT THE REVENUES WERE

21          THAT WERE BEING ACCUSED IN THE CASE, RIGHT?

22          "ANSWER:  I DON'T KNOW THE AMOUNT.  I JUST KNOW THE

23          CHARACTERIZATION BY HIM THAT IT WASN'T A LOT."

24      **MR. REINES:**  AND 179, LINES 5 THROUGH 7, PLEASE.

25      (VIDEO PLAYED AS FOLLOWS:)

PARR – CROSS / REINES

1     "QUESTION:  DID YOU ASK HIM WHAT THE AMOUNT WAS?

2     "ANSWER NO."

3     "QUESTION:  DID YOU ASK COUNSEL FOR DIGITAL REG WHAT

4     THE AMOUNT WAS?

5     "ANSWER:  NO."

6  **BY MR. REINES:**

7  **Q.**  NOW, IN TERMS OF WHAT MICROSOFT -- YOU UNDERSTAND

8  MICROSOFT DISTRIBUTES SOFTWARE, CORRECT?

9  **A.**  OH, SURE.

10 **Q.**  THEY DISTRIBUTE THEM BY DIGITAL DOWNLOAD, RIGHT?

11 **A.**  THEY DO NOW, YES.

12 **Q.**  OKAY.  YOU UNDERSTAND ADOBE ALSO USES DIGITAL DOWNLOADS

13 FOR SOFTWARE?

14 **A.**  YES.

15 **Q.**  AND THAT IS A COMMON PRACTICE IN THE SOFTWARE INDUSTRY?

16 **A.**  YES.

17 **Q.**  AMONG COMPANIES MICROSOFT DOES DIGITAL DOWNLOADS FOR WORD,

18 EXCEL AND A LOT OF VERY SUCCESSFUL AND POPULAR PRODUCTS?

19 **A.**  I'M SURE THEY DO.

20 **Q.**  THAT IS A HUGE BUSINESS FOR MICROSOFT?

21 **A.**  YES.

22 **Q.**  AND IN TERMS OF THE PRODUCTS THAT WERE ACTUALLY LICENSED

23 IN THE MICROSOFT AGREEMENT FOR THIS $487,500, THAT INCLUDED

24 ALL THESE PRODUCTS.  IT INCLUDED WORD, EXCEL, AND IT ACTUALLY

25 INCLUDED THE WINDOWS OPERATING SYSTEM THAT THINKFIRE HAD SAID

1    WAS INFRINGING IN THE ORIGINAL ANALYSIS THAT WAS PERFORMED

2    PRELITIGATION.

3    **A.**  WITHOUT READING THE DOCUMENT, I CAN'T RECALL.  I DON'T

4    RECALL.

5    **Q.**  SO WITH RESPECT TO THE MICROSOFT AGREEMENT, WHICH YOU'VE

6    NOT CONSIDERED, YOU DON'T KNOW WHAT PRODUCTS ARE LICENSED,

7    RIGHT?

8    **A.**  THAT'S RIGHT.

9    **Q.**  SO, IT MIGHT BE THEY WERE LICENSEE TO DIGITALLY DOWNLOAD

10   WORD, BUT YOU JUST DON'T KNOW?

11   **A.**  CORRECT.

12   **Q.**  AND, IN FACT, YOU DON'T -- YOU DIDN'T REALLY LOOK INTO THE

13   MICROSOFT SITUATION ENOUGH TO EVEN UNDERSTAND WHETHER THEY USE

14   ANY DRM AT ALL, RIGHT?

15   **A.**  WELL, THE CASE SETTLED AFTER THE ACCUSED REVENUES WERE

16   FOUND TO BE LACKING.  AND ONCE I COULDN'T RELATE THE AMOUNT OF

17   DAMAGES TO THE REVENUE SO THAT I COULD USE THAT RATIO TO

18   RELATE DAMAGES TO ADOBE, IT WAS -- THE DEAL WAS NO LONGER OF

19   ANY INTEREST.

20   **Q.**  NOW, YOU'RE SAYING THAT IN THIS UNRECORDED CONVERSATION

21   WITH MR. FARLEY, HE TOLD YOU THE REVENUES WERE RELATIVELY LOW,

22   AND HE DID THAT FOR MANY OF THESE ENTITIES.  BUT -- AND THAT

23   YOU DIDN'T ASK WHAT THE REVENUE WAS, RIGHT?  WE SAW THAT FROM

24   THE DEPO CLIP; ISN'T THAT CORRECT?

25   **A.**  THE REASON HE TOLD ME --

PARR – CROSS / REINES

1    **Q.**  I'M JUST ASKING YOU:  YOU DIDN'T ASK HIM WHAT THE REVENUES

2    WERE FOR MICROSOFT.  YOU JUST TOOK HIS SAY-SO THAT IT WAS

3    RELATIVELY LOW, RIGHT?

4    **A.**  WELL, ONCE HE SAID HE DIDN'T KNOW WHAT THE REVENUES WERE,

5    THEN I HAD TO ASK:

6        "WHY DIDN'T YOU KNOW?"

7        AND HE SAID:

8        "THEY WERE SO RELATIVELY LOW."

9        NOW, I DON'T REMEMBER -- WE SAW THE VIDEO CLIP.  THE WHOLE

10   REASON FOR THE CONVERSATION WAS TO ASK WHAT REVENUES WERE

11   ASSOCIATED WITH EACH DEAL.

12   **Q.**  NOW, IN TRIAL WHEN MR. FARLEY WAS HERE ON THE STAND UNDER

13   OATH, I ASKED HIM IF HE KNEW WHAT THE FACTS AND CIRCUMSTANCES

14   WERE OF THE MICROSOFT SETTLEMENT NEGOTIATION THAT ALL OF THESE

15   PRODUCTS, SUCH AS WINDOWS AND EVERYTHING ELSE, WERE GOING TO

16   BE LICENSED FOR BELOW 500,000.  AND HE TESTIFIED THAT HE

17   DOESN'T KNOW WHAT THE CIRCUMSTANCES WERE, AND THAT HE DIDN'T

18   NEGOTIATE THE AGREEMENT.  HE COULDN'T EXPLAIN WHAT THE

19   CIRCUMSTANCES, WHY SUCH A LOW AMOUNT WAS THERE.  DID YOU KNOW

20   THAT?

21   **A.**  NO.

22   **Q.**  NOBODY TOLD YOU THAT?

23   **A.**  I WASN'T HERE FOR HIS --

24   **Q.**  COUNSEL DIDN'T RELATE THAT TO YOU?  THAT'S AT TRANSCRIPT

25   383, LINES 2 THROUGH 6, OF THE TRIAL TRANSCRIPT.

```
1   A.  NO.

2   Q.  LET'S LOOK AT THE NEXT LICENSE, WHICH IS ZYNGA.  AND ZYNGA

3   GOT BOTH THE PATENTS-IN-SUIT AND RELATED PATENTS, AND THEY

4   PAID $50,000, CORRECT?

5   A.  YES.

6   Q.  AND YOUR EXPLANATION FOR WHY ZYNGA WAS TOO LOW IS THAT

7   THERE WAS A POTENTIAL BANKRUPTCY FOR ZYNGA; IS THAT RIGHT?

8   A.  THAT'S ONLY ONE OF THE REASONS, BUT, YES.

9   Q.  THAT'S ONE OF THE THINGS THAT YOU INCLUDE IN YOUR

10  REPORT --

11  A.  THAT'S CORRECT.

12  Q.  -- IS THAT RIGHT?

13      YOU NEVER DID AN INVESTIGATION INTO WHETHER ZYNGA WAS

14  REALLY ON THE VERGE OF BANKRUPTCY SUCH THAT A 50,000 OR A

15  THOUSAND DOLLAR LIABILITY WOULD BE A PROBLEM?

16  A.  NO.  IT WAS A CONCERN OF MIKE FARLEY'S, AND THAT WAS IN

17  HIS NEGOTIATION MIND.  WHETHER IT WAS TRUE WASN'T AS IMPORTANT

18  AS THAT IT BOTHERED HIM TO MAKE A QUICK DEAL.

19  Q.  SO THE FACT THAT MR. FARLEY WANTED TO DO A QUICK DEAL

20  BECAUSE HE WAS FEARFUL OF BANKRUPTCY WAS MORE IMPORTANT TO YOU

21  THAN LOOKING AT A 10K FOR ZYNGA OR LOOKING AT ITS EARNINGS

22  FORECAST?

23  A.  WELL, NO, BECAUSE THERE WAS ANOTHER REASON TO NOT GIVE IT

24  WEIGHT.  AND THE BANKRUPTCY WAS ONLY A SECONDARY REASON.

25  Q.  LET'S STAY WITH THE BANKRUPTCY.
```

PARR – CROSS / REINES

1    **A.**  OKAY.

2    **Q.**  IF YOU WANTED TO YOU COULD HAVE FOUND OUT WHAT ZYNGA'S

3    FINANCIAL VIABILITY WAS AT THE TIME OF THE SETTLEMENT

4    NEGOTIATION, RIGHT?

5    **A.**  ABSOLUTELY, RIGHT.

6    **Q.**  AND THAT WOULD HAVE BEEN TRIVIALLY EASY FOR SOMEONE LIKE

7    YOU?

8    **A.**  I WOULDN'T SAY "EASY."  NOTHING IS TRIVIAL, BUT, YEAH.  I

9    COULD HAVE GONE TO A 10K, DONE SOME RESEARCH, YES.

10   **Q.**  NOW, THE OTHER REASON WHY YOU DISCOUNTED ZYNGA WAS

11   BECAUSE, ACCORDING TO WHAT MR. FARLEY TOLD YOU, ONLY TWO ZYNGA

12   GAMES WERE INVOLVED IN INFRINGEMENT, RIGHT?

13   **A.**  RIGHT.  AND THAT LIMITED REVENUE ASSOCIATED WITH THE TWO

14   GAMES.

15   **Q.**  SO, WITH RESPECT TO ZYNGA, AS WITH RESPECT TO HUSTLER,

16   PLAYBOY, BLOCKBUSTER AND MICROSOFT, THE LOW NUMBER WAS JUST

17   THE RESULT OF DISAPPOINTED EXPECTATIONS ABOUT THE AMOUNT OF

18   INFRINGEMENT THAT WAS ACTUALLY GOING ON, CORRECT?

19   **A.**  YEAH.  THE DISCOVERY FOUND THAT -- RIGHT.  AFTER THE SUIT,

20   DISCOVERY SHOWED A DISAPPOINTING USE OF INFRINGEMENT.  AND NO

21   REASON TO PURSUE IT, AN EXPENSIVE LITIGATION.

22   **Q.**  IN TERMS OF THE TWO ZYNGA PRODUCTS, ZYNGA HAS SOME PRETTY

23   SUCCESSFUL GAMES, CORRECT?

24   **A.**  YES, THEY DO.  BUT I DON'T THINK THEY WERE ACCUSED.  IT

25   WAS JUST THESE TWO SMALLER PRODUCTS THAT WERE ACCUSED.

1    **Q.**   YOU DIDN'T KNOW WHAT ZYNGA'S REVENUES WERE FOR THE TWO

2    PRODUCTS?

3    **A.**   THAT'S CORRECT.  I DID NOT.

4    **Q.**   DID YOU ASK MR. FARLEY HOW COME HE SUED SO MANY PARTIES IN

5    THIS EARLY LITIGATION.  AND THAT IT SEEMS ESSENTIALLY NOBODY

6    WAS MEANINGFULLY USING THE PATENTS, IF YOU ACCEPT HIS

7    TESTIMONY?

8    **A.**   NO, I DIDN'T ASK HIM WHY HE KEEPS DOING THIS.

9    **Q.**   AND DID YOU TAKE THAT INTO ACCOUNT IN VALUING THE PATENTS

10   THE FACT THAT WHEN SUITS ARE BROUGHT AGAINST ALL THESE

11   COMPANIES IT TURNS OUT THEY ARE NOT REALLY USING THEM TO THE

12   POINT IT IS NOT EVEN WORTH THE LITIGATION.  DID YOU TAKE THAT

13   INTO ACCOUNT IN TERMS OF THE VALUE OF THE PATENTS?

14   **A.**   NO.

15   **Q.**   LET'S TALK ABOUT AVG.  NOW, AVG WAS LUMP SUM?

16   **A.**   THAT'S RIGHT.  THEY ALL ARE FOR SETTLEMENT PURPOSES.

17   RIGHT.

18   **Q.**   I'M JUST GOING THROUGH AND TRYING TO BE SYSTEMATIC ABOUT

19   IT.

20   **A.**   OKAY.

21   **Q.**   AND THE AVG LUMP SUM WAS 475,000?

22   **A.**   YES.

23   **Q.**   AND YOU EXCLUDED THAT AGREEMENT.  YOU DIDN'T CONSIDER IT

24   IN TERMS OF COMING UP WITH YOUR ROYALTY RATE.

25   **A.**   THAT'S CORRECT.

1    **Q.** AND DO YOU KNOW -- I MEAN, I GUESS YOU CAN READ THE

2    SCREEN -- BUT DO YOU KNOW HOW LONG AVG'S LICENSE WAS?

3    **A.** NO. REMEMBER, I WAS JUST LOOKING TO CONVERT THE DAMAGES

4    AMOUNT TO THE INFRINGEMENT USE.

5    **Q.** OKAY.

6    **A.** AND I COULDN'T DO THAT, SO I LOST INTEREST IN THE

7    AGREEMENT AFTER THAT.

8    **Q.** SO AS SOON AS YOU DETERMINED THAT YOU COULDN'T GET A

9    RELIABLE REVENUE NUMBER FOR THE ENTITY, YOU DETERMINED THAT

10   YOU WERE JUST GOING TO DISCARD AND DISCARD THE LICENSE

11   AGREEMENT, SETTLEMENT AGREEMENT FOR THE PATENT-IN-SUIT IN YOUR

12   ANALYSIS, RIGHT?

13   **A.** RIGHT, BECAUSE I DIDN'T KNOW -- I COULD NO LONGER FIND OUT

14   IF THIS AGREEMENT, SAY, WAS THE SAME MAGNITUDE OF INFRINGEMENT

15   AS ADOBE'S BEING ACCUSED OF. THAT IS WHAT I HAVE ALWAYS BEEN

16   TRYING TO FIND.

17   **Q.** DID YOU EVEN ASK DIGITAL REG WHAT PRODUCTS AVG WAS SELLING

18   SO YOU COULD TRY AND FIGURE OUT THE REVENUES BY LOOKING AT THE

19   10K'S AND DOING ALL THE THINGS PEOPLE DO?

20   **A.** YOU CAN'T FIND THIS INFORMATION FROM 10K'S. THE REVENUES

21   WOULD HAVE TO BE VERY SPECIFIC FOR WHAT WAS CLAIMED TO BE

22   INFRINGING, AND 10K'S GIVE REVENUE NUMBERS IN VERY BROAD

23   CATEGORIES.

24   **Q.** IN TERMS OF DETERMINING WHAT THE REVENUE IS FOR WHICH THE

25   INFRINGEMENT IS THERE, YOU NEED TO BE REAL CAREFUL TO KNOW

1    THAT YOU ARE NOT BEING OVERINCLUSIVE IN TERMS OF WHAT THE BASE

2    IS, RIGHT?  AND YOU ARE JUST PRECISELY GETTING TO THE

3    PARTICULAR PRODUCTS?

4    **A.**  RIGHT.  IN THIS CASE, LIVECYCLE REVENUES ARE BEING

5    ACCUSED.  BUT IF YOU WENT INTO THE 10K OF ADOBE, I DON'T THINK

6    YOU WOULD FIND LIVECYCLE REVENUES BROKEN OUT SEPARATELY.

7    **Q.**  THAT WASN'T MY QUESTION.  MY QUESTION WAS:  BASED ON THE

8    WAY YOU'RE LOOKING AT THESE AGREEMENTS, INCLUDING AVG, WHAT IS

9    IMPORTANT WHEN YOU LOOK AT A BASE IS TO BE REALLY CAREFUL THAT

10   YOU ARE ONLY INCLUDING IN REVENUE PRODUCTS WHICH ARE PROPERLY

11   BEING ACCUSED OF INFRINGEMENT IN THE CASE.  YOU CAN'T JUST

12   TAKE GENERAL REVENUE NUMBERS CARELESSLY, RIGHT?

13   **A.**  THAT'S WHAT I AM LOOKING FOR FOR ALL OF THESE, WHAT -- THE

14   SETTLEMENT AMOUNT HAS TO RELATE TO SOME ACUTE REVENUE.  AND I

15   WANTED TO FIND OUT:  WHAT IS THAT REVENUE?

16       LIKE WE ARE FINDING OUT IN MOST OF THE CASES THAT REVENUE

17   NUMBER WAS NOT AVAILABLE.

18   **Q.**  RIGHT.  BUT TO MY QUESTION, NOT THESE OTHER POINTS, WHEN

19   YOU LOOK AT THE VALUE OF A LICENSE AND YOU WANT TO FIGURE OUT

20   WHAT THE ROYALTY BASE IS, IT IS IMPORTANT TO YOU TO CONSIDER

21   ONLY THOSE PRODUCTS WHICH ARE PROPERLY ACCUSED OF INFRINGEMENT

22   AND NOT TO OVERBROADLY JUST CAST THE NET ON GENERAL REVENUES;

23   ISN'T THAT CORRECT?

24   **A.**  YES.

25   **Q.**  LET'S TALK ABOUT VALVE.  I THINK EVERYONE WILL BE RELIEVED

PARR – CROSS / REINES

1   THIS IS THE LAST SETTLEMENT LICENSE.  AGAIN, YOU DIDN'T THINK

2   VALVE WAS USEFUL, RIGHT?

3   **A.**  ONCE I COULDN'T IDENTIFY THE ACCUSED REVENUES, THEN IT WAS

4   NOT SOMETHING I COULD USE.

5   **Q.**  AND IN TERMS OF THE ACCUSED REVENUES, THAT IS BECAUSE MIKE

6   FARLEY DIDN'T GIVE YOU A GENERAL CALCULATION OF IT AS HIGH, OR

7   LOW OR A SPECIFIC NUMBER, RIGHT?

8   **A.**  RIGHT.  I HAD NO OTHER SOURCE.

9   **Q.**  AND, ONCE AGAIN, WITH VALVE AS WITH ESSENTIALLY ALL OF

10  THESE LICENSE AGREEMENTS THAT YOU DIDN'T RELY ON, MR. FARLEY

11  TOLD ARE YOU ACTUALLY THEY WEREN'T USING THE ACCUSED

12  TECHNOLOGY MUCH; ISN'T THAT TRUE?

13  **A.**  WELL, FOR INTUIT I KNOW THEY WERE USING IT AT THE

14  14 MILLION-DOLLAR LEVEL.  BUT FOR THE OTHERS, THE ONLY REASON

15  I COULDN'T -- I WOULD HAVE LOVED TO HAVE USED THEM, BUT

16  WITHOUT REVENUES THAT WERE PARTICULAR TO THE ACCUSED REVENUES,

17  I COULDN'T RELATE THE DAMAGES TO THE LEVEL OF INFRINGEMENT.

18  **Q.**  BUT IN TERMS OF THE VALVE LICENSE AMOUNT --

19  **A.**  YES.

20  **Q.**  -- SETTLEMENT LICENSE AMOUNT --

21  **A.**  YES.

22  **Q.**  YOU WERE TOLD AND YOU INCLUDED IN YOUR REPORT AS PART OF

23  YOUR ANALYSIS THAT THERE WAS ONLY A SUBSET OF THE PRODUCTS OF

24  VALVE THAT WERE AT ISSUE, AND, AGAIN, IT WAS A DISAPPOINTMENT

25  ABOUT WHAT WAS ACTUALLY AT ISSUE, CORRECT?

PARR — CROSS / REINES

1   **A.**  YES.

2   **Q.**  ALL RIGHT.  LET'S MOVE QUICKLY TO RPX, WHICH ISN'T ON

3   THIS.  AND JUST -- JUST TO CONFIRM, YOU EXCLUDED RPX FROM YOUR

4   CALCULATION OF WHAT THE REASONABLE ROYALTY ANALYSIS WAS,

5   CORRECT, IN TERMS OF THE RATE THAT YOU CAME UP WITH?

6   **A.**  YES.  I DIDN'T RELY ON IT FOR A RATE.

7   **Q.**  OKAY.  ALL RIGHT.  LET'S NOW TALK ABOUT THE ADOBE PLUG-IN.

8        NOW, IN YOUR REPORT WHEN YOU PERFORMED THE ANALYSIS --

9   WELL, LET ME DO A REFRESH.  THAT IS THE 5.5 PERCENT RATE THERE

10  THAT IS ONE OF THE THREE NUMBERS THAT WERE ON YOUR CHART,

11  CORRECT?

12  **A.**  THAT'S CORRECT.

13                      (PUBLISHED TO JURY.)

14  **Q.**  NOW, YOU STATED IN YOUR ORIGINAL REPORT THAT YOU ONLY

15  ATTRIBUTE A SMALL VALUE TO THE ADOBE AGREEMENT BECAUSE THE

16  DETAILS OF IT ARE UNKNOWN TO YOU, CORRECT?

17  **A.**  THAT IS RIGHT.  I GAVE IT, SAY, LOWER WEIGHT BECAUSE FULL

18  DETAILS ARE NOT KNOWN TO ME.

19  **Q.**  AND YOU ALSO ACKNOWLEDGE IN YOUR REPORT THAT EVIDENCE DOES

20  NOT EXIST SHOWING THAT ADOBE SUCCESSFULLY ENTERED INTO ANY

21  LICENSES UNDER THESE TERMS, RIGHT?

22  **A.**  THAT'S RIGHT.  I ASKED COUNSEL, AND THEY SAID THEY HAVE

23  NOT RECEIVED ANY LICENSES --

24  **Q.**  AND THAT'S --

25  **A.**  -- FROM ADOBE.

PARR - CROSS / REINES

1  **Q.**  AND THAT'S CONSISTENT WITH MR. HERBACH'S TESTIMONY THAT HE

2  ISN'T AWARE OF ANYONE TAKING -- BEING WILLING TO PAY

3  5.5 PERCENT, RIGHT?

4  **A.**  THAT'S RIGHT.

5  **Q.**  NOW, WHAT YOU CITED TO FOR THIS WASN'T EVEN AN AGREEMENT.

6  IT WAS AN ONE-PAGE PRINTOUT FROM A WEB PAGE, RIGHT?  LIKE AN

7  FAQ OR SOMETHING?

8  **A.**  IT WAS ADOBE'S WEB PAGE.

9  **Q.**  RIGHT.

10  **A.**  THAT'S CORRECT.

11  **Q.**  AND YOU TESTIFIED WHEN YOU WERE ANSWERING WHAT YOUR

12  ANALYSIS WAS WHEN YOU ORIGINALLY FORMULATED IT THAT YOU DIDN'T

13  KNOW ANYTHING ABOUT THIS 5.5 PERCENT OTHER THAN THE ONE-PAGE

14  OFF THE ADOBE WEBSITE THAT TALKS ABOUT THE POSSIBILITY OF

15  HAVING A DRM PLUG-IN, RIGHT?

16  **A.**  WHAT DO YOU MEAN?  I KNOW ABOUT THE 5.5 PERCENT, AND IT IS

17  ASSOCIATED WITH THE DRM PLUG-IN.

18  **Q.**  YOUR KNOWLEDGE IS THAT ONE SHEET OF PAPER, CORRECT?

19  **A.**  YES.

20  **Q.**  NOW, YOU'LL AGREE THAT WHATEVER THIS PLUG-IN IS IT IS NOT

21  A PATENT LICENSE AGREEMENT, RIGHT?

22  **A.**  THERE'S NO MENTION OF PATENTS IN THE, SAY, ADVERTISEMENT

23  OF IT.

24  **Q.**  ON THAT ONE-PAGE SHEET THAT YOU SAW?

25  **A.**  THAT'S RIGHT.

PARR – CROSS / REINES

1  **Q.**  YOU HAVE NO BASIS AT ALL TO SAY THAT THERE IS ANY PATENT

2  RIGHTS, RELATED TO DRM OR OTHERWISE, THAT'S INVOLVED IN THIS

3  ADOBE AGREEMENT, RIGHT?

4  **A.**  I HAVE NO BASIS TO SAY THAT, THAT'S RIGHT, THAT THERE ARE

5  PATENT RIGHTS.

6  **Q.**  BY THE WAY, YOU SAY NOVEMBER 4TH, 2013, IS THE DATE OF THE

7  LICENSE GRANT?  LET'S JUST PROBE THAT FOR A MINUTE.  WHAT IS

8  THAT DATE?  I THOUGHT YOU TESTIFIED THERE WAS NO LICENSE

9  GRANT.

10  **A.**  I DON'T KNOW WHAT THAT DATE IS.

11  **Q.**  ISN'T THAT YOUR CHART?

12  **A.**  I DIDN'T MAKE IT.  COUNSEL DID.  SO I DO NOT RECALL THE

13  REASON FOR THAT DATE.

14  **Q.**  WHO MADE THE CHART?

15  **A.**  WELL, COUNSEL PUT IT TOGETHER WITH ME.  BUT I DON'T KNOW

16  WHY WE PUT THAT DATE THERE.

17  **Q.**  DID YOU LOOK AT IT TO APPROVE IT?

18  **A.**  YES.

19  **Q.**  OKAY.  AND YOU JUST DON'T REMEMBER WHY YOU WOULD REPRESENT

20  THAT A 5.5 PERCENT --

21  **A.**  THAT'S CORRECT.

22  **Q.**  -- FAQ IS BEING DESCRIBED AS A LICENSE GRANT WITH A

23  SPECIFIC DATE, AND IT BEING CALLED AN "AGREEMENT"?

24  **A.**  I DON'T RECALL WHY THAT DATE'S THERE.

25  **Q.**  BUT YOU ARE PRETTY SURE THAT THERE IS NO AGREEMENT, RIGHT?

1    YOU ARE NOT TELLING THE JURY THERE IS AN AGREEMENT WHERE

2   SOME SIGNED IT ON NOVEMBER 4TH, 2013 AND ENTERED INTO THIS

3   5.5 PERCENT DEAL, RIGHT?

4   **A.**  THAT'S CORRECT.

5   **Q.**  YOU ARE NOT TRYING TO SUGGEST THAT?

6   **A.**  NO.  NO.  I'M NOT TRYING TO SUGGEST ANYTHING THAT DIDN'T

7   HAPPEN.

8   **Q.**  IN TERMS OF A LICENSE GRANT, YOU DON'T EVEN BELIEVE THERE

9   IS A LICENSE GRANT NOW BECAUSE YOU ARE DEFERRING TO ALL THE

10  PEOPLE WHO ARE TELLING YOU NO ONE EVER DID THIS?

11  **A.**  THAT'S RIGHT.  I NEVER SAW A LICENSE.  SO FROM THE VERY

12  BEGINNING I SUSPECTED THAT THERE MIGHT NOT HAVE BEEN ANY, AND

13  THAT IS WHY I SAID IT IN MY FIRST REPORT.  AND THEN, TESTIMONY

14  SINCE THEN SEEMS TO INDICATE THAT NO ONE HAS TAKEN A LICENSE.

15  **Q.**  AND NOT ONLY IS THIS LICENSE NOT RELATED TO PATENTS, BUT

16  IT'S NOT EVEN FOR DRM, RIGHT?

17  **A.**  OH, IT CERTAINLY IS.  IT'S TO ALLOW YOU TO MAKE A PLUG-IN

18  THAT WILL PROVIDE DRM.

19  **Q.**  THE PERSON THAT'S RECEIVING THE GRANT IS PAYING

20  5.5 PERCENT, BUT THEY ARE NOT GETTING ANY DRM TECHNOLOGY.  SO

21  YOU PAY 5.5 PERCENT.  IF ANYONE EVER WANTED TO DO IT THEY

22  WOULD BE GETTING ACCESS TO THE WHOLE ADOBE ECOSYSTEM AND ALL

23  THAT THAT INCLUDED, RIGHT?

24  **A.**  I THINK IT WAS FOR ACROBAT.  THEY GET ACCESS TO ACROBAT SO

25  THEY CAN CREATE A DRM.  AND IT'S LIMITED TO DRM.  SO I

1    ASSOCIATE THIS AGREEMENT WITH DRM.

2    **Q.**  WE WILL TALK ABOUT THAT IN A SECOND.  BUT HAVING ACCESS TO

3    THE WHOLE ACROBAT ECOSYSTEM, THAT IS PRETTY VALUABLE, RIGHT?

4    YOU RECOGNIZE THAT, DON'T YOU?

5    **A.**  IT IS NOT VALUABLE AT ALL EXCEPT LET'S ME PLUG-IN.  YOU

6    DON'T GET AS FAR AS -- IT WOULD BE INSANE FOR ADOBE FOR

7    5.5 PERCENT TO GIVE YOU THE RIGHTS TO ALL OF ACROBAT TO DO

8    WHATEVER YOU WANT WITH.

9    **Q.**  BUT YOU GET THE RIGHT TO USE YOUR DRM AND MAKE PDF'S WITH

10   YOUR DRM EVEN THOUGH ADOBE IS -- HAS A PRODUCT THAT ITS OWN

11   DRM, RIGHT?  TO PUT THEM IN A COMPETITIVE POSITION, RIGHT?

12   **A.**  RIGHT.  RIGHT.  YOU GET THE RIGHT TO MAKE SOMETHING ELSE.

13   AND THEN, AS WE SAW ON THAT ONE PAGE, OR THEY SUGGEST YOU

14   COULD BUY LIVECYCLE.

15   **Q.**  OKAY.  BUT THE PERSON WHO IS PAYING 5.5 PERCENT -- AND

16   THEN, WE CAN MOVE ON.  I THINK THIS IS STRAIGHTFORWARD -- THEY

17   ARE NOT GETTING ANY DRM TECHNOLOGY FROM ADOBE FOR THAT

18   5.5 PERCENT.  THEY ARE GETTING THIS RIGHT TO ACROBAT ACCESS,

19   WHICH YOU DON'T THINK IS THAT SIGNIFICANT, I UNDERSTAND, BUT

20   THAT'S WHAT THEY ARE GETTING, CORRECT?

21   **A.**  THAT'S CORRECT.

22   **Q.**  ALL RIGHT.  LET'S TALK ABOUT DAMAGE BASE.  I THINK BASED

23   ON THAT ANALYSIS THAT YOU HAD, YOU CAME UP WITH A 2.5 PERCENT

24   NUMBER, CORRECT?

25   **A.**  YES.

1    Q.  AND AS WE TESTIFIED YOU HAVE DONE OTHER ANALYSES BEFORE,

2    AND YOU'VE COME UP WITH 2.5 THOSE OTHER TIMES, CORRECT?

3    A.  YES.

4    Q.  OKAY.  AND WITH RESPECT TO THE DAMAGE BASE, THAT IS A

5    QUESTION OF WHAT ADOBE PRODUCTS ARE BEING ACCUSED, RIGHT?

6    A.  YES.

7    Q.  SO THAT'S JUST LIKE WHEN YOU ARE LOOKING AT HUSTLER OR

8    VALVE OR ZYNGA YOU NEED TO KNOW WHAT ARE THE PRODUCTS OF THESE

9    COMPANIES THAT ARE BEING ACCUSED BEFORE YOU CAN BE CONFIDENT

10   THAT YOU UNDERSTAND WHAT THE REVENUE IS THAT IS AT ISSUE,

11   RIGHT?

12   A.  WELL, I RELIED ON SOMEONE ELSE TO DETERMINE WHICH PRODUCTS

13   WERE ACCUSED.

14          MR. REINES:  YOUR HONOR, MOVE TO STRIKE.  THAT IS

15   NONRESPONSIVE.  THAT IS JUST NOT THE QUESTION.

16          THE COURT:  ALL RIGHT.

17   BY MR. REINES:

18   Q.  MY QUESTION IS:  WHEN YOU ARE LOOKING AT WHAT THE ROYALTY

19   BASE IS, YOU WANT TO UNDERSTAND WHAT THE PRODUCTS ARE THAT ARE

20   ACCUSED OF INFRINGEMENT SO YOU UNDERSTAND WHAT REVENUE YOU'RE

21   GOING TO INCLUDE IN THE BASE, CORRECT?

22   A.  YES.

23   Q.  OKAY.  AND ALSO WHEN YOU WORK IN A CASE LIKE THIS, FOR A

24   HUNDRED-PLUS HOURS, YOU WANT TO HAVE A GENERAL UNDERSTANDING

25   OF WHAT THE PRODUCTS ARE AND HOW THEY WORK THAT ARE AT ISSUE

1    JUST SO THAT YOU HAVE A FEEL FOR WHAT THE ROYALTY AGREEMENT

2    WOULD BE, WHAT THE PATENTS ARE AND WHAT THE PRODUCTS ARE,

3    RIGHT?

4    **A.**  I DON'T NEED TO KNOW THAT MUCH ABOUT THE PRODUCTS.  WHAT I

5    NEED TO KNOW IS THEY INFRINGE AND THEY ARE PART OF THE ROYALTY

6    BASE.  AND I RELY ON OTHERS FOR THAT.  AS FAR AS THE DETAILS

7    OF THE PRODUCT, I JUST NEED TO KNOW GENERALLY WHAT THE PRODUCT

8    IS THAT'S BEING ACCUSED.

9    **Q.**  ALL RIGHT.  LET'S TALK AT A GENERAL LEVEL, THEN.  WHEN YOU

10   PERFORMED YOUR ANALYSIS YOU DIDN'T EVEN KNOW WHAT LIVECYCLE

11   WAS, RIGHT?

12   **A.**  NO, I DESCRIBE IT IN MY REPORT.

13   **Q.**  OKAY.  LET'S GO TO -- LET ME BE CLEAR.  WHEN YOUR

14   DEPOSITION WAS TAKEN BASED ON YOUR REPORT YOU DIDN'T EVEN KNOW

15   WHAT LIVECYCLE WAS, RIGHT?

16   **A.**  WELL --

17   **Q.**  ARE YOU STILL SAYING YOU DID KNOW?

18   **A.**  I DID, BECAUSE IT IS IN MY REPORT.  SO AT MY DEPOSITION IF

19   I SAID I DIDN'T, I MISSPOKE.  I FORGOT.  BECAUSE FROM THE VERY

20   FIRST REPORT I HAVE A SHORT PARAGRAPH THAT DESCRIBES LIVECYCLE

21   AND THE FLASH.

22   **Q.**  DO YOU REMEMBER AT YOUR DEPOSITION YOU SAID YOU COULDN'T

23   SAY WHETHER YOU WERE FAMILIAR WITH LIVECYCLE BECAUSE YOU

24   DIDN'T EVEN KNOW WHAT IT WAS?

25   **A.**  I DON'T REMEMBER.  I JUST KNOW THAT IN MY FIRST REPORT

1    FROM THE VERY BEGINNING I HAVE A DESCRIPTION OF LIVECYCLE AND

2    FLASH.

3    **Q.**  AND WHEN YOU WERE ASKED IN YOUR DEPOSITION IF YOU KNEW

4    WHAT FLASH PLATFORM IS, YOU TESTIFIED YOU DIDN'T KNOW WHAT

5    THAT WAS, RIGHT?

6    **A.**  THEN I MISSPOKE, BECAUSE IT WAS IN MY REPORT FROM THE VERY

7    BEGINNING.

8    **Q.**  AND YOU WERE ASKED WHAT FLASH ACCESS DOES, AND YOU DIDN'T

9    KNOW WHAT THAT WAS, CORRECT?

10   **A.**  I DON'T KNOW.  I MAY HAVE SAID THAT.  BUT, AGAIN, I

11   MISSPOKE.  IT'S WRONG.  IT'S IN MY REPORT.  I GUESS I DIDN'T

12   REMEMBER AT THE TIME.

13   **Q.**  DID YOU KNOW HOW FLASH WAS ACCUSED OF INFRINGEMENT, IF AT

14   ALL?

15   **A.**  NO.  THAT'S A TECHNICAL QUESTION.  I DON'T KNOW HOW IT

16   INFRINGES.

17   **Q.**  IN FACT, IN YOUR OPINIONS IN THIS CASE, YOU DIDN'T

18   CONSIDER THE FEATURES OR FUNCTIONALITIES OF ANY OF THE ADOBE

19   PRODUCTS.  ISN'T THAT TRUE, EVEN THOUGH YOU ARE THE DAMAGES

20   EXPERT FOR DIGITAL REG?

21   **A.**  NO, I UNDERSTAND WHAT −− WHAT WE'RE DOING HERE.  THE DRM

22   ALLOWS YOU TO CONTROL AND REGULATE THE USE OF CONTENT OR

23   SOFTWARE.

24   **Q.**  I WOULD LIKE TO PLAY YOUR DEPOSITION AT PAGE 22, LINE ONE

25   THROUGH LINE 11 FROM JANUARY 23, 2014.

PARR – CROSS / REINES

```
 1        (VIDEO PLAYED AS FOLLOWS:
 2            "QUESTION:  IS IT ALSO TRUE THAT FOR THOSE FOUR
 3            CATEGORIES OF PRODUCTS THAT I JUST DESCRIBED, THAT
 4            WOULD BE LIVECYCLE, FLASH PLATFORM, DIGITAL
 5            PUBLISHING AND THE ACTIVATION" --
 6        THE COURT:  I AM SORRY.
 7        MR. REINES:  MR. BONINI, LET'S START AGAIN.
 8      SORRY.  THERE WAS A GLITCH ON OUR END.  THANK YOU.  THAT
 9    WAS ME.
10        (VIDEO PLAYED AS FOLLOWS:)
11            "QUESTION:  IS IT ALSO TRUE THAT FOR THOSE FOUR
12            CATEGORIES OF PRODUCTS THAT I JUST DESCRIBED, THAT
13            WOULD BE LIVECYCLE, FLASH PLATFORM, DIGITAL
14            PUBLISHING, AND THE ACTIVATION ALM, AMT PRODUCTS,
15            THAT YOU DID NOT LOOK INTO WHAT FEATURES AND
16            FUNCTIONALITIES ARE OFFERED BY THOSE PRODUCTS?
17            "ANSWER:  NO.  I JUST KNOW THEY'RE SOFTWARE PRODUCTS
18            THAT ADOBE SELLS AND THAT THEY'RE ACCUSED OF
19            INFRINGEMENT, AND THAT WAS ALL THAT WAS IMPORTANT TO
20            ME.  I DIDN'T CARE WHAT THEY DID."
21    BY MR. REINES:
22    Q.  NOW, IN TERMS OF THE ACCUSED REVENUE BASE TO DETERMINE
23    WHAT THE 2.5 WAS GOING TO BE MULTIPLIED, RIGHT, BECAUSE YOU
24    NEED BOTH?
25    A.  RIGHT.
```

PARR – CROSS / REINES

1   **Q.**  AND THE BASE IS VERY IMPORTANT, RIGHT?  IT'S ONE OF THE

2   TWO PRIMARY VARIABLES TO COME UP WITH THE PRODUCT, WHICH IS

3   YOUR OVERALL DAMAGES NUMBER?

4   **A.**  WELL, YEAH.  THE BASE IS, SAY, THE AMOUNT OF INFRINGEMENT.

5   **Q.**  AND YOU RELIED ON DIGITAL REG'S ATTORNEYS TO DETERMINE

6   WHAT THE ACCUSED REVENUE BASE WAS, CORRECT?

7   **A.**  WELL, I -- I DON'T KNOW.  I RELIED ON DR. DEVANBU TO

8   IDENTIFY THROUGH A TECHNICAL ANALYSIS WHICH REVENUE BASE WAS

9   APPLICABLE.  AND THEN, ADOBE PROVIDED THE REVENUES FOR THE

10  PERIOD.  AND ALL OF MY INFORMATION ALWAYS COMES THROUGH THE

11  ATTORNEYS.  BUT I DIDN'T RELY ON THEM FOR THESE ANSWERS.  I

12  RELIED ON THEM FOR ACCESS TO THE ANSWERS.

13          **MR. REINES:**  I WOULD LIKE TO PLAY YOUR DEPOSITION --

14  ACTUALLY, LET ME JUST READ IT -- AT PAGE -- ACTUALLY, WHY

15  DON'T WE PLAY IT?  IT IS PAGE 46, LINE 22 THROUGH 47, LINE 3.

16      (VIDEO PLAYED AS FOLLOWS:)

17          "QUESTION:  IS IT FAIR TO SAY THAT YOU RELIED ON

18          DIGITAL REG AND ITS COUNSEL TO GIVE TO YOU REVENUE

19          THAT THEY BELIEVE IS ASSOCIATED WITH ACTUAL ACTS OF

20          INFRINGEMENT?

21          "ANSWER:  I RELIED ON PREM TO IDENTIFY WHAT PRODUCTS

22          ARE ACCUSED OF INFRINGEMENT.  AND THEN, I RELIED ON

23          COUNSEL TO OBTAIN THE INFORMATION FROM THE DEFENDANTS

24          AS TO WHAT REVENUES ARE ACCUSED OF INFRINGEMENT."

25          **MR. PRICE:**  YOUR HONOR, WE OBJECT TO THAT BEING

1    IMPROPER IMPEACHMENT.  THAT IS WHAT HE JUST TESTIFIED TO.

2              **MR. REINES:**  YOUR HONOR, I ASKED HIM ABOUT THE

3    REVENUE THINGS.

4              **THE COURT:**  THE JURY CAN DECIDE.

5    **BY MR. REINES:**

6    **Q.**  YOU SIMPLY ASSUMED FOR EVERY DOLLAR OF REVENUE WHICH YOU

7    WERE PROVIDED BY COUNSEL AS TO THE ACCUSED PRODUCTS, THAT

8    THERE WAS AN ACT OF INFRINGEMENT THAT MATCHED UP TO EVERY

9    DOLLAR OF REVENUE, CORRECT?  THAT WAS JUST AN ASSUMPTION YOU

10   MADE?

11   **A.**  I AM RELYING ON DR. DEVANBU, WHO I REFERRED TO AS "PREM."

12   I HAVE TO RELY ON THE TECHNICAL EXPERT.

13   **Q.**  SO MR. DEVANBU IS THE PERSON THAT PROVIDED THE

14   QUANTIFICATION OF THE AMOUNT OF PRODUCT THAT WAS ACCUSED OF

15   INFRINGEMENT?

16   **A.**  HE IDENTIFIED WHICH PRODUCTS WERE INFRINGING.  AND THEN,

17   ADOBE PRODUCED THE REVENUES ASSOCIATED WITH THOSE PRODUCTS.

18   **Q.**  AND WHEN HE GAVE YOU A PRODUCT CLASSIFICATION, YOU ASSUMED

19   THAT EVERY SINGLE UNIT SOLD WITHIN THAT PRODUCT CLASSIFICATION

20   INFRINGED, CORRECT?

21   **A.**  YES.

22   **Q.**  JUST AN ASSUMPTION YOU MADE?

23   **A.**  RIGHT.  RIGHT.

24   **Q.**  OKAY.

25   **A.**  I HAVE NO WAY TO ARGUE WITH HIM.

PARR – CROSS / REINES

1   **Q.** I DIDN'T MEAN YOU WERE ARGUING WITH ANYBODY.  I'M JUST

2   SAYING THAT WE WANT TO BE CLEAR ABOUT YOUR ASSUMPTION, BECAUSE

3   IT IS SO IMPORTANT IN THIS CASE, THAT IF SOMETHING WAS A

4   PRODUCT CATEGORY -- FOR EXAMPLE, ACROBAT PRO -- YOU ASSUMED

5   EVERY SINGLE UNIT OF ACROBAT PRO WAS AN INFRINGEMENT.

6   CORRECT?

7   **A.** THAT'S CORRECT.

8   **Q.** OKAY.  AND THE REASON YOU ASSUME THAT WAS BECAUSE YOUR

9   UNDERSTANDING IS ACROBAT PRO USES LIVECYCLE DRM, RIGHT?

10  **A.** AND I ALSO UNDERSTAND THAT IT USES ACTIVATION DRM.  BUT,

11  YES, IT DOES USE LIVECYCLE DRM.

12  **Q.** RIGHT.  BUT ACTIVATION, YOU UNDERSTAND, IS NOT IN THE CASE

13  OTHER THAN THIS THREE-MONTH PERIOD?

14  **A.** YES.

15  **Q.** OKAY.  FOR THE YEARS 2005 TO THE LAST DAY, I THINK, OF

16  2013 OR 2012, OTHER THAN THREE MONTHS, YOU ARE RELYING SOLELY

17  ON LIVECYCLE DRM AS YOUR THEORY AS TO HOW YOU GET THE BILLIONS

18  OF DOLLARS OF ACROBAT PROFESSIONAL REVENUE, CORRECT?

19  **A.** YES.

20  **Q.** OKAY.  YOU UNDERSTAND THAT DR. DEVANBU EXPLAINED TO THE

21  JURY THAT ACROBAT PROFESSIONAL ONLY INFRINGES WHEN IT USES THE

22  LIVECYCLE DRM, RIGHT?  YOU HEAR THAT?

23  **A.** I WASN'T HERE FOR THAT, NO.

24  **Q.** DO YOU KNOW IT AS A FACT?

25  **A.** I DON'T KNOW WHAT THE BASIS FOR INFRINGEMENT IS -- THE

1    THEORY FOR INFRINGEMENT IS.

2    **Q.**  OKAY.  AND YOUR OPINION IS THAT ONCE YOU BUY A PRODUCT IT

3    IS INFRINGING EVEN IF YOU NEVER USE IT, CORRECT?  IT JUST

4    DOESN'T MATTER?

5    **A.**  WELL, THAT'S A THEORY I –– THAT IS MY THEORY, BUT I HAVE

6    TO DEFER TO THE TECHNICAL EXPERT HERE TO DETERMINE AND SAY

7    WHEN SOMETHING INFRINGES.  IT'S REALLY A TECHNICAL PROBLEM.

8    IT MIGHT EVEN BE A LEGAL QUESTION.

9    **Q.**  BUT FROM YOUR PERSPECTIVE FOR PURPOSES OF YOUR ASSUMPTION

10   ABOUT THIS 2 BILLION-DOLLAR BASE IN THIS CASE, YOUR ASSUMPTION

11   WAS IF THE PRODUCT SOLD, SUCH AS ACROBAT PROFESSIONAL, IT'S AN

12   INFRINGEMENT EVEN IF IT IS NEVER USED, CORRECT?

13   **A.**  WELL, I DON'T KNOW THAT I ACTUALLY MADE THAT UNDERLYING

14   ASSUMPTION.  I WAS JUST TOLD:

15      "ACROBAT PRO INFRINGES.  HERE'S THE REVENUES FROM ADOBE,"

16   AND I USED THEM.

17   **Q.**  I WOULD LIKE TO PLAY YOUR DEPOSITION FROM JANUARY 23RD,

18   2014, AT PAGE 43, LINES 11 THROUGH PAGE 44, LINE FIVE.

19      (VIDEO PLAYED QUESTION:

20          "QUESTION:  IN OTHER WORDS, YOU DID NOT UNDERTAKE TO

21          DETERMINE WHAT PERCENTAGE OF SALES OF THE ADOBE

22          ACCUSED PRODUCTS ARE USED BY CUSTOMERS.

23          "ANSWER:  WHAT PERCENTAGE OF THE PRODUCT IS USED BY A

24          CUSTOMER?

25          "QUESTION:  UH-HUH.

1        "ANSWER:  LIKE IF THERE WERE CERTAIN FEATURES IN A

2        PRODUCT AND THEY DIDN'T USE ALL THE FEATURES?  THEY

3        USED JUST LIMITED FEATURES?

4        "QUESTION:  YES.  WELL, LET'S START THERE.  DID YOU

5        DO AN ANALYSIS OF THAT?

6        "ANSWER:  NO.  ONCE YOU BY A PRODUCT THAT IS

7        INFRINGING AND YOU MAYBE DON'T USE IT BECAUSE OF

8        THAT.  IF YOU BOUGHT IT, IT WAS TRANSFERRED.  DIGITAL

9        REG RIGHTS MANAGEMENT, SAY, PROTECTED IT.  AND

10       WHETHER THE END USER USES IT FEVERISHLY, USES IT ONCE

11       IN THEIR LIFETIME, IT DOESN'T MATTER.

12       "QUESTION:  OKAY.  FOR YOUR ANALYSIS, YOU MEAN?

13       "ANSWER:  THAT'S CORRECT."

14   BY MR. REINES:

15   Q.  NOW, WITH RESPECT TO THE CLAIMS IN THIS CASE, YOU

16   UNDERSTAND IN A PATENT CASE, EVEN THOUGH YOU ARE NOT A PATENT

17   ATTORNEY, YOU UNDERSTAND THAT THE CLAIMS ARE AN IMPORTANT PART

18   OF THE ANALYSIS, CORRECT?

19   A.  YES.

20   Q.  AND YOU KNOW IN THIS CASE THAT ALL THE CLAIMS HERE ARE

21   METHOD CLAIMS, CORRECT?

22   A.  YES.

23   Q.  AND YOU ALSO KNOW FROM YOUR INVOLVEMENT IN 70 OR SO PATENT

24   CASES WHERE YOU'VE TESTIFIED -- ACTUALLY, YOU'VE TESTIFIED IN

25   70 PATENT CASES?  I HAVE SAID THAT, BUT I WANT TO MAKE SURE IT

PARR – CROSS / REINES

1    IS RIGHT.

2    **A.**  NO, I'VE TESTIFIED AT DEPOSITION OR TRIAL.

3    **Q.**  IN 70?

4    **A.**  NO, I HAVE TESTIFIED 70 TIMES IN DEPOSITION OR TRIAL.

5    **Q.**  AND HOW --

6    **A.**  SO THAT WOULD BOIL DOWN TO MAYBE 35 CASES, BECAUSE, YOU

7    KNOW, EVERY ONE OF THEM HAS A DEPOSITION.

8    **Q.**  AND HOW MANY PATENT CASES HAVE YOU BEEN RETAINED ON WHERE

9    YOU HAVE DONE WORK ON THE CASE?

10   **A.**  I CAN'T EVEN BEGIN TO RECALL.

11   **Q.**  WHAT IS THE RANGE?

12   **A.**  IN THE LAST 25 YEARS?

13   **Q.**  YES.

14   **A.**  A HUNDRED.  IT MUST BE AT LEAST A HUNDRED.

15   **Q.**  NOW, YOU KNOW THAT METHOD CLAIMS IN PATENTS ARE NOT

16   INFRINGED UNLESS THERE IS ACTUALLY USE, RIGHT?  IT IS

17   DIFFERENT FROM AN APPARATUS CLAIM.

18   **A.**  THAT IS WHAT I UNDERSTAND FROM TECHNICAL EXPERTS.

19   **Q.**  YOU UNDERSTAND THAT IS JUST THE RULES OF PATENTS IS IF

20   THERE IS A CLAIM WHERE YOU HAVE A METHOD, SUCH AS A METHOD FOR

21   USING DRM, IF YOU DON'T USE THE METHOD OF DRM, YOU'RE NOT

22   INFRINGING EVEN IF YOU HAVE THE LATENT CAPABILITY OF USING

23   DRM, RIGHT?

24   **A.**  THAT IS WHAT I UNDERSTAND, YES.

25   **Q.**  SO IT WOULD BE TOTALLY IMPROPER, WOULDN'T IT, TO TAKE A

PARR – CROSS / REINES

1   PRODUCT THAT NEVER USES DRM AND SAY IT'S AN INFRINGEMENT, JUST

2   BASED ON WHAT YOU KNOW FROM THAT BASIC FOUNDATIONAL RULE,

3   RIGHT?

4   **A.**  BUT I'M NOT HERE TO PROVE INFRINGEMENT.  JUST CALCULATE

5   DAMAGES BASED ON THE ASSUMPTION THAT ALL OF THE REVENUES

6   INFRINGE.  I AM NOT IN A PLACE TO SAY WHICH INFRINGE AND WHICH

7   DON'T.  THERE'S SOMEONE HAS A THEORY THAT ALL OF THOSE

8   REVENUES INFRINGE.  I DON'T KNOW WHAT IT IS.

9   **Q.**  OKAY.  LET'S STEP BACK.  WE CAN PLAY THE VIDEO AGAIN, BUT

10  I THINK IT'S PRETTY CLEAR.  I THINK THIS IS IMPORTANT STUFF ON

11  THE SUBSTANCE.  THAT YOU SAID YOUR ASSUMPTION WAS YOU DIDN'T

12  CARE IF THE PRODUCT WAS EVER USED WITH DRM.  AS LONG AS IT WAS

13  SOLD, IT WENT INTO YOUR $2 BILLION BASE, CORRECT?

14  **A.**  THAT'S CORRECT.

15  **Q.**  AND NOW YOU'RE SAYING YOU ACKNOWLEDGE THE BASIC RULE THAT

16  WITH RESPECT TO METHOD CLAIMS, WHICH IS WHAT THIS CASE IS

17  ABOUT, IT'S JUST NOT INFRINGEMENT IF NOBODY EVER USES THE

18  SPECIFIC TYPE OF DRM WITH ACROBAT PROFESSIONAL, RIGHT?

19      YOU KNOW THAT BASIC RULE, DON'T YOU?

20  **A.**  I THINK YOU ARE GETTING FAR TOO DEEP INTO TECHNICAL

21  MATTERS THAT ARE BEYOND MY EXPERTISE.  I DO NOT KNOW IN THIS

22  CASE THE THEORY OF WHY ALL ARE INFRINGED.  I TOLD YOU WHAT I

23  THINK.  BUT IF YOU WANT TO TALK ABOUT PROVING THE THEORY OF

24  INFRINGEMENT AND WHY THEY ALL SHOULD BE IN THE ROYALTY BASE,

25  YOU ARE TALKING TO THE WRONG GUY.

PARR – CROSS / REINES

1   **Q.**  I'M NOT ASKING ABOUT ANY OF THAT.  I AM ASKING YOU

2   UNDERSTAND THE BASIC RULE THAT WITH METHOD CLAIMS THERE IS NO

3   INFRINGEMENT UNLESS THE METHOD IS ACTUALLY USED.  YOU JUST

4   TESTIFIED TO THAT A FEW MINUTES AGO.

5   **A.**  I'M TELLING YOU, I UNDERSTAND THAT.

6   **Q.**  OKAY.  NOW, MR. HERBACH CAME AND TESTIFIED FROM ADOBE.

7   AND HE TESTIFIED THAT THERE ARE TENS OF MILLIONS OF ACROBAT

8   PRO USERS.  DID YOU KNOW THAT?

9   **A.**  I HEARD HIM TESTIFY TO THAT, YES.

10  **Q.**  HE SAID THAT LIVECYCLE RIGHTS MANAGEMENT HAD A COUPLE OF

11  HUNDRED USERS, RIGHT?

12  **A.**  YES, I HEARD HIM SAY THAT.

13  **Q.**  DO YOU RECALL HIS TESTIMONY THAT THE AMOUNT OF ACROBAT PRO

14  USERS THAT WOULD EVER TOUCH LIVECYCLE IN ANY WAY, SHAPE OR

15  FORM WAS SUPER TINY?

16  **A.**  YES, I HEARD HIM SAY THAT.

17  **Q.**  DID YOU TAKE -- DO YOU TAKE THAT INTO CONSIDERATION AT ALL

18  IN ANY OF YOUR OPINIONS, THE FACT THAT MINISCULE AMOUNT OF

19  ACROBAT PRO PURCHASERS AND USERS WOULD EVER HAVE ANYTHING TO

20  DO WITH LIVECYCLE?

21  **A.**  NO, THAT IS NOT PART OF MY ANALYSIS.

22  **Q.**  LET ME ASK YOU THIS:  IF IT TURNS OUT THAT ONLY .01

23  PERCENT OF ACROBAT PRO USERS EVER USED DRM WITH LIVECYCLE,

24  WHICH IS THE ACCUSED DRM, WOULD THAT AFFECT YOUR OPINION ABOUT

25  THE BASE BEING $2 BILLION?

1    **A.**  ONLY IF THAT TURNED OUT TO BE THE PROPER THEORY FOR

2    INFRINGEMENT.

3         THE WAY IT IS NOW, MAYBE IT'S ONLY A FEW PEOPLE THAT USE

4    IT, BUT THERE'S A THEORY OF INFRINGEMENT THAT THE ENTIRE BASE

5    I'VE USED IS CORRECT.  IF THAT THEORY IS CHANGED SO THAT WHAT

6    YOU ARE SUGGESTING IS CORRECT, THEN YOU WOULD HAVE TO

7    APPORTION.

8    **Q.**  WHAT IS THIS INFRINGEMENT THEORY THAT YOU UNDERSTAND WHERE

9    YOU CAN SUE ON METHOD CLAIMS AND RECOVER FOR ACROBAT PRO WHEN

10   THE PERSON USING ACROBAT PRO NEVER USES LIVECYCLE AT ALL FOR

11   DRM?

12   **A.**  I DON'T KNOW WHAT THE THEORY IS.  OTHERS ARE SUPPOSED TO

13   PROVE THAT.  AND WHEN THEY DO, IF THEY DO, I'VE GIVEN YOU THE

14   DAMAGES AMOUNT.

15   **Q.**  OKAY.  NOW, IN FACT, YOU ARE AN ACROBAT PROFESSIONAL USER,

16   RIGHT?  YOU PURCHASED A COPY?

17   **A.**  YES.

18   **Q.**  IN YOUR DEPOSITION YOU HAD NO IDEA WHAT LIVECYCLE EVEN

19   WAS, RIGHT?

20   **A.**  THAT'S CORRECT.

21   **Q.**  AND DO YOU THINK YOU'VE EVER USED LIVECYCLE DRM ON YOUR

22   ACROBAT PRO?

23   **A.**  I HAVE ONLY OWNED IT ABOUT TWO YEARS, AND I HAVEN'T

24   ENGAGED IT.

25   **Q.**  OKAY.  AND UNDER YOUR THEORY OF INFRINGEMENT, YOUR $400,

1    OR WHATEVER IT WAS, ADOBE SHOULD PAY SOME PORTION OF THAT TO

2    DIGITAL REG FOR THE LIVECYCLE, RIGHT?

3    **A.**  UNDER SOMEONE ELSE'S THEORY.  I HAVE INCLUDED THAT IN MY

4    REVENUE BASE, THAT'S RIGHT.

5    **Q.**  CAN I ASK YOU SOMETHING SINCE YOU DON'T KNOW WHAT THE

6    THEORY IS?

7    **A.**  RIGHT.

8    **Q.**  WHO IS THIS PERSON'S THEORY?  WHO ARE YOU TALKING ABOUT?

9    **A.**  I AM RELYING ON DR. DEVANBU WHO IDENTIFIED WHAT INFRINGES,

10   AND OTHERS IN THIS CASE THAT HAVE TESTIFIED HAVE TO SHOW THAT.

11   AS I SAID BEFORE, IF THEY DO AND WHEN THEY DO I'VE GOT THE

12   ENTIRE ROYALTY BASE.

13   **Q.**  ARE YOU AWARE THAT DR. DEVANBU TESTIFIED THAT HIS

14   INFRINGEMENT ANALYSIS FOR LIVECYCLE REQUIRES THE USE OF THE

15   LIVECYCLE RIGHTS MANAGEMENT PRODUCT?  THAT'S AT TRIAL

16   TRANSCRIPT 528, 14 THROUGH 25.

17   **A.**  NO.

18   **Q.**  LET ME READ IT TO YOU AND SEE IF IT AFFECTS YOUR OPINION.

19   ACTUALLY, THIS STARTS AT LINE 14:

20       THE QUESTION ASKED WAS:

21       "WHAT ABOUT LIVECYCLE RIGHTS MANAGEMENT?"

22       OH, WE HAVE IT ON THE SCREEN SO EVERYBODY CAN FOLLOW

23   ALONG.

24       "QUESTION:  WHAT ABOUT LIVECYCLE RIGHTS MANAGEMENT?

25       "ANSWER:  LIVECYCLE RIGHTS MANAGEMENT IS A TECHNOLOGY TO

PARR – CROSS / REINES

1   CONTROL ACCESS OR APPLY DRM TO A SPECIFIC DOCUMENT THAT MAY BE

2   VALUABLE.

3        "QUESTION:  IS LIVECYCLE RIGHTS MANAGEMENT, DOES IT WORK

4   WITH ACROBAT PRO, FOR EXAMPLE?

5        "ANSWER:  YES, IT DOES.

6        "QUESTION:  HOW DOES IT -- HOW CAN IT WORK WITH ACROBAT

7   PRO?

8        "ANSWER:  WHEN SOMEBODY WERE TO TRY TO OPEN A DOCUMENT

9   THAT IS PROTECTED BY LIVECYCLE MANAGEMENT, THEIR ACCESS TO

10  THAT DOCUMENT WOULD BE CONTROLLED THROUGH CERTAIN TYPES OF

11  POLICIES."

12       DO YOU SEE THAT?

13  **A.**  YES.

14  **Q.**  DOES THAT CHANGE YOUR OPINION IN THIS CASE?

15  **A.**  NO.

16  **Q.**  ARE YOU AWARE OF ANY TESTIMONY BY DR. DEVANBU THAT ACROBAT

17  PRO CAN BE INFRINGING IF IT'S NEVER USED WITH LIVECYCLE DRM OR

18  ANY DRM?  ARE YOU AWARE OF ANY TESTIMONY FROM ANYBODY ON THAT?

19  **A.**  NO.

20  **Q.**  ARE YOU AWARE OF ANY EVIDENCE OF THAT?

21  **A.**  NO.

22  **Q.**  AND IN TERMS OF YOUR $2 BILLION REVENUE BASE BASED ON

23  ACROBAT PRO, DO YOU HAVE ANY IDEA WHAT PORTION OF THOSE USERS

24  MIGHT ENGAGE LIVECYCLE RIGHTS MANAGEMENT?

25  **A.**  NO.

1    **Q.**  BUT YOU DID HEAR MR. HERBACH SAY IT WAS A SUPER TINY

2    AMOUNT?

3    **A.**  YES.

4    **Q.**  YOU HAVE NO REASON TO QUIBBLE WITH HIM, DO YOU?

5    **A.**  NO.

6    **Q.**  LET'S TALK ABOUT LIVECYCLE, BECAUSE WE'VE HEARD A LOT

7    ABOUT ONLINE ACCESS AND OFFLINE ACCESS.  WE ALL KNOW ABOUT

8    THAT FROM OUR DAILY WORK ON COMPUTERS.  BUT THERE WERE SOME

9    TECHNICAL SPECIFICS.

10        SO LET ME ASK YOU TO AVOID THE TECHNICAL SPECIFICS AND ASK

11   YOU:  YOU INCLUDED LIVECYCLE BOTH WHEN IT'S USED ONLINE OR

12   OFFLINE, IT DIDN'T MATTER.  IT'S JUST IF YOU BOUGHT ACROBAT

13   PRO, IN FOR A DIME, IN FOR A DOLLAR, RIGHT?

14   **A.**  I DIDN'T MAKE ANY DISTINCTION WHETHER IT WAS USED ONLINE

15   OR OFFLINE.

16   **Q.**  DO YOU UNDERSTAND THAT DR. DEVANBU HAS CONCEDED THAT

17   OFFLINE ACCESS DOES NOT SEND AND RECEIVE INFORMATION, AS

18   REQUIRED BY THE PATENT?

19   **A.**  NO, I DON'T RECALL HIM SAYING THAT.

20   **Q.**  YOU ALSO INCLUDED REVENUE.

21            **MR. REINES:**  AND LET'S PUT PARR EXHIBIT 2 UP.

22        AND THIS IS A DEMONSTRATIVE, IF WE CAN PUBLISH, PLEASE.

23            **THE CLERK:**  THAT IS ALL I NEEDED TO HEAR.

24            **MR. REINES:**  THANK YOU.

25                      (PUBLISHED TO JURY.)

1    **BY MR. REINES**

2    **Q.** THIS IS YOUR REVENUE CHART, RIGHT, THAT YOU SHOWED THE

3    JURY?

4    **A.** YES.

5    **Q.** YOU SEE THAT MOST OF THE REVENUE IS THIS ACROBAT

6    PROFESSIONAL?

7    **A.** YES.

8    **Q.** AND THEN, AGAIN, JUST TO BE CLEAR, BECAUSE YOU ALSO HAVE

9    LIVECYCLE SEPARATE, EVEN UNDER YOUR ANALYSIS THE ONLY REASON

10   ACROBAT PROFESSIONAL IS INCLUDED, OTHER THAN THE THREE MONTHS

11   OF THAT ALM EXPERIMENT, THE ONLY REASON IT IS INCLUDED IS YOUR

12   THEORY THAT IT CAN SOMETIMES BE USED WITH LIVECYCLE, RIGHT?

13   **A.** IT'S DR. DEVANBU'S THEORY THAT LIVECYCLE MEANS ACROBAT PRO

14   INFRINGES.

15   **Q.** I'M JUST SAYING IN TERMS OF WHY YOU INCLUDED THE 1.79

16   WHATEVER BILLION OF ACROBAT PROFESSIONAL REVENUE IN YOUR BASE,

17   IT WASN'T -- YOU UNDERSTOOD THAT NO ONE WAS SAYING ACROBAT

18   PROFESSIONAL ALONE INFRINGES.  YOU UNDERSTOOD THAT WAS THE

19   POTENTIAL THAT IT WAS USED WITH LIVECYCLE; ISN'T THAT FAIR?

20   **A.** CORRECT.  THAT'S FAIR.

21   **Q.** NOW, WITH RESPECT TO THE OFFLINE ACCESS, ONLINE ACCESS,

22   LIKE I SAY YOU DIDN'T MAKE ANY DISTINCTION BETWEEN THAT,

23   CORRECT?

24   **A.** THAT'S CORRECT.

25   **Q.** LET'S LOOK AT THE -- SOMETHING YOU HAVE UP THERE CALLED

1   "READER EXTENSIONS."  DO YOU SEE THAT?  IT SAYS, "LC READER

2   EXTENSIONS."

3   **A.**  YES, I SEE THAT.

4   **Q.**  HOW MUCH REVENUE DID YOU INCLUDE FOR THAT?

5   **A.**  LOOKS LIKE THERE'S 152.8 MILLION.

6   **Q.**  DO YOU KNOW WHAT "LC READER EXTENSIONS" ARE?

7   **A.**  I CAN'T RECALL RIGHT NOW, NO.

8   **Q.**  DO YOU KNOW ANY WITNESS IN THIS CASE THAT HAS EVER

9   DISCUSSED THAT?

10  **A.**  NO.

11  **Q.**  AND YOU WILL AGREE THAT IF A PRODUCT OR A CONFIGURATION OF

12  A PRODUCT, SUCH AS ACROBAT PRO AND LIVECYCLE, OR WHATEVER, OR

13  LC READER EXTENSIONS, IF A PRODUCT OR CONFIGURATION IS NOT

14  PART OF DR. DEVANBU'S INFRINGEMENT PRESENTATION, IT SHOULDN'T

15  BE INCLUDED IN THE DAMAGE BASE, BECAUSE WHAT MATTERS IS THE

16  EVIDENCE AT TRIAL.

17  **A.**  WELL, IT'S INCLUDED HERE BECAUSE IT WAS MY UNDERSTANDING

18  THAT DR. DEVANBU IDENTIFIED IT AS INFRINGING.

19  **Q.**  SO IF DR. DEVANBU DIDN'T, FOR EACH OF THESE PRODUCTS,

20  PROVE INFRINGEMENT, THEN YOU'RE NOT TRYING TO TELL THE JURY

21  THEY SHOULD BE INCLUDING THAT REVENUE AMOUNT IN, RIGHT?

22  **A.**  NO.  NO.  NO.  NO.  ONLY PRODUCTS THAT ARE SHOWN TO

23  INFRINGE SHOULD BE PART OF THE REVENUE BASE.

24  **Q.**  LET'S TALK ABOUT FLASH ACCESS.  FLASH ACCESS IS ONE OF THE

25  PRODUCTS; IS THAT CORRECT?

1    **A.**  YES.

2    **Q.**  YOU SEE IT THERE, SECOND FROM THE TOP?

3    **A.**  YES.

4    **Q.**  AND YOU UNDERSTOOD FROM DR. DEVANBU, HE TOLD THE JURY THAT

5    FLASH RELIES ON THE USE OF ADOBE'S FLASH ACCESS PRODUCT?  DO

6    YOU GENERALLY UNDERSTAND THAT?

7    **A.**  I DIDN'T TALK TO HIM.  I DIDN'T HEAR WHAT HE SAID ABOUT

8    IT.

9    **Q.**  YOU'RE NOT AWARE OF ANY TESTIMONY THAT FLASH PROFESSIONAL

10   RELIES ON THE USE OF FLASH ACCESS, RIGHT?

11   **A.**  I DON'T RECALL ANYTHING OTHER THAN DR. DEVANBU IDENTIFIED

12   WHICH PRODUCTS HE BELIEVES IT INFRINGED, AND ADOBE PROVIDED

13   THESE REVENUE NUMBERS.  NOW, I DON'T SEE FLASH -- ADOBE FLASH

14   ACCESS PRO LISTED HERE.  SO I DON'T KNOW WHAT YOUR QUESTION

15   IS.

16   **Q.**  OKAY.  THE THEORY OF DRM INFRINGEMENT FOR THE FLASH FAMILY

17   IS FLASH ACCESS.  DO YOU RECALL -- DO YOU KNOW THAT?

18   **A.**  I ONLY KNOW THAT DR. DEVANBU HAS IDENTIFIED FLASH PRODUCTS

19   THAT INFRINGE.  AND THAT IS WHY THEY ARE INCLUDED IN THE

20   ROYALTY BASE.

21   **Q.**  LET ME ASK YOU, FLASH PROFESSIONAL, THE REVENUE YOU

22   STARTED COUNTING FOR FLASH PROFESSIONAL IS THE SECOND ROW FROM

23   THE BOTTOM, STARTS IN 2006, CORRECT?

24   **A.**  THAT'S RIGHT.

25   **Q.**  AND FLASH ACCESS DOESN'T EVEN GET INTRODUCED UNTIL 2010.

PARR – CROSS / REINES

1    DO YOU SEE THAT?

2    **A.**  YES.

3    **Q.**  CAN YOU THINK OF ANY BASIS WHY YOU WOULD INCLUDE REVENUE

4    FOR FLASH PROFESSIONAL WHEN THE FLASH ACCESS DRM INFRINGEMENT

5    THEORY DOESN'T EVEN START UNTIL 2010?

6    **A.**  BECAUSE THE FLASH ACCESS MAYBE DIDN'T BEGIN SELLING UNTIL

7    2010, BUT THE FLASH PROFESSIONAL WITH INFRINGEMENT BEGAN IN

8    2006.

9    **Q.**  AS TO WHETHER FLASH PROFESSIONAL NEEDS FLASH ACCESS TO BE

10   ARGUABLY INFRINGING OR NOT, YOU HAVE NO IDEA?

11   **A.**  NO, I HAVE TO RELY ON TECHNICAL EXPERTS FOR THAT.

12   **Q.**  AND YOU UNDERSTAND, TO GO BACK, THAT DR. DEVANBU RELIES ON

13   FLASH ACCESS.  DID ANYONE TELL YOU THAT?

14   **A.**  NO, I DON'T KNOW WHAT HE'S RELYING ON.  I AM RELYING ON

15   HIM TO TELL ME WHAT INFRINGES.  I DON'T KNOW WHAT HE IS

16   RELYING ON.  THAT IS HIS TECHNICAL EXPERTISE, AND IT IS BEYOND

17   MY EXPERTISE.

18   **Q.**  I WANT TO AVOID, YOU KNOW, "HE SAID/SHE SAID."  IN TERMS

19   OF THE FLASH PROFESSIONAL, DID HE TELL YOU TO INCLUDE REVENUES

20   FOR FLASH PROFESSIONAL BEFORE FLASH ACCESS WAS EVEN AVAILABLE?

21   **A.**  I DIDN'T TALK TO HIM ABOUT THAT.  I ASKED:

22      "WHAT PRODUCTS DO YOU BELIEVE INFRINGE BETWEEN THE

23   PERIODS."

24      AND THIS IS WHAT CAME OUT.  AND ADOBE PRODUCED THESE

25   NUMBERS.

1   **Q.** REGARDING FLASH PROFESSIONAL, HE TOLD YOU THAT IT WAS

2   INFRINGING PRODUCT.  IS THAT WHAT YOU'RE SAYING?

3   **A.** THAT'S RIGHT.  AND ONCE HE SAID THAT, I WAS DONE.  HOW AND

4   WHY, AND IN WHAT ORDER IT INFRINGED DOESN'T MATTER.

5   **Q.** AND WHEN DIDN'T MATTER TO YOU, EITHER, RIGHT?

6   **A.** NO.  HE IS THE ONE WHO HAS TO DETERMINE WHEN SOMETHING

7   STARTED INFRINGING.

8   **Q.** DID HE TELL YOU, GIVE YOU DATES?

9   **A.** NO.  WELL, YES, 2005.  HE SAID BEGAN AT LEAST IN 2005.

10  **Q.** YOU ARE TESTIFYING HERE NOW THAT DR. DEVANBU TOLD YOU THAT

11  FLASH PROFESSIONAL STARTED INFRINGING IN 2005 EVEN BEFORE

12  FLASH ACCESS WAS ON THE MARKET?

13  **A.** WE NEVER HAD THAT DISCUSSION.

14  **Q.** DID HE EVER TELL YOU THAT FLASH PROFESSIONAL WAS

15  INFRINGING STARTING IN 2005?

16  **A.** WELL, IT'S HERE, SO I GOT THAT INFORMATION FROM SOMEWHERE.

17  **Q.** DO YOU REMEMBER IF DR. DEVANBU TOLD YOU THAT OR NOT?

18  **A.** NO, I DON'T REMEMBER.

19  **Q.** LET'S TALK ABOUT YOUR 30 PERCENT ALLOCATION THEORY.

20     WITH RESPECT TO THE $2 BILLION BASE, YOU DON'T TAKE YOUR

21  2.5 PERCENT FROM THE $2 BILLION BASE.  YOU TAKE THE 2.5

22  PERCENT FROM THE 30 PERCENT OF THAT BASE, CORRECT?

23  **A.** YES.

24  **Q.** AND, ORIGINALLY, YOU HAD SAID THAT YOU COULD REDUCE THE

25  BASE BY 30 PERCENT, BUT THEN YOU WOULD JUST INCREASE THE RATE,

PARR – CROSS / REINES

1  I GUESS, ALMOST TRIPLE.  AROUND TRIPLE, CORRECT, TO MAKE IT

2  LIKE AN 8 PERCENT ROYALTY RATE?

3  **A.**  THAT IS WHAT I ORIGINALLY DID.

4  **Q.**  NOW YOU CHANGED THAT TO SAY YOU TAKE THE $2 BILLION, YOU

5  REDUCE IT BY 30 PERCENT, AND THEN YOU APPLY THE 2.5 PERCENT

6  AGAINST THAT, RIGHT?

7  **A.**  YES.

8  **Q.**  AND THIS 30 PERCENT ALLOCATION, THIS ALSO RELIES ON ALL

9  THE ASSUMPTIONS YOU MADE ABOUT ACROBAT PRO ALWAYS BEING

10  INFRINGING, EVEN IF THE LIVECYCLE IS NOT USED, CORRECT?

11  **A.**  YES.

12  **Q.**  WITH RESPECT TO THAT 30 PERCENT, YOU RELIED PRIMARILY ON,

13  IN TERMS OF SPECIFIC COMPANIES, MICROSOFT, VALVE AND APPLE,

14  RIGHT?

15  **A.**  YES.

16  **Q.**  AND WE SAW THOSE COMPANIES WERE INVOLVED IN PRIOR

17  LITIGATION HERE.  AND THE WAY YOU DID YOUR 30 PERCENT

18  ALLOCATION IS YOU LOOKED AT, WITH RESPECT TO APPLE, ITS APP

19  STORE, RIGHT?  AND APPLE CHARGES 30 PERCENT TO PEOPLE THAT

20  WANT TO SELL THEIR APP THROUGH THE APP STORE, RIGHT?

21  **A.**  RIGHT.

22  **Q.**  AND WITH RESPECT TO MICROSOFT THEY HAVE A SIMILAR WINDOWS

23  APP STORE, AND THAT WAS 30 PERCENT, TOO, RIGHT?

24  **A.**  YES.

25  **Q.**  THEN VALVE, WHICH WE SAW EARLIER, SELLS VIDEO GAMES.  AND

1    THEY HAVE A STORE, TOO.  AND FOR THOSE VIDEO GAMES, IF PEOPLE

2    WANT TO SELL VIDEO GAMES OUT OF THEIR STORE THEY CHARGE

3    30 PERCENT, RIGHT?

4    **A.**  YES.

5    **Q.**  WHAT YOU DETERMINED WAS 30 PERCENT IS A SOFTWARE

6    DISTRIBUTION COST, AND THAT THAT THEREFORE SHOULD BE THE BASE

7    FOR ADOBE BECAUSE 30 PERCENT OF ITS PRODUCT IS SOFTWARE

8    DISTRIBUTION COST.  IS THAT CORRECT?

9    **A.**  WELL, YOU CAN ASSOCIATE 30 PERCENT OF THE REVENUE TO

10   DISTRIBUTION WHERE DIGITAL RIGHTS MANAGEMENT WOULD OCCUR,

11   THAT'S RIGHT.

12   **Q.**  NOW, IN TERMS OF THE APPLE APP STORE -- LET'S TAKE THAT

13   ONE AS KIND OF FAMILIAR EXAMPLE.  NOW, WHEN APPLE CHARGES AND

14   TAKES 30 PERCENT FROM APP DEVELOPERS, THEY ARE GIVING THE APP

15   DEVELOPER A LOT MORE THAN DRM, RIGHT?

16   **A.**  YES.

17   **Q.**  FOR THEIR 30 PERCENT THEY ARE GIVING THEM THE APPLE NAME,

18   RIGHT?

19   **A.**  THEY ARE NOT -- WELL --

20   **Q.**  THEY ARE GIVING THEM ACCESS TO THE GOODWILL --

21   **A.**  THEY ARE GIVING THEM ACCESS TO CUSTOMERS THAT ARE

22   ATTRACTED TO THE APPLE NAME.  I DIDN'T WANT TO SAY OR AGREE

23   THE APP MAKER GETS THE APPLE NAME.

24   **Q.**  FAIR ENOUGH.  FAIR ENOUGH.  I APPRECIATE THAT.  SO AND

25   THEY GET WITH THE APPLE APP STORE INNUMERABLE USERS OF THE

1    APPLE APP STORE THAT ARE ROUTINELY GOING TO THAT APP STORE AND

2    MAKING PURCHASES.  IT'S IS A HUGE CUSTOMER BASE, RIGHT?

3    **A.**   SURE.

4    **Q.**   THAT IS PART OF THE WHAT THE APP DEVELOPER IS PAYING THAT

5    30 PERCENT FOR?

6    **A.**   YES.

7    **Q.**   DO YOU KNOW WHETHER THE APP DEVELOPER IS GETTING DRM FROM

8    APPLE FOR THE APP STORE?  YOU HAVE NO IDEA, RIGHT?

9    **A.**   NO, IT'S JUST THAT IS WHERE IT WOULD HAPPEN, IF IT'S

10   HAPPENING.  BUT I DON'T KNOW THAT APPLE IS TRANSFERRING DRM OR

11   USING DRM WHEN THEY TRANSFER.  I DON'T KNOW.

12   **Q.**   SO THE 30 PERCENT NUMBER THAT YOU'RE TAKING FROM THE APPLE

13   APP STORE, YOU DON'T KNOW IF THAT HAS ANYTHING TO DO WITH DRM?

14   **A.**   I DON'T KNOW IF APPLE'S PROVIDING DRM WHEN THEY DOWNLOAD

15   THE APPS.

16   **Q.**   THE SAME WITH MICROSOFT, CORRECT?

17   **A.**   THAT'S CORRECT.

18   **Q.**   WITH RESPECT TO VALVE, ACCORDING TO YOU DIGITAL REG SUED

19   THEM AND DETERMINED THAT THERE WAS EXTREMELY LITTLE

20   INFRINGEMENT, AND SORT OF ABANDONED THAT, CORRECT?

21   **A.**   THAT'S WHAT I UNDERSTAND, YES.

22   **Q.**   NOW, THE SALES OF A 99-CENT APP THROUGH THE APPLE APP

23   STORE, THAT IS PRETTY DIFFERENT THAN THE DISTRIBUTION OF

24   ENTERPRISE-WIDE ACROBAT PROFESSIONAL SALES THAT MIGHT INVOLVE

25   TENS OR HUNDREDS OF THOUSANDS OF DOLLARS OF REVENUE, CORRECT?

1    IT IS A PRETTY DIFFERENT SALES TRANSACTION?

2    **A.**  WELL, THE VALUE OF AN INDIVIDUAL TRANSACTION CAN BE

3    GREATLY DIFFERENT.  THE TOTAL AMOUNT COULD BE COMPARABLE.

4    **Q.**  I WASN'T SO MUCH FOCUSING ON THE QUANTITY.  OBVIOUSLY, THE

5    QUANTITY IS DIFFERENT FROM 99 CENTS AND A LOT OF MONEY.  BUT

6    THE NATURE OF THE TRANSACTION OF AN APP STORE ON –– FROM APPLE

7    WHERE SOMEONE GOES AND BUYS THE LATEST AND GREATEST APP, THAT

8    IS A PRETTY DIFFERENT TRANSACTION FROM AN ENTERPRISE GETTING A

9    HUNDRED OR A THOUSAND SEAT LICENSES FOR ACROBAT PROFESSIONAL

10   OR PHOTOSHOP FROM ADOBE.  RIGHT?

11   **A.**  WELL, THE DIFFERENCE WOULD BE PRICE, AND THE DIFFERENCE

12   MIGHT BE THE NUMBER OF UNITS.  I MEAN, WHEN I DOWNLOAD

13   SOMETHING, I AM JUST BUYING ONE UNIT.  AN APP AND BUYING ONE

14   UNIT, THEY ARE JUST DIFFERENCE IN PRICE.

15   **Q.**  WILL YOU ADMIT THAT THE TECHNOLOGY THAT APPLE, VALVE AND

16   MICROSOFT IS DIFFERENT THAN THE TECHNOLOGY THAT ADOBE USES FOR

17   THE PROCESS OF DISTRIBUTING, ON ONE HAND, APPS OR GAMES, ON

18   THE OTHER HAND THIS COMPLEX SOFTWARE?

19   **A.**  THAT'S A TECHNICAL QUESTION.  I JUST KNOW THE TECHNOLOGY

20   THEY ARE USING IS DOWNLOADING.

21   **Q.**  YOU DON'T KNOW ANYTHING ––

22   **A.**  I DON'T KNOW THAT IT TAKES –– I DON'T KNOW WHAT MORE IT

23   TAKES IF YOU ARE DOWNLOADING AN APP OR A HUGE GAME OTHER THAN

24   IT PROBABLY TAKES A LOT MORE TIME.  YOU KNOW, A $50 OR $60

25   GAME IS GOING TO TAKE YOU LONGER TO DOWNLOAD THAN AN APP

1    BECAUSE IT MAY HAVE LESS CODE INVOLVED, BUT PROCESS COULD BE

2    THE SAME.

3    **Q.**  ALL RIGHT.  BUT IN TERMS OF WHETHER THE TECHNOLOGY AND THE

4    EFFORT THAT GOES INTO DISTRIBUTING ADOBE SOFTWARE, AS WE HAVE

5    HEARD ABOUT IN THIS CASE FROM THE VARIOUS EXPERTS, VERSUS THE

6    APP STORE, YOU DON'T KNOW BECAUSE YOU ARE NOT A TECHNOLOGIST

7    AND YOU HAVEN'T ASKED ANYBODY; IS THAT RIGHT?

8    **A.**  THAT WOULD BE FAIR.

9    **Q.**  OKAY.  I HAVE TWO MORE TOPICS, AND THEN WE'LL BE DONE FOR

10   NOW.

11       IN YOUR HYPOTHETICAL LICENSE WHERE ADOBE IS PAYING OVER

12   $15 MILLION TO DIGITAL REG, I WANT TO UNDERSTAND WHAT THEY

13   WOULD GET FOR THAT.  WOULD THEY BE GETTING, AT LEAST UNDER

14   YOUR ANALYSIS, RIGHTS UNTIL THE PATENTS EXPIRE IN THE FUTURE

15   LIKE MACROVISION DID, LIKE INTUIT DID AND LIKE ALL THOSE OTHER

16   LICENSES DID?

17   **A.**  NO.

18   **Q.**  SO UNDER YOUR ROYALTY ANALYSIS, ADOBE WOULD BE EXPOSING

19   ITSELF AFTER PAYING $15 MILLION, TO BE SUED TOMORROW FOR 2014

20   REVENUES, 2015 REVENUES, AND SO ON AND SO FORTH, CORRECT?

21   **A.**  RIGHT.  IF THEY CONTINUE INFRINGING THEY WOULD, I GUESS,

22   BE SUED AGAIN.  I'M JUST COMING UP A NUMBER TO CURE THE PAST.

23   **Q.**  AND IN TERMS OF THE -- AND HAVE YOU ASKED DIGITAL REG

24   WHETHER THEY PLAN ON SUING AGAIN ADOBE?

25   **A.**  I HAVE NOT ASKED THAT, NO.

PARR – CROSS / REINES

1    **Q.**  IN TERMS OF PRODUCTS, WHAT PRODUCTS WOULD, UNDER YOUR

2    ANALYSIS -- I'M NOT SAYING THIS IS RIGHT -- BUT UNDER YOUR

3    ANALYSIS WHAT PRODUCTS WOULD BE COVERED BY THIS $15 MILLION?

4        WOULD IT JUST BE THE VERY SPECIFIC PRODUCTS THAT

5    DR. DEVANBU ESTABLISHED INFRINGEMENT FOR?  OR WOULD IT BE ALL

6    OF THE PRODUCTS, LIKE ALL THE OTHER LICENSEES?

7    **A.**  NO, JUST THE PRODUCTS WE'VE IDENTIFIED AND ONLY FOR THE

8    PAST.  SO NO ADDITIONAL PRODUCTS OTHER THAN THE ONES THAT HAVE

9    BEEN ACCUSED.

10   **Q.**  SO ACCORDING TO YOUR ANALYSIS, DIGITAL REG COULD SUE

11   TOMORROW ON OTHER PRODUCTS, OTHER DRM PRODUCTS OF ADOBE, AND

12   THEY WOULD BE FREE TO DO THAT, ACCORDING TO YOU, EVEN

13   BACKWARDS?

14   **A.**  WELL, IF YOU ARE SUGGESTING THAT THERE ARE OTHER PRODUCTS

15   THAT COULD BE SHOWN TO INFRINGE THAT HAVEN'T BEEN INCLUDED

16   TODAY, I GUESS THAT'S RIGHT.  BUT I DON'T KNOW WHY THEY

17   HAVEN'T BEEN INCLUDED TODAY.

18   **Q.**  DOES IT MAKE ANY SENSE TO YOU THAT THEY WOULDN'T BE

19   INCLUDED?

20   **A.**  I WOULD HAVE THOUGHT YOU WOULD INCLUDE EVERYTHING YOU

21   COULD.  BUT I DON'T KNOW WHAT LEGAL STRATEGY OR BUSINESS

22   STRATEGY WOULD HAVE ANY EXCLUDED NOW FOR INCLUSION LATER.

23   **Q.**  OKAY.

24       **MR. REINES:**  AND, YOUR HONOR, WITH THAT, I WOULD MOVE

25   IN THE CHART AS THE NEXT EXHIBIT IN ORDER AS A SUMMARY THAT

PARR – CROSS / REINES

1   GIVES US A RELIABLE STATEMENT OF THE TERMS AND AVOID SOME OF

2   THE PROBLEMS THAT WE HAVE SEEN IN THE PAST WITH OTHER CHARTS.

3          THE COURT:  STRIKING ALL THE COMMENTARY, DO YOU HAVE

4   ANY OBJECTION TO IT BEING RECEIVED?

5          MR. PRICE:  IT DOES EXCLUDE THE -- ONE OF THE

6   LICENSES, YOUR HONOR.

7          THE COURT:  WHICH ONE?

8          MR. PRICE:  RPX, THE LARGEST LICENSE.

9          MR. REINES:  THAT IS NOT RELIED UPON BY THE WITNESS

10   OR OUR WITNESS.

11          THE COURT:  IT WILL BE RECEIVED.

12      (DEFENDANT'S EXHIBIT 695 WAS RECEIVED IN EVIDENCE.)

13   BY MR. REINES:

14   Q.  ALL RIGHT.  THE LAST TOPIC IS NONINFRINGING ALTERNATIVES.

15   NOW, YOU UNDERSTAND WE'RE KIND OF IN A LITTLE BIT OF A CIRCLE

16   HERE, BUT THE -- YOU UNDERSTAND GENERALLY THAT THE ROYALTY

17   THEORY FOR ADOBE IS BASED ON THE EASE OF JUST DESIGNING AROUND

18   THE CURRENT PATENT CLAIMS AND JUST DOING DRM A LITTLE BIT

19   DIFFERENTLY, RIGHT?

20   A.  NO.  THE ROYALTY THEORY THAT I'VE USED RELIES ON MY

21   UNDERSTANDING THAT THERE IS NO EASE FOR DESIGNING AROUND.

22          MR. REINES:  ACTUALLY, LET ME TAKE CARE OF ONE

23   HOUSEKEEPING MATTER.  THE SUMMARY, THE NEXT EXHIBIT IN ORDER

24   IS 694 (SIC), FOR THE RECORD.  HOPEFULLY, THAT EASES REFERENCE

25   FOR THE READERS OF THIS TRANSCRIPT AND EVERYBODY HERE.

1    **BY MR. REINES:**

2    **Q.**  I THINK WE MISCOMMUNICATED.  MAYBE I WAS AT FAULT FOR

3    THIS.

4    **A.**  OKAY.

5    **Q.**  YOU UNDERSTAND THAT ADOBE'S ROYALTY ANALYSIS IS BASED ON

6    THE PRESENCE OF NONINFRINGING ALTERNATIVES.  DO YOU NOT

7    UNDERSTAND THAT, GENERALLY?

8    **A.**  I DON'T WANT TO QUIBBLE.  I WOULD SAY THEIR DAMAGES THEORY

9    IS BASED ON DESIGN AROUND.

10   **Q.**  THAT'S FINE.

11   **A.**  NOT THE ROYALTY.

12   **Q.**  THAT'S FINE.

13   **A.**  OKAY.

14   **Q.**  ALL RIGHT.  AND IN TERMS OF WHAT DRM TECHNOLOGIES WERE

15   AVAILABLE AS ALTERNATIVES AT THE TIME, YOU DIDN'T ANALYZE THAT

16   YOURSELF, RIGHT?

17   **A.**  I TALKED TO -- GENERAL, YES, ABOUT DR. DEVANBU.  ANALYZING

18   IS DIFFERENT.  I TALKED ABOUT UNDERSTANDING WHAT MIGHT HAVE

19   BEEN AVAILABLE.

20   **Q.**  YOU DIDN'T PERFORM ANY ANALYSIS YOURSELF WHERE YOU LOOKED

21   AT MARKET ARTICLES, OR ANYTHING LIKE THAT, IN TERMS OF

22   AVAILABILITIES.  YOU JUST RELIED ON DR. DEVANBU, CORRECT?

23   **A.**  I TALKED TO HIM ABOUT ALTERNATIVES.

24   **Q.**  AND -- BUT YOU DIDN'T CONDUCT AN INDEPENDENT ANALYSIS OF

25   THAT, RIGHT?

1    **A.**  NO.

2    **Q.**  OKAY.  AND DID YOU HEAR DR. DEVANBU TESTIFY?  DO YOU KNOW

3    HE HAS TESTIFIED THAT HE HASN'T FORMED AN OPINION ON THE

4    CHOICES AVAILABLE TO ADOBE?

5    **A.**  NO.

6    **Q.**  WHY DON'T WE READ FOR YOU THE TRIAL TESTIMONY AT 649, 16

7    THROUGH 20 AND SEE IF THAT CHANGES YOUR OPINION.

8                         (DISPLAYED ON SCREEN.)

9        AND YOU SEE THE QUESTION THERE AT LINE 16?

10              "AND YOU'RE NOT OFFERING ANY OPINION THAT THE ONLY

11              WAY ADOBE CAN DO DRM IS THROUGH THE SPECIFIC WAYS

12              THAT ARE DONE IN THE ACCUSED PRODUCTS NOW, RIGHT?"

13       AND YOU SEE HIS ANSWER TO THE JURY LAST WEEK WAS:

14              "SO, I HAVEN'T FORMED AN OPINION ON THE CHOICES

15              AVAILABLE TO ADOBE"?

16   **A.**  I SEE THAT.

17   **Q.**  NOW, DID YOU HEAR DR. WICKER TALK ABOUT ALL THE DIFFERENT

18   ALTERNATIVES THAT ADOBE HAD THAT HE VIEWED AS EQUIVALENT,

19   FULLY EQUIVALENT?

20   **A.**  NO.

21   **Q.**  DO YOU DOUBT THAT HE TESTIFIED TO THAT?

22   **A.**  I DON'T KNOW.  I DON'T KNOW WHAT HE TESTIFIED TO.

23   **Q.**  HAVE YOU CONSIDERED THE ALTERNATIVES THAT DR. WICKER

24   TALKED ABOUT IN THIS COURTROOM LAST WEEK AS WAYS THAT ARE --

25   THAT ADOBE COULD HAVE DONE IT THAT WOULD BE EQUIVALENT?

1  **A.**  NO, I RELIED ON DR. DEVANBU THAT TOLD ME THERE WERE NO

2  EASY DESIGN AROUNDS.

3  **Q.**  NOW, YOU AGREE THAT IF DR. WICKER EXPLAINED THAT THERE WAS

4  FULLY EQUIVALENT NONINFRINGING ALTERNATIVES, AND DR. DEVANBU

5  TESTIFIED THAT HE HADN'T FORMED ANY OPINION ON THE TOPIC, THAT

6  THESE NONINFRINGING ALTERNATIVES WOULD BE IMPORTANT TO THE

7  DAMAGES ANALYSIS, CORRECT?

8  **A.**  YES, THEY ALWAYS ARE.

9  **Q.**  AND YOU WOULD AGREE THAT THE DAMAGES ANALYSIS IN THAT CASE

10  WOULD BE BASED ON THE DESIGN AROUNDS AVAILABLE TO ADOBE, AND I

11  THINK THE TIME AND THE EXPENSE THAT WOULD BE INVOLVED IN THEM,

12  CORRECT?

13  **A.**  IT WOULD ALSO HAVE TO BE SEAMLESS AND EQUIVALENT.

14  **Q.**  EQUIVALENT, RIGHT.

15     OKAY.  AND WHETHER THERE IS ACTUALLY SEAMLESS AND

16  EQUIVALENT NONINFRINGING ALTERNATIVES, THAT IS NOT SOMETHING

17  YOU KNOW ABOUT, RIGHT?

18  **A.**  NO.  THAT WOULD BE EVERYTHING FROM TECHNICAL PEOPLE TO

19  MAYBE EVEN THE MARKETING PEOPLE TO SHOW THAT CUSTOMERS ARE

20  SATISFIED WITH IT.

21         **MR. REINES:**  OKAY.  NO FURTHER QUESTIONS.

22         **THE CLERK:**  YOUR HONOR, JUST TO CLARIFY THE RECORD,

23  NEXT IN LINE WAS 695, NOT 694.  694 WAS PREVIOUSLY MARKED ON

24  AUGUST 27TH.

25         **MR. REINES:**  APOLOGIES.

1    **THE COURT:**  OKAY.  WELL, YOU SHOULD DOUBLE-CHECK YOUR

2    RECORDS AT SOME POINT AND MAKE SURE WE ALL HAVE THE SAME

3    NUMBERS FOR EVERYTHING.

4        OKAY.  WE WILL TAKE OUR BREAK.  IT IS 10:00 O'CLOCK.  WE

5    WILL BREAK UNTIL 10:15.

6        (RECESS TAKEN AT 10:00 AND RESUMED AT 10:15 P.M. A.M.)

7            (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

8        **THE COURT:**  PLEASE BE SEATED.

9        **THE CLERK:**  WE ARE MISSING ONE.

10       **THE COURT:**  YOU MAY PROCEED.

11                    <u>**REDIRECT EXAMINATION**</u>

12   **BY MR. PRICE:**

13   **Q.**  GOOD MORNING, MR. PARR.

14   **A.**  GOOD MORNING.

15   **Q.**  WE HEARD A LOT OF TECHNICAL QUESTIONS FROM ADOBE'S LAWYER.

16   ARE YOU HERE AS A TECHNICAL EXPERT OR DAMAGES EXPERT?

17   **A.**  DAMAGES.

18   **Q.**  TO WHOM DO YOU RELY ON TO ANSWER THESE TECHNICAL

19   QUESTIONS?

20   **A.**  DR. DEVANBU AND OTHERS.

21   **Q.**  IS THAT WHO YOU RELIED ON TO ANSWER THESE TECHNICAL

22   QUESTIONS?

23   **A.**  YES.

24   **Q.**  IS THAT A NORMAL THING FOR A DAMAGES EXPERT TO DO?

25   **A.**  ALWAYS.

1  **Q.**  NOW, WE HEARD A LITTLE TESTIMONY ABOUT THE NUMBER OF

2  PATENTS, AND WE SAW EXHIBIT 695.

3      **MR. PRICE:**  COULD YOU PUT THAT UP?

4          (PUBLISHED TO JURY.)

5  **BY MR. PRICE**

6  **Q.**  REFERRED TO THE NUMBER OF PATENTS THAT WERE INVOLVED IN

7  THE LICENSE.

8      CAN YOU EXPLAIN TO THE JURY WHY ONE VERSUS MANY PATENTS,

9  HOW THAT WOULD AFFECT YOUR ANALYSIS?

10  **A.**  OKAY.  WHEN ANYBODY WANTS TO LICENSE PATENTS, THEY WANT

11  FREEDOM TO OPERATE.  THEY WANT TO BE ABLE TO GO ABOUT THEIR

12  BUSINESS AND NOT BE SUED.  SO IT IS REALLY FREEDOM FROM

13  LITIGATION.

14      AND WHAT THEY WANT IN THE BARGAIN IS ALL THE PATENTS THAT

15  YOU HAVE WHICH WILL GIVE ME FREEDOM TO OPERATE.  NOW,

16  SOMETIMES THAT CAN BE ACCOMPLISHED WITH JUST LICENSING OF ONE

17  PATENT.  OTHER TIMES THERE IS A WHOLE BUNCH THAT ARE REQUIRED

18  TO GET FREEDOM TO OPERATE.

19      AND THE REASON I WANT THEM ALL, WE'LL SETTLE ON A PRICE,

20  WHATEVER PRICE WE DETERMINE, WHAT ROYALTY RATE, AND I WILL PAY

21  YOU THAT FOR THE FREEDOM TO OPERATE.  BECAUSE I DON'T WANT YOU

22  COMING BACK NEXT WEEK WITH A NEW PATENT:

23      "LOOK.  HERE IS ANOTHER ONE YOU HAVE TO LICENSE

24  SEPARATELY."

25      SO IF IT IS ONE THAT GIVES ME FREEDOM TO OPERATE, OR 20,

1    OR A HUNDRED, IT IS THE SAME PRICE.  ONCE WE NEGOTIATE, THE

2    BENEFITS I RECEIVE AND THE PROFITS I WILL MAKE, AND WE COME UP

3    WITH A ROYALTY RATE, AS LONG AS I GET FREEDOM TO OPERATE I

4    DON'T CARE HOW MANY PATENTS ARE INVOLVED.

5           **MR. PRICE:**  IF WE CAN PUT POWER POINT SLIDE ONE UP,

6    PLEASE?

7           **THE CLERK:**  DEMONSTRATIVE?

8           **MR. PRICE:**  YES.

9           **THE CLERK:**  THANK YOU.

10          **MR. PRICE:**  THANK YOU.

11                (PUBLISHED TO JURY.)

12   **BY MR. PRICE:**

13   **Q.**  I WANT TO QUICKLY GO THROUGH THESE.  WITH RESPECT TO THE

14   FIRST ONE, DIGITAL REG MACROVISION, THE 1 PERCENT?

15   **A.**  YES.

16   **Q.**  ADOBE'S LAWYERS ASKED YOU SOME QUESTIONS ABOUT FUTURE

17   SALES.  BUT YOU STILL MAINTAINING THE 1 PERCENT DESPITE FUTURE

18   SALES STILL ACCRUING?

19   **A.**  YES.

20   **Q.**  CAN YOU RESPOND TO THAT AND WHY YOU STILL COUNTED IT AS A

21   1 PERCENT?

22   **A.**  WELL, THIS 1 PERCENT HAS A VERY DIFFERENT CHARACTER THAN

23   THE ROYALTY RATE WE ARE LOOKING FOR HERE.  THIS 1 PERCENT WAS

24   NEGOTIATED WITHOUT ANY CERTAINTY ABOUT INFRINGEMENT OR

25   VALIDITY.  PARTIES DID NOT KNOW.

1      HERE I'M SUPPOSED TO COME UP WITH A ROYALTY RATE THAT

2  WOULD APPLY AFTER THE JURY DECIDES IF THERE IS VALIDITY AND IF

3  THERE IS INFRINGEMENT.

4      NOW, THE PARTIES THAT NEGOTIATE SETTLEMENT AGREEMENTS

5  DON'T KNOW THAT.  AND THEY ARE TRYING TO FIGURE OUT WHETHER

6  THEY WANT TO GO TO TRIAL AND SPEND THE MASSIVE AMOUNTS OF

7  MONEY WE WERE TALKING ABOUT.  SO THEY HAVE TO CONSIDER, AT

8  LEAST FROM THE LICENSOR'S POINT OF VIEW, THE PLAINTIFF:  IF I

9  GO TO COURT AND THE JURY FINDS INVALIDITY, I GET NOTHING.

10      OR IF THEY FIND VALIDITY, BUT THEN THEY FIND THAT THERE

11  WAS NO PATENT INFRINGEMENT, I GET NOTHING.  AND EVEN IF THEY

12  DECIDE "YES" FOR VALIDITY AND "YES" FOR INFRINGEMENT, THEN

13  THEY LOOK AT THE DAMAGES CASE.  THEY MIGHT NOT GIVE THE FULL

14  AMOUNT OF THE DAMAGES CASE.

15      SO AM I WILLING TO SHAVE BACK AND TAKE A LOWER ROYALTY

16  RATE SO I GET SOMETHING?

17      SO SETTLEMENT ROYALTY RATES ARE NOTORIOUSLY LOWER THAN

18  WHAT YOU GET FOR THOSE OTHER TWO ITEMS ARE FOR CERTAIN.  SO I

19  DON'T MIND IF THIS GETS DILUTED A LOT EVEN.  SUPPOSE WHATEVER

20  THEY DID UP TO THIS POINT, THEY'LL IN THE FUTURE DO IT AGAIN,

21  WHICH WOULD MAKE AN EFFECTIVE ROYALTY RATE OF HALF.

22      BUT I'M STILL COMFORTABLE WITH ONE, BECAUSE THERE IS SO

23  MUCH BAKED INTO THIS.  BUT TO LOWER IT, BECAUSE IT IS NOT THE

24  SAME CHARACTERISTICS AS WHAT I AM AFTER HERE.

25  Q.  LET'S TURN TO THE INTUIT AGREEMENT.  THERE WERE SOME

1    QUESTIONS ABOUT MR. FARLEY AND HIS RECOLLECTION WHEN HE

2    TESTIFIED.  HOW DO YOU KNOW MR. FARLEY TOLD YOU THAT NUMBER?

3    **A.**  WELL, IN MY REPORT WHEN I DESCRIBE THIS LICENSE DEAL, I

4    HAVE A FOOTNOTE.  AND THE FOOTNOTE HAS TWO ELEMENTS.  ONE OF

5    THEM IS REFERENCING TO THE DOCUMENT.  AND THE OTHER ELEMENT

6    REFERENCES TO THE TELEPHONE CALL I HAD WITH MIKE FARLEY.

7        AND THE ONLY THING THAT IS IN THAT PARAGRAPH ARE THINGS

8    THAT I GOT FROM THE LICENSE ARE THE ROYALTY -- I MEAN, THE

9    DAMAGES AMOUNT.  AND THE OTHER IMPORTANT THING IN THAT

10   PARAGRAPH IS THE $14 MILLION.

11       NOW, SINCE IT IS NOT FROM THE LICENSE AGREEMENT, THERE IS

12   ONLY ONE OTHER PLACE IT COULD HAVE COME FROM, AND THAT WOULD

13   HAVE BEEN MY DISCUSSION WITH MIKE FARLEY.

14   **Q.**  OKAY.  LET'S LOOK AT THE LAST ONE.  IF WE CAN -- WELL,

15   FIRST OFF.  THERE WAS SOME CRITICISM ABOUT THE DATE BEING PUT

16   IN THERE.  DO YOU SEE THAT NOVEMBER 4TH, 2013 --

17   **A.**  YES.

18   **Q.**  -- DATE IN THE PRESENTATION?

19   **A.**  YES.

20       **MR. PRICE:**  COULD WE PULL UP EXHIBIT 95, AND FOCUS IN

21   ON THE UPPER LEFT-HAND CORNER?

22   **BY MR. PRICE**

23   **Q.**  COULD YOU READ THE DATE THERE FOR ME, SIR?

24   **A.**  NOVEMBER 4TH, 2013.

25   **Q.**  OKAY.  IS THAT WHERE YOU THINK THE DATE CAME FROM?

1    **A.**  YES.  YES.  YES.  I JUST DIDN'T RECALL AT THE TIME.

2    **Q.**  SURE.  AND THEN, THERE WAS SOME QUESTION ABOUT HOW

3    APPLICABLE THIS AGREEMENT WAS.  BUT IF WE COULD -- AND SOME

4    SUGGESTION, I THOUGHT, THAT THEY DIDN'T RELATE TO THESE

5    PRODUCTS.  DO YOU RECALL THAT DISCUSSION?

6    **A.**  COULD YOU SAY THAT AGAIN?

7    **Q.**  THERE SEEMED TO BE SOME SUGGESTION ON CROSS-EXAMINATION

8    THAT THIS DIDN'T RELATE TO THE PRODUCTS AT HAND.  DO YOU

9    RECALL THAT?

10           **MR. REINES:**  OBJECTION, YOUR HONOR.  THAT'S

11   COUNTERFACTUAL.

12           **THE COURT:**  JUST ASK A QUESTION.

13           **MR. PRICE:**  I WILL.

14       LET'S GO DOWN TO THE BOTTOM.  IF WE CAN FOCUS IN ON THE

15   BOTTOM BULLET POINTS.

16   **BY MR. PRICE:**

17   **Q.**  NOW, LOOKING AT THOSE BOTTOM BULLET POINTS, DO YOU FEEL

18   LIKE THIS IS A RELEVANT DATA POINT FOR THESE PRODUCTS?

19   **A.**  ABSOLUTELY.  FIRST OF ALL, THIS SPECIFICALLY TALKS ABOUT

20   THE RIGHTS ASSOCIATED WITH DRM.  AND THEN, THE SECOND BULLET

21   SAYS -- AND THIS IS WHAT THE QUESTION IS:

22       "IF I DON'T WANT TO PAY THE FEE, WHAT ARE MY OPTIONS?"

23       WELL, ADOBE IS SUGGESTING THAT YOU MIGHT WANT TO USE THEIR

24   LIVECYCLE RIGHTS MANAGEMENT SOFTWARE INSTEAD.

25       SO, I SEE A DIRECT RELATIONSHIP HERE.  FIVE-AND-A-HALF

1    PERCENT, OR YOU CAN BY OUR LIVECYCLE PRODUCT.

2        THEY ARE SUGGESTING IT THEMSELVES AS BEING A DIRECT

3    RELATIONSHIP, ALMOST MAYBE EQUIVALENCY.

4    **Q.**  OKAY.  LET'S TURN TO EXHIBIT 695.  DO YOU RECALL THIS AS

5    BEING A LIST OF COMPANIES THAT TOOK A LICENSE TO THE '541

6    PATENT?

7    **A.**  YES.

8    **Q.**  OR OTHER PATENTS OF DIGITAL REG?

9    **A.**  YES.

10   **Q.**  DO YOU SEE ANY LICENSEES MISSING FROM THIS LIST?

11   **A.**  YEAH.

12          **THE COURT:**  WELL, WHY DON'T YOU LEAD AT THIS POINT.

13          **MR. PRICE:**  OKAY.

14   **BY MR. PRICE:**

15   **Q.**  IS RPX ON THE LIST, SIR?

16   **A.**  YES.  NO.  NO.  NO.  IT IS MISSING FROM THE LIST.

17   **Q.**  AND WITHOUT REVEALING THE AMOUNT, WHERE DOES RPX RANK

18   AMONG ALL THE COMPANIES?

19   **A.**  IT IS LARGER THAN ANY OF THEM.

20   **Q.**  NOW, THERE WAS SOME DISCUSSION ABOUT THE ENTIRE ROYALTY

21   BASE?

22   **A.**  YES.

23   **Q.**  BUT, YOU DID WHAT WAS CALLED AN "APPORTIONMENT," RIGHT?

24   **A.**  YES.

25   **Q.**  TELL THE JURY AGAIN HOW THAT APPORTIONMENT WORKED.

1    **A.**  WELL, THE TOTAL -- THE TOTAL AMOUNT OF ACCUSED REVENUE WAS

2    OVER $2 BILLION.  AND I TOOK 30 PERCENT TO REPRESENT THE

3    PORTION OF THE PRICE THAT CAN BE ASSOCIATED WITH DIGITAL

4    DOWNLOAD WHERE RIGHTS MANAGEMENT TAKES PLACE.

5        SO, I APPLIED THE ROYALTY RATE TO THAT PORTION OF THE

6    REVENUE.

7    **Q.**  SO YOU DID A SIGNIFICANT CUTDOWN ON THE ROYALTY BASE BY

8    DOING THIS APPORTIONMENT, CORRECT?

9            **MR. REINES:**  OBJECTION, LEADING.

10           **THE COURT:**  OVERRULED.

11           **THE WITNESS:**  YES, 30 PERCENT IS A SIGNIFICANT

12   REDUCTION TO THE TOTAL VALUE OF THE ACCUSED REVENUE.

13   **BY MR. PRICE**

14   **Q.**  IF YOU CAN DO THE MATH QUICKLY IN YOUR HEAD, SIR, WHAT IS

15   THE DOLLAR AMOUNT THAT WAS REDUCED BY DOING THAT REDUCTION?

16   **A.**  WELL, THE 30 PERCENT REPRESENTS ABOUT 600 MILLION.  SO,

17   1.4 MILLION -- BILLION, I MEAN, IS OUT OF THE EQUATION.

18   **Q.**  OKAY.  TO YOUR KNOWLEDGE -- LET'S TALK ABOUT THE CUSTOMER

19   USE TESTIMONY.

20       TO YOUR KNOWLEDGE, DID ADOBE PROVIDE ANY DATA QUANTIFIABLE

21   DATA ABOUT ITS CUSTOMER USE OF THE ACCUSED PRODUCTS?

22   **A.**  ANY OF THEM?  NO.

23   **Q.**  SO, THAT'S WHAT WE DON'T KNOW.  LET'S TALK ABOUT WHAT WE

24   DO KNOW, OKAY?

25                    (DOCUMENT HANDED TO WITNESS.)

1       YOU'VE JUST BEEN HANDED EXHIBITS 178 AND 179.

2       NOW, YOU WILL RECALL THERE WAS SOME QUESTIONS ABOUT

3   MR. HERBACH'S TESTIMONY?

4   **A.**  YES.

5   **Q.**  AND MR. HERBACH WENT THROUGH THESE DOCUMENTS.  DO YOU

6   RECALL THAT FROM HIS TESTIMONY?

7   **A.**  I MIGHT ONLY RECALL ONE OF THEM.

8   **Q.**  OKAY.  IF YOU WILL LOOK AT 178.

9   **A.**  YEP.

10  **Q.**  AND TURN TO THE SECOND PAGE.

11  **A.**  YES.

12  **Q.**  AND LOOK AT THE TOP.  DO YOU SEE "ADOBE ACROBAT PRO"

13  EXTENDED UP THERE AS THE SCREEN SHOT?

14  **A.**  YES.

15                          (PUBLISHED TO JURY.)

16  **Q.**  AND BELOW THAT DO YOU SEE THE WORD "SECURE" WITH LIKE A

17  LOCK AND A KEYHOLE IN IT?

18  **A.**  YES.

19  **Q.**  OKAY.  AND NOW, IT LOOKS AS IF THE DROPDOWN HAS BEEN

20  ENGAGED.  AND WITHIN THAT DROPDOWN DO YOU SEE "ADOBE LIVECYCLE

21  RIGHTS MANAGEMENT"?

22  **A.**  YES.

23  **Q.**  OKAY.  SO LET'S MOVE TO 179.

24      **MR. REINES:**  YOUR HONOR, I WOULD OBJECT.  HE SAID HE

25  WASN'T TECHNICAL.  WE HAVE BEEN THROUGH THIS ROUND BEFORE.

PARR – REDIRECT / PRICE

```
1   I'M NOT SURE WHERE IT IS GOING.  IT IS BEYOND THE SCOPE OF

2   EVERYTHING.

3            MR. PRICE:  WE GOT --

4            THE COURT:  BEYOND THE SCOPE MIGHT BE WELL-TAKEN.

5   WHAT ARE YOU RESPONDING TO?

6            MR. PRICE:  THERE WAS DISCUSSION ABOUT WHAT

7   MR. HERBACH TESTIFIED ABOUT WITH RESPECT TO CUSTOMER USE.

8   THERE WAS PROBABLY TEN TO 15 MINUTES OF QUESTIONS ABOUT IT.

9   THIS RELATES -- THIS COMPLETES WHAT MR. HERBACH TESTIFIED

10  ABOUT.

11           MR. REINES:  BUT THE WITNESS SAID HE HAD NO IDEA WHAT

12  USAGE THERE WAS AND THAT IT WASN'T AN AREA --

13           THE COURT:  WELL, I DON'T REMEMBER IT, AND I'M NOT

14  CLEAR WHERE YOU ARE GOING.  BUT YOU CAN ASK A FEW MORE

15  QUESTIONS AND WE WILL SEE.

16           MR. PRICE:  I ONLY HAVE A FEW MORE.

17  BY MR. PRICE

18  Q.  TURNING TO 179, LOOKING AT THE TOP, DO YOU SEE IT SAYS:

19  "ACROBAT X PRO, WHAT'S NEW?"  IT'S ON THE FIRST PAGE.

20  A.  YES, "WHAT'S NEW."

21  Q.  NOW, LOOK DOWN AT THE PARAGRAPH UNDER "STREAMLINE USER

22  INTERFACE."

23  A.  OKAY.

24  Q.  DO YOU SEE THAT IT REFERENCES:

25      "THE MOST COMMONLY-USED TOOLS BASED ON THE TASK AT HAND"?
```

PARR - REDIRECT / PRICE

```
1    A.  YES.

2    Q.  NOW, TURN TO THE NEXT PAGE.  AND IT SAYS:

3        "THE TOOL PANE ON THE RIGHT SIDE OF THE WINDOW ORGANIZES

4    THE TOOLS INTO TASK RELATED GROUPS."

5            MR. REINES:  YOUR HONOR --

6    BY MR. PRICE

7    Q.  "BY DEFAULT ONLY THE MOST COMMONLY-USED TOOLS APPEAR."

8        DO YOU SEE THAT?

9    A.  YES.

10           MR. REINES:  IT IS NOT IN HIS REPORT.

11           THE COURT:  SO FAR HE IS LOOKING AT IT, AND IT IS IN

12   EVIDENCE.  SO I DON'T KNOW WE ARE GOING WITH IT.

13           THE CLERK:  179 IS NOT IN EVIDENCE.

14           THE COURT:  OH, OKAY.

15           MR. PRICE:  CAN WE PUBLISH THIS TO THE JURY, YOUR

16   HONOR?

17           MR. REINES:  YOUR HONOR, HE DOESN'T HAVE FOUNDATION,

18   HE HASN'T LOOKED AT IT.  HE'S DISCLAIMED KNOWLEDGE OF THE

19   SUBJECT MATTER.  I DON'T KNOW WHAT ELSE THERE IS.  HE SAYS HE

20   DOESN'T KNOW ABOUT USAGE.  HE WOULD DEFER TO DEVANBU.

21           THE COURT:  ALL RIGHT.  WELL, WHY DON'T YOU TRY TO

22   LAY A BETTER FOUNDATION, THEN.

23   BY MR. PRICE

24   Q.  DID YOU HEAR THE TESTIMONY FROM MR. HERBACH ON THIS TOPIC?

25   A.  YES.
```

1    **Q.**  AND DID YOU HEAR HIM READING THESE EXACT SAME PASSAGES

2    FROM THIS DOCUMENT?

3    **A.**  YES.

4    **Q.**  AND TO YOU, DID THAT SUGGEST THAT THESE WERE AMONG THE

5    MOST COMMONLY-USED TOOLS OF ADOBE?

6            **MR. REINES:**  OBJECTION, LEADING, CUMULATIVE.

7            **THE COURT:**  OVERRULED.

8            **THE WITNESS:**  YES.  SO I WAS CONFUSED.  THEN HE SAID

9    THERE IS TEENY TINY NUMBER OF USERS.  SO I DIDN'T KNOW WHAT TO

10   MAKE OF IT.

11   **BY MR. PRICE:**

12   **Q.**  RIGHT.  DID HE SAY "USERS" OR DID HE SAY "ORGANIZATIONS"?

13   **A.**  AH, I DON'T RECALL EXACTLY.  COULD HAVE BEEN

14   "ORGANIZATIONS."

15   **Q.**  DO YOU RECALL HIM SAYING THAT ONE OF THE CUSTOMERS WAS THE

16   U.S. MILITARY?

17   **A.**  YES.

18   **Q.**  NOW, IF THE U.S. MILITARY IS A USER, WOULD THAT REPRESENT

19   ONE USER OR WOULD THAT REPRESENT POTENTIALLY TENS OF THOUSANDS

20   OF USERS, IF NOT MORE?

21           **MR. REINES:**  YOUR HONOR, OBJECT, SO FAR BEYOND THE

22   FOUNDATION --

23           **THE COURT:**  SUSTAINED.

24   **BY MR. PRICE:**

25   **Q.**  NONINFRINGING ALTERNATIVES.  LET'S TALK ABOUT THAT FOR

1    JUST A SECOND.

2        NOW, THERE WAS SOME QUESTIONS ABOUT DR. WICKER'S

3    TESTIMONY ABOUT POTENTIALLY NONINFRINGING ALTERNATIVES.  IF

4    THE EVIDENCE SHOWS THAT THOSE NONINFRINGING ALTERNATIVES ARE

5    INFERIOR IN ANY WAY, HOW WOULD THAT AFFECT YOUR ANALYSIS OF

6    THOSE NONINFRINGING ALTERNATIVES?

7    **A.**  I WOULDN'T RELY ON THEM AS A BASIS FOR DAMAGES AT ALL.

8    **Q.**  WHY NOT?

9    **A.**  BECAUSE THEY'RE NOT SEAMLESS AND EQUIVALENT.

10   **Q.**  WHY DO THEY NEED TO BE SEAMLESS AND EQUIVALENT?

11   **A.**  WELL, BECAUSE THEY'RE NOT AN ALTERNATIVE IF -- IF YOU HAVE

12   A DIFFERENT WAY OF GOING ABOUT IT, BUT IT REQUIRES DIFFERENT

13   STEPS.  SAY FOR THE END USER, I'VE GOT SOMETHING THAT HAPPENS

14   WITH A PRODUCT AUTOMATICALLY EVERY SINGLE TIME.  AND IT

15   INFRINGES.  THAT MIGHT EVEN BE A FEATURE I LIKE THAT WHATEVER

16   IS HAPPENING HAPPENS ALL THE TIME.

17       AND SOMEONE SAYS, WELL, I CAN COME ALONG AND BEAT THAT SO

18   IT IS NOT INFRINGING BY MAKING YOU PUSH A BUTTON EVERY TIME

19   YOU WANT THAT TO HAPPEN.

20       OKAY.  THE EVENT STILL HAPPENS.  BUT IT IS NOT EQUIVALENT.

21   IT IS NOT SEAMLESS.  IT IS NOT DESIRABLE.  I HAVE TO TAKE AN

22   ACTION WHERE BEFORE IT HAPPENED AUTOMATICALLY.  SO, IF YOU'RE

23   SAYING YOU'VE GOT A DESIGN AROUND, BUT IT DOESN'T GIVE ME THE

24   EXACT SAME UTILITY THAT I EXPERIENCED, THEN IT IS NOT A DESIGN

25   AROUND.

PARR – RECROSS– REINES

1    **Q.**  WHAT IF IT IS SLOWER?

2    **A.**  SAME THING.

3    **Q.**  WHAT IF I HAVE TO DO MORE TO MAKE IT WORK?

4    **A.**  WELL, IT WOULD BE LIKE I WAS SAYING:  PUSHING A BUTTON.

5    NO, IF YOU HAVE TO DO MORE, IT IS NOT EQUIVALENT.  IT IS NOT

6    AN ALTERNATIVE.

7    **Q.**  AND THEN, FINALLY, BACK TO THAT 30 PERCENT NUMBER.  WHY

8    DID YOU RELY ON THAT 30 PERCENT NUMBER?  WHY WAS THAT THE

9    NUMBER YOU CHOSE TO DO YOUR APPORTIONMENT WITH?

10   **A.**  IT IS AN INDUSTRY STANDARD.

11          **MR. PRICE:**  ALL RIGHT.  PASS THE WITNESS.

12                    **RECROSS–EXAMINATION**

13   **BY MR. REINES**

14   **Q.**  ALL RIGHT.  LET'S START WITH MACROVISION.  YOU TESTIFIED

15   THAT THE PRESSURE ON THE SETTLEMENT VALUE FOR MACROVISION

16   WOULD BE DOWNWARD BECAUSE OF UNCERTAINTY AS TO INFRINGEMENT

17   AND VALIDITY, CORRECT?

18   **A.**  YES.  YES.

19   **Q.**  OKAY.  WOULDN'T THERE BE INCREDIBLE UPWARD PRESSURE ON THE

20   DOLLAR AMOUNT WITH MACROVISION FACING THE POTENTIAL FOR

21   MILLIONS OF DOLLARS OF LEGAL FEES, AND SOMEONE SAYS TO YOU,

22   YOU CAN PAY $89,000 AND HAVE A LICENSE, OR YOU HAVE TO INCUR

23   HUNDREDS AND HUNDREDS OF THOUSAND OF DOLLARS OF ADDITIONAL

24   FEES?

25          **MR. REINES:**  OH, THANK YOU.

1   **BY MR. REINES**

2   **Q.**  SO WITH RESPECT TO THE UPWARD PRESSURE FOR THE LITIGATION

3   SETTLEMENT, DON'T THE -- DOESN'T THE COST OF LITIGATION CREATE

4   UPWARD PRESSURE ON THE PRICING?

5   **A.**  I DON'T THINK I UNDERSTAND COMPLETELY.  THE ONE FACTOR

6   THAT WOULD MAKE YOU SETTLE IS THAT YOU'VE STARTED SPENDING

7   MONEY, AND YOU'VE DISCOVERED THERE IS NOT A WHOLE LOT OF

8   DAMAGE, SO YOU WANT TO SHUT IT DOWN AND NOT SPEND ANY MORE.

9       BUT, I WAS TALKING IN GENERAL BOTH PARTIES WOULD AGREE TO

10  A SETTLEMENT ROYALTY RATE THAT IS LOWER THAN WHAT MIGHT

11  OTHERWISE BE INVOLVED BECAUSE THEY BOTH WANT TO AVOID THE RISK

12  OF VALIDITY AND INFRINGEMENT.

13  **Q.**  FROM THE LICENSEE PERSPECTIVE OF MACROVISION ITSELF, THERE

14  WOULD BE UPWARD PRESSURE ON THE $89,000 BECAUSE OF ALL THE

15  SAVINGS IN LITIGATION COST.  YOU'LL AGREE WITH THAT, WON'T

16  YOU?

17      HAVE YOU --

18  **A.**  NO, I DON'T KNOW THAT THEY WOULD PAY A HUGE AMOUNT BECAUSE

19  THEY WANT TO SAVE.  BOTH PARTIES WANT OUT AT THE POINT WHERE

20  DAMAGES LOOK LIKE THEY ARE GOING TO BE INSIGNIFICANT.  IT IS

21  NO LONGER WORTH FIGHTING ABOUT.

22  **Q.**  THAT IS IF YOU ARE PAYING HOURLY RATES, CORRECT?

23  **A.**  TO WHO?  WHAT DO YOU MEAN "HOURLY"?

24  **Q.**  TO LAWYERS.  IF YOUR LEGAL COSTS ARE HOURLY RATES, THEN

25  YOU ARE CONCERNED ABOUT THE HUNDREDS OR POTENTIALLY MILLIONS

1    OF DOLLARS OF FEES.  AND IF YOU CAN PAY $89,000 TO GET OUT,

2    THAT IS GOING TO SOUND LIKE A GOOD DEAL?

3    A.  OH, SURE.

4    Q.  I THINK THAT MAKES THE POINT.

5        WITH RESPECT TO INTUIT, IF MR. FARLEY'S STATEMENTS

6    REGARDING WHAT HE BELIEVES INTUIT'S REVENUES MIGHT BE ARE NOT

7    RELIABLE ENOUGH TO BE ADMISSIBLE IN COURT, WHY SHOULD WE RELY

8    ON YOUR UNRECORDED DISCUSSION WITH HIM THAT YOU DON'T

9    REMEMBER?

10   A.  I REMEMBER THE DISCUSSION, AND I KNOW THAT THE NUMBER CAME

11   DIRECTLY FROM THAT DISCUSSION.  THERE IS NO OTHER PLACE IT

12   CAME FROM.

13       BUT THE REASON YOU SHOULD RELY ON ME IS BECAUSE I SWORE TO

14   TELL THE TRUTH.  I HAVE NO REASON TO MAKE UP THE $14 MILLION.

15   I HAVE NO REASON TO MAKE UP ANY NUMBER.

16   Q.  BUT ALL YOU CAN VOUCH FOR IS WHAT MR. FARLEY SAID, NOT

17   WHAT HIS BASIS IS, BECAUSE YOU DON'T KNOW WHAT HIS BASIS IS.

18   A.  THAT'S CORRECT.  BUT I'M TELLING YOU YOU CAN RELY ON ME TO

19   PROVIDE YOU WITH WHAT I GOT AS TRUTH.  IT'S TRUTH FROM WHERE I

20   GOT IT FROM.

21   Q.  IN TERMS OF FREEDOM TO OPERATE, INTUIT GOT A LOT OF PATENT

22   RIGHTS, CORRECT?

23   A.  YES.

24   Q.  AND THEY HAVE FREEDOM TO OPERATE ON 14-PLUS PATENTS AND

25   PATENT APPLICATIONS AND ADDITIONAL RIGHTS, CORRECT?

1    **A.**  YES.

2    **Q.**  FOR THE $15 MILLION THAT ADOBE WOULD OWE UNDER YOUR

3    ANALYSIS, THEY ARE ONLY GETTING FREEDOM TO OPERATE UNDER TWO

4    OF THE PATENTS, RIGHT?  OR ARE YOU SAYING THEY ARE GETTING

5    FREEDOM TO OPERATE UNDER THE ENTIRE DIGITAL REG PORTFOLIO?

6    **A.**  NO, THEY GET THE FREEDOM TO OPERATE THAT THEY NEED FOR --

7    WELL, IT CURES THE PAST INFRINGEMENT IN A SENSE IT WOULD HAVE

8    GIVEN THEM FREEDOM TO OPERATE FOR THE DAMAGES PERIOD, BECAUSE

9    THAT IS THE ONLY THING WE ARE MEASURING DAMAGES FOR.

10   **Q.**  SO THEY DON'T HAVE ANY FREEDOM TO OPERATE GOING FORWARD?

11   **A.**  THAT'S RIGHT.  THEY DON'T.

12   **Q.**  AND THEY DON'T HAVE ANY FREEDOM TO OPERATE FOR -- OTHER

13   THAN THE PATENTS THAT ARE IN THIS SUIT, AT LEAST ACCORDING TO

14   YOU?

15   **A.**  THAT'S RIGHT.

16   **Q.**  AND THE INTUIT SETTLEMENT AGREEMENT WAS $350,000 FOR THAT?

17   **A.**  YES.

18   **Q.**  AND INTUIT IS A PRETTY BIG SOFTWARE COMPANY?

19   **A.**  YES.

20   **Q.**  NOW, LET'S TALK ABOUT THE PLUG-IN.  YOUR COUNSEL

21   HIGHLIGHTED THE STATEMENT UNDER THE PLUG-IN WHERE IT SAID,

22   "AND YOU CAN GO USE OUR LIVECYCLE DRM SOLUTION AS AN

23   ALTERNATIVE TO PAYING THIS AMOUNT," CORRECT?

24   **A.**  YES.

25   **Q.**  AND YOU UNDERSTAND THAT FROM MR. HERBACH'S TESTIMONY THAT

1    IN A WAY IF WE LET OTHER PEOPLE USE DRM WITH OUR FLAGSHIP

2    PRODUCTS, SUCH AS ACROBAT PROFESSIONAL, WE'RE KIND OF

3    COMPETING WITH OURSELVES BECAUSE WE ARE TRYING TO GET THIS

4    LIVECYCLE PRODUCT TO MORE THAN A COUPLE HUNDRED PLACES, RIGHT?

5    **A.**  I AM GOING TO SAY OTHER PEOPLE WOULD BE COMPETING WITH

6    THEM.

7    **Q.**  RIGHT.  THEY ARE ENABLING PEOPLE TO COMPETE WITH THEM BY

8    MAKING THEM COMPATIBLE WITH THEIR FLAGSHIP PRODUCTS, ACROBAT

9    PROFESSIONAL, FOR EXAMPLE, RIGHT?

10   **A.**  THAT'S RIGHT.

11   **Q.**  THAT WOULD BE UPWARD PRESSURE -- IT'S UPWARD WHEN YOU

12   ENABLE SOMEONE TO COMPETE WITH YOU?

13   **A.**  YES.

14   **Q.**  NOW, LET'S TALK ABOUT THE BASE AND THIS QUESTION OF USAGE.

15   FIRST OF ALL, DO YOU KNOW WHICH ELEMENTS OF THE U.S. MILITARY

16   HAVE ACCESS TO LIVECYCLE?

17   **A.**  NO.

18   **Q.**  DID YOU UNDERSTAND MR. HERBACH TO BE SUGGESTING THAT EVERY

19   SINGLE PERSON IN THE U.S. MILITARY HAS LIVECYCLE?

20   **A.**  NO, I DID NOT.

21   **Q.**  AND REGARDING THE TOOLBAR ON THE TOP THAT WE SAW, ALL THE

22   COMPLICATED THING TO GET ALL THE WAY DOWN TO LIVECYCLE, ON

23   YOUR COPY OF ACROBAT PROFESSIONAL IT IS GRAYED OUT AT

24   LIVECYCLE, RIGHT?  SO IF YOU CLICKED IT YOU GET THAT

25   FRUSTRATION WHEN IT WON'T EVEN ACKNOWLEDGE THAT YOU ARE

1    CLICKING ON YOUR MOUSE?

2    **A.**  I THINK THAT IS TRUE.

3    **Q.**  SO IF YOU WANTED TO USE LIVECYCLE ALL YOU WOULD GET WOULD

4    BE NOTHING, RIGHT?

5    **A.**  CORRECT.

6    **Q.**  AND YOU STILL WANT ADOBE TO PAY DIGITAL REG 2.5 PERCENT OF

7    30 PERCENT OF THE REVENUE THAT YOU PAID?

8    **A.**  YES.

9    **Q.**  NOW, IN TERMS OF USAGE, I JUST WANT TO COVER A COUPLE OF

10   THINGS.  IN TERMS OF WHO IS RESPONSIBLE FOR SAYING THIS

11   PORTION OF THE ADOBE PRODUCTS ARE USED IN AN INFRINGING

12   FASHION, AND THIS PORTION OF THE ADOBE PRODUCTS AREN'T, WHOSE

13   RESPONSIBILITY WAS THAT IN THE DIGITAL REG OPERATION?

14   **A.**  IT WOULD BE THE TECHNICAL EXPERT IS THE PERSON I RELY ON

15   TO DETERMINE WHAT'S INFRINGED.

16   **Q.**  DID YOU ASK HIM WHAT THE PERCENT OF USAGE OF LIVECYCLE WAS

17   WITH ACROBAT PROFESSIONAL?

18   **A.**  NO, I JUST ASKED HIM:  DOES HE CONSIDER ACROBAT

19   PROFESSIONAL TO INFRINGE?

20   **Q.**  YOU DIDN'T ASK ANY USAGE QUESTIONS?

21   **A.**  NO.

22   **Q.**  DID YOU ASK ON ANY OF THE PRODUCTS?

23   **A.**  NO.  NO.

24   **Q.**  YOU DIDN'T ASK ANY OF THE YEARS OF USE OR ANYTHING LIKE

25   THAT?

1   **A.**  WELL, IT SHOWED UP IN THE 2005-TO-PRESENT INFORMATION THAT

2   ADOBE PROVIDED.

3   **Q.**  SO JUST BECAUSE ADOBE PROVIDED INFORMATION UNDER THE

4   COURT'S RULES YOU ASSUME THAT, THEREFORE, THAT MEANT ALL OF IT

5   WAS INFRINGING?

6   **A.**  BECAUSE DR. DEVANBU IDENTIFIED THOSE PRODUCTS DURING THE

7   PERIOD AS INFRINGING.

8   **Q.**  SOMETIME DURING THE PERIOD, BUT HE DIDN'T SPECIFY THE

9   EXACT INFRINGING PERIOD, RIGHT?  I THINK WE HIT THAT ON CROSS.

10  RIGHT?  FLASH PROFESSIONAL, REMEMBER?

11  **A.**  HE JUST -- THE ONLY REASON THEY ARE THERE IS BECAUSE

12  DR. DEVANBU INDICATES HE BELIEVES THEY INFRINGE.

13  **Q.**  NOW, IN TERMS OF INVESTIGATING USAGE, YOU SAID YOU DIDN'T

14  KNOW WHAT ADOBE PRODUCED IN THAT REGARD, RIGHT?  BECAUSE THAT

15  WAS DR. DEVANBU'S AREA OF WORK, NOT YOURS.

16  **A.**  RIGHT.

17  **Q.**  SO YOU NEVER LOOKED INTO WHAT ADOBE PRODUCED?

18  **A.**  RIGHT.

19  **Q.**  AND YOU NEVER -- AND DO YOU HAVE ANY IDEA WHAT DIGITAL REG

20  DID IN TERMS OF THEIR DILIGENCE TO TRY AND DETERMINE WHICH

21  PRODUCTS WERE ACTUALLY USED IN AN INFRINGING FASHION AND WHICH

22  WEREN'T?

23  **A.**  NO.  I RELIED ON DR. DEVANBU.

24  **Q.**  DO YOU HAVE ANY IDEA AT ALL WHAT DIGITAL REG DID TO

25  DETERMINE WHICH PRODUCTS WERE POSSIBLY INFRINGING IN WHICH

1    YEARS?

2    **A.**  NO.  THAT'S THE TECHNICAL EXPERT'S AREA.

3    **Q.**  DID YOU HEAR DR. DEVANBU MENTION ANYTHING ABOUT ANY YEARS

4    WHEN HE WAS ON THE STAND?

5    **A.**  I DIDN'T.  I WASN'T HERE FOR HIS TESTIMONY.

6    **Q.**  DID YOU HEAR HIM DISCUSS ANYTHING ABOUT PERCENTAGES OF

7    USAGE OR EVEN CATEGORIES OF USAGE?

8    **A.**  NO, I WASN'T HERE FOR HIS TESTIMONY.

9    **Q.**  AND ANYONE TELL YOU ABOUT IT?

10   **A.**  NO.

11   **Q.**  YOUR LEGAL TEAM DIDN'T TELL YOU ABOUT IT?

12   **A.**  NO.

13            **MR. REINES:**  NO FURTHER QUESTIONS.

14            **THE COURT:**  ANYTHING ELSE?

15            **MR. PRICE:**  NO QUESTIONS, YOUR HONOR.

16            **THE COURT:**  YOU ARE EXCUSED.  YOU MAY STEP DOWN.

17            **THE WITNESS:**  THANK YOU, YOUR HONOR.

18            **THE COURT:**  YOU MAY CALL YOUR NEXT WITNESS.

19            **MR. DINOVO:**  AT THIS TIME, YOUR HONOR, SUBJECT TO THE

20   EXHIBITS THAT ARE UNDER SUBMISSION AND THE COURT HAS TAKEN

21   UNDER ADVISEMENT AND THE OPPORTUNITY TO PROVIDE REBUTTAL

22   TESTIMONY, THE PLAINTIFF RESTS ITS CASE.

23            **MR. REINES:**  YOUR HONOR, PURSUANT TO RULE 50(A) WE

24   PLAN ON MOVING --

25            **THE COURT:**  WE WILL DEEM YOU TO HAVE MADE THE

1    CUSTOMARY MOTIONS, AND WE WILL TAKE THEM UNDER SUBMISSION, AND

2    YOU CAN PROVIDE THE BASIS FOR THEM LATER.

3            **MR. REINES:**  THANK YOU.

4          **THE COURT:**  YOU MAY CALL YOUR FIRST WITNESS.

5            **MR. REINES:**  YOUR HONOR, PURSUANT TO THE WAY WE HAVE

6    ALL AGREED TO STRUCTURE THE CASE, WE ARE GOING TO BE PROVIDING

7    OUR DAMAGES WITNESS JUST FOR THE EASE OF THE JURY TO HAVE

8    BACK-TO-BACK DAMAGES WITNESSES, NOT THAT THAT IS OUR LEAD

9    WITNESS.

10           **THE COURT:**  OKAY.

11           **MR. REINES:**  SO DR. PROWSE WILL BE ON THE STAND NOW.

12          **THE COURT:**  SO THIS WILL BE ANOTHER EXAMPLE WHERE WE

13   WILL TAKE THE WITNESSES OUT OF WHAT WOULD BE THE NORMAL ORDER

14   SO YOU CAN HEAR THE TWO DAMAGES WITNESSES IN A ROW, WHICH I

15   THINK MIGHT MAKE IT EASIER FOR YOU TO REMEMBER.

16           **THE CLERK:**  THERE IS WATER AND CUPS AT THE WITNESS

17   STAND.

18      RAISE YOUR RIGHT HAND FOR ME, PLEASE.

19      STAND AND RAISE YOUR RIGHT HAND FOR ME PLEASE.  THANK YOU.

20      (**STEPHEN PROWSE**, CALLED AS A WITNESS FOR THE DEFENDANT,

21   HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

22           **THE WITNESS:**  I DO.

23           **THE CLERK:**  PLEASE BE SEATED, AND ONCE SEATED I'M

24   GOING TO ASK THAT YOU PLEASE STATE AND SPELL YOUR FIRST AND

25   LAST NAME FOR THE RECORD, PLEASE.

1          **THE WITNESS:**  MY NAME IS STEPHEN PROWSE.

2     S-T-E-P-H-E-N; P-R-O-W-S-E.

3          **THE CLERK:**  THANK YOU.

4                    **DIRECT EXAMINATION**

5     **BY MR. REINES**

6     **Q.**  AND, DR. PROWSE, WILL YOU PLEASE INTRODUCE YOURSELF TO THE

7     JURY?

8     **A.**  HELLO.  MY NAME IS STEPHEN PROWSE, AND I'M A SENIOR

9     MANAGING DIRECTOR AT A COMPANY CALLED FTI CONSULTING.

10    **Q.**  CAN YOU EXPLAIN WHY YOU ARE HERE TODAY?

11    **A.**  YES.  I'M HERE TO GIVE MY OPINION REGARDING THE DAMAGES

12    ADOBE WOULD OWE TO DIGITAL REG SHOULD YOU, THE JURY, FIND THAT

13    THE '541 AND '670 PATENTS ARE VALID, AND THAT ADOBE INFRINGED

14    THEM.

15        AS YOU CAN IMAGINE THAT THERE'S A LOT OF ANALYSIS BEHIND

16    MY OPINION, SO I HAVE CREATED SLIDES TO HELP US WALK THROUGH

17    THE BASES FOR MY OPINION.

18          **MR. REINES:**  WE WOULD LIKE TO PUBLISH THE

19    PRESENTATION.  THANK YOU.

20                    (PUBLISHED TO JURY.)

21    **BY MR. REINES**

22    **Q.**  BEFORE YOU GET TO YOUR OPINIONS, LET'S TALK ABOUT YOUR

23    QUALIFICATIONS AND CREDENTIALS.  CAN YOU DESCRIBE THOSE?

24    **A.**  YES.  AS I SAID, I'M A SENIOR MANAGING DIRECTOR AT A

25    COMPANY CALLED FTI CONSULTING.  AND THE MAIN THINGS I DO AT

PROWSE - DIRECT /REINES

1   FTI CONSULTING ARE GIVE ECONOMIC, FINANCIAL, VALUATION AND

2   STATISTICAL CONSULTING ADVICE TO CORPORATIONS AND TO

3   INDIVIDUALS.

4   Q.   DID YOU WORK AS AN EXPERT CONSULTANT PRIOR TO JOINING FTI?

5   A.   YES.  PRIOR TO FTI I WAS AT A BIG FOUR ACCOUNTING FIRM

6   CALLED KPMG.  I WAS A PARTNER THERE.  AND PRIOR TO THAT I WAS

7   AT ANOTHER BIG FOUR ACCOUNTING FIRM CALLED

8   PRICEWATERHOUSECOOPERS WHERE I DID LARGELY THE SAME TYPES OF

9   ACTIVITY THAT I DO NOW AT FTI CONSULTING.

10  Q.   BRIEFLY DESCRIBE YOUR EDUCATIONAL BACKGROUND.

11  A.   YES.  AS YOU CAN SEE FROM THE SLIDE, I HAVE A BA IN

12  ECONOMICS FROM CAMBRIDGE UNIVERSITY IN CAMBRIDGE, ENGLAND.  I

13  HAVE A MASTER'S IN ECONOMICS FROM CAL TECH IN PASADENA

14  CALIFORNIA.  AND I HAVE A PH.D. IN ECONOMICS FROM U.C.L.A.

15       I'M ALSO A CFA CHARTERHOLDER AND MEMBER OF THE LICENSING

16  EXECUTIVES SOCIETY.

17  Q.   CAN YOU EXPLAIN WHAT CFA CHARTERHOLDER IS.  AT LEAST I

18  DON'T KNOW WHAT THAT IS.

19  A.   YES.  JUST VERY BRIEFLY, A CFA CHARTERHOLDER IS SOMEONE

20  WHO HAS TAKEN AND PASSED A THREE-YEAR COURSE IN ECONOMICS,

21  FINANCE, ACCOUNTING, VALUATION, AND ALSO HAD, I BELIEVE, THREE

22  YEARS OF WORK EXPERIENCE IN THOSE AREAS.

23  Q.   NOW, YOU -- INTERESTING ITEM HERE IS SENIOR ECONOMIST AND

24  POLICY ADVISER AT THE FEDERAL RESERVE.  CAN YOU DESCRIBE WHAT

25  YOU'VE DONE AT THE FEDERAL RESERVE?

PROWSE - DIRECT /REINES

1  **A.**  YES.  PRIOR TO BECOMING AN ECONOMIC CONSULTANT, I WORKED

2  FOR TEN YEARS IN THE FEDERAL RESERVE SYSTEM AS AN ECONOMIST AT

3  THE FEDERAL RESERVE BOARD IN WASHINGTON, AND THEN AS A SENIOR

4  ECONOMIST AND POLICY ADVISER AT THE FEDERAL RESERVE BANK IN

5  DALLAS IN DALLAS, TEXAS.

6      AND, BASICALLY, THE TYPES OF WORK I DID THERE WAS RESEARCH

7  INTO FINANCIAL MARKETS AND OTHER MARKETS.  AND I PRESENTED, I

8  PUBLISHED THAT RESEARCH IN ACADEMIC JOURNALS AND BOOKS AND

9  OTHER OUTLETS.

10      I HAVE ABOUT 20 PUBLISHED ARTICLES ON ECONOMIC AND FINANCE

11  AND VALUATION TOPICS.  THE OTHER PART OF THE WORK I DID THERE

12  WAS AT THE DIRECTION OR AT THE REQUEST OF SENIOR MEMBERS OF

13  THE FEDERAL RESERVE BOARD.  ULTIMATELY, WHEN I WAS AT THE FED

14  IT WAS ALAN GREENSPAN, OR THE PRESIDENT OF THE DALLAS FED, TO

15  CONDUCT A CERTAIN ANALYSIS INTO FINANCIAL MARKETS AND PRESENT

16  TO THEM THE RESULTS OF MY ANALYSIS.

17  **Q.**  WOULD YOU DESCRIBE YOUR INVOLVEMENT IN PATENT LITIGATION

18  VALUATION?

19  **A.**  YES.  SO I HAVE -- I HAVE BEEN WORKING IN PATENT -- DOING

20  PATENT WORK FOR OVER 15 YEARS, PROBABLY FOR CLOSE TO A HUNDRED

21  CLIENTS.  SO I'VE BEEN DOING IT FOR A WHILE.

22  **Q.**  DOES ALL YOUR WORK NOW INVOLVE THIS EXERTING LIKE WE HAVE

23  SEEN MR. PARR AND YOURSELF AND OTHERS HERE DO?

24  **A.**  NO.  A SIGNIFICANT AMOUNT OF WHAT I DO IS NOT IN THE

25  CONTEXT OF LITIGATION, IS, FOR EXAMPLE, VALUING A BUSINESS OR

1    VALUING A SUBDIVISION OR DIVISION OF A BUSINESS OR VALUING

2    CERTAIN ASSETS HELD BY A BUSINESS, LIKE THEIR INTELLECTUAL

3    PROPERTY ASSETS.

4        SO I HAVE OFTEN BEEN ASKED TO, FOR PURPOSES OF EITHER

5    INVESTMENT OR FOR TAX REASONS, TO VALUE INTELLECTUAL PROPERTY

6    SUCH AS PATENTS, TRADEMARKS, COPYRIGHTS THAT A PARTICULAR

7    COMPANY HOLDS AND IS CONTEMPLATING EITHER SELLING OR MOVING TO

8    ANOTHER DIVISION.

9    **Q.**  WOULD YOU DESCRIBE YOUR TEACHING IN THE AREA OF PATENT

10   VALUATION?

11   **A.**  YES.  I'VE BEEN AN ADJUNCT PROFESSOR AT SOUTHERN METHODIST

12   UNIVERSITY.  AND CURRENTLY I'M A GUEST LECTURER THERE.  I

13   TAUGHT VALUATION CLASSES THERE.  AND PART OF WHAT I TEACH

14   THERE IS HOW TO VALUE INTELLECTUAL PROPERTY, SUCH AS PATENTS,

15   TRADEMARKS AND COPYRIGHTS.

16   **Q.**  DO YOU ALWAYS WORK FOR ACCUSED INFRINGERS WHEN YOU VALUE

17   PATENTS AND COME UP IN THIS KIND OF CONTEXT THAT YOU'RE IN

18   NOW?

19   **A.**  NO.  I WORK FOR −− IN LITIGATION WORK, I WORK FOR

20   PLAINTIFFS AND DEFENDANTS, PATENT OWNERS, AS WELL AS ACCUSED

21   INFRINGERS.  AND I WOULD SAY THE BREAKOUT OF MY WORK IS ABOUT

22   50/50 BETWEEN THOSE DIFFERENT TYPES OF ENTITIES.

23   **Q.**  HAVE YOU EVER GIVEN A CLIENT OR A LITIGATION TEAM AN

24   OPINION THEY DIDN'T WANT TO HEAR?

25   **A.**  YES.  I MEAN, I REGARD MY OPINION AS MY OPINION.  IT'S THE

1    OPINION I SINCERELY COME TO.  AND, ON OCCASION, I'VE COME TO

2    AN OPINION THAT A CLIENT WAS NOT HAPPY WITH.  AND I HAVE

3    APOLOGIZED FOR COMING TO THAT OPINION, BUT I HAVE SAID I AM

4    SORRY.  THAT IS MY OPINION.

5         **MR. REINES:**  YOUR HONOR, BASED ON THAT PRESENTATION,

6    WE WOULD MOVE FOR DR. PROWSE TO BE RECOGNIZED AS AN EXPERT IN

7    THE FIELD OF ECONOMICS AND THE CALCULATIONS OF DAMAGES ON

8    BEHALF OF ADOBE.

9         **MR. PRICE:**  NO OBJECTION, YOUR HONOR.

10        **THE COURT:**  ALL RIGHT.

11   **BY MR. REINES**

12   **Q.**  ALL RIGHT.  LET'S NOW TALK ABOUT THE ROLE YOU HAVE IN THIS

13   CASE.  YOU'RE HERE FOR ADOBE.  WHY DON'T WE TALK ABOUT YOUR

14   COMPENSATION SO THAT EVERYONE KNOWS WHAT THAT IS AT THE FRONT.

15   ARE YOU PAID CONTINGENTLY, ON AN HOURLY, HOW DOES IT WORK?

16   **A.**  WELL, MY COMPANY, THE COMPANY I WORK FOR, IS PAID ON AN

17   HOURLY BASIS AT MY HOURLY RATE OF $655.

18   **Q.**  DO YOU HAVE ANY KIND OF CONTINGENT INTEREST IN THIS CASE?

19   **A.**  I HAVE NONE.

20   **Q.**  WHAT WAS YOUR ASSIGNMENT?

21   **A.**  SO, AS I MENTIONED EARLIER, MY ASSIGNMENT WAS TO CALCULATE

22   THE DAMAGES THAT ADOBE WOULD OWE TO DIGITAL REG MAKING THE

23   ASSUMPTION THAT THE JURY FINDS THE PATENTS BOTH VALID AND

24   INFRINGED BY ADOBE.

25   **Q.**  WHAT DID YOU DO TO FORMULATE THAT OPINION?  WHAT DID YOU

PROWSE - DIRECT /REINES

1   CONSIDER?

2   **A.**  SO, I CONSIDERED A LARGE AMOUNT OF INFORMATION.  I THINK

3   WE HAVE A SLIDE ON THAT.  A LARGE AMOUNT OF INFORMATION

4   REGARDING ADOBE AND REGARDING DIGITAL REG, INCLUDING FINANCIAL

5   INFORMATION, MARKETING DOCUMENTS, NUMEROUS SETTLEMENT

6   AGREEMENTS, WHICH WE HEARD A LOT OF DISCUSSION ABOUT ALREADY.

7   PUBLIC INFORMATION ON THE DIGITAL RIGHTS MANAGEMENT HISTORY.

8   I READ A LOT OF DEPOSITION TESTIMONY BY THE PARTIES TO THIS

9   CASE.

10      I ALSO INTERVIEWED PROFESSOR WICKER ON TWO OCCASIONS, AND

11  I ALSO HAD AN INTERVIEW WITH JONATHAN HERBACH, ADOBE'S SENIOR

12  PRODUCT MANAGER WHO TESTIFIED HERE AT TRIAL.

13      I ALSO READ THE '541 AND '670 PATENTS.  AND FOR MOST OF

14  LAST WEEK I WAS PRESENT HERE FOR THE LIVE TESTIMONY BY THE

15  WITNESSES.

16  **Q.**  HOW LONG DID IT TAKE YOU TO PERFORM YOUR ANALYSIS WHERE

17  YOU ARRIVED AT YOUR DAMAGE VALUATION HERE?

18  **A.**  SO IT TOOK ME -- I WORKED ON AND OFF PROBABLY ABOUT

19  TWO-AND-A-HALF MONTHS AND CLOSE TO A HUNDRED HOURS OF MY TIME

20  TO COME TO MY OPINION.

21  **Q.**  LET'S TURN TO YOUR OPINIONS IN THIS CASE.  BEFORE WE START

22  TALKING ABOUT SPECIFIC NUMBERS, IF YOU CAN TAKE A FEW MINUTES

23  AND EXPLAIN THE MEASURE OF DAMAGES FOR PATENT INFRINGEMENT SO

24  WE HAVE A GENERAL WORKING KNOWLEDGE OF THAT.

25  **A.**  SURE.  SURE.  SO THE GENERAL GUIDANCE -- AND I THINK WE

```
1    HAVE A SLIDE ON THIS -- THE GUIDANCE FOR PATENT INFRINGEMENT

2    DAMAGES IS UNITED STATES CODE 35284, WHICH SAYS THAT UPON

3    FINDING FOR THE CLAIMANT, IN OTHER WORDS, UPON FINDING THAT

4    THE PATENTS ARE VALID AND INFRINGED, THE COURT SHALL AWARD THE

5    CLAIMANT DAMAGES ADEQUATE TO COMPENSATE FOR THE INFRINGEMENT,

6    BUT IN NO EVENT LESS THAN A REASONABLE ROYALTY.

7    Q.  IF THE JURY DETERMINES THAT THE PATENTS-IN-SUIT ARE NOT

8    INFRINGED, DO THEY NEED TO CONSIDER ANY OF THIS?

9    A.  NO.  IF THE JURY CONSIDERS THAT ADOBE HAS NOT INFRINGED ON

10   THE PATENTS, THEN DAMAGES, BY DEFINITION, ARE ZERO.

11   Q.  AND SAME WITH INVALIDITY, CORRECT?

12   A.  AND THE SAME WITH VALIDITY.  IF THE JURY FINDS THAT THE

13   PATENTS ARE NOT VALID, THEN DAMAGES, THEN, BY DEFINITION, ARE

14   ZERO.

15   Q.  OKAY.

16       AND THEN, THE SECTION YOU IDENTIFIED REFERS TO REASONABLE

17   ROYALTY.  CAN YOU EXPLAIN WHAT A REASONABLE ROYALTY IS AND HOW

18   YOU ARRIVE AT IT?

19   A.  YES.  SO WE HAVE HEARD A LOT OF TALK ABOUT A ROYALTY.  A

20   ROYALTY IS SIMPLY A PAYMENT FOR THE USE OF THE TECHNOLOGY

21   COVERED BY A PATENT.

22       NOW, A REASONABLE ROYALTY COMES OUT OF PATENT LITIGATION

23   AND IS BASICALLY DEFINED AS WHAT THE PARTIES IN THIS CASE,

24   ADOBE AND DIGITAL REG, WOULD HAVE AGREED TO IN TERMS OF A

25   ROYALTY THAT WOULD HAVE BEEN PAID TO LICENSE THE '541 AND THE
```

1    '670 PATENT.

2    **Q.**  HAVE YOU PERFORMED AN ANALYSIS USING THIS METHODOLOGY?

3    **A.**  YES, I HAVE.

4    **Q.**  AND THE JURY'S HEARD A LOT ABOUT THE TWO PARTIES HERE.

5    BUT CAN YOU SET THE STAGE FOR THIS HYPOTHETICAL NEGOTIATION --

6    **A.**  YES.

7    **Q.**  -- PLEASE?

8    **A.**  YES, I CAN.

9        AND THE NEXT SLIDE SHOWS THE CONSTRUCT OR THE THEORETICAL

10   CONSTRUCT THAT GOVERNS THE DETERMINATION OF A REASONABLE

11   ROYALTY.  AND THAT IS WHAT IS CALLED "THE HYPOTHETICAL

12   NEGOTIATION."  AND MR. PARR TALKED ABOUT THIS A LITTLE BIT,

13   TOO.

14       AND THAT IS THAT WE, AS DAMAGES EXPERTS -- AS A DAMAGES

15   EXPERT I ENVISION A HYPOTHETICAL NEGOTIATION BETWEEN THE TWO

16   PARTIES, THE PATENT OWNER, DIGITAL REG, AND ADOBE, THE ALLEGED

17   INFRINGER.  AND BASED ON CONSIDERATION OF A FAIR NUMBER OF

18   ECONOMIC, FINANCIAL AND TECHNICAL FACTORS THAT WOULD HAVE

19   INFLUENCED THIS NEGOTIATION, I COME TO A CONCLUSION ABOUT WHAT

20   THE PARTIES WOULD HAVE AGREED TO AT THIS HYPOTHETICAL

21   NEGOTIATION.

22       AND AS YOU MENTIONED, IT IS IMPORTANT FIRST TO UNDERSTAND

23   WHERE -- WHO THE PARTIES ARE.  AND THE JURY, I THINK, HAS

24   HEARD A LOT OF TESTIMONY ABOUT THIS, BUT JUST TO SET THE STAGE

25   DIGITAL REG IS THE PATENT OWNER.  THEY DON'T MAKE ANY

1    PRODUCTS.  THEY JUST OWN PATENTS.  AND THEY MAKE MONEY BY

2    EITHER LICENSING THE PATENTS OR LITIGATING THEM.

3        ADOBE IS THE ALLEGED INFRINGER.  THEY MAKE A LARGE NUMBER

4    OF DIGITAL MEDIA PRODUCTS, INCLUDING ACROBAT READER, ACROBAT

5    PROFESSIONAL, LARGE NUMBER OF DIGITAL PUBLISHING MEDIA TOOLS,

6    SOME OF WHICH -- NOT ALL -- BUT SOME OF WHICH ARE ACCUSED IN

7    THIS LITIGATION.

8    **Q.**  IN TERMS OF THIS NEGOTIATION AND OUTPUT, WHAT ARE THE KEY

9    STRUCTURES?   IN OTHER WORDS, HOW DO YOU STRUCTURE YOUR

10   ANALYSIS AND DIVIDE IT UP?

11   **A.**  YES.  SO I THINK THERE IS REALLY THREE KEY ISSUES TO

12   ADDRESS IN DETERMINING WHAT THE APPROPRIATE LEVEL OF DAMAGES

13   IS IN THIS CASE.

14       AND I'VE LISTED THEM HERE ON THE SLIDE.  THE FIRST IS

15   UNDERSTANDING WHEN WOULD THE HYPOTHETICAL NEGOTIATION HAVE

16   HAPPENED.

17       THE SECOND IS WHAT IS THE STRUCTURE OF THE AGREED-UPON

18   ROYALTY.  AND BY THE STRUCTURE, I MEAN -- AND WE HAVE HEARD

19   SOME DISCUSSION ABOUT THIS BEFORE -- THERE IS A VARIETY OF

20   DIFFERENT STRUCTURES THAT PARTIES CAN COME TO AN AGREEMENT

21   ABOUT HOW THE ROYALTY IS GOING TO LOOK LIKE.

22       THERE CAN BE A RUNNING ROYALTY WHERE IT IS ON A

23   PAY-AS-YOU-GO BASICALLY STRUCTURE, WHERE THE PAYMENT IS SOME

24   RATE TIMES THE NUMBER OF UNITS SOLD OR THE AMOUNT OF REVENUE

25   SOLD, OR SOMETHING LIKE THAT.

1    ANOTHER FORM OF -- OR ANOTHER STRUCTURE IS A LUMP SUM

2    PAYMENT, WHEREBY THE PARTIES AGREE THAT AT THE SIGNING OF THE

3    LICENSE AGREEMENT A LUMP SUM AMOUNT OF DOLLARS IS PAID AT THAT

4    POINT IN TIME.  AND FROM THEN ON THE LICENSEE HAS RIGHTS TO

5    USE THE TECHNOLOGY UNTIL THE PATENT EXPIRES.

6    AND THERE CAN BE SOME -- THERE CAN BE HYBRID FORMS THAT

7    COMBINE BOTH OF THOSE ELEMENTS.  BUT THAT IS WHAT I MEAN BY

8    THE STRUCTURE OF THE AGREED UPON ROYALTY.

9    AND THEN, FINALLY, THE QUESTION IS:  WELL, HAVING

10   DETERMINED THE FIRST TWO THINGS, WHAT IS THE AMOUNT OF THE

11   ROYALTY IN TERMS OF DOLLARS THAT DIGITAL REG AND ADOBE WOULD

12   HAVE AGREED TO AT THE HYPOTHETICAL NEGOTIATION?

13   **Q.**  ALL RIGHT.  LET'S GO THROUGH THOSE ONE AT A TIME.  WHEN

14   WOULD THE HYPOTHETICAL NEGOTIATION HAVE HAPPENED IN THIS

15   PARTICULAR CASE?

16   **A.**  SO, THIS IS SOMETHING THAT MR. PARR AND I DON'T REALLY

17   DISAGREE ABOUT.  WE AGREE THE HYPOTHETICAL NEGOTIATION WOULD

18   HAVE HAPPENED FOR THE PURPOSES OF OUR DAMAGES ANALYSIS

19   SOMETIME IN 2005, BECAUSE THAT'S THE FIRST DATE THAT AN

20   ALLEGEDLY INFRINGING ADOBE PRODUCT WAS SOLD.

21   **Q.**  LET'S LOOK AT THE LICENSING STRUCTURE.  WHAT STRUCTURE DO

22   YOU BELIEVE THE PARTIES WOULD HAVE AGREED TO IN THIS

23   NEGOTIATION?

24   **A.**  HERE'S WHERE MR. PARR AND I HAVE OUR FIRST MAJOR

25   DISAGREEMENT.  I BELIEVE THAT ALL THE EVIDENCE SHOWS THAT THE

1   PARTIES WOULD HAVE AGREED TO A LUMP SUM AMOUNT.  IN OTHER

2   WORDS, A PAYMENT OF A FIXED AMOUNT UPFRONT FOR LICENSE TO THE

3   '670 AND '541 PATENT AT THE HYPOTHETICAL NEGOTIATION.

4        AND I DON'T BELIEVE THERE IS ANY EVIDENCE THAT EITHER

5   PARTY WOULD HAVE AGREED TO ENTER INTO A RUNNING ROYALTY.  BUT

6   SO MY OPINION IS THAT A LUMP SUM WOULD BE THE APPROPRIATE

7   STRUCTURE AT THE HYPOTHETICAL NEGOTIATION.

8   **Q.**  AND THEN, IN TERMS OF WHAT ROYALTY THERE WOULD BE?

9   **A.**  SO, IN TERMS --

10  **Q.**  WHY DON'T WE JUST GO AND GET INTO -- SINCE THERE IS A

11  DISAGREEMENT HERE, LET'S GET INTO THE SUBSTANCE OF THE

12  STRUCTURE.

13       WHAT IS THE BASIS FOR YOUR CONCLUSION AND, FRANKLY,

14  DISAGREEMENT WITH MR. PARR THAT IT WOULD BE A LUMP SUM ROYALTY

15  IN THIS HYPOTHETICAL NEGOTIATION, NOT A RUNNING ROYALTY?

16  **A.**  SO, A NUMBER OF POINTS.  FIRST OF ALL, ALL THE DIGITAL REG

17  SETTLEMENT AGREEMENTS AND LICENSE AGREEMENTS THAT WE SEE IN

18  THIS MATTER ARE FOR A LUMP SUM.  AND SO THAT'S CLEAR EVIDENCE

19  THAT DIGITAL REG WOULD HAVE FOUND A LUMP SUM, WOULD HAVE BEEN

20  WILLING TO LICENSE ON A LUMP SUM BASIS TO ADOBE AT THE

21  HYPOTHETICAL NEGOTIATION.

22       SECONDLY, ADOBE HAS A CLEAR PREFERENCE FOR A LUMP SUM, AS

23  WELL.  AND WE UNDERSTAND THAT BECAUSE, JUST IN GENERAL, LUMP

24  SUM LICENSES ARE A LOT LESS CLUNKY.  THEY ARE A LOT LESS HARD

25  TO -- A LOT EASIER TO -- THERE IS NO MONITORING.  THERE IS NO

1    TRACKING.  YOU PAY THE AMOUNT UPFRONT, AND THEN YOU'RE DONE.

2        SO IT IS A LOT EASIER THAN A RUNNING ROYALTY WHICH WOULD

3    INVOLVE TRACKING AND AUDITING AND ACCOUNTING FOR THE LICENSED

4    PRODUCTS AND HOW MUCH WERE SOLD.

5        AND WE SEE IN SOME OF THE ADOBE LICENSES THAT ALL OF THEM

6    ARE FOR LUMP SUM AMOUNTS.

7        SO CLEARLY ADOBE HAS A PREFERENCE FOR LUMP SUMS.

8        AND THEN, I HEARD MR. FARLEY TESTIFY LAST WEEK THAT

9    BASICALLY WHILE HE MIGHT HAVE TRIED TO GET A RUNNING ROYALTY

10   OUT OF ADOBE, HE DIDN'T THINK IT WAS POSSIBLE TO DO SO.

11   **Q.**  AND IS THIS THE TESTIMONY THAT SUPPORTS YOUR OPINION?

12   **A.**  YES.  THIS IS THE TESTIMONY FROM THE TRIAL TRANSCRIPT LAST

13   WEEK.  AND MR. FARLEY SAYS:

14        FROM A BUSINESS PERSPECTIVE, I WOULD THINK A RUNNING

15   ROYALTY RATE WOULD BE BETTER.  BUT NORMALLY YOU DON'T GET A

16   RUNNING ROYALTY, FROM WHAT I HAVE EXPERIENCED TO DATE.

17        AND THEN, HE SAID IMMEDIATELY AFTERWARDS:

18        I WOULD HAVE TRIED FOR A RUNNING ROYALTY, BUT I DOUBT WE

19   WOULD HAVE GOTTEN IT.  BUT WE WOULD HAVE TRIED.  IT WOULD HAVE

20   BEEN BEST FROM OUR PERSPECTIVE.

21   **Q.**  OKAY.  ONCE YOU HAVE DETERMINED THAT YOU ARE APPLYING A

22   LUMP SUM ROYALTY, THAT'S NOT THE END OF YOUR WORK IN TERMS OF

23   THIS ROYALTY ANALYSIS.  YOU HAVE TO ACTUALLY FIGURE OUT WHAT

24   THE AMOUNT IS, RIGHT?

25   **A.**  THAT'S CORRECT.

1    **Q.**  AND THAT TENDS TO BE A LONGER ANALYSIS, DOESN'T IT?

2    **A.**  THAT'S AN ANALYSIS THAT CAN BE VERY INVOLVED.  AND THE

3    REASON IT CAN BE VERY INVOLVED IS THAT IT IS GOVERNED BY THE

4    GEORGIA-PACIFIC FACTORS.  AND THESE ARE SOME OF THE FACTORS

5    THAT MR. PARR TALKED ABOUT EARLIER IN HIS TESTIMONY.  AND

6    GEORGIA-PACIFIC IS A CASE THAT ENUMERATED A NUMBER OF FACTORS

7    THAT A DAMAGES EXPERT SHOULD CONSIDER IN DETERMINING THE

8    AMOUNT OF A REASONABLE ROYALTY IN A PATENT INFRINGEMENT CASE.

9         I'M NOT GOING TO GO THROUGH EACH FACTOR IN TURN.  THERE'S

10   A LOT OF THEM.  BUT WHAT I HAVE DONE HERE IN THIS SLIDE I HAVE

11   SORT OF GROUPED THEM BY TOPIC OR SUBJECT MATTER.

12        SO I HAVE A LIST OF THE FACTORS ONE, TWO, THREE, FOUR AND

13   SEVEN THAT COME UNDER WHAT I CALL "THE LICENSING BUCKET."

14   THESE HAVE TO DO WITH THE NATURE OF LICENSES THAT WE KNOW THAT

15   ARE OUT THERE FOR THE PATENTS-IN-SUIT, THE '541 AND '670, AND

16   THE LICENSING BEHAVIOR OF THE PARTIES ARE THAT MIGHT INFLUENCE

17   THE AMOUNT -- AND THE STRUCTURE, TO BE HONEST -- OF THE

18   REASONABLE ROYALTY AGREED TO.

19        THEN, THERE IS A GROUP OF FACTORS IN THE MIDDLE COLUMN

20   WHICH ARE MORE RELATED TO THE FINANCIAL, ECONOMIC AND BUSINESS

21   ASPECTS OF THE TWO PARTIES.  AND THEN, THE TOP COLUMN ON THE

22   RIGHT-HAND SIDE GOES MORE TO THE PATENTS THEMSELVES, THE

23   NATURE OF THE TECHNOLOGY, WHETHER THE TECHNOLOGY THAT IS

24   PATENTED HAS ANY BENEFITS OVER ALTERNATIVES.

25        AND THEN, FINALLY, THERE'S A GENERAL SECTION THAT SUMS UP

1    FACTOR 15 WITH THE HYPOTHETICAL NEGOTIATION BETWEEN THE

2    LICENSOR AND THE LICENSEE.  AND I HAVE HIGHLIGHTED IN BOLD

3    HERE THE FACTORS THAT I THINK ARE THE REALLY IMPORTANT ONES.

4         WHILE I DID CONSIDER EVERY SINGLE FACTOR IN MY ANALYSIS, I

5    AM GOING TO TALK MOSTLY ABOUT THE ONES THAT ARE BOLDED,

6    BECAUSE THOSE ARE THE MOST IMPORTANT FACTORS IN DETERMINING A

7    REASONABLE ROYALTY IN THIS MATTER.

8    **Q.**  BEFORE WE GO THROUGH THESE FACTORS, AS YOU JUST DESCRIBED

9    IT, CAN YOU DESCRIBE SOME OF THE ASSUMPTIONS THAT GO INTO THIS

10   GEORGIA-PACIFIC ANALYSIS AT THE FRONT?

11   **A.**  YES.  SO AS I'VE SAID BEFORE, I MUST ASSUME THAT THE

12   PATENTS ARE FOUND TO BE VALID AND INFRINGED.  AND I ASSUME

13   THAT THE PARTIES AT THE HYPOTHETICAL NEGOTIATION TABLE BELIEVE

14   THAT, TOO.  AND THEN, I MUST ASSUME THAT THE PARTIES AT THE

15   HYPOTHETICAL NEGOTIATION TABLE ARE A WILLING LICENSOR ON

16   DIGITAL REG'S BEHALF, AND A WILLING LICENSEE ON ADOBE'S

17   BEHALF.

18   **Q.**  ALL RIGHT.  LET'S APPLY THE FACTORS HERE ACCORDING TO HOW

19   YOU'VE SEEN IT BASED ON ALL THIS WORK THAT YOU'VE DONE.  CAN

20   YOU DESCRIBE THE LICENSING FACTORS AND HOW THEY'VE CONTRIBUTED

21   TO YOUR ANALYSIS?

22   **A.**  YES.  SO IN THE LICENSING BUCKET, WE HAVE HERE FIVE

23   FACTORS ENUMERATED.  THE MOST IMPORTANT FACTORS FOR ME HERE

24   WAS, FACTOR ONE, THE ROYALTIES RECEIVED BY THE PATENTEE FOR

25   THE LICENSING OF THE PATENT IN SUIT, TENDING TO SHOW AN

1  ESTABLISHED ROYALTY RATE.

2      IN OTHER WORDS, THESE ARE -- THIS IS A FACTOR WHICH ASKS

3  THE QUESTION:  ARE THERE ANY OTHER LICENSES OUT THERE THAT

4  DIGITAL REG HAS ENTERED INTO THAT INCLUDE THEIR LICENSES FOR

5  THE '541 AND THE '670 PATENT, OR ONE OR THE OTHER?

6      AND THERE ARE, AND SO THAT IS AN IMPORTANT FACTOR TO LOOK

7  AT.

8      AND THEN, THE LICENSOR'S -- FACTOR FOUR -- ESTABLISHED

9  POLICY AND MARKETING PROGRAM TO MAINTAIN PATENT MONOPOLY.

10  THAT ASKS THE QUESTION:  WELL, WHAT IS DIGITAL REG'S -- IN

11  THIS CASE, WHAT IS DIGITAL REG'S POLICY ABOUT LICENSING AND

12  HOW MIGHT THAT AFFECT THE HYPOTHETICAL NEGOTIATION?

13  **Q.**  ALL RIGHT.  WELL, LET'S LOOK AT THIS CHART YOU HAVE

14  CREATED OF THE LICENSES.  CAN YOU WALK THROUGH THIS AND

15  EXPLAIN TO US HOW THIS IS RELEVANT TO YOUR ROYALTY

16  CALCULATION?

17  **A.**  YES.  SO THIS IS THE LIST OF THE NINE RELEVANT SETTLEMENT

18  AGREEMENTS THAT DIGITAL REG ENTERED INTO FOR EITHER THE '541

19  PATENT OR THE '670 PATENT, OR BOTH, WITH THE LICENSEE.  AND

20  THE LICENSEE IS LISTED ON THE LEFT-HAND SIDE.

21      AND THEN, THE AMOUNT THAT THE LICENSEE PAID IN TERMS OF A

22  LUMP SUM IS LISTED ON THE RIGHT-HAND SIDE.  AND YOU CAN SEE

23  THEY VARY FROM 42-AND-A-HALF THOUSAND THAT BLOCKBUSTER PAID TO

24  715,000 THAT VALVE PAID.  AND THERE ARE NINE LICENSES HERE,

25  NINE LICENSEES.  AND SO AT THE BOTTOM THERE I HAVE SORT OF

1    TAKEN SOME -- DONE SOME SIMPLE MATH TO CALCULATE WHAT SOME OF

2    THE MEASURES OF AVERAGES OF THIS RANGE FROM 42.5 TO 715,000.

3        AND THE MEDIAN, THE ONE RIGHT IN THE MIDDLE -- THAT

4    HAPPENS TO BE THE MACROVISION LICENSE -- IS FOR 89,000.

5        AND THE SIMPLE MEAN, OR THE AVERAGE IF YOU TOTAL ALL THESE

6    UP AND DIVIDE BY NINE, IS A LITTLE OVER 260,000.

7        SO THAT IS THE NUMERICAL DATA THAT I'M WORKING WITH WITH

8    REGARDS TO THE RELEVANT SETTLEMENT AGREEMENTS.  AND I DRAW A

9    NUMBER OF CONCLUSIONS FROM THAT DATA.

10   **Q.**  CAN YOU DESCRIBE THOSE, PLEASE?

11   **A.**  SURE.  SO THE FIRST CONCLUSION IS -- THIS IS JUST GOING

12   INTO A LITTLE MORE DETAIL -- MORE EVIDENCE REGARDING THE

13   STRUCTURE OF THE LICENSE, THE HYPOTHETICAL NEGOTIATION.

14       SO EACH ONE OF THESE LICENSES, ALL NINE OF THEM, WAS A

15   LUMP SUM LICENSE, WHICH CLEARLY SHOWS A WILLINGNESS FOR

16   DIGITAL REG TO LICENSE ON A LUMP SUM BASIS.

17       THE SECOND THING I NOTE FROM THESE NUMBERS IS THE RANGE OF

18   THEM.  THEY RANGE FROM 42.5 TO 715 WITH TWO MEASURES OF THE

19   AVERAGE BEING 89,000 AND $262,000.

20       AND I THINK THOSE ARE VERY -- THOSE ARE A LIMITED

21   INDICATION OF THE RANGE WITHIN WHICH THE HYPOTHETICAL

22   NEGOTIATION WOULD GO.  LIMITED BECAUSE I DON'T THINK THERE IS

23   ONE SPECIFIC LICENSE THAT IS SPECIFIC -- THAT IS DEFINITIVE.

24   AND NONE OF THESE LICENSEES ARE ADOBE, BUT I THINK WHEN YOU

25   HAVE NINE LICENSEES ALL LICENSING THE PATENTS-IN-SUIT, OR ONE

1    OR THE OTHER OF THEM, FOR A RANGE OF VALUES IN-BETWEEN HERE,

2    THAT PROVIDES SOME INDICATION WITH REGARDS TO WHAT WOULD

3    HAPPEN AT THE HYPOTHETICAL NEGOTIATION.

4        AND, THIRDLY, THE THIRD POINT I NOTE IS THAT THESE NUMBERS

5    THAT I SEE HERE ARE REALLY, REALLY LOW.  I MEAN, THEY DON'T --

6    THEY DON'T GET OUT OF THE SIX FIGURES.  AND FOR LICENSING

7    VALUABLE PATENTS YOU WOULD EXPECT THE NUMBERS TO BE MUCH

8    HIGHER THAN THIS.

9        AND WHAT THIS INDICATES TO ME IS REALLY THE VERY LOW VALUE

10    OF THE PATENTS-IN-SUIT THEMSELVES, TAKEN AS A WHOLE, BECAUSE

11    YOU HAVE NINE DIFFERENT ENTITIES HERE AGREEING TO LICENSE,

12    AGREEING TO LUMP SUM LICENSE AGREEMENTS WITH DIGITAL REG, THE

13    HIGHEST OF WHICH IS $715,000; THE LOWEST OF WHICH IS UNDER

14    $50,000; AND THE AVERAGE IS BETWEEN 90 AND $260,000.

15        AND I HEARD MR. PARR TALK ABOUT, WELL, HOW THESE NUMBERS

16    MIGHT BE UNDERSTATED BECAUSE THEY ARE NEGOTIATED UNDER

17    CONDITIONS OF UNCERTAINTY ABOUT VALIDITY AND INFRINGEMENT.

18        AND WHILE THAT'S TRUE, THERE IS REALLY NO WAY THAT I THINK

19    MR. PARR CAN SAY HE KNOWS FOR CERTAIN EXACTLY WHAT THE PARTIES

20    BELIEVE DIGITAL REG AND BLOCKBUSTER BELIEVED ABOUT HOW MUCH

21    UNCERTAINTY WAS AROUND VALIDITY AND INFRINGEMENT, OR HOW MUCH

22    INTUIT AND DIGITAL REG BELIEVED ABOUT HOW MUCH UNCERTAINTY WAS

23    AROUND VALIDITY AND INFRINGEMENT.

24        WHAT I THINK IS CERTAIN, WHAT WE DO KNOW ABOUT THESE

25    NUMBERS, IS THAT THEY WERE ALL NEGOTIATED UNDER -- IN

1   LITIGATION.  THEY ARE ALL SETTLEMENT AGREEMENTS.  SO THE

2   LICENSEE KNOWS THAT IF IT DOES NOT AGREE TO A LICENSE WITH

3   DIGITAL REG, THEY ARE GOING TO BE FORCED TO SPEND MILLIONS OF

4   DOLLARS ON LITIGATION IN A PATENT INFRINGEMENT SUIT.  AND THAT

5   INCREASES OR INFLATES THE VALUE THAT THEY WOULD BE WILLING TO

6   SETTLE FOR RELATIVE TO THE TRUE VALUE OF THE PATENTS.

7        SO BUT EVEN GIVEN THAT, THESE ARE VERY LOW NUMBERS, IN MY

8   VIEW, AND INDICATE OVER ALL THE LOW VALUE OF THE

9   PATENTS-IN-SUIT.

10  **Q.**  AND IN HOW MANY DIFFERENT ENGAGEMENTS HAVE YOU LOOKED AT

11  LITIGATION SETTLEMENTS AND SEEN DIFFERENT NUMBERS TO HAVE A

12  BASIS TO SAY THIS IS LOW?

13  **A.**  OH, AN EXTREMELY LARGE NUMBER OF ENGAGEMENTS.  I HAVE BEEN

14  AN EXPERT IN PATENT LITIGATION FOR PROBABLY CLOSE TO 50, 60,

15  70 TIMES.

16  **Q.**  LET'S -- ACTUALLY, BEFORE WE MOVE ON, IS THERE ANOTHER

17  AGREEMENT INVOLVING THE PATENTS-IN-SUIT THAT YOU THINK SHEDS

18  SOME LIGHT THAT ISN'T THESE LITIGATION SETTLEMENTS?

19  **A.**  THERE IS.  THERE IS ANOTHER INDICATION OF VALUE SEPARATE

20  AND INDEPENDENT FROM THE LICENSE AGREEMENTS THAT DIGITAL REG

21  ENTERED INTO WITH OTHER PARTIES.  AND THAT IS WHAT DIGITAL REG

22  ACTUALLY PAID FOR THE PATENTS WHEN THEY WANTED TO BUY THEM.

23       AND I WAS HERE WHEN I HEARD MR. FARLEY'S TESTIMONY ABOUT

24  DIGITAL REG PAYING $500,000 FOR THE PATENTS-IN-SUIT.  AND I

25  THINK A FEW OTHER PATENTS, TOO, BUT THE '541 AND '670 PATENT.

PROWSE - DIRECT /REINES

1        AND THAT TO ME IS ANOTHER DATA POINT, SEPARATE AND

2   INDEPENDENT FROM THE SETTLEMENT AGREEMENTS, THAT ACTUALLY SORT

3   OF FALLS IN THE OVERALL RANGE THAT WE'RE TALKING ABOUT WITH

4   THE SETTLEMENT AGREEMENTS.

5        THE DIFFERENCE WITH THE PURCHASE AND SALE IS THAT WAS A

6   PURCHASE AND SALE.  IT WASN'T A LICENSE AGREEMENT.  IT WAS HOW

7   MUCH MONEY ARE YOU WILLING TO PAY TO OBTAIN OWNERSHIP OF THE

8   PATENTS?  NOT JUST TO LICENSE THE TECHNOLOGY.

9   Q.  WHY DON'T WE MOVE TO THE NEXT CLASS OF FACTORS.  THIS

10  REFERS TO THE FINANCIAL AND BUSINESS FACTORS.  AND YOU

11  HIGHLIGHT ONE AS BEING WORTHY OF CALLOUT.  CAN YOU TALK ABOUT

12  THAT, PLEASE?

13  A.  YES.  SO, AGAIN, I EXAMINED ALL OF THESE FACTORS FIVE,

14  SIX, EIGHT, 12 AND 13.  BUT I'M GOING TO TALK ABOUT THE ONE I

15  THINK IS MOST IMPORTANT, AND THAT IS THE PROFITABILITY,

16  COMMERCIAL SUCCESS AND THE POPULARITY OF THE PRODUCTS MADE

17  UNDER THE PATENT.

18  Q.  ALL RIGHT.  WHY DON'T YOU ASSESS FOR THE JURY, TAKING ALL

19  THE INFORMATION YOU HAVE AND SYNTHESIZING IT, WHAT THE

20  PATENTED TECHNOLOGY ESTABLISHES IN TERMS OF ITS SUCCESS?

21  A.  SO, THE FIRST THING I NOTED, OR THE CONCLUSION I CAME TO,

22  WAS THAT THE PATENTED TECHNOLOGY DOES NOT DRIVE COMMERCIAL

23  SUCCESS OF ANY COMPANY, AND PARTICULARLY WITH RESPECT TO

24  ADOBE.

25        AND THERE ARE A NUMBER OF PIECES OF INFORMATION OR PIECES

PROWSE - DIRECT /REINES

1    OF DATA THAT I USED TO COME TO THAT CONCLUSION.

2        THE FIRST WAS MY UNDERSTANDING OF THE HISTORY OF DIGITAL

3    REG AND ITS PREDECESSORS THAT THEY HAVE TRIED, BUT BEEN

4    UNABLE, TO COMMERCIALIZE A PRODUCT BASED ON THE PATENTED

5    TECHNOLOGY FOR MANY YEARS.  AND, IN FACT, ONE ENTITY -- I

6    THINK IT WAS DESKGATE -- ACTUALLY WENT INTO BANKRUPTCY AS A

7    RESULT OF THAT FAILURE TO COMMERCIALIZE A PRODUCT.

8        THE SECOND ELEMENT IS THAT THE PATENTED TECHNOLOGY, BEING

9    DIGITAL RIGHTS MANAGEMENT TECHNOLOGY, IT IS NOT SOMETHING THAT

10   CONSUMERS OF PRODUCTS ACTUALLY SEEK OUT AND GO OUT TO BUY.  I

11   DON'T BUY A VIDEO GAME BECAUSE IT HAS DRM ATTACHED TO IT.

12       AND A TYPICAL CONSUMER DOESN'T GO OUT AND BUY A COPY OF

13   WORD OR A COPY OF ANYTHING ELSE, EVEN IF IT DOES HAVE DRM

14   ATTACHED TO IT.

15       IN FACT, THERE'S QUITE A BIT OF DISCUSSION IN THE TRADE

16   PRESS THAT I TALKED ABOUT IN MY REPORT THAT ACTUALLY TALKED

17   ABOUT HOW DIGITAL RIGHTS MANAGEMENT CAN ACTUALLY HURT DEMAND

18   FOR A COMPANY'S PRODUCTS BECAUSE IT IS SO INCONVENIENT FOR

19   LEGITIMATE CUSTOMERS TO USE.

20       AND ONE EXAMPLE OF THAT, I BELIEVE, IS WHAT PROFESSOR

21   WICKER TALKED ABOUT LAST WEEK WHEN HE TESTIFIED ABOUT ADOBE'S

22   LICENSE MANAGER TECHNOLOGY, THE ALM TECHNOLOGY, THAT IT WAS

23   ACTUALLY DISABLED AFTER THREE MONTHS, BECAUSE IT JUST WASN'T

24   DOING WHAT IT WAS SUPPOSED TO DO, AND CUSTOMERS WERE UNHAPPY

25   ABOUT IT.

1    SO THOSE ARE SOME OF THE DATA POINTS THAT WENT INTO MY

2    EVALUATION HERE THAT THE PATENTED TECHNOLOGY THAT WE ARE

3    TALKING ABOUT IS NOT A DRIVER OF COMMERCIAL SUCCESS IN ANY

4    WAY.

5    **Q.** LET'S TALK ABOUT THE BENEFITS AND THE TECHNICAL ASPECTS IN

6    TERMS OF THAT CLASS OF FACTORS WITHIN THIS RUBRIC.

7    **A.** SO, I CONSIDERED EACH OF THESE FACTORS NINE, TEN AND 11.

8    AS I SAID BEFORE, THE THRUST OF THESE FACTORS GOES TO

9    BASICALLY:  WHAT ARE THE BENEFITS OF THE PATENTED TECHNOLOGY,

10   AND OVER ALTERNATIVE METHODS OF DOING WHATEVER THE PATENTED

11   TECHNOLOGY DOES?  ALTERNATIVE DRM METHODS WE ARE TALKING ABOUT

12   HERE.

13       AND SO ONE OF THE MOST IMPORTANT DRIVERS HERE TO

14   UNDERSTAND HOW VALUABLE THE PATENTED TECHNOLOGY IS IS:  IS

15   THERE AN ALTERNATIVE OUT THERE, OR IS THERE NOT AN ALTERNATIVE

16   OUT THERE THAT DOES NOT INFRINGE ON THE PATENTS-IN-SUIT, BUT

17   DOES ACHIEVE THE SAME TYPES OF FUNCTION THAT THE PATENTED

18   TECHNOLOGY ALLEGEDLY ACHIEVES?

19       AND THIS HAS TO GO, ESSENTIALLY, TO NONINFRINGING

20   ALTERNATIVES.  YOU HEARD SOME DISCUSSION FROM -- I THINK WE

21   HEARD SOME TESTIMONY FROM PROFESSOR WICKER ABOUT THAT LAST

22   WEEK.  WE HEARD SOME TESTIMONY FROM MR. PARR TODAY ABOUT THAT,

23   ESSENTIALLY.

24       SO WHAT I DID WAS I ASKED PROFESSOR WICKER.  I SAID TO

25   HIM, I KNOW YOU DON'T -- I UNDERSTAND IN MY INTERVIEW -- I

1    SAID, I UNDERSTAND YOU DON'T AGREE WITH MR. DEVANBU'S

2    INFRINGEMENT ASSERTIONS.  BUT ASSUME FOR A MINUTE THAT

3    MR. DEVANBU IS CORRECT.  WOULD THERE BE AN EASY WAY TO COME UP

4    WITH A NONINFRINGING ALTERNATIVE, ACCORDING TO MR. DEVANBU'S

5    THEORY OF INFRINGEMENT THAT WOULDN'T INFRINGE, ACCORDING TO

6    MR. DEVANBU'S THEORY, BUT THAT WOULD STILL GIVE THE CUSTOMER

7    OR THE BUYER OF THE PRODUCT A SIMILAR EXPERIENCE AND WOULD NOT

8    MATERIALLY IMPACT THE CUSTOMER?

9        AND BASED ON PROFESSOR WICKER'S ANALYSIS, WHICH I

10   UNDERSTAND INCLUDED INTERVIEWS WITH ADOBE SOFTWARE ENGINEERS,

11   HE SAID, YES, THERE WAS.

12       AND HE SAID IN MOST CASES IT WOULD BE VERY TRIVIAL TO COME

13   UP WITH A NONINFRINGING ALTERNATIVE TO -- IN RESPONSE TO

14   MR. DEVANBU'S INFRINGEMENT CONTENTIONS.

15       SO AS A VERY CONSERVATIVE APPROACH TO THAT, WHAT I ASSUMED

16   IS THAT IN ORDER TO IMPLEMENT THIS NONINFRINGING ALTERNATIVE,

17   IT WOULD TAKE TWO ADOBE ENGINEERS THREE MONTHS TO DO.  AND IT

18   WOULD INVOLVE EQUIPMENT AND MATERIALS' COST OF BETWEEN FIVE

19   AND $15,000.  AND I GOT THESE NUMBERS FROM JONATHAN HERBACH

20   AND PROFESSOR WICKER.

21       FOR EXAMPLE, THE AVERAGE ADOBE ENGINEER SALARY, FULLY

22   LOADED, INCLUDING BENEFITS, I GOT FROM MR. HERBACH.  AND HE

23   SAID THE AVERAGE SALARY VARIES FROM 160,000 TO 125,000.

24       AND SO TO BE CONSERVATIVE, I TOOK THE HIGH END OF ALL

25   THESE NUMBERS.  SO THE SALARY COSTS WOULD BE TWO ENGINEERS

1    TIMES THEIR ANNUAL SALARY OF $225,000 TIMES A QUARTER OF A

2    YEAR, THREE MONTHS.  THE COST WOULD BE $112,500.

3        PLUS THE UPPER END OF THE EQUIPMENT AND MATERIALS' COSTS:

4    COMPUTERS, SOFTWARE, THINGS LIKE THAT, $15,000.  MEANS THE

5    TOTAL DESIGNAROUND COST OR NONINFRINGING ALTERNATIVE COSTS

6    WOULD BE A LITTLE UNDER $130,000.

7        AND THAT IS AN IMPORTANT NUMBER BECAUSE AT THE

8    HYPOTHETICAL NEGOTIATION DAMAGES EXPERTS ARE TO ASSUME THAT

9    BOTH PARTIES KNOW THE EXACT INFRINGEMENT CONTENTIONS OF THE

10   PATENT OWNER AND ALSO WHETHER THERE ARE ANY DESIGNAROUNDS AND

11   HOW MUCH THEY WOULD COST.

12       THAT WOULD BE AN IMPORTANT -- ALSO AN IMPORTANT ELEMENT IN

13   ADDITION TO THE OTHER DATA POINTS I HAVE TALKED TO WITH

14   REGARDS TO THE AGREED-UPON ROYALTY AT THE HYPOTHETICAL

15   NEGOTIATION.

16   **Q.**  NOW, THE NATURAL QUESTION IS:  IF IT'S TRIVIAL TO MAKE

17   THIS KIND OF CHANGE, WHY WOULDN'T A COMPANY JUST DO THIS

18   INSTEAD OF BEING HERE TODAY?

19   **A.**  WELL, IN THE REAL WORLD, WHY -- I MEAN, MY IMPRESSION

20   IS -- YOU'D HAVE TO ASK ADOBE THAT -- BUT, FIRST OFF, ADOBE

21   PROBABLY DOESN'T THINK -- I'M SURE ADOBE DOESN'T THINK IT

22   INFRINGES.  AND WE HAVE HEARD EVIDENCE FROM PROFESSOR WICKER

23   ON THAT.

24       BUT EVEN SO, EVEN SETTING THAT ASIDE, ADOBE WASN'T PUT ON

25   NOTICE OF THE EXACT INFRINGEMENT CONTENTIONS UNTIL IT HAD

1   MR. DEVANBU'S REPORT, WHICH WAS SORT OF LATE LAST YEAR.

2       SO, TO EXPECT THEM TO HAVE GONE TO A NONINFRINGING

3   ALTERNATIVE IN 2005 JUST ISN'T REALISTIC BECAUSE THEY DIDN'T

4   KNOW UNTIL LATE 2013 EXACTLY WHAT DIGITAL REG'S INFRINGEMENT

5   CONTENTIONS WERE WITH RESPECT TO HOW THE PRODUCTS ACTUALLY

6   INFRINGED.

7   **Q.**  AND WERE YOU HERE WHEN MR. PARR EXPLAINED THAT DIGITAL

8   REG, BASED ON THE HISTORY, APPARENTLY HAD A PATTERN OF SUING

9   PEOPLE WITHOUT REALLY KNOWING WHAT PRODUCTS WERE INFRINGING

10  AND WHICH ONES DID AND DIDN'T, AND WHAT THE EXTENT OF IT WAS?

11  **A.**  YES, I HEARD THAT.  YES.

12  **Q.**  ALL RIGHT.  LET'S GO TO THE GENERAL FACTORS.  THIS ONE IS

13  ALWAYS FUNNY BECAUSE IT IS A LITTLE BIT CIRCULAR.  BUT DID YOU

14  TAKE INTO ACCOUNT THE OPINION TESTIMONY OF QUALIFIED EXPERTS?

15  TO THE EXTENT IT IS YOURSELF, I GUESS YOU DID.  BUT CAN YOU

16  DESCRIBE THIS ONE AND HOW IT FACTORED IN?

17  **A.**  YES.  THE WAY I READ THAT FACTOR IS IT REFERS TO OTHER

18  EXPERTS APART FROM ME.  SO, THE OPINION TESTIMONY OF OTHER

19  EXPERTS IS PROFESSOR WICKER.  I RELIED ON HIM FOR MY GENERAL

20  UNDERSTANDING OF THE TECHNOLOGY, BUT ALSO HIS SPECIFIC OPINION

21  WITH REGARDS TO NONINFRINGING ALTERNATIVES.

22      THEN, THE FINAL FACTOR IS THE HYPOTHETICAL NEGOTIATION

23  BETWEEN THE LICENSOR AND THE LICENSEE.  AND HERE WE'RE SORT

24  OF -- NOW, WE'RE SORT OF FACTORING IN ALL THE ECONOMIC,

25  FINANCIAL, LICENSING, TECHNICAL BENEFITS FACTORS THAT WE HAVE

1    GONE THROUGH IN THE GEORGIA-PACIFIC FACTOR -- FACTORS;

2    IDENTIFIED THE ONES THAT WE THINK ARE MOST IMPORTANT IN THIS

3    PARTICULAR CASE.  AND EACH CASE WILL BE DIFFERENT.  DIFFERENT

4    FACTORS WILL BE OF DIFFERENT IMPORTANCE.  BUT IN THIS CASE,

5    IDENTIFYING WHICH OF THE ONES ARE THE MOST IMPORTANT.  AND

6    THEN, COMING TO AN OPINION WITH REGARDS TO WHAT THAT ANALYSIS

7    TELLS US WITH REGARDS TO A -- THE OUTCOME OF THE HYPOTHETICAL

8    NEGOTIATION.

9    **Q.** WHY DON'T YOU EXPLAIN, YOU KNOW, WHAT FACTORS STOOD OUT TO

10   YOU IN THE ANALYSIS?

11   **A.** SO SORT OF SUMMING UP WHAT I HAVE BEEN TALKING ABOUT FOR

12   THE LAST HALF HOUR OR SO, I THINK IT IS CLEAR THAT THE PARTIES

13   WOULD HAVE AGREED TO A LUMP SUM AMOUNT OF A ROYALTY AT THE

14   HYPOTHETICAL NEGOTIATION.

15        THAT'S INFORMED NOT ONLY BY DIGITAL REG'S ACTUAL BEHAVIOR

16   AND ADOBE'S PREFERENCES AND ADOBE'S ACTUAL BEHAVIOR, BUT ALSO

17   BECAUSE THERE IS THIS -- THERE ARE OTHER FACTORS, INCLUDING

18   THE DESIGNAROUND, THAT INDICATE A LUMP SUM WOULD BE THE MOST

19   IMPORTANT.  OR LUMP SUM WOULD BE THE AGREED-UPON STRUCTURE TO

20   THE ROYALTY.

21        THEN, WITH REGARDS TO HOW MUCH, I'VE TALKED ABOUT A NUMBER

22   OF INDEPENDENT SORT OF INDICATORS OF VALUE.  FIRST IS THE

23   OVERALL AMOUNTS PAID IN THE FORM OF A LUMP SUM BY NINE

24   DIFFERENT ENTITIES TO DIGITAL REG FOR THE PATENTS-IN-SUIT

25   EARLIER IN TIME.  AND THEIR SORT OF AVERAGES, WHICH RANGE FROM

1    89,000 TO 262,000.

2        THEN, MY UNDERSTANDING FROM PROFESSOR WICKER THAT THERE

3    WAS A LOW-COST DESIGNAROUND OF APPROXIMATELY -- TO BE

4    CONSERVATIVE -- $150,000, ALL IN.

5        AND THEN, FINALLY, THE FACT THAT THE PATENTED TECHNOLOGY

6    DOESN'T REALLY SHOW ANY HUGE AMOUNT OF VALUE, DOESN'T DRIVE

7    COMMERCIAL SUCCESS.  IT IS REFLECTED, AND IT'S REFLECTED IN

8    THE SETTLEMENT AGREEMENTS THAT HAVE SUCH LOW NUMBERS

9    ASSOCIATED WITH THEM.  SO ALL OF THOSE WERE FACTORS THAT WERE

10   IMPORTANT IN COMING UP WITH MY OPINION.

11   **Q.**  AND YOUR CONCLUSION WAS?

12   **A.**  AND MY CONCLUSION WAS THAT THE TOTAL DAMAGES THAT WOULD BE

13   DUE DIGITAL REG, IF THE PATENTS WERE FOUND VALID AND

14   INFRINGED, SHOULD BE $150,000.  THAT WOULD BE THE NUMBER THAT

15   WOULD COME OUT OF MY ANALYSIS OF ALL THE GEORGIA-PACIFIC

16   FACTORS AND THE HYPOTHETICAL NEGOTIATION.

17   **Q.**  NOW, YOU WERE IN THE COURTROOM WHEN WE HEARD MR. PARR

18   PROVIDE HIS $15 MILLION-PLUS NUMBER?

19   **A.**  YES, I WAS IN THE COURTROOM LAST WEEK AND TODAY TO HEAR

20   THAT.

21   **Q.**  DO YOU DEGREE WITH HIS ANALYSIS?  FORGET THE NUMBER, BUT

22   HIS UNDERPINNINGS OF THAT ANALYSIS?

23   **A.**  NO.  I THINK MR. PARR'S ANALYSIS HAS SOME VERY, VERY

24   SERIOUS ERRORS.

25   **Q.**  AND YOU'VE TESTIFIED IN THESE MANY CASES THAT YOU HAD

PROWSE – DIRECT /REINES

```
 1    AGAINST OTHER DAMAGE EXPERTS WHERE YOU HAVE DONE CRITIQUES?

 2    A.  YES.

 3    Q.  AND WHERE DOES THIS ONE STACK UP IN TERMS OF THE

 4    DEFICIENCIES THAT YOU PERCEIVE?

 5    A.  WELL, I THINK IN TERMS OF STACKING UP, I THINK THERE

 6    ARE -- THERE'S AN EXTREME NUMBER OF VERY SERIOUS ERRORS HERE

 7    THAT I WOULD NOT EXPECT A DAMAGES EXPERT TO MAKE.

 8    Q.  ALL RIGHT.  WOULD YOU WALK THROUGH THE ONES YOU CONSIDER

 9    TO BE MOST SIGNIFICANT FOR PRESENT PURPOSES?

10    A.  SURE.

11       AND SORT OF AT A HIGH LEVEL THEY ARE IDENTIFIED IN THIS

12    SLIDE.

13       SO THE FIRST POINT -- AND I HAVE TALKED ABOUT THIS

14    BEFORE -- IS I DON'T BELIEVE THERE IS ANY EVIDENCE FOR A

15    RUNNING ROYALTY IN THIS MATTER, THAT THE PARTIES WOULD AGREE

16    TO A RUNNING ROYALTY IN THIS MATTER.  AND THE REASON IS, AS

17    I'VE SAID BEFORE, ALL OF THE SETTLEMENTS ARE LUMP SUM.  ADOBE

18    HAS A CLEAR PREFERENCE FOR A LUMP SUM, AS WELL.

19       DIGITAL REG HAS SHOWN A WILLINGNESS TO ACCEPT A LUMP SUM.

20    AND THAT WAS -- THAT WAS CRYSTALLIZED IN MR. FARLEY'S

21    TESTIMONY LAST WEEK.

22    Q.  NOW, WHAT IS THE SECOND POINT?

23    A.  SO THE SECOND POINT IS, AS NO DOUBT YOU WILL RECALL,

24    MR. PARR HAS THREE DATA POINTS FOR HIS ROYALTY RATE THAT HE

25    ULTIMATELY COMES UP WITH.
```

1  I THINK ALL OF THEM ARE EXTREMELY UNRELIABLE.  AND JUST TO

2  GO THROUGH THEM, IN TURN, THE FIRST, THE ADOBE PLUG-IN

3  LICENSE, I THINK THAT IS JUST NOT GERMANE TO THIS CASE.  IT'S

4  NOT A PATENT LICENSE.  IT'S NOT A LICENSE FOR DRM.  IT'S A

5  LICENSE FOR BASICALLY EVERYTHING BUT DRM.

6  IT'S THE COMPANY THAT'S TAKING THE LICENSE THAT IS GOING

7  TO MAKE THE DRM HOWEVER IT WANTS TO MAKE IT.  IT'S NOT GOING

8  TO PAY ANYTHING TO ADOBE FOR MAKING THE DRM.  IT'S ONLY GOING

9  TO PAY SOMETHING TO ADOBE IF IT ENTERS INTO AN AGREEMENT WITH

10  ADOBE TO USE ITS OWN DRM WITH ADOBE'S PRODUCTS.

11  SO WHAT THE LICENSEE IN THIS PLUG-IN ARRANGEMENT IS

12  GETTING IS ACCESS TO ADOBE'S PRODUCTS, NOT ANY KIND OF DRM

13  TECHNOLOGY, KNOWLEDGE HOW TO MAKE DRM, PATENTED TECHNOLOGY

14  CONCERNING DRM.  IT HAS GOT NOTHING TO DO WITH DRM TECHNOLOGY.

15  IN ADDITION, WHAT MR. PARR DIDN'T TALK ABOUT WAS THE

16  FACT -- AND I HEARD MR. HERBACH SAY THIS -- THAT MR. HERBACH

17  CAN'T EVEN REMEMBER A TIME WHEN THERE WAS ACTUALLY A

18  TRANSACTION AT THE 5.5 PERCENT RATE THAT IS ON THE ADOBE

19  WEBSITE.

20  SO THERE IS NO EVIDENCE THAT ANY PARTY ACTUALLY AGREED TO

21  PAY 5.5 PERCENT FOR ACCESS TO ADOBE SOFTWARE AS PART OF THIS

22  PLUG-IN ARRANGEMENT.

23  FINALLY, I NOTICED FROM THE WEBSITE ITSELF THAT ADOBE

24  ACTUALLY SAYS, WELL, YOUR DRM PLUG-IN, WE ARE NOT GOING TO

25  CHARGE YOU ANYTHING IF YOU USE IT WITH ACROBAT PRO, OR I THINK

1   ANOTHER PRODUCT.  WE ARE ONLY GOING TO CHARGE YOU SOMETHING IF

2   YOU USE IT WITH ACROBAT READER.

3       SO IN MANY CASES THERE MAY BE FREE USE OF THIS DRM PLUG-IN

4   WITHOUT ANY PAYMENT BEING MADE.

5       SO I THINK THE ADOBE PLUG-IN LICENSE IS JUST NOT RELEVANT,

6   NOT GERMANE TO THIS MATTER.

7   **Q.**  HOW ABOUT THE INTUIT LICENSE?

8   **A.**  SO THE INTUIT LICENSE, IF YOU REMEMBER, THAT'S THE

9   2.5 PERCENT THAT MR. PARR CAME UP WITH.  AND AS FAR AS I CAN

10  MAKE OUT FROM THE TESTIMONY OF MR. FARLEY AND MR. PARR, THAT'S

11  BASED ON A NUMBER THAT MR. PARR TESTIFIED HE DIDN'T KNOW.

12      THE TRIAL TRANSCRIPT IS HERE, AND I WAS HERE TO LISTEN TO

13  IT.  AND THE QUESTION WAS:

14          "MR. FARLEY, DO YOU HAVE ANY KNOWLEDGE ABOUT WHAT

15          PERCENT OF THE SALES UNDERLIE THE AGREEMENT THAT YOU

16          REACHED WITH INTUIT?"

17      AND THE COURT SAYS:

18          "THAT'S A 'YES' OR 'NO.'"

19      AND THE WITNESS TESTIFIED:

20          "NO."

21      AND SO EVEN SETTING ASIDE THE FACT THAT I DON'T AGREE THAT

22  IT SHOULD BE A RUNNING ROYALTY, EVEN IF YOU ACCEPT THAT IT

23  SHOULD BE A RUNNING ROYALTY, I DON'T BELIEVE THERE IS ANY

24  EVIDENCE, RELIABLE EVIDENCE FOR TURNING THE $350,000 THAT WAS

25  ACTUALLY PAID BY INTUIT TO DIGITAL REG INTO A RELIABLE RUNNING

1    ROYALTY.

2        AND I ALSO HEARD MR. PARR'S TESTIMONY THIS MORNING THAT HE

3    DOESN'T KNOW IF INTUIT MADE FUTURE SALES BECAUSE THIS $350,000

4    COVERED FUTURE SALES OF INTUIT.  AND, OBVIOUSLY, IF INTUIT

5    MAKES FUTURE SALES THAT 2.5 PERCENT IS GOING TO GO DOWN.  AND

6    IT MAY GO DOWN -- IN MR. PARR'S EXAMPLE, IT MAY GO DOWN A LOT.

7    IT MAY GO DOWN BY HALF OR MORE, BUT HE DOESN'T KNOW THAT.

8    Q.  NOW, MR. PARR TESTIFIED TO 2.5 PERCENT.  YOU WILL RECALL

9    MR. FARLEY SAID 2 PERCENT ON THAT DEMONSTRATIVE THAT WAS BEING

10   USED BY DIGITAL REG, SAID 2 PERCENT.  DO YOU KNOW WHETHER IT

11   IS 2 OR 2.5 PERCENT?

12       DO YOU HAVE ANY EXPLANATION FOR WHY THEY ARE IN CONFLICT

13   ON THAT?

14   A.  I HAVE NO IDEA HOW THESE NUMBERS ARE COMING IN AND BEING

15   USED.  I DON'T KNOW WHAT THE 2 PERCENT RELATES TO, THE

16   2.5 PERCENT RELATES TO.  THERE JUST DOESN'T SEEM TO BE A

17   RELIABLE BASIS FOR ANY OF THE PERCENT ROYALTY RATES COMING OUT

18   OF THE INTUIT LICENSE, WHETHER IT BE TWO, OR TWO-AND-A-HALF,

19   WHATEVER IT IS.

20   Q.  LET'S GO TO THE THIRD KEY DATA POINT THAT MR. PARR RELIED

21   ON, WHICH IS THE MACROVISION LICENSE.  DO YOU RECALL THE

22   MACROVISION LICENSE?

23   A.  YES.

24   Q.  CAN YOU EXPLAIN WHY THAT IS SOMETHING THAT YOU CONSIDERED

25   TO BE UNRELIABLE IN ADDITION TO THE OTHER TWO KEY DATA POINTS

PROWSE - DIRECT /REINES

```
1    YOU RELIED ON?

2    A.  YES.  SO, THIS IS SLIGHTLY DIFFERENT FROM THE INTUIT

3    LICENSE IN THAT IN THE MACROVISION LICENSE THERE IS A CLAUSE

4    IN THERE WHICH SAYS THAT THE $89,000 THAT MACROVISION IS

5    PAYING TO DIGITAL REG REPRESENTS SOME KIND -- REPRESENTS

6    1 PERCENT OF SALES.

7        A FEW -- I NOTICED A COUPLE OF THINGS ABOUT THAT.  FIRST,

8    MR. FARLEY SAID THAT WHEN HE NEGOTIATED THIS LICENSE HE HAD NO

9    IDEA THAT THE 1 PERCENT WAS IN THERE.  SO IT WASN'T IN HIS

10   HEAD AS A NEGOTIATOR FOR DIGITAL REG WHEN HE WAS NEGOTIATING

11   THIS LICENSE.  HE WAS FOCUSED ON THE LUMP SUM OF $89,000.

12       AND I HEARD HIM SAY THAT LAST WEEK AND HERE IS THE TRIAL

13   TRANSCRIPT WHEN HE IS ASKED THE QUESTION:

14           "YOU DIDN'T READ THE LICENSE AGREEMENT WITH RESPECT

15           TO THE 1 PERCENT?"

16   AND HE SAID:

17           "NO, I DIDN'T."

18   AND THE QUESTION WAS:

19           "WHEN YOU SIGNED IT, YOU HAD NO IDEA ABOUT THIS

20           1 PERCENT.  WHAT YOU KNEW ABOUT WAS THE $89,000 YOU

21           WERE GOING TO GET?"

22   HE SAYS:

23           "NO."

24   AND THEN, THE QUESTION WAS:

25           "IN FACT, WHEN I ASKED YOU ABOUT THE 6.7 -- THAT IS
```

1              THE CLAUSE 6.7 IN THE MACROVISION LICENSE AGREEMENT,

2         WHICH CONTAINS THE 1 PERCENT LANGUAGE -- WASN'T IT

3         TRUE WITH THE 6.7 PROVISION WHERE YOU AGREED TO AN

4         EFFECTIVE ROYALTY RATE OF 1 PERCENT THAT YOUR VIEW OF

5         THAT THAT IT WAS JUST LAWYER STUFF?"

6      AND MR. FARLEY AGREED WITH THAT.  WHAT THAT TELLS ME IS

7  DIGITAL REG WAS NOT THINKING WHEN IT SAT DOWN WITH

8  MACROVISION, IT WAS NOT THINKING ABOUT A RUNNING ROYALTY RATE

9  OF 1 PERCENT.  IT WAS THINKING ABOUT THE $89,000.

10  **Q.**  LET'S TALK ABOUT THE APPORTIONMENT ANALYSIS.  CAN YOU

11  EXPLAIN TO THE JURY, BECAUSE THAT IS A LITTLE BIT -- AT LEAST

12  FOR ME IT WAS A LITTLE BIT TRICKY TO FIGURE OUT HOW THAT FIT

13  INTO THIS.

14  **A.**  THERE ARE TWO THINGS ABOUT MR. PARR'S BASE, WHICH I

15  SEVERELY, SERIOUSLY DISAGREE WITH.  THE FIRST THING HAS TO DO

16  WITH HIS USE OF THE $2 BILLION BASE.  AND I THINK WE HEARD

17  TESTIMONY LAST WEEK AND THIS MORNING THAT INDICATED THAT THE

18  ROYALTY BASE,  BASED ON DIGITAL REG'S INFRINGEMENT

19  CONTENTIONS, IS LIKELY TO BE MUCH, MUCH, MUCH LOWER THAN THE

20  $2 BILLION THAT MR. PARR IS USING, BECAUSE -- SIMPLY BECAUSE

21  THE ACROBAT PRO ONLY IMPLEMENTS THE LIVECYCLE READER IN A

22  SUPER TINY NUMBER OF INSTANCES.

23      SO, JUST TO START WITH, AND THEN THERE IS THE ISSUE WITH

24  THE FLASH ACCESS WHERE MR. PARR IS COUNTING REVENUES ON FLASH

25  PRO FROM 2005, EVEN THOUGH IT'S MY UNDERSTANDING -- I'M NOT A

PROWSE - DIRECT /REINES

1    TECHNICAL EXPERT -- BUT IT'S MY UNDERSTANDING THAT THE

2    INFRINGEMENT CONTENTIONS RELATE ONLY TO FLASH ACCESS.

3        AND SO THERE IS A SIGNIFICANT AMOUNT OF REVENUE THAT

4    MR. PARR IS COUNTING WITH REGARDS TO FLASH PRO THAT, AGAIN, MY

5    UNDERSTANDING IS DOESN'T HAVE ANYTHING TO DO WITH THE

6    INFRINGEMENT CONTENTIONS.

7        AND THEN, I UNDERSTAND THERE'S BEEN NO TESTIMONY ABOUT THE

8    LC READER EXTENSIONS, WHICH, AGAIN, IS A SIGNIFICANT AMOUNT OF

9    REVENUE.  IF YOU ADD UP ALL THAT REVENUE THAT'S PROBABLY

10   95 PERCENT PLUS OR MORE OF THE ENTIRE REVENUE THAT MR. PARR IS

11   APPLYING HIS 2.5 PERCENT TO.

12       MR. PARR DOES TWO THINGS WITH HIS BASE.  HE TAKES THE

13   $2 BILLION, AND THEN HE CUTS IT, BECAUSE HE HAS TO, BY -- HE

14   TAKES 30 PERCENT OF IT TO GET TO WHAT HE CALLED THE "SMALLEST

15   SALABLE UNIT."

16       THAT'S SOMETHING THAT DAMAGES EXPERTS ARE REQUIRED TO DO

17   IN MANY CASES.  NOT ALL CASES, BUT IN MANY CASES THEY ARE

18   REQUIRED TO GET DOWN TO A SMALLEST SALABLE UNIT.  AND THAT WAS

19   MR. PARR'S METHOD OF DOING THAT.

20       AND THE PROBLEM I HAVE WITH THAT 30 PERCENT IS THAT IT

21   REALLY DOESN'T HAVE ANYTHING TO DO WITH ADOBE.  THERE IS NO

22   ADOBE-SPECIFIC INFORMATION TO UNDERSTAND, WELL, WHAT'S THE

23   PROPER SMALLEST SALABLE UNIT FOR THE PRODUCTS THAT ADOBE

24   SELLS?  AND HOW WOULD YOU GET DOWN TO THAT?

25       WHAT MR. PARR DOES IS HE USES A VALVE -- SOME KNOWLEDGE

1    ABOUT VALVE, SOME KNOWLEDGE ABOUT MICROSOFT AND SOME KNOWLEDGE

2    ABOUT APPLE OBTAINED FROM SOME DOCUMENTS TO MAKE THE

3    30 PERCENT CUT OF HIS $2 BILLION ROYALTY BASE.

4         BUT, AGAIN, THERE'S NO NEXUS.  THERE IS NO CONNECTION.

5    THERE'S NO -- WITH ADOBE.  AND WE KNOW -- WHAT WE DO KNOW IS

6    THAT APPLE SELLS VERY DIFFERENT PRODUCTS THAN ADOBE DOES.  AND

7    VALVE SELLS VERY DIFFERENT PRODUCTS THAN ADOBE DOES.

8         VALVE SELLS GAMES.  APPLE SELLS ALL SORTS OF THINGS:  APPS

9    AND ITUNES AND THINGS LIKE THAT, THOSE ARE VERY DIFFERENT FROM

10   THE TYPES OF PRODUCTS THAT ADOBE SELLS.

11        SO, IT JUST SEEMS TO BE AN ANALYTICAL GAP FOR ME BETWEEN

12   THE NUMBER THAT MR. PARR USES, THE 30 PERCENT, AND APPLYING

13   THAT TO ADOBE.

14   **Q.**   THANK YOU.

15        **MR. REINES:**  NO FURTHER QUESTIONS, YOUR HONOR.

16                    **CROSS-EXAMINATION**

17   **BY MR. PRICE:**

18   **Q.**   GOOD MORNING, DR. PROWSE.

19   **A.**   GOOD MORNING.

20   **Q.**   MY NAME IS ADAM PRICE.

21        YOU SAID DIGITAL REG WAS UNABLE TO COMMERCIALIZE A

22   PRODUCT.  DID I HEAR THAT CORRECTLY?

23   **A.**   I SAID DIGITAL REG OR ITS PREDECESSORS WERE UNABLE TO.  MY

24   UNDERSTANDING WAS DIGITAL REG OR ITS PREDECESSORS, INCLUDING

25   DESKGATE AND OTHERS, WERE UNABLE TO.

1    Q.  ARE YOU FAMILIAR WITH DIGITAL REG'S CORPORATE STRUCTURE,

2    SIR?

3    A.  DIGITAL REG, PER SE?  YES, I THINK I HEARD SOME TESTIMONY

4    ABOUT THAT.

5    Q.  AND ARE YOU AWARE OF ANY OTHER DIGITAL REG AFFILIATES

6    PRODUCING ANY PRODUCTS?

7    A.  I'M NOT AWARE OF ANY AFFILIATES PRODUCING PRODUCTS THAT

8    COMMERCIALIZE THE PATENTED TECHNOLOGY.

9    Q.  HAVE YOU INVESTIGATED THAT ISSUE?

10   A.  I HAVE READ DEPOSITION TESTIMONY FROM MR. FARLEY ON THAT.

11   AND SO, IN THAT SENSE, YES, I HAVE.

12   Q.  OKAY.  WITH RESPECT TO YOUR OPINION AND ITS SCOPE, IF

13   THERE ARE SOME PRODUCTS THAT ADOBE SELLS THAT AREN'T IN THIS

14   CASE, BUT COULD BE ASSERTED IN ANOTHER CASE, WOULD YOU FEEL

15   LIKE ADOBE, IF THEY PAID $150,000, THAT THAT WOULD BE FOR ALL

16   PRODUCTS OR JUST THE PRODUCTS THAT ARE IN THIS CASE?

17   A.  MY OPINION IS SPECIFIC TO THE DAMAGES ASSOCIATED WITH

18   ALLEGED INFRINGEMENT OF THE '541 AND THE '670 PATENT.  AND MY

19   ASSUMPTION IS THAT ALL THE PRODUCTS THAT DIGITAL REG IS

20   ALLEGING INFRINGE THOSE PATENTS HAVE BEEN IDENTIFIED.  IF

21   THERE ARE OTHER PRODUCTS THAT ARE ALLEGED TO INFRINGE THE '541

22   AND THE '670 PATENT THAT HAVEN'T BEEN IDENTIFIED IN THIS CASE,

23   AND ARE NOT RELEVANT TO THIS CASE, I THINK LARGE PARTS OF MY

24   ANALYSIS WOULD STAY THE SAME.

25        I WOULD HAVE TO UNDERSTAND IF THERE WAS A NONINFRINGING

1    ALTERNATIVE FOR THOSE PRODUCTS.  I THINK THERE PROBABLY WOULD

2    BE, THE WAY I UNDERSTAND THE DRM TECHNOLOGY TO WORK.  BUT I

3    WOULD HAVE TO LOOK AT THAT.

4    **Q.**  YOU HAVEN'T DONE THAT ANALYSIS?

5    **A.**  I HAVE ANALYZED THE SPECIFIC '541 AND OF '670 PRODUCTS --

6    '670 PATENTS AND THE INFRINGEMENT CONTENTIONS OF DIGITAL REG

7    IN THIS MATTER, WHICH RELATE TO THE LIST OF PRODUCTS THAT WE

8    SAW ON MR. PARR'S EXHIBIT.  SO I HAVEN'T CONSIDERED ANY OTHER

9    PRODUCTS.

10   **Q.**  SO YOU DON'T CONSIDER ANY OTHER PRODUCTS, JUST TO BE CLEAR

11   ON THAT?

12   **A.**  I HAVEN'T CONSIDERED ANY OTHER PRODUCTS.  MY OPINION MIGHT

13   BE THE SAME, BUT I WOULD HAVE TO KNOW WHAT THOSE PRODUCTS ARE

14   AND HOW THEY ARE ALLEGED TO USE DRM TECHNOLOGY, AND THINGS

15   LIKE THAT.

16   **Q.**  RIGHT.  BUT WHEN THE JURY IS CONSIDERING THE CASE, THEY

17   SHOULD JUST -- IN THE CONTEXT IF THEY ADOPT YOUR DAMAGES

18   ANALYSIS, IT WOULD BE IN THE CONTEXT OF JUST THESE PRODUCTS?

19   **A.**  YEAH.  I MEAN, I DON'T SEE HOW THEY SHOULD CONSIDER IT ANY

20   OTHER FASHION BECAUSE THESE ARE THE ONLY PRODUCTS IDENTIFIED

21   BY DIGITAL REG TO ALLEGEDLY INFRINGE.

22   **Q.**  I THOUGHT I HEARD YOU TESTIFY THAT ALM HAD BEEN DISABLED.

23   I THINK MAYBE I SAW IT ON THE SLIDE DECK; IS THAT CORRECT,

24   SIR?

25   **A.**  THAT'S MY UNDERSTANDING, YES.

1    **Q.**  ARE YOU AWARE THAT ADOBE HAS CONTINUED TO USE ALM AFTER

2    ITS DISABLEMENT IN OTHER CONTEXT?

3    **A.**  I HEARD OTHER -- I READ A LOT OF DEPOSITION TESTIMONY

4    ABOUT ALM BEING DISABLED BECAUSE IT WASN'T -- CUSTOMERS WERE

5    COMPLAINING ABOUT IT.  BUT I CAN'T RECALL SITTING HERE ANY

6    DEPOSITION TESTIMONY THAT IT'S BEEN USED IN OTHER WAYS.

7            **MR. REINES:**  YOUR HONOR, WE OBJECT AND REQUEST A

8    CAUTION.

9            **THE COURT:**  YOU'RE NOT GOING TO GO ANY FURTHER ON

10   THIS?

11           **MR. PRICE:**  THAT IS ALL I HAD ON IT, YOUR HONOR.

12   **BY MR. PRICE:**

13   **Q.**  DO YOU KNOW HOW LONG IT TOOK ADOBE TO DEVELOP THE FLASH

14   ACCESS PRODUCT?

15   **A.**  IF THAT WAS IN THE DEPOSITION TESTIMONY OF WITNESSES, I

16   WOULD HAVE READ THAT.  BUT I CAN'T RECALL SITTING HERE.

17   **Q.**  SO, IN CONSIDERING YOUR NONINFRINGING ALTERNATIVES, YOU

18   DID NOT CONSIDER HOW LONG IT TOOK TO ACTUALLY DEVELOP THE

19   ENTIRE PRODUCT?

20   **A.**  NO, BECAUSE THAT'S -- THAT'S SORT OF IRRELEVANT TO

21   FIGURING OUT WHETHER THERE IS A WAY TO COME UP WITH A

22   NONINFRINGING ALTERNATIVE SPECIFIC TO THE DRM TECHNOLOGY AND

23   SPECIFIC TO THE WAY THAT DRM TECHNOLOGY IS ALLEGED TO INFRINGE

24   BY DIGITAL REG.  THE UNDERLYING PRODUCT IS NOT REALLY RELEVANT

25   TO THAT ANALYSIS.

1    **Q.**  IF YOU COULD LIMIT YOUR ANSWERS TO MY QUESTION ALONE, YOUR

2    LAWYER CAN COME UP AND ASK FOR -- GIVE YOU FOR MORE

3    EXPLANATION.

4        HOW LONG DID IT TAKE FOR ADOBE TO DEVELOP THE LIVECYCLE

5    RIGHTS MANAGEMENT PRODUCT?

6    **A.**  I MAY HAVE -- I MAY HAVE KNOWN THAT AT SOME POINT LOOKING

7    AT DEPOSITION TESTIMONY, BUT I CAN'T RECALL SITTING HERE.

8    **Q.**  YOU DID NOT LOOK AT THAT INFORMATION IN CONDUCTING YOUR

9    ANALYSIS?

10   **A.**  I MAY HAVE LOOKED AT IT IF IT WAS IN -- IF IT WAS IN

11   SOMEONE'S DEPOSITION TESTIMONY THAT IT TOOK THEM HOWEVER MANY

12   MONTHS OR YEARS TO DEVELOP LIVECYCLE MANAGEMENT, BUT I CAN'T

13   RECALL THAT TIME SITTING HERE.

14   **Q.**  YOU DID NOT RELY ON THAT?

15   **A.**  IT WASN'T IMPORTANT TO MY NONINFRINGING ALTERNATIVE

16   ANALYSIS, IF THAT IS WHAT YOU ARE ASKING.

17   **Q.**  YOU DID NOT LOOK AT HOW LONG IT TOOK ADOBE TO DEVELOP ITS

18   ACTIVATION TECHNOLOGY?

19   **A.**  AGAIN, THAT WASN'T RELEVANT TO MY ANALYSIS.  SO WHILE I

20   MAY HAVE NOTED IT AT SOME POINT, IT DIDN'T COME INTO PLAY.

21   **Q.**  LET'S TALK ABOUT YOUR NONINFRINGING ALTERNATIVES ANALYSIS.

22   YOUR ANALYSIS, AS I UNDERSTAND IT, IS BASED ON ADOBE CHANGING

23   COURSE AND USING A DIFFERENT TECHNOLOGY FROM WHAT IT ACTUALLY

24   USED, RIGHT?

25   **A.**  MY ANALYSIS IS BASED ON WHETHER THERE IS A NONINFRINGING

1   ALTERNATIVE THAT ADOBE COULD IMPLEMENT IN RESPONSE TO

2   MR. DEVANBU'S INFRINGEMENT CONTENTIONS AND THE EFFECT OF THAT

3   IMPLEMENTATION ON ITS PRODUCTS AND ON CONSUMER ACCEPTANCE OF

4   THOSE PRODUCTS.

5   **Q.**  OKAY.  IF YOU CAN LISTEN TO MY QUESTION AND ANSWER IT.

6       YOUR ANALYSIS IS BASED ON ADOBE CHANGING COURSE AND USING

7   A TECHNOLOGY DIFFERENT FROM WHAT IT ACTUALLY USED, RIGHT?

8   **A.**  NO.  THE WAY YOU PHRASED IT, THAT IS NOT CORRECT.  I'M

9   LOOKING AT THE NONINFRINGING ALTERNATIVE IN THE CONTEXT OF THE

10  HYPOTHETICAL NEGOTIATION AND WHAT WOULD BE –– WHAT THE PARTIES

11  WOULD KNOW ABOUT HOW EASY IT WOULD BE TO COME UP WITH A

12  NONINFRINGING ALTERNATIVE AT THE HYPOTHETICAL NEGOTIATIONS.

13  NOT TALKING ABOUT THE ACTUALLY WORLD IN THE WAY YOU TALKED

14  ABOUT IT.

15  **Q.**  ARE YOU SUGGESTING TO THE JURY THAT ADOBE ACTUALLY ADOPTED

16  THESE NONINFRINGING ALTERNATIVES?

17  **A.**  NO.  I DON'T KNOW WHETHER THEY DID OR NOT.

18  **Q.**  SO YOU ARE NOT SUGGESTING THEY ACTUALLY ADOPTED THE

19  NONINFRINGING ALTERNATIVES?

20  **A.**  NO, I DON'T BELIEVE I SUGGESTED THAT.

21  **Q.**  SO, WHEN IT COMES TO THE WORKAROUND, THE TECHNICAL

22  ANALYSIS THAT YOU DID WAS YOUR RELIANCE ON DR. WICKER; IS THAT

23  CORRECT?

24  **A.**  YES.  I RELIED ON PROFESSOR WICKER FOR MY UNDERSTANDING OF

25  WHETHER THERE WAS A NONINFRINGING ALTERNATIVE RESPONSIVE TO

1    MR. DEVANBU'S INFRINGEMENT CONTENTIONS.

2    **Q.**  YOU BASED IT ON JUST A COUPLE OF PHONE CALLS WITH ADOBE'S

3    EXPERT; IS THAT CORRECT?

4    **A.**  YES.  THEY WERE LONG PHONE CALLS, BUT A COUPLE OF THEM,

5    YEAH.

6    **Q.**  THEY WERE JUST A COUPLE OF HOURS LONG, RIGHT?

7    **A.**  IN TOTAL, YEAH.

8    **Q.**  AND IT WAS JUST A COUPLE OF DAYS BEFORE YOUR REPORT WAS

9    DUE, RIGHT?

10   **A.**  PROBABLY, YEAH.

11   **Q.**  AND A LAWYER ON ADOBE'S TRIAL TEAM WAS ON THE PHONE, AS

12   WELL, RIGHT?

13   **A.**  I BELIEVE SO, YES.

14   **Q.**  SO YOU FORMED THIS ENTIRE OPINION IN ABOUT TWO HOURS OVER

15   THE COURSE OF TWO CALLS; IS THAT CORRECT?

16   **A.**  NO.  WELL, FORMED THE ENTIRE OPINION.  I ASKED MR. OR

17   PROFESSOR WICKER THE SIMPLE QUESTION OF WOULD THERE BE AN EASY

18   DESIGN AROUND.  AND IF SO, HOW EASY, TO MR. DEVANBU'S

19   INFRINGEMENT CONTENTIONS.

20       AND HE SAID, YES, I BELIEVE THERE WOULD BE.

21       AND I SUBSEQUENTLY READ PROFESSOR WICKER'S REPORT ON THIS

22   WHICH HAD PROBABLY 15 OR 20 PAGES ON THE NONINFRINGING

23   ALTERNATIVES THAT COULD HAVE BEEN ADOPTED.

24   **Q.**  DID DR. WICKER ACTUALLY BUILD A NONINFRINGING ALTERNATIVE?

25   **A.**  I DON'T BELIEVE HE -- I DON'T BELIEVE HE DID.  HE TOLD ME

1    THERE WAS AN EASY WAY TO COME UP WITH A NONINFRINGING

2    ALTERNATIVE.

3    **Q.**  DID YOU LOOK AT ANY TESTS OR STUDIES THAT SUPPORTED DR.

4    WICKER'S VIEW THAT A NONINFRINGING ALTERNATIVE WOULD ACTUALLY

5    WORK?

6    **A.**  WELL, I DON'T KNOW IF I WOULD BE QUALIFIED TO EVALUATE ANY

7    TEST OR STUDIES HE DID, BECAUSE I'M NOT A TECHNICAL EXPERT.

8    **Q.**  DID YOU LOOK AT CLOCK TIMES OR RESPONSIVENESS OF THE

9    PRODUCT WITH THE NONINFRINGING ALTERNATIVE IN IT?

10   **A.**  NO, I DIDN'T DO THAT BECAUSE I DON'T BELIEVE I WOULD BE

11   QUALIFIED TO EVALUATE ANY OF THE TESTS.  I TOOK PROFESSOR

12   WICKER AT HIS WORD ON HIS -- WITH REGARDS TO HIS OPINION THAT

13   THERE WOULD BE AN EASY NONINFRINGING ALTERNATIVE THAT COULD BE

14   COME UP WITH BY ADOBE.  AND THEN, I SUBSEQUENTLY READ HIS

15   REPORT, WHICH, AS I SAID, WAS 15 OR 20 PAGES ON THE

16   NONINFRINGING ALTERNATIVES.

17   **Q.**  SO TO BE CLEAR, YOU DIDN'T INDEPENDENTLY VERIFY

18   DR. WICKER'S WORK ON THIS?

19   **A.**  NO, BECAUSE I DON'T THINK I COULD.  I'M NOT A TECHNICAL

20   EXPERT.

21   **Q.**  YOU NEVER GOT UNDER THE HOOD YOURSELF?

22   **A.**  BECAUSE IT WOULD HAVE BEEN DANGEROUS IF I HAD, BECAUSE I'M

23   NOT A TECHNICAL EXPERT.

24   **Q.**  WELL, IN FACT, NO ONE VERIFIED THAT THESE ALTERNATIVES

25   WORKED, DID THEY?

1    **A.**  WELL, I'M NOT SURE IF MR. DEVANBU DID SOME ANALYSIS OF

2    THAT OR NOT.  I HEARD THIS MORNING THAT HE DIDN'T ANALYZE THAT

3    AT ALL, SO I DON'T THINK HE TESTED IT.

4    **Q.**  NO ONE ON ADOBE'S SIDE VERIFIED THAT THESE NONINFRINGING

5    ALTERNATIVES WOULD ACTUALLY WORK THE WAY THEY WERE SUPPOSED

6    TO, DID THEY?

7    **A.**  I DON'T KNOW.  PROFESSOR WICKER SAID HE TALKED ABOUT

8    NONINFRINGING ALTERNATIVES WITH A LARGE NUMBER OF ADOBE

9    SOFTWARE ENGINEERS AND HE -- HIS OPINION WAS, IN PART, BASED

10   ON THOSE DISCUSSIONS, TOO.  SO WHETHER THERE WAS ANY

11   DISCUSSION ABOUT TESTING OR NOT, I DON'T KNOW.

12   **Q.**  NOW, YOU SAID YOU SPOKE TO MR. HERBACH; IS THAT CORRECT?

13   **A.**  YES.

14   **Q.**  AND THAT DISCUSSION WAS THE SAME DAY AS YOUR CALL WITH

15   DR. WICKER AND ADOBE'S LAWYER?

16   **A.**  I BELIEVE SO, YES.

17   **Q.**  AND THE ADOBE FROM -- PARDON ME.  AND A LAWYER FROM

18   ADOBE'S TRIAL TEAM WAS ON THE CALL WITH MR. HERBACH, AS WELL,

19   RIGHT?

20   **A.**  I THINK THAT'S RIGHT, YES.

21   **Q.**  AND YOU UNDERSTAND THAT MR. HERBACH IS AN EMPLOYEE OF

22   ADOBE?

23   **A.**  YES.  I UNDERSTAND THAT.

24   **Q.**  AND HE GETS PAID BY ADOBE?

25   **A.**  I DIDN'T GO INTO HIS SALARY.  I JUST ASKED WHAT WERE THE

PROWSE – CROSS / PRICE

1   SALARIES OF ADOBE ENGINEERS.

2   **Q.**   BUT HE IS, TO THE BEST OF YOUR KNOWLEDGE, COMPENSATED BY

3   ADOBE BECAUSE HE WORKS THERE?

4   **A.**   I WOULD EXPECT SO, BUT I DIDN'T ASK HIM THAT QUESTION.

5   **Q.**   YOU ONLY TALKED TO HIM FOR 15 MINUTES, DIDN'T YOU, SIR?

6   **A.**   YES, BECAUSE I ONLY NEEDED TO GET THE AVERAGE SALARY OF AN

7   ADOBE ENGINEER.

8   **Q.**   AND WHAT DID YOU DO TO INDEPENDENTLY VERIFY THAT

9   MR. HERBACH HAD CORRECTLY GIVEN YOU THE AMOUNT OF TIME IT

10  WOULD TAKE SOMEONE TO DO THIS THEORETICAL DESIGNAROUND THAT

11  DR. WICKER DESCRIBED?

12  **A.**   HE DIDN'T GIVE ME THE TIME.  PROFESSOR WICKER GAVE ME THE

13  TIME.

14  **Q.**   WHAT DID YOU DO TO VERIFY THAT TIME?

15  **A.**   LIKE I SAID, IT WOULD BE DANGEROUS FOR ME TO DO ANY

16  VERIFICATION BECAUSE I'M NOT A TECHNICAL EXPERT.  I RELY ON

17  PROFESSOR WICKER FOR HIS EXPERT OPINION ON THAT.

18  **Q.**   SO YOU RELIED ON DR. WICKER FOR BOTH HOW -- WHAT THE

19  DESIGNAROUND WOULD BE AND HOW LONG IT WOULD TAKE TO DO THE

20  DESIGNAROUND?

21  **A.**   CORRECT.

22  **Q.**   AND THEN, YOU TALKED TO MR. HERBACH, AND HE TOLD YOU THAT

23  IT WOULD ONLY COST, AFTER YOUR CALCULATION, ABOUT $127,500 FOR

24  ADOBE TO AVOID INFRINGING DIGITAL REG'S PATENTS?

25  **A.**   HE DIDN'T GIVE ME THE $127,000 NUMBER.  I CAME UP WITH

1    THAT AFTER UNDERSTANDING FROM PROFESSOR WICKER WHAT THE AMOUNT

2    OF TIME WOULD BE FOR AN ADOBE -- TWO ADOBE SOFTWARE ENGINEERS

3    TO IMPLEMENT THE DESIGNAROUND.  AND I GOT FROM MR. HERBACH THE

4    FULLY-LOADED SALARY OF ADOBE ENGINEERS.

5    **Q.**  THIS ALL OCCURRED ON THE SAME DAY AS YOUR DISCUSSION WITH

6    DR. WICKER?

7    **A.**  I CAN'T RECALL NOW, BUT IT MIGHT HAVE BEEN.

8    **Q.**  SO IN TWO CALLS TOTALING TWO TO THREE HOURS WITH

9    DR. WICKER AND ONE CALL FOR 15 MINUTES WITH MR. HERBACH YOU

10   WERE ABLE TO MAKE THIS ASSESSMENT OF THIS NONINFRINGING

11   ALTERNATIVE; IS THAT CORRECT?

12   **A.**  YES, THAT'S CORRECT.

13   **Q.**  LET'S TALK ABOUT THE PURCHASE OF THE PATENTS FROM

14   WACHOVIA.  WE HEARD A LITTLE TESTIMONY ABOUT THAT.

15   **A.**  YES.

16   **Q.**  DO YOU RECALL THAT?  THE PATENTS WERE PURCHASED IN 2002?

17   **A.**  YES, I THINK THAT'S CORRECT.

18   **Q.**  FOR HALF A MILLION DOLLARS?

19   **A.**  YES.

20   **Q.**  BUT YOU'LL AGREE WITH ME THAT THE WORLD OF DRM WAS VERY

21   DIFFERENT BACK IN 2002, WOULDN'T YOU?

22   **A.**  I HAVEN'T DONE A STUDY OF HOW THE WORLD OF DRM DIFFERED

23   OVER TIME.  IT CERTAINLY MAY HAVE BEEN DIFFERENT.

24   **Q.**  WELL, LET'S LIMIT IT TO DIGITAL REG'S PATENTS.

25       THE '541 PATENT ISSUED IN MAY OF 2002, RIGHT?

1    **A.**  I BELIEVE THAT'S CORRECT.

2    **Q.**  AND DIGITAL REG PURCHASED THE PATENTS IN JUNE OF 2002,

3    RIGHT?

4    **A.**  I THINK SO.

5    **Q.**  THE '670 PATENT WASN'T EVEN A PATENT YET.  IT WAS AN

6    APPLICATION AT THE TIME.

7    **A.**  I THINK THAT'S CORRECT, YES.

8    **Q.**  NOW, YOU DON'T KNOW IF ANYONE ACTUALLY WAS INFRINGING THE

9    '541 PATENT IN JUNE OF 2002, DO YOU?

10   **A.**  NO.

11   **Q.**  AND, OBVIOUSLY, NO ONE COULD INFRINGE THE '670 PATENT

12   BECAUSE IT HADN'T BEEN ISSUED YET.

13   **A.**  CORRECT.

14   **Q.**  SO, THE HALF MILLION DOLLARS WAS PAID FOR THE

15   ONE-MONTH-OLD PATENT.

16   **A.**  AND OTHER THINGS, INCLUDING PATENT APPLICATIONS, PATENTS

17   ABOUT TO BE ISSUED.  NOT JUST THE '541 AND '670 PATENTS.

18   OTHER PATENTS, TOO.

19   **Q.**  LET'S LIST THOSE.  SO THE HALF MILLION DOLLARS WAS PAID

20   FOR THE ONE-MONTH-OLD PATENT, THE PATENT THAT HAD NOT ISSUED

21   AND NO KNOWN INFRINGERS?

22   **A.**  AND OTHER PATENTS, I BELIEVE.  I'M NOT SURE, BUT I THINK

23   THERE WERE OTHER PATENTS INVOLVED IN THE TRANSACTION.

24   **Q.**  NOW, THE HYPOTHETICAL NEGOTIATION WHICH YOU TESTIFIED

25   OCCURRED IN 2005, RIGHT?

1    **A.**   CORRECT.

2    **Q.**   OCCURRED THREE YEARS LATER.  THE '541 PATENT WAS NOW THREE

3    YEARS OLDER, CORRECT?

4    **A.**   YES.

5    **Q.**   THE '670 PATENT HAD ISSUED AT THE TIME?

6    **A.**   THAT'S CORRECT.

7    **Q.**   AND FOR YOUR ANALYSIS OF THE HYPOTHETICAL NEGOTIATION YOU

8    HAD TO ASSUME THAT ADOBE INFRINGED?

9    **A.**   THAT'S CORRECT.

10   **Q.**   YOU HAD TO ASSUME THAT THE PATENTS WERE VALID?

11   **A.**   THAT'S CORRECT.

12   **Q.**   AND YOU HAD TO ASSUME THE PATENTS WERE ENFORCEABLE?

13   **A.**   THAT'S CORRECT.

14   **Q.**   AND NONE OF THOSE THREE FACTORS WERE PRESENT WHEN THE

15   PATENTS WERE PURCHASED FROM WACHOVIA, WERE THEY?

16   **A.**   THEY WEREN'T KNOWN AT THE TIME, CERTAINLY.

17   **Q.**   YOU CERTAINLY COULDN'T ASSUME THAT.

18   **A.**   RIGHT.

19   **Q.**   LET'S TALK ABOUT SOME OF THESE SETTLEMENT AGREEMENTS.

20        YOU TESTIFIED ABOUT SOME OF THE SETTLEMENT AGREEMENTS THAT

21   DIGITAL REG ENTERED INTO.  DO YOU RECALL THAT TESTIMONY?

22   **A.**   YES.

23   **Q.**   COMPANIES LIKE MICROSOFT, INTUIT, SONY -- WELL, MAYBE NOT

24   SONY.  AVG?

25   **A.**   I DON'T BELIEVE SO.

1    **Q.**  YES, SONY IS ON A DIFFERENT LIST, I THINK.

2         DO YOU REMEMBER THAT TESTIMONY?

3    **A.**  YES.

4    **Q.**  NOW, THESE WERE ACTUAL NEGOTIATIONS, WEREN'T THEY?

5    **A.**  I BELIEVE THEY WERE, YES.

6    **Q.**  AND BECAUSE THEY WERE ACTUAL NEGOTIATIONS VALIDITY WAS

7    BEING CONTESTED?

8    **A.**  VALIDITY MIGHT HAVE BEEN BEING CONTESTED.  I DON'T KNOW,

9    BECAUSE NEITHER I NOR MR. PARR KNOW THE DETAILS OF THE

10   NEGOTIATIONS.

11   **Q.**  HOW MANY SETTLEMENT AGREEMENTS HAVE YOU SEEN, SIR, WHERE

12   THE PARTY ENTERING THE AGREEMENTS -- THE DEFENDANT -- ADMITS

13   THAT THEY INFRINGE THE PATENT IN THE BODY OF THE AGREEMENT?

14   **A.**  OH, IN THE BODY OF THE AGREEMENT?  NEVER.

15   **Q.**  AND HAVE YOU EVER SEEN AN INSTANCE WHERE THE PARTY THAT IS

16   ACCUSED OF INFRINGEMENT ADMITS THAT THE PATENTS ARE VALID IN

17   THE BODY OF THE AGREEMENT?

18   **A.**  CERTAINLY IN THE BODY OF THE AGREEMENT, NEVER.  BUT IN THE

19   NEGOTIATIONS IT MIGHT BE QUITE A DIFFERENT STORY.

20   **Q.**  DO YOU HAVE ANY EVIDENCE THAT THESE WERE NOT CONTESTED

21   LITIGATIONS AT THE TIME OF THE SETTLEMENTS?

22   **A.**  THEY MAY HAVE BEEN.  THEY CERTAINLY WERE IN LITIGATION.

23   BUT WHAT WAS SAID IN THE SETTLEMENT NEGOTIATIONS ABOUT

24   UNCERTAINTY ABOUT VALIDITY AND INFRINGEMENT IS NOT SOMETHING I

25   KNOW AND IT IS NOT SOMETHING MR. PARR KNOWS.  AND SO IT IS

1   VERY HARD TO QUANTIFY THAT EFFECT.

2   **Q.**  SO THE ANSWER TO MY QUESTION IS "NO," CORRECT?

3   **A.**  CAN YOU REPEAT YOUR QUESTION?

4   **Q.**  MY QUESTION IS:  DO YOU HAVE ANY EVIDENCE THAT VALIDITY OR

5   INFRINGEMENT WERE NOT BEING CONTESTED?

6   **A.**  I HAVE -- IN THE SETTLEMENT NEGOTIATIONS I HAVE NO

7   EVIDENCE THEY WERE BEING CONTESTED AND NO EVIDENCE THEY WERE

8   NOT BEING CONTESTED.

9   **Q.**  AGAIN, WE ARE TALKING ABOUT THE HYPOTHETICAL NEGOTIATION,

10  RIGHT?

11  **A.**  RIGHT.

12  **Q.**  HOW YOU HAD TO ASSUME VALIDITY.

13  **A.**  WHICH I DID, YES.

14  **Q.**  AND YOU HAD TO ASSUME INFRINGEMENT?

15  **A.**  WHICH I DID, YES.

16  **Q.**  AND YOU HAD TO ASSUME ENFORCEABILITY?

17  **A.**  CORRECT, YES, WHICH I DID.

18  **Q.**  BUT, FOR YOUR ANALYSIS OF THE SETTLEMENT AGREEMENTS YOU

19  TREATED THEM ALL THE SAME?

20  **A.**  I DON'T SEE WHAT YOU MEAN BY "TREATED THEM ALL THE SAME."

21  **Q.**  YOU DIDN'T MAKE ANY ADJUSTMENT FOR THE FACT THAT VALIDITY,

22  INFRINGEMENT, ENFORCEABILITY WERE BEING CONTESTED AT THE TIME.

23  **A.**  NO, BECAUSE -- AND THE REASON IS BECAUSE I DON'T KNOW, AND

24  NEITHER DOES MR. PARR, HOW TO QUANTIFY THAT.  THERE IS NO WAY

25  TO KNOW IN THOSE NEGOTIATIONS TO WHAT EXTENT THE SETTLEMENT

1    AGREEMENT WOULD HAVE BEEN HIGHER HAD CERTAINTY EXISTED ABOUT

2    VALIDITY AND INFRINGEMENT.

3        SIMILARLY, THERE IS NO WAY TO KNOW HOW THE SETTLEMENT

4    AGREEMENT WOULD ACTUALLY HAVE BEEN LOWER HAD THERE BEEN NO

5    THREAT OF TAKING A DEFENDANT TO LITIGATION.  THESE ARE THINGS

6    THAT ARE VERY HARD TO QUANTIFY.

7        MR. PARR DOES SOME BACK-OF-THE-ENVELOPE QUANTIFYING BY

8    SAYING, WELL, I'M JUST GOING TO ELIMINATE FUTURE SALES, AND

9    I'M GOING TO ASSUME THAT THAT IS EXACTLY THE SAME, AND IT IS

10   AN OFFSET TO AN UNCERTAINTY ABOUT VALIDITY AND INFRINGEMENT.

11       I THINK THAT'S -- I DON'T THINK THAT IS A RELIABLE WAY OF

12   DOING IT.

13   **Q.**  BUT YOU DID NOTHING TO MAKE AN ADJUSTMENT.

14   **A.**  BECAUSE THERE'S NOTHING TO DO BECAUSE THERE IS NO RELIABLE

15   DATA TO QUANTIFY HOW MUCH UNCERTAINTY ABOUT VALIDITY AND

16   INFRINGEMENT WOULD HAVE HAD AN EFFECT ON THE ACTUAL AMOUNT

17   AGREED TO.

18       THE ONE THING YOU ARE CERTAIN OF IS THAT THERE IS -- THERE

19   IS AN UPWARD EFFECT ON THE SETTLEMENT AGREEMENTS THAT WOULDN'T

20   EXIST AT THE HYPOTHETICAL NEGOTIATION BECAUSE OF THE THREAT OF

21   LITIGATION.

22       SO, I GUESS IF YOU WANT TO SAY I MADE NO ADJUSTMENT, NO.

23   I MEAN, I'M COUNTERBALANCING THOSE EFFECTS BY JUST LOOKING AT

24   THE NUMBERS THEMSELVES.  AND I THINK THAT IS THE BEST ONE CAN

25   DO.

1    Q.  I JUST WANT TO MAKE SURE YOUR TESTIMONY IS CLEAR.

2        FOR THE HYPOTHETICAL NEGOTIATION YOU'RE SUPPOSED TO ASSUME

3    VALIDITY, INFRINGEMENT AND ENFORCEABILITY, RIGHT?

4    A.  IN ADDITION TO OTHER THINGS INCLUDING NO THREAT OF BEING

5    TAKEN TO COURT ON LITIGATION.

6    Q.  OKAY.  AND THESE SETTLEMENT AGREEMENTS WERE NEGOTIATED

7    WITH ALL THREE OF THOSE FACTORS BEING CONTESTED, CORRECT?

8    A.  ALL FOUR --

9    Q.  STICK TO MY QUESTION, PLEASE?

10   A.  ALL FOUR, IF YOU COUNT THE LITIGATION THREAT.  BUT THOSE

11   THREE TO YOUR QUESTION, YES.

12   Q.  AND YOU MADE NO ADJUSTMENT.  YOU MADE NO ADJUSTMENT

13   WHATSOEVER FOR THE DIFFERENCE BETWEEN THE REAL NEGOTIATION AND

14   THE HYPOTHETICAL NEGOTIATION, DID YOU?

15   A.  I TOOK THE NUMBERS AS THEY WERE -- AS THEY WERE ACTUALLY

16   AGREED TO.  I TOOK THE ACTUALLY AGREED-TO NUMBERS, AND I DID

17   NOT MOVE THEM UP, AND I DID NOT MOVE THEM DOWN.

18   Q.  WELL, AND YOU DIDN'T EVEN TAKE ALL OF THE ACTUALLY

19   AGREED-TO NUMBERS, DID YOU?

20   A.  I TOOK THE NINE RELEVANT SETTLEMENT AGREEMENTS.  I LOOKED

21   AT THE NINE RELEVANT SETTLEMENT AGREEMENTS.

22   Q.  WHAT YOU DETERMINE TO BE THE NINE RELEVANT SETTLEMENT

23   AGREEMENTS, CORRECT?

24   A.  NO, WHAT THE COURT DETERMINED TO BE THE NINE RELEVANT

25   SETTLEMENT AGREEMENTS.

PROWSE - CROSS / PRICE

1    **Q.**  I DON'T THINK THE COURT HAS MADE ANY DETERMINATION --

2              **THE COURT:**  THIS ISN'T A GOOD ARGUMENT FOR YOU TO BE

3    GETTING INTO AT THIS POINT.  WHY DON'T YOU MOVE ON?

4    **BY MR. PRICE:**

5    **Q.**  YOU OMITTED --

6              **THE COURT:**  WHY DON'T YOU MOVE ON?

7    **BY MR. PRICE:**

8    **Q.**  NOW, YOU ALSO LOOKED AT FOUR AGREEMENTS THAT ADOBE ENTERED

9    INTO.  DO YOU RECALL DOING THAT FOR YOUR ANALYSIS?

10   **A.**  YES.

11   **Q.**  AND ONE OF THEM WAS A SETTLEMENT AGREEMENT ADOBE ENTERED

12   INTO WITH A COMPANY NAMED Z4?

13   **A.**  YES.

14   **Q.**  ARE YOU AWARE THAT DR. WICKER FOUND THE Z4 PATENTS TO BE

15   COMPARABLE TO THE DIGITAL REG PATENTS-IN-SUIT?

16   **A.**  YES, I BELIEVE HE DID, IN A BROAD SENSE.

17   **Q.**  AND ADOBE PAID Z4 $5 MILLION TO SETTLE THAT CASE?

18   **A.**  I CAN'T RECALL SITTING HERE.  I WOULDN'T DISPUTE THAT

19   NUMBER, BUT I CAN'T RECALL THE NUMBER.

20             **MR. PRICE:**  I HAVE A BINDER.  MAY I APPROACH, YOUR

21   HONOR?

22             **THE COURT:**  YES.

23                  (BINDER HANDED TO WITNESS.)

24   **BY MR. PRICE**

25   **Q.**  IF YOU WILL TURN TO PAGE 22, PARAGRAPH 49 OF YOUR REPORT.

```
1              (DISPLAYED ON SCREEN.)

2    Q.  HAVE YOU HAD A CHANCE TO LOOK AT IT?

3    A.  LOOK AT MY REPORT OR LOOK AT THE SETTLEMENT AGREEMENT?

4    Q.  CAN YOU CONFIRM THE $5 MILLION NUMBER BASED ON YOUR

5    REPORT?

6              MR. REINES:  YOUR HONOR, AT THIS POINT WE OBJECT.

7    THIS IS UNDER 403 THIS A TOTAL DETOUR.  NO EXPERT, PARR OR

8    MR. PROWSE HAS RELIED ON THIS NUMBER AS PROBATIVE OF ANYTHING.

9              THE COURT:  IT IS THE FIRST I'VE HEARD OF IT.

10             MR. PRICE:  YOUR HONOR, SURE.  I WOULD LIKE TO

11   IMPEACH THE WITNESS IN THAT HE -- HE, AGAIN, DID AN AVERAGE

12   AND DROPPED THE HIGH.  I JUST WANT TO POINT THAT PATTERN OUT.

13             MR. REINES:  HE DIDN'T TESTIFY ON DIRECT ABOUT THIS

14   AT ALL.

15             MR. PRICE:  IT'S IN HIS REPORT AND HIS DEPOSITION,

16   YOUR HONOR.

17             MR. REINES:  BUT HE NEVER RELIED ON IT FOR THE

18   NUMBER. THAT'S THE POINT.

19             THE COURT:  ALL RIGHT.  WELL, I'LL ALLOW IT.

20   BY MR. PRICE:

21   Q.  NOW, ISN'T IT TRUE, SIR, THAT WHEN YOU ANALYZED THE FOUR

22   AGREEMENTS THAT ADOBE ENTERED INTO THAT DR. WICKER FOUND

23   RELEVANT, THAT YOU DROPPED THE Z4 AGREEMENT FROM THE ANALYSIS

24   AND JUST AVERAGED THE REMAINING THREE?

25   A.  UM, I MAY HAVE DONE THAT IN PARTS OF MY REPORT.  BUT I
```

1    SAY -- I SAY SOMEWHERE IN MY REPORT -- IT'S NOT HERE ON THE

2    SCREEN -- THAT I DON'T REGARD ANY OF THESE AGREEMENTS AS BEING

3    INDICATIVE OF THE VALUE OF THE PATENTS-IN-SUIT.

4    **Q.**  DO YOU RECALL GIVING A DEPOSITION IN THIS CASE?

5    **A.**  YES.

6    **Q.**  AND DO YOU RECALL GIVING TESTIMONY ON THIS SUBJECT?

7    **A.**  YES.

8    **Q.**  IS YOUR TESTIMONY HERE TODAY CONSISTENT WITH YOUR

9    TESTIMONY AT THE TIME OF YOUR DEPOSITION?

10   **A.**  I BELIEVE SO.

11       **MR. PRICE:**  IF WE CAN PLAY CLIP 111, PLEASE.  IT IS

12   64, PAGE 64, LINE 11 THROUGH PAGE 65, LINE 24.

13       (VIDEO PLAYED AS FOLLOWS:

14           "QUESTION:  LET'S LOOK AT PARAGRAPH 53.  AND YOU SAY,

15           'I HAVE REVIEWED THESE AGREEMENTS AND CONCLUDE THAT

16           THEY OFFER NO GUIDANCE AS TO THE APPROPRIATE ROYALTY

17           IN THIS MATTER OUTSIDE OF THE STRUCTURE OF ALL

18           AGREEMENTS RESULTING IN LUMP SUM PAYMENTS (SIC).'

19           "I THINK IN PARAGRAPH 49, IF YOU LOOK, YOU MENTION

20           THAT MR. PARR DIDN'T CONSIDER THESE REPORTS, FAILS TO

21           ADDRESS THEM.  DOES IT MATTER THAT HE DIDN'T ADDRESS

22           THEM, GIVEN THAT YOU DON'T THINK THEY'RE RELEVANT?

23           "ANSWER:  WELL, I -- I --NUMBER ONE, I THINK IT DOES

24           MATTER THAT HE DIDN'T ADDRESS THEM.  IT JUST IS

25           ANOTHER EXAMPLE OF THE INCOMPLETENESS OF HIS

1      ANALYSIS.

2      NUMBER TWO, THAT SENTENCE IS PROBABLY A LITTLE

3      INARTFULLY WORDED.

4      "QUESTION:  WHICH ONE?

5      "ANSWER:  THE SENTENCE YOU JUST QUOTED BEGINNING

6      PARAGRAPH 53.

7      "QUESTION:  OKAY.

8      "ANSWER:  AND IT'S CLARIFIED A LITTLE BIT BY LOOKING

9      AT THE SENTENCE -- SECOND SENTENCE.

10     "MY OPINION WITH REGARDS TO THE SETTLEMENT AGREEMENTS

11     IS THAT BECAUSE -- IS THAT THEY -- IT'S REASONABLE TO

12     LOOK AT THEM.  YOU SHOULD LOOK AT THEM.  YOU SHOULD

13     CONSIDER THEM.  AND HAVING -- HAVING LOOKED AT THEM,

14     I CONSIDER THEM TO BE A DATA POINT WITH -- WITH ONE

15     CLARIFICATION.

16     "IT'S CLEAR THAT THERE'S A WIDE RANGE OF VALUES ON

17     THESE DIFFERENT SETTLEMENTS.  THEY VARY FROM 180,000

18     TO $5 MILLION.  BUT IT'S CLEAR, BASED ON WHAT I TALK

19     ABOUT IN PARAGRAPH 53, THAT THERE ARE REASONS TO

20     BELIEVE THAT THE PATENTS INVOLVED IN THE Z4 AGREEMENT

21     ARE MUCH -- HAVE A MUCH HIGHER ECONOMIC VALUE THAN

22     THE PATENTS-IN-SUIT IN THIS MATTER.

23     "AND SO IF YOU TAKE THAT ONE OUT, YOU'RE LOOKING AT

24     THREE SETTLEMENT AGREEMENTS BETWEEN 180 AND A

25     MILLION -- 180,000 AND A MILLION DOLLARS, WHICH I

```
 1          THINK IS A DATA POINT THAT IS REASONABLE TO

 2          CONSIDER."

 3          MR. PRICE:  THE PAGE NUMBERS WERE 64, LINE 11 THROUGH

 4     65, LINE 24.

 5     BY MR. PRICE:

 6     Q.  SO WHY DIDN'T YOU INCLUDE Z4 IN YOUR ASSESSMENT?

 7     A.  WELL, I THINK PARAGRAPH 53 OF MY REPORT, WHICH I REFERRED

 8     TO IN MY DEPOSITION TESTIMONY, EXPLAINS WHY I DIDN'T CONSIDER

 9     THE FACTOR TWO LICENSES, THAT PARTICULAR LICENSE TO BE OF

10     PARTICULAR RELEVANCE.  IT IS FOR -- WELL, ONE, IT'S FOR AN

11     EXTREMELY LARGE NUMBER OF PATENTS, PATENT APPLICATIONS.  I

12     THINK 14.  IT'S A WORLDWIDE LICENSE.

13          THERE'S -- WITHOUT LOOKING AT PARAGRAPH 53, I CAN'T GO

14     THROUGH THE LIST OF REASONS THAT I GAVE.  BUT SITTING HERE

15     RIGHT NOW I CAN THINK OF THOSE REASONS.

16     Q.  WELL, YOU DO HAVE YOUR REPORT IN FRONT OF YOU, IF YOU

17     WOULD LIKE TO REFER TO THAT PARAGRAPH.

18                    (PUBLISHED TO JURY.)

19          MR. PRICE:  HAS THIS BEEN ENTERED?

20          THE COURT:  I HOPE NOT.

21          MR. PRICE:  IT IS BEING DISPLAYED.

22       (DOCUMENT REMOVED AND DISPLAYED TO WITNESS, COURT AND

23     COUNSEL.)

24          THE WITNESS:  RIGHT.  SO I SAY THERE THAT WHILE I

25     HAVE REVIEWED THESE AGREEMENTS, WHILE I UNDERSTAND THESE
```

1   AGREEMENTS GENERALLY RELATE TO DRM, IT DOESN'T MEAN THAT ANY

2   PARTICULAR ADOBE SETTLEMENT AGREEMENT IS A RELEVANT INDICATOR

3   OF THE VALUE FOR THE PATENTS-IN-SUIT, OF THE '541 AND '670

4   PATENT.

5        THEN, I TALK ABOUT THE Z4 AGREEMENT.  AND IN THAT

6   AGREEMENT MICROSOFT WAS FOUND TO HAVE INFRINGED THE PATENTS;

7   THAT THEY WERE VALID; AND THAT THEY WERE TO PAY 115 MILLION TO

8   Z4 FOR INFRINGING, ACTUALLY, A SUNSET OF THE PATENTS THAT

9   ADOBE LATER LICENSED.

10       AND I CONTRAST THAT WITH THE SETTLEMENT AGREEMENTS THAT

11  DIGITAL REG ACTUALLY ENTERED INTO, ONE BEING MICROSOFT FOR

12  $487,500.

13       SO I THINK THERE IS CLEAR DISTINCTION HERE BETWEEN THE

14  ECONOMIC VALUE OF THE PATENTS INVOLVED WITH THE Z4 SETTLEMENT

15  AGREEMENT AND THE PATENTS INVOLVED HERE.

16  **BY MR. PRICE:**

17  **Q.**  YOU SAID ONE OF THE FACTORS THAT YOU LOOKED AT WAS THE

18  NUMBER OF PATENTS THAT WERE LICENSED IN CONNECTION WITH Z4?

19  **A.**  I DON'T SAY THAT HERE IN MY PARAGRAPH.  BUT LOOKING AT

20  THE -- LOOKING AT THE Z4 AGREEMENT IT LOOKS LIKE THERE IS A

21  LOT OF PATENTS INVOLVED.

22  **Q.**  I THINK YOUR TESTIMONY EARLIER WAS THAT IT WAS 14 PATENTS

23  THAT YOU BELIEVE WAS INVOLVED IN THE Z4 AGREEMENT?

24  **A.**  YEAH.  I'M HAVING TROUBLE FINDING WHERE THAT NUMBER IS.

25  BUT IT'S A LARGE NUMBER, ANYWAY.

PROWSE – CROSS / PRICE

1  **Q.**  DO YOU HAVE A SENSE OF THE SIZE OF DIGITAL REG'S PATENT

2  PORTFOLIO?

3  **A.**  DIGITAL REG'S TOTAL PATENT PORTFOLIO AS APART FROM THE

4  '541 AND THE '670?

5  **Q.**  YES, SIR.

6  **A.**  WELL, CERTAINLY BIGGER THAN THE '541 AND THE '670.

7  **Q.**  RIGHT.  I THINK WE HEARD TESTIMONY FROM MR. FARLEY THAT IT

8  EXCEEDED 20 PATENTS.  DO YOU RECALL THAT?

9  **A.**  THAT MIGHT BE, BUT THAT IS NOT RELEVANT TO THE ANALYSIS

10  HERE.

11  **Q.**  I THOUGHT YOU SAID THAT THE FACT THAT 14 PATENTS WERE PART

12  OF THE Z4 LICENSE THAT THAT WAS RELEVANT TO THE ANALYSIS.

13  **A.**  IT WAS RELEVANT TO THE AMOUNT PAID TO Z4, CERTAINLY,

14  BECAUSE THE MORE PATENTS, THE MORE YOU ARE GOING TO PAY.  BUT

15  WE ARE NOT HERE TRYING TO FIGURE OUT THE REASONABLE ROYALTY

16  DAMAGES FOR ALL 20 OF DIGITAL REG'S PATENTS.  DIGITAL REG

17  HASN'T ASSERTED ANY OF THOSE PATENTS AGAINST ADOBE EXCEPT FOR

18  JUST TWO:  THE '541 AND THE '670.  SO, THAT'S WHAT WE ARE

19  CONCERNED WITH HERE.

20      **THE COURT:**  WHY DON'T WE TAKE OUR BREAK?  IT IS

21  12:15.  WE WILL BREAK UNTIL 12:30.

22      (RECESS TAKEN AT 12:15 AND RESUMED AT 12:30 P.M.)

23      (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

24      **THE CLERK:**  REMAIN SEATED COME TO ORDER.  COURT IS

25  BACK IN SESSION.

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930**

1        **THE COURT:** GO AHEAD.

2        **MR. PRICE:** THANK YOU, YOUR HONOR.

3   **BY MR. PRICE:**

4   **Q.** JUST A COUPLE OF MORE QUESTIONS, DR. PROWSE.

5        HOW MANY PATENTS WERE ASSERTED AGAINST ADOBE BY Z4?

6   **A.** I DON'T KNOW.

7   **Q.** SO YOU DON'T KNOW HOW MANY OF THE 14 ACTUALLY WERE AT

8   ISSUE IN THE LAWSUIT?

9   **A.** I DON'T KNOW HOW MANY WERE AT ISSUE IN THE LAWSUIT. I

10  KNOW HOW MANY WERE LICENSED THAT WERE PAID FOR.

11  **Q.** OKAY.

12      NOW, IF TWO PARTIES ARE NEGOTIATING A LICENSE AGREEMENT

13  AND SOMEBODY WALKS IN AND SAYS THE COURT JUST FOUND THAT THE

14  PATENTS ARE VALID AND INFRINGED, THAT WOULD IMPROVE THE

15  BARGAINING POSITION OF THE PARTY LICENSING THE PATENTS, WOULD

16  IT NOT?

17  **A.** IT MIGHT. UNLESS THERE WAS SUBSTANTIAL AGREEMENT THAT,

18  YEAH, THESE PATENTS ARE PROBABLY VALID, AND THESE PATENTS --

19  AND WE, E.G., THE LICENSEE PROBABLY INFRINGED THEM. IN A

20  SITUATION WHERE -- SO IT WOULDN'T IMPROVE THE BARGAINING

21  POSITION OF THE OWNER OF THE PATENT IN THAT SITUATION.

22      IN A SITUATION WHERE THERE WAS A HUGE AMOUNT OF

23  UNCERTAINTY ABOUT THE VALIDITY AND/OR THE INFRINGEMENT, THEN

24  IT WOULD IMPROVE THE BARGAINING POWER.

25  **Q.** SO IF THERE WERE QUESTIONS ABOUT THE VALIDITY AND THE

1    INFRINGEMENT AND THAT HAPPENED, IT WOULD IMPROVE THE

2    BARGAINING POWER OF THE PARTY LICENSING THE PATENTS?

3    **A.**  IF THERE WAS SUBSTANTIAL UNCERTAINTY ABOUT VALIDITY AND

4    INFRINGEMENT, WHICH IS NOT ALWAYS THE CASE.

5              **MR. PRICE:**  THANK YOU.  PASS THE WITNESS.

6              **MR. REINES:**  A FEW QUESTIONS.

7              **THE COURT:**  OKAY.

8                        **REDIRECT EXAMINATION**

9    **BY MR. REINES:**

10   **Q.**  MR. PROWSE, DO YOU RECALL BEING ASKED QUESTIONS BY DIGITAL

11   REG'S COUNSEL ABOUT THE SUCCESS OR LACK OF SUCCESS OF THE

12   PATENTED TECHNOLOGY IN THEIR HANDS --

13   **A.**  YES.

14   **Q.**  -- IN TERMS OF COMMERCIALIZATION.

15       AND YOU REFERENCED MR. FARLEY'S TESTIMONY ABOUT THE LACK

16   OF SUCCESS OF THE PATENTED TECHNOLOGY IN DIGITAL REG'S HANDS,

17   INCLUDING ITS PREDECESSORS.

18       DO YOU REMEMBER THAT?

19   **A.**  I DO.

20   **Q.**  DO YOU REMEMBER THE PARTICULARS OF HIS TESTIMONY?

21   **A.**  I DON'T REMEMBER EXACTLY WHAT HE SAID, BUT I REMEMBER

22   THERE HAD BEEN THAT DESKGATE AND VARIOUS OTHER ENTITIES HAD

23   ATTEMPTED TO COMMERCIALIZE THE PATENTS FOR MANY YEARS AND HAD

24   NOT BEEN ABLE TO DO SO.  HAD NOT SUCCESSFULLY DONE SO.

25   **Q.**  DO YOU RECALL "YES" OR "NO", WHETHER MR. FARLEY TESTIFIED

1    IN TRIAL THAT HE COULDN'T SAY THAT DIGITAL REG SUCCESSFULLY

2    COMMERCIALIZED THE PATENTED TECHNOLOGY?

3    **A.**  YES, I THINK I HEARD THAT.

4    **Q.**  ALL RIGHT.  LET ME ASK YOU A QUESTION NOW ABOUT THE EFFECT

5    OF $150,000 VERDICT IN THIS CASE.

6        YOU RECALL COUNSEL FOR DIGITAL REG ASKED YOU QUESTIONS

7    ABOUT WOULD THE $150,000 VERDICT IN THIS CASE PREVENT THEM,

8    THAT IS, DIGITAL REG FROM ASSERTING PATENTS AGAINST ADOBE IN

9    THE FUTURE.

10       DO YOU REMEMBER THAT GENERALLY?

11   **A.**  YES.

12   **Q.**  OKAY.  IF THE JURY INVALIDATED THE PATENTS HERE, WOULD

13   DIGITAL REG BE ABLE TO CONTINUE SUING ADOBE FOR PATENT

14   INFRINGEMENT UNDER THESE PATENTS?

15   **A.**  I DON'T BELIEVE SO.  THAT GETS TO LEGAL ISSUES.  BUT IF

16   THE PATENTS ARE FOUND INVALID BY A COURT, MY GENERAL

17   UNDERSTANDING IS THEY CAN'T BE ASSERTED DOWN THE ROAD.

18   **Q.**  LET ME ASK YOU ABOUT THE VALUE OF THE PATENTS AT THE TIME

19   OF THE $500,000 IN THIS 2002 TIME FRAME.

20       ONE OF THE THINGS YOU DID WAS YOU REVIEWED MR. VENTERS'

21   DEPOSITION AS PART OF YOUR WORK IN THIS CASE?

22   **A.**  I DID.

23   **Q.**  DO YOU RECALL MR. VENTERS SAID ABOUT WHEN HE THOUGHT ADOBE

24   WAS INFRINGING, WHEN HE CAME TO THAT CONCLUSION?

25   **A.**  YES.  I WAS HERE FOR HIS TESTIMONY.  I THINK HE SAID -- I

1    CAN'T RECALL THE EXACT SPECIFICS OF IT.

2    Q.  LET ME SEE IF I CAN REFRESH YOUR RECOLLECTION.

3        THIS IS IN MR. VENTERS' DEPOSITION, MARCH 26TH, 2013, AT

4    PAGE 305, LINE 2 THROUGH 12.

5            "QUESTION:  DID YOU GENUINELY BELIEVE IN THE 2002 TO

6            2004 TIME PERIOD THAT ANY OF THE DEFENDANT IN THIS

7            CASE WERE INFRINGING ON ANY OF THE PATENTS-IN-SUIT?"

8        MR. VENTERS' ANSWER WAS:

9            "YES."

10       THE QUESTION WAS:

11           "WHICH COMPANIES?"

12       THE ANSWER WAS:

13           "ADOBE."

14       THE QUESTION WAS:

15           "BASED ON WHAT PRODUCT?"

16       THE ANSWER WAS:

17           "THE ADOBE DRM SERVER WAS THE FIRST DRM PRODUCT THAT

18           ADOBE MADE."

19       AND THE QUESTION WAS:

20           "AND WHAT ELSE?"

21           "WE SUSPECTED MICROSOFT."

22       DO YOU RECALL READING THIS TESTIMONY WHEN YOU REVIEWED THE

23   DEPOSITION OF MR. VENTERS?

24   A.  YES, I RECALL THAT NOW.

25   Q.  LET'S TALK A LITTLE BIT ABOUT THE ADOBE LICENSES.

1        WITH RESPECT TO THE ADOBE LICENSES, AND WE HEARD ABOUT Z4,

2    DIGITAL REG HIRED AN EXPERT, MR. PARR.  DID YOU HEAR MR. PARR

3    SAY ANYTHING ABOUT THE ADOBE LICENSES AND THEIR RELEVANCE IN

4    DIRECT EXAMINATION UP HERE?

5    **A.**  NO, I DID NOT.  HE DIDN'T CONSIDER THEM.

6    **Q.**  AND DO YOU RECALL IN DEPOSITION THAT MR. PARR TESTIFIED HE

7    DIDN'T EVEN KNOW THAT THERE WERE ADOBE LICENSE AGREEMENTS?

8    **A.**  YES, I RECALL THAT.

9    **Q.**  AND DO YOU RECALL MR. PARR SAID IN DEPOSITION HE DIDN'T

10   REMEMBER ANYTHING ABOUT A Z4 LICENSE?

11   **A.**  I RECALL THAT, YES.

12   **Q.**  AND DO YOU REMEMBER MR. PARR TESTIFIED IN DEPOSITION, THIS

13   IS PAGE 112, THAT HE WOULD GO LOOK AT THE ADOBE LICENSES, AND

14   IF HE THOUGHT THEY WERE RELEVANT HE WOULD CONSIDER THEM?

15   **A.**  I REMEMBER SOMETHING TO THAT EFFECT, YES.

16   **Q.**  OKAY.

17        AND IN TRIAL HERE, YOU HAVEN'T HEARD ANY EFFORT BY DIGITAL

18   REG TO PRESENT THOSE Z4 LICENSE OR ANY OTHER LICENSE TO

19   MR. PARR?

20   **A.**  HE DIDN'T DISCUSS THEM IN HIS TESTIMONY.

21            **MR. REINES:**  NO FURTHER QUESTIONS, YOUR HONOR.

22                  <u>**RECROSS-EXAMINATION**</u>

23   **BY MR. PRICE:**

24   **Q.**  JUST -- DR. PROWSE, WE SAW THE TESTIMONY FROM MR. VENTERS

25   EARLIER.  THE DRM SERVER THAT HE WAS TESTIFYING ABOUT IS NOT A

1    PRODUCT IN THIS CASE, IS IT, SIR?

2    **A.**  I DON'T KNOW WHAT HE WAS REFERRING TO THERE.  I KNOW HE

3    WAS -- I KNOW HE WAS TALKING ABOUT HE THOUGHT ADOBE INFRINGED.

4    **Q.**  AND IN YOUR REVIEW OF MR. VENTERS' TESTIMONY, DID YOU SEE

5    MORE DISCUSSION ABOUT WHAT PRODUCTS WERE IN THIS CASE THAT

6    WOULD SHED SOME LIGHT ON THIS ANSWER?

7    **A.**  SITTING HERE I CAN'T RECALL.  I WOULD HAVE TO LOOK AT HIS

8    DEPOSITION.

9         **MR. PRICE:**  CAN WE PUT UP -- WE CAN'T PUT IT UP?

10   **BY MR. PRICE:**

11   **Q.**  SO YOU UNDERSTAND THAT MR. VENTERS TESTIFIED THAT IN 2004,

12   WHEN HE MET WITH ADOBE, THEY WERE DISCUSSING THAT THEY WERE --

13   NOT DISCUSSING ADOBE'S FLASH PRODUCTS?

14        I AM SORRY.  I FUMBLED THAT.  LET ME START OVER.

15        LET ME JUST CLARIFY YOUR TESTIMONY HERE, SIR.

16        IS THE DRM SERVER IN THE CASE OR IS IT NOT?

17   **A.**  I'M NOT QUITE SURE WHAT YOU MEAN BY THE "DRM SERVER".

18        **THE COURT:**  I'M NOT SURE WHAT YOU MEAN BY "IN THE

19   CASE".

20   **BY MR. PRICE:**

21   **Q.**  IS IT AN ACCUSED PRODUCT THAT YOU ANALYZED?

22   **A.**  I HAVEN'T ANALYZED ANYTHING CALLED THE DRM SERVER.  IF

23   THAT'S A NAME FOR SOMETHING ELSE THAT I HAVE ANALYZED, I DON'T

24   KNOW.

25        **MR. PRICE:**  OKAY.  PASS THE WITNESS.

1           **MR. REINES:**  NO FURTHER QUESTIONS.

2           **THE COURT:**  ALL RIGHT.  YOU ARE EXCUSED.  YOU MAY

3    STEP DOWN.

4       YOU MAY CALL YOUR NEXT WITNESS.

5           **MR. REINES:**  YOUR HONOR, ADOBE CALLS PAUL BETLEM AS

6    OUR NEXT WITNESS.

7           **THE COURT:**  ALL RIGHT.

8           **THE CLERK:**  PLEASE RAISE YOUR RIGHT HAND.  STAND AND

9    RAISE YOUR RIGHT HAND FOR ME.

10       (**PAUL BETLEM**, CALLED AS A WITNESS FOR THE DEFENDANT,

11   HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

12          **THE WITNESS:**  I DO.

13          **THE CLERK:**  PLEASE BE SEATED, AND ONCE SEATED, IF YOU

14   CAN PLEASE STATE AND SPELL YOUR FIRST AND LAST NAME FOR THE

15   RECORD, PLEASE.

16          **THE WITNESS:**  MY NAME IS PAUL BETLEM, P-A-U-L,

17   B-E-T-L-E-M.

18          **THE CLERK:**  THANK YOU.

19          **MR. REINES:**  WHY DON'T YOU SCOOT A LITTLE FORWARD SO

20   YOU'RE AUDIBLE FOR THE COURT REPORTER AND THE REST OF THE

21   PEOPLE HERE.

22                    <u>**DIRECT EXAMINATION**</u>

23   BY MR. REINES:

24   Q.  THANK YOU.  I WANT TO THANK YOU AT THE OUTSET FOR BEING

25   PATIENT AND --

1    **A.**  OF COURSE.

2    **Q.**  -- WAITING UNTIL TODAY TO SPEAK.  THAT'S THE PROCESS THAT

3    WE HAVE, AND YOU HAVE BEEN PATIENT.  SO I APPRECIATE THAT.

4         WOULD YOU PLEASE INTRODUCE YOURSELF?

5    **A.**  YES.  I'M PAUL BETLEM REPRESENTING ADOBE SYSTEMS.

6    **Q.**  YOU UNDERSTAND YOU'RE THE CORPORATE REPRESENTATIVE AT THIS

7    TRIAL FOR ADOBE; IS THAT RIGHT?

8    **A.**  YES.  I UNDERSTAND THAT.

9    **Q.**  WHERE DO YOU LIVE?

10   **A.**  I LIVE IN WOODSIDE, CALIFORNIA.

11   **Q.**  AND CAN YOU DESCRIBE YOUR EDUCATIONAL BACKGROUND?

12   **A.**  SURE.  I HAVE A BACHELOR OF SCIENCE DEGREE IN SOFTWARE

13   DEVELOPMENT FROM A SCHOOL CALLED CLARKSON UNIVERSITY IN

14   UPSTATE NEW YORK.  AND I HAVE A MASTER OF SCIENCE DEGREE IN

15   SOFTWARE DEVELOPMENT IN MANAGEMENT FROM ROCHESTER INSTITUTE OF

16   TECHNOLOGY, AND ALSO AN MBA FROM ROCHESTER INSTITUTE OF

17   TECHNOLOGY.

18   **Q.**  HOW DID YOU GET FROM BACK EAST TO OUT WEST?

19   **A.**  I HAD A DEEP INTERNAL PASSION TO WORK IN SILICON VALLEY.

20   **Q.**  AND WHAT IS YOUR POSITION AT ADOBE?

21   **A.**  I'M SENIOR DIRECTOR.

22   **Q.**  OTHER THAN ADOBE, HAVE YOU BEEN WORKING WITH ANY OTHER

23   ORGANIZATION?

24   **A.**  I DONATE MY TIME TO KINGS MOUNTAIN VOLUNTEER FIRE BRIGADE

25   FOR WHICH I SPENT TEN YEARS IN THE ORGANIZATION.

BETLEM – DIRECT / REINES

1    **Q.**  WHAT KIND OF THINGS DO YOU DO WITH THAT?

2    **A.**  HELP PUT OUT BURNING HOUSES, CAR FIRES, MEDICAL AIDES,

3    ANYTHING -- ANYTHING YOU WOULD EXPECT OF A FIREMAN.

4    **Q.**  HOW LONG HAVE YOU WORKED AT ADOBE?

5    **A.**  I STARTED A COMPANY CALLED MACROMEDIA IN MAY OF 2000, AND

6    MACROMEDIA WAS ACQUIRED BY ADOBE IN DECEMBER 2005.  SO

7    EFFECTIVELY A NINE-YEAR SPAN SINCE DECEMBER 2005 UNTIL TODAY.

8    **Q.**  AS SENIOR DIRECTOR, WOULD YOU DESCRIBE WHAT YOUR

9    RESPONSIBILITIES ARE AT ADOBE?

10   **A.**  SURE.  I THINK I HAVE SORT OF TWO SETS OF

11   RESPONSIBILITIES.  ONE IS SORT OF A HIGH LEVEL SET OF

12   RESPONSIBILITIES WHERE I HELP SET PRODUCT DIRECTION AND WORK

13   ON CORPORATE STRATEGY WITH THE EXECUTIVE TEAM.  AND I ALSO

14   HAVE PRODUCT SPECIFIC RESPONSIBILITIES WHERE WE DEVELOP OUR

15   OWN PRODUCTS.

16   **Q.**  WHY DON'T YOU START WITH WHAT PRODUCT SPECIFIC

17   RESPONSIBILITIES DO YOU HAVE?

18   **A.**  PRODUCT SPECIFIC RESPONSIBILITIES I LEAD THE DIGITAL

19   PUBLISHING TEAM AT ADOBE SYSTEMS.

20   **Q.**  AND JUST REAL QUICK, WHAT'S INCLUDED IN DIGITAL

21   PUBLISHING, NOT COMPREHENSIVE BUT --

22   **A.**  SURE.

23        THE EASIEST WAY TO DESCRIBE IT IS IF YOU HAVE A TABLET OR

24   MOBILE PHONE AND YOU'VE READ A DIGITAL MAGAZINE ON THERE,

25   CHANCES ARE IT WAS PROBABLY CREATED WITH A SOFTWARE THAT MY

1   TEAM CREATES.

2   **Q.**  NOW LET'S FOCUS ON YOUR BROADER GENERAL RESPONSIBILITIES

3   AT ADOBE.

4       CAN YOU DESCRIBE THAT FOR THE JURY, PLEASE?

5   **A.**  SURE.

6       SO I WILL ATTEND VARIOUS STRATEGY MEETINGS, EXECUTIVE

7   MEETINGS WITH THE LEADERSHIP TEAM AT ADOBE TO SET CORPORATE

8   STRATEGY, SET DIRECTION FOR THE COMPANY AND MAKE SURE THAT

9   GETS INFUSED INTO THE ORGANIZATION.

10      I ALSO AM A MEMBER OF A SMALL GROUP OF ENGINEERING

11  LEADERSHIP CALLED THE ADOBE ENGINEERING COUNCIL, WHICH IS

12  ABOUT 20 TO 25 PEOPLE.  AND WE HELP SET TECHNICAL DIRECTION,

13  MAKE DECISIONS AROUND KEY PROMOTIONS IN THE COMPANY, AND THOSE

14  SORTS OF AREAS.

15      AND THEN I ALSO HELP SET SOME OF THE PLANS AND SOME OF THE

16  AGENDAS FOR SOME OF OUR STRATEGIC MEETING EVENTS LIKE THE

17  ADOBE TECH SUMMIT, AND ORGANIZATIONS LIKE THAT.

18  **Q.**  AS A SENIOR DIRECTOR OF ADOBE, HAVE YOU PRESENTED YOURSELF

19  AT THESE ADOBE EVENTS?

20  **A.**  YES, I HAVE.  I'VE GIVEN A PRESENTATION AT THE ADOBE TECH

21  SUMMIT WHICH IS A GATHERING OF A LARGE NUMBER -- THOUSANDS OF

22  ADOBE ENGINEERS TYPICALLY IN SAN JOSE WHERE WE SHARE

23  TECHNOLOGY IDEAS, WE COLLABORATE ON DIFFERENT PRODUCT

24  CAPABILITIES, AND SORT OF BRING EVERYONE TOGETHER AND HELP

25  ALIGN PEOPLE.

1    I HAVE ALSO GIVEN PRESENTATIONS AT THE ADOBE CUSTOMER

2    CONFERENCE CALLED ADOBE MAX WHICH IS SOMEWHERE BETWEEN THREE

3    AND 5,000 CUSTOMERS OF ADOBE SYSTEMS.

4    **Q.**  AS PART OF YOUR WORK AT ADOBE, HAVE YOU WORKED IN THE AREA

5    OF INTELLECTUAL PROPERTY AND PATENTS?

6    **A.**  NO, NOT DIRECTLY.  OF COURSE, AS I ALLUDED TO EARLIER

7    INDIRECTLY, I'M NOT AN ATTORNEY.  I DO HELP ADVOCATE FOR

8    PATENTS INTERNALLY.  I HELP ENCOURAGE MY TEAMS TO TAKE NEW AND

9    INNOVATIVE IDEAS AND MATURE THEM AND REFINE THEM SO THEY CAN

10   BE GRANTED PATENTS.  I DON'T DIRECTLY WORK ON PATENT-RELATED

11   ISSUES OR LITIGATIONS.

12   **Q.**  AND HAVE YOU BEEN INVOLVED IN ANY COMMITTEES THAT RELATE

13   TO INTELLECTUAL PROPERTY, JUST AT LEAST AT SOME POINT IN YOUR

14   CAREER?

15   **A.**  YES.  I'VE PARTICIPATED IN THE PATENT REVIEW COMMITTEE,

16   WHICH IS A SMALL GROUP OF PEOPLE INTERNALLY THAT HELP REVIEW

17   INTERNAL IDEAS TO SEE IF THEY ARE ALIGNED WITH ADOBE STRATEGY

18   AND HAVE MERIT FOR PURSUING LONG TERM.

19   **Q.**  IN TERMS OF YOUR ROLE WITH THE PATENT REVIEW COMMITTEE

20   WHEN YOU HAD THAT FUNCTION, WAS IT TO -- WHAT WAS IT?  WAS

21   IT --

22   **A.**  IT WAS REALLY AN ADVISORY ROLE.  SORRY.

23   **Q.**  GO AHEAD.

24   AN ADVISORY ROLE FROM WHAT PERSPECTIVE?

25   **A.**  IT'S AN ADVISORY ROLE FROM A PRODUCT DEVELOPMENT

BETLEM – DIRECT / REINES

1   PERSPECTIVE TO TAKE A LOOK AT EACH OF THE IDEAS THAT MIGHT

2   COME UP FROM AN ENGINEER IN THE ORGANIZATION AND MAKE A

3   DETERMINATION, IS THAT SOMETHING WE WANT TO PURSUE, INVEST IN,

4   AND ULTIMATELY WORK WITH EXTERNAL COUNSEL TO SUBMIT A PATENT

5   APPLICATION.  BUT IT REALLY ISN'T ANY KIND OF DECISION-MAKING

6   BODY.

7   Q.  ALL RIGHT.  LET'S TALK ABOUT ADOBE ITSELF.

8       WHEN WAS ADOBE STARTED?

9   A.  LET ME THINK.  SO ADOBE WAS FOUNDED IN 1982, I BELIEVE.

10  THERE ARE TWO FOUNDERS JOHN WARNOCK AND CHUCK GESCHKE, AND

11  THEY -- I THINK WE TALKED ABOUT LAST WEEK, THEY CAME FROM AN

12  ORGANIZATION CALLED XEROX PARC, THE PALO ALTO RESEARCH CENTER.

13  Q.  WHERE DOES THE NAME "ADOBE" COME FROM?

14  A.  ADOBE AS A NAME ORIGINATES WITH A CREEK THAT RAN

15  THROUGH -- THAT RUNS THROUGH LOS ALTOS.  IT WAS IN THE

16  BACKYARD OF ONE OF THE FOUNDERS.

17  Q.  HOW MANY PEOPLE WORK AT ADOBE?

18  A.  THE LAST NUMBER I SAW WAS ABOUT 12,000 EMPLOYEES

19  WORLDWIDE.

20  Q.  CAN YOU BRIEFLY DESCRIBE SOME OF ADOBE'S CORPORATE

21  INITIATIVES?

22  A.  SURE.

23      BEYOND BUILDING PRODUCTS AND BRINGING THEM TO CUSTOMERS,

24  WE HAVE A NUMBER OF CORPORATE INITIATIVES INTERNALLY TO HELP

25  SUPPORT OUR COMMUNITY.  WE GIVE A LARGE AMOUNT OF SOFTWARE TO

BETLEM – DIRECT / REINES

1    DIFFERENT WORTHY ORGANIZATIONS LIKE SCHOOLS AND NONPROFITS.

2    LAST YEAR, I BELIEVE, WE GAVE SOFTWARE TO 15,000

3    ORGANIZATIONS.

4        WE ENCOURAGE EMPLOYEES TO PARTICIPANT DIRECTLY IN THEIR

5    COMMUNITY AND VOLUNTEER THEIR TIME.

6        I WAS SELECTED A SHORT TIME AGO TO HEAD UP A PROJECT FOR A

7    NONPROFIT ORGANIZATION TO CONTRIBUTE MY SKILLS TO HELP THEM

8    BUILD AN ALUMNI NETWORK FOR AN ORGANIZATION THAT HELPS INVEST

9    IN WHAT THEY CALL THE SOCIAL SECTOR.  SO SOCIAL WELFARE,

10   THINGS LIKE DISASTER RECOVERY, SOCIAL EDUCATION.

11       ADOBE -- WE ALSO MATCH EMPLOYEE CONTRIBUTIONS TO NONPROFIT

12   CHARITABLE ORGANIZATIONS AT A HUNDRED PERCENT.

13       SO WE ARE ENCOURAGED TO DO A LOT FOR THE COMMUNITY AND WE

14   BACK THAT UP.

15   **Q.**  JUST IN TERMS OF YOU AND THIS PROJECT, HAVE YOU STARTED ON

16   THIS PRO BONO PROJECT THAT'S BEING SUPPORTED BY ADOBE?

17   **A.**  I HAVE NOT.  IT'S A PROJECT WITH AN ORGANIZATION CALLED

18   THE NEW SECTOR ALLIANCE, AND IT WILL START AS SOON AS I'M

19   COMPLETED WITH THIS LITIGATION.

20   **Q.**  WHY DON'T YOU INTRODUCE SOME OF THE PRODUCTS TO THE JURY.

21   THEY HAVE BEEN HEARING ABOUT THE TECHNICAL DETAILS AND EVEN

22   THE FINANCIAL DIMENSIONS, BUT WHY DON'T YOU PUT IT IN KIND OF

23   A MORE CONSUMER PERSPECTIVE?

24   **A.**  SURE.  PROBABLY YOU HAVE HEARD ABOUT MANY OF ADOBE

25   PRODUCTS PRIOR TO THIS FORUM, IF NOT HERE.

BETLEM – DIRECT / REINES

1    ADOBE CREATES PRODUCTS FOR CREATIVE PROFESSIONALS LIKE

2    PHOTOSHOP TO DO DIGITAL IMAGING AND EDITING.  ADOBE FLASH

3    WE'VE TALKED ABOUT TODAY.  ADOBE ACROBAT FOR CREATING

4    DOCUMENTS, CREATING PDF FILES.  AND PRODUCTS LIKE DREAM WEAVER

5    FOR CREATING HTML PAGES, CREATING WEBSITES.

6    **Q.**  WOULD YOU JUST DESCRIBE PDF'S?  YOU MENTIONED PDF'S AND

7    THAT'S KIND OF A FAMILIAR THING, AT LEAST FOR ME.  CAN YOU

8    DESCRIBE WHAT PDF'S ARE AND WHAT THE ADOBE APPROACH HAS BEEN

9    ON THAT?

10   **A.**  OKAY.

11    PDF STANDS FOR PORTABLE DOCUMENT FORMAT, AND IT IS A FILE

12   FORMAT THAT ALLOWS PEOPLE TO CREATE DOCUMENTS THAT MAINTAIN

13   FIDELITY FROM A SCREEN THAT YOU LOOK AT, LIKE WE'VE SEEN HERE

14   IN THE COURT, TO A PRINTED COPY SO THAT YOU CAN MOVE THOSE

15   DOCUMENTS ACROSS DIFFERENT PLATFORMS, DESKTOP COMPUTERS,

16   LAPTOPS, AND HAVE THEM LOOK THE SAME WAY IN EACH CASE.

17    THE TECHNOLOGY TOOK OFF AND HAS BEEN SO UBIQUITOUS IN THE

18   INDUSTRY THAT BACK IN 2008, ADOBE WORKED WITH AN INTERNATIONAL

19   STANDARDS ORGANIZATION TO OPEN UP THAT PDF STANDARD, MAKE ALL

20   OF THE PATENTS RELATED TO IT ROYALTY FREE AND PUBLICLY

21   AVAILABLE.  SO IT IS NOW AN OPEN FILE FORMAT THAT ANYONE CAN

22   EITHER CREATE A TOOL TO GENERATE PDF FILES OR CREATE A TOOL TO

23   DISPLAY THEM, PRINT THEM, WHATEVER YOU CHOOSE.

24   **Q.**  THANK YOU.

25    CAN YOU DESCRIBE -- LET'S TALK A LITTLE BIT ABOUT ADOBE'S

BETLEM – DIRECT / REINES

```
 1    RESEARCH AND DEVELOPMENT.
 2        CAN YOU DESCRIBE THE RESEARCH AND DEVELOPMENT PHILOSOPHY
 3    AT ADOBE?  OBVIOUSLY YOU'RE IN THE MIDDLE OF THAT IN TERMS OF
 4    YOUR SENIOR DIRECTOR DUTIES.
 5    A.  SO, ADOBE -- ADOBE'S ROOTS IN R&D REALLY COME FROM ITS
 6    FOUNDERS.  THE FOUNDERS STARTED AN ORGANIZATION CALLED XEROX
 7    PARC THAT WE DISCUSSED.  AND THAT'S AN ORGANIZATION THAT WAS
 8    REALLY ROOTED IN DEEP RESEARCH AND TECHNICAL INNOVATION.
 9        THAT TRANSFERRED OVER AND HAS REALLY BECOME PART OF THE
10    DNA AT ADOBE WHERE ENGINEERS AND PRODUCT DEVELOPMENT TEAMS ARE
11    ENCOURAGED TO COME UP WITH INVENTIONS AND INNOVATIONS TO
12    REALLY PURSUE THAT RESEARCH MINDSET, REALLY DIG INTO A PROBLEM
13    DEEPLY, UNDERSTAND WHAT CUSTOMERS NEED, AND BUILD A PRODUCT
14    AROUND THOSE IDEAS SO THAT WE CAN CREATE, YOU KNOW, THESE
15    REALLY INNOVATIVE AND NEW OPPORTUNITIES IN THE MARKET BY
16    FOLLOWING BACK TO OUR ROOTS AND DEEP RESEARCH.
17    Q.  HOW MANY PATENTS DOES ADOBE HAVE?
18    A.  I DON'T KNOW AN EXACT ANSWER.  I BELIEVE IT'S IN THE RANGE
19    OF THOUSANDS OF PATENTS.
20    Q.  NOW, ONE QUESTION OF THE DAY HERE IS, DOES ADOBE RESPECT
21    INTELLECTUAL PROPERTY?
22    A.  OF COURSE.  WE HAVE A DEEP RESPECT FOR INTELLECTUAL
23    PROPERTY.  NOT ONLY DO WE CREATE THOUSANDS OF PATENTS
24    OURSELVES, BUT WE ALSO LICENSE THE PATENTS OF OTHERS.  SO IT'S
25    AN IMPORTANT CONSIDERATION FOR US.
```

BETLEM – DIRECT / REINES

1    **Q.**  LET'S TURN TO DRM TECHNOLOGY.

2       HOW LONG HAS ADOBE BEEN INVOLVED IN USING DRM TECHNOLOGY?

3    **A.**  I HAVE LIMITED KNOWLEDGE OF THE TOPIC.  I HAVE NEVER

4    WORKED, DIRECTLY WORKED ON A DRM PRODUCT MYSELF.

5       I KNOW THAT THE INITIAL WORK BEGAN IN THE 1990'S WITH OUR

6    E-BOOKS PRODUCT TO PROTECT A CONTENT OWNER'S ELECTRONIC BOOK

7    THAT WAS DISTRIBUTED TO CONSUMERS.

8    **Q.**  HAVE YOU HAD BUSINESS RESPONSIBILITIES WITH THE E-BOOK

9    LINE OF PRODUCTS AT ADOBE?

10   **A.**  FOR A SHORT PERIOD OF TIME.  I DID PICK UP THE PRODUCT.

11   IT WAS IN SORT OF A MATURE PHASE OF DEVELOPMENT, SO WE WEREN'T

12   ADDING ANY CAPABILITIES AROUND IT.

13   **Q.**  JUST TO BE CLEAR, BECAUSE I MAY HAVE LOST TRACK IN WHAT I

14   AM TRYING TO DO HERE, THE E-BOOK PRODUCT HAD DRM FOR ADOBE,

15   BASED ON YOUR KNOWLEDGE FROM YOUR WORK WITH IT, BACK TO THE

16   1990'S; IS THAT CORRECT?

17   **A.**  YES.  WE HAVE A LOT OF DRM PRODUCTS.  THEY ALL HAVE

18   DIFFERENT NUANCES.  WE CREATE THEM FOR VERY SPECIFIC

19   OPPORTUNITY IN THE MARKET.  SO THERE IS A WHOLE RANGE OF

20   DRM-RELATED PRODUCTS.

21   **Q.**  ARE YOU SAYING THERE'S ADOBE DRM OTHER THAN THE PRODUCTS

22   THAT WE HAVE BE HEARING ABOUT OVER THE LAST WEEK?

23   **A.**  YES.  THERE'S A NUMBER OF ADOBE PRODUCTS THAT USE

24   PROTECTION TECHNOLOGIES ON THEM THAT WE HAVEN'T DISCUSSED IN

25   THE LAST TWO WEEKS.

BETLEM – DIRECT / REINES

1 **Q.** NOW, I UNDERSTAND YOU ARE NOT AN EXPERT ON THE TECHNICAL

2 SPECIFICS OF DRM, BUT DO YOU HAVE AN UNDERSTANDING FROM A

3 STRATEGY PERSPECTIVE FOR THE COMPANY WHETHER DRM IS CONSIDERED

4 A GOOD THING THAT YOU WANT TO PROLIFERATE THROUGH THE COMPANY?

5 **A.** THAT'S A DIFFICULT QUESTION TO ANSWER.

6 DRM AT ITS ROOTS IS A COMPLICATED COMPLEX TECHNOLOGY AS

7 WE'VE GOTTEN A LITTLE BIT OF INSIGHT THIS WEEK. AND IT'S --

8 IT'S A MIXED BLESSING IN THAT YOU DO IT BECAUSE YOUR

9 CUSTOMERS, THE PEOPLE WHO PAY YOU MONEY, ASK FOR IT. THEY

10 WANT THE RIGHTS OF THE CONTENT, THE -- BE IT IMAGES OR

11 DOCUMENTS OR WHATEVER, THEY WANT THOSE PRESERVED. THEY WANT

12 TO BE ABLE TO PROTECT IT, BUT CONSUMERS WANT EASY ACCESS TO

13 THAT CONTENT.

14 SO YOU HAVE TO STRIKE A MIDDLE GROUND BETWEEN DOING ENOUGH

15 TO PROTECT THE RIGHTS OF THE PEOPLE THAT OWN THE CONTENT, BUT

16 NOT MAKING IT INTRUSIVE SUCH THAT THE PEOPLE WHO WANT TO GET

17 ACCESS TO THE CONTENT ARE IMPAIRED OR IMPEDED IN DOING SO.

18 AND EVEN TODAY WE MADE MENTION OF, I BELIEVE IT'S CALLED,

19 THE ALM TECHNOLOGY, THE ADOBE LICENSE MANAGER THAT WE

20 IMPLEMENTED IT IN A WAY THAT IT WAS SO INTRUSIVE AND

21 FRUSTRATING FOR CUSTOMERS, WE ENDED UP PULLING OUT A FEW

22 MONTHS LATER BECAUSE WE RECEIVED SO MANY COMPLAINTS.

23 **Q.** ALL RIGHT. LET'S TURN TOWARDS DIGITAL REG.

24 HAD YOU EVER HEARD OF DIGITAL REG BEFORE THIS CASE?

25 **A.** NO. I HAD NOT.

1    **Q.**  HAD ADOBE, TO YOUR KNOWLEDGE, BEEN NOTIFIED BEFORE THIS

2    CASE THAT DIG REG BELIEVED IT WAS INFRINGING?

3    **A.**  NO.  SPEAKING ONLY FOR MYSELF, THE FIRST I HEARD OF IT WAS

4    AS PART OF THIS LITIGATION.  SO I AM AWARE OF NO PRIOR

5    NOTIFICATION.

6    **Q.**  WHY DOES ADOBE NOT JUST PAY DIG REG, DIGITAL REG JUST LIKE

7    THAT LONG LIST OF COMPANIES THAT PAID -- YOU WERE SITTING

8    HERE, I KNOW YOU ARE NOT MEMORIZING WHAT'S GOING ON, BUT YOU

9    SAW THERE IS A BUNCH OF COMPANIES THAT PAID, HOW COME ADOBE

10   DOESN'T JUST DO THE SAME THING?

11   **A.**  BECAUSE I FEEL CONFIDENT IN SAYING THAT WE DON'T -- WE

12   DIDN'T INFRINGE ON THE PATENTS THAT ARE IN QUESTION IN THIS

13   CASE.

14       I HAVE LISTENED TO SOME EXPERT TESTIMONY.  I HAVE

15   CONFIDENCE IN THE FACTS THAT THEY ARE RELYING ON AND

16   COMMUNICATING IN THE COURT, AND SO IT WOULDN'T MAKE SENSE FOR

17   US TO PAY TO LICENSE THOSE PATENTS WHEN WE ARE, IN FACT, NOT

18   TAKING ADVANTAGE OF THEM.

19           **MR. REINES:**  NO FURTHER QUESTIONS, YOUR HONOR.

20                     **CROSS-EXAMINATION**

21   BY MR. DINOVO:

22   **Q.**  GOOD AFTERNOON, MR. BETLEM.  JUST A FEW QUESTIONS, SIR.

23   **A.**  SURE.

24   **Q.**  ALL RIGHT.

25       SO HOW LONG HAVE YOU BEEN INVOLVED WITH THE FLASH PRODUCT,

1   THE FLASH PLATFORM?

2   **A.**   I MANAGED FLASH PLAYER FOR APPROXIMATELY NINE TO TEN

3   YEARS.

4   **Q.**   ALL RIGHT.   AND YOU'RE GENERALLY FAMILIAR WITH FLASH

5   ACCESS?

6   **A.**   I HAVE A HIGH LEVEL KNOWLEDGE OF FLASH ACCESS.

7   **Q.**   YOU UNDERSTAND IT USES CONTENT PROTECTION?

8   **A.**   YES, IT DOES.

9   **Q.**   THAT'S A FORM OF DRM?

10   **A.**   YES, IT IS.

11   **Q.**   ALL RIGHT.

12       AND YOU MENTIONED ALSO IN YOUR DIRECT TESTIMONY THAT YOU

13   HAVE FROM TIME TO TIME GIVEN PRESENTATIONS?

14   **A.**   YES.

15   **Q.**   CORRECT?

16       AND ONE SUCH PRESENTATION WAS WITH A COLLEAGUE OF YOURS

17   NAMED MR. PRITHAM?

18   **A.**   PRITHAM SHETTY.

19   **Q.**   PRITHAM SHETTY.   THANK YOU, SIR.

20       THAT WAS ON NOVEMBER 19TH, 2008?

21   **A.**   YES.

22   **Q.**   AND WHO WAS THE AUDIENCE AT THAT PRESENTATION?

23   **A.**   THAT WAS AT THE ADOBE MAX CUSTOMER CONFERENCE.

24   **Q.**   AND WAS IT YOUR TESTIMONY THAT THERE WERE THOUSANDS OF

25   CUSTOMERS PRESENT?

1   **A.** IN THE ACTUAL -- THERE WERE THOUSANDS OF CUSTOMERS AT THE

2   CONFERENCE.  THERE WERE MAYBE A HUNDRED OR SO, TWO HUNDRED AT

3   THE ACTUAL PRESENTATION.  THEY PICK DIFFERENT SESSIONS THAT

4   THEY'LL ATTEND.

5   **Q.** OKAY.  BUT NONETHELESS, WITH THOUSANDS IN GENERAL

6   ATTENDANCE AND A COUPLE HUNDRED IN THE SEATS, YOU DIDN'T WANT

7   TO SAY ANYTHING MISLEADING, RIGHT?

8   **A.** CORRECT.

9   **Q.** DO YOU RECALL MAKING -- AS PART OF YOUR PRESENTATION

10  POINTING OUT THAT CONTENT PROTECTION IS A CUSTOMER NEED FOR

11  FLASH?

12  **A.** YES.  SOME CUSTOMERS DO HAVE THAT NEED.  LIKE THE MOVIE

13  STUDIOS, THE HOLLYWOOD MOVIE STUDIOS HAVE THE NEED TO PROTECT

14  THEIR CONTENT.

15  **Q.** AND WHAT WAS THE BASIS THAT YOU PROVIDED THIS INFORMATION

16  TO YOUR CUSTOMERS?  WHO TOLD YOU THAT THAT WAS A CUSTOMER

17  NEED?

18  **A.** CUSTOMERS HAVE REQUESTED THE FUTURE.  SO THEY TOLD US

19  DIRECTLY.  THE SPECIFIC SET OF CUSTOMERS THAT HAVE A NEED TO

20  PROTECT VIDEO CONTENT TOLD US WE NEED OUR CONTENT PROTECTED.

21  **Q.** THOSE CUSTOMERS WOULD INCLUDE HULU AND AMAZON, RIGHT?

22  **A.** AT THE TIME, YES.

23  **Q.** DO YOU RECALL WHAT YOU SPECIFICALLY SAID AT THE

24  PRESENTATION ABOUT WHY THERE WAS A NEED FOR CONTENT PROTECTION

25  IN THE FLASH PLATFORM?

1   **A.**  I DO NOT.  I KNOW THERE'S A PUBLIC VERSION OF MY

2   PRESENTATION AVAILABLE, BUT I DON'T RECALL THE SPECIFICS.

3   **Q.**  WHY DON'T WE PLAY CLIP 5 TO REFRESH YOUR RECOLLECTION,

4   SIR.

5           **THE COURT:**  I AM GOING --

6           **MR. REINES:**  OBJECTION --

7           **THE COURT:**  -- TO NEED A DEPO AND PAGE AND LINE

8   REFERENCE.

9           **MR. DINOVO:**  YOUR HONOR, I'M TRYING TO REFRESH HIS

10  RECOLLECTION WITH THE ACTUAL COMMENTS HE MADE AT THIS

11  PRESENTATION.

12          **THE COURT:**  THEN YOU JUST SHOW IT TO HIM IN A HARD

13  COPY.  HE LOOKS AT IT, READS IT TO HIMSELF, AND ANSWERS

14  WHETHER IT REFRESHES HIS RECOLLECTION.

15          **MR. DINOVO:**  THIS IS AN ANIMATION.  IT'S A VIDEO OF

16  WHAT HE SAID AT THE CONFERENCE.

17          **MR. REINES:**  WE HAVEN'T BEEN SHOWN --

18          **THE COURT:**  BE THAT AS IT MAY, THAT IS NOT HOW YOU

19  REFRESH RECOLLECTION.  SO MAYBE YOU HAVE A TRANSCRIPT OR I

20  DON'T KNOW WHAT TO SUGGEST.

21          **MR. DINOVO:**  ALL RIGHT.

22  BY MR. DINOVO:

23  **Q.**  IN THE CONTEXT OF THE FLASH PLATFORM SIR --

24  **A.**  YES.

25  **Q.**  -- ADOBE PROVIDES CONTENT PROTECTION IN THE FORM OF THE

1   FLASH ACCESS TECHNOLOGY, RIGHT?

2   **A.**   THAT IS CORRECT.

3   **Q.**   OKAY.  THAT WAS LAUNCHED IN 2008?

4   **A.**   THAT IS MY UNDERSTANDING FROM THIS CASE.

5   **Q.**   OKAY.  FLASH IS A PERVASIVE TECHNOLOGY ON THE INTERNET,

6   ISN'T IT?

7   **A.**   YES, IT IS.  FLASH PLAYER IS PERVASIVE TECHNOLOGY.

8            **THE COURT:**  SPEAK INTO THE MICROPHONE.  MOVE YOUR

9   CHAIR FORWARD.  PULL THE MIC TOWARDS YOU.  HAVE IT IN THE

10  DIRECTION THAT YOUR FACE WILL BE FACING WHEN YOU SPEAK.

11  **BY MR. DINOVO:**

12  **Q.**   SO IN –– MAYBE THESE PERCENTAGES AREN'T PRECISELY RIGHT,

13  BUT YOU'VE SAID IN THE PAST THAT FLASH CONTENT REACHES

14  98 PERCENT OR MORE OF INTERNET VIEWERS?

15  **A.**   THAT IS CORRECT.

16  **Q.**   AND OVER 80 PERCENT OF ALL VIDEO VIEWED ON THE INTERNET IS

17  FLASH.

18  **A.**   THAT WAS TRUE AT THE TIME.  I'M NOT –– I DON'T THINK

19  THAT'S TRUE TODAY.

20  **Q.**   WHAT PERCENTAGE TODAY?

21  **A.**   I COULDN'T HAZARD A GUESS.  YOU KNOW, MY ROUGH GUESS WOULD

22  BE SOMEWHERE BETWEEN 25 TO 50 PERCENT OF VIDEO.

23  **Q.**   OKAY.

24      AND AS A CONSEQUENCE OF THIS CUSTOMER NEED, ADOBE

25  DEVELOPED AND MARKETED THIS FLASH ACCESS PRODUCT, RIGHT?

BETLEM – CROSS / DINOVO

1  **A.**  YES, BY A SELECT SET OF CUSTOMERS.

2  **Q.**  AND THIS FLASH ACCESS PRODUCT HAS BEEN OFFERED BY ADOBE

3  FROM 2008, ITS COMMERCIAL LAUNCH, UNTIL THIS DAY, RIGHT?

4  **A.**  THAT IS MY ASSUMPTION.

5  **Q.**  AND YOU MENTIONED ADOBE LICENSE MANAGER, BUT ARE YOU

6  AWARE, SIR, THAT ADOBE HAS PROVIDED A LIST OF VERSIONS OF

7  ADOBE LICENSE MANAGER TO US?

8       **MR. REINES:**  OBJECTION, YOUR HONOR.  THIS IS ANOTHER

9  ATTEMPT TO DO WHAT IS OBJECTIONABLE.

10       **MR. DINOVO:**  YOUR HONOR, I WOULD SAY THAT THEY HAVE

11  REPEATEDLY SAID THAT ADOBE LICENSE MANAGER WAS DISCONTINUED

12  AFTER THREE MONTHS.  THE DOCUMENTATION, INCLUDING THEIR OWN

13  SWORN INTERROGATORY RESPONSES, INDICATE THAT VERSIONS OF THAT

14  PROGRAM WERE USED FOR YEARS.

15     AND WE'RE NOT -- WE UNDERSTAND THOSE PRODUCTS AREN'T IN

16  THE CASE, BUT WE THINK IT'S UNFAIR FOR THEM TO SUGGEST THAT

17  THE ALM HAS ONLY BEEN IN USE FOR THREE MONTHS.

18       **THE COURT:**  WHY WOULD WE TALK ABOUT IT IF THEY

19  WEREN'T IN THE CASE?

20       **MR. DINOVO:**  BECAUSE THEY ARE TELLING THE JURY THAT

21  AFTER THIS THREE MONTHS THEY GOT RID OF IT BECAUSE IT WAS NOT

22  USEFUL.  AT LEAST THAT'S THE IMPLICATION I TAKE AWAY FROM IT.

23       **MR. REINES:**  IT'S EXTINGUISHED BY THIS CASE.  I MEAN,

24  THEY FAILED TO PURSUE IT IN THIS CASE AND IT WAS IN THE CASE,

25  SO IT'S GONE.

1      **MR. DINOVO:**  WE THINK THAT'S UNFAIR, YOUR HONOR.

2      **THE COURT:**  WE WILL TAKE IT UP OUTSIDE THE PRESENCE

3   OF THE JURY.

4      **MR. DINOVO:**  ALL RIGHT.

5      **THE COURT:**  I DON'T QUITE UNDERSTAND WHAT THE ISSUE

6   IS HERE.

7   **BY MR. DINOVO:**

8   **Q.**  LET'S JUST TALK A LITTLE BIT ABOUT WHAT YOUR EXPERT,

9   ADOBE'S EXPERT, DR. WICKER, HAD TO SAY ABOUT ADOBE FLASH.

10     BASED ON YOUR EXPERIENCE, YOU CAN EITHER CONFIRM OR MAYBE

11  YOU DON'T KNOW.

12     YOU'VE BEEN HERE THROUGHOUT THE TRIAL AND YOU'VE SEEN

13  DR. WICKER'S TESTIMONY?

14  **A.**  YES, I DID.

15  **Q.**  SO DO YOU AGREE WITH DR. WICKER THAT FLASH ACCESS, THE

16  FLASH SDK, FLASH MEDIA SERVER, FLASH PLAYER, AND FLASH AIR

17  FORM A PLATFORM THAT WORKS COOPERATIVELY?

18  **A.**  I'M NOT FAMILIAR WITH EXACTLY WHAT'S BEING REFERRED TO

19  WITH THE FLASH SDK, BUT THE OTHER COMPONENTS I WOULD AGREE ARE

20  PART OF A PLATFORM.

21  **Q.**  OKAY.  AND MAYBE I TRUNCATED THE ACTUAL WORDS.  I THINK HE

22  SAID FLASH ACCESS SOFTWARE DEVELOPERS KIT, SDK.

23     DOES THAT RING A BELL?

24  **A.**  I HEARD ABOUT IT IN THIS CASE.  I DON'T -- FROM AN ADOBE

25  MARKETING PERSPECTIVE, IT WAS NOT CONSIDERED A PART OF THE

1    FLASH PLATFORM.

2         **MR. REINES:**  OBJECTION.  I DIDN'T WANT TO INTERRUPT,

3    YOUR HONOR.

4       THIS IS WELL BEYOND THE SCOPE.  I DON'T EVEN KNOW IF WE

5    MENTIONED FLASH, WE MENTIONED ONE WORD ABOUT IT.  WE DIDN'T

6    PRESENT HIM ON THE TECHNICAL SPECIFICS, MUCH LESS ALL THIS.

7         **MR. DINOVO:**  YOUR HONOR, HE HAS BEEN A FLASH ENGINEER

8    FOR TEN YEARS.  THAT'S A PRODUCT IN THE CASE.  WE THOUGH IT

9    WOULD BE USEFUL TO LEARN MORE ABOUT THE FLASH PLATFORM FROM

10   THE WITNESS.

11        **MR. REINES:**  IT'S NOT AN ISSUE OF WHETHER HE'S

12   KNOWLEDGEABLE.  IT'S AN ISSUE OF IT'S BEYOND THE SCOPE.  HE'S

13   OUR WITNESS, AND WE DIDN'T QUESTION HIM ABOUT THE SPECIFICS OF

14   FLASH.

15        **MR. DINOVO:**  ALL RIGHT.  I WILL MOVE ON THEN.

16   **BY MR. DINOVO:**

17   **Q.**  WHICH CUSTOMERS DID YOU IDENTIFY IN YOUR 2008

18   PRESENTATION; DO YOU RECALL?

19   **A.**  I DO NOT.

20   **Q.**  LET ME JUST SHOW YOU A SCREEN SHOT FROM CLIP 4.

21        **MR. DINOVO:**  SO, MS. MASON, PLEASE DON'T PLAY IT OR

22   PUBLISH IT TO THE JURY.

23                  (DISPLAYED ON SCREEN.)

24       COULD YOU GO TO THE NEXT CLIP, MS. MASON?

25

**BY MR. DINOVO:**

**Q.** ALL RIGHT, SIR.

I WILL REPRESENT TO YOU THAT THAT'S A SCREEN SHOT TAKEN

FROM YOUR PRESENTATION. DOES IT LOOK FAMILIAR TO YOU?

**A.** VAGUELY FAMILIAR. I CAN'T PLACE IT, BUT IT SEEMS LIKE A

REASONABLE FACSIMILE.

**Q.** OKAY. YOU DON'T HAVE ANY REASON, LOOKING AT IT, TO THINK

IT IS MISTAKEN OR WRONG?

**A.** NO, I DO NOT.

**Q.** OKAY. DOES THIS REFRESH YOUR RECOLLECTION ABOUT THE

CUSTOMERS THAT WERE USING FLASH ACCESS AT THE TIME YOU MADE

THIS PRESENTATION IN 2008?

**A.** NO. I WOULD ASSERT THESE ARE A SET OF CUSTOMERS USING

FLASH VIDEO, WHICH THEY COULD OPT INTO USING FLASH ACCESS, BUT

MOST OF THEM I DO NOT THINK ARE FLASH ACCESS CUSTOMERS.

AGAIN, I DON'T -- I DIDN'T WORK ON FLASH ACCESS, SO I

CAN'T SPEAK WITH AUTHORITY, BUT THE VAST MAJORITY, LIKE

YOUTUBE, DID NOT USE FLASH ACCESS. SO ALL THE CONTENT THEY

DISTRIBUTED WAS FLASH VIDEO DID NOT USE FLASH ACCESS. NO --

NO DRM.

**Q.** OKAY. BUT THOSE WHO YOU PROVIDE -- YOU'VE HEARD THE TERM

"PREMIUM CONTENT"?

**A.** PREMIUM CONTENT IS PAID-FOR CONTENT.

**Q.** OKAY. SO THOSE WHO PROVIDE PAID-FOR CONTENT WOULD HAVE

MORE OF AN INCENTIVE TO USE THIS SORT OF THE TECHNOLOGY,

1    RIGHT?

2           **MR. REINES:**  OBJECTION, YOUR HONOR.  CALLS FOR

3    SPECULATION AS TO INCENTIVE AND HE ALREADY SAYS HE LACKS

4    FOUNDATION ABOUT BEING AUTHORITATIVE ON THIS SUBJECT.  IT IS

5    BEYOND THE SCOPE.

6           **MR. DINOVO:**  IT IS FROM HIS PRESENTATION.  LET ME

7    REPHRASE THE QUESTION.

8           **THE COURT:**  BEYOND THE SCOPE OBJECTION, THOUGH, SEEMS

9    TO BE WELL-TAKEN.

10          **MR. DINOVO:**  ALL RIGHT.

11   **BY MR. DINOVO:**

12   **Q.**  SIR, AGAIN, YOU WERE PRESENT FOR THE TESTIMONY EARLIER

13   THIS –– OVER THE PAST WEEK AND A HALF?

14   **A.**  YES.

15   **Q.**  YOU KNOW THAT MR. HERBACH HAS SOME PATENTS THAT REFERENCE

16   PATRICK PATTERSON'S PATENTS, RIGHT?

17   **A.**  I DID SEE THAT IN THE TESTIMONY.

18   **Q.**  OKAY.  AND YOU REFERRED TO A PATENT REVIEW COMMITTEE.

19        COULD YOU EXPLAIN WHAT THAT IS?

20   **A.**  SURE.

21        EARLY, EARLY IN THE FIRST YEAR WHEN I STARTED AT ADOBE, SO

22   IT WOULD HAVE BEEN IN 2009, I SPENT APPROXIMATELY SIX MONTHS

23   ON A, WHAT IS CALLED A PATENT REVIEW COMMITTEE.  AND THE NAME

24   IS A LITTLE BIT INACCURATE IN THAT WE ARE ACTUALLY NOT

25   REVIEWING PATENTS, WE ARE REVIEWING IDEAS THAT ARE POTENTIALLY

1   PATENTABLE.

2        SO IN MY SIX-MONTH TERM, IT'S A ROTATING GROUP OF MEMBERS,

3   WE ARE PRESENTED FROM TIME TO TIME WITH A SET OF IDEAS FROM

4   ANY PLACE IN THE COMPANY FOR WHICH THERE IS INTEREST IN

5   POTENTIALLY SUBMITTING AN APPLICATION FOR THAT PATENT.

6        SO MY RESPONSIBILITY, ALONG WITH THE OTHERS ON THE

7   COMMITTEE, WAS TO SAY THAT IS AN INTERESTING IDEA, AND IT IS

8   ALIGNED WITH ADOBE STRATEGY, WE SHOULD LIKELY PURSUE IT.  IT

9   SORT OF PASSES A SNIFF TEST, IN OTHER WORDS.

10  **Q.**  OKAY.  AND IS PART OF THAT SNIFF TEST WHETHER OR NOT

11  THERE'S WHAT YOU WOULD CONSIDER RELEVANT PRIOR ART?

12  **A.**  NO, IT IS NOT.

13  **Q.**  SO THERE'S NO ASSESSMENT TAKEN OF THE PATENTS THAT HAVE

14  BEEN ASSERTED AGAINST -- AGAINST ADOBE BY THE U.S. PATENT AND

15  TRADEMARK OFFICE?

16  **A.**  NO.  THERE IS ABSOLUTELY NO DISCUSSION OF PRIOR ART IN

17  THAT FORM.  WE ARE SIMPLY TARGETING A SET OF INFORMED

18  ENGINEERS IN THE ORGANIZATION IF A PATENT -- OR AN IDEA IS

19  POTENTIALLY PATENTABLE IN TERMS OF IS IT ALIGNED WITH OUR

20  STRATEGY?  IS IT SOMETHING WE WANT TO PURSUE?  BUT THERE IS NO

21  PRIOR ART EXAMINATION.  THAT'S DONE BY EXTERNAL COUNSEL.

22  **Q.**  DO YOU KNOW IF IT'S DONE BY IN-HOUSE COUNSEL AS WELL?

23  **A.**  I DO NOT KNOW THE ANSWER TO THAT.

24  **Q.**  SIR, YOU MADE A GENERAL STATEMENT, I THINK, THAT ADOBE

25  RESPECTS INTELLECTUAL PROPERTY, RIGHT?

1    **A.** YES.

2           **MR. DINOVO:** YOUR HONOR, WE THINK THAT MR. BETLEM IS

3    PERSONALLY AWARE OF AN INSTANCE WHERE HIS FORMER COMPANY AND

4    ADOBE HAD A DISPUTE, AND THERE WAS AN ISSUE, AND SO I WOULD

5    LIKE TO GO INTO THAT SINCE THEY MADE THE BROAD-BASED ASSERTION

6    THAT THEY RESPECT INTELLECTUAL PROPERTY.

7           **THE COURT:** IF THAT HASN'T BEEN DISCUSSED BEFORE, I

8    THINK WE BETTER HEAR ABOUT IT OUTSIDE THE PRESENCE OF THE JURY

9    FIRST.

10          **MR. DINOVO:** VERY WELL, YOUR HONOR.

11   **BY MR. DINOVO:**

12   **Q.** FINALLY, MR. BETLEM, AND SUBJECT TO THE -- US DISCUSSING

13   THIS OTHER ISSUE ABOUT THIS OTHER MATTER, YOU MENTIONED I

14   THINK AS ADOBE'S CORPORATE REPRESENTATIVE YOU WEREN'T AWARE OF

15   ANY CONTACTS, OR WAS THAT BASED ON YOUR PERSONAL KNOWLEDGE,

16   THE NOTICE OF THE PATENTS, FOR EXAMPLE?

17   **A.** THAT'S BASED ON MY PERSONAL KNOWLEDGE.

18   **Q.** SO YOU ARE NOT HERE TESTIFYING OR ON BEHALF OF ADOBE

19   SAYING THERE WASN'T A MEETING IN 2004, FOR EXAMPLE?

20   **A.** NO.  THAT -- I HAVE NO KNOWLEDGE OF THAT MEETING.

21   **Q.** DO YOU KNOW IF THERE WAS A MEETING IN 2008 OR --

22   **A.** I DO NOT.

23   **Q.** SO YOU ARE NOT HERE AS ADOBE'S REPRESENTATIVE SAYING THAT

24   THERE WAS NO SUCH MEETING AFTER HAVING HEARD ALL THIS

25   TESTIMONY, AFTER HAVING THE OPPORTUNITY TO DISCUSS THIS WITH

1    EVERYONE AT ADOBE AND YOUR OUTSIDE COUNSEL, YOU ARE NOT

2    DENYING THOSE MEETINGS OCCURRED?

3              **MR. REINES:**  OBJECTION, YOUR HONOR, ABOUT HAVING THE

4    OPPORTUNITY --

5              **THE COURT:**  RIGHT.  HE'S HERE AS A PERSONAL WITNESS.

6    THERE'S -- WE DON'T HAVE 30(B)(6) WITNESSES AT TRIAL.

7              **MR. DINOVO:**  OKAY.

8    **BY MR. DINOVO:**

9    **Q.**  YOU ARE NOT IN A POSITION --

10             **THE COURT:**  HE SAID HE DIDN'T KNOW PERSONALLY OF ANY

11   SUCH CONTACT, ONE WAY OR THE OTHER.

12             **MR. DINOVO:**  ALL RIGHT.  THANK YOU, YOUR HONOR.  WE

13   WOULD LIKE TO BRING UP THAT OTHER MATTER OUTSIDE THE PRESENCE

14   OF THE JURY, IF WE COULD.

15             **THE COURT:**  ALL RIGHT.  NOT NOW, BUT SOME OTHER TIME

16   WE CAN.

17             **MR. REINES:**  WE ARE READY TO CALL OUR NEXT WITNESS.

18      WE HAVE NO FURTHER QUESTIONS.

19             **THE COURT:**  WE WILL RECALL HIM IF WE NEED TO.

20             **MR. DINOVO:**  VERY WELL.

21             **THE COURT:**  HE WILL BE HERE, I PRESUME.

22      OKAY.  YOU MAY STEP DOWN THEN, SIR, SUBJECT TO RECALL

23   PERHAPS.

24      AND YOU MAY CALL YOUR NEXT WITNESS.

25             **MR. REINES:**  YOUR HONOR, THE NEXT WITNESS IS JOHN

1    SCHULL.

2           **THE CLERK:**  COME ON UP.  STAND AND RAISE YOUR RIGHT

3    HAND.

4       (**JON SCHULL,** CALLED AS A WITNESS FOR THE DEFENDANT, HAVING

5    BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

6           **THE WITNESS:**  I DO.

7           **THE CLERK:**  YOU MAY BE SEATED.  ONCE SEATED, I'M

8    GOING TO ASK THAT YOU PLEASE STATE AND SPELL YOUR FIRST AND

9    LAST NAME FOR THE RECORD, PLEASE.

10          **THE WITNESS:**  JON SCHULL.  JON, S-C-H-U-L-L.

11          **THE CLERK:**  U-L-L?

12          **THE WITNESS:**  CORRECT.

13          **THE CLERK:**  THANK YOU.

14                        **DIRECT EXAMINATION**

15   **BY MR. REINES:**

16   **Q.**  PLEASE INTRODUCE YOURSELF TO THE JURY.

17   **A.**  MY NAME IS JON SCHULL.  I'M A RESEARCH SCIENTIST AT

18   ROCHESTER INSTITUTE OF TECHNOLOGY.

19   **Q.**  WHERE DO YOU LIVE?

20   **A.**  ROCHESTER, NEW YORK.

21   **Q.**  CAN YOU PLEASE DESCRIBE YOUR EDUCATIONAL BACKGROUND?

22   **A.**  I WENT TO REED COLLEGE AS AN UNDERGRADUATE IN PORTLAND,

23   OREGON.  I GOT A PH.D. IN BIOLOGICAL PSYCHOLOGY AT THE

24   UNIVERSITY OF PENNSYLVANIA.

25   **Q.**  YOU WERE -- BEFORE YOU WERE A RESEARCH SCIENTIST AT

SCHULL – DIRECT / REINES

1    ROCHESTER INSTITUTE OF TECHNOLOGY, WHAT WAS YOUR ROLE THERE?

2    **A.**  I WAS AN ASSOCIATE PROFESSOR.

3    **Q.**  AND CAN YOU DESCRIBE WHAT THAT POSITION INVOLVED?

4    **A.**  YEAH.  I WAS TEACHING COURSES IN HUMAN COMPUTER

5    INTERACTION AND IN INNOVATION AND INVENTION FOR 12 YEARS.

6    **Q.**  AND DID -- YOU WERE YOU TENURED?

7    **A.**  YES.

8    **Q.**  ARE YOU STILL WORKING -- LET ME ASK YOU:  HOW COME YOU

9    LEFT THE POSITION OF A TENURED PROFESSOR AT ROCHESTER

10   INSTITUTE OF TECHNOLOGY AND BECAME THIS RESEARCH POSITION?

11   **A.**  MY DEPARTMENT CHAIR WANTED ME TO DO MORE TEACHING OF

12   COURSES OTHER THAN THE ONES I REALLY WANTED TO DO.  I REALIZED

13   I WAS ELIGIBLE FOR RETIREMENT, BUT INSTEAD NEGOTIATED A NEW

14   POSITION AS RESEARCH SCIENTIST IN THE CENTER FOR MAGIC AT RIT.

15   **Q.**  LET'S TALK ABOUT THAT IN A SECOND.  CAN YOU JUST DESCRIBE

16   WHAT CLASSES YOU DID WANT TO TEACH THAT --

17   **A.**  SURE.  INNOVATION AND INVENTION.  I HAD SORT OF MADE A

18   LETTER CAREER OUT OF TEACHING STUDENTS HOW TO DO THINGS THAT

19   NO ONE KNEW HOW TO DO.  THAT WAS MY PASSION.

20   **Q.**  AND BECAUSE THE COURT REPORTER IS TAKING DOWN WHAT'S BEING

21   SAID AND BECAUSE WE ARE TOWARDS THE END OF A LONG DAY THAT

22   STARTED EARLY, PLEASE BE SURE THAT YOU WAIT FOR ME TO COMPLETE

23   MY QUESTION AND I'LL TRY AND DO MY BEST TO AFFORD YOU THE SAME

24   COURTESY.  AS ALSO IN TERMS OF THE PACE, LET'S KEEP THE PACE

25   SLOWER THAN WE WOULD NORMALLY SPEAK IN REGULAR INTERACTION.

1    **A.** SURE.

2    **Q.** THANK YOU.  I KNOW THESE ARE NOT TYPICAL RULES, BUT WE

3    WOULD ALL APPRECIATE IT.

4         IN TERMS OF INVENTION AND INNOVATION, WHY DON'T YOU JUST

5    BRIEFLY DESCRIBE WHAT THE PRINCIPLES ARE AS TO THE DISTINCTION

6    BETWEEN THOSE THAT YOU TEACH IN YOUR CLASS WHEN YOU TEACH THAT

7    CLASS?

8    **A.** SURE.

9         INVENTION IS COMING UP WITH INTERESTING NEW IDEAS.

10   INNOVATION IS EVEN HARDER.  IT'S GETTING THOSE NEW IDEAS TO BE

11   ADOPTED IN THE WORLD, AND DO SOME GOOD.

12   **Q.** NOW, YOU REFERENCED MAGIC.  CAN YOU DESCRIBE WHAT MAGIC

13   IS?

14   **A.** THAT'S THE CENTER FOR MEDIA ARTS, GAMES, INTERACTION AND

15   CREATIVE AT RIT.

16   **Q.** WHEN YOU STARTED AS A RESEARCH SCIENTIST THERE, WHAT WAS

17   YOUR EXPECTATION AS TO WHAT WOULD BE ON YOUR PLATE?

18   **A.** THE IDEA IS THAT I WOULD NOW ACTUALLY BE DOING INNOVATION

19   AND INVENTION MYSELF, NOT SPENDING LESS TIME TEACHING IT, MORE

20   TIME DOING IT, AND I ENDED UP BEING INVOLVED IN AN INTERESTING

21   PROJECTS.

22   **Q.** PLEASE DESCRIBE THAT.

23   **A.** THE BIG ONE RIGHT NOW IS A PROJECT CALLED E-NABLE.

24   IT'S -- YOU CAN GO TO ENABLING THE FUTURE DOT ORG ON THE WEB

25   AND YOU'LL FIND THAT WE'VE CREATED AN ONLINE COMMUNITY --

1          **THE COURT:**  BUT DON'T.

2          **THE WITNESS:**  BUT DON'T.

3          **MR. REINES:**  RIGHT.  THAT'S IMPORTANT.

4          **THE WITNESS:**  AN ONLINE COMMUNITY OF VOLUNTEERS WHO

5    ARE USING 3D PRINTERS TO MAKE PROSTHETIC HANDS FOR CHILDREN

6    BORN WITHOUT FINGERS.  AND WE GIVE THEM AWAY FOR FREE.

7    BY MR. REINES:

8    **Q.**  CAN YOU DESCRIBE HOW THAT CAME ABOUT?

9    **A.**  THIS IS AN EXAMPLE OF TRYING TO TAKE EMERGING TECHNOLOGIES

10   AND PUT THEM INTO PRACTICE.  AND I FOUND A WAY OF TAKING SOME

11   DESIGNS THAT SOMEONE HAD PUT ONLINE AND MAKING THEM AVAILABLE

12   TO 3D PRINTING ENTHUSIASTS IN SUCH A WAY THAT THE ENTHUSIASTS

13   FEEL TERRIFIC GIVING HANDS TO THE KIDS, AND THE KIDS AND THEIR

14   PARENTS FEEL TERRIFIC BECAUSE THEY ARE NOW GETTING FOR FREE

15   PROSTHETICS THAT ARE FAVORABLY COMPARED TO COMMERCIAL DEVICES

16   COSTING $30,000.

17   **Q.**  DESCRIBE HOW THAT AROSE AND --

18   **A.**  I SAW A YOUTUBE VIDEO, AS A MATTER OF FACT, OF A SOUTH

19   AFRICAN CARPENTER WHO CUT THE FINGERS OFF OF HIS HAND.  AND HE

20   FOUND A PUPPETEER FROM WASHINGTON STATE, AND TOGETHER THEY

21   CAME UP WITH A NEW SOLUTION OF 3D PRINTABLE PROSTHETIC HAND.

22         AND ON THE YOUTUBE VIDEO, HE MENTIONED THAT HE WAS NOW

23   GOING TO USE IT FOR CHILDREN WHO WERE BORN WITHOUT FINGERS AND

24   THAT HE WAS GOING TO PUT THE DESIGN ON THE INTERNET.

25         AND I CREATED A GOOGLE MAP, AND I INVITED PEOPLE WHO HAD

1    PRINTERS OR WHO NEEDED HANDS TO PUT THEMSELVES ON THE MAP AND

2    START WORKING TOGETHER, AND IT HAS TAKEN OFF SINCE THEN.

3    **Q.**   DID YOU FIND OUT ANYTHING ABOUT PEOPLE THAT HAVE 3D

4    PRINTERS IN THE COURSE OF THIS?

5    **A.**   A LOT.

6    **Q.**   WHAT DID YOU FIND OUT?

7    **A.**   THEY ARE ALL OVER, AND AS A MATTER OF FACT, MANY OF THEM

8    ARE DELIGHTED TO HAVE AN ANSWER TO THE QUESTION, HONEY, WHY

9    DID YOU BUY THAT 3D PRINTER.

10       SO IT HAS SOMETHING GOOD TO DO WITH IT.

11   **Q.**   IS THIS A PROFIT, A PROFITABLE --

12   **A.**   NO.  IT'S A VOLUNTEER ORGANIZATION.

13   **Q.**   WHAT PERCENTAGE OF YOUR TIME ARE YOU INVESTING IN THIS?

14   **A.**   A HUNDRED AND TEN.

15   **Q.**   AND WHAT IS THE RATE OF GROWTH OF THIS ENTERPRISE?

16   **A.**   WE CROSSED THE 1500-MEMBER MARK THIS WEEK.  WE ARE ALREADY

17   UP TO 1540.  WE ARE GROWING BY ABOUT TEN PERCENT A WEEK RIGHT

18   NOW.  I AM GIVING -- SORRY.

19   **Q.**   YOU CAN FINISH YOUR ANSWER.

20   **A.**   I'M GIVING A TALK ON THIS VERY TOPIC ON FRIDAY AT

21   STANFORD.

22   **Q.**   ALL RIGHT.  LET'S GO BACK IN TIME NOW.

23       WERE YOU A PROFESSOR AT ANOTHER INSTITUTION BEFORE YOU

24   WERE AT ROCHESTER INSTITUTE OF TECHNOLOGY?

25   **A.**   YES.  MY FIRST ACADEMIC CAREER WAS AT HAVERFORD COLLEGE.

SCHULL – DIRECT / REINES

1  **Q.** DESCRIBE WHEN YOU WENT TO HAVERFORD AND WHAT YOU DID

2  THERE.

3  **A.** I WENT TO HAVERFORD DIRECTLY AFTER GRADUATE SCHOOL. IT'S

4  NEAR PHILADELPHIA. AND I WAS AN ASSOCIATE PROFESSOR AND I WAS

5  TEACHING EXPERIMENTAL PSYCHOLOGY AND BIOLOGICAL PSYCHOLOGY

6  THERE FOR 12 YEARS.

7  **Q.** WHAT WAS THE NATURE OF YOUR RESEARCH?

8  **A.** AT THE TIME I WAS STUDYING ACTUALLY THIS GENERAL QUESTION

9  OF HOW NEW ADAPTATIONS ARISE IN BIOLOGY, IN LEARNING, AND IN

10  SOCIETY. AND I WAS ALSO STUDYING BIOLOGICAL RHYTHMS IN RATS.

11  **Q.** CAN YOU DESCRIBE A LITTLE BIT ABOUT THE BIOLOGICAL RHYTHMS

12  IN RATS THAT LEADS TO THIS CASE SOMEHOW, BUT WHY DON'T WE JUST

13  START WITH THAT?

14  **A.** SURE.

15  THE WAY YOU DID THIS RESEARCH IN THOSE DAYS IS YOU WOULD

16  HAVE A RACK OF CAGES OF RATS AND RUNNING WHEELS. AND EACH OF

17  THOSE WHEELS WOULD TURN AND IT WOULD CAUSE A NEEDLE TO TWITCH

18  ON A MOVING PAPER TAPE.

19  ONCE A DAY YOU WERE SUPPOSED TO SLICE ONE RAT'S STRETCH

20  OFF OF THE TAPE AND GLUE IT ONTO A POSTER. THE NEXT DAY YOU

21  WOULD DO IT, THE NEXT DAY YOU WOULD DO IT, AND EVENTUALLY YOU

22  WOULD HAVE A WHOLE POSTER THAT SHOWED SIX MONTHS IN A RAT'S

23  LIFE, AND YOU COULD SEE PATTERNS OF ACTIVITY ON THAT POSTER.

24  BUT IT WAS A TEDIOUS PROCESS.

25  **Q.** WHY WOULD YOU WANT TO KNOW THE PATTERNS OF ACTIVITY OF A

1  RAT ON A WHEEL?

2  **A.**  IN THIS PARTICULAR CASE, WE WERE INTERESTED IN CONNECTIONS

3  BETWEEN DISTURBANCES OF BIOLOGICAL RHYTHMS AND MENTAL

4  ILLNESSES AND THYROID HORMONES.  SO WE WERE LOOKING FOR

5  PATTERNS OF ACTIVITY THAT WE COULD COMPARE IT TO PATTERNS OF

6  ACTIVITY IN PEOPLE WITH THESE HORMONAL DISORDERS.

7  **Q.**  DID YOU UNDERTAKE TO DO SOMETHING TO IMPROVE THE DATA

8  GATHERING ASPECT OF THIS RAT-BASED RESEARCH YOU WERE DOING?

9  **A.**  I DECIDED TO INVEST MY TIME IN COMPUTER PROGRAMMING RATHER

10  THAN PAPER SLICING, SO THE COMPUTER COULD COLLECT THE DATA AND

11  PUT THE GRAPHS UP ON THE SCREEN AUTOMATICALLY AND MORE

12  FLEXIBLY.

13  **Q.**  WHEN WAS THIS?

14  **A.**  THIS WOULD HAVE BEEN IN THE LATE '80S.

15  **Q.**  CAN YOU DESCRIBE A LITTLE BIT MORE ABOUT THIS SOFTWARE

16  DEVELOPMENT PROJECT THAT YOU UNDERTOOK?

17  **A.**  SURE.

18      I ENDED UP CREATING SOME SOFTWARE THAT DID WHAT I SAID, IT

19  COLLECTED THE DATA AND IT VISUALIZED THE DATA, AND USED IT FOR

20  SOME OF MY OWN PUBLICATIONS.  AND THEN REALIZED THAT I WANTED

21  TO MAKE IT AVAILABLE TO OTHER RESEARCHERS IN SIMILAR LABS

22  AROUND THE WORLD.

23  **Q.**  MAYBE I'M UNINFORMED ABOUT WHAT A BIOLOGICAL PSYCHOLOGY

24  DEGREE IS, BUT HOW WOULD YOU LEARN ABOUT CREATING A PROGRAM

25  LIKE THAT?

1  **A.**  IN THIS CASE I WAS A SELF-TAUGHT PROGRAMMER.  BUT THESE

2  DAYS, MOST SUCH BIOLOGICAL PSYCHOLOGISTS LEARN PROGRAMMING FOR

3  THE SAME REASON IS BECAUSE YOU CAN ANALYZE DATA AND MAKE

4  USEFUL TOOLS THAT WAY.

5      IN THOSE DAYS, IT WASN'T THAT COMMON FOR A PSYCHOLOGIST TO

6  BE LEARNING HOW TO PROGRAM.

7  **Q.**  HOW LONG DID IT TAKE YOU TO COME UP WITH THIS PROGRAM, AT

8  LEAST ITS FIRST ITERATION?

9  **A.**  PROBABLY A YEAR.

10  **Q.**  AT SOME POINT DID YOU GET THE IDEA TO SHARE IN THE WAY, I

11  GUESS, YOU ARE SHARING WITH THE PROSTHETICS IDEA?

12  **A.**  THAT'S RIGHT.  ONCE I HAD SOMETHING GOOD, I WANTED TO MAKE

13  IT AVAILABLE TO OTHER SCIENTISTS.  AT WHICH POINT I SORT OF

14  MADE THE DISCOVERY THAT EVERYONE DISCOVERS, THAT IN ORDER TO

15  MAKE A PIECE OF SOFTWARE THAT YOU'VE DEVELOPED USEFUL TO OTHER

16  PEOPLE, YOU HAVE TO SPEND AT LEAST AS MUCH TIME AGAIN MAKING

17  IT ROBUST AND USABLE.

18      SO I HAD TO TAKE -- IT WAS GOING TO TAKE SUBSTANTIAL

19  AMOUNT OF TIME TO MAKE THOSE IMPROVEMENTS, AND THAT'S WHEN I

20  BEGAN TO MOVING INTO THE ENTREPRENEURIAL REALM.

21  **Q.**  CAN YOU DESCRIBE YOUR DISTRIBUTION TO SOFTWARE, HOW THAT

22  CAME ABOUT?

23  **A.**  YEAH.  IN THOSE DAYS THERE WAS A THEN NEW AND EXCITING

24  CONCEPT CALLED SHAREWARE IN WHICH PEOPLE WERE NOW DISTRIBUTING

25  SOFTWARE ANY WHICH WAY THEY COULD BY MAILING FLOPPY DISKS, OR

1  BY UPLOADING IT BULLETIN BOARDS OR ENCOURAGING PEOPLE TO MAKE

2  COPIES AND PASS THEM AROUND.

3     I THOUGHT THAT WAS GREAT AND I WANTED TO TAKE ADVANTAGE OF

4  IT BECAUSE I DIDN'T HAVE A WAY OF -- I DIDN'T WANT TO GET INTO

5  THE BUSINESS OF SELLING PACKAGES IN STORES, WHICH IS NOT THE

6  WAY I WANTED TO DO THINGS.

7     AND SO I CAME UP WITH A METHOD OF DISTRIBUTING THE

8  SOFTWARE THAT WAY, BUT UNLIKE SHAREWARE AT THE TIME, ALSO

9  ARRANGING TO HAVE PEOPLE WHO WANTED TO USE THE SOFTWARE FOR

10  PROFESSIONAL PURPOSES SUPPORT THE DEVELOPMENT OF THE SOFTWARE

11  BY PURCHASING AN AUTHORIZATION TO USE THE ADVANCED FEATURES.

12  **Q.**  WE HAVE HEARD ABOUT LARGE-SCALE SOFTWARE DISTRIBUTION BY

13  THE ADOBES AND MICROSOFTS OF THE WORLD, BUT WHAT WAS THE

14  POPULATION OF RESEARCHERS THAT WERE LIKELY TO BE SLICING RAT

15  DATA?

16  **A.**  MAYBE ONE OR 200 AROUND THE WORLD.

17  **Q.**  AND SO WHAT DID YOU DO TO ATTEMPT IN THE CASE OF PEOPLE

18  THAT -- WHAT DID YOU SAY, WERE USING IT IN A COMMERCIAL

19  SETTING OR --

20  **A.**  NO, NOT IN A COMMERCIAL SETTING, BUT THEY MIGHT, FOR

21  EXAMPLE, GET SOME RESULTS THAT THEY WANTED TO PUBLISH.  AND

22  THEN THEY WOULD NEED TO PRINT A HIGH QUALITY GRAPH, NOT JUST

23  SEE IT ON THEIR SCREEN.

24     AT THE POINT WHERE THEY WANTED TO PRINT A HIGH QUALITY

25  GRAPH, THEY WOULD BE POLITELY INFORMED THAT THEY NEEDED TO

SCHULL – DIRECT / REINES

1   PURCHASE AN UNLOCKING CODE AND THEY WERE TOLD TO DIAL A NUMBER

2   AND THEY WOULD BE ABLE TO PURCHASE AN UNLOCKING CODE THAT

3   WOULD ALLOW THEM TO MAKE HIGH QUALITY GRAPHS ON THEIR COMPUTER

4   FOR THE REST OF TIME.

5   **Q.**  SO WHEN YOU WERE A YOUNG ASSOCIATE PROFESSOR AT HAVERFORD

6   COLLEGE, YOU WERE DISTRIBUTING THIS SOFTWARE WITH KIND OF THE

7   TWO TIERS THAT WE ARE NOW FAMILIAR WITH; ONE WHERE IT IS BASIC

8   AND IT'S FREE AND THE OTHER --

9   **A.**  THAT'S RIGHT.  IT WAS ONE OF THE EARLY TRY AND THEN BUY

10  REDISTRIBUTION SCHEMES.

11  **Q.**  AND AT SOME POINT DID YOU FIND THAT THIS DISTRIBUTION IS

12  GETTING A LITTLE BEYOND WHAT YOU COULD MANAGE IN YOUR ROLE?

13  **A.**  RIGHT.  BECAUSE I WOULD BE TEACHING A COURSE ON ANIMAL

14  BEHAVIOR AND I WOULD HEAR THE PHONE RINGING IN MY OFFICE NEXT

15  DOOR, AND I WOULD HAVE TO INTERRUPT MY CLASS AND RUN TO MY

16  OFFICE AND ANSWER THE PHONE.  AND SOMEONE WOULD TELL ME THEY

17  WANTED TO PURCHASE A PASSWORD.  I WOULD RUN THIS SOFTWARE THAT

18  WOULD GENERATE THE UNLOCKING CODE, AND I WOULD GIVE IT TO THEM

19  AND THEN I WOULD RUN BACK TO CLASS.  WHILE THIS WAS A GOOD

20  PROBLEM TO HAVE, IT BECAME A REAL PROBLEM.  I DECIDED AND

21  REALIZED THAT THERE WAS ON ANOTHER OPPORTUNITY FOR AUTOMATING

22  THE PROCESS TO MAKE IT MORE FLUID AND LESS HUMAN INTENSIVE.

23  **Q.**  PLEASE DESCRIBE THE AUTOMATED APPROACH YOU HAD TO THE COPY

24  CONTROL FOR SOFTWARE?

25  **A.**  WELL, IT WAS -- IT WAS -- IT WAS PRETTY OBVIOUS THAT YOU

1    COULD ALLOW PEOPLE, FOR EXAMPLE, TO DIAL A NUMBER.  IT BECAME

2    1-800-SOFTLOCK.

3        AND AN AUTOMATED VOICE COULD SAY, "THANK YOU FOR CALLING

4    SOFTLOCK SERVICES, PLEASE TELL ME WHAT PRODUCT YOU WANT TO

5    UNLOCK."

6        AND THEY WOULD PUNCH IN A PRODUCT NUMBER.  AND IT WOULD

7    SAY, WHAT IS YOUR SOFTLOCK I.D. NUMBER, AS WE CALLED IT.  THEY

8    WOULD PUNCH IN ANOTHER NUMBER.  AND IT WOULD TAKE PAYMENT

9    INFORMATION.  AND IT WOULD THEN GIVE BACK AN UNLOCKING CODE,

10   WHICH THEY WOULD TYPE INTO THEIR COMPUTER FOR JUST ONCE, AND

11   NOW THEY WOULD BE ABLE TO DO THE, WHATEVER IT WAS THEY WANTED

12   TO DO.  AND WE'D ALL GET ON WITH OUR LIVES; THEM SPENDING TWO

13   MINUTES MAKING A ONE-TIME PURCHASE AND ME BEING ABLE TO

14   CONTINUE MY LECTURE UNINTERRUPTED.

15   **Q.**  WHAT TIME PERIOD WAS THIS?

16   **A.**  WELL, THE STORY I JUST TOLD WAS TYPICAL OF THE FIRST

17   VERSION OF THE COMMERCIAL COMPANY THAT WE STARTED CALLED

18   SOFTLOCK SERVICES, INC.  SO THAT WOULD HAVE BEEN AROUND '92,

19   SOON AFTER I GAVE UP TENURE AT HAVERFORD.

20   **Q.**  CAN YOU DESCRIBE -- I GUESS YOU HAVE GIVEN UP TENURE

21   TWICE, IS IT, PROFESSOR?

22   **A.**  I HAVE, YES.  I AM THAT GUY.

23   **Q.**  IN TERMS OF THE FIRST TIME, CAN YOU DESCRIBE WHAT CAUSED

24   YOU TO LEAVE YOUR PSYCHOLOGY PROFESSORSHIP AT HAVERFORD TO GO

25   INTO SOFTWARE?

1    A.  WELL, I CAME TO REALIZE THAT THIS PROBLEM THAT I WAS

2    SOLVING FOR MYSELF, THE PROBLEM OF HOW CAN I DISTRIBUTE

3    VALUABLE DIGITAL INTELLECTUAL PROPERTY FOR FREE AND STILL GET

4    PAID FOR IT WAS GOING TO BE A BIG AND GENERAL PROBLEM.

5        WE NOW CALL THAT THE NAPSTER PROBLEM, IF YOU WILL, BUT

6    THIS WAS TEN YEARS BEFORE NAPSTER EXISTED.  I SORT OF SAW THAT

7    COMING, AND I REALIZED THAT A REALLY INTERESTING BUSINESS THAT

8    WAS ACTUALLY ALL ABOUT THE ADOPTION OF USEFUL TECHNOLOGY COULD

9    BE BASED ON AN AUTOMATED SYSTEM FOR SELLING UNLOCKING CODES TO

10   FREELY DISTRIBUTABLE DIGITAL PRODUCTS.

11   Q.  PLEASE DESCRIBE YOUR TRANSITION FROM THE PROFESSORSHIP TO

12   THE COMMERCIAL COMPANY AND HOW THAT HAPPENED.

13   A.  WELL, SURE.

14       SO I HAD A STUDENT THAT YEAR NAMED BRIAN NATTS (PHONETIC)

15   WHO WAS A PHILOSOPHY MAJOR WHO HAD TAKEN A COMPUTER COURSE.

16   AND HE LEARNED HOW TO PROGRAM.  AND HE WANTED NOT TO GO TO

17   PHILOSOPHY GRADUATE SCHOOL, WHICH IS WHAT I TOLD HIM HE SHOULD

18   DO, BUT HE WANTED TO START A BUSINESS IN COMPUTERS.

19       I SAID, WELL, I DON'T WANT TO START BUSINESS, BUT I HAVE A

20   REALLY POWERFUL IDEA.  WHY DON'T WE BECOME PARTNERS.  SO WE

21   EACH PUT IN $500.  I WAS PRESIDENT.  HE WAS VICE PRESIDENT.

22   AND WE TRIED TO START A COMPANY CALLED SOFTLOCK SERVICES, INC.

23   Q.  HOW DID IT EVOLVE FROM THERE?

24   A.  OVER TIME IT BECAME CLEAR THAT HE DID NOT LIKE BEING AN

25   ENTREPRENEUR, AND I GOT THE BUG.  I GOT VERY INTERESTED IN THE

1   POSSIBILITY THAT THERE WAS A REALLY INTERESTING BUSINESS THAT

2   COULD DO -- PROVIDE A LOT OF SERVICE TO A LOT OF PEOPLE IN

3   WHAT WAS BECOMING AN EXPLODING INTERNET ECONOMY.

4       AND SO I ENDED UP BECOMING THE ENTREPRENEUR.  I TOOK A

5   LEAVE OF ABSENCE.  I GAVE UP TENURE.  AND I STARTED A

6   BUSINESS.  SOFTLOCK SERVICES BECAME SOFTLOCK DOT COM BECAME

7   DIGITAL GOODS DOT COM.

8   Q.  WHEN WAS -- WHEN DID YOU ACTUALLY TAKE LEAVE FROM

9   HAVERFORD SUCH THAT YOU REALLY BECAME FULL TIME ON THE

10  BUSINESS?

11  A.  THAT WOULD HAVE BEEN '92.

12  Q.  YOU MENTIONED THIS SYSTEM OF USING THE PHONES FOR CODES

13  BACK AND FORTH OR FLOPPY DISKS AND SOME OF THE OTHER KIND OF

14  TECHNOLOGIES WE ALL ASSOCIATE MORE WITH THE '70S AND THE '80S,

15  WHEN DID YOU START ENVISIONING -- NOT ENVISIONING, WHEN DID

16  YOU START WITH EMAILING CODES?

17  A.  PROBABLY AROUND THE SAME TIME.  IT WAS CLEAR THAT THE

18  PHONE-BASED SYSTEM WAS SORT OF THE FIRST AND THE MOST

19  ACCESSIBLE, BUT IT WAS ALSO CLEAR THAT WE WOULD WANT TO USE

20  EMAIL AND, IN FACT, THE INTERNET AND THE WORLDWIDE WEB AS SOON

21  AS THAT WAS POSSIBLE.  AND THAT WAS REALLY THE ERA IN WHICH IT

22  BECAME POSSIBLE, WITHIN ANOTHER YEAR.

23  Q.  1992, 1993 TIME?

24  A.  YEAH.

25  Q.  AND IN TERMS OF THE BULLETIN BOARDS THAT YOU TALKED ABOUT

1    POSTING IN COLLEGES, WERE THOSE ATTACHED TO THE INTERNET?

2    **A.**  WELL, NO.  SOMETIMES THEY WERE, BUT THAT WAS SORT OF THE

3    JUST-BEFORE-INTERNET SOLUTION.  THE WHOLE BULLETIN BOARD

4    STORY, WHICH I MENTIONED IN THE PATENT, DIDN'T TURN OUT TO BE

5    IMPORTANT FOR OUR BUSINESS.  THAT WAS RIGHT AT THE MOMENT WHEN

6    BULLETIN BOARDS WERE BECOMING THE LAST THING AND INTERNET WAS

7    BECOMING THE NEXT THING.

8         **THE COURT:**  IF THIS IS A GOOD STOPPING POINT, WE CAN

9    BREAK.  IT'S 1:30.

10        TOMORROW IS WEDNESDAY.  WE WILL START AGAIN AT 8:30.  AND

11   WE ARE MOVING ALONG PROMPTLY.  SO THANK YOU FOR BEING ON TIME.

12        REMEMBER NOT TO DISCUSS THE CASE AMONGST YOURSELVES OR

13   WITH ANYONE ELSE AND DON'T GO ON THE INTERNET AND LOOK AT

14   ANYTHING RELATED TO THIS CASE.  AND WE WILL SEE YOU TOMORROW

15   MORNING AT 8:30.

16        (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

17        **THE COURT:**  I WOULD LIKE TO SEE THE ATTORNEYS FOR A

18   MOMENT, PLEASE.

19        YOU MAY STEP DOWN.

20        CAN YOU GIVE ME YOUR WITNESS LINEUP?

21        **MR. REINES:**  YES.

22        DO YOU HAVE THAT?

23        **MS. MEHTA:**  YES, YOUR HONOR.

24        AFTER DR. SCHULL, WILL BE DR. WICKER, OUR INVALIDITY

25   EXPERT.  AND THEN OUR EXPECTATION IS THEY WILL DO THEIR

1    INVALIDITY EXPERT, DR. KELLER, AND THAT SHOULD BE IT.

2              **THE COURT:**  IS THAT RIGHT?

3              **MR. DINOVO:**  YES.  UNLESS WE HAVE THE OPPORTUNITY TO

4    RECALL MR. BETLEM.

5              **THE COURT:**  OKAY.  THAT'S IT THEN?

6              **MS. MEHTA:**  THAT SHOULD BE IT.

7              **THE COURT:**  NOW WHAT WAS IT YOU WANTED TO BRING OUT

8    ABOUT SOME FORMER INFRINGEMENT BY ADOBE?

9              **MR. DINOVO:**  SO, YES.  HE SAID ON DIRECT THAT --

10             **THE COURT:**  I HEARD THAT.  WHAT IS IT THAT YOU WANT

11   TO BRING OUT?

12             **MR. DINOVO:**  OKAY.  SO MACROMEDIA WAS THE COMPANY

13   THAT WAS ACQUIRED BY ADOBE THAT HAD DEVELOPED FLASH, AND HE

14   WAS INSTRUMENTAL IN THAT.

15     MACROMEDIA, AROUND THAT TIME IT WAS ACQUIRED OR SHORTLY

16   BEFORE, SUED ADOBE AND DEMONSTRATED AND HAD AN ADJUDICATION

17   THAT ADOBE HAD INFRINGED THREE OF MACROMEDIA'S PATENTS.  AND

18   SO --

19             **MR. REINES:**  I DON'T KNOW IF HE KNOWS ANYTHING ABOUT

20   IT.

21     DO YOU HAVE EVIDENCE OF THAT?

22             **MR. DINOVO:**  DO I HAVE EVIDENCE THAT IT OCCURRED?

23             **MR. REINES:**  YES.

24             **MR. DINOVO:**  ABSOLUTELY.

25             **MR. REINES:**  CAN I SEE IT?

1           **THE COURT:**  IF THIS IS -- YOU WEREN'T AWARE OF THIS?

2           **MR. REINES:**  IT WAS NEVER -- WE WEREN'T GIVEN ANY

3    NOTICE OF IT, NO.

4           **THE COURT:**  YOU ARE GOING TO HAVE TO TALK ABOUT IT

5    AMONGST YOURSELVES.  IT'S SORT OF LIKE A PRIOR BAD ACT IN A

6    CRIMINAL CASE.  IT GENERALLY DOESN'T COME IN UNLESS THERE'S

7    SOME SORT OF SIMILAR MODUS OPERANDI, OR SOMETHING LIKE THAT.

8    IT CERTAINLY COULDN'T COME IN THROUGH A WITNESS WHO DOESN'T

9    KNOW ANYTHING ABOUT IT.

10      WHY DON'T YOU DISCUSS IT DURING THE BREAK.  IF IT SEEMS

11   APPROPRIATE, WE CAN TALK ABOUT IT --

12          **MR. DINOVO:**  WE WOULDN'T HAVE BROUGHT IT UP, YOUR

13   HONOR, EXCEPT THAT HE TESTIFIED THAT ADOBE RESPECTS

14   INTELLECTUAL PROPERTY RIGHT AND IN HIS OWN EXPERIENCE THAT'S

15   NOT THE CASE.

16          **MR. REINES:**  YOUR HONOR, ONE KIND OF HOUSEKEEPING

17   MATTER, AND THEN A COUPLE OF OTHER POINTS.

18      ONE IS, WE WANTED TO ASK PERMISSION OF THE COURT FOR OUR

19   CLOSING ARGUMENT, THE WAY WE WOULD LIKE TO STRUCTURE THAT IS

20   FOR MS. SONAL MEHTA AND MYSELF TO SHARE IT.  WE WOULD BE

21   EFFICIENT.  WE WOULDN'T SPEND A LOT OF TIME GETTING DIFFERENT

22   SLIDES UP OR ANYTHING, BUT -- AND I TRUST THAT THERE'S NO

23   OBJECTION TO THAT.  BUT THE QUESTION IS WHETHER YOU HAVE ANY

24   PROBLEM WITH TWO OF US SPLITTING THE ARGUMENT.

25          **MR. ELLWANGER:**  WE HAVE NO OBJECTION, YOUR HONOR.

1      **THE COURT:**  OKAY.

2      **MR. REINES:**  AND THEN IN TERMS OF THE ISSUES THAT

3  ARE, I THINK, NEAR TERM FOR THE COURT THAT HAVE BEEN SUBMITTED

4  IN VARIOUS AND SUNDRY PAPERS, AND I KNOW THE COURT HAS BEEN

5  BUSY WITH US HERE AND THE WHOLE DOCKET THAT THE COURT HAS, BUT

6  WE HAVE REQUESTED A CURATIVE INSTRUCTION REGARDING MR. PARR'S

7  RELIANCE ON THE FARLEY TESTIMONY UNDER 703, WHICH I THINK IS

8  MANDATED BY THE NINTH CIRCUIT CASE.

9      WE FILED A MOTION REGARDING THE PATTERSON EXHIBIT 121.

10     **THE COURT:**  DO YOU HAVE DOCKET NUMBERS BY CHANCE?

11     SO CURATIVE -- THE PLAINTIFFS WANTED A CURATIVE

12  INSTRUCTION ABOUT --

13     **MR. REINES:**  WE ARE BOTH SEEKING IT.  THIS IS THE 703

14  ISSUE THAT WE RAISED THAT WHEN AN EXPERT RELIES ON FACTS AND

15  DATA THAT ARE NOT ADMISSIBLE EVIDENCE, AS IN THIS CASE.

16     **THE COURT:**  YOU'RE TALKING ABOUT THE

17  14 MILLION-DOLLAR THING?

18     **MR. REINES:**  YES, EXACTLY.

19     **THE COURT:**  OKAY.

20     **MR. REINES:**  THAT'S ONE.  THAT DOCKET NUMBER IS -- WE

21  DON'T HAVE THE DOCKET NUMBERS YET, BUT HOPEFULLY I CAN GET

22  THEM TO YOU IN A MINUTE.

23     PATTERSON, WHICH IS THE EXHIBIT 121, WHICH IS THE NOTES TO

24  THE DANE NDA WHERE HE -- EVEN AS A WITNESS, WHO HAD A PIECE OF

25  THE ACTION KNOWING THAT THAT WAS GOING TO BE THE SUBJECT OF

1    THE DEPOSITION AND EVEN THOUGH THEY IDENTIFIED THAT AS THE

2    ONLY CONCEPTION DOCUMENT, HE TESTIFIED THAT HE DIDN'T KNOW

3    ANYTHING ABOUT IT, DIDN'T RECOGNIZE IT, AND HE WOULDN'T CHANGE

4    HIS TESTIMONY AT TRIAL.

5        WE MOVE TO STRIKE THAT DOCUMENT BECAUSE UNDER THE LEGAL

6    STANDARD THAT THERE'S NO LEGAL BASIS FOR THE JURY TO DECIDE

7    THAT THAT WAS A PROPER DOCUMENT.

8            **MR. ELLWANGER:**  WOULD YOUR HONOR PREFER ORAL OR

9    WRITTEN RESPONSE TO THE MOTION?

10           **THE COURT:**  WELL, I'M GOING TO HAVE TO GO BACK AND

11   READ IT AGAIN.  THIS ISN'T RINGING A BELL, I'M SORRY TO SAY.

12   THIS IS THEIR WITNESS PATTERSON --

13           **MR. REINES:**  RIGHT.

14           **THE COURT:**  -- WHO YOU WANTED TO PUT IN AN NDA OR

15   THEY WANTED TO PUT IN AN NDA?

16           **MR. REINES:**  THERE WAS AN NDA BUT WITH A GUY NAMED

17   DANE, MR. DANE.  THERE WAS AN ATTACHMENT TO IT AT THE

18   DEPOSITION.  IT WASN'T -- IN FACT, IT WAS JUST CONTINUOUS

19   BATES NUMBERS.  AND AT DEPOSITION HE TESTIFIED HE DIDN'T KNOW

20   WHO WROTE IT, HE HADN'T SEEN IT, HE NEVER GAVE TECHNICAL

21   INFORMATION TO DANE THAT HE COULD REMEMBER, AND HE JUST

22   TOTALLY DISOWNED THE DOCUMENT.

23           **THE COURT:**  AT THE DEPO.

24           **MR. REINES:**  AT THE DEPO.  AND HE HAD A PERCENTAGE

25   INTEREST.  HE HAD ALREADY GOT HALF A MILLION DOLLARS FROM THE

1   MICROSOFT CASE FROM THESE GUYS. HE KNEW THAT WE WERE GOING TO

2   BE TALKING ABOUT THE PATENT, AND THEY ALREADY IDENTIFIED THIS

3   DOCUMENT AS THE CONCEPTION DOCUMENT.

4     IT'S INCONCEIVABLE THAT HE COULD GO INTO DEPOSITION,

5   DISOWN THE DOCUMENT, SAY THAT HE'S NOT GOING TO CHANGE HIS

6   TESTIMONY FOR TRIAL. I MEAN, THESE ARE EXCEPTIONAL

7   CIRCUMSTANCES, AND THEN COME TO TRIAL AND SAY HE RECOGNIZES

8   THEM LIKE THEY'RE THE HOUSE NEXT DOOR, AND GET THEM INTO

9   EVIDENCE.

10    WE HAD ASKED THE COURT IF WE COULD DO A VOIR DIRE TO

11   DEMONSTRATE THAT HE HAD NO CREDIBILITY WHATSOEVER FOR THAT

12   POINT. THE COURT DIDN'T WANT TO HANDLE IT THAT WAY, WHICH IS

13   APPROPRIATE. I MEAN, THERE'S DIFFERENT WAYS YOU CAN HANDLE

14   THAT, AND THAT'S NOT THE WAY WE THOUGHT IN THIS CASE WE

15   SHOULD, BUT WE'RE NOW SAYING THERE'S AUTHORITY FOR THE POINT

16   THAT IF NO REASONABLE JUROR COULD CONCLUDE A DOCUMENT IS

17   AUTHENTIC, WHICH WE BELIEVE THIS CASE FITS PERFECTLY INTO, THE

18   DOCUMENT SHOULD NOT BE IN EVIDENCE. THAT'S THE PATTERSON

19   ISSUE.

20        **THE COURT:** HE SAID HE DIDN'T RECOGNIZE THE DOCUMENT

21   AT DEPO.

22        **MR. REINES:** HE DIDN'T RECOGNIZE IT. HE DIDN'T KNOW

23   WHO WROTE IT. HE NEVER GAVE TECHNICAL INFORMATION TO DANE

24   THAT HE COULD REMEMBER.

25        **THE COURT:** AND YOU'RE SAYING NOW IT'S A FORGERY

1    OR --

2           **MR. REINES:**  HE COMPLETELY DISOWNED IT.  I MEAN, HIS

3    TESTIMONY AT TRIAL COMPLETELY LACKS ANY CREDIBILITY THAT ANY

4    JURY COULD ACKNOWLEDGE.  THEN HE PROMISED THAT HE WOULDN'T

5    CHANGE HIS TESTIMONY.

6           **THE COURT:**  WELL, ONE CAN MAKE SUCH PROMISES AND

7    CHANGE THEIR TESTIMONY IF THEY REMEMBER SOMETHING, OR IF THE

8    FACTS TURN OUT TO BE DIFFERENTLY.  SO THAT --

9                 (SIMULTANEOUS COLLOQUY.)

10         **MR. REINES:**  SUMMARY --

11        **THE COURT:**  -- HOLD PEOPLE TO THAT.

12    AND I CAN SEE WHERE YOU COULD IMPEACH HIM AT TRIAL WITH

13    SAYING THAT HE DIDN'T REMEMBER IT FROM BEFORE, BUT YOU SEEM TO

14    BE SAYING IT IS ACTUALLY A FORGERY.

15         **MR. REINES:**  IT'S NOT SO MUCH THAT IT'S A FORGERY.

16    FIRST OF ALL, THIS IS A CONCEPTION DOCUMENT.  SO THERE'S THE

17    HEIGHTENED CONCERN ABOUT THAT.

18    WHAT I'M SAYING IS THAT I DON'T BELIEVE HE HAS A BASIS TO

19    SAY THAT THAT'S HIS DOCUMENT THAT PROVES THE INVENTION.  SO

20    IT'S AS MUCH TESTIMONY AS IS THE DOCUMENT.

21    THE ANALOGY YOUR HONOR --

22         **THE COURT:**  HE CAN BE IMPEACHED BY, AS I'M SURE YOU

23    DID THOUGH I DON'T REMEMBER IT, BUT HE WOULD HAVE BEEN

24    IMPEACHED, I ASSUME, BY HIS STATEMENT PREVIOUSLY THAT HE HAD

25    NEVER SEEN IT AND DIDN'T KNOW ANYTHING ABOUT IT.

```
1            MR. REINES:  WE DID ALL OF THAT.

2            THE COURT:  SO WHAT DO YOU WANT MORE THAN THAT?

3            MR. REINES:  WE WANT THE STRIKING OF THE EVIDENCE AND

4    THE ANALOGY -- THIS IS A PERFECT ANALOGY THAT MAYBE HELPS

5    BRING THIS INTO FOCUS, WHICH IS THE SUMMARY JUDGMENT CONTEXT,

6    WHERE A WITNESS COMES FORWARD WITH TESTIMONY ON THE MOTION AND

7    SAYS THINGS THAT ARE COMPLETELY INCONSISTENT WITH THAT

8    POSITION THAT THE --

9            THE COURT:  YOU ARE TALKING ABOUT A SHAM AFFIDAVIT --

10           MR. REINES:  EXACTLY.

11           THE COURT:  -- CREATING A DISPUTE OF MATERIAL FACT.

12   THAT'S KIND OF A DIFFERENT CONTEXT.

13           MR. REINES:  IT'S THE SAME LEGAL STANDARD, THOUGH.

14           THE COURT:  YOUR IDEA IS TO STRIKE THE EXHIBIT.

15           MR. ELLWANGER:  YOUR HONOR, MAY I BE HEARD ON THIS?

16           MR. REINES:  AND THE RELATED TESTIMONY.

17           THE COURT:  AND THE RELATED TESTIMONY.  DID YOU --

18   AND YOU FILED A MOTION TO THIS EFFECT?

19           MR. REINES:  WE FILED A MOTION AND WE --

20           THE COURT:  DO YOU KNOW THE DOCKET NUMBER?

21           MR. REINES:  YES.  THE DOCKET NUMBER IS 683.

22           MR. ELLWANGER:  683, YOUR HONOR.  IF WE CAN RESPOND.

23           THE COURT:  DO YOU HAVE THE PAGE AND LINE OF THE

24   TESTIMONY THAT YOU'RE REFERRING TO?

25           MR. ELLWANGER:  I DO, YOUR HONOR.
```

1           **MR. REINES:**  IT'S ALL IN THERE.

2           **THE COURT:**  WHAT IS IT?

3           **MR. ELLWANGER:**  WE WOULD DIRECT YOUR ATTENTION TO

4   PAGE 180, LINES 2 THROUGH 20 WHERE THE SUBJECT DOCUMENT WAS

5   ADMITTED WITHOUT OBJECTION, THEREBY WAIVING ANY OBJECTION AT

6   THIS POINT.

7           **MR. REINES:**  YOUR HONOR --

8           **THE COURT:**  WELL, ON THE MERITS, THOUGH, WHAT DO YOU

9   HAVE TO SAY?

10           **MR. ELLWANGER:**  ON THE MERITS, YOUR HONOR, AS YOU

11   CORRECTLY POINTED OUT, THESE ARE DIFFERENT STANDARDS UNDER THE

12   SUMMARY JUDGMENT SHAM AFFIDAVIT.

13       THE JURY CAN TEST THE CREDIBILITY OF THE WITNESS.  AS YOU

14   SAID, HE WAS IMPEACHED ON THIS POINT.  THEY WERE ABLE TO DRAW

15   OUT THE TESTIMONY FROM HIS DEPOSITION THAT -- BY ADOBE'S

16   ARGUMENT DIFFERS FROM WHAT HE SAID HERE IN COURT.  HE WAS

17   CLEAR TO YOUR HONOR'S QUESTIONS ABOUT THE AUTHENTICITY OF THE

18   DOCUMENT THAT HE WROTE IT, THAT THEY WERE HIS PAPERS, AND

19   BASED ON THAT, YOU ADMITTED IT WITH NO OBJECTION.

20       NOW ADOBE IS TRYING TO TAKE THIS DECISION OF CREDIBILITY

21   OUT OF THE HANDS OF THE JURY WHERE IT BELONGS AT THIS POINT.

22           **THE COURT:**  OKAY.  I WILL HAVE TO GO BACK AND LOOK AT

23   THE DOCUMENT AND REVIEW THE TESTIMONY AND LOOK AT THE MEMO.

24           **MR. REINES:**  YOUR HONOR, THE ONLY POINT I WOULD ADD

25   TO THAT OTHER THAN I KICKED AND SCREAMED ABOUT IT, WAS THAT IT

```
 1    WOULD -- THIS WOULD NEVER PASS THE SHAM DECLARATION TEST THAT

 2    YOU APPLY IN ALL SUMMARY JUDGMENT MOTIONS THAT COME TO THIS

 3    COURT EVERY DAY.

 4            THE COURT:  SO WHAT'S YOUR THEORY ABOUT THE DOCUMENT?

 5    IT WAS SOMEONE ELSE'S DOCUMENT?

 6            MR. REINES:  WHATEVER IT IS, IT'S NOT EVIDENCE OF

 7    INVENTION.  HE CAN'T COME IN AND SAY, YES, THAT'S ALL ABOUT MY

 8    INVENTION THAT DISCLOSES THAT IT'S MY CONCEPTION, WHEN HE

 9    LOOKED AT AND READ IT, AND SAID I DON'T RECOGNIZE ANY OF THIS.

10            THE COURT:  DOESN'T IT HAVE HIS INITIALS --

11            MR. REINES:  NO, IT HAS PAT DANE'S.

12            MR. ELLWANGER:  WHO'S SIGNATURE IS ALSO ON THE NDA

13    AND WHO INITIALS EVERY PAGE OF THE DISCLOSURE.

14        THE POINT IS, YOUR HONOR, THE SHAM DECLARATION, IT'S --

15            THE COURT:  FORGET THE SHAM DECLARATION.  I'M TRYING

16    TO FIGURE OUT IF THERE'S A CLAIM THAT IT'S ACTUALLY

17    INAUTHENTIC OR IF IT'S SOMEONE ELSE'S DOCUMENT THAT HE PERHAPS

18    DIDN'T KNOW ABOUT THAT HE'S NOW TRYING TO USE.

19            MR. REINES:  THAT'S WHAT HE SAID ORIGINALLY.

20            MR. ELLWANGER:  BUT AT TRIAL HE DID NOT, AND THERE'S

21    CONFLICTING TESTIMONY BEFORE THIS JURY, AND THAT IS THE

22    PROVINCE OF THE JURY TO GAUGE HIS CREDIBILITY.

23        THERE IS NO SUGGESTION IN THE RECORD THAT THIS IS A

24    FORGERY, AS YOUR HONOR SAID.  AND, IN FACT, WE EXPECT THE

25    EVIDENCE WILL SHOW IN CLOSING THAT THE -- THAT MR. DANE SIGNED
```

```
1    AND DATED EVERY SINGLE PAGE, BOTH THE NDA AND THE WORK PAPERS.

2           THE COURT:  SO HOW DOES THAT GET ATTRIBUTABLE TO THIS

3    PLAINTIFF?

4           MR. ELLWANGER:  MR. PATTERSON ALSO SIGNED THE

5    DOCUMENT AND TESTIFIED TO THE JURY AND IN RESPONSE TO YOUR

6    HONOR'S QUESTIONS THAT HE WROTE THESE PAPERS.  IT'S IN THEIR

7    HANDS NOW.

8       AGAIN, YOUR HONOR, SUBSTANTIVELY WE HAVE A STRONG

9    ARGUMENT, BUT THE WAIVER ARGUMENT SHOULD NOT BE OVERLOOKED.

10   THERE'S -- WE HAVE SEVERAL CIRCUIT COURT OPINIONS SAYING IT

11   CAN'T BE.

12          THE COURT:  PATTERSON'S SIGNATURE IS ON THE DOCUMENT?

13          MR. ELLWANGER:  THERE'S TWO DOCUMENTS, YOUR HONOR.

14   THERE'S AN NDA AND THEN THERE ARE WORK PAPERS THAT SAY --

15          THE COURT:  OH, RIGHT.  IT WASN'T ATTACHED AT THE

16   TIME OR WASN'T IT ATTACHED AT THE TIME.

17          MR. ELLWANGER:  EXACTLY.  THAT'S ALL FOR THE JURY TO

18   BE ABLE TO CONSIDER AS TO WHETHER THEY BELIEVE THAT OR NOT.

19          THE COURT:  OKAY.

20          MR. REINES:  ALL WE ARE ASKING IS THE SHAM

21   DECLARATION STANDARD BE APPLIED, AND IT WILL FAIL.

22          MR. ELLWANGER:  CAN I RESPOND TO THAT VERY BRIEFLY?

23          THE COURT:  NO.  THE SHAM DECLARATION THEORY ISN'T

24   CORRECT.  IF IT -- IT MAY BE INADMISSIBLE FOR ONE REASON OR

25   ANOTHER, BUT WITNESSES CAN CHANGE THEIR TESTIMONY.  THAT'S
```

1    WHAT TRIALS ARE ABOUT, AND THEN YOU IMPEACH THEM.

2           **MR. REINES:**  I WOULD ASK THAT YOU READ OUR AUTHORITY

3    ON THAT.

4           **THE COURT:**  I WILL TAKE A LOOK AT YOUR MOTION AND

5    I'LL TAKE A LOOK AT THE TESTIMONY.

6           **MR. REINES:**  THANK YOU.

7           **THE COURT:**  NOW, CURATIVE INSTRUCTION REGARDING --

8    I'M SORRY, I DIDN'T WRITE DOWN WHAT YOU SAID AND NOW I HAVE

9    FORGOTTEN ALREADY.  YOU WANTED --

10          **MR. REINES:**  REGARDING --

11                  (SIMULTANEOUS COLLOQUY.)

12          **THE COURT:**  -- ABOUT PARR REGARDING.

13          **MR. REINES:**  THERE'S COMPETING CURATIVE -- NOT

14   COMPETING, THEY ARE PARALLEL ACTUALLY, REGARDING PARR.  OURS

15   IS REGARDING THE 13 MILLION.  IF IT'S NOT GOOD --

16          **THE COURT:**  THE 14 MILLION.

17          **MR. REINES:**  14 MILLION.

18          **THE COURT:**  AND YOURS, I DID -- I DID READ YOURS AND

19   I FOUND IT TOO STRONG.  SO I WOULD CONSIDER SAYING SOMETHING

20   ABOUT THE ASPERSIONS CAST ON PARR'S REPORT, WHICH THE PROBLEM

21   I HAVE WITH IT IS THAT I DID RULE IT OUT.  I DON'T LIKE TO

22   GIVE INSTRUCTIONS THAT ARE NOT TRUE.  I'M HAPPY TO GIVE

23   INSTRUCTIONS THAT IT'S NOT FOR YOU TO CONSIDER AND THINGS LIKE

24   THAT, BUT I DON'T LIKE TO SAY THINGS AREN'T TRUE WHEN, IN

25   FACT, THEY ARE TRUE.

1          FOR THAT REASON I WOULDN'T GIVE IT AS YOU GAVE IT.  THE

2     PHRASE THAT WAS USED WAS "ALL THAT WAS STRUCK BY THE COURT AS

3     INAPPROPRIATE.  ALL THAT IS OUT."

4          SO, I MEAN, I GUESS I CAN TRY AND WRITE SOMETHING MYSELF

5     OR YOU CAN TRY TO WRITE IT IN A DIFFERENT WAY.

6               **MS. GLAUSER:**  I THINK WE ARE --

7               **THE COURT:**  AND I WOULD CONSIDER IT.  I SUPPOSE IF WE

8     HAVE A DIFFERENT PROBLEM AND WE WERE GOING TO GIVE TWO THINGS

9     ABOUT HIM, WE WOULD HAVE TO HAVE THEM BOTH TOGETHER.

10         SO DID YOU -- THIS IS ALSO SOMETHING YOU WROTE.  DID YOU

11    WRITE A PROPOSED CURATIVE INSTRUCTION AS WELL?

12              **MR. REINES:**  YES.  OUR PROPOSED CURATIVE INSTRUCTION

13    682 AND -- YOU MEAN FOR -- THIS IS ON INTUIT.  I DON'T WANT TO

14    MIX APPLES AND ORANGES.

15              **THE COURT:**  FOR YOUR SIDE, WE ARE TALKING ABOUT THE

16    14 MILLION.  YES, INTUIT.  682?

17              **MR. REINES:**  YEP.  YOU WANT ME TO READ IT?  IT IS TWO

18    SENTENCES.

19              **THE COURT:**  OKAY.

20              **MR. REINES:**  BEFORE WE RESUME TESTIMONY --

21              **THE COURT:**  SLOWLY THOUGH.

22              **MR. REINES:**  BEFORE WE RESUME TESTIMONY, I NEED TO

23    CLARIFY ONE ISSUE.

24         ON FRIDAY YOU HEARD DIGITAL REG'S EXPERT, MR. PARR,

25    TESTIFY THAT THE INTUIT LICENSE AGREEMENT HAD AN EFFECTIVE

1    ROYALTY RATE OF 2.5 PERCENT.  THERE IS NO EVIDENCE OF INTUIT'S

2    ACCUSED REVENUES OR IN THE EFFECT OF ROYALTY RATE FOR THE

3    INTUIT LICENSE AGREEMENT.  YOU ARE TO DISREGARD ANY TESTIMONY

4    BY MR. PARR OVER ROYALTY RATE FOR THE INTUIT AGREEMENT.

5          **MS. GLAUSER:**  YOUR HONOR, THEY FILED --

6          **THE COURT:**  I DON'T KNOW THAT THAT'S REALLY TRUE.  AN

7    EXPERT CAN RELY ON THINGS THAT EXPERTS NORMALLY RELY UPON.  IF

8    IT TURNS OUT THAT THEY RELIED UPON SOMETHING THAT THEY

9    NORMALLY RELIED UPON, BUT IN THIS CASE TURNED OUT TO BE

10   UNRELIABLE, THAT GOES TO THE CREDIBILITY OF THE EXPERT.  I

11   DON'T KNOW THAT IT NECESSARILY MEANS THERE IS NO EVIDENCE.  IT

12   MEANS THERE'S -- THAT THE EXPERT WAS PERHAPS FOOLED IN THIS

13   INSTANCE OR WAS -- RELIED ON SOMETHING THAT NORMALLY IS

14   RELIABLE BUT IN THIS CASE WASN'T, AND YOU WOULD MAKE THAT

15   ARGUMENT.  I'M NOT SURE IT WOULD RESULT IN ACTUAL STRIKING OF

16   IT.

17         **MR. REINES:**  SO THE ANALYTIC STRUCTURE UNDER 703 IS,

18   FIRST THERE'S A BALANCING UNDER 403 AS TO WHETHER HE CAN RELY

19   ON SOMETHING THAT'S NOT IN EVIDENCE AT ALL.  PEOPLE WERE

20   CONCERNED ABOUT THE JUNK SIGNS AND ALL OF THAT IN THE '90S.

21         **THE COURT:**  IT'S RELYING ON FACTS THAT AREN'T

22   OTHERWISE ADMISSIBLE.

23         **MR. REINES:**  RIGHT.  AND AS A --

24         **THE COURT:**  AND AN EXPERT MIGHT NORMALLY GO TO THE

25   CEO OF A COMPANY AND SAY WHAT WAS THIS NUMBER, AND IT MIGHT

1    NORMALLY BE PRUDENT TO RELY UPON THAT.

2              **MR. REINES:**  IF IT PASSES THE 403 TEST, UNDER THE LAW

3    WHAT NEEDS TO BE DONE IS IT NEEDS TO BE MADE CLEAR -- AND I

4    HAVE AN ALTERNATIVE HERE WHICH I KIND OF WISH WAS THE ONE I

5    THOUGHT I WAS READING, WHICH WAS THE SOFTER ONE -- WHICH DOES

6    IT EXACTLY RIGHT, RIGHT UNDER THE LAW.  IT'S THE MOST GENEROUS

7    TO THE OTHER SIDE, MAYBE THAT'S WHY IT WASN'T IN HERE.  BUT IT

8    SAYS --

9              **THE COURT:**  THAT'S ALL RIGHT.  I WILL GO TAKE ANOTHER

10   LOOK AT IT.

11             **MR. REINES:**  LOOK AT THE --

12             **THE COURT:**  YOU SAID YOU HAD SOMETHING ELSE, TOO?

13             **MR. REINES:**  LOOK AT THE FOOTNOTE OF PAGE (SIC) 27

14   AND 28, BECAUSE THAT NAILS IT, I THINK.  IT SAYS, "THIS

15   TESTIMONY MAY BE CONSIDERED SOLELY AS THE BASIS FOR MR. PARR'S

16   OPINION AND NOT AS SUBSTANTIVE EVIDENCE OF THAT RATE."

17      THAT'S THE STANDARD.

18             **THE COURT:**  PAGE 27 AND 28 OF --

19             **MR. REINES:**  LINE 27 AND 28 OF -- WHICH IS A

20   FOOTNOTE 1 OF OUR PROPOSED DOCUMENT, WHICH IS 682.

21             **THE COURT:**  OKAY.

22             **MS. GLAUSER:**  YOUR HONOR, WE WOULD REQUEST AN

23   OPPORTUNITY TO FILE A RESPONSE CONSIDERING THAT THIS CURATIVE

24   INSTRUCTION AND THE REQUEST FOR IT WAS FILED THIS MORNING AS

25   WE WERE WALKING INTO COURT.

1    **THE COURT:** OKAY.

2    **MR. REINES:** AND THEN, YOUR HONOR, ALL OF THIS ISSUE

3    HAS BEEN ON THE TABLE FOR AT LEAST A FEW DAYS.

4    THEN THE ADDITIONAL ISSUE IS THE VENTERS' ADOBE VALUE

5    PROPOSITION DOCUMENT.

6    THE BIG NEWS FROM OUR BUSY WEEKEND, HOPEFULLY --

7    **THE COURT:** THAT ALL -- I DID READ ALL THAT STUFF.

8    AND MY FEELING ABOUT IT IS THAT I'M NOT TOO CONCERNED ABOUT

9    THE WITNESSES BECAUSE I KNOW EVERYONE IS BUSY AND THERE'S A

10   LOT OF LOOSE ENDS, BUT IT SEEMS AS THOUGH BOTH SIDES SORT OF

11   KNEW THAT THERE WAS MORE OUT THERE THAN HAD BEEN DISCLOSED AND

12   THAT MORE COULD HAVE BEEN DISCLOSED AND NO ONE ASKED HIM, IT

13   SEEMS.  OR IF THEY DID, I HAVEN'T HEARD ABOUT IT.  SO I'M NOT

14   GOING TO CONCERN MYSELF WITH THE WITNESSES.

15   THE DOCUMENT, I THINK THE FAIREST THING TO DO WOULD BE TO

16   TAKE THE LEAST COMMON DENOMINATOR OF WHAT'S IN ANY OF THE

17   DOCUMENTS, AND I THINK THAT'S PROBABLY DOCUMENT 1, WHICH IS

18   SOMEWHAT DIFFERENT THAN DOCUMENT 2 AND SOMEWHAT DIFFERENT FROM

19   DOCUMENT 125, AND WE WOULD JUST USE DOCUMENT 1, WHICH WOULD

20   ALLOW YOU TO ARGUE THAT THE '670 PATENT IS NOT IDENTIFIED BY

21   NUMBER IN THAT DOCUMENT.  IT'S IDENTIFIED SORT OF BY NAME, BUT

22   IT'S GOT THE WRONG NAME BECAUSE THE ACTUAL NAME IS "TRACKING

23   ELECTRONIC COMPONENT" NOT TRACKING ELECTRONIC CONTENT.  AND

24   IT'S ALSO DIFFERENT IN THAT THERE'S FAR LESS ABOUT THE '541

25   PATENT IN IT THAN THERE IS IN DOCUMENT NUMBER 2.

1        SO, THAT WOULD GIVE YOU ARGUMENTS TO MAKE THAT LESS WAS

2   DISCLOSED, BUT I DON'T THINK THERE'S AN ARGUMENT TO BE MADE

3   THAT NOTHING WAS DISCLOSED.

4        **MR. REINES:**  ON THE NOTHING DISCLOSED, AT LEAST

5   PRESERVATIONALLY, THERE'S A CLEAR BEST EVIDENCE RULE.  THEY

6   SAY THEY HAVE A DOCUMENT --

7        **THE COURT:**  I DON'T KNOW WHAT BEST EVIDENCE MEANS IN

8   THE ELECTRONIC DOCUMENT ERA.

9        **MR. REINES:**  THERE'S NO --

10       **THE COURT:**  THERE'S NO REAL DEFINITION OF A DOCUMENT.

11  IF IT HAS TRACK CHANGES AND ONE WAY OF LOOKING AT IT SHOWS

12  THEM AND ANOTHER WAY OF LOOKING AT IT DOESN'T SHOW THEM, IS

13  THAT TWO DIFFERENT DOCUMENTS?  WHICH IS THE ORIGINAL?  I DON'T

14  KNOW.  IT'S A METAPHYSICAL QUESTION.

15       **MR. REINES:**  IT ACTUALLY TURNS OUT TO NOT BE A

16  METAPHYSICAL QUESTION.

17       SO THE ANSWER IS, MR. VENTERS KEEPS ALL THESE DOCUMENTS ON

18  HIS LAPTOP, WHICH THE COURT HEARD.  THERE'S DOZENS OF THEM FOR

19  ALL DIFFERENT COMPANIES.  THERE'S, YOU KNOW, TEN

20  APPROXIMATELY --

21       **THE COURT:**  I KNOW THAT.

22       **MR. REINES:**  -- FOR ADOBE, RIGHT?  HE SAYS HE

23  MAINTAINED THEM ALL.  HE HAD NO REASON -- THIS IS ALL IN OUR

24  PAPERS -- HE HAD NO REASON TO EVER ERASE ANY OF THEM.  HE

25  NEVER INTENDED TO.  HE NEVER WOULD DO IT.

1      THE DOCUMENT THAT THE JURY WAS TOLD WAS GIVEN TO US WHICH

2   IS DIFFERENT TEXTUALLY.  THERE'S A --

3           THE COURT:  THAT'S NOT THE ONE I PROPOSE TO USE --

4           MR. REINES:  HE CAN'T FIND IT ANYWHERE --

5                   (SIMULTANEOUS COLLOQUY)

6           MR. REINES:  HE CAN'T FIND IT ANYWHERE.  AND THAT'S A

7   PROBLEM.  TO SAY, WELL, THERE'S ANOTHER VERSION WHICH WE

8   DIDN'T PRODUCE TO YOU, FOR WHICH WE DO HAVE THE DOCUMENT, I

9   MEAN I -- IS -- IS NOT APPROPRIATE.

10      I GUESS I WOULD SAY PRESERVING ALL RIGHTS ON THIS, I GUESS

11  I WOULD SAY IF THE COURT IS GOING TO INTRODUCE A DIFFERENT

12  VERSION AS WHAT WAS HIS SCRIPT FOR THIS CALL THAT SUPPOSEDLY

13  HAPPENED, THAT THE JURY BE TOLD THAT THIS DOCUMENT WAS -- DUE

14  TO A FAILURE DURING DISCOVERY PROCESS, THIS DOCUMENT WAS NOT

15  PRODUCED, AND WE WERE DEPRIVED OF AN OPPORTUNITY TO

16  CROSS-EXAMINE THE WITNESS WITH ALL THE DIFFERENT VERSIONS FROM

17  2004.

18          THE COURT:  IF YOU WANT TO CALL VENTER (SIC) AGAIN,

19  YOU CAN DO THAT.

20          MS. GLAUSER:  WE WOULD BE HAPPY TO DO THAT.

21          MR. REINES:  LET ME THINK ABOUT THAT.  SO WE CAN CALL

22  DOCTOR -- WE CAN CALL MR. VENTERS AGAIN, BUT, I MEAN, TO ME

23  THAT LETS THEM CURE AND SHIFT THE STORY.  I MEAN I --

24          THE COURT:  IT'S UP TO YOU.  I'M NOT GOING TO STRIKE

25  THE ENTIRE DOCUMENT.

1      **MR. REINES:**  RIGHT.

2          **THE COURT:**  I WILL GIVE YOU A CHOICE.  YOU CAN USE

3    THE 125, YOU CAN USE DOCUMENT 1, YOU CAN HAVE A CURATIVE

4    INSTRUCTION, AND YOU CAN CALL VENTERS BACK.

5          **MR. REINES:**  OKAY.

6          **THE COURT:**  ANY OF THOSE THAT YOU WANT.

7          **MR. REINES:**  RIGHT.  AND SO THE ONE I WAS PROPOSING

8    WAS THE CURATIVE INSTRUCTION BECAUSE I DON'T SEE HOW WE CAN

9    GIVE A DIFFERENT DOCUMENT TO THE JURY WITHOUT EXPLAINING WHY

10   WE ARE COMING UP WITH A DIFFERENT VERSION.

11      THAT'S ALL I WOULD HAVE SAID.

12          **THE COURT:**  THAT'S FINE.

13      BUT THE CURATIVE INSTRUCTION CAN'T BE "WE DIDN'T HAVE AN

14   OPPORTUNITY TO EXAMINE HIM ABOUT THIS", BECAUSE I'M GIVING YOU

15   AN OPPORTUNITY TO EXAMINE HIM ABOUT THIS.  SO IT WILL HAVE TO

16   BE A DIFFERENT CURATIVE INSTRUCTION.  AND YOU'RE WELCOME TO

17   TRY TO WRITE IT.

18      I WOULD SAY SOMETHING LIKE, "MANY VERSIONS OF THIS EXISTED

19   ON HIS COMPUTER.  THE WRONG ONE WAS ADMITTED.  WE ARE NOT

20   REALLY SURE WHICH ONE IS THE RIGHT ONE, BUT WE ARE GIVING YOU

21   A GENERIC DOCUMENT THAT INCLUDES -- I DON'T KNOW.  SOMETHING

22   LIKE THAT.

23          **MR. REINES:**  OKAY.  LET ME CONSULT WITH THE TEAM.

24          **THE COURT:**  OKAY.

25          **MR. REINES:**  FINAL THING THAT I THINK WE ARE IN

1    AGREEMENT ON THIS WAS --

2                         (LAUGHTER)

3        -- LET'S END THE DAY ON THAT, IS IF WE COULD AGREE EVEN IF

4    WE DON'T FINISH OUT TOMORROW WITH ALL THE TESTIMONY, ALTHOUGH

5    WE MAY, IT'S GOING TO BE CLOSE, THAT WE COME BACK AND DON'T DO

6    CLOSINGS UNTIL THURSDAY SO THAT WE CAN, IN AN ORDERLY WAY,

7    PREPARE OUR CLOSINGS.

8             **THE COURT:**  THAT'S FINE.

9        I HAVE GIVEN YOU MY CURRENT SET OF JURY INSTRUCTIONS FOR

10   YOU TO LOOK AT.  AND I HAVE, I GUESS, A NEWER VERDICT FORM

11   THAT I HAVEN'T GIVEN YOU YET.

12       MY ONLY QUESTION, I GUESS, ON THE BACK AND FORTH THERE WAS

13   ODDLY, IT SEEMED AS THOUGH THE PLAINTIFF WANTED TO SPECIFY IN

14   THE DAMAGES QUESTION LIMITING THE NUMBER OF PRODUCTS THAT

15   WOULD BE -- HAVE THE ROYALTY ATTACHED TO IT.

16       AND THE DEFENDANT WANTED IT TO SAY -- NOT TO SPECIFY.  I

17   WOULD HAVE THOUGHT IT WOULD HAVE BEEN THE OTHER WAY AROUND AND

18   I -- WHAT I COULD SAY IS SOMETHING LIKE "FOR THE CLAIMS THAT

19   YOU FOUND VALID AND INFRINGED BY ADOBE'S ACCUSED PRODUCTS".

20            **MS. GLAUSER:**  THAT WOULD ALSO WORK, YOUR HONOR.

21            **THE COURT:**  I DON'T KNOW WHY YOU WOULD WANT TO MAKE

22   IT SEEM POSSIBLY BROADER.

23            **MR. REINES:**  I THINK THE REAL POLITIC OF THAT HERE IS

24   THAT THEY WANT TO SUE US ON OTHER PRODUCTS.  SO, WE'LL SEE IF

25   THAT PASSES THE BASIC PRECLUSION --

1          **THE COURT:**  YOU ARE THE ONE WHO DOESN'T WANT ME TO

2     SPECIFY THAT IT'S ONLY THE ACCUSED PRODUCTS.  WOULDN'T YOU

3     RATHER I SAY "ADOBE'S ACCUSED PRODUCTS" OR EVEN AS THEY

4     PROPOSE, LIST THEM ALL SO WE'RE CERTAIN THAT WE AREN'T GOING

5     TO BE TAGGED WITH UNACCUSED PRODUCTS?

6        THAT'S WHY IT'S ODD TO ME THAT YOU'RE TAKING THESE TACTS.

7     I WOULD HAVE THOUGHT IT WOULD BE THE OPPOSITE.

8          **MR. REINES:**  WELL BECAUSE I THINK THE JURY IS GOING

9     TO UNDERSTAND THE LIMITS OF THE CLAIMS AND THEN WE DON'T WANT

10    MISUSE OF THE VERDICT FORM TO SUGGEST THAT THE CASE WAS

11    NARROWER THAN IT ACTUALLY WAS IN PRECLUSION SETTINGS.

12         **MS. GLAUSER:**  AND WE ARE, IN FACT, TRYING TO DO THE

13    SAME --

14         **THE COURT:**  OH, I SEE --

15                   (SIMULTANEOUS COLLOQUY)

16         **THE COURT:**  TEACHING USES.

17         **MR. REINES:**  RIGHT.  BECAUSE THAT'S WHAT THIS IS

18    ABOUT, THEY WANT TO SUE US --

19         **THE COURT:**  OH, I SEE.  OKAY.  WELL THEN -- THEN THAT

20    ACTUALLY PERSUADES ME THAT WE SHOULD BE MORE SPECIFIC.  SO WE

21    CAN SAY "ADOBE'S ACCUSED PRODUCTS".  WE CAN LIST THE PRODUCTS.

22         **MR. REINES:**  I'D SAY "ACCUSED PRODUCTS".

23         **THE COURT:**  THAT'S ALL RIGHT WITH YOU?

24         **MS. GLAUSER:**  YES.

25         **THE COURT:**  WE WILL DO THAT THEN.

1        **MR. REINES:**  ALL RIGHT.  THANK YOU VERY MUCH.

2        **THE COURT:**  DID YOU HAVE OTHER ISSUES?

3        **MS. GLAUSER:**  NO.  THAT'S IT FOR TODAY.

4     THANK YOU VERY MUCH.

5        **THE COURT:**  OKAY.

6        **MR. DINOVO:**  THANK YOU, YOUR HONOR.

7            (PROCEEDINGS CONCLUDED AT 1:51 P.M.)

8

9

10                **CERTIFICATE OF REPORTER**

11        I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE

12    UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY

13    CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

14    RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

15

16                    *Diane E. Skillman*

17            DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

18                TUESDAY, SEPTEMBER 2, 2014

19

20

21

22

23

24

25

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930**