VOLUME 7

PAGES 1218 - 1510

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DIGITAL REG OF TEXAS, LLC   )
                            )
            PLAINTIFF,      )   NO. C-12-1971 CW
                            )
 VS.                        )   WEDNESDAY, SEPTEMBER 3, 2014
                            )
ADOBE SYSTEMS, INC., ET AL.,)   OAKLAND, CALIFORNIA
                            )
            DEFENDANTS.     )   JURY TRIAL
_____)


BEFORE THE HONORABLE CLAUDIA WILKEN, JUDGE

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**FOR PLAINTIFF:**          DINOVO, PRICE, ELLWANGER & HARDY LLP
                            7000 NORTH MOPAC EXPRESSWAY, SUITE 350
                            AUSTIN, TEXAS 78731
                    BY:  ANDREW G. DINOVO, ESQUIRE
                         ADAM G. PRICE, ESQUIRE
                         GREGORY DONAHUE, ESQUIRE
                         JAY D. ELLWANGER, ESQUIRE
                         NICOLE E. GLAUSER, ESQUIRE



                            BARTKO ZANKEL BUNZEL MILLER
                            ONE EMBARCADERO CENTER, SUITE 800
                            SAN FRANCISCO, CALIFORNIA 942111
                    BY:  W. PAUL SCHUCK, ESQUIRE


**ALSO PRESENT:**           MICHAEL FARLEY, COMPANY REPRESENTATIVE

                        (APPEARANCES CONTINUED)

**REPORTED BY:**            DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
                            OFFICIAL COURT REPORTER
        TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

1

2

3

4   **FOR DEFENDANT**          WEILL, GOTSHAL & MANGES, LLP
    **ADOBE SYSTEMS:**         201 REDWOOD SHORES PARKWAY
5                              REDWOOD SHORES, CALIFORNIA 94065
                        BY:   EDWARD R. REINES, ESQUIRE
6                              SONAL N. MEHTA, ESQUIRE
                               BYRON BEEBE, ESQUIRE
7                              ANANT PRADHAN, ESQUIRE

8

9   **ALSO PRESENT:**          PAUL BETLEM, COMPANY REPRESENTATIVE
                               KAREN ROBINSON, IN-HOUSE COUNSEL
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

I N D E X

2     **DEFENDANT'S WITNESSES:**                              **PAGE**    **VOL.**

3     **SCHULL, JON**

4     DIRECT EXAMINATION BY MR. REINES                    1226       7

5     CROSS-EXAMINATION BY MR. DINOVO                     1249       7

6     **WICKER, STEPHEN**

7     DIRECT EXAMINATION BY MS. MEHTA                     1264       7

8     CROSS-EXAMINATION BY MR. DINOVO                     1313       7

9     REDIRECT EXAMINATION BY MS. MEHTA                   1330       7

10    RECROSS-EXAMINATION BY MR. DINOVO                   1339       7

11    FURTHER REDIRECT EXAMINATION BY MR. MEHTA           1343       7

12

13    **PLAINTIFF'S REBUTTAL WITNESS:**

14    **KELLER, ARTHUR**

15    DIRECT EXAMINATION BY MR. DINOVO                    1346       7

16    CROSS-EXAMINATION BY MS. MEHTA                      1381       7

17    REDIRECT EXAMINATION BY MR. DINOVO                  1406

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

| PLAINTIFF'S EXHIBITS: | EVD. | VOL. |
|---|---|---|
| 4 (PG. 156) | 1304 | 7 |

| DEFENDANT'S EXHIBITS: | | |
|---|---|---|
| 418 | 1231 | 7 |
| 421 | 1295 | 7 |
| 589 | 1242 | 7 |
| 614 | 1244 | 7 |
| 639 | 1246 | 7 |
| 679 | 1508 | 7 |

| | |
|---|---|
| 1 | WEDNESDAY, SEPTEMBER 3, 2014                          8:30 A.M. |
| 2 | P R O C E E D I N G S |
| 3 | THE CLERK:  REMAIN SEATED.  COME TO ORDER.  COURT IS |
| 4 | IN SESSION. |
| 5 | (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.) |
| 6 | THE COURT:  GOOD MORNING.  SO ON THE CURATIVE |
| 7 | INSTRUCTIONS I'M NOT FINISHED WITH THEM.  WHAT I'M GOING TO DO |
| 8 | IS GIVE THEM WITHIN THE FINAL INSTRUCTIONS.  THERE WON'T BE |
| 9 | LITTLE MESSY INSTRUCTIONS HERE AND THERE.  WE WILL WORK THEM |
| 10 | INTO THE FINAL INSTRUCTIONS. |
| 11 | AND THEN, YOU HAD A PROBLEM WITH SOME SLIDES? |
| 12 | MR. DINOVO:  YES, YOUR HONOR.  THREE SLIDES -- |
| 13 | THE COURT:  DO YOU HAVE THEM THAT I CAN LOOK AT? |
| 14 | THE CLERK:  ARE YOU PUTTING THEM ON THE SCREEN? |
| 15 | MS. MEHTA:  I DON'T KNOW WHAT NUMBERS. |
| 16 | THE COURT:  24, 30 AND 31. |
| 17 | MR. DINOVO:  YES, YOUR HONOR. |
| 18 | MS. MEHTA:  WHAT NUMBERS? |
| 19 | THE COURT:  24, 30 AND 31. |
| 20 | MR. DINOVO:  YES, YOUR HONOR. |
| 21 | SO ALL OF THESE SLIDES HAVE THE SAME BASIC EXCERPT FROM |
| 22 | FIGURE 2 OF THE SCHULL PATENT.  THIS FIGURE 2 WAS NEVER |
| 23 | DISCLOSED OR DISCUSSED IN THE WICKER REPORT IN 700 PAGES. |
| 24 | MS. MEHTA:  THAT IS NOT TRUE, YOUR HONOR. IT'S ON |
| 25 | PAGE -- |

1        **THE COURT:**  I AM SORRY.  WHAT IS --

2        **MS. MEHTA:**  I THINK --

3        **THE COURT:**  THE FIGURE -- THIS SLIDE DOESN'T HAVE A

4    FIGURE.

5        **MS. MEHTA:**  IT HAS AN EXCERPT FROM A FIGURE ON THE

6    RIGHT-HAND SIDE.

7        **THE COURT:**  OH.

8        **MS. MEHTA:**  AND THE FIGURE APPEARS IN ITS ENTIRETY ON

9    PAGE 32 OF THE REPORT.  I'M HAPPY TO HAND IT UP, YOUR HONOR.

10   I'M NOT SURE WHAT THE OBJECTION IS.  IT IS RIGHT HERE IN THE

11   REPORT.

12       **THE COURT:**  DID YOU SHOW IT TO THE OTHER SIDE?

13       **MR. DINOVO:**  I ASKED HER FOR THE CITATIONS, AND SHE

14   CANCELED OUR CONFERENCE LAST NIGHT, BUT --

15       **MS. MEHTA:**  I JUST GOT YOUR REQUEST THIS MORNING.

16   THERE IT IS.

17       **MR. DINOVO:**  THERE IS NO DISCUSSION OF THIS FIGURE IN

18   CONNECTION WITH EITHER THE TOKEN OR THE ENCRYPTION ASPECT OF

19   IT THAT THEY ARE NOW RELYING ON IN THIS NEW THEORY.

20       **MS. MEHTA:**  ACTUALLY, YOUR HONOR -- IF I CAN HAVE IT

21   BACK SO --

22       **MR. DINOVO:**  YES, OF COURSE.

23     THIS IS A SUMMARY OF THE REFERENCE, NOT A DISCUSSION OF

24   THE THEORY OF INVALIDITY.

25       **MS. MEHTA:**  YOUR HONOR, SO I'M NOT SURE EXACTLY WHAT

1    THE OBJECTION IS, BUT THE REPORT GOES INTO GREAT DETAIL

2    DESCRIBING DR. WICKER'S THEORY.  HE POINTS TO THE PASSWORD AS

3    THE TOKEN AND THE PERMISSION AND EXPLAINS HOW ALL OF THAT MAPS

4    TO THE CLAIMS.  AND THEN, WHEN HE IS DESCRIBING HOW THE

5    PASSWORD IS GENERATED ON PAGE 32 OF HIS REPORT, HE DESCRIBES

6    HOW THE PASSWORD IS GENERATED, AND THEN EXCERPTS FIGURE 2.

7        SO EVERYTHING THAT HE IS GOING TO SAY IS RIGHT THERE IN

8    HIS REPORT ON PAGE 32.

9        THIS IS NOT A NEW THEORY AT ALL.  IT IS RIGHT THERE IN HIS

10   REPORT.

11           MR. DINOVO:  THERE IS A PICTURE OF FIGURE 2, BUT

12   THERE IS NO DISCUSSION OF ANY SORT OF ENCRYPTION OR

13   DECRYPTION. SO THIS IS NEW IN THIS PRESENTATION.  IT'S A NEW

14   THEORY THAT WAS NOT PRESENTED IN HIS REPORT.

15           MS. MEHTA:  YOUR HONOR, IT IS RIGHT THERE IN THE

16   REPORT.  IT SAYS:  "ENCRYPTION, FIGURE 2."

17       AND IF THE ISSUE IS THE ENCRYPTION-DECRYPTION, THAT IS

18   ACTUALLY A NEW THEORY THAT THE PLAINTIFFS CAME UP WITH DURING

19   THEIR INFRINGEMENT CASE WHICH IS THIS CONCEPT OF REGENERATION

20   BY ENCRYPTION.  THAT IS NOWHERE IN DR. DEVANBU'S REPORT.  AND

21   SO WE ARE ACTUALLY AHEAD OF THE CURVE IN TERMS OF HAVING

22   PREEMPTED THE ARGUMENT.

23       SO THE SUGGESTION THAT THEY CAN OFFER NEW EXPERT OPINIONS

24   ON THE INFRINGEMENT AND WE CAN'T EVEN PUT INTO EVIDENCE THE

25   OPINIONS RESPONDING TO THOSE THAT WE PREBUTTED BY PUTTING THEM

SCHULL – DIRECT / REINES

1    IN THE REBUTTAL REPORT IS SORT OF HARD TO UNDERSTAND.

2             **THE COURT:**  I'M INCLINED TO ALLOW THIS, BUT I WILL

3    LOOK AT THE OTHER TWO.  WHAT ARE YOUR OTHER TWO PROBLEMS?

4             **MR. DINOVO:**  SAME ISSUE WITHOUT.

5             **THE COURT:**  OKAY.

6             **MR. DINOVO:**  AND IF --

7             **THE COURT:**  THE FIGURE IS HERE, AND IT'S -- I'M SURE

8    YOU CAN HANDLE IT ON CROSS-EXAMINATION.

9             **MR. DINOVO:**  ALL RIGHT.  VERY WELL, YOUR HONOR.

10            **MR. REINES:**  YOUR HONOR, ONE THING ON THE CURATIVE

11   INSTRUCTIONS YOU KNOW WHETHER WE ARE RIGHT OR WRONG, THAT WE

12   CARE A LOT, ESPECIALLY ON 125C.

13            **THE COURT:**  THAT WHAT?

14            **MR. REINES:**  WE CARE A LOT ON 125C.

15            **THE COURT:**  SO YOU SAID.

16            **MR. REINES:**  I KNOW.  I AM SORRY.  THE QUESTION IS:

17   BEFORE YOU GIVE IT TO THE JURY WILL WE HAVE AN OPPORTUNITY TO

18   LOOK AT IT?

19            **THE COURT:**  YOU WILL HAVE AN OPPORTUNITY TO WRITE IT.

20   I GAVE YOU THE DRAFT INSTRUCTIONS YESTERDAY, RIGHT?

21            **MR. REINES:**  NO, I MEAN THE CURATIVES.

22            **THE COURT:**  RIGHT.  IT IS GOING TO GO INTO THE DRAFT

23   INSTRUCTIONS.

24            **MR. REINES:**  RIGHT.

25            **THE COURT:**  SO IT WILL NEED TO BE REWRITTEN.  NOW IT

SCHULL - DIRECT / REINES

1   WON'T SAY, YESTERDAY WE THOUGHT OR BEFORE WE GO ON WITH

2   TESTIMONY.  IT WILL HAVE TO -- YOU WILL HAVE TO FIND A PLACE

3   FOR IT IN THE FINAL INSTRUCTIONS.  YOU WILL HAVE TO HAVE A

4   LITTLE TRANSITION AND EXPLAIN WHY WE ARE SAYING THIS.  AND IT

5   IS GOING TO TAKE SOME DRAFTING.  AND YOU CAN CERTAINLY TAKE

6   THE FIRST CRACK AT IT.

7            **MR. REINES:**  OKAY.

8            **THE COURT:**  AND IF I DON'T LIKE IT I WILL DO IT

9   MYSELF AND SHOW IT TO YOU.

10           **MR. REINES:**  THAT IS VERY HELPFUL.  THANK YOU FOR

11  YOUR GUIDANCE.

12           **THE CLERK:**  THEY ARE HERE.  ARE YOU READY?

13           **THE COURT:**  BRING THEM IN.

14       (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

15           **THE COURT:**  PLEASE BE SEATED.  GOOD MORNING, LADIES

16  AND GENTLEMEN.  WE WILL PROCEED WITH THE DIRECT EXAMINATION OF

17  DR. SCHULL.

18       (**JONATHAN SCHULL** RESUMED THE STAND AND HAVING PREVIOUSLY

19  BEEN PLACED UNDER OATH, CONTINUED DIRECT EXAMINATION AS

20  FOLLOWS:)

21                **DIRECT EXAMINATION RESUMED**

22  BY MR. REINES

23  **Q.**  GOOD MORNING, DR. SCHULL.

24  **A.**  GOOD MORNING.

25  **Q.**  ALL RIGHT.  WHEN WE LEFT WE WERE TALKING ABOUT YOUR

1    BEGINNING YOUR SOFTLOCK ENTERPRISE.  DO YOU RECALL, GENERALLY,

2    THAT IS WHERE WE LEFT OFF?

3    **A.**   UH-HUH.

4    **Q.**   BECAUSE THE COURT REPORTER IS TAKING DOWN WHAT IS BEING

5    SAID WE NEED  --

6    **A.**   YES, I DO REMEMBER.

7    **Q.**   THANK YOU.  AGAIN, WE ARE IN THIS ARTIFICIAL ENVIRONMENT,

8    AT LEAST FOR NORMAL PEOPLE.  THANK YOU.

9        BEFORE I GET INTO THE SOFTLOCK STORY, ARE YOU AN ADOBE

10   EMPLOYEE?

11   **A.**   NO.

12   **Q.**   HAVE YOU EVER BEEN AN ADOBE EMPLOYEE?

13   **A.**   NO.

14   **Q.**   DO YOU HAVE ANY OBLIGATION TO HAVE FLOWN HERE FROM THE

15   EAST COAST AND PARTICIPATE IN THIS THAT YOU KNOW OF?

16   **A.**   NO.

17   **Q.**   WHY DID YOU AGREE TO APPEAR AT THE TRIAL AND COME TO TELL

18   THE SOFTLOCK STORY?

19   **A.**   I LOVE TELLING THE SOFTLOCK STORY.

20   **Q.**   ARE YOU BEING COMPENSATED BY ADOBE FOR YOUR TIME?

21   **A.**   YES.

22   **Q.**   CAN YOU DESCRIBE THAT?

23   **A.**   I OCCASIONALLY CONSULT ON PATENT MATTERS LIKE THIS, AND

24   THEY ARE PAYING FOR MY TIME, MY COMING OUT HERE, ET CETERA.

25   **Q.**   AND WHAT IS THE HOURLY RATE?

SCHULL – DIRECT / REINES

1     **A.**  $450.

2     **Q.**  NOW, LET'S TALK ABOUT THE BEGINNING OF SOFTLOCK.

3         WHEN YOU STARTED SOFTLOCK, DID YOU HAVE ANY FUNDING AT

4     THAT POINT IN TIME?

5     **A.**  WHEN WE STARTED MY STUDENT AND I EACH PUT IN, I THINK,

6     $500.

7     **Q.**  DID YOU CONTINUE TO USE THE LOCKING MECHANISM THAT YOU

8     DESCRIBED A BIT YESTERDAY WITH YOUR SOFTLOCK PROGRAM WHEN YOU

9     STARTED THE COMPANY, AS COMPARED TO WHEN YOU WERE JUST AT

10    HAVERFORD?

11    **A.**  YES, THE ESSENTIAL LOCKING TECHNOLOGY REMAINED THE SAME.

12    **Q.**  DID YOU OBTAIN ANY PATENTS?

13    **A.**  I DID EVENTUALLY, YES.  I WROTE THE PATENTS DURING THE

14    PERIOD WE HAVE BEEN TALKING ABOUT.  THEY WERE GRANTED SOMEWHAT

15    LATER.

16    **Q.**  AND HOW DID YOU GO ABOUT FILING YOUR PATENT APPLICATIONS?

17    **A.**  I THINK I MENTIONED I PURCHASED A BOOK CALLED PATENT IT

18    YOURSELF.  I READ IT.  I WROTE THE PATENTS.  I HAD A FREE

19    CONSULT WITH A PATENT ATTORNEY, AND I THEN SUBMITTED A

20    PROVISIONAL, WHICH EVENTUALLY BECAME A GRANTED PATENT.

21    **Q.**  WHAT MOTIVATED YOU TO SEEK THE PATENT?

22    **A.**  WELL, IN ORDER TO START THE COMPANY, WE NEEDED TO BE ABLE

23    TO GET INVESTMENT IN ORDER TO BUILD OUR SERVER SYSTEM, AND SO

24    ON.  AND TO DO THAT WE NEEDED TO ASSURE OUR INVESTORS THAT WE

25    HAD SOME ASSETS AND THAT THEY POTENTIALLY WOULD BE ABLE TO

SCHULL — DIRECT / REINES

1  RECOUP THEIR INVESTMENT FOR THE VALUE OF THE PATENT.

2  **Q.**  HOW QUICKLY DID YOU FIRST GET YOUR FIRST CUSTOMER IN THE

3  DOOR FROM WHEN YOU STARTED SOFTLOCK?

4  **A.**  WE HAD SOME LOW VOLUME CUSTOMERS WELL WITHIN THE FIRST

5  YEAR.

6  **Q.**  WHEN YOU WERE IN THIS COMMERCIALIZATION STAGE, DID YOU

7  STILL USE THE PHONE CALLS FOR THE PERMISSION CODES?

8  **A.**  WE DID.

9  **Q.**  AND WHEN DID YOU AUTOMATE THE PROCESS SO THAT IT WAS USED

10  ON THE WORLDWIDE WEB?

11  **A.**  PRETTY MUCH AS SOON AS IT WAS POSSIBLE AND LEGAL TO DO

12  COMMERCIAL TRANSACTIONS ON THE WORLDWIDE WEB, WE BEGAN DOING

13  THOSE TRANSACTIONS.  WE CREATED A WEBSITE CALLED "DOWNTOWN

14  ANYWHERE," A VIRTUAL CITY.

15    AND WE MAY ACTUALLY HAVE DONE ONE OF THE FIRST

16  CREDIT-CARD-BASED TRANSACTIONS ON THE WORLDWIDE WEB.  THAT WAS

17  THE WEEK WHEN THIS THING WAS BEGINNING TO HAPPEN, AND WE WERE

18  THERE.

19  **Q.**  WHAT YEAR WAS THAT?

20  **A.**  I THINK THAT WAS PROBABLY '93.

21  **Q.**  AND WHAT IS YOUR UNDERSTANDING THAT THE WEB BECAME SORT OF

22  GENERALLY AVAILABLE AND PEOPLE WERE USING IF?

23  **A.**  WELL, THE WEB ITSELF HAD BEEN AVAILABLE FOR NONCOMMERCIAL

24  PURPOSES FOR A FEW YEARS PRIOR TO THAT.  BUT UNTIL THAT MOMENT

25  IT WAS NOT ALLOWED TO DO COMMERCIAL TRANSACTIONS.

SCHULL – DIRECT / REINES

1     **Q.**   HOW DID DOWNTOWN ANYWHERE RELATE TO YOUR DRM TECHNOLOGY?

2     **A.**   TO THE DRM TECHNOLOGY, THAT'S WHERE WE HAD OUR SOFTLOCK

3     SERVER, AS WE DESCRIBED IT, WHOSE JOB IT WAS TO THEN GENERATE

4     AND SELL PASSWORDS AND DELIVER THEM BACK TO CUSTOMERS.

5     **Q.**   HOW MANY EMPLOYEES DID YOU HAVE AT SOFTLOCK?

6     **A.**   AT THE BEGINNING IT WAS ME AND BRIAN.  AT THE END IT WAS

7     75 PEOPLE.

8     **Q.**   DID YOU HAVE MANY CUSTOMERS?

9     **A.**   WE DID.

10    **Q.**   APPROXIMATELY HOW MANY?

11    **A.**   I WOULD GUESS YOU WOULD SAY IN THE LOW HUNDREDS.  AND EACH

12    OF THOSE CUSTOMERS MIGHT HAVE HAD ANYWHERE FROM ONE TO A

13    HUNDRED PRODUCTS.

14    **Q.**   WHO WERE SOME OF YOUR CUSTOMERS?

15    **A.**   THE MCGRAW-HILL WAS THE FIRST RECOGNIZABLE NAME. LATER WE

16    HAD STANDARD & POOR.  AND AT ONE POINT STEPHEN KING WAS

17    PUBLISHING AN ELECTRONIC NOVEL USING OUR TECHNOLOGY, AS WELL.

18    **Q.**   HOW LONG DID YOU WORK WITH SOFTLOCK?

19    **A.**   IT WAS A 12-YEAR PERIOD.

20    **Q.**   AND THEN, AT SOME POINT YOU WENT BACK TO ACADEMIA?

21    **A.**   THAT'S RIGHT.

22    **Q.**   CAN YOU DESCRIBE WHERE YOU APPLIED AND HOW YOU GOT THE

23    POSITION?

24    **A.**   RIGHT.  SO, AS YOU COULD TELL SOFTLOCK SORT OF WAS

25    STRUGGLING FOR QUITE AWHILE.  AND THEN, WHEN THE INTERNET

1   THING, THE WEB THING REALLY TOOK OFF THE COMPANY GREW VERY

2   RAPIDLY.  AND WHEN THE INTERNET BUBBLE BURST, THE VENTURE

3   CAPITALISTS WITHDREW THEIR SUPPORT, AND WE HAD TO CLOSE THE

4   COMPANY.

5       AND A YEAR LATER I GOT A JOB AT RIT WHERE I WAS NOW

6   TEACHING INFORMATION TECHNOLOGY, NOT BIOLOGICAL PSYCHOLOGY.

7   **Q.**  LET'S TURN TO YOUR PATENT, WHICH IS 418.  WOULD YOU PLEASE

8   LOOK AT THAT?  YOU CAN LOOK AT YOUR BINDER.  THE SCREEN IS

9   JUST AS CONVENIENT.  AND CONFIRM THIS IS YOUR PATENT?

10  **A.**  YES, IT IS.

11                  (DISPLAYED ON SCREEN.)

12  **Q.**  AND YOU FILED FOR THIS IN DECEMBER OF 1992, CORRECT?

13  **A.**  CORRECT.

14          **MR. REINES:**  WITH THAT, YOUR HONOR, WE WOULD MOVE

15  INTO EVIDENCE THE SCHULL '070 PATENT.

16          **MR. DINOVO:**  NO OBJECTION.

17          **THE COURT:**  RECEIVED.

18      (DEFENDANT'S EXHIBIT 418 WAS RECEIVED IN EVIDENCE.)

19  **BY MR. REINES**

20  **Q.**  NOW, I HAD MENTIONED YOUR PATENT.  YOU FILED FOR IT IN

21  1992.  IT ISSUED IN 1996; IS THAT CORRECT?

22  **A.**  CORRECT.

23  **Q.**  AND THIS AROSE OUT OF YOUR WORK WHICH WAS STARTED AT

24  HAVERFORD COLLEGE?

25  **A.**  THAT'S TRUE.

1    **Q.**  IS THIS PATENT LIMITED TO THE WORK YOU DID AT HAVERFORD,

2    OR WAS IT BASED ON SUBSEQUENT IMPROVEMENTS?

3    **A.**  IT WAS BASED ON SUBSEQUENT IMPROVEMENTS, AS IT HAD TO BE,

4    SINCE THE PRIOR WORK I HAD DONE HAD BEEN OUT IN THE MARKET

5    FOR A WHILE, IT WAS NO LONGER PATENTABLE.  SO THIS PATENT

6    REPRESENTS ADVANCEMENTS OVER WHAT I HAD BEEN DOING WITH THE

7    BIOLOGICAL RHYTHM SOFTWARE AT HAVERFORD.

8    **Q.**  I WOULD LIKE TO TURN TO EXHIBIT 418, PAGE 2.

9                         (PUBLISHED TO JURY.)

10        THIS IS FIGURE ONE, WHICH IS A LITTLE BUSY FOR THE SCREEN

11   SIZE WE HAVE, BUT WE WILL HAVE YOU SORT OF PILOT US THROUGH

12   THIS.

13        DO YOU SEE THE TOP OF THE FIGURE WHERE IT SAYS THAT "USER

14   PASSES COPY ON TO OTHERS"?

15   **A.**  YES, I DO.

16   **Q.**  WHAT DOES THAT MEAN?

17   **A.**  THE WHOLE POINT OF THIS SOFTWARE WAS TO ALLOW AND EVEN

18   ENCOURAGE PEOPLE TO PASS COPIES ALONG, SO THAT WE COULD TAKE

19   ADVANTAGE OF THE FREE DISTRIBUTION CHANNEL THAT THE SYSTEM

20   MADE POSSIBLE.

21   **Q.**  AND AS WE GO THROUGH THIS, YOU KNOW, RECOGNIZE THAT NOT

22   EVERYBODY IS  -- CERTAINLY I'M NOT AS TECHNICALLY SAVVY AS

23   YOURSELF.  SO JUST TO THE EXTENT YOU CAN WALK US THROUGH IN

24   BITE-SIZE PIECES, THAT WOULD BE HELPFUL.

25        ASSUMING A USER HAS POSSESSION OF A COPY OF SOFTWARE

1   THAT -- TO WHICH YOUR INVENTION'S APPLIED, UNDER FIGURE ONE,

2   WHAT HAPPENS WHEN THAT PERSON ATTEMPTS TO ACCESS THE

3   SOFTWARE'S ADVANCED FEATURES?

4   **A.**  IF THEY HAVE A VALID PASSWORD ON THEIR COMPUTER THEY

5   SIMPLY GET ACCESS TO ADVANCED FEATURES.  IF THEY DON'T, THEY

6   ARE INVITED TO PURCHASE THE ADVANCED FEATURES.

7   **Q.**  WOULD THERE BE A CHECK TO SEE IF THE USER HAD A

8   PRE-EXISTING PERMISSION?

9   **A.**  YES.

10  **Q.**  WHERE IS THAT CHECK FOR A PRE-EXISTING PERMISSION

11  REFLECTED ON FIGURE 1?

12          **MR. DINOVO:**  YOUR HONOR, AT THIS POINT I'M GOING TO

13  OBJECT.  COUNSEL APPEARS TO BE USING TERMINOLOGY FROM THE

14  PATENT.  AND AS I UNDERSTAND IT, DR. SCHULL IS NOT AN EXPERT

15  FROM THE ASSERTED PATENT.  AND IF HE WANTS TO ASK ABOUT THE

16  SYSTEM THAT DR. SCHULL DEVELOPED, THAT IS ONE THING.  BUT IF

17  HE IS GOING TO START USING THIS TO COMPARE WITH THAT CLAIM

18  THAT IS SUBJECT TO THE MOTION IN LIMINE.

19          **THE COURT:**  I DIDN'T HEAR THAT IN THE QUESTION.  I

20  CAN GO BACK.  ARE YOU SAYING HE ASKED SUCH A QUESTION NOW --

21          **MR. DINOVO:**  YES.

22          **THE COURT:**  -- OR ARE YOU JUST WORRIED THAT HE MIGHT?

23          **MR. DINOVO:**  NO, HE DID.  HE ASKED WHETHER THERE WAS

24  A PRE-EXISTING PERMISSION, WHICH IS CLAIM LANGUAGE FROM THE

25  '541 PATENT.

1    **THE COURT:**  OH.  WELL, I GUESS YOU COULD USE A

2    DIFFERENT WORD.

3    **MR. REINES:**  BUT, YOUR HONOR, IT'S -- I MEAN, IT

4    WOULD BE UNHELPFUL TO EVERYBODY.  AND IT IS NOT AS THOUGH I'M

5    PUTTING A PATENT UP WITH A CLAIM WHERE HE'S CONSTRUED THE

6    CLAIM OR IS INTERPRETING THE PATENT.

7    I AM ASKING HIM WHAT IS IN HIS PRIOR ART --

8    **THE COURT:**  START WITH WORDS THAT ARE IN HIS, AND

9    COMPARE IT TO OTHER WORDS, IF YOU WANT TO. IF HE HAS SOMETHING

10   THAT YOU THINK IS LIKE A PRE-EXISTING PERMISSION, THEN ASK HIM

11   ABOUT THAT IN HIS PATENT FIRST.

12   **BY MR. REINES**

13   **Q.**  OKAY.  WHAT WHAT HAPPENS AT FIGURE -- AT BLOCK 45?

14   **A.**  THE SOFTWARE CHECKS TO SEE WHETHER THERE'S A PREVIOUSLY

15   INSTALLED PASSWORD.  AND IF IT IS, IT PROVIDES ACCESS TO THE

16   ADVANCED FEATURE.

17   **Q.**  AND WHAT HAPPENS IF THERE IS A PASSWORD?  WHAT HAPPENS

18   NEXT?

19   **A.**  WE UNLOCK THE ADVANCED FEATURE, AND WE LET THE CUSTOMER

20   GET ON WITH HIS TASK.

21   **Q.**  NOW, ASSUME THERE IS NO PASSWORD, AND THUS THERE IS NO

22   PERMISSION, RIGHT?  IS THAT CORRECT?  THERE WOULD BE NO

23   PERMISSION AT THAT POINT IN TIME?

24   **A.**  SURE.

25   **MR. DINOVO:**  OBJECTION, LEADING, YOUR HONOR.

1          **THE COURT:**  OVERRULED.

2     **BY MR. REINES**

3     **Q.**  WHAT WOULD –– ASSUMING THAT THERE IS NOT THAT PASSWORD,

4     WHAT HAPPENS AT BLOCK 55?  AND WE ARE HIGHLIGHTING THAT SO

5     THAT IT IS EASIER TO FOLLOW.

6     **A.**  RIGHT.  THE SOFTWARE GIVES THE CUSTOMER THE CHOICE OF

7     PURCHASING THE ADVANCED FEATURE OR DOING WITHOUT IT.

8     **Q.**  WHAT DOES THE USER HAVE TO DO TO OBTAIN THE PASSWORD

9     PERMISSION SO THAT HE CAN ACCESS THE DOCUMENT?

10    **A.**  THEY HAVE TO GIVE THEIR CONSENT, AND SOMETIMES THEY HAVE

11    TO PARTICIPATE.  IN THE EARLY DAYS THEY WOULD FOLLOW THE

12    INSTRUCTIONS ON THEIR SCREEN, AND THEY WOULD DIAL

13    1-800-SOFTLOCK, AND THEY WOULD GO THROUGH THE PURCHASING

14    TRANSACTION.

15         LATER, THE SOFTWARE SAID THINGS LIKE, WOULD YOU LIKE ME TO

16    GO THROUGH THE INTERNET TO SELL YOU A PASSWORD?

17         AND THEY WOULD SIMPLY CLICK "YES" OR "NO."  AND IN EITHER

18    CASE, THEY WOULD END UP PURCHASING AND RECEIVING A PASSWORD.

19    **Q.**  DO YOU HAVE A LICENSING SERVER IN FIGURE ONE?

20    **A.**  YES, WE DO.

21    **Q.**  AND CAN YOU DESCRIBE WHICH ITEM THAT IS?

22    **A.**  THAT WOULD BE ITEM 85, THE LICENSING PROCESSOR WHICH RUNS

23    ITEM 90, THE LICENSING PROGRAM.

24    **Q.**  WHAT INFORMATION IN YOUR PATENT IS SENT FROM THE USER WHO

25    IS ATTEMPTING TO ACCESS ADVANCED CONTENT TO THE LICENSING

1    SERVER FROM THE USER COMPUTER?

2    **A.**   MINIMALLY, WE NEED THEIR I.D., AS WE CALL IT, IN THE

3    PATENT; THE DISTINGUISHING FEATURES OF THEIR PRODUCT AND THEIR

4    MACHINE.  ALSO, TYPICALLY, WE NEEDED THEM TO SEND PAYMENT

5    AUTHORIZATION AND NAME AND OTHER SUCH INFORMATION.

6    **Q.**   IS THAT KNOWN AS A MACHINE I.D.?

7    **A.**   THE I.D. IN QUESTION IS A MIX OF A MACHINE I.D. AND A

8    PRODUCT I.D.

9    **Q.**   WHAT DOES THE LICENSING SERVER DO WHEN IT RECEIVES THE

10   INFORMATION FROM THE USER REQUESTING ACCESS?

11   **A.**   TYPICALLY, IT FIRST DEBITS THE CREDIT CARD TO MAKE SURE

12   THAT THE PAYMENT TRANSACTION HAS OCCURRED.  AND THEN, IT TAKES

13   THE SOFTLOCK I.D. AND USES IT TO ENCRYPT SOME INFORMATION THAT

14   WILL BE CRUCIAL FOR THE OPERATION OF THE USER'S PROGRAM.

15   SENDS THAT INFORMATION BACK, CALLING IT A PASSWORD, AND THE

16   PASSWORD IS THEN DELIVERED TO THE CUSTOMER.

17   **Q.**   IS THAT PASSWORD THAT COMES FROM THE SERVER BACK TO THE

18   USER COMPUTER, DOES THAT HAVE ELEMENTS OF THE MACHINE I.D.

19   AND/OR PRODUCT INFORMATION IN IT?

20        **MR. REINES:**  LET ME WITHDRAW THE QUESTION.  THAT WAS

21   INARTFUL.

22   **BY MR. REINES**

23   **Q.**   WHAT IS THE PASSWORD?  WHY DON'T I ASK IT THAT WAY?

24   THAT'S PROBABLY A BETTER QUESTION.

25   **A.**   SO THE MAGIC HERE IS THAT FOR EVERY PRODUCT THERE IS A

SCHULL – DIRECT / REINES

1  SECRET, SOME PARTICULAR COLLECTION OF CHARACTERS WHICH ARE

2  ESSENTIAL FOR THE PROGRAM TO RUN.  THOSE SECRETS ARE STORED ON

3  THE SERVER.  AND SO WHEN THE SERVER LEARNS WHAT PRODUCT THE

4  CUSTOMER WANTS TO BUY, THE SERVER LOOKS UP THE SECRET, AND THE

5  SERVER THEN DELIVERS IT BACK TO THE CUSTOMER IN SUCH A WAY

6  THAT IT WILL BE AVAILABLE ONLY TO THAT -- ON THAT PARTICULAR

7  CUSTOMER'S MACHINE.

8      AND THE WAY WE DO THAT IS WE TAKE THE SECRET, WE ENCRYPT

9  IT WITH THE I.D. THAT WE HAD JUST GOTTEN, AND WE SEND IT BACK

10  TO THE USER.

11  Q.  NOW, DO YOU EVER USE THE TERM "SEED" IN RELATION TO THIS

12  PASS WORD?

13  A.  WE DO.

14  Q.  CAN YOU DESCRIBE WHAT A "SEED" IS, PLEASE?

15  A.  WHEN YOU'RE ENCRYPTING SOMETHING, YOU WILL -- YOU OFTEN --

16  SO ENCRYPTION IS OFTEN BASED ON A RANDOM NUMBER GENERATOR.

17  AND A RANDOM NUMBER GENERATOR TYPICALLY IS GIVEN A SEED WHICH

18  DETERMINES WHAT STRING OF RANDOM NUMBERS WILL BE DELIVERED.

19  Q.  ALL RIGHT.  WHY DON'T WE TURN TO FIGURE 2 AND LOOK AT THAT

20  MORE CLOSELY.  CAN YOU DESCRIBE WHAT FIGURE 2 SHOWS?

21  A.  FIGURE 2 DESCRIBES THIS PROCESS BY WHICH WE TAKE THE

22  I.D.'S FROM THE USER.  WE TAKE THE SECRET THAT WAS STORED ON

23  THE SERVER, AND WE WRAP THEM UP, AND WE SEND THEM BACK TO THE

24  CUSTOMER.

25  Q.  WHEN YOU SAY "WRAP THEM UP," IS THAT --

1    **A.**  THAT IS THE ENCRYPTION OF THE SECRET USING THE I.D.

2    **Q.**  AND YOUR FIGURE 2 OF YOUR PATENT FROM 1992 SHOWS THE

3    ENCRYPTION OF THE PASSWORD GOING FROM THE SERVER TO THE

4    CLIENT?

5    **A.**  THE ENCRYPTION OF THE SECRET GOING TO THE CLIENT, YES.

6    **Q.**  CAN YOU DESCRIBE WHAT BOX 230 SHOWS?

7    **A.**  IT SHOWS THIS PROCESS BY WHICH WE USE THE I.D. TO ACCESS

8    THE SECRET, WHICH IS SPECIFIC TO THAT PARTICULAR FEATURE,

9    THAT'S THE PRODUCT, THE SECRET FOR THE PRODUCT.  AND THEN, WE

10   USE THE I.D., THE PASSWORDABLE I.D, AS I MENTIONED, TO ENCRYPT

11   THAT SECRET.  AND THEN, WE SEND THAT ENCRYPTED SECRET BACK TO

12   THE USER.  THIS IS THE POINT AT WHICH IT GETS CALLED THE

13   "PASSWORD" BECAUSE IT NOW PROVIDES ACCESS TO THE ADVANCED

14   FEATURES.  AND THAT'S WHAT IT SAYS.  AND WE SEND IT BACK TO

15   THE USER.

16   **Q.**  SO IN TERMS OF WHAT PERMITS THE USER TO ACCESS THE

17   SOFTWARE, THAT'S THIS PASSWORD THAT YOU ARE DESCRIBING?

18   **A.**  CORRECT.

19   **Q.**  IS THE SECRET TIED TO A PARTICULAR MACHINE?

20   **A.**  THE SECRET IS NOT -- THE SECRET IS GENERAL TO THE PRODUCT.

21   SO THE SAME SECRET IS INVOLVED ON EVERY MACHINE.

22   **Q.**  IS THE PERMISSION TIED TO THE MACHINE?

23   **A.**  YES, IT IS.

24   **Q.**  CAN YOU DESCRIBE HOW?

25   **A.**  THE MACHINE KNOWS OR CAN REGENERATE ITS I.D., AND SO IT

1   CAN USE THAT TO UN -- TO DECRYPT THE VERY SECRET THAT WE

2   ENCRYPTED ON THE SERVER SIDE.

3       BUT IT NEEDS TO HAVE THE SAME I.D. THAT IT CLAIMED IT HAD

4   WHEN IT PURCHASED THE PASSWORD.  SO IF YOU TRY TO USE THE I.D.

5   FROM A DIFFERENT MACHINE, YOU WON'T GET THE RIGHT ANSWER, AND

6   IT WON'T WORK.

7       SHOULD I TRY TO SAY THAT MORE SIMPLY?

8   Q.  IF YOU WANT TO SAY IT AGAIN MORE SIMPLY, SIMPLE IS GOOD.

9   A.  THIS WAS THE POINT OF THE WHOLE PATENT WAS TO MAKE SURE

10  THAT THE PASSWORD WE SENT TO ONE MACHINE WOULDN'T WORK IF IT

11  WAS TRANSFERRED TO ANOTHER MACHINE.

12      AND SO WE DIDN'T CARE IF PEOPLE TRANSFERRED IT TO ANOTHER

13  MACHINE.  THE WAY WE DID THAT WAS TO SEND IT OVER USING SOME

14  INFORMATION AVAILABLE ONLY TO THE MACHINE IN QUESTION.  THAT'S

15  THE I.D.  AND THAT I.D. COULD THEN BE USED TO UNLOCK THAT

16  PASSWORD ON THAT MACHINE SUCCESSFULLY.

17  Q.  LET'S ASSUME A PIRATE, SO TO SPEAK, BECAUSE WE HAVE HAD

18  PIRATE REFERENCES HERE, WAS ABLE TO INTERCEPT THE PASSWORD

19  COMING FROM YOUR LICENSING SERVER BACK TO THE USER AFTER THE

20  PAYMENT HAS BEEN MADE.  WOULD THAT INTERCEPTOR BE ABLE TO USE

21  THAT PASSWORD TO GAIN ACCESS TO COPIES?

22  A.  NOT ON A DIFFERENT MACHINE.

23  Q.  AND JUST WHY NOT, SO WE ARE CLEAR ON THAT?

24  A.  WELL, THE PASSWORD IS ENCRYPTED, SO IT IS NOT GOING TO BE

25  OF ANY USE TO THEM UNLESS THEY TRY TO ENCRYPT IT.  IN ORDER TO

SCHULL – DIRECT / REINES

1  ENCRYPT IT THEY WOULD NEED TO KNOW THE SOFTLOCK I.D. OF THE

2  MACHINE IT WAS INTENDED TO.  AND THEY DON'T KNOW THAT BECAUSE

3  THEY INTERCEPTED IT.  THEY WEREN'T RESIDING ON THE USER'S

4  MACHINE.

5  **Q.**  LET'S GO BACK TO FIGURE ONE, IF WE CAN.

6                        (PUBLISHED TO JURY.)

7     AND AFTER THE SECRET IS ENCRYPTED, WHERE IS IT SENT NEXT?

8  **A.**  IT IS SENT BACK TO THE USER, AND IT'S INSTALLED ON THE

9  USER'S MACHINE.

10 **Q.**  IS THAT INDICATED BY THE TRANSMIT PASSWORD?

11 **A.**  IT IS.

12 **Q.**  WHAT DOES BLOCK 100 REFLECT?

13 **A.**  THAT'S THE INSTALLATION OF THE PASSWORD PROCESS.  AND,

14 TYPICALLY, ALL WE DID WAS TO STORE THE PASSWORD IN A FILE ON

15 THE COMPUTER'S HARD DRIVE.

16 **Q.**  AND IN TERMS OF WHAT'S HAPPENING AT BLOCK 100, IS THAT

17 INSTALLATION HAPPENING BASED ON THE RECEIPT OF THE PERMISSION?

18 **A.**  THE RECEIPT OF THE PASSWORD.

19 **Q.**  THE PASSWORD.

20    NOW, THAT YOU'VE -- THE ENCRYPTED SECRET AT THE USER, DO

21 YOU HAVE ACCESS TO THE SOFTWARE?

22 **A.**  YES.

23 **Q.**  YOU MENTIONED THAT THE SECRET IS ENCRYPTED.  HOW IS IT

24 DECRYPTED?

25 **A.**  WE REGENERATE THE SOFTLOCK I.D., AND WE THEN USE THAT TO

1  DECRYPT THE INFORMATION IN THE PASSWORD.  THAT PRODUCES THE

2  SECRET FOR THE ADVANCED FEATURE IN QUESTION.  AND WE USE THE

3  SECRET TO UNLOCK THE ADVANCED FEATURE.

4  **Q.**  SO IF I UNDERSTAND YOU CORRECTLY, THE SECRET IS ENCRYPTED

5  AT THE SERVER AND DECRYPTED AT THE USER'S COMPUTER?

6  **A.**  CORRECT.

7  **Q.**  WHERE IS THE PERMISSION GENERATED IN YOUR SYSTEM?

8  **A.**  IT'S GENERATED BY THE SERVER.

9  **Q.**  AND IF ONE WANTED TO MOVE THE PERMISSION GENERATION

10  PROCESS FROM THE SERVER TO THE USER, WOULD IT BE DIFFICULT TO

11  DO THAT?

12  **A.**  NO.  YOU WOULD JUST MOVE THE CODE THAT RUNS ON THE SERVER

13  INTO THE CLIENT PROGRAM.

14  **Q.**  DOES THIS PATENT ACCURATELY REFLECT HOW YOUR SOFTLOCK

15  SYSTEM WORKED?

16  **A.**  YES.

17  **Q.**  AND WE'VE TALKED A BIT ABOUT THIS PARTICULAR PATENT.  IS

18  THIS THE ONLY PATENT YOU HAVE?

19  **A.**  NO.  I HAVE AT THIS POINT 18 PATENTS ON THIS TOPIC, I

20  THINK.

21  **Q.**  ARE THOSE ALL DRM?

22  **A.**  YEAH.

23  **Q.**  LET'S TALK ABOUT SOME SOFTLOCK DOCUMENTS, IF YOU WOULD.

24      **MR. REINES:**  LET'S CALL UP EXHIBIT 589.

25          (DISPLAYED ON SCREEN.)

SCHULL – DIRECT / REINES

1    **BY MR. REINES**

2    **Q.**  DO YOU HAVE IT IN FRONT OF YOU?

3    **A.**  UH-HUH.

4    **Q.**  YOU NEED TO ANSWER WITH A WORD?

5    **A.**  YES, SIR.

6    **Q.**  AND I AM SORRY ABOUT THAT.

7    **A.**  NO.  NO.  I APOLOGIZE.

8    **Q.**  WOULD YOU PLEASE STATE WHAT EXHIBIT 589 IS, FOR THE

9    RECORD?

10   **A.**  THIS IS A MARKETING DOCUMENT THAT WE CREATED TO EXPLAIN TO

11   A BOOK AND ARTICLE PUBLISHERS HOW THE SYSTEM WORKED AND WHAT

12   VALUE IT WOULD PROVIDE TO THEM.

13           **MR. REINES:**  YOUR HONOR, WE WOULD MOVE THIS DOCUMENT

14   INTO EVIDENCE.

15           **MR. DINOVO:**  NO OBJECTION.

16           **THE COURT:**  RECEIVED.

17       (DEFENDANT'S EXHIBIT 589 WAS RECEIVED IN EVIDENCE.)

18                   (PUBLISHED TO JURY.)

19   **BY MR. REINES**

20   **Q.**  WHO PREPARED THIS DOCUMENT?

21   **A.**  I DID.

22   **Q.**  WHEN?

23   **A.**  THIS WAS WHEN WE BEGAN WORKING WITH MCGRAW-HILL OR WHEN WE

24   TRIED TO GO FROM MCGRAW-HILL TO OTHER PUBLISHERS.  SO I THINK

25   IT WAS ABOUT '93 OR '94.

SCHULL – DIRECT / REINES

1   **Q.**  LET'S TURN TO PAGE 3, PLEASE.

2       AND WHY DON'T WE LOOK UNDER THE "HOW DO WE DO IT"

3   PARAGRAPH THERE?

4   **A.**  UM-HUM.

5        **MR. REINES:**  MATT, CAN WE EVEN –– EXCUSE ME ––

6   MR. BONINI, CAN WE PULL THAT PARAGRAPH UP EVEN BIGGER FOR

7   EVERYONE'S CONVENIENCE?

8       OKAY.  GOOD.

9   **BY MR. REINES**

10  **Q.**  IS THIS PARAGRAPH AN ACCURATE DESCRIPTION OF THE PRODUCT

11  THAT YOUR COMPANY SOLD?

12  **A.**  YES.

13  **Q.**  IS THIS DESCRIPTION CONSISTENT WITH WHAT IS DESCRIBED IN

14  YOUR PATENT?

15  **A.**  YES.

16  **Q.**  LET'S TURN TO PAGE 5 OF THIS DOCUMENT.

17                      (PUBLISHED TO JURY.)

18      AND IS THIS FIGURE CONSISTENT WITH WHAT YOU JUST DESCRIBED

19  ABOUT YOUR PATENT?

20  **A.**  YES, IT IS.

21  **Q.**  AND HOW IT WORKS?

22  **A.**  YES, IT IS.

23  **Q.**  SO IT DISCLOSES THE SAME PROCESS; IS THAT CORRECT?

24  **A.**  YEP.

25  **Q.**  ALL RIGHT.  I WOULD LIKE TO REFERENCE EXHIBIT 614, AND

1    BRING THAT UP FOR IDENTIFICATION.

2                    (DISPLAYED ON SCREEN.)

3        IT SHOULD BE ON YOUR SCREEN, AND ALSO FEEL FREE TO LOOK AT

4    THE HARD COPY, IF THAT IS YOUR PREFERENCE.

5    **A.**  UH-HUH.

6    **Q.**  PLEASE IDENTIFY THIS FOR THE RECORD.

7    **A.**  THIS IS A DESCRIPTION OF A SOFTLOCK PRODUCT THAT WE HAD ON

8    DOWNTOWN ANYWHERE, THE WEBSITE WE WERE USING TO SELL AND

9    MARKET OUR SERVICES.

10   **Q.**  YOU AUTHORED THIS DOCUMENT?

11   **A.**  I DID.

12           **MR. REINES:**  YOUR HONOR, WE WOULD MOVE EXHIBIT 614

13   INTO EVIDENCE, REFLECTING THE SOFTLOCK SYSTEM.

14           **MR. DINOVO:**  NO OBJECTION.

15          **THE COURT:**  RECEIVED.

16       (DEFENDANT'S EXHIBIT 614 WAS RECEIVED IN EVIDENCE.)

17                  (PUBLISHED TO JURY.)

18   **BY MR. REINES**

19   **Q.**  WHERE IS THIS DOCUMENT FROM?  WHERE WAS THIS -- WAS THIS

20   ON THE SOFTLOCK WEB PAGE?

21   **A.**  IT WAS ON ONE OF THE SOFTLOCK WEB PAGES AT THE WEBSITE

22   CALLED "DOWNTOWN ANYWHERE.COM."

23   **Q.**  AND DO YOU SEE THE DATE AT THE BOTTOM?

24   **A.**  I DO.

25   **Q.**  CAN YOU JUST --

1    **A.**  JANUARY 14TH, 1996.

2    **Q.**  JUST MAKING SURE WE ARE NOT USING THE EUROPEAN SYSTEM.  I

3    GUESS THE 14 HELPS US WITH THAT.

4         CAN YOU PLEASE READ THE THIRD PARAGRAPH?

5    **A.**  (READING)

6              "THE SECOND METHOD IS SOFTLOCK ENCRYPTION.  YOU CAN

7              ENCRYPT DATA WHICH IS ESSENTIAL TO YOUR ADVANCED

8              FEATURE, AND THEN THE VALID PASSWORD IS REQUIRED IN

9              ORDER TO ACCESS THE DATA.  THE SOFTLOCK PASSWORD

10             ITSELF IS PART OF THE KEY USED TO DECRYPT THE DATA.

11             SO EVEN IF A HACKER WERE TO FOOL YOUR PROGRAM INTO

12             THINKING A BOGUS PASSWORD WAS VALID, THE CRUCIAL DATA

13             WOULD STILL BE INACCESSIBLE."

14   **Q.**  AND THIS REFERS TO THE ENCRYPTION PROCESS DESCRIBED IN

15   YOUR PATENT, OR RELATES TO IT, ANYWAY?

16   **A.**  SURE.

17   **Q.**  IF THE UNDERLYING CONTENT IS ENCRYPTED, HOW DOES ONE GET

18   ACCESS TO THE CONTENT?

19   **A.**  WELL, THERE ARE A NUMBER OF WAYS.  BUT, TYPICALLY, YOU

20   WOULD USE THE SECRET, WHICH WE TALKED ABOUT BEFORE, AND YOU

21   WOULD THEN USE IT AS A DECRYPTION KEY TO DECRYPT THE CONTENT

22   IN QUESTION.

23   **Q.**  I WOULD LIKE TO DIRECT YOUR ATTENTION TO EXHIBIT 639 FOR

24   IDENTIFICATION.

25                     (DISPLAYED ON SCREEN.)

SCHULL - DIRECT / REINES

```
1    Q.  IF YOU WOULD PLEASE LOOK AT EXHIBIT 639.  AGAIN, WHETHER

2    SOFT COPY OR HARD COPY IS MORE CONVENIENT IS YOUR CHOICE.

3        AND CAN YOU DESCRIBE THIS FOR THE RECORD?

4    A.  THIS WAS AN INTERNAL MEMO CALLED "THE SOFTLOCK TRUTH BOOK"

5    THAT WE USED TO HELP US KEEP STRAIGHT IN WHAT OUR VARIOUS

6    PROCEDURES AND METHODS WERE.

7    Q.  WHO AUTHORED THE DOCUMENT?

8    A.  I DID.

9        MR. REINES:  YOUR HONOR, WE WOULD MOVE EXHIBIT 639

10   INTO EVIDENCE REFLECTING THE SOFTLOCK SYSTEM.

11       MR. DINOVO:  NO OBJECTION, YOUR HONOR.

12       THE COURT:  RECEIVED.

13       (DEFENDANT'S EXHIBIT 639 WAS RECEIVED IN EVIDENCE.)

14   BY MR. REINES

15   Q.  DOES THE SOFTLOCK TRUTH BOOK INCLUDE SOURCE CODE?

16   A.  IT INCLUDES SNIPPETS OF SOURCE CODE.

17   Q.  AND DO YOU SEE A DATE FOR THIS DOCUMENT?

18   A.  JANUARY 23RD, 1993.

19   Q.  CAN YOU TURN TO THE SECOND PAGE, AND ABOUT HALFWAY DOWN IT

20   SAYS "SECRET"?  IS THIS THE SECRET THAT'S DISCUSSED IN YOUR

21   PATENT?

22   A.  YES, IT IS.

23   Q.  CAN YOU READ OUT LOUD INTO THE RECORD WHERE IT BEGINS:

24       "THE PASSWORD IS, IN FACT"?

25   A.  (READING)
```

1          "THE PASSWORD IS, IN FACT, AN ENCRYPTION OF THE

2              SECRET WITH THE SOFTLOCK I.D. USED AS KEY.  WHEN A

3              CANDIDATE PASSWORD IS SUBMITTED" --

4      YOU WANT ME TO GO ON?

5  **Q.**  I THINK THAT'S SUFFICIENT.

6      IS THAT ACCURATE AND CONSISTENT WITH YOUR PATENT?

7  **A.**  YES, SIR.

8  **Q.**  SO IT DISCLOSES -- THIS DISCLOSES THE SAME THING THAT IS

9  IN YOUR PATENT, CORRECT?

10  **A.**  YES.

11  **Q.**  ALL RIGHT.  WHY DON'T WE READ THAT NEXT SENTENCE NOW?

12  **A.**  (READING)

13          "WHEN A CANDIDATE PASSWORD IS SUBMITTED THE LOGICALLY

14              AVAILABLE SOFTLOCK I.D. IS USED TO DECRYPT THE

15              CANDIDATE'S SECRET."

16  **Q.**  AGAIN, THAT'S THE SAME DECRYPTION THAT IS DISCLOSED IN

17  YOUR PATENT?

18  **A.**  YES.

19  **Q.**  DOES THAT STATE THAT THE SECRET IS DECRYPTED AT THE CLIENT

20  BY THE MACHINE I.D.?  IS THAT WHAT THAT MEANS?

21  **A.**  THAT IS EXACTLY WHAT IT MEANS.

22  **Q.**  AND, AGAIN, THAT'S WHAT YOUR PATENT TEACHES TO?

23  **A.**  YES.

24  **Q.**  THE THREE DOCUMENTS WE JUST LOOKED AT, DO THEY DESCRIBE

25  THE SAME SYSTEM?

 1    **A.**  THEY DO.

 2    **Q.**  DURING YOUR TIME AT SOFTLOCK, WERE YOU FOLLOWING THE DRM

 3    INDUSTRY?

 4    **A.**  YES.

 5    **Q.**  DID YOU KNOW WHO THE MAJOR COMPANIES WERE IN THE DRM

 6    SPACE?

 7    **A.**  MOST OF THEM.

 8    **Q.**  AND THAT WAS FROM THIS -- I GUESS FROM 1990, UP TO AROUND

 9    2002?

10    **A.**  YES.

11    **Q.**  IS THAT YOUR WINDOW?

12        CAN YOU NAME A FEW OF THOSE COMPANIES THAT WERE PROMINENT

13    IN THE DRM SPACE?

14    **A.**  INTERTRUST, WHICH INTRODUCED ME TO THE PHRASE "DRM."  SO

15    WE HAD BEEN DOING THIS FOR A WHILE, BUT THEY MADE THAT TERM

16    POPULAR.  CONTENTGUARD WERE THE MAJOR PLAYERS THAT COME TO

17    MIND.

18    **Q.**  HAD YOU EVER HEARD OF DRM TECHNOLOGIES?

19    **A.**  NO.

20    **Q.**  DIGITAL CONTAINERS?

21    **A.**  NOT AS A BUSINESS NAME.

22    **Q.**  PATRICK PATTERSON?

23    **A.**  NO.

24    **Q.**  DESKGATE?

25    **A.**  NO.

1   **Q.** HAVE YOU EVER HEARD OF THE '541 PATENT?  DOES THAT RING A

2   BELL?

3   **A.** DOES NOT.

4   **Q.** AND HAVE YOU EVER HEARD OF DIGITAL REG?

5   **A.** NOT BEFORE THIS ENGAGEMENT.

6   **Q.** HAVE YOU EVER HEARD OF THE '670 PATENT?

7   **A.** NO.

8            **MR. REINES:**  NO FURTHER QUESTIONS, YOUR HONOR.

9                    **CROSS-EXAMINATION**

10  **BY MR. DINOVO**

11  **Q.** GOOD MORNING, PROFESSOR SCHULL.

12  **A.** GOOD MORNING.

13  **Q.** I WOULD LIKE TO TALK A LITTLE BIT MORE ABOUT YOUR SOFTLOCK

14  SYSTEM, IF WE COULD.

15      I THINK YOU SAID YOU WERE BEING COMPENSATED BY ADOBE FOR

16  YOUR TIME?

17  **A.** CORRECT.

18  **Q.** AT 450 AN HOUR?

19  **A.** CORRECT.

20  **Q.** HAVE YOU EVER ALSO ENGAGED ADOBE'S LAWYERS TO REPRESENT

21  YOU?

22  **A.** NO.

23  **Q.** WOULD IT SURPRISE YOU TO KNOW THAT WE WERE TOLD THAT WE

24  COULDN'T CONTACT YOU EXCEPT THROUGH THEM?

25  **A.** I DON'T KNOW HOW THIS WORKS, SO I'LL -- I'M NOT SURE

1    WHETHER I WOULD BE SURPRISED OR INFORMED.

2    **Q.**  ALL RIGHT.  LET'S LOOK --

3        **MR. REINES:**  OBJECTION, YOUR HONOR.  THERE IS NO

4    EVIDENCE IN THE RECORD THAT --

5        **THE COURT:**  THE LAWYERS' QUESTIONS ARE NOT EVIDENCE.

6    **BY MR. DINOVO**

7    **Q.**  ALL RIGHT.  LET'S PUT UP ADOBE'S WITNESS LIST FOR THE

8    PRETRIAL, IF WE COULD.

9                    (DISPLAYED ON SCREEN.)

10       **THE COURT:**  WELL, THIS IS IRRELEVANT.  MOVE ON.

11       **MR. DINOVO:**  ALL RIGHT, YOUR HONOR.

12   **BY MR. DINOVO**

13   **Q.**  ALL RIGHT.  LET'S LOOK AT FIGURE ONE OF YOUR PATENT, SIR.

14       **MR. DINOVO:**  MS. MASON, IF YOU CAN CALL UP 418,

15   PAGE 2.

16                    (PUBLISHED TO JURY.)

17     IF YOU COULD ZOOM INTO THE BOTTOM, SAY, THIRD OF THE

18   DIAGRAM SO WE CAN SEE IT.

19   **BY MR. DINOVO**

20   **Q.**  I JUST WANT TO FOCUS IN ON THIS ONE PART OF THE FLOW

21   CHART.  I AGREE WITH COUNSEL FOR ADOBE.  THERE IS A LOT GOING

22   ON HERE.  BUT WE SEE THE GENERATION OF A PASSWORD, RIGHT, IN

23   THE BOX ON THE RIGHT THERE?

24   **A.**  CORRECT.

25   **Q.**  OKAY.  AND THAT SAME PASSWORD THAT IS GENERATED AT THE

1    SERVER IS THEN TRANSMITTED TO THE CLIENT, RIGHT?

2    **A.**  CORRECT.

3    **Q.**  AND THE IDENTICAL THING THERE CALLED THE "PASSWORD,"

4    WHICH, I THINK, IS A CAP P IN YOUR PATENT?

5    **A.**  IS A WHAT?

6    **Q.**  I THINK IT HAS A CAP P AS IF IT IS SORT OF BEING

7    DEFINED --

8    **A.**  THAT'S CORRECT.

9    **Q.**  -- IS THEN INSTALLED AT THE CLIENT, RIGHT?

10   **A.**  CORRECT.

11   **Q.**  NOW, I THINK YOU TESTIFIED THAT EVEN IF THIS PASSWORD WERE

12   COPIED, YOU DON'T CARE.

13   **A.**  CORRECT.

14   **Q.**  BECAUSE IT'S STILL ENCRYPTED, RIGHT?

15   **A.**  THAT'S ONE REASON WE DON'T CARE.

16   **Q.**  BUT IT IS STORED IN AN ENCRYPTED FASHION THE SAME WAY IT

17   WAS GENERATED AT THE SERVER AND TRANSMITTED.

18   **A.**  YES.

19   **Q.**  DOES THIS PASSWORD CONTAIN A LIST OF PERMISSIONS THAT THE

20   USER CAN USE?

21   **A.**  NO.

22   **Q.**  DOES IT INDICATE WHEN THE USER CAN'T DO THINGS?

23   **A.**  IT HAS IMPLICATIONS FOR WHETHER THE USER CAN OR CAN'T DO

24   THINGS.

25   **Q.**  WELL, SPECIFICALLY, WHETHER THAT PERSON CAN DECRYPT THE

1   SOFTWARE, RIGHT?

2   **A.**   IT DETERMINES WHETHER THE USER CAN DECRYPT THE SOFTWARE.

3   **Q.**   AND THAT'S IT?

4   **A.**   YEAH.

5   **Q.**   WHEN DID YOU FILE THE '070 PATENT?  I'M NOT TRYING TO QUIZ

6   YOU IF YOU WOULD LIKE TO LOOK AT IT. IT WAS '92, RIGHT?

7   **A.**   THAT'S CORRECT.

8   **Q.**   YOU RELEASED A PRODUCT THAT CONFORMED TO THIS SORT OF MORE

9   AUTOMATED PROCESS WHEN?

10  **A.**   WITHIN A YEAR OF THAT.

11  **Q.**   OKAY.  DID YOU FEEL THAT YOU WORKED DILIGENTLY OVER THAT

12  PERIOD?

13  **A.**   IN WHAT SENSE?

14  **Q.**   DID YOU WORK HARD TO DEVELOP THIS TECHNOLOGY?

15  **A.**   YES, SIR.

16  **Q.**   AND YOU FELT THAT THAT WASN'T INCONSISTENT THAT IT TOOK

17  YOU A FULL YEAR TO GET THIS ROLLED OUT?

18  **A.**   NO.

19  **Q.**   NOW, WHEN DID --

20  **A.**   I'M NOT SURE IT DID TAKE US A FULL YEAR.  WITHIN A YEAR WE

21  HAD THE PRODUCT IN ACTION.

22  **Q.**   OKAY.  FAIR ENOUGH.

23       NOW, WHEN DID YOUR COMPANY CEASE OPERATIONS?

24  **A.**   2001.

25  **Q.**   SO, IT WAS AROUND FOR WHAT, NINE -- YOU SAID 12 YEARS; IS

1    THAT RIGHT?

2    **A.**  (WITNESS NODS HEAD.)

3    **Q.**  AND THE FACT THAT IT FAILED YOU DON'T THINK IS REFLECTIVE

4    OF THE FACT THAT YOUR TECHNOLOGY WAS BAD, DO YOU?

5    **A.**  I DO NOT.

6    **Q.**  LET'S TURN TO EXHIBIT 614.

7         **MR. DINOVO:**  NOW, THIS DOCUMENT, MS. MASON, IF YOU

8    CAN PULL UP 614.001.  AND IF YOU CAN GO TO THE VERY TOP RIGHT

9    CORNER OF THE DOCUMENT.  IT IS ALMOST INVISIBLE.

10   **BY MR. DINOVO**

11   **Q.**  WHAT IS THIS FILE PATH INDICATE?

12   **A.**  THIS SHOWS THAT IT WAS RESIDING ON THE C DRIVE OF

13   SOMEONE'S HARD DISK IN A HTML DOCUMENT.

14   **Q.**  DID YOU PULL THIS OFF OF A HARD DISK RECENTLY?

15   **A.**  NO.

16   **Q.**  IT DOESN'T HAVE A URL ON IT?

17   **A.**  THAT'S CORRECT.

18   **Q.**  SO THIS IS A DOCUMENT THAT I UNDERSTAND YOUR TESTIMONY TO

19   BE WAS PUT ON THE INTERNET, BUT THIS ISN'T ACTUALLY A WEB

20   PAGE, RIGHT?

21   **A.**  THIS WAS RETRIEVED FROM A HARD DRIVE, NOT THROUGH A WEB

22   BROWSER.  BUT IT WAS, IN FACT, ALTERED TO BE A WEB PAGE.

23   **Q.**  CAN YOU SAY WITH ANY SPECIFICITY WHEN THIS WAS ACTUALLY

24   PUT ON A WEB PAGE?

25   **A.**  WITHIN THE FIRST -- WHEN DOWNTOWN ANYWHERE OPENED -- I

1    DON'T REMEMBER THAT YEAR.  I'M GOING TO GUESS IT WAS '93 OR

2    '94 -- THIS WAS AMONG THE VERY FIRST THINGS ON THAT WEBSITE,

3    BECAUSE THAT IS ONE OF THE REASONS WE CREATED THAT WEBSITE.

4    Q.  WHEN DID YOU CREATE THE SOFTLOCK.COM WEBSITE?  DO YOU

5    RECALL?

6    **A.**  LATER.

7    Q.  DO YOU RECALL THE DATE?

8    **A.**  I DON'T RECALL THE DATE.  EVENTUALLY, DOWNTOWN ANYWHERE

9    AND SOFTLOCK PARTED COMPANY IN ORDER TO DISENTANGLE THESE TWO

10   BUSINESSES.  AT AROUND THE SAME TIME WE CHANGED THE NAME OF

11   SOFTLOCK SERVICES INC. TO SOFTLOCK.COM.  AND AT THAT POINT WE

12   CREATED OUR OWN WEBSITE.

13   Q.  DOES 1998 SOUND ABOUT RIGHT?

14   **A.**  THAT SOUNDS LATE TO ME.

15        **MR. DINOVO:**  MS. MASON, IF YOU CAN PULL BACK --

16   **BY MR. DINOVO**

17   Q.  ARE YOU FAMILIAR, SIR, WITH THE WAYBACK MACHINE?

18   **A.**  I AM.

19   Q.  AND YOU KNOW THAT IT ATTEMPTS TO RECORD OLD VERSIONS OF

20   WEBSITES?

21   **A.**  YES.

22   Q.  LET ME SEE IF THIS REFRESHES YOUR RECOLLECTION.

23        **MR. DINOVO:**  MS. MASON, IF YOU CAN PULL THE

24   JANUARY 15TH, 1998 WAYBACK MACHINE FOR SOFT --

25        **MR. REINES:**  EXCUSE ME.  IS THIS IN EVIDENCE?

1    **MR. DINOVO:**  NO.  IT IS NOT IN EVIDENCE.

2    **BY MR. DINOVO**

3    **Q.**  SIR, YOU HAVE A BINDER IN FRONT OF YOU THAT YOU CAN REFER

4    TO.

5    **A.**  OKAY.

6    **Q.**  AND YOU WILL SEE ONE OF THE TABS SAYS "JANUARY 15TH,

7    '98 SOFTLOCK HOME PAGE."

8    **A.**  ACTUALLY, I DON'T SEE THAT.

9         **THE COURT:**  YOU CAN SHOW IT TO THE WITNESS WITHOUT

10   SHOWING IT TO THE JURY.  IT IS ON THE WITNESS' SCREEN NOW.

11        **MR. DINOVO:**  MAY I APPROACH, YOUR HONOR?

12        **THE WITNESS:**  I HAVE IT ON SCREEN.

13        **MR. DINOVO:**  OH, YOU DO?

14        **THE WITNESS:**  ON THE SCREEN, YES.

15        **THE COURT:**  I JUST SAID YOU CAN SHOW IT TO THE

16   WITNESS WITHOUT SHOWING IT TO THE JURY, AND IT IS ON THE

17   SCREEN NOW.

18        **MR. DINOVO:**  THANK YOU, YOUR HONOR.

19      MAY I APPROACH WITH THE BINDER?

20        **THE COURT:**  YES.

21             (BINDER HANDED TO WITNESS.)

22        **THE WITNESS:**  THANK YOU.

23   **BY MR. DINOVO**

24   **Q.**  ALL RIGHT, SIR.  LOOKING AT THIS PAGE, DO YOU SEE ON THE

25   TOP RIGHT CORNER THERE IS AN INDICATION OF JANUARY 15TH, 1998?

1    **A.**  I AM SORRY.  I DO NOT.

2    **Q.**  IT'S --

3    **A.**  I AM SORRY.  GO ALL THE WAY DOWN?

4    **Q.**  I AM SORRY?

5         **THE COURT:**  ALL THE WAY UP.  IT IS ON THE TOP RIGHT.

6    **BY MR. DINOVO**

7    **Q.**  THE TOP RIGHT CORNER.

8    **A.**  AH, THERE WE GO.  I SEE A DATE OF 21, DECEMBER --THERE YOU

9    GO.

10   **Q.**  ALL RIGHT.

11   **A.**  I DO SEE THAT DATE, YES.

12   **Q.**  AND THIS INDICATES FROM SOFTLOCK.COM.  YOU SEE THE LITTLE

13   CAPTION BOX FROM WAYBACK ON THE TOP?

14   **A.**  YES.

15   **Q.**  OKAY.  AND THIS INDICATES STILL THE USE OF THE FRONT

16   STREET WEB PAGE?

17   **A.**  YES.

18   **Q.**  ALL RIGHT.  AND LET'S TURN TO THE FOLLOWING EXHIBIT, WHICH

19   HAS A DATE OF MAY 24TH, '98.

20   **A.**  OKAY.

21   **Q.**  AND NOW IT LOOKS LIKE THERE'S A SOFTLOCK.COM WEB PAGE,

22   RIGHT?

23   **A.**  CORRECT.

24   **Q.**  DOES THAT REFRESH YOUR RECOLLECTION AS TO THE TIMING AS TO

25   WHEN YOU LAUNCHED THAT?

1    **A.**   WELL, IT DOES.  WHEN I -- THIS REMINDS ME THAT

2    SOFTLOCK.COM -- THE PREVIOUS IMAGE THAT YOU SHOWED ME REMINDS

3    ME THE SOFTLOCK.COM OVERLAPPED WITH DOWNTOWN ANYWHERE, INC.,

4    AND THAT WE WERE SERVING -- PROVIDING SERVICES THROUGH

5    DOWNTOWN ANYWHERE WITH THE NAME SOFTLOCK.COM.

6        WITH REGARD TO THE DATE OF THIS MATERIAL, THIS SHOWS THAT

7    IT WAS STILL ON THE WEB IN 1998.  IT DOESN'T SAY WHEN IT

8    SHOWED UP ON THE WEB.  AND I STILL DON'T HAVE A GOOD

9    RECOLLECTION OF WHEN THAT WAS.

10   **Q.**   OKAY.  FAIR ENOUGH.

11       LET'S TURN TO EXHIBIT 639, WHICH HAS BEEN ADMITTED INTO

12   EVIDENCE.

13                        (PUBLISHED TO JURY.)

14       LET'S LOOK AT THE FIRST PAGE OF THAT DOCUMENT.  SO, THIS

15   IS CALLED THE "SOFTLOCK TRUTH BOOK"?

16   **A.**   UH-HUH.  YES, SIR.

17   **Q.**   AND SO WHAT'S THE NATURE OF THIS DOCUMENT?

18   **A.**   THIS WAS AN INTERNAL MEMO THAT THE PROGRAMMERS AND I USED

19   TO KEEP TRACK OF OUR METHODS AND JUDGMENTS, DECISIONS.

20   **Q.**   IT WAS INTERNAL.  IT WAS NEVER MADE PUBLIC?

21   **A.**   NO.  THIS CONTAINS SECRETS.

22   **Q.**   OKAY.

23   **A.**   PROPRIETARY INFORMATION.

24   **Q.**   THANK YOU.  AND, IN FACT, ON THE FIRST PAGE THERE, IF YOU

25   BLOW UP THE FIRST PARAGRAPH, YOU HAD A KEY TO INDICATE

1    PROPRIETARY INFORMATION OF THREE ASTERISKS, IF THAT IS THE

2    RIGHT PLURAL.

3    **A.**  CORRECT.

4    **Q.**  AND SO LET'S MOVE DOWN LOWER ON THAT SAME PAGE.  YOU HAVE

5    A DESCRIPTION OF THE PASSWORD.  AND WHAT WAS THE FORM, THE

6    DATA FORMAT OF THE PASSWORD THAT YOU WERE REFERRING TO?  THIS

7    THING THAT WAS GENERATED AT THE SERVER, TRANSMITTED TO THE

8    CLIENT AND STORED.

9    **A.**  IT WAS A STRING OF LETTERS.  AND, IN FACT, IT WAS NOT ALL

10   POSSIBLE LETTERS.  IT WAS WHAT WE CALLED "PROHEX." IT WAS A

11   WAY OF PROVIDING THAT INFORMATION SO THAT PEOPLE WOULDN'T

12   CONFUSE THE SOUND OF AN M AND AN N OVER THE PHONE.

13   **Q.**  PROHEX, THAT IS DIFFERENT THAN HEXADECIMAL?

14   **A.**  RIGHT.  IT WAS EXPRESSING HEXADECIMAL, BUT USING A LIMITED

15   ALPHABET.  SO IF I SAID YOUR PASSWORD IS PMN -- NO, THAT

16   WOULDN'T WORK.  IF I SAID YOUR PASSWORD IS PMR, THEN EVEN IF

17   YOU THOUGHT YOU HAD HEARD BNR, IT WOULD WORK.

18   **Q.**  OKAY.  AND YOU CHARACTERIZED THAT AS A STRING, RIGHT?

19   **A.**  CORRECT.

20   **Q.**  THAT IS NOT A FILE?

21   **A.**  CORRECT.

22         **MR. DINOVO:**  AND IF YOU PULL UP 639.007, THE FIRST

23   ENTRY THERE.  YES, THANK YOU.

24                    (DISPLAYED ON SCREEN.)

25

1  **BY MR. DINOVO:**

2  **Q.**  THIS IS CONSISTENT, THEN, THAT IT SAYS:

3        "IT IS THE STRING ORIGINALLY GIVEN TO THE CUSTOMER BY

4        SLS AS THE PASSWORD, WE HOPE."

5  **A.**  CORRECT.  THAT IS WHAT IT SAYS.

6  **Q.**  WHAT DOES IT MEAN BY "GIVEN TO THE CUSTOMER BY SLS"?

7  **A.**  SLS IS SOFTLOCK SERVICES.  AND SO THIS IS THE STEP IN

8  WHICH WE HAVE TRANSMITTED THE PASSWORD FROM THE SERVER TO THE

9  CLIENT.

10  **Q.**  OKAY.  LET'S GO TO 639.11.

11                          (PUBLISHED TO JURY.)

12      AND I'M LOOKING FOR THE PART WHERE IT SAYS -- IT'S

13  TOWARD -- YES, THERE YOU GO.

14      A STRING -- "A PASSWORD IS A STRING ENTERED BY THE USER."

15  IS THAT ACCURATE?

16  **A.**  IT IS ACCURATE.  AND THIS WAS -- WHEN THIS PARTICULAR

17  PHRASE WAS WRITTEN THE TYPICAL PROCESS WAS THAT THE CUSTOMER

18  WOULD BE TOLD THE PASSWORD OVER THE PHONE, AND IT WAS THEIR

19  JOB TO ENTER IT ONTO THEIR LOCAL MACHINE.

20  **Q.**  OKAY.

21  **A.**  IN LATER CASES IT WASN'T MANUALLY ENTERED BY THE CUSTOMER.

22  **Q.**  IN THAT CASE IT WAS THE PASSWORD THAT WAS TRANSMITTED DOWN

23  FROM THE SERVER?

24  **A.**  YES.

25  **Q.**  BUT IN BOTH CASES IT WAS THE SAME STRING OF EIGHT

1    CHARACTERS?

2    **A.**  OR EQUIVALENT.

3          **MR. DINOVO:**  NOW, IF WE CAN GO BACK TO 639.2.

4                    (PUBLISHED TO JURY.)

5    **A.**  LET ME BE CLEAR.

6    **Q.**  ALL RIGHT.

7    **A.**  IF IT IS BEING TRANSMITTED FROM SERVER TO CLIENT DIRECTLY

8    THERE WOULD HAVE BEEN NO NEED TO PUT IT INTO THAT

9    PRONOUNCEABLE HEX FORMAT.  AND SO I DON'T REALLY KNOW WHETHER

10   WE BOTHERED TO DO THAT.  MY GUESS IS THAT WE DIDN'T.

11   **Q.**  IN THAT CASE IT WOULD BE JUST A STRING OF NUMBERS?

12   **A.**  NUMBERS OR LETTERS OR CHARACTERS, YES.

13   **Q.**  OKAY.  SO 639.002, THERE IS A PASSAGE -- I'M TRYING TO

14   FIND IT ON THE PAGE.

15          **MR. DINOVO:**  YES, THANK YOU. MS. MASON IS AHEAD OF

16   ME, AS USUAL.

17   **BY MR. DINOVO**

18   **Q.**  IT SAYS:

19          "SOFTLOCK PRODUCTS AND THE SOFTLOCK LIBRARY DO NOT

20          CONTAIN THE PASSWORDS THEY REQUIRE FOR FULL

21          FUNCTIONALITY AND THEY DON'T KNOW HOW TO GENERATE

22          THEM."

23     CAN YOU EXPLAIN TO ME WHAT YOU MEAN BY THE FACT THAT

24   SOFTLOCK PRODUCTS DON'T KNOW HOW TO GENERATE PASSWORDS?

25   **A.**  YES.  THE POINT OF THE SYSTEM WAS TO SAY THAT THE

1    PASSWORDS HAVE TO COME ON FROM THE SERVER.  AND SO WE SAW TO

2    IT THAT THE CLIENT COULD REQUEST PASSWORDS FROM THE SERVER,

3    BUT IT COULDN'T GENERATE VALID PASSWORDS ON ITS OWN.

4    Q.  OKAY.  I THINK THAT'S CONFIRMED AT THE BOTTOM OF THE

5    PARAGRAPH THERE WHERE IT SAYS "EVEN THOUGH" -- THE SAME

6    PARAGRAPH, BUT THE LAST SENTENCE:

7          "EVEN THOUGH THEY DON'T KNOW HOW TO GENERATE VALID

8          PASSWORDS."

9    A.  CORRECT.

10   Q.  OKAY.  AND NOW THE NEXT PARAGRAPH HAS A REFERENCE TO

11   "SECRET."  DO YOU SEE THAT?

12   A.  YEP.

13   Q.  AND TALKS ABOUT THE SECRET, AND IT REFERS TO IN THE THIRD

14   FULL SENTENCE:

15         "SECRETS ARE GENERATED FROM PRODUCT NUMBERS USING A

16         HIGHLY PROPRIETARY ROUTINE, WHICH IS NOT INCLUDED IN

17         THE PROGRAMMER'S TOOL KIT."

18   WHAT DID YOU MEAN BY "HIGHLY PROPRIETARY"?

19   A.  WE MEANT THIS WAS A SECRET, IN ANOTHER SENSE.  THIS WAS A

20   TRADE SECRET THAT WE STORED ON THE SERVER SIDE SO THAT IT

21   COULDN'T BE ACCESSED BY A HACKER PLAYING WITH THE

22   REDISTRIBUTABLE PRODUCT.

23   Q.  SO THAT WASN'T DISCLOSED IN YOUR 1992 APPLICATION?

24   A.  NO, I THINK IT WAS.

25   Q.  WELL, THIS WAS SUBSEQUENT TO THAT, RIGHT?

1   **A.**  DOESN'T MEAN IT WASN'T TRUE EARLIER.

2   **Q.**  SO YOU'RE SAYING THAT THIS IS INACCURATE AT THE TIME?

3   **A.**  NO.  I AM SORRY.  MAYBE I DIDN'T UNDERSTAND YOUR QUESTION.

4   **Q.**  I'M SAYING THIS HIGHLY PROPRIETARY ROUTINE, WAS THAT HELD

5   AS A TRADE SECRET?

6   **A.**  IT WAS.

7   **Q.**  OKAY.  WAS IT REVEALED AT SOME POINT?

8   **A.**  NOT DURING THE OPERATION OF THE BUSINESS.

9   **Q.**  OKAY.  I GUESS IT IS BEING REVEALED TODAY, BUT DURING THE

10  RELEVANT TIME PERIOD UNTIL YOU CLOSED THE DOORS IT WAS HELD AS

11  HIGHLY PROPRIETARY?

12  **A.**  THAT'S RIGHT.  BUT THE EXISTENCE OF IT WAS NOT A SECRET.

13  THE EXISTENCE OF IT WAS SOMETHING WE BOASTED IN OUR MARKETING

14  INFORMATION, BECAUSE IT EXPLAINED WHY OUR SYSTEM WAS -- WAS AS

15  GOOD AS IT WAS.

16  **Q.**  OKAY.  BUT THE ROUTINE ITSELF WAS HELD AS HIGHLY

17  PROPRIETARY?

18  **A.**  YES.

19  **Q.**  OKAY.

20  **A.**  AND IN ANSWER TO YOUR EARLIER QUESTION, THE FACT THAT THE

21  PROPRIETARY ROUTINE WOULD BE STORED ON THE SERVER WAS, I

22  THINK, DISCLOSED IN THE PATENT.

23  **Q.**  OKAY.  NOW, IF YOU TURN TO 639.005.

24              (PUBLISHED TO JURY.)

25  AND THE SECOND PARAGRAPH, THERE IS A NUMBER OF QUESTION

1    MARKS HERE AFTER "INTERNAL FUNCTIONS."  WHAT DOES THAT

2    INDICATE?

3    **A.**  WE NEEDED MORE INFORMATION.

4    **Q.**  OKAY.  SO, DO I GATHER THAT THIS SYSTEM WASN'T FULLY

5    BAKED, IF YOU WILL, AT THIS TIME?

6    **A.**  NO.  THE DOCUMENT WASN'T FULLY BAKED.  THAT IS WHAT THE

7    QUESTION MARKS INDICATE IS THAT OUR TRUTH BOOK IS INCOMPLETE.

8    IT DOESN'T CAPTURE ALL OF THE TRUTH OF WHAT WE DO.

9    **Q.**  I SEE.  SO YOU ARE SAYING THE DOCUMENT ITSELF NEEDED

10   FURTHER WORK?

11   **A.**  YES.

12   **Q.**  I SEE.  I THINK YOU TESTIFIED THAT YOU COULD HAVE

13   GENERATED THE PASSWORD AT THE CLIENT, RIGHT?

14   **A.**  IF WE HAD ORGANIZED THE CODE BASE DIFFERENTLY.

15   **Q.**  OKAY.  AND THAT ISN'T HOW YOU DID IT?

16   **A.**  CORRECT.

17   **Q.**  AND, IN FACT, YOU SPECIFICALLY CALLED OUT IN THIS TRUTH

18   BOOK THAT YOU DIDN'T -- THE CLIENTS DIDN'T KNOW HOW TO

19   GENERATE THE PASSWORD?

20   **A.**  CORRECT.

21           **MR. DINOVO:**  THANK YOU, SIR.

22      NO FURTHER QUESTIONS AT THIS TIME.

23           **MR. REINES:**  NOTHING, YOUR HONOR.

24           **THE COURT:**  ALL RIGHT.  YOU ARE EXCUSED.  THANK YOU.

25   YOU MAY STEP DOWN.

1      YOU MAY CALL YOUR NEXT WITNESS.

2          **MR. REINES:**  YOUR HONOR, WE ARE GOING TO CALL

3   PROFESSOR WICKER AS OUR NEXT WITNESS.

4          **THE COURT:**  ALL RIGHT.  YOU HAVE BEEN PREVIOUSLY

5   SWORN IN THIS PROCEEDING, SIR, AND YOU ARE STILL UNDER OATH.

6          **THE WITNESS:**  YES, YOUR HONOR.

7          **MS. MEHTA:**  YOUR HONOR, MAY PROFESSOR WICKER HAVE

8   PERMISSION TO USE THE LAPEL MIC?

9          **THE COURT:**  YES.

10              (PAUSE IN THE PROCEEDINGS.)

11      (**STEPHEN WICKER**, HAVING BEEN PREVIOUSLY SWORN, WAS CALLED

12   AS A WITNESS BY THE DEFENDANTS AND TESTIFIED AS FOLLOWS:)

13                  **DIRECT EXAMINATION**

14   **BY MS. MEHTA:**

15   **Q.**  GOOD MORNING, PROFESSOR WICKER.

16   **A.**  GOOD MORNING.

17   **Q.**  WELCOME BACK.

18   **A.**  THANK YOU.

19   **Q.**  SO NOW I WOULD LIKE TO SHIFT FOCUS TO INVALIDITY.  AND WE

20   TALKED ABOUT NONINFRINGEMENT LAST WEEK, AND I WANT TO SHIFT TO

21   INVALIDITY.

22          **MS. MEHTA:**  YOUR HONOR, PROFESSOR WICKER WAS

23   PREVIOUSLY ACCEPTED AS AN EXPERT IN THE FIELDS OF THE '541 AND

24   '670 PATENTS.  I ASSUME THAT CONTINUES FOR HIS INVALIDITY

25   EXAMINATION?

1        **THE COURT:**  I WOULD THINK SO.

2        **MR. DINOVO:**  YES.

3        **THE COURT:**  YES.

4        **MS. MEHTA:**  OKAY.  THANK YOU, YOUR HONOR.

5   BY MS. MEHTA:

6   Q.  PROFESSOR WICKER, CAN YOU TELL US WHAT YOUR ASSIGNMENT WAS

7   WITH RESPECT TO INVALIDITY OF THE PATENTS-IN-SUIT?

8   A.  I WAS ASKED TO LOOK AT THE PATENTS-IN-SUIT, AND IN

9   PARTICULAR, THE ASSERTED CLAIMS AND DETERMINE WHETHER OR NOT

10  SOMEONE ELSE HAD THOUGHT OF THE CONTENT OF THESE CLAIMS

11  BEFORE.  AND SO THAT INVOLVED STUDYING THE PRIOR ART, SEEING

12  WHAT THE STATE OF THE PRIOR ART WAS AT THE TIME OF THE DIG REG

13  INVENTION, AND DETERMINE WHETHER OR NOT SOMEONE HAD THOUGHT OF

14  IT OR IT WOULD HAVE BEEN OBVIOUS TO SOMEONE AT THE TIME.

15  Q.  PROFESSOR WICKER, WHY DON'T WE TURN TO THE DEMONSTRATIVE

16  EXHIBITS THAT YOU HAVE PREPARED?

17       **MS. MEHTA:**  MS. RILEY, IF YOU WOULDN'T MIND.

18       **THE CLERK:**  THANK YOU.

19       **MS. MEHTA:**  THANK YOU.

20            (PUBLISHED TO JURY.)

21  BY MS. MEHTA:

22  Q.  IF YOU COULD START WITH THE SCHULL REFERENCE IN THE

23  SOFTLOCK SYSTEM, AND IF YOU COULD EXPLAIN JUST SOME BACKGROUND

24  ABOUT THAT AND HOW YOU APPLIED TO YOUR ANALYSIS.

25  A.  OKAY.  WE HAVE JUST HEARD PROFESSOR SCHULL TALK IN SOME

1    DETAIL ABOUT WHAT HE INVENTED AND THE COMPANY THAT HE FOUNDED

2    BASED ON THESE -- THIS INVENTION.  AND WHAT I FOCUSED ON HERE

3    WAS THE SCHULL '070 PATENT.  IT IS A METHOD FOR ENCOURAGING

4    PURCHASE OF EXECUTABLE AND NONEXECUTABLE SOFTWARE.

5        THE INVENTOR, OF COURSE, IS PROFESSOR SCHULL.  AND IT WAS

6    FILED IN DECEMBER OF 1992.

7    **Q.**  AND DID YOU APPLY THE SCHULL PATENT TO THE '541 PATENT,

8    THE '670 PATENT OR BOTH?

9    **A.**  TO BOTH.

10   **Q.**  AND BEFORE WE GET INTO THE DETAILS OF THAT, COULD YOU

11   DESCRIBE HOW THE SCHULL PATENT RELATES TO WHAT WAS CONSIDERED

12   BY THE PATENT OFFICE FOR THE '541 AND '670 PATENTS?

13   **A.**  CERTAINLY.

14       EVERY PATENT HAS A LIST OF REFERENCES CITED ON THE FRONT.

15   IT TELLS FOLKS WHAT THE PATENT EXAMINER WAS LOOKING AT WHEN

16   DETERMINING WHETHER OR NOT THE APPLICATION SHOULD BECOME A

17   PATENT.

18       AND WHAT THIS TELLS ME IS THAT THE PATENT EXAMINER DID NOT

19   KNOW ABOUT THE SCHULL PATENT.  IT WAS NOT IN FRONT OF HIM OR

20   HER, AND SO IT WASN'T SOMETHING THEY CONSIDERED.

21   **Q.**  IS THAT ALSO TRUE FOR THE '670 PATENT?

22   **A.**  YES, IT IS.

23   **Q.**  NOW, DR. WICKER, CAN YOU PLEASE MAYBE SUMMARIZE HOW THE

24   SCHULL PATENT OPERATION RELATES TO THE OPERATION OF THE '541

25   PATENT FOR US?

1   **A.**  CERTAINLY.  AND THIS MIGHT BE -- IF I MAY POINT AT THE

2   SCREEN.

3          **MS. MEHTA:**  YOUR HONOR, MAY HE APPROACH THE SCREEN?

4          **THE COURT:**  YES.

5          **THE WITNESS:**  I HAVE TO GET DISENTANGLED FIRST.

6     THERE WE GO.

7     OKAY.  WHAT WE SEE HERE IS A FIGURE, FIGURE 5 FROM THE

8   '541 PATENT ON THE LEFT AND ON THE RIGHT FIGURE ONE FROM

9   PROFESSOR SCHULL'S PATENT, THE '070.

10    AND SO WHAT I'M SHOWING HERE IS I'M SHOWING HOW THE TWO

11  FIGURES TRACK.  SO IN THE FIGURE 5 OF THE '541 PATENT WE HAVE

12  "CHECK REGISTRY FOR THE UNIQUE CODED KEY."

13    OVER HERE IN THE SCHULL PATENT WE HAVE "CHECK FOR VALID

14  PASSWORD."

15    THEY ARE DOING ESSENTIALLY THE SAME THING.

16  **Q.**  I'M GOING TO GO FORWARD.  IF YOU CAN GO TO THE NEXT STEP.

17  **A.**  OKAY.  THIS IS A QUESTION IS -- DOES THE REGISTRY INCLUDE

18  THE UNIQUE CODED KEY?  IN THIS CASE IT IS NOT FOUND.  JUST AS

19  IN PROFESSOR SCHULL'S PATENT, "CHECK FOR PASSWORD.  NO."  THEN

20  WE HAVE A NUMBER OF THINGS WE DO HERE, AS WELL.

21    SO BASICALLY BOTH ARE DOING A DECISION PROCESS.  IF YES,

22  WE MOVE ON AND ACCESS THE CONTENT.  IF NO, WE DO SOME OTHER

23  THINGS.

24  **Q.**  WHAT HAPPENS IF THERE IS NO PERMISSION FOUND?

25  **A.**  OKAY.  SO IF THERE IS NO --

1   **Q.**  SORRY.  THAT WAS MY FAULT.

2   **A.**  IF THERE IS NO PERMISSION FOUND, BASICALLY YOU GO THROUGH

3   THE PROCESS OF TRYING TO GET ACCESS IN BOTH THESE PATENTS.

4   **Q.**  AND ASK CAN YOU DESCRIBE THAT?

5   **A.**  CERTAINLY.  SO IN FIGURE 5 IN THE '541 PATENT "NOT FOUND"

6   LEADS TO PAYMENT AND INSTALLATION PROCESS.  AND IN THE SCHULL

7   PATENT, "NOT FOUND" LEADS TO "OBTAIN VALID PASSWORD," AND THE

8   PROCESS OF PAYING AND GETTING THE PASSWORD.

9   **Q.**  NOW, BEFORE WE GET INTO THE CLAIMS, IF YOU CAN JUST

10  QUICKLY SUMMARIZE WHAT WAS YOUR CONCLUSION WITH RESPECT TO

11  INVALIDITY OF THE ASSERTED CLAIMS OF THE '541 PATENT RELATIVE

12  TO THE SCHULL '070 PRIOR ART REFERENCE?

13  **A.**  WHAT I FOUND WAS THE SCHULL REFERENCE DID DISCLOSE THE

14  ASSERTED CLAIMS OF THE '541.  SO IT ANTICIPATED THOSE CLAIMS.

15  **Q.**  AND DID YOU CONSIDER PERSPECTIVE OF PARTICULAR PERSON WHEN

16  YOU WERE APPLYING YOUR INVALIDITY ANALYSIS?

17  **A.**  YES.

18  **Q.**  AND WHO WAS THAT?

19  **A.**  SO THIS PERSON OF ORDINARY SKILL WOULD BE THE PERSON WHO

20  THE PATENT WAS INTENDED FOR.  AND AFTER READING IT AND

21  THINKING ABOUT THE STUDENTS I'VE TAUGHT, AND WHATNOT, I

22  DETERMINED THAT THIS PERSON OF ORDINARY SKILL WOULD HAVE A

23  BACHELOR'S DEGREE IN ELECTRICAL ENGINEERING OR COMPUTER

24  SCIENCE AND TWO FOR FOUR YEARS OF WORK OR RESEARCH EXPERIENCE

25  IN SECURE DATA NETWORKING, SECURE INFORMATION NETWORKS.

1   **Q.**  NOW, IF WE CAN TURN TO CLAIM 1.  AND I WOULD ASK YOU TO

2   WALK US THROUGH ELEMENT BY ELEMENT YOUR ANALYSIS OF CLAIM 1.

3   SO WHY DON'T WE START WITH ELEMENT ONE, WHICH IS THE PREAMBLE

4   OF THE CLAIM?

5   **A.**  OKAY.  AGAIN, THE FIRST LINE OF THE CLAIM:

6           "A COMPUTER-IMPLEMENTED METHOD OF REGULATING ACCESS

7            TO DIGITAL CONTENT."

8       SO "REGULATING ACCESS TO DIGITAL CONTENT," WHEN WE LOOK AT

9   PROFESSOR SCHULL'S PATENT I'M LOOKING AT COLUMN 2, LINE 66

10  THROUGH COLUMN 3, LINE 3, WE SEE THAT DR. SCHULL'S PATENT

11  ALLOWS USERS TO EVALUATE AND EXPLOIT USEFUL SOFTWARE BEFORE

12  DECIDING WHETHER TO PURCHASE, AND TO PROVIDE A CONVENIENT AND

13  RAPID WAY FOR THEM TO PURCHASE ACCESS.

14      SIMILARLY, A LITTLE LATER IN PROFESSOR SCHULL'S PATENT,

15  COLUMN 3, LINE 49 THROUGH 52:

16          "HOWEVER, CERTAIN ADVANCED FEATURES OF THE PROGRAM

17           ARE INACCESSIBLE ON A GIVEN MACHINE UNTIL A UNIQUE,

18           OR NEARLY-UNIQUE PASSWORD IS INSTALLED."

19      SO WHAT IT IS SAYING IS WE ARE GOING TO CONTROL ASSESS TO

20  THESE ADVANCED FEATURES, JUST AS IT IS CALLED FOR IN THE FIRST

21  STEP OF THE '541 CLAIM.

22  **Q.**  WHY DON'T WE GO TO THE NEXT STEP, THEN, STEP TWO?

23  **A.**  OKAY.  AND WHAT I DO IS I CHECK IT OFF TO INDICATE I FOUND

24  IT IN THE SCHULL PATENT.

25      SO THE NEXT STEP, CLAIM 2, HAS A COUPLE OF PIECES TO IT.

1    WE WILL START WITH "AT A CLIENT" PART.  THAT'S THE

2    CLIENT-CENTRIC ELEMENT TO IT.  CERTAIN THINGS HAVE TO HAPPEN

3    THERE.  AND PROFESSOR SCHULL'S PATENT, FOR EXAMPLE, COLUMN 5,

4    LINE 40 TALKS ABOUT THE PROGRAMMERS PROGRAM.

5        COLUMN 5, LINE 33 TALKS ABOUT THAT PROGRAM AGAIN, THE FILE

6    BEING ON A HARD DISK.  THE MEMORY OF THE USER COMPUTER -- I'M

7    MISSING A LITTLE BIT OF THAT.  I THINK IT SAYS "MEMORY OF THE

8    USER'S COMPUTER."  IT IS CUT OFF.

9        BUT ANYWAY, INTERACTING WITH HIS OR HER PROCESSOR.

10       SO, CLEARLY, PROFESSOR SCHULL IN HIS PATENT IS TALKING

11   ABOUT THINGS HAPPENING AT THE CLIENT.

12   **Q.**  LET'S GO TO THE NEXT PART OF ELEMENT 2, THE EXECUTING AN

13   ACCESS CHECKING PROCESS?

14   **A.**  OKAY.  SO THE STEP CALLS FOR EXECUTING AN ACCESS CHECKING

15   PROCESS.  WHEN I LOOKED AT PROFESSOR SCHULL'S PATENT,

16   COLUMN 5, LINE 40 THROUGH 47, IT TALKS ABOUT "CONDUCTS A CHECK

17   TO DETERMINE WHETHER THE PREVIOUSLY INSTALLED PASSWORD, IF

18   ANY, IS THE CORRECT MATCH."

19       SO IT'S LOOK TO SEE IF THAT PERMISSION IS ALREADY THERE.

20   **Q.**  AND WHAT ABOUT THE NEXT PART OF LIMITATION TWO, THE

21   "DETERMINE WHETHER THE CLIENT HOLDS A PRE-EXISTING

22   PERMISSION."

23       IS THAT DISCLOSED IN THE SCHULL REFERENCE?

24   **A.**  YES, IT IS.  IN FACT, I JUST TALKED ABOUT THAT.  COLUMN 5,

25   LINE 40 THROUGH 47 TALKS ABOUT DETERMINING "WHETHER THE

1    PREVIOUSLY INSTALLED PASSWORD, IF ANY, IS THE CORRECT MATCH."

2    SO WHAT IT IS DOING HERE IS DETERMINING WHETHER WHAT'S IN

3    MEMORY INDICATES THERE'S A PREVIOUSLY EXISTING PERMISSION.

4    **Q.**  SO, DR. WICKER, THEN COULD YOU SUMMARIZE -- OR, ACTUALLY,

5    LET ME HAVE YOU GO TO THE LAST PIECE, AND THEN I WILL HAVE YOU

6    SUMMARIZE.

7    WHAT ABOUT THE "FOR A RESOURCE TO ACCESS THE DIGITAL

8    CONTENT," IS THAT MET?

9    **A.**  YES.  THIS IS A PERMISSION FOR A RESOURCE TO ACCESS THE

10   DIGITAL CONTENT.  AND WHEN I LOOKED AT PROFESSOR SCHULL'S

11   PATENT, IT SAYS WE ARE LOOKING FOR A PASSWORD THAT WILL GIVE

12   US UNIMPEDED ACCESS TO THE PROGRAM'S ADVANCED FEATURES.

13   AND SO WHAT I DID WAS I CUT A CHUNK OUT OF THE FIGURE THAT

14   I SHOWED YOU, THE RATHER COMPLICATED FIGURE.  AND YOU CAN SEE

15   HERE THERE IS A CHECK FOR "VALID PASSWORD:  YES," THEN UNLOCK

16   ADVANCED FEATURES.

17   "NO," THEN WE GO THROUGH THE PROCESS OF GETTING A

18   PASSWORD.

19   **Q.**  DR. WICKER, NOW IF YOU CAN SUMMARIZE WITH RESPECT TO THE

20   "AT A CLIENT" LIMITATION, WHETHER THAT IS MET IN THE SCHULL

21   '070 REFERENCE?

22   **A.**  IT IS.  AS I'VE SHOWN YOU, I FOUND THAT THERE WAS

23   OPERATION AT A CLIENT.  THERE WAS THE EXECUTION OF AN ACCESS

24   CHECKING PROCESS.  THAT PROCESS DETERMINED WHETHER THE CLIENT

25   HELD A PRE-EXISTING PERMISSION FOR A RESOURCE TO ACCESS THE

1    DIGITAL CONTENT.

2        IN THIS CASE, THE ADVANCED FEATURES OF THE SOFTWARE THAT

3    WAS PROTECTED BY DR. SCHULL'S WORK.

4    Q.  OKAY.

5        NOW, LET'S TURN TO THE THIRD LIMITATION, THE "IF NOT"

6    LIMITATION.  COULD YOU DESCRIBE YOUR ANALYSIS WITH RESPECT TO

7    THAT?

8    A.  OKAY.  SO, ONCE AGAIN, A LITTLE BIT OF A PROGRAMMING TERM.

9    YOU CHECK SOMETHING, AND THEN IF NOT, YOU DO SOMETHING ELSE.

10   SO THAT "IF NOT" IS ONE PATH OUT OF THAT QUESTION:  DID THIS

11   HAPPEN?  WAS THERE A VALID PASSWORD?  "NO" IN THIS INSTANCE.

12   OR "YES."

13       SO WE SEE THIS SPELLED OUT IN COLUMN 5, LINE 49 OF THE

14   SCHULL PATENT.  IF CHECKED, 45 DOES NOT FIND A VALID PASSWORD,

15   THEN WE DO SOMETHING.  SO IT IS CLEARLY SETTING UP THE SAME

16   THING.  CHECK, IF NOT, DO SOMETHING ELSE.

17   Q.  WHAT IS IT SETTING UP?

18   A.  OKAY?  WHAT IT IS SETTING UP IS REQUESTING PERMISSION FROM

19   AN EXTERNAL SOURCE FOR THE RESOURCE TO ACCESS THE DIGITAL

20   CONTENT, FOR THE PERMISSION.

21       SO THAT'S WHAT DR. SCHULL SAYS ON COLUMN 5, LINE 59

22   THROUGH 63.

23       "IF THE USER'S DECISION IS TO OBTAIN A VALID PASSWORD,

24   THEN AN AUTHORIZATION CHANNEL MUST BE ACTIVATED WHICH

25   ESTABLISHES COMMUNICATION BETWEEN THE USER AND THE LICENSING

1   SYSTEM.

2        SO THAT'S WHAT FOLLOWS AFTER THE "IF NOT."

3        THERE IS COMMUNICATION BETWEEN THE USER AND THE LICENSING

4   SYSTEM.  AND THAT'S NOTED DOWN HERE, COLUMN 10, LINE 50,

5   "DIRECT COMMUNICATION WITH THE LICENSING PROCESSOR."

6   **Q.**  SO IS THE THIRD LIMITATION, THE "IF NOT" LIMITATION OF THE

7   '541 CLAIM 1 MET?

8   **A.**  YES.

9   **Q.**  NOW, LET'S TURN TO LIMITATION FOUR, WHICH IS THE

10  "RECEIVING THE TOKEN" LIMITATION.  AND BEFORE WE GET INTO YOUR

11  ANALYSIS OF THAT LIMITATION, COULD YOU DESCRIBE FOR US WHAT

12  THE INTERPRETATION OF "TOKEN" WAS THAT YOU APPLIED IN YOUR

13  ANALYSIS?

14  **A.**  OKAY.  JUST AS IN INFRINGEMENT, I USED THE SAME

15  CONSTRUCTION THAT THE COURT PROVIDED IN MY INVALIDITY

16  ANALYSIS.

17       AND THE COURT TOLD ME THAT "TOKEN" MEANS -- AND THIS IS TO

18  QUOTE THE COURT'S INSTRUCTION:

19       "THIS MAKES CLEAR THAT A TOKEN DOES NOT SIMPLY INDICATE

20  THAT ACCESS SHOULD BE GRANTED, BUT ALSO INCLUDES -- ALSO

21  CONTAINS A YES/NO INDICATOR, EXHIBITING EITHER APPROVAL OR

22  REJECTION."

23       SO I USE THE SAME APPROACH, THE SAME DEFINITION FOR

24  "TOKEN" THAT THE COURT PROVIDED IN BOTH MY ANALYSES.

25  **Q.**  AND UNDER THAT CONSTRUCTION OF "TOKEN," WOULD THE SCHULL

1    PATENT ACTUALLY DISCLOSE A YES/NO INDICATOR?

2    **A.**  NO.  NO, IT DOES NOT.

3    **Q.**  SO, IF THE SCHULL PATENT DOESN'T DISCLOSE A YES/NO

4    INDICATOR CAN YOU WALK US THROUGH YOUR ANALYSIS WITH RESPECT

5    TO LIMITATION FOUR, THE "RECEIVING A TOKEN" LIMITATION?

6    **A.**  OKAY.

7        SO WHAT SCHULL DISCLOSES IS ACTUALLY A LOT WHAT ADOBE

8    DOES.  IT PASSES AN ENCRYPTED KEY.  SO WHAT PROFESSOR SCHULL

9    SAID IN COLUMN 5 OF HIS PATENT, LINE 64 THROUGH THE BEGINNING

10   OF THE NEXT COLUMN:

11            "TO TRANSMIT A VALID PASSWORD FROM THE LICENSING

12            SYSTEM TO THE PROGRAMMER'S PROGRAM."

13       AND TO PROVIDE A LITTLE MORE DETAIL, THIS IS -- I BELIEVE

14   IT IS FIGURE 2.  AN EXCEPT FROM FIGURE 2 WHERE IT TALKS ABOUT

15   USE ENCRYPTED SEED AS S AS PASSWORD.

16       SO, BASICALLY, THERE IS A SEED THAT HAS BEEN ENCRYPTED,

17   AND IT WILL GO FROM THE SERVER TO THE CLIENT.  AND THEN, THE

18   CLIENT WILL USE -- DECRYPT IT AND USE THAT SEED TO ACCESS THE

19   CONTENT.

20   **Q.**  NOW, COULD YOU HELP US RECONCILE YOUR NONINFRINGEMENT

21   POSITIONS WITH YOUR INTERPRETATION OF SCHULL?  SO ESPECIALLY

22   WITH RESPECT TO YES/NO.  YOU TESTIFIED SCHULL DOESN'T HAVE A

23   YES/NO.  HOW DOES THAT RECONCILE WITH YOUR OTHER OPINIONS IN

24   THE CASE?

25   **A.**  WELL, THE FIRST THING I NOTED, I LISTENED TO DR. DEVANBU'S

1    TESTIMONY AND, OF COURSE, I READ HIS REPORT.  TO THE EXTENT

2    DIGITAL REG ARGUES THAT ADOBE IS INFRINGING, WELL, THEN SCHULL

3    DOES DISCLOSE THIS.  SCHULL TALKS ABOUT TRANSMITTING A VALID

4    PASSWORD FROM THE LICENSING SYSTEM TO THE CLIENT.

5         LOOKING AT COLUMN 5, LINE 64 THROUGH 6, LINE ONE.  AND

6    THEN, AGAIN, ON COLUMN 11, LINES 8 THROUGH 13, THERE IS A

7    LICENSING PROCESSOR TRANSMIT THAT PASSWORD BACK OVER THE

8    AUTHORIZATION CHANNEL.

9         WELL, THIS IS JUST WHAT DR. DEVANBU SAID IS A TOKEN.  HE

10   SAID:

11        "IT'S A LICENSE THAT'S RECEIVED FROM THE ALM LICENSE

12   SERVER.

13        "PERMISSION IS A SPECIALIZED PIECE OF CRYPTOGRAPHIC DATA,

14   THAT IS SECRETLY ENCODED DATA, THAT IS PRESENT INSIDE THE

15   LICENSE TOKEN."

16        SO THERE DR. SCHULL AND DR. DEVANBU ARE TALKING ABOUT THE

17   SAME THING.

18   Q.  NOW, DO YOU DEGREE WITH DR. DEVANBU THAT THAT WOULD BE

19   ENOUGH TO SATISFY THE CLAIM LIMITATION FOR TOKEN?

20   A.  NO.

21   Q.  SO, THEN, WHAT IS YOUR OPINION WITH RESPECT TO INVALIDITY?

22   A.  OKAY.  WELL, BASICALLY, I THINK IT WOULD HAVE BEEN OBVIOUS

23   TO CREATE A YES/NO INDICATION, AND THEN SEND IT TO THE CLIENT

24   AND HAVE THE PASSWORD GENERATED AT THE CLIENT.

25        IN FACT, YOU HEARD DR. SCHULL SAY THAT JUST A FEW MOMENTS

1    AGO.  THERE ARE THINGS THAT ARE DONE AT THE SERVER IN HIS

2    INVENTION THAT CAN BE DONE AT THE CLIENT.

3        AND SO I'M NOT SAYING THIS IS A TOKEN.  THERE IS NO TOKEN.

4    BUT I'M SAYING IT WOULD HAVE BEEN OBVIOUS, SO I PUT AN

5    ASTERISK THERE.  IF DR. DEVANBU'S INCORRECT UNDERSTANDING IS

6    ADOPTED -- WELL, IF ADOBE HAS A TOKEN, THIS CLEARLY HAS A

7    TOKEN.  I DON'T THINK IT DOES.  SO THAT IS WHY I SAY IT IS

8    OBVIOUS.

9    **Q.**  NOW, LET'S TURN TO THE FIFTH LIMITATION, THE "BASED ON THE

10   RECEIVED TOKEN EXECUTING AN INSTALLATION PROCESS" LIMITATION.

11   AND WE WILL BREAK THAT DOWN INTO CHUNKS.  SO IF YOU COULD

12   START WITH THE "BASED ON THE RECEIVED TOKEN" PIECE.

13   **A.**  OKAY.  SO WE START WITH THE "BASED ON THE RECEIVED TOKEN"

14   THERE IS GOING TO BE ACTION TAKEN.  WELL, UPON RECEIPT OF THE

15   PASSWORD, COLUMN 6, LINES 6 THROUGH 11, DR. SCHULL DESCRIBES

16   WHAT HAPPENS UPON RECEIPT OF THE PASSWORD.

17   **Q.**  LET'S GO TO THE NEXT PART OF THAT LIMITATION.

18   **A.**  THE NEXT PORTION OF THIS STEP IS "EXECUTING AN

19   INSTALLATION PROCESS THAT GENERATES AT THE CLIENT A

20   PERMISSION."

21       AND DR. SCHULL IN HIS PATENT -- AGAIN, PARAGRAPH --

22   SORRY -- COLUMN 6, LINE 6 THROUGH 11, TALKS ABOUT INSTALLING

23   THE PASSWORD IN STORAGE LOCATION 40.  IT IS ALSO SHOWN IN THE

24   FIGURE?  WE HAVE "INSTALL PASSWORD."

25       BUT, AGAIN, I WANT TO NOTE THERE IS THAT TENSION.  I DON'T

1    THINK THERE IS A TOKEN THERE, AND I WANT TO NOTE THAT DIGITAL

2    REG'S ACTUALLY INTERPRETING THIS TWO DIFFERENT WAYS FOR TWO

3    DIFFERENT PURPOSES.

4    **Q.**  LET'S BE VERY CLEAR, THEN.  WHEN YOU SAY DIGITAL REG IS

5    INTERPRETING IT TWO DIFFERENT WAYS FOR TWO DIFFERENT PURPOSES,

6    CAN YOU BE MORE SPECIFIC ABOUT WHAT IT IS THAT YOU ARE

7    FLAGGING?

8    **A.**  CERTAINLY.  IF YOU CAN GO TO THE NEXT SLIDE, I CAN SHOW

9    YOU THAT THERE IS BASICALLY TWO DIFFERENT APPROACHES BEING

10   TAKEN.

11       DIGITAL REG AGREES THE PERMISSION MUST BE CREATED LOCALLY.

12   THIS IS FROM '541 PATENT, CLAIM 1:

13       "BASED ON THE RECEIVED TOKEN EXECUTING AN INSTALLATION

14   PROCESS THAT GENERATES AT THE CLIENT A PERMISSION."

15       THIS PORTION OF THE CLAIM HAS BEEN CONSTRUED BY THE COURT

16   TO MEAN "RUNNING AN INSTALLATION PROGRAM THAT CREATES A

17   PERMISSION LOCALLY, WHICH PERMISSION IS" -- AND THERE IS TWO

18   REQUIREMENTS FOR THE PERMISSION -- "LOCKED UNIQUELY TO THE

19   CLIENT AND CAPABLE OF BEING FOUND LOCALLY BY A LATER

20   EXECUTION."

21       YOU GO BACK AND LOOK LATER, AND, OKAY, IT'S THERE.

22   **Q.**  SO WHAT IS THE INCONSISTENCY THAT YOU ARE HIGHLIGHTING

23   WITH RESPECT TO THAT LIMITATION AND DIGITAL REG'S APPLICATION?

24   **A.**  WELL, IT IS THE QUESTION OF WHAT GENERATING IS.  WHEN I

25   LOOK AT DR. DEVANBU'S REPORT AND LISTENED TO HIS TESTIMONY

1  WITH RESPECT TO WHAT IS GENERATING IS, HE SAYS GENERATING IS

2  DECRYPTING.

3      I SHOULD SAY IT THE OTHER WAY AROUND.  HE SAYS WHEN WE

4  DECRYPT, THAT'S GENERATING.

5      "JUST TALKING ABOUT DECRYPTING IT, RIGHT?

6      "CORRECT."

7      DR. KELLER SAYS THAT IS NOT ENOUGH.  DR. KELLER WILL TALK

8  ABOUT VALIDITY SHORTLY, AS I UNDERSTAND IT.  IN HIS REPORT HE

9  SAYS CLAIM ONE RECITES THAT THE PERMISSION MUST BE GENERATED

10  AT THE CLIENT.  THE PASSWORD ON WHICH DR. WICKER RELIES IS

11  GENERATED AT A SERVER, EVEN THOUGH DECRYPTION DOES TAKE PLACE

12  AT THE CLIENT, AS DESCRIBED BY DR. SCHULL HERE IN COURT AND AS

13  DESCRIBED IN HIS PATENT.  FOR EXAMPLE, IN THIS EXCERPT FROM

14  FIGURE 2.

15  **Q.**  SO JUST BECAUSE I THINK THIS IS GOING TO BE IMPORTANT, WHY

16  DON'T YOU WALK THROUGH THE FIGURE 2 ENCRYPTION/DECRYPTION

17  PROCESS A LITTLE BIT SO WE CAN UNDERSTAND HOW THAT RELATES TO

18  DIGITAL REG'S ALLEGATIONS?

19  **A.**  THIS IS FIGURE 2 FROM DR. SCHULL'S PATENT.  I NOTE THE

20  PASSWORD -- AND THE PASSWORD IS ACTUALLY A SEED, THE SEED THAT

21  IS GOING TO BE USED TO ACCESS THE CONTENT.  AND THAT SEED IS

22  THEN ENCRYPTED.  SO THE PASSWORD IS AN ENCRYPTED SECRET KEY --

23  HE CALLS IT A "SEED" -- THAT HAS TO BE DECRYPTED AT THE

24  CLIENT.

25      SO WHAT WE SEE HERE IS A PASSWORDABLE I.D. IS USED TO

1    DECRYPT THE ENCRYPTING SEED FROM THE PASSWORD.

2       MAYBE I SHOULD START OVER HERE TO MAKE IT A LITTLE MORE

3    CLEARER.

4       WE USE THE ENCRYPTED SEED S AS THE PASSWORD.  THEN, WE

5    SEND THAT TO THE USER SYSTEM.  THE USER SYSTEM GETS IT, AND

6    THEN USES -- ITS CALLED A "PASSWORDABLE I.D." -- TO DECRYPT

7    THE ENCRYPTED SEED TO GET THE SEED, AND THEN ACCESS THE

8    CONTENT.

9    **Q.**  SO I DON'T WANT THERE TO BE ANY CONFUSION ON THIS DOWN THE

10   ROAD.  IN YOUR VIEW, IS THE PROCESS OF GENERATING A PERMISSION

11   OR PASSWORD AT THE SERVER ENCRYPTING IT, TRANSMITTING IT TO

12   THE CLIENT, DECRYPTING IT AND STORING IT ENOUGH TO MEET THE

13   CLAIM ELEMENT OF THE '541 PATENT?

14   **A.**  NO.

15   **Q.**  SO YOU DON'T AGREE THAT IS ENOUGH.  HOW DOES THAT RELATE

16   TO THE SCHULL PATENT THEN?

17   **A.**  OKAY.  SO WITH REGARD TO THE SCHULL PATENT, SCHULL IS

18   DESCRIBING SOMETHING SIMILAR TO WHAT ADOBE DOES.  AND I

19   DESCRIBED LAST WEEK WHY THAT IS NOT GENERATING AT THE CLIENT.

20   THAT IS GENERATING AT THE SERVER, AND SIMPLY ENCRYPTING IT AND

21   SENDING IT TO THE CLIENT.

22      BUT DR. SCHULL DID SAY IN HIS PATENT THAT SOME OF THESE

23   THINGS DONE AT THE SERVER CAN BE DONE AT THE CLIENT.  SO I

24   ASSERT THAT IT WOULD HAVE BEEN OBVIOUS TO DO IT THE WAY THE

25   '541 DESCRIBES IT.

1    **Q.**  OKAY.  LET'S GO TO THE NEXT PART OF THAT LAST LIMITATION,

2    THE UNIQUE LOCKING.  IF YOU CAN DESCRIBE YOUR OPINION WITH

3    RESPECT TO THAT PHRASE.

4    **A.**  OKAY.  SO WHAT'S REQUIRED HERE IS THAT THE PERMISSION BE

5    LOCKED UNIQUELY TO THE CLIENT.  DR. SCHULL IN HIS PATENT --

6    I'M LOOKING AT COLUMN 6, LINES 6 THROUGH 11 -- TALKS ABOUT

7    INSTALLING THE PASSWORD.

8        IN THE ABSTRACT HE ALSO POINTS OUT THAT A VALID PASSWORD

9    WHICH IS UNIQUE TO A PARTICULAR TARGET I.D. GENERATED ON AN

10   I.D. TARGET, SUCH AS THE USER'S SYSTEM.

11       IN ENGLISH, THAT MEANS THAT THIS PERMISSION IS LOCKED TO

12   THE CLIENT BY ENCRYPTING IT USING A CLIENT I.D.

13   **Q.**  AND THEN, WITH RESPECT TO THE LAST PHRASE IN CLAIM ELEMENT

14   FIVE?

15   **A.**  THE LAST PHRASE IS "THAT MAY BE FOUND BY A LATER EXECUTION

16   OF THE ACCESS CHECKING PROCESS."

17       IS THIS SOMETHING WE CAN NOW FIND LATER AND REPEAT THE

18   PROCESS?

19       THAT IS SOMETHING DR. SCHULL DESCRIBES IN COLUMN 11,

20   LINES 35 THROUGH 40.  SO THAT ON SUBSEQUENT OCCASIONS, WHEN

21   THE LICENSING SOFTWARE IS RUN ON THE LICENSING PROCESSOR, THE

22   CURRENT PASSWORD WILL BE FOUND.

23       SO, YOU CAN GO BACK AND FIND THAT PASSWORD LATER AND

24   REPEAT THE PROCESS.

25       OKAY.  NOW, JUST A SUMMARY WITH RESPECT TO YOUR OPINION ON

1   CLAIM ELEMENT FIVE.

2   **A.**  OKAY.  SO, CLAIM ELEMENT FIVE, AGAIN, I DON'T THINK IT'S

3   THERE.  I DON'T THINK IT IS IN SCHULL.  BUT I THINK SCHULL

4   DOES DESCRIBE THAT IT COULD BE DONE AT THE CLIENT.  AND,

5   THEREFORE, I PUT AN ASTERISK THERE.  THAT MEANS THAT, AS WITH

6   THE PREVIOUS ONE, I THINK IT WOULD HAVE BEEN OBVIOUS.  BUT IF

7   DR. DEVANBU'S UNDERSTANDING IS ADOPTED -- WELL.  IF IT IS IN

8   ADOBE IT HAS TO BE HERE IN SCHULL.

9   **Q.**  YOU MENTIONED A COUPLE OF TIMES WITH RESPECT TO THE

10  RECEIVING THE TOKEN LIMITATION AND THE BASED ON LIMITATION

11  THAT IT WOULD HAVE BEEN OBVIOUS.  IF YOU CAN WALK US THROUGH

12  IN JUST A LITTLE BIT MORE DETAIL THE ANALYSIS THAT YOU DID FOR

13  THAT PARTICULAR CONCLUSION.

14  **A.**  OKAY.  WITH REGARD TO OBVIOUSNESS, I NOTED THAT, FIRST

15  OFF, SCHULL DOES THE GENERATION AT THE SERVER.  SO, THE

16  SECRET, AS HE CALLED IT, THE SEED, IS ENCRYPTED AT THE SERVER

17  AND SENT TO THE CLIENT.  OKAY?

18      SO IT'S LIKE ADOBE.  IT IS DONE AT THE SERVER.

19      BUT THE CLAIMS REQUIRE THAT IT BE DONE AT THE CLIENT.  SO

20  I HAD TO ASK MYSELF:

21      "WOULD A PERSON OF SKILL WITH HIS OR HER ABILITY,

22  KNOWLEDGE IN READING THE SCHULL PATENT HAVE THOUGHT IT WAS

23  OBVIOUS TO DO IT AT THE CLIENT?"

24      WELL, I NOTE THAT DR. SCHULL ACTUALLY TALKED ABOUT DOING

25  THINGS AT THE CLIENT.  AND IT WOULD HAVE BEEN OBVIOUS TO

1   TRANSMIT THAT YES/NO AND LET THE CLIENT DO THE WORK INSTEAD OF

2   THE SERVER.

3   **Q.**  YOU KNOW, YOU JUST REMINDED ME OF ONE THING, WHICH IS WE

4   HAD A SLIDE EARLIER WHERE YOU DESCRIBED THE LEVEL OF ORDINARY

5   SKILL IN THE ART.  AND I UNDERSTAND THERE MAY BE A LITTLE BIT

6   OF A DISAGREEMENT BETWEEN YOU AND DR. KELLER ABOUT THAT.

7       DO THOSE SMALL DIFFERENCES IMPACT YOUR OPINION IN ANY WAY?

8   **A.**  NO, THEY DON'T.  I THINK THE DIFFERENCE WAS, IF I REMEMBER

9   CORRECTLY, DR. KELLER SAID THAT HAVING A MASTER'S DEGREE WAS

10  ENOUGH.  I DON'T THINK HE REQUIRED WORK EXPERIENCE IF YOU HAD

11  A MASTER'S DEGREE.

12      CERTAINLY WITH REGARD TO THE ANALYSIS I AM DOING A

13  MASTER'S DEGREE WOULD BE ENOUGH.

14  **Q.**  THANK YOU.  SO NOW LET'S TALK A LITTLE BIT MORE ABOUT YOUR

15  CONCLUSION WITH RESPECT TO OBVIOUSNESS.  AND IF YOU COULD

16  POINT US IN THE SCHULL REFERENCE TO WHAT YOU WERE JUST

17  DESCRIBING.

18  **A.**  OKAY.  SO THIS IS FROM COLUMN 8 OF THE '070 PATENT,

19  PROFESSOR SCHULL'S PATENT.  AND LINE 66 THROUGH COLUMN 9, LINE

20  FOUR, WHAT HE STATES HERE IS THAT IN THAT CASE, THE METHOD BY

21  WHICH THE PROGRAMMER'S PROGRAM DETERMINES THE VALIDITY OF THE

22  PASSWORD IS USE THE SAME METHOD TO GENERATE THE PASSWORD IN

23  THE USER'S PROCESSOR.  OKAY?

24      SO YOU CAN GENERATE A COPY OF THE PASSWORD LOCALLY DURING

25  THE CHECK.  SO HE SAYS THIS IS SOMETHING SOMEONE MIGHT

1    CONSIDER.  IT IS A DESIGN CHOICE AND WOULD HAVE NO EFFECT ON

2    PERFORMANCE, ESSENTIALLY.

3    **Q.**  OKAY.  THANK YOU, DR. WICKER.  LET'S GO THROUGH THE

4    DEPENDENT CLAIMS, AND WE WILL START WITH CLAIM 2.

5    **A.**  OKAY.  DEPENDENT CLAIM 2, AND IT STARTS WITH THE METHOD OF

6    CLAIM 1.  SO AS I UNDERSTAND IT, EVERYTHING IN CLAIM 1 IS IN

7    CLAIM 2.  AND IT SAYS:

8        "WHEREIN REQUESTING THE PERMISSION, RECEIVING THE TOKEN

9    AND SELECTIVELY GRANTING THE RESOURCE ACCESS ARE PERFORMED AT

10   THE CLIENT."

11   **Q.**  WE HAVE ALREADY TALKED ABOUT THE PERMISSION AND THE TOKEN,

12   BUT LET'S TURN TO THE "SELECTIVELY GRANTING THE RESOURCE

13   ACCESS" PIECE OF THAT.  CAN YOU DESCRIBE YOUR ANALYSIS WITH

14   RESPECT TO THAT?

15   **A.**  OKAY.  SO WHAT I'M LOOKING TO DO IS DETERMINE WHETHER OR

16   NOT THAT "SELECTIVELY GRANTING" IS DONE AT THE CLIENT.  SO

17   THIS IS FROM THE ABSTRACT WHERE IT SAYS:

18       "PROGRAMMER'S PROGRAM" -- AND, OF COURSE, THAT IS RUNNING

19   ON THE CLIENT -- "ALLOWS THE USER TO ACCESS ADVANCED

20   FEATURES."

21       AND IN PROFESSOR SCHULL'S PATENT IT IS THE ADVANCED

22   FEATURES THAT ARE LOCKED.  THAT IS WHAT WE ARE TRYING TO GET

23   ACCESS TO, AND THAT IS WHY WE HAVE MADE THIS REQUEST.  AND SO

24   THE ACCESS IS GRANTED AT THE CLIENT.

25   **Q.**  NOW, IF WE CAN JUST, AS A QUICK RECAP, GO THROUGH FIGURE

1   ONE, AND YOU CAN WALK US THROUGH HOW THAT RELATES TO CLAIM 2.

2   **A.**  OKAY.  FIGURE ONE IS, OF COURSE, KIND OF BUSY.  AND THE

3   FIRST OF THE THREE THINGS WE ARE LOOKING AT IS "REQUESTING

4   PERMISSION."  OKAY.

5        SO THE USER DOES PUT THE SOFTWARE IN THE COMPUTER, AND

6   THEN LATER ON OBTAIN VALID PASSWORD.  THAT IS A REQUEST FOR

7   PERMISSION THAT STARTS THIS BALL ROLLING.

8   **Q.**  AND THEN, WHERE IS THE SECOND PART OF CLAIM 2?

9   **A.**  "RECEIVING THE TOKEN."

10        NOW, AGAIN, WE TALKED ABOUT THIS.  I DON'T THINK IT IS A

11   TOKEN.  BUT ACCORDING TO DR. DEVANBU AN ENCRYPTED SEED OR

12   PASSWORD IS A TOKEN.  AND SO WE SEE THAT HERE.  THIS IS

13   "TRANSMIT PASSWORD FROM THE SERVER TO THE CLIENT."

14   **Q.**  AND WHAT ABOUT THE LAST PART OF THAT CLAIM?

15   **A.**  "ACCESS TO RESOURCES, UNLOCK ADVANCED FEATURES."

16        SO WE SEE "REQUESTING PERMISSION, OBTAIN VALID PASSWORD,"

17   YES REQUEST.  "RECEIVING TOKEN," IT COMES INTO THE CLIENT HERE

18   (INDICATING), AND THEN ACCESS TO FEATURES THERE.

19        I'M POINTING TO FIGURE ONE.

20   **Q.**  OKAY.  SO WITH RESPECT TO CLAIM 2, JUST IF YOU COULD

21   QUICKLY SUMMARIZE YOUR OPINION.

22   **A.**  WELL, ALL OF CLAIM 1 I HAVE SHOWN IS THERE, AND THE PART

23   THAT IS ADDED BY CLAIM 2 IS ALSO THERE.

24   **Q.**  JUST SO THE RECORD IS CLEAR, THE ASTERISKES OR

25   ASTERISKS -- I AM NOT SURE, EITHER, HOW TO DO THE PLURAL OF

1    THAT -- FOR FOUR AND FIVE, WHAT DO THOSE REPRESENT?

2    **A.**   THOSE REPRESENT MY OPINION THAT IT IS OBVIOUS.  IT IS NOT

3    ANTICIPATED.  IT IS OBVIOUS.  BUT IF DR. DEVANBU'S

4    UNDERSTANDING IS ADOPTED, THEN IT WOULD BE PRESENT IN

5    PROFESSOR SCHULL'S PATENT.

6    **Q.**   LET'S GO TO CLAIM 4 OF THE NEXT DEPENDENT CLAIM.  AND IF

7    WE CAN QUICKLY WALK THROUGH THAT.  CAN YOU FOCUS US IN ON

8    WHERE, IF ANYWHERE, YOU FOUND THE CLAIM FOUR REQUIREMENT IN

9    THE SCHULL PATENT?

10   **A.**   OKAY.  SO CLAIM 4, AGAIN, DEPENDS FROM CLAIM 1, AND IT

11   ADDS:

12       "THE PERMISSION COMPRISES A UNIQUE CODED KEY CORRESPONDING

13   TO THE DIGITAL CONTENT."

14       AND DR. SCHULL, FOR EXAMPLE, IN THE ABSTRACT OF HIS PATENT

15   TALKS ABOUT THE VALID PASSWORD WHICH IS UNIQUE TO A PARTICULAR

16   TARGET I.D.  IT'S UNIQUE TO THE CLIENT MACHINE.

17       IN COLUMN 7, LINES 10 THROUGH 15, HE TALKS ABOUT

18   GENERATING DIFFERENT I.D.'S, SO YOU WILL HAVE DIFFERENT THINGS

19   YOU CAN BE UNIQUE TO.

20   **Q.**   SO, WHAT IS YOUR OPINION WITH RESPECT TO CLAIM 4?

21   **A.**   WHAT IS ADDED BY CLAIM 4 IS DISCLOSED IN DR. SCHULL'S

22   PATENT.

23   **Q.**   OKAY.  AND I APOLOGIZE, BUT WE ARE GOING TO HAVE TO GO

24   THROUGH THIS ONE CLAIM AT A TIME.  LET'S GO TO CLAIM 13.  AND

25   SO IF YOU CAN SUMMARIZE YOUR OPINION WITH RESPECT TO CLAIM 13.

1  **A.**  OKAY.  AGAIN, A METHOD OF CLAIM 1, SO WE ARE ADDING

2  SOMETHING.  IN THIS CASE WE ARE ADDING "REQUESTING THE

3  PERMISSION FROM THE EXTERNAL SOURCE INITIATES AN AUTHORIZATION

4  PROCEDURE, AND THE TOKEN RECEIVED IS BASED ON A RESULT OF THE

5  AUTHORIZATION PROCEDURE."

6  **Q.**  DID YOU FIND THAT IN THE SCHULL '070 PATENT?

7  **A.**  YES.  IN FACT, PROFESSOR SCHULL EXPLICITLY DISCLOSES WHAT

8  HE CALLS AN "AUTHORIZATION CHANNEL" IN FIGURE ONE.  YOU CAN

9  SEE THAT THERE IS A TRANSMISSION OF I.D., PAYMENT,

10  AUTHORIZATION AND REGISTRATION INFORMATION.  IF AUTHORIZED, WE

11  GENERATE THE PASSWORD AND TRANSMIT THE PASSWORD ON WHAT IS

12  CALLED IN FIGURE ONE NUMBER 80, AN AUTHORIZATION CHANNEL.

13  **Q.**  YOUR CONCLUSION WITH RESPECT TO '541, CLAIM 13?

14  **A.**  WHAT IS ADDED BY CLAIM 13 IS PRESENT.

15  **Q.**  OKAY.  LET'S SHIFT TO THE '670 PATENT.  WE ARE GOING TO

16  START WITH CLAIM 32 OF THE '670 PATENT, WHICH WE DID NOT TALK

17  ABOUT WITH RESPECT TO INFRINGEMENT, BUT IS A CLAIM THAT IS

18  ASSERTED FOR THE PURPOSES OF THE INVALIDITY ANALYSIS.  SO THIS

19  IS A LITTLE BIT NEW TO THE JURY.

20      SO IF YOU CAN WALK US THROUGH CLAIM 32 AND YOUR ANALYSIS

21  WITH RESPECT TO CLAIM 32.

22  **A.**  OKAY.  THIS IS CLAIM 32.  WOULD YOU LIKE ME TO READ IT OR

23  STEP THROUGH -- I'M HAPPY TO WALK THROUGH IT.

24  **Q.**  WHY DON'T WE STEP THROUGH IT?

25  **A.**  OKAY.  SO CLAIM 32 BEGINS WITH:

1    "A COMPUTER-IMPLEMENTED METHOD OF REGULATING ACCESS TO

2    DIGITAL CONTENT  -- TO ELECTRONIC CONTENT."  EXCUSE ME.

3        AND AS WE HAVE SEEN PROFESSOR SCHULL'S PATENT, COLUMN 2,

4    LINE 66 THROUGH COLUMN 3, LINE 3, TALKS ABOUT:

5        "TO ALLOW USERS TO EVALUATE AND EXPLOIT USEFUL SOFTWARE

6    AND PROVIDE A CONVENIENT AND RAPID WAY FOR THEM TO PURCHASE

7    ACCESS TO ADVANCED FEATURES."

8        WE ARE REGULATING ACCESS TO THE ADVANCED FEATURES, WHICH

9    ARE THE ELECTRONIC CONTENT OF INTEREST.

10   Q.  SO DID YOU FIND THE PREAMBLE OF CLAIM 32 TO BE DISCLOSED

11   IN THE SCHULL '070 PATENT?

12   A.  YES, I DID.

13   Q.  WHY DON'T WE GO TO THE "COLLECTING NOTIFICATION

14   INFORMATION STEP"?

15   A.  OKAY.  SO THIS STEP CALLS FOR COLLECTING NOTIFICATION

16   INFORMATION FROM A RECIPIENT AND SUCCESSIVE RECIPIENTS OF THE

17   ELECTRONIC CONTENT IN RESPONSE TO AN ATTEMPT TO ACCESS THE

18   ELECTRONIC CONTENT.

19       SO I'M GOING TO FOCUS ON THE RECIPIENT AND SUCCESSIVE

20   RECIPIENTS.  PROFESSOR SCHULL DESCRIBES AND AS YOU CAN SEE AT

21   THE TOP OF FIGURE ONE IN HIS PATENT, HE ACTUALLY SHOWS THE

22   PEOPLE.

23       YOU'VE GOT A USER RECEIVING COPYABLE SOFTWARE.  AND THEN,

24   HE OR SHE PASSES IT ON TO, IN THIS CASE, THREE DIFFERENT

25   PEOPLE OR A NUMBER OF DIFFERENT PEOPLE.  SO IT'S CERTAINLY

1    PRESENT THERE.

2        AND HE TALKS ABOUT:

3        "USER RECEIVE COPYABLE SOFTWARE.  USER PASSES COPIES ON TO

4    OTHER USERS."

5    **Q.**  SO WHO WOULD BE THE RECIPIENT AND WHO WOULD BE THE

6    SUCCESSIVE RECIPIENT IN FIGURE ONE?

7    **A.**  THE RECIPIENT WOULD BE THIS FIRST PERSON, THE PERSON WHO

8    RECEIVES THE COPYABLE SOFTWARE.

9        THE SUCCESSIVE RECIPIENTS WOULD BE THESE FOLKS OVER HERE

10   ON THE RIGHT TO WHOM THE INITIAL USER HAS PASSED COPIES.

11   **Q.**  NOW, LET'S TALK A LITTLE BIT ABOUT THE COLLECTING

12   NOTIFICATION INFORMATION REQUIREMENT AND YOUR ANALYSIS WITH

13   RESPECT TO THAT LIMITATION.

14       SO CAN YOU EXPLAIN WHAT YOU DID WITH RESPECT TO LOOKING

15   FOR THAT IN THE SCHULL PATENT?

16   **A.**  YES.  SO WHAT THIS STEP CALLS FOR COLLECTING NOTIFICATION

17   INFORMATION IN RESPONSE TO AN ATTEMPT TO ACCESS THE ELECTRONIC

18   CONTENT.

19       OKAY.  SO, DR. SCHULL IN FIGURE ONE OF HIS PATENT HAS THE

20   USER PUTTING THE SOFTWARE IN THE PROCESSOR.  NOW, IF WE LOOK

21   AT COLUMN 10, LINES 20 THROUGH 25 OF HIS PATENT, IT EXPLICITLY

22   SAYS:

23           "PERSONAL REGISTRATION INFORMATION, SUCH AS NAME,

24           ADDRESS, TELEPHONE NUMBER, COMPUTER SYSTEMS, ET

25           CETERA ARE GOING TO GOING TO BE COLLECTED."

WICKER – DIRECT / MEHTA

1  **Q.**  CAN YOU DESCRIBE HOW YOUR ANALYSIS WITH RESPECT TO

2  NOTIFICATION INFORMATION RELATES TO HOW DIGITAL REG IS READING

3  THE PATENT FOR PURPOSES OF INFRINGEMENT?

4  **A.**  YES.  SO, ONCE AGAIN, THERE IS SOME TENSION HERE BETWEEN

5  WHAT IS BEING SAID FOR INFRINGEMENT AND WHAT'S BEING SAID FOR

6  VALIDITY.

7      IN ONE CASE IT IS PLENTY, AND IN ONE CASE IT'S NOT ENOUGH.

8  I NOTE THAT DR. DEVANBU SAYS PERSONAL INFORMATION CERTAINLY

9  SATISFIES THIS.  THIS IS USUALLY IN THE FORM OF SOME PRINCIPAL

10  SOMETHING ABOUT THE PARTICULAR PERSON.  IT'S WHAT MAKES IT

11  PERSONAL.

12      DR. KELLER SAYS THE PERSONAL REGISTRATION INFORMATION  --

13  LET ME START OVER.

14      THE PERSONAL REGISTRATION INFORMATION IS -- DOES NOT

15  SATISFACTORY THE REQUIREMENTS.  HE'S SAYING WE NEED MORE.

16  **Q.**  IF DR. DEVANBU IS RIGHT IN TERMS OF DIGITAL REG'S

17  INFRINGEMENT THEORY AGAINST ADOBE, WOULD THE SCHULL PATENT

18  DISCLOSE NOTIFICATION INFORMATION?

19  **A.**  YES.

20  **Q.**  WHERE DID YOU FIND THAT?

21  **A.**  I FOUND THAT, FOR EXAMPLE, IN COLUMN 10, LINE 20 THROUGH

22  25:

23          "PERSONAL REGISTRATION INFORMATION, SUCH AS NAME,

24          ADDRESS, TELEPHONE NUMBER, COMPUTER SYSTEM."

25      THEN, AGAIN, COLUMN 11, LINES 25 THROUGH 28:

1            "USER'S NAME, ADDRESS, TELEPHONE NUMBER, MAKE AND

2            MODEL OF THE PROCESSOR."

3       LOOKS LIKE PERSONAL -- LOOKS LIKE NOTIFICATION INFORMATION

4    TO ME.

5    Q.   NOW, JUST A QUICK SUMMARY WITH RESPECT TO COLLECTING THE

6    NOTIFICATION LIMITATION.  IS THAT MET IN THE SCHULL PATENT?

7    A.   IT IS CERTAINLY PRESENT, YES.

8    Q.   LET'S GO TO THE NUMBER THREE, THEN:

9        "THE ATTEMPTING TO TRANSMIT LIMITATION."

10   A.   OKAY.  SO I WILL BREAK THIS ONE UP INTO PIECES, AS WELL.

11       "STEP THREE:  ATTEMPTING TO TRANSMIT THE COLLECTED

12   NOTIFICATION INFORMATION."

13       OKAY?  WELL, WE SEE THE TRANSMISSION OF THE NOTIFICATION

14   INFORMATION HERE IN FIGURE ONE:  OBTAIN VALID PASSWORD.  YES.

15   WE ARE GOING TO TRY THAT.  SO YOU TRANSMIT THE I.D., PAYMENT

16   AUTHORIZATION AND REGISTRATION INFORMATION.

17       COLUMN 10, LINES 20 THROUGH 25 TALKS ABOUT:

18            "THE I.D. MUST BE TRANSMITTED TO THE CENTRAL

19            COMPUTER.  IN ADDITION, THE SOFTWARE VENDOR, THE

20            PERSON RUNNING THE CENTRAL COMPUTER, MAY WANT TO

21            RECEIVE PAYMENT AND PERSONAL REGISTRATION

22            INFORMATION."

23       IT SEEMS PRETTY CLEAR.

24   Q.   WHAT ABOUT THE NEXT PART OF THE LIMITATION NUMBER THREE:

25   "THE TO AN ADDRESS OTHER THAN THE IMMEDIATE SENDER" LANGUAGE?

1    **A.**  OKAY.  SO IT IS A LITTLE INVOLVED, BUT BASICALLY THIS

2    NOTIFICATION INFORMATION IS GOING TO GO TO AN ADDRESS OTHER

3    THAN THAT FROM WHICH THE USER RECEIVED THE SOFTWARE.  WELL,

4    THE USER MAY HAVE RECEIVED IT FROM ANOTHER USER, BUT THE

5    NOTIFICATION INFORMATION IS TRANSMITTED TO THE CENTRAL

6    COMPUTER.

7         THAT IS FROM COLUMN 10, LINES 20 TO 25.

8    **Q.**  DID YOU SEE THAT ANYWHERE ELSE IN THE SPECIFICATION?

9    **A.**  YES.  THERE WERE SEVERAL PLACES.  THIS IS COLUMN 10, LINES

10   50 THROUGH 58.  IT TALKS ABOUT ALTERNATIVELY IF THE USER'S

11   PROCESSOR CAN BE PUT IN DIRECT COMMUNICATION WITH A LICENSING

12   PROCESSOR, THAT CHANNEL WILL BE USED.

13   **Q.**  CAN YOU SUMMARIZE YOUR OPINION WITH RESPECT TO THE

14   "ATTEMPTING TO TRANSMIT" LIMITATION OF CLAIM 32?

15   **A.**  YES.  I THOUGHT IT WAS PRESENT.  IT WAS DISCLOSED BY

16   PROFESSOR SCHULL'S PATENT.

17   **Q.**  THANK YOU.  LET'S GO TO THE NEXT LIMITATION:  "SELECTIVELY

18   GRANTING ACCESS."

19        IF YOU CAN WALK US THROUGH THAT?

20   **A.**  OKAY.  I WILL DO THIS IN TWO PIECES, AS WELL.  WE HAVE GOT

21   "SELECTIVELY GRANTING ACCESS," AND THEN THERE'S "BASED ON

22   RESULT," WHICH I WILL TALK ABOUT IN A MINUTE.

23        LET'S TALK ABOUT SELECTIVELY GRANTING ACCESS.  PROFESSOR

24   SCHULL, AS HE DESCRIBED HERE IN COURT AND AS HE DESCRIBED IN

25   HIS PATENT, TALKS ABOUT UNLOCKING ADVANCED FEATURES.  YOU'VE

1    GOT SOME SOFTWARE, AND YOU'RE ALLOWED BASIC ACCESS, WHATEVER

2    THAT MAY BE.

3        BUT IF YOU GET THE PASSWORD, YOU CAN UNLOCK THE ADVANCED

4    STUFF.  SO, COLUMN 6, LINES 6 THROUGH 11 TALKS ABOUT:

5        "UNLOCKS THE ADVANCED FEATURES OF THE PROGRAM."

6        COLUMN 2, LINE 66 THROUGH COLUMN 3, LINE 3 TALKS ABOUT:

7            "ADVANCED FEATURES, SEVERALLY OR INDIVIDUALLY, BEING

8            GIVEN ACCESS TO."

9    **Q.**  LET'S GO TO THE NEXT HALF OF THAT LIMITATION, THE "BASED

10   ON A RESULT OF THE ATTEMPTED TRANSMISSION OF NOTIFICATION

11   INFORMATION."

12       WAS THERE ANY CLAIM CONSTRUCTIONS THAT YOU APPLIED, IN

13   PARTICULAR, FOR THAT PIECE OF YOUR ANALYSIS?

14   **A.**  YES.  SO THE LANGUAGE HERE IS:

15       "BASED ON A RESULT OF THE ATTEMPTED TRANSMISSION OF THE

16   NOTIFICATION INFORMATION."  AND THE COURT CONSTRUED THIS TERM

17   FOR THIS CLAIM TO MEAN BASED ON WHETHER OR NOT NOTIFICATION

18   INFORMATION WAS SENT.

19   **Q.**  AND WHAT WAS YOUR ANALYSIS WITH RESPECT TO APPLYING THAT

20   CLAIM CONSTRUCTION?

21   **A.**  OKAY.  IF WE CAN BACK UP ONE SLIDE.

22   **Q.**  SORRY.

23   **A.**  I JUST WANTED TO NOTE WHAT WE ARE TALKING ABOUT IS

24   SELECTIVELY GRANTING ACCESS BASED ON THE RESULT OF THE

25   ATTEMPTED TRANSITION.  SO WE ARE GOING TO SELECTIVELY GRANT

 1   ACCESS BASED ON WHETHER OR NOT THE INFORMATION WAS SENT.

 2       I AM SORRY.  I JUST WANTED TO SUMMARIZE IT.

 3   **Q.**  NO, THANK YOU FOR THAT.

 4       SO MAYBE YOU CAN WALK US THROUGH YOUR ANALYSIS WITH

 5   RESPECT TO THAT PARTICULAR LIMITATION AND THE COURT'S CLAIM

 6   CONSTRUCTION YOU APPLIED.

 7   **A.**  OKAY.  THIS IS FROM THE '515 FILE HISTORY.  AND THIS IS

 8   ONE OF DIGITAL REG'S ARGUMENTS TO THE PATENT OFFICE IN A

 9   RELATED PATENT THAT I THINK WE TALKED ABOUT LAST TIME.

10       AND HERE IS WHAT THE EXAMINER SAID:

11       "THE INVENTION, AS CLAIMED, GRANTS ACCESS IMMEDIATELY UPON

12   TRANSMISSION OF THE NOTIFICATION WITHOUT WAITING FOR A

13   RESPONSE FROM THE SERVER TO GRANT ACCESS."

14       IN OTHER WORDS, THE TRANSMISSION OF THE NOTIFICATION IS

15   THE TRIGGERING EVENT.  THAT'S WHAT DETERMINES WHEN ACCESS IS

16   GRANTED.  TRANSMISSION.  NOTHING ELSE.

17   **Q.**  SO APPLYING THE COURT'S CLAIM CONSTRUCTION, THEN, DO YOU

18   FIND THAT THAT LIMITATION OR HAVING ACCESS GRANTED TRIGGERED

19   BY TRANSMISSION OF NOTIFICATION INFORMATION TO BE A CONCEPT

20   THAT'S DISCLOSED IN THE SCHULL PATENT?

21   **A.**  NO.

22   **Q.**  OKAY.

23   **A.**  WHAT PROFESSOR SCHULL DISCLOSED IS, AGAIN, MORE LIKE

24   ADOBE.  ACCESS IS GRANTED WHEN YOU GET SOMETHING BACK FROM THE

25   SERVER.  OKAY?  WHEN YOU GET, FOR EXAMPLE, A PASSWORD BACK

1    FROM THE SERVER.

2         SO, HERE IS THE LANGUAGE SAYS:

3         "BASED ON A RESULT OF THE ATTEMPTED TRANSMISSION."

4         COLUMN 6, LINE 6 THROUGH 11 OF PROFESSOR SCHULL'S PATENT

5    SAYS:  "UPON RECEIPT OF THE PASSWORD."

6         SO THE TRIGGER HERE IS TRANSMISSION.  THE TRIGGER -- I'M

7    POINTING AT THE CLAIM LANGUAGE FROM THE '670 -- AND THE

8    TRIGGER IN PROFESSOR SCHULL'S PATENT IS RECEIPT OF THE

9    PASSWORD.  THOSE ARE TWO DIFFERENT THINGS.

10   **Q.**  SO IF THAT LIMITATION IS NOT DISCLOSED IN PROFESSOR

11   SCHULL'S PATENT, THEN CAN YOU EXPLAIN HOW IT IS THAT YOU CAME

12   TO YOUR INVALIDITY CONCLUSION WITH RESPECT TO CLAIM 32?

13   **A.**  OKAY.  WELL, THERE IS OTHER PRIOR ART THAT DOES TEACH

14   THIS.  SO THE QUESTION WAS:  WOULD IT HAVE BEEN OBVIOUS TO USE

15   A TRIGGER BASED ON THE TRANSMISSION?

16        AND SO WHAT I DID WAS I FOUND ANOTHER PATENT, GRISWOLD,

17   WHICH IS 5940 -- '504 PATENT -- EXCUSE ME.  THIS IS AN OLDER

18   PATENT, TOO.  IT WAS FILED IN 1992.  AND THIS WAS A PATENT

19   THAT WAS NOT AVAILABLE TO THE PTO WHEN DIGITAL REG'S PATENTS

20   WERE BEING CONSIDERED.

21             **MS. MEHTA:**  YOUR HONOR, AT THIS TIME WE WOULD MOVE

22   EXHIBIT 421, THE GRISWOLD PRIOR ART REFERENCE, INTO EVIDENCE.

23             **MR. PRICE:**  NO OBJECTION.

24             **MR. DINOVO:**  NO OBJECTION, YOUR HONOR.

25             **THE COURT:**  RECEIVED.

```
 1              (DEFENDANT'S EXHIBIT 421 WAS RECEIVED IN EVIDENCE.)

 2    BY MS. MEHTA:

 3    Q.   DR. WICKER, IF YOU CAN EXPLAIN YOUR ANALYSIS WITH RESPECT

 4    TO HOW THE GRISWOLD PATENT TEACHES THE CLAIM LIMITATION FOUR

 5    THAT WE WERE DISCUSSING, THE GRANTING ACCESS BASED ON A RESULT

 6    OF THE ATTEMPTED TRANSMISSION OF NOTIFICATION INFORMATION?

 7    A.   OKAY.  WELL, GRISWOLD, THE '504 PATENT, SAYS THE

 8    FOLLOWING.  AND THIS IS COLUMN 4, LINES 23 THROUGH 29:

 9              "AFTER A REQUEST DATAGRAM HAS BEEN SENT OUT, A USER

10              MAY BE PERMITTED TO USE THE LICENSED PRODUCT FOR A

11              LIMITED DURATION."

12         SO THE TRIGGER HERE IS THE SENDING OUT.  AND A DATAGRAM IS

13    AN IP PACKET, ESSENTIALLY.  THE REQUEST IS SENT OUT, AND THEN

14    ACCESS IS GRANTED.  AND WE DON'T WAIT FOR A RETURN.

15    Q.   WHY WOULD A PERSON OF ORDINARY SKILL IN THE ART COMBINE

16    THE SCHULL '070 PATENT WITH THE '504 GRISWOLD PATENT?

17    A.   OKAY.  WHAT GRISWOLD TALKS ABOUT IS A PROBLEM THAT WOULD

18    ARISE IN THIS CONTEXT WHERE YOU ARE DEALING WITH A SERVER.

19         WHAT HE SAID WAS THIS FEATURE MAY BE NECESSARY, THIS

20    FEATURE OF GRANTING ACCESS UPON TRANSMISSION, NOT WAITING FOR

21    A RETURN.  THIS FEATURE MAY BE NECESSARY BECAUSE OF THE DELAYS

22    IN NETWORK COMMUNICATIONS.  IT WAS AN OLDER TIME.

23         THE INTERNET USED TO BE VASTLY -- LITERALLY, MANY ORDERS

24    OF MAGNITUDE SLOWER THAN IT IS NOW.  SO YOU MIGHT HAVE TO WAIT

25    A WHILE.
```

1    SO WHAT GRISWOLD IS SAYING IS IF YOU ARE WORKING IN A

2  NETWORKED WORLD, AND YOU WANT TO GET SOMETHING FROM A SERVER,

3  YOU MIGHT NOT WANT TO WAIT UNTIL IT COMES BACK.  YOU MAY WANT

4  TO GO AHEAD AND GRANT ACCESS WHILE THE SERVER IS DOING ITS

5  THING.

6  **Q.**  ARE THERE ANY OTHER REASONS THAT IT WOULD BE WITHIN THE

7  KNOWLEDGE AND CAPABILITIES OF A PERSON OF ORDINARY SKILL IN

8  THE ART AND WITHIN THEIR DESIRE TO COMBINE THE SCHULL AND THE

9  GRISWOLD REFERENCES?

10  **A.**  WELL, CERTAINLY.  FIRST OFF, THERE IS A LOT OF

11  SIMILARITIES BETWEEN THE SCHULL PATENT AND THE GRISWOLD

12  PATENT.

13    I NOTE THAT SCHULL DISCLOSES THAT NOTIFICATION INFORMATION

14  IS COLLECTED AND TRANSMITTED.  GRISWOLD DISCLOSES THAT

15  NOTIFICATION INFORMATION IS COLLECTED AND TRANSMITTED.

16    THEY ARE WORKING IN THE SAME WORLD.  SO IT WOULD NOT HAVE

17  BEEN AT ALL A STRETCH FOR SOMEONE TRYING TO MODIFY SCHULL TO

18  LOOK AT GRISWOLD.  THEY ARE DOING THE SAME THINGS.

19    AND THE COMBINATION WOULD BE PREDICTABLE.  THERE IS NO

20  SURPRISES HERE AS TO WHAT WOULD HAPPEN IF WE MODIFIED SCHULL'S

21  PATENT TO ACT LIKE GRISWOLD TO MAKE THE TRIGGER TRANSMISSION.

22  THERE IS NO SURPRISES THERE.

23  **Q.**  SO, DOES THE COMBINATION OF SCHULL AND GRISWOLD THEN

24  DISCLOSE THE FIRST FOUR ELEMENTS OF CLAIM 32?

25  **A.**  YES, IT DOES.

1    **Q.**  LET'S GO TO THE LAST LIMITATION THE:

2       "WHEREIN EXECUTABLE INSTRUCTION LIMITATION."

3       AND IF YOU CAN WALK US THROUGH YOUR ANALYSIS WITH RESPECT

4    TO THAT PARTICULAR LIMITATION.

5    **A.**  OKAY.  SO THIS LANGUAGE TALKS ABOUT:

6       "EXECUTABLE INSTRUCTIONS COLLECT THE NOTIFICATION

7    INFORMATION AND SELECTIVELY DENY ACCESS TO THE ELECTRONIC

8    CONTENT UNTIL THE NOTIFICATION INFORMATION IS TRANSMITTED."

9       SO WE'RE NOT GOING TO ALLOW ACCESS UNTIL THAT NOTIFICATION

10   INFORMATION IS TRANSMITTED.

11   **Q.**  AND WHERE IS THAT DISCLOSED IN SCHULL AND GRISWOLD?

12   **A.**  OKAY.  SO I WILL LOOK AT THE COMBINATION.  THE '070

13   PATENT, DR. SCHULL'S PATENT, TALKS ABOUT ADVANCED FEATURES OF

14   THE MACHINE ARE INACCESSIBLE UNTIL SOMETHING HAPPENS.

15      THAT'S FROM COLUMN 3, LINES 49 THROUGH 52, AND THEN

16   COLUMN 2, LINE 66 THROUGH COLUMN 3, LINE 3:

17          "PURCHASE ACCESS TO ADVANCED FEATURES SEVERALLY OR

18          INDIVIDUALLY."

19      SO THAT IS THE SELECTIVE PART.  I CAN GET SOME.  I CAN GET

20   ALL.

21      THE '504 PATENT, AGAIN, I'VE NOTED WHAT THE GRISWOLD

22   PATENT SAYS AT COLUMN 4, LINES 23 THROUGH 29:

23          "AFTER A REQUEST DATAGRAM HAS BEEN SENT OUT, A USER

24          MAY BE PERMITTED TO USE THE LICENSED PRODUCT FOR A

25          LIMITED DURATION."

1    SO, THE TRIGGER HERE IS THE TRANSMISSION OF THE

2  NOTIFICATION INFORMATION.  AND GRISWOLD AND SCHULL TEACHES US

3  THAT WHAT WE GET AFTER THE TRIGGER IS ACCESS TO THE ADVANCED

4  FEATURES.

5  **Q.**  ALL RIGHT.  IF YOU COULD SUMMARIZE YOUR OPINION WITH

6  RESPECT TO CLAIM 32 AND THE COMBINATION OF SCHULL AND GRISWOLD

7  THAT YOU'VE DESCRIBED.

8  **A.**  OKAY.  SO WHAT I HAVE SHOWN HERE IS THAT WHEN YOU COMBINE

9  SCHULL AND GRISWOLD, ALL OF THE ELEMENTS ARE PRESENT.  ALL OF

10  THE STEPS ARE TAUGHT BY THE PRIOR ART.

11  **Q.**  THANK YOU, DR. WICKER.

12    NOW, LET'S TURN BACK TO CLAIM 45, WHICH IS A LITTLE BIT

13  MORE FAMILIAR TERRITORY FOR ALL OF US.  AND IF YOU COULD WALK

14  US --

15        **THE COURT:**  WE ARE ABOUT DUE FOR A BREAK.  IS THIS A

16  GOOD TIME?

17        **MS. MEHTA:**  THIS IS A PERFECT TIME, YOUR HONOR.

18        **THE COURT:**  IT IS 10:05.  LET'S BREAK UNTIL 10:20.

19    CAN I GET A COPY OF PATTERSON'S DEPOSITION FROM SOMEBODY?

20  IF YOU CAN GIVE IT TO MS. RILEY.  IF IT IS IN THE EXHIBIT

21  BINDER ONLINE SOMEWHERE, I CAN LOOK AT IT THAT WAY.

22        **MS. MEHTA:**  WE WILL GET YOU A HARD COPY, YOUR HONOR.

23    (RECESS TAKEN AT 10:06 A.M.; RESUMED AT 10:20 A.M.)

24    (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

25        **THE CLERK:**  EVERYBODY CAN BE SEATED.

1        REMAIN SEATED.  COME TO ORDER.  COURT IS BACK IN SESSION.

2              **THE COURT:**  YOU MAY PROCEED.

3              **MS. MEHTA:**  THANK YOU, YOUR HONOR.

4              **MS. MEHTA:**  MR. BONINI, IF YOU CAN PUT UP THE --

5              **THE CLERK:**  YOU ARE PUTTING UP DEMONSTRATIVES?

6              **MS. MEHTA:**  YES, THANK YOU.

7                     (PUBLISHED TO JURY.)

8              **MS. MEHTA:**  THERE WE GO.

9    **BY MS. MEHTA:**

10   **Q.**  ALL RIGHT, DR. WICKER.  IF WE CAN PICK UP WHERE WE LEFT

11   OFF.  AND WE ARE IN THE HOME STRETCH HERE.  SO LET'S GO TO

12   CLAIM 45 OF THE '670 PATENT.  AND IF YOU COULD WALK US THROUGH

13   YOUR ANALYSIS WITH RESPECT TO INVALIDITY FOR CLAIM 45.

14        WHY DON'T WE START WITH THE PREAMBLE, THE METHOD FOR

15   TRACKING ACCESS TO ELECTRONIC CONTENT.

16   **A.**  OKAY.  THIS PREAMBLE IS SIMILAR TO WHAT WE SAW WITH THE

17   PREVIOUS ANALYSIS, A METHOD OF TRACKING ACCESS TO ELECTRONIC

18   CONTENT.

19        PROFESSOR SCHULL'S PATENT, COLUMN 1, LINES 9 THROUGH 11

20   TALKS ABOUT "FREELY COPYABLE SOFTWARE."

21   **Q.**  SO IS THAT LIMITATION OR PREAMBLE MET?

22   **A.**  YES, IT IS.

23   **Q.**  LET'S GO TO ELEMENT TWO.  AND WE WILL BREAK THAT DOWN.  IF

24   YOU COULD START WITH THE:

25        "CREATING A FILE THAT INCLUDES ELECTRONIC CONTENT"

1    REQUIREMENT.

2    **A.**    OKAY.  SO WE LOOK AT PROFESSOR SCHULL'S PATENT, COLUMN 4,

3    LINES 49 THROUGH 54.  AND HE TALKS ABOUT SOFTWARE TOOLS WHICH

4    COMPUTER PROGRAMS CAN INCORPORATE INTO THEIR OWN PROGRAMS.

5        IN OTHER WORDS, INTO THEIR OWN ELECTRONIC CONTENT.

6    **Q.**    AGAIN, JUST TO PUT THIS IN CONTEXT FOR ALL OF US, AND FOR

7    THE JURY, IN PARTICULAR, CAN YOU DESCRIBE HOW THIS RELATES TO

8    DR. DEVANBU'S ANALYSIS FOR INFRINGEMENT AND DR. KELLER'S

9    ANALYSIS FOR HIS OPINION THAT THERE IS NO INVALIDITY?

10   **A.**    CERTAINLY.  THERE IS DEFINITELY A PARTING OF THE WAYS

11   BETWEEN DIGITAL REG'S TWO EXPERTS, BECAUSE THEY ARE

12   INTERPRETING THIS TWO DIFFERENT WAYS, DEPENDING ON WHETHER IT

13   IS INFRINGEMENT OR INVALIDITY OR VALIDITY.

14   **Q.**    CAN YOU EXPLAIN THAT FURTHER?

15   **A.**    CERTAINLY.  IF WE CAN GO BACK TO THE PREVIOUS SLIDE.

16       THANK YOU.

17       WHAT WE ARE LOOKING AT IS CAUSES ACCESS TO THE ELECTRONIC

18   CONTENT TO BE DENIED UNTIL NOTIFICATION INFORMATION COLLECTED

19   BY EXECUTABLE INSTRUCTIONS HAS BEEN SUCCESSFULLY TRANSMITTED.

20       SO NOW, GO TO THE NEXT SLIDE.

21       FOR INFRINGEMENT, DR. DEVANBU FINDS THIS LIMITATION BY THE

22   RECEIPT OF INFORMATION BACK FROM THE SERVER.  SO, WITH REGARD

23   TO INFRINGEMENT, THE TRIGGER IS NOT TRANSMISSION.  IT'S

24   GETTING SOMETHING BACK FROM THE SERVER.

25       BUT FOR VALIDITY, DR. KELLER SAYS:

1      "NO, THE TRIGGER IS TRANSMISSION, NOT RECEIPT."

2      HE SAYS:

3      "PASSAGE CITED BY ME DOES NOT DISCLOSE GRANTING ACCESS

4  BASED ON WHETHER OR NOT NOTIFICATION INFORMATION IS SENT, BUT

5  INSTEAD DISCLOSES GRANTING ACCESS UPON RECEIPT OF A PASSWORD A

6  USER PURCHASES."

7      SO THE RECEIPT OF INFORMATION BACK FROM THE SERVER WORKS

8  FOR INFRINGEMENT, APPARENTLY, BUT NOT FOR INVALIDITY.

9  Q.  I WANT TO TALK A LITTLE BIT MORE ABOUT THE -- WELL,

10 ACTUALLY, LET ME STEP BACK ONE SECOND AND TALK ABOUT WHAT IS

11 DISCLOSED IN SCHULL.  AND THEN, WE WILL TALK ABOUT HOW THIS

12 FRAMEWORK THAT YOU HAVE JUST LAID OUT IN TERMS OF THE

13 INFRINGEMENT AND INVALIDITY READS APPLIES.

14     SO JUST TO STEP BACK REALLY QUICKLY, WITH RESPECT TO

15 SCHULL YOU SAID THERE WAS A RECEIPT OF A PASSWORD?

16 A.  YES.

17 Q.  WHERE IN THE PATENT DID YOU FIND THAT IN THE SCHULL '070

18 PATENT?

19 A.  I'M LOOKING AT COLUMN 6, LINES 6 THROUGH 11.  I AM SORRY,

20 I WILL TRY AND REMEMBER TO DO THAT.

21     AND WHAT IT STATES IS, "UPON RECEIPT OF THE PASSWORD,

22 UNLOCKS THE ADVANCED FEATURES OF THE PROGRAM."

23     SO THE TRIGGER IS RECEIPT FROM THE SERVER.

24 Q.  OKAY.  NOW, WITH RESPECT TO DR. DEVANBU'S ANALYSIS, ON THE

25 ONE HAND, AND DR. KELLER'S ANALYSIS, ON THE OTHER HAND, CAN

```
1    YOU HELP US RECONCILE THAT WITH YOUR OPINIONS RELATING TO

2    NONINFRINGEMENT AND ALSO THE SCHULL REFERENCE?

3    A.  YES.  IN MY OPINION, DR. KELLER IS ACTUALLY CORRECT.  THE

4    TRIGGER MUST BE THE TRANSMISSION.  THE TRIGGER CAN'T BE

5    RECEIVING SOMETHING FROM THE SERVER.

6        AND I THINK WE HAVE TALKED ABOUT THAT ALREADY.  AND I

7    WOULD LIKE TO NOTE WHY I THINK THAT'S TRUE, BECAUSE OF

8    SOMETHING THE PATENT OFFICE HAS SAID OR SEVERAL THINGS THE

9    PATENT OFFICE HAS SAID.

10       BASICALLY, THIS IS THE PATENT OFFICE'S UNDERSTANDING THAT

11   NOTIFICATION INFORMATION TRIGGERS ACCESS.  THE TRANSMISSION OF

12   THE INFORMATION.  NOT THE RECEIPT OF SOMETHING LATER ON.

13       AND THERE WAS A PRIOR ART REFERENCE THAT WAS DISCUSSED IN

14   THE '515 FILE HISTORY.  IT IS A RELATED PATENT APPLICATION.

15       AND THAT PRIOR ART REFERENCE IS CALLED "VENKATRAMAN."

16       AND WHAT THE PATENT OFFICE SAID IN THIS '515 FILE HISTORY

17   IS WHAT VENKATRAMAN DID.  VENKATRAMAN REQUIRES THAT THE SEVER

18   GRANTS ACCESS IF THE CONTENTS OF THE NOTIFICATION IS DEEMED

19   APPROPRIATE BY THE SERVER.

20       VENKATRAMAN WAS LIKE ADOBE.  YOU SEND SOMETHING TO THE

21   SERVER, AND THEN YOU GET SOMETHING BACK.  AND IT IS ONLY WHEN

22   YOU GET SOMETHING BACK THAT YOU GET ACCESS.

23   Q.  IS VENKATRAMAN ALSO LIKE SCHULL?

24   A.  YES.

25   Q.  OKAY.
```

1    **A.**  IT IS LIKE SCHULL.

2    **Q.**  NOW, REGARDING THE BOTTOM HALF OF THE SLIDE, MAYBE YOU CAN

3    EXPLAIN HOW THE PRIOR ART STATEMENT THAT VENKATRAMAN IS LIKE

4    ADOBE AND SCHULL, HOW THAT RELATES WITH YOUR ANALYSIS WITH

5    RESPECT TO CLAIM 45?

6    **A.**  OKAY.  SO THIS IS THE OFFICE ACTION, ONE OF THE OFFICE

7    ACTIONS FOR THE '670 FILE HISTORY.  AND NOW WHAT THE PATENT

8    OFFICE IS TELLING US IS VENKATRAMAN IS NOT LIKE CLAIM 45.  YOU

9    CAN'T USE VENKATRAMAN TO INVALIDATE CLAIM 45, BECAUSE

10   VENKATRAMAN DOES NOT EXPLICITLY DISCLOSE DENYING ACCESS UNTIL

11   NOTIFICATION INFORMATION IS SENT.

12       WHAT VENKATRAMAN DOES, ACCORDING TO THE FILE HISTORY OF

13   THE '515, IS GRANT ACCESS WHEN WE GET SOMETHING BACK FROM THE

14   SERVER.  IT IS NOT WHAT CLAIM 45 IS, NAMELY DENYING ACCESS

15   UNTIL TRANSMISSION.  THE TRIGGER FOR VENKATRAMAN IS GETTING

16   SOMETHING BACK.  THE TRIGGER FOR CLAIM 45 IS TRANSMISSION.

17       **MS. MEHTA:**  YOUR HONOR, AT THIS TIME WE WOULD MOVE

18   PLAINTIFF'S EXHIBIT 4, AT PAGE 156.  THIS IS THE FILE HISTORY

19   FOR THE '670 PATENT.  AND, IN PARTICULAR, THE TESTIMONY

20   REFERENCES TO PAGE 156 OF THAT INTO EVIDENCE.

21       **MR. DINOVO:**  NO OBJECTION.

22       **THE COURT:**  WELL, AGAIN, WE ARE NOT PUTTING IN THE

23   WHOLE THING.

24       **MS. MEHTA:**  THAT'S RIGHT.

25       **THE COURT:**  YOU GAVE ME A STIPULATION ABOUT PORTIONS

1    OF FILE HISTORIES.

2            **MS. MEHTA:**  YOUR HONOR, I THINK THE STIPULATION WAS

3    ABOUT PORTIONS OF ADOBE'S FILE HISTORIES.  WE WILL WORK

4    TOGETHER TO COMPILE THE FINAL LIST OF THIS EXHIBIT.

5            **THE COURT:**  ALL RIGHT.  IT WILL BE RECEIVED SUBJECT

6    TO THAT.

7            **MS. MEHTA:**  THANK YOU, YOUR HONOR.

8    (PLAINTIFF'S EXHIBIT 4 (PAGE 156) WAS RECEIVED IN EVIDENCE.)

9    **BY MS. MEHTA:**

10   **Q.**  SO, NOW WE'VE TALKED ABOUT VENKATRAMAN AND ADOBE AND

11   SCHULL, ON THE ONE HAND, AND THE CLAIM 45 ON THE OTHER HAND.

12   IF THESE THINGS ARE DIFFERENT, THEN PLEASE EXPLAIN NOW IT IS

13   THAT YOU DID YOUR INVALIDITY ANALYSIS WITH RESPECT TO SCHULL

14   AND CLAIM 45.

15   **A.**  OKAY.  SO IF WE CAN GO ON, THIS IS SIMPLY NOTING THAT THEY

16   HAVE DIFFERING OPINIONS, THE TWO EXPERTS FOR DIGITAL REG.

17   NAMELY, DR. KELLER SAYS ACCESS IS BASED ON WHETHER OR NOT

18   INFORMATION WAS SENT.  DR. DEVANBU SAYS ACCESS IS DENIED UNTIL

19   RECEIPT OF A LICENSE.  THEY CAN'T BOTH BE RIGHT.

20       AGAIN, I AGREE WITH DR. KELLER.  I THINK THAT THE TRIGGER

21   IS TRANSMISSION.  AND IF WE CAN GO ON TO THE NEXT SLIDE, AS

22   YOU'VE SEEN, GRISWOLD DISCLOSES THAT.  THAT APPROACH IS NOT

23   NOVEL.

24       GRISWOLD, COLUMN 4, LINES 23 THROUGH 29, TELLS US THAT WE

25   CAN HAVE A SYSTEM WHERE AFTER A REQUEST DATAGRAM HAS BEEN SENT

1   OUT, A USER MAY BE PERMITTED TO USE THE LICENSED PRODUCT FOR A

2   LIMITED DURATION.

3       THIS IS WHAT THE CLAIM LANGUAGE IN THE '670 CALLS FOR:

4       "TRIGGERING ON TRANSMISSION CAUSES ACCESS TO THE

5   ELECTRONIC CONTENT TO BE DENIED UNTIL NOTIFICATION INFORMATION

6   COLLECTED BY EXECUTABLE INSTRUCTIONS HAS BEEN SUCCESSFULLY

7   TRANSMITTED."

8   **Q.**  AND I THINK YOU TALKED ABOUT THIS BRIEFLY EARLIER, BUT IN

9   TERMS OF THE COMBINATION OF GRISWOLD AND SCHULL, IF YOU CAN

10  JUST VERY QUICKLY RECAP YOUR OPINION WITH RESPECT TO WHETHER

11  IT WOULD BE WITHIN THE SKILL OF A PERSON OF ORDINARY SKILL IN

12  THE ART TO COMBINE THOSE TWO REFERENCES AND WHY THEY WOULD

13  WANT TO DO THAT?

14  **A.**  OKAY.  THE FIRST THING I THINK OF WITH QUESTIONS LIKE THAT

15  IS:  WHAT DOES THIS PERSON OF SKILL KNOW?  WELL, THEY'VE GOT A

16  BACHELOR'S DEGREE.  AND THEY'VE GOT SOME EXPERIENCE, IN MY

17  OPINION.  OR THEY COULD SIMPLY HAVE A MASTER'S DEGREE -- WELL,

18  NOT "SIMPLY" -- THEY CAN HAVE A MASTER'S DEGREE, ACCORDING TO

19  DR. KELLER.

20      SO THAT ALONE WOULD GIVE US SOME INTEREST IN COMBINING

21  BECAUSE WE ARE IN THE SAME WORLD.  BUT IF WE LOOK AT THE '504

22  PATENT, THE GRISWOLD PATENT, IT NOTES THAT THIS FEATURE MAY BE

23  NECESSARY BECAUSE OF THE DELAYS IN NETWORK COMMUNICATIONS.

24      THAT WOULD MOTIVATE US, IF WE ARE WORKING WITH PROFESSOR

25  SCHULL'S PATENT, TO SAY:

1        "WELL, MAYBE WE WANT TO USE THE GRISWOLD APPROACH BECAUSE

2   WE MIGHT HAVE DELAYS THAT WOULD SLOW US DOWN FROM GETTING

3   ACCESS."

4   **Q.**   EARLIER YOU TALKED ABOUT SOME SIMILARITIES BETWEEN THE

5   SCHULL AND GRISWOLD REFERENCES THAT WOULD SUPPORT A

6   COMBINATION AND ALSO THAT A COMBINATION WOULD BE PREDICTABLE.

7        WOULD THAT STILL BE THE CASE FOR THE COMBINATION OF SCHULL

8   AND GRISWOLD FOR CLAIM 45?

9   **A.**   YES.   THE SIMILARITIES ARE IMPORTANT.   THESE TWO PATENTS

10  ARE IN THE SAME BALLPARK.   YOU ARE TALKING ABOUT VERY SIMILAR

11  THINGS.   SO IT WOULD BE NATURAL FOR SOMEONE WORKING WITH

12  SCHULL TO LOOK AT GRISWOLD.

13       AND THE NEXT THING I NOTE HERE IS THAT COMBINING THESE TWO

14  WOULD BE PREDICTABLE.   IN OTHER WORDS, WE WOULD GET RESULTS

15  THAT WOULD BE VERY PREDICTABLE.   NOTHING SURPRISING WOULD

16  HAPPEN IF WE MODIFIED SCHULL TO GRANT ACCESS UPON

17  TRANSMISSION.

18  **Q.**   THANK YOU.

19       WHY DON'T YOU, IF YOU DON'T MIND, SUMMARIZE YOUR OPINION

20  WITH RESPECT TO THE CREATING A FILE LIMITATION FOR CLAIM 45?

21  **A.**   OKAY.   ONCE AGAIN, I PUT AN ASTERISK BECAUSE I DON'T THINK

22  IN SCHULL THE TRIGGER IS TRANSMISSION.

23       IN SCHULL, IT IS GETTING SOMETHING BACK FROM THE SERVER.

24  BUT IF YOU ADD GRISWOLD, NOW YOU'VE GOT IT COVERED.   SO NOW

25  YOU'RE IN A SITUATION WHICH THIS IS DISCLOSED.   SO I PUT THE

1    ASTERISK HERE TO NOTE IT WOULD HAVE BEEN OBVIOUS TO COMBINE

2    THESE TWO TO GET THIS LIMITATION.

3        BUT I ALSO NOTE IF DR. DEVANBU'S UNDERSTANDING IS ADOPTED,

4    THEN SCHULL'S GOT TT.  IF IT IS SUFFICIENT TO WAIT TO GET

5    SOMETHING BACK, WELL SCHULL DISCLOSES THAT.

6        AND, SECOND, IF DR. KELLER'S UNDERSTANDING IS ADOPTED,

7    SCHULL DOESN'T HAVE IT, BUT GRISWOLD DOES.

8    **Q.**  NOW, LET'S TURN TO THE NEXT LIMITATION, THE TRANSMITTING

9    THE FILE LIMITATION.  COULD YOU DESCRIBE YOUR ANALYSIS WITH

10   RESPECT TO THAT?

11   **A.**  OKAY.  IT SAYS:

12       "TRANSMITTING THE FILE TO AT LEAST ONE ADDRESS."

13       AND WHAT WE SEE HERE IS THIS IS AN EXCERPT FROM

14   FIGURE ONE, PROFESSOR SCHULL'S PATENT.  WE SEE THE USER

15   RECEIVES A COPY OF THE SOFTWARE AND THEN SENDS IT ON, IN THIS

16   CASE, TO THREE OTHER PEOPLE.  THOSE THREE OTHER PEOPLE

17   CONSTITUTE TRANSMISSION OF THE FILE TO AT LEAST ONE ADDRESS.

18       AND THEN, IN COLUMN 1, LINES 9 THROUGH 11 OF PROFESSOR

19   SCHULL'S PATENT, HE TALKS ABOUT THE METHOD OF ENCOURAGING

20   DISTRIBUTION AND REGISTRATION.  IN COURT JUST A COUPLE OF

21   HOURS AGO, DR. SCHULL SAID THAT, YOU KNOW, HE DESIGNED HIS

22   SYSTEM SO PEOPLE WOULD WANT TO SHARE THE SOFTWARE.

23   **Q.**  SO CAN YOU SUM UP YOUR OPINION WITH RESPECT TO THAT

24   LIMITATION?

25   **A.**  OKAY.  I THINK IT'S DISCLOSED.

1   **Q.**   GREAT.  LET'S GO TO THE LAST ONE.  SO:

2        "RECEIVING NOTIFICATION INFORMATION FROM A SUCCESSIVE

3   RECIPIENT."

4        AND IF YOU CAN WALK US THROUGH YOUR ANALYSIS OF THAT

5   LIMITATION OF CLAIM 45.

6   **A.**   OKAY.  SO COLUMN 10, LINES 20 THROUGH 25, PROFESSOR SCHULL

7   TALKS ABOUT THE I.D. MUST BE TRANSMITTED TO THE CENTRAL

8   COMPUTER.  OKAY?

9        SO IT IS SENT BACK TO SOMETHING OTHER THAN THE IMMEDIATE

10   SENDER OF THE INFORMATION.  IF I GIVE YOU THE SOFTWARE, YOU

11   ATTEMPT TO ACCESS IT, THE NOTIFICATION WILL GO TO THE CENTRAL

12   COMPUTER, NOT TO ME.

13        OKAY?  THEN, COLUMN 10, LINES 50 THROUGH 58 TALKS ABOUT

14   DIRECT COMMUNICATION WITH A LICENSING PROCESSOR.  NOT THE

15   PERSON WHO GAVE ME THE SOFTWARE, BUT WITH THE LICENSING

16   PROCESSOR.

17   **Q.**   AND IF YOU COULD JUST GIVE US YOUR CONCLUSION WITH RESPECT

18   TO CLAIM 45?

19   **A.**   OKAY.  I'VE CHECKED OFF ALL THE STEPS.  WE HAVE AN

20   ASTERISK BECAUSE IT'S A COMBINATION OF SCHULL AND GRISWOLD.  I

21   THINK CLAIM 45 IS OBVIOUS IN LIGHT OF SCHULL AND GRISWOLD AND

22   NOT ANTICIPATED.

23        HOWEVER, IF YOU THINK DR. DEVANBU'S UNDERSTANDING IS

24   CORRECT, THEN THIS STEP IS PRESENT IN SCHULL.  SO WE HAVE

25   ANTICIPATION BY SCHULL.

WICKER – DIRECT / MEHTA

1  **Q.**  LET'S LOOK AT THE DEPENDENT CLAIM NOW, CLAIM 52, WHICH IS

2  OUR LAST CLAIM.  AND IF YOU COULD QUICKLY WALK US THROUGH YOUR

3  ANALYSIS WITH RESPECT TO CLAIM 52.

4  **A.**  OKAY.  SO WE'VE GOT 45.  ALL THOSE STEPS ARE PRESENT.  AND

5  THEN, WE ADD THE STEP:

6      "WHEREIN, CREATING THE FILE COMPRISES ENCRYPTING" -- IT

7  SHOULD SAY -- "THE ELECTRONIC CONTENT."

8  **Q.**  IF YOU CAN TELL US IF YOU FOUND THAT IN THE SCHULL '070

9  PATENT?

10  **A.**  YES.  COLUMN 14, LINES 46 THROUGH 56:

11      "THE ADVANCED FEATURES IN QUESTION ARE ENCRYPTED DATA."

12  **Q.**  SO NOW YOUR CONCLUSION WITH RESPECT TO CLAIM 52, THE

13  DEPENDENT CLAIM?

14  **A.**  YES.  ALL OF THE REQUIRED STEPS ARE PRESENT IN SCHULL IN

15  COMBINATION WITH GRISWOLD.

16  **Q.**  NOW, THE COURT IS GOING TO INSTRUCT THE JURY ON SECONDARY

17  CONSIDERATIONS FOR OBVIOUSNESS.  DID YOU DO AN ANALYSIS WITH

18  RESPECT TO SECONDARY CONSIDERATION?

19  **A.**  YES, I DID.

20  **Q.**  CAN YOU TELL US AT A HIGH LEVEL WHAT THAT ANALYSIS WAS,

21  AND THEN WE WILL WALK THROUGH SOME OF THOSE CONSIDERATIONS?

22  **A.**  OKAY.  AS I UNDERSTAND IT, SECONDARY CONSIDERATIONS ARE

23  THINGS THAT I'M SUPPOSED TO THINK ABOUT WHEN I'M CONSIDERING

24  VALIDITY.  THINGS THAT MIGHT POINT TO NONOBVIOUSNESS.

25      THEY ARE CONSIDERATIONS THAT SAY IF THESE THINGS OR SOME

1   COMBINATION OF THEM ARE PRESENT, THAT POINTS TOWARDS NOT BEING

2   OBVIOUS, AS OPPOSED TO BEING OBVIOUS.

3   **Q.**  YOU CONSIDERED THOSE FACTORS IN YOUR ANALYSIS?

4   **A.**  YES.

5   **Q.**  DID YOU FIND ANY OF THOSE FACTORS TO POINT AWAY FROM AN

6   OBVIOUSNESS FINDING?

7   **A.**  NO.

8   **Q.**  CAN YOU WALK US THROUGH THAT, PLEASE, PROFESSOR WICKER?

9   **A.**  CERTAINLY.  FOR EXAMPLE, ONE OF THOSE SECONDARY

10  CONSIDERATIONS IS COMMERCIAL SUCCESS.  AND, UNFORTUNATELY, AS

11  WE'VE HEARD IN COURT, MR. FARLEY AND MR. VENTERS ADMITTED

12  THEIR TECHNOLOGY WAS NOT SUCCESSFUL.

13      THE ACCUSED ALM PRODUCTS WERE ONLY ON THE MARKET FOR

14  TWO-AND-A-HALF MONTHS.  THEY BASICALLY FAILED PRODUCT BECAUSE

15  OF ALL THE CRITICISM OF ITS FUNCTIONALITY.

16  **Q.**  BY POINTING TO THE ACCUSED ALM PRODUCTS THERE, ARE YOU

17  SUGGESTING THAT THOSE PRODUCTS PRACTICE THE DIGITAL REG'S

18  PATENTS?

19  **A.**  NO.

20  **Q.**  WHY DID YOU CONSIDER THOSE?

21  **A.**  BASICALLY, I WANTED TO POINT OUT IF YOU ARE TRYING TO

22  CREATE A CONNECTION BETWEEN WHAT IS PATENTED AND ANY SUCCESS

23  IN ADOBE, I WANT TO NOTE THAT THE ALM PRODUCTS WERE AN EXAMPLE

24  OF A PRODUCT THAT FAILED.

25      I DON'T THINK, AS I SAID, THERE IS ANY CONNECTION BETWEEN

1    THE ADOBE PRODUCTS AND THE ASSERTED CLAIMS.

2    Q.  WHAT ABOUT LONG FELT UNRESOLVED NEEDS?  DID YOU CONSIDER

3    THAT?

4    A.  YES, I DID.  THIS IS ANOTHER AREA IN WHICH, FOR EXAMPLE,

5    IF SOMEONE CAME UP WITH SOMETHING THAT PEOPLE HAVE BEEN TRYING

6    TO DO FOR A LONG TIME, AND THE INVENTION SATISFIED THIS LONG

7    FELT NEED, THAT WOULD SUGGEST THAT THIS WASN'T OBVIOUS.

8        BUT THERE IS NO SUCH LONG FELT, UNRESOLVED NEED.  THERE

9    WAS NO MARKET DEMAND FOR DIGITAL REG'S SOLUTION.  THE COMPANY

10   WAS UNSUCCESSFUL.  AND I POINT OUT THAT GENERALLY DRM HAD

11   ALREADY BEEN AROUND FOR A WHILE, AS WE ALL HEARD.

12   Q.  YOU MAY HAVE JUST MENTIONED THIS, BUT WITH RESPECT TO THE

13   CONSIDERATION OF FAILURE OF OTHERS, CAN YOU DESCRIBE WHAT YOUR

14   ANALYSIS WAS THERE?

15   A.  OKAY.  THIS IS ANOTHER ONE OF THOSE CONSIDERATIONS.  AND

16   I'M SUPPOSED TO ASK MYSELF:

17       "IF A LOT OF PEOPLE TRIED TO DO THIS AND FAILED, THAT

18   MIGHT SUGGEST IT'S NOT OBVIOUS."

19       BUT IT IS NOT THE CASE.  AS WE HAVE SEEN, PEOPLE LIKE

20   PROFESSOR SCHULL, MR. GRISWOLD, MR. WOLFE, WHO WAS MENTIONED,

21   SOMEONE IN THE FILE HISTORY A WHILE BACK, THERE HAVE BEEN A

22   LOT OF PATENTS IN THE DRM SPACE.  AND WE SIMPLY CAN'T SAY THAT

23   OTHERS HAVE FAILED TO CREATE DRM.  IT DIDN'T HAPPEN.  THERE

24   WAS A LOT OF DRM AVAILABLE.

25   Q.  WHAT ABOUT THE FACTOR THAT RELATES TO SKEPTICISM BY

1  EXPERTS?

2  **A.**  THIS IS ANOTHER SITUATION IN WHICH I ASK MYSELF THE

3  QUESTION:

4      "WERE THE EXPERTS SURPRISED?  DID THEY EXPECT THIS

5  APPROACH TO FAIL?  WAS THERE SOMETHING SURPRISING ABOUT THE

6  INVENTION?"

7      AND I WILL NOTE THAT I WAS IN COURT WHEN MR. PATTERSON

8  TESTIFIED.  HE SAID NO ONE WAS SKEPTICAL HIS INVENTION WOULD

9  WORK.  AND I WOULD AGREE THAT THERE IS NO UNEXPECTED RESULT.

10  IT IS A STRAIGHTFORWARD ALGORITHM.

11  **Q.**  WHAT ABOUT COPYING?  CAN YOU DESCRIBE WHAT THAT

12  CONSIDERATION IS, AND THEN WHAT YOUR ANALYSIS WAS?

13  **A.**  THIS IS ANOTHER SITUATION WHERE IF I INVENT SOMETHING AND

14  OTHER PEOPLE COPY IT, THAT MIGHT INDICATE IT WASN'T OBVIOUS.

15      WHEN THEY SAW MY INVENTION, THEY MIGHT SAY:

16      "WELL, YOU KNOW, I GOT TO COPY THAT.  I NEVER THOUGHT OF

17  THAT BEFORE."

18      BUT THAT IS NOT WHAT HAPPENED HERE.  MR. VENTERS ADMITS

19  THERE IS NO EVIDENCE OF COPYING.  AND LIVECYCLE ACTUALLY CAME

20  OUT BEFORE.  IN OTHER WORDS, IT HAD ITS OWN TECHNOLOGY BEFORE

21  THE PATENTS-IN-SUIT WERE FILED.

22  **Q.**  AND THE FINAL CONSIDERATION, "PRAISE BY OTHERS," CAN YOU

23  DESCRIBE YOUR ANALYSIS OF THAT SECONDARY CONSIDERATION?

24  **A.**  CERTAINLY.  THE BASIC IDEA HERE IS THAT IF YOU INVENT

25  SOMETHING AND PEOPLE LAUD IT IN THE PRESS.  THEY SAY IT'S

1    GREAT.  THAT MIGHT INDICATE THAT IT'S NOT OBVIOUS.

2        AND THERE WAS SOME DISCUSSION ABOUT DIGITAL CONTAINERS

3    HAVING AN AWARD.  BUT AS DISCUSSED IN COURT THERE WAS NO

4    CONNECTION BETWEEN DIGITAL CONTAINERS' AWARD AND THE ACTUAL

5    PATENTS-IN-SUIT.

6        SO THERE IS REALLY NOTHING IN THIS SPACE THAT TELLS ME

7    PEOPLE WERE PRAISING WHAT ACTUALLY HAS BEEN ASSERTED HERE IN

8    COURT.

9            **MS. MEHTA:**  THANK YOU, DR. WICKER.

10    I PASS THE WITNESS.

11            **MR. DINOVO:**  YOUR HONOR, MAY I APPROACH?

12            **THE COURT:**  YES.

13            **THE WITNESS:**  THANK YOU.

14                    (BINDER HANDED TO WITNESS.)

15                    <u>CROSS-EXAMINATION</u>

16    **BY MR. DINOVO**

17    **Q.**  ALL RIGHT, SIR.  WE'VE TALKED A LITTLE BIT ABOUT A COUPLE

18    OF TERMS:  ANTICIPATION AND OBVIOUSNESS.  WHAT IS

19    ANTICIPATION?

20    **A.**  IT IS MY UNDERSTANDING THAT -- FIRST OFF, I SHOULD POINT

21    OUT I'M NOT A LAWYER.  BUT I'VE BEEN TOLD WHAT ANTICIPATION

22    IS.  AND "ANTICIPATION" MEANS SOMEONE PREVIOUS TO THE

23    INVENTION, FOR EXAMPLE, DIG REG'S INVENTIONS, CAME UP WITH THE

24    IDEA AND WE CAN SHOW IT WITHIN THE FOUR CORNERS OF A DOCUMENT,

25    PUBLIC DOCUMENT, OR SOMEONE'S ALREADY USED IT OR SOLD IT IN

1    THE UNITED STATES.

2    **Q.**  OKAY.  AND HOW LONG HAVE YOU BEEN INVOLVED IN THIS CASE,

3    ROUGHLY?

4    **A.**  I CAN'T TELL YOU EXACTLY.  IT'S BEEN A WHILE, A COUPLE OF

5    YEARS, TWO YEARS.

6    **Q.**  DID YOU DO A SEARCH FOR PRIOR ART IN CONNECTION WITH

7    FORMING YOUR OPINIONS?

8    **A.**  YES, I DID.

9    **Q.**  AND WERE YOU PROVIDED PRIOR ART BY ADOBE'S COUNSEL OR

10   ADOBE?

11   **A.**  YES, I WAS.

12   **Q.**  AND AFTER THOSE TWO YEARS OF ANALYSIS, I UNDERSTAND YOUR

13   TESTIMONY TODAY TO BE THAT YOU CAN'T TESTIFY THAT ANY CLAIM,

14   ANY ASSERTED CLAIM OF EITHER PATENT IS ANTICIPATED.

15   **A.**  THAT'S CORRECT.  IT'S BASED ON MY UNDERSTANDING OF THE

16   ASSERTED CLAIMS.  THERE IS OBVIOUSNESS, BUT NOT ANTICIPATION.

17   **Q.**  OKAY.

18          **MR. DINOVO:**  MS. MASON, IF YOU CAN PULL UP FIGURE ONE

19   OF -- IT'S EXHIBIT 418, PAGE 2.

20                    (PUBLISHED TO JURY.)

21       AND IF YOU CAN FOCUS IN TOWARDS THE BOTTOM, ABOUT THE

22   BOTTOM THIRD OF THE --

23   **BY MR. DINOVO**

24   **Q.**  AND YOU WERE PRESENT, SIR, FOR PROFESSOR SCHULL'S

25   TESTIMONY ABOUT THIS PERMISSION?

1  **A.**  YES, I WAS.

2  **Q.**  AND HE TESTIFIED THAT THE PERMISSION IS GENERATED AT THE

3  SERVER, THAT SAME PERMISSION IS TRANSMITTED.  AND THEN, THAT

4  SAME PERMISSION WITHOUT MODIFICATION IS STORED, RIGHT?

5  **A.**  I BELIEVE THERE WAS SOME DISCUSSION OF ENCRYPTION.  SO I

6  WANT TO MAKE SURE, ARE YOU DISCOUNTING ENCRYPTION IN TERMS OF

7  MODIFICATION?  WE DID DISCUSS THAT LAST TIME WE SPOKE.

8  **Q.**  MY UNDERSTANDING -- MAYBE YOUR RECOLLECTION DIFFERS -- WAS

9  THAT HE SAID THAT THE SAME THING THAT WAS TRANSMITTED WAS

10  STORED.  THAT IS WHY IT IS CALLED THE SAME THING, THE

11  PASSWORD?

12  **A.**  RIGHT.  THE SEED THAT IS GENERATED AT THE SERVER IS

13  ENCRYPTED, TRANSMITTED.  IT IS THE SAME SEED THAT IS USED TO

14  BASICALLY ACCESS THE SOFTWARE.

15  **Q.**  SO THAT SAME STRING OF DATA GENERATED, TRANSMITTED,

16  STORED, WITHOUT MODIFICATION.

17  **A.**  OTHER THAN ENCRYPTION AND DECRYPTION.

18  **Q.**  WELL, HOLD ON.  THE PASSWORD AS GENERATED IS ENCRYPTED,

19  RIGHT?

20  **A.**  YES, THE PASSWORD ITSELF.  THE PASSWORD IS AN ENCRYPTED

21  SEED.  I THINK THAT'S PART OF THE CONFUSION.  IN OTHER WORDS,

22  IT'S THE SEED THAT IS USED TO ACCESS.  THE SEED IS ENCRYPTED,

23  AND THE ENCRYPTED SEED IS CALLED THE "PASSWORD."  IT'S THE

24  PASSWORD THAT IS SENT AND THEN INSTALLED.  THAT'S CORRECT.

25  **Q.**  SO THE SAME DATA IN THE SAME REPRESENTATION IS GENERATED,

1    TRANSMITTED, STORED?

2    **A.**  THE SAME PASSWORD THAT IS GENERATED AT THE SERVER IS

3    STORED AT THE CLIENT, THAT'S CORRECT.

4    **Q.**  OKAY.  NOW, LET'S TALK ABOUT WHAT IS MISSING, SINCE WE

5    AGREE, YOU AND DR. KELLER AGREE THAT SCHULL '070 DOESN'T SHOW

6    EVERYTHING IN THE '541 PATENT, CLAIM 1, FOR EXAMPLE.  RIGHT?

7    **A.**  THAT'S CORRECT.

8    **Q.**  SO TELL ME WHAT'S MISSING?

9    **A.**  OKAY.  SO THERE IS ACTUALLY A SLIDE I CAN SHOW YOU.  BUT,

10   FIRST OFF, THE TOKEN.  THERE IS NO YES/NO INDICATION SENT FROM

11   THE SERVER TO THE CLIENT THAT IS THEN USED TO GENERATE THE

12   PERMISSION.  SCHULL DOESN'T DESCRIBE THAT.

13   **Q.**  WHAT ELSE IS MISSING?

14   **A.**  I NEED TO CHECK THE CLAIM, IF I COULD, OR BRING UP MY

15   SLIDE.

16   **Q.**  SURE.

17   **A.**  I WANT TO MAKE SURE I CAPTURE EVERYTHING.

18   **Q.**  FAIR ENOUGH.  I AM NOT TRYING TO QUIZ YOUR MEMORY HERE.

19            **MR. DINOVO:**  SO CAN WE BRING UP SLIDE 34 OF THE

20   WICKER DEMONSTRATIVE, PLEASE?

21   **BY MR. DINOVO**

22   **Q.**  DOES THAT HELP YOU?

23   **A.**  YES.  SO WHAT I NOTICED HERE THE LAST LIMITATION IS NOT

24   PRESENT, EITHER, IN SCHULL.

25   **Q.**  OKAY.

1    **A.**   AGAIN, BASED ON MY INTERPRETATION AND DR. KELLER'S.

2    **Q.**   OKAY.  AND WERE YOU HERE WHEN PROFESSOR SCHULL WAS

3    TESTIFYING ABOUT THE DATA FORMAT OF THIS PASSWORD?

4    **A.**   YES, I WAS.

5    **Q.**   WHAT DID HE SAY, DO YOU RECALL?

6    **A.**   BASICALLY, THE PASSWORD, AGAIN, IS AN ENCRYPTED SEED.  AND

7    THE ENCRYPTION INVOLVES A COMBINATION OF A MACHINE I.D. AND

8    SOMETHING HE CALLED "A PASSWORDABLE I.D."

9    **Q.**   AND DID HE TESTIFY THAT THE PASSWORD IS EXPRESSED AS A

10   STRING?

11   **A.**   YES, HE DID.

12   **Q.**   OKAY.  SO IT IS BASICALLY A SEQUENCE OF NUMBERS OR

13   LETTERS?

14   **A.**   THAT'S CORRECT.

15   **Q.**   OKAY.  AND THAT IS NOT A FILE, IS IT?

16   **A.**   WELL, IT DEPENDS ON THE CONTEXT.  IN OTHER WORDS, IF I'M

17   TRANSMITTING IT THROUGH THE INTERNET IT WILL BE A FILE IN THE

18   SENSE IT IS SOMETHING THAT HAS BEEN EMBEDDED IN THE DATAGRAM,

19   AND SOMETHING THAT HAS TO BE MANIPULATABLE BY THE VARIOUS

20   LAYERS OF THE RECEIVER.

21   **Q.**   WELL, YOU TESTIFIED IN DEPOSITION IN THIS CASE; IS THAT

22   RIGHT?

23   **A.**   YES.

24   **Q.**   YOU RECALL US DISCUSSING WHETHER OR NOT A STRING LIKE A

25   KEY COULD SATISFY THE TOKEN REQUIREMENT, RIGHT?

1   **A.**   THAT'S CORRECT.

2   **Q.**   AT THAT TIME DURING YOUR DEPOSITION YOU SAID THAT COULD

3   NOT SATISFACTORY THE TOKEN REQUIREMENT, DIDN'T YOU?

4   **A.**   I STILL AGREE WITH THAT.

5   **Q.**   OKAY.  NOW, YOU PREPARED A REPORT IN THIS CASE?

6   **A.**   YES, I DID.

7   **Q.**   AND YOU UNDERSTOOD IT WAS YOUR OBLIGATION TO PRESENT ALL

8   OF YOUR OPINIONS IN THAT REPORT TO THE BEST OF YOUR ABILITY?

9   **A.**   YES.

10  **Q.**   AND YOU DID THAT?

11  **A.**   YES, I DID.

12  **Q.**   OKAY.  AND IN YOUR REPORT YOU POINTED TO THE SAME THING AS

13  BOTH THE TOKEN AND THE PERMISSION IN SCHULL, RIGHT?

14  **A.**   YES.

15  **Q.**   THE PASSWORD, RIGHT?

16  **A.**   THAT'S CORRECT.  AGAIN, UNDER DR. DEVANBU'S

17  INTERPRETATION.

18  **Q.**   OKAY.  WHAT DO YOU MEAN BY THAT?

19  **A.**   IN OTHER WORDS, I DON'T THINK THERE IS A TOKEN PRESENT.

20  **Q.**   SO LET'S FOCUS ON YOUR OPINION, AND THEN GET TO

21  DR. DEVANBU'S OPINION MAYBE A LITTLE BIT LATER.

22      SO YOUR OPINION IS NO TOKEN IS PRESENT AND THERE IS

23  NOTHING GENERATED.  THERE IS NO PERMISSION GENERATED AT THE

24  SERVER BASED ON THE TOKEN, RIGHT?

25  **A.**   THAT IS RIGHT.  THERE IS NO TOKEN BECAUSE THERE IS NO

1    INDICATION, YES OR NO, THAT ACCESS IS GRANTED.  SIMPLY A KEY.

2

3    **Q.**  NOW, YOU SAY THAT THE FAILURE OF SCHULL TO TEACH

4    GENERATING A PERMISSION IS A MATTER OF DESIGN CHOICE, RIGHT?

5    **A.**  THAT'S CORRECT.

6    **Q.**  BUT PROFESSOR SCHULL TESTIFIED THAT THAT WASN'T A DESIGN

7    CHOICE HE MADE, RIGHT?  YOU HEARD HIM TESTIFY THAT HIS CODE,

8    AS REFLECTED IN THE BOOK OF TRUTH, DIDN'T GENERATE THINGS AT

9    THE CLIENT.  DIDN'T GENERATE PASSWORDS AT THE CLIENT.

10   **A.**  OH, I AM SORRY.  I MISUNDERSTOOD.  I THOUGHT YOU WERE

11   SAYING HE DIDN'T THINK IT WAS A DESIGN CHOICE.  HE MADE A

12   DIFFERENT DESIGN CHOICE.

13   **Q.**  OKAY.

14   **A.**  YES.

15   **Q.**  AND, IN FACT, THE DESIGN CHOICE HE MADE, AS SET FORTH IN

16   THE BOOK OF TRUTH, WAS THAT THE CLIENT WAS UNABLE TO GENERATE

17   A PASSWORD.

18   **A.**  THAT'S CORRECT.

19   **Q.**  OKAY.  LET'S LOOK AT CLAIM TWO OF THE '541 PATENT FOR A

20   MOMENT.

21       AND IT SHOULD BE --

22           **THE CLERK:**  I AM SORRY.

23           **MR. DINOVO:**  IT IS EXHIBIT 418.  I'M NOT SURE OF THE

24   PAGE NUMBER.  JUST A MOMENT.

25                   (PAUSE IN THE PROCEEDINGS.)

```
 1          MR. DINOVO:  LET'S DO EXHIBIT 1, PAGE 22, PLEASE.

 2      IF YOU CAN BLOW UP CLAIM 2.

 3      WOULD YOU ZOOM IN ON THAT A LITTLE BIT MORE.

 4                    (PUBLISHED TO JURY.)

 5  BY MR. DINOVO

 6  Q.  OKAY, SIR.  YOU UNDERSTAND THIS TO BE AN ASSERTED CLAIM IN

 7  THE CASE.  RIGHT?

 8  A.  YES, I DO.

 9  Q.  AND I BELIEVE YOUR TESTIMONY WAS THIS IS PRESENT?

10  A.  AGAIN, TO THE EXTENT THERE IS A TOKEN IT'S PRESENT.

11  Q.  OKAY.  THAT WAS THE CLARIFICATION I WANT TO MAKE.  SO IT'S

12  ACTUALLY YOUR OPINION THAT THERE IS NO TOKEN DISCLOSED IN

13  SCHULL?

14  A.  THAT'S CORRECT.

15  Q.  SO IN THAT REGARD CLAIM 2 IS NOT TAUGHT BY SCHULL?

16  A.  THAT'S CORRECT.  YOU HAVE TO HAVE THE ADDITION OF

17  GRISWOLD.

18      EXCUSE ME.  YOU HAVE TO HAVE THE ADDITION OF THE KNOWLEDGE

19  OF ONE SKILLED IN THE ART TO MAKE THE MODIFICATION NECESSARY

20  TO HAVE A TOKEN.

21  Q.  AND GRISWOLD RELATES TO THE '670.  THAT WAS A MISTAKE?

22  A.  MY MISTAKE, I AM SORRY.

23  Q.  OKAY.  LET'S TURN TO THE '670 PATENT.

24      NOW, HERE AGAIN, YOU DON'T ASSERT TODAY ANTICIPATION OF

25  ANY OF THE THREE CLAIMS THAT YOU DISCUSSED?
```

 1    **A.**  THAT'S CORRECT.

 2    **Q.**  OKAY.  AND YOUR COMBINATION OF REFERENCES IS SCHULL AND

 3    GRISWOLD; IS THAT RIGHT?

 4    **A.**  YES, SIR.  THAT'S CORRECT.

 5    **Q.**  OKAY.  NOW, WITH SCHULL YOU DON'T HAVE TO COMMUNICATE BACK

 6    TO THE SERVER IF YOU HAVE A THE PASSWORD STORED LOCALLY,

 7    RIGHT?

 8    **A.**  THAT'S CORRECT.

 9    **Q.**  WHAT IS THE PLAIN AND ORDINARY MEANING OF THE TERM

10    "NOTIFICATION INFORMATION" TO A PERSON OF ORDINARY SKILL IN

11    THE ART?

12    **A.**  I DON'T RECALL WHETHER THERE WAS A CLAIM CONSTRUCTION ON

13    THAT.  I DON'T BELIEVE THERE WAS.  WAS THERE?

14    **Q.**  NO, SIR.  THERE WASN'T.

15    **A.**  OKAY.  SO NOTIFICATION INFORMATION TO A PERSON OF SKILL

16    WOULD BE INFORMATION THAT SERVES NOTICE.  IT DEPENDS ON THE

17    CONTEXT.  IT COULD BE SAYING SOMEONE WANTS TO SPEAK WITH YOU,

18    TO SOMEONE'S REQUESTING SOMETHING.  BASICALLY, IT'S PUTTING

19    SOMEONE ON NOTICE.

20    **Q.**  NOW, IN ANALYZING WHAT NOTIFICATION MEANS TO A PERSON OF

21    ORDINARY SKILL IN THE ART, YOU WOULD LOOK AT THE PATENT

22    CLAIMS, THE SPECIFICATION AND THE PROSECUTION HISTORY, RIGHT?

23    **A.**  THAT'S CORRECT.

24    **Q.**  AND YOU DID THAT?

25    **A.**  YES, I DID.

1   **Q.**  SO YOU'RE FAMILIAR WITH THE PASSAGES IN THE PROSECUTION

2   HISTORY THAT TALK ABOUT WHAT IS REQUIRED OF NOTIFICATION

3   INFORMATION?

4   **A.**  YES.

5   **Q.**  OKAY.

6         **MR. DINOVO:**  LET'S PUT UP PLAINTIFF'S EXHIBIT 4,

7   PAGE 232.

8   **BY MR. DINOVO**

9   **Q.**  IF YOU LOOK AT THE HIGHLIGHTED PORTION, SIR, DO YOU SEE

10  THAT IN THIS DISCUSSION IN THE PROSECUTION HISTORY THE

11  PATENTEE TELLS THE PATENT OFFICE STRAIGHT UP THAT THE

12  NOTIFICATION INSTRUCTIONS PERMIT TRACKING AND AUTHENTICATION

13  OF ANY SUCCESSIVE RECIPIENT.

14      DO YOU SEE THAT?

15  **A.**  YES, I DO.

16  **Q.**  OKAY.  LET'S LOOK AT ANOTHER PASSAGE FROM THE PROSECUTION

17  HISTORY OF THE '670 PATENT.  THIS IS PLAINTIFF'S EXHIBIT 4,

18  PAGE 234.

19                      (PUBLISHED TO JURY.)

20        **MR. DINOVO:**  AND IF YOU CAN PLEASE BLOW UP PAGE 234,

21  THE HIGHLIGHTED PORTION.

22  **BY MR. DINOVO**

23  **Q.**  OKAY.  HERE, SIR, DO YOU SEE THAT, AGAIN, THIS IS A

24  REFERENCE TO THE TRACKING ASPECT OF THE PRESENT INVENTION?

25  **A.**  YES.

1   **Q.**  AND IT SAYS IT PROVIDES NOTIFICATION AND CONTROL

2   CAPABILITY THROUGHOUT SUCCESSIVE RECIPIENTS.  DO YOU SEE THAT?

3   **A.**  YES, I DO.

4   **Q.**  OKAY.  AND THE FINAL ONE WE WILL TAKE A LOOK AT

5   PLAINTIFF'S EXHIBIT 4, 235.

6          **THE CLERK:**  EXHIBIT 4, PAGE 235?

7          **MR. DINOVO:**  YES.

8       IF YOU CAN BLOW UP THE HIGHLIGHTED PORTION.

9   **BY MR. DINOVO**

10  **Q.**  AND HERE'S THE REFERENCE WITH WHICH YOU ARE FAMILIAR, THE

11  VENKATRAMAN REFERENCE.  AND IT SAYS THAT:

12      "THE PRESENT INVENTION IS DIRECTED TO FLEXIBLY TRACKING

13  MULTIPLE INSTANCES OF ELECTRONIC CONTENT ACCESSES TO UNKNOWN

14  SUCCESSIVE RECIPIENT DESTINATIONS."

15      DOES -- WOULD A PERSON OF ORDINARY SKILL READING THESE

16  PASSAGES FROM THE PROSECUTION HISTORY UNDERSTAND NOTIFICATION

17  INFORMATION IS DIRECTED TO TRACKING THE ACCESS TO THE CONTENT?

18  **A.**  YES.

19  **Q.**  LET'S TALK ABOUT THE DIFFERENCES IN CLAIMS 32 AND 45.

20  THEY ARE BOTH DEPENDENT CLAIMS, RIGHT?

21  **A.**  THAT'S CORRECT.

22  **Q.**  AND DO YOU AGREE WITH ME, SIR, THAT CLAIM 32 SPEAKS TO

23  SELECTIVELY GRANTING ACCESS?

24  **A.**  AGAIN, IF I RECALL CORRECTLY, THERE WAS SOMETHING IN THE

25  FILE HISTORY, IF THAT IS WHAT YOU ARE REFERRING TO, WHERE THE

1    WORD "GRANT" WAS CHANGED TO "DENY" AT SOME POINT.

2         BUT, GENERALLY SPEAKING, IT IS SELECTIVELY GRANTING

3    ACCESS, THAT'S CORRECT.

4    **Q.**  I'M JUST PUTTING ASIDE THE PROSECUTION HISTORY FOR A

5    MOMENT.  JUST CLAIM 32 ALONE, THAT USES THE LANGUAGE

6    "SELECTIVELY GRANTING ACCESS," RIGHT?

7    **A.**  THAT'S CORRECT.

8    **Q.**  CLAIM 45 DOESN'T USE THAT LANGUAGE?

9    **A.**  NO, IT DOES NOT.

10   **Q.**  NOW, CLAIM 45 HAS ANOTHER DIFFERENCE.  "SUCCESSFUL

11   TRANSMISSION," DO YOU RECALL THAT PHRASE?

12   **A.**  YES, I DO.

13   **Q.**  WOULD IT BE HELPFUL FOR ME TO SHOW YOU THE CLAIMS SO YOU

14   HAVE IT IN FRONT OF YOU?

15   **A.**  CERTAINLY.

16   **Q.**  OKAY.

17         **MR. DINOVO:**  IF YOU CAN PULL UP PLAINTIFF'S EXHIBIT

18   3.  AND, YES, CLAIM 45.

19                    (PUBLISHED TO JURY.)

20   **BY MR. DINOVO**

21   **Q.**  I DON'T KNOW IF YOU CAN READ THAT, SIR.

22   **A.**  YES, I CAN.

23   **Q.**  HERE, UNLIKE CLAIM 32, THERE IS THIS NOTION OF SUCCESSFUL

24   TRANSMISSION, RIGHT?

25   **A.**  THAT'S CORRECT.

1  **Q.**  AND HOW WOULD A PERSON OF ORDINARY SKILL IN THE ART

2  UNDERSTAND WHETHER OR NOT SUCCESSFUL TRANSMISSION HAS

3  OCCURRED?

4  **A.**  OKAY.  SO SUCCESSFUL TRANSMISSION WOULD OCCUR WHEN THE

5  PROCESS OF TRANSMISSION IS COMPLETE.  SO, FOR EXAMPLE, WHEN

6  THE INFORMATION RADIATED FROM THE ANTENNA WHEN IT WAS PLACED

7  ON THE ETHERNET CABLE AND WENT OUTWARD FROM THE ADAPTOR, OR

8  SOMETHING LIKE THAT.  IN OTHER WORDS, WHEN WHAT THE

9  TRANSMITTER DOES IS COMPLETED SUCCESSFULLY.

10  **Q.**  IT IS YOUR UNDERSTANDING, IF I GATHER CORRECTLY, THAT

11  "SUCCESSFUL TRANSMISSION" DOESN'T MEAN THAT ANYBODY ACTUALLY

12  GETS IT.

13  **A.**  THAT'S CORRECT.  IT SIMPLY HAS TO LEAVE THE TRANSMITTER

14  SUCCESSFULLY.  THE TRANSMITTER HAS TO HAVE FUNCTIONED

15  PROPERLY.

16  **Q.**  AND THAT IS THE UNDERSTANDING ON WHICH YOU BASED YOUR

17  OPINION?

18  **A.**  THAT'S CORRECT.

19  **Q.**  LET'S TURN TO WICKER DEMONSTRATIVE SLIDE 70.

20      ALL RIGHT, SIR.  SO THIS IS THE ELEMENT THAT YOU

21  ACKNOWLEDGE SCHULL DOESN'T TEACH, RIGHT?

22  **A.**  THAT'S CORRECT.

23  **Q.**  AND SO AS A CONSEQUENCE, YOU TURN TO GRISWOLD TO FILL IN

24  THE GAP, IF YOU WILL?

25  **A.**  ESSENTIALLY.  I FOUND THAT GRISWOLD WOULD HAVE BEEN

1    SOMETHING A PERSON OF SKILL WOULD HAVE LOOKED AT TO ARRIVE AT.

2    **Q.**   OKAY.   SO BASICALLY WHAT THIS SAYS IS -- AND CORRECT ME IF

3    I'M PARAPHRASING IT INCORRECTLY -- THAT AFTER YOU SEND A

4    REQUEST DATAGRAM ACCESS CAN BE PROVIDED FOR A PERIOD OF TIME.

5    **A.**   THAT'S CORRECT.

6    **Q.**   HOW LONG?

7    **A.**   IT DEPENDS ON THE DESIRE OF THE PROGRAMMER.   I DON'T

8    KNOW -- CERTAINLY, THIS PORTION, IN OTHER WORDS, DOESN'T

9    SPECIFY AN AMOUNT OF TIME.

10   **Q.**   OKAY.

11   **A.**   IT SAYS "A LIMITED DURATION."

12   **Q.**   SO WHAT THIS PASSAGE IS REALLY SAYING IS THAT GRISWOLD

13   PROVIDES ACCESS AFTER A REQUEST DATAGRAM IS SENT FOR A LIMITED

14   PERIOD OF TIME.

15   **A.**   LET ME MAKE SURE I UNDERSTAND THE QUESTION.   SO GRISWOLD

16   SAYS WE ARE GOING TO GRANT ACCESS FOR A LIMITED PERIOD OF TIME

17   ONCE THE DATAGRAM HAS BEEN SENT OUT.

18   **Q.**   IT DOESN'T -- THIS PASSAGE DOESN'T ACTUALLY SAY WHAT

19   HAPPENS BEFORE THE DATAGRAM IS SENT OUT, DOES IT?

20   **A.**   WELL, I THINK IT'S DEFINITELY -- WHAT IT IS SAYING IS THAT

21   A USER MAY BE PERMITTED TO USE THE LICENSED PRODUCT AFTER A

22   REQUESTED DATAGRAM HAS BEEN SENT OUT.   THAT TELLS ME THEY

23   WEREN'T ALLOWED BEFORE.

24   **Q.**   THAT IS AN INFERENCE YOU ARE DRAWING?

25   **A.**   I THINK IT IS PRETTY CLEAR.

1    **Q.**  IS THERE ANY SUPPORT IN THE SPECIFICATION THAT YOU ARE

2    RELYING ON?

3    **A.**  COLUMN 4, LINES 23 TO 29.

4    **Q.**  OTHER THAN THAT?  DOES IT SPEAK TO WHAT HAPPENS PRIOR TO

5    THE REQUEST DATAGRAM BEING SENT OUT?

6    **A.**  I WOULD HAVE TO CHECK THE GRISWOLD PATENT, BUT I DON'T

7    RECALL.

8    **Q.**  OKAY.  NOW, IN YOUR REPORT WHERE YOU TRIED TO BE AS

9    THOROUGH AS POSSIBLE, YOU SAID THAT GRISWOLD ANTICIPATED,

10   RIGHT?

11   **A.**  YES.  THAT'S CORRECT.

12   **Q.**  BUT YOU DON'T SAY THAT ANYMORE?

13   **A.**  I ONLY DEALT WITH ONE PRIMARY REFERENCE IN MY TESTIMONY

14   HERE TODAY, AND THAT WOULD HAVE BEEN SCHULL.

15   **Q.**  LET'S PULL UP A FEW OF YOUR SLIDES.  WE CAN TALK THROUGH

16   THOSE, AND THEN I WILL BE DONE.

17            **MR. DINOVO:**  SLIDE 43 OF THE WICKER DEMONSTRATIVE,

18   PLEASE.

19                     (PUBLISHED TO JURY.)

20   **BY MR. DINOVO**

21   **Q.**  AND WE MAY HAVE ALREADY RUN THROUGH THIS, BUT YOUR CURRENT

22   TESTIMONY IS THAT NEITHER CLAIM 2, NOR THE FINAL ELEMENTS, THE

23   FINAL TWO ELEMENTS OF CLAIM 1 ARE PRESENT IN YOUR OPINION IN

24   SCHULL.

25   **A.**  THAT'S RIGHT.

1    **Q.**  OKAY.

2           **MR. DINOVO:**  AND COULD YOU PULL UP SLIDE 67, PLEASE?

3    **BY MR. DINOVO**

4    **Q.**  I JUST WANTED TO TALK ABOUT THIS PASSAGE IN THE CONTEXT OF

5    CLAIM 45.  I THINK YOU TESTIFIED A MOMENT AGO THAT CLAIM 45

6    DOESN'T REFER TO SELECTIVELY GRANTING ACCESS.

7    **A.**  THAT'S CORRECT.  IT TALKS ABOUT GRANTING ACCESS.

8    **Q.**  TALKS ABOUT DENYING ACCESS?

9    **A.**  DENYING ACCESS.

10   **Q.**  OKAY.

11   **A.**  BUT THEREBY AFTER THE DENIAL IS OVER YOU ARE GRANTING

12   ACCESS.

13   **Q.**  WELL, CLAIM 32 TALKS ABOUT BOTH.

14   **A.**  EXPLICITLY TALKS ABOUT BOTH.  EXCUSE ME.

15   **Q.**  ALL RIGHT.  THANK YOU.  AND LET'S TURN TO SLIDE 70.

16        THIS IS AN ACKNOWLEDGMENT THAT SCHULL DOESN'T TEACH THIS

17   ELEMENT OF THE '670 PATENT.

18   **A.**  THAT'S CORRECT.

19   **Q.**  OKAY.  LET'S TURN TO SLIDE 96.  WERE YOU HERE WHEN

20   MR. BETLEM TESTIFIED ABOUT THE MARKET NEED FROM CUSTOMERS FOR

21   FLASH ACCESS?

22   **A.**  YES, I WAS.

23   **Q.**  THAT WAS FOR CONTENT PROTECTION?

24   **A.**  THAT'S CORRECT.

25   **Q.**  DID YOU CONSIDER THAT?

1    **A.**  YES, I DID.

2    **Q.**  LET'S TURN TO THE FOLLOWING SLIDE.  OH, BEFORE WE MOVE OFF

3    THAT ONE, I'M NOT GOING TO GET INTO GREAT DETAIL HERE, BUT YOU

4    UNDERSTAND THERE ARE LATER VERSIONS OF ALM?

5         **MS. MEHTA:**  OBJECTION, YOUR HONOR.  NOW WE ARE BACK

6    INTO EXACTLY WHAT WE TALKED ABOUT YESTERDAY, WHICH IS A

7    VIOLATION OF THE COURT'S RULING ON PRODUCTS THAT WERE EXCLUDED

8    AND THAT AREN'T IN THIS CASE.

9         **MR. DINOVO:**  YOUR HONOR, I'M SIMPLY TRYING TO ADDRESS

10   THE ISSUE –– THE CLAIM THAT THIS PRODUCT WAS FAILED.  AND SO

11   WE CAN PROVIDE INTERROGATORY RESPONSES, OR WHATEVER YOUR HONOR

12   CARES TO.  WE ARE NOT TRYING TO TALK ABOUT THESE PRODUCTS AS

13   IN THE CASE.

14        **MS. MEHTA:**  YOUR HONOR, WHETHER OR NOT THERE ARE

15   SUBSEQUENT PRODUCTS THAT HAVE NOTHING TO DO WITH THE ISSUES IN

16   THIS CASE AND WHETHER OR NOT THEY WORK ANYTHING LIKE ALM HAS

17   NOTHING TO DO WITH HIS OPINION.

18        **THE COURT:**  WHY TALK ABOUT WHETHER IT'S FAILED OR ON

19   WITHOUT TALKING ABOUT FUTURE PRODUCTS THAT ARE NOT BEFORE THIS

20   JURY?

21        **MR. DINOVO:**  I WILL MOVE ON, YOUR HONOR.

22      SLIDE 97.

23   **BY MR. DINOVO**

24   **Q.**  HERE YOU SAY LIVECYCLE DEVELOPED FIRST.  BUT YOU KNOW

25   WE'RE TALKING ABOUT LIVECYCLE RIGHTS MANAGEMENT, RIGHT?

1    **A.**  THAT'S CORRECT.

2    **Q.**  WHEN WAS THAT COMMERCIALLY RELEASED?

3    **A.**  LIVECYCLE RIGHTS MANAGEMENT WAS LATER.  I DON'T REMEMBER

4    THE EXACT DATE SITTING HERE.

5         **MR. DINOVO:**  I WILL PASS THE WITNESS.

6                   **REDIRECT EXAMINATION**

7    **BY MS. MEHTA:**

8    **Q.**  ALL RIGHT.  PROFESSOR WICKER, JUST SOME FOLLOWUP ON THAT.

9         WITH RESPECT TO THE '541 PATENT, THERE WAS SOME DISCUSSION

10   WITH MR. DINOVO AS TO WHETHER OR NOT IT WOULD BE OBVIOUS TO

11   MOVE THE GENERATION OF THE PERMISSION FROM THE SERVER, AS IT'S

12   DONE IN THE ADOBE PRODUCTS OR IN THE SCHULL PATENT, TO THE

13   CLIENT, AS IS REQUIRED BY THE COURT'S CLAIM CONSTRUCTION.

14        CAN YOU EXPLAIN WHY PERSONS OF ORDINARY SKILL IN THE ART

15   WOULD WANT TO DO THAT?  WHY THAT WOULD BE WITHIN THE

16   KNOWLEDGE AND LEVEL OF A PERSON OF ORDINARY SKILL IN THE ART?

17   **A.**  OKAY.  FIRST I WOULD LIKE TO NOTE THAT IT IS SOMETHING

18   THAT IS DISCUSSED IN THE REFERENCES.

19        SECONDLY, THERE ARE REASONS WHY YOU MIGHT WANT TO OFFLOAD

20   SOME COMPLEXITY FROM THE SERVER.  ESPECIALLY IN EARLIER YEARS,

21   COMPLEXITY WAS AN ISSUE AT SERVERS.  AND THE MORE COMPLICATED

22   THE SERVER, THE MORE LIKELY YOU WOULD HAVE PROBLEMS.

23        SO THERE HAS DEFINITELY BEEN AN EFFORT OVER TIME TO TRY TO

24   PUSH OUT SOME OF THAT FUNCTIONALITY.  NOW, A PERSON OF SKILL

25   IN THE ART -- AND, AGAIN, IN MY OPINION A PERSON WITH AN

1    ELECTRICAL ENGINEERING OR COMPUTER SCIENCE DEGREE AND TWO

2    YEARS OF WORK EXPERIENCE, THEY WOULD HAVE KNOWN HOW TO USE THE

3    SOFTWARE FUNCTIONALITY THAT WAS IN THE SERVER TO DUPLICATE

4    THAT FUNCTIONALITY AT A CLIENT.  IT IS SOMETHING THAT WOULD

5    HAVE BEEN WELL WITHIN THEIR ABILITIES.

6    **Q.**  WOULD THAT HAVE BEEN KNOWN TO A PERSON OF ORDINARY SKILL

7    IN THE ART APPLYING DR. KELLER'S DEFINITION OF THAT LEVEL?

8    **A.**  YES.  AGAIN, THE DISTINCTION IS THAT HE SAYS:

9       "OR IT CAN BE A PERSON WITH A MASTER'S DEGREE."  I DON'T

10   THINK THAT'S A SIGNIFICANT DIFFERENCE GIVEN THESE QUESTIONS.

11   **Q.**  NOW, WERE YOU IN THE COURTROOM LAST WEEK WHEN MR. VENTERS

12   TESTIFIED ABOUT THIS CONCEPT OF A CLIENT-CENTRIC SYSTEM?

13   **A.**  YES.

14   **Q.**  HOW DOES THAT RELATE TO WHAT YOU JUST DESCRIBED IN TERMS

15   OF MOVING THE GENERATION OF A PERMISSION FROM THE SERVER TO

16   THE CLIENT AS REQUIRED BY THE PATENT?

17   **A.**  THE CLIENT-CENTRIC SYSTEM MEANS FOCUSING THE FUNCTIONALITY

18   ON THE CLIENT.  SOME OF THE BENEFITS THAT HAVE BEEN DISCUSSED,

19   SUCH AS THE ONES I'VE JUST MENTIONED, ALSO INCLUDE SOME

20   POTENTIAL BENEFITS IN TERMS OF HIJACKING, THAT HAS BEEN

21   MENTIONED.

22      BUT, BASICALLY, CLIENT-CENTRIC MEANS MOVING FUNCTIONALITY

23   INTO THE CLIENT.  DOING MOST OF IT THERE INSTEAD OF AT THE

24   SERVER.

25   **Q.**  NOW, MR. DINOVO ASKED YOU SOME QUESTIONS ABOUT WHETHER OR

1   NOT THE SCHULL '070 PATENT DISCLOSES GENERATING A PASSWORD AT

2   THE SERVER, AND THEN TRANSMITTING IT AND STORING IT AT THE

3   CLIENT.

4        AND I WANT YOU TO FOCUS IN ON HOW THAT RELATES TO THE

5   ADOBE PRODUCTS IN TERMS OF YOUR INFRINGEMENT, NONINFRINGEMENT

6   OPINION AND YOUR INVALIDITY OPINION.

7   **A.**  OKAY.  BASICALLY, WHAT IS HAPPENING IN SCHULL IS YOU'VE

8   GOT A SEED THAT IS A SECRET.  OKAY?  HE'S TALKED ABOUT THE

9   SECRETS BEING STORED AT THE SERVER.

10       THAT SECRET IS THEN ENCRYPTED.  SENT ACROSS THE

11  COMMUNICATION LINK, AND IT ARRIVES AT THE CLIENT WHERE THE

12  CLIENT CAN DECRYPT IT AND USE THAT SECRET, THAT SEED TO ACCESS

13  THE CONTENT.

14       WELL, THAT'S BASICALLY WHAT ADOBE'S ACCUSED PRODUCTS DO.

15  THEY HAVE PASSWORDS THAT ARE EMBEDDED IN VOUCHERS WHICH ARE

16  ENCRYPTED AT THE SERVER AND SENT TO THE CLIENT WHERE THEY ARE

17  DECRYPTED TO RECOVER THE INFORMATION THAT WAS ORIGINALLY AT

18  THE SERVER.

19       SO WE'VE GOT THE SAME SITUATION.  IN THE ADOBE PRODUCTS,

20  YOU HAVE GOT SOMETHING AT THE SERVER WHICH IS EVENTUALLY GOING

21  TO BE AT THE CLIENT.  THE SAME THING.  AND THAT IS WHAT

22  PROFESSOR SCHULL WAS TEACHING.

23       THE SECRET IS OVER HERE AT THE SERVER AND EVENTUALLY IT IS

24  GOING TO BE OVER HERE AT THE CLIENT AND USED TO ACCESS THE

25  PRODUCT.

1   **Q.**  NOW, IN PROFESSOR SCHULL'S SYSTEM IN HIS PATENT, DOES THE

2   PASSWORD THAT GETS TRANSMITTED TO THE CLIENT, WOULD THAT WORK

3   WITHOUT DECRYPTION?

4   **A.**  NO.

5   **Q.**  CAN YOU PLEASE EXPLAIN THAT?

6   **A.**  IT WOULDN'T WORK BECAUSE YOU'VE GOT TO DECRYPT THAT

7   PASSWORD.  AND THE THING ABOUT PROFESSOR SCHULL'S PATENT YOU

8   HAVE TO REMEMBER THE PASSWORD IS AN ENCRYPTED SEED.  SO YOU

9   HAVE TO DECRYPT THE PASSWORD TO GET THE SEED, AND USE THE SEED

10  TO ACCESS THE CONTENT.

11  **Q.**  THERE WAS SOME TESTIMONY FROM PROFESSOR SCHULL AND SOME

12  QUESTIONS FROM MR. DINOVO ABOUT WHETHER OR NOT THE PASSWORD IN

13  THE SCHULL SYSTEM IS A STRING OF NUMBERS.  DO YOU RECALL THAT?

14  **A.**  YES.

15  **Q.**  DOES THAT HAVE ANYTHING TO DO WITH THE CLAIM REQUIREMENTS

16  OF THE '541 PATENT?

17  **A.**  NO.

18  **Q.**  CAN YOU EXPLAIN WHY NOT?

19  **A.**  BASICALLY, WHAT'S CALLED FOR ARE PERMISSIONS, YOU KNOW,

20  VARIOUS THINGS.  BUT THERE IS NO LIMITATION ON THE DATA

21  FORMAT. IN OTHER WORDS, THERE IS NOTHING IN THE CLAIM LANGUAGE

22  THAT SAYS YOUR PASSWORD HAS TO HAVE A CERTAIN FORM, OR YOUR

23  SEED, OR WHATEVER THE CASE MAY BE.  SO I DON'T UNDERSTAND THE

24  ISSUE.

25      I DON'T SEE WHY IT CAN'T BE A STRING OF NUMBERS.

1    **Q.**  NOW, IN TERMS OF THE CLAIM CONSTRUCTION FOR TOKEN, YOU

2    UNDERSTAND THAT REQUIRES A FILE, RIGHT?

3    **A.**  YES.

4    **Q.**  NOW, YOU'RE NOT CONTENDING THAT THE SCHULL REFERENCE

5    ITSELF DISCLOSES A TOKEN?

6    **A.**  THAT'S CORRECT.  IT DOES NOT.

7    **Q.**  SO YOUR ANALYSIS WITH RESPECT TO THE SCHULL PATENT IS

8    UNDER DIGITAL REG'S INFRINGEMENT THEORY?

9    **A.**  THAT'S CORRECT.

10   **Q.**  NOW, I WANT TO TURN A BIT TO '670 PATENT.  AND THERE WAS A

11   GOOD DEAL OF DISCUSSION ABOUT THE FILE HISTORY ON THE '670 AND

12   STATEMENTS THAT WERE MADE WITH RESPECT TO NOTIFICATION

13   INFORMATION.

14       DO YOU RECALL THAT?

15   **A.**  YES, I DO.

16   **Q.**  AND THERE WAS A DISCUSSION ABOUT NOTIFICATION INFORMATION

17   REQUIRING THE ABILITY TO TRACK.

18       DO YOU RECALL THAT?

19   **A.**  YES, I DO.

20   **Q.**  DID DR. DEVANBU OFFER ANY OPINION THAT FOR PURPOSES OF THE

21   INFRINGEMENT READ THAT THAT WAS THE NOTIFICATION INFORMATION

22   DEFINITION THAT HE WAS APPLYING?

23   **A.**  NO.

24   **Q.**  SO CAN YOU EXPLAIN, THEN, HOW YOUR OPINION WITH RESPECT TO

25   INVALIDITY FOR THE NOTIFICATION INFORMATION RELATES TO DIGITAL

```
 1   REG'S INFRINGEMENT THEORY?

 2   A.  OKAY.  SO BASICALLY THE NOTIFICATION INFORMATION IS A

 3   REQUEST FOR ACCESS WITH SOME POTENTIALLY REGISTRATION

 4   INFORMATION INCLUDED.

 5       THERE IS NOTHING BUILT IN THAT WOULD PROVIDE A HIGHER

 6   LEVEL OF TRACKING, ACCORDING TO DIGITAL REG'S INFRINGEMENT

 7   THEORY.  AND SO THAT IS THE WAY I WAS APPLYING IT, MY

 8   ANALYSIS.

 9   Q.  NOW, DOCTOR -- I AM SORRY -- MR. DINOVO POINTED YOU TO

10   CLAIM 32 AND SOME LANGUAGE IN CLAIM 45.  DO YOU RECALL THAT?

11   A.  YES, I DO.

12   Q.  I THINK HE WAS TRYING TO DRAW A DISTINCTION BETWEEN THE

13   CONCEPT OF GRANTING ACCESS AND DENY ACCESS UNTIL.  DO YOU

14   RECALL THAT?

15   A.  YES, I DO.

16   Q.  IS THAT A VALID DISTINCTION FROM YOUR PERSPECTIVE?

17   A.  NO, I THINK BOTH CLAIMS ARE TALKING ABOUT THE SAME THING

18   IN THE SENSE OF WE DENY UNTIL A POINT, OR WE GRANT AFTER A

19   POINT.  IT AMOUNTS TO THE SAME THING.

20   Q.  NOW, MR. DINOVO WAS ALSO ASKING YOU SOME QUESTIONS ABOUT

21   SUCCESSFULLY TRANSMITTING AS OPPOSED TO RECEIVING SOMETHING

22   BACK.

23       AND I THINK HE WAS ASKING YOU WHETHER THE LANGUAGE OF

24   RECEIPT IS IN THE CLAIMS.  I WOULD LIKE TO FOCUS YOU IN ON --

25           MS. MEHTA:  AND, MR. BONINI, IF YOU WOULDN'T MIND
```

1    PULLING UP EXHIBIT THREE, AT PAGE 023.  THIS IS THE '670

2    PATENT.

3        AND IF YOU CAN HIGHLIGHT UNDER THE SUMMARY OF THE

4    INVENTION, JUST THE FIRST TWO PARAGRAPHS.  BLOW UP THOSE UP

5    FOR US.

6                        (PUBLISHED TO JURY.)

7        DR. WICKER, IF YOU CAN READ THE LAST SENTENCE OF THE FIRST

8    PARAGRAPH?

9    A.  OKAY.

10   Q.  THE EXECUTABLE INSTRUCTIONS DENY ACCESS TO THE ELECTRONIC

11   CONTENT UNTIL THE NOTIFICATION INFORMATION IS TRANSMITTED

12   SUCCESSFULLY.  DO YOU SEE THAT?

13   A.  YES, I DO.

14   Q.  AND THAT'S SIMILAR TO THE LANGUAGE IN CLAIM 45.

15   A.  THAT'S CORRECT.

16   Q.  IF YOU CAN GO TO THE NEXT PARAGRAPH WHERE IT IS DESCRIBING

17   OTHER EMBODIMENTS, AND THE SECOND SENTENCE SAYS:

18       "THE EXECUTABLE INSTRUCTIONS MAY DENY ACCESS UNTIL AN

19   ACCESS-GRANTING MESSAGE IS RECEIVED IN RESPONSE TO THE

20   SUCCESSFUL TRANSMISSION OF NOTIFICATION INFORMATION.  DO YOU

21   SEE THAT?

22   A.  YES, I COULD.

23   Q.  COULD YOU EXPLAIN HOW THOSE TWO CONCEPTS EITHER RELATE OR

24   DON'T RELATE TO ONE ANOTHER?

25   A.  OKAY.  SO LET'S TAKE THE FIRST -- CAN I POINT AT THE

1   SCREEN?

2        **MS. MEHTA:**  MR. BONINI, IF YOU CAN JUST HIGHLIGHT THE

3   TWO SENTENCES I READ SO WE CAN BE FOCUSED IN ON THEM?

4        **THE WITNESS:**  WE HAVE TWO DIFFERENT CONCEPTS.  THIS

5   CONCEPT, THE EXECUTABLE INSTRUCTIONS DENY ACCESS TO THE

6   ELECTRONIC CONTENT UNTIL THE NOTIFICATION INFORMATION IS

7   TRANSMITTED SUCCESSFULLY.  UNTIL IT LEAVES.

8        SO THE TRIGGER IS THE SUCCESSFUL TRANSMISSION.

9        IF YOU WILL GO TO THE SECOND SENTENCE, I THINK IT STARTS

10   HERE (INDICATING.)

11        "THE EXECUTABLE INSTRUCTIONS MAY DENY ACCESS UNTIL AN

12   ACCESS-GRANTING MESSAGE IS RECEIVED IN RESPONSE TO THE

13   SUCCESSFUL TRANSMISSION OF NOTIFICATION INFORMATION."

14        SO HERE THE TRIGGER IS RECEIVING A RESPONSE.

15   SPECIFICALLY, RECEIVING AN ACCESS-GRANTING MESSAGE.  TWO

16   DIFFERENT TRIGGERS.

17        SO THE TRIGGER HERE:

18        "SUCCESSFUL TRANSMISSION." HERE, I'M POINTING TO THE FIRST

19   SENTENCE.

20        THE SECOND SENTENCE THE TRIGGER IS:

21        "RECEIVING AN ACCESS-GRANTING MESSAGE."

22   **Q.**  WHICH ONE OF THOSE IS CLAIMED IN CLAIM 45?

23   **A.**  THAT WOULD BE THE FIRST ONE.

24   **Q.**  NOW, JUST TO WRAP UP ON A COUPLE OF LAST THINGS.  WITH

25   RESPECT TO YOUR SECONDARY CONSIDERATIONS ANALYSIS, THERE WAS

1    SOME QUESTIONS FROM MR. DINOVO ABOUT MR. BETLEM'S TESTIMONY

2    RELATING TO FLASH ACCESS.  DO YOU RECALL THAT?

3    **A.**  YES.

4    **Q.**  WHAT WAS ARE THE TIMING OF MR. BETLEM'S FLASH ACCESS

5    TESTIMONY?  AND HOW WOULD THAT RELATE TO THE TIMING FOR THE

6    OBVIOUSNESS ANALYSIS IN THIS CASE?

7    **A.**  OKAY.  SO MR. BETLEM WAS TALKING ABOUT THE CURRENT SUCCESS

8    OF FLASH, WHERE IT IS CURRENTLY IN THE WORLD OF -- WELL, OUR

9    FOCUS IS ON DRM.

10       SO FOR PURPOSES OF OBVIOUSNESS, I WAS LOOKING AT THE TIME

11   OF THE INVENTION.  SO I WAS LOOKING MUCH EARLIER.  SO MY

12   OBVIOUSNESS ANALYSIS FOCUSED ON AN EARLIER POINT IN TIME THAN

13   WHAT MR. BETLEM WAS TALKING ABOUT.

14   **Q.**  DID YOU FIND ANY EVIDENCE IN THE RECORD THAT THERE WAS ANY

15   LONG FELT OR UNRESOLVED NEED FOR THE CLAIMED INVENTIONS OF

16   EITHER OF THE '541 OR '670 PATENTS AT THE APPROPRIATE TIME FOR

17   THE OBVIOUSNESS ANALYSIS?

18   **A.**  NO.

19   **Q.**  AND THEN, THERE WAS ALSO A SUGGESTION FROM MR. DINOVO

20   THAT -- OR LET ME STATE IT A LITTLE BIT ARE DIFFERENTLY SO YOU

21   CAN REMEMBER WHAT I AM REFERRING TO.

22       MR. DINOVO ASKED YOU ABOUT THE LIVECYCLE POLICY SERVER.

23   DO YOU RECALL THAT?

24   **A.**  YES, I DO.

25   **Q.**  OR LIVECYCLE RIGHTS MANAGEMENT?

1    **A.** YES.

2    **Q.** AND HE ASKED YOU ABOUT WHEN THAT PRODUCT WAS RELEASED.  DO

3    YOU RECALL THAT?

4    **A.** YES, I DO.

5    **Q.** YOU WE ARE HERE FOR MR. HERBACH'S TESTIMONY, RIGHT?

6    **A.** YES.

7    **Q.** YOU RECALL MR. HERBACH TESTIFIED THERE WAS ANOTHER NAME

8    FOR THE PRODUCT BEFOREHAND?

9    **A.** YES.

10   **Q.** DO YOU RECALL WHEN MR. HERBACH TESTIFIED THAT HE FIRST

11   IMPLEMENTED OR CAME UP WITH THE DRM TECHNIQUES THAT ARE USED

12   IN LIVECYCLE THAT STILL EXIST TO THIS DAY?

13   **A.** YES.  I BELIEVE HE SAID IT WAS EARLIER.

14   **Q.** OKAY.

15           **MS. MEHTA:**  I PASS THE WITNESS, YOUR HONOR.

16                       **RECROSS-EXAMINATION**

17   **BY MR. DINOVO**

18   **Q.** JUST A FEW LAST QUESTIONS.  NOW, REFERRING BACK TO THE

19   TESTIMONY OF PROFESSOR SCHULL.

20   **A.** YES.

21   **Q.** YOU RECALL THAT HE SAID THAT WHEN THE PASSWORD WAS SENT

22   THERE WERE NO PERMISSIONS SENT WITH IT, RIGHT?

23   **A.** I BELIEVE THE SPECIFIC CONTEXT THERE WERE NO SPECIFIC

24   PERMISSIONS WITH REGARD TO:  "CAN ARE YOU PRINT?  CAN YOU DO

25   SPECIFIC THINGS?"  IT IS SIMPLY GRANTED ACCESS.

1    **Q.**  OKAY.

2    **A.**  YES, THAT IS WHAT HE SAID.

3    **Q.**  OKAY.  AND YOU ALSO HEARD HIM SAY, DIDN'T YOU, THAT THE

4    PASSWORD AS HE IMPLEMENTED IT WAS NOT A FILE.

5    **A.**  HE SAID IT WAS A STRING OF NUMBERS.

6    **Q.**  AND NOT A FILE.

7    **A.**  I BELIEVE HE MAY HAVE SAID THAT.

8    **Q.**  AND YOU DON'T DISAGREE WITH HIM?

9    **A.**  I DON'T BELIEVE HE ESTABLISHED A CONTEXT WITH THE QUESTION

10   AS TO WHETHER OR NOT IT WAS A FILE, SO I'M NOT CERTAIN WHAT HE

11   WAS THINKING.  THERE WOULD BE CERTAIN CASES WHERE YOU CAN TURN

12   A STRING OF NUMBERS INTO A FILE.  CERTAIN CASES WHERE YOU HAVE

13   TO.  AND CERTAIN CASES WHEN YOU DON'T.

14   **Q.**  OKAY.  BUT I THINK YOUR OWN TESTIMONY THERE INDICATES IT

15   IS NOT A FILE UNTIL YOU TURN IT INTO ONE, RIGHT?

16   **A.**  WELL, THAT IS CERTAINLY TRUE.

17   **Q.**  OKAY.  GOOD.

18       NOW, THERE IS A LOT OF THINGS THAT THE PARTIES DISAGREE

19   ABOUT.  LET'S ESTABLISH WHAT THE EXPERTS, AT LEAST THE

20   EXPERTS, THE VALIDITY EXPERTS AGREE ON.

21       IN THE '541 PATENT SCHULL DOESN'T TEACH A TOKEN?

22   **A.**  WELL, DR. KELLER AND I AGREE ON THAT.  DR. DEVANBU DOES

23   NOT.

24   **Q.**  OKAY.  LET'S JUST TALK ABOUT YOU AND DR. KELLER, YOUR

25   COUNTERPART, ON VALIDITY.

1    **A.**  OKAY.

2    **Q.**  THERE IS NO TOKEN IN THE '541 TAUGHT IN SCHULL?

3    **A.**  THAT'S CORRECT.

4    **Q.**  THERE IS NO PERMISSION TAUGHT IN SCHULL.

5    **A.**  THERE'S -- YOU'RE -- LITTLE MORE TO IT THAN THAT.  THERE

6    IS PERMISSION IN THE SENSE THAT YOU ARE PROVIDED WITH ACCESS.

7    BUT THERE IS NO PERMISSION AS CALLED FOR IN THE FINAL STEP OF

8    THE CLAIM.

9    **Q.**  PART OF THAT IS BECAUSE THERE IS NO GENERATION OF THE

10   PERMISSION BASED ON THE RECEIVED TOKEN?

11   **A.**  THAT'S CORRECT.

12   **Q.**  SO YOU AND DR. KELLER AGREE ON THAT.

13       AND THEN WITH RESPECT TO THE '670, YOU AND DR. KELLER

14   AGREE THERE IS NO DENIAL OF ACCESS UNTIL A SUCCESSFUL

15   TRANSMISSION TAUGHT IN SCHULL.

16   **A.**  IN SCHULL, THAT'S CORRECT.

17   **Q.**  OKAY.  NOW, LET ME REFER -- WE TALKED A LITTLE BIT ABOUT

18   SUCCESSFUL TRANSMISSION.  DO YOU DEGREE WITH ME THAT

19   SUCCESSFUL TRANSMISSION CAN BE SHOWN BY A NETWORK

20   ACKNOWLEDGMENT, WITHIN THE MEANING OF THE '670 PATENT?

21   **A.**  WHAT DO YOU MEAN BY A "NETWORK ACKNOWLEDGMENT"?

22   **Q.**  YOU DON'T KNOW WHAT THAT IS?

23   **A.**  THAT IS ACTUALLY NOT A COMMON TERM OF ART.  IF YOU MEAN

24   THERE IS A NETWORK LAYER RESPONSE OF SOME KIND, AN ACT, THAT

25   WOULD CERTAINLY BE ONE WAY OF SHOWING THAT THE TRANSMISSION

 1    REACHED THE FAR END.

 2    **Q.**  SO YOU ARE NOT FAMILIAR WITH THE TERM "NETWORK

 3    ACKNOWLEDGMENT"?

 4    **A.**  NOT IN THE CONTEXT YOU ARE USING IT.  THERE IS A NETWORK

 5    LAYER AC.  THERE ARE SUCH THINGS.

 6    **Q.**  OKAY.  WELL, LET'S LOOK --

 7    **A.**  OR DATA LINK LAYER, I SHOULD SAY.

 8    **Q.**  LET'S LOOK AT EXHIBIT 3, PAGE 26.  AND COLUMNS 17 THROUGH

 9    20.

10         **MR. DINOVO:**  EXCUSE ME.  COLUMN 8, LINE 17 THROUGH

11    20.  CAN WE PUT THAT ON THE SCREEN, PLEASE?

12                        (PUBLISHED TO JURY.)

13    **BY MR. DINOVO**

14    **Q.**  SO LET ME LET YOU CATCH UP.  THERE IS A LOT OF WORDS

15    THERE.  BUT DO YOU SEE THE LINE BEGINNING "ADDITIONALLY"?  IT

16    SAYS -- LET ME JUST READ IT INTO THE RECORD.

17         "ADDITIONALLY, EVEN THOUGH TRANSMISSION DOES NOT RESULT IN

18    A NETWORK SERVICE ERROR, THE COMPUTER SENDING THE NOTIFICATION

19    INFORMATION, 130A, 130B, MAY NOT RECEIVE A NETWORK

20    ACKNOWLEDGMENT, MESSAGE THAT INDICATES SUCCESSFUL TRANSMISSION

21    AND RECEIPT OF THE NOTIFICATION INFORMATION."

22         DO YOU SEE THAT?

23    **A.**  YES, I DO.

24    **Q.**  SO YOU SEE THAT THE '670 PATENT TALKS ABOUT A NETWORK

25    ACKNOWLEDGMENT INDICATING SUCCESSFUL TRANSMISSION.

1  **A.**  THAT'S CORRECT.

2  **Q.**  OKAY.  NOW, JUST THE LAST QUESTION, THERE WAS SOME

3  DISCUSSION ABOUT THE TIME OF THE INVENTION AND THE LONG FELT

4  NEED.

5      YOU ARE NOT SAYING THAT –– OR THE CUSTOMER NEED.  YOU ARE

6  NOT SAYING THAT THE CUSTOMER NEED AROSE AFTER THE INVENTION,

7  ARE YOU?  BECAUSE YOU WERE SAYING THAT FLASH ACCESS CAME

8  LATER.

9  **A.**  OH, I'M NOT SUGGESTING THERE WAS EVER A CUSTOMER NEED FOR

10  WHAT IS IN THE DIGITAL REG PATENTS.

11  **Q.**  I'M CONFUSED WHY IT'S RELEVANT IN YOUR OPINION THAT ADOBE

12  TESTIFIED THAT THERE WAS A CUSTOMER NEED FOR CONTENT

13  PROTECTION.  AND YOU SAID, WELL, THAT WAS A FEW YEARS LATER.

14  **A.**  I THINK THE POINT WAS THAT, YOU KNOW, ADOBE'S RESPONDING

15  TO THE NEEDS OF THE CUSTOMER SHOULD NOT BE TAKEN AS AN

16  INDICATION THAT THERE WAS A LONG FELT NEED FOR WHAT DIGITAL

17  REG PATENTED.  I DON'T THINK THAT IS THE CASE.

18  **Q.**  OKAY.  BUT THERE WAS A CUSTOMER NEED ADOBE TALKED ABOUT

19  FOR DRM AND THAT PRODUCT?

20  **A.**  THAT'S CORRECT.

21          **MR. DINOVO:**  NO MORE QUESTIONS.  THANK YOU, SIR.

22          **MS. MEHTA:**  YOUR HONOR, I HAVE ONE OR TWO.

23              **FURTHER REDIRECT EXAMINATION**

24  **BY MS. MEHTA:**

25  **Q.**  DR. WICKER, I JUST WANT TO BE VERY CLEAR ABOUT YOUR

1    OPINIONS, BECAUSE WE TALKED A LOT ABOUT MOVING PARTS AND CLAIM

2    LIMITATIONS AND ALL OF THAT.

3        IF THE JURY WERE TO REJECT DR. DEVANBU'S INFRINGEMENT

4    ANALYSIS, UNDER YOUR OPINION WOULD THE CLAIMS OF THE '541 AND

5    '670 PATENT STILL BE INVALID?

6    **A.**  YES.

7    **Q.**  CAN YOU JUST EXPLAIN THAT.  BECAUSE WE DID A LOT OF:

8        "WELL, UNDER HIS THEORY THIS."

9        BUT EXPLAIN IF THEY WERE TO FIND THAT THERE IS NO

10   INFRINGEMENT BY ADOBE, WHAT WOULD BE THE THEORY UNDER WHICH --

11   OR OPINION UNDER WHICH YOU WOULD BE OFFERING AN INVALIDITY

12   OPINION FOR THE TWO PATENTS?

13   **A.**  OKAY.  SO THERE ARE CERTAIN THINGS THAT AREN'T IN SCHULL.

14   SO THEN THE QUESTION I ASKED MYSELF WAS:  WOULD A PERSON OF

15   SKILL HAVE WANTED TO PUT THE THINGS THAT ARE MISSING IN

16   ANYWAY?  ARE THEY TAUGHT BY ANOTHER REFERENCE?  OR WOULD IT

17   SIMPLY BE SOMETHING THAT THEY WOULD KNOW HOW TO DO?

18       THIS FALLS UNDER OBVIOUSNESS.  AND, IN MY OPINION, THESE

19   CLAIMS ARE OBVIOUS.  IN OTHER WORDS, A PERSON OF SKILL GIVEN

20   KNOWLEDGE OF THE PRIOR ART WOULD HAVE KNOWN THESE THINGS AND

21   NOT BEEN SURPRISED BY HOW THEY WORKED.

22           **MS. MEHTA:**  THANK YOU, YOUR HONOR.  NO FURTHER

23   QUESTIONS.

24           **THE COURT:**  ANYTHING FURTHER?

25           **MR. DINOVO:**  NO, YOUR HONOR.

```
1           THE COURT:  ALL RIGHT.  YOU'RE EXCUSED.  YOU MAY STEP

2    DOWN.

3           THE WITNESS:  THANK YOU, YOUR HONOR.

4           THE COURT:  ARE YOU PREPARED TO REST AT THIS POINT

5    SUBJECT TO ADMISSION OF EXHIBITS?

6           MS. MEHTA:  YES, YOUR HONOR.  SUBJECT TO ADMISSION OF

7    EXHIBITS, DEFENDANTS REST.

8           THE COURT:  DID YOU HAVE ANY REBUTTAL?

9           MR. DINOVO:  WE HAVE DR. ARTHUR KELLER ON VALIDITY.

10          THE COURT:  ALL RIGHT.  YOU MAY CALL HIM.

11          MR. DINOVO:  ALL RIGHT.  OH, AND YOUR HONOR, PENDING

12   SUBMISSION OF THE EXHIBITS, YOUR HONOR, WE WOULD URGE THE

13   CUSTOMARY MOTIONS AT THIS POINT RELATING TO THEIR INVALIDITY

14   DEFENSE.

15          THE COURT:  YES, YOU WILL BE DEEMED TO HAVE MADE THEM

16   AND I WILL TAKE THEM UNDER SUBMISSION AND --

17          MR. REINES:  HE IS SUBMITTING THEM IN WRITING

18   TONIGHT.

19          THE COURT:  WE WILL DISCUSS IT LATER.

20          THE CLERK:  PLEASE STAND, AND RAISE YOUR RIGHT HAND.

21        (ARTHUR KELLER, CALLED AS A WITNESS FOR THE PLAINTIFF,

22   HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

23          THE WITNESS:  YES.

24          THE CLERK:  PLEASE BE SEATED.  AND ONCE SEATED, I'M

25   GOING TO ASK THAT YOU PLEASE STATE AND SPELL YOUR FIRST NAME
```

1    FOR THE RECORD, PLEASE.

2            **THE WITNESS:**  MY NAME IS ARTHUR KELLER.  A-R-T-H-U-R,

3    K-E-L-L-E-R.

4            **THE CLERK:**  THANK YOU.

5                        <u>**DIRECT EXAMINATION**</u>

6    **BY MR. DINOVO**

7    **Q.**  ALL RIGHT.  GOOD MORNING, DR. KELLER.  WHAT IS LEFT OF THE

8    MORNING.  COULD YOU PLEASE INTRODUCE YOURSELF TO THE JURY?

9    **A.**  SORRY.  MY MOUTH IS A LITTLE DRY.

10            **THE CLERK:**  THERE'S CUPS AND WATER.

11            **THE WITNESS:**  YES.  THANK YOU.  I JUST HAD ONE.

12      MY NAME IS ARTHUR KELLER, AND I LIVE IN PALO ALTO,

13    CALIFORNIA, RIGHT NEAR HERE.

14    **Q.**  ON WHAT SUBJECT WILL YOU BE TESTIFYING HERE TODAY?

15    **A.**  I WILL BE TESTIFYING ON THE VALIDITY OF THE TWO PATENTS,

16    THE '541 AND THE '670 PATTERSON PATENTS.

17    **Q.**  OKAY.  AND I THINK THE JURY AND EVERYONE IN THE COURTROOM

18    ARE FAMILIAR WITH THE GENERAL SUBJECT MATTER.  WHAT

19    EDUCATIONAL BACKGROUND DO YOU HAVE THAT IS RELATED TO THAT?

20    **A.**  SURE.  I RECEIVED MY BACHELOR'S DEGREE IN COMPUTER --

21    INFORMATION SCIENCE AND MATHEMATICS.  BOTH MAJORS AT BROOKLYN

22    COLLEGE, THE CITY UNIVERSITY OF NEW YORK.

23        AND THEN, I RECEIVED A MASTER'S DEGREE IN COMPUTER SCIENCE

24    AND PH.D. IN COMPUTER SCIENCE FROM STANFORD UNIVERSITY.

25    **Q.**  ALL RIGHT, SIR.  AND WHEN DID YOU RECEIVE YOUR PH.D. FROM

1    STANFORD?

2    **A.**  IN 1985.

3    **Q.**  DO YOU HAVE ANY TEACHING EXPERIENCE IN THE FIELD OF

4    COMPUTER SCIENCE?

5    **A.**  YES.  SHORTLY AFTER RECEIVING MY BACHELOR'S DEGREE I

6    TAUGHT AT BROOKLYN COLLEGE A COURSE IN COMPUTERS AND SOCIETY.

7        AND THEN, AT STANFORD UNIVERSITY I TAUGHT COURSES IN

8    INTRODUCTORY COMPUTER PROGRAMMING AND ALSO VARIOUS ASPECTS OF

9    DATABASES.

10       ALSO WHILE I WAS AT STANFORD, I TAUGHT COURSES AT AN

11   ORGANIZATION CALLED "THE WESTERN INSTITUTE OF COMPUTER

12   SCIENCE."  AND THESE ARE COURSES IN ELECTRONIC COMMERCE,

13   INTERNET SECURITY, OBJECT-RELATIONAL DATABASES AND THE LIKE.

14       INTERNET SECURITY.  OBJECT-ORIENTED DATABASES -- SORRY.  I

15   AM TALKING TOO FAST.  I APOLOGIZE.

16       IN ADDITION, I WAS INVITED TO TEACH WHILE AT STANFORD AT

17   THE HELSINKI UNIVERSITY OF TECHNOLOGY IN FINLAND, AND ALSO AT

18   PASCAL UNIVERSITY IN ARGENTINA.  AND I TAUGHT COURSES ON

19   DATABASES THERE.

20       AND, AFTERWARDS, I TAUGHT AT THE UNIVERSITY OF CALIFORNIA

21   AT SANTA CRUZ.

22   **Q.**  DO YOU HAVE ANY POSITIONS WITH ANY PROFESSIONAL SOCIETIES

23   IN THE FIELD OF COMPUTER SCIENCE?

24   **A.**  YES.  I AM THE STANDARDS COORDINATOR FOR THE IEEE VOTING

25   STANDARDS COMMITTEE?

1  **Q.** DOES THAT WORK HAVE ANY APPLICATION HERE IN THIS AREA?

2  **A.** YES, IT DOES.  SO WE ARE FINALIZING A STANDARD ON ELECTION

3  RESULTS REPORTING.  SO THAT THE RESULTS THAT YOU GET ON

4  ELECTION NIGHT WILL BE MORE DETAILED AND MORE COMPLETE AND

5  AVAILABLE FOR RESEARCHERS TO ANALYZE BETTER AND THE PRESS TO

6  PRODUCE BETTER PREDICTIONS OF WHO WON.

7      IN ADDITION, I JUST GOT NOTIFICATION LAST NIGHT THAT THE

8  IEEE POWERS THAT BE APPROVED A NEW STANDARD THAT WE ARE

9  STARTING WORK ON, WHICH IS RECOMMENDED PRACTICE FOR VOTING

10  METHODS MATHEMATICAL MODELS.

11      AND ONE OF THE VOTING METHODS THAT IS USED AS AN EXAMPLE

12  IS SOMETHING THAT IS CALLED "RANK CHOICE VOTING."  THAT THOSE

13  OF YOU FROM OAKLAND MAY BE FAMILIAR WITH IN THE MAYOR'S RACE

14  SO UNDERSTANDING MORE PRECISELY WHAT RANK CHOICE VOTING MEANS

15  WOULD BE QUITE USEFUL.

16  **Q.** ANYTHING ELSE THAT YOU ARE INVOLVED IN IN THE PUBLIC

17  SECTOR HERE IN NORTHERN CALIFORNIA?

18  **A.** YES.  I ALSO SERVE ON THE PLANNING AND TRANSPORTATION

19  COMMISSION FOR THE CITY OF PALO ALTO.  THAT IS A VOLUNTEER

20  POSITION FOR RESIDENT.  I'M CURRENTLY ACTING -- CURRENTLY IN

21  THE ROLE OF VICE CHAIR.

22  **Q.** DO YOU HAVE ANY PRACTICAL WORK EXPERIENCE IN THE FIELD OF

23  COMPUTER SCIENCE?

24  **A.** YES.  WHILE I WAS AT STANFORD UNIVERSITY I WAS CHIEF

25  TECHNICAL ADVISER AND A MEMBER OF THE BOARD OF DIRECTORS OF

1    PERSISTENT SOFTWARE WHICH DID WORK IN OBJECT-RELATIONAL

2    DATABASES, AND THEN ON APPLICATION SERVERS FOR INTERNET

3    COMMERCE.

4        AND I ALSO A CO-FOUNDER AND CFO AND MEMBER OF THE BOARD OF

5    DIRECTORS OF MERCHANT SYSTEMS THAT DID ELECTRONIC COMMERCE

6    CATALOGUE INTEGRATION.

7        ALSO MY SENIOR PROJECT IN COLLEGE WAS THE DEVELOPMENT OF

8    THE TUITION SYSTEM FOR BROOKLYN COLLEGE.  I WAS 20 YEARS OLD

9    AT THE TIME, OR ACTUALLY STARTED AT 19 AND CREATED THE SYSTEM

10   THAT WAS USED TO REGISTER FOR 35,000 STUDENTS.  AND IT WORKED

11   FIRST TIME.

12   Q.  ARE YOU INVOLVED IN STARTUPS PRESENTLY?

13   A.  YES, I AM.  I AM INVOLVED IN SEVERAL STARTUPS.  ONE OF

14   THOSE IS CALLED PSYCHE ANALYTICS.  AND WE ARE SCREENING FOR

15   MENTAL HEALTH CONDITIONS THAT CAN EFFECT PRIMARY CARE, SUCH AS

16   ADHERENCE TO TREATMENT.

17       AND I'M ALSO INVOLVED IN A STARTUP THAT IS A HARDWARE

18   STARTUP THAT MAKES VAPOR DISPLAY SCREENS AND PROJECTS IMAGES

19   ON THESE VAPOR DISPLAY SCREENS.

20       FOR EXAMPLE, IT IS USED IN TRADE SHOWS AND THE LIKE.  IT

21   IS KIND OF A FUN DEVICE.

22           MR. DINOVO:  AT THIS TIME, YOUR HONOR, WE WILL SUBMIT

23   DR. KELLER AS AN EXPERT IN THE FIELD OF COMPUTER SCIENCE AND

24   SYSTEM DESIGN.

25           MS. MEHTA:  YOUR HONOR, NO OBJECTION.  I'M NOT SURE

1    EXACTLY THE WAY WE HAVE BEEN DEFINING THE FIELD, BUT IN TERMS

2    OF THE PATENTS-IN-SUIT, NO OBJECTION.

3              **THE COURT:**  ALL RIGHT.

4              **MR. DINOVO:**  THANK YOU.

5    **BY MR. DINOVO**

6    **Q.**  DR. KELLER, ARE YOU BEING PAID FOR YOUR TIME?

7    **A.**  YES, I AM.

8    **Q.**  HOW MUCH?

9    **A.**  I'M BEING PAID $500 AN HOUR.

10   **Q.**  DOES YOUR COMPENSATION DEPEND ON THE SUBSTANCE OF YOUR

11   TESTIMONY?

12   **A.**  NO, IT DOES NOT.

13   **Q.**  WHAT PATENTS DID YOU ANALYZE IN CONNECTION WITH YOUR

14   TESTIMONY TODAY?

15   **A.**  WELL, FIRSTLY, THE PATENTS IN THE SUIT, THE TWO PATTERSON

16   PATENTS, THE '541 AND THE '670 PATENTS.  AND THAT INCLUDES THE

17   PATENTS THEMSELVES, THE FILE HISTORY, WHICH IS THE PROCESS OF

18   INTERACTING BETWEEN THE APPLICANT OF THE PATENT AND THE PATENT

19   OFFICE.

20       I ALSO ANALYZED THE ALLEGED PRIOR ART THAT WAS DESCRIBED

21   BY DR. WICKER TODAY.  AND I ALSO ANALYZED DR. WICKER'S REPORT

22   DESCRIBING HIS THEORIES OF WHY HE CLAIMS THAT THE PATTERSON

23   PATENTS WERE NOT VALID.

24   **Q.**  ALL RIGHT.  AND YOU WERE HERE A MOMENT AGO FOR

25   DR. WICKER'S TESTIMONY?

KELLER - DIRECT / DINOVO

1    **A.**  YES, I WAS.

2    **Q.**  DO YOU AGREE WITH HIM THAT NO CLAIM OF EITHER PATENT IS

3    ANTICIPATED?

4    **A.**  YES, I DO AGREE WITH HIM ON THAT.

5    **Q.**  WHY DON'T WE TURN TO A HIGH LEVEL DESCRIPTION OF THE

6    TECHNOLOGY OF THE '541 PATENT?  AND LET'S TURN TO THE

7    DEMONSTRATIVE THAT YOU PREPARED RELATING TO THAT TECHNOLOGY.

8                    (PUBLISHED TO JURY.)

9    **Q.**  OKAY.  WHAT DO YOU HAVE SHOWN HERE, DR. KELLER?

10   **A.**  SO HERE IS THE '541 PATENT.  AND THIS IS CLAIM ONE.  AND

11   IT SAYS THAT AT A CLIENT'S WE HAVE A PROCESS EXECUTING AN

12   ACCESS CHECKING PROCESS TO DETERMINE WHETHER THE CLIENT HOLDS

13   A PRE-EXISTING PERMISSION FOR A RESOURCE TO ACCESS THE DIGITAL

14   CONTENT.

15       SO, IN THE ANIMATION YOU SEE A SERVER AND A CLIENT.  THE

16   CLIENT HAS A DIGITAL RESOURCE, DIGITAL CONTENT.  AND THEN,

17   THERE'S AN ACCESS CHECKING PROCESS WHERE IT GOES TO WHAT I'M

18   CALLING A PERMISSION STORE TO SEE WHETHER THAT PERMISSION IS

19   THERE TO ALLOW THE CLIENT TO ACCESS THE DIGITAL CONTENT.

20   **Q.**  OKAY.  WHAT IS SHOWN HERE?

21   **A.**  SO IF THERE IS NO PRE-EXISTING CONDITION -- I AM SORRY --

22   PRE-EXISTING PERMISSION, THEN THE CLIENT IS TOLD -- BASICALLY

23   DETERMINES THAT THAT -- THAT THE -- THERE'S NO PERMISSION FOR

24   ACCESSING THE DIGITAL CONTENT.

25   **Q.**  SO, THEN WHAT HAPPENS?

1    **A.**  SO THEN WE HAVE THE NEXT STEP, WHICH IS IF NOT, REQUESTING

2    PERMISSION FROM AN EXTERNAL SOURCE, THAT EXTERNAL SOURCE BEING

3    THE SERVER, FOR THE RESOURCE TO ACCESS THE DIGITAL CONTENT.

4        AND THEN, RECEIVING FROM THE DIGITAL SOURCE THE TOKEN.  SO

5    THERE IS THAT TOKEN THAT COMES BACK FROM THE SERVER TO THE

6    CLIENT.

7    **Q.**  ALL RIGHT.  WHAT IS THE NEXT STEP OF THE PATENT?

8    **A.**  SO BASED ON THE RECEIVED TOKEN, SO THIS TOKEN THAT THE

9    CLIENT NOW HAS, EXECUTING INSTALLATION PROCESS THAT GENERATES

10   AT THE CLIENT A PERMISSION THAT IS LOCKED UNIQUELY TO THE

11   CLIENT AND MAY BE FOUND BY A LATER EXECUTION OF THE ACCESS

12   CHECKING PROCESS.

13       SO LET'S GO THROUGH THE SEQUENCE HERE.  THERE IS A -- CAN

14   WE GO BACK?

15   **Q.**  SORRY.

16   **A.**  SO WHAT WE HAVE HERE IS -- I WILL LET YOU UNPACK THIS.

17   THE FIRST -- SO WE HAVE THE TOKEN COMING IN.  AND JUST GO TO

18   THE NEXT PART.

19       SO, THERE'S THE TOKEN.  AND THE NEXT STEP IS THE

20   GENERATION OF THE PERMISSION.  SO YOU CAN SEE HERE THAT THAT

21   LITTLE GEAR THING IS GENERATING A PERMISSION.  THIS GO THING

22   FROM THE TOKEN.  THOSE ARE TWO DIFFERENT THINGS.  YOU START

23   WITH A TOKEN.  YOU GENERATE A PERMISSION.

24       AND THEN, THAT PERMISSION IS INSTALLED AT THE CLIENT,

25   WHICH IS WHY THE PERMISSION STORE NOW HAS AN UP ARROW.

1    **Q.**  SO IF I UNDERSTAND YOUR TESTIMONY CORRECTLY IT IS WHAT IS

2    INSTALLED, THE PERMISSION, HAS TO BE DIFFERENT THAN WHAT IS

3    RECEIVED.

4          **MS. MEHTA:**  OBJECTION, YOUR HONOR, LEADING.

5          **THE COURT:**  SUSTAINED.

6    **BY MR. DINOVO**

7    **Q.**  LET ME REPHRASE THE QUESTION.

8          DO THE PERMISSION AND THE TOKEN HAVE TO BE DIFFERENT IN

9    YOUR INTERPRETATION OF THE '541 PATENT?

10   **A.**  MY UNDERSTANDING IS THAT IN ORDER TO GENERATE THE

11   PERMISSION FROM THE TOKEN, THAT YOU HAVE TO START WITH THE

12   TOKEN, AND THEN IN SOME PROCESS STARTING FROM THE TOKEN YOU

13   GENERATE THE PERMISSION.  AND, THEREFORE, THE PERMISSION HAS

14   TO BE DIFFERENT FROM THE TOKEN.  IF THEY WERE THE SAME THEY

15   WOULDN'T BE A GENERATION PROCESS.

16   **Q.**  ALL RIGHT.  SO LET'S JUMP INTO THE SCHULL REFERENCE.  AND

17   I THINK WE TALKED ABOUT DR. WICKER'S TESTIMONY THAT THERE'S

18   THINGS MISSING FROM THIS REFERENCE, RIGHT?  LET'S WALK THROUGH

19   THE TESTIMONY.

20         **MS. MEHTA:**  OBJECTION, YOUR HONOR.  OBJECT TO THE

21   CHARACTERIZATION —

22         **THE COURT:**  THE COMMENT IS STRICKEN.

23   **BY MR. DINOVO**

24   **Q.**  ALL RIGHT.  DO YOU RECALL WHETHER OR NOT DR. WICKER SAID

25   THERE WERE MISSING ELEMENTS?

1    A.  YES.  DR. WICKER SAID THERE WERE SOME MISSING ELEMENTS

2    FROM THE SCHULL PATENT.

3    Q.  OKAY.  LET'S WALK THROUGH WHAT THE SCHULL PATENT ACTUALLY

4    SHOWS.  ALL RIGHT?

5        WHAT IS SHOWN HERE ON THIS SLIDE?

6    A.  WELL, IF YOU SEE THE HIGHLIGHTED PORTION, IT SAYS:

7        "UPON RECEIPT OF THE PASSWORD, THE PROGRAMMER'S

8    PROGRAM" -- THIS IS THE PROGRAM ON THE CLIENT -- "THAT UNLOCKS

9    THE ADVANCED FEATURES OF THE PROGRAM, JUST AS IN STEP 50, AND

10   ALSO INSTALLS THE PASSWORD IN THE STORAGE LOCATION."

11       SO WHAT IS GOING ON HERE IS THE PASSWORD COMES FROM THE

12   SERVER TO THE CLIENT.  AND THE SAME EXACT PASSWORD IS THEN

13   STORED IN THE STORAGE LOCATION ON THE CLIENT, ON THIS USER'S

14   PC.

15   Q.  WERE YOU PRESENT FOR PROFESSOR SCHULL'S TESTIMONY TODAY?

16   A.  YES, I WAS.

17   Q.  DO YOU FEEL HE CORROBORATED OR CONFLICTED WITH YOUR

18   UNDERSTANDING HERE?

19   A.  I THINK HE AGREED THAT -- AND SO DID PROFESSOR SCHULL --

20   THAT THE PASSWORD IS THE SAME THING THAT IS TRANSMITTED FROM

21   THE SERVER TO THE CLIENT AND THE SAME THING THAT IS STORED ON

22   THE PC.

23   Q.  WHAT ABOUT SLIDE NINE?  WHAT IS SHOWN HERE?

24   A.  SO HERE'S THE PROCESS THAT WE ARE GOING THROUGH IN TERMS

25   OF INSTALLING THE PASSWORD.  AND IF YOU SEE THERE IN BOX 93 IT

1    SAYS:

2         "GENERATE PASSWORD THAT IS AT THE SERVER."

3         AND THEN, INSTALL THE PASSWORD THAT IS TRANSMITTED ON LINE

4    80.

5         AND THEN, ON BOX 100 IT IS INSTALLED ON THE CLIENT.  IT IS

6    THE SAME EXACT PASSWORD THAT IS GENERATED AND INSTALLED.

7    **Q.**  ALL RIGHT.  DID YOU PREPARE THIS ANIMATION?  WHAT IS IT

8    INTENDED TO SHOW?

9    **A.**  YES.  THIS ANIMATION SHOWS THE OPERATION OF THE SCHULL

10   PATENT.  SO WHAT WE DO IS FIRST THERE IS A CHECK AT THE

11   CLIENT, OR THE USER'S PC, FOR A VALID PASSWORD.  SO THE CHECK

12   IS AGAINST THE PASSWORD STORE AND THERE ISN'T A VALID

13   PASSWORD.

14   **Q.**  OKAY.  AND WHAT HAPPENS THEN?

15   **A.**  SO THEN THERE IS A TRANSMISSION FROM THE CLIENT TO THE

16   SERVER OF AN I.D.  IN THIS CASE WHAT THEY ARE CALLING IT IS A

17   PASSWORDABLE I.D.  IT IS SOME I.D. KNOWN TO THE CLIENT THAT

18   THE SERVER NEEDS IN ORDER TO BE ABLE TO CONTINUE PROCESSING.

19        THE SERVER THEN TAKES THAT I.D. WE TALKED ABOUT THE SEED

20   AND USES IT TO GENERATE A PASSWORD.  THAT PASSWORD IS

21   GENERATED AT THE SERVER AND THEN SENT TO THE CLIENT.

22   **Q.**  OKAY.  AND FINALLY WHAT HAPPENS?

23   **A.**  THEN, THAT VERY SAME PASSWORD THAT'S RECEIVED FROM THE

24   SERVER IS STORED ON THE PASSWORD STORE ON THE CLIENT.

25   **Q.**  HOW DOES THE SYSTEM IN SCHULL KNOW WHETHER OR NOT THERE'S

1    A PASSWORD?

2    **A.**  THERE IS -- THIS PASSWORD IS STORED EXACTLY AS RECEIVED

3    FROM THE SERVER.  WE TALKED EARLIER ABOUT THE I.D. THAT WAS

4    SENT FROM THE -- FROM THE CLIENT TO THE SERVER?  THIS I.D. IS

5    THE PASSWORDABLE I.D.  THE PASSWORD IS THEN CHECKED AGAINST

6    THE PASSWORDABLE I.D.

7        AND WHEN THAT CHECKING IS DONE, IT IS THEN USED TO ACCESS

8    THE CONTENT.

9    **Q.**  OKAY.  WITH RESPECT TO --

10            **MR. DINOVO:**  CAN WE BRING THE DEMONSTRATIVE FOR THE

11   '541 PATENT UP?

12                    (PAUSE IN THE PROCEEDINGS.)

13   **BY MR. DINOVO**

14   **Q.**  AND WHILE HE'S DOING THAT, SIR, CLAIM 2 OF THE '541

15   PATENT --

16            **MR. DINOVO:**  IF WE CAN PUT THAT UP ON THE SCREEN.

17   **BY MR. DINOVO**

18   **Q.**  OR IT IS IN YOUR BINDER.  DO YOU SEE CLAIM 2:

19       "WHEREIN REQUESTING THE PERMISSION, RECEIVING THE TOKEN

20   AND SELECTIVELY GRANTING THE RESOURCE ACCESS ARE PERFORMED ON

21   THE CLIENT"?

22   **A.**  YES, SIR.

23   **Q.**  OKAY.  AND DID YOU ANALYZE THAT CLAIM, AS WELL?

24   **A.**  YES, I DID.

25   **Q.**  OKAY.

1          **MR. DINOVO:**  DEMONSTRATIVE THAT HAS THE COLUMNS IN

2    IT.

3               (DEMONSTRATIVE DISPLAYED ON EASEL.)

4    **Q.**  LET'S START WITH CLAIM 1, AND THEN WE WILL TALK ABOUT

5    CLAIM 2.

6          CLAIM 1, AND IT IS EXHIBIT 122, PAGE 22.

7          WITH RESPECT TO CLAIM 1, DID YOU FORM AN OPINION ABOUT THE

8    ABSENCE OF CERTAIN ELEMENTS?

9    **A.**  YES, I DID.

10   **Q.**  OKAY.  WHICH ELEMENTS DID YOU DETERMINE WERE ABSENT FROM

11   SCHULL?

12   **A.**  MAY I MARK THEM ON THERE?

13          **MR. DINOVO:**  YOUR HONOR, MAY HE APPROACH THE EXHIBIT?

14          **THE COURT:**  YES.

15          **THE WITNESS:**  THANK YOU.  DOES THIS MICROPHONE WORK?

16          **THE COURT:**  I DON'T KNOW.

17          **THE WITNESS:**  DOES THE MICROPHONE WORK NOW?

18          **THE CLERK:**  I NEED TO SWITCH IT.  GO AHEAD.

19          **THE COURT:**  SAY SOMETHING AND WE WILL FIND OUT.

20          **THE WITNESS:**  TESTING ONE, TWO.  OKAY.  IT IS

21   WORKING.  MAYBE A LITTLE TOO WELL.

22   **Q.**  ALL RIGHT, SIR, AFTER YOUR ANALYSIS, AND YOUR HEARING

23   DR. WICKER, WHAT ELEMENTS ARE MISSING FROM SCHULL?

24   **A.**  YES.  SO, LET ME PULL THIS CORD A LITTLE BIT.

25          SO THERE ARE SEVERAL ELEMENTS THAT ARE MISSING FROM

1    SCHULL.  SO, THE FIRST THING IS THAT BECAUSE IN SCHULL THE

2    PASSWORD IS BOTH -- IS CLAIMED TO BE BOTH THE TOKEN AND THE

3    PERMISSION, CAN'T BE BOTH.  AND, THEREFORE, ESSENTIALLY SCHULL

4    HAS -- CAN YOU TURN ON THE SOUND JUST SLIGHTLY?  I AM HEARING

5    MYSELF.

6          THANK YOU.  THAT'S BETTER.

7          **THE WITNESS:**  SO SINCE YOU CAN'T HAVE THE PASSWORD BE

8    BOTH THE TOKEN AND THE PERMISSION, THEN WE DON'T HAVE A TOKEN

9    AND A PERMISSION.  SO, THEREFORE, WHAT WE HAVE IS THERE'S NO

10   PRE-EXISTING PERMISSION FOR RESOURCE, BECAUSE THERE ISN'T A

11   PERMISSION.

12         IN ADDITION, WE ARE NOT REQUESTING A PERMISSION.  WE'RE --

13   FROM THE -- FROM THE EXTERNAL RESOURCE.  THAT'S NOT FOUND

14   THERE.

15         AND, IN ADDITION, WE'RE NOT RECEIVING A TOKEN BECAUSE

16   THERE'S NO DISTINCTION BETWEEN TOKEN AND PASSWORD, SO THERE IS

17   NO TOKEN EITHER.

18         AND BASED ON THE RECEIVED TOKEN, WE ARE NOT -- WE ARE NOT

19   GENERATING AT THE CLIENT A PERMISSION THAT IS LOCKED UNIQUELY

20   TO THE CLIENT.  SO WE ARE NOT GENERATING A PERMISSION FROM THE

21   RECEIVED TOKEN.  SO THAT'S NOT HAPPENING, EITHER, BECAUSE WE

22   HAVE THE SAME THING.  WE HAVE BOTH THE TOKEN AND PERMISSION

23   CLAIMING TO BE THE SAME, BUT THEY CAN'T BOTH BE THE SAME.

24   **BY MR. DINOVO**

25   **Q.**  DR. KELLER, LET ME STOP YOU THERE.  AND IT MAY BE IT IS

1    EASIER FOR YOU TO MOVE THE MIC DOWN IF YOU ARE TRYING TO AVOID

2    FEEDBACK.

3              (PAUSE IN THE PROCEEDINGS.)

4         **THE WITNESS:**  IS THAT BETTER?  I THINK SO.

5    **BY MR. DINOVO**

6    **Q.**  I THINK SO.  YES.  SO JUST AT THE END SINCE YOU ARE AT THE

7    END OF CLAIM 1, DO YOU RECALL WHETHER OR NOT DR. WICKER AGREED

8    WITH YOU ABOUT THE ABSENCE OF THE FINAL TWO ELEMENTS FROM

9    SCHULL?

10   **A.**  YES.  DR. WICKER AGREED THAT THERE IS NO TOKEN, AND HE

11   ALSO AGREED THERE IS NO GENERATIONAL PERMISSION.

12   **Q.**  LET'S TURN TO CLAIM 2, THE ELEMENT OR THE REQUIREMENT THAT

13   "WHEREIN REQUESTING THE PERMISSION, RECEIVING THE TOKEN AND

14   SELECTIVELY GRANTING THE RESOURCE ACCESS ARE PERFORMED ON THE

15   CLIENT."

16        IS IT YOUR OPINION THAT'S PRESENT IN THE SCHULL PATENT?

17   **A.**  SINCE THERE IS NO PERMISSION AND NO TOKEN, YOU CAN'T BE

18   REQUESTING THE PERMISSION RECEIVING THE TOKEN, SO THAT CAN'T

19   HAPPEN, EITHER.

20   **Q.**  DID YOU HEAR WHETHER OR NOT DR. WICKER AGREES THAT THAT IS

21   ABSENT APPLYING THE COURT'S CONSTRUCTION?

22   **A.**  YES.  I HEARD HIM SAY HE AGREES.

23   **Q.**  AND THERE'S A COUPLE OF OTHER COLUMNS THERE:  "RICHARDSON

24   AND SCHULL.  AND "CHRISTIAN AND SCHULL."

25        WE PREPARED THIS BEFORE DR. WICKER'S TESTIMONY.  DID HE

1 TALK ABOUT THOSE COMBINATIONS TODAY?

2 **A.** NO, HE DIDN'T TALK ABOUT THOSE, SO I WILL JUST LINE THOSE

3 OUT.

4 **Q.** ALL RIGHT. WITH RESPECT TO THE TWO FINAL CLAIMS ON THIS

5 PAGE, CLAIMS FOUR AND 13, IS IT YOUR OPINION -- OR WHAT IS

6 YOUR OPINION ABOUT THE VALIDITY OF THOSE CLAIMS IN VIEW OF THE

7 SCHULL PATENT?

8 **A.** WELL, THIS REQUIRES A PERMISSION, WHICH WE DON'T HAVE.

9 AND, THEREFORE, THIS ISN'T INVALID. AND CLAIM 13 ALSO

10 REQUIRES A PERMISSION AND A TOKEN RECEIVED. AND, THEREFORE,

11 THAT IS NOT FOUND, EITHER.

12 **Q.** ALL RIGHT. SIR, DOES THIS FAIRLY AND ACCURATELY REPRESENT

13 THE OPINION AND YOUR TESTIMONY TODAY ABOUT WHETHER THE SCHULL

14 PATENT PROVIDES OR TEACHES THE ELEMENTS OF THESE CLAIMS OF THE

15 '541 PATENT?

16 **A.** THAT'S CORRECT. THE SCHULL PATENT DOES NOT TEACH THESE

17 ELEMENTS AND THE PATENT IS NOT INVALID IN VIEW OF SCHULL.

18 **MR. DINOVO:** YOUR HONOR, WE WOULD OFFER THIS EXHIBIT

19 INTO EVIDENCE AS REFLECTING THE TESTIMONY OF DR. KELLER ON THE

20 STAND.

21 **MS. MEHTA:** OBJECTION, YOUR HONOR. IF WE ARE GOING

22 TO START INTRODUCING DEMONSTRATIVES THEN DR. WICKER'S

23 DEMONSTRATIVES SHOULD ALSO GO INTO EVIDENCE.

24 **THE COURT:** RIGHT. WE WILL DISCUSS IT LATER.

25 **MR. DINOVO:** FAIR ENOUGH.

1      **THE COURT:**  IT IS GOING TO BE ALL OR NONE.  I'M

2      VOTING FOR NONE.

3              **MR. DINOVO:**  ALL RIGHT, SIR.  LET'S MOVE ON TO THE

4      '670 PATENT.  AND I THINK, FRANKLY, FOR MOST OF THE ROOMS WE

5      CAN FOCUS JUST ON THE SINGLE COMBINATION OF SCHULL AND THE

6      GRISWOLD PATENT.

7      **Q.**  NOW, HAVE YOU REVIEWED IN CONNECTION WITH DEVELOPING YOUR

8      OPINION, DR. KELLER, THE '670 PATENT?

9      **A.**  YES, I HAVE.

10     **Q.**  AND IS IT YOUR OPINION THAT THE '670 PATENT AND THE CLAIMS

11     32, 45 AND 52 ARE VALID OR INVALID IN VIEW OF THE COMBINATION

12     OF SOFTLOCK AND GRISWOLD?

13     **A.**  IT IS MY VIEW THAT -- THAT THE CLAIMS, THREE CLAIMS, 32,

14     45, AND 52, ARE ALL VALID IN VIEW OF THOSE REFERENCES.

15     **Q.**  OKAY.  AND WE PUT TOGETHER THIS DEMONSTRATIVE A FEW DAYS

16     AGO, RIGHT?

17     **A.**  THAT'S CORRECT.

18     **Q.**  AND IT HAS THE WORD "SOFTLOCK" AND "GRISWOLD" INSTEAD OF

19     SCHULL AND GRISWOLD.  CAN YOU EXPLAIN THAT?

20     **A.**  YES.  SCHULL IS THE PATENT AND SOFTLOCK IS A DESCRIPTION

21     IN HERE.  HE, DR. WICKER, ACTUALLY REFERRED TO BOTH THE

22     SOFTLOCK PATENT AND THE SOFTLOCK DOCUMENTS.  SO HERE I'M

23     REFERRING TO IT AS SOFTLOCK.  BUT IT IS THE SAME THING AS WHAT

24     DR. WICKER REFERRED TO AS SCHULL.

25     **Q.**  OKAY.  LET'S RUN THROUGH AT A HIGH LEVEL THE OPERATION OF

1    THE '670 PATENTS.  SO IF WE CAN GO TO THE KELLER DEMONSTRATIVE

2    SLIDES STARTING AT SLIDE 34.

3        OKAY.  LET'S MOVE TO THE NEXT SLIDE.

4                    (PUBLISHED TO JURY.)

5        WHAT IS SHOWN HERE, DR. KELLER?

6    **A.**  SO THIS IS CLAIM 32 OF THE '670 PATENT.  AND IT -- THE

7    FIRST ELEMENT IS COLLECTING NOTIFICATION INFORMATION FROM A

8    RECIPIENT AND SUCCESSIVE RECIPIENTS OF THE ELECTRONIC CONTENT

9    IN RESPONSE TO AN ATTEMPT TO ACCESS THE ELECTRONIC CONTENT.

10        SO WE HAVE A SERVER, A RECIPIENT, WHICH IS THE FIRST

11   RECIPIENT OF THAT DIGITAL CONTENT.  AND WE HAVE A SECOND

12   RECIPIENT OF THAT ELECTRONIC CONTENT, SUCCESSIVE RECIPIENT.

13   **Q.**  OKAY.  WHAT IS SHOWN HERE?

14   **A.**  SO HERE IS THE OTHER PART OF THAT WHICH IS IT IS

15   COLLECTING NOTIFICATION INFORMATION.  SO THE RECIPIENT AND

16   SUCCESSIVE RECIPIENT, BOTH RECEIVE THE NOTIFICATION -- WELL,

17   BOTH COLLECT NOTIFICATION INFORMATION ON THOSE LOCAL PC'S.

18   **Q.**  AND DO YOU HAVE AN OPINION ABOUT WHAT THE TERM

19   "NOTIFICATION INFORMATION" WOULD MEAN TO A PERSON OF ORDINARY

20   SKILL IN THE ART IN VIEW OF THE INTRINSIC RECORD, THE PATENT,

21   THE PROSECUTION HISTORY?

22   **A.**  YES.  NOTIFICATION INFORMATION IS USED TO -- IS

23   INFORMATION USED TO IDENTIFY AND TRACK THE RECIPIENTS.

24        **MR. DINOVO:**  LET'S PULL UP PLAINTIFF'S EXHIBIT 3 AT

25   PAGE 25.

1            (PUBLISHED TO JURY.)

2        COLUMN 5, LINES 20 THROUGH 38.

3   **BY MR. DINOVO**

4   **Q.** ALL RIGHT, SIR. I'M NOT SURE IF YOU CAN MAKE IT OUT ON

5   YOUR SCREEN THERE. BUT THIS IS AN EXCERPT FROM –– THAT YOU

6   IDENTIFIED IN YOUR REPORT. WHAT DOES THIS INDICATE TO YOU

7   ABOUT WHAT NOTIFICATION INFORMATION IS.

8   **A.** SO THIS INDICATES THAT THE NOTIFICATION INFORMATION IS

9   BEING USED BOTH TO IDENTIFY THE RECIPIENT OF THE INFORMATION,

10  ONE PERSON IS TRYING TO ACCESS THE INFORMATION, AND ALSO USED

11  TO TRACK IT.

12       FOR EXAMPLE, THERE IS A DISCUSSION ABOUT INVALUABLE

13  MARKETING DATA YOU SEE ON LINE 35 OR SO. INVALUABLE MARKETING

14  DATA THAT TRACKS THE NUMBER AND DEMOGRAPHIC ATTRIBUTES OF

15  USERS ACCORDING TO –– I AM SORRY –– ACCESSING A PARTICULAR

16  SET OF ELECTRONIC CONTENT.

17  **Q.** OKAY. AND LET'S GO BACK TO YOUR SLIDE PRESENTATION.

18  SLIDE 36, I THINK WE WERE.

19                    (PUBLISHED TO JURY.)

20       OKAY. I THINK WE HAVE ALREADY GONE THROUGH THIS ONE.

21       SO WHAT HAPPENS TO THE NOTIFICATION INFORMATION?

22  **A.** SO, HERE WE HAVE NOTIFICATION INFORMATION ON BOTH THE ––

23  ON BOTH RECIPIENT AND SUCCESSIVE RECIPIENT.

24       IN THE NEXT ELEMENT WE HAVE ATTEMPTING TO TRANSMIT THE

25  COLLECTED NOTIFICATION INFORMATION TO AN ADDRESS OTHER THAN

1    THAT OF THE IMMEDIATE SENDER OF THE ELECTRONIC CONTENT WHEN

2    TRIGGERED BY AN EVENT.

3        SO THE SUCCESSIVE RECIPIENT IS RECEIVED IT FROM THE

4    IMMEDIATE SENDER BEING THE RECIPIENT.  SO IT IS SENDING IT TO

5    THE SERVER, THAT IS OTHER THAN THE IMMEDIATE RECIPIENT, THE

6    COLLECTED NOTIFICATION INFORMATION.

7    Q.  WHO IS THE IMMEDIATE SENDER HERE?

8    A.  THE IMMEDIATE SENDER IS THE RECIPIENT AND SO THE

9    SUCCESSIVE RECIPIENT, THE ONE THAT -- THE RECIPIENT SENT THE

10   INFORMATION TO THE SUCCESSIVE RECIPIENT.  SO THE IMMEDIATE --

11   THE IMMEDIATE SENDER IS THE RECIPIENT.

12       AND THE COMPUTER OTHER THAN THE IMMEDIATE SENDER IS THE

13   SERVER.  AND THEN, THAT SERVER TRANSMITS -- I AM SORRY --

14   RECEIVES THE NOTIFICATION INFORMATION FROM THE SUCCESSIVE

15   RECIPIENT.

16   Q.  LET'S TURN TO THE THIS DIAGRAM.  WHAT ARE YOU INTENDING TO

17   SHOW HERE?

18   A.  SO THIS IS HOW PEOPLE TYPICALLY SHOW COMMUNICATION BETWEEN

19   CLIENTS AND SERVERS, OR JUST, IN GENERAL, NETWORK

20   COMMUNICATION.

21       SO HERE WE HAVE THE SERVER ON THE LEFT AND THE SUCCESSIVE

22   RECIPIENT ON THE RIGHT.  AND THE TWO LINES INDICATE ON THE

23   LEFT INDICATE COMMUNICATION FROM OR TO THE SERVER.  AND THE

24   VERTICAL LINE ON THE RIGHT INDICATES -- INDICATES

25   COMMUNICATION FROM OR TO THE SUCCESSIVE RECIPIENT.

1    AND THESE LINES POINTING DOWN, THE REASON THAT THERE IS A

2    DOWN ARROW IS BECAUSE TIME MARCHES DOWNWARD.  SO ON THE TOP IS

3    EARLIER.  ON THE BOTTOM IS DOWNWARD.

4        THEN WE SEE THE SLOPING LINE.  AND THE SLOPING LINE GOING

5    FROM THE RIGHT TO THE LEFT INDICATES -- CAN WE GO BACK?

6    **Q.**  YES.

7    **A.**  THE SLOPING LINE FROM THE RIGHT TO THE LEFT INDICATES A

8    MESSAGE.  AND MESSAGES ON THE INTERNET ARE NOT INSTANTANEOUSLY

9    SENT AND RECEIVED.  THEY'RE SENT, AND THEN SOMETIME LATER THEY

10   ARE RECEIVED BECAUSE THEY HAVE TO PROPAGATE THROUGH THE

11   INTERNET AND GET TO WHERE THEY'RE GOING.

12       SO THIS SHOWS THAT THE MESSAGE IS TRANSMITTED.

13   NOTIFICATION INFORMATION IS TRANSMITTED FROM THE SUCCESSIVE

14   RECIPIENT TO THE SERVER THAT'S MOVING DOWNWARD.

15   **Q.**  OKAY.  WHAT IS SHOWN HERE?

16   **A.**  SO, THIS IS SELECTIVELY GRANTING ACCESS TO ELECTRONIC

17   CONTENT BASED ON A RESULT OF THE ATTEMPTED TRANSMISSION OF THE

18   NOTIFICATION INFORMATION.  WELL, HOW DO YOU KNOW WHAT IS THE

19   RESULT OF THE ATTEMPTED TRANSMISSION?  THAT MEANS THE

20   TRANSMISSION HAS BEEN SUCCESSFUL.

21       AND THE WAY YOU KNOW THE TRANSMISSION HAS BEEN SUCCESSFUL

22   IS THE ACKNOWLEDGMENT OF TRANSMISSION.  THAT IS THE

23   ACKNOWLEDGMENT COMING BACK FROM THE SERVER SAYING:

24       "YES, THE TRANSMISSION HAS BEEN SUCCESSFUL."  THAT IS THE

25   RESULT OF THE ATTEMPTED TRANSMISSION.

1    **Q.**  OKAY.  AND WE CAN PROBABLY FOREGO PUTTING IT BACK ON THE

2    SCREEN.  WERE YOU HERE FOR THE TESTIMONY OF DR. WICKER WHEN WE

3    RAN THROUGH THE PASSAGE OF THE '670 TALKING ABOUT A NETWORK

4    ACKNOWLEDGMENT?

5    **A.**  YES.  EXACTLY.  AND SO THAT IS WHERE WE ARE TALKING ABOUT

6    THE SUCCESSFUL TRANSMISSION IS BASED ON NETWORK

7    ACKNOWLEDGMENT. AND THIS ACKNOWLEDGMENT OF TRANSMISSION IS THE

8    NETWORK ACKNOWLEDGMENT.

9    **Q.**  OKAY.  SO WHAT IS SHOWN HERE BY THE ARROW ON THE RIGHT?

10   **A.**  SO THIS IS THE STEP OF SELECTIVELY GRANTING ACCESS.  SO

11   ONCE WE HAVE THE ACKNOWLEDGMENT OF THE TRANSMISSION, IN OTHER

12   WORDS THE RESULT OF THE ATTEMPTED TRANSMISSION, THEN FROM HERE

13   ON IS THE GRANTING OF ACCESS.  SO THAT LINE THAT STARTS AT THE

14   POINT WHEN WE -- WHEN THE ACKNOWLEDGMENT WAS RECEIVED THEN IS

15   THE POINT AT WHICH ACCESS CAN -- STARTS TO BE GRANTED FROM

16   THERE ON.

17   **Q.**  OKAY.  WHAT ABOUT THIS SECOND DOWNWARD ARROW?

18   **A.**  SO HERE WE HAVE:

19   "WHEREIN EXECUTABLE INSTRUCTIONS COLLECT THE NOTIFICATION

20   INFORMATION AND SELECTIVELY DENY ACCESS TO THE ELECTRONIC

21   CONTENT UNTIL NOTIFICATION INFORMATION IS TRANSMITTED."

22   SO HERE WE'RE SAYING IS THAT NOT ONLY DO YOU GRANT ACCESS

23   STARTING AT THE POINT AT WHICH THE ACKNOWLEDGMENT TRANSMISSION

24   HAPPENS, BUT THAT YOU, IN FACT, DENY ACCESS UNTIL THAT POINT.

25   AND THAT THIS IS THE PRECISE POINT WHEN YOU -- WHEN ACCESS

1    STARTS.

2         BEFORE THAT THERE IS NO ACCESS.  AFTER IT THERE IS ACCESS.

3    THIS IS THE EXACT POINT WHERE THAT ACCESS STARTS.

4         SO WE'VE SEEN HOW THERE'S DISCUSSIONS HERE ABOUT HOW

5    THERE'S AN AUTHORIZATION THAT HAPPENS.  AND SO THE WAY -- THE

6    WAY THAT THIS TYPICALLY HAPPENS IS WHEN YOU TRANSMIT A REQUEST

7    FOR ACCESS, THEN EVENTUALLY THE SERVER WILL SAY:

8         "YEAH, I THINK I WILL GRANT ACCESS."  OR "NO, I WON'T

9    GRANT ACCESS."

10        AND, THEREFORE, THE AUTHORIZATION REQUEST, EITHER SUCCESS

11   OR DENIAL, COMES BACK -- COMES BACK FROM THE SERVER TO THE

12   CLIENT.  AND THIS HAPPENS SOMETIME LATER.  AND SO WE SEE THIS

13   AS A SEPARATE STEP AFTER THE CLAIM 32 ALLOWS FOR SUCCESSIVE --

14   ALLOWS FOR DENYING OR GRANTING ACCESS.

15        AND THEN, THE NEXT STEP YOU SEE GENERALLY WHENEVER YOU

16   SEND A MESSAGE OVER THE INTERNET, THE MESSAGE IS SENT.  AND

17   THEN, AS WAS MENTIONED BY DR. WICKER THERE IS A LOW-LEVEL

18   PROCESS IN THE NETWORK LATER WHERE YOU ACTUALLY SEND BACK AN

19   ACKNOWLEDGMENT.

20        SO THE TRANSMIT AUTHORIZATION IS ALSO SENT BACK.  EXCUSE

21   ME.  THE TRANSMIT AUTHORIZATION IS ALSO SENT BACK FROM THE

22   ACKNOWLEDGMENT OF THE TRANSMISSION BACK TO THE SERVER.

23   Q.  OKAY, DR. KELLER.  LET'S RUN QUICKLY THROUGH THE

24   DIFFERENCES OR SOME OF THE DIFFERENCES BETWEEN CLAIMS 32 AND

25   45.

1        AND SO WE HAVE ALREADY SEEN THIS SORT OF SLIDE.  THIS IS

2    BASICALLY THE SAME, RIGHT?  THE SUCCESSIVE RECIPIENT?

3            **THE WITNESS:**  EXACTLY.

4            **THE COURT:**  IS THIS ABOUT A GOOD TIME OR FINISH UP

5    THIS CLAIM?

6            **MR. DINOVO:**  SURE, EITHER WAY.  IT'S FINE.

7            **THE COURT:**  WHY DON'T WE BREAK THEN.  IT'S NOON.

8    LET'S BREAK UNTIL 12:15.

9        (RECESS TAKEN AT 12:00 P.M.; RESUMED AT 12:15 P.M.)

10        (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

11            **THE CLERK:**  REMAIN SEATED.  COURT IS BACK IN ORDER.

12    BE SEATED.

13    **BY MR. DINOVO:**

14    **Q.**  SO, DR. KELLER, BEFORE THE BREAK WE WERE BEGINNING ON

15    CLAIM 45 AND THE DIFFERENCES.

16        CAN YOU TELL ME IF THERE'S ANY SIGNIFICANCE TO THE

17    PREAMBLE OF CLAIM 45?

18    **A.**  YES.

19        THE PREAMBLE OF CLAIM 45 TALKS ABOUT A METHOD OF TRACKING

20    ACCESS TO ELECTRONIC CONTENT.  AND THEN THE METHOD COMPRISING

21    CREATING A FILE THAT INCLUDES ELECTRONIC CONTENT AND CAUSES

22    ACCESS TO THE ELECTRONIC CONTENT TO BE DENIED UNTIL

23    NOTIFICATION INFORMATION COLLECTED BY EXECUTABLE INSTRUCTIONS

24    HAS BEEN SUCCESSFULLY TRANSMITTED.

25        SO YOU NOTICE THIS IS A METHOD OF TRACKING ACCESS TO THE

1    ELECTRONIC CONTENT.

2    **Q.**  ALL RIGHT.  I THINK THE COURT REPORTER WOULD APPRECIATE IT

3    IF YOU AND I BOTH SLOWED DOWN.

4              **THE COURT:**  IT'S NOT ON THE RECORD, WHATEVER YOU JUST

5    SAID.  SO IF YOU WANT IT ON THE RECORD, YOU WILL NEED TO SAY

6    IT AGAIN.

7              **THE WITNESS:**  I WILL SAY IT AGAIN.

8         CLAIM 45 TALKS ABOUT A METHOD OF TRACKING ACCESS TO

9    ELECTRONIC CONTENT.  SO HERE WE HAVE A METHOD OF -- THIS IS AN

10   IMPORTANT PHRASE -- TRACKING ACCESS TO ELECTRONIC CONTENT

11   MAKING CLEAR, IF IT WASN'T ALREADY CLEAR, THAT WHAT'S GOING ON

12   IS -- IS A METHOD FOR TRACKING ACCESS.  THAT'S AN IMPORTANT

13   PHRASE.

14        AND THEN THE METHOD IS COMPRISING A NEXT STEP, WHICH IS

15   CREATING A FILE, ET CETERA, THAT WE'LL TALK A LITTLE BIT MORE.

16   **BY MR. DINOVO:**

17   **Q.**  OKAY.  AND THIS IS A SIMILAR SEQUENCE OF STEPS AS WE

18   DISCUSSED IN CONNECTION WITH CLAIM 32, RIGHT?  THIS --

19   **A.**  THAT'S CORRECT.  WE ARE TRANSMITTING A FILE TO AT LEAST

20   ONE ADDRESS.

21   **Q.**  OKAY.  AND LET'S TALK NOW ABOUT THE DIFFERENCES IN THIS

22   TIMING DIAGRAM THAT YOU'VE DRAWN UP.

23        WHAT HAPPENS DIFFERENTLY IN THE CONTEXT OF CLAIM 32?

24   **A.**  CAN WE GO BACK?

25   **Q.**  YES.

1    **A.**   THE –– THE –– THERE –– THERE WE GO.

2         SO HERE WE HAVE RECEIVING NOTIFICATION INFORMATION FROM A

3    SUCCESSIVE RECIPIENT OTHER THAN THAT OF THE IMMEDIATE SENDER.

4         SO RECEIVING NOTIFICATION INFORMATION FROM A SUCCESSIVE

5    RECIPIENT, WHICH IS THE ONE OTHER THAN THE FIRST RECIPIENT.

6    OTHER THAN THE IMMEDIATE SENDER –– THAT IMMEDIATE SENDER IS

7    THE FIRST RECIPIENT –– OF THE ELECTRONIC CONTENT.

8         AND THEN THERE'S A CREATION OF A FILE THAT INCLUDES

9    ELECTRONIC CONTENT AND CAUSES ACCESS TO THE ELECTRONIC CONTENT

10   TO BE DENIED –– CAN WE GO BACK?

11        TO BE DENIED –– ANOTHER HEADER BACK.  THERE WE GO.

12        SO NOTIFICATION INFORMATION COLLECTED BY EXECUTABLE

13   INSTRUCTIONS HAS BEEN SUCCESSFULLY TRANSMITTED.

14        SO YOU SEE THERE, HAS BEEN SUCCESSFULLY TRANSMITTED.  THAT

15   SUCCESSFUL TRANSMISSION IS THE ACKNOWLEDGMENT OF THE

16   TRANSMISSION.  THAT'S HOW YOU KNOW THAT IT'S ACTUALLY BEEN

17   SUCCESSFULLY TRANSMITTED IS THAT IT'S BEEN RECEIVED.  DOESN'T

18   MEAN IT NECESSARILY HAS BEEN ACTED ON, IT MEANS IT HAS BEEN

19   RECEIVED SO THAT WE GET THIS ACKNOWLEDGMENT OF TRANSMISSION.

20        THAT'S HOW WE KNOW IT HAS BEEN SUCCESSFULLY TRANSMITTED.

21   **Q.**   DO YOU HAVE AN ANALOGY FOR THIS NOTION OF SUCCESSFUL

22   TRANSITION THAT YOU SHARED WITH ME A FEW DAYS AGO?

23   **A.**   YES.

24        SO I HAVE 21–YEAR–OLD TWIN DAUGHTERS.  WHEN THEY WERE

25   YOUNGER, SOMETIMES ONE WOULD ASK ME SOMETHING AND THE OTHER

1    ONE WOULD ASK ME SOMETHING.  I DIDN'T ALWAYS WANT TO ANSWER

2    RIGHT AWAY.

3        SO SOMEBODY WOULD SAY, YOU KNOW, CAN I GET SOMETHING OR DO

4    SOMETHING, AND I WOULD SAY, I HEAR YOU, BUT I'LL GIVE YOU AN

5    ANSWER LATER.  SO THAT "I HEAR YOU" IS THE ACKNOWLEDGMENT OF

6    THE RECEIPT, IT ISN'T THE PERMISSION TO DO IT.  IT IS JUST

7    SAYING, I HEAR YOU, I WILL THINK ABOUT IT AND GET BACK TO YOU.

8    **Q.**  ALL RIGHT, SIR.  THIS DENYING ACCESS, IS THAT AN ELEMENT

9    OF CLAIM 45?

10   **A.**  YES.

11       SO, HERE WE SEE, IF YOU WILL LOOK AT THE BIGGER PHRASE,

12   "CREATING A FILE THAT INCLUDES ELECTRONIC CONTENT".  HERE WE

13   SAY, "CAUSES ACCESS TO THE ELECTRONIC CONTENT TO BE DENIED".

14   SO THIS DENIAL HAPPENS UNTIL THE ACKNOWLEDGMENT OF THE

15   TRANSMISSION.

16       SO, IF YOU DENY IT LONGER THAN THAT, THAT DOESN'T WORK --

17   IF YOU DENY IT LESS THAN THAT.  IF YOU DENY IT WITHOUT WAITING

18   FOR THE ACKNOWLEDGMENT OF TRANSMISSION, THAT'S A PROBLEM.  SO

19   YOU ACTUALLY HAVE TO DENY UNTIL THAT POINT.

20   **Q.**  OKAY.

21       NOW LET'S TALK ABOUT THE SPECIFIC REFERENCE COMBINATION

22   THAT DR. WICKER DISCUSSED IN HIS TESTIMONY.  ALL RIGHT?

23       AND YOU UNDERSTOOD HIS TESTIMONY TO BE DIRECTED TO THE

24   COMBINATION OF SOFTLOCK AND GRISWOLD?

25   **A.**  YES.  THAT'S CORRECT.

1    **Q.**  DID YOU HEAR ANY TESTIMONY ABOUT GRISWOLD ALONE

2    INVALIDATING THE PATENTS?

3    **A.**  NO, I DID NOT HEAR SUCH TESTIMONY.

4    **Q.**  THE CLAIMS I MEANT.

5        WHAT ABOUT ZIPLOCK AND GRISWOLD, DID YOU HEAR ANYTHING

6    ABOUT THAT?

7    **A.**  NO, I DIDN'T HEAR ANYTHING ABOUT GRISWOLD.

8    **Q.**  OKAY.

9    **A.**  SORRY, ZIPLOCK, FROM DR. WICKER TODAY.

10           **THE COURT:**  ZIPLOCK?

11           **MR. DINOVO:**  YES, YOUR HONOR.  IT'S ONE OF THE

12    REFERENCES THAT WAS PREVIOUSLY IDENTIFIED.

13           **MS. MEHTA:**  I THINK THE ISSUE IS, YOUR HONOR, THAT

14    DR. WICKER, TO SAVE TIME, NARROWED HIS INVALIDITY ANALYSIS.

15    AND SO THEY ARE REFERRING TO REFERENCES THAT HE HAS OPINED ARE

16    INVALIDATING, BUT HE DIDN'T PRESENT TODAY FOR TIME SAKE.

17           **MR. DINOVO:**  WE WERE NOTIFIED LAST NIGHT, SO AFTER

18    THIS BOARD WAS MADE.

19    **BY MR. DINOVO:**

20    **Q.**  SO, WHAT HE TALKED ABOUT WAS SOFTLOCK AND GRISWOLD, RIGHT?

21    **A.**  YES.

22    **Q.**  ALL RIGHT.  WOULD IT BE HELPFUL TO APPROACH THE

23    DEMONSTRATIVE?

24    **A.**  MAY I?

25           **THE COURT:**  YES.

1          **THE WITNESS:**  THANK YOU.

2          JUST –– SO JUST AS WE DID LAST TIME, LET ME CROSS OUT

3     GRISWOLD ALONE, AND SOFTLOCK AND GRISWOLD BECAUSE WE ARE

4     TALKING ONLY ABOUT DR. WICKER'S INVALIDITY CONTENTIONS

5     REGARDING SOFTLOCK, IF YOU WILL, OF SCHULL AND GRISWOLD.

6     **BY MR. DINOVO:**

7     **Q.**  OKAY.

8          AND WITH RESPECT TO EITHER INDEPENDENT CLAIM, IS THE

9     NOTIFICATION INFORMATION REQUIREMENT PRESENT?

10    **A.**  NO.  THE NOTIFICATION INFORMATION IS NOT PRESENT IN EITHER

11    CLAIM BECAUSE WE DON'T HAVE INFORMATION USED TO IDENTIFY AND

12    TRACK THE RECIPIENT INFORMATION; IS ONLY USED TO IDENTIFY.  AS

13    WE TALKED ABOUT, THERE'S A REQUIREMENT IN THE FILE HISTORY AND

14    IN THE PATENT ITSELF THAT NOTIFICATION INFORMATION BE USED FOR

15    TRACKING.

16    **Q.**  DO YOU KNOW WHAT THE TITLE OF THE '670 PATENT IS?

17    **A.**  YES.  IT'S TRACKING –– IT START WITH TRACKING.  I THINK

18    IT'S TRACKING SOMETHING.  IT'S EITHER CONTENT –– BUT –– YEAH.

19    **Q.**  THERE WAS A CERTIFICATE OF CORRECTION?

20    **A.**  THERE WAS A CERTIFICATE OF CORRECTION, BUT THE FIRST WORD

21    IN IT IS "TRACKING ELECTRONIC CONTENT" AS OPPOSED TO

22    COMPONENT.  ANYWAY.

23    **Q.**  ALL RIGHT.  SO WHICH ELEMENTS, BASED ON YOUR OPINION, THAT

24    NOTIFICATION INFORMATION IS NOT TAUGHT BY THE COMBINATION,

25    WHICH ELEMENTS ARE MISSING?

1       COULD YOU INDICATE WITH AN "X"?

2   **A.**  SO HERE WE HAVE NOTIFICATION INFORMATION REQUIRED

3   (INDICATING).  HERE WE HAVE NOTIFICATION INFORMATION BEING

4   REQUIRED (INDICATING).  HERE WE HAVE NOTIFICATION INFORMATION

5   BEING REQUIRED SEVERAL PLACES.

6       SO, BECAUSE WE DON'T HAVE NOTIFICATION INFORMATION, NONE

7   OF THESE ELEMENTS ARE MET.

8   **Q.**  OKAY.  AND HOW ABOUT IN CLAIM 45?

9   **A.**  SO IN CLAIM 45, AGAIN, WE HAVE NOTIFICATION INFORMATION.

10  AND WE ALSO HAVE NOTIFICATION INFORMATION OVER HERE

11  (INDICATING).  AND SO THOSE ARE NOT MET EITHER.

12      AND WHAT WE ALSO HAVE IS THAT -- EVEN CLEARER BECAUSE WE

13  DON'T HAVE TRACKING.

14  **Q.**  DR. KELLER, COULD I JUST ASK YOU TO RETURN TO THE STAND SO

15  I CAN SHOW YOU ANOTHER REFERENCE?

16  **A.**  SURE.

17  **Q.**  ANOTHER PORTION OF THE REFERENCE.

18      SO, DID YOU HEAR DR. WICKER SAY THAT HE AGREES THAT

19  SOFTLOCK ISN'T -- DOESN'T TEACH GRANTING ACCESS WHEN

20  NOTIFICATION INFORMATION IS TRANSMITTED?

21  **A.**  THAT'S CORRECT.

22  **Q.**  OKAY.  AND DO YOU AGREE WITH THAT?

23  **A.**  YES, I DO AGREE WITH THAT.

24  **Q.**  DO YOU KNOW HOW HE TRIED TO -- ON WHAT BASIS HE SAID THAT

25  THE CLAIM WAS NONETHELESS INVALID?

1    **A.**   HE USED GRISWOLD.

2    **Q.**   OKAY.  LET'S TURN TO THAT PASSAGE.

3              **MR. DINOVO:**   IF YOU CAN PLEASE PUT ON THE SCREEN,

4    MS. MASON, EXHIBIT 421, 11.  AND WE ARE REFERRING TO THE

5    GRISWOLD PATENT AT COLUMN 4, LINES 23 THROUGH 39.

6         IF WE CAN PLEASE PUBLISH THAT TO THE JURY.  I BELIEVE THAT

7    HAS BEEN ADMITTED.

8                        (PUBLISHED TO JURY.)

9    **BY MR. DINOVO:**

10   **Q.**   OKAY.  SO, IN PARTICULAR, THAT FIRST PARAGRAPH, THIS IS, I

11   BELIEVE, WHAT DR. WICKER POINTED TO.

12        WHAT DOES THIS SAY ABOUT WHEN ACCESS IS PROVIDED?

13   **A.**   SO, THIS SAYS THAT -- IN THE FIRST PARAGRAPH HERE, "AFTER

14   A REQUEST DATAGRAM HAS BEEN SENT OUT, A USER MAY BE PERMITTED

15   TO USE THE LICENSED PRODUCT FOR A LIMITED DURATION".

16        AND SO IT (SIC) HAPPENS HERE IS THAT ONCE THE REQUEST TO

17   SEND OUT THE DATAGRAM -- AT LEAST WHAT IT SAYS HERE -- BEFORE

18   THE ACKNOWLEDGMENT COMES BACK, THE USER IS ALLOWED TO ACCESS

19   THE LICENSED PRODUCT.

20   **Q.**   AND DOES THAT INDICATE WHETHER OR NOT TRANSMISSION HAS

21   BEEN SUCCESSFUL?

22   **A.**   NO.  IT IS NOT BASED ON WHETHER TRANSMISSION HAS BEEN

23   SUCCESSFUL.  IT IS SIMPLY BASED ON THE DATAGRAM BEING SENT

24   OUT.

25        SO ONE OF THE THINGS INTERESTING ABOUT NETWORK

1    TRANSMISSION IS THAT DATAGRAMS ARE SENT OUT AND THEY ARE

2    CONSIDERED UNRELIABLE, THEREFORE, YOU DON'T KNOW THAT IT'S

3    ACTUALLY BEEN SUCCESSFULLY TRANSMITTED BECAUSE IT MAY HAVE

4    BEEN LOST IN THE MIDDLE UNLESS YOU GET AN ACKNOWLEDGMENT BACK.

5         THAT'S THE IDEA OF A DATAGRAM.  YOU SEND IT OUT AND YOU

6    HOPE IT GETS THERE.  IF IT DOESN'T GET THERE, YOU TRY SENDING

7    IT AGAIN.  AND WHEN YOU GET AN ACKNOWLEDGMENT, THEN YOU KNOW

8    IT HAS BEEN RECEIVED, AND YOU STOP TRYING TO TRANSMIT, STOP

9    ATTEMPTING TO TRANSMIT.

10   Q.  DOES THAT MASSAGE TALK ABOUT WHETHER ACCESS IS PROVIDED

11   BEFORE THE REQUEST DATAGRAM?

12   A.  NO.  THIS PASSAGE IS SILENT ON THAT ISSUE.  IT MAY BE --

13   IT MAY BE PERMITTED PRIOR TO THE DATAGRAM BEING SENT OUT.

14   Q.  SO IT DOESN'T NECESSARILY -- WELL, DOES IT DEMONSTRATE TO

15   YOU THAT ACCESS IS TRIGGERED ON THE REQUEST DATAGRAM?

16   A.  NO, IT DOESN'T -- IT INDICATES THAT AT LEAST IT'S -- IT'S

17   ACCESSIBLE FOR SOME PERIOD OF TIME AFTERWARDS AND IT ISN'T

18   TRIGGERED BASED ON THE SUCCESS OF THE -- ON THE SUCCESSFUL

19   TRANSMISSION OF THE REQUEST.

20   Q.  ALL RIGHT.  LET'S LOOK AT FIGURE 3 OF THE GRISWOLD

21   REFERENCE, WHICH IS ON 421, PAGE 4.

22                    (PUBLISHED TO JURY.)

23        MR. DINOVO:  IF YOU COULD PLEASE ZOOM IN ON THE

24   FIGURE.

25

1    **BY MR. DINOVO:**

2    **Q.**  WOULD IT BE HELPFUL TO ZOOM IN ON THE TOP RECTANGLE OR IS

3    THAT ABOUT AS CLOSE AS WE CAN GET?

4    **A.**  IT'S FINE.

5    **Q.**  ALL RIGHT, SIR.  GENERALLY SPEAKING, WHAT DO YOU

6    UNDERSTAND FIGURE 3 TO BE?

7    **A.**  WELL, THIS IS A COMPLICATED DESCRIPTION OF WHAT'S GOING

8    ON.

9        BUT ESSENTIALLY WHAT IT'S TALKING ABOUT IS THE PROGRAM IS

10   STARTING -- IT STARTS TO BE EXECUTED.  SO THE LICENSED PRODUCT

11   STARTS AT BEING EXECUTED, IT INVOKES THE LICENSE CHECK

12   MONITOR.  AND THEN THERE'S A PROCESS WHERE IT SAYS, WELL, DO I

13   HAVE A LICENSE?  HAS TIME EXPIRED OR WHATEVER?  AND IT'S DOING

14   THIS WHILE THE PROGRAM IS CONTINUING TO OPERATE.

15       AND SO THE PROGRAM OPERATES FOR A PERIOD OF TIME, AND THEN

16   IT SENDS UP THE DATAGRAM.  AND THEN IF THE DATAGRAM IS

17   OVERDUE, THEN IT STOPS ALLOWING ACCESS.

18       BUT ESSENTIALLY WHAT HAPPENS HERE IS THAT THIS PROCESS IS

19   GOING ON WHILE THE PROGRAM IS CONTINUING TO OPERATE.  BECAUSE

20   WE ARE NOT GOING TO WAIT UNTIL THE DATAGRAM COMES BACK.  WE

21   ARE NOT EVEN WAITING FOR THE DATAGRAM TO BE SENT.  WE ARE JUST

22   ALLOWING ACCESS UNTIL THE TIME IS UP.

23   **Q.**  SO, SIR, WITH THAT UNDERSTANDING, COULD YOU, AGAIN,

24   APPROACH THE DEMONSTRATIVE AND INDICATE WHICH OTHER ELEMENTS,

25   IF ANY, ARE NOT PRESENT?

1    **A.**   YES.  SO, HERE WE SEE THE IDEA OF SUCCESSFULLY GRANTING

2    ACCESS BASED ON A RESULT OF THE ATTEMPTED TRANSMISSION.

3        WELL, IT'S NOT -- AND -- AND SELECTIVELY DENYING ACCESS

4    UNTIL NOTIFICATION INFORMATION IS TRANSMITTED.

5        WELL, IT'S NOT DENYING IT UNTIL.  IT'S ACTUALLY ALLOWING

6    IT EARLIER.  AND SO THIS ONE IS -- THERE'S A PROBLEM HERE WITH

7    THIS, AND SO THAT'S STILL INVALID.

8        AND OVER HERE (INDICATING), IT'S THE DENYING UNTIL -- THE

9    NOTIFICATION INFORMATION COLLECTED BY EXECUTABLE INSTRUCTIONS

10   HAS BEEN SUCCESSFULLY TRANSMITTED.  SO IT'S THE NOT (SIC)

11   DENIED UNTIL IT HAS BEEN SUCCESSFULLY TRANSMITTED, IT IS

12   DENYING UNTIL IT TIMES OUT.  THAT'S THE WRONG TIME FOR -- FOR

13   THE POINT -- FOR WHEN WE STOP DENYING IT.

14       SO, AGAIN, WE HAVE ANOTHER REASON WHY THAT'S (SIC) PATENT

15   IS -- IS NOT -- WHY SOFTLOCK AND GRISWOLD DO NOT RENDER --

16   CLAIMS 32 AND 45 OBVIOUS.

17   **Q.**   OKAY.

18       I THINK YOU SAID A WORD, I JUST WANT TO CLEAR IT UP FOR

19   THE RECORD.  YOU SAID THE WORD "INVALID".

20       DID YOU MEAN THAT -- WHAT DID YOU MEAN BY THAT?

21   **A.**   SO, INVALID MEANS THAT A CLAIM IS -- IS INVALID BECAUSE

22   IT'S EITHER ANTICIPATED, MEANING ONE ART INVALIDATES THE

23   PATENT, ANTICIPATES IT, OR IT'S OBVIOUS BASED ON MULTIPLE

24   PATENT -- MULTIPLE DOCUMENTS TOGETHER MAKE THE PATENT INVALID.

25       IN THIS CASE, THE MULTIPLE PATENTS TOGETHER DON'T MAKE THE

1   MULTIPLE PATENTS, MULTIPLE DOCUMENTS, GRISWOLD AND SOFTLOCK

2   TOGETHER DO NOT MAKE EITHER OF THESE TWO CLAIMS INVALID.  AND

3   PARTICULARLY THEY DON'T ALSO -- THEY ALSO DON'T MAKE CLAIM 52

4   INVALID.

5   **Q.**  WHY NOT?

6   **A.**  SO WHEN YOU HAVE A DEPENDENT CLAIM, A DEPENDENT CLAIM --

7   SO FIRST OF ALL, WHEN YOU HAVE AN INDEPENDENT CLAIM LIKE

8   CLAIM 45, IT'S ONLY INVALID, IN OTHER WORDS, IT IS ONLY

9   ANTICIPATED OR RENDERED OBVIOUS IF EACH OF THE ELEMENTS ARE

10  FOUND IN THE PRIOR ART.  SO THEY (SIC) ALL THE ELEMENTS HAVE

11  TO BE FOUND IN THE PRIOR ART, EACH AND EVERY ONE.

12          **MS. MEHTA:**  OBJECTION, YOUR HONOR.  I THINK THE

13  WITNESS IS TRYING TO GIVE THE JURY INSTRUCTIONS ON THE LEGAL

14  STANDARDS, WHICH IS THE COURT'S PURVIEW AND NOT WITNESS'

15  PURVIEW.

16  **BY MR. DINOVO:**

17  **Q.**  ALL RIGHT, SIR.

18      WHY, IN YOUR OPINION AS AN EXPERT, DO YOU BELIEVE CLAIM 52

19  TO BE VALID?

20  **A.**  SO CLAIM 52 IS VALID BECAUSE IT DEPENDS ON CLAIM 45.  AND

21  SO SINCE CLAIM 45 IS VALID, CLAIM 52, WHICH DEPENDS ON

22  CLAIM 45, IS VALID BECAUSE IT -- BECAUSE THE -- THE ELEMENTS

23  HERE ARE IMPLIED BY 52.

24      SO YOU HAVE TO FIND ALL THE ELEMENTS OF 52 AND THE

25  ELEMENTS -- SORRY, ELEMENTS OF 45 AND THE ELEMENTS OF 52

1   TOGETHER HAVE TO BE FOUND.

2   **Q.**  DR. KELLER, DOES THIS DEMONSTRATIVE FAIRLY AND ACCURATELY

3   REPRESENT YOUR OPINION TESTIMONY TODAY?

4   **A.**  YES.  EXCEPT I WILL ALSO PUT AN "X" THERE BECAUSE THE

5   METHOD OF TRACKING IS ALSO NOT FOUND.

6   **Q.**  ALL RIGHT.

7        SO, JUST TO SUMMARIZE, AND THEN I'LL -- YOU WILL BE DONE

8   WITH ME ANYWAY, CAN YOU SUMMARIZE YOUR OPINIONS RELATIVE TO

9   THE ASSERTED CLAIMS AND CLAIM 32 RELATIVE TO VALIDITY IN VIEW

10  OF THE ASSERTIONS OF DR. WICKER?

11  **A.**  SURE.

12       SO, CLAIMS 32 AND 45 AND 52 ARE ALL VALID.  THEY ARE NOT

13  RENDERED OBVIOUS BY SOFTLOCK AND GRISWOLD, OF THE COMBINATION

14  FOR THE REASONS THAT I'VE STATED HERE.

15         **MS. MEHTA:**  OBJECTION, YOUR HONOR, MOVE TO STRIKE.

16  THERE'S NO OPINION WITH RESPECT TO VALIDITY.  THERE'S ONLY AN

17  OPINION WITH RESPECT TO NO INVALIDITY.  I JUST WANT TO MAKE

18  THAT DISTINCTION CLEAR.

19         **MR. DINOVO:**  OKAY.

20       WE'LL WITHDRAW QUESTION.

21         **THE COURT:**  I DON'T UNDERSTAND.  IS THAT AN OBJECTION

22  TO THE QUESTION OR AN OBJECTION TO THE ANSWER?

23         **MS. MEHTA:**  IT'S A MOTION TO STRIKE THE ANSWER, YOUR

24  HONOR.  IT'S OUTSIDE THE SCOPE OF HIS REPORT.  HE ONLY

25  RESPONDED TO CERTAIN INVALIDITY SHOWINGS.  HE DIDN'T OFFER ANY

1    AFFIRMATIVE OPINION AS TO VALIDITY, WHICH WOULD NOT BE

2    APPROPRIATE, IN ANY EVENT.

3              MR. DINOVO:  I'LL LIMIT MY QUESTION TO DR. WICKER'S

4    ALLEGATIONS.

5              THE COURT:  OKAY.  WELL, I GUESS REPHRASE YOUR

6    QUESTION TO ELICIT A MORE PRECISE ANSWER.

7    BY MR. DINOVO:

8    Q.  BASED ON EVERYTHING THAT DR. WICKER SAID HERE TODAY, DO

9    YOU AGREE WITH HIM OR DISAGREE WITH HIM THAT THE CLAIMS ARE

10   INVALID?

11   A.  SO, I DISAGREE THAT DR. WICKER HAS SHOWN THAT BASED ON THE

12   ART HE SHOWED, SOFTLOCK AND GRISWOLD, THAT CLAIMS 32, 45 AND

13   52 ARE INVALID.  HE HASN'T SHOWN THAT.

14   Q.  ALL RIGHT.

15             MR. DINOVO:  THANK YOU, SIR.

16             MS. MEHTA:  MR. ELLWANGER, IF YOU DON'T MIND PUTTING

17   THE '541 CHART UP.  I APPRECIATE THAT.

18                  (CHART DISPLAYED ON EASEL.)

19        THANK YOU.

20                  **CROSS-EXAMINATION**

21   BY MS. MEHTA:

22   Q.  GOOD AFTERNOON, DR. KELLER.

23   A.  GOOD AFTERNOON.

24   Q.  I WANT TO TALK ABOUT SOME BACKGROUND IN TERMS OF WHAT YOU

25   CONSIDERED WHEN YOU WERE FORMING YOUR OPINIONS, AND THEN WE'LL

1    DIVE RIGHT INTO THE PATENTS.

2    **A.**   SURE.

3    **Q.**   FIRST, YOU WILL AGREE WITH ME THAT MR. PATTERSON DIDN'T

4    INVENT DRM, RIGHT?

5    **A.**   THAT'S CORRECT.

6    **Q.**   AND AS OF 1996, THE CONCEPT OF WRAPPING SOFTWARE CONTENT

7    WITHIN A SECURE CONTAINER TO CONTROL ACCESS TO THAT CONTENT,

8    THAT WAS KNOWN IN THE ART, RIGHT?

9    **A.**   I BELIEVE SO.

10   **Q.**   AND IT WAS KNOWN THAT YOU COULD ENCRYPT CONTENT TO CONTROL

11   ACCESS TO CONTENT AS OF 1996, CORRECT?

12   **A.**   YES.

13   **Q.**   AND IT WAS KNOWN IN THE ART THAT YOU COULD SEND DATA WITH

14   EXECUTABLE INSTRUCTIONS WITHIN IT, RIGHT?

15   **A.**   YES.

16   **Q.**   AND YOU'RE NOT OFFERING ANY OPINION TODAY WITH RESPECT TO

17   ANY POINT OF NOVELTY THAT THE PATENT EXAMINERS MAY HAVE FOUND

18   WITH RESPECT TO MR. PATTERSON'S PATENTS, RIGHT?

19   **A.**   I'M NOT SURE I UNDERSTAND YOUR QUESTION.

20   **Q.**   WELL, YOU DIDN'T CONSIDER WHAT THE EXAMINERS MIGHT HAVE

21   FOUND TO BE NOVEL OR NOT NOVEL ABOUT THE PATENT WHEN YOU

22   FORMED YOUR OPINIONS, RIGHT?

23       YOU WEREN'T THINKING ABOUT THE PATENT EXAMINATION PROCESS,

24   CORRECT?

25   **A.**   I DID REVIEW THE FILE HISTORY IN THE CONCERT OF MAKING MY

1    REPORT.  AND MY REPORT IS BASED ON REBUTTING THE CLAIMS OF

2    INVALIDITY BY DR. WICKER.

3    **Q.**  OKAY.  SO ASIDE FROM REBUTTING DR. WICKER'S OPINIONS ON

4    INVALIDITY, YOU ARE NOT GOING OUTSIDE OF THAT IN TERMS OF WHAT

5    THE PATENT OFFICE WAS THINKING ABOUT, RIGHT?

6    **A.**  I -- IN TERMS OF REBUTTING DR. WICKER, THE PATENT OFFICE

7    SAID CERTAIN THINGS THAT ARE RELEVANT IN THAT REBUTTAL.  SO --

8    BUT MY REBUTTAL WAS CONFINED TO REBUTTING THOSE THINGS THAT

9    DR. WICKER SAID.

10   **Q.**  FAIR ENOUGH.  THANK YOU.

11       NOW, AT THE TIME OF THE '541 PATENT, IT WAS KNOWN THAT YOU

12   COULD SAVE LICENSING INFORMATION FOR DIGITAL CONTENT AT A

13   LOCAL DEVICE OR USER DEVICE SO YOU WOULDN'T HAVE TO GO BACK TO

14   THE SERVER TO ACCESS THAT CONTENT EVERY TIME, RIGHT?

15   **A.**  YES.  THERE IS SOME ABILITY TO SAVE THAT INFORMATION.

16   **Q.**  AT THE TIME OF THE '541 PATENT, IT WAS KNOWN IN THE ART

17   THAT YOU COULD SEND ENCRYPTED PASSWORDS FROM A SERVER TO A

18   CLIENT TO ALLOW ACCESS TO DIGITAL CONTENT, RIGHT?

19   **A.**  YOU COULD SEND ENCRYPTED PASSWORDS, YES.

20   **Q.**  AND AT THE TIME OF THE '541 PATENT, IT WAS KNOWN THAT YOU

21   COULD SEND DECRYPTION KEYS FROM A SERVER TO A CLIENT TO ALLOW

22   THE CLIENT TO HAVE ACCESS TO ENCRYPTED CONTENT, CORRECT?

23   **A.**  YES.

24   **Q.**  NOW, YOU HAVE EXPERIENCE IN THE FIELD OF DRM, RIGHT?

25   **A.**  YES.

1  Q.  AND YOU HAVE KNOWLEDGE OF WHAT DRM SOLUTIONS EXISTED OVER

2  THE LAST COUPLE OF DECADES, RIGHT?

3  A.  SOME KNOWLEDGE, BUT I'M NOT SURE I'M AWARE OF EVERY PIECE

4  OF ART THAT'S OUT THERE.

5  Q.  FAIR ENOUGH.  YOU CONSIDER YOURSELF ENOUGH OF AN EXPERT ON

6  DRM TO TESTIFY BEFORE THE JURY ON THE SUBJECT MATTER, RIGHT?

7  A.  YES.

8  Q.  AND PRIOR TO WORKING ON THIS CASE, YOU HAD HEARD OF SOME

9  OF THE PRIOR ART THAT'S AT ISSUE, RIGHT?

10  A.  I'M NOT SURE WHICH PIECES OF PRIOR ART I HEARD OF BEFORE.

11  Q.  LET ME ASK MORE SPECIFICALLY.

12     PRIOR TO WORKING ON THIS CASE, YOU HEARD OF SOFTLOCK

13  BEFORE, HADN'T YOU?

14  A.  I'M NOT SURE EXACTLY WHAT POINT I LEARNED ABOUT SOFTLOCK.

15  Q.  I'M GOING TO READ FROM YOUR DEPOSITION AT PAGE 34.

16        "QUESTION:  FAIR ENOUGH.  HAD YOU HEARD OF THE" --

17        LET ME START THE QUESTION OVER.

18     **THE COURT:**  MAY I HAVE A COPY --

19     **MS. MEHTA:**  OH, YES, YOUR HONOR.  I APOLOGIZE.

20        (DEPOSITION HANDED TO COURT.)

21     **MS. MEHTA:**  PAGE 34, LINE 15.

22        "QUESTION:  HAD YOU HEARD OF THE SOFTLOCK SYSTEM

23        BEFORE YOU WERE RETAINED IN THIS CASE?

24        "ANSWER:  I BELIEVE I HAD HEARD OF THAT'S.

25

1    **BY MS. MEHTA:**

2    **Q.**  NOW, PRIOR TO BEING RETAINED IN THE CASE, YOU'D NEVER

3    HEARD OF DIGITAL REG BEFORE, RIGHT?

4    **A.**  I BELIEVE THAT'S CORRECT.

5    **Q.**  AND YOU NEVER HEARD OF PC DESKGATE BEFORE, RIGHT?

6    **A.**  I DON'T RECALL ANY SPECIFIC RECOLLECTION.

7    **Q.**  AND YOU'VE NEVER HEARD OF PAT PATTERSON BEFORE, RIGHT?

8    **A.**  THAT'S CORRECT.

9    **Q.**  NOW, YOU KNOW THAT THE SCHULL '070 PATENT WAS FILED IN

10   1992, RIGHT?

11   **A.**  YES.

12   **Q.**  AND YOU DON'T HAVE ANY REASON TO QUIBBLE WITH THAT DATE IN

13   TERMS OF THE FILING DATE OF THE PATENT, RIGHT?

14   **A.**  NO, I DON'T HAVE ANY REASON.

15   **Q.**  I WANT TO TALK A LITTLE BIT ABOUT THE BACKDROP OF THE WORK

16   THAT YOU DID IN TERMS OF THE FULL PICTURE OF WHAT THE JURY IS

17   CONSIDERING.

18       YOU UNDERSTAND THAT PATENT CLAIMS HAVE TO BE READ THE SAME

19   WAY FOR INFRINGEMENT AND INVALIDITY, RIGHT?

20   **A.**  YES.  I UNDERSTAND THAT THE COURT INTERPRETS THE CLAIMS.

21   AND -- AND THAT MY ANALYSIS IS BASED ON THE COURT'S CLAIM

22   INTERPRETATIONS.

23   **Q.**  YOU UNDERSTAND THAT DIGITAL REG HAS TO BE CONSISTENT IN

24   ITS READING OF THE PATENT CLAIMS FOR INFRINGEMENT AND FOR

25   INVALIDITY, RIGHT?  THEY CAN'T APPLY ONE SCOPE OF THE CLAIMS

1    FOR INFRINGEMENT AND A DIFFERENT SCOPE OF THE CLAIMS FOR

2    INVALIDITY, CORRECT?

3    **A.**  THAT'S MY UNDERSTANDING.

4    **Q.**  NOW, YOU DON'T HAVE ANY OPINION ON INFRINGEMENT BY THE

5    ADOBE PRODUCTS, RIGHT?

6    **A.**  NO, I DON'T.

7    **Q.**  WHEN YOU FORMED YOUR OPINIONS IN THIS CASE, YOU HADN'T

8    LOOKED AT ANY DOCUMENTS OR EVIDENCE ABOUT HOW THE ADOBE

9    PRODUCTS WORK, RIGHT?

10   **A.**  THAT'S CORRECT.

11   **Q.**  AND, IN FACT, YOU HADN'T LOOKED AT THE INFRINGEMENT

12   CONTENTIONS THAT DIGITAL REG HAD PROVIDED, RIGHT?

13   **A.**  I BELIEVE THAT'S CORRECT.

14   **Q.**  AND YOU DIDN'T CONSIDER DR. DEVANBU'S INFRINGEMENT

15   THEORIES BEFORE YOU FORMED YOUR INVALIDITY CONTENTIONS IN THIS

16   CASE, CORRECT?

17   **A.**  THAT'S CORRECT.

18   **Q.**  LET'S TURN TO THE '541 PATENT.  AND I WANT TO START WITH

19   THE DISCUSSION OF WHAT IT IS THAT YOU SAID YOU FOUND MISSING

20   FROM THE 54 -- STRIKE THAT.

21       WHAT IT IS YOU FOUND MISSING FROM THE SCHULL '070 PATENT

22   AS IT RELATES TO THE '541.  ARE YOU WITH ME?

23   **A.**  YES.

24   **Q.**  OKAY.  SO I'M GOING TO LOOK AT THE DEMONSTRATIVE THAT

25   YOU'VE CREATED, AND YOU MARKED OFF SOME BOXES THAT YOU SAID

1    WERE MISSING, RIGHT?

2    **A.**  THAT'S CORRECT.

3    **Q.**  AND IF I UNDERSTOOD YOUR TESTIMONY CORRECTLY, FOR EACH OF

4    THE FOUR "X" MARKS THAT YOU PUT DOWN, YOUR REASON THAT YOU

5    THOUGHT IT WAS MISSING WAS EITHER THAT THE LIMITATION REQUIRED

6    A PERMISSION OR THAT THE LIMITATION REQUIRED A TOKEN, CORRECT?

7    **A.**  THAT'S CORRECT.

8    **Q.**  SO YOUR OPINION, IN TERMS OF WHY YOU DISAGREE WITH

9    DR. WICKER FOR THE '541 PATENT, IS BASED ON THE TOKEN AND

10   PERMISSION REQUIREMENTS, RIGHT?

11   **A.**  YES.  THE TOKEN PERMISSION HAVE TO BE DISTINCT, AND WHAT

12   WAS ASSERTED FOR SCHULL IS A PASSWORD WHICH THEY -- WHICH

13   DR. WICKER CLAIMS SATISFIES BOTH, AND IT CAN'T SATISFY BOTH.

14   **Q.**  OKAY.  I APPRECIATE THAT CLARIFICATION, BUT LET'S FOCUS IN

15   ON MY QUESTION.  AND WE'RE GOING TO WE EXPLORE THAT AT LENGTH,

16   I PROMISE YOU, ALTHOUGH NOT TOO MUCH LENGTH.

17       SO WITH RESPECT TO WHAT IT IS THAT IS THE BASIS FOR

18   YOUR -- YOUR OPINION, I JUST WANT TO BE VERY CLEAR.  THE ONLY

19   TWO THINGS THAT YOU ARE SAYING YOU DISAGREE WITH DR. WICKER

20   ABOUT WITH RESPECT TO THE '541 ARE THE TOKEN AND THE

21   PERMISSION; YOU ARE NOT ARGUING ABOUT ANY OF THE REST OF THE

22   CLAIM, RIGHT?

23   **A.**  WELL --

24   **Q.**  THOSE ARE THE ONLY THINGS THAT YOU PRESENTED ON DIRECT

25   EXAMINATION IN TERMS OF WHAT WAS MISSING.

1    **A.**  WELL, I TALKED ABOUT THE GENERATION OF THE PERMISSION FROM

2    THE TOKEN AND, THEREFORE, THAT'S THE REQUIREMENT THAT THEY BE

3    DIFFERENT.

4         I -- THOSE -- THOSE ARE SPECIFIC THINGS I TALKED ABOUT.

5    **Q.**  OKAY.  LET'S FOCUS IN ON THAT.

6         SO, AS I UNDERSTAND IT -- WHY DON'T WE TALK ABOUT THE

7    PATENT AND HOW YOU UNDERSTAND TOKEN AND PERMISSION IN THE

8    CONTEXT OF THE PATENT.

9            **MS. MEHTA:**  SO, MR. BONINI, IF YOU CAN PULL UP

10   SLIDE 6 OF DR. KELLER'S PRESENTATION.

11                     (PUBLISHED TO JURY.)

12        THAT'S A GOOD PLACE TO START, I THINK.

13   **BY MS. MEHTA:**

14   **Q.**  YOU RECOGNIZE THIS SLIDE, RIGHT, DR. KELLER?

15   **A.**  YES.

16   **Q.**  NOW, AS I UNDERSTOOD YOUR DIRECT TESTIMONY, THAT LITTLE

17   SILVER GEAR IN THE MIDDLE THERE, DO YOU SEE THAT?

18   **A.**  YES, MA'AM.

19   **Q.**  THAT WAS AN ICON THAT YOU USED TO DEPICT THE CONCEPT OF

20   GENERATING, RIGHT?

21   **A.**  YES.

22   **Q.**  AND THE GEARS WORK, AND THEY ARE DOING THE PROCESSING TO

23   ACTUALLY GENERATE THE PERMISSION, RIGHT?

24   **A.**  BASED ON THE RECEIVED TOKEN.

25   **Q.**  OKAY.  AND IN THE CONTEXT OF THE '541 PATENT, WHAT YOU ARE

1    SHOWING HERE ON SLIDE 6 IS THAT THE GEARS ARE WORKING AT THE

2    CLIENT, CORRECT?

3    **A.**  THAT'S CORRECT.  THE GEAR IS TAKING THE TOKEN FROM THE

4    SERVER OPERATING AT THE CLIENT, AND THEN CREATING THE

5    PERMISSION WHICH IS THEN STORED IN –– IN WHAT I'M CALLING THE

6    PERMISSION STORE.

7    **Q.**  AND IF IT WERE THE CASE IN THE PRIOR ART DEVICE THAT THE

8    GEARS WERE ACTUALLY AT THE SERVER AND THE WORK OF GENERATING

9    THE PERMISSION WAS BEING DONE AT THE SERVER, THAT WOULDN'T

10   FALL WITHIN THE '541 PATENT TO YOUR UNDERSTANDING, CORRECT?

11   **A.**  MY UNDERSTANDING IS THAT IF THE –– IS THAT THERE NEEDS TO

12   BE A PROCESS AT THE CLIENT THAT TAKES A TOKEN AND DOES SOME

13   SORT OF CONVERSION, GENERATION, PROCESSING THAT GOES TO THE ––

14   CREATES THE –– THE –– THE PERMISSION THAT IS THEN STORED AT

15   THE CLIENT.

16       THERE'S, OF COURSE, SOME PROCESS GOING ON AT THE SERVER.

17   AND I'M NOT TALKING ABOUT WHAT'S GOING ON AT THE SERVER, I'M

18   TALKING ABOUT WHAT'S GOING ON AT THE CLIENT.

19   **Q.**  RIGHT.  I WANT YOU TO LISTEN CAREFULLY ON MY QUESTION

20   BECAUSE I WANT TO MAKE SURE WE'RE REALLY FOCUSED IN ON WHAT

21   MATTERS.  YOU WILL HAVE TIME TO EXPLORE WHATEVER ELSE YOU WANT

22   TO TALK ABOUT WITH MR. DINOVO.

23       WITH RESPECT TO MY QUESTION ON SLIDE 6, YOU AGREE WITH ME

24   THAT IF THE GEARS THAT ARE DOING THE GENERATING OF THE

25   PERMISSION WERE AT THE SERVER, THEN THE REQUIREMENTS OF THE

1    '541 WOULDN'T BE MET BECAUSE IT WOULDN'T BE GENERATING THE

2    PERMISSION AT THE CLIENT.  CORRECT?

3            **MR. DINOVO:**  I AM GOING TO OBJECT TO THAT AS ASKED

4    AND ANSWERED, YOUR HONOR.

5            **THE COURT:**  OVERRULED.

6            **THE WITNESS:**  OKAY.  SO THE QUESTION AS TO WHAT'S THE

7    SERVER ALSO IS DEPENDS ON WHAT'S THE CLIENT.  THERE MAY BE A

8    PROCESS AT THE SERVER --

9            **THE COURT:**  TRY TO ANSWER THE QUESTION FIRST.  IT IS

10   PHRASED AS A "YES" OR "NO".  IF YOU CAN'T ANSWER IT "YES" OR

11   "NO" AND EXPLAIN, THEN SAY YOU CAN'T ANSWER IT "YES" OR "NO",

12   BUT IF YOU COULD -- IF YOU ARE ABLE TO ANSWER IT "YES" OR

13   "NO", WOULD YOU DO THAT BEFORE YOUR EXPLANATION?

14   **BY MS. MEHTA:**

15   **Q.**  MAYBE I CAN HELP YOU.

16   **A.**  SURE.

17   **Q.**  WE DON'T NEED TO TALK ABOUT HYPOTHETICALS OR ANYTHING.  I

18   JUST WANT TO TALK ABOUT YOUR SLIDE.

19   **A.**  YES.

20   **Q.**  IF THE GEARS ON YOUR SLIDE WERE MOVED OVER TO THE SERVER

21   THAT YOU'VE DEPICTED ON YOUR SLIDE, THAT WOULDN'T MEET THE

22   CLAIM REQUIREMENT, RIGHT?

23       I THINK THAT'S PRETTY SIMPLE.

24   **A.**  WELL, FIRST OF ALL, THERE'S ONE GEAR.  SO I'M NOT SURE

25   WHAT YOU MEAN BY "GEARS".

1        AND SECOND -- BUT IF THERE ARE GEARS, THERE COULD BE ONE

2   AT THE SERVER AND ONE AT THE CLIENT.  SO I REALLY DON'T

3   UNDERSTAND YOUR QUESTION IN THAT REGARD.

4   **Q.**  SO YOU JUST DON'T HAVE AN OPINION ON THAT?

5   **A.**  WELL, I DO HAVE AN OPINION.

6        MY OPINION IS THAT YOU HAVEN'T TOLD ME WHAT'S AT THE

7   CLIENT.  AND, THEREFORE, WITHOUT KNOWING WHAT'S -- WHAT

8   REMAINS AT THE CLIENT, I CAN'T ANSWER YOUR QUESTION.

9   **Q.**  OKAY.  FAIR ENOUGH.

10       LET'S GO TALK ABOUT MAYBE SOMETHING THAT YOU WILL BE ABLE

11  TO ANSWER.

12       SO LET'S TALK ABOUT THE SCHULL PATENT.  AND AS I

13  UNDERSTAND IT, YOUR OPINION IS THAT THE TOKEN AND THE

14  PERMISSION HAVE TO BE DISTINCT THINGS, RIGHT?

15  **A.**  THAT'S CORRECT.

16  **Q.**  AND, IN FACT, THE PERMISSION HAS TO BE SOMETHING THAT'S

17  GENERATED BASED ON A RECEIVED TOKEN, CORRECT?

18  **A.**  YES.  THE -- THE PERMISSION IS, ACCORDING TO THE CLAIM,

19  GENERATED BASED ON THE RECEIVED TOKEN.  THAT'S CORRECT.

20  **Q.**  OKAY.

21       AND SOMETHING THAT'S GENERATED AT A SERVER AND PASSED TO A

22  LOCAL USER OR CLIENT DEVICE AND STORED ON THAT DEVICE, WOULD

23  NOT FALL WITHIN THE SCOPE OF THE CLAIM, FROM YOUR PERSPECTIVE,

24  CORRECT?

25  **A.**  SOMETHING THAT IS GENERATED AT THE SERVER, TRANSMITTED TO

1   THE CLIENT, AND THEN STORED UNCHANGED AT THE -- AT THE CLIENT

2   UNCHANGED -- THAT'S AN IMPORTANT POINT.  I'M NOT SURE WHETHER

3   THAT WAS PART OF THE QUESTION.  THAT'S UNCHANGED WHEN IT'S

4   STORED AT THE CLIENT, THAT DOES NOT SATISFY THE SCOPE OF THE

5   CLAIM.

6   **Q.**  AND, IN FACT, IN YOUR OPINION, THE PERMISSION HAS TO BE

7   CREATED AT THE CLIENT AND IT CAN'T BE SOMETHING THAT WAS

8   PASSED FROM THE SERVER, RIGHT?

9   **A.**  WELL, IT'S BASED ON THE TOKEN PASSED FROM THE SERVER.  SO

10  IT ISN'T -- IT ISN'T CREATED FROM WHOLE CLOTH.  IT'S BASED ON

11  THAT TOKEN.

12  **Q.**  BUT IT HAS TO BE CREATED AT THE CLIENT AND CAN'T JUST BE

13  THE THING PASSED FROM THE SERVER; THAT'S YOUR OPINION?

14  **A.**  IT CAN'T BE THE EXACT SAME THING.  IT HAS TO BE

15  TRANSFORMED OR CHANGED OR GENERATED IN SOME WAY.

16  **Q.**  NOW YOU HEARD DR. SCHULL TESTIFY ABOUT HIS SYSTEM THIS

17  MORNING, RIGHT?

18  **A.**  YES.

19  **Q.**  AND YOU HEARD DR. WICKER'S OPINION WITH RESPECT TO THE

20  SYSTEM, RIGHT?

21  **A.**  YES.

22  **Q.**  NOW, YOU UNDERSTAND THAT IN THE CONTEXT OF THE SCHULL '070

23  PATENT, THERE IS A SECRET OR ENCRYPTED SEED THAT IS EMBEDDED

24  IN THE PASSWORD THAT GETS TRANSMITTED FROM THE SERVER TO THE

25  CLIENT, RIGHT?

1    YOU UNDERSTAND THAT'S HOW THE SYSTEM WORKS?

2    **A.**  I'M NOT SURE WHAT YOU MEAN BY "EMBEDDED".  BUT THE WAY I

3    WOULD UNDERSTAND IS THAT THE SEED -- THE -- THE -- THAT THE --

4    THERE'S SOME PROCESS ON THE SERVER WHEREBY THE PASSWORD IS

5    CREATED FROM THE SECRET, AND THEN THAT PASSWORD IS TRANSFERRED

6    TO THE CLIENT, AND THEN STORED -- THE PASSWORD IS STORED ON

7    THE CLIENT.

8    **Q.**  YOU UNDERSTAND THAT IN THAT PROCESS, THE THING THAT'S

9    CREATED AT THE SERVER IS ACTUALLY ENCRYPTED, THEN IT'S

10   TRANSMITTED TO THE CLIENT, AND THEN IT'S DECRYPTED, RIGHT?

11   YOU KNOW THAT'S HOW IT WORKS?

12   **A.**  WELL, I THINK THERE'S A COUPLE OF STEPS MISSING.  SO....

13   **Q.**  WE WILL GET INTO THE DETAILS, BUT AT A HIGH LEVEL, YOU

14   AGREE WITH ME AND YOU HEARD DR. SCHULL TESTIFY, THAT THE WAY

15   THAT THE PATENT WORKS IS YOU GENERATE THE PASSWORD BASED ON

16   THE SEED, IT'S ENCRYPTED, TRANSMITTED, AND DECRYPTED, RIGHT?

17   THAT'S HOW IT WORKS?

18   **A.**  I THINK THAT THAT'S A -- A POOR CHARACTERIZATION OF HOW IT

19   WORKS.

20   **Q.**  SO YOU THINK THAT WHEN DR. SCHULL TESTIFIED THAT THAT IS

21   HOW HIS SYSTEM WORKS THAT HE WAS BEING INACCURATE?

22   **A.**  NO, I THINK IT'S BEING INCOMPLETE.

23      WHAT I'M SAYING IS, THAT WHAT HAPPENS IS, THE PASSWORD IS

24   CREATED AT THE SERVER.  IT IS THEN TRANSFERRED TO THE CLIENT.

25   IT IS THEN STORED AT THE CLIENT UNCHANGED.  AND THEN THERE'S A

1    PROCESS OF CHECKING THAT PASSWORD.  THE PROCESS OF CHECKING

2    THAT PASSWORD CAN INCLUDE DECRYPTION.  BUT WHAT'S STORED IS

3    NOT THE DECRYPTED PASSWORD.  WHAT IS STORED IS EXACTLY THE

4    SAME THING THAT'S RECEIVED FROM THE SERVER.

5    Q.  OKAY.

6            MS. MEHTA:  OBJECTION, YOUR HONOR.  THAT WAS

7    NONRESPONSIVE.  MOVE TO STRIKE.  IT'S ALSO OUTSIDE THE SCOPE

8    OF HIS REPORT.

9            MR. DINOVO:  YOUR HONOR, HE'S SIMPLY TRYING TO ANSWER

10   THE QUESTION SHE'S POSING.

11           MS. MEHTA:  THAT WAS NOT MY QUESTION.

12           THE COURT:  I WON'T STRIKE IT.

13           MS. MEHTA:  LET ME --

14           THE COURT:  YOU MAY ASK IT AGAIN, IF YOU WOULD LIKE.

15           MS. MEHTA:  I'M SORRY, YOUR HONOR.

16   BY MS. MEHTA:

17   Q.  LET ME FOCUS YOU A LITTLE BIT MORE.  WE ARE GOING TO

18   UNPACK WHAT YOU JUST SAID.

19   A.  SURE.

20   Q.  WHAT I WANT TO TALK ABOUT IS THE CONCEPT OF ENCRYPTION AND

21   DECRYPTION.

22       SO YOU WILL AGREE WITH ME THAT THE THING THAT'S PASSED

23   FROM THE SERVER IN THE SCHULL SYSTEM IS GENERATED AT THE

24   SERVER AND THEN ENCRYPTED AT THE SERVER, RIGHT?

25   A.  YES.

1    Q.  AND THAT THING THAT'S ENCRYPTED IS THEN PASSED TO THE

2    CLIENT, RIGHT?

3    A.  YES.

4    Q.  AND THEN AT THE CLIENT, THERE IS A DECRYPTION PROCESS,

5    RIGHT?

6    A.  THERE IS SOME SORT OF DECRYPTION PROCESS AS PART OF THE --

7    AS PART OF THE PASSWORD CHECKING PROCESS.

8    Q.  IN YOUR VIEW, THAT PROCESS THAT WE JUST WENT OVER IN

9    SCHULL, THAT'S NOT ENOUGH TO MEET THE LIMITATIONS OF THE

10   CLAIM?

11   A.  THAT'S CORRECT.

12   Q.  NOW, LET'S LOOK AT SLIDES 12 AND 13 OF YOUR PRESENTATION.

13        MS. MEHTA:  LET'S START WITH SLIDE 12, MR. BONINI.

14                  (PUBLISHED TO JURY.)

15    THANK YOU.

16   BY MS. MEHTA:

17   Q.  SO THIS WAS A SLIDE THAT YOU USED TO DESCRIBE YOUR

18   UNDERSTANDING OF THE SCHULL '070 PATENT, CORRECT?

19   A.  YES.

20   Q.  AND YOU DON'T INCLUDE IN HERE ANY DEPICTION OF THE

21   ENCRYPTION PROCESS, RIGHT?

22   A.  I DON'T TALK ABOUT THE PROCESS OF GENERATING THE PASSWORD

23   AT THE SERVER.

24   Q.  OKAY.  AND THE PROCESS OF GENERATING THE PASSWORD AT THE

25   SERVER IN THE SCHULL SYSTEM IS GENERATING A PASSWORD BASED ON

1   THE SEED, AND THEN ENCRYPTING IT AT THE SERVER, RIGHT?

2   **A.**  THAT'S WHAT I UNDERSTAND.

3   **Q.**  OKAY.

4           **MS. MEHTA:**  IF YOU CAN GO TO SLIDE 13, MR. BONINI.

5                   (PUBLISHED TO JURY.)

6   **BY MS. MEHTA:**

7   **Q.**  IN SLIDE 13, YOU DON'T TALK ABOUT ANY OF THE DECRYPTION

8   THAT'S HAPPENING ON THE CLIENT SIDE EITHER, CORRECT?  THAT'S

9   NOT DEPICTED HERE.

10  **A.**  NO.  IT'S DEPICTED ON SLIDE 14.

11  **Q.**  WITH RESPECT TO THAT DECRYPTION PROCESS, YOU AGREE THAT

12  HAPPENS AT THE CLIENT SIDE?

13  **A.**  I AGREE IT HAPPENS ON THE CLIENT SIDE AFTER INSTALLING THE

14  PASSWORD.

15  **Q.**  LET'S TALK ABOUT THE '670 PATENT FOR A BIT.

16          **MS. MEHTA:**  IF I COULD ASK MR. BEEBE.  MAYBE YOU CAN

17  HELP ME.  I WANT TO PUT UP THE '670 SLIDE -- THE BOARD WE HAVE

18  FOR THAT SO WE CAN GET GROUNDED HERE.

19  **BY MS. MEHTA:**

20  **Q.**  SO, DR. KELLER, AS I UNDERSTOOD YOUR TESTIMONY, THERE WERE

21  TWO BASIC LIMITATIONS THAT YOU FOUND MISSING FROM THE '670

22  PATENT.  ONE WOULD BE NOTIFICATION INFORMATION AND THE OTHER

23  ONE WAS THE CONCEPT OF DENYING ACCESS UNTIL TRANSMISSION,

24  RIGHT?

25  **A.**  THAT'S CORRECT.

1    **Q.**  OKAY.  AND JUST SO THAT EVERYONE IS CLEAR, THOSE ARE THE

2    TWO BASES THAT YOU PRESENTED ON DIRECT EXAMINATION IN TERMS OF

3    YOUR DISAGREEMENT WITH DR. WICKER, RIGHT?

4    **A.**  THAT'S CORRECT.

5    **Q.**  THOSE ARE THE TWO ISSUES THE JURY NEEDS TO DECIDE?

6    **A.**  YES.

7    **Q.**  LET'S TALK ABOUT NOTIFICATION INFORMATION.  YOU TALKED A

8    BIT ABOUT YOUR UNDERSTANDING OF THAT TERM.

9    **A.**  YES.

10   **Q.**  YOU UNDERSTAND THE COURT HAS NOT ACTUALLY CONSTRUED THE

11   "NOTIFICATION INFORMATION" TERM, RIGHT?

12   **A.**  THAT'S WHAT I UNDERSTAND.

13   **Q.**  SO YOU ARE NOT APPLYING THE COURT'S CLAIM CONSTRUCTION FOR

14   THAT?

15   **A.**  THERE IS NO COURT CLAIM CONSTRUCTION TO APPLY.

16   **Q.**  SO YOU WERE JUST APPLYING YOUR OWN UNDERSTANDING OF THE

17   TERM, RIGHT?

18   **A.**  I'M APPLYING THE UNDERSTANDING OF ONE OF ORDINARY SKILL IN

19   THE ART BASED ON THE PATENTS AND THE PROSECUTION HISTORY.

20   **Q.**  FAIR ENOUGH.

21       THAT'S AN UNDERSTANDING THAT YOU CAME TO YOURSELF; THAT

22   WASN'T SOMETHING THAT SOMEONE ELSE GAVE YOU TO APPLY, RIGHT?

23   **A.**  YES.  I CAME TO IT BASED ON THOSE MATERIALS.

24   **Q.**  OKAY.

25       AND YOUR UNDERSTANDING THAT YOU CAME TO FOR NOTIFICATION

1    INFORMATION WAS THAT NOTIFICATION INFORMATION REQUIRES THAT

2    YOU BOTH IDENTIFY AND TRACK A RECIPIENT, CORRECT?

3    **A.**   THAT'S CORRECT.

4    **Q.**   AND ONE OF THE THINGS I THINK YOU POINTED TO ON DIRECT

5    EXAMINATION WAS A DISCLOSURE IN THE PATENT THAT YOU SAID

6    SUGGESTS THAT NOTIFICATION INFORMATION HAS TO ALLOW FOR

7    TRACKING BECAUSE IT PROVIDES INVALUABLE MARKETING DATA THAT

8    TRACKS THE NUMBER AND DEMOGRAPHIC INFORMATION OF USERS.

9        DO YOU RECALL THAT?

10   **A.**   YES.

11   **Q.**   AND YOU AGREE THAT THAT'S PART OF THE REASON THAT FORMS

12   THE BASIS FOR YOUR UNDERSTANDING OF NOTIFICATION INFORMATION,

13   RIGHT?

14   **A.**   THAT'S PART OF THE REASON, YES.

15   **Q.**   NOW, WITH RESPECT TO THE SOFTLOCK SYSTEM, YOUR OPINION IS

16   THAT THE SOFTLOCK SYSTEM DOES NOT DISCLOSE NOTIFICATION

17   INFORMATION; IS THAT RIGHT?

18   **A.**   MY UNDERSTANDING IS THAT THERE WAS NO DISCLOSURE --

19   THAT -- OF THE SOFTLOCK SYSTEM.  I DIDN'T SEE ANYTHING IN

20   DR. WICKER'S REPORT.

21   **Q.**   LET ME BE MORE PRECISE SO WE CAN FOCUS IN ON WHAT THE --

22   WHAT WE WERE TALKING ABOUT EARLIER TODAY.

23       SO I'M REFERRING TO SOFTLOCK, WHICH IS ON YOUR CHART RIGHT

24   THERE?

25   **A.**   YES.

1  Q.  AND IN PARTICULAR THE '070 PATENT.

2      AND YOUR TESTIMONY ON DIRECT EXAMINATION WAS THAT THE '070

3  PATENT DOES NOT DISCLOSE NOTIFICATION INFORMATION IN YOUR

4  VIEW.  CORRECT?

5  A.  THAT'S CORRECT.

6  Q.  AND YOUR BASIS FOR THAT WAS THAT YOU BELIEVE THAT THE '070

7  PATENT DOES NOT TEACH THE IDENTIFICATION AND TRACKING OF

8  RECIPIENTS, RIGHT?

9  A.  MY BASIS FOR THAT IS THAT DR. WICKER DID NOT SHOW ANY

10  PLACE WHERE TRACKING OCCURRED.

11  Q.  OKAY. NOW YOU UNDERSTAND THAT DR. WICKER POINTED TO A

12  DISCLOSURE IN THE '070 PATENT THAT SHOWS THAT PERSONAL

13  REGISTRATION INFORMATION ABOUT THE USERS IS COLLECTED AND

14  TRANSMITTED, RIGHT?

15  A.  THAT'S -- I SAW THAT -- THAT DESCRIPTION, BUT IT IS NOT

16  USED FOR TRACKING.

17  Q.  SO THAT -- THAT'S WHAT I'M TRYING TO GET AT.

18      YOU UNDERSTAND THAT SOFTLOCK DISCLOSES THE IDENTIFICATION

19  OF AND TRANSMISSION OF PERSONAL REGISTRATION INFORMATION ABOUT

20  A USER, RIGHT?

21  A.  THAT'S CORRECT.

22  Q.  AND YOU DON'T THINK THAT PERSONAL INFORMATION ABOUT THE

23  USER IS ENOUGH TO CONSTITUTE NOTIFICATION INFORMATION, RIGHT?

24  A.  THAT'S RIGHT.  IT HAS TO BE USED FOR BOTH IDENTIFICATION

25  AND FOR TRACKING.

1    **Q.**  AND IN THE SOFTLOCK SYSTEM, THE TRACKING THAT YOU THINK IS

2    MISSING IS THAT YOU ARE NOT GETTING -- STRIKE THAT.  LET ME

3    ASK A LITTLE BIT MORE FOCUSED QUESTION.

4        YOU KNOW THAT IN THE SOFTLOCK PATENT, THE '070 PATENT,

5    THERE'S ACTUALLY A DISCLOSURE ABOUT TRACKING INFORMATION ABOUT

6    USERS TO SOLVE THE PROBLEM ASSOCIATED WITH MARKETING DATA,

7    RIGHT, AND WANTING TO ACCESS MARKETING DATA?

8    **A.**  I DON'T RECALL ANY SUCH PROVISIONS CITED BY DR. WICKER.

9    **Q.**  OKAY.

10          **MS. MEHTA:**  MR. BONINI, COULD YOU PUT UP EXHIBIT 418,

11   WHICH IS THE '070 PATENT, AT COLUMN 1.

12       RIGHT THERE UP FRONT.

13                  (PUBLISHED TO JURY.)

14       AND LINES 32 TO 36.

15   **BY MS. MEHTA:**

16   **Q.**  SO THIS IS IN THE SOFTLOCK PATENT.

17       AND WHAT THE SOFTLOCK PATENT SAYS, THE '070 PATENT SAYS IS

18   THAT ONE OF THE PROBLEMS IT'S TRYING TO SOLVE IS TO RECEIVE

19   PAYMENT AND REGISTRATION INFORMATION FROM THE USERS, AND THAT

20   THEY WANT TO MAKE SURE THAT THE PRODUCERS OF THE SOFTWARE ARE

21   NOT FORFEITING THE REVENUES AND VALUABLE INFORMATION ABOUT

22   THEIR CUSTOMER BASE AND POTENTIAL MARKETS.

23       DO YOU SEE THAT?

24   **A.**  YES, I SEE THAT.

25       COULD YOU TELL ME WHERE THIS IS IN THE PATENT?  AND DO I

1    HAVE THAT PATENT IN MY BINDER?

2    **Q.**  YOU DO.  IT'S RIGHT THERE IN COLUMN 1.

3       ALL I WANT TO KNOW IS, YOU WEREN'T CONSIDERING THIS WHEN

4    YOU OFFERED YOUR DIRECT TESTIMONY, I'M ASSUMING?

5    **A.**  WHAT I CONSIDERED WAS WHAT DR. WICKER CITED IN HIS REPORT.

6    **Q.**  SO YOU DIDN'T REFERENCE THIS FOR YOUR DIRECT TESTIMONY?

7    **A.**  NO.

8       IS THIS IN THE BACKGROUND SECTION?

9    **Q.**  IT'S IN COLUMN 1.

10      LET'S TALK ABOUT THE "UNTIL" LIMITATION.

11      SO AS I UNDERSTAND YOUR TESTIMONY -- AND LET'S PULL UP

12   SLIDE 42 OF YOUR PRESENTATION.

13                    (PUBLISHED TO JURY.)

14      YOUR TESTIMONY IS THAT IN THE CONTEXT OF THE '670 PATENT,

15   THE EVENT THAT TRIGGERS ACCESS TO THE CONTENT IS A RECEIPT OF

16   ACKNOWLEDGMENT INFORMATION BACK FROM THE SERVER; IS THAT

17   RIGHT?

18   **A.**  THAT'S CORRECT.

19         **MS. MEHTA:**  NOW, MR. BONINI --

20   **BY MS. MEHTA:**

21   **Q.**  WELL, LET ME ASK ONE MORE QUESTION AND THEN WE'LL GO TO

22   THE NEXT THING.

23      IS IT FAIR TO SAY THAT IN YOUR UNDERSTANDING OF THE '670

24   PATENT, WHEN THE CLIENT SENDS NOTIFICATION INFORMATION TO THE

25   SERVER, THAT THE ACCESS IS NOT BASED ONLY ON WHETHER OR NOT

1    NOTIFICATION INFORMATION IS SENT, BUT IT'S ACTUALLY BASED ON

2    OR TRIGGERED BY AN ACKNOWLEDGMENT BACK, RIGHT?

3        THAT'S YOUR UNDERSTANDING?

4    A.  IN CLAIM 32, THE ACCESS IS DENIED UNTIL THE ACKNOWLEDGMENT

5    COMES BACK.  AND THE ACCESS IS GRANTED AT THE POINT THE

6    ACKNOWLEDGMENT COMES BACK.  THAT'S CLAIM 32.

7    Q.  OKAY.  NOW, YOU KNOW THAT THE COURT CONSTRUED CLAIM 32 OR

8    ELEMENTS OF CLAIM 32, RIGHT?

9    A.  YES.

10          MS. MEHTA:  MR. BONINI, IF WE CAN PUT UP THE TAB 1,

11   WHICH IS THE COURT'S CLAIM CONSTRUCTION IN THE JURY BOOK.

12                    (PUBLISHED TO JURY.)

13       AND LET'S LOOK AT THE CONSTRUCTION FOR "BASED ON".

14   BY MS. MEHTA:

15   Q.  DO YOU HAVE THAT IN FRONT OF YOU, DR. KELLER?

16   A.  YES, MA'AM.

17   Q.  SO THIS IS THE COURT'S CONSTRUCTION FOR "BASED ON THE

18   RESULT OF THE ATTEMPTED TRANSMISSION", DO YOU SEE THAT?

19   A.  YES.

20   Q.  WHAT THE COURT SAID THAT MEANT WAS, "BASED ON WHETHER OR

21   NOT THE NOTIFICATION INFORMATION WAS SENT".

22       DO YOU SEE THAT?

23   A.  YES, MA'AM.

24   Q.  AND THERE'S NO REFERENCE IN THE COURT'S CLAIM CONSTRUCTION

25   TO A NETWORK ACKNOWLEDGMENT, CORRECT?

KELLER – CROSS / MEHTA

1   **A.**  IT ISN'T SENT UNTIL -- YOU -- THE PROCESS OF SENDING IS --

2   ENDS WITH THE -- WITH THE RECEIPT OF THE MESSAGE.

3           **MS. MEHTA:**  OBJECTION, MOVE TO STRIKE.

4   **BY MS. MEHTA:**

5   **Q.**  IT'S A "YES" OR "NO" QUESTION.

6       THERE'S NOTHING IN THE COURT'S CLAIM CONSTRUCTION THAT

7   REQUIRES A NETWORK ACKNOWLEDGMENT.  "YES" OR "NO"?

8   **A.**  I -- I -- THE WORDS "NETWORK ACKNOWLEDGMENT" DO NOT

9   APPEAR.  HOWEVER, THE UNDERSTANDING THAT I HAVE OF WHAT

10  NOTIFICATION INFORMATION WAS SENT DO INCLUDE NETWORK

11  ACKNOWLEDGMENT.

12          **MS. MEHTA:**  OBJECTION, MOVE TO STRIKE, YOUR HONOR.

13  AND AT THIS POINT WE WOULD REQUEST THAT THE COURT ISSUE A

14  CURATIVE INSTRUCTION BECAUSE WHAT WE HAVE IS TESTIMONY THAT'S

15  OFFERED INCONSISTENT WITH THE COURT'S RULING.

16          **MR. DINOVO:**  YOUR HONOR --

17          **THE COURT:**  WELL, THE FIRST ANSWER THAT YOU MOVED TO

18  STRIKE IS STRICKEN.  THE SECOND ANSWER WON'T BE STRICKEN, BUT

19  THE JURY HAS IN FRONT OF IT WHAT THE CLAIM CONSTRUCTION SAYS,

20  AND THAT IS, IN FACT, WHAT IT SAYS.

21          **MS. MEHTA:**  THANK YOU, YOUR HONOR.

22  **BY MS. MEHTA:**

23  **Q.**  NOW, LET'S TALK ABOUT HOW THE SOFTLOCK SYSTEM WORKS IN

24  TERMS OF THE TRANSMISSION OF INFORMATION.

25      ARE YOU WITH ME?

1    **A.**  YES.

2    **Q.**  OKAY.

3       SO, YOU AGREE WITH ME THAT THE SOFTLOCK SYSTEM TRANSMITS

4    PERSONAL REGISTRATION INFORMATION ABOUT THE USER, CORRECT?

5    **A.**  IT DOES REPRESENT INFORMATION THAT'S USED TO IDENTIFY THE

6    USER, YES.

7    **Q.**  AND YOUR PRIMARY ARGUMENT FOR WHY THE SOFTLOCK SYSTEM

8    DOESN'T MEET THE "UNTIL ACCESS IS DENIED" OR THE "BASED ON"

9    RECEIVING —— I'M SORRY, "BASED ON ATTEMPTING TO TRANSMIT

10   LIMITATIONS", IS THAT IN THE SOFTLOCK SYSTEM, YOU ACTUALLY

11   HAVE TO RECEIVE AN AUTHORIZATION BACK FROM THE SERVER IN ORDER

12   TO HAVE ACCESS TO THE CONTENT, RIGHT?

13   **A.**  YES.  THAT'S CORRECT.

14   **Q.**  SO FROM YOUR PERSPECTIVE, IF THERE'S A SYSTEM THAT HAS

15   INFORMATION THAT'S SENT TO THE SERVER AND REQUIRES THE SERVER

16   GIVE YOU AN ACTUAL AUTHORIZATION OR POSITIVE RESPONSE BACK

17   BEFORE YOU CAN ACCESS THE CONTENT, THAT WOULD NOT BE ENOUGH

18   UNDER THE CLAIMS OF THE '670 PATENT, RIGHT?

19   **A.**  COULD YOU REPEAT THE QUESTION?

20   **Q.**  SURE.

21      I'M JUST TRYING TO UNDERSTAND WHY IT IS THAT YOU THINK THE

22   '670 IS NOT INVALIDATED BY SOFTLOCK.  AND WE JUST ESTABLISHED

23   THAT IN THE '070 PATENT, YOU HAVE TO SEND INFORMATION TO THE

24   SERVER AND GET AN ACTUAL AUTHORIZATION BACK.  RIGHT?

25   **A.**  YES.

1    **Q.**  AND THAT'S THE REASON THAT YOU THINK THE CLAIMS AREN'T

2    MET, RIGHT, IS THAT LAST PIECE?

3    **A.**  I SAID THAT THERE ARE TWO REASONS.  ONE IS TRACKING AND

4    THE OTHER REASON WAS THE TIMING OF WHEN ACCESS IS GRANTED OR

5    DENIED.

6    **Q.**  FAIR ENOUGH.

7       SO WE TALKED ABOUT NOTIFICATION INFORMATION AND TRACKING.

8    SO I'M GOING TO PUT THAT TO THE SIDE FOR A SECOND.  WE'VE

9    COVERED THAT.  NOW I WANT TO FOCUS ON THE TIMING OF WHEN YOU

10   GET ACCESS.  I WANT TO BE VERY CLEAR.

11      FROM YOUR PERSPECTIVE, THE REASON THAT THE SOFTLOCK SYSTEM

12   DOESN'T MEET THE GRANTING OF ACCESS LIMITATIONS OF THE '670 IS

13   BECAUSE YOU HAVE TO SEND INFORMATION AND ACTUALLY GET AN

14   AUTHORIZATION BACK, CORRECT?

15   **A.**  THE GRANTING IS BASED ON THE RECEIPT OF THE PASSWORD.

16   **Q.**  AND A SYSTEM IN WHICH GRANTING OF ACCESS TO THE CONTENT IS

17   BASED ON RECEIPT OF A PASSWORD OR A KEY FROM THE SERVER, THAT

18   WOULD FALL OUTSIDE THE SCOPE OF THE CLAIMS FROM YOUR

19   PERSPECTIVE, RIGHT?

20   **A.**  IF THAT'S -- IF THAT'S THE ONLY REASON THAT IT WAS

21   GRANTED.  OBVIOUSLY THERE ARE OTHER LIMITATIONS TO THE CLAIM.

22   **Q.**  FAIR ENOUGH.

23      BUT WITH RESPECT TO THE GRANTING AND DENIAL OF ACCESS,

24   THAT WOULDN'T BE ENOUGH.

25   **A.**  THAT'S MY UNDERSTANDING.

1          MS. MEHTA:  PASS THE WITNESS, YOUR HONOR.

2          MR. DINOVO:  JUST A FEW QUESTIONS, SIR.

3      COULD YOU PLEASE PUT UP THE '541 DEMONSTRATIVE?

4          (DEMONSTRATIVE DISPLAYED ON EASEL.)

5          MR. DINOVO:  IT LOOKS LIKE WE MAY ACTUALLY FINISH

6  TODAY.

7                  **REDIRECT EXAMINATION**

8  BY MR. DINOVO:

9  Q.  OKAY.  I THINK THERE WAS SOME -- YOU WERE SEEKING AN

10  OPPORTUNITY TO EXPLAIN ONE OF YOUR ANSWERS, AND I WOULD LIKE

11  TO GIVE YOU THAT OPPORTUNITY.

12      DOES CLAIM 1 OF THE '541 PATENT RECITE WHAT IS OR IS NOT

13  DONE AT THE SERVER?

14  A.  THE '541 PATENT DOESN'T DESCRIBE THE PROCESS AT THE

15  SERVER.  IT DESCRIBES THE PROCESS AT THE CLIENT.

16  Q.  OKAY.

17      AND SO IN PERFORMING YOUR ANALYSIS, YOU WERE FOCUSED ON

18  WHAT THE ACTUAL METES AND BOUNDS OF THE CLAIM WERE?

19  A.  THAT'S CORRECT.

20  Q.  OKAY.

21      THERE WAS SOME DISCUSSION ABOUT THIS PROCESS IN SCHULL OF

22  ENCRYPTING AND DECRYPTING.  AND YOU SAID THAT THERE WERE

23  CERTAIN ASPECTS OF THE HYPOTHETICAL THAT WERE BEING LEFT OUT.

24      DO YOU RECALL THAT?

25  A.  YES, SIR.

KELLER – REDIRECT / DINOVO

1  **Q.** WHAT ASPECTS OF THE HYPOTHETICAL WEREN'T BEING MENTIONED?

2  **A.** SO, THE -- THERE'S A PROCESS THAT'S IN THE FIRST ELEMENT

3  THERE -- CAN I GO UP THERE?

4      **THE COURT:** YES.

5      **THE WITNESS:** THANK YOU.

6    OKAY. SO, AT THE CLIENT, THERE'S AN ACCESS CHECKING

7  PROCESS TO DETERMINE WHETHER THE CLIENT HOLDS A PRE-EXISTING

8  PERMISSION.

9    SO, THAT PROCESS OF CHECKING MAY INVOLVE DECRYPTION TO SEE

10 WHETHER OR NOT THE -- THE -- THE -- THAT THING WHICH IS

11 PERMISSION IS ACTUALLY THE -- A PERMISSION FOR THE RESOURCE.

12 SO YOU CAN USE IT TO DECRYPT, YOU CAN USE IT FOR WHATEVER YOU

13 WANT. SO THAT HAPPENS AS PART OF THE ACCESS CHECKING PROCESS.

14   DOWN HERE (INDICATING) WE SAY BASED ON A RECEIVED TOKEN

15 EXECUTING INSTALLATION PROCESS THAT GENERATES AT THE CLIENT

16 PERMISSION THAT IS FOUND BY A LATER EXECUTION OF THE ACCESS

17 CHECKING PROCESS (SIC). SO --

18     **THE COURT:** SIR?

19     **THE WITNESS:** YES. AM I TALKING TOO FAST?

20     **THE COURT:** WHEN YOU READ, THEY OFTEN THINK THAT

21 EVERYONE IS FOLLOWING ALONG AND, THEREFORE, THEY CAN READ IT

22 REALLY FAST. THE COURT REPORTER ISN'T FOLLOWING ALONG. SHE

23 CAN ONLY HEAR WHAT YOU SAY --

24     **THE WITNESS:** I --

25     **THE COURT:** YOU NEED TO PAY ATTENTION WHEN YOU READ

1      TO SPEAK SLOWLY.

2          THAT LAST PHRASE YOU SAID SHE UNDOUBTEDLY DID NOT GET.

3              **THE WITNESS:**  I APPRECIATE THAT.  THANK YOU.

4          SO LET ME START AGAIN.  SO AT THE CLIENT WE ACCESS

5      CHECKING PROCESS TO DETERMINE WHETHER THE CLIENT HOLDS A

6      PRE-EXISTING PERMISSION.

7          SO THAT PROCESS TAKES THE STORED PERMISSION.  IT CAN

8      INVOLVE DECRYPTION.  IT CAN INVOLVE ANY OTHER PROCESS FOR

9      USING -- FOR ACCESSING THE DATA.

10         SO YOU -- YOU TAKE THE PASSWORD, YOU DECRYPT IT, AND YOU

11     CAN DECRYPT IT AND THEN YOU CAN USE IT TO ACCESS THE DATA.

12     THAT'S OKAY.

13         DOWN HERE, THERE IS -- ON THE LAST ELEMENT OF CLAIM 1,

14     BASED ON THE RECEIVED TOKEN EXECUTING INSTALLATION PROCESS

15     THAT GENERATES AT THE CLIENT A PERMISSION THAT MAY BE FOUND BY

16     A LATER EXECUTION OF THE ACCESS CHECKING PROCESS.

17         SO HERE WE HAVE THE TOKEN THAT COMES IN.  THE TOKEN IS

18     SOMEHOW USED TO GENERATE, TRANSFORMED IN SOME WAY, SOME --

19     SOME SORT OF THE CHANGE FROM WHAT IS SENT TO WHAT IS STORED,

20     AND THAT PERMISSION THAT IS STORED IS DIFFERENT FROM TOKEN AND

21     THEN IS FOUND BY A LATER PROCESS.

22     **BY MR. DINOVO:**

23     **Q.**  OKAY.  THAT'S HELPFUL.

24         SIR, WITH RESPECT TO THE SCHULL PATENT, THERE'S THIS

25     DISCUSSION OF A PASSWORD.  IS THE SAME THING, TO YOUR

1    UNDERSTANDING, IS THE SAME THING THAT'S SENT, TRANSMITTED, AND

2    RECEIVED STORED?

3    **A.**  YES.

4        THE RECEIVED -- WHAT THEY CLAIM IS A -- WHAT -- WHAT MAY

5    BE CONSIDERED A TOKEN, WHAT'S RECEIVED FROM THE EXTERNAL

6    SOURCE, MIGHT -- IT -- IT -- THAT DR. WICKER REFERRED TO AS A

7    TOKEN, THAT IS THE PASSWORD.

8        THE SAME PASSWORD IS THEN STORED IN -- AT THE CLIENT AS A

9    PERMISSION.  AND THEN THAT PASSWORD IS THEN USED WHEN IT'S

10   LAST STORED, AND IT IS THEN AFTER STORING, IT IS THEN

11   RETRIEVED AND DECRYPTED IN ORDER TO BE ABLE TO ACCESS THE

12   CONTENT.

13   **Q.**  IS IT YOUR UNDERSTANDING THAT THE TESTIMONY OF PROFESSOR

14   SCHULL, OF ADOBE'S EXPERT DR. WICKER, AND YOURSELF IS

15   CONSISTENT ON THAT POINT?

16   **A.**  YES.  THE TESTIMONY OF EVERYBODY IS CONSISTENT ON THAT

17   POINT.

18   **Q.**  OKAY.

19           **MR. DINOVO:**  COULD YOU PLEASE PUT UP '670?

20               (DEMONSTRATIVE DISPLAYED ON EASEL.)

21   **BY MR. DINOVO:**

22   **Q.**  ALL RIGHT, SIR.  JUST REAL BRIEFLY.

23       THERE WAS SOME DISCUSSION ON YOUR CROSS ABOUT THE GRANTING

24   OF ACCESS.  THE SELECTIVE -- SELECTIVELY GRANTING ACCESS, THAT

25   APPEARS IN WHICH CLAIM?

1           **THE WITNESS:**  MAY I?

2           **THE COURT:**  YES.

3           **THE WITNESS:**  SO, THE SELECTIVELY GRANTING ACCESS

4      APPEARS HERE IN CLAIM 32.  AND -- YES.

5      **BY MR. DINOVO:**

6      **Q.**  AND IS CLAIM 32 EVEN ASSERTED IN THIS CASE FROM AN

7      INFRINGEMENT STANDPOINT?

8      **A.**  I WASN'T INVOLVED IN INFRINGEMENT, BUT MY UNDERSTANDING IS

9      IT'S NOT.

10     **Q.**  LAST QUESTION FOR YOU, SIR.

11          **MR. DINOVO:**  IF YOU, MS. MASON, IF YOU CAN PULL UP

12     418, PAGE 4.

13                    (PUBLISHED TO JURY.)

14     **BY MR. DINOVO:**

15     **Q.**  PLEASE TAKE YOUR SEAT, SIR.

16          THERE WAS A PASSAGE THAT WAS SHOWN TO YOU ON CROSS, AND

17     YOU HAD ASKED WHERE IT CAME FROM, AND WHETHER IT CAME FROM THE

18     BACKGROUND.

19          I'M NOT SURE YOU GOT AN ANSWER.  I JUST WANTED TO SHOW YOU

20     THE PASSAGE IN CONTEXT.

21          DO YOU SEE THAT THIS REFERENCE TO INFORMATION -- HAVE YOU

22     LOCATED THAT?

23     **A.**  YES.  WHICH LINES IS THIS?

24     **Q.**  I BELIEVE IT STARTS AROUND LINE 32 OF COLUMN 1.

25     **A.**  YES.  THIS LOOKS LIKE IT IS IN THE BACKGROUND SECTION

1    TALKING ABOUT WHAT OTHER PEOPLE HAVE DONE.

2    **Q.**  OKAY.  AND SO DOES THE SUMMARY OF INVENTION AND THE

3    DETAILED DESCRIPTION, DO THOSE OCCUR LATER?

4    **A.**  YES.  EXACTLY.

5    **Q.**  OKAY.

6           **MR. DINOVO:**  I HAVE NO FURTHER QUESTIONS.

7        I WOULD OFFER AT THIS TIME PLAINTIFF'S EXHIBIT 4, WHICH IS

8    THE PROSECUTION HISTORY, PAGES 234 THROUGH 235.

9           **THE COURT:**  THAT CAN BE INCLUDED IN A GROUP EXHIBIT

10   OF THE PROSECUTION HISTORY.

11          **MR. DINOVO:**  THANK YOU.

12          **THE CLERK:**  ACTUALLY, A PAGE OR SO OF 4 I THINK IS --

13   4 IS ADMITTED, I SHOW AS OF EARLIER TODAY.

14          **MR. DINOVO:**  THANK YOU.

15          **MS. MEHTA:**  YOUR HONOR, WE WOULD REQUEST, IN VIEW OF

16   THE COURT'S IN LIMINE ORDER, A CURATIVE INSTRUCTION RELATING

17   TO THE CLAIM CONSTRUCTION.  AND IN PARTICULAR, WITH YOUR

18   PERMISSION, I CAN HAND YOU UP THE CLAIM CONSTRUCTION ORDER AT

19   PAGE 13.

20       THE TESTIMONY OFFERED BY DR. KELLER IS DIRECTLY IN

21   CONTRAVENTION TO THE COURT'S REASONING, SO WE WOULD ASK

22   PERMISSION -- WE WOULD ASK THE COURT TO OFFER A CURATIVE

23   INSTRUCTION TO CLARIFY THAT.

24          **THE COURT:**  WE WILL TAKE THAT UP WITH THE REST OF THE

25   INSTRUCTIONS.

1        **MS. MEHTA:**  OKAY.  SUBJECT TO THAT, THEN WE DON'T

2   HAVE ANYTHING FURTHER WITH DR. KELLER.

3        **THE COURT:**  ALL RIGHT.

4      YOU'RE EXCUSED THEN.  YOU MAY STEP DOWN.

5        **THE WITNESS:**  THANK YOU.

6        **THE COURT:**  THE PLAINTIFF RESTS THEN I TAKE IT

7   SUBJECT TO ADMISSION OF ANY EXHIBITS THAT HAVEN'T BEEN

8   ADMITTED?

9        **MR. DINOVO:**  THAT'S CORRECT, YOUR HONOR.  THANK YOU.

10       **THE COURT:**  THE DEFENDANT HAS NOTHING FURTHER, I TAKE

11  IT?

12       **MS. MEHTA:**  YOUR HONOR, SUBJECT TO THE DOCUMENT

13  ISSUE, WE DON'T HAVE ANYTHING FURTHER.

14       **THE COURT:**  RIGHT.  OKAY.

15     SO WE ARE GOING TO BREAK A LITTLE BIT EARLY TODAY.  WHAT

16  WE NEED TO DO IS PREPARE THE INSTRUCTIONS THAT I WILL GIVE YOU

17  TOMORROW MORNING.

18     SO WE WILL HEAR THOSE INSTRUCTIONS FIRST TOMORROW MORNING,

19  AND THEN WE WILL HEAR CLOSING ARGUMENT FROM BOTH SIDES, AND

20  THEN YOU WILL BEGIN YOUR DELIBERATIONS.

21     SO YOU'VE HEARD ALL THE EVIDENCE, BUT IT IS STILL

22  IMPORTANT THAT YOU NOT MAKE UP YOUR MIND ABOUT CASE, YOU NOT

23  DISCUSS THE CASE WITH ANYONE ELSE, OR EVEN WITH EACH OTHER

24  UNLESS YOU ARE ALTOGETHER DISCUSSING IT IN THE JURY ROOM.

25     IT ALSO CONTINUES TO BE IMPORTANT THAT YOU NOT DO ANY

1    INDEPENDENT RESEARCH OR INVESTIGATION ABOUT THE CASE ON YOUR

2    OWN.

3        YOU MAY WISH TO PLAN FOR -- TOMORROW IS THURSDAY?  FOR

4    TOMORROW AND POSSIBLY FRIDAY THAT YOU MIGHT WISH TO STAY LATER

5    THAN 1:30.  THE CASE WILL GO TO YOU PERHAPS IN LATE MORNING,

6    AND YOU MAY WANT TO NOT RUSH RIGHT HOME BUT HAVE SOME TIME

7    WITH EACH OTHER TO START YOUR DELIBERATIONS TOMORROW.  PERHAPS

8    YOU CAN STAY UNTIL 4, 4:30.  YOU CAN SEE IF YOU CAN PLAN THAT

9    OUT THIS EVENING, AND THE SAME WITH FRIDAY.  YOU MAY WISH TO

10   TAKE A LONGER DAY ON FRIDAY AS WELL.

11       SO, WE WILL START UP AGAIN PROMPTLY AT 8:30 TOMORROW

12   MORNING, AND WE'LL SEE YOU THEN.

13       (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

14           **THE COURT:**  I WOULD LIKE TO SEE THE ATTORNEYS PLEASE.

15       SO I WOULD LIKE TO TAKE A BREAK AND THEN COME BACK AND

16   TALK ABOUT INSTRUCTIONS.  BUT BEFORE WE DO THAT, I WOULD LIKE

17   TO JUST POINT OUT A FEW OF THE ISSUES ABOUT THE INSTRUCTIONS

18   SO YOU CAN BE THINKING ABOUT THEM WHILE YOU ARE HAVING LUNCH

19   AND THEN BE PREPARED TO COME BACK AND DISCUSS THEM.

20       DEFENDANT GAVE ME LIKE A ONE-PAGE OBJECTION TO THE DRAFT

21   FINAL INSTRUCTIONS.  I DON'T KNOW IF YOU'VE HAD A CHANCE TO

22   LOOK AT THAT, BUT IF YOU HAVEN'T, IF YOU WOULD, AND THEN COME

23   BACK AND TELL ME WHETHER YOU AGREE WITH THEIR THOUGHTS OR NOT.

24       CERTAINLY IF THE WRITTEN DESCRIPTION IS OUT, IT'S OUT.

25   THERE'S NO POINT INSTRUCTING ON THAT.

1      IF THERE ISN'T AN ISSUE ABOUT THE ORDER OF THE STEPS BEING

2  PERFORMED, THEN THERE'S CERTAINLY NO NEED TO TALK ABOUT THAT.

3      WE PROBABLY DO NEED TO SAY SOMETHING ABOUT THE FACT THAT

4  IT'S A METHOD PATENT AND WHAT THAT MEANS, BOTH WITH RESPECT TO

5  INFRINGEMENT AND WITH RESPECT TO DAMAGES.  IF YOU DON'T AGREE

6  WITH WHAT THEY HAVE TO SAY ABOUT HOW TO DO THAT, IF YOU COULD

7  WRITE UP AN ALTERNATIVE PROPOSAL, IF POSSIBLE PRINT IT -- I

8  DON'T KNOW IF YOU HAVE A PRINTER SOMEWHERE -- AND GIVE IT TO

9  THEM AND HAVE ONE FOR ME.

10     WITH RESPECT TO THE VERDICT FORM, AGAIN, IF THERE'S NO

11 WRITTEN DESCRIPTION ISSUE, THEN THE LAST VERSION THAT I GAVE

12 YOU WOULD HAVE THAT BOX DELETED FROM IT.  I DON'T KNOW IF

13 THERE'S ANYTHING ELSE THAT NEEDS TO BE CHANGED IN THE VERDICT

14 FORM.

15     **MS. GLAUSER:**  WE BELIEVE THERE IS ONE ISSUE THAT CAME

16 UP TODAY, YOUR HONOR -- ON THE VERDICT FORM.

17     I BELIEVE THE TESTIMONY TODAY WAS THAT THEY ARE NOT

18 ASSERTING ANTICIPATION FOR THE '670 EITHER ANYMORE.  AND IF

19 THAT'S THE CASE, THEN YOU HAD PREVIOUSLY REVISED THE VERDICT

20 FORM TO TAKE OUT ANTICIPATION WITH REGARD TO THE '541, BUT

21 DR. WICKER TESTIFIED ON THE STAND TODAY THAT HE ALSO WASN'T

22 OFFERING AN OPINION THAT THE '670 WAS INVALID BASED ON

23 ANTICIPATION.

24     SO WE WOULD LIKE TO MOVE THAT THAT PORTION BE REMOVED FROM

25 THE VERDICT FORM AS WELL.

1          **MS. MEHTA:**  YOUR HONOR, NO, THAT'S NOT WHAT HE

2     TESTIFIED.  WHAT HE TESTIFIED WAS, UNDER HIS VIEW OF THE

3     CORRECT INTERPRETATION OF THE CLAIMS, IT WOULDN'T BE

4     ANTICIPATED, BUT UNDER THEIR INFRINGEMENT THEORY, AND IN TERMS

5     OF APPLYING A CONSISTENT SCOPE, THEN IT WOULD BE.  SO

6     ANTICIPATION NEEDS TO BE INCLUDED.

7          **THE COURT:**  OKAY.

8          **MR. REINES:**  BUT THERE IS, I THINK, A

9     NONCONTROVERSIAL AMENDMENT TO THE VERDICT FORM, WHICH IS THE

10    '541 PATENT CLAIM -- CLAIMS FOR DIRECT INFRINGEMENT FOR ADOBE

11    SHOULD COME OUT.  THAT WAS THE BACK AND FORTH.  I THINK THE

12    COURT OBSERVED THAT ITSELF.

13         **THE COURT:**  WHAT QUESTION?

14         **MR. REINES:**  ON QUESTION 1, ON THE FIRST FOUR BOXES,

15    WHICH RELATE TO THE '541 PATENT, THOSE SHOULD COME OUT AND

16    THEN THE SAME FOR FLASH AND LIVECYCLE.

17         **MS. GLAUSER:**  I BELIEVE THOSE HAVE --

18         **THE COURT:**  YOU ARE LOOKING AT THE OLD VERSION.

19         **MR. REINES:**  I'M SORRY.  MY BAD.  I'M BEHIND YOU.

20         **THE COURT:**  AND THEN WITH RESPECT TO SOME OF THE

21    OTHER ISSUES, I'M NOT -- I'M STILL GIVING THIS SOME THOUGHT,

22    BUT I'M NOT INCLINED TO STRIKE THE 121 EXHIBIT -- OH.  HAVE

23    YOU DECIDED WHAT YOU WANT TO DO ABOUT THE 125?  I TAKE IT YOU

24    DON'T WANT TO RECALL VENTERS.

25         **MR. REINES:**  RIGHT.  WE SUBMITTED DOCUMENT 693 HAS A

1    PROPOSED INSTRUCTION.

2         **THE COURT:**  OH.

3         **MS. GLAUSER:**  WE SUBMITTED A RESPONSE TO THAT, YOUR

4    HONOR.

5         **THE COURT:**  OKAY.

6         **MR. REINES:**  I WANTED TO JUST REVISE THAT.

7       I THINK IT'S IMPORTANT TO -- LET ME ADDRESS THAT.

8       WE GOT THEIR OBJECTION.  I THINK WE CAN NARROW THE ISSUE

9    ANYWAY.  THIS IS 693.  IN THE BLOCK-IN QUOTE, WHICH IS THE

10   PROPOSED INSTRUCTION.

11        **THE COURT:**  SO YOUR IDEA IS THAT --

12        **MR. REINES:**  WE TRIED TO ADOPT YOUR IDEA, BUT WE

13   FILLED IT OUT.

14        **THE COURT:**  RIGHT.  BUT WHICH VERSION WOULD IT BE

15   THAT WOULD BE ADMITTED INSTEAD?

16        **MR. REINES:**  ATTACHMENT 1.

17        **THE COURT:**  1, OKAY.

18        **MR. REINES:**  AND JUST ONE THING THAT -- FRANKLY, IT

19   WAS MY LITTLE SLIP THERE.

20      MR. VENTERS -- DIGITAL REG STATED THAT THE MEETING WAS IN

21   JUNE 2004, AS THE COURT WILL REMEMBER IN OPENING.  AND WE

22   WANT -- HE'S NOW TESTIFIED, BECAUSE THERE'S NEW DOCUMENTS WITH

23   METADATA THAT WE NEVER HAD BEFORE, THAT THERE'S NO WAY IT

24   HAPPENED IN JUNE 2004.  THAT'S THE UNDISPUTED STUFF.

25      WE SAID -- MR. -- THE PROPOSAL IN THERE IS MR. VENTERS NOW

1    ACKNOWLEDGES THE MEETING COULD NOT HAVE BEEN IN JUNE 2004.  I

2    WANT TO NARROW THAT BECAUSE I THINK A VALID POINT WAS MADE

3    THAT HE DIDN'T TESTIFY.  RIGHT?

4        SO I THINK IF YOU REMOVE "NOW" THEN THAT ACCOMPLISHES WHAT

5    WE WANT, WHICH IS MR. VENTERS ACKNOWLEDGES THE MEETING COULD

6    NOT HAVE BEEN IN JUNE 2004.

7              **THE COURT:**  DID HE EVER SAY IT WAS IN JUNE --

8              **MR. REINES:**  NO.

9              **THE COURT:**  SO WHY DON'T WE CROSS OUT THE SENTENCE?

10             **MR. REINES:**  RIGHT.  THIS THE ISSUE.

11             **THE COURT:**  CROSS OUT THE WHOLE SENTENCE.

12             **MS. GLAUSER:**  THAT'S OUR PROPOSAL, YOUR HONOR.

13             **MR. REINES:**  I DO NOT WANT TO DO THAT BECAUSE DIGITAL

14   REG STATED IN OPENING THAT THE MEETING WAS IN JUNE 2004.  SO

15   THE JURY MIGHT BELIEVE THAT.  WE COULD HAVE IMPEACHED THEIR

16   OPENING -- WILL, HOPEFULLY, AND WOULD HAVE IF WE WOULD HAVE

17   HAD THE FACT THAT THE DOCUMENTS COULD NOT HAVE BEEN FROM JUNE

18   2004, WHICH WE NOW HAVE ONLY BY VIRTUE OF THE LATE DISCOVERY

19   BECAUSE THE METADATA FOR ATTACHMENT 1 AND 2 WHICH WERE

20   NONPRODUCED WITH NO LEGITIMATE BASIS.

21             **MS. GLAUSER:**  YOUR HONOR, THE TESTIMONY THAT

22   MR. VENTERS GAVE WAS THAT THE MEETING OCCURRED OVER THE

23   SUMMER.

24        WHEN MR. REINES ATTEMPTED TO CROSS EXAMINE HIM AND SAID,

25   DIDN'T YOU TESTIFY THAT IT OCCURRED IN JUNE, HE SAID, NO, I

1    THOUGHT I SAID THE SUMMER.  OUR TIME LINE REFERS TO THE FACT

2    THAT THE MEETING OCCURRED IN LATE 2004.

3        DURING OPENING, WE DID STATE THAT THE MEETING OCCURRED IN

4    JUNE, AND IT WAS LITERALLY A SLIP OF THE TONGUE.  THE OPENING

5    ISN'T EVIDENCE.  YOUR HONOR HAS THE INSTRUCTION TO THE JURY

6    THAT IT WASN'T EVIDENCE.  THE LIKELIHOOD THAT THEY EVEN HEARD

7    IT AND REMEMBERED IT, IS VERY SLIM.

8        AND IN CLOSING, THE ARGUMENT WILL NOT BE THAT THE MEETING

9    OCCURRED IN JUNE.  THE ARGUMENT WILL BE CONSISTENT WITH THE

10   EVIDENCE THAT WAS PRESENTED TO THE JURY THAT THE MEETING

11   OCCURRED IN THE SUMMER OF 2004 SHORTLY AFTER THE '670 PATENT

12   ISSUED.

13          **THE COURT:**  I JUST DON'T SEE ANY PREJUDICE BY SAYING

14   THAT IT WASN'T IN JUNE.

15          **MS. GLAUSER:**  I'M HAPPY TO DO THAT.  THE SENTENCE

16   THAT THEY HAVE DRAFTED, EVEN TAKING OUT THE "NOW", INCLUDES

17   THE "ACKNOWLEDGED" WHICH SEEMS TO SUGGEST THAT HE'S BEEN

18   IMPEACHED ON THAT IN SOME WAY.  SO A SIMPLE FACTUAL STATEMENT

19   THAT SAYS THE MEETING DIDN'T OCCUR -- THAT THE MEETING

20   OCCURRED IN THE SUMMER OF 2004 IS FINE.

21          **MR. REINES:**  WE CAN'T --

22          **THE COURT:**  WE JUST DON'T HAVE TO USE THE WORD

23   "ACKNOWLEDGE".  MR. VENTERS STATES --

24          **MS. GLAUSER:**  TESTIFIED.  EITHER ONE.

25          **THE COURT:**  OKAY.

1          **MS. GLAUSER:**  WE FILED A RESPONSE TO THE OTHER

2     PORTIONS OF THAT SUGGESTED CURATIVE INSTRUCTION.

3          **THE COURT:**  YES.

4          ALL RIGHT.  WELL, I'LL COME UP WITH SOMETHING.  I'M JUST

5     TRYING TO FIGURE OUT WHERE IT WOULD GO.  I GUESS IT WOULD

6     GO --

7          **MR. REINES:**  MY --

8          **THE COURT:**  -- IN THE PART ABOUT WILLFUL

9     INFRINGEMENT.

10         **MR. REINES:**  THAT'S THE LOGICAL PLACE.  THAT'S ON

11    PAGE 12 OF THE DRAFT, PRESUMABLY AT THE END OF LINE 27 OR SO.

12         **THE COURT:**  OKAY.

13         THEN THE PATTERSON ONE, AS I SAY I'M INCLINED TO NOT

14    STRIKE THAT, BUT I DO THINK IT WAS A RATHER EGREGIOUS CHANGE

15    OF HEART.

16         SO I WOULD BE INCLINED TO DO SOME THINGS TO MITIGATE IT,

17    WHICH WOULD BE UNDER THE DEPOSITION INSTRUCTION.  I WOULD GO

18    BEYOND THAT AND STATE THAT AT A DEPOSITION, EACH SIDE IS

19    ALLOWED TO PREPARE THEIR WITNESS, AND GO OVER DOCUMENTS BEFORE

20    THE DEPOSITION.  DOCUMENTS ARE ADMITTED AT THE DEPOSITION.

21    THE COURT REPORTER MAINTAINS CUSTODY OF THE ORIGINALS AND EACH

22    PARTY HAS ITS OWN COPIES THAT IT CAN KEEP IF IT WANTS TO AND

23    GO OVER WITH THE WITNESS IF IT WANTS TO.  AND ALSO AFTER THE

24    DEPOSITION IS COMPLETED, A COPY IS SENT TO THE WITNESS AND TO

25    BOTH SIDES WITH THE OPPORTUNITY TO MAKE ANY CORRECTIONS WITHIN

```
 1    A CERTAIN TIME FRAME AND RETURN IT.

 2              MR. DINOVO:  YOUR HONOR, I MIGHT HAVE A SOLUTION TO

 3    THIS, IF I COULD.

 4       BASED ON THEIR EXPERT'S REDUCTION OF THEIR INVALIDITY

 5    THEORIES, I DON'T BELIEVE IT TO BE RELEVANT -- THE DATE OF

 6    CONCEPTION IS NO LONGER MATERIAL.

 7              THE COURT:  THAT WAS WHAT I WAS WONDERING, TOO, IS

 8    WHETHER THE DATE OF CONCEPTION ACTUALLY IS IN DISPUTE.  THAT

 9    WAS ANOTHER QUESTION.

10              MR. DINOVO:  I THINK ALL OF THEIR ART NOW IS BASED ON

11    PRINTED PUBLICATIONS AS OPPOSED TO OTHER DOCUMENTS, SO I DON'T

12    KNOW THAT IT MATTERS.

13              MR. REINES:  I'M NOT SURE THERE WAS EVER A REAL

14    PRIORITY CONTEST, BUT OBVIOUSLY DIGITAL REG MADE A BIG DEAL

15    ABOUT THIS DOCUMENT.

16              MR. DINOVO:  WELL, KRISHNAN WAS ONE SUCH REFERENCE,

17    AND THAT'S NOT -- THAT HASN'T BEEN DISCUSSED.

18       SO, IF THERE WAS NO EVIDENCE ON THE RECORD ABOUT KRISHNAN

19    AS FAR AS I'M AWARE, SO I DON'T THINK WE NEED TO PROVE

20    CONCEPTION.

21              MR. REINES:  I THINK WE ABSOLUTELY NEED -- WHAT'S

22    GONE ON WITH THE SUPPOSED 2004 MEETING, THE SUPPOSED --

23              THE COURT:  RIGHT.  BUT IF IT ALL TURNS OUT TO BE A

24    TEMPEST IN A TEAPOT AND NOT RELEVANT, WE JUST STRIKE IT ALL.

25              MR. REINES:  I AGREE THAT IT SHOULD BE STRICKEN.
```

1          **THE COURT:**  OKAY.  SO WE WILL JUST STRIKE ALL OF THE

2    DOCUMENT AND ALL OF HIS TESTIMONY THAT RELATES TO THE DATE OF

3    THAT DOCUMENT.

4          **MR. DINOVO:**  DOES THAT HAVE SOME SORT OF SUGGESTION

5    OF IMPROPRIETY?

6          **THE COURT:**  GIVE IT SOME THOUGHT.

7          **MR. DINOVO:**  OKAY.

8          **THE COURT:**  I DON'T WANT TO PUT A QUESTION BEFORE

9    THEM THAT THEY DON'T HAVE TO ANSWER JUST BECAUSE WE WANT -- IT

10   MIGHT, I SUPPOSE, GO TO THE CREDIBILITY OF THE REST OF HIS

11   TESTIMONY.

12         **MR. DINOVO:**  RIGHT.

13         **MS. GLAUSER:**  IT ALSO GOES TO GENERAL BACKGROUND OF

14   HIS DEVELOPMENT OF THE INVENTION, I MEAN EVEN IF WE ARE NOT

15   TALKING ABOUT A DEFINITIVE CONCEPTION DATE.

16       MAYBE THE PARTIES CAN MEET AND CONFER ON IT A BIT MORE AND

17   COME BACK TO YOU THIS AFTERNOON.

18         **THE COURT:**  YOU NEED TO THINK ABOUT YOUR PROS AND

19   CONS HERE AND WHAT'S BEST FOR EACH OF YOU OVERALL.  IT MIGHT

20   BE THAT THE SAME THING IS BEST FOR BOTH OF YOU, IN WHICH CASE

21   YOU MIGHT COULD AGREE ON THAT.  BUT I CERTAINLY DON'T WANT TO

22   ASK THE JURY QUESTIONS OR MAKE AN ISSUE OUT OF DATA OF

23   CONCEPTION IF THAT, IN FACT, ISN'T AN ISSUE, WHICH I DON'T

24   THINK IT IS.

25       WE COULD DO A FALSO IN UNO, FALSO IN OMNIBUS INSTRUCTION

1    SUCH THAT THIS WOULD GO TO THE CREDIBILITY OF THE REST OF HIS

2    TESTIMONY IF WE -- I MEAN THAT MIGHT BE RELEVANT TO THAT

3    POINT.

4         **MR. REINES:**  JUST A MINOR POINT.  ON PAGE 15, LINE 21

5    THROUGH 25, IS -- TELLS THE JURY IT MUST DETERMINE A DATE OF

6    CONCEPTION.

7         **THE COURT:**  THAT'S WHAT I QUESTIONED.  I WONDERED WHY

8    THAT WAS IN THERE.  I WAS PLANNING TO ASK YOU THAT AND IT NOW

9    APPEARS IT ISN'T RELEVANT, AND THUS THOSE THINGS WOULD GO OUT

10   AS WELL.

11        **MS. GLAUSER:**  AGREED.  IT WAS DRAFTED WHEN THE

12   REFERENCES WERE DIFFERENT THAN THOSE PRESENTED IN TRIAL.

13        **MS. MEHTA:**  YOUR HONOR, ONE OTHER CURATIVE

14   INSTRUCTION JUST TO FOLLOW UP ON THE TESTIMONY TODAY.

15        SO, WE HEARD TESTIMONY TODAY FROM DR. KELLER THAT'S

16   DIRECTLY CONTRADICTORY TO YOUR CLAIM CONSTRUCTION ORDER AT

17   PAGE 13, LINES 4 TO 8.  IF I CAN HAND THAT UP.

18        **THE COURT:**  IT WAS PRETTY CONTRADICTORY TO THIS PLAIN

19   LANGUAGE OF THE CLAIM CONSTRUCTION AS FAR AS I COULD SEE.  I

20   DON'T KNOW THAT WE NEED TO GO BEYOND THAT.

21        **MS. MEHTA:**  THE CONCERN I HAVE, YOUR HONOR, IS HE

22   ATTEMPTED TO SAY, THE WORDS AREN'T THERE, BUT THAT IS THE WAY

23   I UNDERSTAND IT.  AND WHAT YOUR HONOR SAID WAS, THE PATENTEE

24   IS LIMITED TO AN INVENTION THAT GRANTS ACCESS IMMEDIATELY UPON

25   THE ATTEMPT TO TRANSMIT THE NOTIFICATION, WITHOUT WAITING FOR

1    A RESPONSE FROM THE SERVER.

2         AND SO HE ATTEMPTED TO SAY, WELL, THE WAY I UNDERSTAND IT

3    IS, YOU HAVE TO GET A RESPONSE FROM THE SERVER, WHICH IS

4    DIRECTLY CONTRADICTORY TO THIS LINE.  SO I THINK WE NEED A

5    CURATIVE INSTRUCTION.

6         **THE COURT:**  I SUPPOSE WHAT WE COULD DO IS WHAT WE DID

7    WITH THE OTHER ONE, WHICH IS ADD IT TO THE DEFINITION ATTACHED

8    TO THE INSTRUCTION.

9         **MR. DINOVO:**  SO, A COUPLE OF THINGS.

10        FIRST OF ALL, THAT RELATED TO CLAIM 32, NOT CLAIM 45.

11   CLAIM 45 TALKS ABOUT SUCCESSFUL TRANSMISSION.  THAT'S THE

12   CLAIM THAT WE'RE ASSERTING IN THE CASE.

13        SO IF THERE'S ANY SORT OF INSTRUCTION, IT HAS TO BE

14   LIMITED TO CLAIM 32, WHICH IS TO WHAT YOUR CONSTRUCTION WAS

15   LIMITED.

16        ALSO, I DON'T HAVE IT IN FRONT OF ME, BUT THERE'S A

17   DISTINCTION THAT HE WAS DRAWN BETWEEN A SERVER ACKNOWLEDGMENT

18   IN THE FORM OF AN AUTHORIZATION, WHICH WAS THE SUBJECT OF THE

19   MOTION PRACTICE EARLIER VERSUS A NETWORK ACKNOWLEDGMENT THAT

20   TRANSMISSION HAS OCCURRED.

21        **THE COURT:**  BE THAT AS IT MAY, THE CLAIM CONSTRUCTION

22   DOES NOT SPECIFY WHICH CLAIM IT'S CONSTRUING.  IT JUST SAYS,

23   IT CONSTRUES THE PHRASE BASED ON A RESULT OF AN ATTEMPTED

24   TRANSMISSION.

25        SO I DON'T KNOW WHAT CLAIM THAT PHRASE IS IN, BUT WHATEVER

1    CLAIM THAT PHRASE IS IN, IS CONSTRUED AS I CONSTRUED IT, AND

2    I'LL ADD THAT SENTENCE TO IT.

3            MR. DINOVO:  OKAY.  THAT'S LIMITED TO CLAIM 32

4    THOUGH --

5            THE COURT:  IF IT IS, IT IS.  I DON'T HAVE IT IN

6    FRONT OF ME.  I CAN'T RESPOND TO THAT.

7            MS. MEHTA:  THERE'S TWO ISSUES, YOUR HONOR.

8        WHAT WE, I THINK WITH YOUR HONOR'S GUIDANCE, I THINK THIS

9    IS WHAT YOU ARE SAYING IS, TAB 1 IN THE JURY BOOK, WE SHOULD

10   ADD TO THE CONSTRUCTION FOR THIS BASED ON, THE CELL FOR THIS

11   LIMITATION, THIS SENTENCE FROM YOUR CLAIM CONSTRUCTION ORDER.

12   WE WILL ADD IT TO THE JURY INSTRUCTIONS.

13       THANK YOU, YOUR HONOR.

14           MS. GLAUSER:  I DON'T KNOW IF YOUR HONOR IS PLANNING

15   ON DOING ANY WORK ON THE CLAIM CONSTRUCTION PORTION OF IT

16   WHILE WE ARE TAKING THE BREAK, BUT I DON'T KNOW IF YOU ALL

17   HAVE HAD A CHANCE TO NOTICE THAT IT APPEARS THAT THE AGREED

18   OTHER CLAIM CONSTRUCTION FOR CLAIM 1 OF THE '541 GOT DROPPED

19   ON THE CLAIM CONSTRUCTION THAT YOU HAVE IN THE JURY

20   INSTRUCTIONS COMPARED TO THE ONE THAT WAS IN THE JURORS'

21   NOTEBOOK.

22       I CAN BRING YOU A COPY OF THE JURORS' NOTEBOOK IF YOU'D

23   LIKE TO HAVE --

24           THE COURT:  I HAD IT IN THERE BEFORE, DIDN'T I?

25           MS. GLAUSER:  I THINK THAT'S RIGHT, YOUR HONOR.

1        THE COURT:  WHAT IS IT AGAIN?  A WORD OR TWO.

2        MS. MEHTA:  "EXECUTING AN INSTALLATION PROCESS", YOUR

3    HONOR.

4        THE COURT:  OKAY.  THAT MUST HAVE JUST GOTTEN OUT OF

5    HAND IN THE VERSION CONTROL.

6      OKAY.  SO, WITH REGARD TO THE PARR ISSUES, WHICH ARE THE

7    14 MILLION-DOLLAR ISSUE AND THE PRIOR-REPORT-IS-OUT ISSUE, I

8    HAVEN'T WRITTEN THEM YET, BUT I WOULD -- MY IDEA WOULD BE TO

9    WRITE SOMETHING ABOUT THAT THAT WOULD GO INTO THE EXPERT

10   OPINION SECTION.

11     AND ONE THING WOULD TALK ABOUT EXPERTS RELYING ON

12   INFORMATION THAT'S NOT ADMISSIBLE IN EVIDENCE.  AND I DON'T

13   KNOW HOW FAR I WOULD GET INTO THE SPECIFICS.

14     BUT WITH REGARD TO THE PRIOR REPORT, I WOULD SAY SOMETHING

15   LIKE THE COURT HAS OCCASION TO REVIEW EXPERT OPINIONS BEFORE

16   THEY ARE PRESENTED TO THE JURY.  AND THE COURT DID SO IN THIS

17   CASE, AND THE COURT'S PRIOR RULINGS ARE NOT YOUR PROVINCE, OR

18   SOMETHING LIKE THAT.

19        MR. REINES:  THAT SEEMS LOGICAL.

20        MR. PRICE:  YOUR HONOR, I THINK WE CAN PROBABLY

21   RESOLVE THIS QUICKLY.  ON THE LATTER ISSUE, WE WOULD JUST

22   SUGGEST NOT TO HAVE A CURATIVE INSTRUCTION.  IT WAS FIVE DAYS

23   AGO NOW.  I'D RATHER JUST NOT BRING IT UP.

24        THE COURT:  THAT IS ALWAYS A GOOD POLICY.

25        MR. PRICE:  WE JUST NEED CONFIRMATION THAT THAT WILL

```
 1    NOT COME UP IN CLOSING OR ANYTHING LIKE THAT.

 2              MR. REINES:  THAT WILL NOT COME UP.

 3              MR. PRICE:  AND THEN ON THE FORMER ISSUE --

 4              THE COURT:  SO IN OTHER WORDS, YOU DON'T WANT TO

 5    UNRING THE BELL AND YOU WOULD RATHER JUST NOT BRING IT UP

 6    AGAIN AND DRAW ATTENTION TO IT?

 7              MR. PRICE:  YOU WERE QUICK TO STRIKE IT.

 8              THE COURT:  I WILL PRETEND IT DIDN'T HAPPEN, AND THAT

 9    WILL BE THAT.

10              MR. PRICE:  EXACTLY.

11       ON THE FORMER ISSUE, YOUR HONOR, WE LOOKED AT WHAT ADOBE

12    PROPOSED IN THE FOOTNOTE.  THEY HAD TWO PROPOSALS ON THE

13    CURATIVE INSTRUCTION?

14              THE COURT:  PROBABLY THEIR FOOTNOTE IS OKAY.  I KNOW

15    YOU THINK IT'S --

16              MR. PRICE:  WE ARE OKAY WITH THAT.

17              THE COURT:  I'M NOT THRILLED WITH IT, BUT I THINK

18    IT'S PROBABLY GOOD ENOUGH.  I WILL TAKE ANOTHER LOOK AT IT.

19    BUT IT WILL BE EITHER THAT AND SOMETHING BETWEEN THAT AND

20    THEIR FIRST CHOICE.

21       THEN WE HAVE CONTRIBUTORY INFRINGEMENT.  THIS BUSINESS

22    ABOUT A COMMON COMPONENT SUITABLE FOR NONINFRINGING USE.  I

23    JUST DON'T THINK THAT'S RELEVANT HERE.

24       WHAT COULD BE SUITABLE?  JUST THE WHOLE PROGRAM OR JUST

25    THE DRM?  COULD THE DRM SOMEHOW BE SOLD SEPARATELY WITH A
```

1    NONINFRINGING USE?  IT JUST STRIKES ME TO BE INAPPOSITE.

2         **MR. REINES:**  HERE'S FROM, OBVIOUSLY FROM THE DEFENSE

3    PERSPECTIVE, THERE'S MANY WAYS IN WHICH THESE HAVE SUBSTANTIAL

4    NONINFRINGING USES.

5         **THE COURT:**  WHAT?

6         **MR. REINES:**  THEY HAVE SUBSTANTIAL NONINFRINGING

7    USES.

8         **THE COURT:**  OF WHAT?

9         **MR. REINES:**  THE DRM COMPONENTS THAT ARE ACCUSED OF

10   INFRINGEMENT HAVE SUBSTANTIAL NONINFRINGING USES.

11       SO REMEMBER OFFLINE AND ONLINE, AND PRE-LICENSED AND NOT

12   PRE-LICENSED AND TRY AND BUY.  SO THERE'S MANY SITUATIONS IN

13   WHICH YOU CAN USE THE DRM TECHNOLOGY THAT'S IN THE SOFTWARE IN

14   WAYS THAT'S NOT EVEN ACCUSED OF INFRINGING BY DR. DEVANBU.

15       SO, IT DOES HAVE SUBSTANTIAL AMOUNT OF INFRINGING USES.

16   IN FACT, WE WOULD SUGGEST IT DOESN'T BELONG IN THE CASE.

17        **MR. DINOVO:**  SO, TO RESPOND TO THAT BRIEFLY, YOUR

18   HONOR, SO YOUR INSTINCT WAS CORRECT.  AT LEAST MY

19   UNDERSTANDING OF THE CASE LAW IS THAT THE FEDERAL CIRCUIT

20   DOESN'T SAY YOU LOOK AT THE WHOLE PRODUCT.  THEY SAY THAT YOU

21   LOOK AT THE SUBSET OF FUNCTIONALITY.

22        **THE COURT:**  THAT'S WHAT HE'S --

23        **MR. REINES:**  THAT'S WHAT I'M DOING.

24        **THE COURT:**  -- ACKNOWLEDGING.

25        **MR. DINOVO:**  RIGHT.  RIGHT.  I THINK WE ARE IN

1    AGREEMENT, BUT I DON'T WANT TO PUT WORDS IN HIS MOUTH.

2        IN TERMS OF WHAT DR. DEVANBU SAID, THE ONLINE AND OFFLINE,

3    HE SAID IN BOTH INSTANCES THERE'S INFRINGEMENT.  THERE'S A

4    CACHE REFERRED TO AND THEN THERE'S AN EFFORT TO REACH OUT TO

5    THE LICENSE SERVER.  NOW, THE OFFLINE HAPPENS AFTER THERE IS A

6    CONNECTION AGAIN.  BUT I THINK -- WE THINK IT SHOULD REMAIN IN

7    THE CASE SUBJECT TO THAT UNDERSTANDING.

8        **MS. MEHTA:**  YOUR HONOR, SO A COUPLE OF THINGS.  ONE

9    IS --

10       **THE COURT:**  I'M SORRY.  I DIDN'T REALLY UNDERSTAND

11   WHAT YOU WERE SAYING.

12       **MR. DINOVO:**  OF COURSE.  IF WE ONLY LOOK AT THE DRM

13   COMPONENT --

14       **THE COURT:**  RIGHT.

15       **MR. DINOVO:**  -- I THINK WHAT I UNDERSTOOD MR. REINES

16   TO SAY IS THAT ONLINE AND OFFLINE, ONE OF THEM, WHICH I DON'T

17   KNOW WHICH ONE HE MEANT, WAS A SUBSTANTIAL NONINFRINGING USE.

18   DR. DEVANBU'S TESTIMONY IS THAT THEY BOTH INFRINGE, SO WE

19   DON'T AGREE WITH THAT.

20       AND THE ACTIVATION WORKS BASICALLY THE SAME WAY EVERY

21   TIME.  IT'S INTENDED -- IT'S SOMETHING THAT HAS TO WORK A

22   CERTAIN WAY BECAUSE THAT'S HOW PEOPLE USE IT.  I GUESS THEY

23   HAVE THEIR FREE TRIAL PERIOD CONCEPT.

24       **THE COURT:**  GIVE ME THE BOTTOM LINE RATHER THAN THE

25   ARGUMENT.

1    MR. DINOVO:  THE BOTTOM LINE IS, ANY NONINFRINGING

2    USE IS NOT SUBSTANTIAL.

3         THE COURT:  OKAY.  SO YOU THINK YOU WIN, BUT THAT

4    DOESN'T MEAN IT'S OUT OF THE CASE.

5         MR. DINOVO:  THAT'S OUR VIEW IS THAT WE SHOULD KEEP

6    IT IN.

7         THE COURT:  THAT'S WHAT THEY SAY, SO WE ARE ALL IN

8    AGREEMENT EXCEPT FOR ME, I'D LIKE TO TAKE IT OUT BECAUSE I

9    DON'T THINK IT APPLIES.  YOU BOTH WANT IT IN, YOU CAN HAVE IT

10   IN.

11        MS. MEHTA:  YOUR HONOR, I THINK THERE'S ONE ISSUE --

12   AND I'M SORRY TO INTERRUPT YOU -- IT'S JUST THAT WITH RESPECT

13   TO THAT, THAT LANGUAGE SHOULD BE IN IF THE QUESTION OF

14   CONTRIBUTORY GOES TO THE JURY.

15        FROM OUR PERSPECTIVE, THERE'S NO ACTUAL DISPUTE WITH

16   RESPECT TO CONTRIBUTORY BECAUSE THERE WAS NO SUGGESTION BY

17   DR. DEVANBU THAT THERE WEREN'T SUBSTANTIAL NONINFRINGING USES.

18        I ASKED HIM IF HE HAD AN OPINION ON THAT.  HE SAID HE

19   DIDN'T.  AND THEN WE PROVED UP THROUGH CROSS-EXAMINATION AND

20   DR. WICKER'S TESTIMONY THAT THERE ARE PANOPLY OF SUBSTANTIAL

21   NONINFRINGING USES SPECIFIC TO THE ACCUSED DRM METHODOLOGIES.

22        SO FROM OUR PERSPECTIVE, AND YOU WILL PRESUMABLY BE SEEING

23   THIS IN OUR MOTIONS TODAY ON JMOL, CONTRIB SHOULD NOT BE IN

24   THE CASE.  IF IT IS GOING TO GO IN THE CASE, THAT LANGUAGE

25   SHOULD BE IN THE INSTRUCTION.

1        **THE COURT:**  YOU ARE PURSUING YOUR CONTRIBUTORY

2   INFRINGEMENT THEORY?

3        **MR. DINOVO:**  LET US TALK ABOUT IT ON OUR END, AND WE

4   WILL GET BACK TO YOU AFTER THE LUNCH BREAK.

5        **THE COURT:**  SO I GUESS WE CAN WORRY ABOUT IT LATER.

6      THE THING I DON'T LIKE ABOUT THIS COMMON COMPONENT

7   INSTRUCTION IS NOT ONLY THAT IT'S THERE AT ALL, BUT IT TALKS

8   ABOUT OTHER USES ARE NOT OCCASIONAL, FAR-FETCHED, IMPRACTICAL,

9   EXPERIMENTAL OR HYPOTHETICAL.  I SUPPOSE THOSE APPLY.  MAYBE

10  NOT ALL OF THOSE WORDS.

11       **MR. REINES:**  IF YOU WANT TO NARROW THAT DOWN.  I

12  MEAN, THAT'S TO FLESH OUT AND GIVE GUIDANCE AS TO WHAT

13  INSUBSTANTIAL MEANS IN THE CONTEXT OF THAT INSTRUCTION.

14       **THE COURT:**  AND THEN -- OKAY.  SO WE HAVE ALREADY

15  DETERMINED THAT THE DATE OF CONCEPTION INSTRUCTIONS CAN GO

16  OUT.

17     OKAY.  SO, WHY DON'T WE TAKE AN HOUR AND COME BACK AT --

18  WHY DON'T YOU ALL TAKE 45 MINUTES AND COME BACK AND DISCLOSE

19  TO EACH OTHER YOUR VARIOUS VIEWS AND SEE IF THERE'S ANYTHING

20  YOU ARE BOTH AGREED UPON.  I WILL COME BACK IN AN HOUR AND

21  HEAR THAT AND ANY OTHER REMAINING DISPUTES.

22       **MS. GLAUSER:**  ONE OF THE OTHER THINGS, CAN WE, WHEN

23  WE COME BACK, SEEK GUIDANCE ON HOW YOU WANT TO PROCEED WITH

24  THE RULE 50(A) MOTIONS?

25       **THE COURT:**  I DON'T REALLY CARE.  MY STRONG

1    INCLINATION IS TO SEND EVERYTHING TO THE JURY JUST IN CASE.

2    AND IF I'M GOING TO SET IT ASIDE, SET IT ASIDE LATER.  YOU CAN

3    WRITE IT DOWN TONIGHT IF YOU WANT TO, I GUESS.

4           **MR. REINES:**  WE JUST WANT TO PRESERVE APPELLATE

5    RIGHTS.

6           **THE COURT:**  YOU NEED AT LEAST TO PRESERVE WHAT ISSUES

7    YOU ARE MOVING ON, OTHERWISE YOU WON'T BE ABLE TO DO

8    POST-TRIAL MOTIONS WITH THEM.  SO IF YOU HAVE -- ARE ABLE TO

9    DO SO, I SUPPOSE DOING IT IN WRITING OVER THE EVENING WOULD BE

10   THE BEST WAY TO GO ABOUT IT.

11          **MR. REINES:**  AND THEN THE ONLY OTHER THING BEFORE WE

12   ALL GO TO LUNCH, IS -- HAS THE COURT THOUGHT ABOUT EXERCISING

13   ITS BARR V. GORE AUTHORITY TO REMOVE WILLFULNESS, WHICH ISN'T

14   A TYPICAL -- IT'S NOT A JMOL REALLY.

15          **THE COURT:**  AGAIN, MY INCLINATION IS TO SEND IT TO

16   THE JURY, REGARDLESS OF WHETHER I'M LIKELY TO LET IT SURVIVE

17   IF IT SURVIVES ON THE THEORY THAT AT LEAST YOU HAVE A VERDICT

18   AND IT GETS REVERSED, YOU CAN GO BACK TO IT.

19       BUT THAT DID REMIND ME OF ONE OTHER THING.  WHAT WAS IT.

20       TO EXTENT WE HAVE TALKED ABOUT SOME LITTLE SENTENCES HERE

21   AND THERE TO EXPLAIN THINGS LIKE DEPOSITIONS AND $14 MILLION,

22   AND THINGS LIKE THAT, TO THE EXTENT YOU CAN WRITE SOMETHING

23   FOR ME THAT'S NEUTRAL AND EXPLANATORY, AND SHOW IT TO EACH

24   OTHER IN 45 MINUTES -- I GUESS MAYBE I ALREADY SAID THAT ABOUT

25   WRITING SOMETHING UP.  BUT THERE MAY BE OTHER EXAMPLES OTHER

1    THAN THE ONE I WAS TALKING ABOUT.

2        OKAY.

3            **MS. GLAUSER:**  OKAY.

4            **MR. REINES:**  THANK YOU.

5            **THE COURT:**  THANK YOU.

6        (RECESS TAKEN AT 1:35 P.M.; RESUMED AT 2:53 P.M.)

7        (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

8            **THE CLERK:**  REMAIN SEATED.  COME TO ORDER.  COURT IS

9    BACK IN SESSION.

10           **THE COURT:**  SO WE WILL WALK THROUGH THOSE, AS YOU ARE

11   FOND OF SAYING, AND I WILL TELL YOU WHAT I HAVE CHANGED AND

12   WHAT I HAVE QUESTIONS ABOUT.

13       UNLESS -- WELL, FIRST, YOU TELL ME IF YOU HAVE AGREED ON

14   ANYTHING OR WITHDRAWN ANYTHING THAT I SHOULD KNOW ABOUT.

15           **MS. GLAUSER:**  WE HAVE A COUPLE OF SMALL AGREEMENTS WE

16   WERE ABLE TO REACH.

17           **THE COURT:**  OKAY.

18           **MS. GLAUSER:**  THE FIRST IS IN THE SUMMARY OF

19   CONTENTIONS, THE WAY IT WAS DRAFTED, AT LEAST IN THE VERSION

20   THAT WE HAD, SO THIS IS ON -- IT WAS ON PAGE 6.  IT LOOKS LIKE

21   NOW IT MIGHT BE 6 CARRYING OVER TO 7.

22       BUT THE CONTENTION AS CURRENTLY DRAFTED TO STATE THAT

23   DIGITAL REG SEEKS MONEY DAMAGES FROM ADOBE FOR ALLEGEDLY

24   INFRINGING THE '541 PATENT AND THE '670 PATENT BY MAKING,

25   USING, SELLING, AND OFFERING FOR SALE PRODUCTS, BUT BECAUSE

```
1    IT'S AN ALL METHOD CLAIMS, WE PROPOSED REVISING THAT TO READ

2    THAT WE SEEK MONEY DAMAGES FROM ADOBE FOR ALLEGEDLY INFRINGING

3    THE '541 PATENT AND THE '670 PATENT BY ADOBE AND USERS OF ITS

4    SOFTWARE PRACTICING METHODS CLAIMED IN DIGITAL REG'S PATENTS.

5            THE COURT:  PRACTICING?

6            MS. GLAUSER:  METHODS CLAIMED IN DIGITAL REG'S

7    PATENTS.

8            THE COURT:  IT'S NOT THE MOST GRAMMATICAL THING IN

9    THE WORLD.  HOW ABOUT IF WE SAY, SEEKS MONEY DAMAGES FROM

10   ADOBE BECAUSE -- WELL, FOR ALLEGEDLY INFRINGING THE '541 IN

11   THAT ADOBE AND USERS OF ITS SOFTWARE PRACTICED METHODS.

12           MS. GLAUSER:  THAT WOULD ALSO BE ACCEPTABLE, AND

13   PROBABLY BETTER GRAMMAR.  THANK YOU.

14           THE COURT:  OKAY.

15           MS. GLAUSER:  THE NEXT AREA OF AGREEMENT WAS THAT

16   WRITTEN DESCRIPTION COMES OUT.

17           THE COURT:  YES.  THAT I KNOW.

18           MS. GLAUSER:  THAT'S AN EASY ONE AND IT'S PROBABLY

19   ALREADY BEEN PICKED UP.

20      WE HAVE A FEW OTHER OBJECTIONS AND RESPONSES TO ADOBE'S,

21   BUT WE MET ON IT AND WEREN'T ABLE TO COME TO AN AGREEMENT.

22           THE COURT:  DID YOU DECIDE ANYTHING ABOUT

23   CONTRIBUTORY INFRINGEMENT?

24           MR. DINOVO:  YOUR HONOR, WE ARE OKAY TAKING THAT OUT.

25           THE COURT:  TAKING THE WHOLE THEORY OUT?
```

1          MR. DINOVO:  YES.  INDUCEMENT, OF COURSE, IS ANOTHER

2     THEORY.

3          THE COURT:  YES, AND THAT WILL BE MUCH EASIER TO

4     UNDERSTAND IF WE ONLY HAVE ONE THEORY OF INDIRECT

5     INFRINGEMENT.  THEN WE DON'T HAVE TO WORRY ABOUT THE

6     COMPONENTS.

7          AND I DON'T KNOW IF YOU'VE GIVEN ANY THOUGHT TO THIS

8     PATTERSON DOCUMENT, BUT I JUST DON'T THINK IT GETS YOU

9     ANYWHERE.

10         YES, IT WAS AN EGREGIOUS CHANGE IN POSITION, BUT IT

11    DOESN'T HELP HIM ANY AT THIS POINT ONE WAY OR THE OTHER.  SO

12    THE ARGUMENT THAT YOU COULD MAKE WITH IT IS SORT OF LIKE, OH,

13    HE SAID SOMETHING DIFFERENT IN HIS DEPO, BUT SO WHAT?  IT'S

14    NOT LIKE HE WAS GETTING ANY -- HE PERHAPS WAS AT THE TIME, BUT

15    NOW HE ISN'T.  SO I JUST THINK IT'S -- I THINK IT'S MOOT.  I

16    THINK IT'S OVER.

17         MR. REINES:  YOU JUST WANT TO LEAVE IT ALONE FOR THE

18    INSTRUCTION.

19         THE COURT:  DROP IT.  STRIKE THE DOCUMENTS.  NOT

20    MENTION IT.

21         MR. REINES:  WE WOULD -- WE WOULD LIKE TO RELY ON IT

22    FOR CREDIBILITY.  I THINK MAYBE WE JUST LEAVE IT ALONE FOR THE

23    INSTRUCTIONS.

24         THE COURT:  WELL, NO, THAT WON'T WORK.

25         WHAT DO YOU WANT IT FOR?  HE SAID, WHAT?  HE SAID THIS

```
1    WASN'T HIS DOCUMENT?  LATER HE SAID IT WAS?  SO WHAT?

2              MR. REINES:  HE CLAIMED --

3              THE COURT:  I DON'T THINK IT HELPS YOU ANY.

4              MR. REINES:  HE CLAIMED TO THE JURY --

5              THE COURT:  IT CLEARLY WAS HIS DOCUMENT.  I DON'T

6    KNOW WHAT HE WAS THINKING AT HIS DEPOSITION.

7         HE WAS NOT BEING COOPERATIVE.  HE WAS BEING RECALCITRANT.

8    HE WAS BEING A JERK.  I DON'T KNOW WHAT HE WAS DOING, BUT HE

9    WAS SAYING FOR WHATEVER REASON THAT HE DIDN'T RECOGNIZE IT.

10   BUT CLEARLY IT WAS HIS DOCUMENT.  AND LATER IT TURNS OUT IT

11   WAS, BUT SO WHAT?  IT DOESN'T HELP HIM ANY.

12             MR. REINES:  I HAVE MULTIPLE ISSUES WITH THAT.  I

13   DON'T THINK --

14             THE COURT:  YOU DON'T HAVE TO ARGUE.  IF YOU WANT IT,

15   YOU CAN HAVE IT.  I'M JUST SUGGESTING THAT IT'S NOT HELPFUL TO

16   YOU AND IT WOULD BE A LOT EASIER TO JUST FORGET ABOUT IT.  BUT

17   IF YOU THINK IT'S HELPFUL, WE WILL PUT IT IN.

18             MR. REINES:  I THINK WHAT I WOULD -- YES, I DO

19   THINK -- WHAT I DO -- WHAT I WANT TO DO IS I DON'T WANT

20   ANYTHING THAT PREVENTS US FROM COMMENTING ON THE CREDIBILITY

21   THAT THE CHANGE IN POSITION REFLECTS ON HIM, WHICH, FOR ALL

22   KINDS OF WITNESSES, THEY TESTIFIED TO THINGS WHICH ARE EITHER

23   HIGHLY MATERIAL OR TURN OUT NOT TO BE MATERIAL, YOU CAN

24   COMMENT ON THE CREDIBILITY OF THE FLIP-FLOPS.

25        SO WHATEVER RELIEF WE GET WE DON'T WANT THE RELIEF TO BE
```

1    THAT WE'RE PREVENTED FROM BRINGING THAT UP.

2              **THE COURT:**  OKAY.

3              **MR. DINOVO:**  IF THAT'S GOING TO HAPPEN, YOUR HONOR --

4              **THE COURT:**  THAT'S TRUE, WE DON'T NEED TO INSTRUCT

5    ABOUT ANYTHING.

6              **MR. REINES:**  I THINK THAT SOUNDS LIKE THAT'S PROBABLY

7    THE BEST PLACE WE ARE IN.

8              **MR. ELLWANGER:**  IF THAT'S GOING TO HAPPEN, YOUR

9    HONOR, I WANT TO MAKE SURE AND CLEAR SOMETHING WITH YOU NOW SO

10   WE DON'T RUN INTO A PROBLEM TOMORROW.

11     I'M NOT GOING TO TALK ABOUT DANE DURING THE FIRST CLOSING.

12   SO, IF ADOBE BRINGS IT UP, I'M GOING TO BE FORCED IN REBUTTAL

13   TO EXPLAIN WHY IT'S NOT RELEVANT BECAUSE THEY HAVE DROPPED A

14   PIECE OF PRIOR ART AT THE 11TH HOUR AFTER FIRST SUBMITTING IT,

15   AND NOW NOT RELYING ON IT.  I DON'T WANT TO BE --

16             **THE COURT:**  ALL YOU HAVE TO SAY IS, OKAY, HE MADE A

17   MISTAKE.  SO WHAT?  IT WASN'T SELF-SERVING.  IT DIDN'T HELP

18   HIM IN ANY WAY.  HE MADE AS MISTAKE.  WHO CARES?

19             **MR. ELLWANGER:**  I COULD DO THAT BUT I THINK THE JURY

20   IS GOING TO BE HEAD SCRATCHING AS TO WHY --

21             **THE COURT:**  THEY'RE GOING TO BE HEAD SCRATCHING ON

22   WHY HE'S MAKING A BIG DEAL OUT OF IT, IS WHAT I THINK THEY

23   WILL BE DOING.  BUT THAT'S ALL YOU NEED TO DO IS SAY, OKAY, HE

24   WAS CONFUSED, HE WAS MISTAKEN, HE WAS RECALCITRANT, HE WAS

25   WHATEVER.  HE DIDN'T THINK IT WAS HIS DOCUMENT.  LATER HE

1    FOUND IT IS.  SO WHAT?  IT DOESN'T MATTER IF IT IS OR IT

2    ISN'T.  TEMPEST IN A TEAPOT.

3            **MR. ELLWANGER:**  OKAY.

4            **THE COURT:**  SO, I GUESS I WILL STILL -- I GUESS I

5    WILL THROW IN THE EXPLANATION OF DEPOSITION IN A NEUTRAL WAY.

6    IT WON'T HURT ANYTHING.

7        HE DID SAY THIS WEIRD THING ABOUT HOW THEY TOOK ALL THE

8    DOCUMENTS AWAY FROM HIM.  SO WE'LL -- AND PEOPLE TALKED ABOUT

9    THE FACT THAT THE REPORTER TAKES CUSTODY OF THEM.  HE'S NOT

10   YOUR CLIENT.

11           **MR. ELLWANGER:**  WE REPRESENTED HIM FOR THE

12   DEPOSITION.

13           **THE COURT:**  YOU DID?

14           **MR. ELLWANGER:**  UH-HUH.

15           **THE COURT:**  OKAY.  SO HAD HE REALLY WANTED TO SEE A

16   DOCUMENT, HE COULD HAVE SAID, HEY --

17          **MS. GLAUSER:**  THAT'S EXACTLY WHAT HAPPENED.

18           **THE COURT:**  AND HE DID?

19          **MS. GLAUSER:**  THAT'S WHAT HE TESTIFIED HAPPENED IS

20   AFTER THE DEPOSITION HE ASKED FOR A COPY AND WE PROVIDED THE

21   COPY TO HIM.

22           **THE COURT:**  I DID ADD UNDER IMPEACHMENT EVIDENCE, I

23   DID ADD A FALSO IN UNO INSTRUCTION.

24       IF YOU BELIEVE THAT A WITNESS TESTIFIED FALSELY CONCERNING

25   ANY IMPORTANT MATTER, YOU MAY DISTRUST THE WITNESS' TESTIMONY

1    CONCERNING OTHER MATTERS.

2          **MR. ELLWANGER:**  OKAY.

3          **THE COURT:**  THEN ON THE EXPERT TESTIMONY RIGHT BELOW

4    THAT, I PUT IN IN BRACKETS THERE AT THE END OF IT THE PROPOSAL

5    THAT -- ADOBE'S PLAN B PROPOSAL THAT DIGITAL REG DIDN'T OBJECT

6    TO TOO MUCH.

7          **MR. ELLWANGER:**  OKAY.

8          **THE COURT:**  I JUST COPIED IT.

9        MAYBE YOU CAN TELL ME THE PARTICULARS OF CORRECTING A DEPO

10   AFTERWARDS, AFTER A DEPOSITION IS COMPLETED, THE COURT

11   REPORTER SENDS A COPY TO THE WITNESS, OR NOTIFIES THE WITNESS

12   THAT A COPY IS AVAILABLE?

13         **MR. REINES:**  I WOULD JUST DO A PASSIVE VOICE.  A COPY

14   IS MADE AVAILABLE.

15         **THE COURT:**  A COPY IS MADE AVAILABLE.

16         **MS. GLAUSER:**  ALTHOUGH, YOUR HONOR, THE ERRATA IS

17   REALLY ABOUT CORRECTING TRANSCRIPTION ERRORS, AND REALLY ISN'T

18   AN OPPORTUNITY TO BRING UP THE FACT THAT HE RE-STUDIED THE

19   DOCUMENT, UNDERSTOOD THAT IT WAS HIS BECAUSE NOBODY ELSE HAD

20   INFORMATION OR ACCESS TO THE INFORMATION THAT WAS CONTAINED IN

21   THERE.

22       SO MENTIONING THE ERRATA AND AN OPPORTUNITY TO REVIEW AND

23   SIGN ISN'T REALLY A NEUTRAL STATEMENT HERE BECAUSE IT

24   WASN'T -- TRIAL IS REALLY HIS OPPORTUNITY TO SAY, YOU KNOW

25   WHAT?  AFTER THE DEPOSITION, WHEN YOU DIDN'T GIVE ME A CHANCE

1    TO REVIEW IT, I GOT TO SIT DOWN AND STUDY.

2         **THE COURT:**  YEAH.  IF YOU WANT IT, I'LL GIVE IT.

3         **MR. REINES:**  IT'S GENERIC INFORMATION.

4         **THE COURT:**  I'M NOT GOING TO SAY MR. WHATEVER HIS

5    NAME WAS, I'M JUST GOING TO SAY IT IN DISGUISE AS PART OF A

6    GENERAL DESCRIPTION OF HOW DEPOSITIONS WORK.

7         SO I JUST WANT TO HAVE THE FACTS RIGHT.  A WITNESS -- A

8    COPY IS MADE AVAILABLE AND THE WITNESS, WHAT, HAS AN

9    OPPORTUNITY TO MAKE -- CORRECT -- TO SIGN AND MAKE

10   CORRECTIONS --

11        **MR. REINES:**  YES.

12        **MS. GLAUSER:**  I THINK IT'S TO MAKE TRANSCRIPTION

13   ERROR CORRECTIONS ONLY.

14        **THE COURT:**  MANY PEOPLE CHANGE FROM THE LIGHT WAS RED

15   TO THE LIGHT IS GREEN.

16        **MR. REINES:**  CORRECTIONS IS --

17        **THE COURT:**  PEOPLE DO.  I DON'T KNOW IF THEY'RE

18   SUPPOSED TO, BUT THEY DO.  YOU SIGN A THING SAYING THIS IS

19   CORRECT OR IT'S NOT CORRECT.  IF HE WANTED TO, OR IT COULD

20   HAVE BEEN SUPPLEMENTED.

21        I JUST WANT TO HAVE THE FACTS RIGHT, THOUGH.  THE WITNESS

22   CAN WHAT, WHAT ARE THEY ACTUALLY TOLD --

23        **MR. REINES:**  MAKE CORRECTIONS.

24        **THE COURT:**  MAYBE IT SAYS AT THE BACK OF HIS DEPO.

25   SOMETIMES THE COURT REPORTER PUTS THE LITTLE LETTER RIGHT IN

```
1    THE BACK OF THE DEPO.

2         MS. GLAUSER:  DO WE HAVE A COPY OF A DEPOSITION?  CAN

3    WE SEE WHAT THE ERRATA SHEET SAYS?  CAN YOU GOOGLE ERRATA

4    SHEET AND FIND OUT WHAT THE STANDARD LANGUAGE IS?

5         THE COURT:  WE COULD GO OFF THE RECORD FOR A MOMENT

6    AND DIANE COULD TELL US.

7      HERE WE GO.

8         "I, ARTHUR KELLER, DO HEREBY CERTIFY UNDER PENALTY OF

9          PERJURY THAT I HAVE READ THE FOREGOING TRANSCRIPT,

10         MADE CORRECTIONS, AND TESTIMONY AS CORRECTED IS

11         TRUE."

12     SO THEY DON'T ACTUALLY HAVE TO SIGN THAT, RIGHT?  THEY CAN

13   JUST NOT SIGN IT --

14         MR. REINES:  THERE'S WAIVER.

15         THE COURT:  AND IT'S DEEMED TO BE TRUE.

16     SO WE WILL USE SOMETHING LIKE THAT.  SO IT'S AN

17   OPPORTUNITY TO CORRECT AND SIGN.  I WILL JUST SAY OPPORTUNITY

18   TO CORRECT.

19     OKAY.  THERE WAS JUST THE ONE DEPO READ, RIGHT?

20         MR. REINES:  THERE WAS ONE WITNESS WHO APPEARED BY

21   DEPOSITION.  THAT'S TRUE.

22         THE COURT:  THEN ON PAGE 12 UNDER WILLFUL

23   INFRINGEMENT IS WHERE I PUT THE BUSINESS ABOUT VENTERS.

24         MR. REINES:  ALL RIGHT.

25         THE COURT:  AND I HAD TO ADD A FEW THINGS TO IT, BUT
```

1    YOU CAN LOOK AT THAT AND SEE WHAT YOU THINK.  I COULDN'T JUST

2    USE WHAT YOU WROTE COLD.  I HAD TO HAVE A TRANSITION.

3           MR. REINES:  THE ISSUE THAT I SEE KIND OF IMMEDIATELY

4    IS THE DOCUMENT MR. VENTERS STATES WAS SENT.  I THINK IT'S

5    MEANINGFULLY BETTER TO HAVE THE LANGUAGE THAT WE USED, WHICH

6    IS, AN EXEMPLAR OF A DOCUMENT.

7           THE COURT:  I DON'T KNOW WHAT THAT MEANS.  WHAT IS AN

8    EXEMPLAR?

9           MR. REINES:  THE PROBLEM IS THAT HE DOESN'T KNOW

10   WHICH DOCUMENT HE SENT.  SO IT'S NOT TRUE --

11          THE COURT:  WELL, EXEMPLAR DOESN'T SOLVE THAT

12   PROBLEM.

13          MR. REINES:  EXEMPLAR --

14          THE COURT:  I'M NOT GOING TO SAY EXEMPLAR.  I DON'T

15   KNOW WHAT IT MEANS.  THEY ARE NOT GOING TO KNOW WHAT IT MEANS.

16   IT'S GOT TO BE SOMETHING THEY ARE GOING TO UNDERSTAND.

17     A DOCUMENT CONTAINING THE INFORMATION THAT MR. VENTERS

18   SAYS HE INCLUDED?

19          MS. GLAUSER:  I THINK --

20          THE COURT:  A GENERIC VERSION OF THE DOCUMENT?

21          MS. GLAUSER:  I THINK THAT'S SIMILAR TO THE

22   INSTRUCTION THAT WE PROPOSED THAT SAYS THAT -- I HAVE TO LOOK

23   UP THE EXACT LANGUAGE, BUT ESSENTIALLY THAT THE INFORMATION

24   CONTAINED IN THE ADOBE VALUE PROPOSITION SENT TO ADOBE

25   VENTURES.

1           **THE COURT:**  A DOCUMENT THAT COMES CLOSEST TO WHAT

2    MR. VENTERS STATES HE SENT?

3           **MR. REINES:**  I WAS THINKING OF SUCH AS.

4           **THE COURT:**  SUCH AS WHAT?

5           **MR. REINES:**  MR. VENTERS STATES HE SENT A DOCUMENT

6    SUCH AS TRIAL EXHIBIT 696, AND THAT WILL BE --

7           **THE COURT:**  ONE VERSION OF THE DOCUMENT?  THE

8    DOCUMENT MOST LIKELY TO BE?

9           **MR. REINES:**  I THINK -- I MEAN IT'S GOT TO BE WHAT

10   HE'S SAYING BECAUSE WE DON'T --

11          **THE COURT:**  HE DOES SAY THAT, RIGHT?

12     DOESN'T HE SAY THAT?

13          **MR. REINES:**  HE SAYS HE DOESN'T KNOW WHICH ONE.

14          **MS. GLAUSER:**  WHAT HE ACTUALLY --

15          **THE COURT:**  BY LOOKING AT ALL OF THEM, WE CONCLUDED

16   IT HAD TO BE NUMBER 1.

17          **MR. REINES:**  NO.  I DON'T THINK SO.

18          **MS. GLAUSER:**  AT HIS DEPOSITION, WHAT HE TESTIFIED TO

19   IS ATTACHMENT 1 PREDATES ATTACHMENT 2.

20          **THE COURT:**  RIGHT.

21          **MS. GLAUSER:**  SO IT'S HIS BELIEF THAT BECAUSE

22   ATTACHMENT 1 WAS LASTED EDITED BY BARRY PHILLIPS, WHO WOULD

23   NOT HAVE BEEN THE FINAL SIGN-OFF, AND BECAUSE IT PREDATES

24   ATTACHMENT 2, THAT ATTACHMENT 1 IS NOT IT.  HE'S NOT SURE IF

25   IT'S ATTACHMENT 2 OR 125C, BUT ATTACHMENT 2 AND 125C MATCH

```
 1    WITH REGARD TO THE DISCUSSION OF THE '541 AND THE '670.  AND,

 2    IN FACT, MATCH WITH REGARD TO ANY OF THE TESTIMONY THAT

 3    MR. VENTERS GAVE ON THE STAND ABOUT THE DOCUMENT.

 4       SO THE PARTICULAR PARAGRAPHS ABOUT WHICH HE TESTIFIED ARE

 5    SUBSTANTIALLY THE SAME.  I CAN'T GUARANTEE IF THERE'S A

 6    DIFFERENT "A" VERSUS A "THE", BUT OTHER THAN THAT ARE

 7    MATERIALLY THE SAME IN ATTACHMENT 2 AND 125C.

 8              MR. REINES:  THAT'S A SUBSTANTIVE ARGUMENT --

 9              THE COURT:  WE ARE GOING TO USE 1, SO WE JUST NEED TO

10    HAVE WORDS.

11              MS. GLAUSER:  I THINK THE INSTRUCTION THAT WE PROPOSE

12    THAT SAYS THE INFORMATION MR. VENTERS STATES WAS SENT TO ADOBE

13    VENTURES IS SET FORTH IN T, TRIAL EXHIBIT 696.

14              THE COURT:  THAT SOUNDS GOOD.

15              MR. REINES:  I THINK "LIKE" IS BETTER BECAUSE I DON'T

16    WANT TO ELIMINATE THE UNCERTAINTY.

17              THE COURT:  JUST SAY THAT AGAIN?  THE INFORMATION --

18              MS. GLAUSER:  CAN YOU REPEAT IT BACK FOR ME?

19              THE COURT:  THE INFORMATION --

20              MS. GLAUSER:  THE INFORMATION MR. VENTERS TESTIFIED

21    WAS SENT TO ADOBE VENTURES --

22              THE REPORTER:  DO YOU WANT ME TO REPEAT IT, JUDGE?

23              THE COURT:  SURE.

24       (READ BACK AS FOLLOWS:

25              THE INSTRUCTION WE PROPOSE THAT SAYS, THE INFORMATION
```

1               MR. VENTERS STATES WAS SENT TO ADOBE VENTURES IS SET

2          FORTH IN T, TRIAL EXHIBIT 696.)

3          MS. GLAUSER:  I THINK I WOULD CHANGE THAT TO

4     TESTIFIES RATHER THAN STATES, SO IT IS CLEAR THAT THAT'S WHAT

5     HAPPENED AT TRIAL.

6          THE COURT:  OKAY.  YOU WANT --

7          MR. REINES:  I WOULD LIKE TO PUT "LIKE" IN FRONT --

8          THE COURT:  YOU WANT THE WORD "LIKE" IN THERE?

9          MR. REINES:  YES.

10          THE COURT:  WHERE EXACTLY?

11          MR. REINES:  IN A DOCUMENT "LIKE EXHIBIT".

12          THE COURT:  THE INFORMATION MR. VENTERS STATES WAS

13     SENT TO ADOBE VENTURES --

14          MR. REINES:  IN A DOCUMENT LIKE --

15          THE COURT:  -- IS SET FORTH IN TE 696.  I GUESS WE

16     COULD SAY, WHICH WILL BE PLACED IN EVIDENCE INSTEAD OF.

17          MR. REINES:  RIGHT.

18          THE COURT:  OR IN PLACE OF.

19          MR. REINES:  I DISAGREE THAT IT'S THE SAME

20     INFORMATION.  THERE'S ALL KINDS OF DIFFERENCES IN THE

21     INFORMATION.  I DON'T WANT TO BELABOR THE RECORD WITH THAT.

22        IN THE DOCUMENT LIKE THAT DOCUMENT.  BECAUSE, IN FACT, HE

23     ADMITS IT WASN'T THAT DOCUMENT.

24          MS. GLAUSER:  WE COULD --

25                    (SIMULTANEOUS COLLOQUY.)

1        **THE COURT:**  IT JUST SAYS THE INFORMATION.

2        **MR. REINES:**  BUT --

3        **THE COURT:**  THAT IS THE INFORMATION.  HE SAID HE

4   DIDN'T READ EVERY SINGLE WORD OF IT, BUT THE GENERAL

5   INFORMATION HE SAID WAS IN THERE.

6        **MR. REINES:**  THEN "GENERAL" IS GOOD.

7        **MS. GLAUSER:**  OR MATERIALS SINCE THE ISSUE THAT WE

8   ARE TALKING ABOUT IS THE '670 AND THE '541.

9        **THE COURT:**  I THINK THIS IS FINE.

10       THE INFORMATION MR. VENTERS STATES WAS SENT TO ADOBE

11  VENTURES IS SET FORTH IN TE 696, WHICH WILL BE RECEIVED IN

12  EVIDENCE IN PLACE OF TE 125C.

13       I THINK THAT'S FINE.

14       DO YOU WANT THIS LAST SENTENCE?  I WILL GIVE IT TO YOU IF

15  YOU WANT, BUT IT SEEMS PRETTY ODD.  I MEAN, YOU DON'T REALLY

16  THINK HE DIDN'T SEND ANYTHING.

17       **MR. REINES:**  ABSOLUTELY BELIEVE THAT.  OBVIOUSLY

18  THAT'S -- THROUGH THE TRIAL WHEN WE HAVE TALKED ABOUT THIS,

19  THAT'S WHY -- THAT'S THE DISCONNECT.

20       **THE COURT:**  YOU DON'T THINK HE SENT ANYTHING?

21       **MR. REINES:**  ABSOLUTELY --

22       **THE COURT:**  THERE'S 12 VERSIONS OF SOMETHING AND HE

23  DIDN'T SEND ANY OF THEM?

24       **MR. REINES:**  RIGHT.  THERE'S NO FINAL VERSIONS AT

25  ALL.  AND THEY WERE CHANGED FROM 2004 TO 2008.

1           THE COURT:  OKAY.

2           MR. REINES:  I ABSOLUTELY -- I'M CONVINCED KNOWING

3    THE SITUATION THAT HE DIDN'T.

4        HAVING TO LOOK AT THE WAY-BACK MACHINE TO RECREATE WHO THE

5    WITNESSES MIGHT HAVE BEEN.

6           THE COURT:  OKAY.  UNDER ANTICIPATION.

7           MR. REINES:  BY THE WAY, NO ONE AT ADOBE HAD THE

8    DOCUMENT AND NONE OF THE WITNESSES -- NOT WITNESSES, NONE OF

9    THE PEOPLE AT ADOBE VENTURES EVER HEARD OF HIM OR ANYTHING TO

10   DO WITH IT.

11          THE COURT:  THAT ISN'T IN EVIDENCE, SO YOU WON'T BE

12   ABLE TO ARGUE THAT.

13          MR. REINES:  I'M JUST TELLING YOU -- I'M JUST

14   DEFENDING MYSELF AS TO WHY I ABSOLUTELY DO NOT BELIEVE THAT

15   CALL HAPPENED.

16          THE COURT:  RIGHT.

17          MR. REINES:  IN MY HEART.

18          THE COURT:  RIGHT.  BUT IT DOESN'T MATTER TO ME.  IT

19   ONLY MATTERS TO THE JURY.

20          MR. REINES:  YOU'VE CONCLUDED THAT YOU BELIEVE IT

21   HAPPENED, SO I UNDERSTAND.

22          THE COURT:  I'M SORRY?

23          MR. REINES:  I GET THE IMPRESSION YOU THINK IT

24   HAPPENED.  SO I UNDERSTAND.

25          THE COURT:  I THINK THE REASONABLE INFERENCE FROM THE

1    EVIDENCE IS THAT IT HAPPENED, AND THAT THE JURY WILL THINK

2    SOMETHING WAS SENT, AND THEY WON'T KNOW WHAT.  SO -- WELL,

3    WHATEVER.

4         **MR. REINES:**  UNDERSTOOD.

5         **THE COURT:**  DO WHAT YOU WANT.

6         **MR. REINES:**  YEP.

7         **THE COURT:**  ANTICIPATION.  THIRD FULL PARAGRAPH.

8    HERE'S A LIST OF WAYS.  POINT 2, CLAIMED INVENTION WAS ALREADY

9    PATENTED.  THAT'S FINE.

10    I POSIT THAT THE REST OF THAT POINT IS NOT RELEVANT AND

11    SHOULD BE DELETED.

12    YOU ARE NOT TALKING ABOUT ANY PRINTED PUBLICATIONS, ARE

13    YOU?

14         **MR. DINOVO:**  NO, YOUR HONOR.

15         **MR. REINES:**  I JUST DON'T KNOW THE EXTENT TO WHICH,

16    FRANKLY, I JUST DON'T KNOW THE EXTENT TO WHICH WE ARE RELYING

17    ON THE RELATED SOFTLOCK MATERIALS, WHICH ARE PRINTED

18    PUBLICATIONS.  THEY WERE PRESENTED TO THE JURY.  IT SHOWS WHAT

19    WAS KNOWN.

20         **MR. DINOVO:**  ACTUALLY, I THINK SCHULL TESTIFIED THEY

21    WEREN'T MADE PUBLIC.  AT LEAST WE DON'T HAVE ANY EXPERT

22    TESTIMONY.  AND MR. SCHULL WAS PRECLUDED FROM TESTIFYING ABOUT

23    VALIDITY, AT LEAST READING IT ON THE CLAIMS.

24         **THE COURT:**  GIVE IT SOME THOUGHT.  I DON'T KNOW THAT

25    THERE'S ANY EVIDENCE TO SUPPORT THIS.

1       YOU CAN CHECK AND SEE IF THERE IS.  AND IF THERE IS, YOU

2  CAN TELL ME TOMORROW AND I WILL -- OR FILE SOMETHING AND I

3  WILL TAKE A LOOK AT IT.

4       AND WHAT ABOUT BULLET POINT 4?

5            **MR. REINES:**  I THINK WE CAN TAKE THAT OUT.

6            **THE COURT:**  A CLAIMED INVENTION WAS ALREADY MADE BY

7  SOMEONE ELSE?

8            **MR. REINES:**  YES.

9            **THE COURT:**  AND THEN THE PARAGRAPH ABOUT, YOU MUST

10  DETERMINE A DATE OF CONCEPTION?

11            **MR. REINES:**  THAT ALL COMES OUT, I THINK, PER THE

12  PARTIES' DISCUSSION BEFORE THE BREAK.

13            **THE COURT:**  I'M SORRY, I DON'T MEAN TO SAY I BELIEVE

14  OR DISBELIEVE ANYTHING.  I'M JUST SAYING WHAT THE REASONABLE

15  INFERENCES WOULD APPEAR TO BE.  I'M NOT DECIDING THE MATTER

16  MYSELF.

17            **MR. REINES:**  UNDERSTOOD.

18            **MR. DINOVO:**  THIS THIRD BULLET REFERS TO DATE OF

19  CONCEPTION.

20            **THE COURT:**  THIRD BULLET.

21            **MR. DINOVO:**  THE TOP ONE ON THIS PAGE 15.

22            **MR. REINES:**  THIRD BULLET?

23            **MS. GLAUSER:**  IT'S ON PAGE 15 --

24            **THE COURT:**  I SEE.

25            **MS. GLAUSER:**  IT'S THE THIRD BULLET ABOVE THE ONE WE

1    JUST DISCUSSED.

2                **MR. REINES:**  FIRST ON THE PAGE, THOUGH.

3                **MS. GLAUSER:**  YES.

4                **THE COURT:**  ANOTHER PATENT APPLICATION OR PUBLISHED

5    PATENT BASED ON A PATENT APPLICATION.  SO THAT'S NOT

6    APPLICABLE EITHER.  THESE WERE BOTH ISSUED PATENTS THAT YOU

7    ARE RELYING ON, RIGHT?

8                **MR. REINES:**  LET ME JUST CHECK.

9        THIS ONE NEEDS TO STAY IN.  THIS IS WHY YOU NEED TO BE

10   CAREFUL.

11       BECAUSE I THINK THE CLEANEST PRIOR ART THEORY FOR SCHULL

12   IS 102(E) WHICH REQUIRES THAT IT'S THE FILING OF THE

13   APPLICATION THAT PREDATES THE PATENT.  SO WE NEED THE 1992.

14   THIS THE ONLY ONE.  IF THEY WANT TO SAY BEFORE THE FILING DATE

15   OF THE PATENT, THAT'S FINE.

16               **MR. DINOVO:**  WELL, NO.  WE ARE GOING TO LEAVE IN THE

17   DATE OF CONCEPTION, WHICH IS THE APPROPRIATE STANDARD, I

18   SUPPOSE WE NEED --

19               **MR. REINES:**  IT'S NOT THE APPROPRIATE STANDARD IF YOU

20   ARE NOT ATTEMPTING TO SWEAR BACK BEHIND IT.  THEN THE FILING

21   DATE IS THE EFFECTIVE CONCEPTION DATE.

22               **MR. DINOVO:**  WHY ISN'T THAT COVERED --

23               **MR. REINES:**  BECAUSE THAT'S THE 102(E) ANALOG.

24       BULLET 2 REQUIRES THAT IT BE ALREADY PATENTED.  AND JUST

25   TO ELIMINATE ANY ISSUE, WE WANT IT TO BE THAT THE APPLICATION

1    UNDER 102(E) IS BEFORE.  IT'S CLEARLY PRIOR ART.

2           **MR. DINOVO:**  THE PROBLEM IS ALL OF THESE BULLET

3    POINTS REFER TO DATE OF CONCEPTION.

4           **THE COURT:**  LET'S JUST REPHRASE THEM.

5           **MR. REINES:**  IT'S THE FILING DATE, RIGHT?

6           **MR. DINOVO:**  WE CAN --

7           **THE COURT:**  WHAT'S YOUR DATE OF CONCEPTION?

8           **MR. DINOVO:**  IT'S '96.

9           **THE COURT:**  WHEN DID HE FILE HIS APPLICATION?

10          **MR. REINES:**  HE FILED HIS APPLICATION IN '98.

11   THERE'S NO -- THERE'S NOT EVEN CLOSE TO A CORROBORATED

12   CONCEPTION DATE.

13       YOU WOULD NEED ANOTHER PERSON TO DO IT.  I MEAN, ARE THEY

14   REALLY SAYING THAT SCHULL ISN'T PRIOR ART?

15          **MR. DINOVO:**  WELL, BUT NO.  THIS IS SUPPOSED TO TRACK

16   102(A) AND 102(B) RIGHT?  SO WE NEED TO EXPRESS WHAT 102(A)

17   AND 102(B) ARE CORRECTLY, AND NOT PARAPHRASE THEM.

18          **MR. REINES:**  ABSOLUTELY WRONG.  IT GOES TO THE

19   CONTENTIONS IN THE CASE.

20          **THE COURT:**  I DON'T WANT TO HAVE A DISPUTE ABOUT DATE

21   OF CONCEPTION IF THERE ISN'T A LEGITIMATE DISPUTE ABOUT DATE

22   OF CONCEPTION.  I DON'T WANT TO CONFUSE THEM WITH THINGS THAT

23   AREN'T AT ISSUE.

24       SO TELL ME WHAT YOU THINK IS AT ISSUE WITH REGARD TO THE

25   DATE OF CONCEPTION, IF ANYTHING?

1        **MR. DINOVO:**  I DON'T.  BUT THE PROBLEM IS, THAT

2    THESE, IT'S MY UNDERSTANDING THAT THESE ARE DERIVED FROM

3    102(A) AND 102(B).  THIS IS LANGUAGE FROM A STATUTE, AND HE'S

4    SAYING LET'S CHANGE THE LANGUAGE --

5        **THE COURT:**  I'M SAYING THAT, AND THAT'S BECAUSE

6    THERE'S NO DISPUTE ABOUT THE DATE OF CONCEPTION.

7        SO, WE'LL REPLACE IT WITH SOMETHING ELSE.

8        **MR. DINOVO:**  FOR EXAMPLE, NUMBER ONE, PUBLICLY KNOWN

9    AND PUBLICLY USED.  THIS MAY BE SOMETHING WE CAN TALK ABOUT IN

10   A MOMENT, BUT THE FEDERAL CIRCUIT CASE LAW SAYS THAT SECRET

11   USE OF A METHOD IS NOT PUBLIC.

12       AND THERE WAS TESTIMONY FROM PROFESSOR SCHULL THAT THERE

13   WERE SECRET USE OF A METHOD.  WE DON'T KNOW WHEN THAT WAS

14   DISCLOSED.  SO, IN OTHER WORDS, IF WE ARE GOING TO LEAVE THIS

15   IN HERE -- IF WE ARE GOING TO REFER TO THESE BASES FOR

16   ANTICIPATION OR OBVIOUSNESS, THAT'S FINE, BUT I THINK WE

17   SHOULD STAY TRUE TO THE STATUTORY LANGUAGE.

18       **THE COURT:**  WELL, I'M NOT GOING TO DO THAT BECAUSE I

19   NEED TO EXPLAIN WHAT DATE IS INVOLVED, IF IT'S NOT DISPUTED.

20       **MR. REINES:**  MY UNDERSTANDING IS THEY DON'T WANT TO

21   RELY ON THE PATTERSON/DANE DOCUMENT.  THERE'S NO OTHER

22   EVIDENCE OF CONCEPTION BEFORE THE FILING DATE THAT'S LEGALLY

23   COGNIZABLE.

24       **THE COURT:**  WHAT'S THE FILING DATE OF YOUR PATENTS?

25       **MR. REINES:**  THAT'S THE SMART WAY TO DO IT.

1          **MR. DINOVO:**  THEY ARE 1998.  I SUPPOSE WE CAN TURN

2     THIS AROUND AND SAY, IF THE DATE OF CONCEPTION IS IMMATERIAL,

3     WHY DON'T WE JUST SAY IT WAS '96 AND STIPULATE TO THAT?

4          **MR. REINES:**  IT'S COUNTERFACTUAL.

5          **MR. DINOVO:**  WHY DO WE GET THE --

6          **THE COURT:**  BECAUSE IT'S CLEAR THAT IT WAS FILED AT A

7     CERTAIN DATE.

8          **MR. DINOVO:**  YES.

9          **THE COURT:**  AND THAT'S THE DATE YOU WANT, SO LET'S

10    JUST SAY THAT DATE INSTEAD OF SAYING DATE OF CONCEPTION.

11       WHICH APPLICATION WAS FILED EARLIER?

12         **MR. DINOVO:**  THE '541 WAS FILED IN MAY.

13         **THE COURT:**  WHAT DATE WAS IT FILED?

14         **MS. GLAUSER:**  MAY 15TH, 1998.

15         **THE COURT:**  MAY 15TH OF 1998.

16         **MR. REINES:**  AND THE '670 IS NOVEMBER 24TH, 1998.

17         **THE COURT:**  SO WE'LL JUST SAY, THE CLAIMED INVENTION

18    WAS ALREADY PUBLICLY KNOWN OR PUBLICLY USED BY OTHERS -- NOW

19    ARE YOU SAYING IT WAS?  WAS SCHULL PUBLICLY KNOWN OR PUBLICLY

20    USED BY OTHERS BEFORE '98?

21         **MR. REINES:**  IT WAS A '96 PATENT.

22         **THE COURT:**  IT WAS A PATENT, BUT WAS IT AN INVENTION

23    THAT WAS KNOWN OR USED OR DO WE ONLY NEED THE PATENT OR PATENT

24    APPLICATION PRONGS?

25       IF YOU ARE JUST RELYING --

1        **MR. REINES:**  WE CAN GET RID OF THE FIRST ONE.

2        **THE COURT:**  SO THE CLAIMED INVENTION WAS ALREADY

3   PATENTED.  AND YOU'RE GOING TO CHECK WHETHER YOU THINK THAT

4   YOU ARE RELYING ON ANY PRINTED PUBLICATION OR NOT --

5        **MR. REINES:**  EXACTLY.

6        **THE COURT:**  -- BUT EITHER WAY, OR DESCRIBED IN A

7   PRINTED PUBLICATION ANYWHERE IN THE WORLD BEFORE 5/15/98.

8        **MR. REINES:**  WELL, WE HAVE TO DO IT FOR -- THAT'S FOR

9   THE 54 --

10       **THE COURT:**  THE OTHER ONE'S LATER, SO IT DOESN'T

11   MATTER.

12       **MR. REINES:**  THERE'S NOTHING IN BETWEEN THE TWO

13   DATES.  THAT'S FINE.

14       **THE COURT:**  SO THE NEXT ONE IS, THE CLAIMED INVENTION

15   WAS ALREADY DESCRIBED IN ANOTHER UNITED STATES PATENT

16   APPLICATION OR PUBLISHED PATENT THAT WAS BASED ON A PATENT

17   APPLICATION FILED BEFORE THE DATE OF CONCEPTION.

18       **MR. REINES:**  IT WAS FILED IN 1992.  SO IT'S A LITTLE

19   HARD TO UNDERSTAND WHAT THE ISSUE IS HERE.  BUT I THINK YOU

20   CAN SUBSTITUTE THE FILING DATE THERE, TOO.

21       **THE COURT:**  YOU WERE CONCERNED THAT IT DIDN'T ISSUE

22   UNTIL --

23       **MR. REINES:**  '96.  I MEAN, IT'S PRIOR ART, SO -- BUT

24   THERE SHOULD JUST BE NO QUESTION.  IT'S NOT ONE WHERE I THINK

25   COMPROMISE FROM US MAKES ANY SENSE.  THEY HAVE NO CONCEPTION

1    EVIDENCE ANYWAY.

2            **MR. DINOVO:**  WELL, OBVIOUSLY WE DISAGREE WITH THAT

3    CHARACTERIZATION.  IT SOUNDS LIKE WE CAN SUBSTANTIALLY REDUCE

4    SOME OF THESE.  MAYBE WE CAN WORK ON THIS PARTICULAR LANGUAGE

5    AND SUBMIT SOMETHING?

6            **MR. REINES:**  I DON'T KNOW --

7            **THE COURT:**  WE ARE GOING TO DO IT RIGHT NOW.

8            **MR. REINES:**  WE AGREE THE SECOND AND THIRD ONE ARE

9    IN.  I'M AGREEING THE FIRST ONE IS OUT, WHICH A DEFENDANT

10   NORMALLY GETS --

11           **THE COURT:**  YOU DON'T NEED THE APPLICATION IF THE

12   PATENT ITSELF CLEARLY ISSUED -- WHEN DID THE PATENT ISSUE?

13   WHEN DID THE SCHULL --

14           **MR. REINES:**  THAT'S THE THING.

15           **THE COURT:**  -- SCHULL AND GRISWOLD, WHEN DID THEY

16   ISSUE?

17           **MR. REINES:**  WHY DON'T WE PUT THEIR PRIOR ART IN, IF

18   WE ARE GOING TO THAT LEVEL?

19           **THE COURT:**  THAT DOESN'T HELP US ANY IF THE JURY

20   DOESN'T KNOW WHAT THAT MEANS.  I JUST NEED TO KNOW --

21           **MR. REINES:**  APRIL 16TH, 1996.

22           **THE COURT:**  4/16/96.  THAT'S SCHULL?

23           **MR. REINES:**  THAT IS SCHULL.

24           **THE COURT:**  DO YOU NEED GRISWOLD, TOO?

25           **MR. REINES:**  YES, WE DO NEED GRISWOLD.

```
 1            THE COURT:  WHAT'S THE DATE OF GRISWOLD?

 2            MR. REINES:  I DON'T KNOW WHY WE'RE BEING ASKED TO --

 3            THE COURT:  BECAUSE I WANT TO CROSS MORE STUFF OUT IF

 4   I DON'T NEED IT.  I DON'T WANT TO GO BACK TO AN APPLICATION IF

 5   I'VE GOT A PERFECTLY GOOD PATENT.  WHY SHOULD I FOOL AROUND

 6   WITH TALKING ABOUT WHEN THE APPLICATION WAS FILED IF THE

 7   PATENT ITSELF WAS FILED IN PLENTY OF TIME.

 8            MR. REINES:  I DON'T MIND CUTTING DOWN FAR MORE THAN

 9   GENERALLY IS BECAUSE THERE COULD BE THREE THEORIES OF WHY THIS

10   IS IN, BUT I'M GOING TO ASK AND OBJECT TO THE EXTENT THAT I'M

11   PRECLUDED ON EITHER OF THE TWO THEORIES.

12        THERE'S TWO THEORIES OF IT BEING PRIOR ART.  THEY ARE

13   OBVIOUSLY STILL CONTENDING IT'S NOT PRIOR ART.

14            THE COURT:  I DON'T KNOW HOW.

15            MR. REINES:  I DON'T KNOW HOW EITHER, BUT YOU HEAR

16   THE ARGUMENT, SO --

17            THE COURT:  SO YOU WANT THE APPLICATION THEN?

18            MR. REINES:  THE APPLICATION AND THE PRINTED

19   PUBLICATION.

20        I JUST DON'T THINK I'M BEING CHURLISH OR INAPPROPRIATE --

21            THE COURT:  I'M NOT SUGGESTING YOU'RE BEING CHURLISH.

22   I'M JUST ASKING YOU TO CONSIDER WHETHER THERE'S ANY EVIDENCE

23   OF THOSE THINGS.  AND IF THERE ISN'T, TO LET ME CROSS THEM

24   OUT.

25            MR. REINES:  OH, YES.
```

1           THE COURT:  SO IF YOU DON'T KNOW OFFHAND, I WILL BE

2    HAPPY TO GIVE YOU TIME TO GO LOOK AT THEM AND TELL ME LATER

3    THIS EVENING OR TOMORROW.

4           MR. REINES:  OKAY.  I MISUNDERSTOOD.

5           THE COURT:  I'M NOT TRYING TO TAKE SOMETHING AWAY

6    THAT YOU HAVE.  I'M JUST TRYING TO TAKE SOMETHING AWAY THAT

7    YOU DON'T NEED.

8           MR. REINES:  I MISUNDERSTOOD.  I THOUGHT YOU SAID IF

9    YOU MEET ONE, THEN SHOULD WE ELIMINATE THE OTHERS.  THAT'S

10   WHAT I WAS RESISTING.

11      SO THE SECOND AND THIRD ONES WE HAVE SUBSTANTIAL EVIDENCE

12   WHICH MEETS BOTH OF THOSE.  WE CAN PROVE UP THAT WE HAVE A

13   PATENT APPLICATION BEFORE THEIR DATE OF INVENTION OR

14   CONCEPTION OR FILING DATE, AND WE CAN DO THE SAME WITH THE

15   PATENT.

16          MR. DINOVO:  WHY CAN'T WE JUST USE 102(B) --

17          THE COURT:  YOU ARE NOT -- IF YOU WANT TO SPEAK FOR

18   THE RECORD, YOU NEED TO SPEAK TO ME AND LOUDLY ENOUGH FOR THE

19   REPORTER TO HEAR.

20      IF YOU WANT TO HAVE A CONFERENCE WITH MR. REINES, WE CAN

21   TAKE A BREAK AND YOU CAN -- AND I WILL LEAVE AND YOU CAN HAVE

22   A CONFERENCE WITH HIM.

23          MR. DINOVO:  I WAS JUST TRYING TO AVOID THIS NOTION

24   OF DATE OF CONCEPTION.  102(B) REFERS TO THE CRITICAL DATE,

25   WHICH IS MORE THAN ONE YEAR PRIOR TO THE FILING DATE.  AND

```
 1    THAT WOULD STILL ALLOW THEM PRINTED PUBLICATIONS, PATENTS,

 2    PUBLIC USE, OR ON SALE IN THIS COUNTRY.  SO I GUESS --

 3         THE COURT:  I DON'T KNOW WHAT YOU'RE SAYING.  YOU

 4    WANT SOMETHING DIFFERENT SAID THAN WHAT WE HAVE BEEN TALKING

 5    ABOUT?  WHAT WOULD YOU LIKE ME TO SAY?

 6         MR. DINOVO:  RATHER THAN THE DATE OF CONCEPTION,

 7    WHICH THESE REFER TO, WE COULD REFER TO MORE THAN ONE YEAR

 8    PRIOR TO THE DATE FILING, WHICH THAT DATE WE'RE NOT --

 9    OBVIOUSLY NO ONE IS DISPUTING THAT HERE.

10         SO I'M SAYING THEY GET ALL THEIR PRIOR ART IN UNDER 102(B)

11    AND WE DON'T HAVE TO REFER TO DATE OF CONCEPTION AT ALL.

12         THE COURT:  WE AREN'T GOING TO.  WE'RE GOING TO HAVE

13    A DATE CERTAIN WHICH IS GOING TO BE, AS FAR AS I'M CONCERNED,

14    MAY 15TH OF 1998.

15         MS. GLAUSER:  THE ONLY PROBLEM WITH THAT IS THAT WE

16    ARE INPUTING THAT DATE INTO A STATUTORY PROVISION THAT SAYS

17    THE DATE OF CONCEPTION.  SO IT'S A SUGGESTION --

18         THE COURT:  IN THIS CASE THE RELEVANT DATE IS THE

19    DATE OF FILING.  I MEAN, THE DATE OF -- YEAH, FILING.

20         MS. GLAUSER:  I THINK THE ISSUE IS WE DIDN'T HAVE A

21    DISPUTE THAT NEEDED TO GO TO THE JURY ABOUT THE DATE OF

22    CONCEPTION BECAUSE EVEN IF THE DANE DOCUMENT WAS IN, IT

23    DOESN'T PREDATE SCHULL.

24         MR. DINOVO:  RIGHT.  WE DON'T WANT TO MAKE A

25    CONCESSION ABOUT DATE OF INCEPTION.
```

1       WE APPRECIATE THAT IT'S NOT MATERIAL BASED ON THE TWO

2   COMBINATIONS THAT THEY HAVE NOW IDENTIFIED, BUT WE CERTAINLY

3   DON'T WANT TO AGREE TO THIS -- THE FILING DATE AS THE DATE OF

4   THE CONCEPTION FOR ALL TIME TO COME.

5       SO THAT'S WHY WE LIKE THE CRITICAL DAY, WHICH IS A YEAR

6   PRIOR.  I DON'T KNOW WHAT THAT POSSIBLY LOSES THEM, IF

7   ANYTHING.

8           **THE COURT:**  YOU WANT TO MAY 15TH, 1997?

9           **MR. DINOVO:**  YES, YOUR HONOR.

10      IF I COULD READ THE COURT, A PERSON SHALL BE ENTITLED TO A

11  PATENT --

12          **THE COURT:**  HOLD ON.

13      HOW ABOUT MAY 15TH, 1997?

14          **MR. REINES:**  WHICH OF THE PRIOR ART THEORIES --

15          **THE COURT:**  INSTEAD OF MAY 15TH, 1998.

16          **MR. REINES:**  THAT'S FINE.  AS LONG AS WE ARE AT LEAST

17  PRESERVING TWO DIFFERENT PRIOR ART THEORIES SINCE THEY ARE

18  APPARENTLY CONTESTING IT.

19          **THE COURT:**  OKAY.

20          **MR. REINES:**  ON PRINTED PUBLICATION, I WILL RESPOND

21  TO YOU ON THAT TOMORROW MORNING.

22          **THE COURT:**  NOW, WHAT IS THE -- WHY DO WE CARE WHAT

23  THE LEVEL OF ORDINARY SKILL IN THE FIELD IS?

24      WE ARE GOING TO FIGHT ABOUT WHETHER IT IS A MASTERS DEGREE

25  OR TWO YEARS OF WORK, AND THAT'S GOING TO MATTER WHY?

1          **MR. REINES:**  I MEAN NOW THAT WE HAVE THE TESTIMONY

2     FROM THE DIFFERENT EXPERTS, I DON'T KNOW THAT EITHER SIDE

3     WANTS TO HAVE SORT OF SOMETHING CONCLUSIVELY FOUND AGAINST --

4     IS THERE A WAY THAT YOU CAN THINK OF --

5          **THE COURT:**  CROSS IT OUT.

6          **MR. REINES:**  THE WHOLE THING?

7          **THE COURT:**  THEY DON'T HAVE TO DECIDE THAT.  IT

8     DOESN'T MATTER WHAT THEY DECIDE.

9       SO WHAT THAT WOULD MEAN IS, THE ULTIMATE CONCLUSION OF

10    WHETHER A CLAIM IS OBVIOUS SHOULD BE BASED UPON YOUR

11    DETERMINATION OF SEVERAL FACTUAL DECISIONS.  ONE, THE LEVEL OF

12    EDUCATION AND EXPERIENCE OF PERSONS WORKING IN THE FIELD.

13    TWO, THE TYPES OF PROBLEMS ENCOUNTERED.  THREE, THE

14    SOPHISTICATION OF THE TECHNOLOGY, WHEN WE TAKE OUT THE WHOLE

15    PARAGRAPH ABOUT THE COMPETING CONTENTIONS.

16       SECOND, YOU MUST DECIDE THE SCOPE AND CONTENT OF THE PRIOR

17    ART.  AND THEN I SAY --

18          **MR. REINES:**  I AGREE.

19          **THE COURT:**  -- DELETE THE REST OF THAT PARAGRAPH.  NO

20    ONE IS DISPUTING THAT THE PRIOR ART AT ISSUE IS, IN FACT,

21    PRIOR ART.  THERE IS NOT SOME CLAIM THAT SCHULL ISN'T IN THE

22    FIELD OF THE INVENTION.

23          **MR. REINES:**  I DON'T KNOW WHY WE HAVE THESE

24    CONTENTIONS IN HERE.

25          **MS. GLAUSER:**  I THINK THE REASON IS BECAUSE IT WAS

```
 1    BASED ON YOUR ORIGINAL INVALIDITY --

 2           THE COURT:  IT MAY WELL BE.  THERE MIGHT HAVE BEEN

 3    ORIGINALLY REASONS FOR THEM TO BE THERE, BUT NOW I DON'T THINK

 4    THOSE REASONS STAND.

 5           MS. GLAUSER:  ONE SECOND FOR US TO REVIEW IT.  I

 6    THINK THAT MIGHT BE RIGHT.

 7                 (PAUSE IN THE PROCEEDINGS.)

 8           MS. GLAUSER:  I THINK WE ARE OKAY TAKING OUT THE

 9    BRACKETED PARAGRAPH.  THERE'S LATER WHAT WE NEED TO DISCUSS IS

10    THE ISSUE OF PRIOR ART IS ONLY PRIOR ART IF IT WASN'T SECRET.

11       BUT I THINK AS FAR AS THE TIMING GOES, WHICH IS WHAT THAT

12    PARAGRAPH MORE RELATES TO AND THE SUBJECT MATTER, I THINK THAT

13    CAN COME OUT BECAUSE THE PRIOR ART REFERENCES UPON WHICH ADOBE

14    HAS RELIED FOR THIS TRIAL SATISFIES THAT PARAGRAPH.

15           THE COURT:  YES, I THINK SO.

16           MR. REINES:  SO THE TWO HARD BRACKETED PARAGRAPHS ON

17    PAGE 16 COME OUT.  THAT MAKES SENSE.

18           THE COURT:  YES.  AS WELL AS THE ONE ON PAGE 15 THAT

19    GOES OVER TO 16.

20           MR. REINES:  RIGHT.

21           THE COURT:  THEY DON'T HAVE TO DECIDE THE LEVEL OF

22    SKILL.  IT DOESN'T MATTER WHAT IT WAS.

23       THIRD AND FINALLY ON THE OTHER STUFF.

24           MR. REINES:  LET ME ASK YOU QUESTION ABOUT THAT.

25       SO, I THINK THEY SHOULD BE -- YOU DON'T EVEN WANT TO POSE
```

1    THE QUESTION TO THEM?  BECAUSE THEN YOU HAVE ONE, TWO, THREE.

2    YOU WOULD ELIMINATE ALL OF THAT?

3         **THE COURT:**  IT GOES THE ULTIMATE CONCLUSION OF

4    WHETHER A CLAIM IS OBVIOUS SHOULD BE BASED UPON YOUR

5    DETERMINATION UPON SEVERAL FACTUAL DECISIONS.  ONE, THE LEVELS

6    OF EDUCATION, ET CETERA.  TWO, THE TYPES OF PROBLEMS, ET

7    CETERA.  THREE, THE SOPHISTICATION OF THE TECHNOLOGY.

8         SECOND, YOU MUST -- OH, NO, THAT SHOULDN'T BE A SECOND

9    THERE.  CROSS THAT OUT.  YOU MUST DECIDE THE SCOPE AND CONTENT

10   OF THE PRIOR ART.

11        LET'S CALL THAT THIRD OR FOURTH, THE SCOPE AND CONTENT OF

12   THE PRIOR ART.

13        **MR. REINES:**  THAT'S FINE.

14        **THE COURT:**  WE WILL DO THAT OVER.

15        THE ULTIMATE CONCLUSION OF WHETHER A CLAIM IS OBVIOUS

16   SHOULD BE BASED UPON YOUR DETERMINATION OF SEVERAL FACTUAL

17   DECISIONS.  ONE, THE LEVELS OF EDUCATION, ET CETERA.  TWO, THE

18   TYPES OF PROBLEMS, ET CETERA.  THREE, THE SOPHISTICATION OF

19   THE TECHNOLOGY.  FOUR, THE SCOPE AND CONTENT OF THE PRIOR ART.

20        THAT'S PERFECT.

21        **MR. REINES:**  THEN YOU HAVE TO PROPAGATE THAT ONE MORE

22   DOWN, FIVE, WHAT THE DIFFERENCES ARE.

23        **THE COURT:**  YOU'RE RIGHT.  FIVE, THE DIFFERENCES, IF

24   ANY, EXIST -- WHAT DIFFERENCES, IF ANY, EXISTED.

25        **MS. GLAUSER:**  THEN I THINK THIS WOULD BE THE PLACE WE

1    WOULD SAY SIX, AND I WILL HAVE TO LOOK AT MY EXACT PROPOSED

2    LANGUAGE, BUT THAT IT WOULD HAVE TO BE PUBLIC NOT SECRET.

3         **THE COURT:**  LET'S WAIT UNTIL WE GET TO THAT.

4       FINALLY, YOU SHOULD CONSIDER WHETHER ANY OF THE FOLLOWING

5    FACTORS -- THEN HERE'S -- SO WHERE IS THE SECRET BUSINESS?

6         **MS. GLAUSER:**  THIS IS AN OBJECTION THAT WE INTENDED

7    TO FILE OR DISCUSS TODAY.  BUT THE ISSUE IS THAT IN ORDER TO

8    CONSTITUTE PRIOR ART, THE INFORMATION CAN'T BE KEPT SECRET.

9         **THE COURT:**  IS THERE A PROPOSED INSTRUCTION THAT SAYS

10   THAT?

11        **MS. GLAUSER:**  THERE IS ONE THAT I'VE DRAFTED.  WE

12   HAVEN'T FILED OURS YET, BUT IT WAS SOMETHING THAT I DRAFTED

13   AND DISCUSSED WITH THE OTHER SIDE.

14        **THE COURT:**  SO WHAT DO YOU THINK WAS KEPT SECRET,

15   SCHULL FILED A PATENT APPLICATION.

16        **MS. GLAUSER:**  SCHULL TESTIFIED THAT PART OF WHAT WAS

17   INVOLVED IN HIS SYSTEM WAS KEPT A TRADE SECRET AND WAS NOT

18   DISCLOSED.  AND PART OF WHAT ADOBE IS RELAYING ON FOR THEIR

19   INVALIDITY CASE IS THE SCHULL SYSTEM.  PART OF THAT SYSTEM WAS

20   NOT PUBLIC.  MR. SCHULL TESTIFIED ON THE STAND THAT IT WAS A

21   PROPRIETARY TRADE SECRET THAT THEY DID NOT DISCLOSE.

22        **MR. REINES:**  YOUR HONOR --

23        **THE COURT:**  IS THAT RIGHT?

24        **MR. REINES:**  I MEAN I DISAGREE THAT THERE'S ANYTHING

25   MEANINGFUL ABOUT THAT.  WHAT HE SAID WAS, IN TERMS OF HIS

```
1    ENCRYPTION AND DECRYPTION TECHNIQUE, THAT WITH RESPECT TO

2    THAT, THAT HE -- THAT THE PARTICULAR VERY SPECIFIC DETAIL OF

3    THAT, HOW AND WHAT HE USED WAS CONFIDENTIAL, OBVIOUSLY.  BUT

4    THE FACT THERE WAS ENCRYPTION, DECRYPTION, WHICH IS ALL THAT

5    MATTERS, WAS PUBLICLY DISCLOSED.  WE ARE NOT RELYING ON

6    ANYTHING SECRET TO PROVE INVALIDITY.  WE WON'T ARGUE IT IN

7    CLOSE.  WE HAVEN'T ARGUED IT TO THIS POINT.  PROFESSOR WICKER

8    HASN'T RELIED ON IT.

9          THE COURT:  SOMEWHERE THERE'S A PATTERN INSTRUCTION

10   THAT TALKS ABOUT SOMETHING BEING SECRET.  IT'S IN -- AROUND

11   HERE SOMEWHERE.  WHERE IS IT?  IS IT UNDER PRIOR ART OR

12   SOMETHING?  OR ANTICIPATION PERHAPS?

13         MS. GLAUSER:  I DIDN'T SEE IT UPON REVIEWING THE

14   INSTRUCTIONS.  I HAVE TO ADMIT WE WERE DOING IT QUITE QUICKLY.

15         THE COURT:  IF IT'S NOT IN HERE NOW, IT WAS IN HERE

16   AT ONE TIME.

17      WHAT ARE YOU RELYING ON TO ASK FOR THAT?  SO WE CAN TRY

18   AND FIND IT.

19         MS. GLAUSER:  WE ARE ACTUALLY -- WHAT I'VE CITED AND

20   WHAT WE INTENDED TO FILE IS CASE LAW ON THE STATUTORY

21   PROVISION THAT EXPLICITLY REQUIRES PUBLIC USE AND THEN CASE

22   LAW THAT REQUIRES A SYSTEM TO BE PUBLICLY DISCLOSED.  THAT THE

23   USE OF A METHOD CAN'T BE SECRET.

24         THE COURT:  AND IT'S NOT IN ANY FORM INSTRUCTION?

25         MS. GLAUSER:  I CAN TRY TO FIND OUT IF IT IS, YOUR
```

1    HONOR, BUT I DON'T KNOW AS I STAND HERE RIGHT NOW.

2        WHAT I KNOW IS IT IS THE BASIC TENET OF THE LAW THAT A

3    PRIOR ART -- PRIOR ART CANNOT BE BASED ON SOMETHING THAT WAS

4    SECRET.

5            **MR. DINOVO:**  FOR METHODS.

6            **MR. REINES:**  NO ONE HAS ARGUED THAT THERE'S SOMETHING

7    SECRET THAT IS PRIOR ART.

8            **THE COURT:**  THEY ARE.

9            **MR. REINES:**  THEY'RE -- THE PATENT -- PROFESSOR

10   WICKER WHO SET FORTH THE INVALIDITY THEORIES NEVER IDENTIFIED

11   ANYTHING THAT WAS SECRET.

12           **THE COURT:**  I GUESS YOU'LL JUST HAVE TO FILE WHATEVER

13   IT WAS THEN.  I THOUGHT IT WAS A PATTERN INSTRUCTION.  IF IT

14   WAS, I WOULD USE IT, BUT I CAN'T FIND IT.

15           **MS. GLAUSER:**  I WILL ATTEMPT TO DO SO, YOUR HONOR.

16           **MR. REINES:**  YOUR HONOR, I ASSUME -- I'M IN

17   OBVIOUSNESS, THAT OUR ENTREATIES TO THIN OUT THE SECONDARY

18   CONSIDERATIONS BASED ON THE ABSENCE OF EVIDENCE IS NOT -- WE

19   ARE NOT DOING THE SAME NARROWING ON SECONDARY CONSIDERATIONS

20   THAT WE JUST DID?

21           **THE COURT:**  WELL, THEY ALL SEEMED -- I DIDN'T SEE ANY

22   THERE THAT SEEMED IRRELEVANT.  ARE YOU SAYING THAT THERE ARE

23   SOME?

24           **MR. REINES:**  I JUST DON'T THINK THERE'S EVIDENCE OF

25   THEM, LIKE COPYING, FOR EXAMPLE.

1        **THE COURT:**  THEY ARGUED THAT.  ANYTHING ELSE?

2        **MR. REINES:**  I DON'T THINK THERE HAS BEEN ANY NEXUS

3   THAT THERE IS ANY COMMERCIAL SUCCESS THAT IN ANY WAY TIES TO

4   THE PATENTED INVENTION.

5        **THE COURT:**  IT'S THE OPPOSITE.  I WAS GOING TO CROSS

6   THAT OUT UNTIL I HEARD YOU TALKING ABOUT THE COMMERCIAL

7   FAILURE.  SO THEN I THOUGHT, OH, WELL, THE OPPOSITE OF

8   COMMERCIAL SUCCESS IS COMMERCIAL FAILURE, AND THE DEFENDANT IS

9   ARGUING IT COMMERCIALLY FAILED.

10       IF YOU DON'T WANT IT, MAYBE NEITHER SIDE WANTS IT.

11       **MR. REINES:**  I DON'T THINK --

12       **THE COURT:**  I SUPPOSE UNEXPECTED AND SUPERIOR RESULTS

13   CAN BE TAKEN OUT.

14       **MR. REINES:**  THAT CAN BE TAKEN OUT.

15       **MS. GLAUSER:**  ON THE COMMERCIAL SUCCESS ASPECT, IT

16   DOESN'T NECESSARILY HAVE TO BE DIGITAL REG'S.  PART OF THAT

17   COULD BE ADOBE'S COMMERCIAL SUCCESS OF USING THE PRODUCT.

18       **MR. REINES:**  BUT THERE'S NO EVIDENCE OF NEXUS.

19   THAT'S THE PROBLEM.

20       **THE COURT:**  THERE IS NO EVIDENCE THAT THERE WAS ANY

21   COMMERCIAL SUCCESS ATTRIBUTABLE TO THE DRM.

22       **MR. DINOVO:**  WELL, YOUR HONOR --

23       **THE COURT:**  WHAT THIS DOES -- ARE THESE THINGS --

24   THESE THINGS ARE DEMONSTRATING WHAT?

25       **MR. DINOVO:**  SECONDARY INDICIA OF NONOBVIOUSNESS.

1           **THE COURT:**  OF NON --

2           **MR. REINES:**  THEY TEND TO SHOW THEY ARE NONOBVIOUS.

3           **THE COURT:**  THEY'RE NOT OBVIOUS.

4           **MR. DINOVO:**  THESE -- MY UNDERSTANDING OF THE CASE

5  LAW IS THESE HAVE TO BE CONSIDERED?

6           **MR. REINES:**  IF THERE'S EVIDENCE --

7           **THE COURT:**  THE ONLY THING THAT HAS TO BE CONSIDERED

8  IS THINGS SUPPORTED BY THE EVIDENCE.  IF THERE'S SOMETHING

9  THAT'S NOT SUPPORTED BY THE EVIDENCE, THEN THEY DON'T HAVE TO

10  CONSIDER IT.

11      SO IF THESE ARE THINGS THAT WOULD SUPPORT NONOBVIOUSNESS,

12  THEN THERE SHOULD BE SOME EVIDENCE OF THEM IN ORDER TO SUPPORT

13  NONOBVIOUSNESS.  SO, COMMERCIAL SUCCESS OF A PRODUCT, IS THERE

14  A PRODUCT THAT WAS COMMERCIALLY SUCCESSFUL?

15          **MR. DINOVO:**  FLASH ACCESS, FOR EXAMPLE, WE HEARD FROM

16  MR. BETLEM THAT CUSTOMERS DEMANDED THAT CAPABILITY IN AMAZON

17  AND HULU.  SO, YES --

18          **THE COURT:**  DEMANDED DRM IN THEIR FLASH ACCESS?

19          **MR. DINOVO:**  YES.

20          **THE COURT:**  OKAY.  LONG-FELT NEED FOR THE SOLUTION:

21  I GUESS THERE IS SOME EVIDENCE OF THAT.

22      UNSUCCESSFUL ATTEMPTS BY OTHERS?

23          **MR. REINES:**  I DON'T KNOW -- I HAVEN'T HEARD ANY

24  REFERENCE TO THAT.

25          **THE COURT:**  IS THERE ANY EVIDENCE OF UNSUCCESSFUL

1    ATTEMPTS BY OTHERS?

2         **MR. DINOVO:**  ALL I KNOW IS THE BACKGROUND TESTIMONY

3    OF MR. PATTERSON RELATING TO THIS NEED AND -- THAT HE

4    PERCEIVED.

5         **THE COURT:**  THAT'S THE LONG-FELT NEED.

6         **MR. DINOVO:**  RIGHT.

7         **MS. GLAUSER:**  I THINK MR. VENTERS ALSO TESTIFIED THAT

8    IN HIS ELECTRONIC COMMUNICATIONS BUSINESSES HE WAS BEING ASKED

9    ABOUT SECURE COMMUNICATIONS AND COULDN'T FIND A SOLUTION TO

10   THE PROBLEM.

11        **MR. REINES:**  THAT'S NOT A FAILURE EITHER.

12        **THE COURT:**  UNEXPECTED AND SUPERIOR RESULTS FROM THE

13   CLAIMED INVENTION?  I GUESS WE CAN SAY SUPERIOR RESULTS, NOT

14   NECESSARILY UNEXPECTED.

15        **MR. REINES:**  BACK TO -- THAT SEEMS CLEAR.

16      BUT BACK TO FOUR, I DON'T SEE HOW MR. HERBACH'S TESTIMONY

17   IS CONSISTENT WITH ANY COPYING THEORY.

18        **THE COURT:**  YOU KNOW WHAT THEIR COPYING THEORY IS.

19   THERE IT IS.

20      PRAISE -- WE DO HAVE LICENSING OF THE CLAIMED INVENTION.

21      IS THERE ANY PRAISE FROM OTHERS IN THE FIELD?

22        **MR. DINOVO:**  THERE WAS AN AWARD, YOUR HONOR.  THEY

23   HAVE QUESTIONED THE NEXUS BETWEEN THE AWARD AND THE PATENTS,

24   BUT THE TECHNOLOGY THAT ACHIEVED THE AWARD WAS TESTIFIED

25   ABOUT.

1          **MR. REINES:**  MR. PATTERSON TESTIFIED THERE WAS NO

2    PRAISE FOR ANYTHING IN THE PATENT.  POINT BLACK.

3          **MR. DINOVO:**  I THINK WHAT HE SAID WAS THAT THE

4    PATENTS WEREN'T PRAISED.  THE TECHNOLOGY IN THE PATENTS

5    OBVIOUSLY HAVE A RELATIONSHIP.

6          **MR. REINES:**  THAT WASN'T WHAT HE TESTIFIED TO.

7          **THE COURT:**  NOW WHAT ABOUT THE DAMAGES?

8       DO YOU HAVE ANY -- THIS IS THE THING THAT THEY FILED ABOUT

9    THE METHOD -- METHOD CLAIM DAMAGES DELETING -- WE ARE ON

10   PAGE 20 NOW.

11      DELETING THE NAIL ANALOGY AND STATING THAT IF PARTICULAR

12   PRODUCTS SOLD BY ADOBE ARE NEVER USED IN AN INFRINGING MANNER,

13   THERE IS NO INFRINGEMENT, AND SUCH UNITS OF PRODUCT SHOULD NOT

14   BE INCLUDED IN THE ROYALTY BASE.

15         **MR. DINOVO:**  SO LUCENT, THE LUCENT CASE, AND WE

16   SHARED THIS WITH ADOBE, SPECIFICALLY SAYS THERE IS NO RIGID

17   REQUIREMENT THAT DAMAGES IN ALL CIRCUMSTANCES BE LIMITED TO

18   SPECIFIC INSTANCES OF INFRINGEMENT.

19      AND THEY TALK ABOUT, FOR EXAMPLE, THAT MAYBE THE PARTIES

20   JUST DON'T MONITOR USAGE AND IT MAY BE VALUABLE TO HAVE THE

21   CAPABILITY IN THE PRODUCT.

22      SO WE'VE TRIED TO BE VERY BRIEF WITH THIS EXCERPT FROM

23   LUCENT, WHICH IS FROM THE FEDERAL CIRCUIT A FEW YEARS AGO

24   SAYING THERE IS NO RIGID REQUIREMENT THAT THE DAMAGES BE TIED

25   ON A ONE-TO-ONE BASIS TO INSTANCES OF PRACTICING THE METHOD.

1          SO WE HAVE THIS IN OUR PROPOSAL THAT WE PLAN TO FILE THIS

2     EVENING.  RIGHT?

3          **MR. REINES:**  YOUR HONOR, THIS IS NO APPLICABILITY TO

4     THIS CASE.

5          **THE COURT:**  I AM SORRY.  I HAVE LOST THE THREAD.  DO

6     YOU HAVE ANY PROBLEM WITH DELETING THE NAIL EXAMPLE?

7          **MS. GLAUSER:**  IT IS PART OF THE PATTERN JURY

8     INSTRUCTIONS, AND I THINK IT DOES GIVE THE JURY A PRACTICAL

9     EXAMPLE OF HOW THIS PLAYS OUT.  IT'S IN THE NORTHERN DISTRICT

10    OF CALIFORNIA MODEL PATENT JURY INSTRUCTIONS.

11         **THE COURT:**  IS IT APPLICABLE TO A METHOD CLAIM?  THE

12    ANALOGY IN THAT COVERS A NAIL.  IT SOUNDS MORE LIKE AN

13    APPARATUS THAN A METHOD.

14         WE HAVE GOT THE CAR EXAMPLE.  WE DO NEED TO EXPLAIN, BASE

15    TIMES RATE EQUALS AMOUNT, BUT WE DON'T NEED NAILS AND CARS, I

16    DON'T THINK.

17         WELL, THE CAR GOES FOR THE APPORTIONMENT, I GUESS.  IF YOU

18    WANT TO WRITE AN EXAMPLE THAT APPLIES TO A METHOD CLAIM, I CAN

19    USE THAT, BUT THE NAIL THING, I AGREE, IS NOT VERY

20    ILLUMINATING SINCE DRM ISN'T MUCH LIKE A NAIL.

21         AND THEN THE NEXT QUESTION I HAD WAS WHETHER THESE

22    SENTENCE -- THE ADDITIONAL SENTENCE THEY WROTE IS CORRECT, AND

23    YOU'RE SAYING THAT IF A PRODUCT IS SOLD AND ISN'T USED IN AN

24    INFRINGING MANNER, IT CAN SUPPORT A ROYALTY ANYWAY?

25         **MR. DINOVO:**  YES.  THAT'S WHAT THE FEDERAL CIRCUIT

1    SAYS.

2         **THE COURT:**  YOU ARE GOING TO FILE SOMETHING THAT

3    TELLS ME ABOUT THAT THAT YOU HAVEN'T YET?  IT WASN'T IN YOUR

4    PREVIOUSLY PROPOSED INSTRUCTIONS THAT I HAVE?

5         **MR. DINOVO:**  WE'RE INCLUDING THIS IN RESPONSE TO

6    THEIR PROPOSAL ABOUT IT NEVER BEING -- THE FEDERAL CIRCUIT

7    SAYS THERE IS NO SUCH RULE.

8         **THE COURT:**  WHAT ARE THE DAMAGES IN A METHOD CASE?

9         **MR. DINOVO:**  WELL, WE'VE INCLUDED A TRUNCATED VERSION

10   HERE FROM THE LUCENT MATTER.

11        **THE COURT:**  WHERE?  YOU HAVE INCLUDED THAT WHERE?

12        **MS. GLAUSER:**  I'M SORRY, YOUR HONOR, WE DIDN'T FILE

13   THE OBJECTIONS THAT WE HAD IN AN ATTEMPT TO WORK IT OUT WITH

14   THE OTHER SIDE FIRST.  WE DRAFTED THE OBJECTION AND WHAT WE

15   ARE LOOKING AT IS THE PAPER COPY THAT WE'VE DRAFTED, ASSUMING

16   THAT SOME OF THEM WOULD GET WORKED OUT DURING THE CHARGE

17   CONFERENCE, WE WOULD THEN FILE THE OBJECTIONS THAT ARE STILL

18   OUTSTANDING.

19        **THE COURT:**  OKAY.  MORE THAN OBJECTIONS, I WOULD LIKE

20   AN EXPLANATION OF WHAT ARE THE PROPER DAMAGES IN A METHOD

21   CLAIM IN SOME WAY THAT WILL BE UNDERSTANDABLE TO THE JURY MORE

22   THAN NAILS.

23        SO I'M THINKING THAT PERHAPS SINCE YOU KNEW IT WAS A

24   METHOD CLAIM, THAT MAYBE THE ORIGINAL INSTRUCTIONS THAT YOU

25   ALL FILED WOULD HAVE EXPLAINED HOW YOU CALCULATE A ROYALTY IN

1    A METHOD CASE.  I CAN LOOK BACK AT THOSE, WHICH I STILL HAVE.

2         **MR. REINES:**  I DON'T THINK THAT'S GOING TO HAVE THE

3    ANSWER FOR YOU, YOUR HONOR.

4         **THE COURT:**  NO?

5         **MR. REINES:**  CAN I BRIEFLY ADDRESS THE ISSUE BECAUSE

6    IT REALLY IS A BIG --

7         **THE COURT:**  HOW ABOUT THE NINTH CIRCUIT OR THE

8    NORTHERN DISTRICT INSTRUCTIONS?  THIS MUST COME UP ALL THE

9    TIME.  IT'S NOT THE FIRST CASE OF ROYALTIES ON A METHOD CLAIM.

10        **MR. REINES:**  THE CIRCUMSTANCES ARE SOMEWHAT UNIQUE IN

11   THE SENSE THAT THEY WANT TO HAVE -- OBTAIN A ROYALTY ON OUR

12   ACROBAT PRO PRODUCTS, WHICH IS $1.7 BILLION OF PRODUCT BASED

13   ON THE SALE OF A FEW HUNDRED UNITS OF LIVECYCLE ON THE THEORY

14   THAT IF PEOPLE BUY LIVECYCLE AND THEY HAVE ACROBAT PRO AND

15   THEY USE THEM TOGETHER IT'S INFRINGING BECAUSE YOU NEED

16   LIVECYCLE.

17       NOW, IN AN ATTEMPT TO -- I THINK THAT'S AN OUTRAGEOUS

18   DAMAGE THEORY.

19        **THE COURT:**  IT INFRINGES ONLY IF THEY ARE USING

20   LIVECYCLE AND ADOBE.

21        **MR. REINES:**  THAT'S WHAT DEVANBU SAYS, YES.  BUT I

22   UNDERSTAND THEM TO BE ARGUING -- IT'S IMPORTANT ENOUGH, IF I

23   CAN HAVE JUST A COUPLE OF MINUTES OF BEING ABLE TO EXPLAIN

24   THIS.

25        **THE COURT:**  YOU CAN --

1          **MR. REINES:** WHAT THEY ARE --

2          **THE COURT:** YOU CAN IN A MINUTE, BUT WHAT I WOULD

3    REALLY LIKE IS TO SEE WHAT REALLY THE NORTHERN DISTRICT OR --

4    WELL, THE NORTHERN DISTRICT SAYS ABOUT --

5          **MR. REINES:** THIS IS --

6          **THE COURT:** -- ROYALTIES IN A METHOD CLAIM.

7          **MR. REINES:** IF I CAN HAVE TWO MINUTES, I THINK I CAN

8    BE HELPFUL.

9          THE NORMAL WAY THAT IT WOULD WORK IN THIS CONTEXT, IF YOU

10   SELL YOUR PRODUCT AND YOU ENCOURAGE PEOPLE TO USE A METHOD,

11   THEN NORMALLY PEOPLE WOULD SEEK A ROYALTY EITHER ON THE USES,

12   THAT'S HARD, OR ON THE PURCHASE PRICE FOR THAT UNIT.

13         WHAT IS BEING ARGUED BY THE OTHER SIDE IS, WE'RE NOT THE

14   NORMAL CASE.  WE ARE MORE LIKE A FIRE EXTINGUISHER, WHICH IS

15   YOU GET THE FIRE EXTINGUISHER, YOU DON'T WANT TO USE IT.  YOU

16   ARE STILL GAINING THE BENEFIT OF THE POSSIBILITY THAT IF

17   THERE'S A FIRE YOU CAN USE IT.

18         SO THEY'RE SAYING, IF IT'S A METHOD FOR USING A FIRE

19   EXTINGUISHER, THEY SHOULDN'T NOT GET ANYTHING JUST BECAUSE

20   PEOPLE DON'T HAVE A FIRE.  RIGHT?  SO WE ARE OUT OF THE NORM

21   ALREADY.

22         I'M NOT SAYING IT'S BAD, I'M JUST SAYING YOU'RE NOT GOING

23   TO FIND A PATTERN INSTRUCTION BECAUSE WE ARE OUT OF THE NORM.

24         THE RESPONSE TO THAT IS, WELL, THAT MIGHT BE TRUE BUT IF

25   YOU NEED TO GO BUY A SEPARATE NOZZLE TO PUT ON THE FIRE

1    EXTINGUISHER SO THAT IT'S EVEN CAPABLE OF PUTTING OUT FIRES,

2    AND YOU NEVER BUY THAT IS NOZZLE, THE IDEA YOU HAVE A FIRE

3    EXTINGUISHER THAT CAN'T BE USED BECAUSE YOU HAVEN'T BOUGHT THE

4    OTHER THING, DOESN'T APPLY.

5        THIS IS WORTH ALMOST THE ENTIRE DAMAGES IN THIS CASE. IT

6    REALLY IS OUTRAGEOUS, TO MY BELIEF, THAT IT'S GOTTEN THIS FAR

7    WHERE THEY ARE PRESENTING ALL THE ACROBAT PROFESSIONAL

8    REVENUES, 1.7 BILLION, BASED ON A FEW HUNDRED UNITS OF

9    LIVECYCLE, WHICH IS NOT ENABLED -- ACROBAT PRO DOESN'T ENABLE

10   LIVECYCLE UNLESS YOU BUY LIVECYCLE AND HAVE A LIVECYCLE SERVER

11   AND HAVE IT ALL SET UP, WHICH A FEW HUNDRED ENTITIES DO.

12       **THE COURT:**  OKAY.  THIS WHOLE DISPUTE WAS NOT TEE'D

13   UP IN THE ORIGINAL ROUND OF JURY INSTRUCTION DISPUTES BY

14   EITHER SIDE.

15       **MR. REINES:**  THERE IS SOME EXCULPATORY EXPLANATION

16   FOR BOTH SIDES ON THAT.

17       I THINK THERE IS, WHICH IS -- AND I'M SURE WE COULD HAVE

18   DONE BETTER, THAT WHAT REALLY CAUSED THIS WAS THAT THE

19   ORIGINAL THEORY AS TO HOW THEY WERE GOING TO GET ALL THAT

20   ACROBAT PRO REVENUE, WHICH IS WHAT THEY WANT, ALL THIS OTHER

21   STUFF IS IN THE NOISE, WAS THROUGH THE ALM/AMT ISSUE.  SO WHEN

22   THE COURT SAID THEY COULDN'T PURSUE AMT, THEY HAD TO FALL BACK

23   TO THIS VERY, VERY WEAK LIVECYCLE ARGUMENT.  THAT'S WHAT'S

24   GOING ON HERE.

25       **MR. DINOVO:**  TO TEN-SECOND RESPONSES.

1    ONE, IN OUR VERY ORIGINAL CONTENTIONS WHEN WE FILED THIS

2    CASE, ACROBAT PRO WAS IDENTIFIED IN LIVECYCLE.  TWO --

3    **THE COURT:**  I'M SORRY?

4    **MR. DINOVO:**  ACROBAT PRO WAS IDENTIFIED AS A PRODUCT

5    WITH LIVECYCLE THAT INFRINGED.

6    NUMBER TWO, THE LUCENT CASE THAT WE WILL DIRECT THE

7    COURT'S ATTENTION TO --

8    **THE COURT:**  CAN I HAVE THE CITE OF THAT?

9    **MR. DINOVO:**  YES.  580 F. 3D, 1301, 1332 THROUGH 35,

10   FED CIRCUIT 2009.  IT'S NOT A FIRE HYDRANT CASE OR FIRE

11   EXTINGUISHER CASE, IT'S A COMPUTER CASE, AND THE COURT

12   SPECIFICALLY SAYS IN THE CONTEXT OF COMPUTER SOFTWARE

13   INVENTIONS.

14   **THE COURT:**  LUCENT V. WHO?

15   **MR. DINOVO:**  LUCENT V. GATEWAY.

16   **THE COURT:**  DO YOU HAVE A CASE --

17   **MR. REINES:**  I KNOW --

18   **THE COURT:**  ARE YOU SAYING I SHOULD JUST READ LUCENT

19   AND READ IT YOUR WAY, OR DO YOU HAVE ANOTHER CASE YOU'D LIKE

20   US TO LOOK AT WHILE WE ARE WAITING FOR YOU TO FILE YOUR

21   PAPERS, WHICH WILL TAKE AWHILE?

22   **MR. REINES:**  I CAN ADDRESS LUCENT.  I SUBMITTED

23   PAPERS ON IT AND FOLLOWED THE CASE.  IT'S THE DATE PICKER CASE

24   WHERE YOU PICK THE CASE IN OUTLOOK.  AND THE ISSUE --

25   **THE COURT:**  I WAS THINKING OF LITTLE FRUITS.

1          **MR. REINES:**  I THOUGHT YOU WERE THINKING OF MAYBE

2     ROMANTIC DATES.  BUT, NO, IT'S CALENDAR DATES.

3          **THE COURT:**  OKAY.

4      I CAN READ <u>LUCENT</u>.  I'M JUST WONDERING IF THERE'S SOME

5     OTHER CASE THAT YOU RECOMMEND THAT I READ WHILE I'M WAITING.

6          **MR. REINES:**  NO.

7          **THE COURT:**  SO I'LL JUST READ <u>LUCENT</u> AND --

8          **MR. REINES:**  I JUST WANTED A MINUTE TO ADDRESS THE

9     FACTUAL DISTINCTIONS BECAUSE I THINK THIS IS A VERY IMPORTANT

10    ISSUE.

11         **THE COURT:**  OKAY.

12         **MR. REINES:**  WHAT YOU WILL FIND THAT <u>LUCENT</u> DOES NOT

13    INVOLVE SOFTWARE OR YOU CAN'T USE THE DATE PICKER UNLESS YOU

14    BUY SOMETHING ELSE.  AND MILLIONS OF PEOPLE WHO BOUGHT OUTLOOK

15    OR USE OUTLOOK AND ONLY A HUNDRED ENTITIES ALLOW YOU TO USE

16    DATE PICKER AT ALL BECAUSE YOU HAVE THE ENABLED SOFTWARE.

17      THAT DIFFERENCE IS ABSOLUTELY CRITICAL BECAUSE, YES, IT'S

18    TRUE YOU DON'T HAVE TO GO TO EVERYONE'S COMPUTER AND FIGURE

19    OUT THE NUMBER OF TIMES THEY USE DATE PICKER IN ORDER TO SEE

20    WHAT YOUR RATE OF ROYALTY IS.  THAT MAKES SENSE.  I CAN

21    UNDERSTAND THAT.  IT'S FACTUALLY INAPPOSITE.

22      AND, THE BOTTOM LINE, THEN I WILL LET EVERYONE ELSE MOVE

23    ON AND SO FORTH, IS THE MAIN POINT IS THAT THIS IS A FRINGE

24    DAMAGE THEORY IN GENERAL ON THE BASE.  AND WE DID RAISE IT.

25    WE RAISED IT IN OUR IN LIMINES AND OUR OTHER MOTIONS, WHICH IS

```
 1    THEY'RE TRYING TO GET ALL THIS ACROBAT PROFESSIONAL EVEN

 2    THOUGH A SUPER TINY AMOUNT OF PEOPLE COULD EVER POSSIBLY HAVE

 3    USED THE INVENTION WITH IT.

 4         THE COURT:  OKAY.  SO WHAT IF WE SAID, IF PARTICULAR

 5    PRODUCTS SOLD BY ADOBE DO NOT CONTAIN UNNECESSARY COMPONENT TO

 6    ALLOW INFRINGING USE, THEN --

 7         MR. REINES:  THE ISSUE IS THAT, I BELIEVE --

 8         THE COURT:  BECAUSE THEY DON'T HAVE LIVECYCLE WITH

 9    THEM.

10         MR. REINES:  WITHOUT ME REPRESENTING, I THINK THERE

11    IS LATENT CODE IN THE SOFTWARE.  IT'S JUST NOT ENABLED UNLESS

12    YOU HAVE THE LIVECYCLE SERVER, AND SO FORTH.

13       SO IT'S NOT A COMPONENT.  IT'S NOT AN APPARATUS COMPONENT

14    ISSUE.  IT'S NOT ENABLED.  SO THAT'S WHAT I WOULD SUGGEST.

15         THE COURT:  THE TESTIMONY WAS THAT IT WAS GRAYED OUT.

16    THEY BOUGHT ACROBAT AND --

17         MR. REINES:  RIGHT.

18         THE COURT:  -- YOU CAN SEE IT ON A DROP DOWN.  IF YOU

19    CLICKED ON IT, NOTHING WOULD HAPPEN.

20         MR. REINES:  THAT'S WHY I SAY I THINK THE BETTER WAY

21    BECAUSE IT'S A PROCESS AND NOT AN APPARATUS IS ARE NOT ENABLED

22    TO BE USED IN AN INFRINGING MANNER.  THEN I THINK THAT

23    ADDRESSES EVERYONE'S CONCERNS IN A BALANCED WAY.

24         THE COURT:  MAYBE IF I KNEW WHAT "ENABLED" MEANT.  I

25    MEAN THAT GETS -- I GUESS THEY DON'T KNOW ABOUT ENABLEMENT.
```

1       THE WAY YOU'VE WRITTEN IT IS NOT RIGHT BECAUSE IT SAYS ARE

2   NEVER USED IN AN INFRINGING MANNER.  THAT WOULD COVER SOMEONE

3   WHO GOT LIVECYCLE AND JUST DIDN'T BOTHER TO EVER USE IT,

4   ALTHOUGH THEY COULD HAVE WITH NO PROBLEM.  SO THAT NEEDS TO BE

5   TIGHTENED UP.

6       **MR. REINES:**  SO AND NEVER ENABLED TO BE USED.  I KNOW

7   YOU DON'T LIKE THAT IN FIRST REACTION, BUT IT MAY BE A GOOD

8   SOLUTION.

9       **THE COURT:**  DO YOU HAVE ANY BETTER IDEAS THAN

10  ENABLED?

11      **MR. DINOVO:**  I WOULD ASK YOUR HONOR TO LOOK AT THE

12  LUCENT CASE.  I UNDERSTAND THIS IS SOMEWHAT FACTUALLY

13  DISTINGUISHED FROM IT, BUT AT THE END OF THE DAY THE QUESTION

14  IS, IS THIS FEATURE USED OR NOT?  AS MR. REINES INDICATED, THE

15  TESTIMONY IS THAT EVERY COPY OF ACROBAT PRO HAS THIS CODE

16  EMBEDDED IN IT.  AND THE QUESTION IS HOW OFTEN IS IT USED.

17      LUCENT CASE SAYS THAT CERTAINLY SHOULD BE CONSIDERED BY

18  THE JURY, BUT OTHER FACTORS WOULD BE CONSIDERED IN A COMPUTER

19  ENVIRONMENT IN A HYPOTHETICAL NEGOTIATION.

20      **THE COURT:**  OKAY.  IF I'M GOING TO SAY SOMETHING LIKE

21  THIS, ARE YOU JUST AS HAPPY WITH ENABLED TO BE USED AS

22  ANYTHING ELSE YOU CAN THINK OF?

23      **MR. DINOVO:**  YES.

24      **THE COURT:**  OKAY.  THEN THE DAMAGES WE'LL NEED TO

25  TAKE OUT THE REFERENCE TO CONTRIBUTORY.

1          **MR. REINES:**  JUST TO BE CLEAR FOR THIS ISSUE, AS WITH

2     THE OTHERS, WE STAND ON THE DEFINITIVE -- OUR POSITION'S IN

3     THE DEFINITIVE RULINGS PRETRIAL SUCH AS THE IN LIMINE, AND

4     WE -- ANY OBJECTIONS WE SUBMITTED IN 593.

5          **THE COURT:**  I DIDN'T UNDERSTAND WHAT YOU JUST SAID.

6          **MR. REINES:**  IT WAS FOR THE RECORD.  I JUST WANTED TO

7     SAY THAT, YOU KNOW, WE DON'T BELIEVE THAT THIS DAMAGES -- I'M

8     CONFIDENT THIS DAMAGES THEORY SHOULDN'T BE GIVEN TO THE JURY.

9          **THE COURT:**  WHICH DAMAGES THEORY?

10         **MR. REINES:**  THE IDEA THAT THE BASE FOR ACROBAT PRO,

11    $1.7 BILLION WORTH OF ACROBAT PRO SHOULD BE PRESENTED TO THE

12    JURY.

13       AND I UNDERSTAND PROBABLY THE COURT'S THINKING IS IT'S

14    GOING TO LET IT GO TO THE JURY.  AND IF IT HAS TO CLEAN UP ON

15    THE BACK END, IT WILL CLEAN IT UP.

16         **THE COURT:**  I DON'T KNOW WHAT YOU ARE REFERRING TO

17    RIGHT NOW.  I'M TALKING ABOUT CALCULATING DAMAGES IN CASE OF

18    INDUCING OR CONTRIBUTORY INFRINGEMENT, AND I'M TALKING ABOUT

19    CROSSING OUT CONTRIBUTORY.

20         **MR. REINES:**  THAT'S FINE.

21         **THE COURT:**  YOU SEEM TO BE GOING BACK TO SOMETHING

22    ELSE.  AND I WOULD LIKE TO KNOW WHAT THAT IS.

23       YOU SAID EARLIER THAT THEY SHOULDN'T EVEN BE ALLOWED TO

24    HAVE THIS THEORY ABOUT THE 1.7 BILLION.

25         **MR. REINES:**  RIGHT.

1          **THE COURT:**  I DON'T, AT THIS VERY MOMENT, REMEMBER

2    MAKING THAT DECISION.  I DON'T KNOW IF THAT WAS TEE'D UP AT

3    SOME POINT?

4          **MR. REINES:**  THAT WAS IN THE DAUBERT -- ONE OF THE

5    GROUNDS FOR STRIKING WAS THAT THE BASE TESTIMONY WAS -- I

6    MEAN, WE ALL SAW IT, THE BASE TESTIMONY DIDN'T PASS MINIMUM

7    STANDARDS BECAUSE THIS THEORY DOESN'T WORK.

8          **THE COURT:**  ONE OF THE DAUBERT GROUNDS FOR STRIKING

9    PARR?

10         **MR. REINES:**  YES.  WAS THAT THE BASE IS IMPROPER,

11   INCLUDING ALL THIS ACROBAT PROFESSIONAL.

12         **THE COURT:**  I DON'T REMEMBER THAT.

13         **MR. REINES:**  I'M PRETTY CONFIDENT.  BUT IN ANY EVENT,

14   I DON'T -- BY YOU AGREEING TO THIS -- MY -- BY AGREEING TO

15   THIS INSTRUCTIONS I'M NOT SAYING THAT WE ARE WAIVING THE

16   INADEQUACY OF THE DAMAGE THEORY THAT'S BEING PRESENTED.  I

17   DON'T KNOW IT SEEMS LIKE A PRUDENT THING TO DO.

18         **THE COURT:**  WELL, IF IT'S NOT SOMETHING I ACTUALLY

19   RULED ON, THEN I WILL RULE ON IT.  I DON'T REMEMBER RULING ON

20   IT.  I'VE MADE A LOT OF RULINGS IN THIS CASE.  MAYBE I'VE

21   RULED ON IT AND FORGOT, BUT I DON'T REMEMBER RULING ON IT.

22         **MS. GLAUSER:**  I THINK THE ISSUE WAS THAT IT WAS

23   RAISED IN THEIR RENEWED MOTION WHERE THEY PUT IN ADDITIONAL

24   BASES FOR THEIR IN LIMINE MOTION OF PARR.  AND YOUR HONOR DID

25   RULE ON THAT AND SAID, NO, YOU HAD AN OPPORTUNITY TO COME

1    FORWARD AT THE BEGINNING.

2        AND I DON'T WANT TO PUT WORDS IN YOUR MOUTH.  BUT I THINK

3    WHAT JUST HAPPENED, THAT HE WAS RESERVING FOR THE RECORD THE

4    FACT THAT THEY'RE OBJECTING TO THE ENTRY OF THE EVIDENCE AS A

5    FINAL RULING, NOT JUST THE IN LIMINE RULING.

6        DID I MISS THAT?

7        **MR. REINES:**  WE HAVE SET FORTH WHY WE THINK THE

8    DAMAGES THEORY PRESENTED THROUGH PARR AND OTHERWISE IS

9    INADEQUATE LEGALLY.  AND I JUST WANT TO SAY THAT BY

10   NEGOTIATING THESE JURY INSTRUCTIONS HERE, WE ARE NOT FOREGOING

11   THE LEGAL INADEQUACY BECAUSE IT'S CLEARLY, IN MY MIND, LEGALLY

12   INADEQUATE IN THIS SITUATION TO SAY THAT A TINY NUMBER OF

13   THESE INSTALLATIONS WARRANT THE BIG NUMBER GOING.

14       **THE COURT:**  RIGHT.  WHAT I DON'T LIKE IS TO HAVE

15   SOMETHING RESERVED AS ERROR WHEN I DON'T REMEMBER RULING ON

16   IT.  BECAUSE IF I DIDN'T RULE ON IT, THEN I WILL RULE ON IT.

17       **MR. REINES:**  I DON'T HAVE THE PAGE AND LINE WHERE WE

18   RAISED IT, BUT I WILL LOOK FOR IT.

19       **THE COURT:**  OKAY.  COUNSEL THINKS IT'S IN SOME

20   SUPPLEMENTAL OBJECTIONS TO PAR, AND IF THAT IS TRUE I WILL GO

21   BACK AND LOOK AT THOSE AND REMIND MYSELF OF IT AND MAKE SURE I

22   REALLY DID RULE ON THAT.

23       **MR. PRICE:**  YOUR HONOR, JUST TO GIVE YOU THE

24   SEQUENCE.  YOUR HONOR RULED ON THE INITIAL MOTION IN LIMINE

25   WITH PARR, AND THEN HE WAS STRUCK, AND THEN WE WERE ORDERED TO

1    KEEP IT IN THE WITHIN THE LINES OF THE ORDER.

2            **THE COURT:**  CORRECT.

3            **MR. PRICE:**  ADOBE FILED SOMETHING, I THINK THE NEXT

4    DAY AFTER THE REPORT, AND SAID, OKAY, NOW THERE ARE THESE TWO

5    OR THREE OTHER REASONS WHY HE SHOULD BE STRUCK.  THAT'S WHAT I

6    THINK IS BEING DONE HERE.  OF COURSE THAT'S THREE WEEKS AFTER

7    THE DEADLINE.

8            **THE COURT:**  YEAH.

9            **MR. PRICE:**  -- TO SUBMIT MOTIONS IN LIMINE.

10           **THE COURT:**  THAT'S WHAT YOUR COLLEAGUE SAID.  IF THAT

11   IS WHAT HAPPENED, I CAN EASILY GO BACK AND READ THAT DOCUMENT

12   AGAIN AND MAKE SURE I DIDN'T MISS SOMETHING.  AND I WILL DO

13   THAT.

14       IF THAT'S WHAT MR. REINES IS REFERRING TO, THEN WE DON'T

15   HAVE A PROBLEM.  I WILL GO BACK AND READ IT, AND I AM SURE I

16   RULED ON IT IF IT WAS FILED.

17           **MR. REINES:**  YOU WILL RECALL THAT WHEN WE STARTED THE

18   CASE, I STATED TO YOUR HONOR THAT ALTHOUGH THE COURT -- THE

19   WAY THE COURT RESOLVED THOSE ISSUES WAS -- USED THE LANGUAGE

20   THAT IT USED, THAT WE HADN'T WAIVED ANY OF OUR QUESTIONS ABOUT

21   THE LEGAL ADEQUACY OF THE DAMAGES THEORY BEING PRESENTED.  AND

22   THE COURT ACKNOWLEDGED THAT WE HADN'T.

23       I JUST DON'T WANT -- IT IS NOT A WAIVER.  WE'VE FIRMLY --

24   ARE CLEARLY STATING AND CERTAINLY STATING NOW THAT IT IS

25   LEGALLY INADEQUATE, THIS DAMAGES THEORY, FOR THE BASE IN

1    ADDITION TO ALL THE OTHER PROBLEMS, BECAUSE THERE'S NO REASON

2    PERMISSIBLE TO PUT THAT BIG NUMBER UP.

3          **THE COURT:**  THIS IS SOMETHING YOU HAVE RAISED BEFORE

4    AND I'VE RULED ON IT ALREADY, EVEN THOUGH I DON'T EXACTLY

5    REMEMBER IT RIGHT THIS MOMENT; IS THAT CORRECT?

6          **MR. REINES:**  MY EXACT MEMORY AND YOUR EXACT MEMORY

7    ARE IN THE SAME STATE, WHICH I DON'T HAVE AN EXACT MEMORY OF

8    EXACTLY WHERE IT.  I BELIEVE IT WAS RAISED IN -- KEEP IN MIND

9    THIS IS POST AMT.  SO WHEN AMT CAME OUT, THAT'S THE FIRST TIME

10   THE ISSUE CAME UP.  SO I REALLY, YOU KNOW, THERE IS NO WAIVER

11   HERE.

12         **THE COURT:**  THERE IS NO WHAT?  OH, WAIVER.

13      WHAT YOU NEED TO DO IS GO BACK AND CHECK, MAKE SURE THAT

14   YOU ACTUALLY DID FILE SOMETHING ON THIS POINT AND I DID RULE

15   ON IT.

16      IF YOU DID AND I DID, THEN YOU'RE CORRECT, I HAVEN'T

17   WAIVED IT.  MAYBE I MADE A MISTAKE, OR WHATEVER.  BUT IF YOU

18   DIDN'T RAISE IT BEFORE, THEN I DIDN'T RULE ON IT BEFORE, AND

19   THEN YOU HAVEN'T RESERVED IT BECAUSE YOU DIDN'T RAISE IT

20   BEFORE.  SO JUST FOR YOUR OWN BENEFIT, MAKE SURE YOU DID RAISE

21   IT BEFORE.

22         **MR. REINES:**  OKAY.  WE ARE FILING A JMOL AS WELL, AND

23   WE WILL INCLUDE IT IN THE JMOL SO ANTICIPATE --

24         **THE COURT:**  I AM GOING TO DO THE INSTRUCTIONS

25   TONIGHT, SO....

1          **MR. REINES:**  I DON'T KNOW WHAT TO SAY.

2          **THE COURT:**  FOR YOUR OWN BENEFIT, YOU NEED TO MAKE

3    SURE YOU RAISED IT BEFORE.

4          **MR. REINES:**  I WOULDN'T THINK IT WOULD BE WAIVED.

5    THE FACT THAT THERE WAS A COMPLETELY -- THE COURT ELIMINATED

6    AN ENTIRE OPINION BASED ON OUR ORIGINAL IN LIMINE.  SO THE

7    FACT THAT WE DIDN'T BRING EVERY POSSIBLE ARGUMENT TO THAT IN

8    LIMINE AND WE PREVAIL TOTALLY, THAT SHOULDN'T BE DEEMED A

9    WAIVER.  THAT'S THE FIRST POINT.

10         THE SECOND POINT IS, WE HAVE A JMOL ABILITY UNDER RULE

11   50(A) TO PRESENT OUR JMOL POSITION BEFORE EVIDENCE CLOSES AND

12   THEN SUBSEQUENTLY UNTIL THE JURY GETS THE ISSUE.  WE WILL BE

13   PRESENTING THIS IN THAT DOCUMENT, TOO.

14         **THE COURT:**  OKAY.

15         **MR. REINES:**  I DON'T SEE HOW THERE IS A WAIVER.

16         **THE COURT:**  OKAY.  WELL, I THINK THAT'S ALL I HAVE

17   EXCEPT I HAVEN'T YET FOUND THAT CLAIM CONSTRUCTION THAT GOT

18   DROPPED OFF SOMEHOW, BUT I WILL FIND IT.

19         **MS. GLAUSER:**  I PUT IT IN OUR OBJECTIONS, WHICH I'M

20   HOPING TO FILE VERY SHORTLY AFTER WE LEAVE.  SO AT LEAST THE

21   LANGUAGE WILL BE THERE IN THE EVENT THAT YOUR HONOR DOESN'T

22   FIND IT BEFORE THEN.

23         **THE COURT:**  OKAY.

24         **MR. PRICE:**  FOR THE RECORD, YOUR HONOR, YOUR RULING

25   WAS IN DOCKET 663.

1        **THE COURT:**  THEN I WAS GOING TO ADD A SENTENCE FROM

2   THE SUMMARY JUDGMENT OPINION ON SOMETHING.  WAS IT TOKEN?

3        **MS. GLAUSER:**  I BELIEVE THAT IT'S ALREADY BEEN ADDED

4   ON PAGE 31.

5        **THE COURT:**  TOKEN WE ADDED, BUT THERE WAS ANOTHER

6   ONE -- OH, ATTEMPTED TRANSMISSION.  WE WERE GOING TO ADD A

7   SENTENCE FROM THE SUMMARY JUDGMENT ORDER TO THE "BASED ON A

8   RESULT OF THE ATTEMPTED TRANSMISSION".  AND I THINK -- WHO WAS

9   IT THAT DIDN'T LIKE THIS ONE?

10        **MR. DINOVO:**  IT'S NOT THAT WE DIDN'T LIKE IT, YOUR

11   HONOR, WE JUST WANTED TO MAKE IT CLEAR, WHICH I THINK THE

12   ORDER DOES, IT WAS A CLAIM 32 TERM AND NOT A CLAIM 45.

13        **THE COURT:**  NO, BUT THERE WAS -- DO YOU REMEMBER,

14   MR. REINES?  I THINK IT WAS A PAGE AND LINE THAT MAYBE

15   MS. MEHTA CAME UP WITH FROM THE CLAIM CONSTRUCTION ORDER?

16        **MR. REINES:**  YES.  I'M SORRY.  I'M TRYING TO --

17        **THE COURT:**  DO YOU BY CHANCE HAVE IT AROUND ANYWHERE?

18        **MR. REINES:**  YES, I DO, YOUR HONOR.

19     IT IS THE CLAIM CONSTRUCTION ORDER AT 13, LINES 4 THROUGH

20   7.  THIS IS THE WITHOUT WAITING FOR RESPONSE FROM THE SERVER,

21   I BELIEVE.

22        **THE COURT:**  SO I WILL ADD THAT IN.

23     OKAY.  ANYTHING ELSE?

24        **MS. GLAUSER:**  WE HAD TWO OTHER, I THINK, WHAT SHOULD

25   BE RELATIVELY SMALL ISSUES.

1    THE FIRST WAS ON THE DAMAGES PORTION.  I'M TRYING TO REFER

2    TO IT IN YOUR HONOR'S REVISED INSTRUCTIONS.  SO ONE MOMENT IF

3    I CAN JUST TURN TO THAT.

4        UNDER THE DAMAGES BURDEN OF PROOF SECTION, WHICH APPEARS

5    IN YOUR REVISED INSTRUCTIONS ON PAGE 18, WE THOUGHT THAT IT

6    SEEMED A LITTLE OUT OF THE BLUE TO HAVE THE ACCUSED PRODUCTS

7    SPECIFICATION ON THE VERDICT FORM WITHOUT AT LEAST HAVING IT

8    IN ONE PLACE IN THE JURY INSTRUCTIONS.

9        SO WE THOUGHT THAT THE RATIONAL PLACE TO PERHAPS INSERT

10   THAT WOULD BE AT THE END OF THE FIRST FULL PARAGRAPH ON

11   PAGE 18.  SO THAT THE SENTENCE CURRENTLY READS:  IF YOU FIND

12   THAT ADOBE INFRINGED ANY VALID AND ASSERTED CLAIM OF DIGITAL

13   REG'S PATENTS, YOU MUST THEN DETERMINE THE AMOUNT OF MONEY

14   DAMAGES TO BE AWARDED TO DIGITAL REG TO COMPENSATE IT FOR THE

15   INFRINGEMENT.

16       AND THEN IT WOULD BE TO ADD, "RELATING TO THE ACCUSED

17   PRODUCTS".

18       AND I THINK EVEN DOING IT IN THAT ONE SPOT WOULD CLARIFY

19   FOR THE JURY WHY IT IS THAT ON THE VERDICT FORM WHEN THEY ARE

20   LOOKING AT THE ROYALTY PROVISION THAT IT SAYS "FOR THE ACCUSED

21   PRODUCTS".

22           **THE COURT:**  IS THAT ALL RIGHT WITH YOU?

23           **MR. REINES:**  I JUST THINK IT'S CLUTTER.  IF THE COURT

24   WANTS TO PUT THOSE CHANGES IN ALL THOSE PLACES, THAT'S FINE.

25   I DON'T SEE HOW IT ADDS ANYTHING.  IT JUST SEEMS CLUTTERING.

1              **THE COURT:**  IT WAS THE ONE PLACE.

2              **MS. GLAUSER:**  IT'S FIVE WORDS IN THE ONE PLACE.

3              **THE COURT:**  HOW ABOUT YOU MUST THEN DETERMINE THE

4    AMOUNT OF MONEY DAMAGES TO BE AWARDED TO DIGITAL REG TO

5    COMPENSATE IT FOR THE INFRINGEMENT BY THE ACCUSED PRODUCTS?

6              **MS. GLAUSER:**  IT'S AFTER --

7              **THE COURT:**  BY ADOBE'S ACCUSED PRODUCTS?

8       WHAT WERE YOU SUGGESTING?

9              **MS. GLAUSER:**  THE LANGUAGE THAT I HAD JUST SAID

10   "RELATING TO THE ACCUSED PRODUCTS" AND ONLY BECAUSE THE

11   INFRINGER WOULD BE THE ACTOR USING IT, NOT THE PRODUCT.

12      I GUESS WE CAN SAY "FOR USE OF THE ACCUSED PRODUCTS OR FOR

13   THE ACCUSED PRODUCTS.

14             **THE COURT:**  WELL, IT'S THE PRODUCTS THAT INFRINGE,

15   RIGHT?  OR BY -- COMPENSATE FOR INFRINGEMENT BY THE USE OF

16   ADOBE'S ACCUSED PRODUCTS?

17             **MS. GLAUSER:**  THAT WOULD WORK.

18             **THE COURT:**  OKAY.

19             **MS. GLAUSER:**  THEN I HAD -- I THINK THE ONLY -- THE

20   LAST ONE WE HAD IS IN THE INDUCING INFRINGEMENT SECTION, IN

21   THE JOINT PROPOSED INSTRUCTIONS THAT WE SUBMITTED, THE PARTIES

22   HAD AGREED WITHOUT AN OBJECTION TO INCLUDING A SENTENCE COMING

23   FROM THE SUPREME COURT'S DECISION IN GLOBAL TECH APPLIANCES

24   VERSUS SEB, STATING THAT THE QUOTE-UNQUOTE "KNOWLEDGE" AND

25   QUOTE-UNQUOTE "AWARENESS" REQUIREMENTS FOR INDUCEMENT CAN BE

1    SATISFIED BY SHOWING ADOBE SHOWED DELIBERATE DISREGARD OR WAS

2    WILLFULLY BLIND, AND THAT WOULD BE IN THE INDUCING

3    INFRINGEMENT SECTION IMMEDIATELY AFTER THE BULLETS THAT YOU

4    CURRENTLY HAVE LISTED IN THE INSTRUCTIONS.

5       AND THAT LANGUAGE IS DIRECTLY FROM THE SUPREME COURT'S

6    DECISION REGARDING THE STANDARDS FOR WILLFUL INFRINGEMENT.

7          **MR. REINES:**  YOUR HONOR, RIGHT BELOW THAT IT STATES

8    INTENTIONAL NEGLECT OF THE ISSUE, I FORGET THE EXACT LANGUAGE

9    THERE, SO IT'S REDUNDANT OF THAT.

10         **THE COURT:**  I AM NOT FOLLOWING YOU.  WHERE -- THIS IS

11   UNDER WILLFUL INFRINGEMENT?

12         **MS. GLAUSER:**  NO, I'M SORRY, YOUR HONOR, IT'S UNDER

13   THE INDUCING INFRINGEMENT SECTION.

14           **THE COURT:**  INDUCING INFRINGEMENT.

15         **MS. GLAUSER:**  YOU HAVE THE FOUR BULLET POINTS?

16         **THE COURT:**  YEAH.

17         **MS. GLAUSER:**  IN THE PROPOSED JURY INSTRUCTIONS TO

18   WHICH ADOBE DIDN'T OBJECT FOR THIS SENTENCE, IMMEDIATELY AFTER

19   THAT FOURTH BULLET POINT THAT SAYS, NOT HAD A GOOD FAITH

20   BELIEF THAT THE PATENT WAS INVALID.

21      THE SENTENCE THAT THE PARTIES HAD AGREED UPON WAS THE

22   "KNOWLEDGE" AND "AWARENESS" REQUIREMENTS FOR INDUCEMENT CAN BE

23   SATISFIED BY SHOWING ADOBE SHOWED DELIBERATE DISREGARD OR WAS

24   WILLFULLY BLIND.  AND THAT'S THE INDUCING INFRINGEMENT

25   STANDARD SET FORTH IN THE SUPREME COURT'S DECISION IN GLOBAL

1    TECH APPLIANCES.

2             MR. REINES:  THAT'S ALREADY COVERED BY LINE 26, "IT

3    TOOK INTENTIONAL ACTS TO AVOID LEARNING THE TRUTH".  IT'S THE

4    SAME THING.

5             THE COURT:  OKAY.  I WILL TAKE A LOOK.  IS ONE OF

6    THESE THE NINTH CIRCUIT INSTRUCTION?

7             MR. REINES:  I DON'T KNOW THE PROGENY OF THE ONE

8    THAT'S PRESENT.  I ASSUME IT'S THE NORTHERN DISTRICT OF

9    CALIFORNIA.  I MEAN, THE LINGUISTIC FORMULATION I DON'T THINK

10   MAKES A BIG DEAL.  I ATTEMPTED TO PERSUADE COUNSEL OF THAT,

11   BUT PUTTING IT IN TWICE DOESN'T MAKE SENSE.

12            THE COURT:  OKAY.

13            MS. GLAUSER:  I THINK THEN SUBJECT TO THE FILING THAT

14   WILL SET FORTH THE LUCENT LANGUAGE AND THE REQUIREMENT THAT

15   THE PRIOR ART NOT BE KEPT A SECRET.

16            THE COURT:  BE SURE YOU PUT EXACTLY THE SENTENCE YOU

17   WANT IN EXACTLY WHERE YOU WANT IT TO GO.

18            MS. GLAUSER:  THAT'S HOW IT IS DRAFTED, YOUR HONOR.

19            THE COURT:  AND THE CITE FOR IT.

20            MS. GLAUSER:  THAT'S HOW IT IS DRAFTED.

21            THE COURT:  OTHER THAN THAT, YOU HAVE NO PROBLEMS?

22            MS. GLAUSER:  SUBJECT TO OUR FILING OUR OWN RULE

23   50(A) MOTION, THEN, NO, I THINK WE HAVE WORKED OUT THE ISSUES.

24            THE COURT:  OKAY.  DO YOU HAVE ANY PROBLEMS?

25            MR. REINES:  I HAVE THREE ISSUES, YOUR HONOR.

1          **THE COURT:**  OKAY.

2          **MR. REINES:**  ONE IS ON THE SECRET, THAT REFERS TO

3    PUBLIC USE.  THEY KEEP SAYING THAT.  THE COURT ASKED US TO

4    ELIMINATE OUR PUBLIC USE DEFENSE.  WE DID SO.  THAT WAS THE

5    FIRST PRONG.  ALL WE HAVE IS PATENTS AND PATENT APPLICATIONS.

6    SO --

7          **THE COURT:**  THAT'S WHERE THE SECRET THING IS AT?

8          **MR. REINES:**  NO.  I DON'T THINK SO.  BUT IF WE ARE

9    REMOVING THE PUBLIC USE DEFENSE, WHY WOULD SECRET STAY IN?

10         I DON'T WANT TO IN A BIG DEBATE ABOUT THAT BECAUSE WE HAVE

11   THE $1.7 BILLION ISSUE I WOULD LIKE TO ADDRESS NEXT.

12         SO GIVEN THE SUGGESTION THAT THERE WAS POSSIBLY ANY

13   NONPRESERVATION, THE SEQUENCE OF EVENTS WAS THAT THEIR EXPERT,

14   MR. PARR, NEVER DESCRIBES WHERE HE GETS THE BASE FROM.  HE

15   JUST SAYS, I CONSIDER ALL THE PRODUCTS ON A SPREADSHEET.

16         THEN HE SAYS, I RELY ON DEVANBU FOR WHAT THE THEORY IS.

17   DEVANBU NEVER SAYS WHAT IS INFRINGING IN USAGE OR WHAT'S BEING

18   INCLUDED IN THOSE NUMBERS, SO WE HAVE NO WAY OF NOTHING.

19         WE ATTACK THE PARR REPORT ON ALL THE PROBLEMS THAT IT HAD

20   AND SUCCESSFULLY KNOCKED THAT OUT.  AMT GETS KNOCKED OUT AT

21   THE SAME TIME.

22         THEN THEY COME BACK WITH A NEW REPORT AND KEEP IN --

23         **THE COURT:**  YOU'RE TALKING ABOUT THE SECOND

24   SUPPLEMENTAL OR THE ONE THAT I ALLOWED AFTER I KNOCKED OUT THE

25   FIRST ONE?

1    FIRST THEY FILED ONE, THEN THEY FILED A SECOND ONE WITHOUT

2    PERMISSION.  THEN I KNOCKED OUT THE FIRST ONE, THE SECOND ONE

3    WAS MOOT.  I LET THEM DO WHAT I WOULD CALL A THIRD ONE, AND

4    THEN YOU ATTACKED THAT ONE.  SO WHICH ONE ARE YOU TALKING

5    ABOUT RIGHT NOW?

6        **MR. REINES:**  TALKING ABOUT THE RENEWED MOTION AGAINST

7    THE THIRD SUPPLEMENTAL, THE ONE THAT YOU ENDED UP PERMITTING

8    IN.

9        AT THAT POINT WE ARGUED -- AND THIS MAY ACTUALLY RING A

10   BELL.  I KNOW YOU HAVE SO MUCH ON YOUR PLATE, BUT THIS MAY

11   RING A BELL, HIS ARGUMENT WAS, WAIT, AMT IS REMOVED AND THE

12   BASE IS STILL 2.1 BILLION?  WE THOUGHT THE CASE SHRUNK TO

13   NOTHING AT THAT POINT IN TIME BECAUSE WE DIDN'T HAVE ANY

14   ANALYSIS FROM THEM TO SAY WHAT THEY WERE ACCUSING OR NOT, SO

15   WE ASSUMED IT WAS ON AMT, WHICH IS WHAT IT WAS.

16       THEY WERE SMART IN HOW THEY DID IT, WHICH WAS THAT IT WAS

17   COMPLETELY INVISIBLE WHAT THE THEORY IS AS TO WHAT PRODUCTS

18   AND WHAT INFRINGEMENT THEORIES JUSTIFIED THE BASE.

19       WHEN WE SAW THAT, WE BROUGHT A MOTION.  IT'S EXHIBIT --

20   EXCUSE ME, DOCUMENT NUMBER 639, OUR SECOND GROUND STARTING ON

21   PAGE 4 AND GOING THROUGH PAGE 6, WHICH I RECALL WRITING

22   PROBABLY OVERNIGHT.  I THINK IT WAS WITHIN -- LESS THAN 24

23   HOURS.

24       AND THE ARGUMENTS WE MAKE ARE HOW COULD THEY BE SEEKING

25   $2 BILLION -- REALLY $1.7 BILLION OF ACROBAT PRO REVENUE WHEN

1    THERE'S ONLY $30 MILLION WORTH OF LIVECYCLE SALES TOTAL.

2    THERE'S NO TIE IN BETWEEN ONE AND THE OTHER.

3        NOT ONLY THAT, THE REAL POINT OF THE MOTION IS PARR NEVER

4    SAYS WHERE HE GETS THE NUMBERS.  HE JUST -- HE JUST SAYS

5    DEVANBU GETS ME THE INFORMATION AS TO WHAT INFRINGEMENT

6    THEORY'S TIED TO WHICH REVENUE, AND OF COURSE DEVANBU DOESN'T

7    DO THAT AT ALL.

8        **THE COURT:**  WELL, HE HAD A CHART OF A BUNCH OF

9    PRODUCTS AND HOW MANY WERE SOLD OF EACH TYPE OF PRODUCT.

10       **MR. REINES:**  RIGHT.  HE DOESN'T KNOW -- HE'S NOT

11   PURPORTING TO DO ANYTHING TO TIE THAT TO ANY INFRINGEMENT.

12   HE'S ASSUMING THAT'S ALL INFRINGING.  THAT'S ALL PARR WILL

13   EVER SAY.

14       THEN WHEN YOU ASK HIM, WELL, HOW DO YOU JUSTIFY ALL THIS?

15   HE SAYS I'M RELYING ON DEVANBU.  THEN WE GAVE YOU THE EXAMPLE,

16   WHICH WAS A GOOD ONE, OF THE FLASH VIDEO WHICH WAS A PRODUCT

17   SOLD SINCE 2005.  AND THE FLASH ENABLEMENT OF ACTUAL DRM

18   DIDN'T COME ONLINE UNTIL 2008.  AND HE'S INCLUDING 2005 TO

19   2008 SALES EVEN THOUGH THE DRM WASN'T EVEN AVAILABLE UNTIL

20   2008.  THAT'S OBVIOUSLY OUTRAGEOUS, BUT THAT'S WHAT'S GONE ON

21   HERE.

22       SO BECAUSE THERE IS NO ONE TYING THE BASE TO THE

23   INFRINGEMENT THEORY BECAUSE IT'S KIND OF LIKE THIS.  SO AS

24   SOON AS WE RECOGNIZE THAT, WE SQUARELY PRESENTED THAT IN THIS

25   DOCUMENT DILIGENTLY AND ON TIME, WITHIN 24 HOURS.  THE COURT

1    SAID, AND I RESPECTFULLY -- I ADMIRE MANY OF YOUR RULINGS IN

2    THIS CASE.  THIS ONE -- NO, IT'S TRUE.

3         **THE COURT:**  THIS ONE NOT TOO MUCH?

4         **MR. REINES:**  THIS ONE I HAD AN ISSUE WITH, WHICH I

5    RAISED WITH THE COURT RESPECTFULLY, WHICH WAS THE COURT SAID,

6    WELL, YOU SHOULD HAVE BOUGHT THAT EARLIER.  TO WHICH WE SAID,

7    BROUGHT IT EARLIER?  I MEAN, AMT WASN'T OUT OF THE CASE.  JUST

8    BECAUSE YOU CAN FIND THREE REASONS --

9         **THE COURT:**  WHY DO YOU SAY AMT WASN'T OUT OF THE

10   CASE?  IT WAS YOUR THEORY THAT JUDGE WESTMORE THREW AMT OUT OF

11   THE CASE MONTHS AGO IN THE CONTEXT OF A DISCOVERY RULING.

12        **MR. REINES:**  WE FILED LIMINES AND WE HAD A SET TIME

13   TO DO IT BY.  AND WE FILED PARALLEL LIMINES AGAINST PARR AND

14   AMT.  AND WHEN THE COURT ISSUED THE RULING ELIMINATING THE

15   PARR REPORT IN TOTAL, THE COURT ALSO SAID AMT IS OUT.

16        SO AMT -- YES, WE COULD HAVE SPECULATED THAT AMT WAS OUT.

17   THE COURT HAS LIMITED AMOUNT OF TIME.  WE HAVE A LIMITED

18   AMOUNT OF PAGES FOR OUR IN LIMINE.

19        I JUST THINK ANY SUGGESTION OF ANY KIND OF WAIVER, GIVEN

20   THE DILIGENCE THAT WE HAVE HAD, IS NOT -- TROUBLES ME.  IF I

21   HAVE OVERREACTED, IT'S THAT, AND I HAVEN'T EATEN YET TO TODAY.

22        SO I THINK THE POINT I WANT TO MAKE IS THAT AT THE

23   EARLIEST REASONABLE MOMENT WE RAISED THIS IN THREE PAGES THAT

24   I WROTE OVERNIGHT, AND IT WAS REJECTED ON THE GROUNDS THAT WE

25   SHOULD HAVE BROUGHT IT AGAINST THE PARR REPORT ORIGINALLY WHEN

1   AMT WAS STILL IN THE CASE, AT LEAST NOMINALLY, AND THERE WAS

2   NO WAY TO KNOW WHAT HE WAS RELYING ON, ONE FOR THE OTHER.

3       WE -- I WAS ACTUALLY A LITTLE IMPRESSED BY MR. DINOVO AND

4   HIS TEAM THAT THEY CAME UP WITH THIS LIVECYCLE BECAUSE WITHOUT

5   WAIVING ANYTHING, THE ADOBE TEAM THOUGHT WHEN AMT CAME OUT,

6   THAT THE ACROBAT PRO WAS GOING TO COME OUT BECAUSE THIS IS

7   SUCH A FRINGE THEORY.

8           **MR. PRICE:**  YOUR HONOR, MAY I RESPOND?

9           **THE COURT:**  YES.  DID YOU RESPOND IN WRITING?  IS

10  THERE SOMETHING I CAN GO LOOK AT?

11          **MR. PRICE:**  WE RESPONDED TO THE WAIVER ISSUE IN

12  WRITING THAT MR. PARR'S REPORT -- THE ALM ISSUE WAS ADDRESSED

13  IN JANUARY.  AND JUDGE WESTMORE RULED, IT DIDN'T GO WELL FOR

14  US.  THEY BROUGHT THE MOTION IN LIMINE I GUESS AS A

15  PROPHYLACTIC THING SO WE WOULDN'T TALK ABOUT HOW ALM ACTUALLY

16  CONTINUED TO BE USED TO COUNTER THE ARGUMENTS THEY ACTUALLY

17  DID MAKE THAT, WE DIDN'T LIKE ALM, SO TOOK IT OUT OF OUR

18  PRODUCTS, IT WAS A FAILURE, AND WE KNEW IT HADN'T BEEN TAKEN

19  ALL THE WAY OUT.

20      SO, IN OUR MINDS, ALM WAS OUT OF THE CASE AS OF JANUARY,

21  OR AT LEAST ADOBE'S MIND IT WAS.  THEY THOUGHT IT WAS OUT.  SO

22  THEY SHOULD HAVE RAISED IT IN THE INITIAL MOTION IN LIMINE.

23  THEY CHOSE NOT TO DO THAT.

24      SUBSTANTIVELY, WE HAVE SHOWN CUSTOMER USE.  WE SHOWED

25  CUSTOMER USE THROUGH DR. DEVANBU WHO TALKED ABOUT HOW EVERY

1    ONE OF THESE ACROBAT PRO PRODUCTS HAS EMBEDDED SOFTWARE WITHIN

2    IT THAT CAN BE ENACTED TO INTERACT AND DO LIVECYCLE

3    FUNCTIONING.

4        WE GOT TESTIMONY FROM MR. HERBACH ABOUT CUSTOMERS USING

5    IT.  AND ALSO, ADDITIONALLY, WE FOUND ON ADOBE'S WEBSITE, YOU

6    WILL RECALL THOSE BUTTONS THAT TALK ABOUT THE MOST COMMONLY

7    USED FEATURES, AND THAT LEADS YOU TO LIVECYCLE AS WELL.

8        **THE COURT:**  FIGURE OUT.  WHAT DID DEVANBU SAY IT

9    WOULD TAKE FOR A PURCHASER OF ADOBE WHO DIDN'T PURCHASE

10   LIVECYCLE TO ENABLE LIVECYCLE?

11       **MR. REINES:**  YOUR HONOR, HE TESTIFIED -- HE DIDN'T

12   SAY THAT IT WAS INFRINGING, FIRST OF ALL.

13       SECOND OF ALL, I HAVE A PROBLEM WITH THE ARGUMENT THAT'S

14   BEING MADE.  WHEN WE FILED OUR MIL NUMBER 3 AGAINST AMT, THE

15   RESPONSE OF THEIR TEAM WAS THAT AMT DID STILL INFRINGE.

16       IN FACT, MR. DINOVO WAS PRETTY EXERCISED BECAUSE THAT WAS

17   THE KEY TO HIS DAMAGES BASE.  AND SPECIFICALLY, PAGE 13,

18   LINE 8, THEY -- THEY SAY DIGITAL REG MARSHALED SUFFICIENT

19   EVIDENCE REGARDING AMT TO MEET ITS BURDEN AT TRIAL, WHICH

20   MEANS THAT THE REPRESENTATION THAT EVERYBODY THOUGHT IT WAS

21   OUT LAST JANUARY IS NOT PROPER.

22       THEY WERE FIGHTING HAMMER AND TONG TO KEEP AMT IN THE CASE

23   UP AND THROUGH THE PRETRIAL CONFERENCE UNTIL THE COURT

24   RESOLVED MIL NUMBER 3.  THAT SUGGESTION IS NOT A FAIR

25   SUGGESTION TO BE MADE IN THIS COURT.  TO THE CONTRARY.

1      ON THE MERITS, IN THEIR RESPONSE, I AM -- THE COURT WANTS

2   TO KNOW WHAT IT'S GOING TO SEE WHEN IT LOOKS TO THEIR

3   OPPOSITION --

4          **THE COURT:**  WHAT I REALLY WANT TO KNOW IS WHAT IT

5   WOULD TAKE FOR A PURCHASER OF ACROBAT TO ENABLE LIVECYCLE IF

6   THE PERSON HAD NOT PURCHASED LIVECYCLE.

7          **MR. REINES:**  THEY HAVE TO HAVE A LIVECYCLE SERVER AND

8   THEN THEY HAVE TO BE REGISTERED WITH THAT LIVECYCLE SERVER.

9          **THE COURT:**  WHAT DO YOU MEAN THEY HAVE TO HAVE A

10  LIVECYCLE SERVER?  THEY HAVE TO PURCHASE A COMPUTER FROM

11  ADOBE?  OR PURCHASE SOME SOFTWARE TO PUT ON THEIR SERVER?

12  WHAT DOES IT MEAN?

13         **MR. REINES:**  THERE HAS TO BE ANOTHER SERVER.  I DON'T

14  BELIEVE ADOBE SELLS THE HARDWARE.  I ASSUME ADOBE SELLS THE

15  SOFTWARE.  I ASSUME IT'S SORT OF A COMPLEX TRANSACTION --

16         **THE COURT:**  SO IT'S SOME ADDITIONAL SOFTWARE THAT A

17  PERSON WOULD HAVE TO BUY FROM ADOBE.

18         **MR. REINES:**  YOU HAVE TO HAVE A SERVER --

19         **THE COURT:**  ANYBODY CAN BUY A SERVER, BUT WHAT DO YOU

20  HAVE TO BUY FROM ADOBE?

21      I'M ASKING MR. REINES.

22         **MR. DINOVO:**  YES, YOUR HONOR.

23         **MR. REINES:**  THERE HAS TO BE A LIVECYCLE SERVER.  I

24  DON'T KNOW WHO BUYS IT OR HOW IT IS PURCHASED.  THERE HAS TO

25  BE -- MR. HERBACH DESCRIBED THIS.  THERE'S A PACKAGE THAT YOU

1    HAVE TO HAVE AND YOU HAVE TO BE REGISTERED WITH THAT SERVER.

2         **THE COURT:**  AND IS THERE ANY EVIDENCE OF HOW MANY

3    PEOPLE WHO HAD ACROBAT ALSO HAD LIVECYCLE?

4         **MR. REINES:**  THAT WAS THE EVIDENCE FROM MR. HERBACH

5    THAT THERE ARE A FEW HUNDRED, I BELIEVE, IS THE PRECISE

6    TESTIMONY.  I SHOULDN'T SAY "PRECISE", BUT WAS A FEW HUNDRED

7    THAT YOU'VE HEARD ABOUT.  IT'S $30 MILLION IN REVENUE.  WE PUT

8    THAT IN OUR MOTION THAT HAVE THAT CAPABILITY THAT ARE LIKE

9    ELEMENTS OF THE U.S. MILITARY ARE REALLY HIGH CRYPT --

10   CRYPTOGRAPHICALLY SENSITIVE ORGANIZATIONS.

11        **THE COURT:**  30 MILLION WHAT?

12        **MR. REINES:**  OF -- OF -- I DON'T KNOW IF THE HARDWARE

13   COMES WITH THE SOFTWARE PACKAGE, BUT OF WHAT THEY CALL THE

14   LIVECYCLE SERVER.

15        **THE COURT:**  $30 MILLION WORTH OF --

16        **MR. REINES:**  IN TEN YEARS.

17        **THE COURT:**  $30 MILLION WORTH OF LIVECYCLE WHATEVER

18   HAS BEEN SOLD IN TEN YEARS?

19        **MR. REINES:**  RIGHT.

20        **THE COURT:**  WHAT IS YOUR VIEW OF WHAT THE EVIDENCE

21   SHOWS ABOUT HOW ONE WHO PURCHASED AN ADOBE PRODUCT -- ACROBAT

22   PRODUCT COULD ENABLE THEIR LIVECYCLE USAGE?

23      WHAT WOULD THEY HAVE TO DO?

24        **MR. DINOVO:**  SO THEY JUST HAVE TO CONFIGURE ACROBAT

25   PRO TO TALK TO SOME OTHER MACHINE.

1          THE COURT:  HOW DO THEY CONFIGURE IT?  DO YOU HAVE TO

2     HAVE THE SOURCE CODE, OR WHAT?

3          MR. DINOVO:  NO, NO.  THERE'S A HELP PAGE THAT TALKS

4     ABOUT HOW -- YOU WANT TO DIRECT IT TO A PARTICULAR COMPUTER.

5     AS SIMPLE AS ENTERING A URL.  TELL ME WHICH COMPUTER TO TALK

6     TO.

7          AND SO EVERY COPY OF ACROBAT PRO, THE TESTIMONY HAS A

8     CODE -- HAS THIS CODE IN IT, AND EVERY COPY HAS THE CAPABILITY

9     OF DOING THIS.

10         AND THEY KEEP SAYING TEENY TINY OR HUNDREDS, BUT WE ARE

11    TALKING ABOUT HUNDREDS OF ORGANIZATIONS.  THE ONE MR. HERBACH

12    MENTIONED ON THE STAND WAS THE U.S. MILITARY.  SO ALTHOUGH THE

13    SERVER CODE ONLY HAS GENERATED $30 MILLION, THE CLIENT CODE,

14    SUCH AS AN ACROBAT PRO HAS GENERATED A MUCH LARGER NUMBER.  SO

15    THAT LIVECYCLE CODE, IT IS UNDISPUTED EVIDENCE, IS PRESENT IN

16    ACROBAT PRO.  IT INCLUDES A LOT MORE --

17         THE COURT:  YOU HAVE TO BUY LIVECYCLE CODE FOR A

18    SERVER IN ORDER TO USE IT.

19         MR. DINOVO:  NO.  YOU --

20         THE COURT:  IF I GO OUT AND BUY ACROBAT PRO AND I

21    DON'T BUY LIVECYCLE, I WON'T BE ABLE TO USE LIVECYCLE, I

22    GATHER.

23         MR. REINES:  THAT'S TRUE.

24         MR. DINOVO:  NO.  YOU WOULD HAVE TO BE PRIVY TO A

25    LIVECYCLE SERVER AT A ORGANIZATION.  SO IT MAY BE YOU ARE A

```
 1   CONSULTANT FOR THAT GROUP.  CONSULTANT SAYS OKAY --

 2          THE COURT:  SOMEBODY BOUGHT LIVECYCLE THEN.

 3          MR. DINOVO:  YES.

 4          THE COURT:  SO I CAN'T JUST GO OUT AND BUY IT AT BEST

 5   BUY, AND PUT IT ON MY COMPUTER AND START USING LIVECYCLE.

 6          MR. DINOVO:  NO.

 7          THE COURT:  SOMEBODY ELSE HAS TO GIVE SOMEBODY SOME

 8   MONEY TO DO SOMETHING MORE.  AND THE EVIDENCE AS TO HOW MANY

 9   PEOPLE GAVE ANYBODY THAT MONEY TO DO THAT IS WHAT?

10          MR. DINOVO:  HUNDREDS OF ORGANIZATIONS HAVE -- THE

11   EVIDENCE, I THINK, IS UNDISPUTED.  HUNDREDS OF ORGANIZATIONS

12   HAVE ESTABLISHED THESE SORTS OF SERVERS.  THE PRECISE NUMBER

13   OF USERS, I DON'T THINK WE HAVE ESTABLISHED, BECAUSE THAT

14   EVIDENCE WASN'T PROVIDED BY ADOBE.

15      THIS IS WHERE THE LUCENT CASE COMES IN --

16          THE COURT:  WHO SAID HUNDREDS OF ORGANIZATIONS?

17          MR. REINES:  MR. HERBACH.  WE ARE IN AGREEMENT WITH

18   THOSE LAST FACTS THAT WERE STATED.

19          THE COURT:  OKAY.  ALL RIGHT.  DO YOU HAVE ANY OTHER

20   PROBLEMS?

21          MR. REINES:  ONE WAS A POINT OF CLARIFICATION, WHICH

22   WAS TO UNDERSTAND WHAT THE CLAIM CONSTRUCTION JUST BECAUSE I

23   DISTRACTED TRYING TO GET THIS INFORMATION FOR THE COURT.

24      IN TERMS OF THE CLARIFICATION OR CURATIVE INSTRUCTION,

25   WHATEVER YOU WANT TO CALL IT THAT MS. MEHTA RAISED, IS THE
```

1    COURT GOING TO INTRODUCE THAT?

2         **THE COURT:**  YES.

3       YOU GAVE ME THE PAGE AND LINE.  I DIDN'T CHECK IT, BUT IF

4    IT'S WHAT MS. MEHTA SAID BEFORE, I WILL ADD IT IN.

5         **MR. REINES:**  THEN THE ONLY OTHER THING THAT WE HAVE,

6    I THINK, IS THE EXHIBITS.  THERE ARE --

7         **THE COURT:**  I AM GOING TO HAVE YOU ALL SIT DOWN WITH

8    MS. RILEY AND GO THROUGH ALL OF THE EXHIBITS AND MAKE SURE

9    EVERYTHING THAT YOU THINK IS IN IS IN, AND EVERYTHING THAT --

10        **THE CLERK:**  THAT PART WE HAVE DONE.  WE ARE ALL IN

11   AGREEMENT AS TO WHAT IS IN EXHIBIT FOR EXHIBIT 4.  THAT IS THE

12   ONE THEY NEED TO GET THE PAGES TOGETHER.

13        **MR. REINES:**  I MEAN JUST WITH A MINUTE, I'M NOT

14   DRAGGING YOU INTO TEDIUM OF EXHIBITS.  WE HAVE THE THREE FILE

15   HISTORY, WHICH IS 4, 503 AND 505 AND THE PARTIES ARE WORKING

16   TOGETHER COOPERATIVELY TO INCLUDE THE OFFICE ACTIONS AND

17   REJECTIONS THAT HAVE BEEN REFERRED TO IN THE COURT, AND IT'S A

18   THIN AMOUNT OF PAGES.  IT'S NOT MUCH.

19      THAT'S ON THE PARTIES TO PUT A STIPULATION IN THAT JUST

20   CLARIFIES THAT.  I DON'T THINK ANYONE IS ANTICIPATING PROBLEMS

21   WITH THAT.

22      THE ONLY ISSUES WE HAVE WITH THAT, AND I THINK AS YOU CAN

23   SEE NICKI -- SORRY FOR -- COUNSEL FOR DIGITAL REG IS GOING TO

24   HAVE THEIRS.

25      WE REALLY HAVE TWO OTHER. ONE IS THE WOLFE PATENT, WHICH

1   WAS REFERRED TO, WHICH IS IMPORTANT FOR THE POINT OF THE

2   CLIENT CENTRIC VERSUS SERVER CENTRIC.  WE WOULD LIKE THAT ONE

3   PATENT PUT INTO EVIDENCE.

4          **THE COURT:**  DID I NOT ALLOW IT?

5          **MR. REINES:**  IT WAS ONE OF THOSE THAT THE COURT TOOK

6   UNDER SUBMISSION AS LET'S OTHER SEE HOW MANY OF THESE YOU HAVE

7   AT THE END BEFORE I START DOING THAT.  SO WE ARE SEEKING

8   PERMISSION FOR THAT.

9          THEN THERE'S THE EXHIBIT 184, WHICH IS THE PROBLEMATIC

10  EXHIBIT THAT THE COURT -- THE COURT EXPRESSED ITS OWN

11  CONCERNS, I EXPRESSED CONCERNS, MAYBE TOO MUCH, BUT IT HAS THE

12  CITES -- IT HAS THE SITESCAPE AND ALL THAT, AND THE LARGE AND

13  LARGER, ALL THAT.  WE WOULD LIKE THAT TO BE STRICKEN FROM

14  EVIDENCE --

15         **THE COURT:**  EITHER THAT OR TAKE THE AMOUNTS OUT AND

16  TAKE THE LAST TWO ITEMS OUT.

17         **MS. GLAUSER:**  WE'VE PREPARED A REVISED ONE THAT I

18  BELIEVE CORRESPONDS TO YOUR HONOR'S INSTRUCTIONS, WHICH IS TO

19  CHANGE THE HEADING.

20         ADOBE HAS ASKED US TO ALSO -- THEY OBJECT TO HAVING

21  SITESCAPE IN THERE AT ALL, BUT I BELIEVE, TO THE EXTENT

22  SITESCAPE IS INCLUDED, HAS REQUESTED THAT WE PUT IN A

23  PARENTHETICAL THAT IT WAS AN OPTION TO LICENSE.

24         AND WE'VE TAKEN OFF THE 2 PERCENT ON INTUIT.  SO IT JUST

25  HAS THE BASE AMOUNT NOW OF THE 350,000.

1          **THE COURT:**  AND TAKE OUT ELECTRONIC ARTS AND

2     SYMANTEC, OR AT LEAST THE AMOUNTS OF THOSE TWO.

3          **MS. GLAUSER:**  THOSE ARE RELEVANT BEYOND JUST THE

4     DAMAGES.  THIS IS SOMETHING THAT WE DISCUSSED FOR THE PRETRIAL

5     HEARING, THE FACT THAT THOSE WERE LICENSED GOES DIRECTLY TO

6     THOSE SECONDARY INDICIA OF NONOBVIOUSNESS.

7          **THE COURT:**  TRUE, BUT NOT THE AMOUNTS.  IT'S

8     PREJUDICIAL.  IT'S CONFUSING.  THEY ARE NOT USED BY THE

9     EXPERTS.  SO EITHER THEY HAVE TO -- EITHER BOTH THOSE LINES

10    HAVE TO GO OUT ALTOGETHER OR THOSE NUMBERS HAVE TO GO OUT.

11         IF YOU WANT, YOU CAN TAKE ALL THE NUMBERS OUT AND JUST USE

12    THE NUMBERS FROM THE DAMAGE CHARTS.  BUT I WON'T HAVE THOSE

13    TWO LICENSES WITH THEIR NUMBERS GOING IN.

14         **MS. GLAUSER:**  OKAY.

15         **THE COURT:**  YOU'RE RIGHT, THE DRM SITESCAPE MUST SAY

16    OPTION TO LICENSE $10,000, OPTION TO LICENSE AT 7 PERCENT AND

17    THE OPTION IS 10,000, OR JUST LEAVE IT OUT ALTOGETHER.

18         I SUGGEST YOU JUST LEAVE OUT THE WHOLE COLUMN OF RATE

19    AMOUNTS.  ALL YOU NEED IS HOW MANY LICENSES THERE WERE.

20         **MR. REINES:**  THAT'S FINE WITH US, YOUR HONOR.

21         **THE COURT:**  YOU GET THE AMOUNTS THAT COME IN TO

22    EVIDENCE THROUGH THE DAMAGES PEOPLE, AND YOU CAN USE THIS

23    EXHIBIT TO SHOW SECONDARY CONSIDERATIONS.

24         THAT'S WHAT I WOULD SUGGEST.  BUT IF YOU WANT AMOUNTS, YOU

25    CAN'T HAVE --

1     **MS. GLAUSER:**  PART OF WHAT WOULD LEAVE THE RECORD

2  INCOMPLETE, DEFENDANTS OFFERED EXHIBIT 695 INTO EVIDENCE, AND

3  I CAN PASS UP THIS COPY IN JUST A MOMENT, BUT IT DOES INCLUDE

4  AMOUNTS OF THE LICENSES THAT PROWSE RELIED ON.

5     **MR. REINES:**  THEY ARE ACCURATE.

6     **MS. GLAUSER:**  THE AMOUNTS LISTED HERE ARE ACCURATE AS

7  WELL.  PART OF WHAT WE NEED IS THE FULL PICTURE THEN OF THE

8  LICENSE AMOUNTS.

9     **MR. REINES:**  INTUIT AND MACROVISION ARE ON THERE.

10     **THE COURT:**  NOT THE TWO THAT WERE NOT ALLOWED TO BE

11  INCLUDED.

12     **MS. GLAUSER:**  UNDERSTOOD, YOUR HONOR.  SO WE CAN TAKE

13  OFF THOSE TWO AMOUNTS AND THEN DO THE OPTION WITH THE

14  INCLUDING THE $10,000 PAYMENT AND A 7 PERCENT IF THE OPTION IS

15  EXERCISED.

16     **THE COURT:**  YES, YOU CAN DO IT THAT WAY IF YOU WANT

17  TO.

18     **MS. GLAUSER:**  OKAY.

19     **MR. REINES:**  YOUR HONOR, I WOULD LIKE TO LOOK AT IT.

20  I HAVE SEEN MULTIPLE VERSIONS --

21     **THE COURT:**  SHOW THEM AS SOON AS YOU CAN.

22     **MS. GLAUSER:**  WILL DO.  I DON'T KNOW IF YOU'RE DONE

23  WITH YOUR --

24     **MR. REINES:**  I'M DONE.

25     **MS. GLAUSER:**  WE HAD A FEW AND I DON'T KNOW HOW YOUR

1    HONOR WOULD LIKE TO HANDLE IT, BUT THERE ARE A FEW EXHIBITS

2    THAT YOU TOOK UNDER SUBMISSION.

3         **THE COURT:**  YOU'VE ALREADY BARGAINED TO IMPASSE WITH

4    THEM ABOUT?

5         **MS. GLAUSER:**  WE HAVE SPOKEN TO THEM ABOUT IT.  MY

6    UNDERSTANDING, AND I WILL LET MR. REINES SPEAK FOR HIMSELF,

7    BUT ADOBE ASKED US ON THE SOURCE CODE TO WAIT UNTIL THE END IN

8    ORDER TO PUT TOGETHER ONE JOINT SOURCE CODE EXHIBIT, WHICH IS

9    WHAT WE DID.

10    WE HAVE NOW PULLED TOGETHER THE PARTICULAR SOURCE CODE

11    PAGES THAT WE BELIEVE WE NEED IN THE APPELLATE RECORD.  WHILE

12    MANY OF THESE ARE BATES LABELED AS SOURCE CODE, THEY ARE NOT,

13    IN FACT, EXCLUSIVELY SOURCE CODE.  I THINK YOU MAY REMEMBER

14    MR. DINOVO BRINGING THIS UP DURING HIS DIRECT EXAMINATION THAT

15    MANY OF THESE ARE JUST DESIGN DOCUMENTS OR SDK'S AND OTHER

16    INTERNAL ADOBE DOCUMENTS.

17    WE HAVE THOSE PAGES.  I BELIEVE ADOBE HAS OBJECTED TO US

18    ENTERING ANY OF THOSE SOURCE CODE PAGES THAT WE EMAILED TO

19    THEM, BUT WE WOULD LIKE TO OFFER THEM INTO EVIDENCE.  TO THE

20    EXTENT THAT WE ARE LACKING IN AGREEMENT, I THINK WE NEED TO

21    READ THOSE PAGES INTO EVIDENCE IN ORDER TO MAKE THE OFFER

22    FORMAL.

23         **MR. REINES:**  YOUR HONOR, THE IDEA THAT WE ARE GIVING

24    SOURCE CODE SNIPPETS TO THE JURY IN BULK, JUST DOESN'T MAKE

25    ANY SENSE.

1           THE COURT:  CAN I SEE THEM?

2           MS. GLAUSER:  DO WE HAVE THEM?

3           THE COURT:  LET ME SEE WHAT IT IS YOU WANT TO PUT IN

4    THAT THEY DON'T WANT TO PUT IN.

5           MS. GLAUSER:  IT'S EXCLUSIVELY THE STUFF THAT

6    MR. DEVANBU TESTIFIED TO DURING HIS DIRECT EXAMINATION.  SO

7    WHEN HE POINTED TO, FOR INSTANCE, A PARTICULAR MODULE THAT

8    CALLED A FUNCTION, AND HE SAID HERE'S THE LINE AND THE SOURCE

9    CODE PAGE THAT IT COMES FROM.

10        SO WE HAVEN'T SOUGHT TO INTRODUCE ALL OF THE SOURCE CODE

11   THAT WE INITIALLY LISTED ON OUR EXHIBIT LIST.  THIS IS LIMITED

12   TO THE PRECISE PAGES THAT INCLUDE THE LINES ABOUT WHICH

13   MR. DEVANBU TESTIFIED.

14        AND WITHOUT THAT, OR AT THE VERY LEAST WITHOUT THE

15   DEMONSTRATIVE THAT CITES TO THOSE SOURCE CODE PAGES AND LINES,

16   THE TRIAL TRANSCRIPT IS INCOMPLETE WITHOUT THE UNDERLYING

17   PHYSICAL EVIDENCE.

18          THE COURT:  I NEED TO KNOW EXACTLY WHAT PIECE OF

19   PAPER WE ARE GOING TO HAND TO THE JURY, WHAT IT LOOKS LIKE.

20   SO IF YOU DON'T HAVE THAT, THEN YOU CAN FILE IT LATER THIS

21   EVENING.

22          MS. GLAUSER:  I DON'T KNOW HOW TO HANDLE IT.  WE CAN

23   SPEAK WITH ADOBE ABOUT IT, BUT WE CAN'T FILE -- I GUESS WE CAN

24   GET YOUR PERMISSION --

25          THE COURT:  PIECES OF PAPER TO HAND THE JURY.

1       **MS. GLAUSER:**  YES, BECAUSE IT IS THE SOURCE CODE,

2   THEY ARE PARTICULARLY SENSITIVE ABOUT US FILING IT.

3       **THE COURT:**  YOU CAN FILE IT UNDER SEAL, BUT THE JURY

4   IS GOING TO SEE IT.

5       **MS. GLAUSER:**  WE BELIEVE THE JURY SHOULD SEE IT.

6   BECAUSE MUCH OF THIS, ALTHOUGH IT'S LABELED AS SOURCE CODE, IS

7   INFORMATION THAT THEY ACTUALLY CAN UNDERSTAND.  THE OTHER

8   PARTS OF IT DIRECTLY SUPPORT MR. -- DR. DEVANBU'S TESTIMONY,

9   AND WE BELIEVE THAT IT WILL BE IMPORTANT FOR THE JURY AND IT

10  WILL BE IMPORTANT TO PRESERVE THE RECORD FOR ANY APPEAL THAT

11  MIGHT BE NECESSARY.

12      **MR. REINES:**  YOUR HONOR, CAN I ADDRESS THAT?

13      **THE COURT:**  YES, BUT I WILL TELL YOU THAT WE'LL NEED

14  TO HAVE, AT THE VERY LEAST, AS SHE SAYS, THE SOURCE CODE THAT

15  WAS SHOWN TO THE JURY IN A DEMONSTRATIVE, IN SOME FORM.

16  WHETHER THAT'S THE DEMONSTRATIVE ITSELF OR A SEPARATE PIECE OF

17  PAPER WITH JUST THOSE LINES OF SOURCE CODE AND SOME SORT OF

18  UNDERSTANDABLE FASHION OR SOMETHING.  SHE HAS A POINT THAT WE

19  HAVE TO HAVE SOMETHING IN THE RECORD BECAUSE IT WAS SHOWN TO

20  THE JURY.

21      **MR. REINES:**  THAT WOULD HAVE SOME WEIGHT IF IT WASN'T

22  THAT MR. -- DR. WICKER SAID HE DIDN'T AGREE -- DIDN'T DISAGREE

23  WITH DR. DEVANBU'S DESCRIPTION OF HOW THE SYSTEMS WORKED AND

24  HOW THE SOURCE CODE APPLIED.

25      **THE COURT:**  WELL, STILL.

1          **MR. REINES:**  OKAY.

2          **THE COURT:**  THE JURY MIGHT BE IMPRESSED BY SEEING THE

3   FANCY WEIRD CODES.

4          **MR. REINES:**  ALL RIGHT.  I OBVIOUSLY MISUNDERSTOOD

5   WHAT THE GROUND RULES WERE FOR WHEN THIS KIND OF INFORMATION

6   GOT SUBMITTED TO THE JURY OR NOT.  SO --

7          **THE COURT:**  I THINK I TOOK IT UNDER SUBMISSION

8   PROBABLY.

9          **MR. REINES:**  RIGHT.

10          **THE COURT:**  NOBODY HAS ASKED ME TO CONSIDER IT, THEN

11   THIS WOULD BE THE ONLY TIME LEFT TO DO SO.

12          **MR. REINES:**  RIGHT.  WHAT I UNDERSTOOD WAS THAT THE

13   COURT WAS SKEPTICAL ABOUT THE IDEA OF SENDING SOURCE CODE TO

14   THE JURY.  SO I WAS PROCEEDING UNDER THE IMPRESSION THAT THAT

15   KIND OF TECHNICAL STUFF WASN'T GOING TO BE SENT ESPECIALLY

16   WHEN IT'S NOT DISPUTED.

17      LOOK, IF IT GOES IN, I DON'T THINK THEY'LL BE ABLE TO READ

18   IT.  IT'S JUST A MATTER OF BEING MORE IN THE RECORD AND IT'S

19   NOT REALLY DISPUTED HOW IT FUNCTIONS AT LEAST --

20          **THE COURT:**  RIGHT.  ASSUMING IT IS GOING TO GO IN,

21   HOW WOULD YOU LIKE IT TO GO IN?  WOULD YOU LIKE IT TO GO IN IN

22   THE FORM OF BEING ON THIS DR. DEVANBU'S DEMONSTRATIVES AS IT

23   WAS SHOWN TO THE JURY?  OR WOULD YOU LIKE IT IN THE FORM OF

24   SEPARATE PIECES OF PAPER THAT HAVE THE VARIOUS THINGS THAT HE

25   HAD ON HIS DEMONSTRATIVES LISTED WITH, I GUESS, A HEADING

1    SAYS, EXCERPTS OF SOURCE CODE OF WHATEVER.  AND, THIRDLY, DO

2    YOU INSIST THAT IT BE FILED -- THAT IT BE MAINTAINED UNDER

3    SEAL?

4         **MR. REINES:**  WITH RESPECT TO HOW IT GOES IN, I THINK

5    WE SHOULD WORK TOGETHER TO JUST PUT IT IN, NOT THE

6    DEMONSTRATIVES, BECAUSE THAT THEN BECOMES THE QUESTION OF ALL

7    THE DEMONSTRATIVES GOING IN OUT OF FAIRNESS.

8         AND I GUESS WHY DON'T WE LOOK AT IT AND WE'LL SEE IF WE

9    THINK IN THE FORM THAT IT'S IN THAT IT CREATES TRADE SECRET

10   ISSUES OR NOT.

11        **THE COURT:**  YOU PREPARE A DOCUMENT THAT SAYS EXCERPTS

12   OF SOURCE CODE OF WHATEVER PATENT AND THEN HAVE ALL THE PIECES

13   OF SOURCE -- ALL THE LINES OF SOURCE CODE THAT WERE INCLUDED

14   ON ANY OF HIS DEMONSTRATIVES, AND SHOW IT TO THEM, AND WE'LL

15   EITHER SUBMIT IT UNDER SEAL OR WE'LL SUBMIT IT NOT UNDER SEAL.

16        ONE WAY OR THE OTHER IT WILL GO TO THE JURY.

17        **MS. GLAUSER:**  WE WILL FOLLOW UP.  WE HAVE SENT THE

18   LIST OF THOSE SOURCE CODE PAGES, SO WE CAN FOLLOW UP WITH THE

19   HEADER THAT YOU ARE REFERRING TO.

20        **THE COURT:**  A PIECE OF PAPER THAT I CAN BE ACTUALLY

21   HAND THEM.

22        **MS. GLAUSER:**  UNDERSTOOD.  THE OTHER EXHIBITS THAT

23   WERE TAKEN UNDER SUBMISSION THAT WE HAVE A FEW PAGES WE WOULD

24   LIKE TO OFFER ARE THE LICENSE AGREEMENTS THAT THE EXPERTS

25   EXPLICITLY DID RELY UPON OR CONSIDER.  AND SO WE HAVE LIMITED

1        PAGES FROM THOSE THAT WE WOULD LIKE TO OFFER.

2                **THE COURT:**  YES.

3                **MS. GLAUSER:**  SO WE CAN READ THOSE INTO THE RECORD OR

4        SUBMIT THEM IN THE PHYSICAL --

5                **THE COURT:**  WE ARE NOT GOING TO READ THEM INTO THE

6        RECORD.  YOU WILL PUT TOGETHER AN EXHIBIT THAT WILL HAVE THE

7        PAGES THAT YOU WANT AND SHOW IT TO COUNSEL, AND THEN GIVE IT

8        TO MS. RILEY AND WE'LL -- THEY WILL BE RECEIVED INTO EVIDENCE.

9                **MR. REINES:**  JUST TO BE CLEAR, YOUR HONOR, BECAUSE I

10       THINK I DIDN'T CLOSE THE LOOP WHEN I SHOULD HAVE, EXHIBIT 679,

11       WHICH IS THE WOLFE PATENT, THAT'S ADMITTED?

12               **THE COURT:**  WHAT'S YOUR PROBLEM WITH THE WOLFE

13       PATENT?

14               **MS. GLAUSER:**  I DON'T THINK WE HAVE A PROBLEM, YOUR

15       HONOR.

16               **THE COURT:**  WE'LL RECEIVE THAT.  DO YOU HAVE A

17       NUMBER?

18               **MR. REINES:**  679.

19               **THE COURT:**  THAT'S RECEIVED.

20               (DEFENDANT'S EXHIBIT 679 RECEIVED IN EVIDENCE)

21               **THE COURT:**  IS THAT IT THEN?

22               **MS. GLAUSER:**  I BELIEVE THAT'S IT.

23               **THE COURT:**  OKAY.  SO, WHAT I'M EXPECTING FROM YOU IS

24       A WRITTEN JMOL FROM EACH OF YOU, AND A COUPLE OF INSTRUCTION

25       PROPOSALS FROM THE PLAINTIFF WITH CITATIONS AND LOCATIONS OF

```
1    WHERE YOU WANT THEM, AND YOU WILL JUST OBJECT TO THEIRS OR DO

2    YOU THINK THERE IS SOMETHING MISSING YET?

3           MR. REINES:  I DON'T THINK THERE'S ANYTHING MISSING

4    OTHER THAN -- I SAID ALL OF THE THINGS I SAID BEFORE, BUT --

5           THE COURT:  SO I'M NOT EXPECTING ANYTHING ELSE FROM

6    YOU --

7           MR. REINES:  IF WE SEE THOSE AND WE HAVE AN ISSUE

8    WITH THEM, WE'LL OBVIOUSLY PUT IN A RESPONSE AND TRY TO KEEP

9    IT CONCISE.

10      THANK YOU VERY MUCH.

11          THE COURT:  IS THAT IT?  THAT'S ALL I WILL BE GETTING

12   FROM ANYBODY?

13          MS. GLAUSER:  I THINK SO.

14          MR. REINES:  BETWEEN NOW AND TOMORROW MORNING?

15          THE COURT:  I WILL DO WHAT I CAN TO GET ANOTHER

16   VERSION OF INSTRUCTIONS TO YOU MAYBE TONIGHT, MORE LIKELY

17   TOMORROW MORNING.  BUT I THINK YOU GENERALLY KNOW WHAT IT'S

18   GOING TO BE.

19      THE VERDICT FORM I THINK IS RESOLVED.

20      WE WILL READ THE INSTRUCTIONS.  WE'LL HAVE CLOSING

21   ARGUMENT FROM THE PLAINTIFF FOR ABOUT HOW LONG?

22          MR. ELLWANGER:  I THINK IN TOTAL IT WILL BE LESS THAN

23   AN HOUR.  WOULD YOU PREFER THAT I SPLIT THAT REBUTTAL TIME IN

24   ADVANCE?

25          MR. REINES:  DO YOU PERMIT REBUTTAL?
```

1          **THE COURT:**  I DO.

2          **MR. ELLWANGER:**  I PREFER PERHAPS 45, 15, OR 50, TEN,

3     SOMETHING LIKE THAT.

4          **MR. REINES:**  WE WERE THINKING 75 MINUTES.

5          **THE COURT:**  DIVIDED BETWEEN YOU AND MS. MEHTA?

6          **MR. REINES:**  THAT'S CORRECT.

7          **THE COURT:**  YOU CAN HAVE UP TO 75 AS WELL.  YOU CAN

8     DIVIDE THEM AS YOU WISH, BUT YOU NEED TO SAVE SOME.  IF YOU

9     USE IT ALL UP, IT'S GONE.

10          **MR. ELLWANGER:**  FAIR ENOUGH.

11          **THE COURT:**  THEN WE'LL -- THEY WILL DELIBERATE AND

12     YOU WILL NEED TO BE ON CALL BOTH TODAY AND TOMORROW.

13          **MR. REINES:**  HOW DO YOU DO THAT?  HOW MANY MINUTES --

14          **THE COURT:**  FIVE.

15          **MR. REINES:**  THANK YOU.

16          **THE COURT:**  OKAY.

17          **MS. GLAUSER:**  THANK YOU.

18          **MR. ELLWANGER:**  THANK YOU.

19               (PROCEEDINGS CONCLUDED AT 4:30 P.M.)

20

21

22

23

24

25

1

2 <u>**CERTIFICATE OF REPORTER**</u>

3      I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE

4 UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY

5 CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

6 RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

7

8

9      DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

10      THURSDAY, SEPTEMBER 4, 2014

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25