VOLUME 8

PAGES 1511 - 1657

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DIGITAL REG OF TEXAS, LLC    )
                             )
          PLAINTIFF,         )    NO. C-12-1971 CW
                             )
  VS.                        )    THURSDAY, SEPTEMBER 4, 2014
                             )
ADOBE SYSTEMS, INC., ET AL.,)    OAKLAND, CALIFORNIA
                             )
          DEFENDANTS.        )    JURY TRIAL
_____)


BEFORE THE HONORABLE CLAUDIA WILKEN, JUDGE

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**FOR PLAINTIFF:**          DINOVO, PRICE, ELLWANGER & HARDY LLP
                            7000 NORTH MOPAC EXPRESSWAY, SUITE 350
                            AUSTIN, TEXAS 78731
                    BY:  ANDREW G. DINOVO, ESQUIRE
                         ADAM G. PRICE, ESQUIRE
                         GREGORY DONAHUE, ESQUIRE
                         JAY D. ELLWANGER, ESQUIRE
                         NICOLE E. GLAUSER, ESQUIRE


                            BARTKO ZANKEL BUNZEL MILLER
                            ONE EMBARCADERO CENTER, SUITE 800
                            SAN FRANCISCO, CALIFORNIA 942111
                    BY:  W. PAUL SCHUCK, ESQUIRE


**ALSO PRESENT:**          MICHAEL FARLEY, COMPANY REPRESENTATIVE

                       (APPEARANCES CONTINUED)

**REPORTED BY:**           DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
                           OFFICIAL COURT REPORTER
          TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

1

2

3

4  **FOR DEFENDANT**          WEILL, GOTSHAL & MANGES, LLP
   **ADOBE SYSTEMS:**         201 REDWOOD SHORES PARKWAY
5                             REDWOOD SHORES, CALIFORNIA 94065
                         BY:  EDWARD R. REINES, ESQUIRE
6                             SONAL N. MEHTA, ESQUIRE
                              BYRON BEEBE, ESQUIRE
7                             ANANT PRADHAN, ESQUIRE

8

9  **ALSO PRESENT:**          PAUL BETLEM, COMPANY REPRESENTATIVE
                              KAREN ROBINSON, IN-HOUSE COUNSEL
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                           I N D E X

 2                                           PAGE    VOL.

 3    CLOSING ARGUMENT BY MR. ELLWANGER       1549     8

 4    CLOSING ARGUMENT BY MS. MEHTA           1584     8

 5    CLOSING ARGUMENT BY MR. REINES          1619     8

 6    REBUTTAL CLOSING ARGUMENT BY MR. ELLWANGER  1635  8

 7

 8    PLAINTIFF'S EXHIBITS          EVD.   VOL.

 9        179.001 - 179.003         1521    8

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | THURSDAY, SEPTEMBER 4, 2014                    8:24 A.M. |

2                          P R O C E E D I N G S

3        (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

4            **THE CLERK:**  REMAIN SEATED.  COME TO ORDER.  COURT IS

5    IN SESSION.

6            **THE COURT:**  GOOD MORNING.  I WILL TELL YOU WHAT I'VE

7    DONE WITH THE INSTRUCTIONS.  YOU HAVE A COPY THERE.  THAT'S

8    ACTUALLY NOT TOTALLY FINAL.  THERE'S A MISTAKE IN THERE, BUT I

9    WILL GO THROUGH AND TELL YOU WHAT I DID, WHERE THERE WERE

10   CHANGES MADE.

11       THE FIRST ONE IS ON PAGE 4.  I ADDED A SENTENCE AT LINE 18

12   TO 20 OR 19 TO 21, I GUESS, THE FALSO IN UNO SENTENCE.

13       PAGE 5, I ADDED THE SENTENCES ABOUT THE COURT REPORTER

14   TAKES CUSTODY OF THE DOCUMENTS IN THE DEPOSITION SECTION AND

15   ALSO A SENTENCE ABOUT THE WITNESS CAN MAKE CORRECTIONS.

16       THEN ON PAGE 7, I FOUND A REFERENCE AT LINE 7 TO

17   "CONTRIBUTED TO", SO I TOOK THAT OUT.

18       AND ON PAGE 9, I JUST REORGANIZED IT A LITTLE BIT TO MAKE

19   IT FLOW BETTER.  AT THE END OF THE GENERAL INFRINGEMENT

20   SECTION, IT STOPS WITH -- WELL, IT GOES TO "CAPABLE OF

21   INFRINGING USE" AND THEN I'M GOING TO ADD A SENTENCE THERE OR

22   REMOVE A SENTENCE UP TO THERE WHICH SAYS, "IN THIS CASE,

23   DIGITAL REG ARGUES THAT ADOBE INFRINGED ITS PATENTS BOTH

24   DIRECTLY AND INDIRECTLY".  THAT'S THE INTRO TO THE NEXT PART

25   WHICH THEN GOES TO DIRECT INFRINGEMENT.  "TO DECIDE", ET

1    CETERA.  THAT PARAGRAPH, THE SENTENCE THAT'S AT THE END OF

2    THAT PARAGRAPH IN YOUR VERSION THAT SENTENCE IS WHAT GETS

3    MOVED TO UP TO THE END OF THE LAST SECTION TO INTRO THE DIRECT

4    VERSUS INDIRECT.  IT JUST FLOWS BETTER THAT WAY.

5        OKAY.  THEN WE HAVE -- THE NEXT SECTION THEN IS INDIRECT

6    INFRINGEMENT AND IT'S GOING TO SAY "INDIRECT INFRINGEMENT:

7    INDUCING INFRINGEMENT" AS THE HEADING.  AND THEN -- THEN WE

8    INTRO THAT WITH THE -- MOVING A SENTENCE THAT WAS SOMEWHERE

9    ELSE BEFORE.  ADOBE ALSO -- "DIGITAL REG ALSO ALLEGES ADOBE

10   INDIRECTLY INFRINGED".  DEFINE INDIRECT INFRINGEMENT.

11       I'M NOT -- THEN I'M GOING TO ADD THE SENTENCE THAT DIGITAL

12   REG WANTS ABOUT WILLFULLY BLIND.

13       AND THEN IN THE WILLFULNESS INSTRUCTION, WHERE WE HAVE NOW

14   ON PAGE 12, LINE 3 TALKING ABOUT THE 125, I SAY, "MR. VENTERS

15   TESTIFIED THAT HE SENT TO ADOBE VENTURES A DOCUMENT ENTITLED

16   'ADOBE VALUE PROPOSITION'.  SUCH A DOCUMENT WAS ADMITTED AS

17   125C, DIFFERENT VERSIONS EXIST", ET CETERA.

18       I'M NOT GOING TO ADD THE SENTENCE THAT DIGITAL REG

19   PROPOSED ABOUT SECRECY, BUT WHAT I AM GOING TO DO -- I LOOKED

20   WHERE THE SECRECY THINGS COME FROM, AND I FOUND THEM.  THEY'RE

21   IN THE FORM INSTRUCTION ABOUT THE DIFFERENT PRONGS OF

22   ANTICIPATION.

23       AND WHERE THEY COME FROM IS 102, AND CASE LAW GLOSSES ON

24   102, WHICH IT MAKE VARIOUS REFERENCES TO BEING ABLE TO FIND

25   DOCUMENTS IN THIS AND THAT.  SO INSTEAD OF STICKING IN THERE

1    SEPARATELY WITHOUT AUTHORITY, I PUT BACK IN ALL OF THE

2    ANTICIPATION POSSIBILITIES THAT MR. REINES RELUCTANTLY AGREED

3    TO TAKE OUT.  I PUT THEM BACK IN WITH THEIR RESPECTIVE SECRECY

4    REQUIREMENTS.

5        SO TO SUM UP, THE SENTENCE THAT DIGITAL REG WANTED, I DID

6    NOT ADD, BUT UNDER ANTICIPATION YOU'LL SEE THE 102 FACTORS

7    WHICH DO HAVE THEIR OWN INTERNAL PUBLICITY REQUIREMENTS.  SO I

8    THINK THAT IS AN ACCURATE STATEMENT OF THE LAW.

9        UNDER OBVIOUSNESS, WE TALKED ABOUT THE CHANGE YESTERDAY

10   THAT I MADE.  AND THAT'S JUST HOW IT IS NOW.  "THE ULTIMATE

11   CONCLUSION OF WHETHER A CLAIM IS OBVIOUS SHOULD BE BASED UPON

12   YOUR DETERMINATION OF SEVERAL FACTUAL DECISIONS", AND THEN WE

13   GO 1 THROUGH 5.  WE TALKED ABOUT THAT YESTERDAY.

14       AND THEN I'M JUST GOING TO LEAVE IN ALL OF THE

15   OBVIOUS/NONOBVIOUS FACTORS.  WE TALKED ABOUT CUTTING SOME OF

16   THEM OUT; I AM JUST GOING TO LEAVE THEM ALL IN.

17       WE TALKED YESTERDAY ABOUT THE DAMAGES, BURDEN OF PROOF,

18   FIRST PARAGRAPH.  AND I USE THIS SENTENCE THAT WE AGREED ON

19   YESTERDAY.  "COMPENSATE IT FOR INFRINGEMENT BY THE USE OF

20   ADOBE'S ACCUSED PRODUCTS."

21       THEN ON THE LUCENT QUESTION, I'M NOT GOING TO GIVE IT IN

22   THE WAY THAT DIGITAL REG ASKED.  HOWEVER, I DID WRITE A

23   SENTENCE STARTING WITH THE PARAGRAPH, "ALTHOUGH" ON PAGE 18 AT

24   LINE 6, WHICH COMES FROM LUCENT AND I THINK IS AN ACCURATE

25   STATEMENT.  "ALTHOUGH THERE IS NO RIGID REQUIREMENT THAT

1    DAMAGES IN ALL CIRCUMSTANCES BE LIMITED TO SPECIFIC INSTANCES

2    OF INFRINGEMENT PROVEN WITH DIRECT EVIDENCE, THE DAMAGES AWARD

3    MUST BE CORRELATED TO THE EXTENT THE INFRINGING METHOD IS USED

4    BY CONSUMERS BECAUSE THIS IS WHAT THE PARTIES TO THE

5    HYPOTHETICAL NEGOTIATION WOULD HAVE CONSIDERED."

6         AND THEN THAT'S FOLLOWED BY THE SENTENCE THAT ADOBE WROTE

7    WHICH WE HAD TALKED ABOUT YESTERDAY.

8         AND THEN I ADDED IN THE CLAIM DEFINITIONS, I HAD TO

9    REWRITE IT A LITTLE BIT, BUT "BASED ON" -- THIS IS PAGE 29,

10   LINE 12.  "BASED ON WHETHER OR NOT NOTIFICATION INFORMATION

11   WAS SENT", THEN THE SENTENCE I ADDED FROM THE CLAIM

12   CONSTRUCTION ORDER READS, "THE PATENTED INVENTION GRANTS

13   ACCESS IMMEDIATELY UPON THE ATTEMPT TO TRANSMIT NOTIFICATION

14   WITHOUT WAITING FOR A RESPONSE FROM THE SERVER".

15        AND THEN I PUT BACK IN THE AGREED-UPON DEFINITION OF

16   "EXECUTING AN INSTALLATION PROCESS".

17        SO I THINK THIS IS ALL WORKABLE.  I GAVE YOU A NEW VERDICT

18   FORM.  THE ONLY CHANGE THERE WAS THE NUMBERING IS CORRECTED.

19        OH, I NEED A COPY OF THAT VERDICT FORM.

20             **THE CLERK:**  I PUT A COPY UP THERE.

21             **THE COURT:**  OKAY.  I'M NOT REALLY ASKING FOR ANY MORE

22   COMMENTS, BUT IF YOU HAVE ANYTHING EARTHSHAKING, YOU CAN TELL

23   ME.

24        I DON'T KNOW WHAT HAPPENED TO THIS MONITOR.  I CAN'T SEE

25   YOU ALL ANYMORE.  IT DIDN'T USED TO BE THERE.

1          **THE CLERK:**  IT'S A MONITOR THEY PUT UP.

2          **THE COURT:**  OH, OKAY.  I DON'T KNOW WHOSE MONITOR

3     THAT IS, BUT IT BLOCKS MY VIEW OF COUNSEL.

4          **MS. GLAUSER:**  I DON'T HAVE ANYTHING.

5          **THE COURT:**  ANYTHING YOU FEEL THE NEED TO ADD?

6          **MR. REINES:**  NOTHING EARTHSHAKING, OBVIOUSLY

7     PRESERVING OUR PRIOR-STATED OBJECTIONS.

8          **THE COURT:**  I DID GO BACK AND LOOK AT THE MOTIONS

9     THAT YOU WERE ALLUDING TO.  YOU MADE THAT MOTION; I DENIED

10    THAT MOTION IN WRITING.  IT PROPOSED STRIKING THE EXPERT'S

11    TESTIMONY ON THE POINT, AND I WILL NOT STRIKE IT.  IT

12    OBVIOUSLY HAS PROBLEMS, AND THE PROBLEMS ARE ADDRESSED IN THE

13    INSTRUCTION, AND YOU CAN ARGUE THEM, BUT I'M NOT GOING TO

14    STRIKE THE EXPERT'S TESTIMONY.

15         **MR. REINES:**  HOPEFULLY, DEPENDING ON THE OUTCOME, YOU

16    WILL LOOK FRESH AT THAT SITUATION AND THE RECORD.

17         **THE COURT:**  TRUE.

18         **MS. GLAUSER:**  WE DIDN'T HAVE ANYTHING ON THE JURY

19    INSTRUCTIONS EITHER, JUST RESERVING THE OBJECTIONS WE'VE

20    ALREADY MADE.

21       THERE WERE A FEW EVIDENCE ISSUES THAT I THINK ARE REALLY

22    JUST HOUSEKEEPING, THOUGH.

23       THE PARTIES FILED A STIPULATION REGARDING THE EVIDENCE

24    THAT WE CAME TO AGREEMENT ON COULD BE ADMITTED BASED ON THE

25    LIMITED PAGES.  SO WE'VE PROVIDED THAT TO MS. RILEY, BUT I

```
1    DON'T KNOW THAT IT CAN BE ACTUALLY ADMITTED UNTIL YOU'VE RULED

2    ON THAT STIPULATION.

3           THE COURT:  OKAY.  I CAN GAVEL IT.  I CAN RULE ON IT

4    ONLINE.

5           MS. GLAUSER:  THERE'S A SIMILAR SOURCE CODE EXHIBIT.

6    WE FILED A MOTION TO SUBMIT IT MANUALLY AND TO HAVE IT UNDER

7    SEAL.  ADOBE HAS REQUESTED THAT IT REMAIN UNDER SEAL SINCE THE

8    PRESENTATION JUST REFERRED TO THE PAGE AND LINE AND DIDN'T

9    NECESSARILY REVEAL THE UNDERLYING CODE.

10       SO WE FILED THAT MOTION FOR PERMISSION TO SUBMIT UNDER

11   SEAL.  THEY REVIEWED OUR SOURCE CODE SUBMISSION, HAVE APPROVED

12   IT, AND SO WE WILL PROVIDE THAT AS WELL TO MS. RILEY AND SEEK

13   TO OFFER THAT AT THIS TIME.

14          THE COURT:  OKAY.  DID YOU FILE A SEALING ORDER?

15          MS. GLAUSER:  WE DID.

16          THE COURT:  SO I CAN DO THAT ONLINE AS WELL.

17          MS. GLAUSER:  YES.

18       AND THEN THE LAST ONE, YOUR HONOR, IS WE FILED AN OFFER OF

19   PROOF REGARDING TRIAL EXHIBIT 179.  WE HAVE OFFERED IT DURING

20   TRIAL, AND THERE WAS NO OBJECTION BY ADOBE.  YOUR HONOR RULED

21   THAT WE MAY NOT NEED ALL OF THE PAGES, SO WE HAVE NOW LIMITED

22   IT TO JUST THREE PAGES.

23       THIS IS THE EXHIBIT THAT HAD THE TOOLBAR THAT INDICATED

24   ONLY THE MOST COMMON FEATURES WERE PROVIDED ON THE TOOLBAR.

25   WE ARE ONLY SEEKING TO OFFER THREE PAGES FROM THAT EXHIBIT.
```

1    ADOBE IS NOW OBJECTING TO IT, AND SO WE SUBMITTED AN OFFER

2    OF PROOF TO NOW MOVE THOSE THREE PAGES OF EXHIBIT 179 INTO

3    EVIDENCE.

4         **MR. REINES:**  THAT WAS THE SITUATION WHERE THE WITNESS

5    DIDN'T KNOW ABOUT THE DOCUMENT AT ALL.  THE COURT DID NOT

6    APPROVE IT AND DID NOT TAKE IT UNDER SUBMISSION.

7    AND WE WOULD OBJECT.  IT'S THAT COMPLICATED STRUCTURE THAT

8    HAS NO FOUNDATION.

9         **THE COURT:**  WELL, ISN'T IT JUST A SCREEN SHOT OF THE

10   MENU DROP DOWN?

11        **MS. GLAUSER:**  YES, IT IS A SCREEN SHOT FROM ADOBE'S

12   WEBSITE.  AND MR. HERBACH WAS ABLE TO TESTIFY ABOUT WHAT WAS

13   HAPPENING ON THAT EXHIBIT.  THERE WAS NO OBJECTION FROM ADOBE.

14   AND WE CITED IN OUR OFFER OF PROOF THE LINES FROM THE TRIAL

15   TRANSCRIPT WHERE YOUR HONOR TOOK IT UNDER SUBMISSION.

16        **THE COURT:**  WHAT ARE THE PAGES YOU WANT?

17        **MS. GLAUSER:**  IT'S THE PAGES OF THE EXHIBIT THAT WE

18   WANT ARE 179.001 TO 179.003.

19        **THE COURT:**  AND THESE ARE PAGES FROM AN ONLINE MANUAL

20   OR SOMETHING LIKE THAT OF ADOBE'S, RIGHT?

21        **MR. REINES:**  I DON'T KNOW WHEN THEY TOOK THE SCREEN

22   SHOTS.  AND WE DIDN'T HAVE ANY WITNESS SAY WHEN IT WAS TAKEN,

23   WHAT IT WAS IS AN ACCURATE REPRESENTATION --

24        **THE COURT:**  IT'S NOT A FORGERY.  IT WAS TAKEN FROM

25   SOMETHING.

1          **MS. GLAUSER:**  YOUR HONOR, THE PARTIES HAVE STIPULATED

2    THAT THE DOCUMENTS PRODUCED BY THE PARTY FROM THEIR OWN

3    POSSESSIONS ARE AUTHENTIC.  SO THERE'S NO AUTHENTICITY

4    OBJECTION TO THIS EXHIBIT.

5          **THE COURT:**  OKAY.  I WILL ALLOW IT.

6       (PLAINTIFF'S EXHIBITS 179.001 – 179.003 RECEIVED IN

7    EVIDENCE)

8          **THE COURT:**  IS THAT IT?

9          **MS. GLAUSER:**  I BELIEVE THOSE ARE ALL THE OUTSTANDING

10   EVIDENTIARY ISSUES.

11         **MR. REINES:**  YES.  ONE THING WE WOULD ASK, AND I KNOW

12   YOU ARE WORKING VERY HARD ON IT AND TRYING TO DO IT AS QUICKLY

13   AS YOU CAN, BUT TO THE EXTENT THE JURY INSTRUCTIONS GET

14   FINALIZED, IF THEY CAN BE E-FILED WITH THE COURT SO THAT WE

15   HAVE ACCESS TO THEM FOR OUR PURPOSES?

16         **THE COURT:**  SURE.

17         **MR. REINES:**  THAT WOULD BE A CONVENIENCE.  THAT WOULD

18   BE APPRECIATED VERY MUCH.

19         **THE COURT:**  SURE.

20       (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

21         **THE COURT:**  PLEASE BE SEATED.

22       MEMBERS OF THE JURY:  NOW THAT YOU HAVE HEARD ALL OF THE

23   EVIDENCE, IT IS MY DUTY TO INSTRUCT YOU AS TO THE LAW OF THE

24   CASE.

25       A COPY OF THESE INSTRUCTIONS WILL BE SENT WITH YOU TO THE

1   JURY ROOM WHEN YOU DELIBERATE.  THESE FINAL INSTRUCTIONS

2   CONTROL AND YOU SHOULD NOT CONCERN YOURSELF WITH ANY

3   DIFFERENCES BETWEEN THEM AND THE PRELIMINARY INSTRUCTIONS.

4   YOU MUST NOT INFER FROM THESE INSTRUCTIONS OR FROM ANYTHING I

5   MAY SAY OR DO THAT I HAVE AN OPINION REGARDING THE EVIDENCE OR

6   WHAT YOUR VERDICT SHOULD BE.

7       IT IS YOUR DUTY TO FIND THE FACTS FROM ALL THE EVIDENCE IN

8   THE CASE.  TO THOSE FACTS YOU WILL APPLY THE LAW AS I GIVE IT

9   TO YOU.  YOU MUST FOLLOW THE LAW AS I GIVE IT TO YOU WHETHER

10  YOU AGREE WITH IT OR NOT.  AND YOU MUST NOT BE INFLUENCED BY

11  ANY PERSONAL LIKES OR DISLIKES, OPINIONS, PREJUDICES, OR

12  SYMPATHY.  THAT MEANS YOU MUST DECIDE THE CASE SOLELY ON THE

13  EVIDENCE BEFORE YOU.  YOU WILL RECALL THAT YOU TOOK AN OATH TO

14  DO SO.

15      IN FOLLOWING MY INSTRUCTIONS, YOU MUST FOLLOW ALL OF THEM

16  AND NOT SINGLE OUT SOME AND IGNORE OTHERS; THEY ARE ALL

17  IMPORTANT.

18      THE EVIDENCE YOU ARE TO CONSIDER IN DECIDING WHAT THE

19  FACTS ARE CONSISTS OF:

20      THE SWORN TESTIMONY OF ANY WITNESS;

21      THE EXHIBITS RECEIVED INTO EVIDENCE;

22      ANY FACTS TO WHICH THE PARTIES HAVE AGREED.

23      IN REACHING YOUR VERDICT, YOU MAY CONSIDER ONLY THE

24  TESTIMONY AND EXHIBITS RECEIVED INTO EVIDENCE AND ANY FACTS TO

25  WHICH THE PARTIES HAVE AGREED.  CERTAIN THINGS ARE NOT

1   EVIDENCE, AND YOU MAY NOT CONSIDER THEM IN DECIDING WHAT THE

2   FACTS ARE.  I WILL LIST THEM FOR YOU.

3       ARGUMENTS AND STATEMENTS BY LAWYERS ARE NOT EVIDENCE.  THE

4   LAWYERS ARE NOT WITNESSES.  WHAT THEY SAID IN THEIR OPENING

5   STATEMENTS, WILL SAY IN THEIR CLOSING ARGUMENTS, AND AT OTHER

6   TIMES IS INTENDED TO HELP YOU INTERPRET THE EVIDENCE, BUT IT

7   IS NOT EVIDENCE.  IF THE FACTS AS YOU REMEMBER THEM DIFFER

8   FROM THE WAY THE LAWYERS HAVE STATED THEM, YOUR MEMORY OF THEM

9   CONTROLS.

10      QUESTIONS AND OBJECTIONS BY LAWYERS ARE NOT EVIDENCE.

11  ATTORNEYS HAVE A DUTY TO THEIR CLIENTS TO OBJECT WHEN THEY

12  BELIEVE A QUESTION IS IMPROPER UNDER THE RULES OF EVIDENCE.

13  YOU SHOULD NOT BE INFLUENCED BY THE OBJECTION OR BY THE

14  COURT'S RULING ON IT.

15      TESTIMONY THAT HAS BEEN EXCLUDED OR STRICKEN, OR THAT YOU

16  HAVE BEEN INSTRUCTED TO DISREGARD, IS NOT EVIDENCE AND MUST

17  NOT BE CONSIDERED.

18      ANYTHING YOU MAY HAVE SEEN OR HEARD WHEN COURT WAS NOT IN

19  SESSION IS NOT EVIDENCE.  YOU ARE TO DECIDE THE CASE SOLELY ON

20  THE EVIDENCE RECEIVED AT THE TRIAL.

21      EVIDENCE MAY BE DIRECT OR CIRCUMSTANTIAL.  DIRECT EVIDENCE

22  IS DIRECT PROOF OF A FACT, SUCH AS TESTIMONY BY A WITNESS

23  ABOUT WHAT THAT WITNESS PERSONALLY SAW OR HEARD OR

24  DID.CIRCUMSTANTIAL EVIDENCE IS PROOF OF ONE OR MORE FACTS FROM

25  WHICH YOU COULD FIND ANOTHER FACT.  YOU SHOULD CONSIDER BOTH

1    KINDS OF EVIDENCE.  THE LAW MAKES NO DISTINCTION BETWEEN THE

2    WEIGHT TO BE GIVEN TO EITHER DIRECT OR CIRCUMSTANTIAL

3    EVIDENCE.  IT IS FOR YOU TO DECIDE HOW MUCH WEIGHT TO GIVE TO

4    ANY EVIDENCE.

5        BEFORE YOU DECIDE THAT A FACT HAS BEEN PROVED BY

6    CIRCUMSTANTIAL EVIDENCE, YOU MUST CONSIDER ALL THE EVIDENCE IN

7    THE LIGHT OF REASON, EXPERIENCE AND COMMON SENSE.

8        THERE ARE RULES OF EVIDENCE THAT CONTROL WHAT CAN BE

9    RECEIVED INTO EVIDENCE.  WHEN A LAWYER ASKED A QUESTION OR

10   OFFERED AN EXHIBIT INTO EVIDENCE AND A LAWYER ON THE OTHER

11   SIDE THOUGHT THAT IT WAS NOT PERMITTED BY THE RULES OF

12   EVIDENCE, THAT LAWYER MAY HAVE OBJECTED.  IF I OVERRULED THE

13   OBJECTION, THE QUESTION WAS ANSWERED OR THE EXHIBIT RECEIVED.

14   IF I SUSTAINED THE OBJECTION, THE QUESTION WAS NOT ANSWERED,

15   OR THE EXHIBIT WAS NOT RECEIVED.  WHENEVER I SUSTAIN AN

16   OBJECTION TO A QUESTION, YOU MUST IGNORE THE QUESTION AND MUST

17   NOT GUESS WHAT THE ANSWER MIGHT HAVE BEEN.

18       IN DECIDING THE FACTS IN THIS CASE, YOU MAY HAVE TO DECIDE

19   WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO BELIEVE.

20   YOU MAY BELIEVE EVERYTHING A WITNESS SAYS, OR PART OF IT, OR

21   NONE OF IT.  PROOF OF A FACT, OR THE WEIGHT OF THE EVIDENCE AS

22   TO A FACT, DOES NOT NECESSARILY DEPEND UPON THE NUMBER OF

23   WITNESSES WHO TESTIFY.

24       IN CONSIDERING THE TESTIMONY OF ANY WITNESSES, YOU MAY

25   TAKE INTO ACCOUNT:

1       ONE, THE OPPORTUNITY AND ABILITY OF THE WITNESS TO SEE OR

2  HEAR OR KNOW THE THINGS TESTIFIED TO;

3       TWO, THE WITNESS' MEMORY;

4       THREE, THE WITNESS' MANNER WHILE TESTIFYING;

5       FOUR, THE WITNESS' INTEREST IN THE OUTCOME OF THE CASE AND

6  ANY BIAS OR PREJUDICE;

7       FIVE, WHETHER OTHER EVIDENCE CONTRADICTED THE WITNESS'

8  TESTIMONY;

9       SIX, WHETHER THE WITNESS GAVE DIFFERENT TESTIMONY ON A

10 PRIOR OCCASION;

11      SEVEN, THE REASONABLENESS OF THE WITNESS' TESTIMONY IN

12 LIGHT OF ALL THE EVIDENCE; AND

13      ANY OTHER FACTORS THAT BEAR ON BELIEVABILITY.

14      THE EVIDENCE THAT A WITNESS LIED UNDER OATH OR GAVE

15 DIFFERENT TESTIMONY ON A PRIOR OCCASION MAY BE CONSIDERED,

16 ALONG WITH ALL OTHER EVIDENCE, IN DECIDING WHETHER OR NOT TO

17 BELIEVE THE WITNESS AND HOW MUCH WEIGHT TO GIVE THE TESTIMONY

18 OF THE WITNESS AND FOR NO OTHER PURPOSE.  IF YOU BELIEVE THAT

19 A WITNESS TESTIFIED FALSELY CONCERNING ANY IMPORTANT MATTER,

20 YOU MAY DISTRUST THE WITNESS' TESTIMONY CONCERNING OTHER

21 MATTERS.  YOU MAY REJECT ALL OF THE TESTIMONY OR YOU MAY

22 ACCEPT SUCH PARTS OF THE TESTIMONY THAT YOU BELIEVE ARE TRUE

23 AND GIVE IT SUCH WEIGHT AS YOU THINK IT DESERVES.

24      SOME WITNESSES, BECAUSE OF EDUCATION OR EXPERIENCE, ARE

25 PERMITTED TO STATE OPINIONS AND THE REASONS FOR THOSE

1    OPINIONS.  OPINION TESTIMONY SHOULD BE JUDGED JUST LIKE ANY

2    OTHER TESTIMONY.  YOU MAY ACCEPT IT OR REJECT IT, AND GIVE IT

3    AS MUCH WEIGHT AS YOU THINK IT DESERVES, CONSIDERING THE

4    WITNESS' EDUCATION AND EXPERIENCE, THE REASONS GIVEN FOR THE

5    OPINION, AND ALL THE OTHER EVIDENCE IN THE CASE.

6        DIGITAL REG'S EXPERT, DAMAGES EXPERT, MR. PARR, TESTIFIED

7    THAT THE INTUIT LICENSE AGREEMENT HAD AN EFFECTIVE ROYALTY

8    RATE OF 2.5 PERCENT BASED ON A DISCUSSION HE REPORTS HAVING

9    WITH MR. FARLEY OF DIGITAL REG.  THIS TESTIMONY MAY BE

10   CONSIDERED SOLELY AS A BASIS FOR MR. PARR'S OPINION AND NOT AS

11   SUBSTANTIVE EVIDENCE OF THAT RATE.

12       A DEPOSITION IS THE SWORN TESTIMONY OF A WITNESS TAKEN

13   BEFORE TRIAL.  THE WITNESS IS PLACED UNDER OATH TO TELL THE

14   TRUTH AND LAWYERS FOR EACH PARTY MAY ASK QUESTIONS.  THE

15   QUESTIONS AND ANSWERS ARE RECORDED.  THE COURT REPORTER TAKES

16   CUSTODY OF THE DOCUMENTS THAT ARE DISCUSSED, ALTHOUGH THE

17   PARTIES KEEP THEIR OWN COPIES.  A COPY OF THE TRANSCRIPT IS

18   MADE AVAILABLE TO THE WITNESS, WHO THEN HAS AN OPPORTUNITY TO

19   MAKE CORRECTIONS.

20       YOU SHOULD CONSIDER DEPOSITION TESTIMONY, PRESENTED TO YOU

21   IN COURT IN LIEU OF LIVE TESTIMONY, INSOFAR AS POSSIBLE, IN

22   THE SAME WAY AS IF THE WITNESS HAD BEEN PRESENT TO TESTIFY.

23       BECAUSE YOU MUST BASE YOUR VERDICT ONLY ON THE EVIDENCE

24   RECEIVED IN THE CASE AND ON THESE INSTRUCTIONS, I REMIND YOU

25   THAT YOU MUST NOT BE EXPOSED TO ANY OTHER INFORMATION ABOUT

1    THE CASE OR ABOUT THE ISSUES IT INVOLVES.  EXCEPT FOR

2    DISCUSSING THE CASE WITH YOUR FELLOW JURORS DURING YOUR

3    DELIBERATIONS:

4         DO NOT COMMUNICATE WITH ANYONE IN ANY WAY AND DO NOT LET

5    ANYONE ELSE COMMUNICATE WITH YOU IN ANY WAY ABOUT THE MERITS

6    OF THE CASE OR ANYTHING TO DO WITH IT.  THIS INCLUDES

7    DISCUSSING THE CASE IN PERSON, IN WRITING, BY PHONE OR

8    ELECTRONIC MEANS, VIA EMAIL, TEXT MESSAGING, OR ANY INTERNET

9    CHAT ROOM, BLOG, WEBSITE OR OTHER FEATURE.  YOU MAY NOT

10   COMMUNICATE ABOUT THE TRIAL WITH YOUR FAMILY MEMBERS OR YOUR

11   EMPLOYER, ALTHOUGH YOU MAY INFORM THEM THAT YOU HAVE BEEN

12   SEATED AS A JUROR IN THE CASE.  YOU MAY NOT COMMUNICATE WITH

13   THE PEOPLE INVOLVED IN THE TRIAL.  IF YOU ARE ASKED OR

14   APPROACHED IN ANY WAY ABOUT YOUR JURY SERVICE OR ABOUT

15   ANYTHING ABOUT THIS CASE, YOU MUST RESPOND THAT YOU HAVE BEEN

16   ORDERED NOT TO DISCUSS THE MATTER AND TO REPORT THE CONTACT TO

17   THE COURT.  YOU MAY COMMUNICATE WITH YOUR FELLOW JURORS

18   PROVIDED THAT ALL THE JURORS ARE PRESENT FOR THE DISCUSSION

19   AND THE DISCUSSION OCCURS IN THE JURY ROOM WITH THE DOOR

20   CLOSED.

21        DO NOT READ, WATCH, OR LISTEN TO ANY NEWS OR MEDIA

22   ACCOUNTS OR COMMENTARY ABOUT THE CASE OR ANYTHING TO DO WITH

23   IT; DO NOT DO ANY RESEARCH, SUCH AS CONSULTING DICTIONARIES,

24   SEARCHING THE INTERNET OR USING OTHER REFERENCE MATERIALS, AND

25   DO NOT MAKE ANY INVESTIGATION OR IN ANY OTHER WAY TRY TO LEARN

1    ABOUT THE CASE ON YOUR OWN.

2        THE LAW REQUIRES THESE RESTRICTIONS TO ENSURE THAT THE

3    PARTIES HAVE A FAIR TRIAL BASED ON THE SAME EVIDENCE THAT EACH

4    PARTY HAS AN OPPORTUNITY TO ADDRESS.  A JUROR WHO VIOLATES

5    THESE RESTRICTIONS JEOPARDIZES THE FAIRNESS OF THESE

6    PROCEEDINGS, AND A MISTRIAL COULD RESULT THAT WOULD REQUIRE

7    THE ENTIRE TRIAL PROCESS TO START OVER.  IF ANY JUROR IS

8    EXPOSED TO ANY OUTSIDE INFORMATION, PLEASE NOTIFY THE COURT

9    IMMEDIATELY.

10       I WILL NEXT GIVE YOU A SUMMARY OF EACH SIDE'S CONTENTIONS

11   IN THIS CASE.  I WILL THEN TELL YOU WHAT EACH SIDE MUST PROVE

12   ON EACH OF ITS CONTENTIONS.  AS I PREVIOUSLY TOLD YOU, DIGITAL

13   REG SEEKS MONEY DAMAGES FROM ADOBE FOR ALLEGEDLY INFRINGING

14   THE '541 PATENT AND THE '670 PATENT IN THAT ADOBE AND USERS OF

15   ITS SOFTWARE PRACTICED METHODS CLAIMED IN DIGITAL REG'S

16   PATENTS.  THE ASSERTED CLAIMS ARE CLAIMS 1, 2, 4 AND 13 OF THE

17   '541 PATENT, AND CLAIMS 45 AND 52 OF THE '670 PATENT.  THE

18   ACCUSED PRODUCTS ARE THE ADOBE FLASH PLATFORM, LIVECYCLE, AND

19   SOFTWARE ACTIVATION SERVICES.  DIGITAL REG ARGUES THAT ADOBE

20   INFRINGED ITS PATENTS AND INDUCED INFRINGEMENT BY USERS OF

21   THESE PRODUCTS.  DIGITAL REG ALSO CONTENDS THAT ADOBE'S

22   INFRINGEMENT OF THE '541 AND '670 PATENTS WAS WILLFUL.

23       ADOBE DENIES THAT IT HAS INFRINGED ANY OF THE ASSERTED

24   CLAIMS OF THE '541 AND '670 PATENTS.  ADOBE ARGUES THAT THE

25   ASSERTED CLAIMS, ALONG WITH CLAIM 32 OF THE '670 PATENT, ARE

INVALID.

YOUR JOB IS TO DECIDE WHETHER THE ASSERTED CLAIMS OF THE

'541 AND '670 PATENTS ARE VALID AND HAVE BEEN INFRINGED BY

ADOBE'S ACCUSED PRODUCTS.

IF YOU DECIDE THAT ANY CLAIM OF THE ASSERTED PATENTS IS

NOT INVALID AND HAS BEEN INFRINGED, THEN YOU WILL NEED TO

DECIDE THE MONEY DAMAGES TO BE AWARDED TO DIGITAL REG TO

COMPENSATE IT FOR THE INFRINGEMENT.  YOU WILL ALSO NEED TO

DECIDE WHETHER THE INFRINGEMENT WAS WILLFUL.  IF YOU DECIDE

THAT ANY INFRINGEMENT WAS WILLFUL, THAT DECISION SHOULD NOT

AFFECT ANY DAMAGES AWARD THAT YOU GIVE.  I WILL TAKE

WILLFULNESS INTO ACCOUNT LATER.

AS I MENTIONED EARLIER, THE PATENT CLAIMS ARE NUMBERED

SENTENCES AT THE END OF THE PATENT THAT DESCRIBE THE

BOUNDARIES OF THE PATENT'S PROTECTION.  IT IS MY JOB AS JUDGE

TO EXPLAIN TO YOU THE MEANING OF ANY LANGUAGE IN THE CLAIMS

THAT NEEDS INTERPRETATION.

I HAVE ALREADY DETERMINED THE MEANING OF CERTAIN TERMS OF

THE CLAIMS OF THE '541 AND '670 PATENTS.  ATTACHED TO THE

WRITTEN COPY OF THE INSTRUCTIONS THAT YOU WILL BE GIVEN IS A

DOCUMENT REFLECTING THOSE MEANINGS.  YOU MUST ACCEPT THOSE

INTERPRETATIONS AS CORRECT.  HOWEVER, MY INTERPRETATION OF THE

LANGUAGE OF THE CLAIMS SHOULD NOT BE TAKEN AS AN INDICATION

THAT I HAVE A VIEW REGARDING ISSUES SUCH AS INFRINGEMENT AND

INVALIDITY.  THE DECISIONS REGARDING INFRINGEMENT AND

1    INVALIDITY ARE YOURS TO MAKE.

2        TO PROVE INFRINGEMENT OF ANY CLAIM, DIGITAL REG MUST

3    PERSUADE YOU THAT IT IS MORE LIKELY THAN NOT THAT ADOBE

4    INFRINGED THAT CLAIM.  A PATENT'S CLAIMS DEFINE WHAT IS

5    COVERED BY THE PATENT.  YOU MUST DECIDE WHETHER ADOBE HAS USED

6    WITHIN THE UNITED STATES A METHOD COVERED BY A CLAIM OF

7    DIGITAL REG'S PATENTS.  IF ADOBE HAS DONE SO, IT INFRINGES.

8        YOU MUST CONSIDER EACH OF THE ASSERTED CLAIMS OF THE

9    PATENT INDIVIDUALLY, AND DECIDE WHETHER ADOBE PRACTICES EVERY

10   REQUIREMENT OF THAT CLAIM.  CLAIM 1 OF THE '541 PATENT, AND

11   CLAIMS 32 AND 45 OF THE '670 PATENT, ARE KNOWN AS INDEPENDENT

12   CLAIMS.  INDEPENDENT CLAIMS CONTAIN A NUMBER OF REQUIREMENTS

13   THAT MUST BE SATISFIED TO SHOW INFRINGEMENT.  CLAIMS 2, 4, AND

14   13 OF THE '541 PATENT, AND CLAIM 52 OF THE '670 PATENT ARE

15   KNOWN AS DEPENDENT CLAIMS.  A DEPENDENT CLAIM INCLUDES ALL OF

16   THE REQUIREMENTS OF THE INDEPENDENT CLAIM TO WHICH IT REFERS,

17   PLUS ADDITIONAL REQUIREMENTS OF ITS OWN.  FOR EXAMPLE, CLAIM 2

18   OF THE '541 PATENT INCORPORATES EVERY REQUIREMENT CONTAINED IN

19   "THE METHOD OF CLAIM 1," BUT ALSO CONTAINS ADDITIONAL

20   REQUIREMENTS THAT MUST BE SATISFIED TO FIND INFRINGEMENT OF

21   CLAIM 2.  AS A RESULT, IF YOU FIND THAT AN INDEPENDENT CLAIM

22   IS NOT INFRINGED, YOU MUST ALSO FIND THAT ITS DEPENDENT CLAIMS

23   ARE NOT INFRINGED AS WELL.  ON THE OTHER HAND, IF YOU FIND

24   THAT AN INDEPENDENT CLAIM HAS BEEN INFRINGED, YOU MUST STILL

25   SEPARATELY DECIDE WHETHER THE ADDITIONAL REQUIREMENTS OF ITS

1    DEPENDENT CLAIMS HAVE ALSO BEEN INFRINGED.

2         THE CLAIMS AT ISSUE ARE METHOD CLAIMS.  METHOD CLAIMS ARE

3    ONLY INFRINGED WHEN THE CLAIMED PROCESS IS INFRINGED, NOT BY

4    THE SALE OF THE APPARATUS THAT IS CAPABLE OF INFRINGING USE.

5         IN THIS CASE, DIGITAL REG ARGUES THAT ADOBE INFRINGED ITS

6    PATENTS BOTH DIRECTLY AND INDIRECTLY.  TO DECIDE WHETHER ADOBE

7    DIRECTLY INFRINGES A CLAIM OF DIGITAL REG'S PATENTS, YOU MUST

8    COMPARE ACTIONS BY ADOBE WITH THE PATENT CLAIM AND DETERMINE

9    WHETHER EVERY REQUIREMENT OF THE CLAIM WAS CARRIED OUT BY

10   ADOBE.  IF SO, ADOBE DIRECTLY INFRINGES THAT CLAIM.  WHETHER

11   OR NOT ADOBE KNEW ITS PRODUCTS INFRINGED OR EVEN KNEW OF THE

12   PATENT DOES NOT MATTER IN DETERMINING DIRECT INFRINGEMENT.

13        EVEN IF ADOBE DOES NOT ITSELF CARRY OUT EVERY REQUIREMENT

14   IN THE PATENT CLAIM, ADOBE CANNOT ESCAPE LIABILITY FOR DIRECT

15   INFRINGEMENT IF IT DIRECTED OR CONTROLLED OTHER PARTIES TO

16   CARRY OUT THE MISSING REQUIREMENTS.  ADOBE DOES NOT DIRECT OR

17   CONTROL ANOTHER PARTIES' ACTIONS MERELY BECAUSE ADOBE ENTERED

18   INTO A BUSINESS RELATIONSHIP WITH THAT PARTY.  INSTEAD, ADOBE

19   MUST SPECIFICALLY INSTRUCT OR CAUSE THAT OTHER PERSON TO

20   PERFORM EACH STEP IN AN INFRINGING MANNER, SO THAT EVERY STEP

21   IS ATTRIBUTABLE TO ADOBE AS THE CONTROLLING PARTY.

22        DIGITAL REG ALSO ALLEGES THAT ADOBE INDIRECTLY INFRINGED

23   AND CONTINUES TO INDIRECTLY INFRINGE DIGITAL REG'S PATENTS BY

24   INDUCING INFRINGEMENT.  THE ACT OF ENCOURAGING OR INDUCING

25   OTHERS TO INFRINGE A PATENT IS CALLED "INDUCING INFRINGEMENT."

1    IN ORDER FOR ADOBE TO INDUCE INFRINGEMENT, ONE OR MORE

2    INDIVIDUALS OR COMPANIES, ACTING ALONE OR COLLECTIVELY, MUST

3    DIRECTLY INFRINGE THE ASSERTED PATENT; IF THERE IS NO DIRECT

4    INFRINGEMENT BY ANYONE, THERE CAN BE NO INDUCED INFRINGEMENT.

5    IN ORDER TO BE LIABLE FOR INDUCEMENT OF INFRINGEMENT, ADOBE

6    MUST HAVE:

7        ONE, INTENTIONALLY TAKEN ACTION THAT ACTUALLY INDUCED

8    DIRECT INFRINGEMENT BY EACH INDIVIDUAL OR COMPANY;

9        TWO, BEEN AWARE OF THE ASSERTED PATENT;

10       THREE, KNOWN THAT THE ACTS IT WAS CAUSING WOULD BE

11   INFRINGING;

12       AND, FOUR, NOT HAD A GOOD FAITH BELIEF THAT THE PATENT WAS

13   INVALID.

14       THE KNOWLEDGE AND AWARENESS REQUIREMENTS FOR INDUCEMENT

15   CAN BE SATISFIED BY SHOWING THAT ADOBE DEMONSTRATED DELIBERATE

16   DISREGARD OR WAS WILLFULLY BLIND.  IF ADOBE DID NOT KNOW OF

17   THE EXISTENCE OF THE PATENT IN QUESTION OR THAT THE FACT -- OR

18   THAT THE ACTS IT WAS INDUCING WERE INFRINGING, IT CAN BE

19   LIABLE FOR INDUCEMENT ONLY IF IT ACTUALLY BELIEVED IT WAS

20   HIGHLY PROBABLE ITS ACTIONS WOULD ENCOURAGE INFRINGEMENT OF A

21   PATENT AND IT TOOK INTENTIONAL ACTS TO AVOID LEARNING THE

22   TRUTH.  IT IS NOT ENOUGH THAT ADOBE WAS MERELY INDIFFERENT TO

23   THE POSSIBILITY THAT IT MIGHT ENCOURAGE INFRINGEMENT OF A

24   PATENT.  NOR IS IT ENOUGH THAT ADOBE TOOK A RISK THAT WAS

25   SUBSTANTIAL AND UNJUSTIFIED.

1        IF YOU FIND THAT ADOBE WAS AWARE OF AN ASSERTED PATENT,

2    BUT BELIEVED THAT THE ACTS IT ENCOURAGED DID NOT INFRINGE THAT

3    PATENT, OR THAT THE PATENT WAS INVALID, THEN ADOBE CANNOT BE

4    LIABLE FOR INDUCING INFRINGEMENT.

5        IN THIS CASE, AS I'VE MENTIONED, DIGITAL REG ARGUES THAT

6    ADOBE WILLFULLY INFRINGED ITS PATENTS.

7        TO PROVE WILLFUL INFRINGEMENT, DIGITAL REG MUST FIRST

8    PERSUADE YOU THAT ADOBE INFRINGED A CLAIM OF ITS PATENTS.

9        IN ADDITION, TO PROVE WILLFUL INFRINGEMENT, DIGITAL REG

10   MUST PERSUADE YOU THAT IT IS HIGHLY PROBABLE THAT ADOBE ACTED

11   WITH RECKLESS DISREGARD OF THE PATENT IT INFRINGED.  THE STATE

12   OF MIND OF ADOBE IS RELEVANT TO THIS INQUIRY.  TO DEMONSTRATE

13   SUCH RECKLESS DISREGARD, DIGITAL REG MUST PERSUADE YOU THAT

14   ADOBE ACTUALLY KNEW, OR IT WAS SO OBVIOUS THAT ADOBE SHOULD

15   HAVE KNOWN THAT ITS ACTIONS CONSTITUTED INFRINGEMENT OF A

16   VALID PATENT.

17       IN DECIDING WHETHER ADOBE ACTED WITH RECKLESS DISREGARD

18   FOR ANY PATENT THAT YOU FIND IS INFRINGED, YOU SHOULD CONSIDER

19   ALL OF THE FACTS SURROUNDING THE ALLEGED INFRINGEMENT

20   INCLUDING, BUT NOT LIMITED TO, THE FOLLOWING FACTORS:

21       ONE, WHETHER ADOBE ACTED IN A MANNER CONSISTENT WITH THE

22   STANDARDS OF COMMERCE FOR THE INDUSTRY.

23       ARE YOU OKAY?

24       TWO, WHETHER ADOBE INTENTIONALLY COPIED DIGITAL REG'S

25   PATENT.

1       THREE, WHETHER ADOBE HAD A REASONABLE BASIS TO BELIEVE

2   THAT IT DID NOT INFRINGE OR HAD A REASONABLE DEFENSE TO

3   INFRINGEMENT.

4       WITH REGARD TO WILLFULNESS, DIGITAL REG CLAIMS, AMONG

5   OTHER THINGS, THAT MR. VENTERS MET WITH ADOBE VENTURES IN THE

6   SUMMER OF 2004 AND TOLD THEM ABOUT THE PATENTS.  MR. VENTERS

7   STATES THAT THE MEETING WAS NOT IN JUNE OF 2004, BUT RATHER

8   SOMETIME LATER.  MR. VENTERS TESTIFIED THAT HE SENT TO ADOBE

9   VENTURES A DOCUMENT ENTITLED ADOBE VALUE PROPOSITION.  SUCH A

10  DOCUMENT WAS ADMITTED AS TRIAL EXHIBIT 125C.  DIFFERENT DRAFTS

11  OF THIS DOCUMENT EXIST, AND WHILE MR. VENTERS STATES A VERSION

12  WAS SENT TO ADOBE VENTURES, HE CANNOT IDENTIFY THE PARTICULAR

13  VERSION.  THE INFORMATION MR. VENTERS STATES WAS SENT TO ADOBE

14  VENTURES IS SET FORTH IN TRIAL EXHIBIT 696, WHICH WILL BE

15  RECEIVED IN EVIDENCE IN PLACE OF TRIAL EXHIBIT 125C.  ADOBE

16  CONTENDS THAT THE CONFUSION OVER WHICH DOCUMENT WAS SENT AND

17  WHEN SUPPORTS ITS PROPOSITION THAT THE EVIDENCE DOES NOT PROVE

18  THAT ANY VERSION WAS SENT.

19      I WILL NOW INSTRUCT YOU ON THE RULES YOU MUST FOLLOW IN

20  DECIDING WHETHER ADOBE HAS PROVEN THAT CLAIMS 1, 2, 4, AND 13

21  OF THE '541 PATENT AND CLAIMS 32, 45 AND 52 OF THE '670 PATENT

22  ARE INVALID.  TO PROVE INVALIDITY OF ANY PATENT CLAIM, ADOBE

23  MUST PERSUADE YOU BY CLEAR AND CONVINCING EVIDENCE THAT THE

24  CLAIM IS INVALID.

25      DURING THIS CASE, ADOBE HAS SUBMITTED PRIOR ART, SOME OF

1    WHICH WAS AND SOME OF WHICH WAS NOT CONSIDERED BY THE UNITED

2    STATES PATENT AND TRADEMARK OFFICE, OR PTO, DURING THE

3    PROSECUTION OF THE '541 AND '670 PATENTS.  ADOBE CONTENDS THAT

4    THIS PRIOR ART INVALIDATES THE CLAIMS OF THE '541 AND '670

5    PATENTS.  IN DECIDING THE ISSUE OF INVALIDITY, YOU MAY TAKE

6    INTO ACCOUNT WHETHER THE PRIOR ART WAS CONSIDERED BY THE PTO

7    WHEN IT ISSUED THE '541 AND '670 PATENTS.  PRIOR ART THAT

8    DIFFERS FROM THE PRIOR ART CONSIDERED BY THE PTO MAY CARRY

9    MORE WEIGHT THAN THE PRIOR ART THAT WAS CONSIDERED AND MAY

10   MAKE ADOBE'S BURDEN OF SHOWING THAT IT IS HIGHLY PROBABLE THAT

11   A PATENT CLAIM IS INVALID EASIER TO SUSTAIN.

12       A PATENT CLAIM IS INVALID IF ADOBE DEMONSTRATES THAT THE

13   CLAIMED INVENTION IS NOT NEW.  THE CLAIMED INVENTION IS NOT

14   NEW IF THE PATENT'S REQUIREMENTS EXISTED IN A SINGLE DEVICE OR

15   METHOD THAT PREDATES THE CLAIMED INVENTION, OR IF ALL OF ITS

16   REQUIREMENTS WERE DESCRIBED IN A SINGLE PREVIOUS PUBLICATION

17   OR PATENT THAT PREDATES THE CLAIMED INVENTION.  IN PATENT LAW,

18   THESE PREVIOUS DEVICES, METHODS, PUBLICATIONS OR PATENTS ARE

19   CALLED "PRIOR ART REFERENCES."  IF A PATENT CLAIM IS NOT NEW

20   WE SAY IT IS "ANTICIPATED" BY A PRIOR ART REFERENCE.

21       THE DESCRIPTION IN THE WRITTEN REFERENCE DOES NOT HAVE TO

22   BE IN THE SAME WORDS AS THE CLAIM, BUT ALL OF THE REQUIREMENTS

23   OF THE CLAIM MUST BE THERE, THERE STATED OR NECESSARILY

24   IMPLIED, SO THAT SOMEONE OF ORDINARY SKILL IN THE FIELD

25   LOOKING AT THAT ONE REFERENCE WOULD BE ABLE TO MAKE AND USE

THE CLAIMED INVENTION.

HERE'S A LIST OF WAYS THAT ADOBE CAN SHOW THAT A PATENT CLAIM WAS NOT NEW:

ONE, THE CLAIMED INVENTION WAS ALREADY PUBLICLY KNOWN OR PUBLICLY USED BY OTHERS IN THE UNITED STATES BEFORE MAY 15TH, 1997;

TWO, THE CLAIMED INVENTION WAS ALREADY PATENTED OR DESCRIBED IN A PRINTED PUBLICATION ANYWHERE IN THE WORLD BEFORE MAY 15TH, 1997. A REFERENCE IS A 'PRINTED PUBLICATION' IF IT IS ACCESSIBLE TO THOSE INTERESTED IN THE FIELD, EVEN IF IT IS DIFFICULT TO FIND;

THREE, THE CLAIMED INVENTION WAS ALREADY DESCRIBED IN ANOTHER UNITED STATES PATENT APPLICATION, OR A PUBLISHED PATENT THAT WAS BASED ON A PATENT APPLICATION FILED BEFORE MAY 15TH, 1997; OR

FOUR, THE CLAIMED INVENTION WAS ALREADY MADE BY SOMEONE ELSE IN THE UNITED STATES BEFORE MAY 15TH, 1997, IF THAT OTHER PERSON HAD NOT ABANDONED THE INVENTION OR KEPT IT SECRET.

NOT ALL INNOVATIONS ARE PATENTABLE. A PATENT CLAIM IS INVALID IF IT IS SHOWN BY CLEAR AND CONVINCING EVIDENCE THAT THE CLAIMED INVENTION WOULD HAVE BEEN OBVIOUS TO A PERSON OF ORDINARY SKILL IN THE FIELD AT THE TIME OF THE INVENTION. THIS MEANS THAT EVEN IF ALL OF THE REQUIREMENTS OF THE CLAIM CANNOT BE FOUND IN A SINGLE PRIOR ART REFERENCE, A PERSON OF ORDINARY SKILL IN THE FIELD WHO KNEW ABOUT ALL THIS PRIOR ART

1    WOULD HAVE COME UP WITH THE CLAIMED INVENTION.

2       THE ULTIMATE CONCLUSION OF WHETHER A CLAIM IS OBVIOUS

3    SHOULD BE BASED UPON YOUR DETERMINATION OF SEVERAL FACTUAL

4    DECISIONS:

5       ONE, THE LEVELS OF EDUCATION AND EXPERIENCE OF PERSONS

6    WORKING IN THE FIELD;

7       TWO, THE TYPES OF PROBLEMS ENCOUNTERED IN THE FIELD;

8       THREE, THE SOPHISTICATION OF THE TECHNOLOGY.

9       FOUR, THE SCOPE AND CONTENT OF THE PRIOR ART; AND

10      FIVE, WHAT DIFFERENCES, IF ANY, EXISTED BETWEEN THE

11   CLAIMED INVENTION AND THE PRIOR ART.

12      FINALLY, YOU SHOULD BE -- YOU SHOULD CONSIDER ANY OF THE

13   FOLLOWING FACTORS THAT YOU FIND HAVE BEEN SHOWN BY THE

14   EVIDENCE:

15      ONE, COMMERCIAL SUCCESS OF A PRODUCT DUE TO THE MERITS OF

16   THE CLAIMED INVENTION;

17      TWO, A LONG FELT NEED FOR THE SOLUTION PROVIDED BY THE

18   CLAIMED INVENTION;

19      THREE, UNSUCCESSFUL ATTEMPTS BY OTHERS TO FIND THE

20   SOLUTION PROVIDED BY THE CLAIMED INVENTION;

21      FOUR, COPYING OF THE CLAIMED INVENTION BY OTHERS;

22      FIVE, UNEXPECTED AND SUPERIOR RESULTS FROM THE CLAIMED

23   INVENTION;

24      SIX, ACCEPTANCE BY OTHERS OF THE CLAIMED INVENTION AS

25   SHOWN BY PRAISE FROM OTHERS IN THE FIELD OR FROM THE LICENSING

1    OF THE CLAIMED INVENTION; AND

2        SIX, ANY OTHER EVIDENCE TENDING TO SHOW NONOBVIOUSNESS.

3        THE PRESENCE OF ANY OF THESE FACTORS MAY BE CONSIDERED BY

4    YOU AS AN INDICATION THAT THE CLAIMED INVENTION WOULD NOT HAVE

5    BEEN OBVIOUS AT THE TIME THE CLAIMED INVENTION WAS MADE.  ON

6    THE OTHER HAND, INDEPENDENT INVENTION OF THE CLAIMED INVENTION

7    BY OTHERS BEFORE OR ABOUT THE SAME TIME AS THE NAMED INVENTOR

8    THOUGHT OF IT, MAY BE CONSIDERED AS AN INDICATION THAT THE

9    CLAIMED INVENTION WOULD HAVE BEEN OBVIOUS AT SUCH TIME.

10       ALTHOUGH YOU SHOULD CONSIDER ANY EVIDENCE OF THESE

11   FACTORS, THE RELEVANCE AND IMPORTANCE OF ANY OF THEM IS UP TO

12   YOU.

13       A PATENT CLAIM COMPOSED OF SEVERAL ELEMENTS IS NOT PROVED

14   OBVIOUS MERELY BY DEMONSTRATING THAT EACH OF ITS ELEMENTS WAS

15   INDEPENDENTLY PRESENT IN THE PRIOR ART.  IN EVALUATING WHETHER

16   SUCH A CLAIM WOULD HAVE BEEN OBVIOUS, YOU MAY CONSIDER WHETHER

17   ADOBE HAS IDENTIFIED A REASON THAT WOULD HAVE PROMPTED A

18   PERSON OF ORDINARY SKILL IN THE FIELD TO COMBINE THE ELEMENTS

19   OR CONCEPTS FROM THE PRIOR ART IN THE SAME WAY AS IN THE

20   CLAIMED INVENTION.  THERE IS NO SINGLE WAY TO DEFINE THE LINE

21   BETWEEN TRUE INVENTIVENESS ON THE ONE HAND, WHICH IS

22   PATENTABLE, AND THE APPLICATION OF COMMON SENSE AND ORDINARY

23   SKILL TO SOLVE A PROBLEM ON THE OTHER HAND WHICH IS NOT

24   PATENTABLE.  HOWEVER, YOU MUST BE CAREFUL NOT TO DETERMINE

25   OBVIOUSNESS USING THE BENEFIT OF HINDSIGHT.  SOMETIMES TRUE

1   INVENTIONS MIGHT SEEM OBVIOUS AFTER THE FACT.  YOU SHOULD PUT

2   YOURSELF IN THE POSITION OF A PERSON OF ORDINARY SKILL IN THE

3   FIELD AT THE TIME THE CLAIMED INVENTION WAS MADE WHEN

4   CONSIDERING WHETHER THE INVENTION WOULD HAVE BEEN OBVIOUS.

5       I WILL INSTRUCT YOU ABOUT THE MEASURE OF DAMAGES.  BY

6   INSTRUCTING YOU ON DAMAGES, I'M NOT SUGGESTING WHICH PARTY

7   SHOULD WIN ON ANY ISSUE.  IF YOU FIND THAT ADOBE INFRINGED ANY

8   VALID AND ASSERTED CLAIM OF DIGITAL REG'S PATENTS, YOU MUST

9   THEN DETERMINE THE AMOUNT OF MONEY DAMAGES TO BE AWARDED TO

10  DIGITAL REG TO COMPENSATE IT FOR INFRINGEMENT BY THE USE OF

11  ADOBE'S ACCUSED PRODUCTS.

12      THE AMOUNT OF THOSE DAMAGES MUST BE ADEQUATE TO COMPENSATE

13  DIGITAL REG FOR THE INFRINGEMENT.  A DAMAGES AWARD SHOULD PUT

14  THE PATENT HOLDER IN APPROXIMATELY THE FINANCIAL POSITION IT

15  WOULD HAVE BEEN IN HAD THE INFRINGEMENT NOT OCCURRED, BUT IN

16  NO EVENT MAY THE DAMAGES AWARD BE LESS THAN A REASONABLE

17  ROYALTY.  YOU SHOULD KEEP IN MIND THAT THE DAMAGES YOU AWARD

18  ARE MEANT TO COMPENSATE THE PATENT HOLDER AND NOT TO PUNISH AN

19  INFRINGER.  DIGITAL REG HAS THE BURDEN TO PERSUADE YOU OF THE

20  AMOUNT OF ITS DAMAGES.  YOU SHOULD AWARD ONLY THOSE DAMAGES

21  THAT DIGITAL REG MORE LIKELY THAN NOT SUFFERED.  WHILE DIGITAL

22  REG IS NOT REQUIRED TO PROVE ITS DAMAGES WITH MATHEMATICAL

23  PRECISION, IT MUST PROVE THEM WITH REASONABLE CERTAINTY.

24  DIGITAL REG IS NOT ENTITLED TO DAMAGES THAT ARE REMOTE OR

25  SPECULATIVE.

1        IN THIS CASE, DIGITAL REG SEEKS TO RECOVER A REASONABLE

2   ROYALTY BASED ON ADOBE'S ALLEGED INFRINGEMENT OF THE ASSERTED

3   CLAIMS.  DIGITAL REG SHOULD BE AWARDED AT LEAST A REASONABLE

4   ROYALTY CONSIDERING THE USE OF ADOBE'S PRODUCTS TO PRACTICE

5   THE ASSERTED CLAIMS.

6        A ROYALTY IS A PAYMENT MADE TO A PATENT HOLDER IN EXCHANGE

7   FOR THE RIGHT TO USE THE CLAIMED INVENTION.  THIS RIGHT IS

8   CALLED A "LICENSE."  A REASONABLE ROYALTY IS THE PAYMENT FOR

9   THE LICENSE THAT WOULD HAVE RESULTED FROM A HYPOTHETICAL

10  NEGOTIATION BETWEEN THE PATENT HOLDER AND THE INFRINGER TAKING

11  PLACE AT THE TIME THE INFRINGING ACTIVITY FIRST BEGAN.

12       IN CONSIDERING THE NATURE OF THIS NEGOTIATION, YOU MUST

13  ASSUME THAT THE PATENT HOLDER AND THE INFRINGER WOULD HAVE

14  ACTED REASONABLY AND WOULD HAVE ENTERED INTO A LICENSE

15  AGREEMENT.  YOU MUST ALSO ASSUME THAT BOTH PARTIES BELIEVED

16  THE PATENT WAS VALID AND INFRINGED.  YOUR ROLE IS TO DETERMINE

17  WHAT THE RESULT OF THAT NEGOTIATION WOULD HAVE BEEN.  THE TEST

18  FOR DAMAGES IS WHAT ROYALTY WOULD HAVE RESULTED FROM THE

19  HYPOTHETICAL NEGOTIATION AND NOT SIMPLY WHAT EITHER PARTY

20  WOULD HAVE PREFERRED.

21       A ROYALTY CAN BE CALCULATED IN SEVERAL DIFFERENT WAYS AND

22  IT IS FOR YOU TO DETERMINE WHICH WAY IS THE MOST APPROPRIATE

23  BASED ON THE EVIDENCE THAT YOU'VE HEARD.  ONE WAY TO CALCULATE

24  A ROYALTY IS TO DETERMINE WHAT IS CALLED AN "ONGOING ROYALTY."

25  TO CALCULATE AN ONGOING ROYALTY, YOU MUST FIRST DETERMINE THE

1  "BASE," THAT IS, THE USE ON WHICH ADOBE IS TO PAY.  YOU THEN

2  NEED TO MULTIPLY THE REVENUE ADOBE OBTAINED FROM THAT BASE BY

3  THE "RATE" OR PERCENTAGE THAT YOU FIND WOULD HAVE RESULTED

4  FROM THE HYPOTHETICAL NEGOTIATION.

5      ALTHOUGH THERE IS NO RIGID REQUIREMENT THAT DAMAGES IN ALL

6  CIRCUMSTANCES BE LIMITED TO SPECIFIC INSTANCES OF INFRINGEMENT

7  PROVEN WITH DIRECT EVIDENCE, THE DAMAGES AWARD MUST BE

8  CORRELATED TO THE EXTENT THE INFRINGING METHOD IS USED BY

9  CONSUMERS, BECAUSE THAT IS WHAT THE PARTIES TO THE

10  HYPOTHETICAL NEGOTIATION WOULD HAVE CONSIDERED.  IF PARTICULAR

11  PRODUCTS SOLD BY ADOBE ARE NEVER ENABLED TO BE USED IN AN

12  INFRINGING MANNER, THERE IS NO INFRINGEMENT AND SUCH UNITS OF

13  PRODUCT SHOULD NOT BE INCLUDED IN THE ROYALTY BASE.

14      IF THE PATENT COVERS ONLY PART OF THE PRODUCT THAT THE

15  INFRINGERS SELLS, THEN THE BASE WOULD NORMALLY BE ONLY THAT

16  FEATURE OR COMPONENT.  FOR EXAMPLE, IF YOU FIND THAT FOR A

17  THOUSAND DOLLAR CAR THE PATENTED FEATURE IS THE TIRES, WHICH

18  SELL FOR $50, THE BASE REVENUE WOULD $50.  HOWEVER, IN A

19  CIRCUMSTANCE IN WHICH THE PATENTED FEATURE IS THE REASON THE

20  CUSTOMERS BUY THE WHOLE PRODUCT, THE BASE REVENUE COULD BE THE

21  VALUE OF THE WHOLE PRODUCT.  EVEN IF THE PATENTED FEATURE IS

22  NOT THE REASON FOR CUSTOMER DEMAND, THE VALUE OF THE WHOLE

23  PRODUCT COULD BE USED IF, FOR EXAMPLE, THE VALUE OF THE

24  PATENTED FEATURE COULD NOT BE SEPARATED OUT FROM THE VALUE OF

25  THE WHOLE PRODUCT.  IN SUCH A CASE, HOWEVER, THE RATE

1    RESULTING FROM THE HYPOTHETICAL NEGOTIATION WOULD BE A LOWER

2    RATE BECAUSE IT IS BEING APPLIED TO THE VALUE OF THE WHOLE

3    PRODUCT AND THE PATENTED FEATURE IS NOT THE REASON FOR THE

4    CUSTOMER'S PURCHASE OF THE WHOLE PRODUCT.

5        ANOTHER WAY TO CALCULATE A ROYALTY IS TO DETERMINE A

6    ONE-TIME LUMP SUM PAYMENT THAT THE INFRINGER WOULD HAVE PAID

7    AT THE TIME OF THE HYPOTHETICAL NEGOTIATION FOR A LICENSE

8    COVERING ALL USES.  THIS DIFFERS FROM THE PAYMENT OF AN

9    ONGOING ROYALTY, BECAUSE WITH AN ONGOING ROYALTY THE LICENSEE

10   PAYS BASED ON THE REVENUE OF ACTUAL LICENSED USE.  WHEN A

11   ONE-TIME LUMP SUM IS PAID, THE INFRINGER PAYS A SINGLE PRICE

12   FOR A LICENSE COVERING BOTH PAST AND FUTURE INFRINGING USE.

13       IN DETERMINING A REASONABLE ROYALTY, YOU MAY CONSIDER, BUT

14   ARE NOT LIMITED TO, THE FOLLOWING FACTORS:

15       ONE, THE ROYALTIES RECEIVED BY DIGITAL REG FOR THE

16   LICENSING OF THE PATENT-IN-SUIT, PROVING OR TENDING TO PROVE

17   AN ESTABLISHED ROYALTY;

18       TWO, THE RATES PAID BY ADOBE FOR THE USE OF OTHER PATENTS

19   COMPARABLE TO THE PATENTS-IN-SUIT;

20       THREE, THE NATURE AND SCOPE OF THE LICENSE, AS EXCLUSIVE

21   OR NONEXCLUSIVE, OR AS RESTRICTED OR NONRESTRICTED IN TERMS OF

22   TERRITORY OR WITH RESPECT TO WHOM THE MANUFACTURED PRODUCT MAY

23   BE SOLD;

24       FOUR, DIGITAL REG'S ESTABLISHED POLICY AND MARKETING

25   PROGRAM TO MAINTAIN ITS PATENT MONOPOLY BY NOT LICENSING

1    OTHERS TO USE THE INVENTION OR BY GRANTING LICENSES UNDER

2    SPECIAL CONDITIONS DESIGNED TO PRESERVE THAT MONOPOLY;

3        FIVE, THE COMMERCIAL RELATIONSHIP BETWEEN DIGITAL REG AND

4    ADOBE, SUCH AS WHETHER THEY ARE COMPETITORS IN THE SAME

5    TERRITORY IN THE SAME LINE OF BUSINESS, OR WHETHER THEY ARE

6    INVENTOR AND PROMOTER;

7        SIX, THE EFFECT OF SELLING THE PATENTED SPECIALTY IN

8    PROMOTING SALES OF OTHER PRODUCTS OF ADOBE, THE EXISTING VALUE

9    OF THE INVENTION TO DIGITAL REG AS A GENERATOR OF SALE --

10   SALES OF ITS NONPATENTED ITEMS, AND THE EXTENT OF WHICH -- THE

11   EXTENT OF SUCH DERIVATIVE OR CONVOYED SALES;

12       SEVEN, THE DURATION OF THE PATENT AND THE TERM OF THE

13   LICENSE;

14       EIGHT, THE ESTABLISHED PROFITABILITY OF THE PRODUCT MADE

15   UNDER THE PATENTS, ITS COMMERCIAL SUCCESS, AND ITS CURRENT

16   POPULARITY;

17       NINE, THE UTILITY AND ADVANTAGES OF THE PATENTED PROPERTY

18   OVER THE OLD MODES OR DEVICES, IF ANY, THAT HAD BEEN USED FOR

19   WORKING OUT SIMILAR RESULTS;

20       TEN, THE NATURE OF THE PATENTED INVENTION, THE CHARACTER

21   OF THE COMMERCIAL EMBODIMENT OF IT AS OWNED AND PRODUCED BY

22   DIGITAL REG, AND THE BENEFITS TO THOSE WHO HAVE USED THE

23   INVENTION;

24       ELEVEN, THE EXTENT TO WHICH ADOBE HAS MADE USE OF THE

25   INVENTION, OR ANY EVIDENCE PROBATIVE OF THE VALUE OF THAT USE;

1    TWELVE, THE PORTION OF THE PROFIT OR OF THE SELLING PRICE

2    THAT MAY BE CUSTOMARY IN THE PARTICULAR BUSINESS OR IN

3    COMPARABLE BUSINESSES TO ALLOW FOR THE USE OF THE INVENTION OR

4    ANALOGOUS INVENTIONS;

5    THIRTEEN, THE PORTION OF THE REALIZABLE PROFITS THAT

6    SHOULD BE CREDITED TO THE INVENTION AS DISTINGUISHED FROM

7    NONPATENTED ELEMENTS, THE MANUFACTURING PROCESS, BUSINESS

8    RISKS, OR SIGNIFICANT FEATURES OR IMPROVEMENTS ADDED BY THE

9    INFRINGER;

10    FOURTEEN, THE OPINION AND TESTIMONY OF QUALIFIED EXPERTS;

11    FIFTEEN, THE AMOUNT THAT DIGITAL REG AND ADOBE WOULD HAVE

12    AGREED UPON AT THE TIME THE INFRINGEMENT BEGAN IF BOTH HAD

13    BEEN REASONABLY AND VOLUNTARILY TRYING TO REACH AN AGREEMENT;

14    THAT IS, THE AMOUNT WHICH A PRUDENT LICENSEE -- WHO DESIRED,

15    AS A BUSINESS PROPOSITION, TO OBTAIN A LICENSE TO MANUFACTURE

16    AND SELL A PARTICULAR ARTICLE EMBODYING THE PATENTED

17    INVENTION -- WOULD HAVE BEEN WILLING TO PAY AS A ROYALTY AND

18    YET BE ABLE TO MAKE A REASONABLE PROFIT AND WHICH AMOUNT WOULD

19    HAVE BEEN ACCEPTABLE BY A PRUDENT PATENTEE WHO WAS WILLING TO

20    GRANT A LICENSE.

21    YOU CAN CONSIDER EVENTS AND CIRCUMSTANCES THAT OCCURRED

22    BEFORE AND AFTER THE TIME OF THE HYPOTHETICAL NEGOTIATION

23    BETWEEN DIGITAL REG AND ADOBE TO DETERMINE A REASONABLE

24    ROYALTY.  IT IS UP TO YOU, BASED ON THE EVIDENCE, TO DECIDE

25    WHAT TYPE OF ROYALTY IS APPROPRIATE IN THIS CASE.

1      IF YOU FIND THAT ADOBE INDUCED INFRINGEMENT, RATHER THAN

2    DIRECTLY INFRINGED, THEN YOU MUST MAKE A NUMBER OF ADDITIONAL

3    FINDINGS BEFORE DAMAGES MAY BE AWARDED.

4      IN ORDER TO RECOVER DAMAGES FOR INDUCED INFRINGEMENT,

5    DIGITAL REG MUST EITHER PROVE THAT THE METHODS PRACTICED BY

6    ADOBE'S ACCUSED PRODUCTS NECESSARILY INFRINGE AT LEAST ONE OF

7    DIGITAL REG'S PATENTS, OR PROVE ACTS OF DIRECT INFRINGEMENT BY

8    OTHERS THAT WERE INDUCED BY ADOBE.  BECAUSE THE AMOUNT OF

9    DAMAGES FOR INDUCED INFRINGEMENT IS LIMITED BY THE NUMBER OF

10   INSTANCES OF DIRECT INFRINGEMENT, DIGITAL REG MUST FURTHER

11   PROVE THE NUMBER OF DIRECT ACTS OF INFRINGEMENT OF AT LEAST

12   ONE OF DIGITAL REG'S PATENTS, FOR EXAMPLE, BY SHOWING

13   INDIVIDUAL ACTS OF DIRECT INFRINGEMENT OR BY SHOWING THAT A

14   PARTICULAR CLASS OF USES DIRECTLY INFRINGES.

15     I WILL GIVE YOU A FEW MORE INSTRUCTIONS ABOUT HOW TO

16   CONDUCT YOUR DELIBERATIONS AFTER WE HAVE HEARD THE CLOSING

17   ARGUMENT.  BUT WHAT I WILL DO BEFORE THE ARGUMENT IS TO READ

18   TO YOU THE VERDICT FORM THAT YOU WILL BE GIVEN TO TELL YOU

19   WHAT QUESTIONS YOU WILL BE ASKED TO ANSWER, SO YOU WILL BE

20   ABLE TO FOLLOW ALONG DURING THE CLOSING ARGUMENT.

21     WE, THE JURY, IN THE ABOVE-ENTITLED ACTION RETURN THE

22   FOLLOWING VERDICT ON THE QUESTIONS SUBMITTED TO US.

23     FIRST, INFRINGEMENT.

24     QUESTION ONE:  DIRECT INFRINGEMENT.  HAS DIGITAL REG

25   PROVEN IT IS MORE LIKELY THAN NOT THAT ADOBE HAS INFRINGED ANY

1    OF THE FOLLOWING CLAIMS?  ENTER "YES" OR "NO" IN EACH BOX.

2         THEN, YOU WILL SEE A CHART WHICH WILL HAVE THE DECISIONS

3    YOU HAVE TO MAKE.  FIRST WILL BE THE ADOBE ACTIVATION PRODUCT

4    AND WHETHER IT IS DIRECTLY INFRINGED BY CLAIM 45, THE

5    INDEPENDENT CLAIM OF THE '670 PATENT.

6         NEXT, UNDER INFRINGEMENT, DIRECT INFRINGEMENT, YOU WILL BE

7    ASKED ABOUT THE ADOBE LIVECYCLE PRODUCT.  AND YOU WILL BE

8    ASKED WHETHER OF THE '670 PATENT, CLAIM 5 -- I AM SORRY --

9    CLAIM 45, THE INDEPENDENT CLAIM IS INFRINGED, WHETHER

10   CLAIM 52, DEPENDENT ON CLAIM 45, IS DIRECTLY INFRINGED.

11        NEXT, YOU WILL BE ASKED ABOUT INDIRECT INFRINGEMENT.  HAS

12   DIGITAL REG PROVEN IT IS MORE LIKELY THAN NOT THAT ADOBE

13   INDIRECTLY INFRINGED ANY OF THE FOLLOWING CLAIMS?

14        ENTER "YES" OR "NO" IN EACH BOX.  AND THERE YOU WILL BE

15   ASKED, AGAIN, ABOUT ADOBE ACTIVATION PRODUCT, BUT YOU WILL BE

16   ASKED ABOUT THE '541 PATENT, CLAIM 1, THE INDEPENDENT CLAIM,

17   CLAIM 2, DEPENDENT ON CLAIM 1, CLAIM 4, ALSO DEPENDENT ON

18   CLAIM 1, AND CLAIM 13, ALSO DEPENDENT ON CLAIM 1.

19        THEN, YOU WILL BE ASKED AGAIN ABOUT THE '670 PATENT,

20   CLAIM 45, THE INDEPENDENT CLAIM.

21        THEN, YOU WILL BE ASKED ABOUT ADOBE FLASH.  AND YOU WILL

22   BE ASKED ABOUT THE '541 PATENT, CLAIM 1, THE INDEPENDENT

23   CLAIM, CLAIM 2, DEPENDENT ON CLAIM 1, CLAIM 4, ALSO DEPENDENT

24   ON CLAIM 1, CLAIM 13, ALSO DEPENDENT ON CLAIM 1.

25        THEN, YOU WILL BE ASKED ABOUT THE ADOBE LIVECYCLE PRODUCT.

1    AND YOU WILL BE ASKED TO ANSWER "YES" OR "NO" ABOUT THE '541

2    PATENT, CLAIM 1, THE INDEPENDENT CLAIM, CLAIMS 2, 4, AND 13,

3    THE DEPENDENT CLAIMS, DEPENDENT ON CLAIM 1, CLAIMS 45, THE

4    INDEPENDENT CLAIM OF THE '670 PATENT, AND CLAIM 52, THE

5    DEPENDENT CLAIM OF CLAIM 45 OF THE '670 PATENT DEPENDENT ON

6    CLAIM 45.

7        NEXT, YOU WILL BE ASKED ABOUT INVALIDITY.  UNDER

8    INVALIDITY YOU WILL BE FIRST ASKED ABOUT ANTICIPATION.  HAS

9    ADOBE PROVEN THAT IT IS HIGHLY PROBABLE THAT THE FOLLOWING

10   CLAIMS OF DIGITAL REG'S PATENTS WERE ANTICIPATED?  OR, IN

11   OTHER WORDS, NOT NEW.

12       ANSWER "YES" OR "NO" IN EACH BOX.  SO THEN YOU WILL BE

13   ASKED ABOUT ANTICIPATED, AND YOU WILL BE ASKED ABOUT THE '670

14   PATENT, CLAIM 32, AN INDEPENDENT CLAIM, CLAIM 45, AN

15   INDEPENDENT CLAIM, AND CLAIM 52, DEPENDENT ON CLAIM 45.

16       NEXT, YOU WILL BE ASKED QUESTIONS ABOUT OBVIOUSNESS.  HAS

17   ADOBE PROVEN THAT IT IS HIGHLY PROBABLE THAT THE FOLLOWING

18   CLAIMS OF DIGITAL REG'S PATENTS WOULD HAVE BEEN OBVIOUS TO A

19   PERSON OF ORDINARY SKILL IN THE FIELD AT THE TIME THE PATENT

20   APPLICATION WAS FILED?  ANSWER "YES" OR "NO" IN EACH BOX.

21       OBVIOUS, FIRST THE '541 PATENT.  CLAIM 1, THE INDEPENDENT

22   CLAIM, CLAIM 2, 4 AND 13, CLAIMS THAT ARE DEPENDENT ON

23   CLAIM 1, AND THE '670 PATENT, CLAIM 32, AN INDEPENDENT CLAIM,

24   CLAIM 45, AN INDEPENDENT CLAIM, AND CLAIM 52, A CLAIM THAT'S

25   DEPENDENT ON CLAIM 45.

1    THEN, YOU WILL BE TOLD IF YOU FOUND THAT AT LEAST ONE

2    PRODUCT INFRINGES AT LEAST ONE VALID PATENT CLAIM, THAT IS,

3    THAT YOU ANSWERED "YES" AS TO INFRINGEMENT OF A PARTICULAR

4    CLAIM BY A PRODUCT IN EITHER QUESTION ONE OR TWO, AND YOU

5    ANSWERED "NO" AS TO EACH OF THE INVALIDITY DEFENDANTS

6    REGARDING THAT CLAIM IN QUESTIONS THREE, FOUR AND FIVE, THEN

7    YOU WILL PROCEED TO ANSWER QUESTIONS SIX AND SEVEN.

8    IF YOU HAVEN'T FOUND THAT ANY PARTICULAR CLAIM IS BOTH

9    NONVALID AND INFRINGED, THEN YOU WON'T ANSWER THESE DAMAGES

10   QUESTIONS.  BUT IF YOU DO FIND THAT, THEN YOU WILL ANSWER

11   THESE QUESTIONS, AND THAT IS DAMAGES.

12   REASONABLE ROYALTY.  FOR THE CLAIMS THAT YOU FOUND VALID

13   AND INFRINGED BY ADOBE'S ACCUSED PRODUCTS, WHAT ROYALTY AMOUNT

14   HAS DIGITAL REG PROVEN THAT IT SHOULD HAVE RECEIVED FROM

15   ADOBE?  AND THEN, YOU WILL ANSWER EITHER A, EITHER AN ONGOING

16   ROYALTY PAYMENT OF ROYALTY RATE BLANK PERCENT.  AND THERE YOU

17   WILL ENTER AN APPROPRIATE ROYALTY RATE, IF YOU FIND ONE, TIMES

18   ROYALTY BASE:  DOLLAR SIGNAL, BLANK.

19   AND THAT WILL BE THE AMOUNT OF THE ROYALTY BASE UPON WHICH

20   YOU DECIDE THE ROYALTY SHOULD BE BASED.  AND THEN, YOU WILL

21   MULTIPLY THE RATE, THE PERCENTAGE, TIMES THE BASE, THE NUMBER,

22   AND REACH A DAMAGES AWARD:  DOLLAR SIGN, BLANK.

23   THAT'S THE ONGOING ROYALTY.  OR INSTEAD, YOU MAY ANSWER B,

24   A ONE-TIME PAYMENT OF:  DOLLAR SIGN, BLANK.  AND THERE YOU

25   WOULD ENTER INSTEAD A LUMP SUM AMOUNT, IF YOU FIND THAT THAT

1   IS APPROPRIATE.

2       NEXT, IF YOU GET TO THIS POINT YOU WILL ANSWER THE

3   WILLFULNESS QUESTION, WHICH WILL ASK YOU:  HAS DIGITAL REG

4   PROVEN THAT IT IS HIGHLY PROBABLE THAT ADOBE ACTUALLY KNEW OR

5   THE EVIDENCE WAS SO OBVIOUS THAT ADOBE SHOULD HAVE KNOWN THAT

6   ITS ACTIONS CONSTITUTED INFRINGEMENT OF A VALID AND

7   ENFORCEABLE PATENT?

8       YOU WILL ANSWER THAT "YES" OR "NO."  AND THEN, YOU WILL

9   RETURN YOUR VERDICT.

10      SO AT THIS TIME WE WILL HEAR, FIRST, CLOSING ARGUMENT FROM

11  PLAINTIFF.  THEN, WE WILL HEAR CLOSING ARGUMENT FROM

12  DEFENDANT, WHICH WILL BE SHARED BETWEEN TWO OF THE ATTORNEYS.

13  AND THEN, WE GO BACK TO THE PLAINTIFF FOR A REBUTTAL, SHORT

14  FINAL CLOSING ARGUMENT.

15      WE WILL TAKE A BREAK IN-BETWEEN THE PLAINTIFF'S OPEN AND

16  CLOSE AND THE DEFENDANTS' CLOSE.  SO YOU MAY ARGUE.  AND YOU

17  MAY TURN THAT PODIUM, IF YOU WOULD LIKE.

18          **THE CLERK:**  WILL YOU ALSO BE USING THE MONITORS?

19          **MR. ELLWANGER:**  YES.

20                  **CLOSING ARGUMENT**

21          **MR. ELLWANGER:**  ADOBE PROTECTS ITS OWN PROPERTY WITH

22  STOLEN PROPERTY.

23          **THE COURT:**  NOT LOUD ENOUGH, I'M AFRAID.  OR IF YOU

24  ARE USING THE MIC, IT IS NOT CLOSE ENOUGH, NOT LOUD ENOUGH OR

25  NOT ON.

1           **MR. ELLWANGER:** IS THIS BETTER?

2           **THE COURT:** YES.

3           **MR. ELLWANGER:** ADOBE PROTECTS ITS OWN PROPERTY WITH

4   STOLEN PROPERTY. THOSE WERE THE FIRST WORDS YOU HEARD ABOUT

5   THIS CASE A WEEK-AND-A-HALF AGO. AND AT THE TIME YOU MIGHT

6   HAVE THOUGHT THAT I WAS TALKING ABOUT SOME MISCREANT, TO

7   BORROW DR. DEVANBU'S PHRASE. A MISCREANT THAT HAD CRAWLED

8   THROUGH SOME WINDOW AND TOOK SOME SOFTWARE.

9           BUT I WASN'T TALKING ABOUT THAT, BECAUSE PATENT

10  INFRINGEMENT IS MORE COMPLICATED THAN THAT. IT'S ABOUT TAKING

11  IDEAS AND USING THOSE IDEAS AND NOT PAYING FOR THOSE IDEAS.

12  AND THAT'S WHAT THE EVIDENCE HAS SHOWN HAPPENED HERE.

13          NOW, I'M NOT GOING TO TAKE YOUR TIME GOING THROUGH THE

14  TESTIMONY OF EVERY SINGLE WITNESS AND EVERY SINGLE DOCUMENT

15  THAT HAS BEEN ADMITTED INTO THIS CASE. BUT I DO WANT TO TAKE

16  THE TIME TO TALK TO YOU ABOUT SOME EVIDENCE THAT'S IN THE

17  RECORD, BUT THAT YOU HAVEN'T HAD A CHANCE TO LOOK AT YET AND

18  CONSIDER.

19          AND I ALSO WANT TO TAKE THE OPPORTUNITY TO CONNECT THE

20  DOTS BETWEEN SOME OF THE EVIDENCE THAT YOU HAVE SEEN AND THE

21  JURY VERDICT THAT THE COURT JUST INSTRUCTED YOU ABOUT, AND

22  THAT WHEN YOU GO BACK IN THAT ROOM THAT YOU WILL HAVE TO FILL

23  OUT.

24          AND THE FIRST THING THAT I WANT TO TALK ABOUT IS

25  WILLFULNESS. IN ORDER TO PROVE WILLFULNESS, THE COURT'S

1    INSTRUCTED THAT TO PROVE WILLFUL INFRINGEMENT DIGITAL REG MUST

2    PERSUADE YOU THAT IT IS HIGHLY PROBABLE THAT ADOBE ACTED WITH

3    RECKLESS DISREGARD OF THE PATENT IT INFRINGED.

4        TO DEMONSTRATE SUCH RECKLESS DISREGARD DIGITAL REG MUST

5    PERSUADE YOU THAT ADOBE ACTUALLY KNEW, OR IT WAS SO OBVIOUS

6    THAT ADOBE SHOULD HAVE KNOWN THAT ITS ACTIONS CONSTITUTED

7    INFRINGEMENT OF A VALID PATENT.

8        AND I WANT TO WALK YOU THROUGH SOME OF ADOBE'S PATENTS

9    THAT THEY HAVE AND THE PROSECUTION HISTORIES, WHICH ARE THE

10   FILES THAT GO BACK AND FORTH BETWEEN THE APPLICANT AND THE

11   UNITED STATES PATENT OFFICE.

12       NOW, I'M NOT SAYING ADOBE DIDN'T DESERVE THESE PATENTS OR

13   THEY WEREN'T ULTIMATELY GRANTED; THAT THEY FIGURED OUT HOW TO

14   PUT THE ERASER AT THE END OF THE PENCIL.  BUT I DO WANT TO

15   TALK ABOUT THE NOTICE THAT THEY SHOW ADOBE WAS UNDER OF THE

16   '541 AND THE '670 PATENT.

17       NOW, IN ORDER TO DO THAT, I WANT TO BRING UP THE FIRST

18   SLIDE.

19       THANK YOU, MS. MASON.

20       AT FIRST, I WANT TO TALK TO YOU ABOUT UNITED STATES PATENT

21   '384.  IT IS PLAINTIFF'S EXHIBIT 6.  AND THIS PATENT, AS

22   YOU'LL SEE, IS ASSIGNED TO ADOBE.  AND ON THE VERY FACE OF

23   THIS PATENT YOU'LL SEE THE PATTERSON PATENT '541 THAT'S

24   INDICATED AS ONE OF THE PATENTS THAT THE PATENT OFFICE POINTED

25   OUT TO ADOBE AS BEING RELEVANT TO THIS ADOBE PATENT.

 1      AND YOU CAN TELL THAT BECAUSE OF THAT ASTERISK RIGHT THERE

 2   NEXT TO THE PATENT NUMBER.  IT SAYS:  "CITED BY EXAMINER."

 3      NOW, AS WE GO THROUGH THIS PROSECUTION HISTORY YOU WILL

 4   SEE THAT THIS '541 PATENT WASN'T JUST MENTIONED, THAT, IN

 5   FACT, A NUMBER OF THE CLAIMS STOOD REJECTED AS UNPATENTABLE IN

 6   VIEW OF U.S. PATENT '541 TO PATTERSON.

 7      AND SO TO OVERCOME THAT, ADOBE HAD TO WRITE PAPERS TO THE

 8   PATENT OFFICE, AND APPEAL IT, AND FIGHT ABOUT WHETHER OR NOT

 9   THE PATTERSON PATENT WAS A REASON TO REJECT THEIR PATENT.

10      ISSUES:  WAS IT PROPERLY REJECTED UNDER PATTERSON?

11   PROPERLY REJECTED UNDER PATTERSON.

12   PROPERLY REJECTED UNDER PATTERSON.

13   HERE YOU WILL SEE ARGUMENT ABOUT:

14   "CLAIM 1 STANDS FINALLY REJECTED AS BEING UNPATENTABLE

15   OVER PATTERSON."

16      YOU WILL SEE IN THE ARGUMENT REFERENCE AFTER REFERENCE

17   AFTER REFERENCE AFTER REFERENCE AFTER REFERENCE TO THE

18   PATTERSON PATENT.

19      AND HOW ADOBE'S LAWYERS HAD TO CONTINUE TO ARGUE ABOUT THE

20   PATTERSON PATENT.  FINALLY, IN RESPONSE TO ARGUMENT, YOU WILL

21   SEE THAT THE PATENT OFFICE SAID THAT THE REFERENCE OF

22   PATTERSON WAS ADDED IN FURTHER REVIEW OF THE PREVIOUSLY-CITED

23   REFERENCES FOR NEW GROUNDS OF REJECTION.

24      AND IN A SHEET YOU WILL SEE IN A NUMBER OF THESE

25   PROSECUTION HISTORIES, NOTICE OF REFERENCES CITED, YOU WILL

```
1    SEE THERE THAT THE EXAMINER OF THE UNITED STATES PATENT
2    OFFICE, MR. TRAN, CITED THE PATTERSON PATENT BY NUMBER TO
3    ADOBE.
4        AND INSIDE OF THAT SAME PATENT BY NAME:
5        "REGULATING ACCESS TO DIGITAL CONTENT."
6        SO NEXT WE MOVE TO THE '143 PATENT.  THAT, AGAIN, IS
7    ANOTHER PATENT FILED BY ADOBE.  AND THIS TIME ON THE VERY FACE
8    OF THIS PATENT YOU WILL SEE THAT THE '541 PATTERSON PATENT IS
9    LISTED AGAIN.  EXCEPT THIS TIME THERE IS NO ASTERISK, BECAUSE
10   THIS TIME THE FILE HISTORY WILL SHOW YOU THAT IN INFORMATION
11   DISCLOSURE STATEMENT BY APPLICANT, ADOBE, THEY LISTED THE '541
12   PATTERSON PATENT.  SOMEONE OVER THERE WAS PAYING ATTENTION.
13       NEXT, WE MOVE TO THE '642 PATENT.  NOW, THIS ONE YOU'VE
14   SEEN BEFORE BECAUSE MR. HERBACH CAME OVER HERE FROM ADOBE,
15   TESTIFIED TO YOU, AND HE ACTUALLY WALKED THROUGH THIS PATENT.
16   THIS WAS HIS.  AND ON THE FACE OF THIS PATENT YOU'LL SEE THAT
17   THE '670 PATTERSON PATENT, THE TRACKING PATENT, WELL, THAT IS
18   ALSO POINTED OUT.
19       AND, LOOK.  THERE IS THAT ASTERISK AGAIN.  AND IF YOU GO
20   INTO THE PROSECUTION HISTORY, YOU WILL SEE THAT, AGAIN, NOTICE
21   OF REFERENCES CITED.  THE PATENT EXAMINER POINTED OUT TO ADOBE
22   THE '670 TRACKING PATENT BY PATRICK PATTERSON.
23       SO WHEN MR. HERBACH FILED WHAT WOULD EVENTUALLY BECOME THE
24   '102 PATENT -- AGAIN, GRANTED TO ADOBE -- THIS TIME ON THE
25   FACE OF THE PATENT THERE IS THE '670, THE TRACKING PATENT.
```

1    BUT THIS TIME NO ASTERISK.  BECAUSE IF YOU LOOK AT THE FILE

2    HISTORY MR. HERBACH AND ADOBE CITED THAT PATENT THEMSELVES.

3         AS YOU'VE SEEN THERE IS A SIGNIFICANT AMOUNT OF

4    UNCONTROVERTED EVIDENCE IN THE DOCUMENTS HELD ONTO BY THE

5    PATENT OFFICE ABOUT WHAT ADOBE KNEW AND WHEN THEY KNEW IT.

6    AND IN ADDITION TO THESE DOCUMENTS, YOU ALSO WERE SHOWN THE

7    ADOBE VALUE PROPOSITION, WHICH MR. VENTERS TESTIFIED HE WENT

8    THROUGH WITH MEMBERS OF ADOBE VENTURES ON THE PHONE DURING THE

9    SUMMER OF 2004.

10        AND HE WENT OVER IN GREAT DETAIL ABOUT WHAT VALUE THESE

11   DIGITAL REG PATENTS COULD GIVE TO ADOBE FOR THEM TO USE IN

12   THEIR PRODUCTS.  HE SAID IT WOULD GIVE USERS OF ADOBE PRODUCTS

13   A WAY TO SECURELY TRACK, AUTHENTICATE AND MONETIZE DOCUMENTS,

14   GRAPHICS AND OTHER MEDIA.

15        HE WENT THROUGH WITH ADOBE HOW, IF THEY USE THESE DIGITAL

16   REG PATENTS IN THEIR ADOBE STANDALONE PRODUCTS, IT WOULD

17   COMPLETE THE ECOSYSTEMS FOR ALL THESE DIFFERENT TYPES OF ADOBE

18   PRODUCTS.

19        AND, FINALLY, IT EVEN DISCUSSED THE TRACKING PATENT BY

20   NAME:

21        "WITH THE GRANTING OF 'TRACKING ELECTRONIC CONTENT' BY THE

22   U.S. PATENT OFFICE, DIGITAL CONTAINERS HAS OBTAINED THE

23   'SUPERDISTRIBUTION' PATENT.

24        AND IN THE NEXT PARAGRAPH YOU WILL SEE THEY REFER TO THE

25   '541 PATENT BY THE NUMBER AND THE NAME:

1       "REGULATING ACCESS TO DIGITAL CONTENT."

2       CONSIDER THIS EVIDENCE WHEN YOU CONSIDER WHAT ADOBE KNEW

3   AND WHEN THEY KNEW IT.

4       NOW, IN ADOBE'S OPENING STATEMENT THEY PUT UP THIS

5   DEMONSTRATIVE OF A TIME LINE SHOWING WHEN LIVECYCLE WAS

6   DEVELOPED, WHEN FLASH ACCESS WAS RELEASED.  BUT IN FIGURING

7   OUT WHAT THEY KNEW AND WHEN THEY KNEW IT, THEY DIDN'T PUT WHEN

8   THE PATENTS WERE FILED THAT ARE AT ISSUE IN THIS CASE OR EVEN

9   WHEN THOSE PATENTS ISSUED.  IN FACT, THEY DIDN'T EVEN LEAVE

10  ROOM ON THE TIME LINE.

11      SO WE HAVE EXTENDED IT BACK TO SHOW YOU IN CONTEXT WHEN

12  THE APPLICATION FOR THE '541 WAS FILED, WHEN THE APPLICATION

13  FOR THE '670 PATENT WAS FILED, WHEN THE APPLICATION FOR THE

14  '541 PATENT WAS GRANTED, AND WHEN THE APPLICATION FOR THE '670

15  PATENT WAS GRANTED.

16      WHEN YOU ARE CONSIDERING WHAT ADOBE KNEW AND WHEN THEY

17  KNEW IT, AND IN LIGHT OF WHEN ALL OF THOSE PATENTS WERE FILED

18  THAT WE DISCUSSED, CONSIDER THAT TIME LINE.

19      AND CONSIDER ALSO THE TESTIMONY THAT YOU HEARD FROM

20  MR. HERBACH THAT WHEN HE WENT THROUGH THAT PATENT APPLICATION

21  PROCESS HIMSELF, YES, HE DID WORK WITH OUTSIDE COUNSEL.  BUT

22  HE ALSO WORKED WITH IN-HOUSE COUNSEL.

23      THOSE ARE LAWYERS WHO ARE EMPLOYED BY ADOBE.  THEY GO TO

24  WORK THERE EVERY DAY.  THEY ARE NOT IN A SEPARATE LAW FIRM.

25  THEY ARE ADOBE EMPLOYEES.

1    AND MR. HERBACH TESTIFIED THAT HE WORKED WITH THEM DURING

2  THAT APPLICATION PROCESS.

3    NOW, ADOBE'S ALSO MADE AN ISSUE THROUGHOUT THIS CASE

4  REGARDING WHAT THEY KNEW AND WHEN THEY KNEW IT THAT WE DRAGGED

5  THEM INTO COURT HERE, AND WE'VE MADE THEM GO TO THE EXPENSE OF

6  HIRING THESE LAWYERS AND EXPERTS AND HAVING EXECUTIVES SIT

7  THROUGH WEEKS OF TRIAL.

8    BUT THEN, ON THE OTHER HAND, THEY SHOWED YOU AN OPENING

9  STATEMENT WITH THIS DEMONSTRATIVE, WHICH WENT THROUGH ALL OF

10  THOSE DATES THAT YOU JUST LOOKED AT.  AND UNDER EACH ONE WROTE

11  "NO LAWSUIT, NO LAWSUIT, NO LAWSUIT, NO LAWSUIT, NO LAWSUIT."

12    IT IS AS IF ADOBE IS TELLING YOU THAT THE ONLY TIME THEY

13  PAY ATTENTION IS WHEN SOMEBODY SUES THEM.

14    MEMBERS OF THE JURY, WE WOULD SUBMIT TO YOU THAT THAT IS

15  RECKLESS.  THAT'S WILLFUL.

16    THE JUDGE HAS INSTRUCTED YOU THAT EVEN IF YOU DON'T FIND

17  WILLFULNESS, EVEN IF THAT NEVER ENTERED INTO THIS COURTROOM,

18  THAT YOU COULD STILL FIND THAT ADOBE INFRINGED OUR PATENTS.

19    AND THERE'S TWO TYPES OF INFRINGEMENT THAT YOU ARE

20  INSTRUCTED ABOUT:  DIRECT AND INDIRECT.  NOW, TO DECIDE

21  WHETHER ADOBE DIRECTLY INFRINGES A CLAIM OF DIGITAL REG'S

22  PATENTS, YOU MUST COMPARE ACTIONS BY ADOBE WITH THE PATENT

23  CLAIMS, AND DETERMINE WHETHER EVERY REQUIREMENT OF THE CLAIM

24  WAS CARRIED OUT BY ADOBE.

25    IF SO, ADOBE DIRECTLY INFRINGES THAT CLAIM.  AND THIS IS

CLOSING ARGUMENT – ELLWANGER

1    WHERE IT IS DIFFERENT FROM WILLFULNESS.  WHETHER OR NOT ADOBE

2    KNEW ITS PRODUCTS INFRINGED, OR EVEN KNEW OF THE PATENT, DOES

3    NOT MATTER IN DETERMINING DIRECT INFRINGEMENT.  IN THIS CASE

4    DIGITAL REG ARGUES THAT ADOBE INFRINGED ITS PATENTS BOTH

5    DIRECTLY AND INDIRECTLY.

6        AND INDIRECT INFRINGEMENT, JUST SO THAT WE UNDERSTAND THE

7    RULES WE ARE LIVING BY, IS THE ACT OF ENCOURAGING OR INDUCING

8    OTHERS TO INFRINGE A PATENT.  THAT'S CALLED "INDUCING

9    INFRINGEMENT."

10       NOW, IN ORDER TO DETERMINE WHETHER OR NOT ADOBE HAS

11   INFRINGED, WHETHER DIRECTLY OR INDIRECTLY, DIGITAL REG'S

12   PATENTS, WE WANT YOU TO FOCUS ON THREE THINGS:  THE DOCUMENTS,

13   THE CODE, AND THE CLAIMS.  THOSE THREE THINGS WILL GIVE YOU

14   YOUR ANSWER.

15       AND I WANT TO SPEND JUST A BRIEF MOMENT TALKING AGAIN

16   ABOUT WHAT IS ACTUALLY AT ISSUE HERE.  IT IS THESE SIX CLAIMS.

17   FOUR CLAIMS OF THE '541 PATENT.  TWO CLAIMS OF THE '670

18   TRACKING PATENT.  AND THERE'S THIS ONE INDEPENDENT CLAIM, THIS

19   METHOD OF REGULATING ACCESS TO DIGITAL CONTENT.  AND IT

20   FOCUSES ON WHAT HAPPENS AT THE CLIENT COMPUTER, THE ONE YOU

21   HAVE ON YOUR DESK.

22       AT A CLIENT EXECUTING AN ACCESS CHECKING PROCESS TO

23   DETERMINE WHETHER THE CLIENT HOLDS A PRE-EXISTING

24   PERMISSION -- OR PERSIMMON, AS DR. DEVANBU SAID -- FOR A

25   RESOURCE TO ACCESS THAT DIGITAL CONTENT.  IF IT DOESN'T, NEXT

1    STEP:  REQUEST PERMISSION FROM AN EXTERNAL SOURCE FOR THAT

2    RESOURCE.

3        RECEIVING FROM THAT EXTERNAL SOURCE A TOKEN.  AND THE LAST

4    STEP:  BASED ORDER THAT RECEIVED TOKEN, EXECUTING AN

5    INSTALLATION PROCESS THAT GENERATES AT THE CLIENT A PERMISSION

6    THAT IS LOCKED UNIQUELY TO THE CLIENT AND THAT MAY BE FOUND BY

7    A LATER EXECUTION OF THAT PROCESS.

8        SO THAT'S THE CLAIM THAT GOVERNS THE REST OF THE ONES IN

9    THE '541.  SO FOR CLAIM 2, 4, AND 13, THE DEPENDENT CLAIMS,

10   THEY DEPEND ON CLAIM 1, AND THEY ADD A LITTLE BIT.

11       CLAIM 2 ADDS WHEN THEY REQUEST THE PERMISSION, YOU RECEIVE

12   A TOKEN AND SELECTIVELY GRANT THE RESOURCE ACCESS, ARE ALL

13   PERFORMED BY THE CLIENT.

14       CLAIM 4 TALKS ABOUT WHERE THE PERMISSION COMPRISES A

15   UNIQUE CODED KEY, RESPONDING TO THE DIGITAL CONTENT.

16       AND THE LAST DEPENDENT CLAIM, 13, TALKS ABOUT REQUESTING

17   THE PERMISSION FROM THE EXTERNAL SOURCE, AND THAT INITIATES

18   THIS WHOLE AUTHORIZATION PROCEDURE YOU'VE HEARD ABOUT.  AND

19   THAT THE TOKEN RECEIVED IS BASED ON THE RESULT OF THAT

20   PROCEDURE.

21       SO AS YOU LOOK AT THE DOCUMENTS AND THE COMPUTER CODE,

22   LOOK AT THE CLAIMS, AND SEE HOW THEY MATCH UP, BECAUSE THE

23   EVIDENCE IS THERE.

24       ON THE '670 PATENT, THIS TALKS ABOUT TRACKING.  TRACKING

25   THE CONTENT.  AND THERE'S A METHOD ABOUT CREATING A FILE.  AND

1    THAT FILE INCLUDES SOME ELECTRONIC CONTENT.  AND THAT CONTENT,

2    IT CAUSES ACCESS TO THE ELECTRONIC CONTENT TO BE DENIED UNTIL

3    NOTIFICATION INFORMATION IS COLLECTED BY EXECUTABLE

4    INSTRUCTIONS AND HAS BEEN SUCCESSFULLY TRANSMITTED OUT.

5        YOU HAVE TO TRANSMIT THE FILE TO AT LEAST ONE ADDRESS, AND

6    THEN RECEIVE A NOTIFICATION INFORMATION FROM THE NEXT

7    RECIPIENT, OTHER THAN THAT OF THE SENDER OF WHAT THE CONTENT

8    IS.

9        AND THEN, THERE IS ONE DEPENDENT CLAIM HERE THAT WHEN YOU

10   CREATE THE FILE THAT INCLUDES ENCRYPTING THE DOCUMENT.  AND

11   ONE WAY TO THINK ABOUT THE CLAIMS OF BOTH THE '541 AND THE

12   '670 IS TO REMEMBER BACK TO WHAT MR. PATTERSON AND I TALKED

13   ABOUT WHEN HE WAS ON THE STAND LAST WEEK.

14       BECAUSE MR. PATTERSON TOLD YOU THAT HIS WHOLE IDEA

15   CENTERED AROUND THAT DIGITAL ENVELOPE, RIGHT?  HOW HE WANTED

16   TO CREATE THIS VESSEL THAT WOULD ALLOW HIM TO PUT

17   COPYRIGHTABLE MATERIALS INTO SOMETHING AND PROTECT IT ALL THE

18   WAY THROUGH THE PROCESS.  SO WHEN YOU LOOKED AT IT ON

19   DIFFERENT MACHINES YOU OWN YOU WOULDN'T HAVE TO KEEP ENTERING

20   IN THE SAME CODES AND GO THROUGH THAT WHOLE PROCESS.  SO YOU

21   COULD ACTUALLY USE MUSIC AND BOOKS AND FILMS, LIKE WE ALL DO

22   TODAY.

23       AND THAT IS WHAT HE TOLD YOU HE WANTED TO DO WAS REGULATE

24   THAT ACCESS TO DIGITAL CONTENT.  BUT IT DIDN'T STOP THERE.  HE

25   KNEW THAT TO MAKE MONEY ON IT IT WOULD BE IMPORTANT FOR YOU TO

1   BE ABLE TO TRACK THAT ELECTRONIC CONTENT.  AND HE TOLD YOU

2   THAT STORY OF JULIAN LENNON, JOHN LENNON'S SON, WHO RELEASED

3   THAT SONG ON THEIR WEBSITE.

4        AND HE SAID THAT THAT FIRST MONTH IT CREATED A LOT OF

5   BUZZ.  IT HAD A QUARTER MILLION DOWNLOADS.  THEY HAD A QUARTER

6   MILLION DOWNLOADS THAT WERE REGULATING ACCESS TO THAT DIGITAL

7   CONTENT.  BUT THAT THEY ALSO HAD HALF A MILLION PASSAROUNDS,

8   HE CALLED THEM.  AND THE REASON THEY KNEW THEY HAD HALF A

9   MILLION PASSAROUNDS IS BECAUSE THEY COULD TRACK WHAT PEOPLE

10  DID WITH THE CONTENT.

11       WHAT HE DESCRIBED IS WHAT HE GOT.  AFTER YEARS OF WORKING

12  THROUGH THE PATENT OFFICE, THE '541 AND THE '670 PATENT WERE

13  BOTH GRANTED.

14       SO NOW TO TALK ABOUT HOW ADOBE HAS INFRINGED THEM, FIRST,

15  LET'S TALK ABOUT THE SOURCE CODE.

16       NOW, DR. DEVANBU TESTIFIED TO YOU A LOT ABOUT THE SOURCE

17  CODE, ABOUT HOW HE SPENT 16 YEARS TEACHING THIS SAME SOURCE

18  CODE, THE SAME COMPUTER CODE THAT ADOBE USES IN ITS PRODUCTS

19  TO HIS STUDENTS AT UC DAVIS.

20       AND HE ALSO TOLD YOU THAT HE'S NEVER TESTIFIED BEFORE.  HE

21  HAS NEVER DONE THIS BEFORE EXCEPT FOR THAT CAR WRECK CASE.  HE

22  NEVER HAS COME INTO COURT AND TOLD THE JURY WHETHER OR NOT

23  THINGS INFRINGE.  ALL HE DOES IS TEACH CODE.  THAT'S HIS JOB.

24       AND HE TOLD YOU THAT SOURCE CODE IS WHAT'S USED BY

25  PROGRAMMERS TO WRITE THE SOFTWARE, TO UNDERSTAND IT AND TO

1    MAINTAIN IT.  AND THAT SOURCE CODE IS THE MOST ACCURATE

2    REPRESENTATION OF WHAT ACTUALLY HAPPENS WHEN A SYSTEM RUNS.

3    AND THAT IS WHY DR. DEVANBU GOT UNDER THE HOOD, EXAMINED THE

4    CODE HIMSELF SO THAT HE DIDN'T HAVE TO ONLY RELY ON DOCUMENTS

5    OR ONLY RELY ON TESTIMONY.  HE GOT UNDER THE HOOD AND LOOKED

6    AT THE CODE.

7        HE SAID:

8        "I LOOKED AT THE DOCUMENTS MADE AVAILABLE BY ADOBE AND THE

9    SOURCE CODE."

10       NOW, DR. WICKER TOLD YOU -- HE'S ADOBE'S EXPERT.  HE TOLD

11   YOU HE CAN ALSO READ CODE.  AND WHAT HE TOLD YOU ON THE STAND

12   IS THAT HE AGREED THAT WHEN DR. DEVANBU DESCRIBED A PIECE OF

13   CODE, HE AGREED WITH WHAT HE WAS SAYING, AFTER CONFIRMING IT,

14   OF COURSE, WITH ADOBE'S ENGINEERS AND HIS OWN INITIAL

15   REACTION.

16       SO DR. WICKER LOOKED AT WHAT DR. DEVANBU DID, HIS CODE

17   ANALYSIS.  LOOKED AT IT BECAUSE HE COULD READ CODE, TOO, AND

18   CONFIRMED IT.  AND THEN TALKED TO ADOBE'S ENGINEERS, WHO

19   OBVIOUSLY CAN READ CODE.  THEY WRITED IT.  AND THEY CONFERRED

20   IT.  NO ONE DISPUTES THAT.

21       SAID:

22       "THAT'S RIGHT.  WHEN I LOOKED AT THE SPECIFIC CODE THAT

23   DR. DEVANBU LOOKED AT, IT APPEARED TO ME THAT HE WAS

24   DESCRIBING IT CORRECTLY."

25       DR. WICKER SAID HE TALKED TO MR. HERBACH, WHO TESTIFIED TO

1    YOU TODAY -- OR TESTIFIED TO YOU DURING THIS TRIAL.  AND

2    AGREED WITH MR. HERBACH THAT THE MOST ACCURATE REFLECTION OF

3    THE ACCUSED TECHNOLOGY IS THE SOURCE CODE.

4         AND DR. WICKER CONFIRMED ON THE STAND THAT HE DIDN'T

5    REVIEW THE SOURCE CODE HIMSELF OTHER THAN WHAT DR. DEVANBU PUT

6    IN HIS REPORT.

7         "THAT'S CORRECT."

8         HE CONFIRMED THAT HE HAD NO PROBLEM WITH IT, AND HE

9    CONFIRMED THAT THE SOURCE CODE DESCRIBES EXACTLY HOW THE

10   PRODUCT WORKS.

11        NOW, YOU ARE GOING TO HAVE TO FOCUS ON ALL OF THE ELEMENTS

12   OF THESE CLAIMS, BUT I DID WANT TO AT LEAST POINT OUT ONE

13   ARGUMENT THAT ADOBE MADE IN THEIR OPENING STATEMENT.  I'M SURE

14   WE WILL HERE MORE ABOUT IT DURING THEIR CLOSING ARGUMENT.

15        AND THAT'S ABOUT THIS RECEIVING FROM THE EXTERNAL SOURCE A

16   TOKEN.

17        NOW, IN THE PARLANCE OF ADOBE YOU'VE HEARD A LOT ABOUT

18   LIVECYCLE'S VOUCHER, AND IN FLASH ABOUT THEIR LICENSED FILES.

19   THAT IS WHAT DIGITAL REG IS SAYING FULFILLS THAT TOKEN

20   REQUIREMENT.

21        AND DR. DEVANBU, IN TESTIFYING IN HIS REPORT ABOUT THE

22   TOKEN, LOOKED TO SEE:  WELL, HOW DOES ADOBE DESCRIBE IT.  WHAT

23   DID MR. HERBACH SAY?  AND CONFIRMED THAT IN A VOUCHER, WHICH

24   IS WHAT ADOBE'S CALLED A TOKEN HERE, A DOCUMENT KEY WITHIN THE

25   VOUCHER, FOR EXAMPLE, IS USED TO SYMMETRICALLY DECRYPT THE

1    DOCUMENT.

2         AND THEN, HE WAS ASKED:

3         "WELL, WHAT ELSE CAN YOU USE IT FOR, JUST THAT?

4         "NO, THE VOUCHER THAT ADOBE USES CAN ALSO INSTRUCT THE

5    CLIENT APPLICATION, LIKE, FOR EXAMPLE, WHETHER OR NOT YOU HAVE

6    PERMISSION TO PRINT."

7         SO IT IS MORE THAN JUST THAT ONE PIECE OF INFORMATION.

8    BUT ADOBE TOLD YOU THAT YOU HAD TO HAVE THAT, WHAT THEY CALLED

9    THE YES/NO TOKEN FROM THE SERVER.  AND THAT IF IT IS A "YES,"

10   THEN GENERATE AT THE CLIENT A PERMISSION LOCKED TO THE CLIENT.

11        TO HELP PROVE UP THAT POINT THEY SHOWED YOU THIS DOCUMENT

12   ABOUT HOW KEYS ARE GENERATED AT THE SERVER.  AND THEY

13   HIGHLIGHTED WHAT YOU SEE BEFORE YOU.

14        BUT WHAT THEY DIDN'T HIGHLIGHT IS, I THINK, EQUALLY

15   IMPORTANT.  WHAT THEY DIDN'T HIGHLIGHT IS THAT IN RESPONSE TO

16   AN E-LICENSE DOWNLOAD REQUEST, IT THEN GOES ON TO SAY:

17        "THE LICENSE IS PROCESSED BY ALM AND IS STORED IN A

18   SECURED CONTAINER AT THE CLIENT MACHINE.  AND THEN, AFTER THAT

19   IS DONE, NO ADDITIONAL NETWORK PACKAGES OR REQUESTS ARE

20   NEEDED."

21        AND THEY SORT OF LEFT IT AT THAT.  THEY DIDN'T TALK ABOUT

22   HOW ONCE IT IS STORED AT THE CLIENT THE PROCESS STILL EXECUTES

23   TO CHECK AT THE CLIENT THE ACCESS CHECKING PROCESS.  THAT

24   STILL HAPPENS.

25        ANOTHER DOCUMENT DR. DEVANBU TALKED ABOUT, STATES:

1      "ISSUING A LICENSE CONTAINING THE CONTENT ENCRYPTION KEY

2   TO DECRYPT THE CONTENT AND THE USAGE RULES ASSOCIATED WITH

3   IT."

4      AGAIN, MORE THAN JUST THE ONE THING IN THAT LICENSE.

5      AND IF ALLOWED BY THE LICENSE, THE CLIENT STORES THE

6   LICENSE TO ENABLE OFFLINE ACCESS.  LICENSE CACHING ALLOWS THE

7   CONSUMER TO VIEW PROTECTED CONTENT WITHOUT REACQUIRING A

8   LICENSE EVERY TIME THEY WANT TO VIEW CONTENT.

9      THAT GOES BACK TO MR. PATTERSON'S IDEA OF BEING ABLE TO

10  ALWAYS ACCESS THE SECURE CONTENT AND KEEP IT SAFE FROM BEING

11  DISTRIBUTED TO PLACES YOU DIDN'T WANT IT TO GO, BUT STILL

12  BEING ABLE TO UTILIZE IT.

13     SO WHAT DID DR. DEVANBU DO?  HE LOOKED AT THE CODE.  AND

14  WHAT DOES THE CODE TELL YOU?  THE CODE TELLS YOU THAT A CHECK

15  IS PERFORMED TO SEE WHETHER OR NOT YOU HAVE A LOCAL VOUCHER

16  STORED ON THE CLIENT.  IS IT AVAILABLE?  IF IT IS, THE CODE

17  SAYS YOU CAN PROCEED.

18     IF IT'S NOT, THE CODE SAYS YOU HAVE TO REQUEST ACCESS

19  ONLINE.

20     SO LOOK AT THOSE STEPS THERE THAT DR. DEVANBU OUTLINED IN

21  THE COMPUTER CODE AND COMPARE THEM TO WHAT HAPPENS IN CLAIM 1

22  OF THE '541 PATENT.  AT A CLIENT, LOCAL VOUCHER, EXECUTING AN

23  ACCESS CHECKING PROCESS TO DETERMINE WHETHER THE CLIENT HOLDS

24  A PRE-EXISTING PERMISSION FOR A RESOURCE TO ACCESS THE DIGITAL

25  CONTENT.

1      THAT LOCAL VOUCHER?  IT IS RIGHT THERE IN THE CODE.  IF

2   NOT, REQUESTING PERMISSION FROM AN EXTERNAL SOURCE OR THE

3   RESOURCE TO ACCESS THE DIGITAL CONTENT.  IT'S RIGHT THERE IN

4   THE CODE.  AVAILABLE?  IF NOT, ASK THE SERVER.

5      THE DOCUMENTS, THE CODE AND THE CLAIMS WILL GOVERN YOUR

6   DECISION HERE TODAY.  AND NO ONE DISPUTES HOW DR. DEVANBU

7   READS THAT CODE.

8      IN ADDITION TO THE CODE, MEMBERS OF THE JURY, YOU ARE ALSO

9   GOING TO HAVE DOCUMENTS THAT YOU CAN TAKE BACK TO THE JURY

10  ROOM AND READ.  AND LIKE I PROMISED YOU, I'M NOT GOING TO GO

11  THROUGH A LOT OF THEM.  BUT I DO WANT TO SHOW YOU THREE.  AND

12  YOU ARE GOING TO HAVE PAPER COPIES THAT LOOK JUST LIKE THIS

13  (INDICATING).  AND YOU ARE GOING TO BE ABLE TO TAKE THEM BACK

14  THERE AND READ THEM CAREFULLY AND COMPARE THEM TO THESE

15  CLAIMS.

16     AND WHAT IS IMPORTANT ABOUT THESE DOCUMENTS, THESE WHITE

17  PAPERS AND WEBSITES, IS THAT THEY WEREN'T WRITTEN FOR THE

18  COURTROOM.  THEY WERE WRITTEN FOR THE BOARDROOM.  THEY WERE

19  WRITTEN WITH BUSINESS IN MIND, NOT A LAWSUIT.

20     THEY WERE WRITTEN WITH THE IDEA OF INSTRUCTING ADOBE'S

21  CUSTOMERS HOW TO USE THE PRODUCTS.

22     LET'S LOOK AT PLAINTIFF'S 16.  ADOBE LICENSE MANAGER.

23     ON THE VERY FIRST PAGE ADOBE LICENSE MANAGER'S DOCUMENT

24  CALLS IT AN EMBEDDED E-LICENSE MANAGEMENT SYSTEM THAT HELPS

25  ORGANIZATIONS MANAGE ADOBE SOFTWARE, E-LICENSES AND MONITOR

1    E-LICENSE USAGE.

2        IT GOES ON TO SAY THAT IT IS TIGHTLY INTEGRATED WITH THE

3    OVERALL ORDERING PROCESSING SYSTEM, AND THAT IT AUTOMATICALLY

4    DOWNLOADS THE APPROPRIATE E-LICENSES FOR SOFTWARE

5    INSTALLATIONS AND PROVIDES REPORTS TO HELP SIMPLIFY

6    RECORDKEEPING FOR INTERNAL CONTROLS.

7        AND THEN, ON PAGE 7 OF EXHIBIT 16, IT TALKS ABOUT

8    E-LICENSE TRACKING.  TRACKING.  AND HOW ALM MAKES IT EASY TO

9    TRACK HOW MANY E-LICENSES HAVE BEEN DOWNLOADED AND TO WHICH

10   CLIENT MACHINES.  JUST LIKE THE '670 PATENT ALLOWED

11   MR. PATTERSON TO TRACK HOW MANY COPIES OF JULIAN LENNON'S SONG

12   WERE DOWNLOADED.

13       AND THEN, ADOBE DESCRIBES HOW ALM WORKS AND HOW IT CHECKS

14   FOR AN E-LICENSE ON A CLIENT MACHINE, ON A USER'S MACHINE, AND

15   THEN VERIFIES THAT THE APPLICATION HAS A PROPER E-LICENSE.

16       IF NO E-LICENSE IS FOUND, IT REQUESTS ONE FROM THE

17   E-LICENSE POOL, MAKING A ONE-TIME CONNECTION TO EITHER THE

18   IN-HOUSE ADOBE LICENSE SERVER OR AN ALM BACK-END SERVICE,

19   DEPENDING ON THE CHOSEN HOSTING OPTION.

20       ONCE AN E-LICENSE IS DOWNLOADED, NO FURTHER COMMUNICATION

21   IS REQUIRED.  IT'S ON THE CLIENT.

22       NEXT, I WANT YOU TO LOOK AT EXHIBIT 52.  THIS ONE IS FROM

23   ADOBE'S WEBSITE ABOUT LIVECYCLE RIGHTS MANAGEMENT, ES2, IS

24   WHAT IT IS CALLED.  IT IS ON ADOBE'S HELP PAGES WHERE

25   CUSTOMERS CAN GO AND RECEIVE INSTRUCTION ABOUT EXACTLY HOW TO

1    USE THEIR PRODUCTS.

2        AND IN ADOBE'S OWN WORDS:

3        "ADOBE LIVECYCLE RIGHTS MANAGEMENT ENSURES THAT ONLY

4    AUTHORIZED USERS CAN USE YOUR DOCUMENTS.  AND USING RIGHTS

5    MANAGEMENT ES2 YOU CAN SAFELY DISTRIBUTE ANY INFORMATION THAT

6    YOU HAVE SAVED IN A SUPPORTED FORMAT."

7        IN OTHER WORDS, YOU CAN REGULATE ACCESS TO DIGITAL

8    CONTENT.  AND YOU CAN DO IT FOR ADOBE PDF FILES AND YOU CAN DO

9    IT FOR ADOBE FLASH FILES.

10       THE DOCUMENT THEN GOES ON TO DESCRIBE ACCESS CONTROL, AND

11   HOW YOU HAVE THE ABILITY TO TRACK EVENTS, SUCH AS WHEN AN

12   AUTHORIZED OR UNAUTHORIZED USER ATTEMPTS TO OPEN THE DOCUMENT.

13       AND ON THE NEXT PAGE OF ADOBE'S DOCUMENT YOU WILL SEE THIS

14   DIAGRAM WHERE THE FOURTH AND FINAL STEP TALKS ABOUT THE

15   ABILITY, USING LIVECYCLE RIGHTS MANAGEMENT, TO TRACK DOCUMENTS

16   AND MODIFY ACCESS TO THEM USING WEB PAGES.

17       AGAIN, THE DOCUMENTS, THE CODE AND THE CLAIMS.

18       THE LAST DOCUMENT I WANT TO SHOW YOU ON THIS SUBJECT IS

19   THIS ADOBE FLASH ACCESS OVERVIEW FOR VERSION 3.0.  AGAIN, YOU

20   WILL SEE IN THE BOTTOM RIGHT CORNER "PUBLISHED BY ADOBE."

21       AND THAT OVERVIEW TALKS ABOUT WHAT FLASH ACCESS DOES AND

22   WHY IT'S IMPORTANT, BECAUSE FLASH ACCESS LETS CONTENT OWNERS

23   AND DISTRIBUTORS CONTROL HOW AND WHERE THEIR CONTENT CAN BE

24   DISTRIBUTED AND EXPERIENCED, PROVIDING END TO END PROTECTION

25   THROUGHOUT THE CONTENT LIFE CYCLE.

1    THINK BACK TO MR. PATTERSON'S TESTIMONY:  THROUGHOUT THE

2    CONTENT LIFE CYCLE, KEEPING THAT COPYRIGHTED MATERIAL

3    PROTECTED.

4    THAT WAS THE WHOLE POINT OF THE '541 AND THE '670 PATENT.

5    IT TALKS ABOUT ENCRYPTING FLASH VIDEO FILES, WHICH CAN THEN BE

6    STREAMED OR DOWNLOADED TO VARIOUS PLATFORMS, AND ENFORCES

7    BUSINESS MODELS, SUCH AS ONLINE VIDEO RENTAL.

8    IT WOULD BE PRETTY IMPORTANT TO COMPANIES THAT YOU HEARD

9    USE IT, LIKE HULU, LIKE AMAZON.COM.

10    THIS DOCUMENT THEN GOES ON TO TALK ABOUT, WELL, HOW DO YOU

11    ACQUIRE A LICENSE?  IT TALKS ABOUT HOW LICENSE ACQUISITION IS

12    THE PROCESS OF ACQUIRING A LICENSE ALLOWING THE CONSUMER TO

13    DECRYPT AND VIEW THAT PROTECTED CONTENT ACCORDING TO A SET OF

14    USAGE RULES.

15    AND THAT LICENSE ACQUISITION OCCURS WHEN A CLIENT SENDS

16    INFORMATION IDENTIFYING THE REQUESTED CONTENT, AND THE MACHINE

17    TO THE LICENSE SERVER.

18    BUT THEN, IN THE NEXT PARAGRAPH IT SAYS:

19    "IF THE USER IS AUTHORIZED TO ACCESS THE CONTENT, THE

20    LICENSE SERVER ISSUES A LICENSE ALLOWING THE RUNTIME CLIENT TO

21    DECRYPT AND PLAYBACK CONTENT BASED ON THE POLICY AND RIGHTS

22    ASSOCIATED WITH" THAT SPECIFIC CONSUMER'S ACCOUNT.

23    AND IT TALKS ABOUT HOW THIS IS, IN FACT, A KEY FEATURE OF

24    ADOBE FLASH ACCESS.  AND JUST LIKE MR. PATTERSON SAID HE

25    DREAMT OF, YOU HAVE PERSISTENT CONTENT PROTECTION.  THE

1   CONTENT REMAINS PROTECTED THROUGHOUT THE DISTRIBUTION CHAIN.

2   ONCE THE CONTENT IS PACKAGED, JUST LIKE IN THAT DIGITAL

3   ENVELOPE, IT REMAINS PROTECTED AT ALL TIMES, AND PORTIONS OF

4   IT ARE ONLY DECRYPTED AT THE TIME OF PLAYBACK AND IN

5   ACCORDANCE WITH THE USAGE RULES.

6       THINK ABOUT CLAIM 52:

7       "WHEREIN CREATING THE FILE COMPRISING ENCRYPTING." BECAUSE

8   THE CONTENT IS PACKAGED WITH USAGE RULES AND LICENSING

9   INFORMATION, PROTECTION ALWAYS TRAVELS WITH THE CONTENT.  AND

10  IF AN UNLICENSED CONSUMER ATTEMPTS TO PLAY THE CONTENT, THE

11  POLICY EMBEDDED IN IT REDIRECTS THEM SO THEY CAN ACQUIRE A

12  VALID LICENSE FOR THE CONTENT.

13      SOUNDS A LOT LIKE CLAIM 1.  IN FACT, IT SOUNDS EXACTLY

14  LIKE CLAIM 1.

15      NOW, WE PROVIDED EVIDENCE THROUGH DR. DEVANBU OF THESE

16  ADDITIONAL INDEPENDENT -- RATHER DEPENDENT CLAIMS ABOUT WHEN

17  YOU REQUEST THE PERMISSION AND RECEIVE THE TOKEN AND

18  SELECTIVELY GRANT THE RESOURCE ACCESS BEING PERFORMED ON THE

19  CLIENT.

20      ABOUT WHERE THE PERMISSION COMPRISES THE UNIQUE CODED KEY

21  CORRESPONDING TO THE DIGITAL CONTENT.  AND HOW WHEN YOU

22  REQUEST PERMISSION FROM THE EXTERNAL SOURCE, THAT INITIATES

23  THIS AUTHORIZATION PROCEDURE.

24      YOU HEARD DR. DEVANBU TESTIFY ABOUT THAT.  AND AS

25  IMPORTANTLY, YOU HEARD THAT DR. WICKER DIDN'T.  HE SAID HE

1    DIDN'T GO BEYOND CLAIM 1, BECAUSE IN HIS MIND IF CLAIM 1 ISN'T

2    INFRINGED, THEN YOU DON'T HAVE TO REACH OPINIONS ON THE

3    OTHERS.

4        HE SAYS HE HASN'T TALKED ABOUT IT.

5        "I DIDN'T TESTIFY ABOUT IT."

6        BUT YOU'VE ALSO HEARD A LOT OF TESTIMONY AND ARGUMENT FROM

7    ADOBE'S SIDE THAT:

8        "WELL, EVEN IF WE DO DO THIS, EVEN IF WE KNEW ABOUT THE

9    '541 AND '670, EVEN IF IT'S INTEGRATED INTO SEVERAL OF OUR

10   PRODUCTS, NO ONE ACTUALLY USES IT.  THERE'S JUST NO CUSTOMER

11   DEMAND FOR THIS.  IT IS JUST A HANDFUL OF PEOPLE."

12       YOU HEARD WITNESS AFTER WITNESS SAY THAT.

13       BUT WHAT DO THE DOCUMENTS SAY?  AND WHAT DO THEIR

14   WITNESSES SAY.  THEIR CORPORATE REPRESENTATIVE WHO HAS BEEN

15   HERE IN TRIAL EVERY DAY GOT ON THE STAND AND TOLD YOU THAT THE

16   WHOLE REASON THAT THEY EVEN HAVE SOME OF THIS TECHNOLOGY IS

17   BECAUSE THE CUSTOMERS HAVE THE NEED.

18       HE POINTED OUT LIKE THE MOVIE STUDIOS.  THE HOLLYWOOD

19   MOVIE STUDIOS HAVE THE NEED TO PROTECT THEIR CONTENT.

20       HE WENT ON TO SAY THAT, WHEN ASKED WHAT WAS THE BASIS THAT

21   THEY PROVIDED THE INFORMATION TO THEIR CUSTOMERS, WHO TOLD YOU

22   THAT IT WAS A CUSTOMER NEED:

23       "WELL, CUSTOMERS HAVE REQUESTED THE FUTURE."  WELL, I

24   THINK HE SAID "THE FEATURE."  BUT THE FUTURE IS WHAT

25   MR. PATTERSON WAS CONCERNED ABOUT.  CUSTOMERS HAVE REQUESTED

1    THE FEATURE.  THEY TOLD US DIRECTLY:

2         "WE NEED TO HAVE OUR CONTENT PROTECTED."

3         AND HE VERIFIED THAT SOME OF THOSE CUSTOMERS INCLUDED HULU

4    AND AMAZON.

5         YOU HEARD OTHER TESTIMONY THAT SUCH CUSTOMERS INCLUDE THE

6    UNITED STATES MILITARY.  SO ON THE ONE HAND THEY SAY:

7         "NOT VERY MANY PEOPLE WANT THIS.  IT IS NOT THAT BIG OF A

8    DEMAND."

9         ON THE OTHER HAND, WE'RE TALKING ABOUT HOLLYWOOD, AMAZON,

10   HULU AND THE UNITED STATES MILITARY, BEING JUST A FEW.

11        AND IT WAS SO IMPORTANT TO THEM THAT WHEN THEIR CLIENTS

12   REQUESTED IT, THEY DEVELOPED NEW PRODUCTS FOR THEM.  I'M

13   PRETTY SURE I HAVE NEVER HAD ADOBE DEVELOP A PRODUCT FOR ME

14   WHEN I'VE ASKED.  YOU HAVE TO BE A PRETTY IMPORTANT CLIENT TO

15   GET THAT KIND OF SERVICE.

16        AND SO THEN WE HAD TO GO TO THE DOCUMENTS TO POINT OUT HOW

17   OFTEN THEIR WORDS SAID THESE FEATURES WERE USED.  AGAIN,

18   DOCUMENTS WRITTEN FOR THE BOARDROOM, NOT THE COURTROOM.

19        AND YOU REMEMBER LOOKING AT THIS DOCUMENT THAT SAID:

20   "ACROBAT FILES MAY BE SECURED USING PASSWORDS, DIGITAL

21   CERTIFICATES OR USING RIGHTS MANAGEMENT PROVIDED BY ADOBE'S

22   LIVECYCLE RIGHTS MANAGEMENT SERVER."

23        AND THIS DOCUMENT IS ACTUALLY A WHITE PAPER FOR THE HEALTH

24   CARE INDUSTRY.  SO THERE'S YET ANOTHER EXAMPLE, ALONG WITH THE

25   MILITARY AND HOLLYWOOD AND HULU AND AMAZON, AGAIN ANOTHER

1  SEGMENT FOR WHICH LIVECYCLE RIGHTS MANAGEMENT SERVER WAS

2  IMPORTANT.

3      AND THERE YOU SEE THAT IT GIVES INSTRUCTIONS ABOUT HOW TO

4  USE YOUR ADOBE LIVECYCLE RIGHTS MANAGEMENT.

5      THEN, YOU ALSO SAW THIS DOCUMENT:  "WHAT IS NEW IN ACROBAT

6  PRO X?"  A STREAMLINED, SIMPLIFIED USER INTERFACE DISPLAYS THE

7  MOST COMMONLY USED TOOLS."

8      AND IT SHOWED YOU HOW THERE WAS NOW CHANGE BETWEEN ACROBAT

9  9 AND ACROBAT X AND WHERE YOU WOULD FIND THAT TO SECURE OR

10  PROTECT YOUR DOCUMENTS.

11      AND THEN, IT WENT ON TO SAY THAT IT'S SUCH AN IMPORTANT

12  FEATURE IT'S INSTALLED BY DEFAULT ON THE TOOLBAR WHERE ONLY

13  THE MOST COMMONLY USED TOOLS APPEAR.

14      NOW, ADOBE TRIED TO RUN FROM THOSE DOCUMENTS.  MR. HERBACH

15  TOLD YOU ON THE STAND, WHEN I ASKED HIM:

16      "YOU WOULD AGREE WITH ME THAT ONLY THE MOST COMMONLY USED

17  TOOLS APPEAR ON THE TOOLBAR IN ADOBE ACROBAT PRO."

18      AND HIS ANSWER WAS:

19      "NO, I WOULDN'T, ACTUALLY."

20      I THEN, I HAD TO SHOW HIM THE DOCUMENTS THAT I JUST SHOWED

21  YOU.

22      AND WHEN I ASKED HIM:

23      "BY DEFAULT, ONLY THE MOST COMMONLY USED TOOLS APPEAR IN

24  THE TOOLBAR," THEN HE HAD TO ANSWER:  "THAT'S WHAT IT SAYS,

25  YES."

1    WE'VE TALKED TO YOU ABOUT WILLFULNESS.  AND I HAVE TALKED

2    TO YOU ABOUT INFRINGEMENT.  TALKED TO YOU ABOUT THE SOURCE

3    CODE AND TALKED TO YOU ABOUT THE DOCUMENTS.  I TALKED TO YOU

4    ABOUT THE CLAIMS.  NOW, IT'S TIME TO TALK ABOUT DAMAGES.

5    YOU SAW EVIDENCE, YOU HEARD EVIDENCE ABOUT A NUMBER OF

6    LICENSE AGREEMENTS THAT DIGITAL REG HAS ALREADY ENTERED INTO

7    WITH COMPANIES LIKE MICROSOFT, EA, INTUIT, AVG, RPX, LARGE

8    COMPANIES THAT TOOK LICENSES TO THESE PATENTS FOR THEIR

9    CUSTOMERS.

10    AND THE DIFFERENCE BETWEEN THOSE LICENSE AGREEMENTS AND

11    WHAT WE HAVE HERE IS THAT THOSE LICENSE AGREEMENTS

12    NEGOTIATIONS WERE ACTUAL.  THERE WAS A FIGHT ABOUT VALIDITY.

13    THERE WAS A FIGHT ABOUT INFRINGEMENT.  AND BY TIME YOU GET

14    THROUGH THE VERDICT FORM TO THIS POINT YOU WILL HAVE ALREADY

15    DETERMINED BOTH INFRINGEMENT AND VALIDITY.  SO THOSE ARE OUT

16    OF THE EQUATION.

17    AND THAT'S WHERE THE HYPOTHETICAL NEGOTIATION FACTORS COME

18    IN.  AND THAT'S WHY IT IS IMPORTANT TO THINK BACK TO OUR

19    EXPERT'S TESTIMONY ABOUT WHAT THAT HYPOTHETICAL NEGOTIATION

20    WOULD MEAN.  AND HOW HE TOOK THE ROYALTY BASE FROM THE

21    PRODUCTS IDENTIFIED IN THIS TRIAL AND CAME UP WITH OVER

22    $2 BILLION OF TOTAL REVENUE OVER THE ACCUSED TIME PERIOD.

23    BUT FOLLOWING INDUSTRY STANDARDS HE THEN REDUCED THAT

24    NUMBER BY 70 PERCENT.  AND THEN, HE APPLIED A 2.5 PERCENT

25    ROYALTY RATE, WHICH HE DEEMED WAS REASONABLE BECAUSE HE

1    LEARNED THAT THERE WERE OTHER LICENSE AGREEMENTS THAT HE FELT

2    APPLIED THAT DIGITAL REG HAD ALREADY ENTERED INTO.

3        AND HE LOOKED AT WHAT ADOBE REQUIRES THEMSELVES,

4    5.5 PERCENT, AND CONSIDERED THAT 2.5 PERCENT WAS LESS THAN

5    HALF OF THAT.

6        AND THAT'S HOW HE CAME UP WITH A REASONABLE ROYALTY

7    FIGURE.  AND WE WOULD ASK THAT YOU CONSIDER THAT EVIDENCE AND

8    YOU CONSIDER YOUR ANSWER TO THIS QUESTION.

9        BUT I ALSO NEED TO TALK TO YOU ABOUT VALIDITY.  THIS

10   CONCEPT THAT ADOBE IS ARGUING THAT EVEN THOUGH MR. PATTERSON

11   WORKED ON THIS IDEA DECADES AGO, WORKED ON IT FOR YEARS.  IT

12   SPENT YEARS IN THE PATENT OFFICE AND ULTIMATELY WAS GRANTED BY

13   THE UNITED STATES PATENT OFFICE, THAT AFTER ALL THIS TIME, ALL

14   OF A SUDDEN HIS PATENTS ARE INVALID.  SHOULDN'T BE CONSIDERED.

15   NEED TO BE THROWN OUT.

16       AND IT'S THEIR BURDEN TO PROVE THIS TO YOU.  CLEAR AND

17   CONVINCING EVIDENCE, A VERY HIGH STANDARD OF PROOF.  AND THE

18   EVIDENCE HAS SHOWN THAT THEY HAVE FAILED TO MEET THEIR BURDEN.

19       THE EVIDENCE HAS SHOWN THAT AFTER WORKING FOR THREE YEARS

20   DR. WICKER CONCEDED HE COULDN'T IDENTIFY A SINGLE REFERENCE,

21   NOT ONE, THAT TEACHES ALL THE ELEMENTS OF THE SIX ASSERTED

22   CLAIMS.  AND HE WAS LOOKING.  HE DIDN'T GIVE YOU AN OPINION

23   THAT ANY ONE OF THOSE CLAIMS WAS ANTICIPATED.  AND HE ADMITTED

24   THAT ADOBE WAS FORCED TO COBBLE TOGETHER MULTIPLE REFERENCES

25   IN ORDER TO ALLEGE THAT:

1      "OH, THIS WAS OBVIOUS.  YOU TAKE THIS PATENT OVER HERE, A

2   FEW PIECES OF IT, AND YOU TAKE THIS PATENT OVER HERE, A FEW

3   PIECES OF THIS, IT IS ABSOLUTELY OBVIOUS."

4      THAT MR. PATTERSON SHOULD HAVE KNOWN THAT.  THAT THE

5   PATENT OFFICE SHOULD HAVE KNOWN THAT.  THAT THE PATENTS NEVER

6   SHOULD HAVE BEEN GRANTED.

7      THE EVIDENCE ISN'T THERE FOR THAT.  PROFESSOR SCHULL

8   CONFIRMED THAT HIS SYSTEM GENERATES THE PASSWORD AT THE

9   SERVER, TRANSMITS IT AND STORES IT IN PRECISELY THE SAME

10  STATE.  THAT NOTHING HAPPENS.

11     ADOBE IS TRYING TO CONFUSE THESE ISSUES BY REFERENCING TO

12  ENCRYPTION AND DECRYPTION THAT OCCUR IN PARTS OF THE SCHULL

13  PROCESS THAT AREN'T RELEVANT TO ANY OF THE ASSERTED CLAIMS.

14     ADOBE COULDN'T IDENTIFY ANY REFERENCE THAT TAUGHT TRACKING

15  IN THE WAY -- IN THE EXACT WAY CLAIMED BY THE '670 PATENT.

16     AND, FINALLY, THE BEST ADOBE COULD DO WAS TRY TO TRICK

17  DR. KELLER WITH A REFERENCE FROM A BACKGROUND SECTION OF THE

18  SCHULL PATENT THAT WAS TALKING ABOUT OTHER SYSTEMS, NOT

19  SCHULL.

20     ADOBE HAS FAILED TO MEET THEIR BURDEN.

21     AT THIS POINT, MEMBERS OF THE JURY, I WANT TO GO OVER THE

22  VERDICT FORM AND TELL YOU THE ANSWERS THAT DIGITAL REG THINKS

23  THE EVIDENCE SUPPORTS; THAT THE DOCUMENTS, THE CODE, AND THE

24  CLAIMS SUPPORT.

25     AND WHEN I DO THAT I ALSO WANT TO MENTION SOMETHING THAT

1    CAME UP IN OPENING STATEMENT.  IT HAS BEEN A THEME THROUGHOUT

2    THIS TRIAL.  AND I WANT TO JUST TAKE A MOMENT TO ADDRESS IT.

3         YOU WERE ASKED IN OPENING STATEMENT BY ADOBE'S LAWYER

4    THAT, WELL, THERE IS TWO KINDS OF CASES IN PATENT LAW.  THERE

5    IS A BIG COMPANY VERSUS ANOTHER BIG COMPANY.  THAT'S ONE KIND

6    OF A CASE.  AND THEN, THERE'S ANOTHER KIND OF CASE WHERE IT IS

7    A BIG COMPANY VERSUS A SMALL COMPANY THAT MAYBE WASN'T AS

8    SUCCESSFUL.

9         WHICH KIND OF CASE IS THIS?  THEY ASKED YOU TO THINK ABOUT

10   THAT.

11        NOWHERE IN THE VERDICT FORM ARE YOU GOING TO BE ASKED FOR

12   THAT QUESTION, BECAUSE THERE IS NO LAW THAT SAYS A BIG COMPANY

13   IS TREATED ANY DIFFERENTLY THAN A SMALL COMPANY.  YOU'RE NOT

14   GOING TO BE ABLE TO ASK THAT QUESTION -- ANSWER THAT QUESTION,

15   BECAUSE IT IS NOT AN ISSUE IN THIS CASE.  DIGITAL REG IS

16   PROTECTED BY THE UNITED STATES PATENT LAWS, JUST LIKE EVERYONE

17   ELSE.

18        NOW, THE VERY FIRST QUESTION YOU WILL BE ASKED IS

19   INFRINGEMENT.  IS THERE DIRECT INFRINGEMENT?  HAS DIGITAL REG

20   PROVEN IT IS SIMPLY MORE LIKELY TRUE THAN NOT TRUE THAT ADOBE

21   HAS INFRINGED ANY OF THE FOLLOWING CLAIMS?

22        AND THE FIRST QUESTION YOU WILL BE ASKED IS ABOUT THE '670

23   PATENT IN CLAIM 45, ADOBE ACTIVATION.

24        DR. DEVANBU, THROUGH HIS REVIEW OF THE DOCUMENTS AND THE

25   CODE AND ANALYZING THE CLAIMS TELLS YOU THAT THE ANSWER IS:

1    YES.

2       NOW, NEXT YOU WILL BE ASKED ABOUT DIRECT INFRINGEMENT AND

3    HAS THE ADOBE LIVECYCLE PRODUCT INFRINGED THE '670 PATENT,

4    CLAIM 45, AND THE '670 PATENT, CLAIM 52 DIRECTLY.

5       AND REMEMBER WHEN I HAD MR. HERBACH ON THE STAND AND I WAS

6    ASKING HIM QUESTIONS?  I ASKED HIM:

7       "DOES ADOBE USE LIVECYCLE ITSELF?"

8       AND HIS ANSWER WAS:  "YES."

9       THEY USE THE PRODUCT THEMSELVES.  IF YOU FIND IT

10   INFRINGES, THEN THE ANSWER IS:  YES.  IT'S DIRECT INFRINGEMENT

11   BY ADOBE.

12      AND AFTER YOU ANSWER THE DIRECT INFRINGEMENT QUESTIONS,

13   YOU WILL BE ASKED THE INDIRECT INFRINGEMENT QUESTIONS.  THOSE

14   ARE THE ONES INVOLVING THE CUSTOMERS.  HAS DIGITAL REG PROVEN

15   IT IS MORE LIKELY THAN NOT THAT ADOBE INDIRECTLY INFRINGED ANY

16   OF THE FOLLOWING CLAIMS?

17      YOU WILL REMEMBER SOME OF THE WITNESSES TRIED TO SAY THAT

18   THEY WEREN'T REALLY INSTRUCTING THEIR USERS HOW TO USE THE

19   SOFTWARE.  THOSE WHITE PAPERS AND HELP PAGES DIDN'T MEAN

20   ANYTHING.  BUT THEY UNDERSTAND THAT THE CUSTOMERS ARE AN

21   IMPORTANT PART OF THIS PROCESS, AND THAT THEY INSTRUCT THESE

22   CUSTOMERS AND ARE IN CONCERT WITH THE CUSTOMERS INDIRECTLY

23   INFRINGE EACH OF THE CLAIMS.

24      DR. DEVANBU WENT THROUGH THE CODE OF THE '541 PATENT AND

25   TOLD YOU DEFINITIVELY THAT:  YES, ADOBE ACTIVATION IS

1    INFRINGED.  AND THERE WAS NO EVIDENCE SUPPORTED BY DR. WICKER

2    AGAINST ANY OF HIS OPINIONS REGARDING THE DEPENDENT CLAIMS.

3        THE SAME CAN BE SAID FOR THE TRACKING PATENT.  DR. DEVANBU

4    TESTIFIED THAT THE TRACKING PATENT, THE '670 PATENT, IS

5    INFRINGED BY ADOBE ACTIVATION.

6        NEXT YOU ARE GOING TO BE ASKED ABOUT FLASH.  THAT CONTENT

7    PROTECTED FLASH THAT THE HOLLYWOOD STUDIOS USE.  AND IS IT

8    MORE LIKELY THAN NOT THAT ADOBE INDIRECTLY INFRINGED EACH OF

9    THOSE CLAIMS?  ONCE AGAIN, BASED ON THE DOCUMENTS, BASED ON

10   THE CODE AND BASED ON THE CLAIMS, THE ANSWER IS:  YES.

11       AND THAT THE INDEPENDENT CLAIM OF THE '541 IS INFRINGED.

12   YOU DIDN'T HEAR EVIDENCE FROM DR. WICKER THAT THE DEPENDENT

13   CLAIMS WERE NONINFRINGED.  YOU ONLY HEARD EVIDENCE FROM

14   DIGITAL REG.

15       WE ALSO WENT THROUGH THE LIVECYCLE PRODUCTS.  LIVECYCLE,

16   YOU SAW PRODUCT MANUALS.  YOU HEARD TESTIMONY.  AND, ONCE

17   AGAIN, YOU HEARD THAT IT WAS MORE LIKELY TRUE THAN NOT TRUE

18   THAT CLAIM 1 OF THE '541 PATENT WAS INFRINGED.  AND THAT CLAIM

19   45 OF THE '670 PATENT, ALONG WITH ITS DEPENDENT CLAIM, WERE

20   ALSO INFRINGED.  THE ANSWER TO THOSE QUESTIONS IS:  YES.

21       NEXT YOU WILL BE ASKED ABOUT INVALIDITY.  AND WHEN YOU ARE

22   ASKED ABOUT INVALIDITY, I WANT YOU TO THINK BACK TO DR. KELLER

23   AND HIS TESTIMONY, HOW HE TALKS TO YOU ABOUT HOW NOT ALL THE

24   REFERENCES WERE CONSIDERED, AND THE ONES THAT WERE SCHULL, IT

25   DIDN'T INCLUDE ALL OF THE ELEMENTS.  AND THEY HAVE TO INCLUDE

1    THOSE ELEMENTS TO BE FOUND INVALID.

2        HE THEN DID THE SAME THING FOR THE '670 PATENT.  AND ONCE

3    AGAIN TALKED ABOUT HOW THIS COMBINATION THAT WAS SO OBVIOUS TO

4    ADOBE ISN'T OBVIOUS AT ALL.  IT DOESN'T IN COMBINATION

5    INVALIDATE THE '670 PATENT.

6        SO WHEN YOU ARE FILLING OUT YOUR VERDICT FORM, CONFIRM

7    WHAT THE PATENT OFFICE HAS ALREADY SAID TWICE:  PATRICK

8    PATTERSON INVENTED THE '541 PATENT AND THE '670 PATENT.  IT

9    WASN'T OBVIOUS, AND NO ONE BEAT HIM TO IT.

10       THE ANSWER AS TO WHETHER THE '670 PATENT WAS ANTICIPATED

11   IS:  NO.

12       THE ANSWER AS TO WHETHER THE '541 AND THE '670 PATENTS

13   WERE OBVIOUS, WHEN YOU COBBLE TOGETHER DIFFERENT PIECES OF

14   PATENTS AND MISHMASH THEM ALL INTO ONE, THE ANSWER THERE IS:

15   NO.

16       NOW, AT THIS POINT YOU WILL READ THIS QUESTION:  IF YOU

17   FOUND THAT AT LEAST ONE PRODUCT INFRINGES AT LEAST ONE VALID

18   PATENT, AND YOU ANSWERED "YES," WELL, THEN YOU MOVE ON TO THE

19   REMAINING QUESTIONS.  AND THE FIRST QUESTION YOU WILL BE ASKED

20   IS DAMAGES.

21       AND I TALKED ABOUT THE METHODOLOGY THAT WE'VE ESTABLISHED

22   ABOUT HOW WE CAME UP WITH OUR ROYALTY RATE BASING IT OFF OF

23   BOTH LICENSES THAT WE'VE ENTERED INTO AND LICENSE AGREEMENT

24   RATES THAT ADOBE PUTS OUT THERE.  AND HOW OURS WAS LESS THAN

25   HALF OF WHAT THEY PUT OUT THERE THEMSELVES.

 1       SO WE ASK YOU TO FILL IN THAT RATE AT 2.5 PERCENT, AND TO

 2   FOLLOW THE PATH THAT YOU'VE HEARD OF DURING THE CASE ABOUT HOW

 3   THERE'S $2.066 BILLION OF A TOTAL ACCUSED REVENUE FOR ALL OF

 4   THE PRODUCTS.  BUT GO AHEAD AND APPLY THAT INDUSTRY STANDARD

 5   DISCOUNT.  KNOCK 70 PERCENT OF THAT NUMBER AWAY.  AND THAT

 6   GETS THE NUMBER FOR WHICH YOU COMPUTE THE ROYALTY RATE TO

 7   619,860,000.

 8       THAT WOULD MEAN THE DAMAGES AWARD IS $15,496,500 FOR THE

 9   INFRINGEMENT THAT DIGITAL REG HAS SUFFERED AT THE HANDS OF

10   ADOBE.  ADOBE, WHO THEY REACHED OUT TO TO TRY TO FORM A

11   BUSINESS RELATIONSHIP.  THEY HAD A MEETING.  THEY GAVE THEM

12   DOCUMENTS.  AND ADOBE TOLD THEM "NO."

13       THAT'S WHAT ADOBE OWES.

14       THE FINAL QUESTION THAT YOU WILL BE ASKED ON YOUR VERDICT

15   FORM, MEMBERS OF THE JURY, IS WILLFULNESS.  AND AS YOU

16   CONSIDER THAT QUESTION I WANT YOU TO CONSIDER THE MOUNTAIN OF

17   EVIDENCE THAT YOU'VE SEEN OF NOTICE AFTER NOTICE AFTER NOTICE

18   BY ADOBE'S OWN PATENTS WHERE WE HAD TESTIMONY THAT THEIR

19   IN-HOUSE LAWYERS WERE INVOLVED IN THE PROCESS.

20       WE HAD TESTIMONY THAT THEIR CORPORATE REPRESENTATIVE SAT

21   ON A PATENT REVIEW BOARD THAT WORKED WITH ENGINEERS TO

22   DETERMINE WHETHER OR NOT IDEAS WERE PATENTABLE.  CONSIDER WHAT

23   ADOBE KNEW AND WHEN THEY KNEW IT.  AND CONSIDER THE CONTENT

24   AND THE DISCUSSIONS BETWEEN MR. VENTERS AND ADOBE VENTURES

25   ABOUT THE ADOBE VALUE PROPOSITION AND HOW IT SPECIFICALLY

1    IDENTIFIED THIS '670 PATENT BY NAME, AND THE '541 PATENT BY

2    NUMBER.

3         THE ANSWER TO WHETHER OR NOT ADOBE'S INFRINGEMENT WAS

4    WILLFUL IS:  YES.  THEY SHOWED A RECKLESS DISREGARD.  I WANT

5    TO THANK YOU FOR ALL YOUR TIME AND ATTENTION DURING THE LAST

6    WEEK-AND-A-HALF IT HAS BEEN AN HONOR TO PRESENT THIS CASE IN

7    FRONT OF YOU.  AND THANK YOU FOR YOUR TIME.

8         AND I'M GOING TO HAVE A CHANCE TO GET UP HERE AFTER

9    ADOBE'S HAD THEIR CLOSING ARGUMENT AND TALK TO YOU FOR JUST A

10   FEW MINUTES MORE TO RESPOND TO SOME OF THEIR ARGUMENTS AND TO

11   WRAP THINGS UP.

12        BUT AS ADOBE'S LAWYERS GO THROUGH THEIR ARGUMENTS, THINK

13   ABOUT WHAT ADOBE KNEW AND WHEN THEY KNEW IT.  THINK ABOUT THE

14   DOCUMENTS, THE CODE AND THE CLAIMS.  BECAUSE IF YOU FOCUS ON

15   THOSE THINGS YOU WILL FIND THAT THE ANSWER THAT THE LAW

16   REQUIRES IN THIS CASE IS A VERDICT FOR THE PLAINTIFF, DIGITAL

17   REG.

18             **THE COURT:**  ALL RIGHT.  WE WILL TAKE OUR BREAK.  IT'S

19   10:25.  WE WILL BREAK UNTIL 10:40.  I WOULD LIKE TO SEE THE

20   ATTORNEYS FOR JUST A MOMENT.

21        (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

22             **THE COURT:**  SO I HAVE TWO NOTES.  ONE SAYS JUROR 608,

23   MICHAEL BANE, HAS A MEDICAL PROCEDURE FRIDAY, SEPTEMBER 5TH AT

24   7 A.M. TO 7:30 A.M. IN SAN JOSE.

25        "IT IS LIKELY A 1.5 HOUR DRIVE TO THE COURTHOUSE.

 1    HOPEFULLY I CAN BE HERE BY NINE A.M."

 2        THEN, I HAVE ANOTHER NOTE:

 3        "TODAY AND TOMORROW I HAVE COMMITMENTS FOR WORK MADE BASED

 4    ON A RECESS TIME OF 1:30 P.M." THAT IS AARON O'DELL, WHO IS

 5    JURY NUMBER THREE.  SO, MAYBE YOU CAN TALK ABOUT THIS AMONGST

 6    YOURSELVES.  ONE SOLUTION IS TO EXCUSE BOTH OF THEM.  IT WILL

 7    CUT INTO OUR DELIBERATION TIME.  WE ONLY NEED SIX.  WE WOULD

 8    STILL HAVE SEVEN.  WE WOULD BE MORE LIKELY TO HAVE UNANIMITY,

 9    PERHAPS, AND LESS LIKELY TO HAVE A MISTRIAL OR HUNG JURY IF WE

10    HAVE FEWER JURORS WHO HAVE TO AGREE.  SO YOU MIGHT DECIDE

11    LET'S JUST EXCUSE THOSE TWO.  AND IF WE DON'T EXCUSE THOSE

12    TWO, WE CERTAINLY HAVE TO LET THE MEDICAL GUY HAVE HIS MEDICAL

13    APPOINTMENT. I CAN INQUIRE FURTHER INTO THIS WORK COMMITMENT,

14    BUT WE COULD JUST LET THAT HAPPEN AND LIKELY THAT THE CASE

15    WOULDN'T BE DECIDED AS QUICKLY.

16        SO UNLESS YOU KNOW RIGHT OFF THE BAT FOR SURE WHAT YOU

17    WANT TO DO, YOU CAN THINK ABOUT IT AND LET ME KNOW AT THE END

18    OF THE BREAK.  I WOULD WANT TO TELL THEM AT THE END OF THE

19    CLOSING ARGUMENT, BECAUSE I SHOULDN'T LET THEM START

20    DELIBERATING WITH EXCESS PEOPLE IF WE ARE GOING TO EXCUSE THEM

21    RIGHT AWAY.  SO WE NEED TO DECIDE BEFORE DELIBERATIONS START.

22            **MR. REINES:**  YOUR HONOR, A QUICK ISSUE ON THE VERDICT

23    FORM?

24            **THE COURT:**  YES.

25            **MR. REINES:**  THE QUESTIONS, IF I HAVE IT RIGHT,

1   CONTAIN AN EXCESSIVE -- AN EXCESS NUMBER.  SO IT STATES

2   "THREE, FOUR AND FIVE" WHEN IT SHOULD BE FOUR.  THIS IS AT

3   PAGE 4, LINE 19.

4           **MS. GLAUSER:**  I THINK WHEN WE REMOVED THE WRITTEN

5   DESCRIPTION QUESTION THE NUMBERING DIDN'T GET FIXED IN THE

6   PARAGRAPH THAT SAYS:

7       "IF YOU ANSWERED 'YES' TO ONE AND TWO, AND 'NO' TO THREE

8   AND FOUR, THEN MOVE ON."

9       IT SHOULD BE TO FIVE AND SIX.

10          **THE COURT:**  OH, I SEE WHAT YOU ARE SAYING.

11      OKAY.  I WILL FIX THAT.

12          **MR. REINES:**  THANK YOU.

13  (RECESS TAKEN AT 10:25 A.M. AND RESUMED AT 10:40 A.M.)

14      (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

15          **THE CLERK:**  REMAIN SEATED COME TO ORDER COURT IS BACK

16  IN SESSION.

17          **THE COURT:**  SO THIS BOOK IS NOT -- I DON'T KNOW IF

18  I'M MISUNDERSTANDING.  THIS BOOK ISN'T GOING INTO EVIDENCE.

19      WHAT I WANT -- WHAT I SAID COULD GO INTO EVIDENCE IS A

20  PIECE OF PAPER THAT SAYS EXCERPTS OF ADOBE SOURCE CODE, BUT IT

21  WOULD ONLY HAVE THE LINES THAT WERE ON -- WHAT'S HIS NAME'S

22  SLIDE.  LIKE A THREE-PAGE DOCUMENT AT MOST, NOT ALL THE SOURCE

23  CODE.

24          **MR. REINES:**  WE REMINDED THEM OF THAT.

25          **THE COURT:**  OKAY.

1              **MR. DINOVO:**  SO TAKING A SINGLE LINE IS LIKE TAKING A

2       LINE OUT OF A BOOK.  YOU CAN'T --

3              **THE COURT:**  THAT'S WHAT IT'S GOING TO BE.

4          OKAY.

5              **THE CLERK:**  READY FOR JURY?

6              **THE COURT:**  YOU DON'T HAVE TO HAVE IT AT ALL, BUT I

7       TOLD YOU FROM THE BEGINNING WE ARE NOT GOING TO HAVE A WHOLE

8       BOOK OF SOURCE CODE THAT NOBODY CAN READ.  SO, NO, ABSOLUTELY

9       NOT.

10             **THE CLERK:**  WE ARE READY FOR YOU.

11         (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

12             **THE COURT:**  I'M SORRY.  DID YOU REACH ANY AGREEMENT

13      ON THAT MATTER WE TALKED ABOUT?

14             **MR. REINES:**  WE ARE GOING TO LEAVE IT AS IS.

15             **THE COURT:**  OKAY.

16         PLEASE BE SEATED.  YOU MAY PROCEED.

17             **MS. MEHTA:**  THANK YOU, YOUR HONOR.

18             **THE COURT:**  NOW, I OFTEN REMIND PEOPLE WHEN THEY ARE

19      RUNNING CLOSE TO THEIR TIME, BUT SINCE I DON'T KNOW HOW YOU

20      HAVE DIVIDED IT UP, I WON'T BE ABLE TO DO THAT.

21             **MS. MEHTA:**  I THINK WE WILL BE ABLE TO TAKE CARE OF

22      THAT OURSELVES.  THANK YOU, THOUGH.

23                          **<u>CLOSING ARGUMENT</u>**

24             **MS. MEHTA:**  GOOD MORNING.

25         THE FIRST THING I WANT TO DO IS THANK YOU AGAIN FOR YOUR

1    TIME AND YOUR ATTENTION OVER THE LAST TWO WEEKS.

2        I THANKED YOU FOR IT IN ADVANCE, AND NOW I CAN SAY, AFTER

3    HAVING WATCHED YOU OVER THE LAST TWO WEEKS, THAT I KNOW YOU

4    HAVE BEEN PAYING ATTENTION, YOU'VE BEEN TAKING NOTES, AND WE

5    REALLY APPRECIATE IT BECAUSE, AS I EXPLAINED DURING THE

6    OPENING, THIS IS AN IMPORTANT CASE FOR ADOBE.

7        MR. ELLWANGER MADE A POINT DURING HIS CLOSING OF REMINDING

8    YOU OF A QUESTION THAT I ASKED YOU TO ASK YOURSELVES DURING

9    THE OPENING.  BUT I THINK HE MAY HAVE MISREMEMBERED WHAT I

10   ACTUALLY SAID.

11       THIS IS NOT A CASE ABOUT BIG COMPANIES VERSUS SMALL

12   COMPANIES OR BIG COMPANIES VERSUS BIG COMPANIES.  WHAT I TOLD

13   YOU DURING THE OPENING WAS THAT I WANTED YOU TO LISTEN FOR THE

14   EVIDENCE TO SEE WHAT TYPE OF PATENT CASE THIS WAS.

15       AND I DESCRIBED THAT THERE ARE TWO DIFFERENT KIND OF

16   PATENT CASES.  NOTHING TO DO WITH BIG COMPANIES OR SMALL

17   COMPANIES.

18       THE CASES HAVE TO DO WITH ACTUAL INNOVATION AND ACTUAL

19   INVENTION.  AND WHAT I ASKED YOU TO LISTEN FOR WAS EVIDENCE

20   ABOUT WHETHER THIS WAS THE FIRST TYPE OF CASE, WHERE THERE'S A

21   REAL INVENTION WHERE SOMEONE REALLY CAME UP WITH SOMETHING

22   NEW, AND THEN WORKED TO MAKE IT HAPPEN, AS PROFESSOR SCHULL

23   SAID, TAKING THE INVENTION AND THEN PUTTING IN THE TIME AND

24   THE MONEY AND MAKING AN INNOVATION.  AND WHETHER IT WAS THAT

25   KIND OF A CASE AND WHETHER IT WAS A CASE WHERE SOMEBODY TOOK

1    THAT TECHNOLOGY AND THEN TRIED TO COMPETE; WHETHER IT WAS A

2    CASE ABOUT TECHNOLOGY.

3        AND THEN I DESCRIBED THAT THERE WERE ANOTHER KIND OF CASE,

4    DIFFERENT PATENT CASES.  CASES THAT ARE NOT ABOUT REAL

5    INVENTION OR REAL INNOVATION.  THEY ARE CASES ABOUT SOMEBODY

6    THAT HAS A PATENT AND THE DEFENDANT THAT HAS A PRODUCT OR SET

7    OF PRODUCTS THAT MAKE MONEY, AND A PLAINTIFF THAT WANTS A CUT

8    OF THAT; CASES THAT ARE ABOUT MONEY.  AND I ASKED YOU TO

9    LISTEN CAREFULLY OVER THE COURSE OF THE TWO WEEKS TO HELP

10   YOURSELVES FIGURE OUT WHAT THIS CASE IS.

11       I KNOW YOU HAVE BEEN PAYING ATTENTION, SO I KNOW THAT

12   YOU'VE SEEN THE TESTIMONY FROM MR. FARLEY.  REMEMBER, HE WAS

13   THE MONEY GUY FOR DIGITAL REG.  HE'S NOT A TECHNOLOGIST.  HE'S

14   THE MONEY GUY.  AND WHAT HE SAID WAS, THEY'VE BEEN TRYING TO

15   TAKE THE PATENT THAT THEY HAVE, THAT PATENT THAT MR. ELLWANGER

16   WAS SHOWING YOU ON DAY ONE, AND MAKE SOMETHING OF IT FOR

17   YEARS.  AND THEY HAVEN'T BEEN SUCCESSFUL.

18       AND MR. VENTERS EXPLAINED, THE MARKETING GUY, THAT THEY

19   HAVE HAD THIS PATENT AND THEY HAVE BEEN TRYING TO MAKE

20   SOMETHING OUT OF IT FOR YEARS.

21       AND ASIDE FROM THE SETTLEMENTS THAT YOU'VE SEEN OVER THE

22   COURSE OF THE CASE, THEY HAVEN'T MADE ANYTHING FROM THE

23   PATENT.

24       SO THEN ASK YOURSELVES, WHEN YOU GO BACK INTO THAT JURY

25   ROOM, IS THIS A CASE ABOUT TECHNOLOGY AND ABOUT WHETHER THERE

1   WAS A REAL INVENTION AND A REAL QUESTION AS TO WHETHER ADOBE

2   IS USING THAT INVENTION, OR WHETHER THIS IS JUST A CASE ABOUT

3   MONEY.

4        NOW, IN ORDER TO HELP YOU CONSIDER THAT QUESTION AND

5   DECIDE THESE ISSUES, WHEN YOU GO BACK INTO THE JURY ROOM, I

6   PRESENTED TO YOU TWO KEY ISSUES IN THE OPENING.  AND THOSE TWO

7   KEY ISSUES ARE STILL THE KEY ISSUES IN THE CASE.

8        THE FIRST I ASKED YOU TO THINK ABOUT, AND WE HAVE HEARD SO

9   MUCH TESTIMONY AND EVIDENCE ABOUT IT OVER THE LAST TWO WEEKS,

10  IS WHETHER THE ADOBE PRODUCTS AT ISSUE ARE IDENTICAL TO THE

11  CLAIMS OF THE PATENTS-IN-SUIT.

12       AND THE SECOND QUESTION THAT I ASKED YOU TO ASK YOURSELVES

13  AND CONSIDER IS, DID MR. PATTERSON REALLY INVENT THIS IDEA OF

14  PROTECTING ELECTRONIC CONTENT AND COPYRIGHTABLE MATERIALS OR

15  WAS IT PROFESSOR SCHULL WHO WAS THINKING ABOUT THE VERY SAME

16  THING AND DOING THE VERY SAME THING YEARS BEFORE.

17       SO THOSE ARE THE TWO QUESTIONS I ASKED YOU TO CONSIDER

18  OVER THE LAST TEN DAYS.  AND YOU'VE DONE THAT.  I KNOW YOU

19  HAVE BEEN PAYING ATTENTION.  I WOULD ASK YOU TO GO BACK AND

20  REVIEW YOUR NOTES AND DISCUSS THOSE ISSUES.

21       WHILE YOU'RE DELIBERATING, THERE ARE OTHER QUESTIONS THAT

22  HAVE COME UP OVER THE COURSE OF THE LAST TEN DAYS THAT I WOULD

23  ALSO ASK YOU TO PLEASE CONSIDER.  THE FIRST OF THOSE IS

24  ACTUALLY ONE THAT MR. ELLWANGER INTRODUCED IN THE OPENING AND

25  THAT HE RE-INTRODUCED TODAY.  AND AS I TOLD YOU IN THE

1   OPENING, WE AGREE COMPLETELY THAT THIS IS A KEY ISSUE IN THE

2   CASE.  WHAT DID THEY KNOW AND WHEN DID THEY KNOW IT?

3       BUT ASK YOURSELVES THAT QUESTION NOT ONLY FOR ADOBE, BUT

4   ALSO FOR DIGITAL REG.  WHAT DID MR. FARLEY KNOW?  WHAT DID

5   MR. VENTERS KNOW, AND WHEN DID THEY KNOW IT?  AND THEN ASK

6   YOURSELF THAT QUESTION FOR PROFESSOR SCHULL.  WHAT DID HE KNOW

7   ABOUT THE PROBLEM OF PROTECTING ELECTRONIC CONTENT AND WHEN

8   DID HE KNOW THE SOLUTION?  AND HOW DOES THAT COMPARE TO WHAT

9   WE HEARD FROM MR. PATTERSON.  THESE ARE GOING TO BE KEY

10  ISSUES.

11      ANOTHER KEY ISSUE THAT'S COME UP OVER THE COURSE OF THE

12  LAST TEN DAYS, CREDIBILITY.  CREDIBILITY.  YOU HAVE SEEN FOR

13  YOURSELF IN PERSON, LIVE, IN FULL COLOR ALL OF THE TESTIMONY

14  OF THE PEOPLE ON BOTH SIDES OF THE STORY.

15      AND THE REASON THAT WE'VE ASKED YOU HERE AND WE HAVE TAKEN

16  YOU AWAY FROM YOUR LIVES FOR THE LAST TWO WEEKS IS SO YOU CAN

17  CONSIDER THE TESTIMONY OF ALL OF THOSE PEOPLE AND WHETHER OR

18  NOT THE TESTIMONY IS CREDIBLE.

19      AND THEN THE FINAL THING, AFTER YOU WEIGH THESE FOUR

20  QUESTIONS, THAT I WOULD ASK YOU TO CONSIDER BASED ON ALL THE

21  EVIDENCE YOU'VE SEEN AND YOUR ANALYSIS OF THESE FOUR QUESTIONS

22  IS, FAIRNESS.

23      WHAT IS THE RIGHT OUTCOME IN THIS CASE?  WHAT IS FAIR?

24  DID ADOBE REALLY DO ANYTHING WRONG?  IS THIS REALLY A CASE

25  ABOUT TECHNOLOGY OR IS THIS JUST A CASE ABOUT MONEY?

1       NOW, THE WAY WE HAVE DECIDED TO SPLIT THINGS UP SO YOU

2   GUYS DON'T GET TOO SICK OF ME, IS I'M GOING TO ADDRESS THE

3   FIRST TWO QUESTIONS.  I'M GOING TO ADDRESS THE QUESTION ABOUT

4   WHETHER THE ADOBE PRODUCTS WORK IDENTICALLY TO THE CLAIMS OF

5   THE PATENT AND I'M GOING TO ADDRESS THE INVALIDITY ISSUES.

6   AND THEN MY COLLEAGUE, MR. REINES, WHO YOU HAVE ALSO GOTTEN TO

7   KNOW OVER THE LAST TWO WEEKS, HE'S GOING TO TALK TO YOU ABOUT

8   THE LAST THREE QUESTIONS.

9       SO LET'S START WITH WHAT IS THIS CASE NOT ABOUT, AND THEN

10  WE CAN TALK ABOUT QUESTION 1.

11      SO I GAVE YOU THE FIVE THINGS THAT WE WOULD SUBMIT THIS

12  CASE IS ABOUT, THE FIVE QUESTIONS THAT WE WOULD ASK THAT YOU

13  TAKE THE TIME TO CONSIDER.

14      WHAT THE CASE IS NOT ABOUT, AND THIS HAS BECOME ABUNDANTLY

15  CLEAR OVER THE LAST TEN DAYS, IS THIS IS NOT A CASE ABOUT

16  STOLEN PROPERTY.  IT WAS THE FIRST LINE YOU HEARD LAST MONDAY.

17  GUESS WHAT?  THE EVIDENCE JUST DOESN'T STACK UP.  THIS IS NOT

18  A CASE ABOUT STOLEN PROPERTY.

19      THIS IS NOT A CASE ABOUT THE ADOBE PATENTS THAT WERE ALL

20  GRANTED OVER THE DIGITAL REG PATENTS, ABOUT THE ADOBE PATENTS

21  THAT REFLECT THE HARD WORK OF PEOPLE LIKE MR. HERBACH AND

22  MR. BETLEM.

23      AND IT'S NOT A CASE ABOUT SUPERFICIAL EVIDENCE OR

24  ARGUMENTS.  IT'S NOT ABOUT GOING THROUGH A STACK OF DOCUMENTS

25  AND HIGHLIGHTING THE WORD "TRACK" WHENEVER IT APPEARS.  OR A

1    TETRIS GAME OF PATTERSON, PATTERSON, PATTERSON THAT ARE JUST

2    PICKED OUT OF A DOCUMENT.

3        THE JOB THAT YOU'RE HERE TO DO, AS YOU'VE BEEN INSTRUCTED

4    BY THE COURT, IS TO CONSIDER THE CLAIMS OF THE PATENT AND THEN

5    CONSIDER THE EVIDENCE AND THE TESTIMONY THAT'S BEEN PRESENTED

6    TO YOU OVER THE LAST TEN DAYS AS TO WHETHER OR NOT THE CLAIMS

7    OF THE PATENT SUPPORT THE CLAIMS THAT DIGITAL REG IS NOW

8    MAKING IN THE LITIGATION.

9        LET'S START WITH THE FIRST QUESTION.  THAT'S INFRINGEMENT.

10   '541 PATENT, AND THEN WE WILL GO TO THE '670 PATENT.

11       NOW, MR. ELLWANGER, WHEN HE WAS TALKING ABOUT INVALIDITY,

12   MENTIONED THE BURDEN OF PROOF.  WHAT HE DIDN'T TALK ABOUT WAS

13   THE BURDEN OF PROOF ON INFRINGEMENT.  ON INFRINGEMENT, DIGITAL

14   REG BEARS THE BURDEN OF PROOF.  THEY MUST PROVE THAT ADOBE'S

15   PRODUCTS INFRINGE.

16       AND TO PROVE THAT ADOBE'S PRODUCTS INFRINGE, WHAT THE

17   COURT'S INSTRUCTION TELLS YOU IS THAT YOU NEED TO CONSIDER AND

18   COMPARE THE ADOBE PRODUCTS WITH THE REQUIREMENTS OF THE CLAIM.

19   AND IN ORDER FOR DIGITAL REG TO PROVE THAT THERE'S

20   INFRINGEMENT, THEY HAVE TO PROVE THAT EVERY REQUIREMENT OF THE

21   CLAIM IS MET.

22       NOW, THIS IS THE CLAIM.  I KNOW YOU GUYS HAVE BECOME

23   INTIMATELY FAMILIAR WITH IT.  AND YOU ARE PROBABLY EXCITED TO

24   FORGET ABOUT IT AFTER THIS WHOLE PROCEEDING, BUT BEFORE YOU

25   CAN FORGET ABOUT IT, I WOULD ASK YOU TO SPEND JUST A LITTLE

1    BIT MORE TIME THINKING HARD ABOUT IT.

2         HAVE THEY ACTUALLY PROVEN THAT THE CLAIM IS MET?  NOW,

3    DURING MR. ELLWANGER'S CLOSING, HE PUT THE CLAIM UP, HE

4    POINTED TO IT, HE TALKED ABOUT HOW THERE'S ACCESS CHECKING,

5    AND ALL OF THAT, BUT WHAT HE DIDN'T TALK ABOUT ARE THE

6    ELEMENTS OF THE CLAIM THAT THEY HAVEN'T PROVEN.  THE ONES THAT

7    WE HAVE BEEN FOCUSED ON FOR THE LAST TEN DAYS.  THE THINGS

8    THAT HE OMITTED ARE THE THINGS THAT ARE AT THE VERY HEART OF

9    THE DISPUTE.

10        DURING THE OPENING, I TOLD YOU THAT THERE WERE GOING TO BE

11   TWO KEY ISSUES FOR YOU TO DECIDE ON THIS PATENT.  AND I THINK

12   YOU CAN TELL FROM THE EVIDENCE, THAT THOSE ARE THE TWO KEY

13   ISSUES THAT ARE IN DISPUTE.  YOU DIDN'T HEAR ANYTHING

14   SUBSTANTIVE FROM MR. ELLWANGER ON THOSE ISSUES.  YOU DID NOT

15   HEAR ANY SUBSTANCE ON WHY THOSE TWO ELEMENTS ARE ACTUALLY MET

16   BY THE ADOBE PRODUCTS.

17        HE TOLD YOU TO FOCUS ON THE CODE AND THE DOCUMENTS.  WE

18   DON'T DISAGREE WITH THAT.  THE CODE AND THE DOCUMENTS ARE

19   IMPORTANT.

20        GUESS WHAT?  THERE'S NO DISPUTE BETWEEN THE EXPERTS ON THE

21   CODE OR THE DOCUMENTS OR THE BASIC FUNCTIONING OF THE SYSTEM.

22        THE QUESTION THAT IS IN YOUR HANDS IS WHETHER OR NOT WHEN

23   YOU LOOK AT THE CODE, WHEN YOU LOOK AT THE DOCUMENTS, AND THEN

24   YOU ANALYZE IT THE WAY THAT DR. DEVANBU AND DR. WICKER WERE

25   SUPPOSED TO ANALYZE IT, WHETHER THOSE -- THAT CODE AND THOSE

1    DOCUMENTS ACTUALLY MAP TO THE LIMITATIONS OF THE CLAIM.

2        AND THAT'S WHERE YOU HEARD NOTHING FROM MR. ELLWANGER.  IN

3    FACT, HE'S GOING TO GET A CHANCE TO COME UP HERE AND TELL YOU

4    MORE ABOUT ALL OF THIS WHEN HE CLOSES IN REBUTTAL.  LISTEN

5    CAREFULLY FOR ANY EVIDENCE FROM DR. DEVANBU THAT ADOBE MEETS

6    THESE REQUIREMENTS.

7        LISTEN CAREFULLY TO SEE IF HE CAN POINT YOU TO ANY

8    TESTIMONY TO THAT EFFECT.  AS I'M GOING TO SHOW YOU IN JUST A

9    MINUTE, HE'S NOT GOING TO BE ABLE TO DO IT BECAUSE IT'S NOT

10   THERE.

11       SO LET'S TALK ABOUT THE FIRST REQUIREMENT.  THE YES/NO

12   TOKEN.  WE HAVE BEEN OVER THIS A LOT.  BUT THINK BACK

13   CAREFULLY TO WHEN WE STARTED TALKING ABOUT THE YES/NO TOKEN

14   LAST WEEK.

15       AND WHEN WE STARTED TALKING ABOUT THE YES/NO TOKEN, THE

16   QUESTION WAS RAISED WITH DR. DEVANBU BY MR. DINOVO ON HIS

17   DIRECT EXAMINATION.

18       WHEN YOU WERE APPLYING THE COURT'S CLAIM CONSTRUCTION,

19   THAT MEANS WHEN YOU WERE MAKING THE DECISION AS TO WHETHER OR

20   NOT YOU THOUGHT ADOBE INFRINGED, WHEN YOU WERE FORMING YOUR

21   OPINION ON INFRINGEMENT, WERE YOU APPLYING A CONSTRUCTION THAT

22   HAD A YES/NO REQUIREMENT?

23       AND DR. DEVANBU SAID NO.  HE DIDN'T CONSIDER THE YES/NO

24   REQUIREMENT.

25       AND THEN THE NEXT DAY, YOU HEARD FROM THE COURT.  YOU

1    HEARD FROM THE COURT THAT IN FACT, THE COURT'S CONSTRUCTION OF

2    TOKEN CONTAINS A YES/NO INDICATOR.  IT REQUIRES A YES OR NO.

3    THE VERY THING THAT DR. DEVANBU SAID HE DIDN'T EVEN CONSIDER,

4    THE COURT MADE CLEAR WAS A REQUIREMENT OF THE CLAIMS.

5        NOW, WHAT THE COURT SAID IS, YOU HAVE TO DISREGARD ANY

6    TESTIMONY THAT THAT'S NOT A REQUIREMENT.  AND YOU WILL SEE IN

7    YOUR JURY INSTRUCTIONS THAT THE COURT'S INSTRUCTION OF THE

8    TERM "TOKEN" REQUIRES A YES/NO INDICATOR.

9        NOT SURPRISINGLY SINCE HE DIDN'T EVEN CONSIDER THE

10   REQUIREMENT, DR. DEVANBU HAS NO EVIDENCE THAT THAT INDICATOR

11   IS REQUIRED.

12       DR. WICKER DID CONSIDER THE REQUIREMENT.  AND WHEN HE

13   CONSIDERED THE REQUIREMENT, HE EXPLAINED IN DETAIL OVER THE

14   COURSE OF HIS EXAMINATION THAT THE REQUIREMENT IS NOT MET.

15   IT'S NOT MET.

16       SO WE HAVE DR. WICKER SAYING, LOOK, IT'S NOT THERE, AND

17   DR. DEVANBU, WHO IS THEIR EXPERT ON AN ISSUE THAT THEY BEAR

18   THE BURDEN OF PROOF ON, SAYING HE DIDN'T EVEN CONSIDER IT.

19       AS I TOLD YOU WE WOULD PROVE IN THE OPENING, ADOBE DOESN'T

20   HAVE A YES/NO INDICATOR AS REQUIRED BY THE CLAIMS.

21       LET'S TALK ABOUT THE SECOND LIMITATION OF THE '541.  THE

22   SECOND ISSUE, THE KEY ISSUE IN DISPUTE, AND THIS IS A SECOND

23   INDEPENDENT GROUND FOR NONINFRINGEMENT.  SO ONE INDEPENDENT

24   GROUND FOR NONINFRINGEMENT IS THAT THERE'S NO YES/NO INDICATOR

25   AND THEY HAVEN'T EVEN PROVIDED ANY EVIDENCE THAT THERE IS.

1    A SECOND ISSUE THAT WE TEE'D UP DURING THE OPENING AND HAS

2    BEEN A FOCUS OF THE TESTIMONY, COMPLETELY INDEPENDENT IS THERE

3    IS NO PERMISSION THAT'S GENERATED AT THE CLIENT.  WE'VE HEARD

4    A LOT ABOUT GENERATING AT THE CLIENT, GENERATING AT THE

5    SERVER.

6    WELL, WHAT THE CLAIM SAYS, THE CLAIM SAYS, AND THIS IS THE

7    KEY THING THEY HAVE TO PROVE, THAT THE PERMISSION IS GENERATED

8    AT THE CLIENT.  AND THE COURT'S CLAIM CONSTRUCTION MAKES CLEAR

9    THAT THE INSTALLATION PROGRAM CREATES THE PERMISSION LOCALLY.

10   WHEN YOU GO BACK AND LOOK AT THE JURY INSTRUCTIONS, READ

11   THAT INSTRUCTION.  IT MAKES CLEAR THAT THE PERMISSION HAS TO

12   BE CREATED LOCALLY; THAT'S AT THE CLIENT, NOT AT THE SERVER.

13   WELL, THIS ISN'T JUST AN INSUBSTANTIAL THING.  IT'S NOT

14   JUST A LITTLE THING THAT WE CAN HAVE WAVE OUR HANDS AND

15   PRETEND ISN'T IMPORTANT.  AS WE SHOWED THROUGHOUT THE LAST TWO

16   WEEKS, THIS IS A KEY ELEMENT OF THE CLAIMS.

17   YOU DON'T GET TO JUST PUT A BOARD UP THERE AND SAY, WELL,

18   IT'S HERE, WITHOUT ACTUALLY PROVING THAT IT'S THERE BECAUSE

19   THIS WAS IMPORTANT.  THIS WAS IMPORTANT BECAUSE WHEN DIGITAL

20   REG GOT THE PATENTS, THEY TOLD THE PATENT OFFICE THAT THE

21   THING THAT MAKES THEM DIFFERENT OVER THE PRIOR ART –– THAT'S

22   THE WOLFE PATENT, YOU HAVE THAT IN THE JURY ROOM, IT'S EXHIBIT

23   679 –– THE THING THAT MAKES THEM DIFFERENT OVER THE WOLFE

24   PATENT AND ALL THIS OTHER PRIOR ART IS THAT THEY ARE

25   GENERATING THE PERMISSION AT THE CLIENT AND NOT AT THE CENTRAL

1    COMPUTER.

2        AND DR. WICKER EXPLAINED, WHEN HE REVIEWED THE FILE

3    HISTORY, WHEN HE LOOKED AT THE EVIDENCE, WHAT IT SHOWS IS THAT

4    THE PERMISSION IS GENERATED LOCALLY, NOT AT THE SERVER.  THE

5    CLAIM SAYS IT, THE COURT'S CLAIM CONSTRUCTION SAID IT, AND

6    DIGITAL REG SAID IT WHEN THEY GOT THE PATENT.

7        BUT THAT'S NOT WHERE THE EVIDENCE STOPS.  MR. PATTERSON

8    HIMSELF WAS DESCRIBING HIS CLIENT CENTRIC APPROACH, AND HE

9    SAID, LOOK, THE CONTROLLING PROCESS FOR PROTECTING THE

10   CONTENT, THAT'S PERFORMED AT THE CLIENT, NOT AT THE SERVER.

11       AND MR. VENTERS, AND WE ARE GOING TO HEAR MORE ABOUT

12   MR. VENTERS LATER, BUT THAT ADOBE VALUE PROPOSITION DOCUMENT

13   THAT HE SAYS HE SENT TO ADOBE?  WHETHER HE SENT IT OR NOT, THE

14   THING HE CLAIMS HE SENT TO ADOBE HIGHLIGHTED THE CLIENT

15   CENTRIC ASPECT OF THE INVENTION.

16       IN FACT, WHEN HE SAYS HE WAS TELLING ADOBE ABOUT THE

17   INVENTION, WHAT HE WAS TELLING THEM WAS, WE ARE CLIENT CENTRIC

18   AND WE STAND IN CONTRAST TO PEOPLE THAT ARE DOING IT AT THE

19   SERVER, AND THAT'S AN IMPORTANT COMPONENT OF OUR INVENTION.

20   CLIENT CENTRIC GENERATED AT THE CLIENT, GENERATED LOCALLY.

21       YOU'VE SEEN THESE ANIMATIONS BEFORE SO WE ARE NOT GOING TO

22   RUN THROUGH THE WHOLE THING.  BUT I JUST WANT TO REMIND YOU OF

23   SOMETHING.

24       REMEMBER DR. WICKER'S TESTIMONY.  AND REMEMBER HOW HE

25   SHOWED YOU HOW THE DIGITAL REG PATENTS WORK AND HOW THOSE

1    GEARS THAT REFLECT THE GENERATING OF THE PERMISSION, THE SAME

2    GEAR THAT DR. KELLER USED TO SHOW PERMISSION GENERATION, THOSE

3    GEARS IN THE PATENT, THEY ARE AT THE CLIENT BECAUSE IT'S

4    CLIENT CENTRIC.

5        AND IN THE ADOBE PRODUCTS, THOSE GEARS, THE PROCESS OF

6    GENERATING THE THING THAT THEY CLAIM IS THE PERMISSION, THOSE

7    ARE AT THE SERVER.  THEY ARE NOT AT THE CLIENT.

8        THEY ARE EXACTLY STANDING IN CONTRAST TO THE CLIENT

9    CENTRIC APPROACH IN JUST THE WAY MR. VENTERS WAS TRYING TO

10   SHOW THAT DISTINCTION.

11       SO WHAT'S THE EVIDENCE?  THE EVIDENCE IS, AND, AGAIN,

12   NEITHER EXPERT DISPUTES HOW THE PRODUCT WORKS IN TERMS OF THE

13   RELEVANT FUNCTIONALITY.  THEY DON'T DISPUTE THE CODE OR THE

14   DOCUMENTS.  WHAT THEY DISPUTE IS THE APPLICATION OF THE CLAIM

15   AND THE CLAIM CONSTRUCTION.

16       AND WHAT DR. WICKER SAYS IS, LOOK, FOR ALL THREE OF THE

17   ADOBE PRODUCTS, THE KEY, THE THING THAT'S BEING POINTED TO AS

18   THE PERMISSION GENERATED AT THE SERVER AND THEN IT'S PASSED TO

19   THE CLIENT.

20       WELL, GUESS WHAT?  YOU HEARD DR. DEVANBU, ALTHOUGH HE

21   DIDN'T ADMIT IT ON DIRECT EXAMINATION, AND HE TRIED TO SUGGEST

22   THAT THERE WAS SOME GENERATION HAPPENING AT THE CLIENT, ON

23   CROSS-EXAMINATION WHEN WE PUT THE QUESTIONS TO HIM, AND I

24   ASKED HIM POINT BLANK, WHERE THE GENERATION'S HAPPENING?  HE

25   EXPLAINED FOR ALL THREE OF THE PRODUCTS, THE GENERATING IS

1    HAPPENING AT THE SERVER, AND THEN THE THING THAT HE IS

2    POINTING TO IS THE PERMISSION IS BEING PASSED TO THE CLIENT.

3        LET'S LOOK AT HIS TESTIMONY.  FOR THE ACTIVATION PRODUCT,

4    HE'S POINTING TO THE E-LICENSE AS THE PERMISSION.

5        AND I SAID, THAT'S GENERATED AT THE SERVER.

6        CORRECT.

7        AND IT'S JUST PASSED TO THE CLIENT?

8        CORRECT.

9        FLASH ACCESS:  THE CEK, THE KEY THAT HE'S POINTING TO AS

10   THE PERMISSION, THAT EXISTS AT THE SERVER BEFORE IT GOES TO

11   THE CLIENT.  IT WAS GENERATED AT THE SERVER.

12       AND FOR LIVECYCLE RIGHTS MANAGEMENT:  THE ENCRYPTED KEY

13   THAT HE'S POINTING TO IS THE PERMISSION.

14       GUESS WHAT?  THAT ALSO EXISTED AT THE SERVER AND WAS

15   GENERATED THERE BEFORE IT WAS PASSED TO THE CLIENT.

16       SO FOR ALL THREE PRODUCTS, HE ADMITTED POINT BLANK THAT

17   HIS CODE REVIEW, HIS REVIEW OF THE DOCUMENTS, AND HIS REVIEW

18   OF THE DEPOSITION TESTIMONY CONFIRMS EXACTLY WHAT DR. WICKER

19   WAS SAYING.  IT'S DONE AT THE SERVER AND NOT AT THE CLIENT.

20   THIS IS NOT CLIENT CENTRIC.  IT DOESN'T FALL WITHIN THE SCOPE

21   OF THE CLAIMS.

22       SO, YOU WOULD THINK, GIVEN THOSE ADMISSIONS, THAT YOU

23   SHOULDN'T ALL BE HERE STILL.  SO HOW DO THEY CONTINUE TO URGE

24   YOU TO FIND INFRINGEMENT NOTWITHSTANDING THE ADMISSIONS OF

25   THEIR OWN EXPERT?  HOW CAN THEY DO IT?

1       WELL, THEY CAME UP WITH A THEORY.  AND THE THEORY IS THAT,

2   YES, IT EXISTED AT THE CLIENT -- SORRY.  IT EXISTED AT THE

3   SERVER AND WAS GENERATED THERE, AND GOT PASSED TO THE CLIENT,

4   BUT WE'RE GOING TO ENCRYPT IT BEFORE WE PASS IT.  AND THAT THE

5   PROCESS OF ENCRYPTING IT AND SENDING IT OVER AND THEN

6   DECRYPTING IT MEANS YOU ARE SOMEHOW REGENERATING IT OR

7   RE-CREATING IT AT THE CLIENT.

8       WELL, WE PROBED THAT A LITTLE BIT ON CROSS-EXAMINATION

9   WITH DR. DEVANBU.  AND WHAT DR. DEVANBU ADMITTED WAS,

10  ENCRYPTION AND DECRYPTION ASIDE -- I AM GOING TO TALK ABOUT

11  THAT IN A SECOND -- THE KEY, THE THING THAT THEY POINT TO AS

12  THE PERMISSION, IT WAS GENERATED AT THE CLIENT AND IT EXISTED

13  THERE.  AND THE EXACT SAME THING IS WHAT'S BEING USED AT

14  THE -- I'M SORRY, I MISSPOKE.  IT WAS GENERATED AT THE SERVER

15  AND EXISTED THERE, AND THE EXACT SAME THING IS BEING USED AT

16  THE CLIENT.

17      SO, WHAT DOES THE ARGUMENT BOIL DOWN TO?  THE ARGUMENT

18  BOILS DOWN TO AN ARGUMENT THAT IF YOU ENCRYPT SOMETHING AND

19  THEN DECRYPT IT, YOU'VE RE-CREATED IT.  THINK ABOUT WHAT THAT

20  MEANS.  YOU'VE ALL BOUGHT THINGS ONLINE, SHOPPED ONLINE AND

21  YOU HAVE PUT YOUR CREDIT CARD INFORMATION ON TO A WEB PAGE.

22      AND GUESS WHAT HAPPENS TO YOUR CREDIT CARD INFORMATION

23  BEFORE IT GOES TO AMAZON?  IT GETS ENCRYPTED.  AND THEN AMAZON

24  DECRYPTS IT AND CHARGES YOUR CREDIT CARD.  AMAZON IS NOT

25  RE-CREATING OR REGENERATING YOUR CREDIT CARD.  ALL THAT WAS

1    DONE WAS YOU PUT A LEVEL OF PROTECTION ON IT, YOU PACKAGE IT

2    UP SO IT CAN BE SENT OVER, AND THEN THE VERY SAME THING THAT

3    YOU PACKAGED UP, JUST GETS UNWRAPPED ON THE OTHER SIDE.

4         DR. WICKER EXPLAINED THAT TO YOU.  HE EXPLAINED IN DETAIL

5    THAT IT'S THE SAME KEY THAT'S GENERATED AT THE SERVER, THE

6    EXACT SAME KEY THAT'S BEING USED AT THE CLIENT.  AND

7    ENCRYPTION AND DECRYPTION AREN'T CHANGING THE KEY, THEY'RE

8    JUST PACKAGING IT UP SO IT CAN BE TRANSMITTED, THE SAME WAY

9    ANY DATA HAS TO BE PACKAGED BEFORE YOU CAN TRANSFER IT OVER A

10   NETWORK.

11        SO AFTER ALL OF THAT, AND CONSIDERING ALL OF THAT, WE

12   WOULD ASK YOU TO GO BACK AND THINK HARD ABOUT THESE TWO

13   QUESTIONS AND FIND THAT FOR THESE TWO INDEPENDENT REASONS AND

14   FOR OTHER REASONS THAT YOU HEARD ABOUT OVER THE COURSE OF THE

15   LAST TEN DAYS THAT I AM NOT GOING TO GET INTO TODAY, THAT

16   ADOBE DOES NOT INFRINGE THE '541 PATENT.  DIGITAL REG HAS NOT

17   PROVED, THEY HAVE NOT MET THEIR BURDEN OF PROVING THAT THE

18   PRODUCTS WORK THE SAME WAY.

19        NOW -- OR THE PRODUCTS WORK THE SAME WAY AS THE CLAIMS, I

20   SHOULD SAY.

21        NOW, WITH RESPECT TO THE '670 PATENT, AGAIN, THEY BEAR THE

22   BURDEN OF PROOF AND THEY HAVE TO PROVE THAT EVERY REQUIREMENT

23   IS MET.

24        AND IN THE '670 PATENT, WE HEARD ABOUT CLAIM 45 AND A

25   BUNCH OF DIFFERENT REQUIREMENTS, BUT I'M GOING TO FOCUS IN ON

1    TWO OF THEM.  THE TWO REQUIREMENTS THAT I WANT TO FOCUS IN ON

2    ARE THE REQUIREMENT THAT YOU DENY ACCESS UNTIL THE

3    TRANSMISSION OF NOTIFICATION INFORMATION AND THEN SUCCESSIVE

4    RECIPIENT.

5         SO, DENYING ACCESS UNTIL THE NOTIFICATION INFORMATION IS

6    SENT.  THIS IS SOMETHING THAT'S DESCRIBED IN THE PATENT.  WE

7    HEARD TESTIMONY ABOUT HOW IT IS DESCRIBED IN THE PATENT AND WE

8    ALSO HEARD TESTIMONY ABOUT HOW IT WAS DESCRIBED IN THE FILE

9    HISTORY.

10        AND MUCH THE SAME WAY AS THE WOLFE PATENT, WHEN THE

11   PATENTEE WAS TRYING TO GET THE '670 PATENT, THERE WAS A

12   DISCUSSION ABOUT ALL THE PRIOR ART THAT WAS OUT THERE AND WHAT

13   MIGHT MAKE CLAIM 45 DIFFERENT.  AND, AGAIN, WHAT THEY SAID

14   WAS, WHAT MAKES US DIFFERENT IS THAT THE DENIAL OF ACCESS IS

15   UP UNTIL THE POINT WHERE YOU SEND THE NOTIFICATION INFORMATION

16   OUT.  AND THEN THE GRANTING OF ACCESS IS TRIGGERED BY THE

17   SENDING OUT OF THE NOTIFICATION INFORMATION.

18        AND WHAT THEY SAID WAS, THAT'S WHAT MAKES US DIFFERENT

19   FROM THE PRIOR ART.  BECAUSE IN THE PRIOR ART, YOU SEND STUFF

20   OUT, BUT YOU HAVE TO GET SOMETHING BACK BEFORE YOU CAN HAVE

21   ACCESS.  SO OUR PATENT IS DIFFERENT BECAUSE WE ONLY SEND IT

22   OUT AND WE DON'T GET ANYTHING BACK.  THAT WAS WHY THEY SAID

23   THEY WERE DIFFERENT FROM THE PRIOR ART.

24        AS DR. WICKER PUT IT, IT'S NOT THE SUCCESSFUL TRANSMISSION

25   THAT DETERMINES WHETHER YOU HAVE ACCESS, IT'S GETTING THE KEY,

1    IT'S GETTING SOMETHING BACK FROM THE SERVER.

2        SO WHAT'S EVIDENCE -- AND MR. HERBACH OBVIOUSLY CONFIRMED

3    THIS.

4        WHAT'S THE EVIDENCE?  WELL, ONCE AGAIN, AND NOT

5    SURPRISINGLY GIVEN THE EXPERTS AGREE ON THE CODE AND THE

6    DOCUMENTS AND HOW THE PRODUCTS WORK BASICALLY, DR. DEVANBU WAS

7    ASKED TO CONSIDER THIS ON DIRECT EXAMINATION.  AND HE SAID,

8    OH, YES, THE LIMITATIONS MET.

9        BUT ON CROSS-EXAMINATION HE CONFIRMED THAT IN THE ACCUSED

10   PRODUCTS, THE ACCESS, THE THING THAT TRIGGERS THE ACCESS IS

11   NOT THE SENDING OUT OF INFORMATION, IT'S GETTING THAT KEY

12   BACK.  IT'S GETTING SOMETHING BACK FROM THE SERVER.

13       SO, AGAIN, IN STARK CONTRAST TO WHAT'S CLAIMED IN THE

14   CLAIMS.

15       AND WHAT HE SAID WAS, YOU HAVE TO GET SOMETHING BACK.  SO

16   FOR ALM, TOO, YOU DON'T HAVE ACCESS UNTIL YOU GET THAT LICENSE

17   E-LICENSE BACK.

18       AND THEN MR. KELLER, THE EXPERT ON INVALIDITY.  MR. KELLER

19   EXPLAINED THAT FROM HIS PERSPECTIVE, IF YOU ACCESS THE

20   TRIGGERING EVENT IS BASED ON GETTING SOMETHING BACK THE WAY IT

21   WORKS IN THE ADOBE PRODUCTS, THAT WOULDN'T FIT HIS

22   UNDERSTANDING OF THE CLAIMS.

23       SO, ACTUALLY, ALL THREE OF THE EXPERTS AGREE.  THEY ALL

24   AGREE.  THE CLAIMS REQUIRE THAT YOU SEND SOMETHING OUT TO GET

25   ACCESS, AND THEN DR. DEVANBU AND DR. WICKER AGREE THAT YOU

1   HAVE TO GET SOMETHING BACK.

2          SO THAT LIMITATION OF THE '670 IS NOT MET.

3          THERE'S A SECOND INDEPENDENT GROUND FOR NONINFRINGEMENT,

4   AND THAT'S THE SUCCESSIVE RECIPIENT LIMITATION THAT'S IN THE

5   CLAIMS.  THERE'S OTHERS, BUT I'M ONLY GOING TO GIVE YOU THE

6   TOP TWO, THE HIGHLIGHTS.

7          SUCCESSIVE RECIPIENT.  WHAT THE PATENT CLAIMS IS SOMEBODY

8   CREATES CONTENT AND THEN THEY SEND IT TO A USER.  AND THEN

9   THAT USER SENDS IT TO ANOTHER RECIPIENT.  SO YOU HAVE A FIRST

10  RECIPIENT AND YOU HAVE A SUCCESSIVE RECIPIENT.

11         AND WHAT THE COURT HAS CONSTRUED THOSE TERMS TO MEAN IS,

12  THE USER THAT RECEIVES THE CONTENT AND THEN THE USER THAT

13  RECEIVES IT FROM A PREVIOUS RECIPIENT.  YOU WILL SEE THAT IN

14  THE JURY INSTRUCTIONS.

15         WELL, YOU HEARD DR. DEVANBU EXPLAIN HIS INFRINGEMENT

16  THEORY FOR ACTIVATION.  AND WHAT HE SAID WAS, LOOK -- AND THIS

17  IS DR. WICKER'S ILLUSTRATIVE TO SHOW HOW THE SYSTEM WORKS, BUT

18  THERE'S NO REAL CONTEST ON HOW THE PRODUCT WORKS.  YOU

19  DOWNLOAD SOFTWARE, ONE PERSON DOWNLOADS IT, ANOTHER PERSON

20  DOWNLOADS IT, ANOTHER PERSON DOWNLOADS IT.

21         DR. DEVANBU ADMITTED THAT HE'S NOT AWARE OF ANY INSTANCE

22  IN WHICH ANYONE HAS ACTUALLY EVER TAKEN THAT DOWNLOADED

23  SOFTWARE ON THEIR LAPTOP AND PUT IN ON A THUMB DRIVE OR SENT

24  IT IN AN EMAIL TO SOMEBODY ELSE.  HE HASN'T COME FORWARD WITH

25  ANY EVIDENCE, AND YOU HAVEN'T HEARD ANY EVIDENCE FROM DIGITAL

1    REG THAT THAT'S NEVER HAPPENED.  THERE IS NO EVIDENCE OF A

2    SUCCESSIVE RECIPIENT FOR THE ACTIVATION PRODUCTS.  IT'S JUST

3    NOT THERE.

4         SO THAT LIMITATION IS NOT MET.

5         SO WHEN YOU GO BACK INTO THE JURY ROOM, I WOULD ASK YOU TO

6    CAREFULLY CONSIDER THE CLAIM REQUIREMENTS.  AND NOT THE CLAIM

7    REQUIREMENTS THAT WERE NOT FOCUSED ON, AS MR. ELLWANGER WAS

8    DOING DURING HIS CLOSING, BUT THE CLAIM REQUIREMENTS THAT WE

9    HAVE FOCUSED ON, THE ONES THAT HAVE BEEN AT THE HEART OF THE

10   TESTIMONY FOR THE LAST TEN DAYS.

11        AND I THINK WHAT YOU'LL FIND IS, THERE'S ACTUALLY

12   REMARKABLE CONSISTENCY BETWEEN DR. DEVANBU AND DR. WICKER ON

13   HOW THE PRODUCTS ACTUALLY WORK.  THERE'S JUST ARGUMENT THAT'S

14   LAYERED ON TOP OF THAT FROM DIGITAL REG THAT SOMEHOW THAT CAN

15   MAP TO THE CLAIMS.

16        AND WE ASK YOU TO THINK REALLY HARD ABOUT WHETHER THAT

17   ARGUMENT WORKS, AND WHETHER IT ACTUALLY COMPORTS WITH THE

18   CLAIM LANGUAGE AND WITH WHAT'S REQUIRED UNDER THE COURT'S

19   CLAIM CONSTRUCTIONS.

20        THERE'S ONE BRIEF SIDE NOTE THAT I WANT TO TAKE YOU ON

21   INFRINGEMENT, WHICH IS WE TALKED A BIT ABOUT DIRECT

22   INFRINGEMENT AND THE COURT INSTRUCTED YOU ON DIRECT

23   INFRINGEMENT.

24        THE COURT ALSO INSTRUCTED YOU ON INDIRECT INFRINGEMENT.

25   WHEN YOU GO BACK TO THE JURY ROOM AND YOU CONSIDER INDIRECT

1    INFRINGEMENT, WHAT YOU'RE BEING ASKED TO CONSIDER IS, EVEN IF

2    ADOBE'S NOT INFRINGING, ARE WE GOING TO HOLD ADOBE LIABLE FOR

3    THE INFRINGEMENT OF OTHERS.

4        FIRST, IN ORDER TO HOLD ADOBE LIABLE FOR THE INFRINGEMENT

5    OF OTHERS, YOU HAVE TO FIND THAT SOMEONE IS INFRINGING.  SO,

6    IF YOU LOOK AT THOSE EXPLANATIONS FOR WHY WE ARE DIFFERENT

7    THAN THE CLAIMS, YOU WOULD FIND THAT NOBODY IS INFRINGING

8    BECAUSE OUR PRODUCTS ARE DIFFERENT, SO THERE CAN'T BE ANY

9    DIRECT INFRINGEMENT, SO THERE CAN'T BE ANY INDIRECT

10   INFRINGEMENT.

11       BUT IF YOU GET BEYOND THAT POINT, THEN YOU HAVE TO ASK

12   YOURSELF, WHAT DOES IT TAKE TO HOLD ADOBE LIABLE FOR THE

13   ACTIONS OF SOMEONE ELSE?  AND THE COURT'S INSTRUCTIONS ON THAT

14   ARE CLEAR.  YOU HAVE TO FIND NOT ONLY THAT THE PRODUCTS

15   INFRINGE AND THAT SOMEONE ELSE IS ACTUALLY USING THEM IN AN

16   INFRINGING WAY, BUT ALSO THAT ADOBE INTENTIONALLY TOOK ACTIONS

17   THAT INDUCED THAT INFRINGEMENT BY THE INDIVIDUALS OR THE

18   COMPANIES THAT YOU FIND TO HAVE BEEN INFRINGING, THAT IT WAS

19   AWARE OF THE PATENT, THAT IT KNEW THE ACTS IT WAS CAUSING

20   WOULD BE INFRINGING, AND THAT IT DIDN'T HAVE A GOOD FAITH

21   BELIEF THAT THE PATENTS WERE INVALID.

22       AND I'M NOT GOING TO GET INTO ALL OF THIS NOW BECAUSE

23   MR. REINES IS GOING TO TALK ABOUT THIS A LOT LATER IN HIS

24   PRESENTATION, ABOUT THE TIME LINE AND ABOUT WHAT REALLY

25   HAPPENED AND WHAT THE EVIDENCE REALLY SHOWS, BUT WHEN YOU HEAR

1    THAT EVIDENCE ON THEIR ALLEGATION THAT ADOBE WAS WILLFUL, I

2    WANT YOU TO CONSIDER THAT SAME EVIDENCE ON INDIRECT

3    INFRINGEMENT.

4         BECAUSE ON INDIRECT INFRINGEMENT, THEY HAVE TO PROVE THAT

5    ADOBE WAS DOING THIS INTENTIONALLY.  THAT'S THE COURT'S CLAIM

6    CONSTRUCTION.  AND WE WOULD SUBMIT THAT THE EVIDENCE THAT

7    SHOWS THAT ADOBE WAS NOT WILLFUL ALSO CONFIRMS THAT EVEN IF

8    YOU WERE TO FIND INFRINGEMENT, WHICH WE DON'T THINK YOU CAN

9    FIND ON THIS RECORD, IT WAS NOT INTENTIONAL AND, THEREFORE,

10   THERE CAN BE NO INDIRECT INFRINGEMENT.

11        LET'S GO TO QUESTION 2, INVALIDITY.  SO, YOU'LL READ THE

12   JURY INSTRUCTIONS ON OBVIOUSNESS.  THE KEY THING THAT I WOULD

13   ASK YOU TO CONSIDER WHEN YOU'RE CONSIDERING OBVIOUSNESS, AND

14   THE KEY ISSUE THAT YOU HAVE TO TAKE BACK FOR YOURSELVES IS,

15   DR. WICKER IS NOT CONTENDING THAT THE SCHULL '070 PATENT IS

16   IDENTICAL TO THE CLAIMS OF THE PATENT BECAUSE THE VERY

17   DIFFERENCES THAT MAKE THE ADOBE PRODUCTS NONINFRINGING, ALSO

18   APPLY TO THE SCHULL PATENT.  BUT THERE'S A DIFFERENT INQUIRY

19   FOR INVALIDITY.

20        SO EVEN WHEN YOU FIND THAT THE ADOBE PRODUCTS ARE

21   DIFFERENT AND THAT EVERY REQUIREMENT OF THE CLAIMS IS NOT

22   PRESENT IDENTICALLY IN THE ADOBE PRODUCTS, YOU HAVE A

23   DIFFERENT ANALYSIS THAT YOU NEED TO DO FOR INVALIDITY.

24        AND THAT ANALYSIS IS, EVEN IF SCHULL IS DIFFERENT FROM THE

25   PATENTS FOR THE SAME REASONS THAT ADOBE IS, IN THE CONTEXT OF

1    INVALIDITY, WOULD IT BE OBVIOUS TO CHANGE SCHULL BACK IN THE

2    DAY TO MAKE IT WORK LIKE THE CLAIMS.

3        NOW, YOU MAY BE THINKING TO YOURSELVES, OKAY, WELL, LET'S

4    SAY WE FIND AS A GROUP THAT THERE'S NO INFRINGEMENT, WE CAN

5    JUST GO HOME, WE DON'T HAVE TO WORRY ABOUT INVALIDITY.

6    INVALIDITY IS IMPORTANT IN THIS CASE.  EVEN IF YOU FIND THAT

7    ADOBE DOESN'T INFRINGE, WHICH WE THINK THE EVIDENCE WILL

8    COMPEL YOU TO DO, WE'D ASK YOU TO REALLY TAKE A HARD LOOK AT

9    THE INVALIDITY QUESTION.  AND THERE'S A REASON FOR THAT.

10        YOU HEARD TESTIMONY THAT DIGITAL REG COULD SUE ADOBE AGAIN

11    TOMORROW ON DIFFERENT PRODUCTS.  AND DIGITAL REG COULD GO TO

12    ANOTHER SOFTWARE COMPANY AND ANOTHER SOFTWARE COMPANY AND

13    ANOTHER SOFTWARE COMPANY AND ASK FOR THEM TO ENTER INTO

14    SETTLEMENTS.

15        IS IT RIGHT TO LET DIGITAL REG DO THAT IF THE PATENTS

16    AREN'T VALID?  WELL YOU HAVE THAT QUESTION BEFORE YOU NOW.

17    ARE THE PATENTS VALID?  AND WE WOULD ASK THAT YOU FIND THAT

18    THEY AREN'T.

19        SO, BEFORE WE DO THAT, LET'S TALK ABOUT WHAT DIGITAL REG

20    AGREES THEY DIDN'T INVENT.  THEY AGREED THEY DID NOT INVENT

21    DRM.  DR. DEVANBU ADMITTED THAT.  DR. KELLER ADMITTED THAT.

22    DID NOT INVENT DRM.

23        YOU HEARD LOTS OF TESTIMONY ABOUT SUGGESTIONS THAT DRM IS

24    CRITICAL AND VERY VALUABLE AND PEOPLE REALLY WANT IT.  LET'S

25    BE CLEAR ABOUT SOMETHING.  MR. PATTERSON DID NOT INVENT DRM.

```
 1    AND NOBODY, NONE OF THEIR EXPERTS ARE SAYING THAT HE DID.

 2    THIS WAS A CROWDED FIELD WITH LOTS OF PEOPLE WORKING IN THE

 3    SPACE.

 4         SO YOU HAVE TO ASK YOURSELF, THESE SPECIFIC CLAIMS, THE

 5    SPECIFIC CLAIMS THAT HE SAYS HE INVENTED, WHAT'S ACTUALLY NEW

 6    ABOUT THEM?  WHAT MAKES THEM NOVEL?  OR WHAT MAKES THEM NOT

 7    OBVIOUS?

 8         WELL, WE ASKED MR. KELLER, DR. KELLER IF SOME OF THESE

 9    CONCEPTS WERE OUT THERE.  AND HE SAID, YES, THESE CONCEPTS

10    WERE OUT THERE.

11         YOU HEARD YESTERDAY -- I ASKED HIM A WHOLE SERIES OF

12    CONTENTS FOR THE PATENT CLAIMS, AND WHETHER THEY WERE KNOWN IN

13    THE ART, AND HE SAID, YES, THAT WAS KNOWN, AND THAT WAS KNOWN,

14    AND THAT WAS KNOWN.

15         SO THEN WE WENT TO THE SOURCE OF THE PATENTS THEMSELVES.

16    AND WE ASKED MR. PATTERSON, WHAT'S NOVEL OR INNOVATIVE ABOUT

17    YOUR PATENTS?  AND HE COULDN'T TELL YOU.

18         MR. ELLWANGER MADE A LOT OF REFERENCES DURING HIS CLOSING

19    TO MR. PATTERSON AND JULIAN LENNON AND PROTECTING COPYRIGHTED

20    MATERIAL, AND ALL OF THAT.

21         WELL, YOU HEARD FROM DR. SCHULL, PROFESSOR SCHULL.  HE WAS

22    DOING THE EXACT SAME THING BEFORE MR. PATTERSON.  HE CAME UP

23    WITH THIS SOFTWARE PROGRAM IN HIS LAB, AND HE WANTED TO

24    PROTECT THAT COPYRIGHTED CONTENT SO HE COULD DISTRIBUTE IT

25    FREELY.  HE WAS DOING THE EXACT SAME THING.
```

1          AND MR. PATTERSON GOT UP THERE AND HE TRIED TO TELL YOU

2     ABOUT HIS WORK PAPERS, THAT HE COULDN'T REMEMBER A YEAR AGO IN

3     DEPOSITION, BUT SUDDENLY REMEMBERED NOW.  BUT AFTER ALL OF

4     THAT, HE NEVER TOLD YOU WHAT WAS ACTUALLY NEW.  DIGITAL REG

5     HAS NEVER TOLD YOU WHAT THEY SAY IS ACTUALLY NEW.

6          AND YOU HEARD FROM DR. SCHULL HIMSELF THAT WHAT THEY ARE

7     NOW SAYING WAS THE IDEA OF THIS PROTECTION OF COPYRIGHTED

8     MATERIAL, IT WASN'T NEW, HE HAD ALREADY COME UP WITH IT.

9          SO LET'S TALK ABOUT DR. SCHULL AND THE SOFTLOCK SYSTEM FOR

10    A SECOND.  WE SHOWED YOU THE PATENT, AND THEN YOU HEARD

11    EXTENSIVE TESTIMONY FROM DR. SCHULL ABOUT THE PROCESS THAT HE

12    WENT THROUGH TO COME UP WITH THE IDEA AND THEN START TO WORK

13    ON THE COMPANY AND INNOVATE AND MAKE IT INTO A PRODUCT.

14         AND WHAT HE TOLD YOU WAS, THAT HE HAD THE SAME IDEA, THE

15    SAME MAGIC OF BEING ABLE TO DISTRIBUTE CONTENT FROM THE SERVER

16    AND THEN HAVE IT PASS FROM PERSON TO PERSON BACK IN 1992,

17    YEARS BEFORE MR. PATTERSON EVEN CLAIMS THAT HE THOUGHT OF THE

18    IDEA.

19         IN FACT, WHAT HE TOLD YOU WAS, THAT HE GOT THIS PATENT IN

20    1992.  AND IF YOU LOOK AT THE TIME LINE -- I ASKED MR. KELLER,

21    DO YOU HAVE ANY REASON TO QUIBBLE WITH THAT DATE?  AND

22    MR. KELLER SAID NO.  THERE'S NO DISPUTE THAT MR. SCHULL'S --

23    DR. SCHULL'S PATENT AND THE SOFTLOCK SYSTEM THAT HE DEVELOPED

24    BASED ON THAT PATENT THAT HE THOUGHT OF THOSE IDEAS BACK IN

25    1992, YEARS BEFORE DIGITAL REG'S FILING.  YEARS BEFORE.

1    THERE'S NO DISPUTE ABOUT THAT.

2         SO THEN YOU HAVE TO ASK YOURSELVES, IF DR. SCHULL HAS BEEN

3    DOING THIS AND HE HAD ALREADY HAD GOTTEN THE PATENT BEFORE

4    MR. PATTERSON, WELL THEN HOW COME MR. PATTERSON HAVE GOTTEN

5    HIS PATENT?  THERE MUST BE SOMETHING NEW THERE, RIGHT?  THE

6    PATENT OFFICE JUST DOESN'T GIVE YOU A PATENT IF SOMEBODY ELSE

7    HAS ALREADY DONE IT.

8         WELL, REMEMBER WHAT I TOLD YOU DURING THE OPENING.  YOU

9    NINE ARE THE FIRST PEOPLE TO EVER CONSIDER THE QUESTION OF

10   WHETHER OR NOT MR. PATTERSON'S PATENTS ARE VALID OVER

11   DR. SCHULL'S WORK.

12        DR. SCHULL'S PATENT WAS NOT CONSIDERED BY THE PATENT

13   OFFICE WHEN IT GRANTED THE '541 PATENT AND IT WAS NOT

14   CONSIDERED BY THE PATENT OFFICE WHEN IT GRANTED THE '670

15   PATENT.

16        AND, IN FACT, NOBODY ELSE FROM THE PATENT OFFICE HEARD

17   WHAT YOU HEARD FROM DR. SCHULL.  HE DIDN'T GO TO THE PATENT

18   OFFICE DURING PROSECUTION OF MR. PATTERSON'S PATENT AND SAY,

19   THIS IS MY SYSTEM, THIS IS MY PATENT, THIS IS HOW IT WORKS.

20   THEY DIDN'T KNOW ANYTHING ABOUT THE '070 PATENT AND THEY

21   DIDN'T HEAR FROM DR. SCHULL.  YOU'RE THE FIRST NINE PEOPLE TO

22   GET TO ANSWER THAT QUESTION.  AND IT'S AN IMPORTANT ONE.  AND

23   WE WOULD ASK YOU TO TAKE IT SERIOUSLY EVEN IF YOU FIND THAT

24   THE PATENT'S NOT INFRINGED.

25        SO LET'S GET INTO THE MERITS NOW OF THE ANALYSIS.  SO, WE

1    LOOK TO CLAIM 1 OF THE '541 PATENT, AND WHAT DR. WICKER TOLD

2    YOU WAS, LOOK, UNDER THE PROPER INTERPRETATION OF THE CLAIMS,

3    IT'S NOT ALL DISCLOSED IN SCHULL BECAUSE SCHULL GENERATES THE

4    PERMISSION AT THE SERVER AND IT'S NOT CLIENT CENTRIC.  HE

5    ADMITTED THAT.  THAT'S REASONABLE.

6        BUT WHAT HE TOLD YOU WAS, IT WOULDN'T HAVE BEEN A LEAP TO

7    TAKE THE GENERATION OF THE SERVER -- OF THE CLIENT --

8    PERMISSION AT THE SERVER AND MOVE IT TO THE CLIENT.  THAT

9    WOULD NOT HAVE BEEN A LEAP.  THAT'S WHAT HE TOLD YOU.

10       WHAT DR. KELLER SAID WAS, LOOK, I'VE GOT ALL THESE REASONS

11   WHY IT'S NOT MET, AND SHOWED YOU ALL THOSE X'S ON THE BOARD.

12   BUT AT THE END OF THE DAY WHEN I ASKED HIM, ALL THOSE X'S,

13   WHAT DO THEY BOIL DOWN TO?  THEY JUST BOIL DOWN TO TWO THINGS.

14   AND, ACTUALLY, REALLY ONLY ONE THING, WHICH IS HIS OPINION

15   THAT AFTER EVERYTHING THAT DR. WICKER TOLD YOU ABOUT WHY

16   SCHULL DISCLOSES EVERYTHING, THAT THAT ONE LIMITATION, THAT

17   DR. KELLER'S OPINION BOILS DOWN TO THE ARGUMENT THAT, WELL,

18   IT'S GENERATED AT THE SERVER AND PASSED TO THE CLIENT, SO IT

19   CAN'T MEET THE CLAIMS.

20       THAT DOESN'T MAKE ANY SENSE.  THAT'S EXACTLY WHAT DIGITAL

21   REG IS SAYING THE ADOBE PRODUCTS DO.  AND SO IF YOU LOOK AT

22   THE TESTIMONY, AND YOU REALLY CONSIDER WHAT YOU HEARD LAST

23   WEEK FROM DR. DEVANBU, AND THIS WEEK FROM DR. KELLER, WHO

24   INCIDENTALLY DIDN'T TALK TO EACH OTHER, DIDN'T REVIEW EACH

25   OTHER'S REPORTS AND DIDN'T EVEN KNOW HOW THEY WERE OPINING ON

1    THEIR DIFFERENT ISSUES BEFORE THEY OFFERED THEIR OPINIONS, HAD

2    NO COORDINATION AT ALL, AND CAME INTO DIRECT CONFLICT WITH ONE

3    ANOTHER.

4        WHAT DR. DEVANBU SAID WAS, LOOK, IT'S DONE AT THE SERVER,

5    BUT WE ARE DECRYPTING IT.  AND IF WE DECRYPT IT, THAT'S THIS

6    REGENERATION THING.  AND WHAT DR. KELLER SAID WAS, WELL, IN

7    THE SCHULL PATENT, IT'S GENERATED AT THE SERVER, ENCRYPTED AND

8    DECRYPTED, BUT THE DECRYPTION ISN'T ENOUGH, AND THAT'S WHY IT

9    IS NOT MET BY SCHULL.

10       AND I WOULD ASK YOU TO CONSIDER CLOSELY WHETHER IT'S

11   REASONABLE FOR DIGITAL REG TO COME IN AND SAY, WELL, FOR ADOBE

12   THIS DECRYPTION PROCESS IS SOMEHOW REGENERATING, BUT FOR

13   SCHULL IT'S NOT.

14       IS THAT RIGHT?  CAN THEY REALLY DO THAT?  CAN THEY REALLY

15   HAVE IT BOTH WAYS FOR INFRINGEMENT AND INVALIDITY?

16       YOU WILL LOOK AT THE EVIDENCE, THE SCHULL PATENT'S IN THE

17   RECORD.  I URGE YOU TO LOOK AT IT.  THIS IS FROM FIGURE 2.

18       FIGURE 2 IN THE SCHULL PATENT SHOWS THE PROCESS OF

19   CREATING A PASSWORD AT THE SERVER, THEN ENCRYPTING IT,

20   TRANSMITTING IT TO THE CLIENT, AND THEN DECRYPTING IT.  LOOK

21   AT THE FIGURE.  IF WORKS JUST LIKE THE ADOBE PRODUCTS DO, JUST

22   LIKE THE ADOBE PRODUCTS DO.

23       NOW, THIS RAISES THE QUESTION.  SO LET'S SAY YOU FIND, AS

24   I HOPE YOU WILL, THAT THEY CAN'T TALK OUT OF BOTH SIDE OF

25   THEIR MOUTH, AND THAT DIGITAL REG HAS TO BE CONSISTENT, AND

```
 1    YOU FIND ADOBE DOESN'T INFRINGE.  WELL, THE SCHULL PATENT

 2    STILL INVALIDATES THE TWO DIGITAL REG PATENTS.

 3         AND THE REASON IS THE OBVIOUSNESS POINT THAT I MADE

 4    EARLIER.  I WANT TO HONE IN ON THE SPECIFIC EVIDENCE OF THAT

 5    NOW.

 6         WITH RESPECT TO OBVIOUSNESS, WHAT DR. WICKER –– I'M SORRY,

 7    WHAT DR. SCHULL TOLD US WAS, YES, I DID IT AT THE SERVER, BUT

 8    IT WOULDN'T HAVE BEEN ANY STRETCH AT ALL BACK IN THE DAY TO DO

 9    THAT AT THE CLIENT, WHICH IS THE THING THAT DIGITAL REG SAID

10    MADE THEM DIFFERENT.  THAT WOULDN'T HAVE BEEN HARD.  HE WOULD

11    HAVE JUST MOVED THE CODE OVER.

12         AND DR. WICKER EXPLAINED THAT THAT MODIFICATION, THE ONE

13    THING THAT'S DIFFERENT BETWEEN SCHULL AND THE PATENTS, THE

14    ONLY THING THAT THEY HAVE IDENTIFIED AS BEING DIFFERENT, THAT

15    THAT MODIFICATION, THAT WOULD HAVE BEEN KNOWN TO DO.  THAT

16    WOULD HAVE BEEN OBVIOUS TO PEOPLE OF ORDINARY SKILL IN THE

17    ART?  SOMEONE WITH A DEGREE IN COMPUTER SCIENCE AND SOME WORK

18    EXPERIENCE, OR EVEN WITHOUT THE WORK EXPERIENCE, SOMEONE WITH

19    A DEGREE IN COMPUTER SCIENCE WOULD KNOW THAT TAKING IT FROM

20    THE SERVER AND MOVING IT TO THE CLIENT WAS NOT A LEAP.  THAT

21    WAS WELL WITHIN THE SKILLS OF A PERSON OF ORDINARY SKILL IN

22    THE ART.

23         AND HE EXPLAINED THAT YOU WOULD BE MOTIVATED TO DO THAT.

24    THERE'S REASONS AND KNOWLEDGE OF THE PEOPLE OF ORDINARY SKILL

25    IN THE ART THAT WOULD ALLOW THEM TO DO THAT IF THEY WANTED TO
```

1    BECAUSE IT WAS KNOWN THAT YOU COULD OFFLOAD SOME OF THE

2    PROCESS AND POWER FROM THE SERVER, SOME OF THE GEAR WORK THAT

3    HAS TO BE DONE TO GENERATE THOSE PERMISSIONS, AND IF YOU

4    WANTED TO DO IT IN THE WAY THAT MR. PATTERSON CHOOSES TO DO

5    IT, WHICH IS AT THE CLIENT, YOU JUST MOVE IT OVER AND THE

6    GEARS MOVE OVER TO THE CLIENT.  THAT'S NOT A LEAP.  THAT'S

7    OBVIOUS.

8        AND DR. KELLER, HE TESTIFIED A LOT ABOUT HOW SCHULL WASN'T

9    EXACTLY THE SAME AS THE PATENTS, WHICH WE AGREE WITH, BUT HE

10   NEVER REBUTTED DR. WICKER'S OPINION THAT YOU COULD MODIFY

11   SCHULL TO JUST MOVE IT OVER FROM THE SERVER TO THE CLIENT, AND

12   THAT WOULD HAVE BEEN SOMETHING THAT WAS WITHIN THE SKILL OF

13   SOMEONE IN THE ART.  HE DIDN'T DENY THAT AT ALL.  IT WAS JUST

14   YESTERDAY.  THINK BACK, LOOK AT YOUR NOTES, THERE WAS NO

15   DENIAL OF THAT.

16       LET'S TALK ABOUT THE '670.  '670 IS CLAIM 32, WHICH WE

17   TALKED ABOUT YESTERDAY, AND CLAIM 45.  AND WHAT WE SAW WHEN WE

18   WERE TALKING ABOUT HOW THE PATENT WORKS WITH DR. WICKER WAS,

19   THE CONCEPT OF THE CREATOR, AND THEN THE FIRST RECIPIENT AND

20   THE SUCCESSIVE RECIPIENT AND ANOTHER SUCCESSIVE RECIPIENT.

21   EACH OF THOSE RECIPIENTS SENDS THEIR NOTIFICATION INFORMATION

22   BACK TO THE SERVER IN THE MIDDLE.

23       SCHULL, SOFTLOCK WORKS THE SAME WAY.  LOOK AT EXHIBIT 624.

24   IT'S GOING TO BE IN THE JURY ROOM FOR YOU.  DR. SCHULL TALKED

25   ABOUT IT YESTERDAY.  IT'S A BROCHURE THAT SHOWS HOW THE SCHULL

1    INVENTION, THE ONE THAT'S IN THE PATENT, THE ONE THAT WAS IN

2    HIS PRODUCTS, HOW IT WORKS.  IT WORKS THE SAME WAY.  IT HAS A

3    CREATOR OF CONTENT SENDING INFORMATION TO A RECIPIENT THAT

4    THEN CAN BE PASSED TO OTHER PEOPLE, AND YOU ARE SENDING

5    INFORMATION BACK.

6         SO WITH THOSE SIMILARITIES, DR. WICKER SAID, LOOK, THERE'S

7    ONE DIFFERENCE, WHICH IS THE KEY LIMITATION, THE "UNTIL"

8    LIMITATION, THE DENYING ACCESS, WHAT'S TRIGGERING THE ACCESS.

9    THE SAME ONE THAT'S THE KEY LIMITATION ON INFRINGEMENT IS THE

10   KEY LIMITATION ON INVALIDITY.

11        DR. WICKER SAID THAT IS NOT DISCLOSED IN SCHULL FOR THE

12   SAME REASONS IT'S NOT DISCLOSED IN THE ADOBE PRODUCTS, BUT IT

13   WOULD HAVE BEEN OBVIOUS TO COMBINE SCHULL WITH GRISWOLD.

14        AND DR. KELLER SAID, LOOK, THESE THINGS ARE DIFFERENT.

15   THEY'RE DIFFERENT FOR TWO REASONS.  HE HAD THE CHART WITH ALL

16   THE X'S, AND HE MARKED THEM ALL OFF.

17        BUT AT THE END OF DAY WHEN I ASKED HIM WHAT ALL THOSE X'S

18   REALLY BOIL DOWN TO, JUST TWO REASONS, NOTIFICATION

19   INFORMATION AND THE DENYING THE ACCESS UNTIL, WHAT IS THE

20   TRIGGER EVENT FOR ACCESS.

21        ON NOTIFICATION INFORMATION, DR. KELLER DIDN'T APPLY THE

22   COURT'S CLAIM CONSTRUCTION BECAUSE THERE WAS NONE.  SO HE

23   APPLIED HIS OWN INTERPRETATION OF NOTIFICATION INFORMATION.

24   FAIR ENOUGH, EXCEPT HIS INTERPRETATION OF NOTIFICATION

25   INFORMATION IS INCONSISTENT WITH DR. DEVANBU'S.

1       SO, FOR PROVING INFRINGEMENT BY ADOBE, DIGITAL REG AND

2   DR. DEVANBU CLAIM THAT IF YOU JUST SEND OUT PERSONAL

3   INFORMATION ABOUT THE USER, PERSONAL REGISTRATION INFORMATION,

4   THAT THAT'S ENOUGH.  BUT DR. KELLER, APPLYING HIS

5   INTERPRETATION FOR INVALIDITY SAID THAT'S NOT ENOUGH.  IT HAS

6   TO BE USED FOR TRACKING.

7       THAT INCONSISTENCY CAN'T BE RECONCILED.  YOU CAN'T HAVE IT

8   BOTH WAYS.

9       LET'S ASSUME THAT YOU AGREE WITH DR. KELLER THAT

10  NOTIFICATION INFORMATION DOES REQUIRE TRACKING.  IN THAT CASE,

11  DR. DEVANBU WOULDN'T HAVE PROVED INFRINGEMENT, SO THERE WOULD

12  BE NONINFRINGEMENT.  BUT THERE WOULD ALSO BE INVALIDITY.

13      AND THE REASON FOR THAT IS, AS DR. WICKER POINTED OUT, THE

14  SCHULL PATENT DOES TEACH TRACKING.  IT DOES TEACH TRACKING.

15  AND THE THING THAT DR. KELLER SAID MADE TRACKING IMPORTANT,

16  COLLECTING MARKETING INFORMATION SO THAT YOU CAN TRACK THE

17  USERS, WELL, THE SCHULL PATENT TALKS ABOUT THAT, TOO.

18      RIGHT THERE IN THE BACKGROUND OF THE INVENTION WHEN THEY

19  ARE EXPLAINING WHY YOU WOULD WANT TO USE THE SCHULL

20  TECHNOLOGY, WHY THE PATENT WAS IMPORTANT, DR. SCHULL SAID,

21  WELL, THIS INVENTION ALLOWS YOU TO TRACK INFORMATION SO THAT

22  YOU'RE NOT LOSING VALUABLE INFORMATION ABOUT YOUR CUSTOMERS

23  AND ABOUT THE MARKET.

24      SO THE VERY SAME REASON THAT DR. KELLER SAID THAT THIS

25  NOTIFICATION INFORMATION AND TRACKING WAS IMPORTANT FOR THE

1  CLAIMS, THE SCHULL PATENT TEACHES THAT.

2      AND DR. KELLER ADMITTED ON CROSS-EXAMINATION THAT HE

3  HADN'T CONSIDERED THAT.  HE DIDN'T REFERENCE THAT DURING HIS

4  DIRECT EXAMINATION.

5      WELL, YOU CAN LOOK AT IT.  YOU WILL HAVE THE SCHULL PATENT

6  IN EVIDENCE.  IT'S EXHIBIT 418.  AND I WOULD ASK YOU TO LOOK

7  AT IT, AND LOOK AT WHETHER EXHIBIT 418 IS DIFFERENT THAN THE

8  DIGITAL REG PATENTS AND WHETHER IT'S DIFFERENT THAN THE '670

9  PATENTS.  IT DOESN'T DIFFER WHEN IT COMES TO NOTIFICATION

10  INFORMATION.

11      THE SECOND THING THAT DR. KELLER POINTED TO AS A

12  DIFFERENCE WAS THIS CONCEPT OF TRIGGERING ACCESS.  DO YOU

13  TRIGGER ACCESS BASED ON SENDING SOMETHING OUT OR DO YOU NEED

14  TO GET THE PERMISSION BACK, THE KEY BACK, THE ACKNOWLEDGMENT

15  BACK.  YOU HAVE TO GET SOMETHING BACK.

16      AND WHAT HE SAID WAS, LOOK, FROM MY PERSPECTIVE, I THINK

17  YOU HAVE TO GET SOMETHING BACK.  YOU HAVE TO GET A NETWORK

18  ACKNOWLEDGMENT BACK, AND THAT'S WHY SCHULL IS DIFFERENT.

19      HE ADMITTED ON CROSS-EXAMINATION THAT THE COURT'S CLAIM

20  CONSTRUCTION ACTUALLY DOESN'T HAVE ANY CONCEPT OF NETWORK

21  ACKNOWLEDGMENT IN IT.  AND WHEN YOU GO BACK TO THE JURY ROOM

22  AND YOU LOOK AT THE CLAIM CONSTRUCTION, THE COURT'S

23  CONSTRUCTION, THE COURT'S CONSTRUCTION MAKES CLEAR THAT THE

24  PATENTED INVENTION GRANTS ACCESS IMMEDIATELY UPON THE ATTEMPT

25  TO TRANSMIT NOTIFICATION, THAT'S THE SENDING, BUT WITHOUT

1    WAITING FOR A RESPONSE FROM THE SERVER.  WITHOUT WAITING FOR A

2    RESPONSE FROM THE SERVER.

3        SO THAT NETWORK ACKNOWLEDGMENT CONCEPT THAT DR. KELLER WAS

4    TALKING ABOUT, THAT'S INCONSISTENT WITH THE COURT'S CLAIM

5    CONSTRUCTION.  SO LOOK AT THE COURT'S CLAIM CONSTRUCTION AND

6    LOOK AT DR. KELLER'S ANALYSIS, AND ASK YOURSELVES IS SCHULL

7    REALLY DIFFERENT WHEN YOU APPLY THE COURT'S CLAIM

8    CONSTRUCTION?  IT'S NOT.

9        NOW, LET'S ASSUME THAT DR. KELLER'S ANALYSIS, WE'RE SORT

10   OF TAKING IT AT FACE VALUE, AND HE'S LOOKING AT WHETHER OR NOT

11   THE GRISWOLD REFERENCE THAT DR. WICKER COMBINED WITH THE

12   SCHULL REFERENCE, WHETHER THE GRISWOLD REFERENCE TEACHES

13   GETTING ACCESS UPON SENDING SOMETHING OUT.

14       WELL, HE SAID IT DOESN'T.  BUT I WOULD ASK YOU TO GO BACK

15   AND LOOK AT THE GRISWOLD REFERENCE WHICH YOU ALREADY HAVE.

16   YOU DON'T HAVE TO READ THE WHOLE THING.  THERE HAVE BEEN KEY

17   PASSAGES THAT HAVE BEEN POINTED OUT TO YOU IN DR. WICKER'S

18   TESTIMONY.  AND WHAT WICKER EXPLAINS AND WHAT THE PATENT SHOWS

19   IS THAT YOU ARE SENDING THE REQUEST OUT, AND THAT YOU ARE

20   TRYING ACCESS BASED ON THE SENDING WITHOUT WAITING FOR A

21   RESPONSE FROM THE SERVER, WITHOUT WAITING TO GET SOMETHING

22   BACK.

23       AND, AGAIN, ON THIS KEY QUESTION, CONSIDER CAN THEY HAVE

24   IT BOTH WAYS?  CAN DR. DEVANBU ADMIT THAT IN ORDER TO PRACTICE

25   THE CLAIMS UNDER HIS READING FOR INFRINGEMENT, YOU HAVE TO

1    SEND SOMETHING OUT AND GET SOMETHING BACK, WHILE DR. KELLER IS

2    SAYING, OH, NO, NO, NO, IF YOU SEND SOMETHING OUT AND GET

3    SOMETHING BACK, THAT THAT'S NOT ENOUGH.  CAN THEY REALLY BE

4    CONSISTENT?  THEY CAN'T.

5         DR. KELLER SAID IF GRANTING OF THE ACCESS IS BASED ON

6    GETTING SOMETHING BACK, YOU HAVE TO GET THE KEY BACK, YOU HAVE

7    TO GET THE VOUCHER BACK, YOU HAVE TO GET THE E-LICENSE BACK.

8    THE WAY IT WORKS IN THE ADOBE PRODUCTS, THAT WOULDN'T BE

9    ENOUGH UNDER HIS READING OF THE CLAIM.  THAT'S NOT ENOUGH FOR

10   THE GRANTING OR DENIAL OF ACCESS.

11        THEIR INFRINGEMENT THEORY AND THEIR INVALIDITY THEORY ARE

12   DIRECTLY IN CONFLICT WITH EACH OTHER.

13        SO THE FINAL THING THAT I WOULD ASK YOU TO THINK ABOUT

14   WHEN IT COMES TO THIS OBVIOUSNESS FOR THIS, AND THIS IS EVEN

15   IF YOU FIND THAT ADOBE DOESN'T INFRINGE THE '670 PATENT, WHICH

16   I THINK THE EVIDENCE WILL COMPEL YOU TO DO, EVEN THEN, BECAUSE

17   IT'S IMPORTANT, CONSIDER THE OBVIOUSNESS OF THE '670 PATENT

18   OVER SCHULL AND OVER GRISWOLD AND ALL THE TESTIMONY YOU HEARD

19   YESTERDAY, AND THEN CONSIDER THAT DR. KELLER NEVER DISPUTED

20   THAT THOSE TWO REFERENCES WOULD BE COMBINED OR COULD BE

21   COMBINED.

22        HE DIDN'T EXPLAIN WHY THAT WOULDN'T BE A REASONABLE

23   COMBINATION.  AND HE NEVER DISPUTED THAT IT WOULD HAVE BEEN

24   WITHIN THE SKILL OF A PERSON OF ORDINARY SKILL IN THE ART TO

25   TAKE SCHULL AND TAKE GRISWOLD AND COME UP WITH EXACTLY THE

1    THING THAT THEY NOW CLAIM IS COVERED BY THE PATENT.  CONSIDER

2    WHAT YOU HEARD FROM DR. WICKER AND WHAT YOU DIDN'T HEAR FROM

3    DR. KELLER.

4        THOSE ARE THE FIRST TWO QUESTIONS.  AT THIS POINT I'M

5    GOING TO TURN IT OVER TO MR. REINES, AND I'M GOING TO ASK YOU,

6    AFTER YOU CONSIDER THOSE TWO QUESTIONS, TO CONSIDER THE NEXT

7    THREE.

8                (PAUSE IN THE PROCEEDINGS.)

9                **CLOSING ARGUMENT**

10       **MR. REINES:**  GOOD MORNING.

11       IN PURSUING THE JOB THAT YOU HAVE RIGHT NOW, I THINK

12   THERE'S THREE TOOLS TO USE:  LOGIC, EVIDENCE, AND CREDIBILITY.

13       LET ME START WITH EVIDENCE ON THE QUESTION OF WHAT THEY

14   KNEW AND WHEN THEY KNEW IT.  THAT WAS THE POSED QUESTION, AND

15   I'M GOING TO ADDRESS IT WITH REFERENCE TO HARD EVIDENCE.

16       THE STATEMENT IN OPENING STATEMENT, AND WE HEARD THE REDUX

17   ON CLOSE WAS THAT ADOBE HAS STOLEN PROPERTY, AND THAT THE

18   TIMING OF WHAT PEOPLE KNEW AND WHEN THEY KNEW IT IS VERY

19   IMPORTANT.

20       LET'S LOOK AT THAT.  YOU WILL REMEMBER THIS TIME LINE THAT

21   WAS PRESENTED BY DIG REG.  LET'S HONE IN ON THE THREE MEETINGS

22   THAT SUPPOSEDLY HAPPENED.  YOU WERE PROMISED IN OPENING

23   STATEMENT THAT YOU WOULD HEAR ABOUT THREE MEETINGS THAT

24   HAPPENED.  2004, 2008 AND 2010.

25       THIS WAS WHAT WAS SAID.  "THEY HAD A MEETING WITH A GROUP

```
 1    IN JUNE OF 2004."  THAT'S WHAT YOU HEARD.

 2         MULTIPLE PROBLEMS.  IT WAS A PHONE CALL, SUPPOSEDLY.

 3        IN TERMS OF WHO THEY MET WITH, NOTWITHSTANDING THE

 4    EMPHASIZE THAT WAS PLACED ON THIS, MR. VENTERS SAYS, NO ONE

 5    EVER ASKED ME WHO I MET WITH.  THERE'S NEVER BEEN ANY

 6    IDENTIFICATION OF ANYONE AT ADOBE VENTURES WHO WAS MET WITH

 7    FROM ANYBODY.  HOW CAN WE DEFEND OURSELVES IF THERE'S NO

 8    STATEMENT OF WHO WE SUPPOSEDLY MET WITH?  IT JUST DOESN'T PASS

 9    THE SMELL TEST IF THIS IS AS CRITICAL AS IT WAS STATED.

10        AND THE DATE.  THEIR ARGUMENT IS JUNE 2004.  YOU KNOW WHAT

11    THE COURT SAID?  NOT IN JUNE.  SO THEY DON'T KNOW WHAT THE

12    DATE IS, THEY DON'T KNOW WHO THE PEOPLE WERE.  AND YOU CAN

13    CALL IT A MEETING, BUT IT WAS A PHONE CALL, AT MOST.

14        THEN DURING THE MEETING, WHAT WAS SUPPOSEDLY SENT WAS A

15    PAPER CALLED THE ADOBE VALUE PROPOSITION.

16        AND MR. VENTERS ON DIRECT EXAMINATION, CONFIDENT, PLAY IT

17    STRAIGHT UP TO YOU, SAID EXHIBIT 125C, HE KNOWS THERE'S DOZENS

18    OF VERSIONS OF THIS, 125C, THIS IS THE PAPER WE SENT, AND THEN

19    HE WENT THROUGH IT LIKE IT WAS A SCRIPT.

20        HE REMEMBERED TEN YEARS AGO, AND HE SAID IN ONE PHONE CALL

21    AMONG ALL THE COMPANIES HE TALKED TO, AND HE SAID THIS IS WHAT

22    I SAID, AND HE WENT DOWN IT.

23        ONE OF THE THINGS HE TOLD YOU IS IT HAD THE NUMBER OF THE

24    '670 PATENT IN IT.  YOU LOOK AT THE EXHIBIT THAT'S ULTIMATELY

25    PUT IN THERE, AND YOU TELL ME WHETHER YOU SEE THE '670 PATENT
```

1   NUMBER IN THERE.

2       BUT ON DIRECT EXAMINATION, HE THEN REVERSED AND SAYS, NO,

3   ACTUALLY, 125C IS NOT THE DOCUMENT.  THE COURT HAD TO STEP IN

4   ON THIS IN INSTRUCTIONS AND SAY, DIFFERENT DRAFTS OF THE

5   DOCUMENT EXIST, AND WHILE HE STATES A VERSION WAS SENT, HE

6   CANNOT IDENTIFY THE PARTICULAR VERSION.

7       EVEN AFTER HE TESTIFIED.  HE DIDN'T KNOW WHAT DOCUMENT HE

8   SENT.  LET'S BE HONEST.  SHIFTING STORY AND ABSOLUTELY NO

9   CORROBORATION.

10      THEY DIDN'T GET MR. FARLEY TO SAY THAT HE HEARD THIS CALL.

11  HE DIDN'T PARTICIPATE.  MR. PATTERSON DIDN'T PARTICIPATE.

12      2008, THE REPRESENTATION FROM DIG REG'S COUNSEL AFTER

13  PREPARING FOR TRIAL SAYS THERE'S A 2008 MEETING.  NO EVIDENCE

14  AT ALL.

15      YOU CAN'T CONCLUDE THERE'S A 2008 MEETING IF THERE'S NO

16  EVIDENCE.  COUNSEL PROMISED YOU THAT IT WOULD COME.  IT DIDN'T

17  COME.

18      2010.  THIS IS FROM THEIR OPENING PROMISE TO YOU.  APRIL

19  OF 2010.  STUDY THAT EVIDENCE WHEN YOU GO BACK.  REMEMBER YOUR

20  NOTES.  NOTHING.  THEY PROMISED YOU THREE MEETINGS WOULD

21  HAPPEN, TWO DEFINITELY DIDN'T, AT LEAST ACCORDING TO THE

22  EVIDENCE, AND ONE IS SKETCHY, AT BEST.

23      ALL RIGHT.  LET'S LOOK AT THE TIME LINE FURTHER.

24      WHAT DID DIGITAL REG KNOW, OKAY?  INSTEAD OF POINTING THE

25  FIGURE, WHAT DID THEY KNOW?  MR. VENTERS TESTIFIED IN 2002 TO

1    2004 HE KNEW ADOBE WAS INFRINGING.  NOT MUCH EQUIVOCATION

2    THERE.  GENUINELY BELIEVED.

3        ALL RIGHT.  NO NOTICE OF INFRINGEMENT, NO LAWSUIT, NOT CAN

4    WE RESOLVE THIS, NOT I THINK YOU'RE INFRINGING, LET'S TALK

5    ABOUT IT.

6        WELL, HE SAYS IN 2004, HE HAD THIS PHONE CALL.  HE

7    MENTIONED ADOBE VALUE PROPOSITION.  THIS DOCUMENT WENT, AMONG

8    OTHERS, TO DOLBY.  AT LEAST DOLBY GOT THE COURTESY OF

9    INFORMATION, WELL, WE THINK YOU MIGHT BE VIOLATING IF HE EVEN

10   SENT IT OUT.

11       BY THE WAY, ONE OTHER THING ABOUT THE ADOBE VALUE

12   PROPOSITION THAT MR. VENTERS WAS SURE HE SENT THAT THEN TURNED

13   OUT HE DIDN'T KNOW WHICH VERSION, IT HAD A COMMENT BUBBLE ON

14   IT THAT SAID, WE CAN'T FIGURE OUT -- THERE'S A TOUGH STRATEGY

15   NUT TO CRACK.

16       WHO SENDS TO A MAJOR COMPANY WHEN THEY ARE APPROACHING

17   THEM A DOCUMENT WITH A COMMENT BUBBLE ON IT AND NO EXPLANATION

18   OF HOW THEY SOLVED THEIR STRATEGY CHALLENGE.

19       BUT IN ANY EVENT, IN THAT MEETING, IF IT HAPPENED, THIS

20   PHONE CALL -- NOW I'M CALLING IT A MEETING -- IN THIS PHONE

21   CALL THEY ARE NOT EVEN SAYING THEY GAVE US THE COURTESY OF

22   SAYING WE THINK YOU MIGHT BE INFRINGING, WE THINK YOU'LL AVOID

23   INFRINGEMENT, NOTHING.  NO OTHER MEETINGS HAPPENED.

24       BUT WHAT THEY DID DO IS IN 2007, AFTER RETAINING

25   THINKFIRE, THEY RETAINED A COMPANY WHOSE SPECIALTY WAS USING

1    THE INFORMATION IN THE MARKETPLACE AND DETERMINING WHO'S

2    INFRINGING.  THINKFIRE.  AND THEY GOT A LONG LIST IN THIS

3    TEXAS LITIGATION IN 2007.

4        NOW, I THOUGHT IT WAS SOMEWHAT BIZARRE BECAUSE WHEN THEY

5    WANTED TO JUSTIFY THE LOW LICENSES AND ALL THE SETTLEMENTS,

6    FIVE FIGURES, 50,000, 40,000 THEY ENDED UP SAYING, WELL, THOSE

7    WERE MISFIRES.  THEY WERE BARELY INFRINGING AT ALL.  WE MADE A

8    BIG MISTAKE.

9        SO, THEY SUED ALL THESE COMPANIES, AND BIG ONES,

10   MICROSOFT, MACROVISION, AND THEY MISFIRED?  BUT THEY DIDN'T

11   THINK TO SUE ADOBE WHO THEY KNEW WAS INFRINGING SUPPOSEDLY

12   FROM 2002 TO 2004?

13       AND THEN MR. VENTERS ADMITTED, PRIOR TO 2011, HE NEVER

14   INFORMED ADOBE THAT IT WAS INFRINGING THE PATENTS-IN-SUIT.  NO

15   ONE EVER SAID, WE THINK YOU ARE INFRINGING, WE THINK YOU HAVE

16   A PROBLEM, LET'S WORK IT OUT LIKE NORMAL BUSINESS PEOPLE

17   WOULD.  ALMOST TEN YEARS OF LYING IN WAIT?

18       NO NOTICE, NO LAWSUIT, NO LAWSUIT.  WE DON'T NEED A

19   LAWSUIT TO PAY ATTENTION.  WE NEED THE COURTESY OF A

20   COMMUNICATION THAT SAYS LET'S TALK ABOUT THIS LIKE RESPONSIBLE

21   BUSINESS PEOPLE.  AND ADOBE DOESN'T THAT EVERY DAY.

22       NOW, JONATHAN HERBACH, WHO CAME UP, AND TALK ABOUT CAST

23   ASPERSIONS.  THEY SAID THEY WERE GOING TO FORCE HIM TO TESTIFY

24   AND CONFIRM THAT HE INTENTIONALLY DESIGNED LIVECYCLE WITH FULL

25   KNOWLEDGE OF THE DIGITAL REG'S PATENTS.  THERE IT IS IN BLACK

 1    AND WHITE.  YOU LEVEL THAT KIND OF ALLEGATION ABOUT A

 2    PROFESSIONAL?

 3        WHAT DID MR. HERBACH SAY?  AND DID YOU BELIEVE MR. HERBACH

 4    WHEN HE TESTIFIED ABOUT HOW HE CAME OUT, HE WORKED -- WORKED

 5    THROUGH COLLEGE FOR ADOBE, CAME OUT AND WORKED IN THE R&D

 6    CENTER.  BY LATE 2000 SUMMER, HE HAD A COMPLETE WORKING

 7    PROTOTYPE BEFORE THIS SUPPOSED PHONE CALL SOMETIME, THEY DON'T

 8    KNOW.

 9        HE DID HIS WORK ON HIS OWN.  I ASKED HIM, HAVE YOU EVER

10    HEARD OF ANYONE GATHERING INFORMATION FROM ADOBE VENTURES AND

11    BRINGING IT OVER?

12        NO, I NEVER -- WE NEVER DO THAT.

13        HAD YOU EVER READ THE DIG REG PATENTS?  REMEMBER THE

14    PROMISE?  WHO COULD HAVE FORCED THIS MAN TO TESTIFY THAT HE

15    READ THE PATENTS AND USED THEM IN HIS DESIGN.

16        THAT'S WHAT HE SAID.  I SHOWED IT TO YOU IN BLACK AND

17    WHITE.

18        MR. HERBACH, I THINK -- I THOUGHT HE HANDLED IT -- I KNOW

19    HE HANDLED IT BETTER THAN I WOULD, AS YOU CAN TELL.

20        HE SAID, NO, I'M PRETTY CONFIDENT WE CAN INNOVATE ON OUR

21    OWN.  WE DON'T NEED MR. PATTERSON.

22        AND THEN I SAID, DO YOU KNOW WHAT KIND OF ALLEGATIONS THEY

23    ARE LEVELING?  AND HE SAID, I'M TOTALLY SURPRISED AND

24    SPEECHLESS.  LIKE A PROFESSIONAL ANSWER.

25        I DIDN'T KNOW WHAT HE WAS GOING TO SAY BECAUSE I NEVER

 1    ASKED HIM THAT BEFORE.

 2        AND THEN MR. VENTERS SAID, NAH, WE CAN'T SAY THEY COPIED

 3    ANYTHING.

 4        ALL RIGHT.  NOW LET'S TALK ABOUT THE PATENTS, THE PATENT

 5    FILINGS.  THE SUGGESTION WAS THAT ADOBE IS SOMEHOW GETTING ALL

 6    THIS INFORMATION FROM DIG REG AND THEN USING IT FOR ITS PATENT

 7    FILINGS, RIGHT?

 8        MR. HERBACH, WITHOUT IMPEACHMENT OF ANY KIND, SAID I FILED

 9    ON HALLOWEEN 2003 A WHOLE SET OF PATENTS COVERING LIVECYCLE.

10    NEVER CHALLENGED.  THAT'S 2003 BEFORE ALL THESE OTHER EVENTS

11    THAT SUPPOSEDLY HAPPENED.

12        NOW, THEY CITE THE '384 PATENT AS ANOTHER EXAMPLE.  LOOK,

13    PATTERSON WAS CITED.  THIS WAS FILED, A DRM PATENT, IN JUNE OF

14    2000.  SO, BEFORE THEY EVEN BOUGHT THE PATENT BACK OUT OF

15    BANKRUPTCY –– ACTUALLY BEFORE ANY OF THE PATENTS ISSUED.  SO

16    IT WASN'T EVEN AVAILABLE INFORMATION.  MR. HERBACH COULDN'T

17    HAVE TAKEN THE INFORMATION, IT WASN'T EVEN AVAILABLE.  SO WE

18    SEE ALL THESE THINGS THAT HAPPENED EVEN BEFORE.

19        HERE'S ANOTHER PATENT.  IT CITES PATTERSON, BUT WHAT YOU

20    HAVE TO ASK YOURSELVES IS WHAT'S THE WHOLE POINT OF THIS

21    ANYWAY?  THAT'S WHAT WE ASK OURSELVES.

22        ALL OF THESE ADOBE PATENTS ISSUED.  THE PATENT OFFICE

23    SAID, WE'RE DIFFERENT.  NOW, WHAT THEY WANT TO SAY IS THAT

24    ADOBE IS THE LITTLE ERASER AT THE TOP OF THE PENCIL AND THAT

25    THE DIG REG'S TEAM CAME UP WITH HOW TO INVENT THE PENCIL IN

1    THE FIRST PLACE.

2        HAVE YOU SEEN ANY EVIDENCE OF THAT?  HAVE YOU SEEN ANY

3    EVIDENCE THAT THESE ADOBE ARE BELLS AND WHISTLES BUILT ON TOP

4    OF WHAT DIG REG'S PATENTS COVER?  NO, YOU HAVE NOT SEEN A

5    MORSEL OF THAT.

6        AND THESE CITATIONS OF PATTERSON, THE MORE PATTERSON WAS

7    CITED, AMONG THE HUNDREDS OF CITATIONS PER PATENT, HUNDREDS.

8    THE MORE HE WAS CITED, THE MORE THAT SHOWS WE ARE DIFFERENT.

9    WE ARE INNOVATIVE.  I JUST DON'T KNOW WHAT ANY KIND OF

10   REASONABLE INFERENCE THEY CAN OBTAIN FROM THAT HISTORY.

11       SO WE WERE FIRST RELATIVE TO KNOWING ANY OF THEIR

12   INFORMATION AND THAT ALL OUR PATENTS ISSUED.  THEY DIDN'T SHOW

13   YOU ONE PATENT THAT GOT -- WHERE THEY SAID, NO, YOU ARE TOO

14   CLOSE TO PATTERSON.

15       LET'S TALK ABOUT CREDIBILITY, ALL RIGHT?  THAT'S WHAT YOU

16   ARE SUPPOSED TO JUDGE.

17       HERE'S THE CAST OF CHARACTERS THAT WE HEARD OVER THE LAST

18   COUPLE OF WEEKS.  LOOK AT THE PEOPLE ON THE LEFT AND LOOK AT

19   THE PEOPLE ON THE RIGHT.  OKAY?  THIS IS FOR YOU TO MAKE THE

20   DECISION.

21       I AM GOING TO PROVIDE MY VIEWS AND EVIDENCE, BUT IT'S YOUR

22   DECISION AND I WANT YOU TO THINK ABOUT THOSE WITNESSES AND HOW

23   THEY APPEARED.  AND THE COURT WILL GIVE YOU A WONDERFUL SET OF

24   TOOLS, ONE THROUGH SEVEN.

25       IT'S THE ONE THAT I CALL OUT AS IMPEACHMENT, DIFFERENT

1    TESTIMONY ON A PRIOR OCCASION. HOW MANY TIMES DID THEY GET

2    IMPEACHED? AND THE THING YOU NOTICE, COUNSEL CAN STEP UP,

3    THEY DID IT ONCE OR TWICE AND SAID, I DON'T THINK IT'S

4    INCONSISTENT TESTIMONY.

5        THEY SWORE ONE THING AT ONE TIME AND CHANGED THEIR

6    TESTIMONY AND SWORE DIFFERENTLY ANOTHER TIME. I DON'T THINK

7    THAT HAPPENED AND PREVENT IMPEACHMENT. DOZENS AND DOZENS OF

8    TIMES THEY WERE IMPEACHED WITH THEIR INCONSISTENT STATEMENTS.

9        THESE CONFLICTING POSITIONS JUST PERMEATE THEIR CASE.

10       RUNNING ROYALTY. YOU REMEMBER MR. PARR. HE SAID THE

11   PARTIES WOULD AGREE TO A RUNNING ROYALTY, NOT A LUMP SUM.

12       SUPPOSEDLY HE WAS GETTING ALL HIS INFORMATION FROM

13   MR. FARLEY. THAT'S WHAT HE TELLS YOU. I DON'T REALLY KNOW

14   THAT MUCH, I JUST GO TO MR. FARLEY AND HE TELLS ME.

15       MR. FARLEY SAYS, NORMALLY YOU DON'T GET A RUNNING ROYALTY

16   AND THEN HE SAID, I DOUBT WE WOULD HAVE GOTTEN IT BECAUSE I

17   HAD TO GO TO ADOBE AND I KNOW ADOBE DOESN'T LIKE THAT KIND OF

18   THING BECAUSE COMPANIES LIKE ADOBE IN THIS SPACE DON'T LIKE

19   IT.

20       WHAT IS THE BASIS FOR THERE TO BE A RUNNING ROYALTY? AND

21   THEIR OWN WITNESSES ARE IN CONFLICT.

22       NOW, THE PROBLEM WITH THAT ISN'T JUST THE INCONSISTENCY,

23   IT'S THIS FALSE PREMISE MR. PARR RUNNING IN THE WRONG

24   DIRECTION. BECAUSE THEN HE USED THIS FACT OF LOOKING AT

25   RUNNING ROYALTIES COMPARED TO A LUMP SUM TO EXCLUDE ALMOST ALL

1    THE EVIDENCE IN THE CASE, AND CHERRY PICK THREE THINGS.

2        HE SAID ALL THE OTHER EVIDENCE I'M NOT GOING TO USE FOR MY

3    ROYALTY BECAUSE I'M COMMITTED TO THIS RUNNING ROYALTY.  SO HE

4    JUST -- AT THIS POINT HE JUST RAN OFF IN THE WRONG DIRECTION.

5        LET'S LOOK AT WHERE THAT DIRECTION LED HIM ASTRAY.  FIRST

6    MACROVISION.  YOU REMEMBER THAT DISCUSSION.  THAT WAS

7    1 PERCENT.  MR. PARR.  LET'S LOOK AT HIS PRIME INFORMATION

8    SOURCE, MR. FARLEY.

9        HE SAID, I HAVE NO IDEA ABOUT THIS 1 PERCENT FROM

10   MACROVISION WHEN I SIGNED THAT AGREEMENT.  THAT WAS JUST

11   LAWYER STUFF.  THE LAWYERS WANT TO PUT A NUMBER IN, SO IF WE

12   ARE IN NEGOTIATION OR SOMETHING, WE'VE GOT SOMETHING WE CAN

13   ARGUE, OR WHATEVER.  I ASSUME THAT'S THE BASIS.

14       ALL HE CARED ABOUT WAS GETTING HIS 89,000 BUCKS.  THAT IS

15   WHAT HE CARED ABOUT.  THAT'S WHAT HE SAID.

16       SO THIS IDEA THAT MR. PARR'S RELYING ON 1 PERCENT WHEN THE

17   PERSON THAT NEGOTIATED THE AGREEMENT AND SIGNED IT SAID THAT

18   WAS IRRELEVANT, TELLS YOU ABOUT THE TYPE OF EVIDENCE THEY ARE

19   RELYING ON.

20       LET'S LOOK AT INTUIT.  AGAIN, MR. PARR WENT TO HIS SOURCE

21   AND SAID, I GOT THE REVENUE NUMBER FROM MY DISCUSSION WITH

22   MIKE FARLEY.  BEFORE I EVEN MOVED TO THE OTHER SIDE OF THE

23   SCREEN, THE COURT SAID, WELL, THAT'S NOT SUBSTANTIVE EVIDENCE.

24       HERE IS WHERE THE COMMON SENSE AND LOGIC COMES IN.  IF

25   MR. FARLEY CAN'T TESTIFY UNDER OATH IN COURT ABOUT WHAT SOME

1    OTHER COMPANY'S REVENUE IS, BECAUSE HE DOESN'T REALLY KNOW,

2    WHY IN THE WORLD WOULD WE LET THAT COME IN AS EVIDENCE BY HIM

3    HAVING AN UNRECORDED CONVERSATION SOMETIME AGO WITH SOMEONE

4    ELSE WHERE YOU, THE JURY, CAN'T SEE IT AND WE CAN'T

5    CROSS-EXAMINE IT.  WHY WOULD THAT EVER BE PERMITTED?  NOT

6    SUBSTANTIVE EVIDENCE.

7        MR. FARLEY WAS ASKED:  DO YOU HAVE ANY KNOWLEDGE OF WHAT

8    INTUIT'S REVENUES WERE?  NOW, I DON'T BLAME MR. FARLEY.  HOW

9    IS HE SUPPOSED TO KNOW WHAT INTUIT'S REVENUES ARE?

10        HIS ANSWER WAS, NO, HE COULDN'T TESTIFY TO A RATE.  SO

11   THERE'S ABSOLUTELY NO BASIS FOR THAT CALCULATED RATE OF

12   2.5 PERCENT, JUST AS A SYLLOGISTIC LOGIC.  AND I KNOW THE

13   CALIBER OF THIS JURY, AND I KNOW YOU CAN FOLLOW THAT.  IT'S

14   NOT THAT HARD.

15        NOW WE HAVE THIS ISSUE OF THE ADOBE PLUG-IN.  SO THEY WANT

16   NO RELY ON THE ADOBE PLUG-IN.  I MEAN, I JUST -- THE WORK

17   PRODUCT THAT SOMEONE WOULD COME, COME IN THIS COURTROOM AFTER

18   SPENDING HUNDREDS OF HOURS IN THE 70 CASES AND SAY, I'M

19   RELYING ON SOMETHING I NEVER SAW IT EVER LICENSED, IT'S NOT

20   ABOUT PATENTS, IT'S NOT ABOUT DRM BECAUSE YOU DON'T GET DRM

21   FOR THE 5.5 PERCENT, AND I'M GOING TO TELL YOU IT WAS A

22   NOVEMBER 4TH, 2013 AGREEMENT.

23        IS THAT THE KIND OF WORK PRODUCT YOU WANT TO RELY ON WHEN

24   YOU ARE DOING YOUR JOB WITH THE SERIOUSNESS THAT YOU ARE

25   TAKING THIS PROJECT?

1    BUT INSTEAD OF LOOKING AT THIS BODY OF EVIDENCE THAT HE

2    HAS OF LICENSES OF THE PATENTS-IN-SUIT THEMSELVES, HE GOES OFF

3    AND LOOKS AT THIS NONPATENT, NONDRM AGREEMENT.

4        AND LOOK AT THOSE NUMBERS.  I THOUGHT MR. PROWSE DID A

5    WONDERFUL JOB OF EXPLAINING TO YOU WHY THE VALUE WAS LOW.  HE

6    JUST SAID, I'VE DONE A LOT OF THESE CASES; THESE NUMBERS ARE

7    LOW.  AND THEY ARE.  ESPECIALLY FOR SOMEONE THAT'S SEEKING

8    15 MILLION FOR ONLY A DOMESTIC LICENSE, FOR ONLY SELECT

9    PRODUCTS, FOR ONLY TWO PATENTS, NOT THE WHOLE PORTFOLIO, AND,

10    BY THE WAY, WE CAN SUE YOU TOMORROW.  AND THAT'S THE

11    IMPORTANCE OF THE VALIDITY QUESTION.

12        THIS IS WHAT HE LOOKED AT, BECAUSE HE WENT RUNNING OFF IN

13    THE WRONG DIRECTION TO THE REASONABLE ROYALTY.  NOW, THE

14    ANSWER MAY BE HE WENT RUNNING IN THAT DIRECTION BECAUSE HE

15    WANTED A DESTINATION SO HE HAD TO RUN IN THAT DIRECTION, AND

16    THAT'S WHY HE MADE THE ASSUMPTION OF REASONABLE ROYALTY WHEN

17    FARLEY WAS SO SURE THAT IT WOULD HAVE BEEN A LUMP SUM.

18        LET'S TALK ABOUT DESIGN AROUND.

19        MR. PARR SAID I RELIED ON DR. DEVANBU.  YOU REMEMBER HE

20    RELIED ON PEOPLE FREQUENTLY WHEN THERE WAS TOUGH QUESTIONS.

21        AND HE SAYS DEVANBU TOLD HIM IN AN UNRECORDED

22    CONVERSATION, YOU'VE NEVER HEARD ANYTHING ABOUT, YOU HAVEN'T

23    SEEN NOTES ABOUT IT, WHY THESE THING HAPPEN OUTSIDE YOUR

24    PRESENCE, OUR PRESENCE, AND THEN GET RELIED ON FOR SOMETHING

25    THAT MR. PARR HAS TO ANSWER.  BUT HE SAID, HE DIDN'T CONSIDER

1   DR. WICKER'S TESTIMONY ABOUT THE DESIGN AROUNDS.

2        IN FRONT OF US IN THE LAST TWO WEEKS, DR. DEVANBU TOOK A

3   PASS.  I HAVEN'T FORMED AN OPINION ON THE CHOICES AVAILABLE TO

4   ADOBE.  HE NEVER COMMENTED ON ALL OF THE SPECIFIC ALTERNATIVES

5   DR. WICKER SAID, AND SAID THAT DOESN'T MAKE SENSE, THAT WOULD

6   BE HARD, THAT'S EXPENSIVE, PEOPLE WOULDN'T LIKE THE PASSWORD

7   HERE OR THE SUBMISSION THERE.

8        NOW, IN SOME WAYS, I THINK THIS IS THE MOST OFFENSIVE

9   PIECE OF THE PUZZLE, WHICH IS THE ATTEMPT TO CAPTURE ALL OF

10  THE ACROBAT PRO REVENUE AND A WHOLE BUNCH OF OTHER REVENUE

11  THAT DOESN'T BELONG IN THIS CASE TO THE LIVECYCLE.

12       AND THE COURT, IT'S IN THE INSTRUCTIONS, SAYS METHOD

13  CLAIMS ARE ONLY INFRINGED WHEN THE PROCESS IS PERFORMED, NOT

14  BY THE SALE OF AN APPARATUS -- PATENT SPEAK FOR A THING AS

15  COMPARED TO AN ACTION -- THAT IS CAPABLE OF INFRINGING USE.

16       SO THE SALE OF THE PRODUCT ISN'T THE INFRINGEMENT, WHETHER

17  IT BE LIVECYCLE OR ANYTHING ELSE, IT'S THE ACTUAL USE OF THE

18  DRM PROCESS.

19       EVEN MORE IMPORTANT AND CENTRAL, AND, AGAIN, WE -- FOR ALL

20  OF THE PERSUASIVE REASONS THAT I AM SO PROUD OF MY PARTNER,

21  SONAL MEHTA, SHE PRESENTED, THERE'S NO WAY WE SHOULD BE

22  HEADING TO DAMAGES IF YOU HEARD THE SAME PRESENTATIONS I HEARD

23  AND THE COMPARISON AND THE FOCUS OF THE EVIDENCE.

24       BUT ASSUMING THAT YOU DO, AND FOCUSING ON THE CREDIBILITY

25  OF THE POINT, THAT'S WHERE I THINK IT'S ACTUALLY RELEVANT AND

1    ENLIGHTENING, IF A PARTICULAR PRODUCT SOLD BY ADOBE IS NEVER

2    ENABLED TO BE USED, AN INFRINGING MANAGER, THERE IS NO

3    INFRINGEMENT AND SUCH UNITS OF PRODUCTS ARE NOT IN THE ROYALTY

4    BASE.

5         MR. PARR:  OH, I JUST ASSUMED EVERYTHING WAS IN THE

6    ROYALTY BASE.

7         IT'S PRETTY GLIB.  IT'S PRETTY GLIB FOR SOMEONE THAT PUTS

8    $2 BILLION UP ON THE SCREEN AND THE NOTE HE TOOK ALL OF THE

9    ACROBAT PROFESSIONAL, EVERY SINGLE COPY THAT WAS SOLD IS ON

10   HIS CHART.

11        AND THE QUESTION WAS, DO YOU KNOW WHO ACTUALLY USED IT

12   WITH LIVECYCLE RIGHTS MANAGEMENT, WHICH YOU NEED TO DO TO

13   INFRINGE, YOU NEVER HEARD ANYBODY SAY THERE WAS ANY OTHER WAY?

14        NO.

15        I SAID:  WILL YOU ACKNOWLEDGE THAT IF YOU DON'T USE THE

16   METHOD OF DRM, YOU ARE NOT INFRINGING EVEN IF THERE IS LATENT

17   CAPABILITY?

18        HE SAID:  YEAH, THAT'S RIGHT.

19        THAT IS THE TRIAL TRANSCRIPT CITE 1052.

20        AND HIS ASSUMPTION WAS HE DIDN'T CARE IF THE PRODUCT WAS

21   EVER USED WITH DRM.  HE FLAT IGNORING THE COURT'S INSTRUCTIONS

22   TO YOU.  AS LONG AS IT WAS SOLVED, IT'S AN APPARATUS,

23   $2 BILLION BASE.

24        THEN ASKED:  WELL, WHAT INFRINGEMENT THEORY WOULD POSSIBLY

25   JUSTIFY INCLUDING ACROBAT PRO WHEN IT NEVER USES LIVECYCLE?

1          OTHERS HAVE TO PROVE THAT.

2          DR. DEVANBU DIDN'T PROVE THAT.  HE SAID:  WITH LIVECYCLE

3     RIGHTS MANAGEMENT ENABLED.  THAT WAS HIS OWN ANSWER.

4          YOU SAW THE JURY INSTRUCTION THAT YOU'RE GOING TO GET THAT

5     SAYS IT HAS TO BE ENABLED IN ORDER FOR IT TO EVEN BE ELIGIBLE.

6     AND ALL HE SAID IS:  THE INFRINGING IS LIVECYCLE RIGHTS

7     MANAGEMENT ENABLED.

8          AND THEN WE ASKED HIM THE $15 MILLION-DOLLAR QUESTION:  IN

9     TERMS OF THIS $2 BILLION REVENUE BASE, DO YOU HAVE ANY IDEA

10    WHAT PORTION OF THOSE USERS MIGHT USE LIVECYCLE RIGHTS

11    MANAGEMENT?

12         NO.  SOMEONE ELSE IS GOING TO TELL HIM SOMEWHERE.  MAYBE

13    MR. FARLEY.

14         BUT WHEN HE WE PUT UP WITNESSES, THEY ANSWERED THE

15    QUESTION AS BEST THEY COULD, WHICH IS, THERE'S TENSE OF

16    MILLIONS OF COPIES OF ACROBAT PROFESSIONAL.  THERE'S A COUPLE

17    OF HUNDRED INSTALLATIONS OF LIVECYCLE.  TENSE OF MILLIONS,

18    COUPLE HUNDRED.

19         I'M SURE ADOBE WISHED MORE PEOPLE USED LIVECYCLE.  I DON'T

20    USE IT.  I DON'T KNOW IF ANY OF YOU HAVE EVER HEARD OF IT.  I

21    HAVEN'T HEARD OF IT BEFORE THIS CASE.  SUPER TINY.

22         SO THEY WANT SUPER TINY TO -- AND THEY'RE ASSUMING THAT

23    EVERYTHING IS USING IT.  THE COURT IS GOING TO TELL YOU THAT'S

24    TOTALLY INAPPROPRIATE.

25         LIKE I SAID, I DON'T THINK YOU GET TO DAMAGES, BUT WHAT

1    DOES THIS SAY ABOUT CREDIBILITY?  THERE'S ALL THESE PRODUCTS

2    THAT YOU HEARD NOTHING ABOUT.  THEY DIDN'T GIVE YOU THE

3    COURTESY.  THEY WANT WHAT IS THAT 150, 2 MILLION FOR LC READER

4    EXTENSIONS?  AND THEY DON'T MENTION IT?

5        JUST BECAUSE THEY PUT IT ON A BIG GRID, DOESN'T MEAN THAT

6    THEY'RE ENTITLED TO IT.  IN FACT, THERE IS NO BASIS FOR THEM

7    BEING ENTITLED TO IT.

8        WHY ARE WE HERE?  WE ARE HERE, I THINK, FROM THE DIG REG

9    PERSPECTIVE FOR THE REASONS STATED BY MR. FARLEY QUITE

10   CANDIDLY HERE, IT IS HIS VIEW THAT GREED IS AN EMOTION THAT HE

11   HAS, AND HE THINKS EVERYONE HAS IT.

12       WE DON'T HAVE TO LIVE IN A WORLD IN A PATENT SYSTEM WHERE

13   THE CULTURE IS THAT EVERYBODY'S GOT GREED, AND THAT'S OKAY.

14   AND I AM GOING TO COME IN COURT AND NOT EVEN BE EMBARRASSED,

15   AND SAY GREED'S THE EMOTION THAT MAYBE CAUSED ME TO PURSUE

16   THIS BUSINESS DEAL.  AND WE ALL HAVE THAT.

17       I THINK THAT'S -- I DON'T WANT TO SPEAK TOO MUCH TO THAT,

18   BUT THAT'S KIND OF SPEAK FOR YOURSELF.

19       THEN FROM THE ADOBE PERSPECTIVE, WHY NOT JUST PAY 70,000,

20   80,000, 150, 200, 600, WHATEVER AMOUNT THEY ARE ASKING WHEN

21   THEY COME IN AND THEY WANT YOU TO -- IT'S GOING TO BE MILLIONS

22   TO LITIGATE.  YOU'VE DONE IT BEFORE.  YOU'VE PAID OFF OTHER

23   PEOPLE.

24       WE DO NOT INFRINGE.  I HAVE SEEN A LOT OF CLOSING

25   ARGUMENTS IN MY DAY, AND THE ONE PUT ON BY MS. MEHTA WHERE SHE

1    WALKED SYSTEMATICALLY THROUGH THE REQUIREMENTS AND THE

2    EVIDENCE AND DEMONSTRATED BEYOND QUESTION THERE WAS NO

3    INFRINGEMENT AND, IN FACT, THESE PATENTS ARE INVALID.

4        YES, SOME PEOPLE ARE GOING TO SETTLE, BUT SOME PEOPLE ARE

5    GOING TO STAND UP.  AND THAT IS WHAT ADOBE IS DOING IN THIS

6    CASE.

7        FAIRNESS DICTATES THAT THE APPEALS TO A SMALL COMPANY, THE

8    APPEALS TO THE CONSTITUTION, THE APPEALS TO GOING TO AN A'S

9    GAME WITH A BASEBALL GLOVE INSTEAD OF WATCHING THE GAME HOPING

10   YOU CATCH A BALL -- THAT'S NOT FAIRNESS.  FAIRNESS IS LOOKING

11   AT THE EVIDENCE, MAKING THE RIGHT DETERMINATION, AND NOT

12   TREATING ADOBE AS SOMEHOW IMPROPER FOR ITS DAY IN COURT TO SAY

13   WE'RE TAKING A STAND THIS TIME.  AND EVERYONE ELSE CAN PAY,

14   WE'RE NOT PAYING.

15       THANK YOU VERY MUCH FOR YOUR ATTENTION.  YOU HAVE BEEN AN

16   INCREDIBLY ATTENTIVE JURY.  AND I THANK YOU VERY MUCH.

17                   **REBUTTAL CLOSING ARGUMENT**

18       **MR. ELLWANGER:**  MAY IT PLEASE THE COURT?

19       IT WAS AN AWFUL LONG CLOSING ARGUMENT TO NOT SHOW YOU ANY

20   ADOBE DOCUMENTS, TO NOT WALK THROUGH THE VERY WORDS THAT ADOBE

21   PUTS ON PAPER TO TALK ABOUT HOW ITS PRODUCTS WORK.

22       THEY DID TALK A LOT ABOUT THE TESTIMONY.  AND I DON'T WANT

23   TO LEAVE THAT UNREBUTTED BECAUSE THERE ARE SOME PIECES OF THE

24   TESTIMONY THAT THEY DIDN'T DISCUSS WITH YOU, AND I WANT TO

25   MAKE SURE YOU HAVE THIS INFORMATION BEFORE YOU GO BACK INTO

 1   THAT JURY ROOM.

 2       WE ARE GOING TO GO CHRONOLOGICALLY THROUGH A FEW KEY

 3   POINTS FROM THE CLOSING.

 4       FIRST OFF, REGARDING THE TOKEN AND FLASH, DR. DEVANBU

 5   TESTIFIED THAT HE DIDN'T CONSIDER THE TERM "YES OR NO".

 6       SORRY, I'VE GOT TO GET OLD FASHION HERE, BUT THIS IS FROM

 7   THE SLIDE YOU JUST SAW.

 8       THE QUESTION WAS:  DOES THAT CONSTRUCTION INCLUDE THE

 9   TERM, THE LANGUAGE "YES OR NO", AND IT DOESN'T.  THEY DON'T

10   USE ENGLISH TERMS LIKE THAT IN COMPUTER CODE.

11       THE COURT HAS INSTRUCTED YOU ABOUT A YES/NO INDICATOR.

12   AND ONCE AGAIN, SAME HIGHLIGHTING ISSUE CAME UP DURING THAT

13   CLOSING ARGUMENT.

14       HERE'S ADOBE'S SLIDE.  WELL, THEY HIGHLIGHTED THAT FIRST

15   SENTENCE IN YELLOW AND THEY HIGHLIGHTED THE LAST SENTENCE IN

16   YELLOW, BUT THEY LEFT OUT THE MIDDLE SENTENCE.  THE ONE I

17   HIGHLIGHTED IN ORANGE.  I WANT YOU TO FOCUS ON THIS ONE FOR

18   JUST A MOMENT.

19       THE COURT INSTRUCTED, I WANTED TO EXPLAIN THAT I

20   INTERPRETED THE TERM "TOKEN" AS YOU WILL SEE IN YOUR PAPERS TO

21   MEAN A FILE INDICATING WHETHER THE TRANSACTION HAS BEEN

22   APPROVED AND ACCESS SHOULD BE GRANTED.

23       SO LET'S LOOK AT THE TESTIMONY.  PAGE 494, LINE 16,

24   DR. DEVANBU WAS ASKED:

25           "OKAY, SIR, BUT AT LEAST AS FAR AS THE TERM "TOKEN"

1           THAT HAS BEEN CONSTRUED BY THE COURT, DID YOU APPLY

2           OR IS YOUR ANALYSIS CONSISTENT WITH THE COURT'S CLAIM

3           CONSTRUCTION FOR TOKEN?

4           "ANSWER:  YES, IT IS."

5      PAGE 510.

6           "ANSWER:  THE EXTERNAL SOURCE PROVIDES A LICENSED

7           TOKEN WHICH CONTAINS INFORMATION THAT ALLOWS THE

8           CLIENT TO DECIDE WHETHER OR NOT TO GRANT ACCESS."

9      YOU SEE, ADOBE KEEPS DIRECTING YOUR ATTENTION TO THINGS

10 GOING ON AT THE SERVER.  BUT AS YOU SEE FROM THE CLAIMS, THE

11 '541 IS FOCUSED ON THE CLIENT.

12      DR. DEVANBU EXPLAINED THAT WHAT IS TRANSMITTED IS USED AS

13 AN INPUT TO GENERATE THE PERMISSION AT THE CLIENT.

14      THE TOKEN ISN'T THE PERMISSION.  THEY MUST BE DIFFERENT.

15 SO IN THE '541 PATENT AND THE ACCUSED PRODUCTS, THEY ARE.

16      IN LIVECYCLE, THE TOKEN IS AN ENCRYPTED VOUCHER.  THE

17 ENCRYPTED VOUCHER INCLUDES A KEY AND A SERIES OF PERMISSIONS.

18 IT'S USELESS IF IT'S INTERCEPTED.  THAT'S THE WHOLE POINT,

19 RIGHT?  THE KEY AND THE PERMISSIONS, WELL THOSE ARE GENERATED

20 AT THE CLIENT.

21      DR. WICKER CONCEDED THAT DIGITAL OBJECTS CAN BE

22 REGENERATED.

23      ON THE FLASH PRODUCT THERE, AS I SAID BEFORE, THE TOKEN IS

24 A LICENSE FILE.  IT HAS AN ENCRYPTED KEY AND PERMISSIONS.

25 AND, AGAIN, IT'S USELESS IF IT IS INTERCEPTED.  IT HAS TO BE

1    PROCESSED AND DECRYPTED BEFORE BEING STORED.

2        AND I MIGHT ADD, THAT STEP ISN'T PRESENT IN THE SCHULL

3    PATENT.

4        AND, AGAIN, MEMBERS OF THE JURY, I APOLOGIZE, I'M JUST

5    READING FROM TRANSCRIPT PAGES, BUT I WANT YOU TO CONSIDER THIS

6    TESTIMONY ALONG WITH WHAT YOU JUST HEARD.

7        DR. WICKER, ADOBE'S EXPERT, ADMITTED ON CROSS-EXAMINATION

8    THAT THE TOKEN ISN'T THE KEY BUT IT'S THE PERMISSIONS AND IT

9    CONTAINS THE SET OF PERMISSIONS.

10        AND, FOR EXAMPLE, THE PERMISSIONS INCLUDE THAT YES/NO

11    INDICATOR AND THAT THE USER COULD, FOR EXAMPLE, ACCESS THE

12    ABILITY TO PRINT.

13        WE'RE UP TO PAGE 758, LINE 2, OF THE WICKER

14    CROSS-EXAMINATION BY MR. DINOVO.

15        SO, FOR EXAMPLE, IT WOULD GIVE A YES OR A NO INDICATION AS

16    TO WHETHER THAT USER COULD PRINT, RIGHT?

17        THAT WOULD BE AN EXAMPLE OF THE RIGHTS, HE ANSWERED.  THAT

18    WOULD BE EITHER ALLOWED OR DISALLOWED.  THAT'S CORRECT.

19        PAGE 773, LINE 2.  SO THE SET OF PERMISSIONS IS NOT THE

20    EDC VOUCHER?

21            "ANSWER:  THE EDC VOUCHER CONTAINS THE PERMISSIONS.

22            AND PERMISSIONS ORIGINATE AT THE SERVER.  THEY ARE

23            EXTRACTED OR OBTAINED FROM THE OBJECT THAT IS

24            DECRYPTED AT THE CLIENT."

25        YOU WERE ALSO WALKED THROUGH A DISCUSSION, ONCE AGAIN, OF

1    THESE SCHULL PATENTS -- THE SCHULL PATENT, EXCUSE ME.  AND

2    HOW, BECAUSE OF THAT PATENT, THE '541 AND THE '670 PATENT,

3    THEY SHOULD JUST BE INVALIDATED.  PATRICK PATTERSON'S PATENTS

4    SHOULD BE TAKEN AWAY.

5        BUT REMEMBER THAT SCHULL GENERATES A PASSWORD AT THE

6    SERVER.  PASSES IT IN THE SAME FORM AND STORES IT IN THE SAME

7    FORM.  PROFESSOR SCHULL, DR. WICKER, AND DR. KELLER ALL AGREED

8    ABOUT THAT.

9        ADOBE, ON THE OTHER HAND, PASSES AN ENCRYPTED TOKEN,

10   DECRYPTS AND EXTRACTS THE KEYS AND PERMISSIONS, AND THEN THOSE

11   DECRYPTED PERMISSIONS ARE STORED.  WHAT'S STORED IS NOT WHAT

12   IS TRANSMITTED BECAUSE THAT MUST BE GENERATED AT THE CLIENT.

13   DR. DEVANBU AND DR. WICKER AGREED.

14       AND ONE MORE POINT ON DR. SCHULL.  HE SEEMED LIKE AN

15   ABSOLUTELY GREAT MAN.  I DON'T HAVE ANY QUIBBLE WITH WHO HE IS

16   AS A PERSON, BUT HIS PATENT DOESN'T DO EXACTLY WHAT THESE

17   PATENTS DO.

18       AND, YOU KNOW, HIS COMPANY, IT WENT BANKRUPT AFTER THE

19   BUBBLE BURST, TOO.  HIS COMPANY DOESN'T EXIST ANYMORE EITHER.

20   BUT IT DOESN'T MEAN, AS HE SAID, THAT HIS TECHNOLOGY WASN'T

21   SOUND.  THE SAME IS TRUE FOR THE '541 AND THE '670 PATENTS.

22       THE FINAL EVIDENTIARY POINT I WANT TO GET TO BEFORE WE

23   DISCUSS CREDIBILITY IS ABOUT THE TIME LINE AND MR. HERBACH

24   FILING THESE LIVECYCLE PATENTS.  HIS FIRST PATENT ON HALLOWEEN

25   2003.

1       WELL, THE PROBLEM WITH THAT IS THAT THIS CASE IS ABOUT

2   LIVECYCLE RIGHTS MANAGEMENT.  AND LIVECYCLE RIGHTS MANAGEMENT,

3   THAT DIDN'T COME AROUND UNTIL 2005.  THAT'S WHAT HE TESTIFIED

4   TO.

5       AND ON DAMAGES, IN ORDER TO THINK ABOUT THESE, AGAIN,

6   SMALLER SETTLEMENTS THAT THEY PUT OUT, OR THIS HUNDRED

7   THOUSAND DOLLAR WORK-AROUND THAT YOU HEARD TESTIMONY ABOUT, DO

8   YOU THINK DIGITAL REG WOULD AGREE TO THAT IF YOU HAD ALREADY

9   FOUND INFRINGEMENT?  IF YOU HAD ALREADY FOUND VALIDITY?

10      ALL THOSE LICENSE AGREEMENTS THAT YOU HEARD ABOUT, THOSE

11  WERE ALL NEGOTIATED WITHIN THE CONTEXT OF PENDING INFRINGEMENT

12  CLAIMS, AND PENDING VALIDITY CLAIMS, AND ALL A FIGHT LIKE

13  THIS.  THAT'S NOT THE HYPOTHETICAL NEGOTIATION.  THAT OCCURS

14  AFTER A JURY LIKE YOU WOULD HAVE FOUND INFRINGEMENT AND FOUND

15  VALIDITY, AND THOSE NUMBERS ARE DIFFERENT.

16      NOW, HE TOLD YOU THAT WE ACCUSED $2 BILLION WORTH OF

17  PRODUCT AND DIDN'T REALLY WANT TO TALK ABOUT THE FACT THAT WE

18  SLICED 70 PERCENT OFF TO FOLLOW THE INDUSTRY STANDARD.

19      AND THE OTHER THING THAT YOU DIDN'T HEAR IS THAT THE

20  REASON WE ACCUSED $2 BILLION WORTH OF PRODUCT IS BECAUSE THAT

21  PRODUCT ALL CONTAINS THE CODE.  IT CONTAINS THAT

22  FUNCTIONALITY.  IT INFRINGES.

23      NOW I WANT TO TALK TO YOU -- I FEEL LIKE I OWE YOU --

24      **MR. REINES:**  OBJECTION, YOUR HONOR.  THE ARGUMENT

25  THAT WAS JUST MADE IS THAT IT'S IN THE CODE AND THAT IT EXISTS

1    AND IT'S INFRINGING FOR $2 BILLION WORTH OF PRODUCT.  THAT IS

2    COUNTER FACTUAL AND COUNTER LEGAL.

3            **THE COURT:**  WELL, THE INSTRUCTIONS WILL GUIDE THE

4    JURY IN THEIR CONSIDERATION OF THESE ARGUMENTS.

5            **MR. ELLWANGER:**  ADOBE'S LAWYER'S RIGHT.  WHEN I WAS

6    11, I PROBABLY DID FOCUS MORE ON TRYING TO CATCH A BALL THAN

7    WATCHING THE GAME.

8        BUT ON SEPTEMBER 26TH, 1987, AT THE COLISEUM ON REGGIE

9    JACKSON DAY, HAROLD BANES HIT A BALL THAT WAS FOULED DOWN THE

10   RIGHT FIELD LINE AND RATTLED AROUND THE BULL PIN, AND HE

11   ACTUALLY FLIPPED IT UP INTO THE STANDS.  AND I REMEMBER THE

12   BALL KIND OF BLOCKING OUT THE SUN, THAT AFTERNOON SUN, AND I

13   WILL NEVER FORGET THE FEEL OF IT HITTING MY GLOVE.  AND THE

14   LOOK ON MY DAD'S FACE WHEN I WALKED BACK TO OUR SEATS AND

15   SHOWED HIM.

16       AND THE FUNNY THING ABOUT MEMORIES IS, I WILL NEVER FORGET

17   CATCHING A BASEBALL AT AN A'S GAME AND I WILL NEVER FORGET

18   THAT FEELING AND I WILL NEVER FORGET WHAT IT LOOKED LIKE GOING

19   INTO MY GLOVE, BUT TO BE HONEST WITH YOU, I FORGOT THE DATE.

20       I HAD TO LOOK UP IN THE BASEBALL ALMANAC WHEN REGGIE

21   JACKSON DAY WAS SO I COULD REMEMBER THE DATE.  AND I ALSO

22   HADN'T REMEMBERED THAT THE A'S LOST 4 TO 3, TWO RUNS GIVEN UP

23   IN THE NINTH BY ERIC CLUNK.  I HAD TO REFRESH MY RECOLLECTION

24   ON THAT ONE.  I BET I REMEMBERED IT WHEN I WAS 11.

25           THE POINT IS, YOU CAN REMEMBER REALLY IMPORTANT THINGS IN

1    YOUR LIFE, THINGS THAT YOU CARRY WITH YOU FOR YOUR WHOLE LIFE,

2    AND IT DOESN'T ALWAYS MEAN THAT YOU REMEMBER THE DATE OR THE

3    SCORE OR WHO THE LOSING PITCHER WAS.  BUT IT DOESN'T CHANGE

4    THE FACT THAT IT HAPPENED.

5        JURORS ARE INCREDIBLE -- THEY ARE INCREDIBLE PEOPLE AT

6    JUDGING CHARACTER.  JURORS ARE VERY GOOD ABOUT BEING ABLE TO

7    ASCERTAIN WHAT'S REAL AND WHAT'S NOT.

8        AND WHEN YOU THINK BACK TO THE TESTIMONY OF PATRICK

9    PATTERSON, AND THOSE NIGHTS WORKING LATE AT FISH & RICHARDSON,

10    PROVING TO THOSE LAWYERS THEY WERE HELPING WRITE HIS PATENT

11    WHETHER HIS INVENTION WORKED, I THINK YOU CAN BELIEVE THAT.

12        AND WHEN MR. VENTERS ADMITTEDLY DID TALK ABOUT VERSION

13    AFTER VERSION, 12 DIFFERENT VERSIONS OF THIS ADOBE VALUE

14    PROPOSITION THAT HE WORKED ON, HIS TEAM WORKED ON, THIS WAS AN

15    IMPORTANT CHANCE FOR THEM TO TRY AND LICENSE THEIR TECHNOLOGY,

16    WHEN THEY KNEW THEY COULDN'T BUILD ON THE SCALE OF ADOBE.

17    ADOBE'S POSITION IS THAT HE JUST COMPLETELY MADE ALL THAT UP?

18        YOU CAN JUDGE CHARACTER.  AND YOU CAN JUDGE TESTIMONY.

19    YOU CAN LOOK AT THE CODE.  YOU CAN LOOK AT THE DOCUMENTS.  YOU

20    CAN LOOK AT THE CLAIMS.  WHEN YOU ARE TRYING TO REMEMBER WHAT

21    ADOBE KNEW AND WHEN ADOBE KNEW IT, DON'T FORGET THIS

22    TESTIMONY.  DON'T FORGET THAT IN ADOBE'S OWN PATENT

23    APPLICATIONS, YOU HAVE THESE PATENTS DISCLOSED BY THE PATENT

24    OFFICE.  THE '670 AND THE '541.

25        WOULD YOU LOOK AT THAT?  THEY EVEN USED OUR LAW FIRM.

1   MEMBERS OF THE JURY, AT THE BEGINNING OF THIS TRIAL I TOLD YOU

2   THAT DIGITAL REG WOULD PROVE THREE THINGS BECAUSE WE KNEW THAT

3   THE EVIDENCE WOULD SHOW YOU BY NOW WHAT WE KNEW THEN.

4       FIRST, ADOBE INFRINGES THE '541 AND '670 PATENT, AND THEY

5   DID SO WILLFULLY.

6       SECOND, PATRICK PATTERSON INVENTED THE '541 AND THE '670

7   PATENTS JUST LIKE THE U.S. PATENT OFFICE SAID HE DID.

8       AND THIRD, ADOBE OWES ROYALTIES FOR USING THESE INVENTIONS

9   AND NOT PAYING FOR THEM.

10      WE ASK THAT YOU FOLLOW THE CODE, YOU FOLLOW THE DOCUMENTS,

11  YOU FOLLOW THE CLAIMS, AND YOU FIND FOR DIGITAL REG.

12          **THE COURT:**  ALL RIGHT, LADIES AND GENTLEMEN, IN A

13  MOMENT I WILL EXCUSE YOU TO BEGIN YOUR DELIBERATIONS.  WHEN

14  YOU DO THAT YOU SHOULD ELECT ONE MEMBER OF THE JURY AS YOUR

15  FOREPERSON.  THAT PERSON WILL RESIDE OVER YOUR DELIBERATIONS

16  AND SPEAK FOR YOU HERE IN COURT.

17      YOU WILL THEN DISCUSS THE CASE WITH YOUR FELLOW JURORS TO

18  REACH AGREEMENT, IF YOU CAN DO SO.  YOUR VERDICT MUST BE

19  UNANIMOUS.  EACH OF YOU MUST DECIDE THE CASE FOR YOURSELF, BUT

20  YOU SHOULD DO SO ONLY AFTER YOU HAVE CONSIDERED ALL THE

21  EVIDENCE, DISCUSSED IT FULLY WITH THE OTHER JURORS, AND

22  LISTENED TO THE VIEWS OF YOUR FELLOW JURORS.

23      DO NOT BE AFRAID TO CHANGE YOUR OPINION IF THE DISCUSSION

24  PERSUADES YOU THAT YOU SHOULD.  BUT DO NOT COME TO A DECISION

25  SIMPLY BECAUSE THE OTHER JURORS THINK IT IS RIGHT.

1    IT IS IMPORTANT THAT YOU ATTEMPT TO REACH A UNANIMOUS

2    VERDICT, BUT OF COURSE ONLY IF EACH OF YOU CAN DO SO AFTER

3    HAVING MADE YOUR ON CONSCIENTIOUS DECISION.  DO NOT CHANGE AN

4    HONEST BELIEF ABOUT THE WEIGHT AND EFFECT OF THE EVIDENCE

5    SIMPLY TO REACH A VERDICT.

6    IF IT BECOMES NECESSARY DURING YOUR DELIBERATIONS TO

7    COMMUNICATE WITH ME, YOU MAY SEND A NOTE THROUGH THE CLERK OR

8    THROUGH THE MARSHAL WHO WILL BE STATIONED OUTSIDE YOUR DOOR,

9    SIGNED BY YOUR FOREPERSON OR BY ONE OR MORE MEMBERS OF THE

10   JURY.  NO MEMBER OF THE JURY SHOULD EVER ATTEMPT TO

11   COMMUNICATE WITH ME EXCEPT BY A SIGNED WRITING, AND I WILL

12   RESPOND TO THE JURY CONCERNING THE CASE ONLY IN WRITING OR

13   HERE IN OPEN COURT.

14   IF YOU SEND OUT A QUESTION, I WILL CONSULT WITH THE

15   LAWYERS BEFORE ANSWERING IT, WHICH MAY TAKE SOME TIME.  YOU

16   MAY CONTINUE YOUR DELIBERATIONS WHILE WAITING FOR THE ANSWER

17   TO ANY QUESTION.

18   REMEMBER THAT YOU ARE NOT TO TELL ANYONE, INCLUDING ME,

19   HOW THE JURY STANDS NUMERICALLY OR OTHERWISE UNTIL AFTER YOU

20   HAVE REACHED A UNANIMOUS VERDICT OR HAVE BEEN DISCHARGED.  DO

21   NOT DISCLOSE ANY VOTE COUNT IN ANY NOTE TO ME.

22   A VERDICT FORM HAS BEEN PREPARED FOR YOU AS I READ TO YOU

23   EARLIER.  WE WILL SEND BACK A SCRATCH COPY FOR EACH OF YOU OF

24   THAT FORM AND THEN THE ORIGINAL THAT YOU WILL BE RETURNING.

25   AFTER YOU'VE REACHED A UNANIMOUS AGREEMENT ON THE VERDICT,

1    YOUR FOREPERSON WILL FILL IN THE FORM, SIGN IT, AND DATE IT,

2    AND ADVISE THE COURT THROUGH THE MARSHAL THAT YOU ARE READY TO

3    RETURN TO THE COURTROOM.

4        AS SOON AS WE GET THE FINAL COPY FINALIZED, WE WILL GIVE

5    YOU EACH A COPY OF THE FINAL JURY INSTRUCTIONS.  MS. RILEY

6    WILL COLLECT FROM YOU THE PRELIMINARY JURY INSTRUCTIONS.  AND

7    AS I SAID EARLIER, THOSE WERE INCOMPLETE AND SOMEWHAT SUBJECT

8    TO CHANGE.  WE WILL TAKE THOSE BACK SO YOU DON'T GET CONFUSED

9    WITH THEM, AND YOU WILL USE THE FINAL JURY INSTRUCTIONS.

10        AS SOON AS WE GET THEM FINALIZED AS WELL, WE WILL SEND

11   BACK THE STACK OF EXHIBITS THAT YOU WILL BE ABLE TO LOOK AT.

12        I UNDERSTAND THAT AT LEAST ONE OF YOUR JURORS IS NOT ABLE

13   TO STAY PASSED 1:30 TODAY, SO YOU WILL NEED TO RECESS AT

14   1:30 IF THERE IS SOMEONE WHO CAN'T STAY.  IF THAT'S THE CASE,

15   THEN YOU PROBABLY SHOULDN'T GO OUT TO LUNCH BECAUSE THAT WOULD

16   GET YOU BACK HERE AFTER 1:30.  SO WE WILL USE OUR USUAL

17   SCHEDULE IF SOMEONE DOES NEED TO LEAVE.

18        IF THAT'S THE CASE AND YOU HAVEN'T REACHED A VERDICT BY

19   THAT TIME, YOU WILL NEED TO COME BACK TOMORROW MORNING.

20        YOU HAVE ANOTHER JUROR WHO HAS AN OBLIGATION IN THE

21   MORNING AND WHO, GIVEN TRAFFIC AND ALL, MAY NOT BE ABLE TO BE

22   HERE UNTIL NINE TOMORROW.  SO JUST SO YOU AREN'T HERE WAITING

23   FOR ANYONE, I WILL HAVE YOU COME BACK TOMORROW AT 9:00 O'CLOCK

24   INSTEAD OF 8:30.  YOU WILL NEED, IF THAT JURY IS DELAYED MORE

25   THAN EXPECTED, YOU WILL NEED TO WAIT FOR THAT JUROR AND DON'T

1    START TALKING ABOUT THE CASE.  YOU CAN TALK ABOUT THE BASEBALL

2    OR WHATEVER YOU LIKE UNTIL THAT TIME.

3        AND WHEN ALL THE JURORS ARE PRESENT AT 9:00 O'CLOCK OR

4    BEFORE OR AFTER THAT, THEN YOU CAN START DELIBERATING AGAIN.

5    AND, AGAIN, YOU HAVE A JUROR WHO CANNOT STAY PASSED 1:30.  I

6    WOULD ASK YOU ALL TO GIVE IT ANOTHER SHOT AND SEE IF YOU MIGHT

7    COULD STAY A BIT LONGER BECAUSE IF YOU DON'T FINISH ON FRIDAY,

8    YOU WILL NEED TO COME BACK AT 8:30 ON MONDAY MORNING TO

9    CONTINUE DELIBERATING.

10       SO WITH THAT, I WILL EXCUSE YOU TO BEGIN YOUR

11   DELIBERATIONS.

12       I AM SORRY, ONE MORE THING.  WE HAVE THE MARSHAL HERE I

13   MENTIONED WILL BE OUTSIDE YOUR DOOR.

14       STEP FORWARD PLEASE, SIR, AND BE SWORN.

15                   (COURT SECURITY OFFICER SWORN.)

16       **THE COURT:**  YOU CAN GO AROUND THE OTHER WAY THROUGH

17   THE HALLWAY AND BE STATIONED OUTSIDE THE JURY ROOM DOOR.

18       I WON'T SPEAK WITH YOU AGAIN AT 1:30.  IF YOU LEAVE AT

19   THAT POINT OR SHORTLY THEREAFTER AND HAVEN'T REACHED A

20   VERDICT, BUT REMEMBER ONCE YOU HAVE LEFT THE JURY ROOM, YOU

21   SHOULD NOT DISCUSS THE CASE EVEN AMONGST A FEW OF YOU OR WITH

22   ANYONE ELSE NOR SHOULD YOU DO ANY INVESTIGATION ABOUT THE CASE

23   ON YOUR OWN.

24       LEAVE YOUR NOTES AND THE INSTRUCTION FORMS AND, OF COURSE,

25   THE EVIDENCE IN THE JURY ROOM IN THE EVENING WHEN YOU LEAVE.

1       SO, WITH THAT, THEN YOU MAY RECESS TO BEGIN YOUR

2   DELIBERATIONS.

3                   (JURORS BEGIN DELIBERATIONS.)

4       (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

5           **THE COURT:** I WOULD LIKE TO SPEAK WITH THE ATTORNEYS

6   FOR A MOMENT.

7       I MEANT TO ASK YOU THIS BEFORE I READ IT, SO I HAD TO READ

8   IT THE WAY IT WAS, ON PAGE 20 THERE'S AN INSTRUCTION THAT SAYS

9   "THE EFFECT OF SELLING THE PATENTED SPECIALTY IN PROMOTING

10  SALES".

11      I DON'T KNOW WHAT A PATENTED SPECIALTY IS AND I WOULD LIKE

12  TO CHANGE IT TO SOMETHING UNDERSTANDABLE IN THE WRITTEN

13  VERSION.  SO IF SOMEONE CAN OFFER ME A SYNONYM FOR PATENTED

14  SPECIALTY, I WOULD APPRECIATE IT.

15          **MR. REINES:** THIS IS IN THE GEORGIA-PACIFIC FACTORS?

16          **THE COURT:** I DON'T KNOW.  IT'S ON PAGE 20, FACTOR 6,

17  LINE 3.  IT WAS IN YOUR PROPOSED INSTRUCTIONS, I BELIEVE.  AND

18  I MEANT TO ASK BUT I FORGOT.

19          **MR. REINES:** I THINK I AM COMFORTABLE INCLUDING

20  INVENTION IN THERE.  I'M SURE COUNSEL WILL AGREE WITH THAT.

21          **THE COURT:** EFFECT OF SELLING THE INVENTION?

22          **MR. DINOVO:** PATENTED INVENTION, I GUESS.

23          **THE COURT:** PATENTED INVENTION?

24          **MR. REINES:** YES.

25          **THE COURT:** OKAY.

1    SO I'M GOING TO MAKE THAT AND A COUPLE OF OTHER TYPOS I

2    CAUGHT AS I WAS READING THEM.  AND THEN I WILL MAKE COPIES FOR

3    THEM, I'LL E-FILE THEM AND MAKE COPIES FOR YOU.  I FIXED THE

4    NUMBERING ISSUE ON THE VERDICT FORM AND E-FILE THAT AND MAKE

5    COPIES FOR THEM AND FOR YOU.

6    I STILL WILL NEED TO SEE THAT CODE EXHIBIT BEFORE WE CAN

7    SEND THE EXHIBITS BACK.

8    AND AS I SAY, YOU WILL NEED TO LEAVE CELL PHONES THAT YOU

9    HAVE ON AND RINGING -- YOU WOULD BE SURPRISED HOW MANY PEOPLE

10   DON'T -- WITH MS. RILEY SO SHE CAN REACH YOU.  SHE WILL LET

11   YOU KNOW IF THEY DO LEAVE AT 1:30, SHE WILL LET YOU KNOW SO

12   YOU CAN LEAVE AS WELL.  AND THEN YOU NEED TO BE BACK AGAIN ON

13   CALL AS OF 9:00 O'CLOCK TOMORROW MORNING UNTIL YOU HEAR

14   OTHERWISE FROM US.

15   **MS. GLAUSER:**  YOUR HONOR, FOR PURPOSES OF THE

16   APPELLATE RECORD, SHOULD IT BE NECESSARY, WE WOULD LIKE TO

17   OFFER THE ORIGINAL 175A, B AND C AS AN OFFER OF PROOF THAT

18   CONTAINS THE SOURCE CODE PAGES THAT WE THINK ARE NECESSARY TO

19   SUPPORT DR. DEVANBU'S TESTIMONY.

20   **THE COURT:**  OKAY.

21   **MS. GLAUSER:**  SO, IF WE CAN PROVIDE THOSE.  WE DON'T

22   HAVE ELECTRONIC COPIES BECAUSE PURSUANT TO THE PROTECTIVE

23   ORDER, WE ARE NOT ALLOWED TO SCAN IT, SO IT WOULD BE -- I

24   DON'T KNOW HOW YOU WOULD LIKE TO HANDLE THAT PROCEDURALLY

25   BECAUSE THE OTHER SIDE HAS ASKED US TO ONLY SUBMIT THEM

1    MANUALLY.

2         **THE COURT:** WELL, THAT'S NOT SOMETHING WE HAVE TO

3    RESOLVE RIGHT THIS SECOND.  THAT'S YOUR OFFER OF PROOF.  I

4    GUESS YOU WANT THE WHOLE BOOK IN FOR THE NINTH CIRCUIT'S

5    BENEFIT?  DO YOU HAVE SOMETHING YOU WANT TO GO TO THE JURY?

6         **MS. GLAUSER:** YES, YOUR HONOR.  WE ARE CURRENTLY

7    PREPARING SOMETHING THAT IS ACCOMMODATING TO YOUR INSTRUCTIONS

8    OF JUST THE LINES.  WE JUST WANTED TO RESERVE FOR THE

9    APPELLATE RECORD TO EITHER HAVE THE PAGES WE ORIGINALLY

10   SUBMITTED, OR THAT ALTERNATIVELY THE DEMONSTRATIVES THAT

11   DR. DEVANBU USED.

12        **THE COURT:** WELL, THAT'S EASY.  YOU WOULD BE

13   SATISFIED FOR YOUR OFFER OF PROOF PURPOSES THAT WE USE THE

14   DEMONSTRATIVES?

15        **MS. GLAUSER:** WE WOULD AS AN ALTERNATIVE, YOUR HONOR.

16        **THE COURT:** YOU WANT THOSE UNDER SEAL AS WELL?

17        **MS. GLAUSER:** THOSE WERE ADMITTED IN OPEN COURT.

18        **MR. REINES:** IT'S CODE FOR THE KEYS TO UNLOCK DRM.

19        **THE COURT:** IF YOU WANT IT, YOU WANT IT.  I DON'T

20   CARE.

21        **MR. REINES:** YES.

22        **THE COURT:** BUT AT LEAST IT'S DIGITAL SO WE CAN PUT

23   IT UNDER SEAL DIGITALLY INSTEAD OF HAVING PIECES OF PAPER

24   FLOATING AROUND.

25        **MS. GLAUSER:** YES, YOUR HONOR.

```
1           THE COURT:  YOU MAY SUBMIT A SEALING ORDER AND FILE

2    THOSE AND I'LL SIGN A SEALING ORDER THAT THOSE CAN BE FILED

3    UNDER SEAL AS AN OFFER OF PROOF AND THEN THE PART THAT'S

4    ACTUALLY GOING TO THE JURY, TRY TO GET IT AS SOON AS YOU CAN

5    BECAUSE THEY START GETTING ANTSY ABOUT GETTING THEIR COPIES.

6         SHOW IT TO THE OTHER SIDE FIRST AND THEN GIVE IT TO

7    MS. RILEY.

8           MS. GLAUSER:  WE ARE.

9           MR. REINES:  THANK YOU, YOUR HONOR.  WE APPRECIATE

10   IT.

11          THE CLERK:  I NEED A CONTACT PERSON FOR EACH SIDE.

12        (RECESS TAKE AT 12:26 P.M.; RESUMED AT 2:05 P.M.)

13        (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

14          THE COURT:  PLEASE BE SEATED.

15        WE ARE GOING TO CALL DIGITAL REG FIRST, SO YOU ALL CAN

16   COME UP.

17          THE CLERK:  WE ARE CALLING C-12-1971, DIGITAL REG OF

18   TEXAS, LLC VERSUS ADOBE SYSTEMS INCORPORATED, ET AL.

19        PLEASE STATE YOUR APPEARANCES.

20          MS. GLAUSER:  NICKI GLAUSER WITH DINOVO PRICE

21   ELLWANGER ON BEHALF OF DIGITAL REG.

22          MR. REINES:  EDWARD REINES ON BEHALF OF ADOBE.

23          THE COURT:  SO THIS IS JUST NOT WHAT I WAS PICTURING.

24   WHAT IS ADOBE'S VIEW OF THIS?

25          MR. REINES:  WELL, WE CERTAINLY DON'T WANT THE
```

1    DEMONSTRATIVES TO GO IN.  AND IN TERMS OF THE BULK SOURCE

2    CODE, I DON'T KNOW HOW THEY CAN POSSIBLY MAKE SENSE OF IT.  IT

3    WASN'T REFERRED TO IN EXAMINATION.  THERE IS NO DISPUTE ABOUT

4    THE FUNCTIONING OF THE PRODUCT IN ANY MATERIAL WAY BASED ON

5    WHAT WE HEARD IN CLOSE.

6        I JUST I DON'T SEE THE BASIS FOR THROWING THAT ALL INTO

7    THE JURY ROOM.

8            **THE COURT:**  BUT APART FROM THAT, DO YOU HAVE A

9    DISAGREEMENT -- I MEAN, DO YOU FIND IT PREJUDICIAL IN SOME

10   WAY?  ARE YOU CONCERNED ABOUT IT?  IS IT JUST SORT OF A

11   BURDENSOMENESS ISSUE?

12           **MR. REINES:**  WELL, DEPENDS ON WHICH TENDER WE ARE

13   TALKING ABOUT.  TO THE --

14           **THE COURT:**  THE CURRENT THING, I GUESS, IS WE HAVE

15   THIS THING THAT'S ABOUT MAYBE A HALF INCH THINK THAT

16   APPARENTLY DIGITAL REG IS REPRESENTING CONTAINS ONLY THE CODE

17   THAT WAS ACTUALLY PLACED ON THE DEMONSTRATIVES THAT WERE SHOWN

18   TO THE JURY.  AND THEN, TO BACK THAT UP, ALTHOUGH I HAVEN'T

19   FULLY BEEN ABLE TO SEE WHETHER IT IS BACKED UP.  TO BACK THAT

20   UP, I HAVE APPARENTLY ALL OF THE DEMONSTRATIVES THAT DEVANBU

21   USED FROM WHICH ONE COULD, ONE HOPES, LOOK AND SEE IF THIS IS

22   ALL THERE.

23       SO, THEIR CURRENT NOTION IS TO FILE ALL OF THE

24   DEMONSTRATIVES AS AN OFFER OF PROOF ABOUT THE EVEN LARGER

25   EXHIBIT THAT I WOULDN'T ALLOW AND TO GIVE TO THE JURY THIS

1    HALF-INCH THICK EXHIBIT THAT SUPPOSEDLY HAS ONLY THE CODE THAT

2    WAS IN THE DEMONSTRATIVES.

3        THAT IS WHAT WE ARE TALKING ABOUT.  TO ME, THIS IS STILL

4    TOO BIG.  IF YOU HAD SOME KIND OF PREJUDICE ARGUMENT ABOUT IT

5    I WOULD LISTEN TO THAT.  OTHERWISE, I WILL JUST CONSIDER THE

6    BURDENSOMENESS ARGUMENT FOR THE JURY.

7            **MR. REINES:**  THE ONLY PREJUDICE ARGUMENT THAT WE HAVE

8    IS THE CONFIDENTIALITY CONCERNS BECAUSE IT'S DRM TECHNOLOGY

9    ABOUT HOW ALL OF THE CONTENT THAT IS BEING USED IN FLASH AND

10   OTHER SYSTEMS IS PRESERVED.  SO IT IS VERY SERIOUS.

11       BUT WITH US MAINTAINING IT UNDER SEAL AND PROTECTED, WE

12   DON'T HAVE ANY OTHER ARGUMENT BEYOND THAT.

13           **THE COURT:**  OKAY.  AND WHY DO YOU WANT ALL THIS?  DO

14   YOU THINK THERE'S SOMEBODY BACK THERE WHO IS GOING TO BE ABLE

15   TO READ IT?  AND YOU ARE HOPING THEY WILL READ IT AND FIGURE

16   SOMETHING OUT THAT WASN'T ARGUED?  WHAT EXACTLY ARE YOU AIMING

17   AT HERE?

18           **MS. GLAUSER:**  THERE WAS TESTIMONY WHERE DR. DEVANBU

19   WOULD CITE A PARTICULAR FUNCTION AND CALL IT OUT.  AND IT

20   NEEDS TO BE THAT THE FACTS UPON WHICH HE RELIED TO SUSTAIN THE

21   BASIS FOR HIS OPINION AVAILABLE FOR THE JURY.  AND TO THE

22   EXTENT THE JURY COMES BACK WITH A DECISION THAT WE FEEL WE

23   NEED TO APPEAL WE NEED TO HAVE THAT UNDERLYING FACTUAL BASIS

24   IN THE RECORD FOR THE APPEAL.

25           **THE COURT:**  WELL, THAT YOU'LL HAVE WITH YOUR OFFER OF

1    PROOF.  THAT IS NO PROBLEM.  BUT DO YOU -- DO YOU THINK THE

2    JURY WILL BE ABLE TO MAKE SENSE OUT OF THIS?  OR YOU THINK

3    THERE IS SOMEONE ON THE JURY, LIKE THE SOFTWARE ENGINEER, FOR

4    EXAMPLE, WHO WILL BE ABLE TO INTERPRET IT FOR THE OTHER JURORS

5    AND ESSENTIALLY GIVE UNTESTED EVIDENCE?

6         **MS. GLAUSER:**  I DON'T KNOW WHETHER ANY OF THE JURORS

7    CAN READ CODE FROM LINE TO LINE.  I SURELY CANNOT.  WHAT I CAN

8    DO, YOU KNOW, TO THE EXTENT THAT DR. DEVANBU TESTIFIED THAT A

9    PARTICULAR FUNCTION IS CALLED, AND THE JURORS ARE INTERESTED

10   IN THAT FUNCTION, IT'S IDENTIFIED BY NAME IN THE CODE.

11        NOW, I DON'T EXPECT THE JURORS TO BE ABLE TO READ FROM

12   START TO FINISH, AND PARTICULARLY NOT WITH THAT SUBMISSION

13   SINCE IT'S JUST INDIVIDUAL LINES BE ABLE TO READ THE

14   FUNCTIONALITY THAT WOULD BE ACTUALLY OPERATING ON THE

15   SOFTWARE.

16        **THE COURT:**  OKAY.  SO ASIDE FROM FORMALISTIC REASONS

17   OF WANTING IT IN THE RECORD, TELL ME AGAIN WHY YOU THINK IT

18   WOULD BE USEFUL TO THE JURY TO HAVE THIS.

19        **MS. GLAUSER:**  I THINK IT DOES GO TO DR. DEVANBU'S

20   CREDIBILITY AND THE BASIS FOR HIS OPINION AND THE JURY

21   WEIGHING HIS OPINION AND THE ULTIMATE CONCLUSIONS THAT HE CAME

22   TO.

23        TO THE EXTENT I DON'T KNOW WHAT THE JURY WILL WANT TO PULL

24   FROM FROM THE EVIDENCE THAT WAS ENTERED IN THE TRIAL.  BUT TO

25   THE EXTENT THAT HE TESTIFIED THIS IS WHAT THE CODE FUNCTION

1    IS, AND THEY WANT TO LOOK AT THAT, IT WAS SOMETHING THAT HE

2    TESTIFIED ABOUT.  AND I THINK THE JURY SHOULD HAVE THE

3    OPPORTUNITY TO DO SO.

4        I CANNOT SPEAK TO WHETHER OR NOT I THINK IT IS LIKELY THAT

5    WOULD HAPPEN.  I DON'T KNOW WHAT QUESTIONS THE JURORS WILL

6    HAVE OR WHAT EVIDENCE THEY WANT TO PULL FROM THE EVIDENCE THAT

7    GOES BACK TO THE JURY ROOM.

8        **THE COURT:**  WELL, NO ONE SAID THAT THAT WASN'T THE

9    SOURCE CODE.  AND NO ONE SAID THAT THAT WASN'T WHAT THE SOURCE

10   CODE DID OR FUNCTIONED AS.  SO IT REALLY ISN'T ACTUALLY IN

11   DISPUTE.  I JUST FIND IT CONFUSING AND BURDENSOME, AND I'M

12   WORRIED THAT SOMEONE BACK THERE CAN READ IT AND WILL MISREAD

13   IT, OR COME UP WITH SOME ODD CONCLUSION FROM IT THAT NO ONE

14   HAS ANTICIPATED.  THAT'S -- THOSE ARE THE REASONS I DON'T

15   ESPECIALLY WANT TO PUT IT IN.

16       **MS. GLAUSER:**  I UNDERSTAND.

17       **THE COURT:**  I'M TRYING TO FIGURE OUT WHAT EXACTLY IS

18   HERE?  WHAT I HAD IN MIND -- I'M AMAZED TO SEE HOW MUCH SOURCE

19   CODE WAS ACTUALLY ON THESE DEMONSTRATIVES.  BUT WHAT I HAD IN

20   MIND WAS TO HAVE LITERALLY ONLY LETTERS THAT ARE ON HERE BE IN

21   THIS.  NOT IF A LINE IS CITED HERE, THEN YOU GET TO QUOTE THE

22   WHOLE LINE.  JUST LITERALLY IF IT SAYS: "A, B, C, D, 1, 2,

23   3," THEN YOU GET A, B, C, D, 1, 2, 3, PERIOD.

24       **MS. GLAUSER:**  IF THAT IS YOUR HONOR'S PREFERENCE,

25   THEN THAT'S WHY WE HAVE SAID LET'S DO THE DEMONSTRATIVES.

1    BECAUSE THERE SIMPLY ISN'T ENOUGH --

2         **THE COURT:**  I CAN SEE WHY THEY DON'T WANT TO DO THAT

3    BECAUSE -- I MEAN, WE CAN PULL OUT JUST THE SOURCE CODE.  THAT

4    MIGHT WORK.  BUT, NO, THEY DON'T WANT THE OTHER STUFF IN HIS

5    DEMONSTRATIVES AND NOT HAVE ANY OF THEIR DEMONSTRATIVES IN.

6    SO THAT IS NOT GOING TO WORK.

7       BUT, YES, IF YOU CAN PULL OUT JUST LITERALLY THE SOURCE

8    CODE FROM THE DEMONSTRATIVES.

9         **MS. GLAUSER:**  THE PROBLEM WITH THAT, YOUR HONOR, IS

10   TWO-FOLD.  ONE, PRACTICALLY, I DON'T THINK THERE IS ANY WAY TO

11   PULL THAT CODE OUT IN A REASONABLE AMOUNT OF TIME TO GET THAT

12   EVIDENCE TO GO BACK TO THE JURY.  SO I THINK OUR POSITION

13   WOULD BE THAT WE WOULD LIKE TO STAND ON OUR OFFER OF WHAT WE

14   THINK THE EVIDENCE IS, AND HAVE YOUR HONOR RULE.  AND WE WILL

15   STICK BY THE OFFER OF PROOF, IF WE NEED TO.

16        **MR. REINES:**  YOUR HONOR, THE CODE -- AS I UNDERSTAND

17   IT, IN THIS BIG EXHIBIT, THE REASON IT IS SO BIG COMPARED TO

18   YOUR EXPECTATIONS IS THAT EXCEEDS WHAT WAS ON THE ACTUAL

19   DEMONSTRATIVE.

20        **THE COURT:**  YES.  I THINK WHAT IS HAPPENING IS IF THE

21   DEMONSTRATIVES GAVE THE TITLE AND THE LINE NUMBERS, THEN IN

22   ADDITION THEY WOULD PUT THE TITLE AND THE LINE NUMBERS AND

23   QUOTE THE LINES, NOT JUST THE LINE NUMBERS.

24        **MR. REINES:**  THAT'S CORRECT.

25        **THE COURT:**  SO THAT, I THINK, IS WHY THIS ONE IS

1    BIGGER THAN I THOUGHT IT WOULD BE.

2            **MR. REINES:**  YOU ARE CORRECT.

3            **THE COURT:**  SO WHAT I WILL DO IS I WILL ADMIT

4    LITERALLY THE LETTERS AND NUMBERS THAT ARE IN THE

5    DEMONSTRATIVES ON THIS, AND NO MORE THAN THAT.

6        SO IF YOU WOULD LIKE THAT, YOU CAN PREPARE SUCH AN

7    EXHIBIT.  BUT JUST BECAUSE YOU PUT A LINE NUMBER HERE DOESN'T

8    MEAN YOU GET THE LINE.  YOU GET THE -- AM I MAKING MYSELF

9    CLEAR?

10           **MS. GLAUSER:**  YOU ARE SAYING A CITATION TO THE SOURCE

11   CODE, NOT WHAT THE SOURCE CODE SAYS ON THAT CITED LINE?

12           **THE COURT:**  NO.  I'M SAYING THAT THE ONLY THING THE

13   JURY SEES ARE LETTERS AND NUMBERS THAT THEY ALREADY SAW ON

14   THESE DEMONSTRATIVES.

15       IF THIS SAYS "A, B, C, 1, 2, 3," THEN YOU GET TO SAY "A,

16   B, C, 1, 2, 3."

17       THIS SAYS LINES ONE TO FOUR, YOU DON'T GET ANYTHING.

18           **MS. GLAUSER:**  I GUESS IT WILL TAKE US SOME TIME TO BE

19   ABLE TO DO THAT.  MAYBE THERE IS SOMETHING WE CAN CONFER

20   FURTHER ON TONIGHT.  AND SEND THEM, I GUESS, AGAIN WHAT OUR --

21           **THE COURT:**  WELL, IT SHOULDN'T BE THAT --

22           **MS. GLAUSER:**  THE NEW VERSION OF THAT.  WE WOULD HAVE

23   TO BE ABLE TO COPY AND PASTE FROM --

24           **THE COURT:**  THIS IS WHAT I MEANT ALL ALONG.

25           **MR. REINES:**  IT IS CLEAR, YOUR HONOR.  WE WILL DO OUR

1    BEST TO MAKE SURE THAT THEY DO WHAT THE COURT HAS DIRECTED.

2            **MS. GLAUSER:**  WE APPRECIATE THE OFFER, AND WE WILL

3    ATTEMPT TO DO THAT AND SHARE IT WITH THE OTHER SIDE.  AND THEY

4    CAN LET US KNOW IF IT IS ACCEPTABLE.

5        I THINK TO THE EXTENT WE GO THIS ROUTE WE WOULD STILL LIKE

6    IT TO BE SUBJECT TO OUR OFFER OF PROOF THAT IT IS STILL

7    INSUFFICIENT FOR WHAT WE WANT TO OFFER.

8            **THE COURT:**  YOU HAVE MADE THAT CLEAR, AND WE WILL

9    SUBMIT ALL OF YOUR DEMONSTRATIVES UNDER SEAL, AND THE COURT OF

10   APPEAL CAN DO WHATEVER THEY WANT TO WITH THEM.  BUT FOR

11   PURPOSES OF THIS JURY I WILL ONLY SEND THEM WHAT I JUST SAID?

12   AND I WILL DO THAT IF YOU GET IT TO ME BEFORE THEY REACH A

13   VERDICT.

14           **MS. GLAUSER:**  UNDERSTOOD.  WE WILL WORK VERY QUICKLY,

15   YOUR HONOR.

16           **MR. REINES:**  THANK YOU, YOUR HONOR.

17           **THE COURT:**  OKAY.

18                   (PROCEEDINGS CONCLUDED AT 2:14 P.M.)

19

20

21

22

23

24

25

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930**

## **CERTIFICATE OF REPORTER**

I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE

UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY

CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

_Diane E. Skillman_

DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

FRIDAY, SEPTEMBER 5, 2014